Theodore H. Frank (SBN 196332)
Anna St. John (*pro hac vice* pending)
**COMPETITIVE ENTERPRISE INSTITUTE
  CENTER FOR CLASS ACTION FAIRNESS**
1899 L Street NW, 12th Floor
Washington, DC 20036
Voice: (202) 331-2263
Email: ted.frank@cei.org
Email: anna.stjohn@cei.org
*Attorneys for Amicus Curiae
Competitive Enterprise Institute
Center for Class Action Fairness*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 2672 |
| This document relates to: ALL CASES | **BRIEF OF AMICUS CURIAE OF THE COMPETITIVE ENTERPRISE INSTITUTE'S CENTER FOR CLASS ACTION FAIRNESS** |

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ....................................................................................................... ii

SUMMARY OF ARGUMENT ................................................................................................... 1

INTEREST OF AMICUS CURIAE............................................................................................. 2

ARGUMENT................................................................................................................................ 3

    I.    This Court has a fiduciary duty to protect absent class members' rights by ensuring fair and reasonable attorneys' fees are awarded. ........................................................................................ 3

    II.    Selecting lead counsel through a competitive bidding process will serve the interests of the class by ensuring a "market rate" for attorneys' fees to be deducted from the class recovery and short-circuiting the potential for collusion among plaintiffs' attorneys................................................. 4

        A.    Competitive bidding allows for *ex ante* evaluation of risk and creates a market system which will avoid the likelihood of above-market returns to plaintiffs' counsel at the expense of the class. ......................................................................................................................................... 7

        B.    The facts and circumstances of this case make it ideally suited for competitive bidding........ 9

        C.    The critiques of competitive bidding are largely inapplicable here or readily addressed through proper judicial scrutiny. .................................................................................................. 11

    III.    The bids should be made public within 48 hours of the submission deadline. ..................... 14

# TABLE OF AUTHORITIES

**Cases**

*In re Amino Acid Antitrust Litig.*,
 918 F. Supp. 1190 (N.D. Ill. 1996) ...................................................................................... 4

*In re Auction Houses Antitrust Litig.*,
 197 F.R.D. 71 (S.D.N.Y. 2000) ............................................................................. 6, 8, 9, 13

*In re Baby Products Antitrust Litig.*,
 708 F.3d 163 (3d Cir. 2013) .................................................................................................. 2

*In re Bank One Shareholders Class Actions*,
 96 F. Supp. 2d 780 (N.D. Ill. 2000) ............................................................................ 7, 9, 12

*In re Bluetooth Headset Prod. Liab. Litig.*,
 654 F.3d 935 (9th Cir. 2011) ................................................................................................ 2

*In re Citigroup Inc. Bond Litig.*,
 988 F. Supp. 2d 371 (S.D.N.Y. 2013) .................................................................................. 3

*In re Dry Max Pampers Litig.*,
 724 F.3d 713 (6th Cir. 2013) ............................................................................................ 2, 3

*Eubank v. Pella Corp.*,
 753 F.3d 718 (7th Cir. 2014) ................................................................................................ 4

*Goldberger v. Integrated Resources, Inc.*,
 209 F.3d 43 (2d Cir. 2000) ................................................................................................... 3

*In re Lucent Techs. Secs. Litig.*,
 194 F.R.D. 137 (D.N.J. 2000) ............................................................................... 5, 6, 8, 12

*In re Mercury Interactive Corp. Secs. Litig.*,
 618 F.3d 988 (9th Cir. 2010) ................................................................................................ 3

*In re Milestone Scientific Secs. Litig.*,
 187 F.R.D. 165 (D.N.J. 1999) .............................................................................................. 6

*In re Network Assoc. Inc.*,
 76 F. Supp. 2d 1017 (N.D. Cal. 1999) ................................................................................. 8

*In re Oracle Secs. Litig.*
 131 F.R.D. 688 (N.D. Cal. 1990) ................................................................................. 7, 10

*In re Oracle Secs. Litig.*
 136 F.R.D. 639 (N.D. Cal. 1991) ......................................................................... 12, 14, 15

*In re Oracle Secs. Litig.*
 852 F. Supp. 1437, 1458 (N.D. Cal. 1994) ..................................................................... 8, 12

*Pearson v. NBTY, Inc.*,
    772 F.3d 778 (7th Cir. 2014) ........................................................................................................2

*Rawlings v. Prudential-Bache Properties, Inc.*,
    9 F.3d 513 (6th Cir. 1993) ............................................................................................................3

*Sherleigh Assocs. v. Windmere-Durable Holdings, Inc.*,
    186 F.R.D. 669 (S.D. Fla. 1999) ..................................................................................................6

*Steinlauf v. Continental Ill. Corp.*,
    962 F.2d 566 (7th Cir. 1992) ........................................................................................................7

*In re Synthroid Mktg. Litig.*,
    264 F.3d 712 (7th Cir. 2001) ......................................................................................................12

