

218 COMMERCE STREET
POST OFFICE BOX 4160
MONTGOMERY, ALABAMA 36103-4160
(334) 269-2343
(800) 898-2034
FAX: (334) 954-7555
BEASLEYALLEN.COM

W. Daniel "Dee" Miles, III
Dee.Miles@BeasleyAllen.com

January 8, 2016

**VIA CM/ECF FILING (RELATES TO ALL CASES)**

Honorable Charles R. Breyer
United States District Judge
Northern District of California
Courtroom 6, 7th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

    Re:    *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation*, 15-MD-2672-CRB (JSC)

           *Leadership Application for W. Daniel "Dee" Miles, III*

Dear Judge Breyer:

    Pursuant to your order of December 9, 2015 (Doc. 2), please accept this correspondence as my application for appointment as co-lead counsel for an automobile dealer track ("dealer track") in the above-referenced Volkswagen litigation. I also support Arthur M. Murray for appointment as co-lead counsel of the dealer track. Alternatively, if a separate dealer track is not created, I seek to represent the interests of independent automobile dealers and consumers through an appointment to the Plaintiffs' Steering Committee ("PSC").

    My firm ("Beasley Allen") and I have extensive experience handling complex litigation, class action lawsuits, and MDL matters. This background will further the goals of leadership in this important litigation. As evidenced by a formidable track record, we have the skill, resources, commitment, and tenacity to see this litigation through to a successful resolution.

## I. A SEPARATE DEALER TRACK WILL BE FURTHER THE JUST, SPEEDY, AND INEXPENSIVE DETERMINATION OF THIS CASE.

Creating a separate dealer track will further the interests of the Court and the litigants in securing the "just, speedy, and inexpensive determination" of this proceeding. See Fed. R. Civ. P. 1. Dealers acquire, maintain, and dispose of automobiles in a manner that is distinct from the way consumers acquire, maintain, use, and dispose of their automobiles. For example, dealers and consumers have distinct purposes and expectations when purchasing an automobile – dealers are primarily concerned with the purchase price and expected resale value, while consumers – although no doubt seeking a vehicle that will hold its value – are also concerned with factors such as safety, style, comfort, fuel economy, and other features that are of less concern to the typical auto dealer. Similarly, dealers and consumers acquire automobiles in distinct ways. Dealers are more likely to acquire pre-owned vehicles at auction or in a private party transaction, while consumers are more likely to purchase their vehicles from dealers, whether affiliated with a brand or independent.

Furthermore, consumers and dealers maintain and use their vehicles differently. Dealers typically take little, if any, action that leads to depreciation of the vehicle. They maintain vehicles in their inventory in the best possible condition for the purpose of maximizing the vehicle's resale price. Consumers, on the other hand, actively depreciate their vehicles on a daily basis through routine use, wear, and tear. A consumer's vehicle is not only a valuable asset, it is also a necessity that furthers and enhances daily life.

Finally, dealers and consumers dispose of their automobiles in different ways as well. Dealers sometimes sell vehicles in their inventory to other dealers, but more often sell to consumers in a negotiated transaction. Consumers, on the other hand, dispose of their vehicles in myriad ways: some vehicles are returned at the expiration of a lease terms, others are traded-in for newer models, others are sold to private parties, some are given to family members or charities, and a few are wrecked beyond repair.

Because of the disparities outlined above, it is likely that dealers will require a damage analysis unique from that employed to assess consumer claims. Not only are dealers purchasing, maintaining, and disposing of vehicles in a manner different from the typical consumer, but dealers, unlike consumers, are not driving the vehicles on a daily basis. As such, consumer claims will encompass not only the expected depreciation due to Volkswagen's fraudulent conduct but, if the expected "fix" leads to a reduction in the vehicle's fuel economy, consumers will also have a claim for the additional fuel costs they can expect to incur.[1] Dealers will not have such a fuel economy claim because they

---

[1] Although Volkswagen has not announced a proposed "fix" for its affected vehicles in the United States, industry experts agree it is likely that a remedy that achieves compliance with EPA regulations will cause an accompanying reduction in vehicle fuel economy.

do not drive the cars. Also, dealers, unlike consumers, likely will not be able to avail themselves of claims under most state consumer protection acts, as dealers are not considered "consumers" under the majority of those statutes. Conversely, some dealers have asserted Lanham Act claims against Volkswagen. This cause of action is not available to consumers. For these reasons, a separate dealer track should be created.

At least 11 cases filed against Volkswagen assert a dealer class.[2] My firm and I have filed the following class action cases on behalf of independent dealers:

(1) A to Z Autosports, LLC, and MSI Auto Sales and Repair, Inc. v. Volkswagen Group of America, Inc. (Case No. 3:15-cv-05963-CRB) (transferred Dec. 22, 2015, from W.D. Wis., Case No. 3:15-cv-00664, filed Oct. 15, 2015); and

(2) A Plus Auto, LLC v. Volkswagen Group of America, Inc., et al. (Case No. 3:15-cv-06193-CRB) (transferred Dec. 29, 2015, from D. Minn., Case No. 0:5-cv-04009, filed Nov. 3, 2015).

