

Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 EIGHTH AVENUE, SUITE 3300
SEATTLE, WA 98101
steve@hbsslaw.com

January 14, 2016

The Honorable Charles R. Breyer
United States District Court
Northern District of California

    Re:    *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, 15-md-02672-CRB, Lead Counsel Application Letter in Reply

Dear Judge Breyer:

    I have reviewed the application letters and impressive qualifications of the many lawyers who have requested appointment to a leadership or committee position in this case.

    There are a few easily identifiable lawyers who, like myself, have held or hold leadership roles and have reached impressive settlements in automobile defect economic-loss cases similar to this case. Experience in *Toyota SUA, Hyundai/Kia MPG, GM*, and *Takata*, appears to establish a bright-line test of the most relevant, nationwide, recent litigation experience in satisfaction of Rule 23(g)(1)(A)(ii).

    Likewise, the lawyers with this most-relevant experience all can easily satisfy the requirement of adequate resources to commit to representing the class. *See* Rule 23(g)(1)(A)(iv). In addition to the factors the Court specifically requested in the opening application letters, what remains to distinguish these front runners under Rule 23(g)(1)(A) is: "(i) the work counsel has done in identifying or investigating potential claims in the action;" and "(iii) counsel's knowledge of the applicable law." In these two categories, I, and my Hagens Berman VW Litigation team, stand out from the applicant pool.

    Hagens Berman began its investigation of VW immediately upon news breaking of the emissions fraud. I filed the first VW case in the nation here in San Francisco one day later. We sent the first evidence preservation letter to VW on September 19, 2015. Within 10 days, we had a case on file with class representative plaintiffs from every state and the District of Columbia. In the ensuing weeks, my VW team worked tirelessly to investigate the case, retain the leading experts, and assist VW owners. We researched and filed the first case seeking mandatory buyback under California's express emissions warranties and the first case seeking a nationwide buyback injunction. We filed seven VW cases with 196 plaintiffs from the 50 states and D.C.

    From the inception of the Dieselgate fiasco, Volkswagen has dragged its feet in responding to consumers and guiding them through this fraud and its fallout. Immediately, Hagens Berman took a leadership role in supplying the public with quick, direct information about the litigation and VW's deceit via our VW Owner Resource Hub on our website. Beginning day one, our firm published videos (receiving more than 18,500 views) to alert the public and announce the filing of our case.

    The VW Owner Resource Hub includes a 49-question FAQ, developed by our legal team proactively to answer anticipated questions from owners. We have continued to disseminate timely information, including updated lists of affected vehicles, letters from VW and Audi, transcriptions of VW CEO's testimony to Congress, daily headlines, and responses from VW's legal team on their TDI Goodwill Package and arbitration language—all to make the fraud and

surrounding case as comprehensible as possible to those affected. Hagens Berman also routinely sends e-newsletters to owners who sign up to receive updates about the case, with breaking news and important case information—our last ten emails reached 62,606 VW owners.

My team responded to thousands of emails, phone calls and online questions, taking time each day to answer individual class members' inquiries. Our organized group then took these concerns and augmented the VW Owner FAQ section, sharing common questions with our growing list of clients and web visitors.

Seeing a need for conversation about the litigation, Hagens Berman also started the hashtag #AskBerman on social media to allow VW owners to share questions and concerns both with the firm and each other, offering a quick and easy sounding board and forum for the latest case updates. This allowed our team to respond to our clients in the methods easiest to them, be it phone, email or lightning-quick social media. But it also established the first global platform where affected VW owners could connect *with each other*.

The VW Owner Resource Hub has been used by thousands of visitors each day. To date, it has received 151,127 views in total. The thoroughness of our information led our FAQ and Hub webpages to rank #1 on Google for relevant key search terms like "VW lawsuit" and "Volkswagen Class Action," further making these resources easy to find and access. More than 18,500 viewers have watched our VW case videos, in which I discuss the VW TDI Goodwill Package, potential recovery, and other updates with VW owners.

