1    Elizabeth J. Cabraser (State Bar No. 083151)
     ecabraser@lchb.com
2    LIEFF CABRASER HEIMANN &
     BERNSTEIN, LLP
3    275 Battery Street, 29th Floor
     San Francisco, CA  94111-3339
4    Telephone:  (415) 956-1000
     Facsimile:  (415) 956-1008
5
     Lead Counsel for Plaintiffs
6    *(Plaintiffs' Steering Committee Members*
     *Listed on Signature Page)*
7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11

12   IN RE: VOLKSWAGEN "CLEAN DIESEL"          MDL 2672 CRB (JSC)
     MARKETING, SALES PRACTICES, AND
13   PRODUCTS LIABILITY LITIGATION             **PLAINTIFFS' NOTICE OF MOTION,
                                               MOTION, AND MEMORANDUM IN
14                                             SUPPORT OF PRELIMINARY
     This Document Relates to:                 APPROVAL OF THE CLASS ACTION
15                                             AGREEMENT AND APPROVAL OF
     ALL CONSUMER AND RESELLER                 CLASS NOTICE**
16   ACTIONS
                                               Hearing: July 26, 2016
17                                             Time:  8:00 a.m.
                                               Courtroom:  6, 17th floor
18
                                               The Honorable Charles R. Breyer
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page(s)**

I.  INTRODUCTION ................................................................................ 1

II.  BACKGROUND AND PROCEDURAL HISTORY ........................................ 4

   A.  Factual Background ................................................................. 4

   B.  Procedural History .................................................................. 5

III.  TERMS OF THE SETTLEMENT .......................................................... 7

   A.  The Class Definition ................................................................ 7

   B.  Benefits to Class Members ...................................................... 8

IV.  THE SETTLEMENT MERITS PRELIMINARY APPROVAL ...................... 11

   A.  The Class Action Settlement Process....................................... 11

   B.  The Standard For Preliminary Approval................................... 12

   C.  The Settlement Is Substantively Fair Because It Provides Very Significant Benefits In Exchange For The Compromise Of Strong Claims.............................. 14

   D.  The Settlement Is The Product Of Good Faith, Informed, And Arm's-Length Negotiations, and It Is Procedurally Fair ................. 17

V.  THE COURT SHOULD CERTIFY THE CLASS ....................................... 18

   A.  The Class Meets The Requirements Of Rule 23(a) ................... 19

     1.  The Class Is Sufficiently Numerous ............................... 19

     2.  There Are Common Questions of Both Law and Fact....... 19

     3.  The Settlement Class Representatives' Claims Are Typical of Other Class Members' Claims .................... 21

     4.  The Settlement Class Representatives and Class Counsel Will Fairly and Adequately Protect the Interests of the Settlement Class............................. 22

       a.  The Interests of the Settlement Class Representatives Are Directly Aligned with those of the Absent Class Members and the Settlement Class Representatives Have Diligently Pursued the Action on Their Behalf ................ 23

       b.  Class Counsel Are Qualified To Serve as Settlement Class Counsel .... 23

   B.  The Requirements Of Rule 23(b)(3) Are Met........................... 24

     1.  Common Issues of Law and Fact Predominate................. 24

     2.  Class Treatment Is Superior in This Case ....................... 27

VI.  THE PROPOSED NOTICE PROGRAM PROVIDES THE BEST PRACTICABLE NOTICE IN PLAIN LANGUAGE, BY DIRECT MAIL AND EXTENSIVE PULICATION ................. 29

VII.  THE PROPOSED FINAL APPROVAL HEARING SCHEDULE................. 32

VIII.  CONCLUSION ............................................................................. 33

CERTIFICATE OF SERVICE ................................................................ 36

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amchem Prods. v. Windsor*,
  521 U.S. 591 (1997) ........................................................................................ 19, 26

*Astiana v. Kashi Co.*,
  291 F.R.D. 493 (S.D. Cal. 2013) ............................................................................ 21

*Butler v. Sears, Roebuck & Co.*,
  702 F.3d 359 (7th Cir. 2012) .................................................................................. 25

*Cartwright v. Viking Indus.*,
  No. 2:07-CV-02159-FCD-EFB, 2009 WL 2982887 (E.D. Cal. Sept. 14, 2009) ................... 28

*Churchill Vill., L.L.C., v. GE*,
  361 F.3d 566 (9th Cir. 2004) .................................................................................. 29

*Class Plaintiffs v. City of Seattle*,
  955 F.2d 1268 (9th Cir. 1992) ................................................................................ 11

*Clemens v. DaimlerChrysler Corp.*,
  534 F.3d 1017 (9th Cir. 2008) ................................................................................ 16

*Clemens v. Hair Club for Men, LLC*,
  No. C 15-01431 WHA, 2016 WL 1461944 (N.D. Cal. Apr. 14, 2016) ........................... 23, 24

*Cohen v. Trump*,
  303 F.R.D. 376 (S.D. Cal. 2014) ............................................................................ 21

*Ellis v. Naval Air Rework Facility*,
  87 F.R.D. 15 (N.D.Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981) ............................... 13

*Estrella v. Freedom Fin'l Network*,
  No. C 09-03156 SI, 2010 WL 2231790 (N.D. Cal. June 2, 2010) .................................. 20

*Friedman v. 24 Hour Fitness USA, Inc.*,
  No. CV 06-6282 AHM (CTx), 2009 WL 2711956 (C.D. Cal. Aug. 25, 2009) ..................... 27

*Guido v. L'Oreal, USA, Inc.*,
  284 F.R.D. 468 (C.D. Cal. 2012) ............................................................................ 21

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ........................................................................... passim

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) .................................................................................. 22

*In re Bluetooth Headset Prods. Liab. Litig.*,
  654 F.3d 935 (9th Cir. 2011) .................................................................................. 18

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  No. C-07-5944-SC, 2016 U.S. Dist. LEXIS 9944 (N.D. Cal. Jan. 6, 2016) ....................... 26

*In re First Alliance Mortg. Co.*,
  471 F.3d 977 (9th Cir. 2006) .................................................................................. 26

*In re Hewlett-Packard Co. S'holder Derivative Litig.*,
  No. 3:12-CV-06003-CRB, 2015 WL 1153864 (N.D. Cal. Mar. 13, 2015) ......................... 13

*In re Netflix Privacy Litig.*,
  No. 5:11-CV-00379 EJD, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) .......................... 12

*In re NFL Players Concussion Injury Litig.*, 2016 WL 1552205, at *26 (3d Cir. Apr.
  18, 2016) ......................................................................................................... 11

*In re Rambus Inc. Derivative Litig.*,
  No. C–06–3515-JF, 2009 WL 166689 (N.D. Cal. Jan. 20, 2009) ................................... 12

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re Syncor ERISA Litig.,*
516 F.3d 1095 (9th Cir. 2008)..............................................................11

*In re Tableware Antitrust Litig.,*
484 F. Supp. 2d 1078 (N.D. Cal. 2007) ...............................12, 13, 14

*In re Transpacific Passenger Air Transp. Antitrust Litig.,*
No. C 07-05634 CRB, 2015 WL 3396829 (N.D. Cal. May 26, 2015) .................................26

*In re Wells Fargo Home Mortg. Overtime Pay Litig.,*
527 F. Supp. 2d 1053 (N.D. Cal. 2007) ...............................................28

*International Molders' & Allied Workers' Local Union No. 164 v. Nelson,*
102 F.R.D. 457 (N.D. Cal. 1983)..........................................................21

*Jones v. Amalgamated Warbasse Houses, Inc.,*
97 F.R.D. 355 (E.D.N.Y. 1982) ...........................................................17

*Keegan v. Am. Honda Motor Co.,*
838 F. Supp. 2d 929 (C.D. Cal. 2012) ..................................................16

*Kim v. Space Pencil, Inc.,*
No. C 11-03796 LB, 2012 WL 5948951 (N.D. Cal. Nov. 28, 2012)..................................15

*Klay v. Humana, Inc.,*
382 F.3d 1241 (11th Cir. 2004)............................................................27

*Kruger v. Subaru of Am.,*
996 F. Supp. 451 (E.D. Pa. 1998) ........................................................16

*Kruse v. Chevrolet Motor Div.,*
Civil Action No. 96-1474, 1997 WL 408039 (E.D. Pa. July 17, 1997)...............................16

*Lane v. Facebook, Inc.,*
696 F.3d 811, 819 (9th Cir. 2012), *cert. denied,* 134 S.Ct. 8 (2013) .....................................13

*Leuthold v. Destination Am., Inc.,*
224 F.R.D. 462 (N.D. Cal. 2004)..........................................................27

*Marshall v. Holiday Magic, Inc.,*
550 F.2d 1173 (9th Cir. 1977)..............................................................17

*Mego Financial Corp. Sec. Litig.,*
213 F.3d 454 (9th Cir. 2000)..............................................12, 14, 15, 17

*Mendoza v. Tucson Sch. Dist. No. 1,*
623 F.3d 1338 (9th Cir. 1980) .............................................................29

*Moreno v. Autozone, Inc.,*
251 F.R.D. 417 (N.D. Cal. 2008) .........................................................28

*Mullane v. Central Hanover Bank & Trust Co.,*
339 U.S. 306 (1950)............................................................................29

*Negrete v. Allianz Life Ins. Co. of N. Am.,*
238 F.R.D. 482 (C.D. Cal. 2006) .........................................................21

*Nobles v. MBNA Corp.,*
No. C 06-3723 CRB, 2009 WL 1854965 (N.D. Cal. June 29, 2009) ............................13, 15

*Officers for Justice v. Civil Service Comm'n,*
688 F.2d 615 (9th Cir. 1982)..............................................12, 13, 14

*Parsons v. Ryan,*
754 F.3d at 657 (9th Cir. 2014)........................................................21, 22

*Pha v. Yang,*
2015 U.S. Dist. LEXIS 109074 (E.D. Cal. Aug. 17, 2015) .................................18

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Pierce v. Rosetta Stone, Ltd.*,
 No. C 11-01283 SBA, 2013 WL 5402120 (N.D. Cal. Sept. 26, 2013) ................................. 18

*Ries v. Arizona Beverages USA LLC*,
 287 F.R.D. 523 (N.D. Cal. 2012) ........................................................................................ 21

*Robbins v. Hyundai Motor America, Inc.*,
 2015 WL 304142 (C.D. Cal. Jan. 14, 2015) ........................................................................ 16

*Rodman v. Safeway, Inc.*,
 No. 11-cv-03003-JST, 2014 WL 988992 (N.D. Cal. Mar. 9, 2014) ..................................... 26

*Rodriguez v. Hayes*,
 591 F.3d 1105 (9th Cir. 2010) ............................................................................................. 22

*Rosales v. El Rancho Farms*,
 No. 1:09-cv-00707-AWI-JLT, 2015 WL 446091 (E.D. Cal. July 21, 2015) ...................... 18

*Rupay v. Volkswagen Group of America Inc.*,
 2012 WL 10634428 (C.D. Cal. Nov. 15, 2012) .................................................................. 16

*Slaven v. BP Am., Inc.*,
 190 F.R.D. 649 (C.D. Cal. 2000) ........................................................................................ 19

