UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION

_____/

This Order Relates To:
ALL CONSUMER AND RESELLER ACTIONS

_____/

MDL No. 2672 CRB  (JSC)

**AMENDED ORDER GRANTING PRELIMINARY APPROVAL OF SETTLEMENT**

Just a little over 10 months ago, the public learned of Volkswagen's allegedly deliberate use of a defeat device—software installed in certain Volkswagen- and Audi-branded turbocharged direct injection ("TDI") diesel vehicles that was designed to cheat emissions tests and deceive state and federal regulators—in nearly 500,000 cars sold in the United States.  Consumers filed hundreds of lawsuits which have been assigned to this Court as a multidistrict litigation ("MDL").  After five months of intensive negotiations, and with the assistance of a Court-appointed Settlement Master, Plaintiffs and Defendants Volkswagen AG, Audi AG, and Volkswagen Group of America, Inc. (collectively, "Volkswagen") reached a settlement that resolves consumer claims concerning certain 2.0-liter diesel TDI vehicles.  (*See* Dkt. No. 1685.)

The Settlement Class Representatives now move the Court to (1) preliminarily approve the proposed Amended Consumer Class Action Settlement Agreement and Release ("Settlement") (*see* Dkt. No. 1685), (2) conditionally certify a Consumer Class, (3) approve their proposed settlement notice plan (*see* Dkt. Nos. 1609-2, 1680), and (4) schedule a fairness hearing.  Having reviewed the proposed settlement and with the benefit of oral argument on July 26, 2016, the Court **GRANTS** the Motion for Preliminary Approval.  The Settlement is sufficiently fair, adequate, and reasonable to the 2.0-liter diesel engine vehicle consumers to move forward with

class notice.

# I.    BACKGROUND

## A.    Factual Allegations

In 2009, Volkswagen began selling its Volkswagen- and Audi-branded TDI "clean diesel" vehicles, which they marketed as being environmentally friendly, fuel efficient, and high performing.  Unbeknownst to consumers and regulatory authorities, Volkswagen installed in these cars a defeat device—software that bypasses, defeats, or renders inoperative certain elements of the vehicles' emissions control system—thus evading United States Environmental Protection Agency ("EPA") and California Air Resources Board ("CARB") emissions test procedures. Specifically, the defeat device senses whether the vehicle is undergoing testing and produces regulation-compliant results, but operates a less effective emissions control system when the vehicle is driven under normal circumstances.  By installing the defeat device on its vehicles, Volkswagen was able to obtain Certificates of Conformity ("COCs") from EPA and Executive Orders ("EOs") from CARB for its 2.0- and 3.0-liter diesel engine vehicles when in fact these vehicles release nitrogen oxides ("NOx") at a factor of up to 40 times over the permitted limit. Over the course of six years, Volkswagen sold American consumers nearly 500,000 diesel vehicles equipped with a defeat device.

## B.    Procedural History

On September 3, 2015, Volkswagen admitted to EPA and CARB that it installed defeat devices on its model year 2009 through 2015 Volkswagen and Audi diesel vehicles equipped with 2.0-liter engines.  On September 18, 2015, the public became aware of the defeat device when EPA issued a Notice of Violation ("NOV") to Volkswagen, alleging that Volkswagen's use of the defeat device violated provisions of the Clean Air Act, 42 U.S.C. § 7401 et seq.  That same day, CARB sent Volkswagen a letter notifying them that CARB had commenced an enforcement investigation concerning the defeat device.

Two months later, EPA issued a second NOV to Volkswagen, as well as Dr. Ing. h.c. F. Porsche AG ("Porsche AG") and Porsche Cars North America, Inc. ("PCNA"), which alleged Volkswagen had installed in its 3.0-liter diesel engine vehicles a defeat device similar to the one

United States District Court
Northern District of California

described in the September 18 NOV.  CARB likewise sent a second letter concerning the same matter.

### 1. Consumer Actions

Consumers nationwide filed hundreds of lawsuits after Volkswagen's use of the defeat device became public, and on December 8, 2015, the Judicial Panel on Multidistrict Litigation ("JPML") transferred 56 related actions, including numerous putative class actions, to this Court for coordinated pretrial proceedings in the above-captioned MDL.  (Dkt. No. 1.)  The JPML has since transferred an additional 832 actions to the Court.  (Dkt. No. 1676.)

The following month the Court appointed Elizabeth J. Cabraser of Lieff, Cabraser, Heimann & Bernstein, LLP as Lead Plaintiffs' Counsel and Chair of the Plaintiffs' Steering Committee ("PSC"), to which the Court also named 21 attorneys.  (Dkt. No. 1084.)  On February 22, 2016, the PSC filed its Consolidated Consumer Class Action Complaint against 13 Defendants: VWGoA; VWAG; Audi AG; Audi of America, LLC; Porsche AG; PCNA; Martin Winterkorn; Mattias Müller; Michael Horn; Rupert Stadler; Robert Bosch GmbH ("Bosch GmbH"); Robert Bosch, LLC ("Bosch LLC"); and Volkmar Denner.  (Dkt. No. 1230.)  The Consolidated Complaint asserts claims under (1) the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), and the Magnusson-Moss Warranty Act, 15 U.S.C. § 2301 et seq.; (2) state fraud, breach of contract, and unjust enrichment laws; and (3) all fifty States' consumer protection laws.  (*Id.* ¶¶ 361-3432.)

### 2. Government Actions

This MDL also includes two actions brought by federal government entities.  The United States Department of Justice ("DOJ") on behalf of EPA has sued VWAG; Audi AG; VWGoA; Volkswagen Group of America Chattanooga Operations, LLC ("VW Chattanooga"); Porsche AG; and PCNA for claims arising under Sections 204 and 205 of the Clean Air Act, 42 U.S.C. §§ 7523 and 7524.  The Federal Trade Commission ("FTC") has also brought an action against VWGoA.  The FTC brings its claims pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §53(b), and alleges violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). //

United States District Court
Northern District of California

3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

3.      PSC, DOJ, and FTC Settlement Negotiations

In January 2016 the Court appointed former Director of the Federal Bureau of Investigation Robert S. Mueller III as Settlement Master to oversee settlement negotiations between the parties.  (Dkt. No. 973.)  Settlement talks began almost immediately, and by April 21, 2016, the parties reached agreements in principle regarding 2.0-liter diesel engine vehicles.  (Dkt. No. 1439 at 4:25-6:15.)  On June 28, 2016, the DOJ, the PSC, and the FTC filed a Partial Consent Decree, proposed Class Action Settlement, and Partial Consent Order, respectively.  (Dkt. Nos. 1605-07.)  The PSC subsequently filed an Amended Settlement on July 26, 2016.  (Dkt. No. 1685.)  The amendment made slight modifications to the class definition. Negotiations concerning 3.0-liter diesel engine vehicles remain ongoing.

## II.      SETTLEMENT TERMS

This Order addresses the proposed Amended Class Action Settlement.  The key provisions of that Settlement are as follows.

**A.      The Settlement Class**

The proposed Settlement Class consists of

> a nationwide class of all persons (including individuals and entities) who, on September 18, 2015, were registered owners or lessees of, or, in the case of Non-Volkswagen Dealers, held title to or held by bill of sale dated on or before September 18, 2015, a Volkswagen or Audi 2.0-liter TDI vehicle in the United States or its territories (an "Eligible Vehicle"), or who, between September 18, 2015, and the end of the Claim Period, become a registered owner of, or, in the case of Non-Volkswagen Dealers, hold title to or hold by bill of sale dated after September 18, 2015, but before the end of the Claims Period, an Eligible Vehicle in the United States or its territories.

(Dkt. No. 1685 ¶ 2.16.)  "Eligible Vehicles" consist of

> Model Year 2009 through 2015 Volkswagen and Audi light-duty vehicles equipped with 2.0-liter TDI engines that (1) are covered, or purported to be covered, by the EPA Test Groups in the table immediately below this paragraph; (2) are, at any point during the period September 18, 2015 to June 28, 2016, registered with a state Department of Motor Vehicles or equivalent agency or held by bill of sale by a non-Volkswagen Dealer in the United States or its territories that (a) holds title to the vehicle or (b) holds the vehicle by bill of sale; (3) for an Eligible Owner, are currently Operable or cease to be Operable only after the Opt-Out Deadline; and (4) have not been modified pursuant to an Approved Emissions Modification.

4

(*Id.* ¶ 2.33.)  Eligible Vehicles do not include Volkswagen or Audi vehicles that were sold outside the United States.  (*Id.*)

Class Members are further categorized as Eligible Lessees, Eligible Owners, or Eligible Sellers.  An Eligible Lessee is

> (1) the current lessee or lessees of an Eligible Vehicle with a lease issued by VW Credit, Inc.; (2) the former lessee or lessees of an Eligible Vehicle who had an active lease issued by VW Credit, Inc. as of September 18, 2015 and who surrendered or surrenders the leased Eligible Vehicle to Volkswagen; or (3) the owner of an Eligible Vehicle who had an active lease issued by VW Credit, Inc. as of September 18, 2015, and who acquired ownership of the previously leased Eligible Vehicle at the conclusion of the lease after June 28, 2016.

