1   Elizabeth J. Cabraser (State Bar No. 083151)
    ecabraser@lchb.com
2   LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP
3   275 Battery Street, 29th Floor
    San Francisco, CA  94111-3339
4   Telephone:  (415) 956-1000
    Facsimile:  (415) 956-1008
5
    Plaintiffs' Lead Settlement Class Counsel
6   *(Plaintiffs' Settlement Counsel*
    *Listed on Signature Page)*
7

8                  UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10                    SAN FRANCISCO DIVISION

11

12  | IN RE: VOLKSWAGEN "CLEAN DIESEL" | MDL 2672 CRB (JSC) |

13  MARKETING, SALES PRACTICES, AND
    PRODUCTS LIABILITY LITIGATION

    **PLAINTIFFS' NOTICE OF MOTION,
    MOTION, AND MEMORANDUM IN
14   SUPPORT OF FINAL APPROVAL OF
     THE 2.0-LITER TDI CONSUMER AND
     RESELLER DEALER CLASS ACTION**
    This Document Relates to:
15   **SETTLEMENT**

    ALL CONSUMER AND RESELLER
16  ACTIONS
    Hearing:  October 18, 2016
17  Time:  8:00 a.m.
    Courtroom:  6, 17th floor
18
    The Honorable Charles R. Breyer
19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page(s)**

I.    INTRODUCTION ......................................................................................................... 1

II.   BACKGROUND AND PROCEDURAL HISTORY ......................................................... 4

    A.   Factual Background ............................................................................................ 4

    B.   Procedural History ............................................................................................. 5

III.  TERMS OF THE 2.0-LITER CLASS SETTLEMENT...................................................... 9

    A.   The 2.0-Liter Settlement Class Definition ......................................................... 9

    B.   Summary of Benefits to Class Members............................................................ 10

IV.   THE 2.0-LITER SETTLEMENT MERITS FINAL APPROVAL ................................... 14

    A.   The Class Action Settlement Process................................................................ 14

    B.   The Settlement Meets the Ninth Circuit's Standards For Final Approval .............. 15

    C.   The Settlement Is Substantively Fair Because It Provides Very Significant Benefits in Exchange for The Compromise of Strong Claims................................ 16

    D.   The Settlement Is Procedurally Fair as the Product of Good Faith, Informed, and Arm's-Length Negotiations .............................................................................. 22

    E.   Class Member Reaction To the Settlement Has Been Overwhelmingly Favorable 24

V.    THE COURT SHOULD CONFIRM THE CERTIFICATION OF THE  2.0-LITER SETTLEMENT CLASS ............................................................................................ 26

    A.   The Class Meets The Requirements Of Rule 23(a) ............................................ 26

        1.   The Class Is Sufficiently Numerous ............................................................. 26

        2.   There Are Common Questions of Both Law and Fact.................................... 27

        3.   The Settlement Class Representatives' Claims Are Typical of Other Class Members' Claims ...................................................................................... 29

        4.   The Settlement Class Representatives and Settlement Class Counsel Fairly and Adequately Protect the Interests of the Settlement Class........................ 30

            a.   The Interests of the Settlement Class Representatives Are Directly Aligned with those of the Absent Class Members and the Settlement Class Representatives Have Diligently Pursued the Action on Their Behalf ............................................................................................... 31

            b.   Settlement Class Counsel Are Adequate Representatives of the Settlement Class ................................................................................ 32

    B.   The Requirements Of Rule 23(b)(3) Are Met..................................................... 32

        1.   Common Issues of Law and Fact Predominate.............................................. 33

        2.   Class Treatment Is Superior in This Case ..................................................... 35

VI.   THE APPROVED NOTICE PROGRAM GAVE THE BEST PRACTICABLE NOTICE TO CLASS MEMBERS AND SATISFIED RULE 23 AND DUE PROCESS .............. 37

VII.  CONCLUSION......................................................................................................... 41

1

2

3  CERTIFICATE OF SERVICE ................................................................................................. 44

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Amchem Prods. v. Windsor,
  521 U.S. 591 (1997) ....................................................................................... 26, 35

Amgen Inc. v. Conn. Ret. Plans & Trust Funds,
  133 S. Ct. 1184 (2013) ........................................................................................ 27

Astiana v. Kashi Co.,
  291 F.R.D. 493 (S.D. Cal. 2013) ......................................................................... 29

Butler v. Sears, Roebuck & Co.,
  702 F.3d 359 (7th Cir. 2012) .............................................................................. 33

Cartwright v. Viking Indus.,
  No. 2:07-CV-02159-FCD-EFB, 2009 WL 2982887 (E.D. Cal. Sept. 14, 2009) ................... 36

Chun-Hoon v. McKee Foods Corp.,
  716 F. Supp. 2d 848 (N.D. Cal. 2010) ................................................................ 25

Churchill Vill., L.L.C. v. GE,
  361 F.3d 566 (9th Cir. 2004) .............................................................................. 25

Class Plaintiffs v. City of Seattle,
  955 F.2d 1268 (9th Cir. 1992) ............................................................................ 14

Clemens v. DaimlerChrysler Corp.,
  534 F.3d 1017 (9th Cir. 2008) ............................................................................ 20

Clemens v. Hair Club for Men, LLC,
  No. C 15-01431 WHA, 2016 U.S. Dist. LEXIS 50573 (N.D. Cal. 2016) ....................... 31, 32

Cohen v. Trump,
  303 F.R.D. 376 (S.D. Cal. 2014) ......................................................................... 28

Ellis v. Naval Air Rework Facility,
  87 F.R.D. 15 (N.D. Cal. 1980), aff'd, 661 F.2d 939 (9th Cir. 1981) ..................................... 16

Estrella v. Freedom Fin'l Network,
  No. C 09-03156 SI, 2010 WL 2231790 (N.D. Cal. June 2, 2010) ........................................ 27

Evon v. Law Offices of Sidney Mickell,
  688 F.3d 1015 (9th Cir. 2012) ........................................................................ 30, 31

Friedman v. 24 Hour Fitness USA, Inc.,
  No. CV 06-6282 AHM (CTx), 2009 WL 2711956 (C.D. Cal. Aug. 25, 2009) ..................... 35

Garner v. State Farm Mut. Auto. Ins. Co.,
  No. C 08 1365 CW (EMC), 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ........................ 25

Glass v. UBS Fin. Serv., Inc.,
  No. C-06-4068-MMC, 2007 WL 221862 (N.D. Cal. Jan. 26, 2007) ................................... 25

Guido v. L'Oreal, USA, Inc.,
  284 F.R.D. 468 (C.D. Cal. 2012) ........................................................................ 29

Hanlon v. Chrysler Corp.,
  150 F.3d 1011 (9th Cir. 1998) ..................................................................... passim

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992)........................................................................... 30

*In re Bluetooth Headset Prods. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011)...................................................................... 13, 23

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   No. C-07-5944-SC, 2016 U.S. Dist. LEXIS 9944 (N.D. Cal. Jan. 6, 2016), *report
   and recommendation adopted*, 2016 U.S. Dist. LEXIS 9766 (N.D. Cal. Jan. 26,
   2016)................................................................................................................. 34

*In re Celera Corp. Sec. Litig.*,
   No. 5:10-CV-02604-EJD, 2014 WL 722408 (N.D. Cal. Feb. 25, 2014) .............. 29

*In re First Alliance Mortg. Co.*,
   471 F.3d 977 (9th Cir. 2006)........................................................................... 35

*In re Netflix Priv. Litig.*,
   No. 5:11-CV-00379 EJD, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013)............. 41

*In re NFL Players Concussion Injury Litig.*,
   821 F.3d 410 (3d Cir. 2016 ........................................................................ 13, 14

*In re Rambus Inc. Derivative Litig.*,
   No. C-06-3515–JF, 2009 WL 166689 (N.D. Cal. Jan. 20, 2009) ........................ 15

*In re Syncor ERISA Litig.*,
   516 F.3d 1095 (9th Cir. 2008).......................................................................... 14

*In re Toys "R" Us-Del., Inc. Fair & Accurate Credit Transactions Act
   (FACTA) Litig.*, 295 F.R.D. 438 (C.D. Cal. 2014)................................................ 41

*In re Transpacific Passenger Air Transp. Antitrust Litig.*,
   No. C 07-05634 CRB, 2015 WL 3396829 (N.D. Cal. May 26, 2015) .................. 34

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
   527 F. Supp. 2d 1053 (N.D. Cal. 2007)............................................................ 36

*International Molders' & Allied Workers' Local Union No. 164 v. Nelson*,
   102 F.R.D. 457 (N.D. Cal. 1983)...................................................................... 29

*Jimenez v. Allstate Ins. Co.*,
   765 F.3d 1161 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 2835 (2015) .................. 28

*Jones v. Amalgamated Warbasse Houses, Inc.*,
   97 F.R.D. 355 (E.D.N.Y. 1982) ....................................................................... 22

*Keegan v. Am. Honda Motor Co.*,
   838 F. Supp. 2d 929 (C.D. Cal. 2012) .............................................................. 21

*Kim v. Space Pencil, Inc.*,
   No. C 11-03796 LB, 2012 WL 5948951 (N.D. Cal. Nov. 28, 2012)..................... 19

*Klay v. Humana, Inc.*,
   382 F.3d 1241 (11th Cir. 2004)......................................................................... 35

*Kruger v. Subaru of Am.*,
   996 F. Supp. 451 (E.D. Pa. 1998) ................................................................... 21

*Kruse v. Chevrolet Motor Div.*,
   Civil Action No. 96-1474, 1997 WL 408039 (E.D. Pa. July 15, 1997)................. 21

1

## TABLE OF AUTHORITIES
**(continued)**

2

**Page(s)**

3

*Lane v. Facebook, Inc.,*
   696 F.3d 811 (9th Cir. 2012), *cert. denied,* 134 S. Ct. 8 (2013) ........................................... 15

4

*Leuthold v. Destination Am., Inc.,*
   224 F.R.D. 462 (N.D. Cal. 2004) ....................................................................................... 36

5

*Marshall v. Holiday Magic, Inc.,*
   550 F.2d 1173 (9th Cir. 1977) .......................................................................................... 22

6

*Mego Financial Corp. Sec. Litig.,*
   213 F.3d 454 (9th Cir. 2000) ............................................................................... 15, 19, 22

7

8

*Moreno v. Autozone, Inc.,*
   251 F.R.D. 417 (N.D. Cal. 2008) ...................................................................................... 27

9

*Mullane v. Cent. Hanover Bank & Trust Co.,*
   339 U.S. 306 (1950) .......................................................................................................... 38

10

*Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.,*
   221 F.R.D. 523 (C.D. Cal. 2004) ...................................................................................... 25

11

12

*Negrete v. Allianz Life Ins. Co. of N. Am.,*
   238 F.R.D. 482 (C.D. Cal. 2006) ...................................................................................... 28

13

*Nobles v. MBNA Corp.,*
   No. C 06-3723 CRB, 2009 WL 1854965 (N.D. Cal. June 29, 2009) .............................. 16, 19

14

*Officers for Justice v. Civil Service Comm'n,*
   688 F.2d 615 (9th Cir. 1982) ............................................................................... 15, 16

15

16

*Palmer v. Stassinos,*
   233 F.R.D. 546 (N.D. Cal. 2006) ...................................................................................... 27

17

*Parsons v. Ryan,*
   754 F.3d 657 (9th Cir. 2014) .............................................................................. 27, 29, 30

18

*Pha v. Yang,*
   No. 2:12-cv-01580-TLN-DAD, 2015 U.S. Dist. LEXIS 109074 (E.D. Cal. Aug.
   17, 2015) ........................................................................................................................... 22

19

20

*Pierce v. Rosetta Stone, Ltd.,*
   No. C 11-01283 SBA, 2013 WL 5402120 (N.D. Cal. Sept. 26, 2013) ............................. 23

21

*Radcliffe v. Experian Info. Sols., Inc.,*
   715 F.3d 1157 (9th Cir. 2013) .......................................................................................... 30

22

*Richie v. Blue Shield of Cal.,*
   No. C-13-2693 EMC, 2014 WL 6982943 (N.D. Cal. Dec. 9, 2014) ................................ 27

23

*Ries v. Arizona Beverages USA LLC,*
   287 F.R.D. 523 (N.D. Cal. 2012) ...................................................................................... 29

24

*Riker v. Gibbons,*
   No. 3:08-cv-00115-LRH-VPC, 2010 WL 4366012 (D. Nev. Oct. 28, 2010) .................... 25

25

*Robbins v. Hyundai Motor Am., Inc.,*
   No. SACV 14-00005-JLS (ANx), 2015 WL 304142 (C.D. Cal. Jan. 14, 2015) ................ 20

26

*Rodman v. Safeway, Inc.,*
   No. 11-cv-03003-JST, 2014 WL 988992 (N.D. Cal. Mar. 9, 2014) .................................. 34

27

28

# TABLE OF AUTHORITIES
**(continued)**

**Page(s)**

*Rodriguez v. Hayes*,
  591 F.3d 1105 (9th Cir. 2010) ............................................................................... 29

*Rosales v. El Rancho Farms*,
  No. 1:09-cv-00707-AWI-JLT, 2015 WL 446091 (E.D. Cal. July 21, 2015) ........................ 22

*Rupay v. Volkswagen Grp. of Am. Inc.*,
  No. CV 12-4478-GW FFMX, 2012 WL 10634428 (C.D. Cal. Nov. 15, 2012) .................... 20

*Slaven v. BP Am., Inc.*,
  190 F.R.D. 649 (C.D. Cal. 2000) ........................................................................... 26

*Smith v. Cardinal Logistics Mgmt. Corp.*,
  No. 07-2104 SC, 2008 WL 4156364 (N.D. Cal. Sept. 5, 2008) ............................................ 36

*Spalding v. City of Oakland*,
  No. C11-2867 TEH, 2012 WL 994644 (N.D. Cal. Mar. 23, 2012) ....................................... 28

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ............................................................................... 16

*Stockwell v. City & County of San Francisco*,
  749 F.3d 1107 (9th Cir. 2014) ............................................................................... 27

*Suchanek v. Sturm Foods, Inc.*,
  764 F.3d 750 (7th Cir. 2014) ............................................................................... 29

*Sullivan v. DB Invs., Inc.*,
  667 F.3d 273 (3d Cir. 2011), *cert denied sub nom.*, *Murray v. Sullivan*, 132 S. Ct.
  1876 (2012) ............................................................................................... 33, 34

