Paul M. Monzione (SBN 101124)
Monzione Law Offices
info@monzionelawoffices.com
1388 Sutter Street Suite 910
San Francisco, CA 94102

Attorney for Objectors
Jessica Grace Li and
Alexander D. Birner

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | ) Case No. 3:15-MDL-02672-CRB  (JSC) ) ) Assigned to Hon. Charles R. Breyer ) |
| This Document Relates to: | ) ) |
| ALL CONSUMER AND RESELLER ACTIONS | ) ) ) |

## OBJECTIONS TO CLASS ACTION SETTLEMENT

# TABLE OF CONTENTS

Page

I.  Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. Rule 23 (h) is not Complied with when the Deadline for Opting Out or Filing Objections Precedes the Motion for Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV. The Court Failed to Comply with its Own Local Civil Rule 7 that Governs Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

V. Basic Requirements of Rule 23 (b) (3) Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

VI. Long Form Notice is Deficient . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

VII. The Use of a Reversionary Clause Is Inappropriate . . . . . . . . . . . . . . . . . . . . . . . . . 10

      A. The goals of the underlying statutes -- deterrence and reversion -- are      violated by the use of a reversion of unspent funds to this defendant . . . . . . . . . . . . . . . . . 10

      B. Circumstances do not require reversion to defendants . . . . . . . . . . . . . . . . . . . . 12

            1. Defendants' course of conduct was intentional and fraudulent . . . . . . . . 12

            2. Redistribution on pro rata basis to claimants is viable and proper. . . . . 13

            3. Pro-rata distribution of any unclaimed funds creates no windfall to claimants or other class members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            4. The pooling fund is created by class members releasing their claims against VW and transferring their property/vehicles to defendant(s) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            5. The Courts favor redistribution to class members absent special circumstances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            6. Reversion to defendants would undermine the deterrent purpose of the statutes it violated and contradict, as well the deterrent purpose of class actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      C.  The amount of unclaimed funds is likely substantial . . . . . . . . . . . . . . . . . . . . . 16

    D. The District court's preliminary legal analysis relative to the
       reversionary clause is flawed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VIII. Strict Eligibility Requirements Are Often Found Where the Settlement
Agreement Includes a Reversionary Clause Present Here . . . . . . . . . . . . . . . . . . . . . . . . . 19

    A. Reversionary clause creates incentive to restrict class definition and
       eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    B. Eligibility requirements are strict and arbitrary . . . . . . . . . . . . . . . . . . . . . . . . . 19

        1. Seller eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

           a. Eligible seller identification time limit is unreasonable . . . . . . . . 19

           b. Other unreasonable eligible seller exclusions . . . . . . . . . . . . . . . . 20

        2. Lessees of these subject vehicles given relief only if VW
          is the lessor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        3. Owner eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        4. Eligible vehicle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    IX. Clear Sailing Agreement Between Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    X. The Exclusion of 3.0 Liter Engines alone from the Class Renders The Settlement
Unreasonable, Unfair and Inadequate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    A. The Consolidated Complaint included 3.0 liter engine vehicles as Class
       Vehicles entitled to relief along with the 2.0 liter vehicles because both
        suffer the same history and irregularities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    B. The Court has understandably expressed concern over the fate of
       owners of  the 3.0 liter cars . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    XI. Objectors and Counsel's Statements Required by Settlement Agreement . . . . . . . . . . 28

    A. Class Member Jessica Grace Li . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    B. Class Member Alexander Birner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    C. Counsel Paul M. Monzione . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    XII. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Allen v. Bedolla* 787 F.3d 1218, 1224 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 11

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Bell v. Consumer Cellular, Inc.*, No. 3:15 CV 00941 SI, 2016 WL-3063870 U.S. Dist. Ct. D. Oregon (May 31, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 11

*Boeing Co. v. Van Gemert* 44 U.S 472 481-82 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir.1992) . . . . . . . . . . . . . . 12

*Dennis v. Kellogg Co.* 697 F.3d 858, 861. (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . 5, 15

*Diamond Chemical., Inc. v. Akzo Noble Chemicals B.V.* 517 F. Supp. 2d 212, 219 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Dudum v. Carter's Retail, Inc.*, 2015 WL 5185933, at *3 (N.D. Cal. Sept. 4, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Baby Products Antitrust Litigation*, 708 F3d 163, 173, (3rd Cir. 2013) . . . . . . . . . 15

*In re Bluetooth Headset Products Liability*, 654 F.3d 935 at 947 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 10, 11, 22

*In re Federal Skywalk cases* 97 F.R.D 365, 357 (D.C Mo. 1982) . . . . . . . . . . . . . . . . . . . . . . 8

*In re Lupron Marketing and Sales Practices Litigation*, 677 F. 3d 21,33 (1st Cir. 2012) cert. Denied, 133 S. Ct. 338, 184 L. Ed 239 . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Mercury Interactive Corp. Securities Litigation* 618 F3d 988 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7

*In re Nissan Motor Corporation Antitrust Litigation* 552 F2d 1088, 1104 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 689-90 (7th Cir. 2013) . . . . . . . . . . . . . . . 15

*Jones v. Agilysys Inc.* 2-14 WL 2090034, 1 N.1 (N.D. Cal. 2014) . . . . . . . . . . . . . . . . . . . 15

*Khanna v. Inter-Con Sec. Sys. Inc., 2012 WL 4465558, at \*11 (E.D.Cal.2012)* . . . . . . . 12

*Klier v. Elf Atochem North America Inc. 658 F3d 468, 476 (5th Cir. 2011)* . . . . . . . . . . . 15

*Koon v. United States, 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*La Parne v. Monex Deposit Co., 2010 WL 4916606, at \*4 (C.D.Cal. Nov. 29, 2010)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Lobatz v. U.S. West Cellular of CA, 222 F.3d at 1148* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Millan v. Cascade Water Servs., Inc., 310 F.R.D. 593, 612 (E.D. Cal. 2015) . . . . . . . . . . . . 11

*Mirfasihi v. Fleet Mortg. Corp., 356 F.3d 781, 785 (7th Cir.2004) (Posner, J.)* . . . . . 4, 22

*Molski v. Gleich, 318 F.3d 937, 946 (9th Cir.2003)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Mullane v. Central Hanover Bank & Trust Co., 339 U.S. at 313, 70 S.Ct. at 656-57* (1950). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Nachsin v. AOL LLC 663 F3d 1034, 1040 (9th Cir. 2011)* . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Nissan Motor Corporation Antitrust Litigation 552 F2d 1088, 1104 (5th Cir. 1977)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Radcliffe v. Experian Info. Solutions Inc.,2013 WL 1831760, at \*5, 715 F.3d 1157 (9th Cir. Apr.22, 2013)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Reynolds v. Beneficial Nat. Bank 288 F.3d 277, 279-80 (7th Cir. 2002)* . . . . . . . . . . . . . . . 5

*Six Mexican Workers v. Ariz. Citrus Growers 904 F. 2d 1304, 1308 (9th Cir. 1990)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 11, 12, 13, 16

*Staton v. Boeing Co., 327 F.3d 938, 952 (9th Cir.2003)* . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Van Gemert v. Boeing 739 F2d 730, 736-37 (2nd Cir. 1984)* . . . . . . . . . . . . . . . . . . . . . . . . 13

*Weinberger v. Great N. Nekoosa Corp., 925 F.2d 518, 524 (1st Cir.1991)* . . . . . . . . . . . . 4

**RULES**

*Federal Rule of Civil Procedure 23* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 23

*28 U.S.C.A § 1332* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**OTHER AUTHORITIES**

Sam Issacharoff Judge Carolyn Kuhl, Francis McGovern, Stephanie Middleton, American Law Institute, *Principles of the Law of Aggregate Litigation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

Barbara J. Rothstein & Thomas E. Willging, *Managing Class Action Litigation: a Pocket Guide for Judges*, Third Edition, Federal Judicial Center (2010) . . . . . . . . . . . . . . . . . . . . 20

Martin H. Redish, Peter Julian & Samantha Zyontz, *Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 Fla. L.Rev. 617 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Manual for Complex Litigation §21.7 at 335 (4th ed..2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Newberg on Class Actions §12:30 fifth edition* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

# I. Preliminary Statement

Early in 2007 Volkswagen, (VW) the world's largest automaker faced a serious challenge it considered insurmountable. It was the State of California, precisely the California Air Resource Board [CARB] which had rules in place to limit smog forming nitrous oxide and other pollutants released by automobiles. VW's solution to this challenge was to cheat by installing a 'defeat device', creating one of the largest scandals in automotive industry and when finally 'caught' indignantly denying its criminal behavior and stonewalling governmental efforts to uncover the truth.

Indeed a PowerPoint presentation was prepared by a top technology executive at VW in 2006 detailing how the automaker could cheat on emissions tests in the United States. A decade later VW's colossal scheme was exposed spawning the current crisis.[1]

The complete absence of corporate or individual integrity—permitted VW cars to spew millions of tons of harmful poisonous nitrogen oxide pollutants into our air at a rate of up to 40 times the legal limit by installing the cheat device on its vehicles, that unlawfully circumvented regulators' tests and fraudulently obtain certificates of conformity.

The tangled web VW wove wreaked devastating economic loss and environmental contamination.

Unfortunately crime did pay very well, with VW conning its way to record profits while sparing no victims and knowingly "polluting the very air we breathe." Complaint.

Introduction ¶ 1-9

As a result, there are almost 500,000 illegal vehicles on the road in the U.S. alone that

---

[1]New York Times article dated April 26, 2016 by Jack Ewing titled "VW Presentation in '06 showed how to foil emissions tests."

continue to pollute our atmosphere after swindling defendants' customers.

Approximately 85,000 of those vehicles are the more costly 3.0 liter engines whose owners *are excluded from* the Settlement primarily based upon the pretense that a fix is imminent and the owners will be returned to the *status quo*— but who in reality are 'thrown under the bus' by this settlement primarily because these 3.0 liter vehicles are considerably more expensive for VW to 'buy back.'  Unfortunately, there is no plan in place to remove these non conforming polluting vehicles from our roads.

Overall, VW sold as 'clean diesels' over eleven million vehicles in over 100 countries that are currently polluting the globe worldwide. (See Mr. Guiffra VW counsel statement Doc. 1270 transcript of 2/25/16 pg. 11 line 5)

Defendants' fraud and lack of conscience has exacted an irreversible human toll. According to MIT and Harvard University peer-reviewed studies, at least 59 early deaths have resulted and, with doubt, compromising the health, particularly the respiratory systems, of untold numbers of innocent victims.[2] It qualifies as a category 5 assault on the environment.

This despicable conduct reaped VW enormous sales/revenue from 2009-2015.

To put this so called 'historic' settlement into perspective, according to VW's annual reports, its sales/revenue from 2009 through 2015 was approximately 1,287 billion dollars. Exhibit 1, annual reports key numbers 2009—2015.

The settlement agreement to which these objectors challenge as unfair, unreasonable and inadequate, truly pales in comparison to the revenue attained by VW's fraudulent

---

[2]And as we also know, the emissions for these cars impact the air quality which in turn can result in adverse health impacts, particularly respiratory issues. Ms. Greenwald dkt 1692 pg. 46 lines 22-24

OBJECTION TO CLASS ACTION SETTLEMENT - CASE 3:15-MDL-02672-CRB (JSC)

enterprise, which prefers profits over people. In fact, the funding pool amounts to roughly 1% of the VW's total sales/revenue for the years it cheated their customers and tricked government regulators.

Class counsel and VW gained preliminary approval of this settlement without *making any accommodation for their 3.0 liter engines equipped with a similar defeat device;* providing any estimate of the actual cost of the 'settlement' to this defendant; the expected percentage of persons who are likely to file claims; the percentage of claimants who are expected or estimated to choose option 1 ["fix it"] which eliminates the buyback cost. No one has called them out publicly for such costs or percentage estimates, which they no doubt possess, because this information is vital for VW to calculate its exposure.

As such, it is reasonable to conclude, this is not a 'settlement' per se, but an agreement to fund a capped 10.33 billion dollar pool on a flexible *installment* basis with *no* minimum, coupled with a reversionary clause that rewards and authorizes VW to retain the resulting substantial and inevitable 'unspent funds'—since the maximum funding pool is based upon an assumed 100% buyback and 100% lease termination of all eligible vehicles, which is highly unlikely to occur. [Settlement agreement dkt. 1606 § 2.42.]

This mammoth corporation's heinous conduct is being rewarded with the inclusion of a reversionary clause, which is contrary to the deterrent purpose of the statutes it violated. Such a concession to VW is unfair, unreasonable and contrary to the standard set by the Ninth Circuit in *Six Mexican Workers v. Ariz. Citrus Growers 904 F. 2d 1304, 1308 (9th Cir. 1990)* See also *Allen v. Bedolla 787 F.3d 1218, 1224 (9th Cir. 2015)* And recently, *Bell v. Consumer Cellular, Inc. 2016 WL-3063870 U.S. Dist. Ct. D. Oregon (May31, 2016)* (citing *Six American Workers* and denying preliminary approval, in part, based upon the

inclusion of a reversionary clause.) This clause is coupled with a 'clear sailing' agreement where defendant is paying class counsel's attorney fees from a fund separate and apart from class funds which carries "the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class," *Lobatz v. U.S. West Cellular of CA,, 222 F.3d at 1148*; *see Weinberger v. Great N. Nekoosa Corp., 925 F.2d 518, 524 (1st Cir.1991)* ("[L]awyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees."); and (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." See *Mirfasihi v. Fleet Mortg. Corp., 356 F.3d 781, 785 (7th Cir.2004) (Posner, J.) In re Bluetooth Headset Prod. Liab. Litig., 654 F.3d 935, 947 (9th Cir. 2011)*.

