Steve W. Berman (*Pro Hac Vice*)
Thomas E. Loeser (SBN 202724)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite #3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com

Richard N. Sox (*Pro Hac Vice*)
BASS SOX MERCER
2822 Remington Green Circle
Tallahassee, FL 32308
Telephone: (850) 878-6404
Facsimile: (850) 942-4869
rsox@dealerlawyer.com

*Counsel for Plaintiffs Napleton Orlando Imports, LLC, Napleton Sanford Imports, LLC, Napleton Automotive of Urbana, LLC and J. Bertolet, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: VOLKSWAGEN 'CLEAN DIESEL' MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>This document relates to:<br><br>*Napleton Orlando Imports, LLC et al. v. Volkswagen Group of America, Inc. et al.*, Case No. 3:16-cv-02086-CRB | MDL No. 02672-CRB (JSC)<br><br>VOLKSWAGEN-BRANDED FRANCHISE DEALER AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT |
| NAPLETON ORLANDO IMPORTS, LLC d/b/a NAPLETON'S VOLKSWAGEN OF ORLANDO, an Illinois limited liability company, NAPLETON SANFORD IMPORTS, LLC d/b/a NAPLETON'S VOLKSWAGEN OF SANFORD, an Illinois limited liability company, and NAPLETON AUTOMOTIVE OF URBANA, LLC d/b/a NAPLETON VOLKSWAGEN OF URBANA, a Florida limited liability company, individually, and J. BERTOLET, INC. dba J. BERTOLET VOLKSWAGEN, on behalf of itself and all similarly situated persons and entities,<br><br>Plaintiffs, | **<u>JURY TRIAL DEMANDED</u>** |

v.

VOLKSWAGEN GROUP OF AMERICA, INC., a New Jersey Corporation, VW CREDIT, INC., a Delaware corporation, VOLKSWAGEN AG, a German corporation, ROBERT BOSCH, LLC, a Michigan limited liability company, and ROBERT BOSCH GmbH, a German corporation.

Defendants.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..... 1

A. The Volkswagen/Bosch "CleanDiesel" Fraud and RICO Conspiracy ..... 1

B. Volkswagen's Unfair Pricing and Allocation Schemes ..... 5

II. JURISDICTION AND VENUE ..... 5

III. PARTIES ..... 6

A. J. Bertolet, Inc. ..... 6

B. Napleton Dealership Group ..... 7

C. Defendants ..... 9

1. Volkswagen Group of America. ..... 9

2. Volkswagen AG. ..... 9

3. Bosch Defendants. ..... 10

4. Robert Bosch GmbH. ..... 11

5. Robert Bosch LLC. ..... 11

D. Non-Defendant Employees of Defendants and Entities Who Participated in the Alleged Criminal Conspiracy ..... 12

1. Martin Winterkorn. ..... 12

2. Matthias Müller. ..... 12

3. Michael Horn. ..... 13

4. Rupert Stadler. ..... 13

5. Volkmar Denner. ..... 14

6. IAV GmbH. ..... 14

IV. FACTUAL ALLEGATIONS CONCERNING THE DIESELGATE SCANDAL ..... 15

A. Volkswagen's Plot to Dominate the Automotive Market ..... 15

B. Defendants' Dirty "Cheat Device" Scheme ..... 19

C. Bosch Played a Critical Role in the Defeat Device Scheme ..... 25

1. Volkswagen and Bosch Conspire to Develop the Illegal Defeat Device. .... 25

2. Volkswagen and Bosch Conspire to Conceal the Illegal "Akustikfunktion". .... 33

3. Volkswagen and Bosch Conspire in the U.S. and Germany to Elude U.S. Regulators. .... 36

4. Bosch Keeps Volkswagen's Secret Safe and Pushes "Clean" Diesel in the U.S. .... 40

5. Denner Also Played a Critical Role in the Scheme. .... 43

D. Volkswagen Falsely Pitched Itself as a Leader in Environmental Issues .... 44

E. Volkswagen Falsely Marketed its Diesel Engine Systems as Clean and Green .... 45

F. Volkswagen's CleanDiesel Engine Systems Were a Fraud .... 55

G. Once Caught, Volkswagen Admitted its Fraud—in Part, but Simultaneously Sought to Cover Up the Scope of Its Deceit .... 57

H. Volkswagen Profited From its Dieselgate Fraud .... 69

I. Volkswagen's False Advertising and Fraud Has Profoundly Harmed Franchise Dealers .... 70

J. Volkswagen's Refusal to Take Any Prompt Action to Remedy its Fraudulent Scheme Continues to Profoundly Harm Consumers, Franchise Dealers and the Environment .... 72

K. Things at Volkswagen Will Not Get Better Anytime Soon .... 75

L. Volkswagen's Illegal Scheme Has Triggered Global Scrutiny .... 76

V. FACTUAL ALLEGATIONS CONCERNING PLAINTIFFS .... 78

A. J. Bertolet Volkswagen .... 78

B. Napleton's Acquisition of Plaintiffs' Volkswagen Dealerships .... 78

C. Volkswagen and Bosch .... 79

D. Volkswagen's Tier Pricing and Manipulation of DSI Sales Metric .... 81

E. Volkswagen's Tier Pricing and Coercion to Force Franchise Dealers to Floor Plan Finance with VCI .... 84

VI. TOLLING OF THE STATUTE OF LIMITATIONS .... 86

A. Discovery Rule Tolling .... 86

B. Fraudulent Concealment Tolling .... 88

C. Estoppel ..... 88

VII. CLASS ALLEGATIONS ..... 88

VIII. VIOLATIONS ALLEGED ..... 92

A. Claims Brought on Behalf of Plaintiffs and the Franchise Dealer Class ..... 92

COUNT I VIOLATIONS OF THE AUTOMOBILE DEALERS' DAY IN COURT ACT 15 U.S.C. § 1221, ET SEQ. (BROUGHT AGAINST VGOA) ..... 92

COUNT II VIOLATIONS OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) VIOLATION OF 18 U.S.C. § 1962(C) - (D) ..... 95

1. The Members of the Emissions Fraud Enterprise. ..... 95

a. Volkswagen Defendants. ..... 96

b. The Volkswagen Defendants' Executives, Officers and Engineers. ..... 97

(1) Martin Winterkorn. ..... 97

(2) Ulrich Hackenberg ..... 98

(3) Frank Tuch ..... 99

(4) Wolfgang Hatz ..... 99

(5) James Robert Liang ..... 100

c. Bosch Defendants ..... 100

d. IAV ..... 103

2. A Criminal Plea that Relates to the RICO Claims and Enterprise. ..... 104

3. Emissions Fraud Enterprise Allegations. ..... 106

4. The Predicate Acts. ..... 110

B. Claims Brought on Behalf of Napleton Plaintiffs ..... 118

COUNT III VIOLATIONS OF THE AUTOMOBILE DEALERS' DAY IN COURT ACT 15 U.S.C. § 1221, ET SEQ. BY NAPLETON PLAINTIFFS AGAINST VGOA ..... 118

COUNT IV VIOLATIONS OF SECTION 320.64(4), FLORIDA STATUTES (AGAINST VGOA) ..... 119

COUNT IV BREACH OF CONTRACT (BASED ON FLORIDA LAW) ..... 122

COUNT V FRAUDULENT CONCEALMENT (BASED ON FLORIDA LAW) ..... 123

C. Claims Brought on Behalf of Illinois Plaintiff .......... 125

COUNT VI VIOLATION OF ILLINOIS MOTOR VEHICLE FRANCHISE ACT 815 ILCS 710/1, ET SEQ. .......... 125

COUNT VII FRAUD BY CONCEALMENT (BASED ON ILLINOIS LAW) .......... 127

COUNT VIII BREACH OF CONTRACT (BASED ON ILLINOIS LAW) .......... 128

REQUEST FOR RELIEF .......... 129

JURY TRIAL DEMANDED .......... 129

Plaintiffs Napleton Orlando Imports, LLC d/b/a Napleton's Volkswagen of Orlando, an Illinois limited liability company, Napleton Sanford Imports, LLC d/b/a Napleton's Volkswagen of Sanford, an Illinois limited liability company and Napleton Automotive of Urbana, LLC d/b/a Napleton Volkswagen of Urbana, a Florida limited liability company (individually "Napleton VW Orlando", "Napleton VW Sanford", "Napleton VW Urbana" and collectively referred to as "Napleton Plaintiffs"), individually, and J. Bertolet, Inc. dba J. Bertolet Volkswagen ("Bertolet"), a Pennsylvania corporation, individually and on behalf of all others similarly situated (the "Franchise Dealer Class"), allege the following:

## I. INTRODUCTION

1. This case arises because Defendants have defrauded VW franchise dealers, federal and state regulators, and consumers with respect to the emissions levels of so-called "CleanDiesel" vehicles; and because Volkswagen and Volkswagen Credit, Inc., have engaged in systematic unfair and illegal pricing practices with respect to vehicle pricing and allocation schemes. In so doing, Defendants have defrauded VW-branded franchise dealers with respect to the cars they sold and held for sale, as well as the value, viability, expected return, and suitability of their dealerships for continued investment.

2. As a direct and foreseeable result of VW's unlawful emissions fraud and RICO conspiracy, illegal pricing and allocation schemes, and coercion to use Volkswagen Credit, VW dealers have been harmed in their business in the form of reduced sales, lost profits, cars sitting on their lots which cannot be sold, and investments in dealerships that are worth substantially less than their purchase, investment, and carrying costs.

### A. The Volkswagen/Bosch "CleanDiesel" Fraud and RICO Conspiracy

3. Defendants' monumental fraud in the certification of Volkswagen's so-called "CleanDiesel" automobiles in the U.S. and worldwide through the use of illegal "defeat devices" was certainly one of the most significant fraudulent events in the automotive industry in the last decade, and one of the most significant environmental crimes in history. As stated by Cynthia Giles, Assistant Administrator for the Office of Enforcement and Compliance Assurance at the EPA: "Using a defeat device in cars to evade clean air standards is illegal and a threat to public

health." Yet that is exactly what Volkswagen did in its 2009-2015 Volkswagen, Audi, and Porsche CleanDiesel vehicles.[1] And the software that enables the defeat device at issue was supplied to Volkswagen by Defendant Robert Bosch GmbH ("Bosch"). Everything about Volkswagen's fraudulent scheme was coolly calculated, as defendant Michael Horn, the newly departed CEO of VW America, confessed in the fall of 2015 at Congressional hearings: "[the defeat device] was installed for this purpose, yes."[2]

4. The United States Government, through the Environmental Protection Agency, as well as individual state regulators, have passed and enforced laws designed to protect citizens from pollution and in particular, certain chemicals and agents known to cause disease in humans. Automobile manufacturers must abide by these laws and must adhere to state and EPA rules and regulations. Following revelations of Volkswagen's widespread use of defeat devices, made possible by Bosch's software, to defraud the EPA and state regulators, hundreds of class action lawsuits were filed on behalf of consumers who purchased the affected vehicles, and independent dealers who owned the affected vehicles, but were unable to sell them because of Volkswagen's fraud. Stop sale orders were placed on all vehicles with defect devices that Franchise Dealers had paid for. The class allegations in this case arise because the Volkswagen/Bosch emissions fraud has also caused great harm to VW-branded franchise dealers like Plaintiffs, whose profits have been erased and whose dealerships have plummeted in value due to the inability to sell tens of thousands of affected vehicles and the significant decline in brand value for all Volkswagen vehicles as a result of Volkswagen/Bosch's purposeful fraud and deceit.

5. Volkswagen promised low-emission environmentally friendly vehicles, with high fuel economy and exceptional performance. In response to Volkswagen's aggressive advertising of "Clean" diesel, consumers bought them in record numbers. Volkswagen has sold more diesel cars in the United States than every other brand combined. From 2009 to 2015, Volkswagen sold

---

[1] *See* Sept. 18, 2015 EPA News Release; Nov. 2, 2015 EPA News Release.

[2] *See* Bill Chappell, *'It Was Installed For This Purpose,' VW's U.S. CEO Tells Congress About Defeat Device*, NPR (Oct. 8, 2015), available at http://www.npr.org/sections/thetwo-way/2015/10/08/446861855/volkswagen-us-ceo-faces-questions-on-capitol-hill.

and/or leased in the United States nearly 580,000 dirty diesels that its defeat device disguised as clean (the "Affected Vehicles").

6. Affected Vehicles include the following:

| **2.0 Liter Diesel Models and Years** | |
|---|---|
| Volkswagen Jetta | 2009-2015 |
| Volkswagen Jetta SportWagen | 2009-2014 |
| Volkswagen Beetle | 2012-2015 |
| Volkswagen Beetle Convertible | 2012-2015 |
| Audi A3 | 2010-2015 |
| Volkswagen Golf | 2010-2015 |
| Volkswagen Golf SportWagen | 2015 |
| Volkswagen Passat | 2012-2015 |

| **3.0 Liter Diesel Models and Years** | |
|---|---|
| Volkswagen Touareg | 2009-2016 |
| Porsche Cayenne | 2013-2016 |
| Audi A6 Quattro | 2014-2016 |
| Audi A7 Quattro | 2014-2016 |
| Audi A8 | 2014-2016 |
| Audi A8L | 2014-2016 |
| Audi Q5 | 2014-2016 |
| Audi Q7 | 2009-2016 |

7. Volkswagen's apparent success in creating the niche CleanDiesel market and exploiting it led to a brand resurgence that significantly enhanced the value of the brand and, therefore, the value of – and cost to purchase and maintain – franchise dealerships. Now however, "there are half a million cars running an emissions setup that never should've left the factory."[3] Each of these Affected Vehicles is illegal and never should have been sold because Volkswagen's fraudulently obtained EPA certificates of conformity were invalid. Since the confirmation of Volkswagen's scheme, the U.S. DOJ and at least 45 state attorneys general have announced they are investigating Volkswagen's misconduct. The FTC has separately sued Volkswagen for fraudulent advertising; and other criminal and civil investigations are underway across the globe.

[3] http://www.popularmechanics.com/cars/a17430/ezra-dyer-volkswagen-diesel-controversy/ (last visited on Sept. 28, 2015).

8. As detailed in the EPA's Notice of Violation ("NOV"), sophisticated software in the Affected Vehicles developed jointly by Volkswagen and Bosch detects when the vehicle is undergoing emissions testing and engages full emissions controls during the test. But otherwise, at all other times that the vehicle is running, the emissions controls are suppressed. Thus, the Affected Vehicles meet emissions standards in the laboratory or testing station, but during normal operation emit oxides of nitrogen (NOx) at up to 40 times the standard allowed under federal and state laws and regulations. The software constituting the defeat device was produced by Defendants Robert Bosch GmbH and Robert Bosch LLC (the "Bosch Defendants") and contained in an Electronic Diesel Control Module ("EDC") that the Bosch Defendants provided to Volkswagen. It is a defeat device as defined by the Clean Air Act.

9. By manufacturing and selling cars with defeat devices that allowed for higher levels of emissions than what was certified to the EPA, and higher levels than state and federal regulations allow, Volkswagen violated the Clean Air Act and state environmental regulations, breached franchisee protection laws, breached its VW-branded franchise dealer agreements, defrauded its VW-branded franchise dealers, engaged in a criminal racketeering enterprise and engaged in unfair competition under state and federal law.

10. Substantial diminution in the value of Affected Vehicles has already been reported. On average, the resale value of Volkswagen diesel cars fell 13% in the first two weeks following the disclosure of the VW fraud.[4] And in the months since then, with a broad no-sale order and no viable fix on the horizon, values have plummeted even more. In addition, former Volkswagen Group of America CEO Michael Horn admitted in Congressional testimony on October 8, 2015, that at least 415,000 of the Affected Vehicles will require software *and hardware* changes and any fix for these vehicles could take years to implement and vehicle performance may be implicated.[5] The precipitous drop in the value of Affected Vehicles, the inability of VW-branded franchise

[4] *See* http://www.buzzfeed.com/matthewzeitlin/resale-value-of-vw-diesels-down-13-percent#.kvRJEo96L.

[5] *See* http://www.autonews.com/article/20151008/OEM02/151009826/older-vw-diesels-will-need-software-and-hardware-fixes-horn-tells.

dealers to sell Affected Vehicles, and the tremendous diminution in the Volkswagen brand value has caused direct and quantifiable harm to Plaintiffs and the Franchise Dealer Class.

11. What makes Volkswagen's fraud on the VW-branded franchise dealers particularly egregious is that Volkswagen knew from at least early 2014 that its fraud was unraveling, yet it kept dealers in the dark until the very day of the Notice of Violation. For example, Plaintiff Napleton Automotive of Urbana was purchased just three days before the September 18, 2015 NOV, yet Volkswagen withheld the truth and pushed the sale through, even though it knew Plaintiff Napleton was purchasing a dealership that would imminently plummet in value. Volkswagen approved multiple dealership purchase and sale agreements that it knew were based upon valuation models that were supported only by its ongoing fraud.

### B. Volkswagen's Unfair Pricing and Allocation Schemes

12. Volkswagen has also engaged in policies with respect to its franchise dealers that are in direct conflict with federal law designed to protect car dealers from unfair practices by vehicle manufacturers, as well as various franchisee protection laws of Florida and Illinois, causing direct and measurable harm to the Napleton Plaintiffs. Napleton Plaintiffs seek damages and injunctive relief under applicable state and federal law.

## II. JURISDICTION AND VENUE

13. The *Napleton* action was originally filed in the Northern District of Illinois and transferred to this Court by the MDL. Plaintiff Bertolet, Inc., files its claims directly in this Court.

14. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, because Plaintiffs' claims arise under the RICO Act, 18 U.S.C. § 1962. The Court also has diversity jurisdiction because Plaintiffs and Defendants reside in different states. The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367. This Court also has original jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a)(1), as modified by the Class Action Fairness Act of 2005, because Plaintiffs and Volkswagen are citizens of different states; there are more than 100 members of the Franchise Dealer Class (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and

costs; and Franchise Dealer Class members reside across the United States. The citizenship of each party is described further below in the "Parties" Section.

15. This Court has personal jurisdiction over each Defendant pursuant to 18 U.S.C. §§ 1965(b) and (d), and/or Cal. Code Civ. P. § 410.10. This Court has personal jurisdiction over Defendants because they have minimum contacts with the United States, this judicial district and this State, and intentionally availed themselves of the laws of the United States and this state by conducting a substantial amount of business throughout the state, including the design, manufacture, distribution, testing, sale, lease, and/or warranty of Volkswagen vehicles in this State and District. At least in part because of Defendants' misconduct as alleged in this lawsuit, Affected Vehicles ended up on this state's roads and dozens of franchise dealerships.

16. Venue is proper in this Court under 28 U.S.C. § 1391, because: (i) Defendants conduct substantial business in this District and have intentionally availed themselves of the laws and markets of the United States and this District; and/or (ii) many of the acts and transactions giving rise to this action occurred in this District, including, *inter alia*, Defendants' promotion, marketing, distribution and sale of the Affected Vehicles to Plaintiffs and other Franchise Dealer Class members in this District. Defendants sell a substantial number of automobiles in this District, have dealerships located throughout this District, and the misconduct occurred in part in this District. Venue is also proper under 18 U.S.C. § 1965(a), because Defendants are subject to personal jurisdiction in this District as alleged in the preceding paragraph, and Defendants have agents located in this District.

## III. PARTIES

### A. J. Bertolet, Inc.

17. Plaintiff J. BERTOLET, INC. is a corporation existing under the laws of the State of Pennsylvania and is authorized to do business in the State of Pennsylvania.

18. Plaintiff's primary place of business is J. Bertolet Volkswagen, located in Orwigsburg, Pennsylvania at 555 Route 61, Orwigsburg, PA 17961. Plaintiff Bertolet VW is a "motor vehicle dealer" as defined in 37 PA Code 301, *et seq.*

19. Bertolet VW began operating a Volkswagen franchise in Orwigsburg, Pennsylvania in 1964. The dealership is located at 555 Route 61, Orwigsburg, Pennsylvania. The dealership was operated by Jack Bertolet, Sr. for 34 years. Jack Bertolet, Jr. grew up in the dealership starting as a lot boy at the age of 15. Jack Bertolet, Jr. is now and has been the dealer operator of the J. Bertolet Volkswagen store since 1998 although his father, Jack Bertolet, Sr., at the age of 87, continues to come into the dealership most every day to assist customers. In addition to Jack Jr. and Jack Sr., Jack Jr.'s brother, Blayne, and son, John, both work at the dealership as a Shareholder/Vice President and General Manager, respectively. The Volkswagen dealership is the only new vehicle franchise ever operated by the Bertolet family.

20. Bertolet VW serves the Reading, Allentown and Harrisburg areas of Pennsylvania. Bertolet VW, like most new franchised motor vehicle dealers, is the community's primary source for charitable giving and sponsorships for everything from the local hospital to the little league baseball team. The Volkswagen brand in this part of Pennsylvania is synonymous with the Bertolet family name. The Bertolet family has invested three generations into the Volkswagen franchise.

**B. Napleton Dealership Group**

21. Plaintiffs NAPLETON VW ORLANDO and NAPLETON VW SANFORD are limited liability companies existing under the laws of the State of Illinois and are authorized to do business in the State of Florida. NAPLETON VW URBANA is an Illinois limited liability company authorized to do and doing business in the State of Illinois.

22. Plaintiffs NAPLETON VW ORLANDO and NAPLETON VW SANFORD are "motor vehicle dealers" as defined in section 320.60(11)(a), Florida Statutes. Plaintiffs' primary places of business are 12700 E. Colonial Drive, Orlando, FL 32826 and 4175 S. Orlando Drive, Sanford, FL 32773.

23. Plaintiff NAPLETON VW URBANA is a "motor vehicle dealer" as defined in 815 ILCS 710/4, *et seq*. whose primary place of business is 1111 O'Brien Drive, Urbana, IL 61802.

24. The Napleton Family has been involved in the automobile dealership business in the Chicago area for three generations. Edward W. Napleton opened his first dealership in 1931 on

Chicago's South Side. Along with his son, Francis Napleton, they grew from a single Buick service station to several franchises in and around Chicago. Five of Francis Napleton's eight children have worked their entire lives in the automobile industry. Edward F. (Ed) Napleton began his career sweeping floors at a dealership owned by his father, Francis, and grandfather, Edward. He worked up the ranks, serving as a technician, in sales, and in finance, eventually becoming a general manager. At 23, Ed Napleton became the youngest car dealer in the United States when he was awarded a Pontiac dealership in Blue Island, Illinois.

25. Today the Napleton family operates more than 50 dealerships in five states. Ed's business has grown to include 56 franchises in 30 different locations in five states. His business employs over 1,800 people in Illinois, Georgia, Florida, Pennsylvania, and Missouri.

26. Ed Napleton believes that with his sizable presence in the marketplace comes a responsibility to stand up for dealerships large and small. Individual dealers and small dealer groups are often at the mercy of the immense vehicle manufacturers with respect to critical pricing terms and vehicle allocations. These smaller firms are often unwilling for fear of reprisal, or unable financially, to hold vehicle manufacturers to the legally required standards of fair play and non-discrimination. Moreover, when foul play is detected, these smaller firms can be placed under extreme duress to play along, or risk retaliation from the automaker that could end their very existence in the market place.

27. On September 15, 2015, Ed purchased his third VW dealership in Urbana, Illinois. He did so based on VW's history, its status as one of the world's largest car manufacturers, and its promise of continuing success of its flagship clean diesel cars. Just three days later, the EPA publicized VW's admission that it had employed a "defeat device" on over 11 million vehicles worldwide. This revelation stunned the world and has had severe repercussions for Plaintiffs and all VW franchise dealers in the United States.

**C. Defendants**

**1. Volkswagen Group of America.**

28. Volkswagen Group of America, Inc. (“VGoA”) is a corporation doing business in all 50 states (including the District of Columbia) and is organized under the laws of the State of New Jersey, with its principal place of business located at 2200 Ferdinand Porsche Dr., Herndon, Virginia 20171. VGoA is a wholly-owned subsidiary of Volkswagen AG, and it engages in business, including the advertising, marketing and sale of Volkswagen automobiles, in all 50 states. In 2014 alone, VGoA sold 552,729 vehicles from its 1,018 dealer locations in all 50 states, including 95,240 TDI® “clean” diesel vehicles.

**2. Volkswagen AG.**

29. Volkswagen AG (“VWAG”) is a German corporation with its principal place of business in Wolfsburg, Germany. VWAG is one of the largest automobile manufacturers in the world, and is in the business of designing, developing, manufacturing, and selling automobiles. VWAG is the parent corporation of VGoA, Audi AG, and Porsche AG. According to VWAG, it sold 10.14 million cars worldwide in 2014 – including 6.12 million VW-branded cars, 1.74 million Audi-Branded cars, and 189,849 Porsche-branded cars. Combined with other brands, VWAG boasts a 12.9% share of the worldwide passenger car market. VWAG’s sales revenue in 2014 totaled €202 billion (approximately $221 billion) and sales revenue in 2013 totaled €197 billion (approximately $215 billion). At €12.7 billion (approximately $13.9 billion), VWAG generated its highest ever operating profit in fiscal year 2014, beating the previous record set in 2013 by €1.0 billion (approximately $1.1 billion).

30. VWAG engineered, designed, developed, manufactured, and installed the defeat device software on the Affected Vehicles equipped with the 2.0-liter and 3.0 liter TDI® and exported these vehicles with the knowledge and understanding that they would be sold throughout the United States at VW-branded franchise dealerships, including Plaintiffs. VWAG also developed, reviewed, and approved the marketing and advertising campaigns designed to sell the Affected Vehicles.

31. VGoA and VWAG were and are at all times relevant to the allegations in this complaint working in concert under the common objective to engage in the emissions scheme described in this complaint. Each of VGoA and VWAG were and are the agents of each other and have acted and act for their common goals and profit. Therefore, all acts and knowledge ascribed to one of VGoA or VWAG are properly imputed to the other. VGoA and VWAG are referred to collectively herein as Volkswagen or "VW."

32. At all times relevant to this action, Volkswagen manufactured, distributed, sold, leased, and warranted the Affected Vehicles under the Volkswagen, Audi, and Porsche brand names throughout the United States. Volkswagen and/or its parents, affiliates and agents designed, manufactured, and installed the CleanDiesel engine systems in the Affected Vehicles, which included the "defeat device," manufactured by Bosch Defendants. Volkswagen and/or its parents, affiliates, and agents developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Affected Vehicles.

**3. Bosch Defendants.**

33. From at least 2005 to 2015, Bosch GmbH, Bosch LLC and CEO Volkmar Denner (together, "Bosch") were knowing and active participants in the creation, development, marketing, and sale of illegal defeat devices specifically designed to evade U.S. emissions requirements in vehicles sold solely in the United States. Bosch participated not just in the development of the defeat device, but in the scheme to prevent U.S. regulators from uncovering the device's true functionality. Moreover, Bosch's participation was not limited to engineering the defeat device (in a collaboration described as unusually close). Rather, Bosch marketed "Clean Diesel" in the United States and lobbied U.S. regulators to approve Affected Vehicles, another highly unusual activity for a mere supplier. These lobbying efforts, taken together with evidence of Bosch's actual knowledge that the "akustikfunction" operated as a defeat device, and participation in concealing the true functionality of the device from U.S. regulators, can be interpreted only one way under U.S. law: Bosch was a knowing and active participant in a massive, decade-long conspiracy with VW to defraud U.S. consumers, regulators and VW-branded franchise dealers.

**4. Robert Bosch GmbH.**

34. Robert Bosch GmbH is a German multinational engineering and electronics company headquartered in Gerlingen, Germany. Robert Bosch GmbH is the parent company of Robert Bosch LLC. Robert Bosch GmbH, directly and/or through its North-American subsidiary Robert Bosch LLC, at all material times, designed, manufactured, and supplied elements of the defeat device to Volkswagen for use in the Affected Vehicles. Bosch GmbH is subject to the personal jurisdiction of this Court because it has availed itself of the laws of the United States through its management and control over Bosch, LLC, and over the design, development, manufacture, distribution, testing, and sale of hundreds of thousands of the defeat devices installed in the Affected Vehicles sold or leased in the U.S.

**5. Robert Bosch LLC.**

35. Robert Bosch LLC is a Delaware limited liability company with its principal place of business located at 38000 Hills Tech Drive, Farmington Hills, Michigan 48331. Robert Bosch LLC is a wholly-owned subsidiary of Robert Bosch Gmbh. Robert Bosch LLC, directly and/or in conjunction with its parent Robert Bosch GmbH, at all material times, designed, manufactured, and supplied elements of the defeat device to Volkswagen for use in the Affected Vehicles.

36. Both Bosch GmbH and Bosch LLC (together with Volkmar Denner, "Bosch") operate under the umbrella of the Bosch Group, which encompasses some 340 subsidiaries and companies. The Bosch Group is divided into four business sectors: Mobility Solutions (formerly Automotive Technology), Industrial Technology, Consumer Goods, and Energy and Building Technology. The Mobility Solutions sector, which supplies parts to the automotive industry, and its Diesel Systems division, which develops, manufacturers and applies diesel systems, are particularly at issue here and include the relevant individuals at both Bosch GmbH and Bosch LLC. Bosch's sectors and divisions are grouped not by location, but by subject matter. Mobility Solutions includes the relevant individuals at both Bosch GmbH and Bosch LLC. Regardless of whether an individual works for Bosch in Germany or the U.S., the individual holds him or herself

out as working for Bosch. This collective identity is captured by Bosch's mission statement: "We are Bosch," a unifying principle that links each entity and person within the Bosch Group.[6]

### D. Non-Defendant Employees of Defendants and Entities Who Participated in the Alleged Criminal Conspiracy

#### 1. Martin Winterkorn.

37. Martin Winterkorn is a resident of Germany. Winterkorn was CEO of VWAG until he resigned on September 23, 2015, in the wake of the diesel emissions scandal. Notably, Winterkorn was widely regarded as a detail-oriented, micromanaging CEO, who retained control over engineering details that many other CEOs would relinquish fully to deputies. Winterkorn is being investigated by the German government for allegations of fraud. Winterkorn reportedly hand-picked the engineers who designed the defeat devices. Winterkorn received compensation from the illegal scheme and course of conduct based on the revenues and profits from the Affected Vehicles and Volkswagen's increased market share. Winterkorn approved, authorized, directed, ratified, and/or participated in the acts complained of herein. Winterkorn is subject to the personal jurisdiction of this Court as he has availed himself of the laws of the United States through his management and control over VW America as well as the manufacture, distribution, testing, and sale of hundreds of thousands of Affected Vehicles imported and sold across the United States. Furthermore, Winterkorn has consistently travelled to the U.S. to attend and make presentations at various car shows across the country in order to promote the sale of the Affected Vehicles.

