1   Elizabeth J. Cabraser (State Bar No. 083151)
    ecabraser@lchb.com
2   LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP
3   275 Battery Street, 29th Floor
    San Francisco, CA  94111-3339
4   Telephone:  (415) 956-1000
    Facsimile:  (415) 956-1008
5
    Plaintiffs' Lead Settlement Class Counsel
6   *(Plaintiffs' Settlement Counsel*
    *Listed on Signature Page)*
7

8                  UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                    SAN FRANCISCO DIVISION

11

12   IN RE: VOLKSWAGEN "CLEAN DIESEL"          MDL 2672 CRB (JSC)
     MARKETING, SALES PRACTICES, AND
13   PRODUCTS LIABILITY LITIGATION             **PLAINTIFFS' REPLY MEMORANDUM
                                               IN SUPPORT OF MOTION FOR FINAL
14                                             APPROVAL OF THE 2.0-LITER TDI
     This Document Relates to:                 CONSUMER AND RESELLER DEALER
15                                             CLASS ACTION SETTLEMENT**
     ALL CONSUMER AND RESELLER
16   ACTIONS                                   Hearing:  October 18, 2016
                                               Time:  8:00 a.m.
17                                             Courtroom:  6, 17th floor

18                                             The Honorable Charles R. Breyer

19

20

21

22

23

24

25

26

27

28

1319495.9

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ......................................................................................... 1

II.    LEGAL STANDARD FOR FINAL SETTLEMENT APPROVAL ................................. 5

III.    ARGUMENT ............................................................................................ 6

    A.    The Settlement Fairly Compensates the Class, and Objections to the Financial Aspects of the Settlement Should Be Overruled. ................................... 6

        1.    The Settlement's Vehicle Valuation Formula Is Fair, Reasonable, and Adequate. .............................................................................. 8

            a.    The Law Does Not Mandate Full Refund of the Purchase Price, and Refunds Must Be Reduced by Offsets. ......................... 8

            b.    A Mileage Adjustment Is an Industry Standard Offset, and the Adjustment Calculations Used Are Fair and Reasonable. ...... 10

            c.    NADA Clean Trade-In Value Is a Fair and Reasonable Valuation Starting Point for the Buyback. ................................... 11

            d.    The Settlement Properly Accounts for Optional Vehicle Equipment Adjustments. ............................................................. 12

        2.    The Restitution Payment Is an Integral Part of the Buyback Compensation Package, and Ensures That All Eligible Owners Are Fairly Compensated, Regardless of Their Individual Circumstances. ...... 13

        3.    The Settlement Fairly Compensates Lessees. .......................................... 14

        4.    The Settlement Fairly Compensates Those Financing Their Vehicles. .................................................................................... 15

        5.    The Settlement Fairly Compensates Those Who Disposed of Their Vehicles ("Eligible Sellers"). ...................................................... 16

        6.    Special Payments to Resellers Are Not Warranted. ................................. 17

    B.    The Class Action Settlement Is an Essential Element of a Synergistic Public/Private Initiative Which Fully Succeeds as a Package Deal. .................... 18

    C.    The Timing and Structure of Settlement Class Counsel's Prospective Fee Request Is Appropriate and Does Not Affect the Fundamental Fairness of the Settlement. ................................................................................. 24

    D.    Objections Regarding Exclusions from the Settlement Should Be Overruled. ................................................................................. 27

    E.    The Class Release Is Fair and Reasonable. ............................................... 28

    F.    Objections Raising Public Policy Concerns Should Be Overruled. .................... 29

        1.    Volkswagen Is Not Profiting From the Settlement. ................................. 29

        2.    Concerns Pertaining to Future Emissions Testing Are Immaterial. .......... 30

        3.    The Settlement Adequately Addresses Environmental Concerns. ............. 30

    G.    Objections Concerning "Reversion" Should be Overruled. ............................. 32

    H.    The Remaining Objections Should Be Overruled. ....................................... 34

        1.    Objections Regarding Private Counsel Attorneys' Fees Are Premature. ................................................................................ 34

## TABLE OF CONTENTS
### (continued)

Page(s)

2.  The Cutoff Date for "Eligible Seller" Class Members Is Neither Arbitrary Nor Unfair. ................................................................ 34

3.  The Deadline for Eligible Sellers to Register Is Fair. .............................. 35

4.  No Health or Personal Injury Claims Are Released by the Settlement. ................................................................................. 36

5.  The Environmental Remediation Fund Should Not Be Distributed to Class Members. .................................................................... 36

6.  Class Counsel's Request to Defer Decision on a Motion to Remand or Opposition to a Motion to Intervene Does Not Create a Conflict with the Interests of the Class. ................................................ 37

7.  The Selection of Settlement Master Robert Mueller Does Not Create a Conflict with the Interests of the Class. ................................. 37

8.  Benefits from the Goodwill Program Are Properly Not Part of the Settlement. ............................................................................ 39

9.  The Other Remaining Objections Should Also Be Overruled. ................. 39

IV.   CONCLUSION .......................................................................................... 41

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>CASES</u>

*Alaniz v. California Processors, Inc.*,
  73 F.R.D. 269 (N.D. Cal. 1976) ................................................................................ 18

*Bischoff v. DirecTV, Inc.*,
  180 F. Supp. 2d 1097 (C.D. Cal. 2002) .................................................................... 27

*Chun-Hoon v. McKee Foods Corp.*,
  716 F. Supp. 2d 848 (N.D. Cal. 2010) ........................................................................ 5

*Churchill Vill., L.L.C. v. Gen. Elec.*,
  361 F.3d 556 (9th Cir. 2004)...................................................................................... 24

*Ebarle v. Lifelock, Inc.*,
  No. 3:15-cv-00258-HSG, D.E. 93 (N.D. Cal. Sept. 20, 2016) ....................... 7, 22, 24

*Exxon Mobil Corp. v. U.S. Environmental Protection Agency*,
  217 F.3d 1246 (9th Cir. 2000)................................................................................... 31

*Four in One Co. v. S.K. Foods, L.P.*,
  No. 2:08-CV-3017 KJM EFB, 2014 WL 4078232 (E.D. Cal. Aug. 14, 2014) ..................... 29

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998)......................................................................... 5, 17, 40

*Hightower v. J.P. Morgan Chase Bank, N.A.*,
  2015 U.S. Dist. LEXIS 174314 (C.D. Cal. Aug. 4, 2015) .................................... 33

*Imber-Gluck v. Google Inc.*,
  No. 5:14-CV-01070-RMW, 2015 WL 1522076 (N.D. Cal. Apr. 3, 2015)................... 23

*In re Bluetooth Headset Products Liability Litigation*,
  654 F.3d 935 (9th Cir. 2011).......................................................................... 25, 26, 33

*In re First Databank Antitrust Litig.*,
  209 F. Supp. 2d 96 (D.D.C. 2002) ........................................................................... 22

*In re Google Referrer Header Priv. Litig.*,
  87 F. Supp. 3d 1122 (N.D. Cal. 2015) ........................................................................ 5

*In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*,
  293 F.R.D. 21 (D. Me. 2013) .................................................................................... 23

*In re Linkedin User Privacy Litig.*,
  309 F.R.D. 573 (N.D. Cal. 2015)................................................................................. 7

*In re LivingSocial Mktg. & Sales Practice Litig.*,
  298 F.R.D. 1 (D.D.C. 2013) ...................................................................................... 38

*In re McKesson HBOC, Inc. Secs. Litig.*,
  2009 U.S. Dist. LEXIS 26846, (N.D. Cal. Mar. 6, 2009) ....................................... 28

*In re Mercury Interactive Corp. Secs. Litig.*,
  618 F.3d 988 (9th Cir. 2010)................................................................................ 24, 25

*In re Nat'l Football League Players Concussion Injury Litig.*,
  821 F.3d 410, 445 (3d Cir. 2016), as amended (May 2, 2016) ............................... 24

1319495.9

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*,
910 F. Supp. 2d 891 (E.D. La. 2012) ................................................. 24

*In re Reebok Easytone Litig.*,
No. 4:10-CV-11977-FDS (D. Mass.) ....................................................... 23

*In re Scotts EZ Seed Litig.*,
304 F.R.D. 397 (S.D.N.Y. 2015) ............................................................. 23

*In re Subway Footlong Sandwich Mktg. & Sales Practices Litig.*,
No. MDL 13-02439, --- F.R.D. --, 2016 WL 755640 (E.D. Wis. Feb. 25, 2016) ................. 23

*In re Syngenta AG MIR 162 Corn Litigation*,
Case No. 2:14-md-02591-JWL-JPO, Dkt. No. 2547 at 29-30 (D. Kan. Sept. 26,
2016) ....................................................................................... 27

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
No. M 07-1827 SI, 2013 WL 1365900  (N.D. Cal. Apr. 3, 2013) ......................... 22

*In re TracFone Unlimited Serv. Plan Litig.*,
112 F. Supp. 3d 993, 1006 (N.D. Cal. 2015), *reconsideration denied*, No. C-13-
3440 EMC, 2015 WL 4735521 (N.D. Cal. Aug. 10, 2015) ............................. 21, 22

*Kamm v. California City Dev. Co.*,
509 F.2d 205 (9th Cir. 1975) ................................................................ 23

*Kim v. Space Pencil, Inc.*,
No. C 11-03796 LB, 2012 U.S. Dist. LEXIS 169922 (N.D. Cal. Nov. 28, 2012) .......... 7

*Kruger v. Subaru of Am.*,
996 F. Supp. 451 (E.D. Pa. 1998) ............................................................. 8

*Kruse v. Chevrolet Motor Div.*,
Civil Action No. 96-1474, 1997 WL 408039 (E.D. Pa. July 15, 1997) ................... 9

*Lane v. Facebook, Inc.*,
696 F.3d 811 (9th Cir. 2012) ............................................................ 17, 40

*Lemus v. H & R Block Enterprises LLC.*,
No. C 09-3179 SI, 2012 WL 3638550 (N.D. Cal. Aug. 22, 2012) ........................ 33

*Mirfasihi v. Fleet Mortg. Corp.*,
356 F.3d 781 (7th Cir 2004) ................................................................ 33

*Moore v. Verizon Communs., Inc.*,
No. C 09-1823 SBA, 2013 U.S. Dist. LEXIS 122901 (N.D. Cal. Aug. 28, 2013) ......... 27

*Nat'l Rural Telecom. Coop. v. DIRECTV, Inc.*, 221 F.R.D.
523 (C.D. Cal. 2004) ........................................................................ 5

*Perkins v. LinkedIn Corp.*,
No. 13-CV-04303-LHK, 2016 U.S. Dist. LEXIS 18649 (N.D. Cal. Feb. 16, 2016) ........ 7, 41

*Robbins v. Hyundai Motor Am., Inc.*,
No. SACV 14-00005-JLS (ANx), 2015 WL 304142 (C.D. Cal. Jan. 14, 2015) ............. 9

*Rodriguez v. W. Publ'g Corp.*,
563 F.3d 948 (9th Cir. 2009) ................................................................ 7

*Rupay v. Volkswagen Grp. of Am. Inc.*,
No. CV 12-4478-GW FFMX, 2012 WL 10634428 (C.D. Cal. Nov. 15, 2012) ........... 9

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Schechter v. Crown Life Ins. Co.*,
   No. 13-cv-5596, 2014 WL 2094323 (C.D. Cal. May 19, 2014) ............................... 5

*Tarlecki v. Bebe Stores, Inc.*,
   No. C 05-1777 MHP, 2009 U.S. Dist. LEXIS 102531 (N.D. Cal. Nov. 3, 2009) ................ 27

*Taylor v. W. Marine Prod., Inc.*,
   No. C 13-04916 WHA, 2015 WL 307236 (N.D. Cal. Jan. 20, 2015) .................................. 29

*Torchia v. W.W. Grainger, Inc.*,
   304 F.R.D. 256 (E.D. Cal. 2014) ......................................................... 29

*United States v. Oregon*,
   913 F.2d 576 (9th Cir. 1990) ................................................................. 5

*Villanueva v. Morpho Detection, Inc.*,
   No. 13-cv-05390-HSG, 2016 WL 1070523 (N.D. Cal. March 18, 2016) ............................. 7

## STATUTES

15 U.S.C. § 2301(12) ............................................................... 9

49 U.S.C. § 30120(a)(1)(A)(iii) ..................................................... 9

Cal. Civ. Code § 1793.2(d)(2)(C) ................................................... 9

## RULES

Fed. R. Civ. P. 23(c)(2)(B) ........................................................ 24

Fed. R. Civ. P. 23(e) ........................................................ 1, 5, 25, 37

Fed. R. Civ. P. 23(h) .............................................................. 24

## TREATISES

Newberg on Class Actions § 13:32 (5th ed.) ........................................ 37

## OTHER AUTHORITIES

*Kelley Blue Book vs. NADA Guides*, http://www.usedcars.com/advice/kelley-blue-
   book-vs-nada-guides/ (last visited Sept. 21, 2016) ................................ 11

PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF THE AMENDED
CLASS ACTION AGREEMENT

1

## I.      INTRODUCTION

2       Like every human endeavor, class actions have come in for their criticism, fair or

3  otherwise.  But this historic Class Action Settlement has achieved the unprecedented,

4  overwhelming support, and the early and eager participation of the Class it was designed to

5  benefit.  The Class Action Settlement, and the Class Members' response to it, demonstrates the

6  importance and achievability of complete resolution of a daunting problem threatening our

7  economy, our basic sense of marketplace integrity, and our belief that citizens going about their

8  lives are entitled to legal protection.  Over 311,000 Class Members have *already* registered for

9  the settlement.  It is impossible to imagine any other process that could have attained this

10  momentum so quickly and so decisively resolve the Volkswagen emissions scandal.  In the words

11  of the typically skeptical U.S. Public Interest Research Group, the settlement "compensates

12  consumers, cleans up the environment, and deters future wrongdoing."[1]

13       The sheer scale of this MDL proceeding is without precedent.  The "clean diesel"

14  emissions fraud not only compromised the interests of car purchasers, it also undermined

15  environmental protection laws, and moved all the way across the spectrum to generate criminal

16  investigations.

