1  Elizabeth J. Cabraser (State Bar No. 083151)
   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2  275 Battery Street, 29th Floor
   San Francisco, CA  94111-3339
3  Telephone:  415.956.1000
   Facsimile:  415.956.1008
4  E-mail: ecabraser@lchb.com

5  *Lead Counsel for Plaintiffs*
   *(Plaintiffs' Steering Committee Members*
6  *Listed on Signature Page)*

7                  UNITED STATES DISTRICT COURT

8               NORTHERN DISTRICT OF CALIFORNIA

9                    SAN FRANCISCO DIVISION

10

11  IN RE: VOLKSWAGEN 'CLEAN DIESEL'
12  MARKETING, SALES PRACTICES, AND          MDL 2672 CRB (JSC)
    PRODUCTS LIABILITY LITIGATION
13

14  This Document Relates to:                **CONSOLIDATED CONSUMER CLASS
                                             ACTION COMPLAINT**
15  ALL CONSUMER ACTIONS
                                             JURY TRIAL DEMANDED
16
    LENA BROOK, *et al.*, on behalf of themselves
17  and all others similarly on behalf of all others
    similarly situated,
18
                    Plaintiffs,
19
    v.
20
    VOLKSWAGEN GROUP OF AMERICA,
21  INC., VOLKSWAGEN AG, AUDI AG, AUDI
    OF AMERICA, LLC, DR. ING. H.C. F.
22  PORSCHE AG, PORSCHE CARS NORTH
    AMERICA, INC., MARTIN WINTERKORN,
23  MATTHIAS MÜLLER, MICHAEL HORN,
    RUPERT STADLER, ROBERT BOSCH
24  GMBH, ROBERT BOSCH, LLC, and
    VOLKMAR DENNER,
25
26                  Defendants.

27

28



1292776 5

CONSOLIDATED CONSUMER CLASS
COMPLAINT MDL 2672 CRB (JSC)

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

JURISDICTION AND VENUE ....................................................................................... 5

INTRADISTRICT ASSIGNMENT ................................................................................. 5

PARTIES ......................................................................................................................... 6

    A.    Individual and Representative Plaintiffs ............................................... 6

        1.    Alabama Plaintiffs ..................................................................... 15

        2.    Alaska Plaintiffs ........................................................................ 16

        3.    Arizona Plaintiffs ...................................................................... 17

        4.    Arkansas Plaintiffs .................................................................... 19

        5.    California Plaintiffs .................................................................... 20

        6.    Colorado Plaintiffs .................................................................... 35

        7.    Connecticut Plaintiffs ................................................................ 37

        8.    Delaware Plaintiffs .................................................................... 39

        9.    District of Columbia Plaintiffs .................................................. 41

        10.    Florida Plaintiffs ........................................................................ 41

        11.    Georgia Plaintiffs ...................................................................... 43

        12.    Hawaii Plaintiffs ........................................................................ 45

        13.    Idaho Plaintiffs .......................................................................... 47

        14.    Illinois Plaintiffs ........................................................................ 48

        15.    Indiana Plaintiffs ....................................................................... 51

        16.    Iowa Plaintiffs ........................................................................... 52

        17.    Kansas Plaintiffs ........................................................................ 55

        18.    Kentucky Plaintiffs .................................................................... 57

        19.    Louisiana Plaintiffs .................................................................... 58

        20.    Maine Plaintiffs ......................................................................... 60

        21.    Maryland Plaintiffs .................................................................... 62

        22.    Massachusetts Plaintiffs ............................................................ 65

        23.    Michigan Plaintiffs .................................................................... 70

        24.    Minnesota Plaintiffs ................................................................... 73

        25.    Mississippi Plaintiffs ................................................................. 77

        26.    Missouri Plaintiffs ..................................................................... 78

        27.    Montana Plaintiffs ..................................................................... 80

        28.    Nebraska Plaintiffs ..................................................................... 82

1292776.5

CONSOLIDATED CONSUMER CLASS
COMPLAINT MDL 2672 CRB (JSC)

| | | |
|---|---|---|
| 29. | Nevada Plaintiffs | 83 |
| 30. | New Hampshire Plaintiffs | 85 |
| 31. | New Jersey Plaintiffs | 86 |
| 32. | New Mexico Plaintiffs | 90 |
| 33. | New York Plaintiffs | 92 |
| 34. | North Carolina Plaintiffs | 95 |
| 35. | North Dakota Plaintiffs | 98 |
| 36. | Ohio Plaintiffs | 99 |
| 37. | Oklahoma Plaintiffs | 100 |
| 38. | Oregon Plaintiffs | 101 |
| 39. | Pennsylvania Plaintiffs | 104 |
| 40. | Rhode Island Plaintiffs | 106 |
| 41. | South Carolina Plaintiffs | 107 |
| 42. | South Dakota Plaintiffs | 108 |
| 43. | Tennessee Plaintiffs | 109 |
| 44. | Texas Plaintiffs | 111 |
| 45. | Utah Plaintiffs | 113 |
| 46. | Vermont Plaintiffs | 116 |
| 47. | Virginia Plaintiffs | 117 |
| 48. | Washington Plaintiffs | 122 |
| 49. | West Virginia Plaintiffs | 124 |
| 50. | Wisconsin Plaintiffs | 126 |
| 51. | Wyoming Plaintiffs | 127 |
| B. | Defendants | 128 |
| 1. | Volkswagen AG | 128 |
| 2. | Volkswagen Group of America, Inc. | 129 |
| 3. | Audi AG | 129 |
| 4. | Audi of America, LLC | 130 |
| 5. | Dr. Ing. h.c. F. Porsche AG | 130 |
| 6. | Porsche Cars North America, Inc. | 130 |
| 7. | Martin Winterkorn | 131 |
| 8. | Matthias Müller | 131 |
| 9. | Michael Horn | 132 |
| 10. | Rupert Stadler | 132 |
| 11. | Robert Bosch GmbH | 133 |
| 12. | Robert Bosch, LLC | 133 |
| 13. | Volkmar Denner | 133 |

COMMON FACTUAL ALLEGATIONS ................................................................. 134

    A.    Volkswagen's Plot to Dominate the Automotive Market ..................... 134

    B.    Defendants' "Defeat Device" Scheme ................................................. 139

    C.    Volkswagen's "Clean" Diesel Advertising Campaign ........................ 145

        1.    VW's False and Misleading Advertisements ............................ 146

        2.    Audi's False and Misleading Advertisements .......................... 156

        3.    Porsche's False and Misleading Advertisements ..................... 160

        4.    Volkswagen's Nationwide Advertising Campaign Was Highly Effective, and Volkswagen Profited Handsomely from Selling the Class Vehicles ........................................................................... 162

    D.    Defendants' Dirty Diesel Scheme Starts to Unravel ........................... 163

    E.    Once Caught, Volkswagen Admitted its Fraud—in Part ..................... 165

    F.    Volkswagen's Failed Attempts at Remedial Action ........................... 175

    G.    Volkswagen Caused Billions of Dollars in Harm to U.S. Consumers ............... 176

    H.    Defendants' Illegal Scheme Caused Health Risks and Quantifiable Harm to the Environment ............................................................................ 178

TOLLING OF THE STATUTES OF LIMITATIONS .............................................. 182

CLASS ACTION ALLEGATIONS ....................................................................... 183

CLAIMS FOR RELIEF ......................................................................................... 193

FEDERAL CLAIMS .............................................................................................. 193

    FEDERAL COUNT I:  Violation of 18 U.S.C. § 1962(c)-(d) The Racketeer Influenced And Corrupt Organizations Act ("RICO") ......................... 193

    A.    Description of the Defeat Device RICO Enterprise ............................ 194

        1.    The Volkswagen Entity Defendants ........................................ 196

        2.    The Volkswagen Entity Defendants' Directors, Officers, and Engineers ................................................................................. 197

            a.    Martin Winterkorn ........................................................ 198

            b.    Matthias Müller ............................................................ 198

            c.    Michael Horn ............................................................... 199

            d.    Rupert Stadler .............................................................. 199

            e.    Scott Keogh .................................................................. 200

            f.    Detlev von Platen ......................................................... 200

            g.    Ulrich Hackenberg ....................................................... 201

            h.    Frank Tuch .................................................................... 202

            i.    Wolfgang Hatz ............................................................. 202

        3.    The Bosch Defendants .............................................................. 203

    B.    The Defeat Device RICO Enterprise Sought to Increase Defendants' Profits and Revenues ......................................................................... 204

    C.    Mail and Wire Fraud ........................................................................ 208

FEDERAL COUNT II: Violation of 15 U.S.C. §§ 2301, *et seq*., The Magnuson-Moss Warranty Act ("MMWA") ...................................... 215

COMMON LAW CLAIMS .......................................................................... 217

COMMON LAW COUNT I: FRAUD ........................................................ 217

COMMON LAW COUNT II: BREACH OF CONTRACT ...................................... 220

COMMON LAW COUNT III: UNJUST ENRICHMENT ........................................ 221

STATE LAW CLAIMS ................................................................................... 222

ALABAMA ...................................................................................... 222

ALABAMA COUNT I: VIOLATION OF ALABAMA DECEPTIVE TRADE PRACTICES ACT (ALA. CODE § 8-19-1, *ET SEQ*.) ............... 222

ALABAMA COUNT II: BREACH OF EXPRESS WARRANTY (ALA. CODE §§ 7-2-313 AND 7-2A-210) ...................................................... 226

ALABAMA COUNT III: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (ALA. CODE §§ 7-2-314 AND 7-2A-212) ....... 230

ALASKA ........................................................................................... 231

ALASKA COUNT I: VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT (ALASKA STAT. § 45.50.471, *ET SEQ*.).................................................. 231

ALASKA COUNT II: BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (ALASKA STAT. §§ 45.02.314 AND 45.12.212) ......................................................................................... 235

ALASKA COUNT III: BREACH OF EXPRESS WARRANTY (ALASKA STAT. §§ 45.02.313 AND 45.12.210) .................................... 236

ARIZONA .......................................................................................... 240

ARIZONA COUNT I: VIOLATION OF THE CONSUMER FRAUD ACT (ARIZ. REV. STAT. § 44-1521, *ET SEQ*.) ...................................... 240

ARIZONA COUNT II: BREACH OF EXPRESS WARRANTY (ARIZ. REV. STAT. §§ 47-2313 AND 47-2A210) ................................................ 244

ARIZONA COUNT III: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (ARIZ. REV. STAT. §§ 47-2314 AND 47-2A212) ......................................................................................... 248

ARKANSAS ....................................................................................... 249

ARKANSAS COUNT I: VIOLATIONS OF THE DECEPTIVE TRADE PRACTICE ACT (ARK. CODE ANN. § 4-88-101, *ET SEQ*.)................ 249

ARKANSAS COUNT II: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (ARK. CODE §§ 4-2-314 AND 4-2A-212) ....... 253

ARKANSAS COUNT III: BREACH OF EXPRESS WARRANTY (ARK. CODE ANN. §§ 4-2-313 AND 4-2A-210) .................................... 254

CALIFORNIA .................................................................................... 258

CALIFORNIA COUNT I: VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT (CAL. CIV. CODE § 1750, ET SEQ.) .......... 258

CALIFORNIA COUNT II: VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE

§ 17200, *ET SEQ.*) .................................................................. 263

CALIFORNIA COUNT III:  VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.*) .................................................................................. 264

CALIFORNIA COUNT IV:  BREACH OF EXPRESS WARRANTY (CAL. COM. CODE §§ 2313 AND 10210) ............................................. 266

CALIFORNIA COUNT V:  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (CAL. COM. CODE §§ 2314 AND 10212) ....... 269

CALIFORNIA COUNT VI:  VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF EXPRESS WARRANTIES (CAL. CIV. CODE §§ 1791.2 & 1793.2(d)) ................. 271

CALIFORNIA COUNT VII: VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (CAL. CIV. CODE §§ 1791.1 AND 1792) ................................................................. 273

CALIFORNIA COUNT VIII: BREACH OF EXPRESS CALIFORNIA EMISSIONS WARRANTIES (Cal. Civ. Code §§ 1793.2, *et seq.*) .......... 275

CALIFORNIA COUNT IX:  FAILURE TO RECALL/RETROFIT ................ 277

COLORADO ............................................................................................ 278

COLORADO COUNT I:  VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT (Col. Rev. Stat. § 6-1-101, *et seq.*) ................................................................................... 278

COLORADO COUNT II:  BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (Col. Rev. Stat. §§ 4-2-313 and 4-2.5-212) ............................................................................................ 282

COLORADO COUNT III:  BREACH OF EXPRESS WARRANTY (Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-210) ............................... 283

CONNECTICUT ..................................................................................... 287

CONNECTICUT COUNT I:  VIOLATION OF CONNECTICUT UNLAWFUL TRADE PRACTICES ACT (Conn. Gen. Stat. § 42-110a, *et seq.*) ................................................................................. 287

CONNECTICUT COUNT II:  BREACH OF EXPRESS WARRANTY (Conn. Gen. Stat. Ann. § 42A-2-313) ....................................... 290

CONNECTICUT COUNT III:  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Conn. Gen. Stat. Ann. § 42A-2-314) .......... 294

DELAWARE ............................................................................................ 295

DELAWARE COUNT I:  VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT (6 Del. Code § 2513, *et seq.*)...................... 295

DELAWARE COUNT II:  BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (6 Del. Code §§ 2-314 and 2A-212)............ 299

DELAWARE COUNT III:  BREACH OF EXPRESS WARRANTY (6 DEL. CODE §§ 2-313 and 2A-210) ............................................. 300

DISTRICT OF COLUMBIA ..................................................................... 303

DISTRICT OF COLUMBIA COUNT I:  VIOLATION OF THE CONSUMER PROTECTION PROCEDURES ACT (D.C. Code

§ 28-3901, *et seq*.) ..................................................................... 303

DISTRICT OF COLUMBIA COUNT II:  BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (D.C. Code §§ 28:2-314
and 28:2A-212) ......................................................................... 308

DISTRICT OF COLUMBIA COUNT III:  BREACH OF EXPRESS
WARRANTY (D.C. Code §§ 28:2-313 and 28:2A-210) ................ 309

FLORIDA ....................................................................................... 313

FLORIDA COUNT I:  VIOLATION OF FLORIDA'S UNFAIR &
DECEPTIVE TRADE PRACTICES ACT (Fla. Stat. § 501.201, *et
seq*.) ........................................................................................... 313

FLORIDA COUNT II:  BREACH OF EXPRESS WARRANTY (F.S.A.
§§ 672.313 and 680.21) .............................................................. 316

FLORIDA COUNT III:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (F.S.A. §§ 672.314 and 680.212) ............. 320

GEORGIA ...................................................................................... 321

GEORGIA COUNT I:  VIOLATION OF GEORGIA'S FAIR BUSINESS
PRACTICES ACT (Ga. Code Ann. § 10-1-390, *et seq*.) ........... 321

GEORGIA COUNT II:  VIOLATION OF GEORGIA'S UNIFORM
DECEPTIVE TRADE PRACTICES ACT (Ga. Code Ann. § 10-1-
370, *et seq*.) ............................................................................. 325

GEORGIA COUNT III:  BREACH OF EXPRESS WARRANTY (Ga.
Code. Ann. §§ 11-2-313 and 11-2A-210) ................................... 328

GEORGIA COUNT IV:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Ga. Code. Ann. §§ 11-2-314 and 11-2A-
212) ........................................................................................... 332

HAWAII ........................................................................................ 333

HAWAII COUNT I:  UNFAIR AND DECEPTIVE ACTS IN
VIOLATION OF HAWAII LAW (Haw. Rev. Stat. § 480, *et seq*.) ......... 333

HAWAII COUNT II:  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (Haw. Rev. Stat. §§ 490:2-314 and 490:2A-
212) ........................................................................................... 337

HAWAII COUNT III:  BREACH OF EXPRESS WARRANTY (Haw.
Rev. Stat. §§ 490:2-313 and 490:2A-210) .................................. 338

IDAHO .......................................................................................... 342

IDAHO COUNT I:  VIOLATION OF THE IDAHO CONSUMER
PROTECTION ACT (IDAHO CODE § 48-601, *ET SEQ*.) ............. 342

IDAHO COUNT II:  BREACH OF EXPRESS WARRANTY (IDAHO
CODE §§ 28-2-313 AND 28-12-210) ......................................... 346

IDAHO COUNT III:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Idaho Code §§ 28-2-314 and 28-12-212) .......... 350

ILLINOIS ...................................................................................... 351

ILLINOIS COUNT I:  VIOLATION OF ILLINOIS CONSUMER
FRAUD AND  DECEPTIVE BUSINESS PRACTICES ACT (815
ILCS 505/1, *ET SEQ*. AND 720 ILCS 295/1a) ........................ 351

ILLINOIS COUNT II:  BREACH OF EXPRESS WARRANTY (810 Ill.
Comp. Stat. §§ 5/2-313 and 5/2A-210) ...................................... 355

ILLINOIS COUNT III:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-
212) ..................................................................................... 359

INDIANA ........................................................................................ 360

INDIANA COUNT I:  VIOLATION OF THE INDIANA DECEPTIVE
CONSUMER SALES ACT (Ind. Code § 24-5-0.5-3) .............................. 360

INDIANA COUNT II:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Ind. Code §§ 26-1-2-314 and 26-1-2.1-212) ..... 364

INDIANA COUNT III:  BREACH OF EXPRESS WARRANTY (Ind.
Code §§ 26-1-2-313 and 26-1-2.1-210) .................................... 365

IOWA ............................................................................................. 369

IOWA COUNT I:  VIOLATIONS OF THE PRIVATE RIGHT OF
ACTION  FOR CONSUMER FRAUDS ACT (**Iowa Code** § 714h.1,
*et seq.*) ................................................................................. 369

IOWA COUNT II:  BREACH OF EXPRESS WARRANTY (Iowa Code
§§ 554.2313 and 554.13210) ................................................. 373

IOWA COUNT III:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Iowa Code §§ 554.2314 and 554.13212) .......... 377

KANSAS ......................................................................................... 378

KANSAS COUNT I:  VIOLATIONS OF THE KANSAS CONSUMER
PROTECTION ACT (Kan. Stat. Ann. § 50-623, *et seq.*) .......................... 378

KANSAS COUNT II:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (KAN. STAT. §§ 84-2-314 and 84-2A-212) ...... 382

KANSAS COUNT III:  BREACH OF EXPRESS WARRANTY (KAN.
STAT. §§ 84-2-314 and 84-2A-210) ........................................ 383

KENTUCKY ..................................................................................... 387

KENTUCKY COUNT I:  VIOLATION OF THE KENTUCKY
CONSUMER PROTECTION ACT (Ky. Rev. Stat. § 367.110, *et
seq.*) ..................................................................................... 387

KENTUCKY COUNT II:  BREACH OF EXPRESS WARRANTY (KY.
REV. STAT. §§ 335.2-313 and 355.2A-210) ............................... 391

KENTUCKY COUNT III:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (KY. REV. STAT. §§ 335.2-314 and
355.2A-212) .......................................................................... 395

LOUISIANA ..................................................................................... 396

LOUISIANA COUNT I:  VIOLATION OF THE LOUISIANA UNFAIR
TRADE PRACTICES  AND CONSUMER PROTECTION LAW
(La. Rev. Stat. § 51:1401, *et seq.*) ............................................ 396

LOUISIANA COUNT II:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY/  WARRANTY AGAINST
REDHIBITORY DEFECTS (La. Civ. Code Art. 2520, 2524) ................. 400

MAINE ........................................................................................... 401

MAINE COUNT I:  VIOLATION OF MAINE UNFAIR TRADE
PRACTICES ACT (Me. Rev. Stat. Ann. Tit. 5 § 205-a, *et seq.*) .............. 401

MAINE COUNT II:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (ME. REV. STAT. TIT. 11 §§ 2-314 and 2-
1212) ........................................................................................................ 405

MAINE COUNT III:  BREACH OF EXPRESS WARRANTY (ME.
REV. STAT. TIT. 11 §§ 2-313 and 2-1210) ............................................ 406

MARYLAND ................................................................................................ 409

MARYLAND COUNT I:  VIOLATIONS OF THE MARYLAND
CONSUMER PROTECTION ACT (Md. Code Com. Law § 13-101,
*et seq.*) .................................................................................................... 409

MARYLAND COUNT II:  MARYLAND LEMON LAW (Md. Code.
Com. Law § 14-1501, *et seq.*) ............................................................... 413

MARYLAND COUNT III:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (MD. CODE COM. LAW §§ 2-314 AND
2A-212) .................................................................................................... 414

MARYLAND COUNT IV:  BREACH OF EXPRESS WARRANTY
(MD. CODE., COMMERCIAL LAW §§ 2-313 and 2a-210) .................. 415

MASSACHUSETTS ...................................................................................... 419

MASSACHUSETTS COUNT I:  DECEPTIVE ACTS OR PRACTICES
PROHIBITED BY MASSACHUSETTS LAW (Mass. Gen. Laws
Ch. 93a, § 1, *et seq.*) .............................................................................. 419

MASSACHUSETTS COUNT II:  MASSACHUSETTS LEMON LAW
(Mass. Gen. Laws Ch. 90, § 7N1/2(1)) .................................................. 423

MASSACHUSETTS COUNT III:  BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (MASS. GEN. LAWS c.
106 §§ 2-314 and 2A-212) ...................................................................... 424

MASSACHUSETTS COUNT IV:  BREACH OF EXPRESS
WARRANTY (MASS. GEN. LAWS C. 106 §§ 2-313 and 2A-210) ....... 425

MICHIGAN .................................................................................................. 429

MICHIGAN COUNT I:  VIOLATION OF THE MICHIGAN
CONSUMER PROTECTION ACT  (Mich. Comp. Laws § 445.903,
*et seq.*) .................................................................................................... 429

MICHIGAN COUNT II:  BREACH OF EXPRESS WARRANTY (Mich.
Comp. Laws §§ 440.2313 and 440.2860) ............................................... 433

MICHIGAN COUNT III:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Mich. Comp. Laws §§ 440.2314 and
440.2860) ................................................................................................. 437

MINNESOTA ................................................................................................ 438

MINNESOTA COUNT I:  VIOLATION OF MINNESOTA
PREVENTION  OF CONSUMER FRAUD ACT  (Minn. Stat.
§ 325f.68, *et seq.*) ................................................................................... 438

MINNESOTA COUNT II:  VIOLATION OF MINNESOTA UNIFORM
DECEPTIVE TRADE PRACTICES ACT (Minn. Stat. § 325d.43-
48, *et seq.*) .............................................................................................. 442

MINNESOTA COUNT III:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Minn. Stat. §§ 336.2-314 and 336.2A-212) ...... 446

MINNESOTA COUNT IV:  BREACH OF EXPRESS WARRANTY
(Minn. Stat. §§ 336.2-313 and 336.2A-210)................................................ 447

MISSISSIPPI ...................................................................................................... 451

MISSISSIPPI COUNT I:  VIOLATION OF MISSISSIPPI CONSUMER
PROTECTION ACT  (Miss. Code. Ann. § 75-24-1, *et seq*.) .................... 451

MISSISSIPPI COUNT II:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Miss. Code §§ 75-2-314 and 75-2A-212) ......... 455

MISSISSIPPI COUNT III:  BREACH OF EXPRESS WARRANTY
(Miss. Code §§ 75-2-313 and 75-2A-210)................................................ 456

MISSOURI............................................................................................................ 459

MISSOURI COUNT I:  VIOLATION OF MISSOURI
MERCHANDISING PRACTICES ACT (Mo. Rev. Stat. § 407.010,
*et seq*.) ..................................................................................................... 459

MISSOURI COUNT II:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Mo. Stat. §§ 400.2-314 and 400.2A-212) ......... 464

MISSOURI COUNT III:  BREACH OF EXPRESS WARRANTY (Mo.
Stat. §§ 400.2-313 and 400.2A-210)................................................ 465

MONTANA ......................................................................................................... 468

MONTANA COUNT I:  VIOLATION OF MONTANA UNFAIR
TRADE PRACTICES AND CONSUMER PROTECTION ACT OF
1973 (Mont. Code Ann. § 30-14-101, *et seq*.) ........................................ 468

MONTANA COUNT II:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Mont. Code §§ 30-2-314 and 30-2A-212) ........ 472

MONTANA COUNT III:  BREACH OF EXPRESS WARRANTY
(Mont. Code §§ 30-2-313 and 30-2A-210)................................................ 473

NEBRASKA ......................................................................................................... 477

NEBRASKA COUNT I:  VIOLATION OF THE NEBRASKA
CONSUMER PROTECTION ACT (Neb. Rev. Stat. § 59-1601, *et
seq*.)............................................................................................................. 477

NEBRASKA COUNT II:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Neb.Rev.St. U.C.C. §§ 2-314 and 2A-212) ...... 481

NEBRASKA COUNT III:  BREACH OF EXPRESS WARRANTY
(Neb.Rev.St. U.C.C. §§ 2-313 and 2A-210)................................................ 482

NEVADA .............................................................................................................. 486

NEVADA COUNT I:  VIOLATION OF THE NEVADA DECEPTIVE
TRADE PRACTICES ACT (Nev. Rev. Stat. § 598.0903, *et seq*.) .......... 486

NEVADA COUNT II:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (N.R.S. §§ 104.2314 and 104A.2212)............... 490

NEVADA COUNT III:   BREACH OF EXPRESS WARRANTY (N.R.S.
§§ 104.2313 and 104A.2210) .................................................................. 491

NEW HAMPSHIRE ............................................................................................ 495

NEW HAMPSHIRE COUNT I:  VIOLATION OF N.H. CONSUMER

PROTECTION ACT (N.H. Rev. Stat. Ann. § 358-a:1, *et seq*.) ............... 495

NEW HAMPSHIRE COUNT II: BREACH OF IMPLIED WARRANTY
OF MERCHANTABILITY (N.H. Rev. Stat. §§ 382-A:2-314 and
382-A:2A-212)........................................................................................ 499

NEW HAMPSHIRE COUNT III: BREACH OF EXPRESS
WARRANTY (N.H. Rev. Stat. §§ 382-A:2-313 and 382-A:2A-210) ...... 500

NEW JERSEY ...................................................................................................... 504

NEW JERSEY COUNT I: VIOLATIONS OF THE NEW JERSEY
CONSUMER FRAUD ACT (N.J. Stat. Ann. §§ 56:8-1, *et seq*.).............. 504

NEW JERSEY COUNT II: BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (N.J.S. 12A:2-314 and 2A-212) ........................ 508

NEW JERSEY COUNT III: BREACH OF EXPRESS WARRANTY
(N.J.S. 12A:2-313 and 2A-210).............................................................. 509

NEW MEXICO ..................................................................................................... 513

NEW MEXICO COUNT I: VIOLATIONS OF THE NEW MEXICO
UNFAIR TRADE PRACTICES ACT (N.M. Stat. Ann. §§ 57-12-1,
*et seq*.)....................................................................................................... 513

NEW MEXICO COUNT II: BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (N.M. Stat. §§ 55-2-314 and 55-2A-212)........... 517

NEW MEXICO COUNT III: BREACH OF EXPRESS WARRANTY
(N.M. Stat. §§ 55-2-313 and 55-2A-210) ................................................ 518

NEW YORK .......................................................................................................... 522

NEW YORK COUNT I: VIOLATIONS OF NEW YORK GENERAL
BUSINESS LAW § 349 (N.Y. Gen. Bus. Law § 349) ............................ 522

NEW YORK COUNT II: VIOLATIONS OF NEW YORK GENERAL
BUSINESS LAW § 350 (N.Y. Gen. Bus. Law § 350) ............................ 526

NEW YORK COUNT III: BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (N.Y. U.C.C. Law §§ 2-314 and 2A-212) .......... 528

NEW YORK COUNT IV: BREACH OF EXPRESS WARRANTY (N.Y.
U.C.C. Law §§ 2-313 and 2A-210) ......................................................... 529

NORTH CAROLINA ............................................................................................ 532

NORTH CAROLINA COUNT I: VIOLATIONS OF THE NORTH
CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES
ACT (N.C. Gen. Stat. §§ 75-1.1, *et seq*.).................................................. 532

NORTH CAROLINA COUNT II: BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (N.C.G.S.A. §§ 25-2-314
AND 252A-212) ....................................................................................... 537

NORTH CAROLINA COUNT III: BREACH OF EXPRESS
WARRANTY (N.C.G.S.A. §§ 25-2-313 and 252A-210) ........................ 538

NORTH DAKOTA ................................................................................................ 541

NORTH DAKOTA COUNT I: VIOLATION OF THE NORTH
DAKOTA CONSUMER FRAUD ACT (N.D. Cent. Code § 51-15-
02)541

NORTH DAKOTA COUNT II: BREACH OF IMPLIED WARRANTY

OF MERCHANTABILITY (N.D. Cent. Code §§ 41-02-31 and 41-02.1-21) ............................................................................ 546

NORTH DAKOTA COUNT III:  BREACH OF EXPRESS WARRANTY (N.D. Cent. Code §§ 41-02-30 and 41-02.1-19) ........................................ 547

OHIO .................................................................................................. 550

OHIO COUNT I:  VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT (Ohio Rev. Code §§ 1345.01, *et seq*.) ...................... 550

OHIO COUNT II:  VIOLATIONS OF THE OHIO DECEPTIVE TRADE PRACTICES ACT (Ohio Rev. Code § 4165.01, *et seq*.) ......................... 555

OHIO COUNT III:  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Ohio Rev. Code Ann. §§ 1302.27 and 1310.19) ............................................................................... 559

OHIO COUNT IV:  BREACH OF EXPRESS WARRANTY (Ohio Rev. Code § 1302.26, *et seq*.) (U.C.C. §2-313)) ................................. 560

OKLAHOMA .......................................................................................... 564

OKLAHOMA COUNT I:  VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT (Okla. Stat. Tit. 15 § 751, *et seq*.) .......................... 564

OKLAHOMA COUNT II:  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Okla. Stat. Tit. 12A §§ 2-314 and 2A-212) ...... 567

OKLAHOMA COUNT III:  BREACH OF EXPRESS WARRANTY (Okla. Stat. Tit. 12A §§ 2-313 and 2A-210) ................................. 569

OREGON .............................................................................................. 572

OREGON COUNT I:  VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT (Or. Rev. Stat. §§ 646.605, *et seq*.) ............. 572

OREGON COUNT II:  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Or. Rev. Stat. § 72.3140 and 72A.2120) .......... 576

OREGON COUNT III:  BREACH OF EXPRESS WARRANTY (OR. REV. STAT. §§ 72.3130 and 72A.2100) .................................... 577

PENNSYLVANIA ..................................................................................... 581

PENNSYLVANIA COUNT I:  VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES  AND CONSUMER PROTECTION LAW (73 P.S. § 201-1, *et seq*.) ................. 581

PENNSYLVANIA COUNT II:  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (13 PA. CONS. STAT. §§ 2314 and 2A212) .......................................................................... 584

PENNSYLVANIA COUNT III:  BREACH OF EXPRESS WARRANTY (13 PA. CONS. STAT.  §§ 2313 and 2A210) ......................... 586

RHODE ISLAND ..................................................................................... 589

RHODE ISLAND COUNT I:  VIOLATION OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT (R.I. GEN. LAWS § 6-13.1, *et seq*.) ................................................................... 589

RHODE ISLAND COUNT II:  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (6A R.I. GEN. LAWS §§ 6A-2-314 and 6A-2.1-212) ........................................................................ 593

RHODE ISLAND COUNT III:  BREACH OF EXPRESS WARRANTY
(6A R.I. GEN. LAWS §§ 6A-2-313 and 6A-2.1-210) .............................. 594

SOUTH CAROLINA ........................................................................................ 598

SOUTH CAROLINA COUNT I:  VIOLATIONS OF THE SOUTH
CAROLINA UNFAIR TRADE PRACTICES ACT (S.C. CODE
ANN. § 39-5-10, *et seq*.)........................................................................ 598

SOUTH CAROLINA COUNT II:  VIOLATIONS OF THE SOUTH
CAROLINA REGULATION OF MANUFACTURERS,
DISTRIBUTORS, AND DEALERS ACT (S.C. CODE ANN. § 56-
15-10, *et seq*.)...................................................................................... 602

SOUTH CAROLINA COUNT III:  BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (S.C. CODE §§ 36-2-314
and 36-2A-212) ...................................................................................... 603

SOUTH CAROLINA COUNT IV:  BREACH OF EXPRESS
WARRANTY (S.C. CODE §§ 36-2-313 and 36-2A-210) ...................... 604

SOUTH DAKOTA ............................................................................................ 608

SOUTH DAKOTA COUNT I:  VIOLATION OF THE SOUTH
DAKOTA  DECEPTIVE TRADE PRACTICES AND CONSUMER
PROTECTION LAW (S.D. CODIFIED LAWS § 37-24-6) .................... 608

SOUTH DAKOTA COUNT II:  BREACH OF IMPLIED WARRANTY
OF MERCHANTABILITY (S.D. CODIFIED LAWS §§ 57A-2-314
and 57A-2A-212) .................................................................................. 612

SOUTH DAKOTA COUNT III:  BREACH OF EXPRESS WARRANTY
(S.D. CODIFIED LAWS §§ 57A-2-313 and 57A-2A-210) .................... 613

TENNESSEE .................................................................................................... 617

TENNESSEE COUNT I:  VIOLATION OF TENNESSEE CONSUMER
PROTECTION ACT OF 1977 (TENN. CODE ANN. § 47-18-101,
*et seq*.) ................................................................................................ 617

TENNESSEE COUNT II:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (TENN. CODE §§ 47-2-314 and 47-2A-
212) ...................................................................................................... 620

TENNESSEE COUNT III:  BREACH OF EXPRESS WARRANTY
(TENN. CODE §§ 47-2-313 and 47-2A-210) ........................................ 622

TEXAS ............................................................................................................ 625

TEXAS COUNT I:  VIOLATIONS OF THE DECEPTIVE TRADE
PRACTICES  ACT – CONSUMER PROTECTION ACT (TEX.
BUS. & COM. CODE §§ 17.41, *et seq*.) .............................................. 625

TEXAS COUNT II:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (TEX. BUS. & COM. CODE §§ 2.314 and
2A.212) ................................................................................................ 629

TEXAS COUNT III:  BREACH OF EXPRESS WARRANTY (TEX.
BUS. & COM. CODE §§ 2.313 and 2A.210)........................................... 631

UTAH.............................................................................................................. 634

UTAH COUNT I:  VIOLATION OF UTAH CONSUMER SALES
PRACTICES ACT (UTAH CODE ANN. § 13-11-1, *et seq*.).................. 634

UTAH COUNT II:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (UTAH CODE §§ 70A-2-314 and 70A-2A-
212) ................................................................................................... 638
UTAH COUNT III:  BREACH OF EXPRESS WARRANTY (UTAH
CODE §§ 70A-2-313 and 70A-2A-210) .................................................. 639

VERMONT ..................................................................................................... 643
VERMONT COUNT I:  VIOLATION OF VERMONT CONSUMER
PROTECTION ACT (VT. STAT. ANN. TIT. 9, § 2451 ET SEQ.) ......... 643
VERMONT COUNT II:  VERMONT LEMON LAW (Vt. Stat. Tit. 9,
§ 4170, et al.) ................................................................................... 647
VERMONT COUNT III:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (VT. STAT. TIT. 9A, §§ 2-314 and 2A-
212) ................................................................................................... 648
VERMONT COUNT IV:  BREACH OF EXPRESS WARRANTY (VT.
STAT. TIT. 9A, §§ 2-313 and 2A-210) .................................................. 649

VIRGINIA ...................................................................................................... 653
VIRGINIA COUNT I:  VIOLATIONS OF THE VIRGINIA
CONSUMER PROTECTION ACT (Va. Code Ann. §§ 59.1-196, *et
seq.*) .................................................................................................... 653
VIRGINIA COUNT II:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (VA. CODE §§ 8.2-314 and 8.2A-212) ............ 656
VIRGINIA COUNT III:  BREACH OF EXPRESS WARRANTY (VA.
CODE §§ 8.2-313 and 8.2A-210) .......................................................... 658

WASHINGTON ............................................................................................. 661
WASHINGTON COUNT I:  VIOLATION OF THE WASHINGTON
CONSUMER PROTECTION ACT (WASH. REV. CODE ANN.
§§ 19.86.010, ET SEQ.) ........................................................................... 661
WASHINGTON COUNT II:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (WASH. REV. CODE §§ 62A.2-314 and
62A.2A-212) ....................................................................................... 665
WASHINGTON COUNT III:  BREACH OF EXPRESS WARRANTY
(WASH. REV. CODE §§ 62A.2-313 and 62A.2A-210) ......................... 666
WASHINGTON COUNT IV:  WASHINGTON LEMON LAW (Wash.
Rev. Code § 19.118.005, *et al*.) ...................................................... 670

WEST VIRGINIA ........................................................................................... 671
WEST VIRGINIA COUNT I:  VIOLATIONS OF THE CONSUMER
CREDIT AND PROTECTION ACT (W. VA. CODE § 46A-1-101,
*et seq.*) ............................................................................................... 671
WEST VIRGINIA COUNT II:  BREACH OF IMPLIED WARRANTY
OF MERCHANTABILITY (W. VA. CODE §§ 46-2-314 and 46-
2A-212) ............................................................................................... 675
WEST VIRGINIA COUNT III:  BREACH OF EXPRESS WARRANTY
(W. VA. CODE §§ 46-2-313 and 46-2A-210) ......................................... 676
WEST VIRGINIA COUNT IV:  BREACH OF NEW MOTOR VEHICLE
WARRANTY (WEST VIRGINIA "LEMON LAW") (W. Va.

CODE §§ 46A-6A-1, et seq.) .................................................... 680

WISCONSIN ........................................................................................ 683

WISCONSIN COUNT I:  VIOLATIONS OF THE WISCONSIN
DECEPTIVE TRADE PRACTICES ACT (WIS. STAT. § 100.18) ......... 683

WISCONSIN COUNT II:  BREACH OF EXPRESS WARRANTY (WIS.
STAT. §§ 402.313 and 411.210) ................................................ 687

WISCONSIN COUNT III:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (WIS. STAT. §§ 402.314 AND 411.212) ......... 690

WYOMING .......................................................................................... 691

WYOMING COUNT I:  VIOLATION OF THE WYOMING
CONSUMER PROTECTION ACT (Wyo. Stat. §§ 40-12-101, *et
seq.*) .................................................................................... 691

WYOMING COUNT II:  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (WYO. STAT. §§ 34.1-2-314 and 34.1-2.A-
212) ...................................................................................... 696

WYOMING COUNT III:  BREACH OF EXPRESS WARRANTY (Wyo.
Stat. § 34.1-2-313) .................................................................. 697

PRAYER FOR RELIEF ........................................................................ 700

DEMAND FOR JURY TRIAL ............................................................... 702

- xiv -

Plaintiffs bring this action on behalf of themselves and all others similarly situated, against (1) the Defendants collectively known as "Volkswagen": Volkswagen Aktiengesellschaft ("VW AG"), Volkswagen Group of America, Inc. ("VW America") (together, "VW"), Audi Aktiengesellschaft ("Audi AG"), Audi of America, LLC ("Audi America") (together, "Audi"), Dr. Ing. h.c. F. Porsche Aktiengesellschaft ("Porsche AG"), Porsche Cars North America, Inc. ("Porsche America") (together, "Porsche"), Martin Winterkorn ("Winterkorn"), Matthias Müller ("Müller"), Michael Horn ("Horn"), and Rupert Stadler ("Stadler"); and (2) the Defendants collectively known as "Bosch": Robert Bosch GmbH, Robert Bosch, LLC, and Volkmar Denner (together, "Bosch").[1] Plaintiffs allege the following based upon information and belief, the investigation of counsel, and personal knowledge as to the allegations pertaining to themselves.

**INTRODUCTION**

1.      This case arises out of one of the most brazen corporate crimes in history, a cautionary tale about winning at any cost. Volkswagen cheated its way to the top of the automotive food chain and spared no victim along the way, targeting its customers, U.S. and foreign regulators, and even the very air we breathe. The linchpin of Volkswagen's fraudulent scheme was the deliberate use of a "defeat device," a secretly embedded software algorithm that, as Volkswagen has since admitted, was designed and installed to cheat emission tests, thereby fooling the Environmental Protection Agency ("EPA"), among other regulators, into approving for sale hundreds of thousands of non-compliant cars (the "Class Vehicles," defined below). For years, Volkswagen got away with it, and the Class Vehicles were sold at record numbers into our stream of commerce. Once on the roads, these cars spewed millions of tons of harmful nitrogen oxide ("NOx") pollutants into our air at a rate of up to 40 times the legal limit. All the while, Volkswagen pitched itself to the American public as the world's foremost innovator of "clean" diesel technology, duping hundreds of thousands of environmentally-conscious consumers who were willing to pay a premium for "clean" diesel vehicles.

---

[1] VW AG, Audi AG, and Porsche AG are sometimes collectively referred to as the "German Volkswagen Defendants," and VW America, Audi America, and Porsche America are collectively referred to as the "American Volkswagen Defendants." Winterkorn, Horn, Müller, and Stadler are collectively referred to as the "Volkswagen Individual Defendants," and inclusively with Denner as the "Individual Defendants."

- 1 -

2.      Fraud fueled Volkswagen's success, and its only real "clean" diesel innovation was how it played dirty. Its ingeniously-designed defeat devices, software installed on engine management systems supplied by defendant Bosch, detected when its dirty diesel engines were being tested in a laboratory or smog station and triggered performance-sapping controls to simulate compliance with emission laws. But when the test ended, and the driver returned to the road under normal operation and use, the performance—and the illegal belch of pollution—returned. Everything about Volkswagen's fraudulent scheme was coolly calculated, as defendant Horn, CEO of VW America, confessed in the fall of 2015 at Congressional hearings: "[the defeat device] was installed for this purpose, yes."[2]

3.      Volkswagen promised low-emission, environmentally friendly vehicles, with high fuel economy and exceptional performance. Consumers believed Volkswagen and bought Volkswagen's VW-, Audi-, and Porsche-branded "clean" diesel vehicles in record numbers. In fact, during the relevant time period, Volkswagen sold more diesel cars in the U.S. than every other automaker combined.[3] From 2009 to 2015, Volkswagen sold and/or leased approximately 580,000 dirty diesels that its defeat device disguised as clean. In doing so, Volkswagen secretly turned the most environmentally-conscious consumers into some of the biggest polluters on the road—and charged them a premium in the process.

4.      As a result, there are over half a million cars on American roads with illegal emission systems that never should have left the factory, and would not have, but for Volkswagen's fraudulently obtained EPA Certificates of Conformity ("COCs"), as well as California Air Resources Board ("CARB") Executive Orders ("EOs"). Since the revelation of Volkswagen's scheme, the Department of Justice ("DOJ") has filed a complaint alleging numerous violations of the Clean Air Act ("CAA"), California and other state attorneys general have announced investigations or filed lawsuits concerning Defendants' fraudulent scheme, and

---

[2] *See* Bill Chappell, *'It Was Installed For This Purpose,' VW's U.S. CEO Tells Congress About Defeat Device*, NPR (Oct. 8, 2015), available at http://www.npr.org/sections/thetwo-way/2015/10/08/446861855/volkswagen-us-ceo-faces-questions-on-capitol-hill.

[3] *Clean Diesel*, Volkswagen (last visited Feb. 8, 2016), *previously available at*, http://www.vw.com/features/clean-diesel/.

countless other government entities have launched criminal and civil investigations around the globe.

5.     Volkswagen's fraud has also taken a human toll.  According to statistical models, the pollution spewed by the Class Vehicles will cause "somewhere between 16 and 94 deaths over seven years, with the annual count increasing more recently as more of the diesels were on the road."[4]  Meanwhile a peer-reviewed study by researchers at MIT and Harvard University has estimated that the pollution from the illegal Vehicles will cause 59 early deaths and result in environmental costs exceeding $450 million.[5]

6.     Plaintiffs and Class members (defined below) are individuals and businesses that purchased or leased a Class Vehicle in the U.S.  The Class Vehicles include the following:

| 2.0-liter Class Vehicles | |
|---|---|
| Volkswagen Jetta TDI | 2009-2015 |
| Volkswagen Jetta SportWagen TDI | 2009-2014 |
| Volkswagen Beetle TDI | 2012-2015 |
| Volkswagen Beetle Convertible TDI | 2012-2015 |
| Audi A3 TDI | 2010-2015 |
| Volkswagen Golf TDI | 2010-2015 |
| Volkswagen Golf SportWagen TDI | 2015 |
| Volkswagen Passat TDI | 2012-2015 |

| 3.0-liter Class Vehicles | |
|---|---|
| Volkswagen Touareg TDI | 2009-2016 |
| Porsche Cayenne Diesel | 2013-2016 |
| Audi A6 Quattro TDI | 2014-2016 |
| Audi A7 Quattro TDI | 2014-2016 |
| Audi A8 TDI | 2014-2016 |
| Audi A8L TDI | 2014-2016 |
| Audi Q5 TDI | 2014-2016 |
| Audi Q7 TDI | 2009-2016 |

---

[4] Seth Borenstein, *AP analysis: VW evasion likely leads to dozens of deaths*, Associated Press (Oct. 5, 2015), http://bigstory.ap.org/article/1670ed00be824b4cbbf414ed1d637428/ap-analysis-vw-evasion-likely-led-dozens-deaths.

[5] Stephen R. H. Barrett, *et al*., *Impact of the Volkswagen emissions control defeat device on US public health*, IOPScience (Oct. 29, 2015), http://iopscience.iop.org/article/10.1088/1748-9326/10/11/114005/meta?mbid=synd_flipboard.

- 3 -

7.      Volkswagen induced Plaintiffs and Class members to purchase or lease the Class Vehicles, which are illegal because they violate the CAA (among other laws) and, on top of that, admittedly do not perform as represented. No one would—or could—have purchased the Class Vehicles but for Volkswagen's fraudulent scheme, because Volkswagen obtained EPA COCs (and CARB EOs) only by cheating. In addition to now owning illegal, dirty diesels, Plaintiffs have suffered economic damages due to the steep diminution in value of their Class Vehicles, which pollute the environment at levels far in excess of the legal limits, cannot pass required emissions tests, and are subject to a planned recall in the indefinite future (even though no complete fix has yet been announced). To the extent the Class Vehicles can be repaired or retrofitted to pass federal and state emission requirements, they will, absent a full and comprehensive compensation program by Defendants, continue to suffer in diminution in value and cause economic loss. This is so because any such repairs or retrofits will reduce mileage per gallon, increase costs of operation, and cause the vehicles to suffer lower performance, durability, and reliability, reducing market value and increasing cost of ownership and operation.

8.      On behalf of themselves, the Nationwide Class, and the respective State Classes, Plaintiffs hereby bring this action for violations of the federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961, *et seq*. ("RICO")); the federal Magnuson-Moss Warranty Act (15 U.S.C. § 2301, *et seq*. ("MMWA")); common law fraud, contract, warranty, unjust enrichment, and consumer protection laws of all 50 states and the District of Columbia.

9.      Plaintiffs seek a buy-back program for the Class Vehicles, monetary damages (including treble damages under RICO), appropriate restitution, pollution mitigation, business reforms, and injunctive and other equitable relief. In addition, Plaintiffs and Class members are entitled to a significant award of punitive or exemplary damages, given that, for years, Volkswagen deliberately, and with malice, deceived Plaintiffs and Class members, disregarded their rights, and used them as unwitting puppets in a scheme that jeopardized the safety of the American public.

**JURISDICTION AND VENUE**

10.     This Consolidated Consumer Complaint is filed as an original action in this District, and as the Consolidated Consumer Class Action in the MDL No. 2672 proceedings, pursuant to Pretrial Order No. 7 therein.

11.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.  Subject-matter jurisdiction also arises under 28 U.S.C. § 1331 based upon the federal RICO claims asserted under 18 U.S.C. § 1961 *et seq*.  The Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§ 1965(b) and (d), and Cal. Code Civ. P. § 410.10, and supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Volkswagen has marketed, advertised, sold, and leased the Class Vehicles, and Defendants otherwise conducted extensive business within this District.  Several named Plaintiffs and proposed Class representatives, as well as tens of thousands of Class members, purchased their Class Vehicles from the multiple Volkswagen dealers located in this District.  Indeed, from 2009 through the present, approximately 24,311 Class Vehicles were registered in the District and 24,650 Class Vehicles were in operation in this District.  This amounts to just under 5% of the *nationwide* totals in each category.  If this District were a state, it would have the sixth most Class Vehicles in the entire country.  Further, CARB maintains a significant presence in this District through its Bay Area Air Quality Management District branch.  CARB played an important initial role in investigating and, ultimately, in revealing Volkswagen's illegal use of the defeat devices.

**INTRADISTRICT ASSIGNMENT**

13.     This action is properly assigned to the San Francisco Division of this District pursuant to N.D. Cal. L.R. 3-2, because a substantial part of the events or omissions giving rise to Plaintiffs' claims arose in the counties served by the San Francisco Division.  Several named

- 5 -

Plaintiffs and proposed Class representatives, as well as thousands of Class members, purchased and maintain their Class Vehicles in the counties served by this Division. Moreover, Volkswagen conducts substantial business in the counties served by this Division, has marketed, advertised, sold and leased the Class Vehicles in those counties, and has caused harm to Class members residing in those counties. Finally, this Consolidated Consumer Class Action Complaint is being filed as an original action in this District and as the Consolidated Consumer Class Action in the MDL No. 2672 proceedings, which have been consolidated before Judge Charles R. Breyer, presiding in the San Francisco Division of this District.

<div align="center">

**PARTIES**

</div>

### A. Individual and Representative Plaintiffs

14. For ease of reference, the following chart identifies and organizes the individual and representative Plaintiffs by the state in which they purchased or leased their Class Vehicles:

| No. | Class Representative | State | Model Year | Make | Model |
|-----|----------------------|-------|------------|------|-------|
| 1 | McIntosh, Marion | Alabama | 2013 | Volkswagen | Passat TDI |
| 2 | Rutland, L. Cooper | Alabama | 2015 | Volkswagen | Passat TDI |
| 3 | Scharein, Arthur A. | Alabama | 2014 | Volkswagen | Beetle Convertible TDI |
| 4 | Hill, Jason | Alaska | 2013 | Volkswagen | Jetta TDI |
| 5 | Preciado, Ray | Arizona | 2015 | Volkswagen | Passat TDI |
| 6 | Tarrence, Susan | Arizona | 2011 | Audi | A3 TDI |
| 7 | Thornton, Steven R. | Arizona | 2014 | Volkswagen | Passat TDI |
| 8 | Rima, Vickie | Arkansas | 2013 | Volkswagen | Beetle TDI |
| 9 | Alba, Romeo James | California | 2010 | Audi | A3 TDI |
| 10 | Argento, Anne Duncan | California | 2013 | Volkswagen | Jetta TDI |
| 11 | Beaven, Simon W. | California | 2011 | Audi | A3 TDI |

| No. | Class Representative | State | Model Year | Make | Model |
|-----|---------------------|-------|------------|------|-------|
| 12 | Brodie, Juliet | California | 2014 | Volkswagen | Jetta TDI |
| 13 | Brook, Lena | California | 2015 | Audi | Q5 TDI |
| 14 | Brophy, Grant M. and Brophy, Catherine | California | 2012 | Volkswagen | Passat TDI |
| 15 | Burt, Sarah | California | 2011 | Volkswagen | Golf TDI |
| 16 | Clark, Phillip | California | 2014 | Volkswagen | Touareg TDI |
| 17 | Dodge, William S. | California | 2015 | Volkswagen | Jetta TDI |
| 18 | Epstein, Aimee | California | 2010 | Volkswagen | Jetta SportWagen TDI |
| 19 | Farquar, George | California | 2010 | Volkswagen | Jetta TDI |
| 20 | Fohet, Jerome | California | 2014 | Porsche | Cayenne Diesel |
| 21 | Hoag, Caroline | California | 2011 | Volkswagen | Jetta SportWagen TDI |
| 22 | Houle, Mark | California | 2015 | Volkswagen | Passat TDI |
| 23 | Kaplan, Rebecca | California | 2012 | Volkswagen | Golf TDI |
| 24 | Kosik-Westly, Helen | California | 2011 | Volkswagen | Golf TDI |
| 25 | Krein, Raymond | California | 2014 | Volkswagen | Jetta SportWagen TDI |
| 26 | McGuire, Margaret Jane | California | 2015 | Volkswagen | Beetle TDI |
| 27 | Meyler, Bernadette and Smith, Matthew | California | 2013 | Volkswagen | Passat TDI |
| 28 | Pellegrini, Rhonnda | California | 2014 | Volkswagen | Passat TDI |
| 29 | Shalit, Susan | California | 2015 | Volkswagen | Golf TDI |
| 30 | Truong, Ted | California | 2014 | Audi | Q5 TDI |
| 31 | Verner, Stephen | California | 2013 | Volkswagen | Golf TDI |
| 32 | Winternitz, Leo | California | 2009 | Volkswagen | Jetta SportWagen TDI |

CONSOLIDATED CONSUMER CLASS
COMPLAINT MDL 2672 CRB (JSC)

| No. | Class Representative | State | Model Year | Make | Model |
|-----|---------------------|-------|-----------|------|-------|
| 33 | Doege, Marcus Alexander | Colorado | 2012 2012 | Volkswagen Volkswagen | Jetta TDI Touareg TDI |
| 34 | Reiser, Mary | Colorado | 2015 | Volkswagen | Golf TDI |
| 35 | Zvyagelsky, Roman | Colorado | 2016 | Audi | Q5 TDI |
| 36 | MacLise-Kane, Leslie | Connecticut | 2013 | Volkswagen | Jetta TDI |
| 37 | Watson, Timothy | Connecticut | 2015 | Audi | A3 TDI |
| 38 | Willingham, Brian | Connecticut | 2015 | Volkswagen | Golf TDI |
| 39 | Fox, DeWayne | Delaware | 2010 | VW | Jetta SportWagen TDI |
| 40 | Shelton, Celia | Delaware | 2014 | Audi | A6 TDI |
| 41 | Terrell, China Boak | District of Columbia | 2010 | Volkswagen | Jetta TDI |
| 42 | Bell, Farrah P. | Florida | 2015 | Audi | A3 TDI |
| 43 | Hiaasen, Scott and Hiaasen, Jenny | Florida | 2012 | Volkswagen | Jetta SportWagen TDI |
| 44 | Lawhon, Jerry | Florida | 2013 | Volkswagen | Passat TDI |
| 45 | Pejsa, Jason Daniel | Georgia | 2015 | Volkswagen | Jetta TDI |
| 46 | Ray, Laura Lee | Georgia | 2010 | VW | Jetta SportWagen TDI |
| 47 | Terry, Michael | Georgia | 2013 | Volkswagen | Passat TDI |
| 48 | Cruise, Michael R. | Hawaii | 2012 | Audi | A3 TDI |
| 49 | Inoue, Duane V. | Hawaii | 2010 | Audi | A3 TDI |
| 50 | Kettley, Sean Alexander | Hawaii | 2012 | Volkswagen | Golf TDI |
| 51 | Dufurrena, John C. | Idaho | 2013 | Volkswagen | Jetta TDI |
| 52 | Gardner, Aaron Patrick | Idaho | 2013 | VW | Passat TDI |

| No. | Class Representative | State | Model Year | Make | Model |
|-----|----------------------|-------|------------|------|-------|
| 53 | Anderson, Scott Clifford | Illinois | 2012 | Volkswagen | Passat TDI |
| 54 | Bahr, Scott | Illinois | 2015 | Volkswagen | Golf TDI |
| 55 | Clark, Samuel M. | Illinois | 2014 | Volkswagen | Touareg TDI |
| 56 | Fry, Karl | Illinois | 2012 | Volkswagen | Jetta TDI |
| 57 | Olmos, Cesar | Indiana | 2014 | Volkswagen | Passat TDI |
| 58 | Priest, James | Indiana | 2014 | Volkswagen | Jetta TDI |
| 59 | Foote, Benjamin | Iowa | 2014 | Volkswagen | Jetta SportWagen TDI |
| 60 | Lucht, Tracy and Soucy, Paul | Iowa | 2014 | Volkswagen | Passat TDI |
| 61 | Manternach, Herbert John | Iowa | 2012 | Volkswagen | Passat TDI |
| 62 | Schnathorst, Britney Lynne | Iowa | 2014 | Volkswagen | Passat TDI |
| 63 | Berg, Carla | Kansas | 2014 | Volkswagen | Passat TDI |
| 64 | Joy, Aaron | Kansas | 2013 | Volkswagen | Jetta TDI |
| 65 | Rice, Ashley | Kansas | 2013 | VW | Jetta TDI |
| 66 | Kannapel, Andrew J. | Kentucky | 2014 | Volkswagen | Jetta TDI |
| 67 | Wagner, Robert | Kentucky | 2015 | Volkswagen | Golf SportWagen TDI |
| 68 | White, Eric Davidson | Louisiana | 2014 | Volkswagen | Golf TDI |
| 69 | Malone, Thomas A. | Louisiana | 2011 | Volkswagen | Jetta SportWagen TDI |
| 70 | Warren, Floyd Beck | Louisiana | 2015 | Volkswagen | Passat TDI |
| 71 | Buchberger, Thomas J. | Maine | 2012 | Volkswagen | Jetta SportWagen TDI |
| 72 | Evans, Russell and Evans, Elizabeth | Maine | 2014 | Volkswagen | Jetta TDI |

| No. | Class Representative | State | Model Year | Make | Model |
|-----|---------------------|-------|-----------|------|-------|
| 73 | Rubin, Carmel | Maine | 2012 | Volkswagen | Jetta SportWagen TDI |
| 74 | Sullivan, Daniel | Maine | 2014 | VW | Passat TDI |
| 75 | Cure, Matthew | Maryland | 2015 | Volkswagen | Golf TDI |
| 76 | DeFiesta, Denise | Maryland | 2013 | Volkswagen | Passat TDI |
| 77 | Hoffman, Michael C. | Maryland | 2012 | Audi | A3 TDI |
| 78 | Rovner, Mark | Maryland | 2015 | Volkswagen | Golf TDI |
| 79 | Walsh, Koreen | Maryland | 2015 | Audi | A3 TDI |
| 80 | Broadbent, Ericsson | Massachusetts | 2011 | Volkswagen | Jetta TDI |
| 81 | Cunningham, Willard D. | Massachusetts | 2014 | Volkswagen | Passat TDI |
| 82 | Garcia, Grant Robert | Massachusetts | 2015 2010 2009 | Volkswagen Volkswagen Volkswagen | Golf SportWagen TDI Jetta SportWagen TDI Jetta SportWagen TDI |
| 83 | Matthews, Sarah | Massachusetts | 2014 | Volkswagen | Jetta TDI |
| 84 | Steudel, Wolfgang | Massachusetts | 2013 2015 | Volkswagen Volkswagen | Golf TDI Jetta TDI |
| 85 | Scolnick, Jeffrey | Massachusetts | 2014 | Volkswagen | Passat TDI |
| 86 | Gotta, Gregory | Massachusetts New Hampshire | 2014 2014 | Audi Porsche | A6 TDI Cayenne Diesel |
| 87 | Heilmann, Michael | Michigan | 2015 | Volkswagen | Touareg TDI |
| 88 | Kingman, Bryan Michael | Michigan | 2015 | Volkswagen | Passat TDI |
| 89 | Matthews, Susan | Michigan | 2011 | Volkswagen | Jetta SportWagen TDI |
| 90 | Cyrankowski, Edward | Minnesota | 2016 | Audi | Q5 TDI |
| 91 | Johnson, Christopher | Minnesota | 2016 | Audi | A6 TDI |

CONSOLIDATED CONSUMER CLASS
COMPLAINT MDL 2672 CRB (JSC)

| No. | Class Representative | State | Model Year | Make | Model |
|---|---|---|---|---|---|
| 92 | Mahle, Anne and McCarthy, David | Minnesota | 2010 2015 | Volkswagen Volkswagen | Jetta SportWagen Golf TDI |
| 93 | Moen, Scott | Minnesota | 2013 2010 | Volkswagen Volkswagen | Golf TDI Jetta TDI |
| 94 | Page, Khamsin | Minnesota | 2009 | Volkswagen | Jetta SportWagen TDI |
| 95 | Schuette, Ryan Joseph | Minnesota | 2013 | Volkswagen | Passat TDI |
| 96 | Haxton, Richardson Ayres | Mississippi | 2014 | Volkswagen | Passat TDI |
| 97 | Katz, Howard | Mississippi | 2014 | Volkswagen | Golf TDI |
| 98 | Walawender, Megan | Missouri | 2014 | Volkswagen | Passat TDI |
| 99 | Morrey, Joseph | Missouri | 2015 | Volkswagen | Passat TDI |
| 100 | Zucker, Bryce | Missouri | 2014 | Volkswagen | Jetta TDI |
| 101 | Di Mauro, Sandra | Montana | 2013 | Volkswagen | Jetta SportWagen TDI |
| 102 | Lorenz, Michael | Montana | 2012 | VW | Jetta TDI |
| 103 | Schram, Sara | Nebraska | 2013 | VW | Passat TDI |
| 104 | Stirek, Nancy L. | Nebraska | 2011 | VW | Jetta SportWagen TDI |
| 105 | Berman, Brian K. | Nevada | 2009 | Volkswagen | Jetta TDI |
| 106 | Perlmutter, Rebecca | Nevada | 2012 2015 | Volkswagen Volkswagen | Jetta TDI Golf SportWagen TDI |
| 107 | Peterson, Jonathan | Nevada | 2015 | Volkswagen | Golf TDI |
| 108 | Minott, Addison | New Hampshire | 2009 | Volkswagen | Jetta SportWagen TDI |
| 109 | Grogan, Richard | New Hampshire | 2015 | Volkswagen | Golf TDI |
| 110 | Bandics, Alan | New Jersey | 2013 | Volkswagen | Passat TDI |
| 111 | Christiana, Charles | New Jersey | 2012 | Volkswagen | Passat TDI |
| 112 | Greczylo, David | New Jersey | 2012 | VW | Golf TDI |

| No. | Class Representative | State | Model Year | Make | Model |
|---|---|---|---|---|---|
| 113 | Laspina, Carrie | New Jersey | 2010 | Volkswagen | Jetta TDI |
| 114 | Forbes, Nathan Giles | New Jersey | 2012 | Volkswagen | Touareg TDI |
| 115 | Converse, Alvin | New Mexico | 2013 | Volkswagen | Jetta TDI |
| 116 | Farmer, Melani Buchanan | New Mexico | 2012 | Volkswagen | Jetta TDI |
| 117 | Hart Hoxeng, Carmelina | New Mexico | 2009 | VW | Jetta TDI |
| 118 | Root, Daniel and Root, Wanpen | New Mexico | 2014 | Volkswagen | Touareg TDI |
| 119 | Bedard, Kevin and Bedard, Elizabeth | New York | 2015 | Audi | A3 TDI |
| 120 | Eslick, Robert | New York | 2013 | Volkswagen | Passat TDI |
| 121 | Kirtland, Cynthia R. | New York | 2014 | VW | Jetta SportWagen TDI |
| 122 | Kolpan, Steven | New York | 2015 | Volkswagen | Passat TDI |
| 123 | Pagano, Yvette | New York | 2014 | Volkswagen | Jetta SportWagen TDI |
| 124 | Shaw, Marjorie Hodges | New York | 2012 | Volkswagen | Jetta SportWagen TDI |
| 125 | Dowd, Matthew | North Carolina | 2015 | Audi | Q7 TDI |
| 126 | Krimmelbein, Michael Charles | North Carolina | 2015 | Volkswagen | Passat TDI |
| 127 | Alexander, Christian | North Carolina | 2012 | VW | Jetta TDI |
| 128 | Harlan, Will | North Carolina North Carolina | 2011 2014 | Volkswagen Volkswagen | Jetta TDI Jetta TDI |
| 129 | Gramling, Michelle | North Dakota | 2015 | Volkswagen | Jetta TDI |
| 130 | Greitzer, Michael J. | Ohio | 2013 | Volkswagen | Passat TDI |
| 131 | Stewart, Marc | Ohio | 2010 | Volkswagen | Jetta TDI |
| 132 | Vigran, Gary | Ohio | 2014 | Porsche | Cayenne Diesel |

| No. | Class Representative | State | Model Year | Make | Model |
|---|---|---|---|---|---|
| 133 | Greenfield, Heather | Oklahoma | 2010 | Volkswagen | Jetta TDI |
| 134 | Ayala, Thomas W. | Oregon | 2014 | Volkswagen | Passat TDI |
| 135 | Cohen, Coby and Jaffee, Miriam A. | Oregon | 2016 | Audi | Q5 TDI |
| 136 | Yussim, Herbert | Oregon | 2015 | Volkswagen | Passat TDI |
| 137 | Bond, Nicholas | Oregon | 2013 | Volkswagen | Jetta SportWagen TDI |
| 138 | Bialecki, Brian J. | Pennsylvania | 2014 2012 | Volkswagen Volkswagen | Passat TDI Jetta TDI |
| 139 | Labbate, Karen | Pennsylvania | 2015 | Volkswagen | Passat TDI |
| 140 | Pratt III, J. Wesley | Pennsylvania | 2014 2013 | Volkswagen Volkswagen | Touareg TDI Jetta TDI |
| 141 | Urbaniak, James J. | Rhode Island | 2014 | Volkswagen | Jetta SportWagen TDI |
| 142 | Mehls, Katherine | Rhode Island | 2015 | Volkswagen | Golf SportWagen TDI |
| 143 | Oxendine, Perry | South Carolina | 2014 | Porsche | Cayenne Diesel |
| 144 | Powers, Whitney | South Carolina | 2011 | Volkswagen | Jetta SportWagen TDI |
| 145 | Goeman, Rodney | South Dakota | 2014 | VW | Passat TDI |
| 146 | Johnson, Robin A. | Tennessee | 2013 | Volkswagen | Beetle TDI |
| 147 | Andrews, Carol | Tennessee | 2012 | Volkswagen | Jetta TDI |
| 148 | Hess, Jason | Tennessee | 2015 | Volkswagen | Passat TDI |
| 149 | Esquivel, Lori | Texas | 2014 | Volkswagen | Jetta TDI |
| 150 | Fitzpatrick, Timothy S. | Texas | 2015 | Volkswagen | Golf SportWagen TDI |
| 151 | McNeal, Roy | Texas | 2014 | Volkswagen | Passat TDI |
| 152 | Nosrat, Amin | Texas | 2014 | Audi | A6 TDI |
| 153 | Alters, Brett | Utah | 2012 | Volkswagen | Golf TDI |

1292776.5

CONSOLIDATED CONSUMER CLASS
COMPLAINT MDL 2672 CRB (JSC)

| No. | Class Representative | State | Model Year | Make | Model |
|-----|---------------------|-------|------------|------|-------|
| 154 | King, Kelly R. | Utah | 2013 | Volkswagen | Jetta TDI |
| 155 | Otto, Rachel | Utah | 2015 | Volkswagen | Golf SportWagen TDI |
| 156 | Wilson, William Andrew | Utah | 2013 | Volkswagen | Passat TDI |
| 157 | Ebenstein, David | Vermont | 2015 | Volkswagen | Golf TDI |
| 158 | Malloy, James | Vermont Vermont | 2014 2011 | Volkswagen Volkswagen | Passat TDI Golf TDI |
| 159 | Ford, Walter | Virginia | 2013 | Volkswagen | Passat TDI |
| 160 | Meintzschel, Michael | Virginia | 2015 | Volkswagen | Golf SportWagen TDI |
| 161 | Schumacher, Mark | Virginia | 2012 | Volkswagen | Passat TDI |
| 162 | Staby, John | Virginia | 2014 | Audi | A6 TDI |
| 163 | Taylor, Scott | Virginia | 2012 | Volkswagen | Passat TDI |
| 164 | Brier, Steven E. | Virginia Virginia | 2010 2014 | Volkswagen Volkswagen | Jetta TDI Jetta SportWagen TDI |
| 165 | Clements, Dan | Washington | 2012 | Volkswagen | Touareg TDI |
| 166 | Dial, Chad | Washington | 2014 | Volkswagen | Passat TDI |
| 167 | Herr, Joseph | Washington | 2015 | Volkswagen | Passat TDI |
| 168 | Mallery, Kurt | Washington | 2010 | Volkswagen | Golf TDI |
| 169 | Lanham, Richard | West Virginia | 2014 | Volkswagen | Jetta TDI |
| 170 | Moore, Marion B. | West Virginia | 2014 | Volkswagen | Jetta TDI |
| 171 | Niegelsen, Chad M. | Wisconsin | 2009 | Volkswagen | Jetta SportWagen TDI |
| 172 | Swenson, Laura | Wisconsin | 2014 | Volkswagen | Jetta SportWagen TDI |
| 173 | Mills, Brian Nicholas | Wyoming | 2015 | Volkswagen | Passat TDI |
| 174 | Tempest, Rone | Wyoming | 2009 | Volkswagen | Jetta TDI |

1.     **Alabama Plaintiffs**

15.     Plaintiff MARION MCINTOSH (for the purpose of this paragraph, "Plaintiff") is a citizen of Alabama domiciled in Camden, Alabama.  On or about June 7, 2013, Plaintiff purchased a new 2013 Volkswagen Passat TDI, VIN 1VWCN7A31DC116194 (for the purpose of this paragraph, the "Class Vehicle"), from Jack Ingram Motors in Montgomery, Alabama. Plaintiff worked as a teacher, coach and principal for the Monroe County Board of Education for thirty years prior to retiring.  Before purchasing the Class Vehicle, Plaintiff saw numerous television ads billing Volkswagen's "clean" diesel vehicles as environmentally-friendly and fuel-efficient.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff has not utilized his Class Vehicle in approximately six months because he is concerned that the illegal levels of noxious pollutants it emits may adversely impact his health.

16.     Plaintiff COOPER RUTLAND JR. (for the purpose of this paragraph, "Plaintiff") is a citizen of Alabama domiciled in Fitzpatrick, Alabama.  On or about March 30, 2015, Plaintiff purchased a new 2015 Volkswagen Passat TDI, VIN 1VWBV7A36FC057500 (for the purpose of this paragraph, the "Class Vehicle"), from Jack Ingram Motors in Montgomery, Alabama. Plaintiff has been the sole proprietor of a law firm in Alabama for approximately the past twenty years.  Before purchasing the Class Vehicle, Plaintiff viewed numerous television ads extolling the virtues of Volkswagen "clean" diesel vehicles, including but not limited to their purported fuel efficiency and low emissions.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a

high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

17.     Plaintiff ARTHUR SCHAREIN (for the purpose of this paragraph, "Plaintiff") is a citizen of Alabama domiciled in Israel. On or about November 20, 2014, Plaintiff purchased a new 2014 Volkswagen Beetle Convertible TDI Premium, VIN 3VW5L7AT9EM818522 (for the purpose of this paragraph, the "Class Vehicle"), from Hiley Volkswagen in Huntsville, Alabama. Plaintiff is a veteran who currently works as Chief of International Armaments Cooperation for the United States Department of Defense. Before purchasing the Class Vehicle, Plaintiff explored various vehicle options through online research and by reading Car & Driver magazine. Additionally, Plaintiff frequently received emails from Hiley Volkswagen touting Volkswagen's vehicles as fuel efficient and "green." The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

## 2.     Alaska Plaintiffs

18.     Plaintiff JASON HILL (for the purpose of this paragraph, "Plaintiff") is a citizen of Alaska domiciled in Eagle River, Alaska. On or about February 2013, Plaintiff purchased a new 2013 Jetta TDI (for the purpose of this paragraph, the "Class Vehicle"), from Kendall

- 16 -

1  Volkswagen of Anchorage in Anchorage, Alaska. Plaintiff is currently serving as a Fuels

2  Distribution Supervisor for the United States Air Force at joint Base Elmendorf-Richardson.

3  Before purchasing the Class Vehicle, Plaintiff thoroughly researched "clean" diesel vehicles and

4  was told the Jetta TDI was a "clean diesel", good for the environment, and best in class for

5  emissions and gas mileage. At the dealership, virtually every other sentence about the car

6  included the term "clean diesel." The emission representations, in combination with the

7  advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a

8  high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at

9  the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission

10  standards and deceive consumers and regulators. Consequently, the Class Vehicle could not

11  deliver the advertised combination of low emissions, high performance, and fuel economy—and

12  was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants'

13  conduct, and would not have purchased the Class Vehicle had Defendants not concealed the

14  illegal defeat device. Plaintiff traded in his vehicle in October 2015. Despite the fact that the

15  vehicle was in pristine condition, he only received $17,000 for it.

16             **3.**      **Arizona Plaintiffs**

17       19.     Plaintiff RAY PRECIADO (for the purpose of this paragraph, "Plaintiff") is a

18  citizen of Arizona domiciled in Benson, Arizona. On or about September 17, 2015, Plaintiff

19  purchased a new 2015 Volkswagen Passat TDI, VIN 1VWCV7A33FC066160 (for the purpose of

20  this paragraph, the "Class Vehicle"), from San Tan Volkswagen in Gilbert, Arizona. Plaintiff is

21  the owner of Boxing Inc. University, a fitness franchise, and has dedicated his professional career

22  to promoting health. He is also concerned with environmental preservation and renewable energy

23  sources. Before purchasing the Class Vehicle, Plaintiff exhaustively researched Volkswagen's

24  "clean" diesel vehicles, viewed Volkswagen's representations about the emissions and fuel

25  performance, and ultimately traded in a hybrid vehicle to purchase his "clean" diesel Passat. The

26  emission representations, in combination with the advertised fuel efficiency and performance, as

27  well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase

28  the Class Vehicle, instead of other vehicles he was considering, including gas/electric hybrid

models. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff is appalled and embarrassed that the Class Vehicle has polluted, and continues to pollute, at levels many times greater than the legal limit.

20.     Plaintiff SUSAN TARRENCE (for the purpose of this paragraph, "Plaintiff") is a citizen of Arizona domiciled in Tucson, Arizona. On or about August 2010, Plaintiff purchased a new 2011 Audi A3 TDI, VIN WAUKJBFMXBA025669 (for the purpose of this paragraph, the "Class Vehicle"), from Chapman Audi in Tucson, Arizona. Plaintiff is a retired professional who is conscious of environmental preservation and renewable energy sources. It was critical to her that whatever vehicle she purchased be environmentally-friendly. Before purchasing the Class Vehicle, Plaintiff exhaustively researched the "clean" diesel vehicles, viewed Audi's representations about the emissions and fuel performance, and ultimately chose her "clean" diesel Audi A3 because the specific make and model was awarded "Green Car of the Year" by Green Car Journal. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle, instead of the others she was considering, including gas/electric hybrid models. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff is appalled and embarrassed that the Class Vehicle has polluted, and continues to pollute, at levels many times greater than the legal limit.

21.     Plaintiff STEVEN R. THORNTON (for the purpose of this paragraph, "Plaintiff") is a citizen of Georgia domiciled in Atlanta, Georgia.  On or about April 2014, Plaintiff purchased a new 2014 Volkswagen Passat TDI, VIN 1VWBN7A30EC062979 (for the purpose of this paragraph, the "Class Vehicle"), from Larry M. Miller Volkswagen in Avondale, Arizona. Plaintiff is a mortgage underwriter with an undergraduate degree in journalism who is familiar with conducting research, and conscious of environmental preservation and renewable energy sources.  It was critical to him that whatever vehicle he purchased be environmentally-friendly. Before purchasing the Class Vehicle, Plaintiff exhaustively researched Volkswagen's "clean" diesel vehicles, viewed Volkswagen's representations about the emissions and fuel performance, and ultimately purchased his Passat because of these misrepresentations.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle instead of the other, "eco-friendly" vehicles he was considering.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.  Plaintiff is appalled and embarrassed that the Class Vehicle has polluted, and continues to pollute, at levels many times greater than the legal limit.

### 4.     Arkansas Plaintiffs

22.     Plaintiff VICKIE RIMA (for the purpose of this paragraph, "Plaintiff") is a citizen of Arkansas domiciled in Hot Springs National Park, Arkansas.  On or about July 13, 2013, Plaintiff purchased a new 2013 Volkswagen Beetle TDI, VIN 3VW5L7AT0DM825888 (for the purpose of this paragraph, the "Class Vehicle"), from Owens Murphy Volkswagen in Little Rock, Arkansas.  Plaintiff is retired, and when she was looking for a car, she and her family sought out an environmentally-friendly, reliable, durable and cost-efficient vehicle for her retirement years. Before purchasing the Class Vehicle, Plaintiff and her family researched "clean" diesel vehicles

and viewed Volkswagen's representations regarding their reliability, fuel economy and low

emissions. The emission representations, in combination with the advertised fuel efficiency and

performance, as well as the vehicle's reputation for maintaining a high resale value, induced

Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the

Class Vehicle contained a defeat device designed to bypass emission standards and deceive

consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised

combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff

has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would

not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

### 5. California Plaintiffs

23. Plaintiff ROMEO JAMES ALBA (for the purpose of this paragraph, "Plaintiff") is

a citizen of California domiciled in Lake Balboa, California. On or about February 8, 2010,

Plaintiff purchased a new 2010 Audi A3 TDI, VIN WAUKJAFM9AA091719 (for the purpose of

this paragraph, the "Class Vehicle"), from the Auto Gallery in Woodland Hills, California.

Plaintiff is an environmental engineer, and he wanted an environmentally-friendly vehicle that

was also luxurious, fuel efficient, and high-performing. Before purchasing the Class Vehicle,

Plaintiff reviewed advertisements for Audi's "clean" diesel vehicles, which led him to believe

that the Class Vehicle was good for the environment, and different from a traditional diesel

vehicle. The emission representations, in combination with the advertised fuel efficiency and

performance, as well as the vehicle's reputation for maintaining a high resale value, induced

Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the

Class Vehicle contained a defeat device designed to bypass emission standards and deceive

consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised

combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff

has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would

not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

Plaintiff is frustrated and appalled that Defendants deliberately installed software in the Class

Vehicle to bypass emissions regulations.

24.     Plaintiff ANNE DUNCAN ARGENTO (for the purpose of this paragraph, "Plaintiff") is a citizen of California domiciled in Santa Maria, California.  On or about May 11, 2013, Plaintiff purchased a new 2013 Volkswagen Jetta TDI, VIN 3VWLL7AJ7DM402814 (for the purpose of this paragraph, the "Class Vehicle"), from Volkswagen Santa Monica in Santa Maria, California.  Plaintiff works in the field of sustainability, and she wanted an environmentally-friendly car that was fuel efficient and had low emissions.  Before purchasing the Class Vehicle, researched Volkswagen's "clean" diesel vehicles, and was led to believe that the Class Vehicle was environmentally-friendly, and would perform better than a hybrid vehicle. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff has made a conscious effort to drive the Class Vehicle less, due to her concerns about the vehicle's emissions.  Plaintiff requested her Volkswagen dealer to buy back the Class Vehicle shortly after she learned about the "clean" diesel emissions scandal, but the dealer did not agree to buy back the vehicle.

25.     Plaintiff SIMON BEAVEN (for the purpose of this paragraph, "Plaintiff") is a citizen of California domiciled in West Lake, California.  On or about March 15, 2011, Plaintiff purchased a new 2011 Audi A3 TDI, VIN WAUKJAFMXBA151685 (for the purpose of this paragraph, the "Class Vehicle"), from Audi Newport Beach in Newport Beach, California. Plaintiff is an Assistant Professor of Medicine at the David Geffen School of Medicine at the University of California, Los Angeles, and he wanted an environmentally-friendly vehicle that was fuel efficient and high-performing.  Before purchasing the Class Vehicle, Plaintiff researched the Class Vehicle and relied on representations from the Audi website, Audi advertisements, and

1 the Audi dealer. The emission representations, in combination with the advertised fuel efficiency

2 and performance, as well as the vehicle's reputation for maintaining a high resale value, induced

3 Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the

4 Class Vehicle contained a defeat device designed to bypass emission standards and deceive

5 consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised

6 combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff

7 has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would

8 not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

9 Plaintiff is frustrated and appalled that Defendants deliberately installed software in the Class

10 Vehicle to bypass emissions regulations. Plaintiff requested his local Audi dealer to buy back the

11 Class Vehicle shortly after learning about the "clean" diesel emissions scandal, but he was given

12 an offer below the fair market value.

13          26.     Plaintiff JULIET BRODIE (for the purpose of this paragraph, "Plaintiff") is a

14 citizen of California domiciled in Menlo Park, California. On or about December 28, 2013,

15 Plaintiff purchased a new 2014 Volkswagen Jetta Sportwagen TDI, VIN 3VWPL7AJ0EM607734

16 (for the purpose of this paragraph, the "Class Vehicle"), from Sunnyvale Volkswagen in

17 Sunnyvale, California. Plaintiff is a Professor and Associate Dean at Stanford Law School who is

18 concerned about protecting the environment. She wanted an environmentally-friendly vehicle

19 that was fuel efficient and high-performing. Before purchasing the Class Vehicle, Plaintiff

20 researched the Class Vehicle and was led to believe that it would be a "clean" and "green" vehicle

21 that would not compromise performance or fuel efficiency. The emission representations, in

22 combination with the advertised fuel efficiency and performance, as well as the vehicle's

23 reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.

24 Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device

25 designed to bypass emission standards and deceive consumers and regulators. Consequently, the

26 Class Vehicle could not deliver the advertised combination of low emissions, high performance,

27 and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and

28 proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had

Defendants not concealed the illegal defeat device.  Plaintiff is frustrated and appalled that

Volkswagen deliberately installed software in the Class Vehicle to bypass emissions regulations,

and is now ashamed to be seen driving the car.

27.     Plaintiff LENA BROOK (for the purpose of this paragraph, "Plaintiff") is a citizen

of California domiciled in San Francisco, California.  On or about March 23, 2015, Plaintiff

purchased a new 2015 Audi Q5 TDI, VIN WA1DMAFP6FA091904 (for the purpose of this

paragraph, the "Class Vehicle"), from California-based Cartelligent and  Palo Alto Audi in Palo

Alto, California.  Plaintiff works for the Natural Resources Defense Council, and has a Masters

degree in Environmental Studies from the Yale School of Forestry & Environmental Studies.

Before purchasing the Class Vehicle, Plaintiff researched the Class Vehicle through various

sources, including Audi's website, and was led to believe that the Class Vehicle was an excellent

environmental choice.  The emission representations, in combination with the advertised fuel

efficiency and performance, as well as the vehicle's reputation for maintaining a high resale

value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of

acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards

and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the

advertised combination of low emissions, high performance, and fuel economy—and was illegal.

Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and

would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat

device.  Prior to learning of the "clean" diesel emissions scandal, Plaintiff was a loyal Audi

customer.  She has since become frustrated and appalled that Defendants deliberately installed

software in the Class Vehicle to bypass emission regulations.  She now tries to drive the Class

Vehicle as little as possible, and is highly concerned with the vehicle's emissions.

28.     Plaintiffs GRANT M. BROPHY and CATHERINE BROPHY (for the purpose of

this paragraph, "Plaintiffs") are citizens of California domiciled in Santa Maria, California.  On or

about October 8, 2011, Plaintiffs purchased a new 2012 Volkswagen Passat TDI, VIN

1VWBN7A36CC011516 (for the purpose of this paragraph, the "Class Vehicle"), from

Community Volkswagen in Santa Maria, California.  Plaintiffs are educated and environmentally-

conscious consumers; Plaintiff Catherine Brophy works as a registered nurse, and Plaintiff Grant Brophy has degrees in aviation and aeronautical science. Before purchasing the Class Vehicle, Plaintiffs researched the Class Vehicle, and were impressed by Volkswagen's claims that the vehicle was environmentally-friendly, fuel efficient, and had high engine performance and reliability. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiffs, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiffs have suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

29.     Plaintiff SARAH BURT (for the purpose of this paragraph, "Plaintiff") is a citizen of California domiciled in Berkeley, California. On or about May 22, 2011, Plaintiff purchased a new 2011 Volkswagen Golf TDI, VIN WVWDM7AJ4BW209117 (for the purpose of this paragraph, the "Class Vehicle"), from Sonnen Motorcars in San Raphael, California. Plaintiff is an environmental lawyer who has dedicated her life to protecting the environment. Before purchasing the Class Vehicle, Plaintiff researched the Class Vehicle and was led to believe that the Class Vehicle provided high fuel efficiency and low emission of pollutants. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff now tries to minimize her driving in the Class Vehicle, and uses her bicycle for transportation when possible.

30.     Plaintiff PHILLIP CLARK (for the purpose of this paragraph, "Plaintiff") is a citizen of California domiciled in Daly City, California.  On or about December 1, 2014, Plaintiff leased a new 2014 Volkswagen Touareg TDI, VIN WVGDP9BP8ED013893 (for the purpose of this paragraph, the "Class Vehicle"), from Serramonte VW in Daly City, California.  Before leasing the Class Vehicle, Plaintiff researched the Class Vehicle, and was led to believe that he would be making an environmentally conscious decision by leasing the Class Vehicle.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to lease the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have leased the Class Vehicle, had Defendants not concealed the illegal defeat device.

31.     Plaintiff WILLIAM S. DODGE (for the purpose of this paragraph, "Plaintiff") is a citizen of California domiciled in Oakland, California.  On or about February 16, 2015, Plaintiff purchased a new 2015 Volkswagen Jetta TDI, VIN 3VWLA7AJXFM291619 (for the purpose of this paragraph, the "Class Vehicle"), from Volkswagen of Oakland in Oakland, California.  Plaintiff is a Professor of Law at the University of California, Davis School of Law, and he wanted a vehicle that would provide good gas mileage, and reduce the environmental impact of his lengthy commute.  Before purchasing the Class Vehicle, Plaintiff researched the Class Vehicle, including reviewing Volkswagen's website and advertisements, and was led to believe that the Class Vehicle provided high fuel efficiency and low emission of pollutants.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low emissions,

high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

32. Plaintiff AIMEE EPSTEIN (for the purpose of this paragraph, "Plaintiff") is a citizen of California domiciled in the Northern District of California. On or about December 27, 2009, Plaintiff purchased a new 2010 Volkswagen Jetta SportWagen TDI, VIN 3VWPL8AJ2AM639326 (for the purpose of this paragraph, the "Class Vehicle"), from Sunnyvale Volkswagen in Sunnyvale, California. Plaintiff is a Stanford-educated environmental scientist who has dedicated her professional and academic career to environmental preservation and renewable energy. It was critical to her that whatever vehicle she purchased be environmentally-friendly. Before purchasing the Class Vehicle, Plaintiff exhaustively researched the "clean" diesel vehicles, viewed Volkswagen's representations about the emissions and fuel performance, and even compared the advertised emissions to those of comparable, gasoline-powered vehicles listed on the EPA website. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff is appalled and embarrassed that the Class Vehicle has polluted, and continues to pollute, up to forty times the legal limits.

33. Plaintiff GEORGE FARQUAR (for the purpose of this paragraph, "Plaintiff") is a citizen of California domiciled in Livermore, California. On or about December 19, 2009, Plaintiff purchased a new 2010 Volkswagen Jetta TDI, VIN 3VWRL7AJ8AM062563 (for the purpose of this paragraph, the "Class Vehicle"), from Sunnyvale Volkswagen in Sunnyvale, California. Plaintiff has a Ph.D. in physical chemistry, and performs scientific consulting and

1    detection of environmental and toxic chemicals. Before purchasing the Class Vehicle, Plaintiff

2    researched the Class Vehicle, and chose the Class Vehicle over other hybrid vehicles he was

3    considering, based on its advertised fuel economy, performance, and "clean" diesel engine. The

4    emission representations, in combination with the advertised fuel efficiency and performance, as

5    well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase

6    the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle

7    contained a defeat device designed to bypass emission standards and deceive consumers and

8    regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low

9    emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete

10    injury as a direct and proximate result of Defendants' conduct, and would not have purchased the

11    Class Vehicle, had Defendants not concealed the illegal defeat device.

12        34.    Plaintiff JEROME FOHET (for the purpose of this paragraph, "Plaintiff") is a

13    citizen of California domiciled in San Jose, California. On or about January 31, 2014, Plaintiff

14    purchased a new 2014 Porsche Cayenne Diesel, VIN WP1AF2A22ELA44682 (for the purpose of

15    this paragraph, the "Class Vehicle"), from Porsche of Fremont in Fremont, California. Before

16    purchasing the Class Vehicle, Plaintiff researched the Class Vehicle, and was led to believe that

17    the "clean" diesel engine would be more fuel efficient and environmentally-friendly than a gas

18    engine vehicle. The emission representations, in combination with the advertised fuel efficiency

19    and performance, as well as the vehicle's reputation for maintaining a high resale value, induced

20    Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the

21    Class Vehicle contained a defeat device designed to bypass emission standards and deceive

22    consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised

23    combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff

24    has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would

25    not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

26        35.    Plaintiff CAROLINE HOAG (for the purpose of this paragraph, "Plaintiff") is a

27    citizen of California domiciled in San Diego, California. On or about January 28, 2011, Plaintiff

28    purchased a new 2011 Volkswagen Jetta Sportwagen TDI, VIN 3VWPL8AJ6BM651240 (for the

1  purpose of this paragraph, the "Class Vehicle"), from South Bay Volkswagen in National City,

2  California.  Before purchasing the Class Vehicle, Plaintiff researched the Class Vehicle and

3  Volkswagen's brochures, and was led to believe that the "clean" diesel engine would provide

4  good performance and fuel efficiency, while also being environmentally-friendly.  The emission

5  representations, in combination with the advertised fuel efficiency and performance, as well as

6  the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the

7  Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a

8  defeat device designed to bypass emission standards and deceive consumers and regulators.

9  Consequently, the Class Vehicle could not deliver the advertised combination of low emissions,

10 high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a

11 direct and proximate result of Defendants' conduct, and would not have purchased the Class

12 Vehicle, had Defendants not concealed the illegal defeat device.  Plaintiff now tries to minimize

13 her driving to reduce the emissions from the Class Vehicle.

14        36.      Plaintiff HON. MARK D. HOULE (for the purpose of this paragraph, "Plaintiff")

15 is a citizen of California domiciled in Laguna Hills, California.  On or about May 8, 2015,

16 Plaintiff purchased a new 2015 Volkswagen Passat TDI, VIN 1VWBV7A33FC090180 (for the

17 purpose of this paragraph, the "Class Vehicle"), from Capistrano Volkswagen in San Juan

18 Capistrano, CA.  Plaintiff is a federal bankruptcy judge in the United States Bankruptcy Court,

19 Central District of California.  Before purchasing the Class Vehicle, Plaintiff researched the Class

20 Vehicle and reviewed an extensive amount of advertising, reviews, and the Volkswagen website

21 regarding the Class Vehicle.  Plaintiff also received materials from the dealer regarding

22 Volkswagen's "clean" diesel vehicles, and the emission representations, in combination with the

23 advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a

24 high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at

25 the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission

26 standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not

27 deliver the advertised combination of low emissions, high performance, and fuel economy—and

28 was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants'

1   conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the

2   illegal defeat device.

3          37.     Plaintiff REBECCA KAPLAN (for the purpose of this paragraph, "Plaintiff") is a

4   citizen of California domiciled in Oakland, California.  On or about September 27, 2011, Plaintiff

5   purchased a new 2012 Volkswagen Golf TDI, VIN WVWDM7AJ4CW074979 (for the purpose

6   of this paragraph, the "Class Vehicle"), from Volkswagen of Oakland in Oakland, California.

7   Plaintiff is the Vice Mayor and Councilmember At-Large for the City of Oakland, California.

8   She has been a lifelong environmental advocate, and has actively worked to reduce emissions and

9   promote clean air in Oakland.  Before purchasing the Class Vehicle, Plaintiff researched the Class

10  Vehicle, and relied on Volkswagen's advertising and representations from the dealership

11  regarding the benefits of its "clean" diesel vehicles.  The emission representations, in combination

12  with the advertised fuel efficiency and performance, as well as the vehicle's reputation for

13  maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to

14  Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to

15  bypass emission standards and deceive consumers and regulators.  Consequently, the Class

16  Vehicle could not deliver the advertised combination of low emissions, high performance, and

17  fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate

18  result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants

19  not concealed the illegal defeat device.  After learning about Volkswagen's "clean" diesel

20  emissions scandal, Plaintiff contacted her dealer to request a buy-back, but the dealer denied her

21  request.  Plaintiff no longer drives the Class Vehicle in light of its true level of emissions, and has

22  registered the car as nonoperational.  It is now stored in a parking/storage facility, and Plaintiff

23  must pay a monthly fee to maintain the storage.

24         38.     Plaintiff HELEN KOSIK-WESTLY (for the purpose of this paragraph, "Plaintiff")

25  is a citizen of California domiciled in Monterey, California.  On or about December 20, 20111

26  Plaintiff purchased a new 2011 Volkswagen Golf TDI, VIN WVWBM7AJ8BW130699 (for the

27  purpose of this paragraph, the "Class Vehicle"), from Volkswagen of Santa Cruz in Santa Cruz,

28  California.  Plaintiff  actively involved in her community, and is dedicated to protecting the

environment. She needed a car to perform her "Meals On Wheels" deliveries in the community, and wanted a car that was environmentally-friendly. Before purchasing the Class Vehicle, Plaintiff researched the Class Vehicle and reviewed Volkswagen's advertising, including television commercials, a Volkswagen brochure, and a newspaper review. She also viewed the car at an auto show at the Moscone Center in San Francisco where she spoke to a sales representative for Volkswagen. The emission representations, in combination with the advertised fuel efficiency and performance, induced Plaintiff to purchase the Class Vehicle instead of the other, "hybrid" vehicles she was considering. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

39.     Plaintiff RAYMOND KREIN (for the purpose of this paragraph, "Plaintiff") is a citizen of California domiciled in San Francisco, California. On or about December 31, 2014, Plaintiff purchased a new 2014 Volkswagen Jetta SportWagen TDI, VIN 3VWPL7AJ5EM627641 (for the purpose of this paragraph, the "Class Vehicle"), from Serramonte Volkswagen in Daly City, California. Plaintiff is a federal revenue agent with the Internal Revenue Service, and he had been a loyal Volkswagen customer for over ten years. Before purchasing the Class Vehicle, Plaintiff researched the Class Vehicle, and relied on Volkswagen's advertising and representations from the dealership regarding the benefits of its "clean" diesel vehicles. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal.

1  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and

2  would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat

3  device.

4          40.    Plaintiff MARGARET JANE MCGUIRE (for the purpose of this paragraph,

5  "Plaintiff") is a citizen of California domiciled in Oakland, California.  On or about July 2015,

6  Plaintiff purchased a new 2015 Volkswagen Beetle TDI, VIN 3VWRA7AT7FM633989 (for the

7  purpose of this paragraph, the "Class Vehicle"), from Dirito Brothers in Walnut Creek,

8  California.  Plaintiff is the Executive Director of the Women's Cancer Resource Center, and is an

9  environmentally-conscious consumer.  Before purchasing the Class Vehicle, Plaintiff researched

10  the Class Vehicle, and was lead to believe that the Class Vehicle would combine fuel efficiency

11  with low environmental impact.  The emission representations, in combination with the

12  advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a

13  high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at

14  the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission

15  standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not

16  deliver the advertised combination of low emissions, high performance, and fuel economy—and

17  was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants'

18  conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the

19  illegal defeat device.  Plaintiff now limits her driving of the Class Vehicle because its emissions

20  and environmental impact, and she relies on friends for alternative transportation when possible.

21          41.    Plaintiffs BERNADETTE MEYLER and MATTHEW SMITH (for the purpose of

22  this paragraph, "Plaintiffs") are citizens of California domiciled in Palo Alto, California.  On or

23  about July 15, 2013, Plaintiffs purchased a new 2013 Volkswagen Passat TDI, VIN

24  1VWCN7A3XDC148996 (for the purpose of this paragraph, the "Class Vehicle"), from

25  Broadway Volkswagen in Redwood City, California.  Plaintiffs are both professors at Stanford

26  University, and they are environmentally-conscious consumers.  Before purchasing the Class

27  Vehicle, Plaintiffs conducted extensive research on the Class Vehicle and competing vehicles,

28  and were led to believe that the Class Vehicle was a fuel efficient, high-performing, and

environmentally-friendly vehicle. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiffs, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiffs have suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

42.     Plaintiff RHONNDA PELLEGRINI (for the purpose of this paragraph, "Plaintiff") is a citizen of California domiciled in Carlotta, California. On or about February 16, 2014, Plaintiff purchased a new 2014 Volkswagen Passat TDI, VIN 1VWCN7A32EC027378 (for the purpose of this paragraph, the "Class Vehicle"), from Chico Volkswagen in Chico, California. Plaintiff is a retired United States Marine service member who is an environmentally-conscious consumer. Before purchasing the Class Vehicle, Plaintiff conducted extensive research on the Class Vehicle, including reviewing Volkswagen's advertising materials, speaking with Volkswagen dealerships, and reading reviews on the vehicle. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

43.     Plaintiff SUSAN SHALIT (for the purpose of this paragraph, "Plaintiff") is a citizen of California domiciled in San Francisco, California. On or about January 8, 2015, Plaintiff purchased a new 2015 Volkswagen Golf TDI, VIN 3VW2A7AU4FM043405 (for the

1    purpose of this paragraph, the "Class Vehicle"), from Sonnen VW in San Raphael, California.

2    Plaintiff is an environmentally-conscious consumer who wanted to purchase a high-performing

3    and fuel efficient vehicle that would have a minimal environmental impact. Before purchasing

4    the Class Vehicle, Plaintiff researched the Class Vehicle, which included reviewing

5    Volkswagen's advertising materials. This led Plaintiff to choose the Class Vehicle over the

6    competing electric and "hybrid" vehicles she was considering. The emission representations, in

7    combination with the advertised fuel efficiency and performance, as well as the vehicle's

8    reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.

9    Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device

10    designed to bypass emission standards and deceive consumers and regulators. Consequently, the

11    Class Vehicle could not deliver the advertised combination of low emissions, high performance,

12    and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and

13    proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had

14    Defendants not concealed the illegal defeat device.

15        44.    Plaintiff TED TRUONG (for the purpose of this paragraph, "Plaintiff") is a citizen

16    of California domiciled in San Francisco, California. On or about June 29, 2014, Plaintiff

17    purchased a new 2014 Audi Q5 TDI, VIN WA1CMAFP2EA122625 (for the purpose of this

18    paragraph, the "Class Vehicle"), from Oakland Audi in Oakland, California. Plaintiff Ted Truong

19    attended the University of California, Davis, and is the Director of Client Services at a research

20    company in Northern California. Before purchasing the Class Vehicle, Plaintiff extensively

21    researched the Class Vehicle, and discovered that the Class Vehicle received extremely high

22    marks for performance and efficiency, higher than Audi's then-available hybrid options. The

23    emission representations, in combination with the advertised fuel efficiency and performance, as

24    well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase

25    the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle

26    contained a defeat device designed to bypass emission standards and deceive consumers and

27    regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low

28    emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete

1    injury as a direct and proximate result of Defendants' conduct, and would not have purchased the

2    Class Vehicle, had Defendants not concealed the illegal defeat device.  Plaintiff now hardly

3    drives the Class Vehicle at all, and instead drives his other car, which runs on gasoline.

4         45.    Plaintiff STEPHEN VERNER (for the purpose of this paragraph, "Plaintiff") is a

5    citizen of California domiciled in Oakland, California.  On or about May 1, 2013, Plaintiff

6    purchased a new 2013 Volkswagen Golf TDI, VIN WVWNM7AJ3DW122154 (for the purpose

7    of this paragraph, the "Class Vehicle"), from Royal Motors in San Francisco, California.  Plaintiff

8    is a graduate of the U.S. Naval Academy and the University of Pennsylvania, and is a veteran of

9    the navy.  He runs his own architectural firm in Oakland, California.  Before purchasing the Class

10   Vehicle, Plaintiff extensively researched the Class Vehicle.  After attending car shows,

11   researching online, and analyzing the vehicle's EPA rating, Plaintiff chose the Class Vehicle over

12   other clean diesel and hybrid cars because he believed that this was the best option from a green

13   and performance perspective.  The emissions representations, in combination with the advertised

14   fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale

15   value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of

16   acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards

17   and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the

18   advertised combination of low emissions, high performance, and fuel economy—and was illegal.

19   Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and

20   would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat

21   device.  In the wake of the revelations about the defeat device, Plaintiff minimizes driving his

22   vehicle, driving his wife's car and/or taking alternative transportation.  As an architect focused on

23   sustainability, Plaintiff's clients are beginning to wonder whether Plaintiff will get rid of the

24   vehicle.

25        46.    Plaintiff LEO WINTERNITZ (for the purpose of this paragraph, "Plaintiff") is a

26   citizen of California domiciled in Carmichael, California.  On or about June 2009, Plaintiff

27   purchased a new 2009 Volkswagen Jetta Sportwagen TDI, VIN 3VWPL71K99M359207 (for the

28   purpose of this paragraph, the "Class Vehicle"), from Niello Volkswagen, in Sacramento,

California.  Plaintiff is an environmental scientist and a board member of the American River
Parkway Foundation, which coordinates the efforts of hundreds of volunteers to restore, maintain,
and improve the American River Parkway.  Before purchasing the Class Vehicle, Plaintiff
researched and test-drove the Jetta and found it to be the perfect combination of performance and
low emissions.  The emission representations, in combination with the advertised fuel efficiency
and performance, as well as the vehicle's reputation for maintaining a high resale value, induced
Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the
Class Vehicle contained a defeat device designed to bypass emission standards and deceive
consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised
combination of low emissions, high performance, and fuel economy—and was illegal.  Plaintiff
has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would
not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

### 6.  Colorado Plaintiffs

47.  Plaintiff MARCUS DOEGE (for the purpose of this paragraph, "Plaintiff") is a
citizen of Colorado domiciled in Castle Rock, Colorado.  On or about March 10, 2012, Plaintiff
purchased a new 2012 Jetta TDI, VIN 3VWLL7AJXCM338427 and a new 2012 Touareg TDI,
VIN WVGFK9BP6CD001701 (for the purpose of this paragraph, the "Class Vehicles"), from
McDonald Automotive Group in Littleton, Colorado.  Plaintiff is a graduate of the German Naval
Academy and Air Force Academy and has been employed by Frontier Airlines as a pilot for the
last 13 years.  Plaintiff traded in his gasoline-powered cars in order to purchase the Class
Vehicles.  Before purchasing the Class Vehicles, Plaintiff researched "clean" diesel vehicles on
the internet and was convinced that "clean" diesel vehicles had better fuel efficiency and cleaner
emissions than gasoline-powered vehicles.  He was told by the dealership that "clean" diesel
vehicles were environmentally-friendly, and "the exhaust coming out of the Touareg is almost
like pool water, drinkable, and safe to inhale."  The emission representations, in combination with
the advertised fuel efficiency and performance, as well as the vehicles' reputation for maintaining
a high resale value, induced Plaintiff to purchase the Class Vehicles.  Unbeknownst to Plaintiff, at
the time of acquisition, the Class Vehicles contained defeat devices designed to bypass emission

standards and deceive consumers and regulators. Consequently, the Class Vehicles could not deliver the advertised combination of low emissions, high performance, and fuel economy—and were illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicles had Defendants not concealed the illegal defeat devices. When he learned the Class Vehicles contained a defeat device designed to bypass emissions standards he wanted to see if Volkswagen would take them back. Plaintiff sent an email to the general manager at McDonald Automotive and stated he had been misled, but did not receive any response.

48.     Plaintiff MARY HILDEGARD REISER (for the purpose of this paragraph, "Plaintiff") is a citizen of Colorado domiciled in Loveland, Colorado. On or about August 3, 2015, Plaintiff purchased a new 2015 Volkswagen Golf TDI, VIN 3VW2A7AU5FM066272 (for the purpose of this paragraph, the "Class Vehicle"), from Ed Carroll Motor Company in Fort Collins, Colorado. Plaintiff is a retired Science Advisor for the National Park Service. She has a master's degree in wildlife ecology and a PhD in Zoology from Northern Arizona University. As an environmentalist, Plaintiff wanted a clean-burning vehicle with a high miles-per-gallon ratio, power, and room for her dogs and camping gear. Before purchasing the Class Vehicle, Plaintiff spent over 100 hours checking on specs and reviews and test-drove a subset of vehicles that matched her criteria. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff was disgusted when she learned the news of Volkswagen's fraud only six weeks after she purchased her brand new 2015 Golf TDI.

49.     Plaintiff ROMAN ZVYAGELSKY (for the purpose of this paragraph, "Plaintiff") is a citizen of Colorado domiciled in Lakewood, Colorado.  On or about August 24, 2015, Plaintiff leased a new 2016 Audi Q5 TDI, VIN WA1DVAFP1GA034718 (for the purpose of this paragraph, the "Class Vehicle"), from Prestige Imports in Lakewood, Colorado.  Plaintiff has a degree in marketing from Southern Illinois University and currently sells cloud-based business communications solutions.  When Plaintiff leased the Class Vehicle, the dealership told him the Audi Q5 TDI had the best gas mileage and performance in its class.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to lease the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have leased the Class Vehicle, had Defendants not concealed the illegal defeat device.

### 7.     Connecticut Plaintiffs

50.     Plaintiff LESLIE MACLISE-KANE (for the purpose of this paragraph, "Plaintiff") is a citizen of Connecticut domiciled in Southbury, Connecticut.  On or about December 28, 2012, Plaintiff purchased a new 2013 Volkswagen Jetta Sportwagen TDI, VIN 3VWML7AJ3DM648859 (for the purpose of this paragraph, the "Class Vehicle"), from Danbury Volkswagen in Danbury, Connecticut.  Plaintiff attended Mount Holyoke College and the University of Massachusetts.  She has spent two decades working in the environmental field and is currently the Center Director for the National Audubon Society and Audubon Center at Bent of the River.  It was paramount for Plaintiff that the vehicle she purchased was the most environmentally-friendly option available in the market in 2012.  Before purchasing her Class Vehicle, Plaintiff conducted exhaustive research, including interviewing mechanics, reading automotive publications, and reading Volkswagen's representations about the emissions and fuel efficiency.  The emission representations, in combination with the advertised fuel efficiency and

performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle, instead of the other, "hybrid" vehicles she was considering at the time. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff is appalled and embarrassed that after extensive research and reliance on Volkswagen's statements that clean diesel was the wave of the future, her vehicle pollutes, continues to pollute, damaging the environment she has worked to protect.

51. Plaintiff TIMOTHY J. WATSON (for the purpose of this paragraph, "Plaintiff") is a citizen of Connecticut domiciled in Waterford, Connecticut. On or about May 29, 2015, Plaintiff purchased a new 2015 Audi A3 TDI, VIN WAUCJGFF7F1043863 (for the purpose of this paragraph, the "Class Vehicle"), from Hoffman Audi in New London, Connecticut. Plaintiff is an Ohio State University-educated PhD of Organic Chemistry and a research fellow at Pfizer. Plaintiff and his family undertake an annual "green" project to help lower their environmental impact, and his project for 2015 was to find a new vehicle with excellent fuel economy and low environmental impact while still being sporty. Before purchasing the Class Vehicle, Plaintiff did extensive internet research and test-drove a variety of diesel vehicles before ultimately choosing the Class Vehicle for its apparently superior green qualities. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and

1  proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had

2  Defendants not concealed the illegal defeat device.

3       52.    Plaintiff BRIAN WILLINGHAM (for the purpose of this paragraph, "Plaintiff") is

4  a citizen of New York domiciled in Katonah, New York. On or about September 10, 2014

5  Plaintiff leased a new 2015 Volkswagen Golf TDI, VIN 3VWRA7AU5FM013215 (for the

6  purpose of this paragraph, the "Class Vehicle"), from Weeks Automobile Corporation in

7  Danbury, Connecticut. Plaintiff is a private investigator and a Certified Fraud Examiner. He is

8  the president and founder of Diligentia Group, an investigation firm in Katonah, New York.

9  Before leasing the Class Vehicle, Plaintiff was inundated with advertisements and billboards for

10  Volkswagen's "clean" diesel vehicles on his daily commute, which resonated with his desire for a

11  "clean" diesel vehicle with excellent fuel economy. The emission representations, in combination

12  with the advertised fuel efficiency and performance, as well as the vehicle's reputation for

13  maintaining a high resale value, induced Plaintiff to lease the Class Vehicle. Unbeknownst to

14  Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to

15  bypass emission standards and deceive consumers and regulators. Consequently, the Class

16  Vehicle could not deliver the advertised combination of low emissions, high performance, and

17  fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate

18  result of Defendants' conduct, and would not have leased the Class Vehicle, had Defendants not

19  concealed the illegal defeat device.

20       **8.**    **Delaware Plaintiffs**

21       53.    Plaintiff DEWAYNE A. FOX (for the purpose of this paragraph, "Plaintiff") is a

22  citizen of Delaware domiciled in Lewes, Delaware. On or about May 19, 2010, Plaintiff

23  purchased a new 2010 Volkswagen Jetta SportWagen TDI, VIN 3VWTL7AJ3AM676037 (for the

24  purpose of this paragraph, the "Class Vehicle"), from Dover Volkswagen in Dover, Delaware.

25  Plaintiff has a PhD in Zoology and is an Associate Professor of Fisheries at Delaware State

26  University. He has focused his education and professional career on ecology. It was important to

27  Plaintiff that his more than ninety-mile a day commute had a minimal environment impact, but he

28  still wanted a comfortable ride. Before purchasing the Class Vehicle, Plaintiff saw Volkswagen's

1    advertisements concerning its alleged overall environmentally-friendly approach to clean diesels,

2    and the performance characteristics of its vehicles.  Plaintiff also conducted research on the

3    United States Department of Energy website before deciding to purchase the Class Vehicle.   The

4    emission representations, in combination with the advertised fuel efficiency and performance, as

5    well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase

6    the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle

7    contained a defeat device designed to bypass emission standards and deceive consumers and

8    regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low

9    emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete

10   injury as a direct and proximate result of Defendants' conduct, and would not have purchased the

11   Class Vehicle, had Defendants not concealed the illegal defeat device.  Plaintiff is embarrassed

12   and disappointed that his vehicle has polluted and continues to pollute at up to 40 times the legal

13   limit.

14          54.     Plaintiff CELIA B. SHELTON (for the purpose of this paragraph, "Plaintiff") is a

15   citizen of Delaware domiciled in Lewes, Delaware.  On or about July 23, 2013, Plaintiff

16   purchased a new 2014 Audi A6 3.0L TDI, VIN WAUHMAFC7EN008537 (for the purpose of

17   this paragraph, the "Class Vehicle"), from Winner Audi in Wilmington, Delaware.  Plaintiff

18   earned a PhD in Comparative Biomedical Sciences and a Bachelor of Science in Zoology, and

19   currently serves as Director of Regulatory Affairs for GlaxoSmithKline.  Before purchasing the

20   Class Vehicle, Plaintiff researched vehicles with good fuel economy, environmental quality,

21   safety ratings and comfort for her long daily commute to and from work.  The emission

22   representations, in combination with the advertised fuel efficiency and performance, as well as

23   the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the

24   Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a

25   defeat device designed to bypass emission standards and deceive consumers and regulators.

26   Consequently, the Class Vehicle could not deliver the advertised combination of low emissions,

27   high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a

28

1  direct and proximate result of Defendants' conduct, and would not have purchased the Class

2  Vehicle, had Defendants not concealed the illegal defeat device.

3  **9.  District of Columbia Plaintiffs**

4      55.  Plaintiff CHINA BOAK TERRELL (for the purpose of this paragraph, "Plaintiff")

5  is a citizen of the District of Columbia domiciled in Washington, D.C.  In or about August 20,

6  2014, Plaintiff purchased a used (Certified Pre-owned) 2010 Volkswagen Jetta Sedan TDI, VIN

7  3VWRL7AJ0AM165119 (for the purpose of this paragraph, the "Class Vehicle"), from Sheehy

8  Volkswagen of Springfield in Springfield, Virginia.  Plaintiff is Associate General Counsel and

9  Director of Programs for the Association of Corporate Counsel.  Before purchasing the Class

10  Vehicle, Plaintiff conducted online research and reviewed Volkswagen's website, articles from

11  "Consumer Reports," and other reviews regarding its fuel economy and benefits for the

12  environment, particularly clean diesel.  The benefits to the environment—especially clean

13  diesel—in combination with the advertised fuel efficiency, as well as the vehicle's solid resale

14  value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of

15  acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards

16  and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the

17  advertised combination of low emissions, high performance, and fuel economy—and was illegal.

18  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and

19  would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat

20  device.

21  **10.  Florida Plaintiffs**

22      56.  Plaintiff FARRAH P. BELL (for the purpose of this paragraph, "Plaintiff") is a

23  citizen of Florida domiciled in Beverly Hills, Florida.  On or about April 11, 2015, Plaintiff

24  leased a new 2015 Audi A3 TDI, VIN WAUAJGFF1F1033935 (for the purpose of this

25  paragraph, the "Class Vehicle"), from Reeves Import Motorcars in Tampa, Florida. Before

26  leasing the Class Vehicle, Plaintiff conducted thorough research on "clean" diesel and the Class

27  Vehicle's environmentally-friendly attributes. These and other emissions representations, in

28  combination with the advertised fuel efficiency and performance, as well as the vehicle's

1  reputation for maintaining a high resale value, induced Plaintiff to lease the Class Vehicle.

2  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device

3  designed to bypass emission standards and deceive consumers and regulators.  Consequently, the

4  Class Vehicle could not deliver the advertised combination of low emissions, high performance,

5  and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and

6  proximate result of Defendants' conduct, and would not have leased the Class Vehicle, had

7  Defendants not concealed the illegal defeat device.

8    57.    Plaintiffs SCOTT and JENNY HIAASEN (for the purpose of this paragraph,

9  "Plaintiffs") are citizens of Florida domiciled in Coral Gables, Florida.  In or about April 2012,

10  Plaintiffs purchased a new 2012 Volkswagen Jetta Sportwagen TDI, VIN

11  3VWPL7AJ4CM658537 (for the purpose of this paragraph, the "Class Vehicle"), from Deel

12  Volkswagen in Miami, Florida.  Plaintiff Scott Hiaasen is a lawyer who sought a vehicle that was

13  environmentally-friendly and had low emissions.  Before purchasing the Class Vehicle, both

14  Plaintiffs spoke with a Volkswagen representative who represented to them that the Class Vehicle

15  was environmentally "cleaner" than traditional vehicles because it had lower emissions than other

16  vehicles.  This and other emission representations, in combination with the advertised fuel

17  efficiency and performance, as well as the vehicle's reputation for maintaining a high resale

18  value, induced Plaintiffs to purchase the Class Vehicle.  Unbeknownst to Plaintiffs, at the time of

19  acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards

20  and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the

21  advertised combination of low emissions, high performance, and fuel economy—and was illegal.

22  Plaintiffs have suffered concrete injury as a direct and proximate result of Defendants' conduct,

23  and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat

24  device

25    58.    Plaintiff JERRY LAWHON (for the purpose of this paragraph, "Plaintiff") is a

26  citizen of Florida domiciled in Winter Haven, Florida.  On or about May 26, 2014, Plaintiff

27  purchased a used 2013 Volkswagen Passat TDI, VIN 1VWCN7A35DC091977 (for the purpose

28  of this paragraph, the "Class Vehicle"), from Lakeland Volkswagen in Lakeland, Florida.  Before

1    purchasing the Class Vehicle, Plaintiff thoroughly researched his available options. Plaintiff

2    sought to acquire a vehicle that performed well was environmentally-friendly and had efficient

3    fuel economy. At the time of purchase, a Volkswagen representative stressed to Plaintiff the

4    "clean" diesel feature of the Class Vehicle. This and other emissions representations, in

5    combination with the advertised fuel efficiency and performance, as well as the vehicle's

6    reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.

7    Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device

8    designed to bypass emission standards and deceive consumers and regulators. Consequently, the

9    Class Vehicle could not deliver the advertised combination of low emissions, high performance,

10   and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and

11   proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had

12   Defendants not concealed the illegal defeat device.

13                      **11.    Georgia Plaintiffs**

14          59.     Plaintiff JASON DANIEL PEJSA (for the purpose of this paragraph, "Plaintiff") is

15   a citizen of Georgia domiciled in Creek, Georgia. In or about February 2015, Plaintiff purchased

16   a new 2015 Volkswagen Jetta TDI, VIN 3VWLA7AJ9FM294902 (for the purpose of this

17   paragraph, the "Class Vehicle"), from Autonation Volkswagen in Buford, Georgia. Plaintiff is a

18   pilot who is also concerned with environmental preservation and renewable energy sources.

19   Before purchasing the Class Vehicle, Plaintiff exhaustively researched Volkswagen's "clean"

20   diesel vehicles, viewed Volkswagen's representations about the emissions and fuel performance,

21   and ultimately purchased his "clean" diesel Jetta because of these misrepresentations. The

22   emission representations, in combination with the advertised fuel efficiency and performance, as

23   well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase

24   the Class Vehicle, instead of other, "hybrid" and "eco-friendly" vehicles he was considering.

25   Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device

26   designed to bypass emission standards and deceive consumers and regulators. Consequently, the

27   Class Vehicle could not deliver the advertised combination of low emissions, high performance,

28   and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and

1    proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had

2    Defendants not concealed the illegal defeat device. Plaintiff attempted to return his vehicle to the

3    dealership without success and is upset that the vehicle's resale value has been substantially

4    diminished. Plaintiff is appalled and embarrassed that the Class Vehicle has polluted, and

5    continues to pollute, at levels much greater than the legal limit.

6         60.    Plaintiff LAURA LEE RAY (for the purpose of this paragraph, "Plaintiff") is a

7    citizen of Tennessee domiciled in Sewanee, Tennessee. On or about September 30, 2014,

8    Plaintiff purchased a used 2010 Volkswagen Jetta Sportwagen TDI, VIN

9    3VWTL7AJ7AM697831 (for the purpose of this paragraph, the "Class Vehicle"), in Lilburn,

10   Georgia. Plaintiff is a self-employed professional with an undergraduate degree in

11   interdisciplinary humanities who is conscious of environmental preservation and renewable

12   energy sources. It was critical to her that whatever vehicle she purchased be environmentally-

13   friendly. Before purchasing the Class Vehicle, Plaintiff exhaustively researched Volkswagen's

14   "clean" diesel vehicles, viewed Volkswagen's representations about the emissions and fuel

15   performance, and ultimately purchased her "clean" diesel Jetta as a result of these

16   misrepresentations. The emission representations, in combination with the advertised fuel

17   efficiency and performance, as well as the vehicle's reputation for maintaining a high resale

18   value, induced Plaintiff to purchase the Class Vehicle, instead of the other "eco-friendly" vehicles

19   she was considering. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle

20   contained a defeat device designed to bypass emission standards and deceive consumers and

21   regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low

22   emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete

23   injury as a direct and proximate result of Defendants' conduct, and would not have purchased the

24   Class Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff is appalled and

25   embarrassed that the Class Vehicle has polluted, and continues to pollute, at levels many times

26   greater than the legal limit.

27        61.    Plaintiff MICHAEL TERRY (for the purpose of this paragraph, "Plaintiff") is a

28   citizen of Georgia domiciled in Columbus, Georgia. On or about January 20, 2014, Plaintiff

1  purchased a new 2013 Volkswagen Passat TDI, VIN 1VWBN7A33DC069956 (for the purpose of

2  this paragraph, the "Class Vehicle"), from Carl Gregory Volkswagen in Columbus, Georgia.

3  Before purchasing the Class Vehicle, Plaintiff exhaustively researched Volkswagen's "clean"

4  diesel vehicles, viewed Volkswagen's representations about the emissions and fuel performance,

5  and ultimately purchased his "clean" diesel Passat because of these misrepresentations. The

6  emissions representations, in combination with the advertised fuel efficiency and performance, as

7  well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase

8  the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle

9  contained a defeat device designed to bypass emission standards and deceive consumers and

10  regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low

11  emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete

12  injury as a direct and proximate result of Defendants' conduct, and would not have purchased the

13  Class Vehicle, had Defendants not concealed the illegal defeat device.

14  **12.  Hawaii Plaintiffs**

15  62.  Plaintiff MICHAEL CRUISE (for the purpose of this paragraph, "Plaintiff") is a

16  citizen of Hawaii domiciled in Honolulu, Hawaii. In or about October, 2011, Plaintiff purchased

17  a new 2012 Audi A3 TDI, VIN WAUKJBFM0CA049125 (for the purpose of this paragraph, the

18  "Class Vehicle") from Audi Hawaii, a division of JN Automotive Group, in Honolulu, Hawaii.

19  Plaintiff is an attorney practicing in Hawaii, and is the former President of the Hawaii Association

20  for Justice. The emission representations, in combination with the advertised fuel efficiency and

21  performance, as well as the vehicle's reputation for maintaining a high resale value, induced

22  Plaintiff to purchase the Class Vehicle, instead of the hybrid vehicle he was considering.

23  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device

24  designed to bypass emission standards and deceive consumers and regulators. Consequently, the

25  Class Vehicle could not deliver the advertised combination of low emissions, high performance,

26  and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and

27  proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had

28  Defendants not concealed the illegal defeat device. Plaintiff is upset that despite his research and

1  efforts to make an environmentally-friendly vehicle choice, he is left with a vehicle that pollutes

2  at unlawful levels. Making matters worse, as a resident of Hawaii, Plaintiff pays far more for

3  diesel fuel than for conventional gasoline, meaning that with each mile he drives, he is pouring

4  money down the drain, and unwittingly leaving a trail of pollutants behind him.

5     63.    Plaintiff DUANE V. INOUE (for the purpose of this paragraph, "Plaintiff") is a

6  citizen of Hawaii domiciled in Mililani, Hawaii. On or about March 20, 2010, Plaintiff purchased

7  a new 2010 Audi A3 TDI, VIN WAUKJAFM3AA115996 (for the purpose of this paragraph, the

8  "Class Vehicle"), from JN Automotive Group in Honolulu, Hawaii. Plaintiff is a retired

9  procurement analyst for the U.S. Army who is conscious of environmental preservation and

10  renewable energy sources. It was critical to him that whatever vehicle he purchased be

11  environmentally-friendly. Before purchasing the Class Vehicle, Plaintiff exhaustively researched

12  the "clean" diesel vehicles, viewed Audi's representations about the emissions and fuel

13  performance, and ultimately chose his "clean" diesel Audi A3 based on these misrepresentations.

14  The emission representations, in combination with the advertised fuel efficiency and

15  performance, as well as the vehicle's reputation for maintaining a high resale value, induced

16  Plaintiff to purchase the Class Vehicle, instead of the others he was considering, including

17  gas/electric hybrid models. Unbeknownst to Plaintiff, at the time of acquisition, the Class

18  Vehicle contained a defeat device designed to bypass emission standards and deceive consumers

19  and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of

20  low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered

21  concrete injury as a direct and proximate result of Defendants' conduct, and would not have

22  purchased the Class Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff is

23  appalled and embarrassed that the Class Vehicle has polluted, and continues to pollute, at levels

24  many times greater than the legal limit.

25     64.    Plaintiff SEAN KETTLEY (for the purpose of this paragraph, "Plaintiff") is a

26  citizen of Hawaii domiciled in Kailua, Hawaii. In or about January, 2012 Plaintiff purchased a

27  new 2012 Volkswagen Golf TDI, VIN WVWDM7AJXCW120900 (for the purpose of this

28  paragraph, the "Class Vehicle"), in Honolulu, Hawaii. Plaintiff had owned a Volkswagen in the

1    past, and he selected the Class Vehicle because he is environmentally-conscious and wished to

2    purchase an environmentally-friendly car. Before purchasing the Class Vehicle, Plaintiff

3    considered environmentally-conscious options such as hybrids. The emission representations, in

4    combination with the advertised fuel efficiency and performance, as well as the vehicle's

5    reputation for maintaining a high resale value, induced Plaintiff to purchase the Class

6    Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a

7    defeat device designed to bypass emission standards and deceive consumers and

8    regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low

9    emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete

10   injury as a direct and proximate result of Defendants' conduct, and would not have purchased the

11   Class Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff is frustrated that

12   he paid a premium to purchase a car that he believed was better for the environment, when it

13   ended up being harmful to the environment.

14              **13.    Idaho Plaintiffs**

15          65.    Plaintiff JOHN C. DUFURRENA (for the purpose of this paragraph, "Plaintiff") is

16   a citizen of Idaho domiciled in Star, Idaho. In or about December 6, 2012, Plaintiff purchased a

17   new 2013 Volkswagen Jetta TDI, VIN 3VW3L7AJ0DM234028 (for the purpose of this

18   paragraph, the "Class Vehicle") in Boise, Idaho. Plaintiff is a retired veteran of the United States

19   Armed Forces. Before purchasing the Class Vehicle, Plaintiff researched the "clean" diesel

20   vehicles on internet websites. The emission representations, in combination with the advertised

21   fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale

22   value, induced Plaintiff to purchase the Class Vehicle, instead of the other, "hybrid" vehicle he

23   was considering. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle

24   contained a defeat device designed to bypass emission standards and deceive consumers and

25   regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low

26   emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete

27   injury as a direct and proximate result of Defendants' conduct, and would not have purchased the

28   Class Vehicle, had Defendants not concealed the illegal defeat device.

66.     Plaintiff AARON PATRICK GARDNER (for the purpose of this paragraph, "Plaintiff") is a citizen of Idaho domiciled in Boone, Idaho.  In or about February 2013, Plaintiff purchased a new 2013 Volkswagen Passat TDI, VIN 1VWBN7A30DC090800 (for the purpose of this paragraph, the "Class Vehicle") from Performance Volkswagen in Boise, Idaho.  Plaintiff is a military veteran who works as an engineer for Union Pacific Railroad.  He purchased the Class Vehicle because he wanted an efficient car that could take him anywhere—to the mountains and across the varying terrains of the American West—and that was healthy for the environment.  Before purchasing the Class Vehicle, Plaintiff exhaustively researched the miles-per-gallon, emissions, and performance of the "clean" diesel vehicles.  He viewed Volkswagen's representations about the emissions and fuel performance.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle, instead of the other gas-powered vehicles that he was considering.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.  Plaintiff is appalled and embarrassed that the Class Vehicle has polluted, and continues to pollute, up to forty times the legal limits.

**14.     Illinois Plaintiffs**

67.     Plaintiff SCOTT ANDERSON (for the purpose of this paragraph, "Plaintiff") is a citizen of Illinois domiciled in Evanston, Illinois.  On or about September 2, 2013, Plaintiff purchased a used 2012 Volkswagen Passat TDI, VIN 1VWCN7A37CC055111 (for the purpose of this paragraph, the "Class Vehicle"), from The Autobarn Limited in Evanston, Illinois.  Plaintiff has been employed as Publisher/Director for Law Bulletin Publishing Company for the last 18 years.  He travels a great deal for his job, so gas mileage and cost of ownership were primary considerations in his purchase.  As a father of five and sole earner in his family, the

cost of gasoline and transportation due to the travel demands of his job were his sole motivators. Before purchasing the Class Vehicle, Plaintiff often saw advertisements in magazines and on television touting the mileage drivers could expect from Volkswagen TDI vehicles. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

68.     Plaintiff SCOTT BAHR (for the purpose of this paragraph, "Plaintiff") is a citizen of Illinois domiciled in Urbana, Illinois. On or about October 8, 2014, Plaintiff purchased a new 2015 Volkswagen Golf TDI, VIN 3VW2A7AU8FM028986 (for the purpose of this paragraph, the "Class Vehicle"), from D'Arcy Volkswagen (now Hawk Volkswagen) in Joliet, Illinois. Plaintiff is a Direct Digital Control Programmer for the University of Illinois in Champaign, Illinois. He and his wife built and live in a Passive House (Eco, Energy Efficient) and wanted a car to match their desire to live in an environmentally conscious manner. Before purchasing the Class Vehicle, Plaintiff read on Volkswagen's website that the Golf TDI was a "clean" diesel and that it got good gas mileage. The Class Vehicle also had great performance when he test-drove it. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants'

conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

69.     Plaintiff SAMUEL CLARK (for the purpose of this paragraph, "Plaintiff") is a citizen of Illinois domiciled in Chicago, Illinois.  On or about July 29, 2015, Plaintiff purchased a used 2014 Volkswagen Touareg TDI, VIN WVGEP9BP6ED010043 (for the purpose of this paragraph, the "Class Vehicle"), from Pugi Volkswagen in Downers Grove, Illinois.  Plaintiff is a retired Chicago Fire Department Paramedic Chief.  Before purchasing the Class Vehicle, Plaintiff conducted internet research and viewed printed and television advertisements for so-called Volkswagen "clean" diesel Vehicles.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

70.     Plaintiff KARL FRY (for the purpose of this paragraph, "Plaintiff") is a citizen of Illinois domiciled in Naperville, Illinois.  On or about April 24, 2013, Plaintiff purchased a used 2012 Volkswagen Jetta TDI, VIN 3VWLL7AJ3CM059529 (for the purpose of this paragraph, the "Class Vehicle"), from Fox Valley in West Chicago, Illinois.  Plaintiff is a military veteran with a bachelor's degree in chemistry from Rhodes College, a degree in civil engineering from University of Illinois Urbana, and a master's degree in engineering management from Northwestern University.  Before purchasing the Class Vehicle, Plaintiff reviewed advertising pertaining to fuel mileage and describing the Jetta TDI as a "clean burning" diesel with unparalleled fuel mileage and durability.  The Volkswagen dealer claimed that Volkswagen diesels commonly last multiple hundreds of thousands of miles.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's

1    reputation for maintaining a high resale value, induced Plaintiff to purchase the Class

2    Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a

3    defeat device designed to bypass emission standards and deceive consumers and

4    regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low

5    emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete

6    injury as a direct and proximate result of Defendants' conduct, and would not have purchased the

7    Class Vehicle, had Defendants not concealed the illegal defeat device.  Plaintiff drives 30,000

8    miles per year and planned to drive the Class Vehicle until his anticipated retirement in 2028.

9                    **15.**    **Indiana Plaintiffs**

10           71.     Plaintiff CESAR OLMOS (for the purpose of this paragraph, "Plaintiff") is a

11   citizen of Indiana domiciled in Avenue Crown Point, Indiana.  On or about September 15, 2013,

12   Plaintiff purchased a new 2014 Volkswagen Passat TDI, VIN 1VWBN7A36EC014449 (for the

13   purpose of this paragraph, the "Class Vehicle"), from Team Volkswagen in Merrillville, Indiana.

14   Plaintiff is an employee of the United States Environmental Protection Agency who sought to

15   purchase a car that promoted clean diesel technology and was environmentally-friendly.  Before

16   purchasing the Class Vehicle, Plaintiff conducted thorough research on diesel vehicles, including

17   Volkswagen's representations about emissions.  The emission representations, in combination

18   with the advertised fuel efficiency and performance, as well as the vehicle's reputation for

19   maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to

20   Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to

21   bypass emission standards and deceive consumers and regulators.  Consequently, the Class

22   Vehicle could not deliver the advertised combination of low emissions, high performance, and

23   fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate

24   result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants

25   not concealed the illegal defeat device.

26           72.     Plaintiff JAMES PRIEST (for the purpose of this paragraph, "Plaintiff") is a

27   citizen of Kentucky domiciled in Louisville, Kentucky.  On or about March 14, 2014, Plaintiff

28   purchased a 2014 Volkswagen Jetta TDI, VIN 3VWLL7AJ4EM384953 (for the purpose of this

paragraph, the "Class Vehicle"), from Sam Swope Auto Group Volkswagen in Clarkville, Indiana.  Before purchasing the Class Vehicle, Plaintiff repeatedly saw the "clean" diesel ads, which advised that the Class Vehicle had lower emissions and was environmentally-friendly.  In addition both a sale representative and a store manager told Plaintiff that the Class Vehicle had lower emissions than other comparable cars.  These and other emissions representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

### 16.    Iowa Plaintiffs

73.    Plaintiff BENJAMIN A. FOOTE (for the purpose of this paragraph, "Plaintiff") is a citizen of Iowa domiciled in Des Moines, Iowa.  On July 19, 2014, Plaintiff leased a new 2014 Volkswagen Jetta Sportwagen TDI, VIN 3VWPL7AJ9EM618179 (for the purpose of this paragraph, the "Class Vehicle") from Volkswagen of Cedar Rapids in Hiawatha, Iowa.  Plaintiff is an IT Quality Control Analyst who leased the Class Vehicle.  It was important to him to lease a car that was environmentally-friendly and had good fuel economy.  Before leasing the Class Vehicle, Plaintiff saw billboards and magazines advertising "clean" diesel TDI by Volkswagen.  Additionally, the dealer repeatedly told Plaintiff: "You can't go wrong with clean diesel: Less emission and more miles per gallon."  The emission representations, in combination with the advertised fuel efficiency and performance, induced Plaintiff to lease the Class Vehicle, instead of the other, "hybrid" vehicles he also considered.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low emissions and fuel economy.  Plaintiff has suffered concrete injury

1  as a direct and proximate result of Defendants' conduct, and would not have leased the Class

2  Vehicle had Defendants not concealed the illegal defeat device.

3        74.    Plaintiff BRITNEY LYNNE SCHNATHORST (for the purpose of this paragraph,

4  "Plaintiff") is a citizen of Iowa domiciled in Newton, Iowa. On July 23, 2014, Plaintiff bought a

5  new 2014 Volkswagen Passat TDI, VIN 1VWBN7A31EC116211 (for the purpose of this

6  paragraph, the "Class Vehicle") from Lithia Volkswagen of Des Moines in Johnston, Iowa.

7  Plaintiff also bought an extended warranty. Plaintiff is a graduate of Drake University Law

8  School and is a practicing attorney. It was important to her to buy a car that was

9  environmentally-friendly and had good fuel economy. Before buying the Class Vehicle, Plaintiff

10  and her husband researched the Volkswagen website and other car industry websites regarding

11  how Volkswagen could provide clean diesel and meet emissions standards. Additionally, the

12  dealer touted "clean" diesel and the environmentally-friendly aspects of the car. The dealer said

13  that there would be no smelling or black smoke, no need to use additives, and that the Class

14  Vehicle would exceed the stated miles per gallon. The emission representations, in combination

15  with the advertised fuel efficiency and performance, induced Plaintiff to purchase the Class

16  Vehicle, instead of the other, "hybrid" vehicles she also considered. Unbeknownst to Plaintiff, at

17  the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission

18  standards and deceive consumers and regulators. Consequently, the Class Vehicle could not

19  deliver the advertised combination of low emissions and fuel economy. Plaintiff has suffered

20  concrete injury as a direct and proximate result of Defendants' conduct, and would not have

21  purchased the Class Vehicle and the extended warranty, had Defendants not concealed the illegal

22  defeat device.

23        75.    Plaintiffs PAUL C. SOUCY and TRACY LUCHT (for the purpose of this

24  paragraph, "Plaintiffs") are citizens of Iowa domiciled in Des Moines, Iowa. On September 16,

25  2014, Plaintiffs purchased a new 2014 Volkswagen Passat TDI SL, VIN 1VWCN7A31EC110106

26  (for the purpose of this paragraph, the "Class Vehicle") from Lithia Volkswagen of Des Moines

27  in Johnston, Iowa. Plaintiffs also bought an extended warranty to cover 84 months or 100,000

28  miles. Plaintiff Soucy, an editor, and his wife, Plaintiff Lucht, an Assistant Professor at Iowa

State University, believe protecting the environment is very important. Plaintiffs wanted a car for Plaintiff Lucht to drive to her work and looked for a car that was fuel efficient and environmentally responsible for the commute. Before buying the Class Vehicle, Plaintiffs saw Volkswagen television commercials advertising clean diesel vehicles and Plaintiff Lucht did extensive research on the Internet. Among other things, Plaintiff Lucht relied on car reviews and articles from sources such as Edmunds.com, Car and Driver, Green Car Reports, Kelley Blue Book, USA Today, and Cars.com. The dealership represented that the Class Vehicle's mileage exceeded what had been certified by the Environmental Protection Agency. The high fuel efficiency with low environmental impact, handling/performance on the road, and strong resale value induced Plaintiffs to purchase the Class Vehicle, instead of the other "hybrid" and diesel vehicles Plaintiffs considered. Unbeknownst to Plaintiffs, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiffs have suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device. Plaintiffs believe that Volkswagen's actions may dissuade consumers from buying clean diesel technology in the future, potentially stifling innovation that could help the environment.

76. Plaintiff HERBERT JOHN MANTERNACH (for the purpose of this paragraph, "Plaintiff") is a citizen of Iowa domiciled in Cascade, Iowa. On October 4, 2013, Plaintiff purchased a certified pre-owned 2012 Volkswagen Passat TDI, VIN 1VWBN7A30CC102863 (for the purpose of this paragraph, the "Class Vehicle") from Lujack's Northpark Auto Plaza (a certified Volkswagen dealer) in Davenport, Iowa. Plaintiff also bought an extended warranty to cover 100,000 miles on the transmission/engine. Plaintiff is retired and needed a fuel efficient vehicle that saved him money on fuel. Before purchasing the Class Vehicle, Plaintiff saw Volkswagen television commercials and magazines advertising the fuel economy and low emissions of its "clean" diesel vehicles. The television commercials convinced Plaintiff that the Passat TCI would get him more miles per gallon of diesel fuel without harming the environment.

1    Additionally, the dealer touted the Class Vehicle's fuel economy and represented that the

2    emissions were "clean." The emission representations, in combination with the advertised fuel

3    efficiency and performance, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to

4    Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to

5    bypass emission standards and deceive consumers and regulators. Consequently, the Class

6    Vehicle could not deliver the advertised combination of low emissions, high performance, and

7    fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate

8    result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants

9    not concealed the illegal defeat device

10            **17.    Kansas Plaintiffs**

11           77.    Plaintiff AARON JOY (for the purpose of this paragraph, "Plaintiff") is a citizen

12   of Kansas domiciled in Fredonia, Kansas. In November 2012, Plaintiff purchased a new 2013

13   Volkswagen Jetta TDI, VIN 3VWLL7AJ8DM210267 (for the purpose of this paragraph, the

14   "Class Vehicle"), from Crown Volkswagen in Lawrence, Kansas. Plaintiff is a Research

15   Engineer with the Naval Air Warfare Center and is concerned with protecting the environment.

16   Before purchasing the Class Vehicle, Plaintiff conducted online research, including reviewing

17   Volkswagen's website and reviews on public forums from other Jetta TDI owners who praised

18   the car's drivability and economy. Additionally, the dealership spoke at length with Plaintiff

19   about "clean diesel," low emissions and approval by the Environmental Protection Agency with

20   regards to the Class Vehicle and touted the superiority of Volkswagen's diesel technology. The

21   benefits to the environment—especially clean diesel – in combination with the advertised fuel

22   efficiency and performance, induced Plaintiff to purchase the Class Vehicle instead of other

23   "hybrid" vehicles. Plaintiff also bought a three-year, bumper-to-bumper extended warranty.

24   Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device

25   designed to bypass emission standards and deceive consumers and regulators. Consequently, the

26   Class Vehicle could not deliver the advertised combination of low emissions, high performance,

27   and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and

28   proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and the

extended warranty had Defendants not concealed the illegal defeat device. Plaintiff has tried to limit his driving of the Class Vehicle.

78. Plaintiff CARLA BERG (for the purpose of this paragraph, "Plaintiff") is a citizen of Kansas domiciled in Lawrence, Kansas. On or about September 23, 2013, Plaintiff purchased a new 2014 Volkswagen Passat TDI, VIN 1VWCN7A37EC020037 (for the purpose of this paragraph, the "Class Vehicle"), from Crown Volkswagen in Lawrence, Kansas. Plaintiff is a Behavior Coach with the Shawnee Mission School District and is concerned with protecting the environment. Plaintiff needed a new car that would provide good gas mileage with minimal environmental damage for a daily commute of 100 miles or more. Before purchasing the Class Vehicle, Plaintiff conducted online research, including reviewing Volkswagen's website and brochures, Edmunds, Kelley Blue Book, and Consumer Reports. She also reviewed the Monroney Sticker. Additionally, the dealership spoke at length with Plaintiff about "clean diesel," the fuel economy and environmental benefits with regards to the Class Vehicle during Plaintiff's visits and test-drives. The benefits to the environment—especially clean diesel – in combination with the advertised fuel efficiency and performance, induced Plaintiff to purchase the Class Vehicle, instead of other "hybrid" vehicles. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle had Defendants not concealed the illegal defeat device.

79. Plaintiff ASHLEY RICE (for the purpose of this paragraph, "Plaintiff") is a citizen of Kansas domiciled in Winona, Kansas. In June 2013, Plaintiff leased a new 2013 Volkswagen Jetta TDI, VIN 3VW3L7AJ4DM444681 (for the purpose of this paragraph, the "Class Vehicle"), from Mike Steven Volkswagen in Wichita, Kansas. Plaintiff is concerned with protecting the environment. Before leasing the Class Vehicle, Plaintiff conducted online research, including reviewing car reviews at Cars.com. Additionally, the dealership spoke at length with Plaintiff about "clean" diesel and the Class Vehicle's fuel economy during Plaintiff's visit and test-drive.

The benefits to the environment—especially clean diesel—in combination with the advertised fuel efficiency and performance, induced Plaintiff to purchase the Class Vehicle, instead of other "hybrid" vehicles. Unbeknownst to Plaintiff, at the time of leasing, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have leased the Class Vehicle had Defendants not concealed the illegal defeat device.

### 18. <u>Kentucky Plaintiffs</u>

80. Plaintiff ANDREW J. KANNAPEL (for the purpose of this paragraph, "Plaintiff") is a citizen of Kentucky domiciled in Louisville, Kentucky. In or about July 2014, Plaintiff purchased a new 2014 Volkswagen Jetta TDI, VIN3VWLL7AJ7EM293224 (for the purpose of this paragraph, the "Class Vehicle"), from Bachman Volkswagen in Louisville, Kentucky. Plaintiff is a college-educated client manager at a payments systems business. Before purchasing the Class Vehicle, Plaintiff watched television commercials about the car, visited the VW's website, and reviewed ads that subsequently targeting him on the internet. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

81. Plaintiff ROBERT WAGNER (for the purpose of this paragraph, "Plaintiff") is a citizen of Kentucky domiciled in Louisville, Kentucky. On or about May 2015, Plaintiff purchased a new 2015 Volkswagen Golf Sportwagen TDI, VIN 3VWCA7AU1FM511157 (for the purpose of this paragraph, the "Class Vehicle"), from Bachman Volkswagen in Louisville,

1  Kentucky.  Plaintiff is an attorney in Louisville.  The emission representations, in combination

2  with the advertised fuel efficiency and performance, as well as the vehicle's reputation for

3  maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to

4  Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to

5  bypass emission standards and deceive consumers and regulators.  Consequently, the Class

6  Vehicle could not deliver the advertised combination of low emissions, high performance, and

7  fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate

8  result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants

9  not concealed the illegal defeat device.

10  **19.    Louisiana Plaintiffs**

11  82.    Plaintiff THOMAS A. MALONE (for the purpose of this paragraph, "Plaintiff") is

12  a citizen of Mississippi domiciled in Diamondhead, Mississippi.  On March 12, 2011, Plaintiff

13  purchased a new 2011 Volkswagen Jetta Sportwagen TDI, VIN 3VWPL7AJ3BM678535 (for the

14  purpose of this paragraph, the "Class Vehicle"), from Northshore Volkswagen in Mandeville,

15  Louisiana.  Plaintiff is retired and an Air Force Veteran who rose to the rank of Lieutenant

16  Colonel before being honorably discharged in 1986. He is concerned with protecting the

17  environment.  Before purchasing the Class Vehicle, Plaintiff saw Volkswagen television

18  commercials and other advertisements on the Internet, as well as in the newspaper, regarding

19  Volkswagen's clean diesel vehicles. Additionally, the statements made at the dealership caused

20  Plaintiff to believe he was buying an environmentally-friendly car with the best gas mileage

21  available. Plaintiff was specifically told that the Volkswagen diesel technology was clean and met

22  environmental standards that other automakers could not. The benefits to the environment—

23  especially clean diesel—in combination with the advertised fuel efficiency and performance,

24  induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of

25  purchase, the Class Vehicle contained a defeat device designed to bypass emission standards and

26  deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the

27  advertised combination of low emissions, high performance, and fuel economy—and was illegal.

28  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and

1    would not have purchased the Class Vehicle had Defendants not concealed the illegal defeat

2    device.

3         83.    Plaintiff FLOYD BECK WARREN (for the purpose of this paragraph, "Plaintiff")

4    is a citizen of Mississippi domiciled in Brookhaven, Mississippi. On August 21, 2015, Plaintiff

5    purchased a new 2015 Volkswagen Passat TDI, VIN 1VWBV7A34FC086140 (for the purpose of

6    this paragraph, the "Class Vehicle"), from Southpoint Volkswagen in Baton Rouge, Louisiana.

7    Plaintiff is a Senior Manager in Revenue Assurance and bought the Class Vehicle based on,

8    among other things, the fuel economy, dependability, and performance. Plaintiff also bought an

9    extended warranty. The benefits to the environment—especially the lower emissions—in

10   combination with the advertised fuel efficiency and performance, induced Plaintiff to purchase

11   the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle

12   contained a defeat device designed to bypass emission standards and deceive consumers and

13   regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low

14   emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete

15   injury as a direct and proximate result of Defendants' conduct, and would not have purchased the

16   Class Vehicle had Defendants not concealed the illegal defeat device.

17        84.    Plaintiff ERIC DAVIDSON WHITE (for the purpose of this paragraph,

18   "Plaintiff") is a citizen of Louisiana domiciled in Baton Rouge, Louisiana. On or about

19   December 3, 2013, Plaintiff purchased a new 2014 Volkswagen Golf TDI, VIN

20   WVWNM7AJ5EW009193 (for the purpose of this paragraph, the "Class Vehicle"), from

21   Southpoint Volkswagen in Baton Rouge, Louisiana. Plaintiff is an Environmental Engineer for

22   The Water Institute of the Gulf and wanted a car that had minimal environmental footprints. He

23   was specifically in the market for a fuel efficient and fun to drive hatchback. Plaintiff was initially

24   concerned about the higher particulate emissions from diesels, but the self-cleaning/incinerating

25   particulate filter technology in the Golf TDI allayed Plaintiff's concerns. Before purchasing the

26   Class Vehicle, Plaintiff conducted extensive online research, mainly with regards to the Golf

27   TDI's fuel efficiency and environmental impact. Additionally, the dealership touted "clean

28   diesel," excellent fuel economy and the fun driving aspects of the Golf TDI during Plaintiff's visit

1  and test-drive. The benefits to the environment—especially clean diesel—in combination with the

2  advertised fuel efficiency and performance, induced Plaintiff to purchase the Class Vehicle

3  instead of other "hybrid" vehicles.  Unbeknownst to Plaintiff, at the time of acquisition, the Class

4  Vehicle contained a defeat device designed to bypass emission standards and deceive consumers

5  and regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of

6  low emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered

7  concrete injury as a direct and proximate result of Defendants' conduct, and would not have

8  purchased the Class Vehicle had Defendants not concealed the illegal defeat device.

9          **20.**    **Maine Plaintiffs**

10      85.    Plaintiff THOMAS J. BUCHBERGER (for the purpose of this paragraph,

11  "Plaintiff") is a citizen of Maine domiciled in Jonesboro, Maine.  On or about October 9, 2012,

12  Plaintiff purchased a new 2012 Volkswagen Jetta Sportwagen TDI, VIN 3VWPL7AJ9CM711734

13  (for the purpose of this paragraph, the "Class Vehicle"), from Darlings Volkswagen in Bangor,

14  Maine. Plaintiff is retired and very environmentally conscious. He recycles and composts as much

15  as possible and bought the Class Vehicle because he wanted a car with good mileage and that met

16  the emissions standards set by the Environmental Protection Agency. Before purchasing the Class

17  Vehicle, Plaintiff reviewed Volkswagen's print ads touting its clean diesel vehicles, and reviewed

18  the websites of Consumer Reports and Edmunds. The benefits to the environment—especially

19  clean diesel—in combination with the advertised fuel efficiency and performance, induced

20  Plaintiff to purchase the Class Vehicle instead of other "hybrid" vehicles.  Unbeknownst to

21  Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to

22  bypass emission standards and deceive consumers and regulators.  Consequently, the Class

23  Vehicle could not deliver the advertised combination of low emissions, high performance, and

24  fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate

25  result of Defendants' conduct, and would not have purchased the Class Vehicle had Defendants

26  not concealed the illegal defeat device.

27      86.    Plaintiffs RUSSELL E. AND ELIZABETH F. EVANS (for the purpose of this

28  paragraph, "Plaintiffs") are citizens of Maine domiciled in Mount Vernon, Maine.  On or about

March 17, 2014, Plaintiffs purchased a new 2014 Volkswagen Jetta TDI, VIN 3VWLL7AJ1EM381136 (for the purpose of this paragraph, the "Class Vehicle") from O'Connor Volkswagen in Augusta, Maine. Plaintiffs also bought an extended warranty. Before purchasing the Class Vehicle, Plaintiffs read a review in Popular Mechanics and a brochure from the dealership. The dealership touted the Class Vehicle's fuel economy during Plaintiffs' visit and test-drive. The benefits to the environment—especially clean diesel—in combination with the advertised fuel efficiency and performance, induced Plaintiffs to purchase the Class Vehicle. Unbeknownst to Plaintiffs, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiffs have suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and extended warranty if they had known about the illegal defeat device.

87. Plaintiff CARMEL A. RUBIN (for the purpose of this paragraph, "Plaintiff") is a citizen of Maine domiciled in Bowdoinham, Maine. On or about November 21, 2011, Plaintiff purchased a new 2012 Volkswagen Jetta Sportwagen TDI 2.0, VIN 3VWML7AJ1CM633369 (for the purpose of this paragraph, the "Class Vehicle"), from O'Connor Volkswagen in Augusta, Maine. Plaintiff is the Court Communications Manager for the State of Maine Judicial Branch and is citizen concerned with protecting the environment. Before purchasing the Class Vehicle, Plaintiff conducted online research and saw Volkswagen television commercials touting clean diesel, low emissions, sporty performance, and fuel savings. Additionally, the dealership touted Volkswagen's clean diesel technology, which did not require consumers to add urea to the fuel, and the performance of the car. The benefits to the environment—especially clean diesel—in combination with the advertised fuel efficiency and performance, induced Plaintiff to purchase the Class Vehicle instead of other "hybrid" vehicles. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal.

1   Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and

2   would not have purchased the Class Vehicle had Defendants not concealed the illegal defeat

3   device. Plaintiff believes Defendants should be held accountable for their actions.

4          88.    Plaintiff DANIEL SULLIVAN (for the purpose of this paragraph, "Plaintiff") is a

5   citizen of Maine domiciled in Cooper, Maine. In or about February 2014, Plaintiff purchased a

6   new 2014 Volkswagen Passat TDI, VIN 1VWBN7A33EC030771 (for the purpose of this

7   paragraph, the "Class Vehicle"), from Darlings Volkswagen in Bangor, Maine. Plaintiff also

8   bought an extended warranty covering the vehicle for 100,000 miles. Plaintiff is an information

9   technology manager and is a citizen concerned with protecting the environment. Before

10  purchasing the Class Vehicle, Plaintiff conducted extensive online research, read customer

11  reviews and bought the car based on the stated miles per gallon ("MPG"), clean diesel

12  technology, and performance. Additionally, the dealership touted the Class Vehicle's clean diesel

13  technology, performance, and MPG during Plaintiff's visit and test-drive. The benefits to the

14  environment—especially clean diesel—in combination with the advertised fuel efficiency and

15  performance, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the

16  time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission

17  standards and deceive consumers and regulators. Consequently, the Class Vehicle could not

18  deliver the advertised combination of low emissions, high performance, and fuel economy—and

19  was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants'

20  conduct, and would not have purchased the Class Vehicle and extended warranty had Defendants

21  not concealed the illegal defeat device. Plaintiff has tried to trade-in the Class Vehicle but not a

22  single dealership has wanted it.

23         **21.   Maryland Plaintiffs**

24         89.    Plaintiff MATTHEW CURE (for the purpose of this paragraph, "Plaintiff") is a

25  citizen of Maryland domiciled in Baltimore, Maryland. On or about November 23, 2014,

26  Plaintiff purchased a new 2015 Volkswagen Golf TDI, VIN 3VWRA7AUXFM021472 (for the

27  purpose of this paragraph, the "Class Vehicle") from Laurel Volkswagen in Laurel, Maryland.

28  Before purchasing the Class Vehicle, Plaintiff saw Volkswagen television commercials that

1  focused on clean diesel and mileage. Additionally, the dealer compared the fuel economy and pep

2  of Volkswagen's clean diesel vehicles with that of current hybrids. The emission representations,

3  in combination with the advertised fuel efficiency and performance, induced Plaintiff to purchase

4  the Class Vehicle, instead of the other, "hybrid" vehicles he was considering. Unbeknownst to

5  Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to

6  bypass emission standards and deceive consumers and regulators. Consequently, the Class

7  Vehicle could not deliver the advertised combination of low emissions, high performance, and

8  fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate

9  result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants

10  not concealed the illegal defeat device.

11  90.  Plaintiff DENISE DEFIESTA (for the purpose of this paragraph, "Plaintiff") is a

12  citizen of Maryland domiciled in Chesapeake, Maryland. On or about October 1, 2012, Plaintiff

13  bought a new 2013 Volkswagen Passat TDI SE, VIN 1VWBN7A37DC001286 (for the purpose

14  of this paragraph, the "Class Vehicle") from Darcars Chrysler Jeep Dodge of Silver Spring in

15  Silver Spring, Maryland. Before buying the Class Vehicle, Plaintiff and her husband researched

16  the Internet regarding the Passat TDI and saw that it was advertised as "clean" diesel, won Motor

17  Trend Car of the Year, had great gas mileage, and reliability. The emission representations, in

18  combination with the advertised fuel efficiency and performance, induced Plaintiff to purchase

19  the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle

20  contained a defeat device designed to bypass emission standards and deceive consumers and

21  regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low

22  emissions and fuel economy. Plaintiff has suffered concrete injury as a direct and proximate

23  result of Defendants' conduct, and would not have purchased the Class Vehicle had Defendants

24  not concealed the illegal defeat device.

25  91.  Plaintiff MICHAEL C. HOFFMAN (for the purpose of this paragraph, "Plaintiff")

26  is a citizen of Maryland domiciled in Annapolis, Maryland. On or about September 6, 2011,

27  Plaintiff purchased a new 2012 Audi A3 TDI, VIN WAUKJAFM5CA031374 (for the purpose of

28  this paragraph, the "Class Vehicle") from Audi Silver Spring in Silver Spring, Maryland. Plaintiff

is a Development Officer in the United States Naval Academy Foundation and is concerned with protecting the environment. Before leasing the Class Vehicle, Plaintiff saw Internet and print advertisements that touted Audi's Green Car of the Year award and increased fuel economy. The dealership also touted the Audi A3 TDI's fuel economy and performance of the clean diesel technology during Plaintiff's visit and test-drive. The emission representations, in combination with the advertised fuel efficiency and performance, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

92. Plaintiff MARK ROVNER (for the purpose of this paragraph, "Plaintiff") is a citizen of Maryland domiciled in Takoma Park, Maryland. On November 25, 2014, Plaintiff leased a new 2015 Volkswagen Golf TDI, VIN 3VWRA7AU6FM038950 (for the purpose of this paragraph, the "Class Vehicle") from Ourisman Volkswagen of Bethesda in Bethesda, Maryland. Plaintiff works in the environmental field and is the Founder and Principal of Sea Change Strategies. Thus, it was important for Plaintiff to lease a car that was "green." Before leasing the Class Vehicle, Plaintiff conducted Internet research. He Googled the words "green car" and "fun to drive," which led him to Volkswagen's website. Additionally, he read online reviews on www.cars.com. The emission representations, in combination with the advertised fuel efficiency and performance, induced Plaintiff to lease the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have leased the Class Vehicle, had Defendants not concealed the illegal defeat device.

93.     Plaintiff KOREEN WALSH (for the purpose of this paragraph, "Plaintiff") is a citizen of Maryland domiciled in Pasadena, Maryland.  On September 19, 2014, Plaintiff purchased a new 2015 Audi A3 TDI, VIN WAUCJGFF4F1043609 (for the purpose of this paragraph, the "Class Vehicle") from Len Stoller Porsche Audi in Owing Mills, Maryland. Plaintiff is a Senior Graphic Designer and is concerned with protecting the environment.  Before buying the Class Vehicle, Plaintiff saw television commercials advertising the new 2015 Audi A3 and did extensive online research regarding the "green" aspects of the vehicle.  The dealership also touted the vehicle's environmentally-friendly aspects, fuel economy, and the AdBlue system that was supposed to make the vehicle run cleaner and smoother.  The emission representations, in combination with the advertised fuel efficiency and performance, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

### 22.     Massachusetts Plaintiffs

94.     Plaintiff GREGORY GOTTA (for the purpose of this paragraph, "Plaintiff") is a citizen of Massachusetts domiciled in Northbridge, Massachusetts. On or about October 2013, Plaintiff purchased a new 2014 Audi A6 TDI, VIN WAUFMAFC3EN026640 from Audi of Shrewsbury in Shrewsbury, Massachusetts, and on or about August 27, 2014, Plaintiff purchased a new 2014 Porsche Cayenne Diesel, VIN WP1AF2A2XELA49452 from Porsche of Nashua in Nashua, NH (collectively, for the purpose of this paragraph, the "Class Vehicles").  Plaintiff researched the Class Vehicles before purchasing them, and was led to believe that the "clean" diesel vehicles were a more environmentally-friendly alternative to traditional vehicles.  These and other emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicles' reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicles.  Unbeknownst to Plaintiff, at the time of acquisition, the

1   Class Vehicles contained a defeat device designed to bypass emission standards and deceive

2   consumers and regulators.  Consequently, the Class Vehicles could not deliver the advertised

3   combination of low emissions, high performance, and fuel economy.  Plaintiff has suffered

4   concrete injury as a direct and proximate result of Defendants' conduct, and would not have

5   purchased the Class Vehicles, had Defendants not concealed the illegal defeat device.

6          95.     Plaintiff JEFFREY SCOLNICK (for the purpose of this paragraph, "Plaintiff") is a

7   citizen of Ohio domiciled in Columbus, Ohio.  On or about March 30, 2016, Plaintiff purchased a

8   new 2014 Volkswagen Passat TDI, VIN 1VWBN7A3XEC089526 (for the purpose of this

9   paragraph, the "Class Vehicle"), from Patrick Auto in Auburn, Massachusetts.  Plaintiff earned a

10  Master of Business Finance at the University of Chicago, and is a senior buyer for Big Lots.  It

11  was important to Plaintiff that his new vehicle had excellent fuel economy and performance, and

12  sound environmental ratings.  Before purchasing the Class Vehicle, Plaintiff researched the

13  "clean" diesel vehicles, viewed Volkswagen's representations concerning their performance and

14  environmental impact, and recalls being told at the dealership that there was no negative impact

15  to the environment when driving a Volkswagen TDI.  The emission representations, in

16  combination with the advertised fuel efficiency and performance, as well as the vehicle's

17  reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle,

18  instead of the other, "hybrid" vehicles he was considering.  Unbeknownst to Plaintiff, at the time

19  of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards

20  and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the

21  advertised combination of low emissions, high performance, and fuel economy—and was illegal.

22  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and

23  would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat

24  device.  Plaintiff has tried to sell the Class Vehicle by posting "for sale" notices online, but has

25  been unable to sell it.

26          96.     Plaintiff WILLARD D. CUNNINGHAM (for the purpose of this paragraph,

27  "Plaintiff") is a citizen of Massachusetts domiciled in Somerville, Massachusetts.  On or about

28  March 30, 2015, Plaintiff purchased a new 2014 Volkswagen Passat TDI, VIN

1   1VWCN7A39EC097282 (for the purpose of this paragraph, the "Class Vehicle"), from Colonial

2   Volkswagen in Medford, Massachusetts.  Plaintiff is the principal broker and owner of Willard

3   Realty Group, Inc.  He has a background in international relations and secondary education.

4   Before purchasing the Class Vehicle, Plaintiff viewed Volkswagen's representations about the

5   alleged fuel economy of and emissions from its diesel vehicles.  He also generally researched

6   mid-size diesel vehicles, and wanted one with superior fuel economy that was environmentally-

7   friendly.  The emission representations, in combination with the advertised fuel efficiency and

8   performance, as well as the vehicle's reputation for maintaining a high resale value, induced

9   Plaintiff to purchase the Class Vehicle, instead of the other, "hybrid" and diesel vehicles he was

10  considering.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a

11  defeat device designed to bypass emission standards and deceive consumers and regulators.

12  Consequently, the Class Vehicle could not deliver the advertised combination of low emissions,

13  high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a

14  direct and proximate result of Defendants' conduct, and would not have purchased the Class

15  Vehicle, had Defendants not concealed the illegal defeat device.

16      97.     Plaintiff ERICSSON BROADBENT (for the purpose of this paragraph,

17  "Plaintiff") is a citizen of Massachusetts domiciled in Harvard, Massachusetts.  On or about

18  February 28, 2011, Plaintiff purchased a new 2011 Volkswagen Jetta TDI, VIN

19  3VWLL7AJ8BM054549 (for the purpose of this paragraph, the "Class Vehicle"), from Colonial

20  Volkswagen in Westboro, Massachusetts.  Plaintiff is a Colby-educated senior software engineer.

21  He has advocated for environment sustainability, and once converted a vehicle to run on recycled

22  vegetable oil.  Before purchasing the Class Vehicle, Plaintiff researched what environmentally-

23  friendly vehicle options were available on the market, and relied on Volkswagen's representations

24  about the environmental cleanliness and fuel efficiency of its vehicles.  The emission

25  representations, in combination with the advertised fuel efficiency and performance, as well as

26  the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the

27  Class Vehicle, instead of an electric vehicle or plug-in hybrid vehicle.  Unbeknownst to Plaintiff,

28  at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass

emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle could

not deliver the advertised combination of low emissions, high performance, and fuel economy—

and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of

Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not

concealed the illegal defeat device.  Plaintiff's use and enjoyment of his Class Vehicle has been

substantially diminished, because he now only drives it when necessary.  He prefers either driving

his wife's vehicle or car-pooling to work in order to minimize the impact his Class Vehicle has on

the environment.

98.     Plaintiff GRANT R. GARCIA (for the purpose of this paragraph, "Plaintiff") is a

citizen of Massachusetts domiciled in Leominster, Massachusetts.  In or about August 2015,

Plaintiff purchased new a 2015 Volkswagen Golf Sportwagen TDI, VIN

3VWFA7AU5FM511837 (for the purpose of this paragraph, the "Class Vehicle"), from Colonial

Volkswagen in Westborough, Massachusetts.  Plaintiff is a managing director at Kitchen

Associates and is a staunch proponent of alternative energy.  When deciding whether to purchase

his 2015 Golf TDI, Plaintiff wanted to know that the new vehicle he was considering was as fuel

efficient, environmentally-friendly and reliable as he thought his 2009 and 2010 Volkswagen

Jetta TDI vehicles were.  Before purchasing each of the Class Vehicles, Plaintiff researched their

environmental cleanliness, performance and fuel-efficiency, and viewed Volkswagen

representations about its engineering, EPA compliance and performance.  The emission

representations, in combination with the advertised fuel efficiency and performance, as well as

the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the

Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a

defeat device designed to bypass emission standards and deceive consumers and regulators.

Consequently, the Class Vehicle could not deliver the advertised combination of low emissions,

high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a

direct and proximate result of Defendants' conduct, and would not have purchased the Class

Vehicle, had Defendants not concealed the illegal defeat device.  Plaintiff is appalled that his

Class Vehicles are worse for the environment than he expected, and that he has no option left but

1 to continue driving a vehicle that has polluted, and continues to pollute, up to 40 times the legal
2 limit.

3       99.     Plaintiff SARAH MATTHEWS (for the purpose of this paragraph, "Plaintiff") is a
4 citizen of Massachusetts domiciled in Amherst, Massachusetts. On or about December 27, 2013,
5 Plaintiff leased a new 2014 Volkswagen Jetta Sportwagen TDI, VIN 3VWLL7AJXEM248522
6 (for the purpose of this paragraph, the "Class Vehicle"), from Northampton Volkswagen in
7 Northampton, Massachusetts. Plaintiff is an attorney who graduated from the Georgetown
8 University Law Center. She has focused her career on representing clients in the renewable
9 energy field, including biofuels, solar and wind energy. As a proponent of alternative energy, it
10 was important to Plaintiff that she do her part to be environmentally conscious in her vehicle
11 selection. Before leasing the Class Vehicle, Plaintiff had a history of owning diesel vehicles,
12 including previously leasing a 2009 Volkswagen Jetta TDI. Plaintiff recalls during the lease of
13 her 2009 Volkswagen Jetta, the Volkswagen sales agent telling her the vehicle was so clean she
14 could stand behind the vehicle, while it was running, and smell no exhaust. The emission
15 representations, in combination with the advertised fuel efficiency and performance, as well as
16 the vehicle's reputation for maintaining a high resale value, induced Plaintiff to lease the Class
17 Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a
18 defeat device designed to bypass emission standards and deceive consumers and regulators.
19 Consequently, the Class Vehicle could not deliver the advertised combination of low emissions,
20 high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a
21 direct and proximate result of Defendants' conduct, and would not have leased the Class Vehicle,
22 had Defendants not concealed the illegal defeat device. Plaintiff feels locked into a lease for a
23 vehicle she did not bargain for, and has contacted Volkswagen and her local Volkswagen
24 dealership in an attempt to trade in her lease for a comparable hybrid vehicle. Volkswagen
25 denied her request and the local dealership explained she would be financially upside down on a
26 trade-in.

27       100.     Plaintiff WOLFGANG STEUDEL (for the purpose of this paragraph, "Plaintiff")
28 is a citizen of Massachusetts domiciled in Newton, Massachusetts. On or about January 7, 2013,

Plaintiff purchased a new 2013 Volkswagen Golf TDI, VIN WVWNM7AJ0DW053293, from Minuteman Volkswagen in Bedford, Massachusetts and, on or about August 11, 2015, Plaintiff purchased another Volkswagen, a new 2015 Volkswagen Jetta TDI, VIN 3VW3A7AJ0FM321453, from the same dealer (for the purpose of this paragraph, the "Class Vehicles"). Plaintiff is an anesthesiologist and licensed to practice medicine in three states. He earned his medical degree from Freie University Berlin Faculty of Medicine, has authored or co-authored several publications in his field, and speaks English, German and French. Plaintiff is a long time purchaser of Volkswagen vehicles, having previously owned a 2006 Volkswagen Golf TDI. Before purchasing the Class Vehicles, Plaintiff did detailed research regarding environmentally-friendly vehicles, with great fuel economy and performance, viewed Volkswagen's representations about performance and environmental impact, as well evaluating his prior experiences with his 2006 Volkswagen Golf TDI. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicles. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicles contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicles could not deliver the advertised combination of low emissions, high performance, and fuel economy. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicles, had Defendants not concealed the illegal defeat device. Plaintiff's use of his Class Vehicles, and the upgrades he purchased for them, has diminished greatly as Plaintiff now minimizes his use of the Class Vehicles.

### 23.  **Michigan Plaintiffs**

101. Plaintiff MICHAEL G. HEILMANN (for the purpose of this paragraph, "Plaintiff") is a citizen of Michigan domiciled in Birmingham, Michigan. On or about May 2015, Plaintiff purchased a new 2015 Volkswagen Touareg TDI, VIN WVGEP9BP1FD004104 (for the purpose of this paragraph, the "Class Vehicle"), from Suburban Imports in Farmington Hills, Michigan. Plaintiff is an attorney and the president of Michael G. Heilmann P.C. and is

1    concerned about environmental preservation and renewable energy sources. Before purchasing

2    the Class Vehicle, Plaintiff exhaustively researched Volkswagen's "clean" diesel vehicles,

3    viewed Volkswagen's representations about the emissions and fuel performance, and ultimately

4    purchased his "clean" diesel Touareg based on these misrepresentations. The emission

5    representations, in combination with the advertised fuel efficiency and performance, as well as

6    the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the

7    Class Vehicle, instead of other vehicles he was considering, including gas/electric hybrid models.

8    Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device

9    designed to bypass emission standards and deceive consumers and regulators. Consequently, the

10   Class Vehicle could not deliver the advertised combination of low emissions, high performance,

11   and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and

12   proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had

13   Defendants not concealed the illegal defeat device. Plaintiff is appalled and embarrassed that the

14   Class Vehicle has polluted, and continues to pollute, at levels many times greater than the legal

15   limit.

16          102.    Plaintiff BRYAN MICHAEL KINGMAN (for the purpose of this paragraph,

17   "Plaintiff") is a citizen of Michigan domiciled in Armada, Michigan. On or about October 17,

18   2014, Plaintiff purchased a new 2015 Volkswagen Passat TDI, VIN 1VWCV7A30FC001749 (for

19   the purpose of this paragraph, the "Class Vehicle"), from Fox Automotive Group, Inc. in

20   Rochester, Michigan. Plaintiff is a new car salesperson and familiar with the latest developments

21   and trends in vehicles equipped with eco-friendly technology. He is also concerned with

22   environmental preservation and renewable energy sources. Before purchasing the Class Vehicle,

23   Plaintiff exhaustively researched Volkswagen's "clean" diesel vehicles, viewed Volkswagen's

24   representations about the emissions and fuel performance, and ultimately purchased his "clean"

25   diesel Passat based on those misrepresentations. The emission representations, in combination

26   with the advertised fuel efficiency and performance, as well as the vehicle's reputation for

27   maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle, instead of other

28   vehicles he was considering, including gas/electric hybrid models. Unbeknownst to Plaintiff, at

the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff is appalled and embarrassed that the Class Vehicle has polluted, and continues to pollute, at levels many times greater than the legal limit.

103. Plaintiff SUSAN MATTHEWS (for the purpose of this paragraph, "Plaintiff") is a citizen of Michigan domiciled in Wolverine Lake, Michigan. On or about January 17, 2013, Plaintiff purchased a used 2011 Volkswagen Jetta TDI, VIN 3VWML8AJ9BM658833 (for the purpose of this paragraph, the "Class Vehicle"), from Thayer Automotive in Livonia, Michigan. Plaintiff is self-employed as president of Loupe, LLC, and is conscious of environmental preservation, her carbon footprint, and renewable energy sources. In fact, she had only driven hybrids prior to considering "clean" diesel vehicles. It was critical to her that whatever vehicle she purchased be environmentally-friendly. Before purchasing the Class Vehicle, Plaintiff exhaustively researched Volkswagen's "clean" diesel vehicles, viewed Volkswagen's representations about the emissions and fuel performance, and ultimately chose her "clean" diesel Jetta because of these misrepresentations. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle, instead of the others she was considering, including gas/electric hybrid models. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff is appalled and embarrassed that the Class Vehicle has polluted, and continues to pollute, at levels many times greater than the legal limit.

### 24.  **Minnesota Plaintiffs**

104.    Plaintiffs ANNE MAHLE and DAVID MCCARTHY (for the purpose of this

paragraph, "Plaintiffs") are citizens of Minnesota domiciled in Minneapolis, Minnesota.

Plaintiffs have purchased two Volkswagen TDI vehicles in the last seven years.  On or about

December 9, 2009, Plaintiffs purchased their first Volkswagen TDI vehicle, a new 2010

Volkswagen Jetta Sportwagen, VIN 3VWTL7AJ7AM630193, and on or about September 12,

2015, Plaintiffs purchased their second Volkswagen vehicle, a new 2015 Volkswagen Golf TDI,

VIN 3VWRA7AU6FM095300 (for the purpose of this paragraph, the "Class Vehicles"), both

from Westside Volkswagen in St. Louis Park, Minnesota.  Plaintiff Anne Mahle graduated from

U.C. Berkeley Law School and has spent the last eleven years as the Senior Vice President at

Teach for America.  Plaintiff David McCarthy is a consultant for McCarthy Media, LLC.

Plaintiffs wanted vehicles that were safe, reliable, fuel efficient and environmentally-friendly.

Before purchasing the Class Vehicles, Plaintiffs viewed Volkswagen's representations about

emission cleanliness and fuel efficiency and consulted with Volkswagen sales agents about the

advantages of "clean" diesel engines.  The emission representations, in combination with the

advertised fuel efficiency and performance, as well as the vehicles' reputation for maintaining a

high resale value, induced Plaintiffs to purchase the Class Vehicles.  Unbeknownst to Plaintiffs, at

the time of acquisition, the Class Vehicles contained a defeat device designed to bypass emission

standards and deceive consumers and regulators.  Consequently, the Class Vehicles could not

deliver the advertised combination of low emissions, high performance, and fuel economy.

Plaintiffs have suffered concrete injury as a direct and proximate result of Defendants' conduct,

and would not have purchased the Class Vehicles, had Defendants not concealed the illegal defeat

device.  Plaintiffs feel betrayed that they relied on Volkswagen's representations so much that

they purchased a second vehicle only six days before the public notifications regarding the defeat

devices in the Class Vehicles.

105.    Plaintiff EDWARD CYRANKOWSKI (for the purpose of this paragraph,

"Plaintiff") is a citizen of Minnesota domiciled in Woodbury, Minnesota.  On or about July 2015,

Plaintiff purchased a new 2016 Audi Q5 TDI, VIN WA1CVAFP5GA012149 (for the purpose of

1    this paragraph, the "Class Vehicle"), from Maplewood Audi in Maplewood, Minnesota. Plaintiff

2    is an engineer and works with nanotechnology at Hysitron Inc. in Minneapolis. Before

3    purchasing the Class Vehicle, Plaintiff researched and discussed with an Audi salesperson his

4    concerns regarding reliability issues he experienced with his previous Audi Q5 TDI vehicle, and

5    viewed Volkswagen's representations regarding its "clean" diesel vehicles. The emission

6    representations, in combination with the advertised fuel efficiency and performance, as well as

7    the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the

8    Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a

9    defeat device designed to bypass emission standards and deceive consumers and regulators.

10   Consequently, the Class Vehicle could not deliver the advertised combination of low emissions,

11   high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a

12   direct and proximate result of Defendants' conduct, and would not have purchased the Class

13   Vehicle, had Defendants not concealed the illegal defeat device.

14         106.     Plaintiff CHRISTOPHER JOHNSON (for the purpose of this paragraph,

15   "Plaintiff") is a citizen of Minnesota domiciled in Minneapolis, Minnesota. On or about August

16   31, 2015, Plaintiff leased a new 2016 Audi A6 TDI, VIN WAUHMAFCXGN013685 (for the

17   purpose of this paragraph, the "Class Vehicle"), from Audi of Minneapolis in Minneapolis,

18   Minnesota. Plaintiff obtained his Medical Doctorate from the Medical College of Virginia over

19   ten years ago. Before leasing the Class Vehicle, Plaintiff researched comparable diesel vehicles,

20   viewed Volkswagen's representations regarding the performance, fuel efficiency and emissions of

21   the Class Vehicle. The emission representations, in combination with the advertised fuel

22   efficiency and performance, as well as the vehicle's reputation for maintaining a high resale

23   value, induced Plaintiff to lease the Class Vehicle, instead of comparable diesel vehicles he

24   considered. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a

25   defeat device designed to bypass emission standards and deceive consumers and regulators.

26   Consequently, the Class Vehicle could not deliver the advertised combination of low emissions,

27   high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a

28   direct and proximate result of Defendants' conduct, and would not have leased the Class Vehicle,

1    had Defendants not concealed the illegal defeat device.  As a physician, Plaintiff is especially

2    concerned about the negative public health implications of excessive emissions.

3         107.    Plaintiff SCOTT P. MOEN (for the purpose of this paragraph, "Plaintiff") is a

4    citizen of Minnesota domiciled in Saint Paul, Minnesota.  Plaintiff owns two Volkswagen TDI

5    vehicles.  On or about May 4, 2013, Plaintiff purchased a certified pre-owned 2013 Volkswagen

6    Golf TDI, VIN WVWDM7AJ7DW058955, and on or about May 28, 2013, Plaintiff purchased a

7    pre-owned 2010 Volkswagen Jetta TDI, VIN 3VWAL7AJ9AM030900 (for the purpose of this

8    paragraph, the "Class Vehicles"), from Schmelz Countryside in Maplewood, Minnesota.  Plaintiff

9    has practiced law since 1984 and is currently a solo practitioner specializing in business

10   transactions.  Before purchasing the Class Vehicles, Plaintiff researched the fuel efficiency,

11   performance and emissions of the vehicles, and he trusted Volkswagen's representations about

12   these matters based on their reputation.  The emission representations, in combination with the

13   advertised fuel efficiency and performance, as well as the vehicles' reputation for maintaining a

14   high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at

15   the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission

16   standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not

17   deliver the advertised combination of low emissions, high performance, and fuel economy—and

18   was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants'

19   conduct, and would not have purchased the Class Vehicles, had Defendants not concealed the

20   illegal defeat device.  Plaintiff not only purchased his two Class Vehicles based on Volkswagen's

21   representations, but he also purchased extended warranties based on Volkswagen's

22   representations.  Since October 2015, Plaintiff has made several attempts to sell his Volkswagen

23   Golf; however, his local dealership has repeatedly refused to purchase the vehicle.

24        108.    Plaintiff KHAMSHIN PAGE (for the purpose of this paragraph, "Plaintiff") is a

25   citizen of Minnesota domiciled in Hopkins, Minnesota.  On or about March 2008, Plaintiff

26   purchased a new 2009 Volkswagen Jetta SportWagen TDI, VIN 3VWPL71K89M317773 (for the

27   purpose of this paragraph, the "Class Vehicle"), from Westside Volkswagen in Minneapolis,

28   Minnesota.  Plaintiff graduated from New York University with a Master's in Education and has

taught for ten years at the Blake Preparatory School in Minneapolis. Prior to purchasing the Class Vehicle, Plaintiff had previously owned Volkswagen vehicles and firmly believed Volkswagen's advertising and representations that the "clean" diesel engines were environmentally-friendly which was important to her. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

109.     Plaintiff RYAN J. SCHUETTE (for the purpose of this paragraph, "Plaintiff") is a citizen of Minnesota domiciled in Saint Michael, Minnesota. On or about May 21, 2013, Plaintiff purchased a new 2013 Volkswagen Passat TDI SE, VIN 1VWBN7A32DC056308 (for the purpose of this paragraph, the "Class Vehicle"), from Luther Brookdale Volkswagen in Brooklyn Park, Minnesota. Plaintiff is a mechanical engineer who has worked for the last four years as a design engineer for Caterpillar, Inc. designing machinery that complies with EPA Tier 4F requirements. It was important to Plaintiff that his vehicle complied with EPA regulations like the machinery he designs. Before purchasing the Class Vehicle, Plaintiff researched the "clean" diesel technology, which he found interesting because of his experience with Caterpillar. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the

1  Class Vehicle, had Defendants not concealed the illegal defeat device.  Plaintiff has concerns

2  about selling his Class Vehicle, even if the option were available, which it is not, because he

3  would be passing along a vehicle that does not comply with EPA regulations and that continues to

4  pollute at unacceptable levels.

5  <div align="center">**25.**  <u>**Mississippi Plaintiffs**</u></div>

6  110.    Plaintiff RICHARDSON HAXTON (for the purpose of this paragraph, "Plaintiff")

7  is a citizen of Mississippi domiciled in Jackson, Mississippi.  In 2014, Plaintiff purchased a new

8  2014 Volkswagen Passat TDI, VIN 1VWBN7A3XEC078655 (for the purpose of this paragraph,

9  the "Class Vehicle"), from Ritchey Automotive Group in Jackson, Mississippi.  Plaintiff is the

10  Executive Director of the Mississippi Association for Justice.  Before purchasing the Class

11  Vehicle, Plaintiff viewed television advertisements and visited the Volkswagen website to learn

12  more about Volkswagen's "clean" diesel vehicles.  Plaintiff was split between purchasing a

13  Subaru or a Volkswagen vehicle.  The "clean" aspect of the diesel was an absolute must for him.

14  At the dealership, the salesman repeatedly talked about the "clean" aspect of the diesel.  The

15  emission representations, in combination with the advertised fuel efficiency and performance, as

16  well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase

17  the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle

18  contained a defeat device designed to bypass emission standards and deceive consumers and

19  regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low

20  emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete

21  injury as a direct and proximate result of Defendants' conduct, and would not have purchased the

22  Class Vehicle, had Defendants not concealed the illegal defeat device.

23  111.    Plaintiff Dr. HOWARD KATZ (for the purpose of this paragraph, "Plaintiff") is a

24  citizen of Mississippi domiciled in Madison, Mississippi.  In 2014, Plaintiff purchased a new

25  2014 Volkswagen Golf TDI, VIN WVWDM7AJXEW008021 (for the purpose of this paragraph,

26  the "Class Vehicle"), from Ritchey Jackson LLC in Jackson, Mississippi.  Plaintiff is a self-

27  employed doctor and purchased the Class Vehicle because he wanted the best car for the

28  environment.  He also believed that the Class Vehicle had better gas mileage than the Toyota

Prius. Before purchasing the Class Vehicle, Plaintiff researched the vehicle on Volkswagen's website and viewed and listened to radio print and television advertisements about the vehicle. Plaintiff was told by the Volkswagen dealership that its "clean" diesel vehicles were safer and better for the environment than the Toyota Prius. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff has significantly decreased the amount of driving he does since he learned of the defect.

### 26. <u>Missouri Plaintiffs</u>

112. Plaintiff JOSEPH MORREY (for the purpose of this paragraph, "Plaintiff") is a citizen of Missouri domiciled in Columbia, Missouri. On or about September 9, 2014, Plaintiff purchased a new 2015 Volkswagen Passat TDI, VIN 1VWBV7A35FC009129 (for the purpose of this paragraph, the "Class Vehicle"), from Joe Machen's Volkswagen in Columbia, Missouri. Plaintiff is a civil engineer who is also concerned with environmental preservation and renewable energy sources. Before purchasing the Class Vehicle, Plaintiff exhaustively researched Volkswagen's "clean" diesel vehicles, viewed Volkswagen's representations about the emissions and fuel performance, and ultimately purchased his "clean" diesel Passat based on those misrepresentations. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle, instead of other vehicles he was considering, including gas/electric hybrid models. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the

1   advertised combination of low emissions, high performance, and fuel economy—and was illegal.

2   Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and

3   would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat

4   device.  Plaintiff is appalled and embarrassed that the Class Vehicle has polluted, and continues to

5   pollute, at levels many times greater than the legal limit.

6          113.    Plaintiff MEGAN WALAWENDER (for the purpose of this paragraph,

7   "Plaintiff") is a citizen of Kansas domiciled in Lenexa, Kansas. On or about July 2014, Plaintiff

8   purchased a new 2014 Volkswagen Passat TDI, 1VWCN7A34EC072385 (for the purpose of this

9   paragraph, the "Class Vehicle"), from Molle Volkswagen in Kansas City, Missouri.  Plaintiff is

10  an attorney who is conscious of environmental preservation, her carbon footprint, and renewable

11  energy sources.  It was critical to her that whatever vehicle she purchased be environmentally-

12  friendly.  Before purchasing the Class Vehicle, Plaintiff exhaustively researched the "clean"

13  diesel vehicles, viewed Volkswagen's representations about the emissions and fuel performance,

14  and ultimately chose her "clean" diesel Passat because of these misrepresentations.  The emission

15  representations, in combination with the advertised fuel efficiency and performance, as well as

16  the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the

17  Class Vehicle, instead of the other vehicles she was considering, including gas/electric hybrid

18  models.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat

19  device designed to bypass emission standards and deceive consumers and regulators.

20  Consequently, the Class Vehicle could not deliver the advertised combination of low emissions,

21  high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a

22  direct and proximate result of Defendants' conduct, and would not have purchased the Class

23  Vehicle, had Defendants not concealed the illegal defeat device.  Plaintiff is appalled and

24  embarrassed that the Class Vehicle has polluted, and continues to pollute, at levels many times

25  greater than the legal limit.

26         114.    Plaintiff BRYCE ZUCKER (for the purpose of this paragraph, "Plaintiff") is a

27  citizen of Missouri domiciled in St. Louis, Missouri.  On or about September 22, 2014, Plaintiff

28  purchased a new 2014 Volkswagen Jetta TDI, VIN 3VW3L7AJXEM328287 (for the purpose of

1   this paragraph, the "Class Vehicle"), from Suntrup Volkswagen in St. Louis, Missouri. Plaintiff

2   is a senior business analyst with an undergraduate degree in engineering who is conscious of

3   environmental preservation and renewable energy sources. It was critical to him that whatever

4   vehicle he purchased be environmentally-friendly. Additionally, Plaintiff has driven Volkswagen

5   vehicles for over a decade. Before purchasing the Class Vehicle, Plaintiff exhaustively researched

6   the "clean" diesel vehicles, viewed Volkswagen's representations about the emissions and fuel

7   performance, and ultimately chose his "clean" diesel Jetta because of these misrepresentations.

8   The emission representations, in combination with the advertised fuel efficiency and

9   performance, as well as the vehicle's reputation for maintaining a high resale value, induced

10  Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the

11  Class Vehicle contained a defeat device designed to bypass emission standards and deceive

12  consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised

13  combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff

14  has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would

15  not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

16  Plaintiff is appalled and embarrassed that the Class Vehicle has polluted, and continues to pollute,

17  at levels many times greater than the legal limit.

18              **27.  Montana Plaintiffs**

19              115.    Plaintiff MICHAEL LORENZ (for the purpose of this paragraph, "Plaintiff") is a

20  citizen of Montana domiciled in Three Forks, Montana. On or about March 30, 2012, Plaintiff

21  purchased a new 2012 Volkswagen Jetta TDI, VIN 3VWLL7AJ8CM029913 (for the purpose of

22  this paragraph, the "Class Vehicle"), from Montana Import Group, Inc. in Bozeman, Montana.

23  Plaintiff is a sales manager with an undergraduate degree in history who is conscious of

24  environmental preservation, his carbon footprint and renewable energy sources. Plaintiff takes

25  personal pride in Montana's beauty and fully intended to drive a "green" vehicle. It was critical

26  to him that whatever vehicle he purchased would be environmentally-friendly. Before purchasing

27  the Class Vehicle, Plaintiff exhaustively researched Volkswagens' "clean" diesel vehicles,

28  viewed Volkswagen's representations about the emissions and fuel performance, and ultimately

1   chose his "clean" diesel Jetta because of these misrepresentations.  The emission representations,

2   in combination with the advertised fuel efficiency and performance, as well as the vehicle's

3   reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.

4   Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device

5   designed to bypass emission standards and deceive consumers and regulators.  Consequently, the

6   Class Vehicle could not deliver the advertised combination of low emissions, high performance,

7   and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and

8   proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had

9   Defendants not concealed the illegal defeat device.  Plaintiff is appalled and embarrassed that the

10   Class Vehicle has polluted, and continues to pollute, at levels many times greater than the legal

11   limit.

12        116.    Plaintiff SANDRA DI MAURO (for the purpose of this paragraph, "Plaintiff") is a

13   citizen of Montana domiciled in Great Falls, Montana.  In or about July, 2013, Plaintiff purchased

14   a new 2013 Volkswagen SportWagen TDI, VIN 3VWPL7AJ3DM663942 (for the purpose of this

15   paragraph, the "Class Vehicle"), from Bennett Motors in Great Falls, Montana.  Plaintiff is deeply

16   concerned about maintaining and improving the quality of our environment, and serves as the

17   Treasurer and a member of the Steering Committee of Citizens for Clean Energy, Inc., an all-

18   volunteer group of Montana citizens dedicated to a healthy and sustainable environment.  Before

19   purchasing the Class Vehicle, Plaintiff compared hybrid and "clean" diesel vehicles, ultimately

20   deciding that a VW TDI vehicle provided the best combination of performance, fuel mileage,

21   value (including resale value), and least impact on air quality.  The emission representations, in

22   combination with the advertised fuel efficiency and performance, as well as the vehicle's

23   reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.

24   Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device

25   designed to bypass emission standards and deceive consumers and regulators.  Consequently, the

26   Class Vehicle could not deliver the advertised combination of low emissions, high performance,

27   and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and

28   proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had

Defendants not concealed the illegal defeat device.  Plaintiff believed that by purchasing her vehicle she was doing her best for the quality of our environment, when in fact her vehicle was responsible for toxic pollution, leaving her feeling duped and defrauded.

### 28.    Nebraska Plaintiffs

117.    Plaintiff SARA SCHRAM (for the purpose of this paragraph, "Plaintiff") is a citizen of Nebraska domiciled in Geneva, Nebraska.  On or about January 31, 2014, Plaintiff purchased a used 2013 Volkswagen Passat TDI, 1VWCN7A37DC077935 (for the purpose of this paragraph, the "Class Vehicle"), from BMW of Lincoln in Lincoln, Nebraska.  Plaintiff is an office manager who is conscious of environmental preservation, her carbon footprint and renewable energy sources.  It was critical to her that whatever vehicle she purchased be environmentally-friendly.  Before purchasing the Class Vehicle, Plaintiff exhaustively researched Volkswagen's "clean" diesel vehicles, viewed Volkswagen's representations about the emissions and fuel performance, and ultimately chose her "clean" diesel Passat because of these misrepresentations.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle, instead of the others she was considering, including gas/electric hybrid models.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.  Plaintiff is appalled and embarrassed that the Class Vehicle has polluted, and continues to pollute, at levels many times greater than the legal limit.

118.    Plaintiff NANCY L. STIREK (for the purpose of this paragraph, "Plaintiff") is a citizen of Nebraska domiciled in Elkhorn, Nebraska.  On or about February 15, 2011, Plaintiff purchased a new 2011 Volkswagen Jetta Sportwagen TDI, VIN 3VWPL7AJ4BM640201 (for the purpose of this paragraph, the "Class Vehicle"), from Performance Volkswagen in La Vista,

1    Nebraska.  Plaintiff is an energy specialist who has dedicated her professional career to meeting

2    the world's future energy needs, and is thus concerned about environmental preservation and

3    renewable energy sources.  Plaintiff understands the environmental impacts of energy production,

4    fully intended to purchase a "green" vehicle, and often commutes via bicycle.  It was critical to

5    her that whatever vehicle she purchased would be environmentally-friendly.  Before purchasing

6    the Class Vehicle, Plaintiff exhaustively researched Volkswagen's "clean" diesel vehicles,

7    viewed Volkswagen's representations about the emissions and fuel performance, and ultimately

8    chose her "clean" diesel Jetta because of these misrepresentations.  The emission representations,

9    in combination with the advertised fuel efficiency and performance, as well as the vehicle's

10    reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.

11    Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device

12    designed to bypass emission standards and deceive consumers and regulators.  Consequently, the

13    Class Vehicle could not deliver the advertised combination of low emissions, high performance,

14    and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and

15    proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had

16    Defendants not concealed the illegal defeat device.  Plaintiff is appalled and embarrassed that the

17    Class Vehicle has polluted, and continues to pollute, at levels many times greater than the legal

18    limit.

19                        **29.**    **Nevada Plaintiffs**

20         119.    Plaintiff BRIAN K. BERMAN (for the purpose of this paragraph, "Plaintiff") is a

21    citizen of Nevada domiciled in Las Vegas, Nevada.  On or about July 11, 2009, Plaintiff

22    purchased a new 2009 Volkswagen Jetta TDI, VIN 3VWRL71K29M097605 (for the purpose of

23    this paragraph, the "Class Vehicle"), from Desert Volkswagen in Las Vegas, Nevada.  Plaintiff is

24    Attorney and President of Brian K. Berman, Chtd. and is concerned with preventing pollution to

25    the environment.  Before purchasing the Class Vehicle, Plaintiff saw Volkswagen's television

26    commercials and print ad campaigns depicting a white handkerchief placed behind the tailpipe.

27    Additionally, the dealership stressed the environmental friendliness aspects of the Class Vehicle.

28    The benefits to the environment—especially clean diesel—in combination with the advertised

fuel efficiency and performance, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

120.    Plaintiff REBECCA PERLMUTTER (for the purpose of this paragraph, "Plaintiff") is a citizen of Nevada domiciled in Henderson, Nevada. On or about March 8, 2013, Plaintiff bought a new 2012 Volkswagen Jetta TDI, VIN 3VWLL7AJ7CM425962. On March 27, 2015, Plaintiff bought a new 2015 Volkswagen Golf TDI SportWagen, VIN 3VWCA7AU3FM500290 (for purposes of this paragraph, the 2012 Volkswagen Jetta TDI and 2015 Golf TDI SportWagen that Plaintiff bought are referred to as "Class Vehicles"). Plaintiff purchased the Class Vehicles from Findlay Volkswagen in Henderson, Nevada and also bought an extended warranty for each of the vehicles. Plaintiff is retired and is concerned with protecting the environment. She bought the Class Vehicles because she thought they had good fuel efficiency, were environmentally-friendly and reliable. The benefits to the environment—especially clean diesel—in combination with the advertised fuel efficiency and performance, induced Plaintiff to purchase the Class Vehicles. Unbeknownst to Plaintiff, at the time of purchase, the Class Vehicles contained defeat devices designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicles could not deliver the advertised combination of low emissions, high performance, and fuel economy. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicles and the extended warranties, had Defendants not concealed the illegal defeat device.

121.    Plaintiff JONATHAN PETERSON (for the purpose of this paragraph, "Plaintiff") is a citizen of Nevada domiciled in Las Vegas, Nevada. On or about December 15, 2014, Plaintiff leased a new 2015 Volkswagen Golf TDI, VIN 3VWRA7AU0FM045943 (for the

1   purpose of this paragraph, the "Class Vehicle"), from AutoNation Volkswagen in Las Vegas,

2   Nevada. Plaintiff is a graduate of the University of Las Vegas and is concerned with protecting

3   the environment. Before leasing the Class Vehicle, Plaintiff saw Volkswagen television

4   commercials and conducted Internet research, and saw that the Golf TDI was awarded Car and

5   Driver Car of the Year, had low emissions, and great gas mileage. Additionally, the dealership

6   described the Volkswagen diesels as "the best bang for the bunk" when it came to gas mileage

7   and performance. The benefits to the environment—especially clean diesel–in combination with

8   the advertised fuel efficiency and performance, induced Plaintiff to lease the Class Vehicle.

9   Unbeknownst to Plaintiff, at the time of leasing, the Class Vehicle contained a defeat device

10   designed to bypass emission standards and deceive consumers and regulators. Consequently, the

11   Class Vehicle could not deliver the advertised combination of low emissions, high performance,

12   and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and

13   proximate result of Defendants' conduct, and would not have leased the Class Vehicle, had

14   Defendants not concealed the illegal defeat device. Plaintiff tried to cancel the lease with the

15   dealership, but would have lost thousands of dollars.

16         **30.**    **New Hampshire Plaintiffs**

17       122.   Plaintiff RICHARD GROGAN (for the purpose of this paragraph, "Plaintiff") is a

18   citizen of New Hampshire domiciled in West Chesterfield, New Hampshire. On or about May

19   23, 2015, Plaintiff purchased a new 2015 Volkswagen Golf TDI, VIN 3VW2A7AU6FM061436

20   (for the purpose of this paragraph, the "Class Vehicle"), from Noyes Volkswagen in Keene, New

21   Hampshire. Plaintiff is a Professor at the University of New Hampshire who sought to purchase a

22   vehicle that was fuel efficient, and environmentally-friendly. Before purchasing the Class

23   Vehicle, a salesperson specifically told Plaintiff that the Class Vehicle had lower carbon dioxide

24   emission levels than comparable gasoline engine vehicles. This and other emission

25   representations, in combination with the advertised fuel efficiency and performance, as well as

26   the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the

27   Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a

28   defeat device designed to bypass emission standards and deceive consumers and regulators.

1    Consequently, the Class Vehicle could not deliver the advertised combination of low emissions,

2    high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a

3    direct and proximate result of Defendants' conduct, and would not have purchased the Class

4    Vehicle, had Defendants not concealed the illegal defeat device. In addition, Plaintiff is deeply

5    troubled by the fact that Volkswagen deliberately created a tool to bypass emissions standards

6    and deceive consumers like him.

7        123.    Plaintiff ADDISON MINOTT (for the purpose of this paragraph, "Plaintiff") is a

8    citizen of Massachusetts domiciled in Boston, Massachusetts. In or about June 2015, Plaintiff

9    purchase a used 2009 Volkswagen SportWagen TDI, VIN 3VWTL71KX9M265092 (for the

10   purpose of this paragraph, the "Class Vehicle"), from Nucci Auto Sales in Windham, New

11   Hampshire. Plaintiff is an engineer who considers herself extremely environmentally conscious.

12   It was critical to her that whatever vehicle she purchased have low emissions. Before purchasing

13   the Class Vehicle, Plaintiff thoroughly researched, among others, the Class Vehicle's gas

14   mileage, diesel particulate filters and its emission ratings, including Volkswagen's representations

15   about emissions. The emission representations, in combination with the advertised fuel efficiency

16   and performance, as well as the vehicle's reputation for maintaining a high resale value, induced

17   Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the

18   Class Vehicle contained a defeat device designed to bypass emission standards and deceive

19   consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised

20   combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff

21   has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would

22   not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

23       **31.    New Jersey Plaintiffs**

24       124.    Plaintiff ALAN BANDICS (for the purpose of this paragraph, "Plaintiff") is a

25   citizen of New Jersey domiciled in Mountainside, New Jersey. On or about January 17, 2013,

26   Plaintiff purchased a used 2011 Volkswagen Jetta Sportwagen TDI, VIN

27   3VWML8AJ9BM658833 (for the purpose of this paragraph, the "Class Vehicle"), from Linden

28   Volkswagen in Linden, New Jersey. Plaintiff is a detective sergeant and is conscious of

environmental preservation and renewable energy sources. It was critical to him that whatever vehicle he purchased be environmentally-friendly. Before purchasing the Class Vehicle, Plaintiff exhaustively researched Volkswagen's "clean" diesel vehicles, viewed Volkswagen's representations about the emissions and fuel performance, and ultimately chose his "clean" diesel Jetta because of these misrepresentations. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle, instead of the others he was considering, including gas/electric hybrid models. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff is appalled and embarrassed that the Class Vehicle has polluted, and continues to pollute, at levels many times greater than the legal limit.

125. Plaintiff CHARLES CHRISTIANA (for the purpose of this paragraph, "Plaintiff") is a citizen of New Jersey domiciled in Roseland, New Jersey. On or about October, 2011, Plaintiff purchased a new 2012 Volkswagen Passat TDI, VIN 1VWCN7A37CC006541 (for the purpose of this paragraph, the "Class Vehicle"), from Volkswagen of Freehold in Freehold, New Jersey. Plaintiff purchased the Class Vehicle in anticipation of retirement with the intention of using it for an extended period of time. A primary concern to Plaintiff in purchasing a car was that it be environmentally-friendly. Before purchasing the Class Vehicle, Plaintiff visited Volkswagen showrooms and test-drove the demonstration models available. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions,

1   high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a

2   direct and proximate result of Defendants' conduct, and would not have purchased the Class

3   Vehicle, had Defendants not concealed the illegal defeat device.  Plaintiff feels frustrated that his

4   best efforts to be environmentally-friendly in his vehicle purchase were thwarted, and he believes

5   he was misled by Volkswagen.

6          126.    Plaintiff NATHAN FORBES (for the purpose of this paragraph, "Plaintiff") is a

7   citizen of New York domiciled in Clifton Park, New York.  On or about May 23, 2014, Plaintiff

8   purchased a used 2012 Volkswagen Touareg TDI Lux, VIN WVGEK9BP0CD005805 (for the

9   purpose of this paragraph, the "Class Vehicle"), from Burlington Volkswagen in Burlington, New

10  Jersey.  Plaintiff is a business development manager and is concerned about environmental

11  preservation and renewable energy sources.  Before purchasing the Class Vehicle, Plaintiff

12  exhaustively researched Volkswagen's "clean" diesel vehicles, viewed Volkswagen's

13  representations about the emissions and fuel performance, and ultimately purchased his "clean"

14  diesel Touareg based on these misrepresentations.  The emission representations, in combination

15  with the advertised fuel efficiency and performance, as well as the vehicle's reputation for

16  maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle, instead of other

17  vehicles he was considering, including gas/electric hybrid models.  Unbeknownst to Plaintiff, at

18  the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission

19  standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not

20  deliver the advertised combination of low emissions, high performance, and fuel economy—and

21  was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants'

22  conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the

23  illegal defeat device.  Plaintiff is appalled and embarrassed that the Class Vehicle has polluted,

24  and continues to pollute, at levels many times greater than the legal limit.

25         127.    Plaintiff DAVID GRECZYLO (for the purpose of this paragraph, "Plaintiff") is a

26  citizen of New Jersey domiciled in Tinton Falls, New Jersey.  On or about February 25, 2013,

27  Plaintiff purchased a new 2012 Volkswagen Golf TDI, VIN WVWDM7AJ4CW349038 (for the

28  purpose of this paragraph, the "Class Vehicle"), from Freehold Volkswagen in Freehold, New

1    Jersey.  Plaintiff is a police lieutenant who is conscious of environmental preservation, his carbon

2    footprint and environmental responsibility, and renewable energy sources.  It was critical to him

3    that whatever vehicle he purchased be environmentally-friendly.  Before purchasing the Class

4    Vehicle, Plaintiff exhaustively researched Volkswagen's "clean" diesel vehicles, viewed

5    Volkswagen's representations about the emissions and fuel performance, and ultimately chose his

6    "clean" diesel Golf because of these misrepresentations.  The emission representations, in

7    combination with the advertised fuel efficiency and performance, as well as the vehicle's

8    reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle,

9    instead of the others he was considering, including gas/electric hybrid models.  Unbeknownst to

10   Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to

11   bypass emission standards and deceive consumers and regulators.  Consequently, the Class

12   Vehicle could not deliver the advertised combination of low emissions, high performance, and

13   fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate

14   result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants

15   not concealed the illegal defeat device.  Plaintiff is appalled and embarrassed that the Class

16   Vehicle has polluted, and continues to pollute, at levels many times greater than the legal limit.

17        128.    Plaintiff CARRIE LASPINA (for the purpose of this paragraph, "Plaintiff") is a

18   citizen of New Jersey domiciled in Oakland, New Jersey.  On or about September, 2010, Plaintiff

19   purchased a new 2010 Volkswagen Jetta TDI, VIN 3VWRL7AJ1AM094948 (for the purpose of

20   this paragraph, the "Class Vehicle"), from Cresmont VW, Lakeland Auto Inc. in Pompton Plains,

21   New Jersey.  Plaintiff selected the Class Vehicle because she wanted a "clean" diesel that got

22   favorable gas mileage and was positive for the environment.  Before purchasing the Class

23   Vehicle, Plaintiff heard promotions on television and radio about Volkswagen "clean" diesel

24   vehicles.  The emission representations, in combination with the advertised fuel efficiency and

25   performance, as well as the vehicle's reputation for maintaining a high resale value, induced

26   Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the

27   Class Vehicle contained a defeat device designed to bypass emission standards and deceive

28   consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised

1   combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff

2   has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would

3   not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

4   Plaintiff would never have purchased her vehicle if she had known at the time of purchase what

5   she knows now about the true qualities of her Class Vehicle. Plaintiff feels extremely

6   inconvenienced by her vehicle, and she has been unsuccessful in her effort to have Volkswagen

7   buy back her Class Vehicle.

8   ### 32.   New Mexico Plaintiffs

9   129.   Plaintiff ALVIN CONVERSE (for the purpose of this paragraph, "Plaintiff") is a

10  citizen of New Mexico domiciled in Santa Fe, New Mexico. On or about May 25, 2013, Plaintiff

11  purchased a new 2013 Volkswagen Jetta TDI, VIN 3VWLL7AJ2DM370130 (for the purpose of

12  this paragraph, the "Class Vehicle"), from Premier Motor Cars of Santa Fe, New Mexico.

13  Plaintiff has a Ph.D. in chemical engineering. Before purchasing the Class Vehicle, Plaintiff

14  believed that VW had mastered the diesel engine, and had previously owned two hybrid cars, a

15  Toyota Prius and a hybrid. The emission representations, in combination with the advertised fuel

16  efficiency and performance, as well as the vehicle's reputation for maintaining a high resale

17  value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of

18  acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards

19  and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the

20  advertised combination of low emissions, high performance, and fuel economy—and was illegal.

21  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and

22  would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat

23  device.

24  130.   Plaintiff MELANIE BUCHANAN FARMER (for the purpose of this paragraph,

25  "Plaintiff") is a citizen of New Mexico domiciled in Albuquerque, New Mexico. On or about

26  September 26, 2011, Plaintiff purchased a new 2012 Volkswagen Jetta TDI, VIN

27  3VWLL7AJ0CM314377 (for the purpose of this paragraph, the "Class Vehicle"), from

28  University Volkswagen-Mazda in Albuquerque, New Mexico. Plaintiff has a Ph.D. from the

California Institute of Integral Studies, and is a resource teacher with Albuquerque Public Schools. Before purchasing the Class Vehicle, Plaintiff researched the Class Vehicle, which included reviewing Volkswagen's advertisements. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

131. Plaintiff CARMELINA HART HOXENG (for the purpose of this paragraph, "Plaintiff") is a citizen of New Mexico domiciled in Albuquerque, New Mexico. On or about December 6, 2008, Plaintiff purchased a new 2009 Volkswagen Jetta TDI, VIN 3VWRL71K09M075652 (for the purpose of this paragraph, the "Class Vehicle"), from University Volkswagen-Mazda in Albuquerque, New Mexico. Plaintiff has a master's degree from the College of Santa Fe and is self-employed. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

132. Plaintiffs WANPEN ROOT and DANIEL ROOT (for the purpose of this paragraph, "Plaintiffs") are citizens of New Mexico domiciled in Williamsburg. On or about June 17, 2015, Plaintiffs purchased a new 2014 Volkswagen Touareg TDI, VIN

1    WVGEP9BP5ED010048 (for the purpose of this paragraph, the "Class Vehicle"), from Sisbarro

2    Volkswagen in Las Cruces, New Mexico.  Prior to purchasing the Class Vehicle, Plaintiffs

3    researched the Class Vehicle, which included reviewing Volkswagen's advertisements and

4    literature on the "clean" diesel models.  The emission representations, in combination with the

5    advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a

6    high resale value, induced Plaintiffs to purchase the Class Vehicle.  Unbeknownst to Plaintiffs, at

7    the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission

8    standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not

9    deliver the advertised combination of low emissions, high performance, and fuel economy—and

10   was illegal.  Plaintiffs have suffered concrete injury as a direct and proximate result of

11   Defendants' conduct, and would not have purchased the Class Vehicle, if they had known about

12   the illegal defeat device.

13              **33.    New York Plaintiffs**

14          133.    Plaintiffs KEVIN BEDARD and ELIZABETH BEDARD (for the purpose of this

15   paragraph, "Plaintiffs") are citizens of New York domiciled in Rockville Centre, New York.  On

16   or about December 13, 2014, Plaintiffs leased a new 2015 Audi A3 TDI, VIN

17   WAUAJGFF4F1036196 (for the purpose of this paragraph, the "Class Vehicle"), from Audi of

18   Lynnbrook in Lynnbrook, New York.  Plaintiffs researched the Class Vehicle before acquiring it,

19   and reviewed advertisements and mailings from Audi and Volkswagen about the "clean" diesel

20   technology.  This led Plaintiffs to believe that the Class Vehicle provided high performance and

21   fuel efficiency, with low emissions.  The emission representations, in combination with the

22   advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a

23   high resale value, induced Plaintiff to lease the Class Vehicle.  Unbeknownst to Plaintiff, at the

24   time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission

25   standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not

26   deliver the advertised combination of low emissions, high performance, and fuel economy—and

27   was illegal.  Plaintiffs have suffered concrete injury as a direct and proximate result of

28

1  Defendants' conduct, and would not have leased the Class Vehicle, had Defendants not concealed

2  the illegal defeat device.

3       134.    Plaintiff ROBERT ESLICK (for the purpose of this paragraph, "Plaintiff") is a

4  citizen of New York domiciled in Old Bethpage, New York.  On or about February 20, 2013,

5  Plaintiff purchased a new 2013 Volkswagen Passat TDI, VIN 1VWCN7A33DC064776 (for the

6  purpose of this paragraph, the "Class Vehicle"), from Platinum Volkswagen in Hicksville, New

7  York.  Before purchasing the Class Vehicle, Plaintiff visited several dealerships, read articles, and

8  reviewed advertisements that touted the performance, economical, and environmental benefits of

9  Volkswagen's "clean" diesel models.  The emission representations, in combination with the

10  advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a

11  high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at

12  the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission

13  standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not

14  deliver the advertised combination of low emissions, high performance, and fuel economy—and

15  was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants'

16  conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the

17  illegal defeat device.

18       135.    Plaintiff CYNTHIA KIRTLAND (for the purpose of this paragraph, "Plaintiff") is

19  a citizen of New York domiciled in Red Hook, New York.  On or about September 28, 2013,

20  Plaintiff purchased a new 2014 Volkswagen Jetta Sportwagen TDI, VIN

21  3VWML7AJ7EM604185 (for the purpose of this paragraph, the "Class Vehicle"), from

22  Volkswagen of Kingston in Kingston, New York..  Before purchasing the Class Vehicle, Plaintiff

23  considered purchasing a Toyota Prius, saw television and magazine ads for VW clean diesel

24  technology, and visited the dealership and took home brochures, which heightened her interest.

25  The emission representations, in combination with the advertised fuel efficiency and

26  performance, as well as the vehicle's reputation for maintaining a high resale value, induced

27  Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the

28  Class Vehicle contained a defeat device designed to bypass emission standards and deceive

1  consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised

2  combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff

3  has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would

4  not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

5         136.   Plaintiff STEVEN KOLPAN (for the purpose of this paragraph, "Plaintiff") is a

6  citizen of New York domiciled in West Hurley, New York. On or about March 22, 2015,

7  Plaintiff purchased a new 2015 Volkswagen Passat TDI, VIN 1VWCV7A32FC009657 (for the

8  purpose of this paragraph, the "Class Vehicle"), from Volkswagen of Kingston in Kingston, New

9  York. Plaintiff is a professor at the Culinary Institute of America, where he has taught for 29

10  years. Before purchasing the Class Vehicle, Plaintiff researched the Class Vehicle and reviewed

11  Volkswagen's advertising on the "clean" diesel technology, which led him to believe that the

12  Class Vehicle would be less detrimental to the environment than a "hybrid" vehicle. The

13  emission representations, in combination with the advertised fuel efficiency and performance, as

14  well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase

15  the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle

16  contained a defeat device designed to bypass emission standards and deceive consumers and

17  regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low

18  emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete

19  injury as a direct and proximate result of Defendants' conduct, and would not have purchased the

20  Class Vehicle, had Defendants not concealed the illegal defeat device.

21         137.   Plaintiff YVETTE PAGANO (for the purpose of this paragraph, "Plaintiff") is a

22  citizen of New York domiciled in Penfield, New York. On or about March 22, 2014, Plaintiff

23  purchased a new 2014 Volkswagen Jetta Sportwagen 2.0 L TDI, VIN 3VWML7AJ0EM613035

24  (for the purpose of this paragraph, the "Class Vehicle"), from Ide Volkswagen in East Rochester,

25  New York. Plaintiff has an MBA from Pepperdine University and is CEO of an engineering and

26  manufacturing company. Prior to purchasing the Class Vehicle, Plaintiff researched the Class

27  Vehicle, and was led to believe that it was a superior choice to the competing electric cars and

28  BMW diesel models she was considering. The emission representations, in combination with the

advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

138. Plaintiff MARJORIE HODGES SHAW (for the purpose of this paragraph, "Plaintiff") is a citizen of New York domiciled in Rochester, New York. On or about December 31, 2012, Plaintiff purchased a new 2012 Volkswagen Jetta Sportwagen TDI, VIN 3VWML7AJ7CM646658 (for the purpose of this paragraph, the "Class Vehicle"), from Dorschel Volkswagen in Rochester, New York. Plaintiff has a law degree from Cornell Law School, and a Ph.D. in Education from the University of Rochester, where she is an Assistant Professor in the School of Medicine and Dentistry. Before purchasing the Class Vehicle, Plaintiff reviewed Volkswagen's advertisements, read reviews on Car and Driver and Edmunds, and examined information about the Class Vehicle on the Volkswagen website. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

### 34. North Carolina Plaintiffs

139. Plaintiff CHRISTIAN ALEXANDER (for the purpose of this paragraph, "Plaintiff") is a citizen of Texas domiciled in Houston, Texas. On or about August 2012, Plaintiff

1    purchased a used 2012 Volkswagen Jetta TDI, VIN 3VWLL7AJ0CM367676 (for the purpose of

2    this paragraph, the "Class Vehicle"), from Crossroads Ford in Cary, North Carolina.  Plaintiff is a

3    businessman who spent eight years in the renewable fuels business, producing and manufacturing

4    renewable fuels.  In light of his extensive experience in the renewable fuels industry, Plaintiff

5    decided to purchase a vehicle with clean diesel technology.  Before purchasing the Class Vehicle,

6    Plaintiff conducted thorough research, including Volkswagen's representations about emissions.

7    The emission representations, in combination with the advertised fuel efficiency and

8    performance, as well as the vehicle's reputation for maintaining a high resale value, induced

9    Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the

10   Class Vehicle contained a defeat device designed to bypass emission standards and deceive

11   consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised

12   combination of low emissions, high performance, and fuel economy—and was illegal.  Plaintiff

13   has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would

14   not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

15          140.    Plaintiff MATTHEW DOWD (for the purpose of this paragraph, "Plaintiff") is a

16   citizen of North Carolina domiciled in Huntersville, North Carolina.  On or about July 22, 2015,

17   Plaintiff purchased a new 2015 Audi Q7 TDI, VIN WA1LMAFE9FD023511 (for the purpose of

18   this paragraph, the "Class Vehicle"), from Audi Northlake in Charlotte, North Carolina.  Before

19   purchasing the Class Vehicle, Plaintiff exhaustively researched the vehicle online and compared

20   the model to other similar vehicles.  Plaintiff settled on the Class Vehicle for its fuel efficiency

21   and its highly recommended diesel engine.  Plaintiff was specifically told by a sales

22   representative that the Class Vehicle's diesel engine was second to none.  This and other

23   emissions representations, in combination with the advertised fuel efficiency and performance, as

24   well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase

25   the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle

26   contained a defeat device designed to bypass emission standards and deceive consumers and

27   regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low

28   emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete

1  injury as a direct and proximate result of Defendants' conduct, and would not have purchased the

2  Class Vehicle, had Defendants not concealed the illegal defeat device.

3       141.   Plaintiff WILL HARLAN (for the purpose of this paragraph, "Plaintiff") is a

4  citizen of North Carolina domiciled in Barnardsville, North Carolina. Plaintiff currently owns

5  two Volkswagen Jetta TDIs. The first was purchased on or about, August 2011, and is a 2011

6  Volkswagen Jetta TDI, VIN 3VWLL7AJ7BM094010. The second vehicle, purchased on or

7  about February 2014, is a 2014 Volkswagen Jetta TDI, VIN 3VWLL7AJ7EM419369 (for

8  purposes of this paragraph both of the aforementioned vehicles are referred to as the "Class

9  Vehicles"). Both vehicles were purchased at Harmony Motors in Asheville, North Carolina.

10  Plaintiff is the Editor-in-Chief of the magazine Blue Ridge Outdoors. In light of his profession,

11  Plaintiff wanted to acquire the most eco-friendly and environmentally responsible vehicle on the

12  market. Before purchasing the Class Vehicles, Plaintiff conducted through researched and

13  encountered Volkswagen claims that the Class Vehicles' diesel technology surpassed others in

14  the market. These and other emissions representations, in combination with the advertised fuel

15  efficiency and performance, as well as the vehicle's reputation for maintaining a high resale

16  value, induced Plaintiff to purchase the Class Vehicles. Unbeknownst to Plaintiff, at the time of

17  acquisition, the Class Vehicles contained defeat devices designed to bypass emission standards

18  and deceive consumers and regulators. Consequently, the Class Vehicles could not deliver the

19  advertised combination of low emissions, high performance, and fuel economy. Plaintiff has

20  suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not

21  have purchased the Class Vehicles, had Defendants not concealed the illegal defeat device.

22       142.   Plaintiff MICHAEL CHARLES KRIMMELBEIN (for the purpose of this

23  paragraph, "Plaintiff") is a citizen of North Carolina domiciled in Biltmore Lake, North Carolina.

24  On or about June 2015, Plaintiff purchased a new 2015 Volkswagen Passat TDI, VIN

25  1VWBV7A39FC073206 (for the purpose of this paragraph, the "Class Vehicle"), from Harmony

26  Motors in Asheville, North Carolina. Before purchasing the Class Vehicle, Plaintiff thoroughly

27  researched the Class Vehicle, including seeing advertisements on television regarding the Class

28  Vehicle's "clean diesel." In addition, a sales representative repeatedly told Plaintiff about the

1   benefits of the Class Vehicle's clean diesel technology.  These and other emissions

2   representations, in combination with the advertised fuel efficiency and performance, as well as

3   the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the

4   Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a

5   defeat device designed to bypass emission standards and deceive consumers and regulators.

6   Consequently, the Class Vehicle could not deliver the advertised combination of low emissions,

7   high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a

8   direct and proximate result of Defendants' conduct, and would not have purchased the Class

9   Vehicle, had Defendants not concealed the illegal defeat device.

10                **35.**    **North Dakota Plaintiffs**

11         143.    Plaintiff MICHELLE GRAMLING (for the purpose of this paragraph, "Plaintiff")

12   is a citizen of North Dakota domiciled in Bismarck, North Dakota.  On or about August 31, 2015,

13   Plaintiff purchased a new 2015 Volkswagen Jetta TDI, VIN 3VWLA7AJ5FM323862 (for the

14   purpose of this paragraph, the "Class Vehicle"), from Bismarck Motor Company in Bismarck,

15   North Dakota.  Before purchasing the Class Vehicle, Plaintiff conducted thorough research,

16   comparing the Class Vehicle to other similar vehicles. In doing so, Plaintiff was impressed by

17   Volkswagen's statements about it "clean" diesel technology and the Class Vehicle's fuel

18   efficiency.  These and other emissions representations, in combination with the advertised fuel

19   efficiency and performance, as well as the vehicle's reputation for maintaining a high resale

20   value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of

21   acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards

22   and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the

23   advertised combination of low emissions, high performance, and fuel economy—and was illegal.

24   Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and

25   would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat

26   device.

27

28

36. **Ohio Plaintiffs**

144. Plaintiff MICHAEL J. GREITZER (for the purpose of this paragraph, "Plaintiff") is a citizen of Ohio domiciled in Springfield, Ohio. On or about October 29, 2014, Plaintiff purchased a used 2013 Volkswagen Passat TDI, VIN 1VWBN7A34DC051661 (for the purpose of this paragraph, the "Class Vehicle"), from Fairfield Volkswagen in Cincinnati, Ohio. Before purchasing the Class Vehicle, Plaintiff reviewed numerous publications, consumer reports, and television and magazine advertisements, promoting the environmental benefits of the Affect Vehicle and its allegedly superior fuel economy. In addition, Plaintiff's sale representative spoke extensively about the Class Vehicle's "clean" diesel technology. These and other emissions representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

145. Plaintiff MARC STEWART (for the purpose of this paragraph, "Plaintiff") is a citizen of Ohio domiciled in Mason, Ohio. On or about February 2, 2010, Plaintiff purchased a new 2010 Volkswagen Jetta TDI, VIN 3VWRL7AJ2AM080167 (for the purpose of this paragraph, the "Class Vehicle"), from Kings Volkswagen in Loveland, Ohio. Plaintiff is a Senior Engineer at Procter and Gamble who sought to buy an environmentally-friendly car. Before purchasing the Class Vehicle, Plaintiff thoroughly researched the car to determine its sustainable and eco-friendly features. It was important to Plaintiff that his car be environmentally-friendly and the Class Vehicle was represented to him as such. This and other emissions representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device

1  designed to bypass emission standards and deceive consumers and regulators.  Consequently, the

2  Class Vehicle could not deliver the advertised combination of low emissions, high performance,

3  and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and

4  proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had

5  Defendants not concealed the illegal defeat device.

6      146.  Plaintiff GARY VIGRAN (for the purpose of this paragraph, "Plaintiff") is a

7  citizen of Indiana domiciled in Zionsville, Indiana.  On or about November 22, 2013, Plaintiff

8  leased a new 2014 Porsche Cayenne Diesel, VIN WPIAF2A2XELA37477 (for the purpose of this

9  paragraph, the "Class Vehicle"), from Beechmont Motors in Cincinnati, Ohio.  Before leasing the

10  Class Vehicle, Plaintiff discussed the Class Vehicle at length with representatives in two separate

11  dealerships.  Both representatives touted the environmental benefits of the Class Vehicle's clean

12  diesel technology, stating that it was one of the most fuel efficient SUVs on the market.  Plaintiff

13  also conducted other market research, which led him to believe the Class Vehicle had efficient

14  gas mileage and was environmentally-friendly.  These and other emissions representations, in

15  combination with the advertised fuel efficiency and performance, as well as the vehicle's

16  reputation for maintaining a high resale value, induced Plaintiff to lease the Class Vehicle.

17  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device

18  designed to bypass emission standards and deceive consumers and regulators.  Consequently, the

19  Class Vehicle could not deliver the advertised combination of low emissions, high performance,

20  and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and

21  proximate result of Defendants' conduct, and would not have leased the Class Vehicle, had

22  Defendants not concealed the illegal defeat device.

23      **37.**  **Oklahoma Plaintiffs**

24      147.  Plaintiff HEATHER GREENFIELD (for the purpose of this paragraph, "Plaintiff")

25  is a citizen of Oklahoma domiciled in Norman, Oklahoma.  On or about August 25, 2010,

26  Plaintiff purchased a new 2010 Volkswagen Jetta TDI, VIN 3VWAL7AJ3AM166746 (for the

27  purpose of this paragraph, the "Class Vehicle"), from Volkswagen of Tulsa in Tulsa, Oklahoma.

28  Plaintiff is an Aerospace Engineer who works for the Department of Defense.  Plaintiff wanted a

1   vehicle that had low carbon emissions and was environmentally-friendly.  Before purchasing the

2   Class Vehicle, Plaintiff conducted thorough research of the Class Vehicle, including speaking

3   with a salesman who represented that the Class Vehicle had "clean" diesel technology, low

4   emissions and high fuel economy.  These and other emissions representations, in combination

5   with the advertised fuel efficiency and performance, as well as the vehicle's reputation for

6   maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to

7   Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to

8   bypass emission standards and deceive consumers and regulators.  Consequently, the Class

9   Vehicle could not deliver the advertised combination of low emissions, high performance, and

10  fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate

11  result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants

12  not concealed the illegal defeat device.

### 38.   Oregon Plaintiffs

14          148.    Plaintiff THOMAS AYALA (for the purpose of this paragraph, "Plaintiff") is a

15  citizen of Oregon domiciled in Lebanon, Oregon.  In October 2014, Plaintiff purchased a new

16  2014 Volkswagen Passat TDI, VIN 1VWBN7A3XEC096587 (for the purpose of this paragraph,

17  the "Class Vehicle"), from Volkswagen of Salem in Salem, Oregon.  Plaintiff is a Doctor in

18  organizational psychology from the Chicago School of Professional Psychology and presently

19  works as managing partner of People Solutions, LLC.  Before purchasing the Class Vehicle,

20  Plaintiff thoroughly researched Defendants' and other manufacturers' vehicles.  He was

21  particularly attracted to Volkswagen's "clean" diesel vehicles because they embodied his

22  environmentally-minded values.  The emission representations, in combination with the

23  advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a

24  high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at

25  the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission

26  standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not

27  deliver the advertised combination of low emissions, high performance, and fuel economy—and

28  was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants'

conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

149.    Plaintiff NICHOLAS BOND (for the purpose of this paragraph, "Plaintiff") is a citizen of Washington domiciled in Tacoma, Washington.  On or about September 1, 2013, Plaintiff purchased a new 2013 Jetta Sportwagen TDI, VIN 3VWML7AJ6DM693455 (for the purpose of this paragraph, the "Class Vehicle"), from Sheppard Volkswagen in Eugene, Oregon.  Before purchasing the Class Vehicle, Plaintiff saw many television ads praising the Class Vehicle as fuel efficient, "eco-friendly," and powerful.  In particular, Plaintiff recalls seeing a television ad that asked viewers, "what sound does your hybrid make?"  Plaintiff was ultimately swayed by the promise of great performance and a "green" image, choosing his Class Vehicle over other environmentally-friendly options like the Chevy Volt and the Prius V.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

150.    Plaintiffs COBY COHEN and MIRIAM JAFFEE (for the purpose of this paragraph, "Plaintiffs") are citizens of Oregon domiciled in Portland, Oregon.  On or about August 15, 2015 Plaintiffs pre-paid a three-year lease on a new 2016 Audi Q5 TDI, VIN WA1DVAFP3GA018374 (for the purpose of this paragraph, the "Class Vehicle"), from Sunset Audi in Beaverton, Oregon.  Plaintiff Cohen, who obtained a Juris Doctor degree from New York Law School and now serves as General Counsel for KinderCare Education, LLC, was attracted to Defendants' "clean" diesel vehicles because he believed leasing this kind of vehicle was beneficial to the environment.  Before leasing the Class Vehicle, Plaintiff Cohen conducted online research, including information provided by Defendant Audi on its website as well as third-party

1  reviews.  Additionally, Plaintiff Cohen spoke with an Audi sales representative, who informed

2  him that "clean" diesel vehicles met emissions standards in all fifty States.  The emission

3  representations, in combination with the advertised fuel efficiency and performance, as well as

4  the vehicle's reputation for maintaining a high resale value, induced Plaintiffs to lease the Class

5  Vehicle.  Unbeknownst to Plaintiffs, at the time of acquisition, the Class Vehicle contained a

6  defeat device designed to bypass emission standards and deceive consumers and regulators.

7  Consequently, the Class Vehicle could not deliver the advertised combination of low emissions,

8  high performance, and fuel economy—and was illegal.  Plaintiffs have suffered concrete injury as

9  a direct and proximate result of Audi's conduct, and would not have leased the Class Vehicle if

10  they had known about the illegal defeat device.

11  151.  Plaintiff HERBERT YUSSIM (for the purpose of this paragraph, "Plaintiff") is a

12  citizen of Oregon domiciled in Bandon, Oregon.  On or about September 6, 2015, Plaintiff

13  purchased a new 2015 Volkswagen Passat TDI, VIN 1VWCV7A31FC083331 (for the purpose of

14  this paragraph, the "Class Vehicle"), from Sheppard Motors, Ltd. in Eugene, Oregon.  Before

15  purchasing the Class Vehicle, Plaintiff conducted extensive online research to compare and

16  contrast the various vehicle options available to him for purchase.  After an exhaustive search,

17  Plaintiff settled on purchasing either a Nissan Altima or the Class Vehicle.  Although the Class

18  Vehicle was more expensive than the Nissan Altima, Plaintiff thought it attractive because it was

19  purportedly more fuel efficient and "green" than the Nissan Altima.  It was a difficult decision,

20  but Plaintiff opted for the Class Vehicle in the end because it was supposed to have very low

21  emissions.  He believed that in making the purchase, he was benefitting future generations, and

22  that his children and grandchildren would be proud of his choice.  The emission representations,

23  in combination with the advertised fuel efficiency and performance, as well as the vehicle's

24  reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.

25  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device

26  designed to bypass emission standards and deceive consumers and regulators.  Consequently, the

27  Class Vehicle could not deliver the advertised combination of low emissions, high performance,

28  and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and

1   proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had

2   Defendants not concealed the illegal defeat device.  On or about September 25, 2015 Plaintiff

3   asked Sheppard Motors to buy back his vehicle, but the dealer refused to do so.

4                    **39.    Pennsylvania Plaintiffs**

5          152.    Plaintiff BRIAN BIALECKI (for the purpose of this paragraph, "Plaintiff") is a

6   citizen of Pennsylvania domiciled in Downingtown, Pennsylvania.  On or about April 13, 2012,

7   Plaintiff purchased a new 2012 Volkswagen Jetta TDI, VIN 3VWLL7AJ8CM369157.

8   Subsequently, on or about June 14, 2014, Plaintiff purchased a 2014 Volkswagen Passat, VIN

9   1VWBN7A3XEC090756 (for the purpose of this paragraph, collectively, the "Class Vehicles").

10  Plaintiff purchased both Class Vehicles at Jeff D'Ambrosio Auto Group in Downingtown,

11  Pennsylvania.  Before purchasing the Class Vehicles, Plaintiff consulted vehicle-review websites,

12  such as Edmunds.com, to compare across models and brands and to determine a fair price for the

13  Class Vehicles.  Although the Class Vehicles were priced higher than comparable cars, Plaintiff's

14  research suggested the higher price tag was justified because the Class Vehicles were

15  "environmentally-friendly" without sacrificing performance.  The emission representations, in

16  combination with the advertised fuel efficiency and performance, as well as the vehicle's

17  reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.

18  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicles contained a defeat device

19  designed to bypass emission standards and deceive consumers and regulators.  Consequently, the

20  Class Vehicles could not deliver the advertised combination of low emissions, high performance,

21  and fuel economy.  Plaintiff has suffered concrete injury as a direct and proximate result of

22  Defendants' conduct, and would not have purchased the Class Vehicles, had Defendants not

23  concealed the illegal defeat device.

24         153.    Plaintiff J. WESLEY PRATT (for the purpose of this paragraph, "Plaintiff") is a

25  citizen of Pennsylvania domiciled in West Chester, Pennsylvania.  On or about November 6,

26  2012, Plaintiff purchased a new 2013 Volkswagen Jetta TDI, VIN 3VWLL7AJ7DM222135.

27  Subsequently, on or about September 24, 2014, Plaintiff purchased a new 2014 Volkswagen

28  Touareg TDI, VIN VWGEP9BP6ED013122 (for the purpose of this paragraph, collectively, the

CONSOLIDATED CONSUMER CLASS
COMPLAINT MDL 2672 CRB (JSC)

1 "Class Vehicles"). Plaintiff purchased both Class Vehicles from Jeff D'Ambrosio Auto Group in

2 Downingtown, Pennsylvania. Before purchasing the Class Vehicle, Plaintiff saw and relied on

3 Volkswagen advertisements promoting the Class Vehicles as "clean." The emission

4 representations, in combination with the advertised fuel efficiency and performance, as well as

5 the vehicles' reputation for maintaining a high resale value, induced Plaintiff to purchase the

6 Class Vehicles. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicles contained

7 a defeat device designed to bypass emission standards and deceive consumers and regulators.

8 Consequently, the Class Vehicles could not deliver the advertised combination of low emissions,

9 high performance, and fuel economy. Plaintiff has suffered concrete injury as a direct and

10 proximate result of Defendants' conduct, and would not have purchased the Class Vehicles, had

11 Defendants not concealed the illegal defeat device.

12       154. Plaintiff KAREN LABBATE (for the purpose of this paragraph, "Plaintiff") is a

13 citizen of Pennsylvania domiciled in Forty-Fort, Pennsylvania. On or about August 14, 2015,

14 Plaintiff purchased a new 2015 Volkswagen Passat TDI, VIN 1VWBV7A36FC060039 (for the

15 purpose of this paragraph, the "Class Vehicle"), from Ciocca Volkswagen in Allentown,

16 Pennsylvania. Plaintiff is currently employed as Vice President of Sales at Commonwealth

17 Energy Group, LLC. In this capacity, Plaintiff develops, sells and implements energy efficiency

18 strategies that help businesses save money through environmentally-friendly practices. Given her

19 profession, Plaintiff prides herself in reducing her carbon footprint wherever possible. Before

20 purchasing the Class Vehicle, Plaintiff viewed and heard various television, radio, newspaper and

21 billboard ads describing "clean" diesel Volkswagens as being "green" and fuel efficient without

22 sacrificing performance. Moreover, the dealership where she purchased the Class Vehicle

23 provided her with marketing materials again praising the Class Vehicle for its purported

24 attributes. The emission representations, in combination with the advertised fuel efficiency and

25 performance, as well as the vehicle's reputation for maintaining a high resale value, induced

26 Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the

27 Class Vehicle contained a defeat device designed to bypass emission standards and deceive

28 consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised

1  combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff

2  has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would

3  not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

4  **40.** **Rhode Island Plaintiffs**

5  155. Plaintiff KATHERINE MEHLS (for the purpose of this paragraph, "Plaintiff") is a

6  citizen of Rhode Island domiciled in Narragansett, Rhode Island. On or about September 7, 2015,

7  Plaintiff purchased a new 2015 Golf Sportwagen TDI, VIN 3VWFA7AU0FM520865 (for the

8  purpose of this paragraph, the "Class Vehicle"), from Speedcraft Volkswagen in Wakefield,

9  Rhode Island. Before purchasing the Class Vehicle, Plaintiff received promotional materials,

10  including print advertisements and emails, representing that Volkswagen "clean" diesel vehicles

11  were fuel efficient and environmentally-friendly. The emission representations, in combination

12  with the advertised fuel efficiency and performance, as well as the vehicle's reputation for

13  maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to

14  Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to

15  bypass emission standards and deceive consumers and regulators. Consequently, the Class

16  Vehicle could not deliver the advertised combination of low emissions, high performance, and

17  fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate

18  result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants

19  not concealed the illegal defeat device.

20  156. Plaintiff JAMES URBANIAK (for the purpose of this paragraph, "Plaintiff") is a

21  citizen of Florida domiciled in Sarasota, Florida. On or about May 6, 2014, Plaintiff leased a new

22  2014 Volkswagen Jetta SportWagen TDI, VIN 3VWPL7AJ2EM609078 (for the purpose of this

23  paragraph, the "Class Vehicle"), from a Volkswagen dealer in Greenwich, Rhode Island. Before

24  purchasing the Class Vehicle, Plaintiff relied on Internet, television, radio and print

25  advertisements billing Volkswagen "clean" diesel vehicles as "green," fuel efficient and

26  performance-oriented. The emission representations, in combination with the advertised fuel

27  efficiency and performance, as well as the vehicle's reputation for maintaining a high resale

28  value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of

acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

### 41. South Carolina Plaintiffs

157. Plaintiff PERRY OXENDINE (for the purpose of this paragraph, "Plaintiff") is a citizen of South Carolina domiciled in Isle of Palms, South Carolina. On or about July 8, 2014, Plaintiff purchased a new 2014 Porsche Cayenne Diesel, VIN WP1AF2A21ELA47072 (for the purpose of this paragraph, the "Class Vehicle"), from Baker Motor Company in Charleston, South Carolina. Before purchasing the Class Vehicle, Plaintiff conducted extensive online research, and obtained information he relied on from the Porsche website among others. In addition to the Porsche Cayenne, Plaintiff also considered purchasing a diesel-powered Mercedes-Benz. However, based on representations that both vehicles had the same level of emissions, Plaintiff opted to purchase the Class Vehicle because it had greater power. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Porsche's conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff attempted to trade in his Class Vehicle at Baker Motors, where he had originally purchased it. However, he was unable to do so because Baker Motors would only take it back for a small fraction of its original cost.

1    158.   Plaintiff WHITNEY POWERS (for the purpose of this paragraph, "Plaintiff") is a

2    citizen of South Carolina domiciled in Charleston, South Carolina.  On or about October 13,

3    2010, Plaintiff purchased a new 2011 Volkswagen Jetta SportWagen TDI, VIN

4    3VWPL7AJ1BM623162 (for the purpose of this paragraph, the "Class Vehicle"), from Low

5    Country Volkswagen in Mount Pleasant, South Carolina.  Plaintiff owned two vehicles each over

6    eighteen years old that she sold after her husband was killed in an accident.  To replace the two

7    vehicles, Plaintiff expressly sought a "green" that aligned with her lifestyle, values and with her

8    architectural firm's focus on sustainability.  Before purchasing the Class Vehicle, Plaintiff relied

9    general knowledge of "clean" diesel vehicles that she gained through exposure to television, radio

10   and print ads, including those published by Defendants.  The emission representations, in

11   combination with the advertised fuel efficiency and performance, as well as the vehicle's

12   reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.

13   Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device

14   designed to bypass emission standards and deceive consumers and regulators.  Consequently, the

15   Class Vehicle could not deliver the advertised combination of low emissions, high performance,

16   and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and

17   proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had

18   Defendants not concealed the illegal defeat device.

19                    **42.    South Dakota Plaintiffs**

20   159.   Plaintiff RODNEY GOEMAN (for the purpose of this paragraph, "Plaintiff") is a

21   citizen of South Dakota domiciled in Sioux Falls, South Dakota.  In or around May 2014,

22   Plaintiff purchased a new 2014 Volkswagen Passat TDI, VIN 1VWCN7A39EC110631 (for the

23   purpose of this paragraph, the "Class Vehicle"), from Graham Automotive Volkswagen in Sioux

24   Falls, South Dakota.  Before purchasing the Class Vehicle, Plaintiff researched the Class Vehicle,

25   and viewed  Volkswagen's advertisements and brochures, which led him to believe that the Class

26   Vehicle would minimize his environmental impact, and maximize his fuel economy.  The

27   emission representations, in combination with the advertised fuel efficiency and performance, as

28   well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase

the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff tried to sell his vehicle after learning of Volkswagen's emissions scandal, but he has been unable to sell the vehicle or trade it in to a dealer.

### 43. Tennessee Plaintiffs

160. Plaintiff CAROL ANDREWS (for the purpose of this paragraph, "Plaintiff") is a citizen of Tennessee domiciled in Nashville, Tennessee. In or around February 2014, Plaintiff purchased a used 2012 Volkswagen Jetta TDI, VIN 3VWLL7AJ0CM004472 (for the purpose of this paragraph, the "Class Vehicle"), from Southeast Signature Volkswagen and Hyundai in Murfreesboro, Tennessee. Plaintiff is a Vice President and Senior Editor of a research company. Before purchasing the Class Vehicle, Plaintiff researched various cars for six weeks and visited numerous dealerships, before settling on the Jetta because of its good resale value and relatively low environmental impact. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff was offered $2000 to trade in her 2012 Volkswagen Jetta that had recently passed a safety inspection.

161. Plaintiff JASON HESS (for the purpose of this paragraph, "Plaintiff") is a citizen of Tennessee domiciled in Nashville, Tennessee. On or about April 13, 2015, Plaintiff purchased

1    a new 2015 Volkswagen Passat TDI, VIN 1VWBV7A34FC011325 (for the purpose of this

2    paragraph, the "Class Vehicle"), from Hallmark Volkswagen of Cool Springs in Franklin,

3    Tennessee.  Plaintiff purchased the vehicle because of its good gas mileage, fuel efficiency,

4    smooth handling, and benefits of clean emissions.  Plaintiff had owned another TDI vehicle prior

5    to purchasing the Class Vehicle and believed TDI vehicles were reliable and trustworthy.  Before

6    purchasing the Class Vehicle, Plaintiff saw television advertisements and brochures at the

7    dealership regarding "clean" diesel vehicles and German engineering.  The dealer had indicated

8    that "diesel engines last longer than others" and made sure he was aware of the fuel efficiency

9    and "clean" diesel bonuses that these "well built" vehicles included.  Plaintiff relied on these

10   advertisements as well as representations made by the dealer to arrive at his decision to purchase

11   the vehicle.  The emission representations, in combination with the advertised fuel efficiency and

12   performance, as well as the vehicle's reputation for maintaining a high resale value, induced

13   Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the

14   Class Vehicle contained a defeat device designed to bypass emission standards and deceive

15   consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised

16   combination of low emissions, high performance, and fuel economy—and was illegal.  Plaintiff

17   has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would

18   not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

19          162.    Plaintiff ROBIN JOHNSON (for the purpose of this paragraph, "Plaintiff") is a

20   citizen of Mississippi domiciled in Southaven, Mississippi.  In or around October 2012, Plaintiff

21   purchased a new 2013 Volkswagen Beetle TDI, VIN 3VWJL7AT9DM611402 (for the purpose of

22   this paragraph, the "Class Vehicle"), from Gossett Volkswagen in Germantown, Tennessee.

23   Plaintiff served 21 years in the United States Navy, during which time she served in

24   administrative and management capacities.  She was awarded Sailor of the Year and received an

25   Honorable Discharge in 1996.  Before purchasing the Class Vehicle, Plaintiff knew that she

26   wanted a "clean" diesel vehicle.  She is a self-proclaimed "Recycle Queen" and made the

27   decision to purchase the Class Vehicle because of it was eco-friendly and fuel efficient.  The

28   emission representations, in combination with the advertised fuel efficiency and performance, as

1  well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase

2  the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle

3  contained a defeat device designed to bypass emission standards and deceive consumers and

4  regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low

5  emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete

6  injury as a direct and proximate result of Defendants' conduct, and would not have purchased the

7  Class Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff placed a "for

8  sale" sign on her Class Vehicle in an attempt to sell it, however, she was unable to sell it for the

9  price she was asking.

10          **44.    Texas Plaintiffs**

11          163.    Plaintiff LORI ESQUIVEL (for the purpose of this paragraph, "Plaintiff") is a

12  citizen of Texas domiciled in San Antonio, Texas. In or around October 2014, Plaintiff

13  purchased a new 2014 Volkswagen Jetta TDI, 3VWLL7AJ2EM438671 (for the purpose of this

14  paragraph, the "Class Vehicle"), from Volkswagen of Alamo Heights in San Antonio, Texas.

15  Prior to purchasing the Class Vehicle, Plaintiff worked for Volkswagen of Alamo Heights and

16  was very familiar with all of the representations the dealership made regarding its "clean" diesel

17  vehicle. In particular, Plaintiff was drawn to the Class Vehicle because it had won a "Green

18  Vehicle of the Year" award. The emission representations, in combination with the advertised

19  fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale

20  value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of

21  acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards

22  and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the

23  advertised combination of low emissions, high performance, and fuel economy—and was illegal.

24  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and

25  would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat

26  device.

27          164.    Plaintiff TIMOTHY FITZPATRICK (for the purpose of this paragraph,

28  "Plaintiff") is a citizen of Texas domiciled in Austin, Texas. On or about July 20, 2015, Plaintiff

purchased a new 2015 Volkswagen Golf Sportwagen TDI, VIN 3VWFA7AU7FM5088695 (for the purpose of this paragraph, the "Class Vehicle"), from Charles Maund Volkswagen in Austin, Texas.  Before purchasing the Class Vehicle, Plaintiff was looking for a car that was environmentally-friendly, fuel efficient, practical and fun to drive.  Although he was considering other vehicles, he settled on the Class Vehicle because he saw various internet and television ads representing Volkswagen "clean" diesel cars as "green," fuel efficient, but focused on performance as well.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.  After Defendants' deception came to light, Plaintiff attempted to trade in his Class Vehicle for a new BMW, but the BMW dealership refused to accept his Class Vehicle as a trade-in.

165.    Plaintiff ROY MCNEAL (for the purpose of this paragraph, "Plaintiff") is a citizen of Texas domiciled in San Antonio, Texas.  In or around October 2014, Plaintiff purchased a new 2014 Volkswagen Passat TDI, VIN 1VWCN7A3XEC112310 (for the purpose of this paragraph, the "Class Vehicle"), from Ancira Volkswagen in San Antonio, Texas. Before purchasing the Class Vehicle, Plaintiff saw television, print and radio advertisements representing that Volkswagen "clean" diesel vehicles are fuel efficient and clean without affecting performance.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised

1   combination of low emissions, high performance, and fuel economy—and was illegal.  Plaintiff

2   has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would

3   not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

4          166.    Plaintiff AMIN NOSRAT (for the purpose of this paragraph, "Plaintiff") is a

5   citizen of Texas domiciled in Houston, Texas.  On or about March 14, 2014, Plaintiff purchased a

6   new 2014 Audi A6 TDI, VIN WAUHMAFCXEN113136 (for the purpose of this paragraph, the

7   "Class Vehicle"), from an Audi dealer in Houston, Texas.  Prior to purchasing his Class Vehicle,

8   Plaintiff was a loyal Toyota customer and drove a hybrid Camry.  He switched brands specifically

9   because television ads and the dealer billed the Audi A6 TDI as fuel efficient and "green."  The

10  emission representations, in combination with the advertised fuel efficiency and performance, as

11  well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase

12  the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle

13  contained a defeat device designed to bypass emission standards and deceive consumers and

14  regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low

15  emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete

16  injury as a direct and proximate result of Audi's conduct, and would not have purchased the Class

17  Vehicle, had Defendants not concealed the illegal defeat device.  Plaintiff sent Scott Keogh, Chief

18  Executive Officer for Audi in the United States a letter asking that Defendant take his vehicle

19  back.  Plaintiff never obtained a response.

20                          **45.    Utah Plaintiffs**

21         167.    Plaintiff BRETT ALTERS (for the purpose of this paragraph, "Plaintiff") is a

22  citizen of Nevada domiciled in Las Vegas, Nevada.  On or about August 12, 2015, Plaintiff

23  purchased used a 2012 Volkswagen Golf TDI, VIN WVWDM7AJ2CW350043 (for the purpose

24  of this paragraph, the "Class Vehicle"), from Findlay Volkswagen in St. George, Utah.  Plaintiff

25  received an education from New York University and is a performer who currently appears in Las

26  Vegas with Cirque du Soleil.  Before purchasing the Class Vehicle, Plaintiff was interested in fuel

27  economy, performance, durability and impact on the environment, and viewed Volkswagen

28  representations about the "clean" diesel vehicles, and discussed his options with Volkswagen

salespersons.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle, instead of other, hybrid and electric vehicles he was considering.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

168.    Plaintiff RACHEL OTTO (for the purpose of this paragraph, "Plaintiff") is a citizen of Utah domiciled in Salt Lake City, Utah.  On or about July 2015, Plaintiff purchased a new 2015 Volkswagen Golf SportWagen TDI, VIN 3VWCA7AU6FM501823 (for the purpose of this paragraph, the "Class Vehicle"), from Southtowne Volkswagen in South Jordan, Utah.  Plaintiff is the Assistant City Attorney for South Jordan City, Utah, with a background in natural resources law.  Plaintiff has a deep concern about the environment and historically commuted to work by bike or on foot.  Before purchasing the Class Vehicle, Plaintiff's top concern was to find a vehicle with a low environmental impact, so she did extensive research on environmentally sound vehicles and viewed Volkswagen representations regarding the "clean" diesel engine.  The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.  Plaintiff has attempted numerous times to sell her "clean" diesel vehicle back to her local Volkswagen dealership, but the dealership has refused and has downplayed her concerns about environmental impact.  Because of

1   her continued concerns relating to the Class Vehicle's pollution levels, Plaintiff limits the use of

2   the Class Vehicle to her work commute, opting to use alternate modes of transportation on the

3   weekends.

4        169.    Plaintiff KELLY R. KING (for the purpose of this paragraph, "Plaintiff") is a

5   citizen of Utah domiciled in Centerville, Utah.  On or about August 27, 2010, Plaintiff purchased

6   a new 2010 Volkswagen Jetta TDI, VIN 3VWRL7AJ6AM104227 (for the purpose of this

7   paragraph, the "Class Vehicle"), from Strong Volkswagen in Salt Lake City, Utah.  Plaintiff is a

8   Brigham Young University educated project manager for L3 Communications Systems-West,

9   specializing in the development, design, manufacturing and integration of secure networked

10  communications.  Before purchasing the Class Vehicle, Plaintiff spent months extensively

11  researching the "clean" diesel vehicles, and viewed Volkswagen's representations regarding fuel

12  efficiency, emissions and performance.  The emission representations, in combination with the

13  advertised fuel efficiency and performance, and the vehicle's reputation for maintaining a high

14  resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the

15  time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission

16  standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not

17  deliver the advertised combination of low emissions, high performance, and fuel economy—and

18  was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants'

19  conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the

20  illegal defeat device.  Plaintiff is embarrassed and dismayed not only that the Class Vehicle

21  pollutes, and continues to pollute, but that he recommended and convinced others to buy similar

22  "clean" diesel vehicles based on Volkswagen's representations regarding emissions and fuel

23  economy.

24       170.    Plaintiff WILLIAM A. WILSON (for the purpose of this paragraph, "Plaintiff") is

25  a citizen of Utah domiciled in Provo, Utah.  On or about October 1, 2013, Plaintiff purchased a

26  new 2013 Volkswagen Passat TDI SE10, VIN 1VWBN7A38DC088762 (for the purpose of this

27  paragraph, the "Class Vehicle"), from Garff Volkswagen in Orem, Utah.  Plaintiff has a B.S. in

28  Sociology and Economics from Brigham Young University and served in the United States

1   military.  Before purchasing the Class Vehicle, Plaintiff did extensive research on the "clean"

2   diesel vehicles, focusing on fuel efficiency, reliability, durability and environmental impact,

3   viewed many Volkswagen representations about "clean" diesel vehicles, and discussed the

4   longevity of "clean" diesel engines with the service manager at Garff Volkswagen.  The emission

5   representations, in combination with the advertised fuel efficiency and performance, as well as

6   the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the

7   Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a

8   defeat device designed to bypass emission standards and deceive consumers and regulators.

9   Consequently, the Class Vehicle could not deliver the advertised combination of low emissions,

10  high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a

11  direct and proximate result of Defendants' conduct, and would not have purchased the Class

12  Vehicle, had Defendants not concealed the illegal defeat device.

13              **46.    Vermont Plaintiffs**

14              171.    Plaintiff DAVID EBENSTEIN (for the purpose of this paragraph, "Plaintiff") is a

15  citizen of Vermont domiciled in Richmond, Vermont.  On or about July 15, 2015, Plaintiff

16  purchased a new 2015 Volkswagen Golf TDI, VIN 3VWRA7AU4FM076208 (for the purpose of

17  this paragraph, the "Class Vehicle"), from Shearer Volkswagen in South Burlington, Vermont.

18  Plaintiff presently works are a Research Technician at the University of Vermont, having earned a

19  Master's Degree in Biology from the University of Southern California in 1986.  Before

20  purchasing the Class Vehicle, Plaintiff read a review in the New York Times that described

21  Volkswagen's "clean" diesel vehicles as emitting reduced levels of combustion pollutants.  The

22  emission representations, in combination with the advertised fuel efficiency and performance, as

23  well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase

24  the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle

25  contained a defeat device designed to bypass emission standards and deceive consumers and

26  regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low

27  emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete

28

1    injury as a direct and proximate result of Defendants' conduct, and would not have purchased the

2    Class Vehicle, had Defendants not concealed the illegal defeat device.

3        172.    Plaintiff JAMES MALLOY (for the purpose of this paragraph, "Plaintiff") is a

4    citizen of Vermont domiciled in Plainfield, Vermont.  In or about May 2011, Plaintiff purchased a

5    new 2011 Volkswagen Golf TDI, VIN WVWMM7AJ8BW330247.  Subsequently, in April 2015,

6    Plaintiff purchased a new 2014 Volkswagen Passat TDI, VIN IVWCN7A38EC098973 (for the

7    purpose of this paragraph, collectively, the "Class Vehicles").  Plaintiff purchased both Class

8    Vehicles from Walker Mazda Volkswagen in Barre, Vermont.  Plaintiff is presently Managing

9    Partner of Black Bear Bio Diesel & TH Malloy, a company that sells biodiesel fuel.  Before

10   purchasing the Class Vehicle, Plaintiff saw myriad advertisements on billboards, bus stops,

11   newspapers, and television.  The ads caught Plaintiff's attention because they all represented,

12   falsely, that Volkswagen's "clean" diesel vehicles retained their full performance all the while

13   producing very few noxious pollutants and being fuel-efficient.  The ads struck a chord with

14   Plaintiff, whose entire business is devoted to making the use of fuel sustainable and "green."  The

15   emission representations, in combination with the advertised fuel efficiency and performance, as

16   well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase

17   the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle

18   contained a defeat device designed to bypass emission standards and deceive consumers and

19   regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low

20   emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete

21   injury as a direct and proximate result of Defendants' conduct, and would not have purchased the

22   Class Vehicle, had Defendants not concealed the illegal defeat device.

23                    **47.    Virginia Plaintiffs**

24       173.    Plaintiff STEVEN BRIER (for the purpose of this paragraph, "Plaintiff") is a

25   citizen of New Jersey domiciled in Maplewood, New Jersey.  On or about June 2010, Plaintiff

26   purchased a new 2010 Volkswagen Jetta TDI, VIN 3VWRL7AJ2AM121056; on or about June

27   2015, Plaintiff purchased a 2014 Jetta Sportwagen TDI, VIN 3VWPL7AJ9EM626928 (for the

28   purpose of this paragraph, these vehicles are considered "Class Vehicles"), from Wes Greenway's

1     Alexandria Volkswagen, in Alexandria, Virginia.  Plaintiff is a self-employed consultant.  Before

2     purchasing the Class Vehicles, Plaintiff researched clean diesel technology on Volkswagen's

3     website, read newspaper and magazine reviews, and visited the dealership that had clean diesel

4     logos displayed throughout.  The emission representations, in combination with the advertised

5     fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale

6     value, induced Plaintiff to purchase the Class Vehicles.  Unbeknownst to Plaintiff, at the time of

7     acquisition, the Class Vehicles contained a defeat device designed to bypass emission standards

8     and deceive consumers and regulators.  Consequently, the Class Vehicles could not deliver the

9     advertised combination of low emissions, high performance, and fuel economy.  Plaintiff has

10     suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not

11     have purchased the Class Vehicles, had Defendants not concealed the illegal defeat device.

12         174.  Plaintiff MARK SCHUMACHER (for the purpose of this paragraph, "Plaintiff")

13     is a citizen of Virginia domiciled in Gainesville, Virginia.  On or about April 2012, Plaintiff

14     purchased a new 2012 Volkswagen Passat TDI, VIN 1VWBN7A30CC071839 (for the purpose of

15     this paragraph, the "Class Vehicle"), from Lindsay Volkswagen in Sterling, Virginia.  Plaintiff is

16     a graduate of Minnesota State University and has worked as an air traffic controller for thirty

17     years.  Before purchasing the Class Vehicle, Plaintiff researched the Volkswagen and bought the

18     car to drive long trips to visit his kids who were playing college sports in neighboring states;

19     Plaintiff believed the cleanliness and long-range of the diesel fuel would make up for the higher

20     price of the fuel.  The emission representations, in combination with the advertised fuel efficiency

21     and performance, as well as the vehicle's reputation for maintaining a high resale value, induced

22     Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the

23     Class Vehicle contained a defeat device designed to bypass emission standards and deceive

24     consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised

25     combination of low emissions, high performance, and fuel economy—and was illegal.  Plaintiff

26     has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would

27     not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

28

1    Plaintiff placed an ad on Craigslist to sell his car, but has been unsuccessful in selling his car thus

2    far.

3         175.    Plaintiff JOHN STABY (for the purpose of this paragraph, "Plaintiff") is a citizen

4    of Virginia domiciled in Vienna, Virginia.  In or about April 2014, Plaintiff purchased a new

5    2014 Audi A6 TDI, VIN WAUFMAFC0EN071468 (for the purpose of this paragraph, the "Class

6    Vehicle"), from Tysons Corner Audi (Penske Automotive Group in Vienna, Virginia.  Plaintiff

7    has a bachelor of science degree in civil engineering and a master's degree in project

8    management.  He currently works as a project manager for the Federal Aviation Administration in

9    Washington D.C.  Before purchasing the Class Vehicle, Plaintiff researched the Class Vehicle on

10   the internet.  Several automotive blogs touted not only the environmentally sound aspects of the

11   A6, but also the fuel economy and performance.  The "clean" diesel advertising and the

12   salesperson at the dealership convinced him he was making an environmentally responsible

13   purchase decision by selecting the A6 TDI.  The emission representations, in combination with

14   the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining

15   a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at

16   the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission

17   standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not

18   deliver the advertised combination of low emissions, high performance, and fuel economy—and

19   was illegal.  Plaintiff has suffered concrete injury as a direct and proximate result of Defendants'

20   conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the

21   illegal defeat device.

22        176.    Plaintiff SCOTT TAYLOR (for the purpose of this paragraph, "Plaintiff") is a

23   citizen of Virginia domiciled in Clifton, Virginia.  On or about October 19, 2012, Plaintiff

24   purchased a new 2013 Volkswagen Passat TDI, VIN 1VWCN7A37DC030467 (for the purpose of

25   this paragraph, the "Class Vehicle"), from Wes Greenway's Alexandria Volkswagen in

26   Alexandria, Virginia.  Plaintiff is an advisor for the U.S. Department of Health and human

27   Services in Washington D.C.  He purchased the Class Vehicle out of his desire to "go green" and

28   liked the idea of low emissions and excellent fuel economy.  Before purchasing the Class Vehicle,

1    Plaintiff conducted internet research that produced multiple articles regarding the vehicle's

2    exemplary fuel economy for its class.  He visited multiple dealerships that similarly touted the

3    vehicle's "clean" diesel technology and exceptional fuel economy.  The emission representations,

4    in combination with the advertised fuel efficiency and performance, as well as the vehicle's

5    reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.

6    Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device

7    designed to bypass emission standards and deceive consumers and regulators.  Consequently, the

8    Class Vehicle could not deliver the advertised combination of low emissions, high performance,

9    and fuel economy—and was illegal.  Plaintiff has suffered concrete injury as a direct and

10   proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had

11   Defendants not concealed the illegal defeat device.  Plaintiff attempted to sell the Class Vehicle

12   after he learned of the defect and was offered only $10,000 by an interested party who pointed out

13   the emissions issue to him as justification for the low offer.  Volkswagen of Alexandria offered

14   him $12,000 on a trade-in.

15          177.    Plaintiff WALTER FORD (for the purpose of this paragraph, "Plaintiff") is a

16   citizen of Virginia domiciled in Charlottesville, Virginia.  On or about August 31, 2103, Plaintiff

17   purchased a new 2013 Volkswagen Passat TDI, VIN 1VWCN7A39DC083543 (for the purpose of

18   this paragraph, the "Class Vehicle"), from Flow Volkswagen in Charlottesville, Virginia.

19   Plaintiff has worked for Northrop Grumman for the last eight years in the International Business

20   Development department.  Before purchasing the Class Vehicle, Plaintiff reviewed articles on

21   Consumer Reports that picked the 2012 Passat TDI as best overall mid-sized car.  After he

22   considered all possible options, he was drawn to the Passat TDI because of its rating in Consumer

23   Reports and the MPG rating of the engine.  The sales people at the dealership emphasized the

24   "clean" diesel aspect of the vehicle and the MPG.  The emission representations, in combination

25   with the advertised fuel efficiency and performance, as well as the vehicle's reputation for

26   maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to

27   Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to

28   bypass emission standards and deceive consumers and regulators.  Consequently, the Class

Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

178.    Plaintiff MICHAEL MEINTZSCHEL (for the purpose of this paragraph, "Plaintiff") is a citizen of Virginia domiciled in Charlottesville, Virginia. On or about June 16, 2015, Plaintiff purchased a new 2015 Volkswagen Golf Sportwagen TDI, VIN 3VWCA7AU8FM502097 (for the purpose of this paragraph, the "Class Vehicle"), from Valley Volkswagen in Staunton, Virginia. Plaintiff has a degree in Business Administration and currently works for the Great Outdoor Provision Company in Charlottesville, Virginia. Before purchasing the Class Vehicle, Plaintiff was looking for a car with great gas mileage and performance. His previous car was 15 years old and he and his wife were looking for a new one. They were looking at Volkswagen for over a year and received regular mailings from the dealership. The Volkswagen Golf TDI was advertised as a high per gallon mileage car with great acceleration for a diesel. They test-drove the vehicle a week before they purchased it and found that it performed as described. The salesperson at the dealership told them Volkswagen TDI vehicles contained new technology that allowed the new diesel engines to burn cleaner and that because of this "we would be seeing a lot more models in diesel." The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

48.     **Washington Plaintiffs**

179.    Plaintiff KURT MALLERY (for the purpose of this paragraph, "Plaintiff") is a citizen of Washington domiciled in Gig Harbor, Washington. On or about April 22, 2010, Plaintiff purchased a new 2010 Volkswagen Golf TDI, VIN WVWNM7AJXAW327854 (for the purpose of this paragraph, the "Class Vehicle"), from Chaplin's Volkswagen in Bellevue, Washington. Plaintiff has a degree in engineering from the United States Air Force Academy and has been employed by Alaska Airlines as a pilot for the last 20 years. Before purchasing the Class Vehicle, Plaintiff thoroughly researched "clean" diesel vehicles on the internet and was convinced that "clean" diesel vehicles had better fuel efficiency and cleaner emissions than hybrid and gasoline-powered vehicles. He decided to purchase the Jetta Golf TDI after test-driving various vehicles. The dealership explained to him the advantages of "clean" diesel vehicles, the durability of the engine, and how the fuel economy would improve over time. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device. When he learned the Class Vehicle contained a defeat device designed to bypass emissions standards put his vehicle into storage and started driving another car.

180.    Plaintiff CHAD DIAL (for the purpose of this paragraph, "Plaintiff") is a citizen of Washington domiciled in Woodinville, Washington. In or about September 2013, Plaintiff purchased a new 2014 Volkswagen Passat TDI, VIN 1VWCN7A36EC021289 (for the purpose of this paragraph, the "Class Vehicle"), from Chaplain's Volkswagen in Bellevue, Washington. Plaintiff has a master's degree in business administration and is currently the Executive Director of HTC America in Seattle, Washington. Before purchasing the Class

Vehicle, Plaintiff visited a Volkswagen dealer and test-drove the "clean" diesel vehicle.  The

dealer also explained the performance, fuel economy, and "clean" diesel technology.  The

emission representations, in combination with the advertised fuel efficiency and performance, as

well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase

the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle

contained a defeat device designed to bypass emission standards and deceive consumers and

regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low

emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete

injury as a direct and proximate result of Defendants' conduct, and would not have purchased the

Class Vehicle, had Defendants not concealed the illegal defeat device.

181.    Plaintiff JOSEPH HERR (for the purpose of this paragraph, "Plaintiff") is a citizen

of Colorado domiciled in Seattle, Washington.  On or about May 30, 2015, Plaintiff purchased a

new 2015 Volkswagen Passat TDI, VIN 1VWCV7A39FC061531 (for the purpose of this

paragraph, the "Class Vehicle"), from Pignataro Volkswagen in Everett, Washington.  Plaintiff

has been the Director of Design for Burnstead Construction for the last 17 years.  When Plaintiff

purchased the Class Vehicle, the dealership told him the Volkswagen Passat TDI had great

mileage and performance.  He was also told that his "clean" diesel vehicle met all emissions

standards and it was better than comparable gasoline vehicles.  The emission representations, in

combination with the advertised fuel efficiency and performance, as well as the vehicle's

reputation for maintaining a high resale value, induced Plaintiff to purchase the Class

Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a

defeat device designed to bypass emission standards and deceive consumers and

regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low

emissions, high performance, and fuel economy—and was illegal.  Plaintiff has suffered concrete

injury as a direct and proximate result of Defendants' conduct, and would not have purchased the

Class Vehicle, had Defendants not concealed the illegal defeat device.

182.    Plaintiff DAN CLEMENTS (for the purpose of this paragraph, "Plaintiff") is a

citizen of Washington domiciled in Everett, Washington.  In or about October 2011, Plaintiff

purchased a new 2012 Touareg TDI, VIN WVGEK9BP5CD008991 (for the purpose of this paragraph, the "Class Vehicle"), from Pignataro Volkswagen in Everett, Washington. Plaintiff has an MBA in International Finance. He is an underwater photographer and public speaker. He purchased the Touareg TDI because he wanted an environmentally clean vehicle with a long driving range that could hold his dive and photography gear. Before purchasing the Class Vehicle, Plaintiff compared the Touareg TDI with Mercedes. They were within a few hundred dollars of each other. Before he purchased the Touareg TDI, Plaintiff was told by the dealership that the "clean" diesel was "much cleaner than gas engines. You can almost breathe the exhaust." The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff contacted Volkswagen after he learned about the defects in his vehicle but has not received a response.

### 49. West Virginia Plaintiffs

183. Plaintiff RICHARD LANHAM (for the purpose of this paragraph, "Plaintiff") is a citizen of West Virginia domiciled in Hurricane, West Virginia. On or about June 4, 2015, Plaintiff purchased a new 2014 Volkswagen Jetta TDI, VIN 3VWLL7AJ7EM416455 (for the purpose of this paragraph, the "Class Vehicle"), from Moses Honda Volkswagen in Huntington, West Virginia. Plaintiff has been a stay at home father since suffering an industrial accident at work that resulted in the loss of his hand. Before purchasing the Class Vehicle, Plaintiff researched reliable and fuel efficient vehicles for his wife's new hour-long commute to work, viewed Volkswagen representations related to the "clean" diesel vehicles, and discussed with his local dealership the advantages of paying a premium price for a "clean" diesel vehicle. The

emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

184. Plaintiff MARION B. MOORE (for the purpose of this paragraph, "Plaintiff") is a citizen of West Virginia domiciled in Charleston, West Virginia. On or about April 25, 2014, Plaintiff purchased a new 2014 Volkswagen Jetta TDI, VIN 3VWPL7AJ5EM614520 (for the purpose of this paragraph, the "Class Vehicle"), from Joe Holland Volkswagen in Charleston, West Virginia. Plaintiff has a B.A. from William Smith College with an emphasis in English. She is currently a stay at home mother. Before purchasing the Class Vehicle, Plaintiff researched the "clean" diesel vehicles for fuel economy and emissions, viewed Volkswagen representations relating to the "clean" diesels, and compared vehicle options through Consumer Reports. The emission representations, in combination with the advertised fuel efficiency and performance, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device. Plaintiff now limits the use of her Class Vehicle. In October 2015, she purchased a new vehicle, one she considered and rejected after viewing Volkswagen's representations of its "clean" diesel vehicles, and which she now drives daily.

**50.** **Wisconsin Plaintiffs**

185.     Plaintiff CHAD M. NIEGELSEN (for the purpose of this paragraph, "Plaintiff") is a citizen of Wisconsin domiciled in La Crosse, Wisconsin.  On or about December 30, 2008, Plaintiff purchased a new 2009 Volkswagen Jetta Sportwagen TDI, 3VWTL81K59M300689 (for the purpose of this paragraph, the "Class Vehicle"), from Burg Auto in La Crosse, Wisconsin. Plaintiff is a Realtor and is concerned with protecting the environment.  Before purchasing the Class Vehicle, Plaintiff reviewed Volkswagen's brochure, which stated in part, "Jetta TDI "clean" diesels offer fuel efficiency, power, performance . . . Or in other words, lean, mean, cleaner burning machines."  Additionally, the brochure stated, "The Volkswagen TDI engine is cleaner than conventional diesels, emitting 95% less soot as well as a reduction in oxides of nitrogen and sulfur. It's powerful, with the kind of low-end torque that racers and tuners demand. It's efficient, using a turbocharger and smart exhaust design to burn fuel more efficiently. So much so, in fact, that Volkswagen expects to be the first automaker to make clean diesel cars that are certified in all 50 states. And best of all, it will help save you money with an out-of-this-world AMCI estimated mileage of 38 city/44 highway** (automatic) and over 600 miles on a single tank of fuel."  Additionally, the dealership touted the 2009 Jetta SportWagen as having a new diesel motor without the "stink." The benefits to the environment—especially clean diesel—in combination with the advertised fuel efficiency and performance, induced Plaintiff to purchase the Class Vehicle, instead of other "hybrid" vehicles.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators.  Consequently, the Class Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

186.     Plaintiff LAURA SWENSON (for the purpose of this paragraph, "Plaintiff") is a citizen of Wisconsin domiciled in Brookfield, Wisconsin.  In or about June 2015, Plaintiff bought a used 2014 Volkswagen Jetta Sportwagen TDI, VIN 3VWML7AJ9EM628472 (for the purpose

1  of this paragraph, the "Class Vehicle"), from Sleepy Hollow in Viroqua, Wisconsin. Plaintiff is

2  concerned with protecting the environment. Before buying the Class Vehicle, Plaintiff saw

3  Volkswagen television commercials about clean diesel vehicles. Additionally, the dealership

4  touted excellent gas mileage with diesel. The benefits to the environment—especially clean

5  diesel—in combination with the advertised fuel efficiency and performance, induced Plaintiff to

6  purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of purchase, the Class Vehicle

7  contained a defeat device designed to bypass emission standards and deceive consumers and

8  regulators. Consequently, the Class Vehicle could not deliver the advertised combination of low

9  emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete

10  injury as a direct and proximate result of Defendants' conduct, and would not have purchased the

11  Class Vehicle, had Defendants not concealed the illegal defeat device

12        **51.**    **Wyoming Plaintiffs**

13       187.    Plaintiff BRIAN MILLS (for the purpose of this paragraph, "Plaintiff") is a citizen

14  of Wyoming domiciled in Cheyenne, Wyoming. On or about September 2, 2015, Plaintiff

15  purchased a new 2015 Volkswagen Passat TDI, VIN 1VWBV7A38FC086335 (for the purpose of

16  this paragraph, the "Class Vehicle"), from Greeley Volkswagen in Greeley, Colorado. Plaintiff is

17  a paramedic for American Medical Response. He purchased the Class Vehicle because of the

18  excellent fuel mileage that was reported, the low emissions, and the minimal footprint the vehicle

19  supposedly left. He also relied on the good reputation on Volkswagen at the time. Before

20  purchasing the Class Vehicle, Plaintiff conducted extensive internet research on Volkswagen

21  websites and consumer review sites like Consumer Reports. Based upon his research, he believed

22  he was getting a reliable vehicle, from a reliable and trusted company that blew the reported fuel

23  mileage out of the water while being eco-friendly. The emission representations, in combination

24  with the advertised fuel efficiency and performance, as well as the vehicle's reputation for

25  maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to

26  Plaintiff, at the time of acquisition, the Class Vehicle contained a defeat device designed to

27  bypass emission standards and deceive consumers and regulators. Consequently, the Class

28  Vehicle could not deliver the advertised combination of low emissions, high performance, and

1    fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate

2    result of Defendants' conduct, and would not have purchased the Class Vehicle, had Defendants

3    not concealed the illegal defeat device. In November 2015, Plaintiff went to Halladay Motors in

4    Cheyenne, Wyoming to see what the trade in value of his vehicle was and was offered only

5    $19,000 for the vehicle he purchased in September 2015 for $25,479.

6    188.    Plaintiff RONE TEMPEST (for the purpose of this paragraph, "Plaintiff") is a

7    citizen of Wyoming domiciled in Lander, Wyoming. On or about July 2009, Plaintiff purchased

8    a new 2009 Volkswagen Jetta TDI, VIN 3VWRL71K09M074789 (for the purpose of this

9    paragraph, the "Class Vehicle"), from Montana Import Group in Bozeman, Montana. Plaintiff is

10   a graduate of UC-Berkeley and worked as a journalist for the Los Angeles Times before

11   retirement. Before purchasing the Class Vehicle, Plaintiff attended a conference on "clean" diesel

12   sponsored by the American Council on Germany, where Volkswagen and Audi executives gave

13   presentations touting the low-emission, high mileage virtues of their forthcoming "clean" diesel

14   vehicles. The emission representations, in combination with the advertised fuel efficiency and

15   performance, as well as the vehicle's reputation for maintaining a high resale value, induced

16   Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the

17   Class Vehicle contained a defeat device designed to bypass emission standards and deceive

18   consumers and regulators. Consequently, the Class Vehicle could not deliver the advertised

19   combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff

20   has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would

21   not have purchased the Class Vehicle, had Defendants not concealed the illegal defeat device.

22   **B.    Defendants**

23   **1.    Volkswagen AG**

24   189.    Volkswagen AG ("VW AG") is a German corporation with its principal place of

25   business in Wolfsburg, Germany. VW AG is one of the largest automobile manufacturers in the

26   world, and is in the business of designing, developing, manufacturing, and selling automobiles.

27   VW AG is the parent corporation of VW America, Audi AG, and Porsche AG. According to VW

28   AG, it sold 10.14 million cars worldwide in 2014 – including 6.12 million VW-branded cars, 1.74

million Audi-Branded cars, and 189,849 Porsche-branded cars.  Combined with other brands,
VW AG boasts a 12.9% share of the worldwide passenger car market.  VW AG's sales revenue in
2014 totaled €202 billion (approximately $221 billion) and sales revenue in 2013 totaled €197
billion (approximately $215 billion).  At €12.7 billion (approximately $13.9 billion), VW AG
generated its highest ever operating profit in fiscal year 2014, beating the previous record set in
2013 by €1.0 billion (approximately $1.1 billion).

190.    VW AG engineered, designed, developed, manufactured, and installed the defeat
device software on the Class Vehicles equipped with the 2.0-liter TDI® and exported these
vehicles with the knowledge and understanding that they would be sold throughout the United
States.  VW AG also developed, reviewed, and approved the marketing and advertising
campaigns designed to sell the Class Vehicles.

### 2.    Volkswagen Group of America, Inc.

191.    Volkswagen Group of America, Inc. ("VW America") is a New Jersey corporation
with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia
20171.  VW America is a wholly-owned subsidiary of Volkswagen AG, and it engages in
business, including the advertising, marketing and sale of Volkswagen automobiles, in all 50
states.  In 2014 alone, VW America sold 552,729 vehicles from its 1,018 dealer locations in all 50
states, including 95,240 TDI® "clean" diesel vehicles.

### 3.    Audi AG

192.    Audi AG ("Audi AG") is a German corporation with its principal place of business
in Ingolstadt, Germany.  Audi AG is the parent of Audi of America, LLC and a subsidiary of the
Audi Group, which is a wholly-owned subsidiary of VW AG.  Audi AG designs, develops,
manufacturers, and sells luxury automobiles.  According to Audi AG, the Audi Group sold 1.74
million cars worldwide in 2014, with sales revenues in 2014 totaling €53.8 billion (approximately
$58.5 billion).  Audi AG's operating profit in fiscal year 2014 was €5.15 billion (approximately
$5.63 billion).

193.    Audi AG engineered, designed, developed, manufactured and installed the defeat
device software on the Class Vehicles equipped with the 3.0-liter TDI® diesel engine, and

exported these vehicles with the knowledge and understanding that they would be sold throughout the United States. Audi AG also developed, reviewed, and approved the marketing and advertising campaigns designed to sell its Class Vehicles.

### 4. Audi of America, LLC

194.    Audi of America, LLC ("Audi America") is a Delaware limited liability company with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171. Audi America is a wholly-owned U.S. subsidiary of Audi AG, and it engages in business, including the advertising, marketing and sale of Audi automobiles, in all 50 states.

### 5. Dr. Ing. h.c. F. Porsche AG

195.    Dr. Ing. h.c. F. Porsche AG ("Porsche AG") is a German corporation with its principal place of business located in Stuttgart, Germany. Porsche AG designs, develops, manufacturers, and sells luxury automobiles. Porsche AG is a wholly-owned subsidiary of VW AG. According to Porsche AG, it sold 187,208 cars worldwide in 2014, with sales revenues in 2014 totaling €17.2 billion (approximately $18.8 billion). Porsche AG's operating profit in fiscal year 2014 was €2.79 billion ($2.97 billion).

196.    Porsche AG installed the defeat device software on the Class Vehicles equipped with the 3.0-liter TDI® diesel engine, and exported these vehicles with the knowledge and understanding that they would be sold throughout the United States. Porsche AG also developed, reviewed, and approved the marketing and advertising campaigns designed to sell its Class Vehicles.

### 6. Porsche Cars North America, Inc.

197.    Porsche Cars North America, Inc. ("Porsche America") is a Delaware corporation with its principal place of business located at 1 Porsche Drive, Atlanta, Georgia 30354. Porsche America is a wholly-owned U.S. subsidiary of Porsche AG, and it engages in business, including the advertising, marketing and sale of Porsche automobiles, in all 50 states. According to Porsche AG, 2014 represented its best annual results in Porsche history in the U.S., with 47,007 automobiles delivered. Porsche America now maintains a network of 189 dealers nationwide.

### 7. Martin Winterkorn

198.    Martin Winterkorn is a resident of Germany.  Winterkorn was CEO of VW AG until he resigned on September 23, 2015, in the wake of the diesel emissions scandal.  Notably, Winterkorn was widely regarded as a detail-oriented, micromanaging CEO, who retained control over engineering details that many other CEOs would relinquish fully to deputies.  Winterkorn is being investigated by the German government for allegations of fraud.  Winterkorn reportedly hand-picked the engineers who designed the defeat devices.  Winterkorn received compensation from the illegal scheme and course of conduct based on the revenues and profits from the Class Vehicles, and Volkswagen's increased market share.  Winterkorn approved, authorized, directed, ratified, and/or participated in the acts complained of herein.  Winterkorn is subject to the personal jurisdiction of this Court as he has availed himself of the laws of the United States through his management and control over VW America as well as the manufacture, distribution, testing, and sale of hundreds of thousands of Class Vehicles imported and sold across the United States.  Furthermore, Winterkorn has consistently travelled to the U.S. to attend and make presentations at various car shows across the country in order to promote the sale of the Class Vehicles.

### 8. Matthias Müller

199.    Matthias Müller is a resident of Germany.  Müller is a 40-year veteran of Volkswagen, where he began as an apprentice toolmaker at Audi AG in 1977.  Müller was appointed coordinator of the Audi model lines in 2002, after Winterkorn took over the management of Audi AG.  In 2007, when Winterkorn became CEO of VW AG, Winterkorn appointed Müller as Head of Product Management across all Volkswagen brands.  In 2010, Müller was appointed CEO of Porsche AG.  In 2014, Müller became the Chief Information Officer of Porsche Automobil Holding SE.  Müller became the CEO of VW AG on September 25, 2015, upon Winterkorn's resignation amidst the emissions scandal.  Müller profited millions of dollars from the illegal scheme and course of conduct based on the revenues and profits from the Class Vehicles and Volkswagen's increased market share.  Müller approved, authorized, directed, ratified, and/or participated in the acts complained of herein.  Müller is subject to the

1   personal jurisdiction of this Court because he has availed himself of the laws of the United States

2   through his management and control of the American Volkswagen Defendants, as well as the

3   design, manufacture, distribution, testing, and/or sale of hundreds of thousands of Class Vehicles

4   imported and sold across the United States. Furthermore, Müller has consistently travelled to the

5   U.S. to attend and make presentations at various car shows across the country in order to promote

6   the sale of the Class Vehicles.

### 9.   Michael Horn

8   200.   Michael Horn is a resident of Virginia. Horn is President and CEO of VW

9   America. Horn received compensation from the illegal scheme and course of conduct based on

10   the revenues and profits from the Class Vehicles, and Volkswagen's increased market share.

11   Horn approved, authorized, directed, ratified, and/or participated in the acts complained of herein.

12   Horn has admitted that he was aware of the vehicles' emissions non-compliance since at least

13   2014.

### 10.   Rupert Stadler

15   201.   Rupert Stadler is a resident of Germany. Stadler became the CEO of Audi AG on

16   January 1, 2010. Stadler joined Audi AG in 1990 and has held various roles at Audi and VW,

17   including the Head of the Board of Management's Office for Volkswagen and the Head of Group

18   Product Planning. In 2003, Stadler became an Audi AG Board Member and was later being

19   responsible for the Finance and Organisation Division. Stadler joined the Board of Management

20   of Volkswagen when he was appointed to his current role as CEO of Audi AG. Stadler received

21   millions of dollars from the illegal scheme and course of conduct based on the revenues and

22   profits from the Class Vehicles and Volkswagen's increased market share. Stadler approved,

23   authorized, directed, ratified, and/or participated in the acts complained of herein. Stadler is

24   subject to the personal jurisdiction of this Court because he has availed himself of the laws of the

25   United States through his management and control over Audi America as well as the design,

26   manufacture, distribution, testing, and/or sale of hundreds of thousands of Class Vehicles

27   imported and sold across the United States. Furthermore, Stadler has consistently travelled to the

28

1    U.S. to attend and make presentations at various car shows across the country in order to promote

2    the sale of the Class Vehicles.

3                    **11.    Robert Bosch GmbH**

4             202.    Robert Bosch GmbH is a German multinational engineering and electronics

5    company headquartered in Gerlingen, Germany.  Robert Bosch GmbH is the parent company of

6    Robert Bosch LLC.  Robert Bosch GmbH, directly and/or through its North-American subsidiary

7    Robert Bosch LLC, at all material times, designed, manufactured, and supplied elements of the

8    defeat device to Volkswagen for use in the Class Vehicles.

9                    **12.    Robert Bosch, LLC**

10            203.    Robert Bosch LLC is a Delaware limited liability company with its principal place

11   of business located at 38000 Hills Tech Drive, Farmington Hills, Michigan 48331.  Robert Bosch

12   LLC is a wholly-owned subsidiary of Robert Bosch Gmbh.  Robert Bosch LLC, directly and/or in

13   conjunction with its parent Robert Bosch GmbH, at all material times, designed, manufactured,

14   and supplied elements of the defeat device to Volkswagen for use in the Class Vehicles.

15                   **13.    Volkmar Denner**

16            204.    Volkmar Denner is a resident of Germany.  Denner has been the Chairman CEO of

17   Robert Bosch GmbH since July 1, 2012.  Denner contemporaneously holds the position of Chief

18   Technology Officer.  Denner joined Bosch in 1986, and has held numerous positions within the

19   company, including, Director of ECU Development, Vice-President of Sales and Development,

20   Semiconductors and Electronic Control Units division, and President of Automotive Electronics

21   division.  In 2006, Denner became a member of Robert Bosch GmbH's Board of Management

22   and was later responsible for research and advance engineering, product planning, and technology

23   coordination across the company's three business sectors from July 2010 until his appointment as

24   CEO.  Denner received millions of dollars from the illegal scheme and course of conduct based

25   on the revenues and profits from the sale of defeat devices to Volkswagen.  Denner approved,

26   authorized, directed, ratified, and/or participated in the acts complained of herein.  Denner is

27   subject to the personal jurisdiction of this Court because he has availed himself of the laws of the

28   United States through his management and control over Robert Bosch, LLC as well as the design,

1  manufacture, distribution, testing, and/or sale of hundreds of thousands of elements of the defeat

2  devices installed in the Class Vehicles.

3                    **COMMON FACTUAL ALLEGATIONS**

4  **A.    Volkswagen's Plot to Dominate the Automotive Market**

5      205.    Volkswagen's illegal scheme was born out of greed and ambition to dominate the

6  global automotive market at any cost. By Volkswagen's own admissions, the seeds for the

7  scandal were planted in 2005, as Volkswagen was repositioning its fleet in light of tightening

8  emission regulations in our country with "a strategic decision to launch a large-scale promotion of

9  diesel vehicles in the United States in 2005."[6] While other automakers focused on hybrid or

10 hydrogen-fueled vehicles, Volkswagen pivoted toward "clean" diesel technology as its primary

11 strategy to reach the growing market of environmentally-conscious consumers.

12     206.    In 2004, the second generation Toyota Prius became an explosive success, tripling

13 global sales from years prior and changing environmentally-friendly vehicles from a niche market

14 to a standard consumer option. Although it was the first mainstream hybrid vehicle, the Prius was

15 widely viewed as a "boring" vehicle, as the improvements in fuel efficiency and emissions were

16 offset by relatively bland styling and lackluster driving performance.

17     207.    Volkswagen took note of the success and sought to achieve the same (or better)

18 efficiency benchmarks as the Prius, but in a "fun-to-drive," high-performance vehicle. This was

19 to be achieved with a supposedly remarkable breakthrough in diesel technology: the EA 189 TDI

20 engine. Volkswagen's TDI (short for "turbocharged direct injection,") diesel engines were the

21 culmination of millions of dollars in research and development, and were heralded as the critical

22 factor that would be responsible for Volkswagen's growth and success in the U.S.

23     208.    In 2007, defendant Winterkorn left his position at Audi to become VW AG's CEO.

24 Winterkorn set goals for Volkswagen to become a world leader in automobile manufacturing.

25 This included a target of tripling U.S. sales to at least 800,000 vehicles by 2018.[7] At the time,

26 ─────────────────
[6] *Volkswagen making good progress with its investigation, technical solutions, and Group
27 realignment*, Volkswagen AG (Dec. 10, 2015),
http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2015/12/VW_PK.html.
28 [7] William Boston, *Volkswagen Emissions Investigation Zeroes In on Two Engineers*, Wall Street
*Footnote continued on next page*

diesel-engine vehicles made up just 5% of the U.S. car market, and Winterkorn recognized this as the perfect opportunity to expand Volkswagen's market share. As shown below in a VW America presentation touting the success of "clean diesel," this strategy was employed with great success:[8]



209. To expand its diesel market penetration in the U.S., Volkswagen needed to overcome the stigmas associated with diesel vehicles. Foremost among these was the consumer perception that diesel engines emit thick, toxic smoke full of dangerous and destructive pollutants, relegated to the smog-filled cities of the past. Volkswagen claimed to have solved all of these environmental problems with the new EA 189 engine, which it aggressively marketed as the clean, green alternative to hybrid engines, such as those in the Prius.

210. Behind the scenes, however, Volkswagen realized internally that it was not possible to roll out these so-called "clean" diesel vehicles within its self-imposed budgets and engineering constraints. To get the job done, Winterkorn appointed two engineers with whom he had worked closely at Audi (Ulrich Hackenberg and Wolfgang Hatz) to head up R&D and engine

---

*Footnote continued from previous page*
Journal (Oct. 5, 2015), http://www.wsj.com/articles/vw-emissions-probe-zeroes-in-on-two-engineers-1444011602.

[8] *Volkswagen AG, TDI: U.S. Market Success*, Clean Diesel Delivers (March, 2015), http://cleandieseldelivers.com/media/Douglas-Skorupski-VWoA_DTF_March2015.pdf.

development for this project.  These two engineers were the chief developers of the TDI engine.[9]

Their primary mandate from management was to develop a diesel engine that maintained the

performance of traditional gasoline engines with reduced $CO_2$ emissions and fuel consumption,

all while meeting the strict $NO_X$ emission standards in the U.S.  Winterkorn also relied upon and

worked closely with Frank Tuch, VW's head of quality assurance, who was intimately familiar

with the engines and transmissions across all Volkswagen brands.

211.    $NO_X$ is a generic term for the mono-nitrogen oxides NO and $NO_2$ (nitric oxide and

nitrogen dioxide), which are predominantly produced from the reaction of nitrogen and oxygen

gases in the air during combustion.  $NO_X$ is produced by the burning of all fossil fuels, but is

particularly difficult to control from the burning of diesel fuel.  $NO_X$ is a toxic pollutant, which

produces smog and a litany of environmental and health problems, as detailed further below.

212.    Diesel fuel is traditionally denser than gasoline, and the syrupy fuel contains

longer hydrocarbon chains, which tends to produce a more efficient vehicle.  In fact, diesel

engines can convert over 45% of diesel's chemical energy into useful mechanical energy,

whereas gasoline engines convert only 30% of gasoline's chemical energy into mechanical

energy.[10]  To make use of this dense diesel fuel, diesel engines combine high pressure to ignite a

combination of diesel fuel and air through "compression ignition," as opposed gasoline engines

that typically use electric discharge from a spark plug to ignite a combination of gasoline and air

through "spark ignition."  Though more efficient, diesel engines come with their own set of

challenges, as emissions from diesel engines can include higher levels of $NO_X$ and particulate

matter ("PM"), or soot than emissions from gasoline engines due to the different ways the

different fuels combust and the different ways the resulting emissions are treated following

combustion.  One way $NO_X$ emissions can be reduced by adjusting the compression and

temperature, but that in turn produces PM, a similarly-undesirable hydrocarbon-based emission.

---

[9] Jack Ewing, *Volkswagen Engine-Rigging Scheme Said to Have Begun in 2008*, N.Y. Times (Oct. 5, 2015), http://www.nytimes.com/2015/10/05/business/engine-shortfall-pushed-volkswagen-to-evade-emissions-testing.html.

[10] *Just the Basics, Diesel Engine*, U.S. Dept. of Energy, Office of Energy Efficiency and Renewable Energy (last visited Feb. 8, 2016), *available at* http://www1.eere.energy.gov/vehiclesandfuels/pdfs/basics/jtb_diesel_engine.pdf.

1    Another way NOX emissions can be reduced is through expensive exhaust gas aftertreatment

2    devices, primarily, catalytic converters, that use a series of chemical reactions to transform the

3    chemical composition of a vehicle's NOX emissions into less harmful, relatively inert, and triple

4    bonded nitrogen gas (N2; just over 78% of the Earth's atmosphere by volume consists of N2) and

5    carbon dioxide (CO2).

6        213.    Diesel engines thus operate according to this trade-off between price, $NO_X$ and

7    PM, and for the EPA to designate a diesel car as a "clean" vehicle, it must produce **both** low PM

8    and low $NO_X$.  In 2000, the EPA announced stricter emission standards requiring all diesel

9    models starting in 2007 to produce drastically less $NO_X$ than years prior.

10       214.    These strict emission standards posed a serious challenge to Volkswagen's

11   engineers.  In fact, during a 2007 demonstration in San Francisco, engine R&D chief Hatz

12   lamented presciently that "[Volkswagen] can do quite a bit and we will do a bit, but 'impossible'

13   we cannot do. . . . From my point of view, the CARB is not realistic . . . I see it as nearly

14   impossible for [Volkswagen]."[11]

15       215.    But it was of utmost importance for Volkswagen to achieve (or at least appear to

16   achieve) this "impossible" goal, for it could not legally sell a single vehicle that failed comply

17   with the governmental emission regulations.  Before introducing a Class Vehicle into the U.S.

18   stream of commerce (or causing the same), Volkswagen was required to first apply for, and

19   obtain, an EPA-administered COC, certifying that the vehicle comported with the emission

20   standards for pollutants enumerated in 40 C.F.R. §§ 86.1811-04, 86.1811-09, and 86.1811-10.

21   The CAA expressly prohibits automakers, like Volkswagen, from introducing a new vehicle into

22   the stream of commerce without a valid EPA COC.  *See* 42 U.S.C. § 7522(a)(1).  Moreover,

23   vehicles must be accurately described in the COC application "in all material respects" to be

24   deemed covered by a valid COC.  *See* 40 C.F.R. §§ 86.1848-10(c)(6).  California's emission

25   ───────────────

26   [11] Danny Hakim, *et al.*, *VW Executive Had a Pivotal Role as Car Maker Struggled With Emissions*, N.Y. Times (Dec. 21, 2015),
     http://www.nytimes.com/2015/12/22/business/international/vw-executive-had-a-pivotal-role-as-

27   car-maker-struggled-with-
     emissions.html?mtrref=undefined&gwh=7E46E42F7CCC3D687AEC40DFB2CFA8BA&gwt=pa

28   y.

standards were even more stringent than those of the EPA. California's regulator, CARB, requires a similar application from automakers to obtain an EO, confirming compliance with California's emission regulations, before allowing the vehicle onto California's roads.

216. Thus, in order to successfully grow the U.S. diesel market and meet its ambitious objectives, it was critical that Volkswagen develop the technology to maintain the efficient, powerful performance of a diesel, while drastically reducing NOx emissions to comply with the CAA and state emission standards.

217. This high-stakes engineering dilemma led to a deep divide within the company, as two divergent exhaust gas aftertreatment technical approaches emerged. One approach involved a selective catalytic reduction ("SCR") system that proved to be effective but expensive. The other, which utilized a lean NOx trap, was significantly cheaper but was less effective and resulted in lower fuel efficiency.

218. In 2006, Wolfgang Bernhard, then a top executive at VW AG (and former Daimler executive), advocated for the SCR system and championed a technology-sharing agreement with Mercedes-Benz and BMW to jointly develop a SCR emission control system utilizing urea— a post-combustion emission reductant generically referred to as "Diesel Exhaust Fluid" or "DEF" and marketed as "Bluetec" by Mercedes and "AdBlue" by Volkswagen and other German vehicle manufacturers that, when injected into the exhaust stream in a catalyst chamber, converts NOx into nitrogen gas, water, and carbon dioxide. This SCR system was expensive, costing $350 per vehicle and came with other compromises, including, primarily, the need for installation of a DEF tank that would require regular refills.

219. Hatz initially supported this solution as well, stating publicly at the Detroit Auto Show in early 2007 that "Bluetec technology allows us to demonstrate Audi's commitment to always being at the very forefront of diesel technology."[12] He withdrew his support, however, as Volkswagen's leadership balked at the $350 per-vehicle cost of the SCR system. Bernhard ultimately lost the internal battle at Volkswagen and resigned

---

[12] *Id.*

220.     Hatz remained and was tasked with implementing the alternative, lower-cost strategy: $NO_X$ traps.  This technology involved the storage of $NO_X$ emissions in a catalyst substrate during vehicle operation.  Once that substrate filled up, the system burned off the stored $NO_X$ by pumping an extra burst of fuel into the cylinders, most of which passed through to the converter, where it then converts the $NO_X$ into less harmful emissions.  This method was cheaper and easier to implement than the SCR system.  The $NO_X$ trap system was less effective at reducing emissions, however, and resulted in lower miles-per-gallon fuel efficiency, directly contradicting one of the key elements (high miles-per-gallon fuel efficiency) necessary to execute Volkswagen's ambitious diesel sales goals.  Accordingly, this option, too, was unacceptable.

221.     But at Volkswagen, failure was not an option.  According to many sources (including journalists, industry insiders, and Volkswagen whistleblowers), Volkswagen's top brass directed its engineers to find a way to meet emission standards despite tight budgetary and technical constraints, or suffer the consequences.  VW AG's former CEO, Ferdinand Piëch, created "a culture where performance was driven by fear and intimidation," and his leadership was characterized as "a reign of terror."[13]  Employees were told, "[y]ou will sell diesels in the U.S., and you will not fail.  Do it, or I'll find somebody who will."[14]  Piëch was infamous for firing subordinates who failed to meet his exacting standards:  "Stories are legion in the industry about Volkswagen engineers and executives shaking in their boots prior to presentations before Piech, knowing that if he was displeased, they might be fired instantly."[15]  And so it seems, out of self-preservation, the defeat device scandal was born.

**B.     Defendants' "Defeat Device" Scheme**

222.     Volkswagen engineers had to find a solution to the "impossible" problem of passing stricter emission standards while maintaining performance and fuel efficiency, all while

---

[13] Bob Lutz, *One Man Established the Culture That Led to VW's Emissions Scandal*, Road & Track (Nov. 4, 2015), http://www.roadandtrack.com/car-culture/a27197/bob-lutz-vw-diesel-fiasco/.

[14] *Id.*

[15] Doron Levin, *The man who created VW's toxic culture still looms large*, Fortune (Oct. 16, 2015), http://fortune.com/2015/10/16/vw-ferdinand-piech-culture/.

1    hamstrung by cost-cutting measures. And it had to be done fast, because the new diesel vehicles

2    were scheduled for imminent release in the U.S.

3        223.    Ultimately, time ran out, and Volkswagen executives and engineers were either

4    unable or unwilling to devise a solution within the constraints of the law and their self-imposed

5    cost-cutting measures. So instead of being honest (and risk being summarily fired), they and

6    others conspired to cheat by installing a "defeat device" in the new diesel vehicles so that those

7    vehicles could "pass" the EPA and CARB emission testing, and Volkswagen could obtain COCs

8    and EOs to sell the vehicles to make its sales targets throughout the U.S and in California.

9        224.    It became clear that the TDI engine could not meet U.S. emission regulations when

10   the launch of the Jetta TDI "clean" diesel, initially scheduled for 2007, had to be delayed after

11   initial emission testing failed.[16] The prospect of failure was unacceptable, so Volkswagen

12   decided to cheat instead. It has been reported that the decision to cheat the EPA, CARB, and

13   countless other regulators worldwide was an "open secret" in Volkswagen's engine development

14   department,[17] as it was necessary for the "EA 189 engine to pass U.S. diesel emissions limits

15   within the budget and time frame allotted."[18]

16       225.    All modern engines are integrated with sophisticated computer components to

17   manage the vehicle's operation, such as an electronic diesel control ("EDC"). Bosch tested,

18   manufactured and sold the EDC system used by Volkswagen in the Class Vehicles. This system

19   is more formally referred to as the Electronic Diesel Control Unit 17 ("EDC Unit 17"). Upon its

20   introduction, EDC Unit 17 was publicly-touted by Bosch as follows:

21               … EDC17 … controls every parameter that is important for
22               effective, low-emission combustion.

23               Because the computing power and functional scope of the new
             EDC17 can be adapted to match particular requirements, it can be

---

[16] *VW delays Jetta TDI diesel into the US*, Clean MPG (last visited Feb. 8, 2016),
http://www.cleanmpg.com/community/index.php?threads/7254/.

[17] Georgina Prodham, *Volkswagen probe finds manipulation was open secret in department*,
Reuters (Jan. 23, 2016), http://www.reuters.com/article/us-volkswagen-emissions-investigation-idUSKCN0V02E7.

[18] Jay Ramey, *VW chairman Poetsch: Company 'tolerated breaches of rules'*, Autoweek
(Dec. 10, 2015), http://autoweek.com/article/vw-diesel-scandal/vw-chairman-poetsch-company-tolerated-breaches-rules.

used very flexibly in any vehicle segment on all the world's markets. In addition to controlling the precise timing and quantity of injection, exhaust gas recirculation, and manifold pressure regulation, it also offers a large number of options such as the control of particulate filters or systems for reducing nitrogen oxides. The Bosch EDC17 determines the injection parameters for each cylinder, making specific adaptations if necessary. This improves the precision of injection throughout the vehicle's entire service life. The system therefore makes an important contribution to observing future exhaust gas emission limits.[19]

226. EDC Unit 17 was widely used throughout the automotive industry, including by BMW and Mercedes, to operate modern clean diesel engines. Bosch worked with each vehicle manufacturer that utilized EDC Unit 17 to create a unique set of specifications and software code to manage the vehicle's engine operation.

227. With respect to the Class Vehicles, however, EDC Unit 17 was also used enable by Bosch and Volkswagen to surreptitiously evade emissions regulations. Bosch and Volkswagen worked together to develop and implement a specific set of software algorithms for implementation in the Class Vehicles, which enabled Volkswagen to adjust fuel levels, exhaust gas recirculation, air pressure levels, and even urea injection rates (for applicable vehicles).[20] When carmakers test their vehicles against EPA emission standards, they place their cars on dynamometers (large rollers) and then perform a series of specific maneuvers prescribed by federal regulations. Bosch's EDC Unit 17 gave Volkswagen the power to detect test scenarios by monitoring vehicle speed, acceleration, engine operation, air pressure and even the position of the steering wheel. When the EDC Unit 17's detection algorithm detected that the vehicle was on a dynamometer (and undergoing an emission test), additional software code within the EDC Unit 17 downgraded the engine's power and performance and upgraded the emissions control systems' performance by switching to a "dyno calibration" to cause a subsequent reduction in emissions to legal levels. Once the EDC Unit 17 detected that the emission test was complete, the

---

[19] *See* February 28, 2006 Bosch press release, "The brain of diesel injection: New Bosch EDC17 engine management system," http://www.bosch-presse.de/presseforum/details.htm?txtID=2603&locale=en

[20] *See, e.g.*, *Engine management*, Bosch Auto Parts (last visited February 8, 2016), http://de.bosch-automotive.com/en/parts_and_accessories/motor_and_sytems/diesel/engine_management_2/engine_control_unit_1.

1    EDC Unit would then enable a different "road calibration" that caused the engine to return to full

2    power while reducing the emissions control systems' performance, and consequently, caused the

3    car to spew the full amount of illegal $NO_X$ emissions out on the road.[21]  This process is illustrated

4    in the following diagram:



## How Volkswagen's defeat device works

'SWITCH' SOFTWARE

Software in the car's electronic control module (ECM)
determines where the car is being driven (i.e. highway,
road, testing) by analysing a series of factors.

FACTORS ANALYSED

Position of          Speed          Duration of          Barometric
steering                            engine operation     pressure

MODE OF THE VEHICLE?

BEING TESTED                              NORMAL OPERATION

Mode switches to "dyno                    Mode switches to "road
calibration," as software recognises      calibration," as software recognises
vehicle is taking emission test.          vehicle is in normal operation.

RESULT                                    RESULT

EPA compliant                             Effectiveness of emission control
emission levels produced.                 system reduced, increasing
                                          Nitrogen oxide levels to 10 to 40
                                          times above standards.

Source: U.S. Environmental Protection Agency

J. Wang, 22/09/2015                                                REUTERS

23       228.    Make no mistake: this workaround was highly illegal.  The CAA expressly

24    prohibits "defeat devices," defined as any auxiliary emission control device "that reduces the

25    effectiveness of the emission control system under conditions which may reasonably be expected

26    to be encountered in normal vehicle operation and use."  40 C.F.R. § 86.1803-01; *see also id.*,

27    _____

28    [21] Russell Hotten, *Volkswagen: The scandal explained*, BBC (Dec. 10, 2015),
      http://www.bbc.com/news/business-34324772.

1    § 86.1809-10 ("No new light-duty vehicle, light-duty truck, medium-duty passenger vehicle, or

2    complete heavy-duty vehicle shall be equipped with a defeat device.").  Moreover, the CAA

3    prohibits the sale of components used as defect devices, "where the person knows or should know

4    that such part or component is being offered for sale or installed for such use or put to such use."

5    42 U.S.C. § 7522(a)(3).  Finally, in order to obtain a COC, automakers must submit an

6    application, which lists all auxiliary emission control devices installed in the vehicle, a

7    justification for each, and an explanation of why the control device is not a defeat device.

8           229.    Thus, in order to obtain the COCs necessary to sell their vehicles, Volkswagen did

9    not disclose, and affirmatively concealed, the presence of the test-detecting and performance

10   altering software code within the EDC Unit 17 from government regulators, thus making that

11   software an illegal "defeat device."  In other words, Volkswagen lied to the government, its

12   customers, and the public at large.  An example of one of Volkswagen's vehicle stickers

13   reflecting its fraudulently-obtained COCs is pictured below:



24          230.    Because the COCs were fraudulently-obtained, and because the Class Vehicles did

25   not conform "in all material respects" to the specifications provided in the COC applications, the

26   Class Vehicles were never covered by a valid COC, and thus, were never legal for sale, nor were

27   they EPA and/or CARB compliant, as represented.  Volkswagen hid these facts from the EPA,

other regulators, and consumers, and it continued to sell and lease the Class Vehicles to the driving public, despite their illegality, and with the complicity of Bosch.

231.     Volkswagen's illegal workaround was enabled by its close partnership with defendant Bosch, which enjoyed a sizable portion of its annual revenue from manufacturing parts used in Volkswagen's diesel vehicles.[22]  Bosch was well aware that Volkswagen was using its emissions control components as a defeat device and, in fact, worked with Volkswagen to develop the software algorithm specifically tailored for the Class Vehicles.  Although Bosch reportedly "advised" Volkswagen as early as 2007 that the components should only be used for internal testing, not for manipulation of the engine in emission testing,[23] it knew (or certainly should have known) that its lip service would be ignored, and that the components would be used as defeat devices.  Bosch supplied Volkswagen with approximately 11 million such emission control components over seven years.

232.     Volkswagen, likewise, knew better—VW America itself is a recidivist violator of the CAA.  In July of 1973, the EPA sought legal action against VW America from the DOJ based on a claim that defeat devices were installed in 1973 Volkswagen vehicles.  The matter was swiftly settled for $120,000 the following year.[24]  And, in June of 2005, VW America entered into a consent decree with the DOJ, wherein it paid a $1.1 million penalty for failing to notify the EPA of emissions problems in certain vehicles manufactured by VW in Mexico.[25]

233.     What's past is prologue, and Volkswagen could not help but repeat its cheating ways.  With respect to the Class Vehicles, Volkswagen hid the fact of the defeat devices from the EPA, such that the COCs were fraudulently obtained.  Specifically, VW America submitted COC

---

[22] Approximately 50,000 of Bosch's 375,000 employees worked in the diesel-technology operations branch of Bosch, and Volkswagen was the biggest diesel manufacturer in the world. *See Bosch probes whether its staff helped VW's emissions rigging*, Automotive News (Jan. 27, 2016), http://www.autonews.com/article/20160127/COPY01/301279955/bosch-probes-whether-its-staff-helped-vws-emissions-rigging.

[23] *VW scandal: Company warned over test cheating years ago*, BBC (Sept. 27, 2015), http://www.bbc.com/news/business-34373637.

[24] Rich Gardellsa, *et al.*, *VW had previous run-in over 'defeat devices'*, NBC News (Sept. 23, 2015), http://www.cnbc.com/2015/09/23/vw-had-previous-run-in-over-defeat-devices.html.

[25] Consent Decree, *United States v. Volkswagen of Am., Inc.*, Case No. 1:05-cv-01193-GK (D.D.C. June 15, 2005 and Nov. 4, 2005), ECF Nos. 1-2.

1  applications on behalf of VW AG, Audi AG, and itself, for the 2.0-liter and VW-and Audi-

2  branded 3.0-liter Class Vehicles, describing compliant specifications and concealing the dual-

3  calibration strategy of the defeat device.  Similarly, Porsche America submitted COC applications

4  on behalf of Porsche AG and itself for the Porsche-branded 3.0-liter Class Vehicles, describing

5  compliant specifications and concealing the dual-calibration strategy of the defeat device.  But,

6  the Class Vehicles differed in "material respects" from the specifications described in the COC

7  applications because they were equipped with undisclosed auxillariary emissions control devices,

8  specifically, the software code described above, that improperly functioned as a banned "defeat

9  device."

10     234.    Because the COCs were fraudulently obtained, the Class Vehicles were never

11  covered by valid COCs, and thus, were never offered legally for sale.  Volkswagen hid these facts

12  from the EPA, CARB and other state regulators, and consumers, and it continued to sell and lease

13  the Class Vehicles to the public, despite their illegality, and with the complicity of Bosch.

14     **C.     Volkswagen's "Clean" Diesel Advertising Campaign**

15     235.    While secretly using defeat devices to bypass emission testing, Volkswagen

16  publicly declared a landmark victory—touting that it had successfully optimized its engines to

17  maintain legal emissions, while simultaneously enjoying the cost savings and convenience factors

18  of a lean $NO_X$ trap system.  Volkswagen claimed it accomplished this by monitoring and

19  adjusting combustion conditions and using a two-stage exhaust gas recirculation system to reduce

20  initial emissions, while neutralizing the remaining ones with a lean $NO_X$ trap to comply with U.S.

21  law.[26]  Volkswagen branded and advertised this purportedly revolutionary technology to

22  American consumers as "CleanDiesel" TDI technology.

23     236.    As we now know, Volkswagen's "clean" diesel campaign was built upon a lie.

24  Indeed, the Class Vehicles were so "dirty" that they could not pass the minimum emission

25  standards in the U.S., and Volkswagen had to lie to the EPA in order to sell them in the U.S.  But,

26

27  ---
[26] *See* Hadler, *et al.*, *Volkswagen's New 2.0l TDI Engine Fulfils the Most Stringent Emission Standards*, Internationales Wiener Motorensymposium 2008; *see also Self Study Program*

28  *826803: 2.0 Liter TDI Common Rail BinS ULEV Engine*, Volkswagen of America, Inc. (2008).

of course, Volkswagen marketed and sold these Class Vehicles without ever disclosing to consumers that they were unlawful to sell or drive due to their high levels of $NO_X$ emissions.

### 1. VW's False and Misleading Advertisements

237. VW's "clean" diesel campaign was its key selling point for consumers increasingly concerned about the environment. Its marketing mission was to "get clean-diesel power the recognition it deserves as a true 'green' technology," thereby growing Volkswagen's market share to match Winterkorn's lofty goals.[27] The objective was to change the way consumers thought of diesel technology, by replacing the mental image of sulfur emissions amid clouds of thick soot with that of heightened efficiency and reduced $CO_2$ emissions. In fact, the VW website stated: "This ain't your daddy's diesel. Stinky, smoky, and sluggish. Those old diesel realities no longer apply. Enter TDI "clean" diesel. Ultra-low-sulfur fuel, direct injection technology, and extreme efficiency. We've ushered in a new era of diesel."[28]

238. Dubbing these diesel engines as "CleanDiesel" was a symptom of the brazen arrogance underlying the fraud. VW's entire marketing campaign, from the branding of the products to the advertisements, focused on convincing consumers that the Class Vehicles were not merely compliant with emission regulations, but that they exceeded them. This deception culminated in a Guinness World Record attempt in a 2013 Volkswagen Passat TDI, which ironically won an award for "lowest fuel consumption—48 U.S. states for a non-hybrid car."[29]

239. VW professed that its diesel-based technology was equal or superior to hybrid and electric options offered by its competitors. As described by Mark Barnes (COO of VW America) when asked, "What is the advantage of a diesel over a hybrid?"

> It's a fantastic power train. It gives very good fuel economy. It's also good for the environment because it puts out 25% less greenhouse gas emissions than what a gasoline engine would. And thanks to the uniqueness of the TDI motor, it cuts out the particulate emissions by 90% and the emissions of nitrous oxide are cut by 95%. So, a very very clean running engine. Clean enough to be

---

[27] See e.g., TDI Clean Diesel, http://www.venturavw.com/TDI-clean-diesel.html.

[28] Supra note 2.

[29] Nick Palermo, Volkswagen Passat TDI Sets World Record for Fuel Economy, Autotrader (July 2013), http://www.autotrader.com/car-news/volkswagen-passat-tdi-sets-world-record-for-fuel-economy-210689.

certified in all 50 states. It's just like driving a high-powered gasoline engine so you are not giving up one bit of the driving experience that you'd expect from a regular gasoline engine.[30]

240.    Facing skepticism, Barnes had a ready, if imaginative, response to the question, "How do you re-brand something that's dirty like diesel as something that's green?"

The way we've gone about it is through a number of communication pieces. One of them we've used is TDI Truth & Dare. It is a very good website that compares some older diesels versus the current TDI clean diesel. And one of the things we do is we put coffee filters over the exhaust pipes of both cars. We let them run for five minutes and after they are done, we take them off and the older diesel product (not a VW diesel) has a sooty spot on that coffee filter. Ours is very clean. In fact they actually make coffee out of the filter that was attached to the Volkswagen clean diesel tail pipe and they drink it.[31]

241.    VW also advertised that its vehicles performed better on the road than in test conditions, touting in a 2008 press release: "While the Environmental Protection Agency estimates the Jetta TDI at an economical 29 mpg city and 40 mpg highway, Volkswagen went a step further to show real world fuel economy of the Jetta TDI.  Leading third-party certifier, AMCI, tested the Jetta TDI and found it performed 24 percent better in real world conditions, achieving 38 mpg in the city and 44 mpg on the highway."[32]  This discrepancy discrepancy between the EPA certified mpg figures (which are reverse calculated based on vehicle performance on a dynometer) and the real world mpg figures came about because, in real world driving, Volkswagen's defeat device *disabled* the full functioning of the $NO_X$ trap system exhaust gas after treatment control (which needed to burn more fuel to work properly), thereby decreasing vehicle operating costs at the expense of massively increased $NO_X$ emissions.

242.    Volkswagen distinguished the TDI "clean" diesel engines from other, "stinky, smoky, sluggish" diesels, proclaiming its "eco-conscious" status and of course failing to disclose

---

[30] Gayathri Vaidyanathan, *Volkswagen: Our Diesel Cars Whup The Prius And Other Hybrids*, Business Insider (Oct. 9, 2009), http://www.businessinsider.com/volkswagen-preps-for-a-diesel-revolution-2009-10.

[31] *Id*.

[32] Jake Fisher, *Did Volkswagen Use 'Cheat Mode' as a Selling Point?*, Consumer Reports (Oct, 19, 2015), http://www.consumerreports.org/volkswagen/did-volkswagen-use-cheat-mode-as-a-selling-point?loginMethod=auto.

that the Class Vehicles were "dirty" themselves. These messages were prevalent in

Volkswagen's extensive marketing campaign.

243.    Some advertisements, for example, specifically emphasized the low emissions and

eco-friendliness of the vehicles:





Ultra low emissions. Jetta TDI Clean Diesel.

244.    Others touted the combination of fuel efficiency and power:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28









245.    Yet others addressed the full package, implying that in contrast to the "stinky,

smoky, and sluggish" diesel vehicles of old, Volkswagen's new diesel vehicles were clean,

efficient, and powerful all at once:





246.    In addition, VW directed consumers to the www.clearlybetterdiesel.org website,

which partnered with affiliates Audi and Porsche, as well as Bosch, Mercedes, and BMW.  This

- 150 -

website touted the benefits of newly developed diesel technology as "clean" and environmentally friendly. Although it has been scrubbed of all content, the website previously contained false and misleading statements, such as:



247. The website also offered a graphic slider, specifically representing that "clean" diesel produced less emissions and dramatically reduced smog, as shown by the following:



248. This website may have accurately portrayed the environmental advantages of BMW diesel vehicles, which have not been implicated in the defeat device scandals, to date. However, Volkswagen's partnership with "www.clearlybetterdiesel.org" falsely or misleadingly

portrayed the Class Vehicles as an environmentally friendly, low emissions choice for discerning and socially responsible consumers.

249. VW also produced a series of TV advertisements for the U.S. market, intended to debunk myths about diesel engines. One ad, titled "Three Old Wives Talk Dirty," featured three elderly women debating whether diesels, though "beautiful," are dirty vehicles:

250. To ostensibly debunk the "Old Wives' Tale" that diesel produced dirty exhaust and hazardous emissions, one of the women held her white scarf to the exhaust to convince the passengers that the exhaust was environmentally friendly, and not, in fact, dirty:



CONSOLIDATED CONSUMER CLASS
COMPLAINT MDL 2672 CRB (JSC)

251. She removed the scarf, gestured at it, and asked her friends "see how clean it is?"



252. Like others in VW's "clean" diesel campaign, this ad falsely or misleadingly portrayed the exhaust emissions from the Class Vehicles as clean and safe. In reality, the Class Vehicles actually emitted invisible and extremely hazardous levels of $NO_X$.

253. These themes extended to print brochures at dealerships and to VW's website. The brochures emphasized that VW's "clean" diesel was "clean," "green," and low emission. For example, a "2012 Volkswagen Family" brochure for all VW models, states:

> Let TDI "clean" diesel set you free from the filling station. Our TDI engines achieve astonishing mileage and range—up to 43 highway mpg and 795 miles on a single tank without sacrificing one bit of turbocharged performance. ***That's all thanks to the TDI technology that uses a direct injection system and runs on ultra-low-sulfur diesel, helping reduce sooty emissions by up to 90% compared to previous diesel engines.*** On most models, you can even choose the available DSG automatic transmission with Tiptronic to take that turbo engine to a whole new level.[33] (Emphasis added.)

254. Similarly, a "2013 Volkswagen Family" brochure, applicable to all models, states:

---

[33] Brochure: 2012 Volkswagen Family, http://cdn.dealereprocess.com/cdn/brochures/volkswagen/2012-family.pdf.

When you've had your fill of filling stations, hit the road in your TDI "clean" diesel Volkswagen. These engines achieve astonishing mileage and range-up to 43 highway mpg and 795 miles on a single tank without sacrificing one bit of turbocharged performance. ***That's all thanks to the TDI technology that uses a direct injection system, and runs on ultra-low-sulfur diesel, helping reduce emissions by up to 90% compared to previous diesels.*** Far and away, it's our best diesel yet.[34]  (Emphasis added.)

255.   And a 2012 "Volkswagen TDI "clean" diesel" brochure for the six models of Volkswagen TDIs then on the market (Jetta, Jetta SportWagen, Golf, Passat, Beetle, and Touareg) states:

**These are not the kind of diesel engines that you find spewing sooty exhaust like an old 18-wheeler.** Clean diesel vehicles meet the strictest EPA standards in the U.S. Plus, TDI technology helps reduce sooty emissions by up to 90%, giving you a fuel-efficient and eco-conscious vehicle.

. . .

**Think beyond green.** TDI represents one part of the Volkswagen Think Blue initiative, our goal of creating and encouraging eco-conscious products and behaviors. Join us in being more responsible on the road and on the planet.[35]

256.   Further, a 2010 TDI Jetta and Jetta SportWagen brochure states:

The 2.0L TDI® "clean" diesel engine gives you 140hp and 236 lbs-ft of torque. This engine is the toast of Europe for its quickness, low emissions, and fuel efficiency—a staggering 38 city/44 highway mpg (automatic) based on real-world AMCI-certified testing (30 city/42 highway mpg. EPA estimates).

. . .

Jetta TDI "clean" diesel offers fuel efficiency, power, performance, and a $1,300 tax credit from Uncle Sam because it qualifies as an Advanced Lean Burn Credit. ***Or, in other words, lean, mean, cleaner burning machines. Volkswagen believes in delivering a no-compromise German-tuned auto that performs, and still leaves a small carbon footprint. The Volkswagen TDI engine is cleaner than conventional diesels, emitting as much as 95% less soot than previous diesel engines, as well as a reduction in oxides of nitrogen and sulfur.*** It's powerful, with the kind of low-end torque

---

[34] Brochure: 2013 Volkswagen Family, http://cdn.dealereprocess.com/cdn/brochures/volkswagen/2013-volkswagenfamily.pdf.
[35] Brochure: 2012 Volkswagen TDI® Clean Diesel, http://cdn.dealereprocess.com/cdn/brochures/volkswagen/2012-family.pdf.

that racers and tuners demand. It's efficient, using a turbocharger and smart exhaust design to burn fuel more effectively. So much so, in fact, that Volkswagen was the first automaker to make clean diesel cars certified in all 50 states. And best of all, it will help save you money with an out-of-this-world AMCI-estimated mileage of 38 city/44 highway mpg (automatic) and over 594 miles on a single tank of fuel.

There's even a Jetta SportWagen TDI "clean" diesel, with the same astonishing clean diesel technology, plus a whopping 66.9 cubic feet of cargo room.[36] (Emphasis added.)

257.   And a Volkswagen 2011 Golf TDI brochure states:

Regardless of which Golf model you get, you'll be seeing a lot fewer gas stations and a lot more road. The 2.5L Golf comes standard with a 170-hp, in-line five-cylinder engine with 177 lbs/ft torque and impressive fuel efficiency rated at 23 city/30 highway mpg. Opt for the Golf TDI model and you'll enjoy a turbocharged clean diesel engine with 140 hp and 236 lbs/ft of torque that will run you even farther at a whopping 30 city/42 highway mpg. That's up to 609 miles per tank. *And you'll do it all with 95 percent fewer sooty emissions than diesel engines of old, making it cleaner for both you and the planet.* So whether you're in the market for IntelliChoice's 2010 "Best Overall Value Compact Car over $17,000," or you want to go for a variation on that theme and get the ever-popular TDI model, you can't go wrong. In fact, you can go very right for a long, long time."[37]

258.   A Volkswagen 2012 Passat TDI brochure states:

Let the Passat TDI "clean" diesel set you free from the filling station. It achieves an astonishing 43 highway mpg and travels 795 miles on a single tank without sacrificing one bit of turbocharged performance. *That's all thanks to its TDI technology that uses a direct injection system and runs on ultra-low-sulfur diesel, helping reduce sooty emissions by up to 90% compared to previous diesel engines.* You can even choose the available DSG automatic transmission with Tiptronic to take that turbo engine to a whole new level.

. . .

The TDI "clean" diesel engine was designed and engineered around one simple belief: driving is more fun than refueling. *So besides the reduced emissions and torque-filled benefits you experience*

---

[36] Brochure: 2010 Volkswagen Jetta and Jetta SportWagen, http://www.slideshare.net/SteveWhiteVW/2010-volkswagen-jetta-brochure-greenville.
[37] Brochure: 2011 Volkswagen Golf, http://cdn.dealereprocess.com/cdn/brochures/volkswagen/2011-golf.pdf.

*behind the wheel of the Passat TDI, it also saves you money at the pump*.[38] (Emphasis added.)

259. A Volkswagen 2013 Beetle TDI brochure states:

Start the TDI® "clean" diesel model and hear the surprisingly quiet purr of *the first clean diesel Beetle,* designed for both power and efficiency.[39] (Emphasis added).

260. A Volkswagen 2014 Beetle TDI brochure states:

2.0L TDI "clean" diesel engine. Engineered with the idea that less is more. The Beetle TDI has lower $CO_2$ emissions compared to 84% of other vehicles. *So every getaway you make will be a cleaner one*.[40] (Emphasis added.)

261. A Volkswagen 2014 TDI Touareg brochure states:

3.0L TDI "clean" diesel engine. Engineered with the idea that less is more. The Touareg TDI has lower $CO_2$ emissions compared to 88% of other vehicles. *So every getaway you make will be a clean one*.[41] (Emphasis added.)

### 2. Audi's False and Misleading Advertisements

262. Audi, like VW, pitched its diesel engines as environmentally friendly, powerful, and efficient. Drawing heavily from the themes in VW's advertisements, Audi deceptively portrayed its Class Vehicles as clean and safe for the environment, unlike the diesels of yesteryear. Examples of such advertisements include:

---

[38] Brochure: 2012 Volkswagen Passat, https://static.beepi.com/Brochures/17001.pdf.

[39] Brochure: 2013 Volkswagen Beetle, https://static.beepi.com/Brochures/22980.pdf.

[40] Brochure: 2014 Volkswagen Beetle, https://static.beepi.com/Brochures/23900.pdf.

[41] Brochure: 2014 Volkswagen Touareg, https://static.beepi.com/Brochures/18663.pdf.



263.    Audi proclaimed that "[d]iesel [was] no longer a dirty word," but failed to disclose that its vehicles were so dirty that they could not pass emission standards in the U.S. and that the only reason why they were introduced into the stream of commerce here is because Audi fraudulently obtained COCs from the EPA for these vehicles.  With equal audacity, Audi advertised that, by driving an Audi TDI, you could "[p]rotect the environment and look good doing it," while failing to disclose the pernicious $NO_X$ spewed into the environment.

264.    Audi also ran numerous TV commercials for its "clean" diesel vehicles, many of which touted the "eco-friendly" characteristics of its diesel technology.  One ad, "The Green Police" (which aired during the 2010 Super Bowl) portrayed a world in which the environmental police ("Green Police") arrested people for using Styrofoam cups, failing to compost, asking for plastic bags at the grocery store, throwing out batteries, and drinking water from plastic bottles.  And at a highway checkpoint, the "ECO ROADBLOCK," the Green Police flagged cars that were harmful to the environment:



265.    When the Green Police at the ECO ROADBLOCK see an Audi A3 TDI SportWagen, they give the car a "thumbs up" and allow the driver to bypass the roadblock.

266.    After the white A3 TDI cruises past the other vehicles, the screen fades to black and falsely touts the supposed "green credentials" of the A3 TDI.

267.    Like VW, Audi also made false representations in print brochures available at dealerships and on Audi's website. For example, an Audi 2011 A3 TDI brochure states:

> With the potent combination of direct diesel injection and turbocharging, the 2.0-liter TDI® clean diesel engine delivers an impressive 236 lb-ft. of torque and produces 140hp. The power and performance is complemented with impressive EPA-estimated 30 MPG city and 42 MPG highway ratings. ***Producing 30 percent fewer $CO_2$ emissions than a comparable gasoline engine, the 2.0 TDI clean diesel also meets or exceeds the 50 state emissions requirements.***
>
> . . .
>
> ***Long gone are the days of dirty, smoking diesel engines. Audi TDI clean diesel technology is responsible for the cleanest diesel engines in the world***, with 30 percent fewer $CO_2$ emissions than comparable gasoline engines, making it an environmentally friendly alternative to gasoline power. ***In fact, TDI clean diesel is compliant with California 's ULEV II requirement—the world's most stringent emission standard. The result is a significant reduction in emissions that contribute to global warming.***[42]
> (Emphasis added.)

---

[42] Brochure: 2011 Audi A3, http://www.slideshare.net/MichiganCarSales/2011-audi-a3-detroit-mi-fred-lavery-company.

268.     Audi's 2016 A6 and A7 brochures similarly (and falsely) stated that the TDI versions of these cars meet emission rating "ULEV II," and the 2016 A6, A7, and Q5 brochures all similarly stated:

> Taking advantage of the greater power density of diesel fuel over traditional gasoline, the available 240-hp 3.0-liter TDI® clean diesel V6 delivers incredible torque (428 lb-ft) and passing power, while boasting impressive fuel efficiency numbers. *It also produces fewer emissions with a combination of Piezo direct injection, a high compression ratio, and innovative after-exhaust treatment that helps eliminate up to 95% of diesel NOx emissions.*[43]
> (Emphasis added.)

269.     An Audi 2016 A8 brochure also listed the TDI models as meeting emission rating "ULEV II," and further stated:

> With 240 hp and 428 lb-ft of torque on tap, the available 3.0-liter TDI® clean diesel engine's elasticity in the passing lane is almost as impressive as its ability to take on even the longest road trips. *And with features like AdBlue® exhaust after-treatment helping to make every journey a little cleaner, this is a performance win for all sides.*[44] (Emphasis added.)

### 3.     Porsche's False and Misleading Advertisements

270.     Porsche similarly exploited the "clean" diesel branding for its Cayenne SUV to falsely convey that the vehicle was environmentally friendly and legal to drive. The "clean" diesel marketing and advertising for the Cayenne SUV also omitted the material fact that the COC issued by the EPA for the vehicle was based on a fundamental lie. Those ads were unfair, deceptive, false, and misleading for the same reasons, as stated above.

---

[43] Brochures 2016 Audi A6, https://www.audiusa.com/content/dam/audiusa/Documents/2016-Audi-A6-brochure.pdf.pdf, and 2016 Audi A7, https://www.audiusa.com/content/dam/audiusa/Documents/2016-Audi-A7-brochure.pdf.
[44] Brochure: 2016 Audi A8, http://pa.motorwebs.com/audi/brochure/a8.pdf.

271.    For example, Porsche expressly marketed the fuel-efficiency of the Cayenne Diesel, even though such efficiency could not be achieved while complying with applicable emission regulations.



272.    Moreover, the brochure for Porsche's diesel-powered 2013 Cayenne SUV, available online and at dealerships, touted the vehicle's "Intelligent Performance and efficiency—the core characteristics of Porsche engineering."[45]  It boasted that "[t]his is no ordinary diesel. This is a Porsche 3.0-liter V6 turbo diesel engine. It's a technological marvel, able to take its unique fuel source and transform it into clean, efficient, and incredibly torque-rich power." Further, the brochure exclaimed Porsche "refined" diesel engine technology, which made its diesel engine "far advanced from what many people perceive—especially in terms of its acceleration, clean emissions, and quiet running operation."[46]  The brochure even touted its "low emissions" on a page entitled: "A cleaner diesel. Exhaust technologies."[47]  Porsche described the exhaust system and stated that its exhaust technologies "help to ensure the reduction of harmful

---

[45] Brochure: 2012 Cayenne Diesel, https://static.beepi.com/Brochures/17053.pdf.
[46] *Id.*
[47] *Id.*

1    pollutants into the environment and make the Cayenne diesel compliant with U.S. emission

2    standards."[48]  Unfortunately, these statements were all untrue.

**4.    Volkswagen's Nationwide Advertising Campaign Was Highly Effective, and Volkswagen Profited Handsomely from Selling the Class Vehicles**

273.    Volkswagen's massive advertising campaign for the Class Vehicles proved highly successful, as Volkswagen took a commanding lead in U.S. diesel vehicle sales.  Volkswagen's diesel vehicles were profiled on environmental websites and blogs as the responsible choice, relying on Volkswagen's representations of high mileage and low emissions.[49]

274.    And the success of Volkswagen's advertising campaign resulted in skyrocketing sales.  In 2007, VW America sold 230,572 cars in the United States—a far cry from Winterkorn's goal of 800,000 sales in 2018—and a negligible number of those were diesel vehicles.  In fact, in 2007 only approximately 16,700 light-duty diesel vehicles were sold in the United States.[50]  As Volkswagen released its "clean" diesel lineup and fraudulent advertising campaign, sales of the Class Vehicles grew dramatically, from 43,869 in 2009 to a peak of 111,285 in 2013.[51]  This largely accounted for VW America's sales growth to over 400,000 sales in 2013, nearly double the sales in 2007.[52]  Likewise, the Class Vehicles contributed significantly to Audi's growth from 93,506 sales in 2007 to 182,011 in 2014.[53]

275.    Volkswagen reaped considerable benefit from their fraud, charging premiums of thousands of dollars for the "clean" diesel models of the Class Vehicles.

---

[48] *Id.*

[49] *See, e.g.*, Jim Motavalli, *Clean diesel: What you need to know*, Mother Nature Network (Apr. 5, 2013), http://www.mnn.com/green-tech/transportation/blogs/clean-diesel-what-you-need-to-know; Anthony Ingram, *2015 VW Golf, Beetle, Passat, Jetta All Get New Clean Diesel Engine*, Green Car Reports (Mar. 19, 2014), http://www.greencarreports.com/news/1090957_2015-vw-golf-beetle-passat-jetta-all-get-new-clean-diesel-engine (last visited on Sept. 28, 2015).

[50] Paul Eisenstein, *Volkswagen Scandal Delivers 'Black Eye' to Diesel Tech as a Whole*, NBC News (Sept. 24, 2015), http://www.nbcnews.com/business/autos/volkswagen-scandal-delivers-black-eye-diesel-tech-whole-n433016.

[51] *Supra* note 7.

[52] *Volkswagen Reports December 2013 and Year-End Results*, Volkswagen (Jan. 3, 2014), http://media.vw.com/release/592/.

[53] *Audi achieves fifth straight year of U.S. record sales with 182,011 vehicles in 2014*, Audi USA (Jan. 5, 2015), https://www.audiusa.com/newsroom/news/press-releases/2015/01/audi-achieves-fifth-straight-year-of-us-record-sales-with-182011-vehicles-in-2014.

276.    Volkswagen also engaged in an aggressive lobbying campaign for federal tax credits for the Class Vehicles, akin to the credits offered for electric cars.[54]  These efforts were met with some success, as many of the Class Vehicles were deemed eligible for federal income tax credits in order to spur "clean" diesel technology.  In fact, at least $78 million was earmarked for TDI Jetta buyers in 2009 and 2010.[55]

### D.    Defendants' Dirty Diesel Scheme Starts to Unravel

277.    Defendants' illegal scheme started to unravel approximately five years after Volkswagen introduced its first diesel model containing the defeat device into the U.S. stream of commerce.  In May 2014, West Virginia University's Center for Alternative Fuels, Engines & Emissions published results of a study commissioned by the International Council on Clean Transportation ("ICCT"), which found that certain of the Class Vehicles' real world $NO_X$ and other emissions exceeded the allowable EPA emission standards.[56]

278.    The ICCT researchers had been comparing the real-world performance of "clean" diesel vehicles in Europe with reported results and noted numerous discrepancies.  Since the U.S. emission regulations were significantly more stringent than its European counterparts, the ICCT sought to test the equivalent U.S. "clean" diesel cars, presuming that they would run cleaner.  West Virginia University's team of emissions researchers was a qualified and enthusiastic partner, as they had already been engaged in the study of heavy truck emissions.

279.    Shockingly, the study showed that, contrary to testing lab results, real world driving of Volkswagen "clean" diesel vehicles produced levels of $NO_X$ up to 40 times higher than legal limits promulgated by the EPA and CARB:

---

[54] Steve Birr, *Volkswagen Lobbied Obama Administration For Green Tax Credits*, The Daily Caller (Oct. 13, 2015), http://dailycaller.com/2015/10/13/volkswagen-lobbied-obama-administration-for-green-tax-credits/.

[55] *Volkswagen shares plunge on emissions scandal; U.S. widens probe*, Reuters (Sept. 21, 2015), https://finance.yahoo.com/news/volkswagen-shares-plunge-most-six-071319964.html.

[56] *See Final Report: In Use Emissions Testing of Light-Duty Diesel Vehicles in the United States*, International Council on Clean Transportation (May 15, 2015), http://www.theicct.org/sites/default/files/publications/WVU_LDDVin-use_ICCT_Report_Final_may2014.pdf.

**Average emissions of nitrogen oxides in on-road testing**

GRAMS OF NITROGEN OXIDES PER KILOMETER

**2011 Volkswagen Jetta**

| | |
|---|---|
| HIGHWAY | 15 times limit |
| URBAN (LOS ANGELES) | 25 times |
| URBAN (SAN DIEGO) | 37 times |
| RURAL (UP AND DOWNHILL) | 38 times |

**2012 Volkswagen Passat**

| | |
|---|---|
| HIGHWAY | 9 times limit |
| URBAN (LOS ANGELES) | 20 times |
| URBAN (SAN DIEGO) | 17 times |
| RURAL (UP AND DOWNHILL) | 17 times |

**U.S. limit**
.04 grams/kilometer

Source: Arvind Thiruvengadam, Center for Alternative Fuels, Engines and Emissions at West Virginia University

280.     The results of this study prompted an immediate investigation by the EPA and CARB, both of whom demanded an explanation from Volkswagen. Despite knowing that the Class Vehicles contained illegal emission systems—and defeat devices intentionally designed to comply with emission standards on a test bench but not under normal driving operation and use—Volkswagen failed to come clean. Instead, Volkswagen denied the allegations and blamed faulty testing procedures.

281.     In December 2014, Volkswagen issued a recall purportedly to update emission control software in the Class Vehicles, and CARB (along with the EPA) conducted follow-up testing of the Class Vehicles in the laboratory and during normal road operation. CARB attempted to identify the source and nature of the Class Vehicles' poor performance and determine why their on-board diagnostic systems did not detect the increased emissions. None of the technical issues suggested by Volkswagen adequately explained the $NO_X$ test results as confirmed by CARB.

282.   Dissatisfied with Volkswagen's explanations, EPA and CARB officials finally threatened to withhold the COCs for Volkswagen's 2016 diesel vehicles until it adequately explained the anomaly of the higher emissions.  Then, and only then, did Volkswagen finally relent and start to lift the curtain on its illegal scheme.

**E.    Once Caught, Volkswagen Admitted its Fraud—in Part**

283.   On September 3, 2015, Volkswagen officials finally disclosed at a meeting with the EPA and CARB that it had installed a sophisticated software algorithm on the 2.0-liter Class Vehicles, which could detect when the car was undergoing emission testing on a test bench and switch the car into a cleaner running mode.  During that meeting, Volkswagen admitted that the software was a "defeat device" forbidden by the CAA and state regulations.

284.   On September 18, 2015, the EPA issued a Notice of Violation of the CAA (the "First NOV") to VW AG, Audi AG, and VW America for installing illegal defeat devices in 2009-2015 Volkswagen and Audi diesel cars equipped with 2.0-liter diesel engines.  That same day, CARB sent a letter to VW AG, Audi AG, and VW America, advising that it had initiated an enforcement investigation of Volkswagen pertaining to the vehicles at issue in the First NOV.

285.   Two days later, Volkswagen made its first public admission of wrongdoing in a written statement and video by VW AG's then-CEO Winterkorn (who would soon resign as a result of this scandal), posted on VW AG's website.  Winterkorn's statement read, in pertinent part:

> I personally am deeply sorry that we have broken the trust of our customers and the public. We will cooperate fully with the responsible agencies, with transparency and urgency, to clearly, openly, and completely establish all of the facts of this case. Volkswagen has ordered an external investigation of this matter. . . . We do not and will not tolerate violation of any kind of our internal rules or of the law.[57]

In his video, Winterkorn further apologized by stating:

> The irregularities in our group's diesel engines go against everything Volkswagen stands for. To be frank with you,

---

[57] *See Statement of Prof. Dr. Martin Winterkorn, CEO of Volkswagen AG*, Volkswagen AG (Sept. 20, 2012), http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2015/09/statement_ceo_of_volkswagen_ag.html.

> manipulation at Volkswagen must never happen again. . . . I personally am deeply sorry that we have broken the trust of our customers. I would like to make a formal apology to our customers to the authorities and to the general public for this misconduct.[58]

286. That same day, Volkswagen confirmed that it had ordered dealers to stop selling both new and used vehicles with 2.0-liter diesel engines.[59] Volkswagen continued to sell its 3.0-liter diesel models, despite containing similar, but not-yet-disclosed defeat devices.

287. On September 21, 2015, Volkswagen spokesman John Schilling stated in an email that Volkswagen was "committed to fixing this issue as soon as possible" and to "developing a remedy that meets emissions standards and satisfies our loyal and valued customers."[60]

288. Defendant Horn, President and CEO of VW America, echoed this sentiment when he took the stage later that evening at a launch event for the 2016 Volkswagen Passat in Brooklyn, New York, telling reporters:

> Our company was dishonest, with the EPA and the California Air Resources Board, and with all of you and in my German words, **we have totally screwed up**. We have to make things right, with the government, the public, our customers, our employees and also very important, our dealers.[61] (Emphasis added.)

Defendant Horn's presentation on the new Passat, notably, did not promote the environmental efficiency of the car's "clean" diesel model.

289. On September 22, 2015, Volkswagen announced that 11 million diesel cars worldwide were installed with the same defeat device software that had evaded emission testing by U.S. regulators. Contemporaneously, Volkswagen announced that it had set aside reserves of 6.5 billion euros ($7.3 billion) in the third quarter to address the matter.[62]

---

[58] *See* Joe Lorio, *VW Chairman Martin Winterkorn Releases Video Addressing Scandal, Is Not Stepping Down*, Car and Driver (Sept. 22, 2015), http://blog.caranddriver.com/vw-chairman-martin-winterkorn-releases-video-addressing-scandal-is-not-stepping-down/.

[59] Jack Ewing, *Volkswagen to Stop Sales of Diesel Cars Involved in Recall*, N.Y. Times (Sept. 20, 2015), http://www.nytimes.com/2015/09/21/business/international/volkswagen-chief-apologizes-for-breach-of-trust-after-recall.html.

[60] Jad Mouadwad, *et al.*, *The Wrath of Volkswagen's Drivers*, N.Y. Times (Sept. 21, 2015), http://www.nytimes.com/2015/09/22/business/the-wrath-of-volkswagens-drivers.html.

[61] Christine Seib, *Volkswagen's US Boss: We Totally Screwed Up*, CNBC (Sept. 22, 2015), http://www.cnbc.com/2015/09/21/volkswagen-us-ceo-screwed-up-on-eca-emissions-diesel-test-rigging.html.

[62] Nathan Bomey, *Volkswagen Emission Scandal Widens: 11 Million Cars Affected*, USA Today (Sept. 22, 2015), http://www.usatoday.com/story/money/cars/2015/09/22/volkswagen-emissions-

*Footnote continued on next page*

290.    On September 23, 2015, Winterkorn resigned from his position as CEO of VW AG. In his resignation statement, Winterkorn insisted that he was not personally involved in the emissions scandal: "Above all, I am stunned that misconduct on such a scale was possible in the Volkswagen Group. I am doing this in the interests of the company even though I am not aware of any wrongdoing on my part."[63]

291.    Following Winterkorn's resignation, Volkswagen released a statement that it had set up a special committee to lead its own inquiry into the scandal and expected "further personnel consequences in the next days." It added: "The internal group investigations are continuing at a high tempo. All participants in these proceedings that have resulted in immeasurable harm for Volkswagen will be subject to the full consequences." However, the committee insisted that Winterkorn "had no knowledge of the manipulation of emissions data."[64]

292.    On September 25, 2015, Matthias Müller, the Chairman of Porsche AG, was named as Winterkorn's successor. Immediately upon assuming his new role, Müller issued a press release stating:

> My most urgent task is to win back trust for the Volkswagen Group—by leaving no stone unturned and with maximum transparency, as well as drawing the right conclusions from the current situation. Under my leadership, Volkswagen will do everything it can to develop and implement the most stringent compliance and governance standards in our industry.[65]

293.    On October 8, 2015, Defendant Horn made frank admissions of culpability in his testimony before the House Committee on Energy and Commerce's Subcommittee on Oversight and Investigations. Under oath, Defendant Horn testified: "On behalf of our Company, and my colleagues in Germany, I would like to offer a sincere apology for Volkswagen's use of a

---

*Footnote continued from previous page*
scandal/72605874/.
[63] Graham Ruddick, *Volkswagen chief quits over emissions scandal as car industry faces crisis*, The Guardian (Sept. 23, 2015), http://www.theguardian.com/business/2015/sep/23/volkswagen-chief-martin-winterkorn-quits-emissions-scandal.
[64] *Id.*
[65] *Matthias Müller appointed CEO of the Volkswagen Group*, Volkswagen AG (Sept. 25, 2015), http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2015/09/CEO.html.

- 167 -

1    software program that served to defeat the regular emissions testing regime."[66]  In response to a

2    question from the Subcommittee Chairman, Representative Tim Murphy, whether the software

3    was installed "for the express purpose of beating tests," Horn testified, "it was installed for this

4    purpose, yes."[67]

5         294.    On November 2, 2015, the EPA issued a second Notice of Violation of the CAA

6    (the "Second NOV") to VW AG, Audi AG, and VW America, this time directed at the larger 3.0-

7    liter, 6-cylinder diesel models—the same vehicles that Volkswagen continued to sell through its

8    dealers after the First NOV.[68]  The Second NOV, which was also issued to Porsche AG and

9    Porsche America, alleged that Volkswagen had installed illegal defeat devices in certain vehicles

10   equipped with 3.0-liter diesel engines for model years 2014–16.  Although not identical, the

11   cheating alleged of Volkswagen in the Second NOV concerned essentially the same mechanism

12   Volkswagen used—and admitted to using—in the First NOV.

13        295.    However, shortly after it received the Second NOV, Volkswagen fired back at the

14   EPA's new claims of fraud, denying that it installed defeat device software in the identified 3.0-

15   liter diesel vehicles.  In response to the Second NOV, Volkswagen issued the following bold

16   statement: "Volkswagen AG wishes to emphasize that no software has been installed in the 3.0-

17   liter V6 diesel power units to alter emissions characteristics in a forbidden manner."[69]

18        296.    Yet, the following day, despite Volkswagen's insistence that the 3.0-liter diesel

19   emission system was legal, Volkswagen ordered dealers to stop selling all six models at issue in

20   the Second NOV, in addition to the Audi Q7, which was also equipped with a 3.0-liter diesel

21   engine.[70]

22   

---

23   [66] *Supra* note 1.

24   [67] *Id*.

     [68] Letter from Susan Shinkman, Director, EPA Office of Civil Enforcement to Volkswagen dated
25   Nov. 2, 2015, http://www.epa.gov/sites/production/files/2015-11/documents/vw-nov-2015-11-
     02.pdf.
26   [69] Emily Field, *Volkswagen Slams Newest EPA Emissions Fraud Claims*, Law360 (Nov. 3, 2015),
     http://www.law360.com/articles/722478/volkswagen-slams-newest-epa-emissions-fraud-claims.
27   [70] Paul Lienert, *Volkswagen tells dealers to stop selling some 3.0 V6 diesel models*, Reuters
     (Nov. 4, 2015), http://www.reuters.com/article/us-volkswagen-emissions-stopsale-
28   idUSKCN0ST2E420151104.

297.     On November 4, 2015, following its directive to halt sales of the 3.0-liter diesel models, Volkswagen announced that an internal investigation revealed "unexplained inconsistencies" with the carbon-dioxide output of 800,000 of its gasoline-powered vehicles.[71]

298.     On November 22, 2015, after almost three weeks of denying the EPA's allegations contained in the Second NOV, Audi finally admitted that defeat device software was installed in all of its Class Vehicles.  Specifically, Audi stated that it had failed to disclose three auxiliary emissions control devices in its 3.0-liter diesel engines to U.S. regulators, and further admitted: "One of them is regarded as a defeat device according to applicable U.S. law. Specifically, this is the software for the temperature conditioning of the exhaust-gas cleaning system."[72]  This admission came almost three months after Volkswagen's initial, more limited *mea culpa*.

299.     Still, despite the admissions and apologies that followed each time a Volkswagen lie was exposed, it became apparent that Volkswagen was not ready to fully accept responsibility for its actions.  Indeed, merely one month after Volkswagen admitted to the findings in the Second NOV, Hans-Gerd Bode, Volkswagen's Group Communications Chief, told a group of reporters: "I can assure you that we certainly did not, at any point, knowingly lie to you. . . .  We have always tried to give you the information which corresponded to the latest level of our own knowledge at the time."[73]

300.     On January 4, 2016, the DOJ, on behalf of the EPA, filed a civil complaint against VW AG, VW America, Volkswagen Group of America Chattanooga Operations LLC, Audi AG, Audi, Porsche AG, and Porsche America for injunctive relief and the assessment of civil penalties for their violations of the CAA.  In addition to alleging the various violations of the CAA, the complaint states that the Defendants impeded the government's efforts to learn the truth about the

---

[71] Benedikt Kammel, *VW Emissions Issues Spread to Gasoline Cars*, Bloomberg (Nov. 3, 2015), http://www.bloomberg.com/news/articles/2015-11-03/volkswagen-emissions-woes-deepen-as-800-000-more-cars-affected.

[72] *Statement on Audi's discussions with the US environmental authorities EPA and CARB*, Volkswagen AG (Nov. 23, 2015), http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2015/11/epa.html.

[73] Andreas Cremer, *Das Auto' no more: Volkswagen plans image offensive*, Reuters (Dec. 22, 2014), http://www.reuters.com/article/us-volkswagen-emissions-communications-i-idUSKBN0U514L20151222.

emission irregularities related to the Class Vehicles with material omissions and misleading information.

301.    On January 10, 2016, in an interview with NPR at the North American International Auto Show, Müller claimed that Volkswagen **did not lie** to U.S. regulators about emissions problems with its diesel engines, and suggested that the whole thing had been a misunderstanding of U.S. law.  Müller stated:

> Frankly spoken, it was a technical problem. We made a default, we
> had a . . . not the right interpretation of the American law. And we
> had some targets for our technical engineers, and they solved this
> problem and reached targets with some software solutions which
> haven't been compatible to the American law. That is the thing.
> And the other question you mentioned—it was an ethical problem?
> I cannot understand why you say that. . . . We didn't lie. We didn't
> understand the question first. And then we worked since 2014 to
> solve the problem.[74]

302.    Moreover, since the fraud was first exposed, Volkswagen has consistently denied that its top executives were involved with, or had knowledge of, the fraudulent scheme, instead pinning the blame on the work of a few rogue engineers.

303.    As an alternative tactic, during defendant Horn's Congressional hearing on October 8, 2015, Horn testified that the installation of the defeat device in certain Volkswagen diesel vehicles was the work of "a couple of software engineers who put this in for whatever reason."[75]  Horn's explanation is not only contrary to prior admissions, but entirely implausible.

304.    To date, at least eleven of Volkswagen's top executives have either resigned under pressure or been fired.  Among the top executives dismissed are defendant Winterkorn, CEO and Chairman of Volkswagen, who resigned almost immediately once the scandal became public; Dr. Ulrich Hackenberg, a top engineering boss in the Audi Group, who was suspended and later resigned; Heinz-Jakob Neusser, described as a Volkswagen "development" boss, who was suspended and later resigned; and Wolfgang Hatz, Porsche's "development" boss and previously

---

[74] Sonari Glinton, *'We Didn't Lie,' Volkswagen CEO Says Of Emissions Scandal*, NPR (Jan. 11, 2016), http://www.npr.org/sections/thetwo-way/2016/01/11/462682378/we-didnt-lie-volkswagen-ceo-says-of-emissions-scandal.

[75] Paul A. Eisenstein, *Could Rogue Software Engineers Be Behind VW Emissions Cheating?*, NBC News (Oct. 9, 2015), http://www.nbcnews.com/business/autos/could-rogue-software-engineers-be-behind-vw-emissions-cheating-n441451.

1   Volkswagen's head of engine development, who was suspended and then resigned. Furthermore,

2   one of Volkswagen's top advertising executives purportedly "resigned" (although the company

3   has said that the resignation was unrelated to the present scandal), and VW America has replaced

4   their general counsel and head of public affairs, David Geanacopoulos. Just recently Frank Tuch,

5   VW AG's head of quality assurance, also resigned, his departure likely tied to leadership

6   overhauls as Volkswagen's internal investigations continue.

7   305.    That a few rogue engineers could orchestrate this massive, worldwide scheme is

8   implausible not only because of the firings of the above-listed executives, but also because

9   Volkswagen has been implicated using not just one, but *two* sophisticated defeat device software

10  programs, in *two* separate engines designed and manufactured by different engineers in different

11  corporate facilities. In addition, more than a dozen different Class Vehicles, involving three

12  separate brands—Volkswagen, Audi and Porsche—have been implicated in a fraud that began

13  more than a decade ago.

14  306.    On October 17, 2015, Reuters reported that anonymous insiders, including a

15  Volkswagen manager and a U.S. official close to the government's investigation of the company,

16  claimed that Volkswagen made several modifications to its emission defeat device software over

17  the seven years the company has admitted to cheating.[76] Such incremental updates to the

18  software, which were made to accommodate new generations of engines during that timeframe,

19  evidences a larger group of employees making an ongoing effort to continue their deception.

20  307.    As discussed above, on January 22, 2016, Germany's *Sueddeutsche Zeitung*

21  newspaper reported that Volkswagen's development of defeat device software to cheat diesel

22  emissions tests was an "open secret" in its engineering development department. Staff members

23  in engine development have stated that they felt pressure from the top of Volkswagen's corporate

24  hierarchy to find a cost-effective solution to develop clean diesel engines to increase U.S. market

25

26

---

27  [76] Andreas Cremer, *et al.*, *VW made several defeat devices to cheat emissions tests: sources*, Reuters (Oct. 17, 2015), http://www.reuters.com/article/us-volkswagen-emissions-software-

28  idUSKCN0SB0PU20151017.

share. Rather than concede that such engines could not be built (*i.e.*, were "impossible" as R&D chief Hatz once proclaimed), the development team decided to push ahead with manipulation.[77]

308. Quoting documents from Volkswagen's internal investigation, which included testimony from a staff member who took part in the fraud, the German newspaper said: "Within the company there was a culture of 'we can do everything', so to say something cannot be done, was not acceptable. . . . Instead of coming clean to the management board that it cannot be done, it was decided to commit fraud."[78] The newspaper further reported that staff in Volkswagen's engine development department took comfort from the fact that regulators would not be able to detect the fraud using conventional examination techniques.

309. The role of Volkswagen's top management in the fraud has recently come under increased scrutiny after reports have emerged that Winterkorn was aware that Volkswagen was rigging emissions tests on its vehicles more than a year before the scandal emerged, yet did nothing to stop the practice.[79]

310. According to German newspaper *Bild-Zeitung*, Winterkorn and other high-level Volkswagen managers were warned by a senior executive about the risk of a U.S. investigation into the use of the defeat devices back in May 2014.[80] The newspaper reported that the warning came in the form of a letter from Bernd Gottweis, an employee known internally as the "fire-fighter," who led a team called the "Product Safety Taskforce," which concentrated on crisis prevention and management. The letter, which was uncovered by the internal investigation carried out on Volkswagen's order, stated: "There is no well-founded explanation for the dramatically higher NOX emissions that can be given to the authorities. It is to be suspected, that the authorities will examine the VW systems to see whether Volkswagen has installed engine management software (a so-called Defeat Device)."

---

[77] Georgina Prodhan, *Volkswagen probe finds manipulation was open secret in department: newspaper*, Reuters (Jan. 23, 2016), http://www.reuters.com/article/us-volkswagen-emissions-investigation-idUSKCN0V02E7.

[78] *Id.*

[79] Geoffrey Smith, *VW's ex-CEO Winterkorn 'Knew About Defeat Device in Early 2014*,' Fortune (Feb. 15, 2016), http://fortune.com/2016/02/15/vw-ceo-winterkorn-defeat-device/.

[80] *Id.*

311.    The newspaper also reported that a senior Volkswagen manager had admitted the true level of emissions to a CARB official on August 5, 2015, over a month before the EPA issued the First NOV I, and that Volkswagen brand chief Herbert Diess had convened meetings on August 24th and August 25th to discuss how to react to the scandal that was about to break.[81]

312.    The letter, of which *Bild-Zeitung* claims to have a copy, is the second leak suggesting that knowledge of the emissions problems and use of the defeat devices extended far higher, far earlier, than Volkswagen has admitted.  Indeed, the German magazine *Manager* has reported that Volkswagen's management had already discussed the issue in the spring of 2014 in reference to a letter received from the EPA.[82]  The revelations from these reports directly contradict arguments made by Winterkorn and Horn that they were unaware of the use of defeat devices applied specifically to circumvent U.S. regulations.

313.    At a December 10, 2015, press conference, during which Volkswagen discussed preliminary results of their internal investigation, executives summed up the state of affairs, and admitted that Volkswagen had installed defeat devices to take shortcuts around engineering challenges.  Faced with "[s]trict and significantly toughening $NO_X$ limits," Volkswagen knew those "$NO_X$ limits could not be met with [their] technological design" for lean $NO_X$ traps so instead they dealt with the problem by installing defeat devices on those Class Vehicles.  The Class Vehicles with urea treatments faced a separate problem: the urea tanks were too small for consumers to maintain urea levels at standard maintenance intervals.  Volkswagen also took shortcuts around these engineering challenges by implementing a defeat device to reduce urea consumption and illegally stretch the capacity of its urea tanks outside of test conditions.  Volkswagen concluded this presentation by implicitly acknowledging the toxicity of its corporate culture, as Volkswagen announced it would establish a "new mindset" among Volkswagen leadership that has "[m]ore capacity for criticism."[83]

---

[81] *Id.*

[82] *Id.*

[83] *Volkswagen AG, The Volkswagen Group is moving ahead: Investigation, customer solutions, realignment*, Volkswagen AG (Dec. 10, 2015),
http://www.volkswagenag.com/content/vwcorp/info_center/en/talks_and_presentations/2015/12/Presentation_MUE_POE.bin.html/binarystorageitem/file/2015_12_10_Pr%C3%A4sentation+PK

*Footnote continued on next page*

314. The entire after-the-fact chronology and explanation of how and why Volkswagen perpetrated its fraud is set forth in its December 10, 2015, presentation, as follows:



VOLKSWAGEN

**What have we already learned about the origins of the NO$_X$ Issue**

| Strategic decision: | Challenge: | Solution: | Problem: | Dealing with the problem: | Market launch of EA189 (Gen 1) in the US: |
|---|---|---|---|---|---|
| Diesel campaign in the US and the EA 189 development order | Strict and significantly toughening NO$_X$ limits | Exhaust gas recirculation + "passive" exhaust gas treatment ("NO$_X$ storage catalytic converter") | NO$_X$ limits could not be met with our technological design. Switch to "active" exhaust gas treatment ("SCR system") unrealistic with the time and cost involved | Two exhaust strategies with one for the test bench and one for the road/ development of corresponding control software | Motor control software recognized test cycle and used e.g. more intense exhaust recirculation to reduce NO$_X$ values on the test bench |

2005 — Spring 2008

16



VOLKSWAGEN

**What have we already learned about the origins of the NO$_X$ Issue (continuation)**

| Market launch EA189 (Gen 1) in the US: | Further development: | Problem: | Dealing with the problem: | Market launch EA189 (Gen 2) in the US: |
|---|---|---|---|---|
| Motor control software recognizes test cycle and uses e.g. more intense exhaust recirculation to reduce NO$_X$ values on the test bench | Generation 2 of EA189 was supposed to be more effective in reducing NO$_X$ by utilizing active exhaust gas recirculation ("SCR system") | Tank for reduction medium ("Diesel Exhaust Fluid") needs to be large enough for oil change interval (approx. 16,000 km) because Diesel Exhaust Fluid could only be refilled at repair garages | Maintain dual exhaust gas strategies for the test bench and the road in order to cope with the conflicting goals by varying "Diesel Exhaust Fluid" dosages | Motor control software recognizes test cycle and uses e.g. higher "Diesel Exhaust Fluid" dosage to reduce NO$_X$ values on the test bench |

Spring 2008 — Early 2011

17

---

*Footnote continued from previous page*
 _Final_ENG.pdf.

## F. Volkswagen's Failed Attempts at Remedial Action

315. While Volkswagen has repeatedly expressed its commitment to fix the problem and restore the public's trust, its attempts at remedial action have been wholly inadequate.

316. On November 8, 2015, Volkswagen announced a "goodwill package" to owners of Class Vehicles subject to the First NOV, but not the Second NOV.[84] The "goodwill package" consisted of a $500 Volkswagen Prepaid Visa Loyalty Card, a $500 Volkswagen Dealership Card, and 24-hour Roadside Assistance for three years. Volkswagen is on record that this package is provided to consumers "without any strings attached," and disavowed any attempt to claim offset for this "goodwill." U.S. Senators Richard Blumenthal and Edward J. Markey decried the program as "insultingly inadequate" and "a fig leaf attempting to hide the true depths of Volkswagen's deception." Volkswagen has since expanded the "goodwill package" to owners of 3.0-liter TDI Touareg models; however, the remaining vehicles at issue in the Second NOV are still excluded.

317. While Volkswagen claims to have a software fix for European cars, it has struggled to find a solution for U.S. cars. In a statement discussing the European fix, it said:

> Due to far stricter nitrogen oxide limits in the United States, it is a greater technical challenge to retrofit the vehicles such that all applicable emissions limits can be met with one and the same emissions strategy. . . . To this end, Volkswagen is cooperating closely with the United States Environmental Protection Agency and the California Air Resources Board.[85]

318. However, that cooperation has not yet been met with any success. On January 12, 2016, CARB rejected Volkswagen's proposal to recall and remedy Class Vehicles equipped with 2.0-liter diesel engines, finding that the plans were "incomplete, substantially deficient, and fall far short of meeting the legal requirements to return these vehicles to the claimed certification

---

[84] Joseph White, *et al.*, *Volkswagen Offers U.S. Diesel Owners $1,000 in Credit Cards*, Reuters (Nov. 9, 2015), http://www.reuters.com/article/2015/11/09/volkswagen-emissionsid-idUSL1N1341ET20151109#eARbZZJFylQvGmG1.99.

[85] Jay Ramey, *VW chairman Poetsch: Company 'tolerated breaches of rules,'* Autoweek (Dec. 10, 2015), http://autoweek.com/article/vw-diesel-scandal/vw-chairman-poetsch-company-tolerated-breaches-rules.

1    configuration."[86]  Following the rejection, CARB initiated an enforcement action against

2    Volkswagen and CARB Chair Mary D. Nichols released the following statement:

3              Volkswagen made a decision to cheat on emissions tests and then
             tried to cover it up. They continued and compounded the lie and
4              when they were caught they tried to deny it. The result is thousands
             of tons of nitrogen oxide that have harmed the health of
5              Californians. They need to make it right. Today's action is a step in
             the direction of assuring that will happen.[87]
6

7    Shortly thereafter, the EPA issued a statement of its own backing CARB's decision not to

8    approve Volkswagen's recall plans.[88]

9         **G.    Volkswagen Caused Billions of Dollars in Harm to U.S. Consumers**

10         319.   Volkswagen's illegal scheme duped hundreds of thousands of U.S. consumers into

11   buying Class Vehicles that never should have left the factory, let alone been sold, at a cost of

12   billions of dollars.

13         320.   In addition, Volkswagen charged premiums of several thousands of dollars for the

14   Class Vehicles, as compared to non-diesel vehicles.  Using recent pricing figures, it has been

15   estimated that Volkswagen charged premiums of from 7 to 27 percent for its 2.0-liter diesel

16   models.[89]  For example, the non-diesel 2015 Passat started at $21,340, while the "clean" diesel

17   fetched at least $27,100.[90]  Though the "clean" diesel model achieves greater mileage, the

18   premium—some $5,755—would buy enough gas to drive the non-diesel model approximately

19   88,000 miles at current gas prices.[91]

20         321.   Class members purchased the Class Vehicles only because Volkswagen

21   fraudulently obtained COCs from the EPA to illegally introduce them into the U.S. stream of

22   ────────────────

23   [86] Ashlee Kieler, *California Rejects VW Proposal To Fix Emissions-Cheating Vehicles*,
     Consumerist (Jan. 12, 2016), http://consumerist.com/2016/01/12/california-rejects-vw-proposal-
24   to-fix-emissions-cheating-vehicles/.
     [87] *Id*.
25   [88] *Id*.

26   [89] Kyle Stock, *Volkswagen's Other Diesel Ruse: Premium Pricing*, Bloomberg (Sept. 23, 2015),
     http://www.bloomberg.com/news/articles/2015-09-23/volkswagen-s-other-diesel-ruse-premium-
27   pricing.
     [90] *Id*.
28   [91] *Id*.

commerce. In addition, Volkswagen engaged in a false and misleading advertising campaign that the "clean" diesel engine system was an environmentally friendly, fuel efficient, and low emission vehicle with high performance. Plaintiffs and Class members bought or leased the Class Vehicles based on these claims, and were harmed as the cars were neither legal nor clean.

322. While Volkswagen once claimed that these vehicles would have "a higher resale value versus comparable gasoline vehicles,"[92] the cars are, in fact, now virtually unsellable and subject to a recall for the indefinite future. With the revelations of Volkswagen's fraud, the Class Vehicles have decreased sharply in value. Within several weeks of the announcement of Volkswagen's emissions fraud, the value of the Class Vehicles plummeted by nearly 16%.[93] In fact, VW, Audi, and Porsche have halted all sales of the Class Vehicles, new or used, so that even dealers are stuck with tainted, stigmatized, and unsellable Class Vehicles.

323. Adding insult to injury, the diesel vehicles that Volkswagen peddled as environmentally responsible spew pollutants up to 40 times the legal limits. It is a cruel irony that Volkswagen has forced Plaintiffs to either sideline their cars (which most people cannot practically do) or drive the Class Vehicles with the knowledge that they are emitting toxic $NO_X$ far in excess of legal limits, exactly what they paid a premium to avoid. Consumers are justifiably outraged about the untenable position Volkswagen has put them in.

324. Moreover, many Plaintiffs and Class members purchased the Class Vehicles with financing in the form of car loans or leases. The plunge in value of the Class Vehicles has caused some Class members to be upside down on their loans, meaning that Class members now owe— often to Volkswagen's financing arm—more than the vehicle is worth—and for a car that is not legal, to boot.

325. Volkswagen cannot fix the Class Vehicles without degrading their performance, including horsepower and/or efficiency. As a result, even if Volkswagen is able to make the

---

[92] *See* Audi of America, TDI® clean diesel (2015),
http://drivedigitalgroup.com/Dealer/classicaudi/brochures/tdi.pdf.
[93] *See* Ryan Beene, *Used VW diesel prices nosedive as fix remains unclear*, Autoweek (Oct. 26, 2015), http://autoweek.com/article/vw-diesel-scandal/used-vw-diesels-prices-nosedive-while-waiting-repair-news.

Class Vehicles compliant, Class members will nonetheless suffer actual harm and damages because their vehicles will no longer perform as promised. This will necessarily result in a diminution in value of every Class Vehicle.

326. Moreover, many Class members purchased extended warranties for their Class Vehicles, intending to own the vehicles beyond the initial warranty period. Class members no longer want to own the Class Vehicles due to revelations of Volkswagen's fraud and, when they sell them, they will lose the value of the extended warranties that they purchased.

327. The harm described herein is quantifiable and ongoing. As a result of Volkswagen's illegal scheme, owners and lessees of the Class Vehicles have suffered losses—and continue to lose—money and property in the magnitude of billions of dollars.

**H.** **Defendants' Illegal Scheme Caused Health Risks and Quantifiable Harm to the Environment**

328. Defendants' illegal scheme has also caused significant injury to public health, including increased health risks to Plaintiffs and Class members, as well as harm to the environment due to the Class Vehicles' emission of hazardous pollutants far in excess of legal limits.

329. As mentioned above, $NO_X$ is a hazardous pollutant and "an indirect greenhouse gas" that contributes to the formation of ground-level ozone, a greenhouse gas, and can travel hundreds of miles from the source of emission. Ozone is a colorless and odorless gas that, even at low levels, can cause cardiovascular and respiratory health problems, including chest pain, coughing, throat irritation, and congestion. The human health concerns from over-exposure to $NO_X$ are well established, and include negative effects on the respiratory system, damage to lung tissue, and premature death. $NO_X$ can penetrate deeply into sensitive parts of the lungs, and is known to cause or worsen respiratory diseases like asthma, emphysema, and bronchitis, as well as aggravate existing heart disease. Children, the elderly, people with lung diseases such as asthma, and people who work or exercise outside are particularly susceptible to such adverse health effects, though its effects are felt on all of society. Public health literature has firmly established

1  a direct link between marginal short run fluctuations in ambient ozone concentrations and

2  mortality rates.[94]

3  330.  Tracing $NO_X$ emissions in one location into economic damages to health can be

4  done through a model that translates the ground-level emissions of $NO_X$ in one location into

5  ozone damages everywhere, as $NO_X$ travels and reacts in spatially heterogeneous ways across the

6  country. One such model is the AP2 Model (Muller, 2015), which has county level resolution,

7  translates $NO_X$ emissions at ground level (and a variety of other pollutants) into economic

8  damage across all other counties in the U.S. and aggregates the results.

9  331.  According to the WVU study, Figure 1 below demonstrates an estimate of

10  marginal damages for driving a representative VW 3.0 TDI Jetta (just one of many models of

11  Class Vehicles), emitting 1.5g of $NO_X$/km for 100,000 miles.[95]

---

[94] Bell *et al.*, *Ozone and Short-term Mortality in 95 US Urban Communities, 1987-2000*, JAMA (Nov. 17, 2004), show evidence of a short-term 10 parts per billion (ppb) rise in ozone concentrations would result in 3,767 additional premature deaths across 95 urban areas in the U.S. For evidence regarding ozone's morbidity and environmental impacts, *see* EPA (2006), Moretti and Neidell (2008), and Neidell (2004, 2009).

[95] The model does not include damages on crops or effects on morbidity, so it is a strict lower bound. It uses the Bell, *et al.* (2004) dose response curve for ozone and a conservative value of a statistical life (VSL) of $2 million as applied in Müller, Mendelsohn and Nordhaus (2011). The standard requires a $NO_X$ limit per kilometer of 0.043 grams. The lower range of the vehicle tested by WVU was 0.61 grams per kilometer and the upper bound was 1.5 grams per kilometer. It is possible to calculate the damages from a vehicle driven for 100,000 miles in any of the over 3,000 counties in the U.S. For the low end of the range of the Jetta test (0.61 g/km), a vehicle driven 100,000 miles emits an additional 201 pounds of $NO_X$ above a compliant car. For the high end of the range of the Jetta test (1.5 g/km), a vehicle driven 100,000 miles emits an additional 516 pounds of $NO_X$ above a compliant car. Figure 1 applies these numbers to the AP2 Model to illustrate the physicality of ozone formation.



332.    Figure 1 (above) displays the spatial damage distribution across the U.S. for the high emitting Jetta.  Figure 2 (below) displays the distributions of damages for the low and high emitting versions of the Jetta and Passat for 100,000 miles as tested by WVU.[96]  The spatial patterns are not affected by the difference in emissions by vehicle type and emissions scenario, yet the overall range of damages is.  The range of damages for the Jetta under the high emissions scenario is roughly $62 to $1,346.  The range for the vehicle with lowest emissions (Passat, low) is roughly $13 to $274.

---

[96] In addition to the Jetta assumptions described, *supra*, for the low end of the range of the Passat test (0.34 g/km), a vehicle driven 100,000 miles emits an additional 105 pounds of $NO_X$ above a compliant car.  For the high end of the range of the Passat test (0.67 g/km) a vehicle driven 100,000 miles emits an additional 222 pounds of $NO_X$ above a compliant car.  Figure 1 applies these numbers to the AP2 Model to illustrate the physicality of ozone formation.

- 180 -



333.  In addition, as a result of the negative environmental and health impacts, one environmental research paper has estimated that the excess emissions from the Class Vehicles between 2008 and 2015 will cause nearly 60 early deaths with a monetized cost of $450 million.[97] Other reports have estimated that the defeat devices "allowed VWs to spew enough pollution to cause somewhere between 16 and 94 deaths over seven years."[98]  Regardless of the precise number of deaths, the serious environmental and physical harm will continue to grow as long as the Class Vehicles remain on the roads.

334.  The notorious legacy of Defendants' unprecedented fraud will live long and spread far.  Defendants' conduct was, and the impact of the conduct remains, highly reprehensible within the meaning of that term, as used by the United States Supreme Court in its jurisprudence guiding the calculation and scaling of punitive damages.  The conduct alleged herein involved repeated, purposeful actions, was the result of intentional deceit, left Plaintiffs defrauded and without remedy, and evinced an indifference and reckless disregard of public health.

---

[97] Steven R H Barrett, *et al.*, *Impact of the Volkswagen emissions control defeat device on US public health*, IOP Science (Oct. 29, 2015), http://iopscience.iop.org/article/10.1088/1748-9326/10/11/114005?fromSearchPage=true.
[98] Seth Borenstein, *Volkswagen's emissions cheating likely caused dozens of deaths in the US*, Business Insider (Oct. 5, 2015), http://www.businessinsider.com/ap-ap-analysis-vw-evasion-likely-led-to-dozens-of-deaths-2015-10.

335.     Plaintiffs and Class members, whose unwitting and undesired operation of the Class Vehicles is implicated in the environmental impact of Defendants' scheme, have a real, compelling, and express interest in effectuating and expediting the necessary repairs and reparations to the environment, and in assisting governmental efforts to do so.  It is practicable as well as necessary to remediate, mitigate, and offset this harm.  For example, the odometer readings of Class members' vehicles, which are practical to obtain and total, provide a ready measure upon which to base monetary offsets to be imposed upon Defendants, and collected by the appropriate governmental entities and used to repair the environment.

## TOLLING OF THE STATUTES OF LIMITATIONS

### Discovery Rule

336.     The tolling doctrine was made for cases of concealment like this one.  Plaintiffs and Class members did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants had conspired to install software that would evade emissions regulations, and that Volkswagen was concealing and misrepresenting the true emissions levels of its vehicles.

337.     Defendants' fraud was elaborate and well concealed.  Indeed, the EPA and CARB uncovered the software manipulation only through a sophisticated and costly investigation involving highly technical equipment.

338.     Plaintiffs and Class members had no realistic ability to discover the presence of the defeat devices, or to otherwise learn of the fraud, until it was discovered by the EPA and CARB and revealed to the public through the September 18, 2015, and November 2, 2015, NOVs.

339.     Any statutes of limitation otherwise-applicable to any claims asserted herein have thus been tolled by the discovery rule.

### Fraudulent Concealment

340.     All applicable statutes of limitation have also been tolled by Volkswagen's knowing, active and ongoing fraudulent concealment of the facts alleged herein.

341.     Defendants have known of the defeat devices installed in the Class Vehicles since at least 2009 when Volkswagen began installing them.  Since then Volkswagen has intentionally

1    concealed from or failed to notify Plaintiffs, Class members, and the public of the defeat devices

2    and the true emissions and performance of the Class Vehicles.

3           342.    There is no question that Volkswagen installed the defeat devices intentionally to

4    deceive, regulators, and the public, as Volkswagen has publicly conceded.

5           343.    Despite knowing about the defeat device and unlawful emissions, Volkswagen did

6    not acknowledge the problem, and in fact actively concealed it, until after the EPA issued its

7    NOVs on September 18, 2015 and November 2, 2015.

8           344.    Any otherwise-applicable statutes of limitation have therefore been tolled by

9    Defendants' exclusive knowledge and Volkswagen's active concealment of the facts alleged

10   herein.

11                                          **Estoppel**

12          345.    Defendants were and are under a continuous duty to disclose to Plaintiffs and

13   Class members the true character, quality, and nature of the Class Vehicles, including their

14   emissions systems and their compliance with applicable federal and state law.  Instead,

15   Volkswagen actively concealed the true character, quality, and nature of the Class Vehicles and

16   knowingly made misrepresentations about the quality, reliability, characteristics, and performance

17   of the Class Vehicles.

18          346.    Plaintiffs and Class members reasonably relied upon Volkswagen's knowing and

19   affirmative misrepresentations and/or active concealment of these facts.

20          347.    Based on the foregoing, Defendants are estopped from relying on any statutes of

21   limitation in defense of this action.

22                                **CLASS ACTION ALLEGATIONS**

23          348.    Plaintiffs bring this lawsuit as a class action pursuant to Federal Rules of Civil

24   Procedure 23(a); (b)(1); (b)(2); (b)(3); and/or (c)(4), on behalf of themselves and all others

25   similarly situated as members of the following Nationwide Class and State Classes (collectively,

26   the "Classes"); on their federal and state claims as the purchasers and lessees of the following

27   Class Vehicles:

28

| 2.0-liter Class Vehicles | |
|---|---|
| Volkswagen Jetta TDI | 2009-2015 |
| Volkswagen Jetta SportWagen TDI | 2009-2014 |
| Volkswagen Beetle TDI | 2012-2015 |
| Volkswagen Beetle Convertible TDI | 2012-2015 |
| Audi A3 TDI | 2010-2015 |
| Volkswagen Golf TDI | 2010-2015 |
| Volkswagen Golf SportWagen TDI | 2015 |
| Volkswagen Passat TDI | 2012-2015 |

| 3.0-liter Class Vehicles | |
|---|---|
| Volkswagen Touareg TDI | 2009-2016 |
| Porsche Cayenne Diesel | 2013-2016 |
| Audi A6 Quattro TDI | 2014-2016 |
| Audi A7 Quattro TDI | 2014-2016 |
| Audi A8 TDI | 2014-2016 |
| Audi A8L TDI | 2014-2016 |
| Audi Q5 TDI | 2014-2016 |
| Audi Q7 TDI | 2009-2016 |

349.    The proposed Classes are defined as:

### Nationwide Class

All persons and entities in the United States who purchased or leased a Class Vehicle.

### Alabama Class

All persons and entities in the state of Alabama who purchased or leased a Class Vehicle.

### Alaska Class

All persons and entities in the state of Alaska who purchased or leased a Class Vehicle.

### Arizona Class

All persons and entities in the state of Arizona who purchased or leased a Class Vehicle.

### Arkansas Class

All persons and entities in the state of Arkansas who purchased or leased a Class Vehicle.

1292776.5

CONSOLIDATED CONSUMER CLASS
COMPLAINT MDL 2672 CRB (JSC)

**California Class**

All persons and entities in the state of California who purchased or leased a Class Vehicle.

**Colorado Class**

All persons and entities in the state of Colorado who purchased or leased a Class Vehicle.

**Connecticut Class**

All persons and entities in the state of Connecticut who purchased or leased a Class Vehicle.

**Delaware Class**

All persons and entities in the state of Delaware who purchased or leased a Class Vehicle.

**District of Columbia Class**

All persons and entities in the District of Columbia who purchased or leased a Class Vehicle.

**Florida Class**

All persons and entities in the state of Florida who purchased or leased a Class Vehicle.

**Georgia Class**

All persons and entities in the state of Georgia who purchased or leased a Class Vehicle.

**Hawaii Class**

All persons and entities in the state of Hawaii who purchased or leased a Class Vehicle.

**Idaho Class**

All persons and entities in the state of Idaho who purchased or leased a Class Vehicle.

**Illinois Class**

All persons and entities in the state of Illinois who purchased or leased a Class Vehicle.

**Indiana Class**

All persons and entities in the state of Indiana who purchased or leased a Class Vehicle.

**Iowa Class**

All persons and entities in the state of Iowa who purchased or leased a Class Vehicle.

**Kansas Class**

All persons and entities in the state of Kansas who purchased or leased a Class Vehicle.

**Kentucky Class**

All persons and entities in the state of Kentucky who purchased or leased a Class Vehicle.

**Louisiana Class**

All persons and entities in the state of Louisiana who purchased or leased a Class Vehicle.

**Maine Class**

All persons and entities in the state of Maine who purchased or leased a Class Vehicle.

**Maryland Class**

All persons and entities in the state of Maryland who purchased or leased a Class Vehicle.

**Massachusetts Class**

All persons and entities in the state of Massachusetts who purchased or leased a Class Vehicle.

**Michigan Class**

All persons and entities in the state of Michigan who purchased or leased a Class Vehicle.

**Minnesota Class**

All persons and entities in the state of Minnesota who purchased or leased a Class Vehicle.

**Mississippi Class**

All persons and entities in the state of Mississippi who purchased or leased a Class Vehicle.

**Missouri Class**

All persons and entities in the state of Missouri who purchased or leased a Class Vehicle.

**Montana Class**

All persons and entities in the state of Montana who purchased or leased a Class Vehicle.

**Nebraska Class**

All persons and entities in the state of Nebraska who purchased or leased a Class Vehicle.

**Nevada Class**

All persons and entities in the state of Nevada who purchased or leased a Class Vehicle.

**New Hampshire Class**

All persons and entities in the state of New Hampshire who purchased or leased a Class Vehicle.

**New Jersey Class**

All persons and entities in the state of New Jersey who purchased or leased a Class Vehicle.

**New Mexico Class**

All persons and entities in the state of New Mexico who purchased or leased a Class Vehicle.

**New York Class**

All persons and entities in the state of New York who purchased or leased a Class Vehicle.

**North Carolina Class**

All persons and entities in the state of North Carolina who purchased or leased a Class Vehicle.

**North Dakota Class**

All persons and entities in the state of North Dakota who purchased or leased a Class Vehicle.

**Ohio Class**

All persons and entities in the state of Ohio who purchased or leased a Class Vehicle.

**Oklahoma Class**

All persons and entities in the state of Oklahoma who purchased or leased a Class Vehicle.

**Oregon Class**

All persons and entities in the state of Oregon who purchased or leased a Class Vehicle.

**Pennsylvania Class**

All persons and entities in the state of Pennsylvania who purchased or leased a Class Vehicle.

**Rhode Island Class**

All persons and entities in the state of Rhode Island who purchased or leased a Class Vehicle.

**South Carolina Class**

All persons and entities in the state of South Carolina who purchased or leased a Class Vehicle.

**South Dakota Class**

All persons and entities in the state of South Dakota who purchased or leased a Class Vehicle.

**Tennessee State Class**

All persons and entities in the state of Tennessee who purchased or leased a Class Vehicle.

**Texas Class**

All persons and entities in the state of Texas who purchased or leased a Class Vehicle.

**Utah Class**

All persons and entities in the state of Utah who purchased or leased a Class Vehicle.

**Vermont Class**

All persons and entities in the state of Vermont who purchased or leased a Class Vehicle.

**Virginia Class**

All persons and entities in the state of Virginia who purchased or leased a Class Vehicle.

**Washington Class**

All persons and entities in the state of Washington who purchased or leased a Class Vehicle.

**West Virginia Class**

All persons and entities in the state of West Virginia who purchased or leased a Class Vehicle.

**Wisconsin Class**

All persons and entities in the state of Wisconsin who purchased or leased a Class Vehicle.

**Wyoming Class**

All persons and entities in the state of Wyoming who purchased or leased a Class Vehicle.

350. Excluded from the Classes are: (A) Defendants, including any entity or division in which Defendants have a controlling interest, as well as their agents, representatives, officers, directors, employees, trustees, parents, children, heirs, assigns, and successors, and other persons or entities related to, or affiliated with Defendants; (B) the Judges to whom this case is assigned, their staff, and their immediate families; and (C) governmental entities. Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses under Rule 23(c)(5), or modified in any other way.

351. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used in individual actions alleging the same claims.

352. This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23 and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of its provisions.

**Numerosity and Ascertainability**

353. The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. There are no less than five hundred thousand members in the Nationwide Class, and at least hundreds of members in each State Class. The precise number and identities of Nationwide Class and State Class members may be

ascertained from Volkswagen's books and records and motor vehicle regulatory data. Defendants have comprehensive lists of Class Vehicle owners and lessees in their possession, and are using them to communicate in writing to the Class members. To date, approximately 580,000 vehicles identified as Class Vehicles have been sold in the United States. Accordingly, the disposition of the claims of Class members in a single action will provide substantial benefits to all parties and to the Court. Class members may be readily notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

### Typicality

354. The claims of the representative Plaintiffs are typical of the claims of the other Class members in that the representative Plaintiffs, like all Class members, purchased or leased a Class Vehicle designed, manufactured, and distributed by Volkswagen, which was equipped with a defeat device designed, manufactured and supplied by Bosch. The representative Plaintiffs, like all Class members, have been damaged by Defendants' misconduct in that they have incurred similar or identical losses relating to the Class Vehicles. Furthermore, the factual bases of Defendants' misconduct are common to all Class members and represent a common thread of misconduct resulting in injury to all Class members.

### Adequate Representation

355. Plaintiffs are members of the Nationwide and State Classes and will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained, and this Court has appointed, counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products generally, and defective automobile systems and parts specifically. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

### Predominance of Common Questions

356. There are numerous questions of law and fact common to Plaintiffs and Class members that predominate over any question affecting only individual Class members. The

answers to these common questions will advance the adjudication or resolution of the litigation as to all Class members.  These common legal and factual questions include:

a.  whether Defendants designed, manufactured, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream, of commerce in the United States;

b.  whether the Class Vehicles contained a defeat device and emitted unlawful levels of pollutants under normal operation;

c.  whether Defendants knew or should have known about the defeat device and emission levels in the Class Vehicles;

d.  whether the true nature of the Class Vehicles' performance, emissions levels, fuel economy, and the inclusion of the defeat device constitute material facts that reasonable consumers would have considered in deciding whether to purchase a Class Vehicle;

e.  whether Class members overpaid for their Class Vehicles;

f.  whether Defendants made material misrepresentations regarding the Class Vehicles.

g.  whether Defendants had a duty to disclose the true nature of the Class Vehicles to Plaintiffs and Class members;

h.  whether Defendants omitted, actively concealed and/or failed to disclose material facts about the Class Vehicles;

i.  whether Defendants concealment of the true nature of the Class Vehicles would have induced a reasonable consumer to act to their detriment by purchasing and/or leasing the Class Vehicles;

j.  whether the Class Vehicles can be made to comply with EPA and state emission standard without substantially degrading their performance and/or efficiency;

k.  whether Bosch supplied the defeat devise to Volkswagen with the knowledge that Volkswagen would use them in production of Class Vehicles;

l.  whether Bosch knew that using the defeat devices in production Class Vehicles constituted criminal activity in violation of both state and federal laws ;

m.  whether Bosch acted in concert with Volkswagen and aided and abetted Volkswagen's fraud;

n.  whether Defendants' conduct violated RICO, the MMWA, consumer protection statutes, warranty laws, and other laws as alleged herein;

o.  whether Plaintiffs and Class members are entitled to a declaratory judgment;

p.  whether Plaintiffs and Class members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction; and

q.  whether Plaintiffs and Class members are entitled to damages and other monetary relief, and, if so, in what amount.

### Superiority

357.  Defendants' scheme treated consumers as a Class to be uniformly deceived. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs and Class members have all suffered and will continue to suffer economic harm and damage as a result of Defendants' unlawful and wrongful conduct, which was directed toward Class members and the public as a whole, rather than specifically or uniquely against any individual Class members.

358.  Defendants have acted in a uniform manner with respect to the Plaintiffs and Class members. Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class members' claims, it is likely that only a few Class members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class members will continue to incur damages, and Defendants' misconduct will continue without effective remedy.

359.  Class treatment in this Court, as a court with original jurisdiction over the Class claims and as an MDL Transferee Court under 28 U.S. § 1407, will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication by providing common answers to the common questions of knowledge, conduct, duty and breach, that predominate in this action.

360.    Classwide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the class, and inconsistent adjudications with respect to the Defendants' liability would establish incompatible standards and substantially impair or impede the ability of Class members to protect their interests.  Classwide relief and Court supervision under Rule 23 assures fair, consistent, and equitable treatment and protection of all Class members, and uniformity and consistency in Defendants' discharge of their duties to perform corrective action regarding the Class Vehicles.

## CLAIMS FOR RELIEF

### FEDERAL CLAIMS

**FEDERAL COUNT I:**
**Violation of 18 U.S.C. § 1962(c)-(d)**
**The Racketeer Influenced And Corrupt Organizations Act ("RICO")**

361.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

362.    Plaintiffs bring this Count on behalf of the Nationwide Class against the following Defendants:  VW AG, Audi AG, Porsche AG, Winterkorn, Müller, Horn, Stadler, and Bosch (inclusively, for purpose of this Count, the "RICO Defendants").

363.    Volkswagen conducts its business – legitimate and illegitimate – through various affiliates and subsidiaries, each of which is a separate legal entity.  Bosch also conducts its business, both legitimate and illegitimate, through hundreds of subsidiaries and affiliates.[99]  At all relevant times, the RICO Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

364.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. §1962(c).

---

[99] http://www.bosch.com/en/com/bosch_group/business_sectors_divisions/business_sectors_divisions_2.php (last visited on Feb. 20, 2016).

365. Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. *See* 18 U.S.C. §1962(d).

366. For many years, the RICO Defendants aggressively sought to increase their sales of the Class Vehicles in an effort to bolster their revenues, augment profits, and increase their market share of the diesel vehicle market. Finding it impossible to achieve their ambitious goals lawfully, however, the RICO Defendants resorted to cheating through their fraudulent scheme and conspiracy. The illegal scheme was hatched overseas by VW AG, Audi AG, and/or Porsche AG ("the German Volkswagen Defendants"), brought to U.S. shores by and through the vehicles of VW America, Audi America, and Porsche America (collectively, the "American Volkswagen Defendants"), and executed with the complicity of Bosch. In particular, the RICO Defendants, along with other entities and individuals, were employed by or associated with, and conducted or participated in the affairs of, one or several RICO enterprises (defined below and referred to collectively as the "Defeat Device RICO Enterprise"), whose purpose was to deceive regulators and the driving public into believing that the Class Vehicles were compliant with emission standards, "clean," and "environmentally friendly" so as to increase revenues and minimize losses from the design, manufacture, distribution and sale of the Class Vehicles and the defeat devices installed therein. As a direct result of their fraudulent scheme and common course of conduct, Defendants were able to extract revenues of billions of dollars from Plaintiffs and the Class. As explained in detail below, the RICO Defendants' misconduct violated Sections 1962(c) and (d).

### A. Description of the Defeat Device RICO Enterprise

367. In an effort to expand its global reach, market share, and standardized marketing and sales in the U.S., VW AG, a publicly-traded German company, formed VW America, a separate New Jersey company, which is headquartered in Virginia. VW America is not publicly traded and thus has no SEC reporting obligations, but it does have reporting obligations, protections and responsibilities unique to the State of New Jersey. VW AG also controls Audi AG and Porsche AG which, in turn, formed separate U.S. subsidiaries that are not publicly traded – Audi America and Porsche America, respectively – to market and sell the Class Vehicles

throughout the U.S. At all relevant times, VW AG maintained tight control over the design, manufacture, and testing of the Class Vehicles.

368. At all relevant times, the RICO Defendants, along with other individuals and entities, including unknown third parties involved in the design, manufacture, testing, and sale of the Class Vehicles, operated an association-in-fact enterprise, which was formed for the purpose of fraudulently obtaining COCs from the EPA (and EOs from CARB) in order to import and sell the Class Vehicles containing the defeat device throughout the U.S., and through which they conducted a pattern of racketeering activity under 18 U.S.C. §1961(4).

369. Alternatively, each of the American Volkswagen Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. §1961(4), through which the RICO Defendants conducted their pattern of racketeering activity in the U.S. Specifically, VW America is the entity through which Volkswagen applied for, and obtained, the EPA COCs for the VW- and Audi-branded Class Vehicles with material misrepresentations and omissions about their specifications in order to introduce them into the U.S. stream of commerce. Similarly, Porsche America is the entity through which Volkswagen applied for, and obtained, the EPA COCs for the Porsche-branded Class Vehicles with material misrepresentations and omissions about their specifications in order to introduce them into the U.S. stream of commerce. And, on information and belief, the German Volkswagen Defendants and Individual Volkswagen Defendants (Winterkorn, Müller, Horn, and Stadler) used each of the American Volkswagen Defendants to distribute and sell the illegal Class Vehicles throughout the U.S. Finally, Bosch participated, either directly or indirectly, in the conduct of the enterprise's affairs by customizing and supplying components for the defeat devices. The American Volkswagen Defendants' separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the RICO Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "Defeat Device RICO Enterprise."

370. At all relevant times, the Defeat Device RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. §1961(4), as legal entities, as

1   well as individuals and legal entities associated-in-fact for the common purpose of engaging in

2   RICO Defendants' profit-making scheme.

3       371.    On information and belief, the association-in-fact Defeat Device RICO Enterprise

4   consisted of the following entities and individuals.

5                   **1.    The Volkswagen Entity Defendants**

6       372.    Each Volkswagen Entity Defendant is a distinct legal entity, but they are all

7   controlled (directly or indirectly) by Defendant VW AG.[100] Specifically, Audi AG is a majority-

8   owned subsidiary of VW AG.  Audi America is also a subsidiary of VW AG.  Porsche AG is a

9   wholly-owned subsidiary of VW AG, and Porsche America is, in turn, a wholly-owned subsidiary

10  of Porsche AG.

11      373.    As noted previously, in 2007, the Volkswagen RICO Defendants made it their

12  mission to become the dominant automotive manufacturing conglomerate in the world.  At the

13  time they articulated this goal, however, Volkswagen was struggling to retain its foothold in the

14  U.S. market.  The strategy of wooing customers with premium products was not paying off, and

15  VW America's costly plant in Chattanooga, Tennessee was "woefully underutilized."[101]

16      374.    In response to these obstacles, VW AG and its leader at the time, Defendant

17  Winterkorn, set in motion an ambitious plan to triple Volkswagen's sales in the U.S.  The

18  linchpin of this strategy was increasing sales of "diesel-powered cars . . . [and] promising high

19  mileage and low emissions without sacrificing performance."[102]

20      375.    Additionally, to achieve their lofty sales goals, the Volkswagen RICO Defendants

21  made a business-driven decision to move away from the original selective catalytic reduction

22  ("SCR") emission control systems they had previously used in their vehicles and focused instead

23  on a less expensive and easier to maintain lean $NO_X$ trap system.[103]  Critically, however, the $NO_X$

---

[100] http://www.volkswagenag.com/content/vwcorp/content/en/brands_and_products.html;
http://www.volkswagenag.com/content/vwcorp/info_center/en/publications/2015/03/Y_2014_e.bin.html/binarystorageitem/file/GB+2014_e.pdf

[101]  Anton Watts. VW Drama: *Why Piech Wants Winterkorn Out-and What the Future May Hold*. Car and Driver (Apr. 16, 2015).

[102]  Danny Kim, Aaron Danny Hakim, Aaron Kessler, and Jack Ewing, "*As Volkswagen Pushed to Be No. 1, Ambitions Fueled a Scandal*," New York Times (Sept. 26, 2015).

[103]  The term "NOx trap" refers to any device whose purpose is to reduce the oxides of nitrogen.

*Footnote continued on next page*

                              CONSOLIDATED CONSUMER CLASS
                                                        COMPLAINT MDL 2672 CRB (JSC)

1  trap technology that the Volkswagen RICO Defendants implemented could not effectively reduce

2  the Class Vehicles' toxic $NO_X$ emissions to lawful levels under normal operating conditions.

3      376.    Accordingly, working with the other members of the Defeat Device RICO

4  Enterprise, including Bosch, the Volkswagen RICO Defendants devised a scheme to illegally

5  circumvent the U.S.'s stringent emissions standards by incorporating a "defeat device" into the

6  Class Vehicles' Electronic Diesel Control Units.  Employing this technology, Defendants

7  fraudulently obtained COCs (and EOs) for the Class Vehicles even though they emit unlawful

8  levels of toxic pollutants into the atmosphere during normal operating conditions.[104]

9      377.    Moreover, in order to profit from the scheme and increase their sales according to

10  plan, the Volkswagen RICO Defendants falsely marketed the Class Vehicles as not only

11  compliant but "*clean*" and "*environmentally friendly*" vehicles.[105]

12      378.    In sum, as part of their effort to become the dominant automotive manufacturing

13  conglomerate in the world, the Volkswagen RICO Defendants controlled and directed an eight-

14  year-long enterprise with the common purpose of deceiving regulators and the public through lies

15  and deception to increase their market shares and profits, and minimize losses.

16      **2.    The Volkswagen Entity Defendants' Directors, Officers, and Engineers**

17      379.    Volkswagen's leaders—including the Individual Defendants (Winterkorn, Müller,

18  Horn, and Stadler) and their unnamed co-conspirators—Ulrich Hackenberg ("Hackenberg"),

19  Frank Tuch ("Tuch"), Wolfgang Hatz ("Hatz"), Scott Keogh ("Keogh"), and Detlev von Platen

20  ("von Platen")—played pivotal roles in the Defeat Device RICO Enterprise's unlawful scheme,

21  common course of conduct, and conspiracy.

22

23  *Footnote continued from previous page*
*See* https://en.wikipedia.org/wiki/NOx_adsorber.  However, the term here is used as a shorthand,
24  informal reference to the emissions control system developed by the Volkswagen Defendants as
an alternative to the SCR system.  Unlike the NOx trap, SCR systems require vehicles to carry an
onboard tank of an exhaust additive, often urea crystals in mineralized water, that has to be
25  refilled every 10,000 miles at a cost of around $300.  Additionally, SCR systems also increase the
vehicles' initial purchase price.
26  [104] *Id*.

27  [105] *See* Jad Mouawad & Sydney Ember, *VW's Pitch to Americans Relied on Fun and Fantasy*,
New York Times (Sept. 27, 2015), http://nytimes.com/2015/09/28/business/media/vws-pitch-to-
28  americans-relied-on-fun-and-fantasy.html?ref=business.

### a. Martin Winterkorn

380.     Defendant Winterkorn took the helm of VW AG in 2007 and was the chief architect of Volkswagen's strategy to triple sales in the U.S. market by relying more heavily on "clean" diesel vehicles.[106]

381.     Winterkorn quickly realized his strategy could not succeed if Volkswagen relied on the same SCR technology that they had used up until then.  Winterkorn instead advocated an alternative course of action that enabled Volkswagen to cut costs and offer the public lower-priced diesel vehicles.  To that end, he appointed Hackenberg and Hatz, two former Audi engineers and unnamed co-conspiring members of the Defeat Device RICO Enterprise, to lead the research and development facet of the "clean" diesel project.

382.     Nevertheless, despite Hackenberg and Hatz's efforts, the technological hurdles were too formidable, and a lawful alternative could not apparently be found.  Although Defendant Winterkorn was routinely apprised of these obvious technical setbacks, he continued to pursue the aggressive cost-cutting, profit driven plan he had originally envisioned.  In so doing, he set into motion the fraudulent scheme to defraud regulators and consumers.

383.     On information and belief, Winterkorn knew or recklessly disregarded that the Class Vehicles utilized defeat devices in order to evade federal and state emission standards.

### b. Matthias Müller

384.     Defendant Müller has worked at Volkswagen for nearly his entire life, starting as an Audi toolmaker and climbing the corporate ladder to become VW's Head of Product Management in 2007, and later, became the CEO of Porsche AG in October 2010.  As CEO of Porsche AG, Müller was a trusted "longtime lieutenant of Mr. Winterkorn,"[107] and grew sales and profits at Porsche AG dramatically.

385.     During Müller's reign over Porsche AG, he oversaw the release of the Porsche Cayenne Diesels discovered by the EPA to be equipped with defeat devices.

---

[106] *Volkswagen AG, TDI: U.S. Market Success*, Clean Diesel Delivers (March, 2015), http://cleandieseldelivers.com/media/Douglas-Skorupski-VWoA_DTF_March2015.pdf.
[107] Danny Hakim and Jack Ewing, *Matthias Müller, in the Driver's Seat at Volkswagen*, New York Times (Oct. 1, 2015), http://www.nytimes.com/2015/10/02/business/international/matthias-muller-in-the-drivers-seat-at-volkswagen.html.

386.     Further, after the revelation of Volkswagen's fraud, Müller was appointed CEO of VW AG on September 25, 2015. He is suspected to be a protégé of VW AG's former CEO Ferdinand Piëch, whom some blame for propagating the Volkswagen culture that ultimately led to the defeat device conspiracy alleged herein.[108]

387.     On information and belief, Müller knew or recklessly disregarded that the Class Vehicles utilized defeat devices to evade federal and state vehicle emissions standards.

### c.     Michael Horn

388.     On January 1, 2014, Defendant Horn became CEO and President of VW America after 23 years working at Volkswagen in various sales leadership positions. Defendant Horn was tasked with continuing Winterkorn's aggressive ambitions to reach 800,000 in U.S. sales by 2018. As part of his position, Defendant Horn oversaw VW America emissions labs, regulatory compliance efforts, and development of new vehicles.

389.     As alleged above, Defendant Horn admitted to Volkswagen's intentional use of defeat devices to overcome state and federal regulation.

390.     Moreover, Defendant Horn admittedly knew about Volkswagen's use of defeat devices at least as early as 2014, and also knew (and concealed) the existence of defeat devices in Class Vehicles when Volkswagen initiated a recall in December 2014 to purportedly update emission control software in the Class Vehicles without notifying regulators, or the Class, about the use of the illegal defeat devices.

### d.     Rupert Stadler

391.     In 1990, Defendant Stadler joined Audi AG, assuming various roles in Audi and VW as he ascended the ranks at Volkswagen. On January 1, 2010, he was appointed CEO of Audi AG, which he remains to present day. As the CEO of Audi AG, Stadler was tasked with implementing Winterkorn's lofty growth goals, as well as overseeing unnamed co-conspirators Hatz and Hackenberg's development of the "clean" diesel engines in Audi vehicles.

---

[108] Victor Luckerson, *5 things to know about Volkswagen's new CEO Matthias Müller*, Fortune (Sept. 25, 2015), http://fortune.com/2015/09/25/volkswagen-ceo-muller/.

392.     Though presumed by many to be Winterkorn's heir apparent, the revelation of Volkswagen's emissions and Audi's extensive involvement in the conspiracy caused Stadler to be passed over for the position of VW AG CEO in favor of Matthias Müller.[109]

393.     On information and belief, Stadler knew or recklessly disregarded that the Class Vehicles utilized defeat devices in order to evade federal and state vehicle emissions standards.

### e.     Scott Keogh

394.     Since June 2012, unnamed co-conspirator Keogh has served as President of Audi America, after a six period as the Chief Marketing Officer of Audi America. His primary missions was "rallying the company's internal and external constituencies to focus on Audi goals for further expansion in the U.S. market,"[110] as promulgated by Winterkorn.

395.     After the revelation of Volkswagen's fraud, Keogh publicly apologized for Audi America's involvement in the defeat device scandal[111] and agreed to return "Green Car of the Year" awards,[112] though he continues to tout the future of Audi diesel vehicles in the U.S.[113]

396.     On information and belief, Keogh knew or recklessly disregarded that the Class Vehicles utilized defeat devices in order to evade federal and state vehicle emissions standards.

### f.     Detlev von Platen

397.     In 1997, unnamed co-conspirator von Platen joined Porsche AG, managing the Porsche brand in France. Over the following decade, von Platen climbed the ranks at Porsche to assume the position of President and CEO of Porsche America on April 1, 2008.

---

[109] *Audi CEO Rupert Stadler to continue with his post*, THE ECONOMIC TIMES (Sept. 25, 2015), http://auto.economictimes.indiatimes.com/news/industry/audi-ceo-rupert-stadler-to-continue-with-his-post/49103955.

[110] *Scott Keogh*, AUDI USA (last visited Feb. 27, 2016), https://www.audiusa.com/newsroom/corporate/executive-team/scott-keogh.

[111] Michael Walker, *L.A. Auto Show: VW, Porsche, Audi Execs Address Diesel Emissions Scandal*, THE HOLLYWOOD REPORTER (Nov. 20, 2015), http://www.hollywoodreporter.com/news/vw-porsche-audi-execs-apologize-842581.

[112] Jackie Wattles, *Volkswagen stripped of two 'Green Car of the Year' titles*, CNN MONEY (Oct. 1, 2015), http://money.cnn.com/2015/10/01/news/companies/volkswagen-green-car-of-year-awards-rescinded/.

[113] Mike Duff, *Audi Chief Thinks Diesel Has a Future in the U.S.*, CAR AND DRIVER (Jan. 19, 2016), http://blog.caranddriver.com/audi-chief-thinks-diesel-has-a-future-in-the-u-s/.

398.    As President and CEO of Porsche America, von Platen was charged with implementing Winterkorn's vision for the Porsche brand in the U.S., as he had oversight "responsibility for the importation and distribution of Porsche cars in North America."[114]  Porsche America was expected to contribute to Winterkorn's lofty sales goals, bolstered by the introduction of "clean" diesel engines for the Porsche Cayenne and increasing sales from 26,035 to a record 47,007 sales in 2014.

399.    On November 1, 2015, as part of a management shakeup in the wake of Volkswagen's diesel scandal, von Platen left his position at Porsche America to become a member of the Executive Board for Sales and Marketing at Porsche AG.

400.    On information and belief, von Platen knew or recklessly disregarded that the Class Vehicles utilized defeat devices in order to evade federal and state vehicle emissions standards.

### g.    Ulrich Hackenberg

401.    On February 1, 2007, unnamed co-conspirator Hackenberg was appointed to Volkswagen's Brand Board of Development.  In this capacity, he was responsible for the technical development of all of the Volkswagen Defendant's brands.[115]

402.    On July 1, 2013, Hackenberg was appointed to the Board of Management of Audi AG and made responsible for its Technical Development department.  In this capacity, Hackenberg spearheaded the development of Audi's TDI "CleanDiesel" engines, which ultimately contained the illegal defeat devices at issue in this case.  As he explained in a press release, Hackenberg's strategy for Audi's technical development included the following:

> [P]ushing forward with development in . . . our TDI engines in the USA -- our clean diesel offensive is bearing substantial fruit. In China, too, we are already introducing the first clean diesel models and watching developments there very closely. We also expect a great deal from g-tron technology, the most sustainable type of gas drive.[116]

---

[114] *President and Chief Executive Officer - PCNA, Inc.*, PORSCHE CARS NORTH AMERICA (last visited Feb. 7, 2016), http://press.porsche.com/more_about/executives/pcna/platen.php.
[115] https://www.audiusa.com/newsroom/corporate/audi-ag-board-of-management/ulrich-hackenberg
[116] "Gentlemen Start Your Engines," http://audi-encounter.com/magazine/ technology/01-

*Footnote continued on next page*

1  Hackenberg's statement is illustrative of the Volkswagen Defendants' efforts to falsely bill Class

2  Vehicles as "clean," "environmentally friendly," and "fuel efficient" when the opposite was true.

3  ### h. Frank Tuch

4  403.    In 2010, unnamed co-conspirator Tuch was appointed head of quality control

5  across the various Volkswagen Defendants' brands.  Defendant Winterkorn hoped Tuch would

6  bring the Volkswagen Defendants "forward in the USA."[117]  Volkswagen's in-house magazine

7  reported that Tuch and Winterkorn worked closely to honor that pledge, meeting "every Monday

8  to discuss quality issues, often taking test drives in vehicles manufactured by the company."  In

9  his role as head of quality assurance, Tuch was also intimately familiar with Volkswagen, Audi,

10  and Porsche engines and transmissions. Among his duties was "the development and production

11  of components such as engines, transmissions, seats and suspension parts" for small, compact,

12  midsize, and full size product lines, including all the Class Vehicles.[118]

13  404.    Significantly, Tuch also oversaw "36 laboratory locations throughout the world in

14  terms of training and auditing and also finds staff to fill laboratory manager positions," including

15  the Volkswagen Defendants' laboratories in the United States, which were primarily responsible

16  for emissions testing of the Class Vehicles.[119]

17  405.    On information and belief, Tuch knew or recklessly disregarded that the Class

18  Vehicles used defeat devices to evade federal and state vehicle emissions standards.

19  ### i. Wolfgang Hatz

20  406.    Unnamed co-conspirator Hatz directed engine development for the Porsche, Audi

21  and Volkswagen brands.  In this role, he supervised the development of the engines and

22  transmissions for the Class Vehicles issue and had intimate knowledge of their technical details.

23

24  *Footnote continued from previous page*
2015/126-gentlemen-start-your-engines (2014).

25  [117] http://www.marketwatch.com/story/volkswagen-suspends-quality-control-chief-2015-10-20-84855452

26  [118] Jack Ewing. "Volkswagen Suspends 5th Executive in Emissions Scandal," The New York

27  Times (Oct. 20, 2015).
[119] http://www.volkswagen-

28  larriere.de/en/what_we_do/corporate_divisions/quality_assurance.html

407.    On information and belief, Hatz knew or recklessly disregarded that the Class Vehicles used defeat devices to evade federal and state vehicle emissions standards.

### 3.    The Bosch Defendants

408.    As explained above, Bosch developed EDC Unit 17, the emissions control system and software that provided the basis for the defeat device, and sold it to Volkswagen.[120]

409.    Defendant Denner has been Chairman and CEO of Bosch since July 2012, after decades of working in Bosch's Engine ECU Development division, managing the development and sale of automotive engine computers, such as the EDC units that Volkswagen used as defeat devices.  Denner fostered Bosch's relationship with key corporate partners, such as Volkswagen, which brought in billions of dollars in annual revenue for Bosch.

410.    Using EDC Unit 17, Bosch worked with Volkswagen to develop and implement a specific and unique set of software algorithms to surreptitiously evade emissions regulations.  To that end, Bosch and Volkswagen equipped EDC Unit 17 in the Class Vehicles with unique software code to detect when it was undergoing emissions testing, as described above.[121]

411.    Bosch was well aware that the EDC Unit 17 could be, and indeed was, used by Volkswagen to cheat on emissions testing.  Indeed, Bosch, seeking to absolve itself of liability, sent a letter to Volkswagen AG in 2007, stating that Class Vehicles *could not be lawfully operated* if the emissions controls were disabled.[122]

412.    Indeed, notwithstanding their knowledge that the Class Vehicles *could not be lawfully operated* if the emissions controls were disabled, Bosch, cementing their position as a leading supplier of diesel emissions equipment, continued to sell approximately *eleven million* EDC Unit 17s to Volkswagen over an eight year period.[123]

413.    Bosch's continued sale of EDC Unit 17 to the Volkswagen Defendants is remarkable considering that:

---

[120] http://www.bosch-presse.de/presseforum/details.htm?txtID=7421&tk_id=108
[121] http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater-software
[122] http://jalopnik.com/feds-are-now-investigating-volkswagen-supplier-bosch-ov-1743624448
[123] http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater-software

a. Bosch manufactured, tested and sold EDC Unit 17 emissions control systems to various other diesel vehicle manufacturers, *none* of which was modified with a defeat device software that allowed vehicles to automatically activate or disable the emissions control systems depending on operating conditions.[124] Bosch could not plausibly believe that the "defeat device" on the Class Vehicles was necessary for any legitimate purpose;

b. None of the varied emissions control systems that Bosch tested, manufactured and sold to other diesel vehicle manufacturers relied on the same $NO_X$ trap technology that Volkswagen was utilizing. Indeed, Volkswagen's competitors, including reputable and technologically-sophisticated brands like Mercedes-Benz and BMW, continued using the more expensive SCR technology;[125] and

c. Absent extraordinary engineering breakthroughs, the EDC Unit 17 presented a practical impossibility.

414. Bosch (including Denner) knew or recklessly disregarded that Volkswagen had *not* actually engineered a revolutionary alternative to the SCR systems that enabled the Class Vehicles to maintain their performance, fuel efficiency, reduce emissions, *and* reduce costs.[126] Instead, Bosch knew or recklessly disregarded that the Class Vehicles utilized Bosh's component parts as defeat devices in order to evade federal and state vehicle emissions standards.

**B.** **The Defeat Device RICO Enterprise Sought to Increase Defendants' Profits and Revenues**

415. The Defeat Device RICO Enterprise began approximately in 2007, with VW AG's decision to produce the illegal Class Vehicles. The Defeat Device RICO Enterprise continued without interruption for eight years, as Volkswagen continued to install Bosch EDC Unit 17's in

---

[124] http://www.inautonews.com/vw-diesel-scandal-bosch-software-cleared-of-wrongdoings-by-epa

[125] http://www.nytimes.com/2015/09/27/business/as-vw-pushed-to-be-no-1-ambitions-fueled-a-scandal.html?_r=0

[126] Sophisticated entities like the Bosch Defendants were also likely aware that Wolfgang Bernhard, a former high-level executive with Mercedes-Benz with a reputation for implementing cost-cutting measures, had been removed from the "clean" diesel project at Volkswagen AG shortly before the Volkswagen Defendants abandoned the SCR systems and inexplicably developed what was purportedly an even cheaper technology. *See*, http://www.foxbusiness.com/features/2015/10/05/vw-emissions-probe-zeroes-in-on-two-engineers.html

1    the Class Vehicles.  It was not until September 2015 that the Defeat Device RICO Enterprise

2    began to unravel, when U.S. regulators finally uncovered the fraudulent scheme.

3         416.    At all relevant times, the Defeat Device RICO Enterprise:  (a) had an existence

4    separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of

5    racketeering in which the RICO Defendants engaged; and (c) was an ongoing and continuing

6    organization consisting of legal entities, including the Volkswagen Defendants, their network of

7    dealerships, the Individual Defendants, Bosch, and other entities and individuals associated for

8    the common purpose of designing, manufacturing, distributing, testing, and selling the Class

9    Vehicles to Plaintiffs and the Nationwide Class through fraudulent COCs, false emissions tests,

10   deceptive and misleading sales tactics and materials, and deriving profits and revenues from those

11   activities.  Each member of the Defeat Device RICO Enterprise shared in the bounty generated by

12   the enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the

13   scheme to defraud Class members nationwide.[127]

14        417.    The Defeat Device RICO Enterprise functioned by selling vehicles to the

15   consuming public.  Many of these products are legitimate, including vehicles that do not contain

16   defeat devices.  However, the RICO Defendants and their co-conspirators, through their illegal

17   Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to

18   increase revenue for Defendants and the other entities and individuals associated-in-fact with the

19   Enterprise's activities through the illegal scheme to sell the Class Vehicles.

20        418.    The Defeat Device RICO Enterprise engaged in, and its activities affected

21   interstate and foreign commerce, because it involved commercial activities across state

22   boundaries, such as the marketing, promotion, advertisement and sale or lease of the Class

23   Vehicles throughout the country, and the receipt of monies from the sale of the same.

24        419.    Within the Defeat Device RICO Enterprise, there was a common communication

25   network by which co-conspirators shared information on a regular basis.  The Defeat Device

26   ───────────────
     [127] The Volkswagen Defendants sold more Class Vehicles by utilizing an emissions control
27   system that was cheaper than SCRs, all the while charging consumers a premium for purportedly
     "clean," "environmentally friendly" and "fuel efficient" Class Vehicles.  Bosch, in turn, sold
     more EDC Units because the Volkswagen Defendants manufactured and sold more Class
28   Vehicles.

RICO Enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Class Vehicles to the general public nationwide.

420.     Each participant in the Defeat Device RICO Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities.  Through the Defeat Device RICO Enterprise, the RICO Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

421.     The RICO Defendants participated in the operation and management of the Defeat Device RICO Enterprise by directing its affairs, as described herein.  While the RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

422.     The Volkswagen RICO Defendants exerted substantial control over the Defeat Device RICO Enterprise, and participated in the affairs of the Defeat Device RICO Enterprise by:

    a.  transitioning their diesel vehicle design away from an effective SCR emissions control system and adopt instead the ineffective $NO_X$ trap technology that generates high levels of toxic pollutants;

    b.  designing the Class Vehicles with defeat devices;

    c.  failing to correct or disable the defeat devices when warned;

    d.  manufacturing, distributing, and selling the Class Vehicles that emitted greater pollution than allowable under the applicable regulations;

    e.  misrepresenting and omitting (or causing such misrepresentations and omissions to be made) vehicle specifications on COC applications;

    f.  introducing the Class Vehicles into the stream of U.S. commerce without a valid EPA COC;

    g.  concealing the existence of the defeat devices and the unlawfully high emissions from regulators and the public;

h.  persisting in the manufacturing, distribution, and sale of the Class Vehicles even after questions were raised about the emissions testing and discrepancies concerning the same;

i.  misleading government regulators as to the nature of the defeat devices and the defects in the Class Vehicles;

j.  misleading the driving public as to the nature of the defeat devices and the defects in the Class Vehicles;

k.  designing and distributing marketing materials that misrepresented and concealed the defect in the vehicles;

l.  otherwise misrepresenting or concealing the defective nature of the Class Vehicles from the public and regulators;

m. illegally selling and/or distributing the Class Vehicles;

n.  collecting revenues and profits from the sale of such products; and

o.  ensuring that the other RICO Defendants and unnamed co-conspirators complied with the fraudulent scheme.

423.   Bosch also participated in, operated and/or directed the Defeat Device RICO Enterprise.  Bosch participated in the fraudulent scheme by manufacturing, installing, testing, modifying, and supplying the EDC Unit 17 to include a "defeat device" in the Class Vehicles.  Additionally, Bosch continuously cooperated with the Volkswagen Defendants to ensure EDC Unit 17 was fully integrated into the Class Vehicles.  Finally, Bosch participated by concealing the truth about the Class Vehicles and collecting the revenues and profits from the same.

424.   Without the RICO Defendants' willing participation, including Bosch's provision of the component parts for the defeat devices contained in the Class Vehicles, the Defeat Device RICO Enterprise's scheme and common course of conduct would not have been successful.

425.   The RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the Defendants' and others' hands.

## C.    **Mail and Wire Fraud**

426.    To carry out, or attempt to carry out the scheme to defraud, the RICO Defendants, each of whom is a person associated-in-fact with the Defeat Device RICO Enterprise, did knowingly conduct or participate, directly or indirectly, in the conduct of the affairs of the Defeat Device RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. §1341 (mail fraud) and §1343 (wire fraud).

427.    Specifically, the RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§1341 and 1343), within the past ten years. The multiple acts of racketeering activity which the RICO Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the Defeat Device RICO Enterprise. The RICO Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

428.    The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions.

429.    In devising and executing the illegal scheme, the RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs and the Nationwide Class or to obtain money from Plaintiffs and the Nationwide Class by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the illegal scheme, the RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

CONSOLIDATED CONSUMER CLASS
COMPLAINT MDL 2672 CRB (JSC)

430. The RICO Defendants' predicate acts of racketeering (18 U.S.C. §1961(1)) include, but are not limited to:

    a.    <u>Mail Fraud</u>:  The RICO Defendants violated 18 U.S.C. §1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the Class Vehicles by means of false pretenses, misrepresentations, promises, and omissions.

    b.    <u>Wire Fraud</u>:  The RICO Defendants violated 18 U.S.C. §1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

431. The RICO Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

    a.   the Class Vehicles themselves;

    b.   component parts for the defeat devices;

    c.   essential hardware for the Class Vehicles;

    d.   falsified emission tests;

    e.   fraudulent applications for EPA COCs and CARB EOs;

    f.   fraudulently-obtained EPA COCs and CARB EOs;

    g.   vehicle registrations and plates as a result of the fraudulently-obtained EPA COCs and CARB EOs;

    h.   documents and communications that facilitated the falsified emission tests;

    i.   false or misleading communications intended to lull the public and regulators from discovering the defeat devices and/or other auxiliary devices;

    j.   sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of the Class Vehicles;

k.  documents intended to facilitate the manufacture and sale of the Class Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

l.  documents to process and receive payment for the Class Vehicles by unsuspecting Class members, including invoices and receipts;

m.  payments to Bosch;

n.  millions of dollars in compensation to the Individual Defendants;

o.  deposits of proceeds; and

p.  other documents and things, including electronic communications.

432.  Based on information and belief, the RICO Defendants (or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of the Class Vehicles and related documents by mail or a private carrier affecting interstate commerce, including the items described above and alleged below:

| From | To | Date | Description |
|------|-----|------|-------------|
| VW America Manufacturing Plant | South Bay VW | October 2011 | Shipment of Volkswagen Jetta TDI Class Vehicles. |
| CARB | VW America | July 2014 | Mailed EO for 2015 Class Vehicles based on fraudulent application. |
| Massachusetts Department of Transportation | Gregory Gotta | August 2014 | Mailed certificate of registration for 2014 Porsche Cayenne Diesel based on false emission test due to concealed defeat device. |
| California Department of Motor Vehicles | Phillip Clark | December 2014 | Mailed registration card for 2014 Volkswagen Touareg TDI based on false emission test due to concealed defeat device. |
| California Department of Motor Vehicles | Caroline Hoag | December 2014 | Mailed renewed registration for 2011 Jetta SportWagen TDI based on false emission test due to concealed defeat device. |
| Washington State Department of Licensing | Dan Clements | February 2015 | Mailed registration certificate for 2012 Volkswagen Touareg TDI based on false emission test due to concealed defeat device. |
| California Department of Motor Vehicles | Susan Shalit | January 2015 | Mailed registration card for 2015 Volkswagen Golf TDI based on false emission test due to concealed defeat device. |

| From | To | Date | Description |
|------|-----|------|-------------|
| California Department of Motor Vehicles | Lena Brook | March 2015 | Mailed validated vehicle registration for 2015 Audi Q5 TDI based on false emission test due to concealed defeat device. |

433. Based on information and belief, the RICO Defendants (or their agents), for the purpose of executing the illegal scheme, transmitted (or caused to be transmitted) in interstate commerce by means of wire communications, certain writings, signs, signals and sounds, including those items described above and alleged below:

| From | To | Date | Description |
|------|-----|------|-------------|
| Pignataro Volkswagen, Washington | American Express, North Carolina | April 2012 | Credit card transaction in the amount of $5,000 for down payment on 2012 VW Touareg by Dan Clements. |
| CARB, California | VW America, Virginia | May 2014 | Email communications concerning WVU study. |
| VW America, Michigan | EPA, Michigan; CARB, California | May 2012 | Misleading application(s) for COC and EO for 2013 VW Passat TDI. |
| VW America, Michigan | EPA, Michigan; CARB, California | January 2013 | Misleading application(s) for COCs and EOs for 2014 Audi A6, A7, A8L, A8, and Q5. |
| Porsche America, Atlanta | EPA, Michigan; CARB, California | April 2013 | Misleading application(s) for COC and EO for 2014 Porsche Cayenne Diesel. |
| VW America, Virginia | CARB, California | October 2014 | Misleading communications about discrepancies identified in WVU study. |
| Audi of Lynnbrook, New York | American Express, North Carolina | December 2014 | Credit card transaction in the amount of $2,586.45 for down payment on lease of 2015 Audi A3 by Kevin and Elizabeth Bedard. |
| VW America, Virginia | EPA, District of Columbia | December 2014 | Misleading communications about software patch for the Class Vehicles without revealing fact of the defeat device. |

434. The RICO Defendants also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities. Specifically, the American Volkswagen Defendants, under the direction and control of the German Volkswagen and Individual Volkswagen Defendants, made misrepresentations about the Class Vehicles on their

1    websites, YouTube, and through ads online, all of which were intended to mislead regulators and

2    the public about the fuel efficiency, emissions standards, and other performance metrics.

3          435.    The RICO Defendants also communicated by U.S. mail, by interstate facsimile,

4    and by interstate electronic mail with various other affiliates, regional offices, divisions,

5    dealerships and other third-party entities in furtherance of the scheme.

6          436.    The mail and wire transmissions described herein were made in furtherance of

7    Defendants' scheme and common course of conduct to deceive regulators and consumers and lure

8    consumers into purchasing the Class Vehicles, which Defendants knew or recklessly disregarded

9    as emitting illegal amounts of pollution, despite their advertising campaign that the Class

10   Vehicles were "clean" diesel cars.

11         437.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate

12   wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants'

13   books and records.  However, Plaintiffs have described the types of, and in some instances,

14   occasions on which the predicate acts of mail and/or wire fraud occurred.  They include

15   thousands of communications to perpetuate and maintain the scheme, including the things and

16   documents described in the preceding paragraphs.

17         438.    The RICO Defendants have not undertaken the practices described herein in

18   isolation, but as part of a common scheme and conspiracy.  In violation of 18 U.S.C. §1962(d),

19   the RICO Defendants conspired to violate 18 U.S.C. §1962(c), as described herein.  Various other

20   persons, firms and corporations, including third-party entities and individuals not named as

21   defendants in this Complaint, have participated as co-conspirators with the RICO Defendants in

22   these offenses and have performed acts in furtherance of the conspiracy to increase or maintain

23   revenues, increase market share, and/or minimize losses for the Defendants and their unnamed

24   co-conspirators throughout the illegal scheme and common course of conduct.

25         439.    The RICO Defendants aided and abetted others in the violations of the above laws,

26   thereby rendering them indictable as principals in the 18 U.S.C. §§1341 and 1343 offenses.

27         440.    To achieve their common goals, the RICO Defendants hid from the general public

28   the unlawfulness and emission dangers of the Class Vehicles and obfuscated the true nature of the

defect even after regulators raised concerns. The RICO Defendants suppressed and/or ignored warnings from third parties, whistleblowers, and governmental entities about the discrepancies in emissions testing and the defeat devices present in the Class Vehicles.

441. The RICO Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling the Class Vehicles (and the defeat devices contained therein).

442. Indeed, for the conspiracy to succeed, each of the RICO Defendants and their co-conspirators had to agree to implement and use the similar devices and fraudulent tactics against their intended targets.

443. The RICO Defendants knew and intended that government regulators, as well as Plaintiffs and Class members, would rely on the material misrepresentations and omissions made by them and the American Volkswagen Defendants about the Class Vehicles. The RICO Defendants knew and intended that consumers would incur costs as a result. As fully alleged herein, Plaintiffs, along with hundreds of thousands of other consumers, relied upon Defendants' representations and omissions that were made or caused by them. Plaintiffs' reliance is made obvious by the fact that they purchased illegal vehicles that never should have been introduced into the U.S. stream of commerce and whose worth has now plummeted since the scheme was revealed. In addition, the EPA and regulators relied on the misrepresentations and material omissions made or caused to be made by the RICO Defendants; otherwise Volkswagen could not have obtained valid COCs and EOs to sell the Class Vehicles.

444. As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiffs and Class members based on their misrepresentations and omissions, while providing Class Vehicles that were worth significantly less than the purchase price paid. The predicate acts

also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

445.     The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants at the expense of Plaintiffs and Class members. The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the Defeat Device RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and Class members' funds and avoiding the expenses associated with remediating the Class Vehicles.

446.     During the design, manufacture, testing, marketing and sale of the Class Vehicles, the RICO Defendants shared technical, marketing, and financial information that revealed the existence of the defeat devices contained therein. Nevertheless, the RICO Defendants shared and disseminated information that deliberately misrepresented the Class Vehicles as legal, "clean," "environmentally friendly," and "fuel efficient."

447.     By reason of, and as a result of the conduct of the RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

        a.  Purchase or lease of an illegal, defective Class Vehicle;

        b.  Overpayment for a Class Vehicle, in that Plaintiffs and Class members believed they were paying for a vehicle that met certain emission and fuel efficiency standards and obtained a vehicle that was anything but;

        c.  The value of the Class Vehicles has diminished, thus reducing their resale value;

        d.  Other out-of-pocket and loss-of-use expenses;

        e.  Payment for alternative transportation; and

        f.  Loss of employment due to lack of transportation.

448.     The RICO Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs and Class members, and Plaintiffs and

Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**FEDERAL COUNT II:**
**Violation of 15 U.S.C. §§ 2301, *et seq*.,**
**The Magnuson-Moss Warranty Act ("MMWA")**

449. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

450. Plaintiffs bring this Count on behalf of the Nationwide Class and against the following Defendants: VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

451. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

452. Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

453. The VW Entity Defendants are "supplier[s]" and "warrantor[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

454. The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

455. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

456. The VW Entity Defendants' provided Plaintiffs and the Nationwide Class with the following two express warranties, which are covered under 15 U.S.C. § 2301(6):

    a.    **Manufacturer's Warranty**—This written warranty provides "bumper-to-bumper" limited express warranty coverage for a minimum of 3 years or 36,000 miles, whichever comes first. The warranty covers emissions related repairs.

    b.    **Federal Emissions Warranty**—Consistent with federal law, the Volkswagen Defendants provided a "performance warranty" and a "design and defect warranty." In the event that a vehicle fails an emissions test, these warranties cover the repair and replacement of: all emission control and emission-related parts for two years or 24,000 miles (whichever comes first); and specified major emission

control components, including catalytic converters, electronic emissions control unit or computer and on–board emissions diagnostic device or computer for 8 years or 80,000 miles (whichever comes first).

457.    The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

458.    The VW Entity Defendants breached these warranties as described in more detail above.  Without limitation, the Class Vehicles share a common design defect in that they emit more pollutants than (a) is allowable under the applicable regulations and (b) the  VW Entity Defendants repeatedly represented were emitted to their customers, the public, and regulators. The VW Entity Defendants have admitted that the Class Vehicles are illegal, defective and of lesser quality than advertised.

459.    Plaintiffs and members of the Nationwide Class have had sufficient direct dealings with the VW Entity Defendants or their agents (dealerships) to establish privity of contract between the VW Entity Defendants, on the one hand, and Plaintiffs and other Class members, on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between the VW Entity Defendants or their dealers, and of their implied warranties.  The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers only.

460.    Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile.  At the time of sale or lease of each Class Vehicle, the Volkswagen Defendants knew of the misrepresentations concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design.  Indeed, the VW Entity Defendants' quest for remedies has been unsuccessful to date.[128]  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiffs or Class members

---

[128] http://arstechnica.com/cars/2016/01/california-regulator-rejects-volkswagens-plan-to-fix-2-0l-diesels-epa-agrees/

resort to an informal dispute resolution procedure and/or afford the VW Entity Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

461.     Plaintiffs and the other Nationwide Class members would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to the VW Entity Defendants.  Because the VW Entity Defendants are refusing to acknowledge any revocation of acceptance and have not immediately returned any payments made, Plaintiffs and the Nationwide Class have not re-accepted their Class Vehicles by retaining them.

462.     The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.  Plaintiffs, individually and on behalf of the Nationwide Class, seek all damages permitted by law, including diminution in the value of their vehicles, in an amount to be proven at trial

## COMMON LAW CLAIMS

### COMMON LAW COUNT I:
### FRAUD

463.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

464.     Plaintiffs bring this Count on behalf of the Nationwide Class or, in the alternative, on behalf of the State Classes, against all Defendants.

465.     As alleged extensively above, Volkswagen intentionally concealed and suppressed material facts concerning the illegality and quality of the Class Vehicles in order to defraud and mislead both regulators and the Class about the true nature of the Class Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the defeat devices in the Class Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.  During normal operation and use, the Class Vehicles emitted grossly larger quantities of noxious pollutants and contaminants, up to 40 times the legal limit. The result was precisely what Volkswagen had intended—the Class

Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to hundreds of thousands of unwitting American consumers.

466.    Volkswagen valued its profits over the trust that Plaintiffs and other Class members entrusted to it.  As one customer, Priya Shah, put it: "It's just a blatant disregard and intentional manipulation of the system.  That's just a whole other level of not only lying to the government, but also lying to your consumer.  People buy diesel cars from Volkswagen because they feel they are clean diesel cars."[129]  In the words of Ms. Shah, which no doubt reflect the sentiments of other Class members:  "I don't want to be spewing noxious gases into the environment."[130]

467.    Necessarily, Volkswagen also took steps to ensure that its employees and co-conspirators like Bosch, did not reveal the details of its scheme to regulators or consumers, including Plaintiffs and Class members.  Volkswagen did so to falsely assure purchasers and lessors of its vehicles, including previously-owned vehicles, that Volkswagen is a reputable manufacturer that complies with applicable law, including federal and state clean air laws and emission regulations, and that its vehicles likewise comply with applicable laws and regulations.

468.    Volkswagen's false representations and omissions were material to consumers, as they concerned both the legality and core marketing features of the Class Vehicles.  As Volkswagen well knew, Plaintiffs and other Class members highly valued that the vehicles they were purchasing or leasing were "clean" diesel cars, and they paid a premium accordingly.

469.    Plaintiffs and Class members reasonably relied on Defendants' deception, and Defendants intended that they would so rely.  Plaintiffs and Class members had no way of discerning that Defendants were, in fact, deceiving them because the defeat devices were extremely sophisticated technology and could not be discerned by regulators, much less consumers.  Plaintiffs and Class members did not, and could not, unravel Defendants' scheme on

---

[129] http://www.latimes.com/business/la-fi-vw-reaction-20150918-htmlstory.html (last visited on Feb. 22, 2016).

[130] *Id.*

1    their own.  In fact, it took years before the engineering community—specifically a research team

2    at WVU's Center for Alternative Fuels, Engines & Emissions—detected the discrepancy of the

3    emissions spewed from the Class Vehicles using sophisticated, expensive equipment and

4    applying decades of combined experience.  And even then, Volkswagen continued to conceal its

5    fraud until the EPA and CARB applied their collective expertise and leverage.

6        470.    Defendants' devious scheme to design and install defeat device software in the

7    Class Vehicles for the specific purpose of circumventing U.S. law, and then concealing their

8    fraudulent scheme through seven model years, reveals a corporate culture that emphasized sales

9    and profits over integrity.  Further, it demonstrates a callous disregard for not only the rule of law

10   but also public health and Volkswagen's customers, including Plaintiffs and Class members.

11       471.    Defendants had a duty to disclose the defeat devices to regulators and the driving

12   public.  That includes Bosch, who had a duty to disclose the scheme, given its knowledge of and

13   complicity in, the design and customization of the defeat devices for the Class Vehicles.

14       472.    Volkswagen hatched the deceptive scheme and knew that its customers, including

15   Plaintiffs and Class members, did not know about (and could not reasonably discover) its scheme.

16   Volkswagen not only concealed the illegal defeat devices, which posed a safety harm, but went

17   further to make affirmative misrepresentations about the quality of the Class Vehicles as

18   "CleanDiesel" vehicles.  Having "opened its mouth" to claim the Class Vehicles were "clean,"

19   Volkswagen had the duty to come clean about its dirty defeat devices – but it failed to do so.

20       473.    Volkswagen actively concealed the defeat devices and actual emission levels of

21   the Class Vehicles to pad its profits and avoid the perception that the Class Vehicles did not

22   comply with federal and state laws governing clean air and emissions.  Volkswagen engaged in

23   this fraudulent concealment at the expense of Plaintiffs and Class members.

24       474.    Plaintiffs and Class members were not aware of the concealed and misrepresented

25   material facts referenced above, and they would not have acted as they did had regulators or the

26   driving public know the truth—Volkswagen would not have been able to obtain COCs or EOs for

27   the sale of the Class Vehicles and as a consequence Plaintiffs and Class members would never

28   have purchased or leased the Class Vehicles in the first place.

475.    As a direct and proximate result of Defendants' fraudulent scheme, Plaintiffs and Class members sustained damages.  They own or lease Class Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, on information and belief, the Class Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

476.    Defendants are liable to Plaintiffs and Class members for damages in an amount to be proven at trial.  Moreover, because Defendants acted wantonly, maliciously, oppressively, recklessly, deliberately, and with intent to defraud Plaintiffs and Class members for the purpose of enriching themselves at Plaintiffs' and Class members' detriment, Defendants' conduct warrants substantial punitive and exemplary damages in an amount to be determined at trial.

### COMMON LAW COUNT II:
### BREACH OF CONTRACT

477.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

478.    Plaintiffs bring this Count on behalf of the Nationwide Class and, in the alternative, on behalf of the State Classes against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

479.    Every purchase or lease of a Class Vehicle from an authorized dealer of the VW Entity Defendants constitutes a contract between the VW Entity Defendants and the purchaser or lessee.  The VW Entity Defendants materially breached these contracts by selling or leasing Plaintiffs and Class members defective, non-compliant Class Vehicles and by misrepresenting or failing to disclose the existence of the "clean" diesel engine system's defeat device, rendering the Vehicles substantially less valuable than the vehicles that the VW Entity Defendants advertised and promised to deliver to Plaintiffs and Class members.

480.    The VW Entity Defendants' misrepresentations and omissions alleged herein, including the VW Entity Defendants' misrepresentation of the clean diesel system and failure to disclose the existence of the defeat, caused Plaintiffs and the other Class members to enter into

their agreements to purchase or lease their Class Vehicles. Absent those misrepresentations and omissions, Plaintiffs and Class members would not have purchased or leased their Class Vehicles, would not have purchased or leased their Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the "clean" diesel engine system and which were not marketed as including such a system. Accordingly, Plaintiffs and Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

481.     The VW Entity Defendants also breached their implied covenant of good faith and fair dealing under the laws of all 50 States and the District of Columbia. By delivering a vehicle that contained defeat device software and thus exceeded, during normal use, federal and state emission limits—and the VW Entity Defendants' advertised and promised emission levels—by up to 40 times, the VW Entity Defendants' blatantly violated Plaintiffs' and Class members' fair and reasonable expectations under their respective contracts. In addition, the VW Entity Defendants' misrepresentations and omissions violated Volkswagen's implied duty to deal honestly, and within reasonable commercial standards of fair dealing, with Plaintiffs and Class members.

482.     As a direct and proximate result of the VW Entity Defendants' breach, Plaintiffs and Class members have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COMMON LAW COUNT III:
## UNJUST ENRICHMENT

483.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

484.     Plaintiffs bring this Count on behalf of the Nationwide Class and, in the alternative, on behalf of the State Classes against all Defendants.

485. Defendants have benefitted from selling and leasing at an unjust profit defective Class Vehicles whose value was artificially inflated by Volkswagen's concealment of the "defeat device," and Plaintiffs and Class members have overpaid for the vehicles.

486. Defendants have received and retained unjust benefits from the Plaintiffs and Class members, and inequity has resulted.

487. It is inequitable and unconscionable for Defendants to retain these benefits.

488. Because Volkswagen concealed its fraud and deception, Plaintiffs and Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from Defendants' misconduct.

489. Defendants knowingly accepted the unjust benefits of its fraudulent conduct.

490. As a result of Defendants' misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and Class members, in an amount to be proven at trial.

## STATE LAW CLAIMS

## ALABAMA

### ALABAMA COUNT I:
### VIOLATION OF ALABAMA DECEPTIVE TRADE PRACTICES ACT
### (ALA. CODE § 8-19-1, *ET SEQ.*)

491. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

492. Plaintiffs McIntosh, Rutland, and Scharein (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Alabama Class against all Defendants.

493. Plaintiffs and the Alabama Class are "consumers" within the meaning of Ala. Code § 8-19-3(2).

494. Plaintiffs, the Alabama Class, and Defendants are "persons" within the meaning of Ala. Code § 8-19-3(5).

495. The Class Vehicles are "goods" within the meaning of Ala. Code § 8-19-3(3).

496. Defendants were and are engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

- 222 -

497.    The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5.

498.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Volkswagen accomplished this by installing defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs and Alabama Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and Alabama Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

499.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

500.    Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that

1    Volkswagen would use and had used the Bosch technology as an emission defeat device, and in

2    fact helped it do so.  Without Bosch's complicity and silence, Volkswagen could not have

3    perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions

4    themselves constitute fraudulent, deceptive, and unfair practices.

5         501.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that

6    violated the Alabama DTPA by installing, failing to disclose and actively concealing the illegal

7    defeat device and the true cleanliness and performance of the "clean" diesel engine system, by

8    marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and

9    by presenting itself as a reputable manufacturer that valued environmental cleanliness and

10   efficiency, and that stood behind its vehicles after they were sold.

11        502.    The Clean Air Act and EPA regulations require that automobiles limit their

12   emissions output to specified levels.  These laws are intended for the protection of public health

13   and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

14   Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By

15   installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

16   for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the

17   Alabama DTPA.

18        503.    Defendants knew the true nature of its "clean" diesel engine system for at least six

19   years, but concealed all of that information until recently.  Volkswagen also knew that it valued

20   profits over environmental cleanliness, efficiency, and compliance with the law, and that it was

21   manufacturing, selling, and distributing vehicles throughout the United States that did not comply

22   with EPA regulations. Volkswagen concealed this information as well.

23        504.    Volkswagen intentionally and knowingly misrepresented material facts regarding

24   the Class Vehicles with intent to mislead Plaintiffs and the Alabama Class.

25        505.    Volkswagen knew or should have known that its conduct violated the Alabama

26   DTPA.

27

28

506.     Defendants owed Plaintiffs and the Alabama Class a duty to disclose illegality, public health and safety risks, the true environmental cleanliness and efficiency of the Class Vehicles and the devaluing of safety at Volkswagen, because Volkswagen:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.    made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

507.     Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed.  The value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

508.     Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Alabama Class.

509.     Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

510.     Plaintiffs and the Alabama Class suffered ascertainable loss an actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Alabama Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to

1  sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of

2  their vehicles, as well as lost or diminished use.

3      511.    Defendants had an ongoing duty to all Volkswagen customers to refrain from

4  unfair and deceptive practices under the Alabama DTPA. All owners of Class Vehicles suffered

5  ascertainable loss in the form of the diminished value of their vehicles as a result of

6  Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's

7  business.

8      512.    Defendants' violations present a continuing risk to Plaintiffs as well as to the

9  general public. Defendants' unlawful acts and practices complained of herein affect the public

10  interest.

11      513.    As a direct and proximate result of Defendants' violations of the Alabama DTPA,

12  Plaintiffs and the Alabama Class have suffered injury-in-fact and/or actual damage.

13      514.    Pursuant to Ala. Code § 8-19-10, Plaintiffs and the Alabama Class seek monetary

14  relief against Defendants measured as the greater of (a) actual damages in an amount to be

15  determined at trial and (b) statutory damages in the amount of $100 for each Plaintiff and each

16  Alabama Class member.

17      515.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or

18  deceptive practices, attorneys' fees, and any other just and proper relief available under the Ala.

19  Code § 8-19-1, *et seq*.

20      516.    On September 30, 2015, certain Plaintiffs sent a letter complying with Ala. Code

21  § 8-19-10(e). Because Volkswagen failed to remedy its unlawful conduct within the requisite

22  time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Alabama Class are

23  entitled.

24                          **ALABAMA COUNT II:**
                    **BREACH OF EXPRESS WARRANTY**
25                  **(ALA. CODE §§ 7-2-313 AND 7-2A-210)**

26      517.    Plaintiffs reallege and incorporate by reference all preceding allegations as though

27  fully set forth herein.

28

518.     Plaintiffs bring this Count on behalf of the Alabama Class against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

519.     The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and "sellers" of motor vehicles under § 7-2-103(1)(d).

520.     With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Ala. Code. § 7-2A-103(1)(p).

521.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

522.     In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

523.     The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

524.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

525.     The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an

1   express warranty for their vehicles through a Federal Emission Control System Defect Warranty.

2   The Design and Defect Warranty required by the EPA covers repair of emission control or

3   emission related parts which fail to function or function improperly because of a defect in

4   materials or workmanship.  This warranty provides protection for two years or 24,000 miles,

5   whichever comes first, or, for the major emission control components, for eight years or 80,000

6   miles, whichever comes first.

7        526.    As manufacturers of light-duty vehicles, the VW Entity Defendants were required

8   to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

9        527.    The VW Entity Defendants' warranties formed a basis of the bargain that was

10   reached when Plaintiffs and other Alabama Class members purchased or leased their Class

11   Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

12        528.    Plaintiffs and the Alabama Class members experienced defects within the warranty

13   period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs

14   and Alabama Class members that the Class Vehicles were intentionally designed and

15   manufactured to be out of compliance with applicable state and federal emissions laws, and failed

16   to fix the defective emission components free of charge.

17        529.    The VW Entity Defendants breached the express warranty promising to repair and

18   correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW

19   Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the

20   Class Vehicles' materials and workmanship defects.

21        530.    Affording the VW Entity Defendants a reasonable opportunity to cure their breach

22   of written warranties would be unnecessary and futile here.  For example, the Frequently Asked

23   Questions ("FAQ") section of VW's informational website states:

24               **How soon will the remedy be available, and how am I going to
   be compensated for this?**

25   

26               We cannot offer a firm date now because we need to work on a
   remedy and review it with the government.  We are proceeding as
   quickly as possible.

27   

28   

                     - 228 -                   CONSOLIDATED CONSUMER CLASS
                                                   COMPLAINT MDL 2672 CRB (JSC)

531.    In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

532.    Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

533.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Alabama Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

534.    Accordingly, recovery by Plaintiffs and the other Alabama Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Alabama Class members, seek all remedies as allowed by law.

535.    Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs and the other Alabama Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

536.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited

remedy within a reasonable time, and any limitation on Plaintiffs' and the other Alabama Class members' remedies would be insufficient to make Plaintiffs and the other Alabama Class members whole.

537.    Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Alabama Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Alabama Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

538.    The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

539.    As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Alabama Class members have been damaged in an amount to be determined at trial.

### ALABAMA COUNT III:
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (ALA. CODE §§ 7-2-314 AND 7-2A-212)

540.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

541.    Plaintiffs bring this Count on behalf of the Alabama Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

542.    The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and "sellers" of motor vehicles under § 7-2-103(1)(d).

543.    With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Ala. Code. § 7-2A-103(1)(p).

- 230 -

544. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

545. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ala. Code §§ 7-2-314 and 7-2A-212.

546. These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

547. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

548. As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Alabama Class members have been damaged in an amount to be proven at trial.

## ALASKA

### ALASKA COUNT I:
### VIOLATION OF THE ALASKA UNFAIR TRADE
### PRACTICES AND CONSUMER PROTECTION ACT
### (ALASKA STAT. § 45.50.471, *ET SEQ*.)

549. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

550. Plaintiff Hill (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Alaska Class against all Defendants.

551. The Alaska Unfair Trade Practices And Consumer Protection Act ("Alaska CPA") declares unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including: "(4) representing that goods or services have sponsorship,

1    approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a

2    person has a sponsorship, approval, status, affiliation, or connection that the person does not

3    have;" "(6) representing that goods or services are of a particular standard, quality, or grade, or

4    that goods are of a particular style or model, if they are of another;" "(8) advertising goods or

5    services with intent not to sell them as advertised;" or  "(12) using or employing deception, fraud,

6    false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or

7    omitting a material fact with intent that others rely upon the concealment, suppression or

8    omission in connection with the sale or advertisement of goods or services whether or not a

9    person has in fact been misled, deceived or damaged."  Alaska Stat. § 45.50.471.

10       552.    In the course of their business, Defendants concealed and suppressed material facts

11   concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device

12   software in the Class Vehicles that caused the vehicles to operate in a low emission test mode

13   only during emissions testing.  During normal operations, the Class Vehicles would emit grossly

14   larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The

15   result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of

16   deliberately induced false readings.  Plaintiffs and Alaska Class members had no way of

17   discerning that Volkswagen's representations were false and misleading because Volkswagen's

18   defeat device software was extremely sophisticated technology.  Plaintiffs and Alaska Class

19   members did not and could not unravel Volkswagen's deception on their own.  In fact, it took

20   years before the academic engineering community—specifically a research team at WVU's

21   Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using

22   sophisticated, expensive equipment and applying decades of combined experience.

23       553.    Defendants thus violated the Act by, at minimum, representing that the Class

24   Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing

25   that the Class Vehicles are of a particular standard and quality when they are not; advertising the

26   Class Vehicles with the intent not to sell them as advertised; and omitting material facts in

27   describing the Class Vehicles.

28

554.     Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's unfair and deceptive conduct, as alleged herein.  Bosch knew or should have known that Volkswagen would use and had used the Bosch technology as an emission defeat device, and in fact helped it do so.  Without Bosch's complicity and silence, Volkswagen could not have perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions themselves constitute fraudulent, deceptive, and unfair practices.

555.     Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Alaska CPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

556.     The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Alaska CPA.

557.     Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

558.     Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Alaska Class.

559.     Volkswagen knew or should have known that its conduct violated the Alaska CPA.

560.     Volkswagen owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true environmental cleanliness and efficiency of the Class Vehicles and the devaluing of safety at Volkswagen, because Volkswagen:

    a.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.     intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.     made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

561.     Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

562.     Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Alaska Class.

563.     Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

564.     Plaintiffs and the Alaska Class suffered ascertainable and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Alaska Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—

would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

565.    Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Alaska CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

566.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

567.    As a direct and proximate result of Defendants' violations of the Alaska CPA, Plaintiffs and the Alaska Class have suffered injury-in-fact and/or actual damage.

568.    Pursuant to Alaska Stat. Ann. § 45.50. 531, Plaintiffs and the Alaska Class seek monetary relief against Defendants measured as the greater of (a) three times the actual damages in an amount to be determined at trial or (b) $500 for each Plaintiff and each Alaska Class member.

569.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices pursuant to Alaska Stat. § 45.50. 535, attorneys' fees, and any other just and proper relief available under the Alaska CPA.

570.    On September 21, 2015, certain Plaintiffs sent a letter complying with Alaska Stat. § 45.40.535(b)(1).

### ALASKA COUNT II:
### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (ALASKA STAT. §§ 45.02.314 AND 45.12.212)

571.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

572.    Plaintiffs bring this Count on behalf of the Alaska Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

573. The VW Entity Defendants are and were at all relevant times "merchant[s]" under Alaska Stat. §§ 45.02.104(a) and 45.12.103(c)(11); and are "seller[s]" of motor vehicles under Alaska Stat. § 45.02.103(a)(4).

574. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Alaska Stat. § 45.12.103(a)(16).

575. The Class Vehicles are and were at all relevant times "goods" within the meaning of Alaska Stat. §§ 45.02.105(a) and 45.12.103(a)(8).

576. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Alaska Stat. §§ 45.02.314 and 45.12.212.

577. These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

578. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

579. As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Alaska Class members have been damaged in an amount to be proven at trial.

## ALASKA COUNT III:
### BREACH OF EXPRESS WARRANTY
### (ALASKA STAT. §§ 45.02.313 AND 45.12.210)

580. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

581.     Plaintiffs bring this Count on behalf of the Alaska Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

582.     The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Alaska Stat. §§ 45.02.104(a) and 45.12.103(c)(11); and is a "seller" of motor vehicles under Alaska Stat. § 45.02.103(a)(4).

583.     With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Alaska Stat. § 45.12.103(a)(16).

584.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Alaska Stat. §§ 45.02.105(a) and 45.12.103(a)(8).

585.     In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

586.     The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

587.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

588.     The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an

express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

589.    As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

590.    The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Alaska Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

591.    Plaintiffs and the Alaska Class members experienced defects within the warranty period. Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Alaska Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

592.    The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

593.    Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here. For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government. We are proceeding as quickly as possible.

594.    In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

595.    Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

596.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Alaska Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

597.    Accordingly, recovery by Plaintiffs and the other Alaska Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Alaska Class members, seek all remedies as allowed by law.

598.    Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs and the other Alaska Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

599.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited

remedy within a reasonable time, and any limitation on Plaintiffs' and the other Alaska Class members' remedies would be insufficient to make Plaintiffs and the other Alaska Class members whole.

600. Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Alaska Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Alaska Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

601. The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

602. As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Alaska Class members have been damaged in an amount to be determined at trial.

## ARIZONA

### ARIZONA COUNT I:
### VIOLATION OF THE CONSUMER FRAUD ACT
### (ARIZ. REV. STAT. § 44-1521, *ET SEQ.*)

603. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

604. Plaintiffs Preciado, Tarrence, and Thornton (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Arizona against all Defendants.

605. Defendants, Plaintiffs, and the Arizona Class are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

606. The Class Vehicles are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

607. The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, … misrepresentation, or concealment, suppression

1   or omission of any material fact with intent that others rely upon such concealment, suppression

2   or omission, in connection with the sale … of any merchandise whether or not any person has in

3   fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz.

4   Rev. Stat. § 44-1522(A).

5        608.    In the course of their business, Defendants concealed and suppressed material facts

6   concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device

7   software in the Class Vehicles that caused the vehicles to operate in a low emission test mode

8   only during emissions testing. During normal operations, the Class Vehicles would emit grossly

9   larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The

10  result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of

11  deliberately induced false readings. Plaintiffs and Arizona Class members had no way of

12  discerning that Volkswagen's representations were false and misleading because Volkswagen's

13  defeat device software was extremely sophisticated technology. Plaintiffs and Arizona Class

14  members did not and could not unravel Volkswagen's deception on their own. In fact, it took

15  years before the academic engineering community—specifically a research team at WVU's

16  Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using

17  sophisticated, expensive equipment and applying decades of combined experience.

18       609.    Defendants thus violated the Act by, at minimum: employing deception, deceptive

19  acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any

20  material fact with intent that others rely upon such concealment, suppression or omission, in

21  connection with the sale of Class Vehicles.

22       610.    Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's

23  unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that

24  Volkswagen would use and had used the Bosch technology as an emission defeat device, and in

25  fact helped it do so. Without Bosch's complicity and silence, Volkswagen could not have

26  perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions

27  themselves constitute fraudulent, deceptive, and unfair practices.

28

611.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Arizona CFA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

612.    The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Arizona CFA.

613.    Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

614.    Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Arizona Class.

615.    Volkswagen knew or should have known that its conduct violated the Arizona CFA.

616.    Volkswagen owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true environmental cleanliness and efficiency of the Class Vehicles and the devaluing of safety at Volkswagen, because Volkswagen:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b. intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

c. made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

617. Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

618. Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Arizona Class.

619. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

620. Plaintiffs and the Arizona Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Arizona Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

621. Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Arizona CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of

Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

622. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

623. The recalls and modifications instituted by Volkswagen have not been adequate.

624. As a direct and proximate result of Defendants' violations of the Arizona CFA, Plaintiffs and the Arizona Class have suffered injury-in-fact and/or actual damage.

625. Plaintiffs and the Arizona Class seek monetary relief against Defendants in an amount to be determined at trial. Plaintiffs and the Arizona Class also seek punitive damages because Volkswagen engaged in aggravated and outrageous conduct with an evil mind.

626. Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

**ARIZONA COUNT II:**
**BREACH OF EXPRESS WARRANTY**
**(ARIZ. REV. STAT. §§ 47-2313 AND 47-2A210)**

627. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

628. Plaintiffs bring this Count on behalf of the Arizona Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

629. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c); and is a "seller" of motor vehicles under Ariz. Rev. Stat. § 47-2103(A)(4).

630. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

631. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

- 244 -

632.     In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

633.     The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

634.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

635.     The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

636.     As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

637.     The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Arizona Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

638.     Plaintiffs and the Arizona Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Arizona Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

639.     The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

640.     Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

641.     In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

642.     Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

643.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Arizona Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

644.    Accordingly, recovery by Plaintiffs and the other Arizona Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Arizona Class members, seek all remedies as allowed by law.

645.    Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs and the other Arizona Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

646.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Arizona Class members' remedies would be insufficient to make Plaintiffs and the other Arizona Class members whole.

647.    Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Arizona Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Arizona Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

648.    The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

649.    As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Arizona Class members have been damaged in an amount to be determined at trial.

<div align="center">

**ARIZONA COUNT III:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(ARIZ. REV. STAT. §§ 47-2314 AND 47-2A212)**

</div>

650.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

651.    Plaintiffs bring this Count on behalf of the Arizona Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

652.    The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c); and is a "seller" of motor vehicles under Ariz. Rev. Stat. § 47-2103(A)(4).

653.    With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

654.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

655.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ariz. Rev. Stat. §§ 47-2314 and 47-2a212.

656.    These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal

and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

657. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

658. As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Arizona Class members have been damaged in an amount to be proven at trial.

## **ARKANSAS**

### **ARKANSAS COUNT I:**
### **VIOLATIONS OF THE DECEPTIVE TRADE PRACTICE ACT**
### **(ARK. CODE ANN. § 4-88-101, *ET SEQ.*)**

659. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

660. Plaintiff Rima (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Arkansas Class against all Defendants.

661. Defendants, Plaintiffs, and the Arkansas Class are "persons" within the meaning of Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), Ark. Code Ann. § 4-88-102(5).

662. The Class Vehicles are "goods" within the meaning of Ark. Code Ann. § 4-88-102(4).

663. The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" Ark. Code Ann. § 4-88-107(a)(10). The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods: "(1) The act, use, or employment by any person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission." Ark. Code Ann. § 4-88-108.

664.     In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.  Plaintiffs and Arkansas Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology.  Plaintiffs and Arkansas Class members did not and could not unravel Volkswagen's deception on their own.  In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

665.     Defendants thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

666.     Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's unfair and deceptive conduct, as alleged herein.  Bosch knew or should have known that Volkswagen would use and had used the Bosch technology as an emission defeat device, and in fact helped it do so.  Without Bosch's complicity and silence, Volkswagen could not have perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions themselves constitute fraudulent, deceptive, and unfair practices.

667.     Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

668.     Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Arkansas DTPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by

- 250 -

marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

669. The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Arkansas DTPA.

670. Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

671. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Arkansas Class.

672. Volkswagen knew or should have known that its conduct violated the Arkansas DTPA.

673. Volkswagen owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true environmental cleanliness and efficiency of the Class Vehicles and the devaluing of safety at Volkswagen, because Volkswagen:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.    made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while

- 251 -

purposefully withholding material facts from Plaintiffs that contradicted these representations.

674.    Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

675.    Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Arkansas Class.

676.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles

677.    Plaintiffs and the Arkansas Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Arkansas Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

678.    Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Arkansas DTPA.  All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

679.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

680.    As a direct and proximate result of Defendants' violations of the Arkansas DTPA, Plaintiffs and the Arkansas Class have suffered injury-in-fact and/or actual damage.

681.    Plaintiffs and the Arkansas Class seek monetary relief against Defendants in an amount to be determined at trial.  Plaintiffs and the Arkansas Class also seek punitive damages because Volkswagen acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice may be inferred.

682.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

<div align="center">

**ARKANSAS COUNT II:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(ARK. CODE §§ 4-2-314 AND 4-2A-212)**

</div>

683.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

684.    Plaintiffs bring this Count on behalf of the Arkansas Class against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

685.    The VW Entity Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ark. Code §§ 4-2-104(1) and 4-2A-103(3), and "seller[s]" of motor vehicles under § 4-2-103(1)(d).

686.    With respect to leases, the VW Entity Defendants are and were at all relevant times "lessor[s]" of motor vehicles under Ark. Code § 4-2A-103(1)(p).

687.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code §§ 4-2-105(1) and 4-2A-103(1)(h).

688.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ark. Code §§ 4-2-314 and 4-2A-212.

689.    These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards. The Class Vehicles have emissions systems that can be rendered inoperative and a "clean" diesel engine system that was not adequately designed, manufactured, and tested.

690.    Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

691.    As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Arkansas Class members have been damaged in an amount to be proven at trial.

### ARKANSAS COUNT III:
### BREACH OF EXPRESS WARRANTY
### (ARK. CODE ANN. §§ 4-2-313 AND 4-2A-210)

692.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

693.    Plaintiffs bring this Count on behalf of the Arkansas Class, against all Defendants.

694.    The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ark. Code §§ 4-2-104(1) and 4-2A-103(3), and "sellers" of motor vehicles under § 4-2-103(1)(d).

695.    With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Ark. Code § 4-2A-103(1)(p).

696.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code §§ 4-2-105(1) and 4-2A-103(1)(h).

697.     In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

698.     The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

699.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

700.     The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

701.     As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or performance of their "clean" diesel system.

702.    The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Arkansas Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

703.    Plaintiffs and the Arkansas Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Arkansas Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

704.    The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

705.    Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

706.    In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

707.    Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

708.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Arkansas Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

709.    Accordingly, recovery by Plaintiffs and the other Arkansas Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Arkansas Class members, seek all remedies as allowed by law.

710.    Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs and the other Arkansas Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

711.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Arkansas Class members' remedies would be insufficient to make Plaintiffs and the other Arkansas Class members whole.

712.    Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Arkansas Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Arkansas Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

713. The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

714. As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Arkansas Class members have been damaged in an amount to be determined at trial.

## CALIFORNIA

### CALIFORNIA COUNT I:
### VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT
### (CAL. CIV. CODE § 1750, ET SEQ.)

715. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

716. Plaintiffs Alba, Argento, Beaven, Brodie, Brook, Brophy and Brophy, Catherine, Burt, Clark, Dodge, Epstein, Farquar, Fohet, Hoag, Houle, Kaplan, Kosik-Westly, Krein, McGuire, Meyler, Smith, Pellegrini, Shalit, Truong, Verner, and Winternitz (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the California Class against all Defendants.

717. Defendants are "person[s]" under Cal. Civ. Code § 1761(c).

718. Plaintiffs and the California Class are "consumers," as defined by Cal. Civ. Code § 1761(d), who purchased or leased one or more Class Vehicles.

719. The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a). Volkswagen has engaged in unfair or deceptive acts or practices that violated Cal. Civ. Code § 1750, *et seq*., as described above and below by, at a minimum, representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

1      a transaction involving Class Vehicles has been supplied in accordance with a previous

2      representation when it has not.

3          720.    In the course of their business, Defendants concealed and suppressed material facts

4      concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device

5      software in the Class Vehicles that caused the vehicles to operate in a low emission test mode

6      only during emissions testing.  During normal operations, the Class Vehicles would emit grossly

7      larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The

8      result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of

9      deliberately induced false readings.  Plaintiffs and California Class members had no way of

10     discerning that Volkswagen's representations were false and misleading because Volkswagen's

11     defeat device software was extremely sophisticated technology.  Plaintiffs and California Class

12     members did not and could not unravel Volkswagen's deception on their own.  In fact, it took

13     years before the academic engineering community—specifically a research team at WVU's

14     Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using

15     sophisticated, expensive equipment and applying decades of combined experience.

16         721.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that

17     violated the CLRA by installing, failing to disclose and actively concealing the illegal defeat

18     device and the true cleanliness and performance of the "clean" diesel engine system, by

19     marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and

20     by presenting itself as a reputable manufacturer that valued environmental cleanliness and

21     efficiency, and that stood behind its vehicles after they were sold.

22         722.    Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's

23     unfair and deceptive conduct, as alleged herein.  Bosch knew or should have known that

24     Volkswagen would use and had used the Bosch technology as an emission defeat device, and in

25     fact helped it do so.  Without Bosch's complicity and silence, Volkswagen could not have

26     perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions

27     themselves constitute fraudulent, deceptive, and unfair practices.

28

723. The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the CLRA

724. Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

725. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the California Class.

726. Volkswagen knew or should have known that its conduct violated the CLRA.

727. Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.    made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

728. Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly

diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

729.    Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the California Class. A vehicle made by a reputable manufacturer of safe vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

730.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles

731.    Plaintiffs and the California ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the California Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

732.    Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the CLRA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

733.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

734.    As a direct and proximate result of Defendants' violations of the CLRA, Plaintiffs and the California Class have suffered injury-in-fact and/or actual damage.

735.    Under Cal. Civ. Code § 1780(a), Plaintiffs and the California Class seek monetary relief against Defendants measured as the diminution of the value of their vehicles caused by Volkswagen's violations of the CLRA as alleged herein.

736.    Under Cal. Civ. Code § 1780(b), Plaintiffs seek an additional award against Defendants of up to $5,000 for each California Class member who qualifies as a "senior citizen" or "disabled person" under the CLRA.  Defendants knew or should have known that their conduct was directed to one or more California Class members who are senior citizens or disabled persons.  Defendants' conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person. One or more California Class members who are senior citizens or disabled persons are substantially more vulnerable to Defendants' conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from Defendants' conduct.

737.    Plaintiffs also seek punitive damages against Defendants because it carried out reprehensible conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs and the California Class to potential cruel and unjust hardship as a result. Defendants intentionally and willfully deceived Plaintiffs on life-or-death matters, and concealed material facts that only Defendants knew.  Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages under Cal. Civ. Code § 3294.

738.    Plaintiffs further seek an order enjoining Volkswagen's unfair or deceptive acts or practices, restitution, punitive damages, costs of court, attorneys' fees under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

739.    Certain Plaintiffs have sent a letter complying with Cal. Civ. Code § 1780(b).

**CALIFORNIA COUNT II:**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)**

740.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

741.    This claim is brought on behalf of the California Class against all Defendants.

742.    California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."   Volkswagen has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

743.    Defendants' conduct, as described herein, was and is in violation of the UCL. Volkswagen's conduct violates the UCL in at least the following ways:

   a.    by knowingly and intentionally concealing from Plaintiffs and the other California Class members that the Class Vehicles suffer from a design defect while obtaining money from Plaintiffs and Class members;

   b.    by marketing Class Vehicles as possessing functional and defect-free, EPA-compliant "clean" diesel engine systems;

   c.    by purposefully installing an illegal "defeat device" in the Class Vehicles to fraudulently obtain EPA certification and cause Class Vehicles to pass emissions tests when in truth and fact they did not pass such tests;

   d.    by violating federal laws, including the Clean Air Act; and

   e.    by violating other California laws, including California laws governing vehicle emissions and emission testing requirements.

744.    Defendants' misrepresentations and omissions alleged herein caused Plaintiffs and the other California Class members to make their purchases or leases of their Class Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other California Class members would not have purchased or leased these vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain "clean" diesel engine systems that failed to comply with EPA and California emissions standards.

745.     Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that Volkswagen would use and had used the Bosch technology as an emission defeat device, and in fact helped it do so. Without Bosch's complicity and silence, Volkswagen could not have perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions themselves constitute fraudulent, deceptive, and unfair practices.

746.     Accordingly, Plaintiffs and the other California Class members have suffered injury in fact including lost money or property as a result of Defendants' misrepresentations and omissions.

747.     Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendant under Cal. Bus. & Prof. Code § 17200.

748.     Plaintiffs requests that this Court enter such orders or judgments as may be necessary to enjoin Volkswagen from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and members of the Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

## CALIFORNIA COUNT III:
## VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW
### (CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.*)

749.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

750.     Plaintiffs bring this Count on behalf of the California Class against Volkswagen.

751.     California Bus. & Prof. Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

752.     Volkswagen caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Volkswagen, to be untrue and misleading to consumers, including Plaintiffs and the other Class members.

753.     Volkswagen has violated § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

754.     Plaintiffs and the other Class members have suffered an injury in fact, including the loss of money or property, as a result of Volkswagen's unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their Class Vehicles, Plaintiffs and the other Class members relied on the misrepresentations and/or omissions of Volkswagen with respect to the safety, performance and reliability of the Class Vehicles.  Volkswagen's representations turned out not to be true because the Class Vehicles are distributed with faulty and defective "clean" diesel engine systems, rendering certain safety and emissions functions inoperative.  Had Plaintiffs and the other Class members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.  Accordingly, Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

755.     All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Volkswagen's business.  Volkswagen's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

756.     Plaintiffs, individually and on behalf of the other Class members, requests that this Court enter such orders or judgments as may be necessary to enjoin Volkswagen from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other Class members any money Volkswagen acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

**CALIFORNIA COUNT IV:**
**BREACH OF EXPRESS WARRANTY**
**(CAL. COM. CODE §§ 2313 AND 10210)**

757.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

758.     Plaintiffs bring this Count on behalf of the California Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

759.     The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

760.     With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

761.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

762.     In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

763.     The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

764.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emissions systems. Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the

1    catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

2    device or computer.

3          765.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties

4    with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an

5    express warranty for their vehicles through a Federal Emission Control System Defect Warranty.

6    The Design and Defect Warranty required by the EPA covers repair of emission control or

7    emission related parts which fail to function or function improperly because of a defect in

8    materials or workmanship.  This warranty provides protection for two years or 24,000 miles,

9    whichever comes first, or, for the major emission control components, for eight years or 80,000

10   miles, whichever comes first.

11         766.    As manufacturers of light-duty vehicles, the VW Entity Defendants were required

12   to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

13         767.    The VW Entity Defendants' warranties formed a basis of the bargain that was

14   reached when Plaintiffs and other California Class members purchased or leased their Class

15   Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

16         768.    Plaintiffs and the California Class members experienced defects within the

17   warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform

18   Plaintiffs and California Class members that the Class Vehicles were intentionally designed and

19   manufactured to be out of compliance with applicable state and federal emissions laws, and failed

20   to fix the defective emission components free of charge.

21         769.    The VW Entity Defendants breached the express warranty promising to repair and

22   correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW

23   Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the

24   Class Vehicles' materials and workmanship defects.

25         770.    Affording the VW Entity Defendants a reasonable opportunity to cure their breach

26   of written warranties would be unnecessary and futile here.  For example, the Frequently Asked

27   Questions ("FAQ") section of VW's informational website states:

28

**How soon will the remedy be available, and how am I going to be compensated for this?**

We cannot offer a firm date now because we need to work on a remedy and review it with the government. We are proceeding as quickly as possible.

771.    In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal. He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

772.    Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

773.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other California Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

774.    Accordingly, recovery by Plaintiffs and the other California Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other California Class members, seek all remedies as allowed by law.

775.    Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other California Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

776.     Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other California Class members' remedies would be insufficient to make Plaintiffs and the other California Class members whole.

777.     Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other California Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other California Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

778.     The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

779.     As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other California Class members have been damaged in an amount to be determined at trial.

**CALIFORNIA COUNT V:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(CAL. COM. CODE §§ 2314 AND 10212)**

780.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

781.     Plaintiffs bring this Count on behalf of the California Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

782.    The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

783.    With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

784.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

785.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

786.    These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

787.    The VW Entity Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

788.    As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other California Class members have been damaged in an amount to be proven at trial.

**CALIFORNIA COUNT VI:**
**VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR**
**BREACH OF EXPRESS WARRANTIES**
**(CAL. CIV. CODE §§ 1791.2 & 1793.2(d))**

789.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

790.     Plaintiffs bring this Count on behalf of the California Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

791.     Plaintiffs and the other Class members who purchased or leased the Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

792.     The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

793.     The VW Entity Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

794.     Plaintiffs and the other Class members bought/leased new motor vehicles manufactured by the VW Entity Defendants.

795.     The VW Entity Defendants made express warranties to Plaintiffs and the other Class members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

796.     In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

797.     The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

798.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty

required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

799. The EPA requires vehicle manufacturers to issue Defect Warranties with respect to their vehicles' emission systems. Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

800. As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers of their "clean" diesel vehicles.

801. The VW Entity Defendants' warranties formed the basis of the bargain that was reached when Plaintiffs and Class members purchased or leased their Class Vehicles equipped with the non-EPA complaint "clean" diesel engine system from Volkswagen.

802. Plaintiffs and Class members experienced defects within the warranty period. Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

803. Plaintiffs and class members gave the VW Entity Defendants or their authorized repair facilities opportunities to fix the defects unless only one repair attempt was possible because the vehicle was later destroyed or because the VW Entity Defendants or their authorized

1  repair facility refused to attempt the repair. The VW Entity Defendants did not promptly replace

2  or buy back the Class Vehicles of Plaintiffs and the other Class members.

3  804. As a result of the VW Entity Defendants' breach of its express warranties,

4  Plaintiffs and the other Class members received goods whose dangerous condition substantially

5  impairs their value to Plaintiffs and the other Class members. Plaintiffs and the other Class

6  members have been damaged as a result of the diminished value of the VW Entity Defendants'

7  products, the products' malfunctioning, and the nonuse of their Class Vehicles.

8  805. Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiffs and the other Class

9  members are entitled to damages and other legal and equitable relief including, at their election,

10  the purchase price of their Class Vehicles, or the overpayment or diminution in value of their

11  Class Vehicles.

12  806. Pursuant to Cal. Civ. Code § 1794, Plaintiffs and the other Class members are

13  entitled to costs and attorneys' fees.

14
15
16

**CALIFORNIA COUNT VII:**
**VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(CAL. CIV. CODE §§ 1791.1 AND 1792)**

17  807. Plaintiffs incorporate by reference all preceding allegations as though fully set

18  forth herein.

19  808. Plaintiffs bring this Count on behalf of the California Class, against VW AG, VW

20  America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW

21  Entity Defendants").

22  809. Plaintiffs and the other Class members who purchased or leased the Class Vehicles

23  in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

24  810. The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code

25  § 1791(a).

26  811. The VW Entity Defendants are "manufacturer[s]" of the Class Vehicles within the

27  meaning of Cal. Civ. Code § 1791(j).

28

812. Volkswagen impliedly warranted to Plaintiffs and the other Class members that its Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792, however, the Class Vehicles do not have the quality that a buyer would reasonably expect.

813. Cal. Civ. Code § 1791.1(a) states:

> "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:
>
> (1) Pass without objection in the trade under the contract description.
>
> (2) Are fit for the ordinary purposes for which such goods are used.
>
> (3) Are adequately contained, packaged, and labeled.
>
> (4) Conform to the promises or affirmations of fact made on the container or label.

814. The Class Vehicles would not pass without objection in the automotive trade because of the defects in the Class Vehicles' "clean" diesel engine system. Specifically, the Class Vehicles do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperable. In addition, the "clean" diesel engine system was not adequately designed, manufactures, and tested.

815. Because of the defects in the Class Vehicles' "clean" diesel engine system, they are not in merchantable condition and thus not fit for ordinary purposes.

816. The Class Vehicles are not adequately labeled because the labeling fails to disclose the defects in the Class Vehicles' "clean" diesel engine system.

817. The VW Entity Defendants breached the implied warranty of merchantability by manufacturing and selling Class Vehicles containing defects associated with the "clean" diesel engine system. Furthermore, these defects have caused Plaintiffs and the other Class members to not receive the benefit of their bargain and have caused Class Vehicles to depreciate in value.

818. As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Class members received goods whose defective condition substantially impairs their value to Plaintiffs and the other Class

members.  Plaintiffs and the other Class members have been damaged as a result of the diminished value of Volkswagen's products, the products' malfunctioning, and the nonuse of their Class Vehicles.

819.    Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and the other Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

820.    Pursuant to Cal. Civ. Code § 1794, Plaintiffs and the other Class members are entitled to costs and attorneys' fees.

<div align="center">

**CALIFORNIA COUNT VIII:**
**BREACH OF EXPRESS CALIFORNIA EMISSIONS**
**WARRANTIES**
**(Cal. Civ. Code §§ 1793.2, *et seq.*)**

</div>

821.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

822.    Plaintiffs bring this Count on behalf of the California Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

823.    Each class vehicle is covered by express California Emissions Warranties as a matter of law.  *See* Cal. Health & Safety Code § 43205; Cal. Code Regs. tit. 13, § 2037.

824.    The express California Emissions Warranties generally provide "that the vehicle or engine is…[d]esigned, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board."  *Id*.  This provision applies without any time or mileage limitation.  *See id*.

825.    The California Emissions Warranties also specifically warrant Class members against any performance failure of the emissions control system for three years or 50,000 miles, whichever occurs first, and against any defect in any emission-related part for seven years or 70,000 miles, whichever occurs first.  *See id*.

826. California law imposes express duties "on the manufacturer of consumer goods sold in this state and for which the manufacturer has made an express warranty." Cal. Civ. Code § 1793.2.

827. Among those duties, "[i]f the manufacturer or its representative in this state is unable to service or repair a new motor vehicle…to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle or promptly make restitution to the buyer" at the vehicle owner's option. *See* Cal. Civ. Code § 1793.2(d)(2).

828. Class members are excused from the requirement to "deliver nonconforming goods to the manufacturer's service and repair facility within this state" because Volkswagen is refusing to accept them and delivery of the California Vehicles "cannot reasonably be accomplished." Cal. Civ. Code § 1793.2(c).

829. This complaint is written notice of nonconformity to Volkswagen and "shall constitute return of the goods." *Id*.

830. Class members are excused from any requirement that they allow a "reasonable number of attempts" to bring California Vehicles into conformity with their California Emissions Warranties based on futility because Volkswagen admits it has no ability to do so at this time. *See In re MyFord Touch Consumer Litig*., 46 F. Supp. 3d 936, 970-71 (N.D. Cal. 2014).

831. In addition to all other damages and remedies, Class members are entitled to "recover a civil penalty of up to two times the amount of damages" for the aforementioned violation. *See* Cal. Civ. Code § 1794(e)(1). Volkswagen's existing "qualified third-party dispute resolution process" does not relieve Volkswagen from the civil penalty imposed because Volkswagen is not offering the process to Class members for resolution of these California Emissions Warranties issues and the process is not "substantially" compliant. *See* Cal. Civ. Code § 1794(e)(2); Cal. Civ. Code § 1793.22(d); 16 C.F.R. § 703.2.

# CALIFORNIA COUNT IX:
## FAILURE TO RECALL/RETROFIT

832.  446.  Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

833.  Plaintiffs bring this Count on behalf of the California State Class against Volkswagen.

834.  Volkswagen manufactured, marketed, distributed, sold, or otherwise placed into the stream of U.S. commerce the Class Vehicles, as set forth above.

835.  Volkswagen knew or reasonably should have known that the Class Vehicles were dangerous when used in a reasonably foreseeable manner, and posed an unreasonable.

836.  Volkswagen became aware that the Class Vehicles were dangerous when used in a reasonably foreseeable manner, and posed an unreasonable after the Vehicles were sold.

837.  Volkswagen failed to recall the Class Vehicles in a timely manner or warn of the dangers posed by Class Vehicles.  In addition, Volkswagens' December 2014 recall in connection with the 2.0-liter Class Vehicles in December 2014 was ineffective because it did not mitigate or otherwise resolve the illegal and excessive NOx emissions.

838.  A reasonable manufacturer in same or similar circumstances would have timely and properly recalled the Class Vehicles.

839.  Plaintiffs and Class members were harmed by Volkswagen's failure to recall the Class Vehicles properly and in a timely manner and, as a result, have suffered damages, including their out-of-pocket costs, losses, and inconvenience expended in complying with the false recall, and caused by Volkswagen's ongoing failure to properly recall, retrofit, and fully repair the Class Vehicles.

840.  Volkswagen's failure to timely recall the Class Vehicles was a substantial factor in causing the harm to Plaintiffs and Class members as alleged herein.

### COLORADO

**COLORADO COUNT I:**
**VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT**
**(Col. Rev. Stat. § 6-1-101,** *et seq.***)**

841.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

842.     Plaintiffs Doege, Reiser, and Zvyagelsky (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Colorado Class against all Defendants.

843.     Defendants are "person[s]" under § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), Col. Rev. Stat. § 6-1-101, *et seq.*

844.     Plaintiffs and Colorado Class members are "consumers" for purposes of Col. Rev. Stat § 6-1-113(1)(a) who purchased or leased one or more Class Vehicles.

845.     The Colorado CPA prohibits deceptive trade practices in the course of a person's business.  Volkswagen engaged in deceptive trade practices prohibited by the Colorado CPA, including: (1) knowingly making a false representation as to the characteristics, uses, and benefits of the Class Vehicles that had the capacity or tendency to deceive Colorado Class members; (2) representing that the Class Vehicles are of a particular standard, quality, and grade even though Volkswagen knew or should have known they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; and (4) failing to disclose material information concerning the Class Vehicles that was known to Volkswagen at the time of advertisement or sale with the intent to induce Colorado Class members to purchase, lease or retain the Class Vehicles.

846.     In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.  Plaintiffs and Colorado Class members had no way of

discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and Colorado Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

847. Defendants thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

848. Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that Volkswagen would use and had used the Bosch technology as an emission defeat device, and in fact helped it do so. Without Bosch's complicity and silence, Volkswagen could not have perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions themselves constitute fraudulent, deceptive, and unfair practices.

849. Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Colorado CPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

850. The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Colorado CPA.

851. Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

852. Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

853. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Colorado Class.

854. Volkswagen knew or should have known that its conduct violated the Colorado CPA.

855. Volkswagen owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true environmental cleanliness and efficiency of the Class Vehicles and the devaluing of safety at Volkswagen, because Volkswagen:

    a. possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b. intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c. made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

856. Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

857.   Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Colorado Class.

858.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles

859.   Plaintiffs and the Colorado Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Colorado Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

860.   Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Colorado CPA.  All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

861.   Plaintiffs and Colorado Class members risk irreparable injury as a result of Volkswagen's act and omissions in violation of the Colorado CPA, and these violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

862.   As a direct and proximate result of Defendants' violations of the Colorado CPA, Plaintiffs and the Colorado Class have suffered injury-in-fact and/or actual damage.

863.   Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiffs, individually and on behalf of the Colorado Class, seek monetary relief against Defendants measured as the greater of (a) actual

damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each Plaintiff and each Colorado Class member.

864. Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Colorado CPA.

<div align="center">

**COLORADO COUNT II:**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(Col. Rev. Stat. §§ 4-2-313 and 4-2.5-212)**

</div>

865. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

866. Plaintiffs bring this Count on behalf of the Colorado Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

867. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of motor vehicles under § 4-2-103(1)(d).

868. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

869. The Class Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

870. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Colo. Rev. Stat. § § 4-2-313 and 4-2.5-212)

871. These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

872. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

873. As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Colorado Class members have been damaged in an amount to be proven at trial.

<div align="center">

**COLORADO COUNT III:**
**BREACH OF EXPRESS WARRANTY**
**(Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-210)**

</div>

874. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

875. Plaintiffs bring this Count on behalf of the Colorado Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

876. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of motor vehicles under § 4-2-103(1)(d).

877. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

878. The Class Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

879. In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

880. The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

<div align="center">- 283 -</div>

881.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emissions systems. Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

882.     The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

883.     As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

884.     The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Colorado Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

885.     Plaintiffs and the Colorado Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Colorado Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

886.     The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

887.     Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here. For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government. We are proceeding as quickly as possible.

888.     In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal. He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

889.     Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

890.     Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Colorado Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

891.     Accordingly, recovery by Plaintiffs and the other Colorado Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and

1   Plaintiffs, individually and on behalf of the other Colorado Class members, seek all remedies as
2   allowed by law.

3        892.   Also, as alleged in more detail herein, at the time the VW Entity Defendants
4   warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were
5   inherently defective and did not conform to their warranties; further, the VW Entity Defendants
6   had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs
7   and the other Colorado Class members were therefore induced to purchase or lease the Class
8   Vehicles under false and/or fraudulent pretenses.

9        893.   Moreover, many of the injuries flowing from the Class Vehicles cannot be
10   resolved through the limited remedy of "replacements or adjustments," as many incidental and
11   consequential damages have already been suffered because of Volkswagen's fraudulent conduct
12   as alleged herein, and because of its failure and/or continued failure to provide such limited
13   remedy within a reasonable time, and any limitation on Plaintiffs' and the other Colorado Class
14   members' remedies would be insufficient to make Plaintiffs and the other Colorado Class
15   members whole.

16        894.   Finally, because of the VW Entity Defendants' breach of warranty as set forth
17   herein, Plaintiffs and the other Colorado Class members assert, as additional and/or alternative
18   remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other
19   Colorado Class members of the purchase or lease price of all Class Vehicles currently owned or
20   leased, and for such other incidental and consequential damages as allowed.

21        895.   The VW Entity Defendants were provided notice of these issues by numerous
22   complaints filed against them, including the instant Complaint, within a reasonable amount of
23   time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade
24   clean air standards.

25        896.   As a direct and proximate result of the VW Entity Defendants' breach of express
26   warranties, Plaintiff and the other Colorado Class members have been damaged in an amount to
27   be determined at trial.

28

1

## CONNECTICUT

2

### CONNECTICUT COUNT I:
### VIOLATION OF CONNECTICUT UNLAWFUL TRADE PRACTICES ACT
### (Conn. Gen. Stat. § 42-110a, *et seq.*)

3

4

897.    Plaintiffs incorporate by reference each preceding paragraph as though fully set

5

forth herein.

6

898.    Plaintiffs MacLise-Kane, Watson, and Willingham (for the purpose of this section,

7

"Plaintiffs") bring this action on behalf of themselves and the Connecticut Class against all

8

Defendants.

9

899.    The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides:  "No

10

person shall engage in unfair methods of competition and unfair or deceptive acts or practices in

11

the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).

12

900.    Defendants are "person[s]" within the meaning of Conn. Gen. Stat. § 42-110a(3).

13

Volkswagen is in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

14

901.    Volkswagen participated in deceptive trade practices that violated the Connecticut

15

UTPA as described herein.

16

902.    In the course of their business, Defendants concealed and suppressed material facts

17

concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device

18

software in the Class Vehicles that caused the vehicles to operate in a low emission test mode

19

only during emissions testing.  During normal operations, the Class Vehicles would emit grossly

20

larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The

21

result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of

22

deliberately induced false readings.  Plaintiffs and Connecticut Class members had no way of

23

discerning that Volkswagen's representations were false and misleading because Volkswagen's

24

defeat device software was extremely sophisticated technology.  Plaintiffs and Connecticut Class

25

members did not and could not unravel Volkswagen's deception on their own.  In fact, it took

26

years before the academic engineering community—specifically a research team at WVU's

27

Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using

28

sophisticated, expensive equipment and applying decades of combined experience.

903.     Defendants thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

904.     Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's unfair and deceptive conduct, as alleged herein.  Bosch knew or should have known that Volkswagen would use and had used the Bosch technology as an emission defeat device, and in fact helped it do so.  Without Bosch's complicity and silence, Volkswagen could not have perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions themselves constitute fraudulent, deceptive, and unfair practices.

905.     Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Connecticut UTPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

906.     The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Connecticut UTPA.

907.     Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

908. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Connecticut Class.

909. Volkswagen knew or should have known that its conduct violated the Connecticut UTPA.

910. Volkswagen owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true environmental cleanliness and efficiency of the Class Vehicles and the devaluing of safety at Volkswagen, because Volkswagen:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.    made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

911. Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

912. Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Connecticut Class.

913. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles

914. Plaintiffs and the Connecticut suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Connecticut Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

915. Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Connecticut UTPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

916. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

917. As a direct and proximate result of Defendants' violations of the Connecticut UTPA, Plaintiffs and the Connecticut Class have suffered injury-in-fact and/or actual damage.

918. Plaintiffs and Class members are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

919. Defendants acted with a reckless indifference to another's rights or wanton or intentional violation to another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights and safety of others.

**CONNECTICUT COUNT II:**
**BREACH OF EXPRESS WARRANTY**
**(Conn. Gen. Stat. Ann. § 42A-2-313)**

920. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

921. Plaintiffs bring this Count on behalf of the Connecticut Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

922. Volkswagen is and was at all relevant times a merchant with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

923. In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

924. The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

925. The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

926. The EPA requires vehicle manufacturers to issue Defect Warranties with respect to their vehicles' emission systems. Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

1    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

2    comes first.

3           927.    As manufacturers of light-duty vehicles, the VW Entity Defendants were required

4    to provide these warranties to purchasers of their "clean" diesel vehicles.

5           928.    The VW Entity Defendants' warranties formed the basis of the bargain that was

6    reached when Plaintiffs and other Class members purchased or leased their Class Vehicles

7    equipped with the non-EPA complaint "clean" diesel engine system from Volkswagen.

8           929.    Plaintiffs and Class members experienced defects within the warranty period.

9    Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and

10   class members that the Class Vehicles were intentionally designed and manufactured to be out of

11   compliance with applicable state and federal emissions laws, and failed to fix the defective

12   emission components free of charge.

13          930.    The VW Entity Defendants breached the express warranty promising to repair and

14   correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW

15   Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the

16   Class Vehicles' materials and workmanship defects.

17          931.    Affording the VW Entity Defendants a reasonable opportunity to cure their breach

18   of written warranties would be unnecessary and futile here.  For example, the Frequently Asked

19   Questions ("FAQ") section of VW's informational website states:

20          **How soon will the remedy be available, and how am I going to
            be compensated for this?**

21

22          We cannot offer a firm date now because we need to work on a
            remedy and review it with the government.  We are proceeding as

23          quickly as possible.

24          932.    In his Congressional testimony on October 8, 2015, Michael Horn stated that

25   Volkswagen intends to make Class Vehicles compliant with emission standards through software

26   fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum."

27   When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a

28

loss in resale values because of the scandal. He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

933.    Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

934.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

935.    Accordingly, recovery by Plaintiffs and the other Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

936.    Also, as alleged in more detail herein, at the time Volkswagen warranted and sold the Class Vehicles they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

937.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

938.    Finally, due to Volkswagen's breach of warranty as set forth herein, Plaintiffs and the other Class members assert as an additional and/or alternative remedy, as set forth in Conn. Gen. Stat. Ann. § 42a-2-711, for a revocation of acceptance of the goods, and for a return to

1   Plaintiffs and the other Class members of the purchase price of all Class Vehicles currently

2   owned or leased, and for such other incidental and consequential damages as allowed under

3   Conn. Gen. Stat. Ann. §§ 42a-2-711 and 42a-2-608.

4       939.    The VW Entity Defendants were provided notice of these issues by numerous

5   complaints filed against them, including the instant Complaint within a reasonable amount of

6   time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade

7   clean air standards.

8       940.    As a direct and proximate result of the VW Entity Defendants' breach of express

9   warranties, Plaintiff and the other Class members have been damaged in an amount to be

10  determined at trial.

11                          **CONNECTICUT COUNT III:**
                   **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
12                      **(Conn. Gen. Stat. Ann. § 42A-2-314)**

13      941.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as

14  though fully set forth herein.

15      942.    Plaintiffs bring this Count on behalf of the Connecticut Class, against VW AG,

16  VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the

17  "VW Entity Defendants").

18      943.    Volkswagen is and was at all relevant times a merchant with respect to motor

19  vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

20      944.    A warranty that the Class Vehicles were in merchantable condition is implied by

21  law in the instant transactions pursuant to Conn. Gen. Stat. Ann. § 42a-2-314.  These Class

22  Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit

23  for the ordinary purpose for which cars are used.  Specifically, the Class Vehicles are inherently

24  defective in that they do not comply with federal and state emissions standards, rendering certain

25  safety and emissions functions inoperative; and the "clean" diesel engine system was not

26  adequately designed, manufactured, and tested.

27      945.    Volkswagen was provided notice of these issues by the investigations of the EPA

28  and individual state regulators, numerous complaints filed against it including the instant

complaint, and by numerous individual letters and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after the allegations of Class Vehicle defects became public.

946. As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## **DELAWARE**

### **DELAWARE COUNT I:**
### **VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT**
### **(6 Del. Code § 2513, *et seq*.)**

947. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

948. Plaintiffs Fox and Shelton (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Delaware Class against all Defendants.

949. Defendants are "person[s]" within the meaning of 6 Del. Code § 2511(7).

950. The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby." 6 Del. Code § 2513(a).

951. In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs and Delaware Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's

1    defeat device software was extremely sophisticated technology. Plaintiffs and Delaware Class

2    members did not and could not unravel Volkswagen's deception on their own. In fact, it took

3    years before the academic engineering community—specifically a research team at WVU's

4    Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using

5    sophisticated, expensive equipment and applying decades of combined experience.

6       952.    Defendants thus violated the Act by, at minimum: by employing deception,

7    deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of

8    any material fact with intent that others rely upon such concealment, suppression or omission, in

9    connection with the sale of Class Vehicles.

10       953.    Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's

11    unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that

12    Volkswagen would use and had used the Bosch technology as an emission defeat device, and in

13    fact helped it do so. Without Bosch's complicity and silence, Volkswagen could not have

14    perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions

15    themselves constitute fraudulent, deceptive, and unfair practices.

16       954.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that

17    violated the Delaware CFA by installing, failing to disclose and actively concealing the illegal

18    defeat device and the true cleanliness and performance of the "clean" diesel engine system, by

19    marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and

20    by presenting itself as a reputable manufacturer that valued environmental cleanliness and

21    efficiency, and that stood behind its vehicles after they were sold.

22       955.    The Clean Air Act and EPA regulations require that automobiles limit their

23    emissions output to specified levels. These laws are intended for the protection of public health

24    and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

25    Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By

26    installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

27    for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the

28    Delaware CFA.

956. Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

957. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Delaware Class.

958. Volkswagen knew or should have known that its conduct violated the Delaware CFA.

959. Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

    a.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.     intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.     made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

960. Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

961. Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Delaware Class.

962. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles

963. Plaintiffs and the Delaware Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Delaware Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

964. Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Delaware CFA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

965. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

966. As a direct and proximate result of Defendants' violations of the Delaware CFA, Plaintiffs and the Delaware Class have suffered injury-in-fact and/or actual damage.

967. Plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of Defendants' unlawful conduct. *See, e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983). Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

968. Defendants engaged in gross, oppressive or aggravated conduct justifying the imposition of punitive damages.

**DELAWARE COUNT II:**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(6 Del. Code §§ 2-314 and 2A-212)**

969.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

970.    Plaintiffs bring this Count on behalf of the Delaware Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

971.    The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 6 Del. C. §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

972.    With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under 6 Del. C. § 2A-103(1)(p).

973.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 6 Del. C. §§ 2-105(1) and 2A-103(1)(h).

974.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 6 Del. C. §§ 2-314 and 2A-212)

975.    These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

976.    Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

977.     As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Delaware Class members have been damaged in an amount to be proven at trial.

### DELAWARE COUNT III:
### BREACH OF EXPRESS WARRANTY
### (6 DEL. CODE §§ 2-313 and 2A-210)

978.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

979.     Plaintiffs bring this Count on behalf of the Delaware Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

980.     The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 6 Del. C. §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

981.     With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under 6 Del. C. § 2A-103(1)(p).

982.     The Class Vehicles are and were at all relevant times "goods" within the meaning of 6 Del. C. §§ 2-105(1) and 2A-103(1)(h).

983.     In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

984.     The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

985.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

986. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

987. As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

988. The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Delaware Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

989. Plaintiffs and the Delaware Class members experienced defects within the warranty period. Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Delaware Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

990. The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

991.    Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

992.    In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

993.    Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

994.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Delaware Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

995.    Accordingly, recovery by Plaintiffs and the other Delaware Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Delaware Class members, seek all remedies as allowed by law.

996.    Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants

had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other Delaware Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

997. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Delaware Class members' remedies would be insufficient to make Plaintiffs and the other Delaware Class members whole.

998. Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Delaware Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Delaware Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

999. The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

1000. As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Delaware Class members have been damaged in an amount to be determined at trial.

## DISTRICT OF COLUMBIA

### DISTRICT OF COLUMBIA COUNT I:
### VIOLATION OF THE CONSUMER PROTECTION PROCEDURES ACT
### (D.C. Code § 28-3901, *et seq.*)

1001. Plaintiffs reallege and incorporate by reference all paragraphs as if fully set forth herein.

1002.   Plaintiff Terrell (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the District of Columbia Class against all Defendants.

1003.   Defendants are "person[s]" under the Consumer Protection Procedures Act ("District of Columbia CPPA"), D.C. Code § 28-3901(a)(1).

1004.   Class members are "consumers," as defined by D.C. Code § 28-3901(1)(2), who purchased or leased one or more Class Vehicles.

1005.   Defendants' actions as set forth herein constitute "trade practices" under D.C. Code § 28-3901.

1006.   Volkswagen participated in unfair or deceptive acts or practices that violated the District of Columbia CPPA.  By willfully failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, Volkswagen engaged in unfair or deceptive practices prohibited by the District of Columbia CPPA, D.C. Code § 28-3901, *et seq*., including: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) representing that the subject of a transaction involving the Class Vehicles has been supplied in accordance with a previous representation when it has not; (5) misrepresenting as to a material fact which has a tendency to mislead; and (6) failing to state a material fact when such failure tends to mislead.

1007.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.  Plaintiffs and District of Columbia Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology.  Plaintiffs and

District of Columbia Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

1008. Defendants thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

1009. Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that Volkswagen would use and had used the Bosch technology as an emission defeat device, and in fact helped it do so. Without Bosch's complicity and silence, Volkswagen could not have perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions themselves constitute fraudulent, deceptive, and unfair practices.

1010. Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the District of Columbia CPPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

1011. The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the District of Columbia CPPA.

1012. Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

1013. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the District of Columbia Class.

1014. Volkswagen knew or should have known that its conduct violated the District of Columbia CPPA.

1015. As alleged above, Volkswagen made material statements about the environmental cleanliness and efficiency of the Class Vehicles and the Volkswagen brand that were either false or misleading.

1016. Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.    made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1017. Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

1018.   Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the District of Columbia Class.

1019.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles

1020.   Plaintiffs and the District of Columbia Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the District of Columbia Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1021.   Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the District of Columbia CPPA.  All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

1022.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1023.   As a direct and proximate result of Defendants' violations of the District of Columbia CPPA, Plaintiffs and the District of Columbia Class have suffered injury-in-fact and/or actual damage.

CONSOLIDATED CONSUMER CLASS
COMPLAINT MDL 2672 CRB (JSC)

1024.   Plaintiff and the District of Columbia Class are entitled to recover treble damages or $1,500, whichever is greater, punitive damages, reasonable attorneys' fees, and any other relief the Court deems proper, under D.C. Code § 28-3901.

1025.   Plaintiffs seek punitive damages against Defendants because their conduct evidences malice and/or egregious conduct.  Defendants maliciously and egregiously misrepresented the environmental cleanliness and efficiency of the Class Vehicles, concealed material facts that only it knew, and repeatedly promised Class members that all vehicles were environmentally clean—all to avoid the expense and public relations nightmare of revealing its fraudulent use of the "defeat device."  Defendants' unlawful conduct constitutes malice warranting punitive damages.

<div align="center">

**DISTRICT OF COLUMBIA COUNT II:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(D.C. Code §§ 28:2-314 and 28:2A-212)**

</div>

1026.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1027.   Plaintiffs bring this Count on behalf of the District of Columbia Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1028.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under D.C. Code §§ 28:2-104(1) and 28:2A-103(a)(20), and "sellers" of motor vehicles under § 28:2-103(1)(d).

1029.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under D.C. Code § 28:2A-103(a)(16).

1030.   The Class Vehicles are and were at all relevant times "goods" within the meaning of D.C. Code §§ 28:2-105(1) and 28:2A-103(a)(8).

1031.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to D.C. Code §§ 28:2-314 and 28:2A-212.

1032. These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1033. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

1034. As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other District of Columbia Class members have been damaged in an amount to be proven at trial.

<div align="center">

**DISTRICT OF COLUMBIA COUNT III:**
**BREACH OF EXPRESS WARRANTY**
**(D.C. Code §§ 28:2-313 and 28:2A-210)**

</div>

1035. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1036. Plaintiffs bring this Count on behalf of the District of Columbia Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1037. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under D.C. Code §§ 28:2-104(1) and 28:2A-103(a)(20), and "sellers" of motor vehicles under § 28:2-103(1)(d).

1038. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under D.C. Code § 28:2A-103(a)(16).

1039. The Class Vehicles are and were at all relevant times "goods" within the meaning of D.C. Code §§ 28:2-105(1) and 28:2A-103(a)(8).

1040. In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of

three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1041.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1042.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1043.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1044.   As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1045.   The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other District of Columbia Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1046. Plaintiffs and the District of Columbia Class members experienced defects within the warranty period. Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and District of Columbia Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1047. The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1048. Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here. For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government. We are proceeding as quickly as possible.

1049. In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal. He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

1050. Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

1051. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other District of Columbia Class members whole and because the VW

1    Entity Defendants have failed and/or have refused to adequately provide the promised remedies

2    within a reasonable time.

3        1052.  Accordingly, recovery by Plaintiffs and the other District of Columbia Class

4    members is not restricted to the limited warranty promising to repair and/or correct a

5    manufacturing defect, and Plaintiffs, individually and on behalf of the other District of Columbia

6    Class members, seek all remedies as allowed by law.

7        1053.  Also, as alleged in more detail herein, at the time the VW Entity Defendants

8    warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were

9    inherently defective and did not conform to their warranties; further, the VW Entity Defendants

10   had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs

11   and the other District of Columbia Class members were therefore induced to purchase or lease the

12   Class Vehicles under false and/or fraudulent pretenses.

13       1054.  Moreover, many of the injuries flowing from the Class Vehicles cannot be

14   resolved through the limited remedy of "replacements or adjustments," as many incidental and

15   consequential damages have already been suffered because of Volkswagen's fraudulent conduct

16   as alleged herein, and because of its failure and/or continued failure to provide such limited

17   remedy within a reasonable time, and any limitation on Plaintiffs' and the other District of

18   Columbia Class members' remedies would be insufficient to make Plaintiffs and the other District

19   of Columbia Class members whole.

20       1055.  Finally, because of the VW Entity Defendants' breach of warranty as set forth

21   herein, Plaintiffs and the other District of Columbia Class members assert, as additional and/or

22   alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the

23   other District of Columbia Class members of the purchase or lease price of all Class Vehicles

24   currently owned or leased, and for such other incidental and consequential damages as allowed.

25       1056.  The VW Entity Defendants were provided notice of these issues by numerous

26   complaints filed against them, including the instant Complaint, within a reasonable amount of

27   time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade

28   clean air standards.

1057.  As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other District of Columbia Class members have been damaged in an amount to be determined at trial.

## **FLORIDA**

### **FLORIDA COUNT I:**
### **VIOLATION OF FLORIDA'S UNFAIR &**
### **DECEPTIVE TRADE PRACTICES ACT**
### **(Fla. Stat. § 501.201, *et seq*.)**

1058.  Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1059.  Plaintiffs Bell, Hiaasen and Hiaasen, and Lawhon (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Florida Class against all Defendants.

1060.  Plaintiffs are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

1061.  Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

1062.  FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" Fla. Stat. § 501.204(1).  Defendants participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.

1063.  In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles.  Defendants accomplished this by designing and installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.  Plaintiffs and Florida Class members had no way of discovering this because Volkswagen's defeat device software was extremely

1   sophisticated technology. Plaintiffs and Florida Class members did not and could not unravel

2   Volkswagen's deception on their own. In fact, it took years before the academic engineering

3   community—specifically a research team at WVU's Center for Alternative Fuels, Engines &

4   Emissions—detected the discrepancies in the emissions using sophisticated, expensive equipment

5   and applying decades of combined experience.

6       1064.   Defendants thus violated the Act by, at minimum employing deception, deceptive

7   acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any

8   material fact with intent that others rely upon such concealment, suppression or omission, in

9   connection with the sale of Class Vehicles.

10      1065.   Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's

11  unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that

12  Volkswagen would use and had used the Bosch technology as an emission defeat device, and in

13  fact helped it do so. Without Bosch's complicity and silence, Volkswagen could not have

14  perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions

15  themselves constitute fraudulent, deceptive, and unfair practices.

16      1066.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that

17  violated the FUDTPA by designing, installing, failing to disclose and actively concealing the

18  illegal defeat device, the vehicles illegality, and the true nature of the "clean" diesel engine

19  system.

20      1067.   The Clean Air Act and EPA regulations require that automobiles limit their

21  emissions output to specified levels. These laws are intended for the protection of public health

22  and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

23  Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By

24  supplying and installing illegal "defeat devices" in the Class Vehicles and by making those

25  vehicles available for purchase equipped with the defeat devices. Defendants violated federal law

26  and therefore engaged in conduct that violates the FUDTPA.

27      1068.   Defendants owed Plaintiffs a duty to disclose the illegality and public health and

28  safety risks of the Class Vehicles because they:

a. possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA and state emissions regulations;

b. intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

c. made incomplete representations about the illegality, emissions and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1069. Because Defendants fraudulently concealed the illegal defeat device and the true nature of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.

1070. Volkswagen's fraudulent and illegal use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Florida Class.

1071. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and Florida Class members, about illegality, emissions, and efficiency of the Class Vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

1072. Plaintiffs and the Florida Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. Plaintiffs and the Florida Class members who purchased or leased the Class Vehicles would not have purchased or leased the vehicles at all, or alternatively, would have paid less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1073. Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the FUDTPA. All owners of Class Vehicles suffered ascertainable loss in the form of the purchase or lease price as well as the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices.

1074. Plaintiffs and Florida Class members risk irreparable injury as a result of Defendants' acts and omissions in violation of the FUDTPA, and these violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1075. As a direct and proximate result of Defendants' violations of the FUDTPA, Plaintiffs and the Florida Class have suffered injury-in-fact and/or actual damage.

1076. Plaintiffs and the Florida Class are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

1077. Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

<div align="center">

**FLORIDA COUNT II:**
**BREACH OF EXPRESS WARRANTY**
**(F.S.A. §§ 672.313 and 680.21)**

</div>

1078. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1079. Plaintiffs bring this Count on behalf of the Florida Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1080. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and "sellers" of motor vehicles under § 672.103(1)(d).

1081. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under F.S.A. § 680.1031(1)(p).

1082. The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

1083. In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of

three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1084.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1085.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, the VW Entity Defendants also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1086.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1087.   As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1088.   The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Florida Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1089.   Plaintiffs and the Florida Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Florida Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1090.   The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1091.   Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

1092.   In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum."  When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

1093.   Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

1094.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Florida Class members whole and because the VW Entity

1    Defendants have failed and/or have refused to adequately provide the promised remedies within a

2    reasonable time.

3        1095.   Accordingly, recovery by Plaintiffs and the other Florida Class members is not

4    restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and

5    Plaintiffs, individually and on behalf of the other Florida Class members, seek all remedies as

6    allowed by law.

7        1096.   Also, as alleged in more detail herein, at the time the VW Entity Defendants

8    warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were illegal

9    and inherently defective and did not conform to their warranties; further, the VW Entity

10   Defendants had wrongfully and fraudulently concealed material facts regarding the Class

11   Vehicles.  Plaintiffs and the other Florida Class members were therefore induced to purchase or

12   lease the Class Vehicles under false and/or fraudulent pretenses.

13       1097.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

14   resolved through the limited remedy of "replacements or adjustments," as many incidental and

15   consequential damages have already been suffered because of Volkswagen's fraudulent conduct

16   as alleged herein, and because of its failure and/or continued failure to provide such limited

17   remedy within a reasonable time, and any limitation on Plaintiffs' and the other Florida Class

18   members' remedies would be insufficient to make Plaintiffs and the other Florida Class members

19   whole.

20       1098.   Finally, because of the VW Entity Defendants' breach of warranty as set forth

21   herein, Plaintiffs and the other Florida Class members assert, as additional and/or alternative

22   remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other

23   Florida Class members of the purchase or lease price of all Class Vehicles currently owned or

24   leased, and for such other incidental and consequential damages as allowed.

25       1099.   The VW Entity Defendants were provided notice of these issues by numerous

26   complaints filed against them, including the instant Complaint, within a reasonable amount of

27   time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade

28   clean air standards.

1100.   As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Florida Class members have been damaged in an amount to be determined at trial.

<div align="center">

**FLORIDA COUNT III:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(F.S.A. §§ 672.314 and 680.212)**

</div>

1101.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1102.   Plaintiffs bring this Count on behalf of the Florida Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1103.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and "sellers" of motor vehicles under § 672.103(1)(d).

1104.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under F.S.A. § 680.1031(1)(p).

1105.   The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

1106.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to F.S.A. §§ 672.314 and 680.212.

1107.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1108.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant

Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

1109. As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Florida Class members have been damaged in an amount to be proven at trial.

## GEORGIA

### GEORGIA COUNT I:
### VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT
### (Ga. Code Ann. § 10-1-390, *et seq.*)

1110. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1111. Plaintiffs Pejsa, Ray, and Terry (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Georgia Class against all Defendants.

1112. The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code. Ann. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code. Ann. § 10-1-393(b).

1113. In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs and Georgia Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and Georgia Class

1    members did not and could not unravel Volkswagen's deception on their own. In fact, it took

2    years before the academic engineering community—specifically a research team at WVU's

3    Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using

4    sophisticated, expensive equipment and applying decades of combined experience.

5        1114. Defendants thus violated the Act by, at minimum: (1) representing that the Class

6    Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2)

7    representing that the Class Vehicles are of a particular standard, quality, and grade when they are

8    not; and (3) advertising the Class Vehicles with the intent not to sell them as advertised.

9        1115. Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's

10   unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that

11   Volkswagen would use and had used the Bosch technology as an emission defeat device, and in

12   fact helped it do so. Without Bosch's complicity and silence, Volkswagen could not have

13   perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions

14   themselves constitute fraudulent, deceptive, and unfair practices.

15       1116. Defendants engaged in misleading, false, unfair or deceptive acts or practices that

16   violated the Georgia FBPA by installing, failing to disclose and actively concealing the illegal

17   defeat device and the true cleanliness and performance of the "clean" diesel engine system, by

18   marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and

19   by presenting itself as a reputable manufacturer that valued environmental cleanliness and

20   efficiency, and that stood behind its vehicles after they were sold.

21       1117. The Clean Air Act and EPA regulations require that automobiles limit their

22   emissions output to specified levels. These laws are intended for the protection of public health

23   and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

24   Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By

25   installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

26   for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the

27   Georgia FBPA.

28

1118.   Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

1119.   Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Georgia Class.

1120.   Volkswagen knew or should have known that its conduct violated the Georgia FBPA.

1121.   Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

> a.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;
>
> b.   intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or
>
> c.   made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1122.   Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished.  In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

1123.   Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Georgia Class.

1124.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

1  cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand,

2  the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the

3  Class Vehicles.

4      1125.  Plaintiffs and the Georgia Class suffered ascertainable loss and actual damages as

5  a direct and proximate result of Defendants' misrepresentations and its concealment of and failure

6  to disclose material information.  Plaintiffs and the Georgia Class members who purchased or

7  leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles'

8  true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have

9  paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well

10  as lost or diminished use.

11      1126.  Defendants had an ongoing duty to all Volkswagen customers to refrain from

12  unfair and deceptive practices under the Georgia FBPA.  All owners of Class Vehicles suffered

13  ascertainable loss in the form of the diminished value of their vehicles as a result of

14  Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's

15  business.

16      1127.  Defendants' violations present a continuing risk to Plaintiffs as well as to the

17  general public.  Defendants' unlawful acts and practices complained of herein affect the public

18  interest.

19      1128.  As a direct and proximate result of Defendants' violations of the Georgia FBPA,

20  Plaintiffs and the Georgia Class have suffered injury-in-fact and/or actual damage.

21      1129.  Plaintiff and the Georgia Class are entitled to recover damages and exemplary

22  damages (for intentional violations) per Ga. Code. Ann. § 10-1-399(a).

23      1130.  Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or

24  deceptive practices, attorneys' fees, and any other just and proper relief available under the

25  Georgia FBPA per Ga. Code. Ann. § 10-1-399.

26      1131.  On October 30, 2015, certain Plaintiffs sent a letter complying with Ga. Code.

27  Ann. § 10-1-399(b).  Because Volkswagen failed to remedy its unlawful conduct within the

requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Georgia Class are entitled.

<div align="center">

**GEORGIA COUNT II:**
**VIOLATION OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(Ga. Code Ann. § 10-1-370, *et seq.*)**

</div>

1132. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1133. This claim is brought only on behalf of the Georgia Class against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1134. Defendants, Plaintiffs, and the Georgia Class are "persons' within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code. Ann. § 10-1-371(5).

1135. The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code. Ann. § 10-1-372(a).

1136. In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs and Georgia Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and Georgia Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's

Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

1137.  Defendants thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

1138.  Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's unfair and deceptive conduct, as alleged herein.  Bosch knew or should have known that Volkswagen would use and had used the Bosch technology as an emission defeat device, and in fact helped it do so.  Without Bosch's complicity and silence, Volkswagen could not have perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions themselves constitute fraudulent, deceptive, and unfair practices.

1139.  Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Georgia UDTPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

1140.  The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Georgia UDTPA.

1141.  Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was

- 326 -

manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

1142.   Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Georgia Class.

1143.   Volkswagen knew or should have known that its conduct violated the Georgia UDTPA.

1144.   Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

>       a.      possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulation;
>
>       b.      intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or
>
>       c.      made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1145.   Because Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

1146.   Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Georgia Class.

1147.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

1148. Plaintiffs and the Georgia Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Georgia Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1149. Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Georgia UDTPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1150. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1151. As a direct and proximate result of Defendants' violations of the Georgia UDTPA, Plaintiffs and the Georgia Class have suffered injury-in-fact and/or actual damage.

1152. Plaintiffs seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA per Ga. Code. Ann § 10-1-373.

### GEORGIA COUNT III:
### BREACH OF EXPRESS WARRANTY
### (Ga. Code. Ann. §§ 11-2-313 and 11-2A-210)

1153. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1154. Plaintiffs bring this Count on behalf of the Georgia Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1155.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and "sellers" of motor vehicles under § 11-2-103(1)(d).

1156.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

1157.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

1158.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1159.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1160.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1161.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in

materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1162.  As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1163.  The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Georgia Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1164.  Plaintiffs and the Georgia Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Georgia Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1165.  The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1166.  Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

1167.  In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum."  When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a

loss in resale values because of the scandal. He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

1168. Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

1169. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Georgia Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1170. Accordingly, recovery by Plaintiffs and the other Georgia Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Georgia Class members, seek all remedies as allowed by law.

1171. Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other Georgia Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1172. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Georgia Class members' remedies would be insufficient to make Plaintiffs and the other Georgia Class members whole.

1173. Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Georgia Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Georgia Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1174. The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

1175. As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Georgia Class members have been damaged in an amount to be determined at trial.

## GEORGIA COUNT IV:
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Ga. Code. Ann. §§ 11-2-314 and 11-2A-212)

1176. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1177. Plaintiffs bring this Count on behalf of the Georgia Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1178. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and "sellers" of motor vehicles under § 11-2-103(1)(d).

1179. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

1180. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

1181.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ga. Code Ann. §§ 11-2-314 and 11-2A-212.

1182.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1183.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

1184.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Georgia Class members have been damaged in an amount to be proven at trial.

## **HAWAII**

### **HAWAII COUNT I:**
### **UNFAIR AND DECEPTIVE ACTS IN VIOLATION OF HAWAII LAW**
### **(Haw. Rev. Stat. § 480, *et seq.*)**

1185.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1186.   Plaintiffs Cruise, Inoue, and Kettley (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Hawaii Class against all Defendants.

1187.   Defendants are "person[s]" under Haw. Rev. Stat. § 480-1.

1188.   Class members are "consumer[s]" as defined by Haw. Rev. Stat. § 480-1, who purchased or leased one or more Class Vehicles.

1189.   Defendants' acts or practices as set forth above occurred in the conduct of trade or commerce.

1190. The Hawaii Act § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.…"

1191. In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs and Hawaii Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and Hawaii Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

1192. Defendants thus violated the Act by, at minimum employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

1193. Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that Volkswagen would use and had used the Bosch technology as an emission defeat device, and in fact helped it do so. Without Bosch's complicity and silence, Volkswagen could not have perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions themselves constitute fraudulent, deceptive, and unfair practices.

1194. In the course of Volkswagen's business, Volkswagen engaged in misleading, false, unfair or deceptive acts or practices that violated Hawaii law by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the

"clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

1195.  The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates Hawaii law

1196.  Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen  also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

1197.  Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Hawaii Class.

1198.  Volkswagen knew or should have known that its conduct violated the Hawaii Act.

1199.  Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

> a.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;
>
> b.   intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or
>
> c.   made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1200.  Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished.  In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

1201.  Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

1202.  Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Hawaii Class.

1203.  Plaintiffs and the Hawaii Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Hawaii Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use. .

1204.  Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Hawaii UDTPA.  All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

1205.  Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1206.   As a direct and proximate result of Defendants' violations of the Hawaii Act, Plaintiffs and the Hawaii Class have suffered injury-in-fact and/or actual damage.

1207.   Pursuant to Haw. Rev. Stat. § 480-13, Plaintiffs and the Hawaii Class seek monetary relief against Defendants measured as the greater of (a) $1,000 and (b) threefold actual damages in an amount to be determined at trial.

1208.   Under Haw. Rev. Stat. § 480-13.5, Plaintiffs seek an additional award against Volkswagen of up to $10,000 for each violation directed at a Hawaiian elder.  Volkswagen knew or should have known that its conduct was directed to one or more Class members who are elders. Volkswagen's conduct caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the elder.  One or more Hawaii Class members who are elders are substantially more vulnerable to Volkswagen's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial economic damage resulting from Volkswagen's conduct.

### HAWAII COUNT II:
### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
#### (Haw. Rev. Stat. §§ 490:2-314 and 490:2A-212)

1209.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1210.   Plaintiffs bring this Count on behalf of the Hawaii Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1211.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Haw. Rev. Stat. §§ 490:2-104(1) and 490:2A-103(b), and "sellers" of motor vehicles under § 490:2-103(1)(d).

1212.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Haw. Rev. Stat. § 490:2A-103(a)(16).

1213.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Haw. Rev. Stat. §§ 490:2-105(1) and 490:2A-103(a)(8).

1214. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Haw. Rev. Stat. §§ 490:2-314 and 490:2A-212.

1215. These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1216. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

1217. As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Hawaii Class members have been damaged in an amount to be proven at trial.

### HAWAII COUNT III:
### BREACH OF EXPRESS WARRANTY
### (Haw. Rev. Stat. §§ 490:2-313 and 490:2A-210)

1218. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1219. Plaintiffs bring this Count on behalf of the Hawaii Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1220. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Haw. Rev. Stat. §§ 490:2-104(1) and 490:2A-103(b), and "sellers" of motor vehicles under § 490:2-103(1)(d).

1221. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Haw. Rev. Stat. § 490:2A-103(a)(16).

1222.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Haw. Rev. Stat. §§ 490:2-105(1) and 490:2A-103(a)(8).

1223.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1224.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1225.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1226.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1227.   As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1228.   The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Hawaii Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1229.   Plaintiffs and the Hawaii Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Hawaii Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1230.   The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1231.   Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

1232.   In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum."  When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

1233.   Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

1234.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Hawaii Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1235.   Accordingly, recovery by Plaintiffs and the other Hawaii Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Hawaii Class members, seek all remedies as allowed by law.

1236.   Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs and the other Hawaii Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1237.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Hawaii Class members' remedies would be insufficient to make Plaintiffs and the other Hawaii Class members whole.

1238.   Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Hawaii Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Hawaii Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1239.   The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

1240.   As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Hawaii Class members have been damaged in an amount to be determined at trial.

<div align="center">

**IDAHO**

**IDAHO COUNT I:**
**VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT**
**(IDAHO CODE § 48-601, *ET SEQ*.)**

</div>

1241.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1242.   Plaintiffs Dufurrena and Gardner (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Idaho Class against all Defendants.

1243.   Defendants are "person[s]" under the Idaho Consumer Protection Act ("Idaho CPA"), Idaho Code § 48-602(1).

1244.   Defendants' acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under Idaho Code § 48-602(2).

1245.   Defendants participated in misleading, false, or deceptive acts that violated the Idaho CPA.

1246.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.  Plaintiffs and Idaho Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat

1    device software was extremely sophisticated technology.  Plaintiffs and Idaho Class members did

2    not and could not unravel Volkswagen's deception on their own.  In fact, it took years before the

3    academic engineering community—specifically a research team at WVU's Center for Alternative

4    Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive

5    equipment and applying decades of combined experience.

6        1247.  Defendants thus violated the Act by, at minimum:  (1) representing that the Class

7    Vehicles have characteristics, uses, and benefits which they do not have; (2) representing that the

8    Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising

9    the Class Vehicles with the intent not to sell them as advertised; (4) engaging in acts or practices

10   which are otherwise misleading, false, or deceptive to the consumer; and (5) engaging in any

11   unconscionable method, act or practice in the conduct of trade or commerce.  See Idaho Code

12   § 48-603.

13       1248.  Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's

14   unfair and deceptive conduct, as alleged herein.  Bosch knew or should have known that

15   Volkswagen would use and had used the Bosch technology as an emission defeat device, and in

16   fact helped it do so.  Without Bosch's complicity and silence, Volkswagen could not have

17   perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions

18   themselves constitute fraudulent, deceptive, and unfair practices.

19       1249.  In the course of its business, Volkswagen willfully failed to disclose and actively

20   concealed the illegal defeat device and the true cleanliness and performance of the "clean" diesel

21   engine system discussed herein and otherwise engaged in activities with a tendency or capacity to

22   deceive.  Volkswagen also engaged in unlawful trade practices by employing deception,

23   deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of

24   any material fact with intent that others rely upon such concealment, suppression or omission, in

25   connection with the sale of Class Vehicles.

26       1250.  Defendants engaged in misleading, false, unfair or deceptive acts or practices that

27   violated the Idaho CPA by installing, failing to disclose and actively concealing the illegal defeat

28   device and the true cleanliness and performance of the "clean" diesel engine system, by

marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

1251. The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Idaho CPA.

1252. Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

1253. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Idaho Class.

1254. Volkswagen knew or should have known that its conduct violated the Idaho CPA.

1255. Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.    made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1256. Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

1257. Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Idaho Class.

1258. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

1259. Plaintiffs and the Idaho Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Idaho Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1260. Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Idaho CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

1261. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1262.   As a direct and proximate result of Defendants' violations of the Idaho CPA, Plaintiffs and the Idaho Class have suffered injury-in-fact and/or actual damage.

1263.   Pursuant to Idaho Code § 48-608, Plaintiffs and the Idaho Class seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each Plaintiff and each Idaho Class member.

1264.   Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho CPA.

1265.   Plaintiffs and Idaho Class members also seek punitive damages against Defendants because Defendants' conduct evidences an extreme deviation from reasonable standards. Volkswagen flagrantly, maliciously, and fraudulently misrepresented the safety and reliability of the Class Vehicles, deceived Class members on life-or-death matters, concealed material facts that only they knew, and repeatedly promised Class members all vehicles were safe—all to avoid the expense and public relations nightmare of correcting a noxious flaw in the Class Vehicles. Volkswagen's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

### IDAHO COUNT II:
### BREACH OF EXPRESS WARRANTY
### (IDAHO CODE §§ 28-2-313 AND 28-12-210)

1266.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1267.   Plaintiffs bring this Count on behalf of the Idaho Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1268.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Idaho Code §§ 28-2-104(1) and 28-12-103(3), and "sellers" of motor vehicles under § 28-2-103(1)(d).

1269.  With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Idaho Code § 28-12-103(1)(p).

1270.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h).

1271.  In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1272.  The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1273.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1274.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1275.   As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1276.   The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Idaho Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1277.   Plaintiffs and the Idaho Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Idaho Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1278.   The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1279.   Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

1280.   In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

1281.  Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

1282.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Idaho Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1283.  Accordingly, recovery by Plaintiffs and the other Idaho Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Idaho Class members, seek all remedies as allowed by law.

1284.  Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs and the other Idaho Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1285.  Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Idaho Class members' remedies would be insufficient to make Plaintiffs and the other Idaho Class members whole.

1286.  Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Idaho Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other

Idaho Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1287.   The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

1288.   As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Idaho Class members have been damaged in an amount to be determined at trial.

<div align="center">

**IDAHO COUNT III:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Idaho Code §§ 28-2-314 and 28-12-212)**

</div>

1289.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1290.   Plaintiffs bring this Count on behalf of the Idaho Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1291.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Idaho Code §§ 28-2-104(1) and 28-12-103(3), and "sellers" of motor vehicles under § 28-2-103(1)(d).

1292.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Idaho Code § 28-12-103(1)(p).

1293.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h).

1294.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Idaho Code §§ 28-2-314 and 28-12-212.

1295.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1296.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

1297.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Idaho Class members have been damaged in an amount to be proven at trial.

## ILLINOIS

### ILLINOIS COUNT I:
### VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### (815 ILCS 505/1, *ET SEQ*. AND 720 ILCS 295/1a)

1298.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1299.   Plaintiffs Anderson, Bahr, Clark, and Fry (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Illinois Class against all Defendants.

1300.   Defendants are "person[s]" as that term is defined in 815 ILCS 505/1(c).

1301.   Plaintiff and the Illinois Class are "consumers" as that term is defined in 815 ILCS 505/1(e).

1302.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or

commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

1303. In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs and Illinois Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and Illinois Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

1304. Defendants thus violated the Act by, at minimum willfully failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system.

1305. Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that Volkswagen would use and had used the Bosch technology as an emission defeat device, and in fact helped it do so. Without Bosch's complicity and silence, Volkswagen could not have perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions themselves constitute fraudulent, deceptive, and unfair practices.

1306. Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Illinois CFA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and

by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

1307.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Illinois CFA.

1308.   Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

1309.   Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Illinois Class.

1310.   Volkswagen knew or should have known that its conduct violated the Illinois CFA.

1311.   Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.    made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1312. Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

1313. Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Illinois Class.

1314. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

1315. Plaintiffs and the Illinois Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Illinois Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1316. Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Illinois CFA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

1317. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1318.   As a direct and proximate result of Defendants' violations of the Illinois CFA, Plaintiffs and the Illinois Class have suffered injury-in-fact and/or actual damage.

1319.   Pursuant to 815 ILCS 505/10a(a), Plaintiffs and the Illinois Class seek monetary relief against Volkswagen in the amount of actual damages, as well as punitive damages because Volkswagen acted with fraud and/or malice and/or was grossly negligent.

1320.   Plaintiffs also seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq*.

<div style="text-align:center">

**ILLINOIS COUNT II:**
**BREACH OF EXPRESS WARRANTY**
**(810 Ill. Comp. Stat. §§ 5/2-313 and 5/2A-210)**

</div>

1321.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1322.   Plaintiffs bring this Count on behalf of the Illinois Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1323.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

1324.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

1325.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

1326.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

- 355 -

1327.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1328.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1329.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1330.   As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1331.   The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Illinois Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1332.   Plaintiffs and the Illinois Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Illinois Class members that the Class Vehicles were intentionally designed and manufactured

to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1333.  The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1334.  Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

1335.  In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

1336.  Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

1337.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Illinois Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1338.  Accordingly, recovery by Plaintiffs and the other Illinois Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Illinois Class members, seek all remedies as allowed by law.

1339.  Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs and the other Illinois Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1340.  Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Illinois Class members' remedies would be insufficient to make Plaintiffs and the other Illinois Class members whole.

1341.  Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Illinois Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Illinois Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1342.  The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

1343. As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Illinois Class members have been damaged in an amount to be determined at trial.

## ILLINOIS COUNT III:
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212)

1344. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1345. Plaintiffs bring this Count on behalf of the Illinois Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1346. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

1347. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

1348. The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

1349. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 810 Ill. Comp. Stat. §§ 28-2-314 and 28-12-212.

1350. These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1351. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant

Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

1352.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Illinois Class members have been damaged in an amount to be proven at trial.

## **INDIANA**

### **INDIANA COUNT I:**
### **VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT**
### **(Ind. Code § 24-5-0.5-3)**

1353.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1354.   Plaintiffs Olmos and Priest (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Indiana Class against all Defendants.

1355.   Defendants are "person[s]" within the meaning of Ind. Code § 24-5-0.5-2(2) and a "supplier" within the meaning of Ind. Code § 24-5-.05-2(a)(3).

1356.   Plaintiffs' and Indiana Class members' purchases of the Class Vehicles are "consumer transactions" within the meaning of Ind. Code § 24-5-.05-2(a)(1).

1357.   Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive act," which includes representing:  "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; … (c) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in

writing that such representation is true if such other supplier shall know or have reason to know that such representation was false." Ind. Code § 24-5-0.5-3.

1358.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.  Plaintiffs and Indiana Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology.  Plaintiffs and Indiana Class members did not and could not unravel Volkswagen's deception on their own.  In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

1359.   Defendants thus violated the Act by, at minimum:  (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard and quality when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; and (4) otherwise engaging in conduct likely to deceive.

1360.   Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's unfair and deceptive conduct, as alleged herein.  Bosch knew or should have known that Volkswagen would use and had used the Bosch technology as an emission defeat device, and in fact helped it do so.  Without Bosch's complicity and silence, Volkswagen could not have perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions themselves constitute fraudulent, deceptive, and unfair practices.

1361.   Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

1362.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Indiana DCSA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

1363.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Indiana DCSA.

1364.   Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

1365.   Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Indiana Class.

1366.   Volkswagen knew or should have known that its conduct violated the Indiana DCSA.

1367.   Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

a.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.   intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

c.   made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1368.   Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished.  In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

1369.   Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Indiana Class.

1370.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

1371.   Plaintiffs and the Indiana Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Indiana Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1372.   Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Indiana DCSA.  All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

1373. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1374. As a direct and proximate result of Defendants' violations of the Indiana DCSA, Plaintiffs and the Indiana Class have suffered injury-in-fact and/or actual damage.

1375. Pursuant to Ind. Code § 24-5-0.5-4, Plaintiffs and the Indiana Class seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff and each Indiana Class member, including treble damages up to $1,000 for Volkswagen's willfully deceptive acts.

1376. Plaintiff also seeks punitive damages based on the outrageousness and recklessness of the Volkswagen's conduct and Volkswagen's high net worth.

1377. On September 21, 2015, certain Plaintiffs sent a letter complying with Ind. Code § 24-5-0.5-5(a). Because Volkswagen failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Indiana Class are entitled.

## INDIANA COUNT II:
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Ind. Code §§ 26-1-2-314 and 26-1-2.1-212)

1378. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1379. Plaintiffs bring this Count on behalf of the Indiana Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1380. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and "sellers" of motor vehicles under § 26-1-2-103(1)(d).

1381. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

1382.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

1383.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ind. Code §§ 26-1-2-314 and  26-1-2.1-212.

1384.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1385.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

1386.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Indiana Class members have been damaged in an amount to be proven at trial.

### INDIANA COUNT III:
### BREACH OF EXPRESS WARRANTY
### (Ind. Code §§ 26-1-2-313 and 26-1-2.1-210)

1387.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1388.   Plaintiffs bring this Count on behalf of the Indiana Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1389.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and "sellers" of motor vehicles under § 26-1-2-103(1)(d).

1390.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

1391.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

1392.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1393.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1394.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1395.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1396. As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1397. The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Indiana Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1398. Plaintiffs and the Indiana Class members experienced defects within the warranty period. Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Indiana Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1399. The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1400. Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here. For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government. We are proceeding as quickly as possible.

1401. In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal. He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

1402.   Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

1403.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Indiana Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1404.   Accordingly, recovery by Plaintiffs and the other Indiana Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Indiana Class members, seek all remedies as allowed by law.

1405.   Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs and the other Indiana Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1406.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Indiana Class members' remedies would be insufficient to make Plaintiffs and the other Indiana Class members whole.

1407.   Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Indiana Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other

Indiana Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1408.   The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

1409.   As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Indiana Class members have been damaged in an amount to be determined at trial.

## IOWA

### IOWA COUNT I:
### VIOLATIONS OF THE PRIVATE RIGHT OF ACTION
### FOR CONSUMER FRAUDS ACT
### (Iowa Code § 714h.1, *et seq.*)

1410.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1411.   Plaintiffs Foote, Lucht, Soucy, Manternach, and Schnathorst (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Iowa Class against all Defendants.

1412.   Volkswagen is "person" under Iowa Code § 714H.2(7).

1413.   Plaintiffs and the Iowa Class are "consumers," as defined by Iowa Code § 714H.2(3), who purchased or leased one or more Class Vehicles.

1414.   The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise."  Iowa Code § 714H.3.

1415.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.  Plaintiffs and Iowa Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology.  Plaintiffs and Iowa Class members did not and could not unravel Volkswagen's deception on their own.  In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

1416.   Defendants thus violated the Act by, at minimum by marketing its vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold, Volkswagen engaged in deceptive business practices prohibited by the Iowa CFA.

1417.   Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

1418.   Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's unfair and deceptive conduct, as alleged herein.  Bosch knew or should have known that Volkswagen would use and had used the Bosch technology as an emission defeat device, and in fact helped it do so.  Without Bosch's complicity and silence, Volkswagen could not have perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions themselves constitute fraudulent, deceptive, and unfair practices.

1419.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Iowa CFA by installing, failing to disclose and actively concealing the illegal defeat

device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

1420.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Iowa CFA.407.

1421.   Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

1422.   Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Iowa Class.

1423.   Volkswagen knew or should have known that its conduct violated the Iowa CFA.

1424.   Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

> a.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;
>
> b.   intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or
>
> c.   made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1425.   Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed.  The value of the Class Vehicles has therefore greatly diminished.  In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

1426.   Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Iowa Class.

1427.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

1428.   Plaintiffs and the Iowa Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Iowa Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1429.   Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Iowa CFA.  All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

1430.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1431.   As a direct and proximate result of Defendants' violations of the Iowa CFA, Plaintiffs and the Iowa Class have suffered injury-in-fact and/or actual damage.

1432.   Pursuant to Iowa Code § 714H.5, Plaintiffs seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices; actual damages; in addition to an award of actual damages, statutory damages up to three times the amount of actual damages awarded as a result of Volkswagen's willful and wanton disregard for the rights or safety of others; attorneys' fees; and such other equitable relief as the Court deems necessary to protect the public from further violations of the Iowa CFA.

<div align="center">

**IOWA COUNT II:**
**BREACH OF EXPRESS WARRANTY**
**(Iowa Code §§ 554.2313 and 554.13210)**

</div>

1433.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1434.   Plaintiffs bring this Count on behalf of the Iowa Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1435.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Iowa Code §§ 554.2104(1) and 554.13103(3), and "sellers" of motor vehicles under § 554.2103(1)(d).

1436.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Iowa Code § 554.13103(1)(p).

1437.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Iowa Code §§ 554.2105(1) and 554.13103(1)(h).

1438.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1439.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1440.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1441.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1442.   As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1443.   The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Iowa  Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1444.   Plaintiffs and the Iowa  Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Iowa  Class members that the Class Vehicles were intentionally designed and manufactured

to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1445.  The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1446.  Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

1447.  In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

1448.  Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

1449.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Iowa  Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1450.   Accordingly, recovery by Plaintiffs and the other Iowa Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Iowa Class members, seek all remedies as allowed by law.

1451.   Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other Iowa Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1452.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Iowa Class members' remedies would be insufficient to make Plaintiffs and the other Iowa Class members whole.

1453.   Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Iowa Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Iowa Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1454.   The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

1455.   As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Iowa Class members have been damaged in an amount to be determined at trial.

<div align="center">

**IOWA COUNT III:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Iowa Code §§ 554.2314 and 554.13212)**

</div>

1456.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1457.   Plaintiffs bring this Count on behalf of the Iowa Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1458.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Iowa Code §§ 554.2104(1) and 554.13103(3), and "sellers" of motor vehicles under § 554.2103(1)(d).

1459.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Iowa Code § 554.13103(1)(p).

1460.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Iowa Code §§ 554.2105(1) and 554.13103(1)(h).

1461.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Iowa Code §§ 554.2314 and 554.13212.

1462.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1463.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant

Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

1464.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Iowa Class members have been damaged in an amount to be proven at trial.

# **KANSAS**

### **KANSAS COUNT I:**
### **VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT**
### **(Kan. Stat. Ann. § 50-623, *et seq*.)**

1465.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1466.   Plaintiffs Berg, Joy, and Rice (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Kansas Class against all Defendants.

1467.   Volkswagen is a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. Ann. § 50-624(l).

1468.   Kansas Class members are "consumers," within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased or leased one or more Class Vehicles.

1469.   The sale of the Class Vehicles to the Kansas Class members was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

1470.   The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. Ann. § 50-626(a), and that deceptive acts or practices include:  (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact."  The Kansas

1    CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in

2    connection with a consumer transaction." Kan. Stat. Ann. § 50-627(a).

3         1471.  In the course of their business, Defendants concealed and suppressed material facts

4    concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device

5    software in the Class Vehicles that caused the vehicles to operate in a low emission test mode

6    only during emissions testing.  During normal operations, the Class Vehicles would emit grossly

7    larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The

8    result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of

9    deliberately induced false readings.  Plaintiffs and Kansas Class members had no way of

10   discerning that Volkswagen's representations were false and misleading because Volkswagen's

11   defeat device software was extremely sophisticated technology.  Plaintiffs and Kansas Class

12   members did not and could not unravel Volkswagen's deception on their own.  In fact, it took

13   years before the academic engineering community—specifically a research team at WVU's

14   Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using

15   sophisticated, expensive equipment and applying decades of combined experience.

16        1472.  Defendants thus violated the Act by, at minimum:  (1) representing that the Class

17   Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2)

18   representing that the Class Vehicles are of a particular standard and quality when they are not; (3)

19   advertising the Class Vehicles with the intent not to sell them as advertised; (4) willfully using, in

20   any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a

21   material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing

22   or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in

23   connection with a consumer transaction.

24        1473.  Volkswagen's actions as set forth above occurred in the conduct of trade or

25   commerce.

26        1474.  Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's

27   unfair and deceptive conduct, as alleged herein.  Bosch knew or should have known that

28   Volkswagen would use and had used the Bosch technology as an emission defeat device, and in

1   fact helped it do so.  Without Bosch's complicity and silence, Volkswagen could not have

2   perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions

3   themselves constitute fraudulent, deceptive, and unfair practices.

4       1475.  Defendants engaged in misleading, false, unfair or deceptive acts or practices that

5   violated the Kansas CPA by installing, failing to disclose and actively concealing the illegal

6   defeat device and the true cleanliness and performance of the "clean" diesel engine system, by

7   marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and

8   by presenting itself as a reputable manufacturer that valued environmental cleanliness and

9   efficiency, and that stood behind its vehicles after they were sold.

10      1476.  The Clean Air Act and EPA regulations require that automobiles limit their

11  emissions output to specified levels.  These laws are intended for the protection of public health

12  and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

13  Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By

14  installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

15  for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the

16  Kansas CPA.

17      1477.  Defendants knew the true nature of its "clean" diesel engine system for at least six

18  years, but concealed all of that information until recently. Volkswagen also knew that it valued

19  profits over environmental cleanliness, efficiency, and compliance with the law, and that it was

20  manufacturing, selling, and distributing vehicles throughout the United States that did not comply

21  with EPA regulations. Volkswagen concealed this information as well.

22      1478.  Volkswagen intentionally and knowingly misrepresented material facts regarding

23  the Class Vehicles with intent to mislead Plaintiffs and the Kansas Class.

24      1479.  Volkswagen knew or should have known that its conduct violated the Kansas

25  CPA.

26      1480.  Defendants owed Plaintiffs a duty to disclose the illegality and public health and

27  safety risks of the Class Vehicles because they:

28

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

c.    made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1481.  Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

1482.  Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Kansas Class.

1483.  Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

1484.  Plaintiffs and the Kansas Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Kansas Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1485. Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Kansas CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

1486. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1487. As a direct and proximate result of Defendants' violations of the Kansas CPA, Plaintiffs and the Kansas Class have suffered injury-in-fact and/or actual damage.

1488. Pursuant to Kan. Stat. Ann. § 50-634, Plaintiffs and the Kansas Class seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each Plaintiff and each Kansas Class member

1489. Plaintiff also seeks an order enjoining Volkswagen's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann § 50-623, *et seq.*

### KANSAS COUNT II:
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (KAN. STAT. §§ 84-2-314 and 84-2A-212)

1490. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1491. Plaintiffs bring this Count on behalf of the Kansas Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1492. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and "sellers" of motor vehicles under § 84-2-103(1)(d).

1493.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

1494.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

1495.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Kan. Stat. §§ 84-2-314 and 84-2A-212.

1496.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1497.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

1498.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Kansas Class members have been damaged in an amount to be proven at trial.

### KANSAS COUNT III:
### BREACH OF EXPRESS WARRANTY
### (KAN. STAT. §§ 84-2-314 and 84-2A-210)

1499.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1500.   Plaintiffs bring this Count on behalf of the Kansas Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1501.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and "sellers" of motor vehicles under § 84-2-103(1)(d).

1502.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

1503.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

1504.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1505.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1506.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1507.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in

- 384 -

materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1508.  As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1509.  The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Kansas Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1510.  Plaintiffs and the Kansas Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Kansas Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1511.  The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1512.  Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

1513.  In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum."  When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a

1  loss in resale values because of the scandal.  He said that Volkswagen is not considering

2  providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

3      1514.  Michael Horn's testimony serves as an admission that the limited warranty

4  promising to repair and/or correct a manufacturing defect fails in its essential purpose because the

5  VW Entity Defendants cannot meet that promise within a reasonable time.

6      1515.  Furthermore, the limited warranty promising to repair and/or correct a

7  manufacturing defect fails in its essential purpose because the contractual remedy is insufficient

8  to make Plaintiffs and the other Kansas Class members whole and because the VW Entity

9  Defendants have failed and/or have refused to adequately provide the promised remedies within a

10  reasonable time.

11      1516.  Accordingly, recovery by Plaintiffs and the other Kansas Class members is not

12  restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and

13  Plaintiffs, individually and on behalf of the other Kansas Class members, seek all remedies as

14  allowed by law.

15      1517.  Also, as alleged in more detail herein, at the time the VW Entity Defendants

16  warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were

17  inherently defective and did not conform to their warranties; further, the VW Entity Defendants

18  had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs

19  and the other Kansas Class members were therefore induced to purchase or lease the Class

20  Vehicles under false and/or fraudulent pretenses.

21      1518.  Moreover, many of the injuries flowing from the Class Vehicles cannot be

22  resolved through the limited remedy of "replacements or adjustments," as many incidental and

23  consequential damages have already been suffered because of Volkswagen's fraudulent conduct

24  as alleged herein, and because of its failure and/or continued failure to provide such limited

25  remedy within a reasonable time, and any limitation on Plaintiffs' and the other Kansas Class

26  members' remedies would be insufficient to make Plaintiffs and the other Kansas Class members

27  whole.

28

1519. Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Kansas Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Kansas Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1520. The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

1521. As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Kansas Class members have been damaged in an amount to be determined at trial.

## KENTUCKY

### KENTUCKY COUNT I:
### VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT
### (Ky. Rev. Stat. § 367.110, *et seq.*)

1522. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1523. Plaintiffs Kannapel and Wagner (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Kentucky Class against all Defendants.

1524. Defendants, Plaintiffs, and the Kentucky Class are "persons" within the meaning of the Ky. Rev. Stat. § 367.110(1).

1525. Volkswagen engaged in "trade" or "commerce" within the meaning of Ky. Rev. Stat. § 367.110(2).

1526. The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce …." Ky. Rev. Stat. § 367.170(1). Volkswagen participated in misleading, false, or deceptive acts that violated the Kentucky CPA. By failing to disclose and by actively concealing the "defeat device" and the true cleanliness and performance of the "clean" diesel engine system,

by marketing its vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold, Volkswagen engaged in deceptive business practices prohibited by the Kentucky CPA.

1527. In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs and Kentucky Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and Kentucky Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

1528. Defendants thus violated the Act by, at minimum employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

1529. Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that Volkswagen would use and had used the Bosch technology as an emission defeat device, and in fact helped it do so. Without Bosch's complicity and silence, Volkswagen could not have perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions themselves constitute fraudulent, deceptive, and unfair practices.

1530.  Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Kentucky CPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

1531.  The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Kentucky CPA.

1532.  Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

1533.  Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Kentucky Class.

1534.  Volkswagen knew or should have known that its conduct violated the Kentucky CPA.

1535.  Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

  a.  possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

  b.  intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

c. made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1536. Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

1537. Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Kentucky Class.

1538. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

1539. Plaintiffs and the Kentucky Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Kentucky Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1540. Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Kentucky CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

1541.  Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1542.  As a direct and proximate result of Defendants' violations of the Kentucky CPA, Plaintiffs and the Kentucky Class have suffered injury-in-fact and/or actual damage.

1543.  Pursuant to Ky. Rev. Stat. Ann. § 367.220, Plaintiffs and the Kentucky Class seek to recover actual damages in an amount to be determined at trial; an order enjoining Volkswagen's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under Ky. Rev. Stat. Ann. § 367.220.

## KENTUCKY COUNT II:
### BREACH OF EXPRESS WARRANTY
### (KY. REV. STAT. §§ 335.2-313 and 355.2A-210)

1544.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1545.  Plaintiffs bring this Count on behalf of the Kentucky Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1546.  The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and "sellers" of motor vehicles under § 355.2-103(1)(d).

1547.  With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

1548.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

1549.  In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1550.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1551.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1552.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1553.   As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1554.   The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Kentucky Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1555.   Plaintiffs and the Kentucky Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Kentucky Class members that the Class Vehicles were intentionally designed and

manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1556.   The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1557.   Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

1558.   In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum."  When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

1559.   Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

1560.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Kentucky Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1561. Accordingly, recovery by Plaintiffs and the other Kentucky Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Kentucky Class members, seek all remedies as allowed by law.

1562. Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other Kentucky Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1563. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Kentucky Class members' remedies would be insufficient to make Plaintiffs and the other Kentucky Class members whole.

1564. Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Kentucky Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Kentucky Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1565. The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

1566.   As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Kentucky Class members have been damaged in an amount to be determined at trial.

<div align="center">

**KENTUCKY COUNT III:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(KY. REV. STAT. §§ 335.2-314 and 355.2A-212)**

</div>

1567.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1568.   Plaintiffs bring this Count on behalf of the Kentucky Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1569.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and "sellers" of motor vehicles under § 355.2-103(1)(d).

1570.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

1571.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

1572.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ky. Rev. Stat. §§ 335.2-314 and 355.2A-212.

1573.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1574.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant

Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

1575.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Kentucky Class members have been damaged in an amount to be proven at trial.

## LOUISIANA

### LOUISIANA COUNT I:
### VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES
### AND CONSUMER PROTECTION LAW
### (La. Rev. Stat. § 51:1401, *et seq.*)

1576.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1577.   Plaintiffs White, Malone, and Warren (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Louisiana Class against all Defendants.

1578.   Defendants, Plaintiffs, and the Louisiana Class are "persons" within the meaning of the La. Rev. Stat. § 51:1402(8).

1579.   Plaintiffs and the Louisiana Class are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

1580.   Volkswagen engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(10).

1581.   The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A).  Volkswagen participated in misleading, false, or deceptive acts that violated the Louisiana CPL.

1582.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The

result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs and Louisiana Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and Louisiana Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

1583. Defendants thus violated the Act by, at minimum marketing its vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold, Volkswagen engaged in deceptive business practices prohibited by the Louisiana CPL.

1584. Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that Volkswagen would use and had used the Bosch technology as an emission defeat device, and in fact helped it do so. Without Bosch's complicity and silence, Volkswagen could not have perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions themselves constitute fraudulent, deceptive, and unfair practices.

1585. Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Louisiana CPL by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

1586. The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

Clean Air Act and its regulations. See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Louisiana CPL.

1587. Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

1588. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Louisiana Class.

1589. Volkswagen knew or should have known that its conduct violated the Louisiana CPL.

1590. Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.    made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1591. Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

1592.  Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Louisiana Class.

1593.  Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

1594.  Plaintiffs and the Louisiana Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Louisiana Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1595.  Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Louisiana CPL.  All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

1596.  Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1597.  As a direct and proximate result of Defendants' violations of the Louisiana CPL, Plaintiffs and the Louisiana Class have suffered injury-in-fact and/or actual damage.

1598.  Pursuant to La. Rev. Stat. § 51:1409, Plaintiffs and the Louisiana Class seek to recover actual damages in an amount to be determined at trial; treble damages for Volkswagen's knowing violations of the Louisiana CPL; an order enjoining Volkswagen's unfair, unlawful,

and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under La. Rev. Stat. § 51:1409.

<div align="center">

**LOUISIANA COUNT II:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY/**
**WARRANTY AGAINST REDHIBITORY DEFECTS**
**(La. Civ. Code Art. 2520, 2524)**

</div>

1599.  Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1600.  Plaintiffs bring this Count on behalf of the Louisiana Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1601.  Volkswagen is and was at all relevant times a merchant with respect to motor vehicles.

1602.  A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.  These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1603.  Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after the allegations of Class Vehicle defects became public.

1604.  As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

<div align="center">

- 400 -

</div>

**MAINE**

**MAINE COUNT I:**
**VIOLATION OF MAINE UNFAIR TRADE PRACTICES ACT**
**(Me. Rev. Stat. Ann. Tit. 5 § 205-a, *et seq.*)**

1605.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1606.   Plaintiffs Buchberger, Evans and Evans, Rubin, and Sullivan (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Maine Class against all Defendants.

1607.   Defendants, Plaintiffs, and the Maine Class are "persons" within the meaning of Me. Rev. Stat. Ann. Tit. 5, § 206(2).

1608.   Volkswagen is engaged in "trade" or "commerce" within the meaning of Me. Rev. Stat. Ann. Tit. 5, § 206(3).

1609.   The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…."  Me. Rev. Stat. Ann. Tit. 5 § 207.

1610.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.  Plaintiffs and Maine Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology.  Plaintiffs and Maine Class members did not and could not unravel Volkswagen's deception on their own.  In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

1611. Defendants thus violated the Act by, at minimum by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

1612. Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently.

1613. Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that Volkswagen would use and had used the Bosch technology as an emission defeat device, and in fact helped it do so. Without Bosch's complicity and silence, Volkswagen could not have perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions themselves constitute fraudulent, deceptive, and unfair practices.

1614. Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Maine UTPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

1615. The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Maine UTPA.

1616. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing

vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

1617.  Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Maine Class.

1618.  Volkswagen knew or should have known that its conduct violated the Maine UTPA.

1619.  Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.    made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1620.  Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished.  In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

1621.  Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Maine Class.

1622.  Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand,

the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

1623.  Plaintiffs and the Maine Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Maine Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1624.  Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Maine UTPA.  All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

1625.  Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1626.  As a direct and proximate result of Defendants' violations of the Maine UTPA, Plaintiffs and the Maine Class have suffered injury-in-fact and/or actual damage.

1627.  Pursuant to Me. Rev. Stat. Ann. Tit. 5 § 213, Plaintiffs and the Maine Class seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Maine UTPA.

1628.  On November 18, 2015, certain Plaintiffs sent a letter complying with Me. Rev. Stat. Ann. Tit. 5, § 213(1-A).  Because Volkswagen failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Maine Class are entitled.

**MAINE COUNT II:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(ME. REV. STAT. TIT. 11 §§ 2-314 and 2-1212)**

1629.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1630.  Plaintiffs bring this Count on behalf of the Maine Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1631.  The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Me. Rev. Stat. Ann. Tit. 11,§§ 2-104(1), and  2-1103(3), and is a "seller" of motor vehicles under § 2-103(1)(d).

1632.  With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Me. Rev. Stat. Ann. Tit. 11,§ 2-1103(1)(p).

1633.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. Tit. 11,§§ 2-105(1), and 2-1103(1)(h).

1634.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Me. Rev. Stat. Ann. Tit. 11,§§ 2-314, and 2-1212.

1635.  These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1636.  Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

1637.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Maine Class members have been damaged in an amount to be proven at trial.

<div align="center">

**MAINE COUNT III:**
**BREACH OF EXPRESS WARRANTY**
**(ME. REV. STAT. TIT. 11 §§ 2-313 and 2-1210)**

</div>

1638.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1639.   Plaintiffs bring this Count on behalf of the Maine Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1640.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Me. Rev. Stat. Ann. Tit. 11,§§ 2-104(1) and 2-1103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

1641.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Me. Rev. Stat. Ann. Tit. 11,§ 2-1103(1)(p).

1642.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. Tit. 11,§§ 2-105(1), and 2-1103(1)(h).

1643.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1644.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1645.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

<div align="center">- 406 -</div>

whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1646.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1647.   As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1648.   The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Maine Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1649.   Plaintiffs and the Maine Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Maine Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1650.   The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1651.  Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

1652.  In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

1653.  Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

1654.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Maine Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1655.  Accordingly, recovery by Plaintiffs and the other Maine Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Maine Class members, seek all remedies as allowed by law.

1656.  Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants

1  had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs

2  and the other Maine Class members were therefore induced to purchase or lease the Class

3  Vehicles under false and/or fraudulent pretenses.

4      1657. Moreover, many of the injuries flowing from the Class Vehicles cannot be

5  resolved through the limited remedy of "replacements or adjustments," as many incidental and

6  consequential damages have already been suffered because of Volkswagen's fraudulent conduct

7  as alleged herein, and because of its failure and/or continued failure to provide such limited

8  remedy within a reasonable time, and any limitation on Plaintiffs' and the other Maine Class

9  members' remedies would be insufficient to make Plaintiffs and the other Maine Class members

10  whole.

11      1658. Finally, because of the VW Entity Defendants' breach of warranty as set forth

12  herein, Plaintiffs and the other Maine Class members assert, as additional and/or alternative

13  remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other

14  Maine Class members of the purchase or lease price of all Class Vehicles currently owned or

15  leased, and for such other incidental and consequential damages as allowed.

16      1659. The VW Entity Defendants were provided notice of these issues by numerous

17  complaints filed against them, including the instant Complaint, within a reasonable amount of

18  time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade

19  clean air standards.

20      1660. As a direct and proximate result of the VW Entity Defendants' breach of express

21  warranties, Plaintiff and the other Maine Class members have been damaged in an amount to be

22  determined at trial.

23  <div align="center">**MARYLAND**</div>

24  <div align="center">**MARYLAND COUNT I:**</div>
25  <div align="center">**VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT**
**(Md. Code Com. Law § 13-101,** *et seq.***)**</div>

26      1661. Plaintiffs incorporate by reference each preceding paragraph as though fully set

27  forth herein.

28

1662. Plaintiffs Cure, DeFiesta, Hoffman, Rovner, and Walsh (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Maryland Class against all Defendants.

1663. Defendants, Plaintiffs, and the Maryland Class are "persons" within the meaning of Md. Code Com. Law § 13-101(h).

1664. The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale of any consumer good. Md. Code Com. Law § 13-303. Volkswagen participated in misleading, false, or deceptive acts that violated the Maryland CPA.

1665. In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs and Maryland Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and Maryland Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

1666. Defendants thus violated the Act by, at minimum marketing its vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

1667. Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

1668.   Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's unfair and deceptive conduct, as alleged herein.  Bosch knew or should have known that Volkswagen would use and had used the Bosch technology as an emission defeat device, and in fact helped it do so.  Without Bosch's complicity and silence, Volkswagen could not have perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions themselves constitute fraudulent, deceptive, and unfair practices.

1669.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Maryland CPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

1670.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Maryland CPA.

1671.   Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

1672.   Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Maryland Class.

1673.   Volkswagen knew or should have known that its conduct violated the Maryland CPA.

1674.  Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

    a.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.     intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.     made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1675.  Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed.  The value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

1676.  Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Maryland Class.

1677.  Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

1678.  Plaintiffs and the Maryland Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Maryland Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to

sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1679.   Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Maryland CPA.  All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

1680.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1681.   As a direct and proximate result of Defendants' violations of the Maryland CPA, Plaintiffs and the Maryland Class have suffered injury-in-fact and/or actual damage.

1682.   Pursuant to Md. Code Com. Law § 13-408, Plaintiffs and the Maryland Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

<div align="center">

**MARYLAND COUNT II:**
**MARYLAND LEMON LAW**
**(Md. Code. Com. Law § 14-1501, *et seq.*)**

</div>

1683.   Plaintiff and the Class own or lease "motor vehicles" within the meaning of Md. Code, Com. Law § 14-1501(f), because these vehicles were registered in the state and fall within the categories of vehicles manufactured, assembled, or distributed by Volkswagen. These vehicles are not auto homes.

1684.   The VW Entity Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of Md. Code, Com. Law § 14-1501(d).

1685.   Plaintiff and the Class are "consumers" within the meaning of Md. Code, Com. Law § 14-1501(b) because they: purchased the Class Vehicles, were transferred the Class Vehicles during the warranty period, or are otherwise entitled to the attendant terms of warranty.

1686.   The Class Vehicles did not conform to their "warranties" under Md. Code, Com. Law § 14-1501(g) during the warranty period because they were not cleaner vehicles and

<div align="center">- 413 -</div>

contained a "defeat device" designed to circumvent state and federal emissions standards. These devices did in fact circumvent emissions standards and substantially impaired the use and market value of their motor vehicles.

1687. Volkswagen had actual knowledge of the conformities during the "warranty period" within the meaning of Md. Code, Com. Law § 14-1501(e). But the nonconformities continued to exist throughout this term, as they have not been fixed. Plaintiffs and class members are excused from notifying Volkswagen of the nonconformities because it was already fully aware of the problem—as it intentionally created it—and any repair attempt is futile.

1688. Volkswagen has had a reasonable opportunity to cure the nonconformities during the warranty period because of its actual knowledge of, creation of, and attempt to conceal the nonconformities, but has not done so as required under Md. Code, Com. Law § 14-1502.

1689. Plaintiff and the Class demand a full refund of the purchase price, including all license fees, registration fees, and any similar governmental charges. Md. Code, Com. Law § 14-1502(c). Once payment has been tendered, class members will return their vehicles.

## MARYLAND COUNT III:
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MD. CODE COM. LAW §§ 2-314 AND 2A-212)

1690. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1691. Plaintiffs bring this Count on behalf of the Maryland Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1692. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Md. Code Com. Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

1693. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Md. Code Com. Law § 2A-103(1)(p).

1694. The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Code Com. Law §§ 2-105(1) and 2a-103(1)(h).

1695.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Md. Code Com. Law §§ 2-314, and 2a-212.

1696.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1697.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

1698.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Maryland Class members have been damaged in an amount to be proven at trial.

**MARYLAND COUNT IV:**
**BREACH OF EXPRESS WARRANTY**
**(MD. CODE., COMMERCIAL LAW §§ 2-313 and 2a-210)**

1699.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1700.   Plaintiffs bring this Count on behalf of the Maryland Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1701.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Md. Code Com. Law § 2-104(1)  and "sellers" of motor vehicles under § 2-103(1)(d).

1702.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Md. Code Com. Law § 2A-103(1)(p).

1703.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Code Com. Law §§ 2-105(1) and 2a-103(1)(h).

1704.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1705.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1706.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1707.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1708.   As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1709.  The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Maryland Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1710.  Plaintiffs and the Maryland Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Maryland Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1711.  The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1712.  Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

1713.  In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

1714.  Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

1715.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Maryland Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1716.   Accordingly, recovery by Plaintiffs and the other Maryland Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Maryland Class members, seek all remedies as allowed by law.

1717.   Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs and the other Maryland Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1718.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Maryland Class members' remedies would be insufficient to make Plaintiffs and the other Maryland Class members whole.

1719.   Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Maryland Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Maryland Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1720.   The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

1721.   As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Maryland Class members have been damaged in an amount to be determined at trial.

## MASSACHUSETTS

### MASSACHUSETTS COUNT I:
### DECEPTIVE ACTS OR PRACTICES PROHIBITED BY MASSACHUSETTS LAW
### (Mass. Gen. Laws Ch. 93a, § 1, *et seq.*)

1722.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1723.   Plaintiffs Broadbent, Cunningham, Garcia, Matthews, Steudel, Scolnick, and Gotta (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Massachusetts Class against all Defendants.

1724.   Defendants, Plaintiffs, and the Massachusetts Class are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

1725.   Volkswagen engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

1726.   Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2. Volkswagen participated in misleading, false, or deceptive acts that violated the Massachusetts Act.

1727.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of

deliberately induced false readings. Plaintiffs and Massachusetts Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and Massachusetts Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

1728. Defendants thus violated the Act by, at minimum employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

1729. Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that Volkswagen would use and had used the Bosch technology as an emission defeat device, and in fact helped it do so. Without Bosch's complicity and silence, Volkswagen could not have perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions themselves constitute fraudulent, deceptive, and unfair practices.

1730. Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Massachusetts Act by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

1731. The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Massachusetts Act.

1732. Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

1733. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Massachusetts Class.

1734. Volkswagen knew or should have known that its conduct violated the Massachusetts Act.

1735. Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

  a. possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

  b. intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

  c. made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1736. Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

1737.  Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Massachusetts Class.

1738.  Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

1739.  Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Massachusetts Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1740.  Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Massachusetts Act.  All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

1741.  Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1742.  As a direct and proximate result of Defendants' violations of the Massachusetts Act, Plaintiffs and the Massachusetts Class have suffered injury-in-fact and/or actual damage.

1743.  Pursuant to Mass. Gen. Laws ch. 93A, § 9, Plaintiffs and the Massachusetts Class seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff

and each Massachusetts Class member. Because Volkswagen's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff and each Massachusetts Class member, up to three times actual damages, but no less than two times actual damages.

1744. Plaintiffs also seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

1745. On October 2, 2015, certain Plaintiffs sent a letter complying with Mass. Gen. Laws ch. 93A, § 9(3). Because Volkswagen failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Massachusetts Class are entitled.

1746. As a result of Volkswagen's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

### MASSACHUSETTS COUNT II:
### MASSACHUSETTS LEMON LAW
### (Mass. Gen. Laws Ch. 90, § 7N1/2(1))

1747. Plaintiff and the Class own or lease "motor vehicles" within the meaning of Mass. Gen. Laws Ch. 90, § 7N1/2(1), because these vehicles were constructed or designed for propulsion by power and were sold, leased, or replaced by Volkswagen. These vehicles are not: (1) auto homes, (2) vehicles built primarily for off-read use, and (3) used primarily for business purposes.

1748. The VW Entity Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of Mass. Gen. Laws Ch. 90, § 7N1/2(1).

1749. Plaintiff and the Class are "consumers" within the meaning of Mass. Gen. Laws Ch. 90, § 7N1/2(1) because they bought or leased the Class Vehicles or are otherwise entitled to the attendant terms of warranty.

1750. The Class Vehicles did not conform to their express and implied warranties because they were not cleaner vehicles and contained a "defeat device" designed to circumvent state and federal emissions standards. These devices did in fact circumvent emissions standards and substantially impaired the use, market value, and safety of their motor vehicles.

1751. Volkswagen had actual knowledge of the conformities during the "term of protection" within the meaning of Mass. Gen. Laws Ch. 90, §§ 7N1/2(1)–7N1/2(2). But the nonconformities continued to exist throughout this term, as they have not been fixed. Plaintiffs and class members are excused from notifying Volkswagen of the nonconformities because it was already fully aware of the problem—as it intentionally created it—and any repair attempt is futile.

1752. Volkswagen has had a reasonable opportunity to cure the nonconformities because of its actual knowledge of, creation of, and attempt to conceal the nonconformities, but has not done so as required under Mass. Gen. Laws Ch. 90, § 7N1/2(3).

1753. For vehicles purchased, Plaintiff and the Class demand a full refund of the contract price. For vehicles leased, Plaintiff and the Class demand a full refund of all payments made under the lease agreement. Plaintiff and the Class exercise their "unqualified right" to reject an offer of replacement and will retain their vehicles until payment is tendered under Mass. Gen. Laws Ch. 90, § 7N1/2(3).

<div style="text-align:center">

**MASSACHUSETTS COUNT III:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(MASS. GEN. LAWS c. 106 §§ 2-314 and 2A-212)**

</div>

1754. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1755. Plaintiffs bring this Count on behalf of the Massachusetts Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1756. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under M.G.L. c. 106 § 2-104(1) and is a "seller" of motor vehicles under § 2-103(1) (d).

1757. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under M.G.L. c. 106 § 2A-103(1)(p).

1758. The Class Vehicles are and were at all relevant times "goods" within the meaning of M.G.L. c. 106 §§ 2-105(1) and 2A-103(1)(h).

1759.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to M.G.L. c. 106 §§ 2-314 and 2A-212.

1760.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1761.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

1762.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Massachusetts Class members have been damaged in an amount to be proven at trial.

## MASSACHUSETTS COUNT IV:
## BREACH OF EXPRESS WARRANTY
## (MASS. GEN. LAWS C. 106 §§ 2-313 and 2A-210)

1763.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1764.   Plaintiffs bring this Count on behalf of the Massachusetts Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1765.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under M.G.L. c. 106 § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

1766.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under M.G.L c. 106 § 2A-103(1)(p).

1767.   The Class Vehicles are and were at all relevant times "goods" within the meaning of M.G.L. c. 106 §§ 2-105(1) and 2A-103(1)(h).

1768.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1769.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1770.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1771.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1772.   As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1773.  The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Massachusetts Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1774.  Plaintiffs and the Massachusetts Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Massachusetts Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1775.  The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1776.  Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

1777.  In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

1778.  Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

1779.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Massachusetts Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1780.   Accordingly, recovery by Plaintiffs and the other Massachusetts Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Massachusetts Class members, seek all remedies as allowed by law.

1781.   Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs and the other Massachusetts Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1782.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Massachusetts Class members' remedies would be insufficient to make Plaintiffs and the other Massachusetts Class members whole.

1783.   Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Massachusetts Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Massachusetts Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1784.   The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

1785.   As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Massachusetts Class members have been damaged in an amount to be determined at trial.

## MICHIGAN

### MICHIGAN COUNT I:
### VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
(Mich. Comp. Laws § 445.903, *et seq.*)

1786.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1787.   Plaintiffs Heilmann, Kingman, and Matthews (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Michigan Class against all Defendants.

1788.   Plaintiffs and the Michigan Class members were "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

1789.   At all relevant times, Volkswagen was a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

1790.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce …." Mich. Comp. Laws § 445.903(1).  Volkswagen engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that goods or services have … characteristics … that they do not have ….;" "(e) Representing that goods or services are of a particular standard … if they are of another;" "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;"

"(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

1791.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs and Michigan Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and Michigan Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

1792.   Defendants thus violated the Act by, at minimum employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

1793.   Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that Volkswagen would use and had used the Bosch technology as an emission defeat device, and in fact helped it do so. Without Bosch's complicity and silence, Volkswagen could not have perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions themselves constitute fraudulent, deceptive, and unfair practices.

1794.   Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

1795.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Michigan CPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

1796.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Michigan CPA.

1797.   Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Michigan Class.

1798.   Volkswagen knew or should have known that its conduct violated the Michigan CPA.

1799.   Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

      a.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

      b.     intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

- 431 -

      c.      made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1800. Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

1801. Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Michigan Class.

1802. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

1803. Plaintiffs and the Michigan Class suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Michigan Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1804. Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Michigan CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of

- 432 -

Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

1805. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1806. As a direct and proximate result of Defendants' violations of the Michigan CPA, Plaintiffs and the Michigan Class have suffered injury-in-fact and/or actual damage.

1807. Plaintiffs seek injunctive relief to enjoin Volkswagen from continuing its unfair and deceptive acts; monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiffs and each Michigan Class member; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

1808. Plaintiffs also seek punitive damages against Volkswagen because it carried out despicable conduct with willful and conscious disregard of the rights and safety of others. Volkswagen intentionally and willfully misrepresented the safety and reliability of the Class Vehicles, concealed material facts that only they knew, and repeatedly promised Plaintiffs and Michigan Class members that all vehicles were safe—all to avoid the expense and public relations nightmare of correcting a noxious flaw in the Class Vehicles. Volkswagen's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

**MICHIGAN COUNT II:**
**BREACH OF EXPRESS WARRANTY**
**(Mich. Comp. Laws §§ 440.2313 and 440.2860)**

1809. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1810. Plaintiffs bring this Count on behalf of the Michigan Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1811.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under MICH. COMP. LAWS § 440.2104(1)  and "sellers" of motor vehicles under § 440.2103(1)(c).

1812.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under MICH. COMP. LAWS § 440.2803(1)(p).

1813.   The Class Vehicles are and were at all relevant times "goods" within the meaning of MICH. COMP. LAWS §§ 440.2105(1) and 440.2803(1)(h).

1814.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1815.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1816.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1817.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in

materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1818. As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1819. The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Michigan Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1820. Plaintiffs and the Michigan Class members experienced defects within the warranty period. Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Michigan Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1821. The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1822. Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here. For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government. We are proceeding as quickly as possible.

1823. In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a

1    loss in resale values because of the scandal. He said that Volkswagen is not considering

2    providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

3        1824. Michael Horn's testimony serves as an admission that the limited warranty

4    promising to repair and/or correct a manufacturing defect fails in its essential purpose because the

5    VW Entity Defendants cannot meet that promise within a reasonable time.

6        1825. Furthermore, the limited warranty promising to repair and/or correct a

7    manufacturing defect fails in its essential purpose because the contractual remedy is insufficient

8    to make Plaintiffs and the other Michigan Class members whole and because the VW Entity

9    Defendants have failed and/or have refused to adequately provide the promised remedies within a

10   reasonable time.

11       1826. Accordingly, recovery by Plaintiffs and the other Michigan Class members is not

12   restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and

13   Plaintiffs, individually and on behalf of the other Michigan Class members, seek all remedies as

14   allowed by law.

15       1827. Also, as alleged in more detail herein, at the time the VW Entity Defendants

16   warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were

17   inherently defective and did not conform to their warranties; further, the VW Entity Defendants

18   had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs

19   and the other Michigan Class members were therefore induced to purchase or lease the Class

20   Vehicles under false and/or fraudulent pretenses.

21       1828. Moreover, many of the injuries flowing from the Class Vehicles cannot be

22   resolved through the limited remedy of "replacements or adjustments," as many incidental and

23   consequential damages have already been suffered because of Volkswagen's fraudulent conduct

24   as alleged herein, and because of its failure and/or continued failure to provide such limited

25   remedy within a reasonable time, and any limitation on Plaintiffs' and the other Michigan Class

26   members' remedies would be insufficient to make Plaintiffs and the other Michigan Class

27   members whole.

28

1829. Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Michigan Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Michigan Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1830. The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

1831. As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Michigan Class members have been damaged in an amount to be determined at trial.

<div align="center">

**MICHIGAN COUNT III:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Mich. Comp. Laws §§ 440.2314 and 440.2860)**

</div>

1832. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1833. Plaintiffs bring this Count on behalf of the Michigan Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1834. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under MICH. COMP. LAWS § 440.2104(1) and "sellers" of motor vehicles under § 440.2103(1)(d).

1835. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under MICH. COMP. LAWS § 440.2803(1)(p).

1836. The Class Vehicles are and were at all relevant times "goods" within the meaning of MICH. COMP. LAWS §§ 440.2105(1) and 440.2803(1)(h).

1837.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to MICH. COMP. LAWS §§ 440.2314 and 440.2862.

1838.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1839.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

1840.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Michigan Class members have been damaged in an amount to be proven at trial.

## MINNESOTA

### MINNESOTA COUNT I:
### VIOLATION OF MINNESOTA PREVENTION
### OF CONSUMER FRAUD ACT
### (Minn. Stat. § 325f.68, *et seq.*)

1841.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1842.   Plaintiffs Cyrankowski, Johnson, Mahle, McCarthy, Moen, Page, and Schuette (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Minnesota Class against all Defendants.

1843.   The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

1844.   The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise,

- 438 -

misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby …." Minn. Stat. § 325F.69(1). Volkswagen participated in misleading, false, or deceptive acts that violated the Minnesota CFA.

1845. In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs and Minnesota Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and Minnesota Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

1846. Defendants thus violated the Act by, at minimum employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

1847. Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

1848. Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that Volkswagen would use and had used the Bosch technology as an emission defeat device, and in fact helped it do so. Without Bosch's complicity and silence, Volkswagen could not have

perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions themselves constitute fraudulent, deceptive, and unfair practices.

1849. Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Minnesota CFA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

1850. The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Minnesota CFA.

1851. Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

1852. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Minnesota Class.

1853. Volkswagen knew or should have known that its conduct violated the Minnesota CFA.

1854. Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

   a. possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b. intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

c. made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1855. Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

1856. Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Minnesota Class.

1857. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

1858. Plaintiffs and the Minnesota Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Minnesota Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1859. Volkswagen had an ongoing duty to all Volkswagen and Audi customers to refrain from unfair and deceptive practices under the Minnesota CFA. All owners of Class Vehicles

suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

1860.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1861.   As a direct and proximate result of Defendants' violations of the Minnesota CFA, Plaintiffs and the Minnesota Class have suffered injury-in-fact and/or actual damage.

1862.   Pursuant to Minn. Stat. § 8.31(3a), Plaintiffs and the Minnesota Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

1863.   Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Volkswagen's acts show deliberate disregard for the rights or safety of others.

<div align="center">

**MINNESOTA COUNT II:**
**VIOLATION OF MINNESOTA UNIFORM**
**DECEPTIVE TRADE PRACTICES ACT**
**(Minn. Stat. § 325d.43-48, *et seq.*)**

</div>

1864.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1865.   This claim is brought on behalf of the Minnesota Class against all Defendants.

1866.   The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises goods or services with intent not to sell them as advertised."  Minn. Stat. § 325D.44.  In the course of the Volkswagen's business, it engaged in deceptive practices by representing that Class Vehicles have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that

1  they do not have; representing that Class Vehicles are of a particular standard, quality, or grade,

2  or that goods are of a particular style or model, if they are of another; and advertising Class

3  Vehicles with intent not to sell them as advertised. Volkswagen participated in misleading, false,

4  or deceptive acts that violated the Minnesota DTPA.

5  By failing to disclose and by actively concealing the "defeat device" and the true

6  cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as

7  safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a

8  reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood

9  behind its vehicles after they were sold, Volkswagen engaged in deceptive business practices

10  prohibited by the Minnesota DTPA.

11  1867. Volkswagen's actions as set forth above occurred in the conduct of trade or

12  commerce.

13  1868. In the course of its business, Volkswagen willfully failed to disclose and actively

14  concealed the illegal defeat device and the true cleanliness and performance of the "clean" diesel

15  engine system discussed herein and otherwise engaged in activities with a tendency or capacity to

16  deceive. Volkswagen also engaged in unlawful trade practices by employing deception,

17  deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of

18  any material fact with intent that others rely upon such concealment, suppression or omission, in

19  connection with the sale of Class Vehicles.

20  1869. Volkswagen's actions as set forth above occurred in the conduct of trade or

21  commerce.

22  1870. Defendants engaged in misleading, false, unfair or deceptive acts or practices that

23  violated the Minnesota DTPA by installing, failing to disclose and actively concealing the illegal

24  defeat device and the true cleanliness and performance of the "clean" diesel engine system, by

25  marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and

26  by presenting itself as a reputable manufacturer that valued environmental cleanliness and

27  efficiency, and that stood behind its vehicles after they were sold.

28

1871.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Minnesota DTPA.

1872.   Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

1873.   Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Minnesota Class.

1874.   Volkswagen knew or should have known that its conduct violated the Minnesota DTPA.

1875.   Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

> a.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;
>
> b.   intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or
>
> c.   made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1876.   Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the

defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

1877. Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Minnesota Class.

1878. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

1879. Plaintiffs and the Minnesota Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Minnesota Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use. Plaintiffs did not receive the benefit of their bargain as a result of Volkswagen's misconduct.

1880. Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Minnesota DTPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

1881. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1882. As a direct and proximate result of Defendants' violations of the Minnesota DTPA, Plaintiffs and the Minnesota Class have suffered injury-in-fact and/or actual damage.

1883. Pursuant to Minn. Stat. § 8.31(3a) and 325D.45, Plaintiffs and the Minnesota Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

1884. Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) give the clear and convincing evidence that Volkswagen's acts show deliberate disregard for the rights or safety of others.

<div align="center">

**MINNESOTA COUNT III:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Minn. Stat. §§ 336.2-314 and 336.2A-212)**

</div>

1885. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1886. Plaintiffs bring this Count on behalf of the Minnesota Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1887. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Minn. Stat. § 336.2-104(1) and "sellers" of motor vehicles under § 336.2-103(1)(d).

1888. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

1889. The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. § 336.2-105(1) and 336.2A-103(1)(h).

1890. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Minn. Stat. §§ 336.2-314 and 336.2A-212.

1891. These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal

and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1892. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

1893. As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Minnesota Class members have been damaged in an amount to be proven at trial.

<div align="center">

**MINNESOTA COUNT IV:**
**BREACH OF EXPRESS WARRANTY**
**(Minn. Stat. §§ 336.2-313 and 336.2A-210)**

</div>

1894. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1895. Plaintiffs bring this Count on behalf of the Minnesota Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1896. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Minn. Stat. § 336.2-104(1) and "sellers" of motor vehicles under § 336.2-103(1)(d).

1897. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

1898. The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

1899. In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1900.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1901.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1902.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1903.   As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1904.   The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Minnesota Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1905.   Plaintiffs and the Minnesota Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Minnesota Class members that the Class Vehicles were intentionally designed and

manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1906. The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1907. Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here. For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government. We are proceeding as quickly as possible.

1908. In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal. He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

1909. Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

1910. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Minnesota Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1911. Accordingly, recovery by Plaintiffs and the other Minnesota Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Minnesota Class members, seek all remedies as allowed by law.

1912. Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other Minnesota Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1913. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Minnesota Class members' remedies would be insufficient to make Plaintiffs and the other Minnesota Class members whole.

1914. Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Minnesota Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Minnesota Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1915. The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

1916. As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Minnesota Class members have been damaged in an amount to be determined at trial.

### **MISSISSIPPI**

**MISSISSIPPI COUNT I:**
**VIOLATION OF MISSISSIPPI CONSUMER PROTECTION ACT**
**(Miss. Code. Ann. § 75-24-1, *et seq.*)**

1917. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1918. Plaintiffs Haxton and Katz (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Mississippi Class against all Defendants.

1919. The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair or deceptive trade practices in or affecting commerce." Miss. Code. Ann. § 75-24-5(1). Unfair or deceptive practices include, but are not limited to, "(e) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;" "(g) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(i) Advertising goods or services with intent not to sell them as advertised." Miss. Code. Ann. § 75-24-5. Volkswagen participated in deceptive trade practices that violated the Mississippi CPA as described herein, including representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard and quality when they are not; and advertising Class Vehicles with the intent not to sell them as advertised.

1920. In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of

deliberately induced false readings. Plaintiffs and Mississippi Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and Mississippi Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

1921. Defendants thus violated the Act by, at minimum employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

1922. Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that Volkswagen would use and had used the Bosch technology as an emission defeat device, and in fact helped it do so. Without Bosch's complicity and silence, Volkswagen could not have perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions themselves constitute fraudulent, deceptive, and unfair practices.

1923. Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Mississippi CPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

1924. The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Mississippi CPA.

1925. Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

1926. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Mississippi Class.

1927. Volkswagen knew or should have known that its conduct violated the Mississippi CPA.

1928. Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.    made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1929. Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

1930. Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Mississippi Class.

1931. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

1932. Plaintiffs and the Mississippi Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Mississippi Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1933. Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Mississippi CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

1934. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1935. As a direct and proximate result of Defendants' violations of the Mississippi CPA, Plaintiffs and the Mississippi Class have suffered injury-in-fact and/or actual damage.

1936. Plaintiffs' seek actual damages in an amount to be determined at trial any other just and proper relief available under the Mississippi CPA.

## MISSISSIPPI COUNT II:
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(Miss. Code §§ 75-2-314 and 75-2A-212)

1937.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1938.   Plaintiffs bring this Count on behalf of the Mississippi Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1939.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Miss. Code § 75-2-104(1) and "sellers" of motor vehicles under § 75-2-103(1)(d).

1940.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Miss. Code § 75-2A-103(1)(p).

1941.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Miss. Code §§ 75-2-105(1) and 75-2A-103(1)(h).

1942.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Miss. Code §§ 75-2-314 and 75-2A-212.

1943.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1944.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

- 455 -

1945.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Mississippi Class members have been damaged in an amount to be proven at trial.

<div align="center">

**MISSISSIPPI COUNT III:**
**BREACH OF EXPRESS WARRANTY**
**(Miss. Code §§ 75-2-313 and 75-2A-210)**

</div>

1946.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1947.   Plaintiffs bring this Count on behalf of the Mississippi Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1948.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Miss. Code § 75-2-104(1) and "sellers" of motor vehicles under § 75-2-103(1)(d).

1949.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Miss. Code § 75-2A-103(1)(p).

1950.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Miss. Code §§ 75-2-105(1) and 75-2A-103(1)(h).

1951.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1952.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1953.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1954.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1955.  As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1956.  The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Mississippi Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1957.  Plaintiffs and the Mississippi Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Mississippi Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1958.  The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1959.  Afforrding the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

1960.  In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum."  When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

1961.  Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

1962.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Mississippi Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1963.  Accordingly, recovery by Plaintiffs and the other Mississippi Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Mississippi Class members, seek all remedies as allowed by law.

1964.  Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants

- 458 -

had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other Mississippi Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1965. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Mississippi Class members' remedies would be insufficient to make Plaintiffs and the other Mississippi Class members whole.

1966. Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Mississippi Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Mississippi Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1967. The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

1968. As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Mississippi Class members have been damaged in an amount to be determined at trial.

## MISSOURI

### MISSOURI COUNT I:
### VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT
### (Mo. Rev. Stat. § 407.010, *et seq.*)

1969. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1970.   Plaintiffs Walawender, Morrey, and Zucker (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Missouri Class against all Defendants.

1971.   Volkswagen, Plaintiffs and the Missouri Class are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

1972.   Volkswagen engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

1973.   The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise Mo. Rev. Stat. § 407.020.

1974.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.  Plaintiffs and Missouri Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology.  Plaintiffs and Missouri Class members did not and could not unravel Volkswagen's deception on their own.  In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

1975.   By failing to disclose these defects or facts about the defects described herein known to it or that were available to Volkswagen upon reasonable inquiry, Volkswagen deprived consumers of all material facts about the safety and functionality of their vehicles. By failing to release material facts about the defect, Volkswagen curtailed or reduced the ability of consumers

to take notice of material facts about their vehicle, and/or it affirmatively operated to hide or keep those facts from consumers. 15 Mo. Code of State Reg. § 60-9.110. Moreover, Volkswagen has otherwise engaged in activities with a tendency or capacity to deceive. Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, unfair practices, and/or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

1976. In the course of Volkswagen's business, Volkswagen engaged in misleading, false, unfair or deceptive acts or practices that violated Missouri law by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

1977. The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates Missouri law.

1978. Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

1979. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Missouri Class, including without limitation by failing to disclose the defects in light of circumstances under which the omitted facts

were necessary in order to correct the assumptions, inferences or representations being made by Volkswagen about the environmental cleanliness and efficiency of its vehicles. Consequently, the failure to disclose such facts amounts to misleading statements pursuant to 15 Mo. Code of State Reg. § 60-9.090.

1980. Because Volkswagen knew or believed that its statements regarding environmental cleanliness and efficiency of its vehicles were not in accord with the facts and/or had no reasonable basis for such statements in light of its knowledge of these defects, Volkswagen engaged in fraudulent misrepresentations pursuant to 15 Mo. Code of State Reg. 60-9.100.

1981. Volkswagen's conduct as described herein is unethical, oppressive, or unscrupulous and/or it presented a risk of substantial injury to consumers. Such acts are unfair practices in violation of 15 Mo. Code of State Reg. 60-8.020.

1982. Volkswagen knew or should have known that its conduct violated the Missouri MPA.

1983. Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.    made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1984. Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

1985. Defendants' supply and use of the illegal defeat device and concealment of the true

characteristics of the "clean" diesel engine system were material to Plaintiffs and the Missouri

Class.

1986. Defendants' unfair or deceptive acts or practices were likely to and did in fact

deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand,

the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the

Class Vehicles.

1987. Plaintiffs and the Missouri Class suffered ascertainable loss and actual damages as

a direct and proximate result of Defendants' misrepresentations and its concealment of and failure

to disclose material information. Plaintiffs and the Missouri Class members who purchased or

leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles'

true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have

paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well

as lost or diminished use.

1988. Volkswagen had an ongoing duty to all Volkswagen customers to refrain from

unfair and deceptive practices under the Missouri MPA. All owners of Class Vehicles suffered

ascertainable loss in the form of the diminished value of their vehicles as a result of

Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's

business.

1989. Defendants' violations present a continuing risk to Plaintiffs as well as to the

general public. Defendants' unlawful acts and practices complained of herein affect the public

interest.

1990. As a direct and proximate result of Defendants' violations of the Missouri MPA,

Plaintiffs and the Missouri Class have suffered injury-in-fact and/or actual damage.

1991. Volkswagen is liable to Plaintiffs and the Missouri Class for damages in amounts

to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive

relief enjoining Volkswagen's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

<div align="center">

**MISSOURI COUNT II:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Mo. Stat. §§ 400.2-314 and 400.2A-212)**

</div>

1992.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1993.   Plaintiffs bring this Count on behalf of the Missouri Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

1994.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Mo. Stat. § 400.2-104(1) and "sellers" of motor vehicles under § 400.2-103(1)(d).

1995.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Mo. Stat. § 400.2A-103(1)(p).

1996.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).5.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mo. Stat. § 400.2-314 and Mo. Stat. § 400.2A-212.

1997.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1998.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

1999. As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Missouri Class members have been damaged in an amount to be proven at trial.

<div align="center">

**MISSOURI COUNT III:**
**BREACH OF EXPRESS WARRANTY**
**(Mo. Stat. §§ 400.2-313 and 400.2A-210)**

</div>

2000. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2001. Plaintiffs bring this Count on behalf of the Missouri Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2002. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Mo. Stat. § 400.2-104(1) and "sellers" of motor vehicles under § 400.2-103(1)(d).

2003. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Mo. Stat. § 400.2A-103(1)(p).

2004. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

2005. In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

2006. The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2007. The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2008. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2009. As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

2010. The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Missouri Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2011. Plaintiffs and the Missouri Class members experienced defects within the warranty period. Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Missouri Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2012. The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2013. Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here. For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government. We are proceeding as quickly as possible.

2014. In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal. He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

2015. Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

2016. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Missouri Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2017. Accordingly, recovery by Plaintiffs and the other Missouri Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Missouri Class members, seek all remedies as allowed by law.

2018. Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants

had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other Missouri Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2019. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Missouri Class members' remedies would be insufficient to make Plaintiffs and the other Missouri Class members whole.

2020. Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Missouri Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Missouri Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2021. The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

2022. As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Missouri Class members have been damaged in an amount to be determined at trial.

## MONTANA

### MONTANA COUNT I:
### VIOLATION OF MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT OF 1973
### (Mont. Code Ann. § 30-14-101, *et seq.*)

2023. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2024.   Plaintiffs Di Mauro and Lorenz (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Montana Class against all Defendants.

2025.   Defendants, Plaintiffs and the Montana Class are "persons" within the meaning of Mont. Code Ann. § 30-14-102(6).

2026.   Montana Class members are "consumer[s]" under MONT. CODE ANN. § 30-14-102(1).

2027.   The sale or lease of the Class Vehicles to Montana Class members occurred within "trade and commerce" within the meaning of Mont. Code Ann. § 30-14-102(8), and Volkswagen committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

2028.   The Montana Unfair Trade Practices and Consumer Protection Act ("Montana CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mont. Code Ann. § 30-14-103.

2029.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs and Montana Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and Montana Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

2030.   Defendants thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any

1   material fact with intent that others rely upon such concealment, suppression or omission, in

2   connection with the sale of Class Vehicles.

3       2031.   Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's

4   unfair and deceptive conduct, as alleged herein.  Bosch knew or should have known that

5   Volkswagen would use and had used the Bosch technology as an emission defeat device, and in

6   fact helped it do so.  Without Bosch's complicity and silence, Volkswagen could not have

7   perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions

8   themselves constitute fraudulent, deceptive, and unfair practices.

9       2032.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that

10  violated the Montana CPA by installing, failing to disclose and actively concealing the illegal

11  defeat device and the true cleanliness and performance of the "clean" diesel engine system, by

12  marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and

13  by presenting itself as a reputable manufacturer that valued environmental cleanliness and

14  efficiency, and that stood behind its vehicles after they were sold.

15      2033.    The Clean Air Act and EPA regulations require that automobiles limit their

16  emissions output to specified levels.  These laws are intended for the protection of public health

17  and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

18  Clean Air Act and its regulations.  See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By

19  installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

20  for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the

21  Montana CPA.

22      2034.   Defendants knew the true nature of its "clean" diesel engine system for at least six

23  years, but concealed all of that information until recently. Volkswagen was also aware that it

24  valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it

25  was manufacturing, selling, and distributing vehicles throughout the United States that did not

26  comply with EPA regulations. Volkswagen concealed this information as well.

27      2035.   Volkswagen intentionally and knowingly misrepresented material facts regarding

28  the Class Vehicles with intent to mislead Plaintiffs and the Montana Class.

2036.   Volkswagen knew or should have known that its conduct violated the Montana CPA.

2037.   Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

a.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.   intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

c.   made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2038.   Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished.  In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

2039.   Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Montana Class.

2040.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

2041.   Plaintiffs and the Montana Class ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Montana Class members who purchased or

leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles'
true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have
paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well
as lost or diminished use.

2042. Defendants had an ongoing duty to all Volkswagen customers to refrain from
unfair and deceptive practices under the Montana CPA. All owners of Class Vehicles suffered
ascertainable loss in the form of the diminished value of their vehicles as a result of
Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's
business.

2043. Defendants' violations present a continuing risk to Plaintiffs as well as to the
general public. Defendants' unlawful acts and practices complained of herein affect the public
interest.

2044. As a direct and proximate result of Defendants' violations of the Montana CPA,
Plaintiffs and the Montana Class have suffered injury-in-fact and/or actual damage.

2045. Because Volkswagen's unlawful methods, acts, and practices have caused
Montana Class members to suffer an ascertainable loss of money and property, the Montana Class
seeks from Volkswagen actual damages or $500, whichever is greater, discretionary treble
damages, reasonable attorneys' fees, an order enjoining Volkswagen's unfair, unlawful, and/or
deceptive practices, and any other relief the Court considers necessary or proper, under Mont.
Code Ann. § 30-14-133.

**MONTANA COUNT II:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Mont. Code §§ 30-2-314 and 30-2A-212)**

2046. Plaintiffs reallege and incorporate by reference all allegations of the preceding
paragraphs as though fully set forth herein.

2047. Plaintiffs bring this Count on behalf of the Montana Class, against VW AG, VW
America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW
Entity Defendants").

- 472 -

2048. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Mont. Code § 30-2-104(1) and "sellers" of motor vehicles under § 30-2-103(1)(d).

2049. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Mont. Code § 30-2A-103(1)(p).

2050. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mont. Code §§ 30-2-105(1) and 30-2A-103(1)(h).5.      A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mont. Code §§ 30-2-314 and 30-2A-212.

2051. These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2052. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

2053. As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Montana Class members have been damaged in an amount to be proven at trial.

**MONTANA COUNT III:**
**BREACH OF EXPRESS WARRANTY**
**(Mont. Code §§ 30-2-313 and 30-2A-210)**

2054. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2055. Plaintiffs bring this Count on behalf of the Montana Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2056.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Mont. Code § 30-2-104(1) and "sellers" of motor vehicles under § 30-2-103(1)(d).

2057.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Mont. Code § 30-2A-103(1)(p).

2058.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mont. Code §§ 30-2-105(1) and 30-2A-103(1)(h).

2059.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

2060.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2061.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2062.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in

materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2063.   As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

2064.   The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Montana Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2065.   Plaintiffs and the Montana Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Montana Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2066.   The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2067.   Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

2068.   In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a

1    loss in resale values because of the scandal.  He said that Volkswagen is not considering

2    providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

3         2069.   Michael Horn's testimony serves as an admission that the limited warranty

4    promising to repair and/or correct a manufacturing defect fails in its essential purpose because the

5    VW Entity Defendants cannot meet that promise within a reasonable time.

6         2070.   Furthermore, the limited warranty promising to repair and/or correct a

7    manufacturing defect fails in its essential purpose because the contractual remedy is insufficient

8    to make Plaintiffs and the other Montana Class members whole and because the VW Entity

9    Defendants have failed and/or have refused to adequately provide the promised remedies within a

10   reasonable time.

11        2071.   Accordingly, recovery by Plaintiffs and the other Montana Class members is not

12   restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and

13   Plaintiffs, individually and on behalf of the other Montana Class members, seek all remedies as

14   allowed by law.

15        2072.   Also, as alleged in more detail herein, at the time the VW Entity Defendants

16   warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were

17   inherently defective and did not conform to their warranties; further, the VW Entity Defendants

18   had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs

19   and the other Montana Class members were therefore induced to purchase or lease the Class

20   Vehicles under false and/or fraudulent pretenses.

21        2073.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

22   resolved through the limited remedy of "replacements or adjustments," as many incidental and

23   consequential damages have already been suffered because of Volkswagen's fraudulent conduct

24   as alleged herein, and because of its failure and/or continued failure to provide such limited

25   remedy within a reasonable time, and any limitation on Plaintiffs' and the other Montana Class

26   members' remedies would be insufficient to make Plaintiffs and the other Montana Class

27   members whole.

28

2074.  Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Montana Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Montana Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2075.  The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

2076.  As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Montana Class members have been damaged in an amount to be determined at trial.

## NEBRASKA

### NEBRASKA COUNT I:
### VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT
### (Neb. Rev. Stat. § 59-1601, *et seq.*)

2077.  Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2078.  Plaintiffs Schram and Stirek (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Nebraska Class against all Defendants.

2079.  Volkswagen, Plaintiffs and Nebraska Class members are "person[s]" under the Nebraska Consumer Protection Act ("Nebraska CPA"), Neb. Rev. Stat. § 59-1601(1).

2080.  Volkswagen's actions as set forth herein occurred in the conduct of trade or commerce as defined under Neb. Rev. Stat. § 59-1601(2).

2081.  The Nebraska CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Neb. Rev. Stat. § 59-1602.  The conduct Volkswagen as set forth herein constitutes unfair or deceptive acts or practices.

2082.  In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device

1    software in the Class Vehicles that caused the vehicles to operate in a low emission test mode

2    only during emissions testing. During normal operations, the Class Vehicles would emit grossly

3    larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The

4    result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of

5    deliberately induced false readings. Plaintiffs and Nebraska Class members had no way of

6    discerning that Volkswagen's representations were false and misleading because Volkswagen's

7    defeat device software was extremely sophisticated technology. Plaintiffs and Nebraska Class

8    members did not and could not unravel Volkswagen's deception on their own. In fact, it took

9    years before the academic engineering community—specifically a research team at WVU's

10   Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using

11   sophisticated, expensive equipment and applying decades of combined experience.

12        2083.   Defendants thus violated the Act by, at minimum employing deception, deceptive

13   acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any

14   material fact with intent that others rely upon such concealment, suppression or omission, in

15   connection with the sale of Class Vehicles.

16        2084.   Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's

17   unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that

18   Volkswagen would use and had used the Bosch technology as an emission defeat device, and in

19   fact helped it do so. Without Bosch's complicity and silence, Volkswagen could not have

20   perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions

21   themselves constitute fraudulent, deceptive, and unfair practices.

22        2085.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that

23   violated the Nebraska CPA by installing, failing to disclose and actively concealing the illegal

24   defeat device and the true cleanliness and performance of the "clean" diesel engine system, by

25   marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and

26   by presenting itself as a reputable manufacturer that valued environmental cleanliness and

27   efficiency, and that stood behind its vehicles after they were sold.

28

2086.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Nebraska CPA.

2087.   Volkswagen has known of its use of the "defeat device" and the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations.  Volkswagen concealed this information as well.

2088.   Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Nebraska Class.

2089.   Volkswagen knew or should have known that its conduct violated the Nebraska CPA.

2090.   Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles and the devaluing of environmental cleanliness and integrity at Volkswagen, because Volkswagen:

    a.    possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.    made incomplete representations about the safety, cleanliness, efficiency and reliability of the Class Vehicles generally, and the use of the "defeat device" and true nature of the "clean" diesel engine system in particular, while

- 479 -

purposefully withholding material facts from Plaintiffs that contradicted these representations.

2091. Defendants concealed the illegal defeat device and the true emissions and performance of the "clean" diesel engine system, resulting in a raft of negative publicity once the use of the "defeat device" and true characteristics of the "clean" diesel engine system finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

2092. Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiff and the Nebraska Class. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles.

2093. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

2094. Plaintiff and the Nebraska Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Nebraska Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

2095. Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive acts or practices under the Nebraska CPA. All owners of Class Vehicles

- 480 -

suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

2096. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2097. As a direct and proximate result of Defendants' violations of the Nebraska CPA, Plaintiff and the Nebraska Class have suffered injury-in-fact and/or actual damage.

2098. Because Volkswagen's conduct caused injury to Nebraska Class members' property through violations of the Nebraska CPA, the Nebraska Class seeks recovery of actual damages, as well as enhanced damages up to $1,000, an order enjoining Volkswagen's unfair or deceptive acts and practices, costs of Court, reasonable attorneys' fees, and any other just and proper relief available under Neb. Rev. Stat. § 59-1609.

### NEBRASKA COUNT II:
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Neb.Rev.St. U.C.C. §§ 2-314 and 2A-212)

2099. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2100. Plaintiffs bring this Count on behalf of the Nebraska Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2101. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Neb.Rev.St. U.C.C. § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

2102. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Neb.Rev.St. U.C.C. § 2A-103(1)(p).

2103. The Class Vehicles are and were at all relevant times "goods" within the meaning of Neb.Rev.St. U.C.C. §§ 2-105(1) and 2A-103(1)(h).

2104.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Neb.Rev.St. U.C.C.§§ 2-314 and 2A-212.

2105.  These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2106.  Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

2107.  As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Nebraska Class members have been damaged in an amount to be proven at trial.

### NEBRASKA COUNT III:
### BREACH OF EXPRESS WARRANTY
### (Neb.Rev.St. U.C.C. §§ 2-313 and 2A-210)

2108.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2109.  Plaintiffs bring this Count on behalf of the Nebraska Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2110.  The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Neb.Rev.St. U.C.C. § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

2111.  With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Neb.Rev.St. U.C.C. § 2A-103(1)(p).

2112. The Class Vehicles are and were at all relevant times "goods" within the meaning of Neb.Rev.St. U.C.C. §§ 2-105(1) and 2A-103(1)(h).

2113. In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

2114. The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2115. The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2116. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2117. As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

2118.   The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Nebraska Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2119.   Plaintiffs and the Nebraska Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Nebraska Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2120.   The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2121.   Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

2122.   In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum."  When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

2123.   Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

2124.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Nebraska Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2125.   Accordingly, recovery by Plaintiffs and the other Nebraska Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Nebraska Class members, seek all remedies as allowed by law.

2126.   Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs and the other Nebraska Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2127.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Nebraska Class members' remedies would be insufficient to make Plaintiffs and the other Nebraska Class members whole.

2128.   Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Nebraska Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Nebraska Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2129.   The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

2130.   As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Nebraska Class members have been damaged in an amount to be determined at trial.

<div align="center">

**NEVADA**

**NEVADA COUNT I:**
**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT**
**(Nev. Rev. Stat. § 598.0903, *et seq.*)**

</div>

2131.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2132.   Plaintiffs Berman, Perlmutter, and Peterson (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Nevada Class against all Defendants.

2133.   The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), NEV. REV. STAT. § 598.0903, *et seq.* prohibits deceptive trade practices.  NEV. REV. STAT. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person:  "5.  Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7.  Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "9.  Advertises goods or services with intent not to sell or lease them as advertised"; or "15.  Knowingly makes any other false representation in a transaction."

2134.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device

1   software in the Class Vehicles that caused the vehicles to operate in a low emission test mode

2   only during emissions testing.  During normal operations, the Class Vehicles would emit grossly

3   larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The

4   result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of

5   deliberately induced false readings.  Plaintiffs and Nevada Class members had no way of

6   discerning that Volkswagen's representations were false and misleading because Volkswagen's

7   defeat device software was extremely sophisticated technology.  Plaintiffs and Nevada Class

8   members did not and could not unravel Volkswagen's deception on their own.  In fact, it took

9   years before the academic engineering community—specifically a research team at WVU's

10  Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using

11  sophisticated, expensive equipment and applying decades of combined experience.

12      2135.   Defendants thus violated the Act by, at minimum:  knowingly representing that

13  Class Vehicles have uses and benefits which they do not have; representing that Class Vehicles

14  are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with

15  the intent not to sell or lease them as advertised; and representing that the subject of a transaction

16  involving Class Vehicles has been supplied in accordance with a previous representation when it

17  has not; and knowingly making other false representations in a transaction.

18      2136.   Volkswagen's actions as set forth above occurred in the conduct of trade or

19  commerce.

20      2137.   Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's

21  unfair and deceptive conduct, as alleged herein.  Bosch knew or should have known that

22  Volkswagen would use and had used the Bosch technology as an emission defeat device, and in

23  fact helped it do so.  Without Bosch's complicity and silence, Volkswagen could not have

24  perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions

25  themselves constitute fraudulent, deceptive, and unfair practices.

26      2138.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that

27  violated the Nevada DTPA by installing, failing to disclose and actively concealing the illegal

28  defeat device and the true cleanliness and performance of the "clean" diesel engine system, by

marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

2139. The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Nevada DTPA.

2140. Volkswagen has known of its use of the "defeat device" and the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

2141. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Nevada Class.

2142. Volkswagen knew or should have known that its conduct violated the Nevada DTPA.

2143. Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles and the devaluing of environmental cleanliness and integrity at Volkswagen, because Volkswagen:

    a.    possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

c.  made incomplete representations about the safety, cleanliness, efficiency and reliability of the Class Vehicles generally, and the use of the "defeat device" and true nature of the "clean" diesel engine system in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2144.  Because Defendants concealed the illegal defeat device and the true emissions and performance of the "clean" diesel engine system, resulting in a raft of negative publicity once the use of the "defeat device" and true characteristics of the "clean" diesel engine system finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

2145.  Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Nevada Class.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles.

2146.  Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

2147.  Plaintiffs and the Nevada Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Nevada Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

2148.  Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive acts or practices under the Nevada DTPA.  All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices that occurred in the course of Volkswagen's business.

2149.  Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

2150.  As a direct and proximate result of Defendants' violations of the Nevada DTPA, Plaintiffs and the Nevada Class have suffered injury-in-fact and/or actual damage.

2151.  Accordingly, Plaintiffs and the Nevada Class seek their actual damages, punitive damages, an order enjoining Volkswagen's deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada Deceptive Trade Practices Act.  NEV. REV. STAT. § 41.600.

## NEVADA COUNT II:
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.R.S. §§ 104.2314 and 104A.2212)

2152.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2153.  Plaintiffs bring this Count on behalf of the Nevada Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2154.  The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.R.S. § 104.2104(1) and "sellers" of motor vehicles under § 104.2103(1)(c).

2155.  With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under N.R.S. § 104A.2103(1)(p).

2156.  The Class Vehicles are and were at all relevant times "goods" within the meaning of N.R.S. §§ 104.2105(1) and 104A.2103(1)(h).

2157. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.R.S. §§ 104.2314 and 104A.2212.

2158. These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2159. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

2160. As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Nevada Class members have been damaged in an amount to be proven at trial.

**NEVADA COUNT III:**
**BREACH OF EXPRESS WARRANTY**
**(N.R.S. §§ 104.2313 and 104A.2210)**

2161. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2162. Plaintiffs bring this Count on behalf of the Nevada Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2163. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.R.S. § 104.2104(1) and "sellers" of motor vehicles under § 104.2103(1)(c).

2164. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under N.R.S. § 104A.2103(1)(p).

2165.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.R.S. §§ 104.2105(1) and 104A.2103(1)(h).

2166.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

2167.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2168.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2169.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2170.   As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

2171.  The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Nevada Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2172.  Plaintiffs and the Nevada Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Nevada Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2173.  The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2174.  Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

2175.  In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

2176.  Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

2177. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Nevada Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2178. Accordingly, recovery by Plaintiffs and the other Nevada Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Nevada Class members, seek all remedies as allowed by law.

2179. Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other Nevada Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2180. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Nevada Class members' remedies would be insufficient to make Plaintiffs and the other Nevada Class members whole.

2181. Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Nevada Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Nevada Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2182.  The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

2183.  As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Nevada Class members have been damaged in an amount to be determined at trial.

## NEW HAMPSHIRE

### NEW HAMPSHIRE COUNT I:
### VIOLATION OF N.H. CONSUMER PROTECTION ACT
### (N.H. Rev. Stat. Ann. § 358-a:1, *et seq.*)

2184.  Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2185.  Plaintiffs Minott, Grogan, and Gotta (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the New Hampshire Class against all Defendants.

2186.  Plaintiffs, the New Hampshire Class, and Defendants are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire CPA"), N.H. Rev. Stat. § 358-A:1.

2187.  Volkswagen's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. § 358-A:1.

2188.  The New Hampshire CPA prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but … not limited to, the following: … (V) Representing that goods or services have … characteristics, … uses, benefits, or quantities that they do not have;" "(VII) Representing that goods or services are of a particular standard, quality, or grade, … if they are of another;" and "(IX) Advertising goods or services with intent not to sell them as advertised."  N.H. Rev. Stat. § 358-A:2.

2189.  In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Class Vehicles would emit grossly

- 495 -

1   larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The

2   result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of

3   deliberately induced false readings. Plaintiffs and New Hampshire Class members had no way of

4   discerning that Volkswagen's representations were false and misleading because Volkswagen's

5   defeat device software was extremely sophisticated technology. Plaintiffs and New Hampshire

6   Class members did not and could not unravel Volkswagen's deception on their own. In fact, it

7   took years before the academic engineering community—specifically a research team at WVU's

8   Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using

9   sophisticated, expensive equipment and applying decades of combined experience.

10      2190.   Defendants thus violated the Act by, at minimum: employing deception, deceptive

11  acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any

12  material fact with intent that others rely upon such concealment, suppression or omission, in

13  connection with the sale of Class Vehicles.

14      2191.   Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's

15  unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that

16  Volkswagen would use and had used the Bosch technology as an emission defeat device, and in

17  fact helped it do so. Without Bosch's complicity and silence, Volkswagen could not have

18  perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions

19  themselves constitute fraudulent, deceptive, and unfair practices.

20      2192.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that

21  violated the New Hampshire CPA by installing, failing to disclose and actively concealing the

22  illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system,

23  by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality,

24  and by presenting itself as a reputable manufacturer that valued environmental cleanliness and

25  efficiency, and that stood behind its vehicles after they were sold.

26      2193.   The Clean Air Act and EPA regulations require that automobiles limit their

27  emissions output to specified levels. These laws are intended for the protection of public health

28  and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the New Hampshire CPA.

2194. Volkswagen has known of its use of the "defeat device" and the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

2195. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the New Hampshire Class.

2196. Volkswagen knew or should have known that its conduct violated the New Hampshire CPA.

2197. Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles and the devaluing of environmental cleanliness and integrity at Volkswagen, because Volkswagen:

     a.     possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

     b.     intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

     c.     made incomplete representations about the safety, cleanliness, efficiency and reliability of the Class Vehicles generally, and the use of the "defeat device" and true nature of the "clean" diesel engine system in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2198. Defendants concealed the illegal defeat device and the true emissions and performance of the "clean" diesel engine system, resulting in a raft of negative publicity once the use of the "defeat device" and true characteristics of the "clean" diesel engine system finally

1   began to be disclosed. The value of the Class Vehicles has greatly diminished.  In light of the

2   stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less

3   than they otherwise would be worth.

4   　　　2199.  Defendants' supply and use of the illegal defeat device and concealment of the true

5   characteristics of the "clean" diesel engine system were material to Plaintiffs and the New

6   Hampshire Class.  A vehicle made by a reputable manufacturer of environmentally friendly

7   vehicles is worth more than an otherwise comparable vehicle made by a disreputable and

8   dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than

9   make environmentally friendly vehicles.

10   　　　2200.  Defendants' unfair or deceptive acts or practices were likely to and did in fact

11   deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

12   cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand,

13   the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the

14   Class Vehicles.

15   　　　2201.  Plaintiffs and the New Hampshire Class suffered ascertainable loss and actual

16   damages as a direct and proximate result of Defendants' misrepresentations and its concealment

17   of and failure to disclose material information.  Plaintiffs and the New Hampshire Class members

18   who purchased or leased the Class Vehicles would not have purchased or leased them at all

19   and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered

20   legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished

21   value of their vehicles, as well as lost or diminished use.

22   　　　2202.  Defendants had an ongoing duty to all Volkswagen customers to refrain from

23   unfair and deceptive acts or practices under the New Hampshire CPA.  All owners of Class

24   Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a

25   result of Volkswagen's deceptive and unfair acts and practices that occurred in the course of

26   Volkswagen's business.

27

28

2203. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2204. As a direct and proximate result of Defendants' violations of the New Hampshire CPA, Plaintiffs and the New Hampshire Class have suffered injury-in-fact and/or actual damage.

2205. Because Volkswagen's willful conduct caused injury to New Hampshire Class members' property through violations of the New Hampshire CPA, the New Hampshire Class seeks recovery of actual damages or $1,000, whichever is greater, treble damages, costs and reasonable attorneys' fees, an order enjoining Volkswagen's unfair and/or deceptive acts and practices, and any other just and proper relief under N.H. REV. STAT. § 358-A:10.

### NEW HAMPSHIRE COUNT II:
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.H. Rev. Stat. §§ 382-A:2-314 and 382-A:2A-212)

2206. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2207. Plaintiffs bring this Count on behalf of the New Hampshire Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2208. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.H. Rev. Stat. § 382-A:2-104(1) and "sellers" of motor vehicles under § 382-A:2-103(1)(d).

2209. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

2210. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. §§ 382-A:2-105(1) and 382-A:2A-103(1)(h).

2211. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.H. Rev. Stat. §§ 382-A:2-314 and 382-A:2A-212.

2212.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2213.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

2214.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other New Hampshire Class members have been damaged in an amount to be proven at trial.

<div align="center">

**NEW HAMPSHIRE COUNT III:**
**BREACH OF EXPRESS WARRANTY**
**(N.H. Rev. Stat. §§ 382-A:2-313 and 382-A:2A-210)**

</div>

2215.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2216.   Plaintiffs bring this Count on behalf of the New Hampshire Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2217.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.H. Rev. Stat. § 382-A:2-104(1) and "sellers" of motor vehicles under § 382-A:2-103(1)(d).

2218.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

2219.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. §§ 382-A:2-105(1) and 2A-103(1)(h).

2220.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of

1  three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "any repair to
2  correct a manufacturers defect in materials or workmanship."

3      2221. The Clean Air Act requires manufacturers of light-duty vehicles to provide two
4  federal emission control warranties: a "Performance Warranty" and a "Design and Defect
5  Warranty."

6      2222. The EPA requires vehicle manufacturers to provide a Performance Warranty with
7  respect to the vehicles' emission systems. Thus, Volkswagen also provides an express warranty
8  for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty
9  required by the EPA applies to repairs that are required during the first two years or 24,000 miles,
10  whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major
11  emission control components are covered for the first eight years or 80,000 miles, whichever
12  comes first. These major emission control components subject to the longer warranty include the
13  catalytic converters, the electronic emission control unit, and the onboard emission diagnostic
14  device or computer.

15      2223. The EPA requires vehicle manufacturers to issue Design and Defect Warranties
16  with respect to their vehicles' emission systems. Thus, the VW Entity Defendants also provide an
17  express warranty for their vehicles through a Federal Emission Control System Defect Warranty.
18  The Design and Defect Warranty required by the EPA covers repair of emission control or
19  emission related parts which fail to function or function improperly because of a defect in
20  materials or workmanship. This warranty provides protection for two years or 24,000 miles,
21  whichever comes first, or, for the major emission control components, for eight years or 80,000
22  miles, whichever comes first.

23      2224. As manufacturers of light-duty vehicles, the VW Entity Defendants were required
24  to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

25      2225. The VW Entity Defendants' warranties formed a basis of the bargain that was
26  reached when Plaintiffs and other New Hampshire Class members purchased or leased their Class
27  Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

28

2226.   Plaintiffs and the New Hampshire Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and New Hampshire Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2227.   The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2228.   Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

2229.   In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

2230.   Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

2231.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other New Hampshire Class members whole and because the VW

1    Entity Defendants have failed and/or have refused to adequately provide the promised remedies

2    within a reasonable time.

3        2232.   Accordingly, recovery by Plaintiffs and the other New Hampshire Class members

4    is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect,

5    and Plaintiffs, individually and on behalf of the other New Hampshire Class members, seek all

6    remedies as allowed by law.

7        2233.   Also, as alleged in more detail herein, at the time the VW Entity Defendants

8    warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were

9    inherently defective and did not conform to their warranties; further, the VW Entity Defendants

10   had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs

11   and the other New Hampshire Class members were therefore induced to purchase or lease the

12   Class Vehicles under false and/or fraudulent pretenses.

13       2234.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

14   resolved through the limited remedy of "replacements or adjustments," as many incidental and

15   consequential damages have already been suffered because of Volkswagen's fraudulent conduct

16   as alleged herein, and because of its failure and/or continued failure to provide such limited

17   remedy within a reasonable time, and any limitation on Plaintiffs' and the other New Hampshire

18   Class members' remedies would be insufficient to make Plaintiffs and the other New Hampshire

19   Class members whole.

20       2235.   Finally, because of the VW Entity Defendants' breach of warranty as set forth

21   herein, Plaintiffs and the other New Hampshire Class members assert, as additional and/or

22   alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the

23   other New Hampshire Class members of the purchase or lease price of all Class Vehicles

24   currently owned or leased, and for such other incidental and consequential damages as allowed.

25       2236.   The VW Entity Defendants were provided notice of these issues by numerous

26   complaints filed against them, including the instant Complaint, within a reasonable amount of

27   time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade

28   clean air standards.

2237.   As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other New Hampshire Class members have been damaged in an amount to be determined at trial.

## **NEW JERSEY**

### **NEW JERSEY COUNT I:**
### **VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**
### (N.J. Stat. Ann. §§ 56:8-1, *et seq.*)

2238.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2239.   Plaintiffs Bandics, Christiana, Greczylo, Laspina, and Forbes (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the New Jersey Class against all Defendants.

2240.   Plaintiffs, the New Jersey Class members and Defendants are persons under the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1(d).

2241.   Volkswagen engaged in "sales" of "merchandise" within the meaning of N.J. Stat. §56:8-1(c), (e).  Volkswagen's actions as set forth herein occurred in the conduct of trade or commerce.

2242.   The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. § 56:8-2.

2243.   In the course of Volkswagen's business, Volkswagen intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed CleanDiesel engines in the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Class Vehicles would

1    emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable

2    standards. The result was what Volkswagen intended—the Class Vehicles passed emissions

3    testing by way of deliberately induced false readings. Plaintiffs and New Jersey Class members

4    had no way of discerning that Volkswagen's representations were false and misleading because

5    Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and

6    New Jersey Class members did not and could not unravel Volkswagen's deception on their own.

7    In fact, it took years before the academic engineering community—specifically a research team at

8    WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using

9    sophisticated, expensive equipment and applying decades of combined experience.

10        2244.   Volkswagen thus violated the provisions of the New Jersey CFA, at a minimum

11   by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities

12   which they do not have; (2) representing that the Class Vehicles are of a particular standard,

13   quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell

14   them as advertised; (4) failing to disclose information concerning the Class Vehicles with the

15   intent to induce consumers to purchase or lease the Class Vehicles; and (5) otherwise engaging in

16   conduct likely to deceive.

17        2245.   Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's

18   unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that

19   Volkswagen would use and had used the Bosch technology as an emission defeat device, and in

20   fact helped it do so. Without Bosch's complicity and silence, Volkswagen could not have

21   perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions

22   themselves constitute fraudulent, deceptive, and unfair practices.

23        2246.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that

24   violated the New Jersey CFA by installing, failing to disclose and/or actively concealing the

25   defeat device and the true cleanliness and performance of the "clean" diesel engine system, by

26   marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and

27   by presenting itself as a reputable manufacturer that valued environmental cleanliness and

28   efficiency, and that stood behind its vehicles after they were sold.

2247.  Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

2248.  The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.  Defeat devices like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal defeat devices in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the New Jersey CFA.

2249.  Volkswagen knew it had installed the defeat device in the Class Vehicles, and knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well.

2250.  Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the New Jersey Class.

2251.  Volkswagen knew or should have known that its conduct violated the New Jersey CPA.

2252.  Defendants owed Plaintiffs and New Jersey Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

 c. Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2253. Volkswagen fraudulently concealed the defeat device and the true cleanliness, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Volkswagen's fraud was exposed. The value of the Class Vehicles has therefore plummeted. In light of the stigma Volkswagen's misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

2254. Volkswagen's fraudulent use of the defeat device and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the New Jersey Class. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

2255. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and New Jersey Class members, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

2256. Plaintiffs and New Jersey Class members suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the New Jersey Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

2257.   Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the New Jersey CPA in the course of its business.

2258.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

2259.   As a result of the foregoing wrongful conduct of Defendants, Plaintiffs and the New Jersey Class have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, treble damages, an order enjoining Defendants' deceptive and unfair conduct, costs and reasonable attorneys' fees under N.J. Stat. § 56:8-19, and all other just and appropriate relief.

<div align="center">

**NEW JERSEY COUNT II:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.J.S. 12A:2-314 and 2A-212)**

</div>

2260.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2261.   Plaintiffs bring this Count on behalf of the New Jersey Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2262.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.J.S. 12A:2-104(1) and "sellers" of motor vehicles under 2-103(1)(d).

2263.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under N.J.S. 12A:2A-103(1)(p).

2264.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J.S. 12A:2-105(1) and 2A-103(1)(h).

2265.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.J.S. 12A:2-314 and 2A-212.

2266. These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2267. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

2268. As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other New Jersey Class members have been damaged in an amount to be proven at trial.

**NEW JERSEY COUNT III:**
**BREACH OF EXPRESS WARRANTY**
**(N.J.S. 12A:2-313 and 2A-210)**

2269. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2270. Plaintiffs bring this Count on behalf of the New Jersey Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2271. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.J.S. 12A:2-104(1) and "sellers" of motor vehicles under 2-103(1)(d).

2272. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under N.J.S. 12A:2A-103(1)(p).

2273. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J.S. 12A:2-105(1) and 2A-103(1)(h).

2274. In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of

1   three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "any repair to
2   correct a manufacturers defect in materials or workmanship."

3       2275.  The Clean Air Act requires manufacturers of light-duty vehicles to provide two
4   federal emission control warranties: a "Performance Warranty" and a "Design and Defect
5   Warranty."

6       2276.  The EPA requires vehicle manufacturers to provide a Performance Warranty with
7   respect to the vehicles' emission systems. Thus, Volkswagen also provides an express warranty
8   for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty
9   required by the EPA applies to repairs that are required during the first two years or 24,000 miles,
10  whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major
11  emission control components are covered for the first eight years or 80,000 miles, whichever
12  comes first. These major emission control components subject to the longer warranty include the
13  catalytic converters, the electronic emission control unit, and the onboard emission diagnostic
14  device or computer.

15      2277.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties
16  with respect to their vehicles' emission systems. Thus, the VW Entity Defendants also provide an
17  express warranty for their vehicles through a Federal Emission Control System Defect Warranty.
18  The Design and Defect Warranty required by the EPA covers repair of emission control or
19  emission related parts which fail to function or function improperly because of a defect in
20  materials or workmanship. This warranty provides protection for two years or 24,000 miles,
21  whichever comes first, or, for the major emission control components, for eight years or 80,000
22  miles, whichever comes first.

23      2278.  As manufacturers of light-duty vehicles, the VW Entity Defendants were required
24  to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

25      2279.  The VW Entity Defendants' warranties formed a basis of the bargain that was
26  reached when Plaintiffs and other New Jersey Class members purchased or leased their Class
27  Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

28

2280.   Plaintiffs and the New Jersey Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and New Jersey Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2281.   The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2282.   Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

2283.   In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

2284.   Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

2285.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other New Jersey Class members whole and because the VW Entity

1  Defendants have failed and/or have refused to adequately provide the promised remedies within a

2  reasonable time.

3      2286.   Accordingly, recovery by Plaintiffs and the other New Jersey Class members is not

4  restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and

5  Plaintiffs, individually and on behalf of the other New Jersey Class members, seek all remedies as

6  allowed by law.

7      2287.   Also, as alleged in more detail herein, at the time the VW Entity Defendants

8  warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were

9  inherently defective and did not conform to their warranties; further, the VW Entity Defendants

10  had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs

11  and the other New Jersey Class members were therefore induced to purchase or lease the Class

12  Vehicles under false and/or fraudulent pretenses.

13      2288.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

14  resolved through the limited remedy of "replacements or adjustments," as many incidental and

15  consequential damages have already been suffered because of Volkswagen's fraudulent conduct

16  as alleged herein, and because of its failure and/or continued failure to provide such limited

17  remedy within a reasonable time, and any limitation on Plaintiffs' and the other New Jersey Class

18  members' remedies would be insufficient to make Plaintiffs and the other New Jersey Class

19  members whole.

20      2289.   Finally, because of the VW Entity Defendants' breach of warranty as set forth

21  herein, Plaintiffs and the other New Jersey Class members assert, as additional and/or alternative

22  remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other New

23  Jersey Class members of the purchase or lease price of all Class Vehicles currently owned or

24  leased, and for such other incidental and consequential damages as allowed.

25      2290.   The VW Entity Defendants were provided notice of these issues by numerous

26  complaints filed against them, including the instant Complaint, within a reasonable amount of

27  time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade

28  clean air standards.

2291.   As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other New Jersey Class members have been damaged in an amount to be determined at trial.

## NEW MEXICO

### NEW MEXICO COUNT I:
### VIOLATIONS OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT
### (N.M. Stat. Ann. §§ 57-12-1, *et seq.*)

2292.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2293.   Plaintiffs Converse, Farmer, Hart Hoxeng, and Root and Root (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the New Mexico Class against all Defendants.

2294.   Volkswagen, Plaintiff and New Mexico Class members are or were "person[s]" under the New Mexico Unfair Trade Practices Act ("New Mexico UTPA"), N.M. STAT. ANN. § 57-12-2.

2295.   Volkswagen's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. STAT. ANN. § 57-12-2.

2296.   The New Mexico UTPA makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services … by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. STAT. ANN. § 57-12-2(D). Volkswagen's acts and omissions described herein constitute unfair or deceptive acts or practices under N.M. STAT. ANN. § 57-12-2(D). In addition, Volkswagen's actions constitute unconscionable actions under N.M. STAT. ANN. § 57-12-2(E), since they took advantage of the lack of knowledge, ability, experience, and capacity of the New Mexico Class members to a grossly unfair degree.

2297.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device

1    software in the Class Vehicles that caused the vehicles to operate in a low emission test mode

2    only during emissions testing.  During normal operations, the Class Vehicles would emit grossly

3    larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The

4    result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of

5    deliberately induced false readings.  Plaintiffs and New Mexico Class members had no way of

6    discerning that Volkswagen's representations were false and misleading because Volkswagen's

7    defeat device software was extremely sophisticated technology.  Plaintiffs and New Mexico Class

8    members did not and could not unravel Volkswagen's deception on their own.  In fact, it took

9    years before the academic engineering community—specifically a research team at WVU's

10   Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using

11   sophisticated, expensive equipment and applying decades of combined experience.

12         2298.  Defendants thus violated the Act by, at minimum employing deception, deceptive

13   acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any

14   material fact with intent that others rely upon such concealment, suppression or omission, in

15   connection with the sale of Class Vehicles.

16         2299.  Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's

17   unfair and deceptive conduct, as alleged herein.  Bosch knew or should have known that

18   Volkswagen would use and had used the Bosch technology as an emission defeat device, and in

19   fact helped it do so.  Without Bosch's complicity and silence, Volkswagen could not have

20   perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions

21   themselves constitute fraudulent, deceptive, and unfair practices.

22         2300.  Defendants engaged in misleading, false, unfair or deceptive acts or practices that

23   violated the New Mexico UTPA by installing, failing to disclose and actively concealing the

24   illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system,

25   by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality,

26   and by presenting itself as a reputable manufacturer that valued environmental cleanliness and

27   efficiency, and that stood behind its vehicles after they were sold.

28

2301. The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the New Mexico UTPA

2302. Volkswagen has known of its use of the "defeat device" and the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

2303. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the New Mexico Class.

2304. Volkswagen knew or should have known that its conduct violated the New Mexico UTPA.

2305. Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles and the devaluing of environmental cleanliness and integrity at Volkswagen, because Volkswagen:

    a. possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b. intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c. made incomplete representations about the safety, cleanliness, efficiency and reliability of the Class Vehicles generally, and the use of the "defeat device" and true nature of the "clean" diesel engine system in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

- 515 -

2306.  Defendants concealed the illegal defeat device and the true emissions and performance of the "clean" diesel engine system, resulting in a raft of negative publicity once the use of the "defeat device" and true characteristics of the "clean" diesel engine system finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished.  In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

2307.  Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the New Mexico Class.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles.

2308.  Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

2309.  Plaintiffs and the New Mexico Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the New Mexico Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

2310.  Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive acts or practices under the New Mexico UTPA.  All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a

result of Volkswagen's deceptive and unfair acts and practices that occurred in the course of Volkswagen's business.

2311.  Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

2312.  As a direct and proximate result of Defendants' violations of the New Mexico UTPA, Plaintiff and the New Mexico Class have suffered injury-in-fact and/or actual damage.

2313.  New Mexico Class members seek punitive damages against Volkswagen because Volkswagen's conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith.  Because Volkswagen's conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith, it warrants punitive damages.

2314.  Because Volkswagen's unconscionable, willful conduct caused actual harm to New Mexico Class members, the New Mexico Class seeks recovery of actual damages or $100, whichever is greater, discretionary treble damages, punitive damages, and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. STAT. ANN. § 57-12-10.

**NEW MEXICO COUNT II:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.M. Stat. §§ 55-2-314 and 55-2A-212)**

2315.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2316.  Plaintiffs bring this Count on behalf of the New Mexico Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2317.  The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.M. Stat. § 55-2-104(1) and "sellers" of motor vehicles under § 55-2-103(1)(d).

2318.  With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under N.M. Stat. § 55-2A-103(1)(p).

2319.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.M. Stat. §§ 55-2-105(1) and 55-2A-103(1)(h).

2320.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.M. Stat. §§ 55-2-314 and 55-2A-212.

2321.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2322.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

2323.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other New Mexico Class members have been damaged in an amount to be proven at trial.

**NEW MEXICO COUNT III:**
**BREACH OF EXPRESS WARRANTY**
**(N.M. Stat. §§ 55-2-313 and 55-2A-210)**

2324.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2325.   Plaintiffs bring this Count on behalf of the New Mexico Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2326.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.M. Stat. § 55-2-104(1) and "sellers" of motor vehicles under § 55-2-103(1)(d).

2327.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under N.M. Stat. § 55-2A-103(1)(p).

2328.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.M. Stat. §§ 55-2-105(1) and 55-2A-103(1)(h).

2329.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

2330.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2331.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2332.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2333.  As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

2334.  The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other New Mexico Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2335.  Plaintiffs and the New Mexico Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and New Mexico Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2336.  The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2337.  Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

2338.  In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum."  When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

2339.  Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

2340.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other New Mexico Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2341.  Accordingly, recovery by Plaintiffs and the other New Mexico Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other New Mexico Class members, seek all remedies as allowed by law.

2342.  Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs and the other New Mexico Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2343.  Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other New Mexico Class members' remedies would be insufficient to make Plaintiffs and the other New Mexico Class members whole.

2344.  Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other New Mexico Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other New

Mexico Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2345.   The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

2346.   As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other New Mexico Class members have been damaged in an amount to be determined at trial.

## NEW YORK

### NEW YORK COUNT I:
### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
### (N.Y. Gen. Bus. Law § 349)

2347.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2348.   Plaintiffs Bedard and Bedard, Eslick, Kirtland, Kolpan, Pagano, and Shaw (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the New York Class against all Defendants.

2349.   Plaintiffs, the New York Class members and all Defendants are "persons" under N.Y. Gen. Bus. Law §349(h), the New York Deceptive Acts and Practices Act ("NY DAPA").

2350.   Defendants' actions as set forth herein occurred in the conduct of trade or commerce under the NY DAPA.

2351.   The NY DAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349.  Defendants' conduct, as set forth herein, constitutes deceptive acts or practices under this section.

2352.   In the course of their business, Defendants intentionally or negligently concealed and suppressed material facts concerning the illegal emissions produced by the misnamed "CleanDiesel" engines in the Class Vehicles.  Defendants accomplished this by programming and installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate

1    in a low emission test mode only during emissions testing. During normal operations, the Class

2    Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over

3    applicable standards. The result was what Volkswagen intended – the Class Vehicles passed

4    emissions testing by way of deliberately induced false readings. Plaintiffs and New York Class

5    members had no way of discerning that Defendants' representations were false and misleading

6    because the Defendants' defeat device software was extremely sophisticated technology.

7    Plaintiffs and New York Class members did not and could not unravel the deception on their own.

8    In fact, it took years before the academic engineering community – specifically a research team at

9    WVU's Center for Alternative Fuels, Engines & Emissions – detected Volkswagen's cheat using

10   sophisticated, expensive equipment and applying decades of combined experience.

11        2353.  Volkswagen thus violated the provisions of the NY DAPA by, at a minimum:  (1)

12   representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they

13   do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and

14   grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as

15   advertised; (4) failing to disclose information concerning the Class Vehicles with the intent to

16   induce consumers to purchase or lease the Class Vehicles.

17        2354.  Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's

18   unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that

19   Volkswagen would use and had used the Bosch technology as an emission defeat device, and in

20   fact helped it do so. Without Bosch's complicity and silence, Volkswagen could not have

21   perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions

22   themselves constitute fraudulent, deceptive, and unfair practices.

23        2355.  Defendants engaged in misleading, false, unfair or deceptive acts or practices that

24   violated the NY DAPA by installing, failing to disclose and/or actively concealing the defeat

25   device and the illegal emissions and performance of the "clean" diesel engine system, by

26   marketing its vehicles as legal, reliable, environmentally-clean, efficient, and of high quality, and

27   by presenting itself as a reputable manufacturer that valued environmental cleanliness and

28   efficiency, and that stood behind its vehicles after they were sold.

2356.  Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were compliant, safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

2357.  The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal defeat devices in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the NY DAPA.

2358.  Defendants knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently.  Defendants also knew that they were manufacturing, selling, and distributing vehicles equipped with the defeat devices throughout the United States that did not comply with EPA regulations, but it concealed this information as well.

2359.  Defendants owed Plaintiffs and New York Class members a duty to disclose, truthfully, all the facts concerning the illegality, emissions, efficiency and reliability of the Class Vehicles because they:

    a.  possessed exclusive knowledge that they were manufacturing, selling, and distributing illegal vehicles throughout the United States that did not comply with EPA regulations;

    b.   intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.  Made incomplete or negligent representations about the legality, environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2360. Defendants concealed the defeat device and the illegality, emissions, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Volkswagen's fraud was exposed. The value of the Class Vehicles has therefore plummeted.

2361. Defendants' illegal use of the defeat device and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the New York Class. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

2362. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and New York Class members, about the illegality and true characteristics of Volkswagen CleanDiesel vehicles, the quality of the Volkswagen brand and the value of the Class Vehicles.

2363. Plaintiffs and the New York Class members suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the New York Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or or paid less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

2364. Volkswagen's violations of the NY DAPA present a continuing risk to Plaintiffs and to the general public. Volkswagen's deceptive acts and practices affect the public interest.

2365. As a result of the foregoing willful, knowing, and wrongful conduct of Defendants, Plaintiffs and the New York Class have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to actual damages or $50, whichever is greater, treble damages up to $1,000, punitive damages to the extent available under the law, reasonable attorneys' fees and costs, an order enjoining Defendants' deceptive and unfair conduct, and all other just and appropriate relief available under the NY DAPA.

## NEW YORK COUNT II:
## VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350
### (N.Y. Gen. Bus. Law § 350)

2366.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2367.   Plaintiffs bring this claim only on behalf of the New York Class against Volkswagen.

2368.   Defendants were engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law §350, the New York False Advertising Act ("NY FAA")

2369.   The NY FAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350.  False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …." N.Y. Gen. Bus. Law § 350-a.

2370.   Volkswagen caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements and omissions that were untrue or misleading, and that were known by Volkswagen, or that through the exercise of reasonable care should have been known by Volkswagen, to be untrue and misleading to Plaintiffs and the New York class.

2371.   Volkswagen made numerous material misrepresentations and omissions of fact with intent to mislead and deceive concerning the Class Vehicles, particularly concerning the illegality, efficacy and functioning of the emissions systems on their CleanDiesel vehicles. Specifically, Volkswagen intentionally concealed and suppressed material facts concerning the legality and quality of the Class Vehicles in order to intentionally and grossly defraud and mislead the Plaintiffs and the New York Class members concerning the true emissions produced by the misnamed "CleanDiesel" engines in the Class Vehicles.

2372.   The misrepresentations and omissions regarding set forth above were material and likely to deceive a reasonable consumer.  Specifically, although Volkswagen advertised the Class Vehicles as clean and environmentally-friendly, they in fact used a sophisticated defeat device

1    that was undetectable to the ordinary consumer that made them non-compliant with EPA

2    emission regulations.

3       2373.   Volkswagen intentionally and knowingly misrepresented material facts regarding

4    the Class Vehicles with intent to mislead Plaintiffs and the New York Class.

5       2374.   Volkswagen's false advertising was likely to and did in fact deceive regulators and

6    reasonable consumers, including Plaintiffs and New York Class members, about the illegality and

7    true characteristics of Volkswagen CleanDiesel vehicles, the quality of the Volkswagen brand and

8    the true value of the Class Vehicles.

9       2375.   Volkswagen's violations of the NY FAA present a continuing risk to Plaintiffs and

10    to the general public. Volkswagen's deceptive acts and practices affect the public interest.

11       2376.   The Class Vehicles do not perform as advertised and are not compliant with EPA

12    regulations, making them far less valuable than advertised.

13       2377.   Plaintiffs and New York Class members who purchased Class Vehicles either

14    would not have purchased them at all or paid less but for Volkswagen's false advertising in

15    violation of the NY FAA. Plaintiffs and New York Class members who leased Class Vehicles

16    either would not have leased them at all, or at a lower rate but for Volkswagen's false advertising

17    in violation of the NY FAA.

18       2378.   The Plaintiffs and the New York Class have suffered injury-in-fact and/or actual

19    damages and ascertainable loss as a direct and proximate result of the Defendant's false

20    advertising in violation of the NY FAA, including but not limited to purchasing or leasing an

21    illegal vehicle, diminished or complete lost value for the Class Vehicles they purchased or leased;

22    lost or diminished use, enjoyment and utility of such vehicles; and annoyance, aggravation and

23    inconvenience resulting from Defendant's violations of the NY FAA.

24       2379.   Plaintiffs and the New York Class seek monetary relief against Defendants

25    measured as the greater of (a) actual damages in an amount to be determined at trial, and (b)

26    statutory damages in the amount of $500 each for New York class members. Because

27    Volkswagen's conduct was committed willingly and knowingly, New York class members are

28    entitled to recover three times actual damages, up to $10,000.

2380. The New York Class also seeks an order enjoining Volkswagen's false advertising, attorneys' fees, and any other just and proper relief under N.Y. Gen. Bus. Law § 350.

### NEW YORK COUNT III:
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.Y. U.C.C. Law §§ 2-314 and 2A-212)

2381. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2382. Plaintiffs bring this Count on behalf of the New York Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2383. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

2384. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

2385. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

2386. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.Y. UCC Law §§ 2-314 and 2A-212.

2387. These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2388. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

2389.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other New York Class members have been damaged in an amount to be proven at trial.

<div align="center">

**NEW YORK COUNT IV:**
**BREACH OF EXPRESS WARRANTY**
**(N.Y. U.C.C. Law §§ 2-313 and 2A-210)**

</div>

2390.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2391.   Plaintiffs bring this Count on behalf of the New York Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2392.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.Y. UCC Law §  2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

2393.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

2394.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

2395.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

2396.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2397.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, the VW Entity Defendants also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first

two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2398. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2399. As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

2400. The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other New York Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2401. Plaintiffs and the New York Class members experienced defects within the warranty period. Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and New York Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2402. The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2403.   Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

2404.   In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum."  When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

2405.   Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

2406.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other New York Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2407.   Accordingly, recovery by Plaintiffs and the other New York Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other New York Class members, seek all remedies as allowed by law.

2408.   Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were illegal and inherently defective and did not conform to their warranties; further, the VW Entity

1  Defendants had wrongfully and fraudulently concealed material facts regarding the Class

2  Vehicles. Plaintiffs and the other New York Class members were therefore induced to purchase

3  or lease the Class Vehicles under false and/or fraudulent pretenses.

4      2409. Moreover, many of the injuries flowing from the Class Vehicles cannot be

5  resolved through the limited remedy of "replacements or adjustments," as many incidental and

6  consequential damages have already been suffered because of Volkswagen's fraudulent conduct

7  as alleged herein, and because of its failure and/or continued failure to provide such limited

8  remedy within a reasonable time, and any limitation on Plaintiffs' and the other New York Class

9  members' remedies would be insufficient to make Plaintiffs and the other New York Class

10  members whole.

11      2410. Finally, because of the VW Entity Defendants' breach of warranty as set forth

12  herein, Plaintiffs and the other New York Class members assert, as additional and/or alternative

13  remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other New

14  York Class members of the purchase or lease price of all Class Vehicles currently owned or

15  leased, and for such other incidental and consequential damages as allowed.

16      2411. The VW Entity Defendants were provided notice of these issues by numerous

17  complaints filed against them, including the instant Complaint, within a reasonable amount of

18  time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade

19  clean air standards.

20      2412. As a direct and proximate result of the VW Entity Defendants' breach of express

21  warranties, Plaintiff and the other New York Class members have been damaged in an amount to

22  be determined at trial.

23  ## NORTH CAROLINA

24  **NORTH CAROLINA COUNT I:**
25  **VIOLATIONS OF THE NORTH CAROLINA UNFAIR**
    **AND DECEPTIVE TRADE PRACTICES ACT**
26  **(N.C. Gen. Stat. §§ 75-1.1, *et seq.*)**

27      2413. Plaintiffs incorporate by reference each preceding paragraph as though fully set

28  forth herein.

2414. Plaintiffs Dowd, Krimmelbein, Alexander, and Harlan (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the North Carolina Class against all Defendants.

2415. Plaintiffs and the North Carolina Class members are persons under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq.* ("NCUDTPA").

2416. Volkswagen's acts and practices complained of herein were performed in the course of Volkswagen's trade or business and thus occurred in or affected "commerce," as defined in N.C. Gen. Stat. § 75-1.1(b).

2417. The NCUDTPA makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA. N.C. Gen. Stat. § 75-16.

2418. In the course of Volkswagen's business, Volkswagen intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed Clean Diesel engines in the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs and North Carolina Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and North Carolina Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected

1    Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined

2    experience.

3         2419.   Defendants thus violated the provisions of the NCUDTPA, at a minimum by:

4    (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which

5    they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and

6    grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as

7    advertised; (4) failing to disclose information concerning the Class Vehicles with the intent to

8    induce consumers to purchase or lease the Class Vehicles; and (5) otherwise engaging in conduct

9    likely to deceive.

10        2420.   Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's

11   unfair and deceptive conduct, as alleged herein.  Bosch knew or should have known that

12   Volkswagen would use and had used the Bosch technology as an emission defeat device, and in

13   fact helped it do so.  Without Bosch's complicity and silence, Volkswagen could not have

14   perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions

15   themselves constitute fraudulent, deceptive, and unfair practices.

16        2421.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that

17   violated the NCUDTPA by installing, failing to disclose and/or actively concealing the defeat

18   device and the true cleanliness and performance of the "clean" diesel engine system, by

19   marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and

20   by presenting itself as a reputable manufacturer that valued environmental cleanliness and

21   efficiency, and that stood behind its vehicles after they were sold.

22        2422.   Volkswagen compounded the deception by repeatedly asserting that the Class

23   Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by

24   claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and

25   efficiency, and stood behind its vehicles after they were sold.

26        2423.   The Clean Air Act and EPA regulations require that automobiles limit their

27   emissions output to specified levels.  These laws are intended for the protection of public health

28   and welfare.  Defeat devices like those in the Class Vehicles are defined and prohibited by the

Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal defeat devices in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the NCUDTPA.

2424. Volkswagen knew it had installed the defeat device in the Class Vehicles, and knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well.

2425. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the North Carolina Class.

2426. Volkswagen knew or should have known that its conduct violated the North Carolina CPA.

2427. Defendants owed Plaintiffs and North Carolina Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2428. Volkswagen fraudulently concealed the defeat device and the true cleanliness, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Volkswagen's fraud was exposed. The value of the Class Vehicles has therefore plummeted. In

light of the stigma Volkswagen's misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

2429.  Volkswagen's fraudulent use of the defeat device and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the North Carolina Class.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

2430.  Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and North Carolina Class members, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

2431.  Plaintiffs and North Carolina Class members suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the North Carolina Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

2432.  Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the North Carolina CPA in the course of its business.

2433.  Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

2434.  As a result of the foregoing wrongful conduct of Defendants, Plaintiffs and the North Carolina Class have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to treble damages, an order enjoining Defendants'

deceptive and unfair conduct, court costs and reasonable attorneys' fees, and any other just and proper relief available under N.C. Gen. Stat. § 75-16.

## NORTH CAROLINA COUNT II:
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.C.G.S.A. §§ 25-2-314 AND 252A-212)

2435.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2436.   Plaintiffs bring this Count on behalf of the North Carolina Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2437.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.C.G.S.A. § 25-2-104(1) and "sellers" of motor vehicles under § 25-2-103(1)(d).

2438.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under N.C.G.S.A. § 25-2A-103(1)(p).

2439.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C.G.S.A. § 25-2-105(1) and N.C.G.S.A. § 25-2A-103(1)(h).5. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.C.G.S.A. § 25-2-314 and N.C.G.S.A. § 25-2A-212.

2440.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2441.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

2442. As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other North Carolina Class members have been damaged in an amount to be proven at trial.

**NORTH CAROLINA COUNT III:**
**BREACH OF EXPRESS WARRANTY**
**(N.C.G.S.A. §§ 25-2-313 and 252A-210)**

2443. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2444. Plaintiffs bring this Count on behalf of the North Carolina Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2445. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.C.G.S.A. § 25-2-104(1) and "sellers" of motor vehicles under § 25-2-103(1)(d).

2446. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under N.C.G.S.A. § 25-2A-103(1)(p).

2447. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C.G.S.A. § 25-2-105(1) and N.C.G.S.A. § 25-2A-103(1)(h).

2448. In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

2449. The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2450. The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2451. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2452. As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

2453. The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other North Carolina Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2454. Plaintiffs and the North Carolina Class members experienced defects within the warranty period. Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and North Carolina Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2455. The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2456.   Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

2457.   In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

2458.   Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

2459.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other North Carolina Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2460.   Accordingly, recovery by Plaintiffs and the other North Carolina Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other North Carolina Class members, seek all remedies as allowed by law.

2461.   Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants

had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other North Carolina Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2462. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other North Carolina Class members' remedies would be insufficient to make Plaintiffs and the other North Carolina Class members whole.

2463. Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other North Carolina Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other North Carolina Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2464. The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

2465. As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other North Carolina Class members have been damaged in an amount to be determined at trial.

### NORTH DAKOTA

### NORTH DAKOTA COUNT I:
### VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT
### (N.D. Cent. Code § 51-15-02)

2466. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2467. Plaintiff Gramling (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the North Dakota Class against all Defendants.

2468. Plaintiff, the North Dakota Class members, and Defendants are "persons" within the meaning of N.D. CENT. CODE § 51-15-02(4).

2469. Volkswagen engaged in the "sale" of "merchandise" within the meaning of N.D. CENT. CODE § 51-15-02(3), (5).

2470. The North Dakota Consumer Fraud Act ("North Dakota CFA") makes unlawful "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise…." N.D. CENT. CODE § 51-15-02. As set forth above and below, Volkswagen committed deceptive acts or practices, with the intent that North Dakota Class members rely thereon in connection with their purchase or lease of the Class Vehicles.

2471. In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs and North Dakota Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and North Dakota Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

2472. Defendants thus violated the Act by, at minimum employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any

1   material fact with intent that others rely upon such concealment, suppression or omission, in

2   connection with the sale of Class Vehicles.

3       2473.   Bosch played a critical role in facilitating, and itself contributed to, Volkswagen's

4   unfair and deceptive conduct, as alleged herein.  Bosch knew or should have known that

5   Volkswagen would use and had used the Bosch technology as an emission defeat device, and in

6   fact helped it do so.  Without Bosch's complicity and silence, Volkswagen could not have

7   perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions

8   themselves constitute fraudulent, deceptive, and unfair practices.

9       2474.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that

10  violated the North Dakota CFA by installing, failing to disclose and actively concealing the

11  illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system,

12  by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality,

13  and by presenting itself as a reputable manufacturer that valued environmental cleanliness and

14  efficiency, and that stood behind its vehicles after they were sold.

15      2475.   The Clean Air Act and EPA regulations require that automobiles limit their

16  emissions output to specified levels.  These laws are intended for the protection of public health

17  and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

18  Clean Air Act and its regulations.  See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By

19  installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

20  for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the

21  North Dakota CFA.

22      2476.   Volkswagen has known of its use of the "defeat device" and the true nature of its

23  "clean" diesel engine system for at least six years, but concealed all of that information until

24  recently. Volkswagen was also aware that it valued profits over environmental cleanliness,

25  efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles

26  throughout the United States that did not comply with EPA regulations.  Volkswagen concealed

27  this information as well.

28

2477.   Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the North Dakota Class.

2478.   Volkswagen knew or should have known that its conduct violated the North Dakota CFA.

2479.   Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles and the devaluing of environmental cleanliness and integrity at Volkswagen, because Volkswagen:

      a.    possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

      b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

      c.    made incomplete representations about the safety, cleanliness, efficiency and reliability of the Class Vehicles generally, and the use of the "defeat device" and true nature of the "clean" diesel engine system in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2480.   Defendants concealed the illegal defeat device and the true emissions and performance of the "clean" diesel engine system, resulting in a raft of negative publicity once the use of the "defeat device" and true characteristics of the "clean" diesel engine system finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished.  In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be worth.

2481.   Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiff and the North Dakota Class.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles.

2482. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

2483. Plaintiff and the North Dakota Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the North Dakota Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

2484. Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive acts or practices under the North Dakota CFA. And, in any event, they suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices that occurred in the course of Volkswagen's business.

2485. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2486. As a direct and proximate result of Defendants' violations of the North Dakota CFA, Plaintiff and the North Dakota Class have suffered injury-in-fact and/or actual damage.

2487. North Dakota Class members seek punitive damages against Volkswagen because Volkswagen's conduct was egregious. Volkswagen's egregious conduct warrants punitive damages.

2488. Further, Volkswagen knowingly committed the conduct described above, and thus, under N.D. CENT. CODE § 51-15-09, Volkswagen is liable to Plaintiffs and the North Dakota Class for treble damages in amounts to be proven at trial, as well as attorneys' fees, costs, and

disbursements.  Plaintiffs further seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, and other just and proper available relief under the North Dakota CFA.

<div align="center">

**NORTH DAKOTA COUNT II:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.D. Cent. Code §§ 41-02-31 and 41-02.1-21)**

</div>

2489.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2490.  Plaintiffs bring this Count on behalf of the North Dakota Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2491.  The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.D. Cent. Code § 41-02.04(3) and "sellers" of motor vehicles under § 41-02-03(1)(d).

2492.  With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under N.D. Cent. Code § 41-02.1-03(1)(p).

2493.  The Class Vehicles are and were at all relevant times "goods" within the meaning of N.D. Cent. Code § 41-02-05(2) and N.D. Cent. Code § 41-02.1-03(1)(h).5.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.D. Cent. Code § 41-02-31 and N.D. Cent. Code § 41-02.1-21.

2494.  These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.  Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2495.  Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

<div align="center">- 546 -</div>

2496.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other North Dakota Class members have been damaged in an amount to be proven at trial.

<div align="center">

**NORTH DAKOTA COUNT III:**
**BREACH OF EXPRESS WARRANTY**
**(N.D. Cent. Code §§ 41-02-30 and 41-02.1-19)**

</div>

2497.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2498.   Plaintiffs bring this Count on behalf of the North Dakota Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2499.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.D. Cent. Code § 41-02.04(3) and "sellers" of motor vehicles under § 41-02-03(1)(d).

2500.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under N.D. Cent. Code § 41-02.1-03(1)(p).

2501.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.D. Cent. Code § 41-02-05(2) and N.D. Cent. Code § 41-02.1-03(1)(h).

2502.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

2503.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2504.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2505. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2506. As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

2507. The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other North Dakota Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2508. Plaintiffs and the North Dakota Class members experienced defects within the warranty period. Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and North Dakota Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2509. The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2510.  Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

2511.  In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum."  When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

2512.  Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

2513.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other North Dakota Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2514.  Accordingly, recovery by Plaintiffs and the other North Dakota Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other North Dakota Class members, seek all remedies as allowed by law.

2515.  Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants

1    had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs

2    and the other North Dakota Class members were therefore induced to purchase or lease the Class

3    Vehicles under false and/or fraudulent pretenses.

4        2516.  Moreover, many of the injuries flowing from the Class Vehicles cannot be

5    resolved through the limited remedy of "replacements or adjustments," as many incidental and

6    consequential damages have already been suffered because of Volkswagen's fraudulent conduct

7    as alleged herein, and because of its failure and/or continued failure to provide such limited

8    remedy within a reasonable time, and any limitation on Plaintiffs' and the other North Dakota

9    Class members' remedies would be insufficient to make Plaintiffs and the other North Dakota

10   Class members whole.

11       2517.  Finally, because of the VW Entity Defendants' breach of warranty as set forth

12   herein, Plaintiffs and the other North Dakota Class members assert, as additional and/or

13   alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the

14   other North Dakota Class members of the purchase or lease price of all Class Vehicles currently

15   owned or leased, and for such other incidental and consequential damages as allowed.

16       2518.  The VW Entity Defendants were provided notice of these issues by numerous

17   complaints filed against them, including the instant Complaint, within a reasonable amount of

18   time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade

19   clean air standards.

20       2519.  As a direct and proximate result of the VW Entity Defendants' breach of express

21   warranties, Plaintiff and the other North Dakota Class members have been damaged in an amount

22   to be determined at trial.

23                                    **OHIO**

24                             **OHIO COUNT I:**
         **VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT**
25                    **(Ohio Rev. Code §§ 1345.01, *et seq.*)**

26       2520.  Plaintiffs incorporate by reference each preceding paragraph as though fully set

27   forth herein.

28

2521.  Plaintiffs Greitzer, Stewart, and Vigran (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Ohio Class against all Defendants.

2522.  Volkswagen, Plaintiffs and the Ohio Class are "persons" within the meaning of Ohio Rev. Code § 1345.01(B). Volkswagen is a "supplier" as defined by Ohio Rev. Code § 1345.01(C).

2523.  Plaintiffs and the Ohio Class are "consumers" as that term is defined in Ohio Rev. Code § 1345.01(D), and their purchase and leases of the Class Vehicles with the Defect Devices installed in them are "consumer transactions" within the meaning of Ohio Rev. Code § 1345.01(A).

2524.  Ohio Rev. Code § 1345.02, prohibits unfair or deceptive acts or practices in connection with a consumer transaction.  Ohio CSPA prohibits a supplier from (i) representing that goods have characteristics, uses or benefits which the goods do not have; (ii) representing that their goods are of a particular quality or grade that the product is not; and (iii) representing that the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not.

2525.  In the course of Volkswagen's business, Volkswagen intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed "CleanDiesel" engines in the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.  Plaintiffs and Ohio Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology.  Plaintiffs and Ohio Class members did not and could not unravel Volkswagen's deception on their own.  In fact, it took years before the academic engineering community—specifically a research team at

WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

2526. Volkswagen thus violated the provisions of the Ohio CSPA, at a minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles.

2527. Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Ohio CSPA by installing, failing to disclose and/or actively concealing the "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

2528. Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

2529. The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Ohio CSPA.

2530. Volkswagen knew it had installed the "defeat device" in the Class Vehicles, and knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen also knew that it valued profits over environmental

cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well

2531. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Ohio Class.

2532. Volkswagen knew or should have known that its conduct violated the Ohio CSPA.

2533. The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of Volkswagen in this Complaint, including, but not limited to, the failure to honor both implied warranties and express warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a substantial defect, constitute deceptive sales practices in violation of the CSPA. These cases include, but are not limited to, the following:

     a.   *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

     b.   *State ex rel. Betty D. Montgomery v. Ford Motor Co.* (OPIF #10002123);

     c.   *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

     d.   *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

     e.   *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

     f.   *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);

     g.   *Cranford v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

     h.   *Brown v. Spears* (OPIF #10000403);

     i.   *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427);

     j.   *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326); and

     k.   *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524).

2534. Defendants owed Plaintiffs and Ohio Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

a. possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b. intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

c. Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2535. Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Volkswagen's fraud was exposed. The value of the Class Vehicles has therefore plummeted. In light of the stigma Volkswagen's misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

2536. Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Ohio Class. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

2537. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and Ohio Class members, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

2538. Plaintiffs and Ohio Class members suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Ohio Class members who purchased or

leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

2539.  Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Ohio CSPA in the course of its business.

2540.  Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

2541.  Pursuant to Ohio Rev. Code § 1345.09, Plaintiffs and the Ohio Class seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, actual damages - trebled, and attorneys' fees, costs, and any other just and proper relief, to the extend available under the Ohio CSPA.

<div align="center">

**OHIO COUNT II:**
**VIOLATIONS OF THE OHIO DECEPTIVE TRADE PRACTICES ACT**
**(Ohio Rev. Code § 4165.01,** *et seq.***)**

</div>

2542.  Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2543.  This claim is brought on behalf of the Ohio Class against all Defendants.

2544.  Volkswagen, Plaintiffs and the Ohio Class are "persons" within the meaning of Ohio Rev. Code § 4165.01(D).

2545.  Volkswagen engaged in "the course of [its] business" within the meaning of Ohio Rev. Code § 4165.02(A) with respect to the acts alleged herein.

2546.  The Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.02(A) ("Ohio DTPA") provides that a "person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation," the person does any of the following: "(2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; … (7) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a

<div align="center">- 555 -</div>

1   person has a sponsorship, approval, status, affiliation, or connection that the person does not

2   have; … (9) Represents that goods or services are of a particular standard, quality, or grade, or

3   that goods are of a particular style or model, if they are of another; … [or] (11) Advertises goods

4   or services with intent not to sell them as advertised."

5          2547.   In the course of Volkswagen's business, Volkswagen intentionally or negligently

6   concealed and suppressed material facts concerning the true emissions produced by the misnamed

7   "CleanDiesel" engines in the Class Vehicles. Defendants accomplished this by installing illegal

8   defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission

9   test mode only during emissions testing.  During normal operations, the Class Vehicles would

10  emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable

11  standards.  The result was what Volkswagen intended—the Class Vehicles passed emissions

12  testing by way of deliberately induced false readings.  Plaintiffs and Ohio Class members had no

13  way of discerning that Volkswagen's representations were false and misleading because

14  Volkswagen's defeat device software was extremely sophisticated technology.  Plaintiffs and

15  Ohio Class members did not and could not unravel Volkswagen's deception on their own.  In fact,

16  it took years before the academic engineering community—specifically a research team at

17  WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using

18  sophisticated, expensive equipment and applying decades of combined experience.

19         2548.   Volkswagen thus violated the provisions of the Ohio DTPA, at a minimum by:  (1)

20  representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they

21  do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and

22  grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as

23  advertised; (4) failing to disclose information concerning the Class Vehicles with the intent to

24  induce consumers to purchase or lease the Class Vehicles.

25         2549.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that

26  violated the Ohio DTPA by installing, failing to disclose and/or actively concealing the "defeat

27  device" and the true cleanliness and performance of the "clean" diesel engine system, by

28  marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and

1    by presenting itself as a reputable manufacturer that valued environmental cleanliness and

2    efficiency, and that stood behind its vehicles after they were sold.

3        2550.  Volkswagen compounded the deception by repeatedly asserting that the Class

4    Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by

5    claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and

6    efficiency, and stood behind its vehicles after they were sold.

7        2551.  The Clean Air Act and EPA regulations require that automobiles limit their

8    emissions output to specified levels.  These laws are intended for the protection of public health

9    and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

10   Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By

11   installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

12   for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the

13   Ohio DTPA.

14       2552.  Volkswagen knew it had installed the "defeat device" in the Class Vehicles, and

15   knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of

16   that information until recently. Volkswagen also knew that it valued profits over environmental

17   cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and

18   distributing vehicles throughout the United States that did not comply with EPA regulations, but

19   it concealed this information as well.

20       2553.  Volkswagen intentionally and knowingly misrepresented material facts regarding

21   the Class Vehicles with intent to mislead Plaintiffs and the Ohio Class.

22       2554.  Volkswagen knew or should have known that its conduct violated the Ohio DTPA.

23       2555.  Defendants owed Plaintiffs and Ohio Class members a duty to disclose, truthfully,

24   all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because

25   they:

26           a.    possessed exclusive knowledge that they were
                   manufacturing, selling, and distributing vehicles throughout
27                 the United States that did not comply with EPA regulations;

28

b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

c.    Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2556.  Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Volkswagen's fraud was exposed.  The value of the Class Vehicles has therefore plummeted.  In light of the stigma Volkswagen's misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

2557.  Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Ohio Class. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

2558.  Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and Ohio Class members, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

2559.  Plaintiffs and Ohio Class members suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Ohio Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

2560.   Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Ohio DTPA in the course of its business.

2561.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

2562.   Pursuant to Ohio Rev. Code § 4165.03, Plaintiffs and the Ohio Class seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Ohio DTPA.

### OHIO COUNT III:
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Ohio Rev. Code Ann. §§ 1302.27 and 1310.19)

2563.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2564.   Plaintiffs bring this Count on behalf of the Ohio Class.

2565.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and "sellers" of motor vehicles under § 1302.01(4).

2566.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Ohio Rev. Code § 1310.01(A)(20).

2567.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code §§ 1302.01(8) and 1310.01(A)(8).

2568.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ohio Rev. Code §§ 1302.27 and 1310.19.

2569.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2570.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

2571.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Ohio Class members have been damaged in an amount to be proven at trial.

<div align="center">

**OHIO COUNT IV:**
**BREACH OF EXPRESS WARRANTY**
**(Ohio Rev. Code § 1302.26, *et seq.*) (U.C.C. §2-313))**

</div>

2572.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2573.   Plaintiffs bring this Count on behalf of the Ohio Class.

2574.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and "sellers" of motor vehicles under § 1302.01(4).

2575.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Ohio Rev. Code § 1310.01(A)(20).

2576.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code §§ 1302.01(8), and 1310.01(A)(8).

2577.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

2578.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2579.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty

for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2580. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2581. As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

2582. The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Ohio Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2583. Plaintiffs and the Ohio Class members experienced defects within the warranty period. Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Ohio Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2584. The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. The VW

Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2585. Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here. For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government. We are proceeding as quickly as possible.

2586. In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal. He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

2587. Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

2588. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Ohio Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2589. Accordingly, recovery by Plaintiffs and the other Ohio Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Ohio Class members, seek all remedies as allowed by law.

- 562 -

1      2590.   Also, as alleged in more detail herein, at the time the VW Entity Defendants

2   warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were

3   inherently defective and did not conform to their warranties; further, the VW Entity Defendants

4   had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs

5   and the other Ohio Class members were therefore induced to purchase or lease the Class Vehicles

6   under false and/or fraudulent pretenses.

7      2591.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

8   resolved through the limited remedy of "replacements or adjustments," as many incidental and

9   consequential damages have already been suffered because of Volkswagen's fraudulent conduct

10  as alleged herein, and because of its failure and/or continued failure to provide such limited

11  remedy within a reasonable time, and any limitation on Plaintiffs' and the other Ohio Class

12  members' remedies would be insufficient to make Plaintiffs and the other Ohio Class members

13  whole.

14     2592.   Finally, because of the VW Entity Defendants' breach of warranty as set forth

15  herein, Plaintiffs and the other Ohio Class members assert, as additional and/or alternative

16  remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Ohio

17  Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and

18  for such other incidental and consequential damages as allowed.

19     2593.   The VW Entity Defendants were provided notice of these issues by numerous

20  complaints filed against them, including the instant Complaint, within a reasonable amount of

21  time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade

22  clean air standards.

23     2594.   As a direct and proximate result of the VW Entity Defendants' breach of express

24  warranties, Plaintiff and the other Ohio Class members have been damaged in an amount to be

25  determined at trial.

26

27

28

1

**OKLAHOMA**

2

**OKLAHOMA COUNT I:**
**VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT**
**(Okla. Stat. Tit. 15 § 751, *et seq.*)**

3

4     2595.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

5     forth herein.

6     2596.   Plaintiff Greenfield (for the purpose of this section, "Plaintiffs") bring this action

7     on behalf of themselves and the Oklahoma Class against all Defendants.

8     2597.   Volkswagen, Plaintiffs and the Oklahoma Class are "persons" within the meaning

9     of Okla. Stat. Tit. 15 § 752.1.

10     2598.   Volkswagen engaged in "the course of [its] business" within the meaning of Okla.

11     Stat. Tit. 15 § 752.3 with respect to the acts alleged herein. .

12     2599.   The Oklahoma Consumer Protection Act ("Oklahoma CPA") prohibits, in the

13     course of business: "mak[ing] a false or misleading representation, knowingly or with reason to

14     know, as to the characteristics …, uses, [or] benefits, of the subject of a consumer transaction," or

15     making a false representation, "knowingly or with reason to know, that the subject of a consumer

16     transaction is of a particular standard, style or model, if it is of another or "[a]dvertis[ing],

17     knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it

18     as advertised;" and otherwise committing "an unfair or deceptive trade practice." Okla. Stat. Tit.

19     15 § 753.

20     2600.   In the course of Volkswagen's business, Volkswagen intentionally or negligently

21     concealed and suppressed material facts concerning the true emissions produced by the misnamed

22     "CleanDiesel" engines in the Class Vehicles. Defendants accomplished this by installing illegal

23     defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission

24     test mode only during emissions testing.  During normal operations, the Class Vehicles would

25     emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable

26     standards.  The result was what Volkswagen intended—the Class Vehicles passed emissions

27     testing by way of deliberately induced false readings.  Plaintiffs and Oklahoma Class members

28     had no way of discerning that Volkswagen's representations were false and misleading because

Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and Oklahoma Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

2601. Volkswagen thus violated the provisions of the Oklahoma CPA, at a minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles.

2602. Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Oklahoma CPA by installing, failing to disclose and/or actively concealing the "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

2603. Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

2604. The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Oklahoma CPA.

2605. Volkswagen knew it had installed the "defeat device" in the Class Vehicles, and knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well

2606. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Oklahoma Class.

2607. Volkswagen knew or should have known that its conduct violated the Oklahoma CPA.

2608. Defendants owed Plaintiffs and Oklahoma Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.    Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2609. Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Volkswagen's fraud was exposed. The value of the Class Vehicles has therefore plummeted. In light of the stigma Volkswagen's misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

2610. Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Oklahoma Class. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth

more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

2611.  Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and Oklahoma Class members, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

2612.  Plaintiffs and Oklahoma Class members suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Oklahoma Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

2613.  Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Oklahoma CPA in the course of its business.

2614.  Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

2615.  Pursuant to Okla. Stat. Tit. 15 § 761.1, Plaintiffs and the Oklahoma Class seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Oklahoma CPA.

<div align="center">

**OKLAHOMA COUNT II:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Okla. Stat. Tit. 12A §§ 2-314 and 2A-212)**

</div>

2616.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2617.   Plaintiffs bring this Count on behalf of the Oklahoma Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2618.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Okla. Stat. Tit. 12A §§ 2-104(1) and 2-1103(3), and "sellers" of motor vehicles under § 2A-103(1)(t).

2619.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Okla. Stat. Tit. 12A § 2A-103(1)(p).

2620.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. Tit. 12A §§ 2-105(1) and 2A-103(1)(h).

2621.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Okla. Stat. Tit. 12A §§ 2-314 and 2A-212.

2622.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2623.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

2624.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Oklahoma members have been damaged in an amount to be proven at trial.

**OKLAHOMA COUNT III:**
**BREACH OF EXPRESS WARRANTY**
**(Okla. Stat. Tit. 12A §§ 2-313 and 2A-210)**

2625.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2626.   Plaintiffs bring this Count on behalf of the Oklahoma Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2627.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Okla. Stat. Tit. 12A §§ 2-104(1) and 2-1103(3), and "sellers" of motor vehicles under § 2A-103(1)(t).

2628.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Okla. Stat. Tit. 12A § 2A-103(1)(p).

2629.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. Tit. 12A §§ 2-105(1), and 2A-103(1)(h).

2630.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

2631.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2632.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the

1    catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

2    device or computer.

3         2633.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

4    with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an

5    express warranty for their vehicles through a Federal Emission Control System Defect Warranty.

6    The Design and Defect Warranty required by the EPA covers repair of emission control or

7    emission related parts which fail to function or function improperly because of a defect in

8    materials or workmanship.  This warranty provides protection for two years or 24,000 miles,

9    whichever comes first, or, for the major emission control components, for eight years or 80,000

10   miles, whichever comes first.

11        2634.   As manufacturers of light-duty vehicles, the VW Entity Defendants were required

12   to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

13        2635.   The VW Entity Defendants' warranties formed a basis of the bargain that was

14   reached when Plaintiffs and other Oklahoma Class members purchased or leased their Class

15   Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

16        2636.   Plaintiffs and the Oklahoma members experienced defects within the warranty

17   period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs

18   and Oklahoma members that the Class Vehicles were intentionally designed and manufactured to

19   be out of compliance with applicable state and federal emissions laws, and failed to fix the

20   defective emission components free of charge.

21        2637.   The VW Entity Defendants breached the express warranty promising to repair and

22   correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW

23   Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the

24   Class Vehicles' materials and workmanship defects.

25        2638.   Affording the VW Entity Defendants a reasonable opportunity to cure their breach

26   of written warranties would be unnecessary and futile here.  For example, the Frequently Asked

27   Questions ("FAQ") section of VW's informational website states:

28

**How soon will the remedy be available, and how am I going to be compensated for this?**

We cannot offer a firm date now because we need to work on a remedy and review it with the government. We are proceeding as quickly as possible.

2639. In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal. He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

2640. Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

2641. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Oklahoma members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2642. Accordingly, recovery by Plaintiffs and the other Oklahoma members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Oklahoma members, seek all remedies as allowed by law.

2643. Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other Oklahoma members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2644.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Oklahoma members' remedies would be insufficient to make Plaintiffs and the other Oklahoma members whole.

2645.   Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Oklahoma members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Oklahoma members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2646.   The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

2647.   As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Oklahoma members have been damaged in an amount to be determined at trial.

### **OREGON**

### **OREGON COUNT I:**
### **VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT**
### **(Or. Rev. Stat. §§ 646.605, *et seq.*)**

2648.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2649.   Plaintiffs Ayala, Cohen, Jaffee, Yussim, and Bond (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Oregon Class against all Defendants.

2650.   Volkswagen, Plaintiffs and the Oregon Class are "persons" within the meaning of Or. Rev. Stat. § 646.605(4).

2651.   Volkswagen is engaged in "trade" or "commerce" within the meaning of Or. Rev. Stat. § 646.605(8).

2652.   The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits "unfair or deceptive acts conduct in trade or commerce …." Or. Rev. Stat. § 646.608(1).

2653.   In the course of Volkswagen's business, Volkswagen intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed "CleanDiesel" engines in the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.  Plaintiffs and Oregon Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology.  Plaintiffs and Oregon Class members did not and could not unravel Volkswagen's deception on their own.  In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

2654.   Volkswagen thus violated the provisions of the Oregon UTPA, at a minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles.

2655.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Oregon UTPA by installing, failing to disclose and/or actively concealing the "defeat

device" and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

2656. Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

2657. The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Oregon UTPA.

2658. Volkswagen knew it had installed the "defeat device" in the Class Vehicles, and knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well

2659. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Oregon Class.

2660. Volkswagen knew or should have known that its conduct violated the Oregon UTPA.

2661. Defendants owed Plaintiffs and Oregon Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

a.  possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.  intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

c.  Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2662.   Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Volkswagen's fraud was exposed.  The value of the Class Vehicles has therefore plummeted.  In light of the stigma Volkswagen's misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

2663.   Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Oregon Class.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

2664.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and Oregon Class members, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

2665.   Plaintiffs and Oregon Class members suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Oregon Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to

sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

2666. Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Oregon UTPA in the course of its business.

2667. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2668. Pursuant to Or. Rev. Stat. § 646.638, Plaintiffs and the Oregon Class seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Oregon UTPA.

### OREGON COUNT II:
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Or. Rev. Stat. § 72.3140 and 72A.2120)

2669. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2670. Plaintiffs bring this Count on behalf of the Oregon Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2671. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and "sellers" of motor vehicles under § 72.1030(1)(d).

2672. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

2673. The Class Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

2674. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Or. Rev. Stat. §§ 72.3140 and 72A-2120.

- 576 -

2675.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2676.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

2677.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Oregon Class members have been damaged in an amount to be proven at trial.

**OREGON COUNT III:**
**BREACH OF EXPRESS WARRANTY**
**(OR. REV. STAT. §§ 72.3130 and 72A.2100)**

2678.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2679.   Plaintiffs bring this Count on behalf of the Oregon Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2680.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and "sellers" of motor vehicles under § 72.1030(1)(d).

2681.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

2682.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

2683.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of

three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

2684. The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2685. The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2686. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2687. As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

2688. The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Oregon Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2689.  Plaintiffs and the Oregon Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Oregon Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2690.  The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2691.  Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

2692.  In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

2693.  Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

2694.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Oregon Class members whole and because the VW Entity

Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2695.  Accordingly, recovery by Plaintiffs and the other Oregon Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Oregon Class members, seek all remedies as allowed by law.

2696.  Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs and the other Oregon Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2697.  Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Oregon Class members' remedies would be insufficient to make Plaintiffs and the other Oregon Class members whole.

2698.  Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Oregon Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Oregon Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2699.  The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

2700.   As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Oregon Class members have been damaged in an amount to be determined at trial.

## **PENNSYLVANIA**

### **PENNSYLVANIA COUNT I:**
### **VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**
### **(73 P.S. § 201-1, *et seq.*)**

2701.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2702.   Plaintiffs Bialecki, Labbate, and Pratt III (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Pennsylvania Class against all Defendants.

2703.   Volkswagen, Plaintiffs and the Pennsylvania Class are "persons" within the meaning of 73 P.S. § 201-2.(2).

2704.   Volkswagen is engaged in "trade" or "commerce" within the meaning of 73 P.S. § 201-2(3).

2705.   The Pennsylvania Unfair Trade Practices Act ("Pennsylvania UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …." 73 P.S. § 201-3.

2706.   In the course of Volkswagen's business, Volkswagen intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed "CleanDiesel" engines in the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.  Plaintiffs and Pennsylvania Class members had no way of discerning that Volkswagen's representations were false and misleading because

1   Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and

2   Pennsylvania Class members did not and could not unravel Volkswagen's deception on their own.

3   In fact, it took years before the academic engineering community—specifically a research team at

4   WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using

5   sophisticated, expensive equipment and applying decades of combined experience.

6       2707. Volkswagen thus violated the provisions of the Pennsylvania UTPA, at a

7   minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and

8   qualities which they do not have; (2) representing that the Class Vehicles are of a particular

9   standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent

10  not to sell them as advertised; (4) failing to disclose information concerning the Class Vehicles

11  with the intent to induce consumers to purchase or lease the Class Vehicles.

12      2708. Defendants engaged in misleading, false, unfair or deceptive acts or practices that

13  violated the Pennsylvania UTPA by installing, failing to disclose and/or actively concealing the

14  "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by

15  marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and

16  by presenting itself as a reputable manufacturer that valued environmental cleanliness and

17  efficiency, and that stood behind its vehicles after they were sold.

18      2709. Volkswagen compounded the deception by repeatedly asserting that the Class

19  Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by

20  claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and

21  efficiency, and stood behind its vehicles after they were sold.

22      2710. The Clean Air Act and EPA regulations require that automobiles limit their

23  emissions output to specified levels. These laws are intended for the protection of public health

24  and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

25  Clean Air Act and its regulations. See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By

26  installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

27  for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the

28  Pennsylvania UTPA.

2711.  Volkswagen knew it had installed the "defeat device" in the Class Vehicles, and knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well

2712.  Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Pennsylvania Class.

2713.  Volkswagen knew or should have known that its conduct violated the Pennsylvania UTPA.

2714.  Defendants owed Plaintiffs and Pennsylvania Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.    Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2715.  Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Volkswagen's fraud was exposed.  The value of the Class Vehicles has therefore plummeted.  In light of the stigma Volkswagen's misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

2716.  Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Pennsylvania Class.  A vehicle made by a reputable manufacturer of environmentally friendly

1   vehicles is worth more than an otherwise comparable vehicle made by a disreputable

2   manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than

3   promptly remedying them.

4       2717.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

5   deceive regulators and reasonable consumers, including Plaintiffs and Pennsylvania Class

6   members, about the true environmental cleanliness and efficiency of Volkswagen-branded

7   vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and

8   integrity at Volkswagen, and the true value of the Class Vehicles.

9       2718.   Plaintiffs and Pennsylvania Class members suffered ascertainable loss and actual

10  damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment

11  of and failure to disclose material information.  Plaintiffs and the Pennsylvania Class members

12  who purchased or leased the Class Vehicles would not have purchased or leased them at all

13  and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered

14  legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished

15  value of their vehicles, as well as lost or diminished use.

16      2719.   Defendants had an ongoing duty to all Volkswagen customers to refrain from

17  unfair and deceptive practices under the Pennsylvania UTPA in the course of its business.

18      2720.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

19  general public.  Defendants' unlawful acts and practices complained of herein affect the public

20  interest.

21      2721.   Pursuant to 73 P.S. § 201-9.2(a), Plaintiffs and the Pennsylvania Class seek an

22  order enjoining Volkswagen's unfair and/or deceptive acts or practices, damages, punitive

23  damages, and attorneys' fees, costs, and any other just and proper relief available under the

24  Pennsylvania UTPA.

25                  **PENNSYLVANIA COUNT II:**
                **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
26                **(13 PA. CONS. STAT. §§ 2314 and 2A212)**

27      2722.   Plaintiffs reallege and incorporate by reference all allegations of the preceding

28  paragraphs as though fully set forth herein.

2723. Plaintiffs bring this Count on behalf of the Pennsylvania Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2724. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and "sellers" of motor vehicles under § 2103(a).

2725. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

2726. The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

2727. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 13 Pa. Cons. Stat. §§ 2314 and 2A212.

2728. These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2729. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

2730. As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Pennsylvania Class members have been damaged in an amount to be proven at trial.

**PENNSYLVANIA COUNT III:**
**BREACH OF EXPRESS WARRANTY**
**(13 PA. CONS. STAT. §§ 2313 and 2A210)**

2731.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2732.   Plaintiffs bring this Count on behalf of the Pennsylvania Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2733.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 13 Pa. Cons. Stat. § 2104 and 2A103(a), and "sellers" of motor vehicles under § 2103(a).

2734.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

2735.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. § 2105(a), and 2A103(a).

2736.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

2737.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2738.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the

- 586 -

catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2739. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2740. As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

2741. The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Pennsylvania Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2742. Plaintiffs and the Pennsylvania Class members experienced defects within the warranty period. Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Pennsylvania Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2743. The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2744. Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here. For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

**How soon will the remedy be available, and how am I going to be compensated for this?**

We cannot offer a firm date now because we need to work on a remedy and review it with the government. We are proceeding as quickly as possible.

2745. In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal. He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

2746. Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

2747. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Pennsylvania Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2748. Accordingly, recovery by Plaintiffs and the other Pennsylvania Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Pennsylvania Class members, seek all remedies as allowed by law.

2749. Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other Pennsylvania Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2750.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Pennsylvania Class members' remedies would be insufficient to make Plaintiffs and the other Pennsylvania Class members whole.

2751.   Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Pennsylvania Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Pennsylvania Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2752.   The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

2753.   As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Pennsylvania Class members have been damaged in an amount to be determined at trial.

## RHODE ISLAND

### RHODE ISLAND COUNT I:
### VIOLATION OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT
### (R.I. GEN. LAWS § 6-13.1, *et seq.*)

2754.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2755.   Plaintiffs Urbaniak and Mehls (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Rhode Island Class against all Defendants.

2756.   Volkswagen, Plaintiffs and the Rhode Island Class are "persons" within the meaning of R.I. Gen. Laws § 6-13.1-1(3).

1    2757.  Volkswagen is engaged in "trade" or "commerce" within the meaning of R.I. Gen.

2    Laws § 6-13.1-1(5).

3    2758.  The Rhode Island Deceptive Trade Practices Act ("Rhode Island DTPA")

4    prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce"

5    including: (v) [r]epresenting that goods or services have sponsorship, approval, characteristics,

6    ingredients, uses, benefits, or quantities that they do not have"; "(vii) [r]epresenting that goods or

7    services are of a particular standard, quality, or grade …, if they are of another"; (ix) [a]dvertising

8    goods or services with intent not to sell them as advertised"; "(xiii) [u]sing any other methods,

9    acts or practices which mislead or deceive members of the public in a material respect." R.I. Gen.

10   Laws § 6-13.1-1(6).

11   2759.  In the course of Volkswagen's business, Volkswagen intentionally or negligently

12   concealed and suppressed material facts concerning the true emissions produced by the misnamed

13   "CleanDiesel" engines in the Class Vehicles. Defendants accomplished this by installing illegal

14   defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission

15   test mode only during emissions testing.  During normal operations, the Class Vehicles would

16   emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable

17   standards.  The result was what Volkswagen intended—the Class Vehicles passed emissions

18   testing by way of deliberately induced false readings.  Plaintiffs and Rhode Island Class members

19   had no way of discerning that Volkswagen's representations were false and misleading because

20   Volkswagen's defeat device software was extremely sophisticated technology.  Plaintiffs and

21   Rhode Island Class members did not and could not unravel Volkswagen's deception on their own.

22   In fact, it took years before the academic engineering community—specifically a research team at

23   WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using

24   sophisticated, expensive equipment and applying decades of combined experience.

25   2760.  Volkswagen thus violated the provisions of the Rhode Island DTPA by (1)

26   representing that goods have characteristics, uses, benefits, or qualities that they do not have; (2)

27   representing that goods are of a particular standard or quality if they are of another; (3)

28

advertising goods or services with intent not to provide them as advertised; and (4) engaging in any other unfair or deceptive conduct in trade or commerce.

2761.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Rhode Island DTPA by installing, failing to disclose and/or actively concealing the "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

2762.   Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

2763.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Rhode Island DTPA.

2764.   Volkswagen knew it had installed the "defeat device" in the Class Vehicles, and knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well.

2765.   Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Rhode Island Class.

2766. Volkswagen knew or should have known that its conduct violated the Rhode Island DTPA.

2767. Defendants owed Plaintiffs and Rhode Island Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

    a.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.   intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.   Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2768. Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Volkswagen's fraud was exposed. The value of the Class Vehicles has therefore plummeted. In light of the stigma Volkswagen's misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

2769. Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Rhode Island Class. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

2770. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and Rhode Island Class members, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

2771. Plaintiffs and Rhode Island Class members suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Rhode Island Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

2772. Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Rhode Island DTPA in the course of its business.

2773. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2774. Plaintiffs and the Rhode Island Class are entitled to recover the greater of actual damages or $200 pursuant to R.I. Gen. Laws § 6-13.1-5.2(a). Plaintiffs and the Rhode Island Class are also entitled to punitive damages because Volkswagen engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

## RHODE ISLAND COUNT II:
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (6A R.I. GEN. LAWS §§ 6A-2-314 and 6A-2.1-212)

2775. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2776. Plaintiffs bring this Count on behalf of the Rhode Island Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2777. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 6A R.I. Gen. Laws §§ 6A-2-104(1) and 6A-2.1-103(1)(t), and "sellers" of motor vehicles under § 6A-2-103(a)(4).

2778. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under 6A R.I. Gen. Laws § 6A-2.1-103(1)(p).

2779.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 6A R.I. Gen. Laws §§ 6A-2-105(1) and 6A-2.1-103(1)(h).

2780.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 6A R.I. Gen. Laws §§ 6A-2-314 and 6A-2.1-212.

2781.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2782.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

2783.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Rhode Island Class members have been damaged in an amount to be proven at trial.

**RHODE ISLAND COUNT III:**
**BREACH OF EXPRESS WARRANTY**
**(6A R.I. GEN. LAWS §§ 6A-2-313 and 6A-2.1-210)**

2784.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2785.   Plaintiffs bring this Count on behalf of the Rhode Island Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2786.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 6A R.I. Gen. Laws §§ 6A-2-104(1) and 6A-2.1-103(1)(t), and "sellers" of motor vehicles under § 6A-2-103(a)(4).

2787.  With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under 6A R.I. Gen. Laws § 6A-2.1-103(1)(p).

2788.  The Class Vehicles are and were at all relevant times "goods" within the meaning of 6A R.I. Gen. Laws §§ 6A-2-105(1) and 6A-2.1-103(1)(h).

2789.  In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

2790.  The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2791.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2792.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2793.  As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

2794.  The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Rhode Island Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2795.  Plaintiffs and the Rhode Island Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Rhode Island Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2796.  The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2797.  Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

2798.  In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

2799.  Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

2800.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Rhode Island Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2801.  Accordingly, recovery by Plaintiffs and the other Rhode Island Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Rhode Island Class members, seek all remedies as allowed by law.

2802.  Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs and the other Rhode Island Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2803.  Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Rhode Island Class members' remedies would be insufficient to make Plaintiffs and the other Rhode Island Class members whole.

2804.  Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Rhode Island Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the

other Rhode Island Class members of the purchase or lease price of all Class Vehicles currently

owned or leased, and for such other incidental and consequential damages as allowed.

2805.   The VW Entity Defendants were provided notice of these issues by numerous

complaints filed against them, including the instant Complaint, within a reasonable amount of

time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade

clean air standards.

2806.   As a direct and proximate result of the VW Entity Defendants' breach of express

warranties, Plaintiff and the other Rhode Island Class members have been damaged in an amount

to be determined at trial.

## SOUTH CAROLINA

### SOUTH CAROLINA COUNT I:
### VIOLATIONS OF THE SOUTH CAROLINA
### UNFAIR TRADE PRACTICES ACT
### (S.C. CODE ANN. § 39-5-10, *et seq.*)

2807.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

forth herein.

2808.   Plaintiffs Oxendine and Powers (for the purpose of this section, "Plaintiffs") bring

this action on behalf of themselves and the South Carolina Class against all Defendants.

2809.   Volkswagen, Plaintiffs and the South Carolina Class are "persons" within the

meaning of S.C. Code § 39-5-10(a).

2810.   Volkswagen is engaged in "trade" or "commerce" within the meaning of S.C.

Code § 39-5-10(b).

2811.   The South Carolina Unfair Trade Practices Act ("South Carolina UTPA")

prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C.

Code § 39-5-20(a).

2812.   In the course of Volkswagen's business, Volkswagen intentionally or negligently

concealed and suppressed material facts concerning the true emissions produced by the misnamed

"CleanDiesel" engines in the Class Vehicles. Defendants accomplished this by installing illegal

defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission

test mode only during emissions testing. During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs and South Carolina Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and South Carolina Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

2813. Volkswagen thus violated the provisions of the South Carolina UTPA, at a minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles.

2814. Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the South Carolina UTPA by installing, failing to disclose and/or actively concealing the "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

2815. Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

2816.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the South Carolina UTPA.

2817.   Volkswagen knew it had installed the "defeat device" in the Class Vehicles, and knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well.

2818.   Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the South Carolina Class.

2819.   Volkswagen knew or should have known that its conduct violated the South Carolina UTPA

2820.   Defendants owed Plaintiffs and South Carolina Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

    a.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.   intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.   Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2821.  Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Volkswagen's fraud was exposed.  The value of the Class Vehicles has therefore plummeted.  In light of the stigma Volkswagen's misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

2822.  Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the South Carolina Class.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

2823.  Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and South Carolina Class members, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

2824.  Plaintiffs and South Carolina Class members suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the South Carolina Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

2825.  Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the South Carolina UTPA in the course of its business.

2826.  Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

2827.  Pursuant to S.C. Code § 39-5-140(a), Plaintiffs and the South Carolina Class seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, damages, treble damages for willful and knowing violations, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the South Carolina UTPA.

<div align="center">

**SOUTH CAROLINA COUNT II:**
**VIOLATIONS OF THE SOUTH CAROLINA REGULATION OF MANUFACTURERS,**
**DISTRIBUTORS, AND DEALERS ACT**
**(S.C. CODE ANN. § 56-15-10, *et seq*.)**

</div>

2828.  Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

2829.  This claim is brought on behalf of the South Carolina Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2830.  The VW Entity Defendants were "manufacturer[s]" as set forth in S.C. Code Ann. § 56-15-10, as it was engaged in the business of manufacturing or assembling new and unused motor vehicles.

2831.  The VW Entity Defendants committed unfair or deceptive acts or practices that violated the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Dealers Act"), S.C. Code Ann. § 56-15-30.

2832.  The VW Entity Defendants engaged in actions which were arbitrary, in bad faith, unconscionable, and which caused damage to Plaintiff, the South Carolina Class, and to the public.

2833.  The VW Entity Defendants' bad faith and unconscionable actions include, but are not limited to:  (1) representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Class Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Class Vehicles with the intent not to sell them as advertised, (4) representing that a transaction involving Class Vehicles confers or involves rights, remedies, and obligations which it does not, and (5) representing that the subject

<div align="center">- 602 -</div>

of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

2834.  2838.  The VW Entity Defendants resorted to and used false and misleading advertisements in connection with its business.  As alleged above, the VW Entity Defendants made numerous material statements about the safety, cleanliness, efficiency and reliability of the Class Vehicles that were either false or misleading.  Each of these statements contributed to the deceptive context of Volkswagen's unlawful advertising and representations as a whole.

2835.  Pursuant to S.C. Code Ann. § 56-15-110(2), Plaintiffs bring this action on behalf of themselves and the South Carolina Class, as the action is one of common or general interest to many persons and the parties are too numerous to bring them all before the court.

2836.  Plaintiff and the South Carolina Class are entitled to double their actual damages, the cost of the suit, attorney's fees pursuant to S.C. Code Ann. § 56-15-110.  Plaintiff also seeks injunctive relief under S.C. Code Ann. § 56-15-110.  Plaintiff also seeks treble damages because the VW Entity Defendants acted maliciously.

<div align="center">

**SOUTH CAROLINA COUNT III:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(S.C. CODE §§ 36-2-314 and 36-2A-212)**

</div>

2837.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2838.  Plaintiffs bring this Count on behalf of the South Carolina Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2839.  The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under S.C. Code §§ 36-2-104(1) and 36-2A-103(1)(t), and "sellers" of motor vehicles under § 36-2-103(1)(d).

2840.  With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under S.C. Code § 36-2A-103(1)(p).

2841.  The Class Vehicles are and were at all relevant times "goods" within the meaning of S.C. Code §§ 36-2-105(1) and 36-2A-103(1)(h).

2842.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to S.C. Code §§ 36-2-314 and 36-2A-212.

2843.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2844.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

2845.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other South Carolina Class members have been damaged in an amount to be proven at trial.

### SOUTH CAROLINA COUNT IV:
### BREACH OF EXPRESS WARRANTY
### (S.C. CODE §§ 36-2-313 and 36-2A-210)

2846.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2847.   Plaintiff Goeman (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the South Dakota Class against all Defendants.

2848.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under S.C. Code §§ 36-2-104(1) and 36-2A-103(1)(t), and "sellers" of motor vehicles under § 36-2-103(1)(d).

2849.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under S.C. Code § 36-2A-103(1)(p).

2850.   The Class Vehicles are and were at all relevant times "goods" within the meaning of S.C. Code §§ 36-2-105(1) and 36-2A-103(1)(h).

2851.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

2852.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2853.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2854.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2855.   As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

2856.   The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other South Carolina Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2857.   Plaintiffs and the South Carolina Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and South Carolina Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2858.   The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2859.   Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

2860.   In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

2861.   Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

2862.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other South Carolina Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2863.   Accordingly, recovery by Plaintiffs and the other South Carolina Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other South Carolina Class members, seek all remedies as allowed by law.

2864.   Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs and the other South Carolina Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2865.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other South Carolina Class members' remedies would be insufficient to make Plaintiffs and the other South Carolina Class members whole.

2866.   Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other South Carolina Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other South Carolina Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2867.   The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

2868.   As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other South Carolina Class members have been damaged in an amount to be determined at trial.

## SOUTH DAKOTA

### SOUTH DAKOTA COUNT I:
### VIOLATION OF THE SOUTH DAKOTA
### DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (S.D. CODIFIED LAWS § 37-24-6)

2869.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2870.   Plaintiff Goeman (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the South Dakota Class against all Defendants.

2871.   Volkswagen, Plaintiffs and the South Dakota Class are "persons" within the meaning of  S.D. Codified Laws § 37-24-1(8).

2872.   Volkswagen is engaged in "trade" or "commerce" within the meaning of S.D. Codified Laws § 37-24-1(13).

2873.   The South Dakota Deceptive Trade Practices and Consumer Protection ("South Dakota CPA") prohibits "deceptive acts or practices, which are defined to include "[k]nowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby." S.D. Codified Laws § 37-24-6(1).

2874.   In the course of Volkswagen's business, Volkswagen intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed "CleanDiesel" engines in the Class Vehicles. Defendants accomplished this by installing illegal

defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs and South Dakota Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and South Dakota Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

2875. Volkswagen thus violated the provisions of the South Dakota CPA, at a minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles.

2876. Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the South Dakota CPA by installing, failing to disclose and/or actively concealing the "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

2877. Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

2878.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the South Dakota CPA.

2879.   Volkswagen knew it had installed the "defeat device" in the Class Vehicles, and knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well.

2880.   Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the South Dakota Class.

2881.   Volkswagen knew or should have known that its conduct violated the South Dakota CPA.

2882.   Defendants owed Plaintiffs and South Dakota Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

a.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.   intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

c.   Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2883. Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Volkswagen's fraud was exposed. The value of the Class Vehicles has therefore plummeted. In light of the stigma Volkswagen's misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

2884. Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the South Dakota Class. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

2885. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and South Dakota Class members, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

2886. Plaintiffs and South Dakota Class members were adversely affected and suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the South Dakota Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

2887. Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the South Dakota CPA in the course of its business.

2888. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2889.   Pursuant to S.D. Codified Laws § 37-24-31, Plaintiffs and the South Dakota Class seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief to the extent available under the South Dakota CPA.

### SOUTH DAKOTA COUNT II:
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (S.D. CODIFIED LAWS §§ 57A-2-314 and 57A-2A-212)

2890.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2891.   Plaintiffs bring this Count on behalf of the South Dakota Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2892.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under S.D. Codified Laws §§ 57A-104(1) and 57A-2A-103(1)(t), and "sellers" of motor vehicles under § 57A-104(1)(d).

2893.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under S.D. Codified Laws § 57A-2A-103(1)(p).

2894.   The Class Vehicles are and were at all relevant times "goods" within the meaning of S.D. Codified Laws §§ 57A-2-105(1) and 57A-2A-103(1)(h).

2895.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law S.D. Codified Laws §§ 57A-2-314 and 57A-2A-212.

2896.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2897.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant

Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

2898.  As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other South Dakota Class members have been damaged in an amount to be proven at trial.

<div align="center">

**SOUTH DAKOTA COUNT III:**
**BREACH OF EXPRESS WARRANTY**
**(S.D. CODIFIED LAWS §§ 57A-2-313 and 57A-2A-210)**

</div>

2899.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2900.  Plaintiffs bring this Count on behalf of the South Dakota Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2901.  The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under S.D. Codified Laws §§ 57A-104(1) and 57A-2A-103(1)(t), and "sellers" of motor vehicles under § 57A-104(1)(d).

2902.  With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under S.D. Codified Laws § 57A-2A-103(1)(p).

2903.  The Class Vehicles are and were at all relevant times "goods" within the meaning of S.D. Codified Laws §§ 57A-2-105(1) and 57A-2A-103(1)(h).

2904.  In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

2905.  The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2906.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty

<div align="center">- 613 -</div>

for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2907. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2908. As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

2909. The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other South Dakota Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2910. Plaintiffs and the South Dakota Class members experienced defects within the warranty period. Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and South Dakota Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2911. The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. The VW

Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2912. Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here. For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government. We are proceeding as quickly as possible.

2913. In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal. He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

2914. Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

2915. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other South Dakota Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2916. Accordingly, recovery by Plaintiffs and the other South Dakota Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other South Dakota Class members, seek all remedies as allowed by law.

- 615 -

2917.   Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs and the other South Dakota Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2918.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other South Dakota Class members' remedies would be insufficient to make Plaintiffs and the other South Dakota Class members whole.

2919.   Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other South Dakota Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other South Dakota Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2920.   The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

2921.   As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other South Dakota Class members have been damaged in an amount to be determined at trial.

- 616 -

**TENNESSEE**

**TENNESSEE COUNT I:**
**VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT OF 1977**
**(TENN. CODE ANN. § 47-18-101,** *et seq.***)**

2922. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2923. Plaintiffs Johnson, Andrews, and Hess (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Tennessee Class against all Defendants.

2924. Plaintiffs and the Tennessee Class are "natural persons" and "consumers" within the meaning of Tenn. Code § 47-18-103(2). Defendants are "person[s]" within the meaning of Tenn. Code § 47-18-103(9).

2925. Volkswagen is engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tenn. Code § 47-18-103(9).

2926. The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code § 47-18-104.

2927. In the course of Volkswagen's business, Volkswagen intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed "CleanDiesel" engines in the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs and Tennessee Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and Tennessee Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at

WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

2928. Volkswagen thus violated the provisions of the Tennessee CPA, at a minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles.

2929. Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Tennessee CPA by installing, failing to disclose and/or actively concealing the "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

2930. Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

2931. The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Tennessee CPA.

2932. Volkswagen knew it had installed the "defeat device" in the Class Vehicles, and knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen also knew that it valued profits over environmental

cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well.

2933. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Tennessee Class.

2934. Volkswagen knew or should have known that its conduct violated the Tennessee CPA.

2935. Defendants owed Plaintiffs and Tennessee Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.    Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2936. Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Volkswagen's fraud was exposed. The value of the Class Vehicles has therefore plummeted. In light of the stigma Volkswagen's misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

2937. Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Tennessee Class. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

2938.  Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and Tennessee Class members, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

2939.  Plaintiffs and Tennessee Class members suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Tennessee Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

2940.  Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Tennessee CPA in the course of its business.

2941.  Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

2942.  Pursuant to Tenn. Code § 47-18-109, Plaintiffs and the Tennessee Class seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, damages, treble damages for willful and knowing violations, pursuant to § 47-18-109(a)(3), punitive damages, and attorneys' fees, costs, and any other just and proper relief to the extent available under the Tennessee CPA.

**TENNESSEE COUNT II:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(TENN. CODE §§ 47-2-314 and 47-2A-212)**

2943.  Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2944.   Plaintiffs bring this Count on behalf of the Tennessee Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2945.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of motor vehicles under § 47-2-103(1)(d).

2946.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

2947.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

2948.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Tenn. Code §§ 47-2-314 and 47-2A-212.

2949.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

2950.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

2951.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Tennessee Class members have been damaged in an amount to be proven at trial.

**TENNESSEE COUNT III:**
**BREACH OF EXPRESS WARRANTY**
**(TENN. CODE §§ 47-2-313 and 47-2A-210)**

2952.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2953.   Plaintiffs bring this Count on behalf of the Tennessee Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2954.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of motor vehicles under § 47-2-103(1)(d).

2955.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

2956.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

2957.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

2958.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2959.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emissions systems. Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the

catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2960.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2961.   As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

2962.   The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Tennessee Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

2963.   Plaintiffs and the Tennessee Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Tennessee Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2964.   The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2965.   Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

**How soon will the remedy be available, and how am I going to be compensated for this?**

We cannot offer a firm date now because we need to work on a remedy and review it with the government. We are proceeding as quickly as possible.

2966.  In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal. He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

2967.  Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

2968.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Tennessee Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2969.  Accordingly, recovery by Plaintiffs and the other Tennessee Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Tennessee Class members, seek all remedies as allowed by law.

2970.  Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other Tennessee Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2971.  Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Tennessee Class members' remedies would be insufficient to make Plaintiffs and the other Tennessee Class members whole.

2972.  Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Tennessee Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Tennessee Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2973.  The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

2974.  As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Tennessee Class members have been damaged in an amount to be determined at trial.

## **TEXAS**

### **TEXAS COUNT I:**
### **VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES**
### **ACT – CONSUMER PROTECTION ACT**
### **(TEX. BUS. & COM. CODE §§ 17.41, *et seq.*)**

2975.  Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2976.  Plaintiffs Esquivel, Fitzpatrick, McNeal, and Nosrat (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Texas Class against all Defendants.

2977. Plaintiffs and the Texas Class are individuals, partnerships or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), see Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4).Defendants are "person[s]" within the meaning of Tex. Bus. & Com. Code § 17.45(3).

2978. Volkswagen is engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

2979. The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

2980. In the course of Volkswagen's business, Volkswagen intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed "CleanDiesel" engines in the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs and Texas Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and Texas Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

2981.   Volkswagen thus violated the provisions of the Texas DTPA, at a minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles.

2982.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Texas DTPA by installing, failing to disclose and/or actively concealing the "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

2983.   Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

2984.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Texas DTPA.

2985.   Volkswagen knew it had installed the "defeat device" in the Class Vehicles, and knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and

distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well.

2986.  Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Texas Class.

2987.  Volkswagen knew or should have known that its conduct violated the Texas DTPA.

2988.  Defendants owed Plaintiffs and Texas Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

> a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;
>
> b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or
>
> c.    Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2989.  Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Volkswagen's fraud was exposed.  The value of the Class Vehicles has therefore plummeted.  In light of the stigma Volkswagen's misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

2990.  Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Texas Class. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

2991.  Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and Texas Class members,

about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

2992. Plaintiffs and Texas Class members suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Texas Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

2993. Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Texas DTPA in the course of its business.

2994. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2995. Pursuant to Tex. Bus. & Com. Code § 17.50, Plaintiffs and the Texas Class seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

2996. On September 21, 2015, certain Plaintiffs sent a letter complying with Tex. Bus. & Com. Code § 17.505(a). Because Volkswagen failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Texas Class are entitled.

## TEXAS COUNT II:
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (TEX. BUS. & COM. CODE §§ 2.314 and 2A.212)

2997. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2998.   Plaintiffs bring this Count on behalf of the Texas Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

2999.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104(1) and 2A.103(a)(20), and "sellers" of motor vehicles under § 2.103(a)(4).

3000.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

3001.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

3002.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Tex. Bus. & Com. Code §§ 2.314 and 2A.212.

3003.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

3004.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

3005.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Texas Class members have been damaged in an amount to be proven at trial.

**TEXAS COUNT III:**
**BREACH OF EXPRESS WARRANTY**
**(TEX. BUS. & COM. CODE §§ 2.313 and 2A.210)**

3006.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

3007.   Plaintiffs bring this Count on behalf of the Texas Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

3008.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104(1) and 2A.103(a)(20), and "sellers" of motor vehicles under § 2.103(a)(4).

3009.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

3010.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

3011.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

3012.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

3013.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the

catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

3014.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

3015.   As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

3016.   The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Texas Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

3017.   Plaintiffs and the Texas Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Texas Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

3018.   The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

3019.   Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

**How soon will the remedy be available, and how am I going to be compensated for this?**

We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

3020.   In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

3021.   Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

3022.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Texas Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

3023.   Accordingly, recovery by Plaintiffs and the other Texas Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Texas Class members, seek all remedies as allowed by law.

3024.   Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs and the other Texas Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

3025.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Texas Class members' remedies would be insufficient to make Plaintiffs and the other Texas Class members whole.

3026.   Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Texas Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Texas Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

3027.   The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

3028.   As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Texas Class members have been damaged in an amount to be determined at trial.

## UTAH

### UTAH COUNT I:
### VIOLATION OF UTAH CONSUMER SALES PRACTICES ACT
### (UTAH CODE ANN. § 13-11-1, *et seq.*)

3029.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

3030.   Plaintiffs Alters, King, Otto, and Wilson (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Utah Class against all Defendants.

3031.   Plaintiffs and Utah Class members are "persons" under the Utah Consumer Sales Practices Act ("Utah CSPA"), Utah Code § 13-11-3(5). The sales and leases of the Class Vehicles

1   to the Plaintiffs and Utah Class members were "consumer transactions" within the meaning of

2   Utah Code § 13-11-3(2).

3       3032.   Volkswagen is a "supplier" within the meaning of Utah Code § 13-11-3(6).

4       3033.   The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in

5   connection with a consumer transaction." Specifically, "a supplier commits a deceptive act or

6   practice if the supplier knowingly or intentionally:  (a) indicates that the subject of a consumer

7   transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits,

8   if it has not" or "(b) indicates that the subject of a consumer transaction is of a particular standard,

9   quality, grade, style, or model, if it is not.  Utah Code § 13-11-4.  "An unconscionable act or

10  practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.

11  Utah Code § 13-11-5.

12      3034.   In the course of Volkswagen's business, Volkswagen intentionally or negligently

13  concealed and suppressed material facts concerning the true emissions produced by the misnamed

14  "CleanDiesel" engines in the Class Vehicles. Defendants accomplished this by installing illegal

15  defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission

16  test mode only during emissions testing.  During normal operations, the Class Vehicles would

17  emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable

18  standards.  The result was what Volkswagen intended—the Class Vehicles passed emissions

19  testing by way of deliberately induced false readings.  Plaintiffs and Utah Class members had no

20  way of discerning that Volkswagen's representations were false and misleading because

21  Volkswagen's defeat device software was extremely sophisticated technology.  Plaintiffs and

22  Utah Class members did not and could not unravel Volkswagen's deception on their own.  In fact,

23  it took years before the academic engineering community—specifically a research team at

24  WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using

25  sophisticated, expensive equipment and applying decades of combined experience.

26      3035.   Volkswagen thus violated the Utah CSPA, at a minimum by:  (1) representing that

27  the Class Vehicles have sponsorship, approval, characteristics, ingredients, uses, benefits, or

28  quantities which they do not have; (2) representing that the Class Vehicles are of a particular

standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) using any other methods, acts or practices which mislead or deceive members of the public in a material respect concerning the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles.

3036.  In the course of Volkswagen's business, and in connection with consumer transactions, Volkswagen engaged in misleading, false, unfair or deceptive acts or practices that violated the Utah CSPA by installing, failing to disclose and/or actively concealing the "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

3037.  Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

3038.  The Clean Air Act and EPA implementing regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Utah CSPA.

3039.  Volkswagen knew it had installed the "defeat device" in the Class Vehicles, and knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently.  Volkswagen also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well.

3040.  Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Utah Class.

3041.  Volkswagen knew or should have known that its conduct violated the Utah CSPA.

3042.  Defendants owed Plaintiffs and Utah Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

c.    Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

3043.  Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Volkswagen's fraud was exposed.  The value of the Class Vehicles has therefore plummeted.  In light of the stigma Volkswagen's misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

3044.  Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Utah Class. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

3045.  Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and Utah Class members, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

3046.   Plaintiffs and Utah Class members suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Utah Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

3047.   Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Utah CSPA in the course of its business.

3048.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

<div align="center">

**UTAH COUNT II:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(UTAH CODE §§ 70A-2-314 and 70A-2A-212)**

</div>

3049.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

3050.   Plaintiffs bring this Count on behalf of the Utah Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

3051.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Utah Code § 70A-2-104(1) and 70A-2a-103(1)(t), and "sellers" of motor vehicles under § 70A-2-103(1)(d).

3052.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Utah Code § 70A-2a-103(1)(p).

3053.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Utah Code §§ 70A-2-105(1) and 70A-2a-103(1)(h).

3054.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Utah Code §§ 70A-2-314 and 70A-2a-212.

3055.  These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

3056.  Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

3057.  As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Utah Class members have been damaged in an amount to be proven at trial.

### UTAH COUNT III:
### BREACH OF EXPRESS WARRANTY
### (UTAH CODE §§ 70A-2-313 and 70A-2A-210)

3058.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

3059.  Plaintiffs bring this Count on behalf of the Utah Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

3060.  The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Utah Code § 70A-2-104(1) and 70A-2a-103(1)(t), and "sellers" of motor vehicles under § 70A-2-103(1)(d).

3061.  With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Utah Code § 70A-2a-103(1)(p).

3062. The Class Vehicles are and were at all relevant times "goods" within the meaning of Utah Code §§ 70A-2-105(1) and 70A-2a-103(1)(h).

3063. In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

3064. The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

3065. The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

3066. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

3067. As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

3068.  The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Utah Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

3069.  Plaintiffs and the Utah Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Utah Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

3070.  The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

3071.  Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government.  We are proceeding as quickly as possible.

3072.  In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum."  When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

3073.  Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

3074.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Utah Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

3075.  Accordingly, recovery by Plaintiffs and the other Utah Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Utah Class members, seek all remedies as allowed by law.

3076.  Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs and the other Utah Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

3077.  Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Utah Class members' remedies would be insufficient to make Plaintiffs and the other Utah Class members whole.

3078.  Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Utah Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Utah Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

3079. The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

3080. As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Utah Class members have been damaged in an amount to be determined at trial.

## VERMONT

### VERMONT COUNT I:
### VIOLATION OF VERMONT CONSUMER PROTECTION ACT
### (VT. STAT. ANN. TIT. 9, § 2451 ET SEQ.)

3081. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

3082. Plaintiffs Ebenstein and Malloy (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Vermont Class against all Defendants.

3083. Plaintiffs and the Vermont Class are "consumers" within the meaning of Vt. Stat. Tit. 9, § 2451a(a).

3084. Defendants are "person[s]" within the meaning of Vt. Code R. § 100(3) (citing Vt. Stat. tit. 9, § 2453).

3085. Volkswagen is engaged in "commerce" within the meaning of Vt. Stat. Tit. 9, § 2453(a).

3086. The Vermont Consumer Protection Act ("Vermont CPA") prohibits "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce…." Vt. Stat. Tit. 9, § 2453(a).

3087. In the course of Volkswagen's business, Volkswagen intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed "CleanDiesel" engines in the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would

1   emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable

2   standards. The result was what Volkswagen intended—the Class Vehicles passed emissions

3   testing by way of deliberately induced false readings. Plaintiffs and Vermont Class members had

4   no way of discerning that Volkswagen's representations were false and misleading because

5   Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and

6   Vermont Class members did not and could not unravel Volkswagen's deception on their own. In

7   fact, it took years before the academic engineering community—specifically a research team at

8   WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using

9   sophisticated, expensive equipment and applying decades of combined experience.

10          3088.   Volkswagen thus violated the Act, at a minimum by: (1) soliciting consumers to

11   purchase the Class Vehicles when solicitation was not a bona fide effort to sell the advertised

12   goods or services; (2) engaging in advertising which would create in the mind of a reasonable

13   consumer a false impression; and (3) failing to fully disclose material exclusions, reservations,

14   limitations, modifications, or conditions of the Class Vehicles. Vt. Code R. § 103.

15          3089.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that

16   violated the Vermont UTPA by installing, failing to disclose and/or actively concealing the

17   "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by

18   marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and

19   by presenting itself as a reputable manufacturer that valued environmental cleanliness and

20   efficiency, and that stood behind its vehicles after they were sold.

21          3090.   Volkswagen compounded the deception by repeatedly asserting that the Class

22   Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by

23   claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and

24   efficiency, and stood behind its vehicles after they were sold.

25          3091.   The Clean Air Act and EPA regulations require that automobiles limit their

26   emissions output to specified levels. These laws are intended for the protection of public health

27   and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

28   Clean Air Act and its regulations. See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By

1   installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

2   for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the

3   Vermont UTPA.

4        3092.   Volkswagen knew it had installed the "defeat device" in the Class Vehicles, and

5   knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of

6   that information until recently.  Volkswagen also knew that it valued profits over environmental

7   cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and

8   distributing vehicles throughout the United States that did not comply with EPA regulations, but

9   it concealed this information as well.

10        3093.   Volkswagen intentionally and knowingly misrepresented material facts regarding

11   the Class Vehicles with intent to mislead Plaintiffs and the Vermont Class.

12        3094.   Volkswagen knew or should have known that its conduct violated the Vermont

13   UTPA.

14        3095.   Defendants owed Plaintiffs and Vermont Class members a duty to disclose,

15   truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles

16   because they:

17           a.   possessed exclusive knowledge that they were
manufacturing, selling, and distributing vehicles throughout
18   the United States that did not comply with EPA regulations;

19           b.   intentionally concealed the foregoing from regulators,
Plaintiffs, Class members; and/or
20

21           c.   Made incomplete or negligent representations about the
environmental cleanliness and efficiency of the Class
22   Vehicles generally, and the use of the defeat device in
particular, while purposefully withholding material facts
from Plaintiffs that contradicted these representations.
23

24        3096.   Defendants concealed the illegal defeat device and the true emissions, efficiency

25   and performance of the Class Vehicles, resulting in a raft of negative publicity once

26   Volkswagen's fraud was exposed.  The value of the Class Vehicles has therefore plummeted.  In

27   light of the stigma Volkswagen's misconduct attached to the Class Vehicles, the Class Vehicles

28   are now worth less than they otherwise would be worth.

3097. Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Vermont Class. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

3098. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and Vermont Class members, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

3099. Plaintiffs and Vermont Class members suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Vermont Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

3100. Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Vermont UTPA in the course of its business.

3101. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

3102. Pursuant to Vt. Stat. Tit. 9, § 2461(b), Plaintiffs and the Vermont Class seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, actual damages, damages up to three times the consideration provided, punitive damages, attorneys' fees, costs, and any other just and proper relief available under the Vermont UTPA.

**VERMONT COUNT II:**
**VERMONT LEMON LAW**
**(Vt. Stat. Tit. 9, § 4170, et al.)**

3103.   Plaintiff and the Vermont Class own or lease "motor vehicles" within the meaning of Vt. Stat. tit. 9, § 4171(6), because these vehicles were purchased, leased, or registered in Vermont by Volkswagen and were registered in Vermont within 15 days of the date of purchase or lease. These vehicles are not: (1) tractors, (2) motorized highway building equipment, (3) road-making appliances, (4) snowmobiles, (5) motorcycles, (5) mopeds, (6) the living portion of recreation vehicles, or (7) trucks with a gross vehicle weight over 10,000 pounds.

3104.   The VW Entity Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of Vt. Stat. tit. 9, § 4171(7) because it manufactures and assembles new motor vehicles or imports for distribution through distributors of motor vehicles. It is also a "manufacturer" within the definition of "distributor" and "factory branch." *Id.*

3105.   Plaintiff and the Vermont Class are "consumers" within the meaning of Vt. Stat. tit. 9, § 4171(2) because they bought or leased the Class Vehicles, were transferred their vehicles during the duration the applicable warranty, or are otherwise entitled to the attendant terms of warranty. They are not governmental entities or a business or commercial enterprise that registers or leases three or more motor vehicles.

3106.   The Class Vehicles did not conform to their express warranties during the term of warranty because they were not cleaner vehicles and contained a "defeat device" designed to circumvent state and federal emissions standards. These devices did in fact circumvent emissions standards and substantially impaired the use, market value, and safety of their motor vehicles.

3107.   Volkswagen had actual knowledge of the conformities during the term of warranty. But the nonconformities continued to exist throughout this term, as they have not been fixed. Plaintiffs and class members are excused from notifying Volkswagen of the nonconformities because it was already fully aware of the problem—as it intentionally created it—and any repair attempt is futile.

3108. Volkswagen has had a reasonable opportunity to cure the nonconformities during the relevant period because of its actual knowledge of, creation of, and attempt to conceal the nonconformities, but has not done so as required under Vt. Stat. tit. 9, § 4173.

3109. For vehicles purchased, Plaintiff and the Vermont Class demand a full refund of the contract price and all credits and allowances for any trade-in or down payment, license fees, finance charges, credit charges, registration fees and any similar charges and incidental and consequential damages. Vt. Stat. tit. 9, § 4173(e). For vehicles leased, Plaintiff and the Vermont Class demand the aggregate deposit and rental payments previously paid, and any incidental and consequential damages incurred. Vt. Stat. tit. 9, § 4173(e), (i). Plaintiff and the Vermont Class reject an offer of replacement and will retain their vehicles until payment is tendered.

## VERMONT COUNT III:
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (VT. STAT. TIT. 9A, §§ 2-314 and 2A-212)

3110. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

3111. Plaintiffs bring this Count on behalf of the Vermont Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

3112. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Vt. Stat. tit. 9A, § 2-104(1) and 2A-103(1)(t), and "sellers" of motor vehicles under § 2-103(1)(d).

3113. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Vt. Stat. tit. 9A, § 2A-103(1)(p).

3114. The Class Vehicles are and were at all relevant times "goods" within the meaning of Vt. Stat. tit. 9A, §§ § 2-105(1) and 2A-103(1)(h).

3115. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Vt. Stat. tit. 9A, §§ 2-314 and 2A-212.

3116.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

3117.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

3118.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Vermont Class members have been damaged in an amount to be proven at trial.

<div align="center">

**VERMONT COUNT IV:**
**BREACH OF EXPRESS WARRANTY**
**(VT. STAT. TIT. 9A, §§ 2-313 and 2A-210)**

</div>

3119.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

3120.   Plaintiffs bring this Count on behalf of the Vermont Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

3121.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Vt. Stat. tit. 9A, § 2-104(1) and 2A-103(1)(t), and "sellers" of motor vehicles under § 2-103(1)(d).

3122.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Vt. Stat. tit. 9A, § 2A-103(1)(p).

3123.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Vt. Stat. tit. 9A, §§ § 2-105(1) and 2A-103(1)(h).

3124.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of

three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

3125.  The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

3126.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

3127.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

3128.  As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

3129.  The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Vermont Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

3130. Plaintiffs and the Vermont Class members experienced defects within the warranty period. Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Vermont Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

3131. The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

3132. Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here. For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government. We are proceeding as quickly as possible.

3133. In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal. He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

3134. Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

3135. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Vermont Class members whole and because the VW Entity

1  Defendants have failed and/or have refused to adequately provide the promised remedies within a

2  reasonable time.

3      3136.   Accordingly, recovery by Plaintiffs and the other Vermont Class members is not

4  restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and

5  Plaintiffs, individually and on behalf of the other Vermont Class members, seek all remedies as

6  allowed by law.

7      3137.   Also, as alleged in more detail herein, at the time the VW Entity Defendants

8  warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were

9  inherently defective and did not conform to their warranties; further, the VW Entity Defendants

10  had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs

11  and the other Vermont Class members were therefore induced to purchase or lease the Class

12  Vehicles under false and/or fraudulent pretenses.

13     3138.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

14  resolved through the limited remedy of "replacements or adjustments," as many incidental and

15  consequential damages have already been suffered because of Volkswagen's fraudulent conduct

16  as alleged herein, and because of its failure and/or continued failure to provide such limited

17  remedy within a reasonable time, and any limitation on Plaintiffs' and the other Vermont Class

18  members' remedies would be insufficient to make Plaintiffs and the other Vermont Class

19  members whole.

20     3139.   Finally, because of the VW Entity Defendants' breach of warranty as set forth

21  herein, Plaintiffs and the other Vermont Class members assert, as additional and/or alternative

22  remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other

23  Vermont Class members of the purchase or lease price of all Class Vehicles currently owned or

24  leased, and for such other incidental and consequential damages as allowed.

25     3140.   The VW Entity Defendants were provided notice of these issues by numerous

26  complaints filed against them, including the instant Complaint, within a reasonable amount of

27  time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade

28  clean air standards.

3141.   As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Vermont Class members have been damaged in an amount to be determined at trial.

## **VIRGINIA**

### **VIRGINIA COUNT I:**
### **VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT**
**(Va. Code Ann. §§ 59.1-196, *et seq*.)**

3142.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

3143.   Plaintiffs Ford, Meintzschel, Schumacher, Staby, Taylor, and Brier (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Virginia Class against all Defendants.

3144.   Defendants, Plaintiffs, and the Virginia Class are "persons" within the meaning of Va. Code § 59.1-198.

3145.   Volkswagen is a "supplier" within the meaning of Va. Code § 59.1-198.

3146.   The Virginia Consumer Protection Act ("Virginia CPA") makes unlawful "fraudulent acts or practices."  Va. Code § 59.1-200(A).

3147.   In the course of Volkswagen's business, Volkswagen intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed "CleanDiesel" engines in the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.  Plaintiffs and Virginia Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology.  Plaintiffs and Virginia Class members did not and could not unravel Volkswagen's deception on their own.  In fact, it took years before the academic engineering community—specifically a research team at

WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

3148. Volkswagen thus violated the Act, at a minimum by: (1) misrepresenting the source, sponsorship, approval, or certification of goods or services; (2) misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits; (3) misrepresenting that goods or services are of a particular standard, quality, grade, style or model; (4) advertising goods or services with intent not to sell them as advertised; and (5) using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction. Va. Code § 59.1-200(A).

3149. Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Virginia CPA by installing, failing to disclose and/or actively concealing the "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

3150. Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

3151. The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Virginia CPA.

3152. Volkswagen knew it had installed the "defeat device" in the Class Vehicles, and knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of

that information until recently. Volkswagen also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well.

3153. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Virginia Class.

3154. Volkswagen knew or should have known that its conduct violated the Virginia CPA.

3155. Defendants owed Plaintiffs and Virginia Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.    Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

3156. Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Volkswagen's fraud was exposed. The value of the Class Vehicles has therefore plummeted. In light of the stigma Volkswagen's misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

3157. Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Virginia Class. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of

environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

3158.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and Virginia Class members, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

3159.   Plaintiffs and Virginia Class members suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Virginia Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

3160.   Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Virginia CPA in the course of its business.

3161.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

3162.   Pursuant to Va. Code § 59.1-204(A)–(B), Plaintiffs and the Virginia Class are entitled to the greater of actual damages or $500 for each Virginia Class member, attorneys' fees, and costs. Because Volkswagen's actions were willful, Plaintiffs and the Virginia Class should each receive the greater of treble damages or $1,000.  *Id*.

<div align="center">

**VIRGINIA COUNT II:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(VA. CODE §§ 8.2-314 and 8.2A-212)**

</div>

3163.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

3164.   Plaintiffs bring this Count on behalf of the Virginia Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

3165.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Va. Code § 8.2-104(1) and 8.2A-103(1)(t), and "sellers" of motor vehicles under § 8.2-103(1)(d).

3166.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Va. Code § 8.2A-103(1)(p).

3167.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Va. Code §§ 8.2-105(1) and 8.2A-103(1)(h).

3168.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Va. Code §§ 8.2-314 and 8.2A-212.

3169.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

3170.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

3171.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Virginia Class members have been damaged in an amount to be proven at trial.

**VIRGINIA COUNT III:**
**BREACH OF EXPRESS WARRANTY**
**(VA. CODE §§ 8.2-313 and 8.2A-210)**

3172.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

3173.   Plaintiffs bring this Count on behalf of the Virginia Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

3174.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Va. Code § 8.2-104(1) and 8.2A-103(1)(t), and "sellers" of motor vehicles under § 8.2-103(1)(d).

3175.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Va. Code § 8.2A-103(1)(p).

3176.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Va. Code §§ 8.2-105(1) and 8.2A-103(1)(h).

3177.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

3178.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

3179.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the

1   catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

2   device or computer.

3       3180.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

4   with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an

5   express warranty for their vehicles through a Federal Emission Control System Defect Warranty.

6   The Design and Defect Warranty required by the EPA covers repair of emission control or

7   emission related parts which fail to function or function improperly because of a defect in

8   materials or workmanship.  This warranty provides protection for two years or 24,000 miles,

9   whichever comes first, or, for the major emission control components, for eight years or 80,000

10   miles, whichever comes first.

11       3181.   As manufacturers of light-duty vehicles, the VW Entity Defendants were required

12   to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

13       3182.   The VW Entity Defendants' warranties formed a basis of the bargain that was

14   reached when Plaintiffs and other Virginia Class members purchased or leased their Class

15   Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

16       3183.   Plaintiffs and the Virginia Class members experienced defects within the warranty

17   period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs

18   and Virginia Class members that the Class Vehicles were intentionally designed and

19   manufactured to be out of compliance with applicable state and federal emissions laws, and failed

20   to fix the defective emission components free of charge.

21       3184.   The VW Entity Defendants breached the express warranty promising to repair and

22   correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW

23   Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the

24   Class Vehicles' materials and workmanship defects.

25       3185.   Affording the VW Entity Defendants a reasonable opportunity to cure their breach

26   of written warranties would be unnecessary and futile here.  For example, the Frequently Asked

27   Questions ("FAQ") section of VW's informational website states:

28

**How soon will the remedy be available, and how am I going to be compensated for this?**

We cannot offer a firm date now because we need to work on a remedy and review it with the government. We are proceeding as quickly as possible.

3186.   In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal. He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

3187.   Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

3188.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Virginia Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

3189.   Accordingly, recovery by Plaintiffs and the other Virginia Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Virginia Class members, seek all remedies as allowed by law.

3190.   Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other Virginia Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

3191.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Virginia Class members' remedies would be insufficient to make Plaintiffs and the other Virginia Class members whole.

3192.   Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Virginia Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Virginia Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

3193.   The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

3194.   As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Virginia Class members have been damaged in an amount to be determined at trial.

## **WASHINGTON**

### **WASHINGTON COUNT I:**
### **VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT**
### **(WASH. REV. CODE ANN. §§ 19.86.010, ET SEQ.)**

3195.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

3196.   Plaintiffs Clements, Dial, Herr, and Mallery (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Washington Class against all Defendants.

3197.   Defendants, Plaintiffs, and the Washington Class are "persons" within the meaning of Wash. Rev. Code § 19.86.010(2).

3198.   Volkswagen is engaged in "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.86.010(2).

3199.   The Washington Consumer Protection Act ("Washington CPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Wash. Rev. Code § 19.86.020.

3200.   In the course of Volkswagen's business, Volkswagen intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed "CleanDiesel" engines in the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.  Plaintiffs and Washington Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology.  Plaintiffs and Washington Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

3201.   Volkswagen thus violated the Act, at a minimum by:  (1) making direct statements or causing reasonable inferences about the Class Vehicles that had the tendency to mislead consumers; (2) engaging in advertising concerning the cleanliness of the vehicle, the overall impression of which had the tendency to mislead consumers; and (3) failing to make clear and conspicuous disclosures of limitations, disclaimers, qualifications, conditions, exclusions or restrictions of the Class Vehicles.

3202.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Washington CPA by installing, failing to disclose and/or actively concealing the "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

3203.   Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

3204.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Washington CPA.

3205.   Volkswagen knew it had installed the "defeat device" in the Class Vehicles, and knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently.  Volkswagen also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well.

3206.   Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Washington Class.

3207.   Volkswagen knew or should have known that its conduct violated the Washington CPA.

3208.   Defendants owed Plaintiffs and Washington Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.    Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

3209.   Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Volkswagen's fraud was exposed.  The value of the Class Vehicles has therefore plummeted.  In light of the stigma Volkswagen's misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

3210.   Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Washington Class.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

3211.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and Washington Class members, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

3212.   Plaintiffs and Washington Class members suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment

of and failure to disclose material information. Plaintiffs and the Washington Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

3213.   Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Washington CPA in the course of its business.

3214.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

3215.   Pursuant to Wash. Rev. Code § 19.86.090, Plaintiffs and the Washington Class seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Washington CPA. Because Volkswagen's actions were willful and knowing, Plaintiffs' damages should be trebled. *Id.*

## WASHINGTON COUNT II:
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (WASH. REV. CODE §§ 62A.2-314 and 62A.2A-212)

3216.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

3217.   Plaintiffs bring this Count on behalf of the Washington Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

3218.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Wash. Rev. Code § 62A.2-104(1) and 62A.2A-103(1)(t), and "sellers" of motor vehicles under § 2.103(a)(4).

3219.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

3220. The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

3221. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212.

3222. These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

3223. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

3224. As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Washington Class members have been damaged in an amount to be proven at trial.

### WASHINGTON COUNT III:
### BREACH OF EXPRESS WARRANTY
### (WASH. REV. CODE §§ 62A.2-313 and 62A.2A-210)

3225. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

3226. Plaintiffs bring this Count on behalf of the Washington Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

3227. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Wash. Rev. Code § 62A.2-104(1) and 62A.2A-103(1)(t), and "sellers" of motor vehicles under § 2.103(a)(4).

3228.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

3229.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

3230.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

3231.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

3232.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

3233.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

3234. As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

3235. The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Washington Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

3236. Plaintiffs and the Washington Class members experienced defects within the warranty period. Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Washington Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

3237. The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

3238. Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here. For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government. We are proceeding as quickly as possible.

3239. In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal. He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

3240. Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

3241. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Washington Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

3242. Accordingly, recovery by Plaintiffs and the other Washington Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Washington Class members, seek all remedies as allowed by law.

3243. Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other Washington Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

3244. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Washington Class members' remedies would be insufficient to make Plaintiffs and the other Washington Class members whole.

3245. Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Washington Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other

Washington Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

3246.   The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

3247.   As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Washington Class members have been damaged in an amount to be determined at trial.

### WASHINGTON COUNT IV:
### WASHINGTON LEMON LAW
### (Wash. Rev. Code § 19.118.005, *et al*.)

3248.   Plaintiff and the Washington Class own or lease "new motor vehicles" within the meaning of Wash. Rev. Code § 19.118.021(12), because these vehicles are self-propelled primarily designed for the transportation of persons or property over the public highways and were originally purchased or leased at retail from a new motor vehicle dealer or leasing company in Washington. These vehicles do not include vehicles purchased or leased by a business as part of a fleet of ten or more vehicles at one time or under a single purchase or lease agreement or those portions of a motor home designated, used, or maintained primarily as a mobile dwelling, office, or commercial space.

3249.   The VW Entity Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of Wash. Rev. Code § 19.118.021(8) because it is in the business of constructing or assembling new motor vehicles or is engaged in the business of importing new motor vehicles into the United States for the purpose of selling or distributing new motor vehicles to new motor vehicle dealers.

3250.   Plaintiff and the Washington Class are "consumers" within the meaning of Wash. Rev. Code § 19.118.021(4) because they entered into an agreement or contract for the transfer, lease, or purchase of a new motor vehicle, other than for purposes of resale or sublease, during the eligibility period as defined by Wash. Rev. Code § 19.118.021(6).

3251.   The Class Vehicles did not conform to their warranties as defined by Wash. Rev. Code § 19.118.021(22), during the "eligibility period," defined by Wash. Rev. Code § 19.118.021(6), or the coverage period under the applicable written warranty because they were not cleaner vehicles and contained a "defeat device" designed to circumvent state and federal emissions standards. Wash. Rev. Code § 19.118.031. These devices did in fact circumvent emissions standards and substantially impaired the use, market value, and safety of their motor vehicles.

3252.   Volkswagen had actual knowledge of the conformities during warranty periods. But the nonconformities continued to exist throughout this term, as they have not been fixed. Plaintiffs and class members are excused from notifying Volkswagen of the nonconformities because it was already fully aware of the problem—as it intentionally created it—and any repair attempt is futile.

3253.   Volkswagen has had a reasonable opportunity to cure the nonconformities because of its actual knowledge of, creation of, and attempt to conceal the nonconformities, but has not done so as required under Wash. Rev. Code § 19.118.031.

3254.   For vehicles purchased, Plaintiff and the Washington Class demand a full refund of the contract price, all collateral charges, and incidental costs. Wash. Rev. Code § 19.118.041(1)(b).  For vehicles leased, Plaintiff and the Washington Class demand all payments made under the lease including but not limited to all lease payments, trade-in value or inception payment, security deposit, and all collateral charges and incidental costs. The consumer is also relieved of any future obligation to the lessor or lienholder. Id. Plaintiff and the Washington Class reject an offer of replacement and will retain their vehicles until payment is tendered.

### WEST VIRGINIA

### WEST VIRGINIA COUNT I:
### VIOLATIONS OF THE CONSUMER CREDIT AND PROTECTION ACT
### (W. VA. CODE § 46A-1-101, *et seq.*)

3255.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

3256.   Plaintiffs Lanham and Moore (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the West Virginia Class against all Defendants.

3257.   Defendants, Plaintiffs, and the West Virginia Class are "persons" within the meaning of W. Va. Code § 46A-1-102(31).  Plaintiffs and the West Virginia Class members are "consumers" within the meaning of W. Va. Code §§ 46A-1-102(2) and 46A-1-102(12).

3258.   Volkswagen is engaged in "trade" or "commerce" within the meaning of W. Va. Code § 46A-6-102(6).

3259.   The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  W. Va. Code § 46A-6-104.

3260.   In the course of Volkswagen's business, Volkswagen intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed "CleanDiesel" engines in the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards.  The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.  Plaintiffs and West Virginia Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology.  Plaintiffs and West Virginia Class members did not and could not unravel Volkswagen's deception on their own.  In fact, it took years before the academic engineering community—specifically a research team at WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using sophisticated, expensive equipment and applying decades of combined experience.

3261.   Volkswagen thus violated the West Virginia CCPA, at a minimum by: representing that the Class Vehicles had characteristics, uses, benefits and qualities which they do not have; representing that the Class Vehicles are of a particular standard, quality and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and

1    engaging in other conduct creating a likelihood of confusion or of misunderstanding. See W.Va.

2    Code § 46A-6-102(7)(E), (G), (I) and (L).

3        3262.  Defendants engaged in misleading, false, unfair or deceptive acts or practices that

4    violated the West Virginia CCPA by installing, failing to disclose and/or actively concealing the

5    "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by

6    marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and

7    by presenting itself as a reputable manufacturer that valued environmental cleanliness and

8    efficiency, and that stood behind its vehicles after they were sold.

9        3263.  Volkswagen compounded the deception by repeatedly asserting that the Class

10   Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by

11   claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and

12   efficiency, and stood behind its vehicles after they were sold.

13       3264.  The Clean Air Act and EPA regulations require that automobiles limit their

14   emissions output to specified levels.  These laws are intended for the protection of public health

15   and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

16   Clean Air Act and its regulations.  See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By

17   installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

18   for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the

19   West Virginia CCPA.

20       3265.  Volkswagen knew it had installed the "defeat device" in the Class Vehicles, and

21   knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of

22   that information until recently.  Volkswagen also knew that it valued profits over environmental

23   cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and

24   distributing vehicles throughout the United States that did not comply with EPA regulations, but

25   it concealed this information as well.

26       3266.  Volkswagen intentionally and knowingly misrepresented material facts regarding

27   the Class Vehicles with intent to mislead Plaintiffs and the West Virginia Class.

28

3267.   Volkswagen knew or should have known that its conduct violated the West Virginia CCPA.

3268.   Defendants owed Plaintiffs and West Virginia Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

a.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.   intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

c.   Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

3269.   Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Volkswagen's fraud was exposed.  The value of the Class Vehicles has therefore plummeted.  In light of the stigma Volkswagen's misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

3270.   Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the West Virginia Class.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

3271.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and West Virginia Class members, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

3272. Plaintiffs and West Virginia Class members suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the West Virginia Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

3273. Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the West Virginia CCPA in the course of its business.

3274. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

3275. Pursuant to W. Va. Code § 46A-6-106(a), Plaintiffs and the West Virginia Class seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, damages, punitive damages, and any other just and proper relief available under the West Virginia CCPA.

3276. On September 28, 2015, at least one Plaintiff sent a letter complying with W. VA. CODE § 46A-6-106(c). Because Volkswagen failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the West Virginia Class are entitled.

### WEST VIRGINIA COUNT II:
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (W. VA. CODE §§ 46-2-314 and 46-2A-212)

3277. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

3278. Plaintiffs bring this Count on behalf of the West Virginia Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

3279. The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under W. Va. Code § 46-2-104(1) and 46-2A-103(1)(t), and "sellers" of motor vehicles under § 46-2-103(1)(d).

3280. With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under W. Va. Code § 46-2A-103(1)(p).

3281. The Class Vehicles are and were at all relevant times "goods" within the meaning of W. Va. Code §§ 46-2-105(1) and 46-2A-103(1)(h).

3282. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to W. Va. Code §§ 46-2-314 and 46-2A-212.

3283. These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

3284. Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

3285. As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other West Virginia Class members have been damaged in an amount to be proven at trial.

**WEST VIRGINIA COUNT III:**
**BREACH OF EXPRESS WARRANTY**
**(W. VA. CODE §§ 46-2-313 and 46-2A-210)**

3286. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

3287.   Plaintiffs bring this Count on behalf of the West Virginia Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

3288.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under W. Va. Code §§ 46-2-104(1) and 46-2A-103(1)(t), and "sellers" of motor vehicles under § 46-2-103(1)(d).

3289.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under W. Va. Code § 46-2A-103(1)(p).

3290.   The Class Vehicles are and were at all relevant times "goods" within the meaning of W. Va. Code §§ 46-2-105(1) and 46-2A-103(1)(h).

3291.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

3292.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

3293.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

3294.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an

express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

3295. As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

3296. The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other West Virginia Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

3297. Plaintiffs and the West Virginia Class members experienced defects within the warranty period. Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and West Virginia Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

3298. The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

3299. Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here. For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government. We are proceeding as quickly as possible.

3300.  In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal.  He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

3301.  Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

3302.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other West Virginia Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

3303.  Accordingly, recovery by Plaintiffs and the other West Virginia Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other West Virginia Class members, seek all remedies as allowed by law.

3304.  Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles.  Plaintiffs and the other West Virginia Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

3305.  Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited

remedy within a reasonable time, and any limitation on Plaintiffs' and the other West Virginia

Class members' remedies would be insufficient to make Plaintiffs and the other West Virginia

Class members whole.

3306. Finally, because of the VW Entity Defendants' breach of warranty as set forth

herein, Plaintiffs and the other West Virginia Class members assert, as additional and/or

alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the

other West Virginia Class members of the purchase or lease price of all Class Vehicles currently

owned or leased, and for such other incidental and consequential damages as allowed.

3307. The VW Entity Defendants were provided notice of these issues by numerous

complaints filed against them, including the instant Complaint, within a reasonable amount of

time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade

clean air standards.

3308. As a direct and proximate result of the VW Entity Defendants' breach of express

warranties, Plaintiff and the other West Virginia Class members have been damaged in an amount

to be determined at trial.

**WEST VIRGINIA COUNT IV:**
**BREACH OF NEW MOTOR VEHICLE WARRANTY**
**(WEST VIRGINIA "LEMON LAW")**
**(W. Va. CODE §§ 46A-6A-1, et seq.)**

3309. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

3310. Plaintiffs bring this Count on behalf of the West Virginia Class against the VW

Entity Defendants.

3311. The West Virginia Class members who purchased or leased the Class Vehicles in

West Virginia are "consumers" within the meaning of W. Va. Code § 46A-6A-2(1).

3312. The VW Entity Defendants are "manufacturer[s]" of the Class Vehicles within the

meaning of W. Va. Code § 46A-6A-2(2).

3313. The Class Vehicles are "motor vehicles" as defined by W. Va. Code § 46A-6A-

2(4).

3314.   In connection with the purchase or lease of each one of its new vehicles, Volkswagen provides an express New Vehicle Limited Warranty (NVLW) for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

3315.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

3316.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emissions systems. Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emissions control unit (ECU), and the onboard emissions diagnostic device or computer.

3317.   The EPA requires vehicle manufacturers to issue Defect Warranties with respect to their vehicles' emissions systems. Thus, Volkswagen also provides an express warranty to its vehicles through a Federal Emissions Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emissions control components, for eight years or 80,000 miles, whichever comes first.

3318.   As a manufacturer of light-duty vehicles, Volkswagen was required to provide these warranties to Plaintiffs and the West Virginia Class members.  Volkswagen's warranties formed the basis of the bargain that was reached when Plaintiffs and other Class members purchased or leased their Class Vehicles equipped with the non-compliant CleanDiesel engine system from Volkswagen.

- 681 -

3319.   The emissions defect in the Class Vehicles existed from the date of the original sale of the new vehicle to the consumer but could not be detected by a reasonable consumer exercising reasonable care and diligence.  Therefore, applicable express warranties for the Class Vehicles containing the defeat device software would be extended.  Further extension of the express warranty period is now required because of the difficulties the VW Entity Defendants may have in executing a massive recall of approximately 500,000 Class Vehicles in the United States (along with an additional estimated 11.5 million vehicles worldwide).

3320.   On, September 28, 2015, at least one West Virginia Plaintiff sent a letter to Volkswagen to provide opportunity to cure pursuant to W.Va. Code §§ 46A-6A-3(a) and 5(c). Volkswagen failed to offer to cure within the requisite statutory time period.  Plaintiffs and West Virginia Class members therefore seek all damages and relief available against the VW Entity Defendants under the West Virginia Lemon Law.

3321.   As a direct and proximate result of the VW Entity Defendants' breaches of their duties under West Virginia's Lemon Law, the West Virginia Class members received goods whose defect substantially impairs their value. The West Virginia Class has been damaged by the diminished market value of the vehicles along with the compromised functioning and/or non-use of their Class Vehicles.

3322.   The VW Entity Defendants have a duty under §46A-6A-3 to make all repairs necessary to correct the defect herein described to bring the Class Vehicles into conformity with all written warranties. In the event that the VW Entity Defendants cannot affect such repairs, they have a duty to replace each Class Vehicle with a comparable new motor vehicle that conforms to the warranty.

3323.   As a result of the VW Entity Defendants' breaches, the Plaintiffs and the West Virginia Class are entitled to the following:

> a.   Revocation of acceptance and refund of the purchase price, including, but not limited to, sales tax, license and registration fees, and other reasonable expenses incurred for the purchase of the new motor vehicle, or if there be no such revocation of acceptance, damages for diminished value of the motor vehicle;

b.    Damages for the cost of repairs reasonably required to conform the motor     vehicle to the express warranty;

c.    Damages for the loss of use, annoyance or inconvenience resulting from the nonconformity, including, but not limited to, reasonable expenses incurred for replacement transportation during any period when the vehicle is out of service by reason of the nonconformity or by reason of repair; and

d.    Reasonable attorney fees.

W. Va. Code § 46A-6A-4(b)(1)-(4).

## WISCONSIN

### WISCONSIN COUNT I:
### VIOLATIONS OF THE WISCONSIN
### DECEPTIVE TRADE PRACTICES ACT
### (WIS. STAT. § 100.18)

3324.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

3325.   Plaintiffs Niegelsen and Swenson (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Wisconsin Class against all Defendants.

3326.   Plaintiffs and the Wisconsin Class members are members of "the public" within the meaning of Wis. Stat. § 100.18(1).  Plaintiffs and Wisconsin Class members purchased or leased one or more Class Vehicles.

3327.   Plaintiffs and Wisconsin Class members are "persons" under the Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA"), Wis. Stat. § 100.18(1).

3328.   Volkswagen is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

3329.   The Wisconsin DTPA makes unlawful any "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

3330.   In the course of Volkswagen's business, Volkswagen intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed "CleanDiesel" engines in the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission

1  test mode only during emissions testing. During normal operations, the Class Vehicles would

2  emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable

3  standards. The result was what Volkswagen intended—the Class Vehicles passed emissions

4  testing by way of deliberately induced false readings. Plaintiffs and Wisconsin Class members

5  had no way of discerning that Volkswagen's representations were false and misleading because

6  Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and

7  Wisconsin Class members did not and could not unravel Volkswagen's deception on their own.

8  In fact, it took years before the academic engineering community—specifically a research team at

9  WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using

10  sophisticated, expensive equipment and applying decades of combined experience.

11  3331. Volkswagen thus violated the Wisconsin DTPA, at a minimum by making myriad

12  "representation[s] or statement[s] of fact which [are] untrue, deceptive or misleading" concerning

13  the Class Vehicles.

14  3332. In the course of Volkswagen's business, and in connection with consumer

15  transactions, Volkswagen engaged in misleading, false, unfair or deceptive acts or practices that

16  violated the Wisconsin DTPA by installing, failing to disclose and/or actively concealing the

17  "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by

18  marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and

19  by presenting itself as a reputable manufacturer that valued environmental cleanliness and

20  efficiency, and that stood behind its vehicles after they were sold.

21  3333. Volkswagen compounded the deception by repeatedly asserting that the Class

22  Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by

23  claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and

24  efficiency, and stood behind its vehicles after they were sold.

25  3334. The Clean Air Act and EPA implementing regulations require that automobiles

26  limit their emissions output to specified levels. These laws are intended for the protection of

27  public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and

28  prohibited by the Clean Air Act and its regulations. See 42 U.S.C. § 7522(a)(3)(B); 40 CFR

§ 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the Wisconsin DTPA.

3335. Volkswagen knew it had installed the "defeat device" in the Class Vehicles, and knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of that information until recently. Volkswagen also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well.

3336. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Wisconsin Class.

3337. Volkswagen knew or should have known that its conduct violated the Wisconsin DTPA.

3338. Defendants owed Plaintiffs and Wisconsin Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.    Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

3339. Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Volkswagen's fraud was exposed. The value of the Class Vehicles has therefore plummeted. In light of the stigma Volkswagen's misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

3340.   Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Wisconsin Class.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

3341.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and Wisconsin Class members, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

3342.   Plaintiffs and Wisconsin Class members suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Wisconsin Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

3343.   Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Wisconsin DTPA in the course of its business.

3344.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

3345.   Plaintiffs and the Wisconsin Class seek damages, court costs and attorneys' fees under Wis. Stat. § 100.18(11)(b)(2), and any other just and proper relief available under the Wisconsin DTPA.

**WISCONSIN COUNT II:**
**BREACH OF EXPRESS WARRANTY**
**(WIS. STAT. §§ 402.313 and 411.210)**

3346.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

3347.   Plaintiffs bring this Count on behalf of the Wisconsin Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

3348.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Wis. Stat. § 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under § 402.103(1)(d).

3349.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Wis. Stat. § 411.103(1)(p).

3350.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

3351.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

3352.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

3353.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the

catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

3354.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

3355.   As manufacturers of light-duty vehicles, the VW Entity Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

3356.   The VW Entity Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Wisconsin Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

3357.   Plaintiffs and the Wisconsin Class members experienced defects within the warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform Plaintiffs and Wisconsin Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

3358.   The VW Entity Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

3359.   Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.  For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

**How soon will the remedy be available, and how am I going to be compensated for this?**

We cannot offer a firm date now because we need to work on a remedy and review it with the government. We are proceeding as quickly as possible.

3360. In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal. He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

3361. Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

3362. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Wisconsin Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

3363. Accordingly, recovery by Plaintiffs and the other Wisconsin Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Wisconsin Class members, seek all remedies as allowed by law.

3364. Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other Wisconsin Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

3365. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Wisconsin Class members' remedies would be insufficient to make Plaintiffs and the other Wisconsin Class members whole.

3366. Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Wisconsin Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Wisconsin Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

3367. The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

3368. 21. As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Wisconsin Class members have been damaged in an amount to be determined at trial.

<div align="center">

**WISCONSIN COUNT III:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(WIS. STAT. §§ 402.314 AND 411.212)**

</div>

3369. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

3370. Plaintiffs bring this Count on behalf of the Wisconsin Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

3371.  The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Wis. Stat. § 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under § 402.103(1)(d).

3372.  With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Wis. Stat. § 411.103(1)(p).

3373.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

3374.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wis. Stat. §§ 402.314 and 411.212.

3375.  These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

3376.  Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

3377.  As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Wisconsin Class members have been damaged in an amount to be proven at trial.

## WYOMING

### WYOMING COUNT I:
### VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT
#### (Wyo. Stat. §§ 40-12-101, *et seq.*)

3378.  Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

3379. Plaintiffs Mills and Tempest (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Wyoming Class against all Defendants.

3380. Plaintiffs, the Wyoming Class and Defendants are "persons" within the meaning of Wyo. Stat. § 40-12-102(a)(i).

3381. The Class Vehicles are "merchandise" pursuant to Wyo. Stat. § 40-12-102(a)(vi).

3382. Each sale or lease of an Class Vehicle to a Plaintiff or Wyoming Class member was a "consumer transaction" as defined by Wyo. Stat. § 40-12-102(a)(ii). These consumer transactions occurred "in the course of [Volkswagen's] business" under Wyo. Stat. § 40-12-105(a). Plaintiffs and Wyoming Class members purchased or leased one or more Class Vehicles.

3383. The Wyoming Consumer Protection Act ("Wyoming CPA") prohibits lists unlawful deceptive trade practices, including when a seller: "(i) Represents that merchandise has a source, origin, sponsorship, approval, accessories, or uses it does not have;" "(iii) Represents that merchandise is of a particular standard, grade, style or model, if it is not;" "(x) Advertises merchandise with intent not to sell it as advertised;" "(xv) Engages in unfair or deceptive acts or practices." Wyo. Stat. §§ 40-12-105(a).

3384. In the course of Volkswagen's business, Volkswagen intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed "CleanDiesel" engines in the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 40 times over applicable standards. The result was what Volkswagen intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs and Wyoming Class members had no way of discerning that Volkswagen's representations were false and misleading because Volkswagen's defeat device software was extremely sophisticated technology. Plaintiffs and Wyoming Class members did not and could not unravel Volkswagen's deception on their own. In fact, it took years before the academic engineering community—specifically a research team at

1    WVU's Center for Alternative Fuels, Engines & Emissions—detected Volkswagen's cheat using

2    sophisticated, expensive equipment and applying decades of combined experience.

3         3385.   Volkswagen thus violated the provisions of the Wyoming CPA, at a minimum by:

4    (1) representing that the Class Vehicles have sponsorships, approvals, and uses which they do not

5    have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when

6    they are not; and (3) advertising the Class Vehicles with the intent not to sell them as advertised.

7         3386.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that

8    violated the Wyoming CPA by installing, failing to disclose and/or actively concealing the

9    "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by

10   marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and

11   by presenting itself as a reputable manufacturer that valued environmental cleanliness and

12   efficiency, and that stood behind its vehicles after they were sold.

13        3387.   Volkswagen compounded the deception by repeatedly asserting that the Class

14   Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by

15   claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and

16   efficiency, and stood behind its vehicles after they were sold.

17        3388.   The Clean Air Act and EPA regulations require that automobiles limit their

18   emissions output to specified levels.  These laws are intended for the protection of public health

19   and welfare.  "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

20   Clean Air Act and its regulations.  See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By

21   installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

22   for purchase, Volkswagen violated federal law and therefore engaged in conduct that violates the

23   Wyoming CPA.

24        3389.   Volkswagen knew it had installed the "defeat device" in the Class Vehicles, and

25   knew the true nature of its "clean" diesel engine system for at least six years, but concealed all of

26   that information until recently. Volkswagen also knew that it valued profits over environmental

27   cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and

28

distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well.

3390.  Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Wyoming Class.

3391.  Volkswagen knew or should have known that its conduct violated the Wyoming CPA.

3392.  Defendants owed Plaintiffs and Wyoming Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

    c.    Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

3393.  Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Volkswagen's fraud was exposed.  The value of the Class Vehicles has therefore plummeted.  In light of the stigma Volkswagen's misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

3394.  Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the Wyoming Class.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

3395.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and Wyoming Class members, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Class Vehicles.

3396.   Plaintiffs and Wyoming Class members suffered ascertainable loss and actual damages as a direct and proximate result of Volkswagen's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Wyoming Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

3397.   Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Wyoming CPA in the course of its business.

3398.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

3399.   Pursuant to Wyo. Stat. § 40-12-108(a), Plaintiffs and the Wyoming Class seek damages as determined at trial, and any other just and proper relief available under the Wyoming CPA, including but not limited to court costs and reasonable attorneys' fees as provided in Wyo. Stat. § 40-12-108(b).

3400.   On October 5, 2015, certain Plaintiffs sent a letter complying with Wyo. Stat. § 40-12-109.  Because Volkswagen failed to offer to cure, or failed to complete a remedy of its deceptive trade acts and practices within the required time period, see Wyo. Stat. § 40-12-102(a)(ix), Plaintiffs seek all damages and relief available under the Wyoming CPA.

**WYOMING COUNT II:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(WYO. STAT. §§ 34.1-2-314 and 34.1-2.A-212)**

3401.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

3402.   Plaintiffs bring this Count on behalf of the Wyoming Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

3403.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Wyo. Stat. §§ 34.1-2-104(a) and 34.1-2.A-103(a)(xx), and "sellers" of motor vehicles under § 34.1-2-103(a)(iv).

3404.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Wyo. Stat. § 34.1-2.A-103(a)(xvi).

3405.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wyo. Stat. §§ 34.1-2-105(a) and 34.1-2.A-103(a)(viii).

3406.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wyo. Stat. §§ 34.1-2-314 and 34.1-2.A-212.

3407.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

3408.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

3409.   As a direct and proximate result of the VW Entity Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Wyoming Class members have been damaged in an amount to be proven at trial.

### WYOMING COUNT III:
### BREACH OF EXPRESS WARRANTY
### (Wyo. Stat. § 34.1-2-313)

3410.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

3411.   Plaintiffs bring this Count on behalf of the Wyoming Class, against VW AG, VW America, Audi AG, Audi America, Porsche AG, and Porsche America (collectively, the "VW Entity Defendants").

3412.   The VW Entity Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Wyo. Stat. §§ 34.1-2-104(a) and 34.1-2.A-103(a)(xx), and "sellers" of motor vehicles under § 34.1-2-103(a)(iv).

3413.   With respect to leases, the VW Entity Defendants are and were at all relevant times "lessors" of motor vehicles under Wyo. Stat. § 34.1-2.A-103(a)(xvi).

3414.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wyo. Stat. §§ 34.1-2-105(a) and 34.1-2.A-103(a)(viii).

3415.   In connection with the purchase or lease of each one of its new vehicles, the VW Entity Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

3416.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

3417.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major

emission control components are covered for the first eight years or 80,000 miles, whichever

comes first.  These major emission control components subject to the longer warranty include the

catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

device or computer.

3418.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties

with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an

express warranty for their vehicles through a Federal Emission Control System Defect Warranty.

The Design and Defect Warranty required by the EPA covers repair of emission control or

emission related parts which fail to function or function improperly because of a defect in

materials or workmanship.  This warranty provides protection for two years or 24,000 miles,

whichever comes first, or, for the major emission control components, for eight years or 80,000

miles, whichever comes first.

3419.  As manufacturers of light-duty vehicles, the VW Entity Defendants were required

to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

3420.  The VW Entity Defendants' warranties formed a basis of the bargain that was

reached when Plaintiffs and other Wyoming Class members purchased or leased their Class

Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

3421.  Plaintiffs and the Wyoming Class members experienced defects within the

warranty period.  Despite the existence of warranties, the VW Entity Defendants failed to inform

Plaintiffs and Wyoming Class members that the Class Vehicles were intentionally designed and

manufactured to be out of compliance with applicable state and federal emissions laws, and failed

to fix the defective emission components free of charge.

3422.  The VW Entity Defendants breached the express warranty promising to repair and

correct a manufacturing defect or materials or workmanship of any parts they supplied.  The VW

Entity Defendants have not repaired or adjusted, and have been unable to repair or adjust, the

Class Vehicles' materials and workmanship defects.

3423. Affording the VW Entity Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here. For example, the Frequently Asked Questions ("FAQ") section of VW's informational website states:

> **How soon will the remedy be available, and how am I going to be compensated for this?**
>
> We cannot offer a firm date now because we need to work on a remedy and review it with the government. We are proceeding as quickly as possible.

3424. In his Congressional testimony on October 8, 2015, Michael Horn stated that Volkswagen intends to make Class Vehicles compliant with emission standards through software fixes and the installation of auxiliary hardware, but that fix will take "1 to 2 years, minimum." When questioned on remedies for consumers, he stated that Volkswagen may pay customers for a loss in resale values because of the scandal. He said that Volkswagen is not considering providing loaner vehicles because the U.S. government says the vehicles are safe to drive.

3425. Michael Horn's testimony serves as an admission that the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the VW Entity Defendants cannot meet that promise within a reasonable time.

3426. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Wyoming Class members whole and because the VW Entity Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

3427. Accordingly, recovery by Plaintiffs and the other Wyoming Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Wyoming Class members, seek all remedies as allowed by law.

3428. Also, as alleged in more detail herein, at the time the VW Entity Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, the VW Entity Defendants

had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other Wyoming Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

3429. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Volkswagen's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Wyoming Class members' remedies would be insufficient to make Plaintiffs and the other Wyoming Class members whole.

3430. Finally, because of the VW Entity Defendants' breach of warranty as set forth herein, Plaintiffs and the other Wyoming Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Wyoming Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

3431. The VW Entity Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Class Vehicles to evade clean air standards.

3432. As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiff and the other Wyoming Class members have been damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and State Classes, respectfully request that the Court grant certification of the proposed Nationwide Class and State Classes, including the designation of Plaintiffs as the named representatives of the Nationwide Class and respective State Classes, the appointment of the undersigned as Class Counsel, and the designation of any appropriate subclasses, under the

1    applicable provisions of Fed. R. Civ. P. 23, and that the Court enter judgment in their favor and

2    against Defendants, as follows:

3          A.      An order temporarily and permanently enjoining Defendants from continuing the

4    unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices alleged in this

5    Complaint;

6          B.      Injunctive and equitable relief in the form of a comprehensive program to repair,

7    retrofit, and/or buyback all Class Vehicles, and to fully reimburse and make whole all Class

8    members for all costs and economic losses, and degradation of mileage performance, durability,

9    and reliability that the Class Vehicles will incur by being brought into compliance with federal

10   and state law;

11         C.      Environmental reparations, mitigation, and remediation to offset the harm caused

12   by the illegal emissions of the Class Vehicles, based on the mileage driven by all Class Vehicles

13   and/or other appropriate matrices of environmental harm;

14         D.      A declaration that Defendants are financially responsible for all Class notice and

15   the administration of Class relief;

16         E.      Costs, restitution, compensatory damages for economic loss and out-of-pocket

17   costs, treble damages under Civil RICO, multiple damages under applicable states' laws, punitive

18   and exemplary damages under applicable law; and disgorgement, in an amount to be determined

19   at trial;

20         F.      Rescission of all Class Vehicle purchases or leases, including reimbursement

21   and/or compensation of the full purchase price of all Class Vehicles, including taxes, licenses, and

22   other fees.

23         G.      Any and applicable statutory and civil penalties;

24         H.      An order requiring Defendants to pay both pre- and post-judgment interest on any

25   amounts awarded.

26         I.      An award of costs and attorneys' fees, as allowed by law;

27         J.      Leave to amend this Complaint to conform to the evidence produced at trial; and

28         K.      Such other or further relief as the Court may deem appropriate, just, and equitable.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated:  February 22, 2016

Respectfully submitted,

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

By:      */s/ Elizabeth J. Cabraser*_____
             Elizabeth J. Cabraser

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008
E-mail: *ecabraser@lchb.com*

*Plaintiffs' Lead Counsel*

Benjamin L. Bailey
BAILEY GLASSER LLP
209 Capitol Street
Charleston, WV  25301
Telephone:  304.345.6555
Facsimile:  304.342.1110
E-mail: *Bbailey@baileyglasser.com*

Steve W. Berman
HAGENS BERMAN
1918 8th Avenue, Suite 3300
Seattle, WA 98101
Telephone:  206.623.7292
Facsimile:  206.623.0594
E-mail: *steve@hbsslaw.com*

David Boies
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY  10504
Telephone:  914.749.8200
Facsimile:  914.749.8300
E-mail: *dboies@bsfllp.com*

David Seabold Casey, Jr.
CASEY GERRY SCHENK FRANCAVILLA
  BLATT & PENFIELD, LLP
110 Laurel St.
San Diego, CA 92101-1486
Telephone:  619.238.1811
Facsimile:  619.544.9232
E-mail: *dcasey@cglaw.com*

James E. Cecchi
CARELLA, BYRNE, CECCHI, OLSTEIN,
  BRODY & AGNELLO P.C.
5 Becker Farm Road
Roseland, New Jersey 07068-1739
Telephone: 973.994.1700
Facsimile: 973.994.1744
E-mail: jcecchi@carellabyrne.com

Roxanne Barton Conlin
ROXANNE CONLIN & ASSOCIATES, P.C.
319 Seventh St., Suite 600
Des Moines, IA 50309
Telephone: 515.283.1111
Facsimile: 515.282.0477
E-mail: roxlaw@aol.com

Jayne Conroy
SIMMONS HANLY CONROY LLC
112 Madison Avenue
New York, New York 10016-7416
Telephone: 212.784.6400
Facsimile: 212.213.5949
E-mail: jconroy@simmonsfirm.com

Paul J. Geller
ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561.750.3000
Facsimile: 561.750.3364
E-mail: pgeller@rgrdlaw.com

Robin L. Greenwald
WEITZ & LUXENBERG P.C.
700 Broadway
New York, NY 10003
Telephone: 212.558.5500
Facsimile: 212.344.5461
E-mail: rgreenwald@weitzlux.com

Michael D. Hausfeld
HAUSFELD
1700 K Street, NW, Suite 650
Washington, DC, 20006
Telephone: 202.540.7200
Facsimile: 202.540.7201
E-mail: mhausfeld@hausfeld.com

Michael Everett Heygood
HEYGOOD, ORR & PEARSON
6363 North State Highway 161, Suite 450
Irving, Texas 75038
Telephone: 214.237.9001
Facsimile: 214.237.9002
E-mail: Michael@hop-law.com

Adam J. Levitt
GRANT & EISENHOFER P.A.
30 North LaSalle Street, Suite 2350
Chicago, Illinois 60602
Telephone: 312.610.5400
Facsimile: 312.214.0001
E-mail: alevitt@gelaw.com

W. Daniel "Dee" Miles III
BEASLEY ALLEN LAW FIRM
218 Commerce St.
Montgomery, AL 36104
Telephone: 800.898.2034
Facsimile: 334.954.7555
E-mail: dee.miles@beasleyallen.com

Frank Mario Pitre
COTCHETT PITRE & MCCARTHY LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: 650.697.6000
Facsimile: 650.697.0577
E-mail: fpitre@cpmlegal.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joseph F. Rice
MOTLEY RICE, LLC
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
Telephone:  843.216.9000
Facsimile:  843.216.9450
E-mail: *jrice@motleyrice.com*

Lynn Lincoln Sarko
KELLER ROHRBACK L.L.P.
1201 3rd Avenue, Suite 3200
Seattle, Washington 98101-3052
Telephone:  206.623.1900
Facsimile:  206.623.3384
E-mail: *lsarko@kellerrohrback.com*

J. Gerard Stranch IV
BRANSTETTER, STRANCH &
JENNINGS, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN  37203
Telephone:  615.254.8801
Facsimile:  615.250.3937
E-mail: *gerards@bsjfirm.com*

Lesley Elizabeth Weaver
BLOCK & LEVITON LLP
155 Federal Street, Suite 400
Boston, MA  02110
Telephone:  617.398.5600
Facsimile:  617.507.6020
E-mail: *lweaver@blockesq.com*

Rosemary M. Rivas
FINKELSTEIN THOMPSON LLP
One California Street, Suite 900
San Francisco, CA 94111
Telephone:  415.398.8700
Facsimile:  415.398.8704
E-mail: *rrivas@finkelsteinthompson.com*

Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, New York  10005-4401
Telephone:  212.584.0700
Facsimile:  212.584.0799
E-mail: *cseeger@seegerweiss.com*

Roland K. Tellis
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, CA  91436
Telephone:  818.839.2320
Facsimile:  818.986.9698
E-mail: *trellis@baronbudd.com*

*Plaintiffs' Steering Committee*

CONSOLIDATED CONSUMER CLASS
COMPLAINT MDL 2672 CRB (JSC)