United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION
_______________________________________/

This Order Relates To:
ALL VOLKSWAGEN-BRANDED FRANCHISE DEALER ACTIONS
_______________________________________/

MDL No. 2672 CRB (JSC)

**ORDER GRANTING PRELIMINARY APPROVAL OF THE VOLKSWAGEN-BRANDED FRANCHISE DEALER CLASS ACTION SETTLEMENT AGREEMENT AND RELEASE**

Just over one year ago, the public learned of Volkswagen's allegedly deliberate use of a defeat device—software designed to cheat emissions tests and deceive federal and state regulators—in nearly 500,000 Volkswagen- and Audi-branded turbocharged direct injection ("TDI") diesel engine vehicles sold in the United States. Litigation quickly ensued, and those actions were consolidated and assigned to this Court as a multidistrict litigation ("MDL"). Among the lawsuits that comprise this MDL are lawsuits filed by Volkswagen-branded franchise dealers. On September 30, 2016, Plaintiff J. Bertolet, Inc. dba J. Bertolet Volkswagen ("Plaintiff" or "Bertolet") filed its proposed Volkswagen-Branded Franchise Dealer Class Action Settlement and Release ("Franchise Dealer Settlement" or "Settlement"). (Dkt. No. 1970.)

Plaintiff now moves the Court to (1) preliminarily approve the Franchise Dealer Settlement, (2) conditionally certify the proposed Franchise Dealer Class, (3) approve its proposed notice, and (4) schedule a fairness hearing. (*See* Dkt. No. 1971.) Having considered the proposed Franchise Dealer Settlement and with the benefit of oral argument on October 18, 2016, the Court **GRANTS** the Motion for Preliminary Approval. The Franchise Dealer Settlement is sufficiently fair, adequate, and reasonable to the Franchise Dealers to move forward with class notice.

## I. BACKGROUND

### A. Factual Allegations

In 2009, Volkswagen began selling its Volkswagen- and Audi-branded TDI "clean diesel" vehicles, which they marketed as being environmentally friendly, fuel efficient, and high performing. Unbeknownst to consumers and regulatory authorities, Volkswagen installed in these cars a defeat device that allowed it to evade United States Environmental Protection Agency ("EPA") and California Air Resources Board ("CARB") emissions test procedures. Specifically, the defeat device senses whether the vehicle is undergoing testing and produces regulation-compliant results, but operates a less effective emissions control system when the vehicle is driven under normal circumstances. Only by installing the defeat device on its vehicles was Volkswagen able to obtain Certificates of Conformity ("COCs") from EPA and Executive Orders ("EOs") from CARB for its 2.0- and 3.0-liter diesel engine vehicles; in fact, these vehicles release nitrogen oxides ("NOx") at a factor of up to 40 times over the permitted limit. Over six years, Volkswagen sold American consumers nearly 500,000 diesel vehicles equipped with a defeat device.

### B. Procedural History[1]

On September 3, 2015, Volkswagen admitted to EPA and CARB that it installed defeat devices on its model year 2009 through 2015 Volkswagen and Audi diesel vehicles equipped with 2.0-liter engines. On September 18, 2015, the public became aware of the defeat device when EPA issued a Notice of Violation ("NOV") to Volkswagen, alleging that Volkswagen's use of the defeat device violated provisions of the Clean Air Act, 42 U.S.C. § 7401 et seq. That same day, CARB sent Volkswagen a letter notifying them that CARB had commenced an enforcement investigation concerning the defeat device.

Two months later, EPA issued a second NOV to Volkswagen, as well as Dr. Ing. h.c. F. Porsche AG ("Porsche AG") and Porsche Cars North America, Inc. ("PCNA"), which alleged Volkswagen had installed in its 3.0-liter diesel engine vehicles a defeat device similar to the one

[1] A detailed procedural background regarding the consumer and government actions can be found in the Court's Amended Order Granting Preliminary Approval of Settlement. (*See* Dkt. No. 1698 at 2-3.)

described in the September 18 NOV. CARB also sent a second letter concerning the same matter.

Litigation on behalf of Volkswagen-branded franchise dealers initially began on two separate tracks and eventually merged into a single action. (Dkt. No. 1971 at 4.) Once knowledge of the defeat device became public, Volkswagen-branded dealers nominated a Dealer Investment Committee, consisting of five current Volkswagen-franchise dealers and represented by Bass Sox Mercer, to begin discussions with Volkswagen regarding a remedy for United States franchise dealers to compensate them for losses allegedly caused by the emissions scandal. (*Id.* at 4; Dkt. No. 1972 ¶ 3.)

Napleton Orlando Imports, LLC dba Napleton's Volkswagen of Orlando; Napleton Sanford Imports, LLC dba Napleton's Volkswagen of Sanford; and Napleton Automotive of Urbana, LLC dba Napleton Volkswagen of Urbana (collectively, "Napleton Dealerships") separately retained their own counsel, Hagens Berman, which began extensive pre-filing investigation and research. (Dkt. No. 1971 at 4; Dkt. No. 1972 ¶ 4.) This culminated in the Napleton Dealerships' filing of a proposed class action complaint against Volkswagen Group of American, Inc. ("VWGoA"); Volkswagen Credit, Inc. ("VW Credit"); and Volkswagen AG ("VWAG") in the Northern District of Illinois. (Dkt. No. 1971 at 3-4.) That case was transferred to this MDL. (*See* Dkt. No. 1427.)

