UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: VOLKSWAGEN "CLEAN DIESEL"
MARKETING, SALES PRACTICES, AND
PRODUCTS LIABILITY LITIGATION

_____/

This Order Relates To:
ALL ACTIONS (except the securities action)

_____/

MDL No. 2672 CRB  (JSC)

**ORDER GRANTING FINAL
APPROVAL OF THE 2.0-LITER TDI
CONSUMER AND RESELLER
DEALERSHIP CLASS ACTION
SETTLEMENT**

Just over one year ago, Volkswagen publicly admitted it had secretly and deliberately installed a defeat device—software designed to cheat emissions tests and deceive federal and state regulators—in nearly 500,000 Volkswagen- and Audi-branded TDI diesel vehicles sold to American consumers.  Litigation quickly ensued, and hundreds of consumers' lawsuits were assigned to this Court as a multidistrict litigation ("MDL").

After five months of intensive negotiations conducted under the guidance of a Court-appointed Settlement Master, Plaintiffs and Defendants Volkswagen AG, Audi AG, and Volkswagen Group of America, Inc. (collectively, "Volkswagen") reached a settlement that resolves consumer claims concerning the 2.0-liter TDI diesel vehicles.  The Court preliminarily approved the Amended Consumer Class Action Settlement Agreement ("Settlement") on July 26, 2016 (Dkt. No. 1688) and entered its Amended Order on July 29, 2016 (Dkt. No. 1698).  The Settlement Class Representatives now move the Court to finally approve the Settlement.  (Dkt. No. 1784.)  On October 18, 2016, the Court held a fairness hearing regarding final approval, during which 18 Class Members or attorneys for Class Members addressed the Court.  Having considered the parties' submissions and with the benefit of oral argument, the Court **GRANTS** final approval of the Settlement Agreement.  The Settlement is fair, reasonable, and adequate.

United States District Court
Northern District of California

# I.   BACKGROUND

## A.   Factual Background

Over the course of six years, Volkswagen sold nearly 500,000 Volkswagen- and Audi-branded TDI "clean diesel" vehicles, which they marketed as being environmentally friendly, fuel efficient, and high performing.  Consumers were unaware, however, that Volkswagen had secretly equipped these vehicles with a defeat device that allowed Volkswagen to evade United States Environmental Protection Agency ("EPA") and California Air Resources Board ("CARB") emissions test procedures.  Specifically, the defeat device produces regulation-compliant results when it senses the vehicle is undergoing testing, but operates a less effective emissions control system when the vehicle is driven under normal circumstances.  It was only by using the defeat device that Volkswagen was able to obtain Certificates of Conformity from EPA and Executive Orders from CARB for its TDI diesel engine vehicles.  In reality, these vehicles emit nitrogen oxides ("NOx") at a factor of up to 40 times over the permitted limit.

## B.   Procedural History

On September 3, 2015, Volkswagen admitted to EPA and CARB that it had installed defeat devices on its model years 2009 through 2015 Volkswagen and Audi 2.0-liter diesel engine vehicles.  The public learned of this admission on September 18, 2015, when the EPA issued a Notice of Violation ("NOV") that alleged Volkswagen's use of the defeat device violated provisions of the Clean Air Act, 42 U.S.C. § 7401 et seq.  That same day, CARB sent Volkswagen a notification letter stating CARB had commenced an enforcement investigation concerning the defeat device.

Two months later, EPA issued a second NOV to Volkswagen, as well as Dr. Ing. h.c. F. Porsche AG ("Porsche AG") and Porsche Cars North America, Inc. ("PCNA"), which alleged Volkswagen had installed in its 3.0-liter diesel engine vehicles a defeat device similar to the one described in the September 18 NOV.  CARB also sent a second letter concerning the same matter.

### 1.   Consumer Actions

Consumers nationwide filed hundreds of lawsuits after Volkswagen's use of the defeat device became public, and on December 8, 2015, the Judicial Panel on Multidistrict Litigation

2

United States District Court
Northern District of California

1    ("JPML") transferred 56 related actions, including numerous putative class actions, to this Court

2    for coordinated pretrial proceedings in the above-captioned MDL.  (Dkt. No. 1.)  The JPML has

3    since transferred an additional 1,101 tag-along actions to the Court.  (Dkt. No. 2092.)

4          In January 2016, the Court appointed Elizabeth J. Cabraser of Lieff, Cabraser, Heimann &

5    Bernstein, LLP as Lead Plaintiffs' Counsel and Chair of the Plaintiffs' Steering Committee

6    ("PSC"), to which the Court also named 21 attorneys.  (Dkt. No. 1084.)  On February 22, 2016,

7    the PSC filed its Consolidated Consumer Class Action Complaint against 13 Defendants:

8    VWGoA; VWAG; Audi AG; Audi of America, LLC; Porsche AG; PCNA; Martin Winterkorn;

9    Mattias Müller; Michael Horn; Rupert Stadler; Robert Bosch GmbH ("Bosch GmbH"); Robert

10   Bosch, LLC ("Bosch LLC"); and Volkmar Denner.  (Dkt. No. 1230.)  The Consolidated

11   Complaint asserted claims under (1) the Racketeer Influenced and Corrupt Organizations Act

12   ("RICO"), 18 U.S.C. § 1962(c)-(d), and the Magnusson-Moss Warranty Act, 15 U.S.C. § 2301 et

13   seq.; (2) state fraud, breach of contract, and unjust enrichment laws; and (3) all fifty States'

14   consumer protection laws.  (*Id.* ¶¶ 361-3432.)  The PSC also filed a Consolidated Amended

15   Reseller Dealership Class Action Complaint against the same 13 Defendants, which asserted

16   RICO, fraud, failure to recall/retrofit, and unjust enrichment claims.  (Dkt. No. 1231 ¶¶ 179-292.)

17   The PSC subsequently filed an Amended Consolidated Consumer Class Action Complaint

18   ("Amended Consumer Complaint," Dkt. No. 1804) and a Second Amended Consolidated Reseller

19   Dealership Class Action Complaint ("Second Amended Reseller Complaint," Dkt. No. 1805).

20         2.     <u>Government Actions</u>

21         This MDL also includes actions brought by federal and state government entities.  The

22   United States Department of Justice ("United States") on behalf of EPA has sued VWAG, Audi

23   AG, VWGoA; Volkswagen Group of America Chattanooga Operations, LLC ("VW

24   Chattanooga"), Porsche AG, and PCNA for claims arising under Sections 204 and 205 of the

25   Clean Air Act, 42 U.S.C. §§ 7523 and 7524.  The Federal Trade Commission ("FTC") has also

26   brought an action against VWGoA.  The FTC brings its claims pursuant to Section 13(b) of the

27   Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §53(b), and alleges violations of Section

28   5(a) of the FTC Act, 15 U.S.C. § 45(a).  Additionally, the State of California, on behalf of the

1   People and CARB, has sued VWAG, VWGoA, VW Chattanooga, Audi AG, Porsche AG, and

2   PCNA for violations of the Consumer Financial Protection Act, 12 U.S.C. § 5536, and various

3   California state laws.

4           3.      Settlement Negotiations

5           In January 2016 the Court appointed former Director of the Federal Bureau of

6   Investigation Robert S. Mueller III as Settlement Master to oversee settlement negotiations

7   between the parties.  (Dkt. No. 973.)  Settlement talks began almost immediately, and by April

8   2016, the parties reached agreements in principle regarding 2.0-liter diesel engine vehicles.  (Dkt.

9   No. 1439 at 4:25-6:15.)  On June 28, 2016, the United States, the PSC, and the FTC filed a Partial

10  Consent Decree, proposed Consumer Class Action Settlement Agreement, and Partial Consent

11  Order, respectively.  (Dkt. Nos. 1605-07.)  Additionally, on July 7, 2016, the State of California

12  filed a Partial Consent Decree resolving claims brought on behalf of the People.  (Dkt. No. 1642.)

13  The PSC and the United States subsequently filed an Amended Settlement and an Amended

14  Partial Consent Decree.  (*See* Dkt. Nos. 1685, 1973-1.)  Negotiations concerning the 3.0-liter

15  diesel engine vehicles remain ongoing.

16          4.      Approval of Settlements

17          The Court granted preliminary approval of the Settlement on July 26, 2016.  Thereafter,

18  the Court entered the State of California's consent decree on September 1, 2016 (Dkt. No. 1801).

19          In accordance with the Court's Order Granting Preliminary Approval, Plaintiffs filed a

20  statement regarding their prospective request for attorneys' fees and costs on August 10, 2016 and

21  a motion for final approval on August 26, 2016.  (Dkt. Nos. 1730, 1784.)  The Notice

22  Administrator implemented the Court-approved Notice Program on July 28, 2016 by sending

23  email notice to potential Class Members, and on August 10, 2016, the Notice Administrator

24  mailed Notice of the proposed Settlement Agreement to the putative Class via first class U.S.

25  Mail.  (Dkt. No. 1978 ¶¶ 10, 12; Dkt. No. 1979 ¶¶ 8, 13.)  By September 30, 2016, there were 462

26  timely objections and 3,298 exclusions.  (Dkt. No. 1976 at 3-4; Dkt. No. 1976-2 ¶ 6.)

27

28

United States District Court
Northern District of California

## II.    SETTLEMENT TERMS[1]

The key provisions of the Settlement are as follows.  The Settlement Class is defined as

> all persons (including individuals and entities) who, on September 18, 2015, were registered owners or lessees of, or, in the case of Non-Volkswagen Dealers, held title to or held by bill of sale dated on or before September 18, 2015, a Volkswagen or Audi 2.0-liter TDI vehicle in the United States or its territories (an "Eligible Vehicle"), or who, between September 18, 2015, and the end of the Claim Period, become a registered owner of, or, in the case of Non-Volkswagen Dealers, hold title to or hold by bill of sale dated after September 18, 2015, but before the end of the Claims Period, an Eligible Vehicle in the United States or its territories.

(Dkt. No. 1685 ¶ 2.6.)  Eligible Vehicles are

> Model Year 2009 through 2015 Volkswagen and Audi light-duty vehicles equipped with 2.0-liter TDI engines that (1) are covered, or purported to be covered, by the EPA Test Groups in the table [in paragraph 2.33]; (2) are, at any point during the period September 18, 2015 to June 28, 2016, registered with a state Department of Motor Vehicles or equivalent agency or owned by a Non-Volkswagen Dealer in the United States or its territories that (a) holds title to the vehicle or (b) holds the vehicle by bill of sale; (3) for an Eligible Owner, are currently Operable or cease to be Operable only after the Opt-Out Deadline; and (4) have not been modified pursuant to an Approved Emissions Modification. Eligible Vehicle also excludes any Volkswagen or Audi vehicle that was never sold in the United States or its territories.

(*Id.* ¶ 2.33.)

Class Members are categorized as Eligible Owners, Eligible Lessees, or Eligible Sellers.

An Eligible Owner is

> the registered owner or owners of an Eligible Vehicle on June 28, 2016, or the registered owner or owners who acquire an Eligible Vehicle after June 28, 2016, but before the end of the Claim Period, except that the owner of an Eligible Vehicle who had an active lease issued by VW Credit, Inc. as of September 18, 2015, and purchased an Eligible Vehicle previously leased by that owner after June 28, 2016 shall be an Eligible Lessee.  A Non-Volkswagen Dealer who, on or after June 28, 2016, holds title to or holds by bill of sale an Eligible Vehicle in the United States or its territories shall qualify as an Eligible Owner regardless of whether that Non-Volkswagen Dealer is registered as the owner of the Eligible Vehicle, provided that the Non-Volkswagen Dealer otherwise meets the definition of Eligible Owner.

---

[1] A more detailed explanation of the Settlement terms can be found in the Court's Amended Order.  (Dkt. No. 1698 at 4-14.)

1    (*Id.* ¶ 2.30.)  An Eligible Lessee is

2             (1) the current lessee or lessees of an Eligible Vehicle with a lease
3             issued by VW Credit, Inc.; (2) the former lessee or lessees of an
             Eligible Vehicle who had an active lease issued by VW Credit, Inc.
4             as of September 18, 2015, and who surrendered or surrenders the
             leased Eligible Vehicle to Volkswagen; or (3) the owner of an
5             Eligible Vehicle who had an active lease issued by VW Credit, Inc.
             as of September 18, 2015, and who acquired ownership of the
6             previously leased Eligible Vehicle at the conclusion of the lease
             after June 28, 2016.  For avoidance of doubt, no person shall be
7             considered an Eligible Lessee by virtue of holding a lease issued by
             a lessor other than VW Credit, Inc.

8    (*Id.* ¶ 2.29.)  An Eligible Seller is

9             a person who purchased or otherwise acquired an Eligible Vehicle
10            on or before September 18, 2015, and sold or otherwise transferred
             ownership of such vehicle after September 18, 2015, but before June
11            28, 2016.  For avoidance of doubt, Eligible Seller includes any
             owner (1) who acquired his, her, or its Eligible Vehicle on or before
12            September 18, 2015, (2) whose Eligible Vehicle was totaled, and (3)
             who consequently transferred title of his, her, or its vehicle to an
13            insurance company after September 18, 2015, but before June 28,
             2016.

14   (*Id.* ¶ 2.31.)

