UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION ──────────────────────────────── / This Order Relates To: *United States of America v. Volkswagen AG et al.*, Case No. 16-cv-295 (N.D. Cal.) ──────────────────────────────── / | MDL No. 2672 CRB (JSC) **ORDER GRANTING THE UNITED STATES' MOTION TO ENTER PROPOSED AMENDED CONSENT DECREE** |

In September 2015, Volkswagen publicly admitted it had secretly installed a defeat device—software designed to cheat emissions tests and deceive federal and state regulators—in certain Volkswagen- and Audi-branded turbocharged direct injection ("TDI") diesel engine vehicles. Litigation quickly followed, and hundreds of actions were soon centralized in the above-captioned multidistrict litigation ("MDL"). One of these lawsuits is an action brought by the United States Department of Justice ("United States") on behalf of the U.S. Environmental Protection Agency ("EPA") for violations of the Clean Air Act, 42 U.S.C. § 7401 et seq.

After five months of intensive negotiations under the supervision of a Court-appointed Settlement Master, the United States; the People of the State of California, by and through the California Air Resources Board ("CARB") and Kamala D. Harris, Attorney General of the State of California (collectively, "California"); Volkswagen AG ("VW AG"); Audi AG; Volkswagen Group of America, Inc. ("VWGoA"); and Volkswagen Group of America Chattanooga Operations, LLC ("VW Chattanooga") (collectively, "Volkswagen") reached a Partial Consent Decree that resolves claims concerning the 2.0-liter TDI diesel engine vehicles. (*See* Dkt. No. 1605.) Now, just over one year after news of the defeat device became public, the United States moves for the entry of the proposed Amended Partial Consent Decree ("Consent Decree"). (Dkt.

No. 1973.) The Court held a hearing on the matter on October 18, 2016. For the reasons set forth below, the Court **GRANTS** the United States' Motion for Approval and Entry of the Partial Consent Decree.

## I.   BACKGROUND

### A.   Factual History

In September 2015, Volkswagen admitted it had secretly manufactured and installed a defeat device in nearly 500,000 2.0-liter TDI Volkswagen- and Audi-branded diesel engine vehicles ("subject vehicles"). The defeat device renders the subject vehicles' emissions controls inoperable unless the vehicles are undergoing emissions testing. It was only by installing the defeat device that Volkswagen was able to obtain Certificates of Conformity from EPA and Executive Orders from the California Air Resources Board ("CARB"); in reality, these vehicles emit nitrous oxides ("NOx") at a factor of up to 40 times the EPA-permitted limit.

### B.   Procedural History

In January 2016, the United States sued VW AG; VWGoA; VW Chattanooga; Audi AG; Dr. Ing. H.c. F. Porsche AG ("Porsche AG"); and Porsche Cars North America, Inc. ("PCNA") (collectively, "Defendants") for violations of Section 203 of the Clean Air Act, 42 U.S.C. § 7522. (*See* Dkt. No. 1 ¶¶ 102-31, U.S. Action.)[1] Specifically, the United States claims Defendants (1) imported and sold uncertified vehicles in violation of 42 U.S.C. § 7522(a)(1); (2) manufactured, sold, or installed a defeat device in violation of 42 U.S.C. § 7522(a)(3)(B); (3) tampered by rendering inoperative the certified pollution control system in violation of 42 U.S.C. § 7522(a)(3)(A); and (4) failed to report information required by EPA to determine whether Volkswagen acted in compliance with motor vehicle emissions standards in violation of 42 U.S.C. § 7522 (a)(2)(A). (*See id.*) The United States seeks civil penalties and injunctive relief. (*See id.* ¶¶ a-h.)

Soon after the United States filed its Complaint, the United States, the State of California,

---

[1] Unless otherwise noted, citations in this Order refer to documents filed in the MDL docket, 15-md-2672. Citations to the U.S. Action refer to documents filed in *United States of America v. Volkswagen AG et al.*, Case No. 16-cv-295.

and Volkswagen[2] engaged in intensive settlement negotiations under the guidance of Robert S. Mueller III, the Court-appointed Settlement Master and former Director of the Federal Bureau of Investigation. In April 2016, the parties reached an agreement in principle (*see* Dkt. No. 1439 at 4:25-5:7) and on June 28, 2016, the United States lodged its proposed Partial Consent Decree (*see* Dkt. No. 1605).

