Steve W. Berman (*Pro Hac Vice*)
Thomas E. Loeser (SBN 202724)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite #3300
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com

Richard N. Sox (*Pro Hac Vice*)
BASS SOX MERCER
2822 Remington Green Circle
Tallahassee, FL 32308
Telephone:  (850) 878-6404
Facsimile:  (850) 942-4869
rsox@dealerlawyer.com

*Counsel for Plaintiffs  Napleton Orlando Imports,
LLC, Napleton Sanford Imports, LLC, Napleton
Automotive of Urbana, LLC and J. Bertolet, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: VOLKSWAGEN 'CLEAN DIESEL' MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 02672-CRB (JSC) |
| This document relates to: | PLAINTIFF J. BERTOLET, INC.'S NOTICE OF MOTION, MOTION, AND MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF FRANCHISE DEALER SETTLEMENT AGREEMENT |
| *Napleton Orlando Imports, LLC et al. v. Volkswagen Group of America, Inc. et al.*, Case No. 3:16-cv-02086-CRB | |
| NAPLETON ORLANDO IMPORTS, LLC d/b/a NAPLETON'S VOLKSWAGEN OF ORLANDO, an Illinois limited liability company, NAPLETON SANFORD IMPORTS, LLC d/b/a NAPLETON'S VOLKSWAGEN OF SANFORD, an Illinois limited liability company, and NAPLETON AUTOMOTIVE OF URBANA, LLC d/b/a NAPLETON VOLKSWAGEN OF URBANA, a Florida limited liability company, individually, and J. BERTOLET, INC. dba J. BERTOLET VOLKSWAGEN, on behalf of itself and all similarly situated persons and entities, | Hearing:  January 18, 2017<br>Time:  8:00 a.m.<br>Court:  6, 17th Floor<br><br>The Honorable Charles R. Breyer |
| Plaintiffs, | |

1          v.

2    VOLKSWAGEN GROUP OF AMERICA, INC., a
     New Jersey Corporation,  VW CREDIT, INC., a
3    Delaware corporation, VOLKSWAGEN AG, a
     German corporation, ROBERT BOSCH, LLC, a
4    Michigan limited liability company, and ROBERT
     BOSCH GmbH, a German corporation.
5

6                         Defendants.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR FINAL APPROVAL
OF FRANCHISE DEALER SETTLEMENT
Case No. 02672-CRB (JSC)
010525-11 918432 V1

1

## NOTICE OF MOTION AND MOTION

2   PLEASE TAKE NOTICE that on January 18, 2017, at 8:00 a.m., or as soon thereafter as

3 the matter may be heard by the Honorable Judge Charles R. Breyer of the United States District

4 Court of the Northern District of California, San Francisco Division, in Courtroom 6, located at

5 450 Golden Gate Avenue, San Francisco, California, Plaintiff J. Bertolet, Inc., individually and on

6 behalf of a proposed class of Volkswagen-branded franchise dealers, will and hereby does move

7 the Court pursuant to Federal Rules of Civil Procedure 23 for an order granting final approval to

8 the proposed Franchise Dealer Class Settlement of this case with the Volkswagen Defendants.[1]

9   This unopposed motion is based on this notice of motion and motion for final approval of

10 settlement, the following memorandum of points and authorities, the declarations in support, the

11 accompanying settlement agreement and Court-approved notice, the pleadings and the papers on

12 file in this action, and such other matters as the Court may consider.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

---

27 [1] Volkswagen Defendants, as defined in the Franchise Dealer Class Action Settlement, are Volkswagen AG, Volkswagen Group of America, Volkswagen Credit Incorporated, and

28 Volkswagen Group of America Chattanooga Operations, LLC.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

I.    BACKGROUND .................................................................................................. 2

    A.    Settlement Class ..................................................................................... 2

    B.    Settlement Consideration ....................................................................... 2

        1.    New cash payments representing lost value of dealership investment ................................................................................. 2

        2.    Continuation of incentives and other support payments. ............ 3

        3.    Standstill of capital investment obligations ................................ 3

        4.    Treatment of dealer inventory of Volkswagen diesel vehicles. ....................................................................................... 4

    C.    Release of Claims .................................................................................. 5

    D.    The Value of the Settlement Exceeds Class Counsel's Estimate of Class Damages ........................................................................................ 6

    E.    Notice to the Class ................................................................................. 7

    F.    Claims-Paid Settlement ......................................................................... 8

    G.    There Are No Costs of Settlement Administration Chargeable to the Class ................................................................................................. 8

    H.    Attorneys' Fees ...................................................................................... 9

II.   ARGUMENT ....................................................................................................... 9

    A.    Plaintiffs Have Complied with Rule 23 Notice Requirements .............. 10

    B.    The Settlement Is the Result of Arm's-Length Negotiations ................ 11

    C.    The Settlement Is Substantively Fair, Reasonable and Adequate Resolution of the Franchise Dealer Litigation ...................................... 11

        1.    Plaintiff's case is strong, thus the substantial recovery is warranted. ................................................................................... 11

        2.    There would be substantial risk, expense and complexity in continuing the litigation, which could last for years. ................ 12

        3.    The Franchise Dealer Class carries material certification risk. ............................................................................................ 12

4.  The settlement is by all measures substantial and adequately reflects the magnitude of harm to the Franchise Dealer Class. ................................................................. 13

5.  Beyond the substantial discovery discussed in the Consumer Settlement, Dealer Class Counsel obtained and reviewed discovery specifically geared to the unique aspects of franchise dealers' claims against Volkswagen. ......................... 14

6.  In light of the unique facts and circumstances of this case, that it is being settled at an early stage of the case is not a concern. ................................................................. 14

7.  Plaintiffs' counsel are highly experienced class action and automotive dealer litigators and they fully support the Settlement. ............................................................. 15

8.  The extensive involvement of government in response to the Volkswagen emissions scandal supports approval of this Settlement. ...................................................... 16

9.  The Settlement is broadly supported by the Franchise Dealer Class. ..................................................... 16

D.  The Proposed Plan of Allocation is Fair ................................ 16

III.  THE LIMITED OBJECTIONS TO THE SETTLEMENT ARE ILL-FOUNDED AND SHOULD BE OVERRULED ........................... 18

A.  Objections to the Amount of Money a Franchise Dealer Class Member Will Receive Should Be Overruled .................... 19

1.  Serra Volkswagen. ................................................. 20

2.  Eich Motor Company ............................................ 21

3.  Speedcraft Volkswagen. ........................................ 22

4.  Reydel Volkswagen. .............................................. 23

5.  Smith Volkswagen. ................................................ 23

6.  Steven Volkswagen. .............................................. 24

B.  Objections to the Scope of the Settlement Release ................ 25

1.  Palisades Volkswagen. ........................................... 25

2.  Hansel VW. ........................................................... 32

3.  Mission Bay Motors, Inc. dba City Volkswagen. .......... 34

IV.  CONCLUSION ..................................................................... 34

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

## CASES

4

5

*In re Bluetooth Headset Prods. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) ...........................................................................................11

6

*Boyd v. Avanquest N. Am., Inc.*,
    2015 WL 4396137 (N.D. Cal. July 17, 2015) ...................................................................30

7

8

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    2016 WL 3648478 (N.D. Cal. July 7, 2016) .....................................................................17

9

10

*Chun-Hoon v. McKee Foods Corp.*,
    716 F. Supp. 2d 848 (N.D. Cal. 2010) ..............................................................................18

11

*Churchill Vill., LLC v. GE*,
    361 F.3d 566 (9th Cir. 2004) ......................................................................................10, 15

12

13

*In re Citric Acid Antitrust Litig.*,
    145 F. Supp. 2d 1152 (N.D. Cal. 2001) .......................................................................16, 17

14

15

*In re Currency Conversion Fee Antitrust Litig.*,
    263 F.R.D. 110 (S.D.N.Y. 2009), *aff'd*, 405 F. App'x 532 (2d Cir. 2010) .................................7

16

*Daniels v. Aeropostale West, Inc.*,
    2014 WL 2215708 (N.D. Cal. May 29, 2014)...................................................................30

17

18

*Ellis v. Naval Air Rework Facility*,
    87 F.R.D. 15 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981).........................................15

19

20

*In re Google Referrer Header Privacy Litig.*,
    87 F. Supp. 3d 1122, 1137 (N.D. Cal. 2015) ...................................................................18

21

*Hanlon v Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) .........................................................................................19

22

23

*Kim v. Space Pencil, Inc.*,
    2012 U.S. Dist. LEXIS 169922 (N.D. Cal. Nov. 28, 2012) .......................................................20

24

25

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012) ..........................................................................................10

26

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) ..........................................................................................11

27

28

*In re NASDAQ Market-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998).........................................................................................7

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
  221 F.R.D. 523 (C.D. Cal. 2004) ......................................................15, 18

*Nat'l Super Spuds, Inc. v. New York Mercantile Exch.*,
  660 F.2d 9 (2d Cir. 1981) ..............................................................31

*In re NFL Players Concussion Injury Litig.*,
  821 F.3d 410 (3d Cir. 2016) .............................................................9

*O'Connor v. Uber Techs., Inc.*,
  2016 WL 4398271 (N.D. Cal. Aug. 18, 2016) ..........................................31

*Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*,
  688 F.2d 615 (9th Cir. 1982) ...............................................9, 10, 15

*In re Omnivision Techs.*,
  559 F. Supp. 2d 1036 (N.D. Cal. 2007) ..............................................17

*In re Online DVD Rental Antitrust Litig.*,
  779 F.3d 934 (9th Cir. 2015) ...........................................................10

*Perkins v. LinkedIn Corp.*,
  2016 U.S. Dist. LEXIS 18649 (N.D. Cal. Feb. 16, 2016) .............................20

*Rodriguez v. West Publ'g Corp.*,
  563 F.3d at 965 ...................................................................7, 10, 11

*Ross v. Trex Co., Inc.*,
  2013 WL 6622919 (N.D. Cal. Dec. 16, 2013) ..........................10, 21, 22, 23

*Schechter v. Crown Life Ins. Co.*,
  2014 WL 2094323 (C.D. Cal. May 19, 2014) ........................................18

*Stokes v. Interline Brands, Inc.*,
  2014 WL 5826335 (N.D. Cal. Nov. 10, 2014) ......................................31

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  2011 WL 7575004 (N.D. Cal. Dec. 27, 2011) ......................................17

*Torrisi v. Tuscon Elec. Power Co.*,
  8 F.3d 1370 (9th Cir. 1993) ............................................................9

*UAW v. GMC*,
  497 F.3d 615 (6th Cir. 2007) .........................................................12

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*,
  309 F.3d 978 (7th Cir. 2002) .........................................................23

*Van Bronkhorst v. Safeco Corp.*,
    529 F.2d 943 (9th Cir. 1976) ....................................................................................9

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004) .....................................................................................7

## STATUTES

Cal. Vehicle Code § 11713.3(g)(3)(A) ......................................................................33

## OTHER AUTHORITIES

Fed. R. Civ. P. 23(e)(1) ............................................................................................10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.     INTRODUCTION

Class Representative Plaintiff seeks final approval of his settlement.

