UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION _____/ | MDL No. 2672 CRB  (JSC)<br><br>**ORDER RE: MOTIONS TO DISMISS THE CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT**<br><br>Re: Dkt. Nos. 1705, 1706, 1708 |

This Order Relates To:
*City of St. Clair Shores*, 15-6167
*Travalio*, 15-6168
*George Leon Family Trust*, 15-6168
*Charter Twp. of Clinton*, 16-190
*Wolfenbarger*, 16-184
_____/

In September 2015, the public learned of Volkswagen's allegedly deliberate use of a "defeat device"—software designed to cheat emissions tests and deceive federal and state regulators—in nearly 500,000 Volkswagen- and Audi-branded turbocharged direct injection ("TDI") diesel engine vehicles, also called "clean diesel" vehicles, sold in the United States. Litigation quickly ensued, and those actions were consolidated and assigned to this Court as a multidistrict litigation.  In addition to actions brought by purchasers of the "clean diesel" vehicles and by car dealers, various plaintiffs also filed actions against Volkswagen under the Private Securities Litigation Reform Act ("PSLRA") for securities fraud related to the defeat device emissions scandal.

This order relates to one such securities action brought by Lead Plaintiff Arkansas State Highway Employees' Retirement System ("ASHERS") and Plaintiff Miami Police Relief and Pension Fund ("Miami Police") (collectively, "Plaintiffs"), who represent a proposed class of all persons who purchased Volkswagen-sponsored Level 1 American Depositary Receipts ("ADRs")[1]

_____

[1] An ADR "is a U.S. dollar denominated form of equity ownership in a non-U.S. company.  It

1  on an over-the-counter ("OTC") market in the United States from November 19, 2010 through

2  January 4, 2010 (the "Class Period").  Plaintiffs allege that Volkswagen made material

3  misrepresentations and omissions regarding its vehicles' compliance with emissions regulations as

4  well as the company's overall financial condition that led to the decline in value of their ADRs.

5      Now before the Court are Defendants' collective motion to dismiss and Martin

6  Winterkorn's and Herbert Diess's individual motions to dismiss for lack of personal jurisdiction.

7  (*See* Dkt. Nos. 1705, 1706, 1708.)  Central to Defendants' collective motion are (1) whether the

8  Volkswagen ADRs, which represent foreign shares on a foreign exchange in Germany, are beyond

9  the territorial reach of Section 10(b) of the Securities Exchange Act, and (2) whether Plaintiffs'

10  claims are more properly litigated in Germany, where Volkswagen is already subject to ongoing

11  government investigation and other private litigation.  Because Volkswagen sponsored the ADRs

12  in the United States and Plaintiffs purchased the ADRs here, and because the United States has an

13  interest in protecting domestic investors against securities fraud, the Court concludes that Section

14  10(b) applies to the Volkswagen ADRs and that Plaintiffs' claims are properly before this Court.

15      As discussed below, the Court GRANTS IN PART and DENIES IN PART Defendants'

16  motion to dismiss and DENIES Winterkorn's and Diess's individual motions to dismiss.

17                          **BACKGROUND**[2]

18      This matter is a proposed securities fraud class action relating to Volkswagen ADRs traded

19  here in the United States against corporate Defendants Volkswagen Aktiengesellschaf ("VW

20  AG"); Volkswagen Group of America ("VWGoA"); Volkswagen of America ("VWoA"); and

21  Audi of America, Inc. ("AoA") (collectively, the "Corporate Defendants"), and individual

22  Defendants Martin Winterkorn ("Winterkorn"), former CEO and Chairman of the Management

23  Board of VW AG; Michael Horn ("Horn"), former President and CEO of VWGoA, as well as

24  President of the VWOA brand, from January 2014 to March 2016; Jonathan Browning

25

26  represents the foreign shares of the company held on deposit by a custodian bank in the
company's home country and carries the corporate and economic rights of the foreign shares,

27  subject to the terms specified on the ADR certificate."  (Dkt. No. 1510 ("Compl.") ¶ 33.)

28  [2] The following recitation of facts is taken from the allegations in the Consolidated Securities
Class Action Complaint.  (Dkt. No. 1510.)

United States District Court
Northern District of California

United States District Court
Northern District of California

1  ("Browning"), former President and CEO of VWGoA from October 2010 to December 2013; and

2  Herbert Diess ("Diess"), a Member of the Board of Management of VW AG and Chairman of the

3  Board of Management of the Volkswagen Passenger Cars Brand (collectively, the "Individual

4  Defendants," and all together, "Defendants" or "Volkswagen").

5       According to Volkswagen's website,

6       An American Depositary Receipt ("ADR") is a U.S. dollar
        denominated form of equity ownership in a non-U.S. company. It
7       represents the foreign shares of the company held on deposit by a
        custodian bank in the company's home country and carries the
8       corporate and economic rights of the foreign shares, subject to the
        terms specified on the ADR certificate.
9
        Volkswagen Aktiengesellschaft has two sponsored ADR programs,
10      representing the preference and ordinary shares. Both are sponsored
        by J.P. Morgan and trade in the US on the over-the-counter (OTC)
11      market.

12  (Compl. ¶ 33.)  Volkswagen first sponsored its preference share ADRs in the United States in

13  1988 through a Deposit Agreement entered into with J.P. Morgan (then Morgan Guaranty Trust

14  Company of New York). (*Id.* ¶ 34; Dkt. No. 1708-4.)  Volkswagen also sponsored ordinary ADRs

15  through two Deposit Agreements with J.P. Morgan in 1990 and 2003. (Dkt. Nos. 1708-3, 1708-

16  5.)  Both types of ADRs—Volkswagen Ordinary ADRs (Ticker: VLKPY; CUSIP: 928662303)

17  and Volkswagen Preference Share ADRs (Ticker: VLKAY; CUSIP: 928662402)—trade on an

18  over-the-counter market called the OTCQX market, run by OTC Markets Group Inc. (Compl.

19  ¶ 34.)  During the Class Period, ASHERS purchased, in the United States, Volkswagen's ordinary

20  ADRs, and Miami Police purchased, in the United States, Volkswagen's preference share ADRs.

21  (*Id.* ¶¶ 35-36.)

22       As is now well known, Volkswagen effected a massive fraud related to the alleged

23  compliance of its "clean diesel" vehicles, having installed software "defeat devices" in 11 million

24  vehicles sold worldwide, including 580,000 sold in the United States, that allowed the vehicles to

25  meet emissions standards when undergoing official testing even though the vehicles emitted up to

26  40 times the legal limit of nitrous oxide (NOx) during normal operation. (*Id.* ¶¶ 7-14.)  Despite its

27  knowledge that the vehicles did not comply with U.S. and European emissions regulations,

28  Volkswagen and its executives misled the investing public before and during the Class Period by

United States District Court
Northern District of California

assuring them to the contrary—namely, that the diesel vehicles met all applicable emissions standards, including those in all 50 states of the United States. (*Id.* ¶ 8.) Volkswagen also understated the liabilities that it would suffer as a result of its known emissions non-compliance, including at least $18 billion in fines that it potentially faced for violations of the Clean Air Act alone. (*Id.*)

Volkswagen's material misrepresentations and omissions artificially inflated the price of its securities around the world, including the ordinary and preference ADRs traded here in the United States. (*Id.* ¶¶ 434-35.) Once the truth was revealed in September 2015, Volkswagen's share prices were negatively affected, resulting in a $63-billion drop in Volkswagen's market capitalization. (*Id.* ¶¶ 8, 25.) With respect to the securities at issue here, Volkswagen's fraudulent conduct caused the price of the ordinary ADRs to decline from $38.03 per ADR on September 17, 2015, the day before the Environmental Protection Agency ("EPA") and the California Air Resources Board ("CARB") announced the emissions cheating scandal, to $28.34 per ADR on January 5, 2016; the price of Volkswagen's preference ADRs similarly declined from $38.05 per ADR on September 17, 2015 to $26.16 per ADR on January 5, 2016. (*Id.* ¶¶ 436-445.)

Plaintiffs seek compensatory damages and other equitable relief from Volkswagen for violations of Securities Exchange Act Section 10(b) and SEC Rule 10b-5 because Defendants "made untrue statements of material fact and omitted to state material facts necessary to make their statements not misleading" with regards to Volkswagen's financial condition as well as the defeat devices that Volkswagen installed in its "clean diesel" cars in order to give the appearance of compliance with various emissions standards in the United States and in the European Union. (*Id.* ¶¶ 459-65.) Plaintiffs also allege that VW AG and the Individual Defendants are liable under Section 20(a) of the Exchange Act for Volkswagen's fraudulent conduct as "controlling persons" of the various Corporate Defendants. (*Id.* ¶¶ 466-78.)

## DISCUSSION

Defendants collectively move to dismiss Plaintiffs' complaint on five grounds: (1) Plaintiffs' claims fall outside the territorial reach of Section 10(b) under the Supreme Court's decision in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010); (2) the case should be

4

dismissed on *forum non conveniens* grounds because Germany is the superior forum for resolution of Plaintiffs' claims; (3) Plaintiffs failed to adequately plead facts giving rise to a "strong inference" that Defendants acted with scienter; (4) the misstatements or omissions Plaintiffs identified were merely aspirational and not actionable under Section 10(b); and (5) Plaintiffs failed to plead control person liability under Section 20(a).  (Dkt. No. 1708.)  Diess and Winterkorn each also separately move to dismiss the complaint for lack of personal jurisdiction.  (Dkt. Nos. 1705, 1706.)

## I.      Extraterritorial Application of Section 10(b)

In *Morrison v. National Australia Bank Ltd.*, the Supreme Court considered the extraterritorial application of Section 10(b) of the Securities Exchange Act—that is, whether Section 10(b) applies to acts beyond the borders of the United States.  561 U.S. at 254.  The Supreme Court, noting the presumption against extraterritoriality as well as Congress's silence about Section 10(b)'s extraterritorial application, found that "there is no affirmative indication in the Exchange Act that § 10(b) applies extraterritorially" and "therefore conclude[d] that it does not."  *Id.* at 265.  The Supreme Court thus held that "it is in our view only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies."  *Id.* at 267; *see also id.* at 273 ("Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States.").  After *Morrison*, courts have applied a two-prong test to determine whether a particular securities transaction is properly within the territorial reach of Section 10(b): (1) whether the transaction is in "securities listed on domestic exchanges"; or (2) whether the transaction is a "domestic transaction[] in other securities."  *Id.*

Defendants assert that neither prong of the *Morrison* test is satisfied here with respect to the Volkswagen ADRs that Plaintiffs purchased.  As discussed below, the ADRs satisfy prong two, but not prong one, of *Morrison* and therefore Plaintiffs' securities claims are not an impermissible extraterritorial application of Section 10(b).

