UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 2672 CRB  (JSC) |
| ————————————————/ | **ORDER GRANTING FINAL APPROVAL OF VOLKSWAGEN BRANDED FRANCHISE DEALER CLASS ACTION SETTLEMENT AGREEMENT AND RELEASE** |
| This Order Relates To: ALL ACTIONS (except the securities action) ————————————————/ | |

Just over one year ago, the public learned of Volkswagen's deliberate use of a defeat device—software designed to cheat emissions tests and deceive federal and state regulators—in nearly 600,000 Volkswagens- and Audi-branded turbocharged direct injection ("TDI") diesel engine vehicles sold in the United States. Litigation quickly ensued, and those actions were consolidated and assigned to this Court as a multidistrict litigation ("MDL"). Among the lawsuits that comprise this MDL are lawsuits filed by Volkswagen-branded franchise dealers. On September 30, 2016, Plaintiff J. Bertolet, Inc. dba J. Bertolet Volkswagen ("Plaintiff" or "Bertolet") filed its proposed Volkswagen Branded Franchise Dealer Class Action Settlement and Release ("Settlement"). (Dkt. No. 1970.) The Court preliminarily approved the Settlement on October 18, 2016. (Dkt. No. 2077.)

Plaintiff now moves the Court for final approval of the Settlement. (Dkt. No. 2483.) On January 18, 2017, the Court held a fairness hearing regarding final approval. Having considered the parties' submissions and with the benefit of oral argument, the Court GRANTS final approval of the Settlement. The Settlement is fair, reasonable, and adequate.

United States District Court
Northern District of California

# BACKGROUND

## I.    Factual Allegations

In 2009, Volkswagen began selling its Volkswagen- and Audi-branded TDI "clean diesel" vehicles, which it marketed as being environmentally friendly, fuel efficient, and high performing. Unbeknownst to consumers and regulatory authorities, Volkswagen installed in these cars a defeat device that allowed the vehicles to evade United States Environmental Protection Agency ("EPA") and California Air Resources Board ("CARB") emissions test procedures.  Specifically, the defeat device senses whether the vehicle is undergoing testing and produces regulation-compliant results, but operates a less effective emissions control system when the vehicle is driven under normal circumstances.  Only by installing the defeat device on its vehicles was Volkswagen able to obtain Certificates of Conformity ("COCs") from EPA and Executive Orders ("EOs") from CARB for its 2.0- and 3.0-liter diesel engine vehicles; in fact, these vehicles release nitrogen oxides ("NOx") at a factor of up to 40 times over the permitted limit.  Over six years, Volkswagen sold American consumers nearly 600,000 diesel vehicles equipped with a defeat device.

## II.    Procedural History[1]

On September 3, 2015, Volkswagen admitted to EPA and CARB that it installed defeat devices on its model year 2009 through 2015 Volkswagen and Audi diesel vehicles equipped with 2.0-liter engines.  On September 18, 2015, the public became aware of the defeat device when EPA issued a Notice of Violation ("NOV") to Volkswagen, alleging that Volkswagen's use of the defeat device violated provisions of the Clean Air Act, 42 U.S.C. § 7401 *et seq.*  That same day, CARB sent Volkswagen a letter notifying it that CARB had commenced an enforcement investigation concerning the defeat device.

Two months later, EPA issued a second NOV to Volkswagen, as well as Dr. Ing. h.c. F. Porsche AG ("Porsche AG") and Porsche Cars North America, Inc. ("PCNA"), alleging that Volkswagen had installed in its 3.0-liter diesel engine vehicles a defeat device similar to the one

---

[1] A detailed procedural background regarding the consumer and government actions can be found in the Court's Amended Order Granting Preliminary Approval of Settlement.  (*See* Dkt. No. 1698 at 2-3.)

described in the September 18 NOV.

Litigation on behalf of Volkswagen-branded franchise dealers initially began on two separate tracks and eventually merged into a single action. (Dkt. No. 1971 at 4.) Once knowledge of the defeat device became public, Volkswagen-branded dealers nominated a Dealer Investment Committee, consisting of five current Volkswagen franchise dealers and represented by Bass Sox Mercer, to begin discussions with Volkswagen regarding a remedy for dealers to compensate them for losses allegedly caused by the emissions scandal. (*Id.* at 4; Dkt. No. 1972 ¶ 3.)

Napleton Orlando Imports, LLC dba Napleton's Volkswagen of Orlando; Napleton Sanford Imports, LLC dba Napleton's Volkswagen of Sanford; and Napleton Automotive of Urbana, LLC dba Napleton Volkswagen of Urbana (collectively, the "Napleton Dealerships") separately retained their own counsel, Hagens Berman, which began extensive pre-filing investigation and research. (Dkt. No. 1971 at 4; Dkt. No. 1972 ¶ 4.) This culminated in the Napleton Dealerships' filing of a proposed class action complaint against Volkswagen Group of American, Inc. ("VWGoA"); Volkswagen Credit, Inc. ("VW Credit"); and Volkswagen AG ("VWAG") in the Northern District of Illinois. (Dkt. No. 1971 at 3-4.) That case was transferred to this MDL. (*See* Dkt. No. 1427.)

In July 2016, after Hagens Berman and Bass Sox Mercer independently devoted significant resources and efforts toward the prosecution of Volkswagen, the two firms agreed to work together in order to "efficiently forge the best possible result for all 652 Volkswagen-branded franchise dealers[.]" (Dkt. No. 1971 at 5.) Thereafter, both firms began settlement negotiations with Volkswagen; the parties agreed upon a settlement term sheet in late August 2016. (*Id.*)

On September 30, 2016, Plaintiff, through Class Counsel Hagens Berman and Bass Sox Mercer, filed a Volkswagen-Branded Franchise Dealer Amended and Consolidated Class Action Complaint ("Franchise Dealer Complaint") against VWGoA, VWAG, Bosch GmbH, and Bosch LLC. (*See* Dkt. No. 1969.) On behalf of the Franchise Dealer Class, the complaint asserts federal claims under the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 *et seq.*, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(C)-(D). The complaint also asserts claims on behalf of only the Napleton Dealerships: (1) Florida state claims for

United States District Court
Northern District of California

violations of Florida Statute section 320.64(4), breach of contract, and fraudulent concealment; and (2) Illinois state claims for violations of the Illinois Motor Vehicle Franchise Act, 815 ILCS 710/1 *et seq.*; fraud by concealment; and breach of contract.  (Dkt. No. 1969 ¶¶ 17-20, 292-452.)

Along with the complaint, Plaintiff also filed the Settlement.  (Dkt. No. 1970.)  Plaintiff now seeks final approval of the Settlement.[2]  (Dkt. No. 2483.)

