1   Elizabeth J. Cabraser (State Bar No. 083151)
    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2   275 Battery Street, 29th Floor
    San Francisco, CA  94111-3339
3   Telephone:  (415) 956-1000
    Facsimile:  (415) 956-1008
4   Email: ecabraser@lchb.com

5   Lead Counsel for Plaintiffs
    *(Plaintiffs' Steering Committee Members*
6   *Listed on Signature Page)*

7

8                UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10               SAN FRANCISCO DIVISION

11

12  IN RE: VOLKSWAGEN "CLEAN DIESEL"          MDL 2672 CRB (JSC)
    MARKETING, SALES PRACTICES, AND
13  PRODUCTS LIABILITY LITIGATION             **PLAINTIFFS' NOTICE OF MOTION,**
                                              **MOTION, AND MEMORANDUM IN**
14  This Document Relates to:                 **SUPPORT OF PRELIMINARY**
                                              **APPROVAL OF THE 3.0-LITER TDI**
15  ALL CONSUMER AND RESELLER                 **CLASS ACTION AGREEMENT AND**
    ACTIONS                                   **APPROVAL OF CLASS NOTICE____**
16
                                              Hearing:     February 14, 2017
17                                            Time:        8:00 a.m.
                                              Courtroom:  6, 17th Floor
18
                                              The Honorable Charles R. Breyer
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ........................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 1

I.    INTRODUCTION ............................................................................................... 1

II.   BACKGROUND AND PROCEDURAL HISTORY ........................................ 5

    A.    Factual Background .................................................................................... 5

    B.    Procedural History ...................................................................................... 6

III.  TERMS OF THE SETTLEMENT .................................................................... 9

    A.    The 3.0-Liter Settlement Class Definition ................................................. 9

    B.    Benefits to Class Members ...................................................................... 11

        1.    Generation One Benefits ................................................................ 11

        2.    Generation Two Benefits ................................................................ 12

        3.    Value of Benefits and Attorneys' Fees and Costs .......................... 14

IV.   THE SETTLEMENT MERITS PRELIMINARY APPROVAL ...................... 15

    A.    The Class Action Settlement Process ....................................................... 15

    B.    The Standard For Preliminary Approval ................................................... 16

    C.    The Settlement Is Substantively Fair Because It Provides Very Significant
        Benefits in Exchange for The Compromise of Strong Claims ............................... 18

    D.    The Settlement Is The Product of Good Faith, Informed, and Arm's-Length
        Negotiations, and It Is Procedurally Fair. .................................................. 22

V.    THE COURT SHOULD CERTIFY THE CLASS FOR SETTLEMENT PURPOSES... 23

    A.    The Class Meets The Requirements Of Rule 23(a). ................................. 24

        1.    The Class Is Sufficiently Numerous. .............................................. 24

        2.    There Are Common Questions of Law and Fact. ........................... 25

        3.    The Settlement Class Representatives' Claims Are Typical of Other Class
            Members' Claims. ........................................................................... 27

        4.    The Settlement Class Representatives and Class Counsel Will Fairly and
            Adequately Protect the Interests of the Settlement Class. ............................ 28

            a.    The Interests of the Settlement Class Representatives Are Directly
                Aligned With Those of the Absent Class Members and The
                Settlement Class Representatives Have Diligently Pursued The
                Action On Their Behalf. .................................................................. 29

            b.    Class Counsel Are Qualified To Serve as Settlement Class Counsel. ... 30

    B.    The Requirements Of Rule 23(b)(3) Are Met ........................................... 31

        1.    Common Issues of Law and Fact Predominate ............................... 31

        2.    Class Treatment Is Superior in This Case ...................................... 33

**TABLE OF CONTENTS**
(continued)

Page

VI.    THE PROPOSED NOTICE PROGRAM PROVIDES THE BEST PRACTICABLE NOTICE IN PLAIN LANGUAGE, BY DIRECT MAIL AND EXTENSIVE PUBLICATION ........................................................................................... 35

VII.   THE PROPOSED FINAL APPROVAL HEARING SCHEDULE .................................. 38

VIII.  CONCLUSION ........................................................................................... 39

CERTIFICATE OF SERVICE ................................................................................. 43

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amchem Prods. v. Windsor*,
9521 U.S. 591 (1997)........................................................................................... 23

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
133 S. Ct. 1184 (2013)........................................................................................ 25

*Astiana v. Kashi Co.*,
291 F.R.D. 493 (S.D. Cal. 2013).......................................................................... 26

*Butler v. Sears, Roebuck & Co.*,
702 F.3d 359 (7th Cir. 2012)................................................................................ 31

*Cartwright v. Viking Indus.*,
No. 2:07-CV-02159-FCD-EFB, 2009 WL 2982887 (E.D. Cal. Sept. 14, 2009)................... 34

*Churchill Vill., L.L.C., v. GE*,
361 F.3d 566 (9th Cir. 2004)................................................................................ 35

*Class Plaintiffs v. City of Seattle*,
955 F.2d 1268 (9th Cir. 1992).............................................................................. 15

*Clemens v. DaimlerChrysler Corp.*,
534 F.3d 1017 (9th Cir. 2008).............................................................................. 20

*Clemens v. Hair Club for Men, LLC*,
No. C 15-01431 WHA, 2016 U.S. Dist. LEXIS 50573 (N.D. Cal. 2016) ...................... 29, 30

*Cohen v. Trump*,
303 F.R.D. 376 (S.D. Cal. 2014)........................................................................... 26

*Ellis v. Naval Air Rework Facility*,
87 F.R.D. 15 (N.D.Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981) ...................... 17

*Estrella v. Freedom Fin'l Network*,
No. C 09-03156 SI, 2010 WL 2231790 (N.D. Cal. June 2, 2010)........................... 25

*Evon v. Law Offices of Sidney Mickell*,
688 F.3d 1015 (9th Cir. 2012)......................................................................... 27, 28

*Friedman v. 24 Hour Fitness USA, Inc.*,
No. CV 06-6282 AHM (CTx), 2009 WL 2711956 (C.D. Cal. Aug. 25, 2009).................. 32

*Guido v. L'Oreal, USA, Inc.*,
284 F.R.D. 468 (C.D. Cal. 2012) ......................................................................... 26

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998)......................................................................... passim

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992)............................................................................... 27

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011)............................................................................... 22

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
No. C-07-5944-SC, 2016 U.S. Dist. LEXIS 9944 (N.D. Cal. Jan. 6, 2016), *report
and recommendation adopted*, 2016 U.S. Dist. LEXIS 9766 (N.D. Cal. Jan. 26,
2016)..................................................................................................................... 32

*In re Celera Corp. Sec. Litig.*,
No. 5:10-CV-02604-EJD, 2014 WL 722408 (N.D. Cal. Feb. 25, 2014) ...................... 27

*In re First Alliance Mortg. Co.*,
471 F.3d 977 (9th Cir. 2006)............................................................................... 31

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re Hewlett-Packard Co. S'holder Derivative Litig.*,
  No. 3:12-CV-06003-CRB, 2015 WL 1153864 (N.D. Cal. Mar. 13, 2015) ........................... 17

*In re Netflix Privacy Litig.*,
  No. 5:11-CV-00379 EJD, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ........................... 17

*In re NFL Players Concussion Injury Litig.*,
  821 F.3d 410 (3d Cir. 2016 ................................................................................... 15

*In re Rambus Inc. Derivative Litig.*,
  No. C–06–3515–JF, 2009 WL 166689 (N.D. Cal. Jan. 20, 2009) ........................... 16

*In re Syncor ERISA Litig.*,
  516 F.3d 1095 (9th Cir. 2008) ................................................................................... 16

*In re Tableware Antitrust Litig.*,
  484 F. Supp. 2d 1078 (N.D. Cal. 2007) ......................................................... 17, 18

*In re Transpacific Passenger Air Transp. Antitrust Litig.*,
  No. C 07-05634 CRB, 2015 WL 3396829 (N.D. Cal. May 26, 2015) ........................... 32

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
  No. 2672 CRB (JSC), 2016 WL 4010049 (N.D. Cal. July 26, 2016) ........................... passim

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
  No. 2672 CRB (JSC), 2016 WL 6248426 (N.D. Cal. Oct. 25, 2016) ........................... passim

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
  527 F. Supp. 2d 1053 (N.D. Cal. 2007) ......................................................... 34

*International Molders' & Allied Workers' Local Union No. 164 v. Nelson*,
  102 F.R.D. 457 (N.D. Cal. 1983) ................................................................................... 26

*Jimenez v. Allstate Ins. Co.*,
  765 F.3d 1161 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 2835 (2015) ........................... 25

*Jones v. Amalgamated Warbasse Houses, Inc.*,
  97 F.R.D. 355 (E.D.N.Y. 1982) ................................................................................... 22

*Keegan v. Am. Honda Motor Co.*,
  838 F. Supp. 2d 929 (C.D. Cal. 2012) ......................................................... 20

*Kim v. Space Pencil, Inc.*,
  No. C 11-03796 LB, 2012 WL 5948951 (N.D. Cal. Nov. 28, 2012) ........................... 19

*Klay v. Humana, Inc.*,
  382 F.3d 1241 (11th Cir. 2004) ................................................................................... 32

*Kruse v. Chevrolet Motor Div.*,
  Civil Action No. 96-1474, 1997 WL 408039 (E.D. Pa. July 17, 1997) ........................... 21

*Leuthold v. Destination Am., Inc.*,
  224 F.R.D. 462 (N.D. Cal. 2004) ................................................................................... 33

*Marshall v. Holiday Magic, Inc.*,
  550 F.2d 1173 (9th Cir. 1977) ................................................................................... 22

*Mego Financial Corp. Sec. Litig.*,
  213 F.3d 454 (9th Cir. 2000) ......................................................... 16, 18, 19, 22

*Mendoza v. Tucson Sch. Dist. No. 1*,
  623 F.3d 1338 (9th Cir. 1980) ................................................................................... 35

*Moreno v. Autozone, Inc.*,
  251 F.R.D. 417 (N.D. Cal. 2008) ................................................................................... 25

*Mullane v. Central Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950) ................................................................................... 35

# TABLE OF AUTHORITIES
**(continued)**

**Page(s)**

*Negrete v. Allianz Life Ins. Co. of N. Am.*,
    238 F.R.D. 482 (C.D. Cal. 2006) ............................................................... 25

*Nobles v. MBNA Corp.*,
    No. C 06-3723 CRB, 2009 WL 1854965 (N.D. Cal. June 29, 2009) ............................. 17, 19

*Officers for Justice v. Civil Service Comm'n*,
    688 F.2d 615 (9th Cir. 1982)................................................................. 16, 18

*Palmer v. Stassinos*,
    233 F.R.D. 546 (N.D. Cal. 2006) ............................................................... 24

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014)................................................................. 25, 27, 28

*Pha v. Yang*,
    2015 U.S. Dist. LEXIS 109074 (E.D. Cal. Aug. 17, 2015) ...................................... 22

*Pierce* v. *Rosetta Stone, Ltd.*,
    No. C 11-01283 SBA, 2013 WL 5402120 (N.D. Cal. Sept. 26, 2013)............................... 22

*Radcliffe v. Experian Info. Sols., Inc.*,
    715 F.3d 1157 (9th Cir. 2013)................................................................ 28

*Ries v. Arizona Beverages USA LLC*,
    287 F.R.D. 523 (N.D. Cal. 2012) ............................................................. 26

*Robbins v. Hyundai Motor America, Inc.*,
    2015 WL 304142 (C.D. Cal. Jan. 14, 2015) ................................................... 20

*Rodman v. Safeway, Inc.*,
    No. 11-cv-03003-JST, 2014 WL 988992 (N.D. Cal. Mar. 9, 2014)................................ 32

*Rodriguez v. Hayes*,
    591 F.3d 1105 (9th Cir. 2010)................................................................ 27

*Rosales v. El Rancho Farms*,
    No. 1:09-cv-00707-AWI-JLT, 2015 WL 446091 (E.D. Cal. July 21, 2015)......................... 22

*Rupay v. Volkswagen Group of America Inc.*,
    2012 WL 10634428 (C.D. Cal. Nov. 15, 2012).................................................. 20

*Slaven v. BP Am., Inc.*,
    190 F.R.D. 649 (C.D. Cal. 2000) ............................................................. 24

*Smith v. Cardinal Logistics Mgmt. Corp.*,
    No. 07-2104 SC, 2008 WL 4156364 (N.D. Cal. Sept. 5, 2008) .................................. 34

*Spalding v. City of Oakland*,
    No. C11-2867 TEH, 2012 WL 994644 (N.D. Cal. Mar. 23, 2012) ................................. 26

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003)................................................................. 17

*Stockwell v. City & Cty. of San Francisco*,
    749 F.3d 1107 (9th Cir. 2014)................................................................ 25

*Suchanek v. Sturm Foods, Inc.*,
    764 F.3d 750 (7th Cir. 2014)................................................................. 26

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2011).................................................................. 32

*Sykes v. Mel Harris & Assocs. LLC*,
    285 F.R.D. 279 (S.D.N.Y. 2012) .............................................................. 27

*Trosper v. Styker Corp.*,
    No. 13-CV-0607-LHK, 2014 WL 4145448 (N.D. Cal. Aug. 21, 2014) ............................. 29, 33

# TABLE OF AUTHORITIES
**(continued)**

**Page(s)**

*Tyson Foods, Inc. v. Bouaphakeo,*
   136 S. Ct. 1036 (2016) ........................................................................ 31

