JONATHAN COHEN, DC Bar 483454
jcohen2@ftc.gov
MICHELLE L. SCHAEFER, DC Bar 478773
mschaefer@ftc.gov
AMANDA B. KOSTNER, CA BAR 245345
akostner@ftc.gov
SANGJOON "SIMON" HAN, DC Bar 998971
shan@ftc.gov
MEGAN A. BARTLEY, VA Bar 81840
mbartley@ftc.gov
Federal Trade Commission
600 Pennsylvania Avenue NW, CC-9528
Washington, DC 20580
(202) 326-2551 (Cohen); -3515 (Schaefer);
-2880 (Kostner); -2495 (Han); -3424 (Bartley);
-3197 (fax)

Attorneys for Plaintiff
Federal Trade Commission

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES AND PRODUCT LIABILITY LITIGATION<br><br>This document relates to:<br><br>*FTC v. Volkswagen Group of America, Inc.*, No. 3:16-cv-1534 | MDL 2672 CRB (JSC)<br><br>**AMENDED COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF**<br><br>The Honorable Charles R. Breyer |

Plaintiff, the Federal Trade Commission ("FTC"), for its Amended Complaint alleges:

1. The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive relief, rescission, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), in connection with Defendants' marketing and distribution to consumers of diesel-engine vehicles containing illegal defeat device software designed to enable the vehicles to cheat emissions tests. This Court has already entered an Order against Defendant Volkswagen Group of America, Inc. ("Volkswagen USA") as to the FTC's claims relating to the 2.0-liter engine vehicles.

## JURISDICTION

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. § 45(a).

## VENUE AND INTRADISTRICT ASSIGNMENT

3. Venue is proper in this district under 28 U.S.C. § 1391(b)(1)-(2) and (c)(2), and 15 U.S.C. § 53(b).

4. Intradistrict assignment to the San Francisco Division is proper pursuant to Civil Local Rule 3-2(c) because acts or omissions giving rise to the FTC's claims occurred, among other places, in San Francisco County, California.

## PLAINTIFF

5. The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

6. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be

2

appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A).

## **DEFENDANTS**

7. Defendant Volkswagen USA is a New Jersey corporation with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, VA 20171. Volkswagen USA transacts or has transacted business in this district and throughout the United States.

8. Volkswagen USA also transacts or has transacted business in this district and throughout the United States as Volkswagen of America, Inc. and Audi of America, Inc., fictitious business names registered in Ohio.

9. Volkswagen USA is a subsidiary of Volkswagen AG, with headquarters in Wolfsburg, Germany.

10. Defendant Porsche Cars North America, Inc. ("Porsche NA") is a Delaware corporation with its principal place of business located at 1 Porsche Drive, Atlanta, Georgia 30354. Porsche NA transacts or has transacted business in this district and throughout the United States.

11. Porsche NA is a subsidiary of Porsche AG, a German corporation that is wholly-owned by Volkswagen AG.

12. At all times material to this Amended Complaint, acting alone or in concert with others, Defendants have advertised, marketed, offered for sale, sold, offered for lease, leased, and distributed diesel-engine motor vehicles to consumers throughout the United States, including various makes and models marketed as "Clean Diesel" (collectively, "Defeat Device Vehicles," or "DDVs"). Each of these vehicles contains a defeat device, illegal software designed to enable the vehicle to cheat emissions tests. The defeat device operates when emissions testing occurs and calibrates the emission control system to reduce NOx emissions to legally compliant levels for the duration of the test. After testing, the software resumes its default mode: calibrating the

3

emission control system to allow NOx emissions above the legal limit, which enables more powerful and durable engine performance. Without sophisticated testing equipment, there is no way to know whether a vehicle contains such a defeat device.

## COMMERCE

13. At all times material to this Amended Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

14. Defendant Volkswagen USA sells Volkswagen and Audi vehicles through approximately 1,000 dealers and independent distributors throughout the United States.

15. From late 2008 to late 2015, Defendant Volkswagen USA advertised, marketed, offered for sale, sold, offered for lease, leased, and distributed more than 550,000 Volkswagen-branded and Audi-branded Defeat Device Vehicles to consumers throughout the United States.

