UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION _____/ This Order Relates To: *United States v. Volkswagen AG, et al.*, Case No. 16-cv-00295 (N.D. Cal.) *California v. Volkswagen AG, et al.*, Case No. 16-cv-3620 (N.D. Cal.) _____/ | MDL No. 2672 CRB (JSC) **ORDER GRANTING THE UNITED STATES' MOTION TO ENTER SECOND PARTIAL CONSENT DECREE** |

In the fall of 2015, Volkswagen publicly admitted it had secretly installed a defeat device—software designed to cheat emissions tests and deceive federal and state regulators—in certain Volkswagen-, Porsche-, and Audi-branded 2.0-liter and 3.0-liter TDI diesel engine vehicles. Litigation quickly ensued, and hundreds of actions were consolidated and assigned to this Court as a multidistrict litigation ("MDL"). One of those lawsuits is an action by the United States Department of Justice ("United States"), on behalf of the U.S. Environmental Protection Agency ("EPA"), for violations of the Clean Air Act. Another is an action by the People of California, by and through the California Air Resources Board ("CARB") and the State Attorney General, for violations of California's environmental and unfair competition laws.

In October 2016, the Court approved and entered the First Partial Consent Decree, which partially resolved the United States' and California's claims concerning Volkswagen's 2.0-liter diesel engine vehicles. (Dkt. No. 2103.) Now before the Court is the United States' motion for entry of the Second Partial Consent Decree, which California has joined. (Dkt. Nos. 3083, 3085.) Together with a previously approved Third Partial Consent Decree—which addresses Defendants'

liability under the Clean Air Act for civil penalties and injunctive relief—the proposed Second Partial Consent Decree (1) fully resolves the United States' remaining claims for injunctive relief with respect to Volkswagen's 3.0-liter diesel engine vehicles, and (2) partially resolves California's claims for injunctive relief with respect to the 3.0-liter vehicles. (*See* Dkt. No. 3083 at 8-9.) The Court held a hearing on the matter on May 11, 2017. For the reasons set forth below, the Court **GRANTS** the United States' motion and enters the Second Partial Consent Decree.

## BACKGROUND

### I. Factual Background

Over the course of six years, Volkswagen sold nearly 600,000 Volkswagen-, Audi-, and Porsche-branded TDI "clean diesel" vehicles in the United States, which it marketed as being environmentally friendly, fuel efficient, and high performing. Unbeknownst to consumers and regulatory authorities, Volkswagen installed in these cars a defeat device that allowed the vehicles to evade EPA and CARB emissions requirements. Only by installing the defeat device was Volkswagen able to obtain Certificates of Conformity from EPA and Executive Orders from CARB for its 2.0- and 3.0-liter diesel engine vehicles. In fact, these vehicles release nitrogen oxides (NOx) at a factor of up to 40 times permitted limits.

### II. Procedural History

In January 2016, the United States sued Volkswagen AG ("VW AG"); Volkswagen Group of America, Inc. ("VWGoA"); Volkswagen Group of America Chattanooga Operations, LLC ("VW Chattanooga"); Audi AG; Porsche AG; and Porsche Cars North America, Inc. ("PCNA") (collectively, "Defendants") for violations of Section 203 of the Clean Air Act, 42 U.S.C. § 7522. As alleged in its complaint, and in an amended complaint filed on October 7, 2016, Defendants violated multiple subparagraphs of Section 203 by using a defeat device in their 2.0- and 3.0-liter diesel engine vehicles; namely, Defendants (1) imported and sold uncertified vehicles in violation of 42 U.S.C. § 7522(a)(1); (2) manufactured, sold, or installed a defeat device in violation of 42 U.S.C. § 7522(a)(3)(B); (3) tampered by rendering inoperative certified pollution control systems in violation of 42 U.S.C. § 7522(a)(3)(A); and (4) failed to report information required by EPA in violation of 42 U.S.C. § 7522 (a)(2)(A). (*See* Dkt. No. 2009-3 ¶¶ 176-209.) The United States

seeks civil penalties and injunctive relief. (*See id.* ¶¶ a-f.)

