United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: VOLKSWAGEN "CLEAN DIESEL"
MARKETING, SALES PRACTICES, AND
PRODUCTS LIABILITY LITIGATION

_____/

This Order Relates To:
ALL ACTIONS (except the securities action)

_____/

MDL No. 2672 CRB  (JSC)

**ORDER GRANTING FINAL
APPROVAL OF THE CONSUMER
AND RESELLER DEALERSHIP 3.0-
LITER CLASS ACTION
SETTLEMENT**

In the fall of 2015 the public learned of Volkswagen's deliberate use of a defeat device—software designed to cheat emissions tests and deceive federal and state regulators—in nearly 600,000 Volkswagen-, Porsche-, and Audi-branded turbocharged direct injection ("TDI") diesel engine vehicles sold in the United States.  Litigation quickly ensued, and those actions were consolidated and assigned to this Court as a multidistrict litigation ("MDL").  After months of intensive negotiations and with the assistance of a court-appointed settlement master, Plaintiffs and Defendants Volkswagen AG ("VWAG"); Volkswagen Group of America, Inc. ("VWGoA"); Audi AG; Porsche AG; and Porsche Cars North America, Inc. ("PCNA") (collectively, "Volkswagen" or "Defendants") reached a settlement that resolves consumer claims concerning certain 3.0-liter diesel TDI vehicles.  (*See* Dkt. No. 2894.)  The Court preliminarily approved the Settlement on February 16, 2017.  (*See* Dkt. No. 2919.)

Settlement Class Counsel now move for final approval of the Settlement.  (Dkt. No. 3088.)  On May 11, 2017, the Court held a fairness hearing regarding final approval, during which three Class Members or attorneys for Class Members addressed the Court.  Having considered the parties' submissions, and with the benefit of oral argument, the Court GRANTS final approval of the Settlement.  The Settlement is fair, reasonable, and adequate.

# BACKGROUND

## I. Factual Allegations

Over the course of six years, Volkswagen sold nearly 600,000 Volkswagen-, Audi-, and Porsche-branded TDI "clean diesel" vehicles, which it marketed as being environmentally friendly, fuel efficient, and high performing. Unbeknownst to consumers and regulatory authorities, Volkswagen installed in these cars a software defeat device that allowed the vehicles to evade United States Environmental Protection Agency ("EPA") and California Air Resources Board ("CARB") emissions test procedures. The defeat device senses whether the vehicle is undergoing emissions testing or being operated on the road. During emissions testing, the defeat device produces regulation-compliant results. When the vehicle is on the road, the defeat device reduces the effectiveness of the vehicles' emissions control system. Only by installing the defeat device on its vehicles was Volkswagen able to obtain Certificates of Conformity from EPA and Executive Orders from CARB for its 2.0- and 3.0-liter diesel engine vehicles; in fact, these vehicles release nitrogen oxides at a factor of up to 40 times over permitted limits.

## II. Procedural History

Consumers filed hundreds of lawsuits nationwide after Volkswagen's use of the defeat device became public. On December 8, 2015, the Judicial Panel on Multidistrict Litigation ("JPML") transferred 56 related actions, including numerous putative class actions, to this Court for coordinated pretrial proceedings in the above-captioned MDL. (Dkt. No. 1.) The JPML has since transferred an additional 1,349 tag-along actions to the Court. (Dkt. No. 3175.) Many MDL cases have also been filed directly in this Court. In January 2016, the Court appointed Elizabeth J. Cabraser of Lieff, Cabraser, Heimann & Bernstein, LLP as Lead Plaintiffs' Counsel and Chair of the Plaintiffs' Steering Committee ("PSC"), to which the Court named 21 other attorneys. (Dkt. No. 1084.) On September 2, 2016, Class Counsel filed its Amended Consolidated Consumer Class Action Complaint against 13 named defendants: VWAG; VWGoA; Audi AG; Audi of America, LLC; Porsche AG; PCNA; Martin Winterkorn; Mattias Müller; Michael Horn; Rupert Stadler; Robert Bosch GmbH; Robert Bosch, LLC; and Volkmar Denner. (Dkt. No. 1804.) The complaint asserts against Volkswagen claims under (1) the Racketeer Influenced and Corrupt

1   Organizations Act ("RICO"), 18 U.S.C. § 1962(c)-(d), and the Magnusson-Moss Warranty Act, 15

2   U.S.C. § 2301 *et seq.*; (2) state fraud, breach of contract, and unjust enrichment laws; and (3) all

3   fifty States' consumer protection laws.  Class Counsel also filed a Second Amended Consolidated

4   Reseller Dealership Class Action Complaint against the same 13 defendants; that complaint

5   asserts against Volkswagen RICO, fraud, failure to recall/retrofit, and unjust enrichment claims.

6   (Dkt. No. 1805.)

7          The MDL also includes actions brought by federal and state government entities.  The

8   United States Department of Justice ("United States") on behalf of EPA sued VWAG, VWGoA,

9   Audi AG, Porsche AG, Volkswagen Group of America Chattanooga Operations, LLC ("VW

10  Chattanooga"), and PCNA for claims arising under Sections 204 and 205 of the Clean Air Act, 42

11  U.S.C. §§ 7523 and 7524.  The Federal Trade Commission ("FTC") also brought an action against

12  VWGoA pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C.

13  §53(b), for violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).  Additionally, the State of

14  California, on behalf of the People and CARB, sued VWAG, VWGoA, Audi AG, Porsche AG,

15  VW Chattanooga, and PCNA for violations of the Consumer Financial Protection Act, 12 U.S.C.

16  § 5536, and various California state laws.

17         In January 2016, the Court appointed former Director of the Federal Bureau of

18  Investigation Robert S. Mueller III as Settlement Master to oversee settlement negotiations.  (Dkt.

19  No. 973.)  The parties and government entities subsequently engaged in extensive negotiations,

20  which, in September and October 2016, resulted in the Court approving settlements and consent

21  decrees between Volkswagen and (1) consumers who purchased or leased 2.0-liter diesel engine

22  vehicles (Dkt. No. 2102); (2) the Volkswagen-branded dealerships (Dkt. No. 2807); and (3) EPA,

23  the FTC, and CARB with respects to claims relating to the 2.0-liter diesel engine vehicles (Dkt.

24  Nos. 1801; 2103-04).  Today in separate orders, the Court also (1) approved the United States'

25  Second Partial Consent Decree, which together with an unopposed and previously granted Third

26  Partial Consent Decree (Dkt. No. 3155), fully resolves the United States' claims against

27  Volkswagen relating to the 3.0-liter vehicles, and partially resolves California's claims for

28  injunctive relief with respect to the 3.0-liter vehicles (Dkt. No. 3228); (2) entered the FTC's

Amended Partial Stipulated Order for Permanent Injunction and Monetary Relief, which resolves the FTC's claims related to the 3.0-liter vehicles (Dkt. No. 3227); and (3) entered a California-only consent decree, with further resolves certain of the State's claims related to the 3.0-liter vehicles (Dkt. No. 3226).

The Court granted preliminary approval of the 3.0-liter Settlement on February 16, 2017. (Dkt. No. 2919.)  In accordance with the Court's preliminary approval order, Plaintiffs filed a statement regarding their prospective request for attorneys' fees and costs on February 24, 2017 and a motion for final approval on March 24, 2017.  (Dkt. Nos. 2970, 3088.)  The Notice Administrator implemented the court-approved Notice Program beginning February 16, 2017, by sending email notice to potential Class Members, and on February 24, 2017, the Notice Administrator mailed Notice of the proposed Settlement to potential Class Members by first class mail.  (Dkt. No. 3190-3 ¶¶ 10-12; Dkt. No. 3190-4 ¶¶ 8-15.)  By April 14, 2017, there were 32 timely objections and 593 opt outs.  (Dkt. No. 3190 at 6.)

## SETTLEMENT TERMS[1]

The key provisions of the Settlement are as follows.

## I.  The Settlement Class

The proposed Settlement Class consists of:

> a nationwide class, including Puerto Rico, of all persons (this includes individuals who are United States citizens, residents, United States military, diplomatic personnel and employees living or stationed overseas, as well as entities) who, (1) at any time between September 18, 2015 and November 2, 2015, inclusive, owned or leased a Volkswagen, Audi, or Porsche 3.0-liter TDI vehicle in the United States or its territories (an "Eligible Vehicle," defined more fully in Section 2.40); or who (2) between November 3, 2015 and the Claim Submission Deadline for Eligible Owners and Lessees, inclusive, become the owner of an Eligible Vehicle in the United States or its territories; or who (3) own an Eligible Vehicle in the United States or its territories at the time of participation in the 3.0-liter Class Action Settlement Program.  The Class includes Non-Authorized Dealers who otherwise meet the definition of the Class.

The following entities and individuals are excluded from the Class:

> (a) Owners who acquired an Eligible Vehicle after September 18,

---

[1] A more detailed explanation of the Settlement terms can be found in the Court's preliminary approval order.  (*See* Dkt. No. 2919.)

2015, and sold it before November 2, 2015;

(b) Owners who acquired an Eligible Vehicle after November 2, 2015, and transferred title on or before January 31, 2017;

(c) Lessees of a Generation One Eligible Vehicle leased from a leasing company other than VW Credit, Inc., and lessees of a Generation Two Eligible Vehicle leased from a leasing company other than VW Credit, Inc. or Porsche Financial Services, Inc.;

(d) Owners whose Eligible Vehicle had a Branded Title of Assembled, Dismantled, Flood, Junk, Rebuilt, Reconstructed, or Salvage on September 18, 2015, and was acquired from a junkyard, salvage yard, or salvage dealer after September 18, 2015;

(e) Owners who sell or otherwise transfer ownership of their Eligible Vehicle after January 31, 2017 but on or before the Opt-Out Deadline, unless the Eligible Vehicle is (i) unintentionally damaged after January 31, 2017, in a manner that renders it a total loss (*i.e.*, "totaled") and (ii) transferred to an insurance company or otherwise permanently removed from commerce;

(f) Defendants' officers, directors and employees; Defendants' affiliates and affiliates' officers, directors and employees; their distributors and distributors' officers, directors and employees; participants in Volkswagen's Internal Lease Program and/or Porsche Associate Lease Program; and Authorized Dealers and Authorized Dealers' officers and directors;

(g) Judicial officers and their immediate family members and associated court staff assigned to this case; and

(h) All those otherwise in the Class who or which timely and properly exclude themselves from the Class as provided in this 3.0-liter Class Action Agreement.

(Dkt. No. 2894 ¶ 2.23.)

An Eligible Vehicle under the Settlement means:

the Model Year 2009 through 2016 Volkswagen and Audi and Model Year 2013 through 2016 Porsche light-duty vehicles equipped with 3.0-liter TDI engines that (1) are covered, or purported to be covered, by the EPA Test Groups in the table [in paragraph 2.40]; (2) are, at any point during the period September 18, 2015 to January 31, 2017, registered with a state Department of Motor Vehicles or equivalent agency, or owned by a Non-Authorized Dealer in the United States or its territories that (a) holds title to the vehicle or (b) holds the vehicle by bill of sale; and (3) have not been modified pursuant to an Approved Emissions Modification. Eligible Vehicle also excludes any Volkswagen, Audi, or Porsche vehicle that was never sold or registered in the United States or its territories. A vehicle must be Operable to be considered an Eligible Vehicle for the purpose of the Buyback, Trade-In, Reduced Emissions Modification, or Emissions Compliant

Repair.

(*Id.* ¶ 2.40.)

Class Members are further categorized as Eligible Lessees, Eligible Former Lessees, Eligible Owners, and Eligible Former Owners.

