UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION

_____/

This Order Relates To:
ALL CONSUMER ACTIONS
ALL RESELLER DEALERSHIP ACTIONS

_____/

MDL No. 2672 CRB  (JSC)

**ORDER GRANTING FINAL APPROVAL OF THE BOSCH CLASS ACTION SETTLEMENT**

In the fall of 2015, the public learned of Volkswagen's deliberate use of a defeat device—software designed to cheat emissions tests and deceive federal and state regulators—in nearly 600,000 Volkswagen-, Porsche-, and Audi-branded turbocharged direct injection ("TDI") diesel engine vehicles sold in the United States.  Litigation quickly ensued, and those actions were consolidated and assigned to this Court as a multidistrict litigation ("MDL").  After months of intensive negotiations and with the assistance of a court-appointed settlement master, Plaintiffs and Defendants Robert Bosch GmbH and Robert Bosch, LLC (collectively, "Bosch") reached a settlement that resolves consumer claims concerning affected 2.0- and 3.0-liter diesel TDI vehicles.  (*See* Dkt. No. 2918.)  The Court preliminarily approved the Settlement on February 16, 2017.  (*See* Dkt. No. 2920.)

The Settlement Class Representatives now move for final approval of the Settlement. (Dkt. No. 3086.)  On May 11, 2017, the Court held a fairness hearing regarding final approval, during which the attorney for one Class Member addressed the Court.  Having considered the parties' submissions and with the benefit of oral argument, the Court GRANTS final approval of the Settlement.  The Settlement is fair, reasonable, and adequate.

# BACKGROUND

## I.     Factual Allegations

From 2009 through 2015, Volkswagen sold Volkswagen-, Audi-, and Porsche-branded TDI "clean diesel" vehicles, which it marketed as being environmentally friendly, fuel efficient, and high performing.  Unbeknownst to consumers and regulatory authorities, Volkswagen installed in these cars a software defeat device that allowed the vehicles to evade United States Environmental Protection Agency ("EPA") and California Air Resources Board ("CARB") emissions test procedures.  Specifically, the defeat device senses whether the vehicle is undergoing testing and produces regulation-compliant results, but operates a less effective emissions control system when the vehicle is driven under normal circumstances.  Only by installing the defeat device on its vehicles was Volkswagen able to obtain Certificates of Conformity from EPA and Executive Orders from CARB for its 2.0- and 3.0-liter diesel engine vehicles; in fact, these vehicles release nitrogen oxides at a factor of up to 40 times over the permitted limit.  Over six years, Volkswagen sold American consumers nearly 600,000 diesel vehicles equipped with a defeat device.

As alleged, Bosch worked closely with Volkswagen to develop and supply the defeat device for use in Volkswagen's vehicles.  Despite having knowledge of Volkswagen's illicit use of the defeat device, Bosch continued to work with Volkswagen and even concealed the defeat device in communications with U.S. regulators when concerns were raised about the emission control systems in certain Volkswagen vehicles.  While Volkswagen has publicly admitted wrongdoing, Bosch continues to deny wrongdoing.  (*See* Dkt. No. 2838 at 8.)

## II.     Procedural History

In January 2016, the Court appointed Elizabeth J. Cabraser of Lieff, Cabraser, Heimann & Bernstein, LLP as Lead Plaintiffs' Counsel and Chair of the Plaintiffs' Steering Committee ("PSC"), to which the Court also named 21 other attorneys.  (Dkt. No. 1084.)  On September 2, 2016, the PSC filed its Amended Consolidated Consumer Class Action Complaint against 13 named defendants: Volkswagen Group of America; Volkswagen AG; Audi AG; Audi of America, LLC; Porsche AG; Porsche Cars North America, Inc.; Martin Winterkorn; Mattias Müller;

Michael Horn; Rupert Stadler; Robert Bosch GmbH; Robert Bosch, LLC; and Volkmar Denner. (Dkt. No. 1804.) As against Bosch, the complaint asserts claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)-(d), state fraud and unjust enrichment laws, and all fifty States' consumer protection laws. The PSC also filed a Second Amended Consolidated Reseller Dealership Class Action Complaint against the same 13 defendants; the complaint asserts against Bosch claims for RICO, fraud, and unjust enrichment. (Dkt. No. 1805.)

In January 2016, the Court appointed former Director of the Federal Bureau of Investigation Robert S. Mueller III as Settlement Master to oversee settlement negotiations between the parties. (Dkt. No. 973.) Since that time, in parallel to negotiations for the 2.0-liter and 3.0-liter Volkswagen settlements, the parties have engaged in both litigation and settlement discussions over Bosch's involvement in the Volkswagen emissions scandal. The parties finally reached a proposed Settlement, and the Court preliminarily approved the Settlement on February 16, 2017. (Dkt. No. 2920.)

The Notice Administrator implemented the court-approved Notice Program beginning March 6, 2017 by U.S. first class mail. (Dkt. No.3188-2 ¶ 18.) Plaintiffs filed a motion for final approval on March 24, 2017. (Dkt. No. 3086.) By April 14, 2017, there were four timely objections and 640 opt outs. (Dkt. Nos. 3188 at 5; 3188-1 at 3-15; 2188-2 ¶¶ 43-44.)

## SETTLEMENT TERMS[1]

The key provisions of the Settlement are as follows. The Settlement requires Bosch to create a non-reversionary settlement fund, called the Bosch Settlement Fund, in the amount of $327,500,000 to compensate Class Members. (Dkt. No. 2918 ¶¶ 4.1, 10.1.)

