

Sgt. Henry Camerano Jr

I Henry Camerano object to the Class Action Settlement in IN re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation, No. 3:15-mid-267 (N.D. Cal.)

To Whom it May Concern,

My name is Sgt. Henry Joseph Camerano Jr. I am a owner of a 2014 Audi A6 3.0L TDI Clean Diesel. I am exercising my right to object and I am respectfully requesting the courts permission to appear in court in order to express my concerns with the settlement that was preliminary approved and awaiting final approval on May 11th. I have read much of the preliminary documentation provided via the online website roughly six weeks ago. A few things caught my attention while reading the literature.

1. The monetary compensation provided in the literature for the consumers. The objection here is the very simple. The numbers provided are, in my opinion, extremely low and simply unfair. Based upon the generation the vehicle is classified under determines the amount the consumer will receive. According to the literature we are projected to receive around eight to nine thousand dollars. The original price of my vehicle was around seventy-thousand dollars. I bought the vehicle as a certified Pre-Owned vehicle at just around sixty-thousand dollars with about eleven-thousand dollar down payment. In comparison to the roughly thirty-thousand dollar Audi A3 TDI vehicle and the court settlement of ten-thousand dollars and above. That excludes the buy back due to the vehicle not being able to be repaired but considers depreciation values for both cars for the 2015 numbers. There is a forty-thousand dollar difference between models as sold brand new. If we take into consideration the 2015 depreciation value accounting the the third party entity they referenced from, then we are looking at an A6 depreciating a much faster rate than the A3 in a one year span if the vehicle was bought brand new; mine was bought used. If taken all factors into consideration, then in one year the vehicles depreciated one-third, if not more in value. The question I asked myself was, "how is it that I will receive less money of the cost my car was higher?" I was expecting the compensation to be anywhere between fifteen-thousand and twenty- thousand plus the fix after factoring the classification it falls under. That would increase the buy back amount from roughly twenty five- thousand dollars to thirty-thousand to thirty-five-thousand dollars. It comes down to fairness and that in my opinion seems fair than the numbers already established.

2. The time given to decided which course of action is best or us individually was not sufficient nor was I contacted about the settlement in advance to give my input or opinion for the settlement. Audi sent one letter about a year or a year and a half ago stating they would send periodic updates regarding the issue. I never received any follow up latter from Audi. Lawyers never contacted me. EPA didn't contact me. I sat in the dark as well as all the other eighty-

thousand people that bought a defected vehicle and am expected to make a informed decision in six weeks from when I received the two legal notices in the mail. It is that good my opinion that that was not enough time to make a informed decision and would request more time.

3. With extreme prejudice I would have to object to the EPA compensation of about seventy-million dollars. For starters the EPA failed to to its basic job. The EPA failed to catch the issue before the vehicles went on the market. Essentially that is what they are here for. They are supposed to make sure businesses are manufacturing product within the guidelines of the law. The EPA cannot prove the cheated emissions is having or had a direct impact on the environment today. It will be even harder to the EPA to prove that thirty or fourth years from now. They are working on the assumption that it caused so much damage to the environment that it will take seventy-million dollars to reverse in the future. It seems during the negotiations that the environment became the priority instead of the eighty-thousand people that Volkswagen fraudulently sold diesels vehicle too. That is the injustice in this whole settlement. The priority should have been figuring out a fair and reasonable settle for the consumer. Volkswagen new the cars were botched. The EPA failed to catch it. The EPA should be held accountable as well. In my opinion, it seems the only entity that will be benefiting from this settlement is the EPA and that in simply not fair, nor right and a injustice to the consumer

When all said and done the fact are fairly simple. Volkswagen/Audi/Porsche knew the vehicles were botched. The EPA failed to regulate and catch the discrepancy. Volkswagen/Audi/Porsche fraudulently sold the vehicles knowing they were botched vehicles which resulted in roughly eight-thousand people buying a botched vehicle. Again, in my opinion, the first priority should have been to reach a fair and reasonable settle meant for the consumer. I strongly believe the current purposed settlement is an injustice to the consumer. I spent all the money I saved on my deploy-ment to Afghanistan for this vehicle and I am sad to have found out that I was fraudulently sold a vehicle. I would again ask the courts to grant my request to speak in person my objections to the proposed preliminary courts settlement.

Sgt. Henry Camerano Jr (USMC)

4-14-17

Charles R. Breyer

Phillip Burton Federal Building and
United States Courthouse
450 Golden Gate Avenue
San Francisco, CA 94102

CC: Elizabeth Cabraser, Sharon L. Nelles, Cari K.Dawson

Honorable Charles R Breyer,

Please accept this letter as my official objection to the proposed settlement of the Volkswagon (Audi) class action
lawsuit.

My objection is based on a number of issues in the settlement agreement:
1. All victims of the fraud perpetrated by Volkswagon group are not being treated equally.

   By separating the vehicles into Generation 1 vs Generation 2, only those in Gen 1 vehicles are given the
   option to sell back or trade-in the faulty cars. Just because a "FIX'" may be available doesn't mean the
   owners should have to live with a modified car that was sold to them using fraudulent claims (see
   included 2015 Audi clean diesel advertising brochure).

2. Volkswagon (Audi) claims that the repairs will not substantially modify performance and mileage are
   unsubstantiated.

   I bought my vehicle based on published (**false**) and actual performance specifications and mileage. Any
   change to those performance characteristics or mileage would be considered substantial to me. If the
   repair changes the car in any way, I should not be forced to live with a car that I would not have bought
   originally.
   Nowhere in the settlement document does it set a standard for the modifications in regards to how much
   Volkswagon (Audi) can change the vehicle's characteristics, mileage, acceleration, or horsepower in order
   comply with EPA standards. Volkswagon Group **cannot be trusted** to set these standards; they have
   proven that they will do anything to comply with the EPA standard. Please do not re-victimize the owners
   by leaving this loophole.

3. Volkswagon Group (Audi) should not be allowed to degrade the value of trade-in or buyback vehicles
   based on mileage or condition.

   This lawsuit is about making the owners and lessees whole. Giving Volkswagon group the ability to lower
   the values of the vehicles they buy back or trade-in only serves to increase their profit margin on vehicles
   they are able to resell. I do not believe that this process will do anything but hurt the victims when dealers
   at the time of transfer fight to save every dime for their respective companies, VW, Audi, and Porsche by
   lowering car values. There is no third party arbitration mechanism listed if owners disagree with VW
   group dealer vehicle appraisals.

Thank you, Sir, for considering the above objections. Please let me know if I need to appear to speak to or clarify
any of the above issues.



Marc L. Cobb

RECEIVED MAR 1 0 2017

David and Kandice Connor                                    March 28, 2017



Clerk of the Courts                         Elizabeth Cabraser
Charles R. Breyer                           Lieff Cabraser Heimann & Bernstein
Phillip Burton Federal Building             275 Battery Street, 29th Floor
450 Golden Gate Avenue                      San Francisco, CA 94111
San Francisco CA 94102

Sharon L. Nelles                            Cari K. Dawson
Sullivan & Cromwell LLP                     Alston & Bird LLP
125 Broad Street                            1201 West Peachtree Street
New York, NY 10004                          Atlanta, GA 30309

To Whom It May Concern;

We object to the current proposed settlement in the Clean Diesel Marketing, Sales Practices, and
Product Liability Litigation, No. 3:15-md-2672 (ND Cal.)

We strongly encourage the court to consider a requirement to offer the owners of a 2nd Generation
3.0L diesel a buyback option even if an emission compliant repair is achieved. Owners of said
vehicles have been harmed by Audi's illegal practices and the compensation offered in the proposed
settlement is not commensurate with the harm.

Owners of 2nd generation 3.0L TDI engines will have no recourse for loss of value of the vehicles if the
emissions compliant repair is successful. The financial compensation offered under this aspect of the
settlement does not appear to recognize that once the repair is made the vehicles are still tainted in
the public eye and the value of the vehicle could be adversely impacted for private sale, trade-in or
dealer resale beyond the limits of financial compensation that the settlement proposes. In short, the
owners may be stuck with a vehicle that has limited value and an undesirable reputation. The
vehicles will forever carry with them a scarlet letter of uncertainty regarding their reputation,
reliability and desirability.

Audi should be compelled to offer owners of affected vehicles a buyback option regardless of the
outcome of an emissions compliant repair. The underhandedness and deception that VW, Audi and
Porsche demonstrated in the marketing and sales of the vehicles and their total disregard for the
environment should not be rewarded by allowing them to escape complete restitution to those that
were harmed.

David and Kandice Connor

Vehicle: 2014 Audi Q5 TDI VIN [redacted] Owned since new in July 2014

RECEIVED APR 03 2017

The Honorable Charles R. Breyer
United States Courthouse
450 Golden Gate Av
San Francisco, CA 94102

Dear Judge Breyer,

I am objecting to the proposed class action settlement in re: Volkswagen "Clean Diesel"
Marketing, Sales Practices, and Products Liability Litigation, No. 3:15-md-2672 (N.D. Cal.) as
insufficient compensation for damage to the consumer (owners).

Objection 1:

The current procedure for settlement requires the owner to opt out before knowing the actual
amount Audi will pay us for our vehicle. We must opt out by April 14th and Audi will not be
able to start the valuation process until mid-May. Asking consumers to make a decision to opt
out or in without knowing the amount they may receive is like asking someone to buy something
without knowing the actual price until after they sign the contract?

*** *The opt out period for each individual should start some time after the consumer gets the
actual valuation offer from Audi (not a range that the offer might be)..***

Objection 2:

**Fraud and gross misrepresentation by Audi and Audi dealers.**

- We are a retired couple in our late 60's and bought our 2012 Q7 with the TDI diesel package
expecting it would be the last car we ever bought. We paid cash up front in 2012 for a three year
lease and paid the balance in cash in May, 2015. We have put less than 25,000 miles on the
SUV.

- We paid the full asking price from the Audi dealer (who said they would not discount any cars
from MSRP as they could sell them all for full MSRP.

- We were sold on TDI "Clean Diesel" as a breakthrough technology that exceeded all EPA
requirements.

- We were told that the Q7 diesel should last 200,000 - 300,000 miles of average driving.

- We were told that the gasoline Q7 would be good for 100,000 - 150,000 miles of average
driving.

- Based on Audi and the Audi dealers representations about the TDI diesel it was our expectation
that we were paying a premium price for a Diesel car that should be the last we ever
purchased. Ironically the principle Sales pitch from Audi centered on "Truth In Engineering"
which was a fraudulent claim.

RECEIVED APR 03 2017

- For all practice purposes we stopped driving the vehicle when the notice came out that VW had violated Federal law and our car emitted significantly more emissions than allowed by law. *We have maintained the car like new in every aspect.*

- If we accept the amounts shown in the proposed settlement agreement and have to replace our vehicle we will have to draw significant money from our life savings to do so.

- Audi and Audi dealers have enjoyed and continue to enjoy very high margins on the Audi TDI diesel throughout the period they sold the TDI vehicles and have continued to sell the Audi brand gasoline vehicles at no discount from MSRP. I have tried to trade my TDI in to several Audi dealers and they all refuse to provide any discounts for a replacement vehicle and have a very low trade in value for my car. The trade in value dealers have offered on my low mileage, like new vehicle equates to over $1 a mile cost of ownership to me.

MY REQUEST IS:

* *In addition to the current proposed settlement terms for Audi should be required to offer Generation One vehicle owners an additional incentive of 15% off the MSRP for a new replacement Audi Vehicle if purchased through an Authorized Audi dealership. (Generation One vehicles cannot be brought into compliance)*

Audi's profit (Contribution Margin) on there new cars is well over 15%.

 I thank you in advance for your consideration of my request.

Sincerely,

Hugh Cooley
Hugh Cooley

Audi Q7 TDI Quattro Tiptronic - Premium Plus Package
VIN 

I am an eligible owner and have owned Feb 2012 to the present.
I have reviewed the Class definition and have not opted out of the Class.

Cc:
Elizabeth Cabraser
Leif Cabraser Heimann
& Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111

Sharon L. Nelles
Sullivan & Cromwell LLP
125 Broad St
New York, NY 10004

Cari K. Dawson
Alston & Bird LLP
1201 West Peachtree St
Atlanta, GA 30309

Michael E. Heygood
Heygood, Orr, Pearson
6363 North State Hwy 161
Suite 450
Irving, TX 75038

Glenn Dasmalchi



March 10, 2017

Clerk of the Court/Judge Charles R. Breyer
Phillip Burton Federal Building & United States Courthouse
450 Golden Gate Avenue
San Francisco, CA 94102

Re: Objection to *Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation, No. 3:15-md-2672 (N.D. Cal.)* proposed settlement

Dear Judge Breyer,

I have reviewed the Class definition of the proposed settlement, and have not opted out of the Class. As an "Eligible Lessee" Class Member, I object to the 3.0-liter Class Action Settlement referenced above. My objections apply to all lessees of Generation Two vehicles (except those who were able and opted to purchase their vehicle before January 31, 2017).

My objections are:

- Restitution for lessees who want to exercise the option of purchasing their vehicle at lease-end is inadequate.
  - Eligible lessee restitution applies even to those who purchase their vehicle at lease end, and is fixed at $2,000 for Generation Two vehicles. By contrast, restitution for owners of the same vehicles is significantly more, and its computation includes an adjusted retail value recognizing the vehicles lower market value due to the emissions fraud.
  - While lessees have the option of returning their vehicle, they also proceeded under the expectation of a purchase option at a specified residual value. That residual value is no longer reflective of the vehicle's market value due to the emissions fraud, and so this option has been effectively devalued without adequate restitution.

- The proposed settlement is also unfair in that people who leased, and then subsequently purchased on or before January 31, 2017, are considered "Eligible Owners", qualifying for significantly higher restitution. From a lessee perspective, this seems arbitrary and inconsistent.

- The proposed settlement is also unfair in that many lessees (including myself) will have to make a decision at lease end without the benefit of knowing the court's decision on this proposed settlement.

Sincereley,

*(signature)*                                     3/10/2017

Glenn Dasmalchi
VIN: ████████████
Lease term: April 28, 2014 to April 28, 2017

Cc: Class, Volkswagen, and Porsche Counsel

RECEIVED MAR 1 3 2017

Glenn Dasmalchi



May 12, 2017

Clerk of the Court/Judge Charles R. Breyer
Phillip Burton Federal Building & United States Courthouse
450 Golden Gate Avenue
San Francisco, CA 94102

Re: *Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability*
*Litigation, No. 3:15-md-2672 (N.D. Cal.)* proposed settlement

Dear Judge Breyer,

I'd like to thank the court again for the opportunity to speak at the Fairness Hearing for
the 3.0-Liter Settlement. As a layperson I felt it a valuable experience participating in our
democracy. As a result of the hearing itself, though, I do have one point I'd like to raise.

In the course of the hearing, there was reference to a "written response" to settlement
objections (Document 3190-2). I was unaware of this document, and surprised to hear
about it. I had looked through what I believed were all related documents the previous
day on both the court's website (http://www.cand.uscourts.gov/crb/vwmdl) and the VW
settlement website (https://www.vwcourtsettlement.com/). Perhaps I was looking in the
wrong places.

When I inquired, Ms. Cabraser was kind enough to send me a copy of the document. I
read it, and I really wish I'd had the benefit of this information before presenting my
objection to the court. It would have materially affected what I presented. In particular, I
would have provided information to address arguments in Professor Klonoff's declaration
that I believe are logically unsound or based on misinterpretation. I would welcome the
opportunity to elaborate in any way that might be appropriate at this point.

I appreciate that a careful process is being followed in this settlement, and I don't know
whether this is a disclosure/access oversight or just my ignorance. If it's the latter, I
would just respectfully suggest that in the future objectors be notified of responses, or
that those responses be easily accessible to the laypeople participating in the process.

Thank you for your consideration.

Sincereley,

Glenn Dasmalchi
VIN:
Lease term: April 28, 2014 to April 28, 2017

Cc: Class Counsel

RECEIVED  MAY 1 5 2017

February 17, 2017


Elizabeth Cabraser
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111

Sharon L Nelles
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004

Esquires,

I know you are very busy regarding the Volkswagen settlement, but I hope you can find the time to read this letter. I am a retired, disabled veteran, on a fixed income. My wife and I bought a Volkswagen Touareg in 2014. This has been the most expensive vehicle I have ever purchased and our plans were to keep it around for the rest of our lives. We purchased the vehicle because we were moving from Illinois to Florida and needed something with decent towing capacity. We are also non-meat eating pescatarians and are concerned about the environment. A primary reason for getting the VW was the alleged clean air diesel. We spent a lot of money getting what we needed while still trying to minimize impact to environmental pollution.

Right after we purchased our vehicle, we made numerous trips to Florida in order to self-move our home. This put a significant number of miles on the vehicle prior to the VW announcement regarding the emissions issue. Right now, our vehicle has about 116,000 miles on it. Because of the high miles and being uncertain about the settlement, we have tried not to drive the vehicle anymore and this has caused us great inconvenience. We paid for a premium vehicle that was supposed to be environmentally responsible. We are now actually embarrassed to drive the vehicle and are saddened.

We are not satisfied with the options available to generation 2 vehicles owners. We do not want to keep this vehicle. Due to the issues, the vehicle will become rare in the US and we are concerned about parts and service. The resale value for this vehicle, even with the proposed modification, will be terrible. Additionally, we are embarrassed to drive this vehicle and do not want anything to do with Volkswagen. We still owe a pretty large amount on this vehicle through VW Credit.

The only acceptable option for us is for VW to take the vehicle back, have VW pay off the balance of our loan and provide some compensation for the embarrassment and inconvenience of owning this vehicle. We are not typical owners of these vehicles, we don't have a lot of money and can't afford the equity loss that this incident has pushed upon us. Basically, we want our vehicle treated as if it were a generation 1 vehicle with appropriate compensation and loan pay off.

We did not create this situation. Volkswagen's fraudulent behavior has had a significant negative impact on us financially. We can't afford the immediate and long-term financial hit that other Porch and Audi owners may be able to handle. VW needs to do right by us.

Could you please advise us as to what our options are? As I stated, we don't have a lot of resources – fixed income, retired, disabled vet. Would it help if we appeared at the Fairness Hearing? While we really can't afford to go to California – we also can't afford to get stuck with this vehicle.

Thanks for your help.

James Fatz

Kim French

██████████

██████████████

March 11, 2017

Clerk of the Court

Judge Charles R. Breyer

Phillip Burton Federal Building & United States Courthouse

450 Golden Gate Avenue

San Francisco, CA  94102

RE:  Volkswagen Touareg 3.0 Liter Autos

Honorable Judge Breyer:

It is my understanding Volkswagen has until around November 1, 2017 to obtain an acceptable repair for the 3.0 liter autos and up to another 90 days to obtain the same if needed.

The 2.0 liter auto settlement allowed owners the option to either have their auto repaired or Volkswagen would buy it back.  However, the buyback option is not available for the 3.0 liter owners.

The 3.0 liter settlement allows Volkswagen the option to repair the autos and does not provide the option for Volkswagen to buy back the autos. This is based on the November 1, 2017 date and extension criteria above.

RECEIVED  MAR 1 7 2017

As an owner of a 2014 Volkswagen Touareg, it is very unfair for Volkswagen not to provide this category of owners the option to buy back their auto if the repair deadline is met. These autos as you know are much more expensive than the 2.0 liter autos. This company has damaged the value of our autos tremendously and should be required to buy back the autos. This was a very popular auto before this information came out and now, no one wants one.

Please consider the above on behalf of myself and others in this 3.0 liter category.

Thanks.

Sincerely,

Kim French

CC: Elizabeth Cabraser

Heimann & Bernstien, LLP

275 Battery Street, 29th Floor

San Francisco, CA 94102


Sharon L. Nelles

Sullivan & Cromwell, LLP

125 Broad Street

New York, NY 10004


Cari K. Dawson

Alston & Bird, LLP

1201 Peachtree Street

Atlanta, GA 303097

April 10, 2017

Hon. Charles R. Breyer
c/o Clerk of the Court
Philip Burton Federal Building &
United States Courthouse
450 Golden Gate Avenue
San Francisco, CA 94102

REF:   **Letter of Objection**
       *In re: Volkswagen "Clean Diesel " Marketing, Sales Practices and*
       *Products Liability Litigation*, **No. 3:15-md-2672 (N.D. Cal.)**

To the Honorable Court:

My name is Stephen Gizzi. My contact information is as set forth above. For disclosure purposes, I am a licensed attorney and Judge *pro tem* in the State of California. However, this Letter of Objection is submitted solely on my individual behalf. I do not professionally represent any other individual or entity in this matter, and have no intention of doing so in the future.

I am presently the owner of a pristine, fully equipped, 25,000 mile, 2014 Audi Q7 Premier Plus (VIN: ████████████████ ), with the 3.0 TDI diesel engine, which I have owned since February, 2015. I am writing to the court to specifically **object to** the portion of **the proposed Class Action Settlement** in the matter of *In re: Volkswagen "Clean Diesel " Marketing, Sales Practices and Products Liability Litigation*, No. 3:15-md-2672 (N.D. Cal.), **only to the extent that it relates to the Generation Two vehicles.**

**OVERVIEW**

While the proposed class-action settlement *may* adequately compensate Generation One vehicle owners, the proposal as it applies to Generation Two owners falls woefully short of any reasonable reimbursement for the present and future loss of value, vehicle performance, brand perception, operating costs and the multitude of other factors detailed below. In fact, as proposed, Generation One vehicle owners, on balance, will end up receiving net compensation that far exceeds the amount of Generation Two owners for vehicles that, under normal circumstances, would have a significantly lower market value than their newer counterparts.

Generation Two owners stand to lose even more of their significant vehicle investment under the present proposal. This may be more palatable if the reason for such loss was due to an unforeseen error or unknown product defect that materialized years later. However, in this case, the injury suffered is solely the result of the malicious and intentional acts by the manufacturer, for which it

is now being given a reprieve if the court approves this portion of the settlement. The court must not reward such corporate chicanery and malfeasance.

## BACKGROUND

In December 2010, after owning only BMW vehicles for my previous five cars, I found the Audi to be far superior in terms of engineering, performance and quality, and purchased my first Audi – a 2011 Q7 Premier Plus with the 3.0 TDI diesel. It was an amazing car and I kept it for almost 4 years. I then purchased a brand-new Range Rover HSE for over $100,000. I owned that car for only six weeks and approximately 2,000 miles and *hated* it. I resold the vehicle back to the selling dealership and immediately went out and bought…another (2014) Audi Q7 Premier Plus with the 3.0 TDI diesel, which is the same car I still have today. I did so because I have yet to find another car in any price range that matches the comfort, ride, performance, economy and reliability of this vehicle.

## ARGUMENT

### 1) It's Not Just About the Emission Repair

The manufacturer has tried to characterize the proposed settlement for Generation Two owners as one that will offer "substantial" compensation for the "inconvenience" of having their vehicles repaired or modified.[1] This is a simplistic, self-serving statement that fails to address the larger impacts to the repaired vehicles that even the manufacturer admits it cannot predict. In the approved Notice announcing the proposed *Volkswagen 3.0-Liter Diesel Emissions Class Action Settlement*, the manufacturer states the following:

> *"The **effect on your vehicle is not known now** but it will be disclosed to you if the EPA and CARB approve Reduced Emissions Modification for your vehicle. These disclosures will include information on the effect that the Reduced Emissions Modification will have on your vehicle's emission levels, **reliability, durability, fuel economy, noise vibration and harshness, vehicle performance, drivability, and any other vehicle attributes that may reasonably be important to vehicle owners**."*
> (emphasis added)

It is evident from the text that these "Effects" on each vehicle will not be known, and the disclosures therefore cannot be made, until ***AFTER*** the proposed settlement now before this court is approved. By then it will be too late for Generation Two owners who have become bound to a pittance by comparison to the diminution in the value of their vehicles. I ask this court to seriously consider the question:

**"WHAT REMEDY WILL BE AVAILABLE TO GENERATION TWO OWNERS ONCE THE POST-MODIFICATION EFFECTS ARE KNOWN?"**

---

[1] Assuming such a fix becomes timely available.

As demonstrated by the example above, we buyers are very particular when spending money on a luxury vehicle. Manufacturers know this and spend a great deal of marketing dollars addressing these fine points. Yet, in this settlement, the defendant now expects innocent owners to simply accept that after the repair, they may not be left with the same vehicle that they originally, and so carefully, selected. Instead, in return for the proffered stipend, and a vague disclosure, they expect owners to accept that the "…reliability, durability, fuel economy, noise vibration and harshness, vehicle performance, drivability, and any other vehicle attributes that may reasonably be **important** to [a] vehicle owner…" may change and, if they do…owners will simply be left without recourse.

Volkswagen will argue that it has anticipated future issues and included extended maintenance and warranty features for impacted owners. But most of the "effects" are intangible factors that cannot be mitigated by a warranty or other "repair." For example, if after the repair, the Generation Two vehicles suddenly do not have their trademark torque (vehicle performance) that allows them strong towing capacity, or drivability that allows cornering like a car half their size, or fuel economy that provides over 32 MPG from a 3 ton SUV, they will be a different vehicle than owners originally bargained for. These factors are real to owners and cannot be mitigated.

It is not surprising that the manufacturer is pleased with this proposal. It certainly meets its needs. For its bad acts, it pays owners a small stipend and moves on. But the real innocent parties - the Generation Two owners - are the ones who suffer. They are the ones who have failed to receive the benefit of the bargain that they negotiated for, and will be left without a remedy if the court approves this proposed settlement. Owners should be offered an immediate buyback alternative.

### 2) The Full Scope of Damages For Generation Two Owners Remains Unaddressed and Those Addressed are Inadequately Compensated

The Generation Two vehicles represent the most expensive category of any the court has considered during both the 2.0 and 3.0 diesel litigation. The owners of all the other vehicle categories have rightfully been offered buybacks by the manufacturer, as a consequence of its wrongful actions. It is only this final category of the most expensive vehicles for which the manufacturer has suddenly decided it can find a "fix."

