UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION ─────────────────────────────────────/ This Order Relates To: MDL Dkt. Nos. 3059, 3060 *City of St. Clair Shores*, 15-6167 *Travalio*, 15-6168 *George Leon Family Trust*, 15-6168 *Charter Twp. of Clinton*, 16-190 *Wolfenbarger*, 16-184 ─────────────────────────────────────/ | MDL No. 2672 CRB (JSC) **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS THE FIRST AMENDED CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT** |

In September 2015, Volkswagen admitted to regulators and the public that it had used a "defeat device"—software designed to cheat emissions tests—in nearly 600,000 TDI diesel engine vehicles sold in the United States (the "Affected Vehicles"). Soon after, purchasers of Volkswagen-sponsored Level 1 American Depository Receipts ("ADRs") filed actions against the Company and management under the Private Securities Litigation Reform Act ("PSLRA"). These actions were consolidated before this Court and, in January 2016, the Court appointed Arkansas State Highway Employees' Retirement System ("ASHERS") as Lead Plaintiff. (Dkt. No. 545.) On March 10, 2017, Volkswagen AG pled guilty to three criminal felony counts as a result of the defeat-device scheme, including conspiracy to defraud the United States and the Company's U.S. customers, and to violate the Clean Air Act, by lying about whether the Affected Vehicles complied with U.S. emissions standards. (*See United States v. Volkswagen AG*, No. 16-CR-20394, Dkt. 68 (E.D. Mich. Mar. 10, 2017).)

In an Order issued on January 4, 2017, the Court granted in part and denied in part

Defendants' motions to dismiss the Consolidated Securities Class Action Complaint (the "Original Complaint"). (Dkt. No. 2636.) Plaintiffs subsequently filed their First Amended Consolidated Securities Class Action Complaint (the "Amended Complaint"), in which they attempt to cure the deficiencies the Court identified with the Original Complaint. (Dkt. No. 2862.) In response, Defendants filed motions to dismiss the Amended Complaint, which are currently before the Court. (Dkt. Nos. 3059-60.) Having considered the parties' submissions and the arguments made during the hearing on June 27, 2017, the Court GRANTS in part and DENIES in part Defendants' motions. As to the portions of the Amended Complaint that the Court dismisses, leave to amend is DENIED.

**BACKGROUND**

Lead Plaintiff represents a proposed class of all persons who purchased Volkswagen-sponsored Level 1 ADRs from November 19, 2010 through January 4, 2016 (the "Class Period"). (First Amended Compl. ("FAC") ¶ 6.) The Defendants are Volkswagen Aktiengesellschaf ("VW AG"); Volkswagen Group of America ("VWGoA"); Volkswagen of America ("VWoA"); and Audi of America, Inc. ("AoA") (collectively, the "Corporate Defendants"), and individual Defendants Martin Winterkorn ("Winterkorn"), the former CEO and Chairman of the Management Board of VW AG; Michael Horn ("Horn"), the former President and CEO of VWGoA, as well as President of the VWOA brand, from January 2014 to March 2016; and Herbert Diess ("Diess"), a Member of the Board of Management of VW AG and Chairman of the Board of Management of the Volkswagen Passenger Cars Brand (collectively, the "Individual Defendants," and all together, "Defendants" or "Volkswagen").[1]

Plaintiffs contend that Defendants violated Section 10(b) of the Securities Exchange Act, and SEC Rule10b-5, by making untrue and misleading statements during the Class Period about Volkswagen's financial condition and the Affected Vehicles' compliance with U.S. emissions

---

[1] In the Original Complaint, Plaintiffs also named as a Defendant Jonathan Browning, the President and CEO of VWGoA from October 2010 to December 2013. In the January 4 Order, the Court held that Plaintiffs had not adequately alleged that Browning acted with scienter (*see* Dkt. No. 2636 at 26-27), and Plaintiffs have not named Browning as a Defendant in their Amended Complaint.

2

standards. (FAC ¶ 409.) Plaintiffs also allege that VW AG and the Individual Defendants are liable under Section 20(a) of the Exchange Act as "control persons" of the Corporate Defendants. (*Id.*¶¶ 553-64.) As a result of Defendants' conduct, Plaintiffs contend that they purchased Volkswagen's ADRs at artificially high prices, and that the value of their ADRs dropped significantly after disclosure of the Company's misconduct. (FAC ¶ 523.)

