1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

8

IN RE: VOLKSWAGEN "CLEAN DIESEL"
MARKETING, SALES PRACTICES, AND
PRODUCTS LIABILITY LITIGATION

9

_____/

10

This Order Relates To:
MDL Dkt. Nos. 2893, 2895, 2897

11

12

*BRS v. Volkswagen AG, et al.*, Case No.
16-cv-3435 ("Bondholders Securities Action")

13

_____/

MDL No. 2672 CRB  (JSC)

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTIONS TO DISMISS THE
BONDHOLDERS' CLASS ACTION
COMPLAINT**

14       This order addresses the second of two consolidated securities actions in this MDL.  Both

15    actions are against Volkswagen and members of management, and arise from the Company's use

16    of a "defeat device" in nearly 600,000 TDI diesel engine vehicles sold in the United States from

17    2009 through 2015.  The first action is by Volkswagen shareholders (the "ADR action").  (*See*

18    Dkt. Nos. 2636, 2862, 3392.)  This action is by Volkswagen bondholders—specifically,

19    institutional investors who purchased bonds offered by Volkswagen Group of America Finance,

20    LLC ("VWGoAF") between May 23, 2014 and September 22, 2015.  (Dkt. No. 2507 (Compl.).)

21    The bondholders allege that during the class period Volkswagen failed to disclose its emissions

22    fraud, which rendered statements to prospective bondholders misleading and caused VWGoAF's

23    bonds to sell at inflated prices.  The bondholders contend that Defendants' conduct violated

24    Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

25       Defendants have filed motions to dismiss the bondholders' Complaint.  Central to the

26    motions is the contention that Defendants did not make any material misrepresentations or

27    omissions in the Bond Offering Memorandum on which Lead Plaintiff relied; and, to the extent

28    Defendants did so, the allegations do not support that Defendants made those misrepresentations

or omissions with scienter.  For the reasons that follow, the Court concludes that Lead Plaintiff has plausibly alleged that the relevant Offering Memorandum was misleading, and that at least some (but not all) Defendants made statements and omissions therein with scienter.  The Court accordingly GRANTS in part and DENIES in part the motions.

## BACKGROUND

### I.    The Defeat Device Scheme

Between 2009 and 2015, Volkswagen sold nearly 600,000 Volkswagen-, Audi-, and Porsche-branded TDI "clean diesel" vehicles in the United States, which it marketed as being environmentally friendly, fuel efficient, and high performing.  (Compl. ¶¶ 148-49.)  Unbeknownst to consumers and regulatory authorities, Volkswagen installed a software defeat device in these cars that allows the vehicles to evade EPA and California Air Resources Board ("CARB") emissions test procedures.  The defeat device senses whether the vehicle is undergoing emissions testing or being operated on the road.  During emissions testing, the defeat device produces regulation-compliant results.  When the vehicle is on the road, the defeat device reduces the effectiveness of the vehicles' emissions control systems.  Only by installing the defeat device in its vehicles was Volkswagen able to obtain Certificates of Conformity from EPA and Executive Orders from CARB for its 2.0- and 3.0-liter TDI diesel engine vehicles; in fact, these vehicles release nitrogen oxides (NOx) at a factor of up to 40 times permitted limits.  (*Id.* ¶ 54.)

In the fall of 2015, the public learned about Volkswagen's emissions scheme, when EPA issued two Notices of Violation of the Clear Air Act to Volkswagen Aktiengesellschaf ("VW AG"), Volkswagen Group of America, Inc. ("VWGoA") and related entities, announcing that Volkswagen had admitted to deliberately cheating on emissions tests.  (*Id.* ¶¶ 232-33, 270-71.)  Martin Winterkorn, the CEO and Chairman of the Management Board of VW AG from 2007 to September 23, 2015, acknowledged that Volkswagen broke the public's trust by manipulating environmental standards.  (*Id.* ¶ 237.)  Michael Horn, the President and CEO of VWGoA from January 2014 to March 2016, also admitted that "our company was dishonest with the EPA, and [] CARB and with all of you . . . . We've totally screwed up."  (*Id.* ¶ 241.)

After public disclosure, consumers, dealers, investors, and government entities filed suit

1   against Volkswagen, and hundreds of lawsuits were consolidated before this Court as part of this

2   MDL.  Volkswagen has since settled claims related to the defeat device scheme brought by classes

3   of U.S. consumers, franchise dealers, and reseller dealerships, as well as claims brought by EPA,

4   CARB, and the FTC.  On March 10, 2017, VW AG also pled guilty to three criminal felony

5   counts, including conspiracy to defraud the United States and the Company's U.S. customers, and

6   to violate the Clean Air Act, by lying about whether its "clean diesel" vehicles complied with U.S.

7   emissions standards.  (*See United States v. Volkswagen AG*, No. 16-CR-20394, Dkt. 68 (E.D.

8   Mich. Jan. 11, 2017).)  Together, civil and criminal penalties and civil settlements are expected to

9   cost Volkswagen approximately $20 billion.

10  **II.     The Bond Offerings**

11          On three occasions in 2014 and 2015—prior to public disclosure of the emissions fraud—

12  Volkswagen issued U.S.-dollar denominated bonds, through VWGoAF, for a total of $8.3 billion

13  in par value.  (Compl. ¶ 3.)  VWGoAF is a wholly-owned subsidiary of VWGoA, and the bonds

14  were guaranteed by VW AG, the ultimate parent company of VWGoA and VWGoAF.  (*Id.* ¶¶ 20-

15  22.)  VWGoAF issued the bonds in private placements led primarily by U.S.-based investment

16  banks.  (*Id.* ¶ 15.)  The bonds were exempt from registration with the SEC under Rule 144A, and

17  accordingly could be purchased only by qualified institutional buyers ("QIBs")—institutional

18  investors with at least $100 million in securities under management.  *See* 17 C.F.R.

19  § 230.144A(a)(1)(i).  The bonds traded during the Class Period.  (Compl. ¶ 3.)

20          Each VWGoAF bond offering was made pursuant to an Offering Memorandum.  The

21  Offering Memoranda are dated May 15, 2014 (for a May 23, 2014 offering), November 12, 2014

22  (for a November 20, 2014 offering), and May 19, 2015 (for a May 22, 2015 offering).  (*Id.* ¶ 4.)

23  Each Memorandum includes legal and financial disclosures, the terms of the offering, and various

24  business and regulatory risk factors for investors to consider.  (*See, e.g.*, Stanley Decl., Dkt. No.

25  2896-6 (May 15, 2014 Mem.).)  Appended to each Memorandum are certain audited and

26  unaudited financial statements of VW AG.  (*See id.*; *see also* Giuffra Decl., Dkt. No. 2898-1

27  (excerpts of the May 15, 2014 Mem.).)

28

United States District Court
Northern District of California

### III.     The Bondholders' Lawsuit

After learning about Volkswagen's emissions fraud, VWGoAF bondholders filed securities fraud claims against the Company and members of management.  On October 11, 2016, the Court appointed the Puerto Rico Government Employees and Judiciary Retirement Systems Administration as Lead Plaintiff ("Lead Plaintiff," "Plaintiff," or "PRGERS"), and Abraham, Fruchter & Twersky, LLP as Lead Counsel.  (Dkt. No. 2023.)  Lead Plaintiff purchased 4,210 bonds (CUSIP: 928668AA0) issued as part of the May 23, 2014 offering and pursuant to the May 15, 2014 Offering Memorandum.  (Compl. ¶ 16.)

In its Class Action Complaint, Plaintiff names as defendants VW AG, VWGoA, and VWGoAF (collectively, the "Corporate Defendants"), and Martin Winterkorn and Michael Horn (collectively, the "Individual Defendants," and all together, "Defendants" or "Volkswagen").  (*Id.* ¶¶ 20-25.)  Plaintiff alleges that each Defendant is responsible for false and misleading statements and omissions in the Bond Offering Memoranda with respect to the emissions fraud.  (*Id.* ¶¶ 199-202.)  Plaintiff also alleges that VW AG and Winterkorn made false and misleading statements in the financial statements appended to the Offering Memoranda, by failing to recognize probable liabilities related to the fraud.  (*Id.* ¶¶ 215-17.)  Finally, Plaintiff contends that Defendants made false and misleading statements and omissions in materials outside the Offering Memoranda, including in interim and annual reports (*id.* ¶¶ 203-14), press releases (*id.* ¶¶ 218-26), and Corporate Social Responsibility and Sustainability Reports (*id.* ¶¶ 227-30) issued during the class period.  As a result of Defendants' conduct, Plaintiff asserts that each Defendant violated Section 10(b) the Exchange Act, and that VW AG, VWGoA, Winterkorn, and Horn are also liable as "controlling persons" under Section 20(a) of the Exchange Act.

