UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: VOLKSWAGEN "CLEAN DIESEL"
MARKETING, SALES PRACTICES, AND
PRODUCTS LIABILITY LITIGATION
_____/

This Order Relates To:
MDL Dkt. No. 3354

*Wyoming v. Volkswagen Group of America, Inc.*,
No. 16-cv-6646 (N.D. Cal.)
_____/

MDL No. 2672 CRB  (JSC)

**ORDER GRANTING VOLKSWAGEN'S
MOTION TO DISMISS WYOMING'S
COMPLAINT**

From approximately May 2006 to November 2015, Volkswagen AG conspired to and did defraud the U.S. Environmental Protection Agency (EPA) by surreptitiously installing software in its "clean diesel" vehicles that masked true nitrogen oxide (NOx) emission levels.  In response, the U.S. Department of Justice (on behalf of EPA) filed civil and criminal actions against Volkswagen to enforce the Clean Air Act (CAA), and Volkswagen ultimately pled guilty to three criminal felony counts and settled the civil charges in three partial consent decrees.[1]

The State of Wyoming now brings claims against Volkswagen based on the operation of the "clean diesel" vehicles within the State.  At least eight other States (and one political subdivision) have filed similar actions in state courts.  The question before the Court is whether Wyoming's action is permitted by the Clean Air Act.  For the reasons that follow, the Court concludes that it is not and accordingly GRANTS Volkswagen's motion to dismiss.

---

[1] *See* MDL Dkt. Nos. 2103, 3155, 3226 (EPA Consent Decrees); *United States v. Volkswagen AG*, No. 16-CR-20394, Dkt. 68 (E.D. Mich. Mar. 10, 2017) (Rule 11 Plea Agreement).

# BACKGROUND

## I.     New Vehicle Certification Process

The Clean Air Act, as amended, vests EPA with significant authority to set and enforce motor-vehicle emission standards.  42 U.S.C. § 7521(a).  Pursuant to that authority, EPA has set emission limits for, among other pollutants, NOx and diesel particulate matter.  40 C.F.R. § 86.1811-04.  The Clean Air Act also requires EPA to administer a certification program to ensure that all vehicles introduced into United States commerce satisfy these and other emission standards.  42 U.S.C. § 7525(a).  As part of that certification program, each vehicle manufacturer must submit a detailed application to EPA for each model year and for each test group of vehicles that it intends to sell in the United States.  40 C.F.R. § 86.1844-01 (listing required content).  If, after review and the testing of vehicles, EPA determines that the application is complete and that the vehicles meet the applicable standards, EPA will issue a certificate of conformity.  42 U.S.C. § 7525(a)-(b); *see also* 40 C.F.R. § 86.1848-01.

Among the information a manufacturer must include in an application for certification is a list of all auxiliary emission control devices (AECDs) installed in the vehicles.  40 C.F.R. § 86.1844-01(d)(11).  AECDs sense factors such as engine and vehicle speed for purposes of activating and deactivating vehicle emission controls.  *Id.* § 86.1803-01.  EPA regulations permit the use of AECDs during certain driving conditions, such as at high altitude if the use is justified to protect the vehicle, or during engine start-up.  *See id.* §§ 86.1803-01; 86.1810-09(f)(2).  But an application for certification must include "a justification for each AECD . . . and [a] rationale for why it is not a defeat device."  *Id.* § 86.1844-01(d)(11).

A defeat device is an AECD "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use," subject to limited exceptions.  40 C.F.R. § 86.1803-01.  EPA prohibits the installation of defeat devices in all new passenger vehicles, *see id.* §§ 86.1809-10, 86.1809-12, and the Clean Air Act gives EPA authority to bring a civil action against any disobedient manufacturer, 42 U.S.C. §§ 7522(a)(3)(B); 7524(b).  The Clean Air Act also prohibits manufactures from introducing into commerce any new motor vehicle that is not covered by a certificate of conformity, and similarly

grants EPA authority to enforce that restriction. 42 U.S.C. §§ 7522(a)(1); 7524(b). And even if a manufacturer obtains a certificate of conformity, the certificate is not deemed to cover vehicles that are not as described in the manufacturer's application for certification "in all material respects." 40 C.F.R. § 86.1848-10(c)(6).

While less important for present purposes, California also plays an important role in the certification of new vehicles, as Congress has permitted California to adopt its own vehicle emission standards, which other States may follow. *See Engine Mfrs. Ass'n v. EPA* ("*EMA*"), 88 F.3d 1075, 1079-80 (D.C. Cir. 1996); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. N.Y. State Dept. of Envtl. Conserv.* ("*MVMA*"), 17 F.3d 521, 525-27 (2d Cir. 1994). The California Air Resources Board (CARB) runs that certification program, which is materially similar to EPA's. *See MVMA*, 17 F.3d at 527.

## II. Volkswagen's "Clean Diesel" Vehicles

In or around May 2006, Volkswagen began working on a line of environmentally-friendly diesel engine vehicles for sale in the United States. (Compl. ¶¶ 81-82, 102.) Diesel engines are generally more fuel efficient than gasoline engines, but historically have emitted greater amounts of air pollution, including nitrogen oxides. (*Id.* ¶¶ 82, 93.) To lower NOx emissions, Volkswagen equipped its "clean diesel" vehicles with an exhaust recirculation device and a diesel particulate filter. During the design process, however, it quickly became apparent to Volkswagen's engineers that there was a material problem with the emission-control system; specifically, if the recirculation device was activated as often as needed to bring NOx emissions within EPA limits, the vehicles would produce too much particulate matter, which would clog and break the particulate filter. (*Id.* ¶¶ 86-90, 100-05.)

Rather than altering the design of its cars, Volkswagen decided to develop and install software in the vehicles to detect and evade U.S. NOx emission standards. (*Id.* ¶¶ 106-08.) The software is able to detect whether a vehicle is undergoing emissions testing on a dynamometer, or being driven normally on the road. (*Id.* ¶¶ 96-98, 107-08.) During emissions testing the vehicle's emission-control system will perform in a mode that enables the car to satisfy NOx emission standards. (*Id.* ¶¶ 107-08.) When the vehicle is on the road, however, the software reduces the

3

effectiveness of the emission controls.  (*Id.*)  Programmed in this manner, the software constitutes a defeat device.  (*Id.* ¶¶ 91-92); *see* 40 C.F.R. § 86.1803-01.

