# EXHIBIT A

1  Elizabeth J. Cabraser (State Bar No. 083151)
   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2  275 Battery Street, 29th Floor
   San Francisco, CA  94111-3339
3  Telephone:  415.956.1000
   Facsimile:  415.956.1008
4  E-mail: ecabraser@lchb.com

5  *Lead Counsel for Plaintiffs*
   *(Plaintiffs' Steering Committee Members*
6  *Listed on Signature Page)*

7

8                   UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11

| | |
|---|---|
| 12  IN RE: VOLKSWAGEN 'CLEAN DIESEL' MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL 2672 CRB (JSC) |
| 14 | **[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]** |
| 15  This Document Relates to: | **AUDI CO2 CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT** |
| 16  Audi CO$_2$ Cases | |
| 17 | JURY TRIAL DEMANDED |
| 18  MICHAEL BECK, *et al.*, on behalf of themselves and all others similarly on behalf of all others similarly situated, | |
| 20          Plaintiffs, | |
| 21  v. | |
| 22  AUDI AG; AUDI OF AMERICA, LLC, VOLKSWAGEN AG, VOLKSWAGEN GROUP OF AMERICA, INC., ROBERT BOSCH LLC, and ROBERT BOSCH GMBH, | |
| 25          Defendants. | |

26

27

28

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................................. 1

II. NATURE OF THE ACTION................................................................................. 1

III. PARTIES ............................................................................................................... 6

    A. Plaintiffs .................................................................................................... 6

    B. Defendants .............................................................................................. 16

    C. Non-Party Participants ........................................................................... 19

IV. JURISDICTION AND VENUE ......................................................................... 20

V. INTRADISTRICT ASSIGNMENT.................................................................... 21

VI. FACTS COMMON TO ALL COUNTS ............................................................ 21

    A. The Defendants' Defeat Device Scheme ............................................... 22

    B. The Audi $CO_2$ Defeat Device............................................................... 27

        1. Development of the $CO_2$ Defeat Device ................................... 27

        2. The Discovery of the $CO_2$ Defeat Device ................................ 33

        3. Test Results Confirm the Existence of the $CO_2$ Defeat Device ...................................................................................... 37

    C. The Supplier Defendants' Role.............................................................. 40

    D. Defendants' False Advertising .............................................................. 50

    E. Defendants Intentionally Hid the Excessive Pollution Emitted By the Class Vehicles. ............................................................................... 56

VII. CLASS ACTION ALLEGATIONS .................................................................. 59

        1. Numerosity: Federal Rule of Civil Procedure 23(a)(1)............... 65

        2. Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3) ................................................. 65

        3. Typicality: Federal Rule of Civil Procedure 23(a)(3) ................. 66

        4. Adequacy: Federal Rule of Civil Procedure 23(a)(4) ................. 67

        5. Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2) ..................................................................... 67

        6. Superiority: Federal Rule of Civil Procedure 23(b)(3) ............... 67

1

**TABLE OF CONTENTS**
(continued)

2

**Page**

3    VIII.    ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED ........................... 68

4            A.    Discovery Rule Tolling ....................................................................... 68

5            B.    Tolling Due To Fraudulent Concealment ........................................... 68

6            C.    Estoppel .............................................................................................. 69

7    IX.     CAUSES OF ACTION ................................................................................. 69

8            A.    Claims Asserted on Behalf of the Nationwide Class ......................... 69

9            NATIONWIDE COUNT I: VIOLATION OF 18 U.S.C. § 1962(C)-(D)
             The Racketeer Influenced And Corrupt Organizations Act
10           ("RICO") ......................................................................................... 69

11           B.    Description of the Defeat Device RICO Enterprise ........................... 71

12                 1.    The Volkswagen RICO Defendants ........................................ 73

13                 2.    The Bosch RICO Defendants ................................................... 74

14                 3.    Unnamed Co-Conspirator IAV ................................................ 75

15                 4.    Unnamed Co-Conspirator ZF ................................................... 76

16                 5.    Unnamed Co-Conspirator Continental .................................... 76

17           C.    The Defeat Device RICO Enterprise Sought to Increase
                   Defendants' Profits and Revenues .................................................. 77

18           D.    Mail and Wire Fraud .......................................................................... 81

19           NATIONWIDE COUNT II: FRAUD BY CONCEALMENT (Common
20           Law) ................................................................................................ 88

21           COUNT III: IMPLIED AND WRITTEN WARRANTY Magnuson - Moss
             Warranty Act (15 U.S.C. §§ 2301, *et seq.*) ........................................ 90

22           E.    State-Specific Claims ......................................................................... 92

23           ALABAMA COUNT I:  Violations of the Alabama Deceptive Trade
24           Practices Act Ala. Code § 8-19-1, *et seq.* (On Behalf of the
             Alabama State Class) ..................................................................... 92

25           ALABAMA COUNT II: Breach of Express Warranty Ala. Code §§ 7-2-
26           313 and 7-2A-210 (On Behalf of the Alabama State Class) ............... 95

27           ALABAMA COUNT III: Breach of Implied Warranty of Merchantability
             Ala. Code §§ 7-2-314 and 7-2A-212 (On Behalf of the Alabama
28           State Class) ..................................................................................... 98

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

ALASKA COUNT I: Violations of the Alaska Unfair Trade Practices and
Consumer Protection Act Alaska Stat. Ann. § 45.50.471 *et seq.* (On
Behalf of the Alaska State Class)........................................................................ 99

4

5

ALASKA COUNT II: Breach of Express Warranty Alaska Stat.
§§ 45.02.313 and 45.12.210 (On Behalf of the Alaska State Class)................. 102

6

ALASKA COUNT III: Breach of Implied Warranty of Merchantability
Alaska Stat. §§ 45.02.314 and 45.12.212 (On Behalf of the Alaska
State Class)...................................................................................................... 106

7

8

ARIZONA COUNT I: Violations of the Arizona Consumer Fraud Act
Ariz. Rev. Stat. § 44-1521, *et seq.* (On Behalf of the Arizona State
Class)............................................................................................................... 107

9

10

ARIZONA COUNT II: Breach of Express Warranty Ariz. Rev. Stat. §§ 47-
2313 and 47-2A210 (On Behalf of the Arizona State Class)............................ 109

11

12

ARIZONA COUNT III: Breach of Implied Warranty of Merchantability
Ariz. Rev. Stat. §§ 47-2314 and 47-2A212 (On Behalf of the
Arizona State Class).......................................................................................... 113

13

14

ARKANSAS COUNT I: Violations of the Deceptive Trade Practices Act
Ark. Code Ann. § 4-88-101 *et seq.* (On Behalf of the Arkansas
State Class)...................................................................................................... 114

15

16

ARKANSAS COUNT II: Breach of Express Warranty Ark Code Ann.
§§ 4-2-313 and 4-2A-210 (On Behalf of the Arkansas State Class)................. 117

17

ARKANSAS COUNT III: Breach of Implied Warranty of Merchantability
Ark. Code Ann. §§ 4-2-314 and 4-2A-212 (On Behalf of the
Arkansas State Class)....................................................................................... 120

18

19

CALIFORNIA COUNT I: Violation of California Consumers Legal
Remedies Act Cal Bus. & Prof. Code § 1750, *et seq.* (On Behalf of
the California State Class)................................................................................. 121

20

21

CALIFORNIA COUNT II:  Violations of the California Unfair
Competition Law Cal. Bus. & Prof. Code § 17200 *et seq.* (On
Behalf of the California State Class).................................................................. 123

22

23

CALIFORNIA COUNT III: Violations of the California False Advertising
Law Cal. Civ. Code § 17500 *et seq.* (On Behalf of the California
State Class)...................................................................................................... 125

24

25

CALIFORNIA COUNT IV: Breach of Express Warranty Cal. Com. Code
§§ 2313 and 10210 (On Behalf of the California State Class).......................... 126

26

CALIFORNIA COUNT V: Breach of Implied Warranty of Merchantability
Cal. Com. Code §§ 2314 and 10212 (On Behalf of the California
State Class)...................................................................................................... 130

27

28

1
2

**TABLE OF CONTENTS**
(continued)

Page

3
4

CALIFORNIA COUNT VI: Violation of Song-Beverly Consumer
Warranty Act, Breach of Implied Warranty Cal Civ. Code § 1790,
*et seq.* (On Behalf of the California State Class) ................................. 131

5
6

CALIFORNIA COUNT VII: Violation of the Song-Beverly Consumer
Protection Act, Breach of Express Warranty Cal Civ. Code § 1790,
*et seq.* (On Behalf of the California State Class) ................................. 133

7
8

CALIFORNIA COUNT VIII: Breach of Express California Emissions
Warranties Cal. Civ. Code § 1793.2, *et seq.*  (On Behalf of the
California State Class) ...................................................................... 135

9

CALIFORNIA COUNT IX: Failure to Recall/Retrofit (On Behalf of the
California State Class) ...................................................................... 136

10
11

COLORADO COUNT I: Violations of the Colorado Consumer Protection
Act Colo. Rev. Stat. § 6-1-101 *et seq.* (On Behalf of the Colorado
State Class).................................................................................... 137

12
13

COLORADO COUNT II: Breach of Express Warranty Colo. Rev. Stat.
§§ 4-2-313 and 4-2.5-210 (On Behalf of the Colorado State Class)................. 140

14
15

COLORADO COUNT III: Breach of Implied Warranty of Merchantability
Colo. Rev. Stat. §§ 4-2-314 and 4-2.5-212 (On Behalf of the
Colorado State Class)....................................................................... 143

16
17

CONNECTICUT COUNT I: Violations of Connecticut Unlawful Trade
Practice Act Conn. Gen. Stat. § 42-110a, *et seq.* (On Behalf of the
Connecticut State Class) ................................................................... 144

18

CONNECTICUT COUNT II: Breach of Express Warranty Conn. Gen.
Stat. Ann. § 42A-2-313 (On Behalf of the Connecticut State Class)................. 147

19
20

CONNECTICUT COUNT III: Breach of Implied Warranty of
Merchantability Conn. Gen. Stat. Ann. § 42A-2-314 (On Behalf of
the Connecticut State Class)............................................................... 150

21
22

DELAWARE COUNT I: Violations of the Delaware Consumer Fraud Act
6 Del. Code § 2513 *et seq.* (On Behalf of the Delaware State Class)................ 151

23

DELAWARE COUNT II: Breach of Express Warranty 6 Del. Code §§ 2-
313 and 2A-210 (On Behalf of the Delaware State Class) ................................ 154

24
25

DELAWARE COUNT III: Breach of Implied Warranty of Merchantability
6. Del. Code §§ 2-314 and 7-2A-212 (On Behalf of the Delaware
State Class)..................................................................................... 158

26
27

DISTRICT OF COLUMBIA COUNT I: Violations of the Consumer
Protection Procedures Act D.C. Code § 28-3901 *et seq.* (On Behalf
of the District of Columbia Class) ...................................................... 159

28

- iv -

1

**TABLE OF CONTENTS**
(continued)

2

Page

DISTRICT OF COLUMBIA COUNT II: Breach of Express Warranty D.C.
Code §§ 28:2-313 and 28:2A-210 (On Behalf of the District of
Columbia Class)................................................................................................ 162

DISTRICT OF COLUMBIA COUNT III: Breach of Implied Warranty of
Merchantability D.C. Code §§ 28:2-314 and 28:2A-212 (On Behalf
of the District of Columbia Class) ..................................................................... 166

FLORIDA COUNT I: Violations of the Florida Unfair & Deceptive Trade
Practices Act Fla. Stat. § 501.201, *et seq.* (On Behalf of the Florida
State Class)........................................................................................................ 167

FLORIDA COUNT II: Breach of Express Warranty F.S.A. §§ 672.313 and
680.21 (On Behalf of the Florida State Class) ................................................... 170

FLORIDA COUNT III: Breach of Implied Warranty of Merchantability
F.S.A. §§ 672.314 and 680.212 (On Behalf of the Florida State
Class)................................................................................................................. 173

GEORGIA COUNT I: Violations of Georgia's Fair Business Practices Act
Ga. Code Ann. § 10-1-390 *et seq.* (On Behalf of the Georgia State
Class)................................................................................................................. 174

GEORGIA COUNT II: Violations of Georgia's Uniform Deceptive Trade
Practices Act Ga. Code Ann. § 10-1-370 *et seq.* (On Behalf of the
Georgia State Class).......................................................................................... 177

GEORGIA COUNT III: Breach of Express Warranty Ga. Code Ann.
§§ 11-2-313 and 11-2A-210 (On Behalf of the Georgia State Class)................. 180

GEORGIA COUNT IV: Breach of Implied Warranty of Merchantability
Ga. Code Ann. §§ 11-2-314 and 11-2A-212 (On Behalf of the
Georgia State Class).......................................................................................... 184

HAWAII COUNT I: Unfair and Deceptive Acts in Violation of Hawaii
Law Haw. Rev. Stat. § 480 *et seq.* (On Behalf of the Hawaii State
Class)................................................................................................................. 185

HAWAII COUNT II: Breach of Express Warranty Haw. Rev. Stat.
§§ 490:2-313 and 490:2A-210 (On Behalf of the Hawaii State
Class)................................................................................................................. 187

HAWAII COUNT III: Breach of Implied Warranty of Merchantability
Haw. Rev. Stat. §§ 490:2-314 and 490:2A-212 (On Behalf of the
Hawaii State Class) ........................................................................................... 191

IDAHO COUNT I: Violations of the Idaho Consumer Protection Act Idaho
Code § 48-601 *et seq.* (On Behalf of the Idaho State Class)............................. 192

IDAHO COUNT II: Breach of Express Warranty Idaho Code §§ 28-2-313
and 28-12-210 (On Behalf of the Idaho State Class) ......................................... 195

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

IDAHO COUNT III: Breach of Implied Warranty of Merchantability Idaho
Code §§ 28-2-314 and 28-12-212 (On Behalf of the Idaho State
Class)......................................................................................................... 198

4

5

ILLINOIS COUNT I: Violations of the Illinois Consumer Fraud and
Deceptive Business Practices Act 815 ILCS 505/1, *et seq.* and 720
ILCS 295/1a (On Behalf of the Illinois State Class).......................................... 199

6

7

ILLINOIS COUNT II: Breach of Express Warranty 810 Ill. Comp. Stat.
§§ 5/2-313 and 5/2A-210 (On Behalf of the Illinois State Class)...................... 202

8

ILLINOIS COUNT III: Breach of Implied Warranty of Merchantability
810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212 (On Behalf of the
Illinois State Class) ................................................................................... 206

9

10

INDIANA COUNT I: Violations of the Indiana Deceptive Consumer Sales
Act Ind. Code § 24-5-0.5-3 (On Behalf of the Indiana State Class) .................. 207

11

12

INDIANA COUNT II: Breach of Express Warranty Ind. Code §§ 26-1-3-
313 and 26-1-2.1-210 (On Behalf of the Indiana State Class)............................ 210

13

INDIANA COUNT III: Breach of Implied Warranty of Merchantability
Ind. Code §§ 26-1-3-314 and 26-1-2.1-212 (On Behalf of the
Indiana State Class)................................................................................... 213

14

15

IOWA COUNT I: Violations of the Private Right of Action For Consumer
Frauds Act Iowa Code § 714h.1, *et seq.* (On Behalf of the Iowa
State Class).................................................................................................. 214

16

17

IOWA COUNT II: Breach of Express Warranty Iowa Code §§ 554.2313
and 554.13210 (On Behalf of the Iowa State Class).......................................... 217

18

19

IOWA COUNT III: Breach of Implied Warranty of Merchantability Iowa
Code §§ 554.2314 and 554.13212 (On Behalf of the Iowa State
Class)......................................................................................................... 221

20

21

KANSAS COUNT I: Violations of the Kansas Consumer Protection Act
Kan. Stat. Ann. § 50-623 *et seq.* (On Behalf of the Kansas State
Class)......................................................................................................... 222

22

23

KANSAS COUNT II: Breach of Express Warranty Kan. Stat. §§ 84-2-313
and 84-2A-210 (On Behalf of the Kansas State Class)...................................... 225

24

KANSAS COUNT III: Breach of Implied Warranty of Merchantability
Kan. Stat. §§ 84-2-314 and 84-2A-212 (On Behalf of the Kansas
State Class)................................................................................................. 228

25

26

KENTUCKY COUNT I: Violations of the Kentucky Consumer Protection
Act Ky. Rev. Stat. Ann. § 367.110 *et seq.* (On Behalf of the
Kentucky State Class) ................................................................................ 229

27

28

**TABLE OF CONTENTS**
(continued)

Page

KENTUCKY COUNT II: Breach of Express Warranty Ky. Rev. Stat.
§§ 335.2-313 and 355.2A-210 (On Behalf of the Kentucky State
Class) ........................................................................................................ 232

KENTUCKY COUNT III: Breach of Implied Warranty of Merchantability
Ky. Rev. Stat. §§ 335.2-314 and 355.2A-212 (On Behalf of the
Kentucky State Class) ............................................................................... 236

LOUISIANA COUNT I: Violations of the Louisiana Unfair Trade
Practices and Consumer Protection Law La. Stat. Ann. § 51:1401 *et
seq.* (On Behalf of the Louisiana State Class) .......................................... 237

LOUISIANA COUNT II: Breach of Implied Warranty of
Merchantability/Warranty Against Redhibitory Defects La. Civ.
Code Art. 2520, 2524 (On Behalf of the Louisiana State Class) .............. 240

MAINE COUNT I: Violations of the Maine Unfair Trade Practices Act
Me. Rev. Stat. Ann. Tit. 5, § 205-A *et seq.* (On Behalf of the Maine
State Class) ................................................................................................ 241

MAINE COUNT II: Breach of Express Warranty Me. Rev. Stat. Tit. 11
§§ 2-313 and 2-1210 (On Behalf of the Maine State Class) ..................... 244

MAINE COUNT III: Breach of Implied Warranty of Merchantability Me.
Rev. Stat. Tit. 11 §§ 2-314 and 2-1212 (On Behalf of the Maine
State Class) ................................................................................................ 247

MARYLAND COUNT I: Violations of the Maryland Consumer Protection
Act Md. Code Com. Law § 13-101 *et seq.* (On Behalf of the
Maryland State Class) ............................................................................... 248

MARYLAND COUNT II: Maryland Lemon Law Md. Code Com. Law
§ 14-1501 *et seq.* (On Behalf of the Maryland State Class) .................... 251

MARYLAND COUNT III: Breach of Express Warranty Md. Code Com.
Law §§ 2-313 and 2a-210 (On Behalf of the Maryland State Class) ......... 252

MARYLAND COUNT IV: Breach of Implied Warranty of
Merchantability Md. Code Com. Law §§ 2-314 and 2a-212 (On
Behalf of the Maryland State Class) ......................................................... 256

MASSACHUSETTS COUNT I: Deceptive Acts or Practices Prohibited by
Massachusetts Law Mass. Gen. Laws Ch. 93a, § 1, *et seq.* (On
Behalf of the Massachusetts State Class) .................................................. 257

MASSACHUSETTS COUNT II: Massachusetts Lemon Law Mass. Gen.
Laws Ch. 90, § 7N1/2(1) (On Behalf of the Massachusetts State
Class) ........................................................................................................ 260

MASSACHUSETTS COUNT III: Breach of Express Warranty Mass. Gen.
Laws c. 106 §§ 2-313 and 2A-210 (On Behalf of the Massachusetts
State Class) ................................................................................................ 262

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

MASSACHUSETTS COUNT IV: Breach of Implied Warranty of
Merchantability Mass. Gen. Laws c. 106 §§ 2-314 and 2A-212 (On
Behalf of the Massachusetts State Class) ............................................................ 265

4

5

MICHIGAN COUNT I: Violations of the Michigan Consumer Protection
Act Mich. Comp. Laws § 445.903 *et seq.* (On Behalf of the
Michigan State Class) .......................................................................................... 266

6

7

MICHIGAN COUNT II: Breach of Express Warranty Mich. Comp. Laws
§§ 440.2313 and 440.2860 (On Behalf of the Michigan State Class) ................. 270

8

MICHIGAN COUNT III: Breach of Implied Warranty of Merchantability
Mich. Comp. Laws §§ 440.2314 and 440.2860 (On Behalf of the
Michigan State Class) .......................................................................................... 273

9

10

MINNESOTA COUNT I: Violations of the Minnesota Prevention of
Consumer Fraud Act Minn. Stat. § 325F.68 *et seq.* (On Behalf of
the Minnesota State Class) .................................................................................. 274

11

12

MINNESOTA COUNT II: Violations of the Minnesota Uniform Deceptive
Trade Practices Act Minn. Stat. § 325D.43-48 *et seq.* (On Behalf of
the Minnesota State Class) .................................................................................. 277

13

14

MINNESOTA COUNT III: Breach of Express Warranty Minn. Stat.
§§ 336.2-313 and 336.2A-210 (On Behalf of the Minnesota State
Class) .................................................................................................................... 280

15

16

MINNESOTA COUNT IV: Breach of Implied Warranty of
Merchantability Minn. Stat. §§ 336.2-314 and 336.2A-212 (On
Behalf of the Minnesota State Class) .................................................................. 284

17

18

MISSISSIPPI COUNT I: Violations of Mississippi Consumer Protection
Act Miss. Code. Ann. § 75-24-1, *et seq.* (On Behalf of the
Mississippi State Class) ...................................................................................... 285

19

20

MISSISSIPPI COUNT II: Breach of Express Warranty Miss. Code §§ 75-
2-313 and 75-2A-210 (On Behalf of the Mississippi State Class) ...................... 288

21

22

MISSISSIPPI COUNT III: Breach of Implied Warranty of Merchantability
Miss. Code §§ 75-2-314 and 75-2A-212 (On Behalf of the
Mississippi State Class) ...................................................................................... 291

23

24

MISSOURI COUNT I: Violations of the Missouri Merchandising Practices
Act Mo. Rev. Stat. § 407.010 *et seq.* (On Behalf of the Missouri
State Class) ........................................................................................................... 292

25

26

MISSOURI COUNT II: Breach of Express Warranty Mo. Stat. §§ 400.2-
313 and 400.2A-210 (On Behalf of the Missouri State Class) ........................... 295

27

MISSOURI COUNT III: Breach of Implied Warranty of Merchantability
Mo. Stat. §§ 400.2-314 and 400.2A-212 (On Behalf of the Missouri
State Class) ........................................................................................................... 299

28

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

4

MONTANA COUNT I: Violations of the Montana Unfair Trade Practices
and Consumer Protection Act of 1973 Mont. Code Ann. § 30-14-
101 *et seq.* (On Behalf of the Montana State Class) ........................................ 300

5

MONTANA COUNT II: Breach of Express Warranty Mont. Code §§ 30-2-
313 and 30-2A-210 (On Behalf of the Montana State Class) ........................... 303

6

7

MONTANA COUNT III: Breach of Implied Warranty of Merchantability
Mont. Code §§ 30-2-314 and 30-2A-212 (On Behalf of the
Montana State Class)......................................................................................... 306

8

9

NEBRASKA COUNT I: Violations of the Nebraska Consumer Protection
Act Neb. Rev. Stat. § 59-1601 *et seq.* (On Behalf of the Nebraska
State Class)......................................................................................................... 307

10

11

NEBRASKA COUNT II: Breach of Express Warranty Neb. Rev. St.
U.C.C. §§ 2-313 and 2A-210 (On Behalf of the Nebraska State
Class).................................................................................................................. 310

12

13

NEBRASKA COUNT III: Breach of Implied Warranty of Merchantability
Neb. Rev. St. U.C.C. §§ 2-314 and 2A-212 (On Behalf of the
Nebraska State Class)......................................................................................... 313

14

15

NEVADA COUNT I: Violations of the Nevada Deceptive Trade Practices
Act Nev. Rev. Stat. § 598.0903 *et seq.* (On Behalf of the Nevada
State Class)......................................................................................................... 314

16

17

NEVADA COUNT II: Breach of Express Warranty N.R.S. §§ 104.2313
and 104A.2210 (On Behalf of the Nevada State Class)..................................... 317

18

19

NEVADA COUNT III: Breach of Implied Warranty of Merchantability
N.R.S. §§ 104.2314 and 104A.2212 (On Behalf of the Nevada State
Class).................................................................................................................. 321

20

21

NEW HAMPSHIRE COUNT I: Violations of the New Hampshire
Consumer Protection Act N.H. Rev. Stat. § 358-A:1 *et seq.* (On
Behalf of the New Hampshire State Class)........................................................ 322

22

23

NEW HAMPSHIRE COUNT II: Breach of Express Warranty N.H. Rev.
Stat. §§ 382-A:2-313 and 382-A:2A-210 (On Behalf of the New
Hampshire State Class) ...................................................................................... 324

24

25

NEW HAMPSHIRE COUNT III: Breach of Implied Warranty of
Merchantability N.H. Rev. Stat. §§ 382-A:2-314 and 382-A:2A-212
(On Behalf of the New Hampshire State Class) ................................................ 328

26

27

NEW JERSEY COUNT I: Violations of the New Jersey Consumer Fraud
Act N.J. Stat. Ann. § 56:8-1 *et seq.* (On Behalf of the New Jersey
State Class)......................................................................................................... 329

28

NEW JERSEY COUNT II: Breach of Express Warranty N.J.S. 12A:2-313
and 2A-210 (On Behalf of the New Jersey State Class) .................................... 332

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

NEW JERSEY COUNT III: Breach of Implied Warranty of
Merchantability N.J.S. 12A:2-314 and 2A-212 (On Behalf of the
New Jersey State Class) ..................................................................... 335

4

5

NEW MEXICO COUNT I: Violations of the New Mexico Unfair Trade
Practices Act N.M. Stat. Ann. § 57-12-1 *et seq.* (On Behalf of the
New Mexico State Class) ................................................................... 336

6

7

NEW MEXICO COUNT II: Breach of Express Warranty N.M. Stat. §§ 55-
2-313 and 55-2A-210 (On Behalf of the New Mexico State Class) .................. 340

8

NEW MEXICO COUNT III: Breach of Implied Warranty of
Merchantability N.M. Stat. §§ 55-2-314 and 55-2A-212 (On Behalf
of the New Mexico State Class) ........................................................ 343

9

10

NEW YORK COUNT I: Violations of the New York General Business
Law § 349 N.Y. Gen. Bus. Law § 349 (On Behalf of the New York
State Class) ..................................................................................... 344

11

12

NEW YORK COUNT II: Violations of the New York General Business
Law § 350 N.Y. Gen. Bus. Law § 350 (On Behalf of the New York
State Class) ..................................................................................... 347

13

14

NEW YORK COUNT III: Breach of Express Warranty N.Y. U.C.C. Law
§§ 2-313 and 2A-210 (On Behalf of the New York State Class) ..................... 349

15

16

NEW YORK COUNT IV: Breach of Implied Warranty of Merchantability
N.Y. U.C.C. Law §§ 2-314 and 2A-212 (On Behalf of the New
York State Class) ............................................................................. 353

17

18

NORTH CAROLINA COUNT I: Violations of the North Carolina Unfair
and Deceptive Acts and Practices Act N.C. Gen. Stat. § 75-1.1 *et
seq.* (On Behalf of the North Carolina State Class) ............................. 354

19

20

NORTH CAROLINA COUNT II: Breach of Express Warranty N.C.G.S.A.
§§ 25-2-313 and 252A-210 (On Behalf of the North Carolina State
Class)............................................................................................. 357

21

22

NORTH CAROLINA COUNT III: Breach of Implied Warranty of
Merchantability N.C.G.S.A. §§ 25-2-314 and 252A-212 (On Behalf
of the North Carolina State Class) ..................................................... 360

23

24

NORTH DAKOTA COUNT I: Violations of the North Dakota Consumer
Fraud Act N.D. Cent. Code § 51-15-02 (On Behalf of the North
Dakota State Class) .......................................................................... 361

25

26

NORTH DAKOTA COUNT II: Breach of Express Warranty N.D. Cent.
Code §§ 41-02-30 and 41-02.1-19 (On Behalf of the North Dakota
State Class).................................................................................... 364

27

28

- x -

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

NORTH DAKOTA COUNT III: Breach of Implied Warranty of Merchantability N.D. Cent. Code §§ 41-02-31 and 41-02.1-21 (On Behalf of the North Dakota State Class) ............................................................. 368

4

5

OHIO COUNT I: Violations of the Ohio Consumer Sales Practices Act Ohio Rev. Code § 1345.01 *et seq.* (On Behalf of the Ohio State Class) ............................................................................................................... 369

6

7

OHIO COUNT II: Violations of the Ohio Deceptive Trade Practices Act Ohio Rev. Code § 4165.01 *et seq.* (On Behalf of the Ohio State Class) ............................................................................................................... 373

8

9

OHIO COUNT III: Breach of Express Warranty Ohio. Rev. Code § 1302.26, *et seq.* / U.C.C. § 2-313 (On Behalf of the Ohio State Class) ............................................................................................................... 376

10

11

OHIO COUNT IV: Breach of Implied Warranty of Merchantability Ohio Rev. Code Ann. §§ 1302.27 and 1310.19 (On Behalf of the Ohio State Class) ...................................................................................................... 379

12

13

OKLAHOMA COUNT I: Violations of the Oklahoma Consumer Protection Act Okla. Stat. Tit. 15 § 751 *et seq.* (On Behalf of the Oklahoma State Class) ........................................................................... 380

14

15

OKLAHOMA COUNT II: Breach of Express Warranty Okla. Stat. Tit. 12 §§ 2-313 and 2A-210 (On Behalf of the Oklahoma State Class) ...................... 383

16

OKLAHOMA COUNT III: Breach of Implied Warranty of Merchantability Okla. Stat. Tit. 12A §§ 2-314 and 2A-212 (On Behalf of the Oklahoma State Class) ........................................................ 386

17

18

OREGON COUNT I: Violations of the Oregon Unlawful Trade Practices Act Or. Rev. Stat. § 646.605, *et seq.* (On Behalf of the Oregon State Class) ............................................................................................................... 387

19

20

OREGON COUNT II: Breach of Express Warranty Or. Rev. Stat. §§ 72.3130 and 72A.2100 (On Behalf of the Oregon State Class) .................... 390

21

22

OREGON COUNT III: Breach of Implied Warranty of Merchantability Or. Rev. Stat. §§ 72.3140 and 72A.2120 (On Behalf of the Oregon State Class) ............................................................................................................... 393

23

24

PENNSYLVANIA COUNT I: Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law 73 P.S. § 201-1 *et seq.* (On Behalf of the Pennsylvania State Class) ............................................................. 394

25

26

PENNSYLVANIA COUNT II: Breach of Express Warranty 13. Pa. Cons. Stat. §§ 2313 and 2A210 (On Behalf of the Pennsylvania State Class) ............................................................................................................... 397

27

28

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

PENNSYLVANIA COUNT III: Breach of Implied Warranty of
Merchantability 13. Pa. Cons. Stat. §§ 2314 and 2A212 (On Behalf

4

of the Pennsylvania State Class) ........................................................ 401

5

RHODE ISLAND COUNT I: Violations of the Rhode Island Deceptive
Trade Practices and Consumer Protection Law R.I. Gen. Laws § 6-

6

13.1 *et seq.* (On Behalf of the Rhode Island State Class) ................... 402

7

RHODE ISLAND COUNT II: Breach of Express Warranty 6A R.I. Gen.
Laws §§ 6A-2-313 and 6A-2.1-210 (On Behalf of the Rhode Island

8

State Class).......................................................................................... 405

9

RHODE ISLAND COUNT III: Breach of Implied Warranty of
Merchantability 6A R.I. Gen. Laws §§ 6A-2-314 and 6A-2.1-212

10

(On Behalf of the Rhode Island State Class) ....................................... 408

11

SOUTH CAROLINA COUNT I: Violations of the South Carolina Unfair
Trade Practices Act S.C. Code Ann. § 39-5-10 *et seq.* (On Behalf of

12

the South Carolina State Class)........................................................... 409

13

SOUTH CAROLINA COUNT II: Violations of the South Carolina
Regulation of Manufacturers, Distributors, & Dealers Act S.C.
Code Ann. § 56-15-10 *et seq.* (On Behalf of the South Carolina

14

State Class)........................................................................................... 412

15

SOUTH CAROLINA COUNT III: Breach of Express Warranty S.C. Code
§§ 36-2-313 and 36-2A-210 (On Behalf of the South Carolina State

16

Class)..................................................................................................... 413

17

SOUTH CAROLINA COUNT IV: Breach of Implied Warranty of
Merchantability S.C. Code §§ 36-2-314 and 36-2A-212 (On Behalf

18

of the South Carolina State Class) ....................................................... 417

19

SOUTH DAKOTA COUNT I: Violations of the South Dakota Deceptive
Trade Practices and Consumer Protection Law S.D. Codified Laws

20

§ 37-24-6 (On Behalf of the South Dakota State Class)...................... 418

21

SOUTH DAKOTA COUNT II: Breach of Express Warranty S.D. Codified
Laws §§ 57A-2-313 and 57-2A-210 (On Behalf of the South

22

Dakota State Class) ............................................................................. 421

23

SOUTH DAKOTA COUNT III: Breach of Implied Warranty of
Merchantability S.D. Codified Laws §§ 57A-2-314 and 57-2A-212

24

(On Behalf of the South Dakota State Class) ...................................... 424

25

TENNESSEE COUNT I: Violations of the Tennessee Consumer Protection
Act Tenn. Code Ann. § 47-18-101 *et seq.* (On Behalf of the

26

Tennessee State Class) ......................................................................... 425

27

TENNESSEE COUNT II: Breach of Express Warranty Tenn. Code Ann.
§§ 47-2-313 and 47-2A-210 (On Behalf of the Tennessee State

28

Class)..................................................................................................... 428

# TABLE OF CONTENTS
## (continued)

Page

TENNESSEE COUNT III: Breach of Implied Warranty of Merchantability Tenn. Code Ann. §§ 47-2-314 and 47-2A-212 (On Behalf of the Tennessee State Class) ........................................................................................ 431

TEXAS COUNT I: Violations of the Deceptive Trade Practices Act Tex. Bus. & Com. Code § 17.41 *et seq.* (On Behalf of the Texas State Class) ................................................................................................................. 432

TEXAS COUNT II: Breach of Express Warranty Tex. Bus. & Com. Code §§ 2.313 and 2A.210 (On Behalf of the Texas State Class) .............................. 436

TEXAS COUNT III: Breach of Implied Warranty of Merchantability Tex. Bus. & Com. Code §§ 2.314 and 2A.212 (On Behalf of the Texas State Class) ................................................................................................................. 439

UTAH COUNT I: Violations of the Utah Consumer Sales Practices Act Utah Code Ann. § 13-11-1 *et seq.* (On Behalf of the Utah State Class) ................................................................................................................. 440

UTAH COUNT II: Breach of Express Warranty Utah Code §§ 70A-2-313 and 70-2A-210 (On Behalf of the Utah State Class) ................................ 443

UTAH COUNT III: Breach of Implied Warranty of Merchantability Utah Code §§ 70A-2-314 and 70-2A-212 (On Behalf of the Utah State Class) ................................................................................................................. 446

VERMONT COUNT I: Violations of the Vermont Consumer Fraud Act Vt. Stat. Ann. Tit. 9, § 2451 *et seq.* (On Behalf of the Vermont State Class) ........................................................................................................ 447

VERMONT COUNT II: Vermont Lemon Law Vt. Stat. Tit. 9, § 4170 *et seq.* (On Behalf of the Vermont State Class) .............................................. 450

VERMONT COUNT III: Breach of Express Warranty Vt. Stat. Tit. 9, §§ 2-313 and 2A-210 (On Behalf of the Vermont State Class) ........................ 452

VERMONT COUNT IV: Breach of Implied Warranty of Merchantability Vt. Stat. Tit. 9, §§ 2-314 and 2A-212 (On Behalf of the Vermont State Class) ........................................................................................................ 455

VIRGINIA COUNT I: Violations of the Virginia Consumer Protection Act Va. Code Ann. § 59.1-196 *et seq.* (On Behalf of the Virginia State Class) ........................................................................................................ 456

VIRGINIA COUNT II: Breach of Express Warranty Va. Code §§ 8.2-313 and 8.2A-210 (On Behalf of the Virginia State Class) ...................................... 459

VIRGINIA COUNT III: Breach of Implied Warranty of Merchantability Va. Code §§ 8.2-314 and 8.2A-212 (On Behalf of the Virginia State Class) ........................................................................................................ 462

1

**TABLE OF CONTENTS**
(continued)

2

Page

3   WASHINGTON STATE COUNT I: Violations of the Washington
        Consumer Protection Act Wash. Rev. Code Ann. § 19.86.010 *et*
4       *seq.* (On Behalf of the Washington State Class).................................... 464

5   WASHINGTON STATE COUNT II: Washington Lemon Law Wash. Rev.
        Code § 19.118.005 *et seq.* (On Behalf of the Washington State
6       Class)........................................................................................................ 466

7   WASHINGTON STATE COUNT III: Breach of Express Warranty Wash
        Rev. Code §§ 62A.2-313 and 62A.2A-210 (On Behalf of the
8       Washington State Class) ...................................................................... 468

9   WASHINGTON STATE COUNT IV: Breach of Implied Warranty of
        Merchantability Wash Rev. Code §§ 62A.2-314 and 62A.2A-212
10      (On Behalf of the Washington State Class) ......................................... 471

11  WEST VIRGINIA COUNT I: Violations of the West Virginia Consumer
        Credit and Protection Act W. Va. Code § 46A-1-101 *et seq.* (On
12      Behalf of the West Virginia State Class) ............................................. 472

13  WEST VIRGINIA COUNT II: West Virginia Lemon Law W. Va. Code
        § 46A-6A-1 *et seq.* (On Behalf of the West Virginia State Class) .................... 476

14  WEST VIRGINIA COUNT III: Breach of Express Warranty W. Va. Code
        §§ 46-2-313 and 46-2A-210 (On Behalf of the West Virginia State
15      Class)........................................................................................................ 479

16  WEST VIRGINIA COUNT IV: Breach of Implied Warranty of
        Merchantability W. Va. Code §§ 46-2-314 and 46-2A-212 (On
17      Behalf of the West Virginia State Class) ............................................. 483

18  WISCONSIN COUNT I: Violations of the Wisconsin Deceptive Trade
        Practices Act Wis. Stat. § 100.18 *et seq.* (On Behalf of the
19      Wisconsin State Class)......................................................................... 484

20  WISCONSIN COUNT II: Breach of Express Warranty Wis. Stat.
        §§ 402.313 and 411.210 (On Behalf of the Wisconsin State Class).................. 487

21

22  WISCONSIN COUNT III: Breach of Implied Warranty of Merchantability
        Wis. Stat. §§ 402.314 and 411.212 (On Behalf of the Wisconsin
23      State Class).............................................................................................. 490

24  WYOMING COUNT I: Violations of the Wyoming Consumer Protection
        Act, Wyo. Stat. § 40-12-101, *et seq.* (On Behalf of the Wyoming
25      State Class).............................................................................................. 491

26  WYOMING COUNT II: Breach of Express Warranty Wyo. Stat. §§ 34.1-
        2-313 and 34.1-.2A-210 (On Behalf of the Wyoming State Class).................... 495

27

28  WYOMING COUNT III: Breach of Implied Warranty of Merchantability
        Wyo. Stat. §§ 34.1-2-314 and 34.1-.2A-212 (On Behalf of the
        Wyoming State Class)........................................................................... 498

AUDI CO$_2$ CONSOLIDATED
CLASS ACTION COMPLAINT
MDL 2672 CRB (JSC)

1

**TABLE OF CONTENTS**
(continued)

2

**Page**

3

X.      REQUEST FOR RELIEF ................................................................................. 499

4

XI.     DEMAND FOR JURY TRIAL........................................................................ 500

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.    INTRODUCTION

Plaintiffs Michael Beck, Ira Bernstein, Hector Castillo, Joseph Denney, Mark Dressel, Lyle Fairless, Michael Gray, Russell Green, Jonathan Hecker, Paul Joachimczyk, Connie Jones, Raghu Katta, Ira Margolis, Vinod Marur, Daniel Satterlee, Paul Sherry, Scott Snyder, Allen Taylor, Babu Thomas, Frank Edwin Thompson, Patricia Vance, and Geert Wenes individually and on behalf of all others similarly situated (the "Class"), allege the following against Audi AG, Audi of America, LLC (collectively, "Audi"), Volkswagen Group of America, Inc., Volkswagen AG (collectively, "Volkswagen"), Robert Bosch GmbH, and Robert Bosch LLC (collectively, "Bosch") (together with Audi and Volkswagen, "Defendants") based where applicable on personal knowledge, information and belief, and the investigation of counsel.

# II.    NATURE OF THE ACTION

1.      This action is a further development in a massive ongoing fraud perpetrated by Volkswagen and its Audi and Porsche subsidiaries. In September 2015, the Environmental Protection Agency ("EPA") announced that it had discovered a brazen scheme, in which these manufacturers used embedded software or firmware in their diesel vehicles—in regulatory parlance, a "defeat device"—to defeat emissions testing for certain pollutants (oxides of nitrogen, or "NOx"). In effect, these vehicles' emissions control systems functioned fully only while undergoing emissions testing, and spewed as much as 40 *times* the legal level of these pollutants during normal operation, meaning that the automakers' "Clean Diesel" advertisements of the affected vehicles were false. This allowed the 11 million cheating diesel vehicles that were sold worldwide to achieve better performance, greater fuel efficiency, and longer service intervals, but at the expense of a massive quantity of additional noxious pollution. Litigation in that case has so far yielded settlements and penalties totaling over $20 billion and a guilty plea on behalf of Volkswagen AG.

2.      Rather than engineer cars that actually complied with the emissions requirements and lived up to their "Clean" advertising, Volkswagen, Audi, and Porsche designed their diesel vehicles to cheat on the tests, and perpetrated a massive, worldwide fraud on consumers and government regulators alike. This complaint involves an extension of the same unethical and

1  deceptive business practices. When faced with a similar challenge—the EPA's fleet-wide

2  standards for the emission of carbon dioxide ("$CO_2$") in gasoline vehicles and the NHTSA's fleet-

3  wide fuel economy standards—Volkswagen and Audi once again took an unethical shortcut: they

4  engineered their larger vehicles to detect when they might be undergoing emissions testing, and to

5  operate the transmission differently under conditions consistent with testing from when they are

6  being driven normally. As a result, the vehicles are able to cheat on emissions tests by emitting

7  far less $CO_2$ and other greenhouse gases than it would under ordinary driving conditions.

8          3.      The NOx defeat device in the diesel vehicles and the $CO_2$ defeat device in the

9  gasoline vehicles use different methods to alter their emissions under testing conditions, but they

10  share several key aspects. Most notably, they use at least one of the same triggers to identify

11  testing conditions: the steering wheel. Emissions testing takes place on a dynamometer—

12  essentially a car-size treadmill—and so unlike in real-world driving, the steering wheel is never

13  turned. Thus, like the NOx defeat device in the diesel vehicles, turning the steering wheel after

14  starting up the car disengages the test-defeating low-power mode and engages the normal, higher-

15  polluting mode. The industry term for this is "cycle optimization"—that is, optimizing vehicle

16  functionality to pass test cycles, while operating differently during normal driving. This form of

17  cheating renders test results meaningless and advertising based on them false and misleading.

18          4.      This nationwide class action concerns the installation of "defeat devices" in

19  hundreds of thousands of Audi gasoline vehicles marketed and sold in the United States. The

20  "defeat device" circumvents emissions testing by keeping engine speed—and thus carbon dioxide

21  emissions—artificially low in conditions that only occur when the vehicles are undergoing

22  emissions testing. During normal operation, this program is deactivated, and the vehicles emit

23  carbon dioxide at significantly higher levels. The result is that Audi's vehicles sold in the United

24  States meet fleetwide $CO_2$ emissions requirements in name only: in reality, they emit much, much

25  more.

26          5.      This particular "defeat device" is present in at least some of Audi's gasoline-

27  powered vehicles, and likely in several other vehicles as well. Defendants represented to

28  consumers and regulators that these vehicles offered excellent performance in combination with

1    legal, clean emissions; in truth, those characteristics were mutually exclusive, at least in the Audi

2    fleet. While undergoing emissions testing, the vehicles sacrificed high performance to limit

3    emissions and improve fuel economy; while on the road, the vehicles may have performed as

4    advertised but emitted higher amounts of $CO_2$ and other pollutants and achieved much worse fuel

5    economy.

6         6.    Instead of delivering on their promises of high performance coupled with low or

7    compliant emissions, Defendants devised a way to make it appear that their cars did what they

8    said they would when, in fact, they did not. Put simply, Defendants lied to consumers and

9    regulators alike and continued to lie over a period of years.

10        7.    Defendants intentionally breached U.S. laws, EPA and CARB regulations and

11   California law by selling cars in the United States and California that purposefully evaded

12   applicable laws. As summarized by Cynthia Giles, Assistant Administrator for EPA's Office of

13   Enforcement and Compliance: "Using a defeat device in cars to evade clean air standards is

14   illegal and a threat to public health." Defendants also misled the buyers and lessees of their

15   vehicles by advertising them as environmentally friendly, and by failing to disclose that the

16   vehicles were only able to be sold in the United States at all because they cheated on emissions

17   tests.

18        8.    The story of Volkswagen's 2015 NOx defeat device scandal is now well-known in

19   the public arena: Volkswagen and its subsidiaries installed software that used signals such as

20   whether the steering wheel was being turned to recognize when diesel vehicles were undergoing

21   emissions testing, causing the vehicles' NOx emissions control systems to operate at compliant

22   levels *only* during testing. Under normal operating conditions, these emissions control systems

23   were deactivated or operated at lower levels, resulting in increased performance and fuel

24   efficiency but vastly increased NOx levels. In the autumn of 2015, the Environmental Protection

25   Agency ("EPA") and the California Air Resources Board ("CARB") issued Notices of Violation

26   for these Volkswagen defeat devices, and both private and government litigation ensued.

27        9.    On November 5, 2016, German newspaper *Bild am Sonntag* reported that CARB

28   had discovered another defeat device, this time on several Audi models equipped with a certain 8-

speed automatic transmission. Like the defeat devices used in the diesel vehicles, this device uses engine and transmission management software and the car's sensors to detect when the vehicle is undergoing emissions testing, and then operates vehicle systems to reduce carbon dioxide emissions to legal levels only during test cycles.

10.     According to the *Bild am Sonntag* report, the device works as follows: when the affected vehicles are turned on, they activate a "warm-up" mode. In that mode, the engine management computer instructs the automatic transmission to change gears at unusually low engine speeds (commonly measured in revolutions per minute or RPM), keeping engine speed low and thus burning less fuel and emitting lower amounts of carbon dioxide. However, this mode remains active only until the steering wheel is turned 15 degrees or more, at which point the engine management computer switches the transmission into normal mode, wherein the transmission shifts at normal, higher RPM, offering higher performance, lower fuel economy, and significantly greater carbon dioxide emissions.

11.     Thus, during emissions testing, which typically takes place on a dynamometer, the car remains in "warm-up" mode indefinitely, because the steering wheel is not turned. Meanwhile, in normal driving conditions, any turn requires the steering wheel to be rotated more than 15 degrees, and the car switches to its normal shifting program.

12.     *Bild am Sonntag* further reports that Audi documents confirm this scheme. In February 2013, during testing of Audi vehicles, Audi's then-head of powertrain development, Axel Eiser, asked when the "cycle-optimized shift program" would be ready, and suggested that the emissions-cheating shift program be configured so that it "runs at 100% on the roller, but only .01% with the customer." ████████████████████████████████████████[1]

13.     The transmission used in this scheme is ZF's 8HP55 eight-speed automatic, referred to by Audi as AL551-8Q. These transmissions are equipped on numerous Audi vehicles, including, on information and belief, certain model years of the A6, A7, A8, and Q5 models. The transmission may also be equipped on additional models, and the list of vehicles equipped with

---

[1] ███████████████████████████

1    this transmission that also use the above-described defeat device software may grow or change as

2    the investigations proceed.

3         14.    The gasoline-powered vehicles equipped with the newly-discovered defeat device

4    software targeting carbon dioxide are the subject of this lawsuit, and are referred to hereinafter as

5    the "Class Vehicles," and include the following vehicles with 3.0-liter or larger engines:

6

7

8

| Model | Model Year |
|---|---|
| Audi A6 | 2012-2016 |
| Audi A7 | 2012-2016 |
| Audi A8 and A8L | 2012-2016 |
| Audi Q5 | 2013-2016 |

9

10        15.    Due to Defendants' fraud, there are now at least 100,000 vehicles on the road with

11   illegal emissions systems. These vehicles were issued EPA Certificates of Conformity ("COCs"),

12   or CARB Executive Orders ("EOs"), which are legally required for vehicle sale in the United

13   States, and were, because of the existence of the defeat device, illegally obtained. Had Plaintiffs

14   known that the COCs and EOs were obtained through fraud, they would not have purchased these

15   vehicles. Plaintiffs now own illegal, polluting vehicles and have suffered economic damages

16   because the vehicles are not as advertised, and no recall could fix the emissions problem without

17   affecting the reliability, durability, fuel efficiency and/or driving dynamics of the cars. Plaintiffs

18   are further damaged because the fuel efficiency was falsely reported. Thus, to the extent these

19   vehicles can be retrofitted to comply with federal and state emissions requirements, Class

20   members will suffer diminution in value and economic loss.

21        16.    The environment has suffered as well. In 2008, the first study connecting increased

22   $CO_2$ emissions to deaths was conducted at Stanford University. This preliminary study found a

23   cause and effect relationship between the two, concluding that upward of 20,000 air-pollution-

24   related deaths per year per degree Celsius may be due to this greenhouse gas. 2016 studies

25   confirm that $CO_2$ can be lethal in extreme doses. Indeed, increased $CO_2$ is one of the major causes

26   of global warming. Its effect on California's climate alone is severe. According to the U.S. Global

27   Change Research Program, warming in California's Central Valley caused by carbon emissions is

28   projected to significantly reduce the yields of tomatoes, wheat, rice, maize and sunflowers in that

region. For this reason, increases in $CO_2$ emissions have immediate and deleterious effects on the environment. Plaintiffs purchasing the Class Vehicles did not know that they were consuming more fuel under ordinary driving conditions, which necessarily means more $CO_2$ emissions. Plaintiffs also unknowingly emitted more NOx and carbon monoxide when driving the Class Vehicles on the road than the levels reported by emission testing and advertised by Audi.

17.    Because of Defendants' actions, the Class Vehicles that were sold to Plaintiffs and the Class are not what Volkswagen and Audi promised. During normal operation, these vehicles pollute the atmosphere with much higher levels of pollutants and greenhouse gases than the artificially-manipulated test results disclose, or than are permitted by federal and state environmental protection laws. Meanwhile, when the engine and transmission are operated in a manner that actually limits pollution as certified and advertised, the vehicles cannot also deliver the performance that Volkswagen and Audi advertise.

18.    Defendants' actions substantially increased pollution and decreased the current and resale value of these vehicles.

19.    Plaintiffs bring this action against the Defendants for violations of the federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 *et seq.* ("RICO")) and Magnuson-Moss Warranty Act (15 U.S.C. § 2301 *et seq.* ("MMWA")), and the warranty and consumer protection laws of all 50 states and the District of Columbia, seeking monetary damages and injunctive relief. Plaintiffs and Class members are entitled to a significant award of punitive or exemplary damages because Defendants deliberately, and with malice, deceived Plaintiffs and Class members for a period of years.

### III.    PARTIES

#### A.    Plaintiffs

20.    For ease of reference, the following chart identifies the representative Plaintiffs and the state(s) in which they reside and purchased their Class Vehicles:

| Class Representative | State of Residence | State of Purchase | Model Year | Make/Model |
|---|---|---|---|---|
| Beck, Michael | NY | NY | 2013 | Audi A7 |
| Bernstein, Ira | NY | NY | 2014 | Audi A8 |

| Class Representative | State of Residence | State of Purchase | Model Year | Make/Model |
|---|---|---|---|---|
| Castillo, Hector | CA | CA | 2013 | Audi A6 |
| Denney, Joseph | VA | VA | 2012 | Audi A6 |
| Dressel, Mark | WI | MN | 2014 | Audi A8 |
| Fairless, Lyle | WV | WV | 2013 | Audi A8 |
| Gray, Michael | MD | VA | 2016 | Audi Q5 |
| Green, Russell | CA | CA | 2016 | Audi Q5 |
| Hecker, Jonathan | CA | CA | 2013 | Audi A6 |
| Joachimczyk, Paul | FL | WI | 2013 | Audi A8 |
| Jones, Connie | MO | MO | 2013 | Audi A6 |
| Katta, Raghu | NJ | NJ | 2015 | Audi Q5 |
| Margolis, Ira | MI | MI | 2014 | Audi A8 |
| Marur, Vinod | CA | CA | 2013 | Audi A8 |
| Satterlee, Daniel | ID | ID | 2013 | Audi A8L |
| Sherry, Paul | MA | MA | 2014 | Audi A6 |
| Snyder, Scott | AZ | CA | 2012 | Audi A6 |
| Taylor, Allen | FL | FL | 2013 | Audi A6 |
| Thomas, Babu | FL | FL | 2014 | Audi A8 |
| Thompson, Frank Edwin | CA | CA | 2014 | Audi Q5 |
| Vance, Patricia | CO | CO | 2013 | Audi A6 |
| Wenes, Geert | NM | NM | 2013 | Audi Q5 |

21.     Plaintiff **Michael Beck** (for the purpose of this paragraph, "Plaintiff"), a citizen of New York, residing in Selden, New York, bought a 2013 Audi A7 (for the purpose this paragraph, the "Class Vehicle") on or about April 28, 2013 at Audi of Smithtown, in Smithtown, New York.  Plaintiff decided to buy the Class Vehicle based in part on Audi's representations regarding the vehicle's emissions, fuel economy, and/or performance.  At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting $CO_2$ at levels that are greater than represented.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and/or unauthorized emission control devices.  Plaintiff has suffered a

1   concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

2   purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

3   unauthorized emission control devices.

4       22.     Plaintiff **Ira Bernstein** (for the purpose of this paragraph, "Plaintiff"), a citizen of

5   New York, residing in West Nyack, New York bought a 2014 Audi A8 (for the purpose this

6   paragraph, the "Class Vehicle") on or about November 26, 2013 at Palisades Audi, in Nyack,

7   New York.  Plaintiff decided to buy the Class Vehicle based in part on Audi's representations

8   regarding the vehicle's emissions, fuel economy, and/or performance.  At the time of purchase,

9   Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting $CO_2$ at

10  levels that are greater than represented.  Nor was Plaintiff aware that his Class Vehicle was

11  equipped with undisclosed and/or unauthorized emission control devices.  Plaintiff has suffered a

12  concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

13  purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

14  unauthorized emission control devices.

15      23.     Plaintiff **Hector Castillo** (for the purpose of this paragraph, "Plaintiff"), a citizen

16  of California, residing in Santa Maria, California, bought a 2013 Audi A6 (for the purpose this

17  paragraph, the "Class Vehicle") on or about August 21, 2016 at Capitol Volkswagen, in San Jose,

18  California.  Plaintiff decided to buy the Class Vehicle based in part on Audi's representations

19  regarding the vehicle's emissions, fuel economy, and/or performance.  At the time of purchase,

20  Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting $CO_2$ at

21  levels that are greater than represented.  Nor was Plaintiff aware that his Class Vehicle was

22  equipped with undisclosed and/or unauthorized emission control devices.  Plaintiff has suffered a

23  concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

24  purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

25  unauthorized emission control devices.

26      24.     Plaintiff **Joseph Denney** (for the purpose of this paragraph, "Plaintiff"), a citizen

27  of Virginia, residing in Dumfries, Virginia, bought a 2012 Audi A6 (for the purpose this

28  paragraph, the "Class Vehicle") on or about June 4, 2015 at Honda of Chantilly, in Chantilly,

Virginia.  Plaintiff decided to buy the Class Vehicle based in part on Audi's representations regarding the vehicle's emissions, fuel economy, and/or performance.  At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting CO2 at levels that are greater than represented.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and/or unauthorized emission control devices.  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

25.     Plaintiff **Mark Dressel** (for the purpose of this paragraph, "Plaintiff"), a citizen of Wisconsin, residing in Hudson, Wisconsin, bought a 2014 Audi A8 (for the purpose this paragraph, the "Class Vehicle") on or about April 3, 2016 at Audi St. Paul, in Maplewood, Minnesota.  Plaintiff decided to buy the Class Vehicle based in part on Audi's representations regarding the vehicle's emissions, fuel economy, and/or performance.  At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting $CO_2$ at levels that are greater than represented.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and/or unauthorized emission control devices.  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

26.     Plaintiff **Lyle Fairless** (for the purpose of this paragraph, "Plaintiff"), a citizen of West Virginia, residing in Charleston, West Virginia, bought a 2013 Audi A8 (for the purpose this paragraph, the "Class Vehicle") on or about September 2, 2015 at Moses Factory Outlet, in Hurricane, West Virginia.   Plaintiff decided to buy the Class Vehicle based in part on Audi's representations regarding the vehicle's emissions, fuel economy, and/or performance.  At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting $CO_2$ at levels that are greater than represented.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed and/or unauthorized emission control devices.  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and

1    would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not

2    concealed the unauthorized emission control devices.

3         27.     Plaintiff **Michael Gray** (for the purpose of this paragraph, "Plaintiff"), a citizen of

4    Maryland, residing in White Plains, Maryland, bought a 2016 Audi Q5 (for the purpose this

5    paragraph, the "Class Vehicle") on or about February 27, 2016, at Audi Tysons Corner, in

6    Vienna, Virginia.   Plaintiff decided to buy the Class Vehicle based in part on Audi's

7    representations regarding the vehicle's emissions, fuel economy, and/or performance.  At the time

8    of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

9    emitting $CO2$ at levels that are greater than represented.  Nor was Plaintiff aware that his Class

10   Vehicle was equipped with undisclosed and/or unauthorized emission control devices.  Plaintiff

11   has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and

12   would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not

13   concealed the unauthorized emission control devices.

14        28.     Plaintiff **Russell Green** (for the purpose of this paragraph, "Plaintiff"), a citizen of

15   California, residing in Crescent City, California, leased a 2016 Audi Q5 (for the purpose this

16   paragraph, the "Class Vehicle") on or about September 25, 2016 at DCH Audi Oxnard, in

17   Oxnard, California.  Plaintiff decided to lease the Class Vehicle based in part on Audi's

18   representations regarding the vehicle's emissions, fuel economy, and/or performance.  At the time

19   of lease, Plaintiff did not know that the Class Vehicle could perform as advertised only by

20   emitting $CO2$ at levels that are greater than represented.  Nor was Plaintiff aware that his Class

21   Vehicle was equipped with undisclosed and/or unauthorized emission control devices.  Plaintiff

22   has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and

23   would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not

24   concealed the unauthorized emission control devices.

25        29.     Plaintiff **Jonathan Hecker** (for the purpose of this paragraph, "Plaintiff"), a

26   citizen of California, residing in Agoura Hills, California, bought a 2013 Audi A6 (for the

27   purpose this paragraph, the "Class Vehicle") on or about October 15, 2012 at Rusnak/Westlake

28   Audi, in Westlake Village, California.  Plaintiff decided to buy the Class Vehicle based in part on

1    Audi's representations regarding the vehicle's emissions, fuel economy, and/or performance.  At

2    the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised

3    only by emitting CO2 at levels that are greater than represented.  Nor was Plaintiff aware that his

4    Class Vehicle was equipped with undisclosed and/or unauthorized emission control devices.

5    Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

6    misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

7    Defendants not concealed the unauthorized emission control devices.

8        30.    Plaintiff **Paul Joachimczyk** (for the purpose of this paragraph, "Plaintiff"), a

9    citizen of Florida, residing in Port Orange, Florida, bought a 2013 Audi A8 (for the purpose this

10   paragraph, the "Class Vehicle") in or about May 2013 from International Auto Group's Audi

11   Milwaukee dealership in Milwaukee, WI.  Plaintiff decided to buy the Class Vehicle based in part

12   on Audi's representations regarding the vehicle's emissions, fuel economy, and/or performance.

13   At the time of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised

14   only by emitting $CO_2$ at levels that are greater than represented.  Nor was Plaintiff aware that his

15   Class Vehicle was equipped with undisclosed and/or unauthorized emission control devices.

16   Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

17   misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

18   Defendants not concealed the unauthorized emission control devices.

19       31.    Plaintiff **Connie Jones** (for the purpose of this paragraph, "Plaintiff"), a citizen of

20   Missouri, residing in Sedalia, Missouri, bought a 2013 Audi A6 (for the purpose this paragraph,

21   the "Class Vehicle") on or about June 5, 2013 at Kansas City Audi, in Kansas City, Missouri.

22   Plaintiff decided to buy the Class Vehicle based in part on Audi's representations regarding the

23   vehicle's emissions, fuel economy, and/or performance.  At the time of purchase, Plaintiff did not

24   know that the Class Vehicle could perform as advertised only by emitting CO2 at levels that are

25   greater than represented.  Nor was Plaintiff aware that her Class Vehicle was equipped with

26   undisclosed and/or unauthorized emission control devices.  Plaintiff has suffered a concrete injury

27   as a direct and proximate result of Defendants' misconduct, and would not have purchased the

28

1   Class Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized

2   emission control devices.

3          32.      Plaintiff **Raghu Katta** (for the purpose of this paragraph, "Plaintiff"), a citizen of

4   New Jersey, residing in Little Ferry, New Jersey, purchased a 2015 Audi Q5 (for the purpose this

5   paragraph, the "Class Vehicle") on or about November 12, 2015 at Town Audi, in Englewood,

6   New Jersey.   Plaintiff decided to purchase the Class Vehicle based in part on Audi's

7   representations regarding the vehicle's emissions, fuel economy, and/or performance.  At the time

8   of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

9   emitting CO2 at levels that are greater than represented.  Nor was Plaintiff aware that his Class

10  Vehicle was equipped with undisclosed and/or unauthorized emission control devices.  Plaintiff

11  has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and

12  would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not

13  concealed the unauthorized emission control devices.

14         33.      Plaintiff **Ira Margolis** (for the purpose of this paragraph, "Plaintiff"), a citizen of

15  Michigan, residing in Bingham Farms, Michigan, bought a 2014 Audi A8 (for the purpose this

16  paragraph, the "Class Vehicle") on or about October 12, 2015 at Auto Source Wholesale in Troy,

17  Michigan.  Plaintiff decided to buy the Class Vehicle based in part on Audi's representations

18  regarding the vehicle's emissions, fuel economy, and/or performance.  At the time of purchase,

19  Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting CO2 at

20  levels that are greater than represented.  Nor was Plaintiff aware that his Class Vehicle was

21  equipped with undisclosed and/or unauthorized emission control devices.  Plaintiff has suffered a

22  concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

23  purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

24  unauthorized emission control devices.

25         34.      Plaintiff **Vinod Marur** (for the purpose of this paragraph, "Plaintiff"), a citizen of

26  California, residing in Palo Alto, California, bought a 2013 Audi A8 (for the purpose this

27  paragraph, the "Class Vehicle") on or about May 23, 2013 at cartelligent.com in San Jose,

28  California.   Plaintiff decided to buy the Class Vehicle based in part on Audi's representations

1    regarding the vehicle's emissions, fuel economy, and/or performance.  At the time of purchase,

2    Plaintiff did not know that the Class Vehicle could perform as advertised only by emitting CO2 at

3    levels that are greater than represented.  Nor was Plaintiff aware that his Class Vehicle was

4    equipped with undisclosed and/or unauthorized emission control devices.  Plaintiff has suffered a

5    concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

6    purchased the Class Vehicle, or would have paid less for it, had Defendants not concealed the

7    unauthorized emission control devices.

8         35.    Plaintiff **Daniel Satterlee** (for the purpose of this paragraph, "Plaintiff"), a citizen

9    of Idaho, residing in Meridian, Idaho, bought a 2013 Audi A8L (for the purpose this paragraph,

10   the "Class Vehicle") on or about November 17, 2016 at Audi Boise, in Boise, Idaho.  Plaintiff

11   decided to buy the Class Vehicle based in part on Audi's representations regarding the vehicle's

12   emissions, fuel economy, and/or performance.  At the time of purchase, Plaintiff did not know

13   that the Class Vehicle could perform as advertised only by emitting CO2 at levels that are greater

14   than represented.  Nor was Plaintiff aware that his Class Vehicle was equipped with undisclosed

15   and/or unauthorized emission control devices.  Plaintiff has suffered a concrete injury as a direct

16   and proximate result of Defendants' misconduct, and would not have purchased the Class

17   Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission

18   control devices.

19        36.    Plaintiff **Paul Sherry** (for the purpose of this paragraph, "Plaintiff"), a citizen of

20   Massachusetts, residing in Swampscott, Massachusetts, bought a 2014 Audi A6 (for the purpose

21   this paragraph, the "Class Vehicle") on or about October 12, 2015 at Audi Brookline, a Herb

22   Chambers Company, in Brookline, Massachusetts.  Plaintiff decided to buy the Class Vehicle

23   based in part on Audi's representations regarding the vehicle's emissions, fuel economy, and/or

24   performance.  At the time of purchase, Plaintiff did not know that the Class Vehicle could

25   perform as advertised only by emitting CO2 at levels that are greater than represented.  Nor was

26   Plaintiff aware that his Class Vehicle was equipped with undisclosed and/or unauthorized

27   emission control devices.  Plaintiff has suffered a concrete injury as a direct and proximate result

28

1    of Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

2    less for it, had Defendants not concealed the unauthorized emission control devices.

3          37.    Plaintiff **Scott Snyder** (for the purpose of this paragraph, "Plaintiff"), a citizen of

4    Arizona, residing in Paradise Valley, Arizona, leased a 2012 Audi A6 (for the purpose this

5    paragraph, the "Class Vehicle") on or about July 25, 2012 at Walter's Automotive in Riverside,

6    California.  Plaintiff decided to lease then eventually purchase the Class Vehicle based in part on

7    Audi's representations regarding the vehicle's emissions, fuel economy, and/or performance.  At

8    the time of lease and purchase, Plaintiff did not know that the Class Vehicle could perform as

9    advertised only by emitting $CO_2$ at levels that are greater than represented.  Nor was Plaintiff

10   aware that his Class Vehicle was equipped with undisclosed and/or unauthorized emission control

11   devices.  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

12   misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had

13   Defendants not concealed the unauthorized emission control devices.

14         38.    Plaintiff **Allen Taylor** (for the purpose of this paragraph, "Plaintiff"), a citizen of

15   Florida, residing in Punta Gorda, Florida, bought a 2013 Audi A6 (for the purpose this paragraph,

16   the "Class Vehicle") on or about February 13, 2013 at Jaguar Land Rover Audi of Fort Myers, in

17   Fort Myers, Florida.  Plaintiff decided to buy the Class Vehicle based in part on Audi's

18   representations regarding the vehicle's emissions, fuel economy, and/or performance.  At the time

19   of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

20   emitting $CO_2$ at levels that are greater than represented.  Nor was Plaintiff aware that his Class

21   Vehicle was equipped with undisclosed and/or unauthorized emission control devices.  Plaintiff

22   has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and

23   would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not

24   concealed the unauthorized emission control devices.

25         39.    Plaintiff **Babu Thomas** (for the purpose of this paragraph, "Plaintiff"), a citizen of

26   Florida, residing in Port St. Lucie, Florida, purchased a 2014 Audi A8 (for the purpose this

27   paragraph, the "Class Vehicle") on or about November 14, 2013 at Audi Melbourne, in

28   Melbourne, Florida.   Plaintiff decided to purchase the Class Vehicle based in part on Audi's

1    representations regarding the vehicle's emissions, fuel economy, and/or performance.  At the time

2    of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

3    emitting CO2 at levels that are greater than represented.  Nor was Plaintiff aware that his Class

4    Vehicle was equipped with undisclosed and/or unauthorized emission control devices.  Plaintiff

5    has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and

6    would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not

7    concealed the unauthorized emission control devices.

8           40.    Plaintiff **Frank Edwin Thompson** (for the purpose of this paragraph, "Plaintiff"),

9    a citizen of California, residing in Oakland, California, bought a 2014 Audi Q5 (for the purpose

10   this paragraph, the "Class Vehicle") on or about December 29, 2013 at Audi of Oakland, in

11   Oakland, California.  Plaintiff decided to buy the Class Vehicle based in part on Audi's

12   representations regarding the vehicle's emissions, fuel economy, and/or performance.  At the time

13   of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

14   emitting CO2 at levels that are greater than represented.  Nor was Plaintiff aware that his Class

15   Vehicle was equipped with undisclosed and/or unauthorized emission control devices.  Plaintiff

16   has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and

17   would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not

18   concealed the unauthorized emission control devices.

19          41.    Plaintiff **Patricia Vance** (for the purpose of this paragraph, "Plaintiff"), a citizen

20   of Colorado, residing in Alamosa, Colorado, bought a 2013 Audi A6 (for the purpose this

21   paragraph, the "Class Vehicle") on or about March 13, 2013 at Phil Long Audi, in Colorado

22   Springs, Colorado.  Plaintiff decided to buy the Class Vehicle based in part on Audi's

23   representations regarding the vehicle's emissions, fuel economy, and/or performance.  At the time

24   of purchase, Plaintiff did not know that the Class Vehicle could perform as advertised only by

25   emitting CO2 at levels that are greater than represented.  Nor was Plaintiff aware that her Class

26   Vehicle was equipped with undisclosed and/or unauthorized emission control devices.  Plaintiff

27   has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and

28

1   would not have purchased the Class Vehicle, or would have paid less for it, had Defendants not

2   concealed the unauthorized emission control devices.

3          42.     Plaintiff **Geert Wenes** (for the purpose of this paragraph, "Plaintiff"), a citizen of

4   New Mexico, residing in Santa Fe, New Mexico, bought a 2013 Audi Q5 (for the purpose this

5   paragraph, the "Class Vehicle") on or about April 3, 2013 at Audi/Mercedes-Benz/Porsche of

6   Albuquerque, in Albuquerque, New Mexico.  Plaintiff decided to buy the Class Vehicle based in

7   part on Audi's representations regarding the vehicle's emissions, fuel economy, and/or

8   performance.  At the time of purchase, Plaintiff did not know that the Class Vehicle could

9   perform as advertised only by emitting CO2 at levels that are greater than represented.  Nor was

10  Plaintiff aware that his Class Vehicle was equipped with undisclosed and/or unauthorized

11  emission control devices.  Plaintiff has suffered a concrete injury as a direct and proximate result

12  of Defendants' misconduct, and would not have purchased the Class Vehicle, or would have paid

13  less for it, had Defendants not concealed the unauthorized emission control devices.

14  **B.     Defendants**

15         43.     **Audi AG** ("Audi AG") is a German corporation with its principal place of

16  business in Ingolstadt, Germany.  Audi AG is the parent of Audi of America, LLC and a

17  subsidiary of the Audi Group, which is a wholly-owned subsidiary of VW AG.  Audi AG

18  designs, develops, manufacturers, and sells luxury automobiles.  According to Audi AG, the Audi

19  Group sold 1.74 million cars worldwide in 2014, with sales revenues in 2014 totaling €53.8

20  billion (approximately $58.5 billion).  Audi AG's operating profit in fiscal year 2014 was €5.15

21  billion (approximately $5.63 billion).

22         44.     Audi AG engineered, designed, developed, manufactured and installed the defeat

23  device software on the Class Vehicles and exported these vehicles with the knowledge and

24  understanding that they would be sold throughout the United States.  Audi AG also developed,

25  reviewed, and approved the marketing and advertising campaigns designed to sell the Class

26  Vehicles.

27         45.     **Audi of America, LLC** ("Audi America") is a Delaware limited liability company

28  with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia

20171.  Audi America is a wholly-owned U.S. subsidiary of Audi AG, and it engages in business, including the advertising, marketing and sale of Audi automobiles, in all 50 states.

46.     **Volkswagen AG** ("VW AG") is a German corporation with its principal place of business in Wolfsburg, Germany.  VW AG is one of the largest automobile manufacturers in the world, and is in the business of designing, developing, manufacturing, and selling automobiles. VW AG is the parent corporation of VW America and Audi AG.  According to VW AG, it sold 10.14 million cars worldwide in 2014 – including 6.12 million VW-branded cars, 1.74 million Audi-Branded cars.  Combined with other brands, VW AG boasts a 12.9% share of the worldwide passenger car market.  VW AG's sales revenue in 2014 totaled €202 billion (approximately $221 billion) and sales revenue in 2013 totaled €197 billion (approximately $215 billion).  At €12.7 billion (approximately $13.9 billion), VW AG generated its highest ever operating profit in fiscal year 2014, beating the previous record set in 2013 by €1.0 billion (approximately $1.1 billion).

47.     VW AG engineered, designed, developed, manufactured, and installed the defeat device software on the Class Vehicles and exported these vehicles with the knowledge and understanding that they would be sold throughout the United States.  On information and belief, VW AG also developed, reviewed, and approved the marketing and advertising campaigns designed to sell the Class Vehicles.

48.     **Volkswagen Group of America, Inc.** ("VW America") is a New Jersey corporation with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171.  VW America is a wholly-owned subsidiary of Volkswagen AG, and it engages in business, including the advertising, marketing and sale of Volkswagen automobiles, in all 50 states.  In 2014 alone, VW America sold 552,729 vehicles from its 1,018 dealer locations in all 50 states.

49.     **Robert Bosch GmbH** ("Bosch GmbH") is a German multinational engineering and electronics company headquartered in Gerlingen, Germany.  Bosch GmbH is the parent company of Robert Bosch LLC.  Bosch GmbH, directly and/or through its North-American subsidiary Robert Bosch LLC, at all material times, designed, manufactured, developed, tailored,

1   reviewed, approved, and supplied elements of the defeat device to Volkswagen and Audi for use

2   in the Class Vehicles.  Bosch GmbH is subject to the personal jurisdiction of this Court because it

3   has availed itself of the laws of the United States through its management and control over Bosch,

4   LLC, and over the design, development, manufacture, distribution, testing, and sale of hundreds

5   of thousands of the defeat devices installed in the Class Vehicles sold or leased in the U.S.

6       50.    **Robert Bosch LLC** ("Bosch LLC") is a Delaware limited liability company with

7   its principal place of business located at 38000 Hills Tech Drive, Farmington Hills, Michigan

8   48331.  Bosch LLC is a wholly-owned subsidiary of Bosch GmbH, which wholly owns and

9   controls Bosch LLC.  At all material times, Bosch LLC, directly and/or in conjunction with its

10  parent Bosch GmbH, designed, manufactured, developed, tailored, reviewed, approved, and

11  supplied elements of the defeat device to Volkswagen and Audi for use in the Class Vehicles.

12      51.    Both Bosch GmbH and Bosch LLC (together, "Bosch") operate under the

13  umbrella of the Bosch Group, which encompasses some 340 subsidiaries and companies.  The

14  Bosch Group is divided into four business sectors:  Mobility Solutions (formerly Automotive

15  Technology), Industrial Technology, Consumer Goods, and Energy and Building Technology.

16  Bosch's sectors and divisions are grouped not by location, but by subject matter. The Mobility

17  Solutions sector, which supplies parts to the automotive industry, is particularly at issue here and

18  includes the relevant individuals at both Bosch GmbH and Bosch LLC.  Regardless of whether an

19  individual works for Bosch in Germany or the U.S., the individual holds him or herself out as

20  working for Bosch.  This collective identity is captured by Bosch's mission statement:  "We are

21  Bosch," a unifying principle that links each entity and person within the Bosch Group.[2]

22      52.    From at least 2005 to 2015, Robert Bosch GmbH, Robert Bosch LLC and

23  currently unnamed Bosch employees were knowing and active participants in the creation,

24  development, marketing, and sale of illegal defeat devices specifically designed to evade U.S.

25  emissions requirements in vehicles sold in the United States. Bosch engaged in developing the

26  defeat device that was used in Audi, Volkswagen, Porsche, and Mercedes vehicles to evade

27

---

28  [2] Bosch 2014 Annual Report: "Experiencing quality of life," available at
    http://www.bosch.com/en/com/bosch_group/bosch_figures/publications/archive/archive-
    cg12.php.

AUDI CO$_2$ CONSOLIDATED
CLASS ACTION COMPLAINT
MDL 2672 CRB (JSC)

1   United States emissions standards. Bosch participated not just in the development of the defeat

2   device, but in the scheme to prevent U.S. regulators from uncovering the device's true

3   functionality. Moreover, Bosch's participation was not limited to engineering the defeat device.

4   Rather, Bosch marketed "Clean Diesel" in the United States and lobbied U.S. regulators to

5   approve "Clean Diesel," another highly unusual activity for a mere supplier. Bosch was a

6   knowing and active participant in a massive, decade-long conspiracy with Audi, and others to

7   defraud U.S. consumers and regulators.

8   **C.**      **Non-Party Participants**

9         53.      **Zahnradfabrik Friedrichshafen Aktiengesellschaft** ("ZF AG" or "ZF

10   Friedrichshafen") is a German auto part manufacturer specializing in research, development, and

11   engineering for the automotive industry. ZF AG developed the transmission in the Class Vehicles

12   to be driven in "low rev" mode, which was used to cheat on emissions testing programs. Audi

13   refers to this transmission as the AL551; ZF AG refers to it as the 8HP-55AF. This transmission

14   was used on both the tiptronic and biturbo gasoline vehicles, which were controlled by the $CO_2$

15   defeat device software to shift earlier, which consequently affected the vehicle's fuel

16   consumption and carbon emissions. ZF  AG has also worked closely with Robert Bosch GmbH,

17   and held 50% of ZF Lenksysteme GmbH in a joint venture with Robert Bosch GmbH.  Bosch

18   GmbH acquired ZF AG's share of ZF Lenksysteme GmbH on January 30, 2015, which is now

19   known as Robert Bosch Automotive Steering GmbH.

20         54.      **ZF North America, Inc.** ("ZF America") was established in 1979 in Northville,

21   Michigan and operates as a subsidiary of ZF. ZF AG boasts that "North America has become one

22   of ZF's most important markets; since 2009 alone, ZF has more than tripled its sales in North

23   America."[3]

24         55.      ZF AG and ZF America are collectively referred to herein as "ZF."

25         56.      **IAV GmbH** is a privately held engineering company that is headquartered in

26   Berlin, Germany, and is the parent corporation of IAV-Automotive Engineering, Inc.  The

27

28   [3] *ZF in North America a Long Tradition*,
      https://www.zf.com/corporate/en_de/magazine/magazin_artikel_viewpage_22069481.html.

1  company specializes in powertrain, electronic, and vehicle development, and has at least three

2  offices and one subsidiary in the United States.  Defendants Audi, Bosch, and Volkswagen are

3  clients of IAV GmbH, and Volkswagen AG holds a 50% ownership share of IAV GmbH.[4]

4       57.    **IAV Automotive Engineering, Inc.** ("IAV-AE") is a Michigan corporation with

5  its principal place of business in Northville, Michigan. IAV-AE is a United States subsidiary of

6  IAV GmbH. Defendants Audi, Bosch, and Volkswagen are clients of IAV-AE.

7       58.    IAV GmbH and IAV-AE are collectively referred to herein as "IAV."

8       59.    **Continental AG** ("Continental") is a manufacturing company specializing in

9  automotive parts headquartered in Hanover, Germany. Continental manufactures numerous

10  automotive parts including tires, powertrain and chassis components, electronics, and brake

11  systems. It also owns several corporate subsidiaries, including Continental Automotive Systems,

12  US, Inc. ("CAS"), which and operates the American arm of Continental's automotive electronics

13  and powertrain business and is headquartered in Auburn Hills, Michigan. Continental also

14  develops and supplies engine management systems and other automotive electronics through its

15  VDO brand, which it acquired from Siemens AG in 2007. Certain Class Vehicles use Continental

16  or VDO engine management systems.

17              **IV.    JURISDICTION AND VENUE**

18       60.    This Court has jurisdiction over this action pursuant to the Class Action Fairness

19  Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship

20  from one Defendant, there are more than 100 Class members, and the aggregate amount in

21  controversy exceeds $5 million, exclusive of interest and costs. Subject-matter jurisdiction also

22  arises under 28 U.S.C. § 1331 based upon the federal RICO claims asserted under 18 U.S.C.

23  § 1961, *et seq*. and the Magnuson-Moss Warranty Act claims asserted under 15 U.S.C. § 2301, *et*

24  *seq.*  The Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§ 1965(b) and

25  (d), and Cal. Code Civ. P. § 410.10, and supplemental jurisdiction over the state-law claims

26  pursuant to 28 U.S.C. § 1367.

27

28  _____

[4] The other entities that own IAV GmbH and their respective shares are as follows: Continental Automotive GmbH (20%), Freudenberg & Co. KG (10%), Schaeffler Technologies AG & Co. KG (10%), and SABIC Innovative Plastics B.C. (10%).

1       61.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial

2  part of the events and/or omissions giving rise to the claims occurred in this District, and because

3  Defendants have caused harm to Class members residing in this District. Defendants have

4  marketed, advertised, sold and leased the Class Vehicles from Audi dealers located in this

5  District.  Several named Plaintiffs and proposed Class representatives, as well as tens of

6  thousands of Class members, purchased their Class Vehicles from the multiple Audi dealers

7  located in this District.  Further, CARB maintains a significant presence in this District through

8  its Bay Area Air Quality Management District branch.  CARB played an important initial role in

9  investigating and, ultimately, in revealing Volkswagen's illegal use of the defeat devices.

## V.    INTRADISTRICT ASSIGNMENT

11       62.    This action is properly assigned to the San Francisco Division of this District

12  pursuant to N.D. Cal. L.R. 3-2, because a substantial part of the events or omissions giving rise to

13  Plaintiffs' claims arose in the counties served by the San Francisco Division.  Several named

14  Plaintiffs and proposed Class representatives, as well as thousands of Class members, purchased

15  and maintain their Class Vehicles in the counties served by this Division.  Moreover, Volkswagen

16  and Audi conduct substantial business in the counties served by this Division, has marketed,

17  advertised, sold and leased the Class Vehicles in those counties, and has caused harm to Class

18  members residing in those counties. Finally, this Consolidated Consumer Class Action Complaint

19  is being filed as an original action in this District and as the Consolidated Consumer Class Action

20  in the MDL No. 2672 proceedings, which have been consolidated before Judge Charles R.

21  Breyer, presiding in the San Francisco Division of this District.

## VI.    FACTS COMMON TO ALL COUNTS

23       63.    This case concerns defeat devices in certain Audi gasoline vehicles that were used

24  to evade emissions requirements. This device is referred to herein as the "$CO_2$ defeat device" to

25  distinguish it from the "NOx defeat device" that was the subject of the "Dieselgate" scandal,

26  although it does more than just limit $CO_2$ emissions. The commonalities between the $CO_2$ defeat

27  device and Volkswagen's well-known diesel NOx defeat device are unmistakable. The primary

28  trigger for the $CO_2$ defeat device—a sensor for steering wheel rotation angle—is very similar to,

1   if not the same as, one of the calibrations used in the NOx defeat device. The $CO_2$ defeat device is

2   cut from the same cloth as the NOx device, shares the same origins, and was created and

3   developed by many of the same actors. It reflects the same results-driven, unethical corporate

4   culture and the same disregard for consumers, regulators, and the environment.

### A.      The Defendants' Defeat Device Scheme

6          64.     The story of the Volkswagen and Audi defeat devices begins at Audi in the late

7   1990s. As the New York Attorney General has alleged, in 1999, Audi engineers developing a 3.0-

8   liter diesel engine for Audi models to be sold in Europe solved a noise problem by injecting

9   additional fuel into the engine on ignition. But as a result, the engine could not meet European

10  emissions standards during testing. To solve this problem, Audi tasked Bosch with developing

11  software that could recognize when the car was being tested and deactivate the fuel injection

12  function during testing, then reactivate it during normal driving conditions. Because the defeat

13  device software was related to the goal of reducing engine noise, it became known in German as

14  the "Akustikfunktion."

15         65.     In 2000, the EPA announced stricter emission standards requiring all diesel models

16  starting in 2007 to produce drastically less NOx than years prior. $NO_X$ is a generic term for the

17  mono-nitrogen oxides produced during combustion. $NO_X$ is produced by the burning of all fossil

18  fuels, but is particularly difficult to control from the burning of diesel fuel. $NO_X$ is a toxic

19  pollutant, which produces smog and a litany of environmental and health problems.

20         66.     These strict emission standards posed a serious challenge to Volkswagen's

21  engineers and a major impediment to Volkswagen's goal to expand its market share in the U.S.

22  by introducing economical and "clean" diesel cars. In fact, during a 2007 demonstration in San

23  Francisco, engine R&D chief Wolfgang Hatz lamented presciently that "[Volkswagen] can do

24  quite a bit and we will do a bit, but 'impossible' we cannot do. . . . From my point of view, the

25  CARB is not realistic . . . I see it as nearly impossible for [Volkswagen]."[5]

26  _____

[5] Danny Hakim, *et al.*, *VW Executive Had a Pivotal Role as Car Maker Struggled With*
27  *Emissions*, N.Y. Times (Dec. 21, 2015),
    http://www.nytimes.com/2015/12/22/business/international/vw-executive-had-a-pivotal-role-as-
28  car-maker-struggled-with-emissions.html?mtrref=undefined&gwh=7E46E42F7CCC3D
    687AEC40DFB2CFA8BA&gwt=pay.

67.    Volkswagen also needed to overcome the stigmas associated with diesel vehicles. Foremost among these was the consumer perception that diesel engines emit toxic smoke full of noxious pollutants. Volkswagen claimed to have solved all the environmental problems with its new engines, which it aggressively marketed as the clean, green alternative to hybrid engines, such as those in the Toyota Prius. Behind the scenes, however, Volkswagen realized that it was impossible to roll out these so-called "clean" diesel vehicles within its self-imposed budgets and engineering constraints.

68.    Volkswagen engineers had to find a solution to the "impossible" problem of passing stricter emission standards while maintaining performance and fuel efficiency, all while hamstrung by cost-cutting measures. When it became clear that the 2.0-liter TDI engine being developed for the U.S. market could not meet U.S. emission regulations, and initial emission testing failed, the launch of the Jetta TDI "clean" diesel, initially scheduled for 2007, had to be delayed.[6] The prospect of failure was unacceptable, so Volkswagen decided to cheat instead. Starting in the mid-2000s, Volkswagen engineers, working with Bosch—as detailed further below—and with the knowledge of management, adapted Audi's "Akustikfunktion" concept to the 2.0-liter and 3.0-liter diesel engines for Volkswagen, Audi, and Porsche models to be sold in the U.S. It has been reported that the decision to cheat the EPA, CARB, and countless other regulators worldwide was an "open secret" in Volkswagen's engine development department,[7] as it was necessary for the "engine to pass U.S. diesel emissions limits within the budget and time frame allotted."[8] The resulting defeat device was incorporated into the software required to operate the 2.0-liter and 3.0-liter TDI engines sold in the U.S.

69.    At least twenty Bosch engineers worked on the code for a new Engine Control Unit ("ECU") that could accommodate sophisticated defeat device software. By 2004, Bosch and

---

[6] *VW delays Jetta TDI diesel into the US*, Clean MPG (last visited Feb. 8, 2016), http://www.cleanmpg.com/community/index.php?threads/7254/.

[7] Georgina Prodham, *Volkswagen probe finds manipulation was open secret in department*, Reuters (Jan. 23, 2016), http://www.reuters.com/article/us-volkswagen-emissions-investigation-idUSKCN0V02E7.

[8] Jay Ramey, *VW chairman Poetsch: Company 'tolerated breaches of rules'*, Autoweek (Dec. 10, 2015), http://autoweek.com/article/vw-diesel-scandal/vw-chairman-poetsch-company-tolerated-breaches-rules.

1    Volkswagen had entered into preliminary agreements for further development of this ECU. At a

2    November 20, 2006, meeting, Volkswagen reportedly decided to use a defeat device to "pass"

3    new emission certification standards for oxides of nitrogen that would soon go into effect in the

4    United States.

5         70.    The new ECU was called the EDC17. Bosch introduced the "New Bosch EDC17

6    engine management system" on February 26, 2008 as the "brain of diesel injection," which

7    "controls every parameter that is important for effective, low-emission combustion." The EDC17

8    offered "[e]ffective control of combustion" and a "[c]oncept tailored for all vehicle classes and

9    markets." In the press release, Bosch touted the EDC17 as follows:

10       **EDC17: Ready for future demands**

11           Because the computing power and functional scope of the new
             EDC17 can be adapted to match particular requirements, it can be
12           used very flexibly in any vehicle segment on all the world's
             markets. In addition to controlling the precise timing and quantity
13           of injection, exhaust gas recirculation, and manifold pressure
             regulation, it also offers a large number of options such as the
14           control of particulate filters or systems for reducing nitrogen
             oxides. The Bosch EDC17 determines the injection parameters for
15           each cylinder, making specific adaptations if necessary. This
             improves the precision of injection throughout the vehicle's entire
16           service life. The system therefore makes an important contribution
             to observing future exhaust gas emission limits.[9]

17

18       71.    This sophisticated, programmable system, integrated with numerous sensors

19   throughout the car, enabled developers to integrate various operation modes based on sensor

20   inputs. These modes, if an unethical carmaker so desired, could be used to detect parameters

21   consistent with emissions testing, and defeat the tests by changing the functionality of the car's

22   systems to pass the tests, while operating differently during normal operations. For example,

23   when undergoing test cycles, the ECU could change the functionality of emissions systems (such

24   as regeneration of catalysts, or injection of exhaust aftertreatment fluid) to ensure that emissions

25   levels stayed low enough to pass the test, potentially at the cost of lessened performance or

26   worsened fuel economy that would be unacceptable or undesirable in normal operation. In normal

27

28   [9] *See* Feb. 28, 2006 Bosch press release, "The brain of diesel injection: New Bosch EDC17
     engine management system,"
     http://www.boschpresse.de/presseforum/details.htm?txtID=2603&locale=en.

operation, the car would operate in a mode that maximized performance or fuel economy, or lengthened service intervals by simply not injecting exhaust aftertreatment fluid, at the cost of significantly increased pollution. This, of course, is exactly what Volkswagen, Audi, and Porsche did with NOx in their diesel vehicles. In particular, one of the variables consistent with test cycles but not with normal operation was steering wheel angle: in a laboratory test, the steering wheel is not turned, while in normal driving, of course, the wheel is frequently turned. The signal from the steering wheel could thus be used as a trigger to switch between two different modes: one for emissions tests and one for normal driving.

72.     Bosch's ECU technology provided the means to satisfy Volkswagen and its subsidiaries' ambition to bring fuel-efficient diesel cars that consumers would actually want to drive to the United States, but without having to engineer cars that actually complied with the EPA's stringent emissions standards for NOx. The EDC17 and the development of its defeat device software were integral to Volkswagen's diesel strategy. This could not have been accomplished without years of collaborative work with Bosch.

73.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[10]████████████████████ Shortly after the cheating scandal became public, Volkswagen suspended Hackenberg, and he later resigned.[11]

74.     Bosch made clear that the EDC17 was not one-size-fits-all part. Instead, it was a "[c]oncept tailored for all vehicle classes and markets" that could "be adapted to match particular requirements [and] … be used very flexibly in any vehicle segment on all the world's markets."

---

[10] ██████████████████████

[11] Jack Ewing, Audi Executive Resigns After Suspension over VW Emissions Scandal, NY. Times (Dec. 4, 2015), https://www.nytimes.com/2015/12/05/business/international/ulrich-hackenberg-suspended-over-volkswagen-emissions-scandal-resigns.html.

1  The EDC17 was tailored and adapted for each carmaker who used it by modifying the

2  sophisticated software embedded within the ECU, including Volkswagen and Audi.

3        75.    Bosch, Volkswagen, and Audi therefore worked together closely to modify the

4  software and to create specifications for each vehicle model. Customizing a road-ready ECU is an

5  intensive three- to five-year endeavor involving a full-time Bosch presence at an automaker's

6  facility. Bosch and its customers work so closely that Bosch purposefully locates its component

7  part manufacturing facilities close to its carmaker customers' manufacturing plants and embeds

8  personnel within its customers' organizations.

9        76.

10

11

12

13

14

15 [12]

16       77.

17

18

19

20

21

22

23 [13]

24

25

26 [12]

27

28 [13]

78. ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████

**B.     The Audi CO$_2$ Defeat Device**

79.     Discovery from the Defendants specific to the CO$_2$ defeat device in the gasoline

vehicles at issue here has not yet occurred, but the information garnered from Plaintiffs' ongoing

investigation, expert testing, and information found in public sources, including those documents

made public during the *In re Clean Diesel Litigation* suggest that another defeat device scheme

was implemented in Audi gasoline vehicles.

**1.     Development of the CO$_2$ Defeat Device**

80.     As discussed above, Audi conceptualized the original "Akustikfunktion" defeat

device and worked with Bosch and Volkswagen as they refined an NOx defeat device for use in

diesel vehicles. But the cheating did not end there. The defeat device scheme was not limited to

diesel vehicles, and the Defendants continued to work together to confront new engineering

challenges through cheating and deception.

81.     Fleetwide CO$_2$ standards affecting MY 2012-2015 vehicles were implemented in

2011. EPA and NHTSA established fleetwide standards for both CO$_2$ emissions and average fuel

economy. The EPA set CO$_2$ emissions standards for light-duty vehicles under section 202(a) of

the Clean Air Act. By model year 2016, the EPA standards required light-duty vehicles to meet

an estimated combined average emissions level of 250 grams/mile of CO$_2$. NHTSA set CAFE

fleet fuel economy standards for passenger cars and light trucks under 49 U.S.C. § 32902.

NHTSA's standards required manufacturers of those vehicles to meet an estimated combined

average fuel economy level of 34.1 mpg by model year 2016. The standards for both agencies

1   begin with the 2012 model year, with standards increasing in stringency through model year

2   2016.[14] New, even more stringent $CO_2$ standards went into effect for model year 2017.[15]

3           82.     Defendants knew that to sell the Class Vehicles in the United States, the vehicles

4   had to meet the relevant standards.

5           83.     The Clean Air Act prohibits "defeat devices," defined as any auxiliary emission

6   control device "that reduces the effectiveness of the emission control system under conditions

7   which may reasonably be expected to be encountered in normal vehicle operation and use."

8   40 C.F.R. § 86.1803-01; *see also* 40 C.F.R. § 86.1809-10 ("No new light-duty vehicle, light-duty

9   truck, medium-duty passenger vehicle, or complete heavy-duty vehicle shall be equipped with a

10  defeat device."). Moreover, the CAA prohibits the sale of components used as defeat devices

11  "where the person knows or should know that such part or component is being offered for sale or

12  installed for such use or put to such use." 42 U.S.C. § 7522(a)(3). Finally, in order to obtain a

13  COC, automakers must submit an application that lists all auxiliary emission control devices

14  installed in the vehicle, a justification for each, and an explanation of why the control device is

15  not a defeat device.

16          84.     Revelations about the $CO_2$ defeat device are still unfolding, but it is clear that Audi

17  began its deception by 2013 at the latest. In 1990, Rupert Stadler joined Audi AG, assuming

18  various roles at Audi and Volkswagen as he ascended the ranks within the Volkswagen Group.

19  On January 1, 2010, he was appointed CEO of Audi AG, which he remains to present day. As the

20  CEO of Audi AG, Stadler was tasked with implementing lofty growth goals, as well as

21  overseeing the development of the "clean" diesel engines in Audi vehicles. Stadler's growth goals

22  included sales of Audi gasoline sales in the United States.

23          85.     Audi was aware that emissions and fuel consumption are decisive factors for

24  customers making vehicle purchase decisions. To that end, Audi began to mislead consumers by

25  representing its vehicles as consuming less fuel and emitting less $CO_2$ and other pollutants than

26  they actually do in normal driving conditions.

27  ─────────────────────────
    [14] https://www.gpo.gov/fdsys/pkg/FR-2010-05-07/pdf/2010-8159.pdf, p.8.

28  [15] http://www.eesi.org/papers/view/fact-sheet-vehicle-efficiency-and-emissions-standards#1

86.    Audi was able to disguise this deception by programming its vehicles with the ability to engage different modes, one of which used significantly less fuel and emitted significantly less pollutants, but also delivered significantly less power. This low power mode, also known as the "low $CO_2$" program, works by causing the Class Vehicles to shift gears early to maintain artificially low engine speed (typically measured in revolutions per minute, or RPM) and emissions. Audi deceptively dubbed this the "warm-up" strategy, a mode that activates when the Class Vehicles are started. As long as the "warm-up" function remains activated, the automatic transmission remains in a "switching program" that produces a low engine speed, consumes less fuel, and produces less $CO_2$ and other pollutants.

87.    In February 2013, Audi tested its cars in the "SummerFahrt," or Summer Drive, in South Africa. The final report reflected that the shift quality and issues at the start were noticeable. It was in this report that Audi engineer Axel Eiser made his now-notorious comment that the cycle-optimized "shifting program" was to be set to operate 100% when being tested, and be noticeable only .01% of the time when driven normally.[16]

88.    ███████████████████████████████████████████
████████████[17]

89.    The defeat device software is embedded in the Transmission Control Module ("TCM"). The TCM's primary function is to establish shift logic by reacting to signals from sensors monitoring coolant temperature, exhaust temperature, ignition timing, crankshaft and camshaft positioning, fuel mixture and air flow volumes. The TCM and engine control unit ("ECU") work in tandem to execute the actual cheat function. The engineers embedded the cheat software in the TCM unit, intentionally making its detection less probable.

90.    Audi engineers figured out how to activate this low fuel, low emissions, low power "warm-up" mode during emissions tests. They discovered that only time the Class Vehicles would run continuously with no steering wheel input would be when the vehicles were

---

[16] Kayhan Oezgenc and Jan C. Wehmeyer, "This is How the Manufacturer Cheated on $CO_2$," *Bild am Sonntag* (November 5, 2016) http://www.bild.de/bild-plus/auto/auto-news/audi/so-schummelte-der-hersteller-bei-co-48621300.bild.html.

[17] ████████████████████████

undergoing examination in a lab, on a dynamometer. When sensors detect these lab conditions, the vehicles' TCM set "shift points"—the engine speeds at which the transmission shifts up to the next gear—that allow the vehicles to produce compliant emission results under those conditions (known by Audi as the "dyno calibration" mode). Thus, on a dynamometer, where the steering wheel is never turned, the defeat device enables the Class Vehicles to operate in this low power mode.

91.     At *all other times*—that is, when the Class Vehicles are actually driving under normal conditions—the transmission computer switches to "road calibration" mode, which offers full power to the driver, and which results in increased fuel consumption and greater emissions. Indeed, the road calibration mode activates once the driver turns the steering wheel 15 degrees, something that happens almost immediately under nearly all normal driving conditions.

92.     This defeat device scheme allowed Defendants to deceptively misrepresent the Class Vehicles' fuel consumption and emissions to governmental authorities and to the public. A vehicle's advertised fuel economy, which is listed on the "Monroney sticker," or window sticker, is determined by driving a vehicle over five standardized driving patterns (or drive cycles), all of which are performed in a laboratory on a dynamometer where the conditions for all tests can be controlled. These driving cycles include cold starts, hot starts, highway driving, aggressive and high speed driving, driving with the air conditioner in use under conditions similar to a hot day in the summer in Los Angeles and driving in cold temperatures. Data from the five drive cycles are combined and adjusted for "real world" conditions to represent "City" driving and "Highway" driving. The "combined" fuel economy is the average of the City and Highway values with weights of 55% and 45% respectively. These adjusted and combined values appear on the vehicle's Monroney sticker.

93.     During each of the drive cycles—all of which are performed in a lab, under the Class Vehicles' low power, low emissions, low fuel consumption mode—the amount of each pollutant is measured. This includes un-combusted or partially combusted gasoline (hydrocarbons or HC), carbon monoxide (CO), and carbon dioxide ($CO_2$). The amount of carbon produced is then converted to the amount of gasoline which was required to produce the carbon in the

1  exhaust. The amount of gasoline used during the tests is divided into the distance driven on the

2  test to calculate the fuel economy.

3       94.    Based on this equation, as the amount of $CO_2$ produced increases, the gasoline

4  used increases and the fuel economy decreases. Therefore, if a Class Vehicle produced less $CO_2$

5  during laboratory testing, but higher $CO_2$ when driven on road, the vehicle would have better

6  estimated fuel economy represented on the Monroney sticker than the vehicle would actually

7  achieve on the road.

8       95.    That is exactly what happened here. The defeat device program equips the Class

9  Vehicles with two modes. The "dyno calibration" mode reduces fuel supply and limits

10  revolutions per minute ("RPMs") per gear, resulting in reduced performance but also reducing

11  fuel consumption and lowering emissions. This mode was engaged during all of the laboratory

12  testing used to calculate the Class Vehicles' purported fuel economy. In contrast, the "road

13  calibration" allows the engine to turn higher RPMs in each gear, and provides the necessary (and

14  much higher) fuel supply required to deliver advertised torque and performance. This is the mode

15  engaged during normal driving.

16       96.    Audi installed the defeat device in the vehicles equipped with a certain 8-speed

17  automatic transmission through May 2016.[18] The AL 551 transmission is supplied by ZF

18  Friedrichshafen, commonly known as ZF. The gasoline vehicles that Audi equipped with the AL

19  551—and, therefore, with the defeat device—include, but may not be limited to, the Audi A6, A7,

20  A8, and Q5 models.[19]

21       97.    There is no reasonable question that Audi knew what it was doing. Audi

22  commissioned its own study, in fact, which found that a vehicles' fuel consumption on the road

23  increased by 8.5 percent after the wheel was turned.

24

25  _____

[18] Bertel Schmitt, "CARB Finds New Audi Defeat Device, German Newspaper Digs Up Smoking
26  Gun Document," *Forbes* (November 6, 2016)
     https://www.forbes.com/sites/bertelschmitt/2016/11/06/carb-finds-new-audi-defeat-device-
27  german-paper-digs-up-smoking-gun-document/#58bd6d634d84.
     [19] *New Accusation of Cheating Against Audi*, Handelsblatt (November 13, 2016)
28  http://www.handelsblatt.com/unternehmen/industrie/manipulation-der-co2-werte-
     neueschummelvorwuerfe-gegen-audi/14835360.html.

1    98.    

2

3

4

5

6

7

8

9

10

11

12

13    99.

14

15

16

17

18

19

20

21

22

23

24

25

26    100.    Thus, having made the decision to use shift points to improve fuel economy and

27    comply with fleetwide $CO_2$ emissions standards to be allowed to sell cars in the United States at

28    all, Audi found that the resulting driving experience was unacceptable in light of its advertised

emphasis on performance, and so it opted to conceal the low-power mode from the consumer and make it active, in effect, only when the vehicles were undergoing emissions testing—when the steering wheel is not turned. Audi executives were aware of the risk that consumers would complain about the discrepancy between advertised fuel economy achieved during certification testing and what they would experience in the real world but nonetheless elected to conceal the "low-power" mode from consumers and regulators alike.

101.    ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

### 2.    The Discovery of the $CO_2$ Defeat Device

102.    In late 2015 or early 2016, German authorities—namely, the German Motor Transportation Authority ("KBA")—detected irregularities and increased $CO_2$ emissions in Audi vehicles and questioned Audi about these results. Reports indicate that Audi lied to the KBA, however, telling them that their vehicles would not contain software allowing them to detect dynamometer testing and alter the vehicles' performance as a result. Audi instead pointed to a number of factors that could have distorted the measurement results.[20]

103.    The Audi $CO_2$ defeat device was first publicly disclosed on November 5, 2016.[21] According to reports, "Certain Audi models have been able to distinguish whether they are on a roller stand or on the road using the so-called steering angle detection. If the steering wheel is not moved after the start, a shift program activates itself in automatic gearboxes…if the driver turns the steering wheel, this 'warm-up strategy' is deactivated. The vehicle then runs with a different

---

[20] Carsten Rehder, "Examiners Measure Excessive CO2-Values for Many Car Models," *Bild*, (November 13, 2016) http://www.bild.de/geld/aktuelles/wirtschaft/pruefer-messen-bei-vielen-automodellen-ueberhoehte-48744426.bild.html; "Ministry of Transportation Examines Accusations Against Audi," *Handelsblatt* (November 7, 2016), http://www.handelsblatt.com/politik/deutschland/abgaswertemanipulation-verkehrsministerium-prueft-vorwuerfe-gegen-audi/14804236.html
[21] "CARB Finds New Audi Defect Device, German Paper Digs Up Smoking Gun Document," *Forbes*, (November 6, 2016), http://www.forbes.com/sites/bertelschmitt/2016/11/06/carb-finds-new-audi-defeat-device-german-paper-digs-up-smoking-gun-document/#40762ecf1ce8

1    shifting program that uses more fuel and $CO_2$."[22] This allows vehicles to operate at higher

2    revolutions per minute such that the vehicle has more power and acceleration, but consumes

3    more fuel and emits more carbon dioxide on the road than testing revealed.

4           104.    Based on these revelations, German authorities renewed their investigations.[23]

5           105.    Audi executives were on notice of the potential for $CO_2$ emissions manipulation

6    well before the Audi $CO_2$ defeat device was publicized. Following the public revelation of the

7    NOx defeat device in the "Clean Diesel" vehicles in September 2015 by CARB and EPA, another

8    investigation began to unfold, this one relating to $CO_2$. In November 2015, new Volkswagen

9    CEO Matthias Müller announced that internal investigations had identified irregularities in $CO_2$

10   levels, and that around 800,000 Group vehicles could be affected.[24] Volkswagen did not

11   specifically identify the vehicles, but stated in relevant part: "…during the course of internal

12   investigations irregularities were found when determining type approval $CO_2$ levels. Based on

13   present knowledge around 800,000 vehicles from the Volkswagen Group could be affected. An

14   initial estimate puts the economic risks at approximately two billion euros. The Board of

15   Management of AG will immediately start a dialogue with the responsible type approval agencies

16   regarding the consequences of these findings."

17          106.    In December 2015, in a statement to investors, Mueller changed course, reporting

18   that VW had in fact made a mistake and that there was no such scandal.[25] Volkswagen announced

19   that "[t]he suspicion that fuel consumption figures of current production vehicles had been

20   unlawfully changed was not confirmed…***These cars can be offered for sale by dealers without***

21   ***any reservations***."[26]

22

23

---

24   [22] "New allegations against Audi in exhaust affair," *Bild*, (November 11, 2016).

25   [23] Kayhan Oezgenc and Jan C. Wehmeyer, "This is How the Manufacturer Cheated on $CO_2$," *Bild am Sonntag* (November 5, 2016) http://www.bild.de/bild-plus/auto/auto-news/audi/so-schummelte-der-hersteller-bei-co-48621300.bild.html.

26   [24] "Volkswagen Press Release, "Clarification moving forward: internal investigations at Volkswagen identify irregularities in $CO_2$ levels." November 3, 2015.

27   [25] https://www.youtube.com/watch?v=h9Q9vIzJrVQ.

28   [26] https://www.cnet.com/roadshow/news/volkswagen-drops-carbon-dioxide-issue-uncovers-no-illegal-wrongdoing/ (Emphasis added).

AUDI $CO_2$ CONSOLIDATED
CLASS ACTION COMPLAINT
MDL 2672 CRB (JSC)

107.    More than half a year later, European officials questioned Volkswagen about carbon emissions.[27] Even then, Defendants continued to deny a problem. At no point in time did Defendants inform the public or Class members that they had obtained the COCs and EOs through the use of a $CO_2$ defeat device, or that its emissions and fuel efficiency representations for the Class Vehicles were false.

108.    Internal documents dating back to 2013 at Audi and Volkswagen indicate executives' awareness and concern about the $CO_2$ defeat device—including the fact that the software constituted a defeat device—and the risk of regulatory investigations.

109.    ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████

110.    ████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████

111.    ████████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████

[27] http://www.wsj.com/articles/eu-still-questions-volkswagen-data-on-co2-emissions-documents-show-1464863775

1 ██████████████████████████████████████████████████████

2 ████████████████████████████████████

3      112.   ███████████████████████████████████████████

4 ████████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████

6 ███████████████████████████████████████████████████

7 █████████████████████████████████████████████████

8 ███████████████████████████████████████████████████

9 ████████████████████████████████████████████████████████

10 ██████████████████████████████████████

11      113.    Additional evidence indicates that Volkswagen's now-former CEO, Martin

12 Winterkorn, knew about the defeat device scheme. Volkswagen's former supervisory board chief,

13 Ferdinand Piech, stated that Winterkorn knew about the diesel defeat device "well before the

14 scandal broke." According to Piech, he asked Winterkorn about the matter, and Winterkorn

15 assured him that U.S. authorities were not looking into whether the Company manipulated

16 software to cheat emissions testing. Prosecutors in Germany, however, are investigating

17 Winterkorn for fraud, believing he had sufficient knowledge of the scheme.[28] Winterkorn's rise

18 within the Volkswagen group neatly bookends the defeat device scheme as a whole: he was the

19 CEO of Volkswagen when the NOx scandal broke in 2015; in 1999, when the "Akustikfunktion"

20 scheme was in its infancy at Audi, Winterkorn was Audi's CEO.

21      114.    Following the revelations regarding the $CO_2$ defeat device, Audi reportedly

22 suspended several unidentified "responsible engineers." However, Axel Eiser remains Head of

23 Powertrain Development of the Volkswagen Group. Volkswagen has even relied on Eiser to

24 interface with regulators. When Volkswagen presented to the European Parliament's Committee

25 of Inquiry into Emissions Measurements in the Automotive Sector relating to the NOX defeat

26 device, Eiser was among those questioned.[29]

27 _____

[28] https://www.thelocal.de/20170203/did-volkswagens-ceo-know-about-emissions-cheating-all-along

28 [29] http://www.forbes.com/sites/bertelschmitt/2016/11/06/carb-finds-new-audi-defeat-device-

**3.** **Test Results Confirm the Existence of the $CO_2$ Defeat Device**

115.    Plaintiffs' counsel have retained experts to conduct testing of the Class Vehicles. This testing confirms the existence and functionality of the defeat device.

116.    Testing was conducted to determine whether there was a difference in fuel economy for certain class vehicles when tested using the federal certification tests, with and without turning the vehicle wheels more than 15 degrees prior to testing. The test was designed to determine if the vehicle was designed to have different shift schedules if the vehicle computer believed it was being tested versus being operated on the road. The shift schedule in the default mode—that is, without turning the steering wheel—would have lower average RPM, resulting in lower emission rates and higher fuel economy.

117.    "Early shifting" may result in reduced performance. However, performance is not a criteria during the certification test—only emissions and fuel economy are. Because vehicles emissions levels are determined during certification on a dynamometer, the vehicle is not steered, as opposed to on-road operation where the vehicle must be steered. Thus, a steering wheel sensor could report to the vehicle that it was likely operating in laboratory conditions. This is how Volkswagen diesel vehicles could "know" to operate in a mode which had lower emissions while sacrificing vehicle performance when the vehicle was being tested.

118.    More specifically, the vehicle computers could be programmed to notice if the steering wheels were turned more than 15 degrees left or right, and the vehicle was therefore not being tested. This defeat strategy would result in higher performance on the road at the cost of higher emission rates of pollutants into the environment.

119.    To determine if a similar strategy was employed with the Class Vehicles, Plaintiffs' experts conducted tests using standard certification test procedures for vehicle preparation. The tests focused on determining if there was a difference in shift schedule that caused the vehicle to operate at a lower average RPM resulting in an increase in fuel economy in default mode and a higher average RPM and lower fuel economy in possible defeat mode (after the wheels were turned). Setting the shift points to change from a lower gear to a higher gear

german-paper-digs-up-smoking-gun-document/#40762ecf1ce8

1372049.6                          - 37 -                  AUDI $CO_2$ CONSOLIDATED CLASS ACTION COMPLAINT MDL 2672 CRB (JSC)

1    sooner (that is, at a lower speed or load) in one mode would cause the engine to operate at a lower

2    average RPM, achieving higher fuel economy at the cost of reduced power and torque. The tests

3    with and without turning the wheel were performed by the same driver, and both tests had

4    virtually identical average speeds.

5          120.    Test results showed that in certain class vehicles, fuel economy was higher with no

6    wheel movement before testing than in testing that followed moving the steering wheel fully to

7    the right and left after engine start and just prior to the drive cycle starting, indicating that steering

8    input triggers a switch between modes. The difference in fuel economy was as high as nine

9    percent between the two modes. Average engine speed, measured in RPM, was significantly

10   lower in default mode—without turning the wheel—than in the potential defeat mode—after

11   turning the wheel—just as reported by German media. Both the decrease in fuel economy and the

12   increase in RPM when the vehicle was operated in the potential defeat mode appear to indicate

13   that the vehicle computer is commanding the use of a different shift strategy after the vehicle

14   wheels have been manipulated, which indicates the use of a defeat device.

15         121.    Plaintiffs' experts tested a Class Vehicle equipped with an 8-speed ZF automatic

16   transmission. They conducted a full certification test using the Federal Test Procedure ("FTP75"),

17   the Highway Fuel Economy Test ("HWFET"), and the "US06" test cycle. The test protocol used

18   standard certification test procedures, such as using the approved fuel formulation for certification

19   tests, documenting vehicle conditioning, driving a pre-test cycle, and storing the vehicle overnight

20   at approximately 75 degrees Fahrenheit. The vehicle was tested under certification conditions

21   without turning the steering wheel before the test cycle. The vehicle was then reset for testing

22   (refueled, stored overnight, etc.) and the same set of tests performed again, this time after turning

23   the steering wheel left and right just after engine start and before conducting the drive cycle.

24   Emissions as well as engine RPM were measured during the test cycles.

25         122.    The results show the existence of a defeat device that increases fuel economy

26   (reducing carbon dioxide production) when the steering wheel is not turned, and that it does so by

27   instructing the transmission to shift at lower engine speed, operating at a lower average RPM. On

28   the FTP75 test, when the steering wheel was not turned—a situation that would only ever occur

1    during laboratory testing, never during ordinary driving—average engine RPM was about 15%

2    lower, fuel economy was about 9% higher, and carbon monoxide, carbon dioxide, and NOx

3    emissions were all substantially lower than when the wheel was turned. Respectively, these

4    pollutant levels were 76.3%, 9.7%, and 162% lower when the wheel was not turned and the

5    "defeat device" mode was therefore engaged.

6           123.    Some class vehicles were also "reflashed" with a software update as part of an

7    emissions recall that received regulatory approval on September 16, 2016. This recall, which

8    Audi referred to as "24CO," applied to certain 2012-2016 Audi vehicles with 3.0-liter gasoline

9    engines—including Class Vehicles. The update was described in the recall notice as resolving a

10   software issue wherein the catalytic converter OBD diagnostic thresholds has been set "too

11   tightly", causing the malfunction indicator (MIL) light to come on even though the catalytic

12   converter was working properly.

13          124.    A number of "reflashed" class vehicles were tested on an emissions chassis

14   dynamometer and on public roads. The test procedure was consistent with the test procedure used

15   for class vehicles that did not have the approved software "reflash": the steering wheels were

16   either held straight prior to test, or turned at least 15 degrees prior to test.

17          125.    Plaintiffs' Experts also conducted on-road testing on several 3.0L class vehicles

18   using portable emissions measurement systems ("PEMS").  One PEMS test was carried out on a

19   straight and level road, using a control feature to ensure consistent vehicle acceleration from 0

20   MPH to 50 MPH (the cruise control is enabled at 20 MPH). Vehicle speed and engine speed data

21   were collected via the OBD port, to allow determination of the gear shift points with and without

22   steering input. The test results indicated that the transmission shifted gears at lower engine speeds

23   if the vehicle was operated without steering input: for example, the shift from 5th to 6th gear was

24   observed to occur 4.5 seconds sooner, leading to an approximately 500 RPM drop in engine

25   speed. On the other hand, when the steering wheel was turned before the test, average engine

26   speed during acceleration from 0 MPH to 50 MPH increased by 11%, from 1954 RPM to 2176

27   RPM.

28

126.     The chassis dynamometer tests were carried out on class vehicles according to the procedure described by 40 C.F.R. § 1065, on a four-wheel dynamometer. The test sequence was designed to evaluate the effects of steering input. The testing included FTP75, US06, SC03 and HWFET test cycles. Average engine speed increased when the steering wheel was turned in comparison to when it was not. The greatest increase—9.7%-11.8%—occurred on the US06 test. SC03 test results showed a similar increase of engine speed when the wheel was turned—an increase of 5.8-8.2%. On the cold start FTP75 test, results showed an increase of engine speed of 5.0% to 7.2% after turning the wheel. The HWFET test showed a smaller effect: the average engine speed increased by 0.4% to 2.1% with steering input.

127.     In all, chassis dynamometer results showed a consistent increase in average engine speed, which cannot be explained as normal test-to-test variation. The same is true of on-road testing. This increase in average engine speed between the vehicles' default mode—a mode likely only active when undergoing emissions testing—and the mode used when in normal operation appears to be caused by different transmission control modes and shift points triggered by steering input.

**C.     The Supplier Defendants' Role**

128.     The Class Vehicles use ECUs supplied by both Bosch and Continental, and transmissions supplied by ZF. On information and belief, the TCM—effectively the brains of the transmission—in the Class Vehicles was developed and supplied by Bosch.

129.     As described above, Bosch played an integral role in developing the technology used in Volkswagen's and Audi's defeat device scheme. Evidence already made public makes clear just how deeply involved Bosch was in this scheme and how its involvement went beyond providing the technological platform used by Volkswagen and Audi to include developing the actual defeat device software and even to communicating directly with regulators to mislead them.

130.     The simple fact is that it would have been impossible for Volkswagen and Audi to engage in the defeat device scheme without at least some suppliers' knowledge and assistance. All modern ECUs, including the EDC17 used in the NOx defeat device, run on complex, highly

proprietary engine management software over which suppliers exert near-total control. In fact, the software is typically locked to prevent customers from making significant changes on their own. The NOx defeat device was just such a software change—one that would allow modifications to the vehicle's emission control to turn on only under certain circumstances—that Volkswagen could not have made without Bosch's participation. The same is true of the similar functionality that underlies the $CO_2$ defeat device, which relies on the same sophisticated sensors and similar software.

131.    Bosch's security measures illustrate industry practices and confirm that its customers cannot make significant changes to Bosch software without Bosch involvement. Bosch boasts that its security modules protect vehicle systems against unauthorized access in every operating phase, meaning that no alteration could have been made without either a breach of that security or Bosch's knowing participation.[30] On information and belief, the same is true of Continental ECU software, and of the code used in TCMs as well.

132.    Unsurprisingly, then, at least one car company engineer has confirmed that Bosch maintains absolute control over its software as part of its regular business practices:

> I've had many arguments with Bosch, and they certainly own the dataset software and let their customers tune the curves. Before each dataset is released it goes back to Bosch for its own validation.

> Bosch is involved in all the development we ever do. They insist on being present at all our physical tests and they log all their own data, so someone somewhere at Bosch will have known what was going on.

> All software routines have to go through the software verification of Bosch, and they have hundreds of milestones of verification, that's the structure . . . .

> The car company is *never* entitled by Bosch to do something on their own.[31]

---

[30] *Reliable Protection for* ECUs (May 12, 2016), https://www.escrypt.com/company/single-news/detail/reliable-protection-for-ecus/.
[31] Michael Taylor, *EPA Investigating Bosch over VW Diesel Cheater Software*, Car and Driver (Nov. 23, 2015), https://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater-software/.

133.    Thus, Bosch cannot convincingly argue that the development of the defeat devices in vehicles equipped with Bosch ECUs or TCMs was the work of rogue engineers without Bosch's knowledge or involvement.

134.    Volkswagen's and Bosch's work on the EDC17 instead reflected a highly unusual degree of coordination. It was a massive project that required the work of numerous Bosch coders for a period of at least ten years, and perhaps more.[32]

135.    █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[33]

136.    The enterprise is also memorialized in a series of agreements between Bosch, Volkswagen, and Audi, dating back to mid-2005, and reflecting negotiations that date prior to January, 2005. These agreements cover both diesel and gasoline vehicles.

137.    █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[34]

---

[32] Approximately 50,000 of Bosch's 375,000 employees worked in the diesel-technology operations branch of Bosch, and Volkswagen was the biggest diesel manufacturer in the world. *See* Bosch Probes Whether Its Staff Helped VW's Emissions Rigging, Automotive News (Jan. 27, 2016), http://www.autonews.com/article/20160127/COPY01/301279955/bosch-probes-whether-its-staff-helped-vws-emissions-rigging.

[33] ████████

[34] █████████████████████████



1372049.6

AUDI CO$_2$ CONSOLIDATED
CLASS ACTION COMPLAINT
MDL 2672 CRB (JSC)

1 ███████████████████████[38]██████████████████

2 ████████████████████████████████████████

3 ██████████████████████████████████████████

4 ████████████████████████████████████

5 ████████████████████████████████████████

6 ██████████████████████████████████████████

7 ██████████████████

8     141.    Rather, Bosch was in on the secret and knew that Volkswagen was using Bosch's

9 software algorithm to operate "on/off" switch for emission controls when the Class Vehicle was

10 undergoing testing. The decision to cheat was an "open secret" at Volkswagen, where they

11 continued to use the "Akustikfunktion" code word for their new defeat device.[39] It was an "open

12 secret" at Bosch as well.

13     142.    Written communications ████████████████████████

14 ███████████████████████████████████

15 ██████████████████████████████████████

16 ████████████████████████████████

17 ███████████████[40]████████████████████

18 ██████████████████████████████████████

19 ██████████████████[41]

20     143.    According to the Department of Justice indictment of Volkswagen engineer James

21 Liang, another supplier, ██████████ was also involved. ████████████████████

22 ████████████████████████████████████

23 ████████████████

24 ───────────────

[38] ████████████████

[39] Georgina Prodham, *Volkswagen probe finds manipulation was open secret in department*, Reuters (Jan. 23, 2016), https://www.reuters.com/article/us-volkswagen-emissions-investigation/volkswagen-probe-finds-manipulation-was-open-secret-in-department-newspaper-idUSKCN0V02E7; *see also* Jay Ramey, *VW chairman Poetsch: Company 'tolerated breaches of rules'*, Autoweek (Dec. 10, 2015), http://autoweek.com/article/vw-diesel-scandal/vw-chairman-poetsch-company-tolerated-breaches-rules (it was necessary for the "EA 189 engine to pass U.S. diesel emissions limits within the budget and time frame allotted.").

[40]
[41] ██████████████████



1

2

3

4

5 Liang

6 Indictment at Para. 40, https://www.justice.gov/opa/file/890761/download).

7        144.    Bosch was concerned about getting caught participating in the defeat device fraud.

8 As reported in the German newspaper *Bild am Sonntag* and elsewhere, a Volkswagen internal

9 inquiry found that in 2007 Bosch warned Volkswagen by letter that using the emissions-altering

10 software in production vehicles would constitute an "offense."[42]

11        145.

12

13 [43]

14

15

16

17

18

19

20        146.

21

22

23

24

25 ─────────────────
[42] Automotive News (Sept. 27, 2015)

26 (http://www.autonews.com/article/20150927/COPY01/309279989/bosch-warned-vw-aboutillegal-software-use-in-diesel-cars-report-says); VW Scandal: Company Warned over Test

27 Cheating Years Ago", BBC, Sept. 27, 2015, http://www.bbc.com/news/business-34373637;
http://www.autonews.com/article/20150927/COPY01/309279989/bosch-warned-vw-aboutillegal-

28 software-use-in-diesel-cars-report-says
[43]



147. [redacted]

148. [redacted]

149.     Discovery is ongoing, and Plaintiffs do not have a full record of what unfolded in response to [redacted]. One thing is already certain and indisputable, though: Bosch continued to develop and sell to Volkswagen hundreds of thousands of the defect devices for U.S. vehicles [redacted] And they continued to do so for years. Well after the defect device was developed and integrated into hundreds of thousands of Class Vehicles, Volkswagen and Bosch continued to work together to refine and maintain it.

150. [redacted]

1   ████████████████████████████[47] Volkswagen AG and Bosch continued the lengthy and

2   complicated process of refining the defeat device together in order to evade stringent U.S.

3   emissions standards.

4      151.   ████████████████████████████████████████

5   ██████████████████████████████████████████████████

6   ████████████████████████████████████████████████

7   █████████████████████████████████████████████

8   █████████████████████████████████████████████

9   ████████████████████████████

10      152.   It is likely that ZF, the manufacturer of the transmissions used to actuate the $CO_2$

11   defeat device, was also involved, due to its involvement in the development of the TCM and

12   programming of the "shift points" that are the means by which $CO_2$ emissions are reduced during

13   lab testing. Discovery is ongoing as to the role of ZF and Continental in the development of the

14   $CO_2$ defeat device.

15      153.   ████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ██████████████████████████████████████████

18   ███████████████████████████████████████

19   ██████████████████████████████████████████████████

20   ████████████████████████████████████████

21   ██████████████████████████████████████

22   ████████████████████████████████████████[48]

23      154.   The purpose of the NOx defeat device was to evade stringent U.S. emissions

24   standards. Once Bosch and VW perfected the defeat device, therefore, their attention turned to

25   deceiving U.S. regulators.

26

27   ──────────────────────────

28   [47] ██████████████████████████
    [48]

1    155.    

2

3

4

5

6

7

8                                                                              [49]

9    156.

10

11

12

13

14                                                      [50]

15    157.    Bosch's North American subsidiary, Bosch LLC, was also an essential player in

16    the fraud. Bosch LLC worked closely with Bosch GmbH and Volkswagen, in the United States

17    and in Germany, to ensure that the vehicles equipped with defeat devices passed U.S. emission

18    tests. As set forth below, Bosch LLC employees frequently communicated with U.S. regulators,

19    and actively worked to ensure that vehicles equipped with defeat devices were approved by

20    regulators.

21    158.

22

23

24

25

26

27    [49]

28    [50]



1

2

3 51

4

5 159.

6

7

8

9 52

10 160.

11

12

13

14

15

16

17

18

19

20

21

22

23   161.   In short, there can be no argument that only the carmakers communicated with

24 Volkswagen's and Audi's regulators, or that the suppliers did not understand the regulatory

25 implications of the defeat device software they developed.

26

27

28 51

52

1    **D.    Defendants' False Advertising**

2         162.    Volkswagen and Audi advertised their concern for the environment even while

3    selling vehicles equipped with Defeat Devices that polluted at levels far greater than legal limits.

4    For example, on the "Environment" page of its website, Volkswagen Group of America, Inc.,

5    stated as late as September 2015 that it takes "environmental responsibility very seriously. When

6    it comes to making our cars as green as possible, Volkswagen has an integrated strategy focused

7    on reducing fuel consumption and emissions, building the world's cleanest diesel engines and

8    developing totally new power systems, which utilize new fuel alternatives." That "integrated

9    strategy" for reducing emissions seems to have consisted only of cheating emissions testing so

10   that Volkswagen and Audi vehicles only appeared to offer reduced emissions, while continuing to

11   pollute.

12        163.    Long after Defendants became aware that many of their vehicles were deliberately

13   designed to cheat emissions tests, and even after EPA and CARB issued Notices of Violation for

14   diesel vehicles, Defendants continued to mislead consumers. While sales of new diesel vehicles

15   including those equipped with the defeat device described herein ceased in late 2015, news

16   reports indicate that Audi did not stop producing gasoline vehicles equipped with the defeat

17   device software complained of herein until May 2016, a full eight months after the 2015 scandal

18   broke and one month before the first settlement of the NOx defeat device litigation was

19   announced.

20        164.    Volkswagen and Audi bolstered their apparent environmental bona fides by

21   trumpeting the fact that the Audi A3 TDI and VW Jetta TDI were named the 2010 Green Car of

22   the Year and the 2009 Green Car of the Year, respectively. Shortly after the truth about

23   Volkswagen's diesel Defeat Devices came out in late September 2015, Green Car Journal

24   rescinded those awards.

25        165.    Audi-branded 3.0-liter TDI equipped models were the subject of the second EPA

26   notice of violation in November 2015. These vehicles were advertised as "sipping fuel" while

27   offering cleaner emissions than gasoline models and offering excellent performance, using

28   phrases like "beauty with benevolence," "intelligent performance," and "a cleaner future"

(highlighting added). The below advertisements were live on Audi's www.audiusa.com website as of November 2, 2015:




**Clean Diesel**

**2015 TDI® model lineup**

With everything TDI® clean diesel has to offer, it's no wonder it's the intelligent choice. It starts with incredible performance, efficiency and a range second to none. It also turns out it could make the world a cleaner place—by cutting emissions by 12%.

> View TDI® model gallery

**Clean diesel technology explained**

Understand how clean diesel technology impacts fuel efficiency and performance, while being a more eco-conscious choice.

> Explore clearly better diesel

## Models of note





**A6 TDI®**
Starting at $59,500

**Q5 TDI®**
Starting at $48,100

**A8 L TDI®**
Starting at $85,200



**Sip instead of guzzle**
The Audi A6 TDI clean diesel engine sips fuel while emitting less CO2 when compared with its gasoline counterparts.



166.    Each of the models featured in the first three advertisements is now known to utilize the transmission "warm-up" mode Defeat Device that is the subject of this Complaint. The fourth advertisement makes reference to reduced levels of carbon dioxide pollution, but the truth

1    is that these vehicles emit lower levels of carbon dioxide only on a dynamometer, not during

2    normal operating conditions.

3          167.   Carbon dioxide is a significant greenhouse gas, and the excessive emission of

4    carbon dioxide is a major cause of global warming and ocean acidification. For this reason, the

5    EPA and CARB regulate emissions of carbon dioxide from vehicles sold in the United States and

6    California.

7          168.   Audi television advertisements featuring one of these vehicles, the A8, uses the

8    tagline "Truth in Engineering," and can be seen at:

9    http://www.youtube.com/watch?v=Afwgq0wqx2g.



20         169.   Defendants also launched a "Think Blue" program, which they explained is part of

21   their policy of being "more responsible on the road and more environmentally conscious—not

22   just in our cars." Volkswagen advertised their Think Blue Collection as "eco-conscious" on its

23   Facebook webpage in or about April 2014, using the image below:

1
2
3
4
5
6
7
8
9
10
11
12



13    170.    Unfortunately for consumers who bought the Class Vehicles and for everyone

14 affected by global warming, Defendants' engineering was far from "truthful," and their professed

15 commitment to environmental consciousness was illusory. Defendants have designed and sold

16 cars that emit pollutants at breath-taking levels, and they disguised it by engineering them to

17 detect and then cheat on state and federal environmental testing.

18    171.    On January 11, 2017, the Department of Justice announced that Volkswagen AG,

19 Audi AG, and Volkswagen Group of America "agreed to plead guilty to participating in a [10-

20 year-long] conspiracy to defraud the United States and VW's U.S. customers and to violate the

21 Clean Air Act by lying and misleading the EPA and U.S. customers about whether certain VW,

22 Audi and Porsche branded diesel vehicles complied with U.S. emissions standards."[53]

23    172.    Under the terms of the agreement, which is attached hereto as Exhibit A, each

24 company: plead guilty to criminal felony counts of conspiracy, obstruction of justice, and

25 importing vehicles by using false statements; entered into organization probation for a period of

26

27 [53] *Volkswagen AG Agrees to Plead Guilty and Pay $4.3 Billion in Criminal and Civil Penalties*,
Department of Justice Office of Public Affairs (Jan. 11, 2017),
28 https://www.justice.gov/opa/pr/volkswagen-ag-agrees-plead-guilty-and-pay-43-billion-criminal-
and-civil-penalties-six.

1   three years; agreed to pay a $2.8 billion criminal penalty; and agreed to "cooperate in an ongoing

2   probe that could lead to the arrest of more employees."[54]

3         173.    Audi AG, specifically, agreed to the verity of a number of facts regarding its role

4   in the conspiracy, including the following, which have been excerpted from the agreement:

5
- "VW borrowed the original concept of the dual-mode, emissions cycle beating software from Audi."[55]

6
- "Audi engineers designed and installed software designed to detect, evade and defeat U.S. emissions standards, which constituted a defeat device under U.S.

7
law."[56]

8
- "Audi AG engineers calibrated a defeat device . . . that varied injection levels of a solution consisting of urea and water ("AdBlue") into the exhaust gas system based on whether the vehicle was being tested or not, with less NOx reduction

9
occurring during regular driving conditions."[57]

10
- "Audi AG Employees made a presentation to CARB, during which Audi AG employees did not disclose that the Audi 2.0 and 3.0 Liter Subject Vehicles and the Porsche Vehicles in fact contained a defeat device, which caused emission

11
discrepancies in those vehicles."[58]

12
- "Audi AG employees informed CARB that the 3.0 Liter Subject Vehicles did not possess the same emissions issues as the 2.0 Liter Subject Vehicles when, in fact, the 3.0 Liter Subject Vehicles possessed at least one defeat device that interfered

13
with the emissions systems to reduce NOx emission on the dyno but not on the road."[59]

14
- In anticipation of a litigation hold, "Audi AG employees also destroyed documents related to U.S. Emissions issues. The VW and Audi AG employees who

15
participated in this deletion activity did so to protect both VW and themselves from the legal consequences of their actions."[60]

16

17         174.    On January 11, 2017, the Department of Justice also announced that federal grand

18   jury "returned an indictment today charging six VW executives and employees:" Heinz-Jakob

19   Neusser, who oversaw development of Volkswagen's brand; Jens Hadler, who oversaw engine

20   development; Richard Dorenkamp, another supervisor of engine development; Bernd Gottweis,

21

22

---

23   [54] Michael Biesecker, Tom Krisher and Dee-Ann Durbin, VW pleads guilty in emissions scandal;

24   six employees indicted (Jan. 11, 2007), https://phys.org/news/2017-01-vw-guilty-emissions-scandal-employees.html.

25   [55] *United States of America v. Volkswagen AG*, No. 16-cr-20394 (E.D. Mich.), "Rule 11 Plea Agreement," Ex 2-13, available: https://www.justice.gov/opa/press-release/file/924436/download.

26   [56] *Id.* at Ex 2-15.

   [57] *Id.*

27   [58] *Id.* at 2-25.

   [59] *Id.*

28   [60] *Id.* at Ex 2-27.

                                                 AUDI CO$_2$ CONSOLIDATED
CLASS ACTION COMPLAINT
MDL 2672 CRB (JSC)

1   who helped oversee quality management; and Jürgen Peter who was a liaison between regulatory

2   agencies and the carmaker "for their roles in the nearly 10-year conspiracy."[61]

3        175.    According to an Associated Press report, "In announcing the federal

4   indictments…the Justice Department detailed an elaborate and wide-ranging scheme to commit

5   fraud and then cover it up [involving] [a]t least 40 VW employees [who] were involved in

6   destroying evidence."[62]

7   **E.    Defendants Intentionally Hid the Excessive Pollution Emitted By the Class Vehicles.**

8        176.    Defendants' Defeat Devices are part of a computerized engine control system that

9   monitors sensors throughout the cars' engine, transmission, and exhaust systems and controls

10  operation of the cars' systems to ensure optimal performance. The functions controlled by those

11  systems include transmission shift points, fuel injection, valve and ignition timing, and operation

12  of the engines' forced air induction systems such as turbochargers. The engine control computer

13  can, for example, ensure that the air-to-fuel mixture is correct based on sensor readings such as

14  throttle position, air flow, and engine temperature.

15       177.    Because modern cars include these sophisticated computers and sensors

16  throughout the car's systems, emissions testing sometimes uses a car's existing sensors to

17  measure the presence of pollutants and track compliance with EPA and state emissions standards.

18  Emissions testing stations plug a diagnostic device into the car's on-board diagnostics ("OBD II")

19  port and use the car's own exhaust sensors during the testing procedure to measure the substances

20  emitted. Some states, instead of or in addition to an OBD II diagnostic device, use a probe

21  inserted into the car's exhaust pipe to measure the chemicals emitted.

22       178.    In either case, during testing the cars are driven for a standardized duration and

23  engine speed on a dynamometer, to simulate driving on the road without actually moving. The

24  one respect in which driving on a dynamometer differs significantly from normal operation is that

25

26  [61] Michael Biesecker, Tom Krisher and Dee-Ann Durbin, *VW pleads guilty in emissions scandal; six employees indicted*, Phys.org (Jan. 11, 2007), https://phys.org/news/2017-01-vw-guilty-emissions-scandal-employees.html.

27  [62] Associated Press, *VW pleads guilty in emissions scandal; six employees indicted*, FoxNews

28  Auto (Jan. 11, 2007), http://www.foxnews.com/auto/2017/01/11/vw-admits-emissions-cheating-and-cover-up-will-pay-us-4-3b.html.

1   the steering wheel need not (and, realistically, cannot) be turned more than a few degrees from

2   straight.

3          179.    Here, Defendants programmed the engine control computers in the Class Vehicles

4   with software that effectively detects when the vehicle is undergoing emissions testing by turning

5   off a low-emitting gear-shifting program only once the steering wheel is turned more than fifteen

6   degrees. This ensures that the engine never revs above a certain, unrealistically low engine speed

7   during emissions testing, resulting in less fuel burnt and less carbon dioxide emitted than under

8   normal driving conditions. When the car is not being emissions tested—that is, under the vast

9   majority of normal operating conditions—the engine control systems operate the engine and

10  transmission in a manner that does not comply with EPA or CARB emissions requirements.

11         180.    In short, this software allows Defendants' Class Vehicles to meet emissions

12  standards in labs or state testing stations while permitting the vehicles to emit carbon dioxide at

13  levels above the standard allowed under United States laws and regulations during normal

14  operation. Volkswagen has already admitted that the Defeat Devices relating to oxides of nitrogen

15  installed in its diesel vehicles violated state and federal laws, including CARB standards and the

16  Clean Air Act, but has remained silent about its additional scheme to cheat on emissions tests

17  relating to fleetwide fuel economy and $CO_2$ emissions standards.

18         181.    Nor was the diesel scandal the first time that Volkswagen allegedly engineered

19  vehicles to cheat emission standards. As reported by the *Los Angeles Times* on September 23,

20  2015, Volkswagen paid a $120,000 fine to EPA in 1974 in order to settle charges that "it gamed

21  pollution control systems in four models by changing carburetor settings and shutting off an

22  emissions-control system at low temperatures."

23         182.    Moreover, it appears Defendants were warned as long ago as 2007 by suppliers

24  and their own employees not to cheat on emissions tests. According to September 27, 2015 report

25  by the *Associated Press* concerning the diesel Defeat Device, "VW's internal investigation has

26  found a 2007 letter from parts supplier Bosch warning Volkswagen not to use the software during

27  regular operation." Also, "a Volkswagen technician raised concerns about illegal practices in

28  connection with emissions levels in 2011."

1    183.    Despite those warnings, Defendants manufactured, marketed, and sold cars with

2    Defeat Devices designed to allow higher levels of pollutant emissions than those allowed by state

3    and federal law, thus defrauding their customers, and engaging in unfair competition under state

4    and federal laws.

5    184.    Defendants' illegal and deceptive actions have caused Class members significant

6    harm. Even if Defendants were to repair the Class Vehicles so that they comply with emissions

7    requirements, the repair would not compensate Plaintiffs and the Class for the significant harm

8    Defendants' deception has caused. This is true for at least two reasons.

9    185.    First, any repairs performed as part of the recall are likely to significantly diminish

10   the performance of the Class Vehicles. The Defeat Device works by causing the transmission to

11   shift gears at unusually low engine speed, emitting legal levels of carbon dioxide and using less

12   fuel, at the expense of performance. If Defendants were to "repair" the Class Vehicles by

13   reprogramming the car's software to engage this shift program—which currently operates only

14   when the car first starts up or is undergoing emissions testing—at all times in a manner that

15   reduces available engine power and performance to bring carbon dioxide emissions within legal

16   limits. Plaintiffs' and Class members' cars will therefore not perform as advertised if "repaired"

17   in this manner.

18   186.    Second, even if a more functional repair is possible, it could not compensate for

19   the financial damages Plaintiffs and Class members have suffered, including the high prices

20   Plaintiffs and the Class paid to own high-performing, luxurious Audi-branded vehicles that

21   complied with emissions requirements and comported with Audi's advertised commitment to the

22   environment and the inevitable reduction in resale value caused by any recall to repair the

23   vehicles and any resulting diminished performance. Adding insult to injury, many of the Class

24   Vehicles have already seen their values diminished by Defendants' diesel Defeat Device scandal.

25   187.    Third, Plaintiffs and Class members are already experiencing reputational harm as

26   unwilling vectors for Defendants' pollution-producing vehicles.

27   188.    For those reasons, as a result of Defendants' unfair, deceptive, and/or fraudulent

28   business practices, and its failure to disclose that the Class Vehicles utilize a Defeat Device to

1   cheat emissions tests, owners and/or lessees of the Class Vehicles have suffered losses in money

2   and/or property.

3          189.    Had Plaintiffs and Class members known of the "Defeat Device" at the time they

4   purchased or leased their Class Vehicles, they would not have purchased or leased those vehicles,

5   or would have paid substantially less for the vehicles than they did.

6          190.    Plaintiffs have suffered damages as a result their purchases of the Class Vehicles,

7   including but not limited to (i) overpayment for a vehicle that is incapable of performing as

8   represented, (ii) future additional fuel costs, (iii) loss of performance from future repairs, and (iv)

9   diminution of vehicle value.

10          191.    In the autumn of 2015, after the diesel Defeat Device scandal came to light,

11   Volkswagen's then-CEO, Martin Winterkorn, said in a statement that he was "deeply sorry that

12   we have broken the trust of our customers and the public," and that Defendants would be

13   suspending sales of some 2015 and 2016 vehicles with diesel engines. But despite the appearance

14   of candor, Defendants continued to sell gasoline vehicles equipped with Defeat Devices long after

15   Winterkorn's statement.

16          192.    In sum, Defendants' deliberate strategy to value profit over the truth, human

17   health, and the environment, has caused serious harm to consumers nationwide.

18                         **VII.    CLASS ACTION ALLEGATIONS**

19          193.    Plaintiffs bring this lawsuit as a class action pursuant to Federal Rules of Civil

20   Procedure 23(a); (b)(1); (b)(2); (b)(3); and/or (c)(4), on behalf of themselves and all others

21   similarly situated as members of the following Nationwide Class and State Classes (collectively,

22   the "Classes"); on their federal and state claims as the purchasers and lessees of the following

23   Class Vehicles with 3.0-liter or larger gasoline engines:

24
| Audi A6        | 2012-2016 |
| Audi A7        | 2012-2016 |
| Audi A8 and 8L | 2012-2016 |
| Audi Q5        | 2013-2016 |

25

26

27

28

194.   The proposed Classes are defined as:

## Nationwide Class

All persons and entities in the United States, including its territories, who purchased or leased a Class Vehicle.

## Alabama State Class

All persons and entities in the state of Alabama who purchased or leased a Class Vehicle.

## Alaska State Class

All persons and entities in the state of Alaska who purchased or leased a Class Vehicle.

## Arizona State Class

All persons and entities in the state of Arizona who purchased or leased a Class Vehicle.

## Arkansas State Class

All persons and entities in the state of Arkansas who purchased or leased a Class Vehicle.

## California State Class

All persons and entities in the state of California who purchased or leased a Class Vehicle.

## Colorado State Class

All persons and entities in the state of Colorado who purchased or leased a Class Vehicle.

## Connecticut State Class

All persons and entities in the state of Connecticut who purchased or leased a Class Vehicle.

## Delaware State Class

All persons and entities in the state of Delaware who purchased or leased a Class Vehicle.

## District of Columbia Class

All persons and entities in the District of Columbia who purchased or leased a Class Vehicle.

- 60 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>Florida State Class</u>**

All persons and entities in the state of Florida who purchased or leased a Class Vehicle.

**<u>Georgia State Class</u>**

All persons and entities in the state of Georgia who purchased or leased a Class Vehicle.

**<u>Hawaii State Class</u>**

All persons and entities in the state of Hawaii who purchased or leased a Class Vehicle.

**<u>Idaho State Class</u>**

All persons and entities in the state of Idaho who purchased or leased a Class Vehicle.

**<u>Illinois State Class</u>**

All persons and entities in the state of Illinois who purchased or leased a Class Vehicle.

**<u>Indiana State Class</u>**

All persons and entities in the state of Indiana who purchased or leased a Class Vehicle.

**<u>Iowa State Class</u>**

All persons and entities in the state of Iowa who purchased or leased a Class Vehicle.

**<u>Kansas State Class</u>**

All persons and entities in the state of Kansas who purchased or leased a Class Vehicle.

**<u>Kentucky State Class</u>**

All persons and entities in the state of Kentucky who purchased or leased a Class Vehicle.

**<u>Louisiana State Class</u>**

All persons and entities in the state of Louisiana who purchased or leased a Class Vehicle.

**<u>Maine State Class</u>**

All persons and entities in the state of Maine who purchased or leased a Class Vehicle.

1

**Maryland State Class**

2

All persons and entities in the state of Maryland who purchased or
leased a Class Vehicle.

3

**Massachusetts State Class**

4

5

All persons and entities in the state of Massachusetts who
purchased or leased a Class Vehicle.

6

**Michigan State Class**

7

All persons and entities in the state of Michigan who purchased or
leased a Class Vehicle.

8

9

**Minnesota State Class**

10

All persons and entities in the state of Minnesota who purchased or
leased a Class Vehicle.

11

**Mississippi State Class**

12

All persons and entities in the state of Mississippi who purchased or
leased a Class Vehicle.

13

14

**Missouri State Class**

15

All persons and entities in the state of Missouri who purchased or
leased a Class Vehicle.

16

**Montana State Class**

17

All persons and entities in the state of Montana who purchased or
leased a Class Vehicle.

18

19

**Nebraska State Class**

20

All persons and entities in the state of Nebraska who purchased or
leased a Class Vehicle.

21

**Nevada State Class**

22

All persons and entities in the state of Nevada who purchased or
leased a Class Vehicle.

23

**New Hampshire State Class**

24

25

All persons and entities in the state of New Hampshire who
purchased or leased a Class Vehicle.

26

**New Jersey State Class**

27

All persons and entities in the state of New Jersey who purchased
or leased a Class Vehicle.

28

- 62 -

1

**New Mexico State Class**

2

All persons and entities in the state of New Mexico who purchased
or leased a Class Vehicle.

3

**New York State Class**

4

5

All persons and entities in the state of New York who purchased or
leased a Class Vehicle.

6

**North Carolina State Class**

7

All persons and entities in the state of North Carolina who
purchased or leased a Class Vehicle.

8

**North Dakota State Class**

9

10

All persons and entities in the state of North Dakota who purchased
or leased a Class Vehicle.

11

**Ohio State Class**

12

All persons and entities in the state of Ohio who purchased or
leased a Class Vehicle.

13

14

**Oklahoma State Class**

15

All persons and entities in the state of Oklahoma who purchased or
leased a Class Vehicle.

16

**Oregon State Class**

17

All persons and entities in the state of Oregon who purchased or
leased a Class Vehicle.

18

19

**Pennsylvania State Class**

20

All persons and entities in the state of Pennsylvania who purchased
or leased a Class Vehicle.

21

**Rhode Island State Class**

22

All persons and entities in the state of Rhode Island who purchased
or leased a Class Vehicle.

23

**South Carolina State Class**

24

25

All persons and entities in the state of South Carolina who
purchased or leased a Class Vehicle.

26

**South Dakota State Class**

27

All persons and entities in the state of South Dakota who purchased
or leased a Class Vehicle.

28

**Tennessee State Class**

All persons and entities in the state of Tennessee who purchased or leased a Class Vehicle.

**Texas State Class**

All persons and entities in the state of Texas who purchased or leased a Class Vehicle.

**Utah State Class**

All persons and entities in the state of Utah who purchased or leased a Class Vehicle.

**Vermont State Class**

All persons and entities in the state of Vermont who purchased or leased a Class Vehicle.

**Virginia State Class**

All persons and entities in the state of Virginia who purchased or leased a Class Vehicle.

**Washington State Class**

All persons and entities in the state of Washington who purchased or leased a Class Vehicle.

**West Virginia State Class**

All persons and entities in the state of West Virginia who purchased or leased a Class Vehicle.

**Wisconsin State Class**

All persons and entities in the state of Wisconsin who purchased or leased a Class Vehicle.

**Wyoming State Class**

All persons and entities in the state of Wyoming who purchased or leased a Class Vehicle.

195.    Excluded from the Classes are:  (A) Defendants, including any entity or division in which Defendants have a controlling interest, as well as their agents, representatives, officers, directors, employees, trustees, parents, children, heirs, assigns, and successors, and other persons or entities related to, or affiliated with Defendants; (B) the Judges to whom this case is assigned, their staff, and their immediate families; and (C) governmental entities.

196.     Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses under Rule 23(c)(5), or modified in any other way.

197.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used in individual actions alleging the same claims.

198.     This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23 and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of its provisions.

### 1.     Numerosity: Federal Rule of Civil Procedure 23(a)(1)

199.     The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Plaintiffs are informed and believe that there are not less than hundreds of thousands of members of the Class, and at least hundreds of members in each State Class.  The precise number and identities of Nationwide Class and State Class members may be ascertained from Defendants' records and motor vehicle regulatory data. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

### 2.     Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)

200.     This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    a.     Whether Defendants engaged in the conduct alleged herein;

    b.     Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

    c.     Whether the transmission control system in the Class Vehicles contains a defect in that it does not comply with EPA requirements;

d.      Whether the transmission control systems in Class Vehicles can be made to comply with EPA standards without substantially degrading the performance of the Class Vehicles;

e.      Whether Defendants knew about the defeat device and, if so, how long Defendants have known;

f.      Whether Defendants designed, manufactured, marketed, and distributed Class Vehicles with a "defeat device;"

g.      Whether Defendants' conduct violates consumer protection statutes, warranty laws, and other laws as asserted herein;

h.      Whether Plaintiffs and the other Class members overpaid for their Class Vehicles;

i.      Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief;

j.      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount; and

k.      Whether Defendants continue to unlawfully conceal and misrepresent whether additional vehicles, besides those reported in the press to date, are in fact Class Vehicles.

**3.      Typicality: Federal Rule of Civil Procedure 23(a)(3)**

201.    Plaintiffs' claims are typical of the claims of the Class members whom they seek to represent under Fed. R. Civ. P. 23(a)(3), because Plaintiffs and each Class member purchased a Class Vehicle and were comparably injured through Defendants' wrongful conduct as described above. Neither Plaintiffs nor the other Class members would have purchased the Class Vehicles had they known of the defects in the vehicles. Plaintiffs and the other Class members suffered damages as a direct proximate result of the same wrongful practices by Defendants. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other Class members. Plaintiffs' claims are based upon the same legal theories as the claims of the other Class members.

1

### 4.   Adequacy: Federal Rule of Civil Procedure 23(a)(4)

2      202.   Plaintiffs will fairly and adequately represent and protect the interests of the Class

3   members as required by Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests do not conflict with the

4   interests of the Class members. Plaintiffs have retained counsel competent and experienced in

5   complex class action litigation, including vehicle defect litigation and other consumer protection

6   litigation. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel

7   have interests that conflict with the interests of the other Class members. Therefore, the interests

8   of the Class members will be fairly and adequately protected.

9

### 5.   Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)

10      203.   Defendants have acted or refused to act on grounds generally applicable to

11   Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief

12   and declaratory relief, as described below, with respect to the Class as a whole.

13

### 6.   Superiority: Federal Rule of Civil Procedure 23(b)(3)

14      204.   A class action is superior to any other available means for the fair and efficient

15   adjudication of this controversy, and no unusual difficulties are likely to be encountered in the

16   management of this class action. The damages or other financial detriment suffered by Plaintiffs

17   and the other Class members are relatively small compared to the burden and expense that would

18   be required to individually litigate their claims against Defendants, so it would be impracticable

19   for members of the Class to individually seek redress for Defendants' wrongful conduct.

20      205.   Even if Class members could afford individual litigation, the court system could

21   not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and

22   increases the delay and expense to all parties and the court system. By contrast, the class action

23   device presents far fewer management difficulties and provides the benefits of single

24   adjudication, economy of scale, and comprehensive supervision by a single court.

25

26

27

28

# VIII.   ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED

## A.   Discovery Rule Tolling

206.    The tolling doctrine was made for cases of concealment like this one. For the following reasons, any otherwise-applicable statutes of limitation have been tolled by the discovery rule with respect to all claims.

207.    Through the exercise of reasonable diligence, and within any applicable statutes of limitation, Plaintiffs and members of the proposed Class could not have discovered that Defendants were concealing and misrepresenting the true emissions levels of its vehicles, including but not limited to their use of defeat devices.

208.    Plaintiffs and the other Class members could not have reasonably discovered, and did not know of facts that would have caused a reasonable person to suspect, that Defendants intentionally failed to report information within their knowledge to federal and state authorities, dealerships, or consumers until – at the earliest – November 7, 2016, when published reports surfaced for the first time disclosing the existence of the herein described defeat device.

209.    Likewise, a reasonable and diligent investigation could not have disclosed that Defendants had information in their possession about the existence of its sophisticated emissions deception and that they concealed that information, which was only discovered by Plaintiffs immediately before this action was filed.

## B.   Tolling Due To Fraudulent Concealment

210.    Throughout the relevant time period, all applicable statutes of limitation have been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged in this Complaint.

211.    Upon information and belief, prior to the date of this Complaint, and at least as early as February 2013, if not earlier, Defendants knew of the defeat device in the Class Vehicles, but continued to distribute, sell, and/or lease the Class Vehicles to Plaintiffs and the class members. In doing so, Defendants concealed and expressly denied the existence of problem with $CO_2$ emissions, and/or failed to notify Plaintiffs and the Class members about the true nature of the Class Vehicles.

212.    Instead of disclosing their deception, or that the emissions from the Class Vehicles were far worse than represented, Defendants falsely represented that its vehicles complied with federal and state emissions standards, and that they were reputable manufacturers whose representations could be trusted.

213.    Any otherwise-applicable statutes of limitation have therefore been tolled by Defendants' exclusive knowledge active concealment of the facts alleged herein.

**C.      Estoppel**

214.    Defendants were and are under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles, including their emissions systems and their compliance with applicable federal and state law.

215.    Although Defendants had the duty throughout the relevant period to disclose to Plaintiffs and Class members that they had engaged in the deception described in this Complaint, Defendants chose to evade federal and state emissions and clean air standards with respect to the Class Vehicles, actively concealed the true character, quality, and nature of the Class Vehicles, and knowingly made misrepresentations about the quality, reliability, characteristics, and/or performance of the Class Vehicles.

216.    Defendants actively concealed the true character, quality, performance, and nature of the defeat device in the Class Vehicles, and Plaintiffs and the class members reasonably relied upon Defendants' knowing and active concealment of these facts.

217.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## IX.      CAUSES OF ACTION

**A.      Claims Asserted on Behalf of the Nationwide Class**

**NATIONWIDE COUNT I:**
**VIOLATION OF 18 U.S.C. § 1962(C)-(D)**
**The Racketeer Influenced And Corrupt Organizations Act ("RICO")**

218.    Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

219.    Plaintiffs bring this Count on behalf of the Nationwide Class against Defendants VW AG, VW America, Audi AG, Audi America (collectively for this count, the "Volkswagen RICO Defendants"), and Bosch GmbH and Bosch LLC (collectively for this count, the "Bosch RICO Defendants") (together with the Volkswagen RICO Defendants, the "RICO Defendants").

220.    Volkswagen conducts its business—legitimate and illegitimate—through various affiliates and subsidiaries, each of which is a separate legal entity.  Audi conducts its business— legitimate and illegitimate—through various affiliates and subsidiaries, each of which is a separate legal entity.  Bosch also conducts its business, both legitimate and illegitimate, through various subsidiaries and affiliates.[63]

221.    At all relevant times, the RICO Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

222.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).

223.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions.  *See* 18 U.S.C. § 1962(d).

224.    For many years, the RICO Defendants aggressively sought to increase their sales of the Class Vehicles (and components contained therein) in an effort to bolster their revenues, augment profits, and increase their market share in the United States.  Finding it impossible to achieve their ambitious goals lawfully, however, the RICO Defendants resorted to cheating through their fraudulent scheme and conspiracy.  The illegal scheme was hatched overseas by VW AG and Audi AG (collectively, the "German Volkswagen Defendants"), brought to U.S. shores by and through the vehicles of VW America and Audi America (collectively, the

---

[63] http://www.bosch.com/en/com/bosch_group/business_sectors_divisions/business_sectors_divisions_2.php (last visited on Feb. 20, 2016).

1  "American Volkswagen Defendants"), and executed in conjunction with Bosch and unnamed co-

2  conspirators.

3       225.    In particular, the RICO Defendants, along with IAV, ZF, Continental, and other

4  entities and individuals, were employed by or associated with, and conducted or participated in

5  the affairs of, one or several RICO enterprises (described below and referred to collectively as the

6  "Defeat Device RICO Enterprise"), whose purpose was to deceive regulators and the driving

7  public into believing that the Class Vehicles were compliant with emission standards, consumed

8  less fuel, and emitted less $CO_2$ and other pollutants so as to increase revenues and minimize

9  losses from the design, manufacture, distribution and sale of the Class Vehicles and the $CO_2$

10 defeat devices installed therein.  As a direct and proximate result of their fraudulent scheme and

11 common course of conduct, the RICO Defendants were able to extract millions dollars from

12 Plaintiffs and the Class.  As explained in detail below, the RICO Defendants' years-long

13 misconduct violated Sections 1962(c) and (d).

14       **B.**     **Description of the Defeat Device RICO Enterprise**

15       226.    In an effort to expand its market share in the U.S. and beyond, VW AG, a

16 publicly-traded German company, formed VW America, a separate New Jersey company, which

17 is headquartered in Virginia.  VW America is not publicly traded and thus has no SEC reporting

18 obligations, but it does have reporting obligations, protections and responsibilities unique to the

19 State of New Jersey.  VW AG also controls Audi AG which, in turn, formed a separate U.S.

20 subsidy that is not publicly traded—Audi America—to market and sell the Class Vehicles

21 throughout the U.S.  At all relevant times, VW AG and Audi AG maintained tight control over

22 the design, manufacture, and testing of the Class Vehicles.

23       227.    At all relevant times, the RICO Defendants, along with other individuals and

24 entities, including unknown third parties involved in the design, manufacture, testing, and sale of

25 the Class Vehicles, operated an association-in-fact enterprise, which was formed for the purpose

26 of fraudulently obtaining COCs from the EPA (and EOs from CARB) in order to import and sell

27 the Class Vehicles containing the $CO_2$ defeat device throughout the U.S., and through which they

28 conducted a pattern of racketeering activity under 18 U.S.C. § 1961(4).

228.    Alternatively, each of the American Volkswagen Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the RICO Defendants conducted their pattern of racketeering activity in the U.S.  Specifically, VW America is the entity through which Volkswagen applied for, and obtained, the EPA COCs for the VW- and Audi-branded Class Vehicles with material misrepresentations and omissions about their specifications in order to introduce them into the U.S. stream of commerce.  And, on information and belief, the German Volkswagen Defendants used each of the American Volkswagen Defendants to distribute and sell the illegal Class Vehicles throughout the United States.  Bosch participated, either directly or indirectly, in the conduct of the enterprise's affairs by developing, supplying, and concealing the defeat devices.  IAV participated, either directly or indirectly, in the conduct of the enterprise's affairs by developing, testing, and concealing the defeat devices. Continental participated, either directly or indirectly, in the conduct of the enterprise's affairs by developing and supplying the ECUs used in some of the Class Vehicles, which comprised part of the mechanism by which the defeat devices were actuated.  Finally, ZF participated, either directly or indirectly, in the conduct of the enterprise's affairs by supplying the transmissions used in the Class Vehicles, developing the transmission and TCMs in which the defeat devices are embedded, and programming them to reduce vehicle emissions during emissions testing.  The American Volkswagen Defendants' separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the RICO Defendants and their co-conspirators.

229.    At all relevant times, the Defeat Device RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as legal entities associated-in-fact for the common purpose of engaging in RICO Defendants' profit-making scheme.

230.    The association-in-fact Defeat Device RICO Enterprise consisted of the entities described below.

1.    **The Volkswagen RICO Defendants**

231.    Each Volkswagen RICO Defendant is a distinct legal entity, but they are all controlled (directly or indirectly) by Defendant VW AG.[64]  Specifically, Audi AG is a majority-owned subsidiary of VW AG.  Audi America is also a subsidiary of VW AG.

232.    As noted previously, the Volkswagen RICO Defendants made it their mission to become the dominant automotive manufacturing conglomerate in the world.  At the time they articulated this goal, however, Volkswagen was struggling to retain its foothold in the U.S. market.  The strategy of wooing customers with premium products was not paying off, and VW America's costly plant in Chattanooga, Tennessee was "woefully underutilized."[65]

233.    In response to these obstacles, VW AG and its leader at the time, Martin Winterkorn, set in motion an ambitious plan to triple Volkswagen's sales in the United States. While the linchpin of this strategy was increasing sales of "diesel-powered cars . . . [and] promising high mileage and low emissions without sacrificing performance,"[66] the strategy also included expanding its market share in the U.S. through the sale of gasoline vehicles.  Audi AG's CEO, Rupert Stadler, was tasked with implementing Winterkorn's lofty growth goals through the sale of Audi vehicles, including the Class Vehicles at issue here.

234.    As with diesel vehicle emission standards, the emission standards pertaining to gasoline vehicles in the U.S. were ratcheting up.  Specifically, increasingly stringent standards for both $CO_2$ emissions and average fuel economy were implemented by the EPA and NHTSA beginning in 2011.

235.    The Volkswagen RICO Defendants knew that to sell the Class Vehicles in the U.S., the vehicles had to meet these new standards.  As it turned out, however, the Volkswagen RICO Defendants were either unable or unwilling to devise a solution within the constraints of the law.

---

[64] http://www.volkswagenag.com/content/vwcorp/content/en/brands_and_products.html; http://www.volkswagenag.com/content/vwcorp/info_center/en/publications/2015/03/Y_2014_e.bin.html/binarystorageitem/file/GB+2014_e.pdf

[65] Anton Watts. VW Drama: *Why Piech Wants Winterkorn Out-and What the Future May Hold*. Car and Driver (Apr. 16, 2015).

[66] Danny Kim, Aaron Danny Hakim, Aaron Kessler, and Jack Ewing, "*As Volkswagen Pushed to Be No. 1, Ambitions Fueled a Scandal*," New York Times (Sept. 26, 2015).

236.    Accordingly, the Volkswagen RICO Defendants worked with the other members of the Defeat Device RICO Enterprise, including Bosch, IAV, Continental, and ZF, to devise a scheme to illegally circumvent the U.S.'s stringent emissions standards by incorporating the $CO_2$ defeat device into the Class Vehicles' ECUs and/or TCMs.  Employing this technology, the Volkswagen RICO Defendants fraudulently obtained COCs (and EOs) for the Class Vehicles even though they emit unlawful levels of toxic pollutants into the atmosphere during normal operating conditions.

237.    Moreover, in order to profit from the scheme and increase their sales according to plan, the Volkswagen RICO Defendants falsely marketed the Class Vehicles as not only compliant with EPA and CARB standards, but also as being environmentally friendly without compromising performance.

238.    In sum, as part of their effort to become the dominant automotive manufacturing conglomerate in the world, the Volkswagen RICO Defendants controlled and directed the enterprise with the common purpose of deceiving regulators and the public through lies and deception to increase their market shares and profits, and minimize losses.

**2.      The Bosch RICO Defendants**

239.    As explained above, Bosch supplied the ECUs that were used to actuate the $CO_2$ defeat devices in some of the Class Vehicles.

240.    Defendant Bosch GmbH is a multinational engineering and electronics company headquartered in Gerlingen, Germany, which has hundreds of subsidiaries and companies.  It wholly owns defendant Bosch LLC, a Delaware limited liability company headquartered in Farmington Hills, Michigan.  As explained above, Bosch's sectors and divisions are grouped by subject matter, not location.  The Mobility Solutions (formerly Automotive Technology) is the Bosch sector at issue here and it encompasses employees of Bosch GmbH and Bosch LLC. These individuals were responsible for the design, manufacture, development, customization, and supply of the $CO_2$ defeat device to Volkswagen and Audi for use in the Class Vehicles.

241.    As it did in connection with Volkswagen and Audi's diesel vehicles, Bosch worked with Volkswagen and Audi to develop and implement a specific and unique set of

1    software algorithms to enable their gasoline vehicles to surreptitiously evade emissions

2    regulations.  Bosch similarly customized its ECUs for installation in the Class Vehicles with

3    unique software code to detect when it was undergoing emissions testing, as described above.

4         242.    Bosch was well aware that the ECUs would be used by Volkswagen and Audi to

5    cheat on emissions testing. ███████████████████████████████████████████████

6    █████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████████

8    ████████[67]████████████████████████████████████████████████████████████

9    ████████████████████████████████[68]████████████████████████████████

10   ██████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████████

12   ████████[69]██████████████████████████████████████████████████████

13   ██████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████

15   ███████████████████████████

16       243.    Bosch was also critical to the concealment of the defeat device in communications

17   with U.S. regulators.

18       **3.    Unnamed Co-Conspirator IAV**

19       244.    As explained above, IAV was involved in developing and testing the Class

20   Vehicles.

21       245.    IAV GmbH is a privately held engineering company headquartered in Berlin,

22   Germany, which has various subsidiaries.  It wholly owns IAV-AE, a Michigan corporation

23   headquartered in Northville, Michigan. VW AG holds a 50% ownership share in IAV GmbH.

24   Defendants Volkswagen, Audi, and Bosch are clients of both IAV GmbH and IAV-AE.

25       246.    IAV was also critical to the concealment of the defeat device in communications

26   with U.S. regulators.

27   _____

      67 ████████████████████████

28   68 ███████████

      69 ████

### 4. Unnamed Co-Conspirator ZF

247.    As explained above, ZF was involved in supplying the transmissions used in the Class Vehicles, as well as developing and programming the TCMs that concealed the defeat devices and worked in conjunction with the ECUs to reduce emissions when it was detected that the Vehicles were undergoing emissions testing.

248.    ZF AG is a privately held engineering company headquartered in Friedrichshafen, Germany, which has various subsidiaries.  It wholly owns ZF America, a Michigan corporation headquartered in Northville, Michigan.  ZF AG formerly held a 50% ownership share in a joint venture predecessor to Robert Bosch Automotive Steering GmbH, an independent division within the Bosch Group.

249.    ZF was also critical to the concealment of the defeat device in the Class Vehicles and provided one of the means by which $CO_2$ emissions were reduced during emissions testing.

### 5. Unnamed Co-Conspirator Continental

250.    As explained above, Continental was involved in supplying the ECUs used to actuate the defeat device in some of the Class Vehicles.

251.    Continental AG ("Continental") is a manufacturing company specializing in automotive parts headquartered in Hanover, Germany. Continental manufactures numerous automotive parts including tires, powertrain and chassis components, electronics, and brake systems. Through its VDO brand, acquired from Siemens AG in 2007, Continental also develops and supplies engine management systems and other automotive electronics. Certain Class Vehicles use Continental or VDO engine management systems.

252.    Continental Automotive Systems US, Inc., ("CAS") is one of the American corporate subsidiaries of Continental AG. CAS operates the American arm of Continental's automotive electronics and powertrain business under both the Continental and VDO brands, and is headquartered in Auburn Hills, Michigan.

253.    Continental was also critical to the concealment of the defeat device in the Class Vehicles and provided one of the means by which $CO_2$ emissions were reduced during emissions testing.

C.      **The Defeat Device RICO Enterprise Sought to Increase Defendants' Profits and Revenues**

254.    The Defeat Device RICO Enterprise began by 2013 at the latest, when a final report on Audi's vehicle testing from the "SummerFahrt," or Summer Drive, in South Africa essentially identified the $CO_2$ defeat device as a solution to the increasingly stringent emission and fuel economy standards by reducing vehicle emissions of $CO_2$ through a change in engine electronics.  The $CO_2$ defeat device was a byproduct of the series of agreements entered into between Volkswagen and Bosch starting in mid-2005 to develop what ultimately became the $NO_X$ defeat device.  IAV employees were given access to the ECUs containing the $CO_2$ defeat device pursuant to these agreements between Volkswagen and Bosch.  Continental, through its VDO division, developed and supplied the ECUs for some of the Class Vehicles, while Bosch developed and supplied the ECUs for others.  ZF developed the transmissions and programmed the TCMs—with, on information and belief, input from Bosch—which worked in tandem with the ECUs to execute the actual cheat function.  The Defeat Device RICO Enterprise continued without interruption for years, as Defendants successfully installed Bosch and Continental ECUs in approximately 100,000 of the Class Vehicles sold in the United States.  It was not until late 2015 or early 2016 that the Defeat Device RICO Enterprise began to unravel, when German authorities detected irregularities and increased $CO_2$ emissions in Audi vehicles.  Thereafter, in the summer of 2016, CARB reportedly discovered the $CO_2$ defeat device in the Class Vehicles, thereby uncovering Defendants' scheme.

255.    At all relevant times, the Defeat Device RICO Enterprise:  (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the Volkswagen RICO Defendants, their network of dealerships, the Bosch RICO Defendants, IAV, Continental, ZF, and other entities and individuals associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Class Vehicles to Plaintiffs and the Nationwide Class through fraudulent COCs and EOs, false emissions tests, deceptive and misleading sales tactics and materials, and deriving

1    profits and revenues from those activities.  Each member of the Defeat Device RICO Enterprise

2    shared in the bounty generated by the enterprise, *i.e.*, by sharing the benefit derived from

3    increased sales revenue generated by the scheme to defraud Class members nationwide.[70]

4        256.    The Defeat Device RICO Enterprise functioned by selling vehicles and component

5    parts to the consuming public.  Many of these products are legitimate, including vehicles that do

6    not contain defeat devices.  However, the RICO Defendants and their co-conspirators, through

7    their illegal Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent

8    scheme to increase revenue for Defendants and the other entities and individuals associated-in-

9    fact with the Enterprise's activities through the illegal scheme to sell the Class Vehicles.

10       257.    The Defeat Device RICO Enterprise engaged in, and its activities affected

11   interstate and foreign commerce, because it involved commercial activities across state

12   boundaries, such as the marketing, promotion, advertisement and sale or lease of the Class

13   Vehicles throughout the country, and the receipt of monies from the sale of the same.

14       258.    Within the Defeat Device RICO Enterprise, there was a common communication

15   network by which co-conspirators shared information on a regular basis.  The Defeat Device

16   RICO Enterprise used this common communication network for the purpose of manufacturing,

17   marketing, testing, and selling the Class Vehicles to the general public nationwide.

18       259.    Each participant in the Defeat Device RICO Enterprise had a systematic linkage to

19   each other through corporate ties, contractual relationships, financial ties, and continuing

20   coordination of activities.  Through the Defeat Device RICO Enterprise, the RICO Defendants

21   functioned as a continuing unit with the purpose of furthering the illegal scheme and their

22   common purposes of increasing their revenues and market share, and minimizing losses.

23       260.    The RICO Defendants participated in the operation and management of the Defeat

24   Device RICO Enterprise by directing its affairs, as described herein.  While the RICO Defendants

25   participated in, and are members of, the enterprise, they have a separate existence from the

26

27   [70] The Volkswagen Defendants sold more Class Vehicles while charging consumers a premium
     for purportedly emission compliant, environmentally friendly, and fuel efficient Class Vehicles.
28   Bosch, in turn, sold more ECUs because the Volkswagen Defendants manufactured and sold
     more Class Vehicles.

enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

261.    The Volkswagen RICO Defendants exerted substantial control over the Defeat Device RICO Enterprise, and participated in the affairs of the Defeat Device RICO Enterprise by:

    a.   designing the Class Vehicles with defeat devices;

    b.   failing to correct or disable the defeat devices when warned;

    c.   manufacturing, distributing, and selling the Class Vehicles that emitted greater pollution than allowable under the applicable regulations;

    d.   misrepresenting and omitting (or causing such misrepresentations and omissions to be made) vehicle specifications on COC and EO applications;

    e.   introducing the Class Vehicles into the stream of U.S. commerce without a valid EPA COC and/or CARB EO;

    f.   concealing the existence of the defeat devices and the unlawfully high emissions from regulators and the public;

    g.   persisting in the manufacturing, distribution, and sale of the Class Vehicles even after questions were raised about the emissions testing and discrepancies concerning the same;

    h.   misleading government regulators as to the nature of the defeat devices and the defects in the Class Vehicles;

    i.   misleading the driving public as to the nature of the defeat devices and the defects in the Class Vehicles;

    j.   designing and distributing marketing materials that misrepresented and concealed the defect in the vehicles;

    k.   otherwise misrepresenting or concealing the defective nature of the Class Vehicles from the public and regulators;

    l.   illegally selling and/or distributing the Class Vehicles;

    m.  collecting revenues and profits from the sale of such products; and

n.   ensuring that the other RICO Defendants and unnamed co-conspirators

complied with the fraudulent scheme.

262.   The Bosch RICO Defendants participated in, operated and/or directed the Defeat Device RICO Enterprise.  Bosch participated in the fraudulent scheme by manufacturing, installing, testing, modifying, and supplying ECUs which operated as the $CO_2$ defeat device in the Class Vehicles.  Bosch exercised tight control over the coding and other aspects of the defeat device software and was closely collaborated with Volkswagen to develop, customize, and calibrate the $CO_2$ defeat devices.  Additionally, Bosch continuously cooperated with the Volkswagen RICO Defendants to ensure that the ECUs were fully integrated into the Class Vehicles.  Bosch also participated in the affairs of the Enterprise by concealing the $CO_2$ defeat devices on U.S. documentation and in communications with U.S. regulators.  Bosch collected millions of dollars in revenues and profits from the hidden defeat devices installed in the Class Vehicles.

263.   IAV participated in the Defeat Device RICO Enterprise by developing, testing and concealing the $CO_2$ defeat device in the Class Vehicles. Upon information and belief, Continental participated in the Defeat Device RICO Enterprise by manufacturing, installing, testing, modifying, and supplying ECUs which operated as the $CO_2$ defeat device in the Class Vehicles. ZF also participated in the Defeat Device RICO Enterprise by developing and programming the TCMs that concealed the $CO_2$ defeat device and reduced $CO_2$ emissions so that the Class Vehicles could fraudulently pass emissions testing.  Without the RICO Defendants' and co-conspirators' willing participation, including Bosch's active involvement in developing and supplying the critical defeat devices for the Class Vehicles, IAV's active involvement in testing the Class Vehicles and concealing the results of such testing, Continental's active involvement in developing and supplying the ECUs used to actuate the defeat device in some of the Class Vehicles, and ZF's active involvement in developing the TCMs that concealed the $CO_2$ devices and programming the TCMs to reduce $CO_2$ emissions during emissions testing, the Defeat Device RICO Enterprise's scheme and common course of conduct would not have been successful.

264.     The RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the Defendants' and others' hands.

### D.     Mail and Wire Fraud

265.     To carry out, or attempt to carry out the scheme to defraud, the RICO Defendants, each of whom is a person associated-in-fact with the Defeat Device RICO Enterprise, did knowingly conduct or participate, directly or indirectly, in the conduct of the affairs of the Defeat Device RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

266.     Specifically, the RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.  The multiple acts of racketeering activity which the RICO Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."  The racketeering activity was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the Defeat Device RICO Enterprise.  The RICO Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

267.     The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions.

268.     In devising and executing the illegal scheme, the RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs and the Nationwide Class or to obtain money from Plaintiffs and the Nationwide Class by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.  For the purpose of executing the illegal scheme, the RICO Defendants committed these racketeering acts, which

1   number in the thousands, intentionally and knowingly with the specific intent to advance the

2   illegal scheme.

3       269.    The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1))

4   include, but are not limited to:

5           a.    Mail Fraud:  The RICO Defendants violated 18 U.S.C. § 1341 by sending

6   or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial

7   interstate carriers for the purpose of executing the unlawful scheme to design, manufacture,

8   market, and sell the Class Vehicles by means of false pretenses, misrepresentations, promises, and

9   omissions.

10          b.    Wire Fraud:  The RICO Defendants violated 18 U.S.C. § 1343 by

11  transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire

12  for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses,

13  misrepresentations, promises, and omissions.

14      270.    The RICO Defendants' use of the mails and wires include, but are not limited to,

15  the transmission, delivery, or shipment of the following by the RICO Defendants or third parties

16  that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

17          a.   the Class Vehicles themselves;

18          b.   component parts for the defeat devices;

19          c.   essential hardware for the Class Vehicles;

20          d.   falsified emission tests;

21          e.   fraudulent applications for EPA COCs and CARB EOs;

22          f.   fraudulently-obtained EPA COCs and CARB EOs;

23          g.   vehicle registrations and plates as a result of the fraudulently-obtained EPA

24              COCs and CARB EOs;

25          h.   documents and communications that facilitated the falsified emission tests;

26          i.   false or misleading communications intended to lull the public and regulators

27              from discovering the defeat devices and/or other auxiliary devices;

28

1         j.   sales and marketing materials, including advertising, websites, product

2              packaging, brochures, and labeling, which misrepresented and concealed the

3              true nature of the Class Vehicles;

4         k.   documents intended to facilitate the manufacture and sale of the Class

5              Vehicles, including bills of lading, invoices, shipping records, reports and

6              correspondence;

7         l.   documents to process and receive payment for the Class Vehicles by

8              unsuspecting Class members, including invoices and receipts;

9        m.  payments to Bosch, IAV, Continental, and ZF;

10       n.   deposits of proceeds; and

11       o.   other documents and things, including electronic communications.

12      271.   The RICO Defendants (or their agents), for the purpose of executing the illegal

13 scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or

14 interstate carrier, shipments of the Class Vehicles and related documents by mail or a private

15 carrier affecting interstate commerce, including the items described above and alleged below:

| From | To | Date | Description |
|---|---|---|---|
| VW AG and/or VW America | Palisades Audi, New York | Upon information and belief, fourth quarter of 2013 | Shipment of 2014 Audi A8 Class Vehicles. |
| VW America | Audi Dealerships | Upon information and belief, third quarter of 2014 | Marketing materials for 2015 Class Vehicles. |
| New Mexico Motor Vehicle Division | Geert Wenes | April 2013 | Mailed Certificate of Vehicle Registration for 2013 Audi Q5 based on false emission test due to concealed defeat device. |
| Maryland Department of Transportation, Motor Vehicle Administration | Michael Gray | March 2016 | Mailed Registration Certificate for 2016 Audi Q5 based on false emission test due to concealed defeat device. |
| EPA, Michigan | Volkswagen America, | February 2011 | COC for 2012 Class Vehicles |

| From | To | Date | Description |
|------|-----|------|-------------|
| | Michigan | | based on fraudulent application. |
| EPA, Michigan | Volkswagen America, Michigan | March 2012 and November 2012 | COCs for 2013 Class Vehicles based on fraudulent applications. |
| CARB, California | Volkswagen America, Michigan | June 2013 | EO for 2014 Class Vehicles based on fraudulent application. |
| CARB, California | Volkswagen America, Michigan | May 2014 and June 2014 | EOs for 2015 Class Vehicles based on fraudulent applications. |
| CARB, California | Volkswagen America, Michigan | January 2015 and July 2015 | EOs for 2016 Class Vehicles based on fraudulent applications. |

272.    The Volkswagen RICO Defendants (or their agents), for the purpose of executing the illegal scheme, transmitted (or caused to be transmitted) in interstate commerce by means of wire communications, certain writings, signs, signals and sounds, including those items described above and alleged below:

| From | To | Date | Description |
|------|-----|------|-------------|
| VW America, Michigan | EPA, Michigan and CARB, California | January 25, 2011 | Certification Summary Information Report with emission test results for 2012 Class Vehicles. |
| VW America, Michigan | EPA, Michigan and CARB, California | July 19, 2012 and September 28, 2012 and | Certification Summary Information Reports with emission test results for 2013 Class Vehicles. |
| VW America, Michigan | EPA, Michigan and CARB, California | May 7, 2013 | Certification Summary Information Report with emission test results for 2014 Class Vehicles. |
| VW America, Michigan | EPA, Michigan and CARB, California | June 5, 2014 | Certification Summary Information Reports with emission test results for 2015 Class Vehicles. |
| VW America, Michigan | EPA, Michigan and CARB, California | December 17, 2014 and June 20, 2015 | Certification Summary Information Reports with emission test results for 2016 Class Vehicles. |
| Audi AG | Audi America | June 6, 2013 | Email correspondence regarding concealment of low power shift mode from the public and regulators. |

- 84 -                              AUDI CO$_2$ CONSOLIDATED
                                                                  CLASS ACTION COMPLAINT
                                                                  MDL 2672 CRB (JSC)

1    273.   The RICO Defendants also used the internet and other electronic facilities to carry

2    out the scheme and conceal the ongoing fraudulent activities.  Specifically, the American

3    Volkswagen Defendants, under the direction and control of the German Volkswagen Defendants,

4    made misrepresentations about the Class Vehicles on their websites and through ads online, all of

5    which were intended to mislead regulators and the public about the fuel efficiency, emissions

6    standards, and other performance metrics.

7    274.   The RICO Defendants also communicated by U.S. mail, by interstate facsimile,

8    and by interstate electronic mail with various other affiliates, regional offices, divisions,

9    dealerships and other third-party entities in furtherance of the scheme.

10    275.   The mail and wire transmissions described herein were made in furtherance of the

11    RICO Defendants' scheme and common course of conduct to deceive regulators and consumers

12    and lure consumers into purchasing the Class Vehicles, which the RICO Defendants knew or

13    recklessly disregarded as emitting illegal amounts of pollution, despite their advertising campaign

14    that the Class Vehicles were environmentally friendly without compromising performance.

15    276.   Many of the precise dates of the fraudulent uses of the U.S. mail and interstate

16    wire facilities have been deliberately hidden, and cannot be alleged without access to the RICO

17    Defendants' books and records.  However, Plaintiffs have described the types of, and in some

18    instances, occasions on which the predicate acts of mail and/or wire fraud occurred.  They include

19    thousands of communications to perpetuate and maintain the scheme, including the things and

20    documents described in the preceding paragraphs.

21    277.   The RICO Defendants have not undertaken the practices described herein in

22    isolation, but as part of a common scheme and conspiracy.  In violation of 18 U.S.C. § 1962(d),

23    the RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein.  Various

24    other persons, firms and corporations, including third-party entities and individuals not named as

25    defendants in this Complaint, have participated as co-conspirators with the RICO Defendants in

26    these offenses and have performed acts in furtherance of the conspiracy to increase or maintain

27    revenues, increase market share, and/or minimize losses for the RICO Defendants and their

28    unnamed co-conspirators throughout the illegal scheme and common course of conduct.

278.   The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

279.   To achieve their common goals, the RICO Defendants hid from the general public the unlawfulness and emission dangers of the Class Vehicles and obfuscated the true nature of the defect even after regulators raised concerns.  The RICO Defendants suppressed and/or ignored warnings from third parties, whistleblowers, and governmental entities about the discrepancies in emissions testing and the defeat devices present in the Class Vehicles.

280.   The RICO Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling the Class Vehicles (and the $CO_2$ defeat devices contained therein).

281.   Indeed, for the conspiracy to succeed each of the RICO Defendants and their co-conspirators had to agree to implement and use the similar devices and fraudulent tactics—specifically complete secrecy about the defeat devices in the Class Vehicles.

282.   The RICO Defendants knew and intended that government regulators, as well as Plaintiffs and Class members, would rely on the material misrepresentations and omissions made by them and the American Volkswagen Defendants about the Class Vehicles.  The RICO Defendants knew and intended that consumers would incur costs as a result.  As fully alleged herein, Plaintiffs, along with tens of thousands of other consumers, relied upon the RICO Defendants' representations and omissions that were made or caused by them.  Plaintiffs' reliance is made obvious by the fact that they purchased and leased illegal vehicles that never should have been introduced into the U.S. stream of commerce and whose worth has now plummeted since the scheme was revealed.  In addition, the EPA, CARB, and other regulators relied on the misrepresentations and material omissions made or caused to be made by the RICO Defendants; otherwise Volkswagen and Audi could not have obtained valid COCs and EOs to sell the Class Vehicles.

283.     As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiffs and Class members based on their misrepresentations and omissions, while providing Class Vehicles that were worth significantly less than the purchase price paid.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

284.     The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants at the expense of Plaintiffs and Class members.  The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the Defeat Device RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and Class members' funds and avoiding the expenses associated with remediating the Class Vehicles.

285.     During the design, manufacture, testing, marketing and sale of the Class Vehicles, the RICO Defendants shared technical, marketing, and financial information that revealed the existence of the defeat devices contained therein.  Nevertheless, the Volkswagen RICO Defendants shared and disseminated information that deliberately misrepresented the Class Vehicles as legal, environmentally friendly, and fuel efficient.

286.     By reason of, and as a result of the conduct of the RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

      a.   Purchase or lease of an illegal, defective Class Vehicle;

      b.   Overpayment for a Class Vehicle, in that Plaintiffs and Class members believed they were paying for a vehicle that met certain emission and fuel efficiency standards and obtained a vehicle that was anything but;

      c.   The value of the Class Vehicles has diminished, thus reducing their resale value;

      d.   Other out-of-pocket and loss-of-use expenses;

1          e.   Payment for alternative transportation; and

2          f.   Loss of employment due to lack of transportation.

3      287.   The RICO Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and

4  proximately caused injuries and damages to Plaintiffs and Class members, and Plaintiffs and

5  Class members are entitled to bring this action for three times their actual damages, as well as

6  injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

7                          **NATIONWIDE COUNT II:**
                           **FRAUD BY CONCEALMENT**
8                                **(Common Law)**

9      288.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

10  forth herein.

11     289.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class or, in

12  the alternative, on behalf of the State Subclasses, against all Defendants.

13     290.   Each Defendant committed fraud by installing and calibrating defeat device

14  software in the Defeat Devices Vehicles, which were unlawfully concealed from regulators and

15  consumers alike.  In uniform advertising and materials provided with each Class Vehicle, the

16  Volkswagen and Audi Defendants concealed from Plaintiffs and the Class that the defeat device

17  software circumvented federal and state vehicle emissions standards by lowering emissions of

18  pollutants during emissions certification testing.

19     291.   The Volkswagen and Audi Defendants intentionally concealed, suppressed, and

20  failed to disclose the facts that the Class Vehicles contained illegal defeat device software and

21  emitted unlawfully high levels of pollutants such as $CO_2$.  These Defendants , along with the

22  Bosch Defendants, knew or should have known the true facts, due to their involvement in the

23  design, installment, and calibration of the defeat device software in the Class Vehicles.  And yet,

24  at no time did any of these Defendants reveal the truth to Plaintiffs or the Class.  To the contrary,

25  each Defendant concealed the truth, intending for Plaintiffs and the Class to rely—which they did

26  by purchasing and leasing the Class Vehicles.

27     292.   A reasonable consumer would not have expected that the Class Vehicles contained

28  illegal defeat device software designed to cheat emissions certification testing or that the Class

1   Vehicles would emit unlawfully high levels of pollutants such as $CO_2$ during normal driving

2   operation.  Plaintiffs and the members of the Class did not know of the facts which were

3   concealed from them by Defendants.  Moreover, as consumers, Plaintiffs and the members of the

4   Class did not, and could not, unravel the deception on their own.

5         293.   Defendants had a duty to disclose the defeat device software and that the Class

6   Vehicles emitted unlawfully high levels of pollutants such as $CO_2$ during normal driving

7   operation.  Defendants had such a duty because the true facts were known and/or accessible only

8   to them and because they knew these facts were not known to or reasonably discoverable by

9   Plaintiffs or the members of the Class.

10        294.   The Volkswagen Defendants also had a duty to disclose the true nature of the

11  Class Vehicles in light of their statements about the qualities and characteristics of the Class

12  Vehicles with respect to emissions standards, fuel efficiency and performance, which were

13  misleading, deceptive, and incomplete without the disclosure of the additional facts set forth

14  above regarding the existence of the defeat device software and actual levels of vehicle emissions.

15        295.   Having volunteered to provide information to Plaintiffs and the members of the

16  Class, the Volkswagen Defendants had the duty to disclose the whole truth.  On information and

17  belief, the Volkswagen Defendants have still not made full and adequate disclosures and continue

18  to defraud Plaintiffs and the members of the Class by concealing material information regarding

19  the emissions qualities of the Class Vehicles.

20        296.   Had the truth been revealed, Plaintiffs and the Class would not have purchased the

21  Class Vehicles, or would have paid less for them.  Plaintiffs and the members of the Class have

22  sustained damage because they own or lease Class Vehicles that should never have been placed in

23  the stream of commerce and are diminished in value as a result of Defendants' fraud.

24  Accordingly, Defendants are liable to Plaintiffs and the members of the Class for damages in an

25  amount to be proven at trial.

26        297.   Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with

27  intent to defraud; in reckless disregard of the rights of Plaintiffs and the Class; and to enrich

28  themselves.  Their misconduct warrants an assessment of punitive damages in an amount

1    sufficient to deter such conduct in the future, which amount shall be determined according to

2    proof at trial.

3                                        **COUNT III:**
                        **IMPLIED AND WRITTEN WARRANTY**
4                **Magnuson - Moss Warranty Act (15 U.S.C. §§ 2301, *et seq.*)**

5          298.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

6    forth herein.

7          299.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class

8    against the Volkswagen and Audi defendants (collectively for this count, "Defendants").

9          300.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by

10   virtue of 28 U.S.C. § 1332 (a)-(d).

11         301.    Plaintiffs and Class members are "consumers" within the meaning of the

12   Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

13         302.    Defendants are "supplier[s]" and "warrantor[s]" within the meaning of the

14   Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

15         303.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-

16   Moss Warranty Act, 15 U.S.C. § 2301(1).

17         304.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is

18   damaged by the failure of a warrantor to comply with a written or implied warranty.

19         305.    Defendants' provided Plaintiffs and the Nationwide Class with the following two

20   express warranties, which are covered under 15 U.S.C. § 2301(6):

21                a.    **Manufacturer's Warranty**—This written warranty provides "bumper-to-

22   bumper" limited express warranty coverage for a minimum of 4 years or 50,000 miles, whichever

23   comes first. The warranty covers emissions related repairs.

24                b.    **Federal Emissions Warranty**—Consistent with federal law, the

25   Volkswagen Defendants provided a "performance warranty" and a "design and defect warranty."

26   In the event that a vehicle fails an emissions test, these warranties cover the repair and

27   replacement of: all emission control and emission-related parts for two years or 24,000 miles

28   (whichever comes first); and specified major emission control components, including catalytic

converters, electronic emissions control unit or computer and on–board emissions diagnostic device or computer for 8 years or 80,000 miles (whichever comes first).

306.    The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

307.    The terms of these warranties became part of the basis of the bargain when Plaintiffs and each member of the Class purchased or leased their Class Vehicles.

308.    Defendants breached these written and implied warranties as described in detail above.  Without limitation, the Class Vehicles share a common design defect in that they emit more pollutants than: (a) is allowable under the applicable regulations, and (b) was revealed to regulators, consumers, and the driving public.

309.    Plaintiffs and each member of the Class have had sufficient direct dealings with either Defendants or their agents (including dealerships) to establish privity of contract between Defendants, on the one hand, and Plaintiffs and each member of the Class, on the other hand. Nonetheless, privity is not required here because Plaintiffs and each member of the Class are intended third-party beneficiaries of contracts between Defendants and their dealers, and of their implied warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers only.

310.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile.  At the time of sale or lease of each Class Vehicle, Defendants knew, or should have known, of their misrepresentations and/or material omissions concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the design defect.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs or members of the Class resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

311.    In addition, given the conduct described herein, any attempts by Defendants, in their capacity as warrantors, to limit the implied warranties in a manner that would exclude

1   coverage of the defect is unconscionable and any such effort to disclaim, or otherwise limit,

2   liability for the defect is null and void.

3        312.    Plaintiffs and the other Class members would suffer economic hardship if they

4   returned their Class Vehicles, but did not receive the return of all payments made by them to

5   Defendants.  Because Defendants are refusing to acknowledge any revocation of acceptance and

6   have not immediately returned any payments made, Plaintiffs and the Class have not re-accepted

7   their Class Vehicles by retaining them.

8        313.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the

9   sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of

10  interest and costs, computed on the basis of all claims to be determined in this lawsuit.

11       314.    As a direct and proximate result of the Defendants' breach of the written and

12  implied warranties, Plaintiffs and each member of the Class have suffered damages.

13       315.    Plaintiffs, individually and on behalf of the Class, seek all damages permitted by

14  law, including compensation for the monetary difference between the Class Vehicles as warranted

15  and as sold or leased; compensation for the reduction in resale value; the cost of purchasing,

16  leasing, or renting replacement vehicles, along with all other incidental and consequential

17  damages, statutory attorney fees, and all other relief allowed by law.

18  **E.**     <u>**State-Specific Claims**</u>

19  **ALABAMA COUNT I:**<br>**Violations of the Alabama Deceptive Trade Practices Act**<br>**Ala. Code § 8-19-1, *et seq.***<br>**(On Behalf of the Alabama State Class)**

20

21

22       316.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully

23  set forth herein.

24       317.    This count is brought on behalf of the Alabama State Class against all Defendants.

25       318.    Plaintiffs and the Alabama State Class members are "consumers" within the

26  meaning of Ala. Code § 8-19-3(2).

27       319.    Plaintiffs, the Alabama State Class members, and Defendants are "persons" within

28  the meaning of Ala. Code § 8-19-3(5).

1    320.    The Class Vehicles are "goods" within the meaning of Ala. Code § 8-19-3(3).

2    321.    Defendants were and is engaged in "trade or commerce" within the meaning of

3    Ala. Code § 8-19-3(8).

4    322.    The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several

5    specific actions to be unlawful, including: "(5) Representing that goods or services have

6    sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not

7    have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or

8    that goods are of a particular style or model, if they are of another," and "(27) Engaging in any

9    other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or

10   commerce." Ala. Code § 8-19-5.

11   323.    In the course of its business, Defendants concealed and suppressed material facts

12   concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

13   Class Vehicles that caused the vehicles to operate in a low emission test mode only during

14   emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

15   noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions

16   testing by way of deliberately induced false readings.

17   324.    Plaintiffs and Alabama State Class members had no way of discerning that

18   Defendants' representations were false and misleading because Defendants' defeat device

19   software was extremely sophisticated technology. Plaintiffs and Alabama State Class members

20   did not and could not unravel Defendants' deception on their own.

21   325.    Defendants thus violated the Alabama DTPA by, at minimum: representing that

22   Class Vehicles have characteristics, uses, benefits, and qualities which they do not have;

23   representing that Class Vehicles are of a particular standard, quality, and grade when they are not;

24   advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing

25   that the subject of a transaction involving Class Vehicles has been supplied in accordance with a

26   previous representation when it has not.

27   326.    Defendants intentionally and knowingly misrepresented material facts regarding

28   the Class Vehicles with intent to mislead Plaintiffs and the Alabama State Class.

327.    Defendants knew or should have known that their conduct violated the Alabama DTPA.

328.    Defendants owed Plaintiffs and the Alabama State Class a duty to disclose the illegality, public health and safety risks, the true nature of the Class Vehicles, because Defendants:

      A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

      B.    intentionally concealed the foregoing from regulators, Plaintiffs, and/or Alabama State Class members; and/or

      C.    made incomplete representations about the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

329.    Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to Plaintiffs and the Alabama State Class.

330.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

331.    Plaintiffs and the Alabama State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Alabama State Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs and the Alabama State Class also suffered diminished value of their vehicles, as well as lost or diminished use.

332.    On December 21, 2016, a notice letter was sent to Audi AG and Audi of America, LLC complying with Ala. Code § 8-19-10(e).  Additionally, all Defendants were provided notice

- 94 -

1    of the issues raised in this count and this Complaint by the governmental investigations, the

2    numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs

3    within a reasonable amount of time after the allegations of Class Vehicle defects became public.

4    Moreover, Plaintiffs sent a second notice letter pursuant to Ala. Code § 8-19-10(e) to all

5    Defendants on October 11, 2017.  Because Defendants failed to remedy their unlawful conduct

6    within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the

7    Alabama State Class are entitled.

8                              **ALABAMA COUNT II:**
                               **Breach of Express Warranty**
9                          **Ala. Code §§ 7-2-313 and 7-2A-210**
                          **(On Behalf of the Alabama State Class)**
10

11       333.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

12   fully set forth herein.

13       334.    This count is brought on behalf of the Alabama State Class against the

14   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

15       335.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

16   vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and a "seller" of motor vehicles under

17   § 7-2-103(1)(d).

18       336.    With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

19   of motor vehicles under Ala. Code. § 7-2A-103(1)(p).

20       337.    The Class Vehicles are and were at all relevant times "goods" within the meaning

21   of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

22       338.    In connection with the purchase or lease of each one of its new vehicles,

23   Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

24   occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

25   materials or workmanship."

26       339.    Defendants also made numerous representations, descriptions, and promises to

27   Plaintiffs and Alabama State Class members regarding the performance and emission controls of

28   their vehicles.

340.     For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

> Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
> – is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

341.     The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

342.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

343.     The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express

1    warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

2    Design and Defect Warranty required by the EPA covers repair of emission control or emission

3    related parts, which fail to function or function improperly because of a defect in materials or

4    workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

5    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

6    comes first.

7        344.    As manufacturers of light-duty vehicles, Defendants were required to provide

8    these warranties to purchasers or lessees of Class Vehicles.

9        345.    Defendants' warranties formed a basis of the bargain that was reached when

10   Alabama State Class members purchased or leased their Class Vehicles equipped with the non-

11   compliant emission systems.

12       346.    Despite the existence of warranties, Defendants failed to inform Alabama State

13   Class members that the Class Vehicles were intentionally designed and manufactured to be out of

14   compliance with applicable state and federal emissions laws, and failed to fix the defective

15   emission components free of charge.

16       347.    Defendants breached the express warranty promising to repair and correct

17   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

18   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

19       348.    Affording Defendants a reasonable opportunity to cure their breach of written

20   warranties would be unnecessary and futile here.

21       349.    Furthermore, the limited warranty promising to repair and correct Defendants'

22   defect in materials and workmanship fails in its essential purpose because the contractual remedy

23   is insufficient to make Alabama State Class members whole and because Defendants have failed

24   and/or have refused to adequately provide the promised remedies within a reasonable time.

25       350.    Accordingly, recovery by the Alabama State Class members is not restricted to the

26   limited warranty promising to repair and correct Defendants' defect in materials and

27   workmanship, and they seek all remedies as allowed by law.

28

351.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Alabama State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

352.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship, as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Alabama State Class members' remedies would be insufficient to make them whole.

353.    Finally, because of Defendants' breach of warranty as set forth herein, Alabama State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

354.    Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

355.    As a direct and proximate result of Defendants' breach of express warranties, Alabama State Class members have been damaged in an amount to be determined at trial.

**ALABAMA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Ala. Code §§ 7-2-314 and 7-2A-212**
**(On Behalf of the Alabama State Class)**

356.    Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

357.    This count is brought on behalf of the Alabama State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

358.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and a "seller" of motor vehicles under § 7-2-103(1)(d).

359.    With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Ala. Code. § 7-2A-103(1)(p).

360.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

361.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ala. Code §§ 7-2-314 and 7-2A-212.

362.    These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

363.    Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

364.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Alabama State Class members have been damaged in an amount to be proven at trial.

**ALASKA COUNT I:**
**Violations of the Alaska Unfair Trade Practices and Consumer Protection Act**
**Alaska Stat. Ann. § 45.50.471 *et seq.***
**(On Behalf of the Alaska State Class)**

365.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

366.    This count is brought on behalf of the Alaska State Class against all Defendants.

- 99 -

367.     The Alaska Unfair Trade Practices And Consumer Protection Act ("Alaska CPA") declares unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including: "(4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(6) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" "(8) advertising goods or services with intent not to sell them as advertised;" or "(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged." Alaska Stat. § 45.50.471.

368.     In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

369.     Alaska State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs and Alaska State Class members did not and could not unravel Defendants' deception on their own.

370.     Defendants thus violated the Alaska CPA by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

371.     The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the Alaska CPA.

372.     Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Alaska State Class.

373.     Defendants knew or should have known that their conduct violated the Alaska CPA.

374.     Defendants owed Plaintiffs and the Alaska State Class a duty to disclose the illegality, public health and safety risks, the true nature of the Class Vehicles, because Defendants:

A.       possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

B.       intentionally concealed the foregoing from regulators, Plaintiffs, and/or Class members; and/or

C.       made incomplete representations about the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

375.     Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to Plaintiffs and the Alaska State Class.

376.     Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

377.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

378.    As a direct and proximate result of Defendants' violations of the Alaska CPA, Plaintiffs and the Alaska State Class have suffered injury-in-fact and/or actual damage.

379.    Pursuant to Alaska Stat. § 45.50. 531, Plaintiffs and the Alaska State Class seek monetary relief against Defendants measured as the greater of (a) three times the actual damages in an amount to be determined at trial or (b) $500 for each Plaintiffs and each Alaska State Class member.

380.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices pursuant to Alaska Stat. § 45.50. 535, attorneys' fees, and any other just and proper relief available under the Alaska CPA.

381.    On December 21, 2016, a notice letter was sent to Audi AG and Audi of America, LLC complying with Alaska Stat. § 45.50.535.  Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by consumers within a reasonable amount of time after the allegations of Class Vehicle defects became public. Moreover, Plaintiffs sent a second notice letter pursuant to Alaska Stat. § 45.50.535 to all Defendants on October 11, 2017.  Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Alaska State Class are entitled.

**ALASKA COUNT II:**
**Breach of Express Warranty**
**Alaska Stat. §§ 45.02.313 and 45.12.210**
**(On Behalf of the Alaska State Class)**

382.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

383.    This count is brought on behalf of the Alaska State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

384.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Alaska Stat. §§ 45.02.104(a) and 45.12.103(c)(11), and a "seller" of motor vehicles under Alaska Stat. § 45.02.103(a)(4).

385.     With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Alaska Stat. § 45.12.103(a)(16).

386.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Alaska Stat. §§ 45.02.105(a) and 45.12.103(a)(8).

387.     In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

388.     Defendants also made numerous representations, descriptions, and promises to Plaintiffs and Alaska State Class members regarding the performance and emission controls of their vehicles.

389.     For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:

– was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
– is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

390.     The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

391.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

392.     The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

393.     As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

394.     Defendants' warranties formed a basis of the bargain that was reached when Alaska State Class members purchased or leased Class Vehicles that are equipped with a defeat device and non-compliant emission systems.

395.     Despite the existence of warranties, Defendants failed to inform Alaska State Class members that the Class Vehicles were intentionally designed and manufactured to be out of

1    compliance with applicable state and federal emissions laws, and failed to fix the defective

2    emission components free of charge.

3          396.    Defendants breached the express warranty promising to repair and correct

4    Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

5    have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

6          397.    Affording Defendants a reasonable opportunity to cure their breach of written

7    warranties would be unnecessary and futile here.

8          398.    Furthermore, the limited warranty promising to repair and correct Defendants'

9    defect in materials and workmanship fails in its essential purpose because the contractual remedy

10   is insufficient to make Alaska State Class members whole and because Defendants have failed

11   and/or have refused to adequately provide the promised remedies within a reasonable time.

12         399.    Accordingly, recovery by the Alaska State Class members is not restricted to the

13   limited warranty promising to repair and correct Defendants' defect in materials and

14   workmanship, and they seek all remedies as allowed by law.

15         400.    Also, as alleged in more detail herein, at the time Defendants warranted and sold

16   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

17   not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

18   material facts regarding the Class Vehicles. Alaska State Class members were therefore induced

19   to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

20         401.    Moreover, many of the injuries flowing from the Class Vehicles cannot be

21   resolved through the limited remedy of repairing and correcting Defendants' defect in materials

22   and workmanship fails in its essential purpose as many incidental and consequential damages

23   have already been suffered because of Defendants' fraudulent conduct as alleged herein, and

24   because of its failure and/or continued failure to provide such limited remedy within a reasonable

25   time, and any limitation on the Alaska State Class members' remedies would be insufficient to

26   make them whole.

27         402.    Finally, because of Defendants' breach of warranty as set forth herein, Alaska

28   State Class members assert, as additional and/or alternative remedies, the revocation of

1    acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

2    currently owned or leased, and for such other incidental and consequential damages as allowed.

3        403.    Defendants were provided notice of these issues by numerous complaints filed

4    against them, including the instant Complaint, within a reasonable amount of time.

5        404.    As a direct and proximate result of Defendants' breach of express warranties,

6    Alaska State Class members have been damaged in an amount to be determined at trial.

7                                      **ALASKA COUNT III:**
                          **Breach of Implied Warranty of Merchantability**
8                              **Alaska Stat. §§ 45.02.314 and 45.12.212**
                              **(On Behalf of the Alaska State Class)**
9

10       405.    Plaintiffs re-allege and incorporate by reference all allegations of the preceding

11   paragraphs as though fully set forth herein.

12       406.    This count is brought on behalf of the Alaska State Class against the Volkswagen

13   and Audi Defendants (collectively for this count, "Defendants").

14       407.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

15   vehicles under Alaska Stat. §§ 45.02.104(a) and 45.12.103(c)(11), and a "seller" of motor

16   vehicles under Alaska Stat. § 45.02.103(a)(4).

17       408.    With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

18   of motor vehicles under Alaska Stat. § 45.12.103(a)(16).

19       409.    The Class Vehicles are and were at all relevant times "goods" within the meaning

20   of Alaska Stat. §§ 45.02.105(a) and 45.12.103(a)(8).

21       410.    A warranty that the Class Vehicles were in merchantable condition and fit for the

22   ordinary purpose for which vehicles are used is implied by law pursuant to Alaska Stat.

23   §§ 45.02.314 and 45.12.212.

24       411.    These Class Vehicles, when sold or leased and at all times thereafter, were not in

25   merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

26   Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat

27   device and do not comply with federal and state emissions standards, rendering certain emissions

28   functions inoperative.

412.     Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

413.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Alaska State Class members have been damaged in an amount to be proven at trial.

**ARIZONA COUNT I:**
**Violations of the Arizona Consumer Fraud Act**
**Ariz. Rev. Stat. § 44-1521, *et seq.***
**(On Behalf of the Arizona State Class)**

414.     Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

415.     Plaintiff Scott Snyder (for the purpose of this count, "Plaintiff") brings this count on behalf of himself and the Arizona State Class against all Defendants.

416.     Defendants, Plaintiff, and the Arizona State Class members are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

417.     The Class Vehicles are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

418.     The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, … misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

419.     In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing an illegal defeat device the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit grossly larger

1    quantities of noxious $CO_2$ gasses. The result was what Defendants intended—the Class Vehicles

2    passed emissions testing by way of deliberately induced false readings.

3        420.    Plaintiff and Arizona State Class members had no way of discerning that

4    Defendants' representations were false and misleading because Defendants' defeat device

5    software was extremely sophisticated technology. Plaintiff and Arizona State Class members did

6    not and could not unravel Defendants' deception on their own.

7        421.    Defendants thus violated the Arizona CFA by, at minimum: employing deception,

8    deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of

9    any material fact with intent that others rely upon such concealment, suppression or omission, in

10   connection with the sale of Class Vehicles.

11       422.    Defendants intentionally and knowingly misrepresented material facts regarding

12   the Class Vehicles with intent to mislead Plaintiff and the Arizona State Class.

13       423.    Defendants knew or should have known that their conduct violated the Arizona

14   CFA.

15       424.    Defendants owed Plaintiff and the Arizona State Class a duty to disclose the

16   illegality, public health and safety risks, the true nature of the Class Vehicles, because

17   Defendants:

18           A.    possessed exclusive knowledge that they were manufacturing, selling, and

19   distributing vehicles throughout the United States that did not comply with regulations;

20           B.    intentionally concealed the foregoing from regulators, Plaintiff, and

21   Arizona State Class members; and/or

22           C.    made incomplete representations about the Class Vehicles generally, and

23   the use of the defeat device in particular, while purposefully withholding material facts from

24   Plaintiff and/or Arizona State Class members that contradicted these representations.

25       425.    Defendants' fraudulent use of the "defeat device" and its concealment of the true

26   characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to

27   Plaintiff and the Arizona State Class.

28

426.     Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff, about the true environmental cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

427.     Plaintiff and the Arizona State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Arizona State Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiff and the Arizona State Class also suffered diminished value of their vehicles, as well as lost or diminished use.

428.     Plaintiff and the Arizona State Class seek monetary relief against Defendants in an amount to be determined at trial. Plaintiff and the Arizona State Class also seek punitive damages because Defendants engaged in aggravated and outrageous conduct with an evil mind.

429.     Plaintiff and the Arizona State Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

**ARIZONA COUNT II:**
**Breach of Express Warranty**
**Ariz. Rev. Stat. §§ 47-2313 and 47-2A210**
**(On Behalf of the Arizona State Class)**

430.     Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

431.     Plaintiff Scott Snyder (for the purpose of this count, "Plaintiff") brings this count on behalf of himself and the Arizona State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

432.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c); and is a "seller" of motor vehicles under Ariz. Rev. Stat. § 47-2103(A)(4).

433.     With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

434.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

435.     In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

436.     Defendants also made numerous representations, descriptions, and promises to Plaintiffs and Arizona State Class members regarding the performance and emission controls of their vehicles.

437.     For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

> Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:
>
> – was designed and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
> – is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

438.     The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

439.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

440.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

441.    As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

442.    Defendants' warranties formed a basis of the bargain that was reached when Arizona State Class members purchased or leased Class Vehicles that are equipped with a defeat device and non-compliant emission systems.

443.    Despite the existence of warranties, Defendants failed to inform Arizona State Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

444.     Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

445.     Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

446.     Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Arizona State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

447.     Accordingly, recovery by the Arizona State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

448.     Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Arizona State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

449.     Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Arizona State Class members' remedies would be insufficient to make them whole.

450.     Finally, because of Defendants' breach of warranty as set forth herein, Arizona State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1    451.    Defendants were provided notice of these issues by numerous complaints filed

2    against them, including the instant Complaint, within a reasonable amount of time.

3    452.    As a direct and proximate result of Defendants' breach of express warranties,

4    Arizona State Class members have been damaged in an amount to be determined at trial.

5    **ARIZONA COUNT III:**
**Breach of Implied Warranty of Merchantability**
6    **Ariz. Rev. Stat. §§ 47-2314 and 47-2A212**
**(On Behalf of the Arizona State Class)**
7

8    453.    Plaintiffs re-allege and incorporate by reference all allegations of the preceding

9    paragraphs as though fully set forth herein.

10    454.    Plaintiff Scott Snyder (for the purpose of this count, "Plaintiff") brings this count

11    on behalf of himself and the Arizona State Class against the Volkswagen and Audi Defendants

12    (collectively for this count, "Defendants").

13    455.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

14    vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c); and is a "seller" of motor

15    vehicles under Ariz. Rev. Stat. § 47-2103(A)(4).

16    456.    With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

17    of motor vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

18    457.    The Class Vehicles are and were at all relevant times "goods" within the meaning

19    of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

20    458.    A warranty that the Class Vehicles were in merchantable condition and fit for the

21    ordinary purpose for which vehicles are used is implied by law pursuant to Ariz. Rev. Stat. §§ 47-

22    2314 and 47-2a212.

23    459.    These Class Vehicles, when sold or leased and at all times thereafter, were not in

24    merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

25    Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat

26    device and do not comply with federal and state emissions standards, rendering certain emissions

27    functions inoperative.

28

460.    Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

461.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Arizona State Class members have been damaged in an amount to be proven at trial.

**ARKANSAS COUNT I:**
**Violations of the Deceptive Trade Practices Act**
**Ark. Code Ann. § 4-88-101 *et seq.***
**(On Behalf of the Arkansas State Class)**

462.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

463.    This count is brought on behalf of the Arkansas State Class against all Defendants.

464.    Defendants, Plaintiffs, and the Arkansas State Class are "persons" within the meaning of Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), Ark. Code Ann. § 4-88-102(5).

465.    The Class Vehicles are "goods" within the meaning of Ark. Code Ann. § 4-88-102(4).

466.    The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" Ark. Code Ann. § 4-88-107(a)(10). The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods: "(1) The act, use, or employment by any person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission." Ark. Code Ann. § 4-88-108.

467.    In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during

emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

468.    Arkansas State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs and Arkansas State Class members did not and could not unravel Defendants' deception on their own.

469.    Defendants thus violated the Arkansas DTPA by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

470.    The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the Arkansas DTPA.

471.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Arkansas State Class. Defendants knew or should have known that their conduct violated the Arkansas DTPA.

472.    Defendants owed Plaintiffs and the Arkansas State Class a duty to disclose the illegality, public health and safety risks, the true nature of the Class Vehicles, because Defendants:

A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

B.      intentionally concealed the foregoing from regulators, Plaintiffs, and/or Class members; and/or

C.      made incomplete representations about the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

473.    Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to Plaintiffs and the Arkansas State Class.

474.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

475.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

476.    Plaintiffs and the Arkansas State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Arkansas State Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Arkansas DTPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

477.    As a direct and proximate result of Defendants' violations of the Arkansas DTPA, Plaintiffs and the Arkansas State Class have suffered injury-in-fact and/or actual damage.

1    478.    Plaintiffs and the Arkansas State Class seek monetary relief against Defendants in

2    an amount to be determined at trial. Plaintiffs and the Arkansas State Class also seek punitive

3    damages because Defendants acted wantonly in causing the injury or with such a conscious

4    indifference to the consequences that malice may be inferred.

5    479.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or

6    deceptive practices, attorneys' fees, and any other just and proper relief available under the

7    Arkansas DTPA.

8    **ARKANSAS COUNT II:**
     **Breach of Express Warranty**
9    **Ark Code Ann. §§ 4-2-313 and 4-2A-210**
     **(On Behalf of the Arkansas State Class)**
10

11   480.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

12   fully set forth herein.

13   481.    This count is brought on behalf of the Arkansas State Class against the

14   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

15   482.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

16   vehicles under Ark. Code §§ 4-2-104(1) and 4-2A-103(3), and "seller[s]" of motor vehicles under

17   § 4-2-103(1)(d).

18   483.    With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

19   of motor vehicles under Ark. Code § 4-2A-103(1)(p).

20   484.    The Class Vehicles are and were at all relevant times "goods" within the meaning

21   of Ark. Code §§ 4-2-105(1) and 4-2A-103(1)(h).

22   485.    In connection with the purchase or lease of each one of its new vehicles,

23   Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

24   occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

25   materials or workmanship."

26   486.    Defendants also made numerous representations, descriptions, and promises to

27   Plaintiffs and Arkansas State Class members regarding the performance and emission controls of

28   their vehicles.

487.    For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:

– was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
– is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

488.    The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

489.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

490.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

1  Design and Defect Warranty required by the EPA covers repair of emission control or emission

2  related parts, which fail to function or function improperly because of a defect in materials or

3  workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

4  first, or, for the major emission control components, for eight years or 80,000 miles, whichever

5  comes first.

6      491.    As manufacturers of light-duty vehicles, Defendants were required to provide

7  these warranties to purchasers or lessees of Class Vehicles.

8      492.    Defendants' warranties formed a basis of the bargain that was reached when

9  Arkansas State Class members purchased or leased Class Vehicles that are equipped with a defeat

10  device and non-compliant emission systems.

11      493.    Despite the existence of warranties, Defendants failed to inform Arkansas State

12  Class members that the Class Vehicles were intentionally designed and manufactured to be out of

13  compliance with applicable state and federal emissions laws, and failed to fix the defective

14  emission components free of charge.

15      494.    Defendants breached the express warranty promising to repair and correct

16  Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

17  have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

18      495.    Affording Defendants a reasonable opportunity to cure their breach of written

19  warranties would be unnecessary and futile here.

20      496.    Furthermore, the limited warranty promising to repair and correct Defendants'

21  defect in materials and workmanship fails in its essential purpose because the contractual remedy

22  is insufficient to make Arkansas State Class members whole and because Defendants have failed

23  and/or have refused to adequately provide the promised remedies within a reasonable time.

24      497.    Accordingly, recovery by the Arkansas State Class members is not restricted to the

25  limited warranty promising to repair and correct Defendants' defect in materials and

26  workmanship, and they seek all remedies as allowed by law.

27      498.    Also, as alleged in more detail herein, at the time Defendants warranted and sold

28  or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

1    not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

2    material facts regarding the Class Vehicles. Arkansas State Class members were therefore

3    induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

4         499.    Moreover, many of the injuries flowing from the Class Vehicles cannot be

5    resolved through the limited remedy of repairing and correcting Defendants' defect in materials

6    and workmanship as many incidental and consequential damages have already been suffered

7    because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

8    continued failure to provide such limited remedy within a reasonable time, and any limitation on

9    the Arkansas State Class members' remedies would be insufficient to make them whole.

10        500.    Finally, because of Defendants' breach of warranty as set forth herein, Arkansas

11    State Class members assert, as additional and/or alternative remedies, the revocation of

12    acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

13    currently owned or leased, and for such other incidental and consequential damages as allowed.

14        501.    Defendants were provided notice of these issues by numerous complaints filed

15    against them, including the instant Complaint, within a reasonable amount of time.

16        502.    As a direct and proximate result of Defendants' breach of express warranties,

17    Arkansas State Class members have been damaged in an amount to be determined at trial.

**ARKANSAS COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Ark. Code Ann. §§ 4-2-314 and 4-2A-212**
**(On Behalf of the Arkansas State Class)**

21        503.    Plaintiffs re-allege and incorporate by reference all allegations of the preceding

22    paragraphs as though fully set forth herein.

23        504.    This count is brought on behalf of the Arkansas State Class against the

24    Volkswagen and Audi Defendants (collectively for this count, "Defendants").

25        505.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

26    vehicles under Ark. Code §§ 4-2-104(1) and 4-2A-103(3), and "seller[s]" of motor vehicles under

27    § 4-2-103(1)(d).

506. With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Ark. Code § 4-2A-103(1)(p).

507. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code §§ 4-2-105(1) and 4-2A-103(1)(h).

508. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ark. Code §§ 4-2-314 and 4-2A-212.

509. These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

510. Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

511. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Arkansas State Class members have been damaged in an amount to be proven at trial.

**CALIFORNIA COUNT I:**
**Violation of California Consumers Legal Remedies Act**
**Cal Bus. & Prof. Code § 1750, *et seq.***
**(On Behalf of the California State Class)**

512. Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

513. Plaintiffs Hector Castillo, Russell Green, Jonathan Hecker, Vinod Marur, Scott Snyder, and Frank Edwin Thompson (for the purpose of this count, "Plaintiffs") bring this count on behalf of themselves and the California State Class against all Defendants.

514. Plaintiffs and the other members of the California State Class were deceived by Defendants' failure to disclose that the Class Vehicles share a uniform defect in that they are

1    equipped with "defeat devices." These defeat devices are designed to secretly limit emissions and

2    increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel

3    efficiency testing. However, when the Class Vehicles are in regular use on the road, they emit a

4    substantially increased amount of noxious gasses.

5    515.    Defendants engaged in unfair or deceptive acts or practices when, in the course of

6    its business it, among other acts and practices, knowingly made materially incomplete

7    representations as to the characteristics, uses and benefits of the Class Vehicles.

8    516.    In the various channels of information through which Defendants sold Class

9    Vehicles, Defendants failed to disclose material information concerning the Class Vehicles,

10   which it had a duty to disclose. Defendants had a duty to disclose the defect because, as detailed

11   above, (a) Defendants knew about the defeat device equipped on the Class Vehicles; (b)

12   Defendants had exclusive knowledge of material facts not known to the general public, Plaintiffs,

13   or the other California State Class members; and (c) Defendants actively concealed material facts

14   concerning the defeat device from the general public, Plaintiffs, and the California State Class

15   members. As detailed above, Defendants knew the information concerning the defect at the time

16   of advertising and selling the Class Vehicles, all of which was intended to induce consumers to

17   purchase the Class Vehicles.

18   517.    Defendants intended for the Plaintiffs and the other California State Class

19   members to rely on it to provide adequately designed, and adequately manufactured automobiles

20   and to honestly and accurately reveal the problems described throughout this Complaint.

21   518.    Defendants intentionally failed or refused to disclose the defect to consumers.

22   519.    Defendants' conduct and deceptive omissions were intended to induce Plaintiffs

23   and the other California State Class members to believe that the Class Vehicles were adequately

24   designed and adequately manufactured automobiles.

25   520.    Defendants' conduct constitutes unfair acts or practices as defined by the

26   California Consumers Legal Remedies Act (the "CLRA").

27

28

521.     Plaintiffs and the other California State Class members have suffered injury in fact and actual damages resulting from Defendants' material omissions because they paid inflated purchase prices for the Class Vehicles.

522.     Plaintiffs and the California State Class seek an order enjoining Defendants' unfair or deceptive acts or practices, equitable relief, an award of attorneys' fees and costs under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

523.     On February 21, 2017, Plaintiff Vinod Marur sent notice letters to Volkswagen Group of America, Inc. and Audi of America, LLC complying with Cal. Civ. Code § 1780(b). Plaintiffs sent another notice letter pursuant to Cal. Civ. Code § 1780(b) to all Defendants on October 11, 2017. Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by consumers within a reasonable amount of time after the allegations of Class Vehicle defects became public. Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiff seek all damages and relief to which Plaintiffs and the California State Class are entitled.

**CALIFORNIA COUNT II:**
**Violations of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200 *et seq.***
**(On Behalf of the California State Class)**

524.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

525.     Plaintiffs Hector Castillo, Russell Green, Jonathan Hecker, Vinod Marur, Scott Snyder, and Frank Edwin Thompson (for the purpose of this count, "Plaintiffs") bring this count on behalf of themselves and the California State Class against all Defendants.

526.     California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." Defendants have engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

527.     Defendants' conduct, as described herein, was and is in violation of the UCL. Defendants' conduct violates the UCL in at least the following ways:

A.     by knowingly and intentionally concealing from Plaintiffs and the other California State Class members that the Class Vehicles suffer from a design defect while obtaining money from Plaintiffs and California State Class members;

B.     by marketing Class Vehicles as possessing functional and defect-free, EPA-compliant engine systems;

C.     by purposefully installing an illegal "defeat device" in the Class Vehicles to fraudulently cause Class Vehicles to pass emissions tests when in truth and fact they did not pass such tests;

D.     by violating federal laws, including the Clean Air Act; and

E.     by violating other California laws, including California laws governing vehicle emissions and emission testing requirements.

528.   Defendants' misrepresentations and omissions alleged herein caused Plaintiffs and the other California State Class members to make their purchases or leases of their Class Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other California State Class members would not have purchased or leased these vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain a defeat device that failed to comply with emissions standards.

529.   Bosch played a critical role in facilitating, and itself contributed to, Volkswagen and Audi's unfair and deceptive conduct, as alleged herein. Bosch knew or should have known that Volkswagen and Audi would use and had used the Bosch technology as an emission defeat device, and in fact helped it do so. Without Bosch's complicity and silence, Volkswagen and Audi could not have perpetrated the fraudulent, deceptive, and unfair practices alleged herein, and Bosch's actions themselves constitute fraudulent, deceptive, and unfair practices.

530.   Accordingly, Plaintiffs and the other California State Class members have suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information.

531.     Plaintiffs requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and members of the California State Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

**CALIFORNIA COUNT III:**
**Violations of the California False Advertising Law**
**Cal. Civ. Code § 17500 *et seq.***
**(On Behalf of the California State Class)**

532.     Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

533.     Plaintiffs Hector Castillo, Russell Green, Jonathan Hecker, Vinod Marur, Scott Snyder, and Frank Edwin Thompson (for the purpose of this count, "Plaintiffs") bring this count on behalf of themselves and the California State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

534.     California Bus. & Prof. Code § 17500 states: "It is unlawful for any ... corporation ... with intent directly or indirectly to dispose of real or personal property ... to   induce the public to enter into any obligation relating thereto, to make or disseminate or cause to   be made or disseminated ... from this state before the public in any state, in any newspaper or   other publication, or any advertising device, ... or in any other manner or means whatever,   including over the Internet, any statement ... which is untrue or misleading, and which is known,   or which by the exercise of reasonable care should be known, to be untrue or misleading."

535.     Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been   known to Defendants, to be untrue and misleading to consumers, including Plaintiffs and the other California State Class members.

536.    Defendants have violated § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

537.    Plaintiffs and the other California State Class members have suffered an injury in fact, including   the loss of money or property, as a result of Defendants'   unfair, unlawful, and/or deceptive   practices. In purchasing or leasing their Class Vehicles, Plaintiffs and the other California State Class members   relied on the misrepresentations and/or omissions of Defendants with respect to the safety,   performance and reliability of the Class Vehicles. Defendants' representations turned out not to   be true because the Class Vehicles are distributed with faulty and defective engine    systems, rendering certain safety and emissions functions inoperative. Had Plaintiffs and the other California State Class members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them. Accordingly, Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

538.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

539.    Plaintiffs, individually and on behalf of the other California State Class members, requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other California State Class members any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

**CALIFORNIA COUNT IV:**
**Breach of Express Warranty**
**Cal. Com. Code §§ 2313 and 10210**
**(On Behalf of the California State Class)**

540.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1        541.    Plaintiffs Hector Castillo, Russell Green, Jonathan Hecker, Vinod Marur, Scott

2    Snyder, and Frank Edwin Thompson (for the purpose of this count, "Plaintiffs") bring this count

3    on behalf of themselves and the California State Class against the Volkswagen and Audi

4    Defendants (collectively for this count, "Defendants").

5        542.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

6    vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under

7    § 2103(1)(d).

8        543.    With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

9    of motor vehicles under Cal. Com. Code § 10103(a)(16).

10        544.    The Class Vehicles are and were at all relevant times "goods" within the meaning

11    of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

12        545.    In connection with the purchase or lease of each one of its new vehicles,

13    Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

14    occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

15    materials or workmanship."

16        546.    Defendants also made numerous representations, descriptions, and promises to

17    Plaintiffs and California State Class members regarding the performance and emission controls of

18    their vehicles.

19        547.    For example, as shown below, Defendants included in the warranty booklets for

20    some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped

21    so as to conform at the time of sale with all applicable regulations of the United States

22    Environmental Protection Agency."

23

24

25

26

27

28

Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:

– was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and

– is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

548.    The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

549.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

550.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

1    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

2    comes first.

3           551.    As manufacturers of light-duty vehicles, Defendants were required to provide

4    these warranties to purchasers or lessees of Class Vehicles.

5           552.    Defendants' warranties formed a basis of the bargain that was reached when

6    California State Class members purchased or leased Class Vehicles that are equipped with a

7    defeat device and non-compliant emission systems.

8           553.    Despite the existence of warranties, Defendants failed to inform California State

9    Class members that the Class Vehicles were intentionally designed and manufactured to be out of

10   compliance with applicable state and federal emissions laws, and failed to fix the defective

11   emission components free of charge.

12          554.    Defendants breached the express warranty promising to repair and correct

13   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

14   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

15          555.    Affording Defendants a reasonable opportunity to cure their breach of written

16   warranties would be unnecessary and futile here.

17          556.    Furthermore, the limited warranty promising to repair and correct Defendants'

18   defect in materials and workmanship fails in its essential purpose because the contractual remedy

19   is insufficient to make California State Class members whole and because Defendants have failed

20   and/or have refused to adequately provide the promised remedies within a reasonable time.

21          557.    Accordingly, recovery by the California State Class members is not restricted to

22   the limited warranty promising to repair and correct Defendants' defect in materials and

23   workmanship, and they seek all remedies as allowed by law.

24          558.    Also, as alleged in more detail herein, at the time Defendants warranted and sold

25   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

26   not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

27   material facts regarding the Class Vehicles. California State Class members were therefore

28   induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

559.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the California State Class members' remedies would be insufficient to make them whole.

560.    Finally, because of Defendants' breach of warranty as set forth herein, California State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

561.    Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

562.    As a direct and proximate result of Defendants' breach of express warranties, California State Class members have been damaged in an amount to be determined at trial.

**CALIFORNIA COUNT V:**
**Breach of Implied Warranty of Merchantability**
**Cal. Com. Code §§ 2314 and 10212**
**(On Behalf of the California State Class)**

563.    Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

564.    Plaintiffs Hector Castillo, Russell Green, Jonathan Hecker, Vinod Marur, Scott Snyder, and Frank Edwin Thompson (for the purpose of this count, "Plaintiffs") bring this count on behalf of themselves and the California State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

565.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

566.    With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Cal. Com. Code § 10103(a)(16).

1      567.    The Class Vehicles are and were at all relevant times "goods" within the meaning

2  of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

3      568.    A warranty that the Class Vehicles were in merchantable condition and fit for the

4  ordinary purpose for which vehicles are used is implied by law pursuant to Cal. Com. Code

5  §§ 2314 and 10212.

6      569.    These Class Vehicles, when sold or leased and at all times thereafter, were not in

7  merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

8  Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat

9  device and do not comply with federal and state emissions standards, rendering certain emissions

10  functions inoperative.

11      570.    Defendants were provided notice of these issues by the investigations of the EPA

12  and California state regulators, and numerous complaints filed against it including the instant

13  complaint, within a reasonable amount of time.

14      571.    As a direct and proximate result of Defendants' breach of the implied warranty of

15  merchantability, California State Class members have been damaged in an amount to be proven at

16  trial.

17                              **CALIFORNIA COUNT VI:**
                **Violation of Song-Beverly Consumer Warranty Act, Breach of Implied Warranty**
18                           **Cal Civ. Code § 1790, *et seq.***
                        **(On Behalf of the California State Class)**
19

20      572.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully

21  set forth herein.

22      573.    Plaintiffs Hector Castillo, Russell Green, Jonathan Hecker, Vinod Marur, Scott

23  Snyder, and Frank Edwin Thompson (for the purpose of this count, "Plaintiffs") bring this count

24  on behalf of themselves and the California State Class against the Volkswagen and Audi

25  Defendants (collectively for this count, "Defendants").

26      574.    Plaintiffs and the other members of the California State Class who purchased Class

27  Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791.

28

1    575.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code

2    § 1791(a).

3    576.    Defendants are the "manufacturer[s]" of the Class Vehicles within the meaning of

4    Cal. Civ. Code § 1791(j).

5    577.    Defendants impliedly warranted to Plaintiffs and the other members of the

6    California State Class that the Class Vehicles were "merchantable" within the meaning of Cal.

7    Civ. Code §§ 1791.1(a) & 1792; however, the Class Vehicles do not have the quality that a buyer

8    would reasonably expect.

9    578.    Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or

10   "implied warranty that goods are merchantable" means that the consumer goods meet each of the

11   following:

12              A.    Pass without objection in the trade under the contract description.

13              B.    Are fit for the ordinary purposes for which such goods are used.

14              C.    Are adequately contained, packaged, and labeled.

15              D.    Conform to the promises or affirmations of fact made on the container or

16   label.

17   579.    The Class Vehicles would not pass without objection in the automotive trade

18   because they share a common design defect in that they are equipped with "defeat devices."

19   These defeat devices are designed to secretly limit emissions and increase fuel efficiency when

20   the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when

21   the Class Vehicles are in regular use on the road, they emit a substantially increased amount of

22   noxious gasses.

23   580.    Class Vehicles are not adequately labeled because the labeling fails to disclose the

24   fact that they are defective.

25   581.    In the various channels of information through which Defendants sold Class

26   Vehicles, Defendants failed to disclose material information concerning the Class Vehicles,

27   which it had a duty to disclose. Defendants had a duty to disclose the defect because, as detailed

28   above: (a) Defendants knew about the defect; (b) Defendants had exclusive knowledge of

1    material facts not known to the general public, Plaintiffs, or the other California State Class

2    members; and (c) Defendants actively concealed material facts concerning the fact that the Class

3    Vehicles were equipped with defeat devices from the general public, Plaintiffs, and the California

4    State Class members. As detailed above, Defendants knew the information concerning the defect

5    at the time of advertising and selling the Class Vehicles, all of which was intended to induce

6    consumers to purchase the Class Vehicles.

7            582.    Defendants breached the implied warranty of merchantability by manufacturing

8    and selling Class Vehicles that are defective. Furthermore, this defect has caused Plaintiffs and

9    the other members of the California State Class to not receive the benefit of their bargain and

10   have caused the Class Vehicles to depreciate in value.

11           583.    Plaintiffs and the other members of the California State Class have been damaged

12   as a result of the diminished value of Defendants' products.

13           584.    Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and other members of the

14   California State Class are entitled to damages and other legal and equitable relief including, at

15   their election, the purchase price of their Class Vehicles, or the overpayment or diminution in

16   value of their Class Vehicles.

17           585.    Under Cal. Civ. Code § 1794, Plaintiffs and the other members of the California

18   State Class are entitled to costs and attorneys' fees.

19                              **CALIFORNIA COUNT VII:**
                **Violation of the Song-Beverly Consumer Protection Act, Breach of Express Warranty**
20                         **Cal Civ. Code § 1790, *et seq.***
                          **(On Behalf of the California State Class)**
21

22           586.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully

23   set forth herein.

24           587.    Plaintiffs Hector Castillo, Russell Green, Jonathan Hecker, Vinod Marur, Scott

25   Snyder, and Frank Edwin Thompson (for the purpose of this count, "Plaintiffs") bring this count

26   on behalf of themselves and the California State Class against the Volkswagen and Audi

27   Defendants (collectively for this count, "Defendants").

28

588.   Plaintiffs and the other members of the California State Class who purchased or leased the Class Vehicles in California are "buyers" within the meaning of California Civil Code § 1791(b).

589.   The Class Vehicles are "consumer goods" within the meaning of California Civil Code § 1791(a).

590.   Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of California Civil Code § 1791(j).

591.   Defendants made express warranties to Plaintiffs and the other members of the California State Class within the meaning of California Civil Code §§ 1791.2 and 1793.2, as described above.

592.   As set forth above in detail, the Class Vehicles are inherently defective in that they are equipped with "defeat devices." These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Class Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses. The installation of the defeat device substantially impairs the use and value of the Class Vehicles to reasonable consumers.

593.   As a result of Defendants' breach of their express warranties, Plaintiffs and the other members of the California State Class received goods whose defect substantially impairs their value to Plaintiffs and the other members of the California State Class. Plaintiffs and the other members of the California State Class have been damaged as a result of, *inter alia*, the diminished value of Defendants' products.

594.   Pursuant to California Civil Code §§ 1793.2 & 1794, Plaintiffs and the other members of the California State Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

595.   Pursuant to California Civil Code § 1794, Plaintiffs are entitled to costs and attorneys' fees.

**CALIFORNIA COUNT VIII:**
**Breach of Express California Emissions Warranties**
**Cal. Civ. Code § 1793.2, *et seq.***
**(On Behalf of the California State Class)**

596.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

597.    Plaintiffs Hector Castillo, Russell Green, Jonathan Hecker, Vinod Marur, Scott Snyder, and Frank Edwin Thompson (for the purpose of this count, "Plaintiffs") bring this count on behalf of themselves and the California State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

598.    Each Class Vehicle is covered by express California Emissions Warranties as a matter of law. *See* Cal. Health & Safety Code § 43205; Cal. Code Regs. tit. 13, § 2037.

599.    The express California Emissions Warranties generally provide "that the vehicle or engine is...[d]esigned, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board." *Id.* This provision applies without any time or mileage limitation. *See id.*

600.    The California Emissions Warranties also specifically warrant consumers against any performance failure of the emissions control system for three years or 50,000 miles, whichever occurs first, and against any defect in any emission-related part for seven years or 70,000 miles, whichever occurs first. *See id.*

601.    California law imposes express duties "on the manufacturer of consumer goods sold in this state and for which the manufacturer has made an express warranty." Cal. Civ. Code § 1793.2.

602.    Among those duties, "[i]f the manufacturer or its representative in this state is unable to service or repair a new motor vehicle...to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle or promptly make restitution to the buyer" at the vehicle owner's option. *See* Cal. Civ. Code § 1793.2(d)(2).

603.    Class members are excused from the requirement to "deliver nonconforming goods to the manufacturer's service and repair facility within this state" because Defendants are refusing to accept them and delivery of the California Vehicles "cannot reasonably be accomplished." Cal. Civ. Code § 1793.2(c).

604.    This complaint is written notice of nonconformity to Defendants and "shall constitute return of the goods." *Id.*

605.    California State Class members are excused from any requirement that they allow a "reasonable number of attempts" to bring California Vehicles into conformity with their California Emissions Warranties based on futility because FCA has no ability to do so at this time.

606.    In addition to all other damages and remedies, California State Class members are entitled to "recover a civil penalty of up to two times the amount of damages" for the aforementioned violation. *See* Cal. Civ. Code § 1794(e)(1).

## CALIFORNIA COUNT IX:
### Failure to Recall/Retrofit
### (On Behalf of the California State Class)

607.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

608.    Plaintiffs Hector Castillo, Russell Green, Jonathan Hecker, Vinod Marur, Scott Snyder, and Frank Edwin Thompson (for the purpose of this count, "Plaintiffs") bring this count on behalf of themselves and the California State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

609.    Defendants manufactured, marketed, distributed, sold, or otherwise placed into the stream of U.S. commerce the Class Vehicles, as set forth above.

610.    Defendants knew or reasonably should have known that the Class Vehicles were dangerous when used in a reasonably foreseeable manner, and posed an unreasonable.

611.    Defendants became aware that the Class Vehicles were dangerous when used in a reasonably foreseeable manner, and posed an unreasonable after the Vehicles were sold.

612.    Defendants failed to recall the Class Vehicles in a timely manner or warn of the dangers posed by Class Vehicles.

613.    A reasonable manufacturer in same or similar circumstances would have timely and properly recalled the Class Vehicles.

614.    Plaintiffs and California State Class members were harmed by Defendants' failure to recall the Class Vehicles properly and in a timely manner and, as a result, have suffered damages, caused by Defendants' ongoing failure to properly recall, retrofit, and fully repair the Class Vehicles.

615.    Defendants' failure to timely recall the Class Vehicles was a substantial factor in causing the harm to Plaintiffs and California State Class members as alleged herein.

**COLORADO COUNT I:**
**Violations of the Colorado Consumer Protection Act**
**Colo. Rev. Stat. § 6-1-101 *et seq.***
**(On Behalf of the Colorado State Class)**

616.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

617.    Plaintiff Patricia Vance (for the purpose of this count, "Plaintiff") brings this count on behalf of herself and the Colorado State Class against all Defendants.

618.    Defendants are "person[s]" under § 6-1-102(6) of the Colorado Consumer Protection Act "Colorado CPA"), Col. Rev. Stat. § 6-1-101, *et seq.*

619.    Plaintiff and Colorado State Class members are "consumers" for purposes of Col. Rev. Stat § 6-1-113(1)(a) who purchased or leased one or more Class Vehicles.

620.    The Colorado CPA prohibits deceptive trade practices in the course of a person's business. Defendants engaged in deceptive trade practices prohibited by the Colorado CPA, including: (1) knowingly making a false representation as to the characteristics, uses, and benefits of the Class Vehicles that had the capacity or tendency to deceive Colorado State Class members; (2) representing that the Class Vehicles are of a particular standard, quality, and grade even though Defendants knew or should have known they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; and (4) failing to disclose material information

1    concerning the Class Vehicles that was known to Defendants at the time of advertisement or sale

2    with the intent to induce Colorado State Class members to purchase, lease or retain the Class

3    Vehicles.

4        621.    In the course of its business, Defendants concealed and suppressed material facts

5    concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

6    Class Vehicles that caused the vehicles to operate in a low emission test mode only during

7    emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

8    noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions

9    testing by way of deliberately induced false readings.

10       622.    Colorado State Class members had no way of discerning that Defendants'

11   representations were false and misleading because Defendants' defeat device software was

12   extremely sophisticated technology. Plaintiff and Colorado State Class members did not and

13   could not unravel Defendants' deception on their own.

14       623.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles

15   have characteristics, uses, benefits, and qualities which they do not have; representing that Class

16   Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

17   Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

18   a transaction involving Class Vehicles has been supplied in accordance with a previous

19   representation when it has not.

20       624.    The Clean Air Act and EPA regulations require that automobiles limit their

21   emissions output to specified levels. These laws are intended for the protection of public health

22   and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

23   Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

24   installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

25   for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

26   Colorado CPA.

27       625.    Defendants intentionally and knowingly misrepresented material facts regarding

28   the Class Vehicles with intent to mislead Plaintiff and the Colorado State Class.

1    626.    Defendants knew or should have known that their conduct violated the Colorado

2    CPA.

3    627.    Defendants owed Plaintiff and the Colorado State Class a duty to disclose the

4    illegality, public health and safety risks, the true nature of the Class Vehicles, because

5    Defendants:

6         A.    possessed exclusive knowledge that they were manufacturing, selling, and

7    distributing vehicles throughout the United States that did not comply with regulations;

8         B.    intentionally concealed the foregoing from regulators, Plaintiff, and/or

9    Class members; and/or

10        C.    made incomplete representations about the Class Vehicles generally, and

11   the use of the defeat device in particular, while purposefully withholding material facts from

12   Plaintiff and/or Class members that contradicted these representations.

13   628.    Defendants' fraudulent use of the "defeat device" and its concealment of the true

14   characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to

15   Plaintiff and the Colorado State Class.

16   629.    Defendants' unfair or deceptive acts or practices were likely to and did in fact

17   deceive regulators and reasonable consumers, including Plaintiff, about the true environmental

18   cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

19   of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

20   630.    Defendants' violations present a continuing risk to Plaintiff, Class members, as

21   well as to the general public. Defendants' unlawful acts and practices complained of herein affect

22   the public interest.

23   631.    Plaintiff and the Colorado State Class suffered ascertainable loss and actual

24   damages as a direct and proximate result of Defendants' misrepresentations and its concealment

25   of and failure to disclose material information. Plaintiff and the Colorado State Class members

26   who purchased or leased the Class Vehicles would not have purchased or leased them at all

27   and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered

28   legal to sell—would have paid significantly less for them. Plaintiff and the Colorado State Class

1    members also suffered diminished value of their vehicles, as well as lost or diminished use.

2    Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive

3    practices under the Colorado CPA. All owners of Class Vehicles suffered ascertainable loss in the

4    form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts

5    and practices made in the course of Defendants' business.

6                              **COLORADO COUNT II:**
                              **Breach of Express Warranty**
7                    **Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-210**
                    **(On Behalf of the Colorado State Class)**
8

9        632.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

10   fully set forth herein.

11       633.    Plaintiff Patricia Vance (for the purpose of this count, "Plaintiff") brings this count

12   on behalf of herself and the Colorado State Class against the Volkswagen and Audi Defendants

13   (collectively for this count, "Defendants").

14       634.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

15   vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of motor vehicles

16   under § 4-2-103(1)(d).

17       635.    With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

18   of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

19       636.    The Class Vehicles are and were at all relevant times "goods" within the meaning

20   of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

21       637.    In connection with the purchase or lease of each one of its new vehicles,

22   Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

23   occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

24   materials or workmanship."

25       638.    Defendants also made numerous representations, descriptions, and promises to

26   Plaintiff and Colorado State Class members regarding the performance and emission controls of

27   their vehicles.

28

639.    For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."



> Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
> – is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

640.    The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

641.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

642.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

1    Design and Defect Warranty required by the EPA covers repair of emission control or emission

2    related parts, which fail to function or function improperly because of a defect in materials or

3    workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

4    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

5    comes first.

6         643.    As manufacturers of light-duty vehicles, Defendants were required to provide

7    these warranties to purchasers or lessees of Class Vehicles.

8         644.    Defendants' warranties formed a basis of the bargain that was reached when

9    Colorado State Class members purchased or leased Class Vehicles that are equipped with a defeat

10   device and non-compliant emission systems.

11        645.    Despite the existence of warranties, Defendants failed to inform Colorado State

12   Class members that the Class Vehicles were intentionally designed and manufactured to be out of

13   compliance with applicable state and federal emissions laws, and failed to fix the defective

14   emission components free of charge.

15        646.    Defendants breached the express warranty promising to repair and correct

16   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

17   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

18        647.    Affording Defendants a reasonable opportunity to cure their breach of written

19   warranties would be unnecessary and futile here.

20        648.    Furthermore, the limited warranty promising to repair and correct Defendants'

21   defect in materials and workmanship fails in its essential purpose because the contractual remedy

22   is insufficient to make Colorado State Class members whole and because Defendants have failed

23   and/or have refused to adequately provide the promised remedies within a reasonable time.

24        649.    Accordingly, recovery by the Colorado State Class members is not restricted to the

25   limited warranty promising to repair and correct Defendants' defect in materials and

26   workmanship, and they seek all remedies as allowed by law.

27        650.    Also, as alleged in more detail herein, at the time Defendants warranted and sold

28   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

1    not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

2    material facts regarding the Class Vehicles. Colorado State Class members were therefore

3    induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

4          651.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

5    resolved through the limited remedy of repairing and correcting Defendants' defect in materials

6    and workmanship as many incidental and consequential damages have already been suffered

7    because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

8    continued failure to provide such limited remedy within a reasonable time, and any limitation on

9    the Colorado State Class members' remedies would be insufficient to make them whole.

10         652.   Finally, because of Defendants' breach of warranty as set forth herein, Colorado

11   State Class members assert, as additional and/or alternative remedies, the revocation of

12   acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

13   currently owned or leased, and for such other incidental and consequential damages as allowed.

14         653.   Defendants were provided notice of these issues by numerous complaints filed

15   against them, including the instant Complaint, within a reasonable amount of time.

16         654.   As a direct and proximate result of Defendants' breach of express warranties,

17   Colorado State Class members have been damaged in an amount to be determined at trial.

**COLORADO COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Colo. Rev. Stat. §§ 4-2-314 and 4-2.5-212**
**(On Behalf of the Colorado State Class)**

21         655.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding

22   paragraphs as though fully set forth herein.

23         656.   Plaintiff Patricia Vance (for the purpose of this count, "Plaintiff") brings this count

24   on behalf of herself and the Colorado State Class against the Volkswagen and Audi Defendants

25   (collectively for this count, "Defendants").

26         657.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

27   vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of motor vehicles

28   under § 4-2-103(1)(d).

658.    With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

659.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

660.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-212.

661.    These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

662.    Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

663.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Colorado State Class members have been damaged in an amount to be proven at trial.

**CONNECTICUT COUNT I:**
**Violations of Connecticut Unlawful Trade Practice Act**
**Conn. Gen. Stat. § 42-110a, *et seq.***
**(On Behalf of the Connecticut State Class)**

664.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

665.    This count is brought on behalf of the Connecticut State Class against all Defendants.

666.    The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

1    667.    Defendants are "person[s]" within the meaning of Conn. Gen. Stat. § 42-110a(3).

2    668.    Defendants engaged in "trade" or "commerce" within the meaning of Conn. Gen.

3    Stat. § 42-110a(4).

4    669.    Defendants participated in deceptive trade practices that violated the Connecticut

5    UTPA as described herein.

6    670.    In the course of its business, Defendants concealed and suppressed material facts

7    concerning the Class Vehicles. Defendants accomplished this by installing an illegal defeat device

8    the Class Vehicles that caused the vehicles to operate in a low emission test mode only during

9    emissions testing. During normal operations, the Class Vehicles would emit grossly larger

10   quantities of noxious CO2 gasses. The result was what Defendants intended—the Class Vehicles

11   passed emissions testing by way of deliberately induced false readings.

12   671.    Plaintiffs and Connecticut State Class members had no way of discerning that

13   Defendants' representations were false and misleading because Defendants' defeat device

14   software was extremely sophisticated technology. Plaintiffs and Connecticut State Class members

15   did not and could not unravel Defendants' deception on their own.

16   672.    Defendants thus violated the Connecticut UTPA by, at minimum: employing

17   deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or

18   omission of any material fact with intent that others rely upon such concealment, suppression or

19   omission, in connection with the sale of Class Vehicles.

20   673.    Defendants intentionally and knowingly misrepresented material facts regarding

21   the Class Vehicles with intent to mislead Plaintiffs and the Connecticut State Class.

22   674.    Defendants knew or should have known that their conduct violated the

23   Connecticut UTPA.

24   675.    Defendants owed Plaintiffs and the Connecticut State Class a duty to disclose the

25   illegality, public health and safety risks, the true nature of the Class Vehicles, because

26   Defendants:

27   A.    possessed exclusive knowledge that they were manufacturing, selling, and

28   distributing vehicles throughout the United States that did not comply with regulations;

1          B.      intentionally concealed the foregoing from regulators, Plaintiffs, and/or

2   Connecticut State Class members; and/or

3          C.      made incomplete representations about the Class Vehicles generally, and

4   the use of the defeat device in particular, while purposefully withholding material facts from

5   Plaintiffs that contradicted these representations.

6          676.    Defendants' fraudulent use of the "defeat device" and its concealment of the true

7   characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to

8   Plaintiffs and the Connecticut State Class.

9          677.    Defendants' unfair or deceptive acts or practices were likely to and did in fact

10  deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

11  cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

12  of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

13         678.    Plaintiffs and the Connecticut State Class suffered ascertainable loss and actual

14  damages as a direct and proximate result of Defendants' misrepresentations and its concealment

15  of and failure to disclose material information. Plaintiffs and the Connecticut State Class

16  members who purchased or leased the Class Vehicles would not have purchased or leased them at

17  all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles

18  rendered legal to sell—would have paid significantly less for them. Plaintiffs and the Connecticut

19  State Class also suffered diminished value of their vehicles, as well as lost or diminished use.

20         679.    Plaintiffs and the Connecticut State Class seek monetary relief against Defendants

21  in an amount to be determined at trial. Plaintiffs and the Connecticut State Class also seek

22  punitive damages because Defendants engaged in aggravated and outrageous conduct with an evil

23  mind.

24         680.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or

25  deceptive practices, attorneys' fees, and any other just and proper relief available under the

26  Connecticut CFA.

27         681.    Defendants had an ongoing duty to all their customers to refrain from unfair and

28  deceptive practices under the Connecticut UTPA. All owners of Class Vehicles suffered

1    ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants'

2    deceptive and unfair acts and practices made in the course of Defendants' business.

3         682.    Defendants' violations present a continuing risk to Plaintiffs as well as to the

4    general public. Defendants' unlawful acts and practices complained of herein affect the public

5    interest.

6         683.    As a direct and proximate result of Defendants' violations of the Connecticut

7    UTPA, Plaintiffs and the Connecticut State Class have suffered injury-in-fact and/or actual

8    damage.

9         684.    Plaintiffs and Class members are entitled to recover their actual damages, punitive

10   damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g. Defendants acted with a

11   reckless indifference to another's rights or wanton or intentional violation to another's rights and

12   otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard of the

13   rights and safety of others.

14                              **CONNECTICUT COUNT II:**
                                 **Breach of Express Warranty**
15                           **Conn. Gen. Stat. Ann. § 42A-2-313**
                             **(On Behalf of the Connecticut State Class)**
16

17        685.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

18   fully set forth herein.

19        686.    This count is brought on behalf of the Connecticut State Class against the

20   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

21        687.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

22   vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

23        688.    In connection with the purchase or lease of each one of its new vehicles,

24   Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

25   occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

26   materials or workmanship."

27

28

689.     Defendants also made numerous representations, descriptions, and promises to Plaintiffs and Connecticut State Class members regarding the performance and emission controls of their vehicles.

690.     For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

> Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
> – is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

691.     The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

692.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1       693.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties

2    with respect to their vehicles' emission systems. Thus, Defendants also provide an express

3    warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

4    Design and Defect Warranty required by the EPA covers repair of emission control or emission

5    related parts, which fail to function or function improperly because of a defect in materials or

6    workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

7    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

8    comes first.

9       694.    As manufacturers of light-duty vehicles, Defendants were required to provide

10   these warranties to purchasers or lessees of Class Vehicles.

11      695.    Defendants' warranties formed a basis of the bargain that was reached when

12   Connecticut State Class members purchased or leased Class Vehicles that are equipped with a

13   defeat device and non-compliant emission systems.

14      696.    Despite the existence of warranties, Defendants failed to inform Connecticut State

15   Class members that the Class Vehicles were intentionally designed and manufactured to be out of

16   compliance with applicable state and federal emissions laws, and failed to fix the defective

17   emission components free of charge.

18      697.    Defendants breached the express warranty promising to repair and correct

19   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

20   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

21      698.    Affording Defendants a reasonable opportunity to cure their breach of written

22   warranties would be unnecessary and futile here.

23      699.    Furthermore, the limited warranty promising to repair and correct Defendants'

24   defect in materials and workmanship fails in its essential purpose because the contractual remedy

25   is insufficient to make Connecticut State Class members whole and because Defendants have

26   failed and/or have refused to adequately provide the promised remedies within a reasonable time.

27

28

700.    Accordingly, recovery by the Connecticut State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

701.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Connecticut State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

702.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Connecticut State Class members' remedies would be insufficient to make them whole.

703.    Finally, because of Defendants' breach of warranty as set forth herein, Connecticut State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

704.    Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

705.    As a direct and proximate result of Defendants' breach of express warranties, Connecticut State Class members have been damaged in an amount to be determined at trial.

**CONNECTICUT COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Conn. Gen. Stat. Ann. § 42A-2-314**
**(On Behalf of the Connecticut State Class)**

706.    Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1        707.     This count is brought on behalf of the Connecticut State Class against the

2   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

3        708.     Defendants are and were at all relevant times "merchant[s]" with respect to motor

4   vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

5        709.     A warranty that the Class Vehicles were in merchantable condition and fit for the

6   ordinary purpose for which vehicles are used is implied by law pursuant to Conn. Gen. Stat. Ann.

7   § 42a-2-314.

8        710.     These Class Vehicles, when sold or leased and at all times thereafter, were not in

9   merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

10  Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat

11  device and do not comply with federal and state emissions standards, rendering certain emissions

12  functions inoperative.

13       711.     Defendants were provided notice of these issues by the investigations of the EPA

14  and California state regulators, and numerous complaints filed against it including the instant

15  complaint, within a reasonable amount of time.

16       712.     As a direct and proximate result of Defendants' breach of the implied warranty of

17  merchantability, Connecticut State Class members have been damaged in an amount to be proven

18  at trial.

19                        **DELAWARE COUNT I:**
                  **Violations of the Delaware Consumer Fraud Act**
20                       **6 Del. Code § 2513 *et seq.***
                  **(On Behalf of the Delaware State Class)**
21

22       713.     Plaintiffs incorporate by reference each preceding paragraph as though fully set

23  forth herein.

24       714.     This count is brought on behalf of the Delaware State Class against all Defendants.

25       715.     Defendants are "person[s]" within the meaning of 6 Del. Code § 2511(7).

26       716.     The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use or

27  employment by any person of any deception, fraud, false pretense, false promise,

28  misrepresentation, or the concealment, suppression, or omission of any material fact with intent

1   that others rely upon such concealment, suppression or omission, in connection with the sale,

2   lease or advertisement of any merchandise, whether or not any person has in fact been misled,

3   deceived or damaged thereby." 6 Del. Code § 2513(a).

4         717.   In the course of its business, Defendants concealed and suppressed material facts

5   concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

6   Class Vehicles that caused the vehicles to operate in a low emission test mode only during

7   emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

8   noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions

9   testing by way of deliberately induced false readings.

10         718.   Delaware State Class members had no way of discerning that Defendants'

11   representations were false and misleading because Defendants' defeat device software was

12   extremely sophisticated technology. Plaintiffs and Delaware State Class members did not and

13   could not unravel Defendants' deception on their own.

14         719.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

15   have characteristics, uses, benefits, and qualities which they do not have; representing that Class

16   Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

17   Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

18   a transaction involving Class Vehicles has been supplied in accordance with a previous

19   representation when it has not.

20         720.   The Clean Air Act and EPA regulations require that automobiles limit their

21   emissions output to specified levels. These laws are intended for the protection of public health

22   and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

23   Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

24   installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

25   for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

26   Delaware CFA.

27         721.   Defendants intentionally and knowingly misrepresented material facts regarding

28   the Class Vehicles with intent to mislead Plaintiffs and the Delaware State Class.

722. Defendants knew or should have known that their conduct violated the Delaware CFA.

723. Defendants owed Plaintiffs and the Delaware State Class a duty to disclose the illegality, public health and safety risks, the true nature of the Class Vehicles, because Defendants:

A. possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

B. intentionally concealed the foregoing from regulators, Plaintiffs, and/or Class members; and/or

C. made incomplete representations about the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

724. Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to Plaintiffs and the Delaware State Class.

725. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

726. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

727. Plaintiffs and the Delaware State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Delaware State Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished

1    value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all

2    their customers to refrain from unfair and deceptive practices under the Delaware CFA. All

3    owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their

4    vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of

5    Defendants' business.

6          728.    As a direct and proximate result of Defendants' violations of the Delaware CFA,

7    Plaintiffs and the Delaware State Class have suffered injury-in-fact and/or actual damage.

8          729.    Plaintiffs seek damages under the Delaware CFA for injury resulting from the

9    direct and natural consequences of Defendants' unlawful conduct. *See, e.g.*, *Stephenson v.*

10   *Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983). Plaintiffs also seek an order enjoining

11   Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and

12   any other just and proper relief available under the Delaware CFA.

13         730.    Defendants engaged in gross, oppressive or aggravated conduct justifying the

14   imposition of punitive damages.

15                              **DELAWARE COUNT II:**
                              **Breach of Express Warranty**
16                           **6 Del. Code §§ 2-313 and 2A-210**
                        **(On Behalf of the Delaware State Class)**
17

18         731.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

19   fully set forth herein.

20         732.    This count is brought on behalf of the Delaware State Class against the

21   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

22         733.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

23   vehicles under 6 Del. C. §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-

24   103(1)(d).

25         734.    With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

26   of motor vehicles under 6 Del. C. § 2A-103(1)(p).

27         735.    The Class Vehicles are and were at all relevant times "goods" within the meaning

28   of 6 Del. C. §§ 2-105(1) and 2A-103(1)(h).

736.     In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

737.     Defendants also made numerous representations, descriptions, and promises to Plaintiffs and Delaware State Class members regarding the performance and emission controls of their vehicles.

738.     For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

> Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
> – is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

739.     The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

740.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

1    emission control components are covered for the first eight years or 80,000 miles (whichever

2    comes first). These major emission control components subject to the longer warranty include the

3    catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

4    device or computer.

5          741.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties

6    with respect to their vehicles' emission systems. Thus, Defendants also provide an express

7    warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

8    Design and Defect Warranty required by the EPA covers repair of emission control or emission

9    related parts, which fail to function or function improperly because of a defect in materials or

10   workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

11   first, or, for the major emission control components, for eight years or 80,000 miles, whichever

12   comes first.

13         742.    As manufacturers of light-duty vehicles, Defendants were required to provide

14   these warranties to purchasers or lessees of Class Vehicles.

15         743.    Defendants' warranties formed a basis of the bargain that was reached when

16   Delaware State Class members purchased or leased Class Vehicles that are equipped with a defeat

17   device and non-compliant emission systems.

18         744.    Despite the existence of warranties, Defendants failed to inform Delaware State

19   Class members that the Class Vehicles were intentionally designed and manufactured to be out of

20   compliance with applicable state and federal emissions laws, and failed to fix the defective

21   emission components free of charge.

22         745.    Defendants breached the express warranty promising to repair and correct

23   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

24   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

25         746.    Affording Defendants a reasonable opportunity to cure their breach of written

26   warranties would be unnecessary and futile here.

27         747.    Furthermore, the limited warranty promising to repair and correct Defendants'

28   defect in materials and workmanship fails in its essential purpose because the contractual remedy

1    is insufficient to make Delaware State Class members whole and because Defendants have failed

2    and/or have refused to adequately provide the promised remedies within a reasonable time.

3          748.    Accordingly, recovery by the Delaware State Class members is not restricted to the

4    limited warranty promising to repair and correct Defendants' defect in materials and

5    workmanship, and they seek all remedies as allowed by law.

6          749.    Also, as alleged in more detail herein, at the time Defendants warranted and sold

7    or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

8    not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

9    material facts regarding the Class Vehicles. Delaware State Class members were therefore

10   induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

11         750.    Moreover, many of the injuries flowing from the Class Vehicles cannot be

12   resolved through the limited remedy of repairing and correcting Defendants' defect in materials

13   and workmanship as many incidental and consequential damages have already been suffered

14   because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

15   continued failure to provide such limited remedy within a reasonable time, and any limitation on

16   the Delaware State Class members' remedies would be insufficient to make them whole.

17         751.    Finally, because of Defendants' breach of warranty as set forth herein, Delaware

18   State Class members assert, as additional and/or alternative remedies, the revocation of

19   acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

20   currently owned or leased, and for such other incidental and consequential damages as allowed.

21         752.    Defendants were provided notice of these issues by numerous complaints filed

22   against them, including the instant Complaint, within a reasonable amount of time.

23         753.    As a direct and proximate result of Defendants' breach of express warranties,

24   Delaware State Class members have been damaged in an amount to be determined at trial.

25

26

27

28

**DELAWARE COUNT III:**
**Breach of Implied Warranty of Merchantability**
**6. Del. Code §§ 2-314 and 7-2A-212**
**(On Behalf of the Delaware State Class)**

754.    Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

755.    This count is brought on behalf of the Delaware State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

756.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under 6 Del. C. §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

757.    With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under 6 Del. C. § 2A-103(1)(p).

758.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 6 Del. C. §§ 2-105(1) and 2A-103(1)(h).

759.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 6 Del. C. §§ 2-314 and 2A-212.

760.    These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

761.    Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

762.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Delaware State Class members have been damaged in an amount to be proven at trial.

**DISTRICT OF COLUMBIA COUNT I:**
**Violations of the Consumer Protection Procedures Act**
**D.C. Code § 28-3901 *et seq.***
**(On Behalf of the District of Columbia Class)**

763.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

764.    This count is brought on behalf of the District of Columbia Class against all Defendants.

765.    Defendants are "person[s]" under the Consumer Protection Procedures Act ("District of Columbia CPPA"), D.C. Code § 28-3901(a)(1).

766.    Class members are "consumers," as defined by D.C. Code § 28-3901(1)(2), who purchased or leased one or more Class Vehicles.

767.    Defendants' actions as set forth herein constitute "trade practices" under D.C. Code § 28-3901.

768.    Defendants participated in unfair or deceptive acts or practices that violated the District of Columbia CPPA. By willfully failing to disclose and actively concealing the illegal defeat device, Defendants engaged in unfair or deceptive practices prohibited by the District of Columbia CPPA, D.C. Code § 28-3901, *et seq.*, including: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) representing that the subject of a transaction involving the Class Vehicles has been supplied in accordance with a previous representation when it has not; (5) misrepresenting as to a material fact which has a tendency to mislead; and (6) failing to state a material fact when such failure tends to mislead.

769.    In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

770.   District of Columbia Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs and District of Columbia Class members did not and could not unravel Defendants' deception on their own.

771.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

772.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the District of Columbia CPPA.

773.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the District of Columbia Class.

774.   Defendants knew or should have known that their conduct violated the District of Columbia CPPA.

775.   Defendants owed Plaintiffs and the District of Columbia Class a duty to disclose the illegality, public health and safety risks, the true nature of the Class Vehicles, because Defendants:

A.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

B.      intentionally concealed the foregoing from regulators, Plaintiffs, and/or Class members; and/or

C.      made incomplete representations about the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

776.    Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to Plaintiffs and the District of Columbia Class.

777.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

778.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

779.    Plaintiffs and the District of Columbia Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the District of Columbia Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the District of Columbia CPPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

780.     As a direct and proximate result of Defendants' violations of the District of Columbia CPPA, Plaintiffs and the District of Columbia Class have suffered injury-in-fact and/or actual damage.

781.     Plaintiffs and the District of Columbia Class are entitled to recover treble damages or $1,500, whichever is greater, punitive damages, reasonable attorneys' fees, and any other relief the Court deems proper, under D.C. Code § 28-3901.

782.     Plaintiffs seek punitive damages against Defendants because their conduct evidences malice and/or egregious conduct. Defendants maliciously and egregiously misrepresented the environmental cleanliness and efficiency of the Class Vehicles, concealed material facts that only it knew, and repeatedly promised Class members that all vehicles were environmentally clean—all to avoid the expense and public relations nightmare of revealing its fraudulent use of the "defeat device." Defendants' unlawful conduct constitutes malice warranting punitive damages.

**DISTRICT OF COLUMBIA COUNT II:**
**Breach of Express Warranty**
**D.C. Code §§ 28:2-313 and 28:2A-210**
**(On Behalf of the District of Columbia Class)**

783.     Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

784.     This count is brought on behalf of the District of Columbia Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

785.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under D.C. Code §§ 28:2-104(1) and 28:2A-103(a)(20), and "sellers" of motor vehicles under § 28:2-103(1)(d).

786.     With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under D.C. Code § 28:2A-103(a)(16).

787.     The Class Vehicles are and were at all relevant times "goods" within the meaning of D.C. Code §§ 28:2-105(1) and 28:2A-103(a)(8).

788.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

789.   Defendants also made numerous representations, descriptions, and promises to Plaintiffs and District of Columbia Class members regarding the performance and emission controls of their vehicles.

790.   For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

> Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
> – is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

791.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

792.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

793.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

794.    As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

795.    Defendants' warranties formed a basis of the bargain that was reached when District of Columbia Class members purchased or leased Class Vehicles that are equipped with a defeat device and non-compliant emission systems.

796.    Despite the existence of warranties, Defendants failed to inform District of Columbia Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

797.    Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

798.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

799.     Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make District of Columbia Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

800.     Accordingly, recovery by the District of Columbia Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

801.     Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. District of Columbia Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

802.     Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the District of Columbia Class members' remedies would be insufficient to make them whole.

803.     Finally, because of Defendants' breach of warranty as set forth herein, District of Columbia Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

804.     Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

805.     As a direct and proximate result of Defendants' breach of express warranties, District of Columbia Class members have been damaged in an amount to be determined at trial.

**DISTRICT OF COLUMBIA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**D.C. Code §§ 28:2-314 and 28:2A-212**
**(On Behalf of the District of Columbia Class)**

806.    Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

807.    This count is brought on behalf of the District of Columbia Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

808.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under D.C. Code §§ 28:2-104(1) and 28:2A-103(a)(20), and "sellers" of motor vehicles under § 28:2-103(1)(d).

809.    With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under D.C. Code § 28:2A-103(a)(16).

810.    The Class Vehicles are and were at all relevant times "goods" within the meaning of D.C. Code §§ 28:2-105(1) and 28:2A-103(a)(8).

811.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to D.C. Code §§ 28:2-314 and 28:2A-212.

812.    These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

813.    Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

814.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, District of Columbia Class members have been damaged in an amount to be proven at trial.

**FLORIDA COUNT I:**
**Violations of the Florida Unfair & Deceptive Trade Practices Act**
**Fla. Stat. § 501.201, *et seq.***
**(On Behalf of the Florida State Class)**

815.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein

816.    Plaintiffs Paul Joachimczyk, Allen Taylor, and Babu Thomas (for the purpose of this count, "Plaintiffs") bring this count on behalf of themselves and the Florida State Class against all Defendants.

817.    Plaintiffs are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

818.    Defendants engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

819.    FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" Fla. Stat. § 501.204(1). Defendants participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.

820.    In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

821.    Florida State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs and Florida State Class members did not and could not unravel Defendants' deception on their own.

822.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class

1    Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

2    Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

3    a transaction involving Class Vehicles has been supplied in accordance with a previous

4    representation when it has not.

5          823.    The Clean Air Act and EPA regulations require that automobiles limit their

6    emissions output to specified levels. These laws are intended for the protection of public health

7    and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

8    Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

9    installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

10   for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

11   FUDTPA.

12         824.    Defendants intentionally and knowingly misrepresented material facts regarding

13   the Class Vehicles with intent to mislead Plaintiffs and the Florida State Class.

14         825.    Defendants knew or should have known that their conduct violated the FUDTPA.

15         826.    Defendants owed Plaintiffs and the Florida State Class a duty to disclose the

16   illegality, public health and safety risks, the true nature of the Class Vehicles, because

17   Defendants:

18         A.    possessed exclusive knowledge that they were manufacturing, selling, and

19   distributing vehicles throughout the United States that did not comply with regulations;

20         B.    intentionally concealed the foregoing from regulators, Plaintiffs, and/or

21   Class members; and/or

22         C.    made incomplete representations about the Class Vehicles generally, and

23   the use of the defeat device in particular, while purposefully withholding material facts from

24   Plaintiffs that contradicted these representations.

25         827.    Defendants' fraudulent use of the "defeat device" and its concealment of the true

26   characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to

27   Plaintiffs and the Florida State Class.

28

828.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

829.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

830.   Plaintiffs and the Florida State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Florida State Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the FUDTPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

831.   As a direct and proximate result of Defendants' violations of the FUDTPA, Plaintiffs and the Florida State Class have suffered injury-in-fact and/or actual damage.

832.   Plaintiffs and the Florida State Class are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

833.   Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

**FLORIDA COUNT II:**
**Breach of Express Warranty**
**F.S.A. §§ 672.313 and 680.21**
**(On Behalf of the Florida State Class)**

834.     Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

835.     Plaintiffs Paul Joachimczyk, Allen Taylor, and Babu Thomas (for the purpose of this count, "Plaintiffs") bring this count on behalf of themselves and the Florida State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

836.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

837.     With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under F.S.A. § 680.1031(1)(p).

838.     The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

839.     In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

840.     Defendants also made numerous representations, descriptions, and promises to Plaintiffs and Florida State Class members regarding the performance and emission controls of their vehicles.

841.     For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

> Audi of America, Inc., an operating unit of
> Volkswagen Group of America, Inc. ("Audi"),
> the authorized United States importer of Audi
> vehicles, warrants to the original retail pur-
> chaser or original lessee and any subsequent
> purchaser or lessee that every **model year
> 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to
>   conform at the time of sale with all applica-
>   ble regulations of the United States Environ-
>   mental Protection Agency (EPA), and
> – is free from defects in material and work-
>   manship which causes the vehicle to fail to
>   conform with EPA regulations for 2 years af-
>   ter the date of first use or delivery of the ve-
>   hicle to the original retail purchaser or origi-
>   nal lessee or until the vehicle has been driv-
>   en 24,000 miles, whichever occurs first.

842.     The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

843.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

844.     The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

1    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

2    comes first.

3         845.    As manufacturers of light-duty vehicles, Defendants were required to provide

4    these warranties to purchasers or lessees of Class Vehicles.

5         846.    Defendants' warranties formed a basis of the bargain that was reached when

6    Florida State Class members purchased or leased Class Vehicles that are equipped with a defeat

7    device and non-compliant emission systems.

8         847.    Despite the existence of warranties, Defendants failed to inform Florida State

9    Class members that the Class Vehicles were intentionally designed and manufactured to be out of

10   compliance with applicable state and federal emissions laws, and failed to fix the defective

11   emission components free of charge.

12        848.    Defendants breached the express warranty promising to repair and correct

13   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

14   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

15        849.    Affording Defendants a reasonable opportunity to cure their breach of written

16   warranties would be unnecessary and futile here.

17        850.    Furthermore, the limited warranty promising to repair and correct Defendants'

18   defect in materials and workmanship fails in its essential purpose because the contractual remedy

19   is insufficient to make Florida State Class members whole and because Defendants have failed

20   and/or have refused to adequately provide the promised remedies within a reasonable time.

21        851.    Accordingly, recovery by the Florida State Class members is not restricted to the

22   limited warranty promising to repair and correct Defendants' defect in materials and

23   workmanship, and they seek all remedies as allowed by law.

24        852.    Also, as alleged in more detail herein, at the time Defendants warranted and sold

25   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

26   not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

27   material facts regarding the Class Vehicles. Florida State Class members were therefore induced

28   to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

853.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Florida State Class members' remedies would be insufficient to make them whole.

854.    Finally, because of Defendants' breach of warranty as set forth herein, Florida State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

855.    Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

856.    As a direct and proximate result of Defendants' breach of express warranties, Florida State Class members have been damaged in an amount to be determined at trial.

**FLORIDA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**F.S.A. §§ 672.314 and 680.212**
**(On Behalf of the Florida State Class)**

857.    Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

858.    Plaintiffs Paul Joachimczyk, Allen Taylor, and Babu Thomas (for the purpose of this count, "Plaintiffs") bring this count on behalf of themselves and the Florida State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

859.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

860.    With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under F.S.A. § 680.1031(1)(p).

861.     The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

862.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to F.S.A. §§ 672.314 and 680.212.

863.     These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

864.     Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

865.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Florida State Class members have been damaged in an amount to be proven at trial.

**GEORGIA COUNT I:**
**Violations of Georgia's Fair Business Practices Act**
**Ga. Code Ann. § 10-1-390 *et seq.***
**(On Behalf of the Georgia State Class)**

866.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

867.     This count is brought on behalf of the Georgia State Class against all Defendants.

868.     The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code. Ann. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a

1    particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or

2    services with intent not to sell them as advertised," Ga. Code. Ann. § 10-1-393(b).

3         869.    In the course of its business, Defendants concealed and suppressed material facts

4    concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

5    Class Vehicles that caused the vehicles to operate in a low emission test mode only during

6    emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

7    noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions

8    testing by way of deliberately induced false readings.

9         870.    Georgia State Class members had no way of discerning that Defendants'

10   representations were false and misleading because Defendants' defeat device software was

11   extremely sophisticated technology. Plaintiffs and Georgia State Class members did not and could

12   not unravel Defendants' deception on their own.

13        871.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles

14   have characteristics, uses, benefits, and qualities which they do not have; representing that Class

15   Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

16   Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

17   a transaction involving Class Vehicles has been supplied in accordance with a previous

18   representation when it has not.

19        872.    The Clean Air Act and EPA regulations require that automobiles limit their

20   emissions output to specified levels. These laws are intended for the protection of public health

21   and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

22   Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

23   installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

24   for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

25   Georgia FBPA.

26        873.    Defendants intentionally and knowingly misrepresented material facts regarding

27   the Class Vehicles with intent to mislead Plaintiffs and the Georgia State Class.

28

874.     Defendants knew or should have known that their conduct violated the Georgia FBPA.

875.     Defendants owed Plaintiffs and the Georgia State Class a duty to disclose the illegality, public health and safety risks, the true nature of the Class Vehicles, because Defendants:

A.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

B.     intentionally concealed the foregoing from regulators, Plaintiffs, and/or Class members; and/or

C.     made incomplete representations about the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

876.     Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to Plaintiffs and the Georgia State Class.

877.     Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

878.     Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

879.     Plaintiffs and the Georgia State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Georgia State Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished

1    value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all

2    their customers to refrain from unfair and deceptive practices under the Georgia FBPA. All

3    owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their

4    vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of

5    Defendants' business.

6        880.    As a direct and proximate result of Defendants' violations of the Georgia FBPA,

7    Plaintiffs and the Georgia State Class have suffered injury-in-fact and/or actual damage.

8        881.    Plaintiffs and the Georgia State Class are entitled to recover damages and

9    exemplary damages (for intentional violations) per Ga. Code. Ann. § 10-1-399(a).

10       882.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or

11   deceptive practices, attorneys' fees, and any other just and proper relief available under the

12   Georgia FBPA per Ga. Code. Ann. § 10-1-399.

13       883.    On December 21, 2016, a notice letter was sent to Audi AG and Audi of America,

14   LLC complying with Ga. Code Ann. § 10-1-399.  Additionally, all Defendants were provided

15   notice of the issues raised in this count and this Complaint by the governmental investigations,

16   the numerous complaints filed against them, and the many individual notice letters sent by

17   consumers within a reasonable amount of time after the allegations of Class Vehicle defects

18   became public. Moreover, Plaintiffs sent a second notice letter pursuant to Ga. Code Ann. § 10-1-

19   399 to all Defendants on October 11, 2017.  Because Defendants failed to remedy their unlawful

20   conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs

21   and the Georgia State Class are entitled.

22                          **GEORGIA COUNT II:**
                 **Violations of Georgia's Uniform Deceptive Trade Practices Act**
23                        **Ga. Code Ann. § 10-1-370 *et seq.***
                          **(On Behalf of the Georgia State Class)**
24

25       884.    Plaintiffs incorporate by reference each preceding paragraph as though fully set

26   forth herein.

27       885.    This count is brought on behalf of the Georgia State Class against the Volkswagen

28   and Audi Defendants (collectively for this count, "Defendants").

886.    Defendants, Plaintiffs, and the Georgia State Class are "persons' within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code. Ann. § 10-1-371(5).

887.    The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code. Ann. § 10-1-372(a).

888.    In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

889.    Georgia State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs and Georgia State Class members did not and could not unravel Defendants' deception on their own.

890.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

891.    The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

1    for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

2    Georgia UDTPA.

3         892.    Defendants intentionally and knowingly misrepresented material facts regarding

4    the Class Vehicles with intent to mislead Plaintiffs and the Georgia State Class.

5         893.    Defendants knew or should have known that their conduct violated the Georgia

6    UDTPA.

7         894.    Defendants owed Plaintiffs and the Georgia State Class a duty to disclose the

8    illegality, public health and safety risks, the true nature of the Class Vehicles, because

9    Defendants:

10            A.    possessed exclusive knowledge that they were manufacturing, selling, and

11   distributing vehicles throughout the United States that did not comply with regulations;

12            B.    intentionally concealed the foregoing from regulators, Plaintiffs, and/or

13   Class members; and/or

14            C.    made incomplete representations about the Class Vehicles generally, and

15   the use of the defeat device in particular, while purposefully withholding material facts from

16   Plaintiffs that contradicted these representations.

17        895.    Defendants' fraudulent use of the "defeat device" and its concealment of the true

18   characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to

19   Plaintiffs and the Georgia State Class.

20        896.    Defendants' unfair or deceptive acts or practices were likely to and did in fact

21   deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

22   cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

23   of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

24        897.    Defendants' violations present a continuing risk to Plaintiffs as well as to the

25   general public. Defendants' unlawful acts and practices complained of herein affect the public

26   interest.

27        898.    Plaintiffs and the Georgia State Class suffered ascertainable loss and actual

28   damages as a direct and proximate result of Defendants' misrepresentations and its concealment

1    of and failure to disclose material information. Plaintiffs and the Georgia State Class members

2    who purchased or leased the Class Vehicles would not have purchased or leased them at all

3    and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered

4    legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished

5    value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all

6    their customers to refrain from unfair and deceptive practices under the Georgia UDTPA. All

7    owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their

8    vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of

9    Defendants' business.

10           899.    As a direct and proximate result of Defendants' violations of the Georgia UDTPA,

11    Plaintiffs and the Georgia State Class have suffered injury-in-fact and/or actual damage.

12           900.    Plaintiffs seek an order enjoining Defendants' unfair, unlawful, and/or deceptive

13    practices, attorneys' fees, and any other just and proper relief available under the Georgia

14    UDTPA per Ga. Code. Ann § 10-1-373.

**GEORGIA COUNT III:**
**Breach of Express Warranty**
**Ga. Code Ann. §§ 11-2-313 and 11-2A-210**
**(On Behalf of the Georgia State Class)**

18           901.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

19    fully set forth herein.

20           902.    This count is brought on behalf of the Georgia State Class against the Volkswagen

21    and Audi Defendants (collectively for this count, "Defendants").

22           903.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

23    vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles

24    under § 11-2-103(1)(d).

25           904.    With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

26    of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

27           905.    The Class Vehicles are and were at all relevant times "goods" within the meaning

28    of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

906.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

907.   Defendants also made numerous representations, descriptions, and promises to Plaintiffs and Georgia State Class members regarding the performance and emission controls of their vehicles.

908.   For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:

– was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
– is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

909.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

910.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

1  whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

2  emission control components are covered for the first eight years or 80,000 miles (whichever

3  comes first). These major emission control components subject to the longer warranty include the

4  catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

5  device or computer.

6      911.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties

7  with respect to their vehicles' emission systems. Thus, Defendants also provide an express

8  warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

9  Design and Defect Warranty required by the EPA covers repair of emission control or emission

10 related parts, which fail to function or function improperly because of a defect in materials or

11 workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

12 first, or, for the major emission control components, for eight years or 80,000 miles, whichever

13 comes first.

14     912.    As manufacturers of light-duty vehicles, Defendants were required to provide

15 these warranties to purchasers or lessees of Class Vehicles.

16     913.    Defendants' warranties formed a basis of the bargain that was reached when

17 Georgia State Class members purchased or leased Class Vehicles that are equipped with a defeat

18 device and non-compliant emission systems.

19     914.    Despite the existence of warranties, Defendants failed to inform Georgia State

20 Class members that the Class Vehicles were intentionally designed and manufactured to be out of

21 compliance with applicable state and federal emissions laws, and failed to fix the defective

22 emission components free of charge.

23     915.    Defendants breached the express warranty promising to repair and correct

24 Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

25 have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

26     916.    Affording Defendants a reasonable opportunity to cure their breach of written

27 warranties would be unnecessary and futile here.

28

917.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Georgia State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

918.   Accordingly, recovery by the Georgia State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

919.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Georgia State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

920.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Georgia State Class members' remedies would be insufficient to make them whole.

921.   Finally, because of Defendants' breach of warranty as set forth herein, Georgia State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

922.   Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

923.   As a direct and proximate result of Defendants' breach of express warranties, Georgia State Class members have been damaged in an amount to be determined at trial.

**GEORGIA COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**Ga. Code Ann. §§ 11-2-314 and 11-2A-212**
**(On Behalf of the Georgia State Class)**

924.     Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

925.     This count is brought on behalf of the Georgia State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

926.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

927.     With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

928.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

929.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ga. Code Ann. §§ 11-2-314 and 11-2A-212.

930.     These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

931.     Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

932.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Georgia State Class members have been damaged in an amount to be proven at trial.

**HAWAII COUNT I:**
**Unfair and Deceptive Acts in Violation of Hawaii Law**
**Haw. Rev. Stat. § 480 *et seq.***
**(On Behalf of the Hawaii State Class)**

933.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

934.    This count is brought on behalf of the Hawaii State Class against all Defendants.

935.    Defendants are "person[s]" under Haw. Rev. Stat. § 480-1.

936.    Hawaii State Class members are "consumer[s]" as defined by Haw. Rev. Stat. § 480-1, who purchased or leased one or more Class Vehicles.

937.    Defendants' acts or practices as set forth above occurred in the conduct of trade or commerce.

938.    The Hawaii Act § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.…"

939.    In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

940.    Hawaii State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs and Hawaii State Class members did not and could not unravel Defendants' deception on their own.

941.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

1    a transaction involving Class Vehicles has been supplied in accordance with a previous

2    representation when it has not.

3          942.    The Clean Air Act and EPA regulations require that automobiles limit their

4    emissions output to specified levels. These laws are intended for the protection of public health

5    and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

6    Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

7    installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

8    for purchase, Defendants violated federal law and therefore engaged in conduct that violates

9    Hawaii law.

10         943.    Defendants intentionally and knowingly misrepresented material facts regarding

11   the Class Vehicles with intent to mislead Plaintiffs and the Hawaii State Class.

12         944.    Defendants knew or should have known that their conduct violated Hawaii law.

13         945.    Defendants owed Plaintiffs and the Hawaii State Class a duty to disclose the

14   illegality, public health and safety risks, the true nature of the Class Vehicles, because

15   Defendants:

16              A.     possessed exclusive knowledge that they were manufacturing, selling, and

17   distributing vehicles throughout the United States that did not comply with regulations;

18              B.     intentionally concealed the foregoing from regulators, Plaintiffs, and/or

19   Class members; and/or

20              C.     made incomplete representations about the Class Vehicles generally, and

21   the use of the defeat device in particular, while purposefully withholding material facts from

22   Plaintiffs that contradicted these representations.

23         946.    Defendants' fraudulent use of the "defeat device" and its concealment of the true

24   characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to

25   Plaintiffs and the Hawaii State Class.

26         947.    Defendants' unfair or deceptive acts or practices were likely to and did in fact

27   deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

28

1   cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

2   of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

3       948.    Defendants' violations present a continuing risk to Plaintiffs as well as to the

4   general public. Defendants' unlawful acts and practices complained of herein affect the public

5   interest.

6       949.    Plaintiffs and the Hawaii State Class suffered ascertainable loss and actual

7   damages as a direct and proximate result of Defendants' misrepresentations and its concealment

8   of and failure to disclose material information. Plaintiffs and the Hawaii State Class members

9   who purchased or leased the Class Vehicles would not have purchased or leased them at all

10  and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered

11  legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished

12  value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all

13  their customers to refrain from unfair and deceptive practices under Hawaii law. All owners of

14  Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as

15  a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants'

16  business.

17                              **HAWAII COUNT II:**
                            **Breach of Express Warranty**
18                  **Haw. Rev. Stat. §§ 490:2-313 and 490:2A-210**
                          **(On Behalf of the Hawaii State Class)**
19

20      950.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

21  fully set forth herein.

22      951.    This count is brought on behalf of the Hawaii State Class against the Volkswagen

23  and Audi Defendants (collectively for this count, "Defendants").

24      952.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

25  vehicles under Haw. Rev. Stat. §§ 490:2-104(1) and 490:2A-103(b), and a "seller" of motor

26  vehicles under § 490:2-103(1)(d).

27      953.    With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

28  of motor vehicles under Haw. Rev. Stat. § 490:2A-103(a)(16).

954.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Haw. Rev. Stat. §§ 490:2-105(1) and 490:2A-103(a)(8).

955.     In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

956.     Defendants also made numerous representations, descriptions, and promises to Plaintiffs and Hawaii State Class members regarding the performance and emission controls of their vehicles.

957.     For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

> Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
> – is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

958.     The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

959.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

1  its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

2  required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

3  whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

4  emission control components are covered for the first eight years or 80,000 miles (whichever

5  comes first). These major emission control components subject to the longer warranty include the

6  catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

7  device or computer.

8       960.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties

9  with respect to their vehicles' emission systems. Thus, Defendants also provide an express

10 warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

11 Design and Defect Warranty required by the EPA covers repair of emission control or emission

12 related parts, which fail to function or function improperly because of a defect in materials or

13 workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

14 first, or, for the major emission control components, for eight years or 80,000 miles, whichever

15 comes first.

16      961.    As manufacturers of light-duty vehicles, Defendants were required to provide

17 these warranties to purchasers or lessees of Class Vehicles.

18      962.    Defendants' warranties formed a basis of the bargain that was reached when

19 Hawaii State Class members purchased or leased Class Vehicles that are equipped with a defeat

20 device and non-compliant emission systems.

21      963.    Despite the existence of warranties, Defendants failed to inform Hawaii State

22 Class members that the Class Vehicles were intentionally designed and manufactured to be out of

23 compliance with applicable state and federal emissions laws, and failed to fix the defective

24 emission components free of charge.

25      964.    Defendants breached the express warranty promising to repair and correct

26 Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

27 have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

28

965.     Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

966.     Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Hawaii State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

967.     Accordingly, recovery by the Hawaii State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

968.     Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Hawaii State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

969.     Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Hawaii State Class members' remedies would be insufficient to make them whole.

970.     Finally, because of Defendants' breach of warranty as set forth herein, Hawaii State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

971.     Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

972.     As a direct and proximate result of Defendants' breach of express warranties, Hawaii State Class members have been damaged in an amount to be determined at trial.

**HAWAII COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Haw. Rev. Stat. §§ 490:2-314 and 490:2A-212**
**(On Behalf of the Hawaii State Class)**

973.     Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

974.     This count is brought on behalf of the Hawaii State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

975.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Haw. Rev. Stat. §§ 490:2-104(1) and 490:2A-103(b), and a "seller" of motor vehicles under § 490:2-103(1)(d).

976.     With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Haw. Rev. Stat. § 490:2A-103(a)(16).

977.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Haw. Rev. Stat. §§ 490:2-105(1) and 490:2A-103(a)(8).

978.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Haw. Rev. Stat. §§ 490:2-314 and 490:2A-212.

979.     These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

980.     Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

981.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Hawaii State Class members have been damaged in an amount to be proven at trial.

**IDAHO COUNT I:**
**Violations of the Idaho Consumer Protection Act**
**Idaho Code § 48-601 *et seq.***
**(On Behalf of the Idaho State Class)**

982.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

983.    Plaintiff Daniel Satterlee (for the purpose of this count, "Plaintiff") brings this count on behalf of himself and the Idaho State Class against all Defendants.

984.    Defendants are "person[s]" under the Idaho Consumer Protection Act ("Idaho CPA"), Idaho Code § 48-602(1).

985.    Defendants' acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under Idaho Code § 48-602(2).

986.    Defendants participated in misleading, false, or deceptive acts that violated the Idaho CPA.

987.    In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

988.    Idaho State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiff and Idaho State Class members did not and could not unravel Defendants' deception on their own.

989.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

1    a transaction involving Class Vehicles has been supplied in accordance with a previous

2    representation when it has not.

3         990.    The Clean Air Act and EPA regulations require that automobiles limit their

4    emissions output to specified levels. These laws are intended for the protection of public health

5    and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

6    Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

7    installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

8    for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

9    Idaho CPA.

10        991.    Defendants intentionally and knowingly misrepresented material facts regarding

11   the Class Vehicles with intent to mislead Plaintiff and the Idaho State Class.

12        992.    Defendants knew or should have known that their conduct violated the Idaho CPA.

13        993.    Defendants owed Plaintiff and the Idaho State Class a duty to disclose the

14   illegality, public health and safety risks, the true nature of the Class Vehicles, because

15   Defendants:

16             A.    possessed exclusive knowledge that they were manufacturing, selling, and

17   distributing vehicles throughout the United States that did not comply with regulations;

18             B.    intentionally concealed the foregoing from regulators, Plaintiff, and/or

19   Class members; and/or

20             C.    made incomplete representations about the Class Vehicles generally, and

21   the use of the defeat device in particular, while purposefully withholding material facts from

22   Plaintiff and/or Class members that contradicted these representations.

23        994.    Defendants' fraudulent use of the "defeat device" and its concealment of the true

24   characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to

25   Plaintiff and the Idaho State Class.

26        995.    Defendants' unfair or deceptive acts or practices were likely to and did in fact

27   deceive regulators and reasonable consumers, including Plaintiff, about the true environmental

28

1  cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

2  of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

3      996.    Defendants' violations present a continuing risk to Plaintiff, Idaho State Class

4  members, as well as to the general public. Defendants' unlawful acts and practices complained of

5  herein affect the public interest.

6      997.    Plaintiff and the Idaho State Class suffered ascertainable loss and actual damages

7  as a direct and proximate result of Defendants' misrepresentations and its concealment of and

8  failure to disclose material information. Plaintiff and the Idaho State Class members who

9  purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if

10  the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to

11  sell—would have paid significantly less for them. Plaintiff and the Idaho State Class members

12  also suffered diminished value of their vehicles, as well as lost or diminished use. Defendants had

13  an ongoing duty to all their customers to refrain from unfair and deceptive practices under the

14  Idaho CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the

15  diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and

16  practices made in the course of Defendants' business.

17      998.    As a direct and proximate result of Defendants' violations of the Idaho CPA,

18  Plaintiff and the Idaho State Class have suffered injury-in-fact and/or actual damage.

19      999.    Pursuant to Idaho Code § 48-608, Plaintiff and the Idaho State Class seek

20  monetary relief against Defendants measured as the greater of (a) actual damages in an amount to

21  be determined at trial and (b) statutory damages in the amount of $1,000 for Plaintiff and each

22  Idaho State Class member.

23      1000.  Plaintiff and the Idaho State Class also seek an order enjoining Defendants' unfair,

24  unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available

25  under the Idaho CPA.

26      1001.  Plaintiff and the Idaho State Class also seek punitive damages against Defendants

27  because Defendants conduct evidences an extreme deviation from reasonable standards.

28  Defendants flagrantly, maliciously, and fraudulently misrepresented the safety and reliability of

1    the Class Vehicles, deceived Class members, concealed material facts that only they knew, and

2    repeatedly promised Class members all vehicles were safe—all to avoid the expense and public

3    relations nightmare of correcting a noxious flaw in the Class Vehicles. Defendants' unlawful

4    conduct constitutes malice, oppression, and fraud warranting punitive damages.

**IDAHO COUNT II:**
**Breach of Express Warranty**
**Idaho Code §§ 28-2-313 and 28-12-210**
**(On Behalf of the Idaho State Class)**

8    1002.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

9    fully set forth herein.

10    1003.   Plaintiff Daniel Satterlee (for the purpose of this count, "Plaintiff") brings this

11    count on behalf of himself and the Idaho State Class against the Volkswagen and Audi

12    Defendants (collectively for this count, "Defendants").

13    1004.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

14    vehicles under Idaho Code §§ 28-2-104(1) and 28-12-103(3), and "sellers" of motor vehicles

15    under § 28-2-103(1)(d).

16    1005.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

17    of motor vehicles under Idaho Code § 28-12-103(1)(p).

18    1006.   The Class Vehicles are and were at all relevant times "goods" within the meaning

19    of Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h).

20    1007.   In connection with the purchase or lease of each one of its new vehicles,

21    Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

22    occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

23    materials or workmanship."

24    1008.   Defendants also made numerous representations, descriptions, and promises to

25    Plaintiff and Idaho State Class members regarding the performance and emission controls of their

26    vehicles.

27    1009.   For example, as shown below, Defendants included in the warranty booklets for

28    some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped

1   so as to conform at the time of sale with all applicable regulations of the United States

2   Environmental Protection Agency."

> Audi of America, Inc., an operating unit of
> Volkswagen Group of America, Inc. ("Audi"),
> the authorized United States importer of Audi
> vehicles, warrants to the original retail pur-
> chaser or original lessee and any subsequent
> purchaser or lessee that every **model year
> 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to
>   conform at the time of sale with all applica-
>   ble regulations of the United States Environ-
>   mental Protection Agency (EPA), and
> – is free from defects in material and work-
>   manship which causes the vehicle to fail to
>   conform with EPA regulations for 2 years af-
>   ter the date of first use or delivery of the ve-
>   hicle to the original retail purchaser or origi-
>   nal lessee or until the vehicle has been driv-
>   en 24,000 miles, whichever occurs first.

13      1010.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide

14   two federal emission control warranties: a "Performance Warranty" and a "Design and Defect

15   Warranty."

16      1011.   The EPA requires vehicle manufacturers to provide a Performance Warranty with

17   respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

18   its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

19   required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

20   whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

21   emission control components are covered for the first eight years or 80,000 miles (whichever

22   comes first). These major emission control components subject to the longer warranty include the

23   catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

24   device or computer.

25      1012.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

26   with respect to their vehicles' emission systems. Thus, Defendants also provide an express

27   warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

28   Design and Defect Warranty required by the EPA covers repair of emission control or emission

1   related parts, which fail to function or function improperly because of a defect in materials or

2   workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

3   first, or, for the major emission control components, for eight years or 80,000 miles, whichever

4   comes first.

5   1013.   As manufacturers of light-duty vehicles, Defendants were required to provide

6   these warranties to purchasers or lessees of Class Vehicles.

7   1014.   Defendants' warranties formed a basis of the bargain that was reached when Idaho

8   State Class members purchased or leased Class Vehicles that are equipped with a defeat device

9   and non-compliant emission systems.

10   1015.   Despite the existence of warranties, Defendants failed to inform Idaho State Class

11   members that the Class Vehicles were intentionally designed and manufactured to be out of

12   compliance with applicable state and federal emissions laws, and failed to fix the defective

13   emission components free of charge.

14   1016.   Defendants breached the express warranty promising to repair and correct

15   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

16   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

17   1017.   Affording Defendants a reasonable opportunity to cure their breach of written

18   warranties would be unnecessary and futile here.

19   1018.   Furthermore, the limited warranty promising to repair and correct Defendants'

20   defect in materials and workmanship fails in its essential purpose because the contractual remedy

21   is insufficient to make Idaho State Class members whole and because Defendants have failed

22   and/or have refused to adequately provide the promised remedies within a reasonable time.

23   1019.   Accordingly, recovery by the Idaho State Class members is not restricted to the

24   limited warranty promising to repair and correct Defendants' defect in materials and

25   workmanship, and they seek all remedies as allowed by law.

26   1020.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

27   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

28   not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

1    material facts regarding the Class Vehicles. Idaho State Class members were therefore induced to

2    purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

3        1021.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

4    resolved through the limited remedy of repairing and correcting Defendants' defect in materials

5    and workmanship as many incidental and consequential damages have already been suffered

6    because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

7    continued failure to provide such limited remedy within a reasonable time, and any limitation on

8    the Idaho State Class members' remedies would be insufficient to make them whole.

9        1022.   Finally, because of Defendants' breach of warranty as set forth herein, Idaho State

10   Class members assert, as additional and/or alternative remedies, the revocation of acceptance of

11   the goods and the return to them the purchase or lease price of all Class Vehicles currently owned

12   or leased, and for such other incidental and consequential damages as allowed.

13       1023.   Defendants were provided notice of these issues by numerous complaints filed

14   against them, including the instant Complaint, within a reasonable amount of time.

15       1024.   As a direct and proximate result of Defendants' breach of express warranties,

16   Idaho State Class members have been damaged in an amount to be determined at trial.

17                              **IDAHO COUNT III:**
                    **Breach of Implied Warranty of Merchantability**
18                     **Idaho Code §§ 28-2-314 and 28-12-212**
                        **(On Behalf of the Idaho State Class)**
19

20       1025.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding

21   paragraphs as though fully set forth herein.

22       1026.   Plaintiff Daniel Satterlee (for the purpose of this count, "Plaintiff") brings this

23   count on behalf of himself and the Idaho State Class against the Volkswagen and Audi

24   Defendants (collectively for this count, "Defendants").

25       1027.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

26   vehicles under Idaho Code §§ 28-2-104(1) and 28-12-103(3), and "sellers" of motor vehicles

27   under § 28-2-103(1)(d).

28

1028.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Idaho Code § 28-12-103(1)(p).

1029.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h).

1030.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Idaho Code §§ 28-2-314 and 28-12-212.

1031.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

1032.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1033.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Idaho State Class members have been damaged in an amount to be proven at trial.

**ILLINOIS COUNT I:**
**Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS 505/1, *et seq.* and 720 ILCS 295/1a**
**(On Behalf of the Illinois State Class)**

1034.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1035.   This count is brought on behalf of the Illinois State Class against all Defendants.

1036.   Defendants are "person[s]" as that term is defined in 815 ILCS 505/1(c).

1037.   Plaintiffs and the Illinois State Class are "consumers" as that term is defined in 815 ILCS 505/1(e).

1       1038.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois

2   CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or

3   employment of any deception, fraud, false pretense, false promise, misrepresentation or the

4   concealment, suppression or omission of any material fact, with intent that others rely upon the

5   concealment, suppression or omission of such material fact … in the conduct of trade or

6   commerce … whether any person has in fact been misled, deceived or damaged thereby." 815

7   ILCS 505/2.

8       1039.   In the course of its business, Defendants concealed and suppressed material facts

9   concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

10  Class Vehicles that caused the vehicles to operate in a low emission test mode only during

11  emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

12  noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions

13  testing by way of deliberately induced false readings.

14      1040.   Illinois State Class members had no way of discerning that Defendants'

15  representations were false and misleading because Defendants' defeat device software was

16  extremely sophisticated technology. Plaintiffs and Illinois State Class members did not and could

17  not unravel Defendants' deception on their own.

18      1041.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

19  have characteristics, uses, benefits, and qualities which they do not have; representing that Class

20  Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

21  Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

22  a transaction involving Class Vehicles has been supplied in accordance with a previous

23  representation when it has not.

24      1042.   The Clean Air Act and EPA regulations require that automobiles limit their

25  emissions output to specified levels. These laws are intended for the protection of public health

26  and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

27  Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

28  installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

1    for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

2    Illinois CFA.

3        1043.   Defendants intentionally and knowingly misrepresented material facts regarding

4    the Class Vehicles with intent to mislead Plaintiffs and the Illinois State Class.

5        1044.   Defendants knew or should have known that their conduct violated the Illinois

6    CFA.

7        1045.   Defendants owed Plaintiffs and the Illinois State Class a duty to disclose the

8    illegality, public health and safety risks, the true nature of the Class Vehicles, because

9    Defendants:

10           A.      possessed exclusive knowledge that they were manufacturing, selling, and

11   distributing vehicles throughout the United States that did not comply with regulations;

12           B.      intentionally concealed the foregoing from regulators, Plaintiffs, and/or

13   Class members; and/or

14           C.      made incomplete representations about the Class Vehicles generally, and

15   the use of the defeat device in particular, while purposefully withholding material facts from

16   Plaintiffs that contradicted these representations.

17       1046.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

18   characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to

19   Plaintiffs and the Illinois State Class.

20       1047.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

21   deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

22   cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

23   of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

24       1048.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

25   general public. Defendants' unlawful acts and practices complained of herein affect the public

26   interest.

27       1049.   Plaintiffs and the Illinois State Class suffered ascertainable loss and actual

28   damages as a direct and proximate result of Defendants' misrepresentations and its concealment

1    of and failure to disclose material information. Plaintiffs and the Illinois State Class members

2    who purchased or leased the Class Vehicles would not have purchased or leased them at all

3    and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered

4    legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished

5    value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all

6    their customers to refrain from unfair and deceptive practices under the Illinois CFA. All owners

7    of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles

8    as a result of Defendants' deceptive and unfair acts and practices made in the course of

9    Defendants' business.

10        1050.   As a direct and proximate result of Defendants' violations of the Illinois CFA,

11   Plaintiffs and the Illinois State Class have suffered injury-in-fact and/or actual damage.

12        1051.   Pursuant to 815 ILCS 505/10a(a), Plaintiffs and the Illinois State Class seek

13   monetary relief against Defendants in the amount of actual damages, as well as punitive damages

14   because Defendants acted with fraud and/or malice and/or was grossly negligent.

15        1052.   Plaintiffs also seek an order enjoining Defendants' unfair and/or deceptive acts or

16   practices, punitive damages, and attorneys' fees, and any other just and proper relief available

17   under 815 ILCS § 505/1 *et seq.*

18                          **ILLINOIS COUNT II:**
                          **Breach of Express Warranty**
19            **810 Ill. Comp. Stat. §§ 5/2-313 and 5/2A-210**
                      **(On Behalf of the Illinois State Class)**
20

21        1053.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

22   fully set forth herein.

23        1054.   This count is brought on behalf of the Illinois State Class against the Volkswagen

24   and Audi Defendants (collectively for this count, "Defendants").

25        1055.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

26   vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor

27   vehicles under § 5/2-103(1)(d).

28

1     1056.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

2     of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

3     1057.   The Class Vehicles are and were at all relevant times "goods" within the meaning

4     of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

5     1058.   In connection with the purchase or lease of each one of its new vehicles,

6     Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

7     occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

8     materials or workmanship."

9     1059.   Defendants also made numerous representations, descriptions, and promises to

10    Plaintiffs and Illinois State Class members regarding the performance and emission controls of

11    their vehicles.

12    1060.   For example, as shown below, Defendants included in the warranty booklets for

13    some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped

14    so as to conform at the time of sale with all applicable regulations of the United States

15    Environmental Protection Agency."

> Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
> – is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

26    1061.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide

27    two federal emission control warranties: a "Performance Warranty" and a "Design and Defect

28    Warranty."

1      1062.   The EPA requires vehicle manufacturers to provide a Performance Warranty with

2  respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

3  its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

4  required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

5  whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

6  emission control components are covered for the first eight years or 80,000 miles (whichever

7  comes first). These major emission control components subject to the longer warranty include the

8  catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

9  device or computer.

10     1063.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

11  with respect to their vehicles' emission systems. Thus, Defendants also provide an express

12  warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

13  Design and Defect Warranty required by the EPA covers repair of emission control or emission

14  related parts, which fail to function or function improperly because of a defect in materials or

15  workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

16  first, or, for the major emission control components, for eight years or 80,000 miles, whichever

17  comes first.

18     1064.   As manufacturers of light-duty vehicles, Defendants were required to provide

19  these warranties to purchasers or lessees of Class Vehicles.

20     1065.   Defendants' warranties formed a basis of the bargain that was reached when

21  Illinois State Class members purchased or leased Class Vehicles that are equipped with a defeat

22  device and non-compliant emission systems.

23     1066.   Despite the existence of warranties, Defendants failed to inform Illinois State

24  Class members that the Class Vehicles were intentionally designed and manufactured to be out of

25  compliance with applicable state and federal emissions laws, and failed to fix the defective

26  emission components free of charge.

27

28

1   1067.   Defendants breached the express warranty promising to repair and correct

2   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

3   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

4   1068.   Affording Defendants a reasonable opportunity to cure their breach of written

5   warranties would be unnecessary and futile here.

6   1069.   Furthermore, the limited warranty promising to repair and correct Defendants'

7   defect in materials and workmanship fails in its essential purpose because the contractual remedy

8   is insufficient to make Illinois State Class members whole and because Defendants have failed

9   and/or have refused to adequately provide the promised remedies within a reasonable time.

10   1070.   Accordingly, recovery by the Illinois State Class members is not restricted to the

11   limited warranty promising to repair and correct Defendants' defect in materials and

12   workmanship, and they seek all remedies as allowed by law.

13   1071.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

14   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

15   not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

16   material facts regarding the Class Vehicles. Illinois State Class members were therefore induced

17   to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

18   1072.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

19   resolved through the limited remedy of repairing and correcting Defendants' defect in materials

20   and workmanship as many incidental and consequential damages have already been suffered

21   because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

22   continued failure to provide such limited remedy within a reasonable time, and any limitation on

23   the Illinois State Class members' remedies would be insufficient to make them whole.

24   1073.   Finally, because of Defendants' breach of warranty as set forth herein, Illinois

25   State Class members assert, as additional and/or alternative remedies, the revocation of

26   acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

27   currently owned or leased, and for such other incidental and consequential damages as allowed.

28

1074.   Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

1075.   As a direct and proximate result of Defendants' breach of express warranties, Illinois State Class members have been damaged in an amount to be determined at trial.

**ILLINOIS COUNT III:**
**Breach of Implied Warranty of Merchantability**
**810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212**
**(On Behalf of the Illinois State Class)**

1076.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1077.   This count is brought on behalf of the Illinois State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1078.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

1079.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

1080.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

1081.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 810 Ill. Comp. Stat. §§ 28-2-314 and 28-12-212.

1082.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

1083.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1084.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Illinois State Class members have been damaged in an amount to be proven at trial.

**INDIANA COUNT I:**
**Violations of the Indiana Deceptive Consumer Sales Act**
**Ind. Code § 24-5-0.5-3**
**(On Behalf of the Indiana State Class)**

1085.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1086.   This count is brought on behalf of the Indiana State Class against all Defendants.

1087.   In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

1088.   Indiana State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs and Indiana State Class members did not and could not unravel Defendants' deception on their own.

1089.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

1090.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the Indiana DCSA.

1091.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Indiana State Class.

1092.   Defendants knew or should have known that their conduct violated the Indiana DCSA.

1093.   Defendants owed Plaintiffs and the Indiana State Class a duty to disclose the illegality, public health and safety risks, the true nature of the Class Vehicles, because Defendants:

A.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

B.   intentionally concealed the foregoing from regulators, Plaintiffs, and/or Class members; and/or

C.   made incomplete representations about the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1094.   Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the Class Vehicles' fuel consumption and $CO2$ emissions were material to Plaintiffs and the Indiana State Class.

1095.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

1      1096.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

2   general public. Defendants' unlawful acts and practices complained of herein affect the public

3   interest.

4      1097.   Plaintiffs and the Indiana State Class suffered ascertainable loss and actual

5   damages as a direct and proximate result of Defendants' misrepresentations and its concealment

6   of and failure to disclose material information. Plaintiffs and the Indiana State Class members

7   who purchased or leased the Class Vehicles would not have purchased or leased them at all

8   and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered

9   legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished

10  value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all

11  their customers to refrain from unfair and deceptive practices under the Indiana DCSA. All

12  owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their

13  vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of

14  Defendants' business.

15     1098.   As a direct and proximate result of Defendants' violations of the Indiana DCSA,

16  Plaintiffs and the Indiana State Class have suffered injury-in-fact and/or actual damage.

17     1099.   Pursuant to Ind. Code § 24-5-0.5-4, Plaintiffs and the Indiana State Class seek

18  monetary relief against Defendants measured as the greater of (a) actual damages in an amount to

19  be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiffs and

20  each Indiana State Class member, including treble damages up to $1,000 for Defendants'

21  willfully deceptive acts.

22     1100.   Plaintiffs also seeks punitive damages based on the outrageousness and

23  recklessness of the Defendants' conduct and Defendants' high net worth.

24     1101.   On December 21, 2016, a notice letter was sent to Audi AG and Audi of America,

25  LLC complying with Ind. Code § 24-5-0.5-5(a).  Additionally, all Defendants were provided

26  notice of the issues raised in this count and this Complaint by the governmental investigations,

27  the numerous complaints filed against them, and the many individual notice letters sent by

28  consumers within a reasonable amount of time after the allegations of Class Vehicle defects

became public. Moreover, Plaintiffs sent a second notice letter pursuant to Ind. Code § 24-5-0.5-5(a) to all Defendants on October 11, 2017.  Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Indiana State Class are entitled.

**INDIANA COUNT II:**
**Breach of Express Warranty**
**Ind. Code §§ 26-1-3-313 and 26-1-2.1-210**
**(On Behalf of the Indiana State Class)**

1102.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1103.   This count is brought on behalf of the Indiana State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1104.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and "sellers" of motor vehicles under § 26-1-2-103(1)(d).

1105.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

1106.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

1107.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1108.   Defendants also made numerous representations, descriptions, and promises to Plaintiffs and Indiana State Class members regarding the performance and emission controls of their vehicles.

1109.   For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped

1    so as to conform at the time of sale with all applicable regulations of the United States

2    Environmental Protection Agency."

Audi of America, Inc., an operating unit of
Volkswagen Group of America, Inc. ("Audi"),
the authorized United States importer of Audi
vehicles, warrants to the original retail pur-
chaser or original lessee and any subsequent
purchaser or lessee that every **model year
2014** Audi vehicle imported by Audi:

– was designed, built and equipped so as to
  conform at the time of sale with all applica-
  ble regulations of the United States Environ-
  mental Protection Agency (EPA), and
– is free from defects in material and work-
  manship which causes the vehicle to fail to
  conform with EPA regulations for 2 years af-
  ter the date of first use or delivery of the ve-
  hicle to the original retail purchaser or origi-
  nal lessee or until the vehicle has been driv-
  en 24,000 miles, whichever occurs first.

13    1110.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide

14    two federal emission control warranties: a "Performance Warranty" and a "Design and Defect

15    Warranty."

16    1111.   The EPA requires vehicle manufacturers to provide a Performance Warranty with

17    respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

18    its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

19    required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

20    whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

21    emission control components are covered for the first eight years or 80,000 miles (whichever

22    comes first). These major emission control components subject to the longer warranty include the

23    catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

24    device or computer.

25    1112.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

26    with respect to their vehicles' emission systems. Thus, Defendants also provide an express

27    warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

28    Design and Defect Warranty required by the EPA covers repair of emission control or emission

1    related parts, which fail to function or function improperly because of a defect in materials or

2    workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

3    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

4    comes first.

5        1113.   As manufacturers of light-duty vehicles, Defendants were required to provide

6    these warranties to purchasers or lessees of Class Vehicles.

7        1114.   Defendants' warranties formed a basis of the bargain that was reached when

8    Indiana State Class members purchased or leased Class Vehicles that are equipped with a defeat

9    device and non-compliant emission systems.

10       1115.   Despite the existence of warranties, Defendants failed to inform Indiana State

11   Class members that the Class Vehicles were intentionally designed and manufactured to be out of

12   compliance with applicable state and federal emissions laws, and failed to fix the defective

13   emission components free of charge.

14       1116.   Defendants breached the express warranty promising to repair and correct

15   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

16   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

17       1117.   Affording Defendants a reasonable opportunity to cure their breach of written

18   warranties would be unnecessary and futile here.

19       1118.   Furthermore, the limited warranty promising to repair and correct Defendants'

20   defect in materials and workmanship fails in its essential purpose because the contractual remedy

21   is insufficient to make Indiana State Class members whole and because Defendants have failed

22   and/or have refused to adequately provide the promised remedies within a reasonable time.

23       1119.   Accordingly, recovery by the Indiana State Class members is not restricted to the

24   limited warranty promising to repair and correct Defendants' defect in materials and

25   workmanship, and they seek all remedies as allowed by law.

26       1120.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

27   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

28   not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

1  material facts regarding the Class Vehicles. Indiana State Class members were therefore induced

2  to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

3      1121.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

4  resolved through the limited remedy of repairing and correcting Defendants' defect in materials

5  and workmanship as many incidental and consequential damages have already been suffered

6  because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

7  continued failure to provide such limited remedy within a reasonable time, and any limitation on

8  the Indiana State Class members' remedies would be insufficient to make them whole.

9      1122.   Finally, because of Defendants' breach of warranty as set forth herein, Indiana

10  State Class members assert, as additional and/or alternative remedies, the revocation of

11  acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

12  currently owned or leased, and for such other incidental and consequential damages as allowed.

13      1123.   Defendants were provided notice of these issues by numerous complaints filed

14  against them, including the instant Complaint, within a reasonable amount of time.

15      1124.   As a direct and proximate result of Defendants' breach of express warranties,

16  Indiana State Class members have been damaged in an amount to be determined at trial.

17                        **INDIANA COUNT III:**
**Breach of Implied Warranty of Merchantability**
18              **Ind. Code §§ 26-1-3-314 and 26-1-2.1-212**
**(On Behalf of the Indiana State Class)**
19

20      1125.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding

21  paragraphs as though fully set forth herein.

22      1126.   This count is brought on behalf of the Indiana State Class against the Volkswagen

23  and Audi Defendants (collectively for this count, "Defendants").

24      1127.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

25  vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and "sellers" of motor vehicles

26  under § 26-1-2-103(1)(d).

27      1128.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

28  of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

1129.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

1130.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ind. Code §§ 26-1-2-314 and 26-1-2.1-212.

1131.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

1132.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1133.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Indiana State Class members have been damaged in an amount to be proven at trial.

**IOWA COUNT I:**
**Violations of the Private Right of Action For Consumer Frauds Act**
**Iowa Code § 714h.1, *et seq.***
**(On Behalf of the Iowa State Class)**

1134.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1135.   This count is brought on behalf of the Iowa State Class against all Defendants.

1136.   Defendants are "person[s]" under Iowa Code § 714H.2(7).

1137.   Plaintiffs and the Iowa State Class members are "consumers," as defined by Iowa Code § 14H.2(3), who purchased or leased one or more Class Vehicles.

1138.   The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment,

1    suppression, or omission of a material fact, with the intent that others rely upon the unfair

2    practice, deception, fraud, false pretense, false promise, misrepresentation, concealment,

3    suppression, or omission in connection with the advertisement, sale, or lease of consumer

4    merchandise." Iowa Code § 714H.3.

5        1139.   In the course of its business, Defendants concealed and suppressed material facts

6    concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

7    Class Vehicles that caused the vehicles to operate in a low emission test mode only during

8    emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

9    noxious $CO2$. The result was what Defendants intended—the Class Vehicles passed emissions

10   testing by way of deliberately induced false readings.

11       1140.   Iowa State Class members had no way of discerning that Defendants'

12   representations were false and misleading because Defendants' defeat device software was

13   extremely sophisticated technology. Plaintiffs and Iowa State Class members did not and could

14   not unravel Defendants' deception on their own.

15       1141.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

16   have characteristics, uses, benefits, and qualities which they do not have; representing that Class

17   Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

18   Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

19   a transaction involving Class Vehicles has been supplied in accordance with a previous

20   representation when it has not.

21       1142.   The Clean Air Act and EPA regulations require that automobiles limit their

22   emissions output to specified levels. These laws are intended for the protection of public health

23   and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

24   Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

25   installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

26   for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

27   Iowa CFA.

28

1   1143.   Defendants intentionally and knowingly misrepresented material facts regarding

2   the Class Vehicles with intent to mislead Plaintiffs and the Iowa State Class.

3   1144.   Defendants knew or should have known that their conduct violated the Iowa CFA.

4   1145.   Defendants owed Plaintiffs and the Iowa State Class a duty to disclose the

5   illegality, public health and safety risks, the true nature of the Class Vehicles, because

6   Defendants:

7       A.   possessed exclusive knowledge that they were manufacturing, selling, and

8   distributing vehicles throughout the United States that did not comply with regulations;

9       B.   intentionally concealed the foregoing from regulators, Plaintiffs, and/or

10  Class members; and/or

11      C.   made incomplete representations about the Class Vehicles generally, and

12  the use of the defeat device in particular, while purposefully withholding material facts from

13  Plaintiffs that contradicted these representations.

14  1146.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

15  characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to

16  Plaintiffs and the Iowa State Class.

17  1147.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

18  deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

19  cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

20  of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

21  1148.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

22  general public. Defendants' unlawful acts and practices complained of herein affect the public

23  interest.

24  1149.   Plaintiffs and the Iowa State Class suffered ascertainable loss and actual damages

25  as a direct and proximate result of Defendants' misrepresentations and its concealment of and

26  failure to disclose material information. Plaintiffs and the Iowa State Class members who

27  purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if

28  the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to

1   sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of

2   their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all their

3   customers to refrain from unfair and deceptive practices under the Iowa CFA. All owners of Class

4   Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a

5   result of Defendants' deceptive and unfair acts and practices made in the course of Defendants'

6   business.

7       1150.   As a direct and proximate result of Defendants' violations of the Iowa CFA,

8   Plaintiffs and the Iowa State Class have suffered injury-in-fact and/or actual damage.

9       1151.   Pursuant to Iowa Code § 714H.5, Plaintiffs seek an order enjoining Defendants'

10  unfair and/or deceptive acts or practices; actual damages; in addition to an award of actual

11  damages, statutory damages up to three times the amount of actual damages awarded as a result

12  of Defendants' willful and wanton disregard for the rights or safety of others; attorneys' fees; and

13  such other equitable relief as the Court deems necessary to protect the public from further

14  violations of the Iowa CFA.

15                              **IOWA COUNT II:**
                        **Breach of Express Warranty**
16              **Iowa Code §§ 554.2313 and 554.13210**
                      **(On Behalf of the Iowa State Class)**
17

18      1152.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

19  fully set forth herein.

20      1153.   This count is brought on behalf of the Iowa State Class against the Volkswagen

21  and Audi Defendants (collectively for this count, "Defendants").

22      1154.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

23  vehicles under Iowa Code §§ 554.2104(1) and 554.13103(3), and "sellers" of motor vehicles

24  under § 554.2103(1)(d).

25      1155.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

26  of motor vehicles under Iowa Code § 554.13103(1)(p).

27      1156.   The Class Vehicles are and were at all relevant times "goods" within the meaning

28  of Iowa Code §§ 554.2105(1) and 554.13103(1)(h).

1157.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1158.   Defendants also made numerous representations, descriptions, and promises to Plaintiffs and Iowa State Class members regarding the performance and emission controls of their vehicles.

1159.   For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:

– was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
– is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

1160.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1161.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

1    emission control components are covered for the first eight years or 80,000 miles (whichever

2    comes first). These major emission control components subject to the longer warranty include the

3    catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

4    device or computer.

5         1162.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

6    with respect to their vehicles' emission systems. Thus, Defendants also provide an express

7    warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

8    Design and Defect Warranty required by the EPA covers repair of emission control or emission

9    related parts, which fail to function or function improperly because of a defect in materials or

10   workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

11   first, or, for the major emission control components, for eight years or 80,000 miles, whichever

12   comes first.

13        1163.   As manufacturers of light-duty vehicles, Defendants were required to provide

14   these warranties to purchasers or lessees of Class Vehicles.

15        1164.   Defendants' warranties formed a basis of the bargain that was reached when Iowa

16   State Class members purchased or leased Class Vehicles that are equipped with a defeat device

17   and non-compliant emission systems.

18        1165.   Despite the existence of warranties, Defendants failed to inform Iowa State Class

19   members that the Class Vehicles were intentionally designed and manufactured to be out of

20   compliance with applicable state and federal emissions laws, and failed to fix the defective

21   emission components free of charge.

22        1166.   Defendants breached the express warranty promising to repair and correct

23   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

24   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

25        1167.   Affording Defendants a reasonable opportunity to cure their breach of written

26   warranties would be unnecessary and futile here.

27        1168.   Furthermore, the limited warranty promising to repair and correct Defendants'

28   defect in materials and workmanship fails in its essential purpose because the contractual remedy

1    is insufficient to make Iowa State Class members whole and because Defendants have failed

2    and/or have refused to adequately provide the promised remedies within a reasonable time.

3        1169.   Accordingly, recovery by the Iowa State Class members is not restricted to the

4    limited warranty promising to repair and correct Defendants' defect in materials and

5    workmanship, and they seek all remedies as allowed by law.

6        1170.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

7    or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

8    not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

9    material facts regarding the Class Vehicles. Iowa State Class members were therefore induced to

10   purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

11       1171.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

12   resolved through the limited remedy of repairing and correcting Defendants' defect in materials

13   and workmanship as many incidental and consequential damages have already been suffered

14   because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

15   continued failure to provide such limited remedy within a reasonable time, and any limitation on

16   the Iowa State Class members' remedies would be insufficient to make them whole.

17       1172.   Finally, because of Defendants' breach of warranty as set forth herein, Iowa State

18   Class members assert, as additional and/or alternative remedies, the revocation of acceptance of

19   the goods and the return to them the purchase or lease price of all Class Vehicles currently owned

20   or leased, and for such other incidental and consequential damages as allowed.

21       1173.   Defendants were provided notice of these issues by numerous complaints filed

22   against them, including the instant Complaint, within a reasonable amount of time.

23       1174.   As a direct and proximate result of Defendants' breach of express warranties, Iowa

24   State Class members have been damaged in an amount to be determined at trial.

25

26

27

28

**IOWA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Iowa Code §§ 554.2314 and 554.13212**
**(On Behalf of the Iowa State Class)**

1175.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1176.   This count is brought on behalf of the Iowa State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1177.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Iowa Code §§ 554.2104(1) and 554.13103(3), and "sellers" of motor vehicles under § 554.2103(1)(d).

1178.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Iowa Code § 554.13103(1)(p).

1179.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Iowa Code §§ 554.2105(1) and 554.13103(1)(h).

1180.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Iowa Code §§ 554.2314 and 554.13212.

1181.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

1182.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1183.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Iowa State Class members have been damaged in an amount to be proven at trial.

**KANSAS COUNT I:**
**Violations of the Kansas Consumer Protection Act**
**Kan. Stat. Ann. § 50-623 *et seq.***
**(On Behalf of the Kansas State Class)**

1184.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1185.   This count is brought on behalf of the Kansas State Class against all Defendants.

1186.   Each Defendant is a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. Ann. § 50-624(l).

1187.   Kansas State Class members are "consumers," within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased or leased one or more Class Vehicles.

1188.   The sale of the Class Vehicles to the Kansas State Class members was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

1189.   The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. Ann. § 50-626(a), and that deceptive acts or practices include: (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-627(a).

1190.   In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

1   noxious CO2. The result was what Defendants intended—the Class Vehicles passed emissions

2   testing by way of deliberately induced false readings.

3        1191.   Kansas State Class members had no way of discerning that Defendants'

4   representations were false and misleading because Defendants' defeat device software was

5   extremely sophisticated technology. Plaintiffs and Kansas State Class members did not and could

6   not unravel Defendants' deception on their own.

7        1192.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

8   have characteristics, uses, benefits, and qualities which they do not have; representing that Class

9   Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

10  Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

11  a transaction involving Class Vehicles has been supplied in accordance with a previous

12  representation when it has not.

13       1193.   The Clean Air Act and EPA regulations require that automobiles limit their

14  emissions output to specified levels. These laws are intended for the protection of public health

15  and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

16  Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

17  installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

18  for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

19  Kansas CPA.

20       1194.   Defendants intentionally and knowingly misrepresented material facts regarding

21  the Class Vehicles with intent to mislead Plaintiffs and the Kansas State Class.

22       1195.   Defendants knew or should have known that their conduct violated the Kansas

23  CPA.

24       1196.   Defendants owed Plaintiffs and the Kansas State Class a duty to disclose the

25  illegality, public health and safety risks, the true nature of the Class Vehicles, because

26  Defendants:

27        A.     possessed exclusive knowledge that they were manufacturing, selling, and

28  distributing vehicles throughout the United States that did not comply with regulations;

B.      intentionally concealed the foregoing from regulators, Plaintiffs, and/or Class members; and/or

C.      made incomplete representations about the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1197.   Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to Plaintiffs and the Kansas State Class.

1198.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

1199.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1200.   Plaintiffs and the Kansas State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Kansas State Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Kansas CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1201.   As a direct and proximate result of Defendants' violations of the Kansas CPA, Plaintiffs and the Kansas State Class have suffered injury-in-fact and/or actual damage.

1202.   Pursuant to Kan. Stat. Ann. § 50-634, Plaintiffs and the Kansas State Class seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each Plaintiffs and each Kansas State Class member.

1203.   Plaintiffs also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann § 50-623, *et seq*.

**KANSAS COUNT II:**
**Breach of Express Warranty**
**Kan. Stat. §§ 84-2-313 and 84-2A-210**
**(On Behalf of the Kansas State Class)**

1204.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1205.   This count is brought on behalf of the Kansas State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1206.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and "sellers" of motor vehicles under § 84-2-103(1)(d).

1207.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

1208.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

1209.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1210.   Defendants also made numerous representations, descriptions, and promises to Plaintiffs and Kansas State Class members regarding the performance and emission controls of their vehicles.

1211.   For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:

– was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
– is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

1212.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1213.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1214.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

1    Design and Defect Warranty required by the EPA covers repair of emission control or emission

2    related parts, which fail to function or function improperly because of a defect in materials or

3    workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

4    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

5    comes first.

6        1215.   As manufacturers of light-duty vehicles, Defendants were required to provide

7    these warranties to purchasers or lessees of Class Vehicles.

8        1216.   Defendants' warranties formed a basis of the bargain that was reached when

9    Kansas State Class members purchased or leased Class Vehicles that are equipped with a defeat

10   device and non-compliant emission systems.

11       1217.   Despite the existence of warranties, Defendants failed to inform Kansas State

12   Class members that the Class Vehicles were intentionally designed and manufactured to be out of

13   compliance with applicable state and federal emissions laws, and failed to fix the defective

14   emission components free of charge.

15       1218.   Defendants breached the express warranty promising to repair and correct

16   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

17   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

18       1219.   Affording Defendants a reasonable opportunity to cure their breach of written

19   warranties would be unnecessary and futile here.

20       1220.   Furthermore, the limited warranty promising to repair and correct Defendants'

21   defect in materials and workmanship fails in its essential purpose because the contractual remedy

22   is insufficient to make Kansas State Class members whole and because Defendants have failed

23   and/or have refused to adequately provide the promised remedies within a reasonable time.

24       1221.   Accordingly, recovery by the Kansas State Class members is not restricted to the

25   limited warranty promising to repair and correct Defendants' defect in materials and

26   workmanship, and they seek all remedies as allowed by law.

27       1222.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

28   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

1    not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

2    material facts regarding the Class Vehicles. Kansas State Class members were therefore induced

3    to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

4    1223.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

5    resolved through the limited remedy of repairing and correcting Defendants' defect in materials

6    and workmanship as many incidental and consequential damages have already been suffered

7    because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

8    continued failure to provide such limited remedy within a reasonable time, and any limitation on

9    the Kansas State Class members' remedies would be insufficient to make them whole.

10   1224.   Finally, because of Defendants' breach of warranty as set forth herein, Kansas

11   State Class members assert, as additional and/or alternative remedies, the revocation of

12   acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

13   currently owned or leased, and for such other incidental and consequential damages as allowed.

14   1225.   Defendants were provided notice of these issues by numerous complaints filed

15   against them, including the instant Complaint, within a reasonable amount of time.

16   1226.   As a direct and proximate result of Defendants' breach of express warranties,

17   Kansas State Class members have been damaged in an amount to be determined at trial.

18
                                    **KANSAS COUNT III:**
19                        **Breach of Implied Warranty of Merchantability**
                              **Kan. Stat. §§ 84-2-314 and 84-2A-212**
20                            **(On Behalf of the Kansas State Class)**

21   1227.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding

22   paragraphs as though fully set forth herein.

23   1228.   This count is brought on behalf of the Kansas State Class against the Volkswagen

24   and Audi Defendants (collectively for this count, "Defendants").

25   1229.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

26   vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and "sellers" of motor vehicles under

27   § 84-2-103(1)(d).

28

1230.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

1231.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

1232.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Kan. Stat. §§ 84-2-314 and 84-2A-212.

1233.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

1234.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1235.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Kansas State Class members have been damaged in an amount to be proven at trial.

**KENTUCKY COUNT I:**
**Violations of the Kentucky Consumer Protection Act**
**Ky. Rev. Stat. Ann. § 367.110 *et seq.***
**(On Behalf of the Kentucky State Class)**

1236.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1237.   This count is brought on behalf of the Kentucky State Class against all Defendants.

1238.   Defendants, Plaintiffs, and the Kentucky State Class are "persons" within the meaning of the Ky. Rev. Stat. § 367.110(1).

1239.   Defendants engaged in "trade" or "commerce" within the meaning of Ky. Rev. Stat. § 367.110(2).

1     1240.   The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful

2   "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or

3   commerce …." Ky. Rev. Stat. § 367.170(1). Defendants participated in misleading, false, or

4   deceptive acts that violated the Kentucky CPA. By failing to disclose and by actively concealing

5   the "defeat device" and the true cleanliness and performance of the Class Vehicles, by marketing

6   its vehicles as safe, reliable, efficient, and of high quality, and by presenting itself as a reputable

7   manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its

8   vehicles after they were sold, Defendants engaged in deceptive business practices prohibited by

9   the Kentucky CPA.

10    1241.   In the course of its business, Defendants concealed and suppressed material facts

11   concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

12   Class Vehicles that caused the vehicles to operate in a low emission test mode only during

13   emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

14   noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions

15   testing by way of deliberately induced false readings.

16    1242.   Kentucky State Class members had no way of discerning that Defendants'

17   representations were false and misleading because Defendants' defeat device software was

18   extremely sophisticated technology. Plaintiffs and Kentucky State Class members did not and

19   could not unravel Defendants' deception on their own.

20    1243.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

21   have characteristics, uses, benefits, and qualities which they do not have; representing that Class

22   Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

23   Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

24   a transaction involving Class Vehicles has been supplied in accordance with a previous

25   representation when it has not.

26    1244.   The Clean Air Act and EPA regulations require that automobiles limit their

27   emissions output to specified levels. These laws are intended for the protection of public health

28   and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

1   Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

2   installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

3   for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

4   Kentucky CPA.

5        1245.   Defendants intentionally and knowingly misrepresented material facts regarding

6   the Class Vehicles with intent to mislead Plaintiffs and the Kentucky State Class.

7        1246.   Defendants knew or should have known that their conduct violated the Kentucky

8   CPA.

9        1247.   Defendants owed Plaintiffs and the Kentucky State Class a duty to disclose the

10  illegality, public health and safety risks, the true nature of the Class Vehicles, because

11  Defendants:

12       A.      possessed exclusive knowledge that they were manufacturing, selling, and

13  distributing vehicles throughout the United States that did not comply with regulations;

14       B.      intentionally concealed the foregoing from regulators, Plaintiffs, and/or

15  Class members; and/or

16       C.      made incomplete representations about the Class Vehicles generally, and

17  the use of the defeat device in particular, while purposefully withholding material facts from

18  Plaintiffs that contradicted these representations.

19       1248.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

20  characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to

21  Plaintiffs and the Kentucky State Class.

22       1249.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

23  deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

24  cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

25  of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

26       1250.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

27  general public. Defendants' unlawful acts and practices complained of herein affect the public

28  interest.

1372049.6

1251.   Plaintiffs and the Kentucky State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Kentucky State Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Kentucky CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1252.   As a direct and proximate result of Defendants' violations of the Kentucky CPA, Plaintiffs and the Kentucky State Class have suffered injury-in-fact and/or actual damage.

1253.   Pursuant to Ky. Rev. Stat. Ann. § 367.220, Plaintiffs and the Kentucky State Class seek to recover actual damages in an amount to be determined at trial; an order enjoining Defendants' unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under Ky. Rev. Stat. Ann. § 367.220.

**KENTUCKY COUNT II:**
**Breach of Express Warranty**
**Ky. Rev. Stat. §§ 335.2-313 and 355.2A-210**
**(On Behalf of the Kentucky State Class)**

1254.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1255.   This count is brought on behalf of the Kentucky State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1256.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and "sellers" of motor vehicles under § 355.2-103(1)(d).

1257.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

1258.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

1259.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1260.   Defendants also made numerous representations, descriptions, and promises to Plaintiffs and Kentucky State Class members regarding the performance and emission controls of their vehicles.

1261.   For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."



Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:

– was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and

– is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

1262.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

- 233 -

1        1263.   The EPA requires vehicle manufacturers to provide a Performance Warranty with

2    respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

3    its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

4    required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

5    whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

6    emission control components are covered for the first eight years or 80,000 miles (whichever

7    comes first). These major emission control components subject to the longer warranty include the

8    catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

9    device or computer.

10       1264.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

11   with respect to their vehicles' emission systems. Thus, Defendants also provide an express

12   warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

13   Design and Defect Warranty required by the EPA covers repair of emission control or emission

14   related parts, which fail to function or function improperly because of a defect in materials or

15   workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

16   first, or, for the major emission control components, for eight years or 80,000 miles, whichever

17   comes first.

18       1265.   As manufacturers of light-duty vehicles, Defendants were required to provide

19   these warranties to purchasers or lessees of Class Vehicles.

20       1266.   Defendants' warranties formed a basis of the bargain that was reached when

21   Kentucky State Class members purchased or leased Class Vehicles that are equipped with a

22   defeat device and non-compliant emission systems.

23       1267.   Despite the existence of warranties, Defendants failed to inform Kentucky State

24   Class members that the Class Vehicles were intentionally designed and manufactured to be out of

25   compliance with applicable state and federal emissions laws, and failed to fix the defective

26   emission components free of charge.

27

28

1    1268.   Defendants breached the express warranty promising to repair and correct

2    Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

3    have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

4    1269.   Affording Defendants a reasonable opportunity to cure their breach of written

5    warranties would be unnecessary and futile here.

6    1270.   Furthermore, the limited warranty promising to repair and correct Defendants'

7    defect in materials and workmanship fails in its essential purpose because the contractual remedy

8    is insufficient to make Kentucky State Class members whole and because Defendants have failed

9    and/or have refused to adequately provide the promised remedies within a reasonable time.

10    1271.   Accordingly, recovery by the Kentucky State Class members is not restricted to

11    the limited warranty promising to repair and correct Defendants' defect in materials and

12    workmanship, and they seek all remedies as allowed by law.

13    1272.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

14    or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

15    not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

16    material facts regarding the Class Vehicles. Kentucky State Class members were therefore

17    induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

18    1273.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

19    resolved through the limited remedy of repairing and correcting Defendants' defect in materials

20    and workmanship as many incidental and consequential damages have already been suffered

21    because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

22    continued failure to provide such limited remedy within a reasonable time, and any limitation on

23    the Kentucky State Class members' remedies would be insufficient to make them whole.

24    1274.   Finally, because of Defendants' breach of warranty as set forth herein, Kentucky

25    State Class members assert, as additional and/or alternative remedies, the revocation of

26    acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

27    currently owned or leased, and for such other incidental and consequential damages as allowed.

28

1    1275.   Defendants were provided notice of these issues by numerous complaints filed

2    against them, including the instant Complaint, within a reasonable amount of time.

3    1276.   As a direct and proximate result of Defendants' breach of express warranties,

4    Kentucky State Class members have been damaged in an amount to be determined at trial.

5    **KENTUCKY COUNT III:**
     **Breach of Implied Warranty of Merchantability**
6    **Ky. Rev. Stat. §§ 335.2-314 and 355.2A-212**
     **(On Behalf of the Kentucky State Class)**
7

8    1277.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding

9    paragraphs as though fully set forth herein.

10   1278.   This count is brought on behalf of the Kentucky State Class against the

11   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

12   1279.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

13   vehicles under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and "sellers" of motor vehicles

14   under § 355.2-103(1)(d).

15   1280.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

16   of motor vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

17   1281.   The Class Vehicles are and were at all relevant times "goods" within the meaning

18   of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

19   1282.   A warranty that the Class Vehicles were in merchantable condition and fit for the

20   ordinary purpose for which vehicles are used is implied by law pursuant to Ky. Rev. Stat.

21   §§ 335.2-314 and 355.2A-212.

22   1283.   These Class Vehicles, when sold or leased and at all times thereafter, were not in

23   merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

24   Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat

25   device and do not comply with federal and state emissions standards, rendering certain emissions

26   functions inoperative.

27

28

1       1284.   Defendants were provided notice of these issues by the investigations of the EPA

2   and California state regulators, and numerous complaints filed against it including the instant

3   complaint, within a reasonable amount of time.

4       1285.   As a direct and proximate result of Defendants' breach of the implied warranty of

5   merchantability, Kentucky State Class members have been damaged in an amount to be proven at

6   trial.

7
8   **LOUISIANA COUNT I:**
    **Violations of the Louisiana Unfair Trade Practices and Consumer Protection Law**
    **La. Stat. Ann. § 51:1401 *et seq.***
    **(On Behalf of the Louisiana State Class)**
9

10       1286.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

11   forth herein.

12       1287.   This count is brought on behalf of the Louisiana State Class against all

13   Defendants.

14       1288.   Defendants, Plaintiffs, and the Louisiana State Class are "persons" within the

15   meaning of the La. Rev. Stat. § 51:1402(8)

16       1289.   Plaintiffs and the Louisiana State Class are "consumers" within the meaning of La.

17   Rev. Stat. § 51:1402(1).

18       1290.   Defendants engaged in "trade" or "commerce" within the meaning of La. Rev.

19   Stat. § 51:1402(10).

20       1291.   The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana

21   CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La.

22   Rev. Stat. § 51:1405(A). Defendants participated in misleading, false, or deceptive acts that

23   violated the Louisiana CPL.

24       1292.   In the course of its business, Defendants concealed and suppressed material facts

25   concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

26   Class Vehicles that caused the vehicles to operate in a low emission test mode only during

27   emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

28

- 237 -

1    noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions

2    testing by way of deliberately induced false readings.

3         1293.   Louisiana State Class members had no way of discerning that Defendants'

4    representations were false and misleading because Defendants' defeat device software was

5    extremely sophisticated technology. Plaintiffs and Louisiana State Class members did not and

6    could not unravel Defendants' deception on their own.

7         1294.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

8    have characteristics, uses, benefits, and qualities which they do not have; representing that Class

9    Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

10   Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

11   a transaction involving Class Vehicles has been supplied in accordance with a previous

12   representation when it has not.

13        1295.   The Clean Air Act and EPA regulations require that automobiles limit their

14   emissions output to specified levels. These laws are intended for the protection of public health

15   and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

16   Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

17   installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

18   for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

19   Louisiana CPL.

20        1296.   Defendants intentionally and knowingly misrepresented material facts regarding

21   the Class Vehicles with intent to mislead Plaintiffs and the Louisiana State Class.

22        1297.   Defendants knew or should have known that their conduct violated the Louisiana

23   CPL.

24        1298.   Defendants owed Plaintiffs and the Louisiana State Class a duty to disclose the

25   illegality, public health and safety risks, the true nature of the Class Vehicles, because

26   Defendants:

27        A.    possessed exclusive knowledge that they were manufacturing, selling, and

28   distributing vehicles throughout the United States that did not comply with regulations;

1          B.      intentionally concealed the foregoing from regulators, Plaintiffs, and/or

2   Class members; and/or

3          C.      made incomplete representations about the Class Vehicles generally, and

4   the use of the defeat device in particular, while purposefully withholding material facts from

5   Plaintiffs that contradicted these representations.

6          1299.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

7   characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to

8   Plaintiffs and the Louisiana State Class.

9          1300.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

10  deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

11  cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

12  of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

13         1301.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

14  general public. Defendants' unlawful acts and practices complained of herein affect the public

15  interest.

16         1302.   Plaintiffs and the Louisiana State Class suffered ascertainable loss and actual

17  damages as a direct and proximate result of Defendants' misrepresentations and its concealment

18  of and failure to disclose material information. Plaintiffs and the Louisiana State Class members

19  who purchased or leased the Class Vehicles would not have purchased or leased them at all

20  and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered

21  legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished

22  value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all

23  their customers to refrain from unfair and deceptive practices under the Louisiana CPL. All

24  owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their

25  vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of

26  Defendants' business.

27         1303.   As a direct and proximate result of Defendants' violations of the Louisiana CPL,

28  Plaintiffs and the Louisiana State Class have suffered injury-in-fact and/or actual damage.

1304.   Pursuant to La. Rev. Stat. § 51:1409, Plaintiffs and the Louisiana State Class seek to recover actual damages in an amount to be determined at trial; treble damages for Defendants' knowing violations of the Louisiana CPL; an order enjoining Defendants' unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under La. Rev. Stat. § 51:1409.

**LOUISIANA COUNT II:**
**Breach of Implied Warranty of Merchantability/Warranty Against Redhibitory Defects**
**La. Civ. Code Art. 2520, 2524**
**(On Behalf of the Louisiana State Class)**

1305.   Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

1306.   This count is brought on behalf of the Louisiana State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1307.   Defendants are and were at all relevant times merchants with respect to motor vehicles.

1308.   A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with defeat devices and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

1309.   Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, and by numerous complaints filed against it including the instant complaint, before or within a reasonable amount of time after the allegations of Class Vehicle defects became public.

1310.   As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the other Louisiana State Class members have been damaged in an amount to be proven at trial.

**MAINE COUNT I:**
**Violations of the Maine Unfair Trade Practices Act**
**Me. Rev. Stat. Ann. Tit. 5, § 205-A *et seq.***
**(On Behalf of the Maine State Class)**

1311.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1312.   This count is brought on behalf of the Maine State Class against all Defendants.

1313.   Defendants, Plaintiffs, and the Maine State Class are "persons" within the meaning of Me. Rev. Stat. Ann. Tit. 5, § 206(2).

1314.   Defendants engaged in "trade" or "commerce" within the meaning of Me. Rev. Stat. Ann. Tit. 5, § 206(3).

1315.   The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…." Me. Rev. Stat. Ann. Tit. 5 § 207.

1316.   In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious CO2. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

1317.   Maine State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs and Maine State Class members did not and could not unravel Defendants' deception on their own.

1318.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

1    a transaction involving Class Vehicles has been supplied in accordance with a previous

2    representation when it has not.

3          1319.   The Clean Air Act and EPA regulations require that automobiles limit their

4    emissions output to specified levels. These laws are intended for the protection of public health

5    and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

6    Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

7    installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

8    for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

9    Maine UTPA.

10         1320.   Defendants intentionally and knowingly misrepresented material facts regarding

11   the Class Vehicles with intent to mislead Plaintiffs and the Maine State Class.

12         1321.   Defendants knew or should have known that their conduct violated the Maine

13   UTPA.

14         1322.   Defendants owed Plaintiffs and the Maine State Class a duty to disclose the

15   illegality, public health and safety risks, the true nature of the Class Vehicles, because

16   Defendants:

17              A.     possessed exclusive knowledge that they were manufacturing, selling, and

18   distributing vehicles throughout the United States that did not comply with regulations;

19              B.     intentionally concealed the foregoing from regulators, Plaintiffs, and/or

20   Class members; and/or

21              C.     made incomplete representations about the Class Vehicles generally, and

22   the use of the defeat device in particular, while purposefully withholding material facts from

23   Plaintiffs that contradicted these representations.

24         1323.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

25   characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to

26   Plaintiffs and the Maine State Class.

27         1324.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

28   deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

1    cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

2    of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

3         1325.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

4    general public. Defendants' unlawful acts and practices complained of herein affect the public

5    interest.

6         1326.   Plaintiffs and the Maine State Class suffered ascertainable loss and actual damages

7    as a direct and proximate result of Defendants' misrepresentations and its concealment of and

8    failure to disclose material information. Plaintiffs and the Maine State Class members who

9    purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if

10   the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to

11   sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of

12   their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all their

13   customers to refrain from unfair and deceptive practices under the Maine UTPA. All owners of

14   Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as

15   a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants'

16   business.

17        1327.   As a direct and proximate result of Defendants' violations of the Maine UTPA,

18   Plaintiffs and the Maine State Class have suffered injury-in-fact and/or actual damage.

19        1328.   Pursuant to Me. Rev. Stat. Ann. Tit. 5 § 213, Plaintiffs and the Maine State Class

20   seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive

21   damages, and attorneys' fees, costs, and any other just and proper relief available under the Maine

22   UTPA.

23        1329.   On December 21, 2016, a notice letter was sent to Audi AG and Audi of America,

24   LLC complying with Me. Rev. Stat. Ann. Title 5, § 50-634(g).  Additionally, all Defendants were

25   provided notice of the issues raised in this count and this Complaint by the governmental

26   investigations, the numerous complaints filed against them, and the many individual notice letters

27   sent by consumers within a reasonable amount of time after the allegations of Class Vehicle

28   defects became public. Moreover, Plaintiffs sent a second notice letter pursuant to Me. Rev. Stat.

1  Ann. Title 5, § 50-634(g) to all Defendants on October 11, 2017. Because Defendants failed to

2  remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and

3  relief to which Plaintiffs and the Maine State Class are entitled.

**MAINE COUNT II:**
**Breach of Express Warranty**
**Me. Rev. Stat. Tit. 11 §§ 2-313 and 2-1210**
**(On Behalf of the Maine State Class)**

1330.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1331.   This count is brought on behalf of the Maine State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1332.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Me. Rev. Stat. Ann. Tit. 11,§§ 2-104(1), and 2-1103(3), and is a "seller" of motor vehicles under § 2-103(1)(d).

1333.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Me. Rev. Stat. Ann. Tit. 11,§ 2-1103(1)(p).

1334.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. Tit. 11,§§ 2-105(1), and 2-1103(1)(h).

1335.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1336.   Defendants also made numerous representations, descriptions, and promises to Plaintiffs and Maine State Class members regarding the performance and emission controls of their vehicles.

1337.   For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

Audi of America, Inc., an operating unit of
Volkswagen Group of America, Inc. ("Audi"),
the authorized United States importer of Audi
vehicles, warrants to the original retail pur-
chaser or original lessee and any subsequent
purchaser or lessee that every **model year
2014** Audi vehicle imported by Audi:

– was designed, built and equipped so as to
  conform at the time of sale with all applica-
  ble regulations of the United States Environ-
  mental Protection Agency (EPA), and
– is free from defects in material and work-
  manship which causes the vehicle to fail to
  conform with EPA regulations for 2 years af-
  ter the date of first use or delivery of the ve-
  hicle to the original retail purchaser or origi-
  nal lessee or until the vehicle has been driv-
  en 24,000 miles, whichever occurs first.

1338.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1339.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1340.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

1   first, or, for the major emission control components, for eight years or 80,000 miles, whichever

2   comes first.

3        1341.   As manufacturers of light-duty vehicles, Defendants were required to provide

4   these warranties to purchasers or lessees of Class Vehicles.

5        1342.   Defendants' warranties formed a basis of the bargain that was reached when

6   Maine State Class members purchased or leased Class Vehicles that are equipped with a defeat

7   device and non-compliant emission systems.

8        1343.   Despite the existence of warranties, Defendants failed to inform Maine State Class

9   members that the Class Vehicles were intentionally designed and manufactured to be out of

10  compliance with applicable state and federal emissions laws, and failed to fix the defective

11  emission components free of charge.

12       1344.   Defendants breached the express warranty promising to repair and correct

13  Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

14  have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

15       1345.   Affording Defendants a reasonable opportunity to cure their breach of written

16  warranties would be unnecessary and futile here.

17       1346.   Furthermore, the limited warranty promising to repair and correct Defendants'

18  defect in materials and workmanship fails in its essential purpose because the contractual remedy

19  is insufficient to make Maine State Class members whole and because Defendants have failed

20  and/or have refused to adequately provide the promised remedies within a reasonable time.

21       1347.   Accordingly, recovery by the Maine State Class members is not restricted to the

22  limited warranty promising to repair and correct Defendants' defect in materials and

23  workmanship, and they seek all remedies as allowed by law.

24       1348.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

25  or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

26  not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

27  material facts regarding the Class Vehicles. Maine State Class members were therefore induced to

28  purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1349.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Maine State Class members' remedies would be insufficient to make them whole.

1350.   Finally, because of Defendants' breach of warranty as set forth herein, Maine State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1351.   Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

1352.   As a direct and proximate result of Defendants' breach of express warranties, Maine State Class members have been damaged in an amount to be determined at trial.

**MAINE COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Me. Rev. Stat. Tit. 11 §§ 2-314 and 2-1212**
**(On Behalf of the Maine State Class)**

1353.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1354.   This count is brought on behalf of the Maine State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1355.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Me. Rev. Stat. Ann. Tit. 11,§§ 2-104(1), and 2-1103(3), and is a "seller" of motor vehicles under § 2-103(1)(d).

1356.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Me. Rev. Stat. Ann. Tit. 11,§ 2-1103(1)(p).

1357.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. Tit. 11,§§ 2-105(1), and 2-1103(1)(h).

1358.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Me. Rev. Stat. Ann. Tit. 11,§§ 2-314, and 2-1212.

1359.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

1360.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1361.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Maine State Class members have been damaged in an amount to be proven at trial.

**MARYLAND COUNT I:**
**Violations of the Maryland Consumer Protection Act**
**Md. Code Com. Law § 13-101 *et seq.***
**(On Behalf of the Maryland State Class)**

1362.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1363.   Plaintiff Michael Gray (for the purpose of this count, "Plaintiff") brings this count on behalf of himself and the Maryland State Class against all Defendants.

1364.   Defendants, Plaintiff, and the Maryland State Class are "persons" within the meaning of Md. Code Com. Law § 13-101(h).

1365.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale of any consumer good. Md. Code Com. Law § 13-303. Defendants participated in misleading, false, or deceptive acts that violated the Maryland CPA.

1366.   In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

1367.   Maryland State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiff and Maryland State Class members did not and could not unravel Defendants' deception on their own.

1368.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

1369.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the Maryland CPA.

1370.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Maryland State Class.

1371.   Defendants knew or should have known that their conduct violated the Maryland CPA.

1372.   Defendants owed Plaintiff and the Maryland State Class a duty to disclose the illegality, public health and safety risks, the true nature of the Class Vehicles, because Defendants:

A.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

B.   intentionally concealed the foregoing from regulators, Plaintiff, and/or Class members; and/or

C.   made incomplete representations about the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiff and/or Class members that contradicted these representations.

1373.   Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to Plaintiff and the Maryland State Class.

1374.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff, about the true environmental cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

1375.   Defendants' violations present a continuing risk to Plaintiff, the Maryland State Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1376.   Plaintiff and the Maryland State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Maryland State Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiff and the Maryland State Class also suffered diminished value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the

1    Maryland CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the

2    diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and

3    practices made in the course of Defendants' business.

4        1377.   As a direct and proximate result of Defendants' violations of the Maryland CPA,

5    Plaintiff and the Maryland State Class have suffered injury-in-fact and/or actual damage.

6        1378.   Pursuant to Md. Code Com. Law § 13-408, Plaintiff and the Maryland State Class

7    seek actual damages, attorneys' fees, and any other just and proper relief available under the

8    Maryland CPA.

9                          **MARYLAND COUNT II:**
                           **Maryland Lemon Law**
10                    **Md. Code Com. Law § 14-1501 *et seq.***
                     **(On Behalf of the Maryland State Class)**
11

12       1379.   Plaintiffs incorporate by reference all allegations in this Complaint as though fully

13   set forth.

14       1380.   Plaintiff Michael Gray (for the purpose of this count, "Plaintiff") brings this count

15   on behalf of himself and the Maryland State Class against the Volkswagen and Audi Defendants

16   (collectively for this count, "Defendants").

17       1381.   Plaintiff and the Maryland State Class own or lease "motor vehicles" within the

18   meaning of Md. Code, Com. Law § 14-1501(f), because these vehicles were registered in the state

19   and fall within the categories of vehicles manufactured, assembled, or distributed by Defendants.

20   These vehicles are not auto homes.

21       1382.   Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of Md.

22   Code, Com. Law § 14-1501(d).

23       1383.   Plaintiff and the Maryland State Class are "consumers" within the meaning of Md.

24   Code Com. Law § 14-1501(b) because they: purchased the Class Vehicles, were transferred the

25   Class Vehicles during the warranty period, or are otherwise entitled to the attendant terms of

26   warranty.

27       1384.   The Class Vehicles did not conform to their "warranties" under Md. Code Com.

28   Law § 14-1501(g) during the warranty period because they contained a "defeat device" designed

to circumvent state and federal emissions standards. These devices did in fact circumvent emissions standards and substantially impaired the use and market value of their motor vehicles.

1385.   Defendants had actual knowledge of the conformities during the "warranty period" within the meaning of Md. Code, Com. Law § 14-1501(e). But the nonconformities continued to exist throughout this term, as they have not been fixed. Plaintiffs and Maryland State Class members are excused from notifying Defendants of the nonconformities because it was already fully aware of the problem—as it intentionally created it—and any repair attempt is futile.

1386.   Defendants have had a reasonable opportunity to cure the nonconformities during the warranty period because of its actual knowledge of, creation of, and attempt to conceal the nonconformities, but has not done so as required under Md. Code, Com. Law § 14-1502.

1387.   Plaintiff and the Maryland State Class demand a full refund of the purchase price, including all license fees, registration fees, and any similar governmental charges. Md. Code Com. Law § 14-1502(c). Once payment has been tendered, the Maryland State Class members will return their vehicles.

**MARYLAND COUNT III:**
**Breach of Express Warranty**
**Md. Code Com. Law §§ 2-313 and 2a-210**
**(On Behalf of the Maryland State Class)**

1388.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1389.   Plaintiff Michael Gray (for the purpose of this count, "Plaintiff") brings this count on behalf of himself and the Maryland State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1390.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Md. Code Com. Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

1391.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Md. Code Com. Law § 2A-103(1)(p).

1392.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Code Com. Law §§ 2-105(1) and 2a-103(1)(h).

1393.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1394.   Defendants also made numerous representations, descriptions, and promises to Plaintiff and Maryland State Class members regarding the performance and emission controls of their vehicles.

1395.   For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

> Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
> – is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

1396.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1397.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

1   required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

2   whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

3   emission control components are covered for the first eight years or 80,000 miles (whichever

4   comes first). These major emission control components subject to the longer warranty include the

5   catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

6   device or computer.

7       1398.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

8   with respect to their vehicles' emission systems. Thus, Defendants also provide an express

9   warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

10   Design and Defect Warranty required by the EPA covers repair of emission control or emission

11   related parts, which fail to function or function improperly because of a defect in materials or

12   workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

13   first, or, for the major emission control components, for eight years or 80,000 miles, whichever

14   comes first.

15       1399.   As manufacturers of light-duty vehicles, Defendants were required to provide

16   these warranties to purchasers or lessees of Class Vehicles.

17       1400.   Defendants' warranties formed a basis of the bargain that was reached when

18   Maryland State Class members purchased or leased Class Vehicles that are equipped with a

19   defeat device and non-compliant emission systems.

20       1401.   Despite the existence of warranties, Defendants failed to inform Maryland State

21   Class members that the Class Vehicles were intentionally designed and manufactured to be out of

22   compliance with applicable state and federal emissions laws, and failed to fix the defective

23   emission components free of charge.

24       1402.   Defendants breached the express warranty promising to repair and correct

25   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

26   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

27       1403.   Affording Defendants a reasonable opportunity to cure their breach of written

28   warranties would be unnecessary and futile here.

1      1404.   Furthermore, the limited warranty promising to repair and correct Defendants'

2   defect in materials and workmanship fails in its essential purpose because the contractual remedy

3   is insufficient to make Maryland State Class members whole and because Defendants have failed

4   and/or have refused to adequately provide the promised remedies within a reasonable time.

5      1405.   Accordingly, recovery by the Maryland State Class members is not restricted to

6   the limited warranty promising to repair and correct Defendants' defect in materials and

7   workmanship, and they seek all remedies as allowed by law.

8      1406.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

9   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

10   not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

11   material facts regarding the Class Vehicles. Maryland State Class members were therefore

12   induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

13      1407.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

14   resolved through the limited remedy of repairing and correcting Defendants' defect in materials

15   and workmanship as many incidental and consequential damages have already been suffered

16   because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

17   continued failure to provide such limited remedy within a reasonable time, and any limitation on

18   the Maryland State Class members' remedies would be insufficient to make them whole.

19      1408.   Finally, because of Defendants' breach of warranty as set forth herein, Maryland

20   State Class members assert, as additional and/or alternative remedies, the revocation of

21   acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

22   currently owned or leased, and for such other incidental and consequential damages as allowed.

23      1409.   Defendants were provided notice of these issues by numerous complaints filed

24   against them, including the instant Complaint, within a reasonable amount of time.

25      1410.   As a direct and proximate result of Defendants' breach of express warranties,

26   Maryland State Class members have been damaged in an amount to be determined at trial.

27

28

**MARYLAND COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**Md. Code Com. Law §§ 2-314 and 2a-212**
**(On Behalf of the Maryland State Class)**

1411.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1412.   Plaintiff Michael Gray (for the purpose of this count, "Plaintiff") brings this count on behalf of himself and the Maryland State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1413.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Md. Code Com. Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

1414.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Md. Code Com. Law § 2A-103(1)(p).

1415.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Code Com. Law §§ 2-105(1) and 2a-103(1)(h).

1416.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Md. Code Com. Law §§ 2-314, and 2a-212.

1417.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

1418.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1      1419.   As a direct and proximate result of Defendants' breach of the implied warranty of

2  merchantability, Maryland State Class members have been damaged in an amount to be proven at

3  trial.

**MASSACHUSETTS COUNT I:**
**Deceptive Acts or Practices Prohibited by Massachusetts Law**
**Mass. Gen. Laws Ch. 93a, § 1, *et seq.***
**(On Behalf of the Massachusetts State Class)**

      1420.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

      1421.   Plaintiff Paul Sherry (for the purpose of this count, "Plaintiff") brings this count on behalf of himself and the Massachusetts State Class against all Defendants.

      1422.   Defendants, Plaintiff, and the Massachusetts State Class are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

      1423.   Defendants engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

      1424.   Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2. Defendants participated in misleading, false, or deceptive acts that violated the Massachusetts Act.

      1425.   In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

      1426.   Massachusetts State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiff and Massachusetts State Class members did not and could not unravel Defendants' deception on their own.

1    1427.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

2    have characteristics, uses, benefits, and qualities which they do not have; representing that Class

3    Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

4    Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

5    a transaction involving Class Vehicles has been supplied in accordance with a previous

6    representation when it has not.

7    1428.   The Clean Air Act and EPA regulations require that automobiles limit their

8    emissions output to specified levels. These laws are intended for the protection of public health

9    and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

10   Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

11   installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

12   for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

13   Massachusetts Act.

14   1429.   Defendants intentionally and knowingly misrepresented material facts regarding

15   the Class Vehicles with intent to mislead Plaintiff and the Massachusetts State Class.

16   1430.   Defendants knew or should have known that their conduct violated the

17   Massachusetts Act.

18   1431.   Defendants owed Plaintiff and the Massachusetts State Class a duty to disclose the

19   illegality, public health and safety risks, the true nature of the Class Vehicles, because

20   Defendants:

21           A.      possessed exclusive knowledge that they were manufacturing, selling, and

22   distributing vehicles throughout the United States that did not comply with regulations;

23           B.      intentionally concealed the foregoing from regulators, Plaintiff, and/or

24   Class members; and/or

25           C.      made incomplete representations about the Class Vehicles generally, and

26   the use of the defeat device in particular, while purposefully withholding material facts from

27   Plaintiff and/or Class members that contradicted these representations.

28

1    1432.  Defendants' fraudulent use of the "defeat device" and its concealment of the true

2    characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to

3    Plaintiff and the Massachusetts State Class.

4    1433.  Defendants' unfair or deceptive acts or practices were likely to and did in fact

5    deceive regulators and reasonable consumers, including Plaintiff, about the true environmental

6    cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

7    of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

8    1434.  Defendants' violations present a continuing risk to Plaintiffs as well as to the

9    general public. Defendants' unlawful acts and practices complained of herein affect the public

10   interest.

11   1435.  Plaintiff and the Massachusetts State Class suffered ascertainable loss and actual

12   damages as a direct and proximate result of Defendants' misrepresentations and its concealment

13   of and failure to disclose material information. Plaintiff and the Massachusetts State Class

14   members who purchased or leased the Class Vehicles would not have purchased or leased them at

15   all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles

16   rendered legal to sell—would have paid significantly less for them. Plaintiff and the

17   Massachusetts State Class also suffered diminished value of vehicles, as well as lost or

18   diminished use. Defendants had an ongoing duty to all their customers to refrain from unfair and

19   deceptive practices under the Massachusetts Act. All owners of Class Vehicles suffered

20   ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants'

21   deceptive and unfair acts and practices made in the course of Defendants' business.

22   1436.  As a direct and proximate result of Defendants' violations of the Massachusetts

23   Act, Plaintiff and the Massachusetts State Class have suffered injury-in-fact and/or actual

24   damage.

25   1437.  Pursuant to Mass. Gen. Laws ch. 93A, § 9, Plaintiff and the Massachusetts State

26   Class seek monetary relief against Defendants measured as the greater of (a) actual damages in an

27   amount to be determined at trial and (b) statutory damages in the amount of $25 for Plaintiff and

28   each Massachusetts State Class member. Because Defendants' conduct was committed willfully

1   and knowingly, Plaintiff and each Massachusetts State Class member are entitled to recover, up to

2   three times actual damages, but no less than two times actual damages.

3       1438.   Plaintiff and the Massachusetts State Class also seek an order enjoining

4   Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees,

5   costs, and any other just and proper relief available under the Massachusetts Act.

6       1439.   On December 21, 2016, a notice letter was sent to Audi AG and Audi of America,

7   LLC complying with Mass. Gen. Laws ch. 93A, § 9(3).  Additionally, all Defendants were

8   provided notice of the issues raised in this count and this Complaint by the governmental

9   investigations, the numerous complaints filed against them, and the many individual notice letters

10  sent by consumers within a reasonable amount of time after the allegations of Class Vehicle

11  defects became public. Moreover, Plaintiffs sent a second notice letter pursuant to Mass. Gen.

12  Laws ch. 93A, § 9(3) to all Defendants on October 11, 2017.  Because Defendants failed to

13  remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and

14  relief to which Plaintiff and the Massachusetts State Class are entitled.

15      1440.   As a result of Defendants' conduct, the amount of its unjust enrichment should be

16  disgorged, in an amount according to proof.

### MASSACHUSETTS COUNT II:
**Massachusetts Lemon Law**
**Mass. Gen. Laws Ch. 90, § 7N1/2(1)**
**(On Behalf of the Massachusetts State Class)**

20      1441.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

21  fully set forth herein.

22      1442.   Plaintiff Paul Sherry (for the purpose of this count, "Plaintiff") brings this count on

23  behalf of himself and the Massachusetts State Class against the Volkswagen and Audi Defendants

24  (collectively for this count, "Defendants").

25      1443.   Plaintiff and the Massachusetts State Class own or lease "motor vehicles" within

26  the meaning of Mass. Gen. Laws Ch. 90, § 7N1/2(1), because these vehicles were constructed or

27  designed for propulsion by power and were sold, leased, or replaced by Defendants. These

28

1    vehicles are not: (1) auto homes, (2) vehicles built primarily for off-read use, and (3) used

2    primarily for business purposes.

3        1444.   Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of

4    Mass. Gen. Laws Ch. 90, § 7N1/2(1).

5        1445.   Plaintiff and the Massachusetts State Class are "consumers" within the meaning of

6    Mass. Gen. Laws Ch. 90, § 7N1/2(1) because they bought or leased the Class Vehicles or are

7    otherwise entitled to the attendant terms of warranty.

8        1446.   The Class Vehicles did not conform to their express and implied warranties

9    because they contained a "defeat device" designed to circumvent state and federal emissions

10   standards. These devices did in fact circumvent emissions standards and substantially impaired

11   the use, market value, and safety of their motor vehicles.

12       1447.   Defendants had actual knowledge of the conformities during the "term of

13   protection" within the meaning of Mass. Gen. Laws Ch. 90, §§ 7N1/2(1)–7N1/2(2). But the

14   nonconformities continued to exist throughout this term, as they have not been fixed. Plaintiff and

15   Massachusetts State Class members are excused from notifying Defendants of the

16   nonconformities because it was already fully aware of the problem—as it intentionally created

17   it—and any repair attempt is futile.

18       1448.   Defendants have had a reasonable opportunity to cure the nonconformities because

19   of its actual knowledge of, creation of, and attempt to conceal the nonconformities, but has not

20   done so as required under Mass. Gen. Laws Ch. 90, § 7N1/2(3).

21       1449.   For vehicles purchased, Plaintiff and the Massachusetts State Class demand a full

22   refund of the contract price. For vehicles leased, Plaintiff and the Massachusetts State Class

23   demand a full refund of all payments made under the lease agreement. Plaintiff and the

24   Massachusetts State Class exercise their "unqualified right" to reject an offer of replacement and

25   will retain their vehicles until payment is tendered under Mass. Gen. Laws Ch. 90, § 7N1/2(3).

26

27

28

**MASSACHUSETTS COUNT III:**
**Breach of Express Warranty**
**Mass. Gen. Laws c. 106 §§ 2-313 and 2A-210**
**(On Behalf of the Massachusetts State Class)**

1450.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1451.   Plaintiff Paul Sherry (for the purpose of this count, "Plaintiff") brings this count on behalf of himself and the Massachusetts State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1452.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under M.G.L. c. 106 § 2-104(1) and is a "seller" of motor vehicles under § 2-103(1)(d).

1453.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under M.G.L. c. 106 § 2A-103(1)(p).

1454.   The Class Vehicles are and were at all relevant times "goods" within the meaning of M.G.L. c. 106 §§ 2-105(1) and 2A-103(1)(h).

1455.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1456.   Defendants also made numerous representations, descriptions, and promises to Plaintiff and Massachusetts State Class members regarding the performance and emission controls of their vehicles.

1457.   For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

> Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
> – is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

1458.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1459.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1460.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

1 first, or, for the major emission control components, for eight years or 80,000 miles, whichever

2 comes first.

3    1461.   As manufacturers of light-duty vehicles, Defendants were required to provide

4 these warranties to purchasers or lessees of Class Vehicles.

5    1462.   Defendants' warranties formed a basis of the bargain that was reached when

6 Massachusetts State Class members purchased or leased Class Vehicles that are equipped with a

7 defeat device and non-compliant emission systems.

8    1463.   Despite the existence of warranties, Defendants failed to inform Massachusetts

9 State Class members that the Class Vehicles were intentionally designed and manufactured to be

10 out of compliance with applicable state and federal emissions laws, and failed to fix the defective

11 emission components free of charge.

12    1464.   Defendants breached the express warranty promising to repair and correct

13 Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

14 have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

15    1465.   Affording Defendants a reasonable opportunity to cure their breach of written

16 warranties would be unnecessary and futile here.

17    1466.   Furthermore, the limited warranty promising to repair and correct Defendants'

18 defect in materials and workmanship fails in its essential purpose because the contractual remedy

19 is insufficient to make Massachusetts State Class members whole and because Defendants have

20 failed and/or have refused to adequately provide the promised remedies within a reasonable time.

21    1467.   Accordingly, recovery by the Massachusetts State Class members is not restricted

22 to the limited warranty promising to repair and correct Defendants' defect in materials and

23 workmanship, and they seek all remedies as allowed by law.

24    1468.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

25 or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

26 not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

27 material facts regarding the Class Vehicles. Massachusetts State Class members were therefore

28 induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1469.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Massachusetts State Class members' remedies would be insufficient to make them whole.

1470.   Finally, because of Defendants' breach of warranty as set forth herein, Massachusetts State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1471.   Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

1472.   As a direct and proximate result of Defendants' breach of express warranties, Massachusetts State Class members have been damaged in an amount to be determined at trial.

**MASSACHUSETTS COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**Mass. Gen. Laws c. 106 §§ 2-314 and 2A-212**
**(On Behalf of the Massachusetts State Class)**

1473.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1474.   Plaintiff Paul Sherry (for the purpose of this count, "Plaintiff") brings this count on behalf of himself and the Massachusetts State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1475.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under M.G.L. c. 106 § 2-104(1) and is a "seller" of motor vehicles under § 2-103(1)(d).

1476.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under M.G.L. c. 106 § 2A-103(1)(p).

1477.   The Class Vehicles are and were at all relevant times "goods" within the meaning of M.G.L. c. 106 §§ 2-105(1) and 2A-103(1)(h).

1478.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to M.G.L. c. 106 §§ 2-314 and 2A-212.

1479.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

1480.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1481.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Massachusetts State Class members have been damaged in an amount to be proven at trial.

### MICHIGAN COUNT I:
#### Violations of the Michigan Consumer Protection Act
#### Mich. Comp. Laws § 445.903 *et seq.*
#### (On Behalf of the Michigan State Class)

1482.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1483.   Plaintiff Ira Margolis (for the purpose of this count, "Plaintiff") brings this count on behalf of himself and the Michigan State Class against all Defendants.

1484.   Plaintiff and the Michigan State Class members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

1485.   Defendants are "person[s]" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

1486.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce ...." Mich. Comp. Laws § 445.903(1). Defendants engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that goods or services have ... characteristics ... that they do not have ....;" "(e) Representing that goods or services are of a particular standard ... if they are of another;" "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

1487.   In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

1488.   Michigan State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiff and Michigan State Class members did not and could not unravel Defendants' deception on their own.

1489.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

1    a transaction involving Class Vehicles has been supplied in accordance with a previous

2    representation when it has not.

3        1490.   The Clean Air Act and EPA regulations require that automobiles limit their

4    emissions output to specified levels. These laws are intended for the protection of public health

5    and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

6    Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

7    installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

8    for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

9    Michigan CPA.

10       1491.   Defendants intentionally and knowingly misrepresented material facts regarding

11   the Class Vehicles with intent to mislead Plaintiff and the Michigan State Class.

12       1492.   Defendants knew or should have known that their conduct violated the Michigan

13   CPA.

14       1493.   Defendants owed Plaintiff and the Michigan State Class a duty to disclose the

15   illegality, public health and safety risks, the true nature of the Class Vehicles, because

16   Defendants:

17           A.     possessed exclusive knowledge that they were manufacturing, selling, and

18   distributing vehicles throughout the United States that did not comply with regulations;

19           B.     intentionally concealed the foregoing from regulators, Plaintiff, and/or

20   Class members; and/or

21           C.     made incomplete representations about the Class Vehicles generally, and

22   the use of the defeat device in particular, while purposefully withholding material facts from

23   Plaintiff and the Michigan State Class that contradicted these representations.

24       1494.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

25   characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to

26   Plaintiff and the Michigan State Class.

27       1495.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

28   deceive regulators and reasonable consumers, including Plaintiff, about the true environmental

1    cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

2    of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

3        1496.   Defendants' violations present a continuing risk to Plaintiff, the Michigan State

4    Class, as well as to the general public. Defendants' unlawful acts and practices complained of

5    herein affect the public interest.

6        1497.   Plaintiff and the Michigan State Class suffered ascertainable loss and actual

7    damages as a direct and proximate result of Defendants' misrepresentations and its concealment

8    of and failure to disclose material information. Plaintiff and the Michigan State Class members

9    who purchased or leased the Class Vehicles would not have purchased or leased them at all

10   and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered

11   legal to sell—would have paid significantly less for them. Plaintiff and the Michigan State Class

12   also suffered diminished value of their vehicles, as well as lost or diminished use. Defendants had

13   an ongoing duty to all their customers to refrain from unfair and deceptive practices under the

14   Michigan CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the

15   diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and

16   practices made in the course of Defendants' business.

17       1498.   As a direct and proximate result of Defendants' violations of the Michigan CPA,

18   Plaintiff and the Michigan State Class have suffered injury-in-fact and/or actual damage.

19       1499.   Plaintiff and the Michigan State Class seek injunctive relief to enjoin Defendants

20   from continuing its unfair and deceptive acts; monetary relief against Defendants measured as the

21   greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in

22   the amount of $250 for Plaintiff and each Michigan State Class member; reasonable attorneys'

23   fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

24       1500.   Plaintiff and the Michigan State Class also seek punitive damages against

25   Defendants because it carried out despicable conduct with willful and conscious disregard of the

26   rights and safety of others. Defendants intentionally and willfully misrepresented the safety and

27   reliability of the Class Vehicles, concealed material facts that only they knew, and repeatedly

28   promised Plaintiff and Michigan State Class members that all vehicles were safe—all to avoid the

1   expense and public relations nightmare of correcting a flaw in the Class Vehicles. Defendants'

2   unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

3                            **MICHIGAN COUNT II:**
                          **Breach of Express Warranty**
4              **Mich. Comp. Laws §§ 440.2313 and 440.2860**
                     **(On Behalf of the Michigan State Class)**
5

6       1501.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

7   fully set forth herein.

8       1502.   Plaintiff Ira Margolis (for the purpose of this count, "Plaintiff") brings this count

9   on behalf of himself and the Michigan State Class against the Volkswagen and Audi Defendants

10  (collectively for this count, "Defendants").

11      1503.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

12  vehicles under Mich. Comp. Laws § 440.2104(1) and "sellers" of motor vehicles under

13  § 440.2103(1)(d).

14      1504.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

15  of motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

16      1505.   The Class Vehicles are and were at all relevant times "goods" within the meaning

17  of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

18      1506.   In connection with the purchase or lease of each one of its new vehicles,

19  Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

20  occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

21  materials or workmanship."

22      1507.   Defendants also made numerous representations, descriptions, and promises to

23  Plaintiff and Michigan State Class members regarding the performance and emission controls of

24  their vehicles.

25      1508.   For example, as shown below, Defendants included in the warranty booklets for

26  some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped

27  so as to conform at the time of sale with all applicable regulations of the United States

28  Environmental Protection Agency."

> Audi of America, Inc., an operating unit of
> Volkswagen Group of America, Inc. ("Audi"),
> the authorized United States importer of Audi
> vehicles, warrants to the original retail pur-
> chaser or original lessee and any subsequent
> purchaser or lessee that every **model year
> 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to
>   conform at the time of sale with all applica-
>   ble regulations of the United States Environ-
>   mental Protection Agency (EPA), and
> – is free from defects in material and work-
>   manship which causes the vehicle to fail to
>   conform with EPA regulations for 2 years af-
>   ter the date of first use or delivery of the ve-
>   hicle to the original retail purchaser or origi-
>   nal lessee or until the vehicle has been driv-
>   en 24,000 miles, whichever occurs first.

1509.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1510.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1511.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

1    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

2    comes first.

3        1512.   As manufacturers of light-duty vehicles, Defendants were required to provide

4    these warranties to purchasers or lessees of Class Vehicles.

5        1513.   Defendants' warranties formed a basis of the bargain that was reached when

6    Michigan State Class members purchased or leased Class Vehicles that are equipped with a defeat

7    device and non-compliant emission systems.

8        1514.   Despite the existence of warranties, Defendants failed to inform Michigan State

9    Class members that the Class Vehicles were intentionally designed and manufactured to be out of

10   compliance with applicable state and federal emissions laws, and failed to fix the defective

11   emission components free of charge.

12       1515.   Defendants breached the express warranty promising to repair and correct

13   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

14   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

15       1516.   Affording Defendants a reasonable opportunity to cure their breach of written

16   warranties would be unnecessary and futile here.

17       1517.   Furthermore, the limited warranty promising to repair and correct Defendants'

18   defect in materials and workmanship fails in its essential purpose because the contractual remedy

19   is insufficient to make Michigan State Class members whole and because Defendants have failed

20   and/or have refused to adequately provide the promised remedies within a reasonable time.

21       1518.   Accordingly, recovery by the Michigan State Class members is not restricted to the

22   limited warranty promising to repair and correct Defendants' defect in materials and

23   workmanship, and they seek all remedies as allowed by law.

24       1519.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

25   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

26   not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

27   material facts regarding the Class Vehicles. Michigan State Class members were therefore

28   induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1    1520.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

2    resolved through the limited remedy of repairing and correcting Defendants' defect in materials

3    and workmanship as many incidental and consequential damages have already been suffered

4    because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

5    continued failure to provide such limited remedy within a reasonable time, and any limitation on

6    the Michigan State Class members' remedies would be insufficient to make them whole.

7    1521.   Finally, because of Defendants' breach of warranty as set forth herein, Michigan

8    State Class members assert, as additional and/or alternative remedies, the revocation of

9    acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

10   currently owned or leased, and for such other incidental and consequential damages as allowed.

11   1522.   Defendants were provided notice of these issues by numerous complaints filed

12   against them, including the instant Complaint, within a reasonable amount of time.

13   1523.   As a direct and proximate result of Defendants' breach of express warranties,

14   Michigan State Class members have been damaged in an amount to be determined at trial.

15   **MICHIGAN COUNT III:**
**Breach of Implied Warranty of Merchantability**
16   **Mich. Comp. Laws §§ 440.2314 and 440.2860**
**(On Behalf of the Michigan State Class)**
17

18   1524.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding

19   paragraphs as though fully set forth herein.

20   1525.   Plaintiff Ira Margolis (for the purpose of this count, "Plaintiff") brings this count

21   on behalf of himself and the Michigan State Class against the Volkswagen and Audi Defendants

22   (collectively for this count, "Defendants").

23   1526.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

24   vehicles under Mich. Comp. Laws § 440.2104(1) and "sellers" of motor vehicles under

25   § 440.2103(1)(d).

26   1527.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

27   of motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

28

1528.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

1529.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mich. Comp. Laws §§ 440.2314 and 440.2862.

1530.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

1531.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1532.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Michigan State Class members have been damaged in an amount to be proven at trial.

**MINNESOTA COUNT I:**
**Violations of the Minnesota Prevention of Consumer Fraud Act**
**Minn. Stat. § 325F.68 *et seq.***
**(On Behalf of the Minnesota State Class)**

1533.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1534.   Plaintiff Mark Dressel (for the purpose of this count "Plaintiff") brings this count on behalf of himself and the Minnesota State Class against all Defendants.

1535.   The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

1536.   The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely

1    thereon in connection with the sale of any merchandise, whether or not any person has in fact

2    been misled, deceived, or damaged thereby …." Minn. Stat. § 325F.69(1). Defendants

3    participated in misleading, false, or deceptive acts that violated the Minnesota CFA.

4         1537.   In the course of its business, Defendants concealed and suppressed material facts

5    concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

6    Class Vehicles that caused the vehicles to operate in a low emission test mode only during

7    emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

8    noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions

9    testing by way of deliberately induced false readings.

10        1538.   Minnesota State Class members had no way of discerning that Defendants'

11   representations were false and misleading because Defendants' defeat device software was

12   extremely sophisticated technology. Plaintiff and Minnesota State Class members did not and

13   could not unravel Defendants' deception on their own.

14        1539.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

15   have characteristics, uses, benefits, and qualities which they do not have; representing that Class

16   Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

17   Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

18   a transaction involving Class Vehicles has been supplied in accordance with a previous

19   representation when it has not.

20        1540.   The Clean Air Act and EPA regulations require that automobiles limit their

21   emissions output to specified levels. These laws are intended for the protection of public health

22   and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

23   Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

24   installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

25   for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

26   Minnesota CFA.

27        1541.   Defendants intentionally and knowingly misrepresented material facts regarding

28   the Class Vehicles with intent to mislead Plaintiff and the Minnesota State Class.

1    1542.   Defendants knew or should have known that their conduct violated the Minnesota

2    CFA.

3    1543.   Defendants owed Plaintiff and the Minnesota State Class a duty to disclose the

4    illegality, public health and safety risks, the true nature of the Class Vehicles, because

5    Defendants:

6             A.       possessed exclusive knowledge that they were manufacturing, selling, and

7    distributing vehicles throughout the United States that did not comply with regulations;

8             B.       intentionally concealed the foregoing from regulators, Plaintiff, and/or

9    Class members; and/or

10            C.       made incomplete representations about the Class Vehicles generally, and

11   the use of the defeat device in particular, while purposefully withholding material facts from

12   Plaintiff and the Minnesota State Class that contradicted these representations.

13   1544.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

14   characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to

15   Plaintiff and the Minnesota State Class.

16   1545.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

17   deceive regulators and reasonable consumers, including Plaintiff, about the true environmental

18   cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

19   of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

20   1546.   Defendants' violations present a continuing risk to Plaintiff, the Minnesota State

21   Class, as well as to the general public. Defendants' unlawful acts and practices complained of

22   herein affect the public interest.

23   1547.   Plaintiff and the Minnesota State Class suffered ascertainable loss and actual

24   damages as a direct and proximate result of Defendants' misrepresentations and its concealment

25   of and failure to disclose material information. Plaintiff and the Minnesota State Class members

26   who purchased or leased the Class Vehicles would not have purchased or leased them at all

27   and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered

28   legal to sell—would have paid significantly less for them. Plaintiff and the Minnesota State Class

1   also suffered diminished value of their vehicles, as well as lost or diminished use. Defendants had

2   an ongoing duty to all their customers to refrain from unfair and deceptive practices under the

3   Minnesota CFA. All owners of Class Vehicles suffered ascertainable loss in the form of the

4   diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and

5   practices made in the course of Defendants' business.

6       1548.   As a direct and proximate result of Defendants' violations of the Minnesota CFA,

7   Plaintiff and the Minnesota State Class have suffered injury-in-fact and/or actual damage.

8       1549.   Pursuant to Minn. Stat. § 8.31(3a), Plaintiff and the Minnesota State Class seek

9   actual damages, attorneys' fees, and any other just and proper relief available under the

10  Minnesota CFA.

11      1550.   Plaintiff and the Minnesota State Class also seek punitive damages under Minn.

12  Stat. § 549.20(1)(a) given the clear and convincing evidence that Defendants' acts show

13  deliberate disregard for the rights or safety of others.

14                          **MINNESOTA COUNT II:**
                **Violations of the Minnesota Uniform Deceptive Trade Practices Act**
15                        **Minn. Stat. § 325D.43-48 *et seq.***
                        **(On Behalf of the Minnesota State Class)**
16

17      1551.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

18  forth herein.

19      1552.   Plaintiff Mark Dressel (for the purpose of this count "Plaintiff") brings this count

20  on behalf of himself and the Minnesota State Class against the Volkswagen and Audi Defendants

21  (collectively for this count, "Defendants").

22      1553.   The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits

23  deceptive trade practices, which occur when a person "(5) represents that goods or services have

24  sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not

25  have or that a person has a sponsorship, approval, status, affiliation, or connection that the person

26  does not have;" "(7) represents that goods or services are of a particular standard, quality, or

27  grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises

28  goods or services with intent not to sell them as advertised." Minn. Stat. § 325D.44. In the course

1    of the Defendants' business, it engaged in deceptive practices by representing that Class Vehicles

2    have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do

3    not have; representing that Class Vehicles are of a particular standard, quality, or grade, or that

4    goods are of a particular style or model, if they are of another; and advertising Class Vehicles

5    with intent not to sell them as advertised. Defendants participated in misleading, false, or

6    deceptive acts that violated the Minnesota DTPA.

7        1554.   By failing to disclose and by actively concealing the "defeat device" and the true

8    cleanliness and performance of the Class Vehicles, by marketing its vehicles as safe, reliable,

9    environmentally clean, efficient, and of high quality, and by presenting itself as a reputable

10    manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its

11    vehicles after they were sold, Defendants engaged in deceptive business practices prohibited by

12    the Minnesota DTPA

13        1555.   Defendants' actions as set forth above occurred in the conduct of trade or

14    commerce.

15        1556.   In the course of its business, Defendants concealed and suppressed material facts

16    concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

17    Class Vehicles that caused the vehicles to operate in a low emission test mode only during

18    emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

19    noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions

20    testing by way of deliberately induced false readings.

21        1557.   Minnesota State Class members had no way of discerning that Defendants'

22    representations were false and misleading because Defendants' defeat device software was

23    extremely sophisticated technology. Plaintiff and Minnesota State Class members did not and

24    could not unravel Defendants' deception on their own.

25        1558.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

26    have characteristics, uses, benefits, and qualities which they do not have; representing that Class

27    Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

28    Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

1    a transaction involving Class Vehicles has been supplied in accordance with a previous

2    representation when it has not.

3        1559.   The Clean Air Act and EPA regulations require that automobiles limit their

4    emissions output to specified levels. These laws are intended for the protection of public health

5    and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

6    Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

7    installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

8    for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

9    Minnesota DTPA.

10       1560.   Defendants intentionally and knowingly misrepresented material facts regarding

11   the Class Vehicles with intent to mislead Plaintiff and the Minnesota State Class.

12       1561.   Defendants knew or should have known that their conduct violated the Minnesota

13   DTPA.

14       1562.   Defendants owed Plaintiff and the Minnesota State Class a duty to disclose the

15   illegality, public health and safety risks, the true nature of the Class Vehicles, because

16   Defendants:

17           A.      possessed exclusive knowledge that they were manufacturing, selling, and

18   distributing vehicles throughout the United States that did not comply with regulations;

19           B.      intentionally concealed the foregoing from regulators, Plaintiff, and/or

20   Class members; and/or

21           C.      made incomplete representations about the Class Vehicles generally, and

22   the use of the defeat device in particular, while purposefully withholding material facts from

23   Plaintiff and/or Class members that contradicted these representations.

24       1563.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

25   characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to

26   Plaintiff and the Minnesota State Class.

27       1564.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

28   deceive regulators and reasonable consumers, including Plaintiff, about the true environmental

cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

1565.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1566.   Plaintiff and the Minnesota State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Minnesota State Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiff and the Minnesota State Class also suffered diminished value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Minnesota DTPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1567.   As a direct and proximate result of Defendants' violations of the Minnesota DTPA, Plaintiff and the Minnesota State Class have suffered injury-in-fact and/or actual damage.

1568.   Pursuant Minn. Stat. §§ 8.31(3a) and 325D.45, Plaintiff and the Minnesota State Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

**MINNESOTA COUNT III:**
**Breach of Express Warranty**
**Minn. Stat. §§ 336.2-313 and 336.2A-210**
**(On Behalf of the Minnesota State Class)**

1569.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1570.   Plaintiff Mark Dressel (for the purpose of this count "Plaintiff") brings this count on behalf of himself and the Minnesota State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1571.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Minn. Stat. § 336.2-104(1) and "sellers" of motor vehicles under § 336.2-103(1)(d).

1572.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

1573.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

1574.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1575.   Defendants also made numerous representations, descriptions, and promises to Plaintiff and Minnesota State Class members regarding the performance and emission controls of their vehicles.

1576.   For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:

– was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and

– is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

1577.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1578.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1579.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

1   first, or, for the major emission control components, for eight years or 80,000 miles, whichever

2   comes first.

3       1580.   As manufacturers of light-duty vehicles, Defendants were required to provide

4   these warranties to purchasers or lessees of Class Vehicles.

5       1581.   Defendants' warranties formed a basis of the bargain that was reached when

6   Minnesota State Class members purchased or leased Class Vehicles that are equipped with a

7   defeat device and non-compliant emission systems.

8       1582.   Despite the existence of warranties, Defendants failed to inform Minnesota State

9   Class members that the Class Vehicles were intentionally designed and manufactured to be out of

10   compliance with applicable state and federal emissions laws, and failed to fix the defective

11   emission components free of charge.

12       1583.   Defendants breached the express warranty promising to repair and correct

13   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

14   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

15       1584.   Affording Defendants a reasonable opportunity to cure their breach of written

16   warranties would be unnecessary and futile here.

17       1585.   Furthermore, the limited warranty promising to repair and correct Defendants'

18   defect in materials and workmanship fails in its essential purpose because the contractual remedy

19   is insufficient to make Minnesota State Class members whole and because Defendants have failed

20   and/or have refused to adequately provide the promised remedies within a reasonable time.

21       1586.   Accordingly, recovery by the Minnesota State Class members is not restricted to

22   the limited warranty promising to repair and correct Defendants' defect in materials and

23   workmanship, and they seek all remedies as allowed by law.

24       1587.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

25   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

26   not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

27   material facts regarding the Class Vehicles. Minnesota State Class members were therefore

28   induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1588.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Minnesota State Class members' remedies would be insufficient to make them whole.

1589.   Finally, because of Defendants' breach of warranty as set forth herein, Minnesota State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1590.   Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

1591.   As a direct and proximate result of Defendants' breach of express warranties, Minnesota State Class members have been damaged in an amount to be determined at trial.

**MINNESOTA COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**Minn. Stat. §§ 336.2-314 and 336.2A-212**
**(On Behalf of the Minnesota State Class)**

1592.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1593.   Plaintiff Mark Dressel (for the purpose of this count "Plaintiff") brings this count on behalf of himself and the Minnesota State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1594.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Minn. Stat. § 336.2-104(1) and "sellers" of motor vehicles under § 336.2-103(1)(d).

1595.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

1596.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

1597.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Minn. Stat. §§ 336.2-314 and 336.2A-212.

1598.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

1599.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1600.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Minnesota State Class members have been damaged in an amount to be proven at trial.

**MISSISSIPPI COUNT I:**
**Violations of Mississippi Consumer Protection Act**
**Miss. Code Ann. § 75-24-1, *et seq.***
**(On Behalf of the Mississippi State Class)**

1601.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1602.   This count is brought on behalf of the Mississippi State Class against all Defendants.

1603.   The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair or deceptive trade practices in or affecting commerce." Miss. Code. Ann. § 75-24-5(1). Unfair or deceptive practices include, but are not limited to, "(e) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does

1   not have;" "(g) Representing that goods or services are of a particular standard, quality, or grade,

2   or that goods are of a particular style or model, if they are of another;" and "(i) Advertising goods

3   or services with intent not to sell them as advertised." Miss. Code. Ann. § 75-24-5. Defendants

4   participated in deceptive trade practices that violated the Mississippi CPA as described herein,

5   including representing that Class Vehicles have characteristics, uses, benefits, and qualities which

6   they do not have; representing that Class Vehicles are of a particular standard and quality when

7   they are not; and advertising Class Vehicles with the intent not to sell them as advertised.

8       1604.   In the course of its business, Defendants concealed and suppressed material facts

9   concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

10  Class Vehicles that caused the vehicles to operate in a low emission test mode only during

11  emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

12  noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions

13  testing by way of deliberately induced false readings.

14      1605.   Mississippi State Class members had no way of discerning that Defendants'

15  representations were false and misleading because Defendants' defeat device software was

16  extremely sophisticated technology. Plaintiffs and Mississippi State Class members did not and

17  could not unravel Defendants' deception on their own.

18      1606.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

19  have characteristics, uses, benefits, and qualities which they do not have; representing that Class

20  Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

21  Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

22  a transaction involving Class Vehicles has been supplied in accordance with a previous

23  representation when it has not.

24      1607.   The Clean Air Act and EPA regulations require that automobiles limit their

25  emissions output to specified levels. These laws are intended for the protection of public health

26  and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

27  Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

28  installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

1   for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

2   Mississippi CPA.

3       1608.   Defendants intentionally and knowingly misrepresented material facts regarding

4   the Class Vehicles with intent to mislead Plaintiffs and the Mississippi State Class.

5       1609.   Defendants knew or should have known that their conduct violated the Mississippi

6   CPA.

7       1610.   Defendants owed Plaintiffs and the Mississippi State Class a duty to disclose the

8   illegality, public health and safety risks, the true nature of the Class Vehicles, because

9   Defendants:

10          A.      possessed exclusive knowledge that they were manufacturing, selling, and

11  distributing vehicles throughout the United States that did not comply with regulations;

12          B.      intentionally concealed the foregoing from regulators, Plaintiffs, and/or

13  Class members; and/or

14          C.      made incomplete representations about the Class Vehicles generally, and

15  the use of the defeat device in particular, while purposefully withholding material facts from

16  Plaintiffs that contradicted these representations.

17      1611.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

18  characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to

19  Plaintiffs and the Mississippi State Class.

20      1612.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

21  deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

22  cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

23  of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

24      1613.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

25  general public. Defendants' unlawful acts and practices complained of herein affect the public

26  interest.

27      1614.   Plaintiffs and the Mississippi State Class suffered ascertainable loss and actual

28  damages as a direct and proximate result of Defendants' misrepresentations and its concealment

of and failure to disclose material information. Plaintiffs and the Mississippi State Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Mississippi CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1615.   As a direct and proximate result of Defendants' violations of the Mississippi CPA, Plaintiffs and the Mississippi State Class have suffered injury-in-fact and/or actual damage.

1616.   Plaintiffs' seek actual damages in an amount to be determined at trial any other just and proper relief available under the Mississippi CPA.

**MISSISSIPPI COUNT II:**
**Breach of Express Warranty**
**Miss. Code §§ 75-2-313 and 75-2A-210**
**(On Behalf of the Mississippi State Class)**

1617.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1618.   This count is brought on behalf of the Mississippi State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1619.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Miss. Code § 75-2-104(1) and "sellers" of motor vehicles under § 75-2-103(1)(d).

1620.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Miss. Code § 75-2A-103(1)(p).

1621.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Miss. Code §§ 75-2-105(1) and 75-2A-103(1)(h).

1622.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

1    occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

2    materials or workmanship."

3         1623.   Defendants also made numerous representations, descriptions, and promises to

4    Plaintiffs and Mississippi State Class members regarding the performance and emission controls

5    of their vehicles.

6         1624.   For example, as shown below, Defendants included in the warranty booklets for

7    some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped

8    so as to conform at the time of sale with all applicable regulations of the United States

9    Environmental Protection Agency."

10
11
12
13
14
15
16
17
18

Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:

– was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
– is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

19        1625.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide

20   two federal emission control warranties: a "Performance Warranty" and a "Design and Defect

21   Warranty."

22        1626.   The EPA requires vehicle manufacturers to provide a Performance Warranty with

23   respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

24   its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

25   required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

26   whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

27   emission control components are covered for the first eight years or 80,000 miles (whichever

28   comes first). These major emission control components subject to the longer warranty include the

1    catalytic converters, the electronic emission control unit, and the onboard emission diagnostic
2    device or computer.

3        1627.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties
4    with respect to their vehicles' emission systems. Thus, Defendants also provide an express
5    warranty for their vehicles through a Federal Emission Control System Defect Warranty. The
6    Design and Defect Warranty required by the EPA covers repair of emission control or emission
7    related parts, which fail to function or function improperly because of a defect in materials or
8    workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes
9    first, or, for the major emission control components, for eight years or 80,000 miles, whichever
10   comes first.

11       1628.   As manufacturers of light-duty vehicles, Defendants were required to provide
12   these warranties to purchasers or lessees of Class Vehicles.

13       1629.   Defendants' warranties formed a basis of the bargain that was reached when
14   Mississippi State Class members purchased or leased Class Vehicles that are equipped with a
15   defeat device and non-compliant emission systems.

16       1630.   Despite the existence of warranties, Defendants failed to inform Mississippi State
17   Class members that the Class Vehicles were intentionally designed and manufactured to be out of
18   compliance with applicable state and federal emissions laws, and failed to fix the defective
19   emission components free of charge.

20       1631.   Defendants breached the express warranty promising to repair and correct
21   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and
22   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

23       1632.   Affording Defendants a reasonable opportunity to cure their breach of written
24   warranties would be unnecessary and futile here.

25       1633.   Furthermore, the limited warranty promising to repair and correct Defendants'
26   defect in materials and workmanship fails in its essential purpose because the contractual remedy
27   is insufficient to make Mississippi State Class members whole and because Defendants have
28   failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1634.   Accordingly, recovery by the Mississippi State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

1635.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Mississippi State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1636.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Mississippi State Class members' remedies would be insufficient to make them whole.

1637.   Finally, because of Defendants' breach of warranty as set forth herein, Mississippi State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1638.   Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

1639.   As a direct and proximate result of Defendants' breach of express warranties, Mississippi State Class members have been damaged in an amount to be determined at trial.

**MISSISSIPPI COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Miss. Code §§ 75-2-314 and 75-2A-212**
**(On Behalf of the Mississippi State Class)**

1640.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1641.   This count is brought on behalf of the Mississippi State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1642.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Miss. Code § 75-2-104(1) and "sellers" of motor vehicles under § 75-2-103(1)(d).

1643.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Miss. Code § 75-2A-103(1)(p).

1644.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Miss. Code §§ 75-2-105(1) and 75-2A-103(1)(h).

1645.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Miss. Code §§ 75-2-314 and 75-2A-212.

1646.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

1647.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1648.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Mississippi State Class members have been damaged in an amount to be proven at trial.

**MISSOURI COUNT I:**
**Violations of the Missouri Merchandising Practices Act**
**Mo. Rev. Stat. § 407.010 *et seq.***
**(On Behalf of the Missouri State Class)**

1649.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1650.   Plaintiff Connie Jones (for the purpose of this count, "Plaintiff") brings this count on behalf of herself and the Missouri State Class against all Defendants.

1651.   Defendants, Plaintiff and the Missouri State Class are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

1652.   Defendants engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

1653.   The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise Mo. Rev. Stat. § 407.020.

1654.   In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

1655.   Missouri State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiff and Missouri State Class members did not and could not unravel Defendants' deception on their own.

1656.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

1657.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health

1    and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

2    Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

3    installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

4    for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

5    Missouri MPA.

6         1658.   Defendants intentionally and knowingly misrepresented material facts regarding

7    the Class Vehicles with intent to mislead Plaintiff and the Missouri State Class.

8         1659.   Defendants knew or should have known that their conduct violated the Missouri

9    MPA.

10        1660.   Defendants owed Plaintiff and the Missouri State Class a duty to disclose the

11   illegality, public health and safety risks, the true nature of the Class Vehicles, because

12   Defendants:

13        A.   possessed exclusive knowledge that they were manufacturing, selling, and

14   distributing vehicles throughout the United States that did not comply with regulations;

15        B.   intentionally concealed the foregoing from regulators, Plaintiff, and/or

16   Class members; and/or

17        C.   made incomplete representations about the Class Vehicles generally, and

18   the use of the defeat device in particular, while purposefully withholding material facts from

19   Plaintiff and/or Class members that contradicted these representations.

20        1661.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

21   characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to

22   Plaintiff and the Missouri State Class.

23        1662.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

24   deceive regulators and reasonable consumers, including Plaintiff, about the true environmental

25   cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

26   of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

27

28

1   1663.   Defendants' violations present a continuing risk to Plaintiff, the Missouri State

2   Class, as well as to the general public. Defendants' unlawful acts and practices complained of

3   herein affect the public interest.

4   1664.   Plaintiff and the Missouri State Class suffered ascertainable loss and actual

5   damages as a direct and proximate result of Defendants' misrepresentations and its concealment

6   of and failure to disclose material information. Plaintiff and the Missouri State Class members

7   who purchased or leased the Class Vehicles would not have purchased or leased them at all

8   and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered

9   legal to sell—would have paid significantly less for them. Plaintiff and the Missouri State Class

10  also suffered diminished value of their vehicles, as well as lost or diminished use. Defendants had

11  an ongoing duty to all their customers to refrain from unfair and deceptive practices under the

12  Missouri MPA. All owners of Class Vehicles suffered ascertainable loss in the form of the

13  diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and

14  practices made in the course of Defendants' business.

15  1665.   As a direct and proximate result of Defendants' violations of the Missouri MPA,

16  Plaintiff and the Missouri State Class have suffered injury-in-fact and/or actual damage.

17  1666.   Defendants are liable to Plaintiff and the Missouri State Class for damages in

18  amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as

19  injunctive relief enjoining Defendants' unfair and deceptive practices, and any other just and

20  proper relief under Mo. Rev. Stat. § 407.025.

21  **MISSOURI COUNT II:**
    **Breach of Express Warranty**
22  **Mo. Stat. §§ 400.2-313 and 400.2A-210**
    **(On Behalf of the Missouri State Class)**
23

24  1667.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

25  fully set forth herein.

26  1668.   Plaintiff Connie Jones (for the purpose of this count, "Plaintiff") brings this count

27  on behalf of herself and the Missouri State Class against the Volkswagen and Audi Defendants

28  (collectively for this count, "Defendants").

1669.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Mo. Stat. § 400.2-104(1) and "sellers" of motor vehicles under § 400.2-103(1)(d).

1670.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Mo. Stat. § 400.2A-103(1)(p).

1671.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

1672.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1673.   Defendants also made numerous representations, descriptions, and promises to Plaintiff and Missouri State Class members regarding the performance and emission controls of their vehicles.

1674.   For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."



Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:

– was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and

– is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

1675.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1676.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1677.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1678.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

1679.   Defendants' warranties formed a basis of the bargain that was reached when Missouri State Class members purchased or leased Class Vehicles that are equipped with a defeat device and non-compliant emission systems.

1680.   Despite the existence of warranties, Defendants failed to inform Missouri State Class members that the Class Vehicles were intentionally designed and manufactured to be out of

1  compliance with applicable state and federal emissions laws, and failed to fix the defective

2  emission components free of charge.

3  　　1681.  Defendants breached the express warranty promising to repair and correct

4  Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

5  have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

6  　　1682.  Affording Defendants a reasonable opportunity to cure their breach of written

7  warranties would be unnecessary and futile here.

8  　　1683.  Furthermore, the limited warranty promising to repair and correct Defendants'

9  defect in materials and workmanship fails in its essential purpose because the contractual remedy

10  is insufficient to make Missouri State Class members whole and because Defendants have failed

11  and/or have refused to adequately provide the promised remedies within a reasonable time.

12  　　1684.  Accordingly, recovery by the Missouri State Class members is not restricted to the

13  limited warranty promising to repair and correct Defendants' defect in materials and

14  workmanship, and they seek all remedies as allowed by law.

15  　　1685.  Also, as alleged in more detail herein, at the time Defendants warranted and sold

16  or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

17  not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

18  material facts regarding the Class Vehicles. Missouri State Class members were therefore induced

19  to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

20  　　1686.  Moreover, many of the injuries flowing from the Class Vehicles cannot be

21  resolved through the limited remedy of repairing and correcting Defendants' defect in materials

22  and workmanship as many incidental and consequential damages have already been suffered

23  because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

24  continued failure to provide such limited remedy within a reasonable time, and any limitation on

25  the Missouri State Class members' remedies would be insufficient to make them whole.

26  　　1687.  Finally, because of Defendants' breach of warranty as set forth herein, Missouri

27  State Class members assert, as additional and/or alternative remedies, the revocation of

28

1    acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

2    currently owned or leased, and for such other incidental and consequential damages as allowed.

3         1688.   Defendants were provided notice of these issues by numerous complaints filed

4    against them, including the instant Complaint, within a reasonable amount of time.

5         1689.   As a direct and proximate result of Defendants' breach of express warranties,

6    Missouri State Class members have been damaged in an amount to be determined at trial.

7                              **MISSOURI COUNT III:**
                    **Breach of Implied Warranty of Merchantability**
8                    **Mo. Stat. §§ 400.2-314 and 400.2A-212**
                      **(On Behalf of the Missouri State Class)**
9

10        1690.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding

11   paragraphs as though fully set forth herein.

12        1691.   Plaintiff Connie Jones (for the purpose of this count, "Plaintiff") brings this count

13   on behalf of herself and the Missouri State Class against the Volkswagen and Audi Defendants

14   (collectively for this count, "Defendants").

15        1692.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

16   vehicles under Mo. Stat. § 400.2-104(1) and "sellers" of motor vehicles under § 400.2-103(1)(d).

17        1693.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

18   of motor vehicles under Mo. Stat. § 400.2A-103(1)(p).

19        1694.   The Class Vehicles are and were at all relevant times "goods" within the meaning

20   of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

21        1695.   A warranty that the Class Vehicles were in merchantable condition and fit for the

22   ordinary purpose for which vehicles are used is implied by law pursuant to Mo. Stat. § 400.2-314

23   and Mo. Stat. § 400.2A-212.

24        1696.   These Class Vehicles, when sold or leased and at all times thereafter, were not in

25   merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

26   Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat

27   device and do not comply with federal and state emissions standards, rendering certain emissions

28   functions inoperative.

1    1697.   Defendants were provided notice of these issues by the investigations of the EPA

2    and California state regulators, and numerous complaints filed against it including the instant

3    complaint, within a reasonable amount of time.

4    1698.   As a direct and proximate result of Defendants' breach of the implied warranty of

5    merchantability, Missouri State Class members have been damaged in an amount to be proven at

6    trial.

7
**MONTANA COUNT I:**
**Violations of the Montana Unfair Trade Practices and Consumer Protection Act of 1973**
8
**Mont. Code Ann. § 30-14-101 *et seq.***
**(On Behalf of the Montana State Class)**
9

10   1699.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

11   forth herein.

12   1700.   This count is brought on behalf of the Montana State Class against all Defendants.

13   1701.   Defendants, Plaintiffs and the Montana State Class are "persons" within the

14   meaning of Mont. Code Ann. § 30-14-102(6).

15   1702.   Montana State Class members are "consumer[s]" under MONT. CODE ANN.

16   § 30-14-102(1).

17   1703.   The sale or lease of the Class Vehicles to Montana State Class members occurred

18   within "trade and commerce" within the meaning of Mont. Code Ann. § 30-14-102(8), and

19   Defendants committed deceptive and unfair acts in the conduct of "trade and commerce" as

20   defined in that statutory section.

21   1704.   The Montana Unfair Trade Practices and Consumer Protection Act ("Montana

22   CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or

23   practices in the conduct of any trade or commerce." Mont. Code Ann. § 30-14-103.

24   1705.   In the course of its business, Defendants concealed and suppressed material facts

25   concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

26   Class Vehicles that caused the vehicles to operate in a low emission test mode only during

27   emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

28

1    noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions

2    testing by way of deliberately induced false readings.

3        1706.   Montana State Class members had no way of discerning that Defendants'

4    representations were false and misleading because Defendants' defeat device software was

5    extremely sophisticated technology. Plaintiffs and Montana State Class members did not and

6    could not unravel Defendants' deception on their own.

7        1707.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

8    have characteristics, uses, benefits, and qualities which they do not have; representing that Class

9    Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

10    Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

11    a transaction involving Class Vehicles has been supplied in accordance with a previous

12    representation when it has not.

13        1708.   The Clean Air Act and EPA regulations require that automobiles limit their

14    emissions output to specified levels. These laws are intended for the protection of public health

15    and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

16    Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

17    installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

18    for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

19    Montana CPA.

20        1709.   Defendants intentionally and knowingly misrepresented material facts regarding

21    the Class Vehicles with intent to mislead Plaintiffs and the Montana State Class.

22        1710.   Defendants knew or should have known that their conduct violated the Montana

23    CPA.

24        1711.   Defendants owed Plaintiffs and the Montana State Class a duty to disclose the

25    illegality, public health and safety risks, the true nature of the Class Vehicles, because

26    Defendants:

27        A.    possessed exclusive knowledge that they were manufacturing, selling, and

28    distributing vehicles throughout the United States that did not comply with regulations;

B.      intentionally concealed the foregoing from regulators, Plaintiffs, and/or Class members; and/or

C.      made incomplete representations about the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1712.   Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to Plaintiffs and the Montana State Class.

1713.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

1714.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1715.   Plaintiffs and the Montana State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Montana State Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Montana CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1716.   As a direct and proximate result of Defendants' violations of the Montana CPA, Plaintiffs and the Montana State Class have suffered injury-in-fact and/or actual damage.

1717.   Because Defendants' unlawful methods, acts, and practices have caused Montana State Class members to suffer an ascertainable loss of money and property, the Montana State Class seeks from Defendants actual damages or $500, whichever is greater, discretionary treble damages, reasonable attorneys' fees, an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, and any other relief the Court considers necessary or proper, under Mont. Code Ann. § 30-14-133.

**MONTANA COUNT II:**
**Breach of Express Warranty**
**Mont. Code §§ 30-2-313 and 30-2A-210**
**(On Behalf of the Montana State Class)**

1718.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1719.   This count is brought on behalf of the Montana State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1720.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Mont. Code § 30-2-104(1) and "sellers" of motor vehicles under § 30-2-103(1)(d).

1721.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Mont. Code § 30-2A-103(1)(p).

1722.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mont. Code §§ 30-2-105(1) and 30-2A-103(1)(h).

1723.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1724.   Defendants also made numerous representations, descriptions, and promises to Plaintiffs and Montana State Class members regarding the performance and emission controls of their vehicles.

1725.   For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped

1    so as to conform at the time of sale with all applicable regulations of the United States

2    Environmental Protection Agency."

> Audi of America, Inc., an operating unit of
> Volkswagen Group of America, Inc. ("Audi"),
> the authorized United States importer of Audi
> vehicles, warrants to the original retail pur-
> chaser or original lessee and any subsequent
> purchaser or lessee that every **model year
> 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to
>   conform at the time of sale with all applica-
>   ble regulations of the United States Environ-
>   mental Protection Agency (EPA), and
> – is free from defects in material and work-
>   manship which causes the vehicle to fail to
>   conform with EPA regulations for 2 years af-
>   ter the date of first use or delivery of the ve-
>   hicle to the original retail purchaser or origi-
>   nal lessee or until the vehicle has been driv-
>   en 24,000 miles, whichever occurs first.

12        1726.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide

13   two federal emission control warranties: a "Performance Warranty" and a "Design and Defect

14   Warranty."

15        1727.   The EPA requires vehicle manufacturers to provide a Performance Warranty with

16   respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

17   its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

18   required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

19   whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

20   emission control components are covered for the first eight years or 80,000 miles (whichever

21   comes first). These major emission control components subject to the longer warranty include the

22   catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

23   device or computer.

24        1728.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

25   with respect to their vehicles' emission systems. Thus, Defendants also provide an express

26   warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

27   Design and Defect Warranty required by the EPA covers repair of emission control or emission

28   related parts, which fail to function or function improperly because of a defect in materials or

workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1729. As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

1730. Defendants' warranties formed a basis of the bargain that was reached when Montana State Class members purchased or leased Class Vehicles that are equipped with a defeat device and non-compliant emission systems.

1731. Despite the existence of warranties, Defendants failed to inform Montana State Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1732. Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1733. Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1734. Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Montana State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1735. Accordingly, recovery by the Montana State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

1736. Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

1    material facts regarding the Class Vehicles. Montana State Class members were therefore induced

2    to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

3         1737.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

4    resolved through the limited remedy of repairing and correcting Defendants' defect in materials

5    and workmanship as many incidental and consequential damages have already been suffered

6    because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

7    continued failure to provide such limited remedy within a reasonable time, and any limitation on

8    the Montana State Class members' remedies would be insufficient to make them whole.

9         1738.   Finally, because of Defendants' breach of warranty as set forth herein, Montana

10   State Class members assert, as additional and/or alternative remedies, the revocation of

11   acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

12   currently owned or leased, and for such other incidental and consequential damages as allowed.

13        1739.   Defendants were provided notice of these issues by numerous complaints filed

14   against them, including the instant Complaint, within a reasonable amount of time.

15        1740.   As a direct and proximate result of Defendants' breach of express warranties,

16   Montana State Class members have been damaged in an amount to be determined at trial.

17                                 **MONTANA COUNT III:**
                      **Breach of Implied Warranty of Merchantability**
18                       **Mont. Code §§ 30-2-314 and 30-2A-212**
                          **(On Behalf of the Montana State Class)**
19

20        1741.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding

21   paragraphs as though fully set forth herein.

22        1742.   This count is brought on behalf of the Montana State Class against the

23   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

24        1743.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

25   vehicles under Mont. Code § 30-2-104(1) and "sellers" of motor vehicles under § 30-2-103(1)(d).

26        1744.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

27   of motor vehicles under Mont. Code § 30-2A-103(1)(p).

28

1745.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mont. Code §§ 30-2-105(1) and 30-2A-103(1)(h).

1746.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mont. Code §§ 30-2-314 and 30-2A-212.

1747.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

1748.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1749.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Montana State Class members have been damaged in an amount to be proven at trial.

**NEBRASKA COUNT I:**
**Violations of the Nebraska Consumer Protection Act**
**Neb. Rev. Stat. § 59-1601 *et seq.***
**(On Behalf of the Nebraska State Class)**

1750.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1751.   This count is brought on behalf of the Nebraska State Class against all Defendants.

1752.   Defendants, Plaintiffs and Nebraska State Class members are "person[s]" under the Nebraska Consumer Protection Act ("Nebraska CPA"), Neb. Rev. Stat. § 59-1601(1).

1753.   Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under Neb. Rev. Stat. § 59-1601(2).

1       1754.   The Nebraska CPA prohibits "unfair or deceptive acts or practices in the conduct

2   of any trade or commerce." Neb. Rev. Stat. § 59-1602. The conduct Defendants engaged in as set

3   forth herein constitutes unfair or deceptive acts or practices.

4       1755.   In the course of its business, Defendants concealed and suppressed material facts

5   concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

6   Class Vehicles that caused the vehicles to operate in a low emission test mode only during

7   emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

8   noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions

9   testing by way of deliberately induced false readings.

10       1756.   Nebraska State Class members had no way of discerning that Defendants'

11   representations were false and misleading because Defendants' defeat device software was

12   extremely sophisticated technology. Plaintiffs and Nebraska State Class members did not and

13   could not unravel Defendants' deception on their own.

14       1757.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

15   have characteristics, uses, benefits, and qualities which they do not have; representing that Class

16   Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

17   Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

18   a transaction involving Class Vehicles has been supplied in accordance with a previous

19   representation when it has not.

20       1758.   The Clean Air Act and EPA regulations require that automobiles limit their

21   emissions output to specified levels. These laws are intended for the protection of public health

22   and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

23   Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

24   installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

25   for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

26   Nebraska CPA.

27       1759.   Defendants intentionally and knowingly misrepresented material facts regarding

28   the Class Vehicles with intent to mislead Plaintiffs and the Nebraska State Class.

1    1760.   Defendants knew or should have known that their conduct violated the Nebraska

2    CPA.

3    1761.   Defendants owed Plaintiffs and the Nebraska State Class a duty to disclose the

4    illegality, public health and safety risks, the true nature of the Class Vehicles, because

5    Defendants:

6           A.      possessed exclusive knowledge that they were manufacturing, selling, and

7    distributing vehicles throughout the United States that did not comply with regulations;

8           B.      intentionally concealed the foregoing from regulators, Plaintiffs, and/or

9    Class members; and/or

10          C.      made incomplete representations about the Class Vehicles generally, and

11   the use of the defeat device in particular, while purposefully withholding material facts from

12   Plaintiffs that contradicted these representations.

13   1762.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

14   characteristics of the Class Vehicles' fuel consumption and $CO2$ emissions were material to

15   Plaintiffs and the Nebraska State Class.

16   1763.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

17   deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

18   cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

19   of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

20   1764.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

21   general public. Defendants' unlawful acts and practices complained of herein affect the public

22   interest.

23   1765.   Plaintiffs and the Nebraska State Class suffered ascertainable loss and actual

24   damages as a direct and proximate result of Defendants' misrepresentations and its concealment

25   of and failure to disclose material information. Plaintiffs and the Nebraska State Class members

26   who purchased or leased the Class Vehicles would not have purchased or leased them at all

27   and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered

28   legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished

1    value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all

2    their customers to refrain from unfair and deceptive practices under the Nebraska CPA. All

3    owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their

4    vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of

5    Defendants' business.

6         1766.   As a direct and proximate result of Defendants' violations of the Nebraska CPA,

7    Plaintiffs and the Nebraska State Class have suffered injury-in-fact and/or actual damage.

8         1767.   Because Defendants' conduct caused injury to Nebraska State Class members'

9    property through violations of the Nebraska CPA, the Nebraska State Class seeks recovery of

10   actual damages, as well as enhanced damages up to $1,000, an order enjoining Defendants' unfair

11   or deceptive acts and practices, costs of Court, reasonable attorneys' fees, and any other just and

12   proper relief available under Neb. Rev. Stat. § 59-1609.

13                         **NEBRASKA COUNT II:**
                          **Breach of Express Warranty**
14               **Neb. Rev. St. U.C.C. §§ 2-313 and 2A-210**
                    **(On Behalf of the Nebraska State Class)**
15

16        1768.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

17   fully set forth herein.

18        1769.   This count is brought on behalf of the Nebraska State Class against the

19   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

20        1770.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

21   vehicles under Neb. Rev. St. U.C.C. § 2-104(1) and "sellers" of motor vehicles under § 2-

22   103(1)(d).

23        1771.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

24   of motor vehicles under Neb. Rev. St. U.C.C. § 2A-103(1)(p).

25        1772.   The Class Vehicles are and were at all relevant times "goods" within the meaning

26   of Neb. Rev. St. U.C.C. §§ 2-105(1) and 2A-103(1)(h).

27        1773.   In connection with the purchase or lease of each one of its new vehicles,

28   Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

1    occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

2    materials or workmanship."

3        1774.   Defendants also made numerous representations, descriptions, and promises to

4    Plaintiffs and Nebraska State Class members regarding the performance and emission controls of

5    their vehicles.

6        1775.   For example, as shown below, Defendants included in the warranty booklets for

7    some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped

8    so as to conform at the time of sale with all applicable regulations of the United States

9    Environmental Protection Agency."

> Audi of America, Inc., an operating unit of
> Volkswagen Group of America, Inc. ("Audi"),
> the authorized United States importer of Audi
> vehicles, warrants to the original retail pur-
> chaser or original lessee and any subsequent
> purchaser or lessee that every **model year
> 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to
>   conform at the time of sale with all applica-
>   ble regulations of the United States Environ-
>   mental Protection Agency (EPA), and
> – is free from defects in material and work-
>   manship which causes the vehicle to fail to
>   conform with EPA regulations for 2 years af-
>   ter the date of first use or delivery of the ve-
>   hicle to the original retail purchaser or origi-
>   nal lessee or until the vehicle has been driv-
>   en 24,000 miles, whichever occurs first.

19       1776.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide

20   two federal emission control warranties: a "Performance Warranty" and a "Design and Defect

21   Warranty."

22       1777.   The EPA requires vehicle manufacturers to provide a Performance Warranty with

23   respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

24   its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

25   required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

26   whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

27   emission control components are covered for the first eight years or 80,000 miles (whichever

28   comes first). These major emission control components subject to the longer warranty include the

1   catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

2   device or computer.

3       1778.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

4   with respect to their vehicles' emission systems. Thus, Defendants also provide an express

5   warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

6   Design and Defect Warranty required by the EPA covers repair of emission control or emission

7   related parts, which fail to function or function improperly because of a defect in materials or

8   workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

9   first, or, for the major emission control components, for eight years or 80,000 miles, whichever

10   comes first.

11       1779.   As manufacturers of light-duty vehicles, Defendants were required to provide

12   these warranties to purchasers or lessees of Class Vehicles.

13       1780.   Defendants' warranties formed a basis of the bargain that was reached when

14   Nebraska State Class members purchased or leased Class Vehicles that are equipped with a defeat

15   device and non-compliant emission systems.

16       1781.   Despite the existence of warranties, Defendants failed to inform Nebraska State

17   Class members that the Class Vehicles were intentionally designed and manufactured to be out of

18   compliance with applicable state and federal emissions laws, and failed to fix the defective

19   emission components free of charge.

20       1782.   Defendants breached the express warranty promising to repair and correct

21   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

22   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

23       1783.   Affording Defendants a reasonable opportunity to cure their breach of written

24   warranties would be unnecessary and futile here.

25       1784.   Furthermore, the limited warranty promising to repair and correct Defendants'

26   defect in materials and workmanship fails in its essential purpose because the contractual remedy

27   is insufficient to make Nebraska State Class members whole and because Defendants have failed

28   and/or have refused to adequately provide the promised remedies within a reasonable time.

1     1785.   Accordingly, recovery by the Nebraska State Class members is not restricted to the

2     limited warranty promising to repair and correct Defendants' defect in materials and

3     workmanship, and they seek all remedies as allowed by law.

4          1786.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

5     or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

6     not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

7     material facts regarding the Class Vehicles. Nebraska State Class members were therefore

8     induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

9          1787.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

10    resolved through the limited remedy of repairing and correcting Defendants' defect in materials

11    and workmanship as many incidental and consequential damages have already been suffered

12    because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

13    continued failure to provide such limited remedy within a reasonable time, and any limitation on

14    the Nebraska State Class members' remedies would be insufficient to make them whole.

15         1788.   Finally, because of Defendants' breach of warranty as set forth herein, Nebraska

16    State Class members assert, as additional and/or alternative remedies, the revocation of

17    acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

18    currently owned or leased, and for such other incidental and consequential damages as allowed.

19         1789.   Defendants were provided notice of these issues by numerous complaints filed

20    against them, including the instant Complaint, within a reasonable amount of time.

21         1790.   As a direct and proximate result of Defendants' breach of express warranties,

22    Nebraska State Class members have been damaged in an amount to be determined at trial.

23                          **NEBRASKA COUNT III:**
                **Breach of Implied Warranty of Merchantability**
24              **Neb. Rev. St. U.C.C. §§ 2-314 and 2A-212**
                    **(On Behalf of the Nebraska State Class)**
25

26         1791.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding

27    paragraphs as though fully set forth herein.

28

1       1792.   This count is brought on behalf of the Nebraska State Class against the

2   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

3       1793.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

4   vehicles under Neb. Rev. St. U.C.C. § 2-104(1) and "sellers" of motor vehicles under § 2-

5   103(1)(d).

6       1794.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

7   of motor vehicles under Neb. Rev. St. U.C.C. § 2A-103(1)(p).

8       1795.   The Class Vehicles are and were at all relevant times "goods" within the meaning

9   of Neb. Rev. St. U.C.C. §§ 2-105(1) and 2A-103(1)(h).

10      1796.   A warranty that the Class Vehicles were in merchantable condition and fit for the

11  ordinary purpose for which vehicles are used is implied by law pursuant to Neb. Rev. St.

12  U.C.C.§§ 2-314 and 2A-212.

13      1797.   These Class Vehicles, when sold or leased and at all times thereafter, were not in

14  merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

15  Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat

16  device and do not comply with federal and state emissions standards, rendering certain emissions

17  functions inoperative.

18      1798.   Defendants were provided notice of these issues by the investigations of the EPA

19  and California state regulators, and numerous complaints filed against it including the instant

20  complaint, within a reasonable amount of time.

21      1799.   As a direct and proximate result of Defendants' breach of the implied warranty of

22  merchantability, Nebraska State Class members have been damaged in an amount to be proven at

23  trial.

24                    **NEVADA COUNT I:**
                **Violations of the Nevada Deceptive Trade Practices Act**
25                   **Nev. Rev. Stat. § 598.0903 *et seq.***
                     **(On Behalf of the Nevada State Class)**
26

27      1800.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

28  forth herein.

1801.   This count is brought on behalf of the Nevada State Class against all Defendants.

1802.   The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), Nev. Rev. Stat. § 598.0903, *et seq.* prohibits deceptive trade practices. Nev. Rev. Stat. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "9. Advertises goods or services with intent not to sell or lease them as advertised"; or "15. Knowingly makes any other false representation in a transaction."

1803.   In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

1804.   Nevada State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs and Nevada State Class members did not and could not unravel Defendants' deception on their own.

1805.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

1   1806.   The Clean Air Act and EPA regulations require that automobiles limit their

2   emissions output to specified levels. These laws are intended for the protection of public health

3   and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

4   Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

5   installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

6   for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

7   Nevada DTPA.

8   1807.   Defendants intentionally and knowingly misrepresented material facts regarding

9   the Class Vehicles with intent to mislead Plaintiffs and the Nevada State Class.

10   1808.   Defendants knew or should have known that their conduct violated the Nevada

11   DTPA.

12   1809.   Defendants owed Plaintiffs and the Nevada State Class a duty to disclose the

13   illegality, public health and safety risks, the true nature of the Class Vehicles, because

14   Defendants:

15   A.   possessed exclusive knowledge that they were manufacturing, selling, and

16   distributing vehicles throughout the United States that did not comply with regulations;

17   B.   intentionally concealed the foregoing from regulators, Plaintiffs, and/or

18   Class members; and/or

19   C.   made incomplete representations about the Class Vehicles generally, and

20   the use of the defeat device in particular, while purposefully withholding material facts from

21   Plaintiffs that contradicted these representations.

22   1810.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

23   characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to

24   Plaintiffs and the Nevada State Class.

25   1811.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

26   deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

27   cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

28   of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

1    1812.  Defendants' violations present a continuing risk to Plaintiffs as well as to the

2   general public. Defendants' unlawful acts and practices complained of herein affect the public

3   interest.

4    1813.  Plaintiffs and the Nevada State Class suffered ascertainable loss and actual

5   damages as a direct and proximate result of Defendants' misrepresentations and its concealment

6   of and failure to disclose material information. Plaintiffs and the Nevada State Class members

7   who purchased or leased the Class Vehicles would not have purchased or leased them at all

8   and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered

9   legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished

10  value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all

11  their customers to refrain from unfair and deceptive practices under the Nevada DTPA. All

12  owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their

13  vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of

14  Defendants' business.

15                          **NEVADA COUNT II:**
                     **Breach of Express Warranty**
16               **N.R.S. §§ 104.2313 and 104A.2210**
                 **(On Behalf of the Nevada State Class)**
17

18    1814.  Plaintiffs re-allege and incorporate by reference all preceding allegations as though

19  fully set forth herein.

20    1815.  This count is brought on behalf of the Nevada State Class against the Volkswagen

21  and Audi Defendants (collectively for this count, "Defendants").

22    1816.  Defendants are and were at all relevant times "merchant[s]" with respect to motor

23  vehicles under N.R.S. § 104.2104(1) and "sellers" of motor vehicles under § 104.2103(1)(c).

24    1817.  With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

25  of motor vehicles under N.R.S. § 104A.2103(1)(p).

26    1818.  The Class Vehicles are and were at all relevant times "goods" within the meaning

27  of N.R.S. §§ 104.2105(1) and 104A.2103(1)(h).

28

1    1819.   In connection with the purchase or lease of each one of its new vehicles,

2    Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

3    occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

4    materials or workmanship."

5    1820.   Defendants also made numerous representations, descriptions, and promises to

6    Plaintiffs and Nevada State Class members regarding the performance and emission controls of

7    their vehicles.

8    1821.   For example, as shown below, Defendants included in the warranty booklets for

9    some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped

10   so as to conform at the time of sale with all applicable regulations of the United States

11   Environmental Protection Agency."

12
13
14
15
16
17
18
19
20

> Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
> – is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

21   1822.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide

22   two federal emission control warranties: a "Performance Warranty" and a "Design and Defect

23   Warranty."

24   1823.   The EPA requires vehicle manufacturers to provide a Performance Warranty with

25   respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

26   its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

27   required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

28   whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

1  emission control components are covered for the first eight years or 80,000 miles (whichever

2  comes first). These major emission control components subject to the longer warranty include the

3  catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

4  device or computer.

5          1824.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

6  with respect to their vehicles' emission systems. Thus, Defendants also provide an express

7  warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

8  Design and Defect Warranty required by the EPA covers repair of emission control or emission

9  related parts, which fail to function or function improperly because of a defect in materials or

10  workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

11  first, or, for the major emission control components, for eight years or 80,000 miles, whichever

12  comes first.

13          1825.   As manufacturers of light-duty vehicles, Defendants were required to provide

14  these warranties to purchasers or lessees of Class Vehicles.

15          1826.   Defendants' warranties formed a basis of the bargain that was reached when

16  Nevada State Class members purchased or leased Class Vehicles that are equipped with a defeat

17  device and non-compliant emission systems.

18          1827.   Despite the existence of warranties, Defendants failed to inform Nevada State

19  Class members that the Class Vehicles were intentionally designed and manufactured to be out of

20  compliance with applicable state and federal emissions laws, and failed to fix the defective

21  emission components free of charge.

22          1828.   Defendants breached the express warranty promising to repair and correct

23  Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

24  have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

25          1829.   Affording Defendants a reasonable opportunity to cure their breach of written

26  warranties would be unnecessary and futile here.

27          1830.   Furthermore, the limited warranty promising to repair and correct Defendants'

28  defect in materials and workmanship fails in its essential purpose because the contractual remedy

1    is insufficient to make Nevada State Class members whole and because Defendants have failed

2    and/or have refused to adequately provide the promised remedies within a reasonable time.

3        1831.   Accordingly, recovery by the Nevada State Class members is not restricted to the

4    limited warranty promising to repair and correct Defendants' defect in materials and

5    workmanship, and they seek all remedies as allowed by law.

6        1832.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

7    or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

8    not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

9    material facts regarding the Class Vehicles. Nevada State Class members were therefore induced

10   to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

11       1833.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

12   resolved through the limited remedy of repairing and correcting Defendants' defect in materials

13   and workmanship as many incidental and consequential damages have already been suffered

14   because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

15   continued failure to provide such limited remedy within a reasonable time, and any limitation on

16   the Nevada State Class members' remedies would be insufficient to make them whole.

17       1834.   Finally, because of Defendants' breach of warranty as set forth herein, Nevada

18   State Class members assert, as additional and/or alternative remedies, the revocation of

19   acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

20   currently owned or leased, and for such other incidental and consequential damages as allowed.

21       1835.   Defendants were provided notice of these issues by numerous complaints filed

22   against them, including the instant Complaint, within a reasonable amount of time.

23       1836.   As a direct and proximate result of Defendants' breach of express warranties,

24   Nevada State Class members have been damaged in an amount to be determined at trial.

25

26

27

28

**NEVADA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**N.R.S. §§ 104.2314 and 104A.2212**
**(On Behalf of the Nevada State Class)**

1837.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1838.   This count is brought on behalf of the Nevada State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1839.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.R.S. § 104.2104(1) and "sellers" of motor vehicles under § 104.2103(1)(c).

1840.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under N.R.S. § 104A.2103(1)(p).

1841.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.R.S. §§ 104.2105(1) and 104A.2103(1)(h).

1842.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.R.S. §§ 104.2314 and 104A.2212.

1843.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

1844.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1845.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Nevada State Class members have been damaged in an amount to be proven at trial.

**NEW HAMPSHIRE COUNT I:**
**Violations of the New Hampshire Consumer Protection Act**
**N.H. Rev. Stat. § 358-A:1 *et seq.***
**(On Behalf of the New Hampshire State Class)**

1846.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1847.   This count is brought on behalf of the New Hampshire State Class against all Defendants.

1848.   Plaintiffs, the New Hampshire State Class, and Defendants are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire CPA"), N.H. Rev. Stat. § 358-A:1.

1849.   Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. § 358-A:1.

1850.   The New Hampshire CPA prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but … not limited to, the following: … (V) Representing that goods or services have … characteristics, … uses, benefits, or quantities that they do not have;" "(VII) Representing that goods or services are of a particular standard, quality, or grade, … if they are of another;" and "(IX) Advertising goods or services with intent not to sell them as advertised." N.H. Rev. Stat. § 358-A:2.

1851.   In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

1852.   New Hampshire State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs and New Hampshire State Class members did not and could not unravel Defendants' deception on their own.

1853.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

1854.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the New Hampshire CPA.

1855.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the New Hampshire State Class.

1856.   Defendants knew or should have known that their conduct violated the New Hampshire CPA.

1857.   Defendants owed Plaintiffs and the New Hampshire State Class a duty to disclose the illegality, public health and safety risks, the true nature of the Class Vehicles, because Defendants:

A.      possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

B.      intentionally concealed the foregoing from regulators, Plaintiffs, and/or Class members; and/or

C.      made incomplete representations about the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1   1858.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

2   characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to

3   Plaintiffs and the New Hampshire State Class.

4   1859.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

5   deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

6   cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

7   of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

8   1860.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

9   general public. Defendants' unlawful acts and practices complained of herein affect the public

10  interest.

11  1861.   Plaintiffs and the New Hampshire State Class suffered ascertainable loss and

12  actual damages as a direct and proximate result of Defendants' misrepresentations and its

13  concealment of and failure to disclose material information. Plaintiffs and the New Hampshire

14  State Class members who purchased or leased the Class Vehicles would not have purchased or

15  leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the

16  Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also

17  suffered diminished value of their vehicles, as well as lost or diminished use. Defendants had an

18  ongoing duty to all their customers to refrain from unfair and deceptive practices under the New

19  Hampshire CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the

20  diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and

21  practices made in the course of Defendants' business.

22  **NEW HAMPSHIRE COUNT II:**
    **Breach of Express Warranty**
23  **N.H. Rev. Stat. §§ 382-A:2-313 and 382-A:2A-210**
    **(On Behalf of the New Hampshire State Class)**
24

25  1862.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

26  fully set forth herein.

27  1863.   This count is brought on behalf of the New Hampshire State Class against the

28  Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1864.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.H. Rev. Stat. § 382-A:2-104(1) and "sellers" of motor vehicles under § 382-A:2-103(1)(d).

1865.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

1866.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. §§ 382-A:2-105(1) and 382-A:2A-103(1)(h).

1867.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1868.   Defendants also made numerous representations, descriptions, and promises to Plaintiffs and New Hampshire State Class members regarding the performance and emission controls of their vehicles.

1869.   For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:

– was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and

– is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

1870.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1871.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1872.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1873.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

1874.   Defendants' warranties formed a basis of the bargain that was reached when New Hampshire State Class members purchased or leased Class Vehicles that are equipped with a defeat device and non-compliant emission systems.

1875.   Despite the existence of warranties, Defendants failed to inform New Hampshire State Class members that the Class Vehicles were intentionally designed and manufactured to be

1    out of compliance with applicable state and federal emissions laws, and failed to fix the defective

2    emission components free of charge.

3         1876.   Defendants breached the express warranty promising to repair and correct

4    Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

5    have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

6         1877.   Affording Defendants a reasonable opportunity to cure their breach of written

7    warranties would be unnecessary and futile here.

8         1878.   Furthermore, the limited warranty promising to repair and correct Defendants'

9    defect in materials and workmanship fails in its essential purpose because the contractual remedy

10   is insufficient to make New Hampshire State Class members whole and because Defendants have

11   failed and/or have refused to adequately provide the promised remedies within a reasonable time.

12        1879.   Accordingly, recovery by the New Hampshire State Class members is not

13   restricted to the limited warranty promising to repair and correct Defendants' defect in materials

14   and workmanship, and they seek all remedies as allowed by law.

15        1880.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

16   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

17   not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

18   material facts regarding the Class Vehicles. New Hampshire State Class members were therefore

19   induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

20        1881.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

21   resolved through the limited remedy of repairing and correcting Defendants' defect in materials

22   and workmanship as many incidental and consequential damages have already been suffered

23   because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

24   continued failure to provide such limited remedy within a reasonable time, and any limitation on

25   the New Hampshire State Class members' remedies would be insufficient to make them whole.

26        1882.   Finally, because of Defendants' breach of warranty as set forth herein, New

27   Hampshire State Class members assert, as additional and/or alternative remedies, the revocation

28

1    of acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

2    currently owned or leased, and for such other incidental and consequential damages as allowed.

3         1883.   Defendants were provided notice of these issues by numerous complaints filed

4    against them, including the instant Complaint, within a reasonable amount of time.

5         1884.   As a direct and proximate result of Defendants' breach of express warranties, New

6    Hampshire State Class members have been damaged in an amount to be determined at trial.

7                               **NEW HAMPSHIRE COUNT III:**
                         **Breach of Implied Warranty of Merchantability**
8                    **N.H. Rev. Stat. §§ 382-A:2-314 and 382-A:2A-212**
                        **(On Behalf of the New Hampshire State Class)**
9

10        1885.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding

11   paragraphs as though fully set forth herein.

12        1886.   This count is brought on behalf of the New Hampshire State Class against the

13   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

14        1887.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

15   vehicles under N.H. Rev. Stat. § 382-A:2-104(1) and "sellers" of motor vehicles under § 382-

16   A:2-103(1)(d).

17        1888.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

18   of motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

19        1889.   The Class Vehicles are and were at all relevant times "goods" within the meaning

20   of N.H. Rev. Stat. §§ 382-A:2-105(1) and 382-A:2A-103(1)(h).

21        1890.   A warranty that the Class Vehicles were in merchantable condition and fit for the

22   ordinary purpose for which vehicles are used is implied by law pursuant to N.H. Rev. Stat.

23   §§ 382-A:2-314 and 382-A:2A-212.

24        1891.   These Class Vehicles, when sold or leased and at all times thereafter, were not in

25   merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

26   Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat

27   device and do not comply with federal and state emissions standards, rendering certain emissions

28   functions inoperative.

1       1892.   Defendants were provided notice of these issues by the investigations of the EPA

2   and California state regulators, and numerous complaints filed against it including the instant

3   complaint, within a reasonable amount of time.

4       1893.   As a direct and proximate result of Defendants' breach of the implied warranty of

5   merchantability, New Hampshire State Class members have been damaged in an amount to be

6   proven at trial.

7                          **NEW JERSEY COUNT I:**
                    **Violations of the New Jersey Consumer Fraud Act**
8                      **N.J. Stat. Ann. § 56:8-1 *et seq.***
                      **(On Behalf of the New Jersey State Class)**
9

10      1894.   Plaintiffs incorporate by reference all allegations in this Complaint as though fully

11  set forth herein.

12      1895.   Plaintiff Raghu Katta (for the purpose of this count, "Plaintiff") brings this count

13  on behalf of himself and the New Jersey State Class against all Defendants.

14      1896.   Plaintiff, the New Jersey State Class members, and Defendants are "persons"

15  under the New Jersey Consumer Fraud Act ("New Jersey CFA"), N.J. Stat. § 56:8-1(d).

16      1897.   Defendants engaged in "sales" of "merchandise" within the meaning of N.J. Stat.

17  §56:8-1(c), (e). Defendants' actions as set forth herein occurred in the conduct of trade or

18  commerce.

19      1898.   The New Jersey CFA makes unlawful "[t]he act, use or employment by any person

20  of any unconscionable commercial practice, deception, fraud, false pretense, false promise,

21  misrepresentation, or the knowing concealment, suppression, or omission of any material fact

22  with the intent that others rely upon such concealment, suppression or omission, in connection

23  with the sale or advertisement of any merchandise or real estate, or with the subsequent

24  performance of such person as aforesaid, whether or not any person has in fact been misled,

25  deceived or damaged thereby." N.J. Stat. § 56:8-2.

26      1899.   In the course of its business, Defendants concealed and suppressed material facts

27  concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

28  Class Vehicles that caused the vehicles to operate in a low emission test mode only during

1    emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

2    noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions

3    testing by way of deliberately induced false readings.

4         1900.   New Jersey State Class members had no way of discerning that Defendants'

5    representations were false and misleading because Defendants' defeat device software was

6    extremely sophisticated technology. Plaintiff and New Jersey State Class members did not and

7    could not unravel Defendants' deception on their own.

8         1901.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

9    have characteristics, uses, benefits, and qualities which they do not have; representing that Class

10   Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

11   Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

12   a transaction involving Class Vehicles has been supplied in accordance with a previous

13   representation when it has not.

14        1902.   The Clean Air Act and EPA regulations require that automobiles limit their

15   emissions output to specified levels. These laws are intended for the protection of public health

16   and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

17   Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

18   installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

19   for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

20   New Jersey CFA.

21        1903.   Defendants intentionally and knowingly misrepresented material facts regarding

22   the Class Vehicles with intent to mislead Plaintiff and the New Jersey State Class.

23        1904.   Defendants knew or should have known that their conduct violated the New Jersey

24   CFA.

25        1905.   Defendants owed Plaintiff and the New Jersey State Class a duty to disclose the

26   illegality, public health and safety risks, the true nature of the Class Vehicles, because

27   Defendants:

28

1          A.      possessed exclusive knowledge that they were manufacturing, selling, and

2   distributing vehicles throughout the United States that did not comply with regulations;

3          B.      intentionally concealed the foregoing from regulators, Plaintiff, and/or

4   Class members; and/or

5          C.      made incomplete representations about the Class Vehicles generally, and

6   the use of the defeat device in particular, while purposefully withholding material facts from

7   Plaintiff and/or Class members that contradicted these representations.

8          1906.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

9   characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to

10  Plaintiff and the New Jersey State Class.

11         1907.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

12  deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

13  cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

14  of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

15         1908.   Defendants' violations present a continuing risk to Plaintiff, the New Jersey State

16  Class, as well as to the general public. Defendants' unlawful acts and practices complained of

17  herein affect the public interest.

18         1909.   Plaintiff and the New Jersey State Class suffered ascertainable loss and actual

19  damages as a direct and proximate result of Defendants' misrepresentations and its concealment

20  of and failure to disclose material information. Plaintiff and the New Jersey State Class members

21  who purchased or leased the Class Vehicles would not have purchased or leased them at all

22  and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered

23  legal to sell—would have paid significantly less for them. Plaintiff and the New Jersey State

24  Class also suffered diminished value of their vehicles, as well as lost or diminished use.

25  Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive

26  practices under the New Jersey CFA. All owners of Class Vehicles suffered ascertainable loss in

27  the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair

28  acts and practices made in the course of Defendants' business.

1910.   As a direct and proximate result of Defendants' violations of the New Jersey CFA, Plaintiffs and the New Jersey State Class have suffered injury-in-fact and/or actual damage in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, treble damages, an order enjoining Defendants' deceptive and unfair conduct, costs and reasonable attorneys' fees under N.J. Stat. § 56:8-19, and all other just and appropriate relief.

**NEW JERSEY COUNT II:**
**Breach of Express Warranty**
**N.J.S. 12A:2-313 and 2A-210**
**(On Behalf of the New Jersey State Class)**

1911.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1912.   Plaintiff Raghu Katta (for the purpose of this count, "Plaintiff") brings this count on behalf of himself and the New Jersey State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1913.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.J.S. 12A:2-104(1) and "sellers" of motor vehicles under 2-103(1)(d).

1914.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under N.J.S. 12A:2A-103(1)(p).

1915.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J.S. 12A:2-105(1) and 2A-103(1)(h).

1916.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1917.   Defendants also made numerous representations, descriptions, and promises to Plaintiff and New Jersey State Class members regarding the performance and emission controls of their vehicles.

1918.   For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:

– was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
– is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

1919.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1920.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1921.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1922.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

1923.   Defendants' warranties formed a basis of the bargain that was reached when New Jersey State Class members purchased or leased Class Vehicles that are equipped with a defeat device and non-compliant emission systems.

1924.   Despite the existence of warranties, Defendants failed to inform New Jersey State Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1925.   Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1926.   Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1927.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make New Jersey State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1928.   Accordingly, recovery by the New Jersey State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

1929.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

1    not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

2    material facts regarding the Class Vehicles. New Jersey State Class members were therefore

3    induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

4           1930.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

5    resolved through the limited remedy of repairing and correcting Defendants' defect in materials

6    and workmanship as many incidental and consequential damages have already been suffered

7    because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

8    continued failure to provide such limited remedy within a reasonable time, and any limitation on

9    the New Jersey State Class members' remedies would be insufficient to make them whole.

10          1931.   Finally, because of Defendants' breach of warranty as set forth herein, New Jersey

11   State Class members assert, as additional and/or alternative remedies, the revocation of

12   acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

13   currently owned or leased, and for such other incidental and consequential damages as allowed.

14          1932.   Defendants were provided notice of these issues by numerous complaints filed

15   against them, including the instant Complaint, within a reasonable amount of time.

16          1933.   As a direct and proximate result of Defendants' breach of express warranties, New

17   Jersey State Class members have been damaged in an amount to be determined at trial.

18                              **NEW JERSEY COUNT III:**
                     **Breach of Implied Warranty of Merchantability**
19                        **N.J.S. 12A:2-314 and 2A-212**
                     **(On Behalf of the New Jersey State Class)**
20

21          1934.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding

22   paragraphs as though fully set forth herein.

23          1935.   Plaintiff Raghu Katta (for the purpose of this count, "Plaintiff") brings this count

24   on behalf of himself and the New Jersey State Class against the Volkswagen and Audi

25   Defendants (collectively for this count, "Defendants").

26          1936.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

27   vehicles under N.J.S. 12A:2-104(1) and "sellers" of motor vehicles under 2-103(1)(d).

28

1    1937.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

2    of motor vehicles under N.J.S. 12A:2A-103(1)(p).

3    1938.   The Class Vehicles are and were at all relevant times "goods" within the meaning

4    of N.J.S. 12A:2-105(1) and 2A-103(1)(h).

5    1939.   A warranty that the Class Vehicles were in merchantable condition and fit for the

6    ordinary purpose for which vehicles are used is implied by law pursuant to N.J.S. 12A:2-314 and

7    2A-212.

8    1940.   These Class Vehicles, when sold or leased and at all times thereafter, were not in

9    merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

10   Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat

11   device and do not comply with federal and state emissions standards, rendering certain emissions

12   functions inoperative.

13   1941.   Defendants were provided notice of these issues by the investigations of the EPA

14   and California state regulators, and numerous complaints filed against it including the instant

15   complaint, within a reasonable amount of time.

16   1942.   As a direct and proximate result of Defendants' breach of the implied warranty of

17   merchantability, New Jersey State Class members have been damaged in an amount to be proven

18   at trial.

19   **NEW MEXICO COUNT I:**
**Violations of the New Mexico Unfair Trade Practices Act**
20   **N.M. Stat. Ann. § 57-12-1 *et seq.***
**(On Behalf of the New Mexico State Class)**
21

22   1943.   Plaintiffs incorporate by reference all allegations in this Complaint as though fully

23   set forth herein.

24   1944.   Plaintiff Geert Wenes (for the purpose of this count, "Plaintiff") brings this count

25   on behalf of himself and the New Mexico State Class against all Defendants.

26   1945.   Defendants, Plaintiff, and New Mexico State Class members are "person[s]" under

27   the New Mexico Unfair Trade Practices Act ("New Mexico UTPA"), N.M. Stat. Ann. § 57-12-2.

28

1946.  Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. Stat. Ann. § 57-12-2.

1947.  The New Mexico UTPA makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. Stat. Ann. § 57-12-2(D). Defendants' acts and omissions described herein constitute unfair or deceptive acts or practices under N.M. Stat. Ann. § 57-12-2(D). In addition, Defendants' actions constitute unconscionable actions under N.M. Stat. Ann. § 57-12-2(E), since they took advantage of the lack of knowledge, ability, experience, and capacity of the New Mexico State Class members to a grossly unfair degree.

1948.  In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

1949.  New Mexico State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiff and New Mexico State Class members did not and could not unravel Defendants' deception on their own.

1950.  Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

1951.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the New Mexico UTPA.

1952.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the New Mexico State Class.

1953.   Defendants knew or should have known that their conduct violated the New Mexico UTPA.

1954.   Defendants owed Plaintiff and the New Mexico State Class a duty to disclose the illegality, public health and safety risks, the true nature of the Class Vehicles, because Defendants:

A.      possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

B.      intentionally concealed the foregoing from regulators, Plaintiff, and/or Class members; and/or

C.      made incomplete representations about the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiff and/or Class members that contradicted these representations.

1955.   Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to Plaintiff and the New Mexico State Class.

1956.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff, about the true environmental cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

1957.  Defendants' violations present a continuing risk to Plaintiff, the New Mexico State Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1958.  Plaintiff and the New Mexico State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the New Mexico State Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiff and the New Mexico State Class also suffered diminished value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the New Mexico UTPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1959.  As a direct and proximate result of Defendants' violations of the New Mexico UTPA, Plaintiff and the New Mexico State Class have suffered injury-in-fact and/or actual damage.

1960.  Because Defendants' unconscionable, willful conduct caused actual harm to New Mexico State Class members, the New Mexico State Class seeks recovery of actual damages or $100, whichever is greater, discretionary treble damages, punitive damages, and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. Stat. Ann. § 57-12-10.

1961.  Plaintiff and the New Mexico State Class members also seek punitive damages against Defendants because Defendants' conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith.

**NEW MEXICO COUNT II:**
**Breach of Express Warranty**
**N.M. Stat. §§ 55-2-313 and 55-2A-210**
**(On Behalf of the New Mexico State Class)**

1962.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1963.   Plaintiff Geert Wenes (for the purpose of this count, "Plaintiff") brings this count on behalf of himself and the New Mexico State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1964.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.M. Stat. § 55-2-104(1) and "sellers" of motor vehicles under § 55-2-103(1)(d).

1965.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under N.M. Stat. § 55-2A-103(1)(p).

1966.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.M. Stat. §§ 55-2-105(1) and 55-2A-103(1)(h).

1967.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1968.   Defendants also made numerous representations, descriptions, and promises to Plaintiff and New Mexico State Class members regarding the performance and emission controls of their vehicles.

1969.   For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:

– was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and

– is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

1970.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1971.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1972.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

1    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

2    comes first.

3        1973.   As manufacturers of light-duty vehicles, Defendants were required to provide

4    these warranties to purchasers or lessees of Class Vehicles.

5        1974.   Defendants' warranties formed a basis of the bargain that was reached when New

6    Mexico State Class members purchased or leased Class Vehicles that are equipped with a defeat

7    device and non-compliant emission systems.

8        1975.   Despite the existence of warranties, Defendants failed to inform New Mexico State

9    Class members that the Class Vehicles were intentionally designed and manufactured to be out of

10   compliance with applicable state and federal emissions laws, and failed to fix the defective

11   emission components free of charge.

12       1976.   Defendants breached the express warranty promising to repair and correct

13   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

14   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

15       1977.   Affording Defendants a reasonable opportunity to cure their breach of written

16   warranties would be unnecessary and futile here.

17       1978.   Furthermore, the limited warranty promising to repair and correct Defendants'

18   defect in materials and workmanship fails in its essential purpose because the contractual remedy

19   is insufficient to make New Mexico State Class members whole and because Defendants have

20   failed and/or have refused to adequately provide the promised remedies within a reasonable time.

21       1979.   Accordingly, recovery by the New Mexico State Class members is not restricted to

22   the limited warranty promising to repair and correct Defendants' defect in materials and

23   workmanship, and they seek all remedies as allowed by law.

24       1980.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

25   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

26   not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

27   material facts regarding the Class Vehicles. New Mexico State Class members were therefore

28   induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1981.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the New Mexico State Class members' remedies would be insufficient to make them whole.

1982.   Finally, because of Defendants' breach of warranty as set forth herein, New Mexico State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1983.   Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

1984.   As a direct and proximate result of Defendants' breach of express warranties, New Mexico State Class members have been damaged in an amount to be determined at trial.

**NEW MEXICO COUNT III:**
**Breach of Implied Warranty of Merchantability**
**N.M. Stat. §§ 55-2-314 and 55-2A-212**
**(On Behalf of the New Mexico State Class)**

1985.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1986.   Plaintiff Geert Wenes (for the purpose of this count, "Plaintiff") brings this count on behalf of himself and the New Mexico State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1987.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.M. Stat. § 55-2-104(1) and "sellers" of motor vehicles under § 55-2-103(1)(d).

1988.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under N.M. Stat. § 55-2A-103(1)(p).

1989.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.M. Stat. §§ 55-2-105(1) and 55-2A-103(1)(h).

1    1990.   A warranty that the Class Vehicles were in merchantable condition and fit for the

2    ordinary purpose for which vehicles are used is implied by law pursuant to N.M. Stat. §§ 55-2-

3    314 and 55-2A-212.

4    1991.   These Class Vehicles, when sold or leased and at all times thereafter, were not in

5    merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

6    Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat

7    device and do not comply with federal and state emissions standards, rendering certain emissions

8    functions inoperative.

9    1992.   Defendants were provided notice of these issues by the investigations of the EPA

10   and California state regulators, and numerous complaints filed against it including the instant

11   complaint, within a reasonable amount of time.

12   1993.   As a direct and proximate result of Defendants' breach of the implied warranty of

13   merchantability, New Mexico State Class members have been damaged in an amount to be

14   proven at trial.

**NEW YORK COUNT I:**
**Violations of the New York General Business Law § 349**
**N.Y. Gen. Bus. Law § 349**
**(On Behalf of the New York State Class)**

18   1994.   Plaintiffs incorporate by reference all allegations in this Complaint as though fully

19   set forth herein.

20   1995.   Plaintiffs Michael Beck and Ira Bernstein (for the purpose of this count,

21   "Plaintiffs") bring this count on behalf of themselves and the New York State Class against all

22   Defendants.

23   1996.   Plaintiffs, the New York State Class members and Defendants are "persons" under

24   N.Y. Gen. Bus. Law § 349(h), the New York Deceptive Acts and Practices Act ("NY DAPA").

25   1997.   Defendants' actions as set forth herein occurred in the conduct of trade or

26   commerce under the NY DAPA.

27

28

1    1998.   The NY DAPA makes unlawful "[d]eceptive acts or practices in the conduct of

2    any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Defendants' conduct, as set forth

3    herein, constitutes deceptive acts or practices under this section.

4    1999.   In the course of its business, Defendants concealed and suppressed material facts

5    concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

6    Class Vehicles that caused the vehicles to operate in a low emission test mode only during

7    emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

8    noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions

9    testing by way of deliberately induced false readings.

10    2000.   New York State Class members had no way of discerning that Defendants'

11    representations were false and misleading because Defendants' defeat device software was

12    extremely sophisticated technology. Plaintiffs and New York State Class members did not and

13    could not unravel Defendants' deception on their own.

14    2001.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

15    have characteristics, uses, benefits, and qualities which they do not have; representing that Class

16    Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

17    Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

18    a transaction involving Class Vehicles has been supplied in accordance with a previous

19    representation when it has not.

20    2002.   The Clean Air Act and EPA regulations require that automobiles limit their

21    emissions output to specified levels. These laws are intended for the protection of public health

22    and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

23    Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

24    installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

25    for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

26    NY DAPA.

27    2003.   Defendants intentionally and knowingly misrepresented material facts regarding

28    the Class Vehicles with intent to mislead Plaintiffs and the New York State Class.

2004.   Defendants knew or should have known that their conduct violated the NY DAPA.

2005.   Defendants owed Plaintiffs and the New York State Class a duty to disclose the illegality, public health and safety risks, the true nature of the Class Vehicles, because Defendants:

A.      possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

B.      intentionally concealed the foregoing from regulators, Plaintiffs, and/or Class members; and/or

C.      made incomplete representations about the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2006.   Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to Plaintiffs and the New York State Class.

2007.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

2008.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2009.   Plaintiffs and the New York State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the New York State Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all

1   their customers to refrain from unfair and deceptive practices under the NY DAPA. All owners of

2   Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as

3   a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants'

4   business.

5       2010.   As a direct and proximate result of Defendants' violations of the NY DAPA,

6   Plaintiffs and the New York State Class have suffered injury-in-fact and/or actual damage.

7       2011.   As a result of the foregoing willful, knowing, and wrongful conduct of Defendants,

8   Plaintiffs and the New York State Class have been damaged in an amount to be proven at trial,

9   and seek all just and proper remedies, including but not limited to actual damages or $50,

10  whichever is greater, treble damages up to $1,000, punitive damages to the extent available under

11  the law, reasonable attorneys' fees and costs, an order enjoining Defendants' deceptive and unfair

12  conduct, and all other just and appropriate relief available under the NY DAPA.

13
14              **NEW YORK COUNT II:**
        **Violations of the New York General Business Law § 350**
                **N.Y. Gen. Bus. Law § 350**
15          **(On Behalf of the New York State Class)**

16      2012.   Plaintiffs incorporate by reference all allegations in this Complaint as though fully

17  set forth herein.

18      2013.   Plaintiffs Michael Beck and Ira Bernstein (for the purpose of this count,

19  "Plaintiffs") bring this count on behalf of themselves and the New York State Class against the

20  Volkswagen and Audi Defendants (collectively for this count, "Defendants").

21      2014.   Defendants were engaged in the "conduct of business, trade or commerce," within

22  the meaning of N.Y. Gen. Bus. Law § 350, the New York False Advertising Act ("NY FAA")

23      2015.   The NY FAA makes unlawful "[f]alse advertising in the conduct of any business,

24  trade or commerce." N.Y. Gen. Bus. Law § 350. False advertising includes "advertising,

25  including labeling, of a commodity . . . if such advertising is misleading in a material respect,"

26  taking into account "the extent to which the advertising fails to reveal facts material in light of …

27  representations [made] with respect to the commodity …." N.Y. Gen. Bus. Law § 350-a.

28

2016. Defendants caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements and omissions that were untrue or misleading, and that were known by Defendants, or that through the exercise of reasonable care should have been known by Defendants, to be untrue and misleading to Plaintiffs and the New York State Class.

2017. Defendants made numerous material misrepresentations and omissions of fact with intent to mislead and deceive concerning the Class Vehicles, particularly concerning the illegality, efficacy and functioning of the emissions systems on the Class Vehicles. Specifically, Defendants intentionally concealed and suppressed material facts concerning the legality and quality of the Class Vehicles in order to intentionally and grossly defraud and mislead the Plaintiffs and the New York State Class concerning the true emissions produced by the Class Vehicles.

2018. The misrepresentations and omissions regarding set forth above were material and likely to deceive a reasonable consumer. Specifically, the Class Vehicles used a sophisticated defeat device that was undetectable to the ordinary consumer that made them non-compliant with EPA emission regulations.

2019. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the New York State Class.

2020. Defendants false advertising was likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and New York State Class members, about the illegality and true characteristics of the Class Vehicles, the quality of Defendants brand and the true value of the Class Vehicles.

2021. Defendants violations of the NY FAA present a continuing risk to Plaintiffs and to the general public. Defendants' deceptive acts and practices affect the public interest.

2022. The Class Vehicles do not perform as advertised and are not compliant with EPA regulations, making them far less valuable than advertised.

2023. Plaintiffs and New York State Class members who purchased Class Vehicles either would not have purchased them at all or paid less but for Defendants false advertising in

1   violation of the NY FAA. Plaintiffs and New York State Class members who leased Class

2   Vehicles either would not have leased them at all, or at a lower rate but for Defendants' false

3   advertising in violation of the NY FAA.

4       2024.   The Plaintiffs and the New York State Class have suffered injury-in-fact and/or

5   actual damages and ascertainable loss as a direct and proximate result of the Defendant's false

6   advertising in violation of the NY FAA, including but not limited to purchasing or leasing an

7   illegal vehicle, diminished or complete lost value for the Class Vehicles they purchased or leased;

8   lost or diminished use, enjoyment and utility of such vehicles; and annoyance, aggravation and

9   inconvenience resulting from Defendants' violations of the NY FAA.

10      2025.   Plaintiffs and the New York State Class seek monetary relief against Defendants

11   measured as the greater of (a) actual damages in an amount to be determined at trial, and (b)

12   statutory damages in the amount of $500 each for New York State Class members. Because

13   Defendants' conduct was committed willingly and knowingly, New York State Class members

14   are entitled to recover three times actual damages, up to $10,000.

15      2026.   The New York State Class also seeks an order enjoining Defendants' false

16   advertising, attorneys' fees, and any other just and proper relief under N.Y. Gen. Bus. Law § 350.

17
**NEW YORK COUNT III:**
**Breach of Express Warranty**
18
**N.Y. U.C.C. Law §§ 2-313 and 2A-210**
**(On Behalf of the New York State Class)**
19

20      2027.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

21   fully set forth herein.

22      2028.   Plaintiffs Michael Beck and Ira Bernstein (for the purpose of this count,

23   "Plaintiffs") bring this count on behalf of themselves and the New York State Class against the

24   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

25      2029.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

26   vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

27      2030.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

28   of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

1    2031.   The Class Vehicles are and were at all relevant times "goods" within the meaning

2    of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

3    2032.   In connection with the purchase or lease of each one of its new vehicles,

4    Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

5    occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

6    materials or workmanship."

7    2033.   Defendants also made numerous representations, descriptions, and promises to

8    Plaintiffs and New York State Class members regarding the performance and emission controls of

9    their vehicles.

10    2034.   For example, as shown below, Defendants included in the warranty booklets for

11    some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped

12    so as to conform at the time of sale with all applicable regulations of the United States

13    Environmental Protection Agency."

> Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
> – is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

23    2035.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide

24    two federal emission control warranties: a "Performance Warranty" and a "Design and Defect

25    Warranty."

26    2036.   The EPA requires vehicle manufacturers to provide a Performance Warranty with

27    respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

28    its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

1   required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

2   whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

3   emission control components are covered for the first eight years or 80,000 miles (whichever

4   comes first). These major emission control components subject to the longer warranty include the

5   catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

6   device or computer.

7       2037.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

8   with respect to their vehicles' emission systems. Thus, Defendants also provide an express

9   warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

10  Design and Defect Warranty required by the EPA covers repair of emission control or emission

11  related parts, which fail to function or function improperly because of a defect in materials or

12  workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

13  first, or, for the major emission control components, for eight years or 80,000 miles, whichever

14  comes first.

15      2038.   As manufacturers of light-duty vehicles, Defendants were required to provide

16  these warranties to purchasers or lessees of Class Vehicles.

17      2039.   Defendants' warranties formed a basis of the bargain that was reached when New

18  York State Class members purchased or leased Class Vehicles that are equipped with a defeat

19  device and non-compliant emission systems.

20      2040.   Despite the existence of warranties, Defendants failed to inform New York State

21  Class members that the Class Vehicles were intentionally designed and manufactured to be out of

22  compliance with applicable state and federal emissions laws, and failed to fix the defective

23  emission components free of charge.

24      2041.   Defendants breached the express warranty promising to repair and correct

25  Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

26  have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

27      2042.   Affording Defendants a reasonable opportunity to cure their breach of written

28  warranties would be unnecessary and futile here.

1    2043.   Furthermore, the limited warranty promising to repair and correct Defendants'

2    defect in materials and workmanship fails in its essential purpose because the contractual remedy

3    is insufficient to make New York State Class members whole and because Defendants have failed

4    and/or have refused to adequately provide the promised remedies within a reasonable time.

5    2044.   Accordingly, recovery by the New York State Class members is not restricted to

6    the limited warranty promising to repair and correct Defendants' defect in materials and

7    workmanship, and they seek all remedies as allowed by law.

8    2045.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

9    or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

10   not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

11   material facts regarding the Class Vehicles. New York State Class members were therefore

12   induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

13   2046.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

14   resolved through the limited remedy of repairing and correcting Defendants' defect in materials

15   and workmanship as many incidental and consequential damages have already been suffered

16   because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

17   continued failure to provide such limited remedy within a reasonable time, and any limitation on

18   the New York State Class members' remedies would be insufficient to make them whole.

19   2047.   Finally, because of Defendants' breach of warranty as set forth herein, New York

20   State Class members assert, as additional and/or alternative remedies, the revocation of

21   acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

22   currently owned or leased, and for such other incidental and consequential damages as allowed.

23   2048.   Defendants were provided notice of these issues by numerous complaints filed

24   against them, including the instant Complaint, within a reasonable amount of time.

25   2049.   As a direct and proximate result of Defendants' breach of express warranties, New

26   York State Class members have been damaged in an amount to be determined at trial.

27

28

**NEW YORK COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**N.Y. U.C.C. Law §§ 2-314 and 2A-212**
**(On Behalf of the New York State Class)**

2050.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2051.   Plaintiffs Michael Beck and Ira Bernstein (for the purpose of this count, "Plaintiffs") bring this count on behalf of themselves and the New York State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

2052.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

2053.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

2054.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

2055.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.Y. UCC Law §§ 2-314 and 2A-212.

2056.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

2057.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2058.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, New York State Class members have been damaged in an amount to be proven at trial.

**NORTH CAROLINA COUNT I:**
**Violations of the North Carolina Unfair and Deceptive Acts and Practices Act**
**N.C. Gen. Stat. § 75-1.1 *et seq.***
**(On Behalf of the North Carolina State Class)**

2059.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2060.   This count is brought on behalf of the North Carolina State Class against all Defendants.

2061.   Plaintiffs and the North Carolina State Class members are persons under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.* ("NCUDTPA").

2062.   Defendants' acts and practices complained of herein were performed in the course of Defendants' trade or business and thus occurred in or affected "commerce," as defined in N.C. Gen. Stat. § 75-1.1(b).

2063.   The NCUDTPA makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA. N.C. Gen. Stat. § 75-16.

2064.   In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

2065.   North Carolina State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs and North Carolina State Class members did not and could not unravel Defendants' deception on their own.

- 354 -

1    2066.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

2    have characteristics, uses, benefits, and qualities which they do not have; representing that Class

3    Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

4    Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

5    a transaction involving Class Vehicles has been supplied in accordance with a previous

6    representation when it has not.

7    2067.   The Clean Air Act and EPA regulations require that automobiles limit their

8    emissions output to specified levels. These laws are intended for the protection of public health

9    and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

10   Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

11   installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

12   for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

13   NCUDTPA.

14   2068.   Defendants intentionally and knowingly misrepresented material facts regarding

15   the Class Vehicles with intent to mislead Plaintiffs and the North Carolina State Class.

16   2069.   Defendants knew or should have known that their conduct violated the

17   NCUDTPA.

18   2070.   Defendants owed Plaintiffs and the North Carolina State Class a duty to disclose

19   the illegality, public health and safety risks, the true nature of the Class Vehicles, because

20   Defendants:

21          A.      possessed exclusive knowledge that they were manufacturing, selling, and

22   distributing vehicles throughout the United States that did not comply with regulations;

23          B.      intentionally concealed the foregoing from regulators, Plaintiffs, and/or

24   Class members; and/or

25          C.      made incomplete representations about the Class Vehicles generally, and

26   the use of the defeat device in particular, while purposefully withholding material facts from

27   Plaintiffs that contradicted these representations.

28

2071.   Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to Plaintiffs and the North Carolina State Class.

2072.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

2073.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2074.   Plaintiffs and the North Carolina State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the North Carolina State Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the NCUDTPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

2075.   As a result of the foregoing wrongful conduct of Defendants, Plaintiffs and the North Carolina State Class have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to treble damages, an order enjoining Defendants' deceptive and unfair conduct, court costs and reasonable attorneys' fees, and any other just and proper relief available under N.C. Gen. Stat. § 75-16.

1

**NORTH CAROLINA COUNT II:**
**Breach of Express Warranty**
**N.C.G.S.A. §§ 25-2-313 and 252A-210**
**(On Behalf of the North Carolina State Class)**

2

3

4       2076.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

5   fully set forth herein.

6       2077.   This count is brought on behalf of the North Carolina State Class against the

7   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

8       2078.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

9   vehicles under N.C.G.S.A. § 25-2-104(1) and "sellers" of motor vehicles under § 25-2-103(1)(d).

10      2079.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

11  of motor vehicles under N.C.G.S.A. § 25-2A-103(1)(p).

12      2080.   The Class Vehicles are and were at all relevant times "goods" within the meaning

13  of N.C.G.S.A. § 25-2-105(1) and N.C.G.S.A. § 25-2A-103(1)(h).

14      2081.   In connection with the purchase or lease of each one of its new vehicles,

15  Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

16  occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

17  materials or workmanship."

18      2082.   Defendants also made numerous representations, descriptions, and promises to

19  Plaintiffs and North Carolina State Class members regarding the performance and emission

20  controls of their vehicles.

21      2083.   For example, as shown below, Defendants included in the warranty booklets for

22  some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped

23  so as to conform at the time of sale with all applicable regulations of the United States

24  Environmental Protection Agency."

25

26

27

28

1372049.6

- 357 -

> Audi of America, Inc., an operating unit of
> Volkswagen Group of America, Inc. ("Audi"),
> the authorized United States importer of Audi
> vehicles, warrants to the original retail pur-
> chaser or original lessee and any subsequent
> purchaser or lessee that every **model year
> 2014** Audi vehicle imported by Audi:
> – was designed, built and equipped so as to
>   conform at the time of sale with all applica-
>   ble regulations of the United States Environ-
>   mental Protection Agency (EPA), and
> – is free from defects in material and work-
>   manship which causes the vehicle to fail to
>   conform with EPA regulations for 2 years af-
>   ter the date of first use or delivery of the ve-
>   hicle to the original retail purchaser or origi-
>   nal lessee or until the vehicle has been driv-
>   en 24,000 miles, whichever occurs first.

2084.  The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2085.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2086.  The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

1    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

2    comes first.

3        2087.   As manufacturers of light-duty vehicles, Defendants were required to provide

4    these warranties to purchasers or lessees of Class Vehicles.

5        2088.   Defendants' warranties formed a basis of the bargain that was reached when North

6    Carolina State Class members purchased or leased Class Vehicles that are equipped with a defeat

7    device and non-compliant emission systems.

8        2089.   Despite the existence of warranties, Defendants failed to inform North Carolina

9    State Class members that the Class Vehicles were intentionally designed and manufactured to be

10   out of compliance with applicable state and federal emissions laws, and failed to fix the defective

11   emission components free of charge.

12       2090.   Defendants breached the express warranty promising to repair and correct

13   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

14   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

15       2091.   Affording Defendants a reasonable opportunity to cure their breach of written

16   warranties would be unnecessary and futile here.

17       2092.   Furthermore, the limited warranty promising to repair and correct Defendants'

18   defect in materials and workmanship fails in its essential purpose because the contractual remedy

19   is insufficient to make North Carolina State Class members whole and because Defendants have

20   failed and/or have refused to adequately provide the promised remedies within a reasonable time.

21       2093.   Accordingly, recovery by the North Carolina State Class members is not restricted

22   to the limited warranty promising to repair and correct Defendants' defect in materials and

23   workmanship, and they seek all remedies as allowed by law.

24       2094.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

25   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

26   not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

27   material facts regarding the Class Vehicles. North Carolina State Class members were therefore

28   induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1    2095.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

2    resolved through the limited remedy of repairing and correcting Defendants' defect in materials

3    and workmanship as many incidental and consequential damages have already been suffered

4    because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

5    continued failure to provide such limited remedy within a reasonable time, and any limitation on

6    the North Carolina State Class members' remedies would be insufficient to make them whole.

7    2096.   Finally, because of Defendants' breach of warranty as set forth herein, North

8    Carolina State Class members assert, as additional and/or alternative remedies, the revocation of

9    acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

10    currently owned or leased, and for such other incidental and consequential damages as allowed.

11    2097.   Defendants were provided notice of these issues by numerous complaints filed

12    against them, including the instant Complaint, within a reasonable amount of time.

13    2098.   As a direct and proximate result of Defendants' breach of express warranties,

14    North Carolina State Class members have been damaged in an amount to be determined at trial.

15    **NORTH CAROLINA COUNT III:**
**Breach of Implied Warranty of Merchantability**
16    **N.C.G.S.A. §§ 25-2-314 and 252A-212**
**(On Behalf of the North Carolina State Class)**
17

18    2099.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding

19    paragraphs as though fully set forth herein.

20    2100.   This count is brought on behalf of the North Carolina State Class against the

21    Volkswagen and Audi Defendants (collectively for this count, "Defendants").

22    2101.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

23    vehicles under N.C.G.S.A. § 25-2-104(1) and "sellers" of motor vehicles under § 25-2-103(1)(d).

24    2102.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

25    of motor vehicles under N.C.G.S.A. § 25-2A-103(1)(p).

26    2103.   The Class Vehicles are and were at all relevant times "goods" within the meaning

27    of N.C.G.S.A. § 25-2-105(1) and N.C.G.S.A. § 25-2A-103(1)(h).

28

1    2104.   A warranty that the Class Vehicles were in merchantable condition and fit for the

2    ordinary purpose for which vehicles are used is implied by law pursuant to N.C.G.S.A. § 25-2-

3    314 and N.C.G.S.A. § 25-2A-212.

4    2105.   These Class Vehicles, when sold or leased and at all times thereafter, were not in

5    merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

6    Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat

7    device and do not comply with federal and state emissions standards, rendering certain emissions

8    functions inoperative.

9    2106.   Defendants were provided notice of these issues by the investigations of the EPA

10   and California state regulators, and numerous complaints filed against it including the instant

11   complaint, within a reasonable amount of time.

12   2107.   As a direct and proximate result of Defendants' breach of the implied warranty of

13   merchantability, North Carolina State Class members have been damaged in an amount to be

14   proven at trial.

15                         **NORTH DAKOTA COUNT I:**
                   **Violations of the North Dakota Consumer Fraud Act**
16                        **N.D. Cent. Code § 51-15-02**
                   **(On Behalf of the North Dakota State Class)**
17

18   2108.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

19   forth herein.

20   2109.   This count is brought on behalf of the North Dakota State Class against all

21   Defendants.

22   2110.   Plaintiffs, the North Dakota State Class members, and Defendants are "persons"

23   within the meaning of N.D. Cent. Code § 51-15-02(4).

24   2111.   Defendants engaged in the "sale" of "merchandise" within the meaning of N.D.

25   Cent Code § 51-15-02(3), (5).

26   2112.   The North Dakota Consumer Fraud Act ("North Dakota CFA") makes unlawful

27   "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false

28   pretense, false promise, or misrepresentation, with the intent that others rely thereon in

1   connection with the sale or advertisement of any merchandise….” N.D. Cent. Code § 51-15-02.

2   As set forth above and below, Defendants committed deceptive acts or practices, with the intent

3   that North Dakota State Class members rely thereon in connection with their purchase or lease of

4   the Class Vehicles.

5       2113.   In the course of its business, Defendants concealed and suppressed material facts

6   concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

7   Class Vehicles that caused the vehicles to operate in a low emission test mode only during

8   emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

9   noxious $CO2$. The result was what Defendants intended—the Class Vehicles passed emissions

10  testing by way of deliberately induced false readings.

11      2114.   North Dakota State Class members had no way of discerning that Defendants’

12  representations were false and misleading because Defendants’ defeat device software was

13  extremely sophisticated technology. Plaintiffs and North Dakota State Class members did not and

14  could not unravel Defendants’ deception on their own.

15      2115.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

16  have characteristics, uses, benefits, and qualities which they do not have; representing that Class

17  Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

18  Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

19  a transaction involving Class Vehicles has been supplied in accordance with a previous

20  representation when it has not.

21      2116.   The Clean Air Act and EPA regulations require that automobiles limit their

22  emissions output to specified levels. These laws are intended for the protection of public health

23  and welfare. “Defeat devices” like those in the Class Vehicles are defined and prohibited by the

24  Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

25  installing illegal “defeat devices” in the Class Vehicles and by making those vehicles available

26  for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

27  North Dakota CFA.

28

1    2117.   Defendants intentionally and knowingly misrepresented material facts regarding

2    the Class Vehicles with intent to mislead Plaintiffs and the North Dakota State Class.

3    2118.   Defendants knew or should have known that their conduct violated the North

4    Dakota CFA.

5    2119.   Defendants owed Plaintiffs and the North Dakota State Class a duty to disclose the

6    illegality, public health and safety risks, the true nature of the Class Vehicles, because

7    Defendants:

8             A.       possessed exclusive knowledge that they were manufacturing, selling, and

9    distributing vehicles throughout the United States that did not comply with regulations;

10            B.       intentionally concealed the foregoing from regulators, Plaintiffs, and/or

11   Class members; and/or

12            C.       made incomplete representations about the Class Vehicles generally, and

13   the use of the defeat device in particular, while purposefully withholding material facts from

14   Plaintiffs that contradicted these representations.

15   2120.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

16   characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to

17   Plaintiffs and the North Dakota State Class.

18   2121.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

19   deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

20   cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

21   of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

22   2122.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

23   general public. Defendants' unlawful acts and practices complained of herein affect the public

24   interest.

25   2123.   Plaintiffs and the North Dakota State Class suffered ascertainable loss and actual

26   damages as a direct and proximate result of Defendants' misrepresentations and its concealment

27   of and failure to disclose material information. Plaintiffs and the North Dakota State Class

28   members who purchased or leased the Class Vehicles would not have purchased or leased them at

1    all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles

2    rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered

3    diminished value of their vehicles, as well as lost or diminished use. Defendants had an ongoing

4    duty to all their customers to refrain from unfair and deceptive practices under the North Dakota

5    CFA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value

6    of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the

7    course of Defendants' business.

8         2124.   As a direct and proximate result of Defendants' violations of the North Dakota

9    CFA, Plaintiffs and the North Dakota State Class have suffered injury-in-fact and/or actual

10   damage.

11        2125.   North Dakota State Class members seek punitive damages against Defendants

12   because Defendants' conduct was egregious. Defendants' egregious conduct warrants punitive

13   damages.

14        2126.   Further, Defendants knowingly committed the conduct described above, and thus,

15   under N.D. Cent. Code § 51-15-09, Defendants are liable to Plaintiffs and the North Dakota State

16   Class for treble damages in amounts to be proven at trial, as well as attorneys' fees, costs, and

17   disbursements. Plaintiffs further seek an order enjoining Defendants' unfair and/or deceptive acts

18   or practices, and other just and proper available relief under the North Dakota CFA.

19                         **NORTH DAKOTA COUNT II:**
                           **Breach of Express Warranty**
20                  **N.D. Cent. Code §§ 41-02-30 and 41-02.1-19**
                    **(On Behalf of the North Dakota State Class)**
21

22        2127.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

23   fully set forth herein.

24        2128.   This count is brought on behalf of the North Dakota State Class against the

25   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

26        2129.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

27   vehicles under N.D. Cent. Code § 41-02.04(3) and "sellers" of motor vehicles under § 41-02-

28   03(1)(d).

1    2130.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

2    of motor vehicles under N.D. Cent. Code § 41-02.1-03(1)(p).

3    2131.   The Class Vehicles are and were at all relevant times "goods" within the meaning

4    of N.D. Cent. Code § 41-02-05(2) and N.D. Cent. Code § 41-02.1-03(1)(h).

5    2132.   In connection with the purchase or lease of each one of its new vehicles,

6    Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

7    occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

8    materials or workmanship."

9    2133.   Defendants also made numerous representations, descriptions, and promises to

10   Plaintiffs and North Dakota State Class members regarding the performance and emission

11   controls of their vehicles.

12   2134.   For example, as shown below, Defendants included in the warranty booklets for

13   some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped

14   so as to conform at the time of sale with all applicable regulations of the United States

15   Environmental Protection Agency."

> Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
> – is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

25   2135.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide

26   two federal emission control warranties: a "Performance Warranty" and a "Design and Defect

27   Warranty."

28

1    2136.   The EPA requires vehicle manufacturers to provide a Performance Warranty with

2    respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

3    its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

4    required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

5    whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

6    emission control components are covered for the first eight years or 80,000 miles (whichever

7    comes first). These major emission control components subject to the longer warranty include the

8    catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

9    device or computer.

10    2137.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

11    with respect to their vehicles' emission systems. Thus, Defendants also provide an express

12    warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

13    Design and Defect Warranty required by the EPA covers repair of emission control or emission

14    related parts, which fail to function or function improperly because of a defect in materials or

15    workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

16    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

17    comes first.

18    2138.   As manufacturers of light-duty vehicles, Defendants were required to provide

19    these warranties to purchasers or lessees of Class Vehicles.

20    2139.   Defendants' warranties formed a basis of the bargain that was reached when North

21    Dakota State Class members purchased or leased Class Vehicles that are equipped with a defeat

22    device and non-compliant emission systems.

23    2140.   Despite the existence of warranties, Defendants failed to inform North Dakota

24    State Class members that the Class Vehicles were intentionally designed and manufactured to be

25    out of compliance with applicable state and federal emissions laws, and failed to fix the defective

26    emission components free of charge.

27

28

1  2141.   Defendants breached the express warranty promising to repair and correct

2  Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

3  have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

4  2142.   Affording Defendants a reasonable opportunity to cure their breach of written

5  warranties would be unnecessary and futile here.

6  2143.   Furthermore, the limited warranty promising to repair and correct Defendants'

7  defect in materials and workmanship fails in its essential purpose because the contractual remedy

8  is insufficient to make North Dakota State Class members whole and because Defendants have

9  failed and/or have refused to adequately provide the promised remedies within a reasonable time.

10  2144.   Accordingly, recovery by the North Dakota State Class members is not restricted

11  to the limited warranty promising to repair and correct Defendants' defect in materials and

12  workmanship, and they seek all remedies as allowed by law.

13  2145.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

14  or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

15  not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

16  material facts regarding the Class Vehicles. North Dakota State Class members were therefore

17  induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

18  2146.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

19  resolved through the limited remedy of repairing and correcting Defendants' defect in materials

20  and workmanship as many incidental and consequential damages have already been suffered

21  because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

22  continued failure to provide such limited remedy within a reasonable time, and any limitation on

23  the North Dakota State Class members' remedies would be insufficient to make them whole.

24  2147.   Finally, because of Defendants' breach of warranty as set forth herein, North

25  Dakota State Class members assert, as additional and/or alternative remedies, the revocation of

26  acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

27  currently owned or leased, and for such other incidental and consequential damages as allowed.

28

1      2148.   Defendants were provided notice of these issues by numerous complaints filed

2   against them, including the instant Complaint, within a reasonable amount of time.

3      2149.   As a direct and proximate result of Defendants' breach of express warranties,

4   North Dakota State Class members have been damaged in an amount to be determined at trial.

5                          **NORTH DAKOTA COUNT III:**
                    **Breach of Implied Warranty of Merchantability**
6                   **N.D. Cent. Code §§ 41-02-31 and 41-02.1-21**
                    **(On Behalf of the North Dakota State Class)**
7

8      2150.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding

9   paragraphs as though fully set forth herein.

10     2151.   This count is brought on behalf of the North Dakota State Class against the

11  Volkswagen and Audi Defendants (collectively for this count, "Defendants").

12     2152.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

13  vehicles under N.D. Cent. Code § 41-02.04(3) and "sellers" of motor vehicles under § 41-02-

14  03(1)(d).

15     2153.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

16  of motor vehicles under N.D. Cent. Code § 41-02.1-03(1)(p).

17     2154.   The Class Vehicles are and were at all relevant times "goods" within the meaning

18  of N.D. Cent. Code § 41-02-05(2) and N.D. Cent. Code § 41-02.1-03(1)(h).

19     2155.   A warranty that the Class Vehicles were in merchantable condition and fit for the

20  ordinary purpose for which vehicles are used is implied by law pursuant to N.D. Cent. Code § 41-

21  02-31 and N.D. Cent. Code § 41-02.1-21.

22     2156.   These Class Vehicles, when sold or leased and at all times thereafter, were not in

23  merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

24  Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat

25  device and do not comply with federal and state emissions standards, rendering certain emissions

26  functions inoperative.

27

28

1    2157.   Defendants were provided notice of these issues by the investigations of the EPA

2    and California state regulators, and numerous complaints filed against it including the instant

3    complaint, within a reasonable amount of time.

4    2158.   As a direct and proximate result of Defendants' breach of the implied warranty of

5    merchantability, North Dakota State Class members have been damaged in an amount to be

6    proven at trial.

7
                                   **OHIO COUNT I:**
                   **Violations of the Ohio Consumer Sales Practices Act**
8                     **Ohio Rev. Code § 1345.01 *et seq.***
                          **(On Behalf of the Ohio State Class)**
9

10   2159.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

11   forth herein.

12   2160.   This count is brought on behalf of the Ohio State Class against all Defendants.

13   2161.   Defendants, Plaintiffs and the Ohio State Class members are "persons" within the

14   meaning of Ohio Rev. Code § 1345.01(B). Defendants are a "supplier" as defined by Ohio Rev.

15   Code § 1345.01(C).

16   2162.   Plaintiffs and the Ohio State Class are "consumers" as that term is defined in Ohio

17   Rev. Code § 1345.01(D), and their purchase and leases of the Class Vehicles with the Defect

18   Devices installed in them are "consumer transactions" within the meaning of Ohio Rev. Code

19   § 1345.01(A).

20   2163.   Ohio Rev. Code § 1345.02, prohibits unfair or deceptive acts or practices in

21   connection with a consumer transaction. Ohio CSPA prohibits a supplier from (i) representing

22   that goods have characteristics, uses or benefits which the goods do not have; (ii) representing

23   that their goods are of a particular quality or grade that the product is not; and (iii) representing

24   that the subject of a consumer transaction has been supplied in accordance with a previous

25   representation, if it has not.

26   2164.   In the course of its business, Defendants concealed and suppressed material facts

27   concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

28   Class Vehicles that caused the vehicles to operate in a low emission test mode only during

emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

2165.   Ohio State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs and Ohio State Class members did not and could not unravel Defendants' deception on their own.

2166.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

2167.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the Ohio CSPA.

2168.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Ohio State Class.

2169.   Defendants knew or should have known that their conduct violated the Ohio CSPA.

2170.   The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of Defendants in this Complaint, including, but not limited to, the failure to honor both implied warranties and express warranties, the making and distribution of false, deceptive, and/or misleading representations, and the

concealment and/or non-disclosure of a substantial defect, constitute deceptive sales practices in violation of the CSPA. These cases include, but are not limited to, the following:

    A.    Mason v. Mercedes Benz USA, LLC (OPIF #10002382);

    B.    State ex rel. Betty D. Montgomery v. Ford Motor Co. (OPIF #10002123);

    C.    State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc. (OPIF #10002025);

    D.    *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

    E.    *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

    F.    State ex rel. Jim Petro v. Craftmatic Organization, Inc. (OPIF #10002347);

    G.    Cranford v. Joseph Airport Toyota, Inc. (OPIF #10001586);

    H.    *Brown v. Spears* (OPIF #10000403);

    I.    Brinkman v. Mazda Motor of America, Inc. (OPIF #10001427);

    J.    Mosley v. Performance Mitsubishi aka Automanage (OPIF #10001326); and

    K.    Walls v. Harry Williams dba Butch's Auto Sales (OPIF #10001524).

2171.    Defendants owed Plaintiffs and the Ohio State Class a duty to disclose the illegality, public health and safety risks, the true nature of the Class Vehicles, because Defendants:

    A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

    B.    intentionally concealed the foregoing from regulators, Plaintiffs, and/or Class members; and/or

    C.    made incomplete representations about the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1    2172.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

2    characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to

3    Plaintiffs and the Ohio State Class.

4    2173.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

5    deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

6    cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

7    of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

8    2174.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

9    general public. Defendants' unlawful acts and practices complained of herein affect the public

10   interest.

11   2175.   Plaintiffs and the Ohio State Class suffered ascertainable loss and actual damages

12   as a direct and proximate result of Defendants' misrepresentations and its concealment of and

13   failure to disclose material information. Plaintiffs and the Ohio State Class members who

14   purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if

15   the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to

16   sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of

17   their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all their

18   customers to refrain from unfair and deceptive practices under the Ohio CSPA. All owners of

19   Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as

20   a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants'

21   business.

22   2176.   Pursuant to Ohio Rev. Code § 1345.09, Plaintiffs and the Ohio State Class seek an

23   order enjoining Defendants' unfair and/or deceptive acts or practices, actual damages - trebled,

24   and attorneys' fees, costs, and any other just and proper relief, to the extend available under the

25   Ohio CSPA.

26

27

28

**OHIO COUNT II:**
**Violations of the Ohio Deceptive Trade Practices Act**
**Ohio Rev. Code § 4165.01 *et seq.***
**(On Behalf of the Ohio State Class)**

2177.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2178.   This count is brought on behalf of the Ohio State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

2179.   Defendants, Plaintiffs and the Ohio State Class are "persons" within the meaning of Ohio Rev. Code § 4165.01(D).

2180.   Defendants engaged in "the course of [its] business" within the meaning of Ohio Rev. Code § 4165.02(A) with respect to the acts alleged herein.

2181.   The Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.02(A) ("Ohio DTPA") provides that a "person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation," the person does any of the following: "(2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; … (7) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; … (9) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; … [or] (11) Advertises goods or services with intent not to sell them as advertised."

2182.   In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

2183.   Ohio State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs and Ohio State Class members did not and could not unravel Defendants' deception on their own.

2184.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

2185.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the Ohio DTPA.

2186.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Ohio State Class.

2187.   Defendants knew or should have known that their conduct violated the Ohio DTPA.

2188.   Defendants owed Plaintiffs and the Ohio State Class a duty to disclose the illegality, public health and safety risks, the true nature of the Class Vehicles, because Defendants:

       A.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

       B.     intentionally concealed the foregoing from regulators, Plaintiffs, and/or Class members; and/or

1           C.      made incomplete representations about the Class Vehicles generally, and

2    the use of the defeat device in particular, while purposefully withholding material facts from

3    Plaintiffs that contradicted these representations.

4         2189.  Defendants' fraudulent use of the "defeat device" and its concealment of the true

5    characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to

6    Plaintiffs and the Ohio State Class.

7         2190.  Defendants' unfair or deceptive acts or practices were likely to and did in fact

8    deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

9    cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

10   of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

11        2191.  Defendants' violations present a continuing risk to Plaintiffs as well as to the

12   general public. Defendants' unlawful acts and practices complained of herein affect the public

13   interest.

14        2192.  Plaintiffs and the Ohio State Class suffered ascertainable loss and actual damages

15   as a direct and proximate result of Defendants' misrepresentations and its concealment of and

16   failure to disclose material information. Plaintiffs and the Ohio State Class members who

17   purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if

18   the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to

19   sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of

20   their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all their

21   customers to refrain from unfair and deceptive practices under the Ohio DTPA. All owners of

22   Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as

23   a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants'

24   business.

25        2193.  Pursuant to Ohio Rev. Code § 4165.03, Plaintiffs and the Ohio State Class seek an

26   order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages,

27   and attorneys' fees, costs, and any other just and proper relief available under the Ohio DTPA.

28

**OHIO COUNT III:**
**Breach of Express Warranty**
**Ohio. Rev. Code § 1302.26, *et seq.* / U.C.C. § 2-313**
**(On Behalf of the Ohio State Class)**

2194.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

2195.   This count is brought on behalf of the Ohio State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

2196.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and "sellers" of motor vehicles under § 1302.01(4).

2197.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Ohio Rev. Code § 1310.01(A)(20).

2198.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code §§ 1302.01(8), and 1310.01(A)(8).

2199.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

2200.   Defendants also made numerous representations, descriptions, and promises to Plaintiffs and Ohio State Class members regarding the performance and emission controls of their vehicles.

2201.   For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

1372049.6

AUDI CO$_2$ CONSOLIDATED
CLASS ACTION COMPLAINT
MDL 2672 CRB (JSC)

Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:

– was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
– is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

2202.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2203.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2204.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

1   first, or, for the major emission control components, for eight years or 80,000 miles, whichever

2   comes first.

3        2205.   As manufacturers of light-duty vehicles, Defendants were required to provide

4   these warranties to purchasers or lessees of Class Vehicles.

5        2206.   Defendants' warranties formed a basis of the bargain that was reached when Ohio

6   State Class members purchased or leased Class Vehicles that are equipped with a defeat device

7   and non-compliant emission systems.

8        2207.   Despite the existence of warranties, Defendants failed to inform Ohio State Class

9   members that the Class Vehicles were intentionally designed and manufactured to be out of

10  compliance with applicable state and federal emissions laws, and failed to fix the defective

11  emission components free of charge.

12       2208.   Defendants breached the express warranty promising to repair and correct

13  Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

14  have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

15       2209.   Affording Defendants a reasonable opportunity to cure their breach of written

16  warranties would be unnecessary and futile here.

17       2210.   Furthermore, the limited warranty promising to repair and correct Defendants'

18  defect in materials and workmanship fails in its essential purpose because the contractual remedy

19  is insufficient to make Ohio State Class members whole and because Defendants have failed

20  and/or have refused to adequately provide the promised remedies within a reasonable time.

21       2211.   Accordingly, recovery by the Ohio State Class members is not restricted to the

22  limited warranty promising to repair and correct Defendants' defect in materials and

23  workmanship, and they seek all remedies as allowed by law.

24       2212.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

25  or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

26  not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

27  material facts regarding the Class Vehicles. Ohio State Class members were therefore induced to

28  purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1   2213.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

2   resolved through the limited remedy of repairing and correcting Defendants' defect in materials

3   and workmanship as many incidental and consequential damages have already been suffered

4   because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

5   continued failure to provide such limited remedy within a reasonable time, and any limitation on

6   the Ohio State Class members' remedies would be insufficient to make them whole.

7   2214.   Finally, because of Defendants' breach of warranty as set forth herein, Ohio State

8   Class members assert, as additional and/or alternative remedies, the revocation of acceptance of

9   the goods and the return to them the purchase or lease price of all Class Vehicles currently owned

10  or leased, and for such other incidental and consequential damages as allowed.

11  2215.   Defendants were provided notice of these issues by numerous complaints filed

12  against them, including the instant Complaint, within a reasonable amount of time.

13  2216.   As a direct and proximate result of Defendants' breach of express warranties, Ohio

14  State Class members have been damaged in an amount to be determined at trial.

15  **OHIO COUNT IV:**
16  **Breach of Implied Warranty of Merchantability**
    **Ohio Rev. Code Ann. §§ 1302.27 and 1310.19**
17  **(On Behalf of the Ohio State Class)**

18  2217.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding

19  paragraphs as though fully set forth herein.

20  2218.   This count is brought on behalf of the Ohio State Class against the Volkswagen

21  and Audi Defendants (collectively for this count, "Defendants").

22  2219.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

23  vehicles under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and "sellers" of motor

24  vehicles under § 1302.01(4).

25  2220.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

26  of motor vehicles under Ohio Rev. Code § 1310.01(A)(20).

27  2221.   The Class Vehicles are and were at all relevant times "goods" within the meaning

28  of Ohio Rev. Code §§ 1302.01(8), and 1310.01(A)(8).

2222.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ohio Rev. Code §§ 1302.27 and 1310.19.

2223.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

2224.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2225.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Ohio State Class members have been damaged in an amount to be proven at trial.

**OKLAHOMA COUNT I:**
**Violations of the Oklahoma Consumer Protection Act**
**Okla. Stat. Tit. 15 § 751 *et seq.***
**(On Behalf of the Oklahoma State Class)**

2226.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2227.   This count is brought on behalf of the Oklahoma State Class against all Defendants.

2228.   Defendants, Plaintiffs and the Oklahoma State Class are "persons" within the meaning of Okla. Stat. Tit. 15 § 752.1.

2229.   Defendants engaged in "the course of [its] business" within the meaning of Okla. Stat. Tit. 15 § 752.3 with respect to the acts alleged herein.

2230.   The Oklahoma Consumer Protection Act ("Oklahoma CPA") prohibits, in the course of business: "mak[ing] a false or misleading representation, knowingly or with reason to know, as to the characteristics …, uses, [or] benefits, of the subject of a consumer transaction," or making a false representation, "knowingly or with reason to know, that the subject of a consumer

1    transaction is of a particular standard, style or model, if it is of another or "[a]dvertis[ing],

2    knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it

3    as advertised;" and otherwise committing "an unfair or deceptive trade practice." Okla. Stat. Tit.

4    753.

5         2231.   In the course of its business, Defendants concealed and suppressed material facts

6    concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

7    Class Vehicles that caused the vehicles to operate in a low emission test mode only during

8    emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

9    noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions

10   testing by way of deliberately induced false readings.

11        2232.   Oklahoma State Class members had no way of discerning that Defendants'

12   representations were false and misleading because Defendants' defeat device software was

13   extremely sophisticated technology. Plaintiffs and Oklahoma State Class members did not and

14   could not unravel Defendants' deception on their own.

15        2233.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

16   have characteristics, uses, benefits, and qualities which they do not have; representing that Class

17   Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

18   Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

19   a transaction involving Class Vehicles has been supplied in accordance with a previous

20   representation when it has not.

21        2234.   The Clean Air Act and EPA regulations require that automobiles limit their

22   emissions output to specified levels. These laws are intended for the protection of public health

23   and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

24   Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

25   installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

26   for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

27   Oklahoma CPA.

28

1    2235.   Defendants intentionally and knowingly misrepresented material facts regarding

2    the Class Vehicles with intent to mislead Plaintiffs and the Oklahoma State Class.

3    2236.   Defendants knew or should have known that their conduct violated the Oklahoma

4    CPA.

5    2237.   Defendants owed Plaintiffs and the Oklahoma State Class a duty to disclose the

6    illegality, public health and safety risks, the true nature of the Class Vehicles, because

7    Defendants:

8            A.    possessed exclusive knowledge that they were manufacturing, selling, and

9    distributing vehicles throughout the United States that did not comply with regulations;

10           B.    intentionally concealed the foregoing from regulators, Plaintiffs, and/or

11   Class members; and/or

12           C.    made incomplete representations about the Class Vehicles generally, and

13   the use of the defeat device in particular, while purposefully withholding material facts from

14   Plaintiffs that contradicted these representations.

15   2238.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

16   characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to

17   Plaintiffs and the Oklahoma State Class.

18   2239.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

19   deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

20   cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

21   of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

22   2240.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

23   general public. Defendants' unlawful acts and practices complained of herein affect the public

24   interest.

25   2241.   Plaintiffs and the Oklahoma State Class suffered ascertainable loss and actual

26   damages as a direct and proximate result of Defendants' misrepresentations and its concealment

27   of and failure to disclose material information. Plaintiffs and the Oklahoma State Class members

28   who purchased or leased the Class Vehicles would not have purchased or leased them at all

1    and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered

2    legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished

3    value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all

4    their customers to refrain from unfair and deceptive practices under the Oklahoma CPA. All

5    owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their

6    vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of

7    Defendants' business.

8         2242.   Pursuant to Okla. Stat. Tit. 15 § 761.1, Plaintiffs and the Oklahoma State Class

9    seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive

10   damages, and attorneys' fees, costs, and any other just and proper relief available under the

11   Oklahoma CPA.

12
                        **OKLAHOMA COUNT II:**
                      **Breach of Express Warranty**
13              **Okla. Stat. Tit. 12 §§ 2-313 and 2A-210**
                  **(On Behalf of the Oklahoma State Class)**
14

15        2243.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

16   fully set forth herein.

17        2244.   This count is brought on behalf of the Oklahoma State Class against the

18   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

19        2245.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

20   vehicles under Okla. Stat. Tit. 12A §§ 2-104(1) and 2-1103(3), and "sellers" of motor vehicles

21   under § 2A-103(1)(t).

22        2246.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

23   of motor vehicles under Okla. Stat. Tit. 12A § 2A-103(1)(p).

24        2247.   The Class Vehicles are and were at all relevant times "goods" within the meaning

25   of Okla. Stat. Tit. 12A §§ 2-105(1) and 2A-103(1)(h).

26        2248.   In connection with the purchase or lease of each one of its new vehicles,

27   Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

28

1    occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

2    materials or workmanship."

3        2249.   Defendants also made numerous representations, descriptions, and promises to

4    Plaintiffs and Oklahoma State Class members regarding the performance and emission controls of

5    their vehicles.

6        2250.   For example, as shown below, Defendants included in the warranty booklets for

7    some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped

8    so as to conform at the time of sale with all applicable regulations of the United States

9    Environmental Protection Agency."

10

11

12

13

14

15

16

17

18

> Audi of America, Inc., an operating unit of
> Volkswagen Group of America, Inc. ("Audi"),
> the authorized United States importer of Audi
> vehicles, warrants to the original retail pur-
> chaser or original lessee and any subsequent
> purchaser or lessee that every **model year
> 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to
>   conform at the time of sale with all applica-
>   ble regulations of the United States Environ-
>   mental Protection Agency (EPA), and
> – is free from defects in material and work-
>   manship which causes the vehicle to fail to
>   conform with EPA regulations for 2 years af-
>   ter the date of first use or delivery of the ve-
>   hicle to the original retail purchaser or origi-
>   nal lessee or until the vehicle has been driv-
>   en 24,000 miles, whichever occurs first.

19        2251.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide

20    two federal emission control warranties: a "Performance Warranty" and a "Design and Defect

21    Warranty."

22        2252.   The EPA requires vehicle manufacturers to provide a Performance Warranty with

23    respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

24    its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

25    required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

26    whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

27    emission control components are covered for the first eight years or 80,000 miles (whichever

28    comes first). These major emission control components subject to the longer warranty include the

catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2253.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2254.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

2255.   Defendants' warranties formed a basis of the bargain that was reached when Oklahoma State Class members purchased or leased Class Vehicles that are equipped with a defeat device and non-compliant emission systems.

2256.   Despite the existence of warranties, Defendants failed to inform Oklahoma State Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2257.   Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2258.   Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

2259.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Oklahoma State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1    2260.  Accordingly, recovery by the Oklahoma State Class members is not restricted to

2  the limited warranty promising to repair and correct Defendants' defect in materials and

3  workmanship, and they seek all remedies as allowed by law.

4    2261.  Also, as alleged in more detail herein, at the time Defendants warranted and sold

5  or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

6  not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

7  material facts regarding the Class Vehicles. Oklahoma State Class members were therefore

8  induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

9    2262.  Moreover, many of the injuries flowing from the Class Vehicles cannot be

10  resolved through the limited remedy of repairing and correcting Defendants' defect in materials

11  and workmanship as many incidental and consequential damages have already been suffered

12  because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

13  continued failure to provide such limited remedy within a reasonable time, and any limitation on

14  the Oklahoma State Class members' remedies would be insufficient to make them whole.

15    2263.  Finally, because of Defendants' breach of warranty as set forth herein, Oklahoma

16  State Class members assert, as additional and/or alternative remedies, the revocation of

17  acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

18  currently owned or leased, and for such other incidental and consequential damages as allowed.

19    2264.  Defendants were provided notice of these issues by numerous complaints filed

20  against them, including the instant Complaint, within a reasonable amount of time.

21    2265.  As a direct and proximate result of Defendants' breach of express warranties,

22  Oklahoma State Class members have been damaged in an amount to be determined at trial.

23
**OKLAHOMA COUNT III:**
**Breach of Implied Warranty of Merchantability**
24          **Okla. Stat. Tit. 12A §§ 2-314 and 2A-212**
**(On Behalf of the Oklahoma State Class)**
25

26    2266.  Plaintiffs re-allege and incorporate by reference all allegations of the preceding

27  paragraphs as though fully set forth herein.

28

1    2267.   This count is brought on behalf of the Oklahoma State Class against the

2    Volkswagen and Audi Defendants (collectively for this count, "Defendants").

3    2268.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

4    vehicles under Okla. Stat. Tit. 12A §§ 2-104(1) and 2-1103(3), and "sellers" of motor vehicles

5    under § 2A-103(1)(t).

6    2269.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

7    of motor vehicles under Okla. Stat. Tit. 12A § 2A-103(1)(p).

8    2270.   The Class Vehicles are and were at all relevant times "goods" within the meaning

9    of Okla. Stat. Tit. 12A §§ 2-105(1) and 2A-103(1)(h).

10    2271.   A warranty that the Class Vehicles were in merchantable condition and fit for the

11    ordinary purpose for which vehicles are used is implied by law pursuant to Okla. Stat. Tit. 12A

12    §§ 2-314 and 2A-212.

13    2272.   These Class Vehicles, when sold or leased and at all times thereafter, were not in

14    merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

15    Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat

16    device and do not comply with federal and state emissions standards, rendering certain emissions

17    functions inoperative.

18    2273.   Defendants were provided notice of these issues by the investigations of the EPA

19    and California state regulators, and numerous complaints filed against it including the instant

20    complaint, within a reasonable amount of time.

21    2274.   As a direct and proximate result of Defendants' breach of the implied warranty of

22    merchantability, Oklahoma State Class members have been damaged in an amount to be proven

23    at trial.

24                          **OREGON COUNT I:**
                  **Violations of the Oregon Unlawful Trade Practices Act**
25                      **Or. Rev. Stat. § 646.605, *et seq.***
                      **(On Behalf of the Oregon State Class)**
26

27    2275.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

28    forth herein.

1     2276.   This count is brought on behalf of the Oregon State Class against all Defendants.

2     2277.   Defendants, Plaintiffs and the Oregon State Class are "persons" within the

3     meaning of Or. Rev. Stat. § 646.605(4).

4     2278.   Defendants are engaged in "trade" or "commerce" within the meaning of Or. Rev.

5     Stat. § 646.605(8).

6     2279.   The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits "unfair or

7     deceptive acts conduct in trade or commerce …." Or. Rev. Stat. § 646.608(1).

8     2280.   In the course of its business, Defendants concealed and suppressed material facts

9     concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

10    Class Vehicles that caused the vehicles to operate in a low emission test mode only during

11    emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

12    noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions

13    testing by way of deliberately induced false readings.

14    2281.   Oregon State Class members had no way of discerning that Defendants'

15    representations were false and misleading because Defendants' defeat device software was

16    extremely sophisticated technology. Plaintiffs and Oregon State Class members did not and could

17    not unravel Defendants' deception on their own.

18    2282.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

19    have characteristics, uses, benefits, and qualities which they do not have; representing that Class

20    Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

21    Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

22    a transaction involving Class Vehicles has been supplied in accordance with a previous

23    representation when it has not.

24    2283.   The Clean Air Act and EPA regulations require that automobiles limit their

25    emissions output to specified levels. These laws are intended for the protection of public health

26    and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

27    Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

28    installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

1    for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

2    Oregon UTPA.

3         2284.   Defendants intentionally and knowingly misrepresented material facts regarding

4    the Class Vehicles with intent to mislead Plaintiffs and the Oregon State Class.

5         2285.   Defendants knew or should have known that their conduct violated the Oregon

6    UTPA.

7         2286.   Defendants owed Plaintiffs and the Oregon State Class a duty to disclose the

8    illegality, public health and safety risks, the true nature of the Class Vehicles, because

9    Defendants:

10             A.    possessed exclusive knowledge that they were manufacturing, selling, and

11   distributing vehicles throughout the United States that did not comply with regulations;

12             B.    intentionally concealed the foregoing from regulators, Plaintiffs, and/or

13   Class members; and/or

14             C.    made incomplete representations about the Class Vehicles generally, and

15   the use of the defeat device in particular, while purposefully withholding material facts from

16   Plaintiffs that contradicted these representations.

17        2287.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

18   characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to

19   Plaintiffs and the Oregon State Class.

20        2288.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

21   deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

22   cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

23   of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

24        2289.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

25   general public. Defendants' unlawful acts and practices complained of herein affect the public

26   interest.

27        2290.   Plaintiffs and the Oregon State Class suffered ascertainable loss and actual

28   damages as a direct and proximate result of Defendants' misrepresentations and its concealment

1    of and failure to disclose material information. Plaintiffs and the Oregon State Class members

2    who purchased or leased the Class Vehicles would not have purchased or leased them at all

3    and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered

4    legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished

5    value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all

6    their customers to refrain from unfair and deceptive practices under the Oregon UTPA. All

7    owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their

8    vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of

9    Defendants' business.

10       2291.  Pursuant to Or. Rev. Stat. § 646.638, Plaintiffs and the Oregon State Class seek an

11   order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages,

12   and attorneys' fees, costs, and any other just and proper relief available under the Oregon UTPA.

13                       **OREGON COUNT II:**
                         **Breach of Express Warranty**
14                   **Or. Rev. Stat. §§ 72.3130 and 72A.2100**
                     **(On Behalf of the Oregon State Class)**
15

16       2292.  Plaintiffs re-allege and incorporate by reference all preceding allegations as though

17   fully set forth herein.

18       2293.  This count is brought on behalf of the Oregon State Class against the Volkswagen

19   and Audi Defendants (collectively for this count, "Defendants").

20       2294.  Defendants are and were at all relevant times "merchant[s]" with respect to motor

21   vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and "sellers" of motor vehicles

22   under § 72.1030(1)(d).

23       2295.  With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

24   of motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

25       2296.  The Class Vehicles are and were at all relevant times "goods" within the meaning

26   of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

27       2297.  In connection with the purchase or lease of each one of its new vehicles,

28   Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

1   occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

2   materials or workmanship."

3       2298.   Defendants also made numerous representations, descriptions, and promises to

4   Plaintiffs and Oregon State Class members regarding the performance and emission controls of

5   their vehicles.

6       2299.   For example, as shown below, Defendants included in the warranty booklets for

7   some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped

8   so as to conform at the time of sale with all applicable regulations of the United States

9   Environmental Protection Agency."

10

11

12

13

14

15

16

17

18

> Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
> – is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

19       2300.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide

20   two federal emission control warranties: a "Performance Warranty" and a "Design and Defect

21   Warranty."

22       2301.   The EPA requires vehicle manufacturers to provide a Performance Warranty with

23   respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

24   its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

25   required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

26   whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

27   emission control components are covered for the first eight years or 80,000 miles (whichever

28   comes first). These major emission control components subject to the longer warranty include the

1   catalytic converters, the electronic emission control unit, and the onboard emission diagnostic
2   device or computer.

3       2302.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties
4   with respect to their vehicles' emission systems. Thus, Defendants also provide an express
5   warranty for their vehicles through a Federal Emission Control System Defect Warranty. The
6   Design and Defect Warranty required by the EPA covers repair of emission control or emission
7   related parts, which fail to function or function improperly because of a defect in materials or
8   workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes
9   first, or, for the major emission control components, for eight years or 80,000 miles, whichever
10  comes first.

11      2303.   As manufacturers of light-duty vehicles, Defendants were required to provide
12  these warranties to purchasers or lessees of Class Vehicles.

13      2304.   Defendants' warranties formed a basis of the bargain that was reached when
14  Oregon State Class members purchased or leased Class Vehicles that are equipped with a defeat
15  device and non-compliant emission systems.

16      2305.   Despite the existence of warranties, Defendants failed to inform Oregon State
17  Class members that the Class Vehicles were intentionally designed and manufactured to be out of
18  compliance with applicable state and federal emissions laws, and failed to fix the defective
19  emission components free of charge.

20      2306.   Defendants breached the express warranty promising to repair and correct
21  Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and
22  have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

23      2307.   Affording Defendants a reasonable opportunity to cure their breach of written
24  warranties would be unnecessary and futile here.

25      2308.   Furthermore, the limited warranty promising to repair and correct Defendants'
26  defect in materials and workmanship fails in its essential purpose because the contractual remedy
27  is insufficient to make Oregon State Class members whole and because Defendants have failed
28  and/or have refused to adequately provide the promised remedies within a reasonable time.

1      2309.   Accordingly, recovery by the Oregon State Class members is not restricted to the

2   limited warranty promising to repair and correct Defendants' defect in materials and

3   workmanship, and they seek all remedies as allowed by law.

4      2310.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

5   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

6   not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

7   material facts regarding the Class Vehicles. Oregon State Class members were therefore induced

8   to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

9      2311.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

10   resolved through the limited remedy of repairing and correcting Defendants' defect in materials

11   and workmanship as many incidental and consequential damages have already been suffered

12   because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

13   continued failure to provide such limited remedy within a reasonable time, and any limitation on

14   the Oregon State Class members' remedies would be insufficient to make them whole.

15      2312.   Finally, because of Defendants' breach of warranty as set forth herein, Oregon

16   State Class members assert, as additional and/or alternative remedies, the revocation of

17   acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

18   currently owned or leased, and for such other incidental and consequential damages as allowed.

19      2313.   Defendants were provided notice of these issues by numerous complaints filed

20   against them, including the instant Complaint, within a reasonable amount of time.

21      2314.   As a direct and proximate result of Defendants' breach of express warranties,

22   Oregon State Class members have been damaged in an amount to be determined at trial.

23                          **OREGON COUNT III:**
                    **Breach of Implied Warranty of Merchantability**
24                      **Or. Rev. Stat. §§ 72.3140 and 72A.2120**
                        **(On Behalf of the Oregon State Class)**
25

26      2315.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding

27   paragraphs as though fully set forth herein.

28

1      2316.   This count is brought on behalf of the Oregon State Class against the Volkswagen

2  and Audi Defendants (collectively for this count, "Defendants").

3      2317.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

4  vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and "sellers" of motor vehicles

5  under § 72.1030(1)(d).

6      2318.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

7  of motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

8      2319.   The Class Vehicles are and were at all relevant times "goods" within the meaning

9  of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

10      2320.   A warranty that the Class Vehicles were in merchantable condition and fit for the

11  ordinary purpose for which vehicles are used is implied by law pursuant to Or. Rev. Stat.

12  §§ 72.3140 and 72A-2120.

13      2321.   These Class Vehicles, when sold or leased and at all times thereafter, were not in

14  merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

15  Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat

16  device and do not comply with federal and state emissions standards, rendering certain emissions

17  functions inoperative.

18      2322.   Defendants were provided notice of these issues by the investigations of the EPA

19  and California state regulators, and numerous complaints filed against it including the instant

20  complaint, within a reasonable amount of time.

21      2323.   As a direct and proximate result of Defendants' breach of the implied warranty of

22  merchantability, Oregon State Class members have been damaged in an amount to be proven at

23  trial.

24  **PENNSYLVANIA COUNT I:**
**Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law**
25  **73 P.S. § 201-1 *et seq.***
**(On Behalf of the Pennsylvania State Class)**
26

27      2324.   Plaintiffs incorporate by reference all allegations in this Complaint as though fully

28  set forth herein.

1       2325.   This count is brought on behalf of the Pennsylvania State Class against all

2   Defendants.

3       2326.   Defendants, Plaintiffs and the Pennsylvania State Class are "persons" within the

4   meaning of 73 P.S. § 201-2(2).

5       2327.   Defendants engaged in "trade" or "commerce" within the meaning of 73 P.S.

6   § 201-2(3).

7       2328.   The Pennsylvania Unfair Trade Practices Act ("Pennsylvania UTPA") prohibits

8   "unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 P.S. § 201 3.

9       2329.   In the course of its business, Defendants concealed and suppressed material facts

10  concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

11  Class Vehicles that caused the vehicles to operate in a low emission test mode only during

12  emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

13  noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions

14  testing by way of deliberately induced false readings.

15      2330.   Pennsylvania State Class members had no way of discerning that Defendants'

16  representations were false and misleading because Defendants' defeat device software was

17  extremely sophisticated technology. Plaintiffs and Pennsylvania State Class members did not and

18  could not unravel Defendants' deception on their own.

19      2331.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

20  have characteristics, uses, benefits, and qualities which they do not have; representing that Class

21  Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

22  Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

23  a transaction involving Class Vehicles has been supplied in accordance with a previous

24  representation when it has not.

25      2332.   The Clean Air Act and EPA regulations require that automobiles limit their

26  emissions output to specified levels. These laws are intended for the protection of public health

27  and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

28  Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

1   installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

2   for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

3   Pennsylvania UTPA.

4       2333.   Defendants intentionally and knowingly misrepresented material facts regarding

5   the Class Vehicles with intent to mislead Plaintiffs and the Pennsylvania State Class.

6       2334.   Defendants knew or should have known that their conduct violated the

7   Pennsylvania UTPA.

8       2335.   Defendants owed Plaintiffs and the Pennsylvania State Class a duty to disclose the

9   illegality, public health and safety risks, the true nature of the Class Vehicles, because

10  Defendants:

11          A.      possessed exclusive knowledge that they were manufacturing, selling, and

12  distributing vehicles throughout the United States that did not comply with regulations;

13          B.      intentionally concealed the foregoing from regulators, Plaintiffs, and/or

14  Class members; and/or

15          C.      made incomplete representations about the Class Vehicles generally, and

16  the use of the defeat device in particular, while purposefully withholding material facts from

17  Plaintiffs that contradicted these representations.

18      2336.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

19  characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to

20  Plaintiffs and the Pennsylvania State Class.

21      2337.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

22  deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

23  cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

24  of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

25      2338.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

26  general public. Defendants' unlawful acts and practices complained of herein affect the public

27  interest.

28

1    2339.   Plaintiffs and the Pennsylvania State Class suffered ascertainable loss and actual

2    damages as a direct and proximate result of Defendants' misrepresentations and its concealment

3    of and failure to disclose material information. Plaintiffs and the Pennsylvania State Class

4    members who purchased or leased the Class Vehicles would not have purchased or leased them at

5    all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles

6    rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered

7    diminished value of their vehicles, as well as lost or diminished use. Defendants had an ongoing

8    duty to all their customers to refrain from unfair and deceptive practices under the Pennsylvania

9    UTPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished

10   value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in

11   the course of Defendants' business.

12   2340.   As a direct and proximate result of Defendants' violations of the Pennsylvania

13   UTPA, Plaintiffs and the Pennsylvania State Class have suffered injury-in-fact and/or actual

14   damage.

15   2341.   Pursuant to 73 P.S. § 201-9.2(a), Plaintiffs and the Pennsylvania State Class seek

16   an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive

17   damages, and attorneys' fees, costs, and any other just and proper relief available under the

18   Pennsylvania UTPA.

19                              **PENNSYLVANIA COUNT II:**
                                **Breach of Express Warranty**
20                              **13. Pa. Cons. Stat. §§ 2313 and 2A210**
                                **(On Behalf of the Pennsylvania State Class)**
21

22   2342.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

23   fully set forth herein.

24   2343.   This count is brought on behalf of the Pennsylvania State Class against the

25   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

26   2344.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

27   vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and "sellers" of motor vehicles under

28   § 2103(a).

2345.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

2346.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

2347.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

2348.   Defendants also made numerous representations, descriptions, and promises to Plaintiffs and Pennsylvania State Class members regarding the performance and emission controls of their vehicles.

2349.   For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

> Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
> – is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

2350.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2351.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2352.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2353.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

2354.   Defendants' warranties formed a basis of the bargain that was reached when Pennsylvania State Class members purchased or leased Class Vehicles that are equipped with a defeat device and non-compliant emission systems.

2355.   Despite the existence of warranties, Defendants failed to inform Pennsylvania State Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1    2356.   Defendants breached the express warranty promising to repair and correct

2    Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

3    have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

4    2357.   Affording Defendants a reasonable opportunity to cure their breach of written

5    warranties would be unnecessary and futile here.

6    2358.   Furthermore, the limited warranty promising to repair and correct Defendants'

7    defect in materials and workmanship fails in its essential purpose because the contractual remedy

8    is insufficient to make Pennsylvania State Class members whole and because Defendants have

9    failed and/or have refused to adequately provide the promised remedies within a reasonable time.

10    2359.   Accordingly, recovery by the Pennsylvania State Class members is not restricted

11    to the limited warranty promising to repair and correct Defendants' defect in materials and

12    workmanship, and they seek all remedies as allowed by law.

13    2360.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

14    or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

15    not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

16    material facts regarding the Class Vehicles. Pennsylvania State Class members were therefore

17    induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

18    2361.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

19    resolved through the limited remedy of repairing and correcting Defendants' defect in materials

20    and workmanship as many incidental and consequential damages have already been suffered

21    because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

22    continued failure to provide such limited remedy within a reasonable time, and any limitation on

23    the Pennsylvania State Class members' remedies would be insufficient to make them whole.

24    2362.   Finally, because of Defendants' breach of warranty as set forth herein,

25    Pennsylvania State Class members assert, as additional and/or alternative remedies, the

26    revocation of acceptance of the goods and the return to them the purchase or lease price of all

27    Class Vehicles currently owned or leased, and for such other incidental and consequential

28    damages as allowed.

1    2363.   Defendants were provided notice of these issues by numerous complaints filed

2    against them, including the instant Complaint, within a reasonable amount of time.

3    2364.   As a direct and proximate result of Defendants' breach of express warranties,

4    Pennsylvania State Class members have been damaged in an amount to be determined at trial.

5                            **PENNSYLVANIA COUNT III:**
                  **Breach of Implied Warranty of Merchantability**
6                    **13. Pa. Cons. Stat. §§ 2314 and 2A212**
                    **(On Behalf of the Pennsylvania State Class)**
7

8    2365.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding

9    paragraphs as though fully set forth herein.

10   2366.   This count is brought on behalf of the Pennsylvania State Class against the

11   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

12   2367.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

13   vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and "sellers" of motor vehicles under

14   § 2103(a).

15   2368.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

16   of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

17   2369.   The Class Vehicles are and were at all relevant times "goods" within the meaning

18   of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

19   2370.   A warranty that the Class Vehicles were in merchantable condition and fit for the

20   ordinary purpose for which vehicles are used is implied by law pursuant to 13 Pa. Cons. Stat.

21   §§ 2314 and 2A212.

22   2371.   These Class Vehicles, when sold or leased and at all times thereafter, were not in

23   merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

24   Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat

25   device and do not comply with federal and state emissions standards, rendering certain emissions

26   functions inoperative.

27

28

1       2372.   Defendants were provided notice of these issues by the investigations of the EPA

2   and California state regulators, and numerous complaints filed against it including the instant

3   complaint, within a reasonable amount of time.

4       2373.   As a direct and proximate result of Defendants' breach of the implied warranty of

5   merchantability, Pennsylvania State Class members have been damaged in an amount to be

6   proven at trial.

7   **RHODE ISLAND COUNT I:**

**Violations of the Rhode Island Deceptive Trade Practices and Consumer Protection Law**
8   **R.I. Gen. Laws § 6-13.1 *et seq.***
**(On Behalf of the Rhode Island State Class)**
9

10      2374.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

11  forth herein.

12      2375.   This count is brought on behalf of the Rhode Island State Class against all

13  Defendants.

14      2376.   Defendants, Plaintiffs and the Rhode Island State Class are "persons" within the

15  meaning of R.I. Gen. Laws § 6-13.1-1(3).

16      2377.   Defendants are engaged in "trade" or "commerce" within the meaning of R.I. Gen.

17  Laws § 6-13.1-1(5).

18      2378.   The Rhode Island Deceptive Trade Practices Act ("Rhode Island DTPA")

19  prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce"

20  including: (v) [r]epresenting that goods or services have sponsorship, approval, characteristics,

21  ingredients, uses, benefits, or quantities that they do not have"; "(vii) [r]epresenting that goods or

22  services are of a particular standard, quality, or grade …, if they are of another"; (ix) [a]dvertising

23  goods or services with intent not to sell them as advertised"; "(xiii) [u]sing any other methods,

24  acts or practices which mislead or deceive members of the public in a material respect." R.I. Gen.

25  Laws § 6-13.1-1(6).

26      2379.   In the course of its business, Defendants concealed and suppressed material facts

27  concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

28  Class Vehicles that caused the vehicles to operate in a low emission test mode only during

emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

2380.  Rhode Island State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs and Rhode Island State Class members did not and could not unravel Defendants' deception on their own.

2381.  Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

2382.  The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the Rhode Island DTPA.

2383.  Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Rhode Island State Class.

2384.  Defendants knew or should have known that their conduct violated the Rhode Island DTPA.

2385.  Defendants owed Plaintiffs and the Rhode Island State Class a duty to disclose the illegality, public health and safety risks, the true nature of the Class Vehicles, because Defendants:

A.      possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

B.      intentionally concealed the foregoing from regulators, Plaintiffs, and/or Class members; and/or

C.      made incomplete representations about the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2386.   Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to Plaintiffs and the Rhode Island State Class.

2387.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

2388.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2389.   Plaintiffs and the Rhode Island State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Rhode Island State Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Rhode Island DTPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1    2390.   Plaintiffs and the Rhode Island State Class are entitled to recover the greater of

2  actual damages or $200 pursuant to R.I. Gen. Laws § 6-13.1-5.2(a). Plaintiffs and the Rhode

3  Island State Class are also entitled to punitive damages because Defendants engaged in conduct

4  amounting to a particularly aggravated, deliberate disregard of the rights of others.

**RHODE ISLAND COUNT II:**
**Breach of Express Warranty**
**6A R.I. Gen. Laws §§ 6A-2-313 and 6A-2.1-210**
**(On Behalf of the Rhode Island State Class)**

8    2391.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

9  fully set forth herein.

10    2392.   This count is brought on behalf of the Rhode Island State Class against the

11  Volkswagen and Audi Defendants (collectively for this count, "Defendants").

12    2393.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

13  vehicles under 6A R.I. Gen. Laws §§ 6A-2-104(1) and 6A-2.1-103(1)(t), and "sellers" of motor

14  vehicles under § 6A-2-103(a)(4).

15    2394.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

16  of motor vehicles under 6A R.I. Gen. Laws § 6A-2.1-103(1)(p).

17    2395.   The Class Vehicles are and were at all relevant times "goods" within the meaning

18  of 6A R.I. Gen. Laws §§ 6A-2-105(1) and 6A-2.1-103(1)(h).

19    2396.   In connection with the purchase or lease of each one of its new vehicles,

20  Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

21  occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

22  materials or workmanship."

23    2397.   Defendants also made numerous representations, descriptions, and promises to

24  Plaintiffs and Rhode Island State Class members regarding the performance and emission

25  controls of their vehicles.

26    2398.   For example, as shown below, Defendants included in the warranty booklets for

27  some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped

28

1  so as to conform at the time of sale with all applicable regulations of the United States

2  Environmental Protection Agency."

> Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
> – is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

12      2399.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide

13  two federal emission control warranties: a "Performance Warranty" and a "Design and Defect

14  Warranty."

15      2400.   The EPA requires vehicle manufacturers to provide a Performance Warranty with

16  respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

17  its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

18  required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

19  whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

20  emission control components are covered for the first eight years or 80,000 miles (whichever

21  comes first). These major emission control components subject to the longer warranty include the

22  catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

23  device or computer.

24      2401.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

25  with respect to their vehicles' emission systems. Thus, Defendants also provide an express

26  warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

27  Design and Defect Warranty required by the EPA covers repair of emission control or emission

28  related parts, which fail to function or function improperly because of a defect in materials or

workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2402.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

2403.   Defendants' warranties formed a basis of the bargain that was reached when Rhode Island State Class members purchased or leased Class Vehicles that are equipped with a defeat device and non-compliant emission systems.

2404.   Despite the existence of warranties, Defendants failed to inform Rhode Island State Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2405.   Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2406.   Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

2407.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Rhode Island State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2408.   Accordingly, recovery by the Rhode Island State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

2409.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

1    material facts regarding the Class Vehicles. Rhode Island State Class members were therefore

2    induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

3        2410.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

4    resolved through the limited remedy of repairing and correcting Defendants' defect in materials

5    and workmanship as many incidental and consequential damages have already been suffered

6    because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

7    continued failure to provide such limited remedy within a reasonable time, and any limitation on

8    the Rhode Island State Class members' remedies would be insufficient to make them whole.

9        2411.   Finally, because of Defendants' breach of warranty as set forth herein, Rhode

10   Island State Class members assert, as additional and/or alternative remedies, the revocation of

11   acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

12   currently owned or leased, and for such other incidental and consequential damages as allowed.

13       2412.   Defendants were provided notice of these issues by numerous complaints filed

14   against them, including the instant Complaint, within a reasonable amount of time.

15       2413.   As a direct and proximate result of Defendants' breach of express warranties,

16   Rhode Island State Class members have been damaged in an amount to be determined at trial.

17                       **RHODE ISLAND COUNT III:**
                  **Breach of Implied Warranty of Merchantability**
18                **6A R.I. Gen. Laws §§ 6A-2-314 and 6A-2.1-212**
                   **(On Behalf of the Rhode Island State Class)**
19

20       2414.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding

21   paragraphs as though fully set forth herein.

22       2415.   This count is brought on behalf of the Rhode Island State Class against the

23   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

24       2416.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

25   vehicles under 6A R.I. Gen. Laws §§ 6A-2-104(1) and 6A-2.1-103(1)(t), and "sellers" of motor

26   vehicles under § 6A-2-103(a)(4).

27       2417.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

28   of motor vehicles under 6A R.I. Gen. Laws § 6A-2.1-103(1)(p).

2418.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 6A R.I. Gen. Laws §§ 6A-2-105(1) and 6A-2.1-103(1)(h).

2419.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 6A R.I. Gen. Laws §§ 6A-2-314 and 6A-2.1-212.

2420.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

2421.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2422.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Rhode Island State Class members have been damaged in an amount to be proven at trial.

**SOUTH CAROLINA COUNT I:**
**Violations of the South Carolina Unfair Trade Practices Act**
**S.C. Code Ann. § 39-5-10 *et seq.***
**(On Behalf of the South Carolina State Class)**

2423.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2424.   This count is brought on behalf of the South Carolina State Class against all Defendants.

2425.   Defendants, Plaintiffs and the South Carolina State Class are "persons" within the meaning of S.C. Code § 39-5-10(a).

2426.   Defendants are engaged in "trade" or "commerce" within the meaning of S.C. Code § 39-5-10(b).

- 409 -

1       2427.   The South Carolina Unfair Trade Practices Act ("South Carolina UTPA")

2    prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C.

3    Code § 39-5-20(a).

4       2428.   In the course of its business, Defendants concealed and suppressed material facts

5    concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

6    Class Vehicles that caused the vehicles to operate in a low emission test mode only during

7    emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

8    noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions

9    testing by way of deliberately induced false readings.

10       2429.   South Carolina State Class members had no way of discerning that Defendants'

11    representations were false and misleading because Defendants' defeat device software was

12    extremely sophisticated technology. Plaintiffs and South Carolina State Class members did not

13    and could not unravel Defendants' deception on their own.

14       2430.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

15    have characteristics, uses, benefits, and qualities which they do not have; representing that Class

16    Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

17    Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

18    a transaction involving Class Vehicles has been supplied in accordance with a previous

19    representation when it has not.

20       2431.   The Clean Air Act and EPA regulations require that automobiles limit their

21    emissions output to specified levels. These laws are intended for the protection of public health

22    and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

23    Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

24    installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

25    for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

26    South Carolina UTPA.

27       2432.   Defendants intentionally and knowingly misrepresented material facts regarding

28    the Class Vehicles with intent to mislead Plaintiffs and the South Carolina State Class.

1   2433.   Defendants knew or should have known that their conduct violated the South

2   Carolina UTPA.

3   2434.   Defendants owed Plaintiffs and the South Carolina State Class a duty to disclose

4   the illegality, public health and safety risks, the true nature of the Class Vehicles, because

5   Defendants:

6        A.   possessed exclusive knowledge that they were manufacturing, selling, and

7   distributing vehicles throughout the United States that did not comply with regulations;

8        B.   intentionally concealed the foregoing from regulators, Plaintiffs, and/or

9   Class members; and/or

10       C.   made incomplete representations about the Class Vehicles generally, and

11  the use of the defeat device in particular, while purposefully withholding material facts from

12  Plaintiffs that contradicted these representations.

13  2435.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

14  characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to

15  Plaintiffs and the South Carolina State Class.

16  2436.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

17  deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

18  cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

19  of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

20  2437.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

21  general public. Defendants' unlawful acts and practices complained of herein affect the public

22  interest.

23  2438.   Plaintiffs and the South Carolina State Class suffered ascertainable loss and actual

24  damages as a direct and proximate result of Defendants' misrepresentations and its concealment

25  of and failure to disclose material information. Plaintiffs and the South Carolina State Class

26  members who purchased or leased the Class Vehicles would not have purchased or leased them at

27  all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles

28  rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered

1   diminished value of their vehicles, as well as lost or diminished use. Defendants had an ongoing

2   duty to all their customers to refrain from unfair and deceptive practices under the South Carolina

3   UTPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished

4   value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in

5   the course of Defendants' business.

6       2439.   Pursuant to S.C. Code § 39-5-140(a), Plaintiffs and the South Carolina State Class

7   seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, treble

8   damages for willful and knowing violations, punitive damages, and attorneys' fees, costs, and any

9   other just and proper relief available under the South Carolina UTPA.

10                    **SOUTH CAROLINA COUNT II:**
11   **Violations of the South Carolina Regulation of Manufacturers, Distributors, & Dealers Act
    S.C. Code Ann. § 56-15-10 *et seq.*
12   (On Behalf of the South Carolina State Class)**

13      2440.   Plaintiffs reallege and incorporates by reference all paragraphs as though fully set

14   forth herein.

15      2441.   This count is brought on behalf of the South Carolina State Class against the

16   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

17      2442.   Defendants are "manufacturer[s]" as set forth in S.C. Code Ann. § 56-15-10, as it

18   is engaged in the business of manufacturing or assembling new and unused motor vehicles.

19      2443.   Defendants committed unfair or deceptive acts or practices that violated the South

20   Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Dealers Act"), S.C. Code

21   Ann. § 56-15-30.

22      2444.   Defendants engaged in actions which were arbitrary, in bad faith, unconscionable,

23   and which caused damage to Plaintiffs, the South Carolina State Class, and to the public.

24      2445.   Defendants' bad faith and unconscionable actions include, but are not limited to:

25   (1) representing that Class Vehicles have characteristics, uses, benefits, and qualities which they

26   do not have, (2) representing that Class Vehicles are of a particular standard, quality, and grade

27   when they are not, (3) advertising Class Vehicles with the intent not to sell them as advertised, (4)

28   representing that a transaction involving Class Vehicles confers or involves rights, remedies, and

1    obligations which it does not, and (5) representing that the subject of a transaction involving

2    Class Vehicles has been supplied in accordance with a previous representation when it has not.

3          2446.   Defendants resorted to and used false and misleading advertisements in connection

4    with its business. As alleged above, Defendants made numerous material statements about the

5    safety, efficiency and reliability of the Class Vehicles that were either false or misleading. Each

6    of these statements contributed to the deceptive context of Defendants' unlawful advertising and

7    representations as a whole.

8          2447.   Pursuant to S.C. Code Ann. § 56-15-110(2), Plaintiffs bring this action on behalf

9    of themselves and the South Carolina State Class, as the action is one of common or general

10   interest to many persons and the parties are too numerous to bring them all before the court.

11         2448.   Plaintiffs and the South Carolina State Class are entitled to double their actual

12   damages, the cost of the suit, attorney's fees pursuant to S.C. Code Ann. § 56-15-110. Plaintiffs

13   also seek injunctive relief under S.C. Code Ann. § 56-15-110.  Plaintiffs also seeks treble

14   damages because Defendants acted maliciously.

**SOUTH CAROLINA COUNT III:**
**Breach of Express Warranty**
**S.C. Code §§ 36-2-313 and 36-2A-210**
**(On Behalf of the South Carolina State Class)**

18         2449.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

19   fully set forth herein.

20         2450.   This count is brought on behalf of the South Carolina State Class against the

21   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

22         2451.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

23   vehicles under S.C. Code §§ 36-2-104(1) and 36-2A-103(1)(t), and "sellers" of motor vehicles

24   under § 36-2-103(1)(d).

25         2452.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

26   of motor vehicles under S.C. Code § 36-2A-103(1)(p).

27         2453.   The Class Vehicles are and were at all relevant times "goods" within the meaning

28   of S.C. Code §§ 36-2-105(1) and 36-2A-103(1)(h).

1        2454.   In connection with the purchase or lease of each one of its new vehicles,

2    Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

3    occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

4    materials or workmanship."

5        2455.   Defendants also made numerous representations, descriptions, and promises to

6    Plaintiffs and South Carolina State Class members regarding the performance and emission

7    controls of their vehicles.

8        2456.   For example, as shown below, Defendants included in the warranty booklets for

9    some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped

10   so as to conform at the time of sale with all applicable regulations of the United States

11   Environmental Protection Agency."



Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:

– was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and

– is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

21       2457.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide

22   two federal emission control warranties: a "Performance Warranty" and a "Design and Defect

23   Warranty."

24       2458.   The EPA requires vehicle manufacturers to provide a Performance Warranty with

25   respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

26   its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

27   required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

28   whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

1    emission control components are covered for the first eight years or 80,000 miles (whichever

2    comes first). These major emission control components subject to the longer warranty include the

3    catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

4    device or computer.

5         2459.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

6    with respect to their vehicles' emission systems. Thus, Defendants also provide an express

7    warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

8    Design and Defect Warranty required by the EPA covers repair of emission control or emission

9    related parts, which fail to function or function improperly because of a defect in materials or

10   workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

11   first, or, for the major emission control components, for eight years or 80,000 miles, whichever

12   comes first.

13        2460.   As manufacturers of light-duty vehicles, Defendants were required to provide

14   these warranties to purchasers or lessees of Class Vehicles.

15        2461.   Defendants' warranties formed a basis of the bargain that was reached when South

16   Carolina State Class members purchased or leased Class Vehicles that are equipped with a defeat

17   device and non-compliant emission systems.

18        2462.   Despite the existence of warranties, Defendants failed to inform South Carolina

19   State Class members that the Class Vehicles were intentionally designed and manufactured to be

20   out of compliance with applicable state and federal emissions laws, and failed to fix the defective

21   emission components free of charge.

22        2463.   Defendants breached the express warranty promising to repair and correct

23   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

24   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

25        2464.   Affording Defendants a reasonable opportunity to cure their breach of written

26   warranties would be unnecessary and futile here.

27        2465.   Furthermore, the limited warranty promising to repair and correct Defendants'

28   defect in materials and workmanship fails in its essential purpose because the contractual remedy

1   is insufficient to make South Carolina State Class members whole and because Defendants have

2   failed and/or have refused to adequately provide the promised remedies within a reasonable time.

3        2466.   Accordingly, recovery by the South Carolina State Class members is not restricted

4   to the limited warranty promising to repair and correct Defendants' defect in materials and

5   workmanship, and they seek all remedies as allowed by law.

6        2467.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

7   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

8   not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

9   material facts regarding the Class Vehicles. South Carolina State Class members were therefore

10  induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

11       2468.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

12  resolved through the limited remedy of repairing and correcting Defendants' defect in materials

13  and workmanship as many incidental and consequential damages have already been suffered

14  because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

15  continued failure to provide such limited remedy within a reasonable time, and any limitation on

16  the South Carolina State Class members' remedies would be insufficient to make them whole.

17       2469.   Finally, because of Defendants' breach of warranty as set forth herein, South

18  Carolina State Class members assert, as additional and/or alternative remedies, the revocation of

19  acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

20  currently owned or leased, and for such other incidental and consequential damages as allowed.

21       2470.   Defendants were provided notice of these issues by numerous complaints filed

22  against them, including the instant Complaint, within a reasonable amount of time.

23       2471.   As a direct and proximate result of Defendants' breach of express warranties,

24  South Carolina State Class members have been damaged in an amount to be determined at trial.

25

26

27

28

**SOUTH CAROLINA COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**S.C. Code §§ 36-2-314 and 36-2A-212**
**(On Behalf of the South Carolina State Class)**

2472.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2473.   This count is brought on behalf of the South Carolina State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

2474.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under S.C. Code §§ 36-2-104(1) and 36-2A-103(1)(t), and "sellers" of motor vehicles under § 36-2-103(1)(d).

2475.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under S.C. Code § 36-2A-103(1)(p).

2476.   The Class Vehicles are and were at all relevant times "goods" within the meaning of S.C. Code §§ 36-2-105(1) and 36-2A-103(1)(h).

2477.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to S.C. Code §§ 36-2-314 and 36-2A-212.

2478.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

2479.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2480.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, South Carolina State Class members have been damaged in an amount to be proven at trial.

**SOUTH DAKOTA COUNT I:**
**Violations of the South Dakota Deceptive Trade Practices and Consumer Protection Law**
**S.D. Codified Laws § 37-24-6**
**(On Behalf of the South Dakota State Class)**

2481.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2482.   This count is brought on behalf of the South Dakota State Class against all Defendants.

2483.   Defendants, Plaintiffs and the South Dakota State Class are "persons" within the meaning of S.D. Codified Laws § 37-24-1(8).

2484.   Defendants are engaged in "trade" or "commerce" within the meaning of S.D. Codified Laws § 37-24-1(13).

2485.   The South Dakota Deceptive Trade Practices and Consumer Protection ("South Dakota CPA") prohibits "deceptive acts or practices, which are defined to include "[k]nowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby." S.D. Codified Laws § 37-24-6(1).

2486.   In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

2487.   South Dakota State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs and South Dakota State Class members did not and could not unravel Defendants' deception on their own.

1    2488.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

2    have characteristics, uses, benefits, and qualities which they do not have; representing that Class

3    Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

4    Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

5    a transaction involving Class Vehicles has been supplied in accordance with a previous

6    representation when it has not.

7    2489.   The Clean Air Act and EPA regulations require that automobiles limit their

8    emissions output to specified levels. These laws are intended for the protection of public health

9    and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

10   Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

11   installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

12   for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

13   South Dakota CPA.

14   2490.   Defendants intentionally and knowingly misrepresented material facts regarding

15   the Class Vehicles with intent to mislead Plaintiffs and the South Dakota State Class.

16   2491.   Defendants knew or should have known that their conduct violated the South

17   Dakota CPA.

18   2492.   Defendants owed Plaintiffs and the South Dakota State Class a duty to disclose the

19   illegality, public health and safety risks, the true nature of the Class Vehicles, because

20   Defendants:

21          A.      possessed exclusive knowledge that they were manufacturing, selling, and

22   distributing vehicles throughout the United States that did not comply with regulations;

23          B.      intentionally concealed the foregoing from regulators, Plaintiffs, and/or

24   Class members; and/or

25          C.      made incomplete representations about the Class Vehicles generally, and

26   the use of the defeat device in particular, while purposefully withholding material facts from

27   Plaintiffs that contradicted these representations.

28

1    2493.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

2    characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to

3    Plaintiffs and the South Dakota State Class.

4    2494.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

5    deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

6    cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

7    of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

8    2495.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

9    general public. Defendants' unlawful acts and practices complained of herein affect the public

10   interest.

11   2496.   Plaintiffs and the South Dakota State Class suffered ascertainable loss and actual

12   damages as a direct and proximate result of Defendants' misrepresentations and its concealment

13   of and failure to disclose material information. Plaintiffs and the South Dakota State Class

14   members who purchased or leased the Class Vehicles would not have purchased or leased them at

15   all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles

16   rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered

17   diminished value of their vehicles, as well as lost or diminished use. Defendants had an ongoing

18   duty to all their customers to refrain from unfair and deceptive practices under the South Dakota

19   CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value

20   of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the

21   course of Defendants' business.

22   2497.   Pursuant to S.D. Codified Laws § 37-24-31, Plaintiffs and the South Dakota State

23   Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages,

24   punitive damages, and attorneys' fees, costs, and any other just and proper relief to the extent

25   available under the South Dakota CPA.

26

27

28

1

**SOUTH DAKOTA COUNT II:**
**Breach of Express Warranty**
**S.D. Codified Laws §§ 57A-2-313 and 57-2A-210**
**(On Behalf of the South Dakota State Class)**

2

3

4      2498.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

5   fully set forth herein.

6      2499.   This count is brought on behalf of the South Dakota State Class against the

7   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

8      2500.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

9   vehicles under S.D. Codified Laws §§ 57A-104(1) and 57A-2A-103(1)(t), and "sellers" of motor

10   vehicles under § 57A-104(1)(d).

11      2501.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

12   of motor vehicles under S.D. Codified Laws § 57A-2A-103(1)(p).

13      2502.   The Class Vehicles are and were at all relevant times "goods" within the meaning

14   of S.D. Codified Laws §§ 57A-2-105(1) and 57A-2A-103(1)(h).

15      2503.   In connection with the purchase or lease of each one of its new vehicles,

16   Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

17   occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

18   materials or workmanship."

19      2504.   Defendants also made numerous representations, descriptions, and promises to

20   Plaintiffs and South Dakota State Class members regarding the performance and emission

21   controls of their vehicles.

22      2505.   For example, as shown below, Defendants included in the warranty booklets for

23   some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped

24   so as to conform at the time of sale with all applicable regulations of the United States

25   Environmental Protection Agency."

26

27

28

> Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
>
> – is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

2506.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2507.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2508.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

1    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

2    comes first.

3         2509.   As manufacturers of light-duty vehicles, Defendants were required to provide

4    these warranties to purchasers or lessees of Class Vehicles.

5         2510.   Defendants' warranties formed a basis of the bargain that was reached when South

6    Dakota State Class members purchased or leased Class Vehicles that are equipped with a defeat

7    device and non-compliant emission systems.

8         2511.   Despite the existence of warranties, Defendants failed to inform South Dakota

9    State Class members that the Class Vehicles were intentionally designed and manufactured to be

10   out of compliance with applicable state and federal emissions laws, and failed to fix the defective

11   emission components free of charge.

12        2512.   Defendants breached the express warranty promising to repair and correct

13   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

14   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

15        2513.   Affording Defendants a reasonable opportunity to cure their breach of written

16   warranties would be unnecessary and futile here.

17        2514.   Furthermore, the limited warranty promising to repair and correct Defendants'

18   defect in materials and workmanship fails in its essential purpose because the contractual remedy

19   is insufficient to make South Dakota State Class members whole and because Defendants have

20   failed and/or have refused to adequately provide the promised remedies within a reasonable time.

21        2515.   Accordingly, recovery by the South Dakota State Class members is not restricted

22   to the limited warranty promising to repair and correct Defendants' defect in materials and

23   workmanship, and they seek all remedies as allowed by law.

24        2516.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

25   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

26   not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

27   material facts regarding the Class Vehicles. South Dakota State Class members were therefore

28   induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2517.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the South Dakota State Class members' remedies would be insufficient to make them whole.

2518.   Finally, because of Defendants' breach of warranty as set forth herein, South Dakota State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2519.   Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

2520.   As a direct and proximate result of Defendants' breach of express warranties, South Dakota State Class members have been damaged in an amount to be determined at trial.

**SOUTH DAKOTA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**S.D. Codified Laws §§ 57A-2-314 and 57-2A-212**
**(On Behalf of the South Dakota State Class)**

2521.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2522.   This count is brought on behalf of the South Dakota State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

2523.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under S.D. Codified Laws §§ 57A-104(1) and 57A-2A-103(1)(t), and "sellers" of motor vehicles under § 57A-104(1)(d).

2524.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under S.D. Codified Laws § 57A-2A-103(1)(p).

2525.   The Class Vehicles are and were at all relevant times "goods" within the meaning of S.D. Codified Laws §§ 57A-2-105(1) and 57A-2A-103(1)(h).

1    2526.   A warranty that the Class Vehicles were in merchantable condition and fit for the

2    ordinary purpose for which vehicles are used is implied by law pursuant to S.D. Codified Laws

3    §§ 57A-2-314 and 57A-2A-212.

4    2527.   These Class Vehicles, when sold or leased and at all times thereafter, were not in

5    merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

6    Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat

7    device and do not comply with federal and state emissions standards, rendering certain emissions

8    functions inoperative.

9    2528.   Defendants were provided notice of these issues by the investigations of the EPA

10   and California state regulators, and numerous complaints filed against it including the instant

11   complaint, within a reasonable amount of time.

12   2529.   As a direct and proximate result of Defendants' breach of the implied warranty of

13   merchantability, South Dakota State Class members have been damaged in an amount to be

14   proven at trial.

15                               **TENNESSEE COUNT I:**
                     **Violations of the Tennessee Consumer Protection Act**
16                          **Tenn. Code Ann. § 47-18-101 *et seq.***
                         **(On Behalf of the Tennessee State Class)**
17

18   2530.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

19   forth herein.

20   2531.   This count is brought on behalf of the Tennessee State Class against all

21   Defendants.

22   2532.   Plaintiffs and the Tennessee State Class are "natural persons" and "consumers"

23   within the meaning of Tenn. Code § 47-18-103(2). Defendants are "person[s]" within the

24   meaning of Tenn. Code § 47-18-103(9).

25   2533.   Defendants are engaged in "trade" or "commerce" or "consumer transactions"

26   within the meaning Tenn. Code § 47-18-103(9).

27

28

2534.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code § 47-18-104.

2535.   In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

2536.   Tennessee State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs and Tennessee State Class members did not and could not unravel Defendants' deception on their own.

2537.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

2538.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the Tennessee CPA.

2539.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Tennessee State Class.

1    2540.   Defendants knew or should have known that their conduct violated the Tennessee

2  CPA.

3    2541.   Defendants owed Plaintiffs and the Tennessee State Class a duty to disclose the

4  illegality, public health and safety risks, the true nature of the Class Vehicles, because

5  Defendants:

6        A.    possessed exclusive knowledge that they were manufacturing, selling, and

7  distributing vehicles throughout the United States that did not comply with regulations;

8        B.    intentionally concealed the foregoing from regulators, Plaintiffs, and/or

9  Class members; and/or

10        C.    made incomplete representations about the Class Vehicles generally, and

11  the use of the defeat device in particular, while purposefully withholding material facts from

12  Plaintiffs that contradicted these representations.

13    2542.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

14  characteristics of the Class Vehicles' fuel consumption and $CO2$ emissions were material to

15  Plaintiffs and the Tennessee State Class.

16    2543.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

17  deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

18  cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

19  of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

20    2544.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

21  general public. Defendants' unlawful acts and practices complained of herein affect the public

22  interest.

23    2545.   Plaintiffs and the Tennessee State Class suffered ascertainable loss and actual

24  damages as a direct and proximate result of Defendants' misrepresentations and its concealment

25  of and failure to disclose material information. Plaintiffs and the Tennessee State Class members

26  who purchased or leased the Class Vehicles would not have purchased or leased them at all

27  and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered

28  legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished

1    value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all

2    their customers to refrain from unfair and deceptive practices under the Tennessee CPA. All

3    owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their

4    vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of

5    Defendants' business.

6         2546.   Pursuant to Tenn. Code § 47-18-109, Plaintiffs and the Tennessee State Class seek

7    an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, treble damages

8    for willful and knowing violations, pursuant to § 47-18-109(a)(3), punitive damages, and

9    attorneys' fees, costs, and any other just and proper relief to the extent available under the

10   Tennessee CPA.

11                          **TENNESSEE COUNT II:**
                        **Breach of Express Warranty**
12               **Tenn. Code Ann. §§ 47-2-313 and 47-2A-210**
                   **(On Behalf of the Tennessee State Class)**
13

14        2547.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

15   fully set forth herein.

16        2548.   This count is brought on behalf of the Tennessee State Class against the

17   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

18        2549.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

19   vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of motor vehicles

20   under § 47-2-103(1)(d).

21        2550.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

22   of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

23        2551.   The Class Vehicles are and were at all relevant times "goods" within the meaning

24   of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

25        2552.   In connection with the purchase or lease of each one of its new vehicles,

26   Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

27   occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

28   materials or workmanship."

2553.  Defendants also made numerous representations, descriptions, and promises to Plaintiffs and Tennessee State Class members regarding the performance and emission controls of their vehicles.

2554.  For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

> Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
> – is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

2555.  The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2556.  The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2557.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2558.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

2559.   Defendants' warranties formed a basis of the bargain that was reached when Tennessee State Class members purchased or leased Class Vehicles that are equipped with a defeat device and non-compliant emission systems.

2560.   Despite the existence of warranties, Defendants failed to inform Tennessee State Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2561.   Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2562.   Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

2563.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Tennessee State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2564.   Accordingly, recovery by the Tennessee State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

2565.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Tennessee State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2566.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Tennessee State Class members' remedies would be insufficient to make them whole.

2567.   Finally, because of Defendants' breach of warranty as set forth herein, Tennessee State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2568.   Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

2569.   As a direct and proximate result of Defendants' breach of express warranties, Tennessee State Class members have been damaged in an amount to be determined at trial.

**TENNESSEE COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Tenn. Code Ann. §§ 47-2-314 and 47-2A-212**
**(On Behalf of the Tennessee State Class)**

2570.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1    2571.   This count is brought on behalf of the Tennessee State Class against the

2    Volkswagen and Audi Defendants (collectively for this count, "Defendants").

3    2572.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

4    vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of motor vehicles

5    under § 47-2-103(1)(d).

6    2573.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

7    of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

8    2574.   The Class Vehicles are and were at all relevant times "goods" within the meaning

9    of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

10   2575.   A warranty that the Class Vehicles were in merchantable condition and fit for the

11   ordinary purpose for which vehicles are used is implied by law pursuant to Tenn. Code §§ 47-2-

12   314 and 47-2A-212.

13   2576.   These Class Vehicles, when sold or leased and at all times thereafter, were not in

14   merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

15   Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat

16   device and do not comply with federal and state emissions standards, rendering certain emissions

17   functions inoperative.

18   2577.   Defendants were provided notice of these issues by the investigations of the EPA

19   and California state regulators, and numerous complaints filed against it including the instant

20   complaint, within a reasonable amount of time.

21   2578.   As a direct and proximate result of Defendants' breach of the implied warranty of

22   merchantability, Tennessee State Class members have been damaged in an amount to be proven

23   at trial.

24                          **TEXAS COUNT I:**
                **Violations of the Deceptive Trade Practices Act**
25              **Tex. Bus. & Com. Code § 17.41 *et seq.***
                    **(On Behalf of the Texas State Class)**
26

27   2579.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

28   forth herein.

2580.   This count is brought on behalf of the Texas State Class against all Defendants.

2581.   Plaintiffs and the Texas State Class are individuals, partnerships or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), *see* Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4).Defendants are "person[s]" within the meaning of Tex. Bus. & Com. Code § 17.45(3).

2582.   Defendants engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

2583.   The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

2584.   In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

2585.   Texas State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs and Texas State Class members did not and could not unravel Defendants' deception on their own.

2586.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

1   a transaction involving Class Vehicles has been supplied in accordance with a previous

2   representation when it has not.

3        2587.   The Clean Air Act and EPA regulations require that automobiles limit their

4   emissions output to specified levels. These laws are intended for the protection of public health

5   and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

6   Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

7   installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

8   for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

9   Texas DTPA.

10        2588.   Defendants intentionally and knowingly misrepresented material facts regarding

11   the Class Vehicles with intent to mislead Plaintiffs and the Texas State Class.

12        2589.   Defendants knew or should have known that their conduct violated the Texas

13   DTPA.

14        2590.   Defendants owed Plaintiffs and the Texas State Class a duty to disclose the

15   illegality, public health and safety risks, the true nature of the Class Vehicles, because

16   Defendants:

17            A.    possessed exclusive knowledge that they were manufacturing, selling, and

18   distributing vehicles throughout the United States that did not comply with regulations;

19            B.    intentionally concealed the foregoing from regulators, Plaintiffs, and/or

20   Class members; and/or

21            C.    made incomplete representations about the Class Vehicles generally, and

22   the use of the defeat device in particular, while purposefully withholding material facts from

23   Plaintiffs that contradicted these representations.

24        2591.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

25   characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to

26   Plaintiffs and the Texas State Class.

27        2592.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

28   deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

1    cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

2    of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

3    2593.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

4    general public. Defendants' unlawful acts and practices complained of herein affect the public

5    interest.

6    2594.   Plaintiffs and the Texas State Class suffered ascertainable loss and actual damages

7    as a direct and proximate result of Defendants' misrepresentations and its concealment of and

8    failure to disclose material information. Plaintiffs and the Texas State Class members who

9    purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if

10   the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to

11   sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of

12   their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all their

13   customers to refrain from unfair and deceptive practices under the Texas DTPA. All owners of

14   Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as

15   a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants'

16   business.

17   2595.   Pursuant to Tex. Bus. & Com. Code § 17.50, Plaintiffs and the Texas State Class

18   seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, multiple

19   damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and

20   attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

21   2596.   On December 21, 2016, a notice letter was sent to Audi AG and Audi of America,

22   LLC complying with Tex. Bus. & Com. Code Ann. § 17.505.  Additionally, all Defendants were

23   provided notice of the issues raised in this count and this Complaint by the governmental

24   investigations, the numerous complaints filed against them, and the many individual notice letters

25   sent by consumers within a reasonable amount of time after the allegations of Class Vehicle

26   defects became public. Moreover, Plaintiffs sent a second notice letter pursuant to Tex. Bus. &

27   Com. Code Ann. § 17.505 to all Defendants on October 11, 2017.  Because Defendants failed to

28

1   remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and

2   relief to which Plaintiffs and the Texas State Class are entitled.

3                             **TEXAS COUNT II:**
                         **Breach of Express Warranty**
4               **Tex. Bus. & Com. Code §§ 2.313 and 2A.210**
                   **(On Behalf of the Texas State Class)**
5

6          2597.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

7   fully set forth herein.

8          2598.   This count is brought on behalf of the Texas State Class against the Volkswagen

9   and Audi Defendants (collectively for this count, "Defendants").

10         2599.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

11  vehicles under Tex. Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and "sellers" of motor

12  vehicles under § 2.103(a)(4)

13         2600.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

14  of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

15         2601.   The Class Vehicles are and were at all relevant times "goods" within the meaning

16  of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

17         2602.   In connection with the purchase or lease of each one of its new vehicles,

18  Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

19  occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

20  materials or workmanship."

21         2603.   Defendants also made numerous representations, descriptions, and promises to

22  Plaintiffs and Texas State Class members regarding the performance and emission controls of

23  their vehicles.

24         2604.   For example, as shown below, Defendants included in the warranty booklets for

25  some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped

26  so as to conform at the time of sale with all applicable regulations of the United States

27  Environmental Protection Agency."

28

> Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
> – is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

2605.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2606.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2607.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

1    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

2    comes first.

3         2608.   As manufacturers of light-duty vehicles, Defendants were required to provide

4    these warranties to purchasers or lessees of Class Vehicles.

5         2609.   Defendants' warranties formed a basis of the bargain that was reached when Texas

6    State Class members purchased or leased Class Vehicles that are equipped with a defeat device

7    and non-compliant emission systems.

8         2610.   Despite the existence of warranties, Defendants failed to inform Texas State Class

9    members that the Class Vehicles were intentionally designed and manufactured to be out of

10   compliance with applicable state and federal emissions laws, and failed to fix the defective

11   emission components free of charge.

12        2611.   Defendants breached the express warranty promising to repair and correct

13   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

14   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

15        2612.   Affording Defendants a reasonable opportunity to cure their breach of written

16   warranties would be unnecessary and futile here.

17        2613.   Furthermore, the limited warranty promising to repair and correct Defendants'

18   defect in materials and workmanship fails in its essential purpose because the contractual remedy

19   is insufficient to make Texas State Class members whole and because Defendants have failed

20   and/or have refused to adequately provide the promised remedies within a reasonable time.

21        2614.   Accordingly, recovery by the Texas State Class members is not restricted to the

22   limited warranty promising to repair and correct Defendants' defect in materials and

23   workmanship, and they seek all remedies as allowed by law.

24        2615.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

25   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

26   not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

27   material facts regarding the Class Vehicles. Texas State Class members were therefore induced to

28   purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1    2616.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

2  resolved through the limited remedy of repairing and correcting Defendants' defect in materials

3  and workmanship as many incidental and consequential damages have already been suffered

4  because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

5  continued failure to provide such limited remedy within a reasonable time, and any limitation on

6  the Texas State Class members' remedies would be insufficient to make them whole.

7    2617.   Finally, because of Defendants' breach of warranty as set forth herein, Texas State

8  Class members assert, as additional and/or alternative remedies, the revocation of acceptance of

9  the goods and the return to them the purchase or lease price of all Class Vehicles currently owned

10  or leased, and for such other incidental and consequential damages as allowed.

11    2618.   Defendants were provided notice of these issues by numerous complaints filed

12  against them, including the instant Complaint, within a reasonable amount of time.

13    2619.   As a direct and proximate result of Defendants' breach of express warranties,

14  Texas State Class members have been damaged in an amount to be determined at trial.

**TEXAS COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Tex. Bus. & Com. Code §§ 2.314 and 2A.212**
**(On Behalf of the Texas State Class)**

18    2620.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding

19  paragraphs as though fully set forth herein.

20    2621.   This count is brought on behalf of the Texas State Class against the Volkswagen

21  and Audi Defendants (collectively for this count, "Defendants").

22    2622.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

23  vehicles under Tex. Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and "sellers" of motor

24  vehicles under § 2.103(a)(4)

25    2623.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

26  of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

27    2624.   The Class Vehicles are and were at all relevant times "goods" within the meaning

28  of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

2625.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Tex. Bus. & Com. Code §§ 2.314 and 2A.212.

2626.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

2627.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2628.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Texas State Class members have been damaged in an amount to be proven at trial.

**UTAH COUNT I:**
**Violations of the Utah Consumer Sales Practices Act**
**Utah Code Ann. § 13-11-1 *et seq.***
**(On Behalf of the Utah State Class)**

2629.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2630.   This count is brought on behalf of the Utah State Class against all Defendants.

2631.   Plaintiffs and Utah State Class members are "persons" under the Utah Consumer Sales Practices Act ("Utah CSPA"), Utah Code § 13-11-3(5). The sales and leases of the Class Vehicles to the Plaintiffs and Utah State Class members were "consumer transactions" within the meaning of Utah Code § 13-11-3(2).

2632.   Defendants are "supplier[s]" within the meaning of Utah Code § 13-11-3(6).

2633.   The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction." Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally: (a) indicates that the subject of a consumer

1   transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits,

2   if it has not" or "(b) indicates that the subject of a consumer transaction is of a particular standard,

3   quality, grade, style, or model, if it is not." Utah Code § 13-11-4. "An unconscionable act or

4   practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.

5   Utah Code § 13-11-5.

6        2634.   In the course of its business, Defendants concealed and suppressed material facts

7   concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

8   Class Vehicles that caused the vehicles to operate in a low emission test mode only during

9   emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

10  noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions

11  testing by way of deliberately induced false readings.

12       2635.   Utah State Class members had no way of discerning that Defendants'

13  representations were false and misleading because Defendants' defeat device software was

14  extremely sophisticated technology. Plaintiffs and Utah State Class members did not and could

15  not unravel Defendants' deception on their own.

16       2636.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

17  have characteristics, uses, benefits, and qualities which they do not have; representing that Class

18  Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

19  Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

20  a transaction involving Class Vehicles has been supplied in accordance with a previous

21  representation when it has not.

22       2637.   The Clean Air Act and EPA regulations require that automobiles limit their

23  emissions output to specified levels. These laws are intended for the protection of public health

24  and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

25  Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

26  installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

27  for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

28  Utah CSPA.

1  2638.   Defendants intentionally and knowingly misrepresented material facts regarding
2  the Class Vehicles with intent to mislead Plaintiffs and the Utah State Class.
3  2639.   Defendants knew or should have known that their conduct violated the Utah
4  CSPA.
5  2640.   Defendants owed Plaintiffs and the Utah State Class a duty to disclose the
6  illegality, public health and safety risks, the true nature of the Class Vehicles, because
7  Defendants:
8  A.   possessed exclusive knowledge that they were manufacturing, selling, and
9  distributing vehicles throughout the United States that did not comply with regulations;
10  B.   intentionally concealed the foregoing from regulators, Plaintiffs, and/or
11  Class members; and/or
12  C.   made incomplete representations about the Class Vehicles generally, and
13  the use of the defeat device in particular, while purposefully withholding material facts from
14  Plaintiffs that contradicted these representations.
15  2641.   Defendants' fraudulent use of the "defeat device" and its concealment of the true
16  characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to
17  Plaintiffs and the Utah State Class.
18  2642.   Defendants' unfair or deceptive acts or practices were likely to and did in fact
19  deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental
20  cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing
21  of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.
22  2643.   Defendants' violations present a continuing risk to Plaintiffs as well as to the
23  general public. Defendants' unlawful acts and practices complained of herein affect the public
24  interest.
25  2644.   Plaintiffs and the Utah State Class suffered ascertainable loss and actual damages
26  as a direct and proximate result of Defendants' misrepresentations and its concealment of and
27  failure to disclose material information. Plaintiffs and the Utah State Class members who
28  purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if

1    the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to

2    sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of

3    their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all their

4    customers to refrain from unfair and deceptive practices under the Utah CSPA. All owners of

5    Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as

6    a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants'

7    business.

8        2645.   Pursuant to Utah Code Ann. § 13-11-4, Plaintiffs and the Utah State Class seek

9    monetary relief against Defendants measured as the greater of (a) actual damages in an amount to

10   be determined at trial and (b) statutory damages in the amount of $2,000 for each Plaintiffs and

11   each Utah State Class member, reasonable attorneys' fees, and any other just and proper relief

12   available under the Utah CSPA.

13                                **UTAH COUNT II:**
                             **Breach of Express Warranty**
14                       **Utah Code §§ 70A-2-313 and 70-2A-210**
                           **(On Behalf of the Utah State Class)**
15

16       2646.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

17   fully set forth herein.

18       2647.   This count is brought on behalf of the Utah State Class against the Volkswagen

19   and Audi Defendants (collectively for this count, "Defendants").

20       2648.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

21   vehicles under Utah Code § 70A-2-104(1) and 70A-2a-103(1)(t), and "sellers" of motor vehicles

22   under § 70A-2-103(1)(d).

23       2649.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

24   of motor vehicles under Utah Code § 70A-2a-103(1)(p).

25       2650.   The Class Vehicles are and were at all relevant times "goods" within the meaning

26   of Utah Code §§ 70A-2-105(1) and 70A-2a-103(1)(h).

27       2651.   In connection with the purchase or lease of each one of its new vehicles,

28   Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

1    occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

2    materials or workmanship."

3        2652.   Defendants also made numerous representations, descriptions, and promises to

4    Plaintiffs and Utah State Class members regarding the performance and emission controls of their

5    vehicles.

6        2653.   For example, as shown below, Defendants included in the warranty booklets for

7    some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped

8    so as to conform at the time of sale with all applicable regulations of the United States

9    Environmental Protection Agency."

10
11
12
13
14
15
16
17
18

> Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
> – is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

19        2654.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide

20   two federal emission control warranties: a "Performance Warranty" and a "Design and Defect

21   Warranty."

22        2655.   The EPA requires vehicle manufacturers to provide a Performance Warranty with

23   respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

24   its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

25   required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

26   whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

27   emission control components are covered for the first eight years or 80,000 miles (whichever

28   comes first). These major emission control components subject to the longer warranty include the

1    catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

2    device or computer.

3         2656.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

4    with respect to their vehicles' emission systems. Thus, Defendants also provide an express

5    warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

6    Design and Defect Warranty required by the EPA covers repair of emission control or emission

7    related parts, which fail to function or function improperly because of a defect in materials or

8    workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

9    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

10   comes first.

11        2657.   As manufacturers of light-duty vehicles, Defendants were required to provide

12   these warranties to purchasers or lessees of Class Vehicles.

13        2658.   Defendants' warranties formed a basis of the bargain that was reached when Utah

14   State Class members purchased or leased Class Vehicles that are equipped with a defeat device

15   and non-compliant emission systems.

16        2659.   Despite the existence of warranties, Defendants failed to inform Utah State Class

17   members that the Class Vehicles were intentionally designed and manufactured to be out of

18   compliance with applicable state and federal emissions laws, and failed to fix the defective

19   emission components free of charge.

20        2660.   Defendants breached the express warranty promising to repair and correct

21   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

22   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

23        2661.   Affording Defendants a reasonable opportunity to cure their breach of written

24   warranties would be unnecessary and futile here.

25        2662.   Furthermore, the limited warranty promising to repair and correct Defendants'

26   defect in materials and workmanship fails in its essential purpose because the contractual remedy

27   is insufficient to make Utah State Class members whole and because Defendants have failed

28   and/or have refused to adequately provide the promised remedies within a reasonable time.

2663.   Accordingly, recovery by the Utah State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

2664.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Utah State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2665.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Utah State Class members' remedies would be insufficient to make them whole.

2666.   Finally, because of Defendants' breach of warranty as set forth herein, Utah State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2667.   Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

2668.   As a direct and proximate result of Defendants' breach of express warranties, Utah State Class members have been damaged in an amount to be determined at trial.

**UTAH COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Utah Code §§ 70A-2-314 and 70-2A-212**
**(On Behalf of the Utah State Class)**

2669.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2670.   This count is brought on behalf of the Utah State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

2671.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Utah Code §§ 70A-2-104(1) and 70A-2a-103(1)(t), and "sellers" of motor vehicles under § 70A-2-103(1)(d).

2672.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Utah Code § 70A-2a-103(1)(p).

2673.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Utah Code §§ 70A-2-105(1) and 70A-2a-103(1)(h).

2674.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Utah Code §§ 70A-2-314 and 70A-2a-212.

2675.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

2676.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2677.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Utah State Class members have been damaged in an amount to be proven at trial.

**VERMONT COUNT I:**
**Violations of the Vermont Consumer Fraud Act**
**Vt. Stat. Ann. Tit. 9, § 2451 *et seq.***
**(On Behalf of the Vermont State Class)**

2678.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2679.   This count is brought on behalf of the Vermont State Class against all Defendants.

2680.   Plaintiffs and the Vermont State Class are "consumers" within the meaning of Vt. Stat. Tit. 9, § 451a(a).

2681.   Defendants are "person[s]" within the meaning of Vt. Code R. § 100(3) (citing Vt. Stat. Tit. 9, § 2453).

2682.   Defendants are engaged in "commerce" within the meaning of Vt. Stat. Tit. 9, § 2453(a).

2683.   The Vermont Consumer Protection Act ("Vermont CPA") prohibits "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce...." Vt. Stat. Tit. 9, § 2453(a).

2684.   In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

2685.   Vermont State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs and Vermont State Class members did not and could not unravel Defendants' deception on their own.

2686.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

2687.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

1    Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

2    installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

3    for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

4    Vermont UTPA.

5    2688.   Defendants intentionally and knowingly misrepresented material facts regarding

6    the Class Vehicles with intent to mislead Plaintiffs and the Vermont State Class.

7    2689.   Defendants knew or should have known that their conduct violated the Vermont

8    UTPA.

9    2690.   Defendants owed Plaintiffs and the Vermont State Class a duty to disclose the

10   illegality, public health and safety risks, the true nature of the Class Vehicles, because

11   Defendants:

12              A.      possessed exclusive knowledge that they were manufacturing, selling, and

13   distributing vehicles throughout the United States that did not comply with regulations;

14              B.      intentionally concealed the foregoing from regulators, Plaintiffs, and/or

15   Class members; and/or

16              C.      made incomplete representations about the Class Vehicles generally, and

17   the use of the defeat device in particular, while purposefully withholding material facts from

18   Plaintiffs that contradicted these representations.

19   2691.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

20   characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to

21   Plaintiffs and the Vermont State Class.

22   2692.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

23   deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

24   cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

25   of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

26   2693.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

27   general public. Defendants' unlawful acts and practices complained of herein affect the public

28   interest.

2694.   Plaintiffs and the Vermont State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Vermont State Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Vermont UTPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

2695.   Pursuant to Vt. Stat. Tit. 9, § 2461(b), Plaintiffs and the Vermont State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, actual damages, damages up to three times the consideration provided, punitive damages, attorneys' fees, costs, and any other just and proper relief available under the Vermont UTPA.

**VERMONT COUNT II:**
**Vermont Lemon Law**
**Vt. Stat. Tit. 9, § 4170 *et seq.***
**(On Behalf of the Vermont State Class)**

2696.   Plaintiffs and the Vermont State Class own or lease "motor vehicles" within the meaning of Vt. Stat. tit. 9, § 4171(6), because these vehicles were purchased, leased, or registered in Vermont by Defendants and were registered in Vermont within 15 days of the date of purchase or lease. These vehicles are not: (1) tractors, (2) motorized highway building equipment, (3) roadmaking appliances, (4) snowmobiles, (5) motorcycles, (5) mopeds, (6) the living portion of recreation vehicles, or (7) trucks with a gross vehicle weight over 10,000 pounds.

2697.   Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of Vt. Stat. Tit. 9, § 4171(7) because it manufactures and assembles new motor vehicles or imports for distribution through distributors of motor vehicles. It is also a "manufacturer" within the definition of "distributor" and "factory branch." *Id.*

1    2698.   Plaintiffs and the Vermont State Class are "consumers" within the meaning of Vt.

2    Stat. Tit. 9, § 4171(2) because they bought or leased the Class Vehicles, were transferred their

3    vehicles during the duration the applicable warranty, or are otherwise entitled to the attendant

4    terms of warranty. They are not governmental entities or a business or commercial enterprise that

5    registers or leases three or more motor vehicles.

6    2699.   The Class Vehicles did not conform to their express warranties during the term of

7    warranty because they contained a "defeat device" designed to circumvent state and federal

8    emissions standards. These devices did in fact circumvent emissions standards and substantially

9    impaired the use, market value, and safety of their motor vehicles.

10   2700.   Defendants had actual knowledge of the conformities during the term of warranty.

11   But the nonconformities continued to exist throughout this term, as they have not been fixed.

12   Plaintiffs and Vermont State Class members are excused from notifying Defendants of the

13   nonconformities because it was already fully aware of the problem—as it intentionally created

14   it—and any repair attempt is futile.

15   2701.   Defendants have had a reasonable opportunity to cure the nonconformities during

16   the relevant period because of its actual knowledge of, creation of, and attempt to conceal the

17   nonconformities, but has not done so as required under Vt. Stat. Tit. 9, § 4173.

18   2702.   For vehicles purchased, Plaintiffs and the Vermont State Class demand a full

19   refund of the contract price and all credits and allowances for any trade-in or down payment,

20   license fees, finance charges, credit charges, registration fees and any similar charges and

21   incidental and consequential damages. Vt. Stat. Tit. 9, § 4173(e). For vehicles leased, Plaintiffs

22   and the Vermont State Class demand the aggregate deposit and rental payments previously paid,

23   and any incidental and consequential damages incurred. Vt. Stat. Tit. 9, § 4173(e), (i). Plaintiffs

24   and the Vermont State Class reject an offer of replacement and will retain their vehicles until

25   payment is tendered.

26

27

28

**VERMONT COUNT III:**
**Breach of Express Warranty**
**Vt. Stat. Tit. 9, §§ 2-313 and 2A-210**
**(On Behalf of the Vermont State Class)**

2703.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

2704.   This count is brought on behalf of the Vermont State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

2705.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Vt. Stat. Tit. 9A, §§ 2-104(1) and 2A-103(1)(t), and "sellers" of motor vehicles under § 2-103(1)(d).

2706.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Vt. Stat. Tit. 9A, § 2A-103(1)(p).

2707.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Vt. Stat. Tit. 9A, §§ 2-105(1) and 2A-103(1)(h).

2708.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

2709.   Defendants also made numerous representations, descriptions, and promises to Plaintiffs and Vermont State Class members regarding the performance and emission controls of their vehicles.

2710.   For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

Audi of America, Inc., an operating unit of
Volkswagen Group of America, Inc. ("Audi"),
the authorized United States importer of Audi
vehicles, warrants to the original retail pur-
chaser or original lessee and any subsequent
purchaser or lessee that every **model year
2014** Audi vehicle imported by Audi:

– was designed, built and equipped so as to
  conform at the time of sale with all applica-
  ble regulations of the United States Environ-
  mental Protection Agency (EPA), and
– is free from defects in material and work-
  manship which causes the vehicle to fail to
  conform with EPA regulations for 2 years af-
  ter the date of first use or delivery of the ve-
  hicle to the original retail purchaser or origi-
  nal lessee or until the vehicle has been driv-
  en 24,000 miles, whichever occurs first.

2711.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2712.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2713.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

1    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

2    comes first.

3         2714.   As manufacturers of light-duty vehicles, Defendants were required to provide

4    these warranties to purchasers or lessees of Class Vehicles.

5         2715.   Defendants' warranties formed a basis of the bargain that was reached when

6    Vermont State Class members purchased or leased Class Vehicles that are equipped with a defeat

7    device and non-compliant emission systems.

8         2716.   Despite the existence of warranties, Defendants failed to inform Vermont State

9    Class members that the Class Vehicles were intentionally designed and manufactured to be out of

10   compliance with applicable state and federal emissions laws, and failed to fix the defective

11   emission components free of charge.

12        2717.   Defendants breached the express warranty promising to repair and correct

13   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

14   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

15        2718.   Affording Defendants a reasonable opportunity to cure their breach of written

16   warranties would be unnecessary and futile here.

17        2719.   Furthermore, the limited warranty promising to repair and correct Defendants'

18   defect in materials and workmanship fails in its essential purpose because the contractual remedy

19   is insufficient to make Vermont State Class members whole and because Defendants have failed

20   and/or have refused to adequately provide the promised remedies within a reasonable time.

21        2720.   Accordingly, recovery by the Vermont State Class members is not restricted to the

22   limited warranty promising to repair and correct Defendants' defect in materials and

23   workmanship, and they seek all remedies as allowed by law.

24        2721.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

25   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

26   not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

27   material facts regarding the Class Vehicles. Vermont State Class members were therefore induced

28   to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1    2722.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

2    resolved through the limited remedy of repairing and correcting Defendants' defect in materials

3    and workmanship as many incidental and consequential damages have already been suffered

4    because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

5    continued failure to provide such limited remedy within a reasonable time, and any limitation on

6    the Vermont State Class members' remedies would be insufficient to make them whole.

7    2723.   Finally, because of Defendants' breach of warranty as set forth herein, Vermont

8    State Class members assert, as additional and/or alternative remedies, the revocation of

9    acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

10   currently owned or leased, and for such other incidental and consequential damages as allowed.

11   2724.   Defendants were provided notice of these issues by numerous complaints filed

12   against them, including the instant Complaint, within a reasonable amount of time.

13   2725.   As a direct and proximate result of Defendants' breach of express warranties,

14   Vermont State Class members have been damaged in an amount to be determined at trial.

15
16
17
**VERMONT COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**Vt. Stat. Tit. 9, §§ 2-314 and 2A-212**
**(On Behalf of the Vermont State Class)**

18   2726.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding

19   paragraphs as though fully set forth herein.

20   2727.   This count is brought on behalf of the Vermont State Class against the

21   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

22   2728.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

23   vehicles under Vt. Stat. Tit. 9A, § 2-104(1) and 2A-103(1)(t), and "sellers" of motor vehicles

24   under § 2-103(1)(d).

25   2729.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

26   of motor vehicles under Vt. Stat. Tit. 9A, § 2A-103(1)(p).

27   2730.   The Class Vehicles are and were at all relevant times "goods" within the meaning

28   of Vt. Stat. Tit. 9A, §§ 2-105(1) and 2A-103(1)(h).

1    2731.   A warranty that the Class Vehicles were in merchantable condition and fit for the

2    ordinary purpose for which vehicles are used is implied by law pursuant to Vt. Stat. Tit. 9A, §§ 2-

3    314 and 2A-212.

4    2732.   These Class Vehicles, when sold or leased and at all times thereafter, were not in

5    merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

6    Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat

7    device and do not comply with federal and state emissions standards, rendering certain emissions

8    functions inoperative.

9    2733.   Defendants were provided notice of these issues by the investigations of the EPA

10   and California state regulators, and numerous complaints filed against it including the instant

11   complaint, within a reasonable amount of time.

12   2734.   As a direct and proximate result of Defendants' breach of the implied warranty of

13   merchantability, Vermont State Class members have been damaged in an amount to be proven at

14   trial.

15   **VIRGINIA COUNT I:**
**Violations of the Virginia Consumer Protection Act**
16   **Va. Code Ann. § 59.1-196 *et seq.***
**(On Behalf of the Virginia State Class)**
17

18   2735.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

19   forth herein.

20   2736.   Plaintiffs Joseph Denney and Michael Gray (for the purpose of this count,

21   "Plaintiffs") bring this count on behalf of themselves and the Virginia State Class against all

22   Defendants.

23   2737.   Defendants, Plaintiffs, and the Virginia State Class are "persons" within the

24   meaning of Va. Code § 59.1-198.

25   2738.   Defendants are "supplier[s]" within the meaning of Va. Code § 59.1-198.

26   2739.   The Virginia Consumer Protection Act ("Virginia CPA") makes unlawful

27   "fraudulent acts or practices." Va. Code § 59.1-200(A).

28

1        2740.   In the course of its business, Defendants concealed and suppressed material facts

2 concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

3 Class Vehicles that caused the vehicles to operate in a low emission test mode only during

4 emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

5 noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions

6 testing by way of deliberately induced false readings.

7        2741.   Virginia State Class members had no way of discerning that Defendants'

8 representations were false and misleading because Defendants' defeat device software was

9 extremely sophisticated technology. Plaintiffs and Virginia State Class members did not and

10 could not unravel Defendants' deception on their own.

11        2742.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

12 have characteristics, uses, benefits, and qualities which they do not have; representing that Class

13 Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

14 Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

15 a transaction involving Class Vehicles has been supplied in accordance with a previous

16 representation when it has not.

17        2743.   The Clean Air Act and EPA regulations require that automobiles limit their

18 emissions output to specified levels. These laws are intended for the protection of public health

19 and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

20 Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

21 installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

22 for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

23 Virginia CPA.

24        2744.   Defendants intentionally and knowingly misrepresented material facts regarding

25 the Class Vehicles with intent to mislead Plaintiffs and the Virginia State Class.

26        2745.   Defendants knew or should have known that their conduct violated the Virginia

27 CPA.

28

1    2746.   Defendants owed Plaintiffs and the Virginia State Class a duty to disclose the

2    illegality, public health and safety risks, the true nature of the Class Vehicles, because

3    Defendants:

4            A.     possessed exclusive knowledge that they were manufacturing, selling, and

5    distributing vehicles throughout the United States that did not comply with regulations;

6            B.     intentionally concealed the foregoing from regulators, Plaintiffs, and/or

7    Class members; and/or

8            C.     made incomplete representations about the Class Vehicles generally, and

9    the use of the defeat device in particular, while purposefully withholding material facts from

10   Plaintiffs that contradicted these representations.

11   2747.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

12   characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to

13   Plaintiffs and the Virginia State Class.

14   2748.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

15   deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

16   cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

17   of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

18   2749.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

19   general public. Defendants' unlawful acts and practices complained of herein affect the public

20   interest.

21   2750.   Plaintiffs and the Virginia State Class suffered ascertainable loss and actual

22   damages as a direct and proximate result of Defendants' misrepresentations and its concealment

23   of and failure to disclose material information. Plaintiffs and the Virginia State Class members

24   who purchased or leased the Class Vehicles would not have purchased or leased them at all

25   and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered

26   legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished

27   value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all

28   their customers to refrain from unfair and deceptive practices under the Virginia CPA. All owners

1    of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles

2    as a result of Defendants' deceptive and unfair acts and practices made in the course of

3    Defendants' business.

4         2751.   Pursuant to Va. Code § 59.1-204(A)–(B), Plaintiffs and the Virginia State Class

5    are entitled to the greater of actual damages or $500 for each Virginia State Class member,

6    attorneys' fees, and costs. Because Defendants' actions were willful, Plaintiffs and the Virginia

7    State Class should each receive the greater of treble damages or $1,000. *Id.*

8                              **VIRGINIA COUNT II:**
                              **Breach of Express Warranty**
9                        **Va. Code §§ 8.2-313 and 8.2A-210**
                         **(On Behalf of the Virginia State Class)**
10

11        2752.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

12   fully set forth herein.

13        2753.   Plaintiffs Joseph Denney and Michael Gray (for the purpose of this count,

14   "Plaintiffs") bring this count on behalf of themselves and the Virginia State Class against the

15   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

16        2754.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

17   vehicles under Va. Code §§ 8.2-104(1) and 8.2A-103(1)(t), and "sellers" of motor vehicles under

18   § 8.2-103(1)(d).

19        2755.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

20   of motor vehicles under Va. Code § 8.2A-103(1)(p).

21        2756.   The Class Vehicles are and were at all relevant times "goods" within the meaning

22   of Va. Code §§ 8.2-105(1) and 8.2A-103(1)(h).

23        2757.   In connection with the purchase or lease of each one of its new vehicles,

24   Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

25   occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

26   materials or workmanship."

27

28

1    2758.   Defendants also made numerous representations, descriptions, and promises to

2 Plaintiffs and Virginia State Class members regarding the performance and emission controls of

3 their vehicles.

4    2759.   For example, as shown below, Defendants included in the warranty booklets for

5 some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped

6 so as to conform at the time of sale with all applicable regulations of the United States

7 Environmental Protection Agency."

8

9

Audi of America, Inc., an operating unit of
Volkswagen Group of America, Inc. ("Audi"),
the authorized United States importer of Audi
vehicles, warrants to the original retail pur-
chaser or original lessee and any subsequent
purchaser or lessee that every **model year
2014** Audi vehicle imported by Audi:

– was designed, built and equipped so as to
  conform at the time of sale with all applica-
  ble regulations of the United States Environ-
  mental Protection Agency (EPA), and
– is free from defects in material and work-
  manship which causes the vehicle to fail to
  conform with EPA regulations for 2 years af-
  ter the date of first use or delivery of the ve-
  hicle to the original retail purchaser or origi-
  nal lessee or until the vehicle has been driv-
  en 24,000 miles, whichever occurs first.

17    2760.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide

18 two federal emission control warranties: a "Performance Warranty" and a "Design and Defect

19 Warranty."

20    2761.   The EPA requires vehicle manufacturers to provide a Performance Warranty with

21 respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

22 its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

23 required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

24 whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

25 emission control components are covered for the first eight years or 80,000 miles (whichever

26 comes first). These major emission control components subject to the longer warranty include the

27 catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

28 device or computer.

1    2762.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

2    with respect to their vehicles' emission systems. Thus, Defendants also provide an express

3    warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

4    Design and Defect Warranty required by the EPA covers repair of emission control or emission

5    related parts, which fail to function or function improperly because of a defect in materials or

6    workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

7    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

8    comes first.

9    2763.   As manufacturers of light-duty vehicles, Defendants were required to provide

10   these warranties to purchasers or lessees of Class Vehicles.

11   2764.   Defendants' warranties formed a basis of the bargain that was reached when

12   Virginia State Class members purchased or leased Class Vehicles that are equipped with a defeat

13   device and non-compliant emission systems.

14   2765.   Despite the existence of warranties, Defendants failed to inform Virginia State

15   Class members that the Class Vehicles were intentionally designed and manufactured to be out of

16   compliance with applicable state and federal emissions laws, and failed to fix the defective

17   emission components free of charge.

18   2766.   Defendants breached the express warranty promising to repair and correct

19   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

20   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

21   2767.   Affording Defendants a reasonable opportunity to cure their breach of written

22   warranties would be unnecessary and futile here.

23   2768.   Furthermore, the limited warranty promising to repair and correct Defendants'

24   defect in materials and workmanship fails in its essential purpose because the contractual remedy

25   is insufficient to make Virginia State Class members whole and because Defendants have failed

26   and/or have refused to adequately provide the promised remedies within a reasonable time.

27

28

2769.   Accordingly, recovery by the Virginia State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

2770.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Virginia State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2771.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Virginia State Class members' remedies would be insufficient to make them whole.

2772.   Finally, because of Defendants' breach of warranty as set forth herein, Virginia State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2773.   Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

2774.   As a direct and proximate result of Defendants' breach of express warranties, Virginia State Class members have been damaged in an amount to be determined at trial.

**VIRGINIA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Va. Code §§ 8.2-314 and 8.2A-212**
**(On Behalf of the Virginia State Class)**

2775.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2776.   Plaintiffs Joseph Denney and Michael Gray (for the purpose of this count, "Plaintiffs") bring this count on behalf of themselves and the Virginia State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

2777.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Va. Code §§ 8.2-104(1) and 8.2A-103(1)(t), and "sellers" of motor vehicles under § 8.2-103(1)(d).

2778.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Va. Code § 8.2A-103(1)(p).

2779.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Va. Code §§ 8.2-105(1) and 8.2A-103(1)(h).

2780.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Va. Code §§ 8.2-314 and 8.2A-212.

2781.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

2782.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2783.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Virginia State Class members have been damaged in an amount to be proven at trial.

**WASHINGTON STATE COUNT I:**
**Violations of the Washington Consumer Protection Act**
**Wash. Rev. Code Ann. § 19.86.010 *et seq.***
**(On Behalf of the Washington State Class)**

2784.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2785.   This count is brought on behalf of the Washington State Class against all Defendants.

2786.   Defendants, Plaintiffs, and the Washington State Class are "persons" within the meaning of Wash. Rev. Code § 19.86.010(2).

2787.   Defendants engaged in "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.86.010(2).

2788.   The Washington Consumer Protection Act ("Washington CPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

2789.   In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious $CO2$. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

2790.   Washington State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs and Washington State Class members did not and could not unravel Defendants' deception on their own.

2791.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

1    a transaction involving Class Vehicles has been supplied in accordance with a previous

2    representation when it has not.

3         2792.   The Clean Air Act and EPA regulations require that automobiles limit their

4    emissions output to specified levels. These laws are intended for the protection of public health

5    and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

6    Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

7    installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

8    for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

9    Washington CPA.

10        2793.   Defendants intentionally and knowingly misrepresented material facts regarding

11   the Class Vehicles with intent to mislead Plaintiffs and the Washington State Class.

12        2794.   Defendants knew or should have known that their conduct violated the

13   Washington CPA.

14        2795.   Defendants owed Plaintiffs and the Washington State Class a duty to disclose the

15   illegality, public health and safety risks, the true nature of the Class Vehicles, because

16   Defendants:

17             A.     possessed exclusive knowledge that they were manufacturing, selling, and

18   distributing vehicles throughout the United States that did not comply with regulations;

19             B.     intentionally concealed the foregoing from regulators, Plaintiffs, and/or

20   Class members; and/or

21             C.     made incomplete representations about the Class Vehicles generally, and

22   the use of the defeat device in particular, while purposefully withholding material facts from

23   Plaintiffs that contradicted these representations.

24        2796.   Defendants' fraudulent use of the "defeat device" and its concealment of the true

25   characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to

26   Plaintiffs and the Washington State Class.

27        2797.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

28   deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

1    cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing

2    of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

3         2798.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

4    general public. Defendants' unlawful acts and practices complained of herein affect the public

5    interest.

6         2799.   Plaintiffs and the Washington State Class suffered ascertainable loss and actual

7    damages as a direct and proximate result of Defendants' misrepresentations and its concealment

8    of and failure to disclose material information. Plaintiffs and the Washington State Class

9    members who purchased or leased the Class Vehicles would not have purchased or leased them at

10   all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles

11   rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered

12   diminished value of their vehicles, as well as lost or diminished use. Defendants had an ongoing

13   duty to all their customers to refrain from unfair and deceptive practices under the Washington

14   CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value

15   of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the

16   course of Defendants' business.

17        2800.   Pursuant to Wash. Rev. Code § 19.86.090, Plaintiffs and the Washington State

18   Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages,

19   punitive damages, and attorneys' fees, costs, and any other just and proper relief available under

20   the Washington CPA. Because Defendants' actions were willful and knowing, Plaintiffs'

21   damages should be trebled.

22                              **WASHINGTON STATE COUNT II:**
                                 **Washington Lemon Law**
23                               **Wash. Rev. Code § 19.118.005 *et seq.***
                                 **(On Behalf of the Washington State Class)**
24

25        2801.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

26   fully set forth herein.

27        2802.   This count is brought on behalf of the Washington State Class against the

28   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

1        2803.   Plaintiffs and the Washington State Class own or lease "new motor vehicles"

2    within the meaning of Wash. Rev. Code § 19.118.021(12), because these vehicles are self-

3    propelled primarily designed for the transportation of persons or property over the public

4    highways and were originally purchased or leased at retail from a new motor vehicle dealer or

5    leasing company in Washington. These vehicles do not include vehicles purchased or leased by a

6    business as part of a fleet of ten or more vehicles at one time or under a single purchase or lease

7    agreement or those portions of a motor home designated, used, or maintained primarily as a

8    mobile dwelling, office, or commercial space.

9        2804.   Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of

10   Wash. Rev. Code § 19.118.021(8) because it is in the business of constructing or assembling new

11   motor vehicles or is engaged in the business of importing new motor vehicles into the United

12   States for the purpose of selling or distributing new motor vehicles to new motor vehicle dealers.

13       2805.   Plaintiffs and the Washington State Class are "consumers" within the meaning of

14   Wash. Rev. Code § 19.118.021(4) because they entered into an agreement or contract for the

15   transfer, lease, or purchase of a new motor vehicle, other than for purposes of resale or sublease,

16   during the eligibility period as defined by Wash. Rev. Code § 19.118.021(6).

17       2806.   The Class Vehicles did not conform to their warranties as defined by Wash. Rev.

18   Code § 19.118.021(22), during the "eligibility period," defined by Wash. Rev. Code

19   § 19.118.021(6), or the coverage period under the applicable written warranty because they

20   contained a "defeat device" designed to circumvent state and federal emissions standards. Wash.

21   Rev. Code § 19.118.031. These devices did in fact circumvent emissions standards and

22   substantially impaired the use, market value, and safety of their motor vehicles.

23       2807.   Defendants had actual knowledge of the conformities during warranty periods. But

24   the nonconformities continued to exist throughout this term, as they have not been fixed.

25   Plaintiffs and Washington State Class members are excused from notifying Defendants of the

26   nonconformities because it was already fully aware of the problem—as it intentionally created

27   it—and any repair attempt is futile.

28

1    2808.  Defendants have had a reasonable opportunity to cure the nonconformities because

2    of its actual knowledge of, creation of, and attempt to conceal the nonconformities, but has not

3    done so as required under Wash. Rev. Code § 19.118.031.

4    2809.  For vehicles purchased, Plaintiffs and the Washington State Class demand a full

5    refund of the contract price, all collateral charges, and incidental costs. Wash. Rev. Code

6    § 19.118.041(1)(b). For vehicles leased, Plaintiffs and the Washington State Class demand all

7    payments made under the lease including but not limited to all lease payments, trade-in value or

8    inception payment, security deposit, and all collateral charges and incidental costs. The consumer

9    is also relieved of any future obligation to the lessor or lienholder. Plaintiffs and the Washington

10   State Class reject an offer of replacement and will retain their vehicles until payment is tendered.

11
**WASHINGTON STATE COUNT III:**
**Breach of Express Warranty**
12   **Wash Rev. Code §§ 62A.2-313 and 62A.2A-210**
**(On Behalf of the Washington State Class)**
13

14   2810.  Plaintiffs re-allege and incorporate by reference all preceding allegations as though

15   fully set forth herein.

16   2811.  This count is brought on behalf of the Washington State Class against the

17   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

18   2812.  Defendants are and were at all relevant times "merchant[s]" with respect to motor

19   vehicles under Wash. Rev. Code §§ 62A.2-104(1) and 62A.2A-103(1)(t), and "sellers" of motor

20   vehicles under § 2.103(a)(4).

21   2813.  With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

22   of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

23   2814.  The Class Vehicles are and were at all relevant times "goods" within the meaning

24   of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

25   2815.  In connection with the purchase or lease of each one of its new vehicles,

26   Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

27   occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

28   materials or workmanship."

2816.   Defendants also made numerous representations, descriptions, and promises to Plaintiffs and Washington State Class members regarding the performance and emission controls of their vehicles.

2817.   For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

> Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
> – is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

2818.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2819.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1      2820.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

2  with respect to their vehicles' emission systems. Thus, Defendants also provide an express

3  warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

4  Design and Defect Warranty required by the EPA covers repair of emission control or emission

5  related parts, which fail to function or function improperly because of a defect in materials or

6  workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

7  first, or, for the major emission control components, for eight years or 80,000 miles, whichever

8  comes first.

9      2821.   As manufacturers of light-duty vehicles, Defendants were required to provide

10  these warranties to purchasers or lessees of Class Vehicles.

11      2822.   Defendants' warranties formed a basis of the bargain that was reached when

12  Washington State Class members purchased or leased Class Vehicles that are equipped with a

13  defeat device and non-compliant emission systems.

14      2823.   Despite the existence of warranties, Defendants failed to inform Washington State

15  Class members that the Class Vehicles were intentionally designed and manufactured to be out of

16  compliance with applicable state and federal emissions laws, and failed to fix the defective

17  emission components free of charge.

18      2824.   Defendants breached the express warranty promising to repair and correct

19  Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

20  have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

21      2825.   Affording Defendants a reasonable opportunity to cure their breach of written

22  warranties would be unnecessary and futile here.

23      2826.   Furthermore, the limited warranty promising to repair and correct Defendants'

24  defect in materials and workmanship fails in its essential purpose because the contractual remedy

25  is insufficient to make Washington State Class members whole and because Defendants have

26  failed and/or have refused to adequately provide the promised remedies within a reasonable time.

27

28

2827.   Accordingly, recovery by the Washington State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

2828.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Washington State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2829.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Washington State Class members' remedies would be insufficient to make them whole.

2830.   Finally, because of Defendants' breach of warranty as set forth herein, Washington State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2831.   Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

2832.   As a direct and proximate result of Defendants' breach of express warranties, Washington State Class members have been damaged in an amount to be determined at trial.

**WASHINGTON STATE COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**Wash Rev. Code §§ 62A.2-314 and 62A.2A-212**
**(On Behalf of the Washington State Class)**

2833.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2834.   This count is brought on behalf of the Washington State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

2835.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Wash. Rev. Code § 62A.2-104(1) and 62A.2A-103(1)(t), and "sellers" of motor vehicles under § 2.103(a)(4).

2836.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

2837.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

2838.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212.

2839.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

2840.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2841.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Washington State Class members have been damaged in an amount to be proven at trial.

**WEST VIRGINIA COUNT I:**
**Violations of the West Virginia Consumer Credit and Protection Act**
**W. Va. Code § 46A-1-101 *et seq.***
**(On Behalf of the West Virginia State Class)**

2842.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2843.   Plaintiff Lyle Fairless (for the purposes of this count, "Plaintiff") brings this count on behalf of the West Virginia State Class against all Defendants.

2844.   Defendants, Plaintiff, and the West Virginia State Class are "persons" within the meaning of W. Va. Code § 46A-1-102(31). Plaintiff and the West Virginia State Class members are "consumers" within the meaning of W. Va. Code §§ 46A-1-102(2) and 46A-1-102(12).

2845.   Defendants are engaged in "trade" or "commerce" within the meaning of W. Va. Code § 46A-6-102(6).

2846.   The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." W. Va. Code § 46A-6-104.

2847.   In the course of its business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit larger quantities of noxious CO2. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings.

2848.   West Virginia State Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiff and West Virginia State Class members did not and could not unravel Defendants' deception on their own.

2849.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

2850.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health

and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the West Virginia CCPA.

2851.  Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the West Virginia State Class.

2852.  Defendants knew or should have known that their conduct violated the West Virginia CCPA.

2853.  Defendants owed Plaintiff and the West Virginia State Class a duty to disclose the illegality, public health and safety risks, the true nature of the Class Vehicles, because Defendants:

A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

B.    intentionally concealed the foregoing from regulators, Plaintiff, and/or Class members; and/or

C.    made incomplete representations about the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiff and/or Class members that contradicted these representations.

2854.  Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the Class Vehicles' fuel consumption and CO2 emissions were material to Plaintiff and the West Virginia State Class.

2855.  Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff, about the true environmental cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

1  2856.  Defendants' violations present a continuing risk to Plaintiff, the West Virginia

2  State Class, as well as to the general public. Defendants' unlawful acts and practices complained

3  of herein affect the public interest.

4  2857.  Plaintiff and the West Virginia State Class suffered ascertainable loss and actual

5  damages as a direct and proximate result of Defendants' misrepresentations and its concealment

6  of and failure to disclose material information. Plaintiff and the West Virginia State Class

7  members who purchased or leased the Class Vehicles would not have purchased or leased them at

8  all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles

9  rendered legal to sell—would have paid significantly less for them. Plaintiff and the West

10  Virginia State Class also suffered diminished value of their vehicles, as well as lost or diminished

11  use. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive

12  practices under the West Virginia CCPA. All owners of Class Vehicles suffered ascertainable loss

13  in the form of the diminished value of their vehicles as a result of Defendants' deceptive and

14  unfair acts and practices made in the course of Defendants' business.

15  2858.  Pursuant to W. Va. Code § 46A-6-106(a), Plaintiff and the West Virginia State

16  Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages,

17  punitive damages, and any other just and proper relief available under the West Virginia CCPA.

18  2859.  On December 21, 2016, a notice letter was sent to Audi AG and Audi of America,

19  LLC complying with W. Va. Code § 46A-6-106(b).  Additionally, all Defendants were provided

20  notice of the issues raised in this count and this Complaint by the governmental investigations,

21  the numerous complaints filed against them, and the many individual notice letters sent by

22  consumers within a reasonable amount of time after the allegations of Class Vehicle defects

23  became public. Moreover, Plaintiffs sent a second notice letter pursuant to W. Va. Code § 46A-6-

24  106(b) to all Defendants on October 11, 2017.  Because Defendants failed to remedy their

25  unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which

26  Plaintiff and the West Virginia State Class are entitled.

27

28

**WEST VIRGINIA COUNT II:**
**West Virginia Lemon Law**
**W. Va. Code § 46A-6A-1 *et seq.***
**(On Behalf of the West Virginia State Class)**

2860.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2861.   Plaintiff Lyle Fairless (for the purposes of this count, "Plaintiff") brings this count on behalf of the West Virginia State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

2862.   The West Virginia State Class members who purchased or leased the Class Vehicles in West Virginia are "consumers" within the meaning of W. Va. Code § 46A-6A-2(1).

2863.   Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of W. Va. Code § 46A-6A-2(2).

2864.   The Class Vehicles are "motor vehicles" as defined by W. Va. Code § 46A-6A-2(4).

2865.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

2866.   Defendants also made numerous representations, descriptions, and promises to Plaintiff and West Virginia State Class members regarding the performance and emission controls of their vehicles.

2867.   For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:

– was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
– is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

2868.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2869.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emissions systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emissions control unit (ECU), and the onboard emissions diagnostic device or computer.

2870.   The EPA requires vehicle manufacturers to issue Defect Warranties with respect to their vehicles' emissions systems. Thus, Defendants also provide an express warranty to its vehicles through a Federal Emissions Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly due to a defect in materials or workmanship. This warranty

1   provides protection for two years or 24,000 miles, whichever comes first, or, for the major

2   emissions control components, for eight years or 80,000 miles, whichever comes first.

3        2871.   As a manufacturer of light-duty vehicles, Defendants were required to provide

4   these warranties to Plaintiff and the West Virginia State Class members. Defendants warranties

5   formed the basis of the bargain that was reached when Plaintiff and other Class members

6   purchased or leased their Class Vehicles equipped with the non-compliant engine system from

7   Defendants.

8        2872.   The emissions defect in the Class Vehicles existed from the date of the original

9   sale of the new vehicle to the consumer but could not be detected by a reasonable consumer

10   exercising reasonable care and diligence. Therefore, applicable express warranties for the Class

11   Vehicles containing the defeat device software would be extended. Further extension of the

12   express warranty period is now required because of the difficulties the Defendants may have in

13   executing a massive recall Class Vehicles in the United States.

14        2873.   On December 22, 2016, at least one West Virginia Class member sent a letter to

15   Defendants to provide opportunity to cure pursuant to W.Va. Code §§ 46A-6A-3(a) and 5(c).

16   Defendants failed to offer to cure within the requisite statutory time period. Plaintiff and West

17   Virginia State Class members therefore seek all damages and relief available against Defendants

18   under the West Virginia Lemon Law.

19        2874.   As a direct and proximate result of the Defendants' breaches of their duties under

20   West Virginia's Lemon Law, the West Virginia State Class members received goods whose

21   defect substantially impairs their value. The West Virginia State Class has been damaged by the

22   diminished market value of the vehicles along with the compromised functioning and/or non-use

23   of their Class Vehicles.

24        2875.   Defendants have a duty under § 46A-6A-3 to make all repairs necessary to correct

25   the defect herein described to bring the Class Vehicles into conformity with all written warranties.

26   In the event that Defendants cannot affect such repairs, they have a duty to replace each Class

27   Vehicle with a comparable new motor vehicle that conforms to the warranty.

28

1      2876.   As a result of Defendants' breaches, the Plaintiff and the West Virginia State Class

2    are entitled to the following:

3           A.     Revocation of acceptance and refund of the purchase price, including, but

4    not limited to, sales tax, license and registration fees, and other reasonable expenses incurred for

5    the purchase of the new motor vehicle, or if there be no such revocation of acceptance, damages

6    for diminished value of the motor vehicle;

7           B.     Damages for the cost of repairs reasonably required to conform the motor

8    vehicle to the express warranty;

9           C.     Damages for the loss of use, annoyance or inconvenience resulting from

10    the nonconformity, including, but not limited to, reasonable expenses incurred for replacement

11    transportation during any period when the vehicle is out of service by reason of the

12    nonconformity or by reason of repair; and

13           D.     Reasonable attorney fees.

**WEST VIRGINIA COUNT III:**
**Breach of Express Warranty**
**W. Va. Code §§ 46-2-313 and 46-2A-210**
**(On Behalf of the West Virginia State Class)**

17      2877.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

18    fully set forth herein.

19      2878.   Plaintiff Lyle Fairless (for the purposes of this count, "Plaintiff") brings this count

20    on behalf of the West Virginia State Class against the Volkswagen and Audi Defendants

21    (collectively for this count, "Defendants").

22      2879.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

23    vehicles under W. Va. Code § 46-2-104(1) and 46-2A-103(1)(t), and "sellers" of motor vehicles

24    under § 46-2-103(1)(d).

25      2880.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

26    of motor vehicles under W. Va. Code § 46-2A-103(1)(p).

27      2881.   The Class Vehicles are and were at all relevant times "goods" within the meaning

28    of W. Va. Code §§ 46-2-105(1) and 46-2A-103(1)(h).

2882.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

2883.   Defendants also made numerous representations, descriptions, and promises to Plaintiff and West Virginia State Class members regarding the performance and emission controls of their vehicles.

2884.   For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

> Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:
>
> – was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and
> – is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

2885.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2886.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

1   emission control components are covered for the first eight years or 80,000 miles (whichever

2   comes first). These major emission control components subject to the longer warranty include the

3   catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

4   device or computer.

5       2887.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

6   with respect to their vehicles' emission systems. Thus, Defendants also provide an express

7   warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

8   Design and Defect Warranty required by the EPA covers repair of emission control or emission

9   related parts, which fail to function or function improperly because of a defect in materials or

10  workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

11  first, or, for the major emission control components, for eight years or 80,000 miles, whichever

12  comes first.

13      2888.   As manufacturers of light-duty vehicles, Defendants were required to provide

14  these warranties to purchasers or lessees of Class Vehicles.

15      2889.   Defendants' warranties formed a basis of the bargain that was reached when West

16  Virginia State Class members purchased or leased Class Vehicles that are equipped with a defeat

17  device and non-compliant emission systems.

18      2890.   Despite the existence of warranties, Defendants failed to inform West Virginia

19  State Class members that the Class Vehicles were intentionally designed and manufactured to be

20  out of compliance with applicable state and federal emissions laws, and failed to fix the defective

21  emission components free of charge.

22      2891.   Defendants breached the express warranty promising to repair and correct

23  Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

24  have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

25      2892.   Affording Defendants a reasonable opportunity to cure their breach of written

26  warranties would be unnecessary and futile here.

27      2893.   Furthermore, the limited warranty promising to repair and correct Defendants'

28  defect in materials and workmanship fails in its essential purpose because the contractual remedy

1   is insufficient to make West Virginia State Class members whole and because Defendants have

2   failed and/or have refused to adequately provide the promised remedies within a reasonable time.

3        2894.   Accordingly, recovery by the West Virginia State Class members is not restricted

4   to the limited warranty promising to repair and correct Defendants' defect in materials and

5   workmanship, and they seek all remedies as allowed by law.

6        2895.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

7   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

8   not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

9   material facts regarding the Class Vehicles. West Virginia State Class members were therefore

10  induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

11       2896.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

12  resolved through the limited remedy of repairing and correcting Defendants' defect in materials

13  and workmanship as many incidental and consequential damages have already been suffered

14  because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

15  continued failure to provide such limited remedy within a reasonable time, and any limitation on

16  the West Virginia State Class members' remedies would be insufficient to make them whole.

17       2897.   Finally, because of Defendants' breach of warranty as set forth herein, West

18  Virginia State Class members assert, as additional and/or alternative remedies, the revocation of

19  acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

20  currently owned or leased, and for such other incidental and consequential damages as allowed.

21       2898.   Defendants were provided notice of these issues by numerous complaints filed

22  against them, including the instant Complaint, within a reasonable amount of time.

23       2899.   As a direct and proximate result of Defendants' breach of express warranties, West

24  Virginia State Class members have been damaged in an amount to be determined at trial.

25

26

27

28

**WEST VIRGINIA COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**W. Va. Code §§ 46-2-314 and 46-2A-212**
**(On Behalf of the West Virginia State Class)**

2900.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

2901.   Plaintiff Lyle Fairless (for the purposes of this count, "Plaintiff") brings this count on behalf of the West Virginia State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

2902.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under W. Va. Code §§ 46-2-104(1) and 46-2A-103(1)(t), and "sellers" of motor vehicles under § 46-2-103(1)(d).

2903.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under W. Va. Code § 46-2A-103(1)(p).

2904.   The Class Vehicles are and were at all relevant times "goods" within the meaning of W. Va. Code §§ 46-2-105(1) and 46-2A-103(1)(h).

2905.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to W. Va. Code §§ 46-2-314 and 46-2A-212.

2906.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

2907.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

1    2908.   As a direct and proximate result of Defendants' breach of the implied warranty of

2    merchantability, West Virginia State Class members have been damaged in an amount to be

3    proven at trial.

4                                  **WISCONSIN COUNT I:**
                     **Violations of the Wisconsin Deceptive Trade Practices Act**
5                                  **Wis. Stat. § 100.18 *et seq.***
                            **(On Behalf of the Wisconsin State Class)**
6

7    2909.   Plaintiffs incorporate by reference all allegations in this Complaint as though fully

8    set forth herein.

9    2910.   Plaintiffs Mark Dressel and Paul Joachimczyk (for the purpose of this count,

10   "Plaintiffs") bring this count on behalf of themselves and the Wisconsin State Class against all

11   Defendants.

12   2911.   Plaintiffs and the Wisconsin State Class members are "persons" and members of

13   "the public" under the Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA"), Wis. Stat.

14   § 100.18(1). Plaintiffs and Wisconsin State Class members purchased or leased one or more Class

15   Vehicles.

16   2912.   Defendants are "person[s], firm[s], corporation[s] or association[s]" within the

17   meaning of Wis. Stat. § 100.18(1).

18   2913.   The Wisconsin DTPA makes unlawful any "representation or statement of fact

19   which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

20   2914.   In the course of its business, Defendants concealed and suppressed material facts

21   concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

22   Class Vehicles that caused the vehicles to operate in a low emission test mode only during

23   emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

24   noxious $CO2$. The result was what Defendants intended—the Class Vehicles passed emissions

25   testing by way of deliberately induced false readings.

26   2915.   Wisconsin State Class members had no way of discerning that Defendants'

27   representations were false and misleading because Defendants' defeat device software was

28

1   extremely sophisticated technology. Plaintiffs and Wisconsin State Class members did not and

2   could not unravel Defendants' deception on their own.

3       2916.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

4   have characteristics, uses, benefits, and qualities which they do not have; representing that Class

5   Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

6   Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

7   a transaction involving Class Vehicles has been supplied in accordance with a previous

8   representation when it has not.

9       2917.   The Clean Air Act and EPA regulations require that automobiles limit their

10  emissions output to specified levels. These laws are intended for the protection of public health

11  and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

12  Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By

13  installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available

14  for purchase, Defendants violated federal law and therefore engaged in conduct that violates the

15  Wisconsin DTPA.

16      2918.   Defendants intentionally and knowingly misrepresented material facts regarding

17  the Class Vehicles with intent to mislead Plaintiffs and the Wisconsin State Class.

18      2919.   Defendants knew or should have known that their conduct violated the Wisconsin

19  DTPA.

20      2920.   Defendants owed Plaintiffs and the Wisconsin State Class a duty to disclose the

21  illegality, public health and safety risks, the true nature of the Class Vehicles, because

22  Defendants:

23          A.      possessed exclusive knowledge that they were manufacturing, selling, and

24  distributing vehicles throughout the United States that did not comply with regulations;

25          B.      intentionally concealed the foregoing from regulators, Plaintiffs, and/or

26  Class members; and/or

27

28

C. made incomplete representations about the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2921. Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to Plaintiffs and the Wisconsin State Class.

2922. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

2923. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2924. Plaintiffs and the Wisconsin State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the Wisconsin State Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Wisconsin DTPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

2925. As a direct and proximate result of Defendants' violations of the Wisconsin DTPA, Plaintiffs and the Wisconsin State Class have suffered injury-in-fact and/or actual damage.

1    2926.   Plaintiffs and the Wisconsin State Class seek damages, court costs and attorneys'

2    fees under Wis. Stat. § 100.18(11)(b)(2), and any other just and proper relief available under the

3    Wisconsin DTPA.

4                              **WISCONSIN COUNT II:**
                             **Breach of Express Warranty**
5                           **Wis. Stat. §§ 402.313 and 411.210**
                          **(On Behalf of the Wisconsin State Class)**
6

7    2927.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

8    fully set forth herein.

9    2928.   Plaintiffs Mark Dressel and Paul Joachimczyk (for the purpose of this count,

10   "Plaintiffs") bring this count on behalf of themselves and the Wisconsin State Class against the

11   Volkswagen and Audi Defendants (collectively for this count, "Defendants").

12   2929.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

13   vehicles under Wis. Stat. §§ 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under

14   § 402.103(1)(d).

15   2930.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]"

16   of motor vehicles under Wis. Stat. § 411.103(1)(p).

17   2931.   The Class Vehicles are and were at all relevant times "goods" within the meaning

18   of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

19   2932.   In connection with the purchase or lease of each one of its new vehicles,

20   Defendants provide an express warranty for a period of four years or 50,000 miles, whichever

21   occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in

22   materials or workmanship."

23   2933.   Defendants also made numerous representations, descriptions, and promises to

24   Plaintiffs and Wisconsin State Class members regarding the performance and emission controls

25   of their vehicles.

26   2934.   For example, as shown below, Defendants included in the warranty booklets for

27   some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped

28

1   so as to conform at the time of sale with all applicable regulations of the United States

2   Environmental Protection Agency."

Audi of America, Inc., an operating unit of
Volkswagen Group of America, Inc. ("Audi"),
the authorized United States importer of Audi
vehicles, warrants to the original retail pur-
chaser or original lessee and any subsequent
purchaser or lessee that every **model year
2014** Audi vehicle imported by Audi:

– was designed, built and equipped so as to
  conform at the time of sale with all applica-
  ble regulations of the United States Environ-
  mental Protection Agency (EPA), and
– is free from defects in material and work-
  manship which causes the vehicle to fail to
  conform with EPA regulations for 2 years af-
  ter the date of first use or delivery of the ve-
  hicle to the original retail purchaser or origi-
  nal lessee or until the vehicle has been driv-
  en 24,000 miles, whichever occurs first.

12   2935.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide

13   two federal emission control warranties: a "Performance Warranty" and a "Design and Defect

14   Warranty."

15   2936.   The EPA requires vehicle manufacturers to provide a Performance Warranty with

16   respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

17   its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

18   required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

19   whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

20   emission control components are covered for the first eight years or 80,000 miles (whichever

21   comes first). These major emission control components subject to the longer warranty include the

22   catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

23   device or computer.

24   2937.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

25   with respect to their vehicles' emission systems. Thus, Defendants also provide an express

26   warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

27   Design and Defect Warranty required by the EPA covers repair of emission control or emission

28   related parts, which fail to function or function improperly because of a defect in materials or

workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2938.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

2939.   Defendants' warranties formed a basis of the bargain that was reached when Wisconsin State Class members purchased or leased Class Vehicles that are equipped with a defeat device and non-compliant emission systems.

2940.   Despite the existence of warranties, Defendants failed to inform Wisconsin State Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

2941.   Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2942.   Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

2943.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Wisconsin State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2944.   Accordingly, recovery by the Wisconsin State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

2945.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

1    material facts regarding the Class Vehicles. Wisconsin State Class members were therefore

2    induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

3        2946.   Moreover, many of the injuries flowing from the Class Vehicles cannot be

4    resolved through the limited remedy of repairing and correcting Defendants' defect in materials

5    and workmanship as many incidental and consequential damages have already been suffered

6    because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or

7    continued failure to provide such limited remedy within a reasonable time, and any limitation on

8    the Wisconsin State Class members' remedies would be insufficient to make them whole.

9        2947.   Finally, because of Defendants' breach of warranty as set forth herein, Wisconsin

10    State Class members assert, as additional and/or alternative remedies, the revocation of

11    acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles

12    currently owned or leased, and for such other incidental and consequential damages as allowed.

13        2948.   Defendants were provided notice of these issues by numerous complaints filed

14    against them, including the instant Complaint, within a reasonable amount of time.

15        2949.   As a direct and proximate result of Defendants' breach of express warranties,

16    Wisconsin State Class members have been damaged in an amount to be determined at trial.

**WISCONSIN COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Wis. Stat. §§ 402.314 and 411.212**
**(On Behalf of the Wisconsin State Class)**

20        2950.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding

21    paragraphs as though fully set forth herein.

22        2951.   Plaintiffs Mark Dressel and Paul Joachimczyk (for the purpose of this count,

23    "Plaintiffs") bring this count on behalf of themselves and the Wisconsin State Class against the

24    Volkswagen and Audi Defendants (collectively for this count, "Defendants").

25        2952.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

26    vehicles under Wis. Stat. §§ 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under

27    § 402.103(1)(d).

28

2953.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Wis. Stat. § 411.103(1)(p).

2954.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

2955.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wis. Stat. §§ 402.314 and 411.212.

2956.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

2957.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

2958.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Wisconsin State Class members have been damaged in an amount to be proven at trial.

**WYOMING COUNT I:**
**Violations of the Wyoming Consumer Protection Act,**
**Wyo. Stat. § 40-12-101, *et seq.***
**(On Behalf of the Wyoming State Class)**

2959.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2960.   This count is brought on behalf of the Wyoming State Class against all Defendants.

2961.   Plaintiffs, the Wyoming State Class and Defendants are "persons" within the meaning of Wyo. Stat. § 40-12-102(a)(i).

2962.   The Class Vehicles are "merchandise" pursuant to Wyo. Stat. § 40-12-102(a)(vi).

1    2963.   Each sale or lease of an Class Vehicle to a Plaintiffs or Wyoming State Class

2    member was a "consumer transaction" as defined by Wyo. Stat. § 40-12-102(a)(ii). These

3    consumer transactions occurred "in the course of [Defendants'] business" under Wyo. Stat. § 40-

4    12-105(a). Plaintiffs and Wyoming State Class members purchased or leased one or more Class

5    Vehicles.

6    2964.   The Wyoming Consumer Protection Act ("Wyoming CPA") prohibits lists

7    unlawful deceptive trade practices, including when a seller: "(i) Represents that merchandise has

8    a source, origin, sponsorship, approval, accessories, or uses it does not have;" "(iii) Represents

9    that merchandise is of a particular standard, grade, style or model, if it is not;" "(x) Advertises

10   merchandise with intent not to sell it as advertised;" "(xv) Engages in unfair or deceptive acts or

11   practices." Wyo. Stat. § 40-12-105(a).

12   2965.   In the course of its business, Defendants concealed and suppressed material facts

13   concerning the Class Vehicles. Defendants accomplished this by installing a defeat device in the

14   Class Vehicles that caused the vehicles to operate in a low emission test mode only during

15   emissions testing. During normal operations, the Class Vehicles would emit larger quantities of

16   noxious $CO_2$. The result was what Defendants intended—the Class Vehicles passed emissions

17   testing by way of deliberately induced false readings.

18   2966.   Wyoming State Class members had no way of discerning that Defendants'

19   representations were false and misleading because Defendants' defeat device software was

20   extremely sophisticated technology. Plaintiffs and Wyoming State Class members did not and

21   could not unravel Defendants' deception on their own.

22   2967.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

23   have characteristics, uses, benefits, and qualities which they do not have; representing that Class

24   Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

25   Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

26   a transaction involving Class Vehicles has been supplied in accordance with a previous

27   representation when it has not.

28

2968.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the Wyoming CPA.

2969.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Wyoming State Class.

2970.   Defendants knew or should have known that their conduct violated the Wyoming CPA.

2971.   Defendants owed Plaintiffs and the Wyoming State Class a duty to disclose the illegality, public health and safety risks, the true nature of the Class Vehicles, because Defendants:

A.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

B.     intentionally concealed the foregoing from regulators, Plaintiffs, and/or Class members; and/or

C.     made incomplete representations about the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

2972.   Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to Plaintiffs and the Wyoming State Class.

2973.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Class Vehicles.

1    2974.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

2    general public. Defendants' unlawful acts and practices complained of herein affect the public

3    interest.

4    2975.   Plaintiffs and the Wyoming State Class suffered ascertainable loss and actual

5    damages as a direct and proximate result of Defendants' misrepresentations and its concealment

6    of and failure to disclose material information. Plaintiffs and the Wyoming State Class members

7    who purchased or leased the Class Vehicles would not have purchased or leased them at all

8    and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered

9    legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished

10   value of their vehicles, as well as lost or diminished use. Defendants had an ongoing duty to all

11   their customers to refrain from unfair and deceptive practices under the Wyoming CPA. All

12   owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their

13   vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of

14   Defendants' business.

15   2976.   Pursuant to Wyo. Stat. § 40-12-108(a), Plaintiffs and the Wyoming State Class

16   seek damages as determined at trial, and any other just and proper relief available under the

17   Wyoming CPA, including but not limited to court costs and reasonable attorneys' fees as

18   provided in Wyo. Stat. § 40-12-108(b).

19   2977.   On December 21, 2016, a notice letter was sent to Audi AG and Audi of America,

20   LLC complying with Wyo. Stat. Ann. § 40-12-109.  Additionally, all Defendants were provided

21   notice of the issues raised in this count and this Complaint by the governmental investigations,

22   the numerous complaints filed against them, and the many individual notice letters sent by

23   consumers within a reasonable amount of time after the allegations of Class Vehicle defects

24   became public. Moreover, Plaintiffs sent a second notice letter pursuant to Wyo. Stat. Ann. § 40-

25   12-109 to all Defendants on October 11, 2017.  Because Defendants failed to remedy their

26   unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which

27   Plaintiffs and the Wyoming State Class are entitled.

28

**WYOMING COUNT II:**
**Breach of Express Warranty**
**Wyo. Stat. §§ 34.1-2-313 and 34.1-.2A-210**
**(On Behalf of the Wyoming State Class)**

2978.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

2979.   This count is brought on behalf of the Wyoming State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

2980.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Wyo. Stat. §§ 34.1-2-104(a) and 34.1-2.A-103(a)(xx), and "sellers" of motor vehicles under § 34.1-2-103(a)(iv).

2981.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Wyo. Stat. § 34.1-2.A-103(a)(xvi).

2982.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wyo. Stat. §§ 34.1-2-105(a) and 34.1-2.A-103(a)(viii).

2983.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

2984.   Defendants also made numerous representations, descriptions, and promises to Plaintiffs and Wyoming State Class members regarding the performance and emission controls of their vehicles.

2985.   For example, as shown below, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency."

Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc. ("Audi"), the authorized United States importer of Audi vehicles, warrants to the original retail purchaser or original lessee and any subsequent purchaser or lessee that every **model year 2014** Audi vehicle imported by Audi:

– was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and

– is free from defects in material and workmanship which causes the vehicle to fail to conform with EPA regulations for 2 years after the date of first use or delivery of the vehicle to the original retail purchaser or original lessee or until the vehicle has been driven 24,000 miles, whichever occurs first.

2986.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2987.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2988.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

1    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

2    comes first.

3           2989.   As manufacturers of light-duty vehicles, Defendants were required to provide

4    these warranties to purchasers or lessees of Class Vehicles.

5           2990.   Defendants' warranties formed a basis of the bargain that was reached when

6    Wyoming State Class members purchased or leased Class Vehicles that are equipped with a

7    defeat device and non-compliant emission systems.

8           2991.   Despite the existence of warranties, Defendants failed to inform Wyoming State

9    Class members that the Class Vehicles were intentionally designed and manufactured to be out of

10   compliance with applicable state and federal emissions laws, and failed to fix the defective

11   emission components free of charge.

12          2992.   Defendants breached the express warranty promising to repair and correct

13   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

14   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

15          2993.   Affording Defendants a reasonable opportunity to cure their breach of written

16   warranties would be unnecessary and futile here.

17          2994.   Furthermore, the limited warranty promising to repair and correct Defendants'

18   defect in materials and workmanship fails in its essential purpose because the contractual remedy

19   is insufficient to make Wyoming State Class members whole and because Defendants have failed

20   and/or have refused to adequately provide the promised remedies within a reasonable time.

21          2995.   Accordingly, recovery by the Wyoming State Class members is not restricted to

22   the limited warranty promising to repair and correct Defendants' defect in materials and

23   workmanship, and they seek all remedies as allowed by law.

24          2996.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

25   or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did

26   not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

27   material facts regarding the Class Vehicles. Wyoming State Class members were therefore

28   induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2997.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Wyoming State Class members' remedies would be insufficient to make them whole.

2998.   Finally, because of Defendants' breach of warranty as set forth herein, Wyoming State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2999.   Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time.

3000.   As a direct and proximate result of Defendants' breach of express warranties, Wyoming State Class members have been damaged in an amount to be determined at trial.

**WYOMING COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Wyo. Stat. §§ 34.1-2-314 and 34.1-.2A-212**
**(On Behalf of the Wyoming State Class)**

3001.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

3002.   This count is brought on behalf of the Wyoming State Class against the Volkswagen and Audi Defendants (collectively for this count, "Defendants").

3003.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Wyo. Stat. §§ 34.1-2-104(a) and 34.1-2.A-103(a)(xx), and "sellers" of motor vehicles under § 34.1-2-103(a)(iv).

3004.   With respect to leases, Defendants are and were at all relevant times a "lessor[s]" of motor vehicles under Wyo. Stat. § 34.1-2.A-103(a)(xvi).

3005.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wyo. Stat. §§ 34.1-2-105(a) and 34.1-2A-103(a)(viii).

3006.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wyo. Stat. §§ 34.1-2-314 and 34.1-2.A-212.

3007.   These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with a defeat device and do not comply with federal and state emissions standards, rendering certain emissions functions inoperative.

3008.   Defendants were provided notice of these issues by the investigations of the EPA and California state regulators, and numerous complaints filed against it including the instant complaint, within a reasonable amount of time.

3009.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Wyoming State Class members have been damaged in an amount to be proven at trial.

## X.   REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and all Subclasses, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.   An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices alleged in this Complaint;

B.   Injunctive and equitable relief in the form of a comprehensive program to repair, retrofit, and/or buyback all Class Vehicles, and to fully reimburse and make whole all Class members for all costs and economic losses, and degradation of mileage performance, durability, and reliability that the Class Vehicles will incur by being brought into compliance with federal and state law;

1    C.   Environmental reparations, mitigation, and remediation to offset the harm

2    caused by the illegal emissions of the Class Vehicles, based on the mileage driven by all Class

3    Vehicles and/or other appropriate matrices of environmental harm;

4    D.   A declaration that Defendants are financially responsible for all Class

5    notice and the administration of Class relief;

6    E.   Costs, restitution, compensatory damages for economic loss and out-of-

7    pocket costs, treble damages under Civil RICO, multiple damages under applicable states' laws,

8    punitive and exemplary damages under applicable law; and disgorgement, in an amount to be

9    determined at trial;

10    F.   Rescission of all Class Vehicle purchases or leases, including

11    reimbursement and/or compensation of the full purchase price of all Class Vehicles, including

12    taxes, licenses, and other fees.

13    G.   Any and applicable statutory and civil penalties;

14    H.   An order requiring Defendants to pay both pre- and post-judgment interest

15    on any amounts awarded.

16    I.   An award of costs and attorneys' fees, as allowed by law;

17    J.   Leave to amend this Complaint to conform to the evidence produced at

18    trial; and

19    K.   Such other or further relief as the Court may deem appropriate, just, and

20    equitable.

21    **XI.   DEMAND FOR JURY TRIAL**

22    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any

23    and all issues in this action so triable of right.

24

25

26

27

28

| | |
|---|---|
| 1 | Dated:  October 12, 2017 |

Respectfully submitted,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP


By: */s/ Elizabeth J. Cabraser*
Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone: 415.956.1000
Facsimile:  415.956.1008
E-mail: ecabraser@lchb.com

*Plaintiffs' Lead Counsel*

Benjamin L. Bailey
BAILEY GLASSER LLP
209 Capitol Street
Charleston, WV 25301
Telephone: 304.345.6555
Facsimile:  304.342.1110
E-mail: bbailey@baileyglasser.com

Roland K. Tellis
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, CA  91436
Telephone: 818.839.2320
Facsimile: 818.986.9698
E-mail: trellis@baronbudd.com

W. Daniel "Dee" Miles III
BEASLEY ALLEN LAW FIRM
218 Commerce Street
Montgomery, AL  36104
Telephone: 800.898.2034
Facsimile:  334.954.7555
E-mail: dee.miles@beasleyallen.com

Lesley E. Weaver
BLEICHMAR FONTI & AULD LLP
1999 Harrison Street, Suite 670
Oakland, CA 94612
Telephone: 415.455.4003
Facsimile: 415.445.4020
E-mail: lweaver@bfalaw.com

David Boies
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY  10504
Telephone: 914.749.8200
Facsimile:  914.749.8300
E-mail: dboies@bsfllp.com

J. Gerard Stranch IV
BRANSTETTER, STRANCH & JENNINGS, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN  37203
Telephone: 615.254.8801
Facsimile: 615.250.3937
E-mail: gerards@bsjfirm.com

James E. Cecchi
CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO P.C.
5 Becker Farm Road
Roseland, NJ  07068-1739
Telephone: 973.994.1700
Facsimile:  973.994.1744
E-mail: jcecchi@carellabyrne.com

David Seabold Casey, Jr.
CASEY GERRY SCHENK FRANCAVILLA BLATT & PENFIELD, LLP
110 Laurel Street
San Diego, CA  92101-1486
Telephone: 619.238.1811
Facsimile:  619.544.9232
E-mail: dcasey@cglaw.com

1372049.6

AUDI CO$_2$ CONSOLIDATED CLASS ACTION COMPLAINT
MDL 2672 CRB (JSC)

Frank Mario Pitre
COTCHETT PITRE & McCARTHY LLP
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  650.697.6000
Facsimile:  650.697.0577
E-mail: fpitre@cpmlegal.com

Adam J. Levitt
DICELLO LEVITT & CASEY LLC
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois  60602
Telephone:  312.214.7900
E-mail: alevitt@dlcfirm.com

Michael D. Hausfeld
HAUSFELD
1700 K Street, N.W., Suite 650
Washington, DC  20006
Telephone: 202.540.7200
Facsimile:  202.540.7201
E-mail: mhausfeld@hausfeld.com

Lynn Lincoln Sarko
KELLER ROHRBACK L.L.P.
1201 3rd Avenue, Suite 3200
Seattle, WA  98101-3052
Telephone: 206.623.1900
Facsimile:  206.623.3384
E-mail: lsarko@kellerrohrback.com

Paul J. Geller
ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone: 561.750.3000
Facsimile:  561.750.3364
E-mail: pgeller@rgrdlaw.com

Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, NY  10005-4401
Telephone: 212.584.0700
Facsimile:  212.584.0799
E-mail: cseeger@seegerweiss.com

Rosemary M. Rivas, Esq.
LEVI & KORSINSKY LLP
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: 415.291.2420
Facsimile:  415.484.1294
E-mail: rrivas@zlk.com

Steve W. Berman
HAGENS BERMAN
1918 8th Avenue, Suite 3300
Seattle, WA  98101
Telephone: 206.623.7292
Facsimile:  206.623.0594
E-mail: steve@hbsslaw.com

Michael Everett Heygood
HEYGOOD, ORR & PEARSON
6363 North State Highway 161, Suite 450
Irving, TX  75038
Telephone: 214.237.9001
Facsimile:  214.237-9002
E-mail: michael@hop-law.com

Joseph F. Rice
MOTLEY RICE, LLC
28 Bridgeside Boulevard
Mount Pleasant, SC  29464
Telephone: 843.216.9000
Facsimile:  843.216.9450
E-mail: jrice@motleyrice.com

Roxanne Barton Conlin
ROXANNE CONLIN & ASSOCIATES, P.C.
319 Seventh Street, Suite 600
Des Moines, IA  50309
Telephone: 515.283.1111
Facsimile:  515.282.0477
E-mail: roxlaw@aol.com

Jayne Conroy
SIMMONS HANLY CONROY LLC
112 Madison Avenue
New York, NY  10016-7416
Telephone: 212.784.6400
Facsimile:  212.213.5949
E-mail: jconroy@simmonsfirm.com

1    Robin L. Greenwald
     WEITZ & LUXENBERG P.C.
2    700 Broadway
     New York, NY  10003
3    Telephone: 212.558.5500
     Facsimile:  212.344.5461
4    E-mail: rgreenwald@weitzlux.com

5                          *Plaintiffs' Steering Committee*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28