United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION

_____/

This Order Relates To:
Dkt. Nos. 2864, 4175

_____/

MDL No. 2672 CRB (JSC)

**ORDER DENYING BOSCH'S MOTION TO DISMISS THE VOLKSWAGEN-BRANDED FRANCHISE DEALERS' SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT**

The Court in this multidistrict litigation has considered claims by consumers, car dealers, investors, States, and federal agencies against Volkswagen AG and related entities based on Volkswagen's "clean diesel" emissions fraud. The emissions fraud remains the subject here, but the primary focus shifts to the conduct of two other defendants, Bosch GmbH and Bosch LLC, referred to here collectively as "Bosch." Plaintiffs are the owners of certain Volkswagen-branded franchise dealerships (the "Franchise Dealers"). They contend that Bosch conspired with Volkswagen to develop and implement the defeat device that Volkswagen used in its "clean diesel" vehicles to evade U.S. emission standards. By doing so, the Franchise Dealers allege that Bosch participated in a racketeering enterprise in violation of the federal RICO statute, 18 U.S.C. § 1962(c), and also conspired to violate that statute, *id.* § 1962(d).

Currently before the Court is Bosch's motion to dismiss the Franchise Dealers' Second Amended Complaint. (Dkt. Nos. 2864, 4175.) Bosch's arguments for dismissal divide into five categories. (1) Justiciability: Bosch contends that the Franchise Dealers lack Article III standing and, alternatively, that the case is moot. (2) Statutory standing: Bosch contends that the Franchise Dealers cannot assert a RICO private cause of action because they have not suffered an injury to their "business or property by reason of" the alleged RICO enterprise. (3) The merits of the

§ 1962(c) RICO claim: a RICO claim has four elements and Bosch contends that the Franchise Dealers have not satisfied any of them. (4) The merits of the § 1962(d) RICO conspiracy claim. And (5) Personal Jurisdiction over Bosch GmbH. As detailed below, the Court concludes that the Franchise Dealers' claims are well pled and that none of Bosch's arguments warrant dismissal at the pleading stage. Bosch's motion to dismiss is accordingly DENIED.

BACKGROUND

## I.    The Defeat Device Scheme[1]

In or around 2006, Volkswagen began working on a line of environmentally-friendly diesel engine vehicles for sale in the United States. (Dkt. No. 3594: SAC ¶ 57; SOF ¶¶ 31-32.) Diesel engines are generally more fuel efficient than gasoline engines, but historically have emitted greater amounts of air pollution, including nitrogen oxides (NOx). (SAC ¶¶ 61, 64.) With its "clean diesel" vehicles, Volkswagen claimed to have solved this pollution problem, stating that the engine in its vehicles would "help[] reduce sooty emissions by up to 90% compared to previous diesel engines." (SAC ¶ 180; *see also id.* ¶ 61.)

During the design process, though, it became apparent to Volkswagen's engineers that the company's "clean diesels" would not be able to meet U.S. emission requirements given certain budget and engineering constraints. (*Id.* ¶ 63; SOF ¶ 33.) Rather than altering the design, Volkswagen decided to develop and install software in these vehicles to evade U.S. NOx emission standards. (SAC ¶ 71; SOF ¶ 33.) The software is able to detect whether each vehicle is undergoing emissions testing, or being driven normally on the road. During emissions testing the vehicle's emission-control system will perform in a mode that enables the car to satisfy NOx emission standards. But when the vehicle is on the road, the software reduces the effectiveness of the emission controls, causing the vehicle to emit NOx at levels up to 40 times higher than legal limits. (SAC ¶¶ 71, 81, 191; SOF ¶ 34.) Programmed in this manner, the software constitutes an

---

[1] Earlier this year, Volkswagen AG pled guilty to three felonies for its involvement in the emissions scheme. (*See United States v. Volkswagen AG*, No. 16-CR-20394, Dkt. 68 (E.D. Mich. Mar. 10, 2017).) The Franchise Dealers have attached the plea agreement to their complaint. Citations to SOF are to the Statement of Facts therein. Citations to SAC are to the Second Amended Complaint.

EPA-prohibited defeat device.  (SAC ¶¶ 85-86 (citing 40 C.F.R. § 86.1803-01).)

The original concept for the defeat device can be traced back to Audi AG, which is a subsidiary of Volkswagen AG.  (SAC ¶ 72; SOF ¶ 35.)  Before the U.S. emissions scheme, Audi allegedly had started using similar software in diesel vehicles sold in Europe to deactivate additional fuel injection during emissions test.  (SAC ¶ 72.)  Audi engineers used the additional fuel injection to eliminate a noise problem that its vehicles had during normal driving conditions. Since the software was related to the goal of reducing engine noise, it became known as the "acoustic function" or, in German, the "akustikfunktion."  (*Id.*)  The Franchise Dealers contend that Volkswagen eventually adapted Audi's "acoustic function" concept for use in the "clean diesels," starting with vehicles released as part of Volkswagen's "US '07 project."  (*Id.* ¶ 73.)

## II.     Bosch's Involvement

The defeat device in Volkswagen's "clean diesels" is part of each vehicle's electronic control unit: a sophisticated computer that manages engine and emission controls.  Bosch designed and manufactured this computer, which is known as the EDC17.  (*Id.* ¶¶ 76, 98.)  The EDC17 is not inherently a tool for deceit; it is widely used by automakers that operate modern diesel engines.  (*Id.* ¶¶ 77, 98.)  But the EDC17 is highly customizable and there is no dispute that it was modified into a defeat device here.

The Franchise Dealers contend that Bosch and Volkswagen worked together to transform the EDC17 into a defeat device.  The specific allegations involving Bosch are discussed below, but generally the Franchise Dealers contend that Bosch exercised near-total control over the EDC17, and that Volkswagen could not have modified the EDC17 without Bosch's involvement and approval.  The Franchise Dealers also allege that Bosch helped conceal the defeat device from regulators and lobbied U.S. and California lawmakers about the benefits of "clean diesel" technology.

## III.    The Franchise Dealers

The Franchise Dealers are four businesses that each operate a Volkswagen-branded franchise dealership.  They are Napleton VW Orlando, Napleton VW Sanford, and Napleton VW Urbana (the "Napleton Dealership Group"), and J. Bertolet, Inc.  (SAC ¶¶ 17-29.)  Each of the

Franchise Dealers purchased "clean diesel" vehicles from Volkswagen and sold those vehicles to consumers. The Franchise Dealers did not learn that the "clean diesels" each included a defeat device until the fall of 2015, when EPA issued two Notices of Violation of the Clear Air Act and announced that Volkswagen had admitted to deliberately cheating on emissions tests. (SAC ¶ 224; SOF ¶¶ 64, 67.) Immediately following those Notices, Volkswagen issued a stop-sale order, which effectively prevents the Franchise Dealers from selling the affected vehicles they still have in inventory. (SAC ¶¶ 4, 21, 29, 285.) Not only can the Franchise Dealers no longer sell these vehicles, but they allege that the market value of the vehicles has also dropped. (*Id.* ¶ 10.)

The Franchise Dealers also named Volkswagen as a defendant in this lawsuit, but J. Bertolet, Inc. and a class of other franchise dealers settled with Volkswagen earlier this year. (*See* Dkt. No. 2807 (Final Approval Order).) The three entities in the Napleton Dealership Group opted out of the settlement. (*See* Dkt. No. 2807-1 at 2 (Opt-Out List).) As part of the settlement, Volkswagen agreed to pay each class member approximately $1.85 million, and to repurchase the class members' inventory of affected vehicles at their net wholesale cost unless regulators approve a fix. (Dkt. No. 2807 at 5-6.) In its motion for final approval, counsel for the class asserted that the total recovery "exceeds even the top end of . . . [the franchise dealers'] exposure." (*Id.* at 14-15.)

