United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: VOLKSWAGEN "CLEAN DIESEL"
MARKETING, SALES PRACTICES, AND
PRODUCTS LIABILITY LITIGATION

_____/

This Order Relates To:
*City of St. Clair Shores*, 15-6167
*Travalio*, 15-6168
*George Leon Family Trust*, 15-6168
*Charter Twp. of Clinton*, 16-190
*Wolfenbarger*, 16-184

MDL Dkt. No. 3036

_____/

MDL No. 2672 CRB (JSC)

**ORDER RE: PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY
JUDGMENT ON THE ISSUES OF
FALSITY AND SCIENTER AGAINST
VOLKSWAGEN AG**

Earlier this year, Volkswagen AG ("VW AG") pled guilty to three felonies as a result of the company's "clean diesel" emissions scheme. The scheme involved selling approximately 585,000 diesel engine vehicles in the United States by using a defeat device to cheat on federal and state emissions tests. The question addressed in this order is whether the company's admissions in its plea agreement establish as a matter of law that 37 statements it made, either in investor reports, press releases, or on engine compliance labels, were knowingly false, such that partial summary judgment on the issues of falsity and scienter is appropriate in a securities-fraud suit against the company.[1]

_____

[1] Pursuant to Civil Local Rule 7–1(b), the Court finds this matter appropriate for resolution without oral argument.

## BACKGROUND

### I.      The Securities Suit and VW AG's Plea Agreement

Plaintiffs previously purchased a U.S. dollar denominated form of equity ownership in VW AG. They generally allege that, by not disclosing the emissions scheme, VW AG and members of management misrepresented the company's financial condition, the environmental friendliness of its "clean diesel" vehicles, and the compliance of those vehicles with U.S. emissions standards. Plaintiffs' causes of action are for violation of (1) Section 10(b) of the Securities Exchange Act and SEC Rule 10b–5(b); and (2) Section 20(a) of the Exchange Act.

After Plaintiffs initiated this suit, VW AG pled guilty to (1) conspiracy to defraud the United States through (a) wire fraud and (b) the making of false statements in materials required to be filed pursuant to the Clean Air Act, 18 U.S.C. §§ 371, 1343; 42 U.S.C. § 7413(c)(2)(A); (2) obstruction of justice, 18 U.S.C. § 1512(c); and (3) introducing imported merchandise into the United States by means of false statements, 18 U.S.C. § 542. (*See United States v. Volkswagen AG*, No. 16-CR-20394, Dkt. No. 68 (E.D. Mich. Mar. 10, 2017).)[2]

The factual basis for VW AG's plea is set out in the Statement of Facts ("SOF"), which is attached to the plea agreement and contains information that VW AG has stipulated is "true and accurate." (Dkt. No. 3038-3 at 2.) The SOF details the involvement of "Supervisors A–F" in the emissions scheme. They were "senior employees" at VW AG during the relevant period, but were "below the level of the VW AG Management Board." (SOF ¶ 1.) Supervisors A–D and F were supervisors in the VW Brand Engine Development department at different times from 2005 through 2017. (*Id.* ¶¶ 7-10, 12.) Supervisor A was later promoted and served as the supervisor in charge of Engine Development for all of VW AG and of Development for VW Brand until

---

[2] At Plaintiffs' request (Dkt. No. 3039), the Court takes judicial notice of the existence of VW AG's plea agreement, which is a fact that is not subject to reasonable dispute because its existence "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Plaintiffs have also included with their motion copies of the plea agreement and the Statement of Facts attached thereto. (*See* Harrod Decl., Exs. B & C, Dkt. Nos. 3038-2, 3038-3.) The statements therein are admissible as non-hearsay party admissions. *See* Fed. R. Evid. 801(d)(2); *In re Homestore.com, Inc.*, No. CV 01-1115 RSWL, 2011 WL 291176, at *9 (C.D. Cal. Jan. 25, 2011) (holding that "the factual admissions in Defendant's plea agreement are admissible on these grounds").

September 2015.  (*Id.* ¶ 7.)  Supervisor E was a mid-level supervisor in VW AG's Quality

Management and Product Safety department from approximately 2007 through 2014.  (*Id.* ¶ 11.)

In the SOF, VW AG admitted that in or around 2006, "VW AG employees working under

the supervision of Supervisors B, C, and F were designing the new EA 189 2.0 liter diesel engine

. . . for use in the United States that would be the cornerstone of a new project to sell passenger

diesel vehicles in the United States."  (SOF ¶ 32.)  "Supervisors B, C, and F, and others, however,

realized that VW could not design a diesel engine that would both meet the stricter U.S. [nitrogen

oxide] NOx emissions standards that would become effective in 2007 and attract sufficient

customer demand in the U.S. market.  Instead of bringing to market a diesel vehicle that could

legitimately meet the new, more restrictive U.S. NOx emissions standards, VW AG employees

acting at the direction of Supervisors B, C, and F and others . . . designed, created, and

implemented a software function to detect, evade and defeat U.S. emissions standards."  (*Id.* ¶ 33.)

In "various Volkswagen, Audi, and Porsche [3.0-liter] diesel vehicles sold in the United States for

model years 2009 through 2016," "Audi AG engineers" also "designed and installed software

designed to detect, evade and defeat U.S. emissions standards."  (*Id.* ¶ 39.)  Audi AG is a

subsidiary of Volkswagen AG.  (*Id.* ¶ 2.)

