1  Robert J. Giuffra, Jr. (*pro hac vice*)
   giuffrar@sullcrom.com
2  Sharon L. Nelles (*pro hac vice*)
   nelless@sullcrom.com
3  William B. Monahan (*pro hac vice*)
   monahanw@sullcrom.com
4  John G. McCarthy (*pro hac vice*)
   mccarthyj@sullcrom.com
5  SULLIVAN & CROMWELL LLP
   125 Broad Street
6  New York, New York 10004
   Telephone: (212) 558-4000
7  Facsimile: (212) 558-3588

8  Laura Kabler Oswell (SBN 241281)
   oswelll@sullcrom.com
9  SULLIVAN & CROMWELL LLP
   1870 Embarcadero Road
10 Palo Alto, California 94303
   Telephone: (650) 461-5600
11 Facsimile: (650) 461-5700

12 *Counsel for Defendants Volkswagen Group*
   *of America, Inc. and Audi of America, LLC*

13

14

15              **UNITED STATES DISTRICT COURT**

16            **NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 17  IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES AND PRODUCT LIABILITY LITIGATION | MDL Docket No. 2672 CRB (JSC) |
| 18 | |
| 19  This Document Relates to: | **VOLKSWAGEN U.S. DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE PRE-NOV PLAINTIFFS' COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| 20 | |
| 21  *Nemet, et al.* v. *Volkswagen Group of America, Inc., et al.*, Case No. 3:17-cv-4372-CRB | |
| 22 | |
| 23 | Hearing Date: March 16, 2018 Time: 10:00 a.m. Courtroom: 6 The Honorable Charles R. Breyer |
| 24 | |

25

26

27

28

**NOTICE OF MOTION AND MOTION TO DISMISS**

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on March 16, 2018, at 10:00 a.m., or as soon thereafter as counsel may be heard, in Courtroom 6 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102-3489, Defendants Volkswagen Group of America, Inc. and Audi of America, LLC will and hereby do move this Court to dismiss the Complaint filed in *Nemet et al.* v. *Volkswagen Group of America, Inc. et al.*, No. 3:17-cv-4372, ECF No. 7 (N.D. Cal.), for (i) lack of standing and (ii) failure to state a claim upon which relief can be granted.  This Motion is made pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, and is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, Appendices, all pleadings and papers filed herein, oral argument of counsel, and any matter that may be submitted at the hearing.

Dated: December 8, 2017                    Respectfully submitted,

/s/ Robert J. Giuffra, Jr.
Robert J. Giuffra, Jr. (*pro hac vice*)
giuffrar@sullcrom.com
Sharon L. Nelles (*pro hac vice*)
nelless@sullcrom.com
William B. Monahan (*pro hac vice*)
monahanw@sullcrom.com
John G. McCarthy (*pro hac vice*)
mccarthyj@sullcrom.com
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

Laura Kabler Oswell (SBN 241281)
oswelll@sullcrom.com
SULLIVAN & CROMWELL LLP
1870 Embarcadero Road
Palo Alto, California 94303
Telephone:  (650) 461-5600
Facsimile:  (650) 461-5700

*Counsel for Volkswagen Group of America, Inc. and Audi of America, LLC*

# TABLE OF CONTENTS

*Page*

SUMMARY OF ARGUMENT ................................................................................1

ISSUES TO BE DECIDED ..................................................................................8

BACKGROUND ...................................................................................................9

    A.    The Clean Air Act's Regulatory Framework ..............................................9

    B.    Volkswagen Emissions Investigations, Litigation and Multi-Billion-Dollar Settlements ................................................................................................10

    C.    The Complaint .......................................................................................12

LEGAL STANDARDS ........................................................................................15

ARGUMENT .......................................................................................................15

I.    THE PRE-NOV PLAINTIFFS LACK ARTICLE III STANDING BECAUSE THEY HAVE NOT PLED ANY COGNIZABLE INJURY-IN-FACT FAIRLY TRACEABLE TO DEFENDANTS' CONDUCT ..........................................15

    A.    The Pre-NOV Plaintiffs' Benefit of the Bargain Theory Does Not Establish Article III Standing ...............................................................................19

    B.    The Pre-NOV Plaintiffs' Payment of an Alleged "Clean Diesel Premium" Does Not Establish Article III Standing .................................................23

        1.    The Pre-NOV Plaintiffs Have Not Adequately Pled That an Alleged "Clean Diesel Premium" Is an Injury-in-Fact Fairly Traceable to Defendants' Conduct ..........................................................................24

        2.    Depreciation and Financing Fees Do Not Constitute an Injury-in-Fact Traceable to Defendants' Conduct ..............................................25

        3.    Lease Payments and Related Fees Do Not Constitute an Injury-in-Fact Traceable to Defendants' Conduct ..........................................29

II.    THE MAGNUSON-MOSS WARRANTY ACT CLAIM FAILS BECAUSE THE PRE-NOV PLAINTIFFS DO NOT ADEQUATELY PLEAD DAMAGES, LACK OF MERCHANTABILITY, PRIVITY, AND ADEQUATE NOTICE ..........30

    A.    The MMWA Claim Fails Because the Pre-NOV Plaintiffs Do Not Allege the Required Element of Damages ...............................................................32

    B.    There Is No Viable Underlying Implied Warranty Claim Because The Pre-NOV Plaintiffs Do Not Allege That Their Vehicles Did Not Fulfill Their Ordinary Purpose .....................................................................................32

C.     The Pre-NOV Plaintiffs Lack Privity with the Volkswagen U.S. Defendants, Which Is Required for Various State Law Implied Warranty Claims ..................33

D.     The Pre-NOV Plaintiffs Did Not Notify the Volkswagen U.S. Defendants of Their Breach of Implied Warranty Claims, as Required for a Number of State Law Implied Warranty Claims...............................................................................36

III.    THE CLEAN AIR ACT PREEMPTS THE PRE-NOV PLAINTIFFS' STATE LAW CLAIMS AND MMWA CLAIM ...........................................................37

A.     The Pre-NOV Plaintiffs' State Law Claims and MMWA Claim Are Expressly Preempted ..........................................................................................................37

B.     The Pre-NOV Plaintiffs' State Law and MMWA Claims Are Impliedly Preempted ..........................................................................................................39

IV.    THE COMPLAINT DOES NOT PLEAD ANY STATE LAW CLAIMS FOR WHICH RELIEF CAN BE GRANTED ...........................................................40

A.     The Complaint Does Not Adequately Plead Damages or Proximate Causation ...41

B.     Many of The Pre-NOV Plaintiffs' State Law Claims Have Additional Fatal Deficiencies.........................................................................................................43

CONCLUSION ...............................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron* v. *Nissan N. Am., Inc.*,
    2010 WL 11553166 (E.D. Tex. Sept. 22, 2010) ................................................................44

*Abuhouran* v. *Kaiserkane, Inc.*,
    2011 WL 6372208 (D.N.J. Dec. 19, 2011) .....................................................................37

*In re Actimmune Mktg. Litig.*,
    2009 WL 3740648 (N.D. Cal. Nov. 6, 2009) ..................................................................31

*Adamson* v. *Mortg. Elec. Registration Sys., Inc.*,
    2011 WL 4985490 (Mass. Super. Ct. Oct. 19, 2011) ......................................................40

*Alaface* v. *Nat'l Inv. Co.*,
    892 P.2d 1375 (Ariz. Ct. App. 1994) ..............................................................................43

*Altria Grp.* v. *Good*,
    555 U.S. 70 (2008) .........................................................................................................38

*Anderson* v. *Hyundai Motor Co.*,
    2014 WL 12579305 (C.D. Cal. July 24, 2014) ..........................................................4, 20

*In re Apple iPhone 3G Prod. Liab. Litig.*,
    859 F. Supp. 2d 1084 (N.D. Cal. 2012) ...........................................................................31

*Arizona* v. *United States*,
    567 U.S. 387 (2012) .......................................................................................................40

*Arnson* v. *Gen. Motors Corp.*,
    377 F. Supp. 209 (N.D. Ohio 1974) ................................................................................35

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009) ...........................................................................................8, 15, 41

*Barakezyan* v. *BMW of N. Am., LLC*,
    2016 WL 2840803 (C.D. Cal. Apr. 7, 2016) ..........................................4, 17, 20, 21, 23

*Bastian* v. *Petren Resources Corp.*,
    892 F.2d 680 (7th Cir. 1990) ..........................................................................................41

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007) .........................................................................................................8

*Bennett* v. *Grant*,
    525 S.W.3d 642 (Tex. 2017) ...........................................................................................42

*In re Bridgestone/Firestone, Inc.*,
   288 F.3d 1012 (7th Cir. 2002) ...................................................................41

*Briehl* v. *Gen. Motors Corp.*,
   172 F.3d 623 (8th Cir. 1999) .....................................................................21

*Bussian* v. *DaimlerChrysler Corp.*,
   411 F. Supp. 2d 614 (M.D.N.C. 2006) ..................................................21, 33

*Cahen* v. *Toyota Motor Corp.*,
   147 F. Supp. 3d 955 (N.D. Cal. 2015) ..........................................5, 21, 27

*Canyon County* v. *Syngenta Seeds, Inc.*,
   519 F.3d 969 (9th Cir. 2008) .....................................................................42

*Carlson* v. *Gen. Motors Corp.*,
   883 F.2d 287 (4th Cir. 1989) .....................................................................33

*In re Carrier IQ, Inc.*,
   78 F. Supp. 3d 1051 (N.D. Cal. 2015) ...................................................6, 37

*In re Caterpillar, Inc.*,
   2015 WL 4591236 (D.N.J. July 29, 2015) ................................................39

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   27 F. Supp. 3d 1015 (N.D. Cal. 2014) .......................................................44

*Centaur Classic Convertible Arbitrage Fund Ltd.* v. *Countrywide Fin. Corp.*,
   878 F. Supp. 2d 1009 (C.D. Cal. 2011) .....................................................43

*Chandler* v. *Gene Messer Ford, Inc.*,
   81 S.W.3d 493 (Tex. Ct. App. 2002) ..........................................................33

*Cipollone* v. *Liggett Grp., Inc.*,
   505 U.S. 504 (1992) ............................................................................37, 38

*City of New York* v. *Smokes-Spirits.Com, Inc.*,
   911 N.E.2d 834 (N.Y. 2009) ......................................................................43

*Clemens* v. *DaimlerChrysler Corp.*,
   534 F.3d 1017 (9th Cir. 2008) ..........................................................6, 31, 33

*Cole* v. *Chevron USA, Inc.*,
   554 F. Supp. 2d 655 (S.D. Miss. 2007) ......................................................44

*Contreras* v. *Toyota Motor Sales USA, Inc.*,
   2010 WL 2528844 (N.D. Cal. June 18, 2010) .......................................20, 22

*Curl* v. *Volkswagen of Am., Inc.*,
   871 N.E.2d 1141 (Ohio 2007) .....................................................................6

*Davis* v. *Fed. Election Comm'n*,
  554 U.S. 724 (2008) ..................................................................................15

*Davis* v. *Homasote Co.*,
  574 P.2d 1116 (Or. 1978) .........................................................................34

*DeBons* v. *Globus Med., Inc.*,
  2014 WL 12586433 (C.D. Cal. Jan. 31, 2014) ....................................8, 42

*Denney* v. *Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006).....................................................................41

*Doe* v. *Chao*,
  540 U.S. 614 (2004)..................................................................................41

*Dura Pharm., Inc.* v. *Broudo*,
  544 U.S. 336 (2005) ..............................................................................5, 16

*EMC Corp.* v. *Sha*,
  2013 WL 4399025 (N.D. Cal. Aug. 13, 2013) .........................................15

*Engine Mfrs. Ass'n* v. *S. Coast Air Quality Mgmt. Dist.*,
  541 U.S. 246 (2004)..................................................................................38

*Enslin* v. *Coca-Cola Co.*,
  136 F. Supp. 3d 654 (E.D. Pa. 2015) .......................................................41

*In re Flash Memory Antitrust Litig.*,
  643 F. Supp. 2d 1133 (N.D. Cal. 2009) ...................................................31

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*,
  2010 WL 2813788 (D.N.J. July 9, 2010)..................................................35

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,
  2001 WL 1266317 (D.N.J. Sept. 30, 1997) ..............................................33

*Friends of the Earth, Inc.* v. *Laidlaw Envtl. Servs., Inc.*,
  528 U.S. 167 (2000)..................................................................................23

*Frye* v. *L'Oreal USA, Inc.*,
  583 F. Supp. 2d 954 (N.D.Ill., 2008) .......................................................42

*Galecka* v. *Savage Arms, Inc.*,
  583 F. Supp. 2d 954 (Mich. Ct. App. June 26, 2014) ..............................42

*Gascho* v. *Glob. Fitness Holdings, LLC*,
  2014 WL 2931859 (S.D. Ohio 2012).......................................................44

*Geier* v. *Am. Honda Motor Co.*,
  529 U.S. 861 (2000)..................................................................................40

*George Williams* v. *Yamaha Motor Corp., U.S.A.*,
2015 WL 13626022 (C.D. Cal. Jan. 7, 2015) .......................................................... 34-35, 36

*Giesen* v. *Herb Chambers of Sudbury, Inc.*,
2015 WL 12697648 (D. Mass. May 13, 2015) ..................................................6, 33

*Haugland* v. *Winnebago Indus.*,
327 F. Supp. 2d 1092 (D. Ariz. 2004) .....................................................33

*Herrington* v. *Johnson & Johnson Consumer Cos.*,
2010 WL 3448531 (N.D. Cal. Sept. 1, 2010) .....................................................22

*Hershenow* v. *Enter. Rent-A-Car Co. of Boston*,
840 N.E.2d 526 (Mass. 2006) .....................................................41

*Hines* v. *Mercedes-Benz USA, LLC*,
358 F. Supp. 2d 1222 (N.D. Ga. 2005) .....................................................33

*Hirn* v. *Teledyne Cont'l Motors*,
1994 WL 685071 (N.D. Ill. Dec. 7, 1994) .....................................................35

*Hobbs* v. *Gen. Motors Corp.*,
134 F. Supp. 2d 1277 (M.D. Ala. 2001) .....................................................36

*Hope* v. *Nissan N. Am., Inc.*,
353 S.W.3d 68 (Mo. Ct. App. 2011) .....................................................32

*Hubert* v. *Gen. Nutrition Corp.*,
2017 WL 3971912 (W.D. Pa. Sept. 8, 2017) .................................................. 19-20

*Humane Soc'y of U.S.* v. *Babbitt*,
46 F.3d 93 (D.C. Cir. 1995) .....................................................17

*Ingersoll-Rand Co.* v. *McClendon*,
498 U.S. 133 (1990) .....................................................38

*IWOI, LLC* v. *Monaco Coach Corp.*,
581 F. Supp. 2d 994 (N.D. Ill. 2008) .....................................................35

*Jackson* v. *Gen. Motors Corp.*,
770 F. Supp. 2d 570 (S.D.N.Y. 2011) .....................................................7, 38, 39

*Jones* v. *Apple, Inc.*,
2016 WL 4429801 (S.D. Ill. Aug. 22, 2016) .....................................................36

*Kahn* v. *Volkswagen of Am., Inc.*,
2008 WL 590469 (Conn. Super. Ct. Feb. 13, 2008) .....................................................34, 35

*Kaing* v. *Pulte Homes, Inc.*,
2010 WL 625365 (N.D. Cal. Feb. 18, 2010) .....................................................28-29

*Koronthaly* v. *L'Oreal USA, Inc.*,
   374 F. App'x 257 (3d Cir. 2010) ...................................................................20, 21

*Krottner* v. *Starbucks Corp.*,
   406 Fed. Appx. 129 (9th Cir. 2010).................................................................8, 41

*Kruse* v. *Chevrolet Motor Div.*,
   1997 WL 408039 (E.D. Pa. July 17, 1997)...........................................................32

*Laird* v. *Tatum*,
   408 U.S. 1 (1972)...............................................................................................16, 17

*Lassen* v. *Nissan N. Am., Inc.*,
   211 F. Supp. 3d 1267 (C.D. Cal. 2016) ...................................................................21

*Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*,
   134 S. Ct. 1377 (2014) ......................................................................................42-43

*Licul* v. *Volkswagen Grp. of Am., Inc.*,
   2013 WL 6328734 (S.D. Fla. Dec. 5, 2013) .............................................5, 27, 41

*Lloyd* v. *Gen. Motors Corp.*,
   575 F. Supp. 2d 714 (D. Md. 2008) .......................................................................36

*Lorenzo* v. *Qualcomm Inc.*,
   2009 WL 2448375 (S.D. Cal. Aug. 10, 2009) ........................................................43

*Lujan* v. *Defs. of Wildlife*,
   504 U.S. 555 (1992)................................................................ 15, 16, 24-25, 30

*Martin* v. *Monsanto Co.*,
   2017 WL 1115167 (C.D. Cal. Mar. 24, 2017)........................................................32

*McNutt* v. *Gen. Motors Acceptance Corp. of Ind.*,
   298 U.S. 178 (1936).................................................................................................15

*Meaunrit* v. *ConAgra Foods Inc.*,
   2010 WL 2867393 (N.D. Cal. July 20, 2010)...........................................31, 37, 39

*Middlesex Cty. Sewerage Auth.* v. *Nat'l Sea Clammers Ass'n*,
   453 U.S. 1 (1981) ................................................................................................ 9-10

*Morales* v. *Trans World Airlines, Inc.*,
   504 U.S. 374 (1992)..................................................................................................38

*Motor Vehicle Mfrs. Ass'n* v. *N.Y.S. Dep't of Envtl. Conservation*,
   17 F.3d 521 (2d Cir. 1994)........................................................................................9

