UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION
_____/

This Order Relates To:
MDL Dkt. Nos. 4580, 4581, 4606

*City of St. Clair Shores*, 15-6167
*Travalio*, 15-6168
*George Leon Family Trust*, 15-6168
*Charter Twp. of Clinton*, 16-190
*Wolfenbarger*, 16-184
_____/

MDL No. 2672 CRB (JSC)

**ORDER RE: ADR PLAINTIFFS' MOTIONS TO COMPEL AND FOR LEAVE TO DEPOSE TWO PRISONERS**

This multidistrict litigation involves claims against Volkswagen, related corporate entities, and members of Volkswagen management (referred to here collectively as "Volkswagen") arising from the company's "clean diesel" emissions scheme. In an ongoing shareholder class action that is part of the MDL, Plaintiffs have moved to compel the production of certain documents from Volkswagen. (*See* Dkt. Nos. 4580, 4581 (Joint Statements of Discovery Disputes).) Plaintiffs have also filed a motion for leave to depose two former Volkswagen supervisors who are now in prison. (Dkt. No. 4606.) For the reasons that follow, the Court GRANTS Plaintiffs' motions to compel and their motion for leave to take the requested depositions.

## LEGAL STANDARD

Federal Rule of Civil Procedure 26(b)(1) provides in part that:

Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the

importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

The test for relevance is not overly exacting: evidence is relevant if it has "any tendency to make . . . more or less probable . . . [a] fact [that] is of consequence in determining the action." Fed. R. Evid. 401. The party requesting discovery has the initial burden of establishing that its request satisfies this relevancy requirement. *La. Pac. Corp. v. Money Mkt. 1 Inst. Inv. Dealer*, 285 F.R.D. 481, 485 (N.D. Cal. 2012). With respect to proportionality, "[t]he parties and the court have a collective responsibility to consider . . . it in resolving discovery disputes." Fed. R. Civ. P. 26, Advisory Committee Notes to 2015 Amendments, Subdivision (b)(1).

## DISCUSSION

### I. Documents Related to European Union Emissions Standards

- Document Request No. 11: All documents concerning any presentations by Volkswagen management or employees regarding emissions standards for the period January 1, 2007 to August 2017. (Dkt. No. 4580 at 7.)

- Document Request No. 46: All documents concerning any formal or informal meetings of the Management Board regarding "clean diesel" and "defeat devices" for the period January 1, 2006 to August 2017. (*Id.*)

Plaintiffs contend that documents responsive to Request Nos. 11 and 46 include not only documents that relate to US emissions standards, but also those that relate to European Union (EU) emissions standards. Volkswagen disagrees. It asserts that documents that concern only EU emissions standards are not relevant to Plaintiffs' claims.

In the operative complaint, Plaintiffs allege that Volkswagen misrepresented to investors that the company's vehicles "complied with emissions standards in all 50 US states and the Euro-5 standards in Europe." (Dkt. No. 2862, First Am. Consol. Sec. Class Action Compl. ("FAC") ¶ 83.) These misrepresentations were false or misleading, Plaintiffs contend, because Volkswagen had installed "defeat-device software in approximately 11 million vehicles with purported 'clean diesel' engines—including approximately 585,000 in the United States and 8.5 million in Europe." (*Id.* ¶ 84.) As a result, vehicles with "clean diesel" engines "did not comply with emissions standards for any US state or Europe." (*Id.*) When the public learned that Volkswagen's vehicles

were not compliant with emissions standards "in all 50 states of the United States and in the European Union," Plaintiffs contend that "investors saw $63 billion of the Company's market capitalization destroyed." (*Id.* ¶ 8.)

These allegations and others in the complaint make clear that Plaintiffs' claims are based on misrepresentations by Volkswagen about its compliance with both US and EU emissions standards. Documents that concern only EU emissions standards and that otherwise satisfy Request Nos. 11 and 46—like similar documents that concern only US emissions standards, or that concern both US and EU emissions standards—are therefore relevant.

