Steve W. Berman (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone:  206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

Robert B. Carey (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 W. Jefferson St., Ste. 100
Phoenix, AZ 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com

Stuart M. Paynter (SBN 226147)
THE PAYNTER LAW FIRM, PLLC
1200 G Street NW Suite 800
Washington, D.C. 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
stuart@paynterlawfirm.com

*Attorneys for Plaintiffs*

[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: VOLKSWAGEN 'CLEAN DIESEL' MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>This document relates to:<br><br>*Nemet, et al. v. Volkswagen Group of America, Inc., et al.,* Case No. 3:17-cv-04372-CRB | No. 02672-CRB (JSC)<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO VOLKSWAGEN U.S. DEFENDANTS' MOTION TO DISMISS THE PRE-NOV PLAINTIFFS' COMPLAINT**<br><br>Hearing Date:  TBD<br>Time:  TBD<br>Courtroom:  6<br>The Honorable Charles R. Breyer |

# TABLE OF CONTENTS

**Page**

I.   ISSUES TO BE DECIDED.................................................................................1

II.  SUMMARY OF THE ARGUMENT ...........................................................1

III. BACKGROUND .............................................................................................4

IV.  ARGUMENT ...................................................................................................6

    A.   Plaintiffs have Article III standing. ...................................................6

        1.   Plaintiffs alleged an "injury in fact." ...........................................7

            a.   Plaintiffs' allegations that they paid a premium for something they didn't receive establish injury-in-fact. ........................................................................................8

            b.   VW's reliance on "no-injury product liability" cases is misplaced. .............................................................10

            c.   VW's claim that Plaintiffs fully recouped their losses ignores comtrolling and contrary allegations in the Complaint and is irrelevant to standing.....................13

            d.   Plaintiffs' injuries are not "generalized," "subjective," or "hypothetical."...........................................16

        2.   Plaintiffs' injuries are "fairly traceable" to Defendants' conduct. ...........................................................................18

            a.   Plaintiffs' allegations establish causation for standing purposes. ...............................................................18

            b.   VW's causation arguments fail. ....................................20

    B.   The Clean Air Act does not preempt Plaintiffs' state law claims. ..........24

        1.   Plaintiffs' state law claims are not expressly preempted.............25

        2.   Plaintiffs' state claims are not impliedly preempted, because Congress did not preempt the field of emissions regulation, and VW can comply with both federal and state law. ...................................................................................29

    C.   Plaintiffs adequately allege their state law claims............................30

        1.   The Complaint adequately alleges damages, proximate causation, and reliance..................................................31

        2.   None of Plaintiffs' state law claims have any other deficiencies. ...............................................................37

a.  None of Plaintiffs' claims are time-barred. ........................................37

b.  None of Plaintiffs' class-action claims are barred by
    state law barring class actions. ..........................................................37

c.  Claims under Mississippi and Texas law should not
    be dismissed based on pre-suit requirements. ...................................39

d.  Plaintiffs have statutory standing under Ohio law. ..........................39

V.  CONCLUSION ..........................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Altria Grp., Inc. v. Good,*
  555 U.S. 70 (2008) .................................................................................................. 27

*Anderson v. Hyundai Motor Co. Ltd.,*
  2014 WL 12579305 (C.D. Cal. July 24, 2014) ................................................ 11, 13

*Andren v. Alere, Inc.,*
  2017 WL 6509550 (S.D. Cal. Dec. 20, 2017) ........................................................ 38

*ASARCO, LLC v. Union Pac. R.R. Co.,*
  765 F.3d 999 (9th Cir. 2014) ................................................................................ 24

*Barakezyan v. BMW of N. Am., LLC,*
  2016 WL 2840803 (C.D. Cal. Apr. 7, 2016) ..................................................... 11, 17

*Bastian v. Petren Res. Corp.,*
  892 F.2d 680 (7th Cir. 1990) ................................................................................ 32

*Bates v. Dow Agrosciences L.L.C.,*
  544 U.S. 431 (2005) .............................................................................................. 28

*Bennett v. Grant,*
  525 S.W.3d 642 (Tex. 2017) ................................................................................. 33

*Bower v. IBM, Inc.,*
  495 F. Supp. 2d 837 (S.D. Ohio 2007) ................................................................. 40

*In re Bridgestone/Firestone, Inc.,*
  288 F.3d 1012 (7th Cir. 2002) .............................................................................. 32

*Briehl v. Gen. Motors Corp.,*
  172 F.3d 623 (8th Cir. 1999) ................................................................................ 13

*Brown v. Hain Celestial Grp., Inc.,*
  2015 WL 3398415 (N.D. Cal. May 26, 2015) ...................................................... 35

*Bruton v. Gerber Prod. Co.,*
  961 F. Supp. 2d 1062 (N.D. Cal. 2013), *rev'd and remanded on other grounds,*
  2017 WL 3016740 (9th Cir. July 17, 2017) ............................................................ 8

*Bussian v. DaimlerChrysler Corp.,*
  411 F. Supp. 2d 614 (M.D.N.C. 2006) .................................................................. 13

*Cahen v. Toyota Motor Corp.,*
  147 F. Supp. 3d 955 (N.D. Cal. 2015) .............................................. 11, 13, 14, 15

*Canyon Cty. v. Syngenta Seeds, Inc.*,
519 F.3d 969 (9th Cir. 2008) ............................................................................. 34

*In re Caterpillar, Inc., C13 and C15 Engine Prods. Liab. Litig.*,
2015 WL 4591236 (D.N.J. July 29, 2015) ..................................................... 27, 29

*City of New York v. Smokes-Spirits.Com, Inc.*,
911 N.E. 2d 834 (N.Y. 2009) ............................................................................. 34

*In re Clorox Consumer Litig.*,
2013 WL 3967334 (N.D. Cal. July 31, 2013) ...................................................... 9

*Cole v. GMC*,
484 F.3d 717 (5th Cir. 2007) ............................................................................. 12

*Contreras v. Toyota Motor Sales USA, Inc.*,
2010 WL 2528844 (N.D. Cal. June 18, 2010), *aff'd in part, rev'd in part,* 484 F.
App'x 116 (9th Cir. 2012) ................................................................................. 11

*Corson v. Toyota Motor Sales, U.S.A., Inc.*,
2013 WL 1802709 (C.D. Cal. Apr. 24, 2013) ................................................... 36

*Counts v. GM, LLC*,
237 F. Supp. 3d 572 (E.D. Mich. 2017) ............................................................ 27

*Cullen v. Valley Forge Life Ins. Co.*,
161 N.C. App. 570 (2003) ................................................................................. 36

*Daniel v. Ford Motor Co.*,
806 F.3d 1217 (9th Cir. 2015) ....................................................................... 3, 35

*Davidson v. Kimberly-Clark Corp.*,
873 F.3d 1103 (9th Cir. 2017) ....................................................................... 9, 19

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006) .............................................................................. 32

*Doe v. Chao*,
540 U.S. 614 (2004) .......................................................................................... 32

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
541 U.S. 246 (2004) .......................................................................................... 26

*Enslin v. Coca-Cola Co.*,
136 F. Supp. 3d 654 (E.D. Pa. 2015)................................................................. 32

*Everts v. Parkinson*,
147 N.C. App. 315 (2001) ................................................................................. 36

*Felix v. Volkswagen Grp. of Am., Inc.*,
    2017 WL 3013080 (N.J. App. Div. July 17, 2017) ............................................. 28, 29

*Frye v. L'Oreal USA, Inc.*,
    583 F. Supp. 2d 954 (N.D. Ill. 2008) ........................................................................ 33

*Galecka v. Savage Arms, Inc.*,
    2014 WL 2931859 (Mich. Ct. App. June 26, 2014) .................................................. 33

*Guido v. L'Oreal, USA, Inc.*,
    2013 WL 3353857 (C.D. Cal. July 1, 2013) ....................................................... 35, 36

*Hedges v. United States*,
    404 F.3d 744 (9th Cir. 2005) ..................................................................................... 30

*Herrington v. Johnson & Johnson Consumer Cos., Inc.*,
    2010 WL 3448531 (N.D. Cal. Sept. 1, 2010) ...................................................... 11, 13

*Hershenow v. Enter. Rent-A-Car Co. of Boston*,
    840 N.E.2d 526 (Mass. 2006) .................................................................................... 32

*Hinojos v. Kohl's Corp.*,
    718 F.3d 1098 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc*
    (July 8, 2013) .......................................................................................................... 1, 8

*Hubert v. Gen. Nutrition Corp.*,
    2017 WL 3971912 (W.D. Pa. Sept. 8, 2017) ........................................................ 7, 13

*In re Hydroxycut Mktg. & Sales Prac. Litig.*,
    299 F.R.D. 648 (S.D. Cal. 2014) ............................................................................... 38

*Jackson v. GMC*,
    770 F. Supp. 2d 570 (S.D.N.Y. 2011), *aff'd sub nom.*, *Butnik v. GMC*, 472 F.
    App'x 80 (2d Cir. 2012) ............................................................................................ 28

*Jensen Family Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*,
    644 F.3d 934 (9th Cir. 2011) ........................................................................... 3, 26, 27

*Johnson v. Triple Leaf Tea Inc.*,
    2014 WL 4744558 (N.D. Cal. Sept. 23, 2014) ........................................................... 8

*Jonna Corp. v. City of Sunnyvale, Cal.*,
    2017 WL 2617983 (N.D. Cal. June 16, 2017) ...................................................... 3, 30

*Jou v. Kimberly-Clark Corp.*,
    2013 WL 6491158 (N.D. Cal. Dec. 10, 2013) ............................................................ 8

*Kaing v. Pulte Homes, Inc.*,
    2010 WL 625365 (N.D. Cal. Feb. 18, 2010) ............................................................. 23

*Kearney v. Hyundai Motor Co.*,
  2010 WL 9093204 (C.D. Cal. June 4, 2010) .............................................................. 12

*Koronthaly v. L'Oreal USA, Inc.*,
  374 F. App'x 257 (3rd Cir. 2010) ................................................................ 11, 13

*Krottner v. Starbucks Corp.*,
  406 F. App'x 129 (9th Cir. 2010) .............................................................................. 32

*Labriola v. Bank of Am., N.A.*,
  2012 WL 1657191 (N.D. Cal. May 10, 2012) ........................................................... 7

*Laird v. Tatum*,
  408 U.S. 1 (1972) ........................................................................................................ 17

*Lanovaz v. Twinings N. Am., Inc.*,
  2013 WL 675929 (N.D. Cal. Feb. 25, 2013) .............................................................. 8

*Lassen v. Nissan N. Am., Inc.*,
  211 F. Supp. 3d 1267 (C.D. Cal. 2016) ............................................................ 11, 13

*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) ................................................................................... 16

*Lee v. Toyota Motor Sales, U.S.A., Inc.*,
  992 F. Supp. 2d 962 (C.D. Cal. 2014) ............................................................. 11, 13

*Levine v. First Am. Title Ins. Co.*,
  682 F. Supp. 2d 442 (E.D. Pa. 2010) ....................................................................... 36

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  134 S. Ct. 1377 (2014) ............................................................................................. 34

*Licul v. Volkswagen Grp. of Am., Inc.*,
  2013 WL 6328734 (S.D. Fla. Dec. 5, 2013) ................................................... 13, 14, 33

*Lilly v. Jamba Juice Co.*,
  308 F.R.D. 231 (N.D. Cal. 2014) ............................................................................. 35

*Lisk v. Lumber One Wood Preserving, LLC*,
  792 F.3d 1331 (11th Cir. 2015) ............................................................................... 38

*Lorenzo v. Qualcomm Inc.*,
  2009 WL 2448375 (S.D. Cal. Aug. 10, 2009) ........................................................ 34

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ...................................................................................... 6, 17, 18

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
  519 F.3d 1025 (9th Cir. 2008) ................................................................................. 21

*Maya v. Centex Corp.*,
    658 F.3d 1060 (9th Cir. 2011) ............................................................................ *passim*

*McCabe v. Daimler AG*,
    948 F. Supp. 2d 1347 (N.D. Ga. 2013) ............................................................... 36

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ............................................................................................ 30

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ....................................................................................... 3, 26

*Morgan v. Wallaby Yogurt Co., Inc.*,
    2013 WL 5514563 (N.D. Cal. Oct. 4, 2013) ..................................................... 8, 9

*Oppenheimer v. Prudential Sec. Inc.*,
    94 F.3d 189 (5th Cir. 1996) ............................................................................... 39

*Phillips v. Apple Inc.*,
    2016 WL 5846992 (N.D. Cal. Oct. 6, 2016) ................................................... 2, 18

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015) ........................................................................... 4, 35

*Reid v. Johnson & Johnson*,
    780 F.3d 952 (9th Cir. 2015) ............................................................................... 8

*Resh v. China Agritech, Inc.*,
    857 F.3d 994 (9th Cir. 2017) ........................................................................... 4, 37

*Ross v. Sioux Honey Ass'n, Co-op.*,
    2013 WL 146367 (N.D. Cal. Jan. 14, 2013) ...................................................... 17

*Rothstein v. UBS AG*,
    708 F.3d 82 (2nd Cir. 2013) .............................................................................. 34

*Safe Air for Everyone v. Meyer*,
    373 F.3d 1035 (9th Cir. 2004) ........................................................................... 15

*Sams v. Yahoo! Inc.*,
    713 F.3d 1175 (9th Cir. 2013) ........................................................................... 24

*Sanchez v. Wal-Mart Stores, Inc.*,
    2008 WL 3272101 (E.D. Cal. Aug. 6, 2008) ..................................................... 12

*Schmier v. U.S. Court of Appeals for the Ninth Circuit*,
    279 F.3d 817 (9th Cir. 2002) ........................................................................ 13, 18

*Schumacher v. State Auto. Mut. Ins. Co.*,
    47 F. Supp. 3d 618 (S.D. Ohio 2014) ................................................................ 40

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010) ................................................................................ 4, 37, 38

*Shobert v. Ill. DOT*,
  304 F.3d 725 (7th Cir. 2002) ........................................................................ 32

*Siemer v. Assocs. First Capital Corp.*,
  2001 WL 35948712 (D. Ariz. Mar. 30, 2001) .............................................. 35

*Sloan v. GM LLC*,
  2017 WL 3283998 (N.D. Cal. Aug. 1, 2017) ................................................ 12

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) .................................................................................. 18

*Stanwood v. Mary Kay, Inc.*,
  941 F. Supp. 2d 1212 (C.D. Cal. 2012) ........................................................ 12

*Stearns v. Ticketmaster Corp.*,
  655 F.3d 1013 (9th Cir. 2011) ...................................................................... 35

*Strome v. DBMK Enters., Inc.*,
  2014 WL 6485533 (N.D. Cal. Nov. 19, 2014) .............................................. 33

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ...................................................................................... 17

*Tait v. BSH Home Appliances Corp.*,
  2011 WL 1832941 (C.D. Cal. May 12, 2011) ............................................... 37

*Taragan v. Nissan N. Am., Inc.*,
  2013 WL 3157918 (N.D. Cal. June 20, 2013) ............................................... 32

*Todd v. Tempur-Sealy Int'l, Inc.*,
  2016 WL 5746364 (N.D. Cal. Sept. 30, 2016), *reconsideration denied*, 2017 WL
  2833997 (N.D. Cal. June 30, 2017) ......................................................... 30, 35

*In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices and Prods. Liab.
  Litig.*,
  915 F. Supp. 2d 1151 (C.D. Cal. 2013) ........................................................ 13

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod.
  Liab. Litig.*,
  754 F. Supp. 2d 1145 (C.D. Cal. 2010) ...................................................... 7, 12

*In re Toyota Motor Corp., Unintended Acceleration Mktg., Sales Practices, & Prods.
  Liab. Litig.*,
  790 F. Supp. 2d 1152 (C.D. Cal. 2011) ........................................................ 12

*Victor v. R.C. Bigelow, Inc.*,
    2014 WL 1028881 (N.D. Cal. Mar. 14, 2014) ................................................ 8, 9, 12, 19

*In re Vizio, Inc., Consumer Privacy Litig.*,
    238 F. Supp. 3d 1204 (C.D. Cal. 2017) ............................................................. 8

*In re Volkswagen "Clean Diesel" Litig.*,
    2016 WL 5347198 (Va. Cir. Ct. Aug. 30, 2016) .................................... 5, 27, 36

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
    2017 WL 4890594 (N.D. Cal. Oct. 30, 2017) ("*Napleton*") ..................... 2, 11, 28

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
    264 F. Supp. 3d 1040 (N.D. Cal. 2017) ("*Wyoming Order*") ..................... 26, 29

## STATUTES

42 U.S.C. § 7543(a) ......................................................................................... 3, 25

42 U.S.C. § 7604(e) .............................................................................................. 25

Tex. Bus. & Com. Code § 17.505(b) ................................................................. 39

## OTHER AUTHORITIES

S. Rep. No. 91-1196 (1970) .................................................................................. 25

## I.   ISSUES TO BE DECIDED

1. Injury-in-fact that is both concrete and particularized—meaning that Plaintiffs must have an injury that is both existing in fact and affects them personally—satisfies Article III. The named Plaintiffs each suffered an economic loss when they overpaid for their Vehicles based on VW's misrepresentation and omission of material facts. The Complaint specifies the loss in several ways, including allegations that the moment Plaintiffs paid for their new Vehicles, they suffered an immediate depreciation in value, part of which was due to the "clean-diesel" premium they paid. The Complaint alleges Plaintiffs could not recoup a material portion of that premium, even though a subsequent sale, and that lease payments were inflated and such inflated payments were not recouped on lease termination, and these allegations control. Do Plaintiffs have standing?

2. Plaintiffs agree to dismissal of the Magnuson-Moss Warranty Act claim.

3. Section 209 of the Clean Air Act states that "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles." Plaintiffs' claims based on Defendants' misrepresentations and omissions regarding their "clean-diesel" Vehicles do not rely on, and are independent of, EPA emissions standards. In other words, the Clean Air Act does not give VW a license to lie to consumers. Has VW failed to meet its burden on the affirmative defense that the CAA preempts Plaintiffs' claims?

4. Plaintiffs allege with specificity and Defendants have conceded in guilty pleas that Defendants fraudulently failed to disclose material information concerning their purportedly "clean" diesel vehicles; the limitations periods on their claims are tolled under *American Pipe*; and state-law bars on class actions and pre-suit requirements are unenforceable, *see Shady Grove*. Has VW failed to meet its burden of articulating why Plaintiffs' claims under broadly worded state consumer protection laws are insufficiently pled?

## II.   SUMMARY OF THE ARGUMENT

Plaintiffs have Article III standing, which requires, at the pleadings stage, that they have suffered an "injury-in-fact" that is causally connected to Defendants' conduct. Where "[p]laintiffs contend that class members paid more for [a product] than they otherwise would have paid, or bought it when they otherwise would not have done so, they have suffered an Article III injury in fact." *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 n.3 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013)[1]. Here, Plaintiffs allege that they and other Class members paid a "clean-diesel premium" on the basis of VW's false promises that their Vehicles were environmentally friendly and met all applicable emissions standards. Plaintiffs would not have paid

---

[1] All internal marks and citations omitted unless otherwise noted.

1   that premium but for VW's misrepresentations and omissions—indeed, they could not have legally

2   purchased the Vehicles but for VW's fraud. This is a "quintessential injury-in-fact" under the law of

3   this Circuit. *Maya v. Centex Corp.*, 658 F.3d 1060, 1069 (9th Cir. 2011).

4          Employing a tactic already rejected by this Court in its *Napleton* decision, VW relies on "no-

5   injury product liability" cases to argue that Plaintiffs fail to allege an injury-in-fact because VW's

6   Vehicles "never malfunction[ed]" and no "defect []ever manifest[ed]." VW Br. at 21. As this Court

7   has already recognized, however, the "defect" alleged here clearly "manifested"—indeed, "the defeat

8   device . . . made the vehicles unsaleable." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices,*

9   *& Prods. Liab. Litig.*, 2017 WL 4890594, at *3 (N.D. Cal. Oct. 30, 2017) ("*Napleton*"). In addition,

10   many of the cases relied on by VW can be distinguished on the basis that they did not involve any

11   misrepresentations by the defendants, but merely alleged that the products were devalued by a latent

12   defect.

13          VW goes on to claim that Plaintiffs have suffered no injury-in-fact because they fully

14   recouped their losses in subsequent sales, but this argument ignores the Complaint's allegations that

15   Plaintiffs and Class members *could not* recoup the full amount of the clean-diesel premium they

16   paid—some amount of which was necessarily consumed by depreciation, including the depreciation

17   suffered by all new vehicles immediately upon sale. Nor does VW's argument acknowledge that

18   lessees did not "sell" and thus could not have recouped any amount of their inflated lease payment

19   through a lease termination.

20          Plaintiffs have also sufficiently alleged the second element of Article III standing—that their

21   injuries-in-fact were "fairly traceable" to Defendants' conduct—a requirement that is "relatively

22   modest," *Phillips v. Apple Inc.*, 2016 WL 5846992, at *8 (N.D. Cal. Oct. 6, 2016), and is satisfied

23   where plaintiffs allege they "would not have purchased" something but for the defendants'

24   misrepresentations or omissions, *Maya v. Centex Corp.*, 658 F.3d at 1070. Here, Plaintiffs allege that

25   they and Class members would not have purchased or leased their Vehicles but for VW's

26   misrepresentations and omissions regarding the cheat device and the Vehicles' purported

27   environmental performance, and that those misrepresentations were "material" both to consumers

28   and to regulators. These allegations are more than sufficient to establish that their injuries are "fairly

traceable" to Defendants' conduct. VW tries to muddy the waters by arguing that Plaintiffs do not allege that the defeat device "caused" (1) the clean-diesel premium, (2) Plaintiffs' Vehicles to depreciate, or (3) Plaintiffs to incur finance charges. But all these arguments evidence a fundamental misunderstanding of the relevant causal connection, which is not between the *defeat devices* and elements of Plaintiffs' injuries, but between *Defendants' misrepresentations and omissions* and Plaintiffs' injuries. The latter connection is clearly alleged in the Complaint.

Like its attack on Plaintiffs' Article III standing, VW's preemption argument also fails. VW bears the burden on its affirmative defense that the Clean Air Act ("CAA") preempts Plaintiffs' claims, but its express preemption argument rests on fundamental misinterpretations of Section 209 of the CAA, which preempts claims only where a "*State or any political subdivision thereof*" is attempting to enforce a "standard relating to the control of emissions from new motor vehicles," 42 U.S.C. § 7543(a) (emphasis added)—not, as here, where private individuals bring fraud-based claims. VW relies on *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992), to suggest that the words "relating to" in Section 209 evince a broad preemptive purpose, but that case has been distinguished in similar cases to the present, with the Ninth Circuit rejecting such a broad reading. *Jensen Family Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934 (9th Cir. 2011). Nor does VW's implied preemption argument fare better, since Congress did not intend to occupy the entire field of motor vehicle regulation, and in any case, there is no conflict between VW's ability to comply with EPA requirements under the CAA and its ability to simultaneously not misrepresent having done so.

Finally, the Court should not consider any of VW's arguments for dismissing Plaintiffs' state-law claims; these arguments are cursory to the point of being unintelligible and rely on its 16-page Appendix, which lists cases with virtually no discussion and flouts the Court's page limits. *See Jonna Corp. v. City of Sunnyvale, Cal.*, 2017 WL 2617983, at *2 n.4 (N.D. Cal. June 16, 2017) (striking appendix "as argument in excess of the page limit"). In any case, VW's arguments are incorrect, since the Complaint adequately alleges damages, proximate cause, and reliance. *See, e.g., Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (plaintiff need only prove that omission "was a substantial factor in his decision," which may be done "by simply proving that, had

1   the omitted information been disclosed, one would have been aware of it and behaved differently");

2   *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 985-86 (9th Cir. 2015) (claim under

3   California UCL or FAL requires only "that members of the public are likely to be deceived," and

4   "does not require individualized proof of deception, reliance, and injury"). Nor are any of Plaintiffs'

5   claims time-barred, *see Resh v. China Agritech, Inc.*, 857 F.3d 994, 1004 (9th Cir. 2017) ("permitting

6   future class action named plaintiffs, who were unnamed class members in previously uncertified

7   classes, to avail themselves of *American Pipe* tolling would advance the policy objectives that led the

8   Supreme Court to permit tolling in the first place"), deficient with respect to their class allegations,

9   *see Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) (state prohibition

10  on class actions not enforceable in federal court), or otherwise inappropriately brought due to pre-

11  suit notice or standing requirements.

## III.   BACKGROUND

13      On September 18, 2015, the U.S. Environmental Protection Agency announced findings that

14  Volkswagen had installed software on diesel cars that enabled them to cheat on emissions tests.

15  Complaint ¶ 2.[2] These so-called "defeat devices" reduced nitrogen oxide emissions when the cars

16  were placed on a test machine but allowed higher emissions and improved engine performance

17  during normal driving. *Id.* The devices were installed on more than half a million diesel vehicles in

18  the U.S., *id.*, which VW marketed as "clean" diesel vehicles in an extensive advertising campaign

19  that touted the Vehicles as at once environmentally friendly, fuel efficient, and powerful. ¶¶ 282-317.

20  The campaign proved highly successful, resulting in skyrocketing sales and allowing VW to charge

21  consumers a significant premium for its "clean diesel" vehicles. *E.g., ¶¶* 318-321.

22      When Defendants' emissions cheat was exposed, consumers filed hundreds of lawsuits, most

23  of which have been coordinated in this federal Multi-District Litigation entitled *In Re: Volkswagen*

24  *"Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 2672.[3]

25  There have been three resulting consumer class action settlements. The first settlement involved

26  affected 2.0-liter models and was given final approval on October 25, 2016. MDL Dkt. 2102 ("2.0L

27      [2] All "¶" references are to the Class Action Complaint, Dkt. 7, unless otherwise noted.

28      [3] References to "MDL Dkt." refer to this MDL litigation.

OPPOSITION TO VOLKSWAGEN U.S.
DEFENDANTS' MOTION TO DISMISS - 4
Case No.: 02672-CRB (JSC)
010686-11 1013163 V1

1   Order"). The second settlement involved 3.0 liter models and was given final approval on May 17,

2   2017. MDL Dkt. 3229 ("3.0L Order"). The third settlement resolved all claims for 2.0 and 3.0

3   vehicles against Robert Bosch GmbH and Robert Bosch LLC (together "Bosch"). Settlement and

4   Release, MDL Dkt. 2837. This settlement cross-referenced the 2.0L and 3.0L class definitions in

5   order to delineate the class with whom Bosch settled all claims. *Id*. § 2.15. This settlement was given

6   final approval on May 17, 2017. MDL Dkt. 3230 ("Bosch Smt. Order"). Collectively, the 2.0L, 3.0L,

7   and Bosch Settlements are referred to as the "Consumer Settlements."

8          The Consolidated Consumer Class Action Complaint in the MDL originally defined the

9   consumer class as "All persons and entities in the United States who purchased or leased a Class

10  Vehicle." MDL Dkt. 1230 at ¶ 349. Nonetheless, all three Consumer Settlements proceeded to

11  exclude consumers who purchased or leased those same Vehicles, but who no longer owned the

12  Vehicles (or whose leases had ended) on September 18, 2015—the date on which the public learned

13  about VW's emissions cheat device scheme. Plaintiffs brought the present action on August 2, 2017,

14  on behalf of those excluded consumers. Dkt. 7.

15         Although none of this Court's orders finally approving the Consumer Settlements made any

16  findings as to the underlying merits of the plaintiffs' claims, the Court held in both its 2.0L Order

17  and its 3.0L Order that the strength of the consumers' case weighed against approving the

18  settlements—noting the fact that "liability [was] not at issue" since "Volkswagen admits to installing

19  and failing to disclose the defeat device in its TDI diesel engine vehicles, which it marketed as

20  environmentally friendly." 3.0L Order at 22; *see also* 2.0L Order at 16.

21         While this MDL action progressed, parallel state court actions were also ongoing, including a

22  consolidated action in Virginia, in which VW attempted to make similar arguments to those raised in

23  its present Motion to Dismiss. *See In re Volkswagen "Clean Diesel" Litig.*, 2016 WL 5347198 (Va.

24  Cir. Ct. Aug. 30, 2016) ("*Virginia Clean Diesel Action*"). The Virginia court rejected VW's

25  argument that federal law preempted consumer plaintiffs' claims under Virginia's Consumer

26  Protection Act ("VCPA"), and likewise rejected VW's attempts to dismiss the plaintiffs' claims for

27  failure to sufficiently allege their claims under the VCPA. *Id*. at *2-11.

28

1    In addition to lawsuits brought by consumers, Defendants faced actions brought by

2    Volkswagen-branded franchise dealerships. Although VW settled those actions, MDL Dkt. 2807,

3    Bosch continued to litigate the claims, filing a motion to dismiss the dealers' RICO claims that was

4    ultimately denied by this Court. MDL Dkt. 4185 ("*Napleton*"). In its Motion to Dismiss, Bosch

5    acknowledges that this Court's opinion in *Napleton* effectively disposes of its arguments that

6    Plaintiffs have failed to plausibly allege a RICO claim against Bosch, but proceeds to make the same

7    arguments in order "to preserve the issues in the event of appellate review." Bosch Br. at 19.

8                                          **IV.    ARGUMENT**

9    **A.    Plaintiffs have Article III standing.**

10    The Volkswagen Defendants ("VW")[4] incorrectly assert that Plaintiffs lack Article III

11    standing.[5] To establish Article III standing, Plaintiffs must show (1) that they have suffered an

12    "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) a causal

13    connection between the injury and the Defendants' conduct; and (3) that it is likely that the injury

14    will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561

15    (1992). "At the pleading stage, general factual allegations of injury resulting from the defendant's

16    conduct may suffice, for on a motion to dismiss[, courts] presume that general allegations embrace

17    those specific facts that are necessary to support the claim." *Id*. at 561.

18    Plaintiffs have standing by alleging that they were injured by paying a premium for

19    something they did not receive—a "quintessential injury-in-fact" under Ninth Circuit precedent—

20    and that they would not have paid that premium (or purchased the Vehicles at all) but for VW's

21    fraud. Indeed, the Complaint alleges that Plaintiffs *could* not have purchased the Vehicles but for

22    VW's fraud, since the Vehicles were illegal to sell.

23

24

-------------------------

25    [4] For convenience, "VW" in this Opposition refers to both Volkswagen U.S. and Volkswagen
26    AG, although Plaintiffs acknowledge that only Volkswagen U.S. brought the present Motion to
      Dismiss.

27    [5] Volkswagen U.S. Defendants' Notice of Motion and Motion to Dismiss the Pre-NOV
      Plaintiffs' Complaint; Memorandum of Points and Authorities in Support Thereof, Dkt. 4534
28    ("VW Br.") at 15-30.

OPPOSITION TO VOLKSWAGEN U.S.
DEFENDANTS' MOTION TO DISMISS - 6
Case No.: 02672-CRB (JSC)
010686-11 1013163 V1

VW relies on inapposite "no-injury product liability" cases[6] to suggest that Plaintiffs must plead "something more" than a possible defect to establish standing;[7] speculates implausibly that Plaintiffs somehow recouped the entire premium they paid at resale; suggests that Plaintiffs' injuries are somehow too subjective or generalized to establish standing; and argues that Plaintiffs have failed to allege facts to support that their injuries were "fairly traceable" to VW's actions. Each of VW's arguments disintegrates in the face of Plaintiffs' specific allegations and clear precedent.

### 1. Plaintiffs alleged an "injury in fact."

As VW's own authority explains, "injury in fact is not Mount Everest." *Hubert v. Gen. Nutrition Corp.*, 2017 WL 3971912, at *9 (W.D. Pa. Sept. 8, 2017) (quoting *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005)). Indeed, "courts have recognized that the 'injury in fact' requirement is not a substantial hurdle and that a minimal, 'identifiable trifle' of injury is sufficient." *Labriola v. Bank of Am., N.A.*, 2012 WL 1657191, at *6 (N.D. Cal. May 10, 2012) (quoting *Preminger v. Peake*, 552 F.3d 757, 763 (9th Cir. 2008)). Here, under clear Ninth Circuit precedent, Plaintiffs have met that minimal hurdle.

VW argues that Plaintiffs fail to allege a sufficient injury-in-fact, but relies primarily on "no-injury product liability" cases in which courts found that plaintiffs had either (i) failed to allege a defect, and/or (ii) failed to allege that such a defect had materialized, in the products at issue. *See generally*, VW Br. at 19-23. Such cases are inapplicable here, for the reasons explained below. Nor does VW fare better with its unsupported factual speculation that Plaintiffs suffered no injury because they somehow recouped 100% of their losses through resale, *see id.* at 16-17, 24, 26, 27, or that Plaintiffs' injuries are too "generalized," "subjective," or "hypothetical" to be cognizable for standing purposes, *see generally id.* at 15-16.

---

[6] *See, e.g., In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1164 (C.D. Cal. 2010) ("*Toyota Acceleration Litig.*") (describing and distinguishing "no-injury product liability" cases).

[7] *See* generally, VW Br. 19-23.

### a. Plaintiffs' allegations that they paid a premium for something they didn't receive establish injury-in-fact.

The Ninth Circuit has held that where "[p]laintiffs contend that class members paid more for [a product] than they otherwise would have paid, or bought it when they otherwise would not have done so, they have suffered an Article III injury in fact." *Hinojos v. Kohl's Corp.*, 718 F.3d at 1104 (quoting *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595 (9th Cir. 2012)). Indeed, in this Circuit it is a "quintessential injury-in-fact" when plaintiffs allege that they "spent money that, absent defendants' actions, they would not have spent." *Maya v. Centex Corp.*, 658 F.3d at 1069; *see also Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015); *Johnson v. Triple Leaf Tea Inc.*, 2014 WL 4744558, at *2 (N.D. Cal. Sept. 23, 2014); *In re Vizio, Inc., Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1217 (C.D. Cal. 2017).

Courts routinely reject standing challenges where consumers allege a misrepresentation of a product caused them to purchase a product they would not otherwise have purchased. *See*, *e.g.*, *Hinojos*, 718 F.3d at 1107 (standing found where defendant "made material representation[s] that induced" a purchase); *Morgan v. Wallaby Yogurt Co., Inc.*, 2013 WL 5514563, at *3-4 (N.D. Cal. Oct. 4, 2013) (standing found where Plaintiffs alleged that they "would not have bought the products had they known the truth about them" and that they paid "a premium price for inferior or undesirable ingredients"); *Lanovaz v. Twinings N. Am., Inc.*, 2013 WL 675929, at *6 (N.D. Cal. Feb. 25, 2013) (injury-in-fact shown by "alleged purchase of a product that plaintiff would not otherwise have purchased but for the alleged unlawful label").[8]

Certainly, where a defendant misrepresents the existence of some characteristic of a product and a consumer purchases the product and pays a premium *for that characteristic*, the defendant cannot escape liability for that misrepresentation by claiming, as VW does here, that the consumer wasn't injured because the product worked fine for its "ordinary purpose," VW Br. at 21. *See Victor*

---

[8] *See also Jou v. Kimberly-Clark Corp.*, 2013 WL 6491158, at *3 (N.D. Cal. Dec. 10, 2013) (standing found where plaintiffs paid a premium for products labeled "natural" and would not have purchased the products but for the defendants' misrepresentations); *Bruton v. Gerber Prod. Co.*, 961 F. Supp. 2d 1062, 1087-88 (N.D. Cal. 2013), *rev'd and remanded on other grounds*, 2017 WL 3016740 (9th Cir. July 17, 2017) (plaintiff adequately alleged injury-in-fact where she "claim[ed] that she paid for products that she would not otherwise have purchased").

1   *v. R.C. Bigelow, Inc.*, 2014 WL 1028881 (N.D. Cal. Mar. 14, 2014); *In re Clorox Consumer Litig.*,

2   2013 WL 3967334, at *4 (N.D. Cal. July 31, 2013) (standing found where plaintiffs alleged that they

3   paid a premium for certain features and that defendant's product did not "perform as advertised");

4   *Morgan v. Wallaby Yogurt Co., Inc.*, 2013 WL 5514563; *cf. Davidson v. Kimberly-Clark Corp.*, 873

5   F.3d 1103, 1111 (9th Cir. 2017). Indeed, other judges in this District have explicitly rejected this

6   type of attack on standing. In *Bigelow,* for example, the plaintiff alleged that the defendant had

7   falsely labeled its tea as containing "healthful antioxidants," that he "paid a premium for purported

8   nutritional and health benefits that the product did not have," and that he would not have purchased

9   the tea had he known that the claim did not comport with food labeling standards and the tea did not

10  in fact have the claimed nutritional and health value. 2014 WL 1028881, at *4. Bigelow argued that

11  plaintiff had not suffered a "real or compensable harm" because he "consumed [the products]

12  without incident or physical injury," and because the products "were not unfit for their intended use"

13  and were not "tainted, spoiled, or contaminated." 2014 WL 1028881, at *4. Judge Orrick found that

14  Bigelow had "seriously misconstrue[d] the plaintiff's contentions" and had "misse[d] the point,"

15  finding that "Bigelow's argument leads to the untenable conclusion that consumers have no legal

16  recourse for intentionally misidentified products. Such a result has no basis in law, and the plaintiffs

17  have standing." *Id*.

18      Here, Plaintiffs allege all the elements necessary to establish an injury-in-fact. *First*, Plaintiffs

19  allege that VW marketed its "clean diesel" Vehicles on the basis of environmental performance—

20  *i.e.*, VW's marketing campaign for the Vehicles hinged on the "cleanliness" of the Vehicles, which

21  VW used to distinguish their "clean" diesels from the "dirty" diesel vehicles of the past.[9] *Second*,

22

23      [9] *See*, *e.g.*, ¶ 12 ("The purported environmental benefit of these vehicles was their identifying

24  characteristic and the basis upon which Defendants marketed them."); ¶ 285 ("VW's entire marketing campaign, from the branding of the products to the advertisements, focused on convincing

25  consumers that the Class Vehicles were not merely compliant with emission regulations, but that they exceeded them."); ¶ 289 ("Volkswagen distinguished TDI 'clean' diesel engines from other,

26  'stinky, smoky, sluggish' diesels, proclaiming its 'eco-conscious' status and failing to disclose that the Class Vehicles were 'dirty' themselves. These messages were prevalent in Volkswagen's

27  extensive marketing campaign."); ¶ 380 ("Class members were promised that their vehicles would be environmentally friendly low-emission vehicles. This was the identifying characteristic of the Class

28  Vehicles, and formed the basis for Defendants' marketing of them.").

1   Plaintiffs allege that VW charged a premium for their "clean diesel" vehicles,[10] and allege facts

2   supporting the existence of the premium.[11] *Finally*, the Complaint alleges that Plaintiffs and Class

3   members did not receive the "clean diesel" which was the very thing for which they paid a

4   premium.[12]

5       These allegations establish a "quintessential injury-in-fact" under the law of this Circuit: *i.e.*,

6   that Plaintiffs "spent money that, absent defendants' actions, they would not have spent." *Maya v.*

7   *Centex Corp.*, 658 F.3d at 1069.

8       **b.   VW's reliance on "no-injury product liability" cases is misplaced.**

9       VW suggests that for standing purposes, Plaintiffs cannot merely allege they overpaid for a

10  "defective" product, but must allege "something more"—specifically, a "malfunction" or a "defect"

11  that "manifest[s]." VW Br. at 20-21. VW claims that Plaintiffs cannot be found to have been injured

12  because VW's Vehicles "never malfunction[ed]" and no "defect []ever manifest[ed]." *Id.* at 21. But

13  this Court has already rejected that standing argument, ruling as follows in *Napleton*:

> Cases cited by Bosch are not on point because they involve scenarios
> in which a product defect never manifests. *See, e.g.*, *Briehl v. Gen.*
> *Motors Corp.*, 172 F.3d 623, 628 (8th Cir. 1999) ("Plaintiffs have not

---

16  [10] *See, e.g.*, ¶ 10 ("Defendants induced Plaintiffs and Class members to purchase or lease the

17  Class Vehicles—at a cost premium—by advertis[ing] them as "clean diesel" cars which would
    benefit the environment."); ¶ 379 ("In fact, Class members paid a premium for this purportedly clean

18  diesel engine . . . ."); ¶ 6 (" . . . Volkswagen secretly turned the most environmentally-conscious
    consumers into some of the biggest polluters on the road—and charged them a premium in the

19  process."); ¶ 320 ("Volkswagen . . . charg[ed] premiums of thousands of dollars for the 'clean' diesel
    models of the Class Vehicles.").

20  [11] Plaintiffs allege at least three facts supporting the existence of the premium: (1) the decline in
    value suffered by the Vehicles after the announcement of VW's fraud, which "confirms that

21  consumers and the market ascribe independent value to the use of a vehicle which is environmentally
    friendly," ¶ 12; (2) the fact that "Class Vehicles leased at a higher per-month rate than other vehicles

22  with otherwise similar traditional performance," ¶ 380; and (3) the price differential between "clean
    diesel" vehicles and their regular gasoline counterparts, which the Complaint uses to estimate the

23  amount of the clean-diesel premium, ¶ 379.

24  [12] *See, e.g.*, ¶ 380 ("Despite paying this 'clean-diesel premium,' Class members never obtained
    the promised environmental benefits." ¶ 4 (Plaintiffs and Class members "never received the clean

25  emissions performance Defendants' promised during their period of ownership"); ¶ 10 ("Plaintiffs
    and Class members never received the cars they bargained for or enjoyed the environmental

26  performance they were promised."); ¶ 12 ("Class members were originally and primarily injured
    when Defendants did not provide them with the superior environmental characteristics that Class

27  members bargained for."). Individual Plaintiffs also allege specifically that they "paid a substantial
    amount for something [they] never received." ¶¶ 24, 27, 38, 51, 57, 62, 69, 72, 77, 81, 85, 94, 98,

28  103, 108, 113, 118, 124, 131, 141, 145, 149, 154.

1

alleged that their ABS brakes have malfunctioned or failed."); *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices and Prods. Liab. Litig.*, 915 F. Supp. 2d 1151, 1157 (C.D. Cal. 2013) (plaintiff has not presented "any evidence that the ABS in his vehicle malfunctioned or failed...."). That is not the situation here, where the defeat device has made the affected vehicles unsaleable.

2017 WL 4890594, at *3.

To support its argument, VW once again cites to a number of cases (including the cases cited by this Court in the foregoing quotation) that courts have referred to as "no-injury product liability" cases, in which courts refused to find standing where plaintiffs alleged injury from a defective product. Each of these cases is distinguishable from the present action for at least one of the two reasons below.

*First*, VW cites a number of cases in which courts were reluctant to find an injury based on the plaintiffs' loss of the "benefit of the bargain" where there was no indication that the "bargain" actually contemplated the subject of plaintiffs' alleged defect—primarily because the defendant made no false representations regarding the alleged defect.[13] This is not such a case. Here, Plaintiffs allege that that VW intentionally failed to inform Plaintiffs that their Vehicles were not legally saleable and affirmatively lied about their environmental benefits and emissions levels. *See, e.g.*, ¶¶ 216, 283, 282-321. Plaintiffs relied on those omissions and misrepresentations, *see, e.g.*, ¶¶ 6, 25, 28, 33, 39, 379, 502, 568, and VW charged Plaintiffs a premium on the basis of those omissions and misrepresentations, *see, e.g.*, ¶¶ 6, 10, 320, 379, 380. In other words, Plaintiffs allege that based on VW's misrepresentations, they paid a premium for "clean diesel" vehicles, which they did not receive due to Defendants' actions. *See supra*, Section IV.A.1.a. Courts routinely reject attempts to

---

[13] *See Contreras v. Toyota Motor Sales USA, Inc.*, 2010 WL 2528844 (N.D. Cal. June 18, 2010), *aff'd in part, rev'd in part*, 484 F. App'x 116 (9th Cir. 2012) (no standing where plaintiffs did not allege that defendant had promoted the allegedly defective braking system as an added safety feature); *Lassen v. Nissan N. Am., Inc.*, 211 F. Supp. 3d 1267, 284 (C.D. Cal. 2016) (no standing where plaintiffs "did not purchase their vehicles based on any expectation that they included [the] additional safety features"); *Barakezyan v. BMW of N. Am., LLC*, 2016 WL 2840803, at *4 (C.D. Cal. Apr. 7, 2016) (no standing where plaintiff did not allege that defendants made any false representation about brake noise levels); *Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962 (C.D. Cal. 2014) (no standing where plaintiffs did not allege that defendants made any false representation regarding the specific performance of the challenged system); *Anderson v. Hyundai Motor Co. Ltd.*, 2014 WL 12579305 (C.D. Cal. July 24, 2014) (same); *Cahen v. Toyota Motor Corp.*, 147 F. Supp. 3d 955, 969 (N.D. Cal. 2015) (same); *Herrington v. Johnson & Johnson Consumer Cos., Inc.*, 2010 WL 3448531, at *3 (N.D. Cal. Sept. 1, 2010) (same); *Koronthaly v. L'Oreal USA, Inc.*, 374 F. App'x 257 (3rd Cir. 2010) (same).

1    rely on product defect cases to defeat standing in the context of allegations similar to those in the

2    Complaint here. *See, e.g., Bigelow*, 2014 WL 1028881, at *4; *Stanwood v. Mary Kay, Inc.*, 941 F.

3    Supp. 2d 1212, 1217 (C.D. Cal. 2012) (product defect cases "would only be relevant if [plaintiff]

4    was seeking redress for an injury related to some defect in the products. She is not. . . . Rather, she

5    was injured because Mary Kay made false representations . . . which induced her to buy a non-

6    defective product she otherwise would not have purchased.").[14] This Court should do so as well.[15]

7         *Second*, even if VW's criminal defrauding of consumers were analyzed as a mere "defect,"

8    there is simply no question that the "defect"—the intentional failure to comply with emissions

9    requirements—"manifested" itself in each one of the Class Vehicles, as this Court already explained

10   in *Napleton*.[16] Plaintiffs allege not only that each of their Vehicles failed to provide the performance

11   promised by VW[17] but also that VW designed this failure to be a part of—and that the failure was

12   thus "manifested in"—each Class Vehicle sold, *e.g.*, ¶¶ 197-216. This distinguishes the present case

---

[14] *See also Sanchez v. Wal-Mart Stores, Inc.*, 2008 WL 3272101 (E.D. Cal. Aug. 6, 2008) (distinguishing "no injury products liability actions" and finding plaintiff had standing where she sought recovery for economic harm of having purchased a stroller that was rendered less valuable due to an alleged defect).

[15] VW also cites a number of cases in which courts found that plaintiffs *did* have standing, but unsuccessfully argues that plaintiffs in those cases somehow alleged more concrete injury than Plaintiffs here. *See Sloan v. GM LLC*, 2017 WL 3283998, at *2 (N.D. Cal. Aug. 1, 2017) (plaintiffs had standing where they alleged overpayment for a defective vehicle, despite the fact that "none of the Plaintiffs allege[d] that their vehicles actually experienced [the alleged defect's adverse effects]"); *In re Toyota Motor Corp., Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 790 F. Supp. 2d 1152, 1166 (C.D. Cal. 2011) ("As long as Plaintiffs . . . offer detailed, non-conclusory factual allegations of the product defect, the economic loss injury flows from the plausibly alleged defect at the pleadings stage.").

[16] Even if Plaintiffs had not alleged the manifestation of the "defect," courts have held that such a manifestation is not necessary to establish that plaintiffs have standing—even in no-injury product liability cases like those cited by VW. *See, e.g., Toyota Acceleration Litig.*, 754 F. Supp. 2d at 1162 (a manifested defect is not necessary for standing where plaintiffs allege economic injuries based on a "benefit of the bargain" theory); *Kearney v. Hyundai Motor Co.*, 2010 WL 9093204 (C.D. Cal. June 4, 2010) (plaintiffs had standing "*even when the alleged defects did not later materialize—i.e.*, the loss was suffered at the moment of purchase") (emphasis in original); *Cole v. GMC*, 484 F.3d 717, 723 (5th Cir. 2007) (plaintiffs had standing where they overpaid for defective vehicles, even when those vehicles had not manifested the alleged defect).

[17] ¶¶ 20 (Plaintiff Nemet), 25 (Plaintiff Kahlert), 29 (Plaintiff Angela Matt Architect, Inc.), 33 (Plaintiff Field), 40 (Plaintiff Dreher), 45 (Plaintiff Schell), 52 (Plaintiff Sheffield), 58 (Plaintiff Lecours), 63 (Plaintiff De La Cruz), 66 (Plaintiff Winebaugh), 70 (Plaintiff Skena), 73 (Plaintiff St. Croix), 78 (Plaintiff Olson), 82 (Plaintiff Kubala), 88 (Plaintiff Daly), 95 (Plaintiff Ferdinand), 99 (Plaintiff Galluccio), 104 (Plaintiff Rawczak), 109 (Plaintiff Miller), 114 (Plaintiff Hofmann), 120 (Plaintiff Siehl), 125 (Plaintiff Schell), 132 (Plaintiff Conner), 136 (Plaintiff Dunn), 142 (Plaintiff Salgado), 146 (Plaintiff Bowman), 150 (Plaintiff Mosley).

1    from those cited by VW in which the courts found no standing where plaintiffs had failed to allege

2    that the defect had actually manifested itself in the plaintiffs' products, or that there was sufficient

3    risk that it would do so.[18]

4          This case is not a no-injury products liability case masquerading as a consumer fraud case.

5    This is a quintessential consumer fraud case in which Plaintiffs allege not only that the Vehicles

6    malfunctioned (*i.e.*, did not perform either as advertised or as required by law) from the time of

7    purchase, but that the "malfunction" reflected the failure of the very aspect of performance for which

8    VW was charging a premium. In other words, not only did Plaintiffs and class members pay a

9    premium for the Vehicles, but they paid that premium specifically for the feature—the "clean diesel"

10   performance—that the Vehicles failed to deliver. This is a "quintessential injury-in-fact."

11         **c.    VW's claim that Plaintiffs fully recouped their losses ignores controlling and
                contrary allegations in the Complaint and is irrelevant to standing.**

12

13         Flying in the face of common sense, VW asserts that Plaintiffs lack standing because they

14   somehow recouped 100% of the premium they paid for their vehicles when they subsequently sold

15         [18] *See Hubert v. Gen. Nutrition Corp.*, 2017 WL 3971912, at *8 (no standing where plaintiffs

16   failed to allege that the product "did not deliver the advertised benefits"); *Contreras*, 2010 WL
     2528844 (no standing where plaintiffs failed to allege that their vehicles had actually manifested the

17   alleged defect in their braking system); *Lassen*, 211 F. Supp. 3d 1267 (no standing where plaintiffs
     made no allegation that the vehicle had malfunctioned, but "merely suggest[ed] possible changes . . .

18   which they believ[ed] would make the product safer"); *Lee*, 992 F. Supp. 2d 972 (no standing where
     plaintiffs' own allegations showed that the vehicle systems challenged by plaintiffs "perform[ed] as

19   described," and no defect had manifested itself in plaintiffs' vehicles); *Anderson*, 2014 WL
     12579305 (plaintiffs failed to "demonstrate[] that there [was] *any* defect in the [vehicle]") (emphasis

20   in original); *Cahen*, 147 F. Supp. 3d at 968 ( "plaintiffs [did] not allege that any consumer, outside
     the realm of controlled experiments, has ever been a victim of [the injury that might be caused by the

21   alleged defect]"); *Herrington*, 2010 WL 3448531, at *3  (plaintiffs failed to allege that the chemicals
     in defendants' bath products even posed a substantial risk of harm, much less had manifested in any

22   actual harm to anyone); *Koronthaly*, 374 F. App'x 257 (plaintiffs did not allege that lead levels in
     lipstick caused any actual harm, and levels were found safe by FDA); *In re Toyota Motor Corp.

23   Hybrid Brake Mktg., Sales Practices & Prods. Liab. Litig.*, 915 F. Supp. 2d 1151 (C.D. Cal. 2013)
     (alleged defect never manifested) *cf. Briehl v. GMC*, 172 F.3d at 628 (no analysis of standing;

24   granting motion to dismiss for failure to state a claim where vehicle "never exhibit[ed the] alleged
     defect"); *Bussian v. DaimlerChrysler Corp.*, 411 F. Supp. 2d 614, 623 (M.D.N.C. 2006) (no analysis

25   of standing; noting only, in context of a warranty claim, that the "ordinary purpose of an automobile
     is to provide transportation"); *Licul v. Volkswagen Grp. of Am., Inc.*, 2013 WL 6328734, at *5 (S.D.

26   Fla. Dec. 5, 2013) (no standing analysis; granting motion to dismiss where plaintiff did not "suffer
     from the defect itself during the term of her title to the [vehicle]"); *Schmier v. U.S. Court of Appeals

27   for the Ninth Circuit*, 279 F.3d 817 (9th Cir. 2002) (attorney didn't have standing to challenge rule
     prohibiting citation to unpublished decisions where he did not allege that he had himself ever been

28   sanctioned or otherwise adversely affected by the rule).

them. *See* VW Br. at 1, 16-17, 24, 26, 27.[19] This argument ignores that the Complaint alleges that "Class members *[could not] have* recouped the full premium that they paid for that initial clean diesel performance," ¶ 382.[20] In other words, even if some Class members sold their Vehicles before VW's fraud was announced,[21] and even if, as the Complaint alleges, subsequent purchasers were willing to pay "slightly more at the time of resale because of the perceived environmental benefits" of the Vehicles, *id.*, those subsequent purchasers were not reimbursing the seller for the entire clean-diesel premium. Indeed, such a suggestion is absurd because, as the Complaint alleges, subsequent purchasers were paying for the clean diesel performance they themselves expected to enjoy in the future—not reimbursing Class members for past clean diesel performance, ¶ 382. Moreover, the Complaint spells out why consumers who purchased a new Vehicle suffered an *immediate* injury in the form of an unrecoupable "new vehicle premium"—part of which consists of an *over*payment for the "clean diesel" feature they did not receive. ¶ 13.[22] None of the cases cited by VW for its "recoupment" argument provide grounds for ignoring these allegations.[23]

---

[19] VW's half-hearted nod to securities cases involving "in-and-out" traders, VW Br. at 16 n.14, suggests a realization that analogizing to such cases is too far a stretch in the present case. Stocks, unlike vehicles, do not depreciate; so while it may be true that a stock trader who sells fraudulently inflated stock while the fraud is still unknown may suffer no injury, the same cannot be said for sellers of depreciating assets such as vehicles.

[20] *See also id.* ("Class members could not have recouped the 'new vehicle' premium . . ."); ¶ 13 ("By definition, [the] new vehicle premium cannot be recouped by a subsequent sale."); ¶¶ 24, 27, 38, 51, 57, 62, 69, 72, 77, 81, 85, 94, 98, 103, 108, 113, 118, 124, 131, 141, 145, 149, 154 ("Plaintiff paid a substantial amount for something she [or he] never received, and was unable to fully recoup that loss through the subsequent sale of the Vehicle.").

[21] The Class is not limited to those consumers who *sold* their Vehicles prior to the announcement of the fraud, but includes all consumers who "no longer owned, held an active lease for, or otherwise had a legal interest" in their vehicles. ¶ 401. This would include, for example, consumers who gifted their Vehicles, or whose Vehicles were destroyed in an accident—none of whom would have had an opportunity to recoup any damages through subsequent sales of their Vehicles.

[22] The Complaint provides additional detail as to this allegation in the form of a specific example of how the "new vehicle premium" interacts with the clean-diesel premium: "For example, assume one of the plaintiffs paid a 'clean diesel' premium of $6,000 and that the purchase price was $22,000. The clean diesel premium was 27% of the purchase price. Assuming the vehicle depreciated by a total of $8,875 during ownership, the clean diesel feature accounted for approximately $2,400 of that depreciation (27% x $8,875). This $2,400 is an overpayment not compensated for in any sale pre-September 18, 2015." ¶ 13.

[23] *Licul v. Volkswagen Grp. of Am., Inc.*, 2013 WL 6328734, at *5 (no analysis of standing; granting motion to dismiss where plaintiff never "suffer[ed] from the defect itself during [her ownership of the vehicle]," and didn't allege that she had paid a premium); *Cahen*, 147 F. Supp. 3d

1       This point also serves to undermine VW's implicit plea that it would be unfair to demand that

2   Defendants compensate Class members here, since such a demand would require "that Defendants

3   pay a second time for the same defeat devices in *same vehicles*," VW Br. at 17 (emphasis in

4   original), *see also id.* at 2 (claiming Plaintiffs are seeking to force VW to pay "double

5   compensation"). Plaintiffs' theory of damages here is that the clean-diesel premium paid by

6   consumers was paid for performance that VW failed to provide to any and all purchasers and lessees

7   of the Vehicles. The fact that VW chose to compensate only a subset of those purchasers/lessees in

8   the Consumer Settlements is irrelevant to whether the rest of the purchasers/lessees—Class members

9   in this action—are entitled to compensation or restitution. Much less is that fact relevant to whether

10  Plaintiffs in this action allege a sufficient injury-in-fact to establish standing.

11      VW's recoupment argument similarly makes no sense in the context of Class members who

12  leased their vehicles. VW does not even attempt to explain how lessee Class members would

13  somehow have recouped their inflated monthly payments (alleged, *inter alia*, at ¶¶ 14, 30) simply

14  because their leases ended prior to the announcement of VW's fraud.[24]

15      Implicitly acknowledging that its entire "recoupment" argument lies wholly outside the

16  bounds of the Complaint, VW cites to a purported "expert" declaration submitted in conjunction with

17  final approval of the previous Consumer Settlements (which excluded Class members in this action).

18  VW Br. at 1 (quoting Declaration of Robert H. Klonoff Addressing Objections by Class Members to

19  the Proposed Volkswagen "Clean Diesel" Settlement, Dkt. 1976-1, ¶ 79). But VW does not claim to

20  be mounting a factual attack on Plaintiffs' standing, such that the Court could rely on VW's extrinsic

21  "evidence" to establish an issue of fact relevant to standing. *Cf. Safe Air for Everyone v. Meyer*, 373

22  F.3d 1035, 1039 (9th Cir. 2004) (explaining the difference between a Rule 12(b)(1) "factual" and a

---

at 971 (no standing where the "alleged economic injury rest[ed] solely upon the existence of a speculative risk of future harm" from criminal hacking).

[24] VW's argues that Plaintiffs have "not plausibly alleged that any depreciation built into the lease payments is traceable to the defeat devices." VW Br. at 29. But this is essentially the same as its argument that Plaintiffs have failed to allege causation because the Vehicles' depreciation was not "caused by" the defeat devices, and suffers from the same defects discussed *infra*, Section IV.A.2.b. Plaintiffs' clear allegations that the clean-diesel premium depreciates applies equally to purchasers and lessees, whose lease payments are alleged to have been based on an inflated initial value for the Vehicles. *E.g.* ¶¶ 14, 30.

"facial" attack on standing). Nor would Mr. Klonoff's declaration be admissible evidence for the proposition VW cites. Mr. Klonoff is a law professor with a purported expertise in "complex civil litigation and civil procedure," Dkt. 1976-1, ¶ 2, and no apparent expertise in economics (other than a bachelor's degree in political science/economics), *id.*, Appendix A. Nonetheless, VW suggests that the Court should credit Mr. Klonoff's "expert" opinion that individuals who sold their "clean diesel" vehicles prior to the disclosure of VW's fraud "suffered no economic harm, since they sold their vehicles before the announcement of the fraud and the resulting price drop of the vehicles." Dkt. 1976-1, ¶ 79. Such a factual challenge is not permissible at this stage, and on its face fails to account for key allegations in the complaint, namely (1) there is no recoupment at sale for the initial new car depreciation that included a diesel premium immediate depreciation,[25] and (2) that those who made inflated lease payments had zero recoupment at lease termination.[26]

### d. Plaintiffs' injuries are not "generalized," "subjective," or "hypothetical."

VW suggests that Plaintiffs haven't suffered any injury because the "direct" injury was to the public at large, VW Br. at 22, and cites cases holding that a "generalized harm to the . . . environment will not alone support standing," *id.* at 16. VW has it backwards: the direct harm was to Plaintiffs and Class members, who overpaid for their Vehicles; the indirect harm was to the public, who suffered from increased pollution. Moreover, as established *supra*, Section IV.A.1.a, the Complaint in this action does not allege that the relevant injury to Plaintiffs consists of harm to the environment in general or to the public at large. This is a case about consumers being defrauded into purchasing vehicles based the advertised environmental benefit of those vehicles, paying a premium for that environmental benefit, and ultimately not getting what they paid for. The environmental

---

[25] ¶ 13.

[26] *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) ("[F]actual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6). Yet, in this case, defendants' arguments in favor of affirming the dismissal of plaintiffs' federal claims rest almost entirely on factual challenges. More importantly, the district court's decision to dismiss plaintiffs' federal claims was rooted in defendants' factual assertions. In granting defendants' motions, the court assumed the existence of facts that favor defendants based on evidence outside plaintiffs' pleadings, took judicial notice of the truth of disputed factual matters, and did not construe plaintiffs' allegations in the light most favorable to plaintiffs. We therefore also reverse the district court's dismissal….").

cases VW attempts to conflate with this case are simply not on point.[27] Nor does VW's citation to the Court's 2.0-Liter Settlement Order establish as a matter of law that VW's fraud caused direct harm only to the environment, and thus that Plaintiffs did not suffer an injury-in-fact sufficient to confer standing.[28]

Nor are Plaintiffs alleging a merely subjective harm. As courts have recognized: "simply stated, . . . labels matter," and indeed "the marketing industry is based on the premise that labels matter, that consumers will choose one product over another similar product based on its label and various tangible and intangible qualities they may come to associate with a particular source." *Ross v. Sioux Honey Ass'n, Co-op.*, 2013 WL 146367, at *6 (N.D. Cal. Jan. 14, 2013) (quoting *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 328 (2011)). Here, VW marketed its Vehicles as "clean" diesels, consumers bought them and paid a premium for them on that basis, and due to VW's fraud, consumers did not get the promised "clean" vehicles. None of the cases cited by VW suggest that such an injury is too "subjective" to establish standing, and all are easily distinguishable.[29]

Finally, VW refers to the alleged clean-diesel premium as "hypothetical," VW Br. at 4, 24, 25, and attempts to discredit the Complaint's allegations of the existence of that premium by focusing on the assumptions made by Plaintiffs in their hypothetical examples—examples VW

---

[27] *Summers v. Earth Island Inst.*, 555 U.S. 488, 495 (2009) (environmental organizations lacked standing where they failed to identify any application of the regulations at issue that "threaten[ed] imminent and concrete harm to the interests of their members"); *Lujan*, 504 U.S. at 560 (environmental organizations lacked standing where members only professed vague "intent" to return to an area where certain animal species were threatened, but no specific plans that would satisfy the "actual or imminent" requirement for injury).

[28] In that Order, Dkt. 2102 at 16, the Court referred to the declaration of Andrew Kull, in which Mr. Kull opined that "[t]he direct harm caused by the TDI engines' nonconformity was not to the vehicle owner—who obtained a vehicle that performed as expected—but to the public at large." Dkt. 1784-2 ¶ 28(b). The Court's citation to that declaration, however, did not establish Mr. Kull's opinion to be fact—nor should it have, since Mr. Kull is not an economist and was not called on to offer an expert opinion as to the nature and extent of all possible damages incurred by consumers as a result of the defendants' actions. *Id.* at 22 (Mr. Kull's background as a law professor). More importantly, however, the Court's citation to Mr. Kull's declaration was in the context of approving a class settlement, and the Court specifically noted that it "need[ed] not 'reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute.'" Dkt. 2102 at 15.

[29] *Barakezyan*, 2016 WL 2840803, at *4 (no standing where plaintiff didn't allege any false representations or that vehicle failed to perform as advertised); *Laird v. Tatum*, 408 U.S. 1 (1972) (no standing where plaintiffs alleged only a subjective chilling effect on their actions as a result of challenged governmental surveillance program).

claims establish that Plaintiffs' alleged injuries are "hypothetical and speculative." *Id*. at 13-14. VW then cites cases noting that an injury-in-fact for standing purposes must not be "hypothetical." *Id*. at 15-16. But nowhere does VW explain what is "hypothetical" about the alleged clean-diesel premium; as explained above, Plaintiffs not only allege that the clean-diesel premium exists,[30] but allege specific facts supporting its existence.[31] Nor do any of the cases cited by VW undermine the fact that those allegations establish an injury-in-fact, or suggest that the mere use of hypothetical examples in a Complaint somehow renders its allegations of concrete harm "hypothetical" for standing purposes.[32]

### 2.  Plaintiffs' injuries are "fairly traceable" to Defendants' conduct.

#### a.  Plaintiffs' allegations establish causation for standing purposes.

"[C]ourts have consistently held that the Article III standard for showing that an injury is 'fairly traceable' to the defendant is 'relatively modest.'" *Phillips v. Apple Inc*., 2016 WL 5846992, at *8 (quoting *Bennett v. Spear*, 520 U.S. 154, 171 (1997)). "To survive a motion to dismiss for lack of constitutional standing, plaintiffs must establish a 'line of causation' between defendants' action and their alleged harm that is more than 'attenuated.'" *Maya*, 658 F.3d at 1070 (quoting *Allen v. Wright*, 468 U.S. 737, 757 (1984)). "A causal chain does not fail simply because it has several 'links,' provided those links are 'not hypothetical or tenuous' and remain 'plausib[le].'" *Id*. (quoting *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002). In other words, "[w]hat matters is not the length of the chain of causation, but rather the 'plausibility of the links that comprise the chain." *Id*. (quoting *Autolog Corp. v. Regan*, 731 F.2d 25, 31 (D.C.Cir.1984).

Where plaintiffs allege that they would not have purchased a product but for the defendant's actions, they allege a sufficient causal link to established standing. Thus, in *Maya*, where plaintiffs alleged "that they would not have purchased their homes had there been proper disclosure of

---

[30] *See supra*, n.10.

[31] *See supra*, n.11.

[32] *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) (remanding standing question where plaintiff alleged "people search engine" company disseminated false information about him); *Schmier*, 279 F.3d 821 (plaintiff did not allege that he had himself ever been adversely affected by the challenged rule, or even that he would be in the future); *Lujan*, 504 U.S. 555 (*see supra*, note 27).

defendants' lending practices," the Court found that plaintiffs had alleged "a direct causal link between defendants' allegedly faulty disclosure and plaintiffs' injuries." *Maya*, 658 F.3d at 1070; *see also Bigelow*, 2014 WL 1028881, at *4 (plaintiff had pled sufficient causation for standing where he attributed to defendant the "mislabeling which led him to purchase products he would not have otherwise purchased"); *cf. Davidson v. Kimberly-Clark Corp.*, 873 F.3d 1103, 1111-12 (9th Cir. 2017) ("a consumer's allegation that 'she would not have bought the product but for the misrepresentation . . . is sufficient to allege causation . . . [and] to allege economic injury.'") (quoting *Kwikset*, 51 Cal. 4th at 330).

Here, each Plaintiff alleges that he or she "would not have purchased [or leased] [their] Vehicle[s] . . . had Defendants not concealed the illegal cheat device," ¶¶ 20, 25, 28, 33, 40, 45, 52, 58, 70, 73, 78, 82, 86, 99, 104, 109, 119, 125, 132, 150, and/or that they "would not have purchased" the Vehicles "had [he or she] known the true emission levels and gas mileage," ¶¶ 58, 63, 66, 70, 78, 82, 95, 142, 146. Plaintiffs also allege generally that "Class members would not have purchased Class Vehicles were it not for Defendants' misrepresentations and fraudulent conduct," ¶ 384, and that Defendants' misrepresentations were "material" both to government regulators and to Plaintiffs and Class members, *e.g.*, ¶¶ 502, 528, 545, 579, and that the facts were "material" because "[a] vehicle made by a reputable manufacturer of environmentally clean vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest manufacturer of polluting vehicles that conceals the amount its car pollutes rather than make environmentally friendly vehicles," *e.g.*, ¶¶ 579, 599, 613. Indeed, Plaintiffs here go further than simply alleging they would not have purchased their Vehicles but for Defendants' conduct—they allege that VW *could not* have legally sold any of the Vehicles without complying with emission regulations, ¶¶ 188-190 (emphasis added); *see also* ¶ 10 ("[n]o Plaintiff or Class member would—*or could*—have purchased the Class Vehicles but for Defendants' fraudulent scheme") ¶ 7 (emphasis added); ¶ 384 ("[n]one of the sales or leases to Class members could have been completed absent Defendants' fraudulent conduct"); ¶ 7 (as a result of Defendants' conduct, "there were over half a million cars on American roads with illegal emission systems that never should have been leased or sold, and would not have [been], but for Volkswagen's fraudulently obtained [certificates of conformity with emissions regulations]").

1      Plaintiffs allegations are more than sufficient to establish that their injuries are "fairly

2    traceable" to Defendants' actions.

3            **b.    VW's causation arguments fail.**

4      Although the allegations above suffice, standing alone, to support that Plaintiffs' injury-in-

5    fact is "fairly traceable" to Defendants' conduct, VW insists on muddying the waters with a jumble

6    of arguments about causal links that are supposedly missing from the Complaint. All of these

7    arguments miss their marks, many of them for the same basic reason: VW ignores the most critical

8    causal link alleged in the Complaint, which is the fact that VW's misconduct caused Plaintiffs to pay

9    a clean-diesel premium that they would not have paid but for VW's fraud—a premium that resulted

10   in an initial purchase value that was artificially inflated.

11     *First*, VW argues that Plaintiffs do not sufficiently allege that the clean-diesel premium "is

12   traceable to the defeat devices, as opposed to other characteristics of the vehicles." VW Br. at 28; *see*

13   *also id.* at 23, 25 ("Tying the 'premium' to NOx emissions is a critical element missing from the

14   Complaint . . . ."). In other words, VW argues, Plaintiffs should bear the burden of alleging that a

15   specific portion of the clean-diesel premium is attributable to reduced NOx emissions, as opposed to

16   the "other benefits of the diesel vehicles," *id.* at 25. This argument is flawed for two reasons. First,

17   the argument misunderstands the relevant causal connection for purposes of standing, which is not

18   the connection between lower NOx emissions and the clean-diesel premium, but between

19   Defendants' misrepresentations and Plaintiffs' injuries. The latter connection is clearly alleged in the

20   Complaint. *See supra*, Section IV.A.2.a. Second, VW misconstrues the Complaint, which alleges not

21   that VW promised consumers a collection of an unrelated, discrete features but rather that VW

22   promised a *combination of features* that all fell under the rubric of "clean diesel." Although the

23   environmental performance of the Vehicles was their "identifying characteristic," ¶ 380, VW didn't

24   just promise consumers that they could have "clean" (*i.e.*, low-emission) vehicles—it promised that

25   they could have clean vehicles *without sacrificing either fuel efficiency or powerful performance*.

26   The Complaint is replete with quotations from VW's own marketing materials to support the

27   allegation that the "linchpin of [VW's plan to increase its U.S. sales] was increasing sales of 'diesel-

28

powered cars . . . [and] *promising high mileage and low emissions without sacrificing performance*.'" ¶ 427 (emphasis added).[33] These were false promises, only made possible by the existence of the "cheat device designed to bypass emissions standards and deceive consumers and regulators"; in reality, "the Vehicle[s] could not deliver the advertised *combination* of low emissions, high performance, and fuel economy." *E.g.*, ¶¶ 20, 25, 29 (emphasis added).

Moreover, *even if* it were critical to allege a causal connection between low NOx emissions and the clean-diesel premium paid by Plaintiffs and Class members, the Complaint does exactly that, alleging that VW touted its ability to meet emissions standards as a key part of the Vehicles' "clean diesel" performance, *e.g.*, ¶¶ 285, 302, 314, and that consumers purchased the Vehicles specifically for the promised environmental benefits, *e.g.*, ¶ 6 ("[c]onsumers believed Volkswagen and bought . . . 'clean' diesel vehicles in record numbers"), ¶ 379 ("Plaintiffs and Class members bought or leased the Class Vehicles based on [Defendants' claims, including claims of low emissions]"); ¶¶ 25, 28, 33, 39 (Plaintiffs' individual allegations that they purchased their Vehicles for the environmental benefits).[34] To the extent VW suggests that Plaintiffs are required to allege the exact portion of the clean-diesel premium attributable to lower NOx emissions, VW's argument is a red herring. Even if proving damages requires parsing the various aspects of the clean-diesel premium— which Plaintiffs believe would be unnecessary—such an analysis will be conducted by experts at later stages of the litigation; the law does not require that Plaintiffs allege that level of detail only to establish standing—nor does VW cite any authority to support such a requirement at the pleadings stage, where the Court is required to "construe the pleadings in the light most favorable to [Plaintiffs]." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).[35]

---

[33] *See, e.g.*, ¶ 303 (brochure touting the TDI engine for its "quickness, low emissions, and fuel efficiency"); ¶ 304 (brochure touting TDI engine's torque, "impressive fuel efficiency," and "fewer sooty emissions"); ¶ 305 (brochure touting high miles-per-gallon numbers, "turbocharged performance," and lower emissions).

[34] Plaintiffs also allege facts that suggest that the clean-diesel premium cannot be explained simply on the basis of the fact that the Vehicles were purported to get better gas mileage than their gasoline counterparts. ¶ 379 ("Though the 'clean' diesel model achieves greater [gas] mileage, the premium—some $5,755—would buy enough gas to drive the non-diesel model approximately 88,000 miles at current gas prices.").

[35] Indeed, not only are Plaintiffs not required to allege the detailed contours of the clean-diesel premium, but Plaintiffs' standing does not even hinge on the existence of that premium *at all*. It is

1    *Second*, VW argues that Plaintiffs fail to establish causation for standing because VW's

2    defeat devices did not cause the depreciation of Plaintiffs' Vehicles, which is simply an "economic

3    fact" of owning a vehicle. VW Br. at 26-28. Again, this misses the point. Plaintiffs do not allege that

4    VW's defeat devices caused their Vehicles to depreciate but rather allege that VW's

5    misrepresentations caused them to purchase vehicles that they otherwise would not (and indeed,

6    legally *could* not) have purchased, or at the very least to pay a clean-diesel premium that they would

7    not have paid but for VW's misrepresentations. Those allegations, by themselves, suffice to confer

8    standing. Although Plaintiffs allege that the "depreciation on [the clean diesel] premium cannot be

9    recovered in a sale," ¶ 13,[36] that fact is only relevant to Plaintiffs' ability to recoup any amount of the

10   clean-diesel premium in a subsequent sale and has nothing to do with whether the original injury,

11   which occurred at purchase, is fairly traceable to VW's criminal conduct.[37] In any case, Plaintiffs do

12   not allege that the entire amount by which their Vehicles depreciated was attributable to VW's

13   misconduct—only that "[a] share of that overall depreciation is allocable to the premium that

14   consumers paid for the 'clean diesel' feature." *E.g.*, ¶ 21.[38]

15   _____

16   more than sufficient that Plaintiffs allege that VW advertised the Vehicles as "clean," *e.g.*, ¶¶ 12,
     289; that it specifically tied its claims of "cleanliness" to the fact that the Vehicles met or exceeded

17   emissions standards, *e.g.*, ¶¶ 285, 302, 314; that those claims were blatant and admitted
     misrepresentations, because VW knew that its misrepresentations to regulators meant that in fact the

18   Vehicles did not meet emissions standards, and were thus not "clean," *e.g.*, ¶¶ 10, 386; and that, as a
     result of VW's misrepresentations, Plaintiffs and Class members purchased or leased Vehicles that

19   they would otherwise not have purchased, *e.g.* ¶¶ 10, 20, 25.

20   [36] VW makes much of what amounts to a mathematical error in one of the Complaint's example
     calculations, claiming that Plaintiffs have conceded that the clean-diesel premium does not

21   depreciate because "[the Complaint's] own hypothetical calculations ascribe the same $6,000
     assumed premium to a newly purchased 2009 Jetta TDI and to a 2009 Jetta TDI that was purchased

22   after three years of leased use, with no reduction in the amount of the 'premium' due to
     depreciation." VW Br. at 27 (emphasis removed). Far from "demonstrat[ing]" the "fallacious[ness]"

23   of Plaintiffs' allegations, *id.* at 27, the use of the same premium amount in those two examples was a
     simple mathematical error, resulting in part from the fact that the Complaint only attempts to provide

24   simple *examples* of how damages might be calculated *given a hypothetical amount for the clean-
     diesel premium*. The Complaint does not purport to calculate each Plaintiffs' actual damages, or the

25   amount of the clean-diesel premium, with specificity—nor does VW cite any authority suggesting
     such a calculation is required in order to establish standing or survive a motion to dismiss.

26   [37] *See also* discussion *infra*, Section IV.C.1 at 32.

27   [38] VW cites to this Court's Order giving final approval to the 3.0-Liter Consumer Settlement, in
     which the Court noted that "[a]ll cars depreciate over time." VW Br. at 26 (quoting Dkt. 3229 at 20).

28   VW suggests that the Court established that losses related to depreciation are "unrelated to the
     conduct at issue in this case." *Id.* This suggestion is misleading. The Court in that Order was simply

1          *Third*, VW argues that the finance charges paid by some Plaintiffs are not "fairly traceable"

2    to Defendants' alleged conduct because Plaintiffs' "choice to use financing, and the specific

3    financing terms they were given . . . can be attributed to countless factors unrelated to Defendants'

4    alleged misconduct." VW Br. at 28. But as with depreciation, Plaintiffs do not allege that the entirety

5    of the finance charges they paid are attributable to Defendants' conduct—only the portion of their

6    finance charges *that they wouldn't have paid but for Defendants' fraud*—which is to say, the amount

7    by which their finance charges were inflated as a result of the clean-diesel premium they paid. Nor

8    does VW's only cited authority suggest, much less hold, that finance charges are an inappropriate

9    category of damages merely because the overall amount of the charges is affected by factors other

10    than Defendants' misconduct.[39]

11          *Finally*, VW argues that Plaintiffs who leased their Vehicles did not suffer an injury "fairly

12    traceable" to Defendants' fraud because (a) Plaintiffs do not allege that their lease agreements "were

13    priced on an assumption that any alleged premium tied to NOx emissions would depreciate," and (b)

14    acquisition and termination fees would have been paid for leasing "any vehicle," and were not

15    alleged to have been "in any way inflated as a result of the defeat devices." VW Br. at 29-30. Like

16    VW's other arguments, this simply ignores Plaintiffs' allegations about the nature of the clean-diesel

17    premium. Plaintiffs allege that "[l]ease rates are based on a vehicle's 'residual value,'" which is "in

18    turn, based on the vehicle's initial purchase value—a value that, in the case of the Class Vehicles,

19    included the inflated 'clean diesel' premium," and that "[t]hus, each payment made by lessee Class

20    members over the course of their leases contained an amount directly attributable to the 'clean

21    diesel' premium, . . . which they paid for a feature they did not receive." ¶ 14. Plaintiffs also allege

22

23    responding to an objection related to extensions of time allowed to VW under the Settlement; in no way did the Court hold as a matter of law that no injuries based on depreciation could be related to

24    VW's conduct here—much less did it hold so in the context of the specific allegations in this case, *i.e.*, that VW charged a premium for its "clean diesel" vehicles, and that that premium was

25    unrecoupable in a subsequent sale due to depreciation.

26        [39] *Kaing v. Pulte Homes, Inc.*, 2010 WL 625365, at *6 (N.D. Cal. Feb. 18, 2010) (injury was not fairly traceable to defendants' acts where it depended on a variety of other factors not in defendants'

27    control, including general downturn in housing market); *compare Maya*, 658 F.3d at 1070 (under facts very similar to those in *Kaing*, rejecting defendants' attempt to require proximate causation in

28    the standing context, and noting that "[w]hat matters is not the length of the chain of causation, but rather the plausibility of the links that comprise the chain").

1   that they "would not have leased the[ir] Vehicle[s] had Defendants not concealed the illegal cheat

2   device," *e.g.* ¶ 29, and "would never have paid [lease-related fees to VW] had [they] been informed

3   of the fraud either before or during the course of the Lease," *e.g.*, ¶ 32. These allegations are more

4   than sufficient to establish standing, which necessitates only that Plaintiffs allege they would not

5   have purchased a product, or would have paid less for it, but for Defendants' actions. *See Maya*, 658

6   F.3d at 1070.

7          In short, Plaintiffs allege that they paid a premium for a feature they did not receive; that they

8   would not have paid that premium, or even purchased the Vehicles, but for Defendants' fraud; and

9   that as a result, they overpaid for their Vehicles. Plaintiffs' allegations are more than suffice to

10  establish Article III standing.

11  **B.      The Clean Air Act does not preempt Plaintiffs' state law claims.**

12         In moving to dismiss on preemption grounds, *see* VW Br. at 37-40, VW seeks immunity for

13  false promises that it voluntarily made to consumers and its concealment of material facts. Under

14  VW's interpretation of the Clean Air Act ("CAA"), a manufacturer can promise consumers that its

15  vehicles are clean, low emitting, and EPA-compliant, and collect a premium for these purported

16  features. When these promises—which no regulator authorized or forced VW to make—are proved

17  to be false and misleading, the manufacturer cannot hide behind CAA preemption. No one forced

18  VW to lie about its emissions compliance and the CAA does not give VW immunity for its lies.

19         VW does not meet its burden on this affirmative defense.[40] As Judge Berg said in a hearing

20  on motions to dismiss in another similar defeat-device case, "[t]hat seems like fraud to me, it seems

21  like it's a pretty bad misrepresentation if somebody is selling me something with a device in it that

22  hides what it's really doing. That sounds crooked." Transcript of Oct. 11, 2017 Hearing on Motions

23  to Dismiss, ECF No. 46 at 24, *Bledsoe v. FCA US LLC*, No. 16-cv-14024-TGB-RSW (E.D. Mich.).

24

25         [40] Federal preemption is an affirmative defense for which the defendants bear the burden of
    proof. "Dismissal under Rule 12(b)(6) on the basis of an affirmative defense is proper only if the
26  defendant shows some obvious bar to securing relief on the face of the complaint." *ASARCO, LLC
    v. Union Pac. R.R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014); *see also Sams v. Yahoo! Inc.*, 713 F.3d
27  1175, 1179 (9th Cir. 2013) ("the assertion of an affirmative defense may be considered properly on a
    motion to dismiss where the 'allegations in the complaint suffice to establish' the defense") (quoting
28  *Jones v. Bock*, 549 U.S. 199, 215 (2007)).

Despite its alleged fraud, VW effectively contends that Plaintiffs lack *any* means to obtain compensation by admitting that "[t]here is no private right of action for compensatory damages under the CAA." VW Br. at 9. As shown below, VW is wrong.

### 1. Plaintiffs' state law claims are not expressly preempted.

VW first erroneously contends that the CAA expressly preempts Plaintiffs' state-law claims. VW Br. at 37-39. Section 209 of the CAA provides that "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles." 42 U.S.C. § 7543(a). VW ignores the words "[n]o State or any political subdivision shall . . . attempt to enforce any standard" throughout its brief, asking whether Plaintiffs' claims are preempted "because each claim relates to emissions standards for new motor vehicles." VW Br. at 3.[41] But the CAA does *not* preempt claims that merely relate to the control of emissions from new motor vehicles. It preempts claims only if *a State or one of its subdivisions* "adopts or attempts to enforce any standard" relating to the control of emissions from new motor vehicles. Moreover, the CAA recognizes the distinction between state bodies and private individuals, providing that "Nothing in this section shall restrict any right which *any person (or class of persons)* may have under *any statute or common law* to seek enforcement of any emission standard or limitation *or to seek any other relief*." 42 U.S.C. § 7604(e) (emphasis added).[42] Here, Plaintiffs are private individuals seeking relief under state laws—not a state body trying to enforce emission-control standards; thus, Section 209 does not apply to Plaintiffs' claims.

Ignoring the fact that Section 209 categorically does not apply to Plaintiffs' claims as private individuals, VW proceeds to misleadingly contend that the "words 'relating to' are indicative of a broad preemptive purpose.'" VW Br. at 38 (quoting *Morales v. Trans World Airlines*, *Inc*., 504 U.S.

---

[41] Similarly, Volkswagen misleadingly asserts that Plaintiffs' claims are preempted because "each claim 'relat[es] to the control of emissions from new motor vehicles.' 42 U.S.C. § 7543(a)." VW Br. at 7. *See id*. ("Because the Pre-NOV Plaintiffs' claims relate to motor vehicle emission standards, their claims are field-preempted….").

[42] In addition, the Senate explained that this "specifically preserve[s] any rights or remedies under any other law. So if damages could be shown, other remedies would remain available." S. Rep. No. 91-1196, at 38 (1970). In other words, Congress had a "clear and manifest" intent *not* to preempt the private state law causes of action alleged here.

374, 383 (1992)). But VW can only argue this by reading the word "standard" out of the language of Section 209. That is not how courts construe the CAA. In *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.* ("*South Coast*"), 541 U.S. 246 (2004), the Court ruled that the term "standard" contemplates "numerical" limits on emissions or equipment and design requirements related to emissions control, *id.* at 253, or a "command, accompanied by sanctions*,* that certain purchasers may buy only vehicles with particular emission characteristics," *id.* at 255. As this Court explained in dismissing claims by the *State* of Wyoming against VW, the purpose of Section 209 is not to preempt any claim "relating to" emissions standards, but to "avoid the 'anarchic patchwork of federal and state regulatory programs' that could otherwise result if each State were free to adopt or enforce new motor vehicle emission standards." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 264 F. Supp. 3d 1040, 1050 (N.D. Cal. 2017) ("*Wyoming Order*") (quoting *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1079 (D.C. Cir. 1996)).[43]

Thus, VW's reliance on *Morales* is misplaced. In *Morales*, the Supreme Court held that the Airline Deregulation Act preempted "state regulation of fare advertisements," because "state restrictions on fare advertising have the forbidden significant effect upon fares." 504 U.S. at 380, 388. Here, in contrast, Plaintiffs' claim for deceptive conduct cannot have *any* effect on emissions standards. Plaintiffs simply do not seek any ruling that would set any standard for emissions.

Similarly, in *Jensen Family Farms, Inc.*, 644 F.3d at 936, the Ninth Circuit distinguished *Morales* in holding that the CAA did not preempt the Monterey pollution control district from "enforcing rules that regulate diesel-powered engines." The court explained that "there is little similarity between the examples laid out in *South Coast* and the registration and fee regime established by [the rules at issue in *Jensen*, which] do not require that a vehicle or engine emit below a certain level of a given pollutant. . . . [but] simply require owners to register and pay fees for

---

[43] This Court cited the same two examples of standards set forth in *South Coast*. As to numerical limits on emissions, this Court stated that the "first example is a 'regulation requiring that vehicles or engines not emit more than a certain amount of a given pollutant.'" *Wyoming Order*, 264 F. Supp. 3d at 1050 (citation omitted). As to a command that vehicles have particular emissions characteristics, this Court stated that the "second [example] is a 'requirement[ ] that a vehicle or engine be equipped with a certain type of pollution-control device, or that a vehicle or engine include some other design feature relating to emissions control.'" *Id.* (citation omitted).

certain kinds of diesel engines." *Id.* at 940. The court in *Jensen* also rejected a broad reading of "relating to," because "[u]nder [that] logic, every rule promulgated by the District relating to nonroad engines and vehicles would be preempted by § 209(e). Such a broad reading of the 'relating to' clause would render inconsequential the analysis contained in *South Coast*, which clarified the breadth of the word 'standard.'" *Id.* at 941. And the Court explained that *Morales* "left room . . . for state actions that are 'too tenuous, remote, or peripheral . . . to have pre-emptive effect.'" *Id.* (quoting *Morales*, 504 U.S. at 390).

Consistent with *South Coast* and *Jensen*, Plaintiffs' claims under consumer protection statutes (¶¶ 519-871) do not adopt or attempt to enforce emissions control standards; rather, they rely on duties not to deceive or fraudulently conceal, and allege harm from breaches of those duties. Courts consistently hold that the CAA does not preempt such claims of deception. For example, in *Counts v. GM, LLC*, 237 F. Supp. 3d 572 (E.D. Mich. 2017), the court held that the CAA did not preempt the plaintiffs' claims against GM for deceptively marketing vehicles that contained defeat devices. The court explained that the claims "focus on 'the deceit about compliance, rather than the need to enforce compliance,'" and that the claims were "not, as GM contends, contingent on proving that GM is in noncompliance with EPA emissions regulations." *Id.* at 592. The court held that there could be "no doubt that proving noncompliance would bolster Plaintiffs' claims, but Plaintiffs need not make that showing to prevail. Accordingly, Plaintiffs' claims are not preempted by the CAA." *Id*. Similarly, the court in the *Virginia Clean Diesel Action* held that the CAA did not preempt consumer fraud claims that "ultimately rest on and seek remediation of injuries arising from misrepresentations and concealment of material facts made to (or hidden from) the Plaintiffs about the compliance, efficiency, and technology of their vehicles." 2016 WL 5347198, at *5; *accord*, *In re Caterpillar, Inc., C13 and C15 Engine Prods. Liab. Litig.*, 2015 WL 4591236, at *13 n.17 (D.N.J. July 29, 2015) (fraud claims not preempted because the "duty not to deceive as embodied by the various state consumer protection laws upon which Plaintiffs rely has nothing to do with emissions control systems").[44] The same analysis applies to Plaintiffs' claims here.

---

[44] *See also Altria Grp., Inc. v. Good*, 555 U.S. 70, 81 (2008) (consumer protection claims not preempted by Federal Cigarette Labeling and Advertising Act because the duty imposed by state law

In a vain attempt to support its preemption argument, VW incorrectly asserts that each state-law claim "rests on allegations that the Volkswagen Defendants violated EPA regulations under the CAA that govern the vehicle emissions certification process." VW Br. at 7. In fact, Plaintiffs' state-law claims rest on VW's *misrepresentations*, not violations of EPA regulations. As this Court explained in *Napleton*, the "scheme, as alleged, was to misrepresent to U.S. regulators and the public that Volkswagen's 'clean diesel' vehicles complied with U.S. emission standards and were environmentally friendly." 2017 WL 4890594, at *13 (citing Second Amended Complaint at ¶¶ 408-09).[45] Indeed, in *Napleton*, this Court did not refer *at all* to violations of EPA regulations, for the simple reason that—like Plaintiffs' claims here—the claims of the plaintiffs in that matter rest on misrepresentations, not violations of regulations.

The cases cited by VW are inapposite. In *Jackson v. GMC*, 770 F. Supp. 2d 570 (S.D.N.Y. 2011), *aff'd sub nom.*, *Butnik v. GMC*, 472 F. App'x 80 (2d Cir. 2012), the plaintiffs based their personal-injury claims for the ingestion of harmful diesel exhaust fumes directly on violations of the CAA—not on any misrepresentation by the defendant—alleging that "the design of Defendants' buses violated the emissions standards set out in the CAA"). In *Felix v. Volkswagen Grp. of Am., Inc.*, the court distinguished *Jackson*, holding that the CAA did not preempt claims that "VW misrepresented its vehicles' high performance capabilities while asserting each vehicle fully complied with federal emissions standards set by the Environmental Protection Agency." 2017 WL 3013080, at *1 (N.J. App. Div. July 17, 2017) (*per curiam*). The court explained, "we find *Jackson*, which alleged direct violations of EPA standards as a predicate for claims of personal injuries, to be entirely distinguishable," *id*. at *5, and explaining it would instead "follow the more persuasive reasoning advanced by courts in two other cases"—*i.e.*, *Counts* and the *Virginia Clean Diesel Action* decision. *Id*. at *5-6.

---

"has nothing to do with smoking and health"); *Bates v. Dow Agrosciences L.L.C.*, 544 U.S. 431, 444 (2005) (rules requiring manufacturers to honor express warranties or other contractual commitments were not requirements for "labeling or packaging" and therefore not preempted).

[45] Plaintiffs allegations in paragraphs 473-74 of the Complaint in this action are identical to the allegations in paragraphs 408-09 of the *Napleton* Second Amended Complaint.

VW also relies on this Court's ruling in its *Wyoming Order*, but ignores the fact that the plaintiff there was the State of Wyoming, not consumers. This Court explained that Wyoming was effectively "seek[ing] to 'enforce [a] standard relating to the control of emissions from new motor vehicles,'" and that "[b]ecause the [CAA] prohibits States from enforcing such standards, Wyoming's claims cannot go forward." 264 F. Supp. 3d at 1057 (quoting 42 U.S.C. § 7543(a)). Distinguishing *Counts*, this Court noted that there the court had relied on "a distinction between attempts to enforce EPA regulations (which are preempted) and attempts to hold GM liable for misrepresentations it made to consumers about its vehicles' emissions more generally (which the court held were not preempted)." *Id.* at 1056. This Court explained that "Wyoming is not attempting to hold Volkswagen liable for deceptive statements made to the State's residents; the State is instead attempting to hold Volkswagen liable for using a defeat device in its vehicles." *Id.* Plaintiffs' claims here are like the claims in *Jensen*, *Counts*, the *Virginia Clean Diesel Action*, and *Felix*—not the claims made by the State of Wyoming.

**2. Plaintiffs' state claims are not impliedly preempted, because Congress did not preempt the field of emissions regulation, and VW can comply with both federal and state law.**

There is no merit to VW's contention that Plaintiffs' state law claims are impliedly preempted. VW Br. at 39-40. As Judge Simandle noted in *Caterpillar*, "the [CAA] savings clause suggests that Congress did not intend to occupy the entire field of motor vehicle regulation," and that instead it "explicitly contemplates continued state involvement in the regulation of motor vehicles." 2015 WL 4591236, at *14. Because Plaintiffs' claims do not hinge on compliance with EPA standards, there is no direct conflict with the federal regulatory scheme that requires compliance. *Id.* at *14-15; *see also Felix*, 2017 WL 3013080, at *7 (same). It is possible for VW to both comply with the EPAs requirements under the CAA and not to make omissions and misrepresentations about having done so—a point VW does not dispute. For that reason, there is no merit to VW's claim that Plaintiffs' state-law claims could result in jury decisions that would create "direct conflicts with the determinations of the EPA and of sister states." VW Br. at 39. VW does not and cannot cite any EPA

1    determination that would conflict with a jury finding that VW made omissions and

2    misrepresentations about the Vehicles and their compliance with emission regulations.

3         Finally, VW erroneously asserts that Plaintiffs' claims are "preempted because they seek to

4    impose remedies beyond those provided by federal law for the same conduct that the EPA is charged

5    with addressing." VW Br. at 39. But VW admits that "[t]here is no private right of action for

6    compensatory damages under the CAA." *Id.* at 9. And VW does not and cannot contend that the EPA

7    can award compensatory damages to Plaintiffs for VW's fraud. So under VW's view, Congress

8    intended to deprive Plaintiffs of ***any*** means of seeking compensation for fraud any time that fraud is

9    related in some way to emissions standards. But as the Supreme Court has stated in a similar context,

10   "[i]t is, to say the least, 'difficult to believe that Congress would, without comment, remove all

11   means of judicial recourse for those injured by illegal conduct,' and it would take language much

12   plainer than the text of § 360k to convince us that Congress intended that result." *Medtronic, Inc. v.*

13   *Lohr*, 518 U.S. 470, 487 (1996) (quoting *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 251 (1984)).

14   Similarly, nothing in the CAA supports VW's argument that Congress, without comment, has

15   removed all judicial recourse for Plaintiffs' state-law claims.

16   **C.   Plaintiffs adequately allege their state law claims.**

17        As the Ninth Circuit has explained, "In a Rule 12(b)(6) motion, the court evaluates the merits

18   of the claims by accepting all allegations in the complaint as true, viewing them in the light most

19   favorable to the plaintiffs, and determining whether they state a claim as a matter of law…. The

20   defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*,

21   404 F.3d 744, 750 (9th Cir. 2005).  VW has failed to meet its burden. Indeed, this Court should not

22   consider any of VW's arguments for dismissing Plaintiffs' state-law claims. VW makes only cursory

23   arguments, citing to an Appendix, Dkt. 4534-1, which lists cases with virtually no discussion. The

24   Court should refuse to consider that Appendix as flouting the page limits set by the Court for VW's

25   Motion.[46]

26

27        [46] This Court routinely rejects attempts to exceed allowable page limits using appendices. *See Jonna Corp. v. City of Sunnyvale, Cal.* 2017 WL 2617983, at *2 (N.D. Cal. June 16, 2017) (striking appendix "as argument in excess of the page limit"); *Todd v. Tempur-Sealy Int'l, Inc.,* 2016 WL 5746364, at *4 n.3 (N.D. Cal. Sept. 30, 2016), *reconsideration denied*, 2017 WL 2833997 (N.D. Cal.

28

1   And in any event, VW's arguments are incorrect, for reasons set forth below.

2   **1.   The Complaint adequately alleges damages, proximate causation, and reliance.**

3   VW has failed to meet its burden of articulating why Plaintiffs' Complaint fails to sufficiently

4   allege damages, proximate cause, or reliance. Indeed, with respect to damages and proximate cause,

5   VW's Motion fails to even identify which claims it asserts are insufficiently pled, save in vague

6   references to its Appendix.

7   The Complaint alleges (1) that VW marketed its "clean diesel" Vehicles on the basis of their

8   environmental performance,[47] (2) that VW charged a premium for their "clean diesel" Vehicles,[48] (3)

9   that Class members did not receive the "clean diesel" for which they paid a premium,[49] (4) that Class

10   members could not have recouped the premium they paid even if they re-sold their Vehicles,[50] (5)

11   that Plaintiffs and Class members relied on VW's misrepresentations, which were material to

12   consumers' decisions to purchase the Vehicles,[51] and (6) for each claim brought in the Complaint,

13   that Plaintiffs and Class members suffered damages as a direct and proximate result of Defendants'

---

17   June 30, 2017) (arguments in appendices were "an unsubtle vehicle for deliberately circumventing the page limits," "violate[d] the Court's rules[,] and diminish[ed] the effectiveness of the parties' advocacy"). Nevertheless, out of an abundance of caution, Plaintiffs have submitted a Responsive Appendix in the same format as VW's Appendix, with specific responses to each of VW's "arguments" (to the extent those arguments could be gleaned from the skeletal format of their appendix).

[47] *See, e.g.*, ¶¶ 12, 285, 289, 380; *supra*, n.9.

[48] *See, e.g.*, ¶¶ 10, 379, 6, 230, 12, 380; *supra*, nn.10 & 11

[49] *See, e.g.*, ¶¶ 380, 10, 12, 24, 27, 38, 51, 57, 62, 69, 72, 77, 81, 85, 94, 98, 103, 108, 113, 118, 124, 131, 141, 145, 149, 154; *supra*, n.12.

[50] *See, e.g.*, ¶¶ 382, 13, 24, 27, 38, 51, 57, 62, 69, 72, 77, 81, 85, 94, 98, 103, 108, 113, 118, 124, 131, 141, 145, 149, 154; *supra*, n.20.

[51] *See, e.g.*, ¶ 6 ("[c]onsumers believed Volkswagen and bought . . . 'clean' diesel vehicles in record numbers"), ¶ 379 ("Plaintiffs and Class members bought or leased the Class Vehicles based on [Defendants' claims, including claims of low emissions]"), ¶ 502 (" . . . Plaintiffs, along with tens of thousands of other consumers, relied upon Defendants' representations and omissions . . ."); ¶ 568 (" . . . Plaintiffs and Class members relied on the misrepresentations and/or omissions of VW with respect to the environmental and other performance of the Class Vehicles."); ¶¶ 502, 528, 545, 579, 599, 613 (facts misrepresented by VW were "material" to consumers' purchasing decisions, as well as to government regulators).

1   conduct.[52] These allegations are more than sufficient to plead damages, proximate cause, and

2   reliance, and VW's gaunt arguments to the contrary do not establish otherwise.[53]

3       *First*, VW incorrectly argues that "the mere presence of an illegal feature in a product is

4   insufficient to constitute damages unless a plaintiff was actually injured." VW Br. at 41. Again, VW

5   ignores the Complaint's allegations that Plaintiffs were injured when they paid a premium for a

6   feature they did not receive, and when they purchased Vehicles that they would not have (and could

7   not have) purchased but for VW's fraud. *See supra* pp. 10 & 31-32. Nor do either of VW's cited

8   authorities suggest that allegations of this type of economic injury are somehow insufficient to

9   adequately plead damages.[54]

10      *Second*, VW erroneously contends that "Plaintiffs have not adequately pled any premium

11  related to NOx emissions, and even if they had, they would have recovered that amount when they

12  sold their vehicles." VW Br. at 41-42. As established above in the discussion on Article III standing,

13  VW's argument simply ignores the Complaint's allegations (1) that the clean-diesel premium is

14  directly linked to VW's promises about low emissions, *see supra*, Section IV.A.2.b at p. 21, and

15  ¶¶ 6, 25, 28, 33, 39, 379, 385, 302, 314; and (2) that Plaintiffs and Class members could not have

16

17      [52] *See, e.g.*, ¶ 507 (RICO), ¶ 518 (Magnuson-Moss), ¶¶ 533, 549, 560, 568, 581, 601, 618, 632
        633, 651, 666, 683, 694, 710, 722, 740, 757, 773, 789, 805, 820, 838, 854, 870 (state law claims).

18      [53] Nor do any of VW's general authorities—citing the unremarkable propositions that pleading
19      damages is different from pleading standing, and that tort claims require a cognizable injury—
        require this Court to find that Plaintiffs have inadequately pled damages. *See Krottner v. Starbucks
20      Corp.*, 406 F. App'x 129 (9th Cir. 2010) (plaintiffs failed to state claim for negligence where alleged
        injuries only "stem[med] from the danger of future harm" from potential misuse of stolen data);
21      *Enslin v. Coca-Cola Co.*, 136 F. Supp. 3d 654 (E.D. Pa. 2015) (no discussion of damages; no
        consumer protection or RICO claims); *Doe v. Chao*, 540 U.S. 614 (2004) (plaintiff did not allege any
22      actual damages, claiming only statutory damages); *Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d
        Cir. 2006) (no damages discussion; plaintiffs alleged sufficient injury to have Article III standing); *In
23      re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1017 (7th Cir. 2002) (reversing district court's
        decision to apply law of states where defendants were headquartered rather than laws of states where
24      product was purchased); *Bastian v. Petren Res. Corp.*, 892 F.2d 680 (7th Cir. 1990) (analyzing "loss
        causation" in context of a securities fraud claim); *Shobert v. Ill. DOT*, 304 F.3d 725 (7th Cir. 2002)
25      (post-trial finding that challenged jury instruction imprecisely conflated "injury" and "damages," but
        that no prejudice resulted).

26      [54] *See Hershenow v. Enter. Rent-A-Car Co. of Boston*, 840 N.E.2d 526, 534 (Mass. 2006) (illegal
27      term in rental car agreement was not alleged to have caused any economic or noneconomic loss);
        *Taragan v. Nissan N. Am., Inc.*, 2013 WL 3157918 (N.D. Cal. June 20, 2013) (injury was
        "theoretical" where alleged defect had not actually manifested in any of plaintiffs' vehicles). *See
28      also*, Responsive Appendix.

recouped the full premium they paid for the promised clean diesel performance, *see supra*, Section IV.A.1.c, and, *e.g.*, ¶¶ 13, 382. Nor does VW's single cited authority establish otherwise as a matter of law.[55]

*Third*, VW incorrectly argues, with respect to damages, that Plaintiffs have "failed to allege that they have met the specific requirements of the relevant state statutes." VW Br. at 42. But VW fails to identify any specific deficiency in Plaintiffs' allegations, save vague references to its Appendix, along with references to Texas's requirements to receive "mental anguish" damages (which Plaintiffs do not seek). *See id.* Instead, VW merely asserts the unremarkable proposition that state laws may require damages beyond Article III injury, and that Plaintiffs' allegations do not satisfy "these formulations" of damages (without any reference to what such formulations are). *Id.* Plaintiffs complaint sufficiently states each of the state claims alleged, *see generally* ¶¶ 519-871. VW's "vague assertions" to the contrary are impossible for Plaintiffs to cogently address and therefore insufficient to meet VW's burden to articulate the deficiencies in the Complaint, *see Strome v. DBMK Enters., Inc.,* 2014 WL 6485533, at *8 (N.D. Cal. Nov. 19, 2014). Nor do VW's cited authorities offer more clarity or support for its conclusory "argument."[56]

*Fourth*, VW erroneously argues that Plaintiffs fail to allege proximate cause, claiming that Plaintiffs do not allege that their injuries "are a direct result of the defeat devices." VW Br. at 43. As with its argument on Article III standing, VW misunderstands the relevant causal connection, which is not the connection between the defeat device and Plaintiffs' injuries, but between *VW's misrepresentations and material omissions* and Plaintiffs' injuries. The Complaint expressly alleges that Plaintiffs and Class member would not (and indeed, could not) have purchased their Vehicles but for VW's material misrepresentations and omissions—allegations that are sufficient to establish a

---

[55] *See Licul*, 2013 WL 6328734 (plaintiff never "suffer[ed] from the defect itself during [her ownership of the vehicle]," and didn't allege that she had paid a premium). *See also* Responsive Appendix.

[56] *See Bennett v. Grant*, 525 S.W.3d 642, 648 (Tex. 2017) (addressing requirements for "mental anguish" damages not sought here); *Galecka v. Savage Arms, Inc.*, 2014 WL 2931859 (Mich. Ct. App.  June 26, 2014) (plaintiff failed to allege that he received anything less than what he expected to receive from transaction); *Frye v. L'Oreal USA, Inc.*, 583 F. Supp. 2d 954, 958 (N.D. Ill. 2008) ("no allegation that the presence of lead in the lipstick had *any* observable economic consequences") (emphasis added); *see also* Responsive Appendix.

causal connection between VW's actions and Plaintiffs' injuries. In any case, Plaintiffs allege a causal connection between low NOx emissions (and thus, the defeat device) and the clean-diesel premium paid by Plaintiffs and Class members. *See supra,* Section IV.A.2.b at 21. None of VW's cited authorities do anything other than suggest the general parameters of proximate cause. Indeed, none of the cases—which involve everything from anti-terrorism claims to discussions of the link between illegal immigrant hiring and county healthcare expenditures—are even remotely factually analogous to the present case.[57] Much less do they establish, or even suggest, that Plaintiffs' allegations here are insufficient to establish proximate causation.

*Finally*, VW erroneously argues that Plaintiffs fail to sufficiently allege reliance as required under Arizona, California, New York, North Carolina, Pennsylvania, and Virginia law, because the Complaint does not identify misrepresentations relied on personally by each individual Plaintiff. VW Br. at 45. As with its other arguments, VW's reliance argument ignores the Complaint's explicit allegations that Plaintiffs and Class members relied on VW's misrepresentations,[58] as well as Plaintiffs' individual allegations that they purchased their Vehicles based on VW's "clean diesel" promises and the Vehicles' reputations as environmentally friendly,[59] and that they "would not have purchased" their Vehicles but for VW's concealment of its illegal cheat device.[60] None of the

---

[57] *See Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969 (9th Cir. 2008) (increase in county's healthcare and criminal justice expenditures was too far removed from defendants' hiring of undocumented immigrants to establish proximate cause under RICO); *Rothstein v. UBS AG*, 708 F.3d 82 (2nd Cir. 2013) (no proximate cause alleged for Anti-Terrorism Act claim, where no allegations that moneys transferred by bank to Iran were used to fund particular terrorist attacks that harmed plaintiffs); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014) (finding proximate cause for Lanham Act claim despite the fact that plaintiff was an indirect victim of defendant's conduct); *Lorenzo v. Qualcomm Inc.*, 2009 WL 2448375 (S.D. Cal. Aug. 10, 2009) (no proximate cause where there were at least three intermediaries between defendants' antitrust violations and plaintiff's injury, and plaintiff failed to allege any facts supporting a causal link); *City of New York v. Smokes-Spirits.Com, Inc.*, 911 N.E. 2d 834 (N.Y. 2009) (city's lost tax revenue not proximately caused by defendants' illegal marketing and shipping of cigarettes over the internet, but was only derivative of consumer claims).

[58] *See supra*, n.51.

[59] ¶¶ 25 (Plaintiff Kahlert), 28 (Angela Matt Architect), 33 (Field), 39 (Dreher), 45 & 125 (Schell), 52 (Sheffield), 58 (Lecours), 70 (Skena), 73 (St. Croix), 78 (Olson), 82 (Kubala), 86 (Daly), 99 (Gallucio), 104 (Rawczak), 114 (Hofmann), 119 (Siehl), 132 (Conner).

[60] ¶¶ 20 (Plaintiff Nemet), 25 (Kahlert), 28 (Angela Matt Architect), 33 (Field), 40 (Dreher), 45 & 125 (Schell), 52 (Sheffield), 58 (Lecours), 63 (De La Cruz), 66 (Winebaugh), 70 (Skena), 73 (St.

authority cited by VW requires a finding that these allegations are insufficient to show reliance.[61]

Nor does VW cite any authority for the proposition that the listed states' consumer protection

statutes require allegations of specific misrepresentations relied on by each individual Plaintiff,

particularly in a context—as alleged in the Complaint—of pervasive, market-wide fraud relied on not

only by consumers, but by regulators certifying the Vehicles as legally saleable. Indeed, courts have

held that such individualized reliance allegations are unnecessary in similar contexts under Arizona,

California, New York, North Carolina, Pennsylvania, and Virginia  law. *See, e.g.*, *Siemer v. Assocs.*

*First Capital Corp.*, 2001 WL 35948712, at *4 (D. Ariz. Mar. 30, 2001) (class-wide reliance under

Arizona Consumer Fraud Act shown by purchasing misrepresented product); *Daniel v. Ford Motor*

*Co.*, 806 F.3d at 1225 (under California UCL & CLRA, plaintiff need only prove that omission "was

a substantial factor in his decision," which may be done "by simply proving that, had the omitted

information been disclosed, one would have been aware of it and behaved differently"); *Pulaski &*

*Middleman, LLC v. Google, Inc.*, 802 F.3d at 985 (stating a claim under California UCL or FAL

requires only a showing "that members of the public are likely to be deceived," and "does not require

individualized proof of deception, reliance, and injury"); *Brown v. Hain Celestial Grp., Inc.*, 2015

WL 3398415, at *11 (N.D. Cal. May 26, 2015) (under CLRA, classwide reliance can be inferred

from material misrepresentations); *Guido v. L'Oreal, USA, Inc.*, 2013 WL 3353857, at *12 (C.D.

---

Croix), 78 (Olson), 82 (Kubala), 86 (Daly), 95 (Ferdinand), 99 (Galluccio), 104 (Rawczak), 109 (Miller), 119 (Siehl), 132 (Conner), 142 (Salgado), 146 (Bowman), 150 (Mosley).

[61] VW cites a handful of cases in its Appendix—which this Court should ignore, as argued *supra* n.46—but none stand for the proposition that Plaintiffs must allege individualized reliance. *See* Responsive Appendix. In fact, VW plainly misrepresents the law. *See Todd v. Tempur-Sealy*, 2016 WL 5746364, at *6-7 ("Defendants first contend that four states – California, Maryland, Washington, and Wisconsin – require proof of individualized reliance rather than a general showing that an objective consumer would be misled. ECF No. 220 at 27. In their brief, they neither offer analysis on this point nor engage with Plaintiffs' cited authority, but instead direct the Court to an appendix, which lists cases that Defendants assert support their arguments. [¶] Having reviewed the competing law offered by both parties, the Court concludes Defendants have misrepresented the law of all four states. With regard to California, this Court has previously held that for false misrepresentation claims, 'an inference of common reliance arises if representations are material, and materiality is judged by an objective standard rather than any understandings specific to the individual consumer.' *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 242 (N.D. Cal. 2014). The Ninth Circuit has reached the same conclusion. *See, e.g., Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011) (The change in California law "decidedly did not change the California rule that relief under the UCL is available without individualized proof of deception, reliance and injury." (citation omitted)).

Cal. July 1, 2013) (for purposes of a false advertising claim "under New York law, there is a presumption of reliance when the defendant controls the relevant information and a consumer of ordinary intelligence could not discover the true state of affairs") (citing *Leider v. Ralfe*, 387 F. Supp. 2d 283, 293, 296 (S.D.N.Y.2005)); *Cullen v. Valley Forge Life Ins. Co.*, 161 N.C. App. 570, 580 (2003) (actual reliance is not a required element for a North Carolina UDTPA claim);[62] *Corson v. Toyota Motor Sales, U.S.A., Inc.*, 2013 WL 1802709, at *8 (C.D. Cal. Apr. 24, 2013) (under Pennsylvania UTPCPL, "'[w]hen one would not have entered the transaction in the presence of full disclosure of a material fact . . . that person has obviously relied'"; thus, plaintiffs alleged reliance where they alleged that "had they known of the defective nature of the Vehicles, they would not have purchased the Vehicles, or would have paid less for them") (quoting *Peerless Wall & Window Coverings, Inc. v. Synchronics, Inc.*, 85 F. Supp. 2d 519, 534 (W.D. Pa. 2000)); *Levine v. First Am. Title Ins. Co.*, 682 F. Supp. 2d 442, 467 (E.D. Pa. 2010) (plaintiffs sufficiently alleged reliance for Pennsylvania UTPCPL claim where they alleged that no plaintiff "would have knowingly paid a premium for title insurance that was higher than the premium that was actually due and owing"); *McCabe v. Daimler AG*, 948 F. Supp. 1347, 1370 (N.D. Ga. 2013) (Virginia plaintiff plausibly alleged justifiable reliance where allegations suggested defendants willfully concealed a material fact, and plaintiff alleged "he expected to receive vehicles free from design or manufacturing defects and that he would not have purchased his vehicles had he known of the defect."); *Virginia Clean Diesel Action,* 2016 WL 5347198, at *8 (plaintiffs sufficiently pled fraud by both misrepresentation and concealment where "complaints contain[ed] statements by Volkswagen CEO . . . acknowledging concealment of the existence of the 'defeat device' software" and plaintiff alleged "reliance on the environmental claims made by VWGA").

Plaintiffs have sufficiently alleged damages, proximate cause, and reliance, and VW's Motion fails to meet its burden to establish otherwise.

---

[62] Additionally, North Carolina courts have held that allegations of reasonable reliance are unnecessary where a claim is based on a failure to disclose a material fact—as Plaintiffs allege here. *See Everts v. Parkinson*, 147 N.C. App. 315, 325-26 (2001); ¶¶ 502, 528, 545, 579, 599, 613 (facts misrepresented and omitted by VW were "material" to consumers' purchasing decisions, as well as to government regulators).

1

2. **None of Plaintiffs' state law claims have any other deficiencies.**

2

a. **None of Plaintiffs' claims are time-barred.**

3

VW erroneously contends that Plaintiffs' claims under the Arizona Consumer Fraud Act and

4

the Oregon Unlawful Trade Practices Act are time-barred. VW Br. at 43. VW ignores paragraph 391

5

of the Complaint, which is entitled "American Pipe Tolling" and alleges that

6

> Plaintiffs and Class members here have tolling of any statutes of
> limitation by virtue of [their] being named as class members in some of
> the original complaints. *See, e.g.*, *Levin v. Volkswagen Group of*
> *America, Inc.*, 3:15cv05638. However, they were not included in the
> class definition of the 2.0-liter and 3.0-liter settlements, and they have
> never had a request for class certification denied.

7

8

9

As a result, the limitations period was already tolled when NOV disclosures were made in 2015. *See*

10

*Resh v. China Agritech, Inc.*, 857 F.3d at 1004 ("We conclude, based on *American Pipe* and *Crown,*

11

*Cork & Seal*, read in the light of *Shady Grove*, *Smith* and *Tyson Foods*, that permitting future class

12

action named plaintiffs, who were unnamed class members in previously uncertified classes, to avail

13

themselves of *American Pipe* tolling would advance the policy objectives that led the Supreme Court

14

to permit tolling in the first place.").

15

b. **None of Plaintiffs' class-action claims are barred by state law barring class**
**actions.**

16

17

VW incorrectly contends that this Court should apply Mississippi's bar on class actions. VW

18

Br. at 44. That argument is premature, because the viability of Plaintiffs' class action allegation is

19

not at issue at this stage of the pleadings. But in any event, VW's argument is incorrect under *Shady*

20

*Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), in which the Supreme

21

Court rejected the defendant's argument that because New York law prohibits class actions in suits

22

seeking penalties or statutory damages, district courts may not certify a class under Rule 23.

23

VW relies on only one case, *Tait v. BSH Home Appliances Corp.*, 2011 WL 1832941 (C.D.

24

Cal. May 12, 2011), which takes a very narrow reading of *Shady Grove* by applying the reasoning of

25

Justice Steven's concurrence. But as the court explained in *In re Lithium Ion Batteries Antitrust*

26

*Litig.*, "Justice Stevens's concurrence in the Supreme Court's fractured decision in [*Shady Grove*] is

27

not the controlling opinion of that case because it cannot be meaningfully regarded as both narrower

28

than another and a common denominator of the Court's reasoning." 2014 WL 4955377, at *20 n.20

(N.D. Cal. Oct. 2, 2014) (citing *Lair v. Bullock*, 697 F.3d 1200, 1205 (9th Cir. 2012)); *accord*,

*Andren v. Alere, Inc.*, 2017 WL 6509550, at *21 (S.D. Cal. Dec. 20, 2017); *In re Hydroxycut Mktg.*

*& Sales Prac. Litig.*, 299 F.R.D. 648, 652-53 & n.2 (S.D. Cal. 2014) (explaining flaw in *Tait* court's

reliance on Justice Stevens' concurring opinion).

The flaw in relying on Justice Steven's concurring opinion is also explained by the Eleventh

Circuit in *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1335 (11th Cir. 2015), which

noted that "of critical importance here, all five justices agreed that applying Rule 23 to allow a class

action for a statutory penalty created by New York law did not abridge, enlarge, or modify a

substantive right; Rule 23 controlled. Regardless of which *Shady Grove* opinion is binding, the

holding is binding. On this there can be no dispute." So the "holding controls our case. There is no

relevant, meaningful distinction between a statutorily created penalty of the kind at issue in *Shady*

*Grove,* on the one hand, and a statutorily created claim for deceptive practices of the kind at issue

here, on the other hand." *Id*. Thus, state "statute[s] restricting class actions, like the New York statute

at issue in *Shady Grove*, do[] not apply in federal court. Rule 23 controls." *Id*. at 1336.

VW also erroneously argues that this Court should dismiss Plaintiffs' claim under the Utah

Consumer Sales Practices Act to the extent it seeks statutory damages for class members in addition

to actual damages. To begin with, that argument is procedurally flawed, because it provides no basis

for dismissal. But in any event, that argument directly contradicts the Supreme Court's holding in

*Shady Grove*, in which Allstate argued that permitting a class action to proceed was not substantively

neutral, because it "'transform[s] [the] dispute over a five hundred dollar penalty into a dispute over

a five million dollar penalty.'" 559 U.S. at 408. The Court did not agree:

> Allstate's aggregate liability . . . does not depend on whether the suit
> proceeds as a class action. Each of the 1,000–plus members of the
> putative class could (as Allstate acknowledges) bring a freestanding
> suit asserting his individual claim. It is undoubtedly true that some
> plaintiffs who would not bring individual suits for the relatively small
> sums involved will choose to join a class action. That has no bearing,
> however, on Allstate's or the plaintiffs' legal rights.

*Id*. The same reasoning applies here. Each member of the putative Utah class could bring an

individual suit for statutory damages, so just as in *Shady Grove*, VW's aggregate liability does not

1    depend on whether the suit proceeds as a class action.

2          c.    **Claims under Mississippi and Texas law should not be dismissed based on pre-suit requirements.**

3

4          VW erroneously contends that Plaintiffs' claim under the Mississippi Consumer Protection

5    Act should be dismissed for failure to engage in informal dispute resolution. VW Br. at 44 (citing

6    Miss. Code Ann. § 75-24015(2)). The informal dispute resolution requirement is not enforceable in a

7    federal-court class action, because it is plainly procedural, not substantive. Under *Shady Grove*, such

8    a bar to a class action in federal court cannot be enforced because it does not abridge, enlarge, or

9    modify a substantive right. If a bar on class actions altogether is unenforceable in federal court, then

10   so too is a requirement of informal dispute resolution before filing such an action. Federal courts

11   have their own dispute resolution procedures, which take place *after* the class action is filed.

12         VW also incorrectly argues in a footnote that Plaintiffs' Texas Deceptive Trade Practices and

13   Consumer Protection Act claim should be dismissed for failure to give 60-day notice before filing

14   suit. VW Br. at 44 n.41. VW ignores section 17.505(b) of that Act, which states, "If the giving of 60

15   days' written notice is rendered impracticable by reason of the necessity of filing suit in order to

16   prevent the expiration of the statute of limitations or if the consumer's claim is asserted by way of

17   counterclaim, the notice provided for in Subsection (a) of this section is not required . . . ." The

18   limitations period is two years, *see* Tex. Bus. & Com. Code § 17.505(b), and VW argues that

19   Plaintiffs "became aware of their claims as of the September 18, 2015 and November 2, 2015 NOV

20   disclosures," VW Br. at 43, Thus, filing the Complaint on August 2, 2017, was necessary to prevent

21   any argument that the two-year limitations period had expired. And even if 60-day notice were

22   required, the remedy is a 60-day abatement, not dismissal. *See Oppenheimer v. Prudential Sec. Inc.*,

23   94 F.3d 189, 194 (5th Cir. 1996) ("the proper remedy for insufficient notice is abatement not

24   dismissal"). But VW has filed a motion to dismiss, not abate, so its argument is moot.

25         d.    **Plaintiffs have statutory standing under Ohio law.**

26         VW seeks dismissal of Plaintiffs' claim under the Ohio Deceptive Trade Practices Act

27   ("ODTPA"). VW Br. at 4. Although courts are split as to whether consumers have standing to sue

28   under that Act, the better-reasoned decisions hold that the Ohio Supreme Court would decide that

consumers have standing. In *Schumacher v. State Auto. Mut. Ins. Co.*, the court held that consumers have standing to sue under the ODTPA, which "states in relevant part, 'A *person* who is injured by a person who commits a deceptive trade practice . . . *may commence a civil action* . . . .'" 47 F. Supp. 3d 618, 630 (S.D. Ohio 2014) (quoting Ohio Rev. Code § 4165.03(A)(2)) (emphasis by the court)." The court further stressed that a "person" is defined to include 'an *individual*.'" *Id.* (quoting Ohio Rev. Code § 4165.01(D)) (emphasis by the court), concluding that consumers have standing to sue:

> The limited number of Ohio lower courts to have considered this issue immediately jump to a comparison of the ODTPA with the Lanham Act without first considering the *actual language* of the ODTPA. That language plainly provides that a "person" may "commence a civil action" against another "person" who has committed a "deceptive trade practice[,]" and included within the statutory definition of "person" is an "individual" along with a litany of legal or commercial entities, with the catch-all phrase "or any other legal or commercial entity [ ]" at the end. *See* Ohio Rev. Code §§ 4165.01(D), 4165.03(A)(2).

*Id.* at 632; *accord*, *Bower v. IBM, Inc.*, 495 F. Supp. 2d 837, 842-44 (S.D. Ohio 2007). Thus, there is no merit to VW's argument that the Ohio Plaintiffs lack standing under the ODTPA.

## V.     CONCLUSION

VW's motion to dismiss should be denied in its entirety, except that Plaintiffs agree to dismissal of their claim under the Magnuson-Moss Warranty Act.

1    DATED:  February 2, 2018                    Respectfully submitted,

2                                                HAGENS BERMAN SOBOL SHAPIRO LLP

3                                                By     /s/ Steve W. Berman
                                                     Steve W. Berman (*Pro Hac Vice*)
4                                                HAGENS BERMAN SOBOL SHAPIRO LLP
                                                 1918 Eighth Avenue, Suite 3300
5                                                Seattle, Washington  98101
                                                 Telephone:  206) 623-7292
6                                                Facsimile:  (206) 623-0594
                                                 Email: steve@hbsslaw.com
7
                                                 Robert B. Carey (*Pro Hac Vice*)
8                                                HAGENS BERMAN SOBOL SHAPIRO LLP
                                                 11 W. Jefferson St., Ste. 100
9                                                Phoenix, AZ 85003
                                                 Telephone: (602) 840-5900
10                                               Facsimile: (602) 840-3012
                                                 Email: rob@hbsslaw.com
11
                                                 Shana E. Scarlett (SBN 217895)
12                                               HAGENS BERMAN SOBOL SHAPIRO LLP
                                                 715 Hearst Avenue, Suite 202
13                                               Berkeley, CA 94710
                                                 Telephone: (510) 725-3000
14                                               Facsimile: (510) 725-3001
                                                 Email:  shanas@hbsslaw.com
15
                                                 Stuart M. Paynter (SBN 226147)
16                                               THE PAYNTER LAW FIRM, PLLC
                                                 1200 G Street NW Suite 800
17                                               Washington, D.C. 20005
                                                 Telephone: (202) 626-4486
18                                               Facsimile: (866) 734-0622
                                                 Email: stuart@paynterlaw.com
19
                                                 Celeste H. G. Boyd (*Pro Hac Vice*)
20                                               THE PAYNTER LAW FIRM, PLLC
                                                 106 S. Churton St., Ste 200
21                                               Hillsborough, NC 27278
                                                 Telephone:  (919) 307-9991
22                                               Email: cboyd@paynterlaw.com

23                                               *Attorneys for Plaintiffs*

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on February 2, 2018, I electronically transmitted the foregoing document

3

to the Court Clerk using the ECF System for filing. The Clerk of the Court will transmit a Notice of

4

Electronic Filing to all ECF registrants.

5

6

_/s/ Steve W. Berman_
STEVE W. BERMAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO VOLKSWAGEN U.S.
DEFENDANTS' MOTION TO DISMISS - 42
Case No.: 02672-CRB (JSC)
010686-11 1013163 V1