Matthew D. Slater (pro hac vice)
2000 Pennsylvania Ave., NW
Washington, DC 20006
(202) 974-1500 (Phone)
(202) 974-1999 (Facsimile)
mslater@cgsh.com

David L. Anderson (SBN 149604)
555 California Street
San Francisco, CA 94104
(415) 772-1200 (Phone)
(415) 772-7400 (Facsimile)
dlanderson@sidley.com

Counsel for Defendants
Robert Bosch LLC and Robert Bosch GmbH

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | MDL DOCKET NO. 2672 CRB (JSC) |
| This Document Relates to: <br><br> *Nemet v. Volkswagen Group of America, Inc.*, <br><br> Case No. 17-cv-04372-CRB | **ROBERT BOSCH LLC'S AND ROBERT BOSCH GMBH'S REPLY IN SUPPORT OF MOTION TO DISMISS CLASS ACTION COMPLAINT** <br><br> Date:   July 13, 2018 <br> Time:   10:00 A.M. |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

SUMMARY OF THE ARGUMENT......................................................................................... 1

ARGUMENT ............................................................................................................................ 2

I.      PLAINTIFFS LACK RICO STANDING............................................................. 2

A. Plaintiffs Fail To Allege A Cognizable RICO Injury. ......................................... 2

B. Plaintiffs Have Failed To Allege That Their Claimed Injuries Were Caused "By Reason Of" A RICO Violation By The Bosch Defendants. ............................................ 7

II.     PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE A RICO CLAIM. ............................... 10

III.    PLAINTIFFS FAIL TO SUPPORT PERSONAL JURISDICTION OVER BOSCH GMBH.................................................................................................................... 13

CONCLUSION ......................................................................................................................... 13

1

2

3

**TABLE OF AUTHORITIES**

**Cases**

*Am. Title Ins. Co. v. Lacelaw Corp.*,
    861 F.2d 224 (9th Cir. 1988)............................................................................8

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*,
    874 F.3d 1064 (9th Cir. 2017)........................................................................13

*Cahen v. Toyota Motor Corp.*,
    147 F. Supp. 3d 955, 971 (N.D. Cal. 2015) ..................................................4

*Cahen v. Toyota Motor Corp.*,
    No. 16-15496, 2017 WL 6525501 (9th Cir. Dec. 21, 2017).........................6

*Canyon Cty. v. Syngenta Seeds Inc.*,
    519 F.3d 969 (9th Cir. 2008)..........................................................................3

*Doe v. Unocal Corp.*,
    248 F.3d 915 (9th Cir. 2001)........................................................................13

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004)...........................................................................9

*Hemi Grp., LLC v. City of N.Y.*,
    559 U.S. 1 (2010)............................................................................................7

*Holmes v. Sec. Inv'r Prot. Corp.*,
    503 U.S. 258 (1992)......................................................................................10

*In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*,
    155 F. Supp. 2d 1069 (S.D. Ind. 2001) .........................................................5

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prods. Liab. Litig.*,
    No. 17-md-02777-EMC, slip op. (N.D. Cal. Mar. 15, 2018)...................... 2, 4-5, 11

*In re Duramax Diesel Litig.*,
    No. 17-cv-11661, 2018 WL 949856 (E.D. Mich. Feb. 20, 2018)....................4-5, 9

*In re Gen. Motors LLC Ignition Switch Litig.*,
    No. 14-MD-2543 (JMF),
    2016 WL 3920353 (S.D.N.Y. July 15, 2016) ......................................5-6

28

*In re Gen. Motors LLC Ignition Switch Litig.*,
   257 F. Supp. 3d 372 (S.D.N.Y 2017)...................................................................................5

*In re Gen. Motors LLC Ignition Switch Litig.*,
   No. 14-MD-2543 (JMF), 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017) ...................5

*In re Merrill Lynch Ltd. P'ships Litig.*,
   154 F.3d 56 (2d Cir. 1998).......................................................................................7

*In re Morning Song Bird Food Litig.*,
   No. 12CV1592 JAH (RBB), 2013 WL 12144051 (S.D. Cal. Sept. 30, 2013)..........................6

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices and Prods. Liab. Litig.*,
   MDL No. 2672 CRB (JSC), 2017 WL 4890594 (N.D. Cal. Oct. 30, 2017)................... *passim*

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
   903 F. Supp. 2d 880 (C.D. Cal. 2012)...................................................................12

*In re Yahoo! Inc. S'holder Derivative Litig.*,
   153 F. Supp. 3d 1107 (N.D. Cal. 2015) .................................................................11

*Kerrigan v. ViSalus, Inc.*,
   112 F. Supp. 3d 580 (E.D. Mich. 2015).................................................................9

*Lam Research Corp. v. Schunk Semiconductor*,
   65 F. Supp. 3d 863 (N.D. Cal. 2014) .....................................................................8

*Mendoza v. Zirkle Fruit Co.*,
   301 F.3d 1163 (9th Cir. 2002)................................................................................3

*Pillsbury, Madison & Sutro v. Lerner*,
   31 F.3d 924 (9th Cir. 1994).....................................................................................7

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979)................................................................................................3

*Safeway Inc. v. Abbott Labs.*,
   761 F. Supp. 2d 874 (N.D. Cal. 2011) ...................................................................8

*Schwarzenegger v. Fred Martin Motor Co.*,
   374 F.3d 797 (9th Cir. 2004)................................................................................13

*Williams v. Countrywide Fin. Corp.*,
   No. 16-CV-04166-CAS(AGRx), 2017 WL 986517 (C.D. Cal. Mar. 13, 2017)........................6

1

### SUMMARY OF THE ARGUMENT

2        Plaintiffs' Opposition ignores the fundamental differences between this action and the

3   Court's decision in *Napleton*, MDL No. 2672 CRB (JSC), 2017 WL 4890594 (N.D. Cal. Oct. 30,

4   2017).  Despite extensive citation to that decision, Plaintiffs have not sustained their burden to

5   support their RICO claim under the materially different allegations contained in this Complaint.

6        *RICO Injury.*  Plaintiffs have no plausible claim that they suffered a concrete injury to

7   "business or property" sufficient to confer RICO standing.  Plaintiffs had no economic interest in

8   the Affected Vehicles at the time the alleged fraud was revealed, critically distinguishing them

9   from the Franchise Dealers in *Napleton*.  Plaintiffs are not dealers who were allegedly left with

10  unsaleable inventory due to stop-sale orders issued following EPA's NOV in September 2015,

11  nor are they consumers who were holding vehicles that allegedly dropped in value as a result of

12  the revelation of the alleged fraud.  Instead, Plaintiffs imagine a hypothetical "clean diesel

13  premium" and then ask the Court to speculate about the depreciation of such a premium,

14  notwithstanding that they received the full value of the vehicles through use and disposal before

15  the VW NOVs were issued.  But RICO provides compensation for concrete injuries, not

16  speculative theories, and Plaintiffs' claim therefore fails.

17       *RICO Causation.*  Contrary to Supreme Court requirements, Plaintiffs' theory of

18  proximate causation would require the Court to "move well beyond the first step," even more

19  than with the Franchise Dealers or consumers who at least held Affected Vehicles when the NOV

20  issued.  Their claim also risks multiple recoveries for the same purported injury and would saddle

21  the Court with difficulties in apportioning damages between different groups of plaintiffs—policy

22  concerns that courts considering the reach of RICO's treble-damages remedy have repeatedly

23  cited in assessing proximate cause.

24       *Further,* Plaintiffs' Complaint fails to adequately allege a pattern of racketeering or the

25  existence of a RICO enterprise.  Rather than address these issues directly, their Opposition largely

26  just block-quotes *Napleton*.  The Complaint also does not support personal jurisdiction over

27  Bosch GmbH in California or the United States as a whole.  The Court need not reach these

28  issues, however, given the fundamental flaws identified above.

1

**ARGUMENT**

2

**I.      PLAINTIFFS LACK RICO STANDING.**

3

     **A. Plaintiffs Fail To Allege A Cognizable RICO Injury.**

4

     Plaintiffs suffered no injury to "business or property" as required under RICO.  Bosch Br.

5

6-9.[1]  Their claimed out-of-pocket loss rests on pure speculation, and any claim for "the lost

6

expectation of driving an environmentally-friendly vehicle," Opp'n Br. 12, is plainly insufficient.

7

     Plaintiffs sold or relinquished their vehicles prior to September 18, 2015, when there was

8

no information in the market concerning the alleged "defeat device."  *See* Compl. ¶ 401.  Though

9

Plaintiffs invoke the same conclusory refrain that they "paid a premium for 'clean diesel' vehicles

10

they never received," they point to no well-pleaded, non-speculative facts in the Complaint

11

showing that they paid and did not recoup any purported "clean diesel" premium through their

12

use of the vehicles – and the superior fuel economy they provided – as well as from consideration

13

received when they sold their vehicles.  *See* Opp'n Br. 9; Compl. ¶¶ 379-85.  Plaintiffs repeatedly

14

ask the Court to "assum[e]" a "clean diesel premium," *e.g.*, Compl. ¶¶ 13, 22, 36, 47, 49, 55, 60,

15

65, but offer no support that there was such a premium for environmental characteristics, and no

16

reason to believe that they did not benefit from the supposed "clean diesel premium" when

17

selling, just as they allegedly paid it when purchasing.[2]  Similarly, with respect to lessees,

18

_____

19

[1] "Bosch Br." refers to Robert Bosch LLC's and Robert Bosch GmbH's Notice of Motion and

20

Motion to Dismiss Class Action Complaint and Memorandum of Points and Authorities in
Support Thereof, ECF No. 4533.  "Opp'n Br." refers to Plaintiffs' Memorandum of Points and

21

Authorities in Opposition to Robert Bosch LLC's and Robert Bosch GmbH's Motion to Dismiss
Class Action Complaint, ECF No. 4714.

22

[2] In rejecting "as implausible" the FCA plaintiffs' claim "to have been injured in an amount equal
to the entire purchase price of the Class Vehicles," Judge Chen recognized that the consumers

23

there "have presumably been using the vehicles and obtaining value from them."  *In re Chrysler-
Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prods. Liab. Litig.* ("*FCA*"), No. 17-md-02777-

24

EMC, slip op. at 26-27 (N.D. Cal. Mar. 15, 2018).  *Cf.* Opp'n Br. 8 (contending that "Plaintiffs
and Class members b[ought] and lease[d] Vehicles that they would not have otherwise bought or

25

leased but for VW's blatant fraud") (citing Compl. ¶ 379).  Here, as in *FCA*, there are no

26

allegations to even suggest that Plaintiffs did not have full use of their vehicles during their
periods of ownership or lease, prior to the market reacting to anything about the alleged "defeat

27

28

**BOSCH DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS (MDL NO. 2672 CRB)**

Plaintiffs offer insufficient factual allegations to support their theory that their lease payments were at all impacted by alleged "defeat devices," which remained unknown at the end of their lease periods, during which they likewise had full use and benefit of the vehicles.[3]

Even assuming that "a consumer who has been overcharged can claim an injury to her property, based on a wrongful deprivation of her money" and that "[m]oney . . . is a form of property," *Canyon Cty. v. Syngenta Seeds Inc.*, 519 F.3d 969, 976 (9th Cir. 2008), Plaintiffs have not adequately pled such an overcharge for "clean" diesel.[4]  In any case, the alleged premium would have been equally gained by Plaintiffs through use and disposition of the vehicles before the alleged fraud could have affected market prices.  These fundamental defects, inherent in the Plaintiffs' class definition, *see* Compl. ¶ 401, go to the "fact of damage" and not to the "amount of damage" and therefore require dismissal.  *See Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1171 (9th Cir. 2002).

Plaintiffs' conclusory assertion that the so-called "clean diesel" premium depreciated, and that the depreciation was unrecoverable in the subsequent transactions, *see, e.g.*, Compl. ¶¶ 13-14, 382, is founded on pure conjecture and takes no account of the use and benefit of the vehicles

---

device."  *See* Bosch Br. 6-7 & n.4.

[3] The Bosch Defendants adopt the VW Defendants' reply arguments further demonstrating that Plaintiffs' alleged injuries are insufficient to confer Article III standing. *See* Volkswagen U.S. Defendants' Reply Memorandum in Further Support of their Motion to Dismiss the Pre-NOV Plaintiffs' Complaint, Part I.

[4] The statement is dicta, and the court did not ultimately find a RICO injury on the basis of overpayment. *Canyon Cty.*, 519 F.3d at 976.  Moreover, the claimed overpayments there were concrete.  *Id*. at 975 (claim for payment of "millions of dollars").  *Canyon County*'s reliance on *Reiter* helps demonstrate the point.  *Id*. at 976.  In *Reiter*, the Supreme Court held that antitrust injury could be premised on a consumer's allegation that "the price of those goods or services [the consumer paid] is artificially inflated by reason of the anticompetitive conduct complained of."  *Reiter v. Sonotone Corp*., 442 U.S. 330, 339 (1979).  In an antitrust case, the plaintiff's complaint is that while it received what it paid for, it was forced to pay more than it should have because of collusive pricing behavior.  By contrast, in the present case Plaintiffs allege that they paid market prices for the goods they sought, but the goods somehow do not conform to their subjective expectations and as a result may suffer a decline of value in the future.  Such expectation-based claims are not injuries to "business or property."

3

associated with any premium.  The theory begins with an intangible, unquantified, presumed "premium" and then makes assumptions as to the behavior of that premium over time.[5]  *See, e.g.*, Compl. ¶ 22 ("*assuming* a 'clean diesel premium' of $6,000 . . .") (emphasis added).  At no point do Plaintiffs identify the actual amount of any supposed premium at the point of sale, nor do they quantify the actual amount of depreciation of the premium incurred – if any – when the vehicles were resold.  The bare conclusion that Plaintiffs "could not have recouped" the purported premium, without an adequate factual basis, is insufficient.

Plaintiffs thus fall far short of alleging the "tangible or concrete financial loss" that RICO requires.  *See Napleton*, 2017 WL 4890594, at *7 (internal quotations and citations omitted).  Their depreciated premium theory is unsupported by any objective factual allegations demonstrating the existence and extent of their claimed losses, and thus fails.  *See Cahen v. Toyota Motor Corp.*, 147 F. Supp. 3d 955, 971 (N.D. Cal. 2015) (finding plaintiffs lacked even Article III standing under an overpayment theory where plaintiffs failed to "allege[ ] a demonstrable effect on the market for their specific vehicles" using objective indicia like "documented recalls or declining Kelley Bluebook values"), *aff'd*, No. 16-15496, 2017 WL 6525501 (9th Cir. Dec. 21, 2017); *see also* Declaration of Robert H. Klonoff Addressing Objections by Class Members to the Proposed Volkswagen "Clean Diesel" Settlement, ECF 1976-1, ¶ 79 (individuals in Plaintiffs' position might be "suffering some anger or resentment" but lack "genuine, demonstrable economic injury").

Plaintiffs' pre-NOV sales also separate them from the plaintiffs in *Napleton*, 2017 WL 4890594, at *5-8, in *In re Duramax Diesel Litig.*, No. 17-cv-11661, 2018 WL 949856, at *21-24 (E.D. Mich. Feb. 20, 2018), and in *FCA*, slip op. at 25-35.  In *Napleton*, the Franchise Dealers were allegedly left with inventory that they were unable to sell because of stop-sale orders issued following the NOV.  *See* 2017 WL 4890594, at *6.  Similarly, *Duramax* and *FCA* involved

---

[5] Underscoring the abstractness of these concepts, Plaintiffs themselves struggled to craft a numerical example illustrating their own theories.  *See* Opp'n Br. 9 n.6.

**BOSCH DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS (MDL NO. 2672 CRB)**

current owners of the relevant vehicles. *See Duramax*, 2018 WL 949856, at *1-2; *FCA*, slip op. at 3-5. Though these decisions found an alleged RICO injury due in part to overcharges at the time of sale, the relevant owners in those cases retained their vehicles through the revelation of the alleged frauds. *See Napleton*, 2017 WL 4890594, at *2; *Duramax*, 2018 WL 949856, at *3-4; *FCA*, slip op. at 3-5. Because Plaintiffs here purchased and sold their Affected Vehicles prior to September 18, 2015, before the market knew anything about the alleged "defeat device," there is no plausible basis to credit a claim that Plaintiffs did not enjoy the same supposed "clean diesel premium" when they sold their Affected Vehicles. *See In re Gen. Motors LLC Ignition Switch Litig.* ("*General Motors*"), No. 14-MD-2543 (JMF), 2017 WL 3443623, at *2 (S.D.N.Y. Aug. 9, 2017) ("a plaintiff who is *injured* at one point in time by a defendant's conduct does not necessarily suffer cognizable *damages* at that same time for purposes of an economic loss claim").

*General Motors* is particularly instructive. That case concerns a set of plaintiffs identically situated to Plaintiffs here—*i.e.*, purchasers of an allegedly defective vehicle who sold, traded-in, or returned their vehicles prior to the announcement of a recall. 257 F. Supp. 3d 372, 403 (S.D.N.Y. 2017). The court in *General Motors* concluded that a "plaintiff who resold her car before the recall suffered no economic loss damages, as the then-unknown defect could not have affected the resale price." *Id.* Plaintiffs argue that *General Motors* should not be considered because it did not address a RICO claim, Opp'n Br. 12 n.10, but if Plaintiffs' claim cannot even be recognized as an injury at all, then it *a fortiori* cannot be recognized as a RICO injury. Bosch Br. 7-9. Despite Plaintiffs' attempts to distinguish the nature of their purported injury here, their claims are no different than those of the plaintiffs in *General Motors* who failed to "plausibly allege[ ] . . . a coherent theory of damage." Opp'n Br. 12 n.10.

Plaintiffs elsewhere try to distinguish a 2016 *General Motors* decision, 2016 WL 3920353, at *1 (S.D.N.Y. July 15, 2016), and *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 155 F. Supp. 2d 1069, 1091 (S.D. Ind. 2001), as supposedly involving "latent" or potential defects that may or may not manifest. Opp'n Br. 10-11. But like the plaintiffs in *General Motors*

5

1    and *Bridgestone/Firestone*, Plaintiffs' alleged injury—the post-NOV "announcement decline in

2    resale value," Compl. ¶ 12—depends on an announcement that did not occur until after Plaintiffs

3    relinquished any property interest in the vehicles, and therefore could not have affected them.[6]

4            Finally, unable to rely on a theory of out-of-pocket loss, Plaintiffs are left to assert only a

5    legally insufficient claim for lost expectation injury.  Bosch Br. 6-9.  Plaintiffs argue that

6    expectation-based, benefit-of-the-bargain damages are available in the Ninth Circuit, especially

7    where a defendant makes "false promises" that they "knew were false" when made.  Opp'n Br.

8    10-12 (citing *Williams v. Countrywide Fin. Corp.*, No. 16-CV-04166-CAS(AGRx), 2017 WL

9    986517, at *9 (C.D. Cal. Mar. 13, 2017); *In re Morning Song Bird Food Litig.*, No. 12CV1592

10   JAH (RBB), 2013 WL 12144051, at *6 (S.D. Cal. Sept. 30, 2013)).  These cited cases, however,

11   involve concrete, out-of-pocket financial loss without recoupment, and not failure to meet a mere

12   expectation, as Plaintiffs claim here.  *Williams*, 2018 WL 799156, at *11-12, *15-16 (C.D. Cal.

13   Feb. 6, 2018) (certifying class with damages based on an "out-of-pocket loss theory"); *Morning

14   Song*, 2013 WL 12144051, at *6 (plaintiff "*spent money* to purchase worthless bird food"

15   (emphasis added)).  To the extent that this Court in *Napleton* recognized an expectation-based

16   theory, it was one where the expectation was allegedly frustrated – where the dealers "expected to

17   be able to sell their stock at a certain price ***and received lower prices***" – and not one where the

18   dealers (like Plaintiffs here) relinquished for full value their vehicles before there was any market

19   information about the alleged fraud.  Indeed, the *Napleton* decision expressly distinguished the

20   dealers' situation from that of consumers.  *Napleton*, 2017 WL 4890594, at *7 (citing *General

21   Motors*, 2016 WL 3920353, at *17) (emphasis added).  Further, Plaintiffs do not allege that the

22   Bosch Defendants made any agreement with them, let alone "false promises."  *General Motors*,

23   2016 WL 3920353, at *17 (S.D.N.Y. July 15, 2016) (requiring an "agreement between the

24   _____

25   [6] Furthermore, Plaintiffs' attempt to distinguish *General Motors* and *In re Bridgestone/Firestone*
     falls flat in light of the Ninth Circuit's decision in *Cahen*, which found that alleged vehicle
26   defects that had yet to manifest were "speculative" and insufficient to confer even Article III
     standing.  *See* 2017 WL 6525501, at *2.

27

28                                           6

parties" that "provided for a certain performance guarantee" for expectation injury to be sufficient).[7]

## B. Plaintiffs Have Failed To Allege That Their Claimed Injuries Were Caused "By Reason Of" A RICO Violation By The Bosch Defendants.

Plaintiffs fail to allege a sufficiently direct relationship between the Bosch Defendants' alleged conduct and their purported injuries. Bosch Br. 9-12. Plaintiffs suggest that they were direct victims of the Bosch Defendants' conduct because marketing materials "targeted Plaintiffs and other consumers and were intended to misrepresent and conceal the true nature of the 'clean diesel' vehicles." Opp'n Br. 14-15. But "[t]he existence of specific intent does not answer the question of whether the injury is specifically direct." *Pillsbury, Madison & Sutro v. Lerner*, 31 F.3d 924, 929 (9th Cir. 1994). Plaintiffs fail to bridge this gap.

*First*, Plaintiffs argue that "there may be two or more direct victims of a racketeering scheme." Opp'n Br. 15-16 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1394 (2014)). But this is not the point. Plaintiffs' arguments fail because there are plainly **more direct** alleged victims than Plaintiffs, including the Franchise Dealers and consumers who at least had an interest in an Affected Vehicle on September 18, 2015, and the governmental parties that brought claims for public harms against VW. Bosch Br. 9-10; *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 10 (2010) (theory of causation that "requires [the Court] to move well beyond the first step" insufficient under RICO). In fact, this Court has already identified the Franchise Dealers as being the most direct victims due to their direct purchases from the Volkswagen Defendants. *See Napleton*, 2017 WL 4890594, at *8-9. Plaintiffs, conversely, did not even have a property interest in an Affected Vehicle when the EPA issued the

---

[7] Plaintiffs also cite *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 59 (2d Cir. 1998), where investors suffered RICO injury at the time of their investment because the partnerships in which they invested "could *never* achieve the promised objectives" and the "investors [had] no contractual or other legal remedies which could assuage [their] injury." *Id.* at 59 (emphasis added). By contrast, Plaintiffs remained free to drive and ultimately disposed of their vehicles, in the process "assuag[ing]" any injury.

7

1  NOV against VW, and they are thus at least one step further removed causally from the purported

2  fraud.  Plaintiffs do not meaningfully address this factual difference or adequately show that they

3  were nonetheless directly injured by the revelation of VW's emissions fraud.

4       Plaintiffs argue that the Bosch Defendants are judicially estopped from arguing that the

5  Franchise Dealers were more direct victims than Plaintiffs due to the Bosch Defendants' prior

6  litigation positions in *Napleton*.  Opp'n Br. 18.  But an argument in a brief cannot be the basis for

7  judicial estoppel where that argument was not accepted by the court.  *See Safeway Inc. v. Abbott*

8  *Labs.*, 761 F. Supp. 2d 874, 891 (N.D. Cal. 2011) ("Because no court accepted [the party's]

9  earlier legal arguments . . . they do not judicially estop [that party] from taking a different legal

10  position.").  Furthermore, the phrase that Plaintiffs selectively quote from the Bosch Defendants'

11  Answer in *Napleton* was taken from an Affirmative Defense, which necessarily responded to the

12  plaintiffs' theories in that case and does not constitute an affirmative statement of fact subject to

13  judicial estoppel.  *See Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988)

14  (defining judicial admissions as "formal admissions in the pleadings which have the effect of

15  withdrawing a fact from issue and dispensing wholly with the need for proof of the fact")

16  (citation omitted); *Lam Research Corp. v. Schunk Semiconductor*, 65 F. Supp. 3d 863, 870 (N.D.

17  Cal. 2014) (noting that doctrine of judicial admissions is inapplicable on questions of law).  In

18  any event, the Bosch Defendants never contended that consumers who did not hold an interest in

19  an Affected Vehicle as of the NOV date were directly injured, even if the Court were to find that

20  the Bosch Defendants suggested that certain consumers (though certainly not the consumers at

21  issue here) were more directly injured than the Franchise Dealers.

22      *Second*, Plaintiffs fail to allege a direct relationship between the relevant alleged conduct

23  here and their purported injury.  Bosch Br. 10-11.  Plaintiffs' claimed injury is premised upon the

24  supposed payment of a premium for the Affected Vehicles, which VW allegedly charged and

25  which the Bosch Defendants had no role in determining.  *Id.*  Plaintiffs respond that they need not

26  allege a "direct relationship between each RICO defendant's conduct and the plaintiff's injury"

27  because "proximate cause requires only a direct relationship to the 'injurious conduct' generally."

28

8

1    Opp'n Br. 19-20 (citing *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)).  But *Holmes*

2    says nothing of the sort, and, indeed, other cases have held that "the proximate causation analysis

3    must be conducted for each defendant in a RICO case."  *Duramax*, 2018 WL 949856, at *25;

4    *Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 608 (E.D. Mich. 2015) (RICO requires "the

5    requisite causal connection between [the plaintiffs'] injuries and predicate acts committed by

6    *each Defendant*") (emphasis added).

7         *Third*, the alleged premium that VW charged for the Affected Vehicles cannot be ascribed

8    to the Bosch Defendants as a "common purpose" of the RICO enterprise or through a theory of

9    co-schemer liability because the premium was at odds with the Bosch Defendants' purported

10   interests.  *See, e.g.*, *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir.

11   2004).  A premium on the Affected Vehicles would necessarily reduce demand, resulting in fewer

12   EDC17s being sold than if VW did not charge a premium.  Bosch Br. 10-11.  Plaintiffs argue that,

13   on the contrary, "[i]f Bosch had not conspired with VW to deceive regulators . . . they would have

14   sold far fewer defeat devices."  Opp'n Br. 20.  But the sale of alleged "defeat devices" is wholly

15   independent from VW charging a premium, and that premium was directly contrary to the Bosch

16   Defendants' interests.

17        *Fourth*, Plaintiffs' claim creates risk of double recovery and presents substantial

18   difficulties in apportioning damages amongst different types of plaintiffs.  Bosch Br. 11-12.

19   Plaintiffs assert claims for damages based on the same purported defect for the same Affected

20   Vehicles for which compensation has already been provided to other parties.  *Id.*  In particular,

21   the Affected Vehicles that Plaintiffs sold or relinquished were necessarily among those held by

22   other consumers on September 18, 2015, who claimed for an alleged "diesel premium" and later

23   loss of value after the EPA issued its NOV, and those plaintiffs have now received generous

24   compensation from VW and Bosch in their respective settlement programs.  Yet Plaintiffs here

25   seek compensation in respect of the same Affected Vehicles. Compl. ¶ 506.  These claims for

26   damages are not merely "mirror image[s]" of the same injury.  *See Napleton*, 2017 WL 4890594,

27   at *6.  Rather, Plaintiffs' claims create the risk of double or triple recovery for multiple parties

28

9

1  from the same Affected Vehicles, which courts caution against.  *See Holmes*, 503 U.S. at 269

2  ("recognizing claims of the indirectly injured would force courts to adopt complicated rules

3  apportioning damages among plaintiffs removed at different levels of injury from the violative

4  acts, to obviate the risk of multiple recoveries").

5  **II.     PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE A RICO CLAIM.**

6        Plaintiffs fail to allege a pattern of racketeering or the existence of an enterprise with the

7  particularity required by Rule 9(b).  Plaintiffs rely entirely on this Court's ruling in *Napleton* for

8  the sufficiency of their RICO claim and fail to address the Bosch Defendants' arguments.[8]

9        *First*, Plaintiffs do nothing more than rely wholesale on this Court's decision in *Napleton*

10  to assert that the Bosch Defendants engaged in a pattern of racketeering, ignoring entirely the

11  arguments raised by the Bosch Defendants in their opening brief.  Opp'n Br. 22-27.  By

12  Plaintiffs' own admission, the "akustikfunktion" was not "Bosch software," Compl. ¶ 239 (noting

13  that the akustikfunktion was developed by Audi), and there is no allegation that the Bosch

14  Defendants exerted any control over software developed by VW or any other party or that the

15  Bosch Defendants would have had actual knowledge as to how the function ultimately impacted

16  emissions or how VW intended to use the function in production vehicles.  Bosch Br. 15-17.

17  Plaintiffs do not respond to these arguments.

18        Even assuming arguendo that Plaintiffs adequately pled that the Bosch Defendants were

19  aware that the "akustikfunktion" could be used to increase emissions or that it actually did

20  increase emissions, there is no allegation that the Bosch Defendants had actual knowledge that

21  VW intended to hide the function from regulators or use it to evade emissions requirements (and

22  thus shared an intent to defraud), particularly when EPA regulations expressly permit a

---

[8] The Bosch Defendants acknowledge that the Court has ruled that allegations similar to the ones that Plaintiffs make here are adequate to plausibly allege the existence of an enterprise and a pattern of racketeering.  *Napleton*, 2017 WL 4890594.  The Bosch Defendants respectfully submit the arguments below to address *Napleton* and to preserve the issues in the event of appellate review.

1    manufacturer to include functions that may increase emissions so long as they are disclosed and

2    approved by authorities.  Bosch Br. 20-21.  Plaintiffs likewise fail to respond to this point.

3         In resting exclusively on *Napleton*, Plaintiffs also ignore the Bosch Defendants' additional

4    context and explanation of the various documents and communications cited in *Napleton* (and

5    relied upon in the Complaint), mistakenly, as evidence of the claimed fraudulent scheme.  Bosch

6    Br. 17-19.  Plaintiffs provide no reason as to why the Court should reaffirm an interpretation of

7    these documents that they do not support.

8         Plaintiffs thus fail to show that the Bosch Defendants were knowing participants in a

9    purported fraudulent scheme.  Accordingly, the Bosch Defendants cannot be held liable for the

10   predicate acts of VW.  Because the Complaint does not allege that the Bosch Defendants

11   independently engaged in any predicate acts, Bosch Br. 22-25, Plaintiffs fail to allege that the

12   Bosch Defendants engaged in a pattern of racketeering.[9]

13        *Second*, Plaintiffs have not alleged either that the Bosch Defendants shared a "common

14   purpose" with VW or that they "directed" the affairs of the purported RICO enterprise.  Bosch Br.

15   26-31.  As discussed *supra* Section I.B., Plaintiffs' injury is premised on a purported premium

16   that VW charged for the Affected Vehicles, which the Bosch Defendants neither shared in nor

17   had any role in determining.  Compl. ¶ 320.  But charging such a premium cannot plausibly be a

18   common purpose of both VW and the Bosch Defendants because increasing the price of a vehicle

19   necessarily decreases the number of vehicles actually sold.  While VW can generate increased

20   revenue from a smaller sales volume thanks to the purported premium, fewer vehicle sales would

21   result in fewer ECU sales for the Bosch Defendants.  Thus, even if Plaintiffs can plausibly allege

---

23   [9] Plaintiffs argue that the Bosch Defendants' arguments regarding the impermissibility of aiding
24   and abetting liability for a civil RICO claim are "irrelevant" and do not respond in substance.
     Opp'n Br. 27.  As a result, Plaintiffs have waived any opposition to this argument.  *See, e.g.*, *In re
25   Yahoo! Inc. S'holder Derivative Litig.*, 153 F. Supp. 3d 1107, 1124 n.11 (N.D. Cal. 2015)
     (recognizing that a party "waive[s] an argument by failing to raise it in opposition to motion to
26   dismiss").  In *FCA*, Judge Chen held that there is no claim for RICO aiding and abetting as a
     matter of law.  *FCA*, slip op. at 63-66.

27

28                                        11
     **BOSCH DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS (MDL NO. 2672 CRB)**

that the Bosch Defendants shared a common purpose with VW to deceive regulators into approving the Affected Vehicles, claims stemming from the purported premium are the result of VW's independent actions, not those of a RICO enterprise.

Nor do Plaintiffs adequately allege that the Bosch Defendants conducted the affairs of the alleged enterprise. Bosch Br. 29-31. Plaintiffs allege that Bosch integrated the Volkswagen software into the EDC17 and presume that that allegation suffices to establish the Bosch Defendants' role in the "chain of command" of the enterprise. *See* Opp'n Br. 29-30 (citing Compl. ¶ 233). But Plaintiffs never allege how or why this integration process would have revealed the true nature of the "akustikfunktion" to the Bosch Defendants, and thus transformed the conduct from simply fulfilling a customer's order to directing the affairs of a RICO enterprise. Bosch Br. 29. Because Plaintiffs do not adequately allege that the Bosch Defendants exercised decision-making power over the alleged enterprise, they fail to meet RICO's "conduct" requirement. *See In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 910-11 (C.D. Cal. 2012).

Plaintiffs' wholesale reliance on *Napleton* is inadequate not only because they ignore the Bosch Defendants' arguments entirely, but also because *Napleton* presumed the existence of an enterprise based on its finding of a plausible allegation of a common scheme to defraud. *Napleton*, 2017 WL 4890594, at *16. For the reasons set forth above, Plaintiffs have not carried their burden of showing that the Bosch Defendants knowingly participated in a scheme to defraud, and thus there is no basis to presume the existence of a RICO enterprise. Without this presumption, the Complaint lacks allegations necessary to satisfy this element, and Plaintiffs offer nothing in their Opposition to otherwise support finding such an enterprise. *See* Opp'n Br. 28-30. Accordingly, the RICO claim must fail.[10]

---

[10] Because Plaintiffs fail to establish the requisite RICO elements, their RICO conspiracy claim must likewise fail. Bosch Br. 31.

**BOSCH DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS (MDL NO. 2672 CRB)**

III.   **PLAINTIFFS FAIL TO SUPPORT PERSONAL JURISDICTION OVER BOSCH GMBH.**

The Complaint fails to make a *prima facie* showing of personal jurisdiction over Bosch GmbH sufficient to satisfy Constitutional due process requirements, whether analyzed with regard to California or on a nationwide basis under Rule 4(k)(2).  Plaintiffs cannot establish specific jurisdiction as to California because they fail to allege that Bosch GmbH purposefully directed its activities at California or that Plaintiffs' claims arose out of those California-directed activities.  *See Schwarzenegger v. Fred Martin Motor Co*., 374 F.3d 797, 802 (9th Cir. 2004).  As to Rule 4(k)(2),  Plaintiffs cannot show that Bosch GmbH "purposefully directed" its activities at the United States by alleging little more than that Bosch GmbH is a German company, Compl. ¶ 162, that developed control units in Germany for another German company, Compl. ¶ 219.  *See Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1071 (9th Cir. 2017).  Further, Plaintiffs cannot plausibly argue that their claim would not have arisen "but for" Bosch GmbH's activities, given their lack of specific allegations as to Bosch GmbH's conduct.  *See* Bosch Br. 33-34; *Doe v. Unocal Corp*., 248 F.3d 915, 924 (9th Cir. 2001).

Accordingly, the Court should decline to exercise general or specific personal jurisdiction over Bosch GmbH.

## CONCLUSION

For the reasons stated above and in the opening Bosch Brief, Plaintiffs' claims should be dismissed with prejudice.

Dated:         March 21, 2018

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _____ /s/ Matthew D. Slater _____
Matthew D. Slater (pro hac vice)
2000 Pennsylvania Ave, NW
Washington, DC 20006
(202) 974-1500 (Phone)

13

1

(202) 974-1999 (Facsimile)
mslater@cgsh.com

2

3

Carmine D. Boccuzzi Jr. (pro hac vice)
One Liberty Plaza

4

New York, NY 10006
(212) 225-2508

5

(212) 225-3999
cboccuzzi@cgsh.com

6

7

David L. Anderson (SBN 149604)
SIDLEY AUSTIN LLP

8

555 California Street
San Francisco, CA 94104

9

(415) 772-1200 (Phone)
(415) 772-7400 (Facsimile)

10

dlanderson@sidley.com

11

Counsel for Defendants

12

Robert Bosch LLC and Robert Bosch GmbH

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14