*In re Wells Fargo Sec. Litig.*,
    157 F.R.D. 467 (N.D. Cal. 1995) ......................................................................................... 4, 12

*Wenderhold v. Cylink Corp.*,
    188 F.R.D. 577 (N.D. Cal. 1999) ..................................................................................................7

*Wenderhold v. Cylink Corp.*,
    No. 98-cv-4292, Order, at 2-3 (N.D. Cal. Nov. 5, 1999) .........................................................14

**Statutes and Rules**

American Bar Association's Model Rules of Professional Conduct Rule 1.5(b) ..................................15

**Other Authorities**

Coffee, John C.,
    *The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action*,
    54 U. CHI. L. REV. 87 (1987) .......................................................................................................5

Eisenberg, Theodore, et al.,
    *A New Look at Judicial Impact: Attorneys' Fees in Securities Class Actions After* Goldberger v. Integrated Resources, Inc.,
    29 WASH. UNIV. J. L. & POLICY 5 (2009) ................................................................................14

Final Report,
    Third Circuit Task Force on the Selection of Class Counse (January 2002) ......................... 6, 10, 13

Fisher, Daniel,
    *Who's Protecting the Clients When Lawyers Collude on Fees?*,
    FORBES (Dec. 23, 2014) ................................................................................................................5

*FTC Workshop—Protecting Consumer Interests in Class Actions*,
    18 GEO. J. LEGAL ETHICS 1243 (2005) .......................................................................................7

BRIEF OF AMICUS CURIAE OF THE COMPETITIVE ENTERPRISE INSTITUTE'S CENTER FOR CLASS ACTION FAIRNESS

Harel, Alon & Stein, Alex
*Auctioning for Loyalty: Selection and Monitoring of Class Counsel*,
22 YALE LAW & POLICY REV. 69 (2004) .................................................................................... 13, 14

Hooper, Laural L. & Leary, Marie,
*Auctioning the Role of Class Counsel in Class Action Cases: A Descriptive Study*,
Federal Judicial Center (Aug. 29, 2001) ........................................................................ 8, 11, 12, 14

Liptak, Adam,
*When Lawyers Cut Their Clients Out of the Deal*,
N.Y. TIMES, Aug. 13, 2013 ............................................................................................................. 2

Ostoyich, Joseph A. & Lavery, William C.,
*So We Agree It's Price-Fixing, But …*,
LAW360 (Aug. 18, 2014) ................................................................................................................ 5

Ostoyich, Joseph,
*That's Your Defense to Price-Fixing?*,
LAW360 (Oct. 24, 2014) ................................................................................................................. 5

Parloff, Roger,
*Should Plaintiffs Lawyers Get 94% of a Class Action Settlement?*,
FORTUNE, Dec. 15, 2015 ................................................................................................................ 2

Perino, Michael A.,
*Markets and Monitors: The Impact of Competition and Experience on Attorneys' Fees in Securities Class Actions*,
St. John's Legal Studies Research Paper, Paper No. 06-0034 (2006) ......................................... 14

Tuxbury, James L.
Note, *A Case for Competitive Bidding for Lead Counsel in Securities Class Actions*,
2003 COLUM. BUS. L. REV. 285 (2003) ................................................................................. 10, 11

## SUMMARY OF ARGUMENT

In Pretrial Orders No. 1 and 2 (Dkts. 2 and 336), this Court indicated that it intends to appoint a Plaintiffs' Steering Committee to conduct and coordinate the pretrial stage of this litigation. The Competitive Enterprise Institute's Center for Class Action Fairness ("CCAF") submits this brief respectfully to recommend that the Court select lead plaintiffs' counsel through a competitive bidding process among the dozens of firms who are qualified. Selection of counsel in this manner will benefit the class to a far greater extent than the traditional process of selecting lead counsel and awarding fees in a hindsight, *ex post* determination. In particular, it will enable the Court to fulfill its fiduciary obligation to avoid awarding windfall attorneys' fees out of the class' recovery by ensuring a "market rate"—consistent with what a plaintiff would negotiate for itself in the market—and minimizing the potential for too-cozy fee agreements, or even collusion, among the numerous plaintiffs' firms vying for their share of the pie at the expense of their putative clients.

This case has all of the characteristics that courts and commentators identify as indicators that competitive bidding is appropriate and beneficial to the class: This is a consolidation of hundreds of lawsuits arising from a government investigation, information about the case is widespread amongst the public, the defendants have acknowledged some wrongdoing and are not likely to enter bankruptcy, the issues and class are well defined, and there is likely to be a large payment to the class. In short, the risk of non-payment for plaintiffs' counsel is very low, and the case requires relatively little independent investigation by plaintiffs' counsel. As a result, there is little need for an excessive "risk premium" to be built into the attorneys' fees; a fee matching the 25% benchmark is almost certain to be a gigantic windfall of thousands of dollars an hour for the attorneys—which is why so many hundreds of duplicative class actions have been filed in the first place. Rather than use the selection process to serve as a lightning-strike for a handful of dozens of qualified firms with that windfall, this Court's use of a bidding process would cause putative lead counsel to bid away the windfall traditionally built into fees for such low-risk but high-payment cases, returning that amount to the class members harmed by the defendants' admitted wrongdoing.

For these reasons, CCAF asks the Court to give preference in its selection process to putative lead plaintiffs' counsel that have submitted applications with detailed qualitative data about the firm's capabilities and commitment to serve as lead counsel (as a bulwark against underbidding by unqualified counsel) and a detailed quantitative fee request, and to require that all bidders certify that they did not discuss or coordinate their bids with other putative lead plaintiffs' counsel. While the bids should remain under seal until 48 hours after the deadline to prevent an unfair advantage for those submitting late bids, the bids should be made publicly available thereafter to promote confidence, transparency, and fairness in the process.

**INTEREST OF AMICUS CURIAE**

CCAF is a sub-unit of the IRC § 501(c)(3) non-profit Competitive Enterprise Institute ("CEI"). (CCAF, which was founded by Ted Frank in 2009, became part of CEI on October 1, 2015.) CCAF is recognized as "the leading critic of abusive class action settlements." Adam Liptak, *When Lawyers Cut Their Clients Out of the Deal*, N.Y. TIMES, Aug. 13, 2013, at A12; *see also* Roger Parloff, *Should Plaintiffs Lawyers Get 94% of a Class Action Settlement?*, FORTUNE, Dec. 15, 2015 (calling CCAF's founder "the nation's most relentless warrior against class-action fee abuse"). CCAF stands for the principles that settlement fairness requires that the primary beneficiary of a class-action settlement should be the class, rather than the attorneys or third parties; and that courts scrutinizing settlements should value them based on what the class actually receives, rather than on illusory measures of relief. In CCAF's six-year history CCAF attorneys have won numerous landmark decisions in support of these principles. *E.g.*, *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014); *In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013) ("*Pampers*"); *In re Baby Products Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013); *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011).

Though this Court has previously awarded CCAF fees for its work benefiting class members, CCAF submits this *amicus* brief *pro bono* and will not seek any compensation for its work on this brief or for its *amicus* brief before the Judicial Panel on Multidistrict Litigation.

# ARGUMENT

## I. This Court has a fiduciary duty to protect absent class members' rights by ensuring fair and reasonable attorneys' fees are awarded.

A district court must act as a "fiduciary for the class," "with a jealous regard" for the rights and interests of such absent class members. *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 994-95 (9th Cir. 2010) (internal quotation and citation omitted). Encompassed within the Court's fiduciary duty is "the Court's responsibility to avoid awarding plaintiffs' counsel a 'windfall' at the expense of the class—a special concern 'when the recovered fund runs into the multi-millions.'" *In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d 371, 374 (S.D.N.Y. 2013) (quoting *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 52 (2d Cir. 2000)).

The fiduciary role is necessary because "the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage," when counsel's "interest in getting paid the most for its work representing the class [is] at odds with the class' interest in securing the largest possible recovery for its members." *See Mercury Interactive Corp.*, 618 F.3d at 994 (internal quotation and citation omitted). "In class-action settlements, the adversarial process—or … 'hard fought' negotiations—extends only to the amount the defendant will pay, not the manner in which that amount is *allocated* between the class representatives, class counsel, and unnamed class members." *Pampers*, 724 F.3d at 717.

> The interest of class counsel in obtaining fees is adverse to the interest of the class in obtaining recovery because the fees come out of the common fund set up for the benefit of the class. In addition, there is often no one to argue for the interests of the class (that their recovery should not be unfairly reduced), since it is to be expected that class members with small individual stakes in the outcome will not file objections, and the defendant who contributed to the fund will usually have scant interest in how the fund is divided between the plaintiffs and class counsel.

*Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993).

"[T]he court's fiduciary obligation to the plaintiff class compels it to secure the best representation possible. To do so, … the court must strive to emulate the arrangements and decisions that the class itself would make were it able to negotiate." *In re Wells Fargo Sec. Litig.*, 157 F.R.D. 467,

468 (N.D. Cal. 1995). In that regard, selecting class counsel *ex ante* through a market-mimicking competitive bidding process is fully consistent with the court's fiduciary duty. *See id.*

## II. Selecting lead counsel through a competitive bidding process will serve the interests of the class by ensuring a "market rate" for attorneys' fees to be deducted from the class recovery and short-circuiting the potential for collusion among plaintiffs' attorneys.

Here, the hundreds of class actions formally consolidated in this MDL demonstrate the tremendous windfalls available to the attorneys who are appointed class counsel. The circumstances of the case make this fact more apparent: the class is large (over 500,000 owners and lessees of affected vehicles); potential payments to the class are in the billions; the defendant has already admitted some wrongdoing; and plaintiffs will be able to piggyback off of government investigations of Volkswagen's conduct. Clearly these actions are considered much more profitable than entrepreneurially investigating wrongdoing that hasn't already been exposed, because everyone involves understands that Volkswagen will eventually pay large sums to settle this litigation, even more so than in the typical class action. *Cf. Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014) (Posner, J.). Given these facts and the conflicts of interest endemic in class actions, appointing lead plaintiffs' counsel raises particularly sharp concerns "that the best interests of the putative plaintiff class [will] not be served by the kind of proliferation of plaintiffs' counsel that ordinarily marks a like proliferation of the number of cases" that has sprung up following the EPA's issuance of a Notice of Violation to Volkswagen alleging unauthorized use of a software-based defeat device in certain of their diesel automobiles. *See In re Amino Acid Antitrust Litig.*, 918 F. Supp. 1190, 1192 (N.D. Ill. 1996).

The feeding frenzy by plaintiffs' attorneys risks collusion among the many firms seeking a piece of what they expect to be windfall fees. In the absence of a court-ordered, market-mimicking approach through which fees will be bid down to market or near-market rates, the many firms now vying to be appointed class counsel are likely to "simply agree to work together and submit a joint fee proposal that they later present the class and the court after they complete their services," rather than "bid against [their] actual rivals by offering to lower [their] fees in order to induce the class to hire [the firm] (or, more precisely, the court to appoint it)." Joseph Ostoyich, *That's Your Defense to Price-Fixing?*,

LAW360 (Oct. 24, 2014);[1] *see also In re Lucent Techs. Secs. Litig.*, 194 F.R.D. 137, 156 (D.N.J. 2000) (remarking on the lack of opposition to the motion for lead counsel as "suggest[ing] possible collusion or a 'too comfortable' arrangement among counsel"). While explicit collusion among all of the potential bidders in this massive MDL is unlikely, there is substantial risk of the firms competing for lead-counsel status tacitly colluding by focusing entirely on qualitative arguments, and refusing to quantify how much they will return to the class and hope to keep for themselves, a risk magnified by Pretrial Order No. 2 not mentioning the fees planned to be charged to the class.

Legal commentators recently observed the apparent collusion that often exists among putative class counsel whereby they "keep their own fees high by refusing to bid against each other for control of litigation." Daniel Fisher, *Who's Protecting the Clients When Lawyers Collude on Fees?*, FORBES (Dec. 23, 2014);[2] *see also* Ostoyich, *supra* ("[T]his looks like price-fixing, and … Sherman Act Section 1 seemingly prohibits this type of per se illegal price fixing by competitors.") Such "collusion," whether explicit or tacit, "harms both actual class members and competition as a whole by reducing overall recoveries for class members, and only benefitting the attorneys." Joseph A. Ostoyich & William C. Lavery, *So We Agree It's Price-Fixing, But …*, LAW360 (Aug. 18, 2014);[3] *see also* John C. Coffee, *The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action*, 54 U. CHI. L. REV. 877, 908 (1987) (observing that where plaintiffs' attorneys elect their own lead counsel, competing groups have "invite[d] other attorneys into the action in order to secure their own vote for lead counsel," and

---

[1] *Available at* http://files.bakerbotts.com/files/Uploads/Documents/That's%20Your%20 Defense%20To%20Price%20Fixing.pdf; *see also* Ostoyich, *supra* ("Think of it … this way: If the putative class sent out a request for proposal asking 10 to 15 law firms to submit bids for the opportunity to represent it, and each firm sent in the proposal saying it was adequate for the job and should be hired—but none contained a fee proposal and, instead, the bidders shortly afterwards pulled their individual bids and submitted a joint fee proposal—that would not likely pass Sherman Act muster.").

[2] *Available at* http://www.forbes.com/sites/danielfisher/2014/12/23/whos-protecting-the-clients-when-lawyers-collude-on-fees/.

[3] *Available at* http://files.bakerbotts.com/files/Uploads/Documents/So%20We%20Agree %20It's%20Price-Fixing%20But%20%20%20.pdf.

that the result of some private ordering is a "political compromise," the price of which is "often both overstaffing and an acceptance of the free-riding or marginally competent attorney, whose vote gave him leverage that his ability did not").

Courts have long expressed related concern regarding the selection of lead counsel by firms ostensibly competing for the position. *See In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71, 75 (S.D.N.Y. 2000) (when "plaintiffs' lawyers negotiate among themselves to select lead counsel or a team of lead counsel, … the choice is not necessarily in the plaintiffs' best interests"); *Lucent*, 194 F.R.D. at 156 ("'unless there has been active, effective client participation in the [selection] process, it is possible that the counsel arrangement may simply reflect bargaining among lawyers for their own stake in the case, and not serve the best interests of the class'" (quoting *In re Milestone Scientific Secs. Litig.*, 187 F.R.D. 165, 177 (D.N.J. 1999)); *Sherleigh Assocs. v. Windmere-Durable Holdings, Inc.*, 186 F.R.D. 669 (S.D. Fla. 1999) (rejecting consortium of ten law firms as "not in the best interests of the class" and instead selecting counsel through competitive bidding to better serve the interests of the class). Indeed, a report by the Third Circuit Task Force on the Selection of Class Counsel found:

> [V]oluntary agreements among lawyers may create cartel-like groupings that favor some lawyers and disfavor others on the basis of factors that have little to do with ability or fees, and such agreements may also result in overstaffing and padded hours. In order to reach a "deal," lead counsel may have to "cut in" so many lawyers that the representation of the class becomes inefficient and the ultimate fee request becomes inflated.

Final Report, Third Circuit Task Force on the Selection of Class Counsel at 10 (January 2002) ("Third Circuit Task Force").[4]

The Court can prevent this harmful practice through active judicial involvement in the selection of lead counsel and, in particular, by appointing lead counsel through a competitive bidding process. Competitive bidding will allow the class to obtain representation at near market rates and thereby will best serve class members' interests in this low-risk case, where information about the case

---

[4] *Available at* http://www.ca3.uscourts.gov/sites/ca3/files/final%20report%20of%20third%20circuit%20task%20force.pdf.

is widespread, there is a closely related government investigation, the defendants' liability is not in doubt, the defendant is solvent, and the class is well-defined.

### A. Competitive bidding allows for *ex ante* evaluation of risk and creates a market system which will avoid the likelihood of above-market returns to plaintiffs' counsel at the expense of the class.

In a competitive market, a firm proposing to a sophisticated client a rate that would result in an above-market return would find itself underbid by competitors willing to accept a smaller above-market return, until all above-market rents were bid away. In class actions, however, the class members cannot properly bargain fees to a market rate, "[s]o the judge has to step in and play surrogate client" by representing the interests of the class as a whole. *Steinlauf v. Continental Ill. Corp.*, 962 F.2d 566, 572 (7th Cir. 1992).

The Court can best replicate market dynamics by selecting lead counsel through a bidding process. Competitive bidding "serves as the 'ideal proxy' for the one-to-one lawyer-client agreement in conventional litigation" and replicates the market rate for legal services better than either the lodestar approach or percentage-of-the-recovery method. *In re Bank One Shareholders Class Actions*, 96 F. Supp. 2d 780, 785 (N.D. Ill. 2000). *See also Wenderhold v. Cylink Corp.*, 188 F.R.D. 577, 587 (N.D. Cal. 1999) (lack of sophisticated lead plaintiff, "together with the inherent conflicts and agency problems in class actions and the limited ability of the court to address such problems through case management" led court to "conclude[] that determination of lead counsel through a competitive bidding process is necessary to protect the interests of the putative class members"). Just as in a competitive market, prospective class counsel would look at the expected opportunity cost, the expected chance that investment in the case would produce no return, and the expected size of a settlement in the litigation. They would then propose a contingency-fee percentage that compensates them for that expected risk and opportunity cost. *See FTC Workshop—Protecting Consumer Interests in Class Actions*, 18 GEO. J. LEGAL ETHICS 1243, 1261 (2005) ("If you're going to award lawyers for the risk that they undertake in litigation, the best time to measure that risk, and in fact the only time that you can do so effectively, is at the outset of the case." (quoting Walker, J.)); *see also In re Oracle Secs.*

*Litig. ("Oracle I")*, 131 F.R.D. 688, 692 (N.D. Cal. 1990) ("[I]t is inherently illogical for lawyers to undertake litigation on the basis of the risks and rewards they perceive at the beginning, yet be compensated on the basis of the risks and rewards the *court* perceives at the end of the litigation…. Determining attorney fees after resolution of the litigation … disserves both the class and class counsel." (emphasis in original)).

Courts that have used competitive bidding to select lead counsel have considered the process successful in enabling the court to protect class members' interests. Following the settlement of a case that employed competitive bidding, the court in *Oracle* observed that "ex ante competitive bidding was effective in this case in producing 'reasonable' fees from an ex post perspective as well." *In re Oracle Secs. Litig. ("Oracle III")*, 852 F. Supp. 1437, 1458 (N.D. Cal. 1994). "By inviting competitive bidding, the court was able to 'shop around' and thereby received a fee schedule that represented substantial savings to the class." *Id. See also Lucent*, 194 F.R.D. at 156 ("determination of lead counsel … through a competitive bid process … is necessary to protect the interests of the proposed class"); *Auction Houses*, 197 F.R.D. at 72 ("employ[ing] an auction in selecting lead counsel" "to ease th[e] tension [arising from the divergence of economic interests of the class and its counsel] and improve the class action as an instrument of justice"). A Federal Judicial Center study found that attorneys' fees in cases that selected lead counsel through competitive bidding resulted in bids for "lower percentage fee awards than what firms might have been expected to obtain under a percentage-of-the-fund method." Laural L. Hooper & Marie Leary, *Auctioning the Role of Class Counsel in Class Action Cases: A Descriptive Study*, Federal Judicial Center (Aug. 29, 2001)[5] at 7-8 (finding that attorneys' fee awards ranged from 5% to 22.5%).

Because "competitive bidding for the lead counsel role tends to reduce substantially the amount of fees awarded and tends to increase the amount of recovery to the class," a court-supervised bidding process is preferable to the *ex post* methodologies frequently used to award attorneys' fees. *In re Network Assoc. Inc.*, 76 F. Supp. 2d 1017 (N.D. Cal. 1999). By design, competitive bidding "align[s]

---

[5] *Available at* http://www2.fjc.gov/sites/default/files/2012/auctioning.pdf.

attorney-client interests more closely, reduce[s] agency costs, and help[s] ensure that the class action mechanism acts as an effective mechanism of justice." *Auction Houses*, 197 F.R.D. at 85. *See also In re Bank One Shareholders Class Actions*, 96 F. Supp. 2d at 784-85 (discussing how *ex ante* fee calculations in auction bidding replicate the free legal market better than does lodestar approach). The competing lodestar method is problematic, by contrast, because it "may induce lead counsel to prolong the litigation beyond the optimal point from plaintiffs' perspective simply in order to accrue more hours," while also "incentiv[izing counsel] to settle the case before it reaches the trial stage, even if trial is in plaintiffs' best interests." *Auction Houses*, 197 F.R.D. at 76. The incentive for counsel to "do unnecessary work … solely in order to accrue more hours" is heightened where, as here, numerous counsel are involved due to the "pressure to generate sufficient attorney hours to compensate all participating attorneys." *Id.* The percentage-of-the-fund method, while simpler than the lodestar approach "creates perverse incentives of its own," such as "lead[ing] the plaintiffs' attorney to settle the case prematurely as soon as counsel's opportunity costs begin to mount." *Id.* at 77. With both methods, the "mismatched incentives" lead to suboptimal results for class members due to the collective action dilemma inherent where classes are "large, dispersed and disorganized." *Id.* at 77-78. Individual class members have no rationale incentive to monitor their purported attorneys' work due to the small stake they have in the litigation.

**B.   The facts and circumstances of this case make it ideally suited for competitive bidding.**

Although courts have rejected the use of competitive bidding in certain cases, a consensus has emerged among courts and commentators about the "ideal" case for competitive bidding. The factors are all present here: "the defendants have accepted or stipulated liability, there is a great deal of information from a criminal or governmental investigation …, information has been widely dispersed through the public via the media or other institutions, the issues in the case are clearly defined, the defendant is not on the verge or likely to enter bankruptcy, … there is the likelihood of a very large recovery for the class, [and] … the action is … a consolidation of numerous suits brought by different counsel to help insure a sufficient number of participants in the competitive bidding process." *See*

James L. Tuxbury, Note, *A Case for Competitive Bidding for Lead Counsel in Securities Class Actions*, 2003 COLUM. BUS. L. REV. 285, 288 (2003). Although a task force convened by the U.S. Court of Appeals for the Third Circuit generally cautioned in 2002 against over-reliance on the auction method for selecting class counsel at "such an early stage of [its] development," the Task Force identified cases with similar characteristics as most appropriate for competitive bidding. Third Circuit Task Force at 15, 18.

The reason that competitive bidding is most effective in cases with these characteristics is that plaintiffs will likely succeed on their claims against a defendant financially able to pay the damages, with much of the investigation undertaken by government entities, almost certainly resulting in attorneys' fees paid to counsel—thus requiring a much lower risk premium than other cases taken on a contingency basis. *See Oracle I*, 131 F.R.D. at 693 ("It is axiomatic that risk demands a premium; the greater the uncertainty of payment, the greater the payment that will be demanded."). As a result, the typical markup for a "risk premium" is not warranted in such cases where the risk of non-payment is so low. Indeed, "[m]uch of the savings on fees occurs through the reduction in the risk premium," because the cases setting fees through the competitive bidding process "do not carry the same level of risk of non-recovery to plaintiff's counsel under the contingency fee regime." Tuxbury, *supra*, at 290. Moreover, the existence of a government investigation allows plaintiffs' counsel a free ride and eliminates any concern that competitive bidding will quash the "entrepreneurial spirit" that can drive plaintiffs' counsel to seek out cases that would bring socially beneficial results but are not brought by individual plaintiffs due to collective action problems. Further, by setting fees at the outset of the case, competitive bidding reduces "uncertainty relating to fees," which ordinarily can "increase[] the risk premium required to attract lawyers" to undertake a case. *Oracle I*, 131 F.R.D. at 692-93 ("By virtue of their experience and knowledge of the law, shrewd plaintiffs' lawyers are able to weigh the risks and rewards of litigation, but they are much less able to gauge in advance the reaction of an individual judge to a fee application that is to be given discretionary review.").

Competitive bidding thus allows the class to recapture some of the risk premium traditionally included in class counsel fees. Empirical analyses confirm that "competitive bidding can offer a real reduction in attorneys' fees, meaning a larger percentage recovery for class members." Tuxbury, *supra*, at 290, 319-20; *see also* Hooper, *supra*, at 7-8. The percentage of recovery paid in attorneys' fees is significantly lower in competitive bidding cases than in non-competitive bidding cases, while research shows the success rate in cases considered "ideal" for competitive bidding is 100 percent. *See* Tuxbury, *supra*, at 319-321 (in securities class actions, the average attorneys' fee was 10.8% and the median was 8.2% in competitive bidding cases, while in non-competitive bidding cases, the mean was 28.5% and the median was 30%). Here, we are almost certain to see competitive bids from highly-skilled firms for single-digit percentages of the proceeds *ex ante*, rather than the 25% to 33% that would be sought *ex post* based on irrelevant comparisons to other megafund awards in district courts in this circuit.

### C. The critiques of competitive bidding are largely inapplicable here or readily addressed through proper judicial scrutiny.

Courts and legal commentators have noted several concerns regarding the use of competitive bidding. While valid in some instances, those concerns are largely inapplicable, unfounded, or readily can be addressed with proper judicial oversight in the present case.

One concern surrounding competitive bidding is that quality of representation might be inversely related to the cost of representation, meaning that while less capable attorneys may charge lower rates, they will recover less for the class. A related concern is that lawyers proposing lower fees have less incentive to perform than lawyers charging higher fees. The result, some critics charge, is likely to be a quick settlement that is unreasonably low, enabling class counsel to work on, and receive fees from, higher margin work on other cases. However, the court certainly is not obligated to select the lowest bid and, as is typically done when lead counsel is selected, should analyze the bids to determine the experience and capabilities of the law firms, how the proposed fee structure benefits the class and incentivizes counsel, and whether a firm properly commits to and will prioritize the case. *See, e.g.*, *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 720 (7th Cir. 2001) ("Judges don't look for the lowest bid; they look for the best bid—just as any private individual would do in selecting a law firm, an

advertising firm, or a construction company ... [and ultimately] select[] the firm that seems likely to generate the highest recovery net of attorneys' fees."); *In re Oracle Secs. Litig. ("Oracle II")*, 136 F.R.D. 639, 648-50 (N.D. Cal. 1991) (selection of class counsel through the bidding process need not, and should not be a function only of price); *In re Wells Fargo Sec. Litig.*, 157 F.R.D. 467, 468 (N.D. Cal. 1995) ("court must examine not only quantitative factors, such as the cost of each firm's services, but also the various qualitative attributes of the … firms and their bids"); s*ee also Oracle III*, 852 F. Supp. at 1456-57 ("The bids were analyzed and compared using multiple criteria before the court made its choice of class counsel. The [winning] bids ultimately selected by the court offered class counsel performance initiatives while simultaneously protecting against lawyer windfalls.").

Reflecting this approach, courts that have selected counsel through competitive bidding have required bidders to submit detailed qualitative and quantitative data to enable it to best protect the interests of the class. *See, e.g.*, *Lucent*, 194 F.R.D. at 157 (requiring bid proposals to state firm's experience and qualifications, whether the firm will post a completion bond or other security, description of malpractice insurance coverage, and detailed fee proposal for each of four contingencies); *see generally* Hooper, *supra*, at 29-36 (describing court guidelines for bid proposals in past cases). This Court has already requested such qualitative data in Pretrial Order No. 2.

And the Court has countless tools to ensure the firm selected as lead counsel acts in the best interests of the class for the entirety of the litigation. It can require the winning firm to place an amount in escrow that would be forfeited if the firm fails to fulfill its obligations to the class, or require the winning firm to guarantee a certain recovery before it will be entitled to fees. Likewise, serious bidders can voluntarily commit to these safeguards, or simply discuss the self-policing incentives built into their bids. *See id.*; *see also In re Bank One Shareholders Class Action,* 96 F. Supp. at 785-89 (analyzing in detail "wide-ranging proposals"); Alon Harel & Alex Stein, *Auctioning for Loyalty: Selection and Monitoring of Class Counsel*, 22 YALE LAW & POLICY REV. 69, 75-76 (2004) (proposing "contract for which bid structures [counsel's] incentives in a way that turns faithful representation of the suing class into the only profitable course of action"); *id.* at 79 (devising auction process in which the only "type of

attorney capable of winning … [is one] who conscientiously estimates the class members' expected recovery, offers them a competitive fee and pledges her earnings from the case as a security for her undertaking to provide the class members both a loyal and competent representation"). The court has a duty to closely scrutinize any settlement before providing approval and can reject any settlement that is reached before the parties to have properly determined the case value or that provides too little benefit to the class.

Another concern is that competitive bidding "may discourage attorneys from searching out and identifying illegal activity, as the attorney who takes this initiative is not necessarily compensated for his or her effort." *Auction Houses*, 197 F.R.D. at 81. As in *Auction Houses*, however, "no attorney initiative was required here to ferret out the alleged wrong committed by defendants." *Id.* at 82. Instead, the hundreds of cases were filed after the EPA conducted an initial investigation and issued a Notice of Violation to the defendants. "The attorney who filed the first complaint in this case therefore is not necessarily any more deserving of the lead counsel position than is any other attorney involved, and selection as lead counsel of someone other than the first-to-file did not deprive an investigating attorney of his or her just reward or dissuade attorneys in other cases from searching out a wrong." *Id.* Due to the extremely large number of cases and attorneys who appear to be interested in serving as lead counsel, the Court is likely to receive a high number of bids. And because "larger markets lead to more competition" and "competition leads to more efficient results," a number of those bids are likely to be high-quality bids from which the Court can choose lead counsel to serve the best interests of the class. *Id.*

Finally, since the Third Circuit Task Force issued its final report in January 2002, the potential for anti-competitive sharing of fees among groups of attorneys at the expense of the class remains unabated, while the understanding of competitive bidding as a means to select class counsel, while still rare, is further developed and no longer at "such an early stage of [its] development." *See, e.g.*, Theodore Eisenberg, et al., *A New Look at Judicial Impact: Attorneys' Fees in Securities Class Actions After* Goldberger v. Integrated Resources, Inc., 29 WASH. UNIV. J. L. & POLICY 5, 17 (2009) (noting that "research

suggests that [lead counsel auctions] are correlated with lower fee requests and fee awards"); Michael A. Perino, *Markets and Monitors: The Impact of Competition and Experience on Attorneys' Fees in Securities Class Actions*, St. John's Legal Studies Research Paper, Paper No. 06-0034 at 3 (2006) (finding that "[d]irect attempts by courts to introduce competition into fee setting through the use of competitive auctions for the role of lead counsel do … have a significant negative correlation with fee requests and fee awards");[6] Harel, *supra*, at 77 (scholarship on selecting counsel through auctions "aims at improving the understanding of the class action agency problem … by rigorously identifying the sources of that problem and by categorizing the available solutions, … by offering its own solution to the problem").

### III. The bids should be made public within 48 hours of the submission deadline.

In the majority of cases in which courts have selected lead counsel through a bidding process, the court has "disclosed the terms of the winning bidder as well as the proposed terms of the competing bidders" at least by the time the court announced its choice for lead counsel. *See* Hooper, *supra*, at 60. The "purpose of soliciting bids [*ex parte* and under seal] was only to ensure nondisclosure prior to selection or rejection" to ensure a level playing field and avoid anti-competitive actions by the bidders. *Wenderhold v. Cylink Corp.*, No. 98-cv-4292, Order, at 2-3 (N.D. Cal. Nov. 5, 1999). "For the court to continue to veil bids after that point would defeat a primary objective of the competitive bidding process, namely, dissemination of information about the market for legal services in class action cases." *Id.*; *see also Oracle II*, 136 F.R.D. at 644-45 ("disclosure of class counsel's compensation arrangements benefits the class … by producing information highly pertinent to class counsel's performance" and impedes the ability of class counsel and defendants to reach a settlement that puts their interests ahead of the class). The American Bar Association's Model Rules of Professional Conduct Rule 1.5(b) reflects these principles, requiring communication to the client of "the basis or rate of the fees and expenses … before or within a reasonable time after commencing the representation."

---

[6] *Available at* http://ssrn.com/abstract=870577.

From a policy standpoint, public bidding promotes class members' confidence in the fair administration of their case, to which they are largely detached due to the inherent structure of class actions, and gives them a fuller view of the process, and also deters the possibility of fraud or other injustice against the class. *See Oracle II*, 136 F.R.D. at 645 (disclosure of class counsel's bids benefits the class because "[u]nlike the usual attorney-client situation, … class members do not participate in the negotiations by which a part of their claim is bargained away").

## CONCLUSION

For the forgoing reasons, lead plaintiffs' counsel should be selected through a competitive bidding process conducted by the Court to ensure fees are awarded at or near market rates and thereby protect the interests of the class.

Dated: December 31, 2015          Respectfully submitted,


                                  <u>*/s/ Theodore H. Frank*</u>

                                  Theodore H. Frank (SBN No. 196332)
                                  Anna St. John (*pro hac vice* pending)
                                  COMPETITIVE ENTERPRISE INSTITUTE
                                    CENTER FOR CLASS ACTION FAIRNESS
                                  1899 L Street, NW, 12th Floor
                                  Washington, DC 20036
                                  Telephone: (202) 331-2263
                                  Email: ted.frank@cei.org
                                  Email: anna.stjohn@cei.org
                                  *Attorneys for Amicus Curiae*
                                      *Competitive Enterprise Institute*
                                      *Center for Class Action Fairness*