We have an understanding of the dealers' unique position and concerns relative to this litigation and, as discussed below, are well-suited to lead a dealer track.[3]

---

[2] We are aware of the following dealer cases that have been transferred to the MDL: A Plus Auto, LLC v. Volkswagen Group of America, Inc., et al. (Case No. 3:15-cv-06193-CRB); A to Z Autosports, LLC, et al. v. Volkswagen Group of America, Inc. (Case No. 3:15-cv-05963-CRB); Iraj Abdy v. Volkswagen AG, et al. (Case No. 13:15-cv-05890-CRB); Brown Daub Chevrolet of Nazareth, Inc. (Case No. 3:15-cv-06245-CRB); Eagle Auto Mall Corp. v. Volkswagen Group of America, Inc. (Case No. 3:15-cv-05923-CRB); Koudisi, Inc. v. Volkswagen Group of America, Inc. (Case No. 3:15-cv-05703-CRB); Pye Auto Sales, LLC, et al. v. Volkswagen Group of America, Inc. (Case No. 3:15-cv-05966-CRB); Saturn Southwest Florida, LLC v. Volkswagen Group of America, Inc., et al. (Case No. 3:15-cv-05959-CRB); Warren Mfr., Inc., et al. v. Volkswagen Group of America, Inc. (Case No. 3:15-cv-05670-CRB). We also are aware of the following cases that have not yet been transferred: Autoport, LLC, et al. v. Volkswagen Group of America, Inc. (Case No. 2:15-cv-04260-NKL, W.D. Mo., filed Nov. 12, 2015); and Windham Motor Co. v. Volkswagen Group of America, Inc. (Case No. 2:15-cv-00652-KD-M, S.D. Ala., filed Dec. 23, 2015). Additionally, G.T. Leasing, Inc. v. Volkswagen Group of America, Inc., et al. (Case No. 3:15-cv-06269-CRB) asserts a class action on behalf of lessors and has some commonalities with the dealer cases.

[3] In addition to cases brought on behalf of dealers, we have filed the following consumer class action cases against Volkswagen: Denise DeFiesta, et al. v. Volkswagen Group of America, Inc. (MDL Case No. 3:15-cv-05637-CRB) (transferred from D. N.J., Case No. 2:15-cv-07102, filed Sept. 22, 2015); Alexa Clark, et al. v. Volkswagen Group of America, Inc. (MDL Case No. 3:15-cv-06194-CRB) (transferred from D. Minn., Case No. 0:15-cv-03924, filed Oct. 23, 2015).

## II. MY APPOINTMENT AS CO-LEAD OF THE DEALER TRACK WILL BE BENEFICIAL TO THE INTEREST OF DEALERS AND THE MDL PROCEEDING AS A WHOLE.

Important criteria for an appointment to a leadership position include: (a) professional experience in this type of litigation; (b) willingness and availability to commit to a time-consuming project; (c) ability to work cooperatively with others; and (d) willingness to commit the necessary resources to pursue this matter at an expeditious pace.[4]

### A. Professional Experience In This Type Of Litigation.

My firm, Beasley Allen, and I have a record of accomplished leadership in MDL cases throughout this country. We have been selected by federal courts as lead counsel or co-lead counsel in the following cases to date:

- *In re: Vioxx Products Liability Litigation*, MDL No. 1657 (Andy Birchfield);

- *In re: Reciprocal of America (ROA) Sales Practices Litigation*, MDL No. 1551 (Dee Miles):

- *In re: American General Life and Accident Insurance Company Industrial Life Insurance Litigation*, MDL No. 1429 (Dee Miles);

- *In re: Dollar General Corp. Fair Labor Standard Acts Litigation*, MDL No. 1653 (Dee Miles); and

- *In re: Xarelto (Rivaroxaban) Products Liability Litigation, MDL No. 2592 (Andy Birchfield).*

In addition, we have been appointed to over 20 different Executive and/or PSC positions in MDL cases, and currently serving on the discovery committee in *In re: Takata Airbag Products Liability Litigation*, MDL No. 2599 responsible for two Auto Manufacturer's discovery.[5]

Presently, I serve on the PSCs in the Target Data Breach Litigation (MDL No.

---

[4] See, e.g., Manual for Complex Litigation – Fourth, § 10.224; see also *In re: Lumber Liquidators Chinese-Manufactured Flooring Products Marketing, Sales Practices and Products Liability Litigation* (MDL No. 1:15md2627 (AJT/TRJ)) (E.D. Va. Jul. 2, 2015 (Doc. 10)).

[5] See "Beasley Allen Case List" attached hereto as Exhibit A.

2522) and the Home Depot Data Breach Litigation (MDL No. 2583). In Target, I not only served on the "bank track" PSC that achieved a $40 million settlement on behalf of banks damaged by the Target data breach, but I was a member of the settlement committee that negotiated that settlement.[6] As far as auto products litigation is concerned, several years ago, in the Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Product Liability Litigation (MDL No. 2151), I served on the PSC that recovered $1.5 billion benefitting approximately 22 million class members. I was involved in the settlement negotiations on the Economic Loss track of the case, and, along with Elizabeth Cabraser, developed the ISP (Intensive Settlement Process) for the PI/PL track of the case in both the MDL and the California JCCP, a procedure that is still presently in place and on-going. Significantly, my leadership application is supported by four of the co-leads in that litigation, Elizabeth J. Cabraser, Mark P. Robinson, Jr., Mark Seltzer and Frank Pitre.[7] Also, over the past decade I have served as lead counsel on behalf of eight states and their Attorneys General in the Average Wholesale Price ("AWP") litigation concerning fraudulent pricing practices in the pharmaceutical industry. This litigation has led to settlements and verdicts exceeding one billion dollars on behalf of the states I represented. For example, the Mississippi Supreme Court recently affirmed a $32 million verdict where I served as lead counsel for the State in a multi-week trial.[8] In summary, my firm and I are experienced and well-qualified to undertake a leadership role in this litigation.

### B. Willingness And Availability To Commit To A Time Consuming Project.

I am, and my law firm are prepared, committed, and fully invested in this litigation. This commitment is evidenced by our track record of successfully litigating complex cases throughout the United States. We employ 77 lawyers and approximately 200 staff members. The staff includes our 7 investigators, a 10 man technical support department, and a comprehensive trial graphics department. At present, we have dedicated two of my law partners, Archie I. Grubb, II, and H. Clay Barnett, and a senior associate, Andrew E. Brashier, to work with me on the Volkswagen litigation. These lawyers are experienced in consumer class actions and complex litigation. We have already given three CLE presentations on the Volkswagen litigation at conferences in

---

[6] The settlement has been preliminarily approved by the court. See *In re: Target Corporation Customer Data Security Breach Litigation* (Case No. 0:14-md-02522-PAM) (D. Minn., Dec. 2, 2015 (Doc. 656)).

[7] See "References" attached hereto as Exhibit B.

[8] *In the Matter of Mississippi Medicaid Pharmaceutical Average Wholesale Price Litigation: Sandoz, Inc. v. State of Mississippi* (Case No. 2012-CA-01610-SCT) (Supreme Court of Mississippi, Oct. 29, 2015).

Case 3:15-md-02672-CRB   Document 684   Filed 01/08/16   Page 6 of 7

P a g e | **6**

Miami and New Orleans. We also have three paralegals, two legal secretaries, and several law clerks assigned to the Volkswagen litigation. This commitment easily can be expanded to accommodate the needs of the case. There should be no doubt that Beasley Allen is willing and able to commit the resources necessary to bring about a successful resolution of this case.

### C.  Ability To Work Cooperatively With Others.

Beasley Allen and I have a proven track record of working cooperatively with co-counsel in thousands of cases over the past three decades, including many complex and MDL matters as outlined above. Beasley Allen has never experienced any discipline or informal complaints involving any matter regarding complex MDL litigation and/or class action litigation. In fact, our record in both serving and bringing resolution to a majority of the cases where we have served in leadership is exemplary and a prime example of our ability to work cooperatively with others. When the firm is serving in a supporting role in multi-district litigation, Beasley Allen has consistently and competently performed all tasks assigned to the firm. Finally, we are well acquainted with many of the attorneys or firms seeking appointment to leadership positions. The attorneys supporting our application for a co-lead position of the dealer track or, alternatively, for a PSC appointment are listed in Exhibit B, attached hereto.

### D.  Willingness To Commit The Necessary Resources To Pursue This Matter At An Expeditious Pace.

The PSC needs financially capable and responsible law firms, and Beasley Allen and I have a full appreciation of the resources required to successfully prosecute this important litigation. Beasley Allen has demonstrated this capability through its substantial and timely financial commitments in past MDLs, and stands ready to provide significant support to this MDL as well. As head of consumer and business litigation in our 77 lawyer, 200 support staff member law firm, I assure the Court that my firm and I are committed to providing the necessary resources to see this litigation through to its conclusion.

### CONCLUSION

My firm, Beasley Allen, and I have extensive experience in complex consumer litigation, auto product liability litigation, and class action litigation along with the track record required for leadership of a monumental case impacting consumers nationally. Beasley Allen is home to some of our nation's best and brightest attorneys, top-notch support staff, and has ample manpower and financial resources to prosecute this case. We maintain the necessary commitment to see this litigation through to a successful resolution. On behalf of my firm and our clients, I request appointment, along with

Arthur M. Murry, as co-leader of an independent dealer track. I will, of course, accept any leadership or appointed position deemed appropriate by the Court.

Yours very truly,

W. DANIEL "DEE" MILES, III

WDMIII/aig
Enclosures

cc: All counsel of record via CM/ECF