Our firm has been committed to shining a light on this issue from the start and making sure that VW owners have been engaged in the process and informed about the litigation. All of these components have made Hagens Berman the go-to resource for owners of affected vehicles during this crisis. When Volkswagen refused to take a stand, my firm responded quickly and put the needs of consumers first. Our outreach and assistance to VW owners led to a flood of requests for information and representation. Nearly 20,000 VW owners have provided us with their contact information and asked us to keep them apprised of events in the case. As of today, over 8,620 VW owners have retained us to represent them and that number increases on a daily basis.

We have not sat idle on the large contact list we have amassed. We continue to actively reach out to help VW owners any way we can. We received calls from servicemen and servicewomen assigned to overseas duty and who had taken their affected VWs with them. They wondered if they could participate in the VW TDI Goodwill Package that provided $500 in cash and $500 in dealer incentives, but required owners to visit a dealer to get signed up. We called VW's lawyers and insisted these owners be included. VW agreed, and soon after announced a policy allowing US servicemen and servicewomen overseas to participate in the TDI Goodwill Package without visiting a dealership.

We've dug deeper into the case, not just into what VW did, but what VW owners thought VW should do now to make it better. We authored and sent a damages survey to our clients, asking *them* what would be a fair resolution. With over 3,550 responses, we have unmatched insight into what the Class thinks is fair. We have extensively investigated the defeat device and the possible fixes; retained the leading experts for emissions testing, including a 30-year veteran of EPA and CARB who was the director of CARB's emissions regulations program for 25 years; and exclusively retained the leading expert on economic loss in auto-defect cases. Now that CARB has rejected VW's first pass at getting a fix approved, this expert team will be even more critical to a successful resolution of the case.

In short, no applicant or firm matches the work my VW team has done in identifying or investigating potential claims in the action.

Likewise, when it comes to "counsel's knowledge of the applicable law," under Rule 23(g)(1)(A)(iii), I and my firm again stand out. As a result of leading *Toyota*, *GM*, and *Hyundai/Kia*, we have lived and breathed automotive economic loss cases on a daily basis for the last seven years. Though *Hyundai/Kia* centered on violation of EPA testing protocols for fuel efficiency, the analogue to emissions testing is readily apparent. As settlement counsel in that case, we gained critical knowledge of the interplay between an automobile manufacturer and the EPA, while simultaneously driving the resolution of a parallel class action MDL.

Some firms and lawyers tout their settlement and negotiation skills, and many have settled very impressive large and international cases *in other areas of law*. But when it comes to settling nationwide auto defect economic loss cases, the field grows very small. The *Toyota SUA* settlement is the largest ever to date. *Hyundai/Kia* is the second largest. I am the only applicant before the Court who was at the table for both of those cases. My firm's resources are acutely focused on the myriad legal and factual issues involved in an auto-defect case and can be immediately brought to bear in this case.

Our expertise in auto-defect litigation would no doubt aid settlement, but it also makes us the leading choice to take a case like VW to trial. This is why I was selected, among many of the same lawyers who seek leadership here, as co-lead trial counsel in the first bellwether case in the *GM* litigation. A genuine threat of trial is and will be critical in driving VW to bring an appropriate offer to any settlement discussion. Creating a genuine threat of trial led me to spend weeks in Toyota's code-vault reviewing source code for errors. I will not hesitate to spend the time necessary in Wolfsburg to understand every nuance of this case to create for this case that genuine threat of trial.

Finally, several attorneys have recently filed "reply" letters advocating the appointment of another attorney. While I cannot say if it is the case here, I have seen in the past where such support stemmed from agreements concerning division of work, which I believe hinder the efficient management of resources and costs. Thus, I am not writing to advocate for any others, and I have not asked any other lawyers to write replies advocating for me.

I firmly believe that if VW owners were asked to choose lead counsel, they would choose me and my team. Not just because we can show we have the experience and know the law, but also because we have fought for them from day one—just as we fought for the Toyota class members, and today fight for GM class members. They know us and they trust us to fight for them, which is why over 8,620 VW Owners have already made their choice.

Thank you for your ongoing consideration of my application.

Respectfully,

HAGENS BERMAN SOBOL SHAPIRO LLP

Steve W. Berman