*Smith v. Cardinal Logistics Mgmt. Corp.*,
 No. 07-2104 SC, 2008 WL 4156364 (N.D. Cal. Sept. 5, 2008) .......................................... 28

*Spalding v. City of Oakland*,
 No. C11-2867 TEH, 2012 WL 994644 (N.D. Cal. Mar. 23, 2012) ...................................... 21

*Staton v. Boeing Co.*,
 327 F.3d 938 (9th Cir. 2003) .......................................................................................... 13, 23

*Stockwell v. City & County of San Francisco*,
 749 F.3d 1107 (9th Cir. 2014) ............................................................................................. 20

*Suchanek v. Sturm Foods, Inc.*,
 764 F.3d 750 (7th Cir. 2014) ............................................................................................... 21

*Sullivan v. DB Invs., Inc.*,
 667 F.3d 273 (3d Cir. 2011), *cert denied sub nom.*, *Murray v. Sullivan*, 132 S. Ct.
 1876 (2012) ..................................................................................................................... 25, 26

*Sykes v. Mel Harris & Assocs. LLC*,
 285 F.R.D. 279 (S.D.N.Y. 2012) ........................................................................................ 21

*Trosper v. Styker Corp.*,
 No. 13-CV-0607-LHK, 2014 WL 4145448 (N.D. Cal. Aug. 21, 2014) ......................... 23, 27

*Tyson Foods, Inc. v. Bouaphakeo*,
 __U.S.__, 136 S. Ct. 1036 (2016) ...................................................................................... 25

*UAW v. GMC*,
 497 F.3d 615 (6th Cir. 2007) ............................................................................................... 15

*Wakefield v. Wells Fargo & Co.*,
 No. C 12-05053 LB, 2014 WL 7240339 (N.D. Cal. Dec. 18, 2014) .................................... 26

*Walker v. Life Ins. Co. of the Sw.*,
 No. CV 10-9198 JVS (RNBx), 2012 WL 7170602 (C.D. Cal. Nov. 9, 2012) ..................... 28

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 338 (2011) ....................................................................................................... 20, 21

*Wolin v. Jaguar Land Rover N. Am., LLC*,
 617 F.3d 1168 (9th Cir. 2010) ............................................................................................. 27

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

**STATUTES**

49 U.S.C. § 30120(a)(1)(A)(iii) ............................................................................ 16

Cal. Civ. Code § 1793.2(d)(2)(C) ..................................................................... 15, 16

**RULES**

Fed. R. Civ. P. 23(a) ................................................................................... 19, 24

Fed. R. Civ. P. 23(a)(1) ..................................................................................... 19

Fed. R. Civ. P. 23(a)(2) ..................................................................................... 20

Fed. R. Civ. P. 23(a)(3) ..................................................................................... 22

Fed. R. Civ. P. 23(a)(4) ................................................................................ 22, 23

Fed. R. Civ. P. 23(b)(3) ............................................................. 19, 25, 27, 29

Fed. R. Civ. P. 23(c)(2)(B) ......................................................................... 29, 30

Fed. R. Civ. P. 23(e) ................................................................................... 11, 12

Fed. R. Civ. P. 23(e)(1) ..................................................................................... 29

Fed. R. Civ. P. 23(g) ........................................................................................ 24

**TREATISES**

2 W. Rubenstein, *Newberg on Class Actions* §4:49 (5th ed. 2012) ............................................ 25

4 Herbert B. Newberg & Alba Conte,
  *Newberg on Class Actions* ("*Newberg*") §11:41 (4th ed. 2002) ............................................ 11

7AA C. Wright, A. Miller, & M. Kane,
  Federal Practice & Procedure §1778, at 123-24 (3d ed. 2005) ............................................ 25

*Manual for Complex Litigation (Fourth)* (2004) ........................................................ passim

*Manual for Complex Litigation (Second)*, § 30.44 (1985) ............................................... 12

## NOTICE OF MOTION AND MOTION

TO THE ALL PARTIES AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on July 26, 2016, at 8:00 a.m., or at such other date as may be agreed upon, in Courtroom 6 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Lead Counsel and the Plaintiffs' Steering Committee, on behalf of a proposed Settlement Class of certain owners and lessees of Volkswagen and Audi branded 2.0-liter TDI vehicles defined in the Class Action Settlement, will and hereby do move the Court for an order granting preliminary approval of the Class Action Settlement, provisionally certifying the Class, directing notice to the Class, and scheduling a fairness hearing.

As discussed in the attached Memorandum and Points of Authorities, the Parties have reached an historic settlement that remediates past environmental harm, minimizes future environmental harm, and compensates consumers for their losses.  Moreover, the proposed notice program, which includes direct mail notice and an extensive media outreach, is the best notice practicable under the circumstances. The proposed Settlement Class Representatives thus respectfully request that the Court grant preliminary approval, provisionally certify the Class, direct notice to the Class, and schedule a fairness hearing.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

For six years, Volkswagen sold its Volkswagen and Audi branded TDI diesel vehicles in the U.S. with resounding success. These cars were marketed as fuel-efficient, safe, well-performing, and reliable cars, and in all these respects, they delivered. In one respect, they deceived. The Volkswagen and Audi TDI were also marketed as "clean diesels," while in fact they violated federal and state emissions rules. The more TDI owners drove, the more environment was harmed.

When this deception was publicly disclosed on September 18, 2015, the owners and lessees alleged harm too, because the market value of their cars dropped.  The mission of these resulting MDL proceedings, comprised of hundreds of consumer suits, and actions by the United

States Department of Justice ("DOJ") on behalf of the United States Environmental Protection Agency ("EPA"), the Federal Trade Commission ("FTC"), and the State of California by and through the California Air Resources Board ("CARB") and California's Office of the Attorney General, has been, as the Court has acknowledged and urged, to "get[] the polluting cars fixed or off the road" and to compensate Volkswagen's aggrieved customers.  March 24, 2016, Status Conference Hr'g Tr. 8:20-21 (Dkt. 1384).

The proposed class action settlement (the "Settlement" or "Class Action Agreement"), and the related EPA/CARB and FTC agreements with Volkswagen, combine to accomplish this environmentally restorative goal in the speediest practicable manner, without the delays, uncertainties, and enforcement problems of protracted litigation. They do so in three ways, summarized here and described more fully in this brief and the Settlement:

1.      Repairing the environmental harm by paying TDI owners and lessees to make their cars emissions compliant by choosing to have Volkswagen install, at its expense, EPA-approved emissions modifications as these become available;

2.      Enabling TDI owners to recoup their lost vehicle value by selling back their operable cars, regardless of condition, to Volkswagen at September 2015 NADA Clean Trade (pre-"scandal") values, with a cash payment on top of this frozen-in-time, vehicle- specific value. Cars recovered by Volkswagen in this "buyback" program cannot be resold, anywhere in the world, unless they are fixed to EPA standards; and

3.      Pursuant to Volkswagen's agreement with the DOJ, requiring Volkswagen to pay a total of $4.7 Billion, (on top of the $10.033 billion funding pool for the Buyback and Emissions Modification program) in environmental reparations, to be administered and enforced by the EPA.

This historic and extraordinary litigation resolving all 2.0-liter TDI claims against Volkswagen, has now reached a partial resolution[1] that represents the largest auto-related class action settlement in U.S. history.  The settlement was achieved through an historic and

---

[1] Plaintiffs' unreleased claims include those concerning 3.0-liter vehicles and all claims against Robert Bosch, LLC, Robert Bosch GmbH, and Volkmar Denner.

extraordinary collaboration among private litigants, DOJ, EPA, CARB and FTC, all facilitated by the diligence of the Court and its specially appointed Settlement Master.  The Settlement, in combination with the related and simultaneously-negotiated FTC Consent Order and DOJ Consent Decree (together, the "Settlements"), are valued at approximately $15 billion, resolve Class Members'[2] claims pertaining to Volkswagen and Audi 2.0-liter TDI vehicles ("Eligible Vehicles") against Volkswagen and honor consumer choice by providing owners and lessees with the options of either a "buyback" or "fix" of their vehicles, while also providing them additional compensation in the form of substantial restitution payments.  The Settlements require Volkswagen to create a $10.033 billion Funding Pool, and also to pay an additional $4.7 billion to environmental remediation and zero emission technology initiatives, to ensure significant ecological mitigation and future environmental protection.[3]

The Settlement comes only nine months after news of Volkswagen's diesel scandal broke, and only five months after this Court appointed Lead Counsel and the Plaintiffs' Steering Committee ("PSC") (together, "Class Counsel").  However, the truncated time frame within which the Settlement was reached belies the Herculean efforts undertaken by Class Counsel and others, including defense counsel, counsel on behalf of multiple government entities, Settlement Master Mueller and his team, and the Court.  Indeed, for the past five months, weekends and weekdays were synonymous and holidays did not exist, as every day that passed without a resolution was another day that the Eligible Vehicles were spewing excessive levels of harmful pollutants into the atmosphere.  The hours worked by Class Counsel (and, indeed, by counsel for all settling parties) are more typical of a multi-year complex litigation than a multi-month litigation.  While these intensive settlement efforts went on around the clock, the litigation did not

---

[2] Capitalized terms have the meaning ascribed to them in Section 2 of the Class Action Settlement.

[3] In addition, a consortium of Attorneys General have reached a related agreement to resolve their states' unfair and deceptive practice act claims against both Volkswagen and Porsche in exchange for (1) $1,100 for each 2.0- and 3.0-liter vehicle originally sold or leased in the participating states prior to September 18, 2015, (2) payment of $20,000,000 to the National Association of Attorneys General ("NAAG"), and (3) an injunction against future unfair and deceptive acts or practices.  The Attorneys General settlement increases the total value of the Settlements to well over $15 billion.

halt—the PSC continued its brisk pace of factual investigation, document review and analysis, and continued to build the case against settling and non-settling Defendants alike.  Class Counsel have, without question, fulfilled (and will continue to fulfill) their commitment to the Court to personally devote their own time, and the time and resources of their respective firms, towards the litigation and resolution of this case.

Plaintiffs are proud to present the Settlement to the Court and respectfully request its approval.  For the reasons explained herein, pursuant to Rule 23 of the Federal Rules of Civil Procedure, this Court should enter an order preliminarily approving the Settlement, provisionally certifying the Settlement Class, directing notice of Settlement to the Class in the manner proposed herein, and setting a schedule for final approval of the Settlement.

## II.      BACKGROUND AND PROCEDURAL HISTORY

### A.      Factual Background

As alleged in the Consolidated Consumer Class Action Complaint (the "Complaint") (Dkt. 1230), this multidistrict litigation arises from Volkswagen's deliberate use of a Defeat Device, a secretly embedded software algorithm installed in its TDI "clean diesel" vehicles that was designed to cheat emissions tests and fool regulators into approving for sale and lease hundreds of thousands of non-compliant Eligible Vehicles.  The Defeat Device engages emission controls to temporarily lower emissions when the TDI engines are being tested, and then deactivates the emission controls when the cars return to normal driving conditions.  Volkswagen was able to obtain Certificates of Conformity ("COCs") from the EPA, and Executive Orders ("EOs") from CARB, only by using the Defeat Device, by misrepresenting the true levels of emissions from the Eligible Vehicles, and by concealing the use of the Defeat Device in its certification applications.  With the Defeat Devices installed and the emissions controls deactivated during normal use, the Eligible Vehicles polluted at an alarming rate of up to forty times the legal limit. And yet, all the while, Volkswagen deceptively pitched itself—through an extensive, worldwide advertising campaign—as the world's foremost innovator of "clean" diesel technology to hundreds of thousands of consumers who paid a premium to purchase or lease what they believed to be "clean" diesel vehicles.

1    From 2009-2015, Volkswagen's Defeat Device scheme remained hidden, and the Eligible

2    Vehicles were sold and leased at record numbers to Class Members.  Even after road tests

3    uncovered that the TDI engines were actually spewing up to 40 times the allowable limits of

4    pollutants during normal road driving, Volkswagen continued to obfuscate the truth and mislead

5    regulators and consumers for over a year.  Finally, after running out of plausible excuses for the

6    discrepancies in the test results, Volkswagen was forced to admit its fraudulent conduct to

7    Congress, to regulators, and to consumers who purchased and leased vehicles equipped with so-

8    called "clean" diesel engines.

9           **B.      Procedural History**

10          On September 3, 2015, Volkswagen officials formally disclosed to EPA and CARB that it

11   had installed Defeat Device software in the Eligible Vehicles.  On September 18, 2015, the EPA

12   issued a Notice of Violation of the Clean Air Act ("CAA") and CARB sent a letter advising that it

13   had initiated an enforcement investigation of Volkswagen.  In the months that followed,

14   consumers filed over 500 class action lawsuits against Volkswagen across the United States, with

15   101 of those lawsuits filed in the state of California alone.  Since Volkswagen's revelation of its

16   scheme, DOJ filed a complaint at the request of the EPA for violations of the CAA, FTC filed a

17   complaint for violations of the FTC Act, California and other state attorneys general announced

18   investigations or filed lawsuits.  Many other domestic and foreign government entities also

19   launched criminal and civil investigations of Volkswagen and related individuals and entities

20   around the world.

21          On December 8, 2015, the Judicial Panel on Multidistrict Litigation transferred all related

22   federal actions (including over 500 putative class actions) to the Northern District of California for

23   coordinated pretrial proceedings before this Court.  Dkt. 1.  On January 19, 2016, the Court

24   appointed former FBI Director Robert S. Mueller as Settlement Master to attempt to facilitate a

25   settlement between the parties.  Dkt. 797.  On January 21, 2016, the Court appointed Plaintiffs'

26   Lead Counsel and the PSC.  Dkt. 1084.

27          In the weeks and months that followed, a fully-deployed PSC worked tirelessly both to

28   prosecute the civil cases on behalf of consumers and to work with Volkswagen, federal and state

1    agencies, and the Settlement Master to try to resolve some or all of the claims asserted in this

2    litigation.  Lead Counsel created more than a dozen PSC working groups to ensure that the

3    prosecution and settlement tracks proceeded in parallel, and that the enormous amount of work

4    that needed to be done in a very short period of time was done in the most organized and efficient

5    manner possible.  Those working groups focused simultaneously on both litigation and settlement

6    tasks, including drafting the consolidated class complaints; serving, responding to, and reviewing

7    voluminous discovery; analyzing economic damages (and retaining experts concerning those

8    issues); reviewing Volkswagen's financial condition and ability to pay any settlement or

9    judgment; assessing technical and engineering issues; coordinating with multiple federal and state

10   governmental agencies as well as with plaintiffs in state court actions; and researching

11   environmental issues, among others.

12       On February 22, 2016, Class Counsel filed a 719-page Consolidated Consumer Class

13   Action Complaint asserting claims for fraud, breach of contract, and unjust enrichment, and for

14   violations of The Racketeer Influenced and Corrupt Organizations Act ("RICO"), The Magnuson-

15   Moss Warranty Act ("MMWA"), and all fifty States' consumer protection laws.  Dkt. 1230.  The

16   length of, and detail in, the Complaint reflects the arduous process undertaken by Class Counsel

17   in understanding the factual complexities of the alleged fraud, and researching and developing the

18   various claims at issue and the remedies available to those who were harmed by Volkswagen's

19   conduct.

20       Following the filing of the Complaint, Class Counsel served Volkswagen with extensive

21   written discovery requests, including interrogatories, requests for production, and requests for

22   admissions, and negotiated comprehensive expert, deposition, preservation, confidentiality, and

23   ESI protocols.  To date, Volkswagen has produced almost 12 million pages of documents, and

24   Class Counsel have reviewed and analyzed approximately 70% of them through a massive,

25   around the clock effort.  That effort required the reviewing attorneys not only to understand the

26   legal complexities of the dozens of claims Plaintiffs asserted, but also to master the difficulties

27   and nuances involved when working with documents written in German.  At the same time, Class

28   Counsel responded to Volkswagen's discovery requests, producing documents from 174 named

PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF THE CLASS ACTION
AGREEMENT AND APPROVAL OF CLASS NOTICE

1   Plaintiffs, in addition to compiling information to complete comprehensive fact sheets, which also

2   included document requests, for each named Plaintiff.

3        Under the Settlement Master's guidance and supervision, Lead Counsel and a settlement

4   working group of the PSC engaged in arm's-length settlement negotiations with Volkswagen in

5   an effort to resolve some or all of the consumer claims brought by Plaintiffs.  At the Court's

6   direction, the settlement negotiations began from almost the moment the Court appointed the

7   Settlement Master, Plaintiffs' Lead Counsel, and the PSC in January 2016.  Since that time,

8   settlement discussions have occurred on both coasts of the United States, in person and

9   telephonically, without regard to holidays, weekends, or time zones.  The negotiations have been

10   extraordinarily intense and complex, particularly considering the timeframe and number of issues

11   and parties involved, including attorney representatives from numerous governmental entities.

12   The result of all these meetings and negotiations is an unprecedented trio of settlements with

13   different emphases—including an outstanding Class Settlement for owners and lessees of 2.0-liter

14   TDI vehicles—that converge to achieve a common restorative goal.

15   **III.    TERMS OF THE SETTLEMENT**

16        **A.    The Class Definition**

17        The Settlement Class consists of all persons (including individuals and entities) who, on

18   September 18, 2015, were registered owners or lessees of a Volkswagen or Audi 2.0-liter TDI

19   vehicle in the United States or its territories (an "Eligible Vehicle," defined more fully in the

20   Class Action Agreement), or who, between September 18, 2015, and the end of the Claim Period,

21   become a registered owner of an Eligible Vehicle.  The following entities and individuals are

22   excluded from the Class:

23        (1)    Owners who acquired their Volkswagen or Audi 2.0-liter TDI vehicles after

24   September 18, 2015, and transfer title before participating in the Settlement Program through a

25   Buyback or an Approved Emissions Modification;

26        (2)    Lessees of a Volkswagen or Audi 2.0-liter TDI vehicle that is leased from a

27   leasing company other than VW Credit, Inc.;

28        (3)    Owners whose Volkswagen or Audi 2.0-liter TDI vehicle (i) could not be driven

PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF THE CLASS ACTION
AGREEMENT AND APPROVAL OF CLASS NOTICE

1    under the power of its own 2.0-liter TDI engine on June 28, 2016, or (ii) had a Branded Title of

2    Assembled, Dismantled, Flood, Junk, Rebuilt, Reconstructed, or Salvage on September 18, 2015,

3    and was acquired from a junkyard or salvage yard after September 18, 2015;

4          (4)    Owners who sell or otherwise transfer ownership of their Volkswagen or Audi 2.0-

5    liter TDI vehicle between June 28, 2016, and September 16, 2016 (the "Opt-Out Deadline"),

6    inclusive of those dates;

7          (5)    Volkswagen's officers, directors and employees; Volkswagen's affiliates and

8    affiliates' officers, directors and employees; their distributors and distributors' officers, directors

9    and employees; and Volkswagen Dealers and Volkswagen Dealers' officers and directors;

10         (6)    Judicial officers and their immediate family members and associated court staff

11    assigned to this case; and

12         (7)    Persons or entities who or which timely and properly exclude themselves from the

13    Class as provided in this Agreement.

14         **B.**    **Benefits to Class Members**

15         Pursuant to the Settlement, Volkswagen will provide the following benefits to the Class

16    Members:

17         (1)    Creation of a Funding Pool of $10.033 billion ($10,033,000,000) from which

18    funds will be drawn to compensate Class Members under the Buyback, Lease Termination and

19    Restitution Payment programs, pursuant to the Class Action Settlement Program, as further

20    detailed below;

21         (2)    The provision of an Approved Emissions Modification for Class Members who do

22    not wish to participate in the Buyback or Lease Termination programs, pursuant to the Class

23    Action Settlement Program, as further detailed below;

24         (3)    Payment of $2.7 billion into a Trust whose purpose is to support environmental

25    programs throughout the country that will reduce $NO_X$ in the atmosphere by an amount equal to

26    or greater than the combined $NO_X$ pollution caused by the cars that are the subject of the lawsuit;

27    and

28         (4)    The investment of $2 billion to create infrastructure for and promote public

awareness of zero emissions vehicles.

Class Members will be grouped into three different categories (Eligible Owners, Eligible Sellers, and Eligible Lessees) and compensated as follows:

(1)    Eligible Owners will be offered the choice between (A) a Buyback and Owner Restitution, including substantial loan forgiveness if applicable, or (B) an Approved Emissions Modification and Owner Restitution.

(2)    Eligible Lessees who retain an active lease of an Eligible Vehicle will be offered the choice between (A) a Lease Termination and Lessee Restitution or (B) an Approved Emissions Modification and Lessee Restitution.

(3)    Eligible Lessees who return or have returned an Eligible Vehicle at the conclusion of the lease will be offered Lessee Restitution.

(4)    Eligible Lessees who obtained ownership of their previously leased Eligible Vehicle after June 28, 2016 will be offered an Approved Emissions Modification and Lessee Restitution.

(5)    Eligible Sellers will be offered Seller Restitution.

(6)    Owners whose Eligible Vehicle was totaled and who consequently transferred title of their vehicle to an insurance company after the Opt-Out Deadline, but before the end of the Claim Period, will be offered Owner Restitution but not a Buyback.

The Buyback and Restitution Payment programs will be based on the September 2015 (prior to the disclosure of the existence of the Defeat Device) National Automobile Dealers Association ("NADA") Clean Trade In value of the Eligible Vehicle adjusted for options and mileage ("Vehicle Value"). The Vehicle Value will be fixed as of September 2015 such that the value of Eligible Vehicles will not depreciate throughout the entire settlement claim period. The restitution amounts for owners and lessees will be same regardless of whether they choose a Buyback/Lease Termination or an Approved Emissions Modification.

The following chart summarizes Class Member options and payments:

| Category | Definition | Benefit Options | Restitution Payment |
|---|---|---|---|
| Eligible Owner (bought car on or before September 18, 2015) | Registered owner of an Eligible Vehicle at the time of Buyback or Approved Emissions Modification. | (1) Buyback Vehicle Value + Restitution Payment + Loan Forgiveness if applicable OR (if approved) (2) Emissions Modification Modification to your car to reduce emissions + Restitution Payment | 20% of the Vehicle Value + $2,986.73 $5,100 minimum |
| Eligible Owner (bought car after September 18, 2015) | Registered owner of an Eligible Vehicle at the time of Buyback or Approved Emissions Modification. | (1) Buyback Vehicle Value + Restitution Payment OR (if approved) (2) Emissions Modification Modification to your car to reduce emissions + Restitution Payment | 10% of the Vehicle Value + $1529 + a proportional share of any restitution not claimed by Eligible Sellers $2,550 minimum |
| Eligible Seller | Registered owner of an Eligible Vehicle on September 18, 2015, who transferred vehicle title after September 18, 2015, but before June 28, 2016. | Restitution Payment | 10% of the Vehicle Value + $ 1,493.365 $2,550 minimum |
| Eligible Lessee (currently leases car) | Registered lessee of an Eligible Vehicle, with a lease issued by VW Credit, Inc., at the time of Early Lease Termination or Approved Emissions Modification. | (1) Lease Termination Early termination of the lease without penalty + Restitution Payment OR (if approved) (2) Emissions Modification Modification to your car to reduce emissions + Restitution Payment | 10% of the Vehicle Value (adjusted for options but not mileage) + $1529 |
| Eligible Lessee (formerly leased car) | Registered lessee of an Eligible Vehicle, with a lease issued by VW Credit, Inc., who returned the Eligible Vehicle at the end of the lease on or after September 18, 2015, or purchased the Eligible Vehicle after June 28, 2016. | Restitution Payment | 10% of the Vehicle Value (adjusted for options but not mileage) + $1,529 |

Another extraordinary aspect of this resolution is its treatment of attorneys' fees.  None of the settlement benefits for Class Members will be reduced to pay attorneys' fees or to reimburse

1   expenses of Class Counsel.  Volkswagen will pay attorneys' fees and costs separately and in

2   addition to the Settlement benefits to Class Members.  Class Counsel have not yet conducted any

3   substantive discussions regarding the payment of attorneys' fees with any defendants.  Deferring

4   the discussion of fees until after substantive settlement terms are agreed upon is a practice

5   routinely approved by courts.  *See In re NFL Players Concussion Injury Litig.*, 2016 WL

6   1552205, at \*26 (3d Cir. Apr. 18, 2016), as amended (May 2, 2016).  Class Members will have

7   the opportunity to comment on or object to any fee petition under Fed. R. Civ. P. 23(h) prior to

8   the award of attorneys' fees.

9   **IV.     THE SETTLEMENT MERITS PRELIMINARY APPROVAL**

10          **A.     The Class Action Settlement Process**

11          Pursuant to Federal Rule of Civil Procedure 23(e), class actions "may be settled,

12  voluntarily dismissed, or compromised only with the court's approval."  As a matter of "express

13  public policy," federal courts favor and encourage settlements, particularly in class actions, where

14  the costs, delays, and risks of continued litigation might otherwise overwhelm any potential

15  benefit the class could hope to obtain.  *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276

16  (9th Cir. 1992) (noting the "strong judicial policy that favors settlements, particularly where

17  complex class action litigation is concerned"); *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101

18  (9th Cir. 2008) (same); *see also* 4 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*

19  ("*Newberg*") §11:41 (4th ed. 2002) (same, collecting cases).

20          The *Manual for Complex Litigation (Fourth)* (2004) (the "*Manual*") describes the

21  contemporary three-step procedure for approval of class action settlements: (1) preliminary

22  approval of the proposed settlement; (2) dissemination of the notice of the settlement to class

23  members, providing for, among other things, a period for potential objectors and dissenters to

24  raise challenges to the settlement's reasonableness; and (3) a formal fairness and final settlement

25  approval hearing.  *Id.* at §21.63.  The *Manual* characterizes the preliminary approval stage as an

26  "initial evaluation" of the fairness of the proposed settlement made by the court on the basis of

27  written submissions and informal presentations from the settlement parties.  *Id.* at § 21.632.  The

28  proposed Settlement Class Representatives request that the Court grant preliminary approval of

1  the Settlement and authorize the dissemination of notice of the Settlement to Class Members.

2  The Settlement Class Representatives further request that the Court appoint the undersigned Lead

3  Counsel and the PSC as Class Counsel and the 2.0-liter TDI owners/lessees listed in Exhibit 1 to

4  this Motion as the Settlement Class Representatives.

5          **B.**      **The Standard For Preliminary Approval**

6        Rule 23 of the Federal Rules of Civil Procedure governs a district court's analysis of the

7  fairness of a settlement of a class action.  *See* Fed. R. Civ. P. 23(e).  To approve a class action

8  settlement, the Court must determine whether the settlement is "fundamentally fair, adequate and

9  reasonable."  *In re Rambus Inc. Derivative Litig.*, No. C–06–3515–JF, 2009 WL 166689, at *2

10  (N.D. Cal. Jan. 20, 2009) (citing Fed. R. Civ. P. 23(e)); *see also Mego Financial Corp. Sec. Litig.*,

11  213 F.3d 454, 459 (9th Cir. 2000); *Officers for Justice v. Civil Service Comm'n,* 688 F.2d 615,

12  625 (9th Cir. 1982)).  Preliminary approval of a proposed settlement is the first step in making

13  this determination.

14        If "the proposed settlement appears to be the product of serious, informed, non-collusive

15  negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to

16  class representatives or segments of the class, and falls within the range of possible approval, then

17  the court should direct that the notice be given to the class members of a formal fairness hearing."

18  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007); *see also In re*

19  *Netflix Privacy Litig.*, No. 5:11-CV-00379 EJD, 2013 WL 1120801, at *4 (N.D. Cal. Mar. 18,

20  2013) (applying at preliminary approval a "presumption" of fairness to settlement that was "the

21  product of non-collusive, arms' length negotiations conducted by capable and experienced

22  counsel").  "The preliminary determination establishes an initial presumption of fairness."  *In re*

23  *Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079–80 (citation omitted).  "Although Rule 23

24  imposes strict procedural requirements on the approval of a class settlement, a district court's

25  only role in reviewing the substance of that settlement is to ensure that it is 'fair, adequate, and

26  free from collusion.'"  *Lane v. Facebook, Inc.,* 696 F.3d 811, 819 (9th Cir. 2012), *cert. denied,*

27  134 S.Ct. 8 (2013) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998)); *see*

28  *also In re Hewlett-Packard Co. S'holder Derivative Litig.*, No. 3:12-CV-06003-CRB, 2015 WL

1   1153864 at *5 (N.D. Cal. Mar. 13, 2015) (granting preliminary approval of third amended

2   settlement in derivative action that "appears to represent a fair, reasonable, and adequate

3   resolution" of the claims).

4        When class counsel is experienced and supports the settlement, and the agreement was

5   reached after arm's-length negotiations, courts should give a presumption of fairness to the

6   settlement.  *See Nobles v. MBNA Corp.,* No. C 06-3723 CRB, 2009 WL 1854965, at *6 (N.D.

7   Cal. June 29, 2009); *Ellis v. Naval Air Rework Facility,* 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd,*

8   661 F.2d 939 (9th Cir. 1981).  Additionally, "[i]t is the settlement taken as a whole, rather than

9   the individual component parts, that must be examined for overall fairness."  *Staton v. Boeing*

10  *Co.*, 327 F.3d 938, 952 (9th Cir. 2003).

11       The Ninth Circuit has identified "the strength of the plaintiffs' case; the risk, expense,

12  complexity, and likely duration of further litigation; the risk of maintaining class action status

13  throughout the trial; the amount offered in settlement; the extent of discovery completed and the

14  stage of the proceedings; the experience and views of counsel; the presence of a governmental

15  participant; and the reaction of the class members to the proposed settlement" as factors for

16  determining whether a settlement is, in the final analysis, fair, reasonable, and adequate.  *See*

17  *Hanlon*, 150 F.3d at 1026.  "The relative degree of importance to be attached to any particular

18  factor will depend on the unique circumstances of each case."  *Officers for Justice*, 688 F.2d at

19  625.

20       To determine whether a proposed settlement is "within the range of possible approval,"

21  the Court also ensures it is "not the product of fraud or overreaching by, or collusion between, the

22  negotiating parties."  *Officers for Justice*, 688 F.2d at 625; *see also Mego*, 213 F.3d at 458.  Thus,

23  to preliminarily assess the reasonableness of the parties' proposed settlement, the Court should

24  review both the substance of the deal and the process used to arrive at the settlement.  *See In re*

25  *Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1080 ("preliminary approval . . . has both a

26  procedural and substantive requirement").

27       This Settlement is well within the range of possible approval as a fair, reasonable, and

28  adequate resolution between the parties, and should be preliminarily approved.  All of the relevant

- 13 -

1   factors set forth by the Ninth Circuit for evaluating the fairness of a settlement at the final stage weigh

2   in favor of preliminary approval now, and there can be no doubt that the Settlement was reached in a

3   procedurally fair manner given Settlement Master Mueller's ongoing guidance and assistance.  For

4   these reasons, the Settlement merits preliminary approval.

5
6   **C.      The Settlement Is Substantively Fair Because It Provides Very Significant Benefits In Exchange For The Compromise Of Strong Claims**

7           As noted in the summary of the Settlement terms above, the Settlement, and the related

8   DOJ Consent Decree and FTC Order, compensate Class Members for the loss in market value of

9   the Eligible Vehicles and for Volkswagen's misrepresentations about the environmental

10  characteristics of the Eligible Vehicles; provide for the buyback and potential refit of the Eligible

11  Vehicles to make them compliant with applicable environmental regulations; and result in the

12  creation of a substantial fund for mitigation of the environmental harms caused by excess

13  emissions from the Eligible Vehicles.  This Settlement, rare among civil litigation resolutions,

14  actually undoes harm, as well as compensating loss.  The Settlement's significant benefits are

15  provided in recognition of the strength of Plaintiffs' case on the merits and the likelihood that

16  Plaintiffs would have been able to certify a litigation class, maintain certification through trial,

17  and prevail.  All PSC members, a uniquely experience group including preeminent class action

18  litigators, consumer and environmental advocates, trial lawyers, and auto litigation veterans,

19  support this Settlement, and it is highly uncertain whether the Class would be able to obtain and

20  keep a better outcome through continued litigation, trial, and appeal.  They certainly would not

21  have been able to secure the commencement of the buyback, emissions modification, and

22  remediation program as swiftly as it will take place under the Settlement.  Moreover, while Class

23  Counsel believe in the strength of this case, they recognize that there are always uncertainties in

24  litigation, making compromise of claims in exchange for certain and timely provision to the Class

25  of the significant benefits described herein an unquestionably reasonable outcome.  *See Nobles*,

26  2009 U.S. Dist. LEXIS 59435, at *5 ("The risks and certainty of recovery in continued litigation

27  are factors for the Court to balance in determining whether the Settlement is fair.") (citing *Mego*,

28  213 F.3d at 458; *Kim v. Space Pencil, Inc.*, No. C 11-03796 LB, 2012 WL 5948951, at *15 (N.D.

- 14 -

1    Cal. Nov. 28, 2012) ("The substantial and immediate relief provided to the Class under the

2    Settlement weighs heavily in favor of its approval compared to the inherent risk of continued

3    litigation, trial, and appeal, as well as the financial wherewithal of the defendant.")).

4            Indeed, should Class Counsel prosecute these claims against Volkswagen to conclusion,

5    that recovery would come years in the future and at far greater expense to the environment and

6    the Class.  There is also a risk that a litigation Class would receive less or nothing at all, despite

7    the compelling merit of its claims, not only because of the risks of litigation, but also because of

8    the solvency risks such prolonged and expanding litigation would almost certainly impose upon

9    Volkswagen.  A judgment that bankrupts Volkswagen would be far less satisfying than a

10   settlement that provides meaningful and certain monetary and restorative relief in the here and

11   now.  *See, e.g.*, *UAW v. GMC*, 497 F.3d 615, 632 (6th Cir. 2007) (affirming approval of

12   settlement class and rejecting objections premised on prospect of plaintiffs complete victory on

13   disputed issue because "any such victory would run the risk of being a Pyrrhic one . . . we need

14   not embellish the point by raising the prospect of bankruptcy").

15           Moreover, in addition to the above, there is a risk that any class recovery obtained at trial

16   would be reduced through offsets.  Restitution remedies for automotive defects based on

17   rescission or repurchase calculations are generally subject to offsets for the car owner's use of the

18   vehicle.  For example, under California law, the Song-Beverly Consumer Warranty Act provides

19   for an offset calculated on the basis of the mileage driven.  *See* Cal. Civ. Code § 1793.2(d)(2)(C);

20   *see also Robbins v. Hyundai Motor America, Inc.*, 2015 WL 304142 at *6 (C.D. Cal. Jan. 14,

21   2015); *Rupay v. Volkswagen Group of America Inc.*, 2012 WL 10634428 at *4 (C.D. Cal.

22   Nov. 15, 2012).  State-law-required offsets could also apply to claims under the federal

23   Magnuson Moss Warranty Act ("MMWA"), because while the MMWA effectively creates a

24   federal cause of action to enforce state-law warranty claims, the MMWA applies state substantive

25   law instead of creating substantively different federal warranty standards.  *Clemens v.*

26   *DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) ("claims under the Magnuson–Moss

27   Act stand or fall with . . . express and implied warranty claims under state law"); *Keegan v. Am.*

28   *Honda Motor Co.*, 838 F. Supp. 2d 929, 954 (C.D. Cal. 2012).  Indeed, the MMWA itself defines

the term "refund" as "refunding the actual purchase price (less reasonable depreciation based on actual use where permitted by rules of the Commission).

Further, California's Lemon Law specifically enumerates a method for calculating depreciation on vehicles in § 1793.2(d)(2)(C), while the National Traffic and Motor Vehicle Safety Act likewise notes that, following a safety recall, an available remedy to consumers is to "refund[] the purchase price, less a reasonable allowance for depreciation."  49 U.S.C. § 30120(a)(1)(A)(iii).  Ultimately, any rescission or refund remedy requires that a plaintiff return the product in a comparable condition to what the plaintiff received.  And because a vehicle's value depreciates significantly with use, courts require a reasonable reduction in the refund amount, to account for the depreciation and value provided to the plaintiff.  *See, e.g.*, *Kruger v. Subaru of Am.*, 996 F. Supp. 451, 457 (E.D. Pa. 1998) ("Thus, because the car is unavailable and because the plaintiffs used the car for eight months, thereby depreciating its value, I conclude that the plaintiffs are not entitled to a full refund."); *Kruse v. Chevrolet Motor Div.*, Civil Action No. 96-1474, 1997 WL 408039, at *6 (E.D. Pa. July 15, 1997) ("Awarding damages equal to the full purchase price does not take into account the natural depreciation of the vehicle from normal usage.").  Accordingly, the buyback calculation in the Settlement is both highly favorable to Class Members, and supported by applicable law.  The settlement provides an array of provisions to compensate for the lost market value of the vehicles, and to restore their ongoing value and utility.

Avoiding years of additional litigation in exchange for the certainty of this Settlement now is also important because of the continued environmental damage being caused by the Eligible Vehicles.  The Settlement will get the Eligible Vehicles off the road through a buyback or fix, reducing further environmental damage and air pollution.  And the $2.7 billion allocated to NOx reduction programs effectively will reverse the environmental damage caused by the Eligible Vehicles' excess pollution.

Although the parties are unable to fully evaluate the reactions to the Settlement from Class Members prior to dissemination of the notice of settlement, based on preliminary discussions with Plaintiffs named in the Complaint as well as individuals who filed complaints consolidated in this

1    multidistrict litigation, the initial reaction has been overwhelmingly positive.  Class Counsel are

2    confident that other Class Members will have similarly positive reactions, especially given the

3    real, immediate, and substantial relief the Settlement provides.

4    **D.    The Settlement Is The Product Of Good Faith, Informed, And Arm's-Length**
         **Negotiations, and It Is Procedurally Fair**
5

6    Lead Counsel and the Class Counsel settlement working group engaged in settlement

7    discussions with Volkswagen and government representatives from the EPA, CARB, and the

8    FTC, under Settlement Master Mueller's guidance and supervision.  Class Counsel also have

9    analyzed huge volumes of discovery material that has provided them sufficient information to

10   enter into a reasoned and well-informed settlement.  *See, e.g.*, *Mego*, 213 F.3d at 459 (holding

11   "significant investigation, discovery and research" supported "district court's conclusion that the

12   Plaintiffs had sufficient information to make an informed decision about the Settlement").

13   Participation of government entities in the settlement process weighs highly in favor of

14   granting preliminary approval.  *See, e.g.*, *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178

15   (9th Cir. 1977) ("The participation of a government agency serves to protect the interests of the

16   class members, particularly absentees, and approval by the agency is an important factor for the

17   court's consideration.") (citation omitted); *Jones v. Amalgamated Warbasse Houses, Inc.*,

18   97 F.R.D. 355, 360 (E.D.N.Y. 1982) ("That a government agency participated in successful

19   compromise negotiations and endorsed their results is a factor weighing heavily in favor of

20   settlement approval—at least where, as here, the agency is 'committed to the protection of the

21   public interest.'") (citation omitted).  So too does a settlement process involving protracted

22   negotiations with the assistance of a court-appointed mediator.  *See Pha v. Yang*, 2015 U.S. Dist.

23   LEXIS 109074, at *13 (E.D. Cal. Aug. 17, 2015) (finding that the fact "the settlement was

24   reached through an arms-length negotiation with the assistance of a mediator through a months-

25   long process . . . weigh[ed] in favor of approval"); *Rosales v. El Rancho Farms*, No. 1:09-cv-

26   00707-AWI-JLT, 2015 WL 446091, at *44 (E.D. Cal. July 21, 2015) ("Notably, the Ninth Circuit

27   has determined the 'presence of a neutral mediator [is] a factor weighing in favor of a finding of

28   non-collusiveness.'") (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th

PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF THE CLASS ACTION
AGREEMENT AND APPROVAL OF CLASS NOTICE

1  Cir. 2011)); *Pierce v. Rosetta Stone, Ltd.*, No. C 11-01283 SBA, 2013 WL 5402120, at *15-16

2  (N.D. Cal. Sept. 26, 2013) (same).

3      Here, settlement negotiations were conducted in good faith, and the Settlement was

4  reached at arms-length with the Court-appointed Settlement Master over the course of months of

5  efforts by the parties.  It is understatement to say that the parties benefited from the assistance of

6  Settlement Master Mueller, who played a crucial role in supervising the negotiations and in

7  helping the parties bridge their differences.

8      Most settlement negotiations take place along two dimensions:  plaintiff versus defendant.

9  These negotiations had at least four.  The negotiations culminating in the related settlements now

10  before the Court transpired along multiple dimensions simultaneously, with three government

11  entities, and the Class, approaching the resolution sometimes alone sometimes together in various

12  combinations with different stances at different times, all to hammer out the best possible

13  resolution from each parties' perspective.  While chaos was prevented by the direction of the

14  Settlement Master and by this Court's repeated directive to move with dispatch, collusion was

15  impossible.

16      Finally, Plaintiffs continue to vigorously prosecute non-settled claims against Volkswagen

17  and other defendants in this litigation, including Volkswagen's corporate affiliate Porsche,

18  Volkswagen's supplier Bosch, and others.  This continued prosecution shows that issues in this

19  case remain contested, and that the Settlement submitted for preliminary approval resulted from

20  vigorous arm's-length negotiations.

21      Taken together, the substantive quality of the Settlement and the procedurally fair manner

22  in which it was reached weigh in favor of granting preliminary approval here.

23  **V.      THE COURT SHOULD CERTIFY THE CLASS**

24      Plaintiffs respectfully request that the Court certify the Class defined in paragraph 2.16 of

25  the Class Action Agreement.  Certification of the Class will allow notice of the Settlement to be

26  issued so that Class Members can be informed of the existence and terms of the Settlement, their

27  right to be heard on its fairness, their right to opt out, and the date, time and place of the fairness

28  hearing.  *Manual*, at §§ 21.632, 21.633.  Rule 23 governs the issue of class certification, whether

1    the proposed class is a litigated class or, as here, a settlement class.  However, when

2    "[c]onfronted with a request for settlement-only class certification, a district court need not

3    inquire whether the case, if tried, would present intractable management problems . . . for the

4    proposal is that there will be no trial."  *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997).

5            Class certification is appropriate where: "(1) the class is so numerous that joinder of all

6    members is impracticable; (2) there are questions of law and fact common to the class; (3) the

7    claims or defenses of the representative parties are typical of the claims or defenses of the class;

8    and (4) the representative parties will fairly and adequately protect the interests of the class."

9    Fed. R. Civ. P. 23(a).  Certification of a class seeking monetary compensation also requires a

10   showing that "questions of law and fact common to class members predominate over any

11   questions affecting only individual members, and that a class action is superior to other available

12   methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  As

13   demonstrated below, the Class readily satisfies each of these requirements, so certification is

14   warranted.

15           **A.     The Class Meets The Requirements Of Rule 23(a)**

16                   **1.     The Class Is Sufficiently Numerous**

17           Rule 23(a)(1) is satisfied when "the class is so numerous that joinder of all class members

18   is impracticable."  Fed. R. Civ. P. 23(a)(1).  Numerosity is generally satisfied when the class

19   exceeds forty members.  *See, e.g.*, *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000).

20   It is undisputed that 475,745 Eligible Vehicles were sold or leased in the U.S., and thus, that the

21   Class consists of hundreds of thousands of members.  The large size of the Class and the

22   geographic dispersal of its members across the United States render joinder impracticable.

23   Therefore, numerosity is easily established.

24                   **2.     There Are Common Questions of Both Law and Fact**

25           "Federal Rule of Civil Procedure 23(a)(2) conditions class certification on demonstrating

26   that members of the proposed class share common 'questions of law or fact.'"  *Stockwell v. City*

27   *& County of San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014).  The "commonality

28   requirement has been 'construed permissively,' and its requirements deemed 'minimal.'"  *Estrella*

1    *v. Freedom Fin'l Network,* No. C 09-03156 SI, 2010 WL 2231790, at *25 (N.D. Cal. June 2,

2    2010) (quoting *Hanlon*, 150 F.3d at 1020).  Indeed, the Supreme Court has held that to satisfy

3    commonality, "'[e]ven a single [common] question' will do."  *Wal-Mart Stores, Inc. v. Dukes*,

4    564 U.S. 338, 359 (2011).  This is because "[w]hat matters to class certification . . . is not the

5    raising of common questions -- even in droves -- but, rather, the capacity of a classwide

6    proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Id.* at 350

7    (emphasis in original) (quotation marks and citations omitted).  Thus, the putative class' "claims

8    must depend upon a common contention . . . of such a nature that it is capable of classwide

9    resolution—which means that determination of its truth or falsity will resolve an issue that is

10   central to the validity of each one of the claims in one stroke."  *Id.* at 349.

11          Here, the claims of the Class all derive directly from Volkswagen's fraudulent scheme to

12   mislead federal and state regulators into approving the Eligible Vehicles for sale or lease through

13   the use of a Defeat Device designed to bypass emission standards and mask the dangerously high

14   levels of pollutants being emitted during normal operating conditions, as well as Volkswagen'

15   concurrent false and misleading marketing campaign that misrepresented and omitted the true

16   nature of the Eligible Vehicles' "clean" diesel engine system.  Volkswagen's common course of

17   conduct raises common questions of law and fact, the resolution of which will generate common

18   answers "apt to drive the resolution of the litigation" for the Class as a whole.  *Dukes*, 564 U.S. at

19   350.  And as Plaintiffs allege that their and the Class's "injuries derive from [D]efendants'

20   alleged 'unitary course of conduct,'" they have "'identified a unifying thread that warrants class

21   treatment.'"  *Sykes v. Mel Harris & Assocs. LLC*, 285 F.R.D. 279, 290 (S.D.N.Y. 2012).

22          Even outside the settlement context, courts routinely find commonality where the class's

23   claims arise from a defendant's uniform course of conduct.  *See, e.g.*, *Negrete v. Allianz Life Ins.*

24   *Co. of N. Am.*, 238 F.R.D. 482, 488 (C.D. Cal. 2006) ("The Court finds that the class members'

25   claims derive from a common core of salient facts, and share many common legal issues. These

26   factual and legal issues include the questions of whether Allianz entered into the alleged

27   conspiracy and whether its actions violated the RICO statute.  The commonality requirement of

28   Rule 23(a)(2) is met.");  *Cohen v. Trump*, 303 F.R.D. 376, 382 (S.D. Cal. 2014) ("Here, Plaintiff

1    argues his RICO claim raises common questions as to 'Trump's scheme and common course of

2    conduct, which ensnared Plaintiff[] and the other Class Members alike.' The Court agrees.");

3    *Spalding v. City of Oakland*, No. C11-2867 TEH, 2012 WL 994644, at *8 (N.D. Cal. Mar. 23,

4    2012) (commonality found where plaintiffs "allege[] a common course of conduct that is

5    amenable to classwide resolution"); *International Molders' & Allied Workers' Local Union No.

6    164 v. Nelson*, 102 F.R.D. 457 (N.D. Cal. 1983) ("commonality requirement is satisfied where it

7    is alleged that the defendants have acted in a uniform manner with respect to the class"); *see also

8    Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (finding that "where the same

9    conduct or practice by the same defendant gives rise to the same kind of claims from all class

10    members, there is a common question").[4] Accordingly, Rule 23's commonality requirement is

11    satisfied here.

12
            **3. The Settlement Class Representatives' Claims Are Typical of Other
13                    Class Members' Claims**

14         "Rule 23(a)(3) requires that 'the claims or defenses of the representative parties are typical

15    of the claims or defenses of the class.'" *Parsons v. Ryan*, 754 F.3d at 657, 685 (9th Cir. 2014)

16    (quoting Fed. R. Civ. P. 23(a)(3)). "Like the commonality requirement, the typicality

17    requirement is 'permissive' and requires only that the representative's claims are 'reasonably co-

18    extensive with those of absent class members; they need not be substantially identical.'"

19    *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quoting *Hanlon*, 150 F.3d at 1020).

20    "The test of typicality is 'whether other members have the same or similar injury, whether the

21    action is based on conduct which is not unique to the named plaintiffs, and whether other class

22    members have been injured by the same course of conduct.'" *Parsons*, 754 F.3d at 685 (quoting

23    *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). Accordingly, "[t]he purpose

24

---

25    [4] Similarly, courts routinely find commonality in cases where uniform misrepresentations and
omissions are employed to deceive the public. *See Ries v. Arizona Beverages USA LLC*, 287
F.R.D. 523, 537 (N.D. Cal. 2012) ("[C]ourts routinely find commonality in false advertising
26    cases."); *Astiana v. Kashi Co.*, 291 F.R.D. 493, 501-02 (S.D. Cal. 2013) (same); *see also Guido v.
L'Oreal, USA, Inc.*, 284 F.R.D. 468, 478 (C.D. Cal. 2012) (whether misrepresentations "are
27    unlawful, deceptive, unfair, or misleading to reasonable consumers are the type of questions
tailored to be answered in 'the capacity of a classwide proceeding to generate common answers
28    apt to drive the resolution of the litigation'") (quoting *Dukes*, 131 S.Ct. at 2551).

of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon*, 976 F.2d at 508.  Thus, where a plaintiff suffered a similar injury and other class members were injured by the same course of conduct, typicality is satisfied. *See Parsons*, 754 F.3d at 685.

Here, the same course of conduct that injured the Settlement Class Representatives also injured other Class Members.  The Settlement Class Representatives, like other Class Members, were the victims of Volkswagen' fraudulent scheme because they purchased or leased an Eligible Vehicle, each of which contained an illegal Defeat Device and produced unlawful levels of $NO_X$ emissions.  The Settlement Class Representatives, like other Class Members, would not have purchased or leased their vehicles had Volkswagen disclosed to government regulators the illegal Defeat Devices and the true nature of the Eligible Vehicles' "clean" diesel engine systems, because without Volkswagen's wrongdoing, the Eligible Vehicles would not have been approved for sale or lease in the U.S.  The Settlement Class Representatives and the other Class Members will similarly benefit from the relief provided by the Settlement.  Accordingly, Rule 23's typicality requirement is satisfied here.

### 4. The Settlement Class Representatives and Class Counsel Will Fairly and Adequately Protect the Interests of the Settlement Class

Finally, Rule 23(a)(4) requires "the representative parties [to] adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "To determine whether the adequacy of representation requirement of Rule 23(a)(4) is satisfied, two questions must be asked '(1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'"  *Clemens v. Hair Club for Men, LLC*, No. C 15-01431 WHA, 2016 WL 1461944, at *6 (N.D. Cal. Apr. 14, 2016) (quoting *Staton*, 327 F.3d at 957).  As discussed below, the answer to each of those questions is a resounding "yes."

a.      **The Interests of the Settlement Class Representatives Are Directly Aligned with those of the Absent Class Members and the Settlement Class Representatives Have Diligently Pursued the Action on Their Behalf**

Plaintiffs do not have any interests antagonistic to the other Class Members and will continue to vigorously protect their interests.  *See Clemens*, 2016 U.S. Dist. LEXIS 50573, at *6. The Settlement Class Representatives and Class Members are entirely aligned in their interest in proving that Volkswagen misled them and share the common goal of obtaining redress for their injuries.

The Settlement Class Representatives understand their duties as class representatives, have agreed to consider the interests of absent Class Members, and have actively participated in this litigation.  For example, the Settlement Class Representatives have provided their counsel with factual information pertaining to their purchase or lease of an Eligible Vehicle to assist in drafting the Complaint.  Furthermore, all representative Plaintiffs were clearly advised of their obligations as class representatives and demonstrated their understanding of those obligations by completing and returning detailed verified Plaintiff Fact Sheets during discovery in this litigation. Plaintiffs also have searched for, and provided, relevant documents and information to their counsel, and have assisted in preparing discovery responses and completing comprehensive fact sheets.  Moreover, Plaintiffs have regularly communicated with their counsel regarding various issues pertaining to this case, and they will continue to do so until the Settlement is approved and its administration completed.  All of this together is more than sufficient to meet the adequacy requirement of Rule 23(a)(4).  *See Trosper v. Styker Corp.*, No. 13-CV-0607-LHK, 2014 WL 4145448, at *43 (N.D. Cal. Aug. 21, 2014) ("All that is necessary is a rudimentary understanding of the present action and . . . a demonstrated willingness to assist counsel in the prosecution of the litigation.").

b.      **Class Counsel Are Qualified To Serve as Settlement Class Counsel**

Class Counsel have already demonstrated their qualifications to the Court.  Lead Counsel and each member of the PSC participated in perhaps the most competitive application process in

- 23 -

1    an MDL ever, during which they described to the Court their qualifications, experience, and

2    commitment to this litigation.  The criteria the Court established and considered in appointing

3    Class Counsel are substantially similar to the considerations set forth in Rule 23(g) governing the

4    appointment of class counsel.  *Compare* Dkt. 336 and 1084, *with Clemens*, 2016 U.S. Dist.

5    LEXIS 50573, at *6.  Class Counsel are highly qualified lawyers who have experience in

6    successfully prosecuting high-stakes complex cases and consumer class actions.  Further, Class

7    Counsel, and their respective law firms, have already undertaken an enormous amount of work,

8    effort and expense in this litigation and have demonstrated their willingness to devote whatever

9    resources are necessary to see this case through to an historic and successful outcome.  *See, e.g.*,

10   May 24, 2016, Status Conference Hr'g Tr. 8:6-14 (Dkt.  1535)  ("Finally, the Court must note

11   that, while it has not and will not make a judgment on the proposed settlements until the

12   appropriate time, it is grateful for the enormous effort of all parties, including the governmental

13   agencies – their efforts to obtain a global resolution of the issues raised by these cases. I have

14   been advised by the Settlement Master that all of you have devoted substantial efforts, weekends,

15   nights, and days, and perhaps at sacrifice to your family.").  Here, the Court need look no further

16   than the significant benefits already obtained for the Class through Class Counsel's zealous and

17   efficient prosecution of this action.  Accordingly, the Court should find that Class Counsel are

18   adequate.

19                    **B.        The Requirements Of Rule 23(b)(3) Are Met**

20           In addition to the requirements of Rule 23(a), the Court must find that the provisions of

21   Rule 23(b) are satisfied.  The Court should certify a Rule 23(b)(3) class when: (i) "questions of

22   law or fact common to class members predominate over any questions affecting only individual

23   members"; and (ii) a class action is "superior to other available methods for fairly and efficiently

24   adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  This case satisfies both the

25   predominance and superiority requirements.

26                    **1.        Common Issues of Law and Fact Predominate**

27           "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in

28   the case are more prevalent or important than the non-common, aggregation-defeating, individual

issues.'" *Tyson Foods, Inc. v. Bouaphakeo*, __U.S.__, 136 S. Ct. 1036 (2016) (quoting 2 W. Rubenstein, *Newberg on Class Actions* §4:49 at 195-96 (5th ed. 2012)).  "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Id.* (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure §1778, at 123-24 (3d ed. 2005)).  Instead, at its core, "[p]redominance is a question of efficiency." *Butler v. Sears, Roebuck & Co.*, 702 F.3d 359, 362 (7th Cir. 2012).  Thus, "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022 (internal quotations and citations omitted).  Accordingly, it is appropriate to certify a single nationwide class of consumers from all fifty States here.

The Rule 23(b)(3) predominance inquiry in the context of the certification of a nationwide settlement class involving various state consumer protection law claims was the subject of an extensive *en banc* decision by the Third Circuit in *Sullivan v. DB Invs., Inc.*, 667 F.3d 273 (3d Cir. 2011), *cert denied sub nom.*, *Murray v. Sullivan*, 132 S. Ct. 1876 (2012).  In affirming certification a nationwide settlement class, the Third Circuit's predominance inquiry was informed by "three guideposts": "first, that commonality is informed by the defendant's conduct as to all class members and any resulting injuries common to all class members; second, that variations in state law do not necessarily defeat predominance; and third, that concerns regarding variations in state law largely dissipate when a court is considering the certification of a settlement class." *Sullivan*, 667 F.3d at 297.  Here, like in *Sullivan*, any material variations in state law do not preclude a finding of predominance given the uniformity of Volkswagen's conduct and the resulting injuries that are common to all Class Members.

Indeed, this Court has adopted the rationale in *Sullivan* that "state law variations are largely 'irrelevant to certification of a settlement class.'" *Id.* at 304 (quoting *Sullivan*, 667 F.3d at 304) (citation omitted).  *See Wakefield v. Wells Fargo & Co.*, No. C 12-05053 LB, 2014 WL

1  7240339, at *12-13 (N.D. Cal. Dec. 18, 2014); *In re Cathode Ray Tube (CRT) Antitrust Litig.*,

2  No. C-07-5944-SC, 2016 U.S. Dist. LEXIS 9944, at *208-09 (N.D. Cal. Jan. 6, 2016), *report and*

3  *recommendation adopted*, 2016 U.S. Dist. LEXIS 9766 (N.D. Cal. Jan. 26, 2016).  Moreover, this

4  Court has agreed that in the settlement context, the Court need not "differentiate[e] within a class

5  based on the strength or weakness of the theories of recovery."  *In re Transpacific Passenger Air*

6  *Transp. Antitrust Litig.*, No. C 07-05634 CRB, 2015 WL 3396829, at *20 (N.D. Cal. May 26,

7  2015) (quoting *Sullivan*, 667 F.3d at 328); *Rodman v. Safeway, Inc.*, No. 11-cv-03003-JST, 2014

8  WL 988992, at *54-56 (N.D. Cal. Mar. 9, 2014) (citing *Sullivan*, 667 F.3d at 304-07).

9          Here, questions of law or fact common to Class Members predominate over any questions

10  affecting only individual members.  Volkswagen's uniform scheme to mislead regulators and

11  consumers by submitting false applications for COCs and EOs, failing to disclose the existence of

12  the illegal Defeat Devices in the Eligible Vehicles, and misrepresenting the levels of $NO_X$

13  emissions of the Eligible Vehicles are central to the claims asserted in the Complaint.  Indeed, the

14  evidence necessary to establish that Volkswagen engaged in a scheme to design, manufacture,

15  market, sell, and lease the Eligible Vehicles with Defeat Devices is common to all Class

16  Members, as is the evidence of the false and misleading statements that Volkswagen used to mass

17  market the Eligible Vehicles.

18          The Ninth Circuit favors class treatment of fraud claims stemming from a "common

19  course of conduct," like the scheme that is alleged by Plaintiffs here.  *See In re First Alliance*

20  *Mortg. Co.*, 471 F.3d 977, 990 (9th Cir. 2006); *Hanlon*, 150 F.3d at 1022-1023..  And, even

21  outside of the settlement context, predominance is readily met in cases asserting RICO and

22  consumer claims arising from a single fraudulent scheme by a defendant that injured each

23  plaintiff.  *See Amchem Prods.*, 521 U.S. at 625; *Wolin v. Jaguar Land Rover N. Am., LLC*, 617

24  F.3d 1168, 1173, 1176 (9th Cir. 2010) (consumer claims based on uniform omissions are readily

25  certifiable where the claims are "susceptible to proof by generalized evidence," even if

26  individualized issues remain); *Friedman v. 24 Hour Fitness USA, Inc.*, No. CV 06-6282 AHM

27  (CTx), 2009 WL 2711956, at *22-23 (C.D. Cal. Aug. 25, 2009) ("Common issues frequently

28  predominate in RICO actions that allege injury as a result of a single fraudulent scheme."); *see*

PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF THE CLASS ACTION
AGREEMENT AND APPROVAL OF CLASS NOTICE

1  *also Klay v. Humana, Inc.*, 382 F.3d 1241, 1256, 1257 (11th Cir. 2004) (upholding class

2  certification of RICO claim where "all of the defendants operate nationwide and allegedly

3  conspired to underpay doctors across the nation, so the numerous factual issues relating to the

4  conspiracy are common to all plaintiffs . . . [and the] "corporate policies [at issue] . . .

5  constitute[d] the very heart of the plaintiffs' RICO claims"). Thus, Plaintiffs have satisfied the

6  predominance requirement.

### 2.  Class Treatment Is Superior in This Case

8  Finally, Rule 23(b)(3) requires a class action to be "superior to other available methods for

9  fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This factor

10  "requires determination of whether the objectives of the particular class action procedure will be

11  achieved in the particular case." *Hanlon*, 150 F.3d at 1023. Under the Rule, "the Court evaluates

12  whether a class action is a superior method of adjudicating plaintiff's claims by evaluating four

13  factors: '(1) the interest of each class member in individually controlling the prosecution or

14  defense of separate actions; (2) the extent and nature of any litigation concerning the controversy

15  already commenced by or against the class; (3) the desirability of concentrating the litigation of

16  the claims in the particular forum; and (4) the difficulties likely to be encountered in the

17  management of a class action.'" *Trosper*, 2014 U.S. Dist. LEXIS 117453, at *62 (quoting

18  *Leuthold v. Destination Am., Inc.*, 224 F.R.D. 462, 469 (N.D. Cal. 2004)).

19  There can be little doubt that class treatment is superior to the litigation of hundreds or

20  thousands of individual consumer actions here. "From either a judicial or litigant viewpoint,

21  there is no advantage in individual members controlling the prosecution of separate actions. There

22  would be less litigation or settlement leverage, significantly reduced resources and no greater

23  prospect for recovery." *Hanlon*, 150 F.3d at 1023; *see also Wolin*, 617 F.3d at 1176 ("Forcing

24  individual vehicle owners to litigate their cases, particularly where common issues predominate

25  for the proposed class, is an inferior method of adjudication."). The damages sought by each

26  class member here, while representing an important purchase to class members, are not so large

27  as to weigh against certification of a class action. *See Smith v. Cardinal Logistics Mgmt. Corp.*,

28  No. 07-2104 SC, 2008 WL 4156364, at *32-33 (N.D. Cal. Sept. 5, 2008) (finding that class

1    members had a small interest in personally controlling the litigation even where the average

2    amount of damages were $25,000-$30,000 per year of work for each class member); *see also*

3    *Walker v. Life Ins. Co. of the Sw.*, No. CV 10-9198 JVS (RNBx), 2012 WL 7170602, at *49 (C.D.

4    Cal. Nov. 9, 2012). The sheer number of separate trials that would otherwise be required also

5    weighs in favor of certification. *Id.*

6         Moreover, all private federal actions seeking relief for the Class have already been

7    transferred to this District for consolidated MDL pretrial proceedings.[5] Dkt. 950. That the

8    Judicial Panel on Multidistrict Litigation consolidated all related consumer cases in an MDL

9    before this Court is a clear indication that a single proceeding is preferable to a multiplicity of

10   individual lawsuits. The government suits are here too, enabling this Court to approve and

11   enforce all of the provisions of each of these settlements. The certification of the Settlement

12   Class enables and completes this advantageous unified jurisdiction.

13        Additionally, the Class is defined by objective, transactional facts—the purchase or lease

14   of an Eligible Vehicle—and there is no dispute that Class Members can easily be identified by

15   reference to the books and records of the Volkswagen and their dealers. Accordingly, the Class is

16   plainly ascertainable. *See Moreno v. Autozone, Inc.*, 251 F.R.D. 417, 421 (N.D. Cal. 2008)

17   (Breyer, J.) ("A class is ascertainable if it identifies a group of unnamed plaintiffs by describing a

18   set of common characteristics sufficient to allow a member of that group to identify himself or

19   herself as having a right to recover based on the description.").

20        Because the class action device provides the superior means to effectively and efficiently

21   resolve this controversy, and as the other requirements of Rule 23 are each satisfied, certification

22   of the Class is appropriate.

23   _____

24   [5] Although several class actions are pending in various state courts, the existence of these actions
     does not defeat a finding of superiority. *See Cartwright v. Viking Indus.*, No. 2:07-CV-02159-

25   FCD-EFB, 2009 WL 2982887, at *44-*50 (E.D. Cal. Sept. 14, 2009) (certifying CLRA, UCL,
     fraudulent concealment, unjust enrichment, and warranty claims despite a concurrent state court

26   class action that certified warranty claims for class treatment); *In re Wells Fargo Home Mortg.
     Overtime Pay Litig.*, 527 F. Supp. 2d 1053, 1069 (N.D. Cal. 2007) (recognizing that courts often

27   certify concurrent FLSA and UCL class actions). Nor does the existence of actions filed by the
     DOJ or FTC preclude a finding of superiority here, as both of those actions are part of the MDL

28   and the proposed Settlement was negotiated with the participation of those government entities.

## VI. THE PROPOSED NOTICE PROGRAM PROVIDES THE BEST PRACTICABLE NOTICE IN PLAIN LANGUAGE, BY DIRECT MAIL AND EXTENSIVE PULICATION

Upon certifying a Rule 23(b)(3) class, Rule 23(c)(2)(B) requires the Court to "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." The best practicable notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to object." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). In addition, Rule 23(e)(1) requires that before a proposed settlement may be approved, the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." In class action settlements, it is common practice to provide a single notice that satisfies both of these notice standards. *Manual*, at § 21.633. Combined notice helps to avoid confusion that separate notifications of certification and settlement may produce. "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and come forward and be heard.'" *Churchill Vill., L.L.C., v. GE*, 361 F.3d 566, 575 (9th Cir. 2004) (quoting *Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.3d 1338, 1352 (9th Cir. 1980)).

The proposed notice program meets these standards. *See* Exhibit 2, Declaration of Shannon Wheatman on Adequacy of the Class Notice Program ("Wheatman Decl."). It consists of, among other things, a Short and Long Form Notice, in addition to a comprehensive Settlement Website (www.VWCourtSettlement.com), that are clear and complete, and that meet all the requirements of Rule 23.

The Long Form Notice is a 30-plus page document that includes a thorough series of questions and answers designed to explain the Settlement in clear terms in a well-organized and reader-friendly format. Among other things, it includes an overview of the litigation, an explanation of the benefits available under the Settlement, and detailed instructions on how to participate in or opt out of the Settlement. The proposed Long Form Notice is attached to the Class Action Agreement as Exhibit 3.

The Short Form Notice, though less comprehensive than the Long Form Notice, also conveys the basic structure of the Settlement and is designed to capture Class Members' attention in newspapers and periodicals with clear, concise, plain language.  It directs readers to the Settlement Website (where the Long Form Notice is available) or a toll-free number for more information.  The Short Form Notice is attached to the Class Action Agreement as Exhibit 2.

Together, these notices cover all of the elements outlined in Rule 23(c)(2)(B), specifically:

- A description of the nature of the case.  *See* Long Form Notice Summary and Question 10;

- The Class definition. *See* Long Form Notice Question 9;

- A description of the class claims, potential outcomes, and the reasons for the Settlement.  *See* Long Form Notice Summary and Questions 44-46;

- A statement concerning the Class Members' rights to recovery.  *See* Long Form Notice Summary and Questions 1, 18-41;

- The names of representatives for Class Counsel who can answer Class Members' questions.  *See* Long Form Notice Question 51;

- The process and procedure for objecting to the Settlement, and appearing at a final fairness hearing, with or without the aid of an attorney. *See* Long Form Notice at Questions 54-58;

- The process and procedure through which a Class Member may opt out of the Settlement.  *See* Long Form Notice  Summary and Question 48; and

- The fact that the final judgment in this case will release all claims against the Volkswagen and bind all Class Members.  *See* Long Form Notice Summary and Question 47.

The proposed method of disseminating this notice is the best practicable method under the circumstances, and includes individual notice to the Class Members who can be identified through reasonable effort.  In sum, the proposed notice distribution plan consists of various parts, including: (1) individual direct mail notice: (2) paid media; (3) earned media and outreach; and (4) a Settlement Website and toll-free phone number.  Wheatman Decl. ¶¶ 18-42.

1   The principal method of reaching Class Members will be through individual direct mail

2   notice.  This is the quintessential objectively defined and readily identifiable class.  *See Manual*

3   *for Complex Litigation (Fourth)* (2004), § 21.222.  A cover letter and copy of the Long Form

4   Notice can and will be sent to the vast majority of Class Members, who are readily identifiable

5   through Volkswagen's records and/or registration data, such as Polk data.  All mailings will be

6   sent via First Class U.S. Mail, and all addresses will be checked against national databases prior

7   to being sent.  Direct notice will also be mailed and/or emailed to Class Members when the EPA

8   and CARB approve or reject Volkswagen's proposed emissions modifications.

9   A robust media campaign focused on stimulating awareness and involvement will

10   supplement the direct mail notice.  The Short Form Notice will appear as a two-color

11   advertisement in various newspapers, including the *The New York Times*, *The Wall Street*

12   *Journal*, *USA Today*, and other newspapers and magazines, as outlined in the Wheatman

13   Declaration and accompanying attachments.  The paid media campaign will also include, among

14   other things, various methods of disseminating online banner advertisements, social media

15   advertising, and sponsored keyword advertisements on major search engines.  An earned media

16   program—described further in the Wheatman Declaration—also will be implemented to amplify

17   the paid media and provide additional notice to Class Members.  Finally, the Notice Program

18   includes a toll-free telephone number as well as a Settlement Website, which contains

19   background information on the case, the Long Form Notice, the Claim Form and other

20   information that Class Members may find useful and relevant to their claims decisions.  An initial

21   launch of the website will coincide with the filing of the Class Action Agreement, and if the

22   Settlement is  preliminarily approved, at that time, the website will be updated and enhanced to,

23   among other things, allow class members to register, receive Buyback and Approved Emissions

24   Modification offers from Volkswagen, and to file claims.

25   The Parties created this comprehensive proposed notice program—including both the

26   content and the distribution plan—with Kinsella Media, LLC ("KM"), an advertising and legal

27   notification firm in Washington, D.C. that specializes in the design and implementation of

28   notification in complex litigation and has been appointed as notice expert and notice administrator

- 31 -

in scores of major class actions.  Subject to the Court's approval, the parties have selected KM to serve as the Notice Administrator.  The Parties are confident that the Notice Program meets the applicable legal standards and will provide the best notice practicable under the circumstances.

**VII.    THE PROPOSED FINAL APPROVAL HEARING SCHEDULE**

The last step in the settlement approval process is the final approval hearing, at which the Court may hear any evidence and argument necessary to evaluate the Settlement.  At that hearing, proponents of the Settlement may explain and describe its terms and conditions and offer argument in support of settlement approval, and Class Members, or their counsel, may be heard in support of or in opposition to the Settlement.  Plaintiffs propose the following schedule for final approval of the Settlement and implementation of the Settlement Program:

| Date | Event |
| --- | --- |
| June 28, 2016 | Settlement Class Representatives file Motion for Preliminary Approval of Settlement |
| June 30, 2016 | Status Conference with the Court |
| July 5, 2016 | Volkswagen provides Class Action Fairness Act Notice to State Attorneys General |
| July 26, 2016 | Preliminary Approval Hearing [Remainder of schedule assumes entry of Preliminary Approval Order on this date] |
| July 27, 2016 | Class Notice Program begins |
| August 19, 2016 | Class Notice Program ends |
| August 26, 2016 | Motion for Final Approval filed |
| September 16, 2016 | Objection and Opt-Out Deadline |
| September 16, 2016 | End of Eligible Seller Identification Period |
| September 29, 2016 | Deadline for State Attorneys General to file Comments/Objections to this Class Action Agreement |
| September 30, 2016 | Reply Memorandum in Support of Final Approval filed |

| October 3, 2016 – October 7, 2016 (Specific date TBD by Court) | Final Approval Hearing. While the timing and outcome of every determination is at the Court's discretion, the Parties to this Class Action Agreement request and anticipate that the Court would enter the DOJ Consent Decree and FTC Consent Order at the same time as the Final Approval Order.<br><br>The Buyback and Lease Termination program under this Class Action Agreement will begin expeditiously upon Final Approval and entry of the DOJ Consent Decree. To the extent available, the Approved Emissions Modification Option under this Class Action Agreement will begin at the same time. |
|---|---|

## VIII.  CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court preliminarily approve the Settlement, provisionally certify the Class, conditionally appoint the undersigned as Settlement Class Counsel and the Plaintiffs listed in Exhibit 1 hereto as the Settlement Class Representatives, order dissemination of notice to Class Members; and set a date for the final approval hearing.

Dated:  June 28, 2016

Respectfully submitted,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By:  */s/ Elizabeth J. Cabraser*
Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone: 415.956.1000
Facsimile:  415.956.1008
E-mail: *ecabraser@lchb.com*

*Plaintiffs' Lead Counsel*

Benjamin L. Bailey
BAILEY GLASSER LLP
209 Capitol Street
Charleston, WV 25301
Telephone: 304.345.6555
Facsimile: 304.342.1110
E-mail: *Bbailey@baileyglasser.com*

Steve W. Berman
HAGENS BERMAN
1918 8th Avenue, Suite 3300
Seattle, WA  98101
Telephone: 206.623.7292
Facsimile:  206.623.0594
E-mail: *steve@hbsslaw.com*

David Boies
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY  10504
Telephone: 914.749.8200
Facsimile:  914.749.8300
E-mail: *dboies@bsfllp.com*

David Seabold Casey, Jr.
CASEY GERRY SCHENK FRANCAVILLA
BLATT & PENFIELD, LLP
110 Laurel Street
San Diego, CA  92101-1486
Telephone: 619.238.1811
Facsimile:  619.544.9232
E-mail: *dcasey@cglaw.com*

James E. Cecchi
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO P.C.
5 Becker Farm Road
Roseland, NJ  07068-1739
Telephone: 973.994.1700
Facsimile:  973.994.1744
E-mail: jcecchi@carellabyrne.com

Roxanne Barton Conlin
ROXANNE CONLIN & ASSOCIATES, P.C.
319 Seventh Street, Suite 600
Des Moines, IA  50309
Telephone: 515.283.1111
Facsimile:  515.282.0477
E-mail: *roxlaw@aol.com*

Jayne Conroy
SIMMONS HANLY CONROY LLC
112 Madison Avenue
New York, NY  10016-7416
Telephone: 212.784.6400
Facsimile:  212.213.5949
E-mail: *jconroy@simmonsfirm.com*

Paul J. Geller
ROBBINS GELLER RUDMAN &
DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone: 561.750.3000
Facsimile:  561.750.3364
E-mail: *pgeller@rgrdlaw.com*

Robin L. Greenwald
WEITZ & LUXENBERG P.C.
700 Broadway
New York, NY  10003
Telephone: 212.558.5500
Facsimile:  212.344.5461
E-mail: *rgreenwald@weitzlux.com*

Michael D. Hausfeld
HAUSFELD
1700 K Street, N.W., Suite 650
Washington, DC  20006
Telephone: 202.540.7200
Facsimile:  202.540.7201
E-mail: *mhausfeld@hausfeld.com*

Michael Everett Heygood
HEYGOOD, ORR & PEARSON
6363 North State Highway 161, Suite 450
Irving, TX  75038
Telephone: 214.237.9001
Facsimile:  214.237-9002
E-mail: *Michael@hop-law.com*

Adam J. Levitt
GRANT & EISENHOFER P.A.
30 North LaSalle Street, Suite 2350
Chicago, IL  60602
Telephone: 312.610.5400
Facsimile:  312.214.0001
E-mail: *alevitt@gelaw.com*

W. Daniel "Dee" Miles III
BEASLEY ALLEN LAW FIRM
218 Commerce Street
Montgomery, AL  36104
Telephone: 800.898.2034
Facsimile:  334.954.7555
E-mail: *dee.miles@beasleyallen.com*

Frank Mario Pitre
COTCHETT PITRE & McCARTHY LLP
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone: 650.697.6000
Facsimile:  650.697.0577
E-mail: *fpitre@cpmlegal.com*

Joseph F. Rice
MOTLEY RICE, LLC
28 Bridgeside Boulevard
Mount Pleasant, SC  29464
Telephone: 843.216.9000
Facsimile:  843.216.9450
E-mail: *jrice@motleyrice.com*

Rosemary M. Rivas
FINKELSTEIN THOMPSON LLP
One California Street, Suite 900
San Francisco, CA  94111
Telephone: 415.398.8700
Facsimile:  415.393.8704
E-mail: *rrivas@finkelsteinthompson.com*

Lynn Lincoln Sarko
KELLER ROHRBACK L.L.P.
1201 3rd Avenue, Suite 3200
Seattle, WA  98101-3052
Telephone: 206.623.1900
Facsimile:  206.623.3384
E-mail: *lsarko@kellerrohrback.com*

Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, NY  10005-4401
Telephone: 212.584.0700
Facsimile:  212.584.0799
E-mail: *cseeger@seegerweiss.com*

J. Gerard Stranch IV
BRANSTETTER, STRANCH &
JENNINGS, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN  37203
Telephone: 615.254.8801
Facsimile: 615.250.3937
E-mail: *gerards@bsjfirm.com*

Roland K. Tellis
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, CA  91436
Telephone: 818.839.2320
Facsimile: 818.986.9698
E-mail: *trellis@baronbudd.com*

Lesley Elizabeth Weaver
BLOCK & LEVITON LLP
155 Federal Street, Suite 400
Boston, MA  02110
Telephone: 617.398.5600
Facsimile:  617.507.6020
E-mail: *lweaver@blockesq.com*

*Plaintiffs' Steering Committee*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on June 28, 2016, service of this document was accomplished pursuant to the Court's electronic filing procedures by filing this document through the ECF system.

/s/ *Elizabeth J. Cabraser*_____
Elizabeth J. Cabraser

PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF THE CLASS ACTION
AGREEMENT AND APPROVAL OF CLASS NOTICE