(*Id.* ¶ 2.29.)  An Eligible Owner refers to

> the registered owner or owners of an Eligible Vehicle on June 28, 2016, or the registered owner or owners who acquire an Eligible Vehicle after June 28, 2016, but before the end of the Claim Period, except that the owner of an Eligible Vehicle who had an active lease issued by VW Credit, Inc. as of September 18, 2015, and purchased an Eligible Vehicle previously leased by that owner after June 28, 2016, shall be an Eligible Lessee. A Non-Volkswagen Dealer who, on or after June 28, 2016, holds title to or holds by bill of sale an Eligible Vehicle in the United States or its territories shall qualify as an Eligible Owner regardless of whether that Non-Volkswagen Dealer is registered as the owner of the Eligible Vehicle, provided that the Non-Volkswagen Dealer otherwise meets the definition of Eligible Owner.

(*Id.* ¶ 2.30.)  Finally, an Eligible Seller is one "who purchased or otherwise acquired an Eligible Vehicle on or before September 18, 2015, and sold or otherwise transferred ownership of such vehicle after September 18, 2015, but before June 28, 2016."  (*Id.* ¶ 2.31.)  Eligible Sellers are also "any owner (1) who acquired his, her, or its Eligible Vehicle on or before September 18, 2015, (2) whose Eligible Vehicle was totaled, and (3) who consequently transferred title of his, her, or its vehicle to an insurance company after September 18, 2015, but before June 28, 2016."  (*Id.*)

## B.   Consumer Remedies

The Settlement gives Class Members choices as to remedies.  Eligible Owners have two options: Volkswagen will pay cash ("Owner Restitution") *and* either (1) buy the Class Member's

United States District Court
Northern District of California

1   Eligible Vehicle at its pre-defeat device disclosure value, ("the Buyback") or (2) fix the Class

2   Member's vehicle when and if EPA and CARB approve an emissions modification (a "Fix"). [1]

3   Eligible Lessees may (1) terminate their leases without penalty plus receive additional cash

4   ("Lessee Restitution"), or (2) if a Fix is approved, have their leased car fixed plus receive Lessee

5   Restitution.  Finally, Eligible Sellers, that is, consumers who sold their Eligible Vehicle prior to

6   the filing of the proposed Settlement, receive cash ("Seller Restitution").  In general, the condition

7   of the Eligible Vehicle is irrelevant; however, the Vehicle must be operable (i.e., driven under its

8   own power).

9        The Settlement requires Volkswagen to render those Eligible Vehicles returned in a

10   Buyback inoperable by removing and recycling, to the extent permitted by law, the vehicle's

11   Engine Control Unit.  (Dkt. No. 1685 ¶ 4.4.3.)  Volkswagen cannot render the vehicle operable

12   until the vehicle has received a Fix; only under those circumstances does the Settlement permit

13   Volkswagen to re-sell the Eligible Vehicle in the United States or export it.  (*Id.*; *see* Dkt. No.

14   1605-1 ¶ 7.2.3.)  In other words, the Settlement ensures that the defective vehicles will not operate

15   in the United States—or anywhere else in the world—unless and until they are fixed in a manner

16   approved by EPA and CARB.

17        1.   Base Value and Vehicle Value

18        The amount of cash a Class Member receives depends on an Eligible Vehicle's Base Value

19   or Vehicle Value.  Base Value refers to, where available, the Clean Trade value of the vehicle

20   based on the National Automobile Dealers Association ("NADA") Vehicle Identification Code

21   ("VIC") for each Eligible Vehicle in the September 2015 NADA Used Car Guide published in or

22   around August 2015.  (Dkt. No. 1685 ¶ 2.5; Dkt. No. 1685-1 ¶ 11.)  In some instances, like with

23   Model Year 2015 Eligible Vehicles, no value was published by NADA as of September 2015.  For

24   those Eligible Vehicles, the Base Value is calculated by multiplying the Manufacturer's Suggested

25   Retail Price ("MSRP") for each individual vehicle by 0.717.  (*Id.* (both).)  The 0.717 figure is the

26   ratio of average September 2015 Clean Trade values to average MSRPs for Model Year 2015

27

28   _____

[1] The schedule for Volkswagen to submit proposed Fixes can be found in Exhibit 1 to the Settlement (Dkt. No. 1685-1 at 6-7) and the Long Form Notice (Dkt. No. 1685-3 at 19).

United States District Court
Northern District of California

Passats.  (Dkt. No. 1685-1 ¶ 11.)

Vehicle Value refers to the Eligible Vehicle's Base Value, adjusted for Original Equipment Manufacturer ("OEM")-installed options and mileage.  (*Id.* ¶ 12.)  Options adjustments to Base Values are determined by using Volkswagen OEM-installed options, as valued by the September 2015 NADA Used Car Guide.  (*Id.* ¶ 12(a).)  Mileage adjustments to Base Values are determined by the actual mileage at the time the vehicle is surrendered in the Buyback or brought in for a Fix using the mileage adjustment table in the September 2015 NADA Used Car Guide with an allowance for standard NADA mileage of 12,500 miles per year, prorated monthly from September 2015 to the month of surrender.  (*Id.* ¶ 12(b).)

2.    Restitution Calculation

Eligible Owners who purchased their Eligible Vehicles before September 18, 2015 are entitled to a minimum Restitution Payment of $5,100.  (Dkt. No. 1685-1 ¶ 5(a); Dkt. No. 1685-3 at 2.)  Restitution is calculated by adding (1) 20% of the Vehicle Value plus (2) the greater of $2,986.73 or the amount necessary to ensure that Owner Restitution is not less than $5,100.  (Dkt. No. 1685-1 ¶ 5(a).)  In some cases, Eligible Owners will receive more than the minimum $5,100 to as much as $10,000.  (*See id.*)  Eligible Owners who purchased their Eligible Vehicles after September 18, 2015 are entitled to 50% of Owner Restitution as calculated above, plus a share of an unused portion of the funds set aside to pay Seller Restitution as discussed below.  (*Id.* ¶ 5(b).)

Eligible Lessees are also guaranteed a Restitution Payment.  (Dkt. No. 1685-1 ¶ 9.)  Lessee Restitution has two components: (1) a variable component plus (2) a fixed component.  (Dkt. No. 1685-1 ¶ 9.)  The variable component is 10% of the Eligible Vehicle's Base Value adjusted for options, but not mileage.  (*Id.*)  The fixed component is $1,529.  (*Id.*)  Eligible Lessees are entitled to Lessee Restitution even if their leases terminated after September 18, 2015.  (Dkt. No. 1685 ¶ 4.2.4.)

For Eligible Sellers, Restitution is calculated as 10% of the Vehicle Value plus $1,493.36.  (*Id.* ¶ 7; Dkt. No. 1685-3 at 8, 15.)  Eligible Sellers are guaranteed a minimum of $2,550 in Seller Restitution; however, if the sum total of 10% of the Vehicle Value plus $1,493.36 is greater than $2,550, the Eligible Seller is entitled to the higher amount.  (*Id.* at 15.)

United States District Court
Northern District of California

**C.      Claims Process**

The Settlement sets forth a five-step Claims Program, and Class Members may begin to provide the required documentation upon entry of this Order; however, Claims cannot be considered submitted, and no offer can be made, until the Court finally approves the Settlement. (Dkt. No. 1685 ¶ 2.11; Dkt. No. 1685-4 at 1, ¶ 7.)  Eligible Sellers, however, must identify themselves by September 16, 2016 (the "Eligible Seller Identification Period").  (Dkt. No. 1685 ¶ 2.31; Dkt. No. 1685-4 ¶ 7(a).)

At Step One, Class Members learn about their available remedies and compensation.  (Dkt. No. 1685 ¶ 5.1; Dkt. No. 1685-4 ¶ 1.)  There are at least two ways Class Members can do this. Those who wish to obtain information online can visit the Settlement Website (www.VWCourtSettlement.com) and register at the Online Claims Portal.  There, Class Members provide their (1) name; (2) contact information, including email, mailing address, and phone number; (3) address of vehicle registration; (4) Vehicle Identification Number ("VIN"); (5) vehicle mileage, if the Class Member is a current owner or lessee; and (6) information regarding vehicle financing, i.e., whether the Class Member is a current owner or lessee.  (Dkt. No. 1685-4 ¶ 1(a).)  The Claims Portal will display individualized preliminary offers for each Class Member. (*Id.*)  Alternatively, Class Members can call 1-844-98-CLAIM and provide the same information to receive their individualized preliminary offers.  (*Id.* ¶ 1(b).)

At Step Two, Class Members submit a Claim Form that contains information about his or her Eligible Vehicle, as well as the required documentation.  (Dkt. No. 1685 ¶ 5.1; Dkt. No. 1685-4 ¶ 2.)  Class Members can submit their Claim Forms online via the Settlement Website, by fax, or by mail.  (*Id.* ¶ 2(a)(i)-(iii).)  However Class Members choose to submit their Claim Forms, they must also provide information or documentation including: (1) a driver's license or other government-issued identification; (2) the dates the Class Member owned or leased the Eligible Vehicle; (3) proof of ownership, including title (if applicable) and financing or lease information, including financial consent forms (if applicable).  (*Id.*)  Class Members will receive a Claim Number once the Claim is received.  (*Id.* ¶ 2.)

While Class Members need not select a remedy at Step Two, they must submit their claims

prior to September 1, 2018.  (*Id.* ¶ 1(a).)  Eligible Sellers, however, must identify themselves within 45 days of entry of this Order.  They can do this via (1) electronic registration on the Settlement Website or (2) submission of an Eligible Seller identification form by mail or fax.  (Dkt. No. 1685 ¶ 2.32; Dkt. No. 1685-4 ¶ 7(a).)

Step Three involves a determination of the Class Member's eligibility.  (Dkt. No. 1685 ¶ 5.1; Dkt. No. 1685-4 ¶ 3.)  The parties propose Ankura Consulting Group, LLC to act as Claims Supervisor and to review the submitted claims and verify a class member's eligibility.  (Dkt. No. 1685 ¶¶ 2.15, 5.2; Dkt. No. 1685-4 ¶ 3.)  Per the proposed FTC Consent Order, Volkswagen will notify Class Members within at least 10 business days that their claim is either complete or deficient.[2]  (Dkt. No. 1607 at 33.)  Within at least 10 business days of receiving a completed application, Volkswagen will notify the Class Member whether he or she is eligible for the elected remedy.  (*Id.*)  The Class Member thereafter receives a formal offer if he or she is deemed an eligible "Claimant."  (Dkt. No. 1685-4 ¶ 4(a).)

At Step Four, Claimants confirm their selection of an offered remedy, accept the formal offer, and schedule an appointment with a Volkswagen or Audi Dealer.  (Dkt. No. 1685 ¶ 5.1; Dkt. No. 1685-4 ¶ 4.)  Claimants who submitted an online Claim will receive their formal offers through the Claims Portal or via email.  (*Id.* ¶ 4(a).)  Claimants who faxed or mailed a Claim will receive their formal offers via mail or, if they so choose, by email.  (*Id.*)

Claimants may then accept their formal offers either through the Claims Portal or by submitting a paper acceptance form.  (*Id.* ¶ 4(b).)  Claimants need not accept an offer immediately; rather, they can defer selection until the Fix is approved or choose a different remedy if one is available.  (*Id.*; *id.* ¶ 4(c).)  Claimants eligible for a Buyback, Lease Termination, or a Fix may also change their remedy selection up until Step Four is completed, even if they have accepted a formal offer, though this may require additional documentation to verify eligibility.  (*Id.* ¶ 4(b).)  In other words, Claimants may wait until EPA and CARB approve a Fix, if any, before selecting

[2] If a claim application is deficient, Volkswagen shall have 10 business days from resubmission of the claims application to notify the Class Member whether his or her application is complete.  (Dkt. No. 1607 at 33.)

9

United States District Court
Northern District of California

their remedy.  Upon formal acceptance, Claimants must also execute an Individual Release, described in more detail in Section II.F, *infra*.  (*Id.*)

Appointments for a Buyback or a Fix will be available within 90 days of a Claimant's acceptance of a formal offer and scheduling of an appointment.  (*Id.* ¶ 4(c).)  Appointments for a Lease Termination will be available within 45 days of the Claimant's acceptance of a formal offer and scheduling of an appointment.  (*Id.*)  Claimants will be notified via the Claims Portal, email, or mail when the ability to schedule an appointment is available.  (*Id.*)

Claimants schedule appointments for a Buyback or Lease Termination online through the Claims Portal or by calling 1-844-98-CLAIM; they cannot schedule appointments directly with the Volkswagen or Audi Dealer.  (*Id.* ¶ 4(d).)  Appointments for a Fix, on the other hand, may be scheduled either by directly calling the Claimant's preferred Volkswagen or Audi Dealer or through the Claims Portal.  (*Id.* ¶ 4(e).)

At Step Five, Claimants obtain their selected remedy.  (Dkt. No. 1685 ¶ 5.1; Dkt. No. 1685-4 ¶ 5.)  Claimants who opt for a Buyback or Lease Termination will meet with a Settlement Specialist at a Volkswagen or Audi Dealer to complete the process and receive payment.  (Dkt. No. 1685-4 ¶ 5(b).)  Claimants who elect a Fix will bring their Eligible Vehicles to a Volkswagen or Audi Dealer to obtain, at Volkswagen's expense, the Approved Emissions Modification.  (*Id.* ¶ 5(c).)

Class Members or Claimants who dispute an eligibility determination or calculation of compensation may appeal that decision by mailing a form to the Claims Review Committee ("CRC").  (Dkt. No. 1685-4 ¶ 6.)  The CRC will be comprised of three individuals: one representative from Volkswagen, one representative from Class Counsel, and one Court-appointed individual.  (*Id.* ¶ 5.3.)

## D.      Distribution of Settlement Payments

The Settlement requires Volkswagen to create a $10.033 billion Funding Pool to compensate Class Members.  (Dkt. No. 1685 at 3.)  This figure assumes 100% Buyback of all purchased Eligible Vehicles and 100% Lease Termination of all leased Eligible Vehicles.  (*Id.* ¶ 2.42.)  The $10.033 billion includes (1) $42,670,723 in a Loan Forgiveness Designated Fund to

pay Loan Forgiveness; (2) $26 million in the Future Lease Payments Designated Fund to pay remaining future lease payments previously owed to VW Credit, Inc. for those Eligible Lessees choosing Lease Termination; and (3) $9,964,329,277 in the Principal Fund to pay Vehicle Value, Owner Restitution, Lessee Restitution, and Seller Restitution.  (*Id.*)  The Loan Forgiveness Designated Fund, Future Lease Payments Designated Fund, and Principal Fund cannot be used for any funding purposes other than those stated above.  (*Id.*)  Any unused funds in the Funding Pool will revert to Volkswagen upon the completion of the Class Action Settlement Program.  (*Id.*)

Claimants may elect to receive their Buyback and Restitution Payments either by electronic fund transfer or by check.  (Dkt. No. 1685-4 ¶ 5(d).)  An electronic fund transfer will be submitted within three banking days upon (1) the sale or surrender of the Eligible Vehicle; (2) completion of a Fix; or (3) for Eligible Sellers and Eligible Lessees who no longer own or lease an Eligible Vehicle, acceptance of an offer.  (*Id.* ¶ 5(d)(i).)

Claimants who select a Buyback or Lease Termination and payment by check will receive a check for the full amount due at the Dealership Appointment, unless a mileage adjustment is required.  (*Id.* ¶ 5(d)(ii).)  If an upward mileage adjustment is required, the Claimant will not receive a check at the Dealership Appointment but will instead be mailed a check within three banking days.  (*Id.*)  If a downward mileage adjustment is required, the Claimant will receive a check at the Dealership Appointment and will be mailed a second check within three banking days for the additional amount due.  (*Id.*)

Claimants who select a Fix and payment by check will have a one mailed to them within three banking days of the completed Fix.  (*Id.*)  Claimants with Generation 3 Vehicles require a two-stage modification process and thus will receive two-thirds of the Restitution Payment upon completion of the first stage and the remaining one-third of the Restitution Payment upon completion of the second stage.  (*Id.* ¶ 5(d)(iii); Dkt. No. 1685 ¶ 4.3.4.)  The second stage of the Fix will also include a free oil change with respective engine oil filter.  (*Id.*)

**E.      Opt Out Procedure and Objections**

Class Members may request exclusion from the Settlement by mailing a signed, written request stating their desire in clear and unambiguous language, such as "I wish to exclude myself

from the Class in *In re Volkswagen 'Clean Diesel' Marketing, Sales Practices and Products Liability Litigation*, No. 15-md-2672," to the Claims Administrator on or before the Opt-Out Deadline of September 16, 2016.  (*Id.* ¶ 6.1.)  The written request must also include (1) the Class Member's printed name, address, and telephone number; (2) VIN of the Eligible Vehicle; (3) a statement as to whether the class member is an Eligible Owner, Eligible Lessee, or Eligible Seller; and (4) the dates of the Class Member's ownership or lease of the Eligible Vehicle.  (*Id.*)  If the Class Member no longer owns or leases the Eligible Vehicle, he or she must also provide evidence of the Vehicle's sale or lease expiration or termination.  (*Id.*)

The Class Notice shall advise that Class Members may object to the Settlement by filing with the Court a written objection that explains why he or she believes the Court should not approve the Class Action Settlement as fair, reasonable, and adequate.  (*Id.* ¶ 7.1.)  The written objection must include (1) a detailed statement of and specific reasons for the objection; (2) the Class Member's name, address, and telephone number; (3) the VIN of the Eligible Vehicle; (4) the dates of the Class Member's ownership or lease of the Eligible Vehicle; (5) a statement as to whether the Class Member is an Eligible Owner, an Eligible Lessee, or an Eligible Seller; (6) a statement that the Class Member has reviewed the Class definition and has not opted out of the Class; and (6) other supporting documents the class member wishes the Court to consider.  (*Id.*) Class Members may object on their own behalf or through counsel, at the Class Member's own expense.  (*Id.* ¶ 7.2.)

**F.    Release of Claims**

Class Members agree to release all "Released Claims" against "Released Parties." The Settlement defines "Released Parties" as

> (1) Volkswagen AG, Volkswagen Group of America, Inc. (d/b/a Volkswagen of America, Inc. or Audi of America, Inc.), Volkswagen Group of America Chattanooga Operations, LLC, Audi AG, Audi of America, LLC, VW Credit, Inc., VW Credit Leasing, Ltd., VCI Loan Services, LLC, and any former, present, and future owners, shareholders, directors, officers, employees, attorneys, affiliates, parent companies, subsidiaries, predecessors, and successors of any of the foregoing (the "VW Released Entities");
> (2) any and all contractors, subcontractors, and suppliers of the VW Released Entities;
> (3) any and all persons and entities indemnified by any VW

United States District Court
Northern District of California

> Released Entity with respect to the 2.0-liter TDI Matter;
> (4) any and all other persons and entities involved in the design, research, development, manufacture, assembly, testing, sale, leasing, repair, warranting, marketing, advertising, public relations, promotion, or distribution of any Eligible Vehicle, even if such persons are not specifically named in this paragraph, including without limitation all Volkswagen Dealers, as well as non-authorized dealers and sellers;
> (5) Claims Supervisor;
> (6) Notice Administrator;
> (7) lenders, creditors, financial institutions, or any other parties that financed any purchase or lease of an Eligible Vehicle; and
> (8) for each of the foregoing, their respective former, present, and future affiliates, parent companies, subsidiaries, predecessors, successors, shareholders, indemnitors, subrogees, spouses, joint ventures, general or limited partners, attorneys, assigns, principals, officers, directors, employees, members, agents, representatives, trustees, insurers, reinsurers, heirs, beneficiaries, wards, estates, executors, administrators, receivers, conservators, personal representatives, divisions, dealers, and suppliers.

(Dkt. No. 1685 ¶ 9.2.)  The Settlement does not, however, release any claims against Robert Bosch GmbH; Robert Bosch, LLC; or any of its any of its former, present, and future owners, shareholders, directors, officers, employees, attorneys, affiliates, parent companies, subsidiaries, predecessors, or successors.  (*Id.*; Dkt. No. 1685-5 ¶ 6.)

"Released Claims" include

> any and all claims, demands, actions, or causes of action of any kind or nature whatsoever, whether in law or in equity, known or unknown, direct, indirect or consequential, liquidated or unliquidated, past, present or future, foreseen or unforeseen, developed or undeveloped, contingent or noncontingent, suspected or unsuspected, whether or not concealed or hidden, arising from or in any way related to the 2.0-liter TDI Matter, including without limitation (1) any claims that were or could have been asserted in the Action; and (2) any claims for fines, penalties, criminal assessments, economic damages, punitive damages, exemplary damages, liens, injunctive relief, attorneys', expert, consultant, or other litigation fees or costs other than fees and costs awarded by the Court in connection with this Settlement, or any other liabilities, that were or could have been asserted in any civil, criminal, administrative, or other proceeding, including arbitration.

(Dkt. No. 1685 ¶ 9.3.)

Class Members expressly waive and relinquish any rights they may have under California Civil Code section 1542 or similar federal or state law.  (*Id.* ¶ 9.9; Dkt. No. 1685-5 ¶ 3); *see* Cal. Civ. Code § 1542 ("A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him

13

1    or her must have materially affected his or her settlement with the debtor.").

2         Class Members who receive a Buyback, a Fix, a Lease Termination, and/or a Restitution

3    Payment must execute an Individual Release during Step 4 of the Claims Process as a condition of

4    obtaining such relief.  (Dkt. No. 1685 ¶ 9.7; Dkt. No. 1685-4 ¶ 4(b); *see* Dkt. No. 1685-5.)  The

5    Individual Release becomes effective and binding once the Class Member receives a benefit under

6    the Settlement.  (Dkt. No. 1685-4 ¶ 4(b); Dkt. No. 1685-5 ¶ (1).)

7    **G.     Attorneys' Fees and Costs**

8         Volkswagen will pay reasonable attorneys' fees and costs for work performed by Lead

9    Plaintiffs' Counsel and the PSC (collectively, "Class Counsel"), as well as other attorneys

10   designated by Class Counsel to perform work in connection with this MDL, excluding work

11   performed on MDL cases brought under the securities laws, for physical injury, and on behalf of

12   Volkswagen or competitive dealers.  (Dkt. No. 1685 ¶ 11.1.)  Attorneys' fees are subject to the

13   Court's approval.  (*Id.*)  Although Class Counsel and Volkswagen have not yet discussed

14   attorneys' fees and costs, they agree to attempt to negotiate those amounts to be paid after the

15   execution of this Settlement and any settlement agreement concerning the 3.0-liter diesel engine

16   vehicles.  (*Id.*)  If the parties have not reached such a settlement by August 12, 2016, Class

17   Counsel and Volkswagen will begin negotiations as to attorneys' fees and costs to be paid in

18   connection with claims involving the 2.0-liter engine vehicles.  (*Id.*)  Class Counsel and

19   Volkswagen will either submit a negotiated amount to the Court or litigate the fee issues if the

20   parties disagree on the amount.  (*Id.*)

21              **III.     LEGAL STANDARD**

22         "'[T]here is a strong judicial policy that favors settlements, particularly where complex

23   class action litigation is concerned.'"  *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015)

24   (quoting *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008)).  Nevertheless, Federal

25   Rule of Civil Procedure ("Rule") 23(e) requires courts to approve any class action settlement.

26   "[S]ettlement class actions present unique due process concerns for absent class members."

27   *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).  As such, "the district court has a

28   fiduciary duty to look after the interests of those absent class members."  *Allen*, 787 F.3d at 1223

United States District Court
Northern District of California

14

(collecting cases).

Preliminary approval of a class action settlement generally requires two inquiries. *Cotter v. Lyft, Inc.*, 2016 WL 1394236, at *4 (N.D. Cal. Apr. 7, 2016). Courts first assess whether a class exists. *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997). This is "of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." (*Id.*) Second, Rule 23(e) requires courts to determine "whether a proposed settlement is fundamentally fair, adequate, and reasonable." *Hanlon*, 150 F.3d at 1026; *see* Fed. R. Civ. P. 23(e)(2).

## IV.    DISCUSSION

### A.    Class Certification

Class certification is a two-step process. *See Amchem Prods., Inc.*, 521 U.S. at 613. The Settlement Class Representatives must first satisfy Rule 23(a)'s four requirements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Fed. R. Civ. P. 23(a)(1)-(4). "[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied[.]" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (internal quotations omitted).

The Settlement Class Representatives must then establish that a class action may be maintained under either Rule 23(b)(1), (2), or (3). *See Amchem Prods., Inc.*, 521 U.S. at 613. The Settlement Class Representatives seek certification under Rule 23(b)(3), which is appropriate when questions of law or fact common to Class Members predominate and a class action is the superior means to other available methods to resolve the controversy. Fed. R. Civ. P. 23(b)(3).

#### 1.    Rule 23(a)

##### a.    *Numerosity*

Rule 23(a)(1) requires the class to be "so numerous that joinder of all parties is impracticable." Fed. R. Civ. P. 23(a)(1). "A specific minimum number is not necessary, and [a] plaintiff need not state the exact number of potential class members." *Richie v. Blue Shield of Cal.*, 2014 WL 6982943, at *15 (N.D. Cal. Dec. 9, 2014). The numerosity requirement is easily satisfied. There were 475,745 Eligible Vehicles sold or leased to consumers in the United States,

United States District Court
Northern District of California

15

1    and thus hundreds of thousands of potential Class Members.  Rule 23(a)(1) is met because joinder
2    is impossible.  *See Palmer v. Stassinos*, 233 F.R.D. 546, 549 (N.D. Cal. 2006) ("Joinder of 1,000
3    or more co-plaintiffs is clearly impractical.").

4                    b.      *Commonality*

5           Rule 23(a)(2) mandates the existence of "questions of law or fact common to the class."
6    Fed. R. Civ. P. 23(a)(2).  "The existence of shared legal issues with divergent factual predicates is
7    sufficient, as is a common core of salient facts coupled with disparate legal remedies within the
8    class."  *Hanlon*, 150 F.3d at 1019.  Assessing commonality requires courts to have "a precise
9    understanding of the nature of the underlying claims."  *Parsons v. Ryan*, 754 F.3d 657, 676 (9th
10   Cir. 2014) (citing *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95
11   (2013); additional citation omitted).  This allows courts to determine if the class' "claims . . .
12   depend upon a common contention" that is "of such a nature that it is capable of classwide
13   resolution—which means that determination of its truth or falsity will resolve an issue that is
14   central to the validity of each one of the claims in one stroke."  *Dukes*, 564 U.S. at 350.  The
15   commonality "analysis does not turn on the number of common questions, but on their relevance
16   to the factual and legal issues at the core of the purported class' claims."  *Jimenez v. Allstate Ins.
17   Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 2835 (2015).  Rather, a single
18   common question of law or fact satisfies the Rule.  *Dukes*, 564 U.S. at 369.

19          The Settlement Class Representatives satisfy the commonality requirement, as their claims
20   arise from Volkswagen's common course of conduct.  Specifically, the common questions of fact
21   are (1) Volkswagen's fraudulent scheme to deceive state and federal regulatory authorities by
22   installing in its 2.0-liter diesel engine vehicles the defeat device designed, and (2) Volkswagen's
23   "false and misleading marketing campaign that misrepresented and omitted the true nature of the
24   Eligible Vehicles' 'clean' diesel engine system."  (Dkt. No. 1609 at 20.)  Without class
25   certification, individual Class Members would be forced to separately litigate the same issues of
26   law and fact which arise from Volkswagen's use of the defeat device and Volkswagen's alleged
27   common course of conduct.  *See In re Celera Corp. Sec. Litig.*, 2014 WL 722408, at *3 (N.D. Cal.
28   Feb. 25, 2014) (finding commonality requirement met where plaintiffs raised questions of law or

United States District Court
Northern District of California

16

1  fact that would be addressed by other putative class members pursuing similar claims).  As such,

2  the Settlement Class Representatives have satisfied Rule 23(a)(2).

3           c.    *Typicality*

4           Rule 23(a)(3) requires that the representative parties' claims be "typical of the claims or

5  defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Typicality "assure[s] that the interest of the

6  named representative aligns with the interests of the class."  *Wolin v. Jaguar Land Rover N. Am.,*

7  *LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497,

8  508 (9th Cir. 1992)).  Under this "permissive" rule, "representative claims are 'typical' if they are

9  reasonably coextensive with those of absent class members; they need not be substantially

10 identical."  *Parsons*, 754 F.3d at 685 (quoting *Hanlon*, 150 F.3d at 1020).  "The test of typicality

11 is whether other members have the same or similar injury, whether the action is based on conduct

12 which is not unique to the named plaintiffs, and whether other class members have been injured by

13 the same course of conduct."  *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir.

14 2012) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

15          The typicality requirement is met.  The Settlement Class Representatives' claims are based

16 on the same pattern of wrongdoing as those brought on behalf of Class Members.  The Settlement

17 Class Representatives, as well as Class Members, purchased or leased an Eligible Vehicle

18 equipped with a defeat device.  Their claims are typical because they were subject to the same

19 conduct as other Class Members, and as a result of that conduct, the Settlement Class

20 Representatives and Class Members suffered the same injury.  As such, the Court finds Rule

21 23(a)(3) is satisfied.

22          d.    *Adequacy of Representation*

23          Rule 23(a)(4) requires that the representative party be able to "fairly and adequately protect

24 the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "This requirement is rooted in due-process

25 concerns—'absent class members must be afforded adequate representation before entry of a

26 judgment which binds them.'"  *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1165 (9th

27 Cir. 2013) (quoting *Hanlon*, 150 F.3d at 1020).  Courts engage in a dual inquiry to determine

28 adequate representation and ask: "'(1) do the named plaintiffs and their counsel have any conflicts

United States District Court
Northern District of California

17

of interest with other Class Members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Evon*, 688 F.3d at 1031 (quoting *Hanlon*, 150 F.3d at 1020).

First, nothing in the record suggests the Settlement Class Representatives or Class Counsel have any conflicts of interests with other potential Class Members.  There are 75 named Settlement Class Representatives hailing from 39 states.  (*See* Dkt. No. 1609-1.)  The Settlement Class Representatives affirm they "and Class Members are entirely aligned in their interest in proving that Volkswagen misled them and share the common goal of obtaining redress for their injuries."  (Dkt. No. 1609 at 23.)  The Court finds no reason to believe otherwise.

Second, the Court is satisfied that the Settlement Class Representatives and Class Counsel have and will continue to vigorously prosecute this action on behalf of the class.  The Settlement Class Representatives have actively participated in this litigation by providing Class Counsel with factual information concerning the purchase or lease of their Eligible Vehicle, which assisted in the drafting of the Consolidated Complaint.  (*Id.*)  Representative Plaintiffs also submitted detailed verified Plaintiff Fact Sheets during discovery, provided relevant documents and information, assisted in the preparation of discovery responses, and communicated regularly with Class Counsel.  (*Id.*)

Finally, there are no doubts regarding Class Counsel's adequacy.  The Court appointed Lead Plaintiffs' Counsel and the 21 PSC members after a competitive application process, during which the Court received approximately 150 applications.  They are qualified attorneys with extensive experience in consumer class action litigation and other complex cases.  The extensive efforts undertaken thus far in this matter are indicative of Lead Plaintiffs' Counsel's and the PSC's ability to prosecute this action vigorously.  The Court therefore finds the Settlement Class Representatives and Class Counsel are adequate representatives.

           e.    *Summary*

The Settlement Class Representatives meet all four Rule 23(a) requirements for purposes of preliminary approval.  Plaintiffs next "must show that the action is maintainable under Rule 23(b)(1), (2), or (3)."  *Amchem Prods., Inc.*, 521 U.S. at 614.  Plaintiffs seek certification pursuant

1    to Rule 23(b)(3).  (Dkt. No. 1609 at 24-28.)

2          2.      Rule 23(b)(3)

3          A class action may be maintained under Rule 23(b)(3) when "the court finds [1] that the

4    questions of law or fact common to class members predominate over any questions affecting only

5    individual members, and [2] that a class action is superior to other available methods for fairly and

6    efficiently adjudicating the controversy[.]"  Fed. R. Civ. P. 23(b)(3).

7          "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)."

8    *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).  The Rule 23(b)(3) "analysis presumes

9    that the existence of common issues of fact or law have been established pursuant to Rule

10   23(a)(2); thus, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3)."

11   *Hanlon*, 150 F.3d at 1022.  Instead, "[t]he 'predominance inquiry tests whether proposed classes

12   are sufficiently cohesive to warrant adjudication by representation'" and requires "courts to give

13   careful scrutiny to the relation between common and individual questions in a case."  *Tyson*

14   *Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting *Amchem Prods.*, 521 U.S. at

15   623).  Predominance is found "[w]hen common questions present a significant aspect of the case

16   and they can be resolved for all members of the class in a single adjudication[.]"  *Hanlon*, 150

17   F.3d at 1022 (internal quotations omitted).

18         This case meets Rule 23(b)(3)'s predominance requirement.  Plaintiffs allege Volkswagen

19   perpetrated the same fraud in the same manner against all Class Members.  If the Court were to

20   find that Volkswagen has indeed engaged in a deceptive and fraudulent scheme, such a finding

21   would apply to all of the Class Members' claims.  Plaintiffs also allege a common and unifying

22   injury, as their and other Class Members' injuries arise solely from Volkswagen's use of the

23   defeat device.  As such, the Court finds predominance is met.

24         The superiority test is also satisfied.  This inquiry "requires the court to determine whether

25   maintenance of this litigation as a class action is efficient and whether it is fair."  *Wolin*, 617 F.3d

26   at 1175-76.  If Class Members were to bring individual lawsuits against Volkswagen, each

27   Member would be required to prove the same wrongful conduct to establish liability and thus

28   would offer the same evidence.  Given that Class Members number in the hundreds of thousands,

United States District Court
Northern District of California

19

there is the potential for just as many lawsuits with the possibility of inconsistent rulings and results.  Thus, classwide resolution of their claims is clearly favored over other means of adjudication, and the proposed Settlement resolves Class Members' claims at once.  As such, class action treatment is superior to other methods and will efficiently and fairly resolve the controversy.

### 3.   Summary

Plaintiffs satisfy the Rule 23(a) and (b)(3) requirements.  The Court therefore certifies the proposed Class for settlement purposes.

## B.   Preliminary Fairness Determination

The Ninth Circuit has identified eight factors courts should consider to determine whether a settlement agreement is fair, adequate, and reasonable:

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement.

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (citation omitted).  Courts must examine "the settlement taken as a whole, rather than the individual component parts" for fairness.  *Hanlon*, 150 F.3d at 1026.  Courts cannot "delete, modify or substitute certain provisions" of the settlement.  (*Id.* (internal quotations omitted).)

But where, as here, the parties negotiate a settlement before a class has been certified, "courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  Pre-class certification settlements "must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair."  *In re Bluetooth*, 654 F.3d at 946 (citing *Hanlon*, 150 F.3d at 1026).  This heightened scrutiny "ensure[s] that class representatives and their counsel do not secure a disproportionate benefit 'at the expense of the unnamed plaintiffs who class counsel had a duty to represent.'"  *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (quoting *Hanlon*, 150 F.3d

at 1027).  As such, courts must evaluate the settlement for evidence of collusion.  (*Id.*)

Because "[c]ollusion may not always be evident on the face of a settlement, . . . courts therefore must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations."  *In Re Bluetooth*, 654 F.3d at 947.  In *In Re Bluetooth*, the Ninth Circuit identified signs of subtle collusion including, but not limited to,

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded,
> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries "the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class"; and
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund[.]

*Id.* (internal quotations and citations omitted).

However, courts need not assess all of these fairness factors at the preliminary approval stage.  *See Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 665 (E.D. Cal. 2008).  Rather, "the preliminary approval stage [i]s an 'initial evaluation' of the fairness of the proposed settlement made by the court on the basis of written submissions and informal presentation from the settling parties."  *In re High-Tech Empl. Antitrust Litig.*, 2013 WL 6328811, at *1 (N.D. Cal. Oct. 30, 2013) (citing Manual for Complex Litigation (Fourth) § 21.632).  At this stage, "[p]reliminary approval of a settlement is appropriate if 'the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval.'"  *Ruch v. AM Retail Grp., Inc.*, 2016 WL 1161453, at *7 (N.D. Cal. Mar. 24, 2016) (quoting *In re Tableware*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)).  Ultimately, "[t]he initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge."  *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).

1.      Settlement Process

The Court first considers "the means by which the parties arrived at settlement." Preliminary approval is appropriate if the proposed settlement is the product of serious, informed, non-collusive negotiations.  The Settlement is the end result of such negotiations.  Class Counsel received and analyzed "huge volumes of discovery."  (Dkt. No. 1609 at 17.)  This review allowed them to make a well-informed assessment of the merits of the Class' claims and to determine whether Volkswagen's offers adequately compensates Class Members for their injuries.  At the hearing, Class Counsel explained that they had the assistance of auto industry experts, which allowed them to test and analyze for themselves the data provided by Volkswagen.  Moreover, Class Counsel conducted surveys of Class Members so they could evaluate Class Members' goals regarding and reactions to various settlement proposals.  The Settlement is also the result of arm's-length negotiations by experienced Class Counsel and thus is "entitled to 'an initial presumption of fairness.'"  *In re High-Tech Empl.*, 2013 WL 6328811, at *1 (quoting Newberg on Class Actions § 11.41 (4th ed. 2002)).  Moreover, Class Counsel negotiated the Settlement alongside government entities, including EPA and FTC.  (Dkt. No. 1609 at 17.)  While those entities are not technically parties to the Settlement currently before the Court for preliminary approval, their coordination with Class Counsel and support of the Settlement weigh in favor of granting preliminary approval.

Further, the parties negotiated the Settlement under the supervision of the Court-appointed Settlement Master.  While "the mere presence of a neutral mediator, though a factor weighing in favor of a finding of non-collusiveness, is not on its own dispositive of whether the end product is a fair, adequate, and reasonable settlement agreement[,]" *In re Bluetooth*, 654 F.3d at 948, on balance, the Settlement Master's guidance coupled with informed dialogues and the intensive involvement of government entities suggests the parties reached the Settlement after serious, informed, non-collusive negotiations.  This factor therefore weighs strongly in favor of preliminary approval.

        2.      <u>The Presence of Obvious Deficiencies</u>

The second consideration is whether the Settlement contains any obvious deficiencies. The Court finds no glaring concerns at this time.

The first *Bluetooth* factor asks whether class counsel receive a disproportionate distribution of the settlement or whether counsel are amply rewarded while the class receives no monetary distribution.  (*Id.*)  At this point, this factor is not problematic.  As the parties have not yet negotiated attorneys' fees, the Court cannot yet determine if the first situation exists, that is, whether the Settlement awards Class Counsel a disproportionate distribution of the settlement funds.  In any event, the Settlement does not award Class Counsel any portion of the $10.033 billion Funding Pool; those funds are designated solely for Class Members.  Further, this Court makes the final decision as to the amount of Class Counsels' compensation.  The second situation is not also at issue, given that the Settlement provides for significant monetary compensation—the price of a Buyback and additional cash compensation—for Class Members.  As such, there is no evidence of collusion under the first *Bluetooth* factor.

The parties have agreed that Volkswagen will pay reasonable fees separate from the compensation provided to Class Members and that those fees are subject to the Court's approval.  (*Id.*)  As noted earlier, the parties have not agreed on an amount of attorneys' fees and costs.  (Dkt. No. 1685 ¶ 11.1.)  Thus, as of now there is no "clear sailing" agreement and this factor does not weigh against preliminary approval.

If the parties eventually agree as to the amount of attorneys' fees and costs, Class Counsel will submit the negotiated amount to the Court for approval.  (*Id.*)  In the event the parties cannot reach such an agreement, they will litigate the issue.  (*Id.*)  The Notice informs Class Members that Volkswagen will pay Court-approved attorneys' fees and costs and that their compensation will not be reduced by those expenses.  (Dkt. No. 1685-3 at 4.)  It further advises Class Members that they will have opportunity to comment on and/or object to the PSC's request for fees and costs, once made and before the Court rules on any such request.  (*Id.* at 25.)

That the amount of attorneys' fees and costs is still to be determined is not fatal to preliminary approval.  Rule 23(h), which governs attorneys' fees in class actions, does not require Class Counsel to move for its fee award at the preliminary approval juncture, or even upon seeking final approval.  *See* Fed. R. Civ. P. 23(h); *In re Nat'l Football League Players Concussion Injury Litig.* ("*In re NFL Players*"), 821 F.3d 410 (3d Cir. 2016) ("[T]he separation of a fee award

United States District Court
Northern District of California

1    from final approval of the settlement does not violate Rule 23(h).”); *In re Oil Spill by Oil Rig*

2    *Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 910 F. Supp. 2d 891, 918 n.16 (E.D. La.

3    2012), *aff’d sub nom. In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014) (granting final

4    approval where “parties had no discussions regarding fees other than the PSC’s making clear that

5    it would eventually file a request for attorneys’ fees.”).  While Class Members must be given an

6    opportunity to object to a request for fees, *see In re Mercury Interactive Corp. Secs. Litig.*, 618

7    F.3d 988, 994-95 (9th Cir. 2010), they can be given that opportunity after final approval.

8          The Court wants to ensure, however, that Class Members have sufficient information as to

9    the PSC’s prospective request for attorneys’ fees and costs to make an informed decision as to

10   whether they should object to or opt out of the Settlement, a decision which must be made by

11   September 16, 2016.  *See In re NFL Players*, 821 F.3d at 446 (“Even if the class members were

12   missing certain information—for example, the number of hours class counsel worked and the

13   terms of any contingency fee arrangements class counsel have with particular retired players—

14   they still had enough information to make an informed decision about whether to object to or opt

15   out from the settlement.”).  The Court therefore orders Lead Plaintiffs’ Counsel to submit more

16   information regarding the PSC’s request for attorneys’ fees on or before August 10, 2016.  Pretrial

17   Order Number 11 sets forth the guidelines and rules for work done and expenses incurred for the

18   common benefit of all Plaintiffs in this MDL.  In accordance with that Order, Lead Plaintiffs’

19   Counsel should either provide an estimate of the amount of fees and costs the PSC will seek for

20   work in connection with the Settlement or, alternatively, detail the methodology the PSC will use

21   to determine the amount of fees and costs they will seek.  For example, if the PSC intends to rely

22   on a lodestar plus a multiplier, they should so state, as well as indicate the specific multiplier they

23   intend to seek and the range of the hourly rates charged by authorized timekeepers. Such

24   additional information shall be made available to interested Class Members on the Court’s

25   website[3] as well as the Settlement Website.

26         The final *Bluetooth* factor considers whether the settlement provides for funds not awarded

27

28   _____
     [3] The Court’s website concerning this MDL may be found at http://cand.uscourts.gov/crb/vwmdl.

to revert to defendants. *Bluetooth*, 654 F.3d at 947.  Under the Settlement, any funds remaining in the Escrow Account upon the conclusion of the Claim Period or upon the termination or invalidation of the Settlement shall revert to Volkswagen.  (Dkt. No. 1685 ¶¶ 10.3-10.4.)  Such reversionary provisions, while not prohibited, can be problematic. *Fraley v. Facebook Inc.*, 2012 WL 5835366, at *3 (N.D. Cal. Aug. 17, 2012).  While reversion of funds generally minimizes a class action defendant's likely payout, in this case, Volkswagen has an incentive to encourage Class Members to participate in the Settlement.  The proposed Partial Consent Decree between Volkswagen,[4] the DOJ, and the State of California requires Volkswagen to "to remove from commerce in the United States and/or perform a Fix on at least 85% of the 2.0 Liter Subject Vehicles ('Recall Rate')" by June 30, 2019.  (Dkt. No. 1605-1 ¶ 3; *id.*, App'x A ¶ 6.3.)  If Volkswagen fails to achieve the Recall Rate, the Partial Consent Decree requires it to pay additional funds into an Environmental Mitigation Trust, which is to be established to reduce the NOx emissions of the 2.0-liter diesel engine vehicles.  (*Id.* (both); *id.*, App'x D at 1.)  The mandatory 85% Recall Rate and the ensuing penalties if that Rate is not met tempers any motivation Volkswagen may have to maximize the amount of unclaimed funds.  Under these circumstances, the Court finds this factor does not suggest collusion.

Finally, the Settlement creates challenging logistical deadlines for Volkswagen; for example, it has agreed to complete a Buyback within 90 days of the Class Member's acceptance of a formal offer, which in itself must be made within just 10 days of the Class Member's completed claim.  At oral argument, Volkswagen explained to the Court's satisfaction what steps it has taken to ensure that it meets its promises.  VWGoA is tasked with implementing the Settlement under the direction of its Chief Operating Officer ("COO").  Thus far, the COO has worked with legal, finance, information technology, and customer relations teams to ensure the expeditious implementation of the Settlement.  There are 40 key VWGoA individuals dedicated full-time to the Settlement's execution, many of whom have been involved in Settlement process.  VWGoA also intends to hire 250-300 people in Michigan to work exclusively on Settlement, for instance, in

---

[4] The proposed Partial Consent Decree includes the settling Defendants here, as well as VW Chattanooga.  (Dkt. No. 1605-1 at 2.)

United States District Court
Northern District of California

United States District Court
Northern District of California

1  the fields of consumer, claims, dealer, and tech support, as well as parts and dealership logistics.

2  It will provide in-depth training for that team via informational books, videos, and process flow

3  charts.  VWGoA will also train a minimum of 250 settlement specialists to assist Class Members

4  and Volkswagen and Audi Dealers with the Buyback and Lease Termination process at the

5  dealerships.  Additionally, VWGoA is prepared to enter into contracts to provide incremental

6  storage to hold those Eligible Vehicles returned in a Buyback or a Lease Termination.  Given the

7  efforts Volkswagen has and will undertake to guarantee the successful implementation of the

8  Settlement, the Court is assured Volkswagen will be able to uphold its end of the Settlement.

9       At this time, none of the *Bluetooth* factors are present; nor does the Court note any other

10  apparent problems with the Settlement.  The lack of any obvious deficiencies weighs in favor of

11  preliminary approval.

12       3.    <u>Preferential Treatment</u>

13       The third factor asks whether the Settlement provides preferential treatment to any Class

14  Member.  It does not.  Buyback values and Restitution Payments for all Class Members are based

15  on the September 2015 NADA Clean Trade In value of the Eligible Vehicle, which ensures a

16  uniform classwide calculation.  The Settlement also treats, and thus compensates, Class Members

17  equally.  Class Members receive the same amount of Restitution regardless of whether they elect a

18  Buyback or Lease Termination or a Fix.  All Lessees are treated alike as well.  Further, the

19  Settlement does not provide an incentive award for the Settlement Class Representatives or

20  Representative.  The Court is satisfied the Settlement does not afford any Class Member

21  preferential treatment and finds this factor weighs in favor of preliminary approval.

22       4.    <u>Range of Possible Approval</u>

23       Under the fourth factor, courts determine whether a settlement falls within the range of

24  possible approval.  This requires courts to focus on "substantive fairness and adequacy" and

25  "consider plaintiffs' expected recovery balanced against the value of the settlement offer."

26  *Tableware*, 484 F. Supp. 2d at 1080.  As part of this assessment, courts must "estimate the

27  maximum amount of damages recoverable in a successful litigation and compare that with the

28  settlement amount."  *Harris*, 2011 WL 1627973, at *11 (internal quotations omitted).

The full purchase price of Eligible Vehicles is unlikely to represent the maximum recovery, as many state laws allow a deduction for vehicles' use. *See, e.g.*, Md. Code Ann. Com. Law § 14-1502(c)(1)(ii)(2) (requiring manufacturer to "[a]ccept return of the motor vehicle from the consumer and refund to the consumer the full purchase price . . . less: 1. A reasonable allowance for the consumer's use of the vehicle not to exceed 15 percent of the purchase price; and 2. A reasonable allowance for damage not attributable to normal wear . . . ."); Mass. Gen. Laws Ann. ch. 90, § 7N 1/2 ("In instances in which a vehicle is sold and subsequently returned, the manufacturer shall refund the full contract price of the vehicle . . . , less . . . a reasonable allowance for use . . . ."); Wash. Rev. Code Ann. § 19.118.041(1)(a) ("Compensation for a reasonable offset for use shall be paid by the consumer to the manufacturer in the event that the consumer accepts a replacement motor vehicle."). Moreover, as Plaintiffs note, any recovery obtained at trial could also be subject to offsets. (Dkt. No. 1609 at 15); *see, e.g.*, 15 U.S.C. § 2301(12) (defining "refund" as "refunding the actual purchase price (less reasonable depreciation based on actual use where permitted by rules of the Commission)"); Cal. Civ. Code § 1793.2(d)(2)(C) (Restitution "may be reduced by the manufacturer by that amount directly attributable to use by the buyer prior to the time the buyer first delivered the vehicle to the manufacturer or distributor, or its authorized service and repair facility for correction of the problem that gave rise to the nonconformity.").

In line with these laws, the Buyback Option takes into account Class Members' use of their Eligible Vehicles. But because the Buyback price is based in part on the Vehicle Value at the September 2015 NADA Clean Trade In value, this ensures Class Members' recovery is not affected by the loss in value caused by Volkswagen's disclosure of the defeat device. Furthermore, that value does not decrease despite Class Members' use of their vehicle from September 2015 through the conclusion of the Buyback. The Restitution Payment, which is based on a percentage of the same Vehicle Value, likewise factors in Class Members' use of their Eligible Vehicles until September 2015, while also providing additional compensation for Class Members. As such, the Settlement's value is wholly consistent with Class Members' possible recovery in proceeding with litigation. This is how it should be, as liability is not seriously at

1    issue, and the Settlement's substantial compensation to Class Members reflects this reality.

2                                              *****

3          The proposed Settlement is fair, adequate, and reasonable.

4    **C.    Class Notice**

5          1.    Method of Providing Notice

6          For any class certified under Rule 23(b)(3), "the court must direct to class members the

7    best notice that is practicable under the circumstances, including individual notice to all members

8    who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  "[T]he express

9    language and intent of Rule 23(c)(2) leave no doubt that individual notice must be provided to

10   those class members who are identifiable through reasonable effort."  *Eisen v. Carlisle &*

11   *Jacquelin*, 417 U.S. 156, 175 (1974).

12         The Settlement provides that class notice will begin July 27, 2016, or the day after the

13   Court grants preliminary approval.  (Dkt. No. 1685 ¶ 12.3.)  The parties have selected, subject to

14   the Court's approval, Kinsella Media, LLC ("KM") as the Notice Administrator.  (*Id.* ¶ 2.49; Dkt.

15   No. 1609 at 31; Dkt. No. 1680 ¶ 2.)  The Notice Administrator will send via first class mail a

16   personalized cover letter and Long Form Notice, *see* Dkt. No. 1685-3, to all readily identifiable

17   Class Members, as well as anyone who calls the toll-free information line or provides a written

18   request for a Long Form Notice to the Notice Administrator.  (Dkt. No. 1609-2 ¶ 19.)  The names

19   and addresses of Class Members are identifiable through Volkswagen's records and/or registration

20   data.  (Dkt. No. 1609 at 31.)  The Notice Administrator will also mail the Long Form Notice to

21   approximately 15,212 new and 58,167 used Non-Volkswagen Dealers.  (Dkt. No. 1680 ¶ 6.)

22         The Notice Administrator will supplement the direct mail notice with both an email notice

23   and a paid print and digital media program.  (Dkt. No. 1609-2 ¶ 23; Dkt. No. 1680 ¶ 5.)  An email

24   notice summarizing the Settlement will be sent to anyone who provided an email address when

25   registering for the Volkswagen or Audi Goodwill Program.[5]

26

27   _____

28   [5] Shortly after Volkswagen disclosed its use of defeat device, it offered affected owner and lessees a "TDI Goodwill Package" which is unrelated to the Settlement now before the Court.

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1    The Short Form Notice, *see* Dkt. No. 1685-2, will appear as a two-color advertisement, where available, in (1) the Sunday edition of *The New York Times*; (2) the daily editions of *The Wall Street Journal* and *USA Today*; (3) the Sunday and daily editions of 19 newspapers that cover markets with 5,000 or more Eligible Vehicles; (4) the Sunday editions of 26 newspapers that cover markets with 2,000 to 4,999 Eligible Vehicles; and (5) the weekly editions of 27 African American newspapers.  (Dkt. No. 1609-2 ¶¶ 24-25; Dkt. No. 1680 ¶ 7; *see* Dkt. No. 1609-2, Attachment C; Dkt. No. 1680-1.)  A Spanish translation of the Short Form Notice will also appear as a two-color advertisement in the weekly editions of 31 Hispanic newspapers.  (Dkt. No. 1680 ¶ 7; *see* Dkt. No. 1685-2.)

The paid media campaign will also include digital advertising.  This campaign will include third-party targeting, such as banner advertisements delivered to websites using IHS Automotive (Polk) data, which will incorporate advanced targeting and dynamic advertising capabilities from industry-standard third-party data sources.  (Dkt. No. 1609-2 ¶ 28; Dkt. No. 1680 ¶ 9.)  Third-party targeting seeks to reach Eligible Owners and Lessees.

The paid media campaign will also take out advertisements on LinkedIn; social media, such as Facebook, Instagram, and Twitter; and the Google Display Network.  (Dkt. No. 1609-2 ¶¶ 29-32; Dkt. No. 1680 ¶ 9.)  The LinkedIn advertisement in particular will focus on targeting the Non-Volkswagen Dealers.  The Notice Administrator will also implement sponsored keywords and phrases with major search engines such that a when user searches for one of the specified search terms or phrases, sponsored links will appear on the results page.  (*Id.* ¶ 33.)

Additionally, the Notice Administrator will employ an earned media program consisting of a multimedia new release, or "campaign hero microsite," to be distributed on PR Newswire's US1 National Circuit, which reaches approximately 5,000 media outlets and 5,400 websites.  (*Id.* ¶ 34.)  That release will blend text, audio, video, photos, related documents, and social media.  (*Id.*)  Moreover, the Notice Administrator will email the press release and Long Form Notice to 74 Non-Volkswagen Dealers and fleet associations and ask them to share the information with their members.  (Dkt. No. 1680 ¶ 10.)

United States District Court
Northern District of California

1    Finally, Class Members can visit the Settlement Website[6] and call a toll-free telephone

2    number to obtain information about and access the Settlement, the Long Form Notice, the Claim

3    Form, and "other information that Class Members may find useful and relevant to their claims

4    decision."  (*Id.* ¶¶ 37-38; Dkt. No. 1609 at 31.)  The Notice Administrator will also establish a post

5    office box to allow Class Members to contact Class Counsel by mail.  (Dkt. No. 1609-2 ¶ 39.)

6    Identifiable Class Members will receive via email and mail notifications when EPA and CARB

7    approve or reject a Fix, or if Volkswagen does not propose one.  (*Id.* ¶¶ 35-36.)  Updates on the

8    approval of a Fix will also be placed on the Settlement Website.  (*Id.* ¶ 35.)

9        The Court is satisfied the Notice Plan is adequate.  Direct mail provides individual notice

10    to identifiable Class Members, as required by Rule 23(c)(2).  Class Members' names and

11    addresses are readily identifiable, and there is nothing to suggest Class Members cannot be located

12    through reasonable efforts.  Direct mail therefore serves as the best practicable method to notify

13    Class Members of this Settlement.  *See Hunt v. Check Recovery Sys., Inc.*, 2007 WL 2220972, at

14    *3 (N.D. Cal. Aug. 1, 2007), *aff'd sub nom. Hunt v. Imperial Merch. Servs., Inc.*, 560 F.3d 1137

15    (9th Cir. 2009) ("Delivery by first-class mail can satisfy the best notice practicable when there is

16    no indication that any of the class members cannot be identified through reasonable efforts.").

17    The paid print and digital media campaign, earned media program, Settlement Website, and toll-

18    free telephone number further ensure notice will reach Class Members.  The Court thus approves

19    the method of notice as described in Exhibit 2 of Plaintiffs' Motion, Dkt. No. 1609-2, as it

20    provides the best practicable notice that is reasonably calculated to inform Class Members of this

21    Settlement.

22    2.    Contents of the Notice

23        Rule 23(c)(2)(B) also requires the notice clearly and concisely state

24            (i) the nature of the action; (ii) the definition of the class certified;
              (iii) the class claims, issues, or defenses; (iv) that a class member
25            may enter an appearance through an attorney if the member so
              desires; (v) that the court will exclude from the class any member
26            who requests exclusion; (vi) the time and manner for requesting

27

28    [6] The Settlement provides that the Settlement Website is to remain accessible for a minimum of 10
      years after the DOJ Consent Decree (Dkt. No. 1605) is entered.  (Dkt. No 1685 ¶ 4.3.2.)

1   exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

2   Fed. R. Civ. P. 23(c)(2)(B).

3       The 28-page Long Form Notice satisfies each element of Rule 23(c)(2)(B).  (*See* Dkt. No.

4   1685-3.)  It provides a summary of the Settlement and clearly explains how Class Members may

5   object to or opt out of the Settlement, as well as how Class Members may address the Court at the

6   final approval hearing.  *See Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)

7   ("Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to

8   alert those with adverse viewpoints to investigate and to come forward and be heard.").  It also

9   explains in question-and-answer format the benefits provided under the Settlement, how Class

10   Members receive benefits, and who is a Class Member.  Furthermore, the Long Form Notice

11   provides the names and contact addresses of Lead Plaintiffs' Counsel and PSC members and

12   indicates additional information about the Settlement can be found on the Settlement Website or

13   by calling 1-844-98-CLAIM.

14       3.    Costs of Class Notice Program

15       Volkswagen will bear all reasonable and necessary costs of the Class Notice Program.

16   (Dkt. No. 1685 ¶ 8.3.)  Within two days of this Order, Volkswagen shall transfer to or pay the

17   Notice Administrator an amount sufficient to cover the initial costs of the Program.  (*Id.* ¶ 8.4.)

18       **V.    CONCLUSION**

19       The Court finds that the proposed Settlement is the result of intensive, non-collusive

20   negotiations and is reasonable, fair, and adequate.  The Court therefore **GRANTS** Plaintiffs'

21   Motion for Preliminary Approval of Class Settlement as follows:

22       1.    The proposed Settlement Class is conditionally certified pursuant to Federal

23           Rules of Civil Procedure 23(a) and (b)(3) for settlement purposes.  The Settlement

24           Class is defined as

25               a nationwide class of all persons (including individuals and
                 entities) who, on September 18, 2015, were registered
26               owners or lessees of, or, in the case of Non-Volkswagen
                 Dealers, held title to or held by bill of sale dated on or before
27               September 18, 2015, a Volkswagen or Audi 2.0-liter TDI
                 vehicle in the United States or its territories (an "Eligible
28               Vehicle"), or who, between September 18, 2015, and the end
                 of the Claim Period, become a registered owner of, or, in the

United States District Court
Northern District of California

31

case of Non-Volkswagen Dealers, hold title to or hold by bill of sale dated after September 18, 2015, but before the end of the Claims Period, an Eligible Vehicle in the United States or its territories.

2.   The Settlement is preliminarily approved as fair, adequate, and reasonable pursuant to Federal Rule of Civil Procedure 23(e).

3.   The Court appoints Elizabeth J. Cabraser and the 21 members of the PSC listed in Pretrial Order No. 7 (Dkt. No. 1084) as Settlement Class Counsel.

4.   The Court appoints and designates the individuals listed in Exhibit 1 to the Motion (Dkt. No. 1609-1) as Class Representatives for settlement purposes only.

5.   The Court appoints Kinsella Media, LLC as the Notice Administrator to perform the duties set forth in the Settlement.

6.   Notice shall be provided in accordance with the Notice Plan and this Order—that is, **by July 27, 2016**.

7.   The Court appoints Ankura Consulting Group, LLC as Claims Supervisor to perform the duties described in the Settlement.

8.   Class Members shall submit their objections or requests for exclusion by **September 16, 2016** in the manner set forth in the Settlement.

9.   Eligible Seller Class Members shall identify themselves as required by the Settlement by **September 16, 2016.**

10.   Lead Plaintiffs' Counsel shall submit more information regarding the PSC's prospective request for attorneys' fees on or before **August 10, 2016**.

11.   Lead Plaintiffs' Counsel shall file a motion for final approval by **August 26, 2016** and any reply shall be filed by **September 30, 2016**.

The Court will hold a final fairness hearing to finally determine whether the settlement is fair, reasonable, and adequate on **October 18, 2016 at 8:00 a.m.** in Courtroom 6, 450 Golden Gate Avenue, San Francisco, California. The deadline for Class Members to file a Notice of Intent to Appear at final fairness hearing is **October 4, 2016**.

//

//

United States District Court
Northern District of California

1

**IT IS SO ORDERED.**

2

Dated: July 29, 2016

3

4

_____

5

CHARLES R. BREYER
United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California