*Sykes v. Mel Harris & Assocs. LLC*,
  285 F.R.D. 279 (S.D.N.Y. 2012) ........................................................................... 28

*Trosper v. Styker Corp.*,
  No. 13-CV-0607-LHK, 2014 WL 4145448 (N.D. Cal. Aug. 21, 2014) ........................... 31, 36

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) ...................................................................................... 33

*UAW v. GMC*,
  497 F.3d 615 (6th Cir. 2007) ............................................................................... 20

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002) ............................................................................... 13

*Wakefield v. Wells Fargo & Co.*,
  No. C 12-05053 LB, 2014 WL 7240339 (N.D. Cal. Dec. 18, 2014) ................................... 34

*Walker v. Life Ins. Co. of the Sw.*,
  No. CV 10-9198 JVS (RNBx), 2012 WL 7170602 (C.D. Cal. Nov. 9, 2012) ..................... 36

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ...................................................................................... 28, 29

*Wolin v. Jaguar Land Rover N. Am., LLC*,
  617 F.3d 1168 (9th Cir. 2010) ......................................................................... 30, 35, 36

*Wren v. RGIS Inventory Specialists*,
  No. C-06-05778-JCS, 2011 WL 1230826 (N.D. Cal. Apr. 1, 2011) ................................... 25

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

## STATUTES

49 U.S.C. § 30120(a)(1)(A)(iii) ............................................................................ 19

Cal. Civ. Code § 1793.2(d)(2)(C) ......................................................................... 19

## RULES

Fed. R. Civ. P. 23(a) ............................................................................................. 23

Fed. R. Civ. P. 23(a)(1) ........................................................................................ 24

Fed. R. Civ. P. 23(a)(3) ........................................................................................ 27

Fed. R. Civ. P. 23(a)(4) ........................................................................................ 28

Fed. R. Civ. P. 23(b)(3) ........................................................................... 23, 30, 32

Fed. R. Civ. P. 23(c)(2)(B) ................................................................................... 35

Fed. R. Civ. P. 23(e) ........................................................................................ 13, 14

## TREATISES

2 W. Rubenstein, *Newberg on Class Action*
    § 4:49 (5th ed. 2012) ...................................................................................... 34

4 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*
    § 11:41 (4th ed. 2002) .................................................................................... 14

7AA C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure
    § 1778 (3d ed. 2005) ...................................................................................... 34

*Manual for Complex Litigation (Fourth)* (2004)
    § 21.63 ............................................................................................................ 14

## OTHER REFERENCES

Amanda Bronstad, *VW Lawyers' Fee Request Won't Exceed $324M Despite Massive
    Size of Emissions Accord*, Law.com, (Aug. 11, 2016),
    http://www.law.com/sites/almstaff/2016/08/11/vw-lawyers-fee-request-wont-
    exceed-324m-despite-massive-size-of-emissions-accord/ ..................................... 13

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on October 18, 2016, at 8:00 a.m., in Courtroom 6 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Settlement Class Counsel, on behalf of the provisionally certified Settlement Class of owners and lessees of Volkswagen and Audi branded 2.0-liter TDI vehicles, as defined in the Amended Class Action Settlement Agreement and Release, will and hereby do move the Court for an Order granting final approval of the Amended Class Action Settlement Agreement and Release.

As discussed in the accompanying Memorandum and Points of Authorities, the Parties have reached an historic settlement that remediates past environmental harm, reduces future environmental harm, and, importantly, empowers consumers to make choices about the buyback or emissions modifications of their vehicles to make environmental remediation real, restore lost value to their vehicles, and provide recovery for their economic losses. Moreover, the Notice Program ordered by the Court, which included direct mail notice and an extensive media outreach, has timely commenced and is providing the best notice practicable under the circumstances. The Settlement Class Representatives and Settlement Class Counsel thus respectfully request that the Court grant its final approval, upon which the buyback program, the provision of emissions modifications as EPA/CARB approve them, and other class relief will commence.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

For six years, Volkswagen sold its Volkswagen and Audi branded TDI diesel vehicles in the U.S. with resounding success. These cars were marketed as fuel-efficient, safe, well-performing, and reliable, and in all these respects, they delivered. In one significant respect, however, they deceived. Volkswagen heavily marketed these TDI cars as "clean diesels," when in reality, they were not. These TDI cars violated federal and state emissions rules. The use of these cars causes significant environmental damage.

1    When this deception was publicly disclosed on September 18, 2015, the owners and

2    lessees were harmed too, because the market value of their cars dropped substantially.  While TDI

3    owners and lessees thought they were driving clean diesels, they were in reality unwitting agents

4    to Volkswagen's pollution.  The more TDI owners and lessees drove, the more the environment

5    was harmed.

6    The mission of these Multidistrict Litigation ("MDL") proceedings, comprised of

7    hundreds of consumer class suits, and actions by the United States Department of Justice ("DOJ")

8    on behalf of the United States Environmental Protection Agency ("EPA"), the Federal Trade

9    Commission ("FTC"), and the State of California by and through the California Air Resources

10   Board ("CARB") and California's Office of the Attorney General, has been, as the Court has

11   acknowledged and urged, two-fold:  to "get[] the polluting cars fixed or off the road" as soon as

12   possible and to compensate Volkswagen's aggrieved customers.  *See, e.g.*, March 24, 2016,

13   Status Conference Hr'g Tr. 8:20-21 (Dkt. 1384).

14   The proposed 2.0-Liter class action settlement (the "Settlement," "Class Action

15   Settlement" or "Class Action Agreement"), and the related EPA/CARB and FTC agreements with

16   Volkswagen, together accomplish these two goals—mitigating environmental damage and

17   compensating consumers—in the speediest practicable manner, without the delays, uncertainties,

18   and enforcement problems of protracted litigation.  The Settlement accomplishes these goals in

19   three ways, summarized here and described more fully in this brief and the Settlement

20   Agreement:

21        1.    Giving 2.0-liter TDI owners and lessees the option of receiving to EPA-approved

22   emissions modifications as these become available, in combination with a restitution payment;

23        2.    Giving 2.0-liter TDI owners the option to sell back their operable cars, regardless

24   of their condition, to Volkswagen at September 2015 NADA Clean Trade (pre-"scandal") values,

25   with a restitution payment on top of this frozen-in-time, vehicle-specific value.  Cars recovered

26   by Volkswagen in this "buyback" program cannot be resold, anywhere in the world, unless they

27   are fixed to EPA standards; and

28        3.    Pursuant to Volkswagen's agreement with the DOJ, requiring Volkswagen to pay

a total of $4.7 Billion (on top of the $10.033 billion funding pool for the Buyback and Emissions Modification program) in environmental reparations, to be administered by the EPA.

The Settlement is the largest auto-related class action settlement in U.S. history and was achieved through an historic and extraordinary collaboration among private litigants, represented by the PSC/Settlement Class Counsel, and government entities, including the DOJ, EPA, FTC, CARB, and the California Attorney General's Office, all working under conditions of urgency as directed by the Court, and facilitated by the diligence of the Court-appointed Settlement Master. The Settlement, and the related and simultaneously-negotiated FTC Consent Order and DOJ Consent Decree (together, the "Settlements") are valued at approximately $15 billion.  They resolve Class Members'[1] claims pertaining to Volkswagen and Audi 2.0-liter TDI vehicles ("Eligible Vehicles") against Volkswagen,[2] and they honor consumer choice by providing owners and lessees with the options of either a "buyback" or "fix" of their vehicles, while also providing additional consumer redress in the form of substantial restitution payments.  The Settlements require Volkswagen to create a $10.033 billion Funding Pool to fund the buyback and fix program, and to pay an additional $4.7 billion to environmental remediation and zero-emission technology initiatives to ensure significant ecological mitigation and future environmental protection.[3]

The speed in which the Settlement was reached is unprecedented.  The Settlement was announced only nine months after news of Volkswagen's diesel scandal broke, and only five months after this Court appointed Lead Counsel and the Plaintiffs' Steering Committee ("PSC") (together, "Settlement Class Counsel").  The truncated time frame within which the Settlement was reached belies the Herculean efforts undertaken by Settlement Class Counsel and others,

---

[1] Capitalized terms have the meaning ascribed to them in the Class Action Settlement.

[2] Plaintiffs' unreleased claims include those concerning 3.0-liter vehicles and all claims against Robert Bosch, LLC, Robert Bosch GmbH, and Volkmar Denner (collectively, "Bosch").

[3] In addition, a consortium of Attorneys General of at least 44 states have reached a related agreement to resolve their states' unfair and deceptive practice act claims against both Volkswagen and Porsche in exchange for (1) $1,100 for each 2.0- and 3.0-liter vehicle originally sold or leased in the participating states prior to September 18, 2015, (2) payment of $20,000,000 to the National Association of Attorneys General ("NAAG"), and (3) an injunction against future unfair and deceptive acts or practices.  The Attorneys General settlement increases the total value of the Settlements to well over $15 billion.

1   including defense counsel, counsel representing multiple government entities, Settlement Master

2   Mueller and his team, and the Court.  Indeed, from February through June 28, 2016, weekends

3   and weekdays were synonymous and holidays did not exist, as every day that passed without a

4   resolution was another day that the Eligible Vehicles were spewing excessive levels of harmful

5   pollutants into the atmosphere.  The hours worked by Settlement Class Counsel (and, indeed, by

6   counsel for all settling parties) are more typical of a multi-year complex litigation than a multi-

7   month litigation.  While these intensive settlement efforts went on around the clock, the litigation

8   did not halt—the PSC continued its brisk pace of factual investigation, document review and

9   analysis, and continued to build the case against settling and non-settling Defendants alike.

10  Settlement Class Counsel have, without question, fulfilled (and will continue to fulfill) their

11  commitment to the Court to devote their own personal time, and the time and resources of their

12  respective firms, towards the litigation and successful resolution of this case.

13          All indications are that the Settlement Class appreciates the pace of the settlement as well

14  as its benefits, and Class Members have acted swiftly to participate.  As of August 24, 2016, there

15  have been over 1.5 million visits to the official settlement website,

16  www.VWcourtsettlement.com, where approximately 210,000 Class Members had registered for

17  settlement benefits, a noteworthy level of participation in a program whose claims deadline does

18  not occur until September 2018.

19          Settlement Class Representatives and Settlement Class Counsel respectfully request the

20  approval of the Settlement as fair, adequate and reasonable to the Class, under the standards of

21  Fed. R. Civ. P. 23(e) and prevailing jurisprudence.

22  **II.     BACKGROUND AND PROCEDURAL HISTORY**

23          **A.     Factual Background**

24          As alleged in the Consolidated Consumer Class Action Complaint (the "Complaint")

25  (Dkt. 1230),[4] this multidistrict litigation arises from Volkswagen's deliberate use of a Defeat

26  _____

27  [4] On August 16, 2016, Plaintiffs filed the Amended Consolidated Consumer Class Action
    Complaint, which included additional allegations in support of Plaintiffs' claims against
    Volkswagen pertaining to 3.0-liter vehicles, and claims against Bosch. Dkt. 1740-4. This motion

28  addresses the operative complaint at the time of Settlement.

PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF THE AMENDED
CLASS ACTION AGREEMENT

1   Device, a secretly embedded software algorithm installed in its TDI "clean diesel" vehicles that

2   was designed to cheat emissions tests and fool regulators into approving for sale and lease

3   hundreds of thousands of non-compliant Eligible Vehicles.  The Defeat Device activates emission

4   controls to temporarily lower emissions when the car senses that the TDI engine is being tested,

5   and then deactivates the emission controls when the cars return to normal driving conditions.

6   Volkswagen was able to obtain Certificates of Conformity ("COCs") from the EPA, and

7   Executive Orders ("EOs") from CARB, only by using the Defeat Device, by misrepresenting the

8   true levels of emissions from the Eligible Vehicles, and by concealing the use of the Defeat

9   Device in its certification applications.  With the Defeat Devices installed and the emissions

10  controls deactivated during normal use, the Eligible Vehicles polluted at an alarming rate of up to

11  forty times the legal limit.  And yet, all the while, Volkswagen deceptively pitched itself—

12  through an extensive, worldwide advertising campaign—as the world's foremost innovator of

13  "clean" diesel technology to hundreds of thousands of consumers who paid a premium to

14  purchase or lease what they believed to be "clean" diesel vehicles.

15          From 2009-2015, Volkswagen's Defeat Device scheme remained hidden, and the Eligible

16  Vehicles were sold and leased at record numbers to Class Members.  Even after road tests

17  uncovered that the TDI engines were actually spewing up to forty times the allowable limits of

18  pollutants during normal road driving, Volkswagen continued to obfuscate the truth and mislead

19  regulators and consumers for over a year.  Finally, after running out of plausible excuses for the

20  discrepancies in the test results, Volkswagen was forced to admit its fraudulent conduct to

21  Congress, to regulators, and to consumers who purchased and leased vehicles equipped with so-

22  called "clean" diesel engines.

23          **B.      Procedural History**

24          On September 3, 2015, at a meeting with the EPA and CARB, Volkswagen officials

25  formally disclosed that Volkswagen had installed Defeat Device software in the Eligible

26  Vehicles.  On September 18, 2015, the EPA issued to Volkswagen a Notice of Violation of the

27  Clean Air Act ("CAA") and CARB advised that it had initiated an enforcement investigation.  In

28  the months that followed, consumers filed over five hundred civil lawsuits against Volkswagen

PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF THE AMENDED
CLASS ACTION AGREEMENT

1   across the United States, with over one hundred being filed in the State of California alone.  The

2   DOJ, at the request of the EPA, filed a complaint for violations of the CAA, the FTC filed a

3   complaint for violations of the FTC Act, California and other state attorneys general announced

4   investigations or filed lawsuits, and many other domestic and foreign government entities

5   launched criminal and civil investigations of Volkswagen and related individuals and entities

6   around the world.

7       On December 8, 2015, the Judicial Panel on Multidistrict Litigation transferred all related

8   federal actions to the Northern District of California for coordinated pretrial proceedings before this

9   Court.  Dkt. 1.  On January 19, 2016, the Court appointed former FBI Director Robert S. Mueller III

10  as Settlement Master to attempt to facilitate a settlement between the parties.  Dkt. 797.  On

11  January 21, 2016, the Court appointed Plaintiffs' Lead Counsel and the PSC.  Dkt. 1084.

12      Since appointment, Settlement Class Counsel have worked tirelessly both to prosecute the

13  civil cases on behalf of consumers and to work with Volkswagen, federal and state agencies, and

14  the Settlement Master to try to negotiate resolution of some or all of the claims asserted in this

15  litigation in a manner most favorable to Class Members.  Lead Counsel created more than a dozen

16  PSC working groups to ensure that the prosecution and settlement tracks proceeded in parallel,

17  and that the enormous amount of work that needed to be done in a very short period of time was

18  done in the most organized and efficient manner possible.  Those working groups focused

19  simultaneously on both litigation and settlement tasks, including: drafting complaints; serving,

20  responding to, and reviewing voluminous discovery; analyzing economic damages (and retaining

21  experts concerning those issues); reviewing Volkswagen's financial condition and ability to pay

22  any settlement or judgment; assessing technical and engineering issues; coordinating with

23  multiple federal and state governmental agencies as well as with plaintiffs in state court actions;

24  and researching environmental issues, among others.

25      On February 22, 2016, Settlement Class Counsel filed a 719-page Consolidated Consumer

26  Class Action Complaint asserting claims for fraud, breach of contract, and unjust enrichment, and

27  for violations of The Racketeer Influenced and Corrupt Organizations Act ("RICO"), The

28  Magnuson-Moss Warranty Act ("MMWA"), and all fifty States' consumer protection laws.  Dkt.

1230.  The length of, and detail in, the Complaint reflects the arduous process undertaken by Settlement Class Counsel in understanding the factual complexities of the alleged fraud, and researching and developing the various claims at issue and the remedies available to those who were harmed by Volkswagen's conduct.

Following the filing of the Complaint, Settlement Class Counsel served Volkswagen with extensive written discovery requests, including interrogatories, requests for production, and requests for admissions, and negotiated comprehensive expert, deposition, preservation, and ESI protocols.  At the time of Settlement, Volkswagen had produced over 12 million pages of documents, and Settlement Class Counsel had reviewed and analyzed approximately 70% of them through a massive, around-the-clock effort.  That effort required the reviewing attorneys not only to understand the legal complexities of the dozens of claims Plaintiffs asserted, but also to master the difficulties and nuances involved when working with troves of documents produced in German.  At the same time, Settlement Class Counsel responded to Volkswagen's discovery requests, producing documents from 174 named Plaintiffs, in addition to compiling information to complete comprehensive fact sheets, which also included document requests, for each named Plaintiff.

Under the Settlement Master's guidance and supervision, Lead Counsel and a settlement working group of the PSC engaged in arm's-length settlement negotiations with Volkswagen in an effort to resolve the consumer claims brought by Plaintiffs.  At the Court's direction, the settlement negotiations began from almost the moment the Court appointed the Settlement Master, Plaintiffs' Lead Counsel, and the PSC in January 2016.  Since that time, settlement discussions have occurred on both coasts of the United States, in person and telephonically, without regard to holidays, weekends, or time zones.  The negotiations have been extraordinarily intense and complex, particularly considering the timeframe and number of issues and parties involved, including attorney representatives from numerous governmental entities.  The result of all these meetings and negotiations is an outstanding Settlement for all consumers who purchased or leased an Eligible Vehicle.

On June 28, 2016, Plaintiffs and Settlement Class Counsel filed their Motion and

1315975.3

1    Memorandum in Support of Preliminary Approval of the Class Action Agreement and Approval

2    of Class Notice ("Motion for Preliminary Approval").  Dkt. 1609.  On July 26, 2016, the parties

3    presented a comprehensive description of the Settlement terms, benefits and procedures at the

4    hearing on the Motion for Preliminary Approval, and requested preliminary approval of the

5    Amended Consumer Class Action Settlement Agreement and Release ("Settlement").  Dkt.  1685.

6    Later that day, the Court entered its Order Granting Preliminary Approval of Settlement.  Dkt.

7    1688.  On July 29, 2016, the Court entered its Amended Order Granting Preliminary Approval of

8    Settlement ("Preliminary Approval Order"), which corrected the Class definition such that it was

9    consistent with the Settlement. Dkt. 1698.  The Preliminary Approval Order provisionally

10   certified the Settlement Class, preliminarily approved the Settlement, appointed Lead Counsel

11   and the PSC as Settlement Class Counsel, appointed and designated the individuals listed on

12   Exhibit 1 to the Motion for Preliminary Approval as Class Representatives, approved the manner

13   and form of providing notice of the Settlement to Class Members, set a deadline for Class

14   Members to opt-out from or object to the Settlement, and scheduled a final Fairness Hearing.

15   Following preliminary approval, Settlement Class Counsel diligently worked with

16   respected class notice provider Kinsella Media, LLC ("KM") to effectuate the Notice Program

17   ordered by the Court.  The approved Long Form Notice has been directly sent by first class mail

18   (and, for the majority of Class Members, also by e-mail) to all readily identifiable Class

19   Members.  KM further disseminated notice through an extensive print and digital media program.

20   Finally, a Settlement Website and a toll-free telephone number were established to provide details

21   regarding the Settlement to inquiring Class Members.  Class Counsel have made themselves

22   available to directly address questions, comments, and requests for assistance from Class

23   Members.

24   On August 10, 2016, pursuant to the Court's Preliminary Approval Order, Settlement

25   Class Counsel filed its Statement of Additional Information Regarding Prospective Request for

26   Attorneys' Fees and Costs ("Statement"), in order to provide Class Members with sufficient

27   information regarding Settlement Class Counsel's prospective request for attorneys' fees and

28   costs to make an uninformed decision as to whether they should object to or opt out of the

- 8 -

1    Settlement. Dkt. 1730. The Statement papers themselves, and a plain language Executive

2    Summary, were also made available to interested Class Members on the Court's website.

3    **III.     TERMS OF THE 2.0-LITER CLASS SETTLEMENT**

4         **A.     The 2.0-Liter Settlement Class Definition**

5              The Settlement Class consists of all persons (including individuals and entities) who, on

6    September 18, 2015, were registered owners or lessees of, or, in the case of Non-Volkswagen

7    Dealers, held title to or held by bill of sale dated on or before September 18, 2015, a Volkswagen

8    or Audi 2.0-liter TDI vehicle in the United States or its territories (an "Eligible Vehicle," defined

9    more fully in the Class Action Agreement), or who, between September 18, 2015, and the end of

10   the Claim Period, become a registered owner of, or, in the case of Non-Volkswagen Dealers, hold

11   title to or hold by bill of sale, an Eligible Vehicle. The following entities and individuals are

12   excluded from the Class:

13        (1)     Owners who acquired their Volkswagen or Audi 2.0-liter TDI vehicles after

14   September 18, 2015, and transfer title to their vehicle before participating in the Settlement

15   Program through a Buyback or an Approved Emissions Modification;

16        (2)     Lessees of a Volkswagen or Audi 2.0-liter TDI vehicle that is leased from a

17   leasing company other than VW Credit, Inc.;

18        (3)     Owners whose Volkswagen or Audi 2.0-liter TDI vehicle (i) could not be driven

19   under the power of its own 2.0-liter TDI engine on June 28, 2016, or (ii) had a Branded Title of

20   Assembled, Dismantled, Flood, Junk, Rebuilt, Reconstructed, or Salvage on September 18, 2015,

21   and was acquired from a junkyard or salvage yard after September 18, 2015;

22        (4)     Owners who sell or otherwise transfer ownership of their Volkswagen or Audi 2.0-

23   liter TDI vehicle between June 28, 2016, and September 16, 2016 (the "Opt-Out Deadline"),

24   inclusive of those dates;

25        (5)     Volkswagen's officers, directors and employees; Volkswagen's affiliates and

26   affiliates' officers, directors and employees; their distributors and distributors' officers, directors

27   and employees; and Volkswagen Dealers and Volkswagen Dealers' officers and directors;

28        (6)     Judicial officers and their immediate family members and associated court staff

- 9 -

1   assigned to this case; and

2          (7)     Persons or entities who or which timely and properly exclude themselves from the

3   Class as provided in the Agreement.

4          **B.      Summary of Benefits to Class Members**

5          Pursuant to the Settlement, Volkswagen will provide the following benefits to the Class

6   Members:

7          (1)     The creation of a Funding Pool of $10.033 billion ($10,033,000,000) from which

8   funds will be drawn to compensate Class Members under the Buyback, Lease Termination and

9   Restitution Payment programs, pursuant to the Class Action Settlement Program, as further

10   detailed below;

11          (2)     The establishment of an Approved Emissions Modification for Class Members

12   who do not wish to participate in the Buyback or Lease Termination programs, pursuant to the

13   Class Action Settlement Program, as further detailed below;

14          (3)     The payment of $2.7 billion into a Trust established to support environmental

15   programs throughout the country that will reduce $NO_X$ in the atmosphere by an amount equal to

16   or greater than the combined $NO_X$ pollution caused by the cars that are the subject of the lawsuit;

17   and

18          (4)     The investment of $2 billion to create infrastructure for and promote public

19   awareness of zero emission vehicles.

20          Class Members will be grouped into three different categories (Eligible Owners, Eligible

21   Sellers, and Eligible Lessees) and compensated as follows:

22          (1)     Eligible Owners will be offered the choice between (A) a Buyback and Owner

23   Restitution, including substantial loan forgiveness if applicable, or (B) an Approved Emissions

24   Modification and Owner Restitution.

25          (2)     Eligible Lessees who retain an active lease of an Eligible Vehicle will be offered

26   the choice between (A) a Lease Termination and Lessee Restitution or (B) an Approved

27   Emissions Modification and Lessee Restitution.

28          (3)     Eligible Lessees who return or have returned an Eligible Vehicle at the conclusion

of the lease will be offered Lessee Restitution.

(4)     Eligible Lessees who obtained ownership of their previously leased Eligible Vehicle after June 28, 2016 will be offered an Approved Emissions Modification and Lessee Restitution.

(5)     Eligible Sellers will be offered Seller Restitution.

(6)     Owners whose Eligible Vehicles were totaled and who consequently transferred title of their vehicle to an insurance company after the Opt-Out Deadline, but before the end of the Claim Period, will be offered Owner Restitution but not a Buyback.

The Buyback and Restitution Payment programs will be based on the September 2015 (prior to the disclosure of the existence of the Defeat Device) National Automobile Dealers Association ("NADA") Clean Trade In value of the Eligible Vehicle adjusted for options and mileage ("Vehicle Value").  The Vehicle Value will be fixed as of September 2015 such that the value of Eligible Vehicles will not depreciate throughout the entire settlement claim period.  The restitution amounts for owners and lessees will be same regardless of whether they choose a Buyback/Lease Termination or an Approved Emissions Modification.

The following chart summarizes Class Member options and payments:

| Category | Definition | Benefit Options | Restitution Payment |
|---|---|---|---|
| **Eligible Owner (bought car on or before September 18, 2015)** | Registered owner of an Eligible Vehicle at the time of Buyback or Approved Emissions Modification. | (1) Buyback<br>Vehicle Value + Restitution Payment + Loan Forgiveness if applicable<br><br>OR (if approved)<br><br>(2) Emissions Modification<br>Modification to your car to reduce emissions + Restitution Payment | 20% of the Vehicle Value + $2,986.73<br><br>$5,100 minimum |

| Category | Definition | Benefit Options | Restitution Payment |
|---|---|---|---|
| **Eligible Owner (bought car after September 18, 2015)** | Registered owner of an Eligible Vehicle at the time of Buyback or Approved Emissions Modification. | (1) Buyback<br>Vehicle Value + Restitution Payment<br><br>OR (if approved)<br><br>(2) Emissions Modification<br>Modification to your car to reduce emissions + Restitution Payment | 10% of the Vehicle Value + $1529 + a proportional share of any restitution not claimed by Eligible Sellers<br><br>$2,550 minimum |
| **Eligible Seller** | Registered owner of an Eligible Vehicle on September 18, 2015, who transferred vehicle title after September 18, 2015, but before June 28, 2016. | Restitution Payment | 10% of the Vehicle Value + $ 1,493.365<br><br>$2,550 minimum |
| **Eligible Lessee (currently leases car)** | Registered lessee of an Eligible Vehicle, with a lease issued by VW Credit, Inc., at the time of Early Lease Termination or Approved Emissions Modification. | (1) Lease Termination<br>Early termination of the lease without penalty + Restitution Payment<br><br>OR (if approved)<br><br>(2) Emissions Modification<br>Modification to your car to reduce emissions + Restitution Payment | 10% of the Vehicle Value (adjusted for options but not mileage) + $1529 |
| **Eligible Lessee (formerly leased car)** | Registered lessee of an Eligible Vehicle, with a lease issued by VW Credit, Inc., who returned the Eligible Vehicle at the end of the lease on or after September 18, 2015, or purchased the Eligible Vehicle after June 28, 2016. | Restitution Payment | 10% of the Vehicle Value (adjusted for options but not mileage) + $1,529 |

C.      **Attorneys' Fees**

None of the settlement benefits for Class Members will be reduced to pay attorneys' fees or to reimburse expenses of Settlement Class Counsel. Volkswagen will pay attorneys' fees and costs separately from, and in addition to, the Settlement benefits to Class Members. Since the Court's preliminary approval of the Settlement, Settlement Class Counsel and Volkswagen have engaged in substantive discussions regarding the payment of attorneys' fees and costs; however, an agreement as to the amount of attorneys' fees and costs to be paid has not yet been reached.

As the Court noted in its Preliminary Approval Order, "Rule 23(h), which governs attorneys' fees in class actions, does not require Settlement Class Counsel to move for its fee award at the preliminary approval juncture, or even upon seeking final approval."  Dkt. 1698 at 23. Accordingly, that the amount of attorneys' fees and costs is still to be determined does not affect the Court's evaluation of whether final approval of the Settlement is appropriate.  *Id.* (citing *In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 445 (3d Cir. 2016) ("[T]he separation of a fee award from final approval of the settlement does not violate Rule 23(h).")).  Indeed, "[w]hile Class Members must be given an opportunity to object to a request for fees . . . they can be given that opportunity after final approval."  Dkt. 1698 at 24.

Pursuant to the Preliminary Approval Order, on August 10, 2016, Settlement Class Counsel filed its Statement detailing the methodology it will use to determine the amount of fees and costs it will seek for the work done and expenses incurred for the common benefit of Class Members in connection with this action and the Settlement.  Dkt. 1730.  Specifically, Settlement Class Counsel indicated that the common benefit fee application will utilize the percentage methodology approved by the Ninth Circuit for class action settlement fee awards and seek no more than $324 million in attorneys' fees for the common benefit work performed, plus actual and reasonable out-of-pocket costs incurred, not to exceed $8.5 million, through October 18, 2016, the date of the Final Approval Hearing.[5]  *Id.* at 2-3.  The "capped" amount of attorneys' fees identified in the Statement represents an amount far below the 25% benchmark established by the Ninth Circuit, which, if adopted by the Court here, would yield a fee award of more than $3.5 billion.  *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047-48 (9th Cir. 2002).[6]

---

[5] In addition, the Statement advised Class Members that Settlement Class Counsel's fee application will include a proposed formula to reasonably and appropriately compensate counsel for the time and effort that will be spent fulfilling their obligations to Class Members in connection with the implementation of the Settlement through the close of 2018 (if the Court grants final approval).  *Id.* at 3-4.

[6] Initial reactions to Settlement Class Counsel's prospective request for attorneys' fees and costs have been positive, especially given the size of the $10.33 billion funding pool commitment.  *See, e.g.*, Amanda Bronstad, *VW Lawyers' Fee Request Won't Exceed $324M Despite Massive Size of Emissions Accord*, Law.com, (Aug. 11, 2016), http://www.law.com/sites/almstaff/2016/08/11/vw-lawyers-fee-request-wont-exceed-324m-

1    The Statement, which was made available to interested Class Members on the Court's

2    website, provides Class Members with sufficient information as to Settlement Class Counsel's

3    prospective request for attorneys' fees and costs to make an informed decision as to whether they

4    should object to or opt out of the Settlement by the September 16, 2016, Objection and Opt-Out

5    Deadline.  Dkt. 1698 at 24 (citing *In re NFL Players*, 821 F.3d at 446 ("Even if the class members

6    were missing certain information—for example, the number of hours class counsel worked and

7    the terms of any contingency fee arrangements class counsel have with particular retired

8    players—they still had enough information to make an informed decision about whether to object

9    to or opt out from the settlement.")).  Moreover, as stated in the notice informing Class Members

10   of the Settlement, Class Members will have the opportunity to comment on and/or object to

11   Settlement Class Counsel's prospective request for fees and costs before the Court rules on it.

12   Accordingly, Rule 23(h)'s procedures and protections will apply to Settlement Class Counsel's

13   prospective fee application such that there are no deficiencies in this regard that would preclude

14   the Court from granting final approval of the Settlement.

15   **IV.    THE 2.0-LITER SETTLEMENT MERITS FINAL APPROVAL**

16        **A.    The Class Action Settlement Process**

17        Pursuant to Federal Rule of Civil Procedure 23(e), class actions "may be settled,

18   voluntarily dismissed, or compromised only with the court's approval."  As a matter of "express

19   public policy," federal courts favor and encourage settlements, particularly in class actions, where

20   the costs, delays, and risks of continued litigation might otherwise overwhelm any potential

21   benefit the class could hope to obtain.  *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276

22   (9th Cir. 1992) (noting the "strong judicial policy that favors settlements, particularly where

23   complex class action litigation is concerned"); *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101

24   (9th Cir. 2008) (same); *see also* 4 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*

25   § 11:41 (4th ed. 2002) (same, collecting cases).

26        The *Manual for Complex Litigation (Fourth)* (2004) describes the three-step procedure for

27

28   despite-massive-size-of-emissions-accord/.

- 14 -

1  approval of class action settlements: (1) preliminary approval of the proposed settlement;

2  (2) dissemination of the notice of the settlement to class members, providing for, among other

3  things, a period for potential objectors and dissenters to raise challenges to the settlement's

4  reasonableness; and (3) a formal fairness and final settlement approval hearing. *Id.* at § 21.63.

5  The Court completed the first step in the settlement process when it granted preliminary approval

6  to the Settlement.  Thereafter, Settlement Class Counsel completed the second step by

7  implementing the Notice Program pursuant to the terms of the Settlement and the Court's

8  Preliminary Approval Order.  Settlement Class Representatives and Settlement Class Counsel

9  now request that the Court take the third and final step—holding a formal fairness hearing and

10  granting final approval of the Settlement.  Settlement Class Representatives and Settlement Class

11  Counsel further request that the Court certify the Settlement Class and enter a Final Judgment in

12  this action.

13  **B.      The Settlement Meets the Ninth Circuit's Standards For Final Approval**

14         Rule 23 of the Federal Rules of Civil Procedure governs a district court's analysis of the

15  fairness of a settlement of a class action.  *See* Fed. R. Civ. P. 23(e).  To approve a class action

16  settlement, the Court must determine whether the settlement is "fundamentally fair, adequate and

17  reasonable."  *In re Rambus Inc. Derivative Litig.*, No. C-06-3515–JF, 2009 WL 166689, at *2

18  (N.D. Cal. Jan. 20, 2009) (citing Fed. R. Civ. P. 23(e)); *see also Mego Financial Corp. Sec. Litig.*,

19  213 F.3d 454, 459 (9th Cir. 2000); *Officers for Justice v. Civil Service Comm'n,* 688 F.2d 615,

20  625 (9th Cir. 1982)).  In granting preliminary approval of the Settlement, the Court took the first

21  step in making this determination.  *See* Dkt. 1698 at 31 ("The Court finds that the proposed

22  Settlement is the result of intensive, non-collusive negotiations and is reasonable, fair and

23  adequate.").

24         "Although Rule 23 imposes strict procedural requirements on the approval of a class

25  settlement, a district court's only role in reviewing the substance of that settlement is to ensure

26  that it is 'fair, adequate, and free from collusion.'"  *Lane v. Facebook, Inc.,* 696 F.3d 811, 819

27  (9th Cir. 2012), *cert. denied,* 134 S. Ct. 8 (2013) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d

28  1011, 1027 (9th Cir. 1998)).  When class counsel is experienced and supports the settlement, and

- 15 -

1    the agreement was reached after arm's-length negotiations, courts should give a presumption of

2    fairness to the settlement.  *See Nobles v. MBNA Corp.,* No. C 06-3723 CRB, 2009 WL 1854965,

3    at *6 (N.D. Cal. June 29, 2009); *Ellis v. Naval Air Rework Facility,* 87 F.R.D. 15, 18 (N.D. Cal.

4    1980), *aff'd,* 661 F.2d 939 (9th Cir. 1981).  Additionally, "[i]t is the settlement taken as a whole,

5    rather than the individual component parts, that must be examined for overall fairness."  *Staton v.*

6    *Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).

7        The Ninth Circuit has identified "the strength of the plaintiffs' case; the risk, expense,

8    complexity, and likely duration of further litigation; the risk of maintaining class action status

9    throughout the trial; the amount offered in settlement; the extent of discovery completed and the

10   stage of the proceedings; the experience and views of counsel; the presence of a governmental

11   participant; and the reaction of the class members to the proposed settlement" as factors for

12   determining whether a settlement is fair, reasonable, and adequate.  *See Hanlon*, 150 F.3d at

13   1026.  "The relative degree of importance to be attached to any particular factor will depend on

14   the unique circumstances of each case."  *Officers for Justice*, 688 F.2d at 625.  As discussed

15   below, all of the relevant factors set forth by the Ninth Circuit for evaluating the fairness of a

16   settlement at this final stage support final approval, and there can be no doubt that the Settlement was

17   reached in a procedurally fair manner given Settlement Master Mueller's extensive involvement and

18   active guidance and assistance.  For these reasons, the Settlement merits final approval.

19        **C.**     **The Settlement Is Substantively Fair Because It Provides Very Significant**
               **Benefits in Exchange for The Compromise of Strong Claims**
20

21        As noted in the summary of the Settlement terms above, the Settlement compensates Class

22   Members for the loss in market value of the Eligible Vehicles and for Volkswagen's

23   misrepresentations about the environmental characteristics of the Eligible Vehicles, provides for

24   the buyback and potential refit of the Eligible Vehicles to make them compliant with applicable

25   environmental regulations, and results in the creation of a substantial fund for mitigation of the

26   environmental harms caused by excess emissions from the Eligible Vehicles.  This Settlement,

27   rare among civil litigation resolutions, will actually undo harm, as well as compensate for

28   financial loss.  The Settlement's significant benefits are provided in recognition of the strength of

PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF THE AMENDED
CLASS ACTION AGREEMENT

1  Plaintiffs' case on the merits and the likelihood that Plaintiffs would have been able to certify a

2  litigation class, maintain certification through trial, and prevail.  All PSC members, a uniquely

3  experienced group including preeminent class action litigators, consumer and environmental

4  advocates, noted trial lawyers, and auto litigation veterans, support this Settlement, and it is

5  highly uncertain whether the Class would be able to obtain and sustain a better outcome through

6  continued litigation, trial, and appeal.

7          The PSC retained Economist Edward Stockton of The Fontana Group, Inc. to participate

8  throughout the settlement negotiations to evaluate the economic effects on consumers of the

9  allegedly deceptive marketing and sale of Volkswagen TDI vehicles.  Mr. Stockton also aided the

10  PSC in assessing and developing the terms of the Class Action Settlement.  Mr. Stockton's

11  Declaration is appended hereto as Exhibit A.  This Declaration describes Mr. Stockton's role in

12  working with the PSC, Volkswagen, Volkswagen's experts, regulatory personnel, and the

13  Settlement Master throughout the negotiation of this Settlement, sets out Mr. Stockton's

14  economic analysis and conclusions concerning the Settlement, and summarizes the extensive data

15  on which he bases his conclusions.

16          Mr. Stockton's analysis demonstrates that the Settlement restores the Eligible Vehicles to

17  pre-scandal market value, in addition to redressing environmental harms from excess emissions.

18  The baseline for valuation of the class vehicles is the National Automotive Dealers' Association

19  Clean Trade-In ("CTI") price as of September 2015, which predates the announcement of the

20  scandal.  This is a valuation resource relied on throughout the automotive industry, and

21  September 2015 values are the "most proximate valuation available that relied upon pre-

22  announcement market conditions."  Stockton Declaration at 7-8.  Using this valuation metric

23  avoided price depreciation in the wake of the scandal, allowed Settlement Class Members to

24  mitigate the effect on the vehicle's value resulting from overpayment of the TDI price premium,

25  and allowed owners to continue to use their vehicles until the buyback transaction without

26  suffering additional depreciation.  An upward adjustment using an additional 20% of CTI, plus a

27  fixed restitution component of nearly $3,000 per vehicle, results in consumers receiving a

28  minimum of 112.6% of pre-scandal retail value.  *Id.* at 15, 18-19.  This enables Settlement Class

1  Members to replace their Eligible Vehicles with a comparable or better vehicle; they can sever

2  any relationships with VW.[7]  Further, the use of a mileage credit prorates the vehicle mileage

3  used for valuation from the actual date of the buyback transaction back to September 2015, which

4  means that consumers will receive a value for their vehicle reflecting less mileage than they have

5  actually driven.  *Id.* at 16.

6  For vehicles that did not yet have CTI values as of September 2015—namely, certain

7  2015 vehicles—the settlement bases value on "observed relationships of [CTI] value to MSRP for

8  comparable Volkswagen vehicles."  *Id.* at 17.  Thus, a percentage of MSRP analogous to

9  expected CTI value is used as a building block to ensure that owners and lessees of these

10  vehicles, too, receive fair compensation.

11  Overall, in Mr. Stockton's assessment, the settlement "place[s] consumers in a position to

12  replace their vehicles at September 2015 (pre-emissions disclosure) retail value and receive

13  additional real economic benefits," makes "significant individual adjustments to account for

14  certain disparate economic considerations of consumers," and "allows those consumers to

15  purchase comparable vehicles while leaving them additional compensation for the other costs

16  they experienced."  *Id.* at 20-21.[8]

17

18  [7] Some consumer class settlements have been criticized because they require Class Members to
continue a customer relationship with the defendant, such as by buying another product from that
19  defendant or repairing already-purchased products, in order to realize a settlement benefit.  This
Settlement recognizes that while many Class Members wish to keep their vehicles once they are
20  modified to reduce emissions, others do not.  The Settlement provides benefits to both groups and
honors and compensates both choices, and it provides an equal payment – the owner or lessee
21  restitution payment—to Class Members, whether they elect the buyback or emissions
modification.

22  [8] The FTC underscores the importance of replacement value in its Statement Supporting the
Settlement.  It used a particular approach that reached the same result:  "To be made whole,
23  consumers must receive full compensation for their vehicles' full retail value and all other losses
caused by Volkswagen's deception.  Full compensation has to be sufficient for consumers to
24  replace their vehicle.  Because almost all consumers have to do so on the retail market, the FTC
started its calculations with the National Association of Auto Dealers ('NADA') Clean *Retail*
25  value for his or her vehicle before the scandal broke – 'what a person could reasonably pay for a
vehicle [in good condition] at a dealer's lot.' [citations omitted] The Commission then added all
26  other losses consumers incurred, and would incur, because of Volkswagen's deception, including
the 'shoe leather' cost of shopping for a new car, sales taxes and registration, the value of the lost
27  opportunity to drive an environmentally-friendly vehicle, and the additional amount 'Clean
Diesel' consumers paid for a vehicle feature (clean emissions) that Volkswagen falsely
28  advertised."  *Federal Trade Commission's Statement Supporting the Settlement.*  (Dkt. No. 1781).

- 18 -

Professor Andrew Kull reached a similar conclusion regarding the strength of the Settlement's remedies, viewing it through the lens of rescission.  Exhibit B, Kull Declaration, at 18-20.  Professor Kull served as Reporter for the American Law Institute in preparing the *Restatement Third, Restitution and Unjust Enrichment,* the authoritative nationwide restatement on these doctrines, and is thus considered the leading U.S. authority on the law of rescission, restitution and unjust enrichment.  *Id.* at 2.  After carefully reviewing the Complaint, the Settlement documents, and other relevant filings, and conducting research in an area of law and equity with which he is deeply familiar, Professor Kull concludes that the "benefits comprised by the Buyback Option" are at least as valuable as any that an Eligible Owner would hypothetically have been able to recover through a traditional rescissionary remedy, if successful at trial.  *Id.* at 18.  But this is not an apples-to-apples comparison because, as Mr. Kull observes, "[t]he benefits reasonably to be anticipated from an owner's hypothetical suit for rescission must be significantly discounted to reflect the time and expense of reaching a result by independent litigation."  *Id.* at 19.  In contrast, the benefits available under the Settlement "will not be reduced by attorneys' fees and other expenses that ordinarily accompany such a recovery in litigation."  *Id.* at 19-20.  And, of course, they will be delivered much more quickly than they would "through adversary litigation, trial, and appeal."  *Id.*

The Settlement Class certainly would not have been able to secure the commencement of the buyback, emissions modification, and remediation program as swiftly as it will take place under the Settlement through adversarial litigation, judgment, and appeals, even on the expedited time schedule that the PSC sought, and the Court may have granted.  Moreover, while Settlement Class Counsel believe in the strength of this case, they recognize there are always uncertainties in litigation, making resolution of claims in exchange for certain and timely provision to the Class of the significant benefits described herein an unquestionably reasonable outcome.  *See Nobles*, 2009 U.S. Dist. LEXIS 59435, at *5 ("The risks and certainty of recovery in continued litigation are factors for the Court to balance in determining whether the Settlement is fair.") (citing *Mego*, 213 F.3d at 458; *Kim v. Space Pencil, Inc.*, No. C 11-03796 LB, 2012 WL 5948951, at *15 (N.D. Cal. Nov. 28, 2012) ("The substantial and immediate relief provided to the Class under the

1    Settlement weighs heavily in favor of its approval compared to the inherent risk of continued

2    litigation, trial, and appeal, as well as the financial wherewithal of the defendant.")).  Moreover,

3    in this litigation "time is of the essence" is a reality, not a cliché.  All litigation is uncertain, but

4    here environmental harm is certain to continue, unless and until it is reduced by reaching the

5    over-arching goal:  fix the cars, or get them off the road.  The Settlement addresses that goal

6    much sooner than would trial, in an instance where sooner is palpably superior to later.

7         Indeed, should Settlement Class Counsel prosecute these claims against Volkswagen to

8    conclusion, any recovery would come years in the future and at far greater expense to the

9    environment and the Class.  There is also a risk that a litigation Class would receive less or

10   nothing at all, despite the compelling merit of its claims, not only because of the risks of

11   litigation, but also because of the solvency risks such prolonged and expanding litigation could

12   impose upon Volkswagen.  *See, e.g.*, *UAW v. GMC*, 497 F.3d 615, 632 (6th Cir. 2007) (affirming

13   approval of settlement class and rejecting objections premised on prospect of plaintiffs complete

14   victory on disputed issue because "any such victory would run the risk of being a Pyrrhic one . . .

15   we need not embellish the point by raising the prospect of bankruptcy").

16        In addition to the above, there is a risk that any class recovery obtained at trial would be

17   reduced through offsets.  Restitution remedies for automotive defects based on rescission or

18   repurchase calculations may be subject to offset claims for the car owner's use of the vehicle, as

19   detailed in Mr. Kull's Declaration.  Ex. B at 10-18.  For example, under California law, the Song-

20   Beverly Consumer Warranty Act provides for an offset calculated on the basis of the mileage

21   driven.  *See* Cal. Civ. Code § 1793.2(d)(2)(C); *see also Robbins v. Hyundai Motor Am., Inc.*, No.

22   SACV 14-00005-JLS (ANx), 2015 WL 304142 at *6 (C.D. Cal. Jan. 14, 2015); *Rupay v.*

23   *Volkswagen Grp. of Am. Inc.*, No. CV 12-4478-GW FFMX, 2012 WL 10634428, at *4 (C.D. Cal.

24   Nov. 15, 2012).  State-law-required offsets could also apply to claims under the federal

25   Magnuson Moss Warranty Act ("MMWA"), because while the MMWA effectively creates a

26   federal cause of action to enforce state-law warranty claims, the MMWA applies state substantive

27   law instead of creating substantively different federal warranty standards.  *Clemens v.*

28   *DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) ("claims under the Magnuson–Moss

- 20 -

1   Act stand or fall with . . . express and implied warranty claims under state law"); *Keegan v. Am.*

2   *Honda Motor Co.*, 838 F. Supp. 2d 929, 954 (C.D. Cal. 2012).  Indeed, the MMWA itself defines

3   the term "refund" as "refunding the actual purchase price (less reasonable depreciation based on

4   actual use where permitted by rules of the Commission).

5          Further, California's Lemon Law specifically enumerates a method for calculating

6   depreciation on vehicles in § 1793.2(d)(2)(C), while the National Traffic and Motor Vehicle

7   Safety Act likewise notes that, following a safety recall, an available remedy to consumers is to

8   "refund[] the purchase price, less a reasonable allowance for depreciation."  49 U.S.C.

9   § 30120(a)(1)(A)(iii).  Ultimately, any rescission or refund remedy requires that a plaintiff return

10   the product in a comparable condition to what the plaintiff received.  And because a vehicle's

11   value depreciates significantly with use, courts require a reasonable reduction in the refund

12   amount, to account for the depreciation and value provided to the plaintiff.  *See, e.g.*, *Kruger v.*

13   *Subaru of Am.*, 996 F. Supp. 451, 457 (E.D. Pa. 1998) ("Thus, because the car is unavailable and

14   because the plaintiffs used the car for eight months, thereby depreciating its value, I conclude that

15   the plaintiffs are not entitled to a full refund."); *Kruse v. Chevrolet Motor Div.*, Civil Action No.

16   96-1474, 1997 WL 408039, at *6 (E.D. Pa. July 15, 1997) ("Awarding damages equal to the full

17   purchase price does not take into account the natural depreciation of the vehicle from normal

18   usage.").  Accordingly, the buyback calculation in the Settlement is both highly favorable to Class

19   Members, and supported by applicable law.  The settlement provides an array of provisions to

20   compensate for the lost market value of the vehicles, and to restore their ongoing value and

21   utility.

22          Avoiding years of additional litigation in exchange for the certainty of this Settlement now

23   is also important because of the continued environmental damage being caused by the Eligible

24   Vehicles.  The Settlement will get the Eligible Vehicles off the road through a buyback or fix,

25   reducing further environmental damage and air pollution.  And the $2.7 billion allocated to NOx

26   reduction programs effectively will reverse the environmental damage caused by the Eligible

27   Vehicles' excess pollution.

28

1315975.3

1

2

**D.     The Settlement Is Procedurally Fair as the Product of Good Faith, Informed, and Arm's-Length Negotiations**

3     Lead Counsel and the PSC settlement working group engaged in settlement discussions

4     with Volkswagen and government representatives from the DOJ, EPA, CARB, and the FTC,

5     under Settlement Master Mueller's guidance and supervision.  Settlement Class Counsel have

6     also analyzed huge volumes of discovery material that has provided them sufficient information

7     to enter into a reasoned and well-informed settlement.  *See, e.g.*, *Mego*, 213 F.3d at 459 (holding

8     that "significant investigation, discovery and research" supported "district court's conclusion that

9     the Plaintiffs had sufficient information to make an informed decision about the Settlement").

10     Participation of government entities in the settlement process weighs highly in favor of

11     granting final approval.  In *Marshall v. Holiday Magic, Inc.*, the Ninth Circuit observed what has

12     become a well-established bulwark of integrity and fairness: "The participation of a government

13     agency serves to protect the interests of the class members, particularly absentees, and approval

14     by the agency is an important factor for the court's consideration." 550 F.2d 1173, 1178 (9th Cir.

15     1977) (citation omitted); accord *Jones v. Amalgamated Warbasse Houses, Inc.*, 97 F.R.D. 355,

16     360 (E.D.N.Y. 1982) ("That a government agency participated in successful compromise

17     negotiations and endorsed their results is a factor weighing heavily in favor of settlement

18     approval—at least where, as here, the agency is 'committed to the protection of the public

19     interest.'") (citation omitted).  Here, this protective effect was at least quadrupled:  not one, but

20     four, major governmental agencies were involved, and multiple agencies both reflected and

21     protected the trial—interests consumer and environmental—of the Settlement Class itself.

22     Evidence of a settlement negotiation process involving protracted negotiations with the

23     assistance of a court-appointed mediator also weighs in favor of approval.  *See Pha v. Yang*, No.

24     2:12-cv-01580-TLN-DAD, 2015 U.S. Dist. LEXIS 109074, at *13 (E.D. Cal. Aug. 17, 2015)

25     (finding that the fact "the settlement was reached through an arms-length negotiation with the

26     assistance of a mediator through a months-long process . . . weigh[ed] in favor of approval");

27     *Rosales v. El Rancho Farms*, No. 1:09-cv-00707-AWI-JLT, 2015 WL 446091, at *44 (E.D. Cal.

28     July 21, 2015) ("Notably, the Ninth Circuit has determined the 'presence of a neutral mediator

1  [is] a factor weighing in favor of a finding of non-collusiveness.'") (quoting *In re Bluetooth*

2  *Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)); *Pierce v. Rosetta Stone, Ltd.*, No.

3  C 11-01283 SBA, 2013 WL 5402120, at *15-16 (N.D. Cal. Sept. 26, 2013) (same).  It is an

4  understatement to say that the parties benefited from the assistance of Settlement Master Mueller,

5  who played a crucial role in supervising the negotiations and in helping the parties bridge their

6  differences.

7  　　　　As Mr. Stockton's Declaration makes clear, the Settlement is the result of a thorough and

8  extensive negotiation and analytical process, in which the undersigned were armed not only with

9  the facts of this case, and the applicable law, but extensive data on the auto industry and auto

10  market context in which this case arose, and specific data on the class vehicles themselves.  In

11  lengthy sessions of intensive negotiation, the parties and experts evaluated highly specific data

12  including the trim lines, specific vehicle options, mileage, finance terms, trade-in values, and

13  expected retail replacement costs of the class vehicles, and undertook economic analyses of

14  vehicle depreciation rates, overpayment and mitigation thereof, tax implications, vehicle search

15  and acquisition costs, warranty refunds, anticipated vehicle use, buyback timing, and other

16  considerations. These analyses relied on data at the VIN level—that is, specific to individual

17  vehicles—as well as industry vehicle valuation resources.

18  　　　　Most settlement negotiations take place along two dimensions:  plaintiff versus defendant.

19  The negotiations culminating in the related Settlements now before this Court transpired along

20  multiple dimensions simultaneously:  federal and state government entities, and the Class

21  approached resolution sometimes alone, and sometimes together, in various combinations and

22  with different stances at different times, all to hammer out the best possible resolution from each

23  party's perspective.[9]  These unremitting efforts at synthesis and convergence have achieved a

24  uniformly speedy, economically substantial, and environmentally responsible 2.0-liter settlement,

25  ───────────────────

26  [9] *See, e.g.*, *Federal Trade Commission's Statement Supporting the Settlement* (Dkt. No. 1781), filed August 26, 2016, discussing the FTC approach to "full compensation," which, as the FTC notes, the Class Settlement achieves.  The FTC started at NADA Clean Retail to assure the

27  Settlement buyback payments would reasonably pay for comparable replacement vehicles—a goal shared by Class Plaintiffs.  The Class Settlement and the FTC Order achieve the same goal

28  through complementary perspectives.

PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF THE AMENDED
CLASS ACTION AGREEMENT

with the Settlement Class itself as both the beneficiary of economic compensation, and the agent of environmental benefit, as the Settlements are shaped and their objectives accomplished through the buyback or emissions modification choices the Settlement Class Members make for their vehicles.

Settlement Class Counsel continue to vigorously prosecute non-settled claims against Volkswagen and other defendants in this litigation, including Volkswagen's corporate affiliate Porsche, Volkswagen's supplier Bosch, and others.  This continued prosecution shows that issues in this case remain contested, and that the Settlement now being submitted for final approval resulted from vigorous, arm's-length negotiations.

Taken together, the substantive quality of the Settlement, the procedurally fair manner in which it was reached, and the economic and environmental benefits it will achieve if approved weigh in favor of granting final approval.

**E.      Class Member Reaction To the Settlement Has Been Overwhelmingly Favorable**

The deadline for Class Member objections and opt-outs is September 16, 2016, and they will be comprehensively analyzed, reported on, and responded to, in Settlement Class Counsel's Reply Submissions, to be filed on September 30, 2016.

In the meantime, the immediate reaction of Class Members to the proposed Settlement has been overwhelmingly positive.  As detailed in Section VI below, direct mail and e-mail notice has been accomplished.  Over 800,000 notices were sent directly via First Class U.S. Mail to ensure reaching all approximately 475,000 Class Members.  Although the Opt-Out and Objection Deadlines have not yet passed, approximately 235 consumers have requested exclusion from the Class and approximately 110 objections have been received.[10]  Collectively, these numbers

---

[10] Two Class Members filed motions to intervene through counsel for the stated purpose of challenging certain aspects of the Settlement.  On July 22, 2016, Ronald Clark Fleshman, Jr., moved to intervene to oppose final approval of the Settlement to the extent it releases claims against Volkswagen held by Virginia residents.  Dkt. 1672.  On August 17, 2016, the Court denied the motion finding that "Fleshman fail[ed] to show the Consumer Class Action and the Settlement practically impair[ed] his interests."  Dkt. 1742 at 7.  On July 29, 2016, Jolian Kangas moved to intervene in this action for the purpose of conducting discovery concerning "the process through which the settlement … was negotiated and the strength of the defenses to the core

1    represent less than 0.1% of the total Settlement Class.  On the other hand, approximately 210,000

2    Class Members have already registered for the Settlement, a remarkable figure given that the

3    Settlement has not yet been approved and no claims deadline looms.  Comparison of these figures

4    provides powerful evidence of the Settlement's fairness.  *See, e.g.*, *Churchill Vill., L.L.C. v. GE*,

5    361 F.3d 566, 577 (9th Cir. 2004) (affirming approval of settlement with 45 objections and 500

6    opt-outs from class of 90,000 members, roughly 0.6%); *Chun-Hoon v. McKee Foods Corp.*, 716

7    F. Supp. 2d 848, 852 (N.D. Cal. 2010) (finding that sixteen opt outs in class of 329 members, or

8    4.86%, strongly supported settlement); *Glass v. UBS Fin. Serv., Inc.*, No. C-06-4068-MMC, 2007

9    WL 221862, at *5 (N.D. Cal. Jan. 26, 2007) (approving settlement with 2% opt-out rate); *Wren v.*

10   *RGIS Inventory Specialists*, No. C-06-05778-JCS, 2011 WL 1230826, at *11 (N.D. Cal. Apr. 1,

11   2011) (holding that "'the absence of a large number of objections to a proposed class action

12   settlement raises a strong presumption that the terms of a proposed class action settlement are

13   favorable to the class members'") (quoting *Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221

14   F.R.D. 523, 529 (C.D. Cal. 2004)); *see also Garner v. State Farm Mut. Auto. Ins. Co.*, No. C 08

15   1365 CW (EMC), 2010 WL 1687832, at *14 (N.D. Cal. Apr. 22, 2010); *Riker v. Gibbons*, No.

16   3:08-cv-00115-LRH-VPC, 2010 WL 4366012, at *5 (D. Nev. Oct. 28, 2010) ("The small number

17   of objections is an indication that the settlement is fair, adequate, and reasonable.").

18          Because the class action settlement procedure requires affirmative action for exclusion,

19   provides a right of objection, but does not ask for votes of support, the case law, such as that

20   noted above, compares a vocal minority against a silent majority as a proxy for support.  Here, we

21   have strong direct evidence of actual support: the affirmative efforts of approximately 210,000

22   Class Members in the last 30 days, a number increasing by the thousands daily, to register early

23   for the substantial benefits this Settlement offers.  They do not face an impending deadline—they

24   have two more years to make choices and file claims—but the fact that so many of them have

25   already taken steps to secure Settlement benefits just as soon as they become available (if final

26   approval is granted) is a far stronger and more direct demonstration of positive reaction than is

27

28   allegations" on July 29, 2016.  Dkt 1697 at 2.  The Court denied Mr. Kangas's Motion on August
     19, 2016.  Dkt. 1746.

1315975.3

PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF THE AMENDED
CLASS ACTION AGREEMENT

1    the norm in class action approval.

2    **V.      THE COURT SHOULD CONFIRM THE CERTIFICATION OF THE  2.0-LITER**

3            **SETTLEMENT CLASS**

4            Federal Rule of Civil Procedure 23 governs the issue of class certification, whether the

5    proposed class is a litigated class or a settlement class.  However, when "[c]onfronted with a

6    request for settlement-only class certification, a district court need not inquire whether the case, if

7    tried, would present intractable management problems . . . for the proposal is that there will be no

8    trial." *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997).

9            Class certification is appropriate where: "(1) the class is so numerous that joinder of all

10   members is impracticable; (2) there are questions of law and fact common to the class; (3) the

11   claims or defenses of the representative parties are typical of the claims or defenses of the class;

12   and (4) the representative parties will fairly and adequately protect the interests of the class."

13   Fed. R. Civ. P. 23(a).  Certification of a class seeking monetary compensation also requires a

14   showing that "questions of law and fact common to class members predominate over any

15   questions affecting only individual members, and that a class action is superior to other available

16   methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

17           Pursuant to the Preliminary Approval Order, the Court certified the Class defined in

18   paragraph 2.16 of the Class Action Agreement for settlement purposes. Dkt. 1698 at 15-20.  In

19   doing so, the Court found that the Settlement Class Representatives satisfied both Rule 23(a) and

20   (b)(3) requirements, and that Settlement Class Counsel were adequate representatives of the

21   Class.  As demonstrated below, there is no reason for the Court to depart from its previous

22   conclusion that certification of the Class is warranted.

23           **A.      The Class Meets The Requirements Of Rule 23(a)**

24                   **1.      The Class Is Sufficiently Numerous**

25           Rule 23(a)(1) is satisfied when "the class is so numerous that joinder of all class members

26   is impracticable."  Fed. R. Civ. P. 23(a)(1).  Numerosity is generally satisfied when the class

27   exceeds forty members.  *See, e.g.*, *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000).

28   "A specific minimum number is not necessary, and [a] plaintiff need not state the exact number of

- 26 -

1    potential class members." *Richie v. Blue Shield of Cal.*, No. C-13-2693 EMC, 2014 WL

2    6982943, at *15 (N.D. Cal. Dec. 9, 2014).  It is undisputed that 475,745 Eligible Vehicles were

3    sold or leased in the U.S., and thus, that the Class consists of hundreds of thousands of members.

4    The large size of the Class and the geographic dispersal of its members across the United States

5    render joinder impracticable.  *See Palmer v. Stassinos*, 233 F.R.D. 546, 549 (N.D. Cal. 2006)

6    ("Joinder of 1,000 or more co-plaintiffs is clearly impractical.").  Therefore, numerosity is easily

7    established.  Moreover, the Class is defined by objective, transactional facts—the purchase or

8    lease of an Eligible Vehicle—and there is no dispute that Class Members can easily be identified

9    by reference to the books and records of the Volkswagen and their dealers.  Accordingly, the

10   Class is plainly ascertainable.  *See Moreno v. Autozone, Inc.*, 251 F.R.D. 417, 421 (N.D. Cal.

11   2008) (Breyer, J.) ("A class is ascertainable if it identifies a group of unnamed plaintiffs by

12   describing a set of common characteristics sufficient to allow a member of that group to identify

13   himself or herself as having a right to recover based on the description.").

14                    **2.      There Are Common Questions of Both Law and Fact**

15          "Federal Rule of Civil Procedure 23(a)(2) conditions class certification on demonstrating

16   that members of the proposed class share common 'questions of law or fact.'"  *Stockwell v. City*

17   *& County of San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014).  The "commonality

18   requirement has been 'construed permissively,' and its requirements deemed 'minimal.'"

19   *Estrella v. Freedom Fin'l Network,* No. C 09-03156 SI, 2010 WL 2231790, at *25 (N.D. Cal.

20   June 2, 2010) (quoting *Hanlon*, 150 F.3d at 1020).  "The existence of shared legal issues with

21   divergent factual predicates is sufficient, as is a common core of salient facts coupled with

22   disparate legal remedies within the class."  *Hanlon*, 150 F.3d at 1019.  Assessing commonality

23   requires courts to have "a precise understanding of the nature of the underlying claims."

24   *Parsons v. Ryan*, 754 F.3d 657, 676 (9th Cir. 2014) (citing *Amgen Inc. v. Conn. Ret. Plans &*

25   *Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013); additional citation omitted).  This allows courts to

26   determine if the class' "claims . . . depend upon a common contention" that is "of such a nature

27   that it is capable of classwide resolution—which means that determination of its truth or falsity

28   will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-*

1   *Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  The commonality "analysis does not turn

2   on the number of common questions, but on their relevance to the factual and legal issues at the

3   core of the purported class' claims."  *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir.

4   2014), *cert. denied*, 135 S. Ct. 2835 (2015).  Indeed, "[e]ven a single question of law or fact

5   common to the members of the class will satisfy the commonality requirement."  *Dukes*, 564 U.S.

6   at 369.

7         Here, the claims of all members of the Class derive directly from Volkswagen's

8   fraudulent scheme to mislead federal and state regulators into approving the Eligible Vehicles for

9   sale or lease through the use of a Defeat Device designed to bypass emission standards and mask

10  the dangerously high levels of pollutants emitted during normal operating conditions, as well as

11  Volkswagen's concurrent false and misleading marketing campaign that misrepresented and

12  omitted the true nature of the Eligible Vehicles' "clean" diesel engine system.  Volkswagen's

13  common course of conduct raises common questions of law and fact, the resolution of which will

14  generate common answers "apt to drive the resolution of the litigation" for the Class as a whole.

15  *Dukes*, 564 U.S. at 350.  And as Plaintiffs allege that their and the Class' "injuries derive from

16  [D]efendants' alleged 'unitary course of conduct,'" they have "'identified a unifying thread that

17  warrants class treatment.'"  *Sykes v. Mel Harris & Assocs. LLC*, 285 F.R.D. 279, 290 (S.D.N.Y.

18  2012).

19        Courts routinely find commonality where the class' claims arise from a defendant's

20  uniform course of conduct.  *See, e.g.*, *Negrete v. Allianz Life Ins. Co. of N. Am.*, 238 F.R.D. 482,

21  488 (C.D. Cal. 2006) ("The Court finds that the class members' claims derive from a common

22  core of salient facts, and share many common legal issues. These factual and legal issues include

23  the questions of whether Allianz entered into the alleged conspiracy and whether its actions

24  violated the RICO statute.  The commonality requirement of Rule 23(a)(2) is met."); *Cohen v.*

25  *Trump*, 303 F.R.D. 376, 382 (S.D. Cal. 2014) ("Here, Plaintiff argues his RICO claim raises

26  common questions as to 'Trump's scheme and common course of conduct, which ensnared

27  Plaintiff[] and the other Class Members alike.'  The Court agrees."); *Spalding v. City of Oakland*,

28  No. C11-2867 TEH, 2012 WL 994644, at *8 (N.D. Cal. Mar. 23, 2012) (commonality found

1    where plaintiffs "allege[] a common course of conduct that is amenable to classwide resolution");

2    *International Molders' & Allied Workers' Local Union No. 164 v. Nelson*, 102 F.R.D. 457 (N.D.

3    Cal. 1983) ("commonality requirement is satisfied where it is alleged that the defendants have

4    acted in a uniform manner with respect to the class"); *see also Suchanek v. Sturm Foods, Inc.*, 764

5    F.3d 750, 756 (7th Cir. 2014) (finding that "where the same conduct or practice by the same

6    defendant gives rise to the same kind of claims from all class members, there is a common

7    question").[11]  As this Court recognized when granting preliminary approval, "[w]ithout class

8    certification, individual Class Members would be forced to separately litigate the same issues of

9    law and fact which arise from Volkswagen's use of the defeat device and Volkswagen's alleged

10   common course of conduct." Dkt. 1698 at 16-17 (citing *In re Celera Corp. Sec. Litig.*, No. 5:10-

11   CV-02604-EJD, 2014 WL 722408, at *3 (N.D. Cal. Feb. 25, 2014) (finding commonality

12   requirement met where plaintiffs raised questions of law or fact that would be addressed by other

13   putative class members pursuing similar claims).  Accordingly, Rule 23's commonality

14   requirement is satisfied here.

15       **3.    The Settlement Class Representatives' Claims Are Typical of Other
             Class Members' Claims**
16

17       "Rule 23(a)(3) requires that 'the claims or defenses of the representative parties are typical

18   of the claims or defenses of the class.'" *Parsons v. Ryan*, 754 F.3d at 657, 685 (9th Cir. 2014)

19   (quoting Fed. R. Civ. P. 23(a)(3)).  "Like the commonality requirement, the typicality

20   requirement is 'permissive' and requires only that the representative's claims are 'reasonably co-

21   extensive with those of absent class members; they need not be substantially identical.'"

22   *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quoting *Hanlon*, 150 F.3d at 1020).

23   "The test of typicality is 'whether other members have the same or similar injury, whether the

24   ─────────────────

25   [11] Similarly, courts routinely find commonality in cases where uniform misrepresentations and
     omissions are employed to deceive the public. *See Ries v. Arizona Beverages USA LLC*, 287
     F.R.D. 523, 537 (N.D. Cal. 2012) ("[C]ourts routinely find commonality in false advertising
26   cases."); *Astiana v. Kashi Co.*, 291 F.R.D. 493, 501-02 (S.D. Cal. 2013) (same); *see also Guido v.
     L'Oreal, USA, Inc.*, 284 F.R.D. 468, 478 (C.D. Cal. 2012) (whether misrepresentations "are
27   unlawful, deceptive, unfair, or misleading to reasonable consumers are the type of questions
     tailored to be answered in 'the capacity of a classwide proceeding to generate common answers
28   apt to drive the resolution of the litigation'") (quoting *Dukes*, 131 S.Ct. at 2551).

- 29 -

1   action is based on conduct which is not unique to the named plaintiffs, and whether other class

2   members have been injured by the same course of conduct.'" *Evon v. Law Offices of Sidney*

3   *Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d

4   497, 508 (9th Cir. 1992)).  Accordingly, the typicality requirement "assure[s] that the interest of

5   the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N.*

6   *Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d

7   497, 508 (9th Cir. 1992)).  Thus, where a plaintiff suffered a similar injury and other class

8   members were injured by the same course of conduct, typicality is satisfied.  *See Parsons*, 754

9   F.3d at 685.

10      Here, the same course of conduct that injured the Settlement Class Representatives also

11   injured other Class Members.  The Settlement Class Representatives, like other Class Members,

12   were the victims of Volkswagen's fraudulent scheme because they purchased or leased an

13   Eligible Vehicle, each of which contained an illegal Defeat Device and produced unlawful levels

14   of $NO_X$ emissions.  The Settlement Class Representatives, like other Class Members, would not

15   have purchased or leased their vehicles had Volkswagen disclosed to government regulators the

16   illegal Defeat Devices and the true nature of the Eligible Vehicles' "clean" diesel engine systems,

17   because without Volkswagen's wrongdoing, the Eligible Vehicles would not have been approved

18   for sale or lease in the U.S.  The Settlement Class Representatives and the other Class Members

19   will similarly benefit from the relief provided by the Settlement.  Accordingly, Rule 23's

20   typicality requirement is satisfied here.

21

22        **4.**     **The Settlement Class Representatives and Settlement Class Counsel
Fairly and Adequately Protect the Interests of the Settlement Class**

23      Finally, Rule 23(a)(4) requires "the representative parties [to] adequately protect the

24   interests of the class."  Fed. R. Civ. P. 23(a)(4).  "This requirement is rooted in due-process

25   concerns—'absent class members must be afforded adequate representation before entry of a

26   judgment which binds them.'" *Radcliffe v. Experian Info. Sols., Inc.*, 715 F.3d 1157, 1165 (9th

27   Cir. 2013) (quoting *Hanlon*, 150 F.3d at 1020).  Courts engage in a dual inquiry to determine

28   adequate representation and ask: "'(1) do the named plaintiffs and their counsel have any

conflicts of interest with other Class Members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'"  *Evon*, 688 F.3d at 1031 (quoting *Hanlon*, 150 F.3d at 1020).

> **a.      The Interests of the Settlement Class Representatives Are Directly Aligned with those of the Absent Class Members and the Settlement Class Representatives Have Diligently Pursued the Action on Their Behalf**

Plaintiffs do not have any interests antagonistic to the other Class Members and will continue to vigorously protect their interests.  *See Clemens v. Hair Club for Men, LLC*, No. C 15-01431 WHA, 2016 U.S. Dist. LEXIS 50573, at *6 (N.D. Cal. 2016).  The Settlement Class Representatives and Class Members are entirely aligned in their interest in proving that Volkswagen misled them and share the common goal of obtaining redress for their injuries.

The Settlement Class Representatives understand their duties as class representatives, have agreed to consider the interests of absent Class Members, and have actively participated in this litigation.  For example, the Settlement Class Representatives have provided their counsel with factual information pertaining to their purchase or lease of an Eligible Vehicle to assist in drafting the Complaint.  Furthermore, all representative Plaintiffs were clearly advised of their obligations as class representatives and demonstrated their understanding of those obligations by completing and returning detailed verified Plaintiff Fact Sheets during discovery in this litigation. Plaintiffs also have searched for, and provided, relevant documents and information to their counsel, and have assisted in preparing discovery responses and completing comprehensive fact sheets.  Moreover, Plaintiffs have regularly communicated with their counsel regarding various issues pertaining to this case, and they will continue to do so until the Settlement is approved and its administration completed.  All of this together is more than sufficient to meet the adequacy requirement of Rule 23(a)(4).  *See Trosper v. Styker Corp.*, No. 13-CV-0607-LHK, 2014 WL 4145448, at *43 (N.D. Cal. Aug. 21, 2014) ("All that is necessary is a rudimentary understanding of the present action and . . . a demonstrated willingness to assist counsel in the prosecution of the litigation.").

1

2

**b.      Settlement Class Counsel Are Adequate Representatives of the Settlement Class**

3      Settlement Class Counsel have already demonstrated their qualifications to the Court.

4   Lead Counsel and each member of the PSC participated in what was perhaps the most

5   competitive application process ever in an MDL.  During the application process, Settlement

6   Class Counsel established, and the Court recognized, their qualifications, experience, and

7   commitment to this litigation.  The criteria the Court considered in appointing Settlement Class

8   Counsel was substantially similar to the considerations set forth in Rule 23(g).  *Compare* Dkt.

9   336 and 1084, *with Clemens*, 2016 U.S. Dist. LEXIS 50573, at *6.  Settlement Class Counsel are

10   highly qualified lawyers who have experience in successfully prosecuting high-stakes complex

11   cases and consumer class actions.  Further, Settlement Class Counsel, and their respective law

12   firms, have already undertaken an enormous amount of work, effort and expense in this litigation

13   and have demonstrated their willingness to devote whatever resources are necessary to see this

14   case through to a successful and historic outcome.  *See, e.g.*, May 24, 2016, Status Conference

15   Hr'g Tr. 8:6-14 (Dkt.  1535)  ("Finally, the Court must note that, while it has not and will not

16   make a judgment on the proposed settlements until the appropriate time, it is grateful for the

17   enormous effort of all parties, including the governmental agencies—their efforts to obtain a

18   global resolution of the issues raised by these cases. I have been advised by the Settlement Master

19   that all of you have devoted substantial efforts, weekends, nights, and days, and perhaps at

20   sacrifice to your family.").  Here, the Court need look no further than the significant benefits

21   already obtained for the Class through Settlement Class Counsel's zealous and efficient

22   prosecution of this action.  *See* Dkt. 1698 at 18 ("Finally, there are no doubts regarding Class

23   Counsel's adequacy. . . . They are qualified attorneys with extensive experience in consumer class

24   action litigation and other complex cases. The extensive efforts undertaken thus far in this matter

25   are indicative of Lead Plaintiffs' Counsel's and the PSC's ability to prosecute this action

26   vigorously.").  Accordingly, the Court should find that Settlement Class Counsel are adequate.

27   **B.      The Requirements of Rule 23(b)(3) Are Met**

28      In addition to the requirements of Rule 23(a), the Court must find that the provisions of

- 32 -

1    Rule 23(b) are satisfied.  The Court should certify a Rule 23(b)(3) class when: (i) "questions of

2    law or fact common to class members predominate over any questions affecting only individual

3    members"; and (ii) a class action is "superior to other available methods for fairly and efficiently

4    adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  This case satisfies both the

5    predominance and superiority requirements.

6                    **1.      Common Issues of Law and Fact Predominate**

7         "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in

8    the case are more prevalent or important than the non-common, aggregation-defeating, individual

9    issues.'"  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016) (quoting 2 W. Rubenstein,

10   *Newberg on Class Actions* § 4:49 at 195-96 (5th ed. 2012)).  "When 'one or more of the central

11   issues in the action are common to the class and can be said to predominate, the action may be

12   considered proper under Rule 23(b)(3) even though other important matters will have to be tried

13   separately, such as damages or some affirmative defenses peculiar to some individual class

14   members.'"  *Id.* (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure

15   § 1778, at 123-24 (3d ed. 2005)).  Instead, at its core, "[p]redominance is a question of

16   efficiency."  *Butler v. Sears, Roebuck & Co.*, 702 F.3d 359, 362 (7th Cir. 2012).  Thus, "[w]hen

17   common questions present a significant aspect of the case and they can be resolved for all

18   members of the class in a single adjudication, there is clear justification for handling the dispute

19   on a representative rather than on an individual basis."  *Hanlon*, 150 F.3d at 1022 (internal

20   quotations and citations omitted).  Accordingly, it is appropriate to certify a single nationwide

21   class of consumers from all fifty States here.

22        The Rule 23(b)(3) predominance inquiry in the context of the certification of a

23   nationwide settlement class involving various state consumer protection law claims was the

24   subject of an extensive *en banc* decision by the Third Circuit in *Sullivan v. DB Invs., Inc.*,

25   667 F.3d 273 (3d Cir. 2011), *cert denied sub nom.*, *Murray v. Sullivan*, 132 S. Ct. 1876 (2012).

26   In affirming certification a nationwide settlement class, the Third Circuit's predominance

27   inquiry was informed by "three guideposts": "first, that commonality is informed by the

28   defendant's conduct as to all class members and any resulting injuries common to all class

PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF THE AMENDED
CLASS ACTION AGREEMENT

members; second, that variations in state law do not necessarily defeat predominance; and third, that concerns regarding variations in state law largely dissipate when a court is considering the certification of a settlement class." *Sullivan*, 667 F.3d at 297.  Here, like in *Sullivan*, any material variations in state law do not preclude a finding of predominance given the uniformity of Volkswagen's conduct and the resulting injuries that are common to all Class Members.

Indeed, this Court has recently adopted the rationale in *Sullivan*, foreshadowed (specifically in an auto defect class settlement context) by the Ninth Circuit in *Hanlon*, that "state law variations are largely 'irrelevant to certification of a settlement class.'" *Id.* at 304 (quoting *Sullivan*, 667 F.3d at 304) (citation omitted).  *See Wakefield v. Wells Fargo & Co.*, No. C 12-05053 LB, 2014 WL 7240339, at *12-13 (N.D. Cal. Dec. 18, 2014); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2016 U.S. Dist. LEXIS 9944, at *208-09 (N.D. Cal. Jan. 6, 2016), *report and recommendation adopted*, 2016 U.S. Dist. LEXIS 9766 (N.D. Cal. Jan. 26, 2016).  Moreover, this Court has agreed that in the settlement context, the Court need not "differentiate[e] within a class based on the strength or weakness of the theories of recovery." *In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. C 07-05634 CRB, 2015 WL 3396829, at *20 (N.D. Cal. May 26, 2015) (quoting *Sullivan*, 667 F.3d at 328); *Rodman v. Safeway, Inc.*, No. 11-cv-03003-JST, 2014 WL 988992, at *54-56 (N.D. Cal. Mar. 9, 2014) (citing *Sullivan*, 667 F.3d at 304-07).

Here, questions of law or fact common to Class Members predominate over any questions affecting only individual members.  Volkswagen's uniform scheme to mislead regulators and consumers by submitting false applications for COCs and EOs, failing to disclose the existence of the illegal Defeat Devices in the Eligible Vehicles, and misrepresenting the levels of $NO_X$ emissions of the Eligible Vehicles are central to the claims asserted in the Complaint.  Indeed, the evidence necessary to establish that Volkswagen engaged in a scheme to design, manufacture, market, sell, and lease the Eligible Vehicles with Defeat Devices is common to all Class Members, as is the evidence of the false and misleading statements that Volkswagen used to mass market the Eligible Vehicles.

The Ninth Circuit favors class treatment of fraud claims stemming from a "common

1course of conduct," like the scheme that is alleged by Plaintiffs here. *See In re First Alliance*

2*Mortg. Co.*, 471 F.3d 977, 990 (9th Cir. 2006); *Hanlon*, 150 F.3d at 1022-1023. And, even

3outside of the settlement context, predominance is readily met in cases asserting RICO and

4consumer claims arising from a single fraudulent scheme by a defendant that injured each

5plaintiff. *See Amchem Prods.*, 521 U.S. at 625; *Wolin v. Jaguar Land Rover N. Am., LLC*, 617

6F.3d 1168, 1173, 1176 (9th Cir. 2010) (consumer claims based on uniform omissions are readily

7certifiable where the claims are "susceptible to proof by generalized evidence," even if

8individualized issues remain); *Friedman v. 24 Hour Fitness USA, Inc*., No. CV 06-6282 AHM

9(CTx), 2009 WL 2711956, at *22-23 (C.D. Cal. Aug. 25, 2009) ("Common issues frequently

10predominate in RICO actions that allege injury as a result of a single fraudulent scheme."); *see*

11*also Klay v. Humana, Inc.*, 382 F.3d 1241, 1256, 1257 (11th Cir. 2004) (upholding class

12certification of RICO claim where "all of the defendants operate nationwide and allegedly

13conspired to underpay doctors across the nation, so the numerous factual issues relating to the

14conspiracy are common to all plaintiffs . . . [and the] "corporate policies [at issue] . . .

15constitute[d] the very heart of the plaintiffs' RICO claims"). Thus, Plaintiffs have satisfied the

16predominance requirement.

17### 2.      Class Treatment Is Superior in This Case

18Finally, pursuant to Rule 23(b)(3), a class action must be "superior to other available

19methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This

20factor "requires determination of whether the objectives of the particular class action procedure

21will be achieved in the particular case." *Hanlon*, 150 F.3d at 1023. In other words, it "requires

22the court to determine whether maintenance of this litigation as a class action is efficient and

23whether it is fair." *Wolin*, 617 F.3d at 1175-76. Under the Rule, "the Court evaluates whether a

24class action is a superior method of adjudicating plaintiff's claims by evaluating four factors: '(1)

25the interest of each class member in individually controlling the prosecution or defense of

26separate actions; (2) the extent and nature of any litigation concerning the controversy already

27commenced by or against the class; (3) the desirability of concentrating the litigation of the

28claims in the particular forum; and (4) the difficulties likely to be encountered in the management

1   of a class action.'" *Trosper*, 2014 U.S. Dist. LEXIS 117453, at *62 (quoting *Leuthold v.*

2   *Destination Am., Inc.*, 224 F.R.D. 462, 469 (N.D. Cal. 2004)).

3        There can be little doubt that class treatment here is superior to the litigation of hundreds

4   or thousands of individual consumer actions. "From either a judicial or litigant viewpoint, there

5   is no advantage in individual members controlling the prosecution of separate actions. There

6   would be less litigation or settlement leverage, significantly reduced resources and no greater

7   prospect for recovery." *Hanlon*, 150 F.3d at 1023; *see also Wolin*, 617 F.3d at 1176 ("Forcing

8   individual vehicle owners to litigate their cases, particularly where common issues predominate

9   for the proposed class, is an inferior method of adjudication."). The damages sought by each

10  class member here, while representing an important purchase to class members, are not so large

11  as to weigh against certification of a class action. *See Smith v. Cardinal Logistics Mgmt. Corp.*,

12  No. 07-2104 SC, 2008 WL 4156364, at *32-33 (N.D. Cal. Sept. 5, 2008) (finding that class

13  members had a small interest in personally controlling the litigation even where the average

14  amount of damages were $25,000-$30,000 per year of work for each class member); *see also*

15  *Walker v. Life Ins. Co. of the Sw.*, No. CV 10-9198 JVS (RNBx), 2012 WL 7170602, at *49 (C.D.

16  Cal. Nov. 9, 2012). The sheer number of separate trials that would otherwise be required also

17  weighs in favor of certification. *Id.*; *see also* Dkt. 1698 at 19-20 ("Given that Class Members

18  number in the hundreds of thousands, there is the potential for just as many lawsuits with the

19  possibility of inconsistent rulings and results. Thus, classwide resolution of their claims is clearly

20  favored over other means of adjudication, and the proposed Settlement resolves Class Members'

21  claims at all once.").

22       Moreover, all private federal actions seeking relief for the Class have already been

23  transferred to this District for consolidated MDL pretrial proceedings.[12] Dkt. 950. That the

---

[12] Although several class actions are pending in various state courts, the existence of these actions does not defeat a finding of superiority. *See Cartwright v. Viking Indus.*, No. 2:07-CV-02159-FCD-EFB, 2009 WL 2982887, at *44-*50 (E.D. Cal. Sept. 14, 2009) (certifying CLRA, UCL, fraudulent concealment, unjust enrichment, and warranty claims despite a concurrent state court class action that certified warranty claims for class treatment); *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 527 F. Supp. 2d 1053, 1069 (N.D. Cal. 2007) (recognizing that courts often certify concurrent FLSA and UCL class actions). Nor does the existence of actions filed by the DOJ or FTC preclude a finding of superiority because, among other reasons, both of those actions

1   Judicial Panel on Multidistrict Litigation consolidated all related consumer cases in an MDL

2   before this Court is a clear indication that a single proceeding is preferable to a multiplicity of

3   individual lawsuits.  The government suits are here too, enabling this Court to approve and

4   enforce all of the provisions of each of these settlements.  The certification of the Settlement

5   Class enables and completes this advantageous unified jurisdiction.

6        Because the class action device provides the superior means to effectively and efficiently

7   resolve this controversy, and as the other requirements of Rule 23 are each satisfied, final

8   approval of the Court's certification of the Settlement Class is appropriate.  *See* Dkt. 1698 at 20.

9
    **VI.   THE APPROVED NOTICE PROGRAM GAVE THE BEST PRACTICABLE
10           NOTICE TO CLASS MEMBERS AND SATISFIED RULE 23 AND DUE
             PROCESS**

11       In its Preliminary Approval Order, the Court held that "the Notice Plan is adequate"

12  because "it provides the best practicable notice that is reasonably calculated to inform Class

13  Members of this Settlement."  Dkt. 1698 at 30.  That Notice Program, which is currently being

14  implemented, meets and exceeds all legal requirements.  Using a range of diverse techniques

15  designed to ensure maximally effective communication of the Settlement to all Class Members,

16  the Notice Program included direct First Class U.S. Mail mailings to confirmed addresses of

17  Class Members, as well as email notifications; extensive print, digital, and social media

18  campaigns; and a comprehensive website and a toll-free telephone number.  To quantify the

19  scope and scale of the Notice Program:  (a) 811,944 notice packets have been directly mailed to

20  Class Members and dealers; (b) 79,855 email notifications have been sent to Class Members

21  who registered with the Volkswagen or Audi Goodwill Programs, and an additional 374,025

22  notification emails have been sent out; (c) 125 strategically-placed print notifications in national

23  and regional publications with circulations in the millions have been published; (d) more than

24  112,582,506 digital impressions have been published on dozens of relevant Internet websites

25  and on leading social media platforms, including Facebook, Instagram, and Twitter.

26       Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances,

27
28  are part of the MDL and the proposed Settlement was negotiated with the participation of those
    government entities.

1315975.3

1  including individual notice to all members who can be identified through reasonable effort."

2  Fed. R. Civ. P. 23(c)(2)(B).  Publication and other notice techniques are sufficient where

3  individual notice to the Class is impractical.  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339

4  U.S. 306, 315 (1950).  Incorporating both direct and indirect notification methods, the Notice

5  Program here takes every reasonable step to ensure no Class Member is unaware of the

6  Settlement.  The ongoing implementation of the Notice Program is fully consistent with this

7  Court's Preliminary Approval Order.

8  In conjunction with preliminary approval, the Court analyzed the content of the Long-

9  Form Notice in light of the requirements of Rule 23(c)(2)(B), and determined that it "satisfies

10  each element" of that Rule.  Dkt. 1698 at 31.  As Plaintiffs demonstrated in seeking preliminary

11  approval of the Settlement, the Long Form Notice explains how Class Members may object to, or

12  opt out of, the Settlement, and how Class Members may address the Court at the final approval

13  hearing.  It includes a series of questions and answers designed to explain the benefits and other

14  details of the Settlement in clear terms in a well-organized and reader-friendly format.  It also

15  identifies by name and furnishes contact information for Lead Plaintiffs' Counsel and PSC

16  members who can answer Class Members' questions, and indicates that additional information

17  about the Settlement can be found on the settlement website (www.VWCourtSettlement.com) or

18  by calling the toll-free telephone number (1-844-98-CLAIM) specifically established to provide

19  Class Members with additional information about the Settlement and to answer any questions

20  they may have about the Settlement.

21  The principal method of reaching Class Members here was individual direct mail notice.

22  A cover letter and copy of the Long-Form Notice was sent to Class Members who are readily

23  identifiable through Volkswagen's records and/or registration data, such as Polk data.  All

24  mailings have been sent via First Class U.S. Mail, proper postage prepaid, and all addresses have

25  been checked against the United States Postal Service's National Change of Address database

26  prior to being sent.

27  The direct mail notice was supplemented by an email notice delivered to every email

28  address provided by Class Members in connection with the Volkswagen or Audi Goodwill

PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF THE AMENDED
CLASS ACTION AGREEMENT

1   Programs.  This resulted in the notice administrator disseminating 453,880 email notifications of

2   the Settlement.  The Long Form Notice was mailed to 15,212 non-Volkswagen and non-Audi

3   new car dealers, in addition to 58,167 used car dealers who may be eligible for benefits under the

4   Settlement.  Direct notice will also be mailed and/or emailed to Class Members when the EPA

5   and CARB approve or reject Volkswagen's proposed emissions modifications for their vehicles.

6           The Short Form Notice also conveyed the basic structure of the Settlement and was

7   designed to capture Class Members' attention in newspapers and periodicals with clear, concise,

8   plain language.  It has appeared as a two-color advertisement (where available) in the Sunday

9   edition of *The New York Times* (estimated circulation of 2,579,166), the daily edition of *The Wall*

10  *Street Journal* (estimated circulation of 1,321,827), the daily edition of *USA Today* (estimated

11  circulation of 1,100,000), both the Sunday and daily editions of nineteen newspapers covering

12  markets with 5,000 or more Eligible Vehicles, the Sunday edition of 26 newspapers covering

13  markets with 2,000-4,999 Eligible Vehicles, the weekly editions of 31 Hispanic newspapers

14  (translated into Spanish), and the weekly editions of 27 African American newspapers.  These

15  notices direct readers to the Settlement Website (where the Long Form Notice is available) or a

16  toll-free telephone number for more information.

17          In addition to direct mailings, emails, and national and regional publication notices, a

18  robust digital and social media campaign focused on stimulating awareness about the Settlement

19  and encouraging Class Members' participation in the Settlement has been implemented.  Targeted

20  banner advertisements are being published on automotive websites accessed by Class Members

21  (using IHS Automotive (Polk) data), including the National Automobile Dealers Association

22  (www.nada.org), *Hemmings* (www.hemmings.com), and *Kelley Blue Book* (www.kbb.com).

23  Similarly, banner ads and high-impact units (which are interactive advertisements that are larger

24  than banner ads) have been published on websites associated with popular consumer automotive

25  magazines, including *Automobile*, *Car & Driver*, *Motor Trend*, and *Road & Track*.  Fleet owners

26  that may be included in the Settlement have been targeted by placing banner ads on the National

27  Association of Fleet Administrators (www.nafa.org) website, as well as other websites associated

28  with relevant trade publications, including *Automotive Fleet*, *Automotive News*, *Auto Rental*

1   *News*, and *FLEETSolutions*.  Targeted advertising on Facebook, Instagram, and Twitter, banner

2   and video ads published on a broad and diverse range of websites through the Google Display

3   Network, and the use of sponsored keywords/phrases on all major search engines (Google

4   AdWords, Bing Microsoft Advertising, and their search partners), further ensure that Class

5   Members are being notified of the Settlement as extensively, comprehensively, and assiduously

6   as reasonably possible.  To amplify the effect of these digital and social media notice techniques,

7   an earned media program consisting of a multimedia news release distributed on PR Newswire's

8   US1 National Circuit (reaching approximately 5,000 media outlets and 5,400 websites) was also

9   implemented.

10          Each of the print, digital, and social media notices was designed to assist Class Members

11   in obtaining full details of the Settlement by directing them to the Settlement Website and/or the

12   toll-free telephone number.  All of the relevant background information and the Settlement

13   documents (including the Long Form Notice and the Claim Form) have been made available

14   through both the Settlement Website and the toll-free telephone number.  The interactive

15   Settlement Website currently allows Class Members to run a vehicle look-up by VIN number to

16   determine their eligibility to participate in the Settlement.  The Settlement Website will post

17   periodic updates as additional information becomes available, and as the claims process opens, in

18   order to facilitate Class Members' claim submissions.  A final report on the completion of the

19   notice program, including updating of addresses for returned mail, will be submitted by

20   Declaration from the Court–appointed notice providers are part of the September 30, 2016, reply

21   submissions.

22          As discussed above, direct mail notice to Class Members remains the gold standard for

23   adequate class-wide notice under Rule 23(b)(2)(C), Rule 23(e)(1), and principles of due process.

24   Here, all available addresses were used, to assume delivery of notice, and many Class Members

25   received multiple notices.  Indeed, the majority of the Class Members received e-mail notice, as

26   well as U.S. mail notice.  The other forms of notice implemented in this case, including

27   publication and email notice, ordinarily suffice even absent direct notice by mail.  *See, e.g.*, *In re*

28   *Toys "R" Us-Del., Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D.

PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF THE AMENDED
CLASS ACTION AGREEMENT

<table>
<tbody>
<tr><td>1</td><td></td></tr>
</tbody>
</table>

438, 449 (C.D. Cal. 2014) (approving notice by publication in *USA Today* and issuing final

approval of settlement where "[t]he notice clearly apprises class members of the action and of

their legal options."); *In re Netflix Priv. Litig.*, No. 5:11-CV-00379 EJD, 2013 WL 1120801, at \*9

(N.D. Cal. Mar. 18, 2013) (approving notice by email and publication and issuing final approval

of settlement).  The Notice Program being implemented in this case far surpasses the applicable

legal requirements and ensures that all Class Members will receive adequate notice of the

Settlement and an opportunity to object or opt out of the Settlement.

## VII.    CONCLUSION

For the foregoing reasons, Settlement Class Representatives and Settlement Class Counsel

respectfully request that the Court confirm the certification of the Settlement Class and grant final

approval to the Settlement.

Dated:  August 26, 2016                      Respectfully submitted,

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

By:  */s/ Elizabeth J. Cabraser*
Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone: 415.956.1000
Facsimile:  415.956.1008
E-mail: *ecabraser@lchb.com*

*Plaintiffs' Lead Settlement Class Counsel*

Benjamin L. Bailey                           Steve W. Berman
BAILEY GLASSER LLP                           HAGENS BERMAN
209 Capitol Street                           1918 8th Avenue, Suite 3300
Charleston, WV 25301                         Seattle, WA  98101
Telephone: 304.345.6555                      Telephone: 206.623.7292
Facsimile:  304.342.1110                     Facsimile:  206.623.0594
E-mail: *bbailey@baileyglasser.com*          E-mail: *steve@hbsslaw.com*

David Boies
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY  10504
Telephone: 914.749.8200
Facsimile:  914.749.8300
E-mail: *dboies@bsfllp.com*

David Seabold Casey, Jr.
CASEY GERRY SCHENK FRANCAVILLA
BLATT & PENFIELD, LLP
110 Laurel Street
San Diego, CA  92101-1486
Telephone: 619.238.1811
Facsimile:  619.544.9232
E-mail: *dcasey@cglaw.com*

James E. Cecchi
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO P.C.
5 Becker Farm Road
Roseland, NJ  07068-1739
Telephone: 973.994.1700
Facsimile:  973.994.1744
E-mail: *jcecchi@carellabyrne.com*

Roxanne Barton Conlin
ROXANNE CONLIN & ASSOCIATES, P.C.
319 Seventh Street, Suite 600
Des Moines, IA  50309
Telephone: 515.283.1111
Facsimile: 515.282.0477
E-mail: *roxlaw@aol.com*

Jayne Conroy
SIMMONS HANLY CONROY LLC
112 Madison Avenue
New York, NY  10016-7416
Telephone: 212.784.6400
Facsimile:  212.213.5949
E-mail: *jconroy@simmonsfirm.com*

Paul J. Geller
ROBBINS GELLER RUDMAN &
DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone: 561.750.3000
Facsimile:  561.750.3364
E-mail: *pgeller@rgrdlaw.com*

Robin L. Greenwald
WEITZ & LUXENBERG P.C.
700 Broadway
New York, NY  10003
Telephone: 212.558.5500
Facsimile:  212.344.5461
E-mail: *rgreenwald@weitzlux.com*

Michael D. Hausfeld
HAUSFELD
1700 K Street, N.W., Suite 650
Washington, DC  20006
Telephone: 202.540.7200
Facsimile:  202.540.7201
E-mail: *mhausfeld@hausfeld.com*

Michael Everett Heygood
HEYGOOD, ORR & PEARSON
6363 North State Highway 161, Suite 450
Irving, TX  75038
Telephone: 214.237.9001
Facsimile:  214.237-9002
E-mail: *michael@hop-law.com*

Adam J. Levitt
GRANT & EISENHOFER P.A.
30 North LaSalle Street, Suite 2350
Chicago, IL  60602
Telephone: 312.610.5400
Facsimile:  312.214.0001
E-mail: *alevitt@gelaw.com*

W. Daniel "Dee" Miles III
BEASLEY ALLEN LAW FIRM
218 Commerce Street
Montgomery, AL  36104
Telephone: 800.898.2034
Facsimile:  334.954.7555
E-mail: *dee.miles@beasleyallen.com*

Frank Mario Pitre
COTCHETT PITRE & McCARTHY LLP
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone: 650.697.6000
Facsimile: 650.697.0577
E-mail: *fpitre@cpmlegal.com*

1315975.3

1   Joseph F. Rice                        Rosemary M. Rivas
    MOTLEY RICE, LLC                      FINKELSTEIN THOMPSON LLP
2   28 Bridgeside Boulevard               One California Street, Suite 900
    Mount Pleasant, SC  29464             San Francisco, CA  94111
3   Telephone: 843.216.9000               Telephone: 415.398.8700
    Facsimile:  843.216.9450              Facsimile:  415.393.8704
4   E-mail: *jrice@motleyrice.com*        E-mail: *rrivas@finkelsteinthompson.com*

5   Lynn Lincoln Sarko                    Christopher A. Seeger
    KELLER ROHRBACK L.L.P.                SEEGER WEISS LLP
6   1201 3rd Avenue, Suite 3200           77 Water Street
    Seattle, WA  98101-3052               New York, NY  10005-4401
7   Telephone: 206.623.1900               Telephone: 212.584.0700
    Facsimile:  206.623.3384              Facsimile:  212.584.0799
8   E-mail: *lsarko@kellerrohrback.com*   E-mail: *cseeger@seegerweiss.com*

9   J. Gerard Stranch IV                  Roland K. Tellis
    BRANSTETTER, STRANCH &                BARON & BUDD, P.C.
10  JENNINGS, PLLC                        15910 Ventura Boulevard, Suite 1600
    223 Rosa L. Parks Avenue, Suite 200   Encino, CA  91436
11  Nashville, TN  37203                  Telephone: 818.839.2320
    Telephone: 615.254.8801               Facsimile:  818.986.9698
12  Facsimile: 615.250.3937               E-mail: *trellis@baronbudd.com*
    E-mail: *gerards@bsjfirm.com*
13
    Lesley E. Weaver, Esq.
14  1901 Harrison St., #1100
    Oakland, CA 94612
15  Telephone: 415.797.2617
    E-Mail:  *lesley.weaver@gmail.com*
16

17                          *Plaintiffs' Settlement Class Counsel*

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF THE AMENDED
CLASS ACTION AGREEMENT

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that, on August 26, 2016, service of this document was accomplished

3

pursuant to the Court's electronic filing procedures by filing this document through the ECF

4

system.

5

6                                                   _/s/ Elizabeth J. Cabraser_____
                                                      Elizabeth J. Cabraser

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1315975.3

PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF THE AMENDED
CLASS ACTION AGREEMENT