The Ninth Circuit emphasizes that district courts must "scrutinize all incentive awards to determine whether they destroy the adequacy of the class representatives." *Radcliffe v. Experian Info. Solutions Inc.,2013 WL 1831760, at *5, 715 F.3d 1157 (9th Cir. Apr.22, 2013)*. No inquiries were made at any of the hearings to enlighten absent class members regarding this subject.

Indeed, one PSC attorney stated 1,300 clients had *signed* with his firm and alluded to other PSC attorneys doing the same [See July 26. 2016 Doc. 1692 transcript page 54 preliminary approval hearing.] As it turns out, other PSC attorneys have been privately retained by class members. "I would say in addition, the PSC, we had all of the information from their clients. There are thousand of clients that PSC members had." Doc. 1692 Pg. 43-44 [Mr. Sarko] Any 'side retention agreements' should be disclosed so the court is able to determine if there are antagonistic interests between class members and those involved in

OBJECTION TO CLASS ACTION SETTLEMENT - CASE 3:15-MDL-02672-CRB (JSC)

negotiating the settlement agreement.

## II. Legal Standard

District judges scrutinizing proposed settlements of class actions are required to exercise the highest degree of vigilance. The Judge is a fiduciary of the class, and is subject to the highest duty of care the law requires of fiduciaries. *Reynolds v. Beneficial Nat. Bank 288 F.3d 277, 279-80 (7th Cir. 2002)* If a District Court does not apply the correct standard governing distributions of unclaimed funds it constitutes an abuse of discretion in approving the settlement. *Dennis v. Kellogg Co. 697 F.3d 858, 861. (9th Cir. 2012)* Indeed "to survive appellate review, the District Court must show it has explored comprehensively all factors and must give a reasoned response to all non-frivolous objections." *Dennis at 864. (internal citations omitted)*

Upon review the District Court's legal analysis is reviewed *de novo*.

### III. Rule 23 (h) is not Complied with when the Deadline for Opting Out or Filing Objections Precedes the Motion for Fees

In *In re Mercury Interactive Corp. Securities Litigation 618 F3d 988 (9th Cir. 2010)* the Ninth Circuit had the occasion to construe *Rule 23 (h)* and the commonly employed practice of District Courts, to schedule the deadline for the Motion for attorney's fees and supporting documents *after* the deadline for filing objections, a practice utilized by this District Court has done in this case.

The question in issue was whether *Federal Rule of Civil Procedure 23 (h)* required the District Court to set the deadline for objections on a date after the deadline for filing the Fee Motion and supporting documents, which the Appellate Court in *Mercury .id*, considered to be a pure question of law. The Court answered the question in the

affirmative. *Mercury at 993*

The Court reiterated the rule that, "although a district court has broad discretion to determine attorneys' fees, it abuses that discretion if it makes an error of law**. See Koon v. United States, 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)** ("A district court by definition abuses its discretion when it makes an error of law.")" *In re Mercury Interactive Corp. Sec. Litig., at, 993 (9th Cir. 2010)*

The Ninth Circuit after examining relevant portions of *Rule 23 (h) (1) and (2)* concluded,

 "the plain text of the rule requires that any class member be allowed an opportunity to object to the fee "motion" itself, not merely to the preliminary notice that such a motion will be filed. In this case (*Mercury*), although notice of the motion was provided to the class, class members were deprived of an adequate opportunity to object to the motion itself because, by the time they were served with the motion, the time within which they were required to file their objections had already expired."

The Court observed that advisory Committee notes to the 2003 amendments to *Rule 23 (h)* and commentators as well "agreed to this logical interpretation of the Rule.[3] *Mercury at 993-94*

In this case the deadline for opting out or filing objections is September 16, 2016, and no deadline has been yet set for filing the fee motion and supporting documents; and no fee motion has been filed by class counsel or the PSC.

Furthermore, there is no provision in the settlement agreement or the Preliminary

---

[3] For example, Moore's Federal Practice counsels that "[a]ny objection deadline set by the court should provide the eligible parties with an adequate opportunity to review all of the materials that may have been submitted in support of the motion and, in an appropriate case, conduct discovery concerning the fees request." 5 Moore's Federal Practice § 23.124[4] (Matthew Bender 3d ed.2009). In re Mercury Interactive Corp. Sec. Litig., 618 F.3d 988, 994 (9th Cir. 2010)

Approval Order for additional notices or any additional objection deadline or opt out period

in the class settlement agreement or preliminary approval order allowing a class member

to opt out or object to the fee motion, after September 16, 2016.

The long form notice vaguely states that "class members will have an opportunity to

comment on and/or object to the request at an appropriate time." Answer to question 53,

page 25 long form notice. Doc. 1606-3

In fact, all the Court has required is that class counsel on or before August 10, 2016,

submit more information regarding their fees. Merely filing such information does not

serve to 'give notice' to the class and does not serve as a Motion for fees. The deadline to

file the Motion for fees is required to precede the deadline for Objections or opting out.

Indeed no deadline has been set or Motion even filed. Motions for fees must be served by

class counsel directly to class members in a reasonable manner, which not been

accomplished.

Courts have recognized that the primary, if not exclusive, source of information for

most class member will be the initial class notice. Separate notices have been disfavored.

e.g. *Nissan Motor Corporation Antitrust Litigation 552 F2d 1088, 1104 (5th Cir. 1977)* [4]

### IV. The Court Failed to Comply with its Own Local Civil Rule 7
### that Governs Motions

As aptly stated by the Court in *In re Mercury Interactive Corp. Sec. Litig., 618 F.3d*

---

[4]Absentee class members will generally have had no knowledge of the suit until they receive the initial class notice. This will be their primary, if not exclusive, source of information for deciding how to exercise their rights under Rule 23. Although absentee class members are customarily encouraged to make inquiry of the clerk of the district court where the case is filed if they have further questions, this worthwhile advice cannot justify omitting material information. In re Nissan Motor Corp. Antitrust Litig., 552 F.2d 1088, 1104 (5th Cir. 1977)

*988, 995 (9th Cir. 2010)*, id *footnote 1*:

> "We also note that the district court failed to comply with its own Local Rules, which ordinarily govern the length of notice required in filing motions for attorneys' fees, in setting the schedule for objections to lead counsel's attorneys' fee request. Those rules provide that papers supporting a motion "must be filed, served and noticed in writing on the motion calendar of the assigned Judge for hearing not less than 35 days after service of the motion." N.D.Cal. Civ. Local R. 7–2. This means that even in the most routine of fee motions, in which perhaps a few thousand dollars of attorneys' fees may be at stake, the party opposing such fees would have fourteen days to examine the papers supporting the fee request and prepare its opposition. *See* Local Rule 7–3. The Local Rules themselves state that these "are minimum time periods," and when "complex motions" and oppositions to them are being filed, longer time periods may be necessary. Thus, although compliance with the Local Rules is not at issue in this appeal, the time periods for ordinary motions in the Northern District's own Local Rules further support the inadequacy of the procedures in this case."

### V. Basic Requirements of Rule 23 (b) (3) Notice

*Rule 23 © (2) (B)* requires the best practical notice under the circumstances. The essence of due process is that "deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 at 313, 70 S. Ct. 652 at 656-57 (1950)*

Due process requires that members of the class be provided with enough information to make an informed choice. *In re Federal Skywalk cases 97 F.R.D 365, 357 (D.C Mo. 1982)* The best notice practical under the circumstances must contain an adequate description of the proceeding in written objective neutral terms, that *insofar as possible may be understood by the average class member. In re Nissan Motor Corporation Antitrust Litigation 552 F2d 1088, 1104 (5th Cir. 1977)* emphasis added. No notice has been provided regarding fees.

# VI. Long Form Notice is Deficient

The long form notice that relates to attorney's fees and taxable costs is deficient. As noted, the separation of the settlement amount and the attorney's fees is not relevant and criticized by both courts and commentators. Courts have consistently stated that the 'separate funds' are indivisible. *Manual § 21.7 at 335 (4th ed. 2004*

The long form notice provides in relevant part:

*Page 4 of the summary*

Attorneys' Fees

In class actions, the court must approve all plaintiffs' attorneys' fees and costs. Volkswagen has agreed to pay the attorney's fees and cost that the court approves in addition to the settlement benefits described above. This means that class members will receive 100% of the compensation described in this Notice, and their compensation will not be reduced by attorney fees or costs.

_____

First, the fact that the court must approve all fees and costs is mentioned in the first sentence creates the illusion that they need not take action because they are judicially protected.

Second, there is no mention in the summary that class members have the right to contest or object to the fees or costs requested.

In addition, the summary stresses that class members fees do not reduce the compensation to be received, however, courts and commentators stress that the funds are indivisible, and the defendant views the settlement from the vantage point of settling the case as a whole. This non reduction clause, in light of abundant case law, is misleading.

The parties agreement to artificially separate the fee and settlement arrangements should not enabled Class Counsel to circumvent the notice requirements of *Rule 23(b)(3) and (h)* because the entire settlement comes from the same source, the defendants.

("[I]n essence the entire settlement amount comes from the same source. The award to the class and the agreement on attorney fees represent a package deal."); *cf. Manual for Complex Litig.* § 21.75 (4th ed. 2008) ("If an agreement is reached on the amount of a settlement fund and a separate amount for attorney fees ... the sum of the two amounts ordinarily should be treated as a settlement fund for the benefit of the class.") *In re Bluetooth Headset Products Liab. Litig., 654 F.3d 935, 943 (9th Cir. 2011)*

It is reasonable to surmise that most class members will read the summary only. So text that states the compensation received by class counsel and PSC does not affect the overall settlement is misleading and certainly not neutral.

Attorneys' fees and costs are next mentioned on page 26 at line 28 and again presents an inaccurate description as follows:

53. How will the lawyers be paid?

Volkswagen will pay the attorneys' fees and costs in addition to the benefits it is providing to the class members in this settlement. At a later date to be determined by the Court, Class Counsel will ask the Court for an award of attorney's fees and reasonable costs. Class members will have an opportunity to comment and/or object to this request at the appropriate time. The court must approve the award of attorney's fees and costs to be paid by Volkswagen.

The notice is vague and gives the impression that the fees are not part of the settlement proceeds, which they are. And the statement that class members will have an opportunity to comment or object to the fee request at the appropriate time is essentially meaningless without notice and the opportunity to be heard.

Finally, the amount of the attorney's fees awarded directly impacts class members recoveries under the settlement.

**VII. The Use of a Reversionary Clause Is Inappropriate**

**A. The goals of the underlying statutes -- deterrence and reversion – are violated by the use of a reversion of unspent funds to this defendant**.

Initially, *"the distribution plan must meet the standard regardless of whether the*

*award was fashioned by the settling parties or the trial court.*" *Nachsin v. AOL LLC 663 F3d 1034, 1040 (9th Cir. 2011)*

The Ninth Circuit instructs that, "*reversion to the defendant may be appropriate when deterrence is <u>not</u> a goal of the statute or is <u>not required</u> by the circumstances.*" *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1308 (9th Cir. 1990); *see also Allen v. Bedolla, 787 F.3d 1218, 1224 (9th Cir. 2015)* (stating that a "reverter that returns unclaimed fees to the defendant" is a "subtle sign that class counsel have allowed pursuit of their own self-interests ... to infect the negotiations") (quoting *In re Bluetooth Headset Products Liability*, 654 F.3d 935 at 947 (9th Cir. 2011)).

The objectives of RICO and consumer fraud statutes, as well as common law fraud, include deterrence. *See Millan v. Cascade Water Servs., Inc., 310 F.R.D. 593, 612 (E.D. Cal. 2015)* . "If unclaimed funds are to revert to a defendant [in an FLSA case,] the parties should explain why those funds should [so] revert [.]" *Id.*; *see also Dudum v. Carter's Retail, Inc.*, 2015 WL 5185933, at *3 (N.D. Cal. Sept. 4, 2015) (denying a motion for preliminary approval of a class action settlement and directing counsel to explain why any reversion of unclaimed settlement funds to the defendant is appropriate).

Class counsel's motion to approve this settlement provides no explanation, analysis, or authority why reversion of any unclaimed settlement funds to defendant is appropriate here. *Indeed, during* the fairness hearing there was no mention, reason or rationale for the inclusion of a reverter clause. *See Bell v. Consumer Cellular, Inc., No. 3:15 CV 00941 SI, 2016 WL 3063870, at *3 (D. Or. May 31, 2016)* See also; *In re Lupron Marketing and Sales Practices Litigation, 677 F. 3d 21,33 (1st Cir. 2012) cert. Denied, 133 S. Ct. 338, 184 L. Ed 239* (favorably reviewing ALI principles, adopting a"reasonable approximation'

approach to the distribution of unclaimed funds, and noting that " the ALI principles support our adoption" of this pro rata approach. cf. American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.07 (a)

Where a statute's objectives include deterrence, as does RICO and consumer fraud statutes, it contradicts these goals to permit the defendant to retain unclaimed funds. *Khanna v. Inter-Con Sec. Sys. Inc., 2012 WL 4465558, at *11 (E.D.Cal.2012)* (quoting, *inter alia, Six (6) Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1308 (9th Cir.1990)*); *see La Parne v. Monex Deposit Co., 2010 WL 4916606, at *4 (C.D.Cal. Nov. 29, 2010)*

The Ninth Circuit has declared that a strong judicial policy favors settlement of class actions. *Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1276 (9th Cir.1992)*. Nevertheless, where, as here, "parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both [1] the *propriety* of the certification and [2] the fairness of the settlement." *Staton v. Boeing Co., 327 F.3d 938, 952 (9th Cir.2003)*. During this process, Federal Courts must pay "undiluted, even heightened, attention" to class certification requirements in a settlement context. *Amchem Products, Inc. v. Windsor, 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)*; *Molski v. Gleich, 318 F.3d 937, 946 (9th Cir.2003)*.

Moreover, in the Ninth Circuit the distribution plan must meet the standards established by *Six Mexican Workers. id & Nachsin v. AOL LLC 663 F3d 1034, 1040 (9th Cir, 2011)*. This distribution plan does not meet the standard.

**B.  The Circumstances do not justify reversion to defendants**.

**1. Defendants' course of conduct was intentional and fraudulent**.

OBJECTION TO CLASS ACTION SETTLEMENT - CASE 3:15-MDL-02672-CRB (JSC)

In *Van Gemert v. Boeing 739 F2d 730, 736-37 ( 2*nd* Cir. 1984)*, the court permitted reversion to the defendant and rejected reversion to the government as well because — unlike VW — the defendant had followed the letter of the law and could not have anticipated its liability. Thus, reversion to the defendant was appropriate because deterrence was not a goal of the statute, nor was it required by the circumstances. However, this is not the case with VW.

In accordance with *Six (6) Mexican Workers v. Arizona Citrus Growers 904 F.2d 1301, 1309 (9*th* Cir. 1990)* and in light of the deterrence objective of RICO and consumer fraud statutes, as well as the aggravated nature of the VW violations, reversion of the funds to the defendants is not a viable or appropriate option. Consequently, the settlement agreement which includes a reversionary clause should be disapproved by this Court as unfair and unreasonable.

### 2. Redistribution on a pro rata basis to claimants is viable and proper

In some circumstances it is not logistically or economically viable to make additional pro-rata payments to class members, but that is not the case here where class members are identifiable and re-distribution of unclaimed funds is clearly practical. Indeed, at the 'fairness hearing' one PSC member (Mr. Sarko) remarked that the 17 digit long VIN number constitutes a 'digital fingerprint' of each car. [Dkt. 1692 filed 7/28/16 pg. 42.]

Furthermore, defendants are mailing the long form notice by first class mail, which requires the names and addresses of most, if not all class members.

### 3. Pro-rata distribution of any unclaimed funds creates no windfall to claimants or other class members

A pro rata distribution to class member of unspent funds, to these claimants duped by

VW, would not result in a windfall. For example, class members typically bought their vehicles at the retail price from VW but the defendant is buying them back at the 'clean trade in value', which is essentially the wholesale price.

Further, bear in mind, that defendants removed numerous cases from state courts to Federal courts based upon *28 U.S.C.A § 1332 Diversity of citizenship; amount in controversy; costs*, with defendants representing under oath, that the amount in controversy to a legal certainty for each class member's case removed exceeded the sum of $75,000 exclusive of interest and costs.

**4. The pooling fund is created by class members releasing their claims against VW and transferring their property/vehicles to defendant(s)**

This funding pool is distinct from most other mass torts such as oil spills or 'asbestos exposure' because in consideration for funding the pool, defendants not only obtain the release of liability of all claims of all class members, these defendants, in most cases receive the vehicles of these class members. Hence, the class members are by all rights the equitable owners of the funds having given up their claims and property. VW in all fairness is not entitled to their property, be released from liability and then retain the surplus funds. *Boeing Co. v. Van Gemert 44 U.S 472 481-82* ("The members of the class, whether or not they assert their rights, are at least owners of their respective shares in the recovery.")

It is unfair and unreasonable for class members to have their claims extinguished, be exposed to pollutants and have their property constructively repossessed by defendants, allowing VW the right to resell those vehicles, provided their plan to fix the emissions irregularities is successful and yet be beneficiaries of a reverter clause. Perhaps the

reason the record is silent on this matter is that such a clause is indefensible.

**5. The Courts favor redistribution to class members absent special circumstances**

"Money not claimed by class members should be used for the class's benefit to the extent that is feasible." Citing *Six Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301 (9th Cir.1990); Dennis v. Kellogg Co., 697 F.3d 858 (9th Cir.2012).*

See *American Law Institute, Principles of the Law of Aggregate Litigation § 3.07 (a)*

> If individual class members can be identified through reasonable effort, and the distributions are sufficiently large enough to make individual distributions economically viable, settlement proceeds should be distributed directly to individual class members. (2010).

See also Martin H. Redish, Peter Julian & Samantha Zyontz, *Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis, 62 Fla. L.Rev. 617 (2010). Ira Holtzman, C.P.A. v. Turza, 728 F.3d 682, 689-90 (7th Cir. 2013)* Also See *Newberg on Class Actions §12:30 fifth edition.*

In *Jones v. Agilysys Inc. 2-14 WL 2090034, 1 N.1 (N.D. Cal. 2014)*, the court approved a settlement in which "any unclaimed funds will be distributed on a pro-rata basis to those class members who submitted claim forms," and no amount will revert to the defendant .... "[t]he Court lauds the inclusion of a non reversion provision." *Klier v. Elf Atochem North America Inc. 658 F3d 468, 476 (5ᵗʰ Cir. 2011)* ("where it is still logistically feasible and economically viable to make additional pro rata distribution to class members, the District Court should do so.") citing *American Law Institute, Principles of the Law of Aggregate Litigation § 307 (2010)* See also *In re Baby Products Antitrust Litigation, 708 F3d 163, 173, (3ʳᵈ Cir. 2013)* (direct distributions to the class are preferred over cy pres

distributions.)

**6. Reversion to defendants would undermine the deterrent purpose of the statutes it violated and contradict, as well the deterrent purpose of class actions**

The Complaint's statutory allegations have a deterrent or punitive purpose; and when faced with statutes that have a deterrent purpose as a goal, the courts in this circuit have declined to allow reversion of unclaimed funds to a settling defendant when a statute's objectives include deterrence for disgorgement, as it would contradict the goals for the defendant to retain unclaimed funds. *Six Mexican Workers at 1308* (See Newberg § 1120)

In *Diamond Chemical., Inc. v. Akzo Noble Chemicals B.V. 517 F. Supp. 2d 212, 219 (D.D.C. 2007)* court citing *Six Mexican Workers 904 F. 2d 1308* rejected reversion to defendants that were alleged to have violated Sherman Act:

> Moreover, reversion to Defendants appears inappropriate in the instant situation because the settlement was based on allegations that Defendants violated Section 1 of the Sherman Antitrust Act which, in addition to compensatory elements, has punitive and deterrence goals. *See In re Folding Carton Antitrust Litig.,* 557 F.Supp. 1091, 1105 (N.D.Ill.1983), *reversed in part,* 744 F.2d 1252 (7th Cir.1984), (citing *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 494, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) and *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 745–46, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977)). Thus, when faced with statutes that have deterrence as a goal, courts have declined to allow reversion of unclaimed settlement funds to a settling defendant. *See id.* ("in light of the Sherman Act policy of deterrence and the defendants' wrongdoing, we reject their equitable claim to the fund"); 219 *Six Mexican Workers,* 904 F.2d at 1308 ("When ... a statute's objectives include deterrence or disgorgement, it would contradict these goals to permit the defendant to retain unclaimed funds."); *see also* Newberg § 11.20." *       *      Diamond Chem. Co. v. Akzo Nobel Chemicals B.V., 517 F. Supp. 2d 212, 219 (D.D.C. 2007)*

**C. The amount of unclaimed funds is likely substantial**

Although unfortunate, the record is devoid of any studies or estimates of the percentage of persons who are expected to file claims or the percentage of claimants who will likely select option 1 [the fix it solution], the amount of unclaimed funds is likely to be

substantial. In fact the gross pooling fund sum is based on 100% buy back participation.

Furthermore, VW will be receiving in consideration for their 'buyback' costs the transfer of hundreds of thousands of vehicles all of which have a considerable book value especially if the emissions abnormalities are fixed by VW which the company claims is feasible.

Indeed, the record discloses the 'fix it <u>option 1'</u> is expected by VW and the PSC to be popular with class claimants. *"[But] there are a significant number of consumers that love these cars and they want to keep them if they can. So we had to have options"* 7/28/16 transcript dkt. 1692 pg. 24 lines. 20-21. [Mr Rice of the PSC discussing the necessity of Option 1.]

So hypothetically, if 50% of claimants opt for option 1, there are no buyback costs aside from restitution. The net funds paid by this variable alone would amount to nearly half the funding pool or 5.16 billion minus restitution costs. Studies have shown that the median rate of participation in consumer class action settlements is about 10%. However, even if one were to increase that rate by 15 times and 75% participate, this is yet another factor that increases the unspent funds substantially.

**D. The District Courts preliminary legal analysis relative to the reversionary clause is flawed**

The District Court's preliminary approval opinion recognizes that reversion clauses can be problematic and generally minimize class action pay-outs, ¶ 15 but attempts to rationalize VWs retention of unspent funds because the Court believes VW has incentive to encourage class members to participate in the settlement based on the partial consent decree between VW, the DOJ, and the State of California which require VW to "remove

from commerce in the United States *and/or perform a fix* on at least 85% of the 2.0 L

vehicles by June 30, 2019" or suffer monetary damages. (emphasis supplied)

The court's analysis is overly optimistic in VW's favor, because attempting to

determine the incentive of this particular defendant to pay out money is guesswork at best.

Moreover, it is not directly related to the fairness or reasonableness of the agreement or

the propriety of the inclusion of a reversion clause.

Moreover, the record in this case, including the terms of the settlement agreement, do

not support the trial court's rationale.

First of all, VW would much prefer that class members fail to respond—thereby

forfeiting any monetary relief while releasing VW from any past, present, or future liability

regarding the 2.0 liter vehicles owners.

Secondly, VW, no doubt, favors the 'fix it' or option 1 of the settlement agreement which

eliminates VW's  buyback costs altogether.

Indeed, according to VW, option 1 will be a popular option, and it's attorney has stated

on the record that a significant number of owners would like to keep their vehicles because

they love them. And part of the plan is to fix them.  dkt 1692  transcript 7/28/16 pg. 24 lines

20-24.

Common sense suggests that the phenomenal result for VW is that claimants not only

choose option 1, but if option 2 is exercised, the vehicles purchased by VW from its

customers can be fixed, resold and put back on the road — not taken off the road.

Just having offered  a 'fix it' option suggests that VW considers it possible to fix these

vehicles and recoup all or part of the funds expended to buy back the vehicles—and put

them back on the road, once again not take them off as the Court suggests.

OBJECTION TO CLASS ACTION SETTLEMENT - CASE 3:15-MDL-02672-CRB (JSC)

To underscore this point, the Partial Consent Decree includes the 3.0 liter diesel engines (approx. 85,000) and there is no buyback program in existence or championed by VW to get those polluting vehicles 'off the road' The exclusive plan for the 3.0 liter engine dropped from the settlement and apparently favored by VW is to 'fix them', not retire them from service.

Surely, from now to June 30, 2019, leaves of lot of time for technological advancements especially if greatly motivated.

In addition, the strict eligibility requirements imposed by the agreement and amended class definition burdened with numerous exclusions is inconsistent with an incentive to buy back these vehicles and take them off the road permanently.

### VIII. Strict Eligibility Requirements Are Often Found Where the Settlement Agreement Includes a Reversionary Clause Which Is Present Here

### A. Reversionary clause creates incentive to restrict class definition and eligibility

As stated in the *Judge's Pocket Guide to Class Actions*, " a reversion clause creates perverse incentives for a defendant to impose restrictive eligibility conditions and for class counsel and defendants to use the artificially inflated settlement amount as a basis for attorney's fees." The class definition has numerous exclusions based upon arbitrary dates and the Consolidate class definition has been revised to exclude 3.0 liter engines.

### B. Eligibility requirements are strict and arbitrary

#### 1. Seller eligibility

##### a. Eligible seller identification time limit is unreasonable

An eligible seller is defined as a person who acquired an eligible vehicle before September 18, 2015, and sold or transferred ownership after September 18, 2015, but

before June 28, 2016.[5]

The <u>Long Form Notice</u> dkt. 1601-3 to be individually mailed to each class member states in pertinent part on pg. 13 question 17:

**17. How do I identify myself as an Eligible Seller? And when must I do so?**

<u>**To qualify for an eligible seller restitution payment you must identify yourself (and Volkswagen must receive any mailed eligible seller identification form) during the Eligible Seller identification period. This period will last at least for 45 days from entry of the preliminary approval order. If the Court enter the preliminary approval order on July 26, 2016 (the date of the preliminary approval hearing), the Eligible Seller Identification Period will run until September 16, 2016.**</u> (emphasis not supplied)

This is the primary notice given to an 'eligible seller.' The rational for such a 'short date' according to VW at the fairness hearing is:

And the basis for that (short identification period) Your Honor, is that we need to know of their existence (sellers) and their volume and the vehicles involved in order to start the buyback process because there is a payment related to both the seller and the purchaser in that situation. 7/26/16 transcript pg. 38 lines 12-16

First of all, if VW is able to mail a long form notice to 'eligible sellers' containing the above advisory, it certainly knows who the eligible sellers are, where they are, and the vehicles involved. Consequently VW's so called need to know their identity by September 16, 2016, rings hollow. Further no real reason was given for the need to know by September 16, 2016. This is extremely harsh and serves no real reason, except to extinguish the rights of these select persons.

**b. Other unreasonable eligible seller exclusions**

Even if the seller is timely identified, if the seller acquired his vehicle on or after September 16, 2016, he not a class member or eligible seller; or if the seller's vehicle was

---

[5]The dates are arbitrary and will be discussed below

totaled and title was transferred to his insurance company after September 18, 2015, but *before June 28, 2016*, he also is not a class member or eligible seller. ¶ 2.31 SA  The latter exclusion is especially troublesome because it presumes that the class members would have notice of the settlement agreement before notice was sent, which is highly unlikely.

**2. Lessees of these subject vehicles given relief only if VW is the lessor**

Section 2.29 provides that, "no person shall be considered an Eligible Lessee by virtue of holding a lease issued by a lessor other than VW Credit Inc."  The record offers no explanation or rationale for discriminating against lessees issued by companies other than VW Credit Inc., and to do so is unreasonable and unfair.

**3. Owner eligibility**

Section 2.30 of the settlement agreement basically provides an eligible owner ceases to be the eligible owner if he transfers ownership of the eligible vehicle between September 16, 2015, and June 28, 2016, being the date the class settlement agreement was executed. This particular exclusion is unfair and is senseless, unless the otherwise eligible owner is clairvoyant and somehow knew the parties would settle on June 28, 2016.

**4. Eligible vehicle**

Section 2.30 provides that the vehicle otherwise eligible is not eligible if it was not registered with the state Department of Motor Vehicles on June 28, 2016, or currently inoperable prior to the opt out date.  Why should one not have the right to fix the vehicle prior to it actually being brought back.

Section 2.16 "Class" excludes owners who sell or transfer ownership of the eligible vehicles between June 28, 2016, and the opt out date [September 16, 2016.]  The former date occurs before the owner receives notice of the settlement.

Section 4.2.2 of the Settlement agreement also excludes any otherwise eligible vehicle which was totaled and consequently transferred title to their insurance company on or after the Opt out deadline (September 16, 2016) but before the claim deadline (September 1, 2018) are not entitled to the buyback payment, which is unfair and unreasonable because the insurance companies usually pay the cash value of the vehicle at the time of the loss.

Unfortunately, the percentage of vehicles totaled over a two year period is quite significant–as much as 14 % yearly rolling average.[6]   This exclusion is unfair and unreasonable on its face.

## IX. Clear Sailing Agreement Between Parties

When the attorney's fees are to be paid from a fund separate and apart from class funds there carries the risk that class counsel may compromise the claims of the class in return for 'red carpet treatment' on the fees. *In re Bluetooth Headset Prod. Liab. Litig., 654 F.3d 935, 947 (9th Cir. 2011)*. This is especially true where the parties have negotiated a reversionary clause. *Mirfasihi v. Fleet Mortg. Corp., 356 F.3d 781, 785 (7th Cir.2004) (Posner, J.)*.

## X. The Exclusion of 3.0 Liter Engines from the Class Renders The Settlement Unreasonable, Unfair and Inadequate

### A. The Consolidated Complaint included 3.0 liter engine vehicles as Class Vehicles entitled to relief along with the 2.0 liter vehicles because both suffer the same history and irregularities

---

[6]Over the last decade, total loss frequency has increased while overall claim frequency rate has declined. In 2000, about 9 percent of all vehicles for which an appraisal was written were flagged as a total loss; for the rolling 12 months ended June 2013, this number had grown to 14.24 percent (taking into account obvious totals where no appraisal is written, the industry-wide total loss percentage trends about 3 to 4 percent higher [14 percent in 2000 to nearly 19 percent]).[i] Essentially, this equates to a 5-percent total loss frequency increase over the last decade. http://www.propertycasualty360.com/2013/10/04/what-will-drive-total-loss-auto-claims-in-2014?

The original Class definition included 3.0 liter as 'Class Vehicles'.  ¶ 348

"348.   Plaintiffs bring this lawsuit as a class action pursuant to Federal Rules of Civil Procedure 23(a); (b)(1); (b)(2); (b)(3); and/or (c)(4), on behalf of themselves and all others similarly situated as members of the following Nationwide Class and State Classes (collectively, the "Classes"); on their federal and state claims as the purchasers and lessees of the following Class Vehicles:

2.0-liter Class Vehicles

| | |
|---|---|
| Volkswagen Jetta TDI | 2009-2015 |
| Volkswagen Jetta Sport Wagen TDI | 2009-2014 |
| Volkswagen Beetle TDI | 2012-2015 |
| Volkswagen Beetle Convertible TDI | 2012-2015 |
| Audi A3 TDI | 2010-2015 |
| Volkswagen Golf TDI | 2010-2015 |
| Volkswagen Golf Sport Wagen TDI | 2015 |
| Volkswagen Passat TDI | 2012-2015 |

3.0-liter Class Vehicles

| | |
|---|---|
| Volkswagen Touareg TDI | 2009-2016 |
| Porsche Cayenne Diesel | 2013-2016 |
| Audi A6 Quattro TDI | 2013-2016 |
| Audi A7 Quattro TDI | 2014-2016 |
| Audi A8 TDI | 2014-2016 |
| Audi A8L TDI | 2014-2016 |
| Audi Q5 TDI | 2014-2016 |
| Audi Q7 TDI | 2009-2016 |

The Consolidated Complaint dkt. 1230 (Complaint) states that the after VW announced its fraudulent scheme these "Class Vehicles" plummeted in value. ¶ 322 The Complaint. states that "even if Volkswagen is able to make the Class Vehicles compliant, Class members will nonetheless suffer actual harm and damages because their vehicles will no

longer perform as promised. This will necessarily result in a diminution in value of *every* Class Vehicle.¶ 325" (Emphasis supplied)

In addition the Complaint describes Class Vehicles, which includes 3.0 liter cars, as "virtually unsellable" and "subject to recall for the indefinite future." ¶ 322   It further refers to the Class Vehicles, which include 3.0 liter vehicles as *"tainted, stigmatized and unsellable."* ¶ 325

In sum PSC and class counsel realize that these owners suffered similar injuries if not greater than 2.0 liter owners, yet nonetheless were dropped from the class.

These 3.0 liter cars will also suffer in value alone simply by virtue of its negative reputation.  Even a satisfactory fix will not restore market value.

The Court repeatedly stressed during various hearings that the 85, 000  3.0 liter owners are 'part of the case' and entitled to a relief. Unlike the 2.0 liter owners the 3.0 liter cars are not given the benefit of the second 'buy back' option primarily because VW believes it can fix the 3.0 liter cars, which so far is not the case.

However, any fix that takes place does not serve to cure the tainted and stigmatized reputation of the 3.0 liter cars, but unlike the 2.0 liter cars the 3.0 liter cars are not given an election of remedies. Furthermore, the 3.0 liter cars will carry their  own 'baggage', such as an undesirable reputation, so even if a satisfactory fix is accomplished, their value will be forever diminished in the marketplace.

**B. The Court has understandably expressed concern over the fate of owners of the 3.0 liter cars**

For example, at the status hearing held on <u>May 24, 2016</u> the Court stated, *"I have been assured that the parties are working diligently on resolving the 3-liter engine cars'*

*issues.*" pgs 6-7.  dkt 1535

　　　Again during the status hearing held *June 30, 2016*, the Court on page 7 lines 21-25 declared:

Court:

So now I want to turn to the unsettled portion of the case. One of the unsettled portions,  and *the one that concerns the Court the most at this point, are what is it that can be done with the approximate 85,000 car owners who have purchased a 3-liter car.* And I thought maybe I would get an update from the Environmental Protection Agency. Mr. [Van] Eaton, so if you want to come forward and tell us where we are on that. (Emphasis supplied) pg. 7 lines 21-25 & pg. 8 lines 1-2

 Later the Court asked for a report from Mr. Giuffra. Dkt 1629 Pg. 10 lines 12-14

Mr. Giuffra: [ representing VW]

*   *   * Its just a process that will take time, because of the need to do **durability testing** to make sure that the fix is a long lasting fix. [emphasis supplied] *   *   * dkt 1629 pg. 12 lines 15-17

The above reply by Mr. Giuffra at the June 30, 2016, hearing summarizing the process certainly implied that there was a viable fix on the horizon, but that it remained to be seen if it would hold up in the long run in real world conditions. And that would, of course, take time to determine in the meantime leaving these illegal vehicles on the road.  Obviously, this approach has failed to provide any relief to 3.0 liter owners and continue to pollute the environment.

　　　Significantly, on July 13, 2016—less than two weeks after the June 30, 2016 hearing—CARB issued its Notice of Violation [NOV] to VW ref. No. IUC-2016-013 & 014 (Audi and Porsche) regarding the so called proposed 'lasting fix' to the 3.0 liter engines outlining numerous serious violations that go to the core design and engineering of the so called fix.  The NOV to Audi and Porsche stated that: "*Audi and Porches's submissions*

*are incomplete, substantially defective and fall far short of the meeting the legal requirements to return these vehicles to the claimed certified configuration." [¶ 4 of both notices to Audi and Porsche]* See Exhibits 2 and 3 attached hereto.

After VW received these NOV from CARB on *July 13, 2016*, regarding Audi and Porsche 3.0 liter engines models, the Court once again at the *July 26, 2016,* fairness hearing inquired about the 3.0 liter engine status as follows:

Court:

Before I listen to a presentation with respect to the proposed settlement, I'd like to get an update, if I might, on the status of the litigation with respect to the three-liter car. The proposed settlement is the settlement of the two-liter vehicles. But there are approximately 85,000 three- liter cars that are not included within this proposed settlement.

So perhaps I can turn to you Mr. Van Eaton, representing the governmental entities and you could give me a update. [Pg. 6 line 22 to pg. 7 line 5 dkt 1692]

Mr. Van Eaton's response was consistent again giving the impression that it was matter of durability and such testing would be expected to take an extended matter of time. e.g Mr. Van Eaton at pg 8 lines 15-16 *"Absolutely right, Your honor. The term of art they use is "durability."*

Mr. Van Eaton seemed to believe that VW thought it could fix the 3.0 liter engines. However given VW's historicity of misleading governmental agencies there is serious concern regarding the credibility of VW's opinion.

Mr. Van Eaton, for whatever reason, inexplicably failed to mention that earlier in the same month a mere 13 days prior to the July 26, 2016, fairness hearing, CARB had issued its NOV to VW relative to its so called 3.0 liter 'emissions fix.' See *Exhibits 2 and 3*. Even if these non disclosures were inadvertent, can be presumed, it had the effect of 'stringing

the court along.'

More recently at the status hearing held on August 25, 2016, the Court stated: "Thank you very much. So let's turn to major issue that remains yet unresolved which is the three liter cars" Dkt. 1775 pg 11 ln 3-4   8/25/16

Mr. Giuffra hedging on behalf of VW replied in part, "and the long and short of it is the company still believes that it can fix these without adversely affecting their performance. And we believe we can fix them to the standard to which they were originally certified. Can't guarantee it your honor." pg. 11 lines 15-19

Significantly, the long and short of it–to borrow Mr. Guiffra's vernacular–VW could not give any guarantee that any fix would occur or when it might occur. All the Court was given is 'VW opinion' on the matter. Hardly an unbiased opinion and indeed one given by a recidivist prevaricator.  Mr. Van Eaton of the EPA opined that "it's very difficult to project a timetable for resolution because this work is ongoing." dkt. 1775 pg. 17 line 21 8/25/16

The Court quite rightfully stated that, "*having a car on the road in violation of EPA standards is, in the Court's view intolerable.* It's something that must be addressed, and must be corrected, and must be done as expeditiously as possible. *   *   * They cannot continue to be in violation of EPA standards." Page 22 dkt 1775 8/25/16

We add that VW should not be allowed to continue to contaminate the very air we breathe and adversely affect public health and welfare.

Amazingly, once again, no one informed the Court that VW had received a NOV on these 3.0 liter cars in mid July which the Court had every right to be advised.

The class settlement definition, which was modified from the original complaint, without court approval, renders the settlement unfair, unreasonable and inadequate

because it excludes owners of the 3.0 liter cars, who are forced to drive their cars illegally and be exposed to pollutants.

### XI. Objectors and Counsel's Statements Required by Settlement Agreement

### A. Class Member Jessica Grace Li

At all relevant times, this Objector was and is of legal age. She resides at 1745 Shadehill Pl., Diamond Bar, CA 91765-2848. Her telephone number is: 909 630 8613. The VIN of her eligible vehicle is: WVWDM7AJ7CW351611. Her vehicle is eligible and she is an eligible owner. For purposes of clarification, her 2015 validated registration card with the State of California, Department of Motor Vehicles is attached hereto as Exhibit 4. On or about September 3, 2012, this Objector purchased a new 2012 Volkswagen Golf TDI 2.0 liter Clean Diesel from Ontario VW, an authorized VW dealer in Ontario, California, and since then has been the owner of such vehicle.

This Objector entered her VIN at www.VWCourtSettlement.com and was informed that her vehicle qualified. Exhibit 5 (Vehicle Look Up) attached. She has reviewed the Class definition and has not opted out of the Class and further, her attorney will ask the Court to consider supporting papers, materials or briefs that he may wish the court to consider when reviewing her Objections.

She objects through her counsel Paul M. Monzione, who she understands will be filing a notice of appearance with the court on her behalf by the date directed by the Court and will also file a sworn declaration attesting to his representation of her regarding this Objection and all matters pertinent thereto. She further expects that her counsel intends to make an appearance on her behalf at the Fairness Hearing set for October 3- 7, 2016 or such time as otherwise directed by the Court.

## B. Class Member Alexander Birner

At all relevant times this Objector was and is of legal age. He resides at 1211 Oakcrest Circle, Corona, CA. His telephone number is: 309 678 0512. The VIN of his eligible vehicle is: 3VWLL7AJ1CM006554.  His vehicle is eligible and he is an eligible owner.  For purposes of clarification, his 2015 validated registration card with the State of California, Department of Motor Vehicles is attached hereto as Exhibit 6.

On or about August 15, 2015, this Objector purchased from the Morton Auto Auction located in Morton, Illinois, a 2012 Volkswagen Jetta VIN 3VWLL7AJ1CM006554, which he registered in the State of California on or about September 3, 2015.

This Objector entered his VIN at www.VWCourtSettlement.com and was informed that his vehicle qualified. Exhibit 7 (Vehicle Look Up) attached.  He has reviewed the Class definition and has not opted out of the Class.

 Further, he objects through his counsel, Paul M. Monzione, who he understands will be filing a notice of appearance with the court on his behalf  by the date directed by the Court and will file on his behalf a sworn declaration attesting to his representation regarding his Objection and all matters pertinent thereto. He anticipates that his attorney will ask the Court to consider supporting papers, materials or briefs that he may wish for the court to consider when reviewing his Objections. He further expects that his counsel intends to make an appearance on his behalf at the Fairness Hearing set for October 3-7, 2016 or such time as otherwise directed by the Court.

## C. Counsel Paul M. Monzione

Both of these Objectors have hired Counsel to prepare and file their Objections. Their Objections primarily pertain to the entire class, but if some grounds pertain to a specific

subset of the Class, it will be made evident during the course of the argument. I, Paul M. Monzione, have filed a notice of appearance with the Court by the date set forth in the Preliminary Approval and Class Certification Order or as the Court otherwise directed and a sworn declaration attesting to his representation of each of the above named class members on whose behalf the objection is being filed.

I or my co counsel intend to appear at the Fairness Hearing on behalf of the Objectors. I have also filed written notice of our intent to appear at the Fairness Hearing in accordance with the requirements set forth in the Preliminary Approval Order or by such time and in such manner as the Court may otherwise direct.

Furthermore Counsel preserves Objectors' right to appeal any adverse Order or ruling by the Court.

## XII. Conclusion

The proposed settlement should be disapproved by the court because it is unfair, inadequate, and unreasonable. The parties have not met their burden of proof.

Date: September 16, 2016

/s/    Paul M. Monzione
Paul M. Monzione, Objector's Attorney

APPENDIX

Exhibit                                                                      Page

1       Annual Reports Key Numbers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

2       Notice to Audi and Porsche Owners dated _____ . . . . . . . . . . . . . . . . . . . . . . . . .

3       Notice to Audi and Porsche Owners dated _____ . . . . . . . . . . . . . . . . . . . . . . . . .

4       Li 2015 Validated Registration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

5       Li Qualification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

6       Birner 2015 Validated Registration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

7       Birner Qualification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

# EXHIBIT LIST

1.  Key Figures page from annual reports 2009-2015

2.  Notice of Violation from CARB to Audi

3.  Notice of Violation from CARB to Porsche

4.  Jessica Grace Li Vehicle registration 2015

5.  Jessica Grace Li Vehicle Look Up result

6.  Alexander Birner certificate of title

7.  Alexander Birner Vehicle Look Up result

EXHIBIT "1"

# Key Figures

## VOLKSWAGEN GROUP

| Volume data[1] | 2015 | 2014 | % |
|---|---|---|---|
| Vehicle sales (units) | 10,009,605 | 10,217,003 | –2.0 |
| Production (units) | 10,017,191 | 10,212,562 | –1.9 |
| Employees at Dec. 31 | 610,076 | 592,586 | +3.0 |

| Financial data (IFRSs), € million | 2015 | 2014 | % |
|---|---|---|---|
| Sales revenue | 213,292 | 202,458 | +5.4 |
| Operating result before special items | 12,824 | 12,697 | +1.0 |
| as a percentage of sales revenue | 6.0 | 6.3 | |
| Special items | 16,893 | – | x |
| Operating result | –4,069 | 12,697 | x |
| as a percentage of sales revenue | –1.9 | 6.3 | x |
| Earnings before tax | 1,301 | | x |
| Earnings after tax | 1,301 | 14,794 | x |
| Earnings attributable to Volkswagen AG shareholders | –1,361 | 11,068 | x |
| Cash flows from operating activities | –1,582 | 10,847 | x |
| Cash flows from investing activities attributable to operating activities | 13,679 | 10,784 | +26.8 |
| | 15,573 | 16,452 | –5.6 |

| Automotive Division | 2015 | 2014 | % |
|---|---|---|---|
| EBITDA | 7,212 | 23,100 | –68.8 |
| Cash flows from operating activities | 23,796 | 21,593 | +10.2 |
| Cash flows from investing activities attributable to operating activities[3] | 14,909 | 15,476 | –3.7 |
| of which: capex | 12,738 | 11,495 | +10.8 |
| as a percentage of sales revenue | 6.9 | 6.5 | |
| capitalized development costs | 5,021 | 4,601 | +9.1 |
| as a percentage of sales revenue | 2.7 | 2.6 | |
| Net cash flow | 8,847 | 6,117 | +45.3 |
| Net liquidity at Dec. 31 | 24,522 | 17,639 | +39.0 |

| Return on sales % | 2015 | 2014 | |
|---|---|---|---|
| Return on sales before tax | –0.6 | 7.3 | |
| Return on investment (ROI) in the Automotive Division | 0.2 | 14.9 | |
| Return on equity before tax (Financial Services Division)[5] | 12.2 | 12.5 | |

1 Volume data including the unconsolidated Chinese joint ventures.
Including allocation of consolidation adjustments between the Automotive and Financial Services divisions.
2 Operating result plus net depreciation/amortization and impairment losses/reversals of impairment losses on property, plant and equipment

capitalized development costs, lease assets, goodwill and financial assets as reported in the cash flow statement.
4 Excluding acquisition and disposal of equity investments €(7,276)/€(5,719) million.
5 Earnings before tax as a percentage of average equity.

## VOLKSWAGEN AG

| Volume data | 2015 | 2014 | % |
|---|---|---|---|
| Vehicle sales (units) | 2,676,629 | 2,615,686 | +2.3 |
| Production (units) | 1,255,771 | 1,230,891 | +2.0 |
| Employees at Dec. 31 | 114,066 | 112,561 | +1.3 |

| Financial data (HGB), € million | 2015 | 2014 | % |
|---|---|---|---|
| Sales | 73,510 | 68,971 | +6.6 |
| Net loss/net income for the year | –5,515 | 2,476 | x |
| Dividends (€) | | | |
| per ordinary share | 0.11 | 4.80 | |
| per preferred share | 0.17 | 4.86 | |

This version of the annual report is a translation of the German original. The German takes precedence. All figures shown in the report are rounded, so minor discrepancies may arise from addition of these amounts. The figures from the previous fiscal year are shown in parentheses directly after the figures for the current reporting period.

# key Figures

## Volume data

| | | 2013 | % |
|---|---|---|---|
| Vehicle sales (units) | 10,217,003 | 9,728,250 | +5.0 |
| Production (units) | 10,212,562 | 9,727,848 | +5.0 |
| Employees at Dec. 31 | 592,586 | 572,800 | +3.5 |

## Financial data (IFRSs), € million

| | | 2013 | % |
|---|---|---|---|
| Sales revenue | 202,458 | 197,007 | +2.8 |
| Operating profit | 12,697 | 11,671 | +8.8 |
| Profit before tax | 14,794 | 12,428 | +19.0 |
| Profit after tax | 11,068 | 9,145 | +21.0 |
| Profit attributable to Volkswagen AG shareholders | 10,847 | 9,066 | +19.6 |
| Cash flows from operating activities | 10,784 | 12,595 | –14.4 |
| Cash flows from investing activities attributable to operating activities | 16,452 | 14,936 | +10.2 |
| Automotive Division | | | |
| EBITDA | 23,100 | 20,594 | +12.2 |
| Cash flows from operating activities | 21,593 | 20,612 | +4.8 |
| Cash flows from investing activities attributable to operating activities¹ | 15,476 | 16,199 | –4.5 |
| of which: capex | 11,495 | 11,040 | +4.1 |
| as a percentage of sales revenue | 6.5 | 6.3 | |
| capitalized development costs | 4,601 | 4,021 | +14.4 |
| as a percentage of sales revenue | 2.6 | 2.3 | |
| Net cash flow | 6,117 | 4,413 | +38.6 |
| Net liquidity at Dec. 31 | 17,639 | 16,869 | +4.6 |

## Return on sales in %

| | | 2013 | |
|---|---|---|---|
| Return on sales before tax | 7.3 | 6.3 | |
| Return on investment (ROI) in the Automotive Division | 14.9 | 14.5 | |
| Return on equity before tax (Financial Services Division) | 12.5 | 14.3 | |

1 Volume data including the unconsolidated Chinese joint ventures.
2 Including allocation of consolidation adjustments between the Automotive and Financial Services divisions.
3 Operating profit plus net depreciation, amortization and impairment losses/reversals of impairment losses on property, plant and equipment,
4 capitalized development costs, lease assets, goodwill and financial assets as reported in the cash flow statement.
4 Excluding acquisition and disposal of equity investments, €15,719 million (€14,497 million).
5 Profit before tax as a percentage of average equity.

## Volume data

| | | 2013 | % |
|---|---|---|---|
| Vehicle sales (units) | 2,615,886 | 2,495,745 | +4.8 |
| Production (units) | 1,230,891 | 1,169,151 | +5.3 |
| Employees at Dec. 31 | 112,561 | 107,559 | +4.7 |

## Financial data (HGB), € million

| | | 2013 | % |
|---|---|---|---|
| Sales | 68,971 | 65,587 | +5.2 |
| Net income for the year | 2,476 | 3,078 | –19.6 |
| Dividends (€) | | | |
| per ordinary share | 4.80 | 4.00 | |
| per preferred share | 4.86 | 4.06 | |

This version of the annual report is a translation of the German original. The German takes precedence.

# *Key Figures*

| Volume data | | 2012 | % |
|---|---|---|---|
| Vehicle sales (units) | 9,728,250 | 9,344,559 | +4.1 |
| Production (units) | 9,727,848 | 9,255,384 | +5.1 |
| Employees at Dec. 31 | 572,800 | 549,763 | +4.2 |

| Financial data (IFRSs), € million | | 2012 | % |
|---|---|---|---|
| Sales revenue | 197,007 | 192,676 | +2.2 |
| Operating profit | 11,671 | 11,498 | +1.5 |
| Profit before tax | 12,428 | 25,487 | −51.2 |
| Profit after tax | 9,145 | 21,881 | −58.2 |
| Profit attributable to Volkswagen AG shareholders | 9,066 | 21,712 | −58.2 |
| Cash flows from operating activities | 12,595 | 7,209 | +74.7 |
| Cash flows from investing activities attributable to operating activities | 14,936 | 16,840 | −11.3 |
| Automotive Division³ | | | |
|   EBITDA² | 20,594 | 19,895 | +3.5 |
|   Cash flows from operating activities | 20,612 | 16,232 | +27.0 |
|   Cash flows from investing activities attributable to operating activities | 16,199 | 16,455 | −1.6 |
|     of which: investments in property, plant and equipment | 11,040 | 10,271 | +7.5 |
|       as a percentage of sales revenue | 6.3 | 5.9 | |
|       capitalized development costs | 4,021 | 2,615 | +53.8 |
|       as a percentage of sales revenue | 2.3 | 1.5 | |
|   Net cash flow | 4,413 | −223 | x |
|   Net liquidity at Dec. 31 | 16,869 | 10,573 | +59.5 |

| Return ratios in % | | 2012 | % |
|---|---|---|---|
| Return on sales before tax | 6.3 | 13.2 | |
| Return on investment (RoI) in the Automotive Division | 14.5 | 16.6 | |
| Return on equity before tax (Financial Services Division)⁶ | 14.3 | 13.1 | |

1 Volume data including the unconsolidated Chinese joint ventures.
2 Prior-year figures adjusted to reflect application of IAS 19R.
3 Including allocation of consolidation adjustments between the Automotive and Financial Services divisions.
4 Operating profit plus net depreciation/amortization and impairment

losses/reversals of impairment losses on property, plant and equipment, capitalized development costs, leasing and rental assets, goodwill and financial assets as reported in the cash flow statement.
5 Excluding acquisition and disposal of equity investments €14,497 million (€12,526 million).
6 Profit before tax as a percentage of average equity

| Volume data | | 2012 | % |
|---|---|---|---|
| Vehicle sales (units) | 2,495,745 | 2,582,266 | −3.3 |
| Production (units) | 1,169,151 | 1,148,774 | +1.8 |
| Employees at Dec. 31 | 107,559 | 101,794 | +5.7 |

| Financial data (HGB), € million | | 2012 | % |
|---|---|---|---|
| Sales | 65,587 | 64,361 | −4.1 |
| Net income for the year | 3,078 | 6,380 | −51.8 |
| Dividends (€) | | | |
|   per ordinary share | 4.00 | 3.50 | |
|   per preferred share | 4.06 | 3.56 | |

This version of the annual report is a translation of the German original. The German takes precedence.

# Key Figures

## VOLKSWAGEN GROUP

| Volume Data[1] | 2012 | 2011 | % |
|---|---|---|---|
| Vehicle sales (units) | 9,344,559 | 8,361,294 | +11.8 |
| Production (units) | 9,255,384 | 8,494,280 | +9.0 |
| Employees at Dec. 31 | 549,763 | 501,956 | +9.5 |

| Financial Data (IFRSs), € million | 2012 | 2011 | % |
|---|---|---|---|
| Sales revenue | 192,676 | 159,337 | +20.9 |
| Operating profit | 11,510 | 11,271 | +2.1 |
| Profit before tax | 25,492 | 18,926 | +34.7 |
| Profit after tax | 21,884 | 15,799 | +38.5 |
| Profit attributable to shareholders of Volkswagen AG | 21,717 | 15,409 | +40.9 |
| Cash flows from operating activities | 7,209 | 8,500 | −15.2 |
| Cash flows from investing activities attributable to operating activities | 16,840 | 16,002 | +5.2 |
| Automotive Division[2] | | | |
| EBITDA[3] | 19,906 | 17,815 | +11.7 |
| Cash flows from operating activities | 16,232 | 17,109 | −5.1 |
| Cash flows from investing activities attributable to operating activities[4] | 16,455 | 15,998 | +2.9 |
| of which: investments in property, plant and equipment | 10,271 | 7,929 | +29.5 |
| as a percentage of sales revenue | 5.9 | 5.6 | |
| capitalized development costs | 2,615 | 1,666 | +56.9 |
| as a percentage of sales revenue | 1.5 | 1.2 | |
| Net cash flow | −223 | 1,112 | x |
| Net liquidity at Dec. 31 | 10,573 | 16,951 | −37.6 |

| Return ratios in % | 2012 | 2011 | |
|---|---|---|---|
| Return on sales before tax | 13.2 | 11.9 | |
| Return on investment after tax (Automotive Division) | 16.6 | 17.7 | |
| Return on equity before tax (Financial Services Division)[5] | 13.1 | 14.0 | |

1 Volume data including the unconsolidated Chinese joint ventures.
2 Including allocation of consolidation adjustments between the Automotive and Financial Services divisions.
3 Operating profit plus net depreciation/amortization and impairment losses/reversals of impairment losses on property, plant and equipment, capitalized development costs, leasing and rental assets, goodwill and financial assets as reported in the cash flow statement.
4 Excluding acquisition and disposal of equity investments: €12,328 million (€9,371 million).
5 Profit before tax as a percentage of average equity.

## VOLKSWAGEN AG

| Volume Data | 2012 | 2011 | % |
|---|---|---|---|
| Vehicle sales (units) | 2,580,266 | 2,661,327 | −3.0 |
| Production (units) | 1,148,774 | 1,215,058 | −5.5 |
| Employees at Dec. 31 | 101,794 | 97,691 | +4.2 |

| Financial Data (HGB), € million | 2012 | 2011 | % |
|---|---|---|---|
| Sales | 68,361 | 67,178 | +1.8 |
| Net income for the year | 6,380 | 3,418 | +86.7 |
| Dividends (€) | | | |
| per ordinary share | 3.50 | 3.00 | |
| per preferred share | 3.56 | 3.06 | |

This version of the annual report is a translation of the German original. The German takes precedence.

# Key Figures

## VOLKSWAGEN GROUP

| Volume Data[1] | 2010 | 2009 | % |
|---|---|---|---|
| Vehicle sales (units) | 7,278,440 | 6,309,743 | + 15.4 |
| Production (units) | 7,357,505 | 6,054,829 | + 21.5 |
| Employees at Dec. 31 | 399,381 | 368,500 | + 8.4 |

| Financial Data (IFRSs), € million | 2010 | 2009 | % |
|---|---|---|---|
| Sales revenue | 126,875 | 105,187 | + 20.6 |
| Operating profit | 7,141 | 1,855 | x |
| Profit before tax | 8,994 | 1,261 | x |
| Profit after tax | 7,226 | 911 | x |
| Profit attributable to shareholders of Volkswagen AG | 6,835 | 960 | x |
| Cash flows from operating activities | 11,455 | 12,741 | – 10.1 |
| Cash flows from investing activities | 9,278 | 10,428 | – 11.0 |
| Automotive Division[2] | | | |
| EBITDA[3] | 13,940 | 8,005 | + 74.1 |
| Cash flows from operating activities | 13,930 | 12,815 | + 8.7 |
| Cash flows from investing activities[4] | 9,095 | 10,252 | – 11.3 |
| of which: investments in property, plant and equipment | 5,656 | 5,783 | – 2.2 |
| as a percentage of sales revenue | 5.0 | 6.2 | |
| capitalized development costs | 1,667 | 1,948 | – 14.4 |
| as a percentage of sales revenue | 1.5 | 2.1 | |
| Net cash flow | 4,835 | 2,563 | + 88.6 |
| Net liquidity at Dec. 31 | 18,639 | 10,636 | + 75.2 |

| Return ratios in % | 2010 | 2009 | |
|---|---|---|---|
| Return on sales before tax | 7.1 | 1.2 | |
| Return on investment after tax (Automotive Division) | 13.5 | 3.8 | |
| Return on equity before tax (Financial Services Division)[5] | 12.9 | 7.9 | |

1. Volume data including the unconsolidated Chinese joint ventures. Employees in 2009 not including Chinese component plants
2. Including allocation of consolidation adjustments between the Automotive and Financial Services divisions.
3. Operating profit plus net depreciation/amortization and impairment losses/reversals of impairment losses on property, plant and equipment, capitalized development costs, leasing and rental assets, goodwill and financial assets as reported in the cash flow statement.
4. Excluding acquisition and disposal of equity investments: € 7,034 million (€ 7,585 million).
5. Profit before tax as a percentage of average equity.

## VOLKSWAGEN AG

| Volume Data | 2010 | 2009 | % |
|---|---|---|---|
| Vehicle sales (units) | 2,309,648 | 2,053,427 | + 12.5 |
| Production (units) | 1,100,186 | 1,038,344 | + 6.0 |
| Employees at Dec. 31 | 94,787 | 95,164 | – 0.4 |

| Financial Data (HGB), € million | 2010 | 2009 | % |
|---|---|---|---|
| Sales | 57,243 | 47,864 | + 19.6 |
| Net income for the year | 1,550 | 1,082 | + 43.3 |
| Dividends (€) | | | |
| per ordinary share | 2.20 | 1.60 | |
| per preferred share | 2.26 | 1.66 | |

This version of the Annual Report is a translation of the German original. The German takes precedence.

# Consolidated Financial Statements of the Volkswagen Group

## Income Statement of the Volkswagen Group
for the Period January 1 to December 31, 2009

| € million | Note | 2009 | 2008 |
|---|---|---|---|
| Sales revenue | 1 | 105,187 | 113,808 |
| Cost of sales | 2 | −91,608 | −96,612 |
| Gross profit | | 13,579 | 17,196 |
| Distribution expenses | 3 | −10,537 | −10,552 |
| Administrative expenses | 4 | −2,739 | −2,742 |
| Other operating income | 5 | 7,904 | 8,770 |
| Other operating expenses | 6 | −6,352 | −5,339 |
| Operating profit | | 1,855 | 6,333 |
| Share of profits and losses of equity-accounted investments | 7 | 701 | 910 |
| Finance costs | 8 | −2,268 | −1,815 |
| Other financial result | 9 | 972 | 1,180 |
| Financial result | | −595 | 275 |
| Profit before tax | | 1,261 | 6,608 |
| Income tax income/expense | 10 | −349 | −1,920 |
| current | | −1,145 | −2,338 |
| deferred | | 796 | 418 |
| Profit after tax | | 911 | 4,688 |
| Minority interests | | −49 | −65 |
| Profit attributable to shareholders of Volkswagen AG | | 960 | 4,753 |
| | | | |
| Basic earnings per ordinary share in € | 11 | 2.38 | 11.92 |
| Basic earnings per preferred share in € | 11 | 2.44 | 11.98 |
| Diluted earnings per ordinary share in € | 11 | 2.38 | 11.88 |
| Diluted earnings per preferred share in € | 11 | 2.44 | 11.94 |

EXHIBIT "2"




# Air Resources Board

**Mary D. Nichols, Chair**
9480 Telstar Avenue, Suite 4
El Monte, California 91731 • www.arb.ca.gov

Matthew Rodriquez
*Secretary for
Environmental Protection*

Edmund G. Brown Jr.
*Governor*

## Note: This letter, but not the attachment containing confidential business information, is public.

July 13, 2016                                  Reference No. IUC-2016-013

Audi AG
Volkswagen AG
Volkswagen Group of America, Incorporated

Through:

David Detweiler
Executive Vice President and General Counsel
Volkswagen Group of America, Inc.
2200 Ferdinand Porsche Drive
Herndon, Virginia 20171

Stuart Johnson
General Manager
Engineering and Environmental Office
Volkswagen Group of America, Inc.
3800 Hamlin Road
Auburn Hills, Michigan 48326

SUBJECT:     NOTICE OF REJECTION OF VOLKSWAGEN GROUP OF AMERICA INCORPORATED'S DIESEL 3.0 LITER TDI ENGINE INFLUENCED EMISSION RECALL PLAN SUBMITTED ON BEHALF OF VW AND AUDI

Dear Mr. Detweiler and Mr. Johnson:

As you know, the California Air Resources Board (CARB) has been investigating the failure of Volkswagen AG, Volkswagen Group of America, Inc., Volkswagen Group of America Chattanooga Operations, LLC (collectively, VW) and Audi AG (Audi) vehicles to comply with State emission standards, test procedures, on-board diagnostic (OBD) system requirements, and other regulatory requirements. VW stated, and Audi acknowledged, that Audi designed, built, and supplied the 3.0 liter (3.0L) diesel engines for inclusion in VW's and Audi's 3.0L diesel vehicles. In November 2015, Audi admitted to CARB that its 3.0L diesel vehicles were equipped with undisclosed Auxiliary Emission

*The energy challenge facing California is real. Every Californian needs to take immediate action to reduce energy consumption.
For a list of simple ways you can reduce demand and cut your energy costs, see our website: http://www.arb.ca.gov.*

California Environmental Protection Agency

*Printed on Recycled Paper*

2

Control Devices (AECDs), which CARB later determined to be defeat devices that bypass, defeat, or render inoperative elements of the vehicles' emission control systems. These defeat devices were installed on VW's and Audi's 3.0L diesel vehicles manufactured for model years (MY) 2009-2016 (Generations 1, 2.1, and 2.2) in order to circumvent CARB's and the United States Environmental Protection Agency's (EPA) emission test procedures, so that VW and Audi could obtain Executive Orders from CARB and Certificates of Conformity from EPA. These documents were required before these vehicles could legally be introduced into commerce in California.

As a result of VW's and Audi's disclosures and CARB's investigation, in conjunction with EPA and Environment Canada, on November 25, 2015, CARB issued VW and Audi an in-use noncompliance letter covering these VW and Audi 3.0L diesel vehicles (Reference No. IUC-2015-012). CARB's in-use noncompliance letter, among other things, directed VW and Audi to return those vehicles to the claimed certified configuration. Pursuant to California Code of Regulations, title 13, section 2113(b), VW and Audi had until February 2, 2016, to submit a proposed influenced emission recall plan ("recall plan" or "proposed plan") to CARB that met the elements prescribed in California Code of Regulations, title 13, section 2114. VW's and Audi's recall plan was required to correct the nonconformities of their MY 2009-2016 (Generations 1, 2.1, and 2.2) 3.0L light-duty diesel vehicles in an expeditious manner.

VW, on behalf of itself and Audi, submitted a single, incomplete recall plan on February 2, 2016. After the February 2, 2016, deadline, VW and Audi submitted additional significant information and data, both in writing and orally, to CARB relating to the affected vehicles' nonconformities. CARB informed VW and Audi in a confidential letter dated February 17, 2016 (Reference No. IUC-2016-005), that the recall plan failed to address the basic requirements outlined in California Code of Regulations, title 13, sections 2113-2119. This letter also reiterated some of what was needed to fully meet the regulatory requirements. After the February 17, 2016 letter, and as late as June 2016, VW and Audi continued to submit additional significant information and data, both in writing and orally, to CARB relating to the affected vehicles' noncomformities.

VW's and Audi's submissions are incomplete, substantially deficient, and fall far short of meeting the legal requirements to return these vehicles to the claimed certified configuration. The VW/Audi proposed 3.0L influenced emission recall plan does not meet the requirements of California Code of Regulations, title 13, section 2113, subdivision (c), and fail to contain all of the required elements. Specifically, among other deficiencies, the proposed plan fails to do the following, as required under California Code of Regulations, title 13, section 2114, for all Generations 1, 2.1, and 2.2 vehicles:

July 13, 2016
Page 3

- Adequately describe the nonconformities and undisclosed AECDs/defeat devices on the affected vehicles;
- Sufficiently describe the remedial procedure for affected vehicles;
- Provide a meaningful estimated capture rate in California;
- Specify the system by which VW will ensure the availability of sufficient repair parts to institute the proposed fixes;
- Contain the impact of proposed fixes on fuel economy, drivability, performance and safety;
- Describe the impact of repairs on emissions, particularly average noncompliance emission levels, average emission reductions per pollutant, and an average emission level after proposed fixes;
- Demonstrate how the proposed fixes are designed to correct the nonconformities;
- Provide onboard diagnostic system demonstration data;
- Demonstrate how the plan is designed to correct the nonconformities in an expeditious manner; and
- Provide sufficient detail for CARB to evaluate the feasibility and success of the proposed plan.

CARB considers six of the deficiencies in Audi/VW's proposed influenced emission recall plan to be the most serious. First, VW and Audi have failed to disclose and provide a full description of all defeat devices and AECDs. Second, VW and Audi have failed to describe the nonconformities in sufficient detail for CARB to adequately understand them in the context of the recall plan, in order to determine whether the proposed fixes are feasible, would remedy each of the nonconformities, or would not cause adverse impacts on the emissions durability. Third, VW and Audi failed to specifically and completely describe the fixes in their proposed recall plan in a manner that allows CARB to adequately evaluate whether they could be successful or are even technically feasible or would not cause greater emissions deterioration. Fourth, VW's and Audi's proposed recall plan failed to provide required data to demonstrate that the affected vehicles will be returned to the claimed certified configuration including emissions durability during the useful life of the vehicles. Fifth, the proposed plan does not sufficiently address impacts the proposed fixes would have on the engine, the vehicle's overall operation such as drivability and fuel economy, and all related emission control technologies, including the OBD system, emissions durability, or the DEF system's dosing, warnings and inducements. Lastly, the recall plan cannot be completed expeditiously, as certain required data will not be available until early August 2016 for the Generation 2.2, mid-October 2016 for Generation 2.1, and the end of December 2016 for Generation 1. These six problems, as well as additional deficiencies with the recall plan, are described in more detail in the confidential attachment to this letter.

Therefore, CARB is rejecting VW's and Audi's proposed 3.0L influenced emission recall plan for the 3.0L Generations 1, 2.1, and 2.2 diesel vehicles. CARB, in conjunction with EPA, will continue the on-going technical discussions with VW and Audi to evaluate their proposals through the enforcement action process to ensure a legally acceptable and expedited resolution to this matter. If you have any questions, I can be reached at (626) 450-6150.

Sincerely,

Annette Hebert, Chief
Emissions Compliance, Automotive Regulations, and Science Division

Confidential Attachment not to be released to public

cc: (via email only)
    Mr. Byron Bunker, Director
    Compliance Division
    Office of Transportation and Air Quality
    Office of Air and Radiation
    U.S. Environmental Protection Agency
    bunker.byron@epa.gov

    Mr. Linc Wehrly, Director
    Light-Duty Vehicle Center
    U.S. Environmental Protection Agency
    wehrly.linc@epa.gov

    Dr. Todd Sax, Chief
    Enforcement Division
    California Air Resources Board
    todd.sax@arb.ca.gov

*NEWS RELEASE*

**Release #:16-37**
**Date:07/13/2016**

**ARB PIO: (916) 322-2990**
**CONTACT:**

Dave Clegern
(916) 322-2990
dave.clegern@arb.ca.gov

# <u>Volkswagen Update:</u>

## *Air Resources Board rejects Volkswagen recall plan for 3.0 liter diesel passenger cars*

- The California Air Resources Board (CARB) today rejected proposed recall plans submitted by Volkswagen/Audi and Porsche for repair of undisclosed Auxiliary Emission Control Devices (AECDs) and defeat devices in 3.0 liter, diesel passenger cars manufactured for model years 2009-2016. This decision affects about 16,000 3.0 liter diesel Volkswagens, Audis and Porsches sold in California.

CARB staff has determined that the proposed recall plans submitted by the companies are incomplete and deficient in a number of areas (see links below for rejection letters).

CARB, in conjunction with EPA, will continue the on-going technical discussions with the companies through the enforcement process to ensure a legally and technically acceptable resolution is reached which fully mitigates the excess emissions.

See 3.0 liter rejection letters for <u>**Volkswagen/Audi**</u> and for <u>**Porsche**</u>.

Other information concerning VW, Audi and Porsche's violations can be found <u>**here**</u>.

*ARB's mission is to promote and protect public health, welfare, and ecological resources through effective reduction of air pollutants while recognizing and considering effects on the economy. The ARB oversees all air pollution control efforts in*

*California to attain and maintain health based air quality standards.*

EXHIBIT "3"



# Air Resources Board

**Mary D. Nichols, Chair**
9480 Telstar Avenue, Suite 4
El Monte, California 91731 • www.arb.ca.gov

**Matthew Rodriquez**
*Secretary for*
*Environmental Protection*

**Edmund G. Brown Jr.**
*Governor*



**Note: This letter, but not the attachment containing confidential**
**business information, is public.**

July 13, 2016                                   Reference No. IUC-2016-014

Porsche AG
Porsche Cars North America, Incorporated

Through:

Mr. Walter J. Lewis
Manager, Regulatory Affairs
Porsche Cars North America, Incorporated
980 Hammond Drive, Suite 1000
Atlanta, Georgia 30328

SUBJECT:     NOTICE OF REJECTION OF PORSCHE CARS NORTH AMERICA,
             INCORPORATED'S DIESEL 3.0L V6 ENGINE INFLUENCED EMISSION
             RECALL PLAN

Dear Mr. Lewis:

As you know, the California Air Resources Board (CARB) has been investigating the
failure of Porsche AG and Porsche Cars North America, Inc. (Porsche) vehicles to
comply with State emission standards, test procedures, on-board diagnostic (OBD)
system requirements, and other regulatory requirements. Audi AG (Audi) stated, and
Porsche confirmed, that Audi designed, built, and supplied the 3.0 liter (3.0L) diesel
engines for inclusion in Porsche's 3.0L diesel vehicles. In November 2015, Audi
admitted to CARB that its 3.0L diesel engines, including those supplied to Porsche, were
equipped with undisclosed Auxiliary Emission Control Devices (AECDs), which ARB
later determined to be defeat devices that bypass, defeat, or render inoperative
elements of the vehicles' emission control systems. These defeat devices were
installed on Porsche's 3.0L diesel vehicles manufactured for model years (MY) 2013-
2016 (Generations 2.1 and 2.2), in order to circumvent CARB's and the United States
Environmental Protection Agency's (EPA) emission test procedures, so that Porsche
could obtain Executive Orders from CARB and Certificates of Conformity from EPA.
These documents were required before these vehicles could legally be introduced into

commerce in California. Porsche applied for Executive Orders from CARB, and in those applications, Porsche stated that the vehicles met the applicable emission standards. However, the vehicles were equipped with defeat devices and did not meet the applicable emission standards. In the applications for certification, Porsche also stated that the production vehicles would be in all material respects the same as the vehicles for which approval was granted. However, approval was granted for vehicles without defeat devices, while the production vehicles contained defeat devices.

As a result of Audi's disclosures and CARB's investigation, in conjunction with EPA and Environment Canada. on November 25, 2015, CARB issued Porsche an in-use noncompliance letter covering these Porsche 3.0L diesel vehicles (Reference No. IUC-2015-012). CARB's in-use noncompliance letter, among other things. directed Porsche to return those vehicles to the claimed certified configuration. Pursuant to California Code of Regulations, title 13. section 2113(b), Porsche had until February 2, 2016, to submit a proposed influenced emission recall plan ("recall plan" or "proposed plan") to CARB that met the elements prescribed in California Code of Regulations, title 13, section 2114. Porsche's recall plan was required to correct the nonconformities of its MY 2013-2016 (Generations 2.1 and 2.2) 3.0L light-duty diesel vehicles in an expeditious manner.

Porsche submitted an incomplete draft recall plan on February 2, 2016. After the February 2, 2016, deadline, VW and Audi submitted additional significant information and data, both in writing and orally, to CARB relating to the Porsche vehicles' (containing Audi engines) nonconformities. CARB informed Porsche in a confidential letter dated February 17, 2016 (Reference No. IUC-2016-006), that Porsche's recall plan failed to address the basic requirements outlined in California Code of Regulations, title 13, sections 2113-2119. This letter also reiterated some of what was needed to fully meet the regulatory requirements. After the February 17, 2016 letter, and as late as June 2016, VW and Audi continued to submit additional significant information and data, both in writing and orally, to CARB relating to the affected vehicles' nonconformities.

Porsche's submissions are incomplete, substantially deficient, and fall far short of meeting the legal requirements to return these vehicles to the claimed certified configuration. Porsche's proposed 3.0L influenced emission recall plan does not meet the requirements of California Code of Regulations, title 13, section 2113, subdivision (c), and fail to contain all of the required elements. Specifically, among other deficiencies. the proposed plan fails to do the following, as required under California Code of Regulations, title 13, section 2114, for all Generations 2.1 and 2.2 vehicles:

- Adequately describe the nonconformities and undisclosed AECDs/defeat devices on the affected vehicles;
- Sufficiently describe the remedial procedure for affected vehicles;
- Provide a meaningful estimated capture rate in California;
- Specify the system by which Porsche will ensure the availability of sufficient repair parts to institute the proposed fixes;
- Contain the impact of proposed fixes on fuel economy, drivability, performance and safety;
- Describe the impact of repairs on emissions, particularly average noncompliance emission levels, average emission reductions per pollutant, and an average emission level after proposed fixes;
- Demonstrate how the proposed fixes are designed to correct the nonconformities;
- Provide onboard diagnostic system demonstration data;
- Demonstrate how the plans are designed to correct the nonconformities in an expeditious manner; and
- Provide sufficient detail for CARB to evaluate the feasibility and success of the proposed plan.

CARB considers six of the deficiencies in Porsche's proposed influenced emission recall plan to be the most serious. First, Porsche has failed to disclose and provide a full description of all defeat devices and AECDs. Second, Porsche has failed to describe the nonconformities in sufficient detail for CARB to adequately understand them in the context of the recall plan, in order to determine whether the proposed fixes are feasible or would remedy each of the nonconformities or would not cause adverse impacts on the emissions durability. Third, Porsche failed to specifically and completely describe the fixes in its proposed recall plan in a manner that allows CARB to adequately evaluate whether they could be successful or are even technically feasible or would not cause greater emissions deterioration. Fourth, Porsche's proposed recall plan failed to provide required data to demonstrate that the affected vehicles will be returned to the claimed certified configuration including emissions durability during the useful life of the vehicles. Fifth, the proposed plan does not sufficiently address impacts the proposed fixes would have on the engine, the vehicle's overall operation such as drivability and fuel economy, and all related emission control technologies, including the OBD system, emissions durability, or the DEF system's dosing, warnings, and inducements. Lastly, the recall plan cannot be completed expeditiously, as certain required data will not be capable of completion until early August 2016 for the Generation 2.2 and mid-October 2016 for Generation 2.1. These six problems, as well as additional deficiencies with the proposed plan, are described in more detail in the confidential attachment to this letter.

Therefore, CARB is rejecting Porsche's proposed 3.0L influenced emission recall plan for the Generations 2.1 and 2.2 diesel vehicles.

CARB, in conjunction with EPA, as part of their ongoing joint technical discussions with Porsche, will continue to evaluate Porsche's proposals, and will continue to work with Porsche through the enforcement action process to ensure a legally acceptable and expedited resolution to this matter. If you have any questions, I can be reached at (626) 450-6150.

Sincerely,

Annette Hebert, Chief
Emissions Compliance, Automotive Regulations, and Science Division

Confidential Attachment not to be released to public

Cc: (via email only)

Mr. Byron Bunker, Director
Compliance Division
Office of Transportation and Air Quality
Office of Air and Radiation
U.S. Environmental Protection Agency
bunker.byron@epa.gov

Mr. Linc Wehrly, Director
Light-Duty Vehicle Center
U.S. Environmental Protection Agency
wehrly.linc@epa.gov

Dr. Todd Sax, Chief
Enforcement Division
California Air Resources Board
todd.sax@arb.ca.gov

**NEWS RELEASE**

**Release #:16-37**
**Date:07/13/2016**

**ARB PIO: (916) 322-2990**
**CONTACT:**

Dave Clegern
(916) 322-2990
dave.clegern@arb.ca.gov

# Volkswagen Update:

## *Air Resources Board rejects Volkswagen recall plan for 3.0 liter diesel passenger cars*

- The California Air Resources Board (CARB) today rejected proposed recall plans submitted by Volkswagen/Audi and Porsche for repair of undisclosed Auxiliary Emission Control Devices (AECDs) and defeat devices in 3.0 liter, diesel passenger cars manufactured for model years 2009-2016. This decision affects about 16,000 3.0 liter diesel Volkswagens, Audis and Porsches sold in California.

CARB staff has determined that the proposed recall plans submitted by the companies are incomplete and deficient in a number of areas (see links below for rejection letters).

CARB, in conjunction with EPA, will continue the on-going technical discussions with the companies through the enforcement process to ensure a legally and technically acceptable resolution is reached which fully mitigates the excess emissions.

See 3.0 liter rejection letters for **Volkswagen/Audi** and for **Porsche**.

Other information concerning VW, Audi and Porsche's violations can be found **here**.

*ARB's mission is to promote and protect public health, welfare, and ecological resources through effective reduction of air pollutants while recognizing and considering effects on the economy. The ARB oversees all air pollution control efforts in*

*California to attain and maintain health based air quality standards.*

*Office of Communications 1001 I Street, Sacramento CA 95814. Ph: (916) 322-2990*

EXHIBIT "4"

AUTO 09/08/2015 TO 09/08/2016     TYPE 11     LICENSE NUMBER 6XRP567

REGISTRATION VALID FROM

VEHICLE IDENTIFICATION NUMBER
WVWDM7AJ7CW351611

| BODY TYPE MODEL | CYLS | DATE FIRST SOLD | CLASS | MAKE VOLK | YR Model |
|---|---|---|---|---|---|
| 4H | | 00/00/2012 | FY | | 2012 |

| DATE ISSUED | TYPE VEH | WP | TAX | WC | UNLADEN/G.CGW | TOTAL FEES PAID |
|---|---|---|---|---|---|---|
| 07/04/2015 | 120 | D | | | $198 | |

1900

REGISTERED OWNER

LI JESSICA GRACE
OR LI RICHARD
1745 SHADEHILL PL
DIAMOND BAR  CA 91765-2848

LIENHOLDER

VW CREDIT INC
1401 FRANKLIN BLVD
LIBERTYVILLE
0    IL
          60048
R0070
L0118
RJ7070120153003

STATE OF CALIFORNIA
DEPARTMENT OF MOTOR VEHICLES
VALIDATED REGISTRATION CARD   X
READ REVERSE SIDE - IMPORTANT INSTRUCTIONS

TO REMOVE THE STICKER
FROM THE BACKING,
BEND STICKER AT SLIT AND PEEL SLOWLY.

INSTRUCTIONS FOR
APPLYING STICKER TO LICENSE PLATE
1. CLEAN SURFACE THOROUGHLY. SCRAPE
   OFF ACCUMULATED STICKERS (STICKER
   WILL NOT STICK IF WET OR DIRTY).
2. PUT STICKER ON REAR LICENSE PLATE
   AS SHOWN BELOW:
MOTORCYCLES:
   Right Half of This Well

ALL OTHERS:
   In Top Right Corner

CAL
1A0000

CALIFORNIA
1 SAM 123

EXCEPT:
Truck Tractors And Commercial Vehicles With
A Declared Gross Vehicle Weight of 10,001 lbs.
or More—Must Apply Sticker To Front Plate

4

EXHIBIT "5"

# Volkswagen/Audi Diesel Emissions Settlement Program

Learn more about the Settlements and program to modify or buyback
certain Volkswagen or Audi diesel automobiles in the United States

About

Vehicle Look-up

## About

Volkswagen has reached proposed Settlements involving 2.0-liter **Volkswagen and Audi** diesel
vehicles with the United States Environmental Protection Agency ("EPA"), the California Attorney
General, the California Air Resources Board ("CARB"), the Federal Trade Commission, and current
vehicle owners/lessees and certain former vehicle owners/lessees in the United States.

**If the proposed Settlements are approved by the Judge, then Volkswagen has agreed to:**

- Buy back, terminate leases or provide approved emissions modifications for nearly 475,000 2.0-liter TDI diesel cars in the United States;
- Provide cash payments to owners/lessees;
- Pay for environmental remediation; and
- Promote zero emissions vehicle technology.

OWNERS & LESSE **VOLKSWAGEN** (https://www.vwcourtsettlement.com/en/)
GROUP OF AMERICA

(https://www.vwcourtsettlement.com/en/)

5

Buyback of your car (or
early lease termination) + Cash



Modification to your car to
improve emissions. Keep your car +
Cash (Modification must be approved by EPA
and CARB)

# ✓ Vehicle Look-Up

Enter a Vehicle Identification Number ("VIN") to determine if a vehicle is included in the proposed Settlements.

Where can I find a VIN Number?

WVWDM7AJ7CW351611

🔍 Check Eligibility

## This vehicle is included.

The VIN entered is included in the terms of the proposed settlements. Both Vehicle and Owner/Lessee eligibility stipulations apply in order to participate in the Settlements. Please return to this website or sign up below to receive updates as they are available.

**2012 Golf Hatchback 4D TDI**

**First Name**

LI Jessica

**Last Name**

Grace

**VOLKSWAGEN** (https://www.vwcourtsettlement.com/en/)
GROUP OF AMERICA

**Email Address** (https://www.vwcourtsettlement.com/en/)

ZIP Code

✔ Submit Information

# Court Documents

Class Action Settlement Agreement
Department of Justice Consent Decree
FTC Consent Order

# Frequently Asked Questions

## Which vehicles are included in the proposed Settlements?

The following 2.0-liter TDI engine vehicles are included and may be eligible:

**VW Beetle**
2013 - 2015

**VW Golf**
2010 - 2015

**VW Jetta**
2009 - 2015

**VW Passat**
2012 - 2015

**Audi A3**
2010 - 2013; 2015

VOLKSWAGEN (https://www.vwcourtsettlement.com/en/)
GROUP OF AMERICA

## What are the next steps? (https://www.vwcourtsettlement.com/en/)

Judge Charles Breyer will hold what is referred to as a preliminary approval hearing on the proposed Settlements on July 26, 2016. At this hearing, he will hear from the parties about the Settlements.

If the Judge grants preliminary approval, notice will be mailed to owners and lessees announcing the specific terms of the Settlements. At that time, owners/lessees will learn about their rights to exclude themselves, object, or comment on the Settlements as well as the options available to buyback or modify their car, or terminate their lease.

After the notice period is complete, Judge Breyer will hold another hearing, a final approval hearing, to decide whether the Judge will grant final approval to the Settlements. At the final approval hearing, the Judge will consider comments from owners/lessees on whether the Settlements are fair, reasonable, and adequate.

## When will the emissions modification be available?

Volkswagen is working on an emissions modification for each of the cars listed above. EPA and CARB will need to approve any emissions modification before this option becomes available.

## What am I eligible to receive under the proposed Settlements if they are approved?

If you own or lease an eligible vehicle, you have choices. You can opt for (1) Volkswagen Group of America ("VWGoA") buying back your car if you own it, (2) terminating your lease without an early-termination penalty if you are leasing the car, or (3) if an emissions modification is approved for your car by EPA and CARB, getting VWGoA to modify your car's emissions system at no charge. Each of these options includes a cash payment from VWGoA. In addition, pursuant to agreements with the EPA and the CARB, and as referenced in VWGoA's settlement agreement with consumers, VWGoA has committed to pay significant amounts to remediate excess nitrogen oxide emissions and to invest in chargers and other infrastructure for zero emission vehicles.

## If I am a former owner or lessee, am I eligible to participate in the proposed Settlements?

If you owned an eligible vehicle on or before September 18, 2015 and sold it before June 28, 2016, you may be eligible to participate. Likewise, if you were leasing an eligible vehicle as of September 18, 2015, you may be eligible to participate.

**VOLKSWAGEN** (https://www.vwcourtsettlement.com/en/)
GROUP OF AMERICA

📅 Timeline/www.vwcourtsettlement.com/en/)
(https://www.vwcourtsettlement.com/en/)



**JUNE 28** — Settlement papers filed with Court

**JUNE 30** — Court status conference

**JULY 26** — Preliminary approval court hearing

**FALL 16** — Anticipated roll out of Settlement Program (pending Court approval)

EXHIBIT "6"

# CERTIFICATE OF TITLE

58615090311

VEHICLE HISTORY

AUTOMOBILE

| VEHICLE ID NUMBER | YR | MAKE | TITLE NUMBER |
|---|---|---|---|
| 3VWLL7AJ1CM006554 | 2012 | VOLK | 7MEP739 |

| BODY TYPE MODEL | AX | UNLADEN WEIGHT | FUEL | TRANSFER DATE | FEES PAID | REGISTRATION EXP DATE |
|---|---|---|---|---|---|---|
| 4D | | D | | | $1297 | 08/16/2016 |

| YR 1ST SOLD | CLASS | MO | EQUIPMT/TRUST NUMBER | ISSUE DATE |
|---|---|---|---|---|
| DE 2015 WW | | | | 09/03/15 |

MOTORCYCLE ENGINE NUMBER

ODOMETER DATE 08/15/2015

ODOMETER READING 39214 MI

ACTUAL MILEAGE

REGISTERED OWNER(S)

BIRNER ALEXANDER DONALD
1211 OAKCREST CIR
CORONA CA 92882

- - - - -
- - - - -

I certify (or declare) under penalty of perjury under the laws of the State of California that **THE SIGNATURE(S) BELOW RELEASES INTEREST IN THE VEHICLE.**

1a. _____ DATE _____ X _____ SIGNATURE OF REGISTERED OWNER _____

1b. _____ DATE _____ X _____ SIGNATURE OF REGISTERED OWNER _____

Federal and State law requires that you state the mileage upon transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

The odometer now reads |__|__|__|__|__|__| (no tenths) miles and to the best of my knowledge reflects the actual mileage unless one of the following statements is checked.

**WARNING** ☐ Odometer reading is not the actual mileage. ☐ Mileage exceeds the odometer mechanical limits.

*I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

| DATE | TRANSFEROR/SELLER'S SIGNATURE(S) | DATE | TRANSFEREE/BUYER SIGNATURE(S) |
|---|---|---|---|
| | X | | X |
| PRINTED NAME OF SELLER OR AGENT SIGNING FOR A COMPANY | | PRINTED NAME OF BUYER OR AGENT SIGNING FOR A COMPANY | |

## IMPORTANT READ CAREFULLY

Any change of Lienholder (holder of security interest) must be reported to the Department of Motor Vehicles within 10 days.

LIENHOLDER(S)

2. X _____
Signature releases interest in vehicle. (Company names must be countersigned)

Release Date _____

00924 CA 160582548
REG. 17.30RS (REV.10/2012)

AL 6
Cert 6
title

6

EXHIBIT "7"

Official Informational Website

# Volkswagen/Audi Diesel Emissions Settlement Program

Learn more about the Settlements and program to modify or buyback
certain Volkswagen or Audi diesel automobiles in the United States

About

Vehicle Look-up

## About

Volkswagen has reached proposed Settlements involving 2.0-liter **Volkswagen and Audi** diesel vehicles
with the United States Environmental Protection Agency ("EPA"), the California Attorney General, the
California Air Resources Board ("CARB"), the Federal Trade Commission, and current vehicle
owners/lessees and certain former vehicle owners/lessees in the United States.

**If the proposed Settlements are approved by the Judge, then Volkswagen has agreed to:**

- Buy back, terminate leases or provide approved emissions modifications for nearly 475,000 2.0-liter
  TDI diesel cars in the United States;
- Provide cash payments to owners/lessees;
- Pay for environmental remediation; and
- Promote zero emissions vehicle technology.

**OWNERS & LESSEES CAN CHOOSE:**



7

**VOLKSWAGEN**
GROUP OF AMERICA

Buyback of your car (or lease termination) + Cash (https://www.vwcourtsettlement.com/e)

( https://www.vwcourtsettlement.com/en/ )

Modification to your car to
improve emissions. Keep your car +
Cash (Modification must be approved by EPA
and CARB)

# ✓ Vehicle Look-Up

Enter a Vehicle Identification Number ("VIN") to determine if a vehicle is included in the proposed Settlements.

Where can I find a VIN Number?

3vwll7aj1cm006554

🔍 Check Eligibility

## This vehicle is included.

The VIN entered is included in the terms of the proposed settlements. Both Vehicle and Owner/Lessee eligibility stipulations apply in order to participate in the Settlements. Please return to this website or sign up below to receive updates as they are available.

2012 Jetta Sedan 4D TDI

**First Name**

**Last Name**

**Email Address**

ZIP Code

**VOLKSWAGEN** (https://www.vwcourtsettlement.com/e)
GROUP OF AMERICA

(https://www.vwcourtsettlement.com/en) )

Submit Information

# Court Documents

**Class Action Settlement Agreement**
**Department of Justice Consent Decree**
**FTC Consent Order**

# Frequently Asked Questions

## Which vehicles are included in the proposed Settlements?

The following 2.0-liter TDI engine vehicles are included and may be eligible:

**VW Beetle**
2013 - 2015

**VW Golf**
2010 - 2015

**VW Jetta**
2009 - 2015

**VW Passat**
2012 - 2015

**Audi A3**
2010 - 2013; 2015

## What are the next steps?

Judge Charles Breyer will hold what is referred to as a preliminary approval hearing on the proposed Settlements on July 26, 2016. At this hearing, he will hear from the parties about the Settlements.

If the Judge grants pr **VOLKSWAGEN** ice will be mailed to owners and lessees announcing the specific terms of the Settlements. At that time, owners/lessees will learn about their rights to exclude themselves, object, or comment on the Settlements as well as the options available to buyback or modify their car, or terminate their lease.

(https://www.vwcourtsettlement.com/en/ )

After the notice period is complete, Judge Breyer will hold another hearing, a final approval hearing, to decide whether the Judge will grant final approval to the Settlements. At the final approval hearing, the Judge will consider comments from owners/lessees on whether the Settlements are fair, reasonable, and adequate.

## When will the emissions modification be available?

Volkswagen is working on an emissions modification for each of the cars listed above. EPA and CARB will need to approve any emissions modification before this option becomes available.

## What am I eligible to receive under the proposed Settlements if they are approved?

If you own or lease an eligible vehicle, you have choices. You can opt for (1) Volkswagen Group of America ("VWGoA") buying back your car if you own it, (2) terminating your lease without an early-termination penalty if you are leasing the car, or (3) if an emissions modification is approved for your car by EPA and CARB, getting VWGoA to modify your car's emissions system at no charge. Each of these options includes a cash payment from VWGoA. In addition, pursuant to agreements with the EPA and the CARB, and as referenced in VWGoA's settlement agreement with consumers, VWGoA has committed to pay significant amounts to remediate excess nitrogen oxide emissions and to invest in chargers and other infrastructure for zero emission vehicles.

## If I am a former owner or lessee, am I eligible to participate in the proposed Settlements?

If you owned an eligible vehicle on or before September 18, 2015 and sold it before June 28, 2016, you may be eligible to participate. Likewise, if you were leasing an eligible vehicle as of September 18, 2015, you may be eligible to participate.

#  Timeline


JUNE

**Settlement papers filed with Court**



**VOLKSWAGEN** (https://www.vwcourtsettlement.com/e)
GROUP OF AMERICA

(https://www.vwcourtsettlement.com/en/ )

JUNE
**30** — Court status conference

JULY
**26** — Preliminary approval court hearing

FALL
**16** — Anticipated roll out of Settlement Program (pending Court approval)