#### 2. Matthias Müller.

38. Matthias Müller is a resident of Germany. Müller is a 40-year veteran of Volkswagen, where he began as an apprentice toolmaker at Audi AG in 1977. Müller was appointed coordinator of the Audi model lines in 2002, after Winterkorn took over the management of Audi AG. In 2007, when Winterkorn became CEO of VWAG, Winterkorn appointed Müller as Head of Product Management across all Volkswagen brands. In 2010, Müller was appointed CEO of Porsche AG. In 2014, Müller became the Chief Information Officer of Porsche Automobil

---

[6] Bosch 2014 Annual Report: "Experiencing quality of life," available at http://www.bosch.com/en/com/bosch_group/bosch_figures/publications/archive/archive-cg12.php.

Holding SE. Müller became the CEO of VWAG on September 25, 2015, upon Winterkorn's resignation amidst the emissions scandal. Müller profited millions of dollars from the illegal scheme and course of conduct based on the revenues and profits from the Affected Vehicles and Volkswagen's increased market share. Müller approved, authorized, directed, ratified, and/or participated in the acts complained of herein. Müller is subject to the personal jurisdiction of this Court because he has availed himself of the laws of the United States through his management and control of the American Volkswagen Defendants, as well as the design, manufacture, distribution, testing, and/or sale of hundreds of thousands of Affected Vehicles imported and sold across the United States. Furthermore, Müller has consistently travelled to the U.S. to attend and make presentations at various car shows across the country in order to promote the sale of the Affected Vehicles.

**3. Michael Horn.**

39. Michael Horn is a resident of Virginia. Until last month, Horn was President and CEO of VGoA. Horn received compensation from the illegal scheme and course of conduct based on the revenues and profits from the Affected Vehicles and Volkswagen's increased market share. Horn approved, authorized, directed, ratified, and/or participated in the acts complained of herein. Horn has admitted that he was aware of the vehicles' emissions non-compliance since at least 2014.

**4. Rupert Stadler.**

40. Rupert Stadler is a resident of Germany. Stadler became the CEO of Audi AG on January 1, 2010. Stadler joined Audi AG in 1990 and has held various roles at Audi and VW, including the Head of the Board of Management's Office for Volkswagen and the Head of Group Product Planning. In 2003, Stadler became an Audi AG Board Member and was later responsible for the Finance and Organization Division. Stadler joined the Board of Management of Volkswagen when he was appointed to his current role as CEO of Audi AG. Stadler received millions of dollars from the illegal scheme and course of conduct based on the revenues and profits from the Affected Vehicles and Volkswagen's increased market share. Stadler approved, authorized, directed, ratified, and/or participated in the acts complained of herein. Stadler is

subject to the personal jurisdiction of this Court because he has availed himself of the laws of the United States through his management and control over Audi America as well as the design, manufacture, distribution, testing, and/or sale of hundreds of thousands of Affected Vehicles imported and sold across the United States. Furthermore, Stadler has consistently travelled to the U.S. to attend and make presentations at various car shows across the country in order to promote the sale of the Affected Vehicles.

**5. Volkmar Denner.**

41. Volkmar Denner is a resident of Germany. Denner has been the Chairman CEO of Robert Bosch GmbH since July 1, 2012. Denner contemporaneously holds the position of Chief Technology Officer. Denner joined Bosch in 1986, and has held numerous positions within the company, including Director of ECU Development, Vice-President of Sales and Development, Semiconductors and Electronic Control Units division, and President of Automotive Electronics division. In 2006, Denner became a member of Robert Bosch GmbH's Board of Management and was later responsible for research and advance engineering, product planning, and technology coordination across the company's three business sectors from July 2010 until his appointment as CEO. Denner received millions of dollars from the illegal scheme and course of conduct based on the revenues and profits from the sale of defeat devices to Volkswagen. Denner approved, authorized, directed, ratified, and/or participated in the acts complained of herein. He is subject to the personal jurisdiction of this Court because he has availed himself of the laws of the United States through his management and control over Bosch LLC, as well as the design, development manufacture, distribution, testing, and sale of hundreds of thousands of the defeat devices installed in the Affected Vehicles sold or leased in the U.S.

**6. IAV GmbH.**

42. IAV GmbH ("IAV") is a limited liability company headquartered in Berlin, Germany. IAV is an engineering company in the automotive industry and designs products for powertrain, electronics and vehicle development. Volkswagen is an IAV client.

43. IAV Automotive Engineering Inc. is a subsidiary of IAV based in the USA.

44. IAV employees were part of working group that included Bosch and Volkswagen that had a common purpose of designing and implementing a defeat device in U.S.-based diesel Volkswagens.

## IV. FACTUAL ALLEGATIONS CONCERNING THE DIESELGATE SCANDAL

### A. Volkswagen's Plot to Dominate the Automotive Market

45. Volkswagen's illegal diesel emissions scheme was borne out of greed and ambition to dominate the global automotive market at any cost. By Volkswagen's own admissions, the seeds for the scandal were planted in 2005, as Volkswagen was repositioning its fleet of vehicle offerings in light of tightening U.S. emission regulations, "with a strategic decision to launch a large-scale promotion of diesel vehicles in the United States in 2005."[7] While other automakers focused on hybrid, electric or hydrogen fueled vehicles, Volkswagen pivoted toward "clean diesel" technology as its primary strategy to reach the growing target market of environmentally conscious consumers.

46. In 2004, the second generation Toyota Prius became an explosive success, tripling global sales from years prior and changing environmentally-friendly vehicles from a niche market to a standard consumer option. Although it was the first mainstream hybrid vehicle, the Prius was widely viewed as "boring," because the improvements in fuel efficiency and emissions were offset by relatively bland styling and lackluster driving performance.

47. Volkswagen took note of the success of the Prius and sought to achieve the same (or better) efficiency benchmarks, but in a "fun-to-drive," high-performance vehicle. This was to be achieved with a purported remarkable breakthrough in diesel technology: the EA189 TDI engine. TDI, short for "turbocharged diesel injection," was the culmination of millions of dollars in research and development, and was heralded by VW as the critical factor that would be responsible for its growth and success in the U.S.

---

[7] *Volkswagen making good progress with its investigation, technical solutions, and Group realignment*, VOLKSWAGEN AG (Dec. 10, 2015), http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2015/12/VW_PK.html.

48. In 2007, Martin Winterkorn left his position at Audi to become VWAG's CEO. Winterkorn set goals for Volkswagen to become a world leader in automobile manufacturing. This included a target of tripling U.S. sales to at least 800,000 vehicles by 2018.[8] At the time, diesel-engine vehicles made up just 5% of the U.S. car market, and Winterkorn recognized this as the perfect opportunity to expand Volkswagen's market share.

49. To expand its diesel market penetration in the U.S., Volkswagen needed to overcome the stigmas associated with diesel vehicles. Foremost among these was the consumer perception that diesel engines emitted thick, toxic smoke full of dangerous and destructive pollutants, and should be relegated to the smog-filled cities of the past. In developing and marketing a new kind of diesel vehicle, Volkswagen claimed to have solved the environmental problems with its new EA189 engine, which it aggressively marketed as the clean, green, sporty alternative to hybrid engines, such as those in the Prius.

50. Behind the scenes, however, Volkswagen realized internally that it was not possible to roll out these so-called "clean" diesel vehicles within its self-imposed budgets and engineering constraints. To get the job done, Winterkorn appointed two engineers with whom he had worked closely at Audi (Ulrich Hackenberg and Wolfgang Hatz) to lead up R&D and engine development for this project. These two engineers were the chief developers of the TDI engine.[9] Their primary mandate from management was to develop a diesel engine that maintained the performance of traditional gasoline engines with reduced $CO_2$ emissions and lower gas mileage, all while meeting the strict $NO_X$ emission standards in the U.S.

51. Diesel fuel is traditionally denser than gasoline, and the syrupy fuel contains longer hydrocarbon chains, which tend to produce a more efficient vehicle. In fact, diesel engines can convert over 45% of fuel energy into useful mechanical energy, whereas gasoline engines convert

[8] William Boston, *Volkswagen Emissions Investigation Zeroes In on Two Engineers*, WALL STREET JOURNAL (Oct. 5, 2015), http://www.wsj.com/articles/vw-emissions-probe-zeroes-in-on-two-engineers-1444011602.

[9] Jack Ewing, *Volkswagen Engine-Rigging Scheme Said to Have Begun in 2008*, N.Y. TIMES (Oct. 5, 2015), http://www.nytimes.com/2015/10/05/business/engine-shortfall-pushed-volkswagen-to-evade-emissions-testing.html.

only 30% of fuel into energy.[10] To make use of this dense diesel fuel, diesel engines combine high temperatures and high compression to produce a pressure-cooker of mechanical energy, as opposed to a spark ignition in the typical gasoline engine. Though more efficient, diesel engines come with their own set of challenges, as highly-compressed diesel emissions produce high levels of $NO_X$. These $NO_X$ emissions can be reduced by adjusting the compression and temperature, but that in turn produces soot, a similarly-undesirable hydrocarbon emission. Diesel engines exist in a state of balance between these conditions, known as "rich" and "lean" states. A diesel engine in a rich state contains more fuel than air, which in turn tends to burn off less fuel and thereby produces higher amounts of soot, reduced fuel efficiency, and sluggish driving performance. On the other hand, the lean state contains more air than fuel and produces higher amounts of $NO_X$. Neither of these discharges is desirable, and for the EPA to designate a diesel car as a "clean" vehicle, it must produce ***both*** low soot and low $NO_X$.

52. In recent years, the EPA and the California Air Resources Board ("CARB") have promulgated stricter $NO_X$ emission standards, requiring all diesel models starting in 2007 to produce 90% less $NO_X$ than years prior.[11] These strict emission standards posed a challenge to Volkswagen's engineers in developing the EA189 engines. In fact, during a 2007 demonstration in San Francisco, engine R&D chief Hatz lamented presciently that "[Volkswagen] can do quite a bit and we will do a bit, but 'impossible' we cannot do…. From my point of view, the CARB is not realistic … I see it as nearly impossible for [Volkswagen]."[12]

53. Yet, the "impossible" is just what Volkswagen set out to do. In order to successfully grow the U.S. diesel market and meet its ambitious goals, Volkswagen needed to

---

[10] *Just the Basics, Diesel Engine*, U.S. DEPT. OF ENERGY, OFFICE OF ENERGY EFFICIENCY & RENEWABLE ENERGY (last visited Feb. 8, 2016), *available at* http://www1.eere.energy.gov/vehiclesandfuels/pdfs/basics/jtb_diesel_engine.pdf.

[11] *Heavy-Duty Engine and Vehicle Standards and Highway Diesel Fuel Sulfur Control Requirements*, ENVIRONMENTAL PROTECTION AGENCY (Dec. 2000), http://www3.epa.gov/otaq/highway-diesel/regs/f00057.pdf.

[12] Danny Hakim, *et al.*, *VW Executive Had a Pivotal Role as Car Maker Struggled With Emissions*, N.Y. TIMES (Dec. 21, 2015), http://www.nytimes.com/2015/12/22/business/international/vw-executive-had-a-pivotal-role-as-car-maker-struggled-with-emissions.html?mtrref=undefined&gwh=7E46E42F7CCC3D687AEC40DFB2CFA8BA&gwt=pay.

develop the technology to reduce $NO_X$ emissions, while maintaining the efficient, powerful performance of a lean-state diesel engine. This seemingly impossible dilemma mired Volkswagen in an internal struggle about how to best proceed, with two divergent technological solutions available: selective catalytic reduction ("SCR"), or use of a lean $NO_X$ trap ("LNT").

54. Advocating the former of these solutions, in 2006, Wolfgang Bernhard, then a top executive at VWAG (and former Daimler executive), championed a technology-sharing agreement with Mercedes-Benz and BMW to jointly develop a SCR system using urea. This system, which assists in neutralizing emissions of $NO_X$, was generically known as a "Diesel Exhaust Fluid" system and marketed as "Bluetec" by Mercedes and "AdBlue" by Volkswagen and other German vehicle manufacturers. This solution, touted by Bernhard, worked by injecting urea into a diesel vehicle's exhaust stream to react with the $NO_X$, converting it into harmless nitrogen and oxygen.

55. While Hatz initially supported this solution, stating publicly at the Detroit Auto Show in early 2007 that "Bluetec technology allows us to demonstrate Audi's commitment to always being at the very forefront of diesel technology,"[13] his support dissipated as Volkswagen's leadership factionalized – split between those who balked at the $350 per-vehicle cost of the SCR system advocated by Bernhard, and those who thought that the SCR system was the only technologically feasible method to meet emission regulations.

56. Bernhard, the advocate for SCR, ultimately lost the internal battle at Volkswagen and resigned. Consequently, Hatz remained and was tasked with implementing the alternative strategy: the lower-cost LNT. This relatively inexpensive technology involved the storage of $NO_X$ emissions in a separate compartment during vehicle operation. Once that compartment filled up, the system burned off the stored $NO_X$ by pumping an extra burst of fuel into the cylinders, most of which passed through to the converter, where it then burned the $NO_X$ into nitrogen and oxygen. While this method was cheaper and easier to implement than the SCR system advocated by Bernhard, it was less effective and resulted in lower fuel efficiency.

---

[13] *Id.*

57. According to many sources (including journalists, industry insiders, and Volkswagen whistleblowers), Volkswagen's top brass issued a directive to its engineers to find a way to meet emission standards despite tight budgetary and technical constraints, or suffer the consequences. Volkswagen AG's former CEO, Ferdinand Piëch, created "a culture where performance was driven by fear and intimidation" and whose leadership was characterized as "a reign of terror."[14] Employees were told, "[y]ou will sell diesels in the U.S., and you will not fail. Do it, or I'll find somebody who will."[15] Piëch was infamous for firing subordinates who failed to meet his exacting standards: "Stories are legion in the industry about Volkswagen engineers and executives shaking in their boots prior to presentations before Piech, knowing that if he was displeased, they might be fired instantly."[16] And so it seems, out of self-preservation, the defeat device scandal was borne.

**B. Defendants' Dirty "Cheat Device" Scheme**

58. Volkswagen engineers had to find a solution to the "impossible" problem of passing stricter emission standards while maintaining performance and fuel efficiency, all while hamstrung by cost-cutting measures. And it had to be done fast, because the new diesel vehicles were scheduled for imminent release in the U.S.

59. Ultimately, time ran out, and Volkswagen executives and engineers were either unable or unwilling to devise a solution within the constraints of the law and their self-imposed cost-cutting measures. So instead of being honest (and risk being summarily fired), they and others conspired to cheat by installing a "defeat device" in the new diesel vehicles so that those vehicles could "pass" the EPA and CARB emission testing, and Volkswagen could obtain COCs and EOs to sell the vehicles to make its sales targets throughout the U.S and in California.

---

[14] Bob Lutz, *One Man Established the Culture That Led to VW's Emissions Scandal*, ROAD & TRACK (Nov. 4, 2015), http://www.roadandtrack.com/car-culture/a27197/bob-lutz-vw-diesel-fiasco/.

[15] *Id.*

[16] Doron Levin, *The man who created VW's toxic culture still looms large*, FORTUNE (Oct. 16, 2015), http://fortune.com/2015/10/16/vw-ferdinand-piech-culture/.

60. It became clear that the TDI engine could not meet U.S. emission regulations when the launch of the Jetta TDI "clean" diesel, initially scheduled for 2007, had to be delayed after initial emission testing failed.[17] The prospect of failure was unacceptable, so Volkswagen decided to cheat instead. It has been reported that the decision to cheat the EPA, CARB, and countless other regulators worldwide was an "open secret" in Volkswagen's engine development department,[18] as it was necessary for the "EA 189 engine to pass U.S. diesel emissions limits within the budget and time frame allotted."[19]

61. All modern engines are integrated with sophisticated computer components to manage the vehicle's operation, such as an electronic diesel control ("EDC"). Bosch tested, manufactured and sold the EDC system used by Volkswagen in the Affected Vehicles. This system is more formally referred to as the Electronic Diesel Control Unit 17 ("EDC Unit 17"). Upon its introduction, EDC Unit 17 was publicly-touted by Bosch as follows:

> … EDC17 … controls every parameter that is important for effective, low-emission combustion.
>
> Because the computing power and functional scope of the new EDC17 can be adapted to match particular requirements, it can be used very flexibly in any vehicle segment on all the world's markets. In addition to controlling the precise timing and quantity of injection, exhaust gas recirculation, and manifold pressure regulation, it also offers a large number of options such as the control of particulate filters or systems for reducing nitrogen oxides. The Bosch EDC17 determines the injection parameters for each cylinder, making specific adaptations if necessary. This improves the precision of injection throughout the vehicle's entire service life. The system therefore makes an important contribution to observing future exhaust gas emission limits.[20]

---

[17] *VW delays Jetta TDI diesel into the US*, Clean MPG (last visited Feb. 8, 2016), http://www.cleanmpg.com/community/index.php?threads/7254/.

[18] Georgina Prodham, *Volkswagen probe finds manipulation was open secret in department*, Reuters (Jan. 23, 2016), http://www.reuters.com/article/us-volkswagen-emissions-investigation-idUSKCN0V02E7.

[19] Jay Ramey, *VW chairman Poetsch: Company 'tolerated breaches of rules'*, Autoweek (Dec. 10, 2015), http://autoweek.com/article/vw-diesel-scandal/vw-chairman-poetsch-company-tolerated-breaches-rules.

[20] *See* February 28, 2006 Bosch press release, "The brain of diesel injection: New Bosch EDC17 engine management system," http://www.bosch-presse.de/presseforum/details.htm?txtID=2603&locale=en.

62. EDC Unit 17 was widely used throughout the automotive industry, including by BMW and Mercedes, to operate modern clean diesel engines. Bosch worked with each vehicle manufacturer that utilized EDC Unit 17 to create a unique set of specifications and software code to manage the vehicle's engine operation.

63. With respect to the Affected Vehicles, however, EDC Unit 17 was also enabled by Bosch and Volkswagen to surreptitiously evade emissions regulations. Bosch and Volkswagen worked together to develop and implement a specific set of software algorithms for implementation in the Affected Vehicles, which enabled Volkswagen to adjust fuel levels, exhaust gas recirculation, air pressure levels, and even urea injection rates (for applicable vehicles).[21] When carmakers test their vehicles against EPA emission standards, they place their cars on dynamometers (large rollers) and then perform a series of specific maneuvers prescribed by federal regulations. Bosch's EDC Unit 17 gave Volkswagen the power to detect test scenarios by monitoring vehicle speed, acceleration, engine operation, air pressure, and even the position of the steering wheel. When the EDC Unit 17's detection algorithm detected that the vehicle was on a dynamometer (and undergoing an emission test), additional software code within the EDC Unit 17 downgraded the engine's power and performance and upgraded the emissions control systems' performance by switching to a "dyno calibration" to cause a subsequent reduction in emissions to legal levels. Once the EDC Unit 17 detected that the emission test was complete, the EDC Unit would then enable a different "road calibration" that caused the engine to return to full power while reducing the emissions control systems' performance, and consequently, caused the car to spew the full amount of illegal $NO_X$ emissions out on the road.[22] This process is illustrated in the following diagram:

---

[21] *See, e.g.*, *Engine management*, Bosch Auto Parts (last visited February 8, 2016), http://de.bosch-automotive.com/en/parts_and_accessories/motor_and_sytems/ diesel/engine_management_2/engine_control_unit_1.

[22] Russell Hotten, *Volkswagen: The scandal explained*, BBC (Dec. 10, 2015), http://www.bbc.com/news/business-34324772.




64. This workaround was illegal. The CAA expressly prohibits "defeat devices," defined as any auxiliary emission control device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use." 40 C.F.R. § 86.1803-01; *see also id.* § 86.1809-10 ("No new light-duty vehicle, light-duty truck, medium-duty passenger vehicle, or complete heavy-duty vehicle shall be equipped with a defeat device."). Moreover, the CAA prohibits the sale of components used as defeat devices, "where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." 42 U.S.C. § 7522(a)(3). Finally, in order to obtain a COC, automakers must submit an application, which lists all auxiliary emission control devices installed in the vehicle, a justification for each, and an explanation of why the control device is not a defeat device.

65. Thus, in order to obtain the COCs necessary to sell their vehicles, Volkswagen did not disclose, and affirmatively concealed, the presence of the test-detecting and performance altering software code that it developed with Bosch within the EDC Unit 17 from government regulators, thus making that software an illegal "defeat device." In other words, Volkswagen lied to the government, its customers, its dealers and the public at large. An example of one of Volkswagen's vehicle stickers reflecting its fraudulently-obtained COCs is pictured below:




66. Because the COCs were fraudulently-obtained, and because the Affected Vehicles did not conform "in all material respects" to the specifications provided in the COC applications, the Affected Vehicles were never covered by a valid COC, and thus, were never legal for sale, nor were they EPA and/or CARB compliant, as represented. Volkswagen and Bosch hid these facts from the EPA, other regulators, its dealers and consumers, and it continued to sell and lease the Affected Vehicles to the driving public, despite their illegality, and with the complicity of Bosch.

67. Volkswagen's illegal workaround was enabled by its close partnership with defendant Bosch, which enjoyed a sizable portion of its annual revenue from manufacturing parts used in Volkswagen's diesel vehicles.[23] Bosch was well aware that Volkswagen was using its emissions control components as a defeat device and, in fact, worked with Volkswagen to develop

[23] Approximately 50,000 of Bosch's 375,000 employees worked in the diesel-technology operations branch of Bosch, and Volkswagen was the biggest diesel manufacturer in the world. *See Bosch probes whether its staff helped VW's emissions rigging*, Automotive News (Jan. 27, 2016), http://www.autonews.com/article/20160127/COPY01/301279955/bosch-probes-whether-its-staff-helped-vws-emissions-rigging.

the software algorithm specifically tailored for the Affected Vehicles. Although Bosch reportedly "advised" Volkswagen as early as 2007 that the components should only be used for internal testing, not for manipulation of the engine in emission testing,[24] it knew (or certainly should have known) that its lip service would be ignored, and that the components would be used as defeat devices. Bosch supplied Volkswagen with approximately 11 million such emission control components over seven years which, in itself, belies the official company line.

68. Volkswagen, likewise, knew better – VW America itself is a recidivist violator of the CAA. In July of 1973, the EPA sought legal action against VW America from the DOJ based on a claim that defeat devices were installed in 1973 Volkswagen vehicles. The matter was swiftly settled for $120,000 the following year.[25] And, in June of 2005, VW America entered into a consent decree with the DOJ, wherein it paid a $1.1 million penalty for failing to notify the EPA of emissions problems in certain vehicles manufactured by VW in Mexico.[26]

69. Volkswagen could not help but repeat its cheating ways. With respect to the Affected Vehicles, Volkswagen hid the fact of the defeat devices from the EPA, such that the COCs were fraudulently obtained. Specifically, VW America submitted COC applications on behalf of VWAG, Audi AG, and itself, for the 2.0-liter and VW-and Audi-branded 3.0-liter Affected Vehicles, describing compliant specifications and concealing the dual-calibration strategy of the defeat device. But, the Affected Vehicles differed in "material respects" from the specifications described in the COC applications because they were equipped with undisclosed auxiliary emissions control devices, specifically, the software code described above, that improperly functioned as a banned "defeat device."

70. Because the COCs were fraudulently obtained, the Affected Vehicles were never covered by valid COCs, and thus, were never offered legally for sale. Volkswagen hid these facts

[24] *VW scandal: Company warned over test cheating years ago*, BBC (Sept. 27, 2015), http://www.bbc.com/news/business-34373637.

[25] Rich Gardellsa, *et al.*, *VW had previous run-in over 'defeat devices'*, NBC News (Sept. 23, 2015), http://www.cnbc.com/2015/09/23/vw-had-previous-run-in-over-defeat-devices.html.

[26] Consent Decree, *United States v. Volkswagen of Am., Inc.*, Case No. 1:05-cv-01193-GK (D.D.C. June 15, 2005 and Nov. 4, 2005), ECF Nos. 1-2.

from the EPA, CARB and other state regulators, franchise dealers (including Plaintiff) and consumers, and it continued to sell and lease the Affected Vehicles through the franchise dealers, despite their illegality, and with the complicity of Bosch.

**C. Bosch Played a Critical Role in the Defeat Device Scheme**

71. Discovery of Bosch has just begun, but the evidence already proves that Bosch played a critical role in scheme to evade U.S. emission requirements in the Affected Vehicles.[27] ***In 2008, Bosch wrote Volkswagen and expressly demanded that Volkswagen indemnify Bosch for anticipated liability arising from the use of the Bosch-created "defeat device" (Bosch's words), which Bosch knew was "prohibited pursuant to … US Law***."[28] Volkswagen apparently refused to indemnify Bosch, but Bosch nevertheless continued to develop the so-called "akustikfunktion" (the code name used for the defeat device) for Volkswagen for another seven years. During that period, Bosch concealed the defeat device in communications with U.S. regulators once questions were raised about the emission control system in the Affected Vehicles, and went so far as to actively lobby lawmakers to promote Volkswagen's "Clean Diesel" system in the U.S. Bosch's efforts, taken together with evidence of Bosch's actual knowledge that the "akustikfunktion" operated as an illegal defeat device, demonstrate that Bosch was a knowing and active participant in the decade-long illegal enterprise to defraud U.S. consumers.

**1. Volkswagen and Bosch Conspire to Develop the Illegal Defeat Device.**

72. Bosch tightly controlled development of the control units in the Affected Vehicles, and actively participated in the development of the defeat device.

73. As discussed above, Bosch introduced a new generation of diesel ECUs for Volkswagen. The development of the EDC17 was a massive undertaking, which began years before Volkswagen began its push into the U.S. market. At least twenty Bosch engineers were working full-time on writing the code for the EDC17 in the 2001 time frame. By 2004, long before the November 20, 2006 meeting at which Volkswagen apparently decided to use the defeat device

---

[27] Plaintiffs' detailed and specific allegations against Bosch are based almost entirely on publicly-available documents, Plaintiffs' own research, and information produced by Volkswagen.

[28] VW-MDL2672-02570091 (English translation) (emphasis added).

to "pass" emission certification standards in the U.S., Bosch and Volkswagen had already entered into preliminary agreements for further development of the EDC17.[29]

74. A February 28, 2006, Bosch press release introduced the "New Bosch EDC17 engine management system" as the "brain of diesel injection" which "controls every parameter that is important for effective, low-emission combustion." The EDC17 offered "[e]ffective control of combustion" and a "[c]oncept tailored for all vehicle classes and markets." In the press release, Bosch touted the EDC17 as follows:

> **EDC17: Ready for future demands**
> Because the computing power and functional scope of the new EDC17 can be adapted to match particular requirements, it can be used very flexibly in any vehicle segment on all the world's markets. In addition to controlling the precise timing and quantity of injection, exhaust gas recirculation, and manifold pressure regulation, it also offers a large number of options such as the control of particulate filters or systems for reducing nitrogen oxides. The Bosch EDC17 determines the injection parameters for each cylinder, making specific adaptations if necessary. This improves the precision of injection throughout the vehicle's entire service life. The system therefore makes an important contribution to observing future exhaust gas emission limits.[30]

75. Bosch's EDC17 was the technology behind Volkswagen's ambition. The EDC17 and the development of its underlying software were integral to Volkswagen's entire diesel strategy, which by late 2006 included creating software to sense when the vehicles were in test mode and then manipulate the emission control system at that time. This could not have been accomplished without years of collaborative work with Bosch.

76. As early as February 2005, an internal feasibility study drafted by Ulrich Hackenberg (Audi Development Chief) mentioned Bosch's EDC17 as part of a strategy to reduce diesel vehicle emissions of nitrogen oxides ("NOx") by creating a change in engine electronics.[31]

---

[29] *See* PowerPoint presentation at VW-MDL2672-02559528. This internal Volkswagen PowerPoint describes the "akustikfunktion" as activated in "recognition of emission related environment conditions" and proposed it as a solution to the "registration/certification [problem] in the US."

[30] *See* Feb. 28, 2006 Bosch press release, "The brain of diesel injection: New Bosch EDC17 engine management system," http://www.bosch-presse.de/presseforum/details.htm?txtID=2603&locale=en.

[31] VW-MDL2672-00744825.

The study discussed diesel strategies in the U.S. market in light of tightening U.S. emission standards. As discussed above, shortly after the cheating scandal became public, Volkswagen suspended Hackenberg, and he later resigned.[32]

77. Bosch made clear that the EDC17 was not one-size-fits-all. Instead, it was a "[c]oncept tailored for all vehicle classes and markets" that could "be adapted to match particular requirements [and] … be used very flexibly in any vehicle segment on all the world's markets." The EDC17 was tailored and adapted by modifying the sophisticated software embedded within the electronic control unit ("ECU"). Bosch manufactured, developed, and provided the ECU and its base of software to Volkswagen for the Affected Vehicles.

78. Bosch and Volkswagen worked together closely to modify the software, and to create specifications for each vehicle model. Indeed, customizing a road-ready ECU is an intensive three- to five-year endeavor involving a full-time Bosch presence at an automaker's facility. Bosch and its customers work so closely that Bosch purposefully locates its component part manufacturing facilities close to its carmaker customers' manufacturing plants.

79. All Bosch ECUs, including the EDC17, run on complex, highly proprietary engine management software over which Bosch exerts near-total control. In fact, the software is typically locked to prevent customers, like Volkswagen, from making significant changes on their own. The defeat device was just such a software change—one that would allow modifications to the vehicle's emission control to turn on only under certain circumstances—that Volkswagen could not have made without Bosch's participation.

80. Bosch's security measures further confirm that its customers cannot make significant changes to Bosch software without Bosch involvement. Bosch boasts that its security modules protect vehicle systems against unauthorized access in every operating phase, meaning

[32] Jack Ewing, *Audi Executive Resigns After Suspension over VW Emissions Scandal*, NY. Times (Dec. 4, 2015), http://www.nytimes.com/2015/12/05/business/international/ulrich-hackenberg-suspended-over-volkswagen-emissions-scandal-resigns.html.

that no alteration could have been made without either a breach of that security—and no such claims have been advanced—or Bosch's knowing participation.[33]

81. Unsurprisingly, then, at least one car-company engineer has confirmed that Bosch maintains absolute control over its software as part of its regular business practices:

> I've had many arguments with Bosch, and they certainly own the dataset software and let their customers tune the curves. Before each dataset is released it goes back to Bosch for its own validation.
>
> Bosch is involved in all the development we ever do. They insist on being present at all our physical tests and they log all their own data, so someone somewhere at Bosch will have known what was going on.
>
> All software routines have to go through the software verification of Bosch, and they have hundreds of milestones of verification, that's the structure ….
>
> The car company is *never* entitled by Bosch to do something on their own.[34]

Thus, Bosch cannot convincingly argue that the development of the "akustik" device was the work of a small group of rogue engineers.

82. In fact, Volkswagen's and Bosch's work on the EDC17 reflected a highly unusual degree of coordination. It was a massive project that required the work of numerous Bosch coders for a period of more than ten years, or perhaps more.[35] Although Bosch publicly introduced the EDC17 in 2006, it had started to develop the engine management system years before.[36]

83. The size and complexity of the undertaking is captured by a spreadsheet that lists entries for work done by Volkswagen and Bosch employees on the EDC17 from late 2003 to 2009.

---

[33] *Reliable Protection for* ECUs (May 12, 2016), https://www.escrypt.com/company/single-news/detail/reliable-protection-for-ecus/.

[34] Michael Taylor, *EPA Investigating Bosch over VW Diesel Cheater Software*, Car and Driver (Nov. 23, 2015), http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater-software/.

[35] Approximately 50,000 of Bosch's 375,000 employees worked in the diesel-technology operations branch of Bosch, and Volkswagen was the biggest diesel manufacturer in the world. *See Bosch Probes Whether Its Staff Helped VW's Emissions Rigging*, Automotive News (Jan. 27, 2016), http://www.autonews.com/article/20160127/COPY01/301279955/bosch-probes-whether-its-staff-helped-vws-emissions-rigging.

[36] Feb. 28, 2006 Bosch press release, "The brain of diesel injection: New Bosch EDC17 engine management system," http://www.bosch-presse.de/presseforum/details.htm?txtID=2603&locale=en.

Each entry is given one of six descriptors: enhancement, new feature, service, support, integration, or bug/defect. In total, the spreadsheet contains 8,565 entries and lists hundreds of Bosch individuals.[37]

84. The joint enterprise is also memorialized in a series of agreements between Bosch and Volkswagen dating back to as early as mid-2005, reflecting negotiations that date prior to January, 2005. On April 7, 2005, for example, Bosch GmbH's [redacted] and [redacted] executed the "Framework Development Agreement for Software Sharing in EDC/MED17 Control Unit Projects from the Robert Bosch (RB) Diesel Systems (DS) And Gasoline Systems (GS) Motor Vehicle Units." VWAG countersigned the agreement on September 26, 2005. Importantly, the agreement defined software sharing as "the handing over of BOSCH software in the form of object code by BOSCH to VW, so that VW can use this BOSCH software as a basis for developing VW modules for specific EDC/ME(D)17 projects using software development environments from BOSCH." The agreement states that "[p]roviding the VW modules and integrating them to form a complete software product requires close cooperation between the Parties."

85. The contract also outlined responsibilities for software sharing and co-development. Throughout development, the contract dictated Bosch was to retain control over the software. While Bosch provided (and owned) the object code, and Volkswagen developed (and owned) the modules, the parties agreed that "BOSCH carries out any modifications to the BOSCH software that are necessary in order to integrate the intended VW modules at the expense of VW." The agreement further specifies that Bosch would monitor the software, test the implementation of Volkswagen modules, and grant written approval to Volkswagen modules. Only if everything met Bosch's standards would it then "deliver[] the final complete software product for VW to use in combination with a BOSCH control unit."[38] Thus, Bosch needed to conduct extensive testing before delivering the product to VW.

86. Yet another document demonstrates the tight grip that Bosch maintained over EDC17 software and any modifications made to it. On February 20, 2006, VWAG and Bosch

---

[37] VW-MDL2672-02559780.

[38] Volkswagen produced an English translation of the agreement at VW-MDL2672-03752699.

(signed by Bosch GmbH's [redacted], [redacted] of the Diesel Systems division), entered into a supplemental agreement concerning the use of "expanded software" documentation for the EDC17 and EDC16 (its predecessor).[39] Pursuant to this agreement, Bosch identified 35 named individuals, affiliated with either VWAG or IAV (Ingenieurgesellschaft Auto und Verkehr), who were granted access to expanded documentation for the EDC17 for specific functions relating to emissions. Any changes to the list of persons to be given access required the explicit consent of Bosch GmbH, and the access was temporary and non-transferable. Critically, the agreement stated that "[t]his right of use shall not include the right to the change, modify or use the DOCUMENTATION with third-party control units."[40] Bosch thereby tightly controlled both who could access the expanded documentation and the scope of their use of such materials.

87. A later agreement between Bosch GmbH and Volkswagen, this one from a June 12, 2006, governed the implementation, integration, project management, and delivery of certain EDC 17 software functions for diesel vehicles that VWAG had requested from Bosch. This agreement, too, made clear that any changes not explicitly detailed in the agreement would require further approval from Bosch.

88. Along the same lines, several years later, in a February 5, 2011 agreement, Bosch granted VWAG a license to further develop Bosch Denoxtronic functions for the treatment of exhaust from diesel engines. Again, the contract is clear that Bosch maintains rights over the Denoxtronic functions.

89. To recap, as the EA 189 project moved to series production in 2009, Bosch's documented role was to provide to Volkswagen executable software for installation in the EDC17 controller at the VW production line.[41] Bosch insisted that Bosch control the definition of the EDC17 software, that Bosch test the software using bench top and vehicle testing, that Bosch produce the final software release for series production, and that Bosch deliver the software to Volkswagen for installation in the EA 189 engines used in the Affected Vehicles. Bosch's firm

[39] Volkswagen produced an English translation of the agreement at VW-MDL2672-03752757.

[40] VW-MDL2672-03752757.

[41] VW-MDL2672-03752699.

control over the development of and modifications to EDC17 is undeniable. It is inconceivable, then, that Bosch did not know that the software it was responsible for defining, developing, testing, maintaining and delivering contained an illegal defeat device.

90. In fact, Bosch was in on the secret and knew that Volkswagen was using Bosch's software algorithm as an "on/off" switch for emission controls when the Class Vehicle was undergoing testing. As noted above, it has been said the decision to cheat was an "open secret" at Volkswagen.[42] It was an "open secret" at Bosch as well.

91. Volkswagen and Bosch personnel employed code language for the defeat device, referring to it as the "acoustic function" (in German, "akustikfunktion"). As described above, the roots of the "akustikfunktion"—and likely the cheating—can be traced back to the late 1990's when Audi devised software called the "akustikfunktion" that could switch off certain functions when the vehicle was in a test mode.[43] The "akustik" term is derived from the function's ability to modify the noise and vibration produced by the engine. News articles report that, in 2006, VWAG further developed this "akustikfunktion" for the Affected Vehicles.[44]

92. Written communications between and within Bosch and Volkswagen describe the "akustikfunktion" in surprising detail. In emails sent as early as July 2005 from VWAG's Andreas Specht to Bosch's [redacted] and [redacted], Specht discussed emissions measurements from vehicles using the "akustikfunktion" in connection with

[42] Georgina Prodham, *Volkswagen probe finds manipulation was open secret in department*, Reuters (Jan. 23, 2016), http://www.reuters.com/article/us-volkswagen-emissions-investigation-idUSKCN0V02E7. *See also* Jay Ramey, *VW chairman Poetsch: Company 'tolerated breaches of rules'*, Autoweek (Dec. 10, 2015), http://autoweek.com/article/vw-diesel-scandal/vw-chairman-poetsch-company-tolerated-breaches-rules (it was necessary for the "EA 189 engine to pass U.S. diesel emissions limits within the budget and time frame allotted").

[43] https://global.handelsblatt.com/edition/413/ressort/companies-markets/article/dieselgates-roots-stretch-back-to-audi?ref=MTI5ODU1.

[44] Volkswagen Probe Finds Manipulation Was Open Secret in Department: Newspaper", *Reuters* (Jan. 23, 2016), http://www.reuters.com/article/us-volkswagen-emissions-investigation-idUSKCN0V02E7. VW Group Chairman, Hans Dieter Poetsch, explained that a small group of engineers and managers was involved in the creation of the manipulating software. *See* VW Chairman Poetsch: Company 'Tolerated Breaches of Rules'", *Auto Week* (Dec. 10, 2015), http://autoweek.com/article/vw-diesel-scandal/vw-chairman-poetsch-company-tolerated-breaches-rules. *See also* "Scandal Explained", *BBC*, Dec. 10, 2015, http://www.bbc.com/news/business-34324772; Sept. 18, 2015, http://www.autocar.co.uk/car-news/industry/vw-emissions-scandal-how-volkswagens-defeat-device-works.

U.S. emission compliance.[45] A February 2014 PowerPoint prepared by VWAG explained that the akustikfunktion measured speed, acceleration, and engine operation to determine whether a vehicle is undergoing testing.[46]

93. On November 13, 2006, VWAG's Dieter Mannigel (Software Design, U.S. Diesel Engines, Drivetrain Electronics) circulated via email a PowerPoint presentation prepared for VWAG's Rudolf Krebs (who joined Volkswagen from Audi in 2005) about how the "akustikfunktion" is activated and deactivated in recognition of emissions-related environmental conditions, such as temperature and pressure. The presentation explained that the existing vehicles functioning with different drive cycles could not pass U.S. emission tests, and thus proposed the release of the "akustikfunktion" to be driving dependent.[47]

94. On November 20, 2006, Mannigel emailed his colleagues to summarize a meeting with Krebs, at which the PowerPoint described above was likely presented. Krebs had emphasized the importance of not getting caught by U.S. regulators using the "akustikfunktion," and warned that the function must be explainable to regulators. Krebs was skeptical about using the akustikfunktion in the U.S. market due to potential regulatory and legal exposure, and Mannigel was nervous that regulators would be able to detect the "akustikfunktion." Nevertheless, Mannigel reported, Volkswagen was going ahead with the expanded "akustikfunktion" with Bosch.[48] It is likely this was the meeting at which VW decided to use the "akustikfunktion" as a defeat device to evade compliance with U.S. emission requirements.

95. Well after the defeat device was developed and integrated into hundreds of thousands of Affected Vehicles, Volkswagen and Bosch continued to work together to refine and maintain it. For example, both Bosch and Volkswagen were involved in the calibration of the defeat devices for the Affected Vehicles. A November 2014 email from VWAG's Juergen Hintz,

---

[45] VW-MDL2672-02559611.

[46] VW-MDL2672-02572122.

[47] VW-MDL2672-02559527. The email attached an internal Volkswagen PowerPoint that describes the "akustikfunktion" as activated in recognition of emission related environment conditions and proposed it as a solution to the registration emissions certification problems in the U.S. (VW-MDL2672-02559528).

[48] VW-MDL2672-02559526.

entitled "Akustikfunktion," relayed a telephone call with Bosch's [redacted] about the "akustikfunktion" and Volkswagen's role. VWAG's C. Arenz responded that while he had been responsible for the operation of the "akustikfunktion," Bosch was responsible for its calibration. In fact, Arenz disclosed that he planned to meet with Bosch (along with Michael Brand) about calibrating the "akustikfunktion" the following week.[49] In another email, Hintz wrote that Bosch's [redacted] told him that Bosch would be making certain changes to the "akustikfunktion" based on Volkswagen's specifications.[50]

96. In sum, Bosch worked hand-in-glove with Volkswagen to develop and maintain the akustikfunktion/defeat device.[51]

**2. Volkswagen and Bosch Conspire to Conceal the Illegal "Akustikfunktion".**

97. By 2007, and likely earlier, Bosch was critical not only in developing the "akustikfunktion," but also in concealing it. On March 9, 2007, Bosch's [redacted] emailed VW AG's Mathias Klaproth (a technical developer) and Mannigel with the subject of "Erweiterungen Akustikfunktion" (in English, "Further Development of the Acoustic Function").[52] [redacted] ***confirmed that Bosch would remove the description of the enhanced "akustikfunktion" from Volkswagen's fuel pump specification sheets D2250 and D2278***. Klaproth and Mannigel agreed not to list the function in documentation in the U.S., but disagreed whether to disclose it in Europe. Klaproth then took [redacted] off the email chain and insisted the "akustikfunktion" would be applied to the European projects, to which Mannigel responded that he would contact Klaproth off-line.

---

[49] VW-MDL2672-02569895.

[50] Translation at 00387135.

[51] From the information available to date, it appears that at leas in du m Bosch volved in the scheme to develop the illegal defeat device: [redacted], [redacted] [redacted], and [redacted] (based on a July 2005 email from G cht); B based on a March 2007 email with VWAG's Klaproth and Mannigel); [redacted] [redacted] and [redacted] (based on a June 2, 2008 letter attempting to limit Bosch's liability); and [redacted] (recipient of the letter attached to VWAG's June 6, 2008 response). VW-MDL2672-02570091; VW-MDL2672-02559611; VW-MDL2672-02559515.

[52] VW-MDL2672-02559515.

98. Bosch was concerned about getting caught participating in the defeat device fraud. As reported in the German newspaper, *Bild am Sonntag*, and a French publication, a Volkswagen internal inquiry found that in 2007 Bosch warned Volkswagen by letter that using the emissions-altering software in production vehicles would constitute an "offense."[53,54]

99. Bosch expressed similar concerns that use of the defeat device it had created would violate U.S. law. These concerns culminated in a June 2, 2008 letter from Bosch's [redacted] to Volkswagen's Thorsten Schmidt in which Bosch demanded that Volkswagen indemnify Bosch for any liability arising from the creation of a "defeat device," as Bosch itself called it in English. Through the letter, Bosch sought to clarify the roles and responsibilities of Volkswagen and Bosch regarding the development of the EDC 17, and demanded that Volkswagen indemnify Bosch for any legal exposure arising from work on the defeat device:

> The further development [of the EDC17] requested by your company will result, in addition to the already existing possibility of activating enriched data manually, ***in an additional path for the potential to reset data to act as a "defeat device."*** We ask you to have the attached disclaimers executed by your company.[55]

The letter uses the words "defeat device" in English, and further explained that "**[t]he usage of a defeat device is prohibited pursuant to … US Law (CARB/EPA)** (see definition footnote 2)."[56]

100. Bosch's June 2, 2008 letter also warned Volkswagen that the software modifications Volkswagen requested could allow "the certified dataset [to be] replaced with another, possibly non-certified data set[,]" which could, in turn, cause "the vehicle's general operating license

[53] Automotive News (Sept. 27, 2015) (http://www.autonews.com/article/20150927/COPY01/309279989/bosch-warned-vw-about-illegal-software-use-in-diesel-cars-report-says); VW Scandal: Company Warned over Test Cheating Years Ago", *BBC*, Sept. 27, 2015, http://www.bbc.com/news/business-34373637.

[54] http://www.autonews.com/article/20150927/COPY01/309279989/bosch-warned-vw-about-illegal-software-use-in-diesel-cars-report-says.

[55] VW-MDL2672-02570091 (English translation) (emphasis added).

[56] *Id.* at -92 (emphasis added).

(registration) [to] become void."[57] Creating two data sets on emission compliance was illegal under U.S. law. Bosch knew this, and that is why it requested indemnification from Volkswagen.

101. [redacted] and [redacted] at Bosch signed the proposed indemnification; the signature lines for Volkswagen were left blank. When Volkswagen's Hermann Middendorf responded to [redacted] at Bosch. He did not deny the existence of a defeat device, but instead attacked Bosch for involving "the lawyers."

102. Discovery is ongoing, and Plaintiffs do not have a full record of what unfolded in response to Bosch's June 2, 2008 letter. However, it is indisputable that Bosch continued to develop and sell to Volkswagen hundreds of thousands of the defeat devices for U.S. vehicles following Bosch's express, written recognition that its software was being used in the Affected Vehicles as a "defeat device" that was "prohibited pursuant to … US Law."

103. VWAG and Bosch continued over the next few years to refine the defeat device. This was a lengthy and complicated process that required concealing its existence from the onboard diagnostic system, which was intended to report emission controls to comply with U.S., and particularly California's, requirements. In a July 18, 2011 email, Audi's Olaf Busse proposed tying the activation of the "akustikfunktion" more directly to steering angle, instead of vehicle temperature, which was proving to be problematic. This request coincided with inquiries from CARB about on-board diagnostics issues. VWAG's Hanno Jelden (Head of Powertrain Electronics), worried that the change would be too obvious and could not be explained to regulators.[58]

104. Denner and others were also in on the secret. Notes from a May 28, 2014 meeting between Bosch and Volkswagen executives at VW headquarters reflect that the topic of "akustikfunktion" was discussed in the context of Volkswagen's and Bosch's partnership in the U.S. market. VWAG's Friedrich Eichler (Powertrain Development Chief) mentioned the importance of the "akustikfunktion" in Bosch diesel engines. Bosch participants at the meeting

---

[57] *Id.* at -93.

[58] VW-MDL2672-0259489. Jelden was subsequently suspended in connection with the emissions scandal.

included Denner, as well as [redacted] [redacted] [redacted], [redacted], [redacted] [redacted], [redacted] [redacted] [redacted], [redacted], [redacted] [redacted], and [redacted] For VWAG, Winterkorn was also present.[59]

### 3. Volkswagen and Bosch Conspire in the U.S. and Germany to Elude U.S. Regulators.

105. The purpose of the defeat device was to evade stringent U.S. emissions standards. Once Bosch and VW perfected the defeat device, therefore, their attention turned to deceiving U.S. regulators.

106. Evidence already shows that Bosch GmbH employees expressly conspired with VW to hide the function of the defeat device. Shortly after the March 2007 email exchange detailed above, in which VWAG's Klaproth and Mannigel confirmed to Bosch GmbH's [redacted] that the "akustikfunktion" would not be listed in the U.S. documentation for the Affected Vehicles, an internal email from VWAG's Frank Alich (Development, OBD Diesel) to various individuals at VWAG about scheduling a May 9, 2007 meeting, lamented the trouble distinguishing between acoustic and non-acoustic modes relating to soot simulation. Alich complained that he did not know how he would explain the problem to CARB.[60]

107. Bosch's North American subsidiary, Defendant Bosch LLC, was also part of and essential to the fraud. Bosch LLC worked closely with Bosch GmbH and Volkswagen, in the United States and in Germany, to ensure that the non-compliant Affected Vehicles passed U.S. emission tests. As set forth below, Bosch LLC employees frequently communicated with U.S. regulators, and actively worked to ensure the Affected Vehicles were approved by regulators.

108. Employees of Bosch LLC, Bosch GmbH and IAV provided specific information to U.S. regulators about how Volkswagen's vehicles functioned and unambiguously stated that the vehicles met emissions standards. Bosch LLC regularly communicated to its colleagues and clients in Germany about ways to deflect and diffuse questions from US regulators about the Affected Vehicles—particularly CARB. For example, in a May 15, 2008 email from Audi AG's Martin

---

[59] VW-MDL2672-02569909.

[60] VW-MDL2672-02555825.

Hierse to Bosch GmbH's [redacted] (Diesel Systems, Engineering Powertrain Diagnosis), copying Audi's Stefan Forthmann, Hierse noted that auxiliary emission control devices ("AECDs") were a very important subject for certification of U.S. diesels, and admitted discrepancies with the U.S. authorities in AECD documentation.[61] The regulators' questions were chipping away at the discrepancies between on board diagnostic systems, and the emission controls.

109. Accordingly, Hierse worried that there was a possibility that one of the Volkswagen Group's representatives in the U.S. was providing the regulators too much information and data concerning AECD disclosure. He then asked to discuss the matter with Bosch's [redacted] either by telephone or in private at one of their offices due to the confidentiality of the issue.

110. Bosch and VW worked together to craft responses to CARB's questions. For example, an April 2009 email, Suanne Thomas (VW America Regulatory Strategist) and Bosch LLC's [redacted] discussed results from tests sent from an individual at IAV showing defects in the Affected Vehicles' in-use ratios and missing readiness information.

111. On July 1, 2009, VWGoA's Thomas emailed colleagues, again raising concerns about documenting AECDs in Model Year 2010-11 Affected Vehicles to U.S. authorities. At issue was the "low level of detail in the AECD documents [so that] ARB is not able to confirm which strategies are for component protection." Thomas then relayed that CARB asked whether there was a problem getting Bosch to disclose its strategy.[62] In a related email, Thomas commented: "I was not involved in the discussions … with ARB on diesel, however I get the impression that there is a misunderstanding at VW regarding AECDs. That this misunderstanding is the root of the issue – why ARB is not satisfied with the AECD disclosure for diesels."[63] CARB was asking the right questions, and not getting honest answers.

112. Nor can Bosch persuasively distance Bosch GmbH from the communications with regulators, as Bosch GmbH employees directly participated in meetings with CARB. For example, in January, 2015, Bosch GmbH (specifically, Bosch LLC's [redacted]

[61] VW-MDL2672-11873274.

[62] VW-MDL2672-02469411.

[63] VW-MDL2672-02120937.

[redacted], Quality Control, and [redacted] Sales Quality and Warranty) conferred about setting up a conference call with Audi and CARB to explain problems with the diagnostics relating to faulty fuel pumps, issues that likely arose because the defeat device was causing problems with the on board diagnostic system in certain Affected Vehicles. Suanne Thomas of VW coordinated the call between Bosch and CARB.

113. Volkswagen and Bosch held CARB and the EPA at bay with finesse (and fraud) to obtain the necessary COCs and EOs to keep Affected Vehicles on the road. In an August 2009 email from VWGoA shared a comment from CARB regarding 2009 Volkswagen Jetta TDIs test results that "VW 'blatantly did the wrong thing'" and asking Volkswagen if this "is a base strategy from Bosch." Volkswagen responded, "yes."[64]

114. This is not the only document crediting Bosch strategies to obtain regulatory approval. A May 17, 2011 email from CARB to Thomas regarding Volkswagen 2014 TDIs referenced a 2010 conference call where they discussed "the bosch ZFC [Zero Fuel Calibration] strategy and a possible fuel rail pressure disablement." VWAG's Alich then relayed that "ARB accepted our proposal to implement the ZFC 'time to closed loop' monitor with MY [model year] 2013."[65] And in a May 31, 2013 email regarding 2.0-liter Affected Vehicles, Thomas referenced a "[p]roposed strategy" to "get the executive order [from CARB] based on the 'Bosch' strategy."[66] These communications demonstrate Bosch's deep understanding of what regulators allowed and would not allow, and what Bosch did to help VW obtain approval.

115. In short, there can be no argument that Bosch left communications with the regulators to VW, or that Bosch did not understand the regulatory implications of the defeat device software VW paid Bosch to develop. Employees of Bosch GmbH and Bosch LLC worked together with VW to convince U.S. regulators to approve the Affected Vehicles for sale and use in this country. The examples below identify at least six additional instances in which Bosch communicated directly with U.S. regulators to discuss concerns with emissions detection and

[64] VW-MDL2672-00912096.

[65] VW-MDL-2672-02464246.

[66] VW-MDL2672-00530556.

compliance in the Affected Vehicles. During each communication, Bosch LLC provided specific information about how Volkswagen's vehicles functioned and unambiguously stated that the vehicles met emissions standards:

a. In December 2009, Bosch presented CARB with a strategy to allow usage of Injection Quantity Adjustment codes in 2013 Volkswagen diesel models.[67]

b. In or around December 2012, Volkswagen and Bosch submitted separate written responses, including requested documents, to the U.S. National Highway Traffic Safety Administration in response to its investigation into high-pressure fuel pump failures in certain Affected Vehicles.[68]

c. A January 15, 2014 email from CARB to Thomas with the subject, "RE: VW response Re: V6TDI clarifications," CARB's Peter Ho referenced "previous discussions with Bosch," and inquired about false detections in the field.[69]

d. July 23, 2014 notes from Volkswagen referenced a phone call between Volkswagen, Bosch, CARB, and other automakers during which Bosch raised the issue of pin-pointing of wire faults of NOx and particulate matter sensors with a separate control unit.[70]

e. A February 9, 2015 email from VWAG's Steffen Vieser relayed an update from Bosch GmbH about a discussion between CARB and Bosch LLC's [redacted] re: a "non-erasable permanent fault code issue of the fuel pump electronic driver stage diagnostic," which Volkswagen suggested could be fixed by a "software update" requiring Bosch's assistance, which CARB approved.[71]

f. Notes from a June 10-11, 2015 meeting between CARB and Volkswagen reference a "Bosch discussion with ARB regarding PM [particulate matter] sensor introduction with Fe-doping." The meeting notes also record that CARB told Volkswagen that CARB did not want the emission monitors in a "contrived condition."[72]

116. Bosch did not disclose its knowledge of the illegal defeat device in any of these meetings or communications with U.S. regulators.

---

[67] VW-MDL2672-07235955.

[68] VW-MDL2672-00762181.

[69] VW-MDL2672-00465156 (emphasis added). These discussions began in 2011.

[70] VW-MDL2672-00887996.

[71] VW-MDL2672-00902633; VW-MDL2672-02449923.

[72] VW-MDL2672-02296983.

**4. Bosch Keeps Volkswagen's Secret Safe and Pushes "Clean" Diesel in the U.S.**

117. Bosch not only kept Volkswagen's dirty secret safe, it went a step further and actively lobbied lawmakers to push "Clean Diesel" in the U.S., including making Affected Vehicles available for regulators to drive.

118. As early as 2004, Bosch announced a push to convince U.S. automakers that its diesel technology could meet tougher 2007 U.S. emission standards.[73] Its efforts ended up being a multiple-year, multi-million dollar effort, involving key players from both Bosch in Germany and Bosch in the U.S. Following the launch of its new EDC systems in 2006, Bosch hired mcapitol Managers, a lobbying firm to promote its "Clean Diesel" products on Capitol Hill and with the EPA. In Washington, DC, mcapitol Managers lobbied on Bosch's behalf to defeat a proposal that would have favored hybrid vehicle technology over "Clean Diesel" vehicles.

119. Bosch also coordinated studies to advance diesel technology in the U.S. In September 2006, Bosch's [redacted] reached out to Volkswagen and Audi to request their participation in the "Martec Light Duty Diesel Market Opportunity Assessment." The study's goal was to develop coordinated strategies to accelerate advancements of light duty diesel technology in the U.S.[74]

120. Bosch's promotion of diesel technology specifically targeted the U.S. For example, Bosch put on "Diesel Days in California," "Deer Conference: EGT Focus," and "SAE World Congress in Detroit." In 2008, Bosch LLC and VW America co-sponsored the "Future Motion Made in Germany-Second Symposium on Modern Drive Technologies" at the German Embassy in Washington, D.C., with the aim of providing a venue for "stakeholders to gain insight into the latest technology trends and engage in a vital dialogue with industry leaders and policymakers."[75]

121. Bosch LLC hosted multi-day conferences open to many regulators and legislators and held private meetings with regulators, in which it proclaimed extensive knowledge of the

[73] Mar. 8, 2004, Edmund Chew, Autonews.

[74] VW-MDL2672-06136031.

[75] VW-MDL2672-00234383.

specifics of Volkswagen technology, including calibrations necessary for the Affected Vehicles to comply with emissions regulations.

122. For example, in April 2009, Bosch organized and hosted a two-day "California Diesel Days" event in Sacramento, California. Bosch invited a roster of lawmakers, journalists, executives, regulators, and NGOs with the aim of changing perceptions of diesel from "dirty" to "clean." The event featured Affected Vehicles as ambassadors of "Clean Diesel" technology, including a 2009 VW Jetta "green car." The stated goals were to "generat[e] a positive perception of Clean Diesel in passenger vehicles" and to "educate California stakeholders about the immediate benefits [of] Clean Diesel passenger vehicles" in reducing emissions. A key feature of the event included "Bosch Vehicles Being Deployed."[76] Attendees included [redacted] ([redacted] Diesel Systems, Bosch LLC); [redacted] [redacted] Diesel Engineering, Bosch Support Staff, Bosch GmbH); [redacted] ([redacted], Marketing, Diesel Systems, Robert Bosch LLC); and [redacted] ([redacted] External Affairs, Robert Bosch LLC).

123. In 2009, Bosch also became a founding member of the U.S. Coalition for Advanced Diesel Cars. One of this advocacy group's purposes included "generating awareness to legislators and regulators on the benefits of "Clean Diesel" technology for passenger cars, through engagement in policy, regulatory and advocacy activities."

124. Another example of Bosch's U.S. lobbying is the 2009 "California Green Summit." As part of its "Clean Diesel" partnership with Volkswagen, Bosch deployed two 2009 Jetta TDI Volkswagens to attendees with the express purpose of "Influencing California," and inviting CARB, the Western Automotive Journalist Organization, and many others.

125. In September 2009, Bosch held a Diesel Technology Forum in California. [redacted] (Diesel Systems/Engineering; Vehicle and Engine Laboratory of Bosch) attended, as did VW's Stuart Johnson, R. Dorenkamp and G. Pamio, along with Juergen Peter. Following this forum, in October 2009, Mightycomm (Bosch's California lobbyist) outlined a proposal for "OEM

---

[76] *Id.* 115-45; VW-MDL2672-03331605.

Vehicle Placement Program targeting influential California NGOs and Regulators."[77] This memo was addressed to Bosch's [redacted], [redacted] and Bosch Diesel Systems. **Mightycomm specifically stated "[v]ehicles placed with CARB would have to be … *newer models that can withstand possible dynamometer testing. While we do not anticipate a vehicle placed with CARB would be inspected, examined, or tested on a dynamometer, there is no assurance some CARB staff won't want to do this.*"**[78] On the other hand, Mightycomm advised not to worry about a vehicle being tested by the California Energy Commission ("CEC") "as the CEC is not equipped to conduct such inspections."[79]

126. In 2010, Bosch sponsored the Virginia International Raceway with the support of the 2010 Volkswagen Jetta Cup Series. This included the 2009 "Sidewinder" which Bosch featured for its "performance exhaust system."

127. In its lobbying on behalf of "Clean Diesel," Bosch had to continually cover up the dirty secret of the defeat device in the Affected Vehicles. In a January 13, 2010 memo addressed to Bosch's [redacted] and [redacted], Mightycomm noted that "Clean Diesel has been ranked the green car of the year" two years in a row—2009 and 2010. And yet Bosch knew the Affected Vehicles could not obtain the results being advertised without activating the defeat device.

128. Bosch's [redacted] ([redacted]) presented on "Clean Diesel" technology before the CEC on June 19, 2013, specifically pinpointing "key influencers," such as specific NGOs that have not traditionally engaged CARB, "who we need to reach, rally and motivate."[80]

129. In its efforts to promote "Clean Diesel," including the Affected Vehicles, Bosch acted on behalf of its global group. As an example, Bosch put on a two-day presentation on June 27-28, 2007, about meeting the demands of U.S. emission legislation, where it focused on lowering emissions in diesel vehicles. Each of the presentation's 30 pages bears both the "Bosch"

---

[77] VW-MDL2672-15182932

[78] *Id.* (emphasis added).

[79] *Id.*

[80] VW-MDL2672-00885348.

name and "Bosch Engineering GmbH" but makes no mention of Bosch LLC.[81] The aforementioned memo from Mightycomm was addressed to "Bosch Diesel Systems." And each page of the presentation for California Diesel Days bears the label "BOSCH' in emboldened red type.[82] This is consistent with the ongoing representations that the Bosch entities, overseas and in the U.S. were "one-for-all-and-all-for-one" in promoting "Clean Diesel" technology to U.S. stakeholders.

**5. Denner Also Played a Critical Role in the Scheme.**

130. Prior to becoming CEO in 2012, Denner climbed the corporate ladder in Bosch's Engine ECU Development division, managing the development and sale of automotive engine computers, such as the EDC units that Volkswagen used as defeat devices. In 2006, Denner joined Bosch Germany's Board of Management and was later responsible for research and advance engineering, product planning, and technology coordination across the company's three business sectors from July 2010 until his appointment as CEO. Denner has agitated for the company to become more like a "start-up,"[83] and to develop a "culture of failure,"[84] where risk taking is rewarded, in an attempt to replicate the "California venture capitalist model."[85] Denner set the tone at the top of Bosch as a member of Bosch's Board of Management and later CEO. He embraced the Silicon Valley culture of moving fast, taking risks, and asking for forgiveness rather than permission.

---

[81] VW-MDL2672-05676990.

[82] VW-MDL2672-03331605.

[83] *See* Interview with Bosch Director Volkmar Denner, Jan. 21, 2015, available at http://www.uni-stuttgart.de/forschung-leben/forschung-persoenlich/persoenlich_artikel0005.en.html.

[84] *See* Martin-Werner Bucdhenau, The Multinational Start-up: The engineering and electronics giant Bosch is putting aside its conservative tendencies and investing in a new innovation unit that it hopes will rival successful start-up incubators, Handelsblatt, Nov. 28, 2014, available at https://global.handelsblatt.com/edition/64/ressort/companies-markets/article/the-multinational-start-up.

[85] *See* Nick Gibbs, German auto firms try to nurture Silicon Valley boldness, Automotive News, Nov. 22, 2015, available at http://www.autonews.com/article/20151122/OEM06/311239956/german-auto-firms-try-to-nurture-silicon-valley-boldness.

131. As he rose in the ranks, Denner worked to foster Bosch's relationship with key corporate partners, like Volkswagen, which brought in billions of dollars in annual revenues. Denner immersed himself in the day-to-day business of Bosch's important customers. Illustrating how important Volkswagen was to Bosch, Denner communicated directly with Volkswagen's Winterkorn about the companies' relationship and Bosch products sold to Volkswagen. For example, when Bosch ran out of oxygen sensor parts that Volkswagen ordered for its vehicles, Denner reached out directly to Winterkorn. Denner and Winterkorn directly communicated over parts delays and shortages, implying that each was not a manager who governed from afar, but rather was intricately involved in the details of operations.

132. In May 28, 2014, Denner participated in a meeting with Defendant Winterkorn and other Bosch and Volkswagen executives at Volkswagen headquarters concerning their partnership in the U.S. market. Among other topics, participants discussed the "akustikfunktion" in Volkswagen diesel vehicles.[86] Thus, Denner and Winterkorn were aware of the illegal use of the defeat devices at least by May 2014.

133. In sum, Bosch played a crucial role in the fraudulent enterprise and profited handsomely from it. It is no exaggeration to say that Bosch provided Volkswagen with the most critical elements necessary to create an engine capable of being (fraudulently) represented as achieving the most stringent U.S. emission standards. All of the Bosch content provided to the Volkswagen production line combined—including the ECU, software, fuel system, sensors, and harness—accounted for a sizeable portion of the total material cost of the engines. This is very big business for Bosch.

**D. Volkswagen Falsely Pitched Itself as a Leader in Environmental Issues**

134. Despite Volkswagen's ascension to become the world's biggest automaker, Volkswagen sales lagged in the United States. Volkswagen has sought to improve sales in the United States by touting the performance and reliability of its vehicles and its environmental leadership. Volkswagen's 2013 Annual Report emphasizes that "Volkswagen intends to become

[86] VW-MDL2672-02569909.

the global economic and environmental leader among automobile manufactures by 2018" and that "[w]e are focusing in particular on the environmentally friendly orientation and profitability of our vehicle projects." Volkswagen's false proclamations of environmental friendliness were calculated to, and did artificially increase its public goodwill and brand value, and the price dealerships paid for the rights to sell VW cars.[87]

**E. Volkswagen Falsely Marketed its Diesel Engine Systems as Clean and Green**

135. While secretly using defeat devices to bypass emission testing, Volkswagen publicly declared a landmark victory—touting that it had successfully optimized its engines to maintain legal emissions, while simultaneously enjoying the cost savings of a LNT system. Volkswagen claimed it accomplished this by monitoring and adjusting combustion conditions and using a two-stage exhaust gas recirculation system to reduce initial emissions, while neutralizing the remaining ones with a LNT to comply with U.S. law.[88] Volkswagen branded and advertised this purportedly revolutionary technology to American consumers as "Clean Diesel" TDI technology.

136. Volkswagen broadly boasted about the performance and environmental cleanliness of its engine systems. In an October 2008 release, Volkswagen bragged:

> The Jetta TDI is amongst the ten most fuel efficient vehicles on the US market. In the recently published "Fuel Economy Guide 2009" the EPA (Environmental Protection Agency) listed the Jetta TDI in the top ten low consumption and low emissions vehicles.
>
> In the current edition of the publication, the Jetta 2.0 l Clean TDI, introduced to the market two months ago, is praised particularly for its excellent consumption figures - it has a fuel consumption of 5.7 litre per 100 kilometre. Moreover, the Jetta Clean TDI also fulfils stringent Californian emission standards. This was achieved through modifications within the engine and ***by implementing an exhaust treatment system developed especially by Volkswagen and which reduces nitrogen oxide emissions (NOx) by up to 90 percent***. The

[87] The fraudulently inflated costs to dealers not only included amounts dealers paid to acquire dealerships and franchise rights, but also capital investment costs. By artificially and fraudulently inflating its brand value, VW could impose and require franchise dealers to make capital investments, such as building new showrooms.

[88] *See* Hadler, *et al.*, *Volkswagen's New 2.0l TDI Engine Fulfils the Most Stringent Emission Standards*, INTERNATIONALES WIENER MOTORENSYMPOSIUM 2008; *see also Self Study Program 826803: 2.0 Liter TDI Common Rail BinS ULEV Engine*, VOLKSWAGEN OF AMERICA, INC. (2008).

> central element of the exhaust treatment system is the NOx storage catalytic converter.[89]

137. Since introducing the 2.0L TDI CleanDiesel engine in 2008, Volkswagen has touted it as a "fantastic power train" that "gives very good fuel economy" and "is also good for the environment because it puts out 25% less greenhouse gas emissions than what a gasoline engine would … cuts out the particulate emissions by 90% and the emissions of nitrous [sic] oxide are cut by 95% … [and is] clean enough to be certified in all 50 states."[90]

138. The TDI CleanDiesel engines are turbocharged and directly inject fuel into each cylinder via fuel injectors. Volkswagen has stated, "[t]he superior qualities of the 2.0 Liter TDI engine with common rail injection systems are oriented towards future challenges in acoustics, comfort, and exhaust gas after-treatment … confirming Volkswagen's role as a pioneer in diesel technology."

139. Volkswagen has marketed and advertised its CleanDiesel models as extraordinarily clean, EPA certified in all 50 states, and powerful. For example, the following promotional material was used in 2010, and similar materials have been used across the spectrum of models using the CleanDiesel engine system:

---

[89] *See* http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2008/10/vw_in_fuel_economy_guide.html (last accessed Sept. 23, 2015) (emphasis added).

[90] Statement of Volkswagen Group of America, Inc.'s Chief Operating Officer Mark Barnes, to The Business Insider, October 9, 2009.




140. Volkswagen's advertising, which keyed on the unique combination of clean, efficient, and highly performing, was very effective. In fact, Volkswagen has become the largest seller of diesel passenger vehicles in the United States.

141. In an October 2009 interview with Business Insider, when asked "[w]hat is the advantage of a diesel over a hybrid," VGoA's Chief Operating officer, Mark Barnes, stated: "It's also good for the environment because it puts out 25% less greenhouse gas emissions than what a gasoline engine would. And thanks to the uniqueness of the TDI motor, it cuts out the particulate emissions by 90% and the emissions of nitrous[sic] oxide are cut by 95%. So, a very very clean running engine. Clean enough to be certified in all 50 states."[91]

[91] Gayathri Vaidyanathan, *Volkswagen Preps for a Diesel Revolution*, The Business Insider, Oct. 9, 2009, http://www.businessinsider.com/volkswagen-preps-for-adiesel-revolution-2009-10.

142. Volkswagen doubled-down on "clean" and "green" vehicles. Being highly efficient, fun, and "clean" are the central messages for Volkswagen's diesel engine campaign.

143. Volkswagen also touted the performance characteristics of the TDI CleanDiesel, claiming that clean emission technology did not sacrifice its 236 lbs/ft of torque and turbocharged CleanDiesel engine. In a recent 2015 Volkswagen Golf sales brochure, Volkswagen stated "With the 2.0L TDI engine, you'll appreciate every fuel-efficient mile with the EPA-estimated 45 hwy mpg. But that's only half the story. Step on the pedal and feel the 236 lb-ft of torque and let the performance tell the other half."






144. Volkswagen also claimed that TDI Clean Diesel models "typically have a higher resale value versus comparable gasoline vehicles":




145. But even when Volkswagen knew that EPA investigators had discovered—or at the very least suspected—their fraud and the defeat device, it continued to deceive its customers and its franchise dealers like Plaintiffs through false recalls and false advertising.

146. Beginning in April 2015, Volkswagen issued VW Action Code 2306, which was a recall for CleanDiesel equipped vehicles. Volkswagen claimed that the recall was a "repair" and that it "improved" the engine management system. But many owners recorded a marked decrease in fuel efficiency and performance after the recall was completed.

147. Below is a copy of the Recall Notice sent to CleanDiesel owners in April 2015:

Das Auto.

Volkswagen of America, Inc.
3800 Hamlin Road
Auburn Hills, MI 48326

April 2015

**This notice applies to your vehicle:**

**Subject:** **Emissions Service Action 23O6 – ECM Software**
**Certain 2010-2014 Model Year Volkswagen Vehicles Equipped with a 2.0L TDI®**
**Clean Diesel Engine**

Dear Volkswagen Owner,

As part of Volkswagen's ongoing commitment to our environment, and in cooperation with the United States Environmental Protection Agency and the California Air Resources Board, we are informing you of our decision to conduct an emissions service action on certain 2010-2014 model year Volkswagen vehicles equipped with a 2.0L TDI® Clean Diesel engine. Our records show that you are the owner of a vehicle affected by this action.

**What is the issue, and what will we do?**

The vehicle's engine management software has been improved to assure your vehicle's tailpipe emissions are optimized and operating efficiently. Under certain operating conditions, the earlier strategy may have increased the chance of the vehicle's MIL light illuminating. If the MIL illuminates for any reason, your vehicle will not pass an IM emissions inspection in some regions.

To address this issue, your authorized Volkswagen dealer will update the ECM software in your vehicle. This work will take about one hour to complete and will be performed for you free of charge. Please keep in mind that your dealer may need additional time for the preparation of the repair, as well as to accommodate their daily workshop schedule.

**IMPORTANT!**
**Please note that if the ECM in your vehicle has been "chipped," "tuned," or otherwise modified from original factory specifications with aftermarket components and/or software, work needed to repair, replace, or return the ECM to original factory specifications is NOT covered under this action.**

**What should you do?**

In order to limit any possible inconvenience, please contact your authorized Volkswagen dealer as soon as possible to schedule this service.

2306/D8 CALI

148. But after having the recall installed, A3 owners made posts on enthusiast blogs such as the following two posts:

> Had my update done couple weeks ago and I've noticed a sizable performance hit afterwards, compared to previous tanks pre-update.
> 38.00 MPG
> 36.42 MPG

37.77 MPG
37.51 MPG
37.05 MPG
//////Recall performed
34.13 MPG
33.12 MPG

---

edt: real data...
bought car in jan in CA (first two is drive back)
38.14
36.63
32.10
32.99
32.77
32.15
29.94 (recall done during this tank)
26.67
25.79
26.10

149. Volkswagen continued its aggressive campaign to dupe its customers and dealers into believing its cars were clean and environmentally friendly. In advertisements appearing on its webpage as recently as September 21, 2015, Volkswagen extended the deceit. These ads have now been stripped from Volkswagen's websites.




150. Volkswagen's now dubious concern for the environment extended beyond its CleanDiesel campaigns. On the "Environment" page of its website, Volkswagen claims that it takes "environmental responsibility very seriously. When it comes to making our cars as green as

possible, Volkswagen has an integrated strategy focused on reducing fuel consumption and emissions, building the world's cleanest diesel engines and developing totally new power systems, which utilize new fuel alternatives."

151. Volkswagen trumpeted its apparent environmental *bone fides* when the Audi A3 TDI and VW Jetta TDI were named the 2010 Green Car of the Year and the 2009 Green Car of the Year. Ironically, the tag line of the most recent CleanDiesel advertisements was "***Promise kept***."[92]

152. On the Volkswagen CleanDiesel webpage, it continued to mislead consumers, touting the supposedly reduced greenhouse gas emission of the CleanDiesel engine system.[93]




153. Through its "Think Blue" program, Volkswagen claimed to have a policy of being "more responsible on the road and more environmentally conscious—not just in our cars." But whether Volkswagen had any care at all for the environment is now, at best, debatable.

154. On its website to promote its "clean" diesel technology, www.clearlybetterdiesel.org, Volkswagen falsely claimed that its CleanDiesel engine system reduces smog and "meets the highest standards in all 50 states, thanks to ultra-low sulfur diesel (ULSD) fuel and innovative engine technology that burns cleaner."

[92] *See* http://www.vw.com/features/clean-diesel/ (last visited Sept. 21, 2015). The content has since been removed.

[93] *See* http://www.audiusa.com/technology/efficiency/tdi?csref=116751439289858719 (last visited Sept. 21, 2015). The content has since been removed.

155. These themes extended to print brochures at dealerships and to VW's website. The brochures emphasized that VW's "clean" diesel was "clean," "green," and low emission. For example, a "2012 Volkswagen Family" brochure for all VW models, states:

> Let TDI "clean" diesel set you free from the filling station. Our TDI engines achieve astonishing mileage and range—up to 43 highway mpg and 795 miles on a single tank without sacrificing one bit of turbocharged performance. **That's all thanks to the TDI technology that uses a direct injection system and runs on ultra-low-sulfur diesel, helping reduce sooty emissions by up to 90% compared to previous diesel engines.** On most models, you can even choose the available DSG automatic transmission with Tiptronic to take that turbo engine to a whole new level.[94] [Emphasis added.]

156. Similarly, a "2013 Volkswagen Family" brochure, applicable to all models, states:

> When you've had your fill of filling stations, hit the road in your TDI "clean" diesel Volkswagen. These engines achieve astonishing mileage and range-up to 43 highway mpg and 795 miles on a single tank without sacrificing one bit of turbocharged performance. **That's all thanks to the TDI technology that uses a direct injection system, and runs on ultra-low-sulfur diesel, helping reduce emissions by up to 90% compared to previous diesels.** Far and away, it's our best diesel yet.[95] [Emphasis added.]

157. And a 2012 "Volkswagen TDI "clean" diesel" brochure for the six models of Volkswagen TDIs then on the market (Jetta, Jetta SportWagen, Golf, Passat, Beetle, and Touareg) states:

> **These are not the kind of diesel engines that you find spewing sooty exhaust like an old 18-wheeler.** Clean diesel vehicles meet the strictest EPA standards in the U.S. Plus, TDI technology helps reduce sooty emissions by up to 90%, giving you a fuel-efficient and eco-conscious vehicle.
>
> …
>
> **Think beyond green.** TDI represents one part of the Volkswagen Think Blue initiative, our goal of creating and encouraging eco-conscious products and behaviors. Join us in being more responsible on the road and on the planet.[96]

---

94 Brochure: 2012 Volkswagen Family, http://cdn.dealereprocess.com/cdn/brochures/volkswagen/2012-family.pdf.

95 Brochure: 2013 Volkswagen Family, http://cdn.dealereprocess.com/cdn/brochures/volkswagen/2013-volkswagenfamily.pdf.

96 Brochure: 2012 Volkswagen TDI® Clean Diesel, http://cdn.dealereprocess.com/cdn/brochures/volkswagen/2012-family.pdf.

158. Further, a Volkswagen 2010 TDI Jetta and Jetta SportWagen brochure states:

> The 2.0L TDI® "clean" diesel engine gives you 140hp and 236 lbs-ft of torque. This engine is the toast of Europe for its quickness, low emissions, and fuel efficiency—a staggering 38 city/44 highway mpg (automatic) based on real-world AMCI-certified testing (30 city/42 highway mpg. EPA estimates).
>
> …
>
> Jetta TDI "clean" diesel offers fuel efficiency, power, performance, and a $1,300 tax credit from Uncle Sam because it qualifies as an Advanced Lean Burn Credit. **Or, in other words, lean, mean, cleaner burning machines. Volkswagen believes in delivering a no-compromise German-tuned auto that performs, and still leaves a small carbon footprint. The Volkswagen TDI engine is cleaner than conventional diesels, emitting as much as 95% less soot than previous diesel engines, as well as a reduction in oxides of nitrogen and sulfur.** It's powerful, with the kind of low-end torque that racers and tuners demand. It's efficient, using a turbocharger and smart exhaust design to burn fuel more effectively. So much so, in fact, that Volkswagen was the first automaker to make clean diesel cars certified in all 50 states. And best of all, it will help save you money with an out-of-this-world AMCI-estimated mileage of 38 city/44 highway mpg (automatic) and over 594 miles on a single tank of fuel.
>
> There's even a Jetta SportWagen TDI "clean" diesel, with the same astonishing clean diesel technology, plus a whopping 66.9 cubic feet of cargo room.[97] [Emphasis added.]

159. And a Volkswagen 2011 Golf TDI brochure states:

> Regardless of which Golf model you get, you'll be seeing a lot fewer gas stations and a lot more road. The 2.5L Golf comes standard with a 170-hp, in-line five-cylinder engine with 177 lbs/ft torque and impressive fuel efficiency rated at 23 city/30 highway mpg. Opt for the Golf TDI model and you'll enjoy a turbocharged clean diesel engine with 140 hp and 236 lbs/ft of torque that will run you even farther at a whopping 30 city/42 highway mpg. That's up to 609 miles per tank. **And you'll do it all with 95 percent fewer sooty emissions than diesel engines of old, making it cleaner for both you and the planet.** So whether you're in the market for IntelliChoice's 2010 "Best Overall Value Compact Car over $17,000," or you want to go for a variation on that theme and get the ever-popular TDI model, you can't go wrong. In fact, you can go very right for a long, long time."[98]

---

[97] Brochure: 2010 Volkswagen Jetta and Jetta SportWagen, http://www.slideshare.net/SteveWhiteVW/2010-volkswagen-jetta-brochure-greenville.

[98] Brochure: 2011 Volkswagen Golf, http://cdn.dealereprocess.com/cdn/brochures/volkswagen/2011-golf.pdf.

160. A Volkswagen 2012 Passat TDI brochure states:

> Let the Passat TDI "clean" diesel set you free from the filling station. It achieves an astonishing 43 highway mpg and travels 795 miles on a single tank without sacrificing one bit of turbocharged performance. **That's all thanks to its TDI technology that uses a direct injection system and runs on ultra-low-sulfur diesel, helping reduce sooty emissions by up to 90% compared to previous diesel engines.** You can even choose the available DSG automatic transmission with Tiptronic to take that turbo engine to a whole new level.
>
> …
>
> The TDI "clean" diesel engine was designed and engineered around one simple belief: driving is more fun than refueling. **So besides the reduced emissions and torque-filled benefits you experience behind the wheel of the Passat TDI, it also saves you money at the pump**.[99] [Emphasis added.]

161. A Volkswagen 2013 Beetle TDI brochure states:

> Start the TDI® "clean" diesel model and hear the surprisingly quiet purr of **the first clean diesel Beetle,** designed for both power and efficiency.[100] [Emphasis added.]

162. A Volkswagen 2014 Beetle TDI brochure states:

> 2.0L TDI "clean" diesel engine. Engineered with the idea that less is more. The Beetle TDI has lower $CO_2$ emissions compared to 84% of other vehicles. **So every getaway you make will be a cleaner one**.[101] [Emphasis added.]

163. A Volkswagen 2014 TDI Touareg brochure states:

> 3.0L TDI "clean" diesel engine. Engineered with the idea that less is more. The Touareg TDI has lower CO2 emissions compared to 88% of other vehicles. **So every getaway you make will be a clean one.**[102] [Emphasis added.]

## F. Volkswagen's CleanDiesel Engine Systems Were a Fraud

164. Defendants' illegal scheme started to unravel approximately five years after Volkswagen introduced its first diesel model containing the defeat device into the U.S. stream of commerce. In May 2014, West Virginia University's Center for Alternative Fuels, Engines &

---

[99] Brochure: 2012 Volkswagen Passat, https://static.beepi.com/Brochures/17001.pdf.

[100] Brochure: 2013 Volkswagen Beetle, https://static.beepi.com/Brochures/22980.pdf.

[101] Brochure: 2014 Volkswagen Beetle, https://static.beepi.com/Brochures/23900.pdf.

[102] Brochure: 2014 Volkswagen Touareg, https://static.beepi.com/Brochures/18663.pdf.

Emissions published results of a study commissioned by the International Council on Clean Transportation ("ICCT"), which found that certain of the Affected Vehicles' real world $NO_X$ and other emissions exceeded the allowable EPA emission standards.[103]

165. The ICCT researchers had been comparing the real-world performance of "clean" diesel vehicles in Europe with reported results and noted numerous discrepancies. Since the U.S. emission regulations were significantly more stringent than its European counterparts, the ICCT sought to test the equivalent U.S. "clean" diesel cars, presuming that they would run cleaner. West Virginia University was a qualified and enthusiastic partner, as they had already been engaged in the study of heavy truck emissions.

166. Shockingly, the study showed that, contrary to testing lab results, real world driving of Volkswagen "clean" diesel vehicles produced levels of $NO_X$ up to 40 times higher than legal limits promulgated by the EPA and CARB:




167. The results of this study prompted an immediate investigation by the EPA and CARB, both of whom demanded an explanation from Volkswagen. Despite knowing that the Affected Vehicles contained illegal emission systems—and defeat devices intentionally designed to comply with emission standards on a test bench but not under normal driving operation and use—

[103] *See Final Report: In Use Emissions Testing of Light-Duty Diesel Vehicles in the United States*, International Council on Clean Transportation (May 15, 2015), http://www.theicct.org/sites/default/files/publications/WVU_LDDVin-use_ICCT_Report_Final_may 2014.pdf.

Volkswagen failed to come clean. Instead, Volkswagen denied the allegations and blamed faulty testing procedures.

168. In December 2014, Volkswagen issued a recall purportedly to update emission control software in the Affected Vehicles, and CARB (along with the EPA) conducted follow-up testing of the Affected Vehicles in the laboratory and during normal road operation. CARB attempted to identify the source and nature of the Affected Vehicles' poor performance and determine why their on-board diagnostic systems did not detect the increased emissions. None of the technical issues suggested by Volkswagen adequately explained the $NO_X$ test results as confirmed by CARB.

169. Dissatisfied with Volkswagen's explanations, EPA and CARB officials finally threatened to withhold the COCs for Volkswagen's 2016 diesel vehicles until it adequately explained the anomaly of the higher emissions. Then, and only then, did Volkswagen finally relent and start to lift the curtain on its illegal scheme.

**G. Once Caught, Volkswagen Admitted its Fraud—in Part, but Simultaneously Sought to Cover Up the Scope of Its Deceit**

170. On September 3, 2015, Volkswagen officials finally disclosed at a meeting with the EPA and CARB that it had installed a sophisticated software algorithm on the 2.0-liter Affected Vehicles, which could detect when the car was undergoing emission testing on a test bench and switch the car into a cleaner running mode. During that meeting, Volkswagen admitted that the software was a "defeat device" forbidden by the CAA and state regulations.

171. On September 18, 2015, the EPA issued a Notice of Violation of the CAA (the "First NOV") to VWAG, Audi AG, and VW America for installing illegal defeat devices in 2009-2015 Volkswagen and Audi diesel cars equipped with 2.0-liter diesel engines. That same day, CARB sent a letter to VWAG, Audi AG, and VW America, advising that it had initiated an enforcement investigation of Volkswagen pertaining to the vehicles at issue in the First NOV.

172. Two days later, Volkswagen made its first public admission of wrongdoing in a written statement and video by VWAG's then-CEO Winterkorn (who would soon resign as a result of this scandal), posted on VWAG's website. Winterkorn's statement read, in pertinent part:

> I personally am deeply sorry that we have broken the trust of our customers and the public. We will cooperate fully with the responsible agencies, with transparency and urgency, to clearly, openly, and completely establish all of the facts of this case. Volkswagen has ordered an external investigation of this matter…. We do not and will not tolerate violation of any kind of our internal rules or of the law.[104]

173. In his video, Winterkorn further apologized by stating:

> The irregularities in our group's diesel engines go against everything Volkswagen stands for. To be frank with you, manipulation at Volkswagen must never happen again…. I personally am deeply sorry that we have broken the trust of our customers. I would like to make a formal apology to our customers to the authorities and to the general public for this misconduct.[105]

174. That same day, Volkswagen confirmed that it had ordered dealers to stop selling both new and used vehicles with 2.0-liter diesel engines.[106] Volkswagen continued to sell its 3.0-liter diesel models, despite containing similar, but not-yet-disclosed defeat devices.

175. On September 21, 2015, Volkswagen spokesman John Schilling stated in an email that Volkswagen was "committed to fixing this issue as soon as possible" and to "developing a remedy that meets emissions standards and satisfies our loyal and valued customers."[107]

176. Michael Horn, President and CEO of VGoA, echoed this sentiment when he took the stage later that evening at a launch event for the 2016 Volkswagen Passat in Brooklyn, New York, telling reporters:

> Our company was dishonest, with the EPA and the California Air Resources Board, and with all of you and in my German words, ***we have totally screwed up***. We have to make things right, with the

[104] *See Statement of Prof. Dr. Martin Winterkorn, CEO of Volkswagen AG*, Volkswagen AG (Sept. 20, 2012), http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2015/09/statement_ceo_of_volkswagen_ag.html.

[105] *See* Joe Lorio, *VW Chairman Martin Winterkorn Releases Video Addressing Scandal, Is Not Stepping Down*, Car and Driver (Sept. 22, 2015), http://blog.caranddriver.com/vw-chairman-martin-winterkorn-releases-video-addressing-scandal-is-not-stepping-down/.

[106] Jack Ewing, *Volkswagen to Stop Sales of Diesel Cars Involved in Recall*, N.Y. Times (Sept. 20, 2015), http://www.nytimes.com/2015/09/21/business/international/volkswagen-chief-apologizes-for-breach-of-trust-after-recall.html.

[107] Jad Mouadwad, *et al.*, *The Wrath of Volkswagen's Drivers*, N.Y. Times (Sept. 21, 2015), http://www.nytimes.com/2015/09/22/business/the-wrath-of-volkswagens-drivers.html.

> government, the public, our customers, our employees and also very important, our dealers.[108] [Emphasis added.]

177. Horn's presentation on the new Passat, notably, did not promote the environmental efficiency of the car's "clean" diesel model.

178. On September 22, 2015, Volkswagen announced that 11 million diesel cars worldwide were installed with the same defeat device software that had evaded emission testing by U.S. regulators. Contemporaneously, Volkswagen announced that it had set aside reserves of 6.5 billion euros ($7.3 billion) in the third quarter to address the matter.[109]

179. On September 23, 2015, Winterkorn resigned from his position as CEO of VWAG. In his resignation statement, Winterkorn insisted that he was not personally involved in the emissions scandal: "Above all, I am stunned that misconduct on such a scale was possible in the Volkswagen Group. I am doing this in the interests of the company even though I am not aware of any wrongdoing on my part."[110]

180. Following Winterkorn's resignation, Volkswagen released a statement that it had set up a special committee to lead its own inquiry into the scandal and expected "further personnel consequences in the next days." It added: "The internal group investigations are continuing at a high tempo. All participants in these proceedings that have resulted in immeasurable harm for Volkswagen will be subject to the full consequences." However, the committee insisted that Winterkorn "had no knowledge of the manipulation of emissions data."[111]

181. On September 25, 2015, Matthias Müller, the Chairman of Porsche AG, was named as Winterkorn's successor. Immediately upon assuming his new role, Müller issued a press release stating:

---

[108] Christine Seib, *Volkswagen's US Boss: We Totally Screwed Up*, CNBC (Sept. 22, 2015), http://www.cnbc.com/2015/09/21/volkswagen-us-ceo-screwed-up-on-eca-emissions-diesel-test-rigging.html.

[109] Nathan Bomey, *Volkswagen Emission Scandal Widens: 11 Million Cars Affected*, USA Today (Sept. 22, 2015), http://www.usatoday.com/story/money/cars/2015/09/22/volkswagen-emissions-scandal/72605874/.

[110] Graham Ruddick, *Volkswagen chief quits over emissions scandal as car industry faces crisis*, The Guardian (Sept. 23, 2015), http://www.theguardian.com/business/2015/sep/23/volkswagen-chief-martin-winterkorn-quits-emissions-scandal.

[111] *Id.*

> My most urgent task is to win back trust for the Volkswagen Group – by leaving no stone unturned and with maximum transparency, as well as drawing the right conclusions from the current situation. Under my leadership, Volkswagen will do everything it can to develop and implement the most stringent compliance and governance standards in our industry.[112]

182. Meanwhile, in Auburn Hills, Michigan, where VGoA houses its Information Technology Group, VW employees were ignoring a Department of Justice Directive to stop deleting and maintain any electronic records related to the Dieselgate scandal. In a lawsuit filed March 8, 2016, a former VW Technical Manager named Daniel Donovan alleges that he was fired for his refusal to participate in, and attempt to stop, destruction of electronic evidence relevant to the Dieselgate scandal.

183. Donovan alleges in his lawsuit that on the day the NOV was issued, September 18, 2015, he was instructed by his supervisor, Robert Arturi, to contact VW Executive Vice President and Chief Information Officer, Abdallah Shanti, and advise him to "stop deleting data effective immediately pursuant to a Department of Justice hold." Donovan further alleges that when he relayed this message to Shanti, Shanti swore at him and did not stop deletion jobs at VW until September 21, 2015. Donovan alleges that thereafter, VW did not stop deleting back-up data relevant to the Dieselgate scandal, even though it knew that it was supposed to preserve such back-ups. And he alleges that VW did not provide to its outside investigator full access to the electronically stored information available. Finally, Donovan alleges that after contacting VW's Office of General Counsel to report his concerns with these practices, he was fired in retaliation for whistle-blowing.[113]

184. On October 8, 2015, Horn made frank admissions of culpability in his testimony before the House Committee on Energy and Commerce's Subcommittee on Oversight and Investigations. Under oath, Horn testified: "On behalf of our Company, and my colleagues in Germany, I would like to offer a sincere apology for Volkswagen's use of a software program that

[112] *Matthias Müller appointed CEO of the Volkswagen Group*, Volkswagen AG (Sept. 25, 2015), http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2015/09/CEO.html.

[113] *See Donovan v. Volkswagen Group of America, Inc. and Abdallah Shanti*, Case No. 2016-151877-CD (Oakland County Circuit Court March 8, 2016).

served to defeat the regular emissions testing regime."[114] In response to a question from the Subcommittee Chairman, Representative Tim Murphy, whether the software was installed "for the express purpose of beating tests," Horn testified, "it was installed for this purpose, yes."[115]

185. On November 2, 2015, the EPA issued a second Notice of Violation of the CAA (the "Second NOV") to VWAG, Audi AG, and VGoA, this time directed at the larger 3.0-liter, 6-cylinder diesel models—the same vehicles that Volkswagen continued to sell through its dealers after the First NOV.[116] The Second NOV, which was also issued to Porsche AG and Porsche America, alleged that Volkswagen had installed illegal defeat devices in certain vehicles equipped with 3.0-liter diesel engines for model years 2014-16. Although not identical, the cheating alleged of Volkswagen in the Second NOV concerned essentially the same mechanism Volkswagen used—and admitted to using—in the First NOV.

186. However, shortly after it received the Second NOV, Volkswagen fired back at the EPA's new claims of fraud, denying that it installed defeat device software in the identified 3.0-liter diesel vehicles. In response to the Second NOV, Volkswagen issued the following bold statement: "Volkswagen AG wishes to emphasize that no software has been installed in the 3.0-liter V6 diesel power units to alter emissions characteristics in a forbidden manner."[117]

187. Yet, the following day, despite Volkswagen's insistence that the 3.0-liter diesel emission system was legal, Volkswagen ordered dealers to stop selling all six models at issue in the Second NOV, in addition to the Audi Q7, which was also equipped with a 3.0-liter diesel engine.[118]

---

[114] *Supra* note 1.

[115] *Id.*

[116] Letter from Susan Shinkman, Director, EPA Office of Civil Enforcement to Volkswagen dated Nov. 2, 2015, http://www.epa.gov/sites/production/files/2015-11/documents/vw-nov-2015-11-02.pdf.

[117] Emily Field, *Volkswagen Slams Newest EPA Emissions Fraud Claims*, Law360 (Nov. 3, 2015), http://www.law360.com/articles/722478/volkswagen-slams-newest-epa-emissions-fraud-claims.

[118] Paul Lienert, *Volkswagen tells dealers to stop selling some 3.0 V6 diesel models*, Reuters (Nov. 4, 2015), http://www.reuters.com/article/us-volkswagen-emissions-stopsale-idUSKCN0ST2E420151104.

188. On November 4, 2015, following its directive to halt sales of the 3.0-liter diesel models, Volkswagen announced that an internal investigation revealed "unexplained inconsistencies" with the carbon-dioxide output of 800,000 of its gasoline-powered vehicles.[119]

189. On November 22, 2015, after almost three weeks of denying the EPA's allegations contained in the Second NOV, Audi finally admitted that defeat device software was installed in all of its diesel vehicles. Specifically, Audi stated that it had failed to disclose three auxiliary emissions control devices in its 3.0-liter diesel engines to U.S. regulators, and further admitted: "One of them is regarded as a defeat device according to applicable U.S. law. Specifically, this is the software for the temperature conditioning of the exhaust-gas cleaning system."[120] This admission came almost three months after Volkswagen's initial, more limited *mea culpa*.

190. Still, despite the admissions and apologies that followed each time a Volkswagen lie was exposed, it became apparent that Volkswagen was not ready to fully accept responsibility for its actions. Indeed, merely one month after Volkswagen admitted to the findings in the Second NOV, Hans-Gerd Bode, Volkswagen's Group Communications Chief, told a group of reporters: "I can assure you that we certainly did not, at any point, knowingly lie to you…. We have always tried to give you the information which corresponded to the latest level of our own knowledge at the time."[121]

191. On January 4, 2016, the DOJ, on behalf of the EPA, filed a civil complaint against VWAG, VGoA, Volkswagen Group of America Chattanooga Operations LLC, Audi AG, Audi, Porsche AG, and Porsche America for injunctive relief and the assessment of civil penalties for their violations of the CAA. In addition to alleging the various violations of the CAA, the complaint states that the Defendants impeded the government's efforts to learn the truth about the

---

[119] Benedikt Kammel, *VW Emissions Issues Spread to Gasoline Cars*, Bloomberg (Nov. 3, 2015), http://www.bloomberg.com/news/articles/2015-11-03/volkswagen-emissions-woes-deepen-as-800-000-more-cars-affected.

[120] *Statement on Audi's discussions with the US environmental authorities EPA and CARB*, Volkswagen AG (Nov. 23, 2015), http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2015/11/epa.html.

[121] Andreas Cremer, *Das Auto' no more: Volkswagen plans image offensive*, Reuters (Dec. 22, 2014), http://www.reuters.com/article/us-volkswagen-emissions-communications-i-idUSKBN0U514L20151222.

emission irregularities related to the Affected Vehicles with material omissions and misleading information.

192. On January 10, 2016, in an interview with NPR at the North American International Auto Show, Müller claimed that Volkswagen ***did not lie*** to U.S. regulators about emissions problems with its diesel engines, and suggested that the whole thing had been a misunderstanding of U.S. law. Müller stated:

> Frankly spoken, it was a technical problem. We made a default, we had a … not the right interpretation of the American law. And we had some targets for our technical engineers, and they solved this problem and reached targets with some software solutions which haven't been compatible to the American law. That is the thing. And the other question you mentioned – it was an ethical problem? I cannot understand why you say that. … We didn't lie. We didn't understand the question first. And then we worked since 2014 to solve the problem.[122]

193. Moreover, since the fraud was first exposed, Volkswagen has consistently denied that its top executives were involved with, or had knowledge of, the fraudulent scheme, instead pinning the blame on the work of a few rogue engineers.

194. As an alternative tactic, during Horn's Congressional hearing on October 8, 2015, Horn testified that the installation of the defeat device in certain Volkswagen diesel vehicles was the work of "a couple of software engineers who put this in for whatever reason."[123] Horn's explanation is not only contrary to prior admissions, but entirely implausible.

195. To date, at least a dozen of Volkswagen's top executives have either resigned under pressure or been fired. Among the top executives dismissed are Winterkorn, CEO and Chairman of Volkswagen, who resigned almost immediately once the scandal became public; Dr. Ulrich Hackenberg, a top engineering boss in the Audi Group, who was suspended and later resigned; Heinz-Jakob Neusser, described as a Volkswagen "development" boss, who was suspended and later resigned; and Wolfgang Hatz, Porsche's "development" boss and previously Volkswagen's

---

[122] Sonari Glinton, *'We Didn't Lie,' Volkswagen CEO Says Of Emissions Scandal*, NPR (Jan. 11, 2016), http://www.npr.org/sections/thetwo-way/2016/01/11/462682378/we-didnt-lie-volkswagen-ceo-says-of-emissions-scandal.

[123] Paul A. Eisenstein, *Could Rogue Software Engineers Be Behind VW Emissions Cheating?*, NBC News (Oct. 9, 2015), http://www.nbcnews.com/business/autos/could-rogue-software-engineers-be-behind-vw-emissions-cheating-n441451.

head of engine development, who was suspended and then resigned. Furthermore, one of Volkswagen's top advertising executives purportedly "resigned" (although the company has said that the resignation was unrelated to the present scandal), and VGoA has replaced their general counsel and head of public affairs, David Geanacopoulos. Just recently, Frank Tuch, VWAG's head of quality assurance, also resigned, his departure likely tied to leadership overhauls as Volkswagen's internal investigations continue. Finally, Michael Horn, the centerpiece of VW's Congressional responses and head of VGoA, has also recently departed the company.

196. That a few rogue engineers could orchestrate this massive, worldwide scheme is implausible not only because of the firings of the above-listed executives, but also because Volkswagen has been implicated using not just one, but ***two*** sophisticated defeat device software programs, in ***two*** separate engines designed and manufactured by different engineers in different corporate facilities. In addition, more than a dozen different Affected Vehicles, involving three separate brands—Volkswagen, Audi and Porsche—have been implicated in a fraud that began more than a decade ago.

197. On October 17, 2015, Reuters reported that anonymous insiders, including a Volkswagen manager and a U.S. official close to the government's investigation of the company, claimed that Volkswagen made several modifications to its emission defeat device software over the seven years the company has admitted to cheating.[124] Such incremental updates to the software, which were made to accommodate new generations of engines during that timeframe, evidences a larger group of employees making an ongoing effort to continue their deception.

198. As discussed above, on January 22, 2016, Germany's *Sueddeutsche Zeitung* newspaper reported that Volkswagen's development of defeat device software to cheat diesel emissions tests was an "open secret" in its engineering development department. Staff members in engine development have stated that they felt pressure from the top of Volkswagen's corporate hierarchy to find a cost-effective solution to develop clean diesel engines to increase U.S. market

[124] Andreas Cremer, *et al.*, *VW made several defeat devices to cheat emissions tests: sources*, Reuters (Oct. 17, 2015), http://www.reuters.com/article/us-volkswagen-emissions-software-idUSKCN0SB0PU20151017.

share. Rather than concede that such engines could not be built (*i.e.*, were "impossible" as R&D chief Hatz once proclaimed), the development team decided to push ahead with manipulation.[125]

199. Quoting documents from Volkswagen's internal investigation, which included testimony from a staff member who took part in the fraud, the German newspaper said: "Within the company there was a culture of 'we can do everything', so to say something cannot be done, was not acceptable.... Instead of coming clean to the management board that it cannot be done, it was decided to commit fraud."[126] The newspaper further reported that staff in Volkswagen's engine development department took comfort from the fact that regulators would not be able to detect the fraud using conventional examination techniques.

200. The role of Volkswagen's top management in the fraud has recently come under increased scrutiny after reports have emerged that Winterkorn was aware that Volkswagen was rigging emissions tests on its vehicles more than a year before the scandal emerged, yet did nothing to stop the practice.[127]

201. According to German newspaper *Bild-Zeitung*, Winterkorn and other high-level Volkswagen managers were warned by a senior executive about the risk of a U.S. investigation into the use of the defeat devices back in May 2014.[128] The newspaper reported that the warning came in the form of a letter from Bernd Gottweis, an employee known internally as the "fire-fighter," who led a team called the "Product Safety Taskforce," which concentrated on crisis prevention and management. The letter, which was uncovered by the internal investigation carried out on Volkswagen's order, stated: "There is no well-founded explanation for the dramatically higher NOX emissions that can be given to the authorities. It is to be suspected, that the authorities will examine the VW systems to see whether Volkswagen has installed engine management software (a so-called Defeat Device)."

---

[125] Georgina Prodhan, *Volkswagen probe finds manipulation was open secret in department: newspaper*, Reuters (Jan. 23, 2016), http://www.reuters.com/article/us-volkswagen-emissions-investigation-idUSKCN0V02E7.

[126] *Id.*

[127] Geoffrey Smith, *VW's ex-CEO Winterkorn 'Knew About Defeat Device in Early 2014,'* Fortune (Feb. 15, 2016), http://fortune.com/2016/02/15/vw-ceo-winterkorn-defeat-device/.

[128] *Id.*

202. The newspaper also reported that a senior Volkswagen manager had admitted the true level of emissions to a CARB official on August 5, 2015, over a month before the EPA issued the First NOV I, and that Volkswagen brand chief Herbert Diess had convened meetings on August 24th and August 25th to discuss how to react to the scandal that was about to break.[129]

203. The letter, of which *Bild-Zeitung* claims to have a copy, is the second leak suggesting that knowledge of the emissions problems and use of the defeat devices extended far higher, far earlier, than Volkswagen has admitted. Indeed, the German magazine *Manager* has reported that Volkswagen's management had already discussed the issue in the spring of 2014 in reference to a letter received from the EPA.[130] The revelations from these reports directly contradict arguments made by Winterkorn and Horn that they were unaware of the use of defeat devices applied specifically to circumvent U.S. regulations.

204. At a December 10, 2015, press conference, during which Volkswagen discussed preliminary results of their internal investigation, executives summed up the state of affairs, and admitted that Volkswagen had installed defeat devices to take shortcuts around engineering challenges. Faced with "[s]trict and significantly toughening $NO_X$ limits," Volkswagen knew those "$NO_X$ limits could not be met with [their] technological design" for lean $NO_X$ traps so instead they dealt with the problem by installing defeat devices. The Affected Vehicles with urea treatments faced a separate problem: the urea tanks were too small for consumers to maintain urea levels at standard maintenance intervals. Volkswagen also took shortcuts around these engineering challenges by implementing a defeat device to reduce urea consumption and illegally stretch the capacity of its urea tanks outside of test conditions. Volkswagen concluded this presentation by implicitly acknowledging the toxicity of its corporate culture, as Volkswagen announced it would establish a "new mindset" among Volkswagen leadership that has "[m]ore capacity for criticism."[131]

---

[129] *Id.*

[130] *Id.*

[131] *Volkswagen AG, The Volkswagen Group is moving ahead: Investigation, customer solutions, realignment*, Volkswagen AG (Dec. 10, 2015), http://www.volkswagenag.com/

205. The entire after-the-fact chronology and explanation of how and why Volkswagen perpetrated its fraud is set forth in its December 10, 2015, presentation, as follows:







206. By manufacturing and selling cars with defeat devices that allowed for higher levels of emissions than were certified to the EPA, Volkswagen violated the Clean Air Act, defrauded its

content/vwcorp/info_center/en/talks_and_presentations/2015/12/Presentation_MUE_POE.bin.html /binarystorageitem/file/2015_12_10_Pr%C3%A4sentation+PK_Final_ENG.pdf.

customers and dealers, placed in commerce vehicles that were illegal to drive on U.S. roadways, and engaged in a criminal conspiracy. It breached its dealer agreements and violated state and federal laws designed to protect franchise dealers from coercive, fraudulent, and intimidating acts by powerful vehicle manufacturers.

207. Moreover, Volkswagen's fraud harmed not just the customers and dealers it duped into buying its heavily polluting "CleanDiesels," but it harmed the environment. Through six years of fraud, Volkswagen put on the United States roadways over 483,000 cars that spewed up to 40 times the permitted level of NOx and other pollutants. These emissions invariably have harmed the air quality and environment and, as a result, harmed the United States and its citizens. And these acts, no doubt, have and will harm the goodwill value of any franchise dealership that sells VW products.

208. The harm Volkswagen has caused by selling its illegally polluting "CleanDiesel" cars is ongoing and will be for many years. Horn testified before Congress on October 8, 2015, admitting the purposeful use of the defeat device by Volkswagen to defraud regulators and its customers. Horn testified that any fix for at least 420,000 of the Affected Vehicles would require *software and hardware* changes and would take at least many months, and perhaps years to implement.[132] All the while, Volkswagen is not offering replacement cars or a buyback program, thereby forcing unhappy and embarrassed owners to knowingly spew noxious fumes into the environment or make alternative arrangements at their own sole expense.

209. Concomitant to the hundreds of thousands of defrauded and unhappy consumers is a direct and measurable harm to franchise dealers who are now faced with their most loyal and engaged customers feeling profoundly betrayed by Volkswagen: a betrayal that consumers associate directly with the face of Volkswagen that they dealt with—the dealers. The legion bitterly disappointed Volkswagen owners distance themselves from dealers and have turned 180 degrees from reliable referral sources to vocal detractors.

---

[132] *See* http://www.autonews.com/article/20151008/OEM02/151009826/older-vw-diesels-will-need-software-and-hardware-fixes-horn-tells.

210. Beyond the loss of customers, franchise dealers, including Plaintiffs, have been stuck with unsalable cars, new, used, and certified used, that take up valuable inventory space and carrying costs. Further, thousands of customers who might be ready to trade-in or trade-up their Affected Vehicles and buy new cars from dealers cannot do so because the value of the Affected Vehicles has so precipitously plummeted.

211. Plaintiffs and the Franchise Dealer Class have invested millions, collectively hundreds of millions of dollars in the Volkswagen brand, expecting a return concomitant with the value of the brand up until the dieselgate scandal became public. But now the brand value has plummeted, sales of VW diesels have completely halted, and sales of all VW cars have plummeted. Plaintiffs and the Franchise Dealer Class now own VW dealerships that lose money day after day, or at best make far less money than they did prior to the disclosure of the massive dieselgate emissions scandal.

**H. Volkswagen Profited From its Dieselgate Fraud**

212. Volkswagen has charged a substantial premium for the Affected Vehicles, ironically marketed by Volkswagen as “CleanDiesel.” For example, for the 2015 Volkswagen Jetta, the base S model has a starting MSRP of $18,780. The base TDI S CleanDiesel, however, has a starting MSRP of $21,640, a price premium of $2,860. The CleanDiesel premium for the highest trim Jetta model is substantially higher. The highest level gas Jetta SE has a starting MSRP of $20,095, while the CleanDiesel TDI SEL MSRP is $26,410, a staggering $6,315 premium.

213. These premiums occur across all of the vehicles lines in which Volkswagen installed its defeat device for emissions testing. The table below sets forth the price premium in 2015 for each base, mid-level and top-line trim for each affected model. Similar premiums existed for each Affected Vehicle for every model year:

2015 CleanDiesel Price Premiums

| Model | Base | Mid-level | Top-line |
|---|---|---|---|
| VW Jetta | $2,860 | $4,300 | $6,315 |
| VW Beetle | $4,635 | n/a | $2,640 |
| VW Golf | $2,950 | $1,000 | $1,000 |
| VW Passat | $5,755 | $4,750 | $6,855 |
| Audi A3 | $2,805 | $3,095 | $2,925 |

214. The ability of Plaintiffs and the Franchise Dealer Class to sell these vehicles at a premium was a significant contributor to the high value of goodwill and franchise rights associated with owning a Volkswagen dealership. Since the NOV, however, there are no such premiums because the Affected Vehicles cannot be legally sold in the U.S., and all Volkswagen sales have been negatively affected by the diminution in brand value and brand loyalty. As a result, franchise dealer profitability and franchise value have markedly decreased.

## I. Volkswagen's False Advertising and Fraud Has Profoundly Harmed Franchise Dealers

215. As set forth above, consumers paid large premiums to purchase Affected Vehicles. They paid these premiums as a result of Volkswagen's false claims that the CleanDiesel engine system was environmentally friendly, clean, efficient, and EPA compliant. Dealers, in turn, stocked large numbers of the Affected Vehicles and paid top dollar for trade-ins, knowing that (prior to the NOV) they held value remarkably well and could be sold used and/or "certified" for top dollar.

216. As a direct result of the disclosure of Volkswagen's CleanDiesel fraud, Affected Vehicles have sharply decreased in value and are presently unsalable. In fact, Volkswagen has halted all sales of Affected Vehicles, new or used, so that its dealers are stuck with Affected Vehicles that they cannot sell. Within two weeks of the announcement of Volkswagen's emissions fraud the following decreases in model values were documented:

**Diesel models (MY 2009 – 2015):**

| | Pre-Announcement | Post-Announcement | Percent change |
|---|---|---|---|
| **Audi** | **$16,075** | **$16,085** | **0.1%** |
| A3 | $16,075 | $16,085 | 0.1% |
| **Volkswagen** | **$12,822** | **$11,146** | **-13.1%** |
| Beetle | $16,197 | $13,852 | -14.5% |
| Golf | $13,551 | $12,069 | -10.9% |
| Jetta | $11,901 | $10,248 | -13.9% |
| Passat | $16,586 | $15,253 | -8.0% |
| **Grand Total** | **$12,830** | **$11,160** | **-13.0%** |

Each Franchise Dealer Class member therefore suffered a direct pecuniary loss in the form of the decreased value of the Affected Vehicles in their new and used dealership inventory.[133]

217. The loss in value is particularly acute and affects Plaintiffs and Franchise Dealer Class members because consumers do not want to own cars that pollute and harm the environment. Cleanliness was the core of Volkswagen's marketing efforts and a driving factor in purchase decisions. Franchise Dealer Class members want to sell their Affected Vehicles but they cannot legally do so, and instead must store them at least until Volkswagen successfully deploys an approved fix (for which there is presently no time table). Franchise Dealer Class members are also saddled with the expense of secure storage costs for these vehicles.

218. Moreover, many Franchise Dealer Class members purchased their inventory with financing or have limited cash available for inventory—new and used. Because the Affected Vehicles are unsalable, Franchise Dealer Class members cannot shift their inventory investments to vehicles that they can sell, meaning that they have fewer non-diesel vehicles in their showrooms and inventory, leading to additional loss of sales and diminution in franchise value.

219. Volkswagen has been ordered by the EPA to recall the Affected Vehicles and repair them so that they comply with EPA emissions requirements at all times during normal operation. However, Volkswagen will not be able to make the Affected Vehicles comply with emissions standards without substantially degrading their performance characteristics, including their horsepower and their efficiency. As a result, even if Volkswagen is able to make the Affected

[133] *See* http://www.buzzfeed.com/matthewzeitlin/resale-value-of-vw-diesels-down-13-percent#.kvRJEo96L.

Vehicles EPA compliant, Franchise Dealer Class members will nonetheless suffer actual harm and damages because the vehicles on their lots will no longer perform as they did when acquired for resale and as advertised. This will necessarily result in a diminution in value of every Affected Vehicle and a diminution in inventory value, franchise value, and brand value of VW.

220. As a result of Volkswagen's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose that under normal operating conditions the Affected Vehicles emit up to 40 times the allowed levels, franchise dealers have suffered losses in money and/or property. Had Plaintiffs and Franchise Dealer Class members known of the defeat device scheme at the time they purchased their franchise, or entered into dealer agreements to maintain their franchise or purchase inventory, they would not have purchased or maintained their franchise, would not have purchased inventory in the quantity, or at the prices that they paid, or would have paid substantially less for the franchise or to continue as a franchise.

**J. Volkswagen's Refusal to Take Any Prompt Action to Remedy its Fraudulent Scheme Continues to Profoundly Harm Consumers, Franchise Dealers and the Environment**

221. For decades, consumers who have been buying VWs were not just buying cars; for many, the purchase also made a statement about contributing to a cleaner environment. This consumer sentiment and substantial consumer loyalty was a significant contributing factor to the value of owning a franchise dealership that sold and serviced Volkswagen cars. VW purchasers were proud of their choice, as were dealers operating VW franchises. This is true, and perhaps even especially true, for those who purchased, and dealers who sold, vehicles with the "Clean Diesel" engine in 2009-2015, including the Jetta, Beetle, Passat, and Audi A3, the Golf in 2012-2015 and vehicles equipped with the larger 3.0 liter diesel engines from 2009-15, including VW Taureg, Audi A6 and A8, and Porsche Cayenne. Owning and driving these CleanDiesel cars was a source of pride for consumers, and, as a result, selling them was a source of pride and profit for franchise dealers and created substantial goodwill and value in owning and operating a VW franchise.

222. Now, consumers report their pride has turned to humiliation, knowing they are driving vehicles—and are *seen* driving vehicles—that are spewing oxides of nitrogen emissions far

in excess of what is legal or responsible. This is not the choice consumers made. Likewise, it is not the choice that franchise dealers, including Plaintiffs, made. They bought into and have invested substantially in the VW brand based on its prior reputation for remarkable engineering and environmentally friendly culture and product offerings. That brand is now demonstrably and permanently tainted. VW is known as a liar and a cheat; and that image is reflected on Plaintiffs and Franchise Dealer Class members as they are the sole point of interaction with consumers.

223. This sharply negative consumer sentiment has a direct and palpable effect on the value of a Volkswagen franchise dealership and the value of the inventory of Volkswagen cars on any dealer's lot. Consumers used to brag about their VW cars and send their friends and family into the dealerships to buy additional cars. Now they just want to hide. Dealers are left holding the bag with tens of thousands of unsalable CleanDiesel cars, and hundreds of thousands of other Volkswagen vehicles, all of which will be harder to sell and will not command the prices they would have absent the disclosure of Volkswagen's outrageous emissions fraud.

224. Nor has VW offered a solution. Eleven months after this scandal erupted, there is no relief in sight. Volkswagen has stated that unidentified fixes are in development.[134] Volkswagen representatives have told lawmakers and the media that any remedy will take significant time. Mr. Horn told the congressional committee on October 8 that fixing the affected vehicles "will take years and require approval from regulators."[135] While a small number of vehicles will get by with a software fix, according to Mr. Horn, most affected cars will "require

[134] The Associated Press, *VW May Compensate Owners of Diesel Cars for Loss of Value*, N.Y. Times (Oct. 9, 2015), http://www.nytimes.com/aponline/2015/10/08/us/ap-us-volkswagen-consumers.html. *See also* Angelo Young, *Volkswagen Diesel Scandal: Most Recalled Cars Will Require Work To Exhaust Systems, Not Just Software*, International Business Times (Oct. 8, 2015). http://www.ibtimes.com/volkswagen-diesel-scandal-most-recalled-cars-will-require-work-exhaust-systems-not-2132764 ("The necessary hardware fix … has yet to be worked out at the company's Wolfsburg, Germany, headquarters ….").

[135] Reuters, *House Slams Regulators for Not Catching VW for Years*, N.Y. Times (Oct. 9, 2015), http://www.nytimes.com/reuters/2015/10/09/business/09reuters-volkswagen-emissions.html. *See also VW's U.S. chief tells Congress: no timetable to fix diesel cars*, The Dallas Morning News (Oct. 9, 2015), http://www.dallasnews.com/business/headlines/20151008-vws-u.s.-chief-tells-congress-no-timetable-to-fix-diesel-cars.ece ("Hundreds of thousands of owners of Volkswagen diesel cars that skirt emissions standards may have to wait a year or more to get their cars fixed, the head of the automaker's U.S. unit said at a contentious House hearing Thursday.").

more extensive changes including possible installation of urea tanks that neutralize harmful emissions and particulates,"[136] which will not even get started until next year at the earliest and could take up to two years to complete.[137] Because this is a worldwide problem, with over 550,000 Affected Vehicles in the U.S. alone,[138] two years seems optimistic.

225. Volkswagen has rejected suggestions that it provide loaner vehicles and has announced no plans to buy back dealer's vehicles.[139] Thus, dealers presently have no option that any reasonable person would consider satisfactory. Drivers of affected cars are presented with a Hobson's choice: sideline their cars (which most people cannot possibly do) or emit up to 40 times the legal limits for oxides of nitrogen. Consumers are justifiably unhappy about the untenable position they have been forced into by VW. For Plaintiffs and the Franchise Dealer Class there has similarly been limited and ineffective assistance from VW. Sales are plummeting, losses escalating, customers are afraid to bring their cars in for routine servicing for fear that a change will be made to the cars rendering them less fuel-efficient and/or less powerful.

226. Again, the sentiment of consumers has a direct effect on the bottom line of Plaintiffs and the Franchise Dealer Class. When consumers feel betrayed by Volkswagen, there is little they can do to Volkswagen directly, but there is much at stake for the dealerships. Customer visits have sharply decreased, sales premiums have vanished, profits have eroded; plus dealers are saddled with massive inventory carrying costs for vehicles that they cannot sell, and they cannot repurpose their working capital toward vehicles that are salable. Moreover, franchise dealers no longer have offerings from Volkswagen (with whom Franchise Dealer Class members have exclusive sales agreements) to compete with other brands in the high-mileage efficient car space, and thus are losing sales to VW competitors.

---

[136] Reuters, *House Slams Regulators*, *supra* note 67.

[137] Danielle Ivory and Keith Bradsher, *Regulators Investigating 2nd VW Computer Program on Emissions*, N.Y. Times (Oct. 8, 2015), http://www.nytimes.com/2015/10/09/business/international/vw-diesel-emissions-scandal-congressional-hearing.html.

[138] *Id.*

[139] Young, *supra* note 66; Ivory and Bradsher, *supra* note 69.

**K. Things at Volkswagen Will Not Get Better Anytime Soon**

227. VW released a stop-sale order instructing dealers to immediately stop selling the Affected Vehicles.[140] VW has also withdrawn its application to the EPA for approval to sell its model year 2016 diesel vehicles, leaving them quarantined in ports until it resolves the presence of auxiliary emissions control devices to the satisfaction of the EPA.[141] There is no way for Plaintiffs and other franchise dealers to replace the lost inventory with gas-powered models and these actions, of course, have caused serious and long-lasting financial harm to Plaintiffs and the members of the Franchise Dealer Class.

228. Experts now point to the "uniquely awful" corporate governance at VW as a major factor in the fraudulent scheme.[142] VW's "peculiar corporate culture" and "lax boardroom controls," combined with highly centralized decision-making and a culture that encouraged the concealment of problems, greatly increased the risk of corporate fraud and abuse.[143] Alexander Juschus, director of German proxy advisor IVOX, noted that "[t]here have been warnings about VW's corporate governance for years [including prostitution and bribery scandals in 2006], but they didn't take it to heart and now you see the result."[144]

229. To remedy its violations, Volkswagen says that it intends to recall the Affected Vehicles and configure them to settings that produce a clean level of soot and $NO_X$. In reconfiguring to this new setting, the efficiency, power, and performance of the Affected Vehicles will decline dramatically. Further, there will be serious degradation of vehicle durability, as these vehicles are designed to operate under particular settings. Certain parameters such as exhaust gas temperature, oil life, or engine/turbocharger RPMs will change and result in decreased durability as Volkswagen attempts to undo the effects of the fraud. The new VWAG CEO, Matthias Mueller,

[140] http://www.detroitnews.com/story/business/autos/foreign/2015/09/19/vw-us-dealers-halt-sales-diesel-cars/72488232/ (last visited on Oct. 16, 2015).

[141] http://bigstory.ap.org/urn:publicid:ap.org:5c7a66fe0bd448f999b2c59379622488 (last visited on Oct. 16, 2015).

[142] http://www.cnbc.com/2015/10/04/volkswagens-uniquely-awful-governance-at-fault-in-emissions-scandal.html (last visited on Oct. 16, 2015).

[143] *Id.*

[144] *Id.*

has stated that VW expects the recall of Affected Vehicles to begin in January 2016, and that the recall process will take up to a year to complete.[145] As of the filing of this Complaint, in September, 2016, the recall process has not begun—a viable fix has yet to be identified or approved by CARB and the EPA.

230. As speculated by Karl Brauer, senior analyst for Kelley Blue Book: "'It's really unknown, but I think there'll be an extended period of reduced value for [used VW vehicles]. The resolution will probably not leave as big of an impression and won't counteract the initial impression that [consumers] are getting with these diesel cars.'"[146] Of course, reduced values for the Affected Vehicles will directly impact profits for Plaintiffs and the Franchise Dealer Class, which are the primary market for used and certified used VW cars.

**L. Volkswagen's Illegal Scheme Has Triggered Global Scrutiny**

231. According to media reports, the Department of Justice ("DOJ") has launched a criminal investigation into Volkswagen over the emissions cheating scandal.[147] Additionally, the U.S. Senate has investigated Volkswagen's dealings with the IRS in obtaining green energy tax credits,[148] the U.S. Congress's Energy and Commerce committee has called upon Horn to testify to his knowledge of the scheme,[149] 45 state attorneys general have initiated investigations,[150] and the Federal Trade Commission has opened an investigation into Volkswagen's fraudulent

---

[145] *See* http://www.bbc.com/news/business-34455328 (last visited on Oct. 16, 2015).

[146] http://www.cnbc.com/2015/09/24/as-volkswagen-loses-other-automakers-could-benefit.html (last visited on Sept. 28, 2015).

[147] http://www.wsj.com/articles/u-s-justice-department-conducts-criminal-probe-of-volkswagen-sources-say-1442869059 (last visited on Oct. 16, 2015).

[148] http://www.forbes.com/sites/kellyphillipserb/2015/10/07/senate-investigates-volkswagen-dealings-with-irs-on-tax-credits/ (last visited on Oct. 16, 2015).

[149] http://www.cnbc.com/2015/10/08/vw-us-ceo-i-had-no-knowledge-in-2014-of-defeat-devices-on-vehicles.html (last visited on Oct. 16, 2015).

[150] http://www.bloomberg.com/news/articles/2015-10-08/texas-sues-volkswagen-claiming-deception-emissions-violations-ifiqscqq (last visited on Oct. 16, 2015).

advertising.[151] As opined by National Highway Traffic Safety Administration Administrator Mark Rosekind, because of Volkswagen's fraud, "'[w]e're questioning everything now.'"[152]

232. The German government is also reportedly investigating Defendant Winterkorn for criminal fraud, while several other countries in Europe and Asia are likewise investigating both Winterkorn and VW.[153] After becoming CEO of VWAG, Winterkorn personally appointed the head engineers that were directly involved in the diesel strategy and implementation of the defeat devices.[154]

233. As part of their investigation into Volkswagen's conduct, German prosecutors have raided VWAG's Wolfsburg headquarters.[155]

234. On October 15, 2015, VWAG reportedly announced that "Germany's automotive regulator has rejected the company's remediation plan for diesel vehicles equipped with software designed to cheat emissions tests, and has instead instructed the automaker to initiate a recall covering about 8.5 million vehicles across the European Union."[156]

235. Further, the scale and brazenness of the fraud prompted VW to set aside a 6.5 billion Euro fund to address affected consumers and the EPA.[157]

236. In total, Defendants' illegal scheme deceived the public into buying over 550,000 Affected Vehicles at a total cost of billions of dollars to consumers nationwide, not even

---

[151] http://consumerist.com/2015/10/15/federal-trade-commission-opens-probe-into-volkswagens-clean-diesel-advertising/ (last visited on Oct. 16, 2015).

[152] http://www.detroitnews.com/story/business/autos/foreign/2015/09/22/nhtsa-head-vw-diesel-deception-another-reason-question-assumptions/72614662/ (last visited on Oct. 16, 2015).

[153] http://www.reuters.com/article/2015/09/28/us-volkswagen-emissions-idUSKCN0RP14U20150928 (last visited on Oct. 16, 2015); http://www.bloomberg.com/news/articles/2015-09-30/diesel-scandal-undercuts-one-of-vw-s-few-strengths-in-showroom (last visited on Oct. 16, 2015).

[154] http://www.wsj.com/articles/vw-emissions-probe-zeroes-in-on-two-engineers-1444011602 (last visited on Oct. 16, 2015).

[155] http://www.bbc.com/news/business-34475408 (last visited on Oct. 16, 2015).

[156] http://www.law360.com/environmental/articles/714628?nl_pk=b1bf5f0b-4477-40d3-95dc-ea7e5b9e1e58&utm_source=newsletter&utm_medium=email&utm_campaign= environmental (last visited on Oct. 16, 2015).

[157] http://www.bloomberg.com/news/articles/2015-09-22/volkswagen-ceo-s-history-of-sweating-the-details-now-haunts-him (last visited on Oct. 16, 2015).

considering the cost of the harm already caused to the environment and public health, or the ongoing and immediate threat to the same. The illegal scheme defrauded Plaintiffs and the Franchise Dealer Class into paying inflated costs for franchise dealerships and investing millions of dollars in such dealerships based on fraudulently inflated brand value. Moreover, the defrauded consumers will vote with their feet, turning away from Volkswagen franchise dealers like Plaintiffs and the Franchise Dealer Class, causing even further harm and damages to their ongoing businesses.

## V. FACTUAL ALLEGATIONS CONCERNING PLAINTIFFS

### A. J. Bertolet Volkswagen

237. Bertolet VW has expended considerable capital investing in the VW brand during all relevant times to include significant expenditures on employee compensation and training, vehicle purchases and carrying costs, sales and service facility costs, advertising and real estate costs. Bertolet VW has otherwise met or exceeded all material requirements of the Dealer Agreement as well as VW policies and procedures.

### B. Napleton's Acquisition of Plaintiffs' Volkswagen Dealerships

238. On or about February 17, 2014, Plaintiffs Napleton VW Orlando and Napleton VW Sanford, and on September 14, 2015, Plaintiff Napleton VW Orlando, entered into Dealer Sales and Service Agreements with VGoA (the "Dealer Agreements").[158]

239. The Dealer Agreements are each a "franchise agreement" as that term is defined in section 320.60(1), Florida Statutes and 815 ILCS 710/4 of the Illinois Motor Vehicle Franchise Act. Pursuant to the Dealer Agreements, Napleton VW Orlando, Napleton VW Sanford and Napleton VW Urbana operate dealerships for the sale and service of Volkswagen motor vehicles at the Florida and Illinois dealership locations.

---

[158] A true and correct copy of the Dealer Agreement for Napleton VW Orlando is attached hereto and made a part hereof as Exhibit A. A true and correct copy of the Dealer Agreement for Napleton VW Sanford is attached hereto and made a part hereof as Exhibit B. A true and correct copy of the Dealer Agreement for Napleton VW Urbana is attached hereto and made a part hereof as Exhibit C.

240. Napleton VW Urbana entered into a Dealership Acquisition Agreement with O'Brien Automotive of Urbana, LLC ("O'Brien") to purchase, among other things, O'Brien's Volkswagen dealership rights, related real estate, personal property and goodwill only because it was part of an overall transaction involving six (6) other franchises. O'Brien required that all of the franchises be sold together as a condition of sale.

241. Napleton VW Orlando, Napleton VW Sanford and Napleton VW Urbana undertook an exhaustive and time consuming process to obtain approval from Volkswagen Group of America, Inc., to be granted the Dealer Agreements and completed their acquisition of the Volkswagen dealership rights, real estate, personal property, and goodwill and franchise rights (the "VW Dealerships"). Pursuant to the Dealer Agreements, Napleton Plaintiffs currently operate the VW Dealerships for the sale and service of Volkswagen motor vehicles, parts and accessories.

**C. Volkswagen and Bosch**

242. VGoA represents to its dealers that its "stands for reputable and honest business dealings in the course of everyday business which comply with relevant rules and regulations." VGoA characterizes its collaboration with its dealers, such as Plaintiffs, as exemplifying integrity, fairness, transparency, and partnership. However, as set forth more fully herein, the practices of the Defendants are the polemic opposite of these stated principals. Rather than adhering to their espoused principles, VW and VGoA engaged in a pattern of fraud and deception as set forth more fully below.

243. VWAG's, VGoA's, and VCI's actions have been willful and wanton. Upon Plaintiffs' knowledge VWAG, VGoA, VCI and the Bosch Defendants have utilized the mail or wires to engage in the fraudulent conduct and racketeering activities set forth below.

244. At all times material hereto, Plaintiffs have acted in substantial compliance with all material terms of the Dealer Agreements.

245. The purchase by Napleton Plaintiffs of their Volkswagen franchises all occurred prior to when VW's fraudulent acts were made public, and before Plaintiffs learned of same. There can be no doubt but that VWAG and VGoA were aware of the massive deception that was being

foisted on the American public and its Volkswagen dealers when Napleton Plaintiffs acquired their Volkswagen franchises. Perhaps most jarring was the acquisition by Napleton VW Urbana of the Volkswagen franchise and the adulterated inventory which went with it, which proceeded approximately fifty-eight (58) hours before the issuance of the NOV exposing the massive Dieselgate fraud. Notwithstanding that the scandal that was about to break, VWAG and VGoA proceeded with the acquisition by Napleton VW Urbana in a completely "business as usual" fashion. Neither VWAG or VGoA gave Napleton VW Urbana any indication of the impending tsunami of bad publicity, public fallout and inventory expense resulting from the inability to sell the diesel vehicles.

246. In the case of Napleton VW Urbana – and other dealerships similarly situated – the negative impact was magnified because that particular Volkswagen franchise is part of an auto mall with other franchises (Hyundai, Kia, Mazda, Mitsubishi and Toyota/Scion). The fixed expenses of Napleton VW Urbana's operations are shared at the auto mall. As such, Napleton VW Urbana does not simply generate income, but provides incremental gross income of approximately $800,000.00 per year to the overall net profit of the combined operations at the auto mall. Thus, the price that was paid for the auto mall would have been reduced greatly had VGoA disclosed the impending tsunami of bad publicity and the destruction of goodwill that has accompanied the CleanDeisel scandal.

247. The price paid by Napleton VW Orlando, Napleton VW Sanford and Napleton VW Urbana for goodwill and franchise/going concern value of the franchised Volkswagen dealerships at the Florida Locations and Illinois Location was based, among other things, upon the reputation of VWAG and VGoA for producing-high quality, safe, and compliant motor vehicles, parts, and accessories.

248. As a direct result of VWAG's and VGoA's willful and wanton violations of applicable law, the goodwill and franchise/going concern value of all of Plaintiffs has been devalued and gross profits have plummeted. Moreover, Plaintiffs have and will continue to suffer additional expenses resulting from the continuing cost to finance their existing inventory of

CleanDiesel Vehicles which are ineligible for sale by virtue of the Defeat Device and Volkswagen's apparent inability to construct a viable "fix."

249. VGoA, being aware of the catastrophic effect that its conduct was going to have on its dealers, made a furtive attempt to buy the peace by offering to exchange "commitments" with the Volkswagen dealership community through a "Transaction Assistance Agreement" (hereinafter referred to as "TAA"), which included Plaintiffs. The TAA would seem like an attractive offer. Indeed, the TAA would provide Napleton Plaintiffs credits with a minimum cumulative value of $240,000. In exchange for Napleton Plaintiffs' participation in the TAA, VGoA was to receive a release which is almost unlimited in scope and excludes only the following claims, to wit:

> (T)his release shall not be effective to relieve VGoA of any obligation to … (Plaintiffs) … by reason of, or any liability arising out of (a) any warranty obligations, (b) any sales incentive program current as of the Effective Date… (of the TAA) … or (c) any product liability claim alleging a defect in a vehicle manufactured or distributed by VGoA.

250. The insidious nature of this language cannot be overstated for Volkswagen's vehicles are not "defective" in the classic sense. In fact, the gravamen of the claims against Volkswagen as they relate to the CleanDeisel is that they operate exactly as they were designed. They were designed to cheat. Rather than a product defect, it is the affirmative fraud committed by Volkswagen which Plaintiffs may unwittingly been released had they accepted this offer of "assistance" from VW. This, of course, was all done without ever disclosing the existence of the diesel emissions scheme and/or its fraudulent conduct to conceal its actions. Napleton Plaintiffs declined to enter into any agreement with VWAG and/or VGoA which may have been intended by VW to result in a waiver of rights. Instead, Napleton Plaintiffs notified VW and VGoA that they intend to seek all available remedies through legal recourse.

## D. Volkswagen's Tier Pricing and Manipulation of DSI Sales Metric

251. At all times pertinent hereto, VGoA has advised its dealers that its metrics to determine performance and allocation are applied uniformly, fairly, without bias and in-good faith. As is set forth more fully herein, this is simply not true.

252. Each of VGoA's dealers are assigned to Primary Area of Influence ("PAI"). VGoA uses a metric that it refers to as Dealer Sales Index ("DSI") to measure its dealer's sales performance. DSI is supposed to measure of the dealer's sales penetration in the PAI to which the dealer has been assigned or, in other words, the dealer's sales effectiveness. Because a dealer is held responsible for selling into or "penetrating" the entire PAI, the size of the PAI has a direct effect on a dealer's DSI percentage. In other words, the larger the PAI (thus the greater sales responsibility to which the dealer is held) the lower the sales effectiveness score the dealer will generally have.

253. The size and geographic composition of the PAI assigned to the dealer also impacts incentives and discounts for which dealers can qualify. The sales objectives assigned to each dealer are assigned based, in part, on a sales expectancy for each dealer. That sales expectancy is based upon the number of vehicles competitive to VGoA products that are registered within the PAI. Thus, the greater the PAI, the greater the sales expectancy and sales objective for the dealer.

254. Those dealers who do not achieve the sales objectives assigned by VGoA, do not qualify for the same incentive/discount money received by those VGoA dealers who do reach the VGoA assigned objectives. Those dealers achieving the assigned objective numbers are charged a lower effective price for the vehicles that they purchase from VGoA, making them more competitive and able to achieve sales levels that result in benefits, incentives and increased allocations of vehicles based on inventory turnover.

255. When Napleton VW Orlando and Napleton VW Sanford, entered into the Dealer Agreements with VGoA in 2013, there were three dealers in the Central Florida Market area. Plaintiffs and David Maus VW North and David Maus VW South (hereinafter collectively referred to as "Maus VW") were split into four PAI's with each of the dealers being assigned to one PAI for each of its dealership locations. Leesburg Volkswagen ("Leesburg VW") had an adjoining PAI.

256. Maus VW has two stores in the general proximity of the Clermont area, each being approximately 24 miles away. Napleton VW Orlando and Napleton VW Sanford locations are both an additional ten miles and 14 miles further distant from the Clermont area than Maus VW and Leesburg VW, respectively.

257. When a new location for the establishment of a dealership a test market study is conducted a new market area (in this instance a PAI) must be created for that location. In this instance a test market study was conducted for the establishment of a new dealership location in Clermont, Florida (hereinafter referred to as "Clermont Open Point"). In order to accommodate the Clermont Open Point, a new PAI was created for that location (hereinafter referred to as the "Clermont PAI").

258. Due to the fact that both Maus VW and Leesburg VW are significantly closer to the Clermont Open Point than are either Napleton VW Orlando or Napleton VW Sanford, the creation of the Clermont PAI has disproportionately shrunken the PAIs for both Maus VW and Leesberg VW. Thus, Maus VW and Leesburg VW are being measured with reduced PAIs and performance-based discounts and allocations are more readily available to them than to Napleton VW Orlando and Napleton VW Sanford.

259. Maus VW and Leesburg VW are being enabled to operate on an unlevel playing field, getting preferential allocations and more desirable vehicle inventory due to the fact that they are more easily able to achieve their performance objectives. As a result, Napleton VW Orlando and Napleton VW Sanford have been, and will be otherwise be forced in the future, to compete for the sale of Volkswagen motor vehicles with competitors who receive greater discounts, benefit from lower vehicle acquisition costs and get preferential allocations without selling substantially more vehicles. To make matters worse, Volkswagen has purposefully played favorites as between its dealers, distributing advertising (co-op) monies disproportionately and irrationally to favored dealers only.

260. As a result of this wrongful manipulation of the DSI Sales Metric Plaintiffs, Napleton VW Orlando and Napleton VW Sanford, have and will continue to both lose sales and see their margins reduced.

261. Napleton VW Orlando and Napleton VW Sanford are not seeking to assert statutory rights to protest the establishment of the Clermont Open Point, but rather, assert that VGoA's scheme to establish multiple tiered pricing is independently actionable.

**E. Volkswagen's Tier Pricing and Coercion to Force Franchise Dealers to Floor Plan Finance with VCI**

262. VCI is a wholly owned subsidiary of VGoA who offers inventory financing ("Floor Plan Financing") for Volkswagen dealers. VCI also offers consumer financing ("Consumer Financing") to its dealers' customers, whether or not they Floor Plan Finance with VCI. However, as set forth more fully herein, Napleton Plaintiffs and other Volkswagen dealers who do not Floor Plan Finance with VCI are placed at a distinct competitive disadvantage with their competitors who do.

263. No Volkswagen dealer should have to worry that its business operations are going to be affected by the incestuous relationship which exists between VGoA and VCI. VCI is wholly owned by VGoA and is a major profit center for VGoA. However, VGoA and VCI offer Volkswagen dealers direct floor plan financing discounts ("Floor Plan Discounts") as well as discounts associated with VCI Consumer Financing ("Consumer Financing Discounts") which are either unavailable or available to a lesser extent to those Volkswagen dealers, such as Napleton Plaintiffs, who do not utilize VCI for their financing. These corrupt practices have enabled VCI to generate upwards of fourteen percent (14%) of VW and VGoA's reported income and become an integral part of VW's and VGoA's worldwide operations.

264. An example of VW's corrupt practices is found in the Transaction Assistance Agreements ("TAA") VW offered to dealers shortly before the Dieselgate scandal broke. VGoA made a direct offer to provide two years' worth of free VCI floorplan financing which, Napleton Plaintiffs estimate, (based floorplan financing of $5,500,000) would have saved Napleton Plaintiffs $330,000 in floorplan financing costs. But accepting that offer may have eliminated Napleton Plaintiffs' ability to seek redress for any of Volkswagen's abusive and fraudulent behavior, as described herein.

265. VGoA and VCI use direct Floor Plan Discounts to funnel money to its Volkswagen dealers who Floor Plan Finance with VCI lowering acquisition costs and establishing a punitive system of multiple-tiered pricing which penalizes dealers who refuse to Floor Plan Finance with VCI. This pattern of behavior is motivated wholly by greed and is ingrained with VGoA and VCI

who have most recently been canvassing Volkswagen dealers with offers for interest free loans and direct parts subsidies to try to entice them to jump ship with their established lending institutions and Floor Plan Finance with VCI.

266. Multiple-tiered pricing has also been created through the use of "dealer reserve coupons" ("Coupons") from VCI which are to be submitted along with VCI contracts for Consumer Financing and result in a Consumer Finance Discount to the dealer with every Coupon submitted. VCI does not directly distribute Coupons. Rather, this is done by VGoA which doles out Coupons in far greater numbers to those dealers who do their Floor Plan Financing with VCI than those, like Napleton Plaintiffs, who do not. Coupons were, in fact, offered to Napleton VW Orlando and Napleton VW Sanford but this offer came with the admonition that more would be forthcoming if they Floor Plan Financed with VCI. VCI has also made it known that dealers who do their Floor Plan Financing with VCI also receive the benefit that VCI will "buy-deeper" in the consumer market making it easier for them to finance less credit worthy customers and to write a greater number of deals.

267. Just as is the case where VGoA has manipulated the DSI sales metric to the competitive disadvantage of Napleton Plaintiffs, VGoA's actions in persisting to attempt to engage in extortionate conduct to force Napleton Plaintiffs to use VCI for their Floor Plan Financing has and will continue to result in lower acquisition costs to Napleton Plaintiffs competitors thereby reducing sales and profit margins.

268. As early as 2007, VGoA vowed to reach annual sales of 800,000 units, tripling its sales volume at the time. VGoA has continued to tout artificially inflated sales goals which, even before the CleanDeisel scandal, would have required Volkswagen to increase its sales by 100,000 each year for the next four years, "a monumental task in the hypercompetitive U.S. Market."[159] Indeed, prior to the acquisition of Napleton VW Orlando and Napleton VW Sanford, Volkswagen was promoting its plans to freshen its brand with huge research and development spending. Of

[159] http://www.autonews.com/article/20150126/RETAIL01/301269949/how-vw-veered--off-target (last visited April 4, 2016).

course, none of this came to fruition and Volkswagen announced in November, 2015 that it was cutting 1.1 billion euros from its 2016 budget, which includes research and development.[160]

269. Regarding its product line, VW and VGoA purposely and fraudulently induced its dealers to continue to invest in their dealership facilities and to otherwise benefit VW and VGoA. Indeed, VW and VGoA, while touting its sales goals and its plans to develop strategies that would enable it to be competitive in the market, have purposely and intentionally ignored vagaries of the retail market choosing to sell stratospherically priced niche products and being badly outsold by its competitors.

270. Volkswagen has mismanaged supplies and allocations and Volkswagen's brand chief, Herbert Diess, has, in a complete turnaround, expressed skepticism that Volkswagen could compete viably in the U.S. with mass volume brands such as Honda and Toyota. A decision (given the investments that Plaintiffs have made based upon Volkswagen's avowed aspirations to become a serious competitor in the mass volume U.S. market) that was recently characterized as "catastrophic" by Alan Brown, head of Volkswagen's national dealer counsel.[161]

271. Moreover, VGoA has abandoned long standing "stair-step" programs to provide financial assistance to its dealers while, all the time representing to their dealers that VGoA would replace them with new programs providing its Volkswagen dealers an equal or greater benefit than before. This egregious sham was calculated to quell poor publicity as well as dealer outrage at VGoA's conduct and was otherwise calculated to fraudulently induce its dealers and prospective dealers to continue to invest in the Volkswagen brand.

## VI. TOLLING OF THE STATUTE OF LIMITATIONS

### A. Discovery Rule Tolling

272. Plaintiffs and Franchise Dealer Class members had no way of knowing about Volkswagen's deception with respect to its CleanDiesel engine system and "defeat device." It took

[160] http://www.reuters.com/article/volkswagen-emissions-idUSL8N13F2BE20151121 (last visited April 4, 2016).

[161] http://www.autonews.com/article/20160312/RETAIL/303149945/vw-dealers-demand:-stop-the-insanity (last visited April 4, 2016).

federal EPA and California Air Resources Board investigations to uncover Volkswagen's deception, which involved sophisticated software manipulation on Defendants' part. As reported by the *Los Angeles Times* on September 18, 2015, it took California Air Resources Board testing on a special dynamometer in a laboratory, open road testing using portable equipment, and the use of special testing devised by the Board to uncover Volkswagen's scheme and to detect how software on the engine's electronic control module was deceiving emissions certifications tests. Plainly, Volkswagen was intent on expressly hiding its behavior from regulators and consumers. This is the quintessential case for tolling.

273. Within the time period of any applicable statutes of limitation, Plaintiffs and members of the proposed class could not have discovered through the exercise of reasonable diligence that Volkswagen was concealing the conduct complained of herein and misrepresenting the Company's true position with respect to the emission qualities of its vehicles.

274. Plaintiffs and the other Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Volkswagen did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Volkswagen had information in its possession about the existence of its sophisticated emissions scheme and that it opted to conceal that information, which was discovered by Plaintiffs only shortly before this action was filed. Nor in any event would such an investigation on the part of Plaintiffs and other Class members have disclosed that Volkswagen valued profits over compliance with federal and state law, or the trust that Plaintiffs and other Class members had placed in its representations, or that, necessarily, Volkswagen actively discouraged its personnel from raising or disclosing issues with regard to the true quality and quantity of the emissions, and the emissions software, of its vehicles, or of Volkswagen's emissions scheme.

275. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to all vehicles identified herein.

**B. Fraudulent Concealment Tolling**

276. All applicable statutes of limitation have also been tolled by Volkswagen's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

277. Instead of disclosing its emissions scheme, or that the quality and quantity of emissions from the subject vehicles were far worse than represented, and of its disregard of federal and state law, Volkswagen falsely represented that its vehicles complied with federal and state emissions standards, and that it was a reputable manufacturer whose representations could be trusted.

**C. Estoppel**

278. Volkswagen was under a continuous duty to disclose to Plaintiffs and the other Franchise Dealer Class members the true character, quality, and nature of emissions from the vehicles at issue, and of those vehicles' emissions systems, and of the compliance of those systems with applicable federal and state law.

279. Volkswagen knowingly, affirmatively, and actively concealed the true nature, quality, and character of the emissions systems, and the emissions, of the vehicles at issue.

280. Volkswagen was also under a continuous duty to disclose to Plaintiffs and Franchise Dealer Class members that it had engaged in the scheme complained of herein to evade federal and state emissions and clean air standards, and that it systematically devalued compliance with, and deliberately flouted, federal and state laws regulating vehicle emissions and clean air.

281. Based on the foregoing, Volkswagen is estopped from relying on any statutes of limitations in defense of this action.

## VII. CLASS ALLEGATIONS

282. Plaintiff J. Bertolet brings this action pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and the following class:

**The Franchise Dealer Class**

All persons or entities who owned a Volkswagen-branded franchise dealership that operated in the United States as of September 18, 2015.

283. Excluded from the Franchise Dealer Class are Volkswagen and its subsidiaries and affiliates; Bosch Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Franchise Dealer Class. Plaintiffs reserve the right to revise the Franchise Dealer Class definition based upon information learned through discovery.

284. Certification of Plaintiff Bertolet's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

285. This action has been brought and may be properly maintained on behalf of the Franchise Dealer Class under Federal Rule of Civil Procedure 23.

286. <u>Numerosity</u>. Federal Rule of Civil Procedure 23(a)(1): The members of the Franchise Dealer Class are so numerous and geographically dispersed that individual joinder of all Franchise Dealer Class members is impracticable. Plaintiffs are informed and believe that there are not less than 652 members of the Franchise Dealer Class. The precise number of Class members may be ascertained from Volkswagen's books and records. Franchise Dealer Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, express mail, Internet postings, and/or published notice.

287. <u>Commonality and Predominance</u>: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a) Whether Volkswagen and Bosch engaged in the conduct alleged herein;

b) Whether Volkswagen designed, advertised, marketed, distributed, leased, sold, or otherwise placed Affected Vehicles into the stream of commerce in the United States;

c) Whether the CleanDiesel engine system in the Affected Vehicles contains a defect in that it does not comply with U.S. EPA requirements and federal and state emissions regulations;

d) Whether the CleanDiesel engine systems in Affected Vehicles can be made to comply with EPA and state standards without substantially degrading the performance and/or efficiency of the Affected Vehicles;

e) Whether Volkswagen and Bosch knew about the defeat device and, if so, how long Volkswagen has known;

f) Whether Bosch Defendants designed and manufactured a defeat device;

g) whether Bosch supplied the "defeat device" to Volkswagen with the knowledge that Volkswagen would use it in production of Affected Vehicles;

h) whether Bosch acted in concert with Volkswagen and aided and abetted Volkswagen's fraud;

i) Whether Volkswagen marketed, and distributed Affected Vehicles with a defeat device;

j) Whether Volkswagen's conduct violates the federal Dealers' Day in Court Act;

k) Whether Volkswagen's and Bosch's conduct violates RICO and other laws as asserted herein;

l) Whether Volkswagen's conduct violates consumer protection statutes, false advertising laws, sales contracts, warranty laws, and other laws;

m) Whether Plaintiffs and the other Class members overpaid for their dealerships and their inventory of Affected Vehicles;

n) Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

o) Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

288. Typicality: Federal Rule of Civil Procedure 23(a)(3): Plaintiff Bertolet's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Volkswagen's wrongful conduct as described above. Moreover, all Class members entered into like form dealership agreements with VGoA.

289. Adequacy: Federal Rule of Civil Procedure 23(a)(4): Plaintiff Bertolet is an adequate Class representative because its interests do not conflict with the interests of the other members of the Franchise Dealer Class it seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously. The Franchise Dealer Class's interests will be fairly and adequately protected by Plaintiff Bertolet and its counsel.

290. Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2): Volkswagen has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Franchise Dealer Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Franchise Dealer Class as a whole.

291. Superiority: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. It would be impracticable for the members of the Franchise Dealer Class to individually seek redress for Volkswagen's wrongful conduct. Even if Franchise Dealer Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII. VIOLATIONS ALLEGED

### A. Claims Brought on Behalf of Plaintiffs and the Franchise Dealer Class

**COUNT I**
**VIOLATIONS OF THE AUTOMOBILE DEALERS' DAY IN COURT ACT**
**15 U.S.C. § 1221, ET SEQ.**
**(BROUGHT AGAINST VGOA)**

292. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

293. The Federal Automobile Dealer's Day in Court Act, 15 U.S.C. § 1221, *et seq*., provides a cause of action for dealers against manufacturers that fail "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer." 15 U.S.C. § 1222. VGoA is wholly owned by VWAG. VGoA is an agent under the complete control of VWAG and acts in concert with VWAG for the purpose of selling cars to Plaintiffs.

294. Pursuant to 15 U.S.C. § 1221(e), the term "good faith" is defined as "the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: Provided, that recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith."

295. Coercion and intimidation in violation of the statute are not limited to exercise of positive force or direct threats, but may result from any pressure which puts one in actual fear of loss of property or injury to business; unfair and inequitable conduct may be of such a nature as to constitute coercion and intimidation.

296. As set forth above, VWAG and VGoA have purposely and knowingly defrauded Plaintiffs regarding the legality, efficacy and environmental compliance of the Affected Vehicles.

297. Volkswagen and VGoA have known of the use of the "defeat device" and the true nature of its CleanDiesel engine system for at least six years, but concealed all of that information until recently.

298. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

299. By failing to disclose and by actively concealing the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, by marketing its vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles after they were sold, Volkswagen engaged in deceptive business practices.

300. In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the use of the "defeat device" and true cleanliness and efficiency of the CleanDiesel engine system and serious defects discussed above. Volkswagen compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles once they are on the road.

301. Volkswagen's unfair or deceptive acts or practices were likely to and did in fact deceive its franchise dealers, including Plaintiffs, about the true cleanliness and efficiency of the CleanDiesel engine system, the quality of the Volkswagen, Audi and Porsche brands, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Affected Vehicles; all causing the true value of franchise dealerships to be substantially lower than the prices paid for such franchise dealerships.

302. Volkswagen owed Plaintiffs a duty to disclose the true safety, cleanliness, efficiency and reliability of the Affected Vehicles and the devaluing of environmental cleanliness and integrity at Volkswagen, because Volkswagen:

a. Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

b. Intentionally concealed the foregoing from Plaintiffs; and/or

c. Made incomplete representations about the safety, cleanliness, efficiency and reliability of the Affected Vehicles generally, and the “defeat device” and true nature of the CleanDiesel engine system in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

303. Because Volkswagen fraudulently concealed the “defeat device” and the true cleanliness and performance of the CleanDiesel engine system, resulting in a raft of negative publicity once the use of the “defeat device” and true characteristics of the CleanDiesel engine system finally began to be disclosed, the value of the Affected Vehicles has greatly diminished and the value of Volkswagen franchise dealerships and the value of the improved real property used for such dealerships has greatly diminished. In light of the stigma attached to those vehicles by Volkswagen’s conduct, they are now worth significantly less than they otherwise would be and are significantly harder to sell at any price, and may not be sold, and must be stored until such time as Volkswagen renders them legal in the United States.

304. Volkswagen’s fraudulent use of the “defeat device” and its concealment of the true characteristics of the CleanDiesel engine system were material to Plaintiffs and the Franchise Dealer Class. A dealership that sells vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable dealership that sells vehicles made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

305. The actions of VGoA clearly violate the express prohibition set forth in 15 U.S.C. § 1222.

306. As a result of the illegal conduct of VWAG and VGoA, Plaintiffs and the Franchise Dealer Class have suffered damages including, but not limited to, lost profits, increased financing and related expenses, increased inventory carrying costs, loss of sales, and the loss of value of the business as a going concern.

**COUNT II**
**VIOLATIONS OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)**
**VIOLATION OF 18 U.S.C. § 1962(C) - (D)**

307. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

308. Plaintiffs bring this Count individually and on behalf of the Franchise Dealer Class and against Defendants Volkswagen AG; Volkswagen Group of America, Inc.; Robert Bosch GmbH, Inc.; and Robert Bosch, LLC (collectively, "RICO Defendants").

309. The RICO Defendants are all "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

310. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Section 1962(d), in turn, makes it unlawful for "any person to conspire to violate."

311. For many years now, the RICO Defendants have aggressively sought to increase the sales of Affected Vehicles in an effort to bolster revenue, augment profits and increase Volkswagen's share of the diesel vehicle market. Finding it impossible to achieve their goals lawfully, however, the RICO Defendants resorted instead to orchestrating a fraudulent scheme and conspiracy. In particular, the RICO Defendants, along with other entities and individuals, created and/or participated in the affairs of an illegal enterprise ("Emissions Fraud Enterprise") whose direct purpose was to deceive the regulators and the public into believing the Affected Vehicles were "clean" and "environmentally friendly." As explained in greater detail below, the RICO Defendants' acts in furtherance of the Emissions Fraud Enterprise violate §§ 1962(c) and (d).

**1. The Members of the Emissions Fraud Enterprise.**

312. Upon information and belief, the Emissions Fraud Enterprise consisted of the following entities and individuals.

**a. Volkswagen Defendants.**

313. The Volkswagen Defendants include Volkswagen AG, Volkswagen Group of America, and Volkswagen Credit. Although each Volkswagen Defendant is a distinct legally entity, they are all wholly-owned[162] and controlled[163] by Volkswagen AG.

314. As noted previously, in 2007, the Volkswagen Defendants made it their mission to become the dominant automotive manufacturing conglomerate in the world. At the time they articulated this goal, however, the Volkswagen Defendants were struggling to retain their foothold in the American market. Their strategy of wooing customers with premium products was not paying off and VGoA's costly plant in Chattanooga, Tennessee was "woefully underutilized."[164]

315. In response to these obstacles, Defendant Volkswagen AG and its leader at the time, Martin Winterkorn, set in motion an ambitious plan to triple the Volkswagen Defendants' sales in the United States. The linchpin of this strategy was increasing sales of "diesel-powered cars … [and] promising high mileage and low emissions without sacrificing performance."[165]

316. Additionally, to achieve their lofty sales goal, the Volkswagen Defendants made a business-driven decision to move away from the selective catalytic reduction ("SCR") emission control systems they had previously used in their vehicles and that were industry standard at the time. Instead, they sought to replace the SCR systems with the less expensive and easier to maintain lean $NO_X$ trap ("LNT") systems.[166] Critically, however, the LNT technology the

---

[162] http://www.volkswagenag.com/content/vwcorp/info_center/en/publications/2015/03/Shareholdings.bin.html/binarystorageitem/file/Anteilsbesitz+VW+AG+31.12.2014_englisch.pdf.

[163] http://www.volkswagenag.com/content/vwcorp/content/en/brands_and_products.html; http://www.volkswagenag.com/content/vwcorp/info_center/en/publications/2015/03/Y_2014_e.bin.html/binarystorageitem/file/GB+2014_e.pdf.

[164] Anton Watts. VW Drama: Why Piech Wants Winterkorn Out-and What the Future May Hold. Car and Driver (Apr. 16, 2015).

[165] Danny Kim, Aaron Danny Hakim, Aaron Kessler, and Jack Ewing, "As Volkswagen Pushed to Be No. 1, Ambitions Fueled a Scandal," New York Times (Sept. 26, 2015).

[166] The term "NOx trap" refers to any device whose purpose is to reduce the oxides of nitrogen. See https://en.wikipedia.org/wiki/NOx_adsorber. However, the term here is used as a shorthand, informal reference to the emissions control system developed by the Volkswagen Defendants as an alternative to the SCR system. Unlike the NOx trap, SCR systems require vehicles to carry an onboard tank of an exhaust additive, often urea crystals in mineralized water that has to be refilled every 10,000 miles at a cost of around $300. Additionally, SCR systems also increase the vehicles' initial purchase price.

Volkswagen Defendants sought to implement had not been shown to effectively reduce toxic $NO_X$ emissions to lawful levels under normal operating conditions.

317. Accordingly, working with the other members of the Emissions Fraud Enterprise, the Volkswagen Defendants devised a scheme to circumvent the United States' stringent emissions standards by incorporating a "defeat device" into their LNT emissions control system. The "defeat device" automatically increases exhaust gas recirculations and activates the LNT system during *testing conditions only*.[167] Employing this technology, Affected Vehicles routinely pass emissions tests even though in normal operating conditions they emit unlawful levels of toxic pollutants into the atmosphere, when the LNT system is disabled.[168]

318. Making matters worse, in order to profit from the scheme and increase their sales according to plan, the Volkswagen Defendants unabashedly billed the Affected Vehicles as "*clean*" and "*environmentally friendly*" vehicles.[169]

319. In sum, as part of their effort to become the dominant automotive manufacturing conglomerate in the world, the Volkswagen Defendants controlled and directed an eight-year-long enterprise whose purpose was to deceive regulators and the public through lies and deception.

**b. The Volkswagen Defendants' Executives, Officers and Engineers.**

320. Upon information and belief, the Volkswagen Defendants' leaders—including Martin Winterkorn, Ulrich Hackenberg, Frank Tuch, and Wolfgang Hatz—played central roles in the Emissions Fraud Enterprise's unlawful scheme.

**(1) Martin Winterkorn.**

321. Winterkorn took the helm of Volkswagen AG in 2007 and was the chief architect of the Volkswagen Defendants' strategy to triple sales in the American market by relying more heavily on their purportedly revolutionary "clean" diesel offerings.[170]

---

[167] Testimony of Michael Horn, President and CEO of Volkswagen Group of America, Inc. Before H. Comm. on Energy and Commerce, 114th Cong. (2015).

[168] *Id.*

[169] *See* Jad Mouawad & Sydney Ember. VW's Pitch to Americans Relied on Fun and Fantasy. New York Times (Sept. 27, 2015), http://nytimes.com/2015/09/28/business/media/vws-pitch-to-americans-relied-on-fun-and-fantasy.html?ref=business.

322. Still, Winterkorn quickly realized his strategy could not succeed if the Volkswagen Defendants relied on the same SCR technology they had used in their pre-2009 diesel vehicles and that all their competitors used on more expensive diesel offerings. Winterkorn instead advocated an alternative course of action that enabled the Volkswagen Defendants to cut costs and offer the public lower-priced diesel vehicles. To that end, he appointed Ulrich Hackenberg and Wolfgang Hatz, two former Audi engineers and members of the Emissions Fraud Enterprise, to lead the research and development facet of the "clean" diesel project.

323. Despite Hackenberg and Hatz' best efforts, the technological hurdles were too formidable and a viable, lawful LNT-based system could not be found. Although Winterkorn was routinely apprised of these obvious technical setbacks, he continued to pursue the aggressive cost-cutting, profit driven plan he had originally envisioned. In doing so, he directly participated in the scheme to defraud regulators and consumers.

**(2) Ulrich Hackenberg**

324. On February 1, 2007, Hackenberg was appointed to Volkswagen's Brand Board of Development. In this capacity, he was responsible for the technical development of all of the Volkswagen Defendants' brands.[171]

325. On July 1, 2013, Hackenberg was appointed to the Board of Management of Audi AG and made responsible for its Technical Development department. In this capacity, Hackenberg spearheaded the development of Audi's TDI "CleanDiesel" engines. As he explained in a press release, his strategy for Audi's technical development included the following:

> [P]ushing forward with development in … our TDI engines in the USA – our clean diesel offensive is bearing substantial fruit. In China, too, we are already introducing the first clean diesel models and watching developments there very closely. We also expect a great deal from g-tron technology, the most sustainable type of gas drive.[172]

[170] *Volkswagen AG, TDI: U.S. Market Success*, Clean Diesel Delivers (March, 2015), http://cleandieseldelivers.com/media/Douglas-Skorupski-VGoA_DTF_March2015.pdf.

[171] https://www.audiusa.com/newsroom/corporate/audi-ag-board-of-management/ulrich-hackenberg.

[172] "Gentlemen Start Your Engines," http://audi-encounter.com/magazine/ technology/01-2015/126-gentlemen-start-your-engines (2014).

326. Hackenberg's statement is illustrative of the Volkswagen Defendants' efforts to falsely bill Affected Vehicles as "clean," "environmentally friendly," and "fuel efficient" when the opposite was true.

**(3) Frank Tuch**

327. In 2010, Tuch was appointed head of quality control across several of the Volkswagen Defendants' brands. Winterkorn hoped Tuch would bring the Volkswagen Defendants "forward in the USA."[173] Volkswagen's in-house magazine reported that Tuch and Winterkorn worked closely to honor that pledge, meeting "every Monday to discuss quality issues, often taking test drives in vehicles manufactured by the company." In his role as head of quality assurance, Tuch was also intimately familiar with Volkswagen, Audi, and Porsche engines and transmissions. Among his duties was "the development and production of components such as engines, transmissions, seats and suspension parts" for small, compact, midsize, and full size product lines, including all the Affected Vehicles.[174]

328. Significantly, Tuch also oversaw "36 laboratory locations throughout the world in terms of training and auditing and also finds staff to fill laboratory manager positions," including the Volkswagen Defendants' laboratories in the United States, which were primarily responsible for emissions testing of the Affected Vehicles.[175]

329. On information and belief, Tuch knew Affected Vehicles used defeat devices to evade federal and state vehicle emissions standards.

**(4) Wolfgang Hatz**

330. Hatz directed engine development for the Porsche, Audi and Volkswagen brands. In this role, he supervised the development of the engines and transmissions for Affected Vehicles

---

[173] http://www.marketwatch.com/story/volkswagen-suspends-quality-control-chief-2015-10-20-84855452.

[174] Jack Ewing. "Volkswagen Suspends 5th Executive in Emissions Scandal," The New York Times (Oct. 20, 2015).

[175] http://www.volkswagen-larriere.de/en/what_we_do/corporate_divisions/quality_assurance.html.

and had knowledge of their technical details. On information and belief, Hatz knew the Affected Vehicles used defeat devices to evade federal and state vehicle emissions standards.

**(5) James Robert Liang**

331. Liang is a VW engineer who pled guilty on September 9,2016 to one count of conspiracy to commit wire fraud and to violate the Clean Air Act. In connection with pleading guilty, Liang admitted that he helped his co-conspirators continue to lie to the EPA, CARB and VW customers even after the regulatory agencies started raising questions about the vehicles' on-road performance following an independent study commissioned by the International Council on Clean Transportation, which showed that the diesel vehicles' emissions on the road were up to 40 times higher than shown on the dynamometer.

**c. Bosch Defendants**

332. The Bosch Defendants[176] tested, manufactured and sold the electronic control module ("ECM") that managed the LNT emissions control system used by the Volkswagen Defendants in the Affected Vehicles. This particular ECM is more formally referred to as the Electronic Diesel Control Unit 17 ("EDC Unit 17").[177]

333. Defendant Bosch GmbH is a multinational engineering and electronics company headquartered in Gerlingen, Germany, which has hundreds of subsidiaries and companies. It wholly owns defendant Bosch LLC, a Delaware limited liability company headquartered in Farmington Hills, Michigan. As explained above, Bosch's sectors and divisions are grouped by subject matter, not location. The Mobility Solutions (formerly Automotive Technology) is the Bosch sector at issue, particularly its Diesel Services division, and it encompasses employees of Bosch GmbH and Bosch LLC. These individuals were responsible for the design, manufacture, development, customization, and supply of the defeat device to Volkswagen for use in the Affected Vehicles.

---

[176] The Bosch Defendants include: Robert Bosch GmbH, Inc.; and Robert Bosch, LLC.

[177] http://www.bosch-presse.de/presseforum/details.htm?txtID=7421&tk_id=108.

334. Denner has been Chairman and CEO of Bosch since July 2012, after decades of working in Bosch's Engine ECU Development division, managing the development and sale of automotive engine computers, such as the EDC units that Volkswagen used as defeat devices. Denner fostered Bosch's relationship with key corporate partners, such as Volkswagen, which brought in billions of dollars in annual revenue for Bosch. Denner communicated directly with Winterkorn about products sold to Volkswagen. For example, when Bosch had a shortage of oxygen sensor parts that Volkswagen had ordered, Denner reached out directly to Winterkorn. Further, Bosch met in 2014 in person with Winterkorn at VWAG headquarters to discuss, among other topics, the "akustikfunktion" in diesel engines.

335. Bosch worked with Volkswagen to develop and implement a specific and unique set of software algorithms to surreptitiously evade emissions regulations. Bosch customized their EDC Unit 17s for installation in the Affected Vehicles with unique software code to detect when it was undergoing emissions testing, as described above.[178]

336. Bosch was well aware that the EDC Unit 17 would be used by Volkswagen to cheat on emissions testing. As described above, on June 2, 2008, Bosch's [redacted] wrote to his counterparts at Volkswagen, seeking legal indemnification from Volkswagen for the "expanded use" of the EDC Unit 17s which it called a "defeat device."[179] [redacted] explained that "[t]he usage of a defeat device is prohibited pursuant to … US Law (CARB/EPA) (see definition footnote 2),"[180] and warned that the agreed-to software modifications would allow "the certified dataset [to be] replaced with another, possibly non-certified data set," which could cause "the vehicle's general operating license (registration) [to] become void."[181] Volkswagen rebuffed Bosch's request, yet Bosch nonetheless shipped the modified software to Volkswagen for use in the Affected Vehicles for another seven years. Bosch was also critical to the concealment of the defeat

[178] http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater-software.

[179] VW-MDL2672-02570091 (English translation).

[180] *Id.* at -92.

[181] *Id.* at -93.

device in communications with U.S. regulators and went even further to actively lobby U.S. lawmakers on behalf of Volkswagen and its "Clean Diesel" vehicles.

337. EDC Unit 17 could not effectively lower $NO_X$ emissions to legal levels during normal operating conditions. In order to pass the emissions test, then, EDC Unit 17 is equipped with a "defeat device," which is software that allows the vehicle to determine whether it is being operated under normal conditions or testing conditions. Under normal operating conditions, the software downgrades exhaust gas recirculations and shuts off the LNT or SCR after-treatment system thereby allowing the vehicle to perform with high power and efficiency, but also allowing many times more toxic pollutants than is allowable under law. By contrast, under testing conditions, the software ups exhaust gas recirculation and turns on the LNT or SCR after-treatment system, which reduces the $NO_X$ emissions enough to pass the emissions test with flying colors, but negatively impacts the vehicle's gas mileage and performance.[182]

338. As was publicly reported, the Bosch Defendants, seeking to conceal their involvement in the unlawful Emissions Fraud Enterprise, sent a letter to Volkswagen AG in 2007 stating that Affected Vehicles *could not be lawfully operated* if the LNT or SCR after-treatment system was disabled.[183]

339. Indeed, notwithstanding their knowledge that the Affected Vehicles *could not be lawfully operated* if the emissions system was disabled, the Bosch Defendants, driven to cement their position as a leading supplier of diesel emissions equipment, went on to sell approximately *eleven million* EDC Unit 17s to the Volkswagen Defendants over an eight year period.[184]

340. The Bosch Defendants' decision to continue the sale of EDC Unit 17s to the Volkswagen Defendants for years on end is remarkable considering that:

a. The Bosch Defendants manufactured, tested and sold emissions control systems to various other diesel vehicle manufacturers, *none* of which included the "defeat device" software that allowed vehicles to automatically activate or disable the emissions after-treatment

[182] http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater-software.

[183] http://jalopnik.com/feds-are-now-investigating-volkswagen-supplier-bosch-ov-1743624448.

[184] http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater-software.

system depending on operating conditions.[185] Upon information and belief, the Bosch Defendants knew the "defeat device" was not necessary for any legitimate purpose.

b. None of the varied emissions control systems the Bosch Defendants tested, manufactured and sold to other diesel vehicle manufacturers relied on the same technology the Volkswagen Defendants were utilizing. Indeed, the Volkswagen Defendants' competitors, including reputable and technologically sophisticated brands like Daimler (Mercedes-Benz) and BMW, continued using exclusively the more expensive SCR technology.[186]

c. Even for SCR systems in Volkswagen's Gen2 and Gen3 SCR-equipped engine systems, the amount of exhaust fluid the system used and was able to store was too low for normal driving conditions, suggesting that the quantity was calculated to meet just the testing time and not meant to be engaged during normal usage.

341. Absent an extraordinary engineering breakthrough—for which there was no external evidence—the programming of the EDC Unit 17 presented a practical impossibility. The Bosch Defendants should have known or were reckless in failing to realize that the Volkswagen Defendants had *not* actually engineered revolutionary emissions control systems that enabled Affected Vehicles to maintain performance, fuel efficiency, reduce emissions *and* reduce costs.[187]

**d. IAV**

342. IAV engineers were part of the enterprise that developed the emissions systems that contained a defeat device. In the plea agreement of Volkswagen engineer Robert Liang, IAV is identified as "Company A" that aided and abetted Liang and other co-conspirators.

---

[185] http://www.inautonews.com/vw-diesel-scandal-bosch-software-cleared-of-wrongdoings-by-epa.

[186] http://www.nytimes.com/2015/09/27/business/as-vw-pushed-to-be-no-1-ambitions-fueled-a-scandal.html?_r=0.

[187] Upon information and belief, sophisticated entities like the Bosch Defendants were also likely aware that Wolfgang Bernhard, a former high-level executive with Mercedes-Benz with a reputation for implementing cost-cutting measures, had been removed from the "clean diesel" project at Volkswagen AG shortly before the Volkswagen Defendants abandoned the SCR systems and inexplicably developed what was purportedly an even cheaper technology. *See*, http://www.foxbusiness.com/features/2015/10/05/vw-emissions-probe-zeroes-in-on-two-engineers.html.

**2. A Criminal Plea that Relates to the RICO Claims and Enterprise.**

343. On June 1, 2016, an indictment was filed in the United States District court, Eastern District of Michigan in *United States of America v. James Robert Liang*. The indictment arises from Robert Liang's role in VW's violations of the Clean Air Act and wire fraud and alleges that he and others at VW and elsewhere engaged in a conspiracy:

> The purpose of the conspiracy was for LIANG and his co-conspirators to unlawfully enrich VW and themselves by, among other things, (a) deceiving U.S. regulators in order to obtain the necessary certificates to sell diesel vehicles in the United States; (b) selling VW diesel vehicles to U.S. customers knowing that those vehicles did not meet U.S. emissions standards; (c) deceiving U.S. customers by marketing VW diesel motor vehicles as "clean diesel" knowing that those vehicles emitted NOx at levels well above U.S. standards; and (d) concealing the defeat device from U.S. regulators, VW customers, and the U.S. public.

344. On September 9, 2016, Liang entered into a Plea Agreement for one count of wire fraud. The factual basis of the plea supports the plausibility of the RICO claim set forth below and states in pertinent part:

> The following facts are a sufficient and accurate basis for defendant's guilty plea:
>
> From 1983 to May 2008, defendant JAMES ROBERT LIANG was an employee of Volkswagen AG ("VW AG"), working in VW AG's diesel development department in Wolfsburg, Germany.
>
> In about 2006, LIANG and his co-conspirators began to design a new "EA 189" diesel engine. They soon realized, however, that the engine could not meet both customer expectations as well as new, stricter U.S. emissions standards. As a result, LIANG and his co-conspirators pursued and planned the use of a software function to cheat standard U.S. emissions tests (the "defeat device"). LIANG used the defeat device software while working on the EA 189 and assisted in making the defeat device software work. The co-conspirators needed to do so to obtain a certificate of conformity from the United States Environmental Protection Agency ("EPA") in order to sell vehicles in the United States. LIANG understood that EPA would not certify vehicles for sale in the United States if EPA knew that the vehicles contained a defeat device.
>
> In or around 2008, LIANG worked with his co-conspirators to calibrate and refine the defeat device. This defeat device recognized whether the affected VW diesel vehicles were undergoing standard U.S. emissions testing on a dynamometer or being driven on the road under normal driving conditions. The defeat device accomplished this by recognizing the standard drive cycles used in EPA's emissions tests. If the vehicle's software detected that it was being

tested, the vehicle performed in one mode, which satisfied U.S. emissions standards for nitrogen oxide ("NOx"). If the defeat device detected that the vehicle was not being tested, it operated in a different mode, in which the vehicle's emissions control systems were reduced substantially, causing the vehicle to emit substantially higher amounts of NOx, sometimes forty times higher than U.S. standards.

LIANG moved to the United States in May 2008 to assist in the launch of VW's diesel vehicles with EA 189 engines. From about May 2008 to the present, LIANG was the Leader of Diesel Competence for VW Group of America ("VW GOA"), a VW subsidiary. In that role, LIANG assisted in certification, testing, and warranty issues for VW diesel vehicles in the United States.

For each new model year of VW's diesel vehicles, VW employees met with EPA to seek the certifications required to sell the vehicles to U.S. customers. During one of these meetings, which LIANG attended personally in Ann Arbor, Michigan with EPA on March 19, 2007 and on March 21, 2007 with the California Air Resources Board ("CARB"), LIANG participated as his co-conspirators misrepresented that VW diesel vehicles complied with U.S. NOx emissions standards. During this meeting, LIANG's co-conspirators described VW's diesel technology and emissions control systems in detail to the staffs of the EPA and CARB but intentionally omitted LIANG and his co-conspirators' plan to include a defeat device in VW diesel vehicles. LIANG knew that VW was cheating by implementing the defeat device and that he and his co-conspirators were deceiving EPA in this meeting.

As part of the certification process for each new model year, including model years 2009 through 2016, LIANG knew his co-conspirators continued to falsely and fraudulently certify to EPA and CARB that VW diesel vehicles met U.S. emissions standards and complied with the Clean Air Act. During this time, LIANG and his co-conspirators knew that VW marketed VW diesel vehicles to the U.S. public as "clean diesel" and environmentally-friendly, and promoted the increased fuel economy. LIANG and his co-conspirators knew that these representations made to U.S. customers were false, and that VW's diesel vehicles were not clean.

As VW's "clean diesel" vehicles in the United States began to age, they experienced higher rates of warranty claims for parts and components related to emissions control systems. Some of LIANG's coconspirators believed that the increased claims were a result of the vehicle operating in testing mode too long, rather than switching to "road mode." Because of these increased claims, LIANG worked with his co-conspirators to enhance the defeat device to allow the vehicle to more easily recognize when the vehicle was no longer in testing mode. LIANG knew that his co-conspirators falsely and fraudulently told U.S. customers and others that a software update in about 2014 was intended to improve the vehicles when, in fact, LIANG and his co-conspirators knew that part of the update was intended to improve the defeat device's precision in order to reduce the stress on the emissions control systems.

> In the spring of 2014, a non-government organization published the results of a study which identified substantial discrepancies in the NOx emissions from certain VW vehicles when tested on the road compared to when these vehicles were undergoing EPA standard drive cycle tests on a dynamometer. Following the study, CARB, in coordination with the EPA, attempted to work with VW to determine the cause for the higher NOx emissions in VW diesel vehicles on the road as opposed to the dynamometer. LIANG and his co-conspirators discussed how they could answer the regulatory agencies' questions without revealing the defeat device. LIANG knew that, after these discussions, his co-conspirators intentionally made fraudulent explanations to the EPA and CARB when providing testing results, data, presentations, and statements to the EPA and CARB by failing to disclose the fact that the primary reason for the discrepancy was the defeat device.
>
> LIANG knew that his co-conspirators also falsely and fraudulently told U.S. customers, EPA, and CARB that a voluntary recall in or around early 2015 was intended to "fix" the issues that were causing the discrepancy, when, in fact, LIANG and his co-conspirators knew that although the update lowered the NOx emissions in certain VW diesel vehicles on the road, the update did not remove the defeat device software that was the true reason for the discrepancy.
>
> LIANG and his co-conspirators caused defeat device software to be installed in all of the approximately 500,000 VW diesel 2.0 liter light-duty passenger vehicles sold in the United States from 2009 through 2015.

345. The foregoing facts provide an additional plausible basis supporting the allegations of a conspiracy and the existence of a RICO enterprise.

### 3. Emissions Fraud Enterprise Allegations.

346. The persons and entities described in the preceding section are members of and constitute an "association-in-fact" enterprise.

347. The Emissions Fraud Enterprise began as early as 2005, when an internal feasibility study at VWAG identified Bosch's EDC17 as a solution to their engineering dilemma by reducing diesel vehicle emissions of nitrogen oxides ("NOx") through a change in engine electronics. Starting in mid-2005, Volkswagen and Bosch entered into a series of agreements to develop what ultimately became the defeat device for the Affected Vehicles. The Emissions Fraud Enterprise continued without interruption for approximately the next ten years, as the Volkswagen Defendants continued to install Bosch EDC Unit 17s in the Affected Vehicles that employed defeat devices. The Emissions Fraud Enterprise was first disclosed in approximately September of 2015 when U.S.

regulators uncovered the fraudulent scheme and exposed the RICO Defendants to the public. The Emissions Fraud Enterprise ceased shortly after the September 18, 2015, and November 2, 2015 NOVs, when the Volkswagen Defendants ceased selling or leasing the Affected Vehicles.

348. At all relevant times, the Emissions Fraud Enterprise: (a) had an existence separate and distinct from each Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; and (c) was an ongoing organization consisting of legal entities, including the Volkswagen Defendants, the Bosch Defendants, IAV and other entities and individuals associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Affected Vehicles through fraudulent COCs and EOs, false emissions tests, deceptive and misleading marketing and materials, and deriving profits and revenues from those activities. Each member of the Emissions Fraud Enterprise shared in the bounty generated by the enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud consumers and franchise dealers alike nationwide.[188]

349. The Emissions Fraud Enterprise functioned by selling vehicles and component parts to the consuming public. Many of these products are legitimate, including vehicles that do not contain defeat devices. However, the RICO Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell the Affected Vehicles.

350. The Emissions Fraud Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement and sale or lease of the Affected Vehicles throughout the country, and the receipt of monies from the sale of the same.

351. Within the Emissions Fraud Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The Emissions Fraud

[188] The Volkswagen Defendants sold more Affected Vehicles by utilizing an emissions control system that was cheaper than SCRs, all the while charging consumers a premium for purportedly "clean," "environmentally friendly" and "fuel efficient" vehicles. Bosch, in turn, sold more EDC Units because the Volkswagen Defendants manufactured and sold more Affected Vehicles.

Enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Affected Vehicles to the general public nationwide.

352. Each participant in the Emissions Fraud Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the Emissions Fraud Enterprise, the RICO Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

353. The RICO Defendants participated in the operation and management of the Emissions Fraud Enterprise by directing its affairs, as described herein. While the RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

354. The Volkswagen RICO Defendants exerted substantial control and participated in the affairs of the Emissions Fraud Enterprise by:

a. making the decision to transition the design of their diesel vehicles away from an effective SCR emissions control system and adopt instead the ineffective LNT emissions system, controlled by the Bosch-supplied EDC Unit 17;

b. designing the Affected Vehicles with defeat devices;

c. failing to correct or disable the defeat devices when warned;

d. manufacturing, distributing, and selling the Affected Vehicles that emitted greater pollution than allowable under the applicable regulations;

e. misrepresenting and omitting (or causing such misrepresentations and omissions to be made) vehicle specifications on COC and EO applications;

f. introducing the Affected Vehicles into the stream of U.S. commerce without a valid EPA COC and/or CARB EO;

g. concealing the existence of the defeat devices and the unlawfully high emissions from regulators and the public;

h. persisting in the manufacturing, distribution, and sale of the Affected Vehicles even after questions were raised about the emissions testing and discrepancies concerning the same;

i. misleading government regulators as to the nature of the defeat devices and the defects in the Affected Vehicles;

j. misleading the driving public as to the nature of the defeat devices and the defects in the Affected Vehicles;

k. designing and distributing marketing materials that misrepresented and concealed the defect in the vehicles;

l. otherwise misrepresenting or concealing the defective nature of the Affected Vehicles from the public and regulators;

m. illegally selling and/or distributing the Affected Vehicles; collecting revenues and profits from the sale of such products; and ensuring that the other RICO Defendants and unnamed co-conspirators complied with the fraudulent scheme.

355. Bosch also participated in, operated and/or directed the Emissions Fraud Enterprise. Bosch participated in the fraudulent scheme by manufacturing, installing, testing, modifying, and supplying the EDC Unit 17 which operated as a "defeat device" in the Affected Vehicles. Bosch exercised tight control over the coding and other aspects of the defeat device software and was closely collaborated with Volkswagen to develop, customize, and calibrate the defeat devices. Additionally, Bosch continuously cooperated with the Volkswagen Defendants to ensure that the EDC Unit 17 was fully integrated into the Affected Vehicles. Bosch also participated in the affairs of the Enterprise by concealing the defeat devices on U.S. documentation and in communications with U.S. regulators. Finally, Bosch actively lobbied lawmakers in the U.S. on Volkswagen's behalf. Bosch collected tens of millions of dollars in revenues and profits from the hidden defeat devices installed in the Affected Vehicles.

356. IAV participated in the Emissions Fraud Enterprise as outlined in the Indictment:

> 40. On or about November 10, 2006, a Company A employee submitted a request, on behalf of Volkswagen, for a software design change to what was known as the "acoustic function" that would become the defeat device.

357. IAV is "Company A".

358. Without the RICO Defendants' willing participation, including Bosch's active involvement in developing and supplying the critical defeat devices for the Affected Vehicles, the Emissions Fraud Enterprise's scheme and common course of conduct would not have been successful.

359. The RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the Defendants' and others' hands.

360. The members of the Emissions Fraud Enterprise all served a common purpose; namely, to outsell their law-abiding competitors and increase their revenues through the sale of as many Affected Vehicles (including the emissions components made and sold by Bosch) as possible. Each member of the Emissions Fraud Enterprise shared the bounty generated by the enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud. The Volkswagen Defendants sold more Affected Vehicles by utilizing an emissions control system that was cheaper to install and allowed for generous performance and efficiency tuning, all the while charging consumers a premium for purportedly "clean," "environmentally friendly" and "fuel efficient" Affected Vehicles. The Bosch Defendants, in turn, sold more EDC Units because the Volkswagen Defendants manufactured and sold more Affected Vehicles. The RICO Defendants achieved their common purpose by repeatedly misrepresenting and concealing the nature of the Affected Vehicles and the ability of the emissions control systems (including the Bosch-supplied parts) to effectively reduce toxic emissions during normal operating conditions.

**4. The Predicate Acts.**

361. To carry out, or attempt to carry out the scheme to defraud, the RICO Defendants conducted or participated in the conduct of the affairs of the Emissions Fraud Enterprise through a

pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

362. Specifically, the RICO Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit writings travelling in interstate or foreign commerce.

363. The RICO Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

a. application for certificates submitted to the EPA and CARB and Approved Applications received in the mail on April 9, 2008, June 23, 2008, June 6, 2008 and July 2, 2000;

b. applications submitted to the EPA and CARB for each model year as follows:

- Model Year ("MY") 2009-2015 VW Jetta;
- MY 2009-2014 VW Jetta Sportwagen;
- MY 2010-2015 VW Golf;
- MY 2015 VW Golf Sportwagen;
- MY 2010-2015 Audi A3;
- MY 2013-2015 VW Beetle and VW Beetle Convertible; and
- MY 2012-2015 VW Passat

c. the Affected Vehicles themselves;

d. component parts for the defeat devices;

e. essential hardware for the Affected Vehicles;

f. falsified emission tests;

g. fraudulently-obtained EPA COCs and CARB EOs;

h. vehicle registrations and plates as a result of the fraudulently-obtained EPA COCs and CARB EOs;

i. documents and communications that facilitated the falsified emission tests;

j. false or misleading communications intended to lull the public and regulators from discovering the defeat devices and/or other auxiliary devices;

k. sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of the Affected Vehicles;

l. documents intended to facilitate the manufacture and sale of the Affected Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

m. documents to process and receive payment for the Affected Vehicles by unsuspecting franchise dealers, including invoices and receipts;

n. payments to Bosch;

o. deposits of proceeds; and

p. other documents and things, including electronic communications.

364. The RICO Defendants (or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of the Affected Vehicles and related documents by mail or a private carrier affecting interstate commerce, including the items described above and alleged below:

| **From** | **To** | **Date** | **Description** |
|---|---|---|---|
| Bosch LLC | VW America | December 2009 | Documents and communications related to Volkswagen "Clean Diesel" Partnership, 2009 Review and 2010 Opportunities, Bosch Diesel Systems North America Marketing.[189] |
| Bosch LLC | CARB | September 2009 | Documents and communications related to Diesel Tech Day in El Monte, CA.[190] |
| VW America Manufacturing Plant | South Bay VW | October 2011 | Shipment of Volkswagen Jetta TDI Affected Vehicles. |
| Washington State Department of Licensing | Dan Clements | October 2011 | Mailed registration card for 2012 Volkswagen Toareg TDI based on false emission test due to concealed defeat device. |

[189] *See* VW-MDL2672-06900942.

[190] *See* VW-MDL2672-07672454.

| From | To | Date | Description |
|---|---|---|---|
| CARB | VW America | July 2014 | Mailed EO for 2015 Affected Vehicles based on fraudulent application. |
| California Department of Motor Vehicles | Phillip Clark | December 2014 | Mailed registration card for 2014 Volkswagen Touareg TDI based on false emission test due to concealed defeat device. |
| California Department of Motor Vehicles | Caroline Hoag | December 2014 | Mailed renewed registration for 2011 Jetta SportWagen TDI based on false emission test due to concealed defeat device. |
| Washington State Department of Licensing | Dan Clements | February 2015 | Mailed registration certificate for 2012 Volkswagen Touareg TDI based on false emission test due to concealed defeat device. |

365. The RICO Defendants (or their agents), for the purpose of executing the illegal scheme, transmitted (or caused to be transmitted) in interstate commerce by means of wire communications, certain writings, signs, signals and sounds, including those items described above and alleged below:

| From | To | Date | Description |
|---|---|---|---|
| Pignataro Volkswagen, Washington | American Express, North Carolina | April 2012 | Credit card transaction in the amount of $5,000 for down payment on 2012 VW Touareg by Dan Clements. |
| CARB, California | VW America, Virginia | May 2014 | Email communications concerning WVU study. |
| VW America, Michigan | EPA, Michigan; CARB, California | May 2012 | Misleading application(s) for COC and EO for 2013 VW Passat TDI. |
| Bosch America, Farmington Hills, Michigan | Volkswagen, Virginia | January 2013 | Email communications regarding Bosch's promotion of VW Passat TDI through trip from Atlanta to Washington, D.C.[191] |
| VW America, Virginia | CARB, California | October 2014 | Misleading communications about discrepancies identified in WVU study. |
| Audi of Lynnbrook, New York | American Express, North Carolina | December 2014 | Credit card transaction in the amount of $2,586.45 for down payment on lease of 2015 Audi A3 by Kevin and Elizabeth Bedard. |

[191] VW-MDL2672-08348204.

| **From** | **To** | **Date** | **Description** |
|---|---|---|---|
| VW America, Virginia | EPA, District of Columbia | December 2014 | Misleading communications about software patch for the Affected Vehicles without revealing fact of the defeat device. |
| Bosch LLC, Michigan | CARB, California | January 2015 | Email communication re: meeting with CARB.[192] |
| VW America, Michigan | Audi AG, Germany | February 2015 | Email communication concerning meeting with Bosch and CARB re: fault codes.[193] |

366. The RICO Defendants utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described therein.

367. The RICO Defendants also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities. Specifically, Volkswagen Group of America, under the direction and control of Volkswagen AG and its executives, made misrepresentations about the Affected Vehicles on their websites, YouTube, and through ads online, all of which were intended to mislead regulators and the public about the fuel efficiency, emissions standards, and other performance metrics.

368. The RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

369. The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and consumers and lure consumers into purchasing the Affected Vehicles, which Defendants knew or recklessly disregarded as emitting illegal amounts of pollution, despite their advertising campaign that the Affected Vehicles were "clean" diesel cars.

370. Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books

[192] VW-MDL-2672-02461438.

[193] VW-MDL2672-00902633.

and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

371. The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

372. The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

373. To achieve their common goals, the RICO Defendants hid from the general public the unlawfulness and emission dangers of the Affected Vehicles and obfuscated the true nature of the defect even after regulators raised concerns. The RICO Defendants suppressed and/or ignored warnings from third parties, whistleblowers, and governmental entities about the discrepancies in emissions testing and the defeat devices present in the Affected Vehicles.

374. The RICO Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling the Affected Vehicles (and the defeat devices contained therein).

375. Indeed, for the conspiracy to succeed each of the RICO Defendants and their co-conspirators had to agree to implement and use the similar devices and fraudulent tactics—specifically complete secrecy about the defeat devices in the Affected Vehicles.

376. The RICO Defendants knew and intended that government regulators, as well as Plaintiffs and Franchise Dealer Class members, would rely on the material misrepresentations and

omissions made by them and VGoA about the Affected Vehicles. The RICO Defendants knew and intended that franchise dealers, including Plaintiffs and the Franchise Dealer Class would incur costs and damages as a result. As fully alleged herein, Plaintiffs, along with hundreds of franchise dealers, relied upon Defendants' representations and omissions that were made or caused by them. Plaintiffs' reliance is made obvious by the fact that: (1) they purchased hundreds of thousands of vehicles that never should have been introduced into the U.S. stream of commerce and whose worth has now plummeted since the scheme was revealed; and (2) they invested millions of dollars in the continuing operation of their franchise dealerships. In addition, the EPA, CARB, and other regulators relied on the misrepresentations and material omissions made or caused to be made by the RICO Defendants; otherwise Volkswagen could not have obtained valid COCs and EOs to sell the Affected Vehicles.

377. The RICO Defendants' conduct in furtherance of this scheme was intentional. Plaintiffs and the Franchise Dealer Class were harmed as a result of the RICO Defendants' intentional conduct. Plaintiffs, the Franchise Dealer Class, regulators and consumers, among others, relied on the RICO Defendants' material misrepresentations and omissions.

378. As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for many years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiffs and other Franchise Dealer Class members and obtaining significant monies and revenues from them and through them while providing Affected Vehicles worth significantly less than the invoice price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

379. The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants at the expense of Plaintiffs and the Franchise Dealer Class, and consumers. The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the Emissions Fraud Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and Class

members' funds, artificially inflating the brand and dealership goodwill values, and avoiding the expenses associated with remediating the Affected Vehicles.

380. During the design, manufacture, testing, marketing and sale of the Affected Vehicles, the RICO Defendants shared technical, marketing and financial information that plainly revealed the emissions control systems in the Affected Vehicles as the ineffective, illegal and fraudulent piece of technology they were and are. Nevertheless, the RICO Defendants shared and disseminated information that deliberately represented Affected Vehicles as "clean," "environmentally friendly," and "fuel efficient."

381. By reason of and as a result of the conduct of the RICO Defendants, and in particular, its pattern of racketeering activity, Plaintiffs and the Franchise Dealer Class have been injured in their business and/or property in multiple ways, including but not limited to:

a. Overpayment for inventory of Affected Vehicles, in that Plaintiffs and the Franchise Dealer Class believed they were paying for vehicles that met certain emission and fuel efficiency standards and obtained vehicles that were not legal to sell in the U.S.;

b. The value of the Affected Vehicles has diminished, thus reducing their sale and resale value;

c. Paying inventory carrying costs including transportation and storage costs for vehicles that they cannot sell and will not be able to sell for as much as intended when the vehicles were purchased;

d. Payment for alternative inventory;

e. Loss of servicing revenue on lost sales;

f. Loss of customer goodwill and sales associated with replacement vehicles for existing customers;

g. Loss of value of their VW franchise; and

h. Loss of profits.

382. The RICO Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs and the Franchise Dealer Class, and Plaintiffs and the Franchise Dealer Class are entitled to bring this action for three times their actual

damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c). Each of the RICO defendants knew, understood and intended for members of the Dealer Franchise class to purchase the Affected Vehicles, and knew, understood and foresaw that revelation of the truth would injure members of the Franchise Dealer Class.

**B. Claims Brought on Behalf of Napleton Plaintiffs**

**COUNT III**
**VIOLATIONS OF THE AUTOMOBILE DEALERS' DAY IN COURT ACT**
**15 U.S.C. § 1221, ET SEQ.**
**BY NAPLETON PLAINTIFFS AGAINST VGOA**

383. Napleton Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

384. The Federal Automobile Dealer's Day in Court Act, 15 U.S.C. § 1221, *et seq*., provides a cause of action for dealers against manufacturers that fail "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer." 15 U.S.C. § 1222. VGoA is wholly owned by VWAG. VGoA is an agent under the complete control of VWAG and acts in concert with VWAG for the purpose of selling cars to Plaintiffs.

385. Pursuant to 15 U.S.C. § 1221(e), the term "good faith" is defined as "the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: Provided, that recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith."

386. Coercion and intimidation in violation of the statute are not limited to exercise of positive force or direct threats, but may result from any pressure which puts one in actual fear of loss of property or injury to business; unfair and inequitable conduct may be of such a nature as to constitute coercion and intimidation.

387. VGoA has failed to act in good faith in providing adequate assurance that it will adjust its DSI market performance metric for its Volkswagen dealers to take into account

proportionate reductions in Napleton Plaintiffs' areas of responsibility (PAI) resulting from its opening newly established locations.

388. VGoA has manipulated the market and its PAI to distort its DSI sales metric specifically to the detriment of Plaintiffs, Napleton VW Orlando and Napleton VW Sanford and threaten to do so against Napelton VW Urbana.

389. VGoA has attempted to coerce Napleton Plaintiffs to finance their inventories with VCI thereby depriving Napleton Plaintiffs of cost subsidies and favorable allocations afforded to those Volkswagen dealers who knuckle under to VGoA pressure.

390. The actions of VGoA and VCI clearly violate the express prohibition set forth in 15 U.S.C. § 1222.

391. As a result of the illegal conduct of VWAG, VGoA and VCI, Napleton Plaintiffs have suffered damages including, but not limited to, lost profits, increased financing and related expenses, increased inventory carrying costs, loss of sales, and the loss of value of the business as a going concern.

**COUNT IV**
**VIOLATIONS OF SECTION 320.64(4), FLORIDA STATUTES**
**(AGAINST VGOA)**

392. Plaintiffs Napleton VW Orlando and Napleton VW Sanford ("Florida Plaintiffs") incorporate by reference all preceding allegations as though fully set forth herein. This is not a class claim.

393. Section 320.64(4), Florida Statutes, provides in pertinent part as follows:

A licensee is prohibited from committing the following acts:

(4) The applicant or licensee has indulged in any illegal act relating to his or her business.

394. VGoA's conspiracy with VCI to coerce Florida Plaintiffs to finance their inventory with VCI is an illegal act within the meaning of Florida Statutes, section 320.64(4).

395. In the course of Volkswagen's business, VGoA willfully failed to disclose and actively concealed that the CleanDiesel Engine System was non-EPA compliant, and the use of the "defeat device" in Affected Vehicles as described above. Accordingly, Volkswagen and VGoA

engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in FLA. STAT. § 501.204(1), including representing that Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Affected Vehicles are of a particular standard and quality when they are not; advertising Affected Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

396. VGoA's false advertising with respect to the Affected Vehicles is an illegal act within the meaning of Florida Statutes, section 320.64(4).

397. VGoA's use of the Defeat Device in Affected Vehicles to purposely circumvent Federal and State environmental regulations constitute illegal acts within the meaning of Florida Statutes, section 320.64(4).

398. VGoA's violations of section 320.64(4) give rise to a cause of action by Florida Plaintiffs under section 320.697, Florida Statutes, for treble damages, costs and reasonable attorney's fees.

399. Volkswagen and VGoA have known of the use of the "defeat device" and the true nature of its CleanDiesel engine system for at least six years, but concealed all of that information until recently.

400. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

401. By failing to disclose and by actively concealing the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, by marketing its vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles after they were sold, Volkswagen engaged in deceptive business practices.

402. In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the use of the "defeat device" and true cleanliness and efficiency of the CleanDiesel

engine system and serious defects discussed above. Volkswagen compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles once they are on the road.

403. Volkswagen's unfair or deceptive acts or practices were likely to and did in fact deceive Florida Plaintiffs, about the true cleanliness and efficiency of the CleanDiesel engine system, the quality of the Volkswagen and Audi brands, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Affected Vehicles; all causing the true value of Florida Plaintiff's dealerships to be substantially lower than the prices paid for such franchise dealerships.

404. Volkswagen owed Florida Plaintiffs a duty to disclose the true safety, cleanliness, efficiency and reliability of the Affected Vehicles and the devaluing of environmental cleanliness and integrity at Volkswagen, because Volkswagen:

a. Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

b. Intentionally concealed the foregoing from Plaintiffs; and/or

c. Made incomplete representations about the safety, cleanliness, efficiency and reliability of the Affected Vehicles generally, and the "defeat device" and true nature of the CleanDiesel engine system in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

405. Because Volkswagen fraudulently concealed the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, resulting in a raft of negative publicity once the use of the "defeat device" and true characteristics of the CleanDiesel engine system finally began to be disclosed, the value of the Affected Vehicles has greatly diminished and the value of Volkswagen franchise dealerships has greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than

they otherwise would be and are significantly harder to sell at any price, and may not be sold, and must be stored until such time as Volkswagen renders them legal in the United States.

406. Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the CleanDiesel engine system were material to Florida Plaintiffs. A dealership that sells vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable dealership that sells vehicles made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

407. Florida Plaintiffs suffered ascertainable loss caused by Volkswagen's misrepresentations and its concealment of and failure to disclose material information. Florida Plaintiffs either would have paid less for their dealership or would not have purchased it at all.

408. As a direct and proximate result of Volkswagen's violations, Florida Plaintiffs have suffered injury-in-fact and/or actual damage.

409. Florida Plaintiffs were injured as a result of Volkswagen's conduct in that Florida Plaintiffs overpaid for their dealerships and did not receive the benefit of their bargain, and their dealerships have suffered a diminution in value. These injuries are the direct and natural consequence of Volkswagen's misrepresentations and omissions.

410. Section 320.695, Florida Statutes, provides that Florida Plaintiffs may, in the name of the Department, apply to a Circuit Court for an injunction, notwithstanding the existence of any adequate remedy of law, restraining VGoA from violating or continuing to violate any provision of sections 320.60-320.70, Florida Statutes, and that such injunction shall be issued without bond. Accordingly, an injunction preventing VGoA from continuing to violate section 320.64(4), Florida Statues, is appropriate

**COUNT IV**
**BREACH OF CONTRACT**
**(BASED ON FLORIDA LAW)**

411. Plaintiffs Napleton VW Orlando and Napleton VW Sanford ("Florida Plaintiffs") incorporate by reference all preceding allegations as though fully set forth herein. This is not a class claim.

412. Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the CleanDiesel engine system's defect and/or defective design as alleged herein, caused Florida Plaintiffs to purchase their dealership or renew their dealer agreements with Volkswagen. Absent those misrepresentations and omissions, Florida Plaintiffs would not have purchased their dealerships, would not have purchased additional Volkswagen inventory, or would not have done so at the prices they paid, and/or would have purchased alternative vehicles that did not contain the CleanDiesel engine system and which were not marketed as including such a system. Accordingly, Florida Plaintiffs overpaid for their dealerships, overpaid for inventory and did not receive the benefit of their bargain.

413. Every franchise dealer, including Plaintiffs entered into written dealership agreements with Volkswagen. Volkswagen breached these agreements by marketing and selling to Florida Plaintiffs defective Affected Vehicles and by misrepresenting or failing to disclose the existence of the CleanDiesel engine system's defect and/or defective design, including information known to Volkswagen rendering each Affected Vehicle non EPA-compliant, and thus less valuable, than vehicles not equipped with a CleanDiesel engine system.

414. As a direct and proximate result of Volkswagen's breach of contract, Florida Plaintiffs have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT V**
**FRAUDULENT CONCEALMENT**
**(BASED ON FLORIDA LAW)**

415. Plaintiffs Napleton VW Orlando and Napleton VW Sanford ("Florida Plaintiffs") incorporate by reference all preceding allegations as though fully set forth herein. This is not a class claim.

416. Volkswagen intentionally concealed that the CleanDiesel engine systems were not EPA-compliant and used a "defeat device," or acted with reckless disregard for the truth, and denied Florida Plaintiffs information that is highly relevant to their business decisions to purchase and/or maintain a Volkswagen dealership.

417. Volkswagen further affirmatively misrepresented to Florida Plaintiffs in advertising and other forms of communication, including standard and uniform material provided to each dealership, that the Affected Vehicles it was selling were new, had no significant defects, complied with EPA regulations and would perform and operate properly when driven in normal usage.

418. Volkswagen knew these representations were false when made.

419. The Affected Vehicles purchased for inventory and sold by Florida Plaintiffs were, in fact, defective, non-EPA-compliant, unsafe, and unreliable because the Affected Vehicles contained faulty and defective CleanDiesel engine systems, as alleged herein.

420. Volkswagen had a duty to disclose that these Affected Vehicles were defective, unsafe, non-EPA compliant and unreliable in that certain crucial emissions functions of the Affected Vehicles would be rendered inoperative due to the "defeat device" installed in the defective CleanDiesel engine system, because Florida Plaintiffs relied on Volkswagen's material representations that the Affected Vehicles they were purchasing for inventory and selling were safe, environmentally clean, efficient and free from defects.

421. The aforementioned concealment was material because if it had been disclosed, Florida Plaintiffs would not have purchased their dealerships, would not have renewed their agreements with Volkswagen, would not have purchased for inventory the Affected Vehicles, or would not have bought their dealership or Affected Vehicles at the prices they paid.

422. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or operating a dealership. Volkswagen knew or recklessly disregarded that its representations were false because it knew that it had to use the "defeat device" in order for Affected Vehicles to pass EPA emissions requirements. Volkswagen intentionally made the false statements in order to sell Affected Vehicles through Florida Plaintiffs.

423. Florida Plaintiffs relied on Volkswagen's reputation—along with Volkswagen's failure to disclose the faulty and defective nature of the CleanDiesel engine system and Volkswagen's affirmative assurance that its Affected Vehicles were safe and reliable, and other similar false statements—in purchasing and operating their dealership and purchasing Affected Vehicles for inventory.

424. As a result of their reliance, Florida Plaintiffs have been injured in an amount to be proven at trial, including, but not limited to: their lost benefit of the bargain and overpayment at the time of purchase of their dealership; and/or the diminished value of their dealership franchise and the improved real property used for the dealership.

425. Volkswagen's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Florida Plaintiffs. Florida Plaintiffs are therefore entitled to an award of punitive damages.

**C. Claims Brought on Behalf of Illinois Plaintiff**

**COUNT VI**
**VIOLATION OF ILLINOIS MOTOR VEHICLE FRANCHISE ACT**
**815 ILCS 710/1, ET SEQ.**

426. Plaintiff Napleton VW Urbana ("Illinois Plaintiff") incorporates by reference all preceding allegations as though fully set forth herein, except that this is not a class claim.

427. This claim is brought only on behalf of Illinois Plaintiff.

428. Defendants are each a "manufacturer", "distributor", "factory representative", and "distributor representative" as those terms are defined in 815 ILCS 710/2.

429. Illinois Plaintiff is a "Motor Vehicle Dealer" as that term is defined in 815 ILCS 710/2.

430. The Illinois Motor Vehicle Franchise Act ("IMVFA") prohibits "unfair methods of competition and unfair and deceptive acts or practices," including the following:

> "(b) …to engage in any action with respect to a franchise which is arbitrary, in bad faith or unconscionable and which causes damage to any of the parties or to the public." 815 ILCS 710/4(b).
>
> "(d) …(1) to adopt, change, establish or implement a plan or system for the allocation and distribution of new motor vehicles to new motor vehicle dealers which is arbitrary or capricious or to modify an existing plan so as to cause the same to be arbitrary or capricious." 815 ILCS 710/4(d)(1).
>
> "(e) …(2) to offer to sell or lease, or to sell or lease, any new motor vehicle to any motor vehicle dealer at a lower actual price therefor than the actual price offered to any other motor vehicle dealer for the same model vehicle similarly equipped or to utilize any device including, but not limited to, sales promotion plans or programs which result in such lesser actual price or fail to make available to any motor vehicle dealer any preferential pricing,

incentive, rebate, finance rate, or low interest loan program offered to competing motor vehicle dealers in other contiguous states…" 815 ILCS 710/4(e)(2).

431. As set forth herein, Volkswagen and VGoA participated in arbitrary, bad faith and unconscionable acts with respect to a franchise, which caused damage to Illinois Plaintiff and to the public, in violation of the IMVFA.

432. As set forth herein, Volkswagen and VGoA adopted, changed, established and implemented a plan or system for the allocation and distribution of new motor vehicles to new motor vehicle dealers, including Illinois Plaintiff, which was and is arbitrary and capricious, in violation of the IMVFA.

433. As set forth herein, Volkswagen and VGoA offered to sell or lease, or to sell or lease, new motor vehicles to any motor vehicle dealer at a lower actual price therefor than the actual price offered to other motor vehicle dealers for the same model vehicle similarly equipped and utilized sales promotion plans or programs which resulted in such lesser actual price and failed to make available to a motor vehicle dealer preferential pricing, incentive, rebate, finance rate, and low interest loan programs offered to competing motor vehicle dealers in other contiguous states, in violation of the IMVFA.

434. The IMVFA also provides that: "A manufacturer shall not require, directly or indirectly, a motor vehicle dealer to contract with a motor vehicle financing affiliate in order to receive its motor vehicles nor shall a manufacturer prevent, directly or indirectly, a motor vehicle dealer from contracting with a motor vehicle financing affiliate in order to receive its motor vehicles." 815 ILCS 710/3.1.

435. Volkswagen and VGoA have violated 815 ILCS 710/3.1 by linking lowered vehicle pricing and incentives to use of VCI for floor plan financing and discounting.

436. Volkswagen and VGoA's actions have been willful and wanton, thus supporting Illinois Plaintiff's claims for treble damages under 815 ILCS 710/13.

437. Pursuant to 815 ILCS 710/13, Illinois Plaintiff is entitled to an injunction restraining Volkswagen and VGoA from continuing to engage in acts in violation of the IMVFA.

**COUNT VII**
**FRAUD BY CONCEALMENT**
**(BASED ON ILLINOIS LAW)**

438. Illinois Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein, except that this is not a class claim.

439. Volkswagen intentionally concealed that the CleanDiesel engine systems were not EPA-compliant and used a "defeat device," or acted with reckless disregard for the truth, and denied Illinois Plaintiffs information that is highly relevant to their business decisions to purchase and/or maintain a Volkswagen dealership.

440. Volkswagen further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided to each dealership, that the Affected Vehicles it was selling were new, had no significant defects, complied with EPA regulations and would perform and operate properly when driven in normal usage.

441. Volkswagen knew these representations were false when made.

442. The Affected Vehicles purchased for inventory and sold by Illinois Plaintiff were, in fact, defective, non-EPA-compliant, unsafe, and unreliable because the Affected Vehicles contained faulty and defective CleanDiesel engine systems, as alleged herein.

443. Volkswagen had a duty to disclose that these Affected Vehicles were defective, unsafe, non-EPA compliant and unreliable in that certain crucial emissions functions of the Affected Vehicles would be rendered inoperative due to the "defeat device" installed in the defective CleanDiesel engine system, because Illinois Plaintiff relied on Volkswagen's material representations that the Affected Vehicles they were purchasing for inventory and selling were safe, environmentally clean, efficient and free from defects.

444. The aforementioned concealment was material because if it had been disclosed, Illinois Plaintiff would not have purchased its dealership, would not have renewed their agreements with Volkswagen, would not have purchased for inventory the Affected Vehicles, or would not have bought its dealership or Affected Vehicles at the prices they paid.

445. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or operating a dealership. Volkswagen knew

or recklessly disregarded that its representations were false because it knew that it had to use the "defeat device" in order for Affected Vehicles to pass EPA emissions requirements. Volkswagen intentionally made the false statements in order to sell Affected Vehicles through Illinois Plaintiff.

446. Illinois Plaintiff relied on Volkswagen's reputation—along with Volkswagen's failure to disclose the faulty and defective nature of the CleanDiesel engine system and Volkswagen's affirmative assurance that its Affected Vehicles were safe and reliable, and other similar false statements—in purchasing and operating their dealership and purchasing Affected Vehicles for inventory.

447. As a result of its reliance, Illinois Plaintiff has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase of its dealership and/or the diminished value of its dealership.

448. Volkswagen's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Illinois Plaintiff. Illinois Plaintiff is therefore entitled to an award of punitive damages.

**COUNT VIII**
**BREACH OF CONTRACT**
**(BASED ON ILLINOIS LAW)**

449. Illinois Plaintiff incorporates by reference all preceding allegations as though fully set forth herein, except that this is not a class claim.

450. Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the CleanDiesel engine system's defect and/or defective design as alleged herein, caused Illinois Plaintiff to purchase its dealership or renew its dealer agreements with Volkswagen. Absent those misrepresentations and omissions, Illinois Plaintiff would not have purchased its dealerships, would not have purchased additional Volkswagen inventory, or would not have done so at the prices it paid, and/or would have purchased alternative vehicles that did not contain the CleanDiesel engine system and which were not marketed as including such a system. Accordingly, Illinois Plaintiff overpaid for its dealership, overpaid for inventory and did not receive the benefit of its bargain.

451. Illinois Plaintiff entered into written dealership agreements with Volkswagen. Volkswagen breached these agreements by marketing and selling to Illinois Plaintiff defective Affected Vehicles and by misrepresenting or failing to disclose the existence of the CleanDiesel engine system's defect and/or defective design, including information known to Volkswagen rendering each Affected Vehicle non EPA-compliant, and thus less valuable, than vehicles not equipped with a CleanDiesel engine system.

452. As a direct and proximate result of Volkswagen's breach of contract, Illinois Plaintiff has been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually, and Plaintiff J. Bertolet on behalf of the Class, request judgment as follows:

A. Certification of the proposed Franchise Dealer Class pursuant to Federal Rules of Civil Procedure Rule 23(a) and (b)(2);

B. Designation of J. Bertolet, Inc. as representative of the proposed Franchise Dealer Class and designation of Plaintiffs' counsel as Class counsel;

C. Injunctive relief for Plaintiffs individually and for the Franchise Dealer Class;

D. Damages as proven at trial for Plaintiffs individually, and for the Franchise Dealer Class;

E. Treble and punitive damages as allowed under law and as proven at trial;

F. An award to the Plaintiffs individually and the Franchise Dealer Class of prejudgment interest, costs, and attorneys' fees; and

G. An award to the Plaintiffs and Franchise Dealer Class for such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

DATED: September 30, 2016

HAGENS BERMAN SOBOL SHAPIRO LLP

By *___/s/ Steve W. Berman___*
Steve W. Berman

Steve W. Berman (*pro hac* vice)
Thomas E. Loeser (SBN 202724)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com

Richard N. Sox (*pro hac vice)*
BASS SOX MERCER
2822 Remington Green Circle
Tallahassee, FL 32308
Telephone: (850) 878-6404
Facsimile: (850) 942-4869
rsox@dealerlawyer.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2016, I electronically transmitted the foregoing document to the Court Clerk using the ECF System for filing. The Clerk of the Court will transmit a Notice of Electronic Filing to all ECF registrants.

By *_/s/ Steve W. Berman_*
STEVE W. BERMAN