17       The consumers themselves, as well as the federal and state environmental and consumer

18  protection agencies—the DOJ, the EPA, the FTC, CARB, and the California AG are all before

19  this Court, requesting its approval.  Together with Volkswagen, they are jointly eliciting its

20  ongoing jurisdiction and supervision to assure the delivery of these interrelated settlements'

21  consumer and environmental remedies.

22       The immediate issue before this Court under Fed. R. Civ. P. 23(e) is whether the proposed

23  Class Action Settlement fairly and substantially compensates a nationwide class of owners,

24  lessees, and resellers of the 2.0-liter diesel vehicles.  Even this extraordinary class resolution

25  addresses only a part of the integrated remedies at issue.  The Class Action Settlement was

26

27  ──────────────
[1] Press Release, U.S. Public Research Int. Grp., Statement on Announcement of Partial VW
Settlement (June 28, 2016), available at http://www.uspirg.org/news/usp/statement-
28  announcement-partial-vw-settlement.

1319495.9

negotiated and crafted in conjunction with state and federal administrative enforcement to ensure not only compensation for the Class, but mitigation of the environmental damage resulting from the vehicles' unlawful emissions.

Despite the scale of the issues to be resolved, and despite the multiple harms that had to be addressed, the settlement process moved at unmatched speed: the final approval hearing occurs 13 months to the day after the "clean diesel" exposé. This swift resolution is but one element of a successful conclusion. More significant is the overwhelmingly positive response of the Class. As Professor Klonoff sets out in his Declaration,[2] class action settlements for small amounts of harm and recovery often elicit only a passive response from the class. This case is a landmark at the other end of the spectrum. To date, 311,209 owners, lessees and eligible sellers have already taken affirmative steps to register for the relief offered, even before the settlement is final.[3] The Settlement website has received 885,290 discrete visits.[4] Settlement Class Counsel has had many thousands of communications with Class members seeking information and input on the Settlement process.[5]

Far from being a "rationally indifferent" class, whose class members have claims too small to justify examination or engagement, these Class members suffered real harms related to one of their major life purchases. Americans take their car ownership seriously, and the response of the Class members here shows that they took their decision to purchase these cars, with these claimed environmental benefits, very seriously as well. The Class Action Settlement takes them

---

[2] Exhibit 1, Declaration of Robert H. Klonoff Addressing Objections by Class Members to the Proposed Volkswagen "Clean Diesel" Settlement ("Klonoff Decl.").

[3] This registrant data from the settlement website administration includes 311,209 owners, lessees, resellers and eligible sellers who have gone to the website, entered their VIN, and created a Claims Portal account. It does not yet include the additional thousands who are submitting forms on paper, and already represents 303,261 unique VINs—nearly 65% of the approximately 475,000 Eligible Vehicles.

[4] For complete notice statistics and methodology on the mailing and dissemination of Class notice, see the accompanying Declaration of Shannon R. Wheatman, PhD, on Implementation and Accuracy of the Claim Notice Program ("Wheatman Decl.") and Declaration of Jason M. Stinehart re: Notification to Class Members ("Stinehart Decl.").

[5] Exhibit 2, Declaration of Elizabeth J. Cabraser on Settlement Class Member Communications ("Cabraser Decl.").

PLAINTIFFS' REPLY MEMORANDUM
IN SUPPORT OF FINAL APPROVAL
MDL 2672 CRB (JSC)

very seriously too:  it restores the full retail value of their vehicles at pre-emissions scandal levels, and compensates them for economic loss.

When, as here, an engaged and informed class eagerly signs up for benefits in advance of final approval, and when only small numbers opt out or object, a milestone settlement has indeed been reached.  The Settlement objection deadline was September 16, 2016.  Although individual direct notice was mailed to the last known addresses of all potential Class members (and also emailed to most of them), and an unprecedented multi-media class notice program (including nationwide and regional publications, online publications, social media campaigns, a Settlement website, and toll-free phone line) was fully implemented, only 3,298 Class members have opted out of the Settlement.[6]  This represents well less than 1% (closer to 0.7%) of the Class.  Given the high-profile and well-publicized nature of this litigation and the significant sums at stake, this low opt out rate reflects Class members' resounding approval of the Settlement and constitutes powerful evidence of the Settlement's fairness and adequacy.  In contrast, as of September 29, 2016, 311,209 Class members have already registered for Class Action Settlement benefits, two years before the ultimate deadline to do so.[7]  In electoral terms, the ratio of registrations to opt-outs, of "yes" votes to "no" votes, is virtually 100 to 1:  a landslide referendum in favor of settlement approval, by any standard.

To say that this is an active and engaged Class severely underestimates the level of Class Member engagement.  Settlement Class Counsel attorneys and staff have responded by phone, email, and correspondence to over 16,000 inquiries from more than 8,000 Class members; the Settlement call center has received approximately 105,420 calls; and the Settlement website has received 885,290 unique visits since its launch.  As of September 29, 2016, there were over 40,000 registrants from California, and registrants from all 50 states, plus DC, Puerto Rico, USVI, and Guam.  There are over 1,000 registrants, from each of 45 states; over 5,000 registrants

---

[6] This process is now running in reverse:  every day, revocations of earlier opt-outs are being filed with the Court and/or submitted to Ankura.

[7] This September 29, 2016, registrant figure, which will continually increase and which we will update at the October 18, 2016, final approval hearing, includes approximately 13,992 who have identified as Eligible Sellers online.

1319495.9

from each of 21 states; and over 10,000 registrants from each of nine states.  There are 10,160 registrants from Virginia, which is the ninth largest state for registrations.[8]  In contrast to the enthusiastic affirmative response of the clear majority of Class members, only 462, less than one-tenth of one percent (0.1%) of Class members objected to any aspect of the Settlement.  And, notably, not a single state attorney general has voiced any objection.  To the contrary, the Attorneys General actively support the Settlement, and some have even written letters urging Class members to participate.[9]  The high level of attention, and the low level of objections, underscores the value of this Settlement, which will bring more benefits, in less time, to more consumers, than any other.  And none of the relatively few objections establishes that the Settlement is anything other than fair, reasonable, and adequate.

Objections are addressed by general topic in this Reply.  All filed and letter objections about the level, type and/or adequacy of settlement relief provided by the settlement are also addressed in the accompanying Declaration of class action expert Professor Robert H. Klonoff, who has comprehensively reviewed and analyzed all of objections relating to the adequacy of the class relief.[10]  For the most part, the objections come from people who would like to receive more money.  Others are based on mistaken interpretations of the Settlement and/or notice, ungrounded accusations, unsupported legal claims, and a few thinly-veiled attacks on class action litigation in general and plaintiffs' lawyers in particular.  The demand for more relief is understandable, given the outrageous behavior at issue and the ensuing sense of betrayal felt by loyal Volkswagen customers.  But all settlements involve compromise, and this one is no different.  More was demanded and pressed by Class Counsel than could be obtained, in an intense negotiation that consumed not hours or days, but five months of effort.[11]

The question before the Court is not whether additional benefits could conceivably exist—a condition that is true of all negotiated settlements—but whether this particular settlement is fair,

---

[8] There are 159 timely opt outs from Virginia.

[9] Exhibit 3, Letter from Kentucky Attorney General, Andy Beshar.

[10] *See* Ex. 1.

[11] The settlement registration process is described in the September 30, 2016, Declaration of Settlement Master Robert S. Mueller, III, on Settlement of Claims Regarding 2.0-Liter Vehicles.

1319495.9

1    reasonable, and adequate.  It is.  The Settlement is fundamentally sound, and provides an

2    objective, consistent, and transparent structure to efficiently process payment of substantial

3    economic  and emissions-reducing benefits to a Class of nearly half a million consumers.  It more

4    than fulfills Rule 23's final approval standards.  Plaintiffs therefore respectfully urge the Court to

5    grant final approval to this important and far-reaching Settlement, and to enable its prompt

6    implementation.

7    **II.    LEGAL STANDARD FOR FINAL SETTLEMENT APPROVAL**

8        "[O]bjectors to a class action settlement bear the burden of proving any assertions they

9    raise challenging the reasonableness of a class action settlement."  *In re Google Referrer Header*

10   *Priv. Litig.*, 87 F. Supp. 3d 1122, 1137 (N.D. Cal. 2015) (citing *United States v. Oregon*, 913 F.2d

11   576, 581 (9th Cir. 1990)); *see also Schechter v. Crown Life Ins. Co.*, No. 13-cv-5596, 2014 WL

12   2094323, at *2 (C.D. Cal. May 19, 2014) (objector bears burden to show that settlement approval

13   would contravene its equitable objectives).

14       The absence of objections from a large proportion of Class members raises a strong

15   presumption that a settlement is fair, reasonable, and adequate.  *See, e.g.*, *Nat'l Rural Telecom.*

16   *Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004) ("It is established that the absence

17   of a large number of objections to a proposed class action settlement raises a strong presumption

18   that the terms of a proposed class action settlement are favorable to the class members.")

19   (citations omitted); *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal.

20   2010) (stating that the absence of negative reaction strongly supports settlement, and approving a

21   settlement with an opt-out rate of 4.68%).  The presumption of fairness applies here given the

22   relatively small number of Class members (about 0.1%) submitting objections or opting out (less

23   than 1%).

24       While every objection from a Class member merits consideration, the Court must make an

25   independent assessment of the Settlement to determine its overall fairness under Fed. R. Civ. P.

26   23(e).  The question it must answer "is not whether the final product could be prettier, smarter or

27   snazzier, but whether it is fair, adequate and free from collusion."  *Hanlon v. Chrysler Corp.*, 150

28   F.3d 1011, 1027 (9th Cir. 1998).

III.    **ARGUMENT**

A.    **The Settlement Fairly Compensates the Class, and Objections to the Financial Aspects of the Settlement Should Be Overruled.**

This Settlement commits an unprecedented $10.033 billion directly to those affected by the Volkswagen emissions scandal.  It offers every Class member a minimum of thousands of dollars, and up to the mid $40,000's, calculated based on a fair assessment of each vehicle's value, while freezing that value at the most recent available pre-emissions exposé level, and applying an irrefutable presumption that every vehicle, regardless of age or appearance, is in the most excellent cosmetic and mechanical condition.  For those selling their vehicles back to Volkswagen under the Buyback program, the Settlement combines the Clean Trade-In market-value assessment with an additional cash payment.  Those payments together exceed each vehicle's pre-scandal value, no matter the metric (they exceed the vehicles' Clean Retail value and replacement value), and empower Class members to purchase vehicles comparable to the ones they sell back.  These payments are the same payments that constitute the "robust consumer relief" endorsed by the FTC in urging approval of all components of the "global" 2.0-liter "Clean Diesel" settlement: this Class Action Settlement, the DOJ Consent Decree, and the FTC Order.[12]

As with most consumer class action settlements, a small number of objectors are dissatisfied with the compensation they will receive.  The class action notice sent to Class members invited them to voice objections by the simple expedient of writing a letter.  Only 462 out of 490,000 times did so, and only 19 of them (including those who filed after the deadline) filed formal objections.[13]  The low level of dissatisfaction with this Settlement is particularly significant given the substantial stakes of the potential recovery and the tremendous attention that the emissions fraud and ensuing litigation and settlement have generated.  The objections, while for the most part sincere expressions of Class members' personal concerns, are misplaced.  Class action settlements reflect a pragmatic assessment of risks and benefits, where the theoretical

---

[12] *See* FTC Motion (Dkt. No. 1966), filed September 30, 2016.

[13] A chart demonstrating the distribution of the objections by category is attached to the Declaration of Elizabeth Cabraser on Settlement Class Member Communications.

PLAINTIFFS' REPLY MEMORANDUM
IN SUPPORT OF FINAL APPROVAL
MDL 2672 CRB (JSC)

maximum value that could be obtained by a class is reduced by the risks inherent in ongoing

litigation, the cost of delay, and the defendant's ability to pay.  *See, e.g.*, *Perkins v. LinkedIn*

*Corp.*, No. 13-CV-04303-LHK, 2016 U.S. Dist. LEXIS 18649, at *19 (N.D. Cal. Feb. 16, 2016)

(noting that, though massive theoretical statutory damages may exist, the settlement was fair and

adequate in light of the risks and delays associated with litigation); *Kim v. Space Pencil, Inc.*, No.

C 11-03796 LB, 2012 U.S. Dist. LEXIS 169922, at *15 (N.D. Cal. Nov. 28, 2012) ("The

substantial and immediate relief provided to the Class under the Settlement weighs heavily in

favor of its approval compared to the inherent risk of continued litigation, trial, and appeal, as

well as the financial wherewithal of the defendant.").  "That certain Class Members evaluate the

risks differently, or would prefer to go to trial despite those risks, does not prevent the Court from

granting final approval to the Settlement."  *Perkins*, 2016 U.S. Dist. LEXIS 18649, at *19.

The reasonableness of a recovery is related to, among other things, the strength of the case

and risk of non-recovery.  Generally, cases with lower risk warrant settlement values reflecting a

high percentage of the total damages sought than in cases with greater risk.  *See Villanueva v.*

*Morpho Detection, Inc.*, No. 13-cv-05390-HSG, 2016 WL 1070523 *4 (N.D. Cal. March 18,

2016) ("It is well-settled law that a cash settlement amounting to only a fraction of the potential

recovery does not per se render the settlement inadequate or unfair."); *Ebarle v. Lifelock, Inc.*,

No. 15-cv-00258-HSG, 2016 U.S. Dist. LEXIS 128279, at *14-16 (N.D. Cal. Sep. 20, 2016)

(same).  The strength of the instant case is reflected by the significant recovery, especially given

that "courts do not traditionally factor treble damages into the calculus for determining a

reasonable settlement value."  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 964 (9th Cir. 2009).

Additionally, the speed by which the Settlement has been reached and payment obtained for the

Class merits additional, significant consideration.  *See In re Linkedin User Privacy Litig.*, 309

F.R.D. 573, 587 (N.D. Cal. 2015) ("Immediate receipt of money through settlement, even if lower

than what could potentially be achieved through ultimate success on the merits, has value to a

class, especially when compared to risky and costly continued litigation.").  Because of these

factors, the value of this Settlement far exceeds the threshold necessary for its final approval.

**1.      The Settlement's Vehicle Valuation Formula Is Fair, Reasonable, and Adequate.**

As described in detail in Motion for Final Approval and in the Settlement itself, the total compensation available to owners includes the Buyback amount plus the Owner Restitution. Lessees receive Lessee Restitution, and certain seller's receive Seller Restitution.  Integral to all of these calculations is the Vehicle Value.  The method used to determine the Vehicle Value— which, again, is only a *portion* of the total compensation available for those selling their vehicles—is fair, reasonable, and adequate.  For example, when combined with Owner Restitution, the total owner Buyback amount exceeds the Clean Retail Value of the vehicle as of September 2015.

**a.      The Law Does Not Mandate Full Refund of the Purchase Price, and Refunds Must Be Reduced by Offsets.**

The majority of the objections concerning compensation focus on the lack of a full refund of an objector's purchase price, or assert that factoring a vehicle's current mileage into the compensation amount is unfair.  Even assuming a trial outcome in favor of the Class, full rescission may not be available under the law, given that Class members used and benefited from the vehicles, and that the vehicles would therefore be returned in a depreciated state.

Indeed, in its order granting preliminary approval of the Settlement, the Court already observed that restitution remedies for automotive defects based on rescission or repurchase calculations are subject to offset claims for the car owner's use of the vehicle.  Dkt. No. 1688 at 26 ("The full purchase price of Eligible Vehicles is unlikely to represent the maximum recovery, as many state laws allow a deduction for vehicles' use.").  To receive a full rescission or refund remedy, a plaintiff would need to return a product in the same condition as when he received it. Thus, because a vehicle's value depreciates significantly with use, courts require a reasonable reduction in the refund amount, to account for the depreciation of the vehicle and for the value provided to the plaintiff.  *See, e.g.*, *Kruger v. Subaru of Am.*, 996 F. Supp. 451, 457 (E.D. Pa. 1998) ("[B]ecause the car is unavailable and because the plaintiffs used the car for eight months, thereby depreciating its value, I conclude that the plaintiffs are not entitled to a full refund.");

1319495.9

1    *Kruse v. Chevrolet Motor Div.*, Civil Action No. 96-1474, 1997 WL 408039, at *6 (E.D. Pa.

2    July 15, 1997) ("Awarding damages equal to the full purchase price does not take into account the

3    natural depreciation of the vehicle from normal usage. Therefore, I find that plaintiff has not

4    presented evidence that he is entitled to a refund of the full purchase price").

5          Many consumer protection laws codify this offset.  *See* Dkt. No. 1688 at 26 (citing

6    authority).  California's Song-Beverly Consumer Warranty Act, for example, provides for an

7    offset calculated on the basis of the mileage driven.  Cal. Civ. Code § 1793.2(d)(2)(C); *Robbins v.*

8    *Hyundai Motor Am., Inc.*, No. SACV 14-00005-JLS (ANx), 2015 WL 304142 at *6 (C.D. Cal.

9    Jan. 14, 2015); *Rupay v. Volkswagen Grp. of Am. Inc.*, No. CV 12-4478-GW FFMX, 2012 WL

10   10634428, at *4 (C.D. Cal. Nov. 15, 2012).  California's Lemon Law also prescribes a method for

11   calculating depreciation of vehicles.  Cal. Civ. Code § 1793.2(d)(2)(C).  The National Traffic and

12   Motor Vehicle Safety Act likewise notes that, following a safety recall, an available remedy to

13   consumers is to "refund[] the purchase price, less a reasonable allowance for depreciation."

14   49 U.S.C. § 30120(a)(1)(A)(iii).  And the federal Magnuson Moss Warranty Act ("MMWA")

15   defines the term "refund" as "refunding the actual purchase price (less reasonable depreciation

16   based on actual use where permitted by rules of the Commission)."  15 U.S.C. § 2301(12).

17         Under these facts, the demand for return of the full purchase price is not supported by law.

18   This Settlement nevertheless provides extraordinary relief.  A real life example reinforces this

19   point.  Earlier this year, Volkswagen offered to buy back a Class vehicle pursuant to California's

20   Song-Beverly Consumer Warranty Act for a defect unrelated to the defeat device.  Applying the

21   customary valuation and depreciation formula resulted in a payment of approximately $28,000.

22   Under the Settlement, that same vehicle would yield a Buyback payment of approximately

23   $32,000.  This means that the settlement provides almost $4,000 more in compensation than

24   would be available under the traditional valuation formulas of car purchaser protection laws.

25         Accordingly, the Settlement's buyback calculation is supported by applicable law and is

26   highly favorable to Class members, notwithstanding the offsets.  *See* Declaration of Andrew Kull

27   (Dkt. No. 1784-2) ¶¶ 12-13.  In fact, by some calculations, Settlement Class members stand to do

28   even *better* under the Settlement than they would if successful at trial because the Settlement's

1    vehicle valuation is frozen in time at the National Automobile Dealers Association ("NADA")

2    September 2015 Clean Trade-In value and does not decrease to account for up to three years of

3    depreciation between September 2015 and the ultimate date of Buyback.

4              **b.      A Mileage Adjustment Is an Industry Standard Offset, and the**
                         **Adjustment Calculations Used Are Fair and Reasonable.**
5

6          Certain Class members have objected to the mileage adjustment to the Vehicle Value.

7    According to these objections, their vehicles were built to drive long distances and were sold

8    based on their excellent gas mileage.  Some objectors claim they relied on that representation and

9    drove their vehicles long distances.  But the fact remains that some people got more use out of

10   their cars, a criterion well established in the mileage depreciation formulas used under lemon laws

11   and other consumer protection regulations.  No fair, adequate and reasonable settlement can treat

12   in the same fashion individuals who in fact are differently situated.  Fairness dictates

13   acknowledging the reality that some Class members used their vehicles more than others, and

14   therefore incurred more depreciation before surrendering their vehicles to Volkswagen.  A

15   mileage adjustment was necessary to effectuate a fair settlement.

16         At the same time, high mileage drivers actually benefit because the settlement allows

17   Class members to continue driving their vehicles a standard number of miles per month after

18   September 2015 without reducing their compensation ("free miles" as it were).  *See* Declaration

19   of Edward M. Stockton ("Stockton Decl.") (Dkt. No. 1784-1) ¶¶ 30-31.  Some objectors complain

20   that the mileage allotment for the post-September 2015 period is insufficient, but 12,500 miles of

21   driving per year for each vehicle—an allowance that was negotiated—is more generous than the

22   average driver's estimated annual mileage of approximately 12,000 miles.[14]  Accordingly, the

23

24

25

26   [14] *See* Joseph Sinclair & Don Spillane, eBay Motors the Smart Way at 49 (2004) (noting that
     Edmunds "assumes the average annual mileage to be 12,000 miles and penalizes vehicles with
27   mileage above that," the Kelley Blue Book "assumes the average annual mileage to be 13,000
     miles and penalizes mileage above that," and Galves "assumes the average mileage to be about
28   11,500 annually").

1319495.9

1  Settlement adopts reasonable mileage allowances, and no objector has identified a superior

2  mileage model.[15]

3              **c.      NADA Clean Trade-In Value Is a Fair and Reasonable**
                        **Valuation Starting Point for the Buyback.**
4

5           When dealing with hundreds of thousands of cars, it is not possible to kick the tires of

6  each one and take it for a test drive.  Individuals may have all sorts of sentimental attachments to

7  their particular cars, and may have expended great effort in customizing their vehicles.

8  Fortunately, used car sales generate a thick market with clear industry standards for baseline

9  valuation of vehicles.  The best industry valuation for large numbers of vehicles is NADA Clean

10 Trade-In, which provides a fair and reasonable reference point for vehicle valuation.[16]  It is the

11 most objective available method, as other methods, such as MSRP minus depreciation, or Kelley

12 Blue Book ("KBB"), would require more individualized calculations and determinations as to

13 vehicle condition.[17,18]  And, regardless, KBB values are very similar to NADA values.  Stockton

14 Decl. (Dkt. No. 1784-1) ¶ 16.  Moreover, by adopting the September 2015 NADA Clean Trade-In

15 values (or comparable projection, where necessary) for all vehicles, the Settlement avoids the

16 delay, uncertainty, and potential reductions in value associated with the subjective vehicle-by-

17

18 [15] Wheels, Inc. faults the Settlement for failing to include an alternative mileage calculation
   method "using reliable mileage records kept in the ordinary course of business," Dkt. No. 1882 at
19 5, but that alternative method would have been a realistic option for very few, and would have
   added considerable complication for only marginal benefit, if any.

20 [16] Certain Model Year 2015 Vehicles did not have NADA Clean Trade-In values as of September
   2015.  Therefore, Plaintiffs opted to analyze the observed relationships of NADA Clean Trade-In
21 value to MSRP for those 2015 Model Year Volkswagen vehicles that did have NADA Clean
   Trade-In values—as discussed and negotiated by counsel for both Plaintiffs and Volkswagen—
22 and reached a deduction-on-MSRP figure for applicable Model Year 2015 Vehicles of 71.7%.
   These values, intended to approximate NADA Clean Trade-In values, when combined with the
23 restitution payment, provide an average payment of approximately 98% of MSRP and are
   "reasonable, reliable, and the product of a rigorous and analytically sound process."  Stockton
24 Decl. (Dkt. No. 1784-1) ¶ 32.

25 [17] As a peculiar, but perhaps inevitable result of the proposed Settlement, different objectors have
   argued that the NADA Clean Trade-In value is unfairly skewed towards favoring older vehicles,
26 or unfairly skewed towards favoring newer vehicles.  Neither is true.

27 [18] *See, e.g.*, *Kelley Blue Book vs. NADA Guides*, http://www.usedcars.com/advice/kelley-blue-
   book-vs-nada-guides/ (last visited Sept. 21, 2016) ("[KBB] places a large amount of emphasis on
28 mileage, condition, features and popularity, while NADA tends to focus on the vehicle's
   wholesale price (i.e. what the dealer paid for the vehicle)").

1319495.9

1    vehicle appraisals at the time of Buyback or Fix.  Here, all vehicles receive and retain a standard

2    value.  The Buyback requires only that Class members return a vehicle in working order.  This is

3    a benefit not just in terms of time to getting a remedy, but also relieving car owners of the need to

4    fix up their cars, repair dents and other body damage, or otherwise spruce up for the trade-in.

5    This is yet another gain for Class members whose vehicle condition might push them into less

6    desirable trade-in categories, covered by NADA Rough or Average Trade-In, an inferior baseline

7    for valuation compared to NADA Clean Trade-In.

8                    **d.      The Settlement Properly Accounts for Optional Vehicle
                             Equipment Adjustments.**

9

10   Most cars are sold with fairly standard packages of additional features.  This is already

11   captured in the NADA Clean Trade-In values, which includes some of the most common options

12   automatically in the NADA valuation.  Other less-common features, such as optional navigation

13   systems, power sunroofs, or sport packages, are picked up in the Settlement through Vehicle

14   Value adjustments that increase the payments to Class members, regardless of whether they

15   participate in the Buyback or the Modification.

16   Certain objectors have identified vehicle equipment components not accounted for in the

17   Buyback or Modification adjustments, such as fog lights or anti-theft devices.  *See* Lujan

18   Objection (Dkt. No. 1886); Collins Objection (Dkt. No. 1889).  Not adjusting Vehicle Value for

19   this equipment directly matches the NADA pricing guidelines and maintains the administrability

20   of the program and the integrity of the compensation schedules.  Of course, Class Counsel

21   understands that NADA does not account for every single option that Class members purchased.

22   Therefore, as described more fully below, the Settlement restitution payment is designed to

23   ensure that the *combined* payments for all Class members—including those who purchased

24   options that did not affect the underlying Vehicle Value—exceeds the vehicles' September 2015

25   NADA Clean Retail value.

26

27

28

1

2

**2.      The Restitution Payment Is an Integral Part of the Buyback Compensation Package, and Ensures That All Eligible Owners Are Fairly Compensated, Regardless of Their Individual Circumstances.**

3       Taken as a whole, the Buyback compensation package is designed to restore Class

4   members to the positions they would have occupied if Defendants had never committed the

5   frauds.  The Settlement compensation must be understood as a package deal.  Objectors who

6   criticize the Settlement for pegging vehicle value to NADA Clean Trade-In as opposed to NADA

7   Clean Retail miss that point.  Together, the combined payments—which include the Vehicle

8   Value, relevant adjustments, and the restitution payment—amount to more than a 20% premium

9   over the Clean Trade-In value and compensate the average Class member with a minimum of

10  112.6% of the September 2015 *retail* value of their vehicles.  Stockton Decl. (Dkt. No. 1784-1)

11  ¶ 28.

12      While the September 2015 NADA Clean Trade-In fairly captures the pre-scandal market

13  value of the Class Vehicles, it is not intended to cover all the harms suffered as a result of

14  Volkswagen's fraud.  It is not the entirety of the settlement benefits package.  The restitution

15  payment portion of the compensation package provides significant *additional* money to account

16  for that harm.  Plaintiffs' expert, Edward Stockton, discussed these issues in his report on the

17  economic effects on consumers of Volkswagen's conduct, and the reasonableness of the

18  settlement in addressing these effects.  These additional tangible economic costs may include an

19  accelerated purchase of a new vehicle and concomitant transaction costs (Stockton Decl. (Dkt.

20  No. 1784-1) ¶¶ 18, 23), loss of extended warranty coverage or service plan coverage (*id.* at ¶ 24),

21  sales tax on the excess original purchase price (*id.* ¶ 25), sales tax on replacement vehicle

22  purchases (*id.* at ¶¶ 10, 28),[19] inflated vehicle price and heightened insurance premiums

23  associated with the inflated vehicle price (*id.* at ¶ 25).  Intangible costs were also incurred by

24  some Class members, such as uncertainty related to the "clean diesel" scandal and the stress

25  related to excess vehicle emissions and searching for a new vehicle.  *Id.* at ¶¶ 18, 22.  All of these

26  factors, as well as potential storage costs that some Class members may incur by deciding not to

27

28  [19] *See also* Exhibit 4, Reply Declaration of Edward M. Stockton ("Stockton Reply Decl.") ¶¶ 3-4.

PLAINTIFFS' REPLY MEMORANDUM
IN SUPPORT OF FINAL APPROVAL
MDL 2672 CRB (JSC)

1   drive their vehicles, and the inevitability of certain Class members purchasing optional equipment

2   for their vehicles not included in NADA adjustments, were considered in negotiating the

3   additional restitution payment available to all Class members.  *Id.* at ¶¶ 26-28.

4       The restitution payments also provide Class members who purchased extended warranties

5   or service contracts sufficient compensation to cancel the contracts—a typical cancellation fee is

6   $50—and then receive a reimbursement of the pro-rated remaining portion of the warranty

7   purchase price.  Thus, the Settlement provides a remarkable amount of flexibility and choice to

8   conform to each Class member's individual preferences and needs, within an overall system that

9   can be administered in a transparent, predictable, and efficient way to process hundreds of

10  thousands of claims without undue delay.

11              **3.      The Settlement Fairly Compensates Lessees.**

12      Class members leasing their vehicles from Volkswagen are afforded two choices: opt for a

13  Fix and restitution payment, if approved, or terminate their lease at any time prior to the

14  September 2018 Fix deadline and receive a restitution payment.[20]  As is the case with owners,

15  lessees are given flexibility to determine which option best suits their personal situation.

16      Nevertheless, a small number of objectors have criticized the compensation available for

17  lessees—which is less than that available to owners.  This difference in compensation, however,

18  is attributable to the economic relationship a lessee has with his vehicle, as compared to an

19  owner's relationship with his vehicle.  An owner bears the risk of any depreciation of the vehicle

20  during the course of ownership.  Lessees, on the other hand, receive only the right to use the

21  vehicle for the duration of the lease, in exchange for consideration.  *See* Stockton Decl. (Dkt. No.

22  1784-1) ¶ 34.  It would be inequitable for a lessee to receive the same compensation as owners,

23  since owners owned an asset that lost value because of Volkswagen's conduct, and lessees did

24  not.  Despite the differences in compensation, lessees still receive remedies that are functionally

25  analogous to the owner remedies: lessees can relinquish their vehicles or obtain a Fix and

26  continue to drive them.

---

[20] These restitution payments are equal to 10% of the Vehicle Value (adjusted for options but not mileage) plus an additional $1,529.

1319495.9

1    Other lessees have objected to the Settlement based on the structure of their leasing

2    contracts.  Some complain about contractual mileage overages.  Any charges related to mileage

3    overages stem from the Class member's initial lease contract, and would be owed whether or not

4    the vehicles met relevant emissions limits.  The restitution payment offered to lessees explicitly

5    does not include mileage adjustments, because the justification for doing so in the owner context

6    (depreciation and use of the vehicle) does not apply in the lessee context.  Other lessees contend

7    they are not being adequately compensated for larger than normal down payments, or "pre-

8    payments."  But aside from the fact these pre-payments results in reduced monthly payments—a

9    benefit these lessees have continuously enjoyed—this can be resolved by maintaining lease,

10   thereby realizing the benefit of the larger down payment.

11    Finally, a small number of lessees have objected because they intended to become owners

12   of their vehicles at the conclusion of their lease, yet are compensated by the Settlement only as

13   lessees.  But there is a difference between immediately assuming the burdens of ownership and an

14   unconsummated intent to assume ownership at some future date.  The decision to lease a vehicle

15   is, by definition, a decision to not purchase one.  It would be neither practical nor reasonable for

16   the Settlement to treat certain lessees as if they suffered the same harm as owners, when they did

17   not.

18              **4.       The Settlement Fairly Compensates Those Financing Their Vehicles.**

19    Many Class members owe money on their vehicle purchase pursuant to a financing

20   arrangement.  These Class members are treated like any other vehicle owner, unless they owe

21   more on their vehicle loan than the total Buyback compensation would provide.  The Settlement

22   establishes a funding pool of $42,670,723 for such Class members, and they are entitled to an

23   additional amount up to 30% of the Buyback compensation package (inclusive of the restitution

24   payment) as loan forgiveness.  Some objectors believe the loan forgiveness is too generous;

25   others complain it is not generous enough.

26    The extra payments to Class members with more debt merits explanation, because it is not

27   a customary feature of a class settlement.  One of the Settlement's many goals was to make Class

28   members whole.  If that were the only objective, then Class members should be treated identically

1319495.9

1    regardless of whether they financed a portion of their purchase or paid all cash.  But another

2    important objective of the Settlement was to get the polluting cars off the road.  Forgiving the

3    loans (up to a certain point) helps advance both goals by ensuring that no Class member (or at

4    least, very few) would be required to pay additional money to Volkswagen to free themselves of

5    the polluting Vehicles.  It therefore incentivizes more of those Class members to participate in the

6    Settlement and to sell their polluting vehicles back to Volkswagen.  Some are tempted to view the

7    settlement in zero-sum, comparative terms, but no Class member's compensation package under

8    the Settlement was reduced in order to provide this additional benefit to those under water with

9    their loans.

10        Of course, some of those who are eligible for loan forgiveness want more, and seek

11    additional cash compensation in addition to the *enhanced* Buyback amount necessary to pay off

12    the creditors.[21]  The negotiated loan forgiveness compensates these Class members fairly.

### 5.      The Settlement Fairly Compensates Those Who Disposed of Their Vehicles ("Eligible Sellers").

15        Class members who transferred title of their Class vehicles between September 18, 2015

16    and June 27, 2016, are treated as Eligible Sellers under the Settlement and receive half of the

17    restitution amount that Eligible Owners receive: equal to 10% of the Vehicle Value plus a

18    restitution payment of $1,493, subject to a $2,550 minimum.  Some objectors criticize the

19    Settlement for providing less compensation to sellers than to owners, but this difference is

20    justified because a Class member whose vehicle was totaled most likely received or will receive

21    an insurance payout reflecting the value of his vehicle when it was totaled.  Those who sold their

22    cars have also have been partially compensated for the then-current market value of their

23    vehicles.

---

[21] A subset of these objectors have commented on the perceived inequity in a settlement forgiving loans made by VW Credit, equating it to Volkswagen paying the settlement to itself.  These objections misunderstand the nature of the economic relationship.  A Class member who owes money to VW Credit needs the same indemnity from debt as one who owes money to Citibank.  More of the consumer debt is forgiven in either case, which increases the benefit to the class member and facilitates getting a polluting car off the road.  The end result is the same.

PLAINTIFFS' REPLY MEMORANDUM
IN SUPPORT OF FINAL APPROVAL
MDL 2672 CRB (JSC)

1    Those sellers are now eligible for an additional payment—the restitution payment—

2    designed to bridge the gap between the vehicles' then-current value and its fair, pre-fraud

3    valuation and other harm caused them.  These Class members, however, do not face the same

4    costs as current vehicle owners.  Moreover, the sellers' vehicle sales prices would have accounted

5    for certain value-enhancing features, like extended warranties, anti-theft devices, and other

6    features, that, for Eligible Owners, are to be covered by the restitution payment.  For all of these

7    reasons, the seller restitution payment fairly and adequately compensates Eligible Sellers.

8                    **6.      Special Payments to Resellers Are Not Warranted.**

9    Objector Wheels, Inc. argues that the Settlement fails to take adequate account of costs

10   incurred by fleet management and reseller Class members.  Dkt. No. 1882 at 4.  Its claim is that

11   because it owns many vehicles and incurs costs associated with storing them while it awaits the

12   start of the Settlement's Buyback program, it should receive more under the Settlement to offset

13   those costs.  This reasoning is flawed.  As noted above, some individual Class members also

14   incurred storage costs, which were considered in the negotiation of the restitution payments.

15   Moreover, individuals could just as well argue that they incurred costs that fleet members did not

16   incur.  The Settlement treats resellers and consumers equally:  an inclusion and equity that many

17   dealers urged.  Resellers and consumers were equally allegedly misled by Volkswagen, and

18   equally powerless to do anything about it.  It is fully appropriate to treat them similarly, as the

19   Settlement does.

20   This Court "must evaluate the fairness of a settlement as a whole, rather than assessing its

21   individual components."  *Lane v. Facebook, Inc.*, 696 F.3d 811, 818-19 (9th Cir. 2012).  In this

22   regard, Wheels, Inc. fails to understand that, as the Ninth Circuit cautioned, "settlement is the

23   offspring of compromise; the question we address is not whether the final product could be

24   prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion."  *Hanlon*,

25   150 F.3d at 1027.  That Wheels, Inc. would prefer to be paid a greater amount does not render the

26

27

28

1   Settlement unfair, or inadequate, or suggest collusion.  Indeed, Resellers have demonstrated

2   strong support of the Settlement.[22]

3          Moreover, to the extent Wheels believed it should receive additional compensation for the

4   storage of its "over 4,000 affected vehicles," it could have opted-out of the Settlement and

5   pursued those claims individually, like any other Class member.  *See Alaniz v. California*

6   *Processors, Inc.*, 73 F.R.D. 269, 277 (N.D. Cal. 1976) (notice and the right to opt-out afford class

7   members "the opportunity to make an informed and voluntary choice over whether (the

8   Settlement) is satisfactory to them.") (parenthesis in original; internal quotations omitted).  It

9   chose not to do so.

10         **B.     The Class Action Settlement Is an Essential Element of a Synergistic
                    Public/Private Initiative Which Fully Succeeds as a Package Deal.**

11

12         The extraordinary relief reflected in the three related settlements before the Court resulted

13  from an unprecedented joint effort.  As Settlement Master Mueller observed: "The parties had

14  overlapping claims and authority; multiple parties sought economic, injunctive, and

15  environmental relief; *no single party could, as a jurisdictional or practical matter, obtain and*

16  *enforce all the relief sought*."[23]  The Parties thus came together to work towards a "***global***

17  resolution."[24]  As it turned out, the sum of the DOJ/EPA, FTC, and private plaintiffs—led by the

18  PSC—proved much greater than the individual parts.  As the Court observed, it is the

19  "***combination*** of these agreements,"—*i.e.*, the DOJ Consent Decree, FTC Order, and the Class

20  Action Settlement—that provides "payment of substantial compensation to the consumer class

21  members in connection with the car buy back, the car modification, and cancellation of lease

22  options."[25]  "Without the ***cooperation***" of both the government entities and the PSC, "none of this

23

24

---

25  [22] *See, e.g.*, Exhibit 5, Declaration of Suzanne Sarhan; Exhibit 6, Declaration of Abdulrahman Al
    Dachach.

26  [23] *See* accompanying Declaration of Settlement Master Robert S. Mueller, III on Settlement of
    Claims Regarding 2.0 Liter Vehicles, ¶ 7 (emphasis added).

27  [24] May 24, 2016, Case Status Conference, Hr'g Tr. 8:6-18 (emphasis added).

28  [25] Apr. 21, 2016, Case Status Conference, Hr'g Tr. 6:2-8 (emphasis added).

1319495.9

1   would have occurred."[26]  Simply put, then, these agreements cannot be viewed in isolation and

2   each plaintiff group was integral to reaching a quintessential package deal.[27]

3           One hostile objector posits an alternative universe in which aggregate results can be

4   attributed to a single participant.  *See* Comlish Objection (Dkt. No. 1891).  Here, Comlish argues

5   that the extraneous party was the private plaintiffs, and that the Settlement's benefits are properly

6   accredited to the DOJ and, to a lesser extent, the FTC.[28]  He asserts in a variety of ways that while

7   the "DOJ and FTC Orders provide class members with substantial relief," "the [class] Settlement

8   provides no additional relief but instead imposes transaction costs in the form of class counsel

9   fees and expenses and requires a release of class members' claims."  Dkt. No. 1891 at 5.

10  Similarly, he claims that "even if a class member opted out of the Settlement, his/her vehicle must

11  still be repurchased Volkswagen pursuant to the DOJ Consent Decree," and, relatedly, that the

12  DOJ Consent Decree accounts for "99% of the $10 billion that class members will receive if all

13  three orders (the DOJ Order, the FTC Stipulated Order, and Settlement) are entered."  *Id.*  These

14  arguments rely on a misreading of the settlement documents, and a fundamental

15  misunderstanding of the settlement negotiation process, and its resulting, interrelated settlements.

16          ***First***, Comlish's interpretation of the settlement documents themselves is fatally flawed.

17  Those who opt out of the Class Action Settlement are not eligible for the Buyback and cannot

18  recover any cash.  The Executive Summary of the Settlements—which all the Parties, DOJ

19

20

---

21  [26] *Id.* at 12:25-13:3 (emphasis added).

22  [27] As quantum physicist Werner Heisenberg famously stated:  "There is a fundamental error in separating the parts from the whole, the mistake of atomizing what should not be atomized."

23  [28] Ironically, elsewhere, Comlish's counsel—who also represents the Competitive Enterprise Institute and eight other lobbying special interest organizations—takes aim at the DOJ deal too.

24  He filed an objection to the DOJ Consent Decree opposing the ZEV funding component, thus seeking to reduce or eliminate a major, $2 billion component of the environmental relief the Settlements provide. *See* Comments of the Competitive Enterprise Institute, American

25  Commitment, Americans for Prosperity, Freedom Works, Frontiers of Freedom, Heartland Institute, Institute for Energy Research, Rio Grande Foundation, Science and Environmental

26  Policy Project, and Tax Payer Protection Alliance, to the Assistant Attorney General Environment and Natural Resources Division United States Department of Justice, dated August 5, 2016

27  (available at:
    https://cei.org/sites/default/files/Coalition%20Comments%20on%20In%20re%20Volkswagen%2

28  0Clean%20Diesel%20Marketing%20Sales%20Prac....pdf).

1319495.9

1   included, reviewed; which the Court approved; and which is posted on the Court's case website[29]

2   and on the official Settlement website[30]—could not be more clear on this point:  "***If you exclude***

3   ***yourself from the Class***, you may still obtain an Approved Emissions Modification if available

4   for your car, but ***you cannot receive a Buyback or Lease Termination, and you will not receive***

5   ***any cash payment***."  Executive Summary at 1 (emphasis added).  The FTC Order is equally clear:

6   "Defendant must make all payments in accordance with this Order, provided that ***Defendant need***

7   ***not make these payments to those consumers who elect not to participate in the Settlement***

8   ***Program***."  *See* FTC Order (Dkt. No. 1781) at IV(I) (emphasis added).

9          Quite simply, the DOJ did not direct itself to the compensation of Class members.

10  Although the DOJ Consent Decree states that Volkswagen's "obligations under this [decree] are

11  independent of the FTC Order and Class Action Settlement," Dkt. No. 1605-1 at ¶ 4.1, that decree

12  *does not* provide a mechanism to compensate owners and lessees for Volkswagen's deceit.  That

13  obligation is created in the Class Action Settlement. Settlement (Dkt. No. 1784) ¶¶ 4.2.2; 4.2.4;

14  4.3.3.  Likewise, the most specific and detailed existing plan and procedures to deliver consumer

15  benefits to 2.0-liter owners, sellers, and lessees is set forth in the Class Action Settlement, in *e.g.*,

16  ¶¶ 2.9-2.15; 5.1-5.5 and Exhibit 4 ("Class Claims Program and Administration").  This

17  infrastructure, a massive project, is now under intensive construction and implementation by VW

18  and the Court-appointed Claims Supervisor, to administer the prompt processing of buyback and

19  compensation claims, as well as prospective emissions modification claims, upon final approval

20  by the Court.  This infrastructure, which also features input from and monitoring by the FTC (but

21  not a separate competing FTC process), should not be scuttled in favor of a theoretical (and

22  counterfactual) alternative process, all under the guise of a "superiority" argument. Approving

23  only the DOJ Consent Decree, as Comlish proposes, would eradicate Volkswagen's obligation to

24  conduct the Buyback as negotiated; eliminate both the obligation and the class relese incentive to

25  pay restitution to owners and lessees; and would undermine the efforts of the Class, VW, the

26

27  [29] http://www.cand.uscourts.gov/crb/vwmdl/proposed-settlement.
    [30] https://www.vwcourtsettlement.com/en/docs/Executive%20Summary%20of%20Proposed%20S
28  ettlement%20Program.pdf.

1319495.9

1    regulators, and the Court to comprehensively resolve all of the related harms promptly and

2    efficiently.  The Class Action Settlement is not surplusage; it is essential.

3        *Second*, and equally as important, Comlish's objections evince a deep misunderstanding

4    of the settlement process and of the principle of causation.  Comlish erroneously believes that an

5    aggregated settlement result can be attributed to a single participant in the process, while cutting

6    out the rest.  In social psychology this is known as "attribution error":  the fundamental mistake

7    of ascribing all causation to the characteristic under observation.  Colloquially (and with glee in

8    certain quarters), we can observe that recently Cal beat Texas 50-46 in football.  The game was

9    "won", in some sense, by the players who scored the decisive points.  The offensive line did not

10   score any points, but we cannot assume the same result without the line, or even without

11   quarterback Davis Webb.  The record similarly shows that not only were class counsel

12   indispensable to the result, in the manner of the offensive line; but also that they and their

13   counterparts at DOJ and FTC, organized the team in the fashion of rotating quarterbacks.  And, in

14   some sense, by providing Volkswagen with the release it requires to offer any payments at all, the

15   Class Action Settlement scores the "winning" touchdown as well.

16       This district recently recognized this principle and disposed of arguments similar to those

17   made by Comlish here.  *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 1006

18   (N.D. Cal. 2015).  In *In re TracFone* an objector argued that the settlement at issue was solely the

19   work of the FTC and that the consumer action added nothing.  Judge Chen found this argument

20   "without merit" because the "consumer and FTC settlements were reached at the same time as

21   part of a *global* settlement."  *Id.* (emphasis in original).  Further, Judge Chen observed, the

22   defendant in that case stated that it only agreed to pay funds to the FTC "because those funds will

23   be used to pay class members in the consumer cases, thereby resolving all of the pending lawsuits

24   against it."  *Id.*  Here, too, the settlements comprise a "global" package, and there is no reason to

25   believe that Volkswagen would have agreed to the substantial relief provided by the joint

26   settlements without receiving in return the private plaintiff releases necessary to resolve the

27   multitude of consumer suits it is also facing.

28

1319495.9

1   Comlish's error is compounded by his unfounded certainty that the deal was basically

2   wrapped up from the beginning.  Not only does that defy the record, again as captured by Director

3   Mueller, but the claim misapprehends how extraordinary the ultimate remedy is.  At one point

4   Comlish claims remedy could have been had through some self-executing program administered

5   by Volkswagen and Ken Feinberg, but provides no evidence that anything like the Class Action

6   Settlement's generous terms was ever even contemplated early on—or, for that matter, that any

7   remotely similar benefits have been provided anywhere else in the world, for any TDI vehicles.

8   This simply is not a case where—as the objector suggests—a class came along after a

9   government settlement and rode on the government's coattails.  *See, e.g.*, *In re First Databank*

10   *Antitrust Litig.*, 209 F. Supp. 2d 96, 101 (D.D.C. 2002).  To the contrary, as the Court stated, this

11   was a "global" resolution that required "cooperation" and it is the "combination" of the

12   agreements that provides the consumers the relief they so rightly deserve.  Again, neither the FTC

13   Order nor the DOJ Consent Decree provide any mechanism for Class members to receive

14   compensation; both rely upon the Class Action Settlement to put money into Class members'

15   pockets, just as the Class Action Settlement relies upon provisions included only in the FTC

16   Order and the DOJ Consent Decree to effect other important settlement goals.  This is not a pick-

17   and-choose, "either/or" situation.  This public/private resolution is the quintessential "and":  a

18   package deal.

19   For these reasons, Courts regularly approve joint government-class settlements.  *See, e.g.*,

20   *Ebarle*, 2016 U.S. Dist. LEXIS 128279 at *18 ("[T]he settlement was coordinated with the

21   settlement in the FTC Action.  This coordination favors final approval."); *In re TracFone*

22   *Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 1006 (N.D. Cal. 2015) ("The FTC participated

23   heavily in reaching this settlement, and supports the settlement.  Indeed, the FTC will be

24   responsible for the disbursement of the $40M settlement fund to class claimants. . . .  This factor

25   weighs in favor of final approval."), *reconsideration denied*, No. C-13-3440 EMC, 2015 WL

26   4735521 (N.D. Cal. Aug. 10, 2015); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827

27   SI, 2013 WL 1365900, at *1, *17 (N.D. Cal. Apr. 3, 2013) ("Second Amended Order Granting

28   Final Approval of Combined Class, Parens Patriae and Governmental Entity Settlements . . .");

PLAINTIFFS' REPLY MEMORANDUM
IN SUPPORT OF FINAL APPROVAL
MDL 2672 CRB (JSC)

1   *see also In re Reebok Easytone Litig.*, No. 4:10-CV-11977-FDS (D. Mass.), Dkt. No. 61, at *2-3

2   (coordinated settlement of claims by private plaintiffs and the FTC); *id.* at Dkt. No. 74 (approving

3   settlement).

4          Finally, Comlish's misguided argument finds no salvation in *In re Aqua Dots Prod. Liab.*

5   *Litig.*, 654 F.3d 748, 751 (7th Cir. 2011).  As an initial matter, the Ninth Circuit, like many of her

6   sister Circuits, has not adopted the Seventh Circuit's reasoning in *Aqua Dots*, and, in fact,

7   multiple district courts have rejected it.  *See, e.g.*, *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 415

8   (S.D.N.Y. 2015); *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 293 F.R.D. 21,

9   29, 34 (D. Me. 2013); *In re Subway Footlong Sandwich Mktg. & Sales Practices Litig.*, No. MDL

10  13-02439, 2016 WL 755640, at *7-8 (E.D. Wis. Feb. 25, 2016).  In any event, *Aqua Dots* is

11  wholly inapposite given that, here, the government and private settlements were negotiated

12  concurrently. In *Aqua Dots*, makers of a defective children's' toy implemented a recall program

13  with a money back option.  654 F.3d at 750.  Nevertheless, plaintiffs sued on behalf of a putative

14  class seeking full refunds.  *Id.*  The Seventh Circuit affirmed denial of class certification based on

15  the plaintiffs' failure to "fairly and adequately protect the interests of the class" where they "want

16  relief that duplicates a remedy that most buyers already have received, and that remains available

17  to all members of the putative class."  654 F.3d at 752.  Here, by contrast, Class plaintiffs did not

18  file suit when government relief was already in the offing; in fact, to be technical, the Class

19  lawsuits were on file before the DOJ and FTC.  This distinction regularly appears in the authority

20  cited by the objector and is fatal to his argument. *See, e.g.*, *Kamm v. California City Dev. Co.*, 509

21  F.2d 205, 207–08 (9th Cir. 1975) (affirming dismissal of class action where state court action and

22  settlement previously entered); *Imber-Gluck v. Google Inc.*, No. 5:14-CV-01070-RMW, 2015

23  WL 1522076, at *1 (N.D. Cal. Apr. 3, 2015) (denying class certification where the FTC initiated

24  an industry wide investigation "[p]rior to the filing of the complaint" and settled with Apple and

25  Google before plaintiff moved for class certification).

26         In sum, the three agreements were negotiated contemporaneously and provide

27  complementary relief.  The Class Action Settlement is integral to the success of the combined

28  efforts to right Volkswagen's wrong, and Comlish's suggestion to the contrary should be rejected.

PLAINTIFFS' REPLY MEMORANDUM
IN SUPPORT OF FINAL APPROVAL
MDL 2672 CRB (JSC)

**C.     The Timing and Structure of Settlement Class Counsel's Prospective Fee Request Is Appropriate and Does Not Affect the Fundamental Fairness of the Settlement.**

Several objectors have raised concerns about timing and structure of Settlement Class Counsel's prospective fee request.  Those concerns are unfounded and do not undermine the fairness, adequacy, or reasonableness of the Settlement.

With respect to timing, the argument is that the proposed settlement violates Fed. R. Civ. P. 23(h) by failing to provide Class members with an opportunity to object to a fee motion.  *See, e.g.*, Weese Objection (Dkt. No. 1864); Li Objection (Dkt. No. 1871); Andrianos Objection (Dkt. No. 1876).[31]  Rule 23(h) does not require counsel to move for motions for fees prior to final approval of settlement, as the Court already explained in granting preliminary approval: "Rule 23(h), which governs attorneys' fees in class actions, does not require Class Counsel to move for its fee award at the preliminary approval juncture, or even upon seeking final approval."  Dkt. No. 1688 at 23.  Other courts agree.  *See In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 445 (3d Cir. 2016) ("[T]he separation of a fee award from final approval of the settlement does not violate Rule 23(h)."); *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 910 F. Supp. 2d 891 (E.D. La. 2012) (approving settlement where "parties had no discussions regarding fees other than the PSC's making clear that it would eventually file a request for attorneys' fees").  Accordingly, the Settlement, pursuant to which Settlement Class Counsel will move for fees at a later date, does not violate Rule 23(h).

*In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988 (9th Cir. 2010), upon which several objectors rely, does not hold otherwise.  In *Mercury*, the Ninth Circuit disapproved of a

---

[31] A few objectors have also framed this as defect in notice, but Rule 23(c)(2)(B), which sets forth the required contents of class notice, does not require disclosure of the amount of attorneys' fees sought.  *See Ebarle v. Lifelock, Inc.*, No. 3:15-cv-258-HSG, slip op. at 12 (rejecting identical objection to notice in settlement involving segregated fee structure) (citing *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 556, 757 (9th Cir. 2004).  Here, the Long Form Notice went beyond the requirement by explaining that attorneys' fees will be negotiated separately and that Settlement benefits will not change as a result of the Court's award of attorneys' fees and costs, regardless of the amount.  The purpose of notice is to allow class members to decide whether to accept a settlement in light of their recovery and how class counsel is to be compensated.  The settlement notice provides all of that information and more.  *See* Declaration of Shannon R. Wheatman, Ph.D. on Implementation and Adequacy of the Class Notice Program ("Wheatman Reply Decl.").

1   schedule that required "objections to be filed before the fee motion itself is filed," where the fee

2   motion was set for hearing and determination with the final settlement approval, unsurprisingly

3   finding that such sequence "denies the class the full and fair opportunity to examine and oppose

4   the motion that Rule 23(h) contemplates." *Id.* at 995.  That will not happen here.  Class members

5   here will have the opportunity to object to Settlement Class Counsel's fee request, after it is filed.

6          Moreover, contrary to Comlish's suggestion, the Court's Rule 23(e) fairness

7   determination does not require a comparison between the benefit provided to the Class and the

8   ultimate award of attorneys' fees as a condition of settlement approval.  Dkt. No. 1891 at 21.

9   That simply is not the law.  *In re Bluetooth Headset Products Liability Litigation*, upon which

10  Comlish relies for this argument, does not stand for the proposition that the resolution of

11  attorneys' fees following final approval of settlement is problematic, much less that this practice

12  is forbidden by Rule 23(e).  654 F.3d 935 (9th Cir. 2011).  Rather, in *Bluetooth*, the Ninth Circuit

13  held merely that a district court must assure itself that a fee award is "not unreasonably excessive

14  in light of the results achieved." *Id.* at 943.  Here, the Court will have an opportunity to analyze

15  the propriety of Class Counsel's fee request, and to entertain any objections thereto, after Class

16  Counsel files its motion for fees, and of course, when it has the opportunity to observe the results

17  achieved in action, since the consumer relief will commence forthwith upon final approval.  At

18  this point, then, this and other objections to the prospective fee award are premature and should

19  be overruled.  *See, e.g.*, Kangas Objection (Dkt. No. 1826); Andrianos Objection (Dkt. No. 1876);

20  Siewart Objection (Dkt. No. 1895).

21         Even if a fee versus class recovery analysis were necessary or appropriate at this juncture,

22  Class members would have sufficient information to evaluate the prospective fee request.  Per the

23  Court's instruction, Settlement Class Counsel filed a Statement of Additional Information

24  Regarding Prospective Request for Attorney's Fees and Costs on August 10, 2016.  That

25  Statement, available on the Court's website, explained that any request will be limited to $324

26  million in fees and $8.5 million in costs.[32]

27  ───────────────

28  [32] Comlish's *ad hominem* attack on Class Counsel allegedly "running up the lodestar" has no
    basis whatsoever.  There was and could be no moratorium on litigation activity while the

1    Even by the most conservative measures, this fee cap is equivalent to only a small

2    percentage of the cash put into Class members' pockets through the Settlement. Let's freeze the

3    Class at the number of current registrants, although we know that number will grow substantially.

4    As noted, approximately 311,209 Class members have already registered to receive Settlement

5    benefits.  Of those, approximately 14,000 are Eligible Sellers who will receive an average of

6    $3,090.42 each or approximately $43.2 million in all.  Based on the overall vehicle statistics, we

7    can expect that about 5% of the remaining 297,209 registered Class members are lessees.  They

8    will receive an average restitution payment of $3,498.86, resulting in an aggregate of

9    approximately $52 million.  That leaves 282,349 owners in our sample of 311,209.  We do not

10   know what final choices they will make:  that is up to each of them.  But if half of them were to

11   choose the buyback, and the other half the "fix," their combined mileage-adjusted average

12   compensation would total approximately $3.95 billion.  That raises the projected total amount for

13   Class members *who have already registered* to $4.05 billion.  Settlement Class Counsel's

14   fees/costs cap of $324 million represents approximately 8% of the recovery in this conservative

15   scenario, less than one third of the Ninth Circuit's benchmark of 25%.  *See Bluetooth*, 654 F.3d at

16   942.  Based on the extremely conservative assumption that none of the remaining Class members

17   will claim Settlement benefits, although they have two more years in which to do so, and

18   thousands of additional Class members continue to register weekly.  Ultimately, Settlement Class

19   Counsel's fee request will represent an even smaller fraction of the Class members' recovery, and

20   will be well supported by controlling law—a fact that can be discerned even today.

21   Critically, no matter the amount of the fees ultimately awarded, those fees will not be

22   deducted from the Class recovery.  Volkswagen will pay them in addition to the Class

23

24   Settlement was being negotiated:  the pressure of an expedited 2.0-liter trial was essential to an
     intensive and expedited negotiation process.  The PSC sought that trial, were preparing for it, and
25   the Court had advised the parties that the mandate to "get[] the polluting cars fixed or off the
     road," would be addressed with all possible dispatch, through settlement, or trial.  March 24,
26   2016, Case Status Conference, Hr'g Tr. 8:6-21.  It is also ironic that Comlish complains about the
     apparent inefficiency of a lodestar analysis when Comlish's counsel is one of the leading
27   proponents of using the lodestar method as a measure of appropriate fees, even though
     economists and courts have pointed out the perverse and inefficient incentives created by the
28   lodestar method.

1319495.9

1  compensation outlined in the Settlement.  Contrary to Comlish's suggestion, nothing about this

2  statement is misleading.  Dkt. No. 1891 at 16-17.  Comlish envisions a zero-sum world in which

3  any prospective fee application necessarily reduces the compensation available for the Class.

4  That can't be true, especially under these facts.  That Volkswagen will face a claim for fees—of

5  an unknown amount, no less—does not compromise the settlement process any more than the fact

6  that Volkswagen might face further liability in Canada and Europe, or that the 3.0-liter TDI

7  vehicle claims remain unresolved, or even that the price tag on civil and criminal fines and

8  penalties is not yet fixed.  Consequently, Settlement Class Counsel's acquiescence to a segregated

9  fee structure did not harm the Class, as Comlish suggests; to the contrary, it benefits the Class.[33]

10      **D.**    **Objections Regarding Exclusions from the Settlement Should Be Overruled.**

11        A few objectors have criticized the Settlement for failing to include vehicles sold and

12  leases terminated prior to the revelation of Volkswagen's wrongdoing, for failing to allow for

13  Buyback of inoperable vehicles, or for failing to compensate lessees with leases with entities

14  other than VW Credit.  Those whose claims are not covered in the Settlement are not members of

15  the Settlement Class.  "It is well-settled that only class members may object to a class action

16  settlement. Thus, a court need not consider the objections of non-class members because they

17  lack standing."  *Moore v. Verizon Communs., Inc.*, No. C 09-1823 SBA, 2013 U.S. Dist. LEXIS

18  122901, at *33 (N.D. Cal. Aug. 28, 2013) (Armstrong, J.); accord *Tarlecki v. Bebe Stores, Inc.*,

19  No. C 05-1777 MHP, 2009 U.S. Dist. LEXIS 102531, at *4 n.1 (N.D. Cal. Nov. 3, 2009) ("Since

20  [objector] is not a class member, she has no standing to object to the settlement."); *Bischoff v.*

21  *DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1113 (C.D. Cal. 2002) ("as non-class members, [objectors]

22  lacked standing to object and their individual rights would not be affected by the settlement"); *In*

23  *re Syngenta AG MIR 162 Corn Litigation*, Case No. 2:14-md-02591-JWL-JPO, Dkt. No. 2547 at

24  29-30 (D. Kan. Sept. 26, 2016) ("[B]y definition, however, the excluded plaintiffs are not class

25

26  [33] The anti-fee, anti-class counsel arguments raised uniquely by Comlish's counsel were

27  inevitable, and were presaged in two earlier amicus filings by the same counsel—one before the
   Judicial Panel on Multi-district Litigation and one in this Court, before either a settlement or a
   PSC existed, before he appeared for any party, and before Comlish likely knew himself to be a

28  class member.

1319495.9

PLAINTIFFS' REPLY MEMORANDUM
IN SUPPORT OF FINAL APPROVAL
MDL 2672 CRB (JSC)

1  members…."). These objectors are not Class members, and thus they lack standing to object to

2  the Settlement, and certainly cannot attack the Settlement's definitions and structure piecemeal.

3  *In re McKesson HBOC, Inc. Secs. Litig.*, 2009 U.S. Dist. LEXIS 26846, (N.D. Cal. Mar. 6, 2009)

4  (Whyte, J.) (noting that certain objectors' oppositions to exclusion from recovery were entitled to

5  limited consideration, as "the court could not have modified the proposed settlements; it could

6  only have rejected them").

7        Finally, Weese argues that Class members with liens on their Vehicles are improperly

8  excluded, but this is a misapprehension. Dkt. No. 1864 at 5. The Settlement requires that Class

9  members deliver clean title and a release to Volkswagen in exchange for a Buyback payment, and

10  a lien temporarily prevents the delivery of clean title. As is the case with third-party lessors, the

11  Settlement cannot abrogate the rights of parties not privy to the Settlement (such as lienholders),

12  and thus the Settlement cannot eliminate the lien for any individual Class member. Once a Class

13  member has removed the lien from her vehicle, she is eligible for either the Buyback or the fix.

14        **E.     The Class Release Is Fair and Reasonable.**

15        Two Class members object to being "bound by a class-wide compulsory release if the

16  underlined [sic] agreement is voided." Kangas Objection (Dkt. No. 1826) at 12; S. Siewert

17  Objection (Dkt. No. 1877) at 6. Specifically, these Class members take issue with the definition

18  of "Release" in Section 2.57, which provides that separate and apart from the class releases and

19  waivers described in the Settlement, any Class member who actually participates in one of the

20  Settlement programs or otherwise receives restitution will execute an Individual Release as

21  provided for in § 9.7 of the Settlement. That provision is both sensible and fair. If a specific

22  Class member receives the benefits provided for in the Settlement before the Settlement is

23  reversed on appeal, an Individual Release should be given as consideration. These releases are

24  indispensable to getting the settlement program up and running as quickly as possible, subject to

25  this Court's approval. In too many class settlements, frivolous objections tie up cases on appeal,

26  thereby depriving class members of needed relief. The interest in getting the dirty vehicles off the

27  road or fixed is overwhelming, and the ability to enter into a contractual resolution of any

28  individual's claim is imperative. A release executed in the form of a contract on an individual

1319495.9

1   basis allows the program to get underway, even if appeals are ongoing.  No *class-wide* release

2   will be provided unless the Settlement is approved and becomes final.

3       These same objectors take issue with the fact that the class-wide release would release all

4   claims "whether or not concealed or hidden."  Kangas Objection (Dkt. No. 1826) at 13-14

5   (quoting Settlement § 9.3); S. Siewert Objection (Dkt. No. 1877) at 7-8 (same).  Yet similar

6   language is common in class action settlement agreements routinely approved by courts.  *See,*

7   *e.g.*, *Four in One Co. v. S.K. Foods, L.P.*, No. 2:08-CV-3017 KJM EFB, 2014 WL 4078232, at

8   *3, *15-16 (E.D. Cal. Aug. 14, 2014); *Torchia v. W.W. Grainger, Inc.*, 304 F.R.D. 256, 264 (E.D.

9   Cal. 2014); *see also Taylor v. W. Marine Prod., Inc.*, No. C 13-04916 WHA, 2015 WL 307236, at

10  *2 (N.D. Cal. Jan. 20, 2015).

11      Other objectors raise concerns about the breadth of the release with regard to personal

12  injury or death claims—particularly claims related to the potential health effects from the

13  emissions of the Class Vehicles.  This is simply wrong on the facts.  Class members are not

14  waiving any claims they may have for personal injuries or death.  Settlement (Dkt. No. 1685) §

15  9.3.  The Settlement compensates and releases Class members' own emissions-related ***economic***

16  losses only.  If Class members believe health problems they experience are caused by emissions

17  exposure from the affected vehicles, Class members remain able to pursue an action against

18  Volkswagen for those injuries.

19      Finally, some have raised a concern that when a Class member owns more than one

20  eligible vehicle (currently or in the past), the release operates to release claims related all of the

21  Class member's vehicles even if the Class member is settling the claims pertaining to fewer than

22  all of his or her vehicles.  This is not how the Settlement operates.  A Class member can opt out

23  certain vehicles and leave others in the Class.  Only claims pertaining to the vehicle for which a

24  Class member is seeking benefits are released.

25  **F.      Objections Raising Public Policy Concerns Should Be Overruled.**

26      **1.      Volkswagen Is Not Profiting From the Settlement.**

27      Some Class members have expressed concern that Volkswagen will unfairly profit from

28  the Settlement.  This fear is unfounded.  The Settlement reflects an enormous financial obligation

1   for Volkswagen that far outweighs any benefit it ever reaped, or ever will reap, from the dirty

2   diesel vehicles.  Volkswagen has committed more than $10 billion for the buyback and restitution

3   programs.  It is paying another $4.7 billion for environmental remediation. Volkswagen will

4   spend billions more to continue developing and implementing fixes for all three generations of

5   the 2.0-liter vehicles.  In contrast, Volkswagen's total *revenue* (not profit) for the Class vehicles

6   is estimated at $12.937 billion.  Stockton Decl. (Dkt. No. 1784-1) ¶ 33.  Volkswagen may end up

7   re-selling some of the vehicles it buys back, but again, it can do so only after implementing costly

8   repairs.  Volkswagen did not profit from this endeavor—far from it.  By the time this is done,

9   Volkswagen will have more than disgorged its revenues for the vehicles, and will have disgorged

10   its profits many, many times over.

11            **2.      Concerns Pertaining to Future Emissions Testing Are Immaterial.**

12        Some owners raise concerns about perpetuating the fraud in future emissions testing

13   through the use of a still-defective modification, or squashing future diesel innovation if a

14   modification is not approved.  There can be no doubt that all of the state regulators are aware of

15   the defeat device implicated in this case, and of Volkswagen's efforts with the EPA and CARB to

16   achieve an approved fix.  Until such time as a modification is approved, the vehicles will continue

17   to pass emissions tests with the defeat device installed.  Regulators are aware that this is a result

18   of Volkswagen's wrongdoing, not the owner's.  Finding that a fix would be impossible would be

19   limited to these vehicles that had the defeat device installed, and need not implicate the broader

20   diesel market.  If such vehicles comply with applicable emissions requirements, they can continue

21   to be sold.

22            **3.      The Settlement Adequately Addresses Environmental Concerns.**

23        A number of Class members objected raising environmental concerns, claiming the

24   Settlement does not properly account for the environmental harm already caused by the vehicles

25   or the additional harm that will be caused during the Settlement's implementation.  This is not

26   true.  To address the environmental effects, Volkswagen will be paying $2.7 billion to support

27   environmental programs that will reduce NOx in the atmosphere by an amount intended to fully

28   mitigate the past and future excess emissions from the 2.0-liter vehicles as well as spending $2

PLAINTIFFS' REPLY MEMORANDUM
IN SUPPORT OF FINAL APPROVAL
MDL 2672 CRB (JSC)

1    billion to promote non-polluting cars, over and above what it previously planned to spend.

2    Settlement (Dkt. No. 1685) at 3.  These significant environmental investments are specifically

3    designed to account for and offset the environmental harm of all the Class vehicles in the past and

4    continuing into the future through the implementation of the Settlement.

5         Objector Ronald Clark Fleshman, Jr. argues that the Settlement violates state and federal

6    laws because the vehicles are—according to him—illegal to drive.  Fleshman has tried and failed

7    to make these same arguments repeatedly in this Settlement process.  *See* Dkt. Nos. 1672, 1742.

8    Fleshman's objections are, again, without merit, and he again cites no persuasive authority for his

9    argument that state or federal authorities believe that the Class vehicles are illegal to drive.  To

10   the contrary, the EPA has stated it "will not confiscate your vehicle or require you to stop

11   driving."[34]  The 44 states participating in the Attorneys General settlement have also agreed to

12   allow Class vehicles to stay on the road pending participation in the Class Action Settlement.

13        Unsurprisingly, then, Chief Judge White, who recently issued an Opinion Letter order

14   addressing the claims of Fleshman and others raised in the parallel "Clean Diesel" litigation

15   proceeding in Virginia state court observed that "neither the EPA nor Virginia has declared the

16   vehicles to not be road worthy or otherwise illegal."  *In re Volkswagen Clean Diesel Litigation*,

17   CL-2016-9917, Opinion Letter (Dkt. No. 1812-1) at 19.

18        Even if Virginia, or any other state, had made such a statement, that court held, it would

19   be unenforceable because the federal "CAA bars Virginia from attempting to enforce any

20   standard relating to the control of emissions."  *Id.*  Indeed, the Clean Air Act "protects the

21   authority of the states to regulate air pollution" in a number of ways, but "with the exception of

22   … standards for new motor vehicles."  *Exxon Mobil Corp. v. U.S. Environmental Protection

23   Agency*, 217 F.3d 1246, 1254, 1255 (9th Cir. 2000).  In other words, only the EPA can regulate

24   new vehicle emissions standards, and any state implementation plans are irrelevant.

25

26

27   [34] U.S. Envtl. Protection Agency, Frequent Questions about Volkswagen Violations,
     https://www.epa.gov/vw/frequent-questions-about-volkswagen-violations (last visited Aug. 29,
28   2016).

1319495.9

1   Moreover, as this Court already held in denying Fleshman's earlier motion to intervene,

2   "Fleshman may not object on behalf of all Virginia class members. Objecting to a settlement is an

3   individual right that Fleshman cannot usurp from others….Virginia class members can evaluate

4   the Settlement and decide for themselves if they should participate, object, or opt out. Fleshman

5   cannot choose for them."  Dkt. No. 1742 at 6-7.  Notwithstanding his posturing, Fleshman's

6   standing to object does not extend beyond ***his*** claim, and if he does not wish to release that claim

7   he could have elected to opt out.  He did not.

8   ### G.    Objections Concerning "Reversion" Should be Overruled.

9   Some Class members object to what they describe as a "reversion" provision in the

10   Settlement[35]—although they label different clauses of the agreement as the purported reversion

11   language.  *Compare* Kangas Objection (Dkt. No. 1826) at 9 (citing Settlement § 2.42), *with*

12   Chechik Objection (Dkt. No. 1869) at 11 (citing Settlement § 10.3).  These objections

13   misconstrue the Settlement and the manner in which it would operate.

14   Through the Settlement, each Class member is guaranteed to receive his or her full

15   recovery.  If every Class member participated (*i.e.*, there were no opt-outs), and all of them chose

16   the Buyback option, then the Class members' collective compensation would amount to

17   $10,033,000,000—defined as the "Funding Pool" in the Settlement.  Settlement (Dkt. No. 1685)

18   § 2.42.  Pursuant to Section 10.1 of the Settlement, the Parties will set up an escrow account with

19   an initial $1.5 billion deposit to compensate Class members; this account must be replenished

20   whenever it dips below a certain threshold (initially $1.25 billion).  The creation of this escrow

21   account and maintenance of a minimum balance were negotiated by Class Counsel for the benefit

22   of the Class to facilitate timely payment of claims.

23   Moreover, concerns that Volkswagen will somehow avoid expending the majority of the

24   funds in the Funding Pool are misplaced.  Volkswagen has enormous financial incentive to

25   encourage as much Settlement participation as it can.  Under the related DOJ Consent Decree,

26   Volkswagen has stipulated to pay an additional $98.5 million ($85 million to a federal trust, and

27

---

28   [35] *E.g.* Kangas objection (Dkt. No. 1826) at 9-10; Chechik objection (Dkt. No. 1869) at 11-12; G. Siewert objection (Dkt. No. 1895) at 2-3; S. Siewert objection (Dkt. No. 1877) at 3-5.

1319495.9

1    $13.5 million to a California trust) for every 1% that the Settlement participation rate falls below

2    the 85% threshold.  DOJ Consent Decree, App'x A (Dkt. No. 1605-1) § 6.3.  These fines are

3    steep and will properly motivate Volkswagen to help drive a robust turnout.  In any case, the opt-

4    out deadline of September 16, 2016 already has passed, and 99% of Class members decided to

5    remain in the Class.  Therefore, 99% of the Funding Pool remains in play, available to be paid out

6    to Class members.  These Class Members, in deciding between a buyback or a fix, will determine

7    how much is spent, when it is paid out, and how it is allocated.

8         Finally, even if this Settlement contained a traditional reversion clause, such a clause

9    would still not be a basis for denying approval.  Courts generally concerned about reversion

10   clauses have approved settlements containing them where other considerations support

11   approval—as is the case here.  For example, one court placed weight on the fact that "a

12   significant portion of the class participated in the settlement, and the average class member

13   recovery is at least $1,200" in approving a settlement despite concerns about traditional reversion

14   clauses.  *Lemus v. H & R Block Enterprises LLC.*, No. C 09-3179 SI, 2012 WL 3638550, at *5

15   (N.D. Cal. Aug. 22, 2012); *Hightower v. J.P. Morgan Chase Bank, N.A.,* 2015 U.S. Dist. LEXIS

16   174314, at *21 (C.D. Cal. Aug. 4, 2015).  And courts' concerns about reversion clauses are often

17   coupled with concern about possible collusion in reaching the settlement.  *See, e.g.*, *Mirfasihi v.*

18   *Fleet Mortg. Corp.*, 356 F.3d 781, 785 (7th Cir 2004).  Here, there are no indicia of collusion, as

19   the Court has held.  *See* Dkt. No. 1746 at 5 ("[T]he Court carefully reviewed the Settlement in light

20   of the factors set forth in *In re Bluetooth* . . . for signs of collusion.  It found none.") (record citations

21   omitted).  The settlement process was extensive and hard fought—and led by an independent,

22   well-respected, court-appointed mediator.  Moreover, no agreement has been reached on

23   attorneys' fees, and the eventual PSC request is capped at the equivalent of a very low percentage

24   of the overall settlement value—far below the Ninth Circuit benchmark.  The absence of

25   collusion therefore further establishes that objections about supposed "reversion" are unfounded

26   and not a basis for denying final approval.

27

28

**H.      The Remaining Objections Should Be Overruled.**

       **1.      Objections Regarding Private Counsel Attorneys' Fees Are Premature.**

Some objectors contend the Settlement should be rejected because it fails to compensate those Class members' private attorneys who were ***not*** selected by the Court as Class Counsel. *See, e.g.*, D'Angelo Objection (Dkt. No. 1862); Barrera Objection (Dkt. No. 1863); Andrianos Objection (Dkt. No. 1876); Labudde Objection (Dkt. No. 1887); Collins Objection (Dkt. No. 1889).  These objections are premature as there is no proposed distribution of attorneys' fees before the Court.  It would be unseemly to have lawyers try, in effect, to place a lien on a class settlement process until their fees are guaranteed.

       **2.      The Cutoff Date for "Eligible Seller" Class Members Is Neither Arbitrary Nor Unfair.**

Under the terms of the settlement, "'Eligible Seller' means a person who purchased or otherwise acquired an Eligible Vehicle on or before September 18, 2015, and sold or otherwise transferred ownership of such vehicle after September 18, 2015, but before June 28, 2016."  Dkt. No. 1685 at ¶ 2.31.  One objector, Wheels Inc., argues the cutoff date for Eligible Seller Class members is arbitrary.  Dkt. No. 1882 at 2.   Of necessity, any cut-off date is subject to challenge as arbitrary—it could always be moved one day forward or back.  The key is that no one is harmed by the cut-off date.  Vehicles sold after June 28, 2016, are not included in the Settlement.  To the extent that Wheels believes it is entitled to compensation for those transactions, it can pursue them against Volkswagen individually.

Moreover, there is nothing arbitrary about the use of June 28, 2016, as the cutoff date.  That is the date of Class Counsel's filing of the motion for preliminary approval of the Settlement.  The settlement announcement was preceded by approximately one month of extensive publicity as to the issues and likely terms of the settlement.  Individuals who sold their Vehicles after the announcement of the Settlement are differently situated that those who did so before the Settlement.  For example, parties to transactions that took place after the announcement of the Settlement had knowledge that a Buyback program was in place, which

1   certainly affected the pricing of the vehicles.  Class members who sold their vehicles prior to the

2   announcement of the Settlement did not enjoy these same certainties.

3       Wheels' objection to final approval of the Settlement based on the cutoff date for Eligible

4   Seller Class members should be overruled.

5           **3.       The Deadline for Eligible Sellers to Register Is Fair.**

6       Objector Autoport objects to final approval of the Settlement and argues that the opt-in

7   period for Eligible Seller Class members is too short.  Dkt. No. 1879.  The Settlement requires

8   Eligible Sellers to identify themselves to the Court within forty-five days of preliminary

9   approval—*i.e.*, by September 16, 2016.[36]  As of that date, over 13,900 had done so.  Autoport

10  fails to show that the deadline already approved by the Court is unfair to Class members, or that

11  there is any legal requirement for a longer period.[37]

12      Moreover, the objection ignores that, under the Settlement, Eligible Owners who

13  purchased their vehicles after September 18, 2015 are entitled to a share of any funds not claimed

14  by Eligible Sellers.  Accordingly, the Eligible Sellers must be an identified set before it is

15  possible to determine compensation and begin Buyback.  Deferring the Eligible Seller deadline

16  would unnecessarily delay compensation to Class members and removal of the Vehicles from the

17  road.

18      Finally, Autoport alleges that it never received notice of the Settlement, despite the fact

19  that it had actual knowledge of the Settlement and that was able to file its objection in a timely

20  manner.  Instead, Autoport speculates that there must be "hundreds if not thousands" of dealers

21
22  [36] "Eligible Seller Identification Period" means the time period in which an Eligible Seller must
    identify himself, herself, or itself, by (1) electronic registration on the Settlement Website or (2)
    submission of an Eligible Seller identification form by mail or fax. The Eligible Seller
23  Identification Period will last at least 45 days from entry of the Preliminary Approval Order. If
    the Court enters the Preliminary Approval Order on July 26, 2016 (the date of the preliminary
24  approval hearing), the Eligible Seller Identification Period will run until September 16, 2016, the
    same date as the Opt-Out Deadline. Eligible Sellers who do not identify themselves during that
25  time period will not be eligible for a Restitution Payment under this Class Action Agreement."
    Settlement (Dkt. No. 1685) ¶ 2.32.
26  [37] None of the cases Autoport cites supports its contention that there is a ***requirement*** for a longer
    notice period or that the forty-five day notice period here is unfair.  Indeed, none of Autoport's
27  cited cases even pertain to consumer class action settlements; rather, *every* case Autoport cites is
    a conditional collective action certification order under the Fair Labor Standards Act ("FLSA"),
28  which requires class members to affirmatively opt in in order to participate.

1319495.9

1   nationwide who did not receive notice.  Autoport offers no evidence to support its speculation,

2   and it is belied by the fulsome direct and media notice, including direct notice to resellers and

3   their trade organizations, described in the accompanying Declaration of Shannon R. Wheatman,

4   at ¶¶ 39-40.  Instead, Autoport attempts to offer its objection on behalf of some hypothetical

5   dealership that did not receive notice.  Autoport has no authority to speak for anyone other than

6   itself, and Autoport was able to timely file an objection and thus timely register itself as an

7   Eligible Seller.  Indeed, the requirements for registration as an Eligible Seller are far less onerous

8   than filing its objection.

9            **4.      No Health or Personal Injury Claims Are Released by the Settlement.**

10          Objectors Susan and Douglass Day argue the Settlement is inadequate to compensate

11  Class members such as themselves who sold their vehicles prior to the Settlement date because of

12  an alleged belief that the vehicles were causing them personal injuries that they believe to be

13  related to $NO_X$ emissions.  Dkt. No. 1857.

14          As they themselves acknowledge, personal injury claims are not included in or released by

15  the Settlement.  The Days are free to pursue personal injury claims against Volkswagen or any

16  other entity they believe responsible.  Contrary to the Days' suggestion, they do not need the

17  involvement of or dispensation from either the DOJ or the EPA to do so.  The Days' objections to

18  final approval should be overruled.

19          **5.      The Environmental Remediation Fund Should Not Be Distributed to
                        Class Members.**
20

21          Objector Weese objects to final approval of the Settlement because she believes funds to

22  be paid by Volkswagen to government agencies for "environmental remediation and public

23  awareness" should be paid directly to Class members.  Dkt. No. 1864 at 3.  Weese's objection

24  lacks merit.  While the three settlement agreements all address Volkswagen's behavior, the laws

25  applicable to and available to the DOJ, FTC, and private plaintiffs are separate and distinct.  Class

26  members have no legal claim or entitlement to the funds paid to the DOJ and EPA as statutory

27  penalties.  Weese's objection should be overruled.

28

1319495.9

6.   **Class Counsel's Request to Defer Decision on a Motion to Remand or Opposition to a Motion to Intervene Does Not Create a Conflict with the Interests of the Class.**

Some objectors complain that "Settlement counsel have repeatedly asked this court to delay any ruling on motions to remand." and "Settlement Class Counsel have also filed motions in opposition to class members attempts to intervene and to conduct discovery in order to determine whether settlement was in a class member's best interest." Barrera Objection (Dkt. No. 1863) at 6. It is not clear how or why the Barrera Objectors believe that Class Counsel's request that the Court defer (not deny) a motion to remand adversely affected any Class member, let alone the Class as a whole. It did not.

The Barrera Objectors argue that Class Counsel's opposition to fellow objector Kangas' motion to intervene to conduct discovery into the Settlement itself somehow evidences a conflict of interest. But the Barrera Objectors again fail to explain how the opposition was adverse to the interests of the Class rather than adverse to the wishes of the attorney for a single Class member. That opposition was **not** adverse to the interests of the Class. Intervention was unnecessary and unwarranted. District courts thus routinely deny attempts at the underlying discovery requests as inimical to the Court's exclusive control and independent decision making under Rule 23(e). *See* Newberg on Class Actions § 13:32 (5th ed.) (collecting cases). Indeed, as the Court rightly found, denying discovery was not adverse to even Kangas' own interests: "Kangas may opt out of the Settlement and litigate his claims independently. This adequately protects his interests." Dkt. No. 1746 at 3-4 (internal record citation omitted). The Court has already ruled on Kangas' attempts to derail this Settlement; the Barrera Objectors offer nothing new by claiming that Class Counsel's opposition to those attempts indicates a conflict.

7.   **The Selection of Settlement Master Robert Mueller Does Not Create a Conflict with the Interests of the Class.**

Objector Kangas objects to final approval of the Settlement by attacking the impartiality of both the Court and Settlement Master Robert Mueller. Dkt. No. 1826. According to Mr. Kangas, because other attorneys at WilmerHale represent Volkswagen in areas other than this litigation, Settlement Master Mueller "will profit from WilmerHale's representation of

Volkswagen regarding diesel emission tax liabilities in the United States." at 2-3.  This conclusion is unfounded.  In his declaration, Settlement Master Mueller states that he was walled off from his firm's representation of Volkswagen in other matters.  Nevertheless, Kangas asserts his representation "demonstrates a lack of civil litigation experience" and that "the wall separating Mr. Mueller from his law firm was made of tissue paper."  *Id.* at 3.  Kangas offers no evidence in support of his accusations, and they are contradicted by Settlement Master Mueller's declaration.[38]  Moreover, the Court is familiar with Settlement Master Mueller's years of public service as an Assistant United States Attorney, United States Attorney, and Director of the Federal Bureau of Investigation.

Kangas is represented by serial objector Frederic Fletcher.  This is not Mr. Fletcher's first time making unfounded arguments against class action settlements and falsely alleging collusion in the process.  *Id.* at 3.  Mr. Fletcher represented himself as an objector before the United States District Court for the District of Columbia, which wrote:

> While objector Fletcher alleges, without support, that "[t]he Settlement favors LivingSocial to such an unprecedented degree that collusion must have occurred" (Fletcher Obj. at 4), his assumption is based on a flawed understanding of the settlement agreement and the release.

*In re LivingSocial Mktg. & Sales Practice Litig.*, 298 F.R.D. 1, 11 (D.D.C. 2013).

In alleging "cronyism" and conflict, Kangas, of course, conveniently ignores the language of the Court's order that clearly states "Mr. Mueller will not adjudicate, or assist the Court with adjudicating, any issues in these consolidated proceedings; rather, his role will be to use his considerable experience and judgment to facilitate settlement discussions among the various

---

[38] Among the litany of Kangas' other unfounded objections is a complaint about tax implications. Kangas wrongly believes that the Settlement "puts the tax burden on the consumer while Volkswagen is insulated.  On tax matters Volkswagen was adequately represented by WilmarHale [sic], but the class members are forced to fend for themselves in this complex litigation."  Dkt. No. 1826 at 3.  Kangas bases this statement on a single clause in the Settlement that in fact discloses that Class members may have tax advantages and should consult their personal tax advisor for assistance.  At best, Kangas' complaint regarding the tax implications paragraph can be interpreted as dissatisfaction that the Settlement does not provide for Volkswagen or Class Counsel to pay for Class members' tax preparation fees.  This is, of course, utter nonsense.  Regarding the accusation that Class members must "fend for themselves," Mr. Kangas ignores that Class Counsel have been appointed and have been and are working on their behalf.

1319495.9

1   parties in these complex matters."  Dkt. No. 797 at 2.  As the Court is well aware, Settlement

2   Master Mueller was not in a position to force terms of the Settlement to favor or disfavor either

3   side.   Rather, he was there to facilitate Settlement, and his ultimate goal was accomplished to the

4   satisfaction of all parties, including three federal agencies, two state agencies, and the class

5   plaintiffs:  an atmosphere in which cronyism could neither survive nor flourish.  All such

6   insinuations and accusations are belied by the actual account of the settlement process.  *See*

7   Mueller Decl. ¶ 2.

8        Kangas completes his objection about the Settlement Master with a conspiracy theory

9   regarding the consent decrees Volkswagen reached with the FTC and DOJ and President

10  Obama's negotiation of the Trans-Atlantic Trade and Investment Partnership.  Dkt. No. 1826 at 4.

11  There is no basis to consider fancifully speculative effects on international trade policy in

12  determining the fairness and adequacy of this Settlement.

13       Kangas' objections to final approval of the Settlement based on the involvement of

14  Special Master Mueller are unfounded, inaccurate, and irrelevant; they should be overruled.  The

15  Court also has discretion to impose sanctions on counsel for publicly filing such factually and

16  legally baseless accusations.  *See* Fed. R. Civ. P. 11.

17             **8.    Benefits from the Goodwill Program Are Properly Not Part of the
                       Settlement.**
18

19       A number of Class members raised objections related to the "goodwill program" offered

20  by Volkswagen, arguing the goodwill payment should be available even though they missed the

21  April 30, 2016, deadline to request it.  Because the goodwill program was separate from this

22  litigation, and did not affect Class members' claims in this litigation, it has no relevance to the

23  determination of final approval.

24             **9.    The Other Remaining Objections Should Also Be Overruled.**

25       A number of Class members raised objections that, while not expressly requesting more

26  money, argued for additional benefits including loaner cars, transportation to a Volkswagen

27  dealership, and extended warranties or special financing from Volkswagen.  All of these

28  objections fall into the category of "the settlement should be better."  As Professor Klonoff notes

1319495.9

PLAINTIFFS' REPLY MEMORANDUM
IN SUPPORT OF FINAL APPROVAL
MDL 2672 CRB (JSC)

in his Declaration, which analyzes the variety of objections going to the adequacy of class relief, some Class members opined not that they should get more, but that other should get less.  The Settlement procedure facilitated he expression of all views, from a highly-interested and concerned group.  Of course, this Court "must evaluate the fairness of a settlement as a whole, rather than assessing its individual components." *Lane*, 696 F.3d at 818-19.  In this regard, as the Ninth Circuit cautioned, "settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon,* 150 F.3d at 1027.  The Settlement's failure to offer every feature every Class member can dream of does not render it unfair, inadequate, or unreasonable.

One possible alternative to this Class Action Settlement could have been a more individualized, *ad hoc* claims program that evaluated each consumer's claims based upon her particular, and subjective, circumstances.  Objector Comlish, for example, seems to prefer the never-effectuated proposed program to have been administered by Mr. Feinberg.  To our knowledge, Mr. Feinberg, who has a well-earned reputation for tackling challenging compensation scenarios, never actually considered, processed, or paid any Volkswagen claims under such a regime, most likely because the prospects of actually doing so quickly became impracticable.  Such a program, applied to nearly 500,000 claims, would certainly be inferior to the transparent, consistent, and easily calculable provisions of the Settlement that actually came to pass.  From a Fed. R. Civ. P. 23(b)(3) standpoint, a class structure is superior of the available *ad hoc* alternative, as a matter of speed, objectivity, and administrative cost-effectiveness.

One Class member objected that the process should move faster, that the proposed timeline of the Settlement was not being met by Volkswagen, and that the vehicles should be bought back on a first-in, first-out basis.  Speed does matter, and the Class members are eager to receive its benefits.  Those benefits will start essentially immediately, upon the final approval of the Settlement by this Court.

Finally, a number of Class members objected and voiced opposition to the Settlement, or support for less payment, or no liability, by Volkswagen, due to opposition to environmental regulations or to the very existence of federal agencies.  Everyone is entitled to an opinion.

- 40 -

However, "[b]ecause such objections appear to support no recovery for the Class, these objectors'

interests are adverse to the Class" and such objections should be overruled.  *Perkins*, No. 13-CV-

04303-LHK, 2016 WL 613255, at *4 (citations omitted).

## IV.   CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant final

approval of the 2.0-liter TDI consumer and reseller dealer Class Action Settlement.

Dated:  September 30, 2016

Respectfully submitted,

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

By:  */s/ Elizabeth J. Cabraser*
Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone: 415.956.1000
Facsimile:  415.956.1008
E-mail: *ecabraser@lchb.com*

*Plaintiffs' Lead Settlement Class Counsel*

Benjamin L. Bailey
BAILEY GLASSER LLP
209 Capitol Street
Charleston, WV 25301
Telephone: 304.345.6555
Facsimile:  304.342.1110
E-mail: *bbailey@baileyglasser.com*

Steve W. Berman
HAGENS BERMAN
1918 8th Avenue, Suite 3300
Seattle, WA  98101
Telephone: 206.623.7292
Facsimile: 206.623.0594
E-mail: *steve@hbsslaw.com*

David Boies
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY  10504
Telephone: 914.749.8200
Facsimile:  914.749.8300
E-mail: *dboies@bsfllp.com*

David Seabold Casey, Jr.
CASEY GERRY SCHENK FRANCAVILLA
BLATT & PENFIELD, LLP
110 Laurel Street
San Diego, CA  92101-1486
Telephone: 619.238.1811
Facsimile:  619.544.9232
E-mail: *dcasey@cglaw.com*

James E. Cecchi
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO P.C.
5 Becker Farm Road
Roseland, NJ  07068-1739
Telephone: 973.994.1700
Facsimile:  973.994.1744
E-mail: *jcecchi@carellabyrne.com*

Roxanne Barton Conlin
ROXANNE CONLIN & ASSOCIATES, P.C.
319 Seventh Street, Suite 600
Des Moines, IA  50309
Telephone: 515.283.1111
Facsimile:  515.282.0477
E-mail: *roxlaw@aol.com*

PLAINTIFFS' REPLY MEMORANDUM
IN SUPPORT OF FINAL APPROVAL
MDL 2672 CRB (JSC)

1319495.9

1    Jayne Conroy                      Paul J. Geller

Jayne Conroy
SIMMONS HANLY CONROY LLC
112 Madison Avenue
New York, NY 10016-7416
Telephone: 212.784.6400
Facsimile: 212.213.5949
E-mail: *jconroy@simmonsfirm.com*

Paul J. Geller
ROBBINS GELLER RUDMAN &
DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561.750.3000
Facsimile: 561.750.3364
E-mail: *pgeller@rgrdlaw.com*

Robin L. Greenwald
WEITZ & LUXENBERG P.C.
700 Broadway
New York, NY 10003
Telephone: 212.558.5500
Facsimile: 212.344.5461
E-mail: *rgreenwald@weitzlux.com*

Michael D. Hausfeld
HAUSFELD
1700 K Street, N.W., Suite 650
Washington, DC 20006
Telephone: 202.540.7200
Facsimile: 202.540.7201
E-mail: *mhausfeld@hausfeld.com*

Michael Everett Heygood
HEYGOOD, ORR & PEARSON
6363 North State Highway 161, Suite 450
Irving, TX 75038
Telephone: 214.237.9001
Facsimile: 214.237-9002
E-mail: *michael@hop-law.com*

Adam J. Levitt
GRANT & EISENHOFER P.A.
30 North LaSalle Street, Suite 2350
Chicago, IL 60602
Telephone: 312.610.5400
Facsimile: 312.214.0001
E-mail: *alevitt@gelaw.com*

W. Daniel "Dee" Miles III
BEASLEY ALLEN LAW FIRM
218 Commerce Street
Montgomery, AL 36104
Telephone: 800.898.2034
Facsimile: 334.954.7555
E-mail: *dee.miles@beasleyallen.com*

Frank Mario Pitre
COTCHETT PITRE & McCARTHY LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: 650.697.6000
Facsimile: 650.697.0577
E-mail: *fpitre@cpmlegal.com*

Joseph F. Rice
MOTLEY RICE, LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Telephone: 843.216.9000
Facsimile: 843.216.9450
E-mail: *jrice@motleyrice.com*

Rosemary M. Rivas
FINKELSTEIN THOMPSON LLP
One California Street, Suite 900
San Francisco, CA 94111
Telephone: 415.398.8700
Facsimile: 415.393.8704
E-mail: *rrivas@finkelsteinthompson.com*

Lynn Lincoln Sarko
KELLER ROHRBACK L.L.P.
1201 3rd Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: 206.623.1900
Facsimile: 206.623.3384
E-mail: *lsarko@kellerrohrback.com*

Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, NY 10005-4401
Telephone: 212.584.0700
Facsimile: 212.584.0799
E-mail: *cseeger@seegerweiss.com*

1   J. Gerard Stranch IV                          Roland K. Tellis
    BRANSTETTER, STRANCH &                        BARON & BUDD, P.C.
2   JENNINGS, PLLC                                15910 Ventura Boulevard, Suite 1600
    223 Rosa L. Parks Avenue, Suite 200           Encino, CA  91436
3   Nashville, TN  37203                          Telephone: 818.839.2320
    Telephone: 615.254.8801                       Facsimile:  818.986.9698
4   Facsimile: 615.250.3937                       E-mail: *trellis@baronbudd.com*
    E-mail: *gerards@bsjfirm.com*
5
    Lesley Elizabeth Weaver
6   BLEICHMAR FONTI & AULD LLP
    1901 Harrison Street, Suite 1100
7   Oakland, CA 94612
    Telephone: 510.844.7759
8   Facsimile: 510.844.7701.
    E-mail: *lweaver@bfalaw.com*
9
                            *Plaintiffs' Settlement Class Counsel*
10
11  Samuel Issacharoff
    40 Washington Square South
12  New York, NY
    (212) 998-6580
13  sil3@nyu.edu

14                                     *On the Brief*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1319495.9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that, on September 30, 2016, service of this document was accomplished pursuant to the Court's electronic filing procedures by filing this document through the ECF system.

*/s/ Elizabeth J. Cabraser*
Elizabeth J. Cabraser

1319495.9

PLAINTIFFS' REPLY MEMORANDUM
IN SUPPORT OF FINAL APPROVAL
MDL 2672 CRB (JSC)