In July 2016, after Hagens Berman and Bass Sox Mercer independently devoted significant resources and efforts toward the prosecution of Volkswagen, the two firms agreed to work together in order to "efficiently forge the best possible result for all 652 Volkswagen-branded franchise dealers[.]" (Dkt. No. 1971 at 5.) Thereafter, both firms began settlement negotiations with Volkswagen; the parties agreed upon a settlement term sheet in late August 2016. (*Id.*)

On September 30, 2016, Hagens Berman and Bass Sox Mercer filed directly in the MDL a Volkswagen-Branded Franchise Dealer Amended and Consolidated Class Action Complaint ("Franchise Dealer Complaint") against VWGoA, VWAG, Bosch GmbH, and Bosch LLC. (*See* Dkt. No. 1969.) The Franchise Dealer Complaint adds Bertolet as Plaintiff and asserts (1) federal claims under the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 et seq.; the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(C)-(D); (2) Florida state claims for

United States District Court
Northern District of California

violations of Florida Statute section 320.64(4), breach of contract, and fraudulent concealment; and (3) Illinois state claims for violations of the Illinois Motor Vehicle Franchise Act, 815 ILCS 710/1 et seq.; fraud by concealment; and breach of contract. (Dkt. No. 1969 ¶¶ 17-20, 292-452.)

Along with the Franchise Dealer Complaint, Bertolet also filed the Franchise Dealer Settlement and the instant Motion for Preliminary Approval. (*See* Dkt. No. 1970.)

## II. SETTLEMENT TERMS

### A. The Settlement Class

The Franchise Dealer Class is defined as "a nationwide class of all authorized Volkswagen dealers in the United States who, on September 18, 2015, operated a Volkswagen branded dealership pursuant to a valid Volkswagen Dealer Agreement." (Dkt. No. 1970 ¶ 2.4.) Excluded are all persons who timely opt out of the Settlement. (*Id.* ¶ 2.10; Dkt. No. 1971 at 6.) The Class consists of Eligible Dealers, which are "the 652 authorized Volkswagen dealers in the United States on September 18, 2015." (Dkt. No. 1970 ¶ 2.12.)

Further, the Settlement concerns the following Affected Vehicles:

VW Jetta TDI (Model Years 2009-2015);
VW Jetta SportWagen TDI (Model Years 2009-2014);
VW Golf TDI (Model Years 2010-2015);
VW Golf SportWagen TDI (Model Year 2015);
VW Beetle TDI and VW Beetle Convertible TDI (Model Years 2012-2015);
VW Passat TDI (Model Years 2012-2015);
VW Touareg TDI (Model Years 2009-2016);
Used Audi A3 (Model Years 2010-13, 2015-16);
Used Audi A6 Quattro (Model Years 2014-2016);
Used Audi A7 Quattro (Model Years 2014-2016);
Used Audi A8L (Model Years 2014-2016);
Used Audi Q5 (Model Years 2014-2016); and
Used Audi Q7 (Model Years 2009-2015).

(*Id.* ¶ 2.2.)

### B. Remedies

The Settlement offers Class Members cash payments and non-monetary remedies. It further sets forth VWGoA's responsibilities in handling Class Members' inventory of Affected Vehicles and Class Members' obligations to aid consumers.

//

United States District Court
Northern District of California

1. Cash Payments

The Settlement entitles Class Members to a cash Individual Dealer Settlement Payment (the "Settlement Payment"). (Dkt. No. 1970 ¶ 4.1.1.) Under the terms of the Settlement, Volkswagen shall pay a Maximum Settlement Amount of $1.208 billion, which assumes 100% Eligible Dealer participation. (*Id.* ¶¶ 2.18, 4.1.2.) Plaintiff estimates Class Members will receive an average cash payment of $1.85 million. (Dkt. No. 1971 at 6.)

2. Non-Monetary Remedies

The Settlement also offers Class Members non-monetary benefits. (Dkt. No. 1970 ¶ 4.2.) Specifically, for a period of two years after the Opt-Out Deadline, Class Members will have the option to defer any affirmative obligations to renovate or construct dealership facilities or otherwise make capital investments in their real property or facilities. (*Id.* ¶ 4.2.1.) Nor will VWGoA require Class Members to take any such action prior to any future transfer of a Class Member's Volkswagen dealership assets pursuant to Article 12 of the Volkswagen Dealer Agreement, Standard Provisions. (*Id.* ¶ 4.2.2.) The Class Member must, however, propose the transfer to VWGoA within one year after the Opt-Out Deadline. (*Id.*)

3. Class Members' Inventory

Finally, the Settlement requires Volkswagen to repurchase any Affected Vehicles for which it is unable to provide an Approved Emissions Modification or a "Fix" (a "No Fix Vehicle") within 30 days of determining that no such modification is available. (*Id.* ¶ 5.2.) For any used diesel vehicle, Volkswagen shall pay the Class Member the same gross amount that an Eligible Owner would receive (1) under the Consumer and Reseller Dealership Settlement Agreement (*see* Dkt. No. 1685 ¶ 4.2.1), and (2) under a future potential consumer settlement, if any, for any 3.0-liter used TDI diesel engine vehicle. (Dkt. No. 1970 ¶ 5.2.1.1.) For a new vehicle without a Fix, Volkswagen shall pay the Class Member the net wholesale cost that the Class Member paid for such vehicle. (*Id.* ¶ 5.2.1.2.) VWGoA shall retrieve No Fix Vehicles from Class Members at its own expense. (*Id.* ¶ 5.2.2.) While failure to retrieve a No Fix Vehicle within 30 days does not breach the Settlement, VWGoA agrees to pay all reasonable carrying and storage costs relating to the No AEM Vehicle from the date the vehicle is determined to be impossible to

United States District Court
Northern District of California

fix. (*Id.* ¶ 5.2.2.) However, if VWGoA fails to retrieve a No Fix Vehicle within one year of repurchase, the Class Member may ship the vehicle(s) to VWGoA at VWGoA's expense. (*Id.* ¶ 5.2.3.)

On the other hand, if Volkswagen can provide a Fix for any unused Model Year 2015 Affected Vehicles ("New 2015 Vehicles"), VWGoA will establish a VW Credit-administered TDI Lease Program and a TDI Service Loan Program. (*Id.* ¶¶ 5.3.1.-5.3.2.) The TDI Lease Program will offer consumers "attractive lease terms with substantial subvention," or monetary assistance. (*Id.* ¶ 5.3.1.) VW Credit will maintain ownership of the New 2015 Vehicles in the Lease Program. (*Id.*) The TDI Service Loan Program is a 12-month service loan car program for New 2015 Vehicles that charges Class Members a monthly rental fee below the current standard of 2% Manufacturer's Suggested Retail Price ("MSRP") per month. (*Id.* ¶ 5.3.2.) Class Members will have the option to purchase the New 2015 Vehicles at the conclusion of the Service Loan Program. (*Id.*) The VWGoA and/or VW Credit shall administer the TDI Loan Service Program; VW Credit shall maintain ownership of vehicles in that program. (*Id.*)

4. <u>Class Members' Obligations</u>

The Settlement also requires Class Members to use their reasonable best efforts to ensure that consumers are offered at least three appointment dates to complete a Fix in the time frame set forth in the Consumer and Reseller Dealership Settlement and the Federal Trade Commission's Partial Consent Order. (*See* Dkt. Nos. 1607, 1685.)

**C. Claims Process**

Class Members are not required to submit a claim. (Dkt. No. 1970 ¶ 4.1.2.) Rather, Class Members who do not opt out will automatically receive their allocated share of the cash payment via electronic fund transfer. (*Id.*; Dkt. No. 1970-1 at 6.)

**D. Distribution of Settlement Payments**

The Settlement requires VWGoA to pay each Settlement Payment directly to Class Members. (Dkt. No. 1970 ¶ 4.1.1.) The Settlement Payment is equal to each Class Members' pro rata share of the Monthly Financial Assistance Payments that Volkswagen paid to Eligible Dealers in November 2015. (*Id.* ¶ 4.1.6.) The Settlement Payment is broken into two components.

VWGoA will first pay each Class Member an Initial Payment equal to 50% of the Individual Dealer Settlement Payment. (*Id.* ¶ 4.1.3.) VWGoA will then pay the remaining 50% of the Individual Dealer Settlement Payment in 18 equal monthly payments (the "Monthly Installment Payments"). (*Id.* ¶ 4.1.4.)

In addition to the Payment, Volkswagen will continue its Volume-based Incentive Program ("VIP") Level 3 incentives and its Customer Satisfaction Index ("CSI") incentive payments for a 12-month period at the amounts being paid as of the date of the Settlement. (*Id.* ¶ 4.1.8.) These payments shall begin the earlier of (1) 30 days after the Opt-Out Deadline or (2) the date the first Individual Dealer Settlement Payments are made to Class Members. (*Id.*)

The Settlement further provides that VWGoA will pay Class Members the monthly financial assistance it is currently paying Eligible Dealers at the current amount as of the date of the Settlement until either 30 days after the Opt-Out Deadline or the date of the first pay outs of the Individual Dealer Settlement Payments, whichever comes first. (Dkt. No. 1970 ¶ 4.1.9.)

**E. Opt Out Procedures and Objections**

The Settlement requires Class Members to request exclusion within 30 days after class notice is sent. (Dkt. No. 1970 ¶ 2.20.) Class Members who wish to exclude themselves from the Settlement must personally sign and submit a written request to opt out to Plaintiffs' Counsel on or before the Opt-Out Deadline of November 23, 2016. (*Id.* ¶ 7.1.) The request must include (1) a clear and unambiguous statement to the effect of "I wish to exclude myself from the Class in *Napleton et al. v. Volkswagen Group of America, Inc. et al.*, No. 15-md-2672;" (2) the Eligible Dealer's address and telephone number; and (3) a statement that the entity is an Eligible Dealer and the dates of the Eligible Dealer's ownership of a Volkswagen-branded dealership. (*Id.*) Class Members who do not timely and properly opt out of the Settlement will automatically receive their share of the Net Settlement Fund and be bound to the terms of the Settlement and the Court's final approval order. (*Id.* ¶ 7.2.)

Class Members who do not opt out of the Settlement may object to it. (*Id.* ¶¶ 7.3, 8.) Class Members may file with the Court any written objections explaining why they do not believe the Court should approve the Settlement as fair, reasonable, and adequate. (*Id.* ¶ 8.1.) The

objection must include (1) a detailed statement of and specific reasons for the Class Member's objection; (2) the Class Member's name, address, and telephone number; (3) a statement the Class Member has reviewed the Class definition and has not opted out of the Settlement; and (4) any other supporting materials the Class Member wishes the Court to consider. (*Id.*) Class Members may object on their own behalf or through counsel at their own expense. (*Id.* ¶ 8.2.) Failure to timely and properly object waives the Class Member's right to object and/or be heard on such an objection, and also waives the Class Member's right to appeal. (*Id.* ¶ 8.4.)

Class Members may also request to appear at the final fairness hearing by filing a written notice of his or her intent to appear with the Court. (*Id.* ¶ 8.3.)

**F. Release of Claims**

In exchange for benefits under the Settlement, Class Members agree to release claims against released parties. (*Id.* ¶ 9.) "Released Parties" refer to "any person who, or entity that, is or could be responsible or liable in any way whatsoever, whether directly or indirectly, for the claims asserted in the Franchise Dealer Complaint." (*Id.* ¶ 9.1.) Released Parties include, but are not limited to,

> (1) Volkswagen AG, Volkswagen Group of America, Inc. (d/b/a Volkswagen of 16 America, Inc.), Volkswagen Group of America Chattanooga Operations, LLC, VW Credit, Inc., VW Credit Leasing, Ltd., VCI Loan Services, LLC, and any former, present, and future owners, shareholders, directors, officers, employees, attorneys, affiliates, parent companies, subsidiaries, predecessors, and successors of any of the foregoing (the "VW Released Entities"); (2) any and all contractors, subcontractors, and suppliers of the VW Released Entities; (3) any and all persons and entities indemnified by any VW Released Entity with respect to the TDI Matter; (4) any and all other persons and entities involved in the design, research, development, manufacture, assembly, testing, sale, leasing, repair, warranting, marketing, advertising, public relations, promotion, or distribution of any Affected Vehicle, even if such persons are not specifically named in this paragraph; and (5) for each of the foregoing, their respective former, present, and future affiliates, parent companies, subsidiaries, predecessors, successors, shareholders, indemnitors, subrogees, spouses, joint ventures, general or limited partners, attorneys, assigns, principals, officers, directors, employees, members, agents, representatives, trustees, insurers, reinsurers, heirs, beneficiaries, wards, estates, executors, administrators, receivers, conservators, personal representatives, divisions, dealers, and suppliers.

United States District Court
Northern District of California

(*Id.*)

"Released Claims" include

> (1) all claims related in any way to the TDI Matter; (2) all claims related in any way to VWGoA's previously announced goals or objectives for U.S. sales volume growth, including any claims related in any way to incentives and other support payments or programs from VWGoA to any Volkswagen-branded franchise dealer related to such goals and any volume shortfall; (3) all claims for monetary damages arising before the Effective Date of this Franchise Dealer Class Agreement that relate in any way to allocation complaints or irregularities (but allocations may be asserted by any dealer as a defense to a franchise termination by VWGoA); (4) all claims for monetary damages arising before the Effective Date of this Franchise Dealer Class Agreement that relate in any way to the method upon which VWGoA measures the sales and service performance of its Volkswagen-branded franchise dealers or sets the sales and service objectives for its Volkswagen-branded franchise dealers (but the method upon which VWGoA measures the sales and service performance may be asserted by any Volkswagen-branded franchise dealer as a defense to a franchise termination by VWGoA); and (5) all discrimination or coercion claims arising before the Effective Date of this Franchise Dealer Class Agreement related in any way to the sale, incentivization or use of VCI wholesale and retail financing products.

(*Id.* ¶ 9.3.) Class Members also release any potential claims under California Civil Code section 1542 and any similar laws. (*Id.* ¶ 9.7.) Class Members do not, however, release any claims against Bosch GmbH and Bosch LLC or any of their former, present, and future owners, shareholders, directors, officers, employees, attorneys, affiliates, parent companies, subsidiaries, predecessors, or successors. (*Id.* ¶ 9.2.)

### G. Attorneys' Fees and Costs

VWGoA agrees to pay reasonable attorneys' fees and costs related to the negotiation and execution of the Settlement. (*Id.* ¶ 13.1.) Such fees and costs will be paid separately from the Settlement; in other words, Class Members' recovery will not be reduced by attorneys' fees. (*Id.*; *see* Dkt. No. 1971 at 9.) The parties agree to negotiate the amount of attorneys' fees and costs, and if they reach such an agreement, the parties will submit the negotiated amount to the Court for approval. (Dkt. No. 1970 ¶ 13.2.) If the parties are unable to come to a consensus, they will litigate the issue. (*Id.*)

//

## III. LEGAL STANDARD

"'[T]here is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned.'" *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) (quoting *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008)). Nevertheless, Federal Rule of Civil Procedure ("Rule") 23(e) requires courts to approve any class action settlement. "[S]ettlement class actions present unique due process concerns for absent class members." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). As such, "the district court has a fiduciary duty to look after the interests of those absent class members." *Allen*, 787 F.3d at 1223 (collecting cases).

Preliminary approval of a class action settlement generally requires two inquiries. *Cotter v. Lyft, Inc.*, 2016 WL 1394236, at *4 (N.D. Cal. Apr. 7, 2016). Courts first assess whether a class exists. *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997). This is "of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." (*Id.*) Second, Rule 23(e) requires courts to determine "whether a proposed settlement is fundamentally fair, adequate, and reasonable." *Hanlon*, 150 F.3d at 1026; *see* Fed. R. Civ. P. 23(e)(2).

## IV. DISCUSSION

### A. Class Certification

Class certification is a two-step process. *See Amchem Prods., Inc.*, 521 U.S. at 613. Plaintiff must first satisfy Rule 23(a)'s four requirements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Fed. R. Civ. P. 23(a)(1)-(4). "[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied[.]" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (internal quotations omitted).

The Settlement Class Representatives must then establish that a class action may be maintained under either Rule 23(b)(1), (2), or (3). *See Amchem Prods., Inc.*, 521 U.S. at 613. The Settlement Class Representatives seek certification under Rule 23(b)(3), which is appropriate when questions of law or fact common to Class Members predominate and a class action is the

United States District Court
Northern District of California

superior means to other available methods to resolve the controversy. Fed. R. Civ. P. 23(b)(3).

1. Rule 23(a)

a. *Numerosity*

Rule 23(a)(1) requires the class to be "so numerous that joinder of all parties is impracticable." Fed. R. Civ. P. 23(a)(1). "A specific minimum number is not necessary, and [a] plaintiff need not state the exact number of potential class members." *Richie v. Blue Shield of Cal.*, 2014 WL 6982943, at *15 (N.D. Cal. Dec. 9, 2014). There are 652 Eligible Dealers and thus 652 potential Class Members. (Dkt. No. 1970 ¶ 2.12.) Plaintiff therefore satisfies the numerosity requirement. *See Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *4 (N.D. Cal. Mar. 16, 2016) ("[A] proposed class of at least forty members presumptively satisfies the numerosity requirement." (internal quotation marks and citation omitted)); *Yamada v. Nobel Biocare Holding AG*, 275 F.R.D. 573, 577 (C.D. Cal. 2011) ("Joining more than one hundred plaintiffs is impracticable.").

b. *Commonality*

Rule 23(a)(2) mandates the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon*, 150 F.3d at 1019. Assessing commonality requires courts to have "a precise understanding of the nature of the underlying claims." *Parsons v. Ryan*, 754 F.3d 657, 676 (9th Cir. 2014) (citing *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013); additional citation omitted). This allows courts to determine if the class' "claims . . . depend upon a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. The commonality "analysis does not turn on the number of common questions, but on their relevance to the factual and legal issues at the core of the purported class' claims." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 2835 (2015). Rather, a single common question of law or fact satisfies the Rule. *Dukes*, 564 U.S. at 369.

Plaintiff satisfies the commonality requirement, as Plaintiff's and the other Class Members' claims center on one common question. Specifically, their claims focus on whether Volkswagen's use of the defeat device defrauded consumers, government regulators, and franchise dealers. Absent class certification, Class Members would be forced to independently and separately litigate the same issues of law and fact which arise from this alleged common course of conduct. *See In re Celera Corp. Sec. Litig.*, 2014 WL 722408, at *3 (N.D. Cal. Feb. 25, 2014) (finding commonality requirement met where plaintiffs raised questions of law or fact that would be addressed by other putative class members pursuing similar claims). As such, Plaintiff satisfies Rule 23(a)(2).

c. *Typicality*

Rule 23(a)(3) requires that the representative parties' claims be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality "assure[s] that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). Under this "permissive" rule, "representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Parsons*, 754 F.3d at 685 (quoting *Hanlon*, 150 F.3d at 1020). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

Plaintiff meets the typicality requirement. Plaintiff's claims are based on the same pattern of wrongdoing as those brought on behalf of Class Members. Like the other Class Members, Plaintiff is a Volkswagen-branded franchise dealer who sells Volkswagen cars to consumers. Plaintiff and Class Members were also harmed by the same course of conduct, namely, Volkswagen's allegedly unauthorized and secret use of the defeat device which led to a stop sale order on all Volkswagen diesel cars and to a decline in the worth of the Volkswagen brand. Because Plaintiff's claims and underlying facts are identical to those of the Class, Plaintiff

satisfies the typicality requirement.

        d.    *Adequacy of Representation*

      Rule 23(a)(4) requires that the representative party be able to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "This requirement is rooted in due-process concerns—'absent class members must be afforded adequate representation before entry of a judgment which binds them.'" *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013) (quoting *Hanlon*, 150 F.3d at 1020). Courts engage in a dual inquiry to determine adequate representation and ask: "'(1) do the named plaintiffs and their counsel have any conflicts of interest with other Class Members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Evon*, 688 F.3d at 1031 (quoting *Hanlon*, 150 F.3d at 1020).

      Plaintiff represents it is "committed to the action and has devoted substantial time to assisting counsel with this action, providing documents and reviewing pleadings." (Dkt. No. 1971 at 20; *see* Dkt. No. 1972 ¶ 15.) At this point, nothing in the record suggests Plaintiff has any conflicts with Class Members or otherwise cannot adequately represent the Class. Class Members are also represented by adequate counsel. Both Hagens Berman and Bass Sox Mercer are experienced counsel. Hagens Berman has held leadership roles in several prominent automobile class action lawsuits that have resulted in substantial settlements. Notably, Hagens Berman Managing Partner Steve W. Berman is a member of this MDL's Plaintiffs' Steering Committee. (Dkt. No. 1971 at 14.) But Hagens Bermans has held leadership roles in other MDLs as well, including *In Re: Toyota Motor Corporation Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation*, No. 15-md-2151, and *In Re: Hyundai and Kia Fuel Economy Litigation*, No. 13-md-2424. (*Id.*) Bass Sox Mercer offers significant experience representing automobile dealerships in lawsuits and other actions against automobile manufacturers. (*Id.*) In light of the foregoing, it appears Plaintiff is able to vigorously prosecute this action through qualified counsel.

        e.    *Summary*

      Plaintiff meets the Rule 23(a) requirements for purposes of preliminary approval. Next,

Plaintiff "must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc.*, 521 U.S. at 614. Plaintiff seeks certification pursuant to Rule 23(b)(3). (Dkt. No. 1971 at 21-23.)

2. Rule 23(b)(3)

A class action may be maintained under Rule 23(b)(3) when "the court finds [1] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and [2] that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy[.]" Fed. R. Civ. P. 23(b)(3).

"Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). The Rule 23(b)(3) "analysis presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2); thus, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3)." *Hanlon*, 150 F.3d at 1022. Instead, "[t]he 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation'" and requires "courts to give careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting *Amchem Prods.*, 521 U.S. at 623). Predominance is found "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication[.]" *Hanlon*, 150 F.3d at 1022 (internal quotations omitted).

This action meets Rule 23(b)(3)'s predominance requirement. Plaintiff alleges Volkswagen engaged in the same fraud in the same manner against all Class Members. Specifically, Plaintiff asserts Volkswagen defrauded Class Members through its use of the defeat device. Should the Court find Volkswagen indeed engaged in the fraud as described, such a finding would affect all Class Members' claims. Further, Plaintiff alleges all Class Members suffered the same harm from the same cause, specifically, the subsequent stop sale orders and brand damage caused by Volkswagen's disclosure of the device. As such, the Court finds common questions of law or fact predominate.

The superiority test is also satisfied. This test "requires the court to determine whether

United States District Court
Northern District of California

maintenance of this litigation as a class action is efficient and whether it is fair." *Wolin*, 617 F.3d at 1175-76. If Class Members were to litigate their claims independently, each one would be required to prove the same wrongful conduct to establish liability and would offer the same evidence. There are 652 Class Members and thus the potential for just as many lawsuits. This risks the possibility of inconsistent rulings and results. Classwide resolution is clearly favorable compared to other means of adjudication, and the Settlement resolves Class Members' claims at once. Thus, class action treatment is superior to other methods and will efficiently and fairly provide a resolution to this litigation.

4. Summary

Plaintiff satisfies the Rule 23(a) and (b)(3) requirements. Accordingly, the Court conditionally certifies the proposed Class for settlement purposes only.

**B. Preliminary Fairness Determination**

The Ninth Circuit has identified eight factors courts should consider to determine whether a settlement agreement is fair, adequate, and reasonable:

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement.

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (citation omitted). Courts must examine "the settlement taken as a whole, rather than the individual component parts" for fairness. *Hanlon*, 150 F.3d at 1026. Courts cannot "delete, modify or substitute certain provisions" of the settlement. (*Id.* (internal quotations omitted).)

But where, as here, the parties negotiate a settlement before a class has been certified, "courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). Pre-class certification settlements "must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *In re Bluetooth*, 654 F.3d at 946 (citing *Hanlon*, 150 F.3d at 1026). This

United States District Court
Northern District of California

heightened scrutiny "ensure[s] that class representatives and their counsel do not secure a disproportionate benefit 'at the expense of the unnamed plaintiffs who class counsel had a duty to represent.'" *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (quoting *Hanlon*, 150 F.3d at 1027). As such, courts must evaluate the settlement for evidence of collusion. (*Id.*)

Because "[c]ollusion may not always be evident on the face of a settlement, . . . courts therefore must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In Re Bluetooth*, 654 F.3d at 947. In *In Re Bluetooth*, the Ninth Circuit identified signs of subtle collusion including, but not limited to,

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded,
> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries "the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class"; and
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund[.]

*Id.* (internal quotations and citations omitted).

However, courts need not assess all of these fairness factors at the preliminary approval stage. *See Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 665 (E.D. Cal. 2008). Rather, "the preliminary approval stage [i]s an 'initial evaluation' of the fairness of the proposed settlement made by the court on the basis of written submissions and informal presentation from the settling parties." *In re High-Tech Empl. Antitrust Litig.*, 2013 WL 6328811, at *1 (N.D. Cal. Oct. 30, 2013) (citing Manual for Complex Litigation (Fourth) § 21.632). At this stage, "[p]reliminary approval of a settlement is appropriate if 'the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval.'" *Ruch v. AM Retail Grp., Inc.*, 2016 WL 1161453, at *7 (N.D. Cal. Mar. 24, 2016) (quoting *In re Tableware*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)). Ultimately, "[t]he initial decision to approve or reject a settlement proposal is committed to the sound

United States District Court
Northern District of California

discretion of the trial judge." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).

1. Settlement Process

The Court first considers "the means by which the parties arrived at settlement." Preliminary approval is appropriate if the proposed settlement is the product of serious, informed, non-collusive negotiations. The Settlement is the end result of such negotiations. Class Counsel reviewed not just the discovery produced in the consumer action, but "extensive discovery relating to [the] franchise dealers' case." (Dkt. No. 1971 at 13.) Class Counsel-retained economics experts further examined the dealer-specific discovery. (*Id.*) This allowed Class Counsel to be sufficiently prepared to engaged in informed settlement negotiations and to evaluate the strength of Class Members' claims in relation to any settlement offers. Additionally, Class Members reviewed "much investigation and research . . . to assess the effects of the diesel emissions scandal on their operations, expectations and investment value." (*Id.*) The Settlement is also the product of arm's-length negotiations by experienced Class Counsel; as such, it is "entitled to 'an initial presumption of fairness[.]'" *In re High-Tech Employee Antitrust Litig.*, 2013 WL 6328811, at *1 (N.D. Cal. Oct. 30, 2013) (quoting Newberg on Class Actions § 11.41 (5th ed.)). Finally, no neutral mediator supervised settlement negotiations, including Court-appointed Settlement Master and former Director of the Federal Bureau of Investigation Robert S. Mueller III. Nonetheless, having reviewed the initial settlement term sheet and the final proposed Settlement, the Settlement Master has indicated the Settlement should be submitted to the Court for approval. (Dkt. No. 1971 at 16.) Thus, this factor favors preliminary approval.

2. The Presence of Obvious Deficiencies

The second consideration is whether the Settlement contains any obvious deficiencies. The Court finds no obvious concerns at this time.

The first *Bluetooth* factor asks whether class counsel receive a disproportionate distribution of the settlement or whether counsel are amply rewarded while the class receives no monetary distribution. This factor is not present. The Settlement provides for the payment of attorneys' fees and costs separate from the funds awarded to Class Members. (Dkt. No. 1970 ¶ 13.1; Dkt.

No. 1971 at 9.)  Class Counsel thus are not entitled to a disproportionate distribution of the Settlement Funds.  And, because Class Members stand to receive a monetary benefit, the second situation is not implicated.  There is therefore no evidence of collusion under the first *Bluetooth* factor.

The second *Bluetooth* factor looks for a "clear sailing" agreement.  At this point, this factor does not create any concerns, given that Plaintiff has not yet requested attorneys' fees.  That the amount of attorneys' fees and costs is still to be determined is not fatal to preliminary approval. Rule 23(h), which governs attorneys' fees in class actions, does not require Class Counsel to move for its fee award at the preliminary approval juncture, or even upon final approval.  *See* Fed. R. Civ. P. 23(h); *In re Nat'l Football League Players Concussion Injury Litig.* ("*In re NFL Players*"), 821 F.3d 410, 445 (3d Cir. 2016) ("[T]he separation of a fee award from final approval of the settlement does not violate Rule 23(h), which allows a court to award reasonable attorneys' fees and costs in a certified class action subject to certain requirements."); *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 910 F. Supp. 2d 891, 918 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014) (granting final approval even though "the parties had no discussions regarding fees other than the PSC's making clear that it would eventually file a request for attorneys' fees").  Rule 23 requires Class Members be notified of and have an opportunity to object to a motion for attorneys' fees.  *See* Fed. R. Civ. P 23(h); *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 993–94 (9th Cir. 2010) ("The plain text of the rule requires that any class member be allowed an opportunity to object to the fee 'motion' itself, not merely to the preliminary notice that such a motion will be filed.").  But that opportunity need not be at the preliminary approval stage.

That said, Class Members must have sufficient information as to Class Counsel's prospective request for attorneys' fees to inform their decision as to whether to remain a Class Member.  Plaintiff proposes the deadline to submit a motion for attorneys' fees and costs be two weeks before the Opt-Out Deadline, that is, November 9, 2016.  (Dkt. No. 1971 at 24.)  This gives Class Members an opportunity to make an informed decision as to whether they should object or opt out of the Settlement.

The final *Bluetooth* factor considers whether the settlement provides for funds not awarded to revert to defendants. *Bluetooth*, 654 F.3d at 947. The Settlement does not provide a reversionary clause; however, as it does not designate a *cy pres* recipient, the unclaimed funds will presumably revert to VWGoA. Even so, the Court finds no evidence of collusion under this factor. Together, United States Department of Justice's Partial Consent Decree and the Consumer and Reseller Dealership Settlement set forth challenging deadlines for Volkswagen to meet. Specifically, the Consumer and Reseller Dealership Settlement requires Volkswagen to make available appointments for a Buyback or a Fix within 90 days of a consumer's acceptance of a formal offer and scheduling of an appointment. (Dkt. No. 1685-4 ¶ 4(c).) The Partial Consent Decree further requires Volkswagen to buy back or fix 85% of the vehicles by June 30, 2019 and imposes additional fines if Volkswagen fails to achieve that target. (App'x A ¶¶ 6.1, 6.3, Dkt. No. 1973-1.) Volkswagen must rely on their franchise dealers to fulfill its obligations under these agreements, as consumers will take their vehicles to franchise dealers for a Buyback or Lease Termination or a Fix. (*See* Dkt. No. 1685-4 ¶ 5.) Thus, Volkswagen is incentivized to adequately compensate its franchise dealers for their alleged losses to ensure their cooperation in the execution of the other agreements.

In short, the Court finds none of the *Bluetooth* factors are present at this time and sees no other apparent problems with the Settlement. As such, the lack of any obvious deficiencies weighs in favor of preliminary approval.

3. Preferential Treatment

The third factor asks whether the Settlement provides preferential treatment to any Class Member. The Settlement treats all Class Members alike. All Class Members' benefits are calculated according to the same formula; specifically, each Class Member will receive a pro rata share of the Monthly Financial Assistance Payments that Volkswagen paid to Eligible Dealers in November 2015. (Dkt. No. 1970 ¶ 4.1.7.) Further, the Settlement does not provide an incentive award to the Settlement Class Representative, though Plaintiff leaves open the possibility it may seek such an award in the future. *See* Dkt. No. 1971 at 24 (proposing "[l]ast day for motion for attorneys' fees, costs, expenses, and service awards"). The Court is satisfied the Settlement does

United States District Court
Northern District of California

not award any Class Member preferential treatment.

4. Range of Possible Approval

Under the fourth factor, courts determine whether a settlement falls within the range of possible approval. This requires courts to focus on "substantive fairness and adequacy" and "consider plaintiffs' expected recovery balanced against the value of the settlement offer." *Tableware*, 484 F. Supp. 2d at 1080. As part of this assessment, courts must "estimate the maximum amount of damages recoverable in a successful litigation and compare that with the settlement amount." *Harris*, 2011 WL 1627973, at *11 (internal quotation marks omitted).

Plaintiff estimates the average recovery for each Class Members is $1.85 million. (Dkt. No. 1971 at 6, 13.) Attorneys' fees and costs will not reduce that recovery given that Volkswagen will pay those fees separately. At this point, there is nothing before the Court to indicate that this figure is outside the range of possible approval. Moreover, continuing the litigation creates an uncertain future. Plaintiff recognizes this litigation carries certification challenges. Specifically, Plaintiff notes that manageability could create a problem. (Dkt. No. 1971 at 12.) Class Members not only likely have the resources to litigate independently, but they also suffered losses substantial enough to support individual lawsuits. (*Id.*) Additionally, "the many, varied business pressures on dealer operations could put pressure on the cohesiveness of the ongoing class." (*Id.*) Prolonged litigation and the costs associated with it will increase the costs of this action and delay recovery. "Even if Plaintiff[] were to prevail, [it] would be required to expend considerable additional time and resources potentially outweighing any additional recovery obtained through successful litigation." *Collins v. Cargill Meat Sols. Corp.*, 274 F.R.D. 294, 302 (E.D. Cal. 2011).

*****

Given the risks of continuing litigation, the Court finds the proposed Settlement is fair, adequate, and reasonable and in the best interests of Class Members.

**C. Class Notice**

1. Method of Providing Notice

For any class certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members

who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). "[T]he express language and intent of Rule 23(c)(2) leave no doubt that individual notice must be provided to those class members who are identifiable through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 175 (1974).

Notice is to begin one week from the date of this Order. (Dkt. No. 1971 at 24.) Each Class Member has a Dealer Agreement with Volkswagen; thus, the identity and contact information is known to Volkswagen. (*Id.* at 8.) Notice will be sent via overnight express mail to each Class Member's address operations and notice address, if different. (*Id.*) After mailing notice, Volkswagen will telephone Class Members to confirm receipt of the notice.

The Court is satisfied the notice plan is adequate. Direct mail provides individual notice to Class Members, as required by Rule 23(c)(2). *See* Fed. R. Civ. P. 23(c)(2). Class Members' identities and contact information are easily identifiable given that each one has a Dealer Agreement with Volkswagen. Direct mail therefore serves as the best practicable method to notify Class Members of this Settlement. *See Hunt v. Check Recovery Sys., Inc.*, 2007 WL 2220972, at *3 (N.D. Cal. Aug. 1, 2007), *aff'd sub nom. Hunt v. Imperial Merch. Servs., Inc.*, 560 F.3d 1137 (9th Cir. 2009) ("Delivery by first-class mail can satisfy the best notice practicable when there is no indication that any of the class members cannot be identified through reasonable efforts."). The follow-up telephone call to confirm a Class Member in fact received the notice further ensures Class Members will learn of the Settlement. The Court thus approves the method of notice as described in Plaintiff's Motion, as it serves as the best practicable notice reasonably calculated to inform Class Members of the Settlement.

2. <u>Contents of the Notice</u>

Rule 23(c)(2)(B) also requires the notice clearly and concisely state

> (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).

The 14-page notice satisfies the elements of Rule 23(c)(2)(B). (*See* Dkt. No. 1970-1.) It provides a summary of the action and explains how Class Members may address the Court by written objection or by appearing at the final fairness hearing. *See Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." (internal quotation marks and citation omitted)). It also explains in question-and-answer format who is a Class Member, the benefits to which Class Members are entitled, and how Class Members can claim their benefits. Finally, the notice directs Class Members to a toll free telephone number (1-800-657-1758) and a website (www.vwdealersettlement.com) for additional information. The notice also apprises Class Members of Class Counsel's contact information should Class Members wish to communicate with them.

3. Costs of Class Notice Program

Volkswagen agrees to pay all costs associated with the administration of the Settlement. (Dkt. No. 1971 at 9.) The parties agree that no third-party claims or notice administrator is necessary. (*Id.*)

## V. CONCLUSION

The Court finds that the proposed Settlement is the result of intensive, non-collusive negotiations and is reasonable, fair, and adequate. The Court therefore **GRANTS** Plaintiff's Motion for Preliminary Approval of Class Settlement as follows:

1. The proposed Franchise Dealer Class is conditionally certified pursuant to Federal Rule of Civil Procedure 23(a) and (b) for settlement purposes. The Class is defined as "a nationwide class of all authorized Volkswagen dealers in the United States who, on September 18, 2015, operated a Volkswagen branded dealership pursuant to a valid Volkswagen Dealer Agreement."

2. The Franchise Dealer Settlement is preliminary approved as fair, adequate, and reasonable pursuant to Federal Rule of Civil Procedure 23(e).

3. The Court appoints J. Bertolet, Inc. dba J. Bertolet Volkswagen as Class

United States District Court
Northern District of California

Representative.

4. The Court appoints Hagens Berman and Bass Sox Mercer as Settlement Class Counsel.

5. Notice shall be provided in accordance with the Notice Plan and this Order, that is, on or before **October 25, 2016**.

6. Settlement Class Counsel shall move for attorneys' fees on or before **November 9, 2016**.

7. Class Members shall submit their objections or requests for exclusion on or before **November 23, 2016** in the manner set forth in the Franchise Dealer Settlement.

8. Settlement Class Counsel shall move for final approval by **December 12, 2016** and file their reply by **January 11, 2017**.

The Court will hold a fairness hearing to finally determine whether the settlement is fair, reasonable, and adequate on **January 18, 2017 at 8:00 a.m.** in Courtroom 6, 450 Golden Gate Avenue, San Francisco, California. Class Members who wish to address the Court at the fairness hearing must submit their intent to appear by January 4, 2017.

This Order disposes of Docket No. 1971.

**IT IS SO ORDERED.**

Dated: October 18, 2016

CHARLES R. BREYER
United States District Judge

United States District Court
Northern District of California