15        The Settlement gives Class Members choices as to remedies.  Eligible Owners have two

16   options: Volkswagen will pay cash ("Owner Restitution") *and* either (1) buy the Class Member's

17   Eligible Vehicle at its pre-defeat device disclosure value ("the Buyback"), or (2) fix the Class

18   Member's vehicle when and if EPA and CARB approve an emissions modification (a "Fix"). [2]

19   (Dkt. No. 1685 ¶¶ 4.2.1-4.2.2, 4.3.1, 4.3.3.)  Eligible Lessees also have two options.  They may (1)

20   terminate their leases without penalty plus receive additional cash ("Lessee Restitution"), or (2) if

21   a Fix is approved, have their leased car fixed plus receive Lessee Restitution.  (*Id.* ¶¶ 4.2.3-4.2.4,

22   4.3.1, 4.3.3.)  Finally, Eligible Sellers, that is, consumers who sold their Eligible Vehicle prior to

23   the filing of the Settlement, receive cash ("Seller Restitution").  (*Id.* ¶ 2.60.)  The Buyback price

24   and Restitution amounts are based on the September 2015 National Automobile Dealers

25   Association ("NADA") Clean Trade-In value for each Eligible Vehicle.  (*Id.* ¶¶ 2.5, 2.64.)

26   Compensation for Buybacks, Lease Terminations, and Restitution will be drawn from a $10.033

27

28   _____
     [2] The schedule for Volkswagen to submit proposed Fixes can be found in Exhibit 1 to the
     Settlement (Dkt. No. 1685-1 at 6-7) and the Long Form Notice (Dkt. No. 1685-3 at 19).

United States District Court
Northern District of California

billion funding pool.  (*Id.* ¶ 1.)

The Settlement further requires Volkswagen to pay reasonable attorneys' fees and costs.

(*Id.* ¶ 11.1.)  Class Counsel has agreed to seek no more than $324 million, plus no more than $8.5

million in actual and reasonable out-of-pocket costs, for expenses incurred through October 18,

2016.  (Dkt. No. 1730 at 2-3.)

In exchange for benefits under the Settlement, Class Members agree to release all

"Released Claims" against "Released Parties."  The Settlement defines "Released Parties" as

> (1) Volkswagen AG, Volkswagen Group of America, Inc. (d/b/a Volkswagen of America, Inc. or Audi of America, Inc.), Volkswagen Group of America Chattanooga Operations, LLC, Audi AG, Audi of America, LLC, VW Credit, Inc., VW Credit Leasing, Ltd., VCI Loan Services, LLC, and any former, present, and future owners, shareholders, directors, officers, employees, attorneys, affiliates, parent companies, subsidiaries, predecessors, and successors of any of the foregoing (the "VW Released Entities");
> (2) any and all contractors, subcontractors, and suppliers of the VW Released Entities;
> (3) any and all persons and entities indemnified by any VW Released Entity with respect to the 2.0-liter TDI Matter;
> (4) any and all other persons and entities involved in the design, research, development, manufacture, assembly, testing, sale, leasing, repair, warranting, marketing, advertising, public relations, promotion, or distribution of any Eligible Vehicle, even if such persons are not specifically named in this paragraph, including without limitation all Volkswagen Dealers, as well as non-authorized dealers and sellers;
> (5) Claims Supervisor;
> (6) Notice Administrator;
> (7) lenders, creditors, financial institutions, or any other parties that financed any purchase or lease of an Eligible Vehicle; and
> (8) for each of the foregoing, their respective former, present, and future affiliates, parent companies, subsidiaries, predecessors, successors, shareholders, indemnitors, subrogees, spouses, joint ventures, general or limited partners, attorneys, assigns, principals, officers, directors, employees, members, agents, representatives, trustees, insurers, reinsurers, heirs, beneficiaries, wards, estates, executors, administrators, receivers, conservators, personal representatives, divisions, dealers, and suppliers.

(Dkt. No. 1685 ¶ 9.2.)  The Settlement does not, however, release any claims against Bosch

GmbH; Bosch LLC; or any of its any of its former, present, and future owners, shareholders,

directors, officers, employees, attorneys, affiliates, parent companies, subsidiaries, predecessors,

or successors.  (*Id.*; Dkt. No. 1685-5 ¶ 6.)

United States District Court
Northern District of California

In exchange for benefits under the Settlement, Class members release

> any and all claims, demands, actions, or causes of action of any kind or nature whatsoever, whether in law or in equity, known or unknown, direct, indirect or consequential, liquidated or unliquidated, past, present or future, foreseen or unforeseen, developed or undeveloped, contingent or noncontingent, suspected or unsuspected, whether or not concealed or hidden, arising from or in any way related to the 2.0-liter TDI Matter, including without limitation (1) any claims that were or could have been asserted in the Action; and (2) any claims for fines, penalties, criminal assessments, economic damages, punitive damages, exemplary damages, liens, injunctive relief, attorneys', expert, consultant, or other litigation fees or costs other than fees and costs awarded by the Court in connection with this Settlement, or any other liabilities, that were or could have been asserted in any civil, criminal, administrative, or other proceeding, including arbitration.

(Dkt. No. 1685 ¶ 9.3.)

Class Members also expressly waive and relinquish any rights they may have under California Civil Code section 1542 or similar federal or state law. (*Id.* ¶ 9.9; Dkt. No. 1685-5 ¶ 3); *see* Cal. Civ. Code § 1542 ("A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.").

### III.    DISCUSSION – FINAL APPROVAL OF SETTLEMENT

#### A.    Legal Standard

The Ninth Circuit maintains "a strong judicial policy" that favors class action settlements. *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015). Nevertheless, Federal Rule of Civil Procedure ("Rule") 23(e) requires courts to approve any class action settlement. Fed. R. Civ. P. 23(e). "[S]ettlement class actions present unique due process concerns for absent class members." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). As such, "the district court has a fiduciary duty to look after the interests of those absent class members." *Allen*, 787 F.3d at 1223 (collecting cases). Specifically, courts must "determine whether a proposed settlement is fundamentally fair, adequate, and reasonable." *Hanlon*, 150 F.3d at 1026; *see* Fed. R. Civ. P. 23(e)(2). In particular, where "the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).

1    Approval of a settlement is a two-step process.  Courts first "determine[] whether a

2    proposed class action settlement deserves preliminary approval and then, after notice is given to

3    class members, whether final approval is warranted."  *In re High-Tech Employee Antitrust Litig.*,

4    2014 WL 3917126, at *3 (N.D. Cal. Aug. 8, 2014).  "At the fairness hearing, . . . after notice is

5    given to putative class members, the court entertains any of their objections to (1) the treatment of

6    the litigation as a class action and/or (2) the terms of the settlement."  *Ontiveros v. Zamora*, 303

7    F.R.D. 356, 363 (E.D. Cal. 2014) (citing *Diaz v. Trust Territory of Pac. Islands*, 876 F.2d 1401,

8    1408 (9th Cir. 1989)).  After the fairness hearing, the court determines whether the parties should

9    be allowed to settle the class action pursuant to the agreed-upon terms.  *Chavez v. Lumber*

10   *Liquidators, Inc.*, 2015 WL 2174168, at *3 (N.D. Cal. May 8, 2015) (citing *Nat'l Rural*

11   *Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004)).

12   **B.    Final Certification of the Settlement Class**

13       1.    Rule 23(a) and (b) Requirements

14   A class action is maintainable only if it meets the four Rule 23(a) prerequisites:

15           (1) the class is so numerous that joinder of all members is
16           impracticable;
         (2) there are questions of law or fact common to the class;
17           (3) the claims or defenses of the representative parties are typical of
         the claims or defenses of the class; and
         (4) the representative parties will fairly and adequately protect the
18           interests of the class.

19   Fed. R. Civ. P. 23(a).  In a settlement-only certification context, the "specifications of the Rule . . .

20   designed to protect absentees by blocking unwarranted or overbroad class definitions . . . demand

21   undiluted, even heightened, attention[.]"  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620

22   (1997).  "Such attention is of vital importance, for a court asked to certify a settlement class will

23   lack the opportunity, present when a case is litigated, to adjust the class, informed by the

24   proceedings as they unfold."  (*Id.*)

25       In addition to the Rule 23(a) prerequisites, "parties seeking class certification must show

26   that the action is maintainable under Rule 23(b)(1), (2), or (3)."  *Amchem Prods., Inc.*, 521 U.S. at

27   614.  Rule 23(b)(3), relevant here, requires that (1) "questions of law or fact common to class

28   members predominate over any questions affecting only individual members" and (2) "a class

United States District Court
Northern District of California

action is superior to other available methods for fairly and efficiently adjudicating the

controversy." Fed. R. Civ. P. 23(b)(3).  The "pertinent" matters to these findings include

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

(*Id.*)

In its Amended Order, the Court carefully considered whether Plaintiffs satisfied the Rule

23(a) and (b)(3) requirements.  (*See* Dkt. No. 1698 at 15-20.)  "Because the Settlement Class has

not changed, the Court sees no reason to revisit the analysis of Rule 23."  *G.F. v. Contra Costa*

*Cty.*, 2015 WL 7571789, at *11 (N.D. Cal. Nov. 25, 2015) (internal quotation marks and citation

omitted).

### 2.   Rule 23(c) Requirements

"Adequate notice is critical to court approval of a class settlement under Rule 23(e)."

*Hanlon*, 150 F.3d at 1025.  Rule 23(c)(2)(B) requires that "[f]or any class certified under Rule

23(b)(3), the court must direct to class members the best notice that is practicable under the

circumstances, including individual notice to all members who can be identified through

reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  "[T]he express language and intent of Rule

23(c)(2) leave no doubt that individual notice must be provided to those class members who are

identifiable through reasonable effort."  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 175 (1974).

#### a.   *Implementation of the Notice Program*

The Court previously approved the form and content of the Long and Short Form Notices,

as well as the Notice Program as set forth in the Settlement.  (Dkt. No. 1698 at 28-31; *see* Dkt.

Nos. 1680; Dkt. No. 1685 ¶¶ 8.1-8.8.)  The Court appointed Kinsella Media LLC ("KM") as

Notice Administrator to implement the Notice Program on July 27, 2016. (Dkt. No. 1698 at 32.)

Individual direct notice served as the primary means of notification.  (Dkt. No. 1784 at 38.)

Rust Consulting, Inc. ("Rust"), of which KM is a subsidiary, provided direct mail services.  (Dkt.

No. 1978 ¶¶ 7-8.)  Between August 10 and 16, 2016, Rust mailed via First Class U.S. Mail a

United States District Court
Northern District of California

personalized cover letter and the Long Form Notice to 811,944 identified Class Members.  (Dkt. No. 1784 at 37-38; Dkt. No. 1978 ¶ 10; Dkt. No. 1979 ¶ 8; *see* Dkt. Nos. 1979-1, 1979-2.)  Rust obtained Class Members' addresses through Volkswagen's records and/or registration data and by purchasing a mailing list of non-Volkswagen/Audi new and used car dealers.  (Dkt. No. 1784 at 38; Dkt. No. 1979 ¶¶ 5-6.)  Rust checked these addresses against the United States Postal Service's National Change of Address database prior to mailing.  (Dkt. No. 1784 at 38; Dkt. No. 1979 ¶ 7.)  As of September 28, 2016, Rust received 732 undeliverable Notices with a forwarding address, of which 531 have been re-mailed.  (Dkt. No. 1979 ¶ 9.)  As of September 28, 2016, Rust received an additional 29,257 undeliverable Notices without a forwarding address.  (*Id.* ¶ 10.) After running these Notices through an advance address search, such as a skip trace, to locate a more current address, Rust obtained updated addresses for 12,885 records and has re-mailed 8,767 Notices.  (*Id.*)  As of September 29, 2016, 16,372 mailed Notices remained undelivered.  (Dkt. No. 1978 ¶ 11.)  Put another way, 97.98% of mailings were delivered.  (*Id.*)

To supplement the direct mail notice, Rust sent 79,772 email notifications to individuals who registered on the Settlement Website (www.VWCourtSettlement.com) and provided an email address.  (Dkt. No. 1979 ¶ 12; *see* Dkt. No. 1979-4.)  Of those, 76,806 (96.28%) were delivered. (*Id.*)  Rust also sent 374,025 email notifications to individuals who signed up for the Volkswagen or Audi Goodwill Programs.[3]  (Dkt. No. 1784 at 37-39; Dkt. No. 1979 ¶¶ 12, 14; *see* Dkt. No. 1979-5.)  Out of those 374,025 emails, 357,103 (95.48%) were delivered.  (Dkt. No. 1979 ¶ 12.) In total, Rust sent 453,797 emails.  (Dkt. No. 1978.)  Class Members will again receive direct notice via mail or email when EPA and CARB approve or reject Volkswagen's proposed fixes. (Dkt. No. 1784 at 39.)

The Notice Program also provided for notice by publication, both in print and digital form. There have been 125 strategically-placed print notifications in national and regional publications. (Dkt. No. 1784 at 37.)  Specifically, the Short Form Notice appeared as a two-color advertisement (where available) in the Sunday edition of *The New York Times*; the daily edition of *The Wall*

---

[3] The Volkswagen and Audi TDI Goodwill Programs are not part of the Settlement.

*Street Journal*; the daily edition of *USA Today*; both the Sunday and daily editions of nineteen newspapers covering markets with 5,000 or more Eligible Vehicles; the Sunday edition of 26 newspapers covering markets with 2,000-4,999 Eligible Vehicles; the weekly editions of 31 Hispanic newspapers, with the Notice translated into Spanish; and the weekly editions of 27 African American newspapers.  (*Id.* at 39; Dkt. No. 1978 ¶¶ 14-16; *see* Dkt. Nos. 1978-1, 1978-2.) Together, these publications have circulations in the millions.  (*See* Dkt. No. 1784 at 37, 39; *see* Dkt. No. 1978-1 at 4.)

The digital and social media campaign consisted of publishing more than 112,582,506 digital impressions on dozens of relevant websites and on leading social media platforms.  (Dkt. No. 1784 at 37, 39-40; Dkt. No. 1978 ¶¶ 18-27.)  Between July 27, 2016 and August 19, 2016, targeted banner advertisements with a bold message and graphics were published on automotive websites that Class Members visited, according to IHS Automotive data.  (Dkt. No. 1784 at 39; Dkt. No. 1978 ¶¶ 18-19; *see* Dkt. No. 1978-3.)  These websites included the National Automobile Dealers Association (www.nada.org), Hemmings (www.hemmings.com), Kelley Blue Book (www.kbb.com).  (Dkt. No. 1784 at 39; Dkt. No. 1978 ¶ 21.)  An individual who clicked on a banner advertisement was taken directly to the Settlement Website.  (Dkt. No. 1978 ¶ 19.) Targeted internet advertising generated 250,724 clicks to the Settlement Website.  (*Id.* ¶ 18.)

Additionally, to target individuals interested in or researching automobiles, banner advertisements and high-impact units appeared on websites associated with popular consumer automotive magazines, such as *Automobile* (www.automobilemag.com), *Car & Driver* (www.caranddriver.com), *Motor Trend* (www.motortrend.com), and *Road & Track* (www.roadandtrack.com).  (Dkt. No. 1784 at 39; Dkt. No. 1978 ¶ 21.)  Targeted banner advertisements on the National Association of Fleet Administrators website (www.nafa.org) and other websites associated with relevant trade publications, including *Automotive Fleet*, *Automotive News*, *Auto Rental News*, and *FLEETSolutions*, sought to reach fleet owners who may be included in the Settlement.  (Dkt. No. 1784 at 40-41; Dkt. No. 1978 ¶ 22.)

The digital publications also consisted of Facebook, Instagram, and Twitter advertisements to target consumers; banner and video advertisements published on a broad and diverse range of

United States District Court
Northern District of California

12

1    websites through the Google Display Network; and the use of sponsored keywords/phrases on all

2    major search engines, such as Google AdWords, Bing Microsoft Advertising, and their search

3    partners.  (Dkt. No. 1784 at 40; Dkt. No. 1978 ¶¶ 23-25.)

4         There was also significant media coverage of the Settlement.  Between June 28, 2016 and

5    July 25, 2016, there were approximately 11,780 pieces from U.S. media outlets.  (Dkt. No. 1978 ¶

6    28(a).)  Between July 26, 2016 and September 16, 2016, an additional 5,630 news pieces were

7    generated.  (*Id.*)  Approximately 72.3% of the total coverage came from online and print news

8    sources, 18.1% from television news, and 9.4% from blogs.  (*Id.*)  On July 29, 2016, an earned

9    media program consisting of a "campaign hero microsite," or a multimedia news release, was

10   distributed on PR Newswire's US1 National Circuit, which reaches approximately 5,000 media

11   outlets and 5,400 websites.  (Dkt. No. 1784 at 40; Dkt. No. 1978 ¶ 28(b).)

12        Finally, the Short and Long Form Notices direct Class Members to the Settlement Website

13   and a toll-free telephone number (1-844-98-CLAIM).  (Dkt. No. 1784 at 40; Dkt. No. 1978 ¶ 32;

14   *see* Dkt. Nos. 1685-2, 1685-3.)  Both the Website and the telephone number allow Class Members

15   to, among other things, obtain additional information and access the Settlement documents.  As of

16   September 29, 2016, there had been 105,420 calls to the toll-free number.  (Dkt. No. 1978 ¶ 32.)

17   The Settlement Website has also received 885,290 unique visits.  (Dkt. No. 1976 at 3.)

18              b.    *CAFA Compliance*

19        The Class Action Fairness Act ("CAFA") provides that "each defendant that is

20   participating in the proposed settlement shall serve upon the appropriate State official of each

21   State in which a class member resides and the appropriate Federal official, a notice of the

22   proposed settlement[.]"  28 U.S.C. § 1715(b).  Volkswagen mailed notice of the proposed

23   Settlement and Release to the United States Attorney General and all 50 States' Attorneys General

24   on July 5, 2016.  (Dkt. No. 1783 ¶ 2; *see* Dkt. No. 1783-1.)

25              c.    *Adequacy of Notice*

26        The Court is satisfied that the extensive Notice Program was reasonably calculated to

27   notify Class Members of the proposed Settlement.  The Notice "apprise[d] interested parties of the

28   pendency of the action and afford them an opportunity to present their objections."  *Mullane v.*

United States District Court
Northern District of California

13

1   *Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Indeed, the Notice Administrator

2   reports the Notice Program reached more than 90% of potential Class Members. (Dkt. No. 1978

3   ¶ 35.)

4         Objector Autoport, LLC ("Autoport") states it did not receive actual notice and asserts that

5   "presumably hundreds if not thousands of other dealers nationwide who are likewise unaware of

6   their rights under the settlement[.]" (Dkt. No. 1879 at 3-4.) But due process does not require that

7   class members receive actual notice, only that notice "be the best practicable, 'reasonably

8   calculated, under all the circumstances, to apprise interested parties of the pendency of the action

9   and afford them an opportunity to present their objections.'" *Phillips Petroleum Co. v. Shutts*, 472

10   U.S. 797, 812 (1985) (quoting *Mullane*, 339 U.S. at 314). Moreover, Autoport's timely-filed

11   objection indicates it was aware of the Settlement, and its claim that "hundreds if not thousands of

12   other dealers" did not receive notice is unsupported speculation. The Court therefore overrules

13   Autoport's objection regarding notice.

14                                 *****

15         The Settlement Class satisfies Rules 23(a) and 23(b)(3), and Notice satisfies Rule 23(c).

16   Accordingly, the Court grants final class certification.

**C.**     **Fairness, Adequacy, and Reasonableness**

18         Courts may approve a class action settlement "only after a hearing and on finding that it is

19   fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Courts assessing the fairness of a

20   settlement generally weigh

21                  (1) the strength of the plaintiff's case; (2) the risk, expense,

22                  complexity, and likely duration of further litigation; (3) the risk of
               maintaining class action status throughout the trial; (4) the amount

23                  offered in settlement; (5) the extent of discovery completed and the
               stage of the proceedings; (6) the experience and views of counsel;

24                  (7) the presence of a governmental participant; and (8) the reaction
               of the class members of the proposed settlement.

25   *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

26         But where, as here, the parties negotiate a settlement before a class has been certified,

27   "courts must peruse the proposed compromise to ratify both the propriety of the certification and

28   the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). Pre-class

United States District Court
Northern District of California

United States District Court
Northern District of California

certification settlements "must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *In re Bluetooth Prods. Liability Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (citing *Hanlon*, 150 F.3d at 1026). This heightened scrutiny "ensure[s] that class representatives and their counsel do not secure a disproportionate benefit 'at the expense of the unnamed plaintiffs who class counsel had a duty to represent.'" *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (quoting *Hanlon*, 150 F.3d at 1027). As such, courts must evaluate the settlement for evidence of collusion. (*Id.*)

Because "[c]ollusion may not always be evident on the face of a settlement, . . . courts therefore must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth*, 654 F.3d at 947. Signs of subtle collusion include, but are not limited to,

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded,
> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries "the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class"; and
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund[.]

*Id.* (internal quotations and citations omitted).

### 1. The *Churchill* Factors

#### a. *Strength of Plaintiffs' Case*

The first *Churchill* factor does not favor settlement. "Approval of a class settlement is appropriate when plaintiffs must overcome significant barriers to make their case." *G.F.*, 2015 WL 7571789, at *8 (citing *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 851 (N.D. Cal. 2010)). But courts need not "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements."

*Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).

Plaintiffs concede they have a strong case.  (*See* Dkt. No. 2079 at 19:4.)  Liability is not an issue: Volkswagen admits to installing and failing to disclose the defeat device in its TDI diesel engine vehicles, which it marketed as environmentally friendly.  Thus, only the amount of recovery is in dispute.  Plaintiffs submit the declaration of Andrew Kull, Distinguished Senior Lecturer at the University of Texas and former Reporter for the American Law Institute, regarding the strength of the Settlement's remedies.  (Dkt. No. 1784-2 ¶¶ 4, 9.)  Mr. Kull notes that "[a]n Eligible Owner who chose to pursue an independent suit for rescission and restitution would probably be allowed to do so, because the threshold requirements that limit access to the remedy would—in the context of the "clean diesel" litigation—be liberally interpreted in favor of the owner."  (*Id.* ¶ 12; *see id.* ¶ 16 ("[T]he facts underlying the 'clean diesel' litigation make it probable that courts would interpret these rules [regarding rescission] liberally in favor of an Eligible Owner seeking rescission and restitution against Volkswagen.").  But recovery of damages is less certain given that "[t]he direct harm caused by the TDI engines' nonconformity was not to the vehicle owner—who obtained a vehicle that performed as expected—but to the public at large.  Something could be allowed on account of the owner's frustration and inconvenience, but recovery on this basis might be only modest."  (*Id.* ¶ 28(b); *see id.* ¶ 29(a).)  That said, Mr. Kull concedes that "[e]nhanced or exemplary damages might be available in some cases."  (*Id.* ¶ 28(c).)

In their Amended Consumer Complaint and Second Amended Reseller Complaint, Plaintiffs seek rescission, restitution, and compensatory damages.  (Dkt. No. 1804 ¶¶ E-F; Dkt. No. 1805 at 110-11.)  Plaintiffs have a high probability of successfully obtaining their sought-after remedies.  Thus, this factor does not favor final approval.

> b.   *Risk, Expense, Complexity, and Likely Duration of Further Litigation*

But Plaintiffs' strong claims are balanced by the risk, expense, and complexity of their case, as well as the likely duration of further litigation.  *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000), as amended (June 19, 2000).  Settlement is favored in cases that are

16

complex, expensive, and lengthy to try.  *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009).  This factor supports final approval.

Plaintiffs assert that "should Settlement Class Counsel prosecute these claims against Volkswagen to conclusion, any recovery would come years in the future and at far greater expense to the environment and the Class."  (Dkt. No. 1784 at 20.)  Plaintiffs also emphasize that prolonged litigation risks further environmental damage caused by the Eligible Vehicles.  (Dkt. No. 1784 at 21; *see* Dkt. No. 2079 at 19:6-9.)  Settlement, however, will remove the Eligible Vehicles from roads and thus reduce additional environmental damage and air pollution.  (Dkt. No. 1784 at 21.)

There are also potential monetary risks associated with litigation.  Despite their strong claims, Class Counsel "recognize there are always uncertainties in litigation[.]"  (*Id.* at 19.)  It is possible that "a litigation Class would receive less or nothing at all, despite the compelling merit of its claims, not only because of the risks of litigation, but also because of the solvency risks such prolonged and expanding litigation could impose upon Volkswagen."  (*Id.* at 20.)

First, any class recovery obtained at trial could be reduced through offsets.  Several state laws account for offsets based on the owner's use of the vehicle.  *See e.g.,* Cal. Civ. Code § 1793.2(d)(2)(C) ("When restitution is made . . . , the amount to be paid by the manufacturer to the buyer may be reduced by the manufacturer by that amount directly attributable to use by the buyer prior to the time the buyer first delivered the vehicle to the manufacturer or distributor, or its authorized service and repair facility for correction of the problem that gave rise to the nonconformity."); Md. Code Ann. Com. Law § 14-1502(c)(1)(ii)(2) (requiring manufacturer to "[a]ccept return of the motor vehicle from the consumer and refund to the consumer the full purchase price . . . less: 1. A reasonable allowance for the consumer's use of the vehicle not to exceed 15 percent of the purchase price; and 2. A reasonable allowance for damage not attributable to normal wear . . . ."); Mass. Gen. Laws Ann. ch. 90, § 7N 1/2 ("In instances in which a vehicle is sold and subsequently returned, the manufacturer shall refund the full contract price of the vehicle . . . , less . . . a reasonable allowance for use . . . ."); Wash. Rev. Code Ann. § 19.118.041(1)(a) ("Compensation for a reasonable offset for use shall be paid by the consumer to

17

1   the manufacturer in the event that the consumer accepts a replacement motor vehicle.").

2          Second, Mr. Kull opines that if an Eligible Owner were to litigate his or her claims,

3   Volkswagen could reasonably be expected to defend against the action.  (Dkt. No. 1784-2 ¶ 18.)

4   Mr. Kull sets forth a number of threshold issues regarding rescission that Volkswagen could

5   contest, including fraudulent inducement, notice, and continued use.  (*Id.* ¶¶ 18(a)-(f).)  But

6   "[e]ven with a favorable resolution of these issues, the consequence would be to increase the cost

7   and delay the outcome of independent litigation—thereby depressing the expected recovery of an

8   owner's suit for rescission."  (*Id.* ¶ 18(f).)  Moreover, monetary "compensation obtained through

9   an independent lawsuit will necessarily be reduced by the amount of associated legal expenses,

10  resulting in a significant reduction in an owner's expected recovery from independent litigation."

11  (*Id.* ¶ 28(d).)

12          Given the risks of prolonged litigation, the immediate settlement of this matter is far

13  preferable. As the Court stated at the outset, the priority was to get the polluting cars off the road

14  as soon as possible.  (*See* Dkt. No. 365 at 5:7-6:6.)  The Settlement does that. It requires

15  Volkswagen to make the funds to compensate Class Members available within ten days of the

16  Court's final approval order (Dkt. No. 1685 ¶ 10.1), and the Buyback program will begin

17  immediately upon final approval of the Settlement and entry of the United States' Consent Decree

18  (Dkt. No. 1685-3 at 3).  For those Class Members who elect a Fix, the Consent Decree sets forth a

19  schedule for Volkswagen to submit proposed Fixes; the last deadline for Volkswagen's final

20  submittal is October 30, 2017.  (*See* App'x B ¶ 4.2, Dkt. No. 1973-1.)  And, if no Fix is approved,

21  Class Members may instead participate in a Buyback.  The Settlement thus ensures Class

22  Members that a remedy—whether a Buyback or a Fix—is available immediately or, at the latest,

23  2018.  (*See* Dkt. No. 1685 ¶ 4.3.1; Dkt. No. 1784 at 5.)

24          While Plaintiffs might ultimately prevail on their claims, the Settlement provides benefits

25  much sooner than if litigation were to continue.  Moreover, litigation would cause additional

26  environmental damage that the Settlement otherwise reduces.  The second *Churchill* factor

27  therefore supports final approval.

28  //

United States District Court
Northern District of California

18

United States District Court
Northern District of California

c.   *Risk of Maintaining Class Action Status throughout Trial*

The potential difficulties in obtaining and maintaining class certification weighs in favor in final approval.  Plaintiffs represent they would have successfully certified a litigation class and maintained certification through trial.  (Dkt. No. 1784 at 17.)  There does not appear to be any issue with maintaining class certification at this point.  That said, if the parties had not settled, Volkswagen could have opposed Plaintiffs' motion for class certification and, even if the Court certified the class, there is a risk the Court could later de-certify it.  As such, this factor favors settlement.

d.   *Amount Offered in Settlement*

The amount offered in the Settlement favors final approval.  This factor is considered "the most important variable in assessing a class settlement is the amount of relief obtained for the class."  *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 1001 (N.D. Cal. 2015), *reconsideration denied*, 2015 WL 4735521 (N.D. Cal. Aug. 10, 2015).  "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000), as amended (June 19, 2000) (internal quotation marks omitted).  Thus, courts evaluating the amount offered in settlement for fairness must consider the settlement as a "complete package taken as a whole, rather than the individual component parts[.]"  *Officers for Justice*, 688 F.2d at 628.

The Settlement adequately and fairly compensates Class Members.  The Settlement requires Volkswagen to establish a Funding Pool in the amount of $10.033 billion.  (Dkt. No. 1685 ¶ 2.42.)  This amount presumes 100% Buyback of all purchased Eligible Vehicles and 100% Lease Termination of all leased Eligible Vehicles.  (*Id.*)

The amount of cash a Class Member receives depends on the value of his or her Eligible Vehicle.  The Settlement uses the NADA Clean Trade-In ("CTI") price as of September 2015 as a baseline for the Vehicle Value, which determines the price at which Volkswagen will purchase the Eligible Vehicle in a Buyback.  (Dkt. No. 1685 ¶¶ 2.5, 4.2.1.)  Edward M. Stockton, Vice President and Director of Economics Services of The Fontana Group, Inc., explains that the

United States District Court
Northern District of California

September 2015 CTI baseline benefits Class Members, as it (1) "inherently avoid[s] price depreciation that occurred in the post-scandal market;" (2) "allow[s] customers participating in the buyback to mitigate the effect on the vehicle's value that resulted from overpayment for the TDI premium;" and (3) "allow[s] owners . . . to continue to use their vehicles until the buyback date without the vehicle's value experiencing age-related depreciation that normally occurs in the retail vehicle market." (Dkt. No. 1784-1 ¶ 15.) The Vehicle Value is further customized by taking into account OEM-installed options and mileage. (Dkt. No. 1685-1 ¶ 12.)

Restitution, which Class Members receive in addition to either a Buyback or Lease Termination or a Fix, provides additional monetary compensation. Eligible Owners are entitled to a Restitution Payment of $5,100 or 20% of the vehicle value plus $2,986.73, whichever is greater. (*Id.* ¶ 5(a).) Thus, not only do Eligible Owners participating in a Buyback receive monetary compensation that allows them to replace their vehicles at a September 2015 retail value, but they also receive an additional cash payment for other costs. Mr. Stockton calculates this combination of payments is equal to a minimum of 112.6% of the Eligible Vehicles retail values as of September 2015. (Dkt. No. 1784-1 ¶ 28.)

The Settlement also guarantees Eligible Lessees a Restitution Payment comprised of 10% of the Vehicle Value plus $1,529. (Dkt. No. 1685-1 ¶ 9.) While this formula means Restitution for Eligible Lessees is less than Restitution for Eligible Owners, compensation for Eligible Lessees is still fair and adequate. Mr. Stockton notes that the Lessees and Owners have different economic considerations which justify a lesser monetary payment. (Dkt. No. 1784-1 ¶ 34.) Specifically,

> [w]hereas purchasers pay up-front for the entire vehicle, lessees essentially pay for the amount that vehicle's value is expected to diminish over the period of their lease. Lessees pre-negotiate the values of their vehicles that will apply at the end of the lease (residual value) and are, therefore, generally not at a financial risk of excess depreciation. Lessees generally retain their vehicles for shorter time periods than do purchasers and, as a consequence, would have had their subsequent purchases accelerated less by the scandal than did purchasers. Lessees also tend to have strict mileage limitations within their least terms and would experience less harm from overpayment than would purchasers. Finally, lessees would have experienced less uncertainty about their vehicles than would have purchasers as return conditions were pre-established prior to

20

1

the scandal.

2

(*Id.*)  Thus, it is not unreasonable that Eligible Lessees should receive a smaller payment than

3

Eligible Owners.

4

In sum, the Settlement provides recovery for the losses Class Members suffered as a result

5

of Volkswagen's use and subsequent disclosure of the defeat device.  By giving them the

6

September 2015 value of their vehicle, it not only provides sufficient compensation to place Class

7

Members in the same position they were in pre-disclosure but also gives them additional

8

compensation.  As such, the Settlement offers Class Members relief that is fair and adequate.  This

9

factor therefore favors final approval.

10

       e.    *Extent of Discovery Completed and the Stage of the Proceedings*

11

"In the context of class action settlements, formal discovery is not a necessary ticket to the

12

bargaining table where the parties have sufficient information to make an informed decision about

13

settlement."  *In re Mego Fin. Corp.*, 213 F.3d at 459 (9th Cir. 2000) (brackets, citation, and

14

internal quotation marks omitted).  Instead, courts look for indications "the parties carefully

15

investigated the claims before reaching a resolution."  *Ontiveros*, 303 F.R.D. at 371.

16

The extent of discovery completed and the stage of the proceeding weighs in favor of

17

approving the Settlement.  The parties reached this Settlement at an early phase of the litigation;

18

the parties have not engaged in any dispositive motion practice.  But a swift resolution does not

19

mean the parties were unprepared to engage in settlement negotiations.  To the contrary, Class

20

Counsel and Volkswagen engaged in significant discovery such that each party was fully informed

21

to participate in settlement discussions.

22

Prior to filing the Complaint, "Class Counsel served Volkswagen with extensive written

23

discovery requests, including interrogatories, requests for production, and requests for

24

admissions[.]"  (Dkt. No. 1784 at 7.)  In response, Volkswagen produced over 12 million pages of

25

documents; Class Counsel has reviewed and analyzed approximately 70% of them.  (*Id.*)

26

Additionally, Class Counsel "analyz[ed] economic damages (and retain[ed] experts concerning

27

those issues); review[ed] Volkswagen's financial condition and ability to pay any settlement or

28

judgment; assess[ed] technical and engineering issues; . . . and research[ed] environmental issues,

United States District Court
Northern District of California

United States District Court
Northern District of California

1    among others." (*Id.* at 6.)  Volkswagen also propounded discovery requests on Class Counsel,

2    who in turn "produc[ed] documents from 174 named Plaintiffs, in addition to compiling

3    information to complete comprehensive fact sheets, which also included document requests, for

4    each named Plaintiff." (*Id.*)

5         Thus, Class Counsel's careful investigation of their claims before they filed their

6    Complaint and their extensive review of discovery materials indicates they had sufficient

7    information to make an informed decision about the Settlement.  As such, this factor favors

8    approving the Settlement.

9              f.     *Experience and Views of Counsel*

10        "Parties represented by competent counsel are better positioned than courts to produce a

11   settlement that fairly reflects each party's expected outcome in litigation.  *In re Pac. Enters. Sec.*

12   *Litig.*, 47 F.3d 373, 378 (9th Cir. 1995).  Courts afford "great weight to the recommendation of

13   counsel, who are most closely acquainted with the facts of the underlying litigation."  *Nat'l Rural*

14   *Telecomm. Coop.*, 221 F.R.D. at 528 (internal quotation marks omitted).

15        Class Counsel believe it is "highly uncertain whether the Class would be able to obtain and

16   sustain a better outcome through continued litigation, trial, and appeal." (Dkt. No. 1784 at 17.)

17   As the Court previously noted, Class Counsel "are qualified attorneys with extensive experience in

18   consumer class action litigation and other complex cases" who the Court selected after a

19   competitive application process. (Dkt. No. 1698 at 18.)  In light of Class Counsel's considerable

20   experience and their belief that the Settlement provides more than adequate benefits to Class

21   Members, this factor favors final approval.

22             g.     *Presence of Government Participant*

23        This factor weighs heavily in favor of final approval.  Volkswagen provided notice to all

24   50 State Attorneys General and the U.S. Attorney in accordance with CAFA.  "Although CAFA

25   does not create an affirmative duty for either state or federal officials to take any action in

26   response to a class action settlement, CAFA presumes that, once put on notice, state or federal

27   officials will raise any concerns that they may have during the normal course of the class action

28   settlement procedures." *Garner v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 1687832, at *14

1   (N.D. Cal. Apr. 22, 2010) (citing Fed. R. Civ. P. 23(e)(2)).  No state or federal official objected.

2   To the contrary, 44 State Attorneys General support the Settlement.  (Dkt. No. 1784 at 3 n.3; Dkt.

3   No. 2079 at 26:10-13.)   Indeed, in a letter to Kentucky residents, the Attorney General for the

4   State of Kentucky stated that his office had "evaluated the options for Kentucky consumers under

5   the national class action settlement, to make certain they would be adequate – they are."  (Dkt. No.

6   1976-3 at 1.)

7           Moreover, although no government entity is a direct party to the Settlement, Class Counsel

8   negotiated the Settlement alongside the United States, FTC, and CARB.  For over five months, the

9   Settlement Master "communicated on a continuous basis with the representatives of the MDL

10  parties – originally Volkswagen, the Department of Justice, the Environmental Protection Agency

11  and the California Air Resources Board, and the PSC; subsequently, upon the filing of its

12  Complaint, the Federal Trade Commission; and ultimately the California Attorney General."

13  (Dkt. No. 1977 ¶ 4.)  As a result, the agreements—the Consumer and Reseller Dealership Class

14  Action Settlement, the United States' Consent Decree, the FTC's Consent Order, and the State of

15  California's Consent Decree—are inextricably tied to one another.  Indeed, the Settlement Master

16  explains that "[t]his settlement process was iterative and had multiple moving parts and shifting

17  dynamics because it had to address the needs and interests of consumers and state and federal

18  government entities."  (*Id.* ¶ 7.)  To that end, the FTC "strongly supports" the Settlement, noting it

19  "provides the same generous, but appropriate compensation to each consumer as the FTC Order"

20  and "is clearly in the public interest."  (Dkt. No. 1781 at 1-2.)  Accordingly, the Court finds this

21  factor strongly favors settlement.

22          Objector Jolian Kangas challenges the Settlement Master's competence on two grounds.

23  The Court finds no merit in either argument.  First, Kangas asserts that the Settlement Master "has

24  maintained a profitable relationship with Volkswagen."  (Dkt. No. 1826 at 3.)  This allegation is

25  unfounded.  The Settlement Master disclosed any potential conflicts prior to his appointment.

26  (*See* Dkt. No. 797-1.)  The Court was therefore fully aware of these possible issues and was

27  satisfied they would not influence the Settlement Master's ability to guide settlement negotiations.

28  Specifically, the Settlement Master noted WilmerHale had or was currently representing

United States District Court
Northern District of California

23

1   Volkswagen in matters unrelated to the defeat device.  (*Id.*)  He stated, however, that he and other

2   WilmerHale staff working on his team would be walled off from any other Volkswagen-related

3   matters, and that the attorneys involved in the other matters would likewise be walled off from his

4   work as Settlement Master.  (Dkt. No. 797-1 at 1.)  Kangas presents no evidence beyond his bare

5   assertion that the Settlement Master did not abide by his representation or otherwise allowed

6   WilmerHale's unrelated dealings with Volkswagen to influence his work in this MDL.  Indeed,

7   that Class Members are adequately compensated under the Settlement suggests the Settlement

8   Master did not supervise settlement negotiations to the detriment of Class Members.  The Court

9   therefore finds this contention meritless.

10          Second, Kangas accuses the Court of appointing the Settlement Master through

11   "cronyism."  (Dkt. No. 1826 at 3.)  Again, this allegation is specious.  The Court appointed the

12   Settlement Master due to his extensive experience dealing with government entities and private

13   individuals, experience accumulated during his tenure as the former Director of the FBI and as the

14   U.S. Attorney for the Northern District of California, as well as his years in private practice.  (Dkt.

15   No. 797 at 2.)  This made the Settlement Master uniquely qualified to handle settlement

16   negotiations in this MDL, which involved several state and federal government entities, foreign

17   parties, and private individuals.  That the Court was familiar with the Settlement Master's resume

18   is not "cronyism;" it is these very qualifications that warranted the Settlement Master's

19   appointment.

20          Finally, the Court notes that parties had an opportunity to respond to its intent to appoint

21   the Settlement Master to his current role.  (Dkt. No. 797 at 2.)  No party—including Kangas—

22   objected to his appointment.  Accordingly, the Court overrules Kangas' objection concerning the

23   Settlement Master.

24          Yet another objector, Matthew Comlish, seems to believe the participation of government

25   entities detracts from the Settlement.  Comlish alleges the Settlement provides a "negative value"

26   to Class Members because "it provides no additional benefits to class members that the United

27   States and FTC Consent Decrees don't already provide."  (Dkt. No. 1891 at 23.)  He further

28   contends "the Settlement . . . actually imposes **negative** value because class members are required

United States District Court
Northern District of California

24

United States District Court
Northern District of California

1   to release their claims in exchange for nothing but transaction costs of $332 million in attorneys'

2   fees and expenses." (*Id.* at 23-24 (emphasis in the original).)  These objections are without merit.

3          Comlish erroneously claims the Settlement offers nothing more than what is required by

4   the United States' Partial Consent Decree and the FTC's Partial Consent Order.  Simply put, none

5   of the agreements can be viewed in a vacuum and none can function without the others.  As the

6   Settlement Master explains,

7                  [t]his settlement was iterative and had multiple moving parts and
                   shifting dynamics because it had to address the needs and interests
8                  of consumers and federal government entities.  The parties had
                   overlapping claims and authority; multiple parties sought economic,
9                  injunctive, and environmental relief; *no single party could, as a
                   jurisdictional or practical matter obtain and enforce all the relief
10                 sought*; and the parties had different priorities and perspectives.

11  (Dkt. No. 1977 ¶ 7 (emphasis added).)  For instance, while the Partial Consent Decree sets forth a

12  Recall Rate that requires Volkswagen to buy back or fix 85% of the Eligible Vehicles by June

13  2019 (*see* App'x A ¶¶ 6.1, 6.3, Dkt. No. 1973-1), the Settlement requires Volkswagen to pay Class

14  Members monetary compensation (*see* Dkt. No. 1685 ¶¶ 4.2.1-4.2.2, 4.2.3).  Thus, if the Partial

15  Consent Decree were to operate without the Settlement, the cars would be removed from the

16  roads, but Class Members would not be entitled to any compensation for their losses.

17  Undoubtedly, Class Members would have little incentive to give back or fix their cars if they

18  received nothing in return.  On the other hand, if the Settlement were to stand alone, Class

19  Members could receive a Buyback or Fix and Restitution, but Volkswagen would have little

20  motivation buy back or fix as many cars as possible.  The Partial Consent Decree's penalties for

21  failing to meet the Recall Rate ensure Volkswagen will attempt to buy back or fix as many

22  Eligible Vehicles as possible.  Thus, the Settlement does not fail to provide additional benefits as

23  Comlish argues—far from it.  In fact, the Settlement provides the benefits necessary to encourage

24  Class Members to ensure the polluting vehicles are removed from the road, but these benefits can

25  only be successful with the implementation of the Partial Consent Decree and the Partial Consent

26  Order.  Accordingly, the Court overrules Comlish's objection.

27  //

28  //

1          h.      *Reactions of Class Members*

2          There are approximately 490,000 Class Members.[4]  (Dkt. No. 1976 at 6.)  Their interest in

3   the Settlement has been high, as evidenced by the fact that "Class Counsel attorneys and staff have

4   responded by phone, email, and correspondence to over 16,000 inquiries from more than 8,000

5   Class members; the Settlement call center has received approximately 105,420 calls; and the

6   Settlement website has received 885,290 unique visits since its launch."  (Dkt. No. 1976; *see* Dkt.

7   No. 1976-2 ¶ 4.)  At the hearing, Plaintiffs represented that the number of calls to the settlement

8   call center had increased to more than 130,000, and the number of unique visits to the Settlement

9   website had increased to more than 1 million, or approximately 7,000 visits per day.  (Dkt. No.

10  2079 at 16:23-17:1.)

11         As of September 29, 2016, a total of 311,209 Class Members (63.5%) from all 50 states,

12  the District of Columbia, Puerto Rico, the U.S. Virgin Islands, and Guam had registered for

13  benefits under the Settlement.  (*Id.* at 3, 26.)  At the hearing, Plaintiffs stated that as of October 13,

14  2016, the number of registrations increased to 336,612.  (Dkt. No. 2079 at 16:12-14.)  This

15  includes 11,199 current Lessees; 1,715 former Lessees; and 18,045 Eligible Sellers.  (*Id.* at 16:14-

16  16.)  In contrast, only 3,298 Class Members (approximately 0.7%) have opted out.  (Dkt. No. 1976

17  at 3.)  Notably, the number of opt outs continues to decrease as Class Members revoke their

18  request for exclusion.  (Dkt. No. 2079 at 17:4-5.)  A list of Class Members who have opted out of

19  the Settlement can be found in Exhibit 1 to this Order.  An additional 462 Class Members

20  (approximately 0.09%) have timely objected.  (Dkt. No. 1976 at 3.)

21         Given the high claim rate and the low opt-out and objection rates, this factor strongly

22  favors final approval.  *See Churchill Vill.*, 361 F.3d at 577 (finding no abuse of discretion where

23  district court, among other things, reviewed list of 500 opt-outs in a class of 90,000 class

24  members); *Cruz v. Sky Chefs, Inc.*, 2014 WL 7247065, at *5 (N.D. Cal. Dec. 19, 2014) ("A court

25  may appropriately infer that a class action settlement is fair, adequate, and reasonable when few

26  class members object to it."); *Chun-Hoon*, 716 F. Supp. 2d at 852 (granting final approval of

27  _____

28  [4] Although there are 475,745 Eligible Vehicles, some of them have had multiple owners.  This
accounts for the higher number of Class Members than Eligible Vehicles.

United States District Court
Northern District of California

United States District Court
Northern District of California

settlement where 16 out of 329 class members (4.86%) requested exclusion).  That more than half of Class Members have filed a claim also supports final approval.  *See In re TracFone*, 112 F. Supp. 3d 993 at 1006 (approving class action settlement with claim rate of approximately 25-30%); *Moore v. Verizon Commc'ns Inc.*, 2013 WL 4610764, at *8 (N.D. Cal. Aug. 28, 2013) (approving class action settlement with 3% claim rate).  While this figure is remarkable in and of itself, it is particularly impressive given that Class Members have until 2018 to submit a claim. (*See* Dkt. No. 1685 ¶ 2.11.)  Nonetheless, the Court recognizes that not all—albeit a small percentage—of Class Members are not entirely satisfied with the Settlement.  "[I]t is the nature of a settlement, as a highly negotiated compromise . . . that it may be unavoidable that some class members will always be happier with a given result than others."  *Allen*, 787 F.3d at 1223 (internal quotation marks omitted).  The Court has addressed some of those objections above; it addresses the remaining ones here.

i.      Objections to Vehicle Valuation

     o  *2015 NADA CTI Vehicle Valuation*

The most common objection was to the use of the NADA CTI valuation rather than, for instance, the NADA Clean Retail.  (*See* Dkt. No. 1976-2 at 5.)  Plaintiffs argue "[t]he best industry valuation for large numbers of vehicles is NADA Clean Trade-In, which provides a fair and reasonable reference point for vehicle valuation."  (Dkt. No. 1976 at 11.)  They emphasize that other valuation methods, such as MSRP minus depreciation and Kelley Blue Book ("KBB"), require more individualized calculations and determinations as to vehicle conditions.  (*Id.* (footnote omitted).)  Using the NADA CTI value thus benefits Class Members, as it does not reduce benefits if their vehicles are in less than clean condition.

Some Class Members argue the Settlement should rely on the NADA Clean Retail valuation, rather than CTI.  By focusing on the NADA CTI valuation alone, these objections neglect to take into account that the cash payment consists of not just the Buyback price but also a Restitution Payment.  This combination results in a payment that "is significantly *more* than the Clean Retail value."  (Dkt. No. 1976-1 ¶ 40 (emphasis in original); *see* Dkt. No. 1784-1 ¶ 28 ("The blended payment schedule for purchase vehicles are equal to a minimum of *112.6%* of the subject

vehicles' retail values as of September 2015." (emphasis added).)  Also, by relying on the September 2015 value, the Settlement allocates the diminution in value caused by the defeat device to Volkswagen and ensures Class Members do not bear the burden of the disclosure.

The FTC agrees that the Settlement's compensation "fully compensates victims of Volkswagen's unprecedented deception."  (Dkt. No. 1781 at 1.)  Noting that "[f]ull compensation has to be sufficient for consumers to replace their vehicle[,]" the FTC began the calculations for its Partial Consent Order with the NADA Clean Retail value, then factored in the additional losses, "including the 'shoe leather cost of shopping for a new car, sales taxes and registration, the value of the lost opportunity to drive an environmentally-friendly vehicle, and the additional amount 'Clean Diesel' consumers paid for a vehicle feature (clean emissions) that Volkswagen falsely advertised." (*Id.* at 1-2.)  In the end, "[t]he proposed private settlement provides the same generous, but appropriate, compensation to each consumer as the FTC Order."  (*Id.* at 2.)

In sum, although the Settlement begins with NADA CTI value, the addition of the Restitution Payment ensures Class Members are made whole.  As such, the compensation based on the NADA CTI value fairly and adequately compensates Class Members.

o   *Recovery of Full Purchase Price*

Eighty-nine Class Members object to their inability to obtain a full refund of the purchase price of their vehicles.  The Court is not persuaded by these objections.  Again, the Buyback price plus the Restitution Payment place Class Members in a position where they can purchase a vehicle comparable to the one they believed they had in September 2015, before the disclosure of the defeat device.

Class Members could only be entitled to a full refund of purchase price if they returned their vehicles in the same condition they received it.  Such a scenario is virtually inconceivable as it is highly unlikely Class Members never used their vehicles after purchasing them.  Indeed, many Class Members received a great deal of use out of their vehicles over the years.  Under such circumstances, courts have been unwilling to award plaintiffs the full purchase price as either restitution or damages.  *See Brady v. Mercedes-Benz USA, Inc.*, 243 F. Supp. 2d 1004, 1008 (N.D. Cal. 2002) ("[T]he restitution awardable under [California Civil Code] § 1793.2(d)(2)(B) must be

28

1    reduced by the amount directly attributable to use (as measured by miles driven) by the consumer

2    prior to the first repair (or attempted repair) of the problem as pro-rated against a base of 120,000

3    miles."); *Kruse v. Chevrolet Motor Div.*, 1997 WL 408039, at *2 (E.D. Pa. July 17, 1997)

4    ("[I]mplicit in the concept of a refund of the purchase price is the condition that the purchaser

5    return the consumer good at issue. [ ] [P]laintiff accepted and used the car for approximately one

6    and one-half years, thereby diminishing the value of the car.  Awarding damages equal to the full

7    purchase price does not take into account the natural depreciation of the vehicle from normal

8    usage." (internal citations omitted)).  And, as the Court previously noted, state laws generally

9    award consumers the cost of the vehicle less an amount for reasonable use.

10          Additionally, Professor Klonoff opines that requiring Volkswagen "to pay the full

11   purchase, regardless of the age of the vehicle, would increase the cost of the settlement multifold.

12   The possibility of bankruptcy under such a scenario cannot be ignored."  (*Id.* ¶ 32 (footnote

13   omitted).)  Bankruptcy would present "a huge impediment to prompt, efficient, and fair payments

14   to injured claimants."  (*Id.* (footnote omitted).)  Weighing this possibility against the immediate

15   and guaranteed benefits provided by the Settlement, settlement is clearly favored.

16          Some Class Members will inevitably wish they could recover more.  But "the very essence

17   of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes."

18   *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 624 (9th

19   Cir. 1982) (internal quotation marks and citation omitted).  The Settlement provides cash benefits

20   that are consistent with the recovery provided by state and federal laws and are reasonable under

21   the circumstances.[5]

22   //

23

24   _____

25   [5] Even if recovery of the full purchase price were possible, calculating those amounts on a
     classwide basis could present challenges.  For instance, Manufacturer Suggested Retail Prices
26   ("MSRP") would be an unreliable measure of purchase price.  Mr. Stockton notes that
     "[d]ealerships and consumers negotiate prices on the sales of retail vehicles, which are vehicles
27   sold to end-using consumers.  In general, retail vehicles sell for less, and possibly substantially
     less than MSRP."  (Dkt. No. 1784-1 ¶ 14.)  Thus, even if Class Members could recover the full
28   purchase price, MSRP would not accurately reflect that amount.

o  *Mileage Adjustments*

Many Class Members objected to the use of mileage adjustments.  Specifically, Class Members oppose the downward adjustment in the Vehicle Value for high mileage, i.e., mileage that exceeds the allowed 12,500 miles per year.  They contend the Eligible Vehicles were designed to drive long distances and were promoted for their excellent gas mileage.  (Dkt. No. 1976 at 10.)  Relying on this representation, Class members drove their vehicles long distances.  (*Id.*)

Class Members who frequently drove their vehicles undeniably got more use out of them, and, quite simply, mileage affects a vehicle's value.  A vehicle with high mileage is worth less than a vehicle with low mileage.  Indeed, this notion is reflected in federal and state laws, which allow a reduction in a consumer's recovery based on his or her use of the vehicle.  *See, e.g.*, 15 U.S.C. § 2301(12) ("The term 'refund' means refunding the actual purchase price (less reasonable depreciation based on actual use where permitted by rules of the Commission).");  Ala. Code § 8-20A-2(b)(4) ("There shall be offset against any monetary recovery of the consumer a reasonable allowance for the consumer's use of the vehicle.");  Alaska Stat. § 45.45.305 ("[T]he manufacturer or distributor shall . . ., at the owner's option, . . . refund the full purchase price to the owner less a reasonable allowance for the use of the motor vehicle from the time it was delivered to the original owner.");  Cal. Civ. Code § 1793.2(d)(2)(C) ("When restitution is made . . . , the amount to be paid by the manufacturer to the buyer may be reduced by the manufacturer by that amount directly attributable to use by the buyer prior to the time the buyer first delivered the vehicle to the manufacturer or distributor[.]");  Va. Code. Ann. § 59.1-207.13 ("The subtraction of a reasonable allowance for use shall apply to either a replacement or refund of the motor vehicle.").  The Settlement is consistent with this practice.  Notably, the Settlement also increases compensation for Class Members who drove less than 12,500 miles per year and thus incurred less depreciation.

Moreover, the 12,500 mile allowance was a negotiated term that is consistent with, if not more generous than, accepted car valuations.  (*See* Dkt. No. 1976 at 10 ("12,500 miles of driving per year for each vehicle—an allowance that was negotiated—is more generous than the average driver's estimated annual mileage of approximately 12,000 miles." (footnote omitted).)  Plaintiffs submit the Declaration of Professor Robert Klonoff, who reviewed the objections relating to the

1   adequacy of the class relief.  (*See* Dkt. No. 1976-1 ¶¶ 10, 14.)  Professor Klonoff explains that "the

2   12,500 figure is in line with various accepted car valuations" and points out that "[m]ost

3   calculations offered by Carmax, Kelley Blue Book, Edmunds, and others are based on 11,500 to

4   13,000 annual miles."  (*Id.* ¶ 46.)  Indeed, the 12,500 mileage allowance set forth in the

5   Settlement falls on the higher end of that range.

6        At the hearing and in its written objection, Objector Wheels, Inc. ("Wheels") argued the

7   Settlement should value Eligible Vehicles based on their September 2015 mileage in cases where

8   Class Members can produce accurate records of such mileage.  (Dkt. No. 1882 at 5; Dkt. No. 2079

9   at 31:18:24.)  But with close to 500,000 Eligible Vehicles, it would take a substantial amount of

10  time to individually review records of each Vehicle's mileage; this would inevitably impede Class

11  Members' ability to quickly receive their benefits.  In light of the ongoing environmental harms

12  caused by these Vehicles, the need to efficiently process their repurchase is paramount.

13       Thus, the Court finds the mileage adjustment is appropriate.

14       o   *Reimbursement for Sales Tax and Other Fees*

15       Class Members have also objected that the Settlement does not provide reimbursement for

16  sales taxes and other fees, including licensing, DMV fees, smog certificates, and title costs.  Their

17  frustration lies in the notion that they will pay sales tax and other official fees twice: once for the

18  Eligible Vehicle and again for the replacement.

19       Mr. Klonoff notes that "the blue book value of a car does not depend on how much the

20  owner paid for sales taxes and other fees."  (Dkt. No. 1976-1 ¶ 64.)  Such costs are not part of a

21  seller's consideration, and "the fact that such payments were made does not increase the

22  attractiveness of a vehicle from a buyer's perspective."  (*Id.*)  A vehicle's value is independent of

23  the sales tax and fees that the owner paid.  Put another way, a buyer will not pay more for a

24  vehicle simply because of the taxes and fees.

25       Moreover, as noted earlier, the Settlement awards Class Members 112.6% of their Eligible

26  Vehicles' September 2015 value.  This allows Class Members to replace their Eligible Vehicles

27  with an equivalent make and model and still have enough remaining cash to pay the sales tax and

28  other fees on that new purchase.  True, as Mr. Klonoff points out, some lemon laws cover sales

United States District Court
Northern District of California

taxes and other official fees.  (*Id.* ¶ 62 (citing N.J. Stat. Ann. 56:12-21(a)–(b); Wis. Stat. Ann. § 218.015(2)(b).)  But the Settlement is not unfair even if it does not separately compensate these expenses.  Importantly, the Settlement provides Class Members sufficient compensation to purchase an equivalent replacement vehicle at no additional expense.

At the hearing, Class Member Mark Dietrich objected to his inability to recover registration expenses.  (Dkt. No. 2079 at 35:14-21.)  Dietrich had renewed his vehicle's registration just ten days ago, which also required a smog test.  (*Id.* at 35:14-17.)  But, as Plaintiffs noted, although state governments have not been willing to refund registration fees, Class Members can choose to drive their vehicles until the registration expires and then complete the Buyback before they have to renew the registration again.  (*Id.* at 71:15-21.)

Accordingly, the Court finds the Settlement is not unfair because it does not separately reimburse Class Members for the taxes and other fees paid on their Eligible Vehicles.

o   *Reimbursement for Extended Warranties and Service Contracts*

Many Class Members purchased extended warranties or service contracts on their Eligible Vehicles.  Some of them seek reimbursement of the entire costs of those warranties and object on this basis.

Mr. Stockton explains that "[u]nder most extended warranties, a consumer may cancel the warranty for a $50 charge or other nominal amount.  Upon cancellation, customers receive a prorated refund for the remaining period of warranty coverage."  (Dkt. No. 1784-1 ¶ 24.)  The same applies to service contracts.  (Dkt. No. 1976-1 ¶ 52.)  Thus, should Class Members wish to cancel their extended warranties or service contracts, they would only be responsible for the cancellation fee.  The Restitution Payment covers this expense.  Class Members therefore will not be penalized for cancelling their extended warranties or service contracts.

o   *Reimbursement for Other Expenses*

Other Class Members seek reimbursement for factory-installed options.  The Court overrules objections on this ground.  The Settlement provides that Vehicle Value shall be adjusted for Original Equipment Manufacturer ("OEM")-installed options.  (Dkt. No. 1685-1 ¶¶ 4, 12.)  As such, the Settlement fairly compensates Class Members for OEM-installed features on their

United States District Court
Northern District of California

1    Eligible Vehicles.

2           Yet other Class Members seek compensation for non-OEM features, in other words,

3    aftermarket add-ons such as window tinting, security systems, hitches, stereo systems, and car

4    mats.  True, the Settlement only provides reimbursement for OEM-installed options and not

5    aftermarket add-ons.  To offer compensation for aftermarket add-ons complicates the claims

6    process and risks delaying Class Members' payments.  First, Mr. Klonoff notes that the very

7    question of what constitutes an add-on can be problematic.  (Dkt. No. 1976-1 ¶ 57 ("[W]hat would

8    be the scope of the covered additions?  For instance, would a high-powered stereo system, easily

9    removable but nonetheless purchased for use in that vehicle, be covered?  What about seat covers

10   that presumably could be used on another car and sold separately on eBay? Just defining 'add-on'

11   would be difficult.").)  Second, even assuming a workable definition of an "add-on," the value of

12   each one would have to be determined on a case-by-case basis.  Whereas Vehicle Value can be

13   determined by a straightforward formula—i.e., mileage and OEM-installed options—there is no

14   similarly objective way to calculate the value of each aftermarket add-on, particularly given the

15   wide range of add-ons Class Members may have installed on their vehicles.  Further, aftermarket

16   add-ons do not necessarily increase a vehicle's value; according to Mr. Klonoff, "some add-ons

17   may actually be *undesirable* to most consumers" and thus decrease the value of the vehicle.  (*Id.* ¶

18   58 (emphasis in the original).)  Given the size of the Class, an individual review of each

19   aftermarket add-on would require substantial time and resources.  This in turn would significantly

20   delay relief to Class Members.  The Settlement presumes all Vehicles are in the same good

21   condition; the same approach is necessary here to ensure the efficient distribution of benefits.  *See,*

22   *e.g.*, *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139, 155 (E.D.N.Y. 2000) (noting steps

23   to be taken to ensure fair and efficient claims process).

24           o   *Compensation for Eligible Sellers*

25           Some Eligible Sellers object to the amount of Seller Restitution to which they are entitled,

26   asserting that it is less than what Eligible Owners receive.  Seller Restitution is calculated as 10%

27   of the Vehicle Value plus $1,493; however, the Settlement guarantees Eligible Sellers a $2,550

28   minimum in Restitution.  (Dkt. No. 1685-3 at 8.)  The Court finds this fairly and adequately

compensates Eligible Sellers.  If a Class Member has already sold his or her vehicle to a third party, he or she has already received some compensation for that Eligible Vehicle.  But because a post-September 2015 sale price would reflect a diminution in value caused by Volkswagen's disclosure, Seller Restitution accounts for the difference between the pre- and post-disclosure values.  The Settlement thus makes most Eligible Sellers whole.

    o   *Loan Forgiveness*

Some objectors take issue with the amount of loan forgiveness; specifically, some Class Members dislike the additional payment of up to 30% of the combined Buyback plus Restitution Payments ("Buyback Package") for those who owe more on their vehicle than the Buyback Package provides.  Plaintiffs explain that

> [o]ne of the Settlement's many goals was to make Class members whole.  If that were the only objective, then Class members should be treated identically regardless of whether they financed a portion of their purchase or paid all cash.  But another important objective of the Settlement was to get the polluting cars off the road. Forgiving the loans (up to a certain point) helps advance both goals by ensuring that no Class member (or at least, very few) would be required to pay additional money to Volkswagen to free themselves of the polluting Vehicles.  It therefore incentivizes more of those Class members to participate in the Settlement and to sell their polluting vehicles back to Volkswagen.

(Dkt. No. 1976 at 15-16.)

The loan forgiveness does not render the Settlement unfair.  Although loan forgiveness provides additional benefits to some Class Members, it does not entitle them to more cash than Class Members who own their vehicles outright.  Rather, the additional compensation is paid directly to the lender.  (Dkt. No. 1685-1 ¶ 14.)  This ensures Class Members can sell back their vehicles without continuing to be responsible for an outstanding balance on a car they no longer own; at the very least, if loan forgiveness does not cover the entire balance, it reduces the amount owed on the loan and thus the Class Member's obligations.  The Settlement therefore obtains the same benefit for all Class Members regardless of whether they financed their vehicle or not, i.e., it allows Class Members to return their vehicles and relieves or reduces their financial obligations associated with ownership.  Ultimately, loan forgiveness is simply a supplementary benefit to those who need it; it does not reduce the benefits of other Class Members.  And while some Class

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Members eligible for loan forgiveness may want an additional payment on top of the loan

2  forgiveness, they have not shown that the additional 30% is so insufficient so as to render the

3  Settlement unfair.  The Court therefore overrules objections based on loan forgiveness.

4        o  *Lessee Compensation*

5        Seventeen Eligible Lessees have objected to various parts of the Settlement.  First, some

6  protest the amount of compensation available to them.  In addition to a Lease Termination or a

7  Fix, Eligible Lessees are entitled to Lessee Restitution.  Although Lessee Restitution is less than

8  Owner Restitution (*see* Dkt. No. 1685 ¶¶ 4.2.2, 4.2.4), as discussed above, this reflects the fact that

9  owners and lessees have different economic relationships with their vehicles.  Owners, for

10  instance, must bear the diminution in value caused by Volkswagen's disclosure of the defeat

11  device, but Lessees can simply return the vehicle to the lessor without bearing the brunt of the

12  loss.  Moreover, the Settlement treats Eligible Lessees and Eligible Owners equally—they both

13  have the option to return their vehicles to Volkswagen, or they may instead obtain a Fix and retain

14  possession of their vehicles.  In either situation, both Eligible Lessees and Eligible Owners are

15  entitled to Restitution that takes into account their respective losses.

16        Second, some Eligible Lessees have objected to the Settlement due to the structure of their

17  lease contracts, specifically, the contractual charges on mileage overages.  (Dkt. No. 1976 at 15.)

18  But as Plaintiffs point out, "[a]ny charges related to mileage overages stem from the Class

19  member's initial lease contract and would be owed whether or not the vehicles met relevant

20  emissions limits." (*Id.*)  Additionally, there is no downward adjustment to Lessee Restitution

21  based on mileage.  Put another way, even if an Eligible Lessee exceeds the allowed mileage as

22  provided for in his or her lease contract, the amount of Lessee Restitution remains unaffected.

23        Third, other Eligible Lessees object that the Settlement treats them as Lessees

24  notwithstanding their intention to purchase their leased vehicles at the end of their lease.  (Dkt.

25  No. 1976 at 15.)  That they *intended* to become an owner does not negate the fact they are not now

26  owners.  Lessees—even those who intended to purchase their vehicles—simply have not suffered

27  the same harm as those Class Members who have already purchased their vehicles.

28        ii.    Objections to Reversion

United States District Court
Northern District of California

1    Some Class Members object that unused Funds will revert to Volkswagen.  (*See* Dkt. No.

2    1976 at 32.)  Plaintiffs explained at the hearing that the $10.33 billion Funding Pool is not a fixed-

3    fund settlement but rather a commitment for the maximum amount of compensation Volkswagen

4    agrees to pay Class Members.  (Dkt. No. 2079 at 69:21-22.)  Put another way, "[i]f every

5    consumer comes in for the settlement and chooses a buyback, every penny of that gets spent[.]"

6    (*Id.* at 70:3-4.)  But the Settlement is designed to allow Class Members to choose their remedy.  It

7    is possible that not all Class Members will select a Buyback or a Lease Termination; some may

8    choose a Fix.  (*See id.* at 70:9-13 ("If there is a delay in emissions modification, more of them will

9    choose the buyback.  More of the money will be spent.  If people like the emissions modification

10   and they choose to wait and drive their cars, then less of that money will be spent.").)  Because

11   those Class Members will receive less cash, it is reasonable to expect that not all of the $10.033

12   billion will be needed.  Moreover, as noted above, Volkswagen has strong financial incentives to

13   compensate as many Class Members as possible.  Any money it could save by not compensating

14   Class Members would be lost in the form of penalties for failing to achieve the Recall Rate.

15                    iii.        Objections Regarding the Class Definition

16              o   *Individuals Excluded from the Class Definition*

17   Some individuals have objected to the Settlement's failure to include vehicles sold and

18   leases terminated prior to the defeat device's disclosure.  The Class Definition requires Class

19   Members to have owned or leased their Eligible Vehicles on September 18, 2015.  (*See* Dkt. No.

20   1685 ¶ 2.16.)  Thus, these individuals are not Class Members, and the Court need not consider

21   their objections.  *See San Francisco NAACP v. San Francisco Unified Sch. Dist.*, 59 F. Supp. 2d

22   1021, 1032 (N.D. Cal. 1999) ("[N]onclass members have no standing to object to the settlement of

23   a class action.").

24              o   *Eligible Sellers*

25   Objector Wheels argues the June 28, 2016 Eligible Seller cut-off date is arbitrary and

26   unfair.  (Dkt. No. 1882 at 1-2.)  To be an Eligible Seller, a person must have "purchased or

27   otherwise acquired an Eligible Vehicle on or before September 18, 2015, and sold or otherwise

28   transferred ownership of such vehicle after September 18, 2015, but before June 28, 2016."  (Dkt.

36

No. 1685 ¶ 2.31.)  The June 28, 2016 cut-off is not unfair.  On that day, Eligible Sellers knew they would be beneficiaries of the Settlement only if they held onto their Eligible Vehicles.  Thus, those who sold their Eligible Vehicles after the proposed Settlement did so knowing they would be ineligible for benefits.

The Settlement further requires Eligible Sellers to identify themselves within 45 days of the Court's preliminary approval order.  (*Id.* ¶ 2.32.)  Although Objector Autoport contends this deadline is also arbitrary, the Court disagrees.  First, Autoport's assertion that "[t]his opt-in deadline does not apply to consumers, only dealers" is simply not true.  (*See* Dkt. No. 1879 at 2.) The Settlement required dealers and consumers alike to identify themselves as Eligible Sellers by September 16, 2016.  Moreover, this deadline had a purpose.  The Settlement designates certain funds for Seller Restitution; the unclaimed portion of that is distributed to Eligible Owners who purchased their cars after September 18, 2015.  (Dkt. No. 1685 ¶ 2.42; Dkt. No. 1685-1 ¶ 5(b).) Thus, in to accurately calculate the amount of Owner Restitution for those who purchased after the fraud disclosure, the parties must first know which Eligible Sellers will seek Restitution.  The Eligible Seller deadline is therefore appropriate.

> iv.   Objections to Attorneys' Fees

> o   *Class Counsel's Fee Request*

A number of Class Members take issue with the timing and structure of Class Counsel's prospective fee request.  Although Class Counsel still has not moved for attorneys' fees and costs, this does not warrant denying final approval.  Indeed, Rule 23(h) does not require Class Counsel to seek attorneys' fees at the final approval stage.  *See* Fed. R. Civ. P 23(h); *In re Nat'l Football League Players Concussion Injury Litig.* ("*In re NFL Players*"), 821 F.3d 410 (3d Cir. 2016) ("[T]he separation of a fee award from final approval of the settlement does not violate Rule 23(h)."); *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 910 F. Supp. 2d 891, 918 n.16 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014) (granting final approval where "parties had no discussions regarding fees other than the PSC's making clear that it would eventually file a request for attorneys' fees.").  Nor are Class Members in the dark about Class Counsel's prospective fee request.  In accordance with the

37

United States District Court
Northern District of California

1    Court's Order (Dkt. No. 1689 at 23-24), Class Counsel submitted a Statement detailing their

2    forthcoming request for attorneys' fees and costs (Dkt. No. 1730).  Specifically, "Class Counsel's

3    common benefit fee application will seek no more than $324 million in attorneys' fees, plus actual

4    and reasonable out-of-pocket costs, not to exceed $8.5 million." (*Id.* at 3.)  Class Counsel will

5    also propose a formula, "such as the equivalent of a small percentage of payments made to Class

6    Members," to cover costs they continue to incur for addressing Class Members' ongoing requests

7    for information and questions about the Settlement.  (*Id.* at 3-4.)

8         Class Members therefore had sufficient information as to Class Counsel's prospective

9    request prior to the Opt-Out Deadline.  *See In re NFL Players*, 821 F.3d at 446 ("Even if the class

10   members were missing certain information—for example, the number of hours class counsel

11   worked and the terms of any contingency fee arrangements class counsel have with particular

12   retired players—they still had enough information to make an informed decision about whether to

13   object to or opt out from the settlement.").  As of August 10, 2016—more than a month before the

14   Opt-Out Deadline—Class Members knew the maximum amount of attorneys' fees and costs Class

15   Counsel intended to request and also knew Class Counsel would seek ongoing costs to be

16   calculated by a Court-approved formula.  Class Members could thus evaluate the prospective fee

17   request and make an informed decision as to whether to remain in the Class.

18        Importantly, Class Counsels' attorneys' fees will not diminish the benefits awarded to

19   Class Members under the Settlement.  (Dkt. No. 1685 ¶ 4.4.5 ("To the extent Volkswagen elects

20   or is ordered to pay private attorneys' fees or costs, Volkswagen will not receive credit for such

21   payments against obligations to Class Members under this Class Action Agreement and the Final

22   Approval Order.").)  And, in any event, the Court must approve any fee request as reasonable.  *See*

23   *In re Bluetooth*, 654 F.3d at 941 ("[C]ourts have an independent obligation to ensure that the

24   award, like the settlement itself, is reasonable, even if the parties have already agreed to an

25   amount.").  Class Members will also be notified of Class Counsel's fee request, once it is filed.

26   *See* Fed. R. Civ. P. 23(h)(1) ("Notice of the motion must be served on all parties and, for motions

27   by class counsel, directed to class members in a reasonable manner.").  Thereafter, Class Members

28   will have an opportunity to object to the motion.  *See* Fed. R. Civ. P. 23(h)(2).  As the Court stated

1    at the Fairness Hearing, the fees to be sought by Class Counsel did not have any relationship to the

2    monies Volkswagen was willing to devote to compensate the Class.  (Dkt. No. 2079 at 54:19-

3    55:3).

4        o   *Class Members' Personal Attorneys' Fees*

5        Some objectors argue the Settlement is unfair because it does not compensate Class

6    Members for fees for their private attorneys, in other words, those attorneys not appointed to the

7    PSC.  The Settlement is silent as to Volkswagen's obligations to pay the fees and costs for

8    attorneys other than Class Counsel or attorneys Class Counsel designated to perform work in

9    connection with this litigation.  (*See* Dkt. No. 1685.)  However, the Settlement is not unfair simply

10   because it does not require Volkswagen to pay the private attorneys' fees of those Class Members

11   who chose to retain an attorney.

12          v.     Objections Based on Public Policy

13       A number of objectors raise concerns about public policy.  For instance, some Class

14   Members argue Volkswagen will profit from the Settlement.  Mr. Stockton estimates that

15   Volkswagen received at most $12.937 billion in gross revenues for the Eligible Vehicles.  (Dkt.

16   No. 1784-1 ¶ 33.)  Incentives, discounts, and other rebates likely reduce this figure.  (*Id.*)  In

17   comparison, Volkswagen's liability under the Settlement is $10.033 billion.  At first glance,

18   $10.033 billion is less than the estimated revenues Volkswagen received.  However, the United

19   States' Partial Consent Decree, which imposes fines and requires Volkswagen to pay for

20   environmental remediation, increases Volkswagen's liability to $14.7 billion.  That figure could

21   also increase in the event Volkswagen fails to buy back or fix 85% of Eligible Vehicles.  Thus,

22   Volkswagen will not profit under the terms of the Settlement.

23          vi.    Objections Regarding Environmental Concerns

24       Other objectors take issue with the Settlement's ability to address environmental concerns.

25   As an initial matter, the United States on behalf of the EPA can more effectively address

26   environmental concerns than Class Counsel who represent consumers.  The United States'

27   Consent Decree does just that.  Under that agreement, Volkswagen agrees to pay $2 billion over

28   ten years to promote the use of zero emissions vehicles ("ZEV") and $2.7 billion over three years

United States District Court
Northern District of California

39

1    to reduce the excess NOx emissions attributed to the Eligible Vehicles.   (*See* App'x C-D, Dkt.

2    No. 1973-1.) These efforts address the environmental damage caused by Eligible Vehicles.

3          Objector Ronald Clark Fleshman, Jr. argues the Settlement improperly allows Class

4    Members to continue driving their Eligible Vehicles in violation of federal and state laws.[6]  (Dkt.

5    No. 1893 at 10-11.)  Fleshman has previously raised, and the Court rejected, this concern.  (*See*

6    Dkt. No. 1760 at 5, 8; Dkt. No. 1991 at 7-8.)  No federal or state authority has declared the

7    Eligible Vehicles illegal to drive.  As Plaintiffs note, EPA has explicitly stated it will not

8    confiscate Eligible Vehicles, and "[t]he 44 states participating in the Attorneys General statement

9    have also agreed to allow Class vehicles to stay on the road pending participation in the Class

10   Action Settlement."  (Dkt. No. 1976 at 31.)

                            vii.    Objections to Release

12         Several Class Members object to the Release.  (*See* Dkt. No. 1685-5.)  In particular,

13   Objectors Kangas and Scott Siewert raise two concerns.  First, Kangas and Siewert argue Class

14   Members cannot "be bound to a class-wide compulsory release if the underl[ying] agreement is

15   voided." (Dkt. No. 1826 at 12; Dkt. No. 1877 at 6.)   Class Members execute an Individual

16   Release only upon acceptance of an offer.  (Dkt. No. 1685 ¶ 2.57; Dkt. No. 1685-4 ¶ 4(b).)  If a

17   Class Member receives benefits under the Settlement before the Settlement is reversed on appeal,

18   an Individual Release is appropriate consideration.  The Court therefore does not find the

19   Individual Release is unfair.

20         Second, Kangas and Siewert object to the release of "concealed or hidden" claims.  (Dkt.

21   No. 1826 at 13-14; Dkt. No. 1877 at 7-8.)  Class action settlement agreements commonly release

22   concealed or hidden claims.  *See In re Zynga Inc. Sec. Litig.*, 2015 WL 6471171, at *4 (N.D. Cal.

23   Oct. 27, 2015); *Wakefield v. Wells Fargo & Co.*, 2014 WL 7240339, at *7 (N.D. Cal. Dec. 18,

24   2014); *Torchia v. W.W. Grainger, Inc.*, 2014 WL 3966292, at *3 (E.D. Cal. Aug. 13, 2014).

25   Moreover, the Release is limited to claims related to the "2.0-liter TDI Matter," which the

26   Settlement defines as

27   ────────────────

28   [6] Many of Fleshman's objections concern the United States' Partial Consent Decree, not the
     Settlement.  (*See* Dkt. No. 1893.)  The Court does not address those objections here.

                                          40

> (1) the installation or presence of any Defeat Device or other auxiliary emission control device in any Eligible Vehicle; (2) the design, manufacture, assembly, testing, or development of any Defeat Device or other auxiliary emission control device used or for use in an Eligible Vehicle; (3) the marketing or advertisement of any Eligible Vehicle as green, environmentally friendly, and/or compliant with state or federal emissions standards; (4) the actual or alleged noncompliance of any Eligible Vehicle with state or federal emissions standards; and/or (5) the subject matter of the Action, as well as any related events or allegations, with respect to Eligible Vehicles.

Dkt. No. 1685 ¶¶ 2.1, 9.3; *see Taylor v. W. Marine Prod., Inc.*, 2015 WL 307236, at *1 (N.D. Cal. Jan. 20, 2015) (preliminarily approving settlement that "released . . . only . . . claims relating to underpayment of daily overtime pay" whether such claims were "concealed or not concealed or hidden").  To that end, the Release expressly does not include claims of personal injury or wrongful death.  (Dkt. No. 1685 ¶ 9.3; Dkt. No. 1685-5 ¶ 1.)  Thus, Class Members who wish to litigate such claims may do so.

### viii.    Objections Regarding Other Motions

Objectors Maria Barrera, Shawn Blanton, Travis Bourland, Steven Bracht, Pablo Cortez, Jonathan Evans, Evangelina/Leonel Falcon, Luis Guarjardo, Eliseo Hernandez, Allison Kaminski, David King, Sean Luchnick, Maria C. Martinez-Diaz, Duncan Moskowitz, Paul Munro, Brian Planto, Angela Purvis, Ronnie Robledo, Ray A. Robeldo, Ray A. Sarabia, Storm Taliaferrow, and Terry Woodford (collectively, "Barrera Objectors") argue Class Counsel have "actively worked against the interest[s] of non-representative class members" because Class Counsel have allegedly urged the Court not to consider pending motions to remand until after the Opt Out Deadline. (Dkt. No. 1863-3 at 8-9.)  The Barrera Objectors fail to explain why delaying ruling on these motions adversely affects Class Members.  Moreover, if Class Members seeking to remand their case wished to litigate their claims in state court, they simply had to exclude themselves from the Settlement.

The Barrera Objectors further raise the Court's denial of Class Member Jolian Kangas' motion to intervene to conduct discovery.  (*Id.* at 7, 10; *see* Dkt. No. 1746.)  Specifically, they take issue with Class Counsel's opposition to Kangas' motion.  (Dkt. No. 1863-3 at 10.)  They contend this is a sign that "Class Counsel have actively worked against any interest but its own by forcing

United States District Court
Northern District of California

United States District Court
Northern District of California

1    its proposed settlement to become a *fait accompli* among class members." (*Id.*)

2         The Barrera Objectors do not explain why opposing the motion was contrary to Class

3    Members' interests.  The Court denied Kangas' motion because he failed to show that his interests

4    were impaired and to present evidence of collusion.  (*See* Dkt. 1746 at 3-6.)  Given the size of the

5    Class and the scale of the discovery produced, it would delay Class compensation and the removal

6    of polluting cars from roads.  It would also waste resources if Class Counsel allowed any Class

7    Member to conduct discovery into the settlement negotiations, particularly when the Class

8    Member did not provide a basis to do so.  Their opposition was thus proper and not adverse to the

9    Class.

10            2.    The Bluetooth Factors

11        Although the *Churchill* factors favor settlement, consideration of those factors alone is

12   insufficient.  *See In re Bluetooth*, 654 F.3d at 946.  Where, as here, the parties reach a settlement

13   prior to class certification, courts must examine the settlement with "an even higher level of

14   scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under

15   Rule 23(e) before securing the court's approval as fair." (*Id.* (citations omitted).)  "Collusion may

16   not always be evident on the face of a settlement, and courts therefore must be particularly vigilant

17   not only for explicit collusion, but also for more subtle signs that class counsel have allowed

18   pursuit of their own self-interests and that of certain class members to infect the negotiations."

19   (*Id.* at 947.)  Signs of subtle collusion include

20               (1) when counsel receive a disproportionate distribution of the
                 settlement, or when the class receives no monetary distribution but
21               class counsel are amply rewarded;
                 (2) when the parties negotiate a "clear sailing" arrangement
22               providing for the payment of attorneys' fees separate and apart from
                 class funds, which carries the potential of enabling a defendant to
23               pay class counsel excessive fees and costs in exchange for counsel
                 accepting an unfair settlement on behalf of the class; and
24               (3) when the parties arrange for fees not awarded to revert to
                 defendants rather than be added to the class fund.
25

26   (*Id.* (internal quotations marks and citations omitted).)

27        Despite the presence of one *Bluetooth* factor, the Court finds no evidence of collusion.

28   The *Bluetooth* court made clear that these factors are not dispositive but merely "warning signs" or

42

United States District Court
Northern District of California

"indicia of possible implicit collusion." (*Id.*) Even if all three signs are present, courts may still find that a settlement is reasonable. *See id.* at 50 (noting that the district court may find the settlement reasonable notwithstanding the presence of all three *Bluetooth* factors).

The first *Bluetooth* factor asks whether Class Counsel receive a disproportionate distribution of the Settlement or whether Counsel are amply rewarded while the Class receives no monetary distribution. (*Id.* at 947.) This factor is not implicated. First, the Settlement does not entitle Class Counsel to any portion of the Settlement funds; the $10.033 billion Funding Pool is designated solely for Class Members. Second, the Settlement provides for monetary benefits for all Class Members, namely, the price of a Buyback and/or Restitution. Thus, there is no question Counsel is rewarded while the Class receives no monetary award. Further, even if Class Counsel were to receive the maximum they stated they would seek (an unlikely outcome), that amount—$324 million—is less than four percent of the Settlement. As such, this factor does not suggest collusion.

The second *Bluetooth* factor considers whether the parties negotiated a "clear sailing" agreement for the payment of attorneys' fees separate from the class funds. (*Id.* at 947.) The Settlement provides that Volkswagen will pay attorneys' fees separate from, and in addition to, the compensation provided to Class Members. (Dkt. No. 1685 ¶ 11.1.) As noted above, Class Counsel will not seek more than $324 million in attorneys' fees and $8.5 million in costs. (Dkt. No. 1730 at 3.) Importantly, at this juncture, there is no "clear sailing" agreement to cause concern for collusion. Although Class Counsel has agreed not to seek more than a total of $332.5 million in attorneys' fees and costs, plus future costs to be determined by a formula, Volkswagen has not agreed not to contest such a request. Moreover, that dialogues for attorneys' fees began after the parties filed the Settlement suggests Class Counsel did not accept an excessive fee in exchange for an unfair settlement or otherwise allow their fees to interfere with their negotiations for Class Members' benefits. As such, this factor is not indicative of collusion.

The third *Bluetooth* factor, which considers whether the settlement provides for funds not awarded to revert to defendants, is to some extent present. The Settlement provides that upon either the conclusion of the Claim Period or the termination or invalidation of the Settlement, any

43

United States District Court
Northern District of California

1    unused funds shall revert to Volkswagen.  (Dkt. No. 1685 ¶¶ 10.3-10.4.)  While reversionary

2    provisions can sometimes be problematic, that is not the case here.  The proposed Partial Consent

3    Decree requires Volkswagen to buyback or fix 85% of the Eligible Vehicles by June 30, 2019.

4    (Dkt. No. 1973-1 ¶ 3; App'x A ¶¶ 6.1 & 6.3, *id.*)  Failure to do so results in additional monetary

5    penalties for Volkswagen.  (Dkt. No. 1973-1 ¶ 3; App'x A ¶¶ 6.1 & 6.3, *id.*)  And, as the Court

6    previously discussed, Volkswagen appears to have the infrastructure and manpower to fulfill its

7    obligations under the Settlement.  (*See* Dkt. No. 1698 at 25-26.)  Thus, although the Settlement

8    provides that any unused funds will revert to Volkswagen, the Court is satisfied that it is not

9    evidence of collusion.

10        In sum, although one of the three *Bluetooth* factors is present, the Court finds the

11   Settlement is not the result of, or was influenced by, collusion.

12                                             *****

13        In light of the foregoing analysis, the Court finds final approval is appropriate.  The

14   number of objections is small, and their substance does not call into doubt the Settlement's

15   fairness.  The *Churchill* factors support final approval, and the *Bluetooth* factors do not suggest

16   collusion.  Thus, even under heightened scrutiny, the Court concludes the Settlement is fair,

17   adequate, and reasonable.

18                 **IV.    DISCUSSION – CLAIMS REVIEW COMMITTEE**

19        The Settlement creates a Claims Review Committee ("CRC") to review appeals of

20   contested claims deemed ineligible.  (Dkt. No. 1685 ¶ 5.3.)  The CRC is a three-member

21   committee comprised of one PSC representative, one Volkswagen representative, and one Court-

22   appointed "neutral."  (*Id.*)  Class Counsel and Volkswagen nominate David S. Stellings and

23   Sharon L. Nelles, respectively, to serve on the CRC.  The Court now appoints the Honorable Fern

24   M. Smith (ret.) to serve as the third and neutral member.

25                      **V.    DISCUSSION – ALL WRITS ACT**

26        The All Writs Act authorizes district courts to "issue all writs necessary or appropriate in

27   aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C.

28   § 1651(a).  "The power conferred by the [All Writs] Act extends, under appropriate circumstances,

                                              44

1    to persons who, though not parties to the original action or engaged in wrongdoing, are in a

2    position to frustrate the implementation of a court order or the proper administration of justice, [ ]

3    and encompasses even those who have not taken any affirmative action to hinder justice." *United*

4    *States v. New York Tel. Co.*, 434 U.S. 159, 174 (1977) (internal citations omitted).  However, the

5    authority granted by the All Writs Act, though broad, is not unlimited.  *Negrete v. Allianz Life Ins.*

6    *Co. of N. Am.*, 523 F.3d 1091, 1098 (9th Cir. 2008).  Indeed, the Anti-Injunction Act limits the

7    district court's ability to enjoin state proceedings "except as expressly authorized by Act of

8    Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

9    28 U.S.C. § 2283.  "Although comity requires federal courts to exercise extreme caution in

10   interfering with state litigation, federal courts have the power to do so when their jurisdiction is

11   threatened."  *Hanlon*, 150 F.3d at 1025; *see Keith v. Volpe*, 118 F.3d 1386, 1390 (9th Cir. 1997)

12   ("[T]he All Writs Act, 28 U.S.C. § 1651, empowers the federal courts to enjoin state proceedings

13   that interfere, derogate, or conflict with federal judgments, orders, or settlements.").

14          A stay of all state court actions relating to Released Claims, that is, the claims of Class

15   Members who have not properly opted out, is necessary to preserve the Court's jurisdiction.  First,

16   Class Members have been given an opportunity to opt out of the Settlement.  *See Jacobs v. CSAA*

17   *Inter-Ins.*, 2009 WL 1201996, at *2 (N.D. Cal. May 1, 2009) ("A district court may enjoin named

18   and absent members who have been given the opportunity to opt out of a class from prosecuting

19   separate class actions in state court."  (citing *Carlough v. Amchem Prods., Inc.*, 10 F.3d 189, 204

20   (3d Cir. 1993)).  Second, a state court's disposition of claims similar to or overlapping the

21   Released Claims would implicate the same legal and evidentiary issues; thus, such action would

22   threaten the Court's jurisdiction and hinder its ability to decide the case.  *See Jacobs*, 2009 WL

23   1201996, at *3 ("A preliminary injunction is appropriate to preserve jurisdiction because there is a

24   sufficient overlap of claims between the federal and state class actions, such that the same legal

25   and evidentiary issues will be implicated in each case."); *In re Jamster Mktg. Litig.*, 2008 WL

26   4482307, at *6 (S.D. Cal. Sept. 29, 2008) ("Any litigant may be enjoined from proceeding with a

27   state court action where it is 'necessary to prevent a state court from so interfering with a federal

28   court's consideration or disposition of a case as to seriously impair the federal court's flexibility

United States District Court
Northern District of California

45

and authority to decide the case.'" (quoting *In re Diet Drugs Prod. Liab. Litig.*, 282 F.3d 220, 234 (3d Cir. 2002)).  Accordingly, the Court enjoins Class Members who have not opted out from participating in any state court litigation relating to the Released Claims.  This injunction, however, does not prevent Class Members from dismissing or staying his or her Released Claims.

## VI.   CONCLUSION

For the foregoing reasons, the Court **ORDERS** the following:

1. Plaintiffs' Motion for Final Approval of the Settlement is **GRANTED**.  The Settlement in its current form is fair, adequate, and reasonable and is in the best interest of Class Members.  Benefits under the Settlement shall immediately be made available to Class Members.

2. The Court **CONFIRMS** the appointment of Lead Plaintiffs' Counsel and the PSC listed in Pretrial Order No. 7 (Dkt. No. 1084) as Settlement Class Counsel.

3. The Court **CONFIRMS** the appointment of the Settlement Class Representatives listed in Exhibit 1 to the Plaintiffs' Motion for Preliminary Approval of the Settlement and Approval of Class Notice (Dkt. No 1609-1).

4. The Court **CONFIRMS** the appointment of Ankura Consulting Group, LLC as Claims Supervisor.  The Claims Supervisor, including its subcontractors, and the directors, officers, employees, agents, counsel, affiliates and advisors, shall not be liable for their good-faith compliance with their duties and responsibilities as Claims Supervisor under the Settlement, this Order, all prior orders, the Partial Consent Decree, or any further Settlement-related orders or decrees, except upon a finding by this Court that they acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of their duties.

5. The Court **APPOINTS** Citibank Private Bank to serve as the Escrow Agent.

6. The Court **CONFIRMS** the appointment of David S. Stellings and Sharon L. Nelles to the Claims Review Committee and **APPOINTS** and the Hon. Fern M. Smith to serve as the CRC's neutral member on the Court's behalf.

7. The Court **DISMISSES WITH PREJUDICE** the following without costs to any

United States District Court
Northern District of California

party:

a. The claims pertaining to Eligible Vehicles, as between the Settlement Class and all its Members who have not timely and properly excluded themselves, on the one hand, and any Released Party or Parties.  However, costs shall be awarded as specified in this Final Order and Judgment and in the Settlement, such as the motion for an award of attorneys' fees and costs, as contemplated by the settling Parties in Section 11 of the Settlement, which may be filed at the appropriate time to be determined by the Court, and posted on the official Settlement website, www.VWCourtSettlement.com.

b. All related lawsuits pending in the MDL centralized in this Court by the Judicial Panel on Multidistrict Litigation on December 8, 2015 ("MDL"), *see In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 148 F. Supp. 3d 1367 (J.P.M.L. 2015), asserting claims pertaining to Eligible Vehicles, as between a Settlement Class Member who is not an opt-out or otherwise excluded, and any Released Party or Parties.

c. All related lawsuits pending in this MDL containing only claims between a Settlement Class Member who is not an opt-out or otherwise excluded, and against any Released Party or Parties, and pertaining to Eligible Vehicles.

8. Claims related to the 3.0-liter TDI diesel engine vehicles are **NOT DISMISSED.**

9. Class Members who have not properly opted out and any person purportedly acting on behalf of any Class Member(s) are **ENJOINED** from commencing, filing, initiating, instituting, pursuing, maintaining, enforcing or prosecuting, either directly or indirectly, any Released Claims in any judicial, administrative, regulatory, arbitral or other proceeding, in any jurisdiction or forum, against any of the Released Parties.  Nothing herein shall prevent any Class Member, or any person actually or purportedly acting on behalf of any Class Member(s), from taking any actions to dismiss his, her or its Released Claims.

10. Only those persons and entities who timely submitted valid requests to opt out of

47

United States District Court
Northern District of California

the Settlement Class are not bound by this Order, and any such excluded persons and entities are not entitled to any recovery from the Settlement.  A list of those persons can be found in Exhibit 1 to this Order.

11. Persons and entities that are determined by the Claims Administrator or the Court to be excluded from the Class, because his/her/its vehicle is not an "Eligible Vehicle," or for any other reason, are not bound by the Final Order and Judgment, and are not entitled to any recovery from the Settlement.

12. For Settlement Class Members who, because a Fix has not become available, withdraw from the class between May 1, 2018 and June 1, 2018, the statutes of limitations on claims asserted on behalf of those Settlement Class Members in this MDL shall be tolled from the date of the Preliminary Approval Order to the date such Settlement Class Members withdraw from the Settlement Class.

13. Settlement Class Counsel shall file their application for attorneys' fees and costs by **November 8, 2016**.  Any responses shall be due **December 20, 2016**, and any replies shall be due **January 17, 2016**.  The Court will advise the parties if a hearing is necessary.

14. The Court retains the exclusive jurisdiction to enforce, administer, and ensure compliance with all terms of the Settlement in accordance with the Settlement and this Order.

This Order disposes of Docket No. 1784.

**IT IS SO ORDERED.**

Dated: October 25, 2016

_____

CHARLES R. BREYER
United States District Judge

48