In accordance with 28 C.F.R. § 50.7(b), the United States held a 30-day comment period between July 6, 2016 and August 5, 2016. (Dkt. No. 1973 at 6-7; 8 Fed. Reg. 44051 (July 6, 2016).) A total of 1,195 private citizens, state and local government entities, businesses, and institutions and associations submitted comments. (Dkt. No. 1973 at 7; *see* Dkt. No. 1973-3.)

## C.    Consent Decree Terms

The Consent Decree partially resolves claims asserted by the United States for injunctive relief against Volkswagen concerning the 2.0-liter TDI diesel engine vehicles. (Dkt. No. 1973-1 at 4.) It also partially resolves California's 2.0-liter engine claims for injunctive relief for violations of California environmental and unfair competition laws.[3] (*Id.*) California joins the United States' Motion. (Dkt. No. 1974.) Volkswagen has submitted a statement of consent to and entry of the Consent Decree. (Dkt. No. 1975.)

The Consent Decree requires Volkswagen to remove or modify at least 85% of the subject vehicles registered as of September 17, 2015 across the United States ("National Recall Rate Target" for the "National Recall Rate") and in California ("California Recall Rate Target" for the "California Recall Rate") from the roads by June 30, 2019. (Dkt. No. 1973-1 ¶ 3; App'x A ¶ 6.1, Dkt. No. 1973-1.) To do so, Volkswagen must offer every owner and lessee of a subject vehicle a buyback or lease termination or an approved emissions modification (a "Fix"), if one is approved by EPA and CARB. (Dkt. No. 1973-1 ¶ 3; *see* App'x A-B, *id.*) If Volkswagen fails to meet the Recall Rate, it must pay additional monetary penalties. (App'x A ¶ 6.3, *id.*; *see* App'x D, *id.*)

---

[2] Porsche AG and PCNA are not among the Settling Defendants. The proposed Partial Consent Decree does not resolve any claims against either Porsche AG or PCNA.

[3] The Clean Air Act authorizes CARB as a co-regulator "to adopt and enforce standards and other requirements relating to the control of emissions from such vehicles or engines[.]" 42 U.S.C. § 7543(2)(A).

1  Specifically, Volkswagen must pay $85 million for each 1% that the National Recall Rate falls
2  short of the National Recall Rate Target and $13.5 million for each 1% that the California Recall
3  Rate falls short of the California Recall Rate Target. (App'x A ¶ 6.3.1-6.3.2, *id.*)
4        Volkswagen further agrees to make $2 billion of investments over ten years in projects that
5  support the increased use of zero emission vehicles ("ZEV"). (*See* App'x C, *id.*) Such projects
6  include, but are not limited to, the development, construction, and maintenance of ZEV-related
7  infrastructure. (*Id.*) Of the $2 billion, $1.2 billion shall be directed toward national ZEV
8  investments and $800 million shall be used for ZEV investments in California. (App'x C ¶¶ 2.1,
9  3.1; *id.*)
10       In addition, Volkswagen shall pay $2.7 billion into an Environmental Mitigation Trust to
11 fund projects to reduce emissions of NOx caused by the subject vehicles. (*See* App'x D, *id.*) Any
12 penalties Volkswagen pays for failing to meet the National and California Recall Rate Targets
13 shall be placed in the Environmental Mitigation Trust as well. (App'x A ¶¶ 6.3.1-6.3.2, *id.*)

14 **II.   LEGAL STANDARD**

15 Courts may approve a proposed consent decree when it is "fundamentally fair, adequate
16 and reasonable" and "conform[s] to applicable laws." *United States v. State of Oregon*, 913 F.2d
17 576, 580 (9th Cir. 1990). Courts consider consent decrees in light of the public policy favoring
18 settlement. *Sierra Club v. McCarthy*, 2015 WL 889142, at *5 (N.D. Cal. Mar. 2, 2015) (citing
19 *United States v. Comunidades Unidas Contra La Contaminacion*, 204 F.3d 275, 280 (1st Cir.
20 2000)). "This policy is strengthened when a government agency charged with protecting the
21 public interest 'has pulled the laboring oar in constructing the proposed settlement.'" *United*
22 *States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 746 (9th Cir. 1995) (quoting *United States v.*
23 *Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990)). But when a consent decree affects the
24 public interest, courts have a heightened responsibility to protect those interests so as to safeguard
25 those who did not participate in the negotiations of the decree. *Oregon*, 913 F.2d at 581. That
26 said, the consent decree need not "be 'in the public's *best* interest' if it is otherwise reasonable."
27 *Id.* (emphasis in original) (quoting *S.E.C. v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984)).
28 In applying the "fair, adequate and reasonable" standard, courts examine both procedural

and substantive fairness. *See United States v. Coeur d'Alenes Co.*, 767 F.3d 873, 877 (9th Cir. 2014); *Cannons Eng'g Corp.*, 899 F.2d at 86. Procedural fairness requires arms-length settlement negotiations, *In re Tutu Water Wells CERCLA Litigation*, 326 F.3d 201, 207 (3d Cir. 2003), and a "negotiation process [that] was 'fair and full of adversarial vigor,'" *United States v. Google Incorporated*, 2012 WL 5833994, at *2 (N.D. Cal. Nov. 16, 2012) (quoting *United States v. Telluride Co.*, 849 F. Supp. 1400, 1402 (D. Colo. 1994)). "[O]nce the court is satisfied that the decree was the product of good faith, arms-length negotiations, a negotiated decree is presumptively valid and the objecting party has a heavy burden of demonstrating that the decree is unreasonable." *Oregon*, 913 F.2d at 581 (internal quotation marks and citation omitted).

Substantive fairness requires courts to "find that the agreement is based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each potentially responsible party has done." *Arizona v. City of Tucson*, 761 F.3d 1005, 1012 (9th Cir. 2014), *cert. denied sub nom. ABB Inc. v. Ariz. Bd. of Regents*, 136 S. Ct. 30 (2015), *and cert. denied sub nom. Arizona v. Ashton Co. Inc. Contractors & Eng'rs*, 136 S. Ct. 30 (2015). Courts do not ask "whether the settlement is one which the court itself might have fashioned, or considers as ideal[.]" *Cannons Eng'g Corp.*, 899 F.2d at 84. "Rather, the court's approval is nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Oregon*, 913 F.2d at 581 (internal quotation marks omitted). The consent decree need only "represent[] a reasonable factual and legal determination." (*Id.* (internal quotation marks omitted).)

### III.   DISCUSSION

#### A.   Procedural Fairness

Courts evaluate procedural fairness by "look[ing] to the negotiation process and attempt[ing] to gauge its candor, openness, and bargaining balance." *Cannons Eng'g Corp.*, 899 F.2d at 86. The Consent Decree is the result of non-collusive, adversarial negotiations and is thus procedurally fair. *See* Dkt. No. 1977 ¶ 4; *Sierra Club*, 2015 WL 889142, at *12 (concluding proposed consent decree was procedurally fair where the consent was the result of "adversarial negotiations conducted over approximately six months"); *United States v. Chevron U.S.A., Inc.*,

380 F. Supp. 2d 1104, 1112 (N.D. Cal. 2005) ("[T]he process of negotiations was non-collusive and therefore procedurally fair." (citing *United States v. Colorado*, 937 F.2d 505, 509 (10th Cir. 1991)).

Over the course of five months, the United States, California, and Volkswagen (collectively, the "Parties") frequently met in Washington, D.C.; El Monte, California; and Ann Arbor, Michigan. (Dkt. No. 1973 at 9.) The Parties also held meetings with the Federal Trade Commission ("FTC") and the Plaintiffs' Steering Committee ("PSC") to discuss issues of mutual concern. (Dkt. No. 1973 at 9-10; *see* Dkt. No. 1977 ¶ 5.) The Settlement Master reports there were at least 40 such meetings and in-person conferences. (Dkt. No. 1977 ¶ 5.)

EPA's and CARB's attorneys and technical experts worked with Volkswagen to identify and address the complex and technical aspects of the Consent Decree. (Dkt. No 1973 at 9.) EPA and CARB also advised as to the engineering challenges of modifying the subject vehicles, as well as the environmental concerns addressed by the Consent Decree's mitigation and ZEV features. (*Id.*) In addition, the Parties consulted outside experts to further apprise the Parties of their negotiating positions. (*Id.*)

That negotiations were conducted under the Settlement Master's supervision suggests an absence of collusion. *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (while a neutral mediator's presence "is not on its own dispositive of whether the end product is a fair, adequate, and reasonable settlement agreement" it is nevertheless "a factor weighing in favor of a finding of non-collusiveness"). The number of meetings with the Parties, both alone and with the other MDL participants, further indicates a "negotiation process [that] was fair and full of adversarial vigor." *United States v. Pac. Gas & Elec.*, 776 F. Supp. 2d 1007, 1025 (N.D. Cal. 2011) (internal quotation marks omitted)). The Parties were also sufficiently informed to evaluate their claims and any offers of compromise. Accordingly, the Court concludes the Consent Decree is procedurally fair.

**B.    Substantive Fairness**

A consent decree is substantively fair when the "party . . . bear[s] the cost of the harm for which it is legally responsible." *Cannons Eng'g Corp.*, 899 F.2d at 87. To make this

6

determination, "the district court [must] be fully informed regarding the costs and benefits of the decree." *Chevron*, 380 F. Supp. 2d at 1113.

Having reviewed the terms of the Consent Decree, the Court finds it is substantively fair. The Clean Air Act has four goals:

> (1) to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population;
> (2) to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution;
> (3) to provide technical and financial assistance to State and local governments in connection with the development and execution of their air pollution prevention and control programs; and
> (4) to encourage and assist the development and operation of regional air pollution prevention and control programs.

42 U.S.C. § 7401(b).

The Consent Decree establishes both consumer and environmental remedies which further the Act's purpose. Consumer remedies remove the subject vehicles from the road in their current state, either through a buyback process or by fixing them. Environmental remedies negate the subject vehicles' excess NOx emissions and require Volkswagen to make significant investments in ZEV use and availability. This is consistent with the Clean Air Act and in the public interest.

1. Emissions Modification Recall

The Consent Decree also requires Volkswagen to offer consumers a free EPA- and CARB-approved Fix as an alternative to a buyback. (*See* App'x B, Dkt. No. 1973-1.) Appendix B of the Consent Decree also establishes the process for Volkswagen to submit a proposed Fix to EPA and CARB for approval; the technical standards each proposed Fix must meet; and the process by which EPA and CARB will approve or disapprove each proposed Fix. (App'x B §§ 3-5, *id.*) Volkswagen is also required to rigorously test each proposed Fix; Appendix B sets forth specific requirements for those testing procedures. (App'x B § 3, *id.*) Moreover, as part of the Fix, Volkswagen will remove all defeat devices in every vehicle which receives a Fix (a "modified vehicle") and place a label that among other things discloses the Fix, the fuel economy rating of the modified vehicle, and the emission control components installed as part of the Fix. (App'x B ¶¶ 3.1.3, 3.1.6.) Volkswagen will also offer consumers an extended emissions warranty that

covers the emission control system and engine long block.  (App'x B ¶ 3.9, *id.*)

The Consent Decree sets an aggressive timeline for Volkswagen to submit proposed Fixes. (*See* App'x B ¶ 4.2, Dkt. No. 1973-1.)  Volkswagen's first expected submittal deadline is November 11, 2016, less than a month away.  (*Id.*)  Though challenging, this schedule is necessary to avoid any undue delays in addressing the excess NOx emissions.  It also ensures consumers will have a sense as to when they will know whether a Fix is possible.  Indeed, a Fix is not guaranteed; the availability of one is contingent on EPA and CARB's approval and satisfaction that it meets the stringent requirements set forth in Appendix B.  If one does become available, the Consent Decree requires Volkswagen to offer it to every owner and lessee of the relevant subject vehicles free of charge and notwithstanding the owner's or lessee's participation in a class action settlement.[4]  (App'x A ¶¶ 5.1-5.1.2, *id.*)  Volkswagen must continue to offer consumers an approved Fix indefinitely.  (App'x A ¶ 5.2, *id.*)

Despite the fact that a proposed Fix must undergo stringent test procedures and receive EPA and CARB approval, the Fix still represents a compromise.  The United States recognizes there are "engineering limitations faced by all parties – that a fully-compliant 'fix' that brings these vehicles to their certified standard and has no detrimental impacts on vehicle performance is not achievable within a realistic timeframe." (Dkt. No. 1973 at 14.)  For that reason, Appendix B does not require any Fix to bring the subject vehicles to the same standard to which they originally certified.  (*Id.*)  Given the need to expeditiously address excess NOx emissions, the Court is satisfied this is a fair concession.  *See Oregon*, 913 F.2d at 581 ("[A] consent decree need not impose all the obligations authorized by law. [ ] Rather, the court's approval is nothing more than an amalgam of delicate balancing, gross approximations and rough justice." (internal quotation marks and citations omitted)).  While not a perfect solution, by EPA and CARB estimates, a Fix "will reduce NOx emissions from the vast majority of vehicles by approximately 80 to 90 percent compared to their original condition." (*Id.* at 12-13.)  This is certainly preferable to waiting for

---

[4] While the Consent Decree does not provide compensation for consumers, certain owners and lessees may be eligible for cash in addition to a Fix under the terms of the FTC's proposed Consent Order and the PSC's Consumer and Reseller Dealership Class Action Settlement Agreement ("Class Action Settlement").  (*See* Dkt. Nos. 1607, 1685.)

Volkswagen to develop a Fix that fully brings the subject vehicles to their original certification; during that time, vehicles would continue emitting NOx emissions at unacceptable levels. The proposed solution also "avoids the adverse environmental consequences that would result from scrapping nearly half a million noncompliant cars." (*Id.* at 14.) Moreover, a Fix cannot be viewed in a vacuum; the Consent Decree further requires environmental remediation which will also address excess emissions. Together, this significantly reduces emissions caused by the subject vehicles. This compromise is therefore fair and consistent with both the Consent Decree's ultimate goal of reducing excess NOx emissions and the CAA's purpose of protecting air quality in the interests of public health and welfare. *See* 42 U.S.C. § 7401(b)(1).

There were many comments regarding the difficulty of evaluating the Fix option. (Dkt. No. 1973-12 at 5.) Specifically, commenters expressed concerns regarding the uncertainty of when a Fix may become available and the effects a Fix may have on vehicle performance. (*Id.*) But the schedule set forth in Appendix B ensures Volkswagen will submit a proposed fix in the near future. The Consent Decree also requires Volkswagen to notify consumers if a Fix is approved or disapproved before they must select a buyback or a Fix and to provide a detailed emissions modification disclosure that explains how the Fix will likely impact vehicle performance and emissions control. (*See* App'x B ¶ 5.1.1-5.1.2, Dkt. No. 1973-1.) This allows consumers the opportunity to evaluate their options and choose accordingly. If a consumer decides a Fix is not appropriate, the buyback option remains available. Given that consumers will have the ability evaluate any approved Fix and may elect another remedy if the Fix is unsatisfactory, the Court cannot conclude this remedy is substantively unfair.

2.  Buyback Recall and Lease Termination

Because a Fix cannot bring the subject vehicles into full compliance with emissions standards, the Consent Decree requires Volkswagen to also offer every consumer the choice of a buyback or a lease termination. (*See* App'x A, Dkt. No. 1973-1.) Appendix A requires Volkswagen to purchase subject vehicles from owners at no less than "the cost of retail purchase of a comparable replacement vehicle of similar value, condition, and mileage as of September 17, 2015" ("Retail Replacement Value"). (App'x A ¶¶ 2.13, 4.1, *id.*) The Retail Replacement Value

is consistent with the buyback price set forth in the Class Action Settlement. (*See* Dkt. No. 1685 ¶ 4.2.1.) Offering a buyback or lease termination further ensures the subject vehicles will be removed from the roads. Indeed, this mechanism offers an immediate, concrete solution that addresses the subject vehicles. While a Fix is still forthcoming and not guaranteed, Volkswagen must begin offering buybacks and lease terminations within 15 days of the Consent Decree's effective date. (*See* App'x A ¶¶ 4.1, 4.3.)

Approximately 450 commenters expressed dissatisfaction about the compensation for a buyback, arguing compensation should be based on another valuation, such as retail value, private sale value, or purchase price, or should include related costs like sales tax, aftermarket add-ons, and extended warranties. (Dkt. No. 1973-12 at 1.) The issue of compensation, however, is a matter for the Class Action Settlement, which focuses on consumers. In contrast, the Clean Air Act's concern—and thus the Consent Decree's as well—is the protection of air quality as it relates to the public health and welfare. *See* 42 U.S.C. § 7401(b)(1). That said, requiring Volkswagen to purchase the subject vehicles is critical to the success of the implementation of the buyback program. Without an offer of monetary compensation in exchange for the return of their vehicles, consumers would have little incentive to participate in a buyback, thus thwarting attempts to remove the vehicles and reduce the excess emissions. Notably, the exact buyback price is not determined by the Consent Decree; rather, the Class Action Settlement and the FTC Consent Order dictate the exact compensation Volkswagen will pay.

3. <u>Environmental Mitigation Trust</u>

Volkswagen also agrees to create an Environmental Mitigation Trust to fund projects that reduce NOx emissions. (App'x D ¶ 2.0.3, Dkt. No. 1973-1.) The Consent Decree requires Volkswagen to make three payments of $900 million over the course of three years for a total of $2.7 billion. (Dkt. No. 1973-1 ¶ 14.) States, Indian tribes, Puerto Rico, and the District of Columbia may recommend candidates to serve as Trustee to manage the Trust; the United States will then move the Court to appoint a Trustee to manage the Trust. (*Id.* ¶¶ 15(d)-(e).)

Upon the Trust's establishment, those same governmental entities may apply to become beneficiaries of the Trust by submitting a Certification Form. (App'x D ¶ 4.0, Dkt. No. 1973-1;

*see* App'x D-1; *id.*)  There are a number of eligible mitigation projects in which beneficiaries may participate, for instance, projects that to reduce NOx emissions in freight trucks; school, shuttle, or transit buses; ferries and tugs; and airport ground support equipment.  (App'x D-2, *id.*)  Each beneficiary can request an initial allocation of funds as set forth in Appendix D-1.  (*See* App'x D-1, *id.*)  The initial allocation is based on the number of subject vehicles registered in each jurisdiction; the minimum funding allocation is $7.5 million for each beneficiary.  (Dkt. No. 1973 at 17.)  The Trustee will adjust these amounts based on the participation of potential beneficiaries.  (*Id.*)  Moreover, any monetary penalties Volkswagen pays for failing to achieve the National or California Recall Rate Target will be invested in the Trust.  (App'x A ¶ 6.3, Dkt. No. 1973-1.)

According to EPA, "the amount that Settling Defendants are required to initially contribute to the trust fund is sufficient to fund projects to fully mitigate the total, lifetime excess NOx emissions from the 2.0 liter vehicles."  (Dkt. No. 1973 at 18.)  This "ensures that Settling Defendants appropriately mitigate all past and future excess NOx pollution caused by the 2.0 liter vehicles that do not meet emissions standards."  (*Id.*)  Accordingly, the Court finds the establishment of the Environmental Mitigation Trust substantively fair.  Funding projects to mitigate NOx emissions furthers both the public interest and the Clean Air Act's goals by taking steps to ensure cleaner air.

    4. <u>ZEV Investments</u>

In addition to funding the Environmental Mitigation Trust, the Consent Decree requires Volkswagen to invest $2 billion over a ten year period in ZEV technology.  (*See* App'x C, Dkt. No. 1973-1.)  The $2 billion shall be divided such that $1.2 billion will be directed toward nationwide ZEV investments and $800 million will be put toward California ZEV investments.  (App'x C ¶¶ 2.1, 3.1; *id.*)  Volkswagen is required to solicit from state, local, and tribal governments and federal agencies suggestions on a national investment plan.  (App'x C ¶ 2.3, *id.*)  In accordance with Appendix C, Volkswagen can make three types of investments in the national plan: (1) installation of ZEV infrastructure, (2) development of brand-neutral educational or public outreach programs that increase public awareness of ZEVs, or (3) development of programs to increase public exposure and/or access to ZEVs.  (App'x C ¶ 2.1, *id.*; *see* App'x C ¶¶ 1.10.1-

11

1.10.3.) With regard to the California plan, Volkswagen will also invest in the development of a new heavy-duty ZEV fueling infrastructure; a scrap and replace program; and a "Green City" initiative, which involves "the operation of ZEV car sharing services, zero emission transit applications, and zero emission freight transport projects." (App'x C ¶¶ 1.10.1-1.10.4, *id.*)

The Court finds the ZEV investment requirement substantively fair. Whereas the Environmental Mitigation Trust seeks to reduce the harm caused by the subject vehicles, the ZEV investments promotes actual environmentally-friendly vehicles. A commitment of investments in such technology furthers the purpose of the Clean Air Act by promoting the research and development of programs that address air pollution. *See* 42 U.S.C. § 7401(b)(2).

### IV.    CONCLUSION

Having reviewed the proposed Consent Decree, the Court **GRANTS** the United States' Motion. The Consent Decree is a reasonable settlement that is the result of non-collusive and adversarial negotiations. Moreover, the Consent Decree takes a multifaceted approach to mitigate the harm caused by the 2.0-liter diesel engine vehicle and to reduce future NOx emissions. These actions are reasonable and advance the purposes of the Clean Air Act.

This Order disposes of Docket No. 1973.

**IT IS SO ORDERED.**

Dated: October 25, 2016

CHARLES R. BREYER
United States District Judge