On October 18, 2016, this Court granted preliminary approval of the settlement and ordered dissemination of notice to class members.[2]  Since that time, Volkswagen provided notice in accordance with the Court's order and Volkswagen and Class Counsel confirmed that every class member received actual notice.  Class Counsel is pleased to report that out of 651 eligible Class members,[3] all of whom received notice, only seven individual dealerships opted out[4] and just eight objected.[5]  With 637 out of 651 (98%) of the Franchise Dealer Class Members participating in the settlement without objection, the reaction of the class to the settlement was overwhelmingly positive.

This comes as no surprise.  This settlement with a $1.193 billion[6] cash component, and additional non-cash benefits worth at least $444 million more, represents an outstanding result for the class—delivering approximately $1.85 million cash on average to each Volkswagen-branded franchise dealer in the United States, *and* providing valuable non-monetary benefits including: (1) not offsetting prior financial support payments totaling over $270 million; (2) continuation of VIP and CSI incentive payments for a year, which at $600 per car will amount to over $172 million in incentives; (3) a freeze period on capital investment requirements; and (4) disposition of TDI vehicles on dealers' lots.  The conservative value of the Settlement, at $1.637 billion, represents

---

[2] ECF No. 2077.

[3] There are 652 Volkswagen Franchise dealers in the United States.  However, during the negotiation of the Settlement, one dealer, Volkswagen of Newton, entered into an individual settlement with Volkswagen that released its claims in this action.  It was therefore not eligible to participate in this Settlement as a Class Member.  *See* Declaration of Steve W. Berman In Support of Final Approval ("Berman Decl."), ¶ 2.

[4] Of these seven individual dealerships, three are owned by a single entity, and the other four by separate entities.

[5] Nine notices of objection were received.  However, one of the nine objections is from a dealership that is not a Class Member because it was not acquired until August 1, 2016.  *See infra.*

[6] With 100% participation, the cash component of the settlement would have been $1.208 billion.  *See* ECF No. 2077 at p. 5.  The cash component of the Settlement for the seven dealerships that elected to opt-out of the Settlement and Newton Volkswagen (*see, supra,* n.3) was $14.613 million, which will, therefore, not be paid out.  The total actual cash payments by Volkswagen to Class Members will be $1,193,386,553.01.  *See* Berman Decl., ¶ 2.

1   *more than the high-end estimate of damages for the Class of $1.621 billion*, had they prevailed at

2   trial.  All factors regarding the fairness, adequacy, and reasonableness of the settlement support

3   final approval.

4        Plaintiffs respectfully request the Court to grant their motion.

5   ## I.      BACKGROUND

6        Plaintiffs included a detailed discussion of the procedural history of the case and their

7   litigation efforts in their motion for preliminary approval, filed on September 30, 2016.[7]

8   **A.     Settlement Class**

9        The proposed settlement class (the "Franchise Dealer Class") is the same class defined in

10   the Complaint and provisionally certified by the Court in its October 18, 2016 Order:

11           All persons or entities who owned a Volkswagen-branded franchise
             dealership that operated in the United States as of September 18, 2015.

12   The class representative "supports the settlement as reasonable, adequate, and fair to all class

13   members."[8]

14   **B.     Settlement Consideration**

15        **1.     New cash payments representing lost value of dealership investment.**

16        Volkswagen will pay new cash totaling $1,193,386,553.01 to Settlement Class Members.

17   The funds will be allocated to Settlement Class Members *pro rata*, based upon the ratio of each

18   dealer's November 2015 dealer support payments from Volkswagen to the total of all dealer

19   support payments being paid by Volkswagen that month.  No claim form is necessary, every

20   Settlement Class Member who has not opted out will automatically receive their allocated share of

21   the cash payment.  On average, Settlement Class Members will receive $1,853,084.71.[9]

22        Fifty percent of each Settlement Class Members' cash benefit (the "Initial Payment") will

23   be paid up front.  Settlement Class Members who return an executed Individual Release will get

24   their Initial Payment within 30 days of the Settlement Opt-Out Date, or the date a Settlement Class

25   Member executes and returns the Individual Release, if after the opt-out date.  As of the filing of

---

26       [7] ECF No. 1970.

27       [8] *See* Berman Decl., ¶ 4.

28       [9] *See id.*, ¶ 3.

this motion, 350 Settlement Class Members have already returned an Individual Release and will receive their Initial Payment prior to the end of December.[10]  Settlement Class Members who do not execute the Individual Release will receive their Initial Payment with 30 days of the Effective Date of the Settlement.  For all Settlement Class Members, the remaining 50% of the cash payment will be paid in 18 equal monthly installments beginning 30 days after each Settlement Class Members' Initial Payment.  Cash payments under the Settlement are assignable by Settlement Class Members through approved buy/sale agreements of dealerships under the terms set forth in the Settlement Agreement.

### 2.    Continuation of incentives and other support payments.

Volkswagen agrees to continue its "VIP" and "CSI" incentive payments to dealers at current levels until November 23, 2017.  VIP and CSI incentive payments total $600 per car sold. With average sales volume of 24,000 per month for all dealers, this benefit is worth approximately $14.4 million per month, and $172.8 million for the agreed year of continued payments.[11]

Moreover, Volkswagen has agreed to pay its monthly dealer support payments through December 2016, and agreed in the Settlement that these payments *would not offset* the cash component of the Settlement described above.  These support payments totaled approximately $16.67 million per month, meaning the negotiated continuation and non-offset basis is worth approximately $267 million.[12]

### 3.    Standstill of capital investment obligations.

To the extent any Settlement Class Member is obligated under an existing agreement with Volkswagen to make capital investments (*i.e.*, remodel, new construction, etc.) in its dealership, the Settlement Class Member may defer, at its option, such obligations until November 23, 2018, under the terms set forth in the Settlement Agreement.  Volkswagen also agreed not to require capital investment in connection with the sale of a dealership for any sale that is formally proposed to Volkswagen on or before November 23, 2017, under the terms set forth in the Settlement

---

[10] *See id.*, ¶ 5.

[11] *See id.*, ¶ 6.

[12] *See id.*, ¶ 7.

1   Agreement.  Though difficult to quantify, these provisions are highly valuable as: (1) they allow

2   current dealers to concentrate their efforts and resources on the resurgence of the Volkswagen

3   brand, instead of capital investments; and (2) if a dealer choses to sell his dealership, it can do so

4   without saddling a prospective purchaser with expensive capital investment obligations.[13]

5         **4.      Treatment of dealer inventory of Volkswagen diesel vehicles.**

6         For used diesel vehicles for which Volkswagen is unable to provide an approved emissions

7   modification ("AEM"), Volkswagen will repurchase such vehicles from the Dealer Settlement

8   Class Member at the same gross amount that an Eligible Owner would receive (a) under the

9   Consumer Settlement Agreement for 2.0-liter used No AEM Vehicles, and (b) under a future

10  potential consumer settlement, if any, for 3.0-liter used No AEM Vehicles.  For new diesel vehicles

11  with no AEM, Volkswagen will repurchase such vehicles for the net wholesale cost that was paid

12  by the Settlement Class Member for such vehicles.  For all vehicles repurchased from Dealer

13  Settlement Class Members, Volkswagen will pay the reasonable carrying and storage costs of such

14  vehicles from the date such vehicle is determined to have no AEM until Volkswagen retrieves

15  them, and if it fails to retrieve them within one year of repurchase, Dealer Settlement Class

16  Members may ship such cars to Volkswagen at Volkswagen's sole expense.

17        For new, unused Model Year 2015 2.0L diesel vehicles for which Volkswagen is able to

18  provide an AEM, Volkswagen will offer a TDI Lease Program and a TDI Service Loan Program.

19  The TDI Lease Program will provide consumers leasing such AEM Vehicles attractive lease terms

20  with substantial subvention.  The lease program will be administered by VCI, and VCI will

21  maintain ownership of the New MY15 AEM Vehicles placed into the lease program.

22        The TDI Service Loan Program will be a 12-month service loan car program for the New

23  MY15 AEM Vehicles currently in the inventory of Dealer Settlement Class Members whereby

24  Dealer Settlement Class Members will be charged a monthly rental fee below the current standard

25  price of 2% of MSRP per month, and have the option, but not the requirement, to buy such New

26

27

28
    _____
        [13] *See id.*, ¶13.
    MOTION FOR FINAL APPROVAL
    OF FRANCHISE DEALER SETTLEMENT
    Case No. 02672-CRB (JSC)                    - 4 -
    010525-11 918432 V1

MY15 AEM Vehicles at the end of the 12-month program if all of the steps of the AEM have been completed for the vehicle(s).

Resolving the problem of new and used TDI vehicles on dealers' lots is a highly valuable benefit to dealers as it clears their precious retail and inventory space of unsalable vehicles and frees dealers from ongoing carrying and disposition costs of these orphaned Volkswagen models.[14]

## C.     Release of Claims

If the settlement becomes final, Class Representative Plaintiff and Settlement Class Members will release all claims in the Complaint against Volkswagen AG, Volkswagen Group of America, Inc., Volkswagen Credit, Inc., and Volkswagen Group of America Chattanooga Operations, LLC.[15]   Released Claims include:  (1) all claims related in any way to the TDI Matter; (2) all claims related in any way to VWGoA's previously announced goals or objectives for U.S. sales volume growth, including any claims related in any way to incentives and other support payments or programs from VWGoA to any Volkswagen-branded franchise dealer related to such goals and any volume shortfall; (3) all claims for monetary damages arising before the Effective Date of this Franchise Dealer Class Agreement that relate in any way to allocation complaints or irregularities (but allocations may be asserted by any dealer as a defense to a franchise termination by VWGoA); (4) all claims for monetary damages arising before the Effective Date of this Franchise Dealer Class Agreement that relate in any way to the method upon which VWGoA measures the sales and service performance of its Volkswagen-branded franchise dealers or sets the sales and service objectives for its Volkswagen-branded franchise dealers (but the method upon which VWGoA measures the sales and service performance may be asserted by any Volkswagen-branded franchise dealer as a defense to a franchise termination by VWGoA); and (5) all discrimination or coercion claims arising before the Effective Date of this Franchise Dealer Class Agreement related in any way to the sale, incentivization or use of VCI wholesale and retail

---

[14] *See id.*, ¶ 14.

[15] For those Class Members who submitted Individual Releases in order to obtain prompt payment of Settlement proceeds, their releases will take effect upon transmittal of the Initial Payment.

MOTION FOR FINAL APPROVAL
OF FRANCHISE DEALER SETTLEMENT
Case No. 02672-CRB (JSC)                                    - 5 -
010525-11 918432 V1

1    financing products.  Except as specifically enumerated above, all other claims are expressly

2    preserved and are not released.  Claims relating to Robert Bosch GmbH and Robert Bosch, LLC

3    (collectively, "Bosch") are not subject to any release in the Agreement.  Volkswagen has clarified

4    for its dealer network and every Class Member that it will continue to indemnify Class Members

5    for consumer claims: (a) as set forth in each dealer's Dealer Agreement and (b) that a dealer might

6    have against Volkswagen pursuant to federal and state law.  Except for indemnity obligations and

7    the right to assert as a defense to any termination of dealership by Volkswagen to the extent set

8    forth in Section 9.3 of the Settlement Agreement, Settlement Class Members will release all the

9    claims that were brought on their behalf in this litigation, which will essentially wipe the slate

10   clean as to any disputes they have with Volkswagen as of the Effective Date of the Settlement.

11   **D.      The Value of the Settlement Exceeds Class Counsel's Estimate of Class Damages**

12           A conservative estimate of the value of the Settlement is the sum of: (1) the cash

13   component of the settlement, $1.193 billion; (2) the value of the monthly support payments being

14   in addition to and not offsetting the cash component, $267 million; and (3) the value of the

15   continuation of VIP and CSI incentives, $172.8 million.  This $1.633 billion valuation is

16   conservative because it makes no allowance for the value of capital investment requirement freeze

17   and disposition of affected TDI vehicles, both of which provide undeniable benefits and savings to

18   Class Members.

19           Dealer Class Counsel's economic expert estimates that based upon lost profits, total single

20   damages to dealers in this case range from $1,472 billion to $1,621 billion.[16]  This estimate is

21   based upon the work of Fontana Group, noted and well-respected economic experts widely used in

22   large-scale automotive class litigation.[17]  Fontana group arrived at this estimate by determining the

23   present value of dealers' lost profits and lost blue sky, based on actual historic dealer financial

24   performance.[18]

25

26           [16] *See* Declaration of Edward M. Stockton ("Stockton Decl.") at ¶ 7.

27           [17] *See id.*, ¶ 13 & Exh. 1.

28           [18] *See id.*, ¶ 7.

MOTION FOR FINAL APPROVAL
OF FRANCHISE DEALER SETTLEMENT
Case No. 02672-CRB (JSC)                                    - 6 -
010525-11 918432 V1

1    The value of the Settlement thus represents a recovery exceeding the high-end estimate of

2    likely singles damages that could have been obtained had this case proceeded through motions to

3    dismiss, a contested certification process, summary judgment, trial, and certain appeals—a process

4    which would likely have taken several years, at least.

5    A one-hundred percent recovery at this stage of litigation is remarkable, and truly an

6    extraordinary result.  The Ninth Circuit has affirmed the approval of settlements delivering far less,

7    with substantial fanfare.  In *Rodriguez v. West Publ'g Corp.*, the district court approved a $49

8    million antitrust settlement, representing thirty percent of the total damages, estimated by the class

9    expert to be $158 to $168 million.[19]  The Ninth Circuit held that the "negotiated amount is fair and

10   reasonable no matter how you slice it" and that the fact of a cash settlement was a "good indicator

11   of a beneficial settlement."[20]  Here obviously, where Plaintiffs have obtained 100%, the result is at

12   least as good.

**E.    Notice to the Class**

13   The proposed notice plan was carried out pursuant to this Court's preliminary approval

14   order.

15   *Notice was sent via overnight express delivery.*  On or before October 25, 2016, the Court-

16   approved Class Notice was sent by VWGoA via overnight express delivery to each of the 652

17   Settlement Class Members. Thereafter, each Settlement Class Member was contacted by Class

18   Counsel to ensure that the Class Notice was received.  To the best of Class Counsels' and

19   Volkswagen's knowledge, every Settlement Class Member received the Class Notice package.[21]

20   *Dedicated case website and phone line.*  Though not required by the Court's Preliminary

21   Approval Order, Class Counsel created a case website that it made publicly available.[22]  Class

22   Counsel posted the full settlement agreement, the operative complaint, the Court's order granting

---

[19] 563 F.3d 948, 964-65 (9th Cir. 2009).

[20] *Id.  See also In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir. 2004) (approving $44.5 settlement, recovery of 33% of single damages); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 124 (S.D.N.Y. 2009) (approving $336 million settlement, recovery of 31% of single damages), *aff'd*, 405 F. App'x 532 (2d Cir. 2010); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 478 (S.D.N.Y. 1998) (approving settlements of $1.027 billion, recovery of 33%-41% of single damages).

[21] *See* Berman Decl., ¶ 10.

[22] *See id.*, ¶ 11; www.vwdealersettlement.com.

MOTION FOR FINAL APPROVAL
OF FRANCHISE DEALER SETTLEMENT
Case No. 02672-CRB (JSC)                          - 7 -
010525-11 918432 V1

preliminary approval, the long form notice, and the Individual Release.[23]  The website was updated to include Volkswagen's clarification that the Release in this case did not include its indemnity obligations under its dealer agreements and applicable federal and state laws; and it was updated to include Class Counsels' November 9, 2016 filing providing information concerning its eventual request for attorneys' fees and costs.[24]  A toll-free telephone support line was also activated by Class Counsel, which provide a direct connection to *attorneys* at Class Counsels' firms.  To date, Class Counsel has answered hundreds of calls from Franchise Dealer Class Members.[25]

**F.      Claims-Paid Settlement**

The Settlement is "claims-paid", meaning that Settlement Class Members were not required complete any form or claims procedure in order to obtain their benefits under the Settlement.  By returning an Individual Release, as described above, Settlement Class Members are able to obtain the cash portion of the Settlement sooner, but the cash payments and all other benefits will accrue to Settlement Class Members no later than the Effective Date of the Settlement, whether or not the Individual Release is ever executed.  As of the filing of this motion, 350 Settlement Class Members (over 54%) have submitted Individual Releases and each of them will receive their Initial Payment prior to December 23, 2016, or within 30 days of when their Individual Release was received, if after November 23, 2016.[26]  Class Counsel expects that most of the remaining Class Members will likewise submit Individual Release forms soon after the New Year.[27]

**G.      There Are No Costs of Settlement Administration Chargeable to the Class**

Volkswagen paid all costs associated with express overnight delivery of the Class Notice to each Class Member.[28]  Class Counsel (at Volkswagen's request) ensured that every Class member had in fact received Class Notice through follow-up phone calls.[29]  Importantly, Franchise Dealer Class Members paid nothing toward the completion of this 100% effective Class Notice program.

---

[23] *Id.*

[24] *See id.*

[25] *See id.*, ¶ 12.

[26] *See id.*, ¶ 13.

[27] *See id.*

[28] *See id.*, ¶ 14.

[29] *See id.*

**H.**      **Attorneys' Fees**

The Settlement provides that attorneys' fees to Dealer Class Counsel shall be paid by Volkswagen *in addition to the benefits provided to Settlement Class Members.*  As a result, Settlement Class Members' benefits under the Settlement will not be reduced to pay attorneys' fees or reimburse litigation expenses with respect to this settlement.  Volkswagen and Plaintiffs' attorneys have not agreed on the amount of attorneys' fees to be paid in this case, deferring such discussions (and litigation if the parties do not reach agreement) until after substantive terms of the Settlement were settled.[30]  On November 9, 2016, Class Counsel publicly filed Dealer Settlement Class Counsel's Statement of Additional Information Regarding Prospective Request for Attorneys' Fees and Costs.[31]  Therein, Class Counsel pledged that it would seek no more than three percent (3%) *of the cash component* of the Franchise Dealer Settlement ($36.24 million) in fees and costs combined.  No Settlement Class Member has even mentioned, let alone objected to the fee request for Class Counsel capped at three percent (3%) of the cash component of the Settlement.  Attorneys' fees and expenses to be awarded will be subject to Court approval after the Final Fairness Hearing on the Settlement.[32]

## II.      ARGUMENT

It is well established in the Ninth Circuit that "voluntary conciliation and settlement are the preferred means of dispute resolution."[33]  Indeed, "there is an overriding public interest in settling and quieting litigation" and this is "particularly true in class action suits."[34]

In addition to ensuring compliance with Rule 23, the Court exercises its "sound discretion" when deciding whether to grant final approval.[35]  In so doing, "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be

---

[30] *See In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 444-45 (3d Cir. 2016), as amended May 2, 2016.

[31] ECF No. 2177.

[32] *See* ECF No. 2172.

[33] *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).

[34] *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976).

[35] *See Torrisi v. Tuscon Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993).

limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned."[36]

## A.      Plaintiffs Have Complied with Rule 23 Notice Requirements

Rule 23(e)(1) requires that a court approving a class action settlement "direct notice in a reasonable manner to all class members who would be bound by the proposal."[37]  A class action settlement notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard."[38]

The Class Notice approved by the Court[39] follows, as closely as possible, the language recommended by this District's Procedural Guidance for Class Action Settlements[40] and required by the Ninth Circuit.[41]  The Class Notice contained links to the Settlement website that contains the notice of settlement, key court documents, and other important information about the case.

Dealer Settlement Class Counsel and Volkswagen then implemented the approved notice program.[42]  To the best of Class Counsel's knowledge, the notice program was 100% effective in reaching Franchise Dealer Class Members.[43]  This meets the requirements of Rule 23 and has allowed the class a full and fair opportunity to review and respond to the proposed settlement.

---

[36] *Officers for Justice*, 688 F.2d at 625; *see also Ross v. Trex Co., Inc.*, 2013 WL 6622919, at *4 (N.D. Cal. Dec. 16, 2013) ("However, as the Ninth Circuit has made clear, the Court's inquiry 'is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion.'") (quoting *Hanlon v Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998)).

[37] Fed. R. Civ. P. 23(e)(1).

[38] *Churchill Vill., LLC v. GE*, 361 F.3d 566, 575 (9th Cir. 2004) (citation and internal quotation marks omitted); *see also In re Online DVD Rental Antitrust Litig.*, 779 F.3d 934, 946 (9th Cir. 2015).

[39] *See* ECF No. 2077.

[40] *See* http://www.cand.uscourts.gov/ClassActionSettlementGuidance (last visited August 4, 2016).

[41] *E.g.*, *In re Online DVD Rental Antitrust Litig.*, 779 F.3d at 946; *Lane v. Facebook, Inc.*, 696 F.3d 811, 826 (9th Cir. 2012); *Rodriquez*, 563 F.3d at 962.

[42] Berman Decl., ¶ 10.

[43] *See id.*

MOTION FOR FINAL APPROVAL
OF FRANCHISE DEALER SETTLEMENT
Case No. 02672-CRB (JSC)                                    - 10 -
010525-11 918432 V1

**B.      The Settlement Is the Result of Arm's-Length Negotiations**

This settlement arises out of extended, informed, arm's-length negotiations between counsel for the parties.  The parties reached agreement after months of intensive investigation, dealer-specific document discovery, expert retention and consultation.  As a result, Plaintiffs' Counsel had ample information to participate in an informed, and thus reasonable negotiation process.[44]  And with that knowledge to bring to bear, Plaintiffs' counsel held multiple settlement meetings and communications with Volkswagen's counsel, who were similarly very sophisticated and well-informed.

In short, these non-collusive and fully informed negotiations between sophisticated sets of counsel support approval of the settlement agreement.  As the Ninth Circuit has stated, "We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution."[45]

**C.      The Settlement Is Substantively Fair, Reasonable and Adequate Resolution of the Franchise Dealer Litigation**

In determining whether a settlement agreement is fair, adequate, and reasonable, the Court must weigh some or all of the following factors: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed; (6) the stage of the proceedings; (7) the experience and views of counsel; (8) the presence of a governmental participant; and (9) the reaction of the class members to the proposed settlement.[46]  Each of these factors supports approval of the settlement here.

**1.      Plaintiff's case is strong, thus the substantial recovery is warranted.**

Volkswagen purposefully used the Defeat Device to obtain EPA and CARB approval for its 2009-15 diesel passenger vehicles.  As evidenced by the Consumer Settlements and the swift resolution of the related DOJ and FTC civil actions, there is a compelling case for liability.  This liability arguably extends to alleged losses in franchise value suffered by owners of Volkswagen's

---

[44] *See, e.g., In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (holding "significant investigation, discovery and research" supported the district court's conclusion "that the Plaintiffs had sufficient information to make an informed decision about the Settlement").

[45] *Rodriguez v. West Publ'g Corp.*, 563 F.3d at 965.

[46] *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

MOTION FOR FINAL APPROVAL
OF FRANCHISE DEALER SETTLEMENT
Case No. 02672-CRB (JSC)              - 11 -
010525-11 918432 V1

U.S. franchise dealers because those losses flow from the alleged conduct.  Dealers had and still have thousands of new and/or used TDI cars on their lots that became immediately unsalable when Volkswagen issued its broad stop sale orders.  When consumers learned of the emissions scandal, the entire market for Volkswagen's diesel cars immediately disappeared and the tarnished brand name also caused decreases in sales of all Volkswagen cars.  This factor weighs in favor of approval of the settlement because there is clear and meaningful relationship between the strength of the case and the benefits provided in the settlement.

> ### 2.    There would be substantial risk, expense and complexity in continuing the litigation, which could last for years.

Notwithstanding the substantial evidence that Plaintiff can bring to bear in this case, there are always risks in litigation.  Here, and absent the Settlement, Volkswagen's dealers would face an uncertain future.  They are saddled with thousands of cars that they cannot sell, while the TDI vehicles, for some dealers, represented as much as 35% of their total vehicle sales.[47]  Further, while the evidence that Volkswagen defrauded consumers is compelling, Volkswagen could argue that it worked no such material deception on its dealers, and that dealers' contractual obligations with Volkswagen would severely limit, if not prohibit, their ability to recover under several critical damages theories.

Moreover, Volkswagen's branded dealers are the lynchpin in its Consumer Settlements.  An ongoing dealer litigation would make cooperation on the Consumer Settlements difficult, if not impossible, further imperiling Volkswagen's and its dealers' ability to navigate the maelstrom.  This factor supports approval of the settlement because it is important not just to Class Members, but also to Volkswagen to promptly resolve this litigation.

> ### 3.    The Franchise Dealer Class carries material certification risk.

While liability evidence is strong in this case, certification draws a different test and may be challenging to achieve and maintain in this case.  The sophistication of class members and the size of potential recoveries could lead a court faced with a disputed certification motion to conclude

---

[47] *See, e.g., UAW v. GMC*, 497 F.3d 615, 632 (6th Cir. 2007) (rejecting settlement objections premised on Plaintiff prevailing at trial because "any such victory would run the risk of being a Pyrrhic one…").

that a class action is not the superior way to resolve this dispute.  Each Franchise Dealer Class Member is itself a substantial business operation that has either in-house counsel, or ready access to legal counsel that could pursue its individual case.  In addition, dealers' losses are at a level that could support individual litigation—as evidenced by the fact that this settlement will provide, on average, $1.85 million to each Franchise Dealer Class Member.

Another issue is the cohesiveness of the Class.  As litigation progressed, the many, varied business pressures on dealer operations could put pressure on the cohesiveness of the ongoing Class as dealers were forced to sell or cease operations, or even switch to different brands.  The substantial differences between how different dealers operate and what cars they sell could inject material individualized inquiries into the case.  This factor supports approval of the settlement because manageability of a *settlement* class is not a requirement of certification and at present Franchise Dealer Class Members' interests and concerns are substantially aligned and cohesive.

### 4. The settlement is by all measures substantial and adequately reflects the magnitude of harm to the Franchise Dealer Class.

The Settlement in this case, with a conservative valuation exceeding $1.637 billion, is extraordinary.  That estimate is the sum of the cash component ($1,193,386,553.01), the non-offset support payments ($270,885,280.00), and the ongoing VIP and CSI incentives ($172,800,000.00), and does not even count the deferred capital investment and TDI inventory benefits, which clearly contribute additional substantial value.  Measured against Class Counsel's estimate of singles damages for the Class, it slightly exceeds a 100% recovery.  By any measure, it is one of the largest settlements in history.  And in terms of raw size for automotive settlements it ranks behind only the Volkswagen Consumer Settlement, and it exceeds the Toyota Sudden Unintended Acceleration settlement, which was approximately $1.3 billion.  And unlike those cases that had hundreds of thousands of class members that would share in the settlement, this settlement class has only 644 members, thus the average recovery by each participating dealer will be over $1.85 million, a sum that likely exceeds the entire amount of most class action settlements.

The size of the settlement clearly supports approval of the settlement because it is extraordinary by any measure and reflects the strength of Franchise Dealer Class Members' case

1   against Volkswagen and Volkswagen's need to have the cooperation of Franchise Dealer Class

2   Members to effectuate the Consumer Settlement and ensure the ongoing success of the

3   Volkswagen brand in the United States.

4        **5.**       **Beyond the substantial discovery discussed in the Consumer Settlement, Dealer Class Counsel obtained and reviewed discovery specifically geared to the**

5                 **unique aspects of franchise dealers' claims against Volkswagen.**

6        Discovery reviewed in the consumer actions against Volkswagen revealed substantial and

7   material evidence of liability and the participants in the alleged diesel fraud.  But this alone was not

8   sufficient to properly evaluate liability, causation and potential damages in franchise dealers' case

9   against Volkswagen.  As a result, proposed Dealer Class Counsel requested and obtained from

10   Volkswagen extensive discovery relating uniquely to franchise dealers.  All of this discovery was

11   reviewed, and much of it was reviewed by and included within the analysis of noted economic

12   experts who had been retained by Dealer Class Counsel.  In addition, much investigation and

13   research was directed toward the Franchise Dealer Class Members to assess, among other things,

14   the effects of the diesel emissions scandal on their operations, expectations and investment value.

15   This factor supports approval because ample discovery was completed to properly assess the case,

16   evaluate damages, and inform settlement discussions.

17        **6.**       **In light of the unique facts and circumstances of this case, that it is being settled at an early stage of the case is not a concern.**

18        This case is still in an early stage.  While discovery to assess the adequacy of the settlement

19   has been obtained and reviewed, there has been no motions practice.  However, the circumstances

20   of the diesel emissions scandal, and Volkswagen's and its dealers' need to effectuate a prompt

21   resolution for consumers, regulators, and dealers themselves suggests that an early resolution of the

22   dealer case is not only desirable, but indeed required.  The ongoing viability and cooperation of

23   Volkswagen's franchise dealer network is essential to the Consumer Settlement.  Moreover, that

24   Settlement Class Members are obtaining benefits that slightly exceed their estimate of damages

25   begs the question of what else Class Members could obtain if they chose to continue litigating the

26   case?  For these reasons, the early stage of settlement does not militate against preliminary or final

27   approval.

28   MOTION FOR FINAL APPROVAL
OF FRANCHISE DEALER SETTLEMENT
Case No. 02672-CRB (JSC)
010525-11 918432 V1

         - 14 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**7.      Plaintiffs' counsel are highly experienced class action and automotive dealer litigators and they fully support the Settlement.**

Hagens Berman is one of the most experienced plaintiffs' class firms in the country, especially in the context of massive automotive class cases.  Hagens Berman has had and currently has a leadership role in the largest automotive class cases in history, including *In re: Toyota SUA*, which settled for over $1.3 billion, and *In re Hyundai/Kia MPG*, which settled for nearly $400 million; the massive GM ignition switch case, which is currently in active litigation, and the Volkswagen consumer case, for which Hagens Berman Managing Partner, Steve W. Berman, is a member of the Plaintiffs' Steering Committee.[48]

Bass Sox Mercer is a nationwide leader in the representation of automotive dealers in lawsuits and other actions against automobile manufacturers.  Its depth of knowledge and experience in the particular type of dispute at issue in this case brings necessary perspective to dealers' claims and damages in this case and concerns about ongoing litigation.  Hagens Berman and Bass Sox Mercer strongly support this settlement.[49]  It provides Franchise Dealer Class Members with genuine and substantial financial support to compensate them for the loss in the value of their dealerships.  It also, through the non-monetary aspects of the Settlement, provides a cooperative path forward where Volkswagen and its dealers can work cooperatively toward remediation of the diesel emissions scandal and recovery of the brand.  Counsel's judgment that the Settlement is fair and reasonable is entitled to great weight.[50]  "[A]bsent fraud, collusion, or the like, [the Court] should be hesitant to substitute its own judgment for that of counsel."[51]

---

[48] *See* ECF No. 1972.

[49] *See* Berman Decl., ¶ 15.

[50] *See Churchill Vill., L.L.C. v. GE*, 361 F.3d at 576-77; *Officers for Justice*, 688 F.2d at 625 (same); *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981) ("the fact that experienced counsel involved in the case approved the settlement after hard-fought negotiations is entitled to considerable weight").

[51] *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) (citation omitted).

**8.      The extensive involvement of government in response to the Volkswagen emissions scandal supports approval of this Settlement.**

Government regulators and the Department of Justice did not have a direct role in the negotiation of this Settlement, yet their critical presence in the Consumer Settlement support approval of this Settlement.   The EPA, CARB, and the Department of Justice were a guiding force in the Consumer Settlement, which will swiftly reduce ongoing environmental damage by removing the polluting cars from the road and requiring substantial (over $2.5 billion worth) environmental mitigation by Volkswagen.   But the success of the Consumer Settlement depends on, and requires the extensive cooperation of the Franchise Dealer Class.   This Settlement assures that cooperation.

**9.      The Settlement is broadly supported by the Franchise Dealer Class.**

Soon after the diesel emissions scandal was disclosed, Volkswagen dealers nominated a Dealer Investment Committee ("DIC") to provide input toward a negotiated resolution with Volkswagen for all Volkswagen-branded franchise dealers.   The DIC consists of five current Franchise Dealer Class Members, all of whom fully support this Settlement.[52]   In addition, after Class Notice was sent and confirmed to have been received by 100% of the Franchise Dealer Class, only seven of 651 eligible Franchise Dealer Class Members have elected to opt-out of the Class (1%), and only 8 of 652 have filed objections (1%).   This overwhelming support of the Settlement by members of the Settlement Class strongly supports final approval.

Thus, each of the factors to be evaluated for final approval support that this Settlement is substantively fair and should be finally approved.

**D.      The Proposed Plan of Allocation is Fair**

Approving a plan for the allocation of a class settlement fund is governed by the same legal standard that applies to the approval of the settlement terms: that the distribution plan is "fair, reasonable and adequate."[53]   A plan of allocation that reimburses class members based on the

---

[52] *See* Berman Decl., ¶ 4.

[53] *In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001).

extent of their injuries is generally reasonable.[54]  *Pro-rata* distribution plans have been approved in many prior cases in this district.[55]

The plan of allocation set for in the Settlement Agreement reimburses Franchise Dealer Class Members *pro rata*, based upon the extent of their injuries.  Indeed, shortly after the diesel emissions scandal became public, Volkswagen began providing dealers with financial support payments to offset potential harm tied to objective criteria long-used by virtually all vehicle manufacturers worldwide.[56]  Volkswagen primarily based its support payments on each dealer's retail registered[57] Vehicles In Operation ("VIO") for its Primary Area of Influence ("PAI").[58] Volkswagen summed the number of MY2009 – MY2015 Volkswagen vehicles registered in a dealer's PAI as of December 31, 2014—the year-end before the scandal broke.  It then multiplied that count by $10 to arrive at the monthly support payment for November 2015 and thereafter,[59] with an applied floor payment of $15,000 and ceiling payment of $50,000.[60]

The monthly support payments are a fair and reasonable method for compensating dealers for damages alleged in this action because they were derived directly from the size and effectiveness of a dealer in selling Volkswagen cars into the area on which their performance is judged.  This is an appropriate proxy for damages stemming from the diesel emission scandal, *and* it is an appropriate metric for alleged damages stemming from the pricing and allocation claims also alleged in the Complaint and Amended Complaint in this action.

---

[54] *Id.*; *In re Omnivision Techs.*, 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2007).

[55] *See, e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 3648478, at *15 (N.D. Cal. July 7, 2016); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 7575004 (N.D. Cal. Dec. 27, 2011).

[56] *See* Berman Decl., ¶ 16.

[57] Retail registrations were used because this reflected consumer owned vehicles.  *See id.*

[58] *See id.*

[59] The payments began in October 2015 with a double payment to cover September and October of 2015.  *See id.*

[60] *See id.*  The support payments were based on an alternative calculation method for new dealers that used the Capacity Planning Guide (CPG) for such dealers, which is an estimate of the sales that were expected of the dealer.  None of the dealers whose support payments were based upon this alternative calculation have objected to the Settlement or its allocation method.

1    Where the value of a car brand is profoundly damaged, it is fair and reasonable to measure

2    the damages to dealers based upon the number of consumers who own such cars in the dealer's

3    area.  This metric captures not only the dealership size and sales penetration (*i.e.*, damages based

4    on lost sales and lost dealership value), but also loss servicing revenue, trade in revenue, and lost

5    referral sales, all of which were the alleged harm in the Complaint and Amended Complaint in this

6    action.  Likewise, when a dealer is forced to pay more than another for vehicles, or is denied

7    allocation of desirable vehicles, those dealerships responsible for more VIO will have more

8    damages if such allegations are proven true.

9    Allocating the cash component of the Settlement *pro rata* based upon the monthly support

10   payment is fair and reasonable because it necessarily provides each dealer with an Individual

11   Settlement Payment that reflects their damages relative to other dealers and derived from objective

12   industry-standard metrics.  As evidenced by the 99% approval of the Class to the *pro rata*

13   formula—only five dealers think they should have been paid more—the plan of allocation was

14   reasonable and fair.

15   **III.    THE LIMITED OBJECTIONS TO THE SETTLEMENT ARE ILL-FOUNDED AND
           SHOULD BE OVERRULED**

16

17   "[O]bjectors to a class action settlement bear the burden of proving any assertions they raise

18   challenging the reasonableness of a class action settlement."  *In re Google Referrer Header

19   Privacy Litig.*, 87 F. Supp. 3d 1122, 1137 (N.D. Cal. 2015) (citing *United States v. Oregon*, 913

20   F.2d 576, 581 (9th Cir. 1990)); *see also Schechter v. Crown Life Ins. Co.*, 2014 WL 2094323, at *2

21   (C.D. Cal. May 19, 2014) (objector bears burden to show that settlement approval would

22   contravene its equitable objectives).

23   The absence of objections from a large proportion of Class Members raises a strong

24   presumption that a settlement is fair, reasonable, and adequate.  *See, e.g., Nat'l Rural Telecomms.

25   Coop. v. DIRECTV, Inc.*, 221 F.R.D. at 529 ("It is established that the absence of a large number of

26   objections to a proposed class settlement action raises a strong presumption that the terms of a

27   proposed class action settlement are favorable to the class members.") (citations omitted); *Chun-

28   Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010) (stating that the absence

of negative reaction strongly supports settlement, and approving a settlement with an opt-out rate of 4.68%).  The presumption of fairness applies here given the relatively small number of Class Members (about 1%) submitting objections or opting out (less than 1%).

While every objection from a Class Member merits consideration, the Court must make an independent assessment of the Settlement to determine its overall fairness under Fed. R. Civ. P. 23(e).  The question it must answer "is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon v. Chrysler Corp.*, 150 F.3d at 1027.

Seven Franchise Dealer Class Members—and one non-class member—filed objections to the Settlement.  But none of the objections rise to the level of a material impeachment of the procedural and substantive fairness, adequateness, and reasonableness of the Settlement.

**A.      Objections to the Amount of Money a Franchise Dealer Class Member Will Receive Should Be Overruled**

The Franchise Dealer Settlement—after opt-outs—provides *$1.195 billion* in new cash compensation to Franchise Dealer Class Members and conservatively an additional $422 million in benefits.  The average new cash payout exceeds *$1.85 million*, with a minimum payment of *$1.07 million* and maximum payment of *$3.57 million.*  Class Member payments at this level can only be described as extraordinary—if not unique—in the history of class action settlements.  And these sums are in additional to the 13 months of financial support payments that Volkswagen has already paid to its dealers totaling *$16.7 million per month*, which will continue through December 2016, totaling over $250 million of cash compensation *which will not offset the Settlement payments.*  The Settlement effectively provides each dealer with *six years* of the financial support payments— three years' worth now, then double payments for the next 18 months.  But in addition, dealers are also guaranteed to see their CSI and VIP incentive payments continue for another year, a benefit worth a further $172.8 million.

It is not surprising, however, that with 652 potential Class Members, there would be a few who think they should get more money.  Six dealers here feel that way, representing 1% of the Class.  This small fraction of financially dissatisfied Class Members is telling, given the

1    sophistication of each Class Member, the large sums at issue, and the widespread attention that has

2    been given the Volkswagen diesel emissions scheme.  Without discounting the earnestness of the

3    objections, they are ill-founded.

4          Settlement must to some degree reflect a compromise by both sides.  It is conceivable that

5    the Franchise Dealer litigation could have proceeded to trial, and conceivable that at trial a larger

6    recovery could have been obtained.[61]  But there are risks in litigation and there are costs associated

7    with delay.[62]

8          **1.    Serra Volkswagen.**

9          In a single-page filing with no citations and no evidentiary declaration, Serra Volkswagen

10   (i) "objects to the method of calculating the payments due class members" and (ii) "objects to the

11   provision of the settlement whereby a Dealer Settlement Class Member … is prohibited from

12   objecting to the payment to be made to individual Dealer Settlement Class Members."[63]  Serra

13   Volkswagen—absent any legal authority— argues that "[s]uch provision allows defendants to

14   discriminate among class members and/or to act arbitrarily and capriciously in determining the

15   amount due any particular class member in violation of class members' right to due process."[64]

16   Serra counsel also sent a letter describing its objection.[65]

17         Yet as the Settlement Agreement and motion for preliminary approval make clear, the

18   determination of the amount due each individual dealer could not be farther from "arbitrary and

19

20         [61] It bears noting, however, that any such increased recovery is very speculative since Class
     Counsel's economic expert has determined the Settlement value already exceeds 100% of
21   estimated Class damages.  *See supra* § I.D.

22         [62] *See, e.g., Perkins v. LinkedIn Corp.*, 2016 U.S. Dist. LEXIS 18649, at *19 (N.D. Cal. Feb.
     16, 2016) (noting that, though massive theoretical statutory damages may exist, the settlement was
23   fair and adequate in light of the risks and delays associated with litigation); *Kim v. Space Pencil,
     Inc.*, 2012 U.S. Dist. LEXIS 169922, at *15 (N.D. Cal. Nov. 28, 2012) ("The substantial and
24   immediate relief provided to the Class under the Settlement weighs heavily in favor of its approval
     compared to the inherent risk of continued litigation, trial, and appeal, as well as the financial
25   wherewithal of the defendant."). "That certain Class Members evaluate the risks differently, or
     would prefer to go to trial despite those risks, does not prevent the Court from granting final
26   approval to the Settlement."  *Perkins*, 2016 U.S. Dist. LEXIS 18649, at *20.

         [63] ECF No. 2271.
27
         [64] *Id.*
28
         [65] *See* Berman Decl., Exh. A.

MOTION FOR FINAL APPROVAL
OF FRANCHISE DEALER SETTLEMENT
Case No. 02672-CRB (JSC)                                    - 20 -
010525-11 918432 V1

1    capricious."  The amount is a *pro rata* division of the Settlement fund based on an objective factor,

2    the November 2015 monthly support payment each dealer received.  Volkswagen had no ability to

3    arbitrarily or capriciously set Settlement payouts, as it had no discretion whatsoever in setting the

4    payments due each dealer under the Settlement.  The amount was a purely mathematically *pro rata*

5    calculation that was based on pre-existing and pre-determined metrics.

6         Serra Volkswagen's naked allegation that the Settlement allocation deprives it or anyone of

7    a "right to due process" portends a fundamental misunderstanding of that term, and its relevance to

8    class actions under Rule 23.  Serra Volkswagen was wholly provided its due process rights through

9    the opt-out mechanism.  If it feels that the proposed settlement does not provide it a payout

10   sufficient to warrant a release of its claims—which appears facially to be its central complaint—

11   then Serra Volkswagen could simply have opted-out of the Settlement, not entered into a release of

12   claims, and pursued its own case against Volkswagen.

13        Because Serra Volkswagen plainly received notice of the proposed settlement, and had the

14   opportunity to opt-out, there was no deprivation of a "right to due process."  To the extent Serra

15   Volkswagen is actually arguing that a better deal with more money for all should have been

16   obtained, this Court has rejected objections that a settlement "could have been better by providing

17   different or additional relief."[66]  As the Ninth Circuit has made clear, the Court's inquiry "'is not

18   whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and

19   free from collusion.'"[67]

20        **2.    Eich Motor Company**

21        Eich Motor Company objects that the *pro rata* formula used to allocated the cash

22   component of the Settlement is unfair because: (1) it counts only Vehicles in Operation within the

23   dealer's PAI; (2) it does not place increased value on sales of TDI vehicles versus non-TDI

24   vehicles; and (3) it does not provide enhanced payments to "extraordinarily high performing

25

26

---

27        [66] *Ross v. Trex Co., Inc.*, 2013 WL 6622919, at *4.

28        [67] *Id.* (citing *Hanlon,* 150 F.3d at 1027).

MOTION FOR FINAL APPROVAL
OF FRANCHISE DEALER SETTLEMENT
Case No. 02672-CRB (JSC)                          - 21 -
010525-11 918432 V1

1    dealerships."[68]  Thus, Eich argues (without legal support or citation), that the Settlement is unfair

2    for dealerships "whose experiences have been, in one or more respects, as the three dealership

3    experiences we describe below for our dealership."  But Eich nowhere mentions a single dealership

4    other than itself with these three experiences at once, and its objection is, therefore, merely that it

5    thinks it should have received more money.

6            As an initial matter, Eich's contention that its Settlement payment is based upon

7    multiplying 71 times its monthly support payment is incorrect.  Class Counsel did not negotiate or

8    agree to provide dealers with a payment calculated in this manner.  Rather, the gross all-in cash

9    payment of $1.208 billion was negotiated as the gross amount Volkswagen would pay; then an

10   allocation method for that sum was agreed to that would divide the cash settlement *pro rata,* based

11   on the estimated damages of each dealer.

12           But irrespective of its factual inaccuracies, the Eich objection fails because it is really

13   nothing more than a contention that a formula that would have given it more money (and

14   necessarily others less money) should have been used instead of the formula that was used.  It is

15   settled law, however, that the role of the Court is not to determine if there might be a better or

16   different way to resolve a particular case, it is whether the settlement before it is fair, adequate and

17   reasonable.  As the Ninth Circuit has made clear, the Court's inquiry '"is not whether the final

18   product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from

19   collusion.'"[69]

20           **3.      Speedcraft Volkswagen.**

21           Speedcraft Volkswagen objects, like Eich Motor Company, that an allocation that placed

22   more weight on sales of TDI vehicles should have been used so that dealers—namely Speedcraft—

23   would have received more money, while dealers who sold a more balanced mix of Volkswagen

24   cars would receive less.[70]  Speedcraft proposes its own formula which it opines "would be a fair

25   way of compensating the dealerships…."  But the Court is not empowered to judge a settlement (or

26   ───────────────────────

27       [68] *See* Berman Decl., Exh. B.

         [69] *Ross v. Trex Co., Inc.*, 2013 WL 6622919, at *4 (citing *Hanlon,* 150 F.3d at 1027).

28       [70] *See* Berman Decl., Exh. C.

1   allocation formula) that is not before it against the settlement (or allocation formula) that is before

2   it.  "Perhaps there could have been an even more creative settlement or, alternatively, one that is

3   more traditional.  But that is not the question [the court] must resolve."  *Uhl v. Thoroughbred Tech.*

4   *& Telecomms, Inc.,* 309 F.3d 978, 987 (7th Cir. 2002).  Just as with the Serra objection, Speedcraft

5   is arguing the Settlement "could have been better by providing different or additional relief."  But

6   such objections lack merit.[71]

7       **4.**    **Reydel Volkswagen.**

8       Like Eich Motor Company, Speedcraft Volkswagen, and Serra Volkswagen, Reydel

9   Volkswagen objects because it believes it should get more money from the Settlement.[72]  It

10   contends that instead of using the current PAI for Reydel in determining VIO, Volkswagen should

11   have used an historical PAI from a period before Volkswagen established an open point near

12   Reydel.  Reydel makes no claim that the Settlement as a whole is unfair, or the allocation

13   methodology—as applied to all dealers—is unfair.  It simply argues that it should have been paid

14   more.  For the reasons set forth above with respect to Eich and Serra, Reydel's objection should be

15   overruled.

16       It should also be noted that Reydel's assertion that it was shortchanged "a difference of

17   $802,254" is inflated by at least double.  In a call with Class Counsel and VWGoA's counsel prior

18   to filing its objection, Reydel VW's counsel explained that it calculated a difference of $802,254

19   based on the assumption that the November 2015 discretionary payment formula was calculated

20   based on $20.00 per VIO.  As described above, the formula was actually based on $10.00 per

21   VIO.[73]

22       **5.**    **Smith Volkswagen.**

23       Smith Volkswagen contends that the Settlement allocation "has included in the settlement

24   formula cars that dealers sell into each other's AOR….  So why not cars sold into open point

25

26   [71] *See Ross*, 2013 WL 6622919, at *4.

27   [72] *See* Berman Decl., Exh. D.

28   [73] *See* Berman Decl., ¶ 16.

MOTION FOR FINAL APPROVAL
OF FRANCHISE DEALER SETTLEMENT
Case No. 02672-CRB (JSC)
010525-11 918432 V1

- 23 -

areas?"[74]   As an initial matter, Smith's underlying premise is wrong.  Dealers do not get VIO credit

for cars that are sold into another dealer's PAI.  Each dealer gets VIO credit based on the cars that

are within its PAI, regardless of whether it, or another dealer sold those cars.  As such, while Smith

is not getting credit for cars it sold into an open point, which is an unassigned PAI determined by

VWGoA in November 2012, it is getting credit for cars in its PAI that another dealer sold.  This

rule applies across the board for every dealer.  While Smith contends that counting only the

vehicles in his PAI undervalues the size of his dealership, he cannot, and does not contend that the

VIO in each dealer's PAI is not a fair and reasonable method of determining the damages to

dealerships across the population of 652 Volkswagen dealerships at issue in this case.[75]   While

Smith asks the Court "to modify the situation on behalf of my fellow dealers[,]" he does not

mention a single other dealer who wants it modified in this manner.  In the end, just like Serra,

Eich and Reydel, Smith's objection is that he wants more money.  For the reasons set forth above,

this objection should be overruled.

### 6.   Steven Volkswagen.

Steven VW objects based on its factual contention that the VIO tabulation used to calculate

its monthly support payments, and thus its *pro rata* share of the cash component of the Settlement

is incorrect and understated by $509,780.[76]   Steven Volkswagen's objection has no merit.  As an

initial matter, it does not dispute that its Individual Dealer Settlement Payment was properly

calculated because it was "equal to their pro rata share of the Monthly Financial Assistance

Payments that Volkswagen paid to Eligible Dealers in November 2015."[77]   Instead, Steven VW

asserts the underlying formula used by Volkswagen to calculate the November 2015 monthly

---

[74] *See* Smith Volkswagen Letter Objection, p.1, Berman Decl., Exh. E.  Smith uses "AOR" and "AOI" for the Primary Area of Influence ("PAI").

[75] Also ignored from the objections of Smith VW and Reydel VW, the reduction to a dealer's PAI is also a significant benefit to the dealer since the dealer is no longer tasked with selling or servicing vehicles into the reassigned tracts from its PAI, which can strengthen the dealer's DSI, an important metric for determining dealer performance and ongoing incentives from VWGoA.  *See* Berman Decl., ¶ 25.

[76] ECF No. 2290.

[77] Settlement Agreement, § 4.1.6.1.

MOTION FOR FINAL APPROVAL
OF FRANCHISE DEALER SETTLEMENT
Case No. 02672-CRB (JSC)                                    - 24 -
010525-11 918432 V1

1    financial assistance payment should have been based on 2,529 Vehicles in Operation in the region

2    assigned to Steven VW, rather than 1,811.[78]  Steven VW's assertion that its actual VIO was 2,529

3    units rather than 1,811 is simply wrong.

4           Steven VW's VIO of 1,811 was derived by using VW's formula to calculate the November

5    2015 discretionary payments, the same formula uniformly used to calculate all other VW dealers'

6    November discretionary payments.  The November discretionary payment was based on retail VIO

7    in each dealer's PAI for model years 2009 through 2015 as of December 2014.  Exhibit F to the

8    Berman Declaration shows that Steven VW's VIO was 1,811 under this formula and, as a result, its

9    November 2015 discretionary payment was accurately calculated using the same formula as all

10   other Eligible Dealers whose November 2015 discretionary was based on VIO.

11          Steven VW bases his objection on a document that it received from VW in November

12   2016.  That document is entirely irrelevant to the calculation of the November 2015 discretionary

13   payments—and its objection is therefore without any basis—for two reasons.  *First*, as is clear on

14   the face of the document, that document presents a snapshot of Steven VW's VIO "Based on

15   7/31/2016 VIO, whereas the November 2015 discretionary payments to *all* Eligible Dealers was

16   based on each dealership's VIO as of December 2014.  *Second*, the document upon which Steven

17   VW relies also include Fleet and Dealer/Manufacturer sales, whereas the November 2015

18   discretionary payments to *all* Eligible Dealers was based on each dealership's VIO based only on

19   retail sales.  In short, Steven VW based its objection on entirely different sales metric than the one

20   actually used to calculate the November 2015 discretionary payments.  Steven VW's objection

21   therefore should be denied

22   **B.       Objections to the Scope of the Settlement Release**

23           **1.       Palisades Volkswagen.**

24          Palisades Volkswagen contends that the Settlement is "unfair, unreasonable, and

25   inadequate" because it provides Volkswagen with a release that would cause the dismissal of a pre-

26

27   ───────────────

[78] *See* ECF No. 2290.

28
     MOTION FOR FINAL APPROVAL
     OF FRANCHISE DEALER SETTLEMENT                    - 25 -
     Case No. 02672-CRB (JSC)
     010525-11 918432 V1

1    existing lawsuit by Palisades against Volkswagen.[79]  Palisades contends that because the cash

2    component of the Settlement is allocated based upon the level of the support payments provided to

3    dealers following disclosure of the diesel emissions scandal, "Palisades and other class members

4    receive no compensation at all for claims unrelated to the TDI scandal…."[80]  But the very language

5    Palisades quotes from the Settlement makes it clear that the payments are intended to compensate

6    dealers *for more than just the TDI Scandal.*  The Settlement is intended "to compensate Dealer

7    Settlement Class Members for alleged diminution in value of their franchises resulting from the

8    TDI Matter *and other alleged action or inaction by Volkswagen* as described herein, on the terms

9    set forth herein."[81]

10          Palisades' objection is replete with statements of supposed fact that simply ignore what was

11   actually agreed upon in the Settlement Agreement and alleged in the Amended Complaint.  It

12   incorrectly asserts that the Franchise Dealer Settlement concerned only TDI-related claims.

13                  "That settlement payment is designed to cover the losses associated
                    with the TDI Scandal, and nothing else."[82]
14
                    "However, Palisades and other class members receive no
15                  compensation at all for claims unrelated to the TDI Scandal, that
                    Volkswagen contends Palisades will otherwise waive if it opts in.
16                  The lopsided TDI Settlement allocates all of the compensation
                    awarded to class members for TDI-related claims…."[83]
17
                    "It would be easy for the parties to either carve-out these claims for
18                  which class members receive no compensation."[84]

19          To the contrary, the settlement agreement makes abundantly clear that the settlement was

20   not limited to the TDI-related claims, but rather that the average cash payment of $1.85M per

21   Dealer Settlement Class Member and other valuable non-cash benefits were intended to

22

23

24          [79] ECF No. 2276, hereinafter, "Palisades Obj.".

25          [80] Palisades Obj. at 7.

            [81] ECF. No. 1970, p.4:14-16.

26          [82] Palisades Obj. at 3.

27          [83] Palisades Obj. at 7.

            [84] Palisades Obj. at 15.

28

1   compensate, and in exchange release, the five enumerated claims set forth in Section 9.3 of the

2   settlement agreement.  Specifically, the settlement agreement provides as follows:

3           "Volkswagen and counsel representing VW-branded franchise
            dealers reached this Volkswagen Branded Franchise Dealer Class
4           Action Settlement Agreement and Release to settle the claims of
            VW-branded franchise dealers relating to TDI Vehicles and other
5           alleged action or inaction by Volkswagen raised in the complaints."[85]

6           The Settlement likewise makes clear that "[t]he Parties to this
            Franchise Dealer Class Agreement agree to settle all claims of all
7           authorized Volkswagen dealers in the United States as of September
            18, 2015 (who do not opt out of the Settlement), asserted against the
8           Released Parties in the amended Franchise Dealer Complaint to
            compensate Dealer Settlement Class Members for alleged diminution
9           in value of their franchises resulting from the TDI Matter and other
            alleged action or inaction by Volkswagen."[86]
10
            "Individual Dealer Settlement Payments [*i.e.*, the average of $1.85M
11          per dealer settlement class member] are intended *as compensation* to
            Dealer Settlement Class Members for alleged diminution in value of
12          the capital and goodwill in their franchises resulting from the TDI
            Matter *and other alleged action or inaction by Volkswagen to the*
13          *extent such action or inaction is covered in the Released Claims.*"[87]

14          In short, given that the cash component $1.208 billion Net Settlement Amount was reached

15   by the parties specifically "*as compensation* to Dealer Settlement Class Members for alleged

16   diminution in value of the capital and goodwill in their franchises resulting from the TDI *Matter*

17   *and other alleged action or inaction by Volkswagen*," Palisades' Objection that "Palisades and

18   other class members receive no compensation at all for claims unrelated to the TDI Scandal" is

19   simply false.

20          Next, Palisades' Objection separately fails because it is also predicated on the incorrect

21   premise that the Original Complaint and Amended Complaints filed in the Napleton Action were

22   limited only to TDI claims.  In fact, Palisades concedes (as it must) that the class claims released in

23   this settlement are "equivalent" to its New York state law claims alleged in the class complaint.[88]

24   Palisades concedes that the Complaints did, in fact, cover each of the five claims that are released

25   _____

26   [85] ECF. No. 1970, Settlement Agreement at Preamble.

27   [86] *Id.*

     [87] *Id.*, § 4.1.11 (emphasis added).

28   [88] Palisades Obj. at 9.

MOTION FOR FINAL APPROVAL
OF FRANCHISE DEALER SETTLEMENT                    - 27 -
Case No. 02672-CRB (JSC)
010525-11 918432 V1

1    in the Settlement and instead argues that because more space is devoted the TDI scandal claims,

2    this Court should ignore the other claims:  "Class Plaintiffs dedicate volumes of paper to pleading

3    their case regarding the TDI Scandal" whereas "they spend scant time and effort pleading facts in

4    support of unrelated claims equivalent to the New York Act" that are also at issue in Palisades'

5    case pending in federal court in New York.[89]  Putting aside that none of Palisades' inapposite cases

6    (*see infra*) supports its argument that a class settlement can only release the *predominate claim*

7    asserted in a class complaint,[90] in reality both Complaints in this action expressly cover all five

8    categories of claims included in the Released Claims.

9           For example, the Original Complaint alleges as follows:

10               "[Manufacturers] cannot discriminate against some dealers in favor
                 of others, or force dealers to use their own affiliates for related
11               business . . . This suit arises because Volkswagen Group of America,
                 and its German parent, Volkswagen AG, have ignored these basic
12               rules."  (Compl. ¶ 1.)

13               "But Volkswagen's abuse of its smaller dealers did not stop with its
                 fraud in ushering dealership transactions and investments at inflated
14               values, it also abused dealers through creation of unlevel allocation
                 and pricing."  (Compl. ¶ 3.)

15
                 "Ed Napleton believes that with his sizable presence in the
16               marketplace comes a responsibility to stand up for dealerships large
                 and small. Individual dealers and smaller dealer groups are often at
17               the mercy of the immense vehicle manufacturers with respect to
                 critical pricing terms and allocation."  (Compl. ¶ 6.)

18
                 "Volkswagen AG and Volkswagen Group of America, In.
19               (collectively "Volkswagen" or "VW") have defrauded VW franchise
                 dealers . . . and because Volkswagen and Volkswagen Credit, Inc.
20               have engaged in systematic unfair and illegal pricing practices with
                 respect to vehicle pricing and allocation schemes."  (Compl. ¶ 8.)

21
                 "As a direct and foreseeable result of VW's unlawful emissions
22               fraud, illegal pricing and allocation schemes, and coercion to use
                 Volkswagen Credit, VW dealers have been harmed in their business .
23               . ."  (Compl. ¶ 9.)

24               "Volkswagen has engaged in policies with respect to its franchise
                 dealers that are in direct conflict with federal law . . . as well as
25               various franchisee protection laws of several states. . ."  (Compl. ¶

26

27        [89] Palisades Obj. at 9.

28        [90] Palisades Obj. at 9 ("the litigation here is focused squarely on the TDI Scandal").

1    19) (under the header titled "Volkswagen's Unfair Pricing and
     Allocation Schemes").

2
     "At all times pertinent hereto, VGoA has advised its dealers that its
3    metrics to determine performance allocation are applied uniformly,
     fairly, without bias and in-good faith . . . this is simply not true."
4    (Compl. ¶ 180.)

5    "An example of VW's corrupt practices is found in the Transaction
     Assistance Agreements ("TAA") VW offered to dealers shortly
6    before the Dieselgate scandal broke."  (Compl. ¶ 193.)

7    "VGoA has attempted to coerce Plaintiffs to finance their inventories
     with VCI thereby depriving Plaintiffs of cost subsidies and favorable
8    allocations afforded to those Volkswagen dealers who knuckle under
     to VGoA pressure."  (Compl. ¶ 228) (Count 1 of the claims brought
9    on behalf of the Franchise Dealer Class).

10        Similarly, the Amended Complaint alleges the following:

11   "This case arises because Defendants have defrauded VW franchise
     dealers, federal and state regulators, and consumers with respect to
12   the emissions levels of so-called "CleanDiesel" vehicles; and because
     Volkswagen and Volkswagen Credit, Inc., has engaged in systematic
13   unfair and illegal pricing practices with respect to vehicle pricing and
     allocation schemes."  (Amend. Compl. ¶ 1.)
14
     "As a direct and foreseeable result of VW's unlawful emissions fraud
15   and RICO conspiracy, illegal pricing and allocation schemes, and
     coercion to use Volkswagen Credit, VW dealers have been harmed in
16   their business in the form of reduced sales, lost profits, cars sitting on
     their lots which cannot be sold, and investments in dealerships that
17   are worth substantially less than their purchase, investment, and
     carrying costs."  (Amend. Compl. ¶ 2.)
18
     "Volkswagen's Unfair Pricing and Allocation Schemes": VWGOA
19   has engaged in policies with respect to its franchise dealers that are in
     direct conflict with federal law designed to protect car dealers from
20   unfair practices by vehicle manufacturers, as well as various
     franchise protection laws of Florida and Illinois.  (Amend. Compl. ¶
21   12.)

22   Ed Napleton believes that with his sizable presence in the
     marketplace comes a responsibility to stand up for dealerships large
23   and small. Individual dealers and smaller dealer groups are often at
     the mercy of the immense vehicle manufacturers with respect to
24   critical pricing terms and allocation.  (Amend. Compl. ¶ 26.)

25   Volkswagen's "metrics to determine performance and allocation" are
     NOT "applied uniformly, fairly, without bias and in-good faith."
26   (Amend. Compl. ¶ 251.)

27   "Volkswagen's Tier Pricing and Manipulation of DSI Sales Metric"
     (Amend. Compl. ¶¶ 251-261) and "Volkswagen's Tier Pricing and
28

1

2

Coercion to Force Franchise Dealers to Floor Plan Finance with VCI" (Amend. Compl. ¶¶ 262-271), two of the claims included in the Released Claims that Palisades nonetheless seeks to invalidate in its Objection.

3

4      None of the cases upon which Palisades relies provides any support for its attempt to

5   invalidate a release of claims (a) for which all Class Members will receive significant

6   compensation under the settlement, and (b) which were expressly alleged in the two Complaints

7   whose claims will be released under the settlement.

8      *Boyd v. Avanquest N. Am., Inc.*, 2015 WL 4396137 (N.D. Cal. July 17, 2015), provides no

9   support for Palisades' objection.  Importantly, *Boyd* quotes the Ninth Circuit prevailing standard

10  that "[a] settlement agreement may preclude a party from bringing a related claim in the future

11  even though the claim was not presented and might not have been presentable in the class action,

12  but only where the released claim is based on the identical factual predicate as that underlying the

13  claims in the settled class action."  *Id.* at *6 (quoting *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th

14  Cir. 2010)).  The Release in this settlement easily meets the Ninth Circuit's standard, where each of

    the five released claims were, in fact, alleged in the Complaint.

15      In *Boyd*, the release included "any and all actual, potential, filed, known or unknown, fixed

16  or contingent, claimed or unclaimed, suspected or unsuspected . . . whether in law or in equity,

17  accrued or unaccrued, direct, individual or representative, of every nature and description

18  whatsoever, . . . including all claims that were brought or could have been brought in the

19  Action…."  *Id.* at *5.  The Court rejected that release because, among other reasons, it would

20  "prevent a party from bringing future causes of action based upon a set of facts that differs from the

21  one here," "does not contain limitations on future causes of action" and because "such a broad

22  release including unknown claims is unreasonable considering the lack of cash relief to the class

23  members."  *Id.* at *6.  Similarly, Palisades relies on *Daniels v. Aeropostale West, Inc.*, 2014 WL

24  2215708, at *1, *3-5 (N.D. Cal. May 29, 2014), in which it acknowledged that "the court rejected

25  preliminary approval of a settlement that included an 'overbroad release of claims' for 'zero cash.'"

26  Obj. at 13.

27

28

MOTION FOR FINAL APPROVAL
OF FRANCHISE DEALER SETTLEMENT                - 30 -
Case No. 02672-CRB (JSC)
010525-11 918432 V1

1    The facts in *Boyd* and *Daniels* are dramatically different from those at issue here.  Here, in

2    contrast to *Boyd* and *Daniels*, each Class Member will receive on average $1.85M in exchange for

3    releasing the five enumerated claims set forth in the Complaints, while "all other claims are

4    expressly preserved and are not released."  Settlement § 9.3.

5    Palisades also relies on *Stokes v. Interline Brands, Inc.*, 2014 WL 5826335, at *4 (N.D. Cal.

6    Nov. 10, 2014), in which the court rejected a settlement that included a "release [that] gives away

7    claims far outside plaintiff's allegations" and would "bind class members to the overbroad release

8    even if they do not receive notice or a payment."  Here, every Class Member received notice, will

9    receive a seven-figure settlement amount and, as Palisades concedes, each of the released claims is

10   covered in at least "scant time and effort" in the Complaints.

11   In *Nat'l Super Spuds, Inc. v. New York Mercantile Exch.*, 660 F.2d 9 (2d Cir. 1981), the

12   Second Circuit rejected a settlement that "requires Richards to release claims based on both

13   liquidated and unliquidated contracts in return for a portion of the settlement proceeds," which

14   scope far exceeded the "complaint [that] was brought on behalf of all persons who liquidated long

15   positions in May 1976 Maine potato future contracts between April 13, 1976 and the close of

16   trading on May 7 of that year."  *Id*. at 16-18.  As the court explained, "[t]here is no justification for

17   requiring Richards or persons similarly situated to release claims based on unliquidated contracts

18   as part of a settlement in which payments to class members are to be determined solely on the basis

19   of the contracts they liquidated."  *Id.* at *18.  Here, the settlement amounts were intended to

20   compensate for all claims asserted in the Complaint and were not tied to TDI-related damages

21   calculations.

22   In *O'Connor v. Uber Techs., Inc.*, 2016 WL 4398271, at *17-19 (N.D. Cal. Aug. 18, 2016),

23   the court held that the "settlement as a whole as currently structured is not fair, adequate, and

24   reasonable" because the "Court cannot find that the [Private Attorneys General Act] settlement is

25   fair and adequate in view of the purposes and policies of the statute" in light of the fact that

26   "Plaintiffs propose settling PAGA for only 0.1% of the potential verdict value, a reduction that . . .

27

28

MOTION FOR FINAL APPROVAL
OF FRANCHISE DEALER SETTLEMENT                            - 31 -
Case No. 02672-CRB (JSC)
010525-11 918432 V1

has no rational basis."  Palisades does not, and could not, assert that the $1.208B net settlement amount (which reflects just the cash component of the Settlement) suffers from the same defect.

It is also telling here how the Napleton Plaintiffs handled the very issue in this objection. They too believe they have a viable case against Volkswagen for its incentive and allocation practices.  Seeing that those claims would be released under this Settlement, the Napleton Plaintiffs exercised their rights to opt-out of the Settlement.  Thus, they are free to pursue all their claims, both related and unrelated to the diesel emissions scandal.  Napleton Plaintiffs are willing to risk the proceeds of the instant Settlement and pursue their own separate litigation at their own expense.

Palisades could have taken this same course—it was in no manner compelled to participate in this Settlement.  But Palisades apparently seeks to have its cake and eat it too: It is participating in the Settlement, for which it will be paid over $1.5 million and receive additional valuable non-cash benefits (without having to pay a penny of litigation costs or attorney fees) *and* it seeks to continue its prior litigation against Volkswagen for claims it admits mirrors those in this action. But it cannot do both and that does not make the Settlement unfair.

### 2.     Hansel VW.

Hansel objects that the release in the Settlement Agreement would prevent Hansel from raising Released Claims (as defined in the Settlement Agreement) as evidence in a protest to the New Motor Vehicle Board under the California Vehicle Code, Section 3060, *et seq*.  Hansel notes that Cal. Veh. Code § 11713.3, subsection (g)(1)(B) "makes it unlawful for a manufacturer or distributor to obtain from a dealer or enforce against a dealer 'an agreement, provision, release, assignment, novation, waiver, or estoppel that'… 'limits or constrains the right of a dealer to file, pursue, or submit evidence in connection with a protest before the [California New Motor Vehicle Board].'"[91] But that the very same state law quoted by Hansel expressly provides that:  "This subdivision does not do any of the following: (A) Limit or restrict the terms upon which parties to a protest before the board, civil action, or other proceeding can settle or resolve, or stipulate to evidentiary or procedural matters during the course of, a protest, civil action, or other proceeding."

---

[91] *See* Hansel VW Letter Objection, p.1, Berman Decl., Exh. G (emphasis in original).

1   Cal. Vehicle Code § 11713.3(g)(3)(A). Because the parties to the Franchise Dealer Class Action

2   reached a settlement to resolve the claims asserted in this class action, the Settlement Agreement is

3   indisputably not "in violation of California law."

4           Hansel VW also objects that "the release covers claims beyond the subject matter of the

5   litigation." Specifically, Paragraph 2 of the Individual Release (which mirrors Section 9.3 of the

6   Settlement Agreement) "waive[s] claims that extend beyond the TDI matter, including such claims

7   as sales goals and objectives, vehicles allocations, measures of sales and service performance, and

8   discrimination and coercion." However, as explained in detail above in response to Palisades'

9   Objection, the amended dealer class complaint includes allegations to each of the items listed in the

10  release. Nor did VW settle only TDI-related claims for the broad release, it settled the broad class

11  claims asserted against it in the amended dealer class complaint and obtained a release for the

12  claims asserted in that complaint in exchange for the settlement payments "intended as

13  compensation to Dealer Settlement Class Members for alleged diminution in value of the capital

14  and goodwill in their franchises resulting from the TDI Matter *and other alleged action or inaction*

15  *by Volkswagen* to the extent such action or inaction is covered in the Released Claims." (*Id.*, §

16  4.1.11.)

17          Finally, at Section 9.4, the Settlement Agreement release states:

18          9.4    To the extent it is determined that any specific claim may not
       be released under any statute, law, or regulation, that claim shall be
19     severed from this Franchise Dealer Class Agreement and this Release
       shall remain in effect as to all other claims.

20  Thus, if even if Hansel is right about any of this, which it is not, and the California Vehicle Code

21  prohibits interpretation of the release in this case in such a manner as to restrict Hansel's protest

22  rights under California law, then such claims are not released by operation of the Settlement

23  Agreement itself. Moreover, Hansel admits it has no such protest pending, nor does it object "in

24  anticipation of a protest."[92] Therefore its objection is an exercise in speculation, both as to an issue

25  Hansel does not presently have or anticipate having, and to an interpretation of the release that has

26  not ever been made. Its objection lacks merit and should be overruled.

27  _____

28     [92] *See id.*, p.2.

MOTION FOR FINAL APPROVAL
OF FRANCHISE DEALER SETTLEMENT          - 33 -
Case No. 02672-CRB (JSC)
010525-11 918432 V1

1

**3.      Mission Bay Motors, Inc. dba City Volkswagen.**

2      By its own admission, "City Volkswagen became an authorized franchisee of Defendant

3  Volkswagen Group of America, Inc., on or about August 1, 2016...."[93]  As such, City Volkswagen

4  is not a member of the Franchise Dealer Class and it is not a party to this action, via Rule 23 or

5  otherwise.  Moreover, City Volkswagen has not sought to intervene in this action, a step it must

6  take to properly place any pleading before the Court.  It, therefore, has no standing to object to the

7  Settlement.  It is free to pursue any claims it feels it has against Volkswagen unfettered by the

8  release or any other aspect of the Settlement or this litigation.[94]

9

10                        **IV.      CONCLUSION**

11      With this Settlement, plaintiffs have secured recovery of $1,193,386,553.01 in new cash for

12  Franchise Dealer Class Members plus continued financial incentives and valuable non-cash

13  benefits limiting pending capital investment requirements that in total exceed $1.637 billion of

14  value.  The Settlement also provides an express mechanism for the return of unfixable TDI vehicles

15  to Volkswagen for disposal consistent with the Consumer Settlement.  The Settlement will assure

16  the ongoing success and vitality of Volkswagen's dealer network and cement their cooperation in

17  the Consumer Settlement and amelioration of the environmental damage caused by Volkswagen's

18  alleged defeat device fraud.  The Settlement was reached only after extensive arms-length

19      [93] *See See* ECF No. 2278 at p.2.

20      [94] Although beside the point, given that City Volkswagen is not a member of the Franchise
     Dealer Class, its objection further underscores why the Settlement is fair and reasonable.  The
21  reason why the class is defined as "all authorized Volkswagen dealers in the United States who, on
     September 18, 2015, operated a Volkswagen branded dealership pursuant to a valid Volkswagen
22  Dealer Agreement" stems from the fact that transactions that closed after the September 18, 2015
     disclosure of the diesel emissions issues are presumed to have accounted for the knowledge of such
23  issues and, as a result, only the dealer as of September 18, 2015, would have claims for alleged
     damages related to any failure to disclose the diesel emissions issues.

24      By its own admission, City Volkswagen did not even enter into negotiations to purchase its
     franchise until December 2015, several months *after* the diesel emissions scandal became public
25  and did not close its sale until nearly a year after the scandal became public.  As such, the purchase
     price and closing necessarily would have contemplated the diminution in dealership value
26  experienced by all Volkswagen dealers that forms the basis for damages and the extraordinary
     Settlement before the Court.  Under such timing, it is clear why City Volkswagen (and any other
27  similarly situated purchasers of Volkswagen dealerships) would have no claim to assert in this
     action.

28  MOTION FOR FINAL APPROVAL
     OF FRANCHISE DEALER SETTLEMENT
     Case No. 02672-CRB (JSC)                      - 34 -
     010525-11 918432 V1

negotiations and satisfies the *In re: Blutooth* factors.  Plaintiffs respectfully request that this Court grant final approval of the Settlement.

DATED:  December 12, 2016.                    HAGENS BERMAN SOBOL SHAPIRO LLP


By ___*/s/ Steve W. Berman*_____
                 Steve W. Berman
Steve W. Berman (*Pro Hac Vice*)
Thomas E. Loeser (SBN 202724)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com

Richard N. Sox (*Pro Hac Vice*)
BASS SOX MERCER
2822 Remington Green Circle
Tallahassee, FL 32308
Telephone:  (850) 878-6404
Facsimile:  (850) 942-4869
rsox@dealerlawyer.com

*Counsel for Plaintiffs and the proposed Franchise Dealer Class*

1

### CERTIFICATE OF SERVICE

2

I hereby certify that on December 12, 2016, I electronically transmitted the foregoing

3

document to the Court Clerk using the ECF System for filing. The Clerk of the Court will transmit

4

a Notice of Electronic Filing to all ECF registrants.

5

6

*/s/ Steve W. Berman*
STEVE W. BERMAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28