United States District Court
Northern District of California

5

United States District Court
Northern District of California

### A.   "Securities Listed on Domestic Exchanges"

Defendants first argue that the over-the-counter market on which the Volkswagen ADRs trade, the OTCQX market, is not a "domestic exchange" and therefore does not satisfy the first prong of *Morrison*.  (Dkt. No. 1708 at 28.)  The Court agrees.  The district court's reasoning in *Stoyas v. Toshiba Corp.* is persuasive on this point:

> The Court notes that the Supreme Court in <u>Morrison</u> focused on the purposes of the Securities Exchange Act in making its determination that § 10(b) was not intended by Congress to be applied extraterritorially. <u>See Morrison</u>, 561 U.S. at 263, 130 S.Ct. 2869. The statute's statement of purpose explicitly references over-the-counter markets as well as securities exchanges, stating that both "are effected with a national public interest which makes it necessary to provide for regulation and control of such transactions and of practices and matters related thereto." 15 U.S.C. § 78b ("Necessity for regulation"). The statute thus recognizes a distinction between securities exchanges and OTC markets. And looking to the plain language of the statute's requirements for an "exchange" as cited by Plaintiffs, Plaintiffs have not pled or argued that the OTC market at issue here satisfies the requirements to be an "exchange," or that the OTC market satisfies the SEC's regulatory exemptions from those requirements. <u>See</u> 15 U.S.C. § 78c(a)(1); SEC Rule 3a1-1(a), codified at 17 C.F.R. § 240.3a1-1. Thus, the OTC market at issue here is likely just that—an OTC market, not an exchange as meant by <u>Morrison</u> or as defined and regulated by the statute.

No. CV 15-04194 DDP (JCx), 2016 WL 3563084, at *7 (C.D. Cal. May 20, 2016); *see also United States v. Georgiou*, 777 F.3d 125, 134-35 (3d Cir. 2015) (noting that "the stated purpose of the [Securities Exchange] Act refers to 'securities exchanges' and 'over-the-counter markets' separately, which suggests that one is not inclusive of the other").

So too here.  As in *Stoyas*, Plaintiffs do not suggest nor plead in the complaint that the OTCQX market is a securities exchange or that the OTCQX market is exempt from the SEC's requirements to be an exchange.  Plaintiffs' reliance on *SEC v. Ficeto*, 839 F. Supp. 2d 1101 (C.D. Cal. 2011) does not alter the Court's conclusion.  The *Ficeto* court held that, under the Exchange Act, OTC markets and securities exchanges are the same because "so applying § 10(b) *effectuates* the purposes of the Act as expressed in the statute's clear text, while grouping securities traded on the domestic over-the-counter market with securities purchased on foreign exchanges and foreign markets—as Defendants suggest we do—*undermines* the Act's textually expressed purpose."  *Id.*

at 1112 (emphasis in original).  However, "a statute protecting and mentioning both kinds of markets does not mean the markets are the same, particularly when applying <u>Morrison</u>'s two pronged test." *Stoyas*, 2016 WL 3563084, at *7.  For this reason, the Court declines to follow the *Ficeto* court's reasoning.  The OTC market on which the Volkswagen ADRs trade is not a "domestic exchange" and thus the first *Morrison* prong is not satisfied.

### B.   "Domestic Transactions in Other Securities"

Under *Morrison*'s second prong, Plaintiffs argue—and Defendants do not dispute—that Plaintiffs' purchases of the Volkswagen Level 1 ADRs in the United States constitute domestic transactions.  (*See* Dkt. No. 1708 at 28; Dkt. No. 2041 at 39.)  As Plaintiffs note, "the ADRs that Plaintiffs purchased were sold to US investment advisers for the benefit of the US-resident Plaintiffs and were delivered through DTC, the principal US securities clearing and settlement system, to accounts at US financial institutions, and title transferred in the United States."  (Dkt. No. 2041 at 40-41 (citing Compl. ¶¶ 35-37); *see also Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 62 (2d Cir. 2012) ("[W]e hold that to sufficiently allege the existence of a 'domestic transaction in other securities,' plaintiffs must allege facts indicating that irrevocable liability was incurred or that title was transferred within the United States.").)  Relying on the Second Circuit's decision in *Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE*, 763 F.3d 198 (2d Cir. 2014), Defendants counter that even where a domestic transaction exists, Section 10(b) does not apply if the transaction is "predominately foreign."[3]  (Dkt. No. 1708 at 28.)

To demonstrate the foreign nature of this case, Defendants first assert that "the 'character' of the securities at issue here is 'predominantly foreign.'"  (*Id.* at 29-30.)  As noted, Defendants rely heavily on the Second Circuit's *Parkcentral* decision, but that case is distinguishable.[4]

---

[3] The Ninth Circuit has not adopted *Parkcentral*'s "predominately foreign" test and so the undisputed existence of a domestic transaction here arguably ends the inquiry under *Morrison*'s second prong.  In any event, the Court reaches the same conclusion even under *Parkcentral*—that the second prong is satisfied—and addresses Defendants' arguments for the sake of completeness.

[4] Defendants also cite to *In re Societe Generale Securities Litigation*, No. 08 CIV. 2495 RMB, 2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010), stating that the court there "applied *Morrison* to dismiss Section 10(b) claims based on precisely the same kind of securities at issue here—Level 1, sponsored and unlisted ADRs of a foreign issuer."  (Dkt. No. 1708 at 29.)  However, in that case, the parties did not brief *Morrison*'s application to the ADRs at issue.  Moreover, in dismissing the ADRs claim, the court relied on a pre-*Morrison* case, which applied the Second Circuit's

United States District Court
Northern District of California

1   Relying on Porsche's public statements that it had no intention of acquiring control of

2   Volkswagen, the plaintiffs had purchased swap agreements to bet that Volkswagen's stock would

3   decline in value.  When Porsche's true intentions later became public, Volkswagen's stock price

4   rose, causing the plaintiffs to incur losses on their swap agreements.  The plaintiffs sued Porsche

5   under Section 10(b) for making false statements about its intent.  In determining whether Section

6   10(b) applied, the Second Circuit noted that "[t]he plaintiffs d[id] not allege . . . that Porsche was a

7   party to any securities-based swap agreements referencing VW stock, or that it participated in the

8   market for such swaps in any way."  *Parkcentral*, 763 F.3d at 207.  This fact gave the court

9   concern: "Were this suit allowed to proceed as pleaded, it would permit the plaintiffs, *by virtue of*

10  *an agreement independent from the reference securities*, to hale the European participants in the

11  market for German stocks into U.S. courts and subject them to U.S. securities laws."  *Id.* at 216

12  (emphasis added).  The Second Circuit thus held that "the imposition of liability under § 10(b) on

13  these *foreign defendants with no alleged involvement in plaintiffs' transaction*s, on the basis of the

14  defendants' largely foreign conduct, for losses incurred by the plaintiffs in securities-based swap

15  agreements based on the price movements of foreign securities would constitute an impermissibly

16  extraterritorial extension of the statute."  *Id.* at 201 (emphasis added).

17      Here, in contrast, the ADRs are not independent from Volkswagen's foreign securities or

18  from Volkswagen itself; instead, Volkswagen sponsored the ADRs and thus was directly involved

19  in the domestic offering of the ADRs.  (Compl. ¶¶ 33-34.)  As the Third Circuit has explained,

20          ADRs may be either sponsored or unsponsored. An unsponsored
            ADR is established with little or no involvement of the issuer of the
21          underlying security. *A sponsored ADR, in contrast, is established*
            *with the active participation of the issuer of the underlying security.*
22          An issuer who sponsors an ADR enters into an agreement with the

23  _____

24  "conduct" and "effects" tests that were expressly rejected by *Morrison*, for the broad proposition
    that trade in ADRs is considered to be a "predominantly foreign securities transaction."  *See*
25  *Societe Generale*, 2010 WL 3910286, at *6 (quoting *Copeland v. Fortis*, 685 F. Supp. 2d 498, 506
    (S.D.N.Y. 2010)).  Given the allegations here tying Volkswagen's ADRs to the United States, the
26  Court declines to follow *Societe Generale*.  Moreover, as Plaintiffs note, at least one court has
    called into question *Societe Generale*'s ruling.  *See Wu v. Stomber*, 883 F. Supp. 2d 233, 253
27  (D.D.C. 2012) (finding that analysis applied in *Societe Generale* and one other case "is
    inconsistent with the bright line test set forth by the Supreme Court in *Morrison,* which focuses
28  specifically and exclusively on where the plaintiff's purchase occurred"), *aff'd*, 750 F.3d 944
    (D.C. Cir. 2014), and *aff'd*, 750 F.3d 944 (D.C. Cir. 2014); *Phelps v. Stomber*, 883 F. Supp. 2d
    188, 208 (D.D.C. 2012) (same).

depository bank and the ADR owners. The agreement establishes the terms of the ADRs and the rights and obligations of the parties, such as the ADR holders' voting rights.

*Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 367 (3d Cir. 2002) (internal citations omitted; emphasis added).  At least one other court has distinguished *Parkcentral* on this basis.  *See Atlantica Holdings, Inc. v. BTA Bank JSC*, No. 13-CV-5790 JMF, 2015 WL 144165, at *8 (S.D.N.Y. Jan. 12, 2015) (distinguishing *Parkcentral* because "[n]either the defendants nor VW had any involvement with the swaps themselves"); *see also Stoyas*, 2016 WL 3563084, at *11 ("Plaintiffs have not pled that Toshiba listed its securities in United States or *sponsored*, solicited, or engaged in any other affirmative act in connection with securities sales in the United States; thus, § 10(b) does not apply to Toshiba.") (emphasis added).

In light of the allegation that Volkswagen actually sponsored the ADRs, the Court is also not persuaded by Defendants' argument that the level of the ADRs—here, Level 1, as opposed to Level 2 or 3—warrants a conclusion that the transactions are predominately foreign and therefore beyond the reach of Section 10(b).[5]  (*See* Dkt. No. 1708 at 30.)  According to Defendants, "as the issuer under a sponsored Level 1 ADR facility, VWAG neither seeks to raise capital in the United States nor files periodic or other reports with the SEC.  VWAG makes disclosures solely in accordance with German law and is not required to adhere to the reporting requirements of the Exchange Act."  (Dkt. No. 1708 at 30 (internal citations omitted).)  Even accepting these premises,

_____

[5] As Defendants note,

There are three "levels" of ADR facilities, which are "categorized … depending on the extent to which the foreign company has accessed the U.S. markets."  Level 2 ADRs may be listed and traded on a U.S. securities exchange, and Level 3 ADRs permit the foreign company to raise capital in the United States as well.  Given the extent of these contacts with U.S. markets, a foreign company with Level 2 or 3 ADRs must file, in addition to a Form F-6, annual reports with the SEC "contain[ing] extensive financial and non-financial information about the issuer."  VWAG's ADRs, by contrast, are Level 1, which reflects the least contact with the United States of the three levels and does not require disclosures other than pursuant to the laws of Germany."

(Dkt. No. 1708 at 22-23 (internal citations omitted).)  "As the issuer under a sponsored Level 1 ADR facility, VWAG complies with Rule 12g3-2(b) under the Exchange Act, which requires a non-U.S. issuer to post on its website, in English, its reports issued abroad."  (*Id.* at 23 n.3.)

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    the connection of the Volkswagen ADRs to the United States is not as tenuous as Defendants

2    contend.

3         Regardless of the level of the ADRs, Volkswagen took affirmative steps to make its

4    securities available to investors here in the United States.  (*See* Dkt. No. 1708 at 23 (stating that

5    Volkswagen "arranged for [the ADRs'] issuance simply for the convenience of U.S. investors").

6    The Deposit Agreements creating the ADRs were entered into between Volkswagen and J.P.

7    Morgan of New York and provide specifically that the Agreements and the ADRs are governed by

8    New York law.  (Dkt. No. 1708-3 at 18, 42; Dkt. No. 1708-4 at 16, 40.)  Volkswagen submitted

9    Form F-6 Registration Statements with the SEC to make the ADRs available in the United States.

10   (Dkt. Nos. 1708-3, 1708-4.)  As a result of Volkswagen's actions, the ADRs were and are offered

11   to domestic investors on an OTC market located in the United States—and Plaintiffs in fact

12   purchased the ADRs in the United States.  (Compl. ¶¶ 33-36.)  Moreover, although Volkswagen is

13   not subject to the SEC reporting requirements for Level 2 and 3 ADRs, it nevertheless must, and

14   does, comply with SEC Rule 12g3-2(b), which requires a foreign issuer of certain domestic

15   securities, such as ADRs, to provide on its website English-translated versions of market

16   disclosure documents provided in its home country such that U.S. investors have relevant

17   investment information.  *See* 17 C.F.R. § 240.12g3-2(b).  And while Volkswagen's assertion made

18   pre-complaint that one of the "exchanges" its shares traded on was New York (*see* Compl. ¶ 33;

19   Dkt. No. 2043-3 at 2) does not persuade the Court that its shares are traded on a domestic

20   exchange for purposes of *Morrison*'s first prong, it adds to the reasonable inference that

21   Volkswagen intended its ADR offerings to be for the benefit of domestic U.S. investors.  These

22   allegations establish a sufficient connection between Volkswagen's ADRs and the United States.

23        Defendants also argue that the "relevant actions" giving rise to Plaintiffs' claims all point

24   toward Germany, again relying on *Parkcentral*.  (Dkt. No. 1708 at 30.)  While much of

25   Defendants' alleged fraudulent scheme was perpetrated in and from Germany, the Court cannot

26   conclude, as Defendants urge, that no relevant conduct occurred in the United States.  Volkswagen

27   provided on its website English versions of its public disclosures in compliance with United States

28   regulations so that it could offer ADRs to investors in the United States.  Furthermore, Plaintiffs

United States District Court
Northern District of California

specifically allege that the American subsidiaries of Volkswagen—VWGoA, VWoA, and AoA—as well as Horn and Browning made false statements in the United States to regulators and to the American public concerning the "clean diesel" vehicles' alleged compliance with emissions limits and regulations.[6]  (*See, e.g.*, Compl. ¶¶ 310, 329-331, 382-412.)  These relevant actions, which are clearly tied to the United States, take this case beyond the unique circumstances of *Parkcentral*.  *See* 763 F.3d at 216 ("The complaints concern statements made primarily in Germany with respect to stock in a German company traded only on exchanges in Europe.").

Accordingly, the Court concludes that the second prong of *Morrison* is satisfied.  *See, e.g.*, *United States v. Martoma*, No. 12 CR 973 PGG, 2013 WL 6632676, at *5 (S.D.N.Y. Dec. 17, 2013) (finding second prong of *Morrison* satisfied where "it is undisputed that the Elan ADRs at issue were traded on the NYSE, which means that the formation of contracts for those trades, the passing of title to those securities, and the incurring of liability on the part of sellers and purchasers of those ADRs occurred in the United States").[7]  Applying Section 10(b) here is not an

---

[6] Defendants argue that the Volkswagen subsidiaries' misrepresentations should not be considered at all in the "predominantly foreign" analysis:

> Because VWAG, not its subsidiaries, was allegedly responsible for the installation of the defeat devices in Volkswagen vehicles and for the reports issued to investors, the allegedly false and misleading statements of VWAG's subsidiaries in the United States were at most tangential to any alleged harm to investors.  The allegations concerning false and misleading statements attributed to VWGoA, VWoA and AoA are therefore insufficient to undermine the conclusion that the "relevant actions" are "predominantly foreign."

(Dkt. No. 1708 at 31).  This argument appears to address the materiality of the subsidiaries' misstatements, i.e., whether the statements would have been viewed by the reasonable investor as having significantly altered the "total mix" of information available.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988).  But the "determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).  The Court thus declines at this stage to characterize the subsidiaries' statements as "at most tangential" and rejects Defendants' argument.

[7] Defendants attempt to distinguish *Martoma*, and other cases, on grounds that the case involved ADRs listed and traded on the NYSE.  (Dkt. No. 2261 at 13.)  While the *Martoma* court did conclude that prong one of *Morrison* was satisfied by virtue of the NYSE, the court also separately analyzed prong two.  For the second prong, the NYSE was only relevant in that the transactions at issue occurred in the United States.  *See Martoma*, 2013 WL 6632676, at *4 ("Under *Absolute Activist*, transactions are not extraterritorial if 'irrevocable liability was incurred or [ ] title was transferred within the United States.' *Absolute Activist*, 677 F.3d at 62. Here, the Elan ADRs in question were bought and sold on the NYSE, and liability was incurred, and title was transferred,

11

1    impermissible extraterritorial application of the Securities Exchange Act as prohibited by

2    *Morrison*.  The Court therefore DENIES Defendants' motion to dismiss on this ground.

3    **II.    *Forum Non Conveniens***

4        **A.    Legal Standard**

5        A party moving to dismiss based on *forum non conveniens* bears the burden of showing

6    that (1) there is an adequate alternative forum, and (2) the balance of private and public interest

7    factors favors dismissal.  *See Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1142-43 (9th Cir. 2001).

8    A domestic plaintiff's forum choice is entitled to considerable deference, whereas a foreign

9    plaintiff's forum choice is entitled to less deference.  *Ravelo Monegro v. Rosa*, 211 F.3d 509, 513

10   (9th Cir. 2000) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981)).

11       The plaintiff's choice of forum will not be disturbed unless the private and public interest

12   factors strongly favor trial in the foreign country.  *See Gates Learjet Corp. v. Jensen*, 743 F.2d

13   1325, 1334 (9th Cir. 1984).  "[T]he standard to be applied [to a motion for dismissal on the ground

14   of *forum non conveniens*] is whether . . . defendants have made a clear showing of facts which . . .

15   establish such oppression and vexation of a defendant as to be out of proportion to plaintiff's

16   convenience, which may be shown to be slight or nonexistent."  *Cheng v. Boeing Co.*, 708 F.2d

17   1406, 1410 (9th Cir. 1983) (internal quotation marks and citation omitted).

18       **B.    Adequate Alternative Forum**

19       The parties do not dispute that Germany is an adequate alternative forum for resolving

20   Plaintiffs' claims.  The Court agrees.  *See, e.g.*, *Mattel, Inc. v. Greiner & Hausser GmbH*, 354

21   F.3d 857, 868 (9th Cir. 2003) ("Germany provides an adequate forum for resolving disputes[.]").

22       **C.    Deference to Plaintiffs' Choice of Forum**

23       The parties disagree about the amount of deference, if any, that should be accorded to

24   Plaintiffs' choice of a United States forum.  Defendants argue that Plaintiffs' choice of forum is

25   not dispositive because (1) "Plaintiffs' claims relate almost exclusively to transactions, witnesses,

26   and evidence located in, or decisions made in and disseminated from, Germany," and (2)

27   "Plaintiffs elected to invest in 'predominantly foreign' securities, subject only to Germany's

28   within the United States.").

United States District Court
Northern District of California

United States District Court
Northern District of California

1   disclosure laws—not the reporting requirements of the Exchange Act."  (Dkt. No. 1708 at 31-32.)

2   Plaintiffs respond that their forum choice should be given great weight because they are U.S.

3   residents, as are most proposed class members since the putative class consists of persons who

4   acquired Volkswagen ADRs issued in the United States.  (Dkt. No. 2041 at 54.)

5          The Court concludes that Plaintiffs, who are United States residents and bring claims based

6   on United States securities laws, are entitled to considerable deference to their forum choice.  *See,*

7   *e.g.*, *Ravelo Monegro*, 211 F.3d at 513; *Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d

8   1446, 1449 (9th Cir. 1990) ("[G]reat deference is due plaintiffs because a showing of convenience

9   by a party who has sued in his home forum will usually outweigh the inconvenience the defendant

10  may have shown.") (citation omitted).  The Court recognizes that "[t]he presence of American

11  plaintiffs . . . is not in and of itself sufficient to bar a district court from dismissing a case on the

12  ground of *forum non conveniens*."  *Cheng*, 708 F.2d at 1411 (citations omitted).  However, as

13  discussed above with respect to *Morrison*'s extraterritoriality concerns, the case has sufficient

14  connections to the United States—Volkswagen sponsored two types of ADRs through J.P.

15  Morgan on an OTC market in New York in order for Americans to invest (Compl. ¶¶ 33-34); in

16  sponsoring the ADRs, Volkswagen agreed that the agreements and the ADRs themselves would

17  be governed by New York law (Dkt. No. 1708-3 at 42; Dkt. No. 1708-4 at 40); Plaintiffs

18  purchased the Volkswagen-sponsored ADRs in the United States (Compl. ¶¶ 35-36); Volkswagen,

19  through  Defendants, made alleged misrepresentations, including misrepresentations in the United

20  States, that negatively affected the ADRs' share price (*e.g.*, *id.* ¶ 428); and as a result of the

21  misrepresentations and drop in share price, Plaintiffs  sue for violations of United States securities

22  laws (*id.* ¶¶ 459-78).  Plaintiffs' residence in the United States coupled with these additional facts

23  justifies giving deference to Plaintiffs' choice of forum.

24          Defendants' cited cases where claims involving ADRs were dismissed on *forum non*

25  *conveniens* do not compel a different result.  (*See* Dkt. No. 1708 at 33.)  In *Stoyas v. Toshiba*

26  *Corp.*, the district court dismissed on *forum non conveniens* grounds only the remaining Japanese

27  securities law claim.  *See* 2016 WL 3563084, at *14 ("Defendant argues here that under the

28  practical considerations of *forum non conveniens*, this Court should dismiss Plaintiffs' Japanese

law claim.").  Here, in contrast, Plaintiffs' claims are based on United States securities law—namely, Sections 10(b) and 20(a) of the Securities Exchange Act.  This fact also distinguishes the Gulf oil spill case, *Glenn v. BP p.l.c.*; rather than U.S. law, the plaintiff was "seeking to test the outer limits of English law," and the court concluded that "[s]uch an exercise is much better attempted in front of a tribunal deeply ensconced in the relevant law."  27 F. Supp. 3d 755, 766 (S.D. Tex. 2014), *aff'd*, 602 F. App'x 199 (5th Cir. 2015).  And in *Sarandi v. Breu*, the court dismissed plaintiff's claims on *forum non conveniens* where the case was "a derivative action in which the claim [was] not being brought *against* the corporation, but rather, *by* the corporation against its [foreign] officers and directors for injury to the company."  No. C 08-2118 SBA, 2009 WL 2871049, at *8 (N.D. Cal. Sept. 2, 2009) (emphasis in original).  The court noted, however, that plaintiff's arguments for maintaining the litigation in the United States "might have merit *if* this case were brought as a *direct* action against the corporation based on violations of American law."  *Id.* (emphasis in original).  Such is the case here.  Finally, *In re European Aeronautic Defence & Space Co. Securities Litigation* is inapposite because, contrary to here, the plaintiff had only purchased shares in Europe and did "not allege that any class member acquired its EADS shares as ADRs in the United States."  703 F. Supp. 2d 348, 358 (S.D.N.Y. 2010).

For these reasons, Plaintiffs' choice of forum in the United States should be accorded considerable deference.  Therefore, Plaintiffs' choice will not be disturbed unless the private and public interest factors weigh heavily in favor of trial in Germany.  *See Gates*, 743 F.2d at 1334.

## D.    Private Interest Factors

The private interest factors include:

> (1) the residence of the parties and witnesses;
> (2) the forum's convenience to the litigants;
> (3) access to physical evidence and other sources of proof;
> (4) whether unwilling witnesses can be compelled to testify;
> (5) the cost of bringing witnesses to trial;
> (6) the enforceability of the judgment; and
> (7) all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Lueck*, 236 F.3d at 1145 (citations and internal quotation marks omitted).  The private interest factors weigh against dismissal of Plaintiffs' claims.

14

United States District Court
Northern District of California

1    First, the residence of the parties and witnesses weighs against dismissal.  Most notably,

2 Plaintiffs are U.S. residents, as are VWGoA, VWoA, and AoA.[8]  (Compl. ¶¶ 38-39, 42-44.)  This

3 factor only slightly weighs against dismissal, however, due to the fact that several Defendants are

4 residents of foreign countries, including Germany.  (*Id.* ¶ 40; Dkt. No. 1707-1 at 3 ¶ 3.)

5    Second, this forum's convenience to the litigants weighs against dismissal.  The forum is

6 clearly convenient for Plaintiffs as they brought suit here.  *See Carijano v. Occidental Petroleum*

7 *Corp.*, 643 F.3d 1216, 1227 (9th Cir. 2011) ("When a domestic plaintiff initiates litigation in its

8 home forum, it is presumptively convenient.") (citation omitted).  And various named defendants,

9 represented by the same U.S. counsel, are already litigating before the Court in actions related to

10 the same emissions scandal.  (*See* Dkt. Nos. 1805-07 (class action complaints identifying VW AG,

11 VWGoA, AoA, Winterkorn, and Horn as named defendants).)

12    Third, the access-to-evidence factor also does not favor dismissal.  Because Defendants

13 have been litigating cases related to the emissions scandal in the United States, many of the

14 documents relevant to Plaintiffs' claims have already been produced and are available here.  *See*

15 *Volkswagen de Mexico, S.A. v. Germanischer Lloyd*, No. 90 CIV. 1248 (MGC), 1991 WL 230622,

16 at *3 (S.D.N.Y. Oct. 29, 1991) (noting that, given a related domestic litigation, "[i]t also appears

17 that a significant amount of this documentation is already in New York" and thus "[t]he amount of

18 documentation that must be transported is not so substantial that it would impair defendant's

19 access to sources of proof").  Defendants contend that this factor favors dismissal because

20 substantial effort will be required to translate testimony and documentary evidence to English.

21 (Dkt. No. 1708 at 36.)  But, as already noted, much of the relevant documentation has been

22 produced here in related litigation, and Plaintiffs appear to have had no difficulty referring in their

23 complaint to documents that were originally in German.  (*See id.* (Defendants identifying German-

24 language evidence cited to in Plaintiffs' complaint).)

25    Fourth, Defendants contend that "key witnesses who no longer work for VWAG, and thus,

26 are not under its control, could not be compelled to testify in the U.S."  (Dkt. No. 2261 at 17.)

27

28 [8] Plaintiffs also state that Horn is a United States resident (*see* Dkt. No. 2041 at 57), though this
  does not appear to be pled in the complaint.

United States District Court
Northern District of California

While Defendants need not provide a comprehensive list of potential unwilling witnesses, their general assertion of non-party witness unavailability, without identification of even a single unavailable witness, is entitled to little weight.  *See Carijano*, 643 F.3d at 1231 ("'When no witness' unwillingness has been alleged or shown, a district court should not attach much weight to the compulsory process factor.'") (quoting *Duha v. Agrium, Inc.*, 448 F.3d 867, 877 (6th Cir. 2006)).)  This factor therefore does not favor dismissal.

Fifth, the cost of bringing witnesses to trial weighs in favor of dismissal, as there are witnesses outside the United States who will need to travel from Germany.  However, the Court does not give this factor significant weight given that Volkswagen has substantial resources and consequently will face no financial difficulties in bringing witnesses to the forum.  *See In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 230 F. Supp. 2d 376, 389 (S.D.N.Y. 2002) (finding that the convenience of witnesses and location of evidence did not favor dismissal where the defendant, "the parent company to a multinational conglomerate, has vast resources and can therefore easily transport witnesses and evidence to this forum, a major city that is a direct flight from any major city in the world").

Given that only one of the private interest factors weighs in Defendants' favor, the Court finds that the private interest factors overall weigh against dismissal.

### E.    Public Interest Factors

The public interest factors to be considered include:

> (1) local interest of lawsuit;
> (2) the court's familiarity with governing law;
> (3) the burden on local courts and juries;
> (4) congestion in the court; and
> (5) the costs of resolving a dispute unrelated to this forum.

*Lueck*, 236 F.3d at 1147 (citations omitted).

Defendants focus only on the first public interest factor, arguing that Germany has a significant and stronger interest in holding Volkswagen, a German company, responsible for any alleged violations of German public disclosure and anti-market manipulation regulations.  (Dkt. No. 1708 at 35.)  As Defendants point out, German government authorities are already investigating Volkswagen's actions relating to the emissions scandal, and there already exists a

16

United States District Court
Northern District of California

1    "high volume" of investor litigation against Volkswagen in Germany.  (*Id.*)  The Court agrees that

2    on balance Germany has a greater interest in Volkswagen's allegedly fraudulent conduct than the

3    United States.  That is not to say, however, that there is little or no localized interest in this

4    litigation.  While Defendants correctly note that Level 1 ADRs are not subject to the same SEC

5    reporting requirements as higher-level ADRs or securities listed on a domestic exchange,

6    Volkswagen is still required under U.S. regulations—in particular, Rule 12g3-2(b)—to provide

7    English-translated disclosures on its website for the benefit of United States investors.  If domestic

8    investors had no recourse in the United States for fraudulent Rule 12g3-2(b) disclosures (as

9    Defendants seem to suggest), the rule would be superfluous.  But such is not the case, as the

10   United States undoubtedly has an interest in protecting domestic investors from fraudulent

11   conduct.  *See, e.g.*, *Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*, No. 01 CIV. 2946 (AGS), 2002

12   WL 432390, at *7 (S.D.N.Y. Mar. 20, 2002) (denying motion to dismiss on *forum non conveniens*

13   where "this Court, like all American courts, has a strong interest in protecting investors in U.S.

14   securities markets"); *E.ON AG v. Acciona, S.A.*, 468 F. Supp. 2d 559, 588 (S.D.N.Y. 2007)

15   ("[T]here is a strong interest in having an American court interpret and apply U.S. securities law

16   claims.").  Thus, although this factor weighs in favor of Defendants and dismissal, it does not

17   point as "squarely" to Germany as the superior forum as Defendants argue.

18          Defendants do not address any of the remaining public interest factors.  The Court

19   concludes that none of the other factors weighs in favor of dismissal: the Court is familiar with the

20   governing law, the Securities Exchange Act; there is nothing to suggest that hearing this case

21   would create congestion in the Court or cause an undue burden on the Court or on a local jury; and

22   because the Court has already found a sufficient U.S. connection for Plaintiffs' claims, there are

23   no costs of resolving a dispute unrelated to this forum.  Because only the first factor weighs in

24   Defendants' favor, the Court finds that Defendants have shown at best that the public interest

25   factors are neutral.

26                                          *    *    *

27          In sum, the private interest factors weigh against dismissal of Plaintiffs' claims while the

28   public interest factors are neutral.  Defendants have not satisfied their burden of establishing that

the private and public interest factors weigh heavily in favor of dismissal and thus Plaintiffs'

choice of forum must not be disturbed.  Defendants' motion to dismiss on *forum non conveniens* is

therefore DENIED.

**III.     Adequacy of Plaintiffs' Allegations**

      **A.     Legal Standard**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for

failure to state a claim upon which relief may be granted.  Dismissal may be based on either "the

lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal

theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  For purposes of

evaluating a motion to dismiss, a court "must presume all factual allegations of the complaint to be

true and draw all reasonable inferences in favor of the nonmoving party." *Usher v. City of Los

Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  A complaint must plead "enough facts to state a claim

to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A

claim is plausible "when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009).  "Courts must consider the complaint in its entirety, as well as other

sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular,

documents incorporated into the complaint by reference, and matters of which a court may take

judicial notice." *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

Claims for fraud must meet the pleading standard of Federal Rule of Civil Procedure 9(b),

which requires a party "alleging fraud or mistake [to] state with particularity the circumstances

constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Rule 9(b) "requires an account of the time,

place, and specific content of the false representations as well as the identities of the parties to the

misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation

marks omitted).  Securities fraud claims must also meet the heightened pleading requirements of

the PSLRA, which states that the complaint "shall specify each statement alleged to have been

misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding

the statement or omission is made on information and belief, the complaint shall state with

18

particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); *Tellabs*, 551 U.S. at 321.  A court shall dismiss any complaint that does not meet these requirements.  *See* 15 U.S.C. § 78u-4(b)(3)(A).

The PSLRA also requires a plaintiff to state with particularity facts giving rise to a strong inference of a defendant's scienter.  *See* 15 U.S.C. § 78u-4(b)(2).  "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  Therefore, a court "must consider plausible nonculpable explanations for the defendant's conduct."  *Id.*  "Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a 'strong inference' that misleading statements were knowingly or deliberate recklessness made to investors, a private securities fraud complaint is properly dismissed under Rule 12(b)(6)."  *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).

If a court does dismiss a complaint for failure to state a claim, the Federal Rules of Civil Procedure state that the court should freely give leave to amend "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  A court nevertheless has discretion to deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment."  *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## B.      Scienter

"In a § 10(b) action, scienter refers to a mental state embracing intent to deceive, manipulate, or defraud."  *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 648 (2010) (internal quotation and citation omitted).  "To adequately demonstrate that the defendant acted with the required state of mind, a complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (internal quotations and citations omitted).  To establish deliberate recklessness "the plaintiff must plead a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of

ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (internal quotation marks and citation omitted).

### 1.   Winterkorn

Defendants first challenge the scienter allegations against Winterkorn.  The crux of Defendants' argument is that Plaintiffs rely merely on the allegation that Winterkorn was a "detail-oriented, micromanaging CEO" to reach the impermissible conclusion that he therefore must have known about the "defeat devices" and the emissions scandal.  (Dkt. No. 1708 at 40.)  As Defendants urge, "such conclusory allegations about Winterkorn's general management style cannot substitute for detailed factual allegations about what he was told." (*Id.*)  But Plaintiffs' scienter allegations against Winterkorn are not so bare.

While Plaintiffs do note that Winterkorn was a micromanager as VW AG's CEO, they allege not only that he was in a position to receive information about the emissions scandal but that he in fact did receive several reports about the scandal.  (*E.g.*, Compl. ¶¶ 84 ("Defendants have also admitted that Winterkorn received multiple memoranda in 2014, including one in May 2014 from a quality-control expert known as VW AG's 'fireman,' regarding the Company's unlawful use of defeat-device software"), 303 ("[A]s VW AG has admitted, its top executives, including Defendant Winterkorn, knew of and received reports concerning the Company's use of defeat-device software and VW AG's attendant financial and legal exposure.  As early as 2007, Bosch warned VW AG's top executives, including Winterkorn, that the Company's intended use for its emissions-regulating software was illegal.  In 2011, an internal whistleblower warned the Company, including Winterkorn's confidant and Volkswagen's then-head of development Neuβer, that the Company was illegally manipulating reported emissions data.")  One of these reports was a memorandum from Bernd Gottweis, "whom employees referred to as the 'fireman' for his ability to 'smell trouble' and 'sound the alarm' and address emergent crises at the Company." (*Id.* ¶ 201.)  "In Gottweis's memo, which Winterkorn took home to read as part of his 'weekend suitcase,' Gottweis discussed tests by US agencies in which the NOx output of TDI vehicles exceeded acceptable levels by up to 35 times.  Gottweis told Winterkorn that there was no

1   legitimate explanation for either those excessive emissions levels or the defeat device that

2   regulators would no doubt find upon examination."  (*Id.* ¶ 202.)  Defendants argue that

3   Winterkorn may not have even seen the memorandum or that, even if he had, he may not have

4   understood its significance.  But Defendants are asking the Court to draw inferences in their favor

5   which, on Defendants' motion to dismiss, the Court cannot do.  *See Usher*, 828 F.2d at 561.

6   In addition to receiving reports of the scandal, Winterkorn also installed at Volkswagen

7   two of his "top aides during his tenure at Audi," Ulrich Hackenberg and Wolfgang Hatz, where

8   they "had daily responsibility for developing Volkswagen's clean-diesel strategy."  (Compl.

9   ¶ 109.)  The two Winterkorn associates were later reported to be "at the center of [Volkswagen's]

10  probe into the installation of engine software designed to fool regulators."  (*Id.*; *see also id.* ¶ 190

11  ("Credible reports also indicate that Winterkorn's top lieutenants were centrally involved in the

12  decision to use defeat-device software to manipulate emissions data.").)  As Plaintiffs allege,

13  "[g]iven Winterkorn's detail-oriented nature, his knowledge of everything his two close[s]t

14  lieutenants were doing reasonably implies knowledge from the outset of the Class Period."  (*Id.*

15  ¶ 305.)  Winterkorn's knowledge and involvement with his lieutenants can be further inferred

16  from his desire to surpass GM and Toyota—his "Strategy 2018"—and the importance of "clean

17  diesel" vehicles to that strategy.  (*Id.* ¶¶ 12, 46, 125, 160 (Volkswagen "conduct[ed] a massive,

18  years-long advertising and public relations campaign championing its purportedly successful

19  'clean diesel' design."); *see also id.* ¶ 318 ("[There is a compelling inference of scienter because

20  growth through 'clean diesel' sales was a central focus for Volkswagen throughout the Class

21  Period.  As discussed above, VW AG saw expanding diesel sales—particularly in the United

22  States—as a critical driver of market and earnings growth that would enable Volkswagen to

23  become the world's largest automaker.").)

24  In short, in addition to identifying Winterkorn as VW AG's CEO, the complaint contains

25  numerous allegations that lend support to a strong inference of his scienter.  *See S. Ferry LP, No. 2*

26  *v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) ("Allegations regarding management's role in a

27  corporate structure and the importance of the corporate information about which management

28  made false or misleading statements may also create a strong inference of scienter when made in

conjunction with detailed and specific allegations about management's exposure to factual

information within the company.")  Plaintiffs have sufficiently pled Winterkorn's scienter.

### 2.  Diess

Plaintiffs allege that Diess made material misrepresentations in VW AG's Second and

Third Quarter 2015 Interim Reports, both of which Diess signed, because the reports understated

VW AG's total liabilities and overstated its operating profit, total assets, and shareholders' equity.

(Compl. ¶ 326.)  As to the Second Quarter 2015 Interim Report, dated July 29, 2015, Plaintiffs

allege that Diess acted with scienter because prior to signing the report, on July 27, 2015,

"Volkswagen employees discussed the diesel issue on the periphery of a regular meeting about

damage and product issues, in the presence of Martin Winterkorn and Herbert Diess."  (Compl.

¶ 206.)  Defendants respond that "Diess could well have appreciated that there was an 'issue'

without understanding that some diesel vehicles had defeat devices or the financial impact that the

existence of such devices could ultimately have on VWAG."  (Dkt. No. 1708 at 44.)  However,

looking to the complaint as a whole—including, for example, allegations relating to Volkswagen's

knowledge of the May 2014 study conducted by West Virginia University's Center for Alternative

Fuels, Engines & Emissions indicating that the "clean diesel" vehicles had NOx emissions up to

40 times greater than the legal limit (Compl. ¶¶ 19, 86) or other pre-July 2015 documents relating

to Volkswagen's emissions non-compliance (e.g., id. ¶ 202)—one could draw the reasonable and

compelling inference that the discussed "diesel issue" was in fact the emissions scandal that

became public just two months later.  Plaintiffs have adequately alleged a strong inference of

scienter for Diess as to the Second Quarter 2015 Interim Report.

Regarding the Third Quarter 2015 Interim Report, Plaintiffs argue that the report was false

"because it did not recognize the required provisions for VWAG's emissions-related liabilities."

(Dkt. No. 2041 at 71-72 n.36.)  Defendants respond that the first page of the report actually

discloses that "[i]nitial exceptional charges of €6.7 billion [were] recognized for diesel issue;

earnings targets for 2015 to be adjusted."  (Dkt. No. 1708-10 at 4.)  In light of this disclosure, the

Court cannot conclude that the facts as alleged give rise to a strong inference of scienter as to

Diess.  To the extent Plaintiffs believe that the amount of money recognized was insufficient, the

more reasonable inference to be drawn is that VW AG, including Diess, misjudged or

miscalculated the amount of liability rather than actively tried to conceal the true amount.  This is

particularly true given that the emissions-cheating scandal had already been exposed to the public

a month earlier in September 2015.  Therefore, Plaintiffs have not adequately pled allegations

supporting a strong inference of scienter for Diess as to the Third Quarter 2015 Interim Report.

*See Tellabs*, 551 U.S. at 324 ("A complaint will survive . . . only if a reasonable person would

deem the inference of scienter cogent and at least as compelling as any opposing inference one

could draw from the facts alleged.").

### 3.    VW AG

Because the Court concludes that Plaintiffs have adequately alleged scienter with respect to

Winterkorn, such allegations are also sufficient to raise an inference of scienter as to VW AG.  *See*

*Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008) ("In most cases, the most

straightforward way to raise [an inference of scienter] for a corporate defendant will be to plead it

for an individual defendant.") (citation omitted).

Even apart from Winterkorn's scienter, Plaintiffs have sufficiently pled collective scienter.

Defendants challenge whether pleading collective scienter for a corporation is permissible under

the Ninth Circuit's decisions in *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th

Cir. 1995) and *Glazer Capital Management, LP v. Magistri*, 549 F.3d at 736, 745.  Contrary to

Defendants' position, Ninth Circuit law does not prohibit the doctrine of collective scienter in all

circumstances:

> *Nordstrom* does not foreclose the possibility that, in certain
> circumstances, some form of collective scienter pleading might be
> appropriate. For instance, as outlined in the hypothetical posed in
> *Makor*, there could be circumstances in which a company's public
> statements were so important and so dramatically false that they
> would create a strong inference that at least *some* corporate officials
> knew of the falsity upon publication.

*Glazer*, 549 F.3d at 744 (emphasis in original) (citing *Makor Issues & Rights, Ltd. v. Tellabs Inc.*,

513 F.3d 702, 710 (7th Cir. 2008));[9] *see also In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063

---

[9] The *Makor* hypothetical is as follows: "Suppose General Motors announced that it had sold one
million SUVs in 2006, and the actual number was zero.  There would be a strong inference of
corporate scienter, since so dramatic an announcement would have been approved by corporate

United States District Court
Northern District of California

(9th Cir. 2014) ("Nevertheless, in *Glazer Capital*, we opined that the [collective scienter (or corporate scienter)] doctrine might be appropriate in some cases."), *cert. denied sub nom. Cohen v. Nvidia Corp.*, 135 S. Ct. 2349 (2015); *Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607-08 (9th Cir. 2014) ("We may, however, impute scienter to individual defendants in some situations, for example, where we find that 'a company's public statements [are] so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication.") (quoting *Glazer*).

Having determined that pleading collective scienter may be appropriate under certain circumstances, the Court concludes that Plaintiffs' allegations plausibly infer such a circumstance. As noted above, the "clean diesel" vehicles were an integral part of Volkswagen's "Strategy 2018" to become the largest automobile manufacturer in the world. Given that, it is reasonable to infer that at least some corporate officials knew Volkswagen was falsely touting the emissions compliance of 11 million vehicles worldwide (including 580,000 in the United States) when in fact none of the vehicles were in compliance. The importance and falsity of the emissions-compliance statements gives rise to a plausible inference of VW AG's corporate scienter.

Plaintiffs also allege that the resignations, firings, and suspensions of Volkswagen's top executives provide strong evidence of VW AG's scienter. (Compl. ¶ 320; *see also* Dkt. No. 2041 at 74-75.) "[R]esignations, terminations, and other allegations of corporate reshuffling may in some circumstances be indicative of scienter"; "[w]here a resignation occurs slightly before or after the defendant corporation issues a restatement, a plaintiff must plead facts refuting the reasonable assumption that the resignation occurred as a result of [the] restatement's issuance itself in order for a resignation to be strongly indicative of scienter." *Zucco*, 552 F.3d at 1002. Plaintiffs have pled sufficient facts to compel the inference that the Volkswagen resignations, firings, and suspensions are strongly indicative of scienter.[10] For example, Plaintiffs allege that,

officials sufficiently knowledgeable about the company to know that the announcement was false." 513 F.3d at 710.

[10] On this point, Defendants respond only that, under *Zucco*, "resignations and firings must occur *before* the alleged fraud is revealed for them to have any bearing on the scienter inquiry." (Dkt. No. 2261 at 23 (emphasis in original).) Not so. *See Zucco*, 552 F.3d at 1002 (discussing pleading requirements "[w]here a resignation occurs slightly before *or after* the defendant corporation

24

1   "[a]midst Volkswagen's escalating scandal, the Company ousted CEO Winterkorn on September

2   23, 2015, and pledged to prosecute those involved in the scheme to cheat emissions tests."

3   (Compl. ¶ 239.)  The fact that "Volkswagen has replaced virtually all of its prior management,

4   firing or suspending at least 11 of its senior executives, including Winterkorn, Horn, Hatz,

5   Hackenberg, and Neußer" (*id.* ¶ 24) is also compelling evidence of scienter.  Further, various of

6   Volkswagen's former executives are alleged to have expressly admitted wrongdoing.  (*E.g.*, *id.*

7   ¶ 236 (Winterkorn again acknowledged 'misconduct' on September 22, and VWGoA's then-CEO,

8   Defendant Horn, stated that '[o]ur company was dishonest with the EPA, and the [CARB] and

9   with all of you . . . .  [W]e've totally screwed up.'  Winterkorn also apologized again, stating that

10   '[m]illions of people in the world trust our brand, our cars, and our technology.  I am endlessly

11   sorry that we have betrayed that trust.'") (alterations in original)).

12       For the reasons above, the Court concludes that Plaintiffs have sufficiently alleged a strong

13   inference of scienter for VW AG.

### 4.   Horn

15       Plaintiffs allege that Horn acted with scienter because he knew through an email dated

16   May 15, 2014 that "Volkswagen vehicles did not meet governing emissions standards, and was

17   warned of the significant risks arising out of the emissions scandal, including monetary penalties,

18   recall of vehicles, removal of the cars from the United States, and the possibility of having to buy

19   back the cars."  (Compl. ¶ 199.)  The email "attached a letter stating that 500,000-600,000 cars in

20   the United States from model years 2009-2014 could be affected by the diesel scandal.

21   Significantly, the letter also enumerated the potential fines of 'EPA: $37,500, and CARB: $5,500'

22   per violation and specifically warned Horn that given the potential level of penalties, '[t]he

23   contents of this [ICCT] study cannot be ignored!'"  (*Id.* ¶ 288.)  In light of this email, "Horn

24   admitted to the US Congress on October 8, 2015 that he was informed in May 2014 of 'a possible

25   emissions non-compliance.'"  (*Id.* ¶ 199; *see also id.* ¶ 253 ("Critically, Defendant Horn admitted

26

27   issues a restatement . . .") (emphasis added); *see also In re McKesson HBOC, Inc. Sec. Litig.*, 126
    F. Supp. 2d 1248, 1273-74 (N.D. Cal. 2000) (finding that company's issuance of restatement of
28   revenue accompanied by press releases announcing that various employees were fired for cause
    supported finding of scienter).

United States District Court
Northern District of California

on October 8 that he knew of the emissions non-compliance 'in the spring of 2014 when the West Virginia University study was published.'").)  Horn also told Congress at that time that "[w]e have broken the trust of our customers, dealerships, and employees, as well as the public and regulators."  (*Id.* ¶ 288.)  Plaintiffs further allege:

> [T]he US-based Volkswagen entities—VWGoA, VWoA, and AoA, as well as VWGoA and VWoA executives Horn and Browning— acted with scienter because they were centrally involved in the process for acquiring all necessary approvals and certifications so that their vehicles could legally be sold and driven in the United States. As part of the regulatory process, those entities regularly and frequently interacted with regulators, and were responsible for understanding and complying with emissions limits and regulations. The entities were responsible for submitting numerous applications and made detailed representations to regulators and the public confirming the vehicles' compliance with governing regulations, evidencing a high degree of knowledge of the vehicles' emissions and compliance. VWGoA, VWoA, AoA, Horn, and Browning either knew or were reckless in not knowing that the purportedly "clean diesel" vehicles that were subject to these regulatory processes were equipped with defeat devices and in reality emitted NOx emissions far in excess of allowable limits.

(*Id.* ¶ 310.)  Lastly, Plaintiffs allege that Horn's resignation in March 2016, after having served 25 years at Volkswagen, provides further evidence of scienter.  (*Id.* ¶¶ 287, 320.)

Taken as a whole, Plaintiffs' allegations as to Horn give rise to a strong inference of scienter.  As alleged, Horn had knowledge of Volkswagen's "potential emissions non-compliance" as well as the "significant risks arising out of the emissions scandal."  Despite such knowledge, Horn, along with the U.S.-based Volkswagen entities, made material misrepresentations to regulators and to the general public that the Volkswagen "clean diesel" vehicles in fact complied with emissions regulations.  And while Horn's resignation months after the emissions scandal was exposed could arguably be benign as Defendants suggest (*see* Dkt. No. 2252 at 3), the resignation coupled with Plaintiffs' other allegations—including the mass resignations, firings, and suspensions of Volkswagen's top management as well as Horn's own apologies to Congress—is sufficient to strongly indicate scienter.  *See Zucco*, 552 F.3d at 1002.

### 5.    Browning

The only allegations of scienter against Browning are set forth in the same paragraph above discussing the U.S.-based Volkswagen entities involvement in the regulatory process.  (*See*

26

1   Compl. ¶ 310.)  Plaintiffs' allegations are insufficient to support a strong inference of Brown's

2   scienter.  In contrast to the allegations against Horn, there is nothing in the complaint to suggest

3   that Browning knew or should have known about the emissions scandal.  Thus, any statements he

4   made during the regulatory process may very well have been made without culpable intent.

### 6.     VWGoA, VWoA, and AoA

6   Because the Court concludes that Plaintiffs have adequately alleged scienter with respect to

7   Horn, such allegations are also sufficient to raise an inference of scienter as to VWGoA and

8   VWoA.  *See Glazer*, 549 F.3d at 743.  Further, the complaint allegations support a strong

9   inference of corporate scienter as to VWGoA, VWoA, and AoA—the statements made regarding

10  the "clean diesel" vehicles' emissions compliance were so important and so dramatically false that

11  at least one corporate official from those entities must have known of their falsity upon

12  publication.  *See id.* at 744.

13                                *   *   *

14  For the reasons stated above, the Court GRANTS IN PART with leave to amend

15  Defendants' motion to dismiss for failure to adequately plead scienter as to Browning and as to

16  Diess as related to the Third Quarter 2015 Interim Report.  Defendants' motion to dismiss on

17  scienter grounds is otherwise DENIED.

### C.     False Misstatements or Omissions

19  To prevail on a Section 10(b) claim, a plaintiff must show that the defendant made a

20  statement that was "misleading as to a material fact."  *Basic*, 485 U.S. at 238.  In *Basic,* the

21  Supreme Court held that this materiality requirement is satisfied when there is "'a substantial

22  likelihood that the disclosure of the omitted fact would have been viewed by the reasonable

23  investor as having significantly altered the "total mix" of information made available.'"  *Id.* at 231-

24  232.  Moreover, "§ 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and

25  all material information."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).

26  Disclosure is required under these provisions only when necessary "to make . . . statements made,

27  in the light of the circumstances under which they were made, not misleading."  *Id.* at 1321-22

28  (citing 17 C.F.R. § 240.10b-5(b); *Basic*, 485 U.S. at 239 ("Silence, absent a duty to disclose, is not

United States District Court
Northern District of California

misleading under Rule 10b-5.")).  "Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market."  *Matrixx*, 563 U.S. at 45.

To survive a motion to dismiss a § 10(b) claim, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); *Tellabs*, 551 U.S. at 321.  In general terms, Plaintiffs allege that Defendants made material misrepresentations and omissions to investors regarding their "clean diesel" vehicles' purported compliance with United States and European emissions regulations as well as Volkswagen's true financial condition throughout the Class Period.  For the reasons discussed below, Defendants' motion to dismiss Plaintiffs' claims as to Volkswagen's understatement of liability is GRANTED with leave to amend.  Defendants' challenges to the remaining statements are DENIED.

### 1.    VW AG's Aspirational Statements

Defendants first argue that the statements VW AG made are not actionable because the statements made in VW AG's public reports were merely aspirational statements that would be immaterial to a reasonable investor.  (Dkt. No. 1708 at 51.)  In particular, Defendants assert that VW AG's general statements about being "environmentally friendly" are non-actionable puffery. (*See id.* at 53-54 (quoting Compl. ¶¶ 344, 351, 352, 357, 367, 372, 373).)  In response, Plaintiffs first note that Defendants ignore the specific misrepresentations that VW AG, and others, made regarding compliance with emissions regulations.  (*See* Dkt. No. 2041 at 80-81; *see also, e.g.*, Compl. ¶¶ 379 ("Lower raw emissions and its SCR (selective catalytic reduction) emissions control system enable the powertrain to meet the strict requirements of the US BIN5/ULEV emissions laws."), 384 ("Engine specifications: . . . all diesels are new common rail TDI engines; all engines meet Euro-5 emissions standard; all US engines fulfil BIN5 / ULEV PZEV."), 412 ("The Golf TDI Clean Diesel also fulfils the most stringent emissions standards in the world: the LEV3 / TIER 3 standards in the USA.").)  Defendants do not address such statements in reply. Further, Plaintiffs emphasize that the environmental aspect of Volkswagen's cars, including the

United States District Court
Northern District of California

"clean diesel" vehicles in particular, was central to Defendants' core business strategy.  (*See, e.g.*, Compl. ¶¶ 117 ("To reach that goal, and in an effort to produce and market powerful but environmentally friendly cars, Volkswagen spent millions of dollars to develop a 'clean diesel' engine that would offer high performance alongside fuel efficiency and low emissions levels."), 156 ("Expanding diesel sales in the United States was a central focus for Volkswagen as it pursued aggressive growth plans.").)

In light of the unchallenged misrepresentations as well as Defendants' overall business strategy vis-à-vis their "clean diesel" vehicles, the Court concludes that Defendants' contention that VW AG's statements constitute mere "puffery" fails.  Even if the Court were to agree that each of the "environmentally friendly" statements, taken alone, could be interpreted as puffery or merely aspirational, "the Court may not assess the statements listed in the [complaint] in a vacuum, 'plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently "vague" so as to constitute puffery,' but rather will examine the entire statement and its circumstances to determine if it is actionable." *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014) (citation omitted); *see also Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.").  Taken as a whole, the complaint allegations demonstrate that Volkswagen focused on environmental friendliness as a core aspect of its business and its stated goal of becoming the world's largest automobile manufacturer by 2018.  Given this importance to Volkswagen's business, it is plausible that a reasonable investor would view Volkswagen's failure to in fact be environmentally friendly as significantly altering the "total mix" of information available.

### 2.      Understatement of Financial Liabilities

Defendants next challenge the sufficiency of Plaintiffs' allegations as to Volkswagen's understatement of its financial liabilities resulting from the emissions scandal.  (Dkt. No. 1708 at 55-56.)  The complaint alleges that, as required by International Accounting Standards (IAS) 37, "VW AG should have recognized provisions relating to its use of the illegal defeat devices in each

United States District Court
Northern District of California

of its quarterly and annual financial statements issued during the Class Period.  The losses relating to the use of defeat devices were 'probable' under IAS 37 because it was more likely than not that the defeat devices would be discovered and that VW AG would incur enormous liabilities to address this self-inflicted problem."  (Compl. ¶ 222.)  Defendants argue that Plaintiffs fail to state a claim here because "they offer no particularized allegations that VWAG estimated these losses to be probable before it disclosed them in its Third Quarter 2015 Interim Report on October 28, 2015."  (Dkt. No. 1708 at 56.)

The Court concludes that the allegations of the complaint are insufficient to support Plaintiffs' claim that Volkswagen should have recognized financial liabilities due to the emissions scandal "in each of its quarterly and annual financial statements issued during the Class Period." (*Id.* ¶ 222.)  There are no factual allegations permitting the reasonable inference that Volkswagen knew or should have known that its losses were probable during the entirety of the Class Period. For example, although Plaintiffs allege that VW AG knew that it faced "potential EPA fines of $37,500 and CARB fines of $5,000 for each affected car in the United States" (Compl. ¶ 220; *see also* Dkt. No. 2041 at 86), they do not provide sufficient allegations to infer that VW AG would have had such knowledge as early as November 19, 2010.  To the contrary, the earliest-identified notice of such potential fines in the complaint was the May 15, 2014 email that Horn received, which included a letter stating potential fines of "EPA: $37,500, and CARB: $5,500" per violation.  (Compl. ¶ 288.)  Given such allegations, the Court cannot find that each and every Volkswagen quarterly and annual statement during the Class Period gives rise to Defendants' Section 10(b) liability.  Plaintiffs must provide additional allegations as to when during the Class Period Defendants knew or should have known that losses would be probable.

### 3.    Emissions Compliance Car Stickers

Defendants next seek to dismiss Plaintiffs' claims against the allegedly false and misleading statements made on the Volkswagen emissions compliance stickers.  (Dkt. No. 1708 at 57-58.)  Defendants do not contest the alleged falsity of the statements, but rather argue that such stickers were directed toward consumers and not the investing public and therefore are not actionable under Plaintiffs' "fraud-on-the-market" theory.  Defendants also assert that the

1  complaint does not identify the particular defendant responsible for the stickers.

2       The Court declines to dismiss the emissions compliance stickers at this time.  Defendants'

3  cited cases do not indicate that *only* market-related documents, such as regulatory filings, public

4  presentations, or press releases, can contain actionable misstatements under Section 10(b); instead,

5  the cases simply identify types of documents that have previously been found to support a "fraud-

6  on-the-market" theory.  (*See* Dkt. No. 1708 at 57 (citing cases).)  At this stage, the Court cannot

7  declare as a matter of law that a reasonable investor would not have considered the emissions

8  stickers on Volkswagen vehicles to be material investing information; such an assessment is

9  "peculiarly one[] for the trier of fact."  *TSC Indus.*, 426 U.S. at 450.  As for the entities responsible

10  for the stickers, the complaint identifies "VW AG, VWGoA, VWoA, AoA" as responsible for the

11  "[e]missions regulation compliance sticker" throughout the entire Class Period.  (Compl. ¶ 428.)

12                    **4.    Statements by VW AG's Subsidiaries**

13       Defendants lastly argue that statements made by VW AG's U.S. subsidiaries are not

14  actionable against VW AG.  (Dkt. No. 1708 at 58-59.)  According to Defendants, under the

15  Supreme Court's decision in *Janus Capital Group, Inc. v. First Derivative Traders*—which held

16  that "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate

17  authority over the statement, including its content and whether and how to communicate it," 564

18  U.S. 135, 142 (2011)—Plaintiffs must plead specific facts to show that VW AG had "ultimate

19  authority" over each statement alleged to have been made by the subsidiaries, which Defendants

20  assert Plaintiffs have not done.  Plaintiffs respond that the complaint states that "VW AG was

21  involved in the day-to-day operations of, and exercised power and control over, VWGoA, VWoA,

22  and AoA including by, among other things, appointing their boards of directors and executive

23  officers and directing their public statements and regulatory actions."  (Compl. ¶ 40.)  Further,

24  "VW AG also developed, reviewed, and approved the marketing and advertising campaigns

25  designed to sell the illegal cars."  (*Id.* ¶ 41.)  The Court finds these allegations sufficient to satisfy

26  *Janus*'s requirement that VW AG have "ultimate authority" over the alleged fraudulent statements

27  and thus the subsidiaries' statements can be attributed to VW AG.  *See In re Rocket Fuel, Inc. Sec.*

28  *Litig.*, No. 14-CV-3998-PJH, 2015 WL 9311921, at *10 (N.D. Cal. Dec. 23, 2015) (finding

United States District Court
Northern District of California

United States District Court
Northern District of California

allegations that individual defendants "possessed the power and authority to control the contents of the Company's press releases [and] investor and media presentations" sufficient to satisfy *Janus* and withstand motion to dismiss).

### D.       Section 20(a) "Control Person" Claims

"In order to prove a prima facie case under § 20(a), plaintiff must prove: (1) a primary violation of federal securities laws . . . and (2) that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). There is no concrete test for establishing whether a defendant is a control person. The decision "is an intensely factual question" and "involves scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Id.* (quoting *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994)).

Initially, the parties dispute the appropriate pleading standard for the control element of a Section 20(a) claim—Rule 8(a)'s notice pleading standard or Rule 9(b)'s heightened pleading standard for fraud claims. The Court previously addressed this issue in *Howard v. Hui*, No. C 92-3742-CRB, 2001 WL 1159780 (N.D. Cal. Sept. 24, 2001). There the Court found that the plaintiff's "section 20(a) claim is an allegation of fraud" and that "[a]llegations of fraud must be pled with particularity." *Id.* at *4 (citing Fed. R. Civ. P. 9(b)). Thus, "[w]hile a plaintiff need not plead (or ultimately establish) the control person's scienter distinct from the controlled corporation's scienter, a plaintiff must plead the circumstances of the control relationship with sufficient particularity to satisfy rule 9(b)." *Id.* (citing *Howard*, 228 F.3d at 165). Plaintiffs urge the Court to reconsider its *Hui* decision, "respectfully submit[ting] that, particularly in the years since that decision was rendered, the well-reasoned conclusions of numerous courts in this circuit, as well as two courts of appeals and numerous district courts in other circuits, have found that Rule 9(b) applies only to allegations of the underlying § 10(b) violation, while control allegations are subject to notice pleading under Rule 8(a)." (Dkt. No. 2041 at 96.) Having reviewed Plaintiffs' cited cases, the Court notes that neither the Ninth Circuit nor the Supreme Court has addressed the issue since the Court's *Hui* ruling. Absent binding authority to the contrary, the Court declines Plaintiffs' invitation to deviate from its prior decision and will apply Rule 9(b)'s

heightened pleading standard to the Section 20(a) claims.

Defendants first move for dismissal of the Section 20(a) claims on grounds that Plaintiffs have not sufficiently pled a primary violation as to any of the defendants.  Because the Court concludes that at least parts of Plaintiffs' Section 10(b) claims are sufficient to move forward as to each of the Corporate Defendants alleged to be controlled, the Court rejects Defendants' motion to dismiss the Section 20(a) claims on this ground.

Defendants separately argue that the control person claims are not adequately pled as to Diess, Horn, and Browning because Plaintiffs provide no allegations that these individuals exercised actual control over the alleged violators.  (Dkt. No. 1708 at 60.)  The Court agrees. Plaintiffs' control person allegations with respect to Diess are insufficient because, in contrast to the allegations regarding Winterkorn—including, for example, Winterkorn's detail-oriented management style and his personal origination of Volkswagen's "Strategy 2018"—Plaintiffs have not provided anything beyond Diess's position as a member of VW AG's Management Board and Chairman of the Management Board of the VW Passenger Cars Brand to support their claim that he was a control person of VW AG, VWGoA, VWoA, and AoA.  While Plaintiffs allege in conclusory fashion that "Diess was involved in the day-to-day operations of, and exercised power and control over, VW AG, VWGoA, VWoA, and AoA including by, among other things, directing their public statements and regulatory actions" (Compl. ¶ 52), they provide no additional allegations plausibly supporting this assertion.  The allegations of control with respect to Horn and Browning are similarly lacking.  Aside from asserting that each of them was "involved in the day-to-day operations of, and exercised power and control over, VWGoA and VWoA, including by, among other things, directing their public statements and regulatory actions" (*id.* ¶ 50-51), Plaintiffs do not plead the specific circumstances of Horn's and Browning's alleged control.

Therefore, Defendants' motion to dismiss Plaintiffs' Section 20(a) claims is GRANTED with leave to amend as to Diess, Horn, and Browning.

## IV.    Personal Jurisdiction over Diess and Winterkorn

### A.    Legal Standard

The plaintiff bears the burden of establishing personal jurisdiction over a defendant.  *See*

United States District Court
Northern District of California

*Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008).  Personal jurisdiction in federal court must comport with Rule 4(k) of the Federal Rules of Civil Procedure, as well as with federal due process.  *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800-01 (9th Cir. 2004). The overarching framework for personal jurisdiction asks whether the defendant has minimum contacts with the forum such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Because the Securities Exchange Act provides for nationwide service of process, *see* 15 U.S.C. § 78aa, "the question becomes whether the party has sufficient contacts with the United States, not any particular state."  *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985) (citation and internal quotation marks omitted).  In other words, "so long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court."  *Id.* at 1316.

A plaintiff need only make a *prima facie* showing of jurisdictional facts to avoid the granting of a motion to dismiss.  *See Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 128 (9th Cir. 1995).  "Uncontroverted allegations in [Plaintiffs'] complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in [Plaintiffs'] favor."  *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1127 (9th Cir. 2010).

While two types of personal jurisdiction—general and specific—exist, Plaintiffs contend only that the Court has specific personal jurisdiction over Winterkorn and Diess.  Courts within the Ninth Circuit employ a three-prong test for evaluating whether specific personal jurisdiction is consistent with due process: (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or a resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must be reasonable.  *See Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987). The plaintiff bears the burden on the first two prongs.  *See Schwarzenegger*, 374 F.3d at 802.  If the plaintiff fails to satisfy either of these prongs, the motion to dismiss must be granted.  If the plaintiff establishes both prongs one

1    and two, the defendant must come forward with a "compelling case" that the exercise of

2    jurisdiction would not be reasonable.  *Id.* (citation omitted).

3            **B.        Personal Jurisdiction over "Control Persons"**

4            Initially, Plaintiffs assert that personal jurisdiction over Winterkorn, as an alleged control

5    person, is proper under the Ninth Circuit's decision in *San Mateo County Transit District v.*

6    *Dearman, Fitzgerald & Roberts, Inc.*, 979 F.2d 1356, 1358 (9th Cir. 1992), where the court held

7    that personal jurisdiction under Section 20(a) "exists if the plaintiff makes a non-frivolous

8    allegation that the defendant controlled a person liable for the fraud."  Winterkorn disputes *San*

9    *Mateo*'s applicability here because, according to him, the Ninth Circuit there "addressed personal

10   jurisdiction over a US citizen" and "said nothing about jurisdiction over foreign defendants."

11   (Dkt. No. 2249 at 2.)  This fact, however, was not relevant to the Ninth Circuit's decision, and

12   district courts in this Circuit have applied *San Mateo* to foreign defendants.  *See, e.g.*, *Chassin*

13   *Holdings Corp. v. Formula VC Ltd.*, No. 15-CV-02294-MEJ, 2016 WL 1569986, at *5 (N.D. Cal.

14   Apr. 19, 2016) (citing *San Mateo* and finding that English defendant's alleged control over two

15   California-based defendant companies was sufficient to establish that the defendant purposefully

16   directed the alleged fraud at the United States); *Kairalla v. Advanced Med. Optics, Inc.*, No. CV-

17   07-05569 SJO (PLAx), 2008 WL 2879087, at *15 (C.D. Cal. June 6, 2008) (holding under *San*

18   *Mateo* that allegations that officer defendant "was personally involved in creating and

19   disseminating the allegedly misleading statements, and that he was responsible for 'a significant

20   degree of day-to-day control over" the corporate defendant provided a "second" basis for personal

21   jurisdiction).  The Court sees no basis for departing from the rule set forth in *San Mateo*.

22           The "fiduciary shield" doctrine does not, as Winterkorn urges, preclude a finding of

23   personal jurisdiction over him based on his control person status.  According to Winterkorn,

24   "[p]ersonal jurisdiction over a corporate officer or director cannot be premised on general

25   allegations that he is responsible for the corporation's actions because he supervised the

26   corporation."  (Dkt. No. 1706 at 17.)  However, Plaintiffs do not seek liability against Winterkorn

27   based solely on his position of control at Volkswagen.  To the contrary, Plaintiffs allege

28   Winterkorn's direct involvement in the emissions scandal, including directly and indirectly

United States District Court
Northern District of California

making and signing off on various statements that he knew to be false.  Given his alleged direct participation in the fraud, the fiduciary shield doctrine does not protect Winterkorn.  *See Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999) ("A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf.") (internal quotation marks and citation omitted).[11]

Accordingly, because the Court concludes that Plaintiffs have sufficiently pled a control person relationship for Winterkorn, personal jurisdiction over him is proper on this basis.  As discussed previously, *see* Section III.D, *supra*, Plaintiffs have not sufficiently pled that Diess is a control person; thus, this theory is not available to establish personal jurisdiction over him.

### C.      Purposeful Direction and Purposeful Availment

The Court separately also addresses whether, setting aside the "control person" allegations, Diess's and Winterkorn's alleged activities satisfy the purposeful direction and purposeful availment prong.  "Because this is a securities fraud case, minimum contacts may be established either by purposeful direction or purposeful availment."  *SEC v. Ficeto*, No. CV 11-1637-GHK RZX, 2013 WL 1196356, at *4 (C.D. Cal. Feb. 7, 2013) (citations omitted); *see also Chassin*, 2016 WL 1569986, at *5.  "The fraud aspects of a securities case may establish purposeful direction, as in a tort case, while the transactional aspects of a securities case may establish purposeful availment."  *Ficeto*, 2013 WL 1196356, at *4.

---

[11] Winterkorn cites two "fiduciary shield" cases, neither of which helps him here.  In *SCG Characters LLC v. Telebrands Corp.*, No. CV 15-00374 DDP (AGRx), 2015 WL 4624200 (C.D. Cal. Aug. 3, 2015), while the complaint contained allegations that the defendant company's CEO personally participated in the wrongful activity alleged, the CEO provided a declaration stating that he in fact did not participate in the wrongful activity.  The plaintiff did not provide any declaration stating the contrary, and so the court concluded there was no evidence of the CEO's participation.  Here, despite submitting a declaration, Winterkorn does not declare that he was not involved in the actions identified in Plaintiffs' complaint.  (*See* Dkt. No. 1707-1.)  As such, and contrary to *SCG*, the complaint allegations are accepted as true and all inferences must be drawn in Plaintiffs' favor.  And in *Fasugbe v. Willms*, the court found no personal jurisdiction over the CEO where the complaint contained nothing more than "conclusory statements that [the CEO] was a 'guiding spirit' and 'central figure' and made all final decisions."  No. CIV. 2:10-2320 WBS, 2011 WL 3667440, at *3 (E.D. Cal. Aug. 22, 2011).  Plaintiffs' complaint details Winterkorn's involvement in the emissions scandal, from his central role in devising "Strategy 2018" to his being informed of the scandal and the defeat devices, and cannot be said to contain mere "conclusory statements" based on his high-level position at Volkswagen.

United States District Court
Northern District of California

### 1.   Winterkorn

Purposeful direction is assessed under the "*Calder*-effects" test, which requires that "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Brayton*, 606 F.3d at 1128 (citation and internal quotation marks omitted); *see also Calder v. Jones*, 465 U.S. 783 (1984)).  The *Calder* test requires "something more" than mere foreseeability; the effects in the third prong must be expressly aimed at the forum state.  *See Pebble Beach*, 453 F.3d at 1156.  However, the "'express aiming' analysis depends, to a significant degree, on the specific type of tort at issue." *Schwarzenegger*, 374 F.3d at 807.  Each of the "purposeful direction" requirements is met under the complaint allegations: Winterkorn intentionally made and signed off on false statements in the Volkswagen quarterly and annual reports; such statements were expressly directed at United States investors as part of Volkswagen's compliance with SEC Rule 12g3-2(b); and the statements caused harm Winterkorn knew was likely to be suffered in the United States.

Winterkorn's citation to cases where no personal jurisdiction was found based on "passive websites" is unavailing (*see* Dkt. No. 1706 at 14) because here the English-translated documents were placed on the website in compliance with SEC regulations specifically for the benefit of U.S. investors.  Winterkorn's argument against personal jurisdiction because Rule 12g3-2(b) merely permits, but does not require, a foreign private issuer like Volkswagen to publish statements electronically is also unpersuasive.  (*See* Dkt. No. 2249 at 6.)  The SEC's rulemaking comments that Winterkorn relies on regarded prior amendments to Rule 12g3-2(b) the SEC made in March 2007, whereas the SEC amended Rule 12g3-2(b) again in September 2008 to its current form.  *See Exemption From Registration Under Section 12(G) of the Securities Exchange Act of 1934 for Foreign Private Issuers*, 73 Fed. Reg. 52752, 52753 (Sept. 10, 2008) ("The [March 2007] amendments further permit, but do not require, a foreign private issuer that has obtained or will obtain the Rule 12g3- 2(b) exemption[.]").  In fact, within those same comments, the SEC expressly stated that, under the new amendments, an issuer will lose its Rule 12g3-2(b) exemption if it "[f]ails to publish electronically the required non-U.S. disclosure documents[.]"  *Id.* at 52755.

United States District Court
Northern District of California

37

United States District Court
Northern District of California

1   "Next, courts have found that the transactional aspects of securities fraud establish

2   purposeful availment." *Chassin*, 2016 WL 1569986, at *6.  Winterkorn also purposefully availed

3   himself of the benefits of doing business in the United States by taking advantage of the OTC

4   markets available here.  *See In re LDK Solar Sec. Litig.*, No. C 07-05182 WHA, 2008 WL

5   4369987, at *6 (N.D. Cal. Sept. 24, 2008) ("Defendants purposefully availed themselves of the

6   forum by taking advantage of this nation's laws and its capital markets[.]").  Winterkorn, as

7   Volkswagen's CEO, was not required to offer the Volkswagen ADRs here and benefited by

8   having the ADRs available to United States investors.  Therefore, both purposeful availment and

9   purposeful direction are satisfied as to Winterkorn.

10          **2.      Diess**

11          With respect to Diess, the statements attributed to him in the Second Quarter 2015 Interim

12   Report satisfy the purposeful direction prong for the same reasons above: he intentionally made

13   and signed off on false statements in the Interim Report; such statements were expressly directed

14   at United States investors as part of Volkswagen's compliance with SEC Rule 12g3-2(b); and the

15   statements caused harm Diess knew was likely to be suffered in the United States.  The Court

16   concludes, however, that Plaintiffs have not adequately alleged purposeful availment as to Diess in

17   light of their failure to allege his "control person" status.

18          **D.      "But For" Test**

19          The second prong requires Plaintiffs to establish that the claims made against Winterkorn

20   and Diess arise out of their activities related to the United States.  In determining whether a

21   plaintiff's claims arise out of the defendant's local conduct, the Ninth Circuit uses the "but for"

22   test.  *See Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995).  Hence, Plaintiffs must show that

23   they would not have suffered an injury "but for" Diess's and Winterkorn's forum-related conduct.

24   *See Myers v. Bennett Law Offices*, 238 F.3d 1068, 1075 (9th Cir. 2001).  The "but for" test is

25   satisfied here as Plaintiffs have established a direct nexus between their causes of action for

26   securities fraud and Winterkorn's and Diess's contacts with the United States, i.e., the false

27   statements they made regarding the emissions cheating scandal and Volkswagen's financials.

28

United States District Court
Northern District of California

### E.     Reasonableness

Once it has been decided that a defendant purposefully established minimum contacts with a forum, "he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable" in order to defeat personal jurisdiction. *Burger King v. Rudzewicz*, 471 U.S. 462, 477 (1985).  A court must balance seven factors in weighing reasonableness, none of which are dispositive: (1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.  *See Core-Vent Corp. v. Nobel Indus. AB,* 11 F.3d 1482, 1487-88 (9th Cir. 1993).

The first factor regarding purposeful interjection depends on the same analysis regarding purposeful direction and purposeful availment.  *See Roth v. Garcia Marquez*, 942 F.2d 617, 623 (9th Cir. 1991).  For the reasons above, this factor weighs in favor of a finding of reasonableness.

Second, Diess and Winterkorn argue that they would be burdened by having to defend a suit here in the United States, thousands of miles from their residences.  However, "[u]nless such inconvenience is so great as to constitute a deprivation of due process, it will not overcome clear justifications for the exercise of jurisdiction." *Hirsch v. Blue Cross, Blue Shield of Kansas City*, 800 F.2d 1474, 1481 (9th Cir. 1986) (citations omitted).  Neither Winterkorn nor Diess assert that they would suffer a deprivation of due process if forced to defend suit here (and Winterkorn is already a named defendant in other suits before the Court).  This factor does not favor Winterkorn and Diess.

Third, ordinarily, "[w]here, as here, the defendant is from a foreign nation rather than another state, the sovereignty barrier is high and undermines the reasonableness of personal jurisdiction." *Amoco Egypt Oil Co. v. Leonis Nav. Co., Inc.*, 1 F.3d 848, 852 (9th Cir. 1993).  The Court concludes, however, there is no conflict with the sovereignty of Germany here.  While German authorities are investigating Volkswagen's actions, Plaintiffs bring this case for

United States District Court
Northern District of California

1    Defendants' violations of U.S. securities law based on conduct that is sufficiently tied to the

2    United States.  This factor therefore does not weigh against a finding of reasonableness.

3         Fourth, as already noted above, the United States has a localized interest in protecting U.S.

4    investors and in enforcing its own securities laws.  This factor favors a finding of reasonableness.

5         Fifth, the Court must consider the forum that could most efficiently resolve this dispute in

6    light of the location of evidence and witnesses.  *See Caruth*, 59 F.3d at 129.  While witnesses and

7    evidence exist in Germany, Volkswagen has provided much relevant evidence in the United States

8    as a result of related litigation pending before the Court.  This factor thus weighs marginally

9    against a finding of reasonableness, though the factor is "no longer weighed heavily given the

10   modern advances in communication and transportation."  *Panavision Int'l v. Toeppen*, 141 F.3d

11   1316, 1323 (9th Cir. 1998).

12        The sixth factor considers the convenience and effectiveness of relief available to the

13   plaintiff.  "[N]o doctorate in astrophysics is required to deduce that trying a case where one lives is

14   almost always a plaintiff's preference."  *Roth*, 942 F.2d at 624.  Thus, although this factor supports

15   Plaintiffs, it "is not of paramount importance."  *Harris Rutsky & Co. Ins. Servs. v. Bell &*

16   *Clements Ltd.*, 328 F.3d 1122, 1133 (9th Cir. 2003).

17        The seventh factor favors Defendants as there is no dispute that Germany exists as an

18   adequate alternative forum.

19        On balance, Winterkorn and Diess have not presented a "compelling case" based on the

20   above factors demonstrating that the Court's exercise of jurisdiction over them would be

21   unreasonable.  The Court therefore concludes that it may properly exercise personal jurisdiction

22   over Winterkorn and Diess, and their respective motions to dismiss are DENIED.

## CONCLUSION

23        To summarize, for the reasons discussed above, the Court ORDERS as follows:

24

25   (1)    Defendants' motion to dismiss Plaintiffs' Section 10(b) claims under the Supreme

26          Court's *Morrison* decision is DENIED;

27   (2)    Defendants' motion to dismiss on *forum non conveniens* is DENIED;

28   (3)    Defendants' motion to dismiss for failure to adequately plead scienter is

United States District Court
Northern District of California

GRANTED IN PART as to Diess and Browning and is otherwise DENIED;

(4)     Defendants' motion to dismiss because the alleged misrepresentations and omissions were merely aspirational is GRANTED IN PART as to Volkswagen's understatement of its financial liabilities and is otherwise DENIED;

(5)     Defendants' motion to dismiss Plaintiffs' Section 20(a) "control person" claims is GRANTED IN PART as to Diess, Horn, and Browning and is otherwise DENIED; and

(6)     Winterkorn's and Diess's individual motions to dismiss for lack of personal jurisdiction are DENIED.

Because it is not a certainty that Plaintiffs cannot allege facts sufficient to address the deficiencies identified above, the Court gives Plaintiffs leave to amend their complaint.  Plaintiffs shall file a new amended complaint within 30 days of this Order.

**IT IS SO ORDERED.**

Dated: January 4, 2017

CHARLES R. BREYER
United States District Judge