## SETTLEMENT TERMS[3]

The key provisions of the Settlement are as follows.  The Franchise Dealer Class is defined as "a nationwide class of all authorized Volkswagen dealers in the United States who, on September 18, 2015, operated a Volkswagen branded dealership pursuant to a valid Volkswagen Dealer Agreement."  (Dkt. No. 1970 ¶ 2.4.)  Excluded are all persons who timely opt out of the Settlement.  (*Id.* ¶ 2.10; Dkt. No. 1971 at 6.)  The Class consists of Eligible Dealers, which are "the 652 authorized Volkswagen dealers in the United States on September 18, 2015."  (Dkt. No. 1970 ¶ 2.12.)

Further, the Settlement concerns the following Affected Vehicles:

> VW Jetta TDI (Model Years 2009-2015);
> VW Jetta SportWagen TDI (Model Years 2009-2014);
> VW Golf TDI (Model Years 2010-2015);
> VW Golf SportWagen TDI (Model Year 2015);
> VW Beetle TDI and VW Beetle Convertible TDI (Model Years 2012-2015);
> VW Passat TDI (Model Years 2012-2015);
> VW Touareg TDI (Model Years 2009-2016);
> Used Audi A3 (Model Years 2010-13, 2015-16);
> Used Audi A6 Quattro (Model Years 2014-2016);
> Used Audi A7 Quattro (Model Years 2014-2016);
> Used Audi A8L (Model Years 2014-2016);
> Used Audi Q5 (Model Years 2014-2016); and
> Used Audi Q7 (Model Years 2009-2015).

(*Id.* ¶ 2.2.)

The Settlement entitles Class Members to a cash Individual Dealer Settlement Payment (the "Settlement Payment").  (Dkt. No. 1970 ¶ 4.1.1.)  Under the Settlement's terms, Volkswagen

---

[2] The Napleton Dealerships have since opted out of the Settlement.  (*See* Dkt. No. 2484 ¶ 2.)

[3] A more detailed explanation of the Settlement terms can be found in the Court's Order Granting Preliminary Approval.  (*See* Dkt. No. 2077 at 4-9.)

United States District Court
Northern District of California

shall pay a Maximum Settlement Amount of $1.208 billion, which assumes 100% Eligible Dealer participation. (*Id.* ¶¶ 2.18, 4.1.2.)  Plaintiff estimates Class Members will receive an average cash payment of $1.85 million. (Dkt. No. 1971 at 6.)  The Settlement requires VWGoA to pay each Settlement Payment directly to Class Members. (Dkt. No. 1970 ¶ 4.1.1.)  The Settlement Payment is equal to each Class Members' pro rata share of the Monthly Financial Assistance Payments that Volkswagen paid to Eligible Dealers in November 2015. (*Id.* ¶ 4.1.6.)

In addition to the Payment, Volkswagen will continue its Volume-based Incentive Program ("VIP") Level 3 incentives and its Customer Satisfaction Index ("CSI") incentive payments for a 12-month period at the amounts being paid as of the date of the Settlement. (*Id.* ¶ 4.1.8.)  The Settlement further provides that VWGoA will pay Class Members the monthly financial assistance it is currently paying Eligible Dealers at the current amount as of the date of the Settlement until either 30 days after the Opt-Out Deadline or the date of the first pay outs of the Individual Dealer Settlement Payments, whichever comes first. (Dkt. No. 1970 ¶ 4.1.9.)

The Settlement also offers Class Members non-monetary benefits. (Dkt. No. 1970 ¶ 4.2.) Specifically, for a period of two years after the Opt-Out Deadline, Class Members will have the option to defer any affirmative obligations to renovate or construct dealership facilities or otherwise make capital investments in their real property or facilities. (*Id.* ¶ 4.2.1.)  Nor will VWGoA require Class Members to take any such action prior to any future transfer of a Class Member's Volkswagen dealership assets pursuant to Article 12 of the Volkswagen Dealer Agreement, Standard Provisions. (*Id.* ¶ 4.2.2.)  The Class Member must, however, propose the transfer to VWGoA within one year after the Opt-Out Deadline. (*Id.*)

Finally, the Settlement requires Volkswagen to repurchase any Affected Vehicles for which it is unable to provide an Approved Emissions Modification or a "Fix" (a "No Fix Vehicle") within 30 days of determining that no such modification is available. (*Id.* ¶ 5.2.)  For any used diesel vehicle, Volkswagen shall pay the Class Member the same gross amount that an Eligible Owner would receive (1) under the Consumer and Reseller Dealership Settlement Agreement (*see* Dkt. No. 1685 ¶ 4.2.1), and (2) under a future potential consumer settlement, if any, for any 3.0-liter used TDI diesel engine vehicle. (Dkt. No. 1970 ¶ 5.2.1.1.)  For a new

United States District Court
Northern District of California

1  vehicle without a Fix, Volkswagen shall pay the Class Member the net wholesale cost that the

2  Class Member paid for such vehicle.  (*Id.* ¶ 5.2.1.2.)  VWGoA shall retrieve No Fix Vehicles from

3  Class Members at its own expense.  (*Id.* ¶ 5.2.2.)  While failure to retrieve a No Fix Vehicle within

4  30 days does not breach the Settlement, VWGoA agrees to pay all reasonable carrying and storage

5  costs relating to the No Fix Vehicle from the date the vehicle is determined to be impossible to fix.

6  (*Id.*)  If VWGoA fails to retrieve a No Fix Vehicle within one year of repurchase, the Class

7  Member may ship the vehicle(s) to VWGoA at VWGoA's expense.  (*Id.* ¶ 5.2.3.)

8       On the other hand, if Volkswagen can provide a Fix for any unused Model Year 2015

9  Affected Vehicles ("New 2015 Vehicles"), VWGoA will establish a VW Credit-administered TDI

10  Lease Program and a TDI Service Loan Program.  (*Id.* ¶¶ 5.3.1.-5.3.2.) The TDI Lease Program

11  will offer consumers "attractive lease terms with substantial subvention," or monetary assistance.

12  (*Id.* ¶ 5.3.1.)  VW Credit will maintain ownership of the New 2015 Vehicles in the Lease Program.

13  (*Id.*)  The TDI Service Loan Program is a 12-month service loan car program for New 2015

14  Vehicles that charges Class Members a monthly rental fee below the current standard of 2%

15  Manufacturer's Suggested Retail Price ("MSRP") per month.  (*Id.* ¶ 5.3.2.)  Class Members will

16  have the option to purchase the New 2015 Vehicles at the conclusion of the Service Loan

17  Program.  (*Id.*)  VWGoA and/or VW Credit shall administer the TDI Loan Service Program; VW

18  Credit shall maintain ownership of vehicles in that program.  (*Id.*)

19       The Settlement requires Class Members to use their reasonable best efforts to ensure that

20  consumers are offered at least three appointment dates to complete a Fix in the time frame set

21  forth in the Consumer and Reseller Dealership Settlement and the Federal Trade Commission's

22  Partial Consent Order.  (*See* Dkt. Nos. 1607, 1685.)

23       In exchange for benefits under the Settlement, Class Members agree to release claims

24  against released parties.  (*Id.* ¶ 9.)  "Released Parties" refer to "any person who, or entity that, is or

25  could be responsible or liable in any way whatsoever, whether directly or indirectly, for the

26  claims asserted in the Franchise Dealer Complaint."  (*Id.* ¶ 9.1.)  Released Parties include:

27          (1) Volkswagen AG, Volkswagen Group of America, Inc. (d/b/a
             Volkswagen of America, Inc.), Volkswagen Group of America
28          Chattanooga Operations, LLC, VW Credit, Inc., VW Credit

6

Leasing, Ltd., VCI Loan Services, LLC, and any former, present, and future owners, shareholders, directors, officers, employees, attorneys, affiliates, parent companies, subsidiaries, predecessors, and successors of any of the foregoing (the "VW Released Entities"); (2) any and all contractors, subcontractors, and suppliers of the VW Released Entities; (3) any and all persons and entities indemnified by any VW Released Entity with respect to the TDI Matter; (4) any and all other persons and entities involved in the design, research, development, manufacture, assembly, testing, sale, leasing, repair, warranting, marketing, advertising, public relations, promotion, or distribution of any Affected Vehicle, even if such persons are not specifically named in this paragraph; and (5) for each of the foregoing, their respective former, present, and future affiliates, parent companies, subsidiaries, predecessors, successors, shareholders, indemnitors, subrogees, spouses, joint ventures, general or limited partners, attorneys, assigns, principals, officers, directors, employees, members, agents, representatives, trustees, insurers, reinsurers, heirs, beneficiaries, wards, estates, executors, administrators, receivers, conservators, personal representatives, divisions, dealers, and suppliers.

(*Id.*)

"Released Claims" include:

(1) all claims related in any way to the TDI Matter; (2) all claims related in any way to VWGoA's previously announced goals or objectives for U.S. sales volume growth, including any claims related in any way to incentives and other support payments or programs from VWGoA to any Volkswagen-branded franchise dealer related to such goals and any volume shortfall; (3) all claims for monetary damages arising before the Effective Date of this Franchise Dealer Class Agreement that relate in any way to allocation complaints or irregularities (but allocations may be asserted by any dealer as a defense to a franchise termination by VWGoA); (4) all claims for monetary damages arising before the Effective Date of this Franchise Dealer Class Agreement that relate in any way to the method upon which VWGoA measures the sales and service performance of its Volkswagen-branded franchise dealers or sets the sales and service objectives for its Volkswagen-branded franchise dealers (but the method upon which VWGoA measures the sales and service performance may be asserted by any Volkswagen-branded franchise dealer as a defense to a franchise termination by VWGoA); and (5) all discrimination or coercion claims arising before the Effective Date of this Franchise Dealer Class Agreement related in any way to the sale, incentivization or use of VCI wholesale and retail financing products.

(*Id.* ¶ 9.3.) "All Released Claims will be released against all Released Parties upon entry of the Final Approval Order, except that categories 2 through 5 of the Released Claims set forth above in Section 9.3 will not be released with respect to a Franchise Dealer Class Member if, and only if, that Franchise Dealer Class Member previously asserted that released claim or claims in an

United States District Court
Northern District of California

1    existing pending lawsuit that it filed in the United States prior to April 6, 2016."  (Dkt. No. 2802

2    ¶ 9.3.1.[4])  Class Members also release any potential claims under California Civil Code section

3    1542 and any similar laws.  (Dkt. No. 1970 ¶ 9.7.)  Class Members do not, however, release any

4    claims against Bosch GmbH and Bosch LLC or any of their former, present, and future owners,

5    shareholders, directors, officers, employees, attorneys, affiliates, parent companies, subsidiaries,

6    predecessors, or successors.  (*Id.* ¶ 9.2.)

<div align="center">

**DISCUSSION – FINAL APPROVAL OF SETTLEMENT**

</div>

8    **I.      Legal Standard**

9          The Ninth Circuit maintains "a strong judicial policy" that favors class action settlements.

10    *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015).  Nevertheless, Federal Rule of Civil

11    Procedure 23(e) requires courts to approve any class action settlement.  "[S]ettlement class actions

12    present unique due process concerns for absent class members."  *Hanlon v. Chrysler Corp.*, 150

13    F.3d 1011, 1026 (9th Cir. 1998).  As such, "the district court has a fiduciary duty to look after the

14    interests of those absent class members."  *Allen*, 787 F.3d at 1223 (collecting cases).  Specifically,

15    courts must "determine whether a proposed settlement is fundamentally fair, adequate, and

16    reasonable."  *Hanlon*, 150 F.3d at 1026; *see* Fed. R. Civ. P. 23(e)(2).  In particular, where "the

17    parties reach a settlement agreement prior to class certification, courts must peruse the proposed

18    compromise to ratify both the propriety of the certification and the fairness of the settlement."

19    *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).

20          Approval of a settlement is a two-step process.  Courts first "determine[] whether a

21    proposed class action settlement deserves preliminary approval and then, after notice is given to

22    class members, whether final approval is warranted."  *In re High-Tech Employee Antitrust Litig.*,

23    No. 11-CV-02509-LHK, 2014 WL 3917126, at *3 (N.D. Cal. Aug. 8, 2014).  "At the fairness

24    hearing, . . . after notice is given to putative class members, the court entertains any of their

25    objections to (1) the treatment of the litigation as a class action and/or (2) the terms of the

26    settlement."  *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. 2014) (citing *Diaz v. Trust*

---

[4] Pursuant to Section 15.9 of the Settlement, Plaintiff and Volkswagen amended Section 9.3 of the Settlement to include Paragraph 9.3.1.  (Dkt. No. 2802.)

<div align="center">

</div>

<div style="writing-mode: vertical-rl">United States District Court
Northern District of California</div>

*Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989)).  After the fairness hearing, the court determines whether the parties should be allowed to settle the class action pursuant to the agreed-upon terms.  *See Chavez v. Lumber Liquidators, Inc.*, No. CV-09-4812 SC, 2015 WL 2174168, at *3 (N.D. Cal. May 8, 2015) (citation omitted).

## II.     Final Certification of the Settlement Class

### A.     Rule 23(a) and (b) Requirements

A class action is maintainable only if it meets the four Rule 23(a) prerequisites:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  In a settlement-only certification context, the "specifications of the Rule . . . designed to protect absentees by blocking unwarranted or overbroad class definitions . . . demand undiluted, even heightened, attention[.]"  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).  "Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold."  *Id.*

In addition to the Rule 23(a) prerequisites, "parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)."  *Amchem*, 521 U.S. at 614.  Rule 23(b)(3), relevant here, requires that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The "pertinent" matters to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

*Id.*

United States District Court
Northern District of California

In its Order Granting Preliminary Approval, the Court carefully considered whether Plaintiff satisfied the Rule 23(a) and (b)(3) requirements.  (Dkt. No. 2077 at 10-15.)  "Because the Settlement Class has not changed, the Court sees no reason to revisit the analysis of Rule 23."  *G. F. v. Contra Costa Cty.*, No. 13-CV-03667-MEJ, 2015 WL 7571789, at *11 (N.D. Cal. Nov. 25, 2015) (N.D. Cal. Nov. 25, 2015) (internal quotation marks and citation omitted).

## B.    Rule 23(c) Requirements

"Adequate notice is critical to court approval of a class settlement under Rule 23(e)." *Hanlon*, 150 F.3d at 1025.  Rule 23(c)(2)(B) requires that "[f]or any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  "[T]he express language and intent of Rule 23(c)(2) leave no doubt that individual notice must be provided to those class members who are identifiable through reasonable effort."  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 175 (1974).

### 1.    Implementation of the Notice Program

The Court previously approved the form and content of the Class Notice, as well as the Notice Program set forth in the motion for preliminary approval.  (*See* Dkt. No. 2077 at 20-22; Dkt. No. 1970-1; Dkt. No. 1971 at 17-18.)  Pursuant to the Notice Program, on or before October 25, 2016, VWGoA sent the Class Notice via overnight express delivery to each of the 651 eligible Class Members.[5]  (Dkt. No. 2484 ¶ 10.)  Class Counsel then contacted each Class Member to ensure that the Class Member received the Class Notice.  (*Id.*)  According to Class Counsel and Volkswagen, each Class Member received a copy of the Class Notice.  (*Id.*)  Class Counsel also maintained a publicly-available case website with relevant settlement information as well as a toll-free telephone support line through which Class Counsel has answered hundreds of calls from Franchise Dealer Class Members.  (*Id.* ¶¶ 11-12.)

---

[5] While there are 652 Volkswagen franchise dealers in the United States, one dealer, Volkswagen of Newton, individually settled with Volkswagen and released its claims against Volkswagen. (*See* Dkt. No. 2484 ¶ 2.)  Volkswagen of Newton therefore is not eligible as a Class Member in this action.

### 2.     CAFA Compliance

The Class Action Fairness Act ("CAFA") provides that "each defendant that is participating in the proposed settlement shall serve upon the appropriate State official of each State in which a class member resides and the appropriate Federal official, a notice of the proposed settlement[.]"  28 U.S.C. § 1715(b).  Volkswagen mailed notice of the proposed Settlement and Release to the United States Attorney General and all 50 States' Attorneys General on October 13, 2016. (*See* Dkt. No. 2490 ¶ 2; Dkt. No. 2490-1.)

### 3.     Adequacy of Notice

The Court is satisfied that the Notice Program was reasonably calculated to notify Class Members of the proposed Settlement.  The Notice "apprise[d] interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  To the best of Class Counsel's and Volkswagen's knowledge, 100% of Class Members received the Class Notice package.  (Dkt. No. 2484 ¶ 10.)

\*   \*   \*

For the reasons discussed above, the Settlement Class satisfies Rules 23(a) and 23(b)(3), and the Class Notice satisfies Rule 23(c).  Accordingly, the Court grants final class certification.

## III.     Fairness, Adequacy, and Reasonableness

Courts may approve a class action settlement "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).  Courts assessing the fairness of a settlement generally weigh:

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement.

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

But where, as here, the parties negotiate a settlement before a class has been certified, "courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton*, 327 F.3d at 952.  Pre-class certification settlements "must

11

withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *In re Bluetooth Prods. Liability Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (citing *Hanlon*, 150 F.3d at 1026). This heightened scrutiny "ensure[s] that class representatives and their counsel do not secure a disproportionate benefit 'at the expense of the unnamed plaintiffs who class counsel had a duty to represent.'" *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (quoting *Hanlon*, 150 F.3d at 1027). As such, courts must evaluate the settlement for evidence of collusion. *Id.*

Because "[c]ollusion may not always be evident on the face of a settlement, . . . courts therefore must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth*, 654 F.3d at 947. Signs of subtle collusion include, but are not limited to:

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded,
> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries "the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class"; and
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund[.]

*Id.* (internal quotations and citations omitted).

### A.     The *Churchill* Factors

#### 1.     Strength of Plaintiff's Case

The first factor does not favor settlement. "Approval of a class settlement is appropriate when plaintiffs must overcome significant barriers to make their case." *G.F.*, 2015 WL 7571789, at *8 (citing *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 851 (N.D. Cal. 2010)). But courts need not "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).

1    Plaintiff acknowledges it has a strong case.  (*See* Dkt. No. 2484 at 19-20.)  Liability is not

2    an issue: Volkswagen admits to installing and failing to disclose the defeat device in its TDI diesel

3    engine vehicles, which it marketed as environmentally friendly.  Thus, only the amount of

4    recovery is in dispute.  Plaintiff submits the declaration of Edward M. Stockton, Vice President

5    and Director of Economics Services for The Fontana Group, Inc., regarding the strength of the

6    Settlement's remedies.  (Dkt. No. 2485.)  According to Mr. Stockton, "Lost profit exposure of

7    Class Members ranges from $1,471,749,138 to $1,621,301,512.  The calculations supporting this

8    range are the product of conventional economic techniques, reliable data (identified in Exhibit 10),

9    and a principled approach to modeling the economic impact upon Class Members.  The figures

10   reported herein represent a reliable estimate for either the present value of lost profit, or

11   alternatively, a diminishment to the earnings capacity of Class Members' franchises."  (*Id.* ¶ 33.)

12       The Court concludes that Plaintiff has a high probability of successfully obtaining its

13   sought-after remedies.  Thus, this factor does not favor final approval.

14           **2.     Risk, Expense, Complexity, and Likely Duration of Further Litigation**

15       Though Plaintiff has strong claims, the merits of those claims are balanced by the risk,

16   expense, and complexity of the case, as well as the likely duration of further litigation.  *See In re*

17   *Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000), *as amended* (June 19, 2000).

18   Settlement is favored in cases that are complex, expensive, and lengthy to try.  *See Rodriguez v.*

19   *W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009).  Initially, Plaintiff notes that "there are

20   always risks in litigation."  (Dkt. No. 2483 at 20.)  Moreover, absent the Settlement, Class

21   Members would face an "uncertain future," given that "[t]hey are saddled with thousands of cars

22   that they cannot sell, while the TDI vehicles, for some dealers, represented as much as 35% of

23   their total vehicle sales."  (*Id.*)  Additionally, Volkswagen could make arguments at trial that

24   "would severely limit, if not prohibit, [Class Members'] ability to recover under several critical

25   damages theories."  (*Id.*)  Lastly, cooperation from the Volkswagen-branded dealers is an

26   important aspect of the consumer action settlements, and protracted dealer litigation would

27   jeopardize that cooperation and the success of those settlements.  (*Id.*)  Given the foregoing, the

28   Court concludes that this factor supports final approval.

United States District Court
Northern District of California

### 3.     Risk of Maintaining Class Action Status Throughout Trial

The potential difficulties in obtaining and maintaining class certification weigh in favor of final approval.  As discussed above, there does not appear to be any issue with maintaining class certification at this point.  However, Plaintiff asserts that, absent a settlement, there is no guarantee that the Court would certify a class given "[t]he sophistication of class members and the size of potential recoveries."  (Dkt. No. 2483 at 20.)  Further, Plaintiff states, "[a]s litigation progressed, the many, varied business pressures on dealer operations could put pressure on the cohesiveness of the ongoing Class as dealers were forced to sell or cease operations, or even switch to different brands.  The substantial differences between how different dealers operate and what cars they sell could inject material individualized inquiries into the case."  (*Id.* at 21.)  Even if the Court certified the class, there is a risk the Court could later de-certify it.  This factor favors settlement.

### 4.     Amount Offered in Settlement

The amount offered in the Settlement favors final approval.  This factor is considered "the most important variable in assessing a class settlement is the amount of relief obtained for the class."  *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 1001 (N.D. Cal. 2015), *reconsideration denied*, No. C-13-3440 EMC, 2015 WL 4735521 (N.D. Cal. Aug. 10, 2015).  "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair."  *In re Mego*, 213 F.3d at 459 (internal quotation marks omitted).  Thus, courts evaluating the amount offered in settlement for fairness must consider the settlement as a "complete package taken as a whole, rather than the individual component parts[.]"  *Officers for Justice*, 688 F.2d at 628.

The Settlement adequately and fairly compensates Class Members.  According to Mr. Stockton, the total "[l]ost profit exposure of Class Members ranges from $1,471,749,138 [or over $1.47 billion] to $1,621,301,512 [or over $1.62 billion]."  (Dkt. No. 2485 ¶ 33.)  Class Counsel conservatively estimate the value of the Settlement as exceeding $1.637 billion, which includes a cash component of $1,193,386,553.01 (averaging about $1.85 million per Class Member), non-offset support payments of $270,885,280.00, and ongoing VIP and CSI incentives of $172,800,000.00.  (Dkt. No. 2483 at 21.)  This settlement total exceeds even the top end of Mr.

United States District Court
Northern District of California

Stockton's range of Class Members' exposure.  Moreover, "[e]ven if Plaintiffs were to prevail, they would be required to expend considerable additional time and resources potentially outweighing any additional recovery obtained through successful litigation."  *Collins v. Cargill Meat Sols. Corp.*, 274 F.R.D. 294, 302 (E.D. Cal. 2011).  The Settlement therefore offers Class Members relief that is fair and adequate.  This factor favors final approval.

### 5.   Extent of Discovery Completed and the Stage of the Proceedings

"In the context of class action settlements, formal discovery is not a necessary ticket to the bargaining table where the parties have sufficient information to make an informed decision about settlement."  *In re Mego*, 213 F.3d at 459 (brackets, citation, and internal quotation marks omitted).  Instead, courts look for indications "the parties carefully investigated the claims before reaching a resolution."  *Ontiveros*, 303 F.R.D. at 371.

Class Counsel and Volkswagen engaged in significant discovery such that each party was fully informed and prepared to participate in settlement discussions.  In addition to conducting a pre-filing investigation as well as reviewing the 12 million pages of documents Volkswagen produced in the consumer actions, Class Counsel also sought dealer-specific document discovery from Volkswagen, including "historical dealer-by-dealer vehicle deliveries, composite financial statements, Units in Operation figures, buy/sale agreements, and several categories of internal communications and reports relating to the projected impact on dealers from the emissions scandal" as well as documents relating to "dealer inventory of TDI vehicles, Letters of Intent for potential new dealerships and projections for such new dealerships, marketing planning and budgeting, dealer and consumer-facing incentive programs, and certain communications between Volkswagen and its dealers."  (Dkt. No. 1972 ¶¶ 5-6.)  In response, Volkswagen produced "thousands of pages of documents" in addition to the documents it produced in the consumer actions.  (*Id.* ¶ 7.)  Class Counsel then reviewed all of the produced discovery and met with Volkswagen and its counsel.  (*Id.* ¶ 8.)

Thus, while the parties reached the Settlement at an early phase of litigation, Class Counsel's careful pre-filing investigation and their extensive review of discovery materials indicate they had sufficient information to make an informed decision about the Settlement.

15

Accordingly, this factor favors Settlement approval.

### 6.    Experience and Views of Counsel

"Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995).  Courts afford "great weight . . . to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) (internal quotation marks omitted).

Class Counsel "strongly support this settlement" because it "provides Franchise Dealer Class Members with genuine and substantial financial support to compensate them for the loss in the value of their dealerships" as well as "a cooperative path forward where Volkswagen and its dealers can work cooperatively toward remediation of the diesel emissions scandal and recovery of the brand." (Dkt. No. 2483 at 23.)  The Court previously noted that, in light of Class Counsel's substantial experience including leadership roles in other multidistrict litigations, "Plaintiff is able to vigorously prosecute this action through qualified counsel." (Dkt. No. 2077 at 13.)  In light of Class Counsel's considerable experience and their belief that the Settlement provides more than adequate benefits to Class Members, this factor favors final approval.

### 7.    Presence of Government Participant

This factor weighs in favor of final approval.  Volkswagen provided notice to all 50 State Attorneys General and the U.S. Attorney in accordance with CAFA.  "Although CAFA does not create an affirmative duty for either state or federal officials to take any action in response to a class action settlement, CAFA presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedures." *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW EMC, 2010 WL 1687832, at *14 (N.D. Cal. Apr. 22, 2010) (citing Fed. R. Civ. P. 23(e)(2)).  No state or federal official objected, which is particularly notable given the heavy state and federal interest and involvement in the related consumer class actions.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

####        8.        Reactions of Class Members

There are 651 potential Class Members.  (*See* Dkt. No. 2483 at 1 & n.3.)  Class Members'

interest in the Settlement has been high, as evidenced by the fact that "Class Counsel has answered

hundreds of calls from Franchise Dealer Class Members."  (Dkt. No. 2484 ¶ 12.)  Only seven

dealerships (or 1% of Class Members) opted out of the Settlement (*id.* ¶ 2; Dkt. No. 2483 at 24)

and only eight dealerships (or 1%) filed objections (Dkt. No. 2483 at 24).  Furthermore, as

Plaintiff states,

> The response of the Class has been overwhelmingly positive, with
> 374 of 644 Dealers having been paid the initial 50% of their cash
> component in December 2016, 155 Dealers who will receive their
> initial payment on January 13, 2017, and an additional 10 Dealers
> who will receive their initial payment on or about January 20, 2017.
> Thus, not only were objections and opt-outs together limited to just
> 2% of the Class, but 539 of 644 Class Members who did not opt out
> (84%) have taken the affirmative step of completing an Individual
> Release in order to initiate their benefits under the Settlement
> immediately.

(Dkt. No. 2766 at 3.)

Given the low opt-out and objection rates, this factor strongly favors final approval.  *See*

*Churchill*, 361 F.3d at 577 (finding no abuse of discretion where district court, among other

things, reviewed list of 500 opt-outs in a class of 90,000 class members); *Cruz v. Sky Chefs, Inc.*,

No. C-12-02705 DMR, 2014 WL 7247065, at *5 (N.D. Cal. Dec. 19, 2014) ("A court may

appropriately infer that a class action settlement is fair, adequate, and reasonable when few class

members object to it."); *Chun-Hoon*, 716 F. Supp. 2d at 852 (granting final approval of settlement

where 16 out of 329 class members (4.86%) requested exclusion).  That 539 Class Members, or

84% of the Class, have already submitted Individual Releases also supports final approval.

Nonetheless, the Court recognizes that not all—albeit a small percentage—of Class

Members are entirely satisfied with the Settlement.  "[I]t is the nature of a settlement, as a highly

negotiated compromise . . . that it may be unavoidable that some class members will always be

happier with a given result than others."  *Allen*, 787 F.3d at 1223 (internal quotation marks

omitted).  The Court addresses Class Members' received objections below.[6]

### a.      Smith Volkswagen

Thomas Smith, President of Smith VW, spoke at the fairness hearing to address Smith VW's objection.  Specifically, Smith VW objects to the Settlement on grounds that the formula used to calculate each dealer's settlement payment improperly excludes vehicles that the dealer sold into an "open point," which is an area where Volkswagen does not have dealer representation. (*See* Dkt. No. 2484-5; *see also* Dkt. No. 2483 at 32 (noting that an open point "is an unassigned PAI [(Primary Area of Influence)] determined by VWGoA in November 2012").)  According to Smith VW, counting only vehicles in its assigned PAI and excluding vehicles it sold into an "open point" results in approximately $600,000 less that it will receive as part of the Settlement.  (Dkt. No. 2484-5 at 3.)  While the Court is sympathetic to these concerns, Smith VW has not demonstrated—and the Court does not find—that the settlement formula is unfair or unreasonable as applied across the entire Franchise Dealer Class.  Absent such a showing, the Court must overrule Smith VW's objection.  While some class members in class action settlements will inevitably wish they could recover more, "the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes."  *Officers for Justice*, 688 F.2d at 624 (internal quotation marks and citation omitted).

### b.      Serra Volkswagen

Serra VW "objects to the method of calculating the payments due class members."  (Dkt. No. 2271; *see also* Dkt. No. 2484-1.)  Serra VW further "objects to the provision of the settlement whereby a Dealer Settlement Class Member, such as Serra VW, is prohibited from objecting to the payment to be made to individual Dealer Settlement Class Members."  (Dkt. No. 2271.)

---

[6] As set forth in Plaintiff's moving papers, Class Members Smith VW, Eich Motor Co., Steven VW, Reydel VW, and Serra VW submitted objections to the Settlement.  (*See* Dkt. No. 2483 at 28-33.)  Since the filing of Plaintiff's motion, however, these five Class Members have submitted Individual Releases as provided in the Settlement.  (*See* Dkt. No. 2766 at 2 n.3.)  According to Plaintiff, "Smith VW, Eich Motor Co. and Steven VW received their initial payments on or about December 21, 2016.  Reydel VW will receive its initial payment on or about January 13, 2017.  Serra VW submitted its Individual Release on January 10, 2017, and will be paid its Initial Payment on or about January 20, 2017."  (*Id.*)  In light of the executed releases and the associated payments, these five Class Members' objections are moot.  Nevertheless, the Court addresses their objections for the sake of completeness.

United States District Court
Northern District of California

1    According to Serra VW, "[s]uch provision allows defendants to discriminate among class

2    members and/or to act arbitrarily and capriciously in determining the amount due any particular

3    class member in violation of class members' right to due process." (*Id.*)

4        Serra VW's first objection is nothing more than a disagreement with the amount of the

5    cash payment it will receive under the Settlement. As discussed above, the settlement process is

6    one of compromise, and not all Class Members will be satisfied with their allocated payments.

7    The settlement formula, however, is fair and reasonable; the Court thus overrules this objection.

8        The Court also overrules Serra VW's second objection. Serra VW is incorrect that the

9    settlement formula allows Volkswagen "to act arbitrarily and capriciously in determining the

10   amount due any particular class member." (Dkt. No. 2271.) Rather, as Plaintiff notes, "[t]he

11   amount is a *pro rata* division of the Settlement fund based on an objective factor, the November

12   2015 monthly support payment each dealer received." (Dkt. No. 2483 at 29; *see also* Dkt. No.

13   1970 ¶ 4.1.6.1.) Moreover, Serra VW has not been deprived of its right to due process. As

14   discussed above, all Class Members, including Serra VW, were provided adequate notice of the

15   Settlement and its terms. If Serra VW disagreed with its recovery under the Settlement, it had the

16   opportunity to opt out, but did not do so.

17                    **c.    Eich Motor Company**

18       Eich Motor Company objects to the settlement payment formula because: (1) it accounts

19   only for sales within, but not outside of, a dealer's PAI; (2) it does not provide additional

20   compensation for dealers with a disproportionately high percentage of TDI diesel sales; and (3) it

21   does not provide additional compensation to dealers "who have been performing at an

22   extraordinarily high level of sales effectiveness." (*See* Dkt. No. 2484-2.) According to Eich, the

23   failure to include each of these three elements negatively affects the amount that it should receive

24   under the Settlement. As with the objections above, Eich complains of the amount that it will

25   receive under the Settlement but does not establish that the formula is unfair or unreasonable. The

26   Court thus overrules Eich's objections.

27                    **d.    Speedcraft Volkswagen**

28       Speedcraft VW objects to the payment calculation because it "does not fairly compensate

United States District Court
Northern District of California

dealers with significantly larger than average diesel sales penetration" and thus proposes an alternative calculation that would purportedly remedy this problem.  (Dkt. No. 2484-3 at 2.)  This objection is simply an attempt by Speedcraft VW to secure more money under the Settlement. The Court overrules the objection for the same reasons as above.

### e.   Reydel Volkswagen

Similar to Smith VW, Reydel VW objects that its payment is too low because it sells and services Volkswagen vehicles in an open point area for which it does not receive credit under the Settlement.  (*See* Dkt. No. 2484-4.)  According to Reydel VW, "VOA had carved out a pre-existing portion of Reydel VW's market in anticipation of establishing another VW dealership in that market.  Another dealership was never established.  As a result, VW continues to sell cars into that market and the resulting VIO's (Vehicle in Operation) are not included in the Financial Assistance Payment."  (*Id.* at 2.)  Again, an individual dealer's desire for a larger payment is insufficient to establish that the Settlement is unfair or unreasonable.  The objection is overruled.

### f.   Steven Volkswagen

Steven VW objects to its payment under the Settlement because the number of Vehicles in Operation ("VIO") for which it received credit (1,811 units) is too low; instead, Steven VW contends, its proper VIO should be 2,529 units.  (*See* Dkt. No. 2290 at 2.)  Based on this difference, Steven VW argues that it is entitled to an additional $509,780.  It appears, however, that Steven VW's VIO was calculated based on a different formula than that used in the Settlement.  As Plaintiff explains, "Steven VW's VIO of 1,811 was derived by using VW's formula to calculate the November 2015 discretionary payments, the same formula uniformly used to calculate all other VW dealers' November discretionary payments.  The November discretionary payment was based on retail VIO in each dealer's PAI for model years 2009 through 2015 *as of December 2014*."  (Dkt. No. 2483 at 33 (emphasis added).)  Rather than the December 2014 VIO, the document which Steven VW relied upon was based on its July 31, 2016 VIO.  (*See* Dkt. No. 2290 at 4 ("VW UNITS IN OPERATION BASED ON 7/31/2016 VIO").)  Further, Plaintiff notes, the document "also include[d] Fleet and Dealer/Manufacturer sales, whereas the November 2015 discretionary payments to all Eligible Dealers was based on each dealership's

United States District Court
Northern District of California

1    VIO based only on retail sales." (Dkt. No. 2483 at 33 (emphasis omitted).)  In light of the

2    foregoing, the Court concludes that Steven VW's VIO and associated payment under the

3    Settlement are appropriate and overrules Steven VW's objection.

### g.    Palisades Volkswagen

5        Palisades VW submitted both an objection to the Settlement as well as an opposition to

6    Plaintiff's motion for final approval.  (*See* Dkt. Nos. 2276, 2604.)  Palisades VW objects to the

7    scope of the Released Claims because "[t]he TDI Settlement goes 'far beyond' Class Plaintiffs'

8    claims arising from the TDI Scandal, and sucks in completely unrelated claims such as Palisades's

9    claims in the New York Litigation." (Dkt. No. 2276 at 7.)  Palisades VW previously commenced

10   its New York state action for price discrimination based on Volkswagen's Variable Bonus

11   Program ("VBP").  (*Id.* at 8.)  Volkswagen discontinued the VBP as of April 1, 2014.  (*Id.*)

12       Palisades VW's counsel represented at the fairness hearing that its objection would be

13   withdrawn once the parties amended the scope of the Released Claims such that Palisades VW's

14   preexisting litigation would remain intact.  (Dkt. No. 2801 at 25-26.)  The parties have since

15   amended the scope of the Released Claims to exclude any Class Member's claim or claims that

16   existed in a pending lawsuit prior to April 6, 2016 (*see* Dkt. No. 2802 ¶ 9.3.1), thus preserving

17   Palisades VW's claim.  The Court considers Palisades VW's objection to be withdrawn.

### h.    Hansel Volkswagen

19       Hansel VW objects that "the release waives dealer franchise law rights in violation of

20   California law." (Dkt. No. 2484-7 at 2.)  Specifically, Hansel VW notes that "California Vehicle

21   Code section 11713.3, subsection (g)(1)(B) makes it unlawful for a manufacturer or distributor to

22   obtain from a dealer or enforce against a dealer 'an agreement, provision, release, assignment,

23   novation, waiver, or estoppel that' … 'limits [or] constrains the right of a dealer to file, pursue, or

24   submit evidence in connection with a protest before the [California New Motor Vehicle Board].'"

25   (*Id.* (emphasis in original).)  But the same code section later states: "(3) This subdivision does not

26   do any of the following: (A) Limit or restrict the terms upon which parties to a protest before the

27   board, civil action, or other proceeding can settle or resolve, or stipulate to evidentiary or

28   procedural matters during the course of, a protest, civil action, or other proceeding." Cal. Veh.

United States District Court
Northern District of California

Code § 11713.3(g)(3)(A).  The release thus does not violate California law and the Court overrules the objection.

### i.      Mission Bay Motors, Inc. dba City Volkswagen

City VW objects to the definition of the Franchise Dealer Class—specifically, the requirement that Class Members have operated a Volkswagen branded dealership on September 18, 2015.  (*See* Dkt. No. 2278.)  As City VW admits, however, it "became an authorized franchisee of Defendant Volkswagen Group of America, Inc., on or about August 1, 2016."  (*Id.* at 2.)  Thus, City VW is not a Class Member, and the Court need not consider its objection.  *See San Francisco NAACP v. San Francisco Unified Sch. Dist.*, 59 F. Supp. 2d 1021, 1032 (N.D. Cal. 1999) ("[N]onclass members have no standing to object to the settlement of a class action.").

### B.      The *Bluetooth* Factors

Although the *Churchill* factors favor settlement, consideration of those factors alone is insufficient.  *See In re Bluetooth*, 654 F.3d at 946.  Where, as here, the parties reach a settlement prior to class certification, courts must examine the settlement with "an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair."  *Id.* (citations omitted).  "Collusion may not always be evident on the face of a settlement, and courts therefore must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations."  *Id.* at 947.  Signs of subtle collusion include:

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;
> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id.* (internal quotations marks and citations omitted).  The *Bluetooth* court made clear that these factors are not dispositive but merely "warning signs" or "indicia of possible implicit collusion."

United States District Court
Northern District of California

*Id.* Even if all three signs are present, courts may still find that a settlement is reasonable. *See id.* at 950 (noting that the district court may find the settlement reasonable notwithstanding the presence of all three *Bluetooth* factors).

The Court concludes that none of the *Bluetooth* factors are present here and thus there is no evidence of collusion. The first *Bluetooth* factor asks whether Class Counsel will receive a disproportionate distribution of the Settlement or whether Counsel are amply rewarded while the Class receives no monetary distribution. *Id.* at 947. This factor is not implicated. First, the Settlement does not entitle Class Counsel to any portion of the Settlement funds; the cash payments (and other benefits) are designated solely for Class Members. Second, all Class Members that did not opt out will receive monetary and non-monetary benefits as set forth in the Settlement. Thus, there is no concern that Class Counsel is rewarded while Class Members receive no monetary award. Further, even if Class Counsel were to receive the maximum they stated they would seek (an unlikely outcome), that amount— $36.24 million, inclusive of costs— is less than three percent of the cash component of the Settlement. (*See* Dkt. No. 2177 at 5.)

The second *Bluetooth* factor considers whether the parties negotiated a "clear sailing" agreement for the payment of attorneys' fees separate from the class funds. *See In re Bluetooth*, 654 F.3d at 947. The Settlement provides that Volkswagen will pay attorneys' fees separate from, and in addition to, the compensation provided to Class Members. (Dkt. No. 1970 ¶ 13.2.) As noted, Class Counsel will not seek more than $36.24 million in attorneys' fees and costs. Importantly, at this juncture, there is no "clear sailing" agreement to cause concern for collusion. Although Class Counsel has agreed not to seek more than a total of $36.24 million in fees and costs, Volkswagen has not agreed not to contest such a request. (*See id.*) Moreover, discussions for attorneys' fees began after the substantive terms of the Settlement were settled (*see* Dkt. No. 1971 at 18), suggesting that Class Counsel did not accept an excessive fee in exchange for an unfair settlement or otherwise allow their fees to interfere with negotiations for Class Members' benefits. Thus, this factor is not indicative of collusion.

The third *Bluetooth* factor, which considers whether the settlement provides for funds not awarded to revert to defendants, is also not present. The Settlement provides:

Volkswagen shall pay a Maximum Settlement Amount of $1,208,000,000.00 if there is participation of 100% of all Eligible Dealers; *i.e.*, no Eligible Dealer chooses to opt-out of this Franchise Dealer Class Agreement. The Net Settlement Amount is the actual amount to be paid to those Eligible Dealers that do not opt-out of this Franchise Dealer Class Agreement and, therefore, are Dealer Settlement Class Members. This is a claims-paid settlement—every Eligible Dealer who does not opt-out of the settlement shall be paid their share of the Net Settlement Amount by Volkswagen according to the formula set forth in Section 4.1.6.

(Dkt. No. 1970 ¶ 4.1.2.) Thus, once the Franchise Dealer Class is set after all opt-outs, the Net Settlement Amount is fixed and must be paid out by Volkswagen to all Class Members. In other words, there will be no unpaid settlement funds and thus no reversion of funds to Volkswagen.

\*   \*   \*

In light of the foregoing analysis, the Court finds final approval of the Settlement is appropriate. Dealer participation in the Franchise Dealer Class, at 98%, is extraordinarily high. The number of objections is small, and the substance of those objections does not call into doubt the Settlement's fairness. The *Churchill* factors support final approval, and the *Bluetooth* factors do not suggest or evidence collusion. Accordingly, even under heightened scrutiny, the Court concludes the Settlement is fair, adequate, and reasonable.

## DISCUSSION – ALL WRITS ACT

The All Writs Act authorizes district courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). "The power conferred by the [All Writs] Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, [ ] and encompasses even those who have not taken any affirmative action to hinder justice." *United States v. New York Tel. Co.*, 434 U.S. 159, 174 (1977) (internal citations omitted). However, the authority granted by the All Writs Act, though broad, is not unlimited. *Negrete v. Allianz Life Ins. Co. of N. Am.*, 523 F.3d 1091, 1098 (9th Cir. 2008). Indeed, the Anti-Injunction Act limits the district court's ability to enjoin state proceedings "except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

24

United States District Court
Northern District of California

28 U.S.C. § 2283.  "Although comity requires federal courts to exercise extreme caution in interfering with state litigation, federal courts have the power to do so when their jurisdiction is threatened."  *Hanlon*, 150 F.3d at 1025; *see Keith v. Volpe*, 118 F.3d 1386, 1390 (9th Cir. 1997) ("[T]he All Writs Act, 28 U.S.C. § 1651, empowers the federal courts to enjoin state proceedings that interfere, derogate, or conflict with federal judgments, orders, or settlements.").

A stay of all state court actions relating to Released Claims, except as set forth in Paragraph 9.3.1 of the Settlement (*see* Dkt. No. 2802), is necessary to preserve the Court's jurisdiction.  First, Class Members have been given an opportunity to opt out of the Settlement. *See Jacobs v. CSAA Inter-Ins.*, No. C 07-00362 MHP, 2009 WL 1201996, at *2 (N.D. Cal. May 1, 2009) ("A district court may enjoin named and absent members who have been given the opportunity to opt out of a class from prosecuting separate class actions in state court.") (citation omitted).  Second, a state court's disposition of claims similar to or overlapping the Released Claims would implicate the same legal and evidentiary issues; thus, such action would threaten the Court's jurisdiction and hinder its ability to decide the case.  *See id.* at *3 ("A preliminary injunction is appropriate to preserve jurisdiction because there is a sufficient overlap of claims between the federal and state class actions, such that the same legal and evidentiary issues will be implicated in each case."); *In re Jamster Mktg. Litig.*, No. 05-CV-0819JM(CAB), 2008 WL 4482307, at *6 (S.D. Cal. Sept. 29, 2008) ("Any litigant may be enjoined from proceeding with a state court action where it is 'necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide the case.'") (citation omitted).  Accordingly, the Court enjoins Class Members who have not opted out from participating in any state court litigation relating to the Released Claims, except as set forth in Paragraph 9.3.1 of the Settlement.  This injunction, however, does not prevent Class Members from dismissing or staying his or her Released Claims.

## CONCLUSION

For the foregoing reasons, the Court ORDERS as follow:

1.      Plaintiff's Motion for Final Approval of the Settlement is GRANTED. The Settlement is fair, adequate, and reasonable and is in the best interest of Class

United States District Court
Northern District of California

Members.  Benefits under the Settlement shall immediately be made available to Class Members.

2. The Court CONFIRMS the appointment of J. Bertolet, Inc. dba J. Bertolet Volkswagen as Settlement Class Representative.

3. The Court CONFIRMS the appointment of Hagens Berman and Bass Sox Mercer as Settlement Class Counsel.

4. The Court DISMISSES WITH PREJUDICE all Released Claims, except as set forth in Paragraph 9.3.1 of the Settlement (*see* Dkt. No. 2802), as between the Settlement Class and all its Members who have not timely and properly excluded themselves, on the one hand, and any Released Party or Parties.  However, costs shall be awarded as specified in this Order and in the Settlement, such as the motion for an award of attorneys' fees and costs, as contemplated by the settling Parties in Section 13 of the Settlement, which may be filed at the appropriate time to be determined by the Court.

5. Class Members who have not properly opted out and any person purportedly acting on behalf of any Class Member(s) are ENJOINED from commencing, filing, initiating, instituting, pursuing, maintaining, enforcing or prosecuting, either directly or indirectly, any Released Claims, except as set forth in Paragraph 9.3.1 of the Settlement, in any judicial, administrative, regulatory, arbitral or other proceeding, in any jurisdiction or forum, against any of the Released Parties. Nothing herein shall prevent any Class Member, or any person actually or purportedly acting on behalf of any Class Member(s), from taking any actions to dismiss his, her, or its Released Claims.

6. Only those persons or entities who timely submitted valid requests to opt out of the Settlement Class are not bound by this Order, and any such excluded persons or entities are not entitled to any recovery from the Settlement.  A list of those persons or entities can be found in Exhibit 1 to this Order.

7. Pursuant to the Court's prior order (Dkt. No. 2172), Settlement Class Counsel shall

file their application for attorneys' fees and costs by **January 25, 2017**.  Any responses shall be due **February 8, 2017**, and any replies shall be due **February 15, 2017**. The Court will advise the parties if a hearing is necessary.

8.    The Court retains the exclusive jurisdiction to enforce, administer, and ensure compliance with all terms of the Settlement in accordance with the Settlement and this Order.

This Order disposes of Docket No. 2483.

**IT IS SO ORDERED.**

Dated: January 23, 2017

_____
CHARLES R. BREYER
United States District Judge