*UAW v. GMC,*
   497 F.3d 615 (6th Cir. 2007)............................................................... 19

*Wakefield v. Wells Fargo & Co.,*
   No. C 12-05053 LB, 2014 WL 7240339 (N.D. Cal. Dec. 18, 2014) ..................................... 32

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011) ..................................................................... 25, 26

*Wolin v. Jaguar Land Rover N. Am., LLC,*
   617 F.3d 1168 (9th Cir. 2010) ................................................... 27, 31, 33

**STATUTES**

49 U.S.C. § 30120(a)(1)(A)(iii) .............................................................. 20

Cal. Civ. Code § 1793.2(d)(2)(C) ............................................................ 20

**RULES**

Fed. R. Civ. P. 23(a) ...................................................................... 24

Fed. R. Civ. P. 23(a)(1) ................................................................... 24

Fed. R. Civ. P. 23(a)(3) ................................................................... 27

Fed. R. Civ. P. 23(a)(4) ................................................................... 28

Fed. R. Civ. P. 23(b)(3) ............................................................... 24, 31

Fed. R. Civ. P. 23(c)(2)(B) ................................................................ 35

Fed. R. Civ. P. 23(e) .................................................................. 15, 16

Fed. R. Civ. P. 23(e)(1) ................................................................... 35

Fed. R. Civ. P. 23(g) ..................................................................... 30

**TREATISES**

2 W. Rubenstein, *Newberg on Class Actions*
   § 4:49 (5th ed. 2012) ................................................................... 31

4 Herbert B. Newberg & Alba Conte,
   *Newberg on Class Actions* §11:41 (4th ed. 2002) ........................................ 16

7AA C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure
   § 1778 (3d ed. 2005) ................................................................... 31

*Manual for Complex Litigation (Fourth)* (2004) .................................. 16, 23, 35, 37

*Manual for Complex Litigation (Second)*, § 30.44 (1985)......................... 17

- vi -

1

## NOTICE OF MOTION AND MOTION

2
TO THE ALL PARTIES AND COUNSEL OF RECORD:

3
    PLEASE TAKE NOTICE that on February 14, 2017, at 8:00 a.m., or at such other date as

4
may be agreed upon, in Courtroom 6 of the United States District Court for the Northern District

5
of California, located at 450 Golden Gate Avenue, San Francisco, California, Lead Counsel and

6
the Plaintiffs' Steering Committee, on behalf of a proposed Settlement Class of certain owners

7
and lessees of Volkswagen, Audi, and Porsche branded 3.0-liter TDI vehicles defined in the 3.0-

8
Liter TDI Class Action Settlement and in the Memorandum below, will and hereby do move the

9
Court for an order granting preliminary approval of the 3.0-Liter Class Action Settlement,

10
provisionally certifying the Class, appointing Settlement Class Counsel and Class

11
Representatives, directing notice to the Class, and scheduling a formal fairness hearing.

12
    As discussed in the attached Memorandum and Points of Authorities, the Parties have

13
reached another milestone in an historic litigation that remediates past environmental harm,

14
minimizes future environmental harm, and substantially compensates consumers for their losses.

15
Moreover, the proposed notice program, which includes direct mail and e-mail notice and an

16
extensive media outreach, is the best notice practicable under the circumstances.  Plaintiffs thus

17
respectfully request that the Court grant preliminary approval, provisionally certify the Class,

18
direct notice to the Class, and schedule a fairness hearing.

19

## MEMORANDUM OF POINTS AND AUTHORITIES

20
### I.    INTRODUCTION

21
    In the fall of 2015, the U.S. Environmental Protection Agency ("EPA") and the California

22
Air Resources Board ("CARB") issued notices of violation to Volkswagen AG, Audi AG,

23
Porsche AG, Volkswagen Group of America, Inc., and Porsche Cars North America, Inc.

24
(collectively "Volkswagen" or "Defendants"), alleging that certain 2.0-liter and 3.0-liter

25
Volkswagen, Audi, and Porsche branded turbocharged direct-injection ("TDI") diesel vehicles in

26
the United States were equipped with "defeat device" software designed to reduce the

27
effectiveness of the vehicles' emissions control systems with respect to nitrogen oxides ("NOx").

28
    Starting in September 2015, owners, lessees, and dealers filed hundreds of lawsuits

- 1 -

against Defendants in federal courts across the United States, which were consolidated in the United States District Court for the Northern District of California before Your Honor.  The Court appointed Lead Plaintiffs' Counsel, as well as 21-firm Plaintiffs' Steering Committee ("PSC") (together, "Class Counsel"), to oversee the litigation on behalf of affected owners, lessees, and dealers.

After months of negotiations facilitated by Court-appointed Settlement Master Robert Mueller III, former director of the Federal Bureau of Investigation, Volkswagen and the 2.0-liter class representatives reached an agreement to settle the claims of certain current and former owners and lessees of certain Volkswagen and Audi branded vehicles with 2.0-liter TDI engines (the "2.0-Liter Class Action Settlement" or "2.0-Liter Settlement").  The deal, negotiated simultaneously with the United States Department of Justice ("DOJ"), the Federal Trade Commission ("FTC"), EPA, and CARB, secured more than $10.033 billion to compensate defrauded consumers and satisfied the objective of the Class, Court, and public to "get[] the polluting cars fixed or off the road."  March 24, 2016, Status Conf. Hr'g Tr. at 8:20-21 (Dkt. No. 1384).  Barely three months after final approval, the 2.0-Liter Settlement has already proved a tremendous success: more than 450,000 class members have registered for benefits (approximately 95% of the class) and almost $5 billion has already been offered to consumers.

Now, after many more months of intensive negotiations and litigation preparation, the parties have reached a proposed settlement regarding the remaining, 3.0-liter vehicles, listed below (the "Proposed Settlement," "3.0-Liter Class Action Settlement," or "3.0-Liter Settlement"):

| GENERATION ONE | |
|---|---|
| **MODEL** | **MODEL YEARS** |
| **Volkswagen Touareg** | 2009-2012 |
| **Audi Q7** | 2009-2012 |
| GENERATION TWO | |
| **MODEL** | **MODEL YEARS** |
| **Volkswagen Touareg** | 2013-2016 |
| **Audi Q7** | 2013-2015 |
| **Audi A6** | 2014-2016 |
| **Audi A7** | 2014-2016 |
| **Audi A8, A8L** | 2014-2016 |
| **Audi Q5** | 2014-2016 |
| **Porsche Cayenne** | 2013-2016 |

Like the 2.0-Liter Settlement, the proposed 3.0-Liter Settlement further advances the twin missions of consumer compensation and environmental remediation, and (along with the simultaneously-filed proposed settlement with the Bosch defendants) will conclude the consumer and reseller dealer's claims in this MDL if approved.  Specifically, the Proposed Settlement:

> (1)     fairly compensates those who own, owned, lease or leased the affected diesel vehicles with consumer payments totaling between approximately $1.2 billion and $4 billion, depending on whether Volkswagen can timely provide a modification for some of the vehicles that brings them into compliance with the emission standards under which they were originally certified;

> (2)     mitigates future environmental harm by establishing a mechanism to get the vehicles "fixed or taken off the road" through buyback, trade-in, and emissions modification programs; and

> (3)     along with the DOJ 3.0-liter Consent Decree, remediates past environmental harm by securing additional hundreds of millions of dollars to clean the air.

There are two tracks of payments, benefits, and options under this Settlement— necessitated by the design differences between two "Generations" of engines in the 3.0-liter vehicles.  For Generation Two vehicles, it is anticipated that Defendants will develop an engine modification that brings the emissions from Generation Two vehicles into compliance with the emissions standards to which the vehicles were originally certified (an "Emissions Compliant Repair").[1]  In contrast, any Emissions Modification approved for Generation One vehicles will reduce the vehicles' emissions, but will not lower them to the levels of their original certification (a "Reduced Emissions Modification").  The Generation One vehicles thus follow a track similar to the previously approved 2.0-liter class settlement:  the choice of buyback or emissions modification (but not to originally certified levels), plus substantial compensation.  As described more fully below, if Volkswagen obtains *timely* approval for an Emissions Compliant Repair for any subgroup of Generation Two vehicles, owners and lessees of those vehicles will receive that

---

[1] Capitalized terms have the meanings set forth in the Proposed Settlement unless otherwise indicated.

1    Repair and come away with the vehicle they originally thought they were buying or leasing—

2    with both performance and emissions characteristics at or very near the initially-advertised

3    specifications—plus thousands of dollars in additional compensation.  If no such Repair is timely

4    approved, Volkswagen must buyback the vehicles, at values frozen in time in September 2015,

5    plus pay thousands of additional dollars in consumer compensation to each Generation Two Class

6    Member.

7         The total monetary value of these Settlement Benefits (not including the cost of

8    developing or implementing the emissions modifications or administering the buyback) ranges

9    from approximately $1.2 billion if the Emissions Compliant Repair is approved for all Generation

10   Two vehicles, to more than $4 billion if it is not (assuming 100% buyback).  None of these

11   benefits will be reduced to pay Class Counsel's attorneys' fees or expenses.

12        The Settlement comes less than one and a half years after news of Volkswagen's diesel

13   scandal broke, one year after this Court appointed Lead Counsel and the Plaintiffs' Steering

14   Committee ("PSC") (together, "Class Counsel"), and only three months after this Court granted

15   final approval of the 2.0-Liter Settlement.  As with the 2.0-Liter Settlement, the truncated time

16   frame within which the Settlement was reached belies the extensive efforts undertaken by Class

17   Counsel and others, including defense counsel, counsel on behalf of multiple government entities,

18   Settlement Master Mueller and his team, and the Court.  The hours worked towards a 3.0-liter

19   resolution (and, indeed, by counsel for all settling parties) did not wane upon the announcement

20   of the 2.0-Liter Settlement and—though the intensive settlement efforts that commenced upon the

21   approval of the 2.0-Liter Settlement went on around the clock—the PSC continued its brisk pace

22   of factual investigation, document review and analysis, and continued to build the 3.0-liter case

23   against all defendants.  Class Counsel have, without question, fulfilled (and will continue to

24   fulfill) their commitment to the Court to personally devote their own time, and the time and

25   resources of their respective firms, towards the litigation and resolution of this case.

26        Plaintiffs are proud to present the Settlement to the Court and respectfully request that the

27   Court enter an Order preliminarily approving the Proposed Settlement, provisionally certifying

28   the Settlement Class, directing notice of Settlement to the Class, and setting a schedule for final

1  approval of the 3.0-Liter Class Action Settlement.

2  **II.       BACKGROUND AND PROCEDURAL HISTORY**

3        The relevant factual allegations and procedural history are set forth in large part in this the

4  Court's orders granting preliminary approval of the 2.0-Liter Settlement. *See In re Volkswagen*

5  *"Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 2672 CRB (JSC), 2016 WL

6  4010049, at *1-2 (N.D. Cal. July 26, 2016) (Dkt. No. 1688).  Since that time, litigation and

7  settlement talks concerning the 3.0-liter class vehicles have proceeded on separate tracks, both at

8  full speed, and have resulted in this Proposed Settlement.

9        **A.       Factual Background**

10       As the Court previously outlined, this multidistrict litigation arises from Volkswagen's

11  sale of TDI "clean diesel" vehicles containing a "defeat device" to the American public. *Id.* at

12  *1.  Defendants marketed the TDI vehicles to the public "as being environmentally friendly, fuel

13  efficient, and high performing." *Id.*  However, the vehicles contained hidden defeat devices—

14  "software that bypasses, defeats, or renders inoperative certain elements of the vehicles'

15  emissions control system"—to evade emissions testing by government regulators such as the EPA

16  and CARB.  *Id.*  The defeat device sensed when the vehicle was being emission-tested and

17  changed its output to produce legal levels of output.  *Id.*  Then, when testing was complete and

18  normal driving conditions resumed, the car would "release nitrogen oxides ("$NO_X$") at a factor of

19  up to 40 times over the permitted limit." *Id.* (emphasis added).  Volkswagen was able "to obtain

20  Certificates of Conformity ("COCs") from the EPA and Executive Orders ("EOs") from CARB

21  for its 2.0- and 3.0-liter diesel engine vehicles" solely based on the installation of the defeat

22  device. *Id.*

23       Volkswagen's defeat device scheme remained hidden from 2009-2015, and vehicles with

24  both 2.0-liter and 3.0-liter TDI engines were sold to the public at record numbers.  Approximately

25  80,000 3.0-liter TDI vehicles were sold and leased, and over 475,000 2.0-liter TDI vehicles were

26  sold and leased during that period.  After road rest results uncovered that these vehicles were

27  spewing out up to 40 times the allotted limit of pollutants, Volkswagen continued to obfuscate the

28  truth and mislead consumers and regulators for over a year.  Finally, after running out of plausible

excuses, Volkswagen was forced to admit its wrongdoing to Congress, regulators, and the consumers it harmed.  Most recently, on January 11, 2017, Volkswagen entered a plea agreement with the DOJ concerning their actions at issue in this litigation.  Volkswagen pled guilty to (1) conspiracy to defraud the United States and conspiracy to violate the wire fraud statute and Clean Air Act; (2) obstruction of justice; and (3) entry of goods by false statement.  Under the terms of the plea bargain, Volkswagen will pay an additional $4.3 billion dollars in penalties and be placed on organizational probation.  Six Volkswagen employees were also indicted for their role in the scandal.[2]

## B.  Procedural History

On September 3, 2015, Volkswagen admitted to government regulators that it had installed a defeat device on 2009-2015 Volkswagen and Audi 2.0-liter TDI vehicles.  ¶ 355.[3] September 18, 2015, the EPA issued a Notice of Violation ("NOV") to Volkswagen, alleging the defeat device violated provisions of the Clean Air Act, and CARB informed Volkswagen it had commenced an enforcement investigation concerning the defeat device.  ¶ 356.

On November 2, 2015, the "EPA issued a second NOV to Volkswagen, as well as Dr. Ing. h.c. F. Porsche AG and Porsche Cars North America, Inc., which alleged Volkswagen had installed in its 3.0-liter diesel engine vehicles a defeat device similar to the one described in the September 18 NOV."  ¶ 366.  CARB likewise sent a second letter concerning the same matter. ¶ 370.  After originally denying the allegations, "Audi finally admitted that defeat device software was installed not only in the vehicles identified in the Second NOV, but in all 3.0-liter Class Vehicles sold by Volkswagen, Audi, and Porsche."  *Id.*

Following the public disclosure of Defendants' wrongdoing, consumers filed over 500 class actions across the country.  In addition, multiple governmental entities filed suit: the DOJ

---

[2] *See Volkswagen AG Agrees to Plead Guilty and Pay $4.3 Billion in Criminal and Civil Penalties; Six Volkswagen Executives and Employees are Indicted in Connection with Conspiracy to Cheat U.S. Emissions Tests,* U.S. Dept. of Justice, (Jan. 11, 2017), https://www.justice.gov/opa/pr/volkswagen-ag-agrees-plead-guilty-and-pay-43-billion-criminal-and-civil-penalties-six.

[3] All references to "¶__" are to the Amended Consolidated Consumer Class Action Complaint ("Consumer Complaint"), filed on September 2, 2016 (Dkt. No. 1804), unless otherwise noted.

1   filed a complaint on behalf of the EPA for violations of the Clean Air Act, the FTC filed an action

2   for violations of the FTC act, and California and other state attorneys general announced

3   investigations or lawsuits.

4         On December 8, 2015, the Judicial Panel on Multidistrict Litigation ("JPML") transferred

5   all related federal actions to the Northern District of California for consolidated pre-trial

6   proceedings in the above-captioned MDL.  Dkt. No. 1.  The following month, the Court

7   appointed Elizabeth J. Cabraser of Lieff, Cabraser, Heimann & Bernstein, LLP as Lead Counsel

8   and 21 additional attorneys to the PSC, which is chaired by Ms. Cabraser.  Dkt. No. 1084.  The

9   Court also appointed former FBI Director Robert S. Mueller as Settlement Master to facilitate

10  settlement discussions between the parties.  Dkt. No. 797.

11        In the weeks and months that followed, a fully-deployed PSC worked tirelessly both to

12  prosecute the civil cases on behalf of consumers and to work with Volkswagen, federal and state

13  agencies, and the Settlement Master to try to resolve some or all of the claims asserted in this

14  litigation.  Lead Counsel created more than a dozen PSC working groups to ensure that the

15  prosecution and settlement tracks proceeded in parallel, and that the enormous amount of work

16  that needed to be done in a very short period of time was done in the most organized and efficient

17  manner possible.  Those working groups focused simultaneously on both litigation and settlement

18  tasks, including drafting the consolidated class complaints; serving, responding to, and reviewing

19  voluminous discovery; analyzing economic damages (and retaining experts concerning those

20  issues); reviewing Volkswagen's financial condition and ability to pay any settlement or

21  judgment; assessing technical and engineering issues; coordinating with multiple federal and state

22  governmental agencies as well as with plaintiffs in state court actions; and researching

23  environmental issues, among others.

24        On February 22, 2016, Class Counsel filed a 719-page Consolidated Consumer Class

25  Action Complaint (the "Complaint") asserting claims for fraud, breach of contract, and unjust

26  enrichment, and for violations of The Racketeer Influenced and Corrupt Organizations Act

27  ("RICO"), The Magnuson- Moss Warranty Act ("MMWA"), and all fifty States' consumer

28  protection laws.  Dkt. No. 1230.  The length of, and detail in, the Complaint reflects the arduous

1   process undertaken by Class Counsel in understanding the factual complexities of the alleged

2   fraud, and researching and developing the various claims at issue and the remedies available to

3   those who were harmed by Volkswagen's conduct.

4          Following the filing of the Complaint, Class Counsel served Volkswagen with extensive

5   written discovery requests, including interrogatories, requests for production, and requests for

6   admissions, and negotiated comprehensive expert, deposition, preservation, confidentiality, and

7   ESI protocols.  To date, Class Counsel have reviewed and analyzed millions of pages of

8   documents produced by Volkswagen through a massive, around the clock effort.  That effort

9   required the reviewing attorneys not only to understand the legal complexities of the dozens of

10  claims Plaintiffs asserted, but also to master the difficulties and nuances involved when working

11  with documents written in German.  At the same time, Class Counsel responded to Volkswagen's

12  discovery requests, producing documents from 174 named Plaintiffs, 24 of whom are

13  representatives of the proposed 3.0-liter TDI vehicle Settlement Class, in addition to compiling

14  information to complete comprehensive fact sheets, which also included document requests, for

15  each named Plaintiff.

16         Parallel to the prosecution of the litigation, intensive settlement talks began immediately

17  following the Court's appointment of lead counsel and the Settlement Master.  Under the

18  Settlement Master's guidance and supervision, arms-length settlement discussions occurred on

19  both coasts of the United States, in person and telephonically, without regard to holidays,

20  weekends, or time zones. The negotiations were extraordinarily intense and complex, particularly

21  considering the timeframe and number of issues and parties involved, including attorney

22  representatives from numerous governmental entities.

23         The settlement talks resulted in an unprecedented trio of settlements concerning the 2.0-

24  liter TDI vehicles.  Those agreements were reached by April 21, 2016, and on June 28, 2016, the

25  PSC and government plaintiffs presented their settlements concerning the 2.0-liter TDI vehicles

26  for approval.  Dkt. Nos. 1605-07.  No agreement was reached concerning the 3.0-liter vehicles at

27  that time.  On July 26, 2016, the PSC filed an Amended Settlement with slight clarifications to

28  the class definition.  Dkt. No. 1685.  Three days later, the Court entered an amended order

1    preliminarily approving the 2.0-Liter Settlement. *In re Volkswagen*, 2016 WL 4010049.  On,

2    October 25, 2016, the Court granted final approval to the 2.0-Liter Settlement, while litigation

3    and negotiations concerning the 3.0-liter diesel engine vehicles remained ongoing.  *In re*

4    *Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 2672 CRB (JSC),

5    2016 WL 6248426 (N.D. Cal. Oct. 25, 2016).  In the three months from final approval through

6    January 18, 2016, the vast majority of 2.0-liter Class members have registered for that Settlement,

7    and VW had already extended nearly 267,000 offers for buybacks or emissions modifications.

8    *See* January 18, 2017, Status Conf. Hr'g Tr., (Dkt. No. 2801) at 35:17-10.  To date, over 100,000

9    buybacks have been completed, approximately $5 billion in offers have been paid or made, and

10   the rate of buybacks and payments continues to accelerate.  Class Counsel are actively assisting

11   thousands of 2.0-liter Class members navigate the 2.0-liter claims process, and stand poised to do

12   the same for the 3.0-liter class.

13            Litigation continued concerning the 3.0-liter TDI vehicles while the 2.0-Liter Settlement

14   worked its way through the approval process.  On September 2, 2016, the PSC filed an Amended

15   Consolidated Class Action Complaint specifically adding allegations concerning the 3.0-liter TDI

16   vehicles and additional information learned since the original filing.  Additional discovery was

17   exchanged, motions were drafted, and preparation for trial continued.  At the same time, intense

18   settlement talks continued concerning the 3.0-liter TDI vehicles.  Those talks ultimately bore

19   fruit, resulting in another trio of agreements—including the instant Class Action Settlement

20   Agreement presented for preliminary approval here—that collectively, and in coordination with

21   the 3.0 liter Consent Decree, and the FTC's proposed Order achieve a common restorative goal.

22   **III.     TERMS OF THE SETTLEMENT**

23            The Settlement provides substantial benefits to current and former owners and lessees of

24   Volkswagen, Audi, and Porsche 3.0-liter TDI vehicles.

25            **A.     The 3.0-Liter Settlement Class Definition**

26            The Settlement Class consists of all persons (this includes individuals who are United

27   States citizens, residents, United States military, diplomatic personnel and employees living or

28   stationed overseas, as well as entities) who, (1) at any time between September 18, 2015 and

November 2, 2015, inclusive, owned or leased a Volkswagen, Audi, or Porsche 3.0-liter TDI vehicle in the United States or its territories (an "Eligible Vehicle," defined more fully in the 3.0-Liter Class Action Agreement); or who (2) between November 3, 2015 and the Claim Submission Deadline for Eligible Owners and Lessees, become the owner of an Eligible Vehicle in the United States or its territories; or who (3) own an Eligible Vehicle in the United States or its territories at the time of participation in the Settlement Program.  The Class includes Non-Authorized Dealers who otherwise meet the definition of the Class.  The following entities and individuals are excluded from the Class:

(1)    Owners who acquired an Eligible Vehicle after September 18, 2015, and sold it before November 2, 2015;

(2)    Owners who acquired an Eligible Vehicle after November 2, 2015, and transferred title before January 31, 2017;

(3)    Owners who own an Eligible Vehicle as of January 31, 2017 and transfer title before participating in the Settlement Program, unless the Eligible Vehicle is (i) unintentionally damaged after January 31, 2017, in a manner that renders it a total loss (i.e., "totaled") and (ii) transferred to an insurance company or otherwise permanently removed from commerce;

(4)    Lessees of a Generation One Eligible Vehicle leased from a leasing company other than Volkswagen Credit, Inc. and lessees of a Generation Two Eligible Vehicle from a leasing company other than Volkswagen Credit, Inc. or Porsche Financial Services, Inc.;

(5)    Owners whose Eligible Vehicle had a Branded Title of Assembled, Dismantled, Flood, Junk, Rebuilt, Reconstructed, or Salvage on September 18, 2015, and was acquired from a junkyard, salvage yard, or salvage dealer after September 18, 2015;

(6)    Owners who sell or otherwise transfer ownership of their Eligible Vehicle after January 31, 2017, unless ownership of the vehicle was transferred to an insurance company because the vehicle was totaled or otherwise permanently removed from commerce;

(7)    Defendants' officers, directors and employees; Defendants' affiliates and affiliates' officers, directors and employees; their distributors and distributors' officers, directors

1 and employees; participants in Volkswagen's Internal Lease Program and/or Porsche Associate

2 Lease Program; and Authorized Dealers and Authorized Dealers' officers and directors;

3       (8)    Judicial officers and their immediate family members and associated court staff

4 assigned to this case; and

5       (9)    All those otherwise in the Class who or which timely and properly exclude

6 themselves from the Class as provided in this 3.0-liter Class Action Agreement.

7       **B.**    **Benefits to Class Members**

8       The 3.0-liter Class Action Agreement, if approved by the Court, provides substantial

9 compensation to all 3.0-liter Class Members.  The options available to Class Members depend on

10 the generation of 3.0-liter TDI engine in the Class Member's Eligible Vehicle, as described in

11 further detail below.

12       **1.**    **Generation One Benefits**

13       Volkswagen believes that there are no practical engineering solutions that would, without

14 negative impact to vehicle functions and unacceptable delay, bring Generation One vehicles into

15 full compliance with the emissions standards to which they were originally certified.  Class

16 Members who own or lease those Generation One vehicles, therefore, have options similar to

17 those available under the 2.0-Liter Class Action Settlement: a (1) Buyback, (2) Trade-In, or, (3) if

18 approved, an emissions modification that would reduce the vehicles' emissions, but not the levels

19 of their original certification (a "Reduced Emissions Modification").  These options are described

20 more fully in the Proposed Settlement and summarized below:

21       (1)    Buyback/Lease Termination:  Volkswagen must offer to buy back a Class

22 Member's Generation One vehicles at the vehicle's September 2015 Vehicle Clean Trade Value,

23 plus pay an additional Restitution payment, for a total ranging from $24,755 to $57,157.  In other

24 words, the Buyback payment compensates Class Members for the value of their vehicle—frozen

25 in September 2015—using an industry standard for valuing vehicles (the NADA Used Car

26 Guide), and includes an *additional* restitution payment of more than $7,500 (before any

27 adjustment for the vehicle's mileage).  Owners are also eligible for additional loan forgiveness

28 payments and pro-rated refunds of unused portions of extended warranties and service plans.

1    Lessees can terminate their leases without an early termination penalty and will receive a

2    Restitution payment ranging from $5,001 to $6,615.

3           (2)    Trade-In:  Owners of Generation One vehicles can instead choose to trade in their

4    eligible vehicle at a participating Volkswagen dealership and receive the full amount they would

5    receive in a Buyback as a Trade-In Credit towards a new or used vehicle at a Volkswagen or Audi

6    Dealer.

7           (3)    Reduced Emissions Modification: If owners or lessees of Generation One vehicles

8    prefer to keep their vehicles, and if the EPA and CARB approve an emissions modification, those

9    owners and lessees can choose to have Volkswagen modify their vehicle's engine to significantly

10   reduce its emissions and receive an additional Restitution payment ranging from $7,755 to

11   $13,880.

12          Eligible Former Owners—those who sold their vehicles before January 31, 2017—will

13   receive half of the Owner restitution payment (or, if there are two Former owners, one quarter

14   each).  Lessees whose leases terminated or terminate before they obtain Settlement Benefits

15   receive the Lessee Restitution payment described above.

16          The tables included in Exhibit 2 to this Motion show the range of possible payment

17   amounts to owners and lessees of Generation One vehicles under the 3.0-Liter Class Action

18   Settlement.[4]  The precise amount to be offered depends on which option is involved (Buyback or

19   a Reduced Emissions Modification) and the vehicle's model year, model, trim level, and factory

20   options.  The Reduced Emissions Modification option will only be available if the EPA and

21   CARB approve a modification.

22                        **2.    Generation Two Benefits**

23          It is anticipated, and provided for in the 3.0-liter Consent Decree between Volkswagen

24   and DOJ/EPA and CARB, that the newer, Generation Two vehicles can be repaired to comply

25   _____

26   [4] Payment amounts may be adjusted up or down if the vehicle has higher or lower than standard
     mileage (15,000 miles per year) when it is brought into a dealership to participate in the
     settlement program.  The Generation One tables below assume that vehicles are not subject to a
27   mileage adjustment, that a Class Member owned it on September 18, 2015 when the emissions
     accusations became public, and still owns it.  Those who no longer have the vehicle, or purchased
28   it used after September 18, 2015, will be offered a lesser amount, set forth in the Class Notice.

1  with the original emissions standards under which they were originally certified without

2  materially reduced performance of the vehicle.  This repair is called an "Emissions Compliant

3  Repair."  If the regulators decide to approve an Emissions Compliant Repair for Generation Two

4  vehicles in a timely manner, Volkswagen will be required to fix those Generation Two vehicles

5  free of charge.  Under this repair scenario, owners and lessees of Generation Two vehicles will

6  get the vehicles they believed they were purchasing or leasing—with performance and emissions

7  at or very near the initially advertised specifications—and an *additional* payment ("Repair

8  Payment") ranging from $7,039 to $16,114.  Volkswagen expressly represents that the Emissions

9  Compliant Repair will not result in reduced performance.[5]  If the Emissions Compliant Repair

10  materially affects vehicle performance (whether miles per gallon, torque, or peak horsepower),

11  Volkswagen will pay an additional $500 per vehicle, and if adverse performance effect is

12  significant enough, Class Members reserve the right to move the Court for additional remedies

13  that are fair and reasonable under the circumstances.

14      To account for the additional time that these Class Members must wait to receive their

15  ultimate Settlement remedy, Volkswagen will pay half (50%) of the Repair payment up front,

16  shortly after Final Approval,[6] and will offer a "Class Bridge Warranty" (as more specifically

17  described in the Settlement Agreement) to cover the vehicles from today through the Emissions

18  Compliant Repair Decision Dates.

19      As with Generation One, Former Owners will evenly split the Repair payment with a the

20

---

21  [5] The Settlement Agreement provides:  "Defendants represent that the Emissions Compliant
    Repair shall not result in 'Reduced Performance.'  In the event that the Emissions Compliant

22  Repair causes Reduced Performance of the Eligible Vehicle, Volkswagen shall make an
    additional payment of $500 for each affected Eligible Vehicle. . . .  Reduced Performance means

23  a change in any of the following performance attributes:  (1) a reduction in calculated fuel
    economy using the EPA formula of more than 3 MPG; (2) a decrease of greater than 5% in peak

24  horsepower; or (3) a decrease of greater than 5% in peak torque.  The performance impacts shall
    be measured by Volkswagen pursuant to industry standards in connection with its submission of

25  an Emissions Modification Proposal to the EPA and CARB, and, upon final approval of such
    Emissions Modification Proposal, Defendants shall disclose any impact to these performance

26  attributes in the VW Class Action Update. . . .  In the event that the Emissions Compliant Repair
    causes a substantial, material adverse degradation above and beyond the Reduced Performance

27  levels specified above, Plaintiffs reserve their right to seek, and Defendants reserve their right to
    oppose, additional remedies through motion to the Court."

28  [6] These upfront Participation Payments range from approximately $3,500 to $8,000 per vehicle.

Post-September 18, 2015 purchaser, and, if there are to Eligible Former Owners, each will receive one quarter of the total Repair payment.  Lessees are eligible for compensation and those who hold an active lease also will receive an Emissions Compliant Repair.

EPA and CARB will make approval decisions for the Emissions Compliant Repair for vehicles with Generation Two engines on a sub-generation by sub-generation basis.  The 3.0-liter Class Action Settlement Agreement sets a timetable for the "Decision Date" for each sub-generation as follows:

| Sub-Generation | Decision Date for the Emissions Compliant Repair |
|---|---|
| 2.1 SUV | November 8, 2017 |
| 2.2 SUV | October 23, 2017 |
| 2 PC | December 20, 2017 |

If Volkswagen *cannot* obtain EPA and CARB's approval for any sub-generation of Generation Two vehicles by the applicable Decision Date deadline, Volkswagen can purchase an extension of up to 90 additional days after their initial deadlines, by paying the Class Members $500 per vehicle for each 30-day extension.  Ultimately, if no Emissions Compliant Repair is timely approved for their Generation Two vehicles, Class Members associated with those vehicles will have all the rights and options available to Class Members with Generation One vehicles, under the terms described above—namely:  (1) Buyback/Lease Termination, (2) Trade-In, or, (3) if approved, a Reduced Emissions Modification (or untimely Emissions Compliant Repair). These Class Members will also be eligible for a free AdBlue refill and oil change for their Eligible Vehicle while awaiting an emissions modification or repair, Buyback, Trade-In, or Lease Termination.

The tables included in Exhibit 2 to this motion show the range of possible payment amounts to owners and lessees of Generation Two vehicles under the 3.0-Liter Class Action Settlement.

### 3.    Value of Benefits and Attorneys' Fees and Costs

The total monetary value of these settlement benefits (not including the cost of developing

1    or implementing the emissions modifications or administering the buyback) is approximately $1.2

2    billion if the emissions compliant repair is approved for all Generation Two vehicles, and more

3    than $4 billion if no emissions compliant repair is approved for any Generation Two vehicle

4    (assuming 100% buyback).  None of these benefits will be reduced to pay attorneys' fees for, or

5    to reimburse expenses of, Class Counsel.  Volkswagen will pay Class Counsel's attorneys' fees

6    and costs separately and in addition to the Settlement benefits to Class Members.  Class Counsel

7    have not yet conducted <u>any</u> substantive discussions regarding the payment of attorneys' fees with

8    any defendants.  As the Court noted when granting preliminary approval to the 2.0-Liter

9    Settlement, "Rule 23(h), which governs attorneys' fees in class actions, does not require

10   Settlement Class Counsel to move for its fee award at the preliminary approval juncture, or even

11   upon seeking final approval."  *In re Volkswagen*, 2016 WL 4010049, at *15.  Accordingly, that

12   the amount of attorneys' fees and costs is still to be determined does not affect the Court's

13   evaluation of whether preliminary approval of the Settlement is appropriate.  *Id.* (citing *In re NFL*

14   *Players Concussion Injury Litig.*, 821 F.3d 410, 445 (3d Cir. 2016) ("[T]he separation of a fee

15   award from final approval of the settlement does not violate Rule 23(h).")).  Class Counsel prefer

16   to wait to discuss, negotiate, and present an attorneys' fee application at a later point in the

17   settlement process, when important determinations about Generation Two compliance or non-

18   compliance have been made, and the resulting monetary value of benefits available to Class

19   Members is better known.  Class Members will of course have the opportunity to comment on or

20   object to any fee petition under Fed. R. Civ. P. 23(h) prior to the award of attorneys' fees for

21   Class Counsel.

22   **IV.    THE SETTLEMENT MERITS PRELIMINARY APPROVAL**

23            **A.    The Class Action Settlement Process**

24            Pursuant to Federal Rule of Civil Procedure 23(e), class actions "may be settled,

25   voluntarily dismissed, or compromised only with the court's approval."  As a matter of "express

26   public policy," federal courts favor and encourage settlements, particularly in class actions, where

27   the costs, delays, and risks of continued litigation might otherwise overwhelm any potential

28   benefit the class could hope to obtain.  *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276

(9th Cir. 1992) (noting the "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned"); *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008) (same); *see also* 4 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* ("*Newberg*") §11:41 (4th ed. 2002) (same, collecting cases).

The *Manual for Complex Litigation (Fourth)* (2004) (the "*Manual*") describes the three-step procedure for approval of class action settlements: (1) preliminary approval of the proposed settlement; (2) dissemination of the notice of the settlement to class members, providing for, among other things, a period for potential objectors and dissenters to raise challenges to the settlement's reasonableness; and (3) a formal fairness and final settlement approval hearing. *Id.* at §21.63. The *Manual* characterizes the preliminary approval stage as an "initial evaluation" of the fairness of the proposed settlement made by the court on the basis of written submissions and informal presentations from the settlement parties. *Id.* at § 21.632. The proposed Settlement Class Representatives request that the Court grant preliminary approval of the Settlement and authorize the dissemination of notice of the Settlement to Class Members. The Settlement Class Representatives further request that the Court appoint the undersigned Lead Counsel and the PSC as Class Counsel and the 3.0-liter TDI owners and lessees listed in Exhibit 1 to this Motion as the Settlement Class Representatives. *See In re Volkswagen*, 2016 WL 6248426, at *28 (confirming appointment of Lead Counsel and the PSC as Settlement Counsel in the context of the 2.0-Liter Settlement).

### B.     The Standard For Preliminary Approval

Rule 23[7] of the Federal Rules of Civil Procedure governs a district court's analysis of the fairness of a settlement of a class action. *See* Fed. R. Civ. P. 23(e). To approve a class action settlement, the Court must determine whether the settlement is "fundamentally fair, adequate and reasonable." *In re Rambus Inc. Derivative Litig.*, No. C–06–3515–JF, 2009 WL 166689, at *2 (N.D. Cal. Jan. 20, 2009) (citing Fed. R. Civ. P. 23(e)); *see also Mego Financial Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000); *Officers for Justice v. Civil Service Comm'n,* 688 F.2d 615,

---

[7] All references to "Rule" are to the Federal Rules of Civil Procedure.

625 (9th Cir. 1982)).  Preliminary approval of a proposed settlement is the first step in making this determination.

If "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval, then the court should direct that the notice be given to the class members of a formal fairness hearing." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007); *see also In re Netflix Privacy Litig.*, No. 5:11-CV-00379 EJD, 2013 WL 1120801, at *4 (N.D. Cal. Mar. 18, 2013) (applying at preliminary approval a "presumption" of fairness to settlement that was "the product of non-collusive, arms' length negotiations conducted by capable and experienced counsel").  "The preliminary determination establishes an initial presumption of fairness."  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079-80.  "Although Rule 23 imposes strict procedural requirements on the approval of a class settlement, a district court's only role in reviewing the substance of that settlement is to ensure that it is 'fair, adequate, and free from collusion.'"  *Lane v. Facebook, Inc.,* 696 F.3d 811, 819 (9th Cir. 2012) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998)); *see also In re Hewlett-Packard Co. S'holder Deriv. Litig.*, No. 3:12-CV-06003-CRB, 2015 WL 1153864 at *5 (N.D. Cal. Mar. 13, 2015) (granting preliminary approval of settlement in derivative action that "appears to represent a fair, reasonable, and adequate resolution" of the claims).

When class counsel is experienced and supports the settlement, and the agreement was reached after arm's-length negotiations, courts give a presumption of fairness to the settlement. *See Nobles v. MBNA Corp.*, No. C 06-3723 CRB, 2009 WL 1854965, at *6 (N.D. Cal. June 29, 2009); *Ellis v. Naval Air Rework Facility,* 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981).  Additionally, "[i]t is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).

The Ninth Circuit has identified "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status

1   throughout the trial; the amount offered in settlement; the extent of discovery completed and the

2   stage of the proceedings; the experience and views of counsel; the presence of a governmental

3   participant; and the reaction of the class members to the proposed settlement" as factors for

4   determining whether a settlement is, in the final analysis, fair, reasonable, and adequate.  *See*

5   *Hanlon*, 150 F.3d at 1026.  "The relative degree of importance to be attached to any particular

6   factor will depend on the unique circumstances of each case."  *Officers for Justice*, 688 F.2d

7   at 625.

8        To determine whether a settlement is "within the range of possible approval," the Court

9   also ensures it is "not the product of fraud or overreaching by, or collusion between, the

10  negotiating parties."  *Id.*; *see also Mego*, 213 F.3d at 458.  Thus, to preliminarily assess the

11  reasonableness of the parties' proposed settlement, the Court should review both the substance of

12  the deal and the process used to arrive at the settlement.  *See In re Tableware Antitrust Litig.*,

13  484 F. Supp. 2d at 1080 ("preliminary approval . . . has both a procedural and substantive

14  requirement").

15       This Settlement is well within the range of possible approval as a fair, reasonable, and

16  adequate resolution between the parties, and should be preliminarily approved.  All of the relevant

17  factors set forth by the Ninth Circuit for evaluating the fairness of a settlement at the final stage weigh

18  in favor of preliminary approval now, and there can be no reasonable doubt that the Settlement was

19  reached in a procedurally fair manner given Settlement Master Mueller's ongoing guidance and

20  assistance.  For these reasons, the Settlement merits preliminary approval.

21  **C.    The Settlement Is Substantively Fair Because It Provides Very Significant
         Benefits in Exchange for The Compromise of Strong Claims.**
22

23       As noted in the summary of the Settlement terms above, the Settlement, and the related

24  DOJ and CARB Consent Decrees and FTC Consent Order, compensate Class Members for the

25  loss in market value of the Eligible Vehicles and for Volkswagen's misrepresentations about the

26  environmental characteristics of the Eligible Vehicles, and provide for the buyback, trade-in

27  and/or potential refit of the Eligible Vehicles to make them compliant with applicable

28  environmental regulations.  The Settlement's significant benefits are provided in recognition of

the strength of Plaintiffs' claims and the likelihood that Plaintiffs would have been able to certify a litigation class, maintain certification through trial, and prevail on the merits.  All PSC members—a uniquely experienced group including preeminent class action litigators, consumer and environmental advocates, trial lawyers, and auto litigation veterans—support this Settlement, and it is highly uncertain whether the Class would be able to obtain and keep a better outcome through continued litigation, trial, and appeal.  They certainly would not have been able to secure the commencement of the buyback, trade-in, and emissions modification programs as swiftly as it will take place under the Settlement.  Moreover, while Class Counsel believe in the strength of this case, they recognize that there are always uncertainties in litigation, making compromise of claims in exchange for certain and timely provision to the Class of the significant benefits described herein an unquestionably reasonable outcome.  *See Nobles*, 2009 U.S. Dist. LEXIS 59435, at *5 ("The risks and certainty of recovery in continued litigation are factors for the Court to balance in determining whether the Settlement is fair.") (citing *Mego*, 213 F.3d at 458; *Kim v. Space Pencil, Inc.*, No. C 11-03796 LB, 2012 WL 5948951, at *15 (N.D. Cal. Nov. 28, 2012) ("The substantial and immediate relief provided to the Class under the Settlement weighs heavily in favor of its approval compared to the inherent risk of continued litigation, trial, and appeal, as well as the financial wherewithal of the defendant.")).

Indeed, should Class Counsel prosecute these claims against Volkswagen to conclusion, any recovery would come years in the future and at far greater expense to the environment and the Class.  There is also a risk that a litigation Class would receive less or nothing at all, despite the merit of the claims, not only because of the risks of litigation, but also because of the solvency risks that such prolonged and expanding litigation would almost certainly impose upon Volkswagen.  A judgment that bankrupts Volkswagen would be far less satisfying than a settlement that provides meaningful and certain monetary and restorative relief in the here and now.  *See, e.g.*, *UAW v. GMC*, 497 F.3d 615, 632 (6th Cir. 2007) (affirming approval of settlement class and rejecting objections premised on prospect of plaintiffs complete victory on disputed issue because "any such victory would run the risk of being a Pyrrhic one . . . we need not embellish the point by raising the prospect of bankruptcy").  As recognized by the Court in its

order granting final approval of the 2.0-Liter Settlement, "[w]eighing this possibility against the immediate and guaranteed benefits provided by the Settlement, settlement is clearly favored." *In re Volkswagen*, 2016 WL 6248426, at *18.

Moreover, as recognized by the Court in the context of the 2.0-Liter Settlement, in addition to the above, there is a risk that "any class recovery obtained at trial would be reduced through offsets." *Id.* at *11. Restitution remedies for automotive defects based on rescission or repurchase calculations are generally subject to offsets for the car owner's use of the vehicle. *See id.* (citing various "state law [that] account for offsets based on the owner's use of the vehicle"). For example, under California law, the Song-Beverly Consumer Warranty Act provides for an offset calculated on the basis of the mileage driven. *Id.* (citing Cal. Civ. Code § 1793.2(d)(2)(C)); *see also Robbins v. Hyundai Motor America, Inc.*, 2015 WL 304142 at *6 (C.D. Cal. Jan. 14, 2015); *Rupay v. Volkswagen Group of America Inc.*, 2012 WL 10634428 at *4 (C.D. Cal. Nov. 15, 2012). State-law-required offsets could also apply to claims under the federal Magnuson Moss Warranty Act ("MMWA"), because while the MMWA effectively creates a federal cause of action to enforce state-law warranty claims, the MMWA applies state substantive law instead of creating substantively different federal warranty standards. *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) ("claims under the Magnuson–Moss Act stand or fall with . . . express and implied warranty claims under state law"); *Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 954 (C.D. Cal. 2012). Indeed, the MMWA itself defines the term "refund" as "refunding the actual purchase price (less reasonable depreciation based on actual use where permitted by rules of the Commission). Further, California's Lemon Law specifically enumerates a method for calculating depreciation on vehicles in § 1793.2(d)(2)(C), while the National Traffic and Motor Vehicle Safety Act likewise notes that, following a safety recall, an available remedy to consumers is to "refund[] the purchase price, less a reasonable allowance for depreciation." 49 U.S.C. § 30120(a)(1)(A)(iii).

Ultimately, any rescission or refund remedy requires that a plaintiff return the product in a comparable condition to what the plaintiff received. *See In re Volkswagen*, 2016 WL 6248426, at *17. And because a vehicle's value depreciates significantly with use, courts require a reasonable

1    reduction in the refund amount, to account for the depreciation and value provided to the plaintiff.

2    *See id.* at *17 ("Under such circumstances, courts have been unwilling to award plaintiffs the full

3    purchase price as either restitution or damages.") (citing *Brady v. Mercedes-Benz USA, Inc.*,

4    243 F. Supp. 2d 1004, 1008 (N.D. Cal. 2002) ("[T]he restitution awardable under [California

5    Civil Code] § 1793.2(d)(2)(B) must be reduced by the amount directly attributable to use (as

6    measured by miles driven) by the consumer prior to the first repair (or attempted repair) of the

7    problem as pro-rated against a base of 120,000 miles."), and *Kruse v. Chevrolet Motor Div.*, Civil

8    Action No. 96-1474, 1997 WL 408039, at *6 (E.D. Pa. July 15, 1997) ("[I]mplicit in the concept

9    of a refund of the purchase price is the condition that the purchaser return the consumer good at

10   issue. . . . [P]laintiff accepted and used the car for approximately one and one-half years, thereby

11   diminishing the value of the car. Awarding damages equal to the full purchase price does not take

12   into account the natural depreciation of the vehicle from normal usage." (internal citations

13   omitted))).

14          Accordingly, the buyback calculations in the Settlement both for Generation One, and for

15   Generation Two if an Emissions Compliant Repair is not timely available (with 2017 Decision

16   Dates that trigger Generation Two buyback remedies), are both highly favorable to Class

17   Members, and supported by applicable law.  The settlement provides an array of provisions to

18   compensate for the lost market value of the vehicles, and to restore their ongoing value and

19   utility.  Avoiding years of additional litigation in exchange for the certainty of this Settlement

20   now is also important because of the continued environmental damage being caused by the

21   Eligible Vehicles.  The Settlement will get the Eligible Vehicles off the road through a buyback

22   or repair them to originally certified or reduced emission standards, reducing further

23   environmental damage and air pollution.  For Generation Two, there is the added benefit—to both

24   consumers and the environment, of a projective, fully compliant repair that gives consumers the

25   vehicles they thought they were getting when they bought or leased them—by placing these

26   vehicles in what was supposed to be their original, environmentally responsible condition,

27   without materially reducing the performance consumers also expected from these vehicles.

28

1

**D.      The Settlement Is The Product of Good Faith, Informed, and Arm's-Length Negotiations, and It Is Procedurally Fair.**

2

3       As with the 2.0-Liter Settlement, Lead Counsel and the Class Counsel settlement working

4  group engaged intensive settlement discussions with Volkswagen and government representatives

5  from the EPA, CARB, and the FTC, under Settlement Master Mueller's guidance and

6  supervision.  Class Counsel also have analyzed voluminous discovery material that has provided

7  it with sufficient information to enter into a reasoned and well-informed settlement.  *See In re*

8  *Volkswagen*, 2016 WL 4010049, at *14 (holding that Class Counsel's review of discovery

9  "allowed them to make a well-informed assessment of the merits of the Class' claims and to

10  determine whether Volkswagen's offers adequately compensates Class Members for their

11  injuries"); *see also Mego*, 213 F.3d at 459 (holding "significant investigation, discovery and

12  research" supported "district court's conclusion that the Plaintiffs had sufficient information to

13  make an informed decision about the Settlement").

14       Participation of government entities in the settlement process weighs highly in favor of

15  granting preliminary approval.  *See In re Volkswagen*, 2016 WL 6248426, at *14; *see also*

16  *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977) ("The participation of a

17  government agency serves to protect the interests of the class members, particularly absentees,

18  and approval by the agency is an important factor for the court's consideration."); *Jones v.*

19  *Amalgamated Warbasse Houses, Inc.*, 97 F.R.D. 355, 360 (E.D.N.Y. 1982) ("That a government

20  agency participated in successful compromise negotiations and endorsed their results is a factor

21  weighing heavily in favor of settlement approval—at least where, as here, the agency is

22  'committed to the protection of the public interest.'").  So, too, does a settlement process

23  involving protracted negotiations with the assistance of a court-appointed mediator.  *See Pha v.*

24  *Yang*, No. 2:12-cv-01580-TLN-DAD, 2015 U.S. Dist. LEXIS 109074, at *13 (E.D. Cal. Aug. 17,

25  2015) (finding that the fact "the settlement was reached through an arms-length negotiation with

26  the assistance of a mediator through a months-long process . . . weigh[ed] in favor of approval");

27  *Rosales v. El Rancho Farms*, No. 1:09-cv-00707-AWI-JLT, 2015 WL 446091, at *44 (E.D. Cal.

28  July 21, 2015) ("Notably, the Ninth Circuit has determined the 'presence of a neutral mediator

1    [is] a factor weighing in favor of a finding of non-collusiveness.'") (quoting *In re Bluetooth*

2    *Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)); *Pierce v. Rosetta Stone, Ltd.*,

3    No. C 11-01283 SBA, 2013 WL 5402120, at *15-16 (N.D. Cal. Sept. 26, 2013) (citing *In re*

4    *Bluetooth*, 654 F.3d at 946).

5          Here, settlement negotiations were conducted in good faith at all times, and the Settlement

6    was reached through arms-length negotiations under the auspices of the Court-appointed

7    Settlement Master over the course of months of efforts by the parties.  It is an understatement to

8    say that the parties benefited from the assistance of Settlement Master Mueller, who played a

9    crucial role in supervising the negotiations and in helping the parties bridge their differences in

10   order to reach this Settlement.  *See In re Volkswagen*, 2016 WL 4010049, at *14 (finding that

11   "the Settlement Master's guidance coupled with informed dialogues and the intensive

12   involvement of government entities suggests the parties reached the Settlement after serious,

13   informed, non-collusive negotiations").

14         Taken together, the substantive quality of the Settlement and the procedurally fair manner

15   in which it was reached weigh in favor of granting preliminary approval here.

16   **V.    THE COURT SHOULD CERTIFY THE CLASS FOR SETTLEMENT PURPOSES.**

17         Plaintiffs respectfully request that the Court certify the Class defined in paragraph 2.16 of

18   the 3.0-Liter Class Action Settlement for settlement purposes, and order that notice of the

19   Settlement be issued to inform Class Members of: (1) the existence and terms of the Settlement;

20   (2) how to obtain benefits under the Settlement; (3) their right to be heard on its fairness; (4) their

21   right to opt out; and (5) the date, time and place of the fairness hearing.  *Manual*, at §§ 21.632,

22   21.633.

23         When "[c]onfronted with a request for settlement-only class certification, a district court

24   need not inquire whether the case, if tried, would present intractable management problems . . .

25   for the proposal is that there will be no trial."  *Amchem Prods. v. Windsor*, 521 U.S. 591, 620

26   (1997).  Class certification is appropriate where: "(1) the class is so numerous that joinder of all

27   members is impracticable; (2) there are questions of law and fact common to the class; (3) the

28   claims or defenses of the representative parties are typical of the claims or defenses of the class;

1   and (4) the representative parties will fairly and adequately protect the interests of the class."

2   Fed. R. Civ. P. 23(a).  Certification of a class seeking monetary compensation also requires a

3   showing that "questions of law and fact common to class members predominate over any

4   questions affecting only individual members, and that a class action is superior to other available

5   methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

6        In the context of the 2.0-Liter Settlement, the Court certified a substantially similar class

7   of owners and lessees of Volkswagen and Audi branded TDI vehicles.  *In re Volkswagen*, 2016

8   WL 4010049, at *10-12; *see In re Volkswagen*, 2016 WL 6248426, at *6-7 (adopting the

9   certification analysis at the preliminary approval stage and granting final class certification).

10  Given that Plaintiffs' claims here are substantially similar to, and arise from the same facts as,

11  those brought on behalf of the substantially similar 2.0-liter class, the Court's analysis in

12  approving the 2.0-Liter Settlement applies equally here.  As demonstrated below, the Class

13  readily satisfies each of Rule 23's requirements.

14        A.    <u>The Class Meets The Requirements Of Rule 23(a).</u>

15            1.    <u>The Class Is Sufficiently Numerous.</u>

16        Rule 23(a)(1) is satisfied when "the class is so numerous that joinder of all class members

17  is impracticable."  Fed. R. Civ. P. 23(a)(1).  Numerosity is generally satisfied when the class

18  exceeds forty members.  *See, e.g.*, *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000).

19        Here, it is undisputed that 77,429 Eligible Vehicles were sold or leased in the U.S.—

20  19,605 Generation One Eligible Vehicles and 57,824 Generation Two Eligible Vehicles—and

21  thus, that the Class consists of tens of thousands of members.  Therefore, numerosity is easily

22  established.  *See In re Volkswagen*, 2016 WL 4010049, at *10 ("The numerosity requirement is

23  easily satisfied. There were 475,745 [2.0-liter] Eligible Vehicles sold or leased to consumers in

24  the United States, and thus hundreds of thousands of potential Class Members.").  The large size

25  of the Class and the geographic dispersal of its members across the United States render joinder

26  impracticable.  *See id.* (finding numerosity satisfied in context of the 2.0-liter Settlement "because

27  joinder is impractical"); *see Palmer v. Stassinos*, 233 F.R.D. 546, 549 (N.D. Cal. 2006) ("Joinder

28  of 1,000 or more co-plaintiffs is clearly impractical.").

1       Moreover, the Class is defined by objective, transactional facts—the purchase or lease of

2   an Eligible Vehicle—and there is no dispute that Class Members can easily be identified by

3   reference to the books and records of Volkswagen and their dealers.  Accordingly, to the extent

4   required, the Class is readily ascertainable.  *See Moreno v. Autozone, Inc.*, 251 F.R.D. 417, 421

5   (N.D. Cal. 2008) (Breyer, J.) ("A class is ascertainable if it identifies a group of unnamed

6   plaintiffs by describing a set of common characteristics sufficient to allow a member of that group

7   to identify himself or herself as having a right to recover based on the description.").

8                 **2.       There Are Common Questions of Law and Fact.**

9       Further, common questions of law and fact apply to each of the Class Member's claims.

10  "Federal Rule of Civil Procedure 23(a)(2) conditions class certification on demonstrating that

11  members of the proposed class share common 'questions of law or fact.'"  *Stockwell v. City &*

12  *Cty. of San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014).  The "commonality requirement has

13  been 'construed permissively,' and its requirements deemed 'minimal.'"  *Estrella v. Freedom*

14  *Fin'l Network,* No. C 09-03156 SI, 2010 WL 2231790, at *25 (N.D. Cal. June 2, 2010) (quoting

15  *Hanlon*, 150 F.3d at 1020).  "The existence of shared legal issues with divergent factual

16  predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies

17  within the class."  *Hanlon*, 150 F.3d at 1019.  Assessing commonality requires "a precise

18  understanding of the nature of the underlying claims."  *Parsons v. Ryan*, 754 F.3d 657, 676 (9th

19  Cir. 2014) (citing *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95

20  (2013)).  This allows courts to determine if the class' "claims . . . depend upon a common

21  contention" that is "of such a nature that it is capable of classwide resolution—which means that

22  determination of its truth or falsity will resolve an issue that is central to the validity of each one

23  of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  The

24  commonality "analysis does not turn on the number of common questions, but on their relevance

25  to the factual and legal issues at the core of the purported class' claims."  *Jimenez v. Allstate Ins.*

26  *Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 2835 (2015).  Indeed, "'[e]ven

27  a single question of law or fact common to the members of the class will satisfy the commonality

28  requirement."  *Dukes*, 564 U.S. at 369.

Courts routinely find commonality where the class' claims arise from a defendant's uniform course of conduct. *See, e.g.*, *Negrete v. Allianz Life Ins. Co. of N. Am.*, 238 F.R.D. 482, 488 (C.D. Cal. 2006) ("The Court finds that the class members' claims derive from a common core of salient facts, and share many common legal issues. These factual and legal issues include the questions of whether Allianz entered into the alleged conspiracy and whether its actions violated the RICO statute.  The commonality requirement of Rule 23(a)(2) is met."); *Cohen v. Trump*, 303 F.R.D. 376, 382 (S.D. Cal. 2014) ("Here, Plaintiff argues his RICO claim raises common questions as to 'Trump's scheme and common course of conduct, which ensnared Plaintiff[] and the other Class Members alike.'  The Court agrees."); *Spalding v. City of Oakland*, No. C11-2867 TEH, 2012 WL 994644, at *8 (N.D. Cal. Mar. 23, 2012) (commonality found where plaintiffs "allege[] a common course of conduct that is amenable to classwide resolution"); *Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson*, 102 F.R.D. 457 (N.D. Cal. 1983) ("commonality requirement is satisfied where it is alleged that the defendants have acted in a uniform manner with respect to the class"); *see also Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (finding that "where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question").[8]

Here, as in the 2.0-Liter Settlement, the Class Members' claims arise from Volkswagen's "common course of conduct." *In re Volkswagen*, 2016 WL 4010049, at *10. Here, too, "the common questions of fact are (1) Volkswagen's fraudulent scheme to deceive state and federal regulatory authorities by installing in its [3].0-liter diesel engine vehicles the defeat device designed, and (2) Volkswagen's . . .  false and misleading marketing campaign that misrepresented and omitted the true nature of the Eligible Vehicles' 'clean' diesel engine

---

[8] Although the Court need not reach the question, courts routinely find commonality in cases where uniform misrepresentations and omissions are employed to deceive the public. *See Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("[C]ourts routinely find commonality in false advertising cases."); *Astiana v. Kashi Co.*, 291 F.R.D. 493, 501-02 (S.D. Cal. 2013) (same); *see also Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 478 (C.D. Cal. 2012) (whether misrepresentations "are unlawful, deceptive, unfair, or misleading to reasonable consumers are the type of questions tailored to be answered in 'the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation'") (quoting *Dukes*, 131 S.Ct. at 2551).

system." *Id.* Volkswagen's common course of conduct raises common questions of law and fact, the resolution of which will generate common answers "apt to drive the resolution of the litigation" for the Settlement Class as a whole. *Dukes*, 564 U.S. at 350. And as Plaintiffs allege that the Class's "injuries derive from [D]efendants' alleged 'unitary course of conduct,'" they have "'identified a unifying thread that warrants class treatment.'" *Sykes v. Mel Harris & Assocs. LLC*, 285 F.R.D. 279, 290 (S.D.N.Y. 2012).

As this Court recognized when certifying the 2.0-liter class, "[w]ithout class certification, individual Class Members would be forced to separately litigate the same issues of law and fact which arise from Volkswagen's use of the defeat device and Volkswagen's alleged common course of conduct." *In re Volkswagen*, 2016 WL 4010049, at *10 (citing *In re Celera Corp. Sec. Litig.*, No. 5:10-CV-02604-EJD, 2014 WL 722408, at *3 (N.D. Cal. Feb. 25, 2014) (finding commonality met where plaintiffs raised questions of law or fact that would be addressed by other putative class members pursuing similar claims)). Thus, the same is true with the instant Class. Accordingly, commonality is satisfied here.

### 3. The Settlement Class Representatives' Claims Are Typical of Other Class Members' Claims.

The proposed Settlement Class Representatives' claims are also typical of other Settlement Class Members' claims. They include all generations and sub generations of 3.0-liter vehicles, the Volkswagen, Porsche, and Audi-branded vehicles, and both owners and lessees. Rule 23(a)(3) requires that 'the claims or defenses of the representative parties are typical of the claims or defenses of the class.'" *Parsons v. Ryan*, 754 F.3d at 657, 685 (9th Cir. 2014) (quoting Fed. R. Civ. P. 23(a)(3)). "Like the commonality requirement, the typicality requirement is 'permissive' and requires only that the representative's claims are 'reasonably co-extensive with those of absent class members; they need not be substantially identical.'" *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quoting *Hanlon*, 150 F.3d at 1020). "The test of typicality is 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030

1    (9th Cir. 2012) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

2    Accordingly, the typicality requirement "assure[s] that the interest of the named representative

3    aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168,

4    1175 (9th Cir. 2010) (quoting *Hanon*, 976 F.2d at 508). Thus, where a plaintiff suffered a similar

5    injury and other class members were injured by the same course of conduct, typicality is satisfied.

6    *See Parsons*, 754 F.3d at 685.

7            Here, the same course of conduct that injured Settlement Class Representatives also

8    injured other Class Members. Indeed, as in the 2.0-Liter Settlement, "[t]he Settlement Class

9    Representatives' claims are based on the same pattern of wrongdoing as those brought on behalf

10   of Class Members." *In re Volkswagen*, 2016 WL 4010049, at *11. "The Settlement Class

11   Representatives, as well as Class Members, purchased or leased an Eligible Vehicle equipped

12   with a defeat device." *Id.* Thus, "[t]heir claims are typical because they were subject to the same

13   conduct as other Class Members, and as a result of that conduct, the Settlement Class

14   Representatives and Class Members suffered the same injury." *Id.* The Settlement Class

15   Representatives, like other Class Members, would not have purchased or leased their vehicles had

16   the illegal defeat devices been disclosed because the Eligible Vehicles would not have been

17   approved for sale or lease in the U.S. in the first place. Finally, the Settlement Class

18   Representatives and the other Class Members will similarly—and equitably—benefit from the

19   relief provided by the Settlement.

20           Accordingly, Rule 23's typicality requirement is satisfied here. *See In re Volkswagen*,

21   2016 WL 4010049, at *11 (finding typicality satisfied in context of the 2.0-Liter Settlement).

22           **4.        The Settlement Class Representatives and Class Counsel Will Fairly**
             **and Adequately Protect the Interests of the Settlement Class.**

23

24           Adequacy of representation is met. Rule 23(a)(4) requires "the representative parties [to]

25   adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "This requirement is

26   rooted in due-process concerns—'absent class members must be afforded adequate representation

27   before entry of a judgment which binds them.'" *Radcliffe v. Experian Info. Sols., Inc.*, 715 F.3d

28   1157, 1165 (9th Cir. 2013) (quoting *Hanlon*, 150 F.3d at 1020). Courts engage in a two-prong

inquiry: "'(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Evon*, 688 F.3d at 1031 (quoting *Hanlon*, 150 F.3d at 1020).  Here, the answer to question one is no, and the answer to number two is a resounding yes.

a.    <b><u>The Interests of the Settlement Class Representatives Are Directly Aligned With Those of the Absent Class Members and The Settlement Class Representatives Have Diligently Pursued The Action On Their Behalf.</u></b>

The Settlement Class Representatives do not have any interests antagonistic to the other Class Members and will continue to vigorously protect their interests, as they have for the past year.  *See Clemens v. Hair Club for Men, LLC*, No. C 15-01431 WHA, 2016 U.S. Dist. LEXIS 50573, at *6 (N.D. Cal. 2016).  Indeed, the Settlement Class Representatives and Class Members "are entirely aligned in their interest in proving that Volkswagen misled them and share the common goal of obtaining redress for their injuries."  *In re Volkswagen*, 2016 WL 4010049, at *11.

As in the 2.0-Liter Settlement, the Settlement Class Representatives understand their duties as class representatives, have agreed to consider the interests of absent Settlement Class Members, and have actively participated in this litigation.  *See id.*; *see also Trosper v. Styker Corp.*, No. 13-CV-0607-LHK, 2014 WL 4145448, at *43 (N.D. Cal. Aug. 21, 2014) ("All that is necessary is a rudimentary understanding of the present action and . . . a demonstrated willingness to assist counsel in the prosecution of the litigation.").

Here, for example, the Settlement Class Representatives have provided factual information pertaining to their purchase or lease of an Eligible Vehicle in order to assist in drafting the complaints in this litigation.  *In re Volkswagen*, 2016 WL 4010049 at *11.  The Settlement Class Representatives have searched for, and provided, relevant documents and information to their counsel, and have assisted in preparing discovery responses and completing comprehensive fact sheets.  *Id.*  Moreover, the Settlement Class Representatives have regularly communicated with their counsel regarding various issues pertaining to this case, including the terms and process of the proposed Settlement, and they will continue to do so until the Settlement

1   is approved and its administration completed.  *Id.*  All of this together is more than sufficient to

2   meet the adequacy requirement of Rule 23(a)(4).  *See id.*

3               **b.      Class Counsel Are Qualified To Serve as Settlement Class
                          Counsel.**

4

5       Rule 23(g) requires this Court to appoint class counsel to represent the Settlement Class.

6   *See* Fed. R. Civ. P. 23(g).  At the outset of the MDL, as part of a competitive application process

7   before the Court, Lead Counsel and each member of the PSC established, and the Court

8   recognized, their qualifications, experience, and commitment to the successful prosecution of this

9   MDL.  Importantly, the criteria that the Court considered in appointing Lead Counsel and the

10  PSC was substantially similar to the considerations set forth in Rule 23(g).  *Compare* Dkt. Nos.

11  336 and 1084, *with Clemens*, 2016 U.S. Dist. LEXIS 50573, at *6.  In the context of the 2.0-Liter

12  Settlement, the Court found that Class Counsel "are qualified lawyers with extensive experience

13  in consumer class action litigation and other complex cases" and that "there are no doubts

14  regarding Class Counsel's adequacy."  *In re Volkswagen*, 2016 WL 4010049 at *11.  Further,

15  Class Counsel, and their respective law firms, have undertaken an enormous amount of work,

16  effort and expense in this litigation and demonstrated their willingness to devote whatever

17  resources are necessary to see it through to a successful outcome.  *Id.*; *see* 12/22/16, Status Conf.

18  Tr. at 14:7-22 (Dkt. No. 2757) ("I am well aware of the extraordinary effort that the lawyers for

19  all the parties have put into this. . . . Lawyers have families. Lawyers have other obligations.

20  Lawyers have lives. And they have sort of taken all of that, put it to the side, and worked on this

21  task of resolving this issue because of the serious environmental concerns that were raised by this

22  litigation."); 5/24/16 Status Conf. Tr. at 8:6-14 (Dkt. No. 1535) ("I have been advised by the

23  Settlement Master that all of you have devoted substantial efforts, weekends, nights, and days,

24  and perhaps at sacrifice to your family.").

25      The Court need look no further than the significant benefits already obtained for the Class

26  through Class Counsel's zealous and efficient prosecution of this action, and their ongoing efforts

27  on behalf of the TDI consumers.  Accordingly, as this Court found for the 2.0-Liter Settlement,

28  Class Counsel are qualified and adequate to represent the interests of the instant Settlement.  *See*

2016 WL 4010049, at *11 (finding adequacy satisfied in context of the 2.0-Liter Settlement); *see also In re Volkswagen*, 2016 WL 6248426, at 28 (confirming appointment of Lead Counsel and the PSC as Settlement Counsel in the context of the 2.0-Liter Settlement).

**B.    The Requirements Of Rule 23(b)(3) Are Met**

In addition to the requirements of Rule 23(a), the Court must also find that of Rule 23(b)'s requirements are satisfied.  A Rule 23(b)(3) class may be certified where, as here: (i) "questions of law or fact common to class members predominate over any questions affecting only individual members"; and (ii) a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Both requirements are met.

**1.    Common Issues of Law and Fact Predominate**

First, common questions of law and fact predominate over any individual questions.  "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016) (quoting 2 W. Rubenstein, *Newberg on Class Actions* § 4:49 at 195-96 (5th ed. 2012)).  "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Id.* (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Prac. & Proc. § 1778, at 123-24 (3d ed. 2005)).  Instead, at its core, "[p]redominance is a question of efficiency." *Butler v. Sears, Roebuck & Co.*, 702 F.3d 359, 362 (7th Cir. 2012).  Thus, "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022.

The Ninth Circuit favors class treatment of fraud claims stemming from a "common course of conduct," like the scheme alleged here.  *See In re First Alliance Mortg. Co.*, 471 F.3d 977, 990 (9th Cir. 2006); *Hanlon*, 150 F.3d at 1022-1023.  Even outside of the settlement context, predominance is readily met in cases asserting RICO and consumer claims arising from a

1   fraudulent scheme that injured each plaintiff.  *See Amchem Prods.*, 521 U.S. at 625; *Wolin v.*

2   *Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1173, 1176 (9th Cir. 2010) (consumer claims

3   based on uniform omissions are readily certifiable where the claims are "susceptible to proof by

4   generalized evidence," even if individualized issues remain); *Friedman v. 24 Hour Fitness USA,*

5   *Inc.*, No. CV 06-6282 AHM (CTx), 2009 WL 2711956, at *22-23 (C.D. Cal. Aug. 25, 2009)

6   ("Common issues frequently predominate in RICO actions that allege injury as a result of a single

7   fraudulent scheme."); *see also Klay v. Humana, Inc.*, 382 F.3d 1241, 1256, 1257 (11th Cir. 2004)

8   (upholding class certification of RICO claim where "all of the defendants operate nationwide and

9   allegedly conspired to underpay doctors across the nation, so the numerous factual issues relating

10   to the conspiracy are common to all plaintiffs . . . [and the] "corporate policies [at issue] . . .

11   constitute[d] the very heart of the plaintiffs' RICO claims").[9]

12        Here, too, questions of law or fact common to the claims of the Class Members

13   predominate over any questions affecting only individual members.  As the Court found in the

14   context of the 2.0-Liter Settlement, Volkswagen's uniform scheme to mislead regulators and

15   consumers by submitting false applications for COCs and EOs, failing to disclose the existence of

16   the illegal Defeat Devices in the Class Vehicles, and misrepresenting the levels of $NO_X$ emissions

---

[9] The Rule 23(b)(3) predominance inquiry in the context of the certification of a nationwide settlement class involving various state consumer protection law claims was the subject of an extensive *en banc* decision by the Third Circuit in *Sullivan v. DB Invs., Inc.*, 667 F.3d 273 (3d Cir. 2011).  In affirming certification of a nationwide settlement class, the Third Circuit's predominance inquiry was informed by "three guideposts":  (1) "commonality is informed by the defendant's conduct as to all class members and any resulting injuries common to all class members"; (2) "variations in state law do not necessarily defeat predominance"; and (3) "concerns regarding variations in state law largely dissipate when a court is considering the certification of a settlement class."  *Sullivan*, 667 F.3d at 297.

   This Court recently adopted the rationale in *Sullivan*, foreshadowed by the Ninth Circuit in *Hanlon*, that "state law variations are largely 'irrelevant to certification of a settlement class.'"  *Id.* at 304 (quoting *Sullivan*, 667 F.3d at 304); *see Wakefield v. Wells Fargo & Co.*, No. C 12-05053 LB, 2014 WL 7240339, at *12-13 (N.D. Cal. Dec. 18, 2014); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2016 U.S. Dist. LEXIS 9944, at *208-09 (N.D. Cal. Jan. 6, 2016), *report & recommendation adopted*, 2016 U.S. Dist. LEXIS 9766 (N.D. Cal. Jan. 26, 2016).  Moreover, in the settlement context, the Court need not "differentiate[e] within a class based on the strength or weakness of the theories of recovery."  *In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. C 07-05634 CRB, 2015 WL 3396829, at *20 (N.D. Cal. May 26, 2015) (quoting *Sullivan*, 667 F.3d at 328); *Rodman v. Safeway, Inc.*, No. 11-cv-03003-JST, 2014 WL 988992, at *54-56 (N.D. Cal. Mar. 9, 2014) (citing *Sullivan*, 667 F.3d at 304-07).  Here, like in *Sullivan*, any material variations in state law do not preclude a finding of predominance, given the uniformity of Volkswagen's conduct in the scheme and common course of conduct.

---

1    of the Class Vehicles are central to the claims asserted in the Consumer Complaint.  *See In re*

2    *Volkswagen*, 2016 WL 4010049, at *12; *see also* ¶¶ 238-296.  "Plaintiffs allege Volkswagen

3    perpetrated the same fraud in the same manner against all Class Members."  *In re Volkswagen*,

4    2016 WL 4010049, at *12.  Indeed, the Court's prior finding that Volkswagen "engaged in a

5    deceptive and fraudulent scheme" applies to all of the Class Members' claims here.  *Id.*  Plaintiffs

6    also allege a common and unifying injury, as their and other Settlement Class Members' injuries

7    arise solely from the use of the defeat device.  *Id.*   Thus, here too, Plaintiffs satisfy the

8    predominance requirement.

9                    **2.      Class Treatment Is Superior in This Case**

10          Finally, class treatment is superior.  Pursuant to Rule 23(b)(3), a class action must be

11   "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed.

12   R. Civ. P. 23(b)(3).  This factor "requires determination of whether the objectives of the particular

13   class action procedure will be achieved in the particular case."  *Hanlon*, 150 F.3d at 1023.  In

14   other words, it "requires the court to determine whether maintenance of this litigation as a class

15   action is efficient and whether it is fair."  *Wolin*, 617 F.3d at 1175-76.  Under Rule 23, "the Court

16   evaluates whether a class action is a superior method of adjudicating plaintiff's claims by

17   evaluating four factors: '(1) the interest of each class member in individually controlling the

18   prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning

19   the controversy already commenced by or against the class; (3) the desirability of concentrating

20   the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered

21   in the management of a class action.'"  *Trosper*, 2014 U.S. Dist. LEXIS 117453, at *62 (quoting

22   *Leuthold v. Destination Am., Inc.*, 224 F.R.D. 462, 469 (N.D. Cal. 2004)).

23          There can be little doubt that class treatment here is superior to the litigation of thousands

24   of individual consumer actions.  "From either a judicial or litigant viewpoint, there is no

25   advantage in individual members controlling the prosecution of separate actions. There would be

26   less litigation or settlement leverage, significantly reduced resources and no greater prospect for

27   recovery."  *Hanlon*, 150 F.3d at 1023; *see also Wolin*, 617 F.3d at 1176 ("Forcing individual

28   vehicle owners to litigate their cases, particularly where common issues predominate for the

1   proposed class, is an inferior method of adjudication.").  The damages sought by each Class

2   Member here, while related to an important purchase, are not so large as to weigh against

3   certification of a class action.  *See Smith v. Cardinal Logistics Mgmt. Corp.*, No. 07-2104 SC,

4   2008 WL 4156364, at *32-33 (N.D. Cal. Sept. 5, 2008) (class members had a small interest in

5   personally controlling the litigation even where the average amount of damages were $25,000-

6   $30,000 per year of work); *see also Walker v. Life Ins. Co. of the Sw.*, No. CV 10-9198 JVS

7   (RNBx), 2012 WL 7170602, at *16 (C.D. Cal. Nov. 9, 2012) (finding that each class member did

8   not have "a greater interest in pursuing individual claims," even though it was "not the typical

9   case of thousands of class members with very low amounts in controversy").

10         The sheer number of separate trials that would otherwise be required also weighs in favor

11   of certification.  Indeed, "[i]f Class Members were to bring individual lawsuits against

12   Volkswagen, each Member would be required to prove the same wrongful conduct to establish

13   liability and thus would offer the same evidence."  *In re Volkswagen*, 2016 WL 4010049, at *12.

14   "Given that Class Members number in the hundreds of thousands, there is the potential for just as

15   many lawsuits with the possibility of inconsistent rulings and results."  *Id.*  "Thus, classwide

16   resolution of their claims is clearly favored over other means of adjudication, and the proposed

17   Settlement resolves Class Members' claims at all once."  *Id.*

18         Moreover, all private federal actions seeking relief for the Class have already been

19   transferred to this District for consolidated MDL pretrial proceedings.[10]  Dkt. No. 950.  That the

20   JPML consolidated all related federal consumer cases in an MDL before this Court is a clear

21   indication that a single proceeding is preferable to a multiplicity of individual lawsuits.  The

22   government suits are pending as part of this MDL too, enabling this Court to approve and enforce

23   _____

24   [10] Although several class actions are pending in various state courts, the existence of these actions does not defeat a finding of superiority.  *See Cartwright v. Viking Indus.*, No. 2:07-CV-02159-FCD-EFB, 2009 WL 2982887, at *44-*50 (E.D. Cal. Sept. 14, 2009) (certifying CLRA, UCL, fraudulent concealment, unjust enrichment, and warranty claims despite a concurrent state court

25   class action that certified warranty claims for class treatment); *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 527 F. Supp. 2d 1053, 1069 (N.D. Cal. 2007) (recognizing that courts often

26   certify concurrent FLSA and UCL class actions).  Nor does the existence of actions filed by the DOJ or FTC preclude a finding of superiority because, among other reasons, both of those actions

27   are part of the MDL and the proposed Settlement was negotiated with the participation of those government entities.

28

1  all of the provisions of each of these settlements.  The certification of the Settlement Class

2  enables and completes this advantageous unified jurisdiction.  *See In re Volkswagen*, 2016 WL

3  4010049, at *12 (finding superiority satisfied in context of 2.0-Liter Settlement).

4        Because the class action mechanism provides the superior means to effectively and

5  efficiently resolve this controversy, and as the other requirements of Rule 23 are each satisfied,

6  certification of the Settlement Class is appropriate.  *See Id* (finding plaintiffs satisfied the Rule

7  23(a) and (b)(3) requirements and certifying the class in the context of the 2.0-Liter Settlement).

8  **VI.  THE PROPOSED NOTICE PROGRAM PROVIDES THE BEST PRACTICABLE
9  NOTICE IN PLAIN LANGUAGE, BY DIRECT MAIL AND EXTENSIVE
   PUBLICATION**

10        Upon certifying a Rule 23(b)(3) class, Rule 23(c)(2)(B) requires the Court to "direct to

11  class members the best notice that is practicable under the circumstances, including individual

12  notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P.

13  23(c)(2)(B).  The best practicable notice is that which is "reasonably calculated, under all the

14  circumstances, to apprise interested parties of the pendency of the action and afford them an

15  opportunity to object."  *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

16  In addition, Rule 23(e)(1) requires that before a proposed settlement may be approved, the Court

17  "must direct notice in a reasonable manner to all class members who would be bound by the

18  proposal."  Fed. R. Civ. P. 23(e)(1).  In class action settlements, it is common practice to provide a

19  single notice that satisfies both of these notice standards.  *Manual*, at § 21.633.  Combined notice

20  helps to avoid confusion that separate notifications of certification and settlement may produce.

21  "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert

22  those with adverse viewpoints to investigate and come forward and be heard.'"  *Churchill Vill.,*

23  *L.L.C., v. GE*, 361 F.3d 566, 575 (9th Cir. 2004) (quoting *Mendoza v. Tucson Sch. Dist. No. 1*,

24  623 F.3d 1338, 1352 (9th Cir. 1980)).

25        The proposed notice program, which is substantially similar to that utilized in the context

26  of the 2.0-Liter Settlement, meets these standards.  *See* Exhibit 3, Declaration of Shannon

27  Wheatman on Adequacy of the Class Notice Program ("Wheatman Decl.").  It consists of, among

28  other things, a Short and Long Form Notice, in addition to a comprehensive Settlement Website

(www.VWCourtSettlement.com), that are clear and complete, and that meet all the requirements of Rule 23.  *See In re Volkswagen*, 2016 WL 4010049, at *17-19 (approving the form and content of the long and short form Notices, as well as the notice program set forth in the 2.0-Liter Settlement).

The Long Form Notice is a 30-plus page document that includes a thorough series of questions and answers designed to explain the Settlement in clear terms in a well-organized and reader-friendly format.  Among other things, it includes an overview of the litigation, an explanation of the benefits available under the Settlement, and detailed instructions on how to participate in or opt out of the Settlement.  The proposed Long Form Notice is attached to the 3.0-Liter Class Action Agreement as Exhibit 3.

The Short Form Notice, though less comprehensive than the Long Form Notice, also conveys the basic structure of the Settlement and is designed to capture Class Members' attention in newspapers and periodicals with clear, concise, plain language.  It directs readers to the Settlement Website (where the Long Form Notice is available) and a toll-free number for more information.  The Short Form Notice is attached to the 3.0-Liter Class Action Agreement as Exhibit 2.

Together, these notices cover all of the elements outlined in Rule 23(c)(2)(B), specifically:

- A description of the nature of the case.  *See* Long Form Notice Summary and Question 1;
- The Class definition. *See* Long Form Notice Question 2;
- A description of the class claims, potential outcomes, and the reasons for the Settlement.  *See* Long Form Notice Summary and Questions 1, 10-4344-46;
- A statement concerning the Class Members' rights to recovery.  *See* Long Form Notice Summary and Questions 1;
- The names of representatives for Class Counsel who can answer Class Members' questions.  *See* Long Form Notice Question 60;

- The process and procedure for objecting to the Settlement, and appearing at a final fairness hearing, with or without the aid of an attorney. *See* Long Form Notice at Questions 62-66;

- The process and procedure through which a Class Member may opt out of the Settlement.  *See* Long Form Notice Summary and Question 28; and

- The fact that the final judgment in this case will release all claims against the Volkswagen and bind all Class Members.  *See* Long Form Notice Summary and Question 57.

The proposed method of disseminating this notice is the best practicable method under the circumstances, and includes individual notice to the Class Members who can be identified through reasonable effort.  In sum, the proposed notice distribution plan consists of various parts, including: (1) individual direct mail notice: (2) paid media; (3) earned media and outreach; and (4) a Settlement Website and toll-free phone number.  Wheatman Decl. ¶¶ 11-36.

The principal method of reaching Class Members will be through individual direct mail notice, given that the Class is objectively defined and readily identifiable.  *See Manual for Complex Litigation (Fourth)* (2004), § 21.222.  The Short Form Notice can and will be sent to the vast majority of Class Members, who are readily identifiable through Volkswagen's records and/or registration data, such as Polk data.  All mailings will be sent via First Class U.S. Mail, and all addresses will be checked against national databases prior to being sent.  E-mail addresses are available for most of the Class Members, with a link to the Settlement website, and the e-mails will be sent to them:  the first as a short overview and the second containing the long form notice itself.  Wheatman Decl. ¶ 17.  Direct notice will also be mailed and/or emailed to Class Members when the EPA and CARB approve or reject Volkswagen's proposed emissions modifications.

A robust media campaign focused on stimulating awareness and involvement will supplement the direct mail notice.  A Publication Notice will appear as a two-color advertisement in various newspapers, including the *The New York Times*, *The Wall Street Journal*, *USA Today*, and other newspapers and magazines, as outlined in the Wheatman Declaration and

1    accompanying attachments.  The paid media campaign will also include, among other things,

2    various methods of disseminating online banner advertisements, social media advertising, and

3    sponsored keyword advertisements on major search engines.  An earned media program—

4    described further in the Wheatman Declaration—also will be implemented to amplify the paid

5    media and provide additional notice to Class Members.  Finally, the Notice Program includes a

6    toll-free telephone number as well as a Settlement Website, which contains background

7    information on the case, the Long Form Notice, the Claim Form and other information that Class

8    Members may find useful and relevant to their claims decisions.  An initial launch of the website

9    will coincide with the filing of the 3.0-Liter Class Action Settlement, and if the Settlement is

10   preliminarily approved, at that time, the website will be updated and enhanced to, among other

11   things, allow Class Members to register, receive Buyback, Lease Termination and Approved

12   Emissions Modification/Recall Repair offers from Volkswagen, and to file claims.

13       The Parties created this comprehensive proposed notice program—including both the

14   content and the distribution plan—with Kinsella Media, LLC ("KM"), an advertising and legal

15   notification firm in Washington, D.C. that specializes in the design and implementation of

16   notification in complex litigation and has been appointed as notice expert and notice administrator

17   in scores of major class actions.  Subject to the Court's approval, the parties have selected KM to

18   serve as the Notice Administrator.  The Parties are confident that the Notice Program meets the

19   applicable legal standards and will provide the best notice practicable under the circumstances.

20   **VII.**   **THE PROPOSED FINAL APPROVAL HEARING SCHEDULE**

21       The last step in the settlement approval process is the final approval hearing, at which the

22   Court may hear any evidence and argument necessary to evaluate the Settlement.  At that hearing,

23   proponents of the Settlement may explain and describe its terms and conditions and offer

24   argument in support of settlement approval, and Class Members, or their counsel, may be heard in

25   support of or in opposition to the Settlement.  Plaintiffs propose the following schedule for final

26   approval of the Settlement and implementation of the Settlement Program:

27

28

| Date | Event |
|------|-------|
| February 3, 2017 | Volkswagen provides Class Action Fairness Act Notice to State Attorneys General |
| February 14, 2017 | Preliminary Approval Hearing [Remainder of schedule assumes entry of Preliminary Approval Order on this date] |
| February 15, 2017 | Class Notice Program begins |
| March 24, 2017 | Motion for Final Approval filed |
| April 14, 2017 | Objection and Opt-Out Deadline |
| May 1, 2017 | End of Eligible Former Owner Identification Period |
| April 28, 2017 | Reply Memorandum in Support of Final Approval filed |
| May 1, 2017 | End of Eligible Former Owner Identification Period |
| May 1 – May 5, 2017 [precise date TBD by Court] | Final Approval Hearing. While the timing and outcome of every determination is at the Court's discretion, the Parties to this 3.0-liter Class Action Agreement request and anticipate that the Court would enter the DOJ 3.0-liter Consent Decree and FTC 3.0-liter Consent Order at the same time as the Final 3.0-liter Approval Order.<br><br>The Buyback and Lease Termination program under this 3.0-liter Class Action Agreement will begin expeditiously upon Final Approval.  To the extent available, an Approved Emissions Modification under this 3.0-liter Class Action Agreement will begin at the same time. |

## VIII.   CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court preliminarily approve the Settlement, provisionally certify the Class, conditionally appoint the undersigned as Settlement Class Counsel and the Plaintiffs listed in Exhibit 1 hereto as Settlement Class Representatives, order dissemination of notice to Class Members, and set a date for the final approval hearing.

1   Dated:  January 31, 2017

Respectfully submitted,

2                                         LIEFF CABRASER HEIMANN &
                                          BERNSTEIN, LLP

3
                                          By:  */s/ Elizabeth J. Cabraser*
4                                         Elizabeth J. Cabraser
                                          LIEFF CABRASER HEIMANN &
5                                         BERNSTEIN, LLP
                                          275 Battery Street, 29th Floor
6                                         San Francisco, CA  94111
                                          Telephone: 415.956.1000
7                                         Facsimile:  415.956.1008
                                          E-mail: ecabraser@lchb.com
8
                                          *Plaintiffs' Lead Counsel*
9
10  Benjamin L. Bailey                    Roland K. Tellis
    BAILEY GLASSER LLP                    BARON & BUDD, P.C.
    209 Capitol Street                    15910 Ventura Boulevard, Suite 1600
11  Charleston, WV 25301                  Encino, CA  91436
    Telephone: 304.345.6555               Telephone: 818.839.2320
12  Facsimile:  304.342.1110              Facsimile:  818.986.9698
    E-mail: Bbailey@baileyglasser.com     E-mail: trellis@baronbudd.com
13
    W. Daniel "Dee" Miles III             Lesley E. Weaver
14  BEASLEY ALLEN LAW FIRM                BLEICHMAR FONTI & AULD LLP
    218 Commerce Street                   1999 Harrison Street, Suite 670
15  Montgomery, AL  36104                 Oakland, CA 94612
    Telephone: 800.898.2034               Telephone: 415.455.4003
16  Facsimile: 334.954.7555               Facsimile: 415.445.4020
    E-mail: dee.miles@beasleyallen.com    E-mail: lweaver@bfalaw.com
17
    David Boies                           J. Gerard Stranch IV
18  BOIES, SCHILLER & FLEXNER LLP         BRANSTETTER, STRANCH & JENNINGS,
    333 Main Street                       PLLC
19  Armonk, NY  10504                     223 Rosa L. Parks Avenue, Suite 200
    Telephone: 914.749.8200               Nashville, TN  37203
20  Facsimile: 914.749.8300               Telephone: 615.254.8801
    E-mail: dboies@bsfllp.com             Facsimile: 615.250.3937
21                                        E-mail: gerards@bsjfirm.com

22  James E. Cecchi                       David Seabold Casey, Jr.
    CARELLA, BYRNE, CECCHI,               CASEY GERRY SCHENK FRANCAVILLA
23  OLSTEIN, BRODY & AGNELLO P.C.         BLATT & PENFIELD, LLP
    5 Becker Farm Road                    110 Laurel Street
24  Roseland, NJ  07068-1739              San Diego, CA  92101-1486
    Telephone: 973.994.1700               Telephone: 619.238.1811
25  Facsimile:  973.994.1744              Facsimile:  619.544.9232
    E-mail: jcecchi@carellabyrne.com      E-mail: dcasey@cglaw.com
26

27

28

MTN FOR PRELIM. APPROVAL OF 3L TDI CLASS
ACTION AGMT & APPROVAL OF CLASS NOTICE
MDL 2672 CRB (JSC)

Frank Mario Pitre
COTCHETT PITRE & McCARTHY LLP
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone: 650.697.6000
Facsimile:  650.697.0577
E-mail: fpitre@cpmlegal.com

Rosemary M. Rivas
FINKELSTEIN THOMPSON LLP
One California Street, Suite 900
San Francisco, CA  94111
Telephone: 415.398.8700
Facsimile:  415.393.8704
E-mail: rrivas@finkelsteinthompson.com

Adam J. Levitt
GRANT & EISENHOFER P.A.
30 North LaSalle Street, Suite 2350
Chicago, IL  60602
Telephone: 312.610.5400
Facsimile:  312.214.0001
E-mail: alevitt@gelaw.com

Steve W. Berman
HAGENS BERMAN
1918 8th Avenue, Suite 3300
Seattle, WA  98101
Telephone: 206.623.7292
Facsimile:  206.623.0594
E-mail: steve@hbsslaw.com

Michael D. Hausfeld
HAUSFELD
1700 K Street, N.W., Suite 650
Washington, DC  20006
Telephone: 202.540.7200
Facsimile:  202.540.7201
E-mail: mhausfeld@hausfeld.com

Michael Everett Heygood
HEYGOOD, ORR & PEARSON
6363 North State Highway 161, Suite 450
Irving, TX  75038
Telephone: 214.237.9001
Facsimile:  214.237-9002
E-mail: Michael@hop-law.com

Lynn Lincoln Sarko
KELLER ROHRBACK LLP
1201 3rd Avenue, Suite 3200
Seattle, WA  98101-3052
Telephone: 206.623.1900
Facsimile:  206.623.3384
E-mail: lsarko@kellerrohrback.com

Joseph F. Rice
MOTLEY RICE, LLC
28 Bridgeside Boulevard
Mount Pleasant, SC  29464
Telephone: 843.216.9000
Facsimile:  843.216.9450
E-mail: jrice@motleyrice.com

Paul J. Geller
ROBBINS GELLER RUDMAN &
DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone: 561.750.3000
Facsimile:  561.750.3364
E-mail: pgeller@rgrdlaw.com

Roxanne Barton Conlin
ROXANNE CONLIN & ASSOCIATES, P.C.
319 Seventh Street, Suite 600
Des Moines, IA  50309
Telephone: 515.283.1111
Facsimile:  515.282.0477
E-mail: roxlaw@aol.com

Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, NY  10005-4401
Telephone: 212.584.0700
Facsimile:  212.584.0799
E-mail: cseeger@seegerweiss.com

Jayne Conroy
SIMMONS HANLY CONROY LLC
112 Madison Avenue
New York, NY  10016-7416
Telephone: 212.784.6400
Facsimile:  212.213.5949
E-mail: jconroy@simmonsfirm.com

1

2

3

4

Robin L. Greenwald
WEITZ & LUXENBERG P.C.
700 Broadway
New York, NY  10003
Telephone: 212.558.5500
Facsimile:  212.344.5461
E-mail: rgreenwald@weitzlux.com

5

*Plaintiffs' Steering Committee*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 42 -

1

## **CERTIFICATE OF SERVICE**

2      I hereby certify that, on January 31, 2017, service of this document was accomplished

3   pursuant to the Court's electronic filing procedures by filing this document through the ECF

4   system.

5

6                              /s/ *Elizabeth J. Cabraser*_____
                              Elizabeth J. Cabraser

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28