16. Volkswagen USA represented that Volkswagen-branded and Audi-branded DDVs had low emissions, complied with government emissions standards, were environmentally friendly, and retained a high resale value. During this time, Volkswagen USA became the largest seller of light-duty diesel vehicles in the United States. The Volkswagen-branded and Audi-branded DDVs had Manufacturer's Suggested Retail Prices ("MSRPs") ranging from approximately $22,000 for the least expensive Volkswagen-branded 2.0L DDV to approximately $125,000 for the most-expensive Audi-branded 3.0L DDV. Collectively, consumers spent billions purchasing or leasing Defendant Volkswagen USA's DDVs.

17. Defendant Porsche NA sells Porsche vehicles through approximately 200 dealers and independent distributors throughout the United States. From late 2012 to late 2015, Defendant Porsche NA distributed more than 11,000 Porsche-branded Defeat Device Vehicles to consumers throughout the United States. The Porsche-branded DDVs had Manufacturer's

4

Suggested Retail Prices ("MSRPs") ranging from approximately $56,000 to approximately $135,000. Collectively, consumers spent hundreds of millions purchasing or leasing Defendant Porsche NA's DDVs.

**Defendants Sold Defeat Device Vehicles.**

18. Nitrogen oxides ("NOx") are a group of dangerous atmospheric pollutants that contribute to a host of harms to the environment and human health, including smog, acid rain, water quality deterioration, childhood asthma, other respiratory ailments, and premature death.

19. To reduce these risks to the American public, the Environmental Protection Agency ("EPA") promulgated NOx emissions limits. In 2007, the EPA fully implemented these limits for light-duty vehicles, which include passenger cars and SUVs.

20. To ensure that auto manufacturers comply with its emissions standards, EPA administers an emissions certification program, which requires auto manufacturers to apply for a Certificate of Conformity ("COC") for each model and model year. It is illegal to sell a vehicle without a valid COC.

21. To obtain a COC, a manufacturer must submit an application to EPA's Office of Transportation and Air Quality ("OTAQ"), which includes, among other things, the manufacturer's emissions and durability test results. OTAQ reviews the test results, and in some cases, it performs "confirmatory testing" to validate the manufacturer's results. When a manufacturer submits a COC application for a vehicle with a new engine design, OTAQ always performs confirmatory testing. OTAQ's confirmatory testing involves operating the vehicle in a laboratory setting; it does not involve "on-road" testing. Defendants knew how and when OTAQ would perform confirmatory testing.

22. In June 2008, Volkswagen USA submitted a COC application to OTAQ for its first diesel car in the U.S. market, the 2009 Turbocharged Direct Injection ("TDI") Jetta. When

5

OTAQ performed confirmatory testing on the TDI Jetta, it passed solely because it contained illegal software designed to defeat EPA's testing procedures (*i.e.*, a "defeat device").

23. Volkswagen USA began distributing its first Defeat Device Vehicle, the "Clean Diesel" TDI Jetta, in late 2008. According to Volkswagen USA, its introduction of its new "Clean Diesel" technology in the U.S. market was "proof of [Volkswagen] Group's commitment to provide customers an alternative in their purchase of fuel efficient, clean emissions vehicles that are also fun to drive."

24. Over the next seven years, Volkswagen USA sold, leased, or distributed more than 550,000 Defeat Device Vehicles, which have contributed—and will continue to contribute—to environmental and human health harms including smog, acid rain, water quality deterioration, childhood asthma, adult respiratory ailments, and premature death.

25. In 2012, Porsche NA submitted a COC application to OTAQ for its Defeat Device Vehicle, the 2013 Cayenne Diesel. When OTAQ performed confirmatory testing on the Cayenne Diesel, it passed solely because it contained illegal software designed to defeat EPA's testing procedures (*i.e.*, a "defeat device").

26. Porsche NA began distributing its Defeat Device Vehicle, the Cayenne Diesel, in late 2012.

27. Over the next three years, Porsche NA sold, leased, or distributed more than 11,000 Defeat Device Vehicles, which have contributed—and will continue to contribute—to environmental and human health harms including smog, acid rain, water quality deterioration, childhood asthma, adult respiratory ailments, and premature death.

**Volkswagen USA Promoted Its Defeat Device Vehicles As "Clean Diesel."**

28. To induce American consumers to purchase its Defeat Device Vehicles, Volkswagen USA spent tens of millions of dollars on widely-disseminated advertising to convey "diesel's environmental and economic advantages."

6

In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Products Liability Litigation, MDL No. 2672
FTC'S AMENDED COMPLAINT IN FTC v. VOLKSWAGEN GROUP OF AMERICA, No. 3:16-cv-1534

29. Volkswagen USA targeted much of its "Clean Diesel" advertising at "progressive" and "environmentally-conscious" consumers. Volkswagen USA's marketers studied their targets' psychology, concluding that such consumers "rationalize themselves out of their aspirations and justify buying lesser cars under the guise of being responsible." According to Volkswagen USA, such consumers understood purchasing an eco-conscious vehicle as part of being "responsible."

30. Volkswagen USA's "Clean Diesel" advertising included, among other things, nationally-televised advertisements (including a Super Bowl ad), online social media campaigns (including videos, websites and games on Facebook and elsewhere), press releases and public statements, print advertising (including the slogan, "Diesel – It's No Longer A Dirty Word"), posters, brochures and other materials distributed to dealers and independent distributors around the country, collaboration with environmental nonprofits (including The Nature Conservancy), and strategic product placement (for instance, Volkswagen USA arranged for actress Gwyneth Paltrow to arrive at the Hollywood premiere of *Iron Man III* in an Audi "Clean Diesel").

31. According to Volkswagen USA's marketing strategy materials, one of the "key messages" it intended to convey through the word "clean" was that Clean Diesel vehicles produce "NOx emissions [that are] reduced by 95 percent[.]"

**Volkswagen USA Claimed That Its Defeat Device Vehicles Had Low Emissions.**

32. Volkswagen USA's advertisements, promotional materials, and public statements represented that its Defeat Device Vehicles had low emissions, reduced NOx by 90%, had lower NOx than comparable diesel vehicles, had lower emissions than comparable diesel vehicles, and had lower emissions than comparable gasoline vehicles. For example:

A. A 2008 television advertisement, "Do Your Part," depicts people commuting in different environmentally friendly ways: "trying to do their part" by taking the bus, riding a Segway, biking, and driving a car with the bumper sticker "powered

7

by vegetable oil." Then an Audi A3 speeds by, and the announcer observes: "Some just have more fun doing it." The screen reads: "42mpg. 30% fewer emissions." The ad ends with the tagline: "Diesel. It's no longer a dirty word."

B. A 2009 promotional mailer reads: "With the new Jetta TDI Clean Diesel, you get a great car that's low on emissions . . . ." The mailer further claims that the car's engine is "designed to reduce emissions," which is why it is "[c]lean as a whistle."

C. Press coverage of the 2008 "Audi Mileage Marathon," quotes an Audi spokesperson saying: "Diesel is not dirty. This marathon is about getting the word out that clean-diesel technology such as ours can achieve 40-percent better fuel economy and reduce nitrogen-oxide emissions by 90%."

D. A press release for the 2014 Volkswagen Touareg states that the "deNOx catalytic converter . . . helps reduce NOx emissions by up to 90 per cent."

E. According to 2010 press materials, the Volkswagen Jetta's clean diesel technology "reduces nitrogen oxide (NOx) emissions by up to 90% by making internal engine modifications and implementing a NOx storage catalytic converter."

F. A 2009 press release identifies the Audi Q7 as the "world's cleanest diesel SUV," states that it has an "advanced exhaust emission control system" that "reduces smog-causing nitrogen oxides by up to 90% when compared with past generations of diesel technologies sold in the U.S.," and is "significantly less intrusive on the environment than past diesel engines."

G. 2013 emails to consumers promoting Audi TDIs state that "Clean Diesel" offers "fewer NOx emissions than comparable gasoline engines."

8

In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Products Liability Litigation, MDL No. 2672
FTC'S AMENDED COMPLAINT IN FTC v. VOLKSWAGEN GROUP OF AMERICA, No. 3:16-cv-1534

H. An Audi print ad with the tagline "Diesel. It's no longer a dirty word," describes the TDI engine as having "20% fewer emissions than gasoline engines."

I. In the "coffee filter test" video featured on one of Volkswagen USA's online media campaigns at TDITruthandDare.com, two testers compare a "Clean Diesel" Volkswagen Touareg with a "traditional diesel" by placing clean white coffee filters on the tailpipes "to see which one is cleaner after 10 minutes." After the "test," the Touareg filter is still clean white, but the "traditional diesel" filter had a black stain. The tester comments: "That [filter from the "traditional diesel"] is nasty-looking. This [filter from the Touraeg] looks pretty good, though." The tester then proposes making coffee with the filters, commenting: "Traditional diesel coffee, it's got the extra kick. It's got the carbon monoxide, the sulfur oxide . . . . Ready for some sooty emissions, diesel particulates . . . ?"

J. In a 2015 online video titled "Diesel Old Wives' Tale #6: Diesel is Dirty," one of the "old wives" asks: "Aren't diesels dirty?" The TDI driver (another "old wife") responds: "That used to be dirty; this is 2015." She then "proves it" by holding a white scarf to the exhaust of a Volkswagen Golf SportWagen TDI car and then brandishing the clean cloth ("See how clean it is?"). The final tagline reads: "Volkswagen TDI Clean Diesel: Like really clean diesel." This ad reached at least 9 million consumers.

**Volkswagen USA Claimed Its Defeat Device Vehicles Complied With Emissions Standards.**

33. Volkswagen USA's advertisements, promotional materials, and public statements represented that its Defeat Device Vehicles complied with state and federal emissions standards. For example:

A. "Clean Diesel" vehicles "meet the strictest EPA standards in the U.S."

B. "Audi TDI clean diesel technology meets emission standards in all 50 states."

9

In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Products Liability Litigation, MDL No. 2672
FTC'S AMENDED COMPLAINT IN FTC v. VOLKSWAGEN GROUP OF AMERICA, No. 3:16-cv-1534

C. Volkswagen USA presents the "50-state compliant clean diesel Volkswagen Jetta TDI sedan and SportWagen TDI."

D. The "Touareg V6 TDI meet[s] the most stringent emission requirements of the world [with] its advanced DeNOx system."

E. "To achieve its 50-state-legal emissions qualification, a deNOx catalytic converter, augmented by a special injection system that sprays [diesel exhaust fluid ("DEF")] into the exhaust, helps reduce NOx emissions by up to 90 per cent. This lets the engine meet the Tier 2, Bin 5/ULEV II standards imposed across all 50 U.S. states."

F. "Certified for use in all 50 states."

**Volkswagen USA Claimed that Its Defeat Device Vehicles Were Environmentally Friendly.**

34. Volkswagen USA's advertisements, promotional materials, and public statements represented that its Defeat Device Vehicles were environmentally friendly, including that they were "environmentally-conscious," "eco-conscious," or "green." For example:

A. In a television advertisement broadcast during the 2010 Super Bowl, the "Green Police" arrest consumers who use plastic bags or bottles, throw away batteries, fail to compost orange rinds, install incandescent light bulbs, soak in overheated Jacuzzi water, and drink from Styrofoam cups. When an Audi driver encounters an "Eco Check" roadblock, a Green Police officer asks the driver: "You got a TDI here?" The TDI driver responds: "Clean Diesel." An officer replies: "You're good to go, sir." The Audi driver speeds away and the screen goes black, displaying the tagline: "Green has never felt so right." The final tagline reads: "Green Car of the Year. Audi A3 TDI clean diesel."

10

In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Products Liability Litigation, MDL No. 2672
FTC'S AMENDED COMPLAINT IN FTC v. VOLKSWAGEN GROUP OF AMERICA, No. 3:16-cv-1534

B. A press release states that the 2011 Audi Q7 "provides premium SUV buyers with a new level of environmental conscientiousness with its efficient 3.0 TDI clean diesel engine."

C. A page titled "Our environment" in a 2014 Volkswagen Jetta brochure pictures a pristine river winding through lush green forest and states: "Building cars comes with responsibilities—not just to you, but to the environment." Under the caption "Our commitment to the environment," the brochure lists items such as "[e]ncouraging eco-conscious behavior."

D. A press release for the launch of the 2009 Touareg TDI "Clean Diesel" states that the Touareg TDI "reinforces Volkswagen's commitment to clean diesel technology as the most sensible alternative fuel vehicle available today."

E. A 2013 brochure calls a TDI "Clean Diesel" vehicle "[g]ood, clean fun," compares it to a hybrid, and explains its "Think Blue" logo as: "The sky's the limit. The color blue symbolizes our commitment to building environmentally conscious cars . . . [a]nd setting a good example for eco-conscious behavior, everywhere, and every day." It concludes: "Think Blue is the Volkswagen way to drive progress by creating and producing cars that are more efficient, eco-conscious, and fun to drive."

F. A mailer to Volkswagen customers promotes the 2009 Jetta TDI with the heading, "Hybrids? They're so last year . . . ." It further states: "Now going green doesn't have to *feel* like you're going green."

G. Stickers on new "Clean Diesel" cars that disclose price, fuel economy, and other features contain a Volkswagen USA motto: "The People Want Good Clean Diesel Fun." According to Volkswagen USA's internal marketing materials, this

11

In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Products Liability Litigation, MDL No. 2672
FTC'S AMENDED COMPLAINT IN FTC v. VOLKSWAGEN GROUP OF AMERICA, No. 3:16-cv-1534

motto is "meant to convey that VW has the people, processes, [and] products to provide sustainable solutions."

**Volkswagen USA Claimed Its Defeat Device Vehicles Would Retain a High Resale Value.**

35. Through its advertising, public statements, and selling and leasing of cars, Volkswagen USA also represented to consumers that its Defeat Device Vehicles were durable, well-engineered vehicles that would retain a high resale value. For example:

A. Volkswagen USA promoted DDVs as a good investment that likely retains a high resale value. For example, in response to a hypothetical customer's desire for "a return on my investment," a 2015 Audi brochure states: "TDI® clean diesel models typically have a higher resale value versus comparable gasoline vehicles." Press releases and vehicle launches in 2009 cite "better resale value projections" for the Audi Q7 and "phenomenal resale value" for the Volkswagen Touareg.

B. In marketing the benefits of DDVs, Volkswagen USA often used its tagline: "That's the power of German engineering," and referred to its "unparalleled" and "superior" engineering.

C. Volkswagen USA frequently described DDVs as "long-lasting." As one brochure states: "Whether you're . . . driving mile after mile in any of our long-lasting TDI models, Volkswagen is all about performance. In fact, we're known for it . . . no matter what model you choose, every Volkswagen is designed to perform. Year after year after year."

D. In training dealers and distributors to sell and lease DDVs, Volkswagen USA encouraged dealers to highlight the durability and high resale value of TDIs. Training materials and fact sheets for dealers stress that TDIs have a higher resale versus gasoline vehicles (noting a $3,800 resale difference at 48,000 miles and a $3,000 difference at 60,000 miles) and that "[t]he durability of the 3.0-liter TDI

12

engine [ ] minimizes engine wear and tear over the life of the vehicle[,] which can result in substantially higher resale than comparable competitive models with gasoline engines."

**Volkswagen USA Continued to Deceptively Market Defeat Device Vehicles Despite Evidence that the Vehicles Exceeded Legal Emissions Standards.**

36. The International Council on Clean Transportation ("ICCT") hired West Virginia University ("WVU") to conduct complex on-road testing (as opposed to government-mandated laboratory testing) on several diesel light-duty vehicles. In 2013, WVU began conducting on-road testing in collaboration with the California Air Resources Board ("CARB").

37. WVU performed this testing on a "Clean Diesel" Volkswagen Passat and a "Clean Diesel" Volkswagen Jetta. The "Clean Diesels" exceeded EPA's NOx limits by as much as 4,000 percent.

38. ICCT presented the results at a March 2014 conference attended by Volkswagen engineers. By mid-2014, CARB, EPA, and Volkswagen USA were communicating regularly regarding possible causes of the excess emissions. By October 2014, Volkswagen had independently confirmed WVU's excess emissions findings, but provided regulators with scientifically invalid explanations for why its vehicles emitted so much NOx.

39. Volkswagen USA's interaction with CARB and EPA eventually led Volkswagen USA to issue software repairs in late 2014, and a recall of 2.0L "Clean Diesel" vehicles in April 2015 to repair the emissions aftertreatment system. One Volkswagen engineer discussing proposed fixes noted that Volkswagen's 3.0L "Clean Diesel" vehicles have "exactly the same issues, but not public yet." He observed: "They have not been caught."

40. In coordination with EPA, CARB conducted both laboratory and on-road testing on the 2.0L "Clean Diesel" vehicles after the fixes and recalls and discovered that they failed to

13

reduce the "Clean Diesel" vehicles' illegal NOx emissions. The discrepancy between the Defeat Device Vehicles' laboratory performance and their real-world performance remained.

41. Volkswagen USA attempted to explain the discrepancy in various ways that CARB and EPA found increasingly implausible. Nonetheless, during this period, Volkswagen USA continued to market "Clean Diesel" vehicles as producing low emissions, complying with emissions standards, being environmentally friendly, and having a high resale value.

42. In August 2015, EPA and CARB informed Volkswagen USA that it would not receive COCs for 2016 model year 2.0L "Clean Diesel" vehicles until the issue was resolved.

43. At this point, Volkswagen USA admitted that its 2.0L diesel vehicles contained defeat devices. On September 18, 2015, EPA issued Volkswagen USA a Notice of Violation ("NOV") covering approximately 480,000 2.0L Defeat Device Vehicles.

44. However, Volkswagen USA continued selling 3.0L "Clean Diesel" vehicles with TDI engines that also contained defeat devices.

45. On November 2, 2015, EPA issued a second NOV covering 3.0L "Clean Diesel" vehicles. EPA's second NOV explains that the 3.0L vehicles also contain defeat devices that operate when testing occurs, and reduce NOx emissions to compliant levels only during the test. Defendants admitted that these vehicles contain undisclosed software similar to the defeat devices in the 2.0L vehicles.

## VIOLATIONS OF THE FTC ACT

46. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

47. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

48. Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid

14

themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

### Count I:  Deceptive Representations (Volkswagen USA)

49. In numerous instances in connection with the advertising, marketing, offering for sale, sale, offering for lease, lease, and distribution of Defeat Device Vehicles, Defendant Volkswagen USA represented, directly or indirectly, expressly or by implication:

A. That Volkswagen-branded and Audi-branded Defeat Device Vehicles have low emissions, including that they reduce NOx by 90%, have lower NOx than comparable diesel vehicles, have lower emissions than comparable diesel vehicles, and have lower emissions than comparable gasoline vehicles;

B. That Volkswagen-branded and Audi-branded Defeat Device Vehicles meet basic emissions standards, including that DDVs satisfied federal and state standards for emissions compliance;

C. That Volkswagen-branded and Audi-branded Defeat Device Vehicles are environmentally friendly, including that they were "environmentally-conscious," "eco-conscious," or "green"; and

D. That Volkswagen-branded and Audi-branded Defeat Device Vehicles would not suffer a significant reduction in their resale value compared with similar vehicles, including that their resale value would be "higher . . . versus comparable gasoline vehicles."

50. In truth and in fact:

A. Volkswagen-branded and Audi-branded Defeat Device Vehicles do not have low emissions, do not reduce NOx by 90%, do not have lower NOx than comparable diesel vehicles, do not have lower emissions than comparable diesel vehicles, and do not have lower emissions than comparable gasoline vehicles;

15

In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Products Liability Litigation, MDL No. 2672
FTC'S AMENDED COMPLAINT IN FTC v. VOLKSWAGEN GROUP OF AMERICA, No. 3:16-cv-1534

B. Volkswagen-branded and Audi-branded Defeat Device Vehicles do not meet basic emissions standards, including federal and state standards for emissions compliance;

C. Volkswagen-branded and Audi-branded Defeat Device Vehicles are not environmentally friendly, not "environmentally-conscious," not "eco-conscious," and not "green"; and

D. Volkswagen-branded and Audi-branded Defeat Device Vehicles will suffer a significant reduction in their resale value compared with similar vehicles because they contain defeat devices.

51. Therefore, Defendant Volkswagen USA's representations as set forth in Paragraph 49 of this Complaint are false and misleading and constitute a deceptive act or practice, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## **Count II: Deceptive Failure to Disclose (Volkswagen USA)**

52. In numerous instances in connection with the advertising, marketing, offering for sale, sale, offering for lease, lease, and distribution of Volkswagen-branded and Audi-branded Defeat Device Vehicles, Defendant Volkswagen USA represented, directly or indirectly, expressly or by implication, that Volkswagen-branded and Audi-branded DDVs were durable, well-engineered vehicles.

53. In numerous instances in which Volkswagen USA has made the representations set forth in Paragraph 52 of this Complaint, Volkswagen USA failed to disclose that Volkswagen-branded and Audi-branded DDVs contain defeat devices that adversely affect the resale value of the Volkswagen-branded and Audi-branded DDVs.

54. The additional information described in Paragraph 53 of this Complaint would be material to consumers in deciding whether, or at what price, to purchase Volkswagen-branded and Audi-branded DDVs.

16

In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Products Liability Litigation, MDL No. 2672
FTC'S AMENDED COMPLAINT IN FTC v. VOLKSWAGEN GROUP OF AMERICA, No. 3:16-cv-1534

55. Volkswagen USA's failure to disclose the material information described in Paragraph 53, in light of the representations in Paragraph 51, constitutes a deceptive act or practice in violation of Section 5 of the FTC Act, 15 U.S.C. 45(a).

### Count III: Means and Instrumentalities (Volkswagen USA)

56. Defendant Volkswagen USA has distributed advertisements and promotional materials, including but not limited to videos, webpages, brochures, posters, stickers, and point of sale materials containing the representations described in Paragraph 49 to dealers and independent distributors that sold, leased, and distributed Volkswagen-branded and Audi-branded Defeat Device Vehicles. In doing so, Volkswagen USA provided dealers and distributors with the means and instrumentalities for the commission of deceptive acts or practices.

57. Volkswagen USA's practices as set forth in Paragraph 56 of this Complaint constitute a deceptive act or practice, in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count IV: Unfairness (Volkswagen USA & Porsche NA)

58. As described in Paragraphs 22 of this Complaint, Defendant Volkswagen USA's Defeat Device Vehicles contained defeat devices. Volkswagen USA then advertised, marketed, offered for sale, sold, offered for lease, leased, and distributed these vehicles to consumers, as described in Paragraphs 28-455 of this Complaint.

59. As described in Paragraphs 225-247 of this Complaint, Defendant Porsche NA's Defeat Device Vehicles contained defeat devices. Porsche NA then distributed these vehicles to consumers, as described in Paragraph 27 of this Complaint.

60. Defendants' actions caused or are likely to cause substantial injury to consumers, including that consumers unknowingly purchased or leased vehicles that, when driven on roads, exceed legal emission standards, emit high levels of NOx and, as a result, have a substantially

17

reduced value. Because of Defendants' actions, consumers purchased or leased substantially different vehicles than the ones they thought they purchased and did not receive the benefit of their bargain. Collectively, these consumers suffered billions of dollars in injury.

61. Consumers could not have reasonably avoided this substantial injury because they could not reasonably have known the Defeat Device Vehicles contained defeat devices before they purchased or leased the vehicles.

62. The substantial injury suffered by consumers is not outweighed by countervailing benefits to consumers or competition. Because defeat devices are illegal, they produce no legally cognizable benefit to consumers. Additionally, any alleged benefit the defeat devices delivered to consumers is vastly outweighed by the billions in injury consumers suffered. Furthermore, the use of a defeat device disadvantaged auto manufacturers that did not employ illegal software.

63. Therefore, Defendants' practices as described in Paragraphs 58-59 of this Complaint constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## **CONSUMER INJURY**

64. Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## **THIS COURT'S POWER TO GRANT RELIEF**

65. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts,

18

In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Products Liability Litigation, MDL No. 2672
FTC'S AMENDED COMPLAINT IN FTC v. VOLKSWAGEN GROUP OF AMERICA, No. 3:16-cv-1534

restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act by Defendant;

B. Award such additional relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

C. Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

DAVID C. SHONKA
Acting General Counsel

Dated: January 31, 2017

/s/ Jonathan Cohen
JONATHAN COHEN
MICHELLE L. SCHAEFER
AMANDA B. KOSTNER
SANGJOON HAN
MEGAN A. BARTLEY

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

19

In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Products Liability Litigation, MDL No. 2672
FTC'S AMENDED COMPLAINT IN FTC v. VOLKSWAGEN GROUP OF AMERICA, No. 3:16-cv-1534