In June 2016, California also filed a complaint against Defendants, alleging they illegally installed a defeat device in approximately 71,000 2.0-liter and 16,000 3.0-liter vehicles introduced in California. (Case No. 16-cv-3620, Dkt. 1 ¶¶ 2-3.) The Clean Air Act authorizes CARB, as a co-regulator, "to adopt and enforce standards and other requirements relating to the control of emissions from . . . vehicles or engines," 42 U.S.C. § 7543(2)(A), and California's complaint includes an array of claims for violations of State emissions and consumer-protection laws. (*See id.* ¶¶ 127-246.) California also seeks civil penalties and injunctive relief. (*See id.* ¶¶ 247-62.)

Soon after the United States filed its complaint, the United States, California, and Volkswagen began intensive settlement negotiations under the guidance of Robert S. Mueller III, the Court-appointed Settlement Master and former Director of the Federal Bureau of Investigation. The parties ultimately resolved claims related to the 2.0-liter vehicles, and on October 25, 2016, the Court granted the United States' motion to enter the First Partial Consent Decree (Dkt. No. 2103), which California had joined (Dkt. No. 1974). The First Partial Consent Decree requires Volkswagen to remove from the road or modify at least 85% of the subject 2.0-liter vehicles registered across the United States and in California by June 30, 2019. (Dkt. No. 2103 at 3; *see also* Dkt. No. 1973-1 ¶ 3.) Volkswagen further has agreed to invest $2 billion over ten years in projects that support the increased use of zero emission vehicles, and to pay $2.7 billion into an Environmental Mitigation Trust to fund projects to reduce emissions of NOx caused by the subject vehicles. (Dkt. No. 2103 at 4.)

Following entry of the First Partial Consent Decree, the United States, California, and Volkswagen transitioned to negotiating a settlement of claims related the 3.0-liter vehicles. (Dkt. No. 3089 at 3.) The parties quickly reached an agreement in principle, and on December 20, 2016, the United States lodged its proposed Second Partial Consent Decree. (Dkt. No. 2520-1.) In accordance with 28 C.F.R. § 50.7(b), the United States held a public comment period between December 29, 2016 and February 14, 2017, s*ee* 81 Fed. Reg. 96046-01 (Dec. 29, 2016); 82 Fed. Reg. 9076-02 (Feb. 2, 2017), during which it received 104 unique public comments. (*See* Dkt. No. 3083-2.) On March 24, 2017, after the public comment period, the United States moved for

3

entry of the proposed Second Partial Consent Decree (Dkt. No. 3083), which California joined (Dkt. No. 3085).

On January 11, 2017, the United States also lodged a proposed Third Partial Consent Decree. (Dkt. No. 2758.) In that Decree, Volkswagen committed to pay a $1.45 billion civil penalty under the Clean Air Act, and to implement a number of company-wide corporate reforms to ensure future compliance with the Act. (Dkt. No. 3024 at 5-6.) During a public comment period, the United States received no comments on the Third Partial Consent Decree (*id.* at 5), and the Court entered the Decree on April 13, 2017 (Dkt. No. 3155). California and Defendants have also entered into two separate, California only, consent decrees that further resolve the State's claims. The Court entered the first of these California-only decrees on September 1, 2016 (Dkt. No. 1801), and the second today (Dkt. No. 3226). The California-only decrees preserve California's claims for environmental penalties related to both the 2.0- and 3.0-liter vehicles, which the parties continue to negotiate. (See Dkt. Nos. 1974 at 2; 2519 at 2.)

### III. Consent Decree Terms

The proposed Second Partial Consent Decree (the "Decree") requires Defendants (1) to modify or remove from the roads at least 85% of Generation One 3.0-liter TDI diesel engine vehicles, nationally and in California, by November 30, 2019; (2) to do the same for Generation Two 3.0-liter TDI diesel engine vehicles, but by May 31, 2020; and (3) to make an additional $225 million contribution to the Environmental Mitigation Trust to remediate excess NOx emitted by the 3.0-liter vehicles. (*See* Dkt. No. 2520-1 at 17, 68.) If Defendants fail to meet these targets, the Decree requires them to make additional contributions to the Environmental Mitigation Trust, ranging from $5.5 million to $21 million, for every percentage point short of the national 85% recall rate, and from $900,000 to $5.5 million for every percentage point short of the California rate. (*See id.* at 83-84.) To accomplish these repair and removal objectives, Defendants must offer certain recall and vehicle modification options, which mirror options made available as part of the 3.0-liter Class Settlement that the Court approved today in a separate order. (Dkt. No. 3229.)

4

### A. Generation One (Model Years 2009-2012)

#### 1. Buyback and Lease Termination

The proposed Decree requires Defendants to offer Buyback and Lease Termination options for all Generation One Eligible Vehicles. The Decree sets a minimum level of monetary compensation that Defendants must offer to consumers in exchange for their vehicles, defined as Retail Replacement Value (RRV). (Dkt. No. 2520-1 at 91.) The RRV formula is consistent with the valuation formula used in the 3.0-liter Class Settlement, although the Decree does not require Owner Restitution as part of the Buyback. (*Compare* Dkt. No. 2894-1 at 3-7 (3.0-liter Class Settlement Buyback), *with* Dkt. No. 2520-1 at 91-93 (Second Partial Consent Decree Buyback).) The Decree also does not provide for a trade-in option like the one under the 3.0-liter Class Settlement (*see* Dkt. No. 2894-1 at 4), but does not prohibit Defendants from offering an Eligible Owner or Eligible Lessee a trade-in option, so long as Defendants do not offer such a program in lieu of the Buyback option (Dkt. No. 2520-1 ¶ 11.1).[1]

#### 2. Approved Emissions Modification

If approved by EPA and CARB, Defendants must also offer Eligible Owners and Eligible Lessees of a Generation One vehicle an Emissions Modification. (*See* Dkt. No. 2520-1 at 68, 77.) Appendix B of the Consent Decree establishes the process Volkswagen must follow to submit a proposed Emissions Modification to EPA and CARB for approval, as well as the technical standards each proposed modification must meet. (*See* Dkt. No. 2520-1 at 103-45.) If approved, EPA and CARB estimate that an Emissions Modification will reduce NOx emissions from the vast majority of Generation One vehicles by approximately 80 percent compared to the vehicles' original condition. (Dkt. No. 3083 at 17.)

### B. Generation Two (Model Years 2013-2016)

The proposed Decree treats Generation Two vehicles differently than Generation One

---

[1] That the 3.0-liter Class Settlement enhances but does not detract from the Decree is more generally confirmed by the Parallel Agreements clause of the Decree, which provides that "[b]y fulfilling buyback, lease termination, and claims administration obligations of the future FTC Order, Class Action Settlement, or other order of the Court ("Parallel Agreement"), Defendants may satisfy . . . all Buyback and Lease Termination requirements of . . . this Consent Decree." (Dkt. No. 2520-1 at 98 ¶ 3.2.)

5

vehicles, in that it allows Defendants to propose an Emissions Compliant Recall that would bring Generation Two vehicles into compliance with their original certified emissions standards. (Dkt. No. 2520-1 at 68.) The Decree sets firm submission deadlines for a proposed Emissions Modification for each sub-group of Generation Two vehicles and, as with Generation One Emissions Modifications, Appendix B of the Decree establishes the precise testing, standards, and metrics that Defendants must achieve in order to receive approval of an Emissions Compliant Recall from EPA and CARB. (*See id.* at 112-36.) If Defendants are unable to obtain such approval for any sub-group of Generation Two vehicles, the Decree requires Defendants to offer Eligible Owners and Eligible Lessees the same Buyback, Lease Termination and, if available, Reduced Emissions Modification options provided to their Generation One counterparts. (*See id.* at 68, 79-81.)

## LEGAL STANDARD

Courts may approve a proposed consent decree when it is "fundamentally fair, adequate and reasonable" and "conform[s] to applicable laws." *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990). Courts consider consent decrees in light of the public policy favoring settlement. *Sierra Club v. McCarthy*, No. 13-cv-03953-SI, 2015 WL 889142, at *5 (N.D. Cal. Mar. 2, 2015) (citing *United States v. Comunidades Unidas Contra La Contaminacion*, 204 F.3d 275, 280 (1st Cir. 2000)). "This policy is strengthened when a government agency charged with protecting the public interest 'has pulled the laboring oar in constructing the proposed settlement.'" *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 746 (9th Cir. 1995) (quoting *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990)). But when a consent decree affects the public interest, courts have a heightened responsibility to protect those interests so as to safeguard those who did not participate in the negotiations of the decree. *Oregon*, 913 F.2d at 581. That said, the consent decree need not "be 'in the public's *best* interest' if it is otherwise reasonable." *Id.* (emphasis in original) (quoting *S.E.C. v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984)).

In applying the "fair, adequate and reasonable" standard, courts examine both procedural and substantive fairness. *See United States v. Coeur d'Alenes Co.*, 767 F.3d 873, 877 (9th Cir. 2014); *Cannons Eng'g Corp.*, 899 F.2d at 86. Procedural fairness requires arm's length settlement

negotiations, *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d Cir. 2003), and a "negotiation process [that] was fair and full of adversarial vigor," *United States v. Google Inc.*, No. 12-cv-04177-SI, 2012 WL 5833994, at *2 (N.D. Cal. Nov. 16, 2012) (internal quotation marks omitted). "[O]nce the court is satisfied that the decree was the product of good faith, arm's length negotiations, a negotiated decree is presumptively valid and the objecting party has a heavy burden of demonstrating that the decree is unreasonable." *Oregon*, 913 F.2d at 581 (internal quotation marks and citation omitted).

Substantive fairness requires courts to "find that the agreement is based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each potentially responsible party has done." *Arizona v. City of Tucson*, 761 F.3d 1005, 1012 (9th Cir. 2014). Courts do not ask "whether the settlement is one which the court itself might have fashioned, or considers as ideal[.]" *Cannons Eng'g Corp.*, 899 F.2d at 84. "Rather, the court's approval is nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Oregon*, 913 F.2d at 581 (internal quotation marks omitted). The consent decree need only "represent[] a reasonable factual and legal determination." *Id.* (internal quotation marks omitted).

## DISCUSSION

### IV. Procedural Fairness

After the Court approved the First Partial Consent Decree on October 25, 2016, the United States, California, and Volkswagen met on a regular basis over the course of three months in a series of meetings and negotiation sessions. (*See* Dkt. No. 3089 ¶ 4.) The negotiation process involved meetings and in-person conferences at various locations, including San Francisco, New York, and Washington D.C. (*Id.* ¶ 5.) And the Court-appointed Settlement Master, Director Mueller, states that the negotiations involved "the frank exchange of views, spirited debate, vehement disagreement, thoughtful discussion, attention to detail, and the sharing of extensive data and analyses among participants." (*Id.* ¶ 8.)

As the negotiating history demonstrates, the Consent Decree is the result of non-collusive,

7

adversarial negotiations, which supports a finding of procedural fairness. *See, e.g.*, *Sierra Club*, 2015 WL 889142, at *12 (concluding proposed consent decree was procedurally fair where the decree was the result of "adversarial negotiations conducted over approximately six months"); *United States v. Chevron U.S.A., Inc.*, 380 F. Supp. 2d 1104, 1112 (N.D. Cal. 2005) ("[T]he process of negotiations was non-collusive and therefore procedurally fair." (citing *United States v. Colorado*, 937 F.2d 505, 509 (10th Cir. 1991))). That the negotiations were conducted under the Settlement Master's supervision further suggests an absence of collusion. *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (while a neutral mediator's presence "is not on its own dispositive of whether the end product is a fair, adequate, and reasonable settlement agreement" it is nevertheless "a factor weighing in favor of a finding of non-collusiveness"). The Parties were also sufficiently informed to evaluate their claims and any offers of compromise. Accordingly, the Court concludes that the Consent Decree is procedurally fair.

## V. Substantive Fairness

A consent decree is substantively fair when the "party . . . bear[s] the cost of the harm for which it is legally responsible." *Cannons Eng'g Corp.*, 899 F.2d at 87. To make this determination, "the district court [must] be fully informed regarding the costs and benefits of the decree." *Chevron*, 380 F. Supp. 2d at 1113.

Having reviewed the terms of the Consent Decree, the Court finds it is substantively fair. The central objective of the proposed Decree is to modify or remove from the roads the nearly 90,000 3.0-liter vehicles that currently do not meet emissions standards. To further this objective, the Decree sets firm requirements: Defendants must modify or remove from the roads at least 85% of the 3.0-liter vehicles at issue by set dates—November 30, 2019 for Generation One vehicles and by May 31, 2020 for Generation Two vehicles—or else make additional payments to the Environmental Mitigation Trust, ranging from $5.5 million to $21 million for every percentage point short of the national 85% recall rate, and from $900,000 to $5.5 million for every percentage point short of the California rate. (Dkt. No. 2520-1 at 83-84.) If the 85% mark is achieved, NOx emissions will be significantly reduced in furtherance of the Clean Air Act's goal of "protect[ing]

and enhance[ing] the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). If the 85% mark is not achieved, Volkswagen will face costly penalties in the form of additional payments to the Trust, which will become increasingly severe the further below the 85% threshold Volkswagen falls. This penalty mechanism operates as a strong incentive for Defendants to work quickly and diligently to implement the subject Buyback, Emissions Modifications, and Emissions Compliant Recall.

The Consent Decree's requirements are also tailored to the two different generations of 3.0-liter vehicles at issue. Because Generation One vehicles cannot be brought into compliance with their originally certified emissions standards within a reasonable timeframe (Dkt. No. 3083 at 15), the Decree requires Defendants to offer two options to Generation One owners and lessees: the Buyback or Lease Termination and the Emissions Modification. The Buyback and Lease Termination option will immediately remove polluting cars from the roads. The Emissions Modification, if approved, is expected to reduce NOx emissions by approximately 80 percent for most Generation One vehicles. (*See* Dkt. No. 3083 at 17.) Neither option is perfect, as the Buyback may lead to the scrapping of vehicles, offsetting some of the environmental gains, and the Emissions Modification will not bring vehicles into compliance with original emissions certifications. Both options, however, will reduce NOx emissions from their current, unlawful, levels, which is certainly preferable to taking no action or waiting for Volkswagen to develop a modification that fully brings the subject vehicles into compliance. Further, the Consent Decree requires Volkswagen to make an additional $225 million contribution to the Environmental Mitigation Trust, which EPA believes "is sufficient to fund projects to fully mitigate the total, lifetime excess NOx emissions from the 3.0 Liter vehicles." (Dkt. No. 3083 at 19.) The options required by the Decree for Generation One vehicles thus represent a "delicate balancing" of interests that is reasonable and expected for a consent decree. *Oregon*, 913 F.2d at 581.[2]

---

[2] Several of the comments received during the period for public comment expressed dissatisfaction with the proposed compensation amounts under the Buyback. The Decree, however, must be read in conjunction with the 3.0-liter Class Settlement, which—as the Court concluded in its order granting final approval of the Settlement (Dkt. No. 3229)—provides more than adequate

9

Unlike Generation One vehicles, technical experts from Volkswagen, EPA, and CARB believe Defendants can bring Generation Two vehicles into compliance with their original emissions certifications. (Dkt. No. 3083 at 18.) The proposed Decree permits Defendants to attempt to do so in a timely fashion. (*See* Dkt. No. 2520-1 at 112-36 (setting forth submission deadlines and testing metrics that Defendants much achieve in order to obtain approval of an Emissions Compliant Recall).) Of the 104 comments received during the public comment period, 89 were from current or former owners or lessees of Generation Two vehicles, who object to the lack of an immediate buyback option for Generation Two vehicles. Commenters contend that Generation Two owners and lessees are being singled out and treated differently from Generation One owners and lessees, as well as consumers who fell within the scope of the 2.0-liter settlements.

Given that Generation Two vehicles likely can be fixed, offering an immediate buyback option would be counterproductive to the environmental goals of this litigation. A buyback would unnecessarily waste assets that have already been committed to creating, manufacturing, selling, and buying vehicles that may be brought into compliance with EPA and CARB emissions standards. The United States agrees, noting that "there are significant environmental benefits that come from returning the vehicles to their original certified exhaust emission standard and avoiding the potential scrapping of tens of thousands of vehicles." (Dkt. No. 3083 at 22.) If Defendants are unable to implement an Emissions Compliant Recall, the Decree provides Generation Two owners and lessees with the same Buyback and Emissions Modification options as those available to Generation One vehicles. This approach balances competing environmental and consumer interests in a reasonable way.

The proposed Consent Decree requires Defendants to take action to mitigate all past and future excess NOx pollution caused by their 3.0-liter diesel engine vehicles. The actions required by the Decree are reasonable and advance the goals of the Clean Air Act. As a result, the Court concludes that the Decree is substantively fair.

---

compensation for Class Members electing the Buyback.

# CONCLUSION

Having reviewed the proposed Second Partial Consent Decree, the Court GRANTS the United States' motion. The Consent Decree is a reasonable settlement that is the result of non-collusive and adversarial negotiations, and the Decree takes a multifaceted approach to mitigating the harm caused by the 3.0-liter diesel engine vehicles and to reduce future NOx emissions.

**IT IS SO ORDERED.**

Dated: May 17, 2017

CHARLES R. BREYER
United States District Judge