An Eligible Lessee is:

> (1) the current lessee or lessees of an Eligible Vehicle with a lease issued by VW Credit, Inc. (Generation One vehicles) or VW Credit, Inc. or Porsche Financial Services, Inc. (Generation Two vehicles); (2) a former lessee or lessees of an Eligible Vehicle who had an active lease issued by VW Credit, Inc. (Generation One vehicles) or VW Credit, Inc. or Porsche Financial Services, Inc. (Generation Two vehicles) as of September 18, 2015 and/or November 2, 2015 and who surrendered or surrenders the leased Eligible Vehicle under the terms of the lease after January 31, 2017, but before the Claim Submission Deadline; or (3) the owner of an Eligible Vehicle who had an active lease issued by VW Credit, Inc. (Generation One vehicles) or VW Credit, Inc. or Porsche Financial Services, Inc. (Generation Two vehicles) as of September 18, 2015 and/or November 2, 2015, and acquired ownership of the previously leased Eligible Vehicle at the conclusion of the lease after January 31, 2017. For avoidance of doubt, no person shall be considered an Eligible Lessee by virtue of holding a lease issued by a lessor other than VW Credit, Inc. or Porsche Financial Services, Inc.

(*Id.* ¶ 2.38.)

An Eligible Former Lessee is:

> a lessee who leased an Eligible Vehicle from VW Credit, Inc. (Generation One vehicles) or VW Credit, Inc. or Porsche Financial Services, Inc. (Generation Two vehicles) as of September 18, 2015 and/or November 2, 2015, and who surrendered the leased Eligible Vehicle under the terms of the lease on or before January 31, 2017.

(*Id.* ¶ 2.35.)

An Eligible Owner is:

> the owner or owners of an Eligible Vehicle on September 18, 2015, or the owner or owners who acquire an Eligible Vehicle after September 18, 2015, but before the end of the Settlement Benefit Period, except that the owner of an Eligible Vehicle who had an active lease issued by VW Credit, Inc. (Generation One vehicles) or VW Credit, Inc. or Porsche Financial Services, Inc. (Generation Two vehicles) as of September 18, 2015 and/or November 2, 2015, and purchased that previously leased Eligible Vehicle off lease after January 31, 2017, shall be an Eligible Lessee. For avoidance of doubt, an Eligible Owner ceases to be an Eligible Owner if he transfers ownership of the Eligible Vehicle to a third party. A third

party who acquires ownership of an Eligible Vehicle thereby becomes an Eligible Owner if that third party otherwise meets the definition of an Eligible Owner, unless the third party acquired the Eligible Vehicle from an Eligible Lessee, in which case that third party will be an Eligible Lessee. An owner of an Eligible Vehicle will not qualify as an Eligible Owner while the Eligible Vehicle is under lease to any third party, although any such owner, including any leasing company other than VW Credit, Inc. or Porsche Financial Services, Inc., who otherwise meets the definition of an Eligible Owner would become an Eligible Owner if such lease has been canceled or terminated and the owner has taken possession of the vehicle. In exceptional cases, specific arrangements may be made with the leasing company, in consultation with the Claims Supervisor, such that, (1) without canceling or terminating the lease, the leasing company may be treated as an Eligible Owner and obtain (a) an Emissions Compliant Repair plus Lessee Repair Payment or (b) a Reduced Emissions Modification plus Owner Restitution, as appropriate, and (2) a lessor that takes possession of a leased Eligible Vehicle after the Claim Submission Deadline (or the end date of the Claim Program) may nonetheless be entitled to submit a Claim.

(*Id.* ¶ 2.39.)

An Eligible Former Owner is:

a person who purchased or otherwise acquired ownership of an Eligible Vehicle on or before September 18, 2015, and sold or otherwise transferred ownership of such vehicle after September 18, 2015 but on or before January 31, 2017, or who acquired ownership of an Eligible Vehicle on or before November 2, 2015, and sold or otherwise transferred ownership of such vehicle after November 2, 2015 but on or before January 31, 2017. For avoidance of doubt, a sale or transfer of ownership under this definition includes the transfer of ownership of an Eligible Vehicle to an insurance company.

(*Id.* ¶ 2.36.)

## II.  Consumer Remedies

Class Members may seek benefits under the Settlement during the Settlement Benefit Period, which runs from the entry of this Order until (1) September 30, 2019 for Generation One vehicles, or (2) April 30, 2020 for Generation Two vehicles.[2]  (*Id.* ¶ 2.84.)

### A.  Generation One (Model Years 2009-2012)

Class Members who own or lease a Generation One vehicle have three possible options

---

[2] Capitalized terms not otherwise defined in this Order are defined in the Settlement Agreement. (Dkt. No. 2894.)

under the Settlement: (1) Buyback / Lease Termination; (2) Trade-In; or (3) if approved by the EPA and CARB, an emissions modification that would reduce the vehicle's emissions but not to the levels of their original certification (a "Reduced Emissions Modification"). Eligible Former Lessees and Eligible Former Owners are entitled to restitution.

### 1. Buyback / Lease Termination

The first option for Generation One vehicle owners is to receive a Buyback payment that consists of Vehicle Clean Trade Value (or Vehicle Value) plus Owner Restitution. For Class Members electing the Buyback option, the total payment will range from $24,755 to $57,157. (Dkt. No. 3088 at 22-23.)

Vehicle Value is the Base Clean Trade Value adjusted for certain options and, in the case of Eligible Owners and Former Owners, for mileage. (Dkt. No. 2894-1 at 7 ¶ 15.) Base Clean Trade Value for each Eligible Vehicle refers to the Clean Trade value corresponding to that vehicle in the September 2015 National Automobile Dealers Association ("NADA") Used Car Guide, published in or around August 2015. (*Id.* ¶ 14.) Options adjustments are based on Volkswagen or Audi original equipment manufacturer ("OEM")-installed options that are valued in the September 2015 NADA Used Car Guide. (*Id.* ¶ 16.) Mileage adjustments are made using the mileage adjustment table in the September 2015 NADA Used Car Guide. (*Id.* ¶ 17.)

Owner Restitution is composed of a fixed dollar amount that is the same for all Generation One Eligible Vehicles (the "fixed component"), and a variable dollar amount (the "variable component"). (*Id.* at 3 ¶ 8(i).) Owners who acquired a new vehicle at any point in time or a used vehicle on or before September 18, 2015 will receive a fixed component of $5,155 and a variable component consisting of (1) the amount by which Vehicle Clean Retail Value exceeds Vehicle Value, plus (2) state and local taxes on the Vehicle Clean Retail Value. (*Id.*) If Owner Restitution would otherwise be less than $6,000, the variable component will include an additional amount sufficient to raise Owner Restitution to $6,000. (*Id.*) Owners who acquired a used vehicle after September 18, 2015 will receive the same amount just described unless (1) one or more Eligible Former Owners timely file a valid claim related to the same vehicle, or (2) the Eligible Vehicle was previously leased by someone else and the Eligible Former Lessee timely files a valid claim.

(*Id.*)  In such instances, Owner Restitution will be half the amount described above.

The table below provides an illustrative Buyback calculation.  (*See* Dkt. No. 2894-1 at 4.) As noted above, a Buyback payment includes Vehicle Clean *Trade* Value (or Vehicle Value) plus Owner Restitution.  Vehicle Value below is $22,825, assuming standard mileage.  Owner Restitution consists of the fixed component of $5,155 plus the variable component consisting of (1) the amount by which Vehicle Clean *Retail* Value ($25,550) exceeds Vehicle Value ($25,550 - $22,825 = $2,725), plus (2) the appropriate state and local tax rate multiplied by the Vehicle Clean Retail Value (6.35% of $25,550 = $1,622.43).  The variable component thus equals $4,347.43, and Owner Restitution totals $9,502.43 (or $5,155 + $4,347.43).  In this example, the total Buyback amount is $32,327.43 (or $22,825 + $9,502.43).

| Vehicle ID | 100001 |
|---|---|
| **Description** | 2009 Q7 TDI Premium Plus |
| **Vehicle Value** | $22,825 (assumes standard mileage) |
| **Vehicle *Clean Retail* Value** | $25,550 (assumes standard mileage) |
| **State and Local Tax Rate** | Connecticut 6.35% |
| **Tax on Vehicle Clean Retail Value** | 6.35% of $25,550 = $1,622.43 |
| **Difference between Vehicle Clean Retail Value and Vehicle Value** | $25,550 - $22,825 = $2,725 |
| **Owner Restitution** | $5,155.00 [fixed component] + $4,347.43 [variable component: amount by which Vehicle Clean Retail Value exceeds Vehicle Value ($2,725), plus tax ($1,622.43)] + $0 [amount necessary to bring total Owner Restitution to $6,000] = **$9,502.43** |
| **Buyback Amount** | $22,825 + $9,502.43 = **$32,327.43** |
| **Minimums** | Owner Restitution is greater than $6,000, and the Buyback Amount is greater than Retail Replacement Value, so the minimums are not implicated. |

Eligible Lessees who have an active lease of a Generation One Eligible Vehicle can terminate their leases with no penalty for early termination and receive Lessee Restitution.  (Dkt. No. 2894 ¶ 5.4.)  Lessee Restitution ranges from $5,001 to $6,615.  (Dkt. No. 2840 at 19.)  Lessee

9

Restitution consists of a fixed component of $2,577.50 and a variable component that is one half of (1) the amount by which Vehicle Clean Retail Value exceeds Vehicle Value, added to (2) state and average local sales taxes on the Vehicle Clean Retail Value. (Dkt. No. 2894-1 at 5 ¶ 9(i).)

### 2. Trade-In

Owners of Generation One vehicles can choose to trade in their vehicle at a participating Volkswagen or Audi dealership and receive a Trade-In Credit at the dealer. (Dkt. No. 2894 ¶ 5.3.) The Trade-In Credit will be equal to the Buyback Amount to which that owner would be entitled in a Buyback.

### 3. Reduced Emissions Modification

The availability of this option will depend on whether EPA and CARB approve a Reduced Emissions Modification for a Class Member's Generation One vehicle. (*Id.* ¶ 5.5.) The expected timeline for Volkswagen to submit proposed Emissions Modifications for Generation One vehicles is set forth in the United States' Second Partial Consent Decree. (*See* Dkt. No. 2520-1.) If no Emissions Modification is approved for a particular make, model, and model year of Generation One vehicle, Class Members owning or leasing such vehicles will not be able to select a Reduced Emissions Modification. If no Emissions Modification exists, Class Members will be informed that they remain eligible for the Buyback and Trade-In options, and that they may opt out of the Settlement from August 1, 2018 to September 1, 2018. (Dkt. No. 2894 ¶ 2.66.) Owners that receive an approved Emissions Modification will also receive Owner Restitution.

### 4. Restitution for Eligible Former Lessees and Eligible Former Owners

Eligible Former Lessees are entitled to the same Lessee Restitution as Eligible Lessees. (*See* Dkt. No. 2894 ¶ 5.7; Dkt. No. 2894-1 at 5 ¶ 9.) Eligible Former Owners are entitled to receive Former Owner Restitution. (*See* Dkt. No. 2894 ¶ 5.8; Dkt. No. 2894-1 at 6 ¶ 10.) There can be no more than two Eligible Former Owners for each Eligible Vehicle. If only one Eligible Former Owner for a vehicle timely files a valid claim, Former Owner Restitution will be one half the amount of Owner Restitution, as calculated above. If two Eligible Former Owners timely file valid claims, Former Owner Restitution for each former owner will be 25% of Owner Restitution.

**B.      Generation Two (Model Years 2013-2016)**

The benefits available to Generation Two vehicle owners will depend on whether Volkswagen can timely make available an approved Emissions Compliant Repair.  (Dkt. No. 2894 ¶ 6.1.)  An Emissions Compliant Repair would bring an Eligible Vehicle into compliance with Certified Exhaust Emissions Standards and must be approved by the EPA and CARB.  (*Id.* ¶¶ 2.41, 2.6.)

An Emissions Compliant Repair will be considered timely if it is approved (i) on or before the Decision Date for the Sub-Generation to which that Eligible Vehicle belongs, (ii) on or before any subsequent date set by the Court, or (iii) if the Court does not find good cause for the extension, during a 30-day extension period (of which there may be up to three) for which Volkswagen agrees to make a $500 extension payment, per vehicle per extension.  (*Id.* ¶ 6.2; Dkt. No. 2894-3 ¶ 35.)  The Decision Dates for an Emissions Compliant Repair for each Sub-Generation of Generation Two vehicles are as follows:

| Sub-Generation | Decision Date for the Emissions Compliant Repair |
|---|---|
| 2.1 SUV | November 8, 2017 |
| 2.2 SUV | October 23, 2017 |
| 2 PC | December 20, 2017 |

Volkswagen has agreed that an Emissions Compliant Repair will not result in "Reduced Performance," which the Settlement defines as a change in any of the following performance metrics: (1) a reduction in calculated fuel economy using the EPA formula of more than 3 MPG; (2) a decrease of greater than 5% in peak horsepower; or (3) a decrease of greater than 5% in peak torque.  (Dkt. No. 2894 ¶ 7.5.)  In the event that an Emissions Compliant Repair causes Reduced Performance, Volkswagen has agreed to make an additional payment of $500 for each affected Eligible Vehicle.  (*Id.*)  In the event that an Emissions Compliant Repair causes "a substantial, material adverse degradation above and beyond the Reduced Performance levels specified," Plaintiffs reserve their right to seek, and Volkswagen reserves its right to oppose, additional remedies through motion to the Court.  (*Id.*)

In addition to an Emissions Compliant Repair, Eligible Owners and Eligible Lessees of

Generation Two vehicles will be offered a Repair Participation Payment, ranging from $7,039 to $16,114 for owners, and $2,000 for lessees. (Dkt. Nos. 3088 at 24; 2894-3 at 27-28.) For Eligible Owners, the Repair Payment will total 10% of the vehicle's September 2015 NADA Clean Retail Value (adjusted for options, but not mileage), plus a fixed dollar amount of $3,596.74. (Dkt. No. 2894-3 at 27.) Half of the Repair Participation Payment will be made available to Eligible Owners and Eligible Lessees once Volkswagen verifies their claims; the other half will be paid when the Emissions Compliant Repair is made. (*Id.* at 27-28.) Volkswagen will also offer a "Class Bridge Warranty" to cover Generation Two vehicles through the Emissions Compliant Repair Decision Dates. (Dkt. No. 3088 at 25.) As with Generation One restitution, an Eligible Former Owner of a Generation Two vehicle will evenly split the Repair Participation Payment with a post-September 18, 2015 Eligible Owner, and if there are two Eligible Former Owners, each will receive one quarter of the Repair Participation Payment. (*Id.*)

If an Emissions Compliant Repair is not timely approved for any sub-generation of Generation Two vehicles, Class Members associated with those vehicles will have all the rights and options available to Class Members with Generation One vehicles. (*Id.* at 33-34.)

## III. Distribution of Settlement Payments

The Settlement requires Volkswagen to create and fund an Escrow Account, which will be used to compensate Class Members who submit valid claims under the Settlement. (Dkt. No. 2894 ¶ 13.1.) The escrow account will be funded with an initial Funding Amount of $252 million. If the funding level reaches the Minimum Balance, which will initially be set at $168 million, Volkswagen must, within seven business days of being notified, deposit additional funds into the Escrow Account to bring the balance of the account back to the Funding Amount. (*Id.*) The Funding Amount and the Minimum Balance will be adjusted as described in the Settlement depending on whether an Emissions Compliant Repair is available for Generation 2.2 SUV vehicles by October 23, 2017. (*Id.* ¶¶ 13.2, 13.3.) Any unused funds at the end of the Settlement Benefit Period will revert to Volkswagen. (*Id.* ¶ 13.4) In the event that the Settlement is invalidated or terminated for any reason prior to conclusion of the Settlement Benefit Period, any unused funds in the Escrow Account will revert to Volkswagen. (*Id.* ¶ 13.5.)

## IV. Payment of Attorneys' Fees

The Settlement further requires Volkswagen to pay reasonable attorneys' fees and costs. (Dkt. No. 2894 ¶ 14.1.)  Class Counsel have agreed to seek no more than $245 million in combined attorneys' fees and reasonable out-of-pocket costs with respect to the approximately $1.24 billion in monetary benefits that Class Members will receive if all Generation Two vehicles achieve timely Emissions Compliant Repair approval without Reduced Performance.  (Dkt. No. 2970 at 3.)  If certain events increase Class Members' monetary benefits—such as the delay or denial of an Emissions Compliant Repair for any group of Generation Two vehicles—Class Counsel may move for additional fees and costs in an amount no greater than 5% of the additional monetary benefits made available to Class Members.  (*Id.*)  Volkswagen will pay reasonable fees separate from the compensation provided to Class Members and the fees are subject to Court approval.  (Dkt. No. 2894 ¶ 14.1.)

## V. Releases

In exchange for benefits under the Settlement, Class Members agree to release all Released Claims against the Released Parties.  The Settlement defines Released Parties as:

> any person who, or entity that, is or could be responsible or liable in any way whatsoever, whether directly or indirectly, for the 3.0- liter TDI Matter. The Released Parties include, without limitation, (1) Volkswagen AG, Volkswagen Group of America, Inc. (d/b/a Volkswagen of America, Inc. or Audi of America, Inc.), Volkswagen Group of America Chattanooga Operations, LLC, Audi AG, Audi of America, LLC, VW Credit, Inc., VW Credit Leasing, Ltd., VCI Loan Services, LLC, Porsche Automobil Holding SE, Dr. Ing. h.c. F. Porsche AG, Porsche Cars North America, Inc., Porsche Financial Services, Inc., Porsche Leasing Ltd., and any former, present, and future owners, shareholders, directors, officers, employees, attorneys, affiliates, parent companies, subsidiaries, predecessors, and successors of any of the foregoing (the "VW and Porsche Released Entities"); (2) any and all contractors, subcontractors, and suppliers of the VW and Porsche Released Entities; (3) any and all persons and entities indemnified by any VW and Porsche Released Entity with respect to the 3.0-liter TDI Matter; (4) any and all other persons and entities involved in the design, research, development, manufacture, assembly, testing, sale, leasing, repair, warranting, marketing, advertising, public relations, promotion, or distribution of any Eligible Vehicle, even if such persons are not specifically named in this paragraph, including without limitation all Authorized Dealers, as well as non-authorized dealers and sellers; (5) Claims Supervisor; (6) Notice Administrator; (7) lenders, creditors, financial institutions, or any other parties that

13

1
2
3
4
5
6
7
8

financed any purchase or lease of an Eligible Vehicle; and (8) for each of the foregoing, their respective former, present, and future affiliates, parent companies, subsidiaries, predecessors, successors, shareholders, indemnitors, subrogees, spouses, joint ventures, general or limited partners, attorneys, assigns, principals, officers, directors, employees, members, agents, representatives, trustees, insurers, reinsurers, heirs, beneficiaries, wards, estates, executors, administrators, receivers, conservators, personal representatives, divisions, dealers, and suppliers. Notwithstanding the foregoing, this Release does not release any claims against Robert Bosch GmbH and Robert Bosch, LLC or any of its former, present, and future owners, shareholders, directors, officers, employees, attorneys, affiliates, parent companies, subsidiaries, predecessors, or successors unless the Court approves any settlement between Bosch and members of the Class in any way related to, or arising from, the 3.0-liter TDI Matter.

9

(Dkt. No. 2894 ¶ 12.2.)

10

The Released Claims are defined as:

11
12
13
14
15
16
17
18

any and all claims, demands, actions, or causes of action of any kind or nature whatsoever, whether in law or in equity, known or unknown, direct, indirect or consequential, liquidated or unliquidated, past, present or future, foreseen or unforeseen, developed or undeveloped, contingent or noncontingent, suspected or unsuspected, whether or not concealed or hidden, arising from or in any way related to the 3.0-liter TDI Matter, including without limitation (1) any claims that were or could have been asserted in the Action; and (2) any claims for fines, penalties, criminal assessments, economic damages, punitive damages, exemplary damages, liens, injunctive relief, attorneys', expert, consultant, or other litigation fees or costs other than fees and costs awarded by the Court in connection with this Settlement, or any other liabilities, that were or could have been asserted in any civil, criminal, administrative, or other proceeding, including arbitration[.]

19

(*Id.* ¶ 12.3.)

20

Class Members expressly waive and relinquish any rights they may have under California

21

Civil Code § 1542 or other similar federal or state laws. (*Id.* ¶ 12.6; *see* Cal. Civ. Code § 1542 ("A

22

general release does not extend to claims which the creditor does not know or suspect to exist in

23

his or her favor at the time of executing the release, which if known by him or her must have

24

materially affected his or her settlement with the debtor.").)

25

## DISCUSSION – FINAL APPROVAL OF SETTLEMENT

26

### I.      Legal Standard

27

The Ninth Circuit maintains "a strong judicial policy" that favors class action settlements.

28

*Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015).  Nevertheless, Federal Rule of Civil

14

Procedure 23(e) requires courts to approve any class action settlement. "[S]ettlement class actions present unique due process concerns for absent class members." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). As a result, "the district court has a fiduciary duty to look after the interests of those absent class members." *Allen*, 787 F.3d at 1223 (collecting cases). Specifically, courts must "determine whether a proposed settlement is fundamentally fair, adequate, and reasonable." *Hanlon*, 150 F.3d at 1026; *see* Fed. R. Civ. P. 23(e)(2). In particular, where "the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).

Approval of a settlement is a two-step process. Courts first "determine[] whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted." *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2014 WL 3917126, at *3 (N.D. Cal. Aug. 8, 2014). "At the fairness hearing, . . . after notice is given to putative class members, the court entertains any of their objections to (1) the treatment of the litigation as a class action and/or (2) the terms of the settlement." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. 2014) (citing *Diaz v. Trust Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989)). After the fairness hearing, the court determines whether the parties should be allowed to settle the class action pursuant to the agreed-upon terms. *See Chavez v. Lumber Liquidators, Inc.*, No. CV-09-4812 SC, 2015 WL 2174168, at *3 (N.D. Cal. May 8, 2015) (citation omitted).

## II. Final Certification of the Settlement Class

### A. Rule 23(a) and (b) Requirements

A class action is maintainable only if it meets the four Rule 23(a) prerequisites:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In a settlement-only certification context, the "specifications of the Rule . . .

designed to protect absentees by blocking unwarranted or overbroad class definitions . . . demand undiluted, even heightened, attention[.]" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). "Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Id.*

In addition to the Rule 23(a) prerequisites, "parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem*, 521 U.S. at 614. Rule 23(b)(3), relevant here, requires that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The "pertinent" matters to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

*Id.*

In its preliminary approval order, the Court carefully considered whether Plaintiffs satisfied the Rule 23(a) and (b)(3) requirements. (Dkt. No. 2919 at 20-24.) "Because the Settlement Class has not changed, the Court sees no reason to revisit the analysis of Rule 23[(a) and (b)]." *G. F. v. Contra Costa Cty.*, No. 13-CV-03667-MEJ, 2015 WL 7571789, at *11 (N.D. Cal. Nov. 25, 2015) (internal quotation marks and citation omitted).

## B. Rule 23(c) Requirements

"Adequate notice is critical to court approval of a class settlement under Rule 23(e)." *Hanlon*, 150 F.3d at 1025. Rule 23(c)(2)(B) requires that "[f]or any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). "[T]he express language and intent of Rule 23(c)(2) leave no doubt that individual notice must be provided to those class members who are

identifiable through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 175 (1974).

### 1. Implementation of the Notice Program

The Court previously approved the form and content of the Notice, as well as the Notice Program set forth in the Settlement. (Dkt. No. 2919 at 31-34; *see also* Dkt. Nos. 2894-2, 2894-3, 3044.) The Court also appointed Kinsella Media LLC ("KM") as Notice Administrator to implement the Notice Program. (Dkt. No. 2919 at 36.)

Starting February 24, 2017, Rust Consulting, Inc. ("Rust"), of which KM is a subsidiary, mailed 8.5" x 11" color Postcard Notices to 57,010 potential Generation One Class Members; 135,715 potential Generation Two Class Members; and 69,626 non-Volkswagen, non-Porsche, and non-Audi new car and used car dealers. (Dkt. Nos. 3190-3 ¶¶ 8, 10; 3190-4 ¶ 8.) The Postcard Notices provided an overview of the Settlement and directed readers to the Settlement Website and a toll-free number for more information and to access to the Long Form Notice. (*Id.*) Rust obtained potential Class Members' addresses through Volkswagen's records and registration data, and by purchasing a mailing list of non-Volkswagen/Audi new and used car dealers. (Dkt. No. 3190-4 ¶¶ 5-6.) Over 95% of mailings have been delivered. (Dkt. No. 3190-3 ¶ 11.)

To supplement direct mail notice, Rust also sent three email notifications to at least 97,400 potential Class Members who provided an email address when registering for the Volkswagen and Audi Goodwill Program, or for whom an email address was otherwise available. (*Id.* ¶ 12.) The first email, sent between February 11 and February 18, 2017, provided a short overview of the Settlement and directed Class Members to the Settlement Website. The second email, sent between February 17 and February 24, 2017, included a copy of the Long Form Notice. The third email, sent between March 28 and March 31, 2017, reminded readers about the Class Settlement and included a link to an updated Long Form Notice, which the Court approved on March 15, 2017, and which included additional information about Reduced Performance metrics for Generation Two vehicles. (*Id.*; Dkt. Nos. 3190-4 ¶¶ 13-15; 3037-1.)

The Notice Program also included notice by publication, both in print and digital form. The print notification campaign included 45 strategically-placed notifications in national and regional publications. Specifically, the Short Form Notice appeared as a color advertisement

(where available) in the Sunday edition of *The New York Times*; the daily edition of *The Wall Street Journal*; the daily edition of *USA Today*; both the Sunday and daily editions of three newspapers covering markets with 5,000 or more Eligible Vehicles; the Sunday edition of 10 newspapers covering markets with 2,000-4,999 Eligible Vehicles; the weekly editions of 13 Hispanic newspapers, with the Notice translated into Spanish; and the weekly editions of 13 African American newspapers.  (Dkt. No. 3190-3 ¶¶ 14-18, Ex. A.)

The digital and social media campaign consisted of publishing more than 70,516,550 digital impressions on dozens of relevant websites and on leading social media platforms.  (Dkt. No. 3190-3 ¶¶ 27, 19-26.)  From February 15 to March 31, 2017, KM published targeted banner advertisements with a bold message and graphics on websites that Class Members visited, according to IHS Automotive data.  (*Id.* ¶¶ 20-21.)  And to specifically reach fleet owners and others interested in the automotive industry, banner advertisements appeared on the National Automobile Dealers Association (www.nada.org) website.  (*Id.* ¶ 22.)  KM also placed banner ads on websites associated with the following trade publications: *Automotive Fleet*, *Automotive News*, and *Auto Rental News*.  (*Id.* ¶ 22.)  An individual who clicked on a banner advertisement was taken directly to the Settlement Website, and targeted internet advertising generated 130,814 clicks to the Settlement Website.  (*Id.* ¶¶ 19-20.)

The digital media campaign also included Facebook, Instagram, and Twitter advertisements; banner and video advertisements published on a broad and diverse range of websites through the Google Display Network; and the use of sponsored keywords/phrases on all major search engines, including Google AdWords and Bing Microsoft Advertising.  (*Id.* ¶¶ 23-25.)

All notice materials directed Class Members to the Settlement Website and toll-free telephone number.  (Dkt. Nos. 2894-2; 2894-3; 3190-3 ¶ 32.)  As of April 26, 2017, there had been 2,787 calls to the toll-free number related to the 3.0-liter Settlement.  (Dkt. No. 3190-3 ¶ 32.)  And as of April 28, 2017, the section of the Settlement Website related to the 3.0-liter Settlement had received 260,447 unique visits.  (*Id.* ¶ 31.)

## 2. CAFA Compliance

The Class Action Fairness Act ("CAFA") provides that "each defendant that is

18

participating in the proposed settlement shall serve upon the appropriate State official of each State in which a class member resides and the appropriate Federal official, a notice of the proposed settlement[.]" 28 U.S.C. § 1715(b). Volkswagen satisfied this notice requirement on February 2, 2017, when counsel mailed notice of the proposed Settlement to the United States Attorney General and all 50 States' Attorneys General. (*See* Dkt. No. 3203 ¶ 2, Ex. A.)

### 3.    Adequacy of Notice

The Court is satisfied that the Notice Program was reasonably calculated to notify Class Members of the proposed Settlement. The Notice "apprise[d] interested parties of the pendency of the action and afford them an opportunity to present their objections." *Bourne Valley Court Trust v. Wells Fargo Bank, NA*, 832 F.3d 1154, 1158 (9th Cir. 2016) (quoting *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 795 (1983)). Indeed, the Notice Administrator reports the Notice Program reached more than 90% of potential Class Members. (Dkt. No. 3190-3 ¶ 36.)

Several Class Members object that the Notice did not adequately inform them of the thresholds that would constitute "Reduced Performance" for Generation Two vehicles if an Emissions Compliant Repair is approved. This information, however, was provided in the updated Long Form Notice. Specifically, Question 36 asked, "How will the Emissions Compliant Repair affect my vehicle's performance?" (Dkt. No. 3037-1 at 32.) In response to this question, Class Members were informed that:

> As part of the Class Action Settlement, Defendants have represented that the Emissions Compliant Repair shall not result in Reduced Performance. Reduced Performance means a change in any of the following performance attributes: (1) a reduction calculated in fuel economy using the EPA formula of more than 3 MPG; (2) a decrease of greater than 5% in peak horsepower; or (3) decrease of greater than 5% peak torque. These attributes will be measured by Volkswagen according to industry standards when it submits its proposed Emissions Compliant Repairs to EPA and CARB.

(*Id.*)

Although this information was not included in the Postcard Notices or the original Long Form Notice, the Notice Administrator took reasonable steps to alert Class Members of this more detailed information, sending an email with a link to the updated Long Form Notice to 97,414

19

potential Class Members between March 28 and March 31, 2017, two weeks before the opt-out and objection deadline. (Dkt. Nos. 3190-3; 3190-4 ¶¶ 13-15; 3037-1.) The updated Long Form Notice was also made available on the Settlement Website.

Further, the absence of the Reduced Performance specifics in the original Notice was not misleading. The original Long Form Notice explained that it was anticipated that Generation Two vehicles could be repaired "without *materially* reduced performance." (Dkt. No. 2894-3 at 3 (emphasis added).) Class Members were thus made aware that some reductions in performance were possible. The original Long Form Notice also informed Class Members that "[t]he impact [of a Reduced Emissions Modification] on your vehicle is not known at this time, but it will be disclosed to you if the EPA and CARB approve a Reduced Emissions Modification," including "any effects that any Reduced Emissions Modification will have on your vehicle's . . . performance[.]" (*Id.* at 21.) Class Members were therefore made aware that there was some uncertainty with respect to the impact of a Reduced Emissions Modification on their vehicles' performance. Moreover, as early as February 15, 2017, the Settlement Agreement—which specifically defines Reduced Performance in Section 7.5—was made available on the Settlement Website. (*See* Dkt. Nos. 3190-3 ¶ 30; 2894 ¶ 7.5.)

In light of the original Notice and the updated Long Form Notice, the Court concludes that the Class was adequately made aware of the potential Reduced Performance for Generation Two vehicles.

\*　\*　\*

For the reasons discussed above, the Settlement Class satisfies Rules 23(a) and 23(b)(3), and the Class Notice satisfies Rule 23(c). Accordingly, the Court grants final class certification.

**III. Fairness, Adequacy, and Reasonableness**

Courts may approve a class action settlement "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Courts assessing the fairness of a settlement generally weigh:

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount

offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement.

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

But where, as here, the parties negotiate a settlement before a class has been certified, "courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton*, 327 F.3d at 952. Pre-class certification settlements "must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *In re Bluetooth Prods. Liability Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (citing *Hanlon*, 150 F.3d at 1026). This heightened scrutiny "ensure[s] that class representatives and their counsel do not secure a disproportionate benefit 'at the expense of the unnamed plaintiffs who class counsel had a duty to represent.'" *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (quoting *Hanlon*, 150 F.3d at 1027). As such, courts must evaluate the settlement for evidence of collusion. *Id.*

Because "[c]ollusion may not always be evident on the face of a settlement, . . . courts therefore must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth*, 654 F.3d at 947. Signs of subtle collusion include, but are not limited to:

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded,
> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries "the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class"; and
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund[.]

*Id.* (internal quotations and citations omitted).

### A.  The *Churchill* Factors

#### 1.  Strength of Plaintiffs' Case

The first factor does not favor settlement. "Approval of a class settlement is appropriate

when plaintiffs must overcome significant barriers to make their case." *G.F.*, 2015 WL 7571789, at *8 (citing *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 851 (N.D. Cal. 2010)). Such barriers are mostly lacking here, as Plaintiffs acknowledge they have a strong case (*see* Dkt. No. 3088 at 34), and liability is not at issue: Volkswagen admits to installing and failing to disclose the defeat device in its TDI diesel engine vehicles, which it marketed as environmentally friendly.

Plaintiffs also have strong support for their requested relief. Class Members paid for vehicles that lacked certain attributes that Volkswagen had marketed as being present, which would likely support damages. (Stockton Decl., Dkt. No. 3088-1 ¶ 12.) And although rescission is "an extraordinary remedy and is not available when there is an adequate remedy at law," *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 164 (S.D.N.Y. 2014), here Plaintiffs have a strong case for rescission of Generation One vehicle purchases, as it is not possible to timely bring these vehicles into compliance with EPA and CARB emission requirements. (*See* Kull Decl., Dkt. No. 1784-2 ¶ 16 ("[T]he facts underlying the 'clean diesel' litigation make it probable that courts would interpret these rules [regarding rescission] liberally in favor of an Eligible Owner seeking rescission and restitution against Volkswagen.").) Because Plaintiffs claims against Volkswagen are strong, this factor does not favor final approval.

### 2. Risk, Expense, Complexity, and Likely Duration of Further Litigation

Though Plaintiffs have strong claims, the merits of those claims are balanced by the risk, expense, and complexity of the case, as well as the likely duration of further litigation. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458-59 (9th Cir. 2000). Should Class Counsel proceed with litigating Plaintiffs' claims to conclusion, any recovery would likely come years in the future and at far greater expense. In comparison, approval of the Settlement will require Volkswagen to move quickly to repair Eligible Vehicles, or otherwise remove them from the road—a key priority since the outset of this case. (*See* Dkt. No. 365 at 5:7-6:6.) The Settlement requires Volkswagen to fund an Escrow Account used to compensate Class Members within 10 days of the Court's final approval order (Dkt. No. 2894 ¶ 13.1), and the Buyback claims-process for Eligible Owners and Lessees of Generation One vehicles must begin within 15 days of final approval. (*See* Dkt. No.

2894-4 at 3.)  The benefits available to Generation Two vehicle owners will depend on whether Volkswagen can timely make available an Emissions Compliant Repair.  (Dkt. No. 2894 ¶ 6.1.)  But even then, the latest Decision Date for an Emissions Compliant Repair is December 20, 2017—with up to three 30-day extensions—giving Volkswagen a time-limited opportunity to fix the vehicles it believes can be fully repaired.  (*See id.* ¶¶ 6.2, 6.4.)  Thus, while Plaintiffs would likely prevail on their claims, the Settlement provides benefits much sooner than if litigation were to continue—compensating Class Members now and limiting additional environmental damage.  The second *Churchill* factor therefore supports final approval.

### 3.    Risk of Maintaining Class Action Status throughout Trial

The potential difficulties in obtaining and maintaining class certification weigh in favor in final approval.  Although there does not appear to be any issue with maintaining class certification at this point, if the parties had not settled, Volkswagen could have opposed Plaintiffs' motion for class certification and, even if the Court certified the class, there is a risk the Court could later de-certify it.  This factor therefore favors settlement.

### 4.    Amount Offered in Settlement

This factor is considered "the most important variable in assessing a class settlement."  *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 1001 (N.D. Cal. 2015).  Here, it favors settlement because Class Members will be adequately and fairly compensated by Volkswagen  in a number of ways.

For Generation One Eligible Owners, the Settlement provides for a Buyback or Trade-In, plus Owner Restitution, or a combination of a Reduced Emissions Modification and Owner Restitution.  (Dkt. No. 2894 at 25-28.)  For Class Members electing the Buyback or Trade-In options, the baseline valuation for Generation One vehicles is the NADA's Clean Trade value as of September 2015—which predates public disclosure of the scandal.  (Dkt. No. 2894-1.)  As noted by Edward M. Stockton, Vice President and Director of Economics Services at The Fontana Group, Inc., this valuation method "protect[s] buyback participants from the possibility of excess price depreciation that may have occurred in the post-revelation market."  (Dkt. No. 3088-1 ¶ 27.)  Class Members electing the Buyback or Trade-In options will also receive Owner Restitution

equal to a fixed amount of $5,155, plus a variable component of at least $6,000. (Dkt. No. 2894-1 at 3-7.) This formula results in owners receiving between 119.08% and 133.08% of their vehicles' retail value as of September 2015. (Stockton Decl., Dkt. No. 3088-1 ¶ 40.) As for Eligible Lessees of Generation One vehicles, the Settlement allows them to terminate their leases with no penalty and receive Lessee Restitution, which is equal to approximately one-half of the payments to Eligible Owners. (*See id.* ¶ 51.) This difference is reasonable given the economic differences between lessees and purchasers. *See infra* at 35-36 (addressing Class Member objections related to this difference).

The Emissions Compliant Repair offered for the Generation Two vehicles also adequately and fairly compensates Class Members. If an Emissions Compliant Repair is approved for any subgroup of Generation Two vehicles, Eligible Owners and Lessees of vehicles in that subgroup are entitled to that repair—meaning that those Class Members will obtain a vehicle that functions at or very near originally advertised emissions and performance levels. (Dkt. No. 2894 ¶¶ 6.1, 7.5; *see also* FTC Statement in Support, Dkt. No. 2845 at 3 ("Simply put, these consumers will have the car they thought they purchased—in terms of emissions, fuel economy, torque, and horsepower . . . ." (emphasis omitted)).) Generation Two vehicle owners will also receive an Owner Repair Payment equal to 10% of the vehicle's September 2015 NADA Clean Retail value, adjusted for options, plus a fixed amount of $3,596.74. (Dkt. No. 2894-1 at 16.). As Mr. Stockton notes, this formula results in an average Owner Repair Payment of $8,624, which is equal to approximately 13.5% of the original Manufacturer's Suggested Retail Price (MSRP), and likely exceeds the "TDI premium" that Class Members paid to purchase a vehicle with clean diesel technology. (Dkt. No. 2088-1 ¶ 58.) The Settlement also provides Decision Dates by which Volkswagen must obtain regulatory approval of the Emissions Compliant Repair for each group of Generation Two vehicles. (Dkt. No. 2894 ¶ 6.2.) If no Emissions Compliant Repair is timely approved, then Eligible Owners and Eligible Lessees of Generation Two vehicles will have similar remedies as those available to their Generation One counterparts. (*Id.* ¶ 6.7.)

As the above reflects, the Settlement provides a wealth of benefits for both Generation One and Generation Two owners and lessees. Also of importance, given that courts should consider a

settlement as a "complete package taken as a whole," *Officers for Justice v. Civil Serv. Com'n of City and Cnty. of S.F.*, 688 F.2d 615, 628 (9th Cir. 1982), is Plaintiffs' recovery under the Bosch Settlement, which addresses the same consumer harm and was also secured by Class Counsel. (*See* Amended Compl. ¶¶ 237-300 (alleging that Bosch worked closely with Volkswagen to develop and supply the defeat device for use in Volkswagen's vehicles); FTC Response, Dkt. No. 3184 at 2-3 ("Although consumers have distinct legal claims against Volkswagen and Bosch, they did not suffer distinct injuries.").) Under the Bosch Settlement, each owner of an Eligible Vehicle in the 3.0-liter Settlement will receive an additional $1,500, and each lessee of an Eligible Vehicle in the 3.0-liter Settlement will receive an additional $1,200. (Dkt. No. 2838 at 15.) When the benefits under the Bosch and 3.0-liter settlements are combined, Class Members will be made whole for the harm they suffered from the defeat device scandal. (*See* FTC Response, Dkt. No. 3184 at 2.) The amount offered in the Settlement favors approval.

### 5. Extent of Discovery Completed and the Stage of the Proceedings

"In the context of class action settlements, formal discovery is not a necessary ticket to the bargaining table where the parties have sufficient information to make an informed decision about settlement." *In re Mego*, 213 F.3d at 459 (brackets and internal quotation marks omitted). Instead, courts look for indications that "the parties carefully investigated the claims before reaching a resolution." *Ontiveros*, 303 F.R.D. at 371.

The extent of discovery completed and the stage of the proceedings weighs in favor of approving the Settlement. The parties reached this Settlement at an early phase of the litigation— avoiding any dispositive motion practice and submitting the Settlement for preliminary approval a little less than a year after filing the Consolidated Consumer Class Action Complaint. (*See* Dkt. Nos. 1230, 1698.) But a swift resolution does not mean the parties were unprepared to engage in settlement negotiations. To the contrary, Class Counsel and Volkswagen engaged in significant discovery such that each party was fully informed when participating in settlement discussions.

Prior to filing the Complaint, "Class Counsel served Volkswagen with extensive written discovery requests, including interrogatories, requests for production, and requests for admissions[.]" (Dkt. No. 1784 at 15.) In response, Volkswagen produced over 12 million pages

25

of documents, and Class Counsel reviewed and analyzed approximately 70% of them. (*Id.*) Additionally, Class Counsel "analyz[ed] economic damages (and retain[ed] experts concerning those issues); review[ed] Volkswagen's financial condition and ability to pay any settlement or judgment; assess[ed] technical and engineering issues; . . . and research[ed] environmental issues, among others." (*Id.* at 14.) Volkswagen also propounded discovery requests on Class Counsel, who in turn "produc[ed] documents from 174 named Plaintiffs, 24 of whom were named as representatives of the 3.0-liter TDI vehicle Settlement Class, in addition to compiling information to complete comprehensive fact sheets, which also included document requests, for each named Plaintiff." (Dkt. No. 3088 at 18.)

Class Counsel's careful investigation of their claims before they filed their Complaint, and their extensive review of discovery materials, indicates they had sufficient information to make an informed decision about the Settlement. Accordingly, this factor favors approving the Settlement.

### 6.    Experience and Views of Counsel

"Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). Courts afford "great weight . . . to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) (internal quotation marks omitted).

Class Counsel believe it is "highly uncertain whether the Class would be able to obtain and sustain a better outcome through continued litigation, trial, and appeal." (Dkt. No. 3088 at 30.) As the Court has previously noted, Class Counsel "are qualified attorneys with extensive experience in consumer class action litigation and other complex cases" who the Court selected after a competitive application process. (Dkt. No. 2919 at 23.) In light of Class Counsel's considerable experience and their belief that the Settlement provides more than adequate benefits to Class Members, this factor favors final approval.

### 7.    Presence of Government Participant

Although no government entity is a direct party to the Settlement, Class Counsel

1    negotiated the Settlement alongside the United States, FTC, and CARB.  For over three months

2    after this Court approved the 2.0-liter settlement, the parties and the government entities held a

3    series of meetings and communicated "on a continuous basis" until reaching agreement.  (*See* Dkt.

4    No. 3089 ¶ 4.)  As a result, the agreements—the 3.0-liter Settlement, the United States' Second

5    Partial Consent Decree, and the FTC's Consent Order—are inextricably tied to one another.

6    Indeed, the Settlement Master explains that "[t]his settlement process was iterative and had

7    multiple moving parts and shifting dynamics because it had to address the needs and interests of

8    consumers and state and federal government entities."  (*Id.* ¶ 7.)  The FTC also "strongly

9    supports" the Settlement, as it is not only in the public interest, but also "contains the same

10   financial provisions as the proposed FTC Order."  (Dkt. No. 3184 at 1.)  The Court concludes that

11   this factor strongly favors settlement.

12                    **8.      Reactions of Class Members**

13          There are approximately 88,500 3.0-liter Class Members.  (Dkt. No. 3190 at 5.)  Their

14   interest in the Settlement has been high, as evidenced by the fact that, since the announcement of

15   the Settlement, Class Counsel and staff have had approximately 3,000 communications with 3.0-

16   liter Class Members by phone, email, and correspondence; the 3.0-liter Settlement Website has

17   received over 260,000 unique visits since its launch; and more than 87,000 eligible VINs (over

18   98% of the Class) have already been looked up on the Settlement Website.  (Dkt. No. 3190 at 6.)

19   In fact, as of April 28, 2017, 60,788 Class Members (68.7% of the Class) had already registered

20   for benefits under the Settlement, two years before the deadline to do so.  (*Id.*)

21          In contrast, only 593 Class Members (0.67%) have opted out of the Settlement.[3]

22   Moreover, only 32 Class Members—approximately 0.036% of the Class—objected to any aspect

23   of the Settlement.  These opt-out and objection percentages are even lower than those for the 2.0-

24   liter settlement, where approximately 0.7% of the class opted out and approximately 0.09%

25   objected.  (*See* Dkt. No. 2102 at 26.)  A list of Class Members who have opted out of the

26   Settlement can be found in Exhibit 1 to this Order.

27   _____

28   [3] Some Class Members opted out on behalf of multiple vehicles, resulting in a total of 612 unique
     VIN opt outs.  (*See* Dkt. No. 3190 at 6 n.4.)

                                                    27

Given the low opt-out and objection rates, this factor strongly favors final approval. *See Churchill*, 361 F.3d at 577 (finding no abuse of discretion where district court, among other things, reviewed list of 500 opt outs in a class of 90,000 class members); *Cruz v. Sky Chefs, Inc.*, No. C-12-02705 DMR, 2014 WL 7247065, at *5 (N.D. Cal. Dec. 19, 2014) ("A court may appropriately infer that a class action settlement is fair, adequate, and reasonable when few class members object to it."); *Chun-Hoon*, 716 F. Supp. 2d at 852 (granting final approval of settlement where 16 out of 329 class members (4.86%) requested exclusion).

That more than half of Class Members have filed a claim also supports final approval. *See In re TracFone*, 112 F. Supp. 3d at 1006 (approving class settlement with claim rate of approximately 25-30%); *Moore v. Verizon Commc'ns Inc.*, No. C 09-1823 SBA, 2013 WL 4610764, at *8 (N.D. Cal. Aug. 28, 2013) (approving class settlement with 3% claim rate). While the claim rate here is remarkable in and of itself, it is particularly impressive given that the Claim Submission Deadline for Eligible Owners and Eligible Lessees of Generation One vehicles is June 1, 2019, and the Claim Submission Deadline for Eligible Owners and Eligible Lessees of Generation Two vehicles is December 31, 2019. (Dkt. No. 2894 ¶ 2.17.) Nonetheless, the Court recognizes that not all—albeit a small percentage—of Class Members are not entirely satisfied with the Settlement. "[I]t is the nature of a settlement, as a highly negotiated compromise . . . that it may be unavoidable that some class members will always be happier with a given result than others." *Allen*, 787 F.3d at 1223 (internal quotation marks omitted). The Court addressed one of those objections above at its discussion of the Notice Program; it addresses the remainder here.

### a. Lack of an Immediate Buyback Option for Generation Two Vehicles

The most common objection was made by Generation Two vehicles owners who want an immediate buyback option for their vehicles. They note that Generation One owners and consumers in the 2.0-liter settlement received a buyback option. And they doubt that Volkswagen will be able to develop an Emissions Compliant Repair.

The lack of an immediate buyback option for Generation Two vehicle owners is reasonable under the circumstances. Generation Two 3.0-liter vehicles are uniquely situated among the affected "clean diesel" vehicles. These vehicles can be brought into compliance with the emission

standards for which they were originally certified, without affecting performance. (*See* Dkt. No. 3083 at 15-18.) Thus, if Volkswagen obtains timely approval for an Emissions Compliant Repair, owners of Generation Two vehicles will receive the vehicle they originally thought they were buying. (*See* FTC Statement in Support (stating that Generation Two consumers "will have the car they thought they purchased—in terms of emissions, fuel economy, torque, and horsepower") (emphasis omitted).)

Given that these vehicles likely can be fixed, offering an immediate buyback option would actually be counterproductive to the environmental goals of this litigation. A buyback would unnecessarily "waste assets that have already been committed to creating, manufacturing, selling, and buying a vehicle." (Dkt. No. 2917, Hr'g Tr. at 64:10-14.) The United States agrees, noting that "there are significant environmental benefits that come from returning the vehicles to their original certified exhaust emission standard and avoiding the potential scrapping of tens of thousands of vehicles." (Dkt. No. 3083 at 22.)

The potential availability of an Emissions Compliant Repair later this year, or even in early 2018 (*see* Dkt. No. 2894 ¶¶ 6.2-.3), understandably may frustrate some Generation Two vehicle owners, who in the meantime might continue driving a car that does not live up to the environmental standards they expected. The Settlement takes this into account, however, as Generation Two owners will receive a restitution payment ranging from $7,039 to $16,114 (Dkt. No. 3088 at 14), up to half of which will be available shortly after final approval of the Settlement (Dkt. No. 2894-3 at 3). As the FTC notes, this restitution payment is intended to compensate consumers for, among other things, "the lost opportunity to drive an environmentally-friendly vehicle, and the additional amount consumers paid for a feature (clean emissions) that did not exist." (Dkt. No. 3184-1 ¶ 7.) Thus, "no buyback is necessary for Generation 2 because consumers who participate in the settlement will be made whole." (FTC Response, Dkt. No. 3184 at 4.) And if an Emissions Compliant Repair is not approved for any group of Generation Two vehicles, as some Class Members fear, owners of those vehicles will have the option to sell them back to Volkswagen under the same terms available to owners of Generation One vehicles. (*See* Dkt. No. 2984 ¶¶ 6.2-6.3.) The Court overrules this objection.

### b. Reduced Performance for Generation Two Vehicles

o    Objection to Any Reduced Performance

As noted above, Volkswagen represents that the Emissions Compliant Repair for Generation Two vehicles "shall not result in 'Reduced Performance.'" (Dkt. No. 2894 ¶ 7.5.) The Settlement defines Reduced Performance as "(1) a reduction in calculated fuel economy using the EPA formula of more than 3 MPG; (2) a decrease of greater than 5% in peak horsepower; or (3) a decrease of greater than 5% in peak torque." (*Id.*) Some objectors contend that Volkswagen could comply with the terms of the Settlement, not trigger the Reduced Performance provision, but that their vehicles will still have diminished performance. In other words, they contend that the allowable variations in performance are too high.

The FTC has approved the Reduced Performance ranges. It contends that within the band of acceptable diminished performance "consumers will have the car they thought they purchased—in term of emissions, fuel economy, torque, and horsepower." (Dkt. No. 2845 at 3 (emphasis omitted).) Further, some minor reductions in performance are taken into account, and remedied, through the Settlement's restitution payments. The FTC notes that "Volkswagen likely can repair Generation 2 vehicles without affecting their performance," but that "to ensure consumers are fully compensated, the FTC included performance effects and diminished value when determining compensation amounts, even though those effects are unlikely." (Dkt. No. 3184 at 4, Ex. A. ¶ 8.) Because the Reduced Performance metrics are reasonable and are supported by the FTC, the Court overrules the objection.

o    Measuring Reduced Performance

Other objectors contend that the Settlement gives Volkswagen the sole right to determine whether an Emissions Compliant Repair alters performance, and that Volkswagen should not be trusted to make such a determination. The Settlement, however, does not give Volkswagen this authority. Rather, it provides that any Emissions Modification Proposal must ultimately be approved by EPA and CARB. (*See* Dkt. No. 2894 ¶ 7.5.) To that end, the DOJ's Second Partial Consent Decree includes detailed requirements for Volkswagen's submission of an Emissions Modification Proposal to EPA and CARB, and includes precise testing standards and metrics that

Volkswagen must achieve in order to receive approval. (*See* Dkt. No. 2520-1 at 125-134.) Given these detailed requirements, as well as the history of this case and the defeat device scandal, the Court is confident that those agencies will review an Emissions Modification Proposal carefully.

o    Recourse if there is Reduced Performance

A number of objectors contend that they will be insufficiently compensated if Volkswagen ultimately develops an Emissions Compliant Repair that causes Reduced Performance. Noting that Volkswagen has agreed to make an additional payment of $500 for each affected Eligible Vehicle in such a scenario, Objector Koller, for example, contends that this amount is insufficient given that she paid nearly $90,000 for a high performance vehicle. (*See* Dkt. No. 3190-2 at 13.)

The Court overrules this objection for the following reasons. First, such a scenario is not anticipated. As the FTC states, "Volkswagen likely can repair Generation 2 vehicles without affecting their performance," as "these are the newest cars with the largest engines." (Dkt. No. 3184 at 4.) Volkswagen also represents in the Settlement Agreement "that the Emissions Compliant Repair *shall not* result in 'Reduced Performance.'" (Dkt. No. 2894 ¶ 7.5 (emphasis added).) Although the Settlement also includes contingencies for an Emissions Compliant Repair that does cause Reduced Performance, the most reasonable interpretation of this provision is that Reduced Performance is seen by the parties as unlikely. Second, focusing only on the $500 payment misses that this payment is in addition to restitution payments ranging from $7,039 to $16,114 for Generation Two vehicle owners. (Dkt. No. 3088 at 14.) In the event that an Emissions Compliant Repair causes Reduced Performance, some of this compensation can offset any reductions in vehicle value. Finally, the $500 payment is not the only remedy available to affected Class Members. Rather, in the event that an Emissions Compliant Repair causes "a substantial, material adverse degradation above and beyond the Reduced Performance levels specified," "Plaintiffs reserve their right to seek, and [Volkswagen] reserves its right to oppose, additional remedies through motion to the Court." (*Id.*) The Court expects Class Counsel to fully and vigorously protect Class Members' rights—as they have throughout this litigation—should Generation Two vehicles experience such a reduction in performance.

31

  o Reduced Performance Metrics

Objector Schmeltzer contends that the Reduced Performance metrics fail to account for potential reductions in vehicle acceleration. The Porsche Cayenne Press Information he quotes in his objection, however, supports that acceleration derives directly from horsepower and torque—two components expressly covered by the Reduced Performance definition. (*See* Dkt. No. 2894 ¶ 7.5.) The Press Information provides that "The Cayenne Diesel is a powerful and efficient long-distance runner. The 3.0-liter V6 delivers 245 hp and, more importantly, 406 lb-ft. of torque, *ensuring strong acceleration* and excellent pulling power." (emphasis added). Thus, because the definition of Reduced Performance implicitly tracks decreases in acceleration, the Court overrules this objection.

### c. Decision Date Extensions for an Emissions Compliant Repair

If Volkswagen does not develop, and EPA and CARB do not approve, an Emissions Compliant Repair by the Decision Date for each Sub-Generation of Generation Two vehicles, and Volkswagen cannot demonstrate good cause for the delay, it can purchase an extension of up to 90 additional days by paying each affected Class Member $500 for each 30-day extension. (Dkt. No. 2894 ¶ 6.4.) One objector complains that these potential extensions are inappropriate because his vehicle continues to depreciate "at approximately $500 per month."

All cars depreciate over time, and the Settlement is not designed or intended to compensate Class Members for losses that are unrelated to the conduct at issue in this case. But even assuming that some of the Eligible Vehicles depreciate at this rate, and that the depreciation is attributable solely to Volkswagen's conduct, the extension payments would provide sufficient compensation to mitigate the lost value. In short, the $500 extension payments appropriately addresses any lost value associated with the delay. The Court overrules this objection.

### d. Compensation for Owners of Older Vehicles

One Class Member objects to the fact that owners of older Eligible Vehicles receive less Owner Restitution under the Settlement than owners of newer Eligible Vehicles. This Class Member contends that the longer a Class Member owned an Eligible Vehicle, the more he or she was deceived and thus harmed by Volkswagen's conduct.

32

Even if owners of older Eligible Vehicles suffered more emotional distress from the emissions scandal than owners of newer Eligible Vehicles, which is not certain, the difference in compensation for older and newer vehicles reasonably reflects certain economic considerations. For Generation One vehicles, the difference in compensation reflects that a vehicle's value depreciates significantly with use. (*See* Stockton Decl., Dkt. No. 3088-1 ¶ 25 ("In short, motor vehicles are depreciating assets that lose value over time.").) Thus, all other things being equal, the owner of a newer vehicle has a more valuable asset than the owner of an older vehicle of the same make and model, and should receive more compensation in the Buyback.

For Generation Two vehicles, since Eligible Owners will retain their vehicles, Owner Restitution seeks to compensate them for the loss in vehicle value experienced when Volkswagen's emissions-cheating was exposed. Mr. Stockton estimates that up to 10% of vehicle value may have been attributable to the TDI technology (the "TDI premium"). (Dkt. No. 2088-1 ¶ 30.) As Generation Two vehicles age and become less valuable, however, it takes less money to compensate for this 10% reduction in value, which makes the higher Owner Restitution payments to Eligible Owners of newer vehicles reasonable. In fact, the Settlement tends to provide more value to owners of older vehicles than the law ordinarily would require, as the Settlement's vehicle valuations (for purposes of both the Buyback and Owner Restitution) are frozen in time and do not decrease to account for up to three years of depreciation between September 2015 and the ultimate Buyback or restitution payment date. (*See* Stockton Decl., Dkt. No. 3088-1 ¶ 27 ("[T]he frozen values allow[] owners who chose to do so to continue to use their vehicles until the buyback date without the vehicle's value experiencing age-related depreciation that normally occurs in the retail vehicle market.") Accordingly, the Settlement fairly compensates consumers based on the age and use of their vehicles.

### e. Mileage Adjustments

Three Class Members object to the use of a mileage adjustment in valuing their vehicles. As an initial matter, all three objectors appear to be owners of Generation Two vehicles. If an Emissions Compliant Repair is timely approved, these Class Members will receive Repair Participation Payments, which are not adjusted for mileage. (*See* Dkt. No. 2894-3 at 23 n.4.) In

33

any event, the use of mileage adjustments for the Generation One Buyback, or a Generation Two Buyback in a scenario where an Emissions Compliant Repair is not approved, is reasonable. Class Members who frequently drove their vehicles undeniably got more use out of them, and, quite simply, mileage affects a vehicle's value. A vehicle with high mileage is worth less than a vehicle with low mileage.

Related to the discussion of depreciation above, this notion is reflected in federal and state laws that allow a reduction in a consumer's recovery based on his or her use of the vehicle. *See, e.g.*, 15 U.S.C. § 2301(12) (defining the term "refund" for purposes of the Magnuson Moss Warranty Act as "refunding the actual purchase price (less reasonable depreciation based on actual use where permitted by rules of the Commission)"); 49 U.S.C. § 30120(a)(A)(iii) (following a safety recall under the National Traffic and Motor Vehicle Safety Act, an available remedy to consumers is to "refund[] the purchase price, less a reasonable allowance for depreciation"); Cal. Civ. Code § 1793.2(d)(2)(C) (providing a damages offset under California's Song-Beverly Consumer Warranty Act for mileage driven). The Settlement is consistent with this practice. Moreover, the negotiated 15,000 miles per year allowance for each vehicle is consistent with, if not more generous than, the industry average. As Professor Klonoff explained in a declaration submitted in support of the 2.0-liter settlement, and which is equally applicable here, "[m]ost [valuation] calculations offered by Carmax, Kelley Blue Book, Edmunds, and others are based on 11,500 to 13,000 annual miles." (Dkt. No. 1976-1 ¶ 46.) Because the Settlement's mileage allowances are reasonable, the Court overrules these objections.

### f. Compensation for Maintenance Costs

Some objectors contend that the Settlement is unfair because it does not provide additional compensation for already incurred maintenance and repair costs. For example, Objector Rulon discusses the costs associated with an AdBlue system malfunction and "unrelated repairs;" Objector Rinaldo provides invoices for oil changes and the replacement of windshield-wiper blades and brake pads; and Objector McKinney identifies costs he incurred as a result of an engine replacement at approximately 85,000 miles.

The Settlement resolves claims arising from Volkswagen's use of a defeat device to manipulate emissions testing for certain pollutants. None of these objectors plausibly allege that the maintenance or repair costs they incurred were attributable to the conduct at issue, or even that the costs were related to their vehicles' exhaust or emissions systems. Additionally, even if the repairs were shown to be attributable to Volkswagen's defeat device, a settlement that attempted to compensate consumers on an individual basis for their repair bills would require so many individualized assessments that the cost and difficulty of administering it would necessarily result in fewer benefits than the proposed Class-wide Settlement. As Professor Robert H. Klonoff noted when addressing similar objections in the context of the 2.0-liter settlement, the individualized determinations that would be required would create impracticable administrative issues. (Dkt. No. 1976-1 ¶ 75.)

Objector McKinney also contends that the value of his 2010 Volkswagen Touareg increased when he replaced its engine, and that the Settlement does not adequately compensate him for this increase in value. The Generation One Buyback compensation package, however, provides Class Members with a minimum of 119.08% of the September 2015 retail value of their vehicles. (Stockton Decl., Dkt. No. 3088-1 ¶ 40.) If Objector McKinney participates in the Buyback, he will therefore receive compensation above his vehicle's retail value in September 2015. Moreover, the Settlement does not require him to sell his vehicle. Assuming that a Reduced Emissions Modification becomes available, he can have the repair done, receive compensation, and keep his vehicle for later resale, or until the end of its operational life. And if no modification ultimately becomes available for his vehicle, he can withdraw from the Settlement between August 1 and September 1, 2018. (Dkt. No. 2894 ¶ 9.2.)

For the foregoing reasons, the Court overrules the objections seeking additional compensation for past repair and maintenance costs.

### g. Compensation for Eligible Former Owners

One Class Member objects to the fact that Owner Restitution is less for Former Owners than for current Eligible Owners. Eligible Former Owners will be awarded half the applicable Owner Restitution as Eligible Owners under the Settlement, unless two Eligible Former Owners

make a claim, in which case each will receive a restitution payment of approximately one quarter of the applicable Owner Restitution. (Dkt. No. 2894-3 at 16.) The Court concludes that this formula fairly and adequately compensates Eligible Former Owners. If a Class Member has already sold his or her vehicle to a third party, he or she has already received some compensation for that Eligible Vehicle. But because a post-September 2015 sale price would reflect a reduction in value caused by Volkswagen's disclosure, Former Owner Restitution accounts for the difference between the pre- and post-disclosure values. This is a fair and reasonable result, and the Court therefore overrules the objection.

### h. Compensation for Lessees

Objector Dasmalchi leased a Generation Two vehicle and raises three objections with respect to the Settlement's compensation for, and classification of, Eligible Lessees.

Mr. Dasmalchi first objects to the amount of the Lessee Repair Payment, asserting it should not be lower than the amount of the Owner Repair Payment. Class Members in the 2.0-liter settlement raised a similar objection, which the Court addressed in its order granting Class Counsel's motion for final approval:

> Although Lessee Restitution is less than Owner Restitution, as discussed above, this reflects the fact that owners and lessees have different economic relationships with their vehicles. Owners, for instance, must bear the diminution in value caused by Volkswagen's disclosure of the defeat device, but Lessees can simply return the vehicle to the lessor without bearing the brunt of the loss. . . .

(Dkt. No. 2102 at 35 (citations omitted).) The same reasoning applies here. The 3.0-liter Settlement's reduced compensation for Eligible Lessees is reasonable given the different economic relationships owners and lessees have with their vehicles.

Second, Mr. Dasmalchi contends that, although he is a lessee, he intended to purchase his vehicle at the end of his lease for a previously specified residual value, i.e., an option value. That option value, he asserts, is no longer reflective of the vehicle's market value due to the emissions fraud, and he contends that he and other lessees who intended to purchase their vehicles should be compensated for this difference. In fact, Eligible Lessees will be compensated for the reduced option value. As the FTC noted during the Fairness Hearing, reduced option value was considered

when determining the amount of the Lessee Repair Payment. (Dkt. No. 3212, Hr'g Tr. at 79:14-17.)

Finally, Mr. Dasmalchi objects that lessees who purchased their vehicles on or before January 31, 2017 are classified as Eligible Owners, while lessees who purchased their vehicles after January 31, 2017 are classified as Eligible Lessees. January 31 is a reasonable demarcation date, however, as Class Counsel filed their motion for preliminary approval of the 3.0-liter Settlement on that date. (Dkt. No. 2840.) Lessees who purchased their vehicles after January 31 therefore did so with knowledge of the benefits they could expect to receive under the Settlement, if approved. Lessees who purchased their vehicles on or before January 31, in contrast, assumed the burdens of ownership without this information, and therefore are reasonably treated as Eligible Owners under the Settlement.

### i. Extended Warranties and Service Contracts

Several Class Members raise objections regarding warranties and service contracts. First, one Class Member notes that his factory warranty is set to expire while he waits for an Emissions Compliant Repair to be approved or denied, and argues that he should be compensated with an extended warranty. In fact, he will be. The Settlement provides Generation Two owners and lessees with a Bridge Warranty that extends the terms of their vehicles' New Vehicle Limited Warranty and Powertrain Limited Warranty until EPA and CARB approve or deny a proposed Emissions Compliant Repair. (*See* Dkt. No. 2894 ¶ 7.2.)

Several Generation Two vehicle owners also object that the Settlement does not provide them with additional compensation for certain extended vehicle warranties and service contracts that they purchased with their vehicles. If an Emissions Compliant Repair is timely approved, however, these Class Members can continue driving their vehicles and take advantage of their extended warranties and service contracts. If an Emissions Compliant Repair is not timely approved, these Class Members may participate in the Buyback or Trade-In options, pursuant to which the Settlement requires Volkswagen to refund any unused portion of these plans if purchased from an authorized dealer. (*See id.* ¶ 7.4.) Thus, Class Members will be reasonably

compensated for previously purchased extended warranties and service contracts. The Court

therefore overrules these objections.

### j. Dealer Incentives

One Generation One vehicle owner contends that, in addition to the current Buyback

terms, Audi should be required to offer Generation One vehicle owners an additional incentive of

15% off the MSRP for a new replacement vehicle if purchased through an authorized Audi

dealership.

Because "the very essence of a settlement is compromise," *Officers for Justice*, 688 F.2d at

624, the Settlement may leave some Class Members without the exact remedies they would prefer.

That the Settlement does not require dealerships to offer additional incentives to Eligible Owners,

however, does not make the Settlement unfair, unreasonable, or inadequate. To the contrary, for

Generation One vehicles, average Buyback payments are equal to a minimum of 119.08% of

vehicle retail value as of September 2015. (Dkt. No. 3088-1 ¶ 40.) As noted above, the use of

September 2015 values avoids the reduction in market value caused by the alleged emissions

fraud, and also "function[s] as direct compensation for items such as initial overpayment, excess

ownership costs, excess shoe leather [in shopping for a new vehicle], and other incremental costs

of ownership and replacement." (*Id.* ¶ 41.) The Settlement's buyback formulas are more than

adequate to compensate Generation One vehicle owners, and thus the Court overrules the

objection.

### k. Third-Party Leases

One lessee of a Generation Two vehicle objects that she has been improperly excluded

from the Class on account of the fact that her lease is with US Bank, instead of with VW Credit,

Inc., Audi Financial Services, or Porsche Financial Services, Inc. The Settlement's exclusion of

lessees who lease their vehicles from non-captive finance and leasing companies is reasonable.

(*See* Dkt. No. 2894-3 at 9.) As Professor Klonoff notes, "the parties to the settlement cannot

interfere with third-party contracts, and thus cannot offer . . . a lease termination remedy" to those

who have contracted with third parties. (Dkt. No. 3190-2 ¶ 15 n.8.) Lessees who do not qualify

for the Class lose nothing if the Settlement is approved, however. Their claims are preserved if they wish to pursue them.

### l. Punitive Damages

One objector argues that, in addition to the remedies provided, the Settlement should include "punitive compensation." This is essentially an objection to the size of the Settlement, but the objector does not adequately take into that the Settlement provides Class Members with meaningful and certain relief while avoiding the risks and delays involved in proceeding to trial. *See In re High-Tech Employee Antitrust Litig.*, 2015 WL 5159441 at *4 (noting that an objector who sought punitive damages did not "adequately take into account the risks and delays involved in proceeding to trial," and "ignore[d] that the Settlement provides the Class with a timely, certain, and meaningful cash recovery"). Further, "[g]iven that any award of punitive damages is inherently speculative and discretionary, courts regularly approve settlements that offer no or little compensation representing the risk of a punitive damages award." *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 155 (E.D. La. 2013).

It is also worth noting that the Settlement is no mere slap on the wrist. Volkswagen agreed to pay up to $10.033 billion to consumers in the 2.0-liter settlement, and between $1.2 billion and over $4 billion in the 3.0-liter Settlement. Volkswagen will also pay $2.9 billion to support environmental remediation programs and $2 billion to promote zero-emissions technology as part of the DOJ's Consent Decrees. (*See* Dkt. Nos. 2103 at 4; 2520-1 at 163.) And in addition to consumer and environmental payments, substantial criminal penalties have been imposed against Volkswagen in proceedings addressing the defeat device scheme in the Eastern District of Michigan. Specifically, on January 11, 2017, Volkswagen pled guilty to criminal charges and will pay an additional $4.3 billion in criminal and civil penalties and be placed on probation. Six Volkswagen executives have also been indicted for their roles in the defeat device scandal. *See United States v. Volkswagen AG*, No. 16-cr-20394-SFC (E.D. Mich. 2017).[4]

The Settlement offers fair compensation to Class Members, and together with the 2.0-liter

---

[4] *See also* U.S. Department of Justice, *Justice News*, https://www.justice.gov/opa/pr/volkswagen-ag-agrees-plead-guilty-and-pay-43-billion-criminal-and-civil-penalties-six (Jan. 11, 2017).

settlement, and the civil and criminal agreements with state and federal government agencies, serves to adequately punish Volkswagen for its now exposed and admitted conduct. The lack of further punishment does not warrant a denial of final approval of the Settlement.

### m. Opt-Out Deadline

Finally, certain objectors assert that the opt-out deadline did not provide them with enough time to make an informed decision about the Settlement. These objectors contend that the opt-out deadline should not have pre-dated the fairness hearing or the Decision Dates for the Emissions Compliant Repairs.

The opt-out deadline, on April 14, 2017, was nearly two months after the Class Notice Program began (*see* Dkt. No. 3190-4 ¶¶ 8, 13)—ample time for potential Class Members to decide whether to participate in the Settlement or opt out. *See Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993) (finding a 31-day opt-out period adequate and citing with approval opt-out periods of 26 and 38 days). It was also necessary for the opt-out deadline to occur prior to the May 11, 2017 fairness hearing and the Decision Dates for the Emissions Compliant Repair, so that the Court and the parties would have time to effectuate and implement the Settlement. Nonetheless, the Settlement also provides that if, by August 1, 2018, an Emissions Compliant Repair is not available for a given Sub-Generation of Generation Two vehicles, or a Reduced Emissions Modification is not available for Generation One vehicles, affected Class Members will again have an opportunity to withdraw from the Settlement between August 1, 2018 and September 1, 2018. (Dkt. Nos. 2894-3 at 34; 3190 at 17 n.16.) Class Members will therefore have the opportunity to made another informed decision of whether to remain in the Class if an Emissions Compliant Repair or Reduced Emissions Modification is not available. The Court concludes that the opt-out deadline was reasonable and overrules these objections.

### B. The *Bluetooth* Factors

Although the *Churchill* factors favor settlement, consideration of those factors alone is insufficient. *See In re Bluetooth*, 654 F.3d at 946. Where, as here, the parties reach a settlement prior to class certification, courts must examine the settlement with "an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under

Rule 23(e) before securing the court's approval as fair." *Id.* (citations omitted). "Collusion may not always be evident on the face of a settlement, and courts therefore must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* at 947. Signs of subtle collusion include:

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;
> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id.* (internal quotations marks and citations omitted). The *Bluetooth* court made clear that these factors are not dispositive but merely "warning signs" or "indicia of possible implicit collusion." *Id.* Even if all three signs are present, courts may still find that a settlement is reasonable. *See id.* at 950 (noting that the district court may find the settlement reasonable notwithstanding the presence of all three *Bluetooth* factors).

Despite the presence of one *Bluetooth* factor, the Court concludes that there is no evidence of collusion. The first *Bluetooth* factor asks whether Class Counsel will receive a disproportionate distribution of the Settlement or whether Class Counsel are amply rewarded while the Class receives no monetary distribution. *Id.* at 947. This factor is not implicated, as the Settlement does not entitle Class Counsel to any portion of the Settlement funds; rather, the Escrow Account is designated solely for Class Members. Further, the Settlement provides Class Members with significant monetary benefits. And even if Class Counsel were to receive the maximum they stated they would seek in attorneys' fees, that amount— $245 million, inclusive of costs—is approximately 20% of the cash component of the Settlement, which is below the 25% benchmark established by the Ninth Circuit. *See In re Bluetooth*, 654 F.3d at 942. Thus, there is no concern that Class Counsel will be rewarded while Class Members receive no monetary award.

The second *Bluetooth* factor considers whether the parties negotiated a "clear sailing"

41

agreement for the payment of attorneys' fees separate from the class funds. *See In re Bluetooth*, 654 F.3d at 947. Although the Settlement provides that Volkswagen will pay attorneys' fees separate from the compensation provided to Class Members (Dkt. No. 2894 ¶ 14.1), there is no evidence of a "clear sailing" agreement here, as discussions of attorneys' fees began after the substantive terms of the Settlement were settled (*see* Dkt. Nos. 2894 ¶ 14.1; 2970 at 3), suggesting that Class Counsel did not accept an excessive fee in exchange for an unfair settlement or otherwise allow their fees to interfere with negotiations for Class Members' benefits. Additionally, although Class Counsel has agreed not to seek more than a total of $245 million in fees and costs, Volkswagen has not agreed not to contest such a request. (*See* Dkt. No. 2970 at 3.) Thus, this factor is not indicative of collusion.

As the Court noted previously, the third *Bluetooth* factor—which considers whether the settlement provides for funds not awarded to revert to defendants, *see* 654 F.3d at 947—is somewhat present here in light of the fact that any funds remaining in the Escrow Account upon the conclusion of the Settlement Benefit Period shall revert to Volkswagen. (*See* Dkt. No. 2894 ¶¶ 13.4-13.5.) But the reversionary provision here does not cause the Court concern because: (1) Volkswagen is incentivized under the Settlement to develop Emissions Compliant Repairs for vehicles as opposed to simply buying back noncompliant vehicles; and (2) Volkswagen's response with respect to the 2.0-liter vehicles, as well as its efforts in effecting notice to Class Members for this Settlement, evidences that it has not attempted, and will not attempt, to discourage Class Member participation in an effort to maximize unclaimed funds.

In analyzing whether there are any indicia of collusion, the Court has also reviewed and considered the declaration of the Court-appointed Settlement Master, Director Robert S. Mueller III. (Dkt. No. 3089.) As Director Mueller stated, the 3.0-liter Settlement process, like the 2.0-liter and Bosch settlement processes, involved "neither bad faith nor collusive behavior from anyone," but rather was "conducted at arm's length" and involved "the frank exchange of views, spirited debate, vehement disagreement, thoughtful discussion, attention to detail, and the sharing of extensive data and analyses among participants." (*Id.* ¶¶ 8-9.) The Settlement Master's report

supports the Court's conclusion that there was no collusion between the parties in reaching the Settlement.

\* \* \*

In light of the foregoing analysis, the Court finds final approval is appropriate. The number of objections is small, and their substance does not call into doubt the Settlement's fairness. The *Churchill* factors support final approval, and the *Bluetooth* factors do not suggest collusion. Accordingly, even under heightened scrutiny, the Court concludes the Settlement is fair, adequate, and reasonable.

## DISCUSSION – CLAIMS REVIEW COMMITTEE

The Settlement creates a Claims Review Committee ("CRC") to review appeals of contested claims deemed ineligible. (Dkt. No. 2894 ¶ 8.4.) The CRC is a three-member committee comprised of one PSC representative, one Volkswagen representative, and one court-appointed "neutral." (*Id.*) Class Counsel and Volkswagen nominate David S. Stellings and Sharon L. Nelles, respectively, to serve on the CRC. The Court now appoints the Honorable Fern M. Smith (ret.) to serve as the third and neutral member.

## DISCUSSION – ALL WRITS ACT

The All Writs Act authorizes district courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). "The power conferred by the [All Writs] Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, [ ] and encompasses even those who have not taken any affirmative action to hinder justice." *United States v. New York Tel. Co.*, 434 U.S. 159, 174 (1977) (internal citations omitted). However, the authority granted by the All Writs Act, though broad, is not unlimited. *Negrete v. Allianz Life Ins. Co. of N. Am.*, 523 F.3d 1091, 1098 (9th Cir. 2008). Indeed, the Anti-Injunction Act limits the district court's ability to enjoin state proceedings "except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. "Although comity requires federal courts to exercise extreme caution in

interfering with state litigation, federal courts have the power to do so when their jurisdiction is threatened." *Hanlon*, 150 F.3d at 1025; *see Keith v. Volpe*, 118 F.3d 1386, 1390 (9th Cir. 1997) ("[T]he All Writs Act, 28 U.S.C. § 1651, empowers the federal courts to enjoin state proceedings that interfere, derogate, or conflict with federal judgments, orders, or settlements.").

A stay of all state court actions relating to the Released Claims is necessary to preserve the Court's jurisdiction. First, Class Members have been given an opportunity to opt out of the Settlement. *See Jacobs v. CSAA Inter-Ins.*, No. C 07-00362 MHP, 2009 WL 1201996, at *2 (N.D. Cal. May 1, 2009) ("A district court may enjoin named and absent members who have been given the opportunity to opt out of a class from prosecuting separate class actions in state court.") (citation omitted). Second, a state court's disposition of claims similar to or overlapping the Released Claims would implicate the same legal and evidentiary issues; thus, such action would threaten the Court's jurisdiction and hinder its ability to decide the case. *See id.* at *3 ("A preliminary injunction is appropriate to preserve jurisdiction because there is a sufficient overlap of claims between the federal and state class actions, such that the same legal and evidentiary issues will be implicated in each case."); *In re Jamster Mktg. Litig.*, No. 05-CV-0819JM(CAB), 2008 WL 4482307, at *6 (S.D. Cal. Sept. 29, 2008) ("Any litigant may be enjoined from proceeding with a state court action where it is 'necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide the case.'") (citation omitted). Accordingly, the Court enjoins Class Members who have not opted out from participating in any state court litigation relating to the Released Claims. This injunction, however, does not prevent Class Members from dismissing or staying his or her Released Claims.

## CONCLUSION

For the foregoing reasons, the Court ORDERS as follow:

1.     Plaintiffs' motion for final approval of the Settlement is GRANTED. The Settlement is fair, adequate, and reasonable and is in the best interest of Class Members. Benefits under the Settlement shall immediately be made available to Class Members, and Volkswagen shall pay Class Members directly the full amount

44

1   to which they are entitled under the terms of the Settlement.

2.  The Court CONFIRMS the appointment of Lead Plaintiffs' Counsel and the PSC
    listed in Pretrial Order No. 7 (Dkt. No. 1084) as Settlement Class Counsel.

3.  The Court CONFIRMS the appointment of the Settlement Class Representatives
    listed in Exhibit 1 to Plaintiffs' motion for preliminary approval.  (Dkt. No 2840-1.)

4.  The Court CONFIRMS the appointment of Ankura Consulting Group, LLC as
    Claims Supervisor.  The Claims Supervisor, including its subcontractors, and the
    directors, officers, employees, agents, counsel, affiliates and advisors, shall not be
    liable for its good-faith compliance with its duties and responsibilities as Claims
    Supervisor under the Settlement, this Order, all prior orders, or any further
    settlement-related orders or consent decrees, except upon a finding by this Court
    that it acted or failed to act as a result of malfeasance, bad faith, gross negligence,
    or in reckless disregard of its duties.

5.  The Court APPOINTS Citibank Private Bank to serve as the Escrow Agent.

6.  The Court CONFIRMS the appointment of David S. Stellings and Sharon L. Nelles
    to the Claims Review Committee and APPOINTS the Honorable Fern M. Smith
    (ret.) to serve as the CRC's neutral member.

7.  The Court DISMISSES WITH PREJUDICE the following without costs to any
    party:

    a.  All Released Claims as between the Settlement Class and all its Members
        who have not timely and properly excluded themselves, on the one hand,
        and any Released Party or Parties, other than as specified in this Order and
        in the Settlement, such as the motion for an award of attorneys' fees and
        costs, as contemplated by the settling Parties in Section 14 of the
        Settlement, which may be filed at the appropriate time to be determined by
        the Court.

    b.  All claims pertaining to Eligible Vehicles, as between a Settlement Class
        Member who is not an opt out or otherwise excluded, and any Released

45

Party or Parties, in related lawsuits pending in the MDL centralized in this Court by the Judicial Panel on Multidistrict Litigation on December 8, 2015, *see In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.,* 148 F. Supp. 3d 1367 (J.P.M.L. 2015).

    c.    All related lawsuits pending in this MDL containing only claims between a Settlement Class Member who is not an opt out or otherwise excluded, and against any Related Party or Parties, and pertaining to Eligible Vehicles.

9.    Class Members who have not properly opted out and any person purportedly acting on behalf of any Class Member(s) are ENJOINED from commencing, filing, initiating, instituting, pursuing, maintaining, enforcing or prosecuting, either directly or indirectly, any Released Claims in any judicial, administrative, regulatory, arbitral or other proceeding, in any jurisdiction or forum, against any of the Released Parties. Nothing herein shall prevent any Class Member, or any person actually or purportedly acting on behalf of any Class Member(s), from taking any actions to dismiss his, her, or its Released Claims.

10.    Only those persons or entities who timely submitted valid requests to opt out of the Settlement Class are not bound by this Order, and any such excluded persons or entities are not entitled to any recovery from the Settlement. A list of those persons or entities can be found in Exhibit 1 to this Order.

11.    Persons and entities that are determined by the Claims Administrator or the Court to be excluded from the Class, because his/her/its vehicle is not an "Eligible Vehicle," or for any other reason, are not bound by the Final Order and Judgment, and are not entitled to any recovery from the Settlement.

12.    For Settlement Class Members who, because an Approved Emissions Modification has not become available, withdraw from the Class between August 1, 2018 and September 1, 2018, the statutes of limitations on claims asserted on behalf of those Settlement Class Members in this MDL shall be tolled from the date of the Preliminary Approval Order to the date such Settlement Class Members withdraw

from the Settlement Class.

13. Settlement Class Counsel shall file their application for attorneys' fees and costs by **June 30, 2017**. Any responses shall be due **July 14, 2017**, and any replies shall be due **July 21, 2017**. The Court will advise the parties if a hearing is necessary.

14. The Court retains the exclusive jurisdiction to enforce, administer, and ensure compliance with all terms of the Settlement in accordance with the Settlement and this Order.

**IT IS SO ORDERED.**

Dated: May 17, 2017

_____
CHARLES R. BREYER
United States District Judge