The proposed Settlement Class consists of all persons and entities who were eligible for membership in the combination of classes defined in the 2.0-liter and 3.0-liter class action settlement agreements, including anyone who opted out or opts out of those agreements. (*Id.* ¶ 2.17.) The following are excluded from the Settlement Class: (a) Bosch's officers, directors, and

---

[1] A more detailed explanation of the Settlement terms can be found in the Court's preliminary approval order. (*See* Dkt. No. 2920.)

1 | employees; and Bosch's affiliates and affiliates' officers, directors, and employees;

2 | (b) Volkswagen; Volkswagen's officers, directors, and employees; and Volkswagen's affiliates

3 | and affiliates' officers, directors, and employees; (c) any Volkswagen franchise dealer; (d) judicial

4 | officers and their immediate family members and associated court staff assigned to this case; and

5 | (e) any person or entity that timely and properly opted out of the Bosch Settlement. (*Id.*) Eligible

6 | Vehicles under the Settlement are the same eligible vehicles identified in the 2.0-liter and 3.0-liter

7 | settlement agreements. (*Id.* ¶ 2.34.) Any Volkswagen, Audi, or Porsche vehicles that were never

8 | sold in the United States or its territories are excluded from the Eligible Vehicles. (*Id.*)

9 |      The Bosch Settlement Fund will be distributed such that $163,267,450 will be shared

10 | among 2.0-liter Class Members and $113,264,400 will be shared among 3.0-liter Class Members.

11 | (Dkt. No. 2838 at 14.) The Fund will be distributed to Class Members, based on the Federal Trade

12 | Commission's ("FTC") allocation plan (*see* Dkt. No. 2918 ¶ 4.4), as follows:

13 |      An eligible owner of an Eligible Vehicle in the 2.0-liter settlement will receive $350,

14 | except that if an eligible seller or lessee has an approved claim for the same Eligible Vehicle, the

15 | eligible owner will receive $175. (Dkt. No. 2838 at 15.) An eligible seller in the 2.0-liter

16 | settlement with an approved claim will receive $175. (*Id.*) An eligible lessee in the 2.0-liter

17 | settlement will receive $200. (*Id.*)

18 |      An eligible owner of an Eligible Vehicle in the 3.0-liter settlement will receive $1,500,

19 | with three exceptions: (1) if an eligible former owner of the same Eligible Vehicle has an

20 | approved claim in the 3.0-liter settlement, the $1,500 payment will be split equally ($750 each)

21 | between the owner and the former owner; (2) an eligible owner will also receive $750 if an

22 | eligible former lessee of the Eligible Vehicle has an approved claim; and (3) if two former eligible

23 | owners of the Eligible Vehicle have approved claims, the $1,500 will be split such that the eligible

24 | owner receives $750 and each of the two former owners receives $375. (*Id.*) An eligible lessee in

25 | the 3.0-liter settlement will receive $1,200. (*Id.*) The Settlement Benefit Period, or the time

26 | period during which Class Members may obtain benefits under the Settlement, ends on April 30,

27 | 2020. (*Id.* ¶ 2.50.)

28 |      At the conclusion of the Settlement Benefit Period, if any funds remain in the Bosch

Settlement Fund, and it is not feasible or economically reasonable to distribute such funds to Class Members, the funds will be distributed through *cy pres* payments according to a distribution plan and schedule filed by Class Counsel and approved by the Court. (*Id.* ¶ 10.2.) Any unused funds will only revert to Bosch if the Settlement is terminated or invalidated prior to the conclusion of the Settlement Benefit Period. (*Id.* ¶ 10.3.)

Reasonable attorneys' fees and costs for common-benefit work performed by Class Counsel, and other attorneys designated by Class Counsel, will be paid from the Bosch Settlement Fund. (*Id.* ¶ 11.1.) Bosch and Class Counsel did not discuss the amount of fees and expenses to be paid prior to agreement on the terms of the Settlement (*id.*), though with Class Counsel's request for preliminary approval of the Settlement, Class Counsel indicated that it would seek attorneys' fees of no more than 16 percent of the Bosch Settlement Fund (Dkt. No. 2838 at 16). With Class Counsel's request for final approval of the Settlement, Class Counsel moved for $51 million in attorneys' fees and $1 million in costs and expenses, amounting to 15.6% of the Bosch Settlement Fund. (Dkt. No. 3087 at 5.) In a separate order issued today, the Court granted Class Counsel's request. (Dkt. No. 3231.)

In exchange for benefits under the Settlement, Class Members agree to release all Released Claims against the Released Parties. The Settlement defines Released Parties as:

> (1) Robert Bosch GmbH, Robert Bosch LLC, and all current and former parents (direct or indirect), shareholders (direct or indirect), members (direct or indirect), subsidiaries, affiliates, joint venture partners, insurers, contractors, consultants, and auditors, and the predecessors, successors, and assigns of the foregoing (the "Bosch Released Entities"); and (2) all current and former officers, directors, members of the management or supervisory boards, employees, agents, advisors and attorneys of the Bosch Released Entities (the "Bosch Released Personnel").

(Dkt. No. 2918 ¶ 9.2.)

The Released Claims are defined as:

> any and all claims, demands, actions, or causes of action, whether known or unknown, that they may have, purport to have, or may have hereafter against any Released Party, as defined above, that: (i) are related to any Eligible Vehicle; (ii) arise from or in any way relate to the 2.0-liter TDI Matter or the 3.0 Liter TDI Matter; and (iii) that arise from or are otherwise related to conduct by a Released Party that (a) predates the date of this Class Action Settlement

5

Agreement and (b) formed the factual basis for a claim that was made or could have been made in the Complaints. This Release applies to any and all claims, demands, actions, or causes of action of any kind or nature whatsoever, whether in law or in equity, contractual, quasi-contractual, or statutory, known or unknown, direct, indirect or consequential, liquidated or unliquidated, past, present or future, foreseen or unforeseen, developed or undeveloped, contingent or non-contingent, suspected or unsuspected, whether or not concealed or hidden, related to any Eligible Vehicle and arising from or otherwise related to conduct by a Released Party that predates the date of this Class Action Settlement Agreement as set forth above, including without limitation (1) any claims that were or could have been asserted in the Action; (2) all marketing and advertising claims related to Eligible Vehicles; (3) all claims arising out of or in any way related to emissions, emissions control equipment, electronic control units, electronic transmission units, CAN-bus-related hardware, or software programs, programing, coding, or calibration in Eligible Vehicles; (4) all claims arising out of or in any way related to a 2.0-liter TDI Matter under the 2.0-liter Class Action Settlement and a 3.0-liter TDI Matter under the 3.0-liter Class Action Settlement; and (5) any claims for fines, penalties, criminal assessments, economic damages, punitive damages, exemplary damages, statutory damages or civil penalties, liens, rescission or equitable or injunctive relief, attorneys', expert, consultant, or other litigation fees, costs, or expenses, or any other liabilities, that were or could have been asserted in any civil, criminal, administrative, or other proceeding, including arbitration[.]

(*Id.* ¶ 9.3.)

## DISCUSSION – FINAL APPROVAL OF SETTLEMENT

### I.       Legal Standard

The Ninth Circuit maintains "a strong judicial policy" that favors class action settlements. *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015). Nevertheless, Federal Rule of Civil Procedure 23(e) requires courts to approve any class action settlement. "[S]ettlement class actions present unique due process concerns for absent class members." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). As a result, "the district court has a fiduciary duty to look after the interests of those absent class members." *Allen*, 787 F.3d at 1223 (collecting cases). Specifically, courts must "determine whether a proposed settlement is fundamentally fair, adequate, and reasonable." *Hanlon*, 150 F.3d at 1026; *see* Fed. R. Civ. P. 23(e)(2). In particular, where "the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).

Approval of a settlement is a two-step process. Courts first "determine[] whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted." *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2014 WL 3917126, at *3 (N.D. Cal. Aug. 8, 2014). "At the fairness hearing, . . . after notice is given to putative class members, the court entertains any of their objections to (1) the treatment of the litigation as a class action and/or (2) the terms of the settlement." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. 2014) (citing *Diaz v. Trust Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989)). After the fairness hearing, the court determines whether the parties should be allowed to settle the class action pursuant to the agreed-upon terms. *See Chavez v. Lumber Liquidators, Inc.*, No. CV-09-4812 SC, 2015 WL 2174168, at *3 (N.D. Cal. May 8, 2015) (citation omitted).

## II. Final Certification of the Settlement Class

### A. Rule 23(a) and (b) Requirements

A class action is maintainable only if it meets the four Rule 23(a) prerequisites:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In a settlement-only certification context, the "specifications of the Rule . . . designed to protect absentees by blocking unwarranted or overbroad class definitions . . . demand undiluted, even heightened, attention[.]" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). "Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Id.*

In addition to the Rule 23(a) prerequisites, "parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem*, 521 U.S. at 614. Rule 23(b)(3), relevant here, requires that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "a class action is

1   superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed.

2   R. Civ. P. 23(b)(3).  The "pertinent" matters to these findings include:

3           (A) the class members' interests in individually controlling the
            prosecution or defense of separate actions;
4           (B) the extent and nature of any litigation concerning the
            controversy already begun by or against class members;
5           (C) the desirability or undesirability of concentrating the litigation of
            the claims in the particular forum; and
6           (D) the likely difficulties in managing a class action.

7   *Id.*

8           In its preliminary approval order, the Court carefully considered whether Plaintiffs

9   satisfied the Rule 23(a) and (b)(3) requirements.  (Dkt. No. 2920 at 9-13.)  "Because the

10  Settlement Class has not changed, the Court sees no reason to revisit the analysis of Rule 23[(a)

11  and (b)]."  *G. F. v. Contra Costa Cty.*, No. 13-CV-03667-MEJ, 2015 WL 7571789, at *11 (N.D.

12  Cal. Nov. 25, 2015) (internal quotation marks and citation omitted).

13          **B.      Rule 23(c) Requirements**

14          "Adequate notice is critical to court approval of a class settlement under Rule 23(e)."

15  *Hanlon*, 150 F.3d at 1025.  Rule 23(c)(2)(B) requires that "[f]or any class certified under Rule

16  23(b)(3), the court must direct to class members the best notice that is practicable under the

17  circumstances, including individual notice to all members who can be identified through

18  reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  "[T]he express language and intent of Rule

19  23(c)(2) leave no doubt that individual notice must be provided to those class members who are

20  identifiable through reasonable effort."  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 175 (1974).

21          **1.      Implementation of the Notice Program**

22          The Court previously approved the form and content of the Class Notice and the Notice

23  Program as set forth in Class Counsel's motion for preliminary approval.  (*See* Dkt. No. 2920 at

24  18-20.)  Epiq Systems Class Action and Claims Solutions ("ECA") began to implement the Notice

25  Program after the Court preliminarily approved the Settlement.  (Dkt. No. 3188-2 ¶¶ 5-6.)

26          ECA collected mailing and email addresses for 2.0-liter and 3.0-liter Volkswagen owners

27  and lessees from Volkswagen and Ankura Consulting Group, LLC, the Claims Supervisor for the

28  2.0-liter and 3.0-liter Volkswagen settlements.  (*Id.* ¶¶ 12-13.)  From March 6 through March 15,

2017, ECA mailed Postcard Notices to 830,806 2.0-liter Class Members and 113,409 3.0-liter Class Members via U.S. first class mail. (*Id.* ¶ 18.) ECA used two variants of the Postcard Notice—one for 2.0-liter Class Members and the other for 3.0-liter Class Members. (*Id.* ¶ 16.) Each notice was 4.25" x 5.5" in size, featured a prominent headline, and directed the recipients to the Bosch Settlement Website[2] where they could access the Long Form Notice and additional information on the Settlement. (*Id.* ¶¶ 16-46.)

From March 6 through March 15, 2017, ECA also disseminated Email Notices to 773,994 2.0-liter Class Members and 81,246 3.0-liter Class Members for whom a facially valid email address was available. (*Id.* ¶ 21.) The Email Notices contained the Postcard Notice text and included an embedded link to the Bosch Settlement Website. (*Id.* ¶¶ 21-22.) As of April 26, 2017, ECA had emailed or mailed notice to 946,146 unique Settlement Class Members, with 28,059 of those notices currently known to be undeliverable. This represents a 97.04% deliverable rate. (*Id.* ¶ 24.)

ECA also supervised a paid media notice campaign. As part of the campaign, ECA ran targeted banner notices for 45 days, with links to the Bosch Settlement Website. (*Id.* ¶¶ 27-30.) ECA also purchased sponsored search listings on the three most highly-visited internet search engines—*Google*, *Yahoo!*, and *Bing*. (*Id.* ¶ 31.) Combined banner impressions totaled 5.69 million, and the search listings were displayed 16,335 times, resulting in 5,367 click-throughs to the Bosch Settlement Website. (*Id.* ¶¶ 31, 33-34.) ECA also issued a party-neutral Information Release on March 9, 2017 to approximately 5,000 general media (print and broadcast) outlets across North America and 5,400 online databases and websites. (*Id.* ¶ 34.)

As of April 26, 2017, there had been 138,571 unique visitors to the Bosch Settlement Website, and 12,770 calls to a toll-free phone number established for the Settlement. (*Id.* ¶¶ 39-40.)

### 2. CAFA Compliance

The Class Action Fairness Act ("CAFA") provides that "each defendant that is

---

[2] www.BoschVWSettlement.com.

participating in the proposed settlement shall serve upon the appropriate State official of each State in which a class member resides and the appropriate Federal official, a notice of the proposed settlement[.]" 28 U.S.C. § 1715(b).  On February 2, 2017, Stephanie J. Fiereck, of Epiq Legal Noticing, implemented the notice required by CAFA at the direction of the Bosch Defendants, mailing notice of the proposed Settlement to 57 officials, including the Attorney General of the United States, and Attorneys General of each of the 50 states, the District of Columbia, and the United States' Territory officials.  (Dkt. No. 3188-2, Ex. 1 ¶¶ 5-7.)

### 3.    Adequacy of Notice

The Court is satisfied that the Notice Program was reasonably calculated to notify Class Members of the proposed Settlement.  The Notice "apprise[d] interested parties of the pendency of the action and afford[ed] them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  Indeed, the Notice Administrator reports that the notice delivery rate of 97.04% "exceed[ed] the expected range and is indicative of the extensive address updating and re-mailing protocols used."  (Dkt. No. 3188-2 ¶ 24.)

The Court did receive one objection to the Notice Program.  Objector Kangas argues that the Program was deficient because the Postcard Notices sent to 2.0-liter Class Members did not apprise them that 3.0-liter Class Members would be receiving greater compensation.  (Dkt. No. 3159 at 3-4.)  The Postcard Notices, however, did direct Class Members to the Bosch Settlement Website, which included the relevant information on the 3.0-liter award.  (*See* Dkt. No. 3188-2 ¶¶ 16-20.)  ECA's emails to Class Members also included a hyperlink to the Long Form Notice, which also included the 3.0-liter award amounts.  (*Id.* ¶¶ 21-22.)  Sending class members a summary notice, with directions for how to obtain additional information, is an accepted notice practice, and the use of that method here was reasonable.  (*See* Azari Decl. ¶ 44, Dkt. No. 3188-2 ("In my experience, it is common and acceptable practice to tailor the short form notice to provide individual class members with the information relevant to their individual claims, rights, and remedies, so long as that notice also directs each class member to resources with more detailed information about the settlement.").)  The Court therefore overrules the objection.

*    *    *

10

For the reasons discussed above, the Settlement Class satisfies Rules 23(a) and 23(b)(3), and the Class Notice satisfies Rule 23(c).  Accordingly, the Court grants final class certification.

## III.  Fairness, Adequacy, and Reasonableness

Courts may approve a class action settlement "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).  Courts assessing the fairness of a settlement generally weigh:

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement.

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

But where, as here, the parties negotiate a settlement before a class has been certified, "courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton*, 327 F.3d at 952.  Pre-class certification settlements "must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *In re Bluetooth Prods. Liability Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (citing *Hanlon*, 150 F.3d at 1026).  This heightened scrutiny "ensure[s] that class representatives and their counsel do not secure a disproportionate benefit 'at the expense of the unnamed plaintiffs who class counsel had a duty to represent.'" *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (quoting *Hanlon*, 150 F.3d at 1027).  As such, courts must evaluate the settlement for evidence of collusion.  *Id.*

Because "[c]ollusion may not always be evident on the face of a settlement, . . . courts therefore must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth*, 654 F.3d at 947.  Signs of subtle collusion include, but are not limited to:

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded,

11

> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries "the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class"; and
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund[.]

*Id.* (internal quotations and citations omitted).

### A.    The *Churchill* Factors

#### 1.    Strength of Plaintiffs' Case

Settlement Class Counsel believes it has a strong case against Bosch (Dkt. No. 3086 at 21), but unlike Volkswagen, Bosch has not conceded liability for its role in the defeat-device scandal. Rather, Bosch has asserted that Volkswagen unilaterally chose to implement the defeat device (Dkt. No. 2864 at 21), and has advanced competing narratives about a number of key documents underpinning Plaintiffs' case (Dkt. No. 3086 at 20). In a pending motion to dismiss the complaint of the non-settling Volkswagen Franchise Dealers, Bosch has also made legal challenges regarding jurisdiction, standing, causation, and damages (Dkt. No. 2864).

The Court does not need to "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute" in its review of the Settlement. *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). For "it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Id.* At a minimum, it is clear that Plaintiffs' case against Bosch is not as strong as its case against Volkswagen. This factor therefore favors settlement. *See G.F. v. Contra Costa Cty.*, No. 13-cv-03667-MEJ, 2015 WL 7571789, at *11 (N.D. Cal. Nov. 25, 2015) ("Approval of a class settlement is appropriate when plaintiffs must overcome significant barriers to make their case.").

#### 2.    Risk, Expense, Complexity, and Likely Duration of Further Litigation

The second *Churchill* factor relates to the first. Because Bosch does not concede liability and has put forward multiple factual and legal challenges to the claims against it, continued litigation would likely be risky, expensive, and time consuming. Additionally, because Class Members have (or will) receive substantial compensation through the Volkswagen settlements for

12

their economic losses associated with the defeat-device scheme, there is a risk that any potential recovery from Bosch would have been offset, partially or entirely, by the funds Class Members already received. Relatedly, even if the Class secured a judgment against Bosch, Class Members' recovery may have been reduced if Bosch prevailed on an indemnification claim against Volkswagen, as Class Members agreed as part of the Volkswagen settlements to "waive enforcement of [their] judgment against . . . Bosch . . . by the amount of the damages that [Volkswagen is] . . . held to be responsible for by way of indemnification of . . . Bosch." (Dkt. No. 1685-5 ¶ 6.) For these reasons, the second *Churchill* factor favors settlement. *See Kim v. Space Pencil, Inc.*, No. C 11-03796 LB, 2012 WL 5948951, at *15 (N.D. Cal. Nov. 28, 2012) ("The substantial and immediate relief provided to the Class under the Settlement weighs heavily in favor of its approval compared to the inherent risk of continued litigation, trial, and appeal . . . .").

### 3. Risk of Maintaining Class Action Status throughout Trial

The potential difficulties in obtaining and maintaining class certification weighs in favor in final approval. Although there does not appear to be an issue with maintaining class certification at this point, if the parties had not settled Bosch could have opposed Plaintiffs' motion for class certification and, even if the Court certified the class, there is a risk the Court could later de-certify it. This factor favors settlement.

### 4. Amount Offered in Settlement

This factor is considered "the most important variable in assessing a class settlement." *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 1001 (N.D. Cal. 2015), *reconsideration denied*, No. C-13-3440 EMC, 2015 WL 4735521 (N.D. Cal. Aug. 10, 2015). Here, the Bosch Settlement establishes a non-reversionary fund of $327.5 million, which will be distributed to class members in the 2.0-liter and 3.0-liter Volkswagen settlements pursuant to the FTC's formula. (Dkt. No. 2918 ¶¶ 4,1, 10.1.) When combined with the relief provided to Class Members by the 2.0-liter and 3.0-liter settlements—which includes buyback, trade-in, emission repair, and restitution remedies, valued conservatively at $11.29 billion (*see* Dkt. Nos. 2102 at 19; 3088 at 12)—the FTC believes the Bosch Settlement will fully compensate consumers for the

injuries they suffered from the defeat-device scandal.  (Dkt. No. 3184-1.)  The amount of the Bosch Settlement also takes into account that, as the FCC noted, "[a]lthough consumers have distinct legal claims against Volkswagen and Bosch, they did not suffer distinct injuries."  (Dkt. No. 3184 at 2-3.)

In evaluating the amount offered in settlement for fairness, courts consider the settlement as a "complete package taken as a whole, rather than the individual component parts[.]"  *Officers for Justice*, 688 F.2d at 628.  Here, the Bosch Settlement Fund and the 2.0-liter and 3.0-liter settlement awards achieve a great result—making Plaintiffs whole without continued litigation. This factor therefore also favors final approval.

### 5.     Extent of Discovery Completed and the Stage of the Proceedings

"In the context of class action settlements, formal discovery is not a necessary ticket to the bargaining table where the parties have sufficient information to make an informed decision about settlement."  *In re Mego*, 213 F.3d at 459 (brackets, citation, and internal quotation marks omitted).  Instead, courts look for indications that "the parties carefully investigated the claims before reaching a resolution."  *Ontiveros*, 303 F.R.D. at 371.

Here, Class Counsel engaged in significant discovery such that they were fully informed and prepared to participate in settlement discussions.  Following the filing of the Consolidated Consumer Class Action Complaint, Class Counsel served Bosch with extensive written discovery, including interrogatories, requests for production, and requests for admission.  Class Counsel also reviewed and analyzed millions of pages of documents relating to Bosch.  Further, on September 2, 2016, Class Counsel filed the Amended Consumer Complaint, which amplified contentions about Bosch's alleged role in the conspiracy.  (*See* Dkt. No. 1804 at 160-80.)

While the parties reached the Settlement at an early phase of litigation, Class Counsel's careful pre-filing investigation and extensive review of discovery materials indicate that they had sufficient information to make an informed decision about the Settlement.  Accordingly, this factor favors Settlement approval.

### 6.     Experience and Views of Counsel

"Parties represented by competent counsel are better positioned than courts to produce a

settlement that fairly reflects each party's expected outcome in litigation." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). Courts afford "great weight . . . to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) (internal quotation marks omitted).

Class Counsel believe it is "not at all certain that the Class could obtain a better outcome against Bosch through continued litigation, trial, and appeal." (Dkt. No. 3086 at 20.) As the Court previously noted, Class Counsel "are qualified attorneys with extensive experience in consumer class action litigation and other complex cases," who the Court selected after a competitive application process. (Dkt. No. 2919 at 23.) In light of Class Counsel's considerable experience and their belief that the Settlement provides more than adequate benefits to Class Members, this factor favors final approval.

### 7. Presence of Government Participant

Although no government entity is a direct party to the Settlement, Class Counsel negotiated the Settlement alongside the United States, FTC, and CARB. For over three months after the Court approved the 2.0-liter settlement, the Settlement Master met with "the [PSC], Volkswagen, Robert Bosch GmbH, Robert Bosch LLC (Bosch), the Department of Justice (DOJ), the California Attorney General (CAG), and the Federal Trade Commission (FTC)" with respect to settlement negotiations related to the 3.0-liter vehicles and the claims against the Bosch parties. (Dkt. No. 3089 ¶ 4.) The FTC also was ultimately responsible for determining how to allocate the Bosch Settlement Fund and "strong[ly] supports" the Settlement. (Dkt. No. 3184 at 1, Ex. A ¶ 3.) Accordingly, the Court finds that this factor strongly favors settlement.

### 8. Reactions of Class Members

There are approximately 589,000 Class Members. (Dkt. No. 3188 at 5.) Many of them have taken an interest in the Settlement, as evidenced by the fact that, as of April 28, 2017, the Settlement call center had received approximately 12,770 calls and the Bosch Settlement Website had received 138,571 unique visits. (Dkt. 3188-2 ¶¶ 39-40.) Class Counsel have also logged over 3,500 communications with Class Members, including by telephone, correspondence, and email.

(Dkt. 3188-1 ¶¶ 3-4.)

Of the Class, only 640 prospective class members (0.11%) have opted out, and only four Class Members objected to the Settlement.[3] (*Id.* ¶¶ 5-6.) Given the low opt-out and objection rates, this factor strongly favors final approval. *See Churchill*, 361 F.3d at 577 (finding no abuse of discretion where district court, among other things, reviewed a list of 500 opt outs in a class of 90,000 class members); *Cruz v. Sky Chefs, Inc.*, No. C-12-02705 DMR, 2014 WL 7247065, at *5 (N.D. Cal. Dec. 19, 2014) ("A court may appropriately infer that a class action settlement is fair, adequate, and reasonable when few class members object to it."); *Chun-Hoon*, 716 F. Supp. 2d at 852 (granting final approval of settlement where 16 out of 329 class members (4.86%) requested exclusion).

Nonetheless, the Court recognizes that not all Class Members are entirely satisfied with the Settlement—albeit a small percentage. "[I]t is the nature of a settlement, as a highly negotiated compromise . . . that it may be unavoidable that some class members will always be happier with a given result than others." *Allen*, 787 F.3d at 1223 (internal quotation marks omitted). The Court addressed one of those objections above in its discussion of the Notice Program; it addresses the remaining objections here.

### a. Objections Regarding the Allocation of Settlement Funds

o   The Allocation Formula

As noted above, the Settlement provides eligible owners and lessees of a 2.0-liter vehicle respectively with $350 and $200, and eligible owners and lessees of a 3.0-liter vehicle respectively with $1,500 and $1,200, subject to reductions where former owners or eligible lessees have claims for the same vehicle. (Dkt. No. 2918-1 at 9-10.) Objector Kangas argues that the allocation between 2.0-liter and 3.0-liter vehicle owners is unfair to Class Members with 2.0-liter vehicles, and Objector Weiss argues that the allocation between owners and lessees is unfair to lessees. The Court overrules these objections.

---

[3] A list of Class Members who have opted out of the Settlement can be found in Exhibit 1 to this Order.

A settlement allocation formula "need only have a reasonable, rational basis." *In re Cathode Ray Tube (Crt) Antitrust Litig.*, 2016 WL 3763382, at *6 (N.D. Cal. Feb. 29, 2016). The Bosch Settlement formula has one. The Bosch Settlement is the third settlement secured by Class Counsel for vehicle owners and lessees impacted by the defeat-device scandal. In allocating the Fund, the FTC sought to ensure that—when the three settlements are viewed collectively—all affected owners and lessees would be fully compensated for their harm. In furtherance of this goal, the FTC allocated more funds from the Bosch Settlement to 3.0-liter vehicle owners because, unlike the 2.0-liter settlement, the 3.0-liter settlement "left some 3.0-liter owners short of full compensation." (Dkt. No. 3184 at 3.) The FTC's formula furthers the important goal of fully compensating all consumers impacted by the defeat-device fraud. Class Members did not suffer distinct injuries from Volkswagen and Bosch's conduct—both of whom are alleged to have contributed to the same defeat-device fraud—and it is therefore appropriate to view the three settlements together. *See Officers for Justice*, 688 F.2d at 628 ("It is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness."). The fact that 3.0-liter vehicle owners will receive more compensation than 2.0-liter vehicle owners under the Bosch Settlement does not make the Settlement unfair, unreasonable, or inadequate. *Churchill*, 361 F.3d at 575.

As for Objector Weiss's contention that the allocation between owners and lessees is unfair to lessees, such a distinction in compensation exists in all three of the consumer settlements, and, as the Court noted in approving the 2.0-liter settlement, "reflects the fact that owners and lessees have different economic relationships with their vehicles." (Dkt. No. 2102 at 35.) The allocation between owners and lessees in the Bosch Settlement Fund therefore has "a reasonable, rational basis." *In re Cathode Ray Tube*, 2016 WL 3763382, at *6.

       o    Intra-Class Conflict

Objector Kangas also asserts that the Settlement Fund's allocation exposes an intra-class conflict, because the PSC (as Class Counsel) negotiated with Bosch on behalf of both the 2.0-liter and 3.0-liter Class Members.

As noted above, it was the FTC, not Class Counsel, who devised the allocation formula. (*See also* FTC Response, Dkt. No. 3184 at 1 ("[T]he FTC—and only the FTC—determine how to allocate the Bosch funds.").) Class Counsel's goal was instead to obtain the largest settlement fund possible for all Class Members, 2.0-liter and 3.0-liter alike. Thus, as explained by Professor Robert H. Klonoff, Professor of Law at Lewis & Clark Law School, "any theoretical conflict was eliminated because the FTC, not class counsel, was solely responsible for determining the allocation." (Dkt. No. 3190-2 ¶ 73.)

### b. Objection Regarding the Scope of the Class Release

Objector Kangas also argues that the Settlement's class-wide release improperly releases all claims, whether or not concealed or hidden. Class action settlement agreements, however, commonly release concealed or hidden claims. *See, e.g.*, *In re Zynga Inc. Sec. Litig.*, No. 12-cv-04007-JSC, 2015 WL 6471171, at *4 (N.D. Cal. Oct. 27, 2015); *Wakefield v. Wells Fargo & Co.*, No. C 13-05053 LB, 2014 WL 7240339, at *7 (N.D. Cal. Dec. 18, 2014); *Torchia v. W.W. Grainger, Inc.*, No 13-cv-01427 LJO (JLT) 2014 WL 3966292, at *3 (E.D. Cal. Aug. 13, 2014). The Release also expressly excludes claims of personal injury or wrongful death. (*Id.*) Thus, Class Members who wish to litigate such claims may do so.

### c. Objection Regarding Time to Review Class Counsel's Fee Motion

Finally, Objector Booth argues that "[t]he proposed settlement required dissenters to object before class counsel filed its fee motion," and therefore "depriv[ed] class members of information necessary to evaluate whether to object." Objector Booth's concern is not factually correct. Class Counsel filed their motion for attorneys' fees simultaneously with their motion for final approval of the Settlement, on March 24, 2017. (*See* Dkt. No. 3087.) Class Members then had three weeks to review the fees request before the objection deadline of April 14, 2017. Further, as early as January 31, 2017—more than two months before the objection deadline—Class Counsel identified the maximum amount of attorneys' fees they intended to request in their motion for preliminary approval of the Settlement. (Dkt. No. 2838.) Thus, Class Members had the information necessary to object to Class Counsel's request for attorneys' fees.

## B.     The *Bluetooth* Factors

Although the *Churchill* factors favor settlement, consideration of those factors alone is insufficient.  *See In re Bluetooth*, 654 F.3d at 946.  Where, as here, the parties reach a settlement prior to class certification, courts must examine the settlement with "an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair."  *Id.* (citations omitted).  "Collusion may not always be evident on the face of a settlement, and courts therefore must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations."  *Id.* at 947.  Signs of subtle collusion include:

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;
> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id.* (internal quotations marks and citations omitted).  The *Bluetooth* court made clear that these factors are not dispositive but merely "warning signs" or "indicia of possible implicit collusion."  *Id.*  Even if all three signs are present, courts may still find that a settlement is reasonable.  *See id.* at 950 (noting that the district court may find the settlement reasonable notwithstanding the presence of all three *Bluetooth* factors).

The Court concludes that none of the *Bluetooth* factors are present here.  First, in a separate order today, the Court granted Class Counsel's motion for $51 million in attorneys' fees and $1 million in costs.  (Dkt. No. 3231.)  This award amounted to 15.6% of the $327.5 million Settlement Fund, which is a percentage that falls below the 25% benchmark established by the Ninth Circuit, and that is reasonable under the facts of this case.  *See Bluetooth*, 654 F.3d at 942. Class Counsel will therefore not "receive a disproportionate distribution of the settlement," nor will the class "receive[] no monetary distribution."  *Id.* at 947.

19

Second, the parties did not negotiate a "clear sailing" arrangement. Bosch and Class Counsel did not discuss the amount of fees and expenses to be paid prior to agreement on the terms of the Settlement. (Dkt. No. 2837 ¶ 11.1.) Nor did Bosch agree to an arrangement to pay attorneys' fees separate and apart from the Settlement Fund.

Finally, the third *Bluetooth* factor does not apply because the parties have not "arrange[d] for fees not awarded to revert to defendants rather than be added to the class fund." 654 F.3d at 947. To the contrary, if any funds remain in Settlement Fund at the end of the Settlement Benefit Period, and it is not feasible or economically reasonable to distribute the remaining funds to Class Members, those funds will be distributed through *cy pres* payments according to a distribution plan and schedule filed by Class Counsel and approved by the Court. (Dkt. No. 2837 ¶ 10.2.)

An additional factor weighing against collusion here is the "presence of a neutral mediator." *Bluetooth*, 654 F.3d at 948. The Court-appointed Settlement Master, Director Mueller, facilitated settlement negotiations between Class Counsel and Bosch. (*See* Dkt. No. 3089.) He states that these negotiations were "conducted at arm's length" and involved "the frank exchange of views, spirited debate, vehement disagreement, thoughtful discussion, attention to detail, and the sharing of extensive data and analyses . . . ." (*Id.* ¶¶ 8-9.)

Given the absence any *Bluetooth* factor and Director Mueller's opinion, the Court concludes that the Settlement was not the product of collusion among the negotiating parties.

\* \* \*

In light of the foregoing analysis, the Court concludes that final approval is appropriate. The number of objections is small, and their substance does not call into doubt the Settlement's fairness. The *Churchill* factors support final approval, and the *Bluetooth* factors do not suggest collusion. Accordingly, even under heightened scrutiny, the Court concludes the Settlement is fair, adequate, and reasonable.

### DISCUSSION – ALL WRITS ACT

The All Writs Act authorizes district courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). "The power conferred by the [All Writs] Act extends, under appropriate circumstances,

to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, [ ] and encompasses even those who have not taken any affirmative action to hinder justice." *United States v. New York Tel. Co.*, 434 U.S. 159, 174 (1977) (internal citations omitted). However, the authority granted by the All Writs Act, though broad, is not unlimited. *Negrete v. Allianz Life Ins. Co. of N. Am.*, 523 F.3d 1091, 1098 (9th Cir. 2008). Indeed, the Anti-Injunction Act limits the district court's ability to enjoin state proceedings "except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. "Although comity requires federal courts to exercise extreme caution in interfering with state litigation, federal courts have the power to do so when their jurisdiction is threatened." *Hanlon*, 150 F.3d at 1025; *see Keith v. Volpe*, 118 F.3d 1386, 1390 (9th Cir. 1997) ("[T]he All Writs Act, 28 U.S.C. § 1651, empowers the federal courts to enjoin state proceedings that interfere, derogate, or conflict with federal judgments, orders, or settlements.").

A stay of all state court actions relating to the Released Claims is necessary to preserve the Court's jurisdiction. First, Class Members have been given an opportunity to opt out of the Settlement. *See Jacobs v. CSAA Inter-Ins.*, No. C 07-00362 MHP, 2009 WL 1201996, at *2 (N.D. Cal. May 1, 2009) ("A district court may enjoin named and absent members who have been given the opportunity to opt out of a class from prosecuting separate class actions in state court.") (citation omitted). Second, a state court's disposition of claims similar to or overlapping the Released Claims would implicate the same legal and evidentiary issues; thus, such action would threaten the Court's jurisdiction and hinder its ability to decide the case. *See id.* at *3 ("A preliminary injunction is appropriate to preserve jurisdiction because there is a sufficient overlap of claims between the federal and state class actions, such that the same legal and evidentiary issues will be implicated in each case."); *In re Jamster Mktg. Litig.*, No. 05-CV-0819JM(CAB), 2008 WL 4482307, at *6 (S.D. Cal. Sept. 29, 2008) ("Any litigant may be enjoined from proceeding with a state court action where it is 'necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide the case.'") (citation omitted). Accordingly, the

Court enjoins Class Members who have not opted out from participating in any state court litigation relating to the Released Claims. This injunction, however, does not prevent Class Members from dismissing or staying their Released Claims.

## CONCLUSION

For the foregoing reasons, the Court ORDERS as follow:

1. Plaintiffs' motion for final approval of the Settlement is GRANTED. The Settlement is fair, adequate, and reasonable and is in the best interest of Class Members. Benefits under the Settlement shall immediately be made available to Class Members.

2. The Court CONFIRMS the appointment of Lead Plaintiffs' Counsel and the 21 members of the PSC listed in Pretrial Order No. 7 (Dkt. No. 1084) as Settlement Class Counsel.

3. The Court CONFIRMS the appointment of the Settlement Class Representatives listed in Exhibit 1 to Plaintiffs' motion for preliminary approval. (Dkt. No 2918-1.)

4. The Court CONFIRMS the appointment of Epiq Systems, Inc. as the Claims Administrator and Notice Administrator. Epiq, including its subcontractors, and the directors, officers, employees, agents, counsel, affiliates and advisors, shall not be liable for its good-faith compliance with its duties and responsibilities as Claims Administrator and Notice Administrator under the Settlement, this Order, all prior orders, or any further settlement-related orders or consent decrees, except upon a finding by this Court that it acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of its duties.

5. The Court APPOINTS Citibank Private Bank to serve as the Escrow Agent.

7. The Court DISMISSES WITH PREJUDICE the following without costs to any party:

   a. All claims as between the Settlement Class and all its Members who have not timely and properly excluded themselves, on the one hand, and any Released Party or Parties, other than as specified in this Order and in the

22

Settlement.

    b.    All claims pertaining to Eligible Vehicles, as between a Settlement Class Member who is not an opt out or otherwise excluded, and any Released Party or Parties, in related lawsuits pending in the MDL centralized in this Court by the Judicial Panel on Multidistrict Litigation on December 8, 2015, *see In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.,* 148 F. Supp. 3d 1367 (J.P.M.L. 2015).

    c.    All related lawsuits pending in this MDL containing only claims between a Settlement Class Member who is not an opt out or otherwise excluded, and against any Related Party or Parties, and pertaining to Eligible Vehicles.

8.    Class Members who have not properly opted out and any person purportedly acting on behalf of any Class Member(s) are ENJOINED from commencing, filing, initiating, instituting, pursuing, maintaining, enforcing or prosecuting, either directly or indirectly, any Released Claims in any judicial, administrative, regulatory, arbitral or other proceeding, in any jurisdiction or forum, against any of the Released Parties.  Nothing herein shall prevent any Class Member, or any person actually or purportedly acting on behalf of any Class Member(s), from taking any actions to dismiss his, her, or its Released Claims.

9.    Only those persons or entities who timely submitted valid requests to opt out of the Settlement Class are not bound by this Order, and any such excluded persons or entities are not entitled to any recovery from the Settlement.  A list of those persons or entities can be found in Exhibit 1 to this Order.

10.    Persons and entities that are determined by the Claims Administrator or the Court to be excluded from the Class, because his/her/its vehicle is not an "Eligible Vehicle," or for any other reason, are not bound by the Final Order and Judgment, and are not entitled to any recovery from the Settlement.

11.    The Court retains the exclusive jurisdiction to enforce, administer, and ensure compliance with all terms of the Settlement in accordance with the Settlement and

this Order.

**IT IS SO ORDERED.**

Dated: May 17, 2017

_____
CHARLES R. BREYER
United States District Judge