This proposed singular remedy should not be allowed by the court for several reasons. From an owner's standpoint, it is most important because the proposal does not adequately address the myriad of actual damages suffered by the class of Generation Two owners. As stated above, it merely addresses the manufacturer's problems, which it **intentionally** caused in the first place. What it does not consider are the following owner considerations:

a. **Extraordinary Depreciation in Value Due to the Manufacturer's Actions**

Anecdotally, at **3** model years old, the present value of my 2014 Audi Q7 is significantly less (approximately 50% of MSRP) than the amount I sold my **4**-year-old, 2011 Audi Q7 for at <u>wholesale</u> in 2014 (pre-scandal for 77% of

MSRP), and my present vehicle has approximately $6000 more in special options than my previous vehicle, and 20,000 fewer miles.

As further evidence of the effect on actual value, when this scandal first broke, my local Audi dealer offered me $32,000 for the car as a trade, when it was only 18 months old and had 12,000 miles on it. That was less than 50% of its MSRP!

These vehicles have been branded because of the TDI scandal and there is no indication if or when that will ever change. In fact, values may further precipitously decline when the resulting effects of the "fix" become common knowledge.

Why should owners suffer this accelerated diminution in value, which has resulted solely from the intentional acts of the manufacturer? Volkswagen owes Generation Two owners an immediate buyback alternative.

b. **Holding Costs Related to Extended, Unwanted Ownership**

Since September 2015, our TDI vehicles have been essentially "sale proof." Many owners have wanted to sell their vehicles and purchase other vehicles but have been unable to do so without losing tens of thousands of dollars in the process. Even the manufacturer instituted a ban on the sale of new and used TDI vehicles by their dealers over a year ago. Most unaffiliated dealers, fearing litigation, self-imposed a similar moratorium. How then could owners ever hope to sell their vehicles privately except under very distressed circumstances?

In my case, I had no interest in being part of this litigation or scandal and sought to get out of it by selling my car as soon as I learned of the problem. However, I found I was unable do so without losing over $25,000. Instead, I have driven the car less than 7,000 miles in the past 18 months and left it in the garage much of the time awaiting an outcome.

Being forced into this situation through no fault of our own, has been a major inconvenience and hardship for many owners, such as myself. Though I personally do not have a car loan or lease, many owners have had to make payments over this lengthy process, since they have no practical way of getting rid of their car, even though they may have wanted to do so.

How does the small stipend now being offered by the manufacturer even begin to compensate for years of delay keeping a vehicle none of us wanted, and even the manufacturer's own dealers couldn't sell, after the defendant's bad acts became known? Only an immediate buyback alternative can address this loss.

c. **Damages Related to Post-Repair "Effects"**

It is not possible to quantify the amount of damages related to any potential effects arising out of the emissions repair to Generation Two vehicles. This would be purely speculative because at this point it is not known which, if any, effects will arise because of the repair. However, *any* change in the performance, operating costs or reliability of a vehicle denies an owner the very benefits originally sought when purchasing the vehicle. For example, one of the great attractions of the TDI vehicles is the unmatched fuel economy for such a large vehicle. To the extent that is materially altered post-fix, it would negate what had been a primary incentive for the purchase of the vehicle in the first place. This would require significant offsetting compensation to the average owner of a Generation Two vehicle.

If the settlement proposal is approved by the Court, how will Generation Two owners be compensated for these substantive damages that are now unknown but foreseeable, when they are later determined?

d. **The Proposed Compensation to Generation Two Owners is Inadequate**

For all of the reasons set forth above, it is clear that the manufacturer, through its actions, has caused great harm to the buyers of its TDI products. The resultant damages from that harm span many categories – well beyond the non-exhaustive list provided above. Arguably, as part of the settlement, the Generation One owners have been adequately compensated through a buyback of their vehicles in an amount that exceeds historic market value for comparable vehicles. It appears the 2.0 TDI settlement took a similar approach. However, the Generation Two proposal does not adequately compensate owners because it fails to address the actual damages incurred by owners resulting from the manufacturer's intentional, wrongful acts.

My own settlement payment is scheduled to be approximately $8,400. For this amount, I am expected to have my vehicle repaired or modified, without any assurance that it will be the same vehicle following its mechanical lobotomy. Even assuming it is the same following the repair, adding this compensating amount to its present market value, falls far short of what it would have been pre-scandal, based on historic values. None of this addresses the other categories of damages addressed above. Nor does it address that we as owners were the victims of one of the most egregious cases of intentional criminal behavior by a corporation ever witnessed.

Without a buyback alternative, how are Generation Two owners to be made whole? Because the current proposal lacks a buyback alternative and a post-fix remedy, it is not a comprehensive solution for Generation Two owners.

## CONCLUSION

I urge the Court to reject the settlement proposal to the extent that it applies to the Generation Two vehicles because as proposed, the settlement:

1) Does not include a remedy for owners to address the tangible and intangible effects to vehicles following the emissions repair or modification to the extent that it materially alters the reliability, durability, fuel economy, noise vibration and harshness, vehicle performance, drivability, and any other vehicle attributes that may reasonably be important to vehicle owners;

2) Does not provide a mechanism for Generation Two owners to address problems that arise after the emission repair or modifications are performed and all resultant effects to the Generation Two vehicles are finally known. It is therefore premature for this court to approve a settlement proposal that fails to provide such a remedy, when it is known by the court and the manufacturer that this unaddressed void exists;

3) Fails to offer an immediate buyback alternative to Generation Two owners;

4) Fails to address all categories of damages to Generation Two vehicle owners such that all are assured to be made whole, adequately compensated, and receive the benefit of the bargain as each originally negotiated and, to the extent damages are addressed, they are inadequately compensated;

5) Responds only to the needs of the manufacturer and fails to seriously consider the issues of Generation Two owners; and

6) Does not sufficiently address the criminal nature of the manufacturer's conduct and actions, and their impact on all vehicle owners.

I am unavailable to speak at the hearing on May 11, 2017 due to a previously-scheduled teaching commitment at the National Judicial College. However, in the event the hearing is continued for any reason, or further opportunities arise to address the court on this most important issue, I respectfully request permission to participate in future testimony.

Respectfully submitted,

Stephen Gizzi

SG;ds

6

cc:           Elizabeth Cabraser, Esq.
                  Lieff Cabraser Heimann & Bernstein, LLP
                  275 Battery Street, 29th Floor
                  San Francisco, CA 94111

                  Sharon L. Nelles, Esq.
                  Sullivan & Cromwell LLP
                  125 Broad Street
                  New York, NY 10004

                  Cari K. Dawson, Esq.
                  Alston & Bird LLP
                  1201 West Peachtree Street
                  Atlanta, GA 30309

# David Gonzales



April 1, 2017

Honorable Charles Breyer
United States District Court
450 Golden Gate Avenue, Box 36060
San Francisco, CA 94102-3489

By Federal Express

IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY
LITIGATION

Your Honor:

I am an owner of a 2015 Porsche Cayenne Diesel vin # ███████████. In reviewing the 2/10/17
filed Settlement Agreement it designates me a member of the 3.0 Gen 2 class.

I am writing to lodge an objection to the settlement.

In my view, there are at least two levels of deception from the Volkswagen Group:
   a. Government emissions violations and,
   b. Consumer fraud in the sales process.

The Settlement is unfairly weighted to resolve the emission issue and does not fairly manage the
consumer fraud damages. The Settlement as negotiated, inappropriately transfers the risk of asset value
diminution and vehicle performance decline to the consumer instead of the fraud actor.

The settlement presumes there is a repair capable of bringing the vehicle into emission compliance.
However, this repair is not discussed in detail and the consequence on vehicle performance is not
discussed. Moreover, if there is a negative vehicle performance impact resulting from the yet to be
disclosed repair, this loss apparently accrues to the consumer with no further remedy.

Very simply, I purchased a $80,000 product that had very noticeable torque and handling characteristics.
Now it is going to be repaired to remedy Volkswagen Group's deception … but I am stuck with the
repaired vehicle regardless of the performance consequences. This is not a risk characteristic that was
disclosed to me at purchase.

This settlement transfers all risks to the consumer and allows the Volkswagen Group to limit their damage payment to a fraction of what they should be paying.

The following is an extract of one of the VW website settlement summaries. I think it illustrates the "agreement to agree" nature of the proposed repair. Additionally, there is no assurance that the vehicle will stay at its "at purchase" performance levels, it does not manage short or long term value diminution and it very clearly does not provide any remedy to the consumer if it does not maintain performance status quo.

*Summary of Benefits for Generation Two*
*If Volkswagen can repair Generation Two vehicles so that they comply with their originally certified exhaust emissions standards and makes this repair available in a timely manner, Class Members who own or lease Generation Two vehicles will receive the Emissions Compliant Repair free of charge.  In addition to this Emissions Compliant Repair, Volkswagen will pay substantial compensation to owners and lessees of those Generation Two vehicles.*
*On the other hand, if the EPA and CARB determine that Defendants cannot make an Emissions Compliant Repair to a group of Generation Two vehicles, or if Volkswagen cannot meet the time limits for making the Emissions Compliant Repair available, the options and benefits available to owners and lessees in that group will be a choice among:*
*(1) A Buyback as described in Question 42-43 and 45 of this Notice; or (2) A Trade-In as described in Questions 44-45 of this Notice; or (3) An Approved Emissions Modification, if one is available, and Extended Warranty, as described in Questions 38-41 of this Notice; or (4) Lease Termination for Eligible Lessees as described in Questions 46-47 of this Notice.*
*Under each of these options, Class Members will receive substantial compensation.*
*Even before an Emissions Compliant Repair is approved, owners and lessees of Generation Two vehicles can choose to receive up to half of their Emissions Compliant Repair Payment shortly after the Court grants final approval of the Class Action Settlement.  The rest will be paid when the approved repair is made, or, if a repair is not timely available, when the Class Member obtains one of the other four remedies listed above.  Generation Two vehicles that would otherwise be without warranty protection during all or part of this period will receive a "Class Bridge Warranty" until an Emissions Compliant Repair is approved or denied. See Question 34 of this Notice.*
*Additional*

While the Plaintiffs environmental orientation is important, they are not only victim in the Volkswagen Group deception. Moreover, having the EPA and CARB decide on the repair characteristics could be a conflict of objectives regarding the other plaintiffs … the consumers interested in performance.

I think a more appropriate remedy would be for a complete buyback of all vehicles, repair as required by the EPA and CARB, then the Volkswagen Group can remarket the vehicles inside their distribution system. This process will allow the market to determine the economic impact of the repair and any value diminution related to the deception. This is a more appropriate financial remedy, as it places the economic risk on the preparator of the product deception.

I am an investment banker and I regularly navigate bankruptcy disclosure/plan and SEC related documents. I have found the settlement and Volkswagen Group documents difficult to navigate, digest and evaluate. I do not see how anyone without any direct or tangential experience could appropriately navigate this process.

I believe the settlement should be more transparent and re-noticed.

For example, and not an exhaustive list, the repair should be discussed and why or why not it may impact performance. There should be a discussion of the rights, if any, a participating class member gives up by participating {i.e. eliminating the ability to pursue state consumer fraud claims). There should be a discussion of the "intra class" fairness issues raised in this objection. There should be a discussion from the Special Master on why this is a fair economic remedy for the consumer. There should also be a discussion on why a former FBI director has the economic and engineering expertise to represent the interests of the consumers.

Thank you for your consideration.

CC: addressees were delivered via email

Cari K. Dawson (pro hac vice)
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309-3424
Email: cari.dawson@alston.com

Robert J. Giuffra, Jr.
Sharon L. Nelles
George R. Painter IV
Elena L. Coronado
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Email: giuffrar@sullcrom.com
nelless@sullcrom.com
painterg@sullcrom.com
coronadoe@sullcrom.com

Elizabeth J. Cabraser (State Bar No. 083151)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
ecabraser@lchb.com

Robin L. Greenwald
WEITZ & LUXENBERG P.C.
700 Broadway New York, NY 10003
E-mail: rgreenwald@weitzlux.com

*March 23, 2017*

Clerk of the Court/Judge Charles R. Breyer
Phillip Burton Federal Building and U.S. Courthouse
450 Golden Gate Avenue
San Francisco, CA 94102

Elizabeth Cabraser
Lieff Cabraser Heiman & Bersnstein, LLP
275 Battery Street, 29th Floor
San Franscisco, CA 94111

Sharon L. Nelles
Sullivan & Cromwell, LLP
125 Broad Street
New York, NY 10004

Cari K. Dawson
Alston & Bird, LLP
1201 West Peachtree Street
Atlanta, GA 30309

> Re: *Volkswagen Class Action Settlement - Objection of*
> *Vehicle Owners Sorouch Haddad and Kathryn A. Bixby-*
> *Haddad*

To Whom It May Concern:

We the undersigned are owners of an Audi Q5, Vin No.
███████████████████████, which we have owned since
approximately August 1, 2015.   As "Owners" of a subject
vehicle, we are eligible for benefits under the Class Action
Settlement in In re: Volkswagen "Clean Diesel" Marketing,
Sales Practices, and Products Liability Litigation, No. 3:15-md-
2672 (N.D. Cal.).

*p1 of 3*

This letter is to formally lodge our objection to the Class Action Settlement (the "CAS"). We object to the proposed CAS for the following reasons:

(1) We are concerned that the so-called "fix" (the "Emissions Compliant Repair") being offered as part of the CAS with regards to our vehicle will negatively impact the performance of our vehicle, including the mileage and power performance of the vehicle.

(2) Along those same lines, we were promised that the AdBlue additive – intended to increase efficiency and reduce emissions – would need to be added no more than once every 10,000 miles. We are presently adding AdBlue almost twice as frequently as promised. If this is how the vehicle operates now, we have significant concerns about functional deficiencies (compared to what we thought we were purchasing) following the fix.

(3) There is no question, in our minds, that the "fix" will decrease the value of our vehicle. The vehicle has already lost considerable value because of Volkswagen's actions, and the "fix" would continue to decrease that value. In fact, even if the "fix" does not have a demonstrable impact on performance (and we remain concerned that it will), there is no question that auto dealers, or potential third-party buyers, will view our vehicle as damaged goods due to Volkswagen's actions.

(4) We have requested, since as early as April 22, 2015 (case #160008895), that Audi either (a) buy back our vehicle from us, or (b) replace the vehicle with a non-diesel vehicle. Audi has refused to do so, telling us to wait patiently while the CAS was being negotiated. We have waited as instructed - and the value of our vehicle has continued to decrease - but the CAS does not provide any option for a buy back or trade in unless the Emissions Compliant Repair is unsuccessful or delayed. This means that, under the CAS, we will be waiting another year, if not more, for Volkswagen/Audi to deal with this issue, and any

"fix" will still de-value our vehicle.                                    3/23/17

(5) The CAS does not take into account expenses we incurred
    upon purchasing the vehicle - including a service contract
    for $3,730, a road hazard policy for $1,199, and a DuPont
    protection plan for $799 - and does not provide for
    reimbursement of those expenses.

**Ultimately, our principal objection to the CAS is the fact
that we are not being offered an option to simply trade in/sell
back our vehicle.** It has been almost two full years since we
requested a buy-back/trade in from Audi, and they are not
requesting that we wait another year or more while they attempt
to provide a "fix" which, even if successful, will devalue our
vehicle.

We strenuously object to the CAS as constructed, and request
that it be restructured so that all affected vehicle owners have the
option of a buy back or trade in.

Thank you,

_Sorouch Haddad_
Sorouch Haddad

_Kathryn A. Bixby-Haddad_
Kathryn A. Bixby-Haddad

William Haegele

████████████

April 11, 2017

Clerk of the Court / Honorable Charles R. Breyer
Phillip Burton Federal Building & United States Courthouse
450 Golden Gate Avenue
San Francisco, CA 94102

Re: Objection to the Class Action Settlement *in re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Product Liability Litigation,* No. 3:15-md-2672 (N.D. Cal.)

Dear Judge Breyer:

My name is William Haegele. I reside at 6138 Ledgewood Terrace, Dublin CA, 94568. My telephone number is ████████████

I am the owner of a 2014 Audi Q7 3.0 TDI, ████████████████████████ purchased new on January 10, 2014, a Generation Two Vehicle as defined in the amended Consumer and Reseller Dealership 3.0-Liter Class Action Settlement Agreement and Release ("Settlement Agreement" or "Settlement"). I currently still own the above described vehicle.

After careful review and consideration of the Settlement Agreement I object to the Class Action Settlement *in re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Product Liability Litigation,* No. 3:15-md-2672 (N.D.Cal.) as it relates to myself and the Class of Generation Two vehicle owners.

It is important to note that proposed Settlement provides different provisions related to two generations of vehicles, Generation One and Generation Two. My objection is only to the settlement as it relates to the Generation Two vehicle owners.

The Settlement's Executive Summary states that "the ultimate goal of these Agreements is to compensate all owners or lessees of 3.0-liter Eligible Vehicles for any harm they suffered as a result of the emission issues..."[1] As demonstrated below, as it relates to Generation Two vehicle owners, the Settlement does not accomplish this objective. The Settlement does not provide fair and adequate compensation, does not reasonable compensate for further harm and damage, and is not adequate, fair, or reasonable.

---

[1] Executive Summary of Proposed Volkswagen 3.0-Litet Diesel Emissions Class Settlement Program

**Summary of Objections:**

- Contrary to representations made to this Court the Settlement allows Defendants to materially alter the performance of Generation Two vehicles without adequate or fair compensation.

- The Settlement allows for an unreasonable and unfair taking of the purchased performance and the benefit of the consumer's bargain.

Settlement Allows Material Degradation in Performance

The Settlement states that "Defendants expect that Generation Two vehicles can be repaired to compliance with the original emissions standards (the Certified Exhaust Emissions Standards) without materially reducing vehicle performance"[2] (emphasis added).

This assurance is also contained in the Revised Notice of 3.0-Liter TDI Class Action Settlement Agreement ("Notice") and repeated in Plaintiff's Notice of Motion and Memorandum in Support of Preliminary Approval of the 3.0-Liter TDI Class Action Agreement and Approval of Class Notice. The later also includes the statement that "Under this scenario, owners and lessees of Generation Two vehicles will get the vehicles they believed they were purchasing or leasing with performance and emissions at or very near the initially advertised specifications"[3] (emphasis added).

The above statements are false and misleading. The settlement provides for the opposite, the taking of the performance that was advertised and promised, performance that consumers paid a premium of thousands of dollars to obtain. In short, the Settlement allows an unreasonable and unfair taking of this purchased performance and the benefit of the consumer's bargain.

Section 7.5 of the Settlement Agreement allows Volkswagen to degrade Generation Two vehicle fuel economy by 3 MPG and reduce both the horsepower and torque by 5%. Further, for what appears to be an arbitrary payment of just $500, the "repair" can degrade performance beyond these already significant limits.[4] The Settlement Agreement falsely labels these allowed for changes as not material.

The Settlement's allowed for changes in performance are material. Consumers attached significant and material importance to the advertised fuel economy, horsepower and torque. This is clearly demonstrated by the $5,000+ premium charged by Volkswagen, and paid for by the consumer, for the TDI version, when compared to the price of the gasoline powered version, of the same vehicle.[5] Volkswagen also clearly understood the materiality as evidenced by Volkswagen's focus on these performance attributes in the

---

[2] Consumer and Reseller Dealership 3.0-Liter Class Action Settlement Agreement and Release (Amended)
[3] Plaintiffs' Notice of Motion and Memorandum In Support of Preliminary Approval of the 3.0-Liter TDI Class Action Agreement and Approval of Class Notice
[4] Consumer and Reseller Dealership 3.0-Liter Class Action Settlement Agreement and Release (Amended).
[5] www.autoblog.com

marketing and advertising of the TDI vehicles. It is not fair or reasonable for Volkswagen to now claim these performance attributes are not material.

Volkswagen's TDI performance Marketing

Examples of Volkswagen's TDI marketing and advertisement focus on fuel economy combined with performance are well documented in the Plaintiff's Amended Consolidated Consumer Class Action Complaint and include the statements below, along with numerous other examples.[6] Clearly Volkswagen understands that the combination of performance and fuel economy was material to the consumers purchasing decision.

- *"It's like driving a high-powered gasoline engine so you are not giving up one bit of the driving experience that you'd expect from a regular gasoline engine"*

- *"less fuel consumption with added engine power"*

- *"Combining legendary performance and fuel economy, the TDI Clean Diesel is our least thirsty engine yet.."*

- *"the available 240-hp 3.0-liter TDI clean diesel V6 delivers incredible torque (428 lb-ft) and passing power, while boasting impressive fuel economy numbers."*

Material and Unfair Taking of Purchased Performance Demonstrated

Section 7.5 of the Settlement, by definition, allows for a material degradation in performance. In general, as a Certified Public Accountant ("CPA"), I understand an item is material if a reasonable person would attach importance to its existence or nonexistence in determining a course of action in a transaction. This is clearly the case given the $5,000+ premium consumers paid for the TDI version as compared to the gasoline powered version of the same vehicle.[7]

The Settlement Agreement at Section 7.5 allows for the full taking of the purchased benefits and denial of the purchased bargain. Clearly this is material, unfair and unreasonable.

To demonstrate I offer my Generation Two vehicle as an example. My family elected to purchase the diesel version of the Audi Q7 specifically for advertised the fuel economy. We paid a $5,200 premium compared to an identically equipped gasoline version of the Audi Q7 specifically to obtain an environmentally friendly vehicle with the advertised combined benefits of performance and improved fuel economy. A 3 MPG reduction in fuel economy represents a 13.6% reduction in the fuel economy of 22 MPG represented on the window sticker of our vehicle, reducing it nearly to the same level as the gasoline powered version.[8, 9]

---

[6] Consolidated Consumer Class Action Complaint
[7] www.autoblog.com
[8] 2014 Audi Q7 TDI Premium Plus Window Sticker

Additionally, for a payment of just $500 the Settlement Agreement allows for a greater reduction. As an example, a 4 MPG reduction, as provided for in the Settlement Agreement and discussed at the hearing on February 14, 2017, reduces the performance by 18.2%, completely negating the fuel economy benefit purchased for $5,200.[10]

The above example does not consider that in addition to taking the full benefit of the purchased fuel economy, section 7.5 also allows, in combination with the reduced fuel economy, for the horse power and torque to be also be reduced. Additionally, for the same, single arbitrary $500 payment, Volkswagen can take away, in combination, the full benefit of the advertised fuel economy, and reduce both the horsepower and torque by greater than 5%.

Summary

In the Settlement Volkswagen represents that Generation Two Vehicles can be repaired to bring them into full compliance with emissions standards without materially reducing performance. We are told that Generation Two Owners will get the vehicles they believed they were purchasing. By way of this objection I am asking the Court to hold Volkswagen to this representation.

Volkswagens ability to materially reduce the performance of Generation Two Vehicles results in an unreasonable and unfair taking of the purchased performance and the benefit of the consumer's bargain rendering the settlement unfair and unreasonable.

As demonstrated above, the allowed for reductions in performance contained in Section 7.5 of the Settlement Agreement clearly allows Volkswagen to materially alter the performance of Generation Two Vehicles. Further, Section 7.5 allows Volkswagen to reduce performance beyond the limits for just $500, an amount that appears to be arbitrary and not tied to any calculation of damages or reduced value.

The performance reduction limits contained in Section 7.5 should be adjusted to amounts that are consistent with Volkswagens representations, amounts that are not material. Further, Volkswagen should not be allowed to exceed the limits for an arbitrary payment of $500.

First, the fuel economy limitation should be expressed as a percentage and in an amount equal to the allowed for percentage reduction in horse power and torque. Second, the percentages should be reduced to no more than 2%. Third, as described further below, in the event performance is reduced beyond these limits, and therefore becomes material, the applicable payment to the Generation Two vehicle owner should be consistent with the payments as contemplated in the tables for an Approved Emission Modification.

In the event performance is materially changed it is no longer appropriate to consider the Generation Two vehicle repaired. The vehicle may meet the required compliance with the

---

[9] www.fueleconomy.gov

[10] February 14, 2017 preliminary approval hearing transcript, 36:2-5

original emissions standards however it is not repaired but rather modified. In this event the Generation Two vehicle owner is harmed similarly to the Generation One vehicle owners who receive an Approved Emission Modification. It is not fair or reasonable for the Settlement to provide different benefits for similarly situated Class Members.

Absent the above, or similar equivalent changes, I respectfully request the motion for final approval of the Volkswagen 3.0-Liter Diesel Emissions Class Action Settlement be denied.

Respectfully,

William Haegele

cc:     Elizabeth Cabraser - Lieff, Cabraser, Heimann & Bernstein
        Sharon L. Nelles, Sullivan & Cromwell LLP
        Cari K. Dawson, Alston & Bird LLP

William Haegele

████████████

March 25, 2017


Honorable Charles R. Breyer
United States District Court, Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102


Re:  Stipulated Motion and Proposed Order Regarding Revised Settlement Notice
3.0-Liter Diesel Emissions Class Action Settlement Agreement ("Revised Settlement
Notice"


Dear Judge Breyer:


I previously wrote to you on February 24, 2017 to point out an Omission in the
Settlement Notice with reference the allowed for degradation in performance provided
for in the 3.0-Liter Class Action Settlement Agreement and Release ("Settlement
Agreement").

In my previous letter I shared the observation that the original Settlement Notice did not
disclose that an approved Emission Compliant Repair can reduce the performance of the
Generation Two Vehicles by amounts listed in Section 7.5 of the Settlement Agreement
and no disclosure was provided that these reductions will be viewed as not reducing
performance.

Additionally, I shared my view that, as a Generation Two vehicle owner, a clear
understanding of the potential for degradation in performance is a significant
consideration in deciding whether to participate in, object to, or opt out of the Settlement
Agreement.

I recently reviewed the Stipulated Motion and Proposed Order Regarding Revised Notice
of 3.0-Liter TDI Class Action Settlement Agreement filed with the Court on March 15,
2017. While I believe the inclusion of the provisions of section 7.5 of the Settlement
Agreement on page 32, at question 36, of the Revised Settlement Notice is a positive
step, I would like to share my view that this is not enough to inform Eligible Owners so
they can make an informed decision.

As Discussed further below the Revised Notice and Proposed Order: (1) does not require Volkswagen to proactively reach out to the Eligible Owners and inform them of the change in disclosure, (2) does not extend the notice period so the new disclosure can be adequately considered, and (3) does not correct the misleading statement contained on page one of the Settlement Notice.

Need to proactively inform:  The original Settlement Notice was approved and made available to Eligible Owners on February 14, 2017. Eligible Owners reading this notice were not adequately informed, and it is unclear from the proposed order what steps will be taken by Volkswagen to make sure Eligible Owners are aware of the new disclosure.

As an example of the need to proactively inform Eligible Owners of the additional disclosure I offer the following: On February 27, 2017, while waiting at an Audi Dealership for my Audi Q7 to be serviced, I talked with three individuals who also owned effected Q7 TDI vehicles.  In each case the owners had already read the settlement notice and were unaware of the changes that could be made to their vehicles performance, changes that under the Settlement would be viewed as not reducing performance. What steps will Volkswagen take to make sure Eligible Owners are aware of the new disclosure and are no longer relying on the previous Settlement Notice?

Misleading statement on page one of the original and Revised Settlement Notice:  Page one of both the original and Revised Settlement Notice contains the statement, "it is anticipated that the newer Generation Two vehicles can be repaired to bring them into compliance with the exhaust emission standards to which they were originally certified, without materially reduced performance"[1] (emphasis added).

This statement is misleading and does not direct the reader to the additional information contained at Question 36 of the Revised Settlement Notice. Why not simply state: "it is anticipated that the newer Generation Two vehicles can be repaired to bring them into compliance with the exhaust emission standards to which they were originally certified, without reducing fuel economy in excess of 3 MPG, or performance in excess of 5% in peak horsepower, or 5% in peak torque. For details on allowed performance changes see Question 36 of this Notice."

As disclosed in my February 24, 2017 letter, A 3 MPG reduction in fuel economy represents a 13.6% reduction in the fuel economy of 22 MPG represented on the window sticker of our vehicle, reducing it nearly to the same level as the gasoline powered version.[2,3] Additionally a 4 MPG reduction, as provided for in the Settlement Agreement, reduces the performance by 18.2%, completely negating the fuel economy benefit purchased for $5,200.  Because it is reasonable to assume Eligible Owners will find this change to be material it seems inappropriate, and misleading, to continue to label this as not material.

---

[1] Original and Revised Volkswagen 3.0-Liter Diesel Emission Class Action Settlement Long Form Notice
[2] 2014 Audi Q7 TDI Premium Plus Window Sticker
[3] www.fueleconomy.gov

In Summary, while the additional disclosure at question 36 of the Revised Settlement Statement is a positive step it does not cure the problem of the originally deficient disclosure if Eligible Owners are still relying on the original Settlement Notice. Further, by not correction the first page of the Revised Settlement Notice, or otherwise directing the reader to question 36, the reader still may not appreciate the allowed for performance reductions.

It is curious, as an example of detail provide in the first section of the Revised Settlement Notice, that this important section provides notice of the specific time limits for Defendants to make an Emission Compliant Repair and directs the reader to Question 35 for details, provisions an Eligible Owner would view as favorable; but does not provide similar notice or direction with reference allowed for performance changes, maintaining simply that performance will not be "materially reduced".

Respectfully,

William Haegele

cc:    Elizabeth Cabraser - Lieff, Cabraser, Heimann & Bernstein
      Jonathan Cohen - Federal Trade Commission
      Joshua H. Van Eaton, Bethany Engel - U.S Department of Justice
      Kicklas Akers, Laurel Carnes - Office of the Attorney General
      Robert J. Giuffra, Sullivan & Cromwell LLP
      Kara Kennedy, Alston & Bird LLP

William Haegele

February 24, 2017

Kara Kennedy, Esq.
Alston & Bird LLP
1201 West Peachtree Street
Atlanta, GA 30309

Re:  Settlement Notice Omission – 3.0-Liter Diesel Emissions Class Action Settlement

Dear Ms. Kennedy:

I am writing to make you aware of a letter I provided to Judge Breyer to inform the court of a material omission contained in the Long Form Legal Notice in the above matter. I have enclosed this letter for your consideration.

Respectfully,


William Haegele


Encl.

William Haegele

February 24, 2017

Honorable Charles R. Breyer
United States District Court, Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102

Re: Settlement Notice Omission – 3.0-Liter Diesel Emissions Class Action Settlement

Dear Judge Breyer:

I am the owner of a 2014 Audi Q7 3.0 TDI, a Generation Two vehicle as defined in the amended Consumer and Reseller Dealership 3.0-Liter Class Action Settlement Agreement and Release ("Settlement Agreement"). After careful review of both the Settlement Agreement, and the Court Approved Legal Long Form Notice ("Notice"), I find it important to call to the courts attention that the Notice fails to disclose what I believe to be an important and material provision of the Settlement Agreement, a provision Eligible Owners need to be aware of to make an informed decision with reference their participation in the Class.

Disclosure in the Notice: The Notice, bottom of page one, states that "It is anticipated that the newer Generation Two Vehicles **can** be repaired to bring them into compliance with the exhaust emissions standards to which they were originally certified, without materially reduced performance"[1]. At no place in the Notice is there a discussion, or definition, of what "**without materially reduced performance**" represents.

Provision in Settlement Agreement – (not disclosed in the Notice): Section 7.5 of the Settlement Agreement states that "Defendants represent that the Emission Compliant Repair shall not result in "Reduced Performance." In the event that the Emission Compliant Repair causes Reduced Performance of the Eligible Vehicle, Volkswagen shall make an additional payment of $500 for each affected Eligible Vehicle. For purposes of this section, **Reduced Performance** means a change in any of the following performance attributes: (1) a reduction in calculated fuel economy using the EPA formula of more than 3 MPG; (2) a decrease of greater than 5% in peak horsepower; or (3) a decrease of greater than 5% in peak torque"[2] (emphasis added).

---

[1] Long Form Notice – Exhibit 3 to the Consumer and Reseller Dealership 3.0-Liter Class Action Settlement Agreement and Release (Amended).
[2] Consumer and Reseller Dealership 3.0-Liter Class Action Settlement Agreement and Release (Amended).

The Notice does not disclose that an approved Emission Compliant Repair can reduce the performance of a Generation Two vehicle by the amounts listed in Section 7.5 of the Settlement Agreement and no disclosure is provided that these reductions will be viewed as not reducing performance.

Further, the Notice makes no mention that, for an additional payment of $500, the Emission Compliant Repair can reduce performance in excess of 3 MPG, 5% in peak horsepower, and 5% in peak torque.

Failure to disclose the permitted reductions in performance is troubling as the Settlement Agreement provides that Volkswagen can reduce the performance in accordance with these provisions without offering a Buyback. This is important information that should be considered by Eligible Generation Two Owners.

Question 39 of the Notice, "How will the Emission Compliant Repair or Reduced Emissions Modification affect my vehicle?"  This question, found on page 32 of the Notice, provides an opportunity to disclose that the Emission Compliant Repair can alter the performance within the defined limits, and for $500, exceed them. The answer however fails to provide any of the necessary information. The answer simply states "the effect on your vehicle is not known now, but it will be disclosed to you".[3]  A reader who relies on the Notice is left to conclude any reduction in performance is not known, but in any event, it will not be material.

Understanding the potential for degradation in performance is a significant consideration in deciding whether to participate in, object to, or opt out of the Settlement Agreement. To make an informed decision Eligible Owners require knowledge of the allowed reductions in performance and as such it should be included in the Notice.

As an example of the significance I offer the following details. My family elected to purchase the diesel version of the Audi Q7 specifically for the fuel economy. We paid a $5,200 premium compared to an identically equipped gasoline version of the Audi Q7 specifically to obtain this benefit in fuel economy.  A 3 MPG reduction in fuel economy represents a 13.6% reduction in the fuel economy of 22 MPG represented on the window sticker of our vehicle, reducing it nearly to the same level as the gasoline powered version.[4, 5]

The above 13.6% reduction in performance is not considered "Reduced Performance" as contemplated in the Settlement Agreement and the reader of the Notice is not provided the information necessary to evaluate if they agree. Personally, I would consider this to be a material degradation in the performance of our vehicle.

---

[3] Long Form Notice – Exhibit 3 to the Consumer and Reseller Dealership 3.0-Liter Class Action Settlement Agreement and Release (Amended) page 32.
[4] 2014 Audi Q7 TDI Premium Plus Window Sticker
[5] www.fueleconomy.gov

Additionally, for a payment of just $500 the Settlement Agreement allows for a greater reduction. As an example, a 4 MPG reduction, as provided for in the Settlement Agreement, reduces the performance by 18.2%, completely negating the fuel economy benefit purchased for $5,200.

A reduction of 4 MPG was exactly the scenario that was discussed at the hearing on February 14, 2017 as noted in the transcript at page 36 line 2 to 5. "So if we end up in a reduced performance, then the consumer would get a minimum additional $500 per vehicle, and that's sort of when we go to 3 miles a gallon to 4 miles a gallon".[6]

Using my vehicle as an example. If the Eligible Owner only reads the Notice they will not be informed, and therefore not able to consider, that the Settlement Agreement contemplates an 18.2% reduction in the performance of their vehicle, without providing a buyout option.

In Summary, failure to provide notice of the allowed for degradation in performance contained in the Settlement Agreement renders the Notice ineffective and misleading. The Notice does not provide the information necessary for a Generation Two Eligible Owner to make an informed decision whether to participate in, object to, or opt out of the Settlement Agreement.

I am sharing this information with the hope you find it useful. I work as an accountant and as such I am familiar with reading agreements and finding information, information beyond the notice that other Eligible Owners might not take the time to identify. It is with this in mind that I have written this letter.

Respectfully,

William Haegele

cc:    Elizabeth Cabraser - Lieff, Cabraser, Heimann & Bernstein
       Jonathan Cohen - Federal Trade Commission
       Joshua H. Van Eaton, Bethany Engel - U.S Department of Justice
       Kicklas Akers, Laurel Carnes - Office of the Attorney General
       Robert J. Giuffra, Sullivan & Cromwell LLP
       Kara Kennedy, Alston & Bird LLP

---

[6] February 14, 2017 preliminary approval hearing transcript, 36:2-5

William Haegele

Kara Kennedy, Esq.
Alston & Bird LLP
1201 West Peachtree Street
Atlanta, GA 30309

30309-342499

SAN FRANCISCO CA 940

24 FEB 2017 PM 4 L





**Fw: VOLKSWAGEN "CLEAN DIESEL" MARKETING , SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION**

█████████  to: CAND CRBpo                          03/15/2017 02:46 PM
This message is digitally signed.

From:        ████████████████████████
To:          CAND CRBpo@USCOURTS



----- Forwarded by Lashanda Scott/CAND/09/USCOURTS on 03/15/2017 02:46 PM -----

From:        davejaeger@aol.com
To:          crbcrd@cand.uscourts.gov
Date:        03/15/2017 02:41 PM
Subject:     VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION

Dear Ms. Scott,

I am a Porsche Owner (Generation 2, 2.1 SUV (Porsche Cayenne)) and one of the affected Parties to VW's heinous acts of deceit.   I strongly disagree with the recommendations of the Plaintiff's Steering Committee and the Settlement Class Representatives and request that the Court demands that Porsche also be directed to offer a full buyback, at the original purchase price plus taxes, for each of these defective vehicles to the impacted Class Members. Additionally, they should be made to pay additional punitive compensation to the affected parties for this deceit.   VW is in the wrong here and they should not be given the option of what to ultimately offer the affected Parties.  Allowing VW to stretch this process out for another 18 - 21 months is just a reprieve for them when it is abundantly clear that they knowingly defrauded the Consumers.

I know I am just one voice in a sea of 70,000 others (and in an 11,000 member smaller sub-component of that) but I couldn't let my opinions go unheard on this issue and I pray the Court will make the equitable decision to give the ultimate rights to choose the means and method of the settlement choice to the harmed individuals and not the greedy corporation or Lawyers who are most likely not even Class Participants.

Regards,

David Jaeger

████████████████

Dear Judge Breyer,

As the owner of a 2013 Porsche Cayenne Diesel, I would like to state my objections (numbered 1-5 below) to the terms of the proposed settlement.

1) *If the repair causes reduced performance, owners will receive an additional $500 for the affected vehicle.*

> I paid nearly $90,000 for a high performance automobile (sometimes referred to as a sports car disguised as an SUV). The idea of $500 in compensation is, in all honestly, offensive.

2) *If an emissions compliant repair is approved, the older the vehicle, the lower the proposed compensation.*

> I can understand a buyback offer being based upon the age (and therefore resale value) of the vehicle. However, in this case, the older the vehicle, the longer the owner has:

> 1. been deceived that he/she is driving a "green" car while actually polluting significantly more nitrogen oxide than the (lower priced) gasoline powered model
> 2. paid a higher price per gallon for diesel fuel versus the cost of gasoline. (The slightly better MPG of the diesel model still does not cover the higher price of diesel fuel since 2012.)
> 3. incurred additional expenses for servicing, including the cost of AdBlue for the urea system, which should have made the vehicle compliant in the first place

> It seems to me that a better way to calculate compensation would be to make it proportional to both

> 1. The purchase price of the vehicle
> 2. The length of ownership (not the opposite)

3) *If I opt out of the "fix and payment" portion of the settlement, I will not be entitled to the buyback option, even if a fix has not been approved by the proposed deadline.*

> While I find the terms of the "fix and payment" unacceptable and would opt out of that portion, I would readily agree to the buyback

terms.  (In fact, I turned in my 2009 Jetta TDI under the terms of the first settlement.)

4) *Volkswagen Group has until November 8, 2017 (plus an additional 90 days) to come up with an emissions compliant repair, although my "opt out" deadline will be April 14, 2017.*

I have already held my vehicle for more that a year since Volkswagen's admission of cheating, despite my desire to sell it as soon as I learned that my Cayenne was not "green" as advertised.  To benefit from the buyback option (if a fix is *not* approved by the EPA and CARB), I will have to continue driving my "dirty" diesel for another year.

5) *If I opt out of the settlement and choose not to have the fix (perhaps because of reduced performance), it is unclear whether my vehicle would comply with state/federal emissions standards.  If necessary for compliance, I would then be forced to have the repair without any compensation, potentially at my own expense.*

I apologize that I am only writing now, a day before your hearing, but I have just recently learned the full terms of the settlement.  Not only is the link from the Volkswagen website is inactive, ( https://www.vwdieselinfo.com/updates/statement-by-volkswagen-group-of-america-17/ ) communications from Porsche have been virtually non-existent.

There is no mention of the settlement on the Porsche website.  Since the revelations of "Dieselgate" I have received only one correspondence, and that was more than a year ago.  That letter promised to keep owners informed and offered an extended warranty (now expired).  Porsche and Audi 3 liter owners did not receive the $1000 "goodwill" packages given to Volkswagen TDI owners (both 2 and 3 liter alike).  In fact, I am wondering if there has been any adjustment for this discrepancy in the settlement calculations.

I thank you in advance for your consideration and hope that you will require significant amendments to the settlement before approval.

Sincerely,

Melissa Koller

█████████████████████████

████████████████

To : all concerned
RE: Volkswagen "Clean Diesel" Marketing, Sales Practices and Products
Liability Litigation, No. 3:15-md-2672(n.d. Cal)

Understanding.
   Volkswagen proposing emission solution for generation 2 vehicles with
restitution and no buyback.

Request / Objection
   Buyback plus restitution monies going to Garber Audi towards the purchase
of a new 2017 Q5 or Q7.

Reasoning
   Value has been severely tarnished by emissions scandal. Trade in and retail
value is declining.  Vehicle will be un- sellable.  Edmonds – 15% drop in
values as compared to 4.4% of their gas counterparts. Numerous articles
stating that these  vehicles   will continue dropping in value.  This media
coverage will make consumers  skeptical and render these vehicles
worthless. Consumers will not be able to sell or trade them in.

I understand that this request will have zero impact on this scandal. Being a
loyal Audi customer for the past 20 years, I felt an obligation to speak my
mind and thoughts. I currently own an A-6 and a Q5.  I would love to stay in
the Audi family but am having second thoughts.

John Lewkowicz                          3/20/17

Purchased- April, 2015, Audi Q5,

February 23, 2017

To: Judge Charles R. Breyer

Subject: Volkswagen Clean Diesel Marketing, Sales Practices and Products Liability Litigation No. 3:15-mid-2672 (N.D. Cal.)

2011 Audi Q7 3.0 Diesel Vin # ████████████████ Purchased 5/2011, traded in 7/2016

I am writing to object to the class action settlement for my 2011 Audi Q7 3.0 Liter Diesel.

I purchased my 2011 Audi new and traded it in in July of 2016 for a new 2017 Audi Q7. When I traded it in it was known that there was a class action and a settlement was being reached. What was not known was what the actual settlement would be.

I traded my car in at ████████████ for a new 2017 Q7. Most dealers were reluctant to even take the car in trade as they did not know what they could do with the car. ████████ offered me approximately $8,000 less in trade than what I felt the car was worth prior to the class action suit. My only choice was to trade it in to an Audi dealer as no other manufacturer would take the car. I had to talk to Audi corporate office to ask them to convince the dealer to take the car in trade. I had assumed that the class action suit would make me whole in the trade and I purchased a new Audi Q7.

At this time, I am reading that I am considered a "Former Owner" and as such I am slated to receive half of the settlement. ($3-4,000). It is my understanding that ████████ can now claim they own the car and are entitled to the other half of the settlement. Additionally, Audi will purchase the car from ████ ████ at a fair price and destroy the car.

████████ is coming out of this transaction making money as a former owner and Audi will pay them full retail price to destroy the car. The only party coming out whole and considerably ahead in this suit is the Audi Dealer.

What is hard to understand is if I still owned the vehicle, I would be given a full settlement. I feel I did the right thing and got the car off the road. I purchased a new Q7 from the company that perpetrated a fraud on me. Why should I be penalized with half a settlement and the dealer gets the other half? I am the party that took the loss in this case, not the dealer.

If this settlement goes through as published, I will never purchase an Audi again and I own three Audi's. A Q7, an A7, and an A5.

Regards,

Jim Lindley                    2/23/2017

RECEIVED FEB 2 8 2017

March 1, 2017

Clerk of the Court/Judge
Charles R. Breyer
Phillip Burton Federal
Building & United States Courthouse
450 Golden Gate Avenue
San Francisco, CA 94102

Sharon L. Nelles
Sullivan & Cromwell, LLP
125 Broad Street
New York, NY 10004

Elizabeth Cabraser
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111

Cari K. Dawson
Alston & Bird, LLP
1201 West
Peachtree Street
Atlanta, GA 30309

**RE:** Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation, No. 3:15-md-2672 (N.D. Cal.);

Judge Charles Breyer, E. Cabraser, S. Nelles, and C. Dawson,

I'm an individual with very limited legal experience, so I ask that you bear with my lack of legal wording, but I am trying to follow the items listed in the www.vwcourtsettlement.com in the section "How do I tell the court if I do not like the Class Action Settlement. (https://www.vwcourtsettlement.com/en/docs/3Liter/Amended%20Exhibit%203.pdf)

I am the current owner of a 2010 Touareg TDI purchased on 12/28/2011
VIN: 

Chess N. McKinney

While I applaud the great work you have completed in bringing this matter to a close, I do have one objection I would like to express for your consideration in the Class Action Settlement - In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation, No. 3:15-md-2672 (N.D. Cal.)

This settlement does not seem to allow for settlement value to be increased if major work has been required on the vehicle, which may have substantially increased the value. In my specific case, the diesel engine failed July 2016 at 84,360 miles. As the vehicle had full service records, the repairing dealership worked with VW, as anyone would understand a diesel engine should not fail at this mileage, and VW allowed me to purchase parts at half price. Apparently no "engine in a crate" was available and the replacement engine had to be hand built at the dealership. My out the door price was $12,590 for a new engine. Without VW's half price parts

RECEIVED MAR 0 6 2017

offer, it would have been over $20,300. As of today this engine has less than 5,000 miles on it. The bottom line for me is, the vehicle with a new engine is worth more than one with the original engine and I would suggest the agreement should have a clause covering this added value, especially if the reason I had to purchase a hand built engine was due to VW not being able to sell an "engine in a crate" due to this class action.

For your reference, I am including pages 1, 9 and 10 of the repair order. Bottom of page 9, continued on page 10 lists the findings and page 10 lists the charges including the 50/50 parts split.

Thanks for reviewing my objection.

Sincerely,

Chess McHenry   3/1/2017

Chess McKinney

*Also Eng Air Flt chg'd*




CUSTOMER #: ▮

CHESS N MCKINNEY

SERVICE ADVISOR:

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN / OUT | TAG |
|---|---|---|---|---|---|---|
| | 10 | VW TOUAREG 2 | | | 84360/84381 | |

| DEL. DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|---|---|---|---|---|---|---|---|
| 01JAN10 IS | | | | | | | |
| 01JAN10 DD | | | 18:00 24JUN16 | | | CASH | 09AUG16 |

| R.O. OPENED | READY | OPTIONS: | ENG:3.0 Liter TDI |
|---|---|---|---|
| 07:29 22JUN16 | 15:14 09AUG16 | | |

| LINE | OPCODE | TECH | TYPE | HOURS | | LIST | NET | TOTAL |
|---|---|---|---|---|---|---|---|---|

A CUSTOMER STATES ENGINE MAKING A RATTLING TYPE NOISE, ENINGE OIL LIGHT CAME ON, SHUT THE CAR OFF OIL LEAKING ON GROUND

CAUSE: E

CS CUSTOMER STATES:

| | WV | | | | | | (N/C) |
|---|---|---|---|---|---|---|---|
| | 93120 | CPV | | | | 3914.00 | 3914.00 |
| 1 | 06E-121-018-AX WATER PUMP | | | | | | |
| | CPV | | | | 83.58 | 83.58 | 83.58 |
| | WV | | | | | | (N/C) |
| 1 | 059-100-105-CX SHORTBLOCK | | | | | | |
| | CPV | | | | 2109.50 | 2109.50 | 2109.50 |
| CORE CHARGE | | | | | | | |
| | CPV | | | | | 1125.00 | 1125.00 |
| | WV | | | | | | (N/C) |
| CORE CHARGE | | | | | | | |
| | WV | | | | | | (N/C) |
| 1 | 059-121-155 COVER | | | | | | |
| | CPV | | | | 19.70 | 19.70 | 19.70 |
| | WV | | | | | | (N/C) |
| 1 | 059-103-265-LX CYL HEAD | | | | | | |
| | CPV | | | | 1137.50 | 1137.50 | 1137.50 |
| CORE CHARGE | | | | | | | |
| | CPV | | | | | 175.00 | 175.00 |
| | WV | | | | | | (N/C) |
| CORE CHARGE | | | | | | | |
| | WV | | | | | | (N/C) |
| 1 | 059-103-266-LX CYL HEAD | | | | | | |
| | CPV | | | | 1137.50 | 1137.50 | 1137.50 |
| CORE CHARGE | | | | | | | |
| | CPV | | | | | 175.00 | 175.00 |
| | WV | | | | | | (N/C) |
| CORE CHARGE | | | | | | | |
| | WV | | | | | | (N/C) |
| 1 | N-101-703-03 SCREW | | | | | | |
| | | | | | | | (N/C) |

**WARRANTY STATEMENT AND DISCLAIMER: PLEASE SEE THE DEALERSHIP'S LIMITED WARRANTY ON THE REVERSE SIDE OF THIS REPAIR INVOICE.**

By signing below, you acknowledge that you were notified of and authorized the Dealership to perform the services/repairs itemized in this Invoice and that you received (or had the opportunity to inspect) any replaced parts as requested by you. The vehicle is being returned to you in exchange for your payment of the Amount Due. A $35.00 service fee will be charged on all dishonored checks.

**\*SHOP SUPPLY COSTS:** We have added a charge equal to 2.5% of the total cost of labor and parts, not to exceed $20.00, to the Repair Order for shop supplies used in connection with this repair.

**ALL PARTS ARE NEW UNLESS OTHERWISE INDICATED.**

| DESCRIPTION | TOTALS |
|---|---|
| LABOR AMOUNT | |
| PARTS AMOUNT | |
| GAS, OIL, LUBE | |
| SUBLET AMOUNT | |
| MISC. CHARGES * | |
| TOTAL CHARGES | |
| LESS INSURANCE | |
| SALES TAX | |
| **PLEASE PAY THIS AMOUNT** | |

DATE          CUSTOMER SIGNATURE

**CUSTOMER COPY**

DealerCAP ©2006 ADP (01/09) · SERVICE INVOICE TYPE 2 - SI2C - "LIMITED WARRANTY" · TENNESSEE · 9888033




| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN / OUT | TAG |
|-------|------|-----------|-----|---------|------------------|-----|
| | 10 | VW TOUAREG 2 | WVGFK7A91AD002324 | | 84360/84381 | |

| DEL. DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|-----------|-----------|-----------|----------|--------|------|---------|-----------|
| 01JAN10 IS | | | | | | | |
| 01JAN10 DD | | | 18:00 24JUN16 | | | CASH | 09AUG16 |

| R.O. OPENED | READY | OPTIONS: | ENG:3.0_Liter_TDI |
|-------------|-------|----------|-------------------|
| 07:29 22JUN16 | 15:14 09AUG16 | | |

| LINE | OPCODE | TECH | TYPE HOURS | LIST | NET | TOTAL |
|------|--------|------|------------|------|-----|-------|
| | | | WV | | | (N/C) |
| 1 | 7L0-253-115-A | GASKET | | | | |
| | | | CPV | 4.07 | 4.07 | 4.07 |
| | | | WV | | | (N/C) |
| 2 | N-910-144-02 | BOLT | | | | |
| | | | CPV | 3.68 | 3.68 | 7.36 |
| | | | WV | | | (N/C) |
| 2 | N-909-987-02 | BOLT | | | | |
| | | | CPV | 4.54 | 4.54 | 9.08 |
| | | | WV | | | (N/C) |
| 6 | N-104-043-06 | BOLT | | | | |
| | | | CPV | 2.25 | 2.25 | 13.50 |
| | | | WV | | | (N/C) |
| 2 | N-910-941-01 | STUD | | | | |
| | | | CPV | 4.54 | 4.54 | 9.08 |
| | | | WV | | | (N/C) |
| 4 | N-909-913-02 | BOLT | | | | |
| | | | CPV | 3.39 | 3.39 | 13.56 |
| | | | WV | | | (N/C) |
| 2 | G-004-000-M2 | OIL | | | | |
| | | | CPV | 14.62 | 14.62 | 29.24 |
| | | | WV | | | (N/C) |
| 2 | N-013-830-2 | WASHER | | | | |
| | | | CPV | 2.00 | 2.00 | 4.00 |
| | | | WV | | | (N/C) |

FC:
PART#:
COUNT:
CLAIM TYPE:
AUTH CODE:
*

PARTS: 7716.73  LABOR: 3914.00  OTHER: 0.00  TOTAL LINE A: 11630.73
84360 Found connecting rod on engine blow and crack block and
crankshaft. internal damage on engine. Drain oil, drain coolant,

**WARRANTY STATEMENT AND DISCLAIMER: PLEASE SEE THE DEALERSHIP'S LIMITED WARRANTY ON THE REVERSE SIDE OF THIS REPAIR INVOICE.**

By signing below, you acknowledge that you were notified of and authorized the Dealership to perform the services/repairs itemized in this Invoice and that you received (or had the opportunity to inspect) any replaced parts as requested by you. The vehicle is being returned to you in exchange for your payment of the Amount Due. A $35.00 service fee will be charged on all dishonored checks.

**\*SHOP SUPPLY COSTS:** We have added a charge equal to 2.5% of the total cost of labor and parts, not to exceed $20.00, to the Repair Order for shop supplies used in connection with this repair.

**ALL PARTS ARE NEW UNLESS OTHERWISE INDICATED.**

| DESCRIPTION | TOTALS |
|-------------|--------|
| LABOR AMOUNT | |
| PARTS AMOUNT | |
| GAS, OIL, LUBE | |
| SUBLET AMOUNT | |
| MISC. CHARGES * | |
| TOTAL CHARGES | |
| LESS INSURANCE | |
| SALES TAX | |
| PLEASE PAY THIS AMOUNT | |

DATE    CUSTOMER SIGNATURE

**CUSTOMER COPY**

DealerCAP ©2008 ADP (01/08)  SERVICE INVOICE TYPE 2 - SI2C - "LIMITED WARRANTY" - TENNESSEE - 9898033



**754409**

| COLOR | YEAR | MAKE/MODEL | | VIN | LICENSE | MILEAGE IN / OUT | TAG |
|---|---|---|---|---|---|---|---|
| | 10 | VW TOUAREG 2 | | | | 84360/84381 | |

| DEL. DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|---|---|---|---|---|---|---|---|
| )1JAN10 IS | | | | | | | |
| )1JAN10 DD | | | 18:00 24JUN16 | | | CASH | 09AUG16 |

| R.O. OPENED | READY | OPTIONS: | ENG:3.0_Liter_TDI |
|---|---|---|---|
| )7:29 22JUN16 | 15:14 09AUG16 | | |

| .INE OPCODE TECH TYPE HOURS | LIST | NET | TOTAL |
|---|---|---|---|

recover a/c system, remove drivers front seat, disconnect battery,
remove shields, remove front wheels with fender liners, remove calipers
and struts with sway bar from vehicle, remove drive shaft and exhaust,
remove wiper arms, remove covers under, remove engine harness and ecm,
seat it on engine, disconnect hoses, inter cooler pipes, connectors and
lines from all vehicle, remove a/c lines, use alignment tools on sub
frame and install table and drop complete engine with transmission and
suspension. Remove mount and remove starter, remove transmission,
remove engine assembly and remove all parts. put all together new
engine block, install cylinder heads with gaskets and torque all new
bolts to specs. install timing chains with guides and set engine on
time and test it, transfer all parts for old engine to new engine,
replace all gaskets and seals, replace water pump, oil pressure switch,
tensioners, replace belt and roller, rebuilt complete engine and
install all back together, align all assembly and install to vehicle,
top off all fluids, change oil, vacuum and re-charge a/c system, clear
all faults and bleed fuel system 3 times and test drove vehicle for 21
miles. Vehicle operating to specs now.
*************************************************

SPLIT FOR REPAIR ORDER   100 LABOR
SPLIT FOR REPAIR ORDER   50/50 PARTS
CUSTOMER PAY SHOP SUPPLIES FOR REPAIR ORDER                          20.00

**WARRANTY STATEMENT AND DISCLAIMER: PLEASE SEE THE DEALERSHIP'S LIMITED WARRANTY ON THE REVERSE SIDE OF THIS REPAIR INVOICE.**

By signing below, you acknowledge that you were notified of and authorized the Dealership to perform the services/repairs itemized in this Invoice and that you received (or had the opportunity to inspect) any replaced parts as requested by you. The vehicle is being returned to you in exchange for your payment of the Amount Due. A $35.00 service fee will be charged on all dishonored checks.

**\*SHOP SUPPLY COSTS:** We have added a charge equal to 2.5% of the total cost of labor and parts, not to exceed $20.00, to the Repair Order for shop supplies used in connection with this repair.

**ALL PARTS ARE NEW UNLESS OTHERWISE INDICATED.**

| DESCRIPTION | TOTALS |
|---|---|
| LABOR AMOUNT | 3914.00 |
| PARTS AMOUNT | 7716.73 |
| GAS, OIL, LUBE | 0.00 |
| SUBLET AMOUNT | 0.00 |
| MISC. CHARGES * | 20.00 |
| TOTAL CHARGES | 11650.73 |
| LESS INSURANCE | 0.00 |
| SALES TAX | 940.07 |
| PLEASE PAY THIS AMOUNT | 12590.80 |

DATE          CUSTOMER SIGNATURE

**CUSTOMER COPY**



01 MAR 2017 PM 5 L

Elizabeth Cabraser
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111

Jarad Minsky



March 10, 2017

Clerk of the Court/Judge Charles R. Breyer
Phillip Burton Federal Building & United States Courthouse
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Judge Charles R. Breyer,

I object to the Class Action Settlement in In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation, No. 3:15-md- 2672 (N.D. Cal.);

Two of the main reasons I purchased this car were because of the performance and great gas mileage. I paid an extra $8,500 for the diesel and figured I could keep this car for a very long time since the diesels typically last longer. I was told that is about the amount of my settlement payment under generation 2 but have the following objections.

1. I own a generation 2 vehicle which has to get the fix and compensation. The fix they told me they expect but don't know for sure that will decrease the gas mileage by about 3 miles per gallon and decrease the horsepower and torque by about 5%. Seeing that they lied already, I have zero faith in their estimates. Shouldn't the generation 2 vehicles be allowed a buy back since this car will now be different than when I bought it? I bought this under false pretenses and think we should be allowed the same opportunities as the generation 1 vehicles.

2. What happens if the fix is worse than they expect and the mileage and performance goes down more than they expect? Do we have any recourse at that point?

3. I have to opt out no later than April 14th while the court doesn't finalize things until May. Why do we have to commit to something before it's finalized? The attorney I spoke to provide by this settlement said everything is subject to change. Even Audi isn't confirming actual details and keeps telling me to refer to the 54 page settlement which is very confusing.

I'm very disappointed in this and want to get rid of my car. I have no faith in the fix and hope you will reconsider not only expanding a trade in for generation 2 vehicles (like generation1) but also some sort of recourse should the fix not work like they "hoped" it would.

Sincerely,

Jarad Minsky

Aubrey Moradian



March 15, 2017

To Whom It May Concern:

I object to the Class Action Settlement in re: Volkswagen "Clean Diesel" Marketing,
Sales Practices, Products Liability Litigation, No. 3:15-md-2672 (N.D. Cal.) for the
following reasons:

a) I am currently a lessee of a 2014 Audi Q7 3.0L TDI – VIN:
█████████████. My Lease dates are December 13, 2013 to present. Terms of
lease are 4 years/10,000 miles per year at $1034.55/month

b) At the time of lease signing, Audi ████████ chose US Bank as my lessor. I was
not given a choice as to who would finance the lease.

c) In the current settlement agreement being proposed, anyone with a US Bank lease is
automatically excluded from the class action settlement. This is obviously an oversight
in the settlement agreement seeing as how I did not have the option to choose a different
lessor and have suffered financial damages from the "clean diesel" scandal.

Sincerely,

Aubrey Moradian

Aubrey Moradian
3/15/17

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br>ALL CONSUMER AND RESELLER ACTIONS | Case No: MDL 2672 CRB (JSC)<br><br><br><br>**PUTATIVE CLASS MEMBER OBJECTION AND/OR ALTERNATIVE MOTION EXCLUDE FROM 3.0 LITER TDI CLASS ACTION AGREEMENT**<br><br>Honorable Charles R. Breyer |

COMES NOW, Thomas Newkirk, appearing as a consumer affected by preliminary approval of the 3.0-Liter TDI Class Action Agreement, states as follows:

1. Pursuant to instructions from the Clerk, Putative class member Newkirk has emailed this objection directly to Judge Breyer. The clear gave no instructions regarding service to other named parties and as Newkirk is not named counsel, the EDMF system does not apply.

2. Putative class member Newkirk appears pro se in his capacity as an individual affected by proposed class-action settlement regarding 3.0- liter TDI vehicles. Despite being an attorney putative class member Newkirk does not represent any other individual person, group or any corporation that may have a financial interest in the settlement or objections to the settlement.

3. Newkirk files this objection and inquiry regarding whether the proposed settlement is fair and reasonable given all the circumstances. This motion is an objection or an alternative

motion/notice to exclude from the settlement.  This is framed as an alternative to permit Putative

Class Member Newkirk to object, but not allow the deadline to exclude to expire.

4.   The primary purpose of this objection is to identify what appear risks to the

reasonableness of the settlement as a whole. Risks that are unidentified and therefore

unexamined.  It is to ask the Court to extend the time period to exclude/opt out and to include

within the notice to class members more detailed information on how to exclude themselves

from the class, as well as a clear identification of the "unidentified risks" to the reasonableness of

the settlement as a whole.

5.   This objection raises three points of fairness and reasonableness and seeks a limited

solution:

   a.   That because of the lack of analysis of certain unidentified risks, more remedies
        are available to the class and should be provided to the class and because of these
        unidentified risks, support for the rationale for the compromise with VW is
        insufficient,

   b.   That the notice provided to the class about how to exclude/opt out or the reasons
        for opting out are insufficient on their face and insufficient to identify for the class
        members these unidentified risks to the reasonableness of the compromise[1] and

   c.   That further investigation will reveal that VW has received and will receive more
        gains (past and future) from engaging in the fraud than any combination of fines,
        settlements or other punishment imposed and

---

[1] A review of the  mailed notice and VW website suggests that there is in fact a very limited time
to object and to exclude one's self from the class as well as almost zero explanation of how to go
about it.  Even for an attorney the method to exclude is not entirely clear.

d. That a remedy is required to either notify the class of these risks make a decision on opting out and/or the settlement needs to be reviewed and amended.

6. The settlement is not reasonable is because there will be insufficient remedies provided to the class and/or insufficient punishment provided to Volkswagen (VW) for the fraud. The unidentified risk reflects the role of implicit biases played in entrenching favorable perceptions of VW into the market. As a result, these settlements, fines and other costs associated with the admission of fraud are insufficient to return VW to its market or financial position prior to the fraud, which in turn means there is a greater ability to pay more in remedies and fines to the American public and American consumer/members of the class.

7. There also appears to be little if any evidence to suggest that providing greater remedies to the class, in fact the full extent of any available remedies, rather than a compromise sum, will result in long term harm to VW. If this settlement notice or result is not amended, available remedies for the class will remain undistributed and VW will be *effectively rewarded for committing the fraud upon the American consumer and the American car manufacturing industry*. Rewarded simply means that VW has enjoyed and will continue to enjoy well into the future, *more gains from the fraud* than any settlement costs, fines or bad publicity resulting from those settlements or fines will have cost the company.

8. This objection is not intended to impugn or question any attorney representing any government entity or private class members. While a general appreciation for the role of implicit bias in decision-making may exist, it is unlikely that any counsel representing either the government or the class have specific knowledge of the manner in which implicit biases actually work across a host of decisions or how they have likely generated and will continue to generate positive perceptions of VW as a direct result of the fraud. It is not well understood how those

implicit biases have been created and built up over many years and as such, will favor VW in the mind of the public regardless of the admissions of fraud.[2]

Background Information

9.  Given the extensive record and public hashing of that record, this objection will not repeat basic facts other than to provide context for this objection.   Some framing of the behavior of VW is important.

10. The facts should fully support that VW is a sophisticated organization that has finally admitted systemic consumer fraud over an extended period of time.  The facts should also support that it is highly probable that the design of this fraud was in fact just that, a design. There was a calculated risk taken by VW that was intended to significantly alter (increase) market share and therefore income.  The facts should also support that this was done *while planning to ride out the eventual discovery of the use of fraud* to obtain that increased market share.   The facts either support this conclusion or certainly there is no evidence to suggest that is not a reasonable conclusion from the admitted facts.

11. While it appears that VW did initially admit or rather take some responsibility for the impact of fraudulent behavior with regard to the 2.0-liter vehicles after exposure of that fraud, it also appears VW was only willing to admit its further fraud regarding the 3.0-liter vehicles <u>after</u> discovery of additional information either through this litigation or by the federal government. During that time frame *VW continued to sell vehicles including the vehicle purchased by class member Newkirk in 2015*.

---

[2] Even some general understanding of implicit bias does not arm one with the full appreciation for how a positive implicit bias, once formed, acts to block or mute a reaction to an event. The purpose of identifying this risk is therefore not to suggest failure or negligence in any person or lawyer, the issue is that implicit biases are a real risk to real decisions and they represent an unexamined risk to the reasonableness of this settlement as whole.

12. These facts again suggest that even after VW admitted fraud in this litigation, which then resulted in the first settlement for 2.0 vehicles, that VW was still attempting to hide or gloss over its fraud regarding other vehicles. The purpose was designed to continue cash flow as much as possible. This again shows a planned response and business calculation to the fraud.

13. The entire program of fraud and even the behavior tied to the initial admission of wrongdoing once caught has been one designed to gain a business advantage or cover the fraud and now to cover the extent of and the financial benefits to Volkswagen resulting from fraud.

14. This class action appears to be focused recovery for consumers and the removal or repair of certain vehicles. There is nothing wrong with that being part of the goal. However, the public perception is that these settlements (2.0 and 3.0) go hand in hand with the imposed fines and is therefore part of the overall remedy and punishment for VW for fraud. There is insufficient attention paid to whether VW has *improperly benefited and will continue to improperly benefit from the fraud* even after consideration of all fines, litigation costs and fees. That would translate into whether there are additional remedies available for the class. Indeed, one consideration for compromise was the question of not forcing VW into some type of receivership that in turn might result in less remedies for the class. Clearly, the question of whether VW can or should compensate consumers more or less is a question tied to the reasonableness of this settlement.[3]

15. One goal of this objection is to seek public disclosure of the specific financial information provided to the government or to attorneys for the putative class. This contains a

---

[3] There are no facts indicating that VW has even been pushed close to the line of bankruptcy. Publicly available data suggest that VW had $30 billion in cash and that its market share, its income stream and its other substantial assets are largely unaffected and other than a limited and temporary downturn, may have already returned to its prior position or even advanced during the settlement process.

proposal to pause and request that VW provide an **analysis of the present financial condition of VW relative to the costs of this litigation and other fines**.[4]  In short, the following questions have to be explored:

    a.  Has anyone done a full analysis of the start date of the fraud, the position of VW in the market at the start of the fraud, the impact (benefit) on *advancing market share* to VW resulting from the fraud?

    b.  Has anyone considered the impact on the American car manufacturers as a result of the advantage of the fraud of VW enjoyed and how that corresponding downturn in American car sales in turn boosted the advantage to VW again resulting from the fraud?

    c.  Has anyone examined to what extent is the fear of VW taking bankruptcy or losing the financial wherewithal to pay the settlement justified or an exaggeration?

16. If in fact these specific questions have been answered fully, there clearly has been no analysis of consideration for the role that implicit bias has played in VW advancing its position in the market (a question separate from those posed in paragraph 12 a-c), and what role favorable implicit biases will play in VW *maintaining or even advancing its market share over the foreseeable future* within the United States, again as a result not of innovation but fraud creating the perception of innovation.

17. The role of implicit biases affecting business has not been examined nor considered in this settlement.  Some discussion on this topic is therefore warranted to properly inform the Court.

    a.  While negative implicit biases can affect how we view protected classes such as African Americans or females, positive implicit biases also can impact how we positively will view members of certain in-groups and/or in the case of VW, a large business organization. Indeed, positive implicit biases will benefit large

---

[4] Putative Class Member contacted VW prior to filing this objection to inquire about this information and to seek information necessary to examine the role that implicit biases may have on VW and/or to determine if there were records already produced in the litigation that would show the position of VW prior to the fraud, the positive impact of the fraud on VW's market share and public perception and the future benefits of the advances in consumer confidence from the fraud relative to the fines and settlement costs.  VW did not respond despite multiple requests.

organizations such as VW that may engage in fraudulent or improper behavior or even criminal behavior.[5]

b. While an individual person who engages in fraud or other criminal activity may suffer long term consequences in terms of credibility or assessment of character or long term employability, these negative effects do not impact a business organization in the same way. Therefore, a business organization that is a) large enough and b) has a sufficient history of employment or earnings and c) has the wherewithal to engage in a positive-image marketing campaign, can remain largely unaffected. VW was in possession of all of these factors that lend themselves to a positive image that will, other than in the very short term, remain unaffected by allegations, admissions or even criminal convictions for fraud. [6]

18. As a result, positive implicit biases help VW maintain its market share because the criminal charges and/or the fines and/or the exposure of fraud will have very limited effect upon the perception of the public regarding the behavior of VW and will likely not harm sales or market share. The recent advances in VW's market share despite the public fraud and fines already start to show that VW will pay these fines and fix these cars and not miss a beat.[7]

---

[5] The analysis of implicit bias to identify the risks to the reasonableness of the settlement is based on the expertise of the putative class member Newkirk. This Court can easily gain access to any number of social scientists who, along with marketing experts or analysts can provide a reliable opinion both regarding the general nature of implicit bias, the role that implicit bias plays in consumer confidence, the favorable biases that may exist for large corporations like VW and the muted impact from any criminal act resulting from those favorable biases upon the market share of that corporation. Putative Class member provides the analysis to expose the risk and to query whether this risk has been identified or analyzed, but is not suggesting his expertise in implicit bias should be the sole foundation for the Court's ruling. The objection is one regarding *unexamined risks or unidentified risks.* These are serious risks that need to be examined.

[6] As a recent article stated VW is already moving away from the problem: "Thanks to hard-charging sales from its Passat, Golf and Tiguan lines, 2017 is off to a much better start for Volkswagen than 2016. Hoping to finally rid itself of the Dieselgate stench that lingered with it through all of 2016, the German automaker had one of the few sunny performances in the otherwise dreary January sales report." Daily News, February 2, 2017.

[7] The point-in-time public information on VW income or market share is not the issue. Market share may have decreased from the initial hit, or may or may not have advanced in every aspect. What the objection seeks is information and analysis to examine this unidentified risk to the reasonableness of the settlement. A substantive review, not merely a cursory one that may either unfairly exaggerate the benefits to VW or as the case appears to be, unfairly dismiss the long term benefits to VW from the designed fraud.

19. What is also not well understood is how these implicit biases that now benefit VW have been *entrenched over a long period of time*. In short, there are different aspects to how baises form. Any large business like VW may generally have positive biases that may prevent harm to the company from a variety of negative PR. These favorable biases can be generated by the idea that our society values large corporations and their positive impact on the economy. Some biases can be increased in power by a marketing campaign. However, favorable biases can be massively increased in scope and power where as here, a **fraud itself superimposed a positive image of VW upon the American and worldwide consumer** regarding its technological superiority and ability to develop a design "clean" diesel vehicles. The fraud not only advanced to sales of VW's diesel vehicles, but also improved the perception of VW *as a whole* over the time period the VW began to use its fraud to superimpose a better perception of its technology and cleanliness to upon the American and worldwide consumer base.

20. There are likely many pieces of information that can help explain the full business advantage gained or benefit of the fraud. This benefit was far more than simply increasing sales of diesel vehicles. The benefit arose from the idea that this company beat every other car manufacturer in the design and technology of its cars to create not just efficient, but clean diesel. A company with that type of ability must have something going for it. That perception, that feeling, is now locked into the mind of the American consumer and in particular, younger consumers who were most affected by the fraud creating the perception of "environmentally friendly" products. [8]

21. In addition to not taking into account generally favorable implicit biases that mute our response to any large business organization engaging in criminal behavior and that protect it

---

[8] Even a cursory examination of articles about VW shows that they market and appeal to younger consumers and these consumers, more than any other, are enamored of technology and environmentally friendly business approaches.

from declines in market share, the settlement has also clearly failed to account for the benefits, both short-term and long-term benefit to market share, that *arose directly from the fraud* of VW. This failure means that the current settlement and long-term cost to VW, has not even come close to offsetting the benefits that VW has obtained as a result of the fraud.

22. Indeed, as the fraud advanced VW's market share, those advances also build confidence in the consumer base, which in turn provides for more cash and more investment, which in turn provides for a better product and greater market share.[9]  These advances have created the impression of success and further entrenched implicit favorable biases that will continue to benefit VW's market share and sales for the foreseeable future. This advantage in market share harms not only American consumers but American manufacturers of cars and therefore United States Government and other consumers and persons interested in fair competition with foreign manufacturers of goods.[10]

23. Putative class member Newkirk hereby requests an examination of information exchanged that would expose the beginning of the fraud and the actual impact of that fraud upon the advances in market share for VW and any effort to determine the amount of money that has been earned by VW both within United States and worldwide that directly resulted from the fraud, as well as any continued earnings or advances in market share that will result from this point forward and that will remain powered by the positive implicit biases generated by the fraud as well as the advantages gained from harm to other car manufacturers.

24. This objection also seeks information to determine the extent to which the fraud has benefited VW and the extent to which this solution or settlement has been an effort to return

---

[9] The company is **spending $7 million to bolster the number of vehicles it can assemble** at the factory that officially started production in May 2011.

[10] European and Asian automakers have ramped up market share since 2007*, sometimes at the expense of U.S. car companies*. Hyundai, Nissan and Kia have seen big gains in American sales over the period, according to Autodata figures reported by the Detroit Free Press earlier this year.

Volkswagen to its relative pre-fraud position within the market and/or to determine whether there are sufficient open claims and unreleased claims outstanding that would permit individual consumers such as putative class member Newkirk and others, and/or the Federal Government, and/or state governments, to pursue VW for recovery of other damages and/or fines or penalties that would properly return VW to its position in the market or at least the point where it was in the market prior to the fraud.[11]

25.  This objection requests that the Court extend the time for excluding/opting out of the class and that the Court insert a copy of this objection or some reduced version of this objection into any notice provided to putative class members or as part of a follow up notice.

26. While this objection is limited to the 3-0 Liter settlement, the settlement approval documents suggest that the settlements (2.0 and 3.0) should be based on good faith negotiations, and not upon any further fraudulent behavior. What is being missed is that VW's very public and seeming cooperation to achieve these settlements has been with at least some goal of *maintaining the long term benefits from the fraud*.

27. The sooner VW can put this behind it and ensure that the  total cost of the strategic decision to admit fraud and accept punishment in the short term is less than the income earned, or the income that will be earned as a result of the unexamined risks to reasonableness, that are the favorable biases in the market generated by the fraud, then VW made a good business decision or took a reasonable calculated risk when it chose to engage in a system of fraud on the American consumer. Regardless, a review of the documentation and data that would expose the

---

[11] This is again, no effort to seek any representation of any individual or group acting in the role of attorney.  Putative class member Newkirk appears only as an individual and will remain in the role of an individual consumer or at best, pursue a claim either pro-see or by retaining separate counsel if his claims are excluded.

actual financial and market gains to VW resulting from the fraud may expose evidence that may allow for further relief under the other 2.0 liter settlement.

28. In summary, putative class member Newkirk requests the following:

a. That if in fact, there has been a detailed analysis of the advances in income and market share to VW resulting from the fraud that such information be provided for further analysis.

b. That if there has been no such analysis of the actual advances in market share and income gained by the fraud, including the role that implicit biases and consumer confidence plays in those gains, that the Court amend the notice requirements to allow for a longer period to opt out of the class and that the class be informed that the analysis is being done.

c. Class member Newkirk alternatively seeks to exclude himself from the class to the extent this objection and request for adjustment to the class notice and altered date to exclude is denied.

WHEREFORE, putative class member Newkirk objects and request that this objection be considered by the Court, that the Court consider ordering additional notice to the Class advising them of either this objection or ensuring that all the questions have been answered consistent with this objection or for additional information to be exchanged prior to the notice to the putative class and/or that the Court amend or delay final approval pending the disclosure of this information and the analysis of that information.

*/s/ Thomas Newkirk*
Thomas A. Newkirk



Original emailed to Court at crbpo@cand.uscourts.gov per instructions from clerk.

Case 3:15-md-02672-CRB
In RE: Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability
Litigation

Clerk of the Court / Judge
Charles R. Breyer
Philip Burton Federal Building & United States Court House
450 Golden Gate Avenue
San Francisco, CA 94102

Elizabeth Cabraser
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery St, 29th Floor
San Francisco, CA 94111

Sharon L. Nelles
Sullivan & Cromwell, LLP
125 Broad Street
New York, NY 10004

Cari K. Dawson
Alston & Bird LLP
1201 West Peachtree Street
Atlanta, GA 30309

Honorable Breyer:

Pursuant to Section 10, **Objections to the Settlement** of the subject case, I
hereby state that I am an eligible owner of a Class vehicle from November 20, 2013 to
the present. I have reviewed the Class definition and have not opted out of the Class.

I believe the 3.0-Liter Class Action Settlement should not be approved by the
Court as fair, reasonable, and adequate in its present form based upon the following
objections:

1. Per Section 7.5, **Reduced Performance**
   I did not purchase a reduced performance vehicle back on November 20, 2013,
   and I do not believe that I should be forced to accept a reduced performance
   vehicle now in order for VW to comply with the emissions standard. Original
   performance should be just that - - original.  No compromises!

   I vividly remember test driving my Q7 back in November 2013 and in particular
   three attributes: the torque, horsepower, and quietness. Primarily because of
   these three attributes I agreed to pay **$2,500.00 more** for the diesel version than
   the gasoline equivalent.

VW should **NOT** be in charge of the performance testing. An independent third party should be selected. With several billion dollars involved, what makes the court think that VW can be trusted when their history is deception?

2. Per Section 6.4, **Extension Payments**
   Why should VW be granted these three 30 day extensions **at all**? The decision date on my sub generation 2.1 SUV of November 8, 2017 should be **more than adequate** for VW to determine if a compliant repair is possible.

   Please keep in mind that we have been forced into a continual holding pattern of our 3.0-liter vehicles since November of 2015, with no other **practical** options than to hold. For example, I attempted to trade in this 2014 Audi on a new 2017 Q7 in August, 2016, only to be told by the dealer that my trade in value was only $30,000, because his only option from Audi was to hold the vehicle, and his management would not allow him to offer more on a trade. This offer ($30,000) is $9,125 less than the Clean Retail value shown on the attached 2/21/2017 NADA report attached as Exhibit 1. Ironically, this $9,125 price difference almost matches the $8,939 - $9,492 Emissions Compliant Repair payment that I would receive under the current terms of the Class settlement. This does **NOT** fit my definition of a substantial payment!

   For the Generation Two vehicle owners, there appears to be very little consideration given to the time value of money. This Class of vehicle (my 2014 Q7 is a prime example) is depreciating at approximately $500.00 per month. By granting the three 30 day extensions, you are taking the decision date out into February of 2018, and "burning up" approximately $6,000 **more** in depreciation.

   My suggestion to resolve the above objections, and to resolve additional valid objections presented by other Class participants is to utilize the remedies presented in Section 17, **Modification or Termination of this 3.0-liter Class Action Agreement**.

   Thank you for allowing me to present my views on this matter to the Court.

John L. Nussbaum

███████████████ _John D. Nussbaum_
                 John L. Nussbaum

VIN: ████████████████
Vehicle owned from 11/20/2013 to Present

Attachment: Exhibit 1 NADA price report dated 2/21/2017



# NADAguides Price Report
## 2/21/2017

## 2014 Audi Q7-V6

Utility 4D 3.0 TDI Prestige AWD

# Values

|  | Rough Trade-In | Average Trade-In | Clean Trade-In | Clean Retail |
|---|---|---|---|---|
| **Base Price** | $33,475 | $35,875 | $37,875 | $40,125 |
| **Mileage (59,000)** | -$1,400 | -$1,400 | -$1,400 | -$1,400 |
| **Total Base Price** | $32,075 | $34,475 | $36,475 | $38,725 |
| **Options:** |  |  |  |  |
| Towing/Camper Pkg | $350 | $350 | $350 | $400 |
| **Price with Options** | $32,425 | $34,825 | $36,825 | $39,125 |

**Rough Trade-In** - Rough Trade-in values reflect a vehicle in rough condition. Meaning a vehicle with significant mechanical defects requiring repairs in order to restore reasonable running condition. Paint, body and wheel surfaces have considerable damage to their finish, which may include dull or faded (oxidized) paint, small to medium size dents, frame damage, rust or obvious signs of previous repairs. Interior reflects above average wear with inoperable equipment, damaged or missing trim and heavily soiled /permanent imperfections on the headliner, carpet, and upholstery. Vehicle may have a branded title and un-true mileage. Vehicle will need substantial reconditioning and repair to be made ready for resale. Some existing issues may be difficult to restore. Because individual vehicle condition varies greatly, users of NADAguides.com may need to make independent adjustments for actual vehicle condition.

**Average Trade-In** - The Average Trade-In values on nadaguides.com are meant to reflect a vehicle in average condition. A vehicle that is mechanically sound but may require some repairs/servicing to pass all necessary inspections; Paint, body and wheel surfaces have moderate imperfections and an average finish and shine which can be improved with restorative repair; Interior reflects some soiling and wear in relation to vehicle age, with all equipment operable or requiring minimal effort to make operable; Clean title history; Vehicle will need a fair degree of reconditioning to be made ready for resale. Because individual vehicle condition varies greatly, users of nadaguides.com may need to make independent adjustments for actual vehicle condition.

**Clean Trade-In** - Clean Trade-In values reflect a vehicle in clean condition. This means a vehicle with no mechanical defects and passes all necessary inspections with ease. Paint, body and wheels have minor surface scratching with a high gloss finish and shine. Interior reflects minimal soiling and wear with all equipment in complete working order. Vehicle has a clean title history. Vehicle will need minimal reconditioning to be made ready for resale. Because individual vehicle condition varies greatly, users of NADAguides.com may need to make independent adjustments for actual vehicle condition.

**Clean Retail** - Clean Retail values reflect a vehicle in clean condition. This means a vehicle with no mechanical defects and passes all necessary inspections with ease. Paint, body and wheels have minor surface scratching with a high gloss finish and shine. Interior reflects minimal soiling and wear with all equipment in complete working order. Vehicle has a clean title history. Because individual vehicle condition varies greatly, users of NADAguides.com may need to make independent adjustments for actual vehicle condition. Note: Vehicles with low mileage that are in exceptionally good condition and/or include a manufacturer certification can be worth a significantly higher value than the Clean Retail price shown.

© Copyright 2017 National Appraisal Guides, Inc., all rights reserved. National Appraisal Guides, Inc. is a strategic ally of J.D. Power and Associates. © J.D. Power and Associates 2017, all rights reserved.

Good afternoon,

Thank you for your time and effort in the matter referenced above. Please accept this e-mail as my objection to the proposed settlement of this case.

I own a 2014 Audi Q7, a Generation Two vehicle per the settlement document I obtained and read after registering the vehicle on the settlement website. My understanding is that Volkswagen is still in the process of developing an "Emission Compliant Repair" for these vehicles and if approved by the EPA and CARB, this will be the only option offered, along with a restitution payment, to owners of Generation Two vehicles that want to be included in the Class Action Settlement.

Given the fraudulent circumstances that occurred and the stigma that will undoubtedly remain with these vehicles even if repaired, why is a buyback option not an alternative for Generation Two owners who want it? I take great pride in my vehicle and have made a substantial investment in it. I do not wish to have my vehicle repaired, as the value will be next to nothing. Volkswagen knowingly committed illegal acts and created the circumstances. The consumer should be protected and have the ultimate decision and choices of what they want to do with a "tainted" vehicle, including a buyback, not the defendant.

I believe a final decision will be made sometime between Q2 and Q4 2017? I would like to know my options to be offered a buyback option and when I can initiate the procedure. I am sure I am not the only owner with this opinion. Thank you for your time and assistance. Your response is appreciated.

Best Regards,


Paul Palmer

████████

████████████████

████████

Owner of 2014 Audi Q7 VIN ████████████████████

Vladimir Pavlov



To Whom It May Concern:

In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation, No. 3:15-md-2672 (N.D. Cal.) I object to the Class Action Settlement because it clearly signals that the criminal behavior in question is allowed through showing extreme leniency toward Volkswagen by letting it avoid mandatory buyback of Generation 2 3.0L TDI vehicles. The claim that this is done in the name of environmental responsibility also shows a skewed preference towards the defendant as the fair approach would be to buy back Generation 2 vehicles and store until fixed to prevent them from polluting the environment. Since Volkswagen will be allowed to sell them once fixed, this would create a sense of urgency for the defendant and will prevent future violations of this kind. In reality, cheated owners are stuck with the frozen asset, held hostage to risking forfeiting full or partial compensation if sold before the case is concluded, and assume the burden of losses on behalf of the dishonest company. Moreover, it allows Volkswagen to drag the issue well into 2018 or maybe even into 2019 through the multitude of allowed time extensions while we, the owners, are stuck in a limbo awaiting our fate.

If the court still decides to side with Volkswagen, please, consider to address the issues below.

First, allowed performance deviation of 3 MPG and 5% peak power/torque loss can lead to a significant impact on the vehicle's driving experience in addition to absolutely unregulated noise levels. For example, to illustrate the MPG impact, Volkswagen Touareg TDI has a tank capacity of 26 gallons, so with allowed 3 MPG loss, the vehicle's range will decrease by **78** miles, which is not as immaterial as claimed by the defendant and diminishes the advantage of the diesel engine over the gasoline counterpart. This clause also contradicts Volkswagen's claim that they can fix Generation 2 vehicles to the original certification because any deviation from the vehicle's Monroney sticker is deemed unacceptable as this would misrepresent the vehicle that was originally purchased.

Second, the fair vehicle market value is not guaranteed after the alleged fix is performed, which can cause significant financial loss having in mind huge deviations in MPG/performance/unregulated noise allowed.

Third, the average payout is not substantial enough taking into consideration how long it will take to receive it in full due to the uncertainty of future vehicle performance and value, let alone past losses due to frozen asset status and the lifestyle impact. Moreover, federal/state tax liability will diminish its value even further.

Based on this, I urge you to approve this settlement *only* if amended to introduce mandatory buyback for Generation 2 3.0L TDI vehicles.

Sincerely,

February 21, 2017

Vladimir Pavlov
2014 Volkswagen Touareg

Owned: 04/29/2014 - Present

RECEIVED FEB 24 2017

February 20, 2017

Clerk of the Court, Judge Charles R. Breyer

Philip Burton Federal Building & US Courthouse

450 Golden Gate Avenue

San Francisco, CA 94102

RE: OBJECTION to Class Action Settlement in re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Product Litigation No. 3:15- md-2672(N.D.Cal.)

Original Owner: 2015 Audi A7 VIN: ▮▮▮▮▮▮▮▮▮▮▮▮

Dear Judge Breyer:

After reading the proposed settlement on 2-20-2017, I would like to respectfully object to three elements, as follows:

1. VW is to be sole arbiter that the proposed fix of the 3-liter diesel engines will have **no "material affect"** on the performance of the car as to mileage, torque, horse power and **"drivability"**, and therefore the fix will be acceptable to the owners. They alone determine any "material affect" and define it as being within 95% of the original parameters of the car. I object to this.

Firstly, a 5% reduction to a driver is material, and should not be considered good enough as the car is a high- performance vehicle costing almost $80k. Indeed, "drivability" in this circumstance should be in the eye of the beholder, the driver, not left to the discretion of VW which has an obvious bias.

Parenthetically, how could we even be sure that VW's claim of "no material affect" would be true and accurate in the first place, regardless of the percentages? Their track record of committing a major deception in selling the cars should be proof enough that they cannot be trusted. An independent lab of some sort should be brought in to verify any such claim.

RECEIVED FEB 2 2 2017

2.  VW suggests it may reduce certain payments based on a cars mileage to the extent it was driven more than 1250 miles per month. Your honor, how is this fair? This is the first time any of us are hearing any of this, long after the cars have been driven, and long after the initial notice of cheating went out back in August, 2015

3.  VW offers to extend the car's full factory warranty beyond 50k miles if the proposed fix is not completed before 50K, but only until the point at which the fix occurs. Of course, they will also cover the fix itself as they should for an extended period but this is limited to the fix and not the whole car.

    This is not sufficient for those of us who would have purchased an extended warranty to 100k miles but now will not do so as the factory warranty is being extended until the fix is approved, or disapproved, a date in the future to be decided. If a fix is ultimately not approved, the cars will be bought back so it doesn't make sense to purchase an extended warranty before the approval is known.

    The problem arises if a fix is approved and the factory warranty then lapses because the opportunity to purchase a separate extended warranty at that late date will have been lost-warranty companies only offer coverage if the purchase is made within the first 50k miles. As a matter of equity, VW should extend the car's full factory warranty to 100K miles in the event of an approved fix.

Thank you for considering my objections.

Sincerely,

*Arthur Phillips* (signature)

Arthur Phillips

cc:

Elizabeth Cabraser

Lieff Barraser Heiman and Bernstein LLP

275 Battery St, 29th Fl

San Francisico, CA 94111


Sharon Nelles

Sullivan Cromwell LLP

125 Broad St

New York, NY 10004


Carl K. Dawson

Alston & Bird LLP

1201 West Peachtree St

Atlanta, GA 30309

RE: VW Class Action Settlement – Audi 3 Liter Engine

Tanya and Daniel M. Phillips

███████████████████████████████

VIN: ████████████ purchased in March 2015 – Current.

As current owners of an Audi Q5 TDI with a second generation 3 Liter engine, we object to the Class Action Settlement in In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation, No. 3:15-md-2672 (N.D. Cal.). These are the reasons we object to the Class Action Settlement:

- We are not being offered the buyback option and are being forced to have it repaired. All other VW, Audi and Porsche owners with a 2 liter or 1st generation owners are given both options. We do not believe this is a fair and even resolution.
- The compensation calculations are not commensurate with the original VW settlement and do not take in to account that our car cost almost twice as much as those in the first settlement however we are being compensated at a lower percentage AND being forced to keep the car:
  - Original 2 liter engine compensation is 20% of the clean retail value in 2015 plus $2,986.73
  - Our 3 liter engine compensations is 10% of the clean retail value in Sept 2015 plus $3,596.74
- The repair will change the overall performance of the vehicle we purchased. We paid more money for the TDI engine because of this performance. We don't see anywhere in the compensation the impact this decrease will most certainly have on secondary sales demand for our car and the price we will get for it. We are not being fully compensated for paying a significant amount of money for what will be an inferior product—a form of bait and switch.

Sincerely,

Tanya Phillips

Daniel M. Phillips

4/14/2017

4/14/2017





SANTA CLARA CA 951 ☐☐

14 AUG 2017 PM 3 L

Elizabeth Cabraser
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street , 29ᵗ Floor
San Francisco, CA 94111

94111-331400

RE: VW Class Action Settlement Objection

Frank X Rambusch

██████████████

March 15, 2017

Clerk of the Court/Judge Charles R. Breyer
Phillip Burton Federal Building & United States Courthouse
450 Golden Gate Avenue
San Francisco, CA 94102

Elizabeth Cabraser
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111

Sharon L. Neilles
Sullivan & Cromwell, LLP
125 Broad Street
New York, NY 10004

Carl K. Dawson
Alston & Bird, LLC
1201 West Peachtree Street
Atlanta, GA 30309

Re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability
Litigation, No. 3-15-md-2672 (N.D. Cal.)

To the Court:

As owner of a 2015 Audi Q5 TDI Vin #██████████████, "Generation 2" 3.0
Diesel vehicle, purchased on January 5, 2015; I wish to object to the proposed Class
Action Settlement and provide the following reasons for the Court's consideration.

I purchased (and paid a premium for this vehicle) because I was desirous of obtaining a
vehicle that would be environmentally responsible even at a higher cost. I was persuaded
by Audi's environmental claims of this diesel's "clean" operation.

That being my primary consideration; I was also satisfied with the performance and
further persuaded by the high fuel economy and anticipated high resale value.

As I read the proposed settlement, it appears to me that the owners of the "Generation 2"
cars (approximately 10% of all owners) are singled out to be treated differently than all
other owners.  To wit: these owners are not to be given a choice as whether they may

return the car or accept lesser performance along with a payment. As I read the proposal, I will likely be denied this choice.

Further, it seems to suggest that if VW is able to come up with a solution, which may provide higher pollution, lower fuel economy, lesser performance and perhaps lower resale value, I must accept to keep my car along with a token payment.

I am not an attorney; I am merely a common citizen who respects and attempts to follow the law. But it seems to me that if the court approves the settlement as proposed, it will send a message that fraud is permissible as long as it isn't a big fraud. Doesn't this create a suggestion that small frauds are ok?

I object to being among the approximately 10% of victimized owners **not** to be permitted a choice.

I feel that if I am required to keep the vehicle, it must be fixed in a way as to achieve the following:

1. 100% of the pollution standards under which it was sold. Coming close should not be permissible.
2. The exact same fuel economy (not within a few miles per gallon)
3. Identical performance.

In the event that these can be accomplished, the only open items would be:

1. What is the anticipated drop in resale value?
2. What is the penalty to Audi for deceptive sales practices?

In conclusion, my objection is that I respectfully wish to oppose the lack of choice offered to owners of "Generation 2" vehicles. I believe that unless the car can be brought to 100% of what was represented at the sale and that the resale value can be guaranteed, i should have the same choice as the other 90% of the victims and be permitted to return the car.

Thank you for for your consideration.

Respectfully,

Frank Rambusch

14 MARCH 2017

CLERK OF THE COURT/JUDGE CHARLES R BREYER
PHILLP BURTON FEDERAL BUILDING &
UNITED STATES COURTHOUSE
450 GOLDEN GATE AVENUE
SAN FRANCISCO, CA 94102

ELIZABETH CABRASER
LIEFF CABRASER HEINMANN & BERNSTEIN, LLP
275 BATTER STREET, 29TH FLOOR
SAN FRANCISCO, CA 94111

SHARON L NELLES
SULLIVAN & CROMWELL LLP
125 BROAD STREET
NEW YORK, NY 10004

CARI K DAWSON
ALSTON & BIRD LLP
1201 WEST
PEACHTREE STREET
ATLANTA FA 30309

### OBJECTION OF CURRENT SETTLEMENT ON AUDI Q7 DIESEL

To Honorable Judge and Attorneys:

I'm disappointment with the proposed settlement. While there is a financial compensation for us, I feel Volkswagen has a moral obligation to buy back our vehicles due to this very serious crime they committed on us, the U S Government, and against our Climate.

At minimum they should have to pay for any maintenance expenses we've incurred out of warranty over and above whatever compensation they give us. In my case I've spent over $2,000, which I've included receipts.

Historically I trade my vehicle when my extended warranty expires, which I buy when I initially buy a car. I've had to hold on to the Q7 because of the Diesel emission problems. I was not able to sell it, without taking a huge financial loss on the vehicle and incurred additional maintenance costs.

Your consideration will be much appreciated,

Sincerely

Maria Rinaldo

████████████████

Audi Q7 Vin # ████████████████████

| COLOR | YEAR | MAKE/MODEL | | VIN | LICENSE | MILEAGE IN / OUT | TAG |
|---|---|---|---|---|---|---|---|
| BLACK | 14 | AUDI Q7 | | | | 56504/56504 | |

| DEL. DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|---|---|---|---|---|---|---|---|
| 27FEB17 DD | | | WAIT 27FEB17 | | 0.00 | VMC | 27FEB17 |

| R.O. OPENED | READY | OPTIONS: | DLR:405A56 |
|---|---|---|---|
| 09:29 27FEB17 | 15:41 27FEB17 | | |

| LINE OPCODE TECH TYPE HOURS | LIST | NET | TOTAL |
|---|---|---|---|

A CUSTOMER STATES SERVICE BRAKE LIGHT IS ILLUMINATED
   BR001 BRAKE CONCERN

| | LIST | NET | TOTAL |
|---|---|---|---|
| 4213 C1 | | 0.00 | 0.00 |

,,,,56504 found pads and rotors front and rear worn and causing brake
,,,,pad light to become illuminated
      ************************************************

B CUSTOMER STATES REPLACE WIPERS
   TELLUS CUSTOMER STATES

| | LIST | NET | TOTAL |
|---|---|---|---|
| 4213 C1 | | 0.00 | 0.00 |
| 1 4L1-998-002 WIP. BLADE | 52.80 | 52.80 | 52.80 |
| 1 4L0-955-425 WIPERBLADE | 17.66 | 17.66 | 17.66 |

      ************************************************

C PERFORM MULTI-POINT INSPECTION
   MULTI-A PERFORM MULTI-POINT INSPECTION

| | LIST | NET | TOTAL |
|---|---|---|---|
| 4213 C1 | | 0.00 | 0.00 |
| GTIRE TIRES OK | | | |
| 4213 C1 | | 0.00 | 0.00 |
| GBK BRAKES OK | | | |
| 4213 C1 | | 0.00 | 0.00 |
| GBATT BATTERY OK | | | |
| 4213 C1 | | 0.00 | 0.00 |

      ************************************************

D CUSTOMER STATES LUGNUT COVER IS MISSING ON RIGHT REAR WHEEL - PLEASE
     PROVIDE PRICE QUOTE
   TELLUS CUSTOMER STATES

| | LIST | NET | TOTAL |
|---|---|---|---|
| 4213 C1 | | 0.00 | 0.00 |

      ************************************************

E ***Thank you for joining us in the fight against cancer. We've
    partnered with the BCRF to raise funds for the world's most
    promising research to eradicate breast cancer. 100% of your
    donation goes to BCRF. Please visit DrivePink.com for more
    info.**
    DRVPNK1 ***Thank you for joining us in the fight
    against cancer. We've partnered with the

By signing below, you acknowledge that you were notified of and authorized the Dealership to perform the services/repairs itemized in this Invoice and that you received (or had the opportunity to inspect) any replaced parts as requested by you. The vehicle is being returned to you in exchange for your payment of the Amount Due.
If Payment is Made By Check When you provide a check as payment, you authorize us to either use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. If processed as an EFT, funds may be withdrawn from your account as soon as today. You agree that you will not dispute us electronically debiting your account, so long as the amount corresponds to the amount on this invoice. You authorize us or our agent to charge a service fee up to the maximum amount permitted by law.

*SHOP SUPPLY COSTS: We have added a charge equal to ∗3.00 or 12% of the total cost of labor and parts, whichever is greater, to the Repair Order. This charge will not exceed ∗59.95. This charge represents costs and profits to the motor vehicle repair facility for miscellaneous shop supplies and waste disposal. The State of Florida requires a ∗1.00 fee to be collected for each new tire sold in the state [s.403.718], and a ∗1.50 fee to be collected for each new or remanufactured lead-acid battery sold in the state [s.403.7185].

ALL PARTS ARE NEW UNLESS OTHERWISE INDICATED.

| DESCRIPTION | TOTALS |
|---|---|
| LABOR AMOUNT | |
| PARTS AMOUNT | |
| GAS, OIL, LUBE | |
| SUBLET AMOUNT | |
| MISC. CHARGES * | |
| TOTAL CHARGES | |
| LESS INSURANCE | |
| SALES TAX | |
| PLEASE PAY THIS AMOUNT | |

| DATE | CUSTOMER SIGNATURE | AUTHORIZED DEALERSHIP REPRESENTATIVE SIGNATURE |
|---|---|---|

WARRANTY STATEMENT AND DISCLAIMER: PLEASE SEE THE DEALERSHIP'S LIMITED WARRANTY ON THE REVERSE SIDE OF THIS REPAIR

| COLOR | YEAR | MAKE/MODEL | | VIN | LICENSE | MILEAGE IN / OUT | TAG |
|-------|------|-----------|--|-----|---------|------------------|-----|
| BLACK | 14 | AUDI Q7 | | | | 56504/56504 | |

| DEL. DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|-----------|-----------|-----------|----------|--------|------|---------|-----------|
| 27FEB17 DD | | | WAIT 27FEB17 | | 0.00 | VMC | 27FEB17 |

| R.O. OPENED | READY | OPTIONS: | DLR: |
|-------------|-------|----------|------|

09:29 27FEB17  15:41 27FEB17

| LINE | OPCODE | TECH | TYPE HOURS | | LIST | NET | TOTAL |
|------|--------|------|-----------|--|------|-----|-------|

BCRF to raise funds for the world's most
promising research to eradicate breast
cancer. 100% of your donation goes to BCRF.
Please visit DrivePink.com for more info.**

```
     4213    C1                                           0.00      0.00
 DRVPNK Charitable Donation                               2.00      2.00
 ***************************************************
```

F** Brake Disc and Pads, Front - Replace
   BR77 Brake Disc and Pads, Front - Replace
```
     4213 C1ZM                                         270.00    270.00
   1 7L0-698-151-R BRK LINING          195.75  195.75  195.75
   1 7L8-615-301 BRAKE DISC            168.25  168.25  168.25
   1 7L8-615-302 BRAKE DISC            168.25  168.25  168.25
   2 7L0-907-637 SENDER                 42.40   42.40   84.80
```
,,,,56504 replaced front pads and rotors per customer request
```
 ***************************************************
```

G** Brake Disc and Pads, Rear - Replace
   BR80 Brake Disc and Pads, Rear - Replace
```
     4213 C1ZM                                         270.00    270.00
   1 7L0-698-451-H BRK LINING          117.65  117.65  117.65
   2 7L8-615-601-C BRAKE DISC          127.55  127.55  255.10
   2 7L0-907-637-C SENDER               42.40   42.40   84.80
 ***************************************************
```

H** Stop Squeal add with pad replacement - 1 oz **
   PBSS Stop Squeal add with pad replacement - 1 oz
   **
```
     4213    C1                                          10.00     10.00
   1 PP860 STOP SQUEAL                    7.99    7.99     7.99
 ***************************************************
```

I** Stop Squeal add with pad replacement - 1 oz **
   PBSS Stop Squeal add with pad replacement - 1 oz
   **
```
     4213    C1                                          10.00     10.00
   1 PP860 STOP SQUEAL                    7.99    7.99     7.99
```

By signing below, you acknowledge that you were notified of and authorized the Dealership to perform the services/repairs itemized in this invoice and that you received (or had the opportunity to inspect) any replaced parts as requested by you. The vehicle is being returned to you in exchange for your payment of the Amount Due.
If Payment is Made By Check When you provide a check as payment, you authorize us to either use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. If processed as an EFT, funds may be withdrawn from your account as soon as today. You agree that you will not dispute us electronically debiting your account, so long as the amount corresponds to the amount on this invoice. In the event your check or EFT is returned unpaid for any reason, you authorize us or our agent to charge a service fee up to the maximum amount permitted by law.

*SHOP SUPPLY COSTS: We have added a charge equal to $3.00 or 12% of the total cost of labor and parts, whichever is greater, to the Repair Order. This charge will not exceed $59.95. This charge represents costs and profits to the motor vehicle repair facility for miscellaneous shop supplies and waste disposal. The State of Florida requires a $1.00 fee to be collected for each new tire sold in the state [s.403.718], and a $1.50 fee to be collected for each new or remanufactured lead-acid battery sold in the state [s.403.7185].

ALL PARTS ARE NEW UNLESS OTHERWISE INDICATED.

| DESCRIPTION | TOTALS |
|-------------|--------|
| LABOR AMOUNT | |
| PARTS AMOUNT | |
| GAS, OIL, LUBE | |
| SUBLET AMOUNT | |
| MISC. CHARGES * | |
| TOTAL CHARGES | |
| LESS INSURANCE | |
| SALES TAX | |
| PLEASE PAY THIS AMOUNT | |

| DATE | CUSTOMER SIGNATURE | AUTHORIZED DEALERSHIP REPRESENTATIVE SIGNATURE |
|------|--------------------|-----------------------------------------------|

WARRANTY STATEMENT AND DISCLAIMER: PLEASE SEE THE DEALERSHIP'S LIMITED WARRANTY ON THE REVERSE SIDE OF THIS REPAIR



| COLOR | YEAR | MAKE/MODEL | | VIN | LICENSE | MILEAGE IN / OUT | TAG |
|---|---|---|---|---|---|---|---|
| BLACK | 14 | AUDI Q7 | | | | 56504/56504 | |

| DEL. DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|---|---|---|---|---|---|---|---|
| 27FEB17 DD | | | WAIT 27FEB17 | | 0.00 | VMC | 27FEB17 |

| R.O. OPENED | READY | OPTIONS: | DLR:405A56 |
|---|---|---|---|
| 09:29 27FEB17 | 15:41 27FEB17 | | |

| LINE OPCODE TECH TYPE HOURS | | | LIST | NET | TOTAL |
|---|---|---|---|---|---|
| CUSTOMER PAY SHOP CHARGE FOR REPAIR ORDER | | | | | 59.99 |

#6517 CREATED 2017-02-27
07:38:00AM TAKEN BY JO SHUA
FOLEY

Dealer is not authorized to perform recall repairs for non-Dealer brand vehicles and Dealer's Vehicle Safety and Condition Inspection and/or service does not include a review of possible pending recalls or service campaigns issued by manufacturers of other makes and models.

By signing below, you acknowledge that you were notified of and authorized the Dealership to perform the services/repairs itemized in this Invoice and that you received (or had the opportunity to inspect) any replaced parts as requested by you. The vehicle is being returned to you in exchange for your payment of the Amount Due.
If Payment is Made By Check When you provide a check as payment, you authorize us to either use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. If processed as an EFT, funds may be withdrawn from your account as soon as today. You agree that you will not dispute us electronically debiting your account, so long as the amount corresponds to the amount on this Invoice. In the event your check or EFT is returned unpaid for any reason, you authorize us or our agent to charge a service fee up to the maximum amount permitted by law.

*SHOP SUPPLY COSTS: We have added a charge equal to $3.00 or 12% of the total cost of labor and parts, whichever is greater, to the Repair Order. This charge will not exceed $59.95. This charge represents costs and profits to the motor vehicle repair facility for miscellaneous shop supplies and waste disposal. The State of Florida requires a $1.00 fee to be collected for each new tire sold in the state [s.403.718], and a $1.50 fee to be collected for each new or remanufactured lead-acid battery sold in the state [s.403.7185].

ALL PARTS ARE NEW UNLESS OTHERWISE INDICATED.

| DESCRIPTION | TOTALS |
|---|---|
| LABOR AMOUNT | 560.00 |
| PARTS AMOUNT | 1161.04 |
| GAS, OIL, LUBE | 0.00 |
| SUBLET AMOUNT | 0.00 |
| MISC. CHARGES * | 61.99 |
| TOTAL CHARGES | 1783.03 |
| LESS INSURANCE | 0.00 |
| SALES TAX | 115.77 |
| PLEASE PAY THIS AMOUNT | 1898.80 |

| DATE | CUSTOMER SIGNATURE | AUTHORIZED DEALERSHIP REPRESENTATIVE SIGNATURE |
|---|---|---|

**WARRANTY STATEMENT AND DISCLAIMER:** PLEASE SEE THE DEALERSHIP'S LIMITED WARRANTY ON THE REVERSE SIDE OF THIS REPAIR

DealerCar 2014 CDK Global, LLC (05/15) SERVICE INVOICE TYPE 2 - 512C - "LIMITED WARRANTY" - FLORIDA - 9696023




06031AUCS445354 CUSTOMER INFORMATION REGARDING REPAIRS

| CUSTOMER NO. | ADVISOR | TAG NO. | INVOICE DATE |
|---|---|---|---|

| | LABOR RATE | LICENSE NO. | MILEAGE | COLOR | STOCK NO. |
|---|---|---|---|---|---|
| MARIA F RINALDO | | | 54,562 | LAVA GRAY P | 5679 |

| X | YEAR / MAKE / MODEL | DELIVERY DATE | DELIVERY MILES |
|---|---|---|---|
| , | 14/AUDI/Q7/4DR 3.0L QTR TDI | 08/31/13 | 10 |

| VEHICLE I.D. NO. | SELLING DEALER NO. | PRODUCTION DATE |
|---|---|---|

| WNG@A.COM | F.T.E NO. | P.O. NO. | R.O. DATE |
|---|---|---|---|
| | | | 01/09/17 |

| RESIDENCE PHONE | BUSINESS PHONE | COMMENTS | MO: |
|---|---|---|---|

```
LABOR & PARTS--------------------------------------------------------
J# 1 00AUZZZLOF    *OIL CHANGE ALL                TECH(S):384              39.95
              CHANGE ENGINE OIL AND FILTER
              CHECK FLUID LEVELS
              CHANGED ENGINE OIL, OIL FILTER, TOPPED OFF ALL FLUIDS, SET
              TIRE PRESSURES, SCANNED AND RESET SERVICE REMINDER

PARTS------QTY---FP-NUMBER-------------DESCRIPTION------------------UNIT PRICE-
JOB # 1     1    PK14Q7M          Q7 TDI LOF                         ****        ****
JOB # 1     1    N-013-815-7      WASHER                             0.84        0.84
JOB # 1     1    N-016-027-6      PLUG                               1.90        1.90
JOB # 1     1    059-198-405      FILTERELEM                        10.95       10.95
JOB # 1     8    G-052-195-1D     ENG.OIL                            8.63       69.04
                 5W30 CASTROL EDGE PRO LL03 DRUM
                                          JOB #  1 TOTAL PARTS                  82.73

                                JOB #  1 TOTAL LABOR & PARTS                   122.68
-----------------------------------------------------------------------------
J# 2 00AUZADBLUE   ADBLUE                          TECH(S):384             24.95
              ADBLUE FLUID
              TOPPED OFF ADBLUE AND ADAPTED SYSTEM

PARTS------QTY---FP-NUMBER-------------DESCRIPTION------------------UNIT PRICE-
JOB # 2     1    GUS-052-910-A1   UREA                               6.00        6.00
                                          JOB #  2 TOTAL PARTS                   6.00

                                JOB #  2 TOTAL LABOR & PARTS                    30.95
-----------------------------------------------------------------------------
MISC------CODE--------DESCRIPTION-----------------------------CONTROL NO--------
JOB # A      SSS   SHOP SUPPLIES                                           15.36
JOB # 1    25REC  $25 OFF ANY AUDI SERVICE SPECIAL                        -25.00
                                          TOTAL - MISC                     -9.64

ESTIMATE--------------------------------------------------------------------
CUSTOMER HEREBY ACKNOWLEDGES RECEIVING
         ORIGINAL ESTIMATE OF   $155.00 (+TAX)
COMMENTS--------------------------------------------------------------------
++WAITER++
```

*See Back for Brake Estimate* (handwritten)

ALL PARTS ARE NEW UNLESS OTHERWISE
INDICATED.

I ACKNOWLEDGE AND APPROVE OF ALL
WORK PERFORMED, INCLUDING ANY
ADDITIONAL WORK THAT MAY HAVE BEEN
ADDED ON THE ORIGINAL WORK ORDER.
I ACKNOWLEDGE RECEIPT OF A COPY OF
THIS INVOICE AND I HAVE REVIEWED THE
TERMS AND CONDITIONS LISTED ON THE
REVERSE SIDE OF THIS PAGE.

CUSTOMER
SIGNATURE X _____

SF685096 Q (02/16)




CUSTOMER INFORMATION REGARDING REPAIRS

| ADVISOR | | NO. | INVOICE DATE | INVOICE NO. |
|---|---|---|---|---|
| LABOR RATE | LICENSE NO | MILEAGE | COLOR | STOCK NO. |
| | | 54,562 | LAVA GRAY P | 5679 |

MARIA F RINALDO
X

,

WNG@A.COM

| YEAR / MAKE / MODEL | | DELIVERY DATE | DELIVERY MILES |
|---|---|---|---|
| 14/AUDI/Q7/4DR 3.0L QTR TDI | | 08/31/13 | 10 |
| VEHICLE I.D. NO. | | SELLING DEALER NO. | PRODUCTION DATE |

| F.T.E NO. | P.O. NO. | R.O. DATE | |
|---|---|---|---|
| | | 01/09/17 | |

| RESIDENCE PHONE | BUSINESS PHONE | COMMENTS | MO: |
|---|---|---|---|
| | 941-380-8711 | | |

TOTALS----------------------------------------------------------------

THANK YOU FOR YOUR BUSINESS!!
```
************************************************
*  [ ] CASH    [ ] CHECK    CK NO. [    ]  *
*                                          *
*  [ ] VISA   [ ] MASTERCARD  [ ] DISCOVER *
*                                          *
*  [ ] AMER XPRESS   [ ] OTHER   [ ] CHARGE *
************************************************
```

| | |
|---|---|
| TOTAL LABOR.... | 64.90 |
| TOTAL PARTS.... | 88.73 |
| TOTAL SUBLET... | 0.00 |
| TOTAL G.O.G.... | 0.00 |
| TOTAL MISC CHG. | 15.36 |
| TOTAL MISC DISC | -25.00 |
| TOTAL TAX...... | 10.08 |
| | -------- |
| **TOTAL INVOICE $** | **154.07** |

"This charge represents costs and profits to the motor
vehicle repair facility for miscellaneous shop supplies
or waste disposal."[s.559.904(4)]
"The State of Florida requires a $1.00 fee to be collected
for each new tire sold in the state[s.403.718],and a $1.50
fee to be collected for each new or remanufactured battery
sold in the state [s.403.7185]".

_____
    CUSTOMER SIGNATURE

ALL PARTS ARE NEW UNLESS OTHERWISE
INDICATED.

I ACKNOWLEDGE AND APPROVE OF ALL
WORK PERFORMED, INCLUDING ANY
ADDITIONAL WORK THAT MAY HAVE BEEN
ADDED ON THE ORIGINAL WORK ORDER.
I ACKNOWLEDGE RECEIPT OF A COPY OF
THIS INVOICE AND I HAVE REVIEWED THE
TERMS AND CONDITIONS LISTED ON THE
REVERSE SIDE OF THIS PAGE.

CUSTOMER
SIGNATURE X _____

SF885098 Q (02/16)

To: The Honorable Charles Breyer

Re: VW 3.0 Class action settlement reversal

Your Honor,

I'm writing to request your reconsideration of the preliminary approval of the settlement in the 3.0 Liter Case. As an original owner of a 2013 Diesel, my objection to the settlement is founded upon my desire to be included in your case rather than opting out. Your judgement fails to adequately compensate owners of the Gen 2 vehicles. I am in support of forcing a buyback option consistent with the terms offered to the owners of the Gen 1 engines. With all due respect for your time, I hope that my letter conveys the panic I have over your preliminary judgement. In my humble opinion, it appears that the Corporate interests that compromised my trust and peace of mind are being favored over our rights as consumers.

My "Engine Warning Light" remains lit up due to an emissions exhaust system that has been problematic since I have owned the vehicle. The complexities surrounding the exhaust system are extensive and labor is expensive. It began with the Ad Blue system which was the first malfunction to ignite the warning indicator, well before VW eventually issued a recall. The reimbursed cost of repair was approximately $1500.00. Recently the warning indicator returned and upon inspection it was an unrelated repair of almost $2k. Upon bringing the vehicle home from said repair, the warning light immediately returned. Back to the dealer for further diagnostics, I was informed that the emissions sensor needs replacing at an expense of $1500. (attached). The engine warning light remains on because the dealer is unwilling to repair at their expense. Driving with the warning light on as I have is a foolish compromise, brought about by flaws in VW's exhaust design and my financial constraints.

Purchasing of a $70k vehicle, VW provided a Concierge, please find herein a copy of their recent reply upon notifying them of my debacle. The VW dealer is an independent operator and has no interest in offering an acceptable trade in value due to this mess. Considering my operating costs to date combined with the resale valuation and VW's question of integrity, I have lost confidence. The vehicles devaluation is a direct result of VW's reckless business decisions. They should be held accountable to all their customers who placed their confidence in VW vehicles. Gen 2 units are the most expensive products in their lineup and the preliminary settlement fails to place the financial burden on VW for their fraudulent conduct.

My reality is that I can no longer afford to operate this vehicle. Not knowing what other components have been compromised. Combined with my preference to do business with Companies of integrity, whom value the philosophy of long term mutually beneficial relationships, rather than one that has compromised my trust.

RECEIVED MAR 2 4 2017

To date, the exhaust system service on my vehicle exceeds $3500. and compliance was not a factor. I have no doubt they will eventually design something that will bring the vehicles into compliance. The alternative expense for these higher priced vehicles is an obstacle they hope to avoid, but at whose expense? With the settlement, as proposed, we the owners will be suffering the financial consequences long after the "fix". Buyer beware was a learned phrase growing up in the automotive repair industry regarding used vehicles. It's ridiculous that we must be so cautious purchasing a new vehicle. Given the unforeseen implications to me it seems VW sold us lemons. The price points of the Gen 2 vehicles are not so different from Real Estate value's outside of Ca., builders in CO. suffer triple damages when a class action proves misconduct.

Your Honor, I'm not interested in excess reconciliation. I don't believe the existing resolve adequately considers the repercussions to consumers. These vehicles incorporate technology that is foreign to many mechanics, let alone consumers. Owners reliance upon VW technicians regarding repairs which can be subjective, combined with diagnostics and repairs that may or may not be warrantied, is in my opinion a recipe for disaster, especially given this Companies historical motivations.

Please reconsider the implications of the proposed settlement, by requiring VW to provide the buyback option, giving consumers the necessary protection we desire, while holding them accountable to not only the EPA, Gen2 owners as well. "Making owning a Volkswagen something to smile about" is a promotional VW standard that I bought into. A buy back provision regardless of their ability to repair, would put a smile on the faces of Gen 2 owners.

Thank you your honor, I'm grateful for your time and consideration of my plight. I hope that my perspective is worthy of your consideration for a revision to your judgement, in favor of one that is equitably amicable to your constituents.

Sincerely

Bob Rulon

**From:** Bob Rulon <
**Sent:** Friday, March 17, 2017 1:40 PM
**To:** Bob Rulon
**Subject:** Fwd: Volkswagen Customer CARE

Sent from my iPad

Begin forwarded message:

> **From:** VWoA Customer CARE <VWCustomerCARE@vw.com>
> **Date:** March 13, 2017 at 11:07:27 AM MDT
> **To:**
> **Subject: Volkswagen Customer CARE**
>
> Reference #
>
> Dear Mr. Rulon,
>
> Thank you for reaching out to Customer CARE about your intentions to campaign for a repeal of the Court's 3.0L TDI Settlement Agreement and your feedback about your Touareg's repairs. I recognize when you purchased your Touareg you had certain expectations and regret that your viewpoint has changed because of repairs and the TDI Settlement Agreement.
>
> Currently, VW is not able to meet your expectations with a trade-in allowance for your TDI vehicle. Any possible monetary assistance, benefit or repair for the 3.0L TDI Settlement Agreement will be announced by the Court after its upcoming decisions.
>
> While your best resource for discussing the Settlement Agreement is the TDI Claims Support Center, I realize you would like to see certain components covered in the TDI Settlement Agreement. Also, you mentioned that you would like to see coverage be issued in the way of a recall campaign to help with the cost of your needed exhaust sensor repair as the original warranty coverage has been exhausted by time and miles.
>
> Please know that the Court has not yet finalized the TDI Settlement Agreement and/or any proposed TDI repair. As a result, it's too early for the Claims Support Center to know/discuss with accuracy what components will/won't be covered with a proposed fix or if a buy-back could be offered in the future for your Generation 2 vehicle. Further information will be provided at vwcourtsettlement.com and I encourage you to periodically visit the site for updates.
>
> Also, while a recall campaign or extended warranty hasn't been issued, we track repairs and if a trend is discovered, VW may provide coverage in the future. Your concerns have been made available to the appropriate internal departments that look into these possible trends.

If you decide to proceed with the repair, please save your proof-of-purchase and repair order documentation to submit for a possible reimbursement review should one be issued in the future.

Should you have any non-TDI questions, please feel free to enclose them and reply to this message for your convenience. For your TDI concerns, please contact our TDI Claims Support Center at 844-982-5246. They're open Monday through Sunday from 7 a.m. until 11 p.m. (EST).

Sincerely,


Kimberly W.
Customer CARE Advocate



## ESTIMATE OF REPAIRS

Date

**3/7/17**

| Customer Name | PHONE | Fax | E-MAIL |
|---|---|---|---|
| **BOB RULON** | | | |

| Year/Make/Model | Miles | Engine | VIN# | RO # |
|---|---|---|---|---|
| **2013 VW TOUAREG** | **117,890** | **TDI** | | |

| DISCRIPTION OF REPAIRS | TU | PARTS | TAX | LABOR | COMMENTS | Line Total |
|---|---|---|---|---|---|---|
| EGR COOLER | 3.0 | 939.12 | 80.76 | 396.00 | DIAPHRAM IS NOT HOLDING VACUUM | 1,415.88 |
| COOLANT SHUT OFF VALVE | | 98.00 | 8.43 | 0.00 | MAY BE LEAKIGNG MAY BE THE LINE | 106.43 |
| COOLANT | | 28.18 | 2.42 | 0.00 | | 30.60 |
| | | | 0.00 | 0.00 | | 0.00 |
| | | | 0.00 | 0.00 | | 0.00 |
| | | | 0.00 | 0.00 | | 0.00 |
| | | | 0.00 | 0.00 | | 0.00 |
| | | | 0.00 | 0.00 | | 0.00 |
| | | | 0.00 | 0.00 | | 0.00 |
| | | | 0.00 | 0.00 | | 0.00 |
| | | | 0.00 | 0.00 | | 0.00 |
| | | | 0.00 | 0.00 | | 0.00 |
| | | | 0.00 | 0.00 | | 0.00 |
| | | | 0.00 | 0.00 | | 0.00 |
| | | | 0.00 | 0.00 | | 0.00 |

| | |
|---|---|
| LABOR | $396.00 |
| PARTS | $1,065.30 |
| MISC. | $0.00 |
| SUPPLIES | |
| TAX | $91.62 |
| **TOTAL** | **$1,552.92** |

Should additional parts and labor be necessary - customer will be advised and estimate will be revised at that time.
Estimates are approximate and valid for 30 days from date of estimate.

All unpaid invoices will accrue interest at the rate of 1.5% per month commencing 30 days after such invoice
becomes due and payable until paid in full. In the event that Elk Mountain Motors is required to use the services
of an attorney or to initiate legal action of any kind in order to collect any unpaid sums owed, customer is responsible
for and by his/her signature below agrees to pay all reasonable attorney's fees incurred by Glenwood Springs VW/Audi.

AUTHORIZATION:_____ Date: _____

*PLEASE SIGN AND DATE AUTHORIZATION FOR ABOVE REPAIRS*
**FAX TO SERVICE @ 970-384-5356**



| CUSTOMER NO. | | ADVISOR | TAG NO. | INVOICE DATE 02/28/17 | INVOICE NO. |
| --- | --- | --- | --- | --- | --- |

BOB RULON

| | | COLOR / | STOCK NO. |
| --- | --- | --- | --- |

| | YEAR / MAKE / MODEL 13/VOLKSWAGEN/TOUAREG/ | DELIVERY DATE 03/04/03 | DELIVERY MILES |
| --- | --- | --- | --- |

| | VEHICLE I.D. NO. | SELLING DEALER NO. | PRODUCTION DATE |
| --- | --- | --- | --- |

| | F.T.E. NO. | P.O. NO. | R.O. DATE 02/21/17 | REPRINT# 1 |
| --- | --- | --- | --- | --- |

| RESIDENCE PHONE | BUSINESS PHONE | COMMENTS | | MO: |
| --- | --- | --- | --- | --- |

COMMENTS----------------------------------------------------------------------
++WAITER++

TOTALS----------------------------------------------------------------------

```
************************************************
*                                              *
* [ ] CASH   [ ] CHECK  CK NO. [        ]      *
*                                              *
* [ ] VISA   [ ] MASTERCARD  [ ] DISCOVER      *
*                                              *
* [ ] AMER XPRESS    [ ] OTHER   [ ] CHARGE    *
*                                              *
************************************************
```

TOTAL LABOR....        1452.00
TOTAL PARTS....         620.21
TOTAL SUBLET...           0.00
TOTAL G.O.G....           0.00
TOTAL MISC CHG.           0.00
TOTAL MISC DISC        -293.03
TOTAL TAX......          45.34
                     ..........
**TOTAL INVOICE $       1824.52**

THANK YOU FOR YOUR BUSINESS!!

_____
    CUSTOMER SIGNATURE
************************    D U P L I C A T E   I N V O I C E    ****************************

### SERVICE DEPARTMENT HOURS
8:00 a.m. to 5:30 p.m.
Monday - Friday

### TERMS:
**CASH OR CHECK • MASTERCARD • VISA
DISCOVER • AMERICAN EXPRESS**

**AS IS:** The only warranties applying to this part(s) are those which may be offered by the manufacturer. The selling dealer hereby expressly disclaims all warranties, either express or implied, including any implied warranty of merchantability or fitness fora particular purpose and the selling dealer neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of said products. Buyer shall not be entitled to recover from the selling dealer any consequential damages, damages to property, damages for loss of use, loss of time, loss of profits, or income or any other consequential damages. **NO PARTS OR LABOR WARRANTY WHEN USED PARTS ARE INSTALLED.**

**REPAIR ORDER NOTICE:** Colorado law provides from imposition of a lien in favor of any person who repairs or bestows labor on personal property such as motor vehicles. If the repair or service work authorized in this Repair Order is not paid for, or is paid with a check, draft, or order which is subsequently dishonored for any reason, or is charged to an account which is not paid when due, the law gives the motor vehicle repair garage the right to take possession of the motor vehicle and/or commence an action in court to foreclose the lien which may result in the vehicle being sold pursuant to court order.

Supplies - A token charge equivalent to 15% of the labor charge is included for supplies used. Applicable supply items are: nuts, bolts, washers, tape, pins, rags, cleaners, towels, hazardous waste charges, etc.

"SECTION 30-20-1403, COLORADO REVISED STATUTES, REQUIRES RETAILERS TO COLLECT A WASTE TIRE FEE SET BY THE SOLID AND HAZARDOUS WASTE COMMISSION ON THE SALE OF EACH NEW MOTOR VEHICLE TIRE AND EACH NEW TRAILER TIRE."



**BUCKLE UP**

*Thank You!*

**We Appreciate Your Business**
The Reynolds and Reynolds Company  ERAINTINVE
SF681325 Q  (05/15)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

IN RE : VOLKSWAGEN "CLEAN
DIESEL" MARKETING, SALES
PRACTICES AND PRODUCTS
LIABILITY LITIGATION

No. 3-15 MD 2672

Hon. Charles R. Breyer

OBJECTION TO PARAGRAPH 7.5 OF THE 3.0 SETTLEMENT AGREEMENT

PRELIMINARY STATEMENT

Paragraph 7.5 is neither fair, reasonable nor adequate for three reasons. It provides no compensation if the repair results in slower acceleration because 0-60 mph acceleration is omitted from the paragraph. The Plaintiffs' ability to seek additional remedies is illusory because the standard, a "substantial, material adverse degradation", is undefined and will lead potentially to years of further litigation. Most fundamentally, the paragraph does not authorize a Buyback or Trade-In for Cayennes even though Porsche fraudulently induced consumers to purchase diesels. Specifically, the Defendants' criminal cheating on the emissions test enabled Porsche to promote and sell diesels on the basis of their performance advantages over the less expensive gasoline versions.

1

ARGUMENT

**Paragraph 7.5 Provides No Compensation For Slower Acceleration.**

My wife and I are Eligible Owners of a Generation Two 2014 Porsche Cayenne Diesel Platinum Edition ( Vin # ████████████ ) which we purchased in 2014 and own as of this date. We have read the class definition and have not opted out.

The name Porsche is synonymous with performance; and accordingly, unlike its parent defendant Volkswagen who marketed their vehicles as "clean diesels", Porsche promoted the Cayenne Diesels on the basis of their performance and charged more for that performance over the gasoline version. See, e.g., Porsche press information at p. 3 which states: "The Cayenne Diesel is a powerful and efficient long-distance runner. The 3.0 liter V6 delivers 245 hp and, more importantly, 406 lb-ft. of torque, ensuring strong acceleration and excellent pulling power. Though capable of accelerating to 60 mph in 7.2 seconds, it is rated at 29 mpg highway by the U.S. EPA. Thus, the Cayenne Diesel is the <u>most efficient</u> Cayenne; it also stands out with a potential range of 765 miles on a single tank. Top track speed is 135 mph (emphasis added)". Attachment 1. See also Attachment 2 (Platinum Edition Diesel $66,900 vs $63,300 for gasoline version).

One of the most important elements of performance was the "strong" 0-60 mph acceleration time that Porsche emphasized. It was material to our purchase because I wanted to insure that we could safely enter Interstates and other high speed highways where it is important to safely merge with traffic. Paragraph 7.5 of the Settlement Agreement, however, provides no remedy should a timely

Emission Compliant Repair result in slower 0-60 times. While the paragraph provides $500 in compensation for "Reduced Performance", that remedy is limited to the performance characteristics listed in "Reduced Performance" and slower acceleration is not one of those listed performance characteristics.

**The Additional Remedies Option Is Illusory.**

Paragraph 7.5 allows the Plaintiffs to move for additional remedies. That ability is contingent, however, on demonstrating a "substantial, material adverse degradation" which is undefined and could mean anything. For example, does a reduction of 4, 6 or 8 mpg fall within those parameters? Can slower acceleration or a reduced range on a single tank even be considered, since they do not fall within the meaning of "Reduced Performance"? These and other questions about the meaning of "substantial, material adverse degradation" are rife for dispute. They could result in additional years of further litigation before this Court because paragraph 7.5 permits the Defendants to oppose any motion for additional remedies and the above standard is so vague as to make paragraph 7.5 subject to endless dispute.

**Any Reduction In Performance Warrants A Buyback Or Trade-In.**

Because Porsche fraudulently induced consumers like us into purchasing the diesel rather than the gasoline version on the basis of the diesel's performance, and we detrimentally relied on Porsche's representations about that performance, paragraph 7.5 is neither fair, reasonable, nor adequate. In remedying the other Defendants "clean diesel" misrepresentations, Porsche's separate marketing

deception in hyping the Cayenne Diesel's performance, which is a distinct cause of action that is released as part of the settlement, has been ignored.

I knew before purchasing the Cayenne that the EPA approved the diesel's emissions because the EPA mileage estimates were on the windshield sticker and I had read car reviews referencing the EPA estimates. I relied on that approval and its implicit corollary, namely that because the EPA had determined the vehicle met U.S. Government emission requirements, there would be no emission changes affecting the vehicle. The Defendants fraudulently obtained the EPA approval through a defeat device and did not disclose to purchasers that they could neither rely on that approval nor the no performance change inference that can be drawn from the fact that the diesel met the emission standards. See Justice News Release, January 11, 2017: "VW is charged with and agreed to plead guilty to participating in a conspiracy to defraud . . .U.S. customers. . . by lying and misleading ... U.S. customers about whether certain . . .Porsche branded vehicles complied with U.S. emissions standards . . . ." Attachment 3.

Porsche utilized the fraudulent activity on the emissions test to obtain performance characteristics which it employed to induce purchases of the diesels. Obviously, the diesel's performance characteristics were integral for the marketing and sale of the diesels. Why else would Volkswagen believe it was necessary to engage in a criminal conspiracy to defraud the Government and U.S. consumers in the first place? See Attachment 4. It also logically follows that the advertised performance characteristics could not, and cannot today, be attained by complying with the requisite emissions standards. And the Defendants now have

conceded as much but claim that the inevitable reduction in performance that will result from complying with the emissions standards is not "material". See Executive Summary of Proposed Class Settlement Program for 3.0 Liter Engines on this Court's web site: "Generation Two vehicles can be repaired to compliance with the original emissions standards (the "Certified Exhaust Emissions Standards") without materially reducing vehicle performance".

They are wrong. Any reduction in performance is in fact a material change, as well as a substantial adverse degradation, at least with respect to the Porsche diesels. Porsche represented that the diesel would have certain performance characteristics that the gasoline model would not have. Porsche charged a $3600 premium over the gasoline version of the Cayenne Platinum Edition for that performance (see Attachment 2). I relied on that better performance when choosing the diesel over the gasoline version. Thus, Porsche did not sell, and consumers like me did not agree to purchase, slower accelerating vehicles that cannot achieve city/highway 20/29 mpg, cannot go up to 765 miles on a single tank and that have any less horsepower or torque than was advertised. And the $500 payment in paragraph 7.5, (which is not even available for slower acceleration or unless the mpg is reduced below 26 mpg or the horsepower and torque falls by more than 5%), does not compensate for the loss of the performance which Porsche fraudulently represented the Cayenne Diesel Platinum Edition had and for which $3600 was charged over the less efficient gasoline model.

Consequently, a repair which alters the original performance characteristics which Porsche extolled requires a rescission and Porsche must offer a Buyback or Trade-In option. That option is not as costly as it might seem. Unlike the settlement of 2.0 liter diesels, it will not result in any waste because Porsche can resell the Generation Two Cayennes with Emission Compliant Repairs and can recoup a substantial portion of the money paid out under the Buyback or Trade-In option. Moreover, of the 58,000 Generation Two 3.0 liter diesels involved in this settlement only a small percentage are 2013 to 2016 Cayennes, and not all of them would be subject to the above option. The only current Cayenne owners who could avail themselves of the option are those who could have validly relied on the EPA certification and Porsche's representation of vehicle performance. Since the news of the defeat device became widely disseminated in the Fall of 2015, any purchaser after that time could not claim any reliance.

WHEREFORE, the Court should not finally approve the Settlement Agreement unless and until the parties renegotiate paragraph 7.5 and amend it to be fair, reasonable and adequate for Generation Two Porsche Cayenne Diesel owners.

Respectfully submitted,

Howard M. Schmeltzer

Dated: March 15, 2017

CC: Elizabeth Cabraser
    Sharon Nelles
    Cari K. Dawson

ATTACHMENT 1



PORSCHE



# Press Information

Porsche Cayenne

Porsche Cayenne
# An efficient athlete for all seasons

The Porsche Cayenne continues as a cornerstone of the Porsche line-up. The second gene-ration's seven models combine typical Porsche dynamics and efficiency in a variety of con-figurations: eight- and six-cylinder engines are available in gasoline, gasoline-electric hybrid or diesel versions.

The seven models are:

- Cayenne, 300 hp V6 engine, six-speed manual transmission, active all-wheel drive;

- Cayenne Diesel, 245 hp diesel V6 engine, eight-speed Tiptronic S, permanent all-wheel drive;

- Cayenne S, 400 hp V8 engine, eight-speed Tiptronic S, active all-wheel drive;

- Cayenne S Hybrid, with 380 hp, eight-speed Tiptronic S, permanent all-wheel drive;

- Cayenne GTS, 420 hp V8 engine, eight-speed Tiptronic S, active all-wheel drive;

- Cayenne Turbo, 500 hp V8 biturbo engine, eight-speed Tiptronic S, active all-wheel drive;

- Cayenne Turbo S, 550 hp V8 biturbo engine, eight-speed Tiptronic S, active all-wheel drive

The Cayenne has pleased critics and customers alike. In reader surveys and in U.S. market research firm J.D. Power and Associates' APEAL test, the Cayenne has been rated first se-veral times. The Cayenne was the world's most popular Porsche model in 2012.

As well as introducing parallel hybrid technology in the second-generation Cayenne, Porsche pursued increased efficiency across the entire model range. Multiple technologies work together to significantly reduce fuel consumption: an eight-speed Tiptronic S transmission with auto start/stop functionality and a wide ratio spread, optimized thermal management

for engine and transmission cooling circuits and electrical system recuperation. Reduced curb weights in conjunction with intelligent lightweight design also make a significant contribution to efficiency; the Cayenne S is 400 lbs. lighter than the previous generation Cayenne S, for example. Without compromising substance or safety, lightweight materials are used throughout the vehicle and in all-wheel drive systems. In addition to efficiency and emissions improvements, performance, agility and handling also benefit from reduced weight.

### A Cayenne first: the eight-speed Tiptronic S

Porsche has brought the eight-speed Tiptronic S to the Cayenne family. This transmission combines high efficiency, rapid gear changes, and superior smoothness and refinement. The top two gears are both overdrives, made possible by the wide ratio spread and reducing fuel consumption significantly during steady-state cruising. For optimal acceleration, the eight-speed Tiptronic S always launches from rest in first gear. Most models reach top speed in sixth gear except the Cayenne S Diesel, which attains top speed in eighth. Drivers can select between "Normal" and "Sport" modes. The eight-speed Tiptronic S is standard equipment in all models except the standard Cayenne.

### For optimum traction and driving dynamics:
### Porsche Traction Management (PTM) all-wheel drive

Porsche uses two different all-wheel drive systems for the Cayenne range. The PTM in the Cayenne Diesel and Cayenne S Hybrid features a permanent four-wheel drive with a self-locking center differential. The PTM in other models is an active all-wheel drive with an electronically-regulated, map-controlled multi-plate clutch. The system's variable torque distribution improves driving dynamics, agility and rapid traction management.

Depending on the model, the driver can adjust off-road characteristics using a rocker switch on the center console. In off-road mode 1, all relevant systems are tuned for optimum traction. Models with active all-wheel drive system add off-road modes 2 and 3. Off-road mode 2 closes the center coupling to 100 percent for improved traction on difficult terrain and off-road mode 3, activated by another press of the rocker switch, locks the rear differential for even greater traction. In all cases, the hill control assistant is activated by means of a separate switch.

**Chassis and options**

Porsche provides a wide range of suspension tune for the Cayenne. All models except the Cayenne Turbo and Cayenne GTS come with steel springs as standard equipment. Porsche Active Suspension Management (PASM) is optional on other steel-sprung models. All Cayenne Turbo and GTS models are equipped with air suspension and PASM, an optional combination on other models. To further enhance driving dynamics, active all-wheel drive models can be equipped with Porsche Torque Vectoring Plus (PTV Plus); Porsche Dynamic Chassis Control (PDCC) is an additional option on gasoline V6 and V8 models. PTV Plus features variable torque distribution to the rear wheels and an electronically controlled rear differential lock. PDCC integrates with PTV Plus to resist body roll during cornering and improve ride quality on rough roads when driving straight ahead.

**Powerful and economical six-cylinder engines: Cayenne and Cayenne Diesel**

The Cayenne features a 300 hp, 3.6 liter V6 engine with a maximum torque of 295 lb-ft. It accelerates from zero to 60 mph in 7.1 seconds. The eight-speed Tiptronic S is available as an option, and helps the Cayenne accelerate to 60 mph in 7.4 seconds. The Cayenne tops out at 143 mph with either transmission model.

The Cayenne Diesel is a powerful and efficient long-distance runner. The 3.0 liter V6 delivers 245 hp and, more importantly, 406 lb-ft. of torque, ensuring strong acceleration and excellent pulling power. Though capable of accelerating to 60 mph in 7.2 seconds, it is rated at 29 mpg highway by the U.S. EPA. Thus, the Cayenne Diesel is the most efficient Cayenne; it also stands out with a potential range of 765 miles on a single tank. Top track speed is 135 mph.

**Powerful eight-cylinder engines: Cayenne S and Cayenne GTS**

Flexibility, efficiency, superior torque and urgent power delivery are characteristics shared by all naturally aspirated eight-cylinder Porsche engines. Cayenne S and Cayenne GTS demonstrate how vehicles with very different personalities can be designed around one engine. The 400 hp Cayenne S, powered by a 4.8 liter V8, is a well-rounded performer, delivering a 0-60 mph time of 5.6 seconds and a top speed of 160 mph.

Based on the Cayenne S, the Cayenne GTS is tuned for more aggressive driving. Its entire drive system is geared towards performance: The engine is modified to produce 420 hp, the eight-speed Tiptronic S is programmed for faster shifting, and the gear ratios of the front and rear axles are lowered. This makes the Cayenne GTS an enthusiastic sprinter in all conditions. The higher performance is complemented by a suspension lowered .78 inches.

### Efficiency champion with coasting capability: Cayenne S Hybrid

The Cayenne S Hybrid is the first Porsche production car with a hybrid drive. The primary engine of the Cayenne S Hybrid is a 3.0 liter supercharged V6 engine with direct fuel injection that generates 333 hp. The engine is coupled with a 47 hp electric motor, which can drive the Cayenne either alone or in tandem with the supercharged V6. It also acts as both generator and starter motor. The hybrid module consists of this electric motor and a decoupling clutch between the engine and the new eight-speed automatic. The hybrid system is completed by a 288-volt nickel-metal hydride battery (NiMH) under the trunk floor, which stores the electrical energy recovered during braking and driving. With 380 hp total, the six-cylinder Cayenne S Hybrid has the power of an eight-cylinder engine but with significantly lower fuel consumption. The Porsche hybrid drive also furthers efficiency at higher speeds and in certain conditions such as highway driving by shutting the combustion engine off and "coasting", eliminating fuel consumption altogether for portions of the drive.

### Superior performance: Cayenne Turbo and Cayenne Turbo S

Two high performance models, Cayenne Turbo and Cayenne Turbo S, take the top spots of the Porsche SUV range. Their exceptional power and driving performance, as well as their extensive features list, make these two models stand out. The eight-cylinder, bi-turbo Cayenne Turbo engine generates 500 hp and 553 lb-ft. of torque, enabling a 0-60 mph sprint of 4.4 seconds; top track speed is 172 mph. Just like every other flagship Porsche model, the Cayenne Turbo comes with an extensive equipment list as standard, including air suspension and PASM, leather upholstery, and adaptive sports seats.

The 550 hp Cayenne Turbo S is an even more athletic performer, having been designed for maximum driving dynamics throughout. Starting with the air suspension/PASM active damping control combination of the Cayenne Turbo, the Cayenne Turbo S adds Porsche Dynamic Chassis Control (PDCC), which virtually eliminates body roll, as well as Porsche Torque Vectoring Plus (PTV Plus) in combination with an electronically controlled rear differential lock. The Cayenne Turbo S accelerates in 4.3 seconds from zero to 60 mph, reaches a top track speed of 176.

ATTACHMENT 2

**CAR RATINGS & AWARDS**          **CARS FOR SALE**

**CAR ARTICLES & ADVICE**         **CAR REVIEWS**          **ABOUT**

PORSCHE  >  CAYENNE  >  2014  >  Available Trims

# 2014 Porsche Cayenne Available Trims

🏆 **J.D. POWER AWARD RECIPIENT**

➕ 0   [f Share 0]  G+1  0

Return to the details page

### AWD 4dr Man

| | |
|---|---|
| **Transmission** | Manual w/OD |
| **MSRP** | 49600.00 |
| **Engine** | 3.6 L/220 |
| **City/Hwy MPG** | 15/22 |

### AWD 4dr Tiptronic

| | |
|---|---|
| **Transmission** | Automatic w/OD |
| **MSRP** | 52600.00 |
| **Engine** | 3.6 L/220 |
| **City/Hwy MPG** | 17/23 |

### Diesel (AWD 4dr)

| | |
|---|---|
| **Transmission** | Automatic w/OD |
| **MSRP** | 56600.00 |

## Most Popular Articles

10 Most Popular Luxury Cars

Most Reliable 2016 Luxury...

10 Most Popular Midsize SUVs and...

10 Most Popular Compact SUVs and...

2017 Chevrolet Camaro ZL1 Preview

10 Most Popular Small Cars

2017 Nissan GT-R NISMO Unveiled,...

10 Most Popular Luxury SUVs and...

2016 Vehicle Dependability Study:...

| | |
|---|---|
| **Engine** | 3.0 L/181 |
| **City/Hwy MPG** | 20/29 |

### S (AWD 4dr)

| | |
|---|---|
| **Transmission** | Automatic w/OD |
| **MSRP** | 66800.00 |
| **Engine** | 4.8 L/293 |
| **City/Hwy MPG** | 16/22 |

### S (AWD 4dr)

| | |
|---|---|
| **Transmission** | Automatic w/OD |
| **MSRP** | 70900.00 |
| **Engine** | 3.0 L/183 |
| **City/Hwy MPG** | 20/24 |

### GTS (AWD 4dr)

| | |
|---|---|
| **Transmission** | Automatic w/OD |
| **MSRP** | 83300.00 |
| **Engine** | 4.8 L/293 |
| **City/Hwy MPG** | 15/21 |

### Turbo (AWD 4dr)

| | |
|---|---|
| **Transmission** | Automatic w/OD |
| **MSRP** | 110400.00 |
| **Engine** | 4.8 L/293 |
| **City/Hwy MPG** | 15/22 |

### Turbo S (AWD 4dr)

| | |
|---|---|
| **Transmission** | Automatic w/OD |
| **MSRP** | 146000.00 |

**Engine**　　　　4.8 L/293

**City/Hwy MPG**　　14/20

### Platinum Edition (AWD 4dr)

**Transmission**　　Automatic w/OD

**MSRP**　　　　63300.00

**Engine**　　　　3.6 L/220

**City/Hwy MPG**　　17/23

### Diesel Platinum Edition (AWD 4dr)

**Transmission**　　Automatic w/OD

**MSRP**　　　　66900.00

**Engine**　　　　3.0 L/181

**City/Hwy MPG**　　20/29

The Latest New Car Previews, Buyer's guides, Articles and more from J.D. Power:



Recall Roundup: GM Recalls Pontiac Solstice, Saturn Sky Roadsters: Toyota



Hagerty Publishes 2017 "I Cars

ATTACHMENT 3

JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE

Wednesday, January 11, 2017

## Volkswagen AG Agrees to Plead Guilty and Pay $4.3 Billion in Criminal and Civil Penalties; Six Volkswagen Executives and Employees are Indicted in Connection with Conspiracy to Cheat U.S. Emissions Tests

**VW to Pay $2.8 Billion Criminal Fine in Guilty Plea and $1.5 Billion Settlement of Civil Environmental, Customs and Financial Violations; Monitor to Be Appointed to Oversee the Parent Company**

Volkswagen AG (VW) has agreed to plead guilty to three criminal felony counts and pay a $2.8 billion criminal penalty as a result of the company's long-running scheme to sell approximately 590,000 diesel vehicles in the U.S. by using a defeat device to cheat on emissions tests mandated by the Environmental Protection Agency (EPA) and the California Air Resources Board (CARB), and lying and obstructing justice to further the scheme, the Justice Department announced today.

In separate civil resolutions of environmental, customs and financial claims, VW has agreed to pay $1.5 billion. This includes EPA's claim for civil penalties against VW in connection with VW's importation and sale of these cars, as well as U.S. Customs and Border Protection (CBP) claims for customs fraud. In addition, the EPA agreement requires injunctive relief to prevent future violations. The agreements also resolve alleged violations of the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA).

### The Criminal Case:

VW is charged with and has agreed to plead guilty to participating in a conspiracy to defraud the United States and VW's U.S. customers and to violate the Clean Air Act by lying and misleading the EPA and U.S. customers about whether certain VW, Audi and Porsche branded diesel vehicles complied with U.S. emissions standards, using cheating software to circumvent the U.S. testing process and concealing material facts about its cheating from U.S. regulators. VW is also charged with obstruction of justice for destroying documents related to the scheme, and with a separate crime of importing these cars into the U.S. by means of false statements about the vehicles' compliance with emissions limits. Under the terms of the plea agreement, which must be accepted by the court, VW will plead guilty to all these crimes, will be on probation for three years, will be under an independent corporate compliance monitor who will oversee the company for at least three years, and agrees to fully cooperate in the Justice Department's ongoing investigation and prosecution of individuals responsible for these crimes.

In addition, a federal grand jury in the Eastern District of Michigan returned an indictment today charging six VW executives and employees for their roles in the nearly 10-year conspiracy. Heinz-Jakob Neusser, 56; Jens Hadler, 50; Richard Dorenkamp, 68; Bernd Gottweis, 69; Oliver Schmidt, 48; and Jürgen Peter, 59, all of Germany, are charged with one count of conspiracy to defraud the United States, defraud VW's U.S. customers and violate the Clean Air Act by making false representations to regulators and the public about the ability of VW's supposedly "clean diesel" vehicles to comply with U.S. emissions requirements. The indictment also charges Dorenkamp, Neusser, Schmidt and Peter with Clean Air Act violations and charges Neusser, Gottweis, Schmidt and Peter with wire fraud counts. This case has been assigned to U.S. District Judge Sean F. Cox of the Eastern District of Michigan.

Schmidt was arrested on Jan. 7, 2017, in Miami during a visit to the United States and appeared in federal court there on Monday. The other defendants are believed to presently reside in Germany.

Today's announcement was made by Attorney General Loretta E. Lynch, EPA Administrator Gina McCarthy and Assistant Administrator Cynthia Giles, Deputy Attorney General Sally Q. Yates, FBI Deputy Director Andrew McCabe, Acting Deputy Secretary Russell C. Deyo for the Department of Homeland Security, U.S. Attorney Barbara L. McQuade of the Eastern District of Michigan, Assistant Attorney General Leslie R. Caldwell of the Justice Department's Criminal Division, Assistant Attorney General John C. Cruden of the Justice Department's Environment and Natural Resources Division and Principal Deputy Assistant Attorney General Benjamin C. Mizer of the Justice Department's Civil Division.

"Volkswagen's attempts to dodge emissions standards and import falsely certified vehicles into the country represent an egregious violation of our nation's environmental, consumer protection and financial laws," said Attorney General Lynch. "Today's actions reflect the Justice Department's steadfast commitment to defending consumers, protecting our environment and our financial system and holding individuals and companies accountable for corporate wrongdoing. In the days ahead, we will continue to examine Volkswagen's attempts to mislead consumers and deceive the government. And we will continue to pursue the individuals responsible for orchestrating this damaging conspiracy."

"When Volkswagen broke the law, EPA stepped in to hold them accountable and address the pollution they caused," said EPA Administrator McCarthy. "EPA's fundamental and indispensable role becomes all too clear when companies evade laws that protect our health. The American public depends on a strong and active EPA to deliver clean air protections, and that is exactly what we have done."

"This wasn't simply the action of some faceless, multinational corporation," said Deputy Attorney General Yates. "This conspiracy involved flesh-and-blood individuals who used their positions within Volkswagen to deceive both regulators and consumers. From the start of this investigation, we've been committed to ensuring that those responsible for criminal activity are held accountable. We've followed the evidence—from the showroom to the boardroom—and it brought us to the people whose indictments we're announcing today."

"Americans expect corporations to operate honestly and provide accurate information," said Deputy Director McCabe. "Volkswagen's data deception defrauded the U.S. government, violated the Clean Air Act and eroded consumer trust. This case sends a clear message to corporations, no matter how big or small, that if you lie and disregard rules that protect consumers and the environment, you will be caught and held accountable."

"Blatant violations of U.S. customs and environmental laws will not be tolerated, and this case reinforces that," said Acting Deputy Secretary Deyo. "These actions put our economy, consumers and citizens at risk, and the Department of Homeland Security and U.S. Customs and Border Protection will continue to take every step necessary to protect the American people."

According to the indictment, the individuals occupied the following positions within the company:

1. **Heinz-Jakob Neusser:** from July 2013 until September 2015, Neusser worked for VW as head of Development for VW Brand and was also on the management board for VW Brand. From October 2011 until July 2013, Neusser served as the head of Engine Development for VW.

2. **Jens Hadler:** from May 2007 until March 2011, Hadler worked for VW as head of Engine Development for VW.

3. **Richard Dorenkamp:** from 2003 until December 2013, Dorenkamp worked for VW as the head of VW's Engine Development After-Treatment Department in Wolfsburg, Germany. From 2006 until 2013, Dorenkamp led a team of engineers that developed the first diesel engine that was designed to meet the new, tougher emissions standards in the United States.

4. **Bernd Gottweis:** from 2007 until October 2014, Gottweis worked for VW as a supervisor with responsibility for Quality Management and Product Safety.

5. **Oliver Schmidt:** from 2012 through February 2015, Schmidt was the General Manager in charge of the Environment and Engineering Office, located in Auburn

Hills, Michigan. From February 2015 through September 2015, Schmidt returned to VW headquarters to work directly for Neusser, including on emissions issues.

    6. **Jürgen Peter:** Peter worked in the VW Quality Management and Product Safety Group from 1990 until the present. From March 2015 until July 2015, Peter was one of the VW liaisons between the regulatory agencies and VW.

According to the charging documents and statement of facts filed with the court, in 2006, VW engineers began to design a new diesel engine to meet stricter U.S. emissions standards that would take effect by model year 2007. This new engine would be the cornerstone of a new project to sell diesel vehicles in the United States that would be marketed to buyers as "clean diesel," a project that was an important strategic goal for VW's management. When the co-conspirators realized that they could not design a diesel engine that would both meet the stricter NOx emissions standards and attract sufficient customer demand in the U.S. market, they decided they would use a software function to cheat standard U.S. emissions tests.

VW engineers working under Dorenkamp and Hadler designed and implemented a software to recognize whether a vehicle was undergoing standard U.S. emissions testing on a dynamometer or it was being driven on the road under normal driving conditions. The software accomplished this by recognizing the standard published drive cycles. Based on these inputs, if the vehicle's software detected that it was being tested, the vehicle performed in one mode, which satisfied U.S. NOx emissions standards. If the software detected that the vehicle was not being tested, it operated in a different mode, in which the vehicle's emissions control systems were reduced substantially, causing the vehicle to emit NOx up to 40 times higher than U.S. standards.

Disagreements over the direction of the project were articulated at a meeting which Hadler presided, and which Dorenkamp attended. Hadler authorized Dorenkamp to proceed with the project knowing that only the use of the defeat device software would enable VW diesel vehicles to pass U.S. emissions tests. Starting with the first model year 2009 of VW's new "clean diesel" engine through model year 2014, Dorenkamp, Neusser, Hadler and their co-conspirators installed, or caused to be installed, the defeat device software into the vehicles imported and sold in the United States. In order to sell their "clean diesel" vehicles in the United States, the co-conspirators lied to the EPA about the existence of their test-cheating software, hiding it from the EPA, CARB, VW customers and the U.S. public. Dorenkamp, Neusser, Hadler, Gottweis, Schmidt, Peter and their co-conspirators then marketed, and caused to be marketed, diesel vehicles to the U.S. public as "clean diesel" and environmentally-friendly.

Around 2012, hardware failures developed in certain of the diesel vehicles. VW engineers believed the increased stress on the exhaust system from being driven in the "dyno mode" could be the cause of the hardware failures. In July 2012, VW engineers met with Neusser and Gottweis to explain what they believed to be the cause of the hardware failures and explained the defeat device. Gottweis and Neusser each encouraged further concealment of the software. In 2014, the co-conspirators perfected their cheating software by starting the vehicle in "street mode," and, when the defeat device realized the vehicle was being tested, switching to the "dyno mode." To increase the ability of the vehicle's software to recognize that it was being tested on the dynamometer, the VW engineers activated a "steering wheel angle recognition feature." With these alterations, it was believed the stress on the exhaust system would be reduced because the engine would not be operating for as long in "dyno mode." The new function was installed in existing vehicles through software updates. The defendants and other co-conspirators falsely represented, and caused to be represented, to U.S. regulators, U.S. customers and others that the software update was installed to improve durability and emissions issues in the vehicles when, in fact, they knew it was used to more quickly deactivate emission control systems when the vehicle was not undergoing emissions tests.

After years of VW selling their "clean diesel" vehicles in the United States that had the cheating software, in March 2014, West Virginia University's Center for Alternative Fuels, Engines and Emissions published the results of a study commissioned by the International Council on Clean Transportation (ICCT). The ICCT study identified substantial discrepancies in the NOx emissions from certain VW vehicles when tested on the road compared to when these vehicles were undergoing EPA and CARB standard drive cycle tests on a dynamometer. Rather than tell the truth, VW employees, including Neusser, Gottweis, Schmidt and Peter, pursued a strategy to disclose as little as possible – to continue to hide the existence of the software from U.S. regulators, U.S. customers and the U.S. public.

Following the ICCT study, CARB, in coordination with the EPA, attempted to work with VW to determine the cause for the higher NOx emissions in VW diesel vehicles when being driven on the road as opposed to on the dynamometer undergoing standard emissions test cycles. To do this, CARB, in coordination with the EPA, repeatedly asked VW questions that became increasingly more specific and detailed, and tested the vehicles themselves. In implementing their strategy of disclosing as little as possible, Neusser, Gottweis, Schmidt, Peter and their co-conspirators provided EPA and CARB with testing results, data, presentations and statements in an attempt to make it appear that there were innocent mechanical and technological problems to blame, while secretly knowing that the primary reason for the discrepancy was their cheating software that was installed in every VW diesel vehicle sold in the United States. The co-conspirators continued this back-and-forth with the EPA and CARB for over 18 months, obstructing the regulators' attempts to uncover the truth.

The charges in the indictment are merely accusations and each defendant is presumed innocent unless and until proven guilty.

The case was investigated by the FBI and EPA-CID. The prosecution and corporate investigation are being handled by Securities and Financial Fraud Unit Chief Benjamin D. Singer and Trial Attorneys David Fuhr, Alison Anderson, Christopher Fenton and Gary Winters of the Criminal Division's Fraud Section; Trial Attorney Jennifer Blackwell of the Environment and Natural Resources Division's Environmental Crimes Section; and from the U.S. Attorney's Office for the Eastern District of Michigan, Criminal Division Chief Mark Chutkow and White Collar Crime Unit Chief John K. Neal and Assistant U.S. Attorney Timothy J. Wyse. The Justice Department's Office of International Affairs also assisted in the case. The Justice Department also extends its thanks to the Office of the Public Prosecutor in Braunschweig, Germany.

**The Civil Resolutions:**

The first civil settlement resolves EPA's remaining claims against six VW-related entities (including Volkswagen AG, Audi AG and Porsche AG) currently pending in the multidistrict litigation before U.S. District Judge Charles R. Breyer of the Northern District of California. EPA's complaint alleges that VW violated the Clean Air Act by selling approximately 590,000 cars that the United States alleges are equipped with defeat devices and, during normal operation and use, emit pollution significantly in excess of EPA-compliant levels. VW has agreed to pay $1.45 billion to resolve EPA's civil penalty claims, as well as the civil penalty claim of CBP described below. The consent decree resolving the Clean Air Act claims also resolves EPA's remaining claim in the complaint for injunctive relief to prevent future violations by requiring VW to undertake a number of corporate governance reforms and perform in-use testing of its vehicles using a portable emissions measurement system of the same type used to catch VW's cheating in the first place. Today's settlement is in addition the historic $14.7 billion settlement that addressed the 2.0 liter cars on the road and associated environmental harm announced in June 2016, and $1 billion settlement that addressed the 3.0 liter cars on the road and associated environmental harm announced in December 2016, which together included nearly $3 billion for environmental mitigation projects.

A second civil settlement resolves civil fraud claims asserted by U.S. Customs and Border Protection (CBP) against VW entities. VW entities violated criminal and civil customs laws by knowingly submitting to CBP material false statements and omitting material information, over multiple years, with the intent of deceiving or misleading CBP concerning the admissibility of vehicles into the United States. CBP enforces U.S. customs laws as well as numerous laws on behalf of other governmental agencies related to health, safety, and border security. At the time of importation, VW falsely represented to CBP that each of the nearly 590,000 imported vehicles complied with all applicable environmental laws, knowing those representations to be untrue. CBP's relationship with the importing community is one based on trust, and this resolution demonstrates that CBP will not tolerate abrogation of importer responsibilities and schemes to defraud the revenue of the United States. The $1.45 billion paid under the EPA settlement also resolves CBP's claims.

In a third settlement, VW has agreed to pay $50 million in civil penalties for alleged violations of FIRREA. The Justice Department alleged that a VW entity supported the sales and leasing of certain VW vehicles, including the defeat-device vehicles, by offering cooperative financing terms by purchasing from dealers certain automobile retail installment contracts (i.e. loans) and leases entered into by customers that purchased or leased certain VW vehicles, as well as dealer floorplan loans. These financing arrangements were primarily collateralized by the vehicles underlying the loan and lease transactions. The department alleged that certain of these loans, leases and floorplan financings were pooled together to create asset-backed securities and that federally insured financial institutions purchased certain notes in these securities. Today's FIRREA resolution is part of the department's ongoing efforts to deter wrongdoers from using the financial markets to facilitate their fraud and to ensure the stability of the nation's financial system.

Except where based on admissions by VW, the claims resolved by the civil agreements are allegations only.

The civil settlements were handled by the Environmental and Natural Resources Division's Environmental Enforcement Section, with assistance from the EPA; the Civil Division's Commercial Litigation Branch; and CBP.

* * *

Court documents:

VW AG Plea Agreement

VW AG Third Partial Consent Decree

VW AG Notice of Third Partial Consent Decree


VW AG Third Superseding Information

Firrea Settlement Agreement

VW AG CPB Settlement

VW AG Second Superseding Indictment

17-037

Civil Division
Criminal Division
Environment and Natural Resources Division
Office of the Attorney General

*Updated January 11, 2017*

ATTACHMENT 4

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit
http://www.djreprints.com.

https://www.wsj.com/articles/volkswagen-pleads-guilty-to-criminal-charges-in-emissions-cheating-scandal-1489161238

BUSINESS

# Volkswagen Pleads Guilty to Criminal Charges in Emissions-Cheating Scandal

Auto maker pleads guilty to conspiracy, fraud, obstruction, import violations



Volkswagen pleaded guilty on Friday to criminal charges for rigging diesel-powered vehicles to cheat on
government emissions tests. PHOTO: GENE J. PUSKAR/ASSOCIATED PRESS

By **MIKE SPECTOR** in New York and **MIKE COLIAS** in Detroit
Updated March 10, 2017 11:42 a.m. ET

Volkswagen AG pleaded guilty to criminal charges for rigging diesel-powered
vehicles to cheat on government emissions tests, capping the final significant
U.S. legal settlement expected in a long-running deception that hammered the
German auto company's reputation and finances.

In an unprecedented resolution for a criminal case involving an automotive
company, Volkswagen pleaded guilty on Friday in a Detroit federal court to
conspiracy to defraud the U.S., commit wire fraud and violate the Clean Air Act;
obstruction of justice; and import violations. The auto maker's plea agreement,
which was disclosed earlier this year, includes a $2.8 billion criminal fine and
resolves a longstanding Justice Department probe.

Volkswagen has also agreed to an additional $1.5 billion civil penalty to settle the
U.S. investigation. That is on top of previous civil settlements with consumers,
regulators, dealers and state attorneys general in the U.S. that could cost
Volkswagen more than $20 billion. Some current and former Volkswagen
executives and employees were separately charged in the criminal probe but
weren't the subject of Friday's court hearing.

Volkswagen General Counsel Manfred Döss entered Friday's guilty plea on the
company's behalf before U.S. District Judge Sean Cox. The company was
arraigned on the charges earlier before a magistrate judge in a separate hearing.
Volkswagen signed the plea agreement with U.S. prosecutors in January.

Judge Cox said he would forgo sentencing until April 21. That final step would
formalize Volkswagen criminal penalties that include the assignment of an
independent monitor to audit its regulatory-compliance practices for at least

three years.

"Volkswagen's offenses are very, very, very serious," the judge said. "I just want more time to reflect and study."

The guilty plea codified Volkswagen's admission to conspiring for nearly a decade to deceive U.S. officials with illegal software known as defeat devices that allowed nearly 600,000 diesel-powered vehicles to pass emissions tests and then pollute beyond legal limits on the road.

The U.S. Environmental Protection Agency disclosed Volkswagen's deception in September 2015 and said the company's vehicles spewed toxic tailpipe emissions up to 40 times above allowable levels. Volkswagen admitted to installing the problematic software on some 11 million vehicles globally, sparking government hearings, litigation and investigations around the world targeting the company and many of its senior executives.

Volkswagen's emissions fraud was "a very well thought-out, calculated, well-planned offense," said Assistant U.S. Attorney John Neal during Friday's court hearing, adding the conspiracy reached the "highest levels of the corporation."

Mr. Neal said the government could have fined Volkswagen up to $34 billion, but assessed a lower figure given the auto maker's cooperation with the investigation, previous large civil settlements and efforts to compensate consumers affected by its deception.

"It would have been a lot bigger had [Volkswagen] not taken those steps," Jason Weinstein, a lawyer at Steptoe & Johnson LLP representing the auto maker, said in an interview.

Mr. Döss said during court proceedings that some Volkswagen supervisors and employees destroyed documents and files upon learning of the emissions probe, and that the auto maker had deceived U.S. environmental regulators and customers.

A federal grand jury separately indicted seven Volkswagen executives and employees for their role in the emissions fraud. Many of them are believed to reside in Germany and it isn't clear whether they would travel to the U.S. to face charges.

U.S. authorities arrested one of them, Oliver Schmidt, the former head of Volkswagen's Environment and Engineering Office in Auburn Hills, Mich., in January at Miami International Airport as he prepared to travel home to Germany. After being transferred to Detroit, he pleaded not guilty to criminal charges and is being held at an area jail awaiting trial.

An engineer who pleaded guilty to criminal conduct for helping Volkswagen cheat on emissions tests, James Liang, is scheduled to be sentenced in May.

Former Volkswagen Chief Executive Martin Winterkorn resigned in the wake of the emissions crisis, and the company then suffered sales declines and financial losses, in part due to freezing affected vehicles on U.S. dealer lots. But the auto maker reported a profit for 2016 and passed Toyota Motor Corp. as global car-sales leader. Volkswagen recently curbed executive pay amid investor ire emanating from the emissions deception.

Still, the corporate criminal case against Volkswagen represented the harshest punishment yet stemming from an unprecedented government crackdown on automotive firms for safety and environmental lapses. Along with stiff financial penalties, prosecutors have been seeking charges against executives and employees implicated in auto-industry scandals.

Takata Corp. in January pleaded guilty to criminal wrongdoing and agreed to $1 billion in penalties to resolve an investigation of the Japanese supplier's handling of rupture-prone air bags linked to numerous death and injuries and historic recalls. Three executives were also charged.

Toyota and General Motors Co. in recent years settled criminal cases resulting from safety transgressions without pleading guilty to charges and suffering financial penalties smaller than that to which Volkswagen agreed.

In the waning days of the Obama administration, U.S. environmental regulators accused Fiat Chrysler Automobiles NV of using emissions software on diesel-powered Jeep Grand Cherokee sport-utility vehicles and Ram pickup trucks that allowed them to spew illegal levels of pollution. Officials stopped short of saying the software was designed to cheat emissions tests as Volkswagen's did. The Italian-U.S. auto maker has denied wrongdoing.

—*Christina Rogers contributed to this article.*

**Write to** Mike Spector at mike.spector@wsj.com and Mike Colias at Mike.Colias@wsj.com

Copyright &copy;2017 Dow Jones &amp; Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

David J. Solomon



CLERK OF THE COURT/JUDGE CHARLES R. BREYER
Phillip Burton Federal Building & United States Courthouse
450 Golden Gate Avenue
San Francisco, CA 94102

Elizabeth Cabraser
Lieff Cabraser Heimann  & Bernstein, LLP
275 Battery Street
29th Floor
San Francisco, CA 94111

Sharon L. Nelles
Sullivan LLP
125 Broad Street
New York, NY 10004

Cari K. Dawson
Alston & Bird LLP
1201 Peachtree Street
Atlanta, GA 30309

April 3, 2017

**RE: 2014 AUDI Q7 TDI Quattro Tiptronic Prestige model**
**MODEL 4LB5CA**
**VIN:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

To all those concerned:

**Statement:** I, David J. Solomon, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮, object to the proposed Class Action Settlement in <u>In re: Volkswagen "Clean
Diesel Marketing, Sales Practices, and Products Liability Litigation", No. 3:15md-2672
(N.D. Cal.)</u>  as it relates to "3.0 TDI Generation 2" (hereinafter "Gen2") cars, for the
following reasons:

## 1.  The proposed settlement is speculative and therefore unfair

The proposal for the Gen2 cars is to create a subclass that must wait for Defendants to
create a fix that may or may not be possible.  The proposal is also contingent on obtaining
EPA regulatory approval of this potential fix, another unknown which is out of the hands of
this Court, Plaintiffs and Defendants.  Indeed, because of the recent election and policies of

the new administration, whether the EPA is even willing to certify compliance with a prior administration's standard or act at all is a complete unknown.

These two contingencies are far too speculative to be fair, and will cause the Gen2 subclass to wait and continue to drive cars that have the fraudulent software while the rest of the class receives near-immediate relief.  Furthermore, this lawsuit has been occurring for almost 2 years, more than enough time for Defendants to arrive at a fix to Gen2 cars, if one does exist, and to begin seeking regulatory approval.  Defendants should not be permitted more time to start a process that may be of no value.

## 2.  There is no rational basis for treating Gen2 owners/lessees differently from Gen1 3.0 TDI vehicle owners/lessees

In light of the speculative nature of the proposed fix and regulatory approval of the Gen2 settlement, there is no rational basis for treating this subclass differently from the rest of the class.  The settlement will force Gen2 owners/lessees to continue to drive our environmentally noncompliant cars for another year, potentially longer, or risk receiving substantially less value for our vehicles in order to obtain more immediate relief.  The sole claimed difference between Gen1 and Gen2 cars is that Defendants hypothesize they can provide a fix to the Gen2 vehicles that will reduce the amount of money they will need to spend to remedy their fraud.  There is no reason to give Defendants more time to provide relief to this class of owners/lessees except to save the Defendants money and buy more time before they pay out the relief.  Defendants are attempting to take advantage of this group of owners/lessees by offering a completely speculative solution and dragging out resolution of our claims.

## 3.  Gen2 and Gen1 owners should be treated as the same class

There being no fair or rational reason to distinguish Gen2 from Gen1, both generations should be treated the same and receive the same relief.  To require Gen2 to wait for another 10-12 months for satisfaction is unfair.  We are all in one class, and should be so treated.  If Defendants' claim is correct that they can provide a fix to the Gen2 cars, then the most equitable solution would be for Defendants to buy back the Gen2 cars and fix them on their own time, rather than delaying and burdening the owners/lessees of the vehicles.  This would ensure no additional environmental impact and preserve consumer choice.

Thank you and best regards,

David J. Solomon



$0.46

ZIP 10022
041M1127S3

Elizabeth Cabraser
Lieff Cabraser Heimann & Bernstein
275 Battery Street, 29th Floor
San Francisco CA 94111

94111-331400

From:
Kathryn Sutherland

 (bought in November 2014)

Date: April 3, 2017

To:
Clerk of the Court/Judge
Charles R. Breyer
Phillip Burton Federal Building & United States Court House
450 Golden Gate Avenue
San Francisco, CA 94102

Objection to the Class Action Settlement *In re:*
*Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation, No. 3:15-md-2672 (N.D. Cal.);*

Judge Charles R. Breyer,

I am owner of a 2015 Porsche Cayenne Diesel and I would like to object to the class action's approach to generation 2 (gen2) vehicles. I am making the case that if the court approves Volkswagen's modification proposal, gen2 vehicle owners will be left with significant risks of economic loss. No owner should have to accept a financial loss for being a victim of Volkswagen's fraudulent and dishonest behavior.

As I understand it, Volkswagen is seeking approval for modifying generation 2 vehicles and pay owners a compensation. If the court approves this, gen2 owners will have financial exposure to any negative difference between total compensation amount and modification related reductions in second hand vehicle prices.

The risk originated from the fact that Volkswagen cannot guarantee that the emission compliant repairs result in reduced performance. Current wording in document *"3.0L Amended Class Action Settlement and Release"* does not protect vehicle owners and transfer the responsibility from Volkswagen to vehicle owners.

From Consumer and Reseller Dealership 3.0-Liter Class Action Settlement Agreement and Release (amended), 7.5, page 39:

*In the event that the Emissions Compliant Repair causes Reduced Performance of the Eligible Vehicle, Volkswagen shall make a Reduced Performance means a change in any of the following performance attributes: (1) a reduction in calculated fuel economy using the EPA formula of more than 3 MPG; (2) a decrease of greater than 5% in peak horsepower; or (3) a decrease of greater than 5% in peak torque.........In the event that the Emissions Compliant Repair causes a substantial, material adverse degradation above and beyond the Reduced Performance levels specified above, Plaintiffs reserve their right to seek, and Defendants reserve their right to oppose, additional remedies through motion to the Court.*

In scenarios where there is reduced performance, and such reduction is greater that the limits described in the document, the court suggest that Volkswagen compensate vehicle owners with $500. This is an insignificant amount in scenarios where there are factual or perceived information that the vehicles in question have reduced performance. The effect on second hand prices would catastrophic and the court has effectively allowed Volkswagen to transfer the risk of reduced performance to vehicle owners.

The document does note this risk, by suggesting that if the emission compliant repair causes a substantial, material degradation in performance, plaintiffs reserve the right to seek remedies. However, it also grants the Defendants the right to oppose. In this situation, vehicle owners will be left with the nearly impossible and costly task of making the case against Volkswagen.

Whether the performance of the vehicle is reduced within or outside of the limits set the court is irrelevant. In either case the vehicle owner has a significant financial risk and Volkswagen should be allowed to transfer financial cost to customers. If Volkswagen is allowed to modify gen2 vehicles, they should do so after they have bought them back and themselves absorb risks to second hand pricing.

It is known that Porsche will seek to sell "new", modified Cayennes to a significantly reduced price. It is pretty clear that this will further put pressure on second hand pricing and continue to cost gen2 vehicle owners.

I hope the court understand that whichever way I consider the modification option, I am left with substantial financial risk. I trusted Porsche and their marketing when I bought a Porsche Cayenne in 2014. I now know that they lied to me. I strongly suggest to the court that any approval of the modification option will have significant financial ramifications and it is very wrong if Volkswagen is allowed to transfer risk to me.

I strongly suggest that gen2 vehicles owners should be given the same options as gen1 and be allowed to choose what risks they want to absorb. I see no reason why not. If Volkswagen is so sure that they can modify these vehicles, then let them. But, let them also carry the risks of any resulting situation.

Kathryn Sutherland (April 3, 2017)

cc: Elizabeth Cabraser
Sharon L.Nelles
Cari K. Dawson

From:

Kathryn Sutherland

 (purchase Nov 2014)

To:
Cari K. Dawson
Alston & Bird LLP
1201 West
Peachtree Street
Atlanta, GA 30309

Re:
Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation, No. 3:15-md-2672 (N.D. Cal.);

Dear Cari,

I am owner of a 2015 Porsche Cayenne Diesel and I would like to object to the settlement as it is described to me. As I understand it, generation 2 vehicles will receive a vehicle modification and a cash payment. The cash payment is calculated as 10% of NADA Sep 2015 retail prices (adjusted for options, but not mileage) and a fixed amount of $3,596.74. The NADA retail price is taken before the fraud was made public and this was ~1 ½ years ago. If the retail price is set at $61.089 (which by the way is lower than I paid!) the I can expect a cash payment of ~9705.64.

Since the calculation is based on number before the fraud was made public, I have no information about the effect on second-hand prices. It is likely that these cars' second hand value have been affected and it is possible that this reduction is more than $ 9705.64. So, as a 2-generation owner I am left with a financial risk and this should not be the case.

There is significant different between the payment for a buy-back and the modification option. In a buy-back option the 2015 NADA retail price is "locked-in" and I am left with no price risk. In terms of the modification option, I am left with price risk and any compensation could be lost with second-hand pricing. It strongly suggests that I should not be left with this risk and VW should pay a higher compensation amount.

The court asks for supporting material. The supporting material is that there is none. The fact that we do not know the effect that VWs activities have had had on the second-hand price of these cars is the supporting material.

Also, it is known that Porsche will try to sell new Porsche Cayenne (modified) to reduced prices. Clearly this will also reduce the price on existing Cayennes.

The fair calculation is to use the 10% of NADA Retail Price + $3,596.74 + the difference between NADA 2015 Retail price adjusted for negative second-hand price effects. To the extent that VW can't produce validated second-hand price data, an inflated $ number should be used to remove any risk to me as an owner.

Kathryn Sutherland (March 14, 2017)

Elizabeth Cabraser Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA

OBJECTIONS IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY
LITIGATION, NO. 3:15-MD-2672 (N.D. CAL.)

Jeffrey D. Tilden



2013 VW Touareg TDI purchased December 2012 with continuous single ownership
VIN# ▮▮▮▮▮▮▮▮▮▮

Objection:  The proposed settlement places an unfair burden of monetary risk to Gen 2 class action
participants in the event of an approved emission modification.

While the settlement includes specific consumer protection/ performance guidelines for the approved
emission modification, it does not address the uncertain valuation of the owned/leased vehicles in the
market place due to VWs existing inventory of **New Old Stock** (defined as never before titled TDI
Touaregs) which by settlement guidelines would be available for resale at VW option.  NOS vehicles
entering the market if offered with lucrative discounts apply downward price pressure to the used
market place price beyond what would be expected using historical NADA guidelines in a market
without a significant supply of NOS vehicles.

— Existing owners have no influence (discounting, etc) on VW as to how VW chooses to move
  existing 3.0L NOS inventory.  Pricing control resides exclusively with VW.  This practice places
  the owner/lessee in an unfair position with no input/recovery.
— The causation of the overall settlement has nothing to do with owners/lessees actions or
  inactions.
— The 3.0 proposed settlement differs from the 2.0L settlement where all owners were given the
  option of a buyback.  For owners who exercised the buyback option, risk of market devaluation
  was transferred to VW on vehicles that could be resold within the guidelines of the settlement.
  The option for transfer of risk was granted to all owners/lessees equally.

All Gen 2 class action participants of the 3.0L settlement should be entitled to the choice of buyback
irrespective whether or not an approved emission modification is successfully earned by VW.  This
places the market vehicle devaluation risk and responsibility back upon VW.

**Jeffrey Tilden**



Elizabeth Cabraser Lieff Cabraser Heiman & Bernstein
275 Battery Street, 23rd Floor
San Francisco    CA 94111

94111330I C016

**From:** Mark Valentine ███████████████████████████
**Sent:** Friday, March 17, 2017 1:21 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** VW TDI 3.0 Proposed Settlement Objection

Hello,

my name is Mark Valentine and I own a 2014 Audi Q5 TDI VIN #
███████████████████. This is a "gen 2" and a Prestige model with a sticker price
over $62,000.

My objection is to the part of the settlement that says in summary, assuming there is a
fix approved for my car but it results in a reduction in performance or fuel mileage, I am
only entitled to $500. The Q5 TDI was chosen by me and many others because of the
very strong performance from the 428 ft. pounds of torque provided by the 3.0 diesel
combined with the good fuel mileage. Any reduction in either of those two factors will
have a large negative impact on resale, far, far greater than $500.

I realize that it is best for all to stay in the class action and is not economically feasible
to pursue this outside the class action.

Therefore I request VW be required to pay $500 for each 1% reduction in torque and for
each 1% reduction in fuel mileage to a maximum of $2,500. If the combined shortfall
percent is greater than 5%, VW should be required to buyback the vehicle under the
buyback terms in the proposed settlement agreement.

Thank you for your consideration.

Regards,

Mark Valentine
████████████████
████████████