In the January 4 Order, the Court reached the following holdings in Plaintiffs' favor: (1) Plaintiffs' claims fall within the territorial reach of Section 10(b); (2) the claims should not be dismissed on *forum non conveniens* grounds; (3) personal jurisdiction exists over Winterkorn and Diess; (4) Plaintiffs adequately pled their Section 10(b) claims, except on certain limited grounds; and (5) Plaintiffs adequately pled Section 20(a) control-person claims against Winterkorn and VW AG. (Dkt. No. 2636 at 40-41.)

Ruling against Plaintiffs in the January 4 Order, the Court held that the allegations in the Original Complaint did not support (1) that VW AG understated its financial liabilities "in each of its quarterly and annual financial statements issued during the Class Period;" (2) that Diess acted with scienter in approving VW AG's Third Quarter 2015 Interim Report; (3) that Diess was a control person under Section 20(a) of the Exchange Act; or (4) that Horn was a control person under Section 20(a) of the Exchange Act. (*Id.*)

On February 3, 2017, Plaintiffs filed their Amended Complaint. (Dkt. No. 2862.) Defendants responded by filing two motions to dismiss the Amended Complaint; Horn filed the first (Dkt. No. 2059), and the Corporate Defendants, Winterkorn, and Diess filed the second (Dkt. No. 3060). In their motions, Defendants argue that Plaintiffs' Amended Complaint does not cure the four previously noted deficiencies.

**LEGAL STANDARD**

The Court may dismiss a claim under Rule 12(b)(6) if the allegations in the complaint do not support that the claim is plausible. Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

3

Claims for fraud must meet the heightened pleading standard of Rule 9(b), which requires a party "alleging fraud or mistake [to] state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Securities fraud claims must also meet the heightened pleading requirements of the PSLRA, which requires the complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007).

The PSLRA also requires the plaintiff to state with particularity facts giving rise to a strong inference of the defendant's scienter. *See* 15 U.S.C. § 78u-4(b)(2). "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. "Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a 'strong inference' that misleading statements were knowingly or . . . reckless[ly] made to investors, a private securities fraud complaint is properly dismissed under Rule 12(b)(6)." *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).

If the Court dismisses a claim under Rule 12(b)(6), it will grant leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). But if in an amended complaint the plaintiff is unable to cure noted shortcomings, the Court can reasonably conclude that further amendment would be futile and deny leave to further amend. *See Rutman Wine Co. v. E & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987).

**DISCUSSION**

Plaintiffs contend that the Amended Complaint cures the four pleading deficiencies noted in the January 4 Order. Each is addressed in turn below.

### A. Understatement of Financial Liabilities Throughout the Class Period or After May 2014

Plaintiffs allege that VW AG and Winterkorn intentionally or recklessly misstated "each of [VW AG's] quarterly and annual financial statements issued during the Class Period" by failing to

include a provision or contingent liability related to the emissions fraud. (FAC ¶¶ 275, 301.) As VW AG's CEO, Winterkorn signed all of VW AG's financial statements during the Class Period except VW AG's Third Quarter 2015 Interim Report, which was signed by Diess. (*See id.* ¶ 413; Dkt. No. 3200 at 9-10.) The Court addresses allegations related to the alleged misstatements by Diess in Section B.

Recognition of "provisions" and "contingent liabilities" for German companies like VW AG is governed by International Accounting Standard ("IAS") 37, which requires a company to recognize a "provision" if, among other things, "it is probable that an outflow of resources embodying economic benefits will be required to settle . . . a present obligation (legal or constructive) as a result of a past event." (FAC ¶ 265.) An outflow is considered "probable" when the loss is "more likely than not, i.e., a probability of greater than 50%." (*Id.* ¶ 267.) If the likelihood of an outflow does not reach the 50 percent threshold, IAS 37 requires companies to recognize a "contingent liability" for possible or present obligations, when the possibility of an outflow of resources embodying economic benefits is more than "remote." (*Id.* ¶ 275.)

In their Original Complaint, Plaintiffs asserted that provisions were necessary throughout the Class Period because "[t]he losses relating to the use of defeat devices were 'probable' under IAS 37 because it was more likely than not that the defeat devices would be discovered and that VW AG would incur enormous liabilities to address this self-inflicted problem." (Dkt. No. 1510 ¶ 222.) In the January 4 Order, the Court concluded that the allegations did not support this inference, reasoning that:

> There are no factual allegations permitting the reasonable inference that Volkswagen knew or should have known that its losses were probable during the entirety of the Class Period. For example, although Plaintiffs allege that VW AG knew that it faced "potential EPA fines of $37,500 and CARB fines of $5,000 for each affected car in the United States" (Compl. ¶ 220; *see also* Dkt. No. 2041 at 86), they do not provide sufficient allegations to infer that VW AG would have had such knowledge as early as November 19, 2010. To the contrary, the earliest-identified notice of such potential fines in the complaint was the May 15, 2014 email that Horn received, which included a letter stating potential fines of "EPA: $37,500, and CARB: $5,500" per violation. (Compl. ¶ 288.) Given such allegations, the Court cannot find that each and every Volkswagen quarterly and annual statement during the Class Period gives rise to Defendants' Section 10(b) liability. *Plaintiffs must provide additional allegations as to when during the Class*

5

*Period Defendants knew or should have known that losses would be probable.*

(Dkt. No. 2636 at 30 (emphasis added).)

Plaintiffs contend that the Amended Complaint includes allegations of "specific facts demonstrating that VW AG knew or should have known that its losses were probable during the entire Class Period or, at a minimum, no later than May 2014." (Dkt. No. 3200 at 13; *see also id.* at 13-15 (summarizing the most relevant new and repeated allegations).) Alternatively, even if VW AG was not required to recognize provisions throughout the Class Period, Plaintiffs contend that IAS 37 required VW AG and Winterkorn to disclose a contingent liability relating to the Company's emissions fraud, because the possibility of an outflow of resources to settle obligations caused by the fraud "could not be deemed *remote*." (FAC ¶ 275.)

### 1. Whether VW AG was required to recognize provisions or contingent liabilities throughout the Class Period

Even with additional allegations, the Amended Complaint does not support that, throughout the Class Period, VW AG knew or should have known that losses related to the emissions scheme were probable or more than remote. The first financial statement issued during the Class Period was VW AG's 2010 Annual Report, issued on February 25, 2011. (FAC ¶ 413.) By that time, Plaintiffs' Amended Complaint supports that management at VW AG likely knew that the Affected Vehicles used an illegal defeat device, and that without the defeat device the vehicles would not have complied with U.S. emissions standards. (*See, e.g.*, *id.* ¶ 279 ("From approximately May 2006 . . . to approximately November 2015, VW AG, through Supervisors A-F and other VW employees, . . . : (a) knew that the Subject Vehicles . . . did not meet U.S. emissions standards; (b) knew that VW was using software to cheat the U.S. testing process . . . ; and (c) attempted to and did conceal these facts from U.S. regulators and U.S. customers."); ¶ 172 ("Supervisors A-F, and others, knew that if they had told the truth and disclosed the existence of the defeat device, VW would not have obtained the requisite Certificates for the Subject Vehicles . . . .").)[2]

---

[2] Supervisors A-F were six senior VW AG executives in either VW AG's Brand Engine Development department or VW AG's Quality Management and Product Safety department. In

6

These allegations, however, do not support that VW AG knew that *losses* related to the defeat device were probable or more than remote at the beginning of the Class Period. That VW AG may have deliberately employed an illegal defeat device does not mean the Company knew with reasonable certainty that it was going to get caught. Lacking, for example, are allegations that VW AG was under investigation at the beginning of the Class Period with respect to the Affected Vehicles, and knew so. Or that EPA and CARB were asking questions at the beginning of the Class Period about the Affected Vehicles that could not be answered without disclosing Volkswagen's use of the defeat device. Without similar allegations, "the federal securities laws do not require a company to accuse itself of wrongdoing." *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), *aff'd sub nom Albert Fadem Trust v. Citigroup, Inc.*, 165 Fed. App'x 928 (2d Cir. 2006).

The court reached a similar conclusion in granting defendants' motion to dismiss in *Gusinsky v. Barclays PLC*, 944 F. Supp. 2d 279 (S.D.N.Y. 2013), *vacated in part on other grounds sub nom. by Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227 (2d Cir. 2014). There, plaintiffs alleged that between 2007 and 2009 Barclays knowingly understated its borrowing costs by falsely calculating the LIBOR interest rate. *Id.* at 282-84. After the fraud was discovered, plaintiffs argued that Barclays' financial statements from 2006 to 2011 were false and misleading because the Company failed to include contingent liabilities in these statements, as required by IAS 37, related to the LIBOR manipulation scheme. *Id.* at 285, 290-91. In rejecting plaintiffs' argument, the court reasoned that:

> The notion that IAS 37 obligates companies to disclose any potentially illegal conduct the instant it is committed because future liability is always possible, and that failure to do so may form the basis for a material omission under Rule 10b–5, is unrealistic and contrary to precedent. At most, the disclosure obligation would arise when an investigation into the conduct began, and the language of IAS 37 suggests that even an investigation does not trigger the duty to disclose where the

---

its criminal plea agreement, VW AG admitted and accepted responsibility for the knowing misconduct of these executives. (*See id.* ¶¶ 11, 77; *see also United States v. Volkswagen AG*, No. 16-CR-20394, Dkt. No. 68.) The Statement of Facts ("SOF") attached to the plea agreement includes descriptions of the roles that each of the Supervisors held at VW AG. (*See* FAC ¶¶ 7-12; *see also* Dkt. No. 3038-3 (SOF).)

7

possibility of liability remains "remote."

*Id.* at 290-91 (footnote omitted). The same reasoning applies here. That senior executives at VW AG knew the Company was lying to regulators does not mean that VW AG needed to record provisions or contingent liabilities for potential penalties as soon as the fraud began. To the contrary, "[a]t most, the disclosure obligation would arise when an investigation into the conduct began." *Gusinsky*, 944 F. Supp. 2d at 290; *cf. Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016) (defendants violated accounting rules by failing to take loss contingency *despite regulatory investigations*), *cert. granted sub nom. Leidos, Inc. v. Ind. Pub. Ret. Sys.*, 137 S. Ct. 1395 (2017); *In re Silver Wheaton Corp. Sec. Litig.*, No. 15-cv-5145 CAS, 2016 WL 3226004, at *10-11 (C.D. Cal. June 6, 2016) (plaintiffs plausibly alleged that defendants misstated financial statements when they did not recognize a tax liability despite an ongoing tax audit).

Relying on an allegation that was also included in the Original Complaint, Plaintiffs note that "CARB specifically warned VW AG in June 2008 that the Company would be assessed a $5,000 per car penalty for vehicles that contained a defeat device." (FAC ¶ 286; *see also* Dkt. No. 1510 ¶ 147.) The only basis for this allegation, however, is a report in the German newspaper *Süddeutsche Zeitung* (*see* FAC ¶¶ 286, 356), which does not explain the context of the CARB warning. For example, was the warning specific to Volkswagen, or a more generalized statement to the industry, analogous to a posted speed limit? The former example may have given Volkswagen reason to believe that CARB knew it was utilizing a defeat device; the latter would not.

Even if it could be inferred from the 2008 warning that CARB was on the lookout for defeat devices, and that the chances of detection were therefore higher, Plaintiffs do not identify who at VW AG knew about this warning. It therefore does not support that VW AG senior executives, much less Winterkorn, knew at the beginning of the Class Period that losses related to the defeat device were probable or more than remote. *See Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1436 (9th Cir. 1995) ("[C]orporate scienter relies heavily on the awareness of the directors and officers[.]"). Nor does the doctrine of collective scienter apply in this instance, as the alleged financial misstatements at the beginning of the Class Period were not "so important

8

and so dramatically false" that it would be reasonable to conclude that "at least *some* corporate officials knew of the falsity." *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008).

Because the allegations do not plausibly support that VW AG or Winterkorn knew or should have known that losses related to the emissions scheme were probable or more than remote throughout the Class Period, Plaintiffs have not demonstrated that Defendants intentionally or recklessly misstated VW AG's financial statements throughout the Class Period.

### 2. Whether VW AG was required to recognize provisions or contingent liabilities after May 2014

Plaintiffs alternatively argue that, at a minimum, no later than May 2014, VW AG and Winterkorn knew or should have known that VW AG's losses related to the defeat device were probable, or that the likelihood of losses was more than remote. (Dkt. No. 3200 at 12, 18.) In the January 4 Order, the Court noted that even the Original Complaint included some allegations supporting these inferences. (*See* Dkt. No. 2636 at 30.) And when the new allegations in the Amended Complaint are added to those in the Original Complaint, the inference that VW AG knew or should have known, by the end of May 2014, that its losses related to the emissions fraud were not only more than remote, but probable, has become "more than merely plausible or reasonable—it [has become] cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.[3]

Volkswagen's fraud started to come to light in May 2014, when U.S. regulators were alerted to a study conducted at West Virginia University and commissioned by the International Council on Clean Transportation ("ICCT"), which indicated that during road tests Volkswagen's "clean diesel" vehicles emitted NOx at levels up to 40 times higher than the legal limit. (FAC ¶ 21.) Around the same time, there was a flurry of internal activity at Volkswagen related to the ICCT study and the subsequent investigation by EPA and CARB.

---

[3] Because VW AG issued its First Quarter 2014 Interim Report on April 29, 2014; and its Second Quarter 2014 Interim Report on July 31, 2014 (FAC ¶ 413), the Court does not need to determine exactly when during May 2014 the inference of scienter became compelling.

9

For example, "[o]n or about April 28, 2014, members of the VW task force [which was assembled to formulate responses to questions that arose from U.S. regulators] presented the findings of the ICCT study to Supervisor E [Gottweis]," a close confidant of Winterkorn. (FAC ¶¶ 18 & n.2, 201, 204 (final alteration in original).) The presentation included "an explanation of the potential financial consequences VW could face if the defeat device was discovered by U.S. regulators, including . . . applicable fines per vehicle . . . ." (*Id.* ¶ 204.) Then, on May 15, 2014, "Defendant Horn received a letter . . . stating that 500,000-600,000 cars in the United States from model years 2009 [to] 2014 could be affected by the diesel scandal." (*Id.* ¶ 292.) The letter "specifically enumerated the potential fines of 'EPA: $37,500 and CARB: $5,500' per violation and specifically warned Horn that given the potential level of penalties, '[t]he contents of this [ICCT] study cannot be ignored!'" (*Id.* (alterations in original).) Given the number of Affected Vehicles identified in the Horn letter, and the projected monetary penalties, "Horn knew at least as early as May 20, 2014 that Volkswagen's illicit practices could cost Volkswagen between $21.5 and $25.8 billion just in fines from EPA and CARB." (*Id.* ¶ 294 (emphasis omitted).)

With the situation becoming more serious, "Gottweis in the spring of 2014 finally said 'I have to talk to the boss,'" which is alleged to be Winterkorn. (*Id.* ¶ 245.) Winterkorn has since admitted that, "by May 2014, he was aware of the problems regarding impermissibly high emissions levels in the TDI vehicles." (*Id.* ¶ 248.) Sources also support that on May 23, 2014, Gottweis provided Winterkorn with a memo on the emissions fraud, which Winterkorn took home to read as part of his "weekend suitcase." (*Id.* ¶¶ 244-46.) As alleged, Gottweis explained in that memo that "there was no legitimate explanation for either [the] excessive emissions levels or the defeat device," and that "it is to be assumed that the authorities will subsequently examine VW systems to determine if Volkswagen has installed test recognition into the engine control unit software (a so-called defeat device)." (*Id.* ¶¶ 246-47.)[4]

---

[4] Plaintiffs have also incorporated similar allegations into the Amended Complaint from the Second Superseding Indictment ("SSI") that the United States filed against Gottweis and other former VW AG executives in *United States v. Dorenkamp*, No. 2:16-CR-20394 (E.D. Mich. filed Jan. 11, 2017) (*See id.* ¶¶ 2, 207; *see also* Dkt. Nos. 3060 at 9; 3200 at 17 n.9.) Because it is "well settled that 'allegations from other complaints or documents, which are unproved and are contested, may not be used to establish facts to demonstrate scienter,'" *ScripsAmerica, Inc. v.*

These allegations support that, by at least the end of May 2014, senior executives at VWGoA and VW AG knew that Volkswagen was under investigation by EPA and CARB; that these senior executives were also informed about the potential financial consequences if regulators discovered the fraud; that at least one of these senior executives (Gottweis) was in direct contact with Winterkorn about the Affected Vehicles; that Gottweis told Winterkorn that there was no plausible explanation for the ICCT study results, other than the defeat device; and that Gottweis told Winterkorn that regulators could be expected to examine the Affected Vehicles for a defeat device. Together, these allegations support a strong inference that, by the end of May 2014, Winterkorn—and thus VW AG—knew of the financial consequences Volkswagen could face if the fraud was discovered, and knew that losses related to the fraud were probable. Further, given the significant size of the potential liability, a fact finder could also reasonably conclude that the lack of provisions related to the emissions fraud in financial statements after May 2014 was not a "mere publication of inaccurate accounting figures," *Lloyd v. CVB Financial Corp.*, 811 F.3d 1200 (9th Cir. 2016), but that the misstatements were substantial, and knowledge of the misstatements could plausibly be attributed to Winterkorn as VW AG's CEO.

Defendants argue that a separate allegation in the Amended Complaint casts doubt on the May 2014 estimate of potential liability related to the emissions scheme. Specifically, a March 2, 2016 VW AG press release cited in the Amended Complaint states that "'Winterkorn and other top managers' believed in November 2014 . . . that the diesel issues in the United States could be resolved 'by paying a cost-of-doing business fine,' and that resolving claims in North America would cost approximately €20 million." (Dkt. No. 3304 at 6 (quoting FAC ¶ 249).) That different allegations support different liability estimates, however, does not rebut the inference that, by the end of May 2014, VW AG knew or should have known that losses related to the emissions scheme

---

*Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1262 (C.D. Cal. 2015) (quoting *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1203 (N.D. Cal. 2012)), the Court has not considered the SSI allegations. In a few of the allegations relied on above, however, Plaintiffs have used the SSI to corroborate admissions in the SOF accompanying VW AG's plea agreement. For example, although the SOF refers only to Supervisor E by his position and term at VW AG, the SSI describes Gottweis as holding the same position during the same time period. Using the SSI in this manner is appropriate, and the Court therefore considers these joint SOF/SSI allegations.

were probable. Additionally, given management's awareness that 500,000 to 600,000 Affected Vehicles were under investigation, and that EPA and CARB fines could respectively be $37,500 and $5,500 per Affected Vehicle, a fact finder could also reasonably conclude that the smaller estimate in the after-the-fact March 2, 2016 VW AG press release was false. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987) (for purposes of evaluating a motion to dismiss, a court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party").

In sum, Plaintiffs' Amended Complaint plausibly supports that, by the end of May 2014, Winterkorn and VW AG knew or should have known that losses related to the emissions fraud were probable, and that Winterkorn and VW AG therefore intentionally or recklessly misstated financial statements issued after May 2014 by not including a provision in those statements for the emissions fraud. The Amended Complaint does not, however, plausibly support that losses related to the emissions fraud were probable or more than remote before May 2014. Plaintiffs therefore have not adequately alleged that Winterkorn or VW AG intentionally or recklessly misstated financial statements issued before May 2014.

### B.  Understatement of Financial Liabilities by Diess in 2015

Plaintiffs also allege that that Diess made material misrepresentations in VW AG's Second and Third Quarter 2015 Interim Reports, both of which Diess signed, because the reports understated VW AG's total liabilities. (FAC ¶ 413.) In the January 4 Order, the Court concluded that Plaintiffs had adequately alleged a strong inference of scienter for Diess as to the Second Quarter 2015 Interim Report, but not as to the Third Quarter 2015 Interim Report. (Dkt. No. 2636 at 22.) Unlike reports in prior periods during the Class Period, VW AG's Third Quarter 2015 Interim Report disclosed that "[i]nitial exceptional charges of €6.7 billion [were] recognized for diesel issues." (Dkt. No. 1708-10 at 4.) In light of this disclosure, the Court previously held that it "cannot conclude that the facts as alleged give rise to a strong inference of scienter as to Diess" because:

> To the extent Plaintiffs believe that the amount of money recognized was insufficient, the more reasonable inference to be drawn is that VW AG, including

12

> Diess, misjudged or miscalculated the amount of liability rather than actively tried to conceal the true amount. This is particularly true given that the emissions-cheating scandal had already been exposed to the public a month earlier in September 2015.

(Dkt. No. 2636 at 22-23.)

In their Amended Complaint, Plaintiffs have added allegations supporting that Diess was informed about Volkswagen's use of the defeat device by at least July 2015 (FAC ¶¶ 213, 216), and that, well before VW AG issued its Third Quarter 2015 Interim Report on October 28, 2015, "the Company internally estimated $26 billion in exposure from the emissions cheating." (Dkt. No. 3200 at 31 (citing FAC ¶ 366).)

The $26 billion estimate is based on the May 15, 2014 letter to Horn, which, as noted above, stated that 500,000 to 600,000 vehicles in the United States could be affected by the emissions scandal, and that fines could include "EPA: $37,500, and CARB: $5,500" per violation. (FAC ¶ 366.) It is reasonable to conclude that Diess, a member of the Board of Management of VW AG, was aware of this estimate by October 28, 2015—approximately one month *after* Volkswagen's emissions scandal was publicly disclosed. Nonetheless, that Diess knew of this estimate still does not support that he intentionally or recklessly misstated the charge for the emissions fraud in the Third Quarter 2015 Interim Report.

In evaluating whether Plaintiffs have stated with particularity facts giving rise to a strong inference of scienter, the Court "must consider plausible nonculpable explanations for the defendant's conduct." *Tellabs*, 551 U.S. at 314. Here, the Complaint supports such a nonculpable explanation; specifically, that Diess viewed the €6.7 billion charge as only an initial charge, which VW AG would adjust after further evaluation of its legal options. This explanation is supported by the fact that the Third Quarter 2015 Interim Report expressly notes that the charge was an "*[i]nitial* exceptional charge[]." (Dkt. No. 1708-10 at 4 (emphasis added).) The Report also states that "legal risks exist in connection with the diesel issue that cannot be assessed at present." (Dkt. No. 1708-10 at 19.) That VW AG disclosed the fraud to investors, incurred a significant €6.7 billion charge, and then noted that the charge was only an "initial" charge and that additional "legal risks exist[ed]" all supports that Diess was not trying to conceal the full amount of liability

13

VW AG would incur from the emissions fraud. Although it is possible that Diess intentionally misstated the charge to conceal the true cost of the fraud, that inference is simply not "as compelling as [the] opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. As a result, Plaintiffs' allegations remain insufficient to support a strong inference of scienter for Diess as to alleged misstatements in VW AG's Third Quarter 2015 Interim Report.

### C. Section 20(a) Control-Person Claims

In order to establish a prima facie control-person claim under Section 20(a) of the Exchange Act, Plaintiffs must adequately allege (1) a primary violation of federal securities laws, and (2) "that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). In the January 4 Order, the Court held that Plaintiffs had adequately pled primary violations as to each of the Corporate Defendants (VW AG, VWGoA, VWoA, and AoA), and that the Original Complaint supported control-person liability as to Winterkorn and VW AG. (Dkt. No. 2636 at 33.) As to Diess and Horn, though, the Court previously concluded that the second element of the Section 20(a) claim was not adequately pled, "because Plaintiffs provide no allegations that these individuals exercised actual control over the alleged violators." (*Id.*) In their Amended Complaint, Plaintiffs have added allegations as to both Diess and Horn. For the reasons that follow, the allegations are still insufficient to support the control-person claim against Diess, but are sufficient to support the control-person claim against Horn.

#### 1. Diess

In their Original Complaint, Plaintiffs based their control-person claim against Diess on his positions as a member of VW AG's Management Board and as Chairman of the Management Board of the VW Passenger Car Brand, and on conclusory allegations that he was involved in the day-to-day operations of, and exercised power and control over, the Corporate Defendants. (*See* Dkt. No. 2636 at 33.)

In their Amended Complaint, Plaintiffs add additional allegations supporting that Diess was made aware of the defeat devices in July 2015. (FAC ¶¶ 213, 216.) Plaintiffs also highlight allegations that, while not new, support that Diess approved and signed VW AG's Second Quarter

14

and Third Quarter 2015 Interim Reports. (Dkt. No. 3200 at 31; *see also* FAC ¶¶ 12, 259, 271.) Contrary to Plaintiffs' assertions, these are not "substantial additional allegations that Diess was 'active in the day-to-day affairs,' and 'had the power to control corporate actions.'" (Dkt. No. 3200 at 31.) To the contrary, other than Diess's execution of the Second and Third Quarter 2015 Interim Reports, there are no allegations in the Amended Complaint supporting that he was "active in the day-to-day affairs" of any of the Corporate Defendants. (*Id.*) The absence of such allegations distinguishes this case from *Howard*, 228 F.3d 1057, where the defendant CEO not only had "authority over the process of preparing and releasing financial statements," but also "participat[ed] in the day-to-day management of [the corporate defendant]." *Id.* at 1065. "A director is not automatically liable as a controlling person," *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396 (9th Cir. 1993), and Plaintiffs' Amended Complaint does not support control-person liability as to Diess.

### 2. Horn

Plaintiffs alleged in their Original Complaint that Horn was "involved in the day-to-day operations of, and exercised power and control over, VWGoA and VWoA, including by, among other things, directing their public statements and regulatory actions." (Dkt. No. 1510 ¶ 50.) In the January 4 Order, the Court concluded that these allegations were insufficient to support control-person liability as to Horn, because "Plaintiffs do not plead the specific circumstances of Horn's . . . alleged control." (Dkt. No. 2636 at 33.)

The allegations added in the Amended Complaint primarily offer background information about Horn, which adds some, but fairly limited, support for a finding of actual control over VWGoA and VWoA. (*See, e.g.*, FAC ¶ 562 ("[Horn] was a longtime veteran of VW AG in Germany, having joined the Company in 1990 and served as head of sales and marketing for Volkswagen's premium vehicles, then as head of European sales, and then as head of global sales;" Horn was "handpicked by Winterkorn to 'reboot[] [VWGoA's] U.S. strategy,' and turn VWGoA around after a period of slumping sales." (alterations in original) (citation omitted).)

Nonetheless, more extensive briefing on the control-person claim has satisfied the Court that the Horn control-person claim is well pled. While not new to the Amended Complaint,

15

multiple allegations do support that Horn was "active in the day-to-day affairs" of VWGoA and VWoA, and "had the power to control corporate actions" of those entities. *Howard*, 228 F.3d at 1065. For example, Plaintiffs allege that "the US-based Volkswagen entities—VWGoA, VWoA, and AoA, *as well as VWGoA and VWoA executive Horn*[,] . . . were centrally involved in the process for acquiring all necessary approvals and certifications so that [Volkswagen's] vehicles could legally be sold and driven in the United States." (FAC ¶ 396 (emphasis added).) Plaintiffs also allege that Horn was involved in VWGoA's response to the ICCT report: Horn "learn[ed] on or about March 31, 2014 about the upcoming publication of the ICCT report . . . [and] requested reports and analyses . . . from VWGoA's Environmental and Engineering Office." (*Id.* ¶ 241.) Horn also "conveyed the urgency of the CARB situation to multiple VW AG board members . . . . [and] made clear that certification of the MY 2016 Generation 3 vehicles was at risk." (*Id.* ¶ 213.)

That Horn was not only CEO of VWGoA (and head of VWoA brand), but was also centrally involved in communications with regulators about the Affected Vehicles supports that he exercised "day-to-day oversight" over transactions that contributed to the ultimate fraud. *Howard*, 228 F.3d at 1065. Further, after the diesel scandal broke, Horn appeared before Congress in October 2015 on behalf of Volkswagen and admitted that the Company had "broken the trust of our customers, dealerships, and employees, as well as the public and regulators." (FAC ¶ 242.) Horn's appearance on behalf of Volkswagen reflects his position of authority, and his longstanding role as a trusted, senior executive at Volkswagen.

Together, these allegations adequately support that Horn was "active in the day-to-day affairs" of VWGoA and VWoA and "had the power to control corporate actions" of those entities. *Id.*

### D. Request for Reconsideration

In their motion to dismiss, the Volkswagen Defendants also request that the Court reconsider its holdings that (1) Plaintiffs have adequately pled collective scienter with respect to VW AG, VWGoA, VWoA, and AoA as it relates to false and misleading statements about being "environmentally friendly;" and (2) that VW AG had "ultimate authority" over false and misleading statements made by its U.S. subsidiaries under *Janus Capital Group, Inc. v. First*

16

*Derivative Traders*, 564 U.S. 135 (2011). (*See* Dkt. No. 3060 at 13; *see also* Dkt. No. 2636 at 23-25, 27, 31-32.) Volkswagen has not cited a change in controlling law, nor has it convinced the Court that its prior rulings were clearly erroneous. *See Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000). As a result, the Court DENIES the request for reconsideration.

**CONCLUSION**

For the reasons discussed above, the Court ORDERS as follows:

(1) Volkswagen's motion to dismiss Plaintiffs' Section 10(b) claim is GRANTED as to Plaintiffs' claim that VW AG and Winterkorn intentionally or recklessly understated VW AG's financial liabilities in each of the Company's quarterly and annual financial statements issued before May 2014.

(2) Volkswagen's motion to dismiss Plaintiffs' Section 10(b) claim is DENIED as to Plaintiffs' claim that VW AG and Winterkorn intentionally or recklessly understated VW AG's financial liabilities in quarterly and annual financial statements issued after May 2014.

(3) Volkswagen's motion to dismiss Plaintiffs' Section 10(b) claim is GRANTED as to Plaintiffs' claim that Diess intentionally or recklessly understated VW AG's financial liabilities in VW AG's Third Quarter 2015 Interim Report.

(4) Volkswagen's motion to dismiss Plaintiffs' Section 20(a) claim is GRANTED as to Plaintiffs' control-person claim against Diess.

(5) Horn's motion to dismiss Plaintiffs' Section 20(a) claim is DENIED as to Plaintiffs' control-person claim against Horn.

(6) Volkswagen's request for reconsideration of the Court's prior rulings is DENIED.

The Court already provided Plaintiffs an opportunity to amend their Complaint to cure the Section 10(a) and Section 20(a) deficiencies highlighted in the January 4 Order. As to the deficiencies Plaintiffs did not cure, Plaintiffs have not claimed in their opposition or at oral argument that there are any additional material allegations they could make if granted leave to amend yet again. The Court therefore denies further leave to amend. *See Rutman Wine Co.*, 829

17

F.2d at 738.

**IT IS SO ORDERED.**

Dated: June 28, 2017

CHARLES R. BREYER
United States District Judge