Horn, Winterkorn, and the Corporate Defendants have each filed a motion to dismiss the Complaint.  (*See* Dkt. Nos. 2893, 2895, 2897.)  Horn and Winterkorn have also joined the Corporate Defendants' motion.  Together, Defendants argue that the Court should dismiss the Complaint because Plaintiff (1) lacks standing; (2) fails to allege any actionable misstatements or omissions; (3) does not adequately plead that Defendants possessed scienter at the time Plaintiff purchased VWGoAF bonds; and (4) does not adequately plead reliance.  (Dkt. No. 2897 at 3-4.)

United States District Court
Northern District of California

Winterkorn and Horn also challenge the control-person claims against them (Dkt. Nos. 2893 at 20-21; 2895 at 15-16), and Winterkorn additionally argues that Plaintiff's claims against him should be dismissed for lack of personal jurisdiction (Dkt. No. 2895 at 16-23).  The Court held a hearing on the motions on July 7, 2014.

## IV.   The ADR Lawsuit

The shareholders in the ADR action are persons who purchased Volkswagen-sponsored Level 1 American Depositary Receipts in an over-the-counter market in the United States from November 19, 2010 through January 4, 2016.  (*See* Dkt. No. 2862 ¶¶ 6, 35-36.)  The Court addressed motions to dismiss the ADR action on two prior occasions, granting in part and denying in part the motions both times.  (*See* Jan. 4, 2017 Order, Dkt. No. 2636; June 28, 2017 Order, Dkt. No. 3392.)  The causes of action and many of the allegations in the ADR action and the bondholders' action are the same, and in a number of instances the parties here rely on the Court's ADR orders.

## LEGAL STANDARD

Pursuant to the authority granted to the SEC under Section 10(b) of the Exchange Act, the SEC adopted Rule 10b-5, which makes it unlawful for any person, in connection with the purchase or sale of a security, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).  The elements of a securities fraud claim under Section 10(b) and Rule 10b-5 are (1) that the defendant made a material misrepresentation or omission, (2) that the defendant did so with scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  At the pleading stage, plaintiff "must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')." *Reese v. Malone*, 747 F.3d 557, 568 (9th Cir. 2014) (citing *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012)).  Rule 9(b) requires that plaintiff

1  "state with particularity the circumstances constituting fraud or mistake," while the PSLRA

2  requires plaintiff to plead both falsity and scienter with particularity.  Fed. R. Civ. P. 9(b); 15

3  U.S.C. § 78u-4(b); *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 321-22 (2007).

4       Section 20(a) of the Exchange Act makes certain "controlling persons" liable for violations

5  of Section 10(b).  *See* 15 U.S.C. § 78t(a).  "[A] defendant employee of a corporation who has

6  violated the securities laws will be jointly and severally liable to the plaintiff, as long as the

7  plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant

8  exercised actual power or control over the primary violator.'"  *Zucco Partners, LLC v. Digimarc*

9  *Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (quoting *No. 84 Emp'r-Teamster Joint Council Pension*

10 *Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003)).

11      In considering a motion to dismiss a securities fraud action, "courts must, as with any

12 motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual

13 allegations in the complaint as true."  *Tellabs*, 551 U.S. at 322.  Presuming all factual allegations

14 to be true, the Court must then determine if the complaint pleads "enough facts to state a claim to

15 relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim

16 is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable

17 inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662,

18 678 (2009).  "Courts must consider the complaint in its entirety, as well as other sources courts

19 ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents

20 incorporated into the complaint by reference, and matters of which a court may take judicial

21 notice."  *Tellabs*, 551 U.S. at 322.  If the Court grants a motion to dismiss, it will give leave to

22 amend "when justice so requires."  Fed. R. Civ. P. 15(a)(2).

## DISCUSSION

### I.  Standing

25      Initially, Defendants argue that Lead Plaintiff lacks standing to bring claims on behalf of

26 persons or entities who purchased different classes of bonds, or who purchased bonds in offerings

27 other than the May 2014 offering in which Lead Plaintiff participated.  (Dkt. No. 2897 at 45-46.)

28 Defendants' argument is based on two related decisions by Judge Pfaelzer, holding that "the

United States District Court
Northern District of California

named plaintiff must have standing to sue for each of the asserted claims by purchasing in the offerings that are putatively part of the class action." *FDIC v. Countrywide Fin. Corp.*, No. 2:12-CV-4354 MRP, 2012 WL 5900973, at *10 (C.D. Cal. Nov. 21, 2012); *see also In re Countrywide Fin. Corp. Mort.-Backed Sec. Litig.*, 934 F. Supp. 2d 1219, 1229-30 (C.D. Cal. 2013) (citing favorably to decisions where "courts extend standing only to the offerings or tranches purchased by the named plaintiff").

Judge Pfaelzer's decisions predate *Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 799 (2016), which clearly controls and supports Plaintiff's standing. In *Melendres*, the Ninth Circuit noted that there are two rubrics for determining whether a lead plaintiff may pursue claims on behalf of unnamed class members: the "standing approach" and the "class certification approach."

> The "standing approach" treats dissimilarities between the claims of named and unnamed plaintiffs as affecting the "standing" of the named plaintiff to represent the class. In other words, if there is a disjuncture between the injuries suffered by named and unnamed plaintiffs, courts applying the standing approach would say the disjuncture deprived the named plaintiff of standing to obtain relief for the unnamed class members. *See, e.g.*, *Blum v. Yaretsky*, 457 U.S. 991, 999-1002 (1982). The "class certification approach," on the other hand, "holds that once the named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded, and the court proceeds to consider whether the Rule 23(a) prerequisites for class certification have been met." NEWBERG ON CLASS ACTIONS § 2:6.

*Melendres*, 784 F.3d at 1261-62. After discussing these two approaches, the court in *Melendres* held that, "We adopt the class certification approach." *Id.* at 1262. As a result, "representative parties who have a direct and substantial interest have standing," and "the question whether they may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy of representation." *Id.* (quoting 7AA Charles Alan Wright et al., *Federal Practice & Procedure* § 1785.1 (3d ed.)).

Defendants do not attempt to distinguish *Melendres*, but instead assert that *Melendres* does not help Lead Plaintiff, who has failed to state a claim on its own behalf. (*See* Dkt. No. 3124 at 11 n.2.) If Lead Plaintiff does not plead facts sufficient to state its own claim, Defendants are correct that Lead Plaintiff cannot represent others who may have a claim. *See Lierboe v. State Farm Mut.*

United States District Court
Northern District of California

*Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003) ("[I]f Lierboe has no stacking claim, she cannot represent others who may have such a claim . . . ."). But if Lead Plaintiff is able to state its own claim (and it is able to do so as discussed below), *Melendres* clearly forecloses Defendants' argument that Plaintiff lacks standing to represent other putative class members who purchased VWGoAF bonds in different tranches or offerings.

## II.      Section 10(b) Claims

### A.      The Universe of Statements

In considering Plaintiff's Section 10(b) claims, it is first necessary to address whether Plaintiff may rely on statements outside the May 15, 2014 Offering Memorandum, which is the Memorandum that governed Plaintiff's bond purchase. The Complaint relies on statements and omissions within the body of the May 2014 Offering Memorandum, in financial statements appended to the Memorandum, and in materials outside the Offering Memorandum, including in various interim and annual reports (Compl. ¶¶ 203-14), press releases (*id.* ¶¶ 218-26), and Corporate Social Responsibility and Sustainability Reports (*id.* ¶¶ 227-30) issued by Volkswagen during the class period. Plaintiff contends that at least certain of these materials were incorporated by reference into the Offering Memorandum and accordingly should be considered. (*Id.* ¶ 203; *see also* Dkt. No. 3021 at 31.)

The Court agrees with Defendants that Plaintiff can base its securities fraud claims only on the May 2014 Offering Memorandum and the financial statements appended thereto. Near the front of May 2014 Offering Memorandum, at the top of the page and in bold-faced type, is the statement that "**You should rely only on the information contained in this Offering Memorandum**" when considering this investment. (Dkt. No. 2898-1 at 4.) In accepting the Memorandum, "Investors also acknowledge[d] that . . . they ha[d] relied only on the information contained in this document" in making an investment decision. (*Id.*)

Based on this instruction and acknowledgment, Plaintiff, as an institutional investor with more than $100 million in securities under management, could not reasonably have relied on statements outside the May 2014 Offering Memorandum and the appended financial statements in making its investment decision. *See Harsco Corp. v. Segui*, 91 F.3d 337, 342-44 (2d Cir. 1996)

(affirming dismissal where sophisticated plaintiff disclaimed reliance on matters outside of agreement but brought Section 10(b) claim "principally alleging conduct that falls outside [the] boundaries [of the agreement]").

Nor does Plaintiff explain how the May 2014 Offering Memorandum incorporated by reference any of Volkswagen's interim and annual reports, let alone the cited press releases and Corporate Social Responsibility and Sustainability Reports.  The only section of the Memorandum that appears to address the interim and annual reports is a section stating that:

> Information presented in this Offering Memorandum is qualified in its entirety by the description of recent developments related to the Volkswagen Group set forth in '*Developments since January 1, 2014 and Outlook*' which reflects among other things information disclosed in the unaudited interim ***report*** of Volkswagen AG and its consolidated subsidiaries for the period from January 2014 to March 2014.

(Dkt. No. 2898-1 at 9 (second emphasis added).)  This statement does not incorporate Volkswagen's interim reports into the Memorandum.  Rather, it provides that, under the heading *Developments since January 1, 2014 and Outlook*, which is a particular section in the Memorandum, certain information from the interim report is disclosed.  Plaintiff does not assert that the representations in the interim report on which it relies were included in that disclosure.

Given that Plaintiff is a large institutional investor and the May 2014 Offering Memorandum expressly instructed it to rely only on information contained within it, Plaintiff cannot base its securities fraud claims on statements in documents or sources other than the Offering Memorandum and the appended financial statements.

**B.      The Body of the May 2014 Offering Memorandum**

Plaintiff makes different arguments for why the body of the May 2014 Offering Memorandum was false and misleading, and why the appended financial statements were false and misleading.  The Court first addresses the statements and omissions within the body of the Memorandum and in Section C discusses the financial statements.

**1.      Whether the Statements and Omissions Were False and/or Misleading**

Plaintiff contends that the "heart of this action" is Defendants' failure to disclose their massive defeat-device scheme.  (Dkt. No. 3021 at 31.)  Neither side disputes that Volkswagen's

United States District Court
Northern District of California

9

1    use of the defeat device was material information—that is, a reasonable investor would have

2    viewed it "as having significantly altered the 'total mix' of information made available." *Basic*

3    *Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).  Defendants contend, however, that they did not

4    have a duty to disclose the use of the defeat device in the May 2014 Offering Memorandum.

5         Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all

6    material information." *Matrixx*, 563 U.S. at 44.  Instead, a duty to disclose arises only when

7    disclosure is "necessary . . . to make the statements made, in light of the circumstances under

8    which they are made, not misleading."  17 C.F.R. § 240.10b-5(b); *see also Schueneman v. Arena*

9    *Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) ("[O]nce defendants choose to tout positive

10   information to the market, they are bound to do so in a manner that wouldn't mislead investors,

11   including disclosing adverse information . . . ." (internal quotation marks omitted)).

12        Plaintiff highlights two types of statements in the May 2014 Offering Memorandum that it

13   contends were misleading because Defendants did not disclose the defeat-device scheme.  The

14   first category includes statements made about Volkswagen's research and development ("R&D")

15   priorities.  Specifically, the May 2014 Offering Memorandum explained that:

16   •    Volkswagen's top priority for research and development in 2011, 2012 and 2013 was
17        to develop engines and drivetrain concepts to reduce emissions, and to develop and
          expand the modular longitudinal toolkit platforms and the modular transverse toolkit
18        platforms.  (Dkt. No. 2896-6 at 141; *see also* Compl. ¶ 201(a).)

19   •    A focal point of Volkswagen's current and future development activities is and will
20        be innovative mobility concepts and the reduction of fuel consumption and emissions
          of the fleet. . . . With a broad range of development activities in the drivetrain sector,
21        Volkswagen will continue to reduce the emissions of our vehicles in the coming
22        years.  (Compl. ¶ 201(b).)

23   •    Our future business success depends on our ability to develop new, attractive and
          energy-efficient products that are tailored to our customers' needs and to offer these
24        products on competitive terms and conditions.  In their purchasing decisions,
          customers are increasingly emphasizing lower fuel consumption and exhaust
25        emissions.  (*Id.* ¶ 201(h).)

26        The second category includes statements in the Memorandum's "Regulatory, Legal, and

27   Tax-Related Risks" section.  Specifically:

28

United States District Court
Northern District of California

- • Volkswagen is subject to laws and regulations that require it to control automotive emissions, including exhaust emission standards, vehicle evaporation standards and onboard diagnostic system requirements.  (*Id.* ¶ 201(c).)

- • Volkswagen's vehicles must comply with increasingly stringent requirements concerning emissions.  (*Id.* ¶ 201(d).)

- • U.S. federal and state governments and agencies . . . have created a suite of vehicle emission regulations aimed at improving local air quality and minimizing the potential effects of global climate change.  Automobile manufacturers must ensure that their individual vehicles, and in some cases, fleets of vehicles, must comply with various pollutant, carbon dioxide, fuel economy, and zero-emission technology requirements. . . . Volkswagen is responsible under these regulations for the performance of vehicle emission control systems, as well as the emission performance of its sold cars and light duty trucks over certain time and mileage periods.  (*Id.* ¶ 201(e).)

As an initial matter, none of these statements were necessarily false.  Plaintiff does allege that the R&D statements were false "because Defendants did not intend to, or effectively, reduce emissions."  (Compl. ¶ 202(c).)  But the Complaint does not include any allegations supporting that Volkswagen did not wish to reduce emissions, or that it had stopped researching or developing emissions-reducing technologies.  Nor do the allegations support that the "risk factors" were false—Volkswagen *is* subject to U.S. federal and state emissions regulations and Volkswagen must comply with those requirements or face penalties.

Rather than pursuing a falsity argument, Plaintiff instead asserts that the R&D statements and "risk factors" were generally misleading without disclosure of the massive defeat-device scheme.  (Dkt. No. 3021 at 34.)  The Court agrees.  The statements that Volkswagen's "top priority" and "focal point" for R&D was to develop engines that reduced emissions could have led a reasonable investor to conclude that Volkswagen was committed to emissions-reducing technology.  A reasonable investor also could have concluded from the Memorandum that Volkswagen's commitment to emissions-reducing technology was important for the Company's future success given the "increasingly stringent [regulatory] requirements concerning emissions" and that "customers [were] increasingly emphasizing lower fuel consumption and exhaust emissions" when shopping for a vehicle.  (Compl. ¶ 201(d), (h).)  Together, the inference that arises from these statements is that Volkswagen was a good investment *because* of its

11

1  commitment to emissions-reducing technology.  That inference was misleading because

2  Volkswagen was in its fifth year of a massive fraud to cheat emissions standards.

3          In arguing that the statements in the Offering Memorandum are not actionable, Defendants

4  cite to a number of decisions holding that "risk factors," i.e, a company's statements about laws

5  and regulations it is subject to, are not actionable.  *See, e.g., In re LeapFrog Enters., Inc. Sec.*

6  *Litig.*, 527 F. Supp. 2d 1033, 1048 (N.D. Cal. 2007) (a company's "cautionary statements . . . are

7  not actionable to the extent plaintiffs contend defendants should have stated that the adverse

8  factors 'are' affecting financial results rather than 'may' affect financial results"); *In re Foundry*

9  *Networks, Inc.*, No. C00-4823 MMC, 2002 WL 32354617, at *7 (N.D. Cal. June 6, 2002)

10  ("Plaintiffs . . . cannot state a claim based on the disclosure of risk factors."); *Zeid v. Kimberley*,

11  930 F. Supp. 431, 437 (N.D. Cal. 1996) ("[W]arnings regarding potential adverse factors are not

12  actionable as a matter of law.").[1]  The courts reaching these holdings, however, did so while

13  evaluating risk factors in isolation.  Here, it is the combination of Volkswagen's warnings

14  regarding tighter emissions requirements (the "risk factors") and Volkswagen's R&D statements

15  that creates the plausible deceit.  That U.S. regulators were tightening restrictions on emissions

16  made Volkswagen's focus on emissions-reducing technology more important.  Given increased

17  regulatory scrutiny, Volkswagen even acknowledged that, "Our future business success depends

18  on our ability to develop new, attractive and energy-efficient products."  (Compl. ¶ 201(h).)  Yet

19  Volkswagen was intentionally cheating emissions requirements in hundreds of thousands of "clean

20  diesel" vehicles.  (*See generally* Compl. ¶¶ 50-179.)  Reading the risk factors in conjunction with

21  the R&D factors is necessary and appropriate.  *See Bodri v. GoPro, Inc.*, --- F. Supp. 3d ----, 2017

22  WL 1732022, at *7 (N.D. Cal. May 1, 2017) ("A statement is misleading only if a reasonable

23  investor, reading the statement fairly *and in context*, would be misled." (emphasis added)).

24          Defendants also argue that Volkswagen's statements about its "top priority" and "focal

25  point" for R&D constituted corporate puffery, which multiple courts have held is not actionable.

26  *See, e.g., In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (defendants' statement that

27

28  ─────────────────────
[1] (*See also* Defendants' Post-Argument Letter Brief, Dkt. No. 3416-1 (citing similar authorities).)

12

*United States District Court*
*Northern District of California*

"we believe our employee relations are good" was not actionable, even though many employees were leaving the company, because "[w]hen valuing corporations . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers"); *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (statements such as "[a]t Ford quality comes first," and "Ford is a worldwide leader in automotive safety," were not actionable, even though Ford omitted information regarding the dangerousness of Ford Explorer vehicles, because "[s]uch statements are either corporate puffery or hyperbole that a reasonable investor would not view as significantly changing the general gist of available information").

These puffery decisions are distinguishable.  In *Ford*, the Sixth Circuit acknowledged that statements such as "quality comes first" were possibly misleading.  But even if misleading, the court concluded that the statements were not *material*.  381 F.3d at 570-71.  Underlying this conclusion was that the claimed dangers with the Ford Explorer were not as significant as the plaintiffs claimed.  *See id.* at 569 (describing complaints and limited recalls in the Middle East and in Venezuela and a series of lawsuits Ford had settled with injured passengers in the U.S.).  Similarly in *Cutera*, the Ninth Circuit held that the statement "our employee relations are good" was not *material* given its subjectiveness, and the fact that the company made other disclosures about reductions to its sales force.  610 F.3d at 1110-11.  Here, in contrast, it is undisputed that Volkswagen's use of a defeat device was material.  At the time of the May 2014 bond offering, Volkswagen was in the middle of a years-long fraud that affected a significant number of vehicles in the United States and involved intentional deception of regulators and consumers.

Volkswagen's R&D statements were also more specific than the "quality comes first" and "employee relations are good" statements in *Ford* and *Cutera*.  Volkswagen identified its top R&D priority in concrete terms: "to develop engines and drivetrain concepts to reduce emissions, and to develop and expand the modular longitudinal toolkit platforms and the modular transverse toolkit platforms.  (Dkt. No. 2896-6 at 141; see also Compl. ¶ 201(a).)  Even if Volkswagen was pursuing this R&D goal, the statement in context was misleading given the ongoing defeat device scheme.

Ultimately, "[w]hether a public statement is misleading, or whether adverse facts were

adequately disclosed is a mixed question to be decided by the trier of fact." *Fecht v. Price Co.*, 70 F.3d 1078 (9th Cir. 1995), *superseded by statute on other grounds as stated in Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1309 (C.D. Cal. 1996); *see also Durning v. First Boston Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987) ("Like materiality, adequacy of disclosure is normally a jury question."). Here, a fact finder could reasonably conclude that the statements in the May 2014 Offering Memorandum were misleading when viewed in context and when considered along with the defeat-device omission.

> ## 2.  Whether Defendants Made the Statements in the Body of the May 2014 Offering Memorandum with Scienter

Defendants argue that, even if the statements in the May 2014 Offering Memorandum were misleading, they did not make those statements with scienter. Neither Winterkorn nor Horn were responsible for the Offering Memorandum, Defendants argue, so neither of them could have "made" the statements with scienter. And even if Winterkorn and/or Horn were responsible for the Memorandum, Volkswagen argues that the Individual Defendants made the statements therein without knowledge of the defeat device scheme. If the Individual Defendants lacked scienter, Volkswagen argues the Corporate Defendants also lacked scienter.

> ### a.  Whether Winterkorn and Horn "Made" the Statements

"For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Gp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 142 (2011). For example, "a corporate official . . . who, acting with scienter, signs [an] SEC filing containing misrepresentations, 'makes' a statement so as to be liable as a primary violator under § 10(b)." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000). And even without a signature, a corporate official makes a statement if the official "actually participated in and had authority over the [corporation's] filing process." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 693 n.8 (9th Cir. 2011).

Here, neither Winterkorn nor Horn signed the May 2014 Offering Memorandum. Although Winterkorn signed the financial statements appended to the Memorandum, those

historical statements predated the Memorandum, so his signatures on those statements, without more, do not support that he had control over the Memorandum.  Other allegations, however, support that both Winterkorn and Horn "actually participated in and had authority over" VWGoAF's Offering Memorandum.  *Id.*  At the time of the May 2014 bond offering, Winterkorn was the CEO of VW AG, which was the ultimate parent company of VWGoAF and the guarantor of the bonds.  (Compl. ¶¶ 22-23.)  In fact, VWGoAF was incorporated in February 2014 specifically to serve as a debt issuing vehicle for VW AG.  (*Id.* ¶ 22.)  At the same time, Horn was the CEO of VWGoA, a wholly-owned subsidiary of VW AG doing business in the United States, and the direct parent company of VWGoAF.  (*Id.* ¶¶ 21-22.)  In these roles, Plaintiff alleges that both Winterkorn and Horn were "involved in the day-to-day operations of, and exercised power and control over" VWGoAF.  (*Id.* ¶¶ 23, 25.)  Additionally, Plaintiff alleges that both Winterkorn and Horn "were able to and did control the content of the various offering memoranda," and were "provided with copies of documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected."  (*Id.* ¶ 27.)

In the ADR case, the Court held that allegations similar to these were sufficient to satisfy *Janus*.  (*See* Jan. 4, 2017 Order, Dkt. No. 2636 at 31-32.)  The Court reaches the same conclusion here.  Plaintiff's allegations plausibly support that both Winterkorn and Horn had "ultimate authority" over the May 2014 Offering Memorandum, because they were both able to and did control the content of the Memorandum.  The statements in the Memorandum can therefore be attributed to them.  *See In re Rocket Fuel, Inc. Sec. Litig.*, No. 14-CV-3998-PJH, 2015 WL 9311921, at *10 (N.D. Cal. Dec. 23, 2015) (finding allegations that individual defendants "possessed the power and authority to control the contents of the Company's press releases [and] investor and media presentations" sufficient to satisfy *Janus* and withstand motion to dismiss).  The Court therefore continues by analyzing whether Winterkorn and/or Horn "made" the statements in the Offering Memorandum with scienter.

15

United States District Court
Northern District of California

### b. Scienter

#### i. Legal Standard

"In a § 10(b) action, scienter refers to a mental state embracing intent to deceive, manipulate, or defraud." *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 648 (2010) (internal quotation marks omitted). "To adequately demonstrate that the defendant acted with the required state of mind, a complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco*, 552 F.3d at 991 (internal quotations marks and citations omitted). To establish deliberate recklessness "the plaintiff must plead a highly unreasonable omission [of information] . . . that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (internal quotation marks and citation omitted).

To find that a corporate defendant acted with scienter, it is usually necessary to reach "a concurrent finding that a defendant director or officer also had the requisite intent." *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1436 (9th Cir. 1995); *see also In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) ("In the context of Rule 10b-5, we have adopted the general rule of imputation and held that a corporation is responsible for a corporate officer's fraud committed within the scope of his employment[.]" (internal quotation marks omitted)). But even without facts to support that a particular corporate officer acted with scienter, under certain circumstances plaintiff may be able to plead collective scienter for a corporation. As the Ninth Circuit noted in *Glazer Capital Management, LP v. Magistri*, 549 F.3d 736 (9th Cir. 2008):

> [I]n certain circumstances, some form of collective scienter pleading might be appropriate. For instance, as outlined in the hypothetical posed in *Makor*, there could be circumstances in which a company's public statements were so important and so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication.

*Id.* at 744 (emphasis in original) (citing *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)). The *Makor* hypothetical referenced in *Glazer* is that "[s]uppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero."

16

513 F.3d at 710.  In such a circumstance, the *Makor* court concluded that "[t]here would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false."  *Id.*

The PSLRA requires a plaintiff to state with particularity facts giving rise to a strong inference of a defendant's scienter.  *See* 15 U.S.C. § 78u-4(b)(2).  "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  "Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a 'strong inference' that misleading statements were knowingly or . . . reckless[ly] made to investors, a private securities fraud complaint is properly dismissed under Rule 12(b)(6)."  *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).

### ii.     Winterkorn

The allegations support that, by the time Winterkorn made the statements in the May 15, 2014 Offering Memorandum, he knew Volkswagen was using an illegal defeat device.  Plaintiff alleges that in 2007 Bosch—the alleged co-developer of the defeat device—"sent a letter to VW AG's 'top circles' informing the Company that using the software for the planned application of reducing emissions during testing would be illegal."  (Compl. ¶ 127.)  "In 2011, an internal whistleblower [also] warned the Company, including Winterkorn's confidant and Volkswagen's then-head of development Neuβer, that the Company was illegally manipulating reported emissions data."  (*Id.*)  When Winterkorn became CEO of VW AG in 2007, he also installed two of his "top aids during his tenure at Audi," Ulrich Hackenberg and Wolfgang Hatz, both of whom had "daily responsibility for developing Volkswagen's clean-diesel strategy."  (*Id.* ¶ 84.)  It was later reported that these two Winterkorn aids were "at the center of [Volkswagen's] probe into the installation of engine software designed to fool regulators."  (*Id.*)  Plaintiff also alleges that Winterkorn had a "detail-oriented nature" and had "knowledge of everything his two close[s]t lieutenants were doing."  (*Id.* ¶ 312.)  "Clean diesel" vehicles were also an important component of Winterkorn's "'Strategy 2018,' to make VWAG the largest and most profitable car maker in the

17

1   world by 2018." (*Id.* ¶ 35.)

2           Together, these allegations give rise to a strong inference that, by May 2014, and likely

3   much earlier, Winterkorn knew that Volkswagen was using an illegal defeat device in its "clean

4   diesel" vehicles.  While not of the smoking-gun variety, it is highly plausible that Winterkorn

5   knew about the scheme given his attention to detail, his close relationships with aids that were

6   directly involved with the scheme, and the importance of the "clean diesel" vehicles for

7   Volkswagen's growth strategy.  As a result, when Winterkorn made the misleading statements in

8   the May 15, 2014 Offering Memorandum, the allegations support that he knew the statements

9   were misleading or was deliberately reckless to their effect.

10          In challenging the sufficiency of the scienter allegations, Defendants note that it was not

11  until at least May 23, 2014 that Winterkorn is alleged to have received an important memo about

12  the emissions scandal from Bernd Gottweis, VW AG's top quality-assurance executive.  It was in

13  that memo that Gottweis alerted Winterkorn to a study conducted at West Virginia University and

14  commissioned by the International Council on Clean Transportation ("ICCT"), which indicated

15  that during road tests Volkswagen's "clean diesel" vehicles emitted NOx at levels up to 40 times

16  the legal limits.  (Compl. ¶ 151.)  In his memo, Gottweis also explained that CARB would conduct

17  a follow-up investigation, and that "it can be assumed that the authorities will then investigate the

18  VW systems to determine whether Volkswagen implemented a . . . so-called defeat device[]."

19  (Dkt. No. 2898-8 at 7; *see also* Compl. ¶¶ 170-71.)[2]  Defendants argue that because the Gottweis

20  memo postdated the May 15, 2014 Offering Memorandum, Winterkorn did not learn about the

21  emissions fraud until after Gottweis sent his memo.  (Dkt. No. 28971 at 41.)

22          While important, the Gottweis memo is not the only allegation supporting that Winterkorn

23  knew about Volkswagen's use of a defeat device.  Rather, the other allegations discussed above

24  plausibly support that Winterkorn knew about Volkswagen's use of a defeat device by May 2014,

25

26  [2] These quotations are from the Gottweis memo itself, which the Corporate Defendants attached to
their motion to dismiss, and which the Court may consider under the "incorporation by reference"
27  doctrine.  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).  In the June 28, 2017 ADR Order
(Dkt. No. 3392 at 10), the Court instead quoted from the ADR Amended Complaint's summary of
28  the Gottweis memo, as the parties did not provide the memo as part of the motion to dismiss the
ADR Amended Complaint.  The substance of the quotations is the same.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    and perhaps as early as 2007.  Moreover, although the Gottweis memo plausibly put Winterkorn

2    on notice that regulators were investigating Volkswagen's "clean diesel" vehicles, knowledge of

3    an investigation is not necessary to prove scienter as to the statements and omissions in the body

4    of the May 2014 Offering Memorandum.  It was Winterkorn's failure to disclose Volkswagen's

5    use of a defeat device that made the statements in the Memorandum misleading.  And the

6    allegations support that Winterkorn knew about the Company's use of a defeat device by the time

7    he made those statements.

8                         **iii.**      **Horn**

9        The allegations of scienter as to Horn are not as strong.  Horn did not join VWGoA until

10    January 2014, and the earliest allegation supporting that he was aware of the defeat device is that,

11    on the same date VWGoAF issued the May 2014 Offering Memorandum, May 15, he received an

12    email from the then-head of Volkswagen's U.S. Regulatory Compliance Office, Oliver Schmidt,

13    which indicated "that 500,000 [to] 600,000 vehicles in the United States from model years 2009 to

14    2014 could be affected by the diesel scandal[,]" that potential fines included "'EPA: $37,500 and

15    CARB: $5,500' per violation," and that, given the potential penalties, "'[t]he contents of this

16    [ICCT] study cannot be ignored!'"  (Compl. ¶ 290 (third and fourth alterations in complaint).)

17        Even if Plaintiff did not finalize its bond purchase until May 23, 2014, and Horn

18    accordingly had time to read the Schmidt email before the transaction was complete, managers are

19    permitted a reasonable amount of time to consider, digest, and investigate negative information

20    before they disclose that information to the public.  *See, e.g.*, *Slayton v. Am. Express Co.*, 604 F.3d

21    758, 763-64, 774, 777 (2d Cir. 2010) (affirming dismissal; taking two months to "ascertain and

22    disclose future losses" is "both proper and lawful" (citation omitted)); *Higginbotham v. Baxter*

23    *Intern., Inc.*, 495 F.3d 753, 760-61 (7th Cir. 2007) (affirming dismissal; holding that disclosing

24    accounting errors at subsidiary two months after discovery was a "reasonable time" because

25    "[p]rudent managers conduct inquiries rather than jump the gun with half-formed stories as soon

26    as a problem comes to their attention"); *In re Yahoo! Inc. Sec. Litig.*, No. C 11-02732 CRB, 2012

27    WL 3282819, at *22 (N.D. Cal. Aug. 10, 2012) (granting dismissal; relying on *Slayton* and

28    *Higgenbotham* and concluding that the defendants' disclosure of a corporate restructuring five

weeks after receiving notice was reasonable).  Here, it would have been reasonable for Horn to have obtained the Schmidt email and to have considered and investigated the issue for more than a week before disclosing the information to potential bondholders or the public.  The Schmidt email therefore does not support a strong inference that Horn made statements in the May 15, 2014 Offering Memorandum with scienter, or that his failure to correct the Offering Memorandum by May 23, 2014 was done with scienter.[3]

Putting aside the May 15, 2014 Schmidt email, Plaintiff argues that other allegations in the Complaint support scienter as to Horn.  Specifically, Plaintiff highlights allegations that Horn was "centrally involved in the process for acquiring all necessary approvals and certifications so that [Volkswagen's] vehicles could legally be sold and driven in the United States."  (Compl. ¶ 319.) Plaintiff also notes that in the wake of the scandal Horn resigned.  (*Id.* ¶ 289.)  In the January 4 ADR Order, the Court gave weight to these allegations in concluding that scienter was well pled as to Horn.  (*See* Dkt. No. 2636 at 25-26.)  In reaching this conclusion, though, the Court also relied on the Schmidt email.  If the Schmidt email is not considered, the other allegations are not sufficient to support a strong inference that, as of either May 15 or May 23, 2014, Horn knew about the defeat device scheme and intentionally or recklessly omitted information about the scheme in the May 2014 Offering Memorandum.

In a letter brief submitted after oral argument, Plaintiff also argues that scienter may be established under the "core operations" doctrine.  (Dkt. No. 3422-1.)  Under that doctrine, scienter may be inferred if the fraud is based on facts "critical to a business's core operations," such that the company's key officers would know of those facts.  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 783-84 (9th Cir. 2008) (internal quotation marks omitted).  Courts applying the core

---

[3] Pointing to Plaintiff's bond purchase order, which Plaintiff attached as an exhibit to its motion seeking appointment as Lead Counsel (Dkt. No. 1759-3), Horn argues that Plaintiff actually purchased the bonds on May 15, 2014 and that May 23, 2014 is therefore not a relevant date. (Dkt. No. 2893 at 11.)  The purchase order does list May 15, 2014 as the "Trade Date," but it also includes May 23, 2014 in the top right corner, which supports Plaintiff's position that the purchase was not finalized until then.  The exact mechanics of the purchase are not abundantly clear.  At this stage in the proceedings, the Court therefore draws all reasonable inference in Plaintiff's favor, *see Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987), and takes as true the allegation that Plaintiff's purchase was not finalized until May 23, 2014.

United States District Court
Northern District of California

operations doctrine, however, have required plaintiffs to plead "details about the defendants' access to information within the company" related to the fraud.  *Id.* at 785.  For example, in *In re Daou Systems, Inc.*, 411 F.3d 1006 (9th Cir. 2005), plaintiffs successfully relied on the core operations doctrine where the complaint included specific allegations that defendants monitored the data that was the subject of the allegedly false statements.  *Id.* at 1022-23.  Similarly, in *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004), plaintiffs relied on the core operations doctrine to demonstrate a CEO's scienter as to false statements regarding the company's sales, where the CEO stated that: "All of our information is on one database.  We know exactly how much we have sold in the last hour around the world."  *Id.* at 1231.

The situation here is different.  Volkswagen's "clean diesel" campaign was undoubtedly important to the Company's strategy to become the largest and most profitable car maker.  (Compl. ¶¶ 35, 128.)  However, unlike the data in *Daou* and the sales database in *Nursing Home*, the Complaint does not included allegations supporting that information about the *defeat device*— a software program—was readily available to Horn.  (*Id.* ¶ 25.)  The core operations doctrine therefore does not apply and the allegations do not support that Horn intentionally or recklessly made the misleading statements and omissions in the May 2014 Offering Memorandum.

### iv.     Corporate Defendants

The allegations supporting Winterkorn's scienter are also sufficient to raise a strong inference of scienter as to VW AG, because "a corporation is responsible for a corporate officer's fraud committed within the scope of his employment[.]"  *In re ChinaCast*, 809 F.3d at 476.  Additionally, because Winterkorn plausibly participated in, and had authority over, the May 2014 Offering Memorandum, his scienter may be imputed to VWGoAF.  *See Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 317 (S.D.N.Y. 2011) (scienter may be imputed from one entity to another if plaintiff demonstrates "that the parent or affiliate possessed some degree of control over, or awareness about, the fraud").  Conversely, because Plaintiff's allegations do not support a strong inference of scienter as to Horn, and "corporate scienter relies heavily on the awareness of the directors and officers," *Nordstrom*, 54 F.3d at 1436, the allegations also do not support scienter

United States District Court
Northern District of California

as to VWGoA.

Plaintiff contends that the Court should apply the doctrine of collective scienter as to VWGoA.  (Dkt. No. 3021 at 27.)  As noted above, collective scienter may be appropriate in the limited circumstances "in which a company's public statements were so important and so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication."  *Glazer*, 549 F.3d at 744.  But the statements in the May 2014 Offering Memorandum, while misleading, were not false, let alone "so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication."  *Id.*

As a comparison, in the ADR action the Court applied collective scienter as to certain statements by Volkswagen in annual reports and press releases.  (*See* Jan. 4, 2017 Order, Dkt. No. 2636, at 24.)  The statements there were clearly false, as Volkswagen expressly represented that its "clean diesel" vehicles complied with emissions standards.  (*See id.* at 28 ("The Golf TDI Clean Diesel also fulfils the most stringent emissions standards in the world: the LEV3 / TIER 3 standards in the USA." (quoting ADR Compl. ¶ 412)); *id.* ("Lower raw emissions and its SCR (selective catalytic reduction) emissions control system enable the powertrain to meet the strict requirements of the US BIN5/ULEV emissions laws." (quoting ADR Compl. ¶ 379)).)  In contrast, the statements in the May 2014 Offering Memorandum about Volkswagen's "top" R&D priorities and tightening emissions regulations were not false, but were misleading given that Volkswagen omitted to disclose in the Offering Memorandum that it was in the middle of a years-long effort to cheat emissions regulations.  Because these statements were not false, the doctrine of collective scienter does not apply.

### 3. Conclusion as to Statements in the Body of the May 2014 Offering Memorandum

Plaintiff's allegations are sufficient to support that the May 2014 Offering Memorandum was materially misleading.  The allegations also support that Winterkorn, VW AG, and VWGoAF made these misleading statements with scienter.  The allegations do not support scienter as to Horn or VWGoA.

United States District Court
Northern District of California

### C.    The Financial Statements Appended to the May 2014 Offering Memorandum

Defendants appended certain historical VW AG financial statements to the May 15, 2014 Offering Memorandum; specifically, VW AG's Q1 2014 interim and 2012 and 2013 audited consolidated financial statements.  (*See* Dkt. No. 2898-1.)  Plaintiff alleges these financial statements were false and misleading because VW AG and Winterkorn did not recognize a "provision" in the statements for probable liabilities stemming from the emissions fraud.  (Compl. ¶¶ 193-94, 215.)

As discussed in the Court's June 28 ADR Order, International Accounting Standards do not require VW AG to recognize a "provision" until the probability of a *loss* related to an event is probable.  (Dkt. No. 3392 at 5-9.)  And a loss is not probable simply because a company knowingly decides to engage in fraudulent activity.  Rather, "[a]t most, the disclosure obligation would arise when an investigation into the conduct began."  *Gusinsky v. Barclays PLC*, 944 F. Supp. 2d 279, 290-91 (S.D.N.Y. 2013), *vacated in part on other grounds sub nom. by Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227 (2d Cir. 2014).

As in the ADR action, the allegations here plausibly support that, by the end of May 2014, Winterkorn and VW AG knew or should have known that losses related to the emissions fraud were probable.  It was during that month that U.S. regulators learned of the ICCT study results, which indicated that Volkswagen's "clean diesel" vehicles emitted excess emissions during road tests. (Compl. ¶ 67.)  The ICCT study in turn resulted internal communications at Volkswagen about the results, including the May 23, 2014 Gottweis memo, which explained that CARB would conduct a follow-up investigation and would likely investigate whether Volkswagen's vehicles utilized a defeat device.  (Dkt. No. 2898-8 at 7; *see also* Compl. ¶¶ 170-71.)

All of this activity, however, postdated the financial statements appended to the May 15, 2014 Offering Memorandum.  VW AG's Q1 2014 financials were the closest in time of the three appended statements, reflecting results for the three-month period ending March 31, 2014, prepared as of April 29, 2014.  (Dkt. No. 2898-1 at 56.)  Plaintiff argues that, "although VWAG may not have known that it was understating its liabilities when [the] financial statements were initially issued, it certainly knew that it was understating its liabilities as of the date those

1    statements were incorporated in the Offering Memoranda and issued to the Bond investors." (Dkt.

2    No. 3021 at 37.)  The allegations do not support this inference.

3          Plaintiff alleges that Winterkorn received the Gottweis memo in his "extensive weekend

4    mail" or "weekend suitcase" on Friday, May 23, 2014.  (Compl. ¶¶ 171, 173.)  The most

5    reasonable inference accordingly is that, at the earliest, he read the memo on Saturday, May 24,

6    2014.  By this time the Offering Memorandum had been out the door for a week and the bond

7    offering was finalized.  And although there were other communications at VW AG about the

8    ICCT study results earlier than May 24, only the Gottweis memo is tied directly to Winterkorn.

9    Thus, the allegations support that Winterkorn learned that losses related to the emissions fraud

10   were probable only after Plaintiff finalized its bond purchase.  And because "conduct actionable

11   under Rule 10b-5 must occur *before* investors purchase the securities," *Binder v. Gillespie*, 184

12   F.3d 1059, 1066 (9th Cir. 1999) (emphasis added), Plaintiff cannot base its Section 10(b) claim on

13   what Winterkorn learned after the bond purchase.  Lacking a strong inference of scienter, Plaintiff

14   accordingly cannot base its Section 10(b) claim on the financial statements appended to the May

15   2014 Offering Memorandum.

16         **D.     Reliance**

17         Defendants also challenge the reliance element of Plaintiff's Section 10(b) claims.  "The

18   traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was

19   aware of a company's statement and engaged in a relevant transaction—*e.g.*, purchasing common

20   stock—based on that specific misrepresentation."  *Halliburton Co. v. Erica P. John Fund, Inc.*,

21   134 S. Ct. 2398, 2407 (2014) (citation omitted).  In two scenarios, however, a plaintiff may

22   establish a rebuttable presumption of reliance without individualized proof.  Plaintiff contends that

23   this case implicates both of those scenarios.  (*See* Compl. ¶¶ 331-33.)  Defendants argue that

24   neither scenario applies.

25         **1.     The Two Presumption Scenarios**

26         In "omission cases," the Supreme Court's decision in *Affiliated Ute Citizens v. United*

27   *States*, 406 U.S. 128, 153-54 (1972) allows the court to presume reliance when the information

28   withheld is material.  *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009) (per

United States District Court
Northern District of California

24

curiam).  The theory behind *Affiliated Ute* is that proof of reliance in omission cases requires "proof of a speculative negative"—that, "I would not have bought had I known."  *Blackie v. Barrack*, 524 F.2d 891, 908 (9th Cir. 1975).  Because "[d]irect proof" of a negative "would . . . impose a difficult evidentiary burden . . . . the same casual nexus can be adequately established indirectly, by proof of materiality coupled with the common sense that a stock purchaser does not ordinarily seek to purchase a loss in the form of artificially inflated stock."  *Id.*

A claim based in part on misrepresentations may also warrant the *Affiliated Ute* presumption if "the case can be characterized as one that primarily alleges omissions."  *Binder*, 184 F.3d at 1064.  In a "mixed case," the district court must "'analytically characterize [the] action as either primarily a nondisclosure case (which would make the presumption applicable), or a positive misrepresentation case.'"  *Id.* (quoting *Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356, 359 (5th Cir. 1987)).

Alternatively, a plaintiff may establish a rebuttable presumption of reliance under *Basic*, 485 U.S. 224, based on the "fraud-on-the-market" theory.  To demonstrate that the *Basic* presumption applies, plaintiff must prove: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed."  *Halliburton*, 134 S. Ct. at 2408.

### 2.      Application

The *Affiliated Ute* presumption applies here because Plaintiff's case can be characterized as one that primarily alleges omissions.  (*See* Dkt. No. 3021 at 18; *see also* Compl. ¶ 331.)  The heart of the case, as Plaintiff notes, is that Volkswagen misled bond purchasers by failing to disclose its use of a defeat device in its "clean diesel" vehicles.  (*See* Compl. ¶ 4 (noting that Defendants "made numerous materially false and misleading statements and omissions" during the class period, but that "[s]pecifically, Volkswagen failed to disclose that it installed and utilized a 'defeat device' in a substantial amount of vehicles . . .").)  Although the Complaint also alleges misrepresentations, it does so primarily to frame the omission as misleading, which is necessary given that Section 10(b) does not create an affirmative duty to disclose all material information.

United States District Court
Northern District of California

25

*Matrixx*, 563 U.S. at 44.

Defendants contend that "the Complaint contains no less than 18 pages of supposedly 'false and misleading statements' regarding 'the Company's operations, its business and financial condition, and its outlook.'" (Dkt. No. 2897 at 24 (citations omitted).)  Almost all of those statements, however, are *outside* the Offering Memorandum, in interim and annual reports (Compl. ¶¶ 203-14), press releases (*id.* ¶¶ 218-26), and Corporate Social Responsibility and Sustainability Reports (*id.* ¶¶ 227-30).  These are the same materials that Defendants argue cannot be considered given that the Offering Memorandum expressly limited the universe of materials that investors could consider.  Defendants cannot have it both ways—arguing that, on the one hand, these statements should not be considered, but that, on the other hand, these statements make Plaintiff's claims "overwhelmingly based on alleged affirmative misstatements." (Dkt. No. 2897 at 25.)

Defendants also rely on *Desai*, 573 F.3d 931 in challenging *Affiliated Ute*'s application. (Dkt. No. 3124 at 12.)  *Desai*, however, is materially distinguishable, as the Ninth Circuit there held that a stock market manipulation scheme could not be characterized as an omissions claim. *Id.* at 941.  Here, Plaintiff has not alleged a market manipulation scheme.  The distinction between actionable omissions and market manipulation discussed in *Desai* is therefore not relevant.

Although this is a "mixed case" of affirmative misrepresentations and omissions, the action can be "analytically characterize[d] . . . as . . . primarily a nondisclosure case." *Binder*, 184 F.3d at 1064 (quoting *Finkel*, 817 F.2d at 359).  Plaintiff therefore has properly invoked *Affiliated Ute* to plead reliance.  Having concluded that *Affiliated Ute* applies, the Court does not need to determine whether the *Basic* presumption of reliance also applies.

## III.    Section 20(a) Control-Person Claims

To prove a prima facie case under § 20(a), plaintiff must prove: (1) a primary violation of federal securities laws, and (2) that the defendant "exercised actual power or control over the primary violator." *Howard*, 228 F.3d at 1065.  There is no concrete test for establishing whether a defendant is a control person.  The decision "is an intensely factual question" and "involves scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the

26

defendant's power to control corporate actions." *Id.* (quoting *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994)).  "[A] plaintiff must plead the circumstances of the control relationship with sufficient particularity to satisfy rule 9(b)."  *Howard v. Hui*, No. C 92-3742-CRB, 2001 WL 1159780, at *4 (N.D. Cal. Sept. 24, 2001).

Plaintiff brings control-person claims against VW AG, VWGoA, Winterkorn, and Horn. (Compl. ¶ 352.)  Plaintiff contends that VW AG and VWGoA were control persons of VWGoAF (*id.* ¶¶ 353-54), that Winterkorn was a control person of VW AG, VWGoA, and VWGoAF (*id.* ¶¶ 355-56), and that Horn was a control person of VWGoA and VWGoAF (*id.* ¶¶ 355, 357).  The Corporate Defendants do not challenge the control-person claims against them, other than on the basis that the claims fail because Plaintiff has not alleged a primary securities violation. Winterkorn and Horn, however, challenge certain of the control-person claims against them under the second Section 20(a) element.

Because Plaintiff has not adequately alleged a primary violation as to Horn, Plaintiff's control-person claims against him are DISMISSED.  The Court addresses the control-person claims challenged by Winterkorn below.

### A.  Winterkorn's Control over VWGoA

Plaintiff offers the following allegations in support of Winterkorn's power and control over VWGoA.  First, Winterkorn was CEO of VW AG, which is the parent corporation and sole owner of VWGoA.  (Compl. ¶¶ 23, 356.)  Second, he was an infamous micromanager (*id.* ¶¶ 73-76), who "frequently travelled to the United States to attend and make presentations at various car shows across the country in order to promote the sales of Volkswagen cars with the purported clean diesel technology" (*id.* ¶ 24).  Third, "[s]ales of 'clean diesel' cars in the United States were a central part of Volkswagen's [and Winterkorn's] growth strategy."  (*Id.* ¶¶ 35, 38.)  Fourth, he "was involved in the day-to-day operations of, and exercised power and control over VWAG and its subsidiaries, including by, among other things, directing their public statements, and regulatory actions."  (*Id.* ¶ 23.)

Winterkorn argues that these allegations are not particular enough to support that he had power or control over VWGoA.  (Dkt. No. 2895 at 15.)  As to the general allegation that

27

Winterkorn "was involved in the day-to-day operations" of VW AG subsidiaries, the Court held in its January 4 ADR Order that a similar general allegation of control, without more, was not sufficient. (*See* Dkt. No. 2636 at 33 (dismissing control-person claims against Horn and Jonathan Browning where "Plaintiffs do no plead the specific circumstances of [their] alleged control," "[a]side from asserting that each of them was 'involved in the day-to-day operations of, and exercised power and control over, VWGoA and VWoA . . .'").)  Plaintiff, though, offers more than that Winterkorn was simply involved in the day-to-day operations of VWGoA.  Winterkorn's detailed management style and focus on increasing sales in the United States, along with his position as CEO of VWGoA's parent corporation, are particularized allegations that support his active involvement in the "day-to-day affairs" of VWGoA and his "power to control [the] corporate actions" of VWGoA.  *Howard*, 228 F.3d at 1065 (citation omitted).  Plaintiff's claim that Winterkorn is a "controlling person" of VWGoA is therefore well pled.

> **B.    Winterkorn's Control over VWGoAF**

Plaintiff alleges that the following allegations support Winterkorn's control over VWGoAF.  First, he was the CEO of VW AG, which was the ultimate parent company of VWGoAF and the guarantor of VWGoAF's bonds.  (Compl. ¶¶ 20, 23.)  Second, he was able to and did "control the content of the various offering memoranda," and "was provided with copies of documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected."  (*Id.* ¶ 27.)  Third, he was an infamous micromanager.  (*Id.* ¶¶ 73-76.)  Fourth, he was involved in VW AG's financial reporting and accounting, and his signature was on the Offering Memoranda certifications.  (*Id.* ¶ 356.)

The signature allegations are of limited help to Plaintiff.  As Winterkorn notes, his signature was on only the financial statements appended to the Offering Memoranda, which predated the Memoranda and were prepared by VW AG, not VWGoAF.  (*See generally* Dkt. Nos. 2898-1, 2898-2, 2898-3; 2896-6.)  The other allegations, however, are sufficient to support Plaintiff's control-person claim.  That Winterkorn was a detail-oriented executive of VW AG—the guarantor of VWGoAF's bonds—and that he controlled the content of the Memoranda, supports

United States District Court
Northern District of California

that he had "specific control over the preparation and release of the allegedly misleading false and misleading statements," which supports control-person liability. *Bao v. SolarCity Corp.*, No. 14-cv-01435-BLF, 2015 WL 1906105, at *5 (N.D. Cal. Apr. 27, 2015).

## IV.   Personal Jurisdiction – Winterkorn

Winterkorn also challenges personal jurisdiction. (Dkt. No. 2895 at 16-23.) He made a similar challenge in the ADR action, which the Court rejected. (*See* Jan. 4, 2017 Order, Dkt. No. 2636 at 33-40.) The only difference here is that the bondholders' action is based on a different connection between Winterkorn and the forum—specifically, the Offering Memoranda.

Plaintiff contends that the Court has specific jurisdiction over Winterkorn. Plaintiff must therefore make a prima facie showing that the suit "arise[s] out of or relate[s] to [Winterkorn's] contacts with the forum." *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1771, 1780 (2017) (emphasis and citations omitted). "In other words, there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Id.* (alteration in original) (quoting *Goodyear Dunlop Tires Opers., S.A. v. Brown*, 564 U.S. 915, 919 (2011)). To ensure that specific jurisdiction does not offend due process, the exercise of jurisdiction must also be reasonable. *See Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987).

It is undisputed that the relevant forum is the United States. *See Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985) (holding that, because the Exchange Act provides for nationwide service of process, "the question becomes whether the party has sufficient contacts with the United States, not any particular state"). The relevant question is accordingly whether the bondholders' action against Winterkorn arises out of his contacts with the United States.

In the ADR action, the Court concluded that plaintiffs had established a direct nexus between their claims and Winterkorn's contacts with the United States, because Winterkorn intentionally made, and signed off on, false statements in Volkswagen's quarterly and annual reports regarding the emissions scandal, and those reports were "expressly directed at United States investors as part of Volkswagen's compliance with SEC Rule 12g3-2(b)." (Dkt. No. 2636 at 37-38.) Like the financial reports in the ADR action, the bond Offering Memoranda at issue

1    here were intentionally directed at the United States.  The Memoranda governed bonds that were

2    denominated in U.S. dollars and distributed to U.S.-based investment banks to sell to U.S.

3    investors.  (Compl. ¶¶ 3, 15.)

4           Winterkorn does not dispute the connection between Offering Memoranda and the United

5    States.  He instead asserts that Plaintiff has made no showing that he was involved with the

6    Memoranda.  As stated elsewhere in this Order, Plaintiff has made such a showing.  VW AG was

7    the guarantor of the VWGoAF bonds and, as VW AG's CEO, Winterkorn was able to and did

8    "control the content of the various offering memoranda."  (Compl. ¶ 27.)  Winterkorn's

9    involvement with reviewing or preparing the Offering Memoranda is sufficient to support specific

10   jurisdiction over him in this matter.  *See In re LDK Solar Secs. Litig.*, No. C 07-05182 WHA,

11   2008 WL 4369987, at *6 (N.D. Cal. Sept. 24, 2008) ("Defendants purposefully availed themselves

12   of the forum by taking advantage of this nation's laws and its capital markets, and in so doing

13   purposefully directed a fraud at investors" in the U.S.).

14          Winterkorn also argues that requiring him to defend this case in the United States would be

15   unfair and unreasonable.  (*See* Dkt. No. 2895 at 20-23.)  Because Winterkorn's reasonableness

16   arguments are not materially different than those made and rejected in the ADR action (*see* Dkt.

17   No. 2636 at 39-40), the Court does not reconsider those arguments here.

18                                          **CONCLUSION**

19   For the reasons discussed above, the Court ORDERS as follows:

20          (1)    Defendants' motions to dismiss Plaintiff's Section 10(b) claims are GRANTED as

21                 to Defendants Horn and VWGoA.

22          (2)    Defendants' motions to dismiss Plaintiff's Section 10(b) claims are DENIED as to

23                 Defendants Winterkorn, VW AG, and VWGoAF.  Plaintiff, however, may not

24                 base its Section 10(b) claims on the financial statements appended to the May 15,

25                 2014 Offering Memorandum, or on statements outside the Offering Memorandum.

26          (3)    Horn's motion to dismiss Plaintiff's Section 20(a) claims against him is

27                 GRANTED.

28

(4)     Winterkorn's motion to dismiss Plaintiff's Section 20(a) claims against him is

DENIED.

(5)     Winterkorn's motion to dismiss for lack of personal jurisdiction is DENIED.

Because it is not a certainty that Plaintiff cannot allege facts sufficient to address the

deficiencies identified above, the Court gives Plaintiff leave to amend its Complaint.  Plaintiff

shall file a new amended complaint within 30 days of this Order.


**IT IS SO ORDERED.**

Dated: July 19, 2017



CHARLES R. BREYER
United States District Judge