Volkswagen installed its defeat device in nearly 600,000 "clean diesel" vehicles, model years 2009 through 2016.  (Compl. ¶¶ 83, 137.)  But the company did not disclose the defeat device in its applications for new-vehicle certification, or in meetings with EPA and CARB staff during the certification process.  (*Id.* ¶¶ 127-30, 136, 142, 163-71.)  Only by installing the defeat device in its vehicles was Volkswagen able to obtain EPA and CARB certificates of conformity. In fact, these vehicles release NOx at factors up to 40 times higher than EPA limits.  (*Id.* ¶¶ 107, 143.)

In mid-2014 a research group at West Virginia University published a study, which identified significant discrepancies in the level of NOx emitted from certain of Volkswagen's 2.0-liter "clean diesel" vehicles during on-road testing as compared to on a dynamometer.  (*Id.* ¶ 143.) Following the study, CARB and EPA attempted to determine the cause.  Volkswagen, however, continued to conceal the defeat device—offering false explanations for the excess on-road emissions and implementing a software recall to "optimize" emissions.  (*Id.* ¶¶ 149-51, 164-71.) Nevertheless, by the spring of 2015 it became clear to regulators that the software updates had not worked.  (*Id.* ¶¶ 179, 187.)  And with certification of certain model-year 2016 "clean diesel" vehicles at risk, Volkswagen finally explained in September 2015 that certain of its vehicles used defeat-device software.  (*Id.* ¶¶ 202-05.)

The public learned about Volkswagen's emissions scheme in the fall of 2015, when EPA issued two Notices of Violation of the Clear Air Act and announced that the company had admitted to deliberately cheating on emissions tests.  (*Id.* ¶¶ 207-08, 212-14.)  Hundreds of lawsuits were subsequently filed against Volkswagen and consolidated before this Court as part of this multidistrict litigation.  The Department of Justice also filed a criminal indictment against Volkswagen AG before the Honorable Sean F. Cox in the Eastern District of Michigan.  (*See* No. 16-CR-20394 (E.D. Mich.), Dkt. Nos. 1, 32.)  In March 2017, Volkswagen AG pled guilty to three criminal felony counts, including conspiracy to defraud the United States and to violate the Clean Air Act, by making false statements and representations to EPA in violation of 18 U.S.C. § 371

4

and 42 U.S.C. § 7413(c)(2)(A).  (*Id.*, Dkt. No. 68.)  The company also has settled claims related to the scheme brought by classes of U.S. consumers, franchise dealers, and reseller dealerships, as well as claims by EPA, CARB, the FTC, and certain States.[2]

As part of Volkswagen's plea agreement and EPA consent decrees, the company has agreed to pay $4.3 billion in civil and criminal penalties, to invest $2.0 billion in Zero Emission Vehicle technology, to recall and/or repair the affected vehicles, and to contribute $2.925 billion to an emissions mitigation trust.  (Dkt. No. 3495 at 9.)  The trust is expected to fully mitigate the environmental harm caused by Volkswagen's emissions scheme, and the States will be beneficiaries.  (Dkt. No. 2103 at 10-11.)  As a beneficiary, Wyoming is expected to receive approximately $8 million from the trust.  (Dkt. Nos. 2103-1 at 207; 3228-1 at 164.)  Wyoming residents who owned or leased an affected vehicle did or can also receive compensation as part of the consumer settlements.

### III.    Wyoming's Lawsuit and State Implementation Plan

In November 2016, Wyoming filed a complaint against Volkswagen AG; Volkswagen Group of America, Inc.; Audi AG; Audi of America, LLC; Porsche AG; and Porsche Cars North America, Inc. (collectively, "Volkswagen") in the United States District Court for the District of Wyoming.  The Judicial Panel on Multidistrict Litigation later transferred the case to this Court.  (*See Wyoming v. Volkswagen Group of America Inc. et al.*, No. 3:16-cv-06646-CRB (N.D. Cal.).)  Of the nearly 600,000 "clean diesel" vehicles Volkswagen sold in the United States, approximately 1,196 were registered in Wyoming as of November 1, 2015.  (Compl. ¶ 225.)  Wyoming contends that each day one of those vehicles is operated in the State (and each day a non-resident drives an affected vehicle in the State), Volkswagen violates two provisions in Wyoming's State Implementation Plan (SIP).

Before discussing those two provisions further, a bit of background on SIPs may be helpful.  Title I of the Clean Air Act requires each State to develop a SIP to implement, maintain,

---

[2] Volkswagen has settled environmental-type claims with at least Maine, Massachusetts, New York, and Pennsylvania.  (Dkt. No. 3126.)  Unlike Wyoming, each of these States has adopted California's emission standards.  Volkswagen also settled certain consumer-protection claims with at least 41 States.  (*See* Dkt. No. 2834-3.)

and enforce EPA's national ambient air quality standards (NAAQS).  42 U.S.C. § 7410(a)(1).

Each State has significant discretion in developing its SIP, but the SIP must include control

measures and "enforceable emission limitations."  *Id.* § 7410(a)(2)(A).  The Clean Air Act

contemplates that each SIP will be based primarily on State regulation of stationary sources, such

as factories and power plants.  *See EMA*, 88 F.3d at 1078 (explaining that many statutory

requirements for SIPs relate to the regulation of stationary sources); *MVMA*, 17 F.3d at 525 ("The

states have broad license to institute their own programs for the reduction of air pollution,

principally through the regulation of stationary sources, such as industrial stacks and vents.").

States may also regulate the operation of motor vehicles within their borders, but subject to certain

limitations discussed below.

Each State must submit its SIP to EPA for approval; EPA must then determine if the SIP

"meets all of the applicable requirements" of the Clean Air Act.  42 U.S.C. § 7410(k)(3).  Once

approved, "a SIP becomes federal law and must be carried out by the state."  *Cal. Dump Truck

Owners Ass'n v. Nichols*, 784 F.3d 500, 503 (9th Cir. 2015).

EPA approved Wyoming's first SIP in 1972 and approved non-substantive, organizational

changes in 2004.  *See* 37 Fed. Reg. 10842 (May 31, 1972); 69 Fed. Reg. 44965 (July 28, 2004)

(codified in 40 C.F.R. § 52.2620).  Two provisions of the State's SIP are at issue in this case.  The

first is an "anti-tampering" rule, which provides that:

> No person shall intentionally remove, alter or otherwise render ineffective or
> inoperative, . . . any . . . air pollution control device or system which has been
> installed on a motor vehicle or stationary internal combustion engine as a
> requirement of any federal law or regulation.

*Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 13, § 2(a).  Wyoming contends that

Volkswagen violated this provision by "intentionally install[ing] software on the Subject Vehicles

that renders certain air pollution control devices . . . inoperable or ineffective during normal

driving conditions."  (Compl. ¶ 235.)  As noted above, the State contends that a "separate violation

occurs each day a Subject Vehicle is driven in Wyoming."  (*Id.* ¶ 236.)

The second SIP provision at issue is an "anti-concealment" rule, providing that:

No person shall cause or permit the installation or use of any device, contrivance or operational schedule which, without resulting in reduction of the total amount of air contaminant released to the atmosphere, shall dilute or conceal an emission from a source.

*Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 1, § 4(a). Wyoming's SIP defines a "source" as "any property, real or personal, or person contributing to air pollution." *Id.* ch. 1, § 3. The State contends that Volkswagen violated this provision by "install[ing] software in the Subject Vehicles that conceals the vehicles' actual emissions of nitrogen oxides by activating air pollution control systems only when the vehicles are undergoing emissions testing and not during normal on-road operating." (Compl. ¶ 228.) As with the tampering claim, the State contends that a "separate violation occurs each day a Subject Vehicle is driven in Wyoming." (*Id.* ¶ 229.)

## IV.    Volkswagen's Motion to Dismiss and the Other State Cases

Currently before the Court is a motion by Volkswagen to dismiss Wyoming's complaint, in which Volkswagen argues that Wyoming's claims are expressly and impliedly preempted by the Clean Air Act. Volkswagen also contends that the Court lacks personal jurisdiction over the German Defendants (Volkswagen AG, Audi AG, and Porsche AG), because these entities have not purposefully taken actions in or directed towards Wyoming. (Dkt. No. 3354.)

As noted in the introduction and in footnote 2, this is not the only State case against Volkswagen related to the "clean diesel" emissions scandal. And among the others, Volkswagen previously removed 16 to this Court; 8 of which included anti-tampering, concealment, or environmental claims similar to Wyoming's. Unlike Wyoming's action, though, the other States asserted claims only under state law (not EPA-approved SIPs). As a result, in May of this year the Court remanded those cases—or more specifically the 12 State cases remaining after 4 of the 16 cases settled. The Court did so because the States' claims did not necessarily raise a substantial and disputed federal question, *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005), and Volkswagen's preemption defense did not support "arising under" jurisdiction, *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392-93 (1987). *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, MDL No. 2672 CRB (JSC), 2017 WL 2258757, at

*1, 5-9 (N.D. Cal. May 23, 2017); (Dkt. No. 3259.)

A number of these States, and one political subdivision of a State, have filed or joined amicus briefs in support of Wyoming's opposition to Volkswagen's motion to dismiss.  (*See* Dkt. Nos. 3418 (New Hampshire); 3437 (Harris County, Texas); 3450 (Alabama, Illinois, Minnesota, Ohio, Tennessee, and Texas (the "Joint Amicus Brief")).)  The Court held on a hearing on Volkswagen's motion to dismiss on August 1, 2017.

## DISCUSSION

### I.    Preliminary Matters

Volkswagen has moved to dismiss Wyoming's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  The Court will dismiss an action under that rule if the action is not supported by a cognizable legal theory.  *Zamani v. Carnes*, 491 F.3d 990, 996 (9th Cir. 2007).  Before addressing the merits of that inquiry, however, the Court resolves two preliminary matters: (1) whether Volkswagen's challenge should be addressed to the Court of Appeals instead of this Court; and (2) whether preemption even applies given that Wyoming seeks to enforce an EPA-approved SIP.

### A.    Jurisdiction

Federal district courts have jurisdiction to resolve SIP enforcement actions, which may be initiated by EPA, a State, or by citizen suit.  42 U.S.C. § 7604; *Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Com'n*, 366 F.3d 692, 695 (9th Cir. 2004); *Trustees for Alaska v. Fink*, 17 F.3d 1209, 1210 n.3 (9th Cir. 1994).  But challenges to the validity of a SIP provision must be brought in the United States Court of Appeals.  *See Cal. Dump Truck*, 784 F.3d at 502 (court of appeals has exclusive jurisdiction over a preemption suit that, "as a practical matter, challenges the SIP itself"); *El Comite Para El Bienestar de Earlimart v. Warmerdam*, 539 F.3d 1062, 1073 (9th Cir. 2008) (district court lacks jurisdiction "to hold, in effect, that the EPA improperly approved an invalid SIP").  Specifically, Section 307(b)(1) of the Clean Air Act provides that:

> A petition for review of the [EPA] Administrator's action in approving or promulgating any implementation plan . . . which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit.

42 U.S.C. § 7607(b)(1).

Wyoming and the six States joining the Joint Amicus Brief argue that Section 307(b)(1) applies because Volkswagen is in effect challenging EPA's approval of provisions in the State's SIP. The Court disagrees. Volkswagen does not, "as a practical matter, challenge[] the SIP itself." *Cal. Dump Truck*, 784 F.3d at 502. It is undisputed that Wyoming may use its SIP to regulate vehicle tampering and emissions' concealment that occurs within its borders, such when a car is in the shop for repair in the State and a mechanic physically disconnects the catalytic converter. *Cf. United States v. Econ. Muffler & Tire Ctr., Inc.*, 762 F. Supp. 1242, 1244 (E.D. Va. 1991) (anti-tampering violation where repair shop replaced factory-installed three-way catalytic converters with two-way catalytic converters); EPA, *Mechanics: An Important Law that Affects You: Don't Tamper with Emissions Controls!*, Air and Radiation (Sept. 1993) ("Tampering includes: Removing such devices as the catalytic converter . . . ."). Volkswagen instead challenges a particular application of the SIP's tampering and concealment provisions, arguing that Wyoming cannot use those rules to regulate a defeat device installed when a vehicle is manufactured.

A challenge to "a particular interpretation or application" of a SIP, which if accepted would not invalidate the SIP, is not governed by Section 307(b)(1) and instead is properly considered by the district court. *Utah Power & Light Co. v. EPA*, 553 F.2d 215, 218 (D.C. Cir. 1977). This Court accordingly has jurisdiction to consider Volkswagen's motion.

**B.    Interpretive Framework**

Courts have long recognized that Congress has the authority to preempt state law. *See, e.g.*, *Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008) (citing *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). But Wyoming contends that preemption is inapplicable because the Ninth Circuit has held that, "[o]nce approved by the EPA, a SIP becomes federal law." *Cal. Dump Truck*, 784 F.3d at 503. Instead of conducting a preemption analysis, then, Wyoming asks the Court to utilize traditional canons of statutory interpretation to fit the State's SIP and the Clean Air

1    Act "into a harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133

2    (2000).

3          *California Dump Truck* is part of a line of Ninth Circuit cases holding that EPA-approved

4    SIPs are federal law or "have the force and effect of federal law." *See, e.g.*, *Ass'n of Irritated*

5    *Residents v. EPA*, 790 F.3d 934, 947 n.8 (9th Cir. 2015); *El Comite*, 539 F.3d at 1066; *Safe Air for*

6    *Everyone v. EPA*, 488 F.3d 1088, 1091 (9th Cir. 2007); *Bayview*, 266 F.3d at 695; *Trs. for Alaska*,

7    17 F.3d at 1210 n.3.  In none of these cases, however, has the Ninth Circuit addressed whether a

8    particular application of a SIP may be preempted even after EPA approval.  Instead, the Ninth

9    Circuit has referred to SIPs as federal law in the contexts of holding that a SIP requires further

10   EPA approval to be amended, *Safe Air for Everyone*, 488 F.3d at 1092; is enforceable in federal

11   court, *Trs. for Alaska*, 17 F.3d at 1210 n.3; and "trump[s] any inconsistent state law," *Irritated*

12   *Residents*, 790 F.3d at 947 n.8.  These holdings undeniably support that EPA-approved SIPs have

13   a status different from traditional state law.  But it may be more accurate to characterize SIPs as

14   having characteristics of both state and federal law.  After all, Wyoming drafted and proposed the

15   SIP, not Congress or EPA, and Wyoming's tampering and concealment provisions remain in the

16   State's Rules and Regulations.  *See Rules Wyo. Dep't of Envtl. Quality, Air* Quality, ch. 1, § 4(a)

17   (anti-concealment rule); ch. 13, § 2(a) (anti-tampering rule).

18         For present purposes, though, whether Wyoming's SIP is federal law or some combination

19   of state and federal law is not material.  That is because the clause of the Clean Air Act at issue,

20   Section 209(a), expressly provides that "No State . . . shall adopt or *attempt to enforce any*

21   standard relating to the control of emissions from new motor vehicles . . . ."  42 U.S.C. § 7543(a)

22   (emphasis added).  By prohibiting States from attempting to enforce any covered standard, Section

23   209(a) not only preempts certain state law, but also prohibits certain state action.  Accordingly,

24   whether characterized as state or federal law, if Wyoming seeks to use its SIP to enforce a

25   standard within the purview of Section 209(a), it is taking action that the Clean Air Act prohibits

26   States to take.

27         Further, whether the analysis is characterized as preemption or purely as the interpretation

28   of a federal regulatory scheme, the Court's task is the same: to examine the text of Section 209, to

10

consider its context within the Clean Air Act, and to consider relevant precedents and authorities that speak to Congress's purpose and intent. *See, e.g.*, *Dolan v. U.S. Postal Service*, 546 U.S. 481, 486 (2006) (interpreting federal law outside preemption context; "[i]nterpretation . . . depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis"); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485-86 (1996) (interpreting federal law within preemption context; "the purpose of Congress is the ultimate touchstone," as discerned from "the language of the pre-emption statute and the statutory framework surrounding it," as well as the "structure and purpose of the statute as a whole") (internal quotation marks omitted). And to the extent there is a difference between the preemption analysis and standard statutory interpretation, the preemption framework actually *benefits* Wyoming. That is because of the presumption that "the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic*, 518 U.S. at 485 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *see also Pac. Merch. Shipping Ass'n v. Goldstene* ("*Pac. Merch. II*"), 639 F.3d 1154, 1167 (9th Cir. 2011) (applying the presumption against preemption in considering whether the Submerged Lands Act preempted state environmental laws, "[g]iven the historic presence of state law in the area of air pollution") (internal quotation marks omitted).

Wyoming does not contend that Congress lacked the authority necessary to enact Section 209(a), which expressly prohibits States not only from adopting certain laws, but also from taking certain action. The Court therefore continues by applying the above interpretive framework (including the presumption against preemption) in determining whether the Clean Air Act bars Wyoming's claims.

## II. The Clean Air Act and Wyoming's Claims

### A. The Regulation of Motor Vehicle Emissions

Before addressing how Section 209 of the Clean Air Act impacts Wyoming's claims, a bit more background is needed on how the Act generally regulates motor-vehicle emissions. That background starts with the fact that, although environmental regulation "traditionally has been a matter of state authority," *Exxon Mobil Corp. v. EPA*, 217 F.3d 1246, 1255 (9th Cir. 2000), the

Clean Air Act and amendments thereto have made "the States and the Federal Government partners in the struggle against air pollution." *Jensen Family Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934, 938 (9th Cir. 2011) (quoting *General Motors Corp. v. United States*, 496 U.S. 530, 532 (1990)). With respect to emissions from stationary sources, States still have substantial discretion to set and enforce pollution standards. But the regulation of motor-vehicle emissions has become "a principally federal project." *EMA*, 88 F.3d at 1079; *see also Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control Dist.*, 627 F.3d 730, 733 (9th Cir. 2010) ("[T]he [Clean Air] Act gives the states the job of regulating stationary sources of pollution, but the EPA . . . [is] responsible for regulating emissions from motor vehicles and other mobile sources."). As noted by the D.C. Circuit in *Engine Manufacturers*:

> The regulatory difference is explained in part by the difficulty of subjecting motor vehicles, which readily move across state boundaries, to control by individual states. [T]he possibility of 50 different state regulatory regimes [also] raised the spectre of an anarchic patchwork of federal and state regulatory programs, a prospect which threatened to create nightmares for the manufacturers.

*EMA*, 88 F.3d at 1079 (internal quotation marks omitted); *see also* Ann E. Carlson, *Iterative Federalism and Climate Change*, 103 Nw. U. L. Rev. 1097, 1104 (2009) (noting that policymakers have long debated the proper division of authority between the federal government and the States with respect to environmental regulation, but that "[c]ommentators generally accept the need for federal uniformity in regulating national product markets like automobiles").[3]

The Clean Air Act accomplishes this policy by giving EPA significant authority to set and enforce vehicle emission standards, and by taking away similar authority from the States. As

---

[3] The exception to this rule, as alluded to above, is that California may set its own vehicle emission standards (subject to EPA approval) and other States may adopt California's standards. *See* 42 U.S.C. §§ 7507; 7543(b); *Jensen*, 644 F.3d at 938 n.3. Through this exception, Congress recognized that California is a leader in regulating vehicle emissions. *See MVMA*, 17 F.3d at 526. The effect is that "motor vehicles manufactured for sale in the United States must be either 'federal cars'—certified to meet federal vehicle emission standards as set by the EPA—or 'California cars'—certified to meet that state's standards." *Id.* at 526-27. Wyoming has not adopted California's standards. Vehicles sold in Wyoming must therefore be certified to meet federal emission standards.

noted above, EPA is tasked with setting emission limits for new vehicles introduced into commerce, 42 U.S.C. § 7521(a)(1); setting standards governing the use of emission-control devices in those vehicles, *e.g.*, *id.* § 7521(a)(4)(A), (m); and running a certification and testing program to ensure that new vehicles meet these standards, *id.* § 7525. EPA also has authority to enforce these standards by, among other things, refusing to certify vehicles that do not meet all regulatory requirements and bringing civil enforcement actions against violators. *Id.* §§ 7522(a); 7524; 7525(a). The Clean Air Act also requires vehicles to meet EPA emission standards during their "useful life," 42 U.S.C. § 7521(a)(1), (d), and EPA has authority to audit and inspect vehicles after certification, *id.* § 7541(b)-(c).

In contrast, Section 209(a) of the Act provides that:

> No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. . . .

42 U.S.C. § 7543(a). Referred to as "[t]he cornerstone of Title II," *MVMA*, 17 F.3d at 526, it is through Section 209(a) that Congress seeks avoid the "anarchic patchwork of federal and state regulatory programs" that could otherwise result if each State were free to adopt or enforce new motor vehicle emission standards. *EMA*, 88 F.3d at 1079.

Section 216 of the Clean Air Act defines "new motor vehicle," as "a motor vehicle the equitable or legal title to which has never been transferred to an ultimate purchaser." 42 U.S.C. § 7550(3). The Act does not define "standard," but in *South Coast Air Quality* the Supreme Court looked to the term's dictionary definition when interpreting Section 209(a), noting that a "standard" is "that which 'is established by authority, custom, or general consent, as a model or example; criterion; test.'" *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 253 (2004) (quoting Webster's Second New Int'l Dictionary 2455 (1945)). The Court in *South Coast* then provided "examples of requirements contained in Title II of the CAA that would properly be considered 'standards relating to the control of emissions' for federal preemption purposes." *Jensen*, 644 F.3d at 939 (quoting 42 U.S.C. § 7543(a)) (citing *South Coast*, 541 U.S. 246). The first example is a "regulation requiring that vehicles or engines not emit more than a

certain amount of a given pollutant." *Id.* (citing *South Coast*, 541 U.S. at 253). The second is a "requirement[] that a vehicle or engine be equipped with a certain type of pollution-control device, or that a vehicle or engine include some other design feature relating to emissions control." *Id.* at 940 (citing *South Coast*, 541 U.S. at 253).

Section 209(a) does not just prohibit States from adopting emission standards that conflict with EPA standards; the provision instead bars States from "adopt[ing] *or attempting to enforce any* standard" within Section 209(a)'s reach. 42 U.S.C. § 7543(a) (emphasis added). Thus, even if a State "does not establish new or conflicting emission standards," its efforts to enforce new vehicle emission standards, including EPA's standards, will be prohibited. *Sims v. State of Fla., Dept. of Highway Safety and Motor Vehicles*, 862 F.2d 1449, 1455 (11th Cir. 1989); *see also id.* ("[E]nforcement of the Clean Air Act before the first sale of new motor vehicles is the sole and exclusive prerogative of the federal government.").

The Clean Air Act does include a savings clause, which permits States to establish and enforce "in-use" vehicle restrictions. *Pac. Merch. Shipping Ass'n v. Goldstene* ("*Pac. Merch. I*"), 517 F.3d 1108, 1115 (9th Cir. 2008). Specifically, Section 209(d) provides that:

> Nothing in this part shall preclude or deny any State or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles.

42 U.S.C. § 7543(d).

By allowing States to regulate "registered or licensed motor vehicles," as opposed to new motor vehicles, Section 209(d) preserves States' inherent authority to police conduct within their borders, and also enables them to develop additional tools to meet the EPA-established NAAQS. Inspection and maintenance programs are an example of "in use" regulations. *See* 42 U.S.C. § 7541(h)(2). Under such programs, States may require vehicle testing after sale to the ultimate purchaser to identify vehicles emitting excessive pollutants. *See* 42 U.S.C. §§ 7511a(a)(2)(B), (b)(4); 7541(h)(2). Such programs generally "require noncomplying vehicles to be repaired as a prerequisite to continuing to operate within a given area." EPA, Office of Inspector General, *EPA's Oversight of the Vehicle Inspection and Maintenance Program Needs Improvement*, Rpt.

No. 2007-P-00001 at 5 (Oct. 5, 2006).  Other "in use" controls include transportation planning regulations, such as "carpool lanes, restrictions on car use in downtown areas, and programs to control the extended idling of vehicles."  *EMA*, 88 F.3d at 1094; *see also* 42 U.S.C. § 7408(f)(1)(A) (listing other examples of transportation control measures).  Anti-tampering and concealment laws can also be applied as "in use" regulations, prohibiting the disabling of emission-control systems and the use of devices that conceal on-road emissions.  *See* Arnold W. Reitze Jr., *Air Pollution Control Law: Compliance and Enforcement* § 10-5(d) (2001) ("[M]any states prohibit the operation of motor vehicles when air pollution devices have been removed, altered, or rendered inoperative.").

In some circumstances, the dividing line between Section 209(a) and 209(d) can be more difficult to decipher.  Imagine, for example, that a State requires all vehicles within it, once driven off the new-car lot, to be equipped with an emission-control device that is not required by EPA regulations.  The State may argue that this standard is not "relat[ed] to the control of emissions from *new motor vehicles*," 42 U.S.C. § 7543(a) (emphasis added), but instead regulates "the use, operation or movement of registered or licensed motor vehicles," *id.* § 7543(d).  A State regulation of this sort, however, could significantly reduce the Clean Air Act's effectiveness in preventing the type of "anarchic patchwork of federal and state regulatory programs" that would "threaten[] to create nightmares for the manufacturers."  *EMA*, 88 F.3d at 1079 (citation omitted).  Vehicle manufacturers would likely feel pressure to install the emission-control device required by the State in its new vehicles.  And if other States also established shortly-off-the-lot emission-control requirements, manufacturers could face the "possibility of 50 different state regulatory regimes," which Congress sought to avoid.  *Id.*

The court in *Allway Taxi* identified this tension, noting that the Clean Air Act's purpose of "preventing obstruction to interstate commerce" would be defeated if "a state or locality [were] free to impose its own emission control standards the moment after a new car is bought and registered."  *Allway Taxi, Inc. v. City of New York*, 340 F. Supp. 1120, 1124 (S.D.N.Y. 1972), *aff'd*, 468 F.2d 624 (2d Cir. 1972).  To avoid such a result, the court looked not only at the new versus "in use" dividing line, but also considered who would face the burden of complying with

15

the relevant regulation. If the "burden of compliance would be on individual owners and not on manufacturers and distributors," the court reasoned that the regulation "would cause only minimal interference with interstate commerce," and would be a permissible "local regulation of the use or movement of motor vehicles after they have reached their ultimate purchasers." *Id.* Applying that standard, the court held that a city ordinance requiring certain exhaust emission devices to be installed on taxis upon resale or reregistration was not preempted by the Clean Air Act. *Id.* at 1123-24.

In *Engine Manufacturers*, the D.C. Circuit cited favorably to *Allway*, noting that the "*Allway Taxi* interpretation, postponing state regulation so that the burden of compliance will not fall on the manufacturer, has prevented the definition of 'new motor vehicle' from 'nullifying' the motor vehicle preemption regime." *EMA*, 88 F.3d at 1086. EPA has also embraced *Allway Taxi*, explaining that a State's "in use" regulations cannot "amount to a standard relating back to the original design of the engine by the original engine manufacturer." EPA, *Control of Air Pollution; Determination of Significance for Nonroad Sources and Emission Standards for New Nonroad Compression-Ignition Engines At or Above 37 Kilowatts*, 59 Fed. Reg. 31306-01, 31330 (June 17, 1994) ("EPA expects that the principles articulated in *Allway Taxi* will be applied by the courts to any State adoption of in-use controls.").

### B.     Applying Section 209

The dispute between Wyoming and Volkswagen centers on whether Wyoming's claims are prohibited attempts to enforce new-vehicle emission standards, § 209(a); or permitted attempts to regulate the operation of registered vehicles within the State, § 209(d). As noted above, there is no question that the State's tampering and concealment SIP provisions can be applied in a manner that is permitted under Section 209(d). In the example of a mechanic disabling a vehicle's catalytic converter in the repair shop, the tampering and concealment clearly occurs after the vehicle is registered and in use, and the mechanic's tampering is also entirely intrastate conduct that "would cause only minimal interference with interstate commerce." *Allway Taxi*, 340 F. Supp. at 1124. But what about the situation here, where Volkswagen installed a defeat device in thousands of vehicles before they were introduced into interstate commerce?

As an initial matter, it is clear that a rule that prohibits a person from installing a defeat device in a vehicle prior to registration is a "standard relating to the control of emissions from new motor vehicles." 42 U.S.C. § 7543(a). This conclusion follows from the Supreme Court's *South Coast* decision and the text of Section 209(a). As noted above, the Court in *South Coast* defined a "standard" in part as a "criterion [or] test," and reasoned that an example of a "standard relating to the control of emissions" would be a requirement that a vehicle "must be equipped with a certain type of pollution-control device." 541 U.S. at 253. Like a requirement that a vehicle contain a certain pollution-control device, a requirement that a vehicle not contain a defeat device is also a criterion or test, compliance with which can readily be determined. And EPA's rule prohibiting defeat devices also "relat[es] to the control of emissions," because a defeat device by definition "reduces the effectiveness of [a vehicle's] *emission control* system." 40 C.F.R. § 86.1803-01 (emphasis added). States accordingly may not adopt their own rules prohibiting defeat devices in new vehicles, nor may they attempt to enforce EPA's rule barring defeat devices in new vehicles. *See Sims*, 862 F.2d at 1455.

Even though EPA's rule prohibiting defeat devices is a standard covered by Section 209(a), amicus curiae Harris County contends that Section 209(a) prohibits States only from enforcing that standard before the initial sale of EPA-approved vehicles. That conclusion is clear, Harris County suggests, because Section 209(a) provides that States may not adopt or attempt to enforce "standard[s] relating to the control of emissions from *new motor vehicles*." 42 U.S.C. § 7543(a) (emphasis added). Once title to a vehicle has been transferred to the ultimate purchaser, though, the vehicle is no longer new, *see* 42 U.S.C. § 7550(3), and so Harris County contends that the prohibitions covered by Section 209(a) would no longer apply. Applying that reading here, Harris County contends that Section 209(a) does not bar Wyoming's claims because Volkswagen's "clean diesel" vehicles have been certified already, and in some cases have been on the roads in Wyoming for 7 years.

Harris County is correct that Section 209(a) keeps States from intruding into EPA's new-vehicle certification process and its pre-sale regulation of vehicles; but the provision's text and context, and Congress's purpose in enacting it show that even after a vehicle is introduced into

17

commerce certain State regulation comes within Section 209(a)'s bounds.

Starting with the text of Section 209(a), the provision speaks most directly to *what* States are prohibited from regulating, not *when* they are prohibited from doing so. States are prohibited from attempting to enforce "any standard relating to the control of emissions from new motor vehicles." The provision does not state, however, that States are prohibited from attempting to enforce such standards only *before the sale* of new vehicles. The consequence of this distinction is most readily observable in the context of fraud-against-EPA type claims. If, after certification, it is discovered that a manufacturer tampered with vehicles during testing, and the manufacturer's vehicles accordingly did not comply with EPA's new-vehicle emission standards, the Clean Air Act vests EPA with authority to bring a civil action, and in some instances even a criminal action, against the manufacturer. *See* 42 U.S.C. §§ 7413(c)(2); 7522(a); 7524(b). But because Section 209(a) prohibits States from enforcing "standard[s] relating to the control of emissions from new motor vehicles," both before and after the vehicles enter into commerce, States cannot do the same.

Reading Section 209(a) in this way also furthers Congress's purpose in enacting the provision. By barring State enforcement of new-vehicle emission standards, both before and after the initial sale of a vehicle, Section 209(a) keeps States from interfering with EPA investigations and enforcement actions based on fraud or deceit against the Agency during the new-vehicle certification process. If States were also permitted to police such deception, there could be a multiplicity of redundant investigations and enforcement actions, "rais[ing] the spectre of an anarchic patchwork of federal and state regulatory programs, . . . [and] threaten[ing] to create nightmares for the manufacturers." *EMA*, 88 F.3d at 1079 (internal quotation marks omitted).[4]

---

[4] As noted above, States *can* implement inspection and maintenance programs, whereby the State tests vehicles for "in use" compliance with EPA emission standards. Congress made this explicit through Section 207(h)(2) of the Clean Air Act, which provides that, "Nothing in [Section 209(a)] shall be construed to prohibit a State from testing, or requiring testing of, a motor vehicle after the date of sale of such vehicle to the ultimate purchaser . . . ." 42 U.S.C. § 7541(h)(2).

Compliance testing, however, differs from fraud-against-EPA type claims. It is one thing to determine that a car being driven within a State is out-of-compliance with EPA emission standards, and to require the vehicle to be repaired as a prerequisite for continuing operation. *See EPA's Oversight of the Vehicle Inspection and Maintenance Program Needs Improvement*, *supra*

In what appears to be the only other case to address whether a State may bring claims against a manufacturer based on the installation of a defeat device in new vehicles, the court in *In re Office of Attorney General* interpreted Section 209(a) similarly. *See In re Office of Attorney General of State of New York*, 269 A.D.2d 1 (N.Y. App. Div. 2000). There, following settlements between EPA and a group of vehicle manufacturers who installed defeat devices in heavy-duty vehicles, the State of New York subpoenaed the manufacturers for all documents they had provided to EPA as part of the Agency's investigation. *Id.* at 3-5. In opposing a motion to quash, the State argued that the "preemptive effect of the Clean Air Act is not so broad that it forecloses the regulation of [vehicles] after they have been sold and placed in use." *Id.* at 5. The New York appellate court rejected this argument, reasoning that all of the State's claims had their "genesis in the manufacturers' purported concealment or misrepresentation of their violations of the Federal emissions standards," *id.* at 11-12, and so effectively sought to use state law "to penalize the manufacturers for producing engines which failed to comply with the Federal standards promulgated pursuant to the CAA," *id.* at 11. Thus, even though the vehicles at issue had already entered into commerce, the court reasoned that Section 209(a) preempted the State's action.

The Supreme Court's decision in *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001) also supports reading Section 209(a) as prohibiting State claims predicated on deceit against EPA during new-vehicle certification. The plaintiffs there argued they were injured by an FDA-approved medical device, which they asserted FDA would not have approved but for misrepresentations during the FDA approval process. The Court held that the plaintiffs' claims "conflict[ed] with, and [were] therefore impliedly pre-empted" by the Federal Food, Drug, and Cosmetic Act, as amended by the Medical Device Amendments of 1976. *Id.* at 343, 348. Noting that "the federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration," using a "variety of enforcement options," the Court reasoned that this flexibility

---

at 14. It is quite another to allege that a manufacturer deceived EPA into certifying an entire model year of vehicles. Wyoming does not contend otherwise. Nor could it reasonably rely on Section 207(h)(2) because its suit is not based on in-use testing by the State, but rather on Volkswagen's disclosure (following EPA and CARB investigations) that the company had installed a defeat device in hundreds of thousands of vehicles.

would be constrained if applicants were forced to comply with the FDA's regulations "in the shadow of 50 States' tort regimes." *Id.* at 348, 350. The Court also reasoned that the state-law claims would "dramatically increase the burdens facing potential applicants—burdens not contemplated by Congress in enacting the FDCA and the MDA," and which could discourage would-be applicants from seeking approval of devices with potentially beneficial uses. *Id.* at 350.

Although *Buckman* was an implied preemption case, the Court's analysis is instructive in interpreting the scope of Section 209(a). Like the FDA in the realm of medical devices, Congress has vested EPA with significant authority to regulate and enforce new-vehicle emission standards. If, despite this authority, States could bring actions against vehicle manufacturers based on deceit of EPA during new-vehicle certification, manufacturers would be forced to comply with EPA regulations "in the shadow of 50 State" regimes, which would "dramatically increase the burdens" manufactures would face in bringing new vehicles to market. 531 U.S. at 350. These additional burdens would hamper Congress's purpose in enacting Section 209(a), and counsel against a cabined reading of Section 209(a) that would only prohibit States from interfering with the initial sale of EPA-approved vehicles.

Having established (1) that EPA's rule prohibiting the installation of defeat devices in new vehicles is a standard that Section 209(a) bars States from enforcing; and (2) that Section 209(a) proscribes States from enforcing this standard even after the relevant vehicles are introduced into commerce, one more question remains: Is Wyoming attempting to enforce this standard through its tampering and concealment claims against Volkswagen?

The answer is yes. Although the relevant SIP provisions do not use the term "defeat device," their application here is ultimately predicated on Volkswagen installing such a device in its "clean diesel" vehicles during manufacturing. That is not only conduct EPA prohibits, but is also conduct that EPA has already investigated, and which culminated in civil consent decrees, a guilty plea, and billions of dollars in penalties and mitigation costs, some of which will compensate Wyoming and its residents, and together which will fully mitigate the environmental harm caused by Volkswagen's conduct. If Wyoming (and other States) are allowed to hold Volkswagen responsible for the same conduct, they will be effectively "penalize[ing]

20

[Volkswagen] for producing engines which failed to comply with the Federal standards," and for "conceal[ing] or misrepresent[ing] [those] violations." *In re Office of Attorney General*, 269 A.D.2d at 11-12.[5]

Wyoming makes three principal arguments against this conclusion, each of which is addressed in turn here. First, the State asserts that Section 209(a) prohibits only State conduct that "force[s] new action." (Dkt. No. 3404 at 26.) Applying that standard, Wyoming asserts that its claims are not barred because its SIP "does not create any obligations above and beyond what the EPA has already established." (*Id.*) Section 209(a) does not include this "new action" requirement, however. Rather, it prohibits any "attempt to enforce" a standard relating to the control of emissions—which includes enforcement of an already existing EPA standard. *See Sims*, 862 F.2d at 1455 (Section 209(a) bars even state law that "does not establish new or conflicting emission standards").

In support of this "new action" requirement, Wyoming relies on *Metropolitan Taxicab Board of Trade v. City of New York*, 633 F. Supp. 2d 83 (S.D.N.Y. 2009). The question there was whether, under the "adopt" prong of Section 209(a), a local regulation incentivizing the purchase of hybrids "related to" emissions from new vehicles. To make that determination the court reasoned that the Supreme Court's *Travelers* decision[6]—an ERISA preemption case—required a finding that the local regulation "effectively mandates" the purchase of hybrids in order to be preempted (i.e., that the regulation requires new action). *Id.* at 95; *see also id.* at 94, 96. The court's analysis (right or wrong)[7] is inapplicable here, where the focus is on Section 209(a)'s "attempt to enforce" prong. EPA prohibits manufacturers from installing defeat devices in new

---

[5] Nor do the States seek a simple slap on the wrist. Wyoming seeks civil penalties of up to $37,500 "per violation per day," with a separate violation occurring "each day a Subject Vehicle is driven in Wyoming." (Compl. ¶¶ 222, 229, 236.) Based on Wyoming's allegation that, as of November 1, 2015, there were 1,196 subject vehicles registered in the State (*id.* ¶ 231), penalties could total $44.85 million per day and $16.4 billion per year. And that is just Wyoming.

[6] *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins.* Co., 514 U.S. 645 (1995).

[7] Although the Second Circuit affirmed the decision, it reasoned that the district court's "attention to economic impact was misguided" under the circumstances. *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 158 (2d Cir. 2010).

motor vehicles, and Section 209(a) prohibits Wyoming from "attempt[ing] to enforce" that rule, whether or not Wyoming's enforcement action requires "new action" on behalf of Volkswagen.

Second, Wyoming contends that this case is similar to *Counts v. General Motors, LLC*, 237 F. Supp. 3d 572 (E.D. Mich. 2017), where the court held that Section 209(a) did not preempt certain contract, fraudulent concealment, and deceptive advertising claims brought against GM by consumers who alleged that they purchased GM vehicles that contained a defeat device. The court's conclusion there, however, was based on a distinction between attempts to enforce EPA regulations (which are preempted) and attempts to hold GM liable for misrepresentations it made to consumers about its vehicles' emissions more generally (which the court held were not preempted). *See id.* at 592. Whether that distinction is correct is not relevant here; Wyoming is not attempting to hold Volkswagen liable for deceptive statements made to the State's residents; the State is instead attempting to hold Volkswagen liable for using a defeat device in its vehicles.

Third, Wyoming argues that it is not attempting to enforce EPA's standard prohibiting the installation of defeat devices in new vehicles, because its claims are based only on the *operation* of Volkswagen's defeat device within the State. Framed in this way, Wyoming contends that its claims are permitted under the Clean Air Act's savings clause, § 209(d).

The operation of Volkswagen's defeat device on the roads of Wyoming, however, cannot be so easily separated from its installation. For one thing, *all* defeat devices perform by reducing the effectiveness of emission control systems during "normal vehicle operation and use." 40 C.F.R. § 86.1803-01. That is how a defeat device works. Under Wyoming's reading, then, every defeat device installed in a new vehicle that is later registered in the State will violate its tampering and concealment rules, without any additional action by the manufacturer who installed the device. Thus, even if Wyoming is regulating the *use* of defeat devices, it is also effectively regulating their installation.

Further, Wyoming's claims are materially distinguishable from "in use" vehicle regulations permitted under Section 209(d). As noted above, courts and EPA have recognized that, consistent with Congress's purpose in enacting Section 209, permissible "in use" regulations "cause only minimal interference with interstate commerce," and the "burden of compliance" with

an in-use regulation is generally "on individual owners and not on manufacturers and distributors." *Allway Taxi*, 340 F. Supp. at 1124; *see also* 59 Fed. Reg. 31306-01, 31330 (explaining that a State's "in-use" regulations cannot "amount to a standard relating back to the original design of the engine by the original engine manufacturer"). For example, in the case of a mechanic who disconnects a vehicle's catalytic converter in the repair shop, the regulated conduct occurs within a single state and the burden of compliance is on the mechanic and the owner of the vehicle. The same is true of transportation planning regulations, such as carpool lanes, *see EMA*, 88 F.3d at 1094, and with inspection and maintenance programs.

In contrast, Wyoming's tampering and concealment claims place the burden of compliance on Volkswagen as the manufacturer. To ensure accurate emissions' reporting and the full use of vehicle emission controls, Volkswagen must uninstall the defeat-device software. And even then, modifications to the vehicles are needed for them to perform as represented. (*See* Compl. ¶ 104 (noting that if the vehicles' emission-control system operated fully, as currently configured, "particulate matter would . . . clog and break the engine's diesel particulate filter").) Wyoming's regulations therefore amount to impermissible State "standard[s] relating back to the original design of the engine by the original engine manufacturer." 59 Fed. Reg. at 31330. Further, Wyoming's claims (and those of other States) threaten to interfere with interstate commerce, because they are predicated on conduct that occurred during the manufacture of hundreds of thousands of vehicles intended for distribution throughout the United States. This, of course, does not mean that Volkswagen cannot be held responsible for the consequences of its actions. As is readily apparent from this MDL, Volkswagen has indeed been held responsible. But because Volkswagen's conduct took place during manufacturing, Congress determined that EPA, not the 50 States, was best situated to regulate it.[8]

---

[8] Wyoming contends that Volkswagen "continued to tamper with pollution controls through a software recall for vehicles already sold to consumers." (Dkt. No. 3404 at 29 (citing Compl. ¶¶ 151-52, 164-71).) But as Volkswagen notes, its updates as part of the recall brought emissions *down* relative to the original software. (*See* Compl. ¶ 152.) The updates therefore did not violate Wyoming's concealment provision (because the updates brought on-road emissions closer to dynamometer testing emissions), or Wyoming's tampering provision (because the updates did not "render ineffective or inoperative" the emission control systems).

**CONCLUSION**

Wyoming, by attempting to apply its SIP's tampering and concealment rules to Volkswagen's use of a defeat device, seeks to "enforce [a] standard relating to the control of emissions from new motor vehicles." 42 U.S.C. § 7543(a). Because the Clean Air Act prohibits States from enforcing such standards, Wyoming's claims cannot go forward and the Court accordingly GRANTS Volkswagen's motion to dismiss Wyoming's complaint. Finding that amendment of the complaint would be futile, the Court dismisses the complaint with prejudice.

Having concluded that Wyoming's claims are expressly prohibited by the Clean Air Act, the Court does not consider whether the claims are also impliedly preempted, or whether the Court has personal jurisdiction over the German Defendants.

**IT IS SO ORDERED.**

Dated: August 31, 2017

_____
CHARLES R. BREYER
United States District Judge