**IV.    Procedural History**

In June of this year, the Court issued an order addressing Bosch's motion to dismiss the Franchise Dealers' First Amended Complaint. (Dkt. No. 3366.) In that order, the Court did not consider the merits of the Franchise Dealers' claims, but instead instructed the Franchise Dealers to amend their complaint to more clearly identify conduct undertaken by Bosch GmbH on the one hand, and Bosch LLC on the other. After the Franchise Dealers filed their Second Amended Complaint, Bosch and the Franchise Dealers each submitted a supplemental brief. (Dkt. Nos. 3665, 3732.) In considering Bosch's motion to dismiss the Second Amended Complaint, the Court has reviewed those supplemental briefs, two other supplemental briefs on RICO's "injury" requirement (Dkt. Nos. 3371, 3372), and the briefing on Bosch's motion to dismiss the First Amended Complaint, which raised many arguments that were not addressed in the June order

(Dkt. Nos. 2864, 2983, 3052, 4175).

# DISCUSSION

As noted above, Bosch's arguments for dismissal divide into five categories: (1) justiciability; (2) statutory standing; (3) § 1962(c) merits; (4) § 1962(d) merits; and (5) personal jurisdiction over Bosch GmbH. The Court addresses these categories in turn.

## I. Justiciability

### A. Article III Standing

Standing requires a plaintiff to show that "he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice . . . ." *Lujan*, 504 U.S. at 561.

Bosch contends that the Franchise Dealers have alleged only conjectural and hypothetical injuries because they have not sold any of the affected vehicles for a loss since the fraud was disclosed. The reason the Franchise Dealers have not sold any of the affected vehicles, though, is because Volkswagen issued a stop-sale order. (SAC ¶¶ 4, 21, 29, 285.) That means that the Franchise Dealers—whose business it is to sell cars—cannot sell the affected vehicles for *any* price. This amounts to a "clear deprivation" of an "owner's right to sell his property on terms he wishes," *Ybarra v. Town of Los Altos Hills*, 370 F. Supp. 742, 748 n.6 (N.D. Cal. 1973), *aff'd*, 503 F.2d 250 (9th Cir. 1974), which constitutes a concrete and particularized injury.

Cases cited by Bosch are not on point because they involve scenarios in which a product defect never manifests. *See, e.g.*, *Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 628 (8th Cir. 1999) ("Plaintiffs have not alleged that their ABS brakes have malfunctioned or failed."); *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices and Prods. Liab. Litig.*, 915 F. Supp. 2d 1151, 1157 (C.D. Cal. 2013) (plaintiff has not presented "any evidence that the ABS in his vehicle malfunctioned or failed . . . ."). That is not the situation here, where the defeat device has made the affected vehicles unsaleable.

5

**B.    Mootness**

Bosch also argues that the Franchise Dealers have not suffered a cognizable injury because of the Volkswagen settlement, which, as noted above, has or will provide class members with a total recovery that "exceeds even the top end of . . . [their] exposure" from the emissions fraud. (Dkt. No. 2807 at 14-15.)  Bosch contends that the settlement has or will make the Franchise Dealers whole and extinguishes any live controversy.

This argument is better cast as one of mootness than of standing.  The contention is not that the Franchise Dealers were never injured, but that their injuries do not or will not continue and that the case is therefore moot.  *See Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986, 989 (9th Cir. 1999) ("The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980))).  The Volkswagen settlement, however, has not mooted the Franchise Dealers' action against Bosch for two reasons.

First, the Napleton Dealership Group, which includes three of the four named plaintiffs, opted out of the Volkswagen settlement, so they will not receive settlement benefits.  They therefore retain the "requisite personal interest that must exist" to litigate this case.  *Id.*  Second, although the other named plaintiff, J. Bertolet, Inc., is a party to the Volkswagen settlement, J. Bertolet, Inc. retains a claim for treble damages under RICO.  That claim presents a live controversy even if the Volkswagen settlement completely satisfies J. Bertolet, Inc.'s actual damages from the emissions fraud.

The most relevant authority on this second point is *Flintkote Co. v. Lysfjord*, 246 F.2d 368 (9th Cir. 1957).  There, the plaintiff settled a Clayton Act claim with all but one of the named defendants for $20,000 prior to trial.  *Id.* at 373.  The case against the remaining defendant proceeded to trial, where the jury awarded the plaintiff actual damages of $50,000 for injuries arising from the conspiracy.  *Id.* at 373, 397.  In calculating treble damages, the district court trebled the $50,000 jury award and then subtracted the $20,000 settlement (leading to a $130,000 judgment).  On appeal, the defendant argued that the district court should have first subtracted the $20,000 settlement from the jury award and then trebled that, smaller, amount (leading to a

$90,000 judgment). The Ninth Circuit affirmed the district court's judgment and held that any set-off for amounts previously paid in settlement should occur after the damages awarded are trebled. *Id.* The court reasoned that the alternative approach would not provide the plaintiff with full satisfaction of his claim, and would discourage settlements and lessen the incentives for private antitrust actions in contravention of Congress's intent in making treble damages available. *Id.*

Like the Clayton Act, RICO includes a mandatory treble damages provision. *See* 18 U.S.C. § 1964(c) ("Any person [sustaining a RICO injury] *shall* recover threefold the damages he sustains . . . .") (emphasis added). And the Ninth Circuit has explained that the Clayton Act and RICO are to be "interpreted in tandem." *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168 (9th Cir. 2002). The Seventh Circuit has also expressly adopted the *Flintkote* rule in the RICO context. *See Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1310 (7th Cir. 1987) ("[S]etting-off damages *after* trebling is more likely to effectuate the purposes behind RICO."). Under this rule, the Franchise Dealers' case is not moot. Even if the amount of the Volkswagen settlement is equivalent to the Franchise Dealers' actual damages, full satisfaction of their claim would be three times that amount.

Bosch argues that the situation here is distinguishable because the Volkswagen settlement by itself makes J. Bertolet, Inc. whole, whereas the settlement in *Flintkote* was only a partial settlement. Bosch contends that there is accordingly no injury that could be trebled here. (Dkt. No. 3052 at 13.) The Ninth Circuit has not addressed whether *Flintkote* would still apply if the plaintiff settles with a joint defendant for an amount that covers all actual damages, but another district court has applied *Flintkote* in such a scenario. *See In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litig.*, 636 F. Supp. 1138 (C.D. Cal. 1986). In doing so, the court there reasoned that it made no difference that the plaintiffs' "actual damages were completely, rather than only partially, satisfied . . . . because the critical factor is that the 'full satisfaction' to which treble damage claimants are entitled is 'three times the proven actual damages' [and] any award less than that amount constitutes an incomplete recovery." *Id.* at 1152. The district court's approach in *In re National Mortgage* is consistent with *Flintkote*, and this Court accordingly adopts it. Full satisfaction of a civil RICO claim includes a trebling of actual damages, so unless a

plaintiff settles with a joint tortfeasor for three times actual damages, the plaintiff's claim against the non-settling defendant is not moot.

Bosch also relies on *Commercial Union Assurance Co. v. Milken*, 17 F.3d 608 (2d Cir. 1994) in support of its mootness argument. The Second Circuit there held that a RICO claim was moot after the plaintiffs recouped their actual losses during the litigation, even though they did not recover treble damages. *Id.* at 612-613. *Commercial Union* is contrary to the Ninth Circuit's decision in *Flintkote*. *Flintkote* is binding here.

Because J. Bertolet, Inc. has not recovered treble damages, its action is not moot. The Napleton Dealership Group's action is not moot either, as the members of that group opted out of the Volkswagen settlement.

## II.  Statutory Standing

Congress has narrowed the scope of injuries that can trigger a civil RICO violation, specifically limiting standing to those who have suffered (1) an injury to "business or property," that is (2) "by reason of" a RICO violation. 18 U.S.C. § 1964(c). Bosch contends that the Franchise Dealers have not satisfied either of these requirements.

### A.  Injury to Business or Property

RICO's injury standard requires the plaintiff to plead "a harm to a specific business or property interest," which is "a categorical inquiry typically determined by reference to state law." *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc). Personal injuries do not qualify under RICO. In *Oscar v. University Students Co-op. Ass'n*, for example, the Ninth Circuit held that an apartment tenant failed to allege an injury to business or property when she claimed that neighborhood drug dealers caused her "personal discomfort and annoyance." 965 F.2d 783, 787 (9th Cir. 1992) (citation omitted), *abrogated on other grounds by Diaz*, 420 F.3d 897. The Ninth Circuit reached a similar holding in *Berg v. First State Insurance Co.*, concluding that "a personal injury in the form of emotional distress" is "not a claim for an injury to property as [RICO] requires." 915 F.2d 460, 464 (9th Cir. 1990). These decisions reflect the judicial understanding that, by enacting RICO, Congress sought "to thwart the organized criminal invasion and acquisition of legitimate business enterprises and property," not to supplement the "[a]mple law

8

already [in] existe[nce] to provide recovery for wrongfully inflicted personal injuries." *Oscar*, 965 F.2d at 786 (quoting *Gentry v. Resolution Trust Corp.*, 937 F.2d 899, 918 (3d Cir. 1991)).

Not only must a RICO plaintiff adequately plead an injury to a specific business or property interest, but the injury must also be "tangible" or "concrete." *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008); *Diaz*, 420 F.3d at 900. An out-of-pocket loss satisfies this requirement. In *Canyon County*, for example, the court noted that "[i]n the ordinary context of a commercial transaction, a consumer who has been overcharged can claim an injury to her property, based on a wrongful deprivation of her money." 519 F.3d at 976.

An out-of-pocket loss is not required, however, for a financial loss to be tangible or concrete. And in fact, the Ninth Circuit has allowed much more abstract losses to move beyond the pleading stage. In *Mendoza*, for example, a group of agricultural workers brought a RICO claim against agricultural companies that allegedly hired undocumented immigrants. The agricultural workers argued that this practice depressed their wages. 301 F.3d at 1166. In dismissing the complaint, the district court had held that the workers' losses were speculative and not concrete because many intervening factors could have interfered with their wages. *Id.* at 1170-71; *see also Mendoza v. Zirkle Fruit Co.*, No. CS-00-3024-FVS, 2000 WL 33225470, at *9-10 (E.D. Wash. Sept. 27, 2000). The Ninth Circuit reversed, noting that:

> [I]t is important to distinguish between uncertainty in the fact of damage and in the amount of damage. That wages would be lower if, as alleged, the growers relied on a workforce consisting largely of undocumented workers, is a claim at least plausible enough to survive a motion to dismiss, whatever difficulty might arise in establishing how much lower the wages would be.

*Mendoza*, 301 F.3d at 1171 (citation omitted). The Ninth Circuit also reasoned that:

> [T]he workers must be allowed to make their case through presentation of evidence, including experts who will testify about the labor market, the geographic market, and the effects of the illegal scheme. Questions regarding the relevant labor market and the growers' power within that market are exceedingly complex and best addressed by economic experts and other evidence at a later stage in the proceedings.

*Id.*

The en banc panel in *Diaz*, 420 F.3d 897, extended *Mendoza*. The *Diaz* court held that "false imprisonment that caused the victim to lose employment and employment opportunities is an injury to 'business or property' within the meaning of RICO." *Id.* at 898. In reaching this conclusion, the court noted that the "three-judge panel [had] tried to distinguish *Mendoza* on the theory that Diaz did not allege 'that he lost actual employment, only that he 'was rendered unable to pursue gainful employment.'" *Id.* at 900 (quoting *Diaz v. Gates*, 380 F.3d 480, 484 (9th Cir. 2004)). The en banc court concluded that this distinction was untenable, reasoning that:

> There may be a practical difference between current and future employment for purposes of RICO—for instance, it may be easier to prove causation or determine damages for a plaintiff who has lost current employment—but this difference is not relevant to whether there was an injury to "business or property."

*Id.* at 900-01.

Applying these standards here, the Franchise Dealers have plausibly alleged multiple injuries to their business and property interests, and these injuries are sufficiently concrete to survive a motion to dismiss. The stop-sale order has prevented the Franchise Dealers from selling their inventory of affected vehicles. (SAC ¶¶ 4, 21, 29, 285.) As noted above, this amounts to a "clear deprivation" of an "owner's right to sell his property on terms he wishes." *Ybarra*, 370 F. Supp. at 748 n.6. Further, as a result of this deprivation, the Franchise Dealers plausibly allege that they have lost profits, have incurred inventory carrying costs, have had to purchase replacement inventory, and have lost servicing revenues from the vehicles they could not legally sell. (*See* SAC ¶ 441(c), (d), (f), (i).) The Franchise Dealers also allege that they overpaid for the "clean diesels," believing they were compliant with U.S. emission standards. (*Id.* ¶ 441(a).) This out-of-pocket loss is also a cognizable injury to the Franchise Dealers' property. *Canyon Cty.*, 519 F.3d at 976; *see also Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390, 396 (1906) (city suffered injury to property by paying more for water pipes than they were worth as a result of anticompetitive conduct). The mirror image injury is also cognizable: the value of the Franchise Dealers' inventory of affected vehicles declined in value after the fraud was disclosed. *See Oscar*, 965 F.2d at 786-87 (reasoning that, unlike a renter, "one might measure an owner's loss by the diminution in fair market value" of property).

There will be some overlap among these injuries; there may also be offsets to certain injuries, such as if the Franchise Dealers paid for alternative inventory but then successfully sold that inventory for a profit, or if independent market forces caused a drop in profits or a decline in the value of the affected vehicles. But these issues center on the amount of damage, not its existence. As in *Mendoza*, the Franchise Dealers "must be allowed to make their case through presentation of evidence, including experts who will testify about the . . . market . . . and the effects of the illegal scheme." 301 F.3d at 1171.

There is one exception, which is the Franchise Dealers' alleged loss of goodwill. Goodwill is "the positive reputation a business may enjoy in the eyes of the public that creates a probability that old customers will continue their patronage." *In re Thomas*, 246 B.R. 500, 505 (E.D. Pa. 2000); *see also* Cal. Bus. & Prof. Code § 14100 (defining the "good will" of a business as "the expectation of continued public patronage"). Damage to goodwill has been recognized as an intangible injury. *See Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (recognizing that "intangible injuries, such as damage to ongoing recruitment efforts *and goodwill*, quality as irreparable harm") (emphasis added). RICO, however, requires more than "mere injury to a valuable intangible property interest," *Oscar*, 965 F.2d at 785 (internal quotation marks omitted), so a loss of goodwill is not recoverable.

In the Franchise Dealers' First Amended Complaint they explicitly alleged a loss of goodwill. (*See* Dkt. No. 1969, FAC ¶ 381(f).) In their Second Amended Complaint, loss of goodwill has become "[l]oss of sales associated with replacement vehicles for existing customers." (SAC ¶ 441(g).) While cast in different language, the theory is the same: the emissions fraud reduced the likelihood that old customers would return. That is goodwill.

The Franchise Dealers note that California recognizes goodwill as a property interest, as explained in *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1316 (9th Cir. 1989). To support RICO standing, though, an injury must not only be to a "specific business or property interest," but the injury must also result in a "tangible" or "concrete" financial loss. *Diaz*, 420 F.3d at 900; *Canyon Cty.*, 519 F.3d at 975. Goodwill is an intangible injury, *Rent-A-Center*, 944 F.2d at 603, and so does not satisfy this standard.

Bosch argues that *all* of the Franchise Dealers' alleged injuries are premised upon a claim for a loss of goodwill. (*See* Dkt. No. 2864 at 37-38.) That is not so. The complaint does include a number of general allegations about how the emissions fraud angered the Franchise Dealers' former customers. (*See, e.g.*, SAC ¶ 266 ("[The] Franchise Dealers . . . are now faced with their most loyal and engaged customers feeling profoundly betrayed by Volkswagen . . . .") (emphasis omitted).) But those general allegations do not turn all of the asserted injuries into claims for a loss of goodwill. For example, the Franchise Dealers' claim of lost profits is not predicated solely on a loss of sales to former customers, but also on allegations that the Franchise Dealers could not legally sell their inventory of "clean diesels" after Volkswagen issued the stop-sale order. Likewise, the Franchise Dealers allege that the market value of the "clean diesels" declined, not solely because of a loss of goodwill, but also because the demand for those vehicles understandably dropped once EPA disclosed that the vehicles did not comply with U.S. emission standards. The Court accordingly rejects Bosch's reading of the complaint as asserting only injuries to goodwill.

Bosch also cites to certain out-of-circuit cases for the proposition that only out-of-pocket losses are recoverable under RICO. *See, e.g.*, *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 155 F. Supp. 2d 1069, 1090 (S.D. Ind. 2001) (to satisfy RICO's injury requirement, "a plaintiff must prove an actual, concrete monetary loss (*i.e.*, an 'out-of-pocket' loss)"). As noted above, that is not the law in the Ninth Circuit. *See Diaz*, 420 F.3d at 898, 900 (loss of employment and employment opportunities may constitute a RICO injury); *Mendoza*, 301 F.3d at 1166, 1171 (allegations of depressed wages may constitute a RICO injury).

Citing to *In re: General Motors LLC Ignition Switch Litigation*, No. 14-md-2543, 2016 WL 3920353, at *7, 16-17 (S.D.N.Y. July 15, 2016), Bosch also argues that a decline in the value of the affected vehicles is a "benefit-of-the-bargain defect theory" that is too speculative to support a RICO injury. The *General Motors* court reached this holding in the consumer context, reasoning that a harm to a consumer's expectation interest is not a harm to a "property" interest for purposes of RICO. *See id.* at *17 (consumers who purchased vehicles with a latent defect could not "bring a RICO claim for harm to 'property' based on the benefit-of-the-bargain defect theory pressed

here"). In reaching this holding, the court expressly noted that a different result may be warranted "for a RICO claim against New GM by *dealers* in GM-branded vehicles who expected to be able to sell their stock at a certain price and received lower prices when New GM's concealment was revealed." *Id.* (emphasis added). In other words, GM dealers could plausibly allege a harm to their "business," if not their "property," because of a decline in the value of their inventory of GM vehicles. This latter scenario is similar to the one alleged here. *General Motors* therefore does not counsel against the Franchise Dealers' claim.

The Franchise Dealers have plausibly alleged multiple tangible injuries to their business and property interests. They will accordingly be allowed to "make their case through presentation of evidence." *Mendoza*, 301 F.3d at 1171. The one exception is that the Franchise Dealers may not pursue a theory of harm to goodwill, which is an intangible injury that cannot support a RICO claim.

### B.   Injury "By Reason" of a RICO Violation

A plaintiff asserting a private cause of action for a RICO violation must also satisfy a causation requirement: the plaintiff must plausibly allege at the pleading stage that the RICO violation was a "but for" cause and proximate cause of its asserted injuries. *Canyon Cty.*, 519 F.3d at 981.

### 1.   "But For" Causation

The allegations plausibly support that, "but for" the alleged enterprise, the Franchise Dealers would not have suffered the injuries they allege. Each injury stems from the defeat device, which when discovered led to a drop in the value of the "clean diesels" and the stop-sale order.

Bosch argues that "but for" causation is lacking because the Franchise Dealers have alleged that Volkswagen could have accomplished the emissions fraud by using a different electronics supplier. (*See* SAC ¶ 272 ("Had Bosch not agreed to develop and supply the EDC17 . . . either VW could not have sold its ['clean diesel' vehicles] . . . , *or VW would have sought out a different supplier*.") (emphasis added).) This argument is based only on speculation. No other suppliers are identified in the complaint, and the Franchise Dealers elsewhere allege that

Bosch's EDC17 was "integral to Volkswagen's entire diesel strategy," and that the emissions fraud "could not have been accomplished without years of collaborative work" between Volkswagen and Bosch. (SAC ¶ 99.)

## 2. Proximate Cause

"When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). Three nonexhaustive factors are considered as part of this inquiry:

> (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries.

*Mendoza*, 301 F.3d at 1169.

Each of these factors supports a direct connection between Bosch's alleged RICO violation and the Franchise Dealers' alleged injuries. First, there are no more direct victims of the wrongful conduct because the Franchise Dealers bought the affected vehicles directly from co-schemer Volkswagen. To the extent the Franchise Dealers overpaid for the affected vehicles, or those vehicles declined in value, or the Franchise Dealers lost profits from not being able to sell those vehicles, no one other than the Franchise Dealers can assert those injuries.

As for the second factor, at this stage it is sufficient that the relationship between the Franchise Dealers' alleged injuries and Bosch's alleged violation is not "speculative in the extreme." *Canyon Cty.*, 519 F.3d at 982 (affirming dismissal of RICO claim where it was "not clear how [private] companies' hiring of undocumented immigrants would increase demand for health care and law enforcement within Canyon County" as compared to if the companies hired legally authorized workers). Unlike in *Canyon County*, the allegations here support that the emissions fraud led directly to the stop-sale order, which led directly to the Franchise Dealers' inability to sell their inventory of "clean diesel" vehicles. And as noted in *Mendoza*, questions as to the *amount* of damage, as opposed to the plausibility of damage, are best resolved at a later

14

stage in the litigation. *See* 301 F.3d at 1171.

Third, there is no reason to currently conclude that this case will require the Court "to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries." *Id.* at 1169. Courts have found that this factor is implicated in cases involving "passed-on" injury, which is "injury derived from a third party's direct injury." *Id.* For example, in *Holmes* the Court held that an entity representing customers of broker-dealers could not pursue a RICO claim against a stock manipulator who bankrupt the broker-dealers because, among other things, the "directly injured . . . broker-dealers . . . could be counted on to bring suit[.]" *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 273 (1992). By limiting the suit to the directly injured, the Court reasoned that the district court could avoid "hav[ing] to find some way to apportion the possible respective recoveries by the broker-dealers and the customers, who would otherwise each be entitled to recover the full treble damages." *Id.*

Similarly, in *Pillsbury* the Ninth Circuit held that a law firm that subleased office space could not pursue a RICO claim against past and present owners of the building who engaged in a scheme to fraudulently increase rents. The court reasoned that "the apportionment task need not be taken," because "[t]he directly injured party, [the master tenant], can sue for the *whole* injury[.]" *Pillsbury, Madison & Sutro v. Lerner*, 31 F.3d 924, 930 (9th Cir. 1994). Here, there is no passed-on injury, as the Franchise Dealers purchased the affected vehicles directly from Volkswagen. Their claims, then, are not derivative.

Keeping with the third factor, Bosch argues that to resolve this action the Court will need to engage in speculation to determine the degree of the alleged loss attributable to Bosch as opposed to Volkswagen. (Dkt. No. 2864 at 34-35.) Difficulty apportioning damages between defendants, however, is not a factor that is considered in the proximate cause analysis. Instead, the apportionment question centers on whether "the existence of other *injured parties* creates difficulties of apportionment or risks of multiple recovery." *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1055 (9th Cir. 2008) (emphasis added); *see also Holmes*, 503 U.S. at 269 ("[R]ecognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages *among plaintiffs* removed at different levels of injury from the violative acts

. . . .") (emphasis added). The focus on plaintiffs and not the members of the RICO scheme is sensible: those injured by a RICO enterprise should not be prevented from seeking relief simply because of the complexity of the enterprise.

Bosch makes two other proximate cause arguments. First, Bosch asserts that the Franchise Dealers do not satisfy the proximate cause standard because they have alleged a direct relationship only with Volkswagen, not with Bosch. (Dkt. No. 2864 at 33-36.) What matters, though, is not whether there is a direct relationship between the plaintiff and defendant, but whether there is a "sufficiently direct relationship between the defendant's wrongful *conduct* and the plaintiff's injury . . . ." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 657 (2008) (emphasis added). In *Bridge*, for example, the plaintiff, a bidder on tax liens, did not have a direct relationship with the defendant, a competing bidder. But the Court held that the plaintiff satisfied RICO's proximate cause requirement because there was a sufficiently direct relationship between the defendant's wrongful conduct of making misrepresentations to the auctioneer, and the plaintiff's injury of losing out on other bids as a result of those misrepresentations. *Id.* at 643-44, 657-58.

Here, irrespective of whether the Franchise Dealers have a direct relationship with Bosch, there is a sufficiently direct connection between Bosch's alleged *conduct* and the Franchise Dealers' alleged injuries. Specifically, the Franchise Dealers allege that Bosch partnered with Volkswagen to implement the defeat device in Volkswagen's "clean diesel" vehicles. That conduct, in turn, has made the Franchise Dealers' inventory of those vehicles unsaleable.[2]

Finally, Bosch argues that proximate cause is lacking because its preconceived purpose was not to injure the Franchise Dealers. Whether a RICO defendant intended to injure the plaintiff, however, is not part of the proximate cause calculus. *See Hemi Grp., LLC v. City of New*

_____

[2] In *Oki Semiconductor Co. v. Wells Fargo Bank, National Ass'n*, 298 F.3d 768 (9th Cir. 2002), not only was there no direct relationship between the plaintiff and the RICO defendant, but the plaintiff's injury also was not directly caused by the defendant's conduct. The defendant there employed an individual who laundered the proceeds of an armed robbery at plaintiff's manufacturing plant. The court held that the employee's conduct was not a direct cause of the plaintiff's injury because her "financial wizardry" took place only after her co-conspirators stole plaintiff's hardware. *Id.* at 774. And only "[i]n a tenuous way" could her conduct even "be considered a 'but for' cause of [plaintiff's] loss." *Id.* Here, in contrast, the alleged conduct by Bosch took place before the Franchise Dealers were injured and plausibly led directly to those injuries.

United States District Court
Northern District of California

*York*, 559 U.S. 1, 12 (2010) ("The dissent would . . . . find that the City has satisfied [RICO's proximate cause] requirement because the harm is foreseeable [and] it is a consequence that Hemi intended . . . . [But] [o]ur precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm.") (internal quotation marks omitted); *Diaz*, 420 F.3d at 901 ("There is . . . no room in the [RICO] statutory language for [a] . . . requirement that . . . the business or property interest have been the 'direct target' of the predicate act."); *Pillsbury*, 31 F.3d at 929 ("The existence of specific intent does not answer the question of whether the injury is specifically direct.").

In certain shareholder derivative actions, courts have held that injury to the company was not proximately caused by the fraud of management because the alleged injuries "were neither the 'preconceived purpose' nor the 'specifically-intended consequence' of the RICO defendants' acts." *In re Am. Exp. Co. S'holder Litig.*, 39 F.3d 395, 400 (2d Cir. 1994); *see also Brocade Commc'ns Sys., Inc. Derivative Litig.*, 615 F. Supp. 2d 1018, 1043 (N.D. Cal. 2009) (dismissing a Special Litigation Committee's RICO claim against the company's former CEO for granting fraudulent stock options because plaintiff "fail[ed] to allege that any injuries suffered by Brocade were the 'preconceived purpose' or 'specifically-intended consequence' of [the CEO's] acts" (quoting *In re Am. Exp.*, 39 F.3d at 400)). But given that directness, not foreseeability or purpose, is the governing standard for RICO proximate cause, the Court declines to apply these holdings outside of the shareholder derivative context.

The Franchise Dealers have adequately pled that their injuries were directly caused by Bosch's alleged RICO violation. No one other than the Franchise Dealers can assert the injuries they have alleged; questions as to the exact amount of damages are not so speculative as to warrant dismissal; and there is no reason to currently believe that this case will require the Court "to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries." *Mendoza*, 301 F.3d at 1169.

## III. Merits of the RICO Claim

### A. Preliminary Matter: Looking at the Bosch Defendants' Collective Conduct

A RICO claim under 18 U.S.C. § 1962(c) includes four elements. Before turning to those

elements, though, the Court addresses the requirement that the § 1962(c) elements "must be established as to each individual defendant." *Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027 (8th Cir. 2008). In a June order, the Court held that the Franchise Dealers had not satisfied this requirement because their First Amended Complaint "blur[ed] the lines between the conduct of Bosch GmbH on the one hand, and Bosch LLC on the other." (Dkt. No. 3366 at 2.)

The Franchise Dealers have made an effort in their Second Amended Complaint to identify which Bosch entity took which alleged actions. But for the most part it is still difficult to determine which entity did what. The Second Amended Complaint has made clear, though, that the reason for this difficulty is not conclusory or vague pleading on the part of the Franchise Dealers; rather, the blur between Bosch GmbH and Bosch LLC is caused by the way in which employees at both entities work together on certain projects, including the EDC17 project.

The Franchise Dealers allege that both Bosch GmbH and Bosch LLC operate "under the umbrella of the Bosch Group, which encompasses some 340 subsidiaries and companies." (SAC ¶ 39.) The Bosch Group in turn is divided into four business sectors: Mobility Solutions, Industrial Technology, Consumer Goods, and Energy and Building Technology. (*Id.*) Mobility Solutions is the unit at issue here; it supplies parts to the automotive industry. And within Mobility Solutions is Bosch's Diesel Systems division, "which develops, manufacturers and applies diesel systems." (*Id.*)

As alleged, each of Bosch's sectors and divisions is "grouped not by location, but by subject matter." (*Id.*) The result is that Bosch's Diesel Systems division includes employees from both Bosch GmbH and Bosch LLC. (*Id.*) The Franchise Dealers also allege that "[r]egardless of whether . . . individual[s] works for Bosch LLC in the U.S. or Bosch GmbH in Germany, the individuals often hold themselves out as working for 'Bosch.'" (*Id.*) Further, although communications, legal agreements, and other documents sometimes refer to a specific Bosch entity, "Bosch documents and press releases often refer to the author as 'Bosch' without identifying any particular Bosch entity." (*Id.*)

Some of these allegations about the structure of Bosch's sectors and divisions also

18

appeared in the First Amended Complaint. But the Second Amended Complaint has added additional detail and has clarified that, as best the Franchise Dealers can tell at this stage in the litigation, employees in Bosch's Diesel Systems division do not commonly divide themselves along corporate lines. These allegations support a plausible inference that the knowledge of, and action undertaken by, employees of Bosch's Diesel Systems division can be attributed to both Bosch GmbH and Bosch LLC.

Treating Bosch GmbH and Bosch LLC as a collective unit does not prejudice the Bosch Defendants. A key justification for requiring plaintiffs to separately plead allegations of fraud as to each defendant is notice. *See Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) ("To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge . . . ."). Notice is not a problem here. Each Bosch Defendant participated in conducting the affairs of the Diesel Systems division, and each Bosch Defendant accordingly is on notice that it may potentially be held responsible for the conduct of that division.

### B.     The Section 1962(c) Elements

To state a RICO claim, the Franchise Dealers must plausibly allege that Bosch participated, directly or indirectly, in (1) the conduct, (2) of an enterprise that affects interstate commerce, (3) through a pattern, (4) of racketeering activity. *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (citing 18 U.S.C. § 1962(c)). The Court addresses these elements below in reverse order.

#### 1.     Element 4: Racketeering Activity

RICO defines "racketeering activity" as any of the predicate acts listed in 18 U.S.C. § 1961(1). Those predicate acts include mail and wire fraud, which are the acts that the Franchise Dealers contend Bosch committed. *See id.* (citing 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud)).

Mail and wire fraud are identical offenses except for the particular method used to disseminate the fraud. *Eclectic Props.*, 751 F.3d at 997. The elements are (1) a scheme to defraud, (2) the use of the mails or wires to further that scheme, and (3) the specific intent to

defraud. *Id.* The "scheme to defraud" element requires "an affirmative, material misrepresentation." *United States v. Green*, 592 F.3d 1057, 1064 (9th Cir. 2010) (quoting *United States v. Benny*, 786 F.2d 1410, 1418 (9th Cir. 1986)). But the misrepresentation does not need to be made through the mails or wires; rather, the use of the mails or wires only needs to be "a step in the plot." *United States v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2004) (internal quotation marks omitted). The misrepresentation also does not need to be made to the RICO plaintiff, but instead may be made to a third-party. *See Bridge*, 553 U.S. at 661 (bidder on public tax liens had standing to assert RICO claim against a competing bidder who made misrepresentations to the auctioneer, which deprived plaintiff of other bids; "a plaintiff asserting a RICO claim predicated on mail fraud need not show . . . that it relied on the defendant's alleged misrepresentations").

The "scheme to defraud" element of mail and wire fraud is "treated like conspiracy in several respects." *United States v. Stapleton*, 293 F.3d 1111, 1117 (9th Cir. 2002) (quoting *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992)). As a result, each member of the scheme does not need to make a separate misrepresentation. As explained in *Stapleton*:

> Just as acts and statements of co-conspirators are admissible against other conspirators, so too are the statements and acts of co-participants in a scheme to defraud admissible against other participants. We also apply similar principles of vicarious liability. Like co-conspirators, "knowing participants in the scheme are legally liable" for their co-schemers' use of the mails or wires.

*Id.* (quoting *Lothian* 976 F.2d at 1262-63).

Based on these principles, the *Stapleton* court concluded that a defendant may be held liable for mail or wire fraud if (1) the defendant was a knowing participant in a scheme to defraud; (2) the defendant had the intent to defraud; and (3) a co-schemer committed acts of mail or wire fraud during the defendant's participation in the scheme, and those acts were within the scope of the scheme. *Id.* at 1117-18.

Bosch takes issue with the application of *Stapleton* here. Bosch notes that in *Stapleton* the Ninth Circuit addressed mail and wire fraud in the criminal context. And if *Stapleton* is applied in the civil context, Bosch asserts, it will effectively allow civil RICO liability for aiding and abetting, which Congress has not explicitly authorized. *See Cent. Bank of Denver, N.A. v. First*

1   *Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994) (holding that there is no implicit aiding

2   and abetting liability in federal civil statutes, but rather Congress has "taken a statute-by-statute

3   approach"); *Pa. Ass'n of Edwards Heirs v. Rightenour*, 235 F.3d 839, 840 (3d Cir. 2000)

4   (applying *Central Bank of Denver* in interpreting RICO and concluding that the "statutory text

5   does not provide for a private cause of action for aiding and abetting").

6        Bosch misconstrues the RICO statute. First, § 1962(c) makes it unlawful to participate in

7   "a pattern of racketeering activity." This is a criminal offense. Section 1964(c) separately

8   provides for a civil action for "[a]ny person injured in his business or property by reason of a

9   violation of section 1962 . . . ." Whether a violation of § 1962 is asserted as a civil or criminal

10  offense, the definition of "racketeering activity" remains the same: it is defined as any of a number

11  of criminal offenses, including murder, kidnapping, bribery, counterfeiting, and (as relevant here)

12  mail and wire fraud. *See* 18 U.S.C. § 1961(1). The civil RICO statute, then, incorporates the

13  crimes of mail and wire fraud in their entirety. It therefore cannot be that *Stapleton*'s

14  interpretation of mail and wire fraud applies in the criminal context, but not in the civil RICO

15  context.

16       Second, *Stapleton* does not allow civil RICO liability for aiding and abetting. *Stapleton*

17  interpreted only the mail and wire fraud statutes, which are the predicate acts of "racketeering

18  activity." But racketeering activity is only one element of a RICO claim under § 1962(c), and the

19  Supreme Court has expressly held that another RICO element requires *more* than the type of

20  conduct that would trigger aiding and abetting liability. In *Reves*, the Court interpreted

21  § 1962(c)'s requirement that each member of a RICO enterprise "participate . . . in the conduct" of

22  the enterprise's affairs. *Reves v. Ernst & Young*, 507 U.S. 170 (1993). The petitioners argued that

23  "Congress used 'participate' as a synonym for 'aid and abet.'" *Id.* at 178. The Court disagreed,

24  holding that "participate" in the context of § 1962(c) has a narrower meaning: unlike aiding and

25  abetting, which "comprehends all assistance rendered by words, acts, encouragement, support, or

26  presence," *id.* (quoting Black's Law Dictionary 68 (6th ed. 1990)), the Court reasoned that to

27  "participate . . . in the conduct" of an enterprise's affairs requires "some part in directing those

28  affairs," *id.* at 179. *Reves*, then, makes clear that RICO requires more than aiding and abetting

21

conduct to give rise to liability. *Stapleton*'s interpretation of the predicate acts of mail and wire fraud does not change that.

In arguing against co-schemer liability for mail and wire fraud, Bosch also relies on *WellPoint*. In discussing RICO's "pattern" element, the district court there held that "[w]here RICO is asserted against multiple defendants, a plaintiff must allege at least two predicate acts by *each* defendant." *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1035 (C.D. Cal. 2011). The *WellPoint* court went on to note, though, that "the complaint need not identify false statements made by each and every individual," but rather the plaintiff need only "identify the role of each defendant in the alleged fraudulent scheme." *Id.* at 1036 (citation omitted). *WellPoint*, then, is not necessarily inconsistent with *Stapleton*. And to the extent *WellPoint* is inconsistent, the Ninth Circuit's *Stapleton* decision controls.

In sum, the Franchise Dealers can satisfy their burden of demonstrating that Bosch engaged in the predicate acts of mail and wire fraud with allegations that Bosch was (1) a knowing participant in a scheme to defraud, (2) that Bosch participated in the scheme with the intent to defraud, and (3) that a co-schemer's acts of mail and wire fraud occurred during Bosch's participation in the scheme and were within the scope of the scheme. *Stapleton*, 293 F.3d at 1117-18. The allegations supporting each of these elements are considered below.

### a.       Knowing Participant in a Scheme to Defraud

The scheme, as alleged, was to misrepresent to U.S. regulators and the public that Volkswagen's "clean diesel" vehicles complied with U.S. emission standards and were environmentally friendly. (*See* SAC ¶¶ 1, 408-09.) The allegations support that Bosch knowingly participated in this scheme by working with Volkswagen to implement the defeat device that made the scheme possible, and by promoting "clean diesel" technology in the United States.

First, the allegations support that Bosch exercised near-total control over modifications to the EDC17. For example, Volkswagen and Bosch agreed in a 2005 contract that Bosch would retain control over the EDC17 software; that Bosch would test and carry out any modifications necessary in order to integrate Volkswagen modules; that any modules developed by Volkswagen could not be installed without Bosch's written approval; and that only if everything met Bosch's

standards would Bosch "deliver[] the final complete software product for VW to use in combination with a BOSCH control unit."  (SAC ¶¶ 108-110 (alteration in original).)

Bosch's tight control over the EDC17 is further supported by allegations that Bosch typically locked the EDC17 to prevent customers like Volkswagen from making significant changes on their own.  (*Id.* ¶¶ 79, 103.)  An engineer from another car company has also confirmed that Bosch is heavily involved in software development, and that "[t]he car company is never entitled by Bosch to do something on their own."  (*Id.* ¶ 105 (emphasis omitted).)

Taking these allegations as true and construing them in the Franchise Dealers' favor, *Ass'n for L.A. Deputy Sheriffs v. Cty. of Los Angeles*, 648 F.3d 986, 991 (9th Cir. 2011), an inference arises that Bosch was not a mere parts supplier that "innocently suppli[ed] a product that was misused by VW," as Bosch contends.  (Dkt. No. 2864 at 47.)  Rather, because the Franchise Dealers plausibly alleges that Bosch controlled all modifications to the EDC17, the Franchise Dealers' complaint supports an inference that Bosch must have known about and approved the changes that converted the EDC17 into a defeat device.

Internal Volkswagen emails also support that Bosch was involved in the scheme.  In a November 2006 email, for example, Dieter Mannigel, a member of Volkswagen's Software Design team in the U.S. Diesel Engines division, emailed Hanno Jelden, head of Volkswagen's Powertrain Electronics division, about the "US07" project.  (SAC ¶¶ 118, 128; Dkt. No. 4175-5 at 3.)[3]  As noted above, that project involved the design of the first iteration of "clean diesels" for sale in the United States.  (SAC ¶ 73.)  Mannigel's email reads:

> Have you spoken with Bosch about the issue of US07 . . . ?
> This issue is slowly becoming critical . . . .
> I came away from our meeting with Mr. Krebs [who joined Volkswagen from Audi in 2005, SAC ¶ 118] with the following:
> -    When we use the "acoustic function," it should have an appearance that won't

---

[3] Bosch has attached this email and 15 other documents to its motion to dismiss.  (*See* Dkt. No. 4175, Exs. A-P.)  The Court considers these documents as part of the complaint pursuant to the "incorporation by reference" doctrine because "plaintiff's claim depends on the contents of [the] document[s], the defendant attach[ed] the document[s] to its motion to dismiss, and the parties do not dispute the authenticity of the document[s]."  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).  The Court previously permitted Bosch and Volkswagen to redact information from these exhibits that identifies non-parties who are not relevant to the dispute.  (*See* Dkt. No. 4147.)

United States District Court
Northern District of California

get us in trouble . . . .

. . . .

- He is very skeptical about its implementation on the U.S. market: for one thing due to the very critical liability situation . . . .

In my opinion, the requirement of "nondiscoverability" has neither been met for today's function nor the planned expansion.
The FP sheet for the expansion has been submitted to Bosch.
How do we proceed?

(Dkt. No. 4175-5 at 3.)

The express references in this email to the "acoustic function," the "US07" project, and the importance of not getting caught illustrate Volkswagen's deception in undertaking the emissions scheme. But the email also casts Bosch as a strategic partner in the scheme. The "issue" discussed appears to be how to implement the "acoustic function" in the U.S. without being discovered. And Mannigel asks if Jelden has "spoken with Bosch about the issue," suggesting that Bosch might be able to help hide the "acoustic function" from U.S. regulators. Further, from the statement that "[t]he FP sheet for the expansion has been submitted to Bosch," it is also reasonably inferable that Volkswagen had already requested that Bosch modify the EDC17 to implement the "acoustic function."

Other communications between 2005 and 2015 support Bosch's involvement in developing and implementing the defeat device. In a November 2005 email, a Volkswagen employee sent a meeting agenda to other Volkswagen and Bosch employees. Among the agenda items was the "Emission Result[s] of the Current Acoustic / Driving Behavior Calibration" with respect to "Baseline Measurement . . . without NOx Catalyst." (Dkt. No. 4175-7 at 4.) And in a November 2014 email chain, a Volkswagen employee also explained to colleagues that "Bosch will be bringing up with Team 1 the topic of SW use of the acoustic function by VW" in the "context of gasoline hydraulic components." (Dkt. No. 4175-8 at 4.) While this latter email does not directly tie Bosch to the diesel defeat device, it supports the inference that Bosch knew about the "acoustic function" more generally, and that Volkswagen collaborated with Bosch on its use.

Allegations also support that Bosch participated in the scheme by promoting "clean diesel" technology in the United States. The Franchise Dealers allege that following the launch of the

24

EDC17 in 2006, Bosch hired a lobbying firm, mcapitol Managers, to promote its "clean diesel" products in Washington D.C. and with EPA. (SAC ¶ 143.) Bosch also organized and hosted a two-day "California Diesel Days" event in April 2009 in Sacramento, and invited lawmakers, journalists, executives, and regulators to the event, which featured Volkswagen's vehicles "as ambassadors of 'Clean Diesel' technology." (*Id.* ¶ 147.) Bosch also presented in June 2007 on "meeting the demands of U.S. emission legislation, where it focused on lowering emissions in diesel vehicles." (*Id.* ¶ 154.)

Bosch argues that its lobbying and promotional activities focused on promoting "clean diesel" generally, and were not tied directly to Volkswagen. As noted above, though, Bosch used Volkswagen's vehicles as exemplars at certain promotional events. Further, Volkswagen was the biggest diesel-vehicle manufacturer in the world (*id.* ¶ 92 n.24), and made a strategic decision in 2005 to "launch a large-scale promotion of diesel vehicles in the United States" (*id.* ¶ 57). Given Volkswagen's prominence in the "clean diesel" space, and Bosch's use of Volkswagen's vehicles, it is reasonable to conclude that by promoting "clean diesel" Bosch sought to increase demand for Volkswagen's vehicles.[4]

### b.    Intent to Defraud

Bosch's intent to defraud reasonably can be inferred from the scheme itself. *See Eclectic Props.*, 751 F.3d at 997 ("[B]y examining the scheme itself the court may infer a defendant's specific intent to defraud.") (internal quotation marks omitted). No one to date in this multidistrict litigation has sought to justify, or explain a lawful purpose for, software that effectively turns a vehicle's emission systems on or off depending on whether the vehicle is undergoing emissions testing or being operated under normal driving conditions. But according to the allegations in the

---

[4] The *Noerr-Pennington* doctrine does not bar consideration of Bosch's lobbying activities. (*See* Dkt. No. 2864 at 51.) Under that doctrine, "those who petition any department of the government for redress are generally immune from statutory liability *for their petitioning conduct.*" *Sosa*, 437 F.3d at 929 (emphasis added). Here, the Franchise Dealers are not asserting that Bosch's lobbying activity was unlawful. Instead, they contend that Bosch's lobbying activity proves its knowledge of, and intent to participate in, the emissions fraud. *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 n.3 (1965) ("It would of course still be within the province of the trial judge to admit this evidence, if he deemed it probative and not unduly prejudicial . . . if it tends reasonably to show the purpose and character of the particular transactions under scrutiny.").

complaint, that is the function for which Bosch allowed its EDC17 to be used for years in Volkswagen's vehicles. Further, not only did Bosch authorize this use of its EDC17, but it promoted "clean diesel" technology despite knowing that the low NOx emissions levels that Volkswagen reported to U.S. regulators, and promoted to U.S. consumers, were false. The Franchise Dealers' pleadings satisfy the intent requirement.[5]

### c. Volkswagen's Acts of Mail Fraud or Wire Fraud Within the Scope of the Scheme

The complaint alleges numerous misrepresentations by Volkswagen to U.S. regulators and consumers. These include Volkswagen's applications for certification of the affected vehicles, which Volkswagen submitted to EPA and the California Air Resources Board (CARB) for each model year, and which misrepresented that the vehicles complied with EPA and CARB's emission requirements (SAC ¶¶ 86-88, 423(b)); falsified emission tests (*id.* ¶ 423(f)); and sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which all misrepresented or concealed the affected vehicles' emission levels (*id.* ¶¶ 160-88, 423(k)). All of these misrepresentations are alleged to have been made through the use of the mails and wires. All of these misrepresentations also occurred during Bosch's participation in the scheme and were within the scope of the scheme so as to support co-schemer liability. *Stapleton*, 293 F.3d at 1117-18. The Franchise Dealers have accordingly satisfied the "racketeering activity" element of their civil RICO claim.[6]

---

[5] The Franchise Dealers also contend that certain communications between Bosch and U.S. regulators support an intent to defraud. As pled, the Court disagrees. Most of the alleged communications between Bosch and regulators do not explicitly reference emissions, or otherwise plausibly relate to emission-control systems or the defeat device. (*See* generally SAC ¶¶ 115, 135, 140.) The link between Bosch's communications with regulators and the fraudulent scheme is therefore missing.

[6] There is no issue here involving the extraterritorial reach of RICO. The allegations support that Volkswagen used the U.S. mails and wires in furtherance of the scheme, and Bosch does not deny that the use of the U.S. mails and wires is the focus of those statutes. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad . . . ." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016).

## 2. Element 3: A Pattern of Racketeering Activity

A "pattern of racketeering activity" requires the commission of at least two predicate acts within a ten-year period. 18 U.S.C. § 1961(5). "Evidence of multiple schemes is not required . . . and, indeed, proof of a single scheme can be sufficient so long as the predicate acts involved are not isolated or sporadic." *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989)). The predicate acts here were not isolated or sporadic: the Franchise Dealers allege that Volkswagen misrepresented the emission levels of multiple vehicle models over the course of a decade. Bosch does not contend otherwise.

## 3. Element 2: An Enterprise that Affects Interstate Commerce

To state a RICO claim, the plaintiff must connect the alleged racketeering activity with the conduct of an "enterprise" that affects interstate or foreign commerce. 18 U.S.C. § 1962(c). The Franchise Dealers allege that Bosch and Volkswagen were part of an associated-in-fact enterprise. *See* 18 U.S.C. § 1961(4). Such an enterprise has three elements: (1) a common purpose, (2) a structure or organization, and (3) longevity necessary to accomplish the purpose. *Boyle v. United States*, 556 U.S. 938, 946 (2009). Each element is satisfied here.

First, "[e]vidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" *Id.* at 947 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). This is such a case. The allegations that Bosch knowingly participated with Volkswagen in the scheme to defraud also support that Bosch and Volkswagen shared a common purpose to design, manufacture, and sell the "clean diesel" vehicles "through fraudulent [certifications], false emissions tests, [and] deceptive and misleading marketing . . . materials, and [to derive] profits and revenues from those activities." (SAC ¶ 408.)

Second, RICO's structural requirement requires only a "relationship among those associated with the enterprise." *Boyle*, 556 U.S. at 946 (neither a "hierarchy, role differentiation . . . [or] a chain of command" is required). This element is satisfied here, as made clear by contracts between Volkswagen and Bosch (SAC ¶¶ 108-13), and a spreadsheet that tracked Bosch's work for Volkswagen on the EDC17, which is alleged to include 8,565 entries from hundreds of Bosch employees (*id.* ¶ 107).

Third, the Franchise Dealers allege that Bosch and Volkswagen's emissions scheme extended over the course of a decade, as the companies worked together to customize the EDC17 for use in a variety of Volkswagen-branded vehicles offered in model years 2009 through 2016. (SAC ¶¶ 36, 40.) The enterprise, then, had a longevity necessary to accomplish its purpose. *See Boyle*, 556 U.S. at 946 (an enterprise "must have some longevity, since the offense proscribed by [§ 1962(c)] demands proof that the enterprise had 'affairs' of sufficient duration to permit an associate to 'participate' in those affairs through 'a pattern of racketeering activity'").

### 4. Element 1: Conducting the Affairs of the Enterprise

Finally, "[i]n order to 'participate, directly or indirectly, in the *conduct* of [an] enterprise's affairs,' one must have some part in directing those affairs." *Reves*, 507 U.S. at 179 (emphasis added) (quoting 18 U.S.C. § 1962(c)). This requirement does not limit RICO liability "to those with primary responsibility for the enterprise's affairs," nor does it require a participant to exercise "significant control over or within an enterprise." *Id.* at 179 & n.4 (emphasis omitted). But "*some part* in directing the enterprise's affairs is required," *id.* at 179, and "[s]imply performing services for the enterprise," or failing to stop illegal activity, is not sufficient. *Walter v. Drayson*, 538 F.3d 1244, 1248-49 (9th Cir. 2008).

As alleged, Bosch's role was more than "[s]imply performing services for the enterprise," or failing to stop illegal activity. *Id.* In their 2005 agreement, Bosch and Volkswagen agreed that Bosch's approval would be required before any Volkswagen modules could be implemented in the EDC17. Through this approval right, Bosch had the final say as to whether to implement the defeat device. (*See* SAC ¶ 110 ("Only if everything met Bosch's standards would it then deliver the final complete software product for VW to use in combination with a BOSCH control unit.") (internal quotation marks omitted).) Bosch's final-approval right made it "indispensable to achievement of the enterprise's goals," and provided it with a position in the "chain of command" of the enterprise, both factors that support an inference that it had a role in conducting the enterprise's affairs. *Walter*, 538 F.3d at 1249.

### C.     Section 1962(c) Merits Conclusion

The Franchise Dealers' allegations are sufficient to satisfy the four elements of their § 1962(c) RICO claim. They have plausibly alleged that Bosch partnered with Volkswagen to implement the defeat device in the affected vehicles, and by doing so participated in the conduct of a years-long enterprise to defraud U.S. regulators and consumers.

## IV.     Merits of the RICO Conspiracy Claim

The Franchise Dealers also allege that Bosch and Volkswagen engaged in a conspiracy to commit a RICO violation in violation of 18 U.S.C. § 1962(d). "[A] RICO conspiracy under § 1962(d) requires only that the defendant was 'aware of the essential nature and scope of the enterprise and intended to participate in it.'" *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015) (quoting *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004)). The same allegations that demonstrate Bosch's participation in the enterprise support the Franchise Dealers' conspiracy claim. It is plausible that Bosch was aware of the scheme because it exercised near-total control over modifications to the EDC 17. And Bosch's intent to participate in the scheme is inferable from its alleged willingness to let Volkswagen use the modified EDC17 in its vehicles for years.

## V.     Personal Jurisdiction over Bosch GmbH

Finally, Bosch GmbH seeks dismissal for lack of personal jurisdiction. At the pleading stage, the Franchise Dealers "need only make a prima facie showing of jurisdictional facts." *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011) (quoting *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1127 (9th Cir. 2010)). They have done so here.

Personal jurisdiction over Bosch GmbH is proper under Federal Rule of Civil Procedure 4(k)(2). Referred to as the federal long-arm statute, Rule 4(k)(2) applies when (1) the claim against the defendant arises under federal law; (2) the defendant is not subject to the personal jurisdiction of any state court of general jurisdiction; and (3) the federal court's exercise of personal jurisdiction comports with due process. *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 461 (9th Cir. 2007).

The first two elements are not in dispute: the Franchise Dealers' RICO claim arises under federal law, and where (as here) the defendant does not identify a state court of general jurisdiction, the second element is also satisfied. *Id.* at 462 ("[A]bsent any statement from [the defendant] that it is subject to the courts of general jurisdiction in another state, the second requirement of Rule4(k)(2) is met.").

The Court's exercise of personal jurisdiction over Bosch GmbH also comports with due process. Bosch and Volkswagen are alleged to have intentionally designed the defeat device to evade U.S. emission requirements. (*See, e.g.*, SAC ¶ 73 ("Volkswagen engineers, working with Bosch Diesel Systems . . . adapted Audi's 'akustikfunktion' concept . . . for Volkswagen and Audi models to be sold in the U.S."); ¶ 81 (Bosch and Volkswagen customized the EDC17 so that the affected vehicles could "detect[] test scenarios" that were used in the United States).) Employees at Bosch GmbH, working as part of Bosch's Diesel Systems division, also lobbied U.S. regulators and lawmakers about the benefits of "clean diesel" technology. (*Id.* ¶¶ 143, 147, 149-50, 154.) This conduct all "connects [Bosch GmbH] to the forum in a meaningful way." *Walden v. Fiore*, 134 S. Ct. 1115, 1125 (2014). The Franchise Dealers' suit also "arises out of or relates to the defendant's contacts with the forum," so as to support specific jurisdiction. *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014) (citation omitted). "But for" Bosch GmbH's approval of a defeat device targeted at the U.S. vehicle market, it is reasonable to conclude that the Franchise Dealers would not have suffered injuries tied to that device. *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1075 (9th Cir. 2001).

Bosch GmbH contends that this case is like *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011). There, the Court held that New Jersey's courts could not exercise personal jurisdiction over a foreign manufacturer of a product, where the manufacturer had not specifically targeted New Jersey and no more than four of the manufacturer's machines ended up in New Jersey. *Id.* at 877-78 (plurality opinion). Because the jurisdictional inquiry here is under Rule 4(k)(2), the proper analogy would be if Bosch GmbH had not specifically targeted the United States, and no more than four (or some other minimal number) of Bosch's EDC17s had ended up in the United States. That is not what is alleged here. Instead, the Franchise Dealers allege that

Bosch GmbH and Volkswagen specifically targeted the United States and that hundreds of thousands of defeat devices made their way into the United States.

Bosch GmbH also has not "present[ed] a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King v. Rudzewicz*, 471 U.S. 462, 477 (1985). Bosch GmbH argues that it would be burdened by defending in the United States as opposed to in Germany. (Dkt. No. 2864 at 64.) But "[u]nless such inconvenience is so great as to constitute a deprivation of due process, it will not overcome clear justifications for the exercise of jurisdiction." *Hirsch v. Blue Cross, Blue Shield of Kansas City*, 800 F.2d 1474, 1481 (9th Cir. 1986). The inconvenience identified here, that Bosch GmbH is headquartered in Germany, is not an inconvenience of this magnitude. Bosch GmbH also notes that Germany "has a significant sovereign interest in regulating [its] behavior." (Dkt. No. 2864 at 64.) The Court agrees, but there is no conflict with the sovereignty of Germany here, as the Franchise Dealers bring this case for conduct that was specifically targeted at the United States, based on Bosch GmbH's alleged violation of U.S. law.

## CONCLUSION

The Franchise Dealers have satisfied the pleading requirements necessary for this litigation to continue. The motion to dismiss is DENIED.

**IT IS SO ORDERED.**

Dated: October 30, 2017

_____
CHARLES R. BREYER
United States District Judge