To sell its 2.0-liter and 3.0-liter diesel vehicles in the United States (the "Subject

Vehicles"), VW AG was required to obtain approval from the U.S. Environmental Protection

Agency ("EPA") and the California Air Resources Board ("CARB").  In the SOF, VW AG

admitted that during meetings between employees of VW, EPA, and CARB, "some of which

Supervisor F attended personally, VW employees misrepresented . . . that the Subject Vehicles

complied with U.S. NOx emissions standards, when they knew the vehicles did not."  (*Id.* ¶ 41.)

VW AG also admitted that "Supervisors A-F, and others, knew that if they had told the truth and

disclosed the existence of the defeat device, VW would not have obtained the requisite [EPA and

CARB certifications] for the Subject Vehicles and could not have sold any of them in the United

States."  (*Id.* ¶ 42.)

"In order to import the Subject Vehicles into the United States, VW was required to

disclose to [U.S. Customs and Border Protection] whether the vehicles were covered by valid

3

certifications for the United States.  VW did so by affixing a label to the vehicles' engines.  VW employees caused to be stated on the labels that the vehicles complied with applicable EPA and CARB emissions regulations and limitations, knowing that if they had disclosed that the Subject Vehicles did not meet U.S. emissions regulations and limitations, VW would not have been able to import the vehicles into the United States."  (*Id.* ¶ 43.)

VW AG also admitted in the SOF that "Supervisors A and C and others marketed, and caused to be marketed, the Subject Vehicles to the U.S. public as 'clean diesel' and environmentally-friendly, when they knew the Subject Vehicles were intentionally designed to detect, evade, and defeat U.S. emissions standards."  (*Id.* ¶ 44.)

VW AG admitted that it is responsible for the acts of these Supervisors and the acts of other employees as described in the SOF.  (*Id.*, Preamble.)  VW AG also agreed in its plea agreement that it "will neither contest the admissibility of, nor contradict, the [SOF] . . . in any proceeding."  (Dkt. No. 3038-2 at 8, Plea Agreement at 1.E.)

## II.     The False and Misleading Statements

Plaintiffs contend that VW AG's admissions in its plea agreement establish, as a matter of law, that the company made 37 false statements with knowledge that the statements were false. The statements can be divided into three categories: (1) statements made in investor reports, (2) statements made in press releases, and (3) a statement on the compliance label that was affixed to each of the Subject Vehicles.

### A.     Statements Made in Investor Reports

Thirty-one of the 37 statements were made in one or more of 16 annual, interim, and half-yearly VW AG investor reports.  (*See* Dkt. No. 3038, Harrod Decl., Ex. A (App. of Statements).) Many of the statements are identical or vary from each other in only minor ways.  Among the statements are these:

- Thanks to our attractive and environmentally friendly model range, we significantly increased the Group's market share in important key markets; our global market share also recorded encouraging growth.  (Harrod Decl., Ex. D at 152, Dkt. No. 3038-4 at 4.)

- Our attractive and environmentally friendly range of vehicles, which we are steadily and judiciously expanding, and the excellent position enjoyed by our individual brands in the

4

markets worldwide, are key factors allowing us to leverage the Group's strengths and to systematically increase our competitive advantages. (Harrod Decl., Ex. H at 236, Dkt. No. 3038-8 at 3.)

- The decisive advantages that the Volkswagen Group can exploit to master the challenges of the automotive future and to achieve its Strategy 2018 targets [include] its . . . environmentally friendly model range. (Harrod Decl., Ex. L at 245, Dkt. No. 3038-12 at 8.)

- [VW AG's] positive performance is due above all to our attractive and environmentally friendly model portfolio, which impresses customers around the globe. (Harrod Decl., Ex. L at 165, Dkt. No. 3038-12 at 6.)

**B.     Statements in Press Releases**

Five of the remaining six statements were made in three Volkswagen press releases. First, in an April 18, 2011 press release titled "Initial Facts: The Beetle," the following statements appear:

- **US diesel with 140 PS**. When it comes to engines, all signs point toward sustainability. In the USA, the Beetle will be offered as a turbodiesel for the first time. The Beetle 2.0 TDI (103 kW / 140 PS) meets all USA emission limits and attains 40* mpg fuel economy in the Highway cycle, 29* mpg in City driving, and 33* mpg in combined. (Harrod Decl., Ex. T at 3, Dkt. No. 3038-20 at 4.)

- **Engine specifications**: . . . all diesels are new common rail TDI engines; all engines meet Euro-5 emissions standard; all US engines fulfil BIN5 / ULEV PZEV. (Harrod Decl., Ex. T at 5, Dkt. No. 3038-20 at 6.)

Second, in a May 6, 2011 press release titled "32nd International Vienna Motor Symposium: Volkswagen steps up its use of plug-in hybrid technology," the following statements appear:

- [T]he new 2.0l TDI . . . already fulfils stringent BIN 5 / ULEV emission laws in the USA. (Harrod Decl., Ex. U at 1, Dkt. No. 3038-21 at 2.)

- The 2nd generation 2.0 l TDI, familiar from Europe, was modified and further engineered for the new Passat to be produced in Chattanooga exclusively for the North American market. To satisfy BIN5/ULEV emission regulations in the USA, it was necessary to reduce the engine's raw emissions and install an SCR (selective catalytic reduction) emissions control system. (*Id.*)

Third, in a July 10, 2015 press release, titled "New Guinness world record: Golf TDI Clean Diesel attains lowest fuel consumption on 48-state tour of the USA," the following statement appears:

- The Golf TDI Clean diesel also fulfils the most stringent emissions standards in the world: the LEV3 / TIER 3 standards in the USA.  (Ex. V at 1.)

**C.**     **Statement on Compliance Labels**

The final challenged statement was made on the compliance label affixed to each Subject Vehicle's engine.  With their motion, Plaintiffs have included a screenshot of what they contend is one of these labels.  The label represents that the vehicle "Conforms to Regulations," and then lists "U.S. EPA: T285 LDV, OBD: CA II, Fuel: Diesel," and "California: ULEVII PC, OBD: CA II, Fuel: Diesel."  (Harrod Decl., Ex. A at 9, Dkt. No. 3038-1 at 10.)

## LEGAL STANDARD

A civil defendant may be estopped from relitigating an issue that was decided against it in a previous criminal action.  *Emich Motors Corp. v. Gen. Motors Corp.*, 340 U.S. 558, 568 (1951).  For collateral estoppel to apply in such a scenario, the plaintiff must prove that:

> (1) the prior conviction must have been for a serious offense so that the defendant was motivated to fully litigate the charges; (2) there must have been a full and fair trial to prevent convictions of doubtful validity from being used; (3) the issue on which the prior conviction is offered must of necessity have been decided at the criminal trial; and (4) the party against whom the collateral estoppel is asserted was a party or in privity with a party to the prior trial.

*United States v. Real Property Located at Section 18*, 976 F.2d 515, 518 (9th Cir. 1992) (quoting *Avers v. City of Richmond*, 895 F.2d 1267, 1271 (9th Cir. 1990)).  Although three of these requirements reference a trial, the *Real Property* court also noted that "it is settled law in this circuit that a guilty plea may be used to establish issue preclusion in a subsequent civil suit."  *Id.* at 519.

With respect to the third *Real Property* requirement, "[s]imilarity between issues does not suffice; collateral estoppel is applied only when the issues are identical."  *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1357 (9th Cir. 1985) (citing *Parklane Hosiery Co. v. Shore*, 439

U.S. 322, 326 (1979)).  In other words, the same issue must have been "directly determined in [the] previous criminal action."  *Bagley v. CMC Real Estate Corp.*, 923 F.2d 758, 762 (9th Cir. 1991) (internal quotation marks omitted).

If collateral estoppel applies and prevents relitigation of a dispositive issue, or of an element of the plaintiff's claim, summary judgment or partial summary judgment may be warranted.  *See New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 84, 86 (2d Cir. 2000) (affirming grant of partial summary judgment where defendants' prior conviction collaterally estopped them from contesting some, but not all, issues in a related civil case); *SEC v. Reyes*, No. C 06-04435 CRB, 2008 WL 3916247, at *1-3 (N.D. Cal. Aug. 25, 2008) (granting summary judgment for claims where collateral estoppel applied, while denying summary judgment for claims where it did not).

Even when collateral estoppel does not apply, courts may consider a defendant's admissions in a prior plea agreement as evidence in support of summary judgment.  *See SEC v. Hilsenrath*, No. C 03-03252 WHA, 2008 WL 2225709, at *4-5 (N.D. Cal. May 29, 2008) (holding that defendant's plea agreement "cannot be given full preclusive effect for the time period past March 1998," but that it "is still extremely probative as a party admission and evidence of securities fraud" for a subsequent period).  "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'"  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).  That is, the moving party's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party."  William W. Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 488 (1984); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) ("[T]he standard for a directed verdict . . . . is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.").

If the moving party comes forward with sufficient evidence to satisfy its burden, "the burden then moves to the opposing party, who must present significant probative evidence tending

to support its claim or defense." *C.A.R. Transp.*, 213 F.3d at 480 (quoting *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991)). If the moving party does not satisfy its initial burden, the nonmoving party is not obligated to produce any evidence and summary judgment must be denied. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).

## DISCUSSION

With respect to collateral estoppel, there is no dispute that elements (1), (2), and (4) of the *Real Property* standard are satisfied. VW AG's prior convictions were for serious offenses, VW AG had a full and fair opportunity to contest those convictions, and VW AG was a party in the prior proceedings in which it pled guilty. Whether collateral estoppel applies, then, turns on element (3). That is, whether the "issue[s]" on which the prior convictions are offered—the falsity and scienter of each of the 37 challenged statements—were "of necessity . . . decided" in the prior criminal proceedings. *Real Property Located at Section 18*, 976 F.2d at 518. Only if the "identical" issues were "directly determined" in VW AG's plea agreement will this standard be satisfied. *Levi Strauss*, 778 F.2d at 1357; *Bagley*, 923 F.2d at 762.

Irrespective of the applicability of collateral estoppel, Plaintiffs also contend that partial summary judgment is warranted with respect to the falsity of the 37 challenged statements and VW AG's scienter because no reasonable jury could find other than for Plaintiffs on these issues. "Plaintiffs bear the burden of proof on all elements of their Rule 10b–5 claim." *Wong v. Thomas Bros. Rest. Corp.*, 840 F. Supp. 727, 729 (C.D. Cal. 1994). They must therefore "come forward with evidence which would entitle [them] to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp.*, 213 F.3d at 480 (quoting *Houghton*, 965 F.2d at 1536).

The Court begins by considering Plaintiffs' arguments in support of collateral estoppel and partial summary judgment with respect to falsity and scienter for the 31 investor-report and five press-release statements. The Court will then address the same inquiries for the statement on the emissions compliance labels.

8

# I.      Falsity: Investor-Report and Press-Release Statements

## A.      Statements Made in Investor Reports

The 31 challenged statements made in VW AG investor reports are not referenced in VW AG's plea agreement. Their absence is not surprising given that VW AG pled guilty to conspiracy to defraud the United States through misrepresentations to EPA, obstruction of justice, and introducing imported merchandise into the United States by means of false statements to U.S. Customs and Border Protection, not to making false statements to investors. Yet Plaintiffs contend that VW AG admitted the falsity of the 31 investor-report statements through the following plea admissions:

- Supervisors A and C and others marketed, and caused to be marketed, the Subject Vehicles to the U.S. public as 'clean diesel' and environmentally-friendly, when they knew the Subject Vehicles were intentionally designed to detect, evade and defeat U.S. emissions standards. (SOF ¶ 44.)

- Supervisors A–F and others caused defeat device software to be installed on all of the approximately 585,000 Subject Vehicles and the Porsche Vehicles sold in the United States from 2009 through 2015. (*Id.* ¶ 72.)

- Supervisors A–F and other VW employees . . . (a) knew that the Subject Vehicles and the Porsche Vehicles did not meet U.S. emissions standards; (b) knew that VW was using software to cheat the U.S. testing process . . . ; and (c) attempted to and did conceal these facts from U.S. regulators and U.S. customers. (*Id.* ¶ 31.)

The second and third of these admissions did not directly determine the falsity of the 31 investor-report statements. In the 31 statements, VW AG touted its "environmentally friendly" vehicles or its status as a "global environmental leader among automobile manufacturers." But paragraphs 72 and 31 of the plea agreement make no reference to these representations, much less include admissions by VW AG that these representations, or identical representations, were false.

The first of the above admissions (paragraph 44 of the SOF) comes closer. VW AG touted its "environmentally friendly" vehicles in almost all of the 31 investor-report statements, and in paragraph 44 of the plea agreement VW AG admitted that some of the company's "environmentally-friendly" marketing statements were false. The admission in paragraph 44, however, is narrow. VW AG admitted there only that Supervisors A and C marketed "the *Subject*

*Vehicles* to the *U.S. public* as 'clean diesel' and 'environmentally-friendly,'" when they knew these representations were false. (SOF ¶ 44 (emphasis added).) That is, VW AG admitted that certain *diesel* engine vehicles sold in a specific market were not environmentally friendly. In the investor reports, VW AG did not claim that these same vehicles were environmentally friendly. Instead, the company championed its "environmentally friendly model *range* of vehicles . . . in markets *worldwide*," and its "environmentally friendly model *portfolio*, which impresses customers *around the globe*." (Harrod Decl., Ex. H at 236, Ex. L at 165 (emphasis added).) The narrower admission about a subset of its vehicles did not "directly determine[]" the falsity of these broader statements. *Bagley*, 923 F.2d at 762.

Plaintiffs rely on *Reyes*, 2008 WL 3916247, for their collateral estoppel argument, where this Court held that the defendant's conviction for securities fraud, which was based on false statements in Forms 10–K for the fiscal years 2001–2003, collaterally estopped him from challenging the falsity of the same statements in a civil securities-fraud suit. *Id.* at *3. *Reyes*, however, better explains why collateral estoppel is not warranted here. Although the Court concluded that collateral estoppel applied as to the Forms 10–K statements, it also held that collateral estoppel was not appropriate with respect to statements in Forms 10–Q filed for the fiscal years 2001–2004. *Id.* In reaching this conclusion, the Court reasoned that collateral estoppel was inappropriate as to the Forms 10–Q statements because "the jury only convicted Reyes for making four false statements, and the government does not explain how their verdict also *necessarily* determined that the other statements were false." *Id.* The Court also noted that "[c]ollateral estoppel is inappropriate if there is any doubt as to whether an issue was actually litigated in a prior proceeding." *Id.* (citing *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1518 (9th Cir. 1985)).

Similar to the Forms 10–Q statements in *Reyes*, the falsity of the 31 challenged investor-report statements was not necessarily determined in VW AG's criminal proceedings. Differences between the 31 challenged statements and the statements addressed in VW AG's plea agreement at a minimum raise doubts about whether the falsity of these statements was previously decided. Collateral estoppel is accordingly unwarranted.

10

Nor is partial summary judgment as to the falsity of these 31 statements otherwise appropriate. The only evidence of falsity that Plaintiffs offer are VW AG's admissions in its plea agreement. With only that evidence before it, a reasonable trier of fact could conclude that Plaintiffs have not met their burden of proving that the 31 investor-report statements were false. *Liberty Lobby*, 477 U.S. at 250; W. Schwarzer, 99 F.R.D. at 488. To the contrary, the trier of fact could reasonably conclude that VW AG's admission about the falsity of specific "environmentally friendly" representations—related to diesel engine vehicles sold in the United States—does not prove by a preponderance of the evidence that other, broader "environmentally friendly" representations about the company's portfolio of vehicles sold around the world were also false.

Because collateral estoppel does not apply and partial summary judgment is not otherwise warranted, the Court DENIES partial summary judgment with respect to the falsity of the 31 investor-report statements.[3]

**B.      Statements Made in Press Releases**

As with the 31 investor-report statements, none of the five press-release statements are referenced in VW AG's plea agreement. And differences between the challenged statements and VW AG's admissions again make collateral estoppel inappropriate.

The first of the five statements, which was made in an April 18, 2011 press release, states that the "Beetle 2.0 TDI (103 kW / 140 PS) meets all USA emission limits . . . ." (Harrod Decl., Ex. T at 3.) Plaintiffs contend that the plea agreement directly determined this statement's falsity because VW AG admitted there that the Subject Vehicles and the Porsche Vehicles "did not meet U.S. emissions standards." (SOF ¶ 31.) The press release, however, does not refer to a particular

_____

[3] A Rule 10b–5 claim can be based not only on a false statement of a material fact, but also on the omission of a material fact "necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). On occasion in their briefing, Plaintiffs assert that the 37 challenged statements were not only false but also misleading. But their arguments focus only on why VW AG's plea agreement proves that the statements are false. Further, in Plaintiffs' Statement of Issues To Be Decided, they state that they seek partial summary judgment only as to whether VW AG "(1) made *false* statements (2) with scienter." (Dkt. No. 3036 at 6 (emphasis added).) Plaintiffs also note that they "are not moving [for summary judgment] with respect to materiality at this time" (Dkt. No. 3994 at 11 n.6), which is an inquiry that is ultimately tethered to whether an omission was misleading. Given Plaintiffs' focus on falsity, the Court does not separately consider whether the statements were misleading as a matter of law.

model year of the Beetle 2.0 TDI, and only the 2013–2015 model years of the Beetle 2.0 TDI are included in the list of Subject Vehicles in VW AG's plea agreement. (*See* SOF ¶ 23.) Perhaps the press release is referring to one of those model years. But that cannot be determined conclusively based only on VW AG's plea agreement. This is especially so given that the press release was published in April 2011, well before the covered model years. Because there is doubt as to whether VW AG's plea agreement "directly determined" the falsity of this statement, *Bagley*, 923 F.2d at 762, "[c]ollateral estoppel is inappropriate." *Reyes*, 2008 WL 3916247, at *3 (citing *Davis*, 751 F.2d at 1518).

Collateral estoppel with respect to the falsity of the other four press-release statements is inappropriate for a different reason. VW AG admitted in its plea agreement that the Subject Vehicles did not meet "U.S. *NOx* emissions standards." (SOF ¶ 33 (emphasis added); *see also id.* ¶ 41 ("VW employees misrepresented, and caused to be misrepresented, to the EPA and CARB staff that the Subject Vehicles complied with U.S. *NOx* emissions standards, when they knew the vehicles did not.") (emphasis added).) Plaintiffs appear to presume that these are the emissions standards addressed in the press releases at issue. But the press releases do not explicitly refer to NOx standards, instead stating that the vehicles complied with "BIN 5 / ULEV" and "LEV3 / TIER 3" standards. (*See* Ex. T at 5 ("all US engines fulfil BIN5 / ULEV PZEV."); Ex. U at 1 ("[T]he new 2.0l TDI . . . already fulfils stringent BIN 5 / ULEV emission laws in the USA."); Ex. U at 1 ("To satisfy BIN5/ULEV emission regulations in the USA, it was necessary to reduce the engine's raw emissions and install an SCR . . . ."); Ex. V at 1 ("The Golf TDI Clean diesel also fulfils the most stringent emissions standards in the world: the LEV3 / TIER 3 standards in the USA.").) While the "BIN 5 /ULEV" and "LEV3 / TIER 3" standards may in fact be NOx emissions standards, it is not clear from the press releases if they are, and Plaintiffs have not offered other evidence supporting that these are NOx emissions standards. Because of this uncertainty, "[c]ollateral estoppel is inappropriate" with respect to the falsity of these statements as well. *Reyes*, 2008 WL 3916247, at *3.

Nor is partial summary judgment as to the falsity of the five press-release statements otherwise appropriate. Without evidence supporting that the "BIN 5 / ULEV" and "LEV3 / TIER

12

3" standards are NOx emissions standards, the trier of fact could reasonably conclude that Plaintiffs have not satisfied their burden of proving that the four press-release statements that refer to these standards are false. The same goes for the statement about an unidentified model-year Beetle 2.0 TDI.

Because collateral estoppel does not apply and partial summary judgment is not otherwise warranted, the Court DENIES partial summary judgment with respect to the falsity of the five press-release statements.[4]

## II. Scienter: Investor-Report and Press-Release Statements

Plaintiffs also contend that, to the extent the investor-report and press-release statements were false, VW AG knew so and thus made the statements with scienter. *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012) (noting that "[s]cienter can be established by intent, knowledge, or certain levels of recklessness"). Specifically, Plaintiffs contend that partial summary judgment is warranted with respect to scienter "under three well-established legal doctrines." (Dkt. No. 3036 at 26.) First, Plaintiffs contend that VW AG's scienter "rests on a straightforward application of respondeat superior to Supervisors A–F, who 'knew that the Subject Vehicles and the Porsche Vehicles did not meet U.S. emissions standards . . . [and] that VW was using software to cheat the U.S. testing process,' but nevertheless 'attempted to and did conceal these facts from U.S. regulators and U.S. customers.'" (*Id.* (quoting SOF ¶ 31).) Second, Plaintiffs contend that VW AG's scienter is established under principles of "scheme liability." (*Id.* at 27.) Third, Plaintiffs contend that VW AG's scienter is established based on the collective-scienter doctrine. (*Id.* at 27-28.) The Court addresses each of these theories in turn.

### A. Respondeat Superior

Under the doctrine of respondeat superior, "[a]n employer is subject to liability for torts

---

[4] VW AG objects to the admissibility of copies of the challenged press releases and the investor reports as insufficiently authenticated. (*See* Dkt. No. 3729 at 29 n.13 (VW AG's objection); Harrod Decl., Exs. D–W, Dkt. Nos. 3038-4 to 3038-22 (Plaintiffs' filings).) Given the above rulings, it is not necessary for the Court to consider these evidentiary challenges. The Court accordingly DENIES the objections without prejudice.

13

committed by employees while acting within the scope of their employment." Restatement (Third) of Agency § 2.04 (2006). Relatedly, under common law theories of agency, "notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal." *Id.* § 5.03. Based on these principles, Plaintiffs contend that if the challenged statements were false, then VW AG knew so because the knowledge of Supervisors A–F (who admittedly knew about and furthered the emissions fraud) should be imputed to VW AG.

The shortcoming of this argument is that for claims of fraud against a principal, as here, the common law of agency recognizes a limitation on respondeat superior. Specifically, for claims of fraud respondeat superior does not apply "if one agent makes a statement, believing it to be true, while another agent knows facts that falsify the other agent's statement." *Id.* § 5.03 cmt. (d)(2). In such a scenario, no agent of the company has committed fraud because liability for fraud requires that the "defendant made a material misstatement *with an intent to deceive*." *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 648-49 (2010). The result of this limitation is that liability for fraud cannot be imputed to a corporation without evidence that an agent of the corporation who participated in making the challenged statements did so with scienter, i.e., with intent, knowledge of, or deliberate reckless with respect to the statements' falsity.[5]

Multiple circuit courts have adopted this rule in the context of Section 10(b) and Rule 10b–5 claims. In *Southland Securities Corp. v. INSpire Insurance Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004), the Fifth Circuit held that:

> For purposes of determining whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired

---

[5] If an employee who made false statements did so negligently, the employer may nevertheless be subject to liability for negligent misrepresentation. *See* Restatement (Third) Agency § 5.03 cmt. (d)(2) (citing Restatement (Second) Torts § 552 (1977)). Securities-fraud claims under Section 10(b) cannot be based on negligence, however. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1582 (9th Cir. 1990) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)).

in the course of their employment.

*Id.* at 366.

In support of this standard, the *Southland* court noted that it was "consistent with the general common law rule that where, as in fraud, an essentially subjective state of mind is an element of a cause of action also involving some sort of conduct, such as a misrepresentation, the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation, and may not simply be imputed to that individual on general principles of agency." *Id.* (citing Restatement (Second) Agency § 275 cmt. (b), § 268 cmt. (d) (1958)). The Seventh Circuit adopted the same standard in *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir. 2008), quoting directly from *Southland*'s statement of the rule.

Plaintiffs argue that the Court should not apply the fraud limitation on respondeat superior. In support, they rely on *SEC v. Sells*, No. C 11-4941 CW, 2012 WL 3242551 (N.D. Cal. Aug. 12, 2012), where the court considered a claim for aiding and abetting a Section 10(b) and Rule 10b–5 violation and held that a senior sales employee's knowledge could be imputed to his corporate employer, "by application of the doctrine of respondeat superior," even though the sales employee did not "make" the allegedly false statements. *Id.* at *8.

To the extent that *Sells* stands for the proposition that the fraud limitation on respondeat superior does not apply in the context of Section 10(b) and Rule 10b–5 claims, it is against the weight of authority. But *Sells* can also be read as consistent with *Southland*, *Makor*, and the common law standard. The sales employee in *Sells* who knew that the challenged statements were false "was a member of [the company's] disclosure committee, which reviewed and provided comments on [the company's] press releases and SEC quarterly filings." 2012 WL 3242551, at *1. Thus, even if that employee did not "make" the statements at issue in *Sells*, he had some authority over the statements and possibly could have corrected them. The *Southland* and *Makor* courts held that it was appropriate to look to the scienter of employees with such responsibility and authority in determining corporate scienter. *See Makor*, 513 F.3d at 708 ("To establish corporate liability for a violation of Rule 10b–5 requires 'look[ing] to the state of mind of the individual corporate official or officials who make *or* issue the statement (*or* order *or* approve it or

its making or issuance, *or* who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.'" (alteration in original) (emphasis added) (quoting *Southland*, 365 F.3d at 366)). *Sells* therefore does not counsel in favor of a different rule.

Plaintiffs also rely on *In re Marsh & McLennan Cos. Securities Litigation*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) and *In re NUI Securities Litigation*, 314 F. Supp. 2d 388, 412-13 (D.N.J. 2004) in support of their argument that they do not need to demonstrate that an agent of the corporation who participated in making the challenged statements did so with scienter. Both of those decisions, however, were rulings on motions to dismiss Section 10(b) and Rule 10b–5 claims. And as discussed further below, courts (including the *Makor* court) have recognized that under certain circumstances a plaintiff may *plead* scienter collectively.

Applying the common law rules of agency and *Southland* and *Makor* here, Plaintiffs are not entitled to partial summary judgment with respect to VW AG's scienter for the 31 investor-report and five press-release statements. Even if those statements were proved to be false, the plea agreement does not attribute any of them to Supervisors A–F. The plea agreement therefore does not prove that the person or persons who made the challenged statements (or assisted with making them) knew that they were false. A reasonable trier of fact could accordingly conclude that, under the doctrine of respondeat superior, Plaintiffs have not met their burden of proving that an agent of VW AG made (or assisted with making) the allegedly false statements with scienter.

## B. Scheme Liability

Plaintiffs' second theory of scienter requires less discussion, largely because it appears to be a continuation of the first. Plaintiffs begin by stating that "even if Supervisors A–F did not make or cause to be made the false statements at issue . . . , there is no requirement, in order for VW AG to have scienter, that one employee have both made the false statements and known that they were false." (Dkt. No. 3036 at 27.) Plaintiffs then continue by citing *In re Galena Biopharma, Inc. Securities Litigation*, 117 F. Supp. 3d 1145 (D. Or. 2015), where the court held that the issue of who "made" a statement "has no bearing" where "a defendant is alleged to have made deceptive contributions to an overall fraudulent scheme." *Id.* at 1197 (citing *SEC v.*

16

*Monterosso*, 756 F.3d 1326, 1334 (11th Cir. 2014)).

*Galena* and *Monterosso* have no bearing here. Those decisions addressed the scope of scheme liability under Rule 10b–5(a) and (c), which is "not contingent upon the defendant making a specific misrepresentation or public statement," but instead is based on whether the defendant "'committed a manipulative or deceptive act in furtherance of the scheme.'" *Galena*, 117 F. Supp. 3d at 1197 (quoting *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997)); *see also id.* at 1192. That theory is not relevant here, where Plaintiffs claim that VW AG violated Rule 10b–5(b), which prohibits "'mak[ing] any untrue statement of a material fact' in connection with the purchase or sale of securities." *Janus Capital Grp. v. First Derivative Traders*, 564 U.S. 135, 137-38 (2011) (alteration in original) (quoting 17 C.F.R. § 240.10b–5(b)). Under Rule 10b–5(b), Plaintiffs must demonstrate that VW AG made a false or misleading statement with scienter. And to do so, principles of agency law require that Plaintiffs identify an agent or agents of the company who made the challenged statements (or participated in making them). Plaintiffs have not done so.

### C.    Collective Scienter

Finally, Plaintiffs contend that if the challenged statements were false, VW AG's admissions in its plea agreement would prove its corporate scienter based on the theory of collective scienter. The Seventh Circuit discussed this theory in *Makor*, noting that although corporate scienter cannot be proven by "the collective knowledge of all the corporation's officers and employees," 513 F.3d at 708, "it is possible to draw a strong *inference* of corporate scienter without being able to name the individuals who concocted and disseminated the fraud," *id.* at 710 (emphasis added). The court explained:

> Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.

*Id.*

In *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th Cir. 1995), the Ninth Circuit noted that "there is no case law supporting an independent 'collective scienter' theory."

But in *Glazer Capital Management, LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008), the court cited favorably to the *Makor* court's General Motors example, and noted that "*Nordstrom* does not foreclose the possibility that, in certain circumstances, some form of collective scienter pleading might be appropriate." The Second Circuit has also noted that "it is possible to raise the required inference [of scienter] with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). The *Dynex* court also cited the *Makor* court's General Motors hypothetical for this position. *See id.* at 195-96.

VW AG argues that, to the extent the doctrine of collective scienter is ever appropriate, it is only a pleading doctrine and should not be considered in determining whether Plaintiffs have *proven* their Section 10(b) claim. There is support for this limitation. *Glazer*, *Makor*, and *Dynex* all discussed collective scienter in appeals from district court orders addressing motions to dismiss Section 10(b) and Rule 10b–5 claims. And all three courts noted that collective scienter may, in certain circumstances, give rise to a "strong inference" of scienter, which is the pleading standard for Section 10(b) and Rule 10b–5 claims under the Private Securities Litigation Reform Act. *See* 15 U.S.C. § 78u–4(b)(2). When discussing collective scienter in *Glazer*, the Ninth Circuit also referred to the possible application of the doctrine only in the pleading context. *See Glazer*, 549 F.3d at 744 (stating that "some form of collective scienter *pleading* might be appropriate") (emphasis added).

Also supporting that collective scienter is only a pleading doctrine is the Second Circuit's decision in *Dynex*, 531 F.3d 190. Defendants there argued that the district court erred because it applied the doctrine of collective scienter in denying defendants' motion to dismiss. *Id.* To support their argument, defendants relied on *State Teachers Retirement Board v. Fluor Corp.*, 654 F.2d 843, 853 (2d Cir. 1981), where the court affirmed the district court's entry of summary judgment for a corporate defendant in part because the plaintiff had not identified a corporate officer who acted with scienter. *Dynex*, 531 F.3d at 195. In rejecting defendants' argument, the *Dynex* court concluded that:

> [D]efendants' reliance on *Fluor*, a case decided over a decade before the enactment

> of PSLRA, and one involving a motion for summary judgment, rather than a
> motion to dismiss (as here), demonstrates the fundamental flaw in their argument:
> they improperly conflate pleading rules and liability rules.  To prove liability
> against a corporation, of course, a plaintiff must prove that an agent of the
> corporation committed a culpable act with the requisite scienter, and that the act
> (and accompanying mental state) are attributable to the corporation.  *See, e.g.*,
> *Fluor*, 654 F.2d at 853; *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702,
> 708 (7th Cir. 2008).
>
> To survive a Rule 12(b)(6) motion under the PSLRA, a plaintiff must only state
> facts "giving rise to a strong inference that the defendant acted with the required
> state of mind."  15 U.S.C. § 78u–4(b)(2).

*Id.*  By distinguishing in this manner between "pleading rules" and "liability rules," the *Dynex*

court made fairly explicit that collective scienter is a "pleading rule."  After the pleading stage,

though, "[t]o prove liability against a corporation, of course, a plaintiff must *prove* that an agent of

the corporation committed a culpable act with the requisite scienter, and that the act (and

accompanying mental state) are attributable to the corporation."  *Id.* (emphasis added).[6]

       *Glazer*, *Makor* and *Dynex*, then, all support VW AG's argument that collective scienter is

only a pleading doctrine, with *Dynex* the most explicit in this regard.  Ultimately, however, the

Court does not need to determine at this stage whether the trier of fact could rely on a theory of

collective scienter.  Even if the trier of fact could do so, collective scienter only supports a "strong

inference" of scienter, not judgment as a matter of law.  The situation here proves the point.

Although VW AG's admissions about Supervisors A–F could support a strong inference that the

supervisors responsible for the challenged statements also knew they were (allegedly) false, the

trier of fact could instead reasonably conclude that because Supervisors A–F were all members of

either the VW Brand Engine Development department or the Quality Management and Product

Safety department, that the fraud may have been known and furthered only by members of those

departments, and that the VW AG employees who were responsible for the challenged statements

---

[6] In *In re WorldCom, Inc. Securities Litigation*, 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005), a case
cited by Plaintiffs, the court held in an order denying defendant's motion for summary judgment
that "[t]o carry their burden of showing that a corporate defendant acted with scienter, plaintiffs in
securities fraud cases need not prove that any one individual employee of a corporate defendant
also acted with scienter.  Proof of a corporation's collective knowledge and intent is sufficient."
This statement of the rule cannot be squared with the Second Circuit's later decision in *Dynex* and
is therefore unpersuasive.

did not know about the emissions fraud.

Plaintiffs have not cited to any decision in which a court has entered summary judgment on the element of scienter against a corporate defendant on a Section 10(b) and Rule 10b–5 claim based on a theory of collective scienter. Given the lack of precedent for such action, and because material issues of fact remain, the Court declines to do so here. Because partial summary judgment with respect to VW AG's scienter for the 31 investor-report and five press-release statements is not warranted under the doctrine of collateral estoppel, or under any of the three theories raised by Plaintiffs, the Court DENIES Plaintiffs' motion for partial summary judgment on the issue of scienter as to these statements.

## III. Statement on Compliance Labels

### A. Falsity

Unlike the other 36 statements at issue, VW AG admitted in its plea agreement that it affixed a label to the engine of each of the Subject Vehicles, which stated that the vehicles "complied with applicable EPA and CARB emissions regulations and limitations." (SOF ¶ 43.) VW AG also admitted that this statement was false because the Subject Vehicles "did not meet U.S. emissions standards." (*Id.* ¶ 31.) This admission "directly determined" the falsity of the compliance statement. *Bagley*, 923 F.2d at 762.

In opposition, VW AG does not contest the falsity of the compliance statement, but instead challenges the admissibility of the screenshot Plaintiffs submitted with their motion, which Plaintiffs contend is a picture of one of the subject labels. (*See* Harrod Decl., Ex. A at 9, Dkt. No. 3038-1 at 10.) Whether the screenshot is admissible is ultimately immaterial: VW AG admitted in its plea agreement that VW employees affixed a label with the compliance statement to each of the Subject Vehicles. The screenshot is therefore not needed to establish that the compliance labels, and the statement on the labels, existed. And because VW AG has admitted that the compliance statement was false, VW AG is estopped from relitigating the falsity of the statement in these civil proceedings. *Bagley*, 923 F.2d at 762; *Real Property*, 976 F.2d at 518. The Court accordingly GRANTS partial summary judgment as to the falsity of the emissions compliance statement on the label affixed to each of the Subject Vehicles.

### B. Scienter

VW AG also admitted in its plea agreement that "VW employees" affixed the compliance label to the Subject Vehicles with knowledge of the statement's falsity. (*See* SOF ¶ 43 ("VW employees caused to be stated on the labels that the vehicles complied with applicable EPA and CARB emissions regulations and limitations, knowing that if they had disclosed that the Subject Vehicles did not meet U.S. emissions regulations and limitations, VW would not have been able to import the vehicles into the United States.").)

The plea agreement, however, defines "VW" (as used in "VW employees") as "VW AG, Audi AG, and VW GOA" collectively. (SOF ¶ 4.) Because of this, VW AG contends that summary judgment as to its scienter is not warranted because "Plaintiffs offer no evidence establishing that any *VW AG* employee was the 'maker' of (or exercised 'ultimate authority over') the statement." (Dkt. No. 3729 at 25 (emphasis added) (citation omitted).) *See Janus*, 564 U.S. at 141-42 (holding that to be liable under Rule 10b–5(b), the defendant must have "made" a material misrepresentation or omission, and that "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it").

VW AG's argument is not persuasive. One of the three felonies that VW AG pled guilty to was the offense of introducing imported merchandise into the United States by means of false statements in violation of 18 U.S.C. § 542. As set out in VW AG's plea agreement, an element of that offense is that VW AG introduced merchandise into the United States "by means of a false statement, which it knew was false." (Dkt. No. 3038-2 at 7, Plea Agreement § 1.C.) The falsity of the compliance labels formed the factual basis for VW AG's § 542 guilty plea. The two paragraphs of the SOF that reference the compliance labels are the only two paragraphs that reference disclosures to U.S. Customs and Border Protection (*see* SOF ¶¶ 29, 43), and VW AG admitted that the compliance statement on the labels was necessary "[i]n order to import the Subject Vehicles into the United States." (*Id.* ¶ 43.) VW AG, then, admitted as part of its plea agreement that it made the false statement on the compliance labels, and that it did so knowing that the statement was false. In other words, the plea agreement "directly determined" that VW

21

AG made this statement (which satisfies *Janus*) and that VW AG did so knowing that the statement was false (which satisfies Section 10(b) and Rule 10b–5's scienter requirement). Collateral estoppel and partial summary judgment as to the issue of scienter is therefore appropriate. *Bagley*, 923 F.2d at 762.

## CONCLUSION

To summarize, the Court ORDERS as follows:

(1)  Plaintiffs' motion for partial summary judgment as to the falsity of the 31 investor-report and five press-release statements is DENIED.

(2)  Plaintiffs' motion for partial summary judgment as to VW AG's scienter for the 31 investor-report and five press-release statements is DENIED.

(3)  Plaintiffs' motion for partial summary judgment as to the falsity of the challenged statement on the emissions compliance labels is GRANTED.

(4)  Plaintiffs' motion for partial summary judgment as to VW AG's scienter for the challenged statement on the emissions compliance labels is GRANTED.

**IT IS SO ORDERED.**

Dated: December 6, 2017

_____
CHARLES R. BREYER
United States District Judge