*In re MyFord Touch Consumer Litig.*,
   46 F. Supp. 3d 936 (N.D. Cal. 2014) .................................................................36-37

*Or. Prescription Drug Monitoring Prog.* v. *DEA,*
  860 F.3d 1228 (9th Cir. 2017) ...................................................................15

*In re Porsche Cars N. Am., Inc.,*
  880 F. Supp. 2d 801 (S.D. Ohio 2012) ...............................................33-34

*Rader* v. *Greenberg Traurig, LLP,*
  352 P.3d 465 (Ariz. Ct. App. 2015).........................................................44

*Raines* v. *Byrd,*
  521 U.S. 811 (1997)..................................................................................15

*Rojas-Lozano* v. *Google,*
  159 F. Supp. 3d 1101 (N.D. Cal. Feb. 3, 2016) ......................................40

*Rooney* v. *Sierra Pac. Windows,*
  2011 WL 5034675 (N.D. Cal. Oct. 11, 2011)...........................................32

*Rosipko* v. *FCA US, LLC,*
  2015 WL 8007649 (E.D. Mich. Dec. 7, 2015) .........................................31

*Rothstein* v. *UBS AG,*
  708 F.3d 82 (2d Cir. 2013)...............................................................42, 43

*San Diego Cty. Gun Rights Comm.* v. *Reno,*
  98 F.3d 1121 (9th Cir. 1996) ...................................................................15

*Schmier* v. *U.S. Court of Appeals for the Ninth Circuit,*
  279 F.3d 817 (9th Cir. 2002) ......................................................15-16, 25

*Schobert* v. *Ill. DOT,*
  304 F.3d 725 (7th Cir. 2002) ...................................................................41

*Sheris* v. *Nissan N. Am., Inc.,*
  2008 WL 2354908 (D.N.J. June 3, 2008) ................................................32

*Sloan* v. *Gen. Motors LLC,*
  2017 WL 3283998 (N.D. Cal. Aug. 1, 2017) ......................................22-23

*Soares* v. *Lorono,*
  2015 WL 151705 (N.D. Cal. Jan. 12, 2015)..........................................6, 32

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.,*
  996 F. Supp. 2d 942 (S.D. Cal. 2014).......................................................44

*Spokeo, Inc.* v. *Robins,*
  136 S. Ct. 1540 (2016)........................................2, 4, 15, 19, 23, 25, 28, 30

*Steel Co.* v. *Citizens for a Better Env't,*
  523 U.S. 83 (1998)....................................................................................15

*Stonecrest Props., LLC* v. *City of Eugene*,
    382 P.3d 539 (Or. Ct. App. 2016)................................................................36

*Summers* v. *Earth Island Inst.*,
    555 U.S. 488 (2009)................................................................................16

*Tae Hee Lee* v. *Toyota Motor Sales, U.S.A., Inc.*,
    992 F. Supp. 2d 962 (C.D. Cal. 2014) .......................................................21

*Tait* v. *BSH Home Appliances Corp.*,
    2011 WL 1832941 (C.D. Cal. May 12, 2011) .......................................35, 44

*Taragan* v. *Nissan N. Am., Inc.*,
    2013 WL 3157918 (N.D. Cal. June 20, 2013) ...........................................41

*In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prod. Liab. Litig.*,
    915 F. Supp. 2d 1151 (C.D. Cal. 2013) ..........................................3, 19, 21

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*,
    790 F. Supp. 2d 1152 (C.D. Cal. 2011) ..........................................3, 20, 22

*Valley Forge Christian Coll.* v. *Americans United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982)................................................................................17

*In re: Volkswagen "Clean Diesel" Litig.*,
    2016 WL 5347198 (Va. Cir. Ct. Aug. 30, 2016) .....................................7, 39

*Warth* v. *Seldin*,
    422 U.S. 490 (1975)................................................................................15

*Washington* v. *Gen. Motors Corp.*,
    406 U.S. 109 (1972)...............................................................................7, 39

*Weathers Auto Glass, Inc.* v. *Alfa Mut. Ins. Co.*,
    619 So. 2d 1328 (Ala. 1993) ....................................................................36

*Wis. Dep't of Indus., Labor & Human Relations* v. *Gould Inc.*,
    475 U.S. 282 (1986)................................................................................40

**Statutes**

42 U.S.C. § 7521 ........................................................................................9

42 U.S.C. § 7522 ......................................................................................9, 11

42 U.S.C. § 7523 ........................................................................................9

42 U.S.C. § 7541 ........................................................................................9

42 U.S.C. § 7543 .................................................................................7, 9, 37

42 U.S.C. § 7604 .....................................................................................10, 40

Ariz. Rev. Stat. Ann. § 12-541 ......................................................................43

Miss. Code Ann. § 75-24-15 ..........................................................................44

Or. Rev. Stat. Ann. § 646.638 ........................................................................43

Tex. Bus. & Com. Code § 17.505 ...................................................................44

Utah Code Ann. § 13-11-19 ............................................................................44

**Other Authorities**

12 C.F.R. § 213, App. A .................................................................................29

12 C.F.R. § 213.4 ...........................................................................................29

40 C.F.R. § 86.1803-01 ..................................................................................37

40 C.F.R. § 86.1809-12 ..................................................................................10

40 C.F.R. § 86.1844-01 ..................................................................................10

Fed. R. Civ. P. 12 .....................................................................................1, 15

H.R. Rep. No. 90-728 ....................................................................................40

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Volkswagen Group of America, Inc. and Audi of America, LLC (together, the "Volkswagen U.S. Defendants") respectfully submit this memorandum in support of their motion to dismiss the *Nemet* complaint, dated August 9, 2017 (ECF No. 7 in Case No. 3:17-cv-4372; "Complaint" or "Compl.") pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).[1]

## SUMMARY OF ARGUMENT

Since the start of this Multi-District Litigation ("MDL"), the Volkswagen Defendants have moved quickly to settle with their regulators, including the Department of Justice ("DOJ"), the Environmental Protection Agency ("EPA"), the Federal Trade Commission ("FTC"), and the California Air Resources Board ("CARB"), as well as with the 22-member Plaintiffs' Steering Committee ("PSC"), which settled claims on behalf of consumers who owned or leased 2.0-liter and 3.0-liter TDI vehicles on or after September 18, 2015, when the EPA and CARB first issued their Notices of Violation ("NOVs") allegedly causing a decline in the resale value of those vehicles.  Plaintiffs here, in contrast, define their putative class as "persons and entities who owned, leased, or otherwise acquired an Eligible Vehicle and *no longer owned, held an active lease for, or otherwise had a legal interest in that Eligible Vehicle on September 18, 2015.*"  (Compl. ¶¶ 8, 401 (emphasis added).)

These Plaintiffs thus had already sold their vehicles, or terminated their vehicle leases, **before** the NOVs (the "Pre-NOV Plaintiffs").  Notably, the PSC's original consolidated consumer class complaint incorporated the Pre-NOV Plaintiffs into its broad class definition, which included "all persons and entities in the United States who purchased or leased" TDI vehicles **at any time**.  (ECF No. 1230, ¶ 349.)  But the PSC elected to drop any purported claims on behalf of owners and lessees who sold or stopped leasing their vehicles before the NOVs, with their own expert noting that "individuals who sold their vehicles prior to disclosure of the fraud . . . suffered **no economic harm**, since they sold their vehicles before the announcement of the fraud and the resulting price drop of the vehicles."  (Decl. of Robert H. Klonoff Addressing

---

[1] Volkswagen AG ("VWAG") and Audi AG (together with the Volkswagen U.S. Defendants, the "Volkswagen Defendants") are also named as defendants in the Complaint, but the Volkswagen U.S. Defendants understand that VWAG and Audi AG have not yet been served.

1   Objections by Class Members to the Proposed Volkswagen "Clean Diesel" Settlement, ECF

2   1976-1, ¶ 79 (emphasis added).)   Only one of the 22 lawyers on the PSC, Steve Berman, has

3   brought the instant Complaint on behalf of the Pre-NOV Plaintiffs.   Because the Pre-NOV

4   Plaintiffs' claims are nothing more than a legally baseless effort to obtain a windfall, seeking to

5   require the Volkswagen Defendants to pay double compensation (both to Plaintiffs who owned

6   or leased affected vehicles after September 18 **and** to the Pre-NOV Plaintiffs who previously

7   owned or leased the very same cars), this Court should dismiss their Complaint with prejudice.

8         Unlike other consumers in this MDL, the Pre-NOV Plaintiffs *both acquired and*

9   *surrendered* their vehicles before the presence of the defeat devices was known to them or the

10  market, after using their vehicles without any issue for the duration of their ownership or lease.

11  Tellingly, the Pre-NOV Plaintiffs affirmatively *concede* that they "escaped" the "injury of lost

12  resale value"—the injury on which the plaintiffs whose claims settled based their claims.

13  (Compl. ¶ 4.)   Because the Pre-NOV Plaintiffs have sustained no actual, concrete or

14  particularized injury at all, let alone one caused by the Volkswagen Defendants' alleged

15  misconduct, they simply do not have Article III standing to bring their claims under settled law.

16        Beyond the Pre-NOV Plaintiffs' lack of Article III standing, the Court also should

17  dismiss their Complaint for failure to state a claim on which relief can be granted because it does

18  not adequately plead required elements of their claim under the Magnuson-Moss Warranty Act

19  ("MMWA") or the various state law consumer protection and false advertising statutes identified

20  in the Complaint.[2]   As demonstrated more fully below, the Complaint is fundamentally flawed in

21  critical respects and should be dismissed in its entirety with prejudice:

22        **Lack of Article III Standing.**   All of the Pre-NOV Plaintiffs' claims should be

23  dismissed for lack of Article III standing because the Pre-NOV Plaintiffs do not meet their

24  burden of pleading a "concrete and particularized" injury that is fairly traceable to Defendants'

25  alleged misconduct.   *Spokeo, Inc.* v. *Robins*, 136 S. Ct. 1540, 1548 (2016).   Instead, the Pre-

26

27  [2] The Complaint also asserts a claim under the Racketeer Influenced and Corrupt Organizations
    Act ("RICO") against VWAG and Audi AG, but that claim is not asserted against the
28  Volkswagen U.S. Defendants.   (*See* Compl. ¶ 414.)   Accordingly, we do not address the RICO
    claim at this time.

1  NOV Plaintiffs plead only hypothetical injuries for misconduct that did not affect them, hoping
2  to obtain a windfall by making Defendants pay a second time *for the same cars* when the
3  individuals who may have suffered a loss (if their vehicles lost value after the NOVs) have
4  *already* been addressed by the prior class action settlements.  The Pre-NOV Plaintiffs' claims are
5  precisely the sort of claims Article III bars, because an injury "must affect the plaintiff in a
6  personal and individual way" and "actually exist."  *Id.*

7          Unable to plead any actual loss, the Complaint advances two novel—and wholly
8  speculative—theories of injury:  (i) that the Pre-NOV Plaintiffs were "originally and primarily
9  injured" when they purportedly did not receive the benefit of their bargain, because their vehicles
10  lacked the "superior environmental characteristics" they allegedly "bargained for" (Compl. ¶ 12);
11  and (ii) that the Pre-NOV Plaintiffs overpaid for their vehicles because they allegedly paid a so-
12  called "clean diesel premium" that they subsequently lost, because of either (a) depreciation of
13  the vehicles or financing charges associated with acquiring the vehicles (*id.* ¶ 13), or
14  (b) allegedly inflated lease payments and associated lease fees (*id.* ¶ 14).

15          Neither of these theories amounts to a cognizable injury-in-fact sufficient to
16  confer Article III standing.  Beyond "simply alleging an overpayment for a 'defective' product,"
17  the Complaint lacks the "something more" required to establish standing under the benefit of the
18  bargain theory.  *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, &*
19  *Prods. Liab. Litig.*, 790 F. Supp. 2d 1152, 1165 n.11 (C.D. Cal. 2011).   "A plaintiff who
20  purchases a car that never malfunctions over its ordinary period of use," as here, "cannot be said
21  to have received less than what he bargained for when he made the purchase."  *In re Toyota*
22  *Motor Corp. Hybrid Brake Mktg., Sales Practices & Prod. Liab. Litig.*, 915 F. Supp. 2d 1151,
23  1159 (C.D. Cal. 2013) (quoting *In re Canon Cameras Litig.*, 237 F.R.D. 357, 360 (S.D.N.Y.
24  2006)).  Where, as here, the Pre-NOV Plaintiffs "obtained a vehicle that performed as expected,"
25  Oct. 25, 2016 Order on Settlement ("2.0-Liter Settlement Order"), ECF No. 2102, 2016 WL
26  6248426, at *3 (N.D. Cal. Oct. 25, 2016), they suffered no cognizable injury during that period
27  of pre-NOV possession.  And unlike the settlement class plaintiffs, who possessed their vehicles
28  on or after the NOVs, the Pre-NOV Plaintiffs did not even arguably incur any "lost resale value"

1   (Compl. ¶ 4), and thus cannot plead "facts that plausibly demonstrate that the [vehicles] have

2   diminished in value due to the alleged defect."  *Anderson* v. *Hyundai Motor Co.*, 2014 WL

3   12579305, at *7 (C.D. Cal. July 24, 2014); *see also Barakezyan* v. *BMW of N. Am., LLC*, 2016

4   WL 2840803, at *4 (C.D. Cal. Apr. 7, 2016) (no injury where vehicle "work[ed] as described"

5   despite alleged defect).  The Pre-NOV Plaintiffs cannot allege that they incurred any tangible

6   injury during their ownership.  They should not be permitted to recover for any diminution in

7   value that occurred *after* the NOVs, which Defendants have already "adequately and fairly

8   compensate[d]" through the settlements.  2.0-Liter Settlement Order, ECF No. 2102, 2016 WL

9   6248426, at *12.

10          The Pre-NOV Plaintiffs' "injury" theory based on the so-called "clean diesel

11   premium" also fails.  As an initial matter, the Complaint does not adequately plead that there was

12   an objective market value to any hypothetical "clean diesel premium"—a term made up by the

13   Pre-NOV Plaintiffs.  Instead, the Complaint "assumes" in wholly conclusory fashion that the

14   *entire* difference in price between the diesel models and gasoline models of comparable vehicles

15   amounts to this supposed "clean diesel premium," which the Pre-NOV Plaintiffs simply

16   "assume" was always $6,000 regardless of a vehicle's make, model, model year, price or other

17   features.  (*See, e.g.*, Compl. ¶¶ 13, 31, 47, 68, 106, 111, 379.)  Leaving aside that this "assumed"

18   $6,000 price difference is not a real number grounded in fact, the Pre-NOV Plaintiffs themselves

19   acknowledge that there are a host of reasons having nothing to do with NOx emissions why

20   consumers might pay more for a diesel vehicle than a gasoline counterpart, including the fact that

21   the "'clean' diesel model achieves greater mileage."  (*See, e.g., id.* ¶ 379.)  The Complaint does

22   not plead what portion, if any, of the diesel model price was supposedly attributable specifically

23   *to lower NOx emissions*, as opposed to other beneficial performance aspects of diesel models that

24   the Pre-NOV Plaintiffs concede they obtained.  Thus, as a threshold matter, the Pre-NOV

25   Plaintiffs do not adequately plead the existence of the "clean diesel premium"—the very linchpin

26   of their theory of standing—much less that it was "fairly traceable to the challenged conduct of

27   the defendant[s]" (*i.e.*, the use of NOx-related defeat devices).  *Spokeo*, 136 S. Ct. at 1547.

28

Even assuming that the Complaint plausibly alleged that there was some kind of "premium" that related specifically to NOx emissions, the Pre-NOV Plaintiffs have suffered no injury from the existence of that supposed premium.  As the Pre-NOV Plaintiffs concede, the alleged wrongdoing related to NOx was *not* revealed to the public until the announcement of the NOVs.  (Compl. ¶ 389.)  Much like "in-and-out traders" of securities—who have no claims if they both bought and sold their allegedly inflated stock before the alleged price inflation was removed by a "corrective" disclosure, *see, e.g.*, *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 342-44 (2005)—the Pre-NOV Plaintiffs sustained no injury because they both bought (or leased) and sold (or returned) their vehicles at purportedly inflated prices that still included the "premium." *See Licul* v. *Volkswagen Grp. of Am., Inc.*, 2013 WL 6328734, at *5 (S.D. Fla. Dec. 5, 2013) ("[Plaintiff] purchased the Jetta at a price that did not take account of the defect, and she sold the Jetta at a price that did not take account of the defect.  She therefore did not suffer the loss of any value."); *Cahen* v. *Toyota Motor Corp.*, 147 F. Supp. 3d 955, 971 (N.D. Cal. 2015) (plaintiffs lacked Article III standing where they had not "alleged a demonstrable effect on the market for their specific vehicles").  Indeed, fatally for their claims, the Pre-NOV Plaintiffs concede that their vehicles were worth "more at the time of resale because of the perceived environmental benefits." (Compl. ¶ 382.)

The Pre-NOV Plaintiffs spill much ink alleging that they were injured because the vehicles they purchased "depreciated significantly in value" by the time they sold them, and that a "share of that overall depreciation is allocable to the [clean diesel] premium." (*See, e.g.*, Compl. ¶ 21.)  That the Pre-NOV Plaintiffs' vehicles depreciated is, of course, entirely unremarkable—and not fairly traceable to any alleged wrongdoing—given that "[a]ll cars depreciate over time."  May 17, 2017 Order on Settlement, ECF No. 3229, 2017 WL 2212783, at *20 (N.D. Cal. May 17, 2017) ("May 17, 2017 Order").  The Pre-NOV Plaintiffs attempt to avoid this inescapable fact by conclusorily alleging that they were injured when the "clean diesel premium" *itself* depreciated, arguing that it was "diminished by the fact that fewer years were left in the life of the car." (Compl. ¶ 382.)  The Complaint not only lacks any factual allegations to support this theory, but the Pre-NOV Plaintiffs' own calculations in the Complaint (using

hypothetical "assumed" numbers) presuppose that the so-called "clean diesel premium" did *not* depreciate, alleging that the *same $6,000 premium* was reflected in the price of both newly purchased vehicles *and* used vehicles purchased following a lease.  (*Compare id.* ¶¶ 33-36 ($6,000 premium applies to new 2009 Jetta TDI) *with id.* ¶¶ 86-92 ($6,000 premium applies to 2009 Jetta TDI purchased following three years of use as a lease).)

The Pre-NOV Plaintiffs who leased their vehicles similarly attempt to plead injury by alleging that their lease payments were inflated by the purported "clean diesel premium," but this theory suffers from the same basic flaw:  Lease payments are calculated based on the difference in value of the vehicle at the start and end of the lease, and the Complaint's own hypotheticals ascribe the *same value* to the "clean diesel premium" at *both ends* of the lease.  (Compl. ¶¶ 30-31, 90, 92.)  Thus, even if the Pre-NOV Plaintiffs had pled a NOx-related "premium," which they did not, their lease payments would not have been inflated as a result of any such premium.

**Deficient MMWA Claim**.  The Pre-NOV Plaintiffs' MMWA claim should be dismissed because it is predicated on state law warranty claims that are not adequately pled.  *See Clemens* v. *DaimlerChrysler Corp.*, 534 F.3d 1017, 1022, 1027 (9th Cir. 2008).  Specifically, the Pre-NOV Plaintiffs have not adequately alleged that (a) they suffered damages, *Soares* v. *Lorono*, 2015 WL 151705, at *14 (N.D. Cal. Jan. 12, 2015); (b) their vehicles were in breach of the implied warranty of merchantability, *Giesen* v. *Herb Chambers of Sudbury, Inc.*, 2015 WL 12697648, at *8 (D. Mass. May 13, 2015); (c) they were in privity with any of the defendants, as required by the laws of many of the states under which they sue, *see, e.g.*, *Curl* v. *Volkswagen of Am., Inc.*, 871 N.E.2d 1141, 1148 (Ohio 2007); or (d) they complied with applicable notice requirements of various implied warranty statutes, *see In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1103 (N.D. Cal. 2015).

**The Clean Air Act Preempts The Pre-NOV Plaintiffs' State Law Claims**.  All of the Pre-NOV Plaintiffs' state law claims, as well as their MMWA claim that is itself predicated on state implied warranty laws, are expressly and impliedly preempted by the Clean Air Act ("CAA").  *See* Order on MTD Wyoming Compl., ECF No. 3747, 2017 WL 3816738, at

1   *12 (N.D. Cal. Aug. 31, 2017) (where Plaintiffs are "effectively penalizing Volkswagen for

2   producing engines which failed to comply with the Federal standards, and for concealing or

3   misrepresenting those violations . . . [their] claims are expressly prohibited by the Clean Air

4   Act"); *In re: Volkswagen "Clean Diesel" Litig.*, 2016 WL 5347198, at *6 (Va. Cir. Ct. Aug. 30,

5   2016) (warranty claims regarding driving "an 'illegal' vehicle or one that fails to comply with

6   emissions regulations . . . impermissibly relate to the express preemption against enforcing

7   vehicle emission standards, and are further impliedly preempted because . . . [such claims] would

8   directly interfere with a central object of federal emission regulation:  enforcing manufacturer's

9   compliance with emissions standards").   Each claim ultimately rests on allegations that the

10  Volkswagen Defendants violated EPA regulations under the CAA that govern the vehicle

11  emissions certification process,[3] and thus each claim "relat[es] to the control of emissions from

12  new motor vehicles."  42 U.S.C. § 7543(a).  As a result, this Court should hold that CAA Section

13  209(a) expressly preempts the Pre-NOV Plaintiffs' claims.  Order on MTD Wyoming Compl.,

14  ECF No. 3747, 2017 WL 3816738, at *12; *see Jackson* v. *Gen. Motors Corp.*, 770 F. Supp. 2d

15  570, 576-79 (S.D.N.Y. 2011) (state common law claims preempted).

16          The Pre-NOV Plaintiffs' claims are also impliedly preempted under both field-

17  preemption and conflict-preemption principles.  Because the Pre-NOV Plaintiffs' claims relate to

18  motor vehicle emissions standards, their claims are field-preempted by the CAA's

19  comprehensive regulatory scheme:  "Congress has largely pre-empted the field with regard to

20  'emissions from new motor vehicles.'"  *Washington* v. *Gen. Motors Corp.*, 406 U.S. 109, 114

21  (1972).  Their claims are also conflict-preempted because they hinder the federal government's

22  objective to provide and enforce uniform national emissions standards.

---

[3] Although the Pre-NOV Plaintiffs frame their purported "injuries" as a failure to receive "clean emissions performance" or paying a "premium" to purchase their vehicles, their claims are fundamentally centered and contingent on the allegation that the vehicles bypassed emissions standards.  (*See, e.g.*, Compl. ¶ 10 ("No Plaintiff or Class member would—or could—have purchased the Class Vehicles but for Defendants' fraudulent scheme, because Defendants obtained EPA COCs (and CARB EOs) only through deception."); ¶¶ 20, 25, 29, 33, 40.)  The Pre-NOV Plaintiffs' claims therefore seek to penalize the Volkswagen Defendants for "producing engines which failed to comply with the Federal standards."  Order on MTD Wyoming Compl., ECF No. 3747, 2017 WL 3816738, at *12.

**Inadequately Pled State Law Claims**.  In addition to being preempted by the CAA, the Pre-NOV Plaintiffs' state law claims (23 consumer protection claims and two false advertising claims)[4] should be dismissed for two additional reasons:  *First*, their Complaint does not plausibly allege damages or proximate causation, both of which are required elements of all their state law claims and must meet the pleading standards of *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  These pleading standards are separate from, and in addition to, the threshold Article III standing requirements of injury-in-fact and traceability to defendants' conduct.[5]  *Second*, many of their inadequately pled claims suffer from additional deficiencies, including that they are untimely under applicable statutes of limitations, purport to assert class claims that are barred by statute, fail to satisfy pre-suit requirements, and fail to plead the required element of reliance.

## ISSUES TO BE DECIDED

This Motion presents the following issues:

1.    Do the Pre-NOV Plaintiffs lack standing for all their claims under Article III of the U.S. Constitution because they have not pled any concrete, particularized injuries that are fairly traceable to Defendants' challenged conduct?

2.    Can the MMWA claim proceed where the Pre-NOV Plaintiffs fail to allege (a) cognizable damages, (b) that their vehicles breached state implied warranties, (c) that they were in privity with the Volkswagen Defendants, or (d) that they provided proper pre-suit notice?

---

[4]  Although asserting once in passing that they are also bringing unjust enrichment claims (Compl. ¶ 15), the Pre-NOV Plaintiffs' Complaint does not actually allege any standalone unjust enrichment claims.  Instead, it merely seeks "restitution for unjust enrichment" under California's Consumer Legal Remedies Act (*id.* ¶ 550) and disgorgement of "the amount of [Defendants'] unjust enrichment" under Massachusetts Gen. Laws Ch. 93A (*id.* ¶ 637).  Neither of the substantive claims that allegedly provides for remedies tied to "unjust enrichment" is viable or adequately pled.  (*See infra* Sections III and IV.)

[5]  *See, e.g.*, *Krottner* v. *Starbucks Corp.*, 406 Fed. Appx. 129, 131 (9th Cir. 2010) (pleading "an injury-in-fact for purposes of Article III standing does not establish that [plaintiffs] adequately pled damages for purposes of their state-law claims"); *DeBons* v. *Globus Med., Inc.*, 2014 WL 12586433, at *3 (C.D. Cal. Jan. 31, 2014) (statutory "standing under [California's consumer protection act is] substantially narrower than federal standing under article III").

3.   Does Section 209(a) of the CAA expressly and/or impliedly preempt all of the Pre-NOV Plaintiffs' state law false advertising, consumer protection and warranty claims, because each claim relates to emissions standards for new motor vehicles?

4.   Should the Court dismiss the Pre-NOV Plaintiffs' state law claims where the Complaint does not adequately plead damages or proximate causation, and where certain claims (a) are untimely, (b) cannot be brought as class claims, (c) have unsatisfied pre-suit requirements, and (d) require reliance, which is not pled?

## BACKGROUND

### A.   The Clean Air Act's Regulatory Framework

Title II of the CAA establishes a comprehensive federal regulatory scheme governing motor vehicle emissions.  It vests the EPA with the exclusive authority, among other things, (a) to set emissions standards for new motor vehicles, 42 U.S.C. § 7521(a)(l), (b) to issue Certificates of Conformity ("COCs"), *id.* § 7522(a)(1), (c) to determine non-conformity with emissions standards and require manufacturers to remedy such non-conformity, *id.* § 7541(c)(1), and (d) to bring enforcement actions against manufacturers for violations, *id.* § 7523(a)-(b).  Subject to a narrow exception, the CAA's expansive preemption provision, 42 U.S.C. § 7543(a), vests exclusive enforcement authority over new motor vehicle emissions controls in the EPA.  In particular, Section 208(a) of the CAA expressly provides:  "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles." 42 U.S.C. § 7543(a).[6]  There is no private right of action for compensatory damages under the CAA.  *See, e.g.*, *Middlesex Cty. Sewerage Auth.* v. *Nat'l Sea Clammers*

---

[6] In recognition of California's unique environmental problems and efforts in regulating motor vehicle emissions before Congress enacted Title II, the CAA allows California to adopt and enforce its own emissions standards as long as those standards are approved by the EPA.  42 U.S.C. § 7543(b); *Motor Vehicle Mfrs. Ass'n* v. *N.Y.S. Dep't of Envtl. Conservation*, 17 F.3d 521, 525 (2d Cir. 1994).  Other states and the District of Columbia may choose to require that vehicles sold therein meet either the EPA's or California's (set by CARB) emissions requirements.  *See* U.S. EPA, Green Vehicle Guide, *available at* https://www.epa.gov/greenvehicles/smog-rating.

*Ass'n*, 453 U.S. 1, 17 n.27 (1981) ("[P]rivate enforcement suits were intended to be limited to the injunctive relief expressly provided for.").[7]

Every vehicle sold in the United States must be covered by a COC issued by the EPA.  (Compl. ¶ 7.)  To receive a COC, the EPA requires automobile manufacturers to submit an application listing, among other things, "all [AECDs] installed" on the vehicle and the parameters they sense and control, as well as "a detailed justification" for any AECD "that results in a reduction in effectiveness of the emission control system" and "a rationale for why it is not a defeat device."  40 C.F.R. § 86.1844-01(d)(11).  Although AECDs are permissible (and in many cases, necessary, for example to protect an engine from cold weather), "[n]o new [vehicle] shall be equipped with a defeat device."  *Id.* § 86.1809-12(a).

**B.     Volkswagen Emissions Investigations, Litigation and Multi-Billion-Dollar Settlements**

On September 18, 2015, the EPA and CARB issued separate NOVs to VWAG, Audi AG and Volkswagen Group of America, Inc. contending that they had manufactured, imported and sold TDI diesel vehicles containing unlawful defeat devices that caused those vehicles to use different emissions treatment depending on whether the vehicles were on a testing dynamometer or on the road.  (Compl. ¶ 2.)  In January 2016, the DOJ, on behalf of the EPA, filed suit, alleging violations of the CAA from the sale of approximately 580,000 model year 2009 to 2016 TDI diesel vehicles that contained defeat devices.  *United States* v. *Volkswagen AG et al.*, No. 16-cv-295 (N.D. Cal. Jan. 4, 2016) ("EPA Compl."), ECF No. 1, ¶¶ 56-62.  The EPA alleged, among other things, that the Volkswagen Defendants had violated Section 203(a)(3)(A) of the CAA, which prohibits "any person" from "remov[ing] or render[ing] inoperative any device or element of design installed on or in a motor vehicle . . . in compliance with" EPA regulations "prior to its sale and delivery to the ultimate purchaser," and that they had "manufactured, sold, offered for sale, or installed parts or components" of motor vehicles "where

---

[7] The CAA contains a general "citizen suit" provision, which authorizes private lawsuits in certain circumstances.  42 U.S.C. § 7604(a)(1), (b)(1)(B).  But that provision authorizes district courts only to "enforce such an emission standard or limitation"—*i.e.*, issue injunctive relief—or "apply any appropriate civil penalties," not to award damages to private plaintiffs.  *Id.* § 7604(a), (g).  Plaintiffs do not purport to be acting under this "citizen suit" provision here.

a principal effect of the part or component is to bypass, defeat, or render inoperative" certain of the vehicles' emissions controls.  *Id.* ¶¶ 53, 108-21; *see also* 42 U.S.C. § 7522(a)(3)(B).

As this Court is well aware, the Volkswagen Defendants thereafter reached a series of historic settlements, in record time for such complex settlements, with the DOJ, the EPA, CARB, the FTC and a class of the affected consumers (represented by the PSC), under the supervision of Settlement Master Robert S. Mueller III.  These settlements imposed multi-billion-dollar monetary penalties and injunctive remedies on the Volkswagen Defendants, including injunctive relief that the EPA determined would "fully mitigate" the lifetime, nationwide environmental damage caused by the TDI vehicles, including TDI vehicles, like the Pre-NOV Plaintiffs' vehicles, that changed hands prior to the NOVs.[8]  The Volkswagen Defendants also entered into a series of classwide settlements with private consumer plaintiffs who alleged damages under a variety of fraud, contract and warranty-based theories, as well as under RICO and the MMWA.[9]  These Consumer Settlements provided substantial compensation to consumers who owned, leased or sold affected vehicles *after the announcement of the NOVs on September 18, 2015*.  These settlements were in keeping with the Amended Consolidated Consumer Class Action Complaint, which specifically alleged:  "With the revelations of Volkswagen's fraud, the Class Vehicles have decreased sharply in value.  Within several weeks of the announcement of Volkswagen's emissions fraud, the value of the Class Vehicles plummeted by nearly 16%."  *See* ECF No. 1804, ¶ 396 (N.D. Cal. Sept. 2, 2016); *see also, e.g.*, *id.* ¶¶ 548, 634, 751.

None of the settlements provided compensation for consumers, like the Pre-NOV Plaintiffs, who sold or otherwise disposed of their TDI vehicles *prior to* the September 18, 2015 NOVs, and for good reason:  those individuals suffered no legally cognizable injuries.  Indeed,

---

[8] *See* ECF No. 2103 at 11 & Appx. D (First Partial Consent Decree, 2.0L injunctive relief); ECF No. 3228 at 9 & Initial 3.0 Liter Mitigation Allocation Appendix (Second Partial Consent Decree, 3.0L injunctive relief); ECF No. 3155 ¶ 9 (Third Partial Consent Decree, $1.45 billion civil penalty).

[9] *See* Oct. 25, 2016 Order on Settlement ("2.0-Liter Settlement Order"), ECF No. 2102, 2016 WL 6248426, at *3 (N.D. Cal. Oct. 25, 2016); May 17, 2017 Order on Settlement ("3.0-Liter Settlement Order"), ECF No. 3229, 2017 WL 2212783 (N.D. Cal. May 17, 2017) (together, the "Consumer Settlements").

1   the FTC, the federal regulator charged with protecting consumers nationwide, "strongly

2   support[ed]" the Consumer Settlements (notwithstanding the exclusion of uninjured consumers

3   like the Pre-NOV Plaintiffs) and "agree[d] that the Settlement's compensation 'fully

4   compensates victims of Volkswagen's unprecedented deception.'"  2.0-Liter Settlement Order,

5   ECF No. 2102, 2016 WL 6248426, at *17.  While the Pre-NOV Plaintiffs were included in the

6   class definition in the PSC's Consolidated Consumer Class Action Complaint (ECF No. 1230,

7   ¶ 349), they were ultimately excluded from the settlements negotiated by the regulators, the PSC

8   and the Volkswagen Defendants, all under the supervision of Director Mueller.

9          **C.    The Complaint**

10                 Represented by only one of the twenty-two members of the Court-appointed PSC,

11  the Pre-NOV Plaintiffs here purport to bring claims on behalf of a putative class of "persons and

12  entities who owned, leased, or otherwise acquired an Eligible Vehicle and no longer owned, held

13  an active lease for, or otherwise had a legal interest in that Eligible Vehicle on September 18,

14  2015." (Compl. ¶¶ 8, 401.)  The Pre-NOV Plaintiffs do not allege that they suffered any physical

15  injuries, experienced any performance issues with their vehicles during their ownership or lease

16  periods, or had any problems selling or otherwise disposing of their vehicles.[10]  In fact, the Pre-

17  NOV Plaintiffs fatally concede that they "escaped" the "injury of lost resale value" by selling or

18  otherwise surrendering their cars *before issuance of the NOVs*.  (Compl. ¶ 4.)  The Pre-NOV

19  Plaintiffs instead claim to have suffered two purported "injuries":  *First*, they allege that they did

20  not receive the "benefit of their bargain" because they did not obtain "clean emissions

21  performance . . . during their period of ownership" and "unwittingly drove hyper-polluting cars."

22  (*Id.*)  *Second*, the Pre-NOV Plaintiffs allege that they overpaid for the vehicles because of (i) a

23  "clean diesel premium" that they allegedly lost when their newly purchased vehicles depreciated

24

25

---

26  [10]  By contrast, plaintiffs who were part of the Consumer Settlements specifically alleged that
    they (a) attempted to have their vehicles repurchased by dealers, but were turned down (Am.

27  Consolidated Consumer Class Action Compl., ECF No. 1804, ¶¶ 24-25, 36, 45, 104, 125, 148,
    163), (b) attempted to trade in their vehicles but received diminished offers or no offers at all,

28  (*id.* ¶¶ 85, 96, 154, 156-57, 161, 173, 184), or (c) were unable to resell their vehicles, or received
    significantly diminished offers, after issuance of the NOVs (*id.* ¶¶ 92, 156, 159, 171, 173).

1    and when some of them paid financing fees to fund their purchases (*id*. ¶ 13), or (ii) allegedly

2    inflated lease payments and associated lease acquisition and termination fees (*id*. ¶ 14).

3            The Complaint formulaically recites the Pre-NOV Plaintiffs' supposed

4    motivations for purchasing or leasing their vehicles, but conspicuously fails to allege that any of

5    them actually relied on any particular advertisement in choosing his or her vehicle.  (*See* Compl.

6    ¶¶ 20-154.)  In fact, the Pre-NOV Plaintiffs concede that they selected their vehicles for multiple

7    reasons having nothing to do with NOx, including the high performance of TDI vehicles (*id*.

8    ¶ 136), and the Pre-NOV Plaintiffs do not contest that they received multiple benefits from

9    selecting a TDI vehicle instead of a gasoline vehicle, including greater fuel efficiency (*id*. ¶ 185)

10    and superior mileage (*id*. ¶ 279).  The Pre-NOV Plaintiffs nonetheless allege that they overpaid

11    for their TDI vehicles in the form of what they label a "clean diesel premium," which supposedly

12    consists of the *entire* difference between the price of a diesel vehicle and its gasoline counterpart.

13    (*Id*. ¶ 379.)[11]  Their Complaint merely "assumes," without any particularized factual allegations,

14    that the price difference between diesel and gasoline models was a hypothetical $6,000 for *every*

15    purchased vehicle, regardless of the make, model, model year or prices of the vehicles.  (*See,*

16    *e.g., id*. ¶¶ 13, 22, 36, 68, 90.)   Next, the Complaint simply attributes—again without any

17    supporting factual allegations—the entire assumed price difference of $6,000 per vehicle to the

18    alleged NOx emission control features, ascribing no value to the many benefits of diesel models

19    that the Complaint elsewhere acknowledges (*e.g*., fuel economy, greater performance, etc.).  (*Id*.)

20            The Pre-NOV Plaintiffs attempt to manufacture "injury" through a series of

21    calculations based on their hypothetical "assumed" numbers.   In particular, they use their

22    "assumed" $6,000 premium to calculate what percentage of their total payment for each vehicle

23    was attributable to this premium.  (*See, e.g., id*. ¶ 13 (the purchase price of the vehicle (*i.e*.,

24    $22,000) divided by the assumed premium ($6,000) is 27%).)   By using their hypothetical

25    $6,000 as the assumed premium for every vehicle, regardless of differences in the vehicles'

---

11  The Complaint's explanation of the supposed "clean diesel premium" is not supported by
facts; it is highly abstract and uses extensive hypotheticals that incorporate "assumed" numbers.
(*See, e.g*., Compl. ¶ 13 ("[A]ssume one of the plaintiffs paid a 'clean diesel' premium of $6,000
. . . Assuming the vehicle depreciated by a total of $8,875 during ownership . . . [A]ssuming this
plaintiff paid $2,794 in financing charges.").)

1   actual prices, the Complaint alleges that the premium's hypothetical percentage of the total

2   purchase price varied from vehicle to vehicle and from Plaintiff to Plaintiff.  (*See, e.g.*, *id*. (27%),

3   ¶ 22 (17%), ¶ 36 (20%), ¶ 68 (10%), ¶ 75 (23%).)  The Complaint also assumes that these same

4   hypothetical percentages of the purchase prices can be used to calculate the percentage of the

5   vehicles' overall depreciation that was supposedly attributable to the "clean diesel premium,"

6   which the Pre-NOV Plaintiffs then assert is an injury they suffered.  (*See, e.g.*, *id*. ¶ 13 (assuming

7   the vehicle depreciated by $8,875, 27% of the depreciation (or $2,400) is assumed to be the

8   premium-related  depreciation).)[12]    The  Pre-NOV  Plaintiffs  also  assume  that  these  same

9   percentages can be applied to their financing fees to calculate another "injury" they allegedly

10   suffered.  (*Id*.)  The Pre-NOV Plaintiffs engage in a similar series of hypotheticals and assumed

11   numbers—untethered to factual allegations—to calculate a portion of each lease payment that

12   was supposedly attributable to the "clean diesel premium."  (*See, e.g.*, *id*. ¶ 31 (the assumed

13   $6,000 "clean diesel premium" is 17% of the total lease value ($35,250), and therefore 17% of

14   the Pre-NOV Plaintiff's lease-related payments represent "injury").)

15            In  addition  to  being  completely  hypothetical  and  speculative,  the  Pre-NOV

16   Plaintiffs' assumptions are belied by their admission that the TDI vehicles were "*worth slightly*

17   *more* at the time of resale because of the perceived environmental benefits."  (*Id*. ¶ 382

18   (emphasis added).)  Similarly, the Complaint's own hypotheticals assume that the made-up

19   $6,000 "clean diesel premium" is the same at the start *and* end of a lease, and therefore does *not*

20   depreciate.  Thus, by the Complaint's own allegations, any decline in value would have been due

21   to simple depreciation, not to depreciation of any "clean diesel premium."  *See* May 17, 2017

22   Order, 2017 WL 2212783, at *20  ("All cars depreciate over time.").

23

24

25

26

---

27   [12]  The Complaint offers no explanation for its facially unrealistic assumption that every
     individual feature of a vehicle depreciates at the exact same rate, and, thus, it does not explain
28   why the overall percentage by which a vehicle depreciates is also the same percentage by which
     the "clean diesel" feature supposedly depreciates.

**LEGAL STANDARDS**

***Rule 12(b)(1)***.  In response to a motion to dismiss for lack of standing pursuant to Rule 12(b)(1), each plaintiff "must demonstrate [Article III] standing for each claim he seeks to press."  *Davis* v. *Fed. Election Comm'n*, 554 U.S. 724, 734 (2008); *accord Or. Prescription Drug Monitoring Prog.* v. *DEA*, 860 F.3d 1228, 1233 (9th Cir. 2017).

***Rule 12(b)(6)***.  The Complaint must be facially plausible; it must allege sufficient "factual content" to "allo[w] the court to draw the reasonable inference" that the defendants are "liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "If a pleader's allegations of wrongdoing are merely 'threadbare recitals of a cause of action's elements, supported by mere conclusory statements' a court will not accept the allegations as true."  *EMC Corp.* v. *Sha*, 2013 WL 4399025, at *2 (N.D. Cal. Aug. 13, 2013) (quoting *Iqbal*, 556 U.S. at 678).

**ARGUMENT**

**I.    THE PRE-NOV PLAINTIFFS LACK ARTICLE III STANDING BECAUSE THEY HAVE NOT PLED ANY COGNIZABLE INJURY-IN-FACT FAIRLY TRACEABLE TO DEFENDANTS' CONDUCT.**

Standing is "the threshold question in every federal case, determining the power of the court to entertain the suit."  *Warth* v. *Seldin*, 422 U.S. 490, 498 (1975).  "As the parties invoking federal jurisdiction, plaintiffs bear the burden of establishing their standing to sue."  *San Diego Cty. Gun Rights Comm*. v. *Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996) (citing *Lujan* v. *Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  It is settled that the plaintiff "must allege in [her] pleading the facts essential to show jurisdiction," and "[i]f [she] fails to make the necessary allegations [she] has no standing."  *McNutt* v. *Gen. Motors Acceptance Corp. of Ind*., 298 U.S. 178, 189 (1936); *accord Raines* v. *Byrd*, 521 U.S. 811, 818 (1997).

To satisfy this "irreducible constitutional minimum," *Lujan*, 504 U.S. at 560, a plaintiff must "[f]irst and foremost," *Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83, 102 (1998), plead an injury-in-fact:  "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560).  Such an injury "must have actually occurred or must occur imminently; hypothetical, speculative or other 'possible future' injuries do not count in the

1   standings calculus." *Schmier* v. *U.S. Court of Appeals for the Ninth Circuit*, 279 F.3d 817, 821

2   (9th Cir. 2002).  "Allegations of a subjective [harm] are not an adequate substitute for a claim of

3   specific present objective harm or a threat of specific future harm." *Laird* v. *Tatum*, 408 U.S. 1,

4   13-14 (1972).  Similarly, a "generalized harm to the . . . environment will not alone support

5   standing." *Summers* v. *Earth Island Inst.*, 555 U.S. 488, 494 (2009).  Moreover, merely pleading

6   the existence of a cognizable injury-in-fact is not enough to establish Article III standing;

7   plaintiffs must also plead that the injury is "fairly traceable to the challenged action of the

8   defendant." *Lujan*, 504 U.S. at 560 (alterations omitted).

9            None of the named Pre-NOV Plaintiffs pleads any "concrete" injury-in-fact fairly

10  traceable to Defendants' regulatory violations.  These Plaintiffs do not allege that they suffered

11  any injuries traceable to the existence of defeat devices in their vehicles, such as physical injury

12  or property damage; indeed, they concede that their alleged injuries were "unknown . . .

13  throughout the duration of the Class members' ownership, lease, and/or usage of the Class

14  Vehicles." (Compl. ¶ 12.)  Nor do the Pre-NOV Plaintiffs allege that they suffered any injury

15  because of a reduction in the value of their vehicles when they sold or otherwise disposed of

16  them.  Unlike the plaintiffs covered by the Consumer Settlements, who alleged that their vehicles

17  declined in value after the September 18, 2015 NOVs, and unlike the Volkswagen-brand

18  franchise dealers, which alleged that they could not sell the TDI vehicles they had in inventory

19  after the NOVs,[13] the Pre-NOV Plaintiffs do not allege that the emissions issues had any impact

20  on their ability to dispose of their vehicles or the prices at which they disposed of them,

21  admitting that they "escaped" the "injury of lost resale value." (Compl. ¶ 4.)  Indeed, the Pre-

22  NOV Plaintiffs concede that their vehicles "were worth slightly more at the time of resale

23  because of the perceived environmental benefits." (*Id.* ¶¶ 4, 382.)  In short, these Plaintiffs—

24  much like "in-and-out traders" who buy *and sell* their stock before revelation of a fraud in the

25  securities context[14]—recovered at resale any "clean diesel premium" that they supposedly paid

26  _____

27  [13] *See* Oct. 30, 2017 Order on Bosch Motion to Dismiss, ECF No. 4185, at 3.

28  [14] It is settled that plaintiffs in securities cases who both bought and sold their stock at inflated
    prices before revelation of the alleged fraud have not suffered a loss.  *See, e.g.*, *Dura*, 544 U.S. at
    342-44.

when they purchased their vehicles, leaving the only actual injury (if any) to fall upon the individuals who subsequently owned these named Plaintiffs' same vehicles when the September 18, 2015 NOVs issued.  The individuals who took over possession of their TDI vehicles *from* the Pre-NOV Plaintiffs, and who possessed them at the time of the NOVs, have already been fully compensated—and thus the Pre-NOV Plaintiffs' theory of injury demands that Defendants pay a second time for the same defeat devices in the *same vehicles*, but this time to Plaintiffs who incurred no losses because they sold their vehicles or terminated their leases before the NOVs.

Some of the Pre-NOV Plaintiffs also claim to be "appalled," in hindsight, by having had a car that did not meet environmental regulations.  (*Id*. ¶¶ 33, 150.)  But subjective harm of this sort does not constitute a cognizable Article III injury-in-fact.  *See Laird*, 408 U.S. at 13-14 (purely subjective harm insufficient for Article III injury); *Barakezyan*, 2016 WL 2840803, at *4 (no Article III injury where Plaintiff alleged he "personally values his vehicle less than he expected to or less than he could if it were different in some particular way").[15]  Indeed, the "direct harm caused by the TDI engines' nonconformity was not to the vehicle owner—who obtained a vehicle that performed as expected—but to the public at large."  2.0-Liter Settlement Order, ECF No. 2102, 2016 WL 6248426, at *10.  And this harm to the public has been "fully mitigate[d]" by the settlements between the EPA and Volkswagen Defendants.[16]

The Complaint's formulaic repetition of boilerplate allegations of purported "injuries" stands in stark contrast to the specific allegations of economic loss alleged by the plaintiffs whose claims were settled in the Consumer Settlements (*i.e.*, individuals who owned or leased TDI vehicles on or after September 18, 2015):

---

[15] *See also Valley Forge Christian Coll.* v. *Americans United for Separation of Church & State, Inc*., 454 U.S. 464, 485 (1982) ("[P]sychological consequence presumably produced by observation of conduct with which one disagrees . . . is not an injury sufficient to confer standing under Art. III."); *Humane Soc'y of U.S.* v. *Babbitt*, 46 F.3d 93, 98 (D.C. Cir. 1995) ("[G]eneral emotional 'harm,' no matter how deeply felt, cannot suffice for injury-in-fact for standing purposes.").

[16] *See* ECF No. 2103 at 11 & Appx. D (First Partial Consent Decree, 2.0L injunctive relief); ECF No. 3228 at 9 & Initial 3.0 Liter Mitigation Allocation Appendix (Second Partial Consent Decree, 3.0L injunctive relief).

| PRE-NOV PLAINTIFFS | POST-NOV PLAINTIFFS[17] |
|---|---|
| • "Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased [or leased] the Vehicle, had Defendants not concealed the illegal defeat device." (Compl. ¶¶ 25, 29, 33, 40, 52, 58, 70, 73, 82, 99, 104, 109, 114, 120, 125, 132, 136 (purchased); ¶¶ 29, 132 (leased).)<br><br>• "Between the time that Plaintiff purchased the Vehicle and the time that she sold it, the Vehicle depreciated significantly in value." (Compl. ¶¶ 21, 25-26, 46, 54, 59, 64, 67, 71, 74, 79, 83, 91, 96, 100, 105, 110, 115, 121, 126, 138, 143, 147, 151.)[18]<br><br>• "Between the time that Plaintiff leased the Vehicle and the time that Plaintiff turned in the Vehicle, Plaintiff made payments based on the Vehicle's value at the time of the Lease." (Compl. ¶¶ 30, 42, 89, 134.)<br><br>• "Plaintiff does not plan to ever purchase another Volkswagen or Audi." (Compl. ¶ 150.)<br><br>• "[Plaintiff] is appalled by the Vehicle's emissions levels and the amount of environmental pollution." (Compl. ¶ 33; *see also* ¶ 150 ("Plaintiff is appalled that Volkswagen circumvented government regulations and deceived the public and the government concerning fuel efficiency and emissions levels.").) | • "Plaintiff traded in his vehicle in October 2015. Despite the fact that the vehicle was in pristine condition, he only received $17,000 for it." (¶ 18.)<br><br>• "Plaintiff requested his local Audi dealer to buy back the Class Vehicle shortly after learning about the 'clean' diesel emissions scandal, but he was given an offer below the fair market value." (¶ 25.)<br><br>• "Plaintiff has tried to trade-in the Class Vehicle but not a single dealership has wanted it." (¶ 85.)<br><br>• "Plaintiff has tried to sell the Class Vehicle by posting 'for sale' notices online, but has been unable to sell it." (¶ 92.)<br><br>• Dealership denied trade-in request "and the local dealership explained she would be financially upside down on a trade-in." (¶ 96.)<br><br>• Plaintiff's "local dealership has repeatedly refused to purchase the vehicle." (¶ 104.)<br><br>• "Plaintiff attempted to trade in his Class Vehicle at Baker Motors . . . [but] Baker Motors would only take it back for a small fraction of its original cost." (¶ 154.)<br><br>• "Plaintiff attempted to sell the Class Vehicle after he learned of the defect and was offered only $13,000 by an interested party who pointed out the emissions issue to him as justification for the low offer. Volkswagen of Alexandria offered him $12,000 on a trade-in." (¶ 173.) |

---

[17] *See* ECF No. 1804.

[18] The Pre-NOV Plaintiffs concede that it is a "well-known economic fact in the automobile industry" that "[n]ew cars typically lose about 20% of their value the moment they're driven off the lot." (Compl. ¶ 13.)

| | |
|---|---|
| 1<br>2<br>3 | • "When he learned the Class Vehicle contained a defeat device . . . [he] put his vehicle into storage and started driving another car." (¶ 176.) |

4   In an effort to invent an injury-in-fact, the Pre-NOV Plaintiffs allege that they

5   were harmed in two ways:  (i) they allegedly did not receive the "benefit of their bargain"

6   because their vehicles did not contain the "superior environmental characteristics that Class

7   members bargained for" (Compl. ¶ 12); and (ii) they supposedly paid a "clean diesel premium"

8   to have a vehicle with lower NOx emissions, thereby artificially inflating the purchase price and

9   related financing fees of new vehicles (as well as lease payments and related fees of leased

10   vehicles), and, because of vehicle depreciation, some portion of this "premium" was not

11   recovered when they disposed of their vehicles.  None of these speculative theories constitutes a

12   "concrete" injury—one that is "real" and "not abstract"—sufficient to confer Article III standing.

13   *Spokeo*, 136 S. Ct. at 1548.  The purported injuries alleged in the Complaint do not meet these

14   Article III requirements, and that alone is fatal to all of the Pre-NOV Plaintiffs' claims.

15   **A.   The Pre-NOV Plaintiffs' Benefit of the Bargain Theory Does Not Establish**
      **Article III Standing.**

16   Conceding that they "escaped" the "injury of lost resale value," the Pre-NOV

17   Plaintiffs conclusorily claim that they "were originally and primarily injured when Defendants

18   did not provide them with the superior environmental characteristics that Class members

19   bargained for." (Compl. ¶¶ 4, 12.)  Specifically, the 27 named Pre-NOV Plaintiffs all claim that

20   they were deprived of the "benefit of the bargain," formulaically reciting that they "would not

21   have purchased [or leased] the Vehicle, had Defendants not concealed the illegal defeat device."

22   (*See, e.g.*, Compl. ¶¶ 20, 25, 33, 52, 58, 70, 73, 82, 99, 104, 109, 119, 136, 150 (purchased);

23   ¶¶ 29, 40, 88, 132 (leased).)

24   Courts faced with similar allegations—*i.e.*, that plaintiff "would not have paid the

25   same purchase price for his vehicle" if he had known about the alleged defect—have held that

26   such allegations are legally insufficient to "establish the actual injury that is required" for

27   standing.  *In re Toyota Motor Corp.*, 915 F. Supp. 2d at 1157-58; *see* Hubert v. *Gen. Nutrition*

28   *Corp.*, 2017 WL 3971912, at *8 (W.D. Pa. Sept. 8, 2017) ("While we accept as true Plaintiffs'

1   allegation that they would not have purchased the supplements had they known the supplements

2   purportedly contained dangerous ingredients, [Article III injuries] do not necessarily follow as a

3   consequence.").  "When the economic loss is predicated solely on how a product functions, and

4   the product has not malfunctioned, . . . *something more* is required than simply alleging an

5   overpayment for a 'defective' product." *In re Toyota Motor Corp.*, 790 F. Supp. 2d at 1165 n.11

6   (emphasis added); *see also Contreras* v. *Toyota Motor Sales USA, Inc.*, 2010 WL 2528844, at

7   *2, *6 (N.D. Cal. June 18, 2010) (no Article III standing where plaintiffs claimed "they would

8   not have purchased or would have paid less for one of the Vehicles and because their Vehicles

9   are worth substantially less than they would have been without the alleged defect"), *aff'd in

10   relevant part, rev'd on other grounds*, 484 F. App'x 116 (9th Cir. 2012).

11         Courts have also recognized that plaintiffs fail to plead the required "something

12   more" than overpayment for a defective product where, as here, there are no allegations of

13   "actual injury" or that plaintiffs "are unwilling to drive their vehicles, that they have sold or

14   traded their vehicles at a loss, or any other facts that plausibly demonstrate that the [vehicles]

15   have diminished in value due to the alleged defect." *Anderson*, 2014 WL 12579305, at *6-7; *see

16   also Barakezyan*, 2016 WL 2840803, at *4 (dismissing claim for lack of standing where defect

17   caused "extremely long loud high pitched noise" but vehicle "work[ed] as described," did not

18   "experience[] any functional problems" and plaintiff failed to plead "any other facts that

19   plausibly demonstrate any diminished value in his vehicle").  Nor have the Pre-NOV Plaintiffs

20   alleged that they received "a product that failed to work for its intended purpose or was worth

21   objectively less than what one could reasonably expect." *Koronthaly* v. *L'Oreal USA, Inc.*, 374

22   F. App'x 257, 259 (3d Cir. 2010).  In fact, the Pre-NOV Plaintiffs have not pleaded that the

23   value or use of their vehicles was in any way diminished as a result of the defeat devices while

24   they possessed the vehicle—indeed, they concede that their purported injury was "unknown" to

25

26

27

28

them "throughout the duration of the Class members' ownership, lease, and/or usage of the Class Vehicles." (Compl. ¶ 12.)[19]

In short, a "plaintiff who purchases a car that never malfunctions over its ordinary period of use cannot be said to have received less than what he bargained for when he made the purchase." *In re Toyota Motor Corp.*, 915 F. Supp. 2d at 1159 (quoting *In re Canon Cameras Litig.*, 237 F.R.D. 357, 360 (S.D.N.Y. 2006)); *see also Briehl* v. *Gen. Motors Corp.*, 172 F.3d 623, 628 (8th Cir. 1999) (where "a product performs satisfactorily and never exhibits an alleged defect . . . no action lies"). Courts have consistently found that no standing exists where, as here, a defect never manifests during the period of ownership, and there are no allegations of any actual injury. *See Lassen* v. *Nissan N. Am., Inc.*, 211 F. Supp. 3d 1267, 1283 (C.D. Cal. 2016) ("Any actual injury . . . that could result is purely theoretical because no Plaintiff actually experienced that injury."); *Cahen*, 147 F. Supp. 3d at 967-68 ("Judges in this District regularly deny standing in product liability cases where there has been no actual injury."); *Tae Hee Lee* v. *Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962, 972 (C.D. Cal. 2014) (dismissing for lack of standing where "Plaintiffs have not alleged an actual economic injury because they have not had any negative experience with the [vehicles]"); *Barakezyan*, 2016 WL 2840803, at *4 (dismissing for lack of standing where defect not alleged to cause "any functional problems").

Here, the Pre-NOV Plaintiffs "obtained a vehicle that performed as expected." 2.0-Liter Settlement Order, ECF No. 2102, 2016 WL 6248426, at *10. None of these Plaintiffs has pled that his or her product "failed to work for its intended purpose or was worth objectively less than what one could reasonably expect." *Koronthaly*, 374 F. App'x at 259. The Pre-NOV Plaintiffs do not dispute that they received a vehicle that accomplished the "ordinary purpose" of an automobile: "provid[ing] safe, reliable transportation." *Bussian* v. *DaimlerChrysler Corp.*, 411 F. Supp. 2d 614, 623 (M.D.N.C. 2006). Indeed, the Pre-NOV Plaintiffs admit they were

---

[19] Some of the Pre-NOV Plaintiffs half-heartedly allege minor performance issues, such as "mechanical issues with the vehicle such as the windows not rolling down when the weather was hot and a sound coming from the front of the car" (Compl. ¶ 33), "recurrent appearances of the 'check engine' light and failed inspections" (*id.* ¶ 150), and "the clutch w[earing] out when the vehicle was not very old" (*id.* ¶ 109). These isolated inconveniences do not establish Article III standing because the Complaint does not allege that they were traceable to the defeat devices (and, in any event, the Pre-NOV Plaintiffs also do not seek redress for them).

able to use their vehicles without issue for "daily driving and commuting to work."  (*See, e.g.*, Compl. ¶¶ 20, 25, 58, 63, 66, 70, 78, 82.)  The Pre-NOV Plaintiffs also do not contest that their vehicles delivered the mileage and performance they desired.  (*See, e.g., id.* ¶ 136 ("Plaintiff specifically selected and purchased the Vehicle because of its reportedly good gas mileage and high performance."); *see also id.* ¶¶ 58, 73.)[20]  Moreover, the Pre-NOV Plaintiffs concede that they were able to sell their vehicles without any difficulties or "lost resale value" stemming from the defect devices.  (*Id.* ¶ 4.)  Nor can the Pre-NOV Plaintiffs—as *former* owners and *former* lessees—allege that they suffered "the loss of value of a durable good that they still own." *Herrington* v. *Johnson & Johnson Consumer Cos.*, 2010 WL 3448531, at *5 (N.D. Cal. Sept. 1, 2010); *see Contreras*, 2010 WL 2528844, at *6 ("Plaintiffs do not allege that they were forced to replace their vehicles after learning of the alleged defect.").

Unable to allege anything "more" than the unsupported allegation that they paid more for their TDIs than they would have paid if they had known of the defect, the Pre-NOV Plaintiffs claim to have been injured based on the mere fact that their vehicles emitted excess NOx. (*See* Compl. ¶ 4 (Plaintiffs "never received the clean emissions performance Defendants' promised").)  But the Pre-NOV Plaintiffs did not suffer any harm caused by those excessive emissions, and, in any event, such harm has already been fully remediated through prior settlements, including with the EPA.  *See* 2.0-Liter Settlement Order, ECF No. 2102, 2016 WL 6248426, at *10 ("The direct harm caused by the TDI engines' nonconformity was not to the vehicle owner—who obtained a vehicle that performed as expected—but to the public at large.").

The Pre-NOV Plaintiffs' failure to allege that their vehicles manifested any discernable defect while they owned or leased them distinguishes this case from those in which the overpayment theory sufficed for purposes of standing.  *See In re Toyota Motor Corp.*, 790 F. Supp. 2d at 1163 ("Nineteen of the thirty-four lead Plaintiffs allege that they experienced the [sudden acceleration] defect."); *Sloan* v. *Gen. Motors LLC*, 2017 WL 3283998, at *2 (N.D. Cal.

---

[20] One Pre-NOV Plaintiff alleges in passing that he was "frustrated and disappointed" by the mileage of his vehicle, but this subjective emotional response does not constitute an Article III injury and, in any event, he does not allege that any mileage issues were traceable to the defect device.  (Compl. ¶ 33.)

Aug. 1, 2017) (engines allegedly "overheat[ed], . . . c[aught] on fire," and "shu[t] down unexpectedly").  In those cases, unlike here, plaintiffs could plead the required "something more" than overpayment for a defective product.  Here, by contrast, the Pre-NOV Plaintiffs have pled, at most, a case of buyers' remorse that they first developed only after they had sold or returned their vehicles.  *See Barakezyan*, 2016 WL 2840803, at *4 (no Article III injury where Plaintiff only alleged that he "personally values his vehicle less than he expected to or less than he could if it were different in some particular way").  This is not sufficiently concrete to establish Article III standing.  *See Spokeo*, 136 S. Ct. at 1548 (a "concrete" injury is "an invasion of a legally protected interest" that "must be '*de facto*'" and "actually exist").

### B.   The Pre-NOV Plaintiffs' Payment of an Alleged "Clean Diesel Premium" Does Not Establish Article III Standing.

Unable to plead some "benefit of the bargain" injury, the Pre-NOV Plaintiffs alternatively allege that they were harmed because they paid a "clean diesel premium" for the "advertised combination of low emissions, high performance, and fuel economy" (*e.g.*, Compl. ¶¶ 20, 25, 29, 33), but supposedly were denied some portion of that premium.  Specifically, the Pre-NOV Plaintiffs allege that (a) as purchasers, they were harmed when their vehicles depreciated prior to resale or by paying related financing fees, and (b) as lessees, they were harmed by making inflated lease payments and paying related acquisition and termination fees. (*Id.* ¶¶ 13-14.)  Neither of these supposed harms constitutes a "concrete and particularized" injury that is "fairly traceable" to Defendants' alleged conduct.  *Friends of the Earth, Inc.* v. *Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180 (2000).

Even though the Pre-NOV Plaintiffs received numerous benefits from their TDI diesel vehicles, these Plaintiffs assume without any supporting factual allegations that the *entire difference* between the price of a TDI vehicle and its gasoline counterpart constitutes a "clean diesel premium" *entirely* attributable to NOx emission controls.  But the Pre-NOV Plaintiffs have not plausibly pled that *any* portion of the price difference between a diesel vehicle and its gasoline counterpart relates specifically to the TDI vehicles' NOx emission features, as opposed to the other diesel benefits that they do not contest they received.  Thus, the Pre-NOV Plaintiffs

1    have failed to plead plausibly that their payment of a "clean diesel premium" is a cognizable

2    injury-in-fact, much less an injury that is fairly traceable to Defendants' wrongful conduct.

3            Moreover, even if there was some premium specifically related to the TDI

4    vehicles' NOx emissions, the Pre-NOV Plaintiffs who purchased their vehicles would have

5    recouped it when they sold their vehicles prior to the September 18, 2015 NOVs, because, as the

6    Pre-NOV Plaintiffs concede, their TDI vehicles were worth "more at the time of resale because

7    of the perceived environmental benefits" attributable to the "clean diesel premium." (Compl.

8    ¶ 382.)  The Complaint also demonstrates that the lessee Pre-NOV Plaintiffs did not make

9    inflated lease payments as a result of any alleged NOx-related premium.

10                   **1.      The Pre-NOV Plaintiffs Have Not Adequately Pled That an Alleged**
                              **"Clean Diesel Premium" Is an Injury-in-Fact Fairly Traceable to**
11                            **Defendants' Conduct.**

12           When all is said and done, the Pre-NOV Plaintiffs' "overpayment" theory of

13   injury relies entirely on their conclusory assumption that they paid some hypothetical premium

14   relating to lower NOx emissions, which they dub a "clean diesel premium"—a term of their own

15   making.  (Compl. ¶ 13 (referring to "the premium paid for the 'privilege' of buying or leasing a

16   'clean diesel' vehicle."); *see also* ¶¶ 6, 10, 379-80.)  Instead of pointing to any evidence they

17   paid anything for NOx emissions specifically, the Pre-NOV Plaintiffs simply "assume" that they

18   paid a "clean diesel premium" of $6,000 for the "clean diesel feature" of each vehicle, regardless

19   of make, model, model year, price, or any of the vehicles' other features.  (*See, e.g.*, Compl. ¶ 13

20   (general), ¶ 31 (2011 Audi A3), ¶ 36 (2009 Jetta), ¶ 68 (2011 Audi Q7), ¶ 106 (2013 Passat),

21   ¶ 111 (2013 Beetle).)  Although the Pre-NOV Plaintiffs do not explain how they arrived at this

22   $6,000 figure, it appears from the Complaint that they calculated the entire difference between

23   the price of a TDI vehicle and the price of its gasoline counterpart, and then rounded upward to

24   reach the $6,000 number they used in their calculations as the hypothetical "premium" paid for

25   lower NOx emissions.  (*See, e.g.*, *id.* ¶ 379 ("[T]he non-diesel 2015 Passat started at $21,340,

26   while the 'clean' diesel fetched at least $27,100 . . . [resulting in] the premium—some

27   $5,755.").)  But the Pre-NOV Plaintiffs' speculations as to the existence of this hypothetical

28   premium are insufficient to plead an injury-in-fact, which must be "actual or imminent, not

conjectural or hypothetical." *Lujan*, 504 U.S. at 560; *see also id.* at 566 ("Standing is not an ingenious academic exercise in the conceivable."); *Schmier*, 279 F.3d at 821 (injury cannot be "merely abstract" because "hypothetical [or] speculative" injuries "do not count").

This entire construct is a strawman because the relevant question is not whether the TDI vehicles were generally more expensive than comparable gasoline models.  The Pre-NOV Plaintiffs do not contest that TDI vehicles provided significant benefits over gasoline vehicles, including greater fuel efficiency and superior mileage (Compl. ¶¶ 185, 379).  Nor do they contest that they received all of these benefits, which make TDI vehicles fundamentally different from, and generally more expensive than, comparably equipped gasoline vehicles.

Turning to the relevant question, the Complaint lacks any factual allegations showing that any portion of the difference—let alone the entire difference—in price between the TDI and gasoline vehicles stems specifically from *lower NOx emissions*, as opposed to other factors.  Tying the "premium" to NOx emissions is a critical element missing from the Complaint, because it is black-letter law that "there must be a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560.  The Complaint does not allege that any Pre-NOV Plaintiff paid a single dollar more for their TDI vehicle specifically on account of the vehicle's NOx emissions.  Because the Pre-NOV Plaintiffs nowhere allege that *any* portion of the "clean diesel premium" was attributable specifically to *lower NOx emissions*, rather than to the other benefits of the diesel vehicles, they have failed to plausibly plead that their payment of any "premium"—in whole or in part—is an injury-in-fact fairly traceable to Defendants' wrongful conduct. *See Spokeo*, 136 S. Ct. at 1547.

## 2.   Depreciation and Financing Fees Do Not Constitute an Injury-in-Fact Traceable to Defendants' Conduct.

Despite the Pre-NOV Plaintiffs' concession that a "'new vehicle' premium is a well-known economic fact in the automobile industry," the owner Pre-NOV Plaintiffs claim that they were injured when their vehicles depreciated, because some hypothetical portion of that depreciation reflected the (also hypothetical) "clean diesel premium" embedded in the "new car premium." (Compl. ¶ 13.)  The Pre-NOV Plaintiffs also claim "injury" by alleging that they paid

1    inflated financing fees to purchase their vehicles because those fees were based on purchase

2    prices that were inflated by the "clean diesel premium." (*Id.*)

3          The Pre-NOV Plaintiffs cannot manufacture Article III standing from the simple

4    economic reality that all vehicles depreciate.  The Complaint acknowledges the "well-known

5    economic fact" that new cars immediately decrease in value upon leaving the lot because

6    purchasers "[pay] a premium to have a new vehicle in the first instance." (*Id.* ¶¶ 13, 381.)  The

7    fact that the Volkswagen Defendants sold vehicles with a new vehicle premium, which "[b]y

8    definition . . . cannot be recouped by a subsequent sale" (*id.* ¶ 13), does not demonstrate that the

9    Pre-NOV Plaintiffs suffered an injury-in-fact fairly traceable to Defendants' misconduct.

10   Indeed, it cannot be disputed that the depreciation that occurred between the Pre-NOV Plaintiffs'

11   purchases and *pre-NOV* sales of their vehicles was *unrelated* to the presence of a defeat devices.

12   As this Court has stated, "[a]ll cars depreciate over time," and such losses are "unrelated to the

13   conduct at issue in this case."  3.0-Liter Settlement Order, ECF No. 3229, at 20.

14          The Pre-NOV Plaintiffs' apparent theory is that some portion of the usual

15   depreciation is attributable to the "clean diesel premium" they paid, and therefore that portion of

16   the depreciation is an "injury" that is traceable to Defendants' conduct.  This theory is

17   unavailing.  As explained above, the Pre-NOV Plaintiffs have failed to allege that any portion of

18   the price of their vehicles, including the "premium" they paid for a TDI vehicle over its gasoline

19   counterpart, was due to lower NOx emissions.  Nonetheless, even if the Pre-NOV Plaintiffs had

20   adequately alleged that some portion of the higher price they paid for the diesel model was

21   related to NOx emissions, the Pre-NOV Plaintiffs were nevertheless able to recoup that portion

22   when they sold their vehicles before the NOVs and, therefore, before any arguable decline in the

23   vehicles' values due to emissions issues.  As a result, even if a NOx-specific premium did exist

24   or was adequately alleged in the Complaint, that premium would have augmented the price of the

25   vehicle at the time of *both* the original purchase and the subsequent resale.  The Pre-NOV

26   Plaintiffs fatally concede this economic reality.  (*See* Compl. ¶ 382 (vehicles "were worth

27   slightly more at the time of resale because of the perceived environmental benefits.").)  Indeed, a

28   court previously rejected similar allegations that a plaintiff was injured "because she paid more

1   for her [allegedly defective] Jetta than she otherwise would have, thereby suffering from the

2   diminished value of the Jetta," because she "purchased the Jetta at a price that did not take

3   account of the defect, and she sold the Jetta at a price that did not take account of the defect [and]

4   therefore she did not suffer the loss of any value in the Jetta." *Licul*, 2013 WL 6328734, at *5

5   (also noting that plaintiff did not "suffer from the defect itself during the term of her title to the

6   Jetta"); *see also Cahen*, 147 F. Supp. 3d at 971 (plaintiffs lacked Article III standing for purely

7   economic injuries without a demonstrable effect on the resale value of their vehicles).   At

8   bottom, the Pre-NOV Plaintiffs' depreciation theory is nothing more than an attempt to extract

9   additional payments from Defendants for injuries suffered by the *other* individuals to whom the

10  Pre-NOV Plaintiffs sold their vehicles with the same alleged premium they complain of here.

11           The Pre-NOV Plaintiffs try to plug this gaping hole in their "injury" theory by

12  positing that they were injured when the "clean diesel premium" itself depreciated:   "Even if

13  Class Vehicles were worth slightly more at the time of resale because of the perceived

14  environmental benefits, that value was diminished by the fact that fewer years were left in the

15  life of the car." (Compl. ¶ 382.)  Yet the Complaint itself demonstrates that this is fallacious,

16  because its own hypothetical calculations ascribe the *same $6,000 assumed premium* to a newly

17  purchased 2009 Jetta TDI (Compl. ¶¶ 33-36) and to a 2009 Jetta TDI that was purchased after

18  three years of leased use, with no reduction in the amount of the "premium" due to depreciation.

19  (*Id*. ¶¶ 86-92.)  Indeed, the Pre-NOV Plaintiffs have not plausibly pled *any* facts to suggest that

20  they were forced to discount the ultimate sale price of their vehicles because of any NOx-related

21  emissions performance that occurred during their period of possession. *See Cahen*, 147 F. Supp.

22  3d at 971 (no Article III standing without "a demonstrable effect on the market for their specific

23  vehicles").   Moreover, the Pre-NOV Plaintiffs allege that "Class members could not have

24  recouped the 'new vehicle' premium even by immediate sale following purchase, since by

25  definition that premium disappears the moment a vehicle becomes 'used.'" (Compl. ¶ 382.)

26  Thus, under their theory, the Pre-NOV Plaintiffs would have incurred an "injury" *even if* they

27  had bought and immediately sold their vehicles, without ever operating the vehicles or triggering

28  the defeat devices.   Simply put, the fact that the Pre-NOV Plaintiffs' vehicles—like all

vehicles—depreciated over time from their original purchase prices is not an injury fairly traceable to Defendants' alleged misconduct.  *See Spokeo*, 136 S. Ct. at 1547.  It is, as the Pre-NOV Plaintiffs concede, a simple "economic fact" of owning any vehicle.  (Compl. ¶¶ 13, 381.)

Some of the Pre-NOV Plaintiffs also allege that they were injured because they paid financing charges to obtain their new vehicles, but these allegations are also insufficient.[21] (*See, e.g.*, Compl. ¶¶ 23, 37, 56, 61, 76, 93, 107.)  As a preliminary matter, because the Pre-NOV Plaintiffs do not plead that their payment of an alleged premium for a diesel vehicle over its gasoline counterpart is traceable to the defeat devices, as opposed to other characteristics of the vehicles, they also do not plead that financing charges based on the higher purchase prices were fairly traceable to the defeat devices.  The use of financing reflects a Pre-NOV Plaintiff's personal decision as to how she will pay for a vehicle, and those considerations are not unique to TDI vehicles.  Once a consumer decides to use financing to purchase a vehicle, similar financing charges would have applied no matter what vehicle the individual purchased.  *See* 2.0-Liter Settlement Order, ECF No. 2102, at 22 (declining to consider fees that "would be owed whether or not the vehicles met relevant emissions limits").

The Pre-NOV Plaintiffs' choice to use financing to purchase their vehicles, and the specific financing terms they were given (which the Complaint nowhere specifies) can be attributed to countless factors unrelated to Defendants' alleged misconduct, such as their personal finances, credit ratings, willingness to take loans, occupations, and the state of the auto financing market in general and in their own areas.  Indeed, as the Complaint concedes, the Pre-NOV Plaintiffs were not choosing whether to buy a TDI car or no car at all—the choice was *which* car to buy.  (*See, e.g.*, Compl. ¶ 33 ("When Plaintiff decided to purchase a new vehicle in 2008, he considered purchasing a Toyota Prius.").)  This itself shows that the financing fees are not fairly traceable to the presence of a defeat device.  *See Kaing* v. *Pulte Homes, Inc.*, 2010 WL 625365, at *6 (N.D. Cal. Feb. 18, 2010) (holding that an injury is not "fairly traceable" when it is

---

[21] The Pre-NOV Plaintiffs assert, again hypothetically, that if one "assumes" that the alleged "clean diesel premium" represented a percentage of the price of the vehicle, then that same percentage of the financing charges constituted a charge for the "clean diesel premium." (Compl. ¶ 13.)

1    "dependent on many factors," making the causal connection between a defendant's actions and

2    the plaintiff's alleged injuries too attenuated) (citing *Lujan*, 504 U.S. at 560-61).

3                **3.    Lease Payments and Related Fees Do Not Constitute an Injury-in-
                        Fact Traceable to Defendants' Conduct.**

4            The lessee Pre-NOV Plaintiffs allege that they (i) paid higher prices for their

5    leases because of the purported "clean diesel premium," and (ii) incurred acquisition and

6    termination fees relating to their leases.  Neither theory establishes Article III standing.

7            The Pre-NOV Plaintiffs allege that they were injured because the "clean diesel

8    premium" inflated the value of their vehicles and, in turn, increased their lease payments.

9    (Compl. ¶¶ 14, 30-31, 42-43, 134-35.)  As this Court has recognized, lease payments are based

10   on the difference between the initial value of a vehicle before the start of the lease and its

11   estimated residual value at the end of the lease—in other words, "lessees essentially pay for the

12   amount that [the] vehicle's value is expected to diminish over the period of their lease."  2.0-

13   Liter Settlement Order, ECF No. 2102, at 13 (quoting ECF No. 1784-1 ¶ 34).[22]  The Pre-NOV

14   Plaintiffs have not pled that the lease agreements, which were entered into *before* discovery of

15   the defeat devices, were priced on an assumption that any alleged premium tied to NOx

16   emissions would depreciate, or that any depreciation occurred because of the inclusion of the

17   yet-unknown defeat devices.  The Pre-NOV Plaintiffs have therefore not plausibly alleged that

18   any depreciation built into the lease payments is traceable to the defeat devices.  Any amount

19   associated with the NOx emissions would have been included in both the initial value and the

20   residual value of the vehicle and, as a result, would not have increased the lease payments.

21           Indeed, the Complaint's unsupported assertion that "[a] share of that overall

22   depreciation is allocable to the premium that consumers paid for the 'clean diesel' feature,"

23

---

24   [22] In technical terms, a depreciation fee is the adjusted capitalized cost (the agreed-upon price for
25   the vehicle less any down payments or credits) minus the residual value (the estimated value of
     the car at the end of the lease).  That fee is paid in monthly installments over the course of the
26   lease.  12 C.F.R. § 213.4 (f) (2017).  Where both the adjusted capitalized cost (initial value) and
     the residual value are increased by the same premium, the lease payments would not be affected.
27   Lease payments also include a small financing fee or 'rent charge,' but as explained above,
     financing fees are simply part of the costs of obtaining a car, with or without defeat devices, and
28   are therefore not fairly traceable to Defendant's actions.  *Id.*; *see also* 12 C.F.R. § 213, App. A
     (2017) (model lease form demonstrating the mathematical calculation of a lease).

(Compl. ¶ 91),  is contradicted by the Pre-NOV Plaintiffs' own hypotheticals, which assume that the "clean diesel premium" did not depreciate.  The Complaint uses a hypothetical "premium" of approximately $6,000 at both the start and the end of a lease.[23]   For example, Plaintiff Brendan Daly initially leased his vehicle and then purchased it.  (*Id*. ¶ 87.)  The Complaint alleges that when Daly purchased his vehicle at the end of his lease, his purchase price contained the full $6,000 premium allegedly reflected in his lease payments.  (*Id*. ¶¶ 90, 92.)  The Complaint thus assumes that the same benefits and value of a diesel vehicle over its gasoline counterpart existed throughout the life of the vehicle.  As a result, lessee Pre-NOV Plaintiffs suffered no "concrete and particularized" injury-in-fact, nor can they show that any amount they allegedly overpaid was "fairly traceable" to Defendants' alleged misconduct.  *Spokeo*, 136 S. Ct. at 1547-48.

The Pre-NOV Plaintiffs also claim that they were injured because they paid lease acquisition and termination fees, but would not have leased their TDI vehicles at all if they had known about the defeat devices.  (Compl. ¶¶ 14, 29.)  But the Pre-NOV Plaintiffs fail to allege that they would not have paid these same fees for leasing *any* vehicle, and they concede that they would have needed another vehicle if they did not obtain their TDI vehicles.  (*Id*. ¶ 28 ("Plaintiff was looking for a . . . vehicle to lease for business use . . . [and] narrowed down the choices to either a Toyota Prius or the Vehicle").  The Pre-NOV Plaintiffs also do not allege that their lease acquisition and termination fees were in any way inflated as a result of the defeat devices.  Thus, the Pre-NOV Plaintiffs have failed to show the "causal connection between the injury and the conduct complained of" that is required for Article III standing.  *Lujan*, 504 U.S. at 560.

## II.   THE MAGNUSON-MOSS WARRANTY ACT CLAIM FAILS BECAUSE THE PRE-NOV PLAINTIFFS DO NOT ADEQUATELY PLEAD DAMAGES, LACK OF MERCHANTABILITY, PRIVITY, AND ADEQUATE NOTICE.

In their Complaint, the Pre-NOV Plaintiffs bring a MMWA claim (Count II) solely on the basis that their vehicles were in breach of "an implied warranty arising under State

---

[23] The Complaint assumes the premium to be $6,000 of the "Vehicle's value at the time of the Lease," i.e., at the *start* of a lease, for Plaintiffs Angela Matt Architect, Inc., Tonya Dreher, and Bradley Conner.  (Compl. ¶¶ 30-31, 43-43, 134-135.)  For Plaintiff Brendan Daly, however, the Complaint looks instead to the "estimated wholesale value *at end of lease term*," but still alleges that the premium to be $6,000.  (*Id*. ¶ 90.)

law."    (Compl. ¶¶ 514-15 (referencing 15 U.S.C. § 2301(7)).)   Remarkably, the Pre-NOV Plaintiffs have not actually asserted *any* independent state implied warranty claims.  *See Rosipko* v. *FCA US, LLC*, 2015 WL 8007649, at *5 (E.D. Mich. Dec. 7, 2015) (dismissing MMWA claim where "Plaintiffs have not asserted <u>any</u> state-law warranty claim, to say nothing of a <u>viable</u> state-law warranty claim").   Regardless, any state law warranty claim that any Pre-NOV Plaintiff would potentially assert under his or her state's law would be inadequate as a matter of law.[24] MMWA claims "stand or fall" with "warranty claims under state law" and a "court's disposition of state law warranty claims determines the disposition of the [MMWA] claims."  *Clemens*, 534 F.3d at 1022.  Where, as here, a complaint asserting a MMWA claim does not adequately plead the underlying state warranty claims, the  MMWA claim should be dismissed.  *See Meaunrit* v. *ConAgra Foods Inc.*, 2010 WL 2867393, at *10 (N.D. Cal. July 20, 2010) ("The Magnuson-Moss Act requires that a plaintiff successfully plead a violation of a state warranty law" in order to avoid dismissal); *see also In re Apple iPhone 3G Prod. Liab. Litig.*, 859 F. Supp. 2d 1084, 1091 (N.D. Cal. 2012) ("[B]ecause Plaintiffs' MMWA claim is derivative of their state law warranty claims, it follows that the Court's disposition of the MMWA claim must be determined by the Court's disposition of the state law warranty claims.").  Here, the Complaint does not adequately plead any underlying state implied warranty claims.[25]  *First*, the Pre-NOV Plaintiffs have failed to adequately plead that they suffered damages sufficient to state a claim.  *Second*, the Pre-NOV Plaintiffs fail to allege that their vehicles were so defective that they could not fulfill their basic purpose.  *Third*, many of the Pre-NOV Plaintiffs' state implied warranty claims

---

[24] As a preliminary matter, although the Pre-NOV Plaintiffs purport to bring a nationwide class action pursuant to the MMWA, the Pre-NOV Plaintiffs lack standing to bring claims under the laws of the states in which no named Pre-NOV Plaintiff purchased a vehicle.  *See In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1164 (N.D. Cal. 2009) ("Where . . . a representative plaintiff is lacking for a particular state, all claims based on that state's laws are subject to dismissal."); *In re Actimmune Mktg. Litig.*, 2009 WL 3740648, at *17 (N.D. Cal. Nov. 6, 2009) (dismissing state consumer protection claims without a representative plaintiff). Defendants therefore focus specifically in this section on the absence of any viable claim under the implied warranty laws of the states where the Pre-NOV Plaintiffs purchased or leased their vehicles.

[25] Additionally, as discussed below, the Pre-NOV Plaintiffs' state implied warranty claims are preempted because they are based on the vehicles' failure to comply with federal emissions standards.  This is an independent basis for dismissal of the Pre-NOV Plaintiffs' MMWA claim.

fail because they lack contractual privity with Volkswagen U.S. Defendants. *Fourth*, the Pre-NOV Plaintiffs fail to allege they provided Volkswagen U.S. Defendants with the statutorily mandated notice of their warranty claims.

### A. The MMWA Claim Fails Because the Pre-NOV Plaintiffs Do Not Allege the Required Element of Damages.

Under both federal and state law, the Pre-NOV Plaintiffs bear the burden of pleading that they suffered damages as a result of their breach of warranty claims. *Soares*, 2015 WL 151705, at *14 ("To prove breach of warranty under either federal or state law, Soares must prove . . . damages."); *Rooney* v. *Sierra Pac. Windows*, 2011 WL 5034675, at *4, 8-9 (N.D. Cal. Oct. 11, 2011). Damages under a breach of warranty claim are generally the "difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted." *Martin* v. *Monsanto Co.*, 2017 WL 1115167, at *8 (C.D. Cal. Mar. 24, 2017); *see generally* Appendix A-2. As explained above, the Pre-NOV Plaintiffs have not adequately pled that they paid a premium for NOx emissions specifically, much less what the value of their vehicle would have been with all of the benefits of a diesel car (such as higher fuel efficiency), excluding only the presence of the defeat devices. As a result, the Pre-NOV Plaintiffs have not carried their burden of pleading damages. *See Kruse* v. *Chevrolet Motor Div.*, 1997 WL 408039, at *1 (E.D. Pa. July 17, 1997) (dismissing MMWA claim where plaintiff "failed to show that he can produce at trial the evidence necessary to show he suffered damages.").

### B. There Is No Viable Underlying Implied Warranty Claim Because The Pre-NOV Plaintiffs Do Not Allege That Their Vehicles Did Not Fulfill Their Ordinary Purpose.

The MMWA claim also fails because the Pre-NOV Plaintiffs have not adequately pled that their vehicles breached any of the relevant state law implied warranties. Implied warranties of merchantability are guarantees only of a "minimum level of quality." *Sheris* v. *Nissan N. Am., Inc.*, 2008 WL 2354908, at *6 (D.N.J. June 3, 2008); *see also Hope* v. *Nissan N. Am., Inc.*, 353 S.W.3d 68, 90 (Mo. Ct. App. 2011) ("The implied warranty of merchantability does not mean a promise by the merchant that the goods are exactly as the buyer expected, but rather that the goods satisfy a minimum level of quality."). In all of the states relevant here,

products meet this "minimum level of quality" standard when they fulfill their ordinary purpose or achieve their intended use.[26]  With respect to vehicles, courts have found that this standard is met where a vehicle can be driven safely.  *See Hines* v. *Mercedes-Benz USA, LLC*, 358 F. Supp. 2d 1222, 1232-33 (N.D. Ga. 2005); *Giesen*, 2015 WL 12697648, at *8  ("[R]ecovery for breach of the implied warranty of merchantability in the sale of a vehicle requires proof that it was not fit for the ordinary purposes for which an automobile is generally used. . . .  The ordinary purpose of a vehicle is to provide safe, reliable transportation.").[27]

The Complaint nowhere alleges that the inclusion of the defeat devices rendered the Pre-NOV Plaintiffs' vehicles unsafe at the time of ownership, or that they incurred any damages from using their vehicles.  *See In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 2001 WL 1266317, at *22 (D.N.J. Sept. 30, 1997) ("The weight of authority, from courts across the country, indicates that plaintiffs may not recover for breach of the implied warranty of merchantability" where plaintiffs had been driving their cars for years without issue.).  Although alleging that Defendants' actions "jeopardized the safety of the American public" (Compl. ¶ 16), the Pre-NOV Plaintiffs do not allege that Defendants' actions caused them any personal injury.  Because the Pre-NOV Plaintiffs have not adequately pled any violation of state implied warranty laws, their MMWA claim should be dismissed.  *Clemens*, 534 F.3d at 1027.

## C.   The Pre-NOV Plaintiffs Lack Privity with the Volkswagen U.S. Defendants, Which Is Required for Various State Law Implied Warranty Claims.

"[W]here state law requires privity of contract, a plaintiff's implied warranty claims fail both under state law and the MMWA."  *Haugland* v. *Winnebago Indus.*, 327 F. Supp. 2d 1092, 1096 (D. Ariz. 2004); *see also In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801,

---

[26] All of the relevant states have adopted a standard of merchantability derived from the Uniform Commercial Code, which requires goods to be fit for "ordinary use" or "ordinary purposes" in order to be "merchantable."  *See* Appendix A-2.

[27] *See also Chandler* v. *Gene Messer Ford, Inc.*, 81 S.W.3d 493, 503 (Tex. Ct. App. 2002) ("The ordinary purpose of an automobile is to provide transportation"); *Bussian*, 411 F. Supp. 2d at 623 ("[C]ourts have held that the ordinary purpose of an automobile is to provide transportation. Where an automobile provides safe, reliable transportation, it is generally considered merchantable."); *Carlson* v. *Gen. Motors Corp.*, 883 F.2d 287, 297 (4th Cir. 1989) ("Since cars are designed to provide transportation, the implied warranty of merchantability is simply a guarantee that they will operate in a 'safe condition' and 'substantially free of defects.'").

819 (S.D. Ohio 2012) ("Plaintiff fails to meet the privity requirements that are necessary to sustain an implied warranty of merchantability claim . . . [and] therefore fails to state an implied warranty claim under Magnuson–Moss").  Here, Alabama, Arizona, California, Connecticut, Georgia, Illinois, New York, Ohio, Oregon, Utah, and Vermont all require privity of contract in order to bring an implied warranty claim.  *See* Appendix A-2.  Recognizing this requirement, the Complaint includes the formulaic and conclusory allegation that the Pre-NOV Plaintiffs "have had sufficient direct dealings with VW Entity Defendants or their agents (dealerships) to establish privity of contract."  (Compl. ¶ 517.)  But the Pre-NOV Plaintiffs make no factual allegations of any direct dealings with Volkswagen U.S. Defendants.  In fact, the Pre-NOV Plaintiffs acknowledge that they purchased or leased their vehicles from dealerships, not from any of the Defendants named in their Complaint.  (*See, e.g.*, *id.* ¶¶ 20, 25, 28, 33, 39, 58, 63.) Courts have repeatedly held that plaintiffs who purchased or leased their vehicles from dealerships are not in privity with the entities in the distribution chain that did not transact with plaintiffs.  *See Curl*, 871 N.E.2d at 1144 (dismissing claims where plaintiff was "not in privity with Volkswagen because, in Ohio, vertical privity exists only between immediate links in the distribution chain" regardless of the fact that plaintiff purchased from an "authorized dealership of Volkswagen."); *Kahn*, 2008 WL 590469, at *8 ("Connecticut law has maintained a privity requirement that prevents parties who are not in contractual privity with the warrantor from enforcing any implied warranty.").

       Equally unavailing is the Pre-NOV Plaintiffs' attempt to satisfy the privity requirement for state law implied warranty claims by alleging that they interacted with agents of Volkswagen U.S. Defendants.  Even for states where an agency relationship could be used to satisfy this privity requirement,[28] the Pre-NOV Plaintiffs bear the burden of pleading facts establishing such an agency relationship, and they have not done so here.  *See George Williams* v. *Yamaha Motor Corp., U.S.A.*, 2015 WL 13626022, at *6 (C.D. Cal. Jan. 7, 2015) (dismissing

---

[28]  Not all states agree that a principal-agent relationship can be used to satisfy privity requirements.  *See, e.g.*, *Davis* v. *Homasote Co.*, 574 P.2d 1116, 1118n.5 (Or. 1978) (Oregon Supreme Court is "not persuaded by plaintiffs' contention that [defendant] was not a 'remote' seller because plaintiffs were 'bargaining and dealing with defendant's agent.'  To say that a [seller] is 'remote' is just another method of saying that there is no privity of contract.").

claims because plaintiffs failed to plead substantial factual allegations to support an agency relationship between defendant and its authorized dealers).  As here, *George Williams* involved claims against a U.S. subsidiary that imported and marketed goods of a foreign manufacturer, and the court dismissed plaintiffs' MMWA claim based on implied warranties due to plaintiffs' lack of privity with defendant.  *Id.* at *1, *6.  The court squarely rejected plaintiffs' argument that the authorized dealerships they purchased their goods from were agents of the U.S. subsidiary defendant, noting a strong and consistent presumption in the law that dealerships are not agents but rather independent entities.  *Id.* at *6 ("Plaintiffs' new factual allegations" fail to overcome the general rule that automobile "dealers are not 'agents.'"); *see also Kahn*, 2008 WL 590469, at *8 (plaintiff failed "to prove an agency relationship where . . . all direct dealings surrounding the completion of the transaction were between the plaintiff and the dealer").[29]

The Complaint also asserts that "privity is not required here because Plaintiffs . . . are intended third-party beneficiaries of contracts between the VW Entity Defendants or their dealers, and of their implied warranties."  (Compl. ¶ 517.)  This attempt to evade the privity requirement fares no better than the Pre-NOV Plaintiffs' agency theory.  In states where the third-party beneficiary doctrine is recognized as an exception to the privity requirement for implied warranty claims, plaintiffs must allege facts establishing that the doctrine applies; the Pre-NOV Plaintiffs have not done so here.  *See Tait* v. *BSH Home Appliances Corp.*, 2011 WL 1832941, at *4 (C.D. Cal. May 12, 2011) ("[A]lthough a third party beneficiary exception to the vertical privity requirement exists, the laws of all five states require alleged third party beneficiaries to plead the existence of a contract from which they stand to benefit.").[30]  The Pre-

---

[29] Courts have regularly applied this principle to reject similar allegations of agency between automobile manufacturers and dealers. *See IWOI, LLC* v. v. *Monaco Coach Corp.*, 581 F. Supp. 2d 994, 1000 (N.D. Ill. 2008) ("[B]are allegations of an agency relationship between the manufacturer and dealer are insufficient."); *In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*, 2010 WL 2813788, at *16 (D.N.J. July 9, 2010) ("[M]any courts have strongly suggested that automobile dealerships generally are not agents of automobile manufacturers regarding the selling of vehicles."); *Arnson* v. *Gen. Motors Corp.*, 377 F. Supp. 209, 212 (N.D. Ohio 1974) ("[T]he weight of authority . . . support[s] the view that a franchised automobile dealer . . . is an independent merchant and not an agent of the manufacturer.").

[30] Illinois does not recognize the third-party beneficiary theory for implied warranty claims. *Hirn* v. *Teledyne Cont'l Motors*, 1994 WL 685071, at *3 (N.D. Ill. Dec. 7, 1994) ("Implied warranties are not applicable between the buyer and a remote [seller] on a third-party beneficiary theory.").

1   NOV Plaintiffs offer no facts to support their conclusory assertion that they were third-party

2   beneficiaries of contracts between Volkswagen U.S. Defendants and their dealerships, and they

3   reference nothing identifying them as intended beneficiaries of a contract, as is required under

4   the doctrine.  *George Williams*, 2015 WL 13626022, at *6 (rejecting claims because "although

5   Plaintiffs allege that they are third-party beneficiaries of 'any contract of sale' between

6   Defendant and its dealers, they do not provide 'specific allegations identifying or describing the

7   agreements under which Plaintiffs claim third party beneficiary status").[31]  Because the Pre-NOV

8   Plaintiffs have not alleged any facts to satisfy the agency exception or the third-party beneficiary

9   exception to the privity requirement, the Court should dismiss their MMWA claim based on the

10  implied warranty laws of Alabama, Arizona, California, Connecticut, Georgia, Illinois, New

11  York, Ohio, Oregon, Utah, and Vermont.

12          **D.    The Pre-NOV Plaintiffs Did Not Notify the Volkswagen U.S. Defendants of
                    Their Breach of Implied Warranty Claims, as Required for a Number of
13                  State Law Implied Warranty Claims.**

14          "Courts generally incorporate the relevant state law requirements on pre-suit

15  notice for MMWA claims . . . and absence of such notice results in dismissal."  *Jones* v. *Apple,*

16  *Inc.*, 2016 WL 4429801, at *3 (S.D. Ill. Aug. 22, 2016).  To avoid dismissal of a breach of

17  warranty claim against a remote seller or manufacturer in many states, a buyer must provide pre-

18  suit notice to either the remote seller directly or to the immediate seller.[32]  The Pre-NOV

19  Plaintiffs have alleged neither.  Under some state warranty laws, such as Alabama's (for

20  example), the filing of a complaint does not constitute notice as a matter of law.  *See In re*

21  ───────────────────

22  [31] *See also Weathers Auto Glass, Inc.* v. *Alfa Mut. Ins. Co.*, 619 So. 2d 1328, 1329 (Ala. 1993)
    ("A party claiming to be a third-party beneficiary of a contract must establish that the contracting
23  parties intended, upon execution of the contract, to bestow a direct, as opposed to an incidental,
    benefit upon the third party."); *Stonecrest Props., LLC* v. *City of Eugene*, 382 P.3d 539, 543 (Or.
24  Ct. App. 2016) ("Although expressly naming a third party as a beneficiary is not required to
    confer third-party beneficiary status, the failure to do so may serve as an indication that the
25  promisee did not intend to confer a right upon it.").

    [32] *See, e.g.*, *Hobbs* v. *Gen. Motors Corp.*, 134 F. Supp. 2d 1277, 1285 (M.D. Ala. 2001) ("[F]or
26  remote manufacturers to be held liable for an unintentionally-created express warranty . . . notice
    [must be] provided directly to them, or through notice provided to them by the direct seller from
27  the buyer."); *Lloyd* v. *Gen. Motors Corp.*, 575 F. Supp. 2d 714, 723 (D. Md. 2008) (dismissing
    warranty claim brought under Maryland law against automobile manufacturers where "the
28  Plaintiffs have failed to plead that they notified their immediate sellers—presumably, the dealers
    who sold them their cars—of any alleged defect.").

*MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 974 (N.D. Cal. 2014) ("Under Alabama law, the filing of a complaint does not constitute notice.").  As a result, the Pre-NOV Plaintiffs' implied warranty claims under the laws of Alabama, Connecticut, Maryland, Michigan, Missouri, New York, Oregon, Texas, and Virginia fail for lack of notice.  *See* Appendix A-2; *see also In re Carrier IQ, Inc.*, 78 F. Supp. 3d at 1103 (dismissing Maryland, Michigan, and Texas implied warranty claims for failing to comply with the statutes' notice requirements).

### III.   THE CLEAN AIR ACT PREEMPTS THE PRE-NOV PLAINTIFFS' STATE LAW CLAIMS AND MMWA CLAIM.

"Under the Supremacy Clause, state law that conflicts with federal law has no effect."  *Meaunrit*, 2010 WL 2867393, at *5 (citing *Cipollone* v. *Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)).  "[A]s multiple federal courts have recognized, the Clean Air Act does not authorize a private cause of action for compensatory damages for alleged violations of the Act."  *Abuhouran* v. Kaiserkane, Inc., 2011 WL 6372208, at *4 (D.N.J. Dec. 19, 2011).  The Pre-NOV Plaintiffs seek to end-run Congress's careful regime for enforcing environmental regulations by asserting state law claims—including consumer protection and false advertising claims (State Law Claims, Counts 1-25) and the MMWA claim based on implied warranties—based on allegations that their vehicles contained undisclosed "defeat devices" (a term defined exclusively under federal law, *see* 40 C.F.R. § 86.1803-01) that rendered the Vehicles' emissions unlawful under the CAA and its implementing regulations.  (*See, e.g.*, Compl. ¶¶ 20, 25, 29, 33, 40, 52, 58, 63 ("[T]he Vehicle could not deliver the advertised combination of low emissions, high performance, and fuel economy—and was illegal"), ¶¶ 152-201 (listing consumer protection and false advertising statutes).)  All these claims are both expressly and impliedly preempted by the CAA.

#### A.   The Pre-NOV Plaintiffs' State Law Claims and MMWA Claim Are Expressly Preempted.

In the CAA, Congress vested *exclusive* power to regulate emissions from new motor vehicles in the EPA.  Section 209(a) of the CAA provides that "[n]o State or any political subdivision thereof shall adopt or attempt to enforce *any* standard *relating to* the control of emissions from new motor vehicles."  42 U.S.C. § 7543 (emphasis added).  Recognizing the

1    significant role federal preemption plays in the environmental regulatory framework, courts have

2    characterized this provision as "[t]he cornerstone of Title II."  Order on MTD Wyoming Compl.,

3    ECF No. 3747, 2017 WL 3816738, at *8 (quoting *Motor Vehicle Mfrs. Ass'n*, 17 F.3d at 526).

4    "The language of § 209(a) is categorical," *Engine Mfrs. Ass'n* v. *S. Coast Air Quality Mgmt.*

5    *Dist.*, 541 U.S. 246, 256 (2004), and the words "relating to" are indicative of "a broad pre-

6    emptive purpose."  *Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (holding

7    state guidelines were preempted, and analyzing use of words "relating to" in context of the

8    preemption provision of the Airline Deregulation Act).  Indeed, the Supreme Court has explained

9    that the expansive phrase "relating to" is "conspicuous for its breadth," *Ingersoll-Rand Co.* v.

10   *McClendon*, 498 U.S. 133, 138 (1990), and "indicates Congress's intent to pre-empt a large area

11   of state law," *Altria Grp.* v. *Good*, 555 U.S. 70, 85 (2008); Order on MTD Wyoming Compl.,

12   ECF No. 3747, 2017 WL 3816738, at *8.  This broad preemption applies to common law claims

13   by private plaintiffs because "it is the essence of the common law to enforce duties." *Cipollone*,

14   505 U.S. at 522.  As recognized by another court construing the CAA in a case involving claims

15   brought by private plaintiffs, "[i]t is hard to contemplate language that would more plainly

16   demonstrate Congress's intent to preempt state common law tort actions than the 'attempt to

17   enforce' language" in Section 209(a). *Jackson*, 770 F. Supp. 2d at 576.

18          Here, the state law claims hinge on the allegation that the Pre-NOV Plaintiffs

19   "never received the cars they bargained for or enjoyed the environmental performance they were

20   promised [because no] Plaintiff . . . would—or could—have purchased the Class Vehicles but for

21   Defendants' fraudulent scheme, because Defendants obtained EPA COCs (and CARB EOs) only

22   through deception." (Compl. ¶¶ 10, 384.)  This plainly bears a "connection with or reference to"

23   the control of emissions from new motor vehicles, and state law claims based on "whether a

24   defendant complied with standards promulgated under the CAA" are "subject to preemption"

25   because they are "an example of a state attempting to enforce the CAA." *Jackson*, 770 F. Supp.

26   2d at 575 (dismissing state law claims against manufacturers of buses relating to harm plaintiffs

27   allegedly suffered from buses' excess pollutants).  "Like a requirement that a vehicle contain a

28

certain pollution-control device, a requirement that a vehicle not contain a defeat device" is also preempted.  Order on MTD Wyoming Compl., ECF No. 3747, 2017 WL 3816738, at *17.

The same applies to the Pre-NOV Plaintiffs' MMWA claim, which is based solely on state law implied warranties.  (Compl. ¶¶ 514-515.)  The Pre-NOV Plaintiffs allege that these warranties were breached because "the Class Vehicles share a common design defect because they emit more pollutants than (a) is allowable under the applicable regulations and (b) the VW Entity Defendants repeatedly represented were emitted to their customers, the public, and regulators."  (*Id.* ¶ 516.)  Where, as here, state law creates the duty that "is the predicate of the action" and "'relates to' enforcement of new motor vehicle emission standards," any claim based on such a duty is expressly preempted under Section 209.  *In re Volkswagen "Clean Diesel" Litig.*, 2016 WL 5347198, at *5-6 (warranty claims expressly and impliedly preempted by CAA).

### B.     The Pre-NOV Plaintiffs' State Law and MMWA Claims Are Impliedly Preempted.

Under settled principles of "field" and "conflict" preemption, the Pre-NOV Plaintiffs' state law and MMWA claims are also impliedly preempted under the comprehensive regulatory scheme established by the CAA.  As to field preemption, the Supreme Court made clear several years after Title II of the CAA was enacted, "Congress has largely pre-empted the field with regard to 'emissions from new motor vehicles.'"  *Washington*, 406 U.S. at 114; *see also In re Caterpillar, Inc.*, 2015 WL 4591236, at *15 (D.N.J. July 29, 2015) (CAA "clearly manifests Congressional intent to occupy the field of emissions standards enforcement").  Congress's intent to occupy the field of new vehicle emission standards is confirmed by the authority Congress granted to the EPA, which "has developed an extensive set of regulations regarding emissions, in addition to comprehensive enforcement provisions and penalties."  *Jackson*, 770 F. Supp. 2d at 573.  As a result, the Pre-NOV Plaintiffs' claims are impliedly preempted.  *See Meaunrit*, 2010 WL 2867393, at *10 (dismissing consumer protection and MMWA claims where plaintiff's implied warranty claims were preempted under federal law).

As to conflict preemption, the Pre-NOV Plaintiffs' claims are also preempted because they seek to impose remedies beyond those provided by federal law for the same conduct that the EPA is charged with addressing. The CAA empowers private citizens such as

the Pre-NOV Plaintiffs to enforce its provisions only if the EPA has not brought suit "to require compliance with the standard, limitation, or order" at issue, or is not diligently prosecuting such action.  42 U.S.C. §§ 7604(a)(1) & (b)(1)(B).  Here, the EPA has already obtained injunctive relief and civil penalties exceeding one billion dollars from Volkswagen entities,[33] and the time has long since passed for the Pre-NOV Plaintiffs to take part in the enforcement of EPA standards.  Moreover, the Pre-NOV Plaintiffs' state law claims would invite the possibility of "different juries in different States reach[ing] different decisions on similar facts," *Geier* v. *Am. Honda Motor Co.*, 529 U.S. 861, 871 (2000), creating direct conflicts with the determinations of the EPA and of sister states.  This confusion is exactly what preemption is designed to avoid.[34]

## IV.   THE COMPLAINT DOES NOT PLEAD ANY STATE LAW CLAIMS FOR WHICH RELIEF CAN BE GRANTED.

The Pre-NOV Plaintiffs' consumer protection and false advertising claims should be dismissed for several additional reasons.[35]  As a threshold matter, the Pre-NOV Plaintiffs have failed to plausibly plead the required elements of damages and proximate causation for each state law claim.  In addition, as specified below, certain of the state law claims should be dismissed because they are untimely, improperly assert class claims, fail to allege that pre-suit requirements were met, do not allege statutory standing, and do not plead actual reliance.

---

[33] *See* ECF Nos. 2103, 3228, 3155.

[34] *See, e.g.*, H.R. Rep. No. 90-728, at 21 (Oct. 3, 1967) (Title II preemption intended to avoid "uncertainties involved in litigation"); *see also, e.g.*, *Wis. Dep't of Indus., Labor & Human Relations* v. *Gould Inc.*, 475 U.S. 282, 288-89 (1986) (every additional state remedy "incrementally diminishes" the federal agency's control over enforcement of the federal statute and "further detracts from the integrated scheme of regulation created by Congress") (internal quotation marks omitted); *Arizona* v. *United States*, 567 U.S. 387, 402 (2012) ("Permitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted.").

[35] As discussed above, the Complaint does not actually allege any standalone unjust enrichment claims.  (Compl. ¶¶ 550 ("restitution for unjust enrichment" under California's Consumer Legal Remedies Act), 637 ("disgorgement of unjust enrichment" under Massachusetts Gen. Laws Ch. 93A).)  In any event, "there is not a standalone cause of action for unjust enrichment" under California law.  *Rojas-Lozano* v. *Google*, 159 F. Supp. 3d 1101, 1120 (N.D. Cal. Feb. 3, 2016).  The Pre-NOV Plaintiffs' Massachusetts claim is "included for purposes of notice only" (Compl. ¶ 636) and is not adequately pled.  *See Adamson* v. *Mortg. Elec. Registration Sys., Inc.*, 2011 WL 4985490, at *6 (Mass. Super. Ct. Oct. 19, 2011) (plaintiff must "plausibly suggest the unjust conferral of a benefit" to plead Massachusetts standalone unjust enrichment claim).

### A.   The Complaint Does Not Adequately Plead Damages or Proximate Causation.

Even if the Complaint's allegations were sufficient to establish Article III standing, the state law claims still fail because the Complaint does not adequately plead damages or proximate causation.  *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

***Failure to Plead Damages*.**  Courts recognize that even when a plaintiff has "pled an injury-in-fact for purposes of Article III standing [that] does not establish that they adequately pled damages for purposes of their state-law claims." *Krottner*, 406 Fed. Appx. at 131.[36]  Even if the Pre-NOV Plaintiffs satisfied the requirements of Article III standing, and they have not, they must still plead that they suffered the damages required for each of their alleged causes of action. The Pre-NOV Plaintiffs have not done so.

As a general matter, "[n]o injury, no tort, is an ingredient of every state's law." *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1017 (7th Cir. 2002); *see also Bastian* v. *Petren Resources Corp.*, 892 F.2d 680, 684 (7th Cir. 1990) ("No hurt, no tort.").  "Every tort, whether it be one derived from common law or a statutory tort . . . requires a showing of harm." *Schobert* v. *Ill. DOT*, 304 F.3d 725, 731 (7th Cir. 2002).  The Pre-NOV Plaintiffs have violated this axiomatic rule of pleading.  *First*, the mere presence of an illegal feature in a product is insufficient to constitute damages unless a plaintiff was actually injured.  *See, e.g.*, *Hershenow* v. *Enter. Rent-A-Car Co. of Boston*, 840 N.E.2d 526, 534-35 (Mass. 2006) (no damages where illicit rental agreement "made neither rental customer worse off during the rental period than he or she would have been had the [agreement] complied in full with the requirements" of the law); *Taragan* v. *Nissan N. Am., Inc.*, 2013 WL 3157918 (N.D. Cal. June 20, 2013) (no damages where car owners were uninjured by possible rollaway design defect).  *Second*, the Pre-NOV Plaintiffs have not adequately pled any premium related to NOx emissions, and even if they had

---

[36]  *See also Enslin* v. *Coca-Cola Co.*, 136 F. Supp. 3d 654, 669 (E.D. Pa. 2015) ("[W]hether a plaintiff has fairly established an injury-in-fact for standing purposes is a separate issue from whether a plaintiff has sufficiently alleged a basis for relief for each claim of damages."); *Doe* v. *Chao*, 540 U.S. 614, 624-625 (2004) ("an individual subjected to an adverse effect ha[d] injury enough to open the courthouse door, but without more ha[d] no cause of action for damages."); *Denney* v. *Deutsche Bank AG*, 443 F.3d 253, 264-265 (2d Cir. 2006) ("An injury-in-fact . . . alone may not provide sufficient ground for a claim under state tort law.").

they would have recovered that amount when they sold their vehicles.  *See, e.g.*, *Licul*, 2013 WL 6328734, at *5 (where Plaintiff bought and sold "Jetta at a price that did not take account of the defect . . . she did not suffer the loss of any value in the Jetta.").

The Pre-NOV Plaintiffs have also failed to allege that they have met the specific requirements of the relevant state statutes.  *See, e.g.*, *DeBons*, 2014 WL 12586433, at *3 (statutory "standing under [California's consumer protection act is] substantially narrower than federal standing under article III").  Virtually every state law under which the Pre-NOV Plaintiffs bring a claim (Compl. ¶¶ 519-871) expressly requires damages beyond the requirements of an Article III injury.  *See* Appendix A-1.[37]  The Pre-NOV Plaintiffs have not adequately pled that they incurred damages under any of these formulations.  *See, e.g.*, *Frye* v. *L'Oreal USA, Inc.*, 583 F. Supp. 2d 954, 958 (N.D. Ill. 2008) (no "actual damages" where plaintiffs "would not have purchased" a product but failed to show "any observable economic consequences").

*Failure to Plead Proximate Cause.*  Article III's requirement that an injury be "fairly traceable" to defendants' conduct is a "less rigorous . . . causation threshold" than "proximate causation."  *Canyon County* v. *Syngenta Seeds, Inc.*, 519 F.3d 969, 975 n.7 (9th Cir. 2008); *see also Rothstein* v. *UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013).  Because the Pre-NOV Plaintiffs have not satisfied Article III's "fairly traceable" requirement, they *a fortiori* have not met the more exacting requirement of their various state law claims to plead that their alleged damages were proximately caused by the Volkswagen U.S. Defendants' alleged misconduct.  *See* Appendix A-1.  But even if the Pre-NOV Plaintiffs' allegations are deemed sufficient to satisfy the more lenient "fairly traceable" requirement of Article III, they still do not adequately plead proximate causation.  *See Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 134 S.

---

[37] Even in states with a broad conception of injury, Plaintiffs have failed to adequately allege a claim, as they (i) have not met Texas's high bar for the alternative option of "mental anguish," *see Bennett* v. *Grant*, 525 S.W.3d 642, 648 (Tex. 2017) (requiring "a substantial disruption" or "a high degree of mental pain and distress"); (ii) failed to show "traditional injury or loss occurred either to the property, or to plaintiff's expectations concerning it," *Galecka* v. *Savage Arms, Inc.*, 2014 WL 2931859, at *2 (Mich. Ct. App. June 26, 2014) (dismissing claim for lack of loss despite fact that under Michigan law, loss could "consist of the plaintiff's unfulfilled expectations"); and (iii) have failed to plead other requirements, such as actual reliance and proximate cause.  *See* Appendix A-1.

1    Ct. 1377, 1390 (2014) ("[T]he proximate-cause requirement generally bars suits for alleged harm

2    that is 'too remote' from the defendant's unlawful conduct.").[38]   The Complaint does not allege

3    that the Pre-NOV Plaintiffs' "injuries" are a direct result of the defeat devices, resorting instead

4    to contrived calculations using hypothetical and assumed numbers, which demonstrates that their

5    alleged injuries are "too remote" from the Volkswagen U.S. Defendants' conduct.

6         **B.    Many of The Pre-NOV Plaintiffs' State Law Claims Have Additional Fatal Deficiencies.[39]**

7         *Expired Statute of Limitations.*   The Pre-NOV Plaintiffs' claims for violations of

8    the Arizona Consumer Fraud Act (*id.* ¶ 527) and Oregon Unlawful Trade Practices Act (*id.*

9    ¶ 781) are barred by the applicable one-year statute of limitations, which ran from when they

10   discovered (or should have discovered) their claims.  *Alaface* v. *Nat'l Inv. Co.*, 892 P.2d 1375,

11   1379 (Ariz. Ct. App. 1994) (applying Ariz. Rev. Stat. Ann. § 12-541 to the Arizona Consumer

12   Fraud Act); Or. Rev. Stat. § 646.638.  Here, the Pre-NOV Plaintiffs concededly became aware of

13   their claims as of the September 18, 2015 and November 2, 2015 NOV disclosures (Compl. ¶

14   389), but waited nearly two full years to file this action.  The Pre-NOV Plaintiffs' claims under

15   these statutes should be dismissed as untimely.[40]

16

---

17   [38] *See also Rothstein*, 708 F.3d at 91-92 ("Central to the notion of proximate cause is the idea
18   that a person is not liable to all those who may have been injured by his conduct, but only to
     those with respect to whom his *acts were a substantial factor in the sequence of responsible
     causation*."); *Lorenzo* v. *Qualcomm Inc.*, 2009 WL 2448375, at *6 (S.D. Cal. Aug. 10, 2009)
19   (defining proximate cause as "when, in the natural order of things and under the circumstances, it
     would necessarily produce that event"); *City of New York* v. *Smokes-Spirits.Com, Inc.*, 911
20   N.E.2d 834, 839 (N.Y. 2009) (proximate cause is "more than an allegation of 'but for' cause").

21   [39] The Pre-NOV Plaintiffs state that their Alabama Deceptive Trade Practices Act ("ADTPA")
     and the Georgia Fair Business Practices Act ("GFBPA") claims are included for notice purposes
22   only (Compl. ¶¶ 522, 586), but regardless (i) the ADTPA claim would be barred by the one-year
     statute of limitations; (ii) the class claims would be barred under both ADTPA and GFBPA;
23   (iii) their ADTPA and GFBPA claims fail due to the Pre-NOV Plaintiffs' failure to give notice
     *prior to filing* an action; (iv) the GFBPA would fail for failure to adequately plead reliance.  *See*
24   Appendix A-1.

25   [40] The Pre-NOV Plaintiffs cannot use tolling doctrines to salvage their untimely claims under
     Arizona and Oregon law.  (*See* Compl. ¶¶ 387-99.)  The Pre-NOV Plaintiffs' concession that the
26   NOVs put them on notice of their claims more than one year before they filed suit renders
     irrelevant their arguments about the discovery rule, fraudulent concealment, and estoppel.  Nor
27   does *American Pipe* tolling save the Pre-NOV Plaintiffs' claims because "the rule of *American
     Pipe* tolling . . . is not binding on state law claims."  *Centaur Classic Convertible Arbitrage Fund
28   Ltd.* v. *Countrywide Fin. Corp.*, 878 F. Supp. 2d 1009, 1015-17 (C.D. Cal. 2011) (refusing to
     apply *American Pipe* tolling to state law claims filed by a subsequent class action in the same
     California federal court as the earlier action).  In addition, the Pre-NOV Plaintiffs have (*cont.*)

1    ***Class Actions Barred or Limited.***  The putative class claim under the Mississippi

2    Consumer Protection Act (*id.* ¶¶ 655-56) is expressly barred and should be dismissed.  *See*

3    Appendix A-1; *see also Tait*, 2011 WL 1832941, at *8-9 (dismissing state law claims where

4    consumer protection statute barred class actions).  Similarly, the Complaint seeks "statutory

5    damages" under the Utah Consumer Sales Practices Act (Compl. ¶ 839), but that statute limits

6    damages that can be sought in class actions to "actual damages."  Utah Code Ann. § 13-11-

7    19(2)-(3).  The Pre-NOV Plaintiffs' Utah claim should be dismissed to the extent that it seeks

8    statutory damages.

9    ***Pre-Suit Requirements Not Met.***  The Mississippi Consumer Protection Act

10   claim (*id.* ¶¶ 655-68) fails because the Pre-NOV Plaintiff asserting that claim has not alleged that

11   he participated, as required, in a pre-suit settlement program approved by the Mississippi

12   Attorney General.  Miss. Code Ann. § 75-24-15(2); *see Cole* v. *Chevron USA, Inc.*, 554 F. Supp.

13   2d 655, 668 (S.D. Miss. 2007) (dismissing Mississippi Consumer Protection Act claims for

14   failing to attempt to resolve claims).  The Mississippi claim should therefore be dismissed.[41]

15   ***Lack of Statutory Standing.***  The claim under the Ohio Deceptive Trade Practices

16   Act (*id.* ¶¶ 759-74) fails because that statute applies only to commercial injury; consumers, like

17   the Pre-NOV Plaintiffs here, do not have standing to sue.  *See In re Sony Gaming Networks &*

18   *Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 1006 (S.D. Cal. 2014); *Gascho* v. *Glob.*

19   *Fitness Holdings, LLC*, 863 F. Supp. 2d 677, 697-99 (S.D. Ohio 2012).

20

21

---

22   (*cont.*) not pled that Arizona or Oregon permit class action tolling.  *See, e.g.*, *Rader* v. *Greenberg Traurig, LLP*, 352 P.3d 465, 471 (Ariz. Ct. App. 2015) (Arizona would reject cross-jurisdictional

23   tolling).  Moreover, *American Pipe* tolls "only later-filed claims that are identical to those asserted in the earlier-filed class actions, as opposed to tolling new claims asserted by putative

24   class members."  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 27 F. Supp. 3d 1015, 1020 (N.D. Cal. 2014).  The Pre-NOV Plaintiffs have not pled that the earlier class actions contained

25   Arizona or Oregon claims.  (Compl. ¶ 391 (citing an earlier class action that only alleged California consumer protection claims).)

26   [41] In addition, the claim under the Texas Deceptive Trade Practices and Consumer Protection Act (*id.* ¶¶ 808-22) is deficient for failure to provide "written notice . . . at least 60 days *before filing*

27   the suit."  Tex. Bus. & Com. Code § 17.505(a) (emphasis added); *see also Aaron* v. *Nissan N. Am., Inc.*, 2010 WL 11553166, at *3 (E.D. Tex. Sept. 22, 2010) ("[T]he Court abates Plaintiff's

28   DTPA claim until Plaintiff conforms with the notice requirement of Tex. Bus. & Com. Code § 17.505.").

1    **Failure to Plead Reliance.**  The Pre-NOV Plaintiffs must plead actual reliance in

2  order to state a claim under (a) the consumer protection statutes of Arizona, California, North

3  Carolina, Pennsylvania, and Virginia, and (b) the false advertising statutes of California and New

4  York.  *See* Appendix A-1.  These claims should be dismissed because the Complaint does not

5  identify which (if any) of the alleged misrepresentations any of the Pre-NOV Plaintiffs

6  personally relied on in purchasing or leasing their vehicles.

7                              **CONCLUSION**

8           For the foregoing reasons, the Court should dismiss the Complaint in its entirety.

9  December 8, 2017                    Respectfully submitted,

10                                    /s/ Robert J. Giuffra, Jr.
                                      Robert J. Giuffra, Jr. (*pro hac vice*)
11                                    giuffrar@sullcrom.com
                                      Sharon L. Nelles (*pro hac vice*)
12                                    nelless@sullcrom.com
                                      William B. Monahan (*pro hac vice*)
13                                    monahanw@sullcrom.com
                                      John G. McCarthy (*pro hac vice*)
14                                    mccarthyj@sullcrom.com
                                      SULLIVAN & CROMWELL LLP
15                                    125 Broad Street
                                      New York, New York 10004
16                                    Telephone:  (212) 558-4000
                                      Facsimile:  (212) 558-3588
17
                                      Laura Kabler Oswell
18                                    oswelll@sullcrom.com
                                      SULLIVAN & CROMWELL LLP
19                                    1870 Embarcadero Road
                                      Palo Alto, California 94303
20                                    Telephone:  (650) 461-5600
                                      Facsimile:  (650) 461-5700
21
                                      *Counsel for Volkswagen Group of*
22                                    *America, Inc. and Audi of America, LLC*

23

24

25

26

27

28