Volkswagen makes four principal arguments for why it should not be required to disclose documents that concern only EU emissions standards. None of these arguments is persuasive.

First, Volkswagen contends that documents concerning only EU emissions standards are not relevant because "clean diesel," as used in Plaintiffs' complaint and in Document Request No. 46, refers to engine technology that Volkswagen developed expressly for the purpose of selling diesel cars in the United States. (Dkt. No. 4580 at 7 (citing FAC ¶¶ 65-66, 77-80, 88).) The reason Volkswagen developed the engine technology at issue is not of consequence. Regardless of why Volkswagen did so, Plaintiffs allege that Volkswagen sold vehicles with this technology in the European Union, that the vehicles were illegal there, and that Volkswagen made representations to investors to the contrary. Given these EU-related allegations, Volkswagen's focus on the US market does not render documents concerning EU emissions standards irrelevant.

Second, Volkswagen contends that documents regarding EU emissions standards are not relevant because Plaintiffs defined "defeat device" in their document requests by using language that tracks the U.S. Environmental Protection Agency's definition of the term almost verbatim. This observation is correct.[1] But the use of this definition does not limit the term to the extent that

---

[1] *Compare* Dkt. No. 4580 at 3 (defining "defeat device" for purposes of Plaintiffs' requests for production as "an auxiliary emission control device that reduces the effectiveness of emissions control systems under conditions that may be reasonably expected to be encountered in normal vehicle operation and use, as discussed in ¶¶ 83-303 of the Complaint"), *with* 40 C.F.R. § 86.1803–01 (defining "defeat device" as "an auxiliary emission control device (AECD) that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use").

3

it also describes a device that is illegal in the European Union—as Plaintiffs allege. (*See, e.g.*, FAC ¶ 85 ("[T]he installation of the defeat devices in Europe was also illegal and contributed to the cars' purported ability to meet European emissions standards."); *id.* ¶ 335 ("[O]n October 15, 2015, Germany's ministry for transport ordered Volkswagen to conduct a mandatory recall of the 2.4 million cars in Germany, and consequently, all 8.5 million cars in Europe implanted with its emissions-cheating technology.").) Plaintiffs' definition of "defeat device" therefore does not render documents concerning EU emissions standards irrelevant.

Third, Volkswagen contends that EU emissions standards are irrelevant because Plaintiffs' claims are based on statements made by Volkswagen to US, not EU, investors. The value of a US investor's equity ownership in Volkswagen AG, however, plausibly could have been affected by Volkswagen's noncompliance with EU emissions standards, especially given Plaintiffs' allegations that Volkswagen sold 8.5 million "clean diesel" vehicles in Europe that did not comply with EU emissions standards. That the challenged statements were made to US investors therefore does not impact the Court's Rule 26(b)(1) analysis.

Finally, Volkswagen argues that Plaintiffs should be judicially estopped from pursuing claims that are based on false or misleading statements by Volkswagen about EU emissions standards. Judicial estoppel "precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir. 1996). Here, Volkswagen contends that judicial estoppel is warranted because, in opposition to Volkswagen's motion to dismiss the original complaint on *forum non conveniens* grounds, Plaintiffs argued that their choice of forum should be accorded deference because:

> Plaintiffs' claims involve US transactions in US securities that VW AG registered with the SEC, statements published in English for the benefit of US investors (as required by US law and VW AG's contracts creating the ADRs), the fraudulent marketing and sale of cars in the United States, violations of US federal and state emissions regulations, liability of at least $18 billion, and substantial further US civil, criminal, and regulatory exposure.

(Dkt. No. 2041 at 21-22.)

4

In this excerpt, Plaintiffs highlighted the connections this case has with the United States. But they did not take the position that a domestic forum was appropriate because their claims *only* involved the fraudulent marketing and sale of "clean diesel" vehicles in the United States. The district court also recognized the broader scope of Plaintiffs' allegations in ruling on the motion to dismiss, noting that Volkswagen had "installed software 'defeat devices' in 11 million vehicles sold worldwide, include 580,000 sold in the United States." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, MDL No. 2672 CRB (JSC), 2017 WL 66281, at *2 (N.D. Cal. Jan. 4, 2017). Because Plaintiffs did not take a position in opposition to Volkswagen's motion to dismiss that is incompatible with their allegations that Volkswagen violated both US and EU emissions standards, judicial estoppel is inappropriate. *Cf. Rissetto*, 94 F.3d at 598, 605-06 (holding that plaintiff was judicially estopped from asserting that she performed her job adequately after she had obtained a favorable settlement of a workers' compensation claim based on an assertion that she could not work).

Documents that concern only EU emissions standards and that otherwise fit within the limits drawn by Document Request Nos. 11 and 46 are relevant to Plaintiffs' claims. The requests also are proportional to the needs of the case given the substantial number of vehicles that allegedly did not comply with EU emissions standards, and the lack of any arguments suggesting that the requested production would be overly burdensome. The Court accordingly GRANTS Plaintiffs' motion to compel the production of documents that are responsive to Document Request Nos. 11 and 46 and that concern EU emissions standards.

**II.    Documents Concerning the "Akustikfunktion" Technology**

- Document Request No. 8: All documents concerning the "akustikfunktion" technology from the period of January 1, 1999 through August 2017. (Dkt. No. 4581 at 3, 5.)

As alleged in the operative complaint, "akustikfunktion," or "acoustic function" in English, is a term Volkswagen used internally and in discussions with Robert Bosch GmbH to refer to the defeat device used in its "clean diesel" vehicles. Volkswagen does not dispute that certain documents concerning the "akustikfunktion" may be relevant to Plaintiffs' claims, but the company asserts that documents dated earlier than May 2006 are not relevant. To support this

5

temporal cutoff, Volkswagen notes that in the company's plea agreement related to the emissions scheme, it admitted that May 2006 was when certain supervisors at the company began contemplating the use of a defeat device in the "clean diesel" vehicles. (Dkt. No. 4581 at 5 (citing VW AG Plea Agreement, Statement of Facts ¶¶ 32-37.)). Volkswagen also notes that Plaintiffs allege in their complaint that it was in November 2006 that "Supervisor B" decided that Volkswagen should continue with its "US'07 project with the defeat device." (*Id.* (quoting FAC ¶ 89).)

While supervisors at Volkswagen may have ultimately decided to use the defeat device in 2006, Plaintiffs allege that the device has a longer history. The idea for the defeat device "was originally developed under [Martin] Winterkorn's leadership at Audi in 1999." (FAC ¶ 400.) Audi is an affiliate of Volkswagen AG, and Winterkorn (who is a defendant in Plaintiffs' case) was CEO of Audi before he became CEO of Volkswagen AG in 2007, which is a role he maintained until the emissions scheme was publicly disclosed in late 2015. (*Id.* ¶¶ 43, 48, 118.) Plaintiffs allege that in 1999 Audi engine developers "doubted that they could meet stricter [emissions] limits legally, and . . . . Audi experts therefore devised software that could alter certain emissions features during testing. Internally, the device was called 'acoustic mode' and 'acoustic function.'" (*Id.* ¶ 118; *see also id.* ¶ 400.) Audi did not ultimately implement the "akustikfunktion" in 1999, however. (*Id.* ¶ 118.) It was instead not until 2006 that Volkswagen "borrowed the original concept of the dual-mode, emissions cycle beating software from Audi." (*Id.* ¶ 119.)

This history of the defeat device is relevant to Plaintiffs' claims for at least a couple of reasons. In motions to dismiss Plaintiffs' Section 10(b) claim, Volkswagen AG and Winterkorn asserted that they did not know about the defeat device at the time they made certain challenged statements. *See In re Volkswagen*, 2017 WL 66281, at *12-14. If Winterkorn was involved with the development of the defeat device at Audi, that fact has a tendency to make more probable that he would have known about the decision to use the device at Volkswagen starting in 2006. Similarly, to the extent that Audi chose not to use the defeat device in 1999 because of concerns over its legality, that would increase the likelihood that Winterkorn knew that the defeat device

that Volkswagen eventually used was illegal.

As an alternative, Volkswagen states that it would be willing to search only Winterkorn's emails for documents concerning the "akustikfunktion" as far back as 1999. Plaintiffs contend that this search would be insufficient. Based on discussions with Winterkorn's counsel, Plaintiffs contend that there is reason to believe that Winterkorn did not personally use email. (*See* Dkt. No. 4581 at 3.) Plaintiffs also assert that a meaningful production from 1999 would need to include appropriate custodians in addition to Winterkorn, such as Ulrich Hackenberg and Wolfgang Hatz. As alleged, Hackenberg and Hatz were Winterkorn's "top aides during his tenure at Audi." (FAC ¶ 120.) They also both joined Winterkorn at Volkswagen AG when Winterkorn became CEO, and are alleged to have been directly involved with the decision to ultimately use the defeat device in Volkswagen's "clean diesel" vehicles. (*Id.* ¶¶ 15, 116-21.)

The Court agrees that Volkswagen's offer to search only Winterkorn's emails for documents concerning the "akustikfunktion" dating back to 1999 is overly restrictive and may prevent Plaintiffs from obtaining relevant materials. The Court is also not persuaded by Volkswagen's justification for a narrower search—that it would be "extremely burdensome for Defendants to collect, search, and review 18 years' worth of documents (most of which would be in German) to comply with [the] requested time period." (Dkt. No. 4581 at 7.) Although the time period covered by Plaintiffs' request is substantial, the request itself is narrowly tailored to documents concerning the "akustikfunktion" technology. Volkswagen has not offered reason to believe that there are a significant number of documents responsive to this request.

Having concluded that documents concerning the "akustikfunktion" technology dating back to January 1, 1999 are relevant to Plaintiffs' claims, and that Plaintiffs' request for these documents is proportional to the needs of the case, the Court GRANTS Plaintiffs' motion to compel the production of documents responsive to Document Request No. 8 from the period of January 1, 1999 through August 2017.

**III.  Request for Leave To Depose Two Prisoners**

Plaintiffs request leave, pursuant to Federal Rule of Civil Procedure 30(a)(2)(B), to depose James Robert Liang and Oliver Schmidt by oral examination. Liang and Schmidt are former

Volkswagen executives who have been sentenced to terms of imprisonment for their roles in the "clean diesel" emissions scheme. Liang is currently serving a 40-month term of incarceration at Taft Correctional Institution in California. (*See* Dkt. No. 4607, Harrod Decl., Exs. C–D.) Schmidt is serving an 84-month term of incarceration at Milan Correctional Institution in Michigan. (*See id.*, Exs. E–F.) Plaintiffs' motion is unopposed.

The indictments of Liang and Schmidt, their plea agreements, and their sentencing memoranda support that each is likely to have knowledge of facts that are relevant to Plaintiffs' claims, including Volkswagen's senior executives' role in the fraud. (*See id.*, Exs. A–B, G–J.) The Court accordingly GRANTS Plaintiffs' request for leave to depose Liang and Schmidt. Plaintiffs may depose Liang and Schmidt one time each. The Court leaves the timing of the depositions to Plaintiffs' discretion, so long as the timing is otherwise consistent with the Federal Rules of Civil Procedure and the parties' Joint Case Management Statement.

## CONCLUSION

To summarize, the Court ORDERS as follows:

(1) Plaintiffs' motion to compel the production of documents that concern only EU emissions standards in response to Document Request Nos. 11 and No. 46 is GRANTED.

(2) Plaintiffs' motion to compel the production of documents that concern the "akustikfunktion" technology from the period of January 1, 1999 through August 2017 (Document Request No. 8) is GRANTED.

(3) Plaintiffs' motion for leave to take the depositions of Liang and Schmidt is GRANTED.

**IT IS SO ORDERED.**

Dated: January 9, 2018

JACQUELINE S. CORLEY
United States Magistrate Judge