ABRAHAM, FRUCHTER
   & TWERSKY, LLP
IAN D. BERG   (Bar No. 263586)
TAKEO A. KELLAR   (Bar No. 234470)
11622 El Camino Real, Suite 100
San Diego, CA 92130
Tel:   (858) 764-2580
Fax:   (858) 764-2582
*iberg@aftlaw.com*
*tkellar@aftlaw.com*

*Attorneys for Lead Plaintiff Puerto Rico*
*Government Employees and Judiciary*
*Retirement Systems Administration*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 2672 CRB (JSC) |
| | **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS REGARDING VOLKSWAGEN BONDS** |
| This Document Relates To: | |
| *BRS v. Volkswagen AG, et al.,* Case No. 16-cv-3435  ("Bondholders Securities Action") | Judge:   Hon. Charles R. Breyer<br>Courtroom:  6, 17th Floor |

## TABLE OF CONTENTS

Page

I.    NATURE OF THE ACTION ................................................................................1

II.   JURISDICTION AND VENUE .........................................................................4

III.  PARTIES ............................................................................................................6

    A.    Lead Plaintiff ..........................................................................................6

    B.    Defendants ..............................................................................................6

IV.   BACKGROUND ..............................................................................................10

    A.    Volkswagen's History And Ownership Structure.................................10

    B.    Volkswagen Had An Ambitious Growth Plan
          Driven By "Clean Diesel" Marketing ...................................................11

    C.    The United States And Europe Required Emissions
          Standards................................................................................................12

V.    DEFENDANTS' FRAUDULENT SCHEME ....................................................15

    A.    Volkswagen Installs A Defect Device ..................................................15

    B.    Volkswagen Executives Knew Or Were Reckless In
          Not Knowing That Volkswagen Cars Used Defeat
          Devices To Cheat Emissions Testing .....................................................21

    C.    Volkswagen's Emissions Scandal Grew from A
          Corporate Culture That Was Demanding, Tightly
          Controlled, And Tolerant of Rule Breaking ..........................................26

    D.    Volkswagen's Scheme To Cheat Emissions Tests
          Was Necessary To Achieve Its Goal Strategy .......................................31

    E.    Winterkorn Becomes CEO And Changes
          Volkswagen's Emission Control Strategy .............................................33

    F.    Volkswagen Failed To Develop A High-
          Performance Clean Diesel Engine And Was Forced
          To Delay The Introduction Of The Jetta.................................................35

    G.    Volkswagen Was Under Pressure To Produce A
          High-Performance Engine That Could Meet
          Emissions Standards ..............................................................................35

    H.    Unable To Develop Functional Clean Diesel,
          Volkswagen Installs Cheat Devices ......................................................37

    I.    How Volkswagen Cheated The Emissions
          Regulation Certification Process............................................................40

J.   Volkswagen Improperly Markets And Sells Its "Clean Diesel" Cars ...................................................43

K.   Volkswagen Is Successful In Marketing "Clean Diesel," Leading To Increase In Market Share And Profits ...................................................................................45

L.   Volkswagen Tries To Hide Its Defeat Device And Limit Exposure ..................................................50

M.   Volkswagen's Scheme Was A Deliberate Strategy By The Company's Top Management ........................54

N.   Financial Impact Of The Scheme ...........................60

VI.   AS A RESULT OF VOLKSWAGEN'S EMISSION SCHEME, VWAG FRADULENTLY UNDERSTATED CONTINGENT LIABILITIES AND OVERSTATED PROFITS. ......................................................................62

VII.   FALSE AND MISLEADING STATEMENTS AND OMISSIONS ...........................................................65

A.   Defendants Made False And Misleading Statements And Omissions In The Bond Offering Memoranda ...............65

B.   Defendants Made False And Misleading Statements And Omissions In Interim and Annual Reports Referenced In The Offering Memoranda.................70

C.   Defendants Made False And Misleading Statements And Omissions About VWAG's Financial Results And Condition...............................................................74

VIII.   THE TRUTH IS REVEALED ..................................75

IX.   POST CLASS PERIOD DEVELOPMENTS ...............80

X.   ADDITIONAL ALLEGATIONS SUPPORTIVE OF FALSITY AND SCIENTER ....................................95

XI.   RELIANCE ...........................................................103

XII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR ..............................................................109

XIII.   CLASS ACTION ALLEGATIONS .........................110

XIV.   CLAIMS FOR RELIEF ...........................................112

COUNT I For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against Defendants VWAG, VWGoA, VWGoAF, Winterkorn, and Horn ...........................112

COUNT II For Violations Of Section 20(a) Of The
Exchange Act, Asserted Against VWAG, VWGoA,
Winterkorn, And Horn ................................................................................114

XV.     PRAYER FOR RELIEF .............................................................................117

XVI.    JURY DEMAND .........................................................................................117

Lead Plaintiff Puerto Rico Government Employees and Judiciary Retirement Systems Administration ("PRGERS" or "Plaintiff"), by its undersigned counsel ("Lead Counsel"), makes the following allegations in this Second Amended Class Action Complaint for violations of the Federal Securities Laws upon information and belief based upon all of the facts set forth herein which were obtained through an investigation made by and through Lead Counsel.   Lead Counsel's investigation has included, among other things, a review and analysis of public filings by Defendants (defined herein) with government regulators, press releases and other public statements issued by Defendants, new reports, documents filed in other proceedings, and the other sources, set forth herein.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.   NATURE OF THE ACTION

1.    This is a federal securities class action brought by Plaintiff on behalf of a Class consisting of all persons and entities ("Bondholders") who purchased or otherwise acquired private debt (bonds) exempt from registration with the U.S. Securities and Exchange Commission ("SEC") under Rule 144A of the U.S. Securities Act of 1933, 17 C.F.R. § 230.144A ("Rule 144A"), of Volkswagen Aktiengesellschaft (herein, "VWAG") between May 23, 2014, and September 22, 2015, inclusive (the "Class Period"), and who were damaged thereby.  This action seeks to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

2.    Headquartered in Wolfsburg, Germany, Defendant VWAG is one of the world's leading automobile manufacturers and Europe's largest carmaker.  In 2014, the Company sold over ten million cars, representing approximately 13% of the global passenger car market.  The Company encompasses 12 brands:  Volkswagen Passenger Cars, Audi, SEAT, ŠKODA, Bentley, Bugatti, Lamborghini, Porsche, Ducati, Volkswagen Commercial Vehicles, Scania, and MAN. Volkswagen operates 31 production plants throughout the world, including a large production plant in Chattanooga, Tennessee.  Defendant Volkswagen Group of America, Inc. ("VWGoA")

(d/b/a/ Volkswagen of America, Inc. ("VWoA"), and Audi of America, Inc. ("AoA")), is a wholly-owned U.S. subsidiary of VWAG.  Defendant Volkswagen Group of American Finance, LLC ("VWGoAF) is a wholly-owned subsidiary of VWGoA.  Defendant VWGoAF was incorporated on February 14, 2014, as a debt-issuing vehicle for its ultimate parent company, VWAG.  Herein, references to "Volkswagen," "VW," or the "Company" are to VWAG, together with its subsidiaries, including VWGoA and VWGoAF.

3.     On three occasions in 2014 and 2015, VWGoAF issued U.S.-dollar denominated debt securities (the "Bonds") guaranteed by VWAG, raising a total of $8.3 billion dollars in par value, which traded during the Class Period.  Specifically, VWGoAF issued $3.5 billion in bonds on May 23, 2014, $2 billion in bonds on November 20, 2014, and $2.8 billion in bonds on May 22, 2015.  All of these issues were private placements and only offered to U.S. investors pursuant to an exemption from registration with the SEC under Rule 144A.  Plaintiff brings this action on behalf of all purchasers of the above private placement Bonds.

4.     Prior to and during the Class Period, Defendants made numerous materially false and misleading statements and omissions to Bondholders regarding the Company's operations, its business and financial condition, and its outlook, and engaged in a scheme to defraud those Bondholders.  Specifically, Volkswagen failed to disclose that it installed and utilized a "defeat device" in a substantial amount of vehicles, which allowed those vehicles, and particularly certain of its diesel cars, to temporarily reduce emissions during testing to allow them to be certified for sale.  Without the use of the defeat device, and during normal, non-testing operation, those vehicles produced emissions in excess of regulatory requirements, and otherwise would not have been certified for sale.  Furthermore, the use of a defeat device assisted Volkswagen's marketing to environmentally conscious consumers to increase sales of diesel cars, while evading the emissions regulations and standards in the United States and Europe.  As part of this scheme, Defendants made material misrepresentations and omissions to the Class in the Bond Offering Memoranda dated May 15, 2014 (for the May 23, 2014 offering), November 12, 2014 (for the November 20, 2014 offering), and May 19, 2015 (for the May 22, 2015 offering), and failed to disclose material facts or otherwise correct their omissions throughout the Class Period.

5.      As a result of Defendants' scheme and false and misleading statements and omissions, Volkswagen's private debt instruments were issued at favorable rates to Volkswagen, and then, after issuance traded at artificially inflated prices during the Class Period.  In fact, all of the Bonds at issue in this Complaint traded at over 100% of par value during the Class Period, but fell below 100% of par value after Defendants' scheme was revealed to the public.

6.      As described more fully herein, the truth began to be revealed to Bondholders and the markets on Friday, September 18, 2015, when the U.S. Environmental Protection Agency ("EPA") issued a Notice of Violation ("NOV") stating that Volkswagen had installed sophisticated software in Volkswagen and Audi diesel vehicles sold in the United States to favorably alter the results of required emissions tests.  Specifically, the software could detect when the vehicle was undergoing official emissions testing and then turn on full emissions controls to alter the results.  During normal operation, however, the emissions controls were deactivated, meaning that the car released pollution at levels exceeding those allowed by federal and state clean air regulators.  This software produced and used by Volkswagen is a prohibited "defeat device" as defined by the Clean Air Act.

7.      The next day, on September 19, 2015, the *New York Times* published a front-page article titled "U.S. Orders Major Recall Over Emissions Test Trickery."  The article reported that Volkswagen had "illegally installed software in its diesel-power cars to evade standards for reducing smog," and that Volkswagen had "admitted to the use of a so-called defeat device.  The recall involves 4-cylinder Volkswagen and Audi vehicles from model years 2009-2015."  The article also reported that the Department of Justice ("DOJ") had opened an investigation and that fines of as high as $18 billion could be imposed as a result of Defendants' misconduct.

8.      On Sunday, September 20, 2015, Defendant Martin Winterkorn, Volkswagen's then-CEO, admitted on behalf of the Company that it's "manipulations…violate American environmental standards," and stated further that he was "endlessly sorry" and that the Company had broken the "trust" that "millions of people across the world" had in "our brands, our cars, and our technology."  Then, on September 22, 2015, Volkswagen issued a press release revealing that as many as 11 million vehicles worldwide contained the defeat devices used to evade

emissions tests and that the Company would take a $7.3 billion charge to earnings in connection with a portion of the anticipated liabilities associated with the fraud.

9.      Following these disclosures, which revealed the relevant truth that had previously been concealed from the market, the price of Volkswagen securities fell sharply, including the value of the Bonds.  Between September 18, 2015, and September 22, 2015, the price of the Bonds plummeted, falling as much as 7.82% of par value.  Furthermore, after the truth was revealed, the credit ratings of the Bonds were cut, the risk of default on Bonds increased, as indicated by the price of credit default swaps; and all of the Bonds began trading below 100% of par value.  The declines in Bond value when the truth was revealed have resulted in substantial losses to Bondholders, who relied on the accuracy of Defendants' statements and suffered damages as result of Defendants' wrongful conduct.  This action seeks to recover for those losses.

## II.   <u>JURISDICTION AND VENUE</u>

10.      This action arises under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5 ("Rule 10b-5").

11.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331, because this is a civil action arising under the laws of the United States.

12.      This Complaint is being filed as an original action in this District and has been deemed related to the MDL No. 2672 proceedings, which have been consolidated under 28 U.S.C. §1407 before Judge Charles R. Breyer, presiding in the San Francisco Division of this District.

13.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and Section 1391(b) of the Judicial Code, 28 U.S.C. 1391(b), (c), and (d). Defendants conduct business in this District, and many of the acts and transactions that constitute the alleged violations of law occurred in or affected persons in this District.

14.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of securities trading markets in the United States.

15.     All of the transactions in the U.S.-dollar denominated debt securities that are at issue in this action took place either entirely or substantially within the United States, including irrevocable liability and transfer of beneficial ownership. The Issuer of the Bonds was VWGoAF, a Delaware company with its principal place of business in Herndon, Virginia. On the date of the offerings, and in accordance with the Distribution Plan laid out in the Offering Memoranda, VWGoAF distributed the Bonds to the Initial Subscribers/Joint Book-Running Managers, nearly all of which are U.S.-based investment banks, to sell the Bonds to investors. Of the eleven Initial Subscribers/Joint Book Running Managers, only one, Société Générale (who conducts substantial business in the U.S. and in this District), is based outside of the United States. Specifically, the Initial Subscribers/Joint Book-Running Managers for the May 23, 2014 offering are the U.S.-based offices of BNP Paribas Securities Corp. (New York), Citigroup Global Markets Inc. (New York), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") (New York), and RBS Securities Inc. (Connecticut). The Initial Subscribers/Joint Book-Running Managers for the November 20, 2014 offering are the U.S.-based offices of Barclays Capital Inc. (New York), HSBC Securities (USA) Inc. (New York), J.P. Morgan Securities LLC (New York), and Mizuho Securities USA Inc. (New York). The Initial Subscribers/Joint Book-Running Managers for the May 22, 2015 offering are the U.S.-based offices of Citigroup Global Markets Inc. (New York), Goldman Sachs & Co. (New York), Morgan Stanley & Co. LLC (New York), along with the London, England office of Société Générale.

16.     Plaintiff PRGERS purchased 1,870 Bonds (CUSIP: 928668AA0) issued as part of the May 23, 2014, offering through Initial Subscriber/Joint Book-Running Manager, Merrill Lynch's Charlotte office, and 2,340 Bonds (CUSIP: 928668AA0) issued as part of the May 23, 2014, offering through J.P. Morgan Securities' New York office.

17.     Deposit and beneficial interests in the 144A Bonds took place in the United States with Book-entry ownership recorded and held by The Depository Trust Corporation ("DTC"), 55 Water Street, New York, New York.   As disclosed in the Offering Memoranda, DTC is "a limited-purpose trust company organized under the laws of the State of New York, a 'banking organization' under the laws of the State of New York, a member of the U.S. Federal Reserve System, a 'clearing corporation' within the meaning of the New York Uniform Commercial Code and a 'clearing agency' registered pursuant to the provisions of Section 17A of the Exchange Act.   DTC was created to hold securities for its participating organizations (collectively, the 'DTC Direct Participants') and to facilitate the clearance and settlement of securities transactions between DTC Direct Participants through electronic computerized book-entry changes in accounts of the DTC Direct Participants, thereby eliminating the need for physical movement of certificates."

18.     Further, as specified in the Bond Offering Memoranda, the Bond Payments, including payments of principal and interest, are made in U.S. dollars in a designated bank in New York City.

## III.     PARTIES

### A.     Lead Plaintiff

19.     Lead Plaintiff Puerto Rico Government Employees and Judiciary Retirement Systems Administration ("PRGERS") is a public pension fund established for the management and payment of retirement benefits to employees of the Puerto Rico Government and the Judiciary.   PRGERS purchased Volkswagen Bonds at artificially inflated prices during the Class Period and suffered an economic loss when the relevant truth was disclosed and the Bond values declined.   PRGERS's purchases are set forth in the Certification previously filed with the Court and is incorporated herein by reference.   On October 11, 2016, this Court entered an Order appointing PRGERS as Lead Plaintiff.

### B.     Defendants

20.     Defendant Volkswagen Aktiengesellschaft (previously defined as "VWAG") through itself and its divisions, is a multinational automotive manufacturing company

headquartered in Wolfsburg, Lower Saxony, Germany.  VWAG is the ultimate parent and controlling company of defendants VWGoA and VWGoAF and is the Guarantor of the Bond Offerings as defined in the Bond Offering Memoranda.  Defendant VWAG was involved in the day-to-day operations of, and exercised power and control over, VWGoA and VWGoAF, including by, among other things, appointing their boards of directors and executive officers and directing their public statements and regulatory actions.  VWAG engineered, designed, developed, manufactured, and installed the defeat-device software on its diesel cars with the knowledge and understanding that they would be sold throughout the U.S. and the world. VWAG also developed, reviewed, and approved the marketing and advertising campaigns designed to sell the illegal cars.  The Bond Offering Memoranda state that "references to the 'Company', the 'Guarantor' or 'Volkswagen AG' are to [VWAG], and references to 'Volkswagen', the 'Volkswagen Group', 'we', 'us' and 'our' are to [VWAG] together with its consolidated subsidiaries, including the Issuer [VWGoAF]."

21.     Defendant Volkswagen Group of America (previously defined as "VWGoA") (d/b/a/ Volkswagen of America, Inc. ("VWoA"), and Audi of America, Inc. ("AoA")), is a wholly-owned subsidiary of VWAG doing business in the United States and organized under the laws of the State of New Jersey with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171.  VWGoA houses the U.S. operations of many of VWAG's brands, including Volkswagen, Audi, Bentley, Bugatti, and Lamborghini.  VWGoA has approximately 6,000 employees in the United States and sells its vehicles through a 1,000 dealer network in all 50 states.  VWGoA also operates a manufacturing plant in Chattanooga, Tennessee.  In 2014 alone, VWGoA sold 552,729 vehicles in the United States from its U.S. dealer network in all 50 states, including 95,240 "turbocharged direct injection" ("TDI") "clean diesel" vehicles.

22.     Defendant Volkswagen Group of America Finance, LLC (previously defined as "VWGoAF"), is a wholly-owned subsidiary of VWGoA doing business in the United States, organized under the laws of Delaware with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171.  VWGoAF was incorporated on February

14, 2014, as a debt issuing vehicle for VWAG (with VWAG as the ultimate obligor of the debt), and specifically, is the Issuer of the Bonds that are the basis for this action.  At all relevant times, the Board of Directors of VWGoAF included Jan Vycital, who concurrently served as the Executive Vice President and Chief Financial Officer of VWGoA, and Bjoern Baetage, who was the Treasurer of VWGoA under Defendant Horn.

23.     Defendant Martin Winterkorn ("Winterkorn") was appointed Chief Executive Officer ("CEO") of VWAG in 2007 and served as CEO and Chairman of the Board of Management of VWAG until his resignation on September 23, 2015.  Winterkorn also served as Chairman of the Board of Management of Porsche Automobil Holding SE until his resignation on October 17, 2015, and Chairman of the Supervisory Board of Audi AG until his resignation on November 11, 2015.  Defendant Winterkorn was involved in the day-to-day operations of, and exercised power and control over VWAG and its subsidiaries, including by, among other things, directing their public statements, and regulatory actions.  In his capacity as a member of VWAG's Board of Management, Winterkorn signed certifications in the Offering Memoranda to the Bonds at issue in this action, attesting to the truth and accuracy of the Company's financial position, the development and performance of its business, and descriptions of the material opportunities and risks associated with the company's expected development.   Winterkorn signed at least three such certifications, dated February 12, 2013, February 11, 2014, and February 17, 2015.

24.     Defendant Winterkorn is subject to the personal jurisdiction of the Court because he has availed himself of the laws of the United States through his management and control over VWGoA and its subsidiary VWGoAF, as well as the manufacture, distribution, testing, and sale of hundreds of thousands of diesel vehicles imported and sold across the United States.  Further, Winterkorn has frequently traveled to the United States to attend and make presentations at various car shows across the country in order to promote the sales of Volkswagen cars with the purported clean diesel technology.

25.     Defendant Michael Horn ("Horn") was President and CEO of VWGoA, and the president of the VWoA brand, from January 1, 2014 until his resignation on March 9, 2016.

Horn joined Volkswagen in 1990 and held various roles over his 25-year tenure, including Head of Volkswagen Sales North West Europe, Head of Sales and Marketing Luxury Class Vehicles, and Head of Sales for Europe.  Immediately prior to being hand-selected by Winterkorn to assume the role of VWGoA CEO, Horn served as the Global Head of After Sales at VWAG and VWGoA from March 2009 to December 2013.  Defendant Horn, a German national and "Wolfsburg insider" (*WSJ*, Dec. 11, 2014), was considered "a seasoned VW executive with deep ties to Wolfsburg," *i.e.*, VWAG's headquarters (*Automotive News*, Jan. 23, 2015).  Defendant Horn was involved in the day-to-day operations of, and exercised power and control over VWGoA and its subsidiary VWGoAF, including by, among other things, directing their public statements, assisting in the acquisition of regulatory approvals and communicating with regulators.  In addition, multiple VWGoAF Board members reported to Defendant Horn in their responsibilities as executives of VWGoA, including Messrs. Vycital and Baetage.

26.     Defendant Horn is subject to the personal jurisdiction of the Court because he has availed himself of the laws of the United States through his management and control over VWGoA and VWGoAF, as well as the manufacture, distribution, testing, and sale of hundreds of thousands of diesel vehicles imported and sold across the United States.  Further, Horn was a resident of the United States during the Class Period and while heading VWGoA and promoting the sales of Volkswagen cars with the purported clean diesel technology.

27.     As set forth herein, by virtue of their positions with the Company, as well as the Company's centralized and detail-oriented style of management, Defendants Winterkorn and Horn (the "Individual Defendants") had access to adverse undisclosed information about the development of performance of the Company's business, its operations, financial condition, growth, markets, management, earnings, and present and future business prospects.  The Individual Defendants were able to and did control the content of the various offering memoranda, filings, and other statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Additionally, VWAG is a control person of

both VWGoA and VWGoAF by virtue of its direct authority and management over these entities as wholly-owned subsidiaries, and VWGoA is a control person of VWGoAF by virtue of its direct authority and management over its wholly-owned subsidiary, and also because senior executives of VWGoA concurrently served on the Board of Directors of VWGoAF.

**IV.**    **BACKGROUND**

    **A.**    **Volkswagen's History And Ownership Structure**

       28.    VWAG was established in Germany in 1937 to produce an affordable "people's car" for ordinary German workers.  The Company was largely destroyed during World War II but resumed operations in the British Occupation Zone under the ownership of the West German government and the State of Lower Saxony.

       29.    In 1960, West Germany partially privatized VWAG and enacted the "Volkswagen Law" to regulate the privatization.  The Volkswagen Law originally provided that major shareholder resolutions would require an 80% vote.  The State of Lower Saxony held a voting share of 20.2%, giving it the ability to veto any major decision and help prevent a takeover by other shareholders.

       30.    In 2008, the Volkswagen Law was amended to remove restrictions on share ownership, but an 80% vote was still required for major decisions.  The Volkswagen Law was further amended in 2013 to abolish the 80% vote requirement.  Nonetheless, VWAG's highly concentrated ownership remains insulated from the possibility of a takeover.

       31.    VWAG was co-founded by Ferdinand Porsche, who also founded German automaker Porsche Automobil Holdings SE ("Porsche").  Porsche acquired 30.9% of VWAG in 2007 and then moved for a majority stake in 2009 in an attempt to acquire VWAG.  However, Porsche experienced financial difficulties and was unable to complete the acquisition.  Under an agreement between VWAG and Porsche in 2009, VWAG agreed to Porsche's 50.7% ownership of VWAG in exchange for VWAG's management taking control of Porsche.  In effect, instead of Porsche taking control of VWAG, VWAG took control of Porsche.  However, the Porsche family and the related Piëch family own and control Porsche and thus obtained majority control of VWAG.

32.     As a result of the 2009 agreement, Volkswagen is now owned 50.7% by Porsche, 20.0% by the State of Lower Saxony, and 17.0% by Qatar Holding LLC, with only 12.3% of the Company owned by outside, public shareholders.  Furthermore, VWAG's largest shareholder, Porsche, is owned and controlled by the Porsche and Piëch families.  This concentration of majority share ownership in the hands of three shareholders – one of which, owned and controlled by the Porsche and Piëch families, itself accounts for a majority – contributes to a Volkswagen corporate culture of secrecy and lack of accountability.

33.     VWAG's culture of secrecy is reinforced by its insular corporate-governance structure.  Under German law, VWAG has two boards: a Board of Management, which consists of VWAG's Chairman and other senior executive officers and is responsible for managing VWAG's business; and a 20-member Supervisory board, which is responsible for monitoring the Company's management, approving important corporate decisions, and appointing members of the Board of Management.  Under the Germany Co-Determination Act, half of the members of the Supervisory Board are representatives of the Germany labor unions on behalf of the Company's German workers.  Remaining members of the Supervisory Board include the Company's chairman, four members of the Porsche and Piëch families, two representatives of the State of Lower Saxony, two representatives of Qatar Holding LLC, and the chief executive officer of Swedish bank SEB (which is an advisor to Scania, one of VWAG's twelve brands).

**B.     Volkswagen Had An Ambitious Growth
        Plan Driven By "Clean Diesel" Marketing**

34.     VWAG is the largest automobile manufacturer in Europe, accounting for approximately 25% of all cars sold there.  In 2008, VWAG became the third-largest automobile manufacturer in the world.  Though Volkswagen has significant market share globally and abroad, its share of the U.S. car market lagged at less than 2% in the mid-2000s, leaving significant room for growth.

35.     In 2008, Defendant Winterkorn outlined an ambitious growth plan, called "Strategy 2018," to make VWAG the largest and most profitable car maker in the world by 2018. According to *Automotive News Europe*, a central part of "Strategy 2018" was dependent on

boosting core-brand sales in the United States, aiming to at least double its sales from 324,402 units sold in 2007, to 800,000 units sold by 2018.  One strategy for VWAG to achieve its goal would be to increase sales of diesel cars in the United States.

36.     Though popular in Europe, diesel vehicles make up only about 3% of the passenger car market in the United States.  Therefore, an important part of Volkswagen's sales and marketing efforts in the United States involved promoting its diesel vehicles as low-emission, fuel-efficient cars that offer performance comparable to that of gasoline vehicles.

37.     In August 2008, VWAG introduced a new lineup of Model Year 2009 "clean diesel" engines in the U.S. that were purportedly compliant with U.S. emissions standards.  In 2010, Volkswagen announced its goals of doubling its U.S. market share from 2% to 4% by 2014, and of becoming the world's largest automaker by 2018.  In fact, VWAG would become the world's largest automaker in 2015, three years ahead of its plan.

38.     Sales of "clean diesel" cars in the United States were a central part of Volkswagen's growth strategy.  Volkswagen sold 43,869 "clean diesel" vehicles in the U.S. in 2009, 58,784 in 2010, 76,564 in 2011, 99,121 in 2012, 111,285 in 2013, and 98,500 in 2014.  By 2015, Volkswagen had a 70% market share of U.S. diesel vehicle sales, and almost one-quarter of its U.S. sales were sales of diesel vehicles.  Volkswagen's success in becoming the largest seller of diesel passenger vehicles in the United States was a result of its clean diesel marketing plan.

C.     **The United States And Europe**
       **Required Emissions Standards**

39.     Prior to and during the Class Period, various regulatory standards were in place in the United States and the European Union to limit the amount of pollutants that vehicles discharged into the atmosphere, and to further the public health.  In the United States, EPA regulations established Tier 2 and later Tier 3 emissions standards.

40.     Under Tier 2, phased in between 2004 and 2009, emissions standards are structured into 8 certification levels of different stringency, called "certification bins," which include an average fleet standard for nitrogen oxide ("NOx") emissions.  For example, the

average fleet standard for NOx emissions for Bin 5 certification is less than 0.05 grams of NOx per mile during their intermediate life and 0.07 grams of NOx per mile during their full useful life.

41.    Under Tier 3, emissions standards are similarly structured into certification levels that set a fleet-average emission standard, but are more stringent overall, with the highest acceptable emission bin, Bin 160, equivalent to Tier 2's Bin 5 limits.  Tier 3 standards were enacted in March 2014, and are to be phased in from 2017 to 2025.

42.    In addition to the federal regulations, Volkswagen must also comply with the emission regulations of all U.S. States, which may enact stricter requirements than the EPA Standards.  For example, California has enacted stricter requirements, which have also been adopted by other states.  Compliance with California's emission standards is critically important because it is by far the largest market of any other state.

43.    In November 1998, the California Air Resources Board ("CARB"), California's regulatory agency that oversees automotive emissions, adopted the Low Emission Vehicle II emissions standards, to be phased in from 2004 to 2010.  Under the Low Emission Vehicle II standards, carmakers were required to comply with at least one of several emissions categories, including: (1) Low Emission Vehicles ("LEV II"); (2) Ultra Low Emission Vehicles ("ULEV II"); (3) Super Ultra Low Emission Vehicles ("SULEV II"); and (4) Partial Zero Emission Vehicles ("PZEV").  Manufacturers, such as Volkswagen, were permitted to certify vehicles to these standards until Model Year 2019.

44.    In January 2012, CARB adopted the more stringent Low Emission Vehicle III emissions standards, which are to be phased in over the 2015 – 2025 Model Years.  Carmakers are permitted to certify vehicles to these standards before Model Year 2015, and by Model Year 2020, all vehicles must comply with Low Emission Vehicle III emissions standards.  The Low Emission Vehicle III standards expanded upon and tightened the Low Emission Vehicle II standards in several respects, but maintained the rubric of emissions categories under LEV III, ULEV III, SULEV III, and zero emission cars.

45.     Meanwhile, the relevant standards in the European Union during the Class Period were the Euro-5 and Euro-6 emissions standards.  The Euro-5 Standard was implemented in September 2009, and the Euro-6 standard was implemented in September 2014.

46.     There are two main types of internal combustion engines – diesel and gasoline.  A diesel engine is an internal combustion engine in which the ignition of an injected liquid fuel and air mixture is achieved by greatly compressing air until the mixture spontaneously combusts.  This causes the gas to expand forcefully, producing significantly more torque than a gasoline engine – leading to more power.  In contrast, gasoline engines utilize spark plugs to ignite gasoline vapors and propel the vehicle.  Diesel engines make up more than half of all vehicles sold in Europe because they typically provide better fuel economy and efficiency than gasoline engines.

47.     While both diesel and gasoline are refined from crude oil, diesel fuel is a more dense energy source that provides greater fuel economy.  The trade-off is that while diesel cars get better mileage, traditional diesel engines emit far more harmful emissions and particulate matter than gasoline, many of which are costly and difficult to treat or otherwise contain, such as NOx.

48.     NOx is a family of highly reactive gasses that interact with volatile organic compounds in the atmosphere to form ozone, a principal component of smog and acid rain.  Breathing ozone can cause chest pain, coughing, throat irritation, and congestion; can worsen bronchitis, emphysema, and asthma; and can lead to premature death.  High NOx levels also lead to severe harm to marine ecosystems and can cause plant and marine animal death.  Approximately 50% of NOx emitted comes from automobiles and other vehicular sources, and controlling these emissions can add significantly to the cost of the cars and reduce their power, acceleration, and torque.

49.     To limit emissions of NOx, particulate matter, and other pollutants, U.S. federal and state laws require vehicles to be certified as compliant with emissions standards before they can be sold.  Vehicles that are equipped with "defeat devices" cannot be certified or sold.  As defined in 40 CFR §86.004-2, a "defeat device" is an "auxiliary emission control device" that

1   reduces the effectiveness of the emission-control system under conditions that may reasonably be

2   expected to be encountered in normal vehicle operation and use, unless limited exceptions apply.

3   An "auxiliary emission control device" is a design element that senses temperature, vehicle

4   speed, engine revolutions per minute, or other parameters for the purpose of activating,

5   modulating, delaying, or deactivating the vehicle's emission control system.

6   **V.   DEFENDANTS' FRAUDULENT SCHEME**

7       50.    For years leading up to and throughout the Class Period, Defendants fraudulently

8   misrepresented and concealed from investors material facts concerning VWAG's regulatory

9   compliance, financial results, and commitment to producing "environmentally friendly" vehicles.

10      51.    VWAG repeatedly misrepresented to investors that its vehicles complied with

11  emissions standards in all 50 U.S. States and the Euro-5 standards in Europe.  The Company's

12  reported financial results were also materially false and misleading, given that the results failed

13  to properly treat amounts that, based on the likelihood of warranty claims, fines, and other

14  penalties flowing from the Company's emissions cheating, should have been accounted for as

15  provisions under International Accounting Standard ("IAS") 37, and should have

16  correspondingly reduced VWAG's earnings in each reporting period throughout the Class

17  Period.  The failure to accrue such provisions had the effect of inflating VWAG's reported profit

18  and distorting other important financial metrics during the Class Period.

19      52.    As Defendants have now repeatedly admitted, Volkswagen engaged in massive,

20  widespread misconduct through the installation and use of defeat-device software in

21  approximately 11 million vehicles with purported "clean diesel" engines—including

22  approximately 580,000 in the United States and 8.5 million in Europe.  As set forth herein, these

23  defeat devices were designed to (and did) mask the engines' failure to meet emissions standards.

24      **A.    Volkswagen Installs A Defeat Device**

25      53.    In VWAG's Plea Agreement with the United States Justice Department and

26  accompanying Statement of Facts ("Plea Agreement SOF"), VWAG admits that "[f]rom

27  approximately May 2006 to approximately November 2015, [VWAG], through Supervisors A-F

28  and other VW employees, agreed to deceive U.S. regulators and U.S. customers about whether

the Subject Vehicles and the Porsche Vehicles complied with U.S. emissions standards.  During their involvement with design, marketing and/or sale of the Subject Vehicles and the Porsche Vehicles in the United States, Supervisors A-F and other VW employees: (a) knew that the Subject Vehicles and the Porsche Vehicles did not meet U.S. emissions standards; (b) knew that VW was using software to cheat the U.S. testing process by making it appear as if the Subject Vehicles and the Porsche Vehicles met U.S. emissions standards when, in fact, they did not; and (c) attempted to and did conceal these facts from U.S. regulators and U.S. customers." The six Supervisors A-F referred to in the Plea Agreement Statement of are believed to be:

**Supervisor A**: Heiz-Jakob Neußer, who was the supervisor in charge of (a) the VW Brand Engine Development Department from on or about October 2011 until July 2013, (b) Engine Development for all of VW AG from on or about October 2012 to September 2015, and (c) Development for VW Brand from July 2013 to September 2015;

**Supervisor B**: Rudolf Krebs, who was a supervisor in charge of the VW Brand Engine Development Department from in or about May 2005 to in or about April 2007;

**Supervisor C**: Jens Hadler, who was a supervisor in charge of the VW Brand Engine Development Department from in or about May 2007 to in or about March 2011;

**Supervisor D:** Friedrich Eichler, who was a supervisor in charge of the VW Brand Engine Development Department from in or about October 2013 to at least January 11, 2017;

**Supervisor E**: Bernd Gottweis, who was a supervisor with responsibility for VW AG's Quality Management and Product Safety department who reported to the supervisor in charge of Quality Management from in or about 2007 to in or about October 2014; and

**Supervisor F**: Richard Dorenkamp, who was a supervisor within the VW Brand Engine Development Department from in or about 2003 until in or about December 2012.

54.     VWAG admits in the Plea Agreement SOF that in 2006, the engineers in VWAG's Diesel Development Department located in Wolfsburg, Germany began to design a new "EA 189" diesel engine.  "Supervisor B," "Supervisor C," "Supervisor F," and others quickly realized that the engine could not meet both management's expectations of performance and cost, as well as the new, stricter U.S. emissions standards for EPA certification becoming effective in 2007.

55.     As admitted in the Plea Agreement SOF, senior management at VWAG headquarters, comprised of engineers and others with extensive technical expertise, were well aware of the impossibility of the task.  Yet, "[i]nstead of bringing to market a diesel vehicle that could legitimately meet the new, more restrictive U.S. NOx emissions standards, [VWAG] employees acting at the direction of "Supervisor B," "Supervisor C," and "Supervisor F," and others, … designed, created and implemented a software function to detect, evade and defeat U.S. emissions standards."  VWAG admits that these Supervisors and others "knew that U.S. regulators would measure VW's diesel vehicles emissions through standard U.S. tests with specific, published drive cycles" and they hatched a plan to beat the system.

56.     Starting in 2008 and throughout the Class Period, VWAG secretly installed a software defeat device in vehicles equipped with its EA 189 2.0 liter engine and other diesel vehicles.  The device sensed when the vehicles were being tested for compliance with applicable emissions standards versus when they were engaged in real road driving, based on various parameters.  These parameters included the position of the steering wheel, the vehicle's speed, the duration of the engine's operation, and barometric pressure.  While operating under testing conditions, the defeat device caused the vehicles' electronic control module to switch the engine to a "dyno calibration" (referring to the dynamometer equipment used for emissions testing).  The "dyno calibration" permitted the emissions-control system to function at full capacity, reducing NOx emissions to a level that complied with federal and state standards, but also

reducing the vehicles' power and torque.  During normal vehicle operation, the electronic control module instead caused the engine to operate under a different "road calibration" that produced full power and torque, but reduced the effectiveness of the emissions control system.  During normal operation, the Volkswagen 2.0 liter vehicles emitted NOx at levels up to 40 times the EPA limits, depending on the type of vehicle and the driving conditions, and violated prevailing EPA, CARB, and Euro-5 emissions standards.

57.     VWAG admits in the Plea Agreement SOF that they borrowed the defeat device concept from Audi.  "On or about May 17, 2006, a VW engineer, in describing the Audi software, sent an email to employees in the VW Brand Engine Development department that described aspects of the software and cautioned against using it in its current form because it was 'pure' cycle-beating, i.e., as a mechanism to detect, evade and defeat U.S. emissions cycles or tests.  The [VWAG] engineer wrote [as translated from German], 'within the clearance structure of the pre-fuel injection the acoustic function is nearly always activated within our current US'07-data set.  This function is pure [cycle-beating] and can like this absolutely not be used for US'07.'"

58.     James Robert Liang, an engineer that worked in VWAG's diesel development department, along with co-conspirators, planned the use of, calibrated, and refined the EA 189 engine's defeat device with the full understanding that the EPA would not certify vehicles for sale in the U.S. if the EPA knew the vehicles contained defeat devices.  In May of 2008, Liang moved to the United States to assist in the launch of Volkswagen's diesel vehicles with EA 189 engines, serving as the Leader of Diesel Competence for Defendant VWGoA.  A federal jury criminally indicted Liang for his role in the fraud, and on September 9, 2016, Liang pled guilty to one count of conspiracy to defraud the United States, to commit wire fraud, and to violate the Clean Air Act.  ("Liang Plea Agreement").  In August 2017, Liang was sentenced to 40 months in federal prison for his role in the conspiracy to cheat U.S. emissions tests.

59.     For each new Model Year of VW's diesel engines, Volkswagen employees met with U.S. regulators to seek the certifications required to sell the vehicles to U.S. customers.  Liang and VWAG both admit in their respective guilty pleas that VW employees knew

Volkswagen was cheating by implementing the defeat device and that they knowingly "misrepresented and caused to be misrepresented, to the EPA and CARB staff that the Subject Vehicles complied with U.S. NOx emissions standards[.]"  Liang personally attended at least two such meetings, on March 19, 2007 with the EPA and March 21, 2007 with CARB.

60.    During the March 19, 2007 and March 21, 2007 meetings with the EPA, Volkswagen representatives gave detailed descriptions of Volkswagen's diesel technology and emissions control systems, but intentionally omitted any mention of the defeat device. Volkswagen continued to falsely and fraudulently certify to the EPA and CARB that Volkswagen 2.0 liter diesel vehicles utilizing the EA 189 engines met U.S. emissions standards and complied with the Clean Air Act through 2016.

61.    To date, as indicated by the Second Superseding Indictment, *United States v. Dorenkamp, et al.*, No. 2:16-cr-20394, (E.D. Mich. filed Jan. 11, 2017) ("SSI"), six other VW executives have been criminally indicted by a federal jury for their roles in the fraudulent scheme, including:  Richard Dorenkamp, Heinz-Jakob Neußer, Jens Hadler; Bernd Gottweis, Oliver Schmidt, and Jürgen Peter.  Oliver Schmidt, who served as the General Manager in charge of VWoAG's Engineering and Environmental Office from in or about 2012 through February 2015 and then returned to VWAG headquarters in Wolfsburg to work as a principal deputy to Neußer, entered a guilty plea on August 4, 2017.  In December 2017, Schmidt was sentenced to 84 months in prison for his role in the conspiracy to cheat U.S. emissions tests.

62.    The SSI alleges that "[t]hroughout 2014 and the first half of 2015, Neußer, Gottweis, Schmidt, Peter, and their co-conspirators continued to offer, and cause to be offered, software and hardware 'fixes' and explanations to U.S. regulators for the 2.0 Liter Subject Vehicles higher NOx measurements on the road without revealing the underlying reason – the existence of software designed to detect, evade and defeat U.S. emissions tests."  Further, "[o]n or about August 5, 2015, in a meeting in Traverse City, Michigan, Schmidt and another VW employee met with a CARB official to discuss again the discrepancies in emissions of the 2.0 Liter Subject Vehicles.  Schmidt attempted to and did mislead and deceive CARB by offering technical reasons and excuses such as 'irregularities' or 'abnormalities' for the discrepancy

without revealing the…software intentionally installed in VW vehicles to detect, evade, and defeat U.S. emissions testing."

63.    The heightened NOx emissions levels from Volkswagen's vehicles had tangible public health consequences that would impact Volkswagen's business operations.  According to Cynthia Giles, the EPA's Assistant Administrator for the Office of Enforcement and Compliance Assurance, the EPA's position is that "[u]sing a defeat device in cars to evade clean air standards is illegal and a threat to public health."

64.    As reported by the Associated Press ("AP") on October 5, 2015 "Volkswagen's pollution-control chicanery has not just been victimless tinkering, killing between five and 20 people in the United States annually in recent years."  The AP's statistical and computer analysis estimated that over seven years, Volkswagen's illegal emissions caused between 16 and 94 deaths in the United States, with more expected.  Likewise, according to a report published on October 29, 2015 by research scientists at Harvard University and the Massachusetts Institute of Technology, illegally high NOx emissions produced by Volkswagen's diesel vehicles equipped with defeat devices are projected to cause approximately 60 deaths in the United States by the end of 2016.  That report also estimated "mortality costs from 2008 until the end of 2015 due to excess VW NOx emissions … at $450 [million], … while future costs if there is no recall (but no further sales from September 2015) are forecast to be $910 [million]."

65.    VWAG admitted that if it had accurately reported the cars' levels of NOx emissions, it could not have obtained the requisite certifications and could not have legally marketed or sold the cars in the United States.  Similarly, the installation of the defeat devices in Europe was also illegal and contributed to the cars' purported ability to meet European emissions standards.  Thus, contrary to Defendants' representations to regulators, VWAG's cars failed to comply with emissions standards for any U.S. state or Europe, and the VW significantly overstated its financial results by failing to properly record provisions arising out of the liabilities owing to its use of illegal defeat devices.

66.    Significantly, Volkswagen's top executives knew that the Company's "clean diesel" vehicles passed emissions tests only because they were outfitted with defeat-device

software; and, when actually driven, produced NOx and other emissions far in excess of permissible levels.   This scheme was intentionally engineered by Volkswagen's senior management to increase market share in the United States and to become the world's largest car maker by 2018.   Defendants' fraud was further facilitated by a demanding corporate culture to sell cars and keep management happy at all costs, where reported results were far more important than legal and regulatory compliance.

### B. Volkswagen Executives Knew Or Were Reckless In Not Knowing That Volkswagen Cars Used Defeat Devices To Cheat Emissions Testing

67.     Volkswagen's top executives, including Defendants Winterkorn and Horn, knew or were reckless in not knowing that Volkswagen's TDI® Clean Diesel cars used defeat-device software to allow vehicles that would otherwise not pass EPA emissions tests to become certified under EPA and CARB regulations.

68.     In the Plea Agreement SOF, VWAG admits that through six "Supervisors A-F and other VW employees [VWAG]: (a) knew that the Subject Vehicles and the Porsche Vehicles did not meet U.S. emissions standards; (b) knew that VW was using software to cheat the U.S. testing process by making it appear as if the Subject Vehicles and the Porsche Vehicles met U.S. emissions standards when, in fact, they did not; and (c) attempted to and did conceal these facts from U.S. regulators and U.S. customers."   Specifically, "Supervisors B, C, and F, and others…realized that VW could not design a diesel engine that would both meet the stricter NOx emissions standards that would become effective in 2007 and attract sufficient customer demand in the U.S. market."

69.     In 2006, a top VWAG technology executive set forth how the Company could cheat on emissions tests in the United States in a PowerPoint presentation.   VWAG sought to cheat on emissions tests because they knew that the Company could not produce diesel cars that could comply with emission standards and remain affordable and maintain an acceptable level of performance.   Indeed, VWAG executives consistently rejected proposals to improve the emissions equipment so that it would comply with emission rules.   The entire Management Board, led by Defendant Winterkorn, repeatedly rebuffed lower-ranking employees who

submitted technical proposals for upgrading the emissions controls because the upgrades were too costly, and would provide no noticeable performance benefit to customers.

70.     In the fall of 2006, VWAG employees briefed "Supervisor B," the supervisor in charge of the VW Brand Engine Development department, on the purpose and design of the defeat device and voiced their objections.  "Supervisor B" decidedly ignored these warnings and proceeded with production of the US'07 project.  According to the Plea Agreement SOF, during the meeting, he "instructed those in attendance, in sum and substance, not to get caught."

71.     In the Plea Agreement SOF, VWAG also admitted that throughout 2007, various technical issues arose with the diesel engines.  This led to multiple internal discussions and disagreements among members of the VWAG team that was primarily responsible for ensuring vehicles met U.S. emissions standards.  "Those disagreements . . . were expressly articulated during a contentious meeting on or about October 5, 2007, over which Supervisor C presided." "As a result of the meeting, Supervisor C authorized Supervisor F and his team to proceed with the US'07 project despite knowing that only the use of the defeat device software would enable VW diesel vehicles to pass U.S. emissions tests."

72.     As early as 2007, VWAG "top circles" were warned by Bosch, the supplier of the defeat devices, that Volkswagen's intended use of the devices would be illegal.  It is believed that Defendant Winterkorn was among those warned by Bosch.

73.     In 2011, an internal Volkswagen whistleblower warned that Volkswagen was illegally manipulating reported emissions data.  The whistleblower specifically alerted VWAG Management Board member Heinz-Jakob Neuβer, a close confidant of Winterkorn, who was then-VWAG's Head of Development and subsequently the Company's Brand Manager.

74.     VWAG has admitted that "[i]n or around 2012, hardware failures developed in certain of the 2.0 Liter Subject Vehicles that were being used by customers on the road in the United States.  [VWAG] engineers hypothesized that vehicles equipped with the defeat device stayed in 'dyno' mode (i.e., testing mode) even when driven on the road outside of test conditions."  Around July 2012, VW engineers "met, in separate meetings, with Supervisors A and E to explain that they suspected that the root cause of the hardware failures" were ultimately

due to the defeat device.  Despite understanding "the purpose and significance of the software, Supervisors A and E each instructed the engineers who presented the issue to them to destroy the document they had used to illustrate the operation of the defeat device software."

75.    After the 2012 hardware failures, VW engineers sought ways to improve the defeat device to avoid failures.  Specifically, VW engineers would start the vehicle in "'street mode" and, when the defeat device recognized that the vehicle was being tested for compliance with U.S. emissions standards, switch to the "dyno mode."  Engineers added a "steering wheel angle recognition" feature whereby the software would recognize whether the car was being driven on the road or, being tested for certification by whether or not the steering wheel was turned.  VWAG had admitted that in light of those cheat device "updates," employees again expressed concern to senior supervisors about the expansion of the device, and that Supervisor A disregarded their concerns and authorized activation of the software in or about April 2013.

76.    VWAG admits in the Plea Agreement SOF that "VW employees falsely told, and caused others to tell, U.S. regulators, U.S. customers and others in the United States that the software update in or around 2014 was intended to improve the 2.0 Liter Subject Vehicles when, in fact, VW employees knew that the update also used the steering wheel angle of the vehicle as a basis to more easily detect when the vehicle was undergoing emissions tests, thereby improving the defeat device's precision in order to reduce the stress on the emissions control systems."

77.    On March 31, 2014, an engineer at Audi warned colleagues at VWAG and VWGoA to the upcoming publication of a report by the International Council on Clean Transport ("ICCT") and West Virginia University ("WVU"), as set forth in the State of New York's complaint against Volkswagen for violations of its civil environmental laws (*State of New York v. Volkswagen AG, et al.* (N.Y. Sup. Ct. filed July 19, 2016)) (the "New York Complaint").  The results of the study showed that, during normal driving conditions, two of the Company's "clean diesel" vehicles were emitting NOx at levels between five and thirty-five times higher than the allowable limits.  Upon learning about the upcoming publication, Defendant Horn requested reports and analyses of the ICCT report from VWGoA's Environmental and Engineering Office.

78.     In the aftermath of the ICCT and WVU study, VW engineers formed an *ad hoc* task force to formulate responses to questions from regulators.  According to the Plea Agreement SOF, "Supervisors A, D, and E, and others, determined not to disclose to U.S. regulators that the test vehicle models operated with a defeat device.  Instead, Supervisors A, D, and E, and others decided to pursue a strategy of concealing the defeat device in responding to questions from U.S. regulators, while appearing to cooperate."

79.     In attempting to conceal the defeat device from regulators, Defendants blamed faulty testing procedures and "abnormalities" in an attempt to keep their misconduct hidden.  In effect, Volkswagen doubled down on its fraud, and continued to hide its purposeful use of defeat-device software.  Volkswagen then offered software and hardware "fixes" to customers without ever revealing the existence of the defeat device.

80.     On or about April 28, 2014, the *ad hoc* task force of VW engineers presented to "Supervisor E" an explanation of the potential consequences Volkswagen faced if U.S. regulators discovered the defeat device.  As admitted in the Plea Agreement SOF, "Supervisor E" had "supervisory responsibility included addressing safety and quality problems in vehicles in production."

81.     Certain Defendants have admitted that Winterkorn received multiple memoranda in 2014, including a memorandum in May 2014 from Bernd Gottweis, a supervisor with responsibility for VWAG's Quality Management and Product Safety, also known as VWAG's "fireman," regarding the Company's unlawful use of defeat-device software.

82.     According to a *Financial Times* article published March 10, 2016, Defendant Horn received a letter attached to an email on May 15, 2014 stating that Volkswagen vehicles did not meet governing emissions standards, and warning of the potential consequences for the Company including monetary penalties, recall of vehicles, removal of cars from the United States, and the possibility of having to buy back the cars.  The letter stated that 500,000-600,000 cars in the United States from model years 2009-2014 could be affected and warned that Volkswagen could incur a potential fine of $37,500 from the EPA and $5,500 from CARB per violation.

83.     On or about October 1, 2014, VWAG employees met with CARB regarding the ICCT and WVU study results.  VWAG employees did not reveal the existence of the defeat device and continuously lied to CARB about the reasons for the discrepancies.  When U.S. regulators threatened not to certify the 2016 vehicles, VWAG supervisors, including "Supervisor A" and "Supervisor D," called an emergency briefing in the United States, which occurred on or about July 27, 2015.  On or about August 5, 2015, Oliver Schmidt, the General Manager in charge of VWoAG's Engineering and Environmental Office, and other VW employees met with CARB, and again failed to disclose the existence of the defeat device.

84.     On August 18, 2015, "Supervisor A" and "Supervisor D," and others, approved a script to be followed by VWAG employees when speaking with U.S. regulators at an upcoming meeting.  As admitted in the Plea Agreement SOF, "[t]he script provided for the continued concealment of the defeat device from CARB in the 2.0 Liter Subject Vehicles, with the goal of obtaining approval to sell the Gen 3 model year 2.0 Liter Subject Vehicles in the United States."  However, at the meeting with CARB on or about August 19, 2015, a VW employee explained for the first time to U.S. regulators and in direct contravention of instructions from supervisors at [VWAG]" the existence of the defeat device.

85.     Only after U.S. regulators refused to certify Volkswagen's Model Year 2016 lineup of diesel vehicles did Volkswagen admit that Volkswagen installed defeat devices in its "clean diesel" cars.  At that point, after privately telling regulators that "these vehicles were designed and manufactured with a defeat device to bypass, defeat, or render inoperative elements of the vehicles' emissions control system," Defendants finally admitted the truth publicly.  Defendant Winterkorn, then VWAG's CEO, apologized that Volkswagen had "broken the trust of our customers and the public."  Winterkorn further announced that "Volkswagen has ordered an external investigation of this matter," and that the Company would "do everything necessary in order to reverse the damage this has caused."  Winterkorn stated that he was "endlessly sorry that we have disappointed this trust" that "millions of people across the world" had in "our brands, our cars, and our technology."  At the same time, a Volkswagen spokesperson stated that the Company had admitted the truth to regulators.  On September 25, 2015, Berthold Huber,

Deputy Chairman of VWAG's Supervisory Board also stated, "[t]he test manipulations are a moral and political disaster for Volkswagen."

86.    Likewise, VWGoA President and CEO Michael Horn admitted that "our company was dishonest.  With the EPA, and the California Air Resources Board, with all of you.  And in my German words, we have totally screwed up."

### C.    Volkswagen's Emissions Scandal Grew from A Corporate Culture That Was Demanding, Tightly Controlled, And Tolerant of Rule Breaking

87.    Volkswagen's emissions cheating and the current diesel scandal grew out of the Company's culture, in which failures were not tolerated, and pressure came from Volkswagen's top leadership to produce bottom-line results despite technical obstacles.

88.    In early 2007, Winterkorn was installed as VWAG's CEO at the direction of Supervisory Board Chairman Ferdinand Piëch.  Piëch was VWAG's CEO from 1992 to 2002 and became Chairman of the Supervisory Board from 2002 until early 2015.  *Fortune* magazine has called Piëch "a brilliant engineer and a ruthless, terrifying manager who dominated VW" and "infused VW with an ambition and drive that made the most of its political heft, presiding over a culture that was, if not above the law, then not above stretching it, by many accounts."

89.    Bob Lutz, a longtime high-ranking executive at numerous car companies including BMW, Ford, Chrysler, and General Motors, wrote a November 4, 2015 article in *Road & Track* about how the "immensely powerful" Piëch "ran everything" at Volkswagen through "a reign of terror and a culture where performance was driven by fear and intimidation.  He just says, 'You will sell diesels in the U.S., and you will not fail. . . .' The guy was absolutely brutal." As Lutz describes, the corporate culture at Volkswagen that Piëch fostered "gets short-term results, but it's a culture that's extremely dangerous. . . . It's fast and it's efficient, but at huge risk."  Similarly, the *Kolner Stadt-Anzeiger* reported on January 24, 2016 that "there was no room for even well founded objections," and "[t]he culture of fear cultivated by the self-important company leaders is enormously detrimental to the entire company."

90.    Winterkorn was Piëch's protégé and, much like Piëch, Winterkorn was a demanding, detail-oriented micromanager who ran VWAG by instilling fear in employees and

demanding bottom-line results regardless of any obstacles.  Winterkorn touted his imperious management style and attention to technical detail.  In VWAG's 2010 annual report, the Company included a conversation between Winterkorn and German astronaut Hans Wilhelm Schlegel, in which the two compared their "share[d] passion for scientific analysis combined with hands-on expertise."  The annual report described Winterkorn as "someone who is au fait with every last technical detail," and quoted Winterkorn as stating that

> [t]he Volkswagen Group is so successful today because this notion of 'digging deeper' has become part of our corporate culture. . . .  As an automotive manager, it is not enough simply to enjoy driving cars—you have to understand them right down to every last detail.  Many things in our Group today only work because my Board of Management colleagues and I are extremely well versed in all aspects of the business.  If developers say that a solution is not possible from a technical, timing, or financial point of view, I am able to challenge them. And everyone knows that.

91.    Winterkorn further stated that he could "identify with" managers who "keep [their] finger[s] on the pulse of events."

92.    According to a January 23, 2016 report by *Reuters*, an internal Company report confirmed that the pressure at Volkswagen was such that "[w]ithin the company there was a culture of 'we can do everything,' so to say something cannot be done, was not acceptable."  In other words, as reported in German publication *Magazin* on November 8, 2015, "[t]he reason for the manipulations is said to have been the fact that it was impossible to meet the goals set by the VW CEO Martin Winterkorn, who has since resigned, with legal means. . . . A culture of fear is said to have prevailed."

93.    As a micromanager with a deep engineering background, Winterkorn focused particularly closely on even small details of engineering issues that arose at Volkswagen.  Stories of Winterkorn's attention to detail and micromanaging are numerous.  As *Fortune* reported in its March 15, 2016 issue:

> Winterkorn might have been a notch less imperious than [Piëch], but he still displayed an almost theatrical officiousness: . . . He was known for carrying a micrometer to check the minutest measurements of cars.  VW [Volkswagen] routinely transported twice as many vehicles to auto shows as it planned to display because Winterkorn was known for vetoing a particular selection if he detected the slightest imperfection.

1
2
3

Like his mentor [Piëch], Winterkorn had outsize ambitions.  One of his first acts as CEO was to unveil a plan to overtake both General Motors and Toyota by 2018 to become the world's No. 1 automaker, "not just in units, but in profitability, innovation, customer satisfaction, everything," as he put it.  Winterkorn wanted *everything*.

94.      Another key contributor to the emissions-cheating scandal was the Company's unusual corporate structure.   Consistent with the German "codetermination" law, labor representatives hold half of the 20 seats on VWAG's Supervisory Board.  Because of the labor representatives' strong power at the Company, VWAG's management has at times been unable to implement reforms, such as job cuts, that would enable the Company to increase its profit margins.

95.      As a securities analyst from Natixis wrote in a November 24, 2015 report titled "No salvation without a reform of the governance," "[t]he story of the fraud is punctuated by examples of poor strategic decisions and management methods that independent, balanced governance would have prevented or at least curbed. . . . The denial of this fraud for more than a year moreover reflects an authoritarian, centralised climate in the group, which discouraged adversarial debate."  Natixis continued, "we believe that the method of management (visibly an authoritarian climate existed with Mr. Winterkorn, CEO, and Mr. Piëch, chairman) and the lack of independent governance are to blame."  Similarly, an analyst from Evercore ISI reported on November 13, 2015 that "[f]or the last two decades, VW has proven multiple times that shareholder value is at the bottom of its preference list.  The interests from the Union and Lower Saxony weighed more, especially during times when CEOs needed support to build their empire."

96.      According to an interview with Ferdinand Dudenhoeffer ("Dudenhoeffer") published in *Der Westen* on October 20, 2015, "VW is missing the internal control … This is not a case of negligence or a sloppy job," rather, as Dudenhoeffer told *Die Presse* on October 3, 2015, Winterkorn "concentrated all power in his person, and when you pool all power then you feel like god and act like god.  In addition he was a know-it-all and had his hands in everything."

97.      The climate at Volkswagen, where results were demanded at any cost, fostered and rewarded cutting corners.  On December 10, 2015, Hans Dieter Pötsch, the Chairman of

VWAG's Supervisory Board since October 2015, admitted that the emissions scandal occurred in light of the Company's ambition for global dominance and "a tolerance for breaking the rules."

98.    As German newspaper *Bild am Sonntag* ("*Bild*") reported on February 14, 2016, Winterkorn was a "car man who normally took care of every detail" at Volkswagen.  To help take care of those details, Winterkorn installed as his top lieutenants engineers with whom he had long, close relationships.  Specifically, Winterkorn named as VWAG's heads of research and development Ulrich Hackenberg, formerly Audi's chief engineer, and Wolfgang Hatz, formerly a top engine developer at Porsche and Head of Engines and Transmissions Development at Audi, and put Hackenberg and Hatz in charge of the Volkswagen Research and Development Group and Engine Development.

99.    Until his suspension on September 24, 2015 and resignation on December 3, 2015, Hackenberg was a member of the Volkswagen brand's Board for Development from 2007, and was a member of the Audi AG Management Board since 2013, overseeing Audi's technical development.  Also suspended from the Company on September 24, 2015, Hatz was a member of the Porsche AG Management Board in charge of Research and Development since 2011, and also the Head of Engine and Transmission Development for the entire Volkswagen Automotive Group.  Hatz resigned on May 3, 2016.  Both men worked closely with Winterkorn before and after their move to VWAG headquarters, and were known as his 'top aides.'

100.    It was purportedly during Winterkorn's reign at Audi, as early as 1999, that the idea took root to use defeat devices to evade increasingly strict emissions standards. *Handelsblatt* reported on April 19, 2016, that an investigation by law firm Jones Day into the emissions cheating scandal has shown that in 1999, when Winterkorn served as Audi's CEO, engine developers doubted that they could meet stricter emissions limits legally, and were already contemplating installing illegal software to ostensibly comply with those rules.  Audi experts thereafter devised software that could alter certain emissions features during testing. Internally, the device was called "acoustic mode" and "acoustic function."  This illegal plan was not implemented until years later when Winterkorn was CEO of VWAG.

101.    According to press reports, Hackenberg and Hatz were Winterkorn's "top aides during his tenure at Audi," and once at Volkswagen, had daily responsibility for developing Volkswagen's "clean diesel" strategy.  As the *Wall Street Journal* reported on October 5, 2015, Hatz and Hackenberg, along with VWAG Development Head Hanz-Jakob Neußer, "are at the center of [Volkswagen's] probe into the installation of engine software designed to fool regulators."   Indeed, Hatz and Hackenberg were two of the first Volkswagen executives suspended once the Company's emissions cheating became public, and Hackenberg subsequently resigned.  *WirtschaftsWoche* reported on December 4, 2015, that just after the scandal broke on September 21, 2015, "Winterkorn—who until then had a close male bond with Hackenberg—is said to have prompted his longtime companion to take responsibility for the woes . . . so his friend Winterkorn could declare an end to the disaster . . . and continue to rule."

102.    German media have reported on Winterkorn's close relationship with Hackenberg, who worked at Winterkorn's behest and had vast authority at Audi and at VWAG. *Süddeutsche Zeitung* reported on June 24, 2013 that Winterkorn had brought Hackenberg to Volkswagen, describing him as "[a] man who is very close to Winterkorn.  Probably closer than most. . . . The 63-year old, this much can be said, is likely the most important intimate of VW group CEO Martin Winterkorn.  The men value each other a lot.  'Hacki,' as Winterkorn calls the colleague affectionately, has been his problem solver for a long time."  *WirtschaftsWoche* similarly reported on September 24, 2015 that "[w]ithout 'Hacki's' blessing no model and definitely no engine went into production," and that "[t]he down to earth Westphalian is said to be at least as detail-obsessed as Winterkorn."

103.    VWAG has admitted in a December 10, 2015 press release that the centralized control under Winterkorn was a key factor in the emissions scandal:

> Parallel to overcoming the crisis, Volkswagen is also instituting a comprehensive new alignment that affects the structure of the Group, as well as its way of thinking and its strategic goals.

> Volkswagen will be managed in a more decentralized fashion in the future, and its brands and regions will be granted more independence.  The Group's Board of Management is fully focused on its core task: advancing the major, global issues for the future, as well as synergies, controls, and strategy. . . . All these structural changes ultimately aim to reduce managerial complexity and ensure that the Group can be effectively led over the long term.

104.    In a March 1, 2016 presentation by VWAG Management Board member Frank Witter, Volkswagen itself identified the need for a "New structure—Launching a more entrepreneurial & decentralized Group structure" and "New mindset—Profoundly changing the way we do things" as two of the Company's five top priorities, both of which are presently "in progress," along with "New destination—Re-evaluating what we do & re-defining our targets," which is targeted for mid-2016.  The presentation also identified as key focus areas for VWAG moving forward, among other things, overhauling corporate culture to "create [a] modern corporate culture" with "[m]ore responsibility," "strengthen[ing] trust of customers authorities and media," strengthening corporate responsibility, "[r]evamp[ing] management style," and a "[n]ew clearer mission statement focused on transparency, authenticity and openness."

105.    In the wake of the scandal, Volkswagen has also put in place structural changes designed to enhance compliance and accountability, further admitting that almost all of Winterkorn's senior management team needed to be replaced:

> At an organizational level, the Integrity & Law area will be represented as its own department on the Group's Board of Management in the future—a clear indication that these issues are extremely important to Volkswagen.

106.    Commenting on the Company's culture since Winterkorn was replaced by new CEO Matthias Müller ("Müller"), VWAG Management Board member Andreas Renschler told *Dow Jones Business News* in a February 23, 2016 interview that "[t]he difference is like night and day. . . . We all realize that the crisis gives us a huge opportunity to change the company."

D.    **Volkswagen's Scheme To Cheat Emissions Tests Was Necessary To Achieve Its Goal Strategy**

107.    By 2005, it was clear to automakers that consumers' interest in reducing environmental impact could significantly affect car companies' future growth and market share. Many automakers had begun, or were planning to develop and market, fuel-efficient hybrid vehicles, such as Toyota's Prius, which produced low levels of environmentally harmful emissions in comparison with other cars that were popular with consumers.  Those increasingly popular hybrids, however, were perceived as boring and did not offer the exciting driving experience that many consumers wanted and had grown accustomed to.

108.     At that time, Volkswagen sought to increase its 2% U.S. market share and capture a larger portion of the market for environmentally friendly cars; and, to do so by offering diesel cars and avoiding the lagging performance that plagued hybrids.   The Company made "a strategic decision to launch a large-scale promotion of diesel vehicles in the Unites States in 2005."   Indeed, Volkswagen was poised to market diesel vehicles as they were (and have historically been) more widespread in Germany and throughout Europe than in the United States. In fact, around 50% of all new vehicles licensed in the European Union in 2014 were diesel vehicles.  Volkswagen was looking to develop cars that it could sell widely in the United States and Europe.

109.     To reach that goal, and in an effort to produce and market powerful but environmentally friendly cars, Volkswagen spent millions of dollars to develop a "clean diesel" engine that would offer high performance alongside fuel efficiency and low emissions levels. However, at no point were Volkswagen's engineers able to successfully design a true, high performance "clean diesel" engine.  Rather, there was a tradeoff between emissions reduction and performance that the engineers could not work around.  Steps to decrease emissions also negatively affected performance and imposed significant financial costs, while maintaining "fun-to-drive" aspects meant that emissions levels remained at unacceptably high levels.

110.     When Volkswagen first set out to reduce NOx emissions in diesel vehicles in 2005, the Company was divided over two different methods: selective catalytic reduction ("SCR") and NOx traps.

111.     Volkswagen brand CEO Wolfgang Bernhard, a Germany auto industry veteran hired from Daimler by VWAG's then-CEO Bend Pischetsrieder, advocated using an SCR system to treat exhaust gases and reduce harmful NOx emissions.   SCR works by injecting "diesel exhaust fluid" ("DEF"), containing urea, into the exhaust stream, and converting NOx into nitrogen gas, water, and carbon dioxide.   In particular, Bernhard promoted Volkswagen's licensing and use of an SCR system developed primarily by Daimler, and marketed by Daimler brand Mercedes under the name "BlueTec."   Along with other Volkswagen brand managers,

Bernhard believed SCR technology would allow Volkswagen to keep pace with NOx emissions as they became stricter.

112.    Defendant Winterkorn, who headed the Audi brand, advocated for NOx traps. NOx traps function as molecular sponges, trapping and absorbing NOx molecules as they are emitted.  A burst of diesel fuel is then pumped into the NOx trap, which leads to the release of NOx.  The NOx then moves into a catalytic converter that converts the molecules into water and nitrogen.  NOx traps are cheaper and easier to implement than the SCR system, may reduce fuel economy, and are far less effective at reducing emissions.

113.    By late 2006, Bernhard and the engineers he supervised had developed a prototype diesel engine incorporating licensed BlueTec technology, and Volkswagen announced that the Company would introduce a new model of the Jetta that featured a 2.0-liter BlueTec diesel four-cylinder engine.  According to Volkswagen, the new Jetta, which would be available to consumers in the spring of 2008, would meet emissions standards in all 50 U.S. states.  Much of Volkswagen's leadership was put off by the cost of the BlueTec system and the fact that it was developed by a competitor.  As Automotive News Europe reported on September 27, 2015, the SCR system was effective but expensive and posed pragmatic obstacles.  The BlueTec system would cost $350 per vehicle and require cost prohibitive maintenance because it also required the installation of a DEF tank and regular DEF refills.  An additional drawback was that SCR adds weight to vehicles and would take up significant space, making it difficult to use in compact cars like Volkswagen's Golf and Jetta, which were among Volkswagen's best-selling models in the United States at the time.

### E.    Winterkorn Becomes CEO And Changes Volkswagen's Emission Control Strategy

114.    As a result of the problems with BlueTec and divided management, Pischetsrieder and Bernhard were pushed out by VWAG Chairman Piëch in December 2006 and replaced by Winterkorn.  Winterkorn's stated goals were to triple Volkswagen's annual U.S. sales figures over a 10-year period, and despite the shift away from BlueTec, he was focused on expanding

diesel-car ownership in the United States beyond the 3% of the U.S. market that diesel vehicles then represented.

115.    Winterkorn brought with him from Audi his two longtime, trusted colleagues, Hatz and Hackenberg, whom he installed as Volkswagen's top engineers.   Winterkorn also brought Frank Tuch, the former head of quality control at Porsche, to serve as VWAG's Chief Quality Officer and Head of the Company's Group Quality Assurance.   Since being installed in 2010, Tuch worked closely with Winterkorn, and the two met every Monday to discuss quality issues and often test drove Volkswagen vehicles together, according to a *New York Times* article dated October 21, 2015.

116.    Volkswagen's new top engineers had long opposed emissions-reducing measures that would detract from driving performance.   As Hatz stated during a 2007 Volkswagen presentation on automotive technology, "[w]e will do what is possible, but we should keep the pleasure" so that cars are "fun to drive."   Hatz added, "[i]t's not just about transport; our business, it's also about pleasure."

117.    In August 2007, with Hatz and Hackenberg overseeing Volkswagen's engineering decisions and at Hatz's insistence, the Company canceled its BlueTec licensing contract. *Businessweek* described the cancellation as "a classic case of not-invented-here syndrome," implying that Volkswagen wanted to develop its own technology.   In place of the BlueTec SCR system, Hatz was tasked with designing and implementing a strategy focused on the use of NOx traps to reduce NOx emissions to permissible levels.

118.    As *Businessweek* reported, the decision of Winterkorn and his top engineers to pursue a NOx trap strategy "boxed Volkswagen engineers in as they tried to meet emissions targets and protect the driving experience and fuel efficiency."   Although NOx traps are cheaper and easier to implement than the SCR system, they reduce fuel economy and are far less effective at reducing emissions.

1

2

**F.     Volkswagen Failed To Develop A High-
        Performance Clean Diesel Engine And Was
        Forced To Delay The Introduction Of The Jetta**

3

4

5

6

7

8

9

10

11

12

13

14

119.    It quickly became apparent to Defendants that the Company would be unable to produce a high-performance diesel engine that would meet emissions standards.  On April 26, 2016, the *New York Times* published an article revealing that people inside Volkswagen knew that its diesel engines were polluting significantly more than allowed, yet "company executives repeatedly rejected proposals to improve the emissions equipment."   In fact, the entire Management Board led by Defendant Winterkorn "repeatedly rebuffed lower-ranking employees who submitted technical proposals for upgrading the emissions controls . . . because of cost."  By 2006, the Company was already considering cheating on emissions tests in order to sell vehicles that produced emissions at unacceptably high levels.   The *New York Times* reported that investigators into Volkswagen's emissions scandal uncovered a PowerPoint presentation prepared by a top Volkswagen technology executive in 2006 laying out in detail how Volkswagen could cheat on emissions tests in the United States.

15

16

17

18

19

20

21

22

23

120.    The *New York Times*'s April 26 article further reported that VWAG engineers realized that the emissions equipment in their newest diesel engine would wear out too quickly if it were calibrated to meet U.S. pollution standards.  A technology expert at VWAG offered a solution in the PowerPoint presentation, which included a graph that explained the process for testing the amount of pollution spewing from a car.  The pattern of those tests, the presentation said, was entirely predictable and a piece of code embedded in the software that controlled the engine could recognize that pattern and activate equipment to reduce emissions just for testing purposes.  The software discussed in 2006 evolved over the years and was later upgraded to detect other tell-tale signs of regulatory tests.

24

25

**G.     Volkswagen Was Under Pressure To Produce
        A High-Performance Engine That Could Meet
        Emissions Standards**

26

27

28

121.    Volkswagen previously announced that it would introduce a new Jetta TDI by Spring 2008.  With this deadline approaching, pressure was mounting on the Company and its engineers to manufacture an engine to satisfy market demand and the Company's strategy.

---

Volkswagen could not meet this deadline, and on November 8, 2007, VWGoA sent a letter to its dealers announcing that the launch of the new Jetta TDI would be pushed back to the summer of 2008 due to a "technical issue that was found during the later stages of durability testing."

122.    Industry publications recognized at the time that the announced delay was due to Volkswagen's inability to develop a satisfactory diesel engine that met emissions standards.  For example, on November 9, 2007, *Cars.com* reported that "[p]art of Volkswagen's trouble lies in the 50-state test.  The U.S. has some of the strictest emissions standards for diesel vehicles, and in order for automakers to sell their cars in all 50 states, it must meet emissions standards set forth in every state, including California and its stringent Air Resources Board."  Similar concerns were expressed on Autoblog.com, which noted, "[t]he complexity that must be involved to achieve this feat is likely considerable, especially without the use of a urea injection system."

123.    Market observers, including analysts, have long understood that Volkswagen's ability to grow its U.S. business through diesel sales was a tremendous opportunity for Volkswagen.  *Cars.com* reported that "all eyes are on Volkswagen and its new Jetta," and that "[c]onsumer interest certainly seems piqued."  Reports also stated that Volkswagen dealers were disappointed due to the high consumer anticipation for the new Jetta TDI, and that one dealer said that three out of every five calls he received at the time were about the Jetta TDI.

124.    RBS reported on April 28, 2011, as part of a "SWOT" (strengths/weaknesses/opportunities/threats) analysis, that a key opportunity for Volkswagen was to "convert the US to diesel," while a threat was the "reversal of the trend towards diesel." Deutsche Bank reported on January 16, 2013 that "Rising Diesel sales in the US have become a driver for VW as overall Diesel sales grew 30% last year," and the "VW group has almost 75% of the US Diesel market share."

125.    Throughout Volkswagen's plan to expand and achieve "success" in promoting its diesel motor, tightening emissions standards in the United States were an obstacle to Volkswagen's ability to grow its U.S. operations.  In a September 20, 2011 report, an analyst at Morgan Stanley asked, "What About US Fuel Standards?"  Morgan Stanley recognized that "one

of the biggest challenges VW faces in the U.S. is that of tightening emissions legislation (where VW was one of the few notable exceptions to OEMs [Original Equipment Manufacturers]) recently supporting proposals for tighter standards)," and that "emissions remain a serious headwind to the recovery potential of VW's US business."  On October 9, 2012, a Credit Suisse analyst reported that "[e]fficient and low emissions vehicles will be increasingly important going forward."

126.    The market continued to focus on Volkswagen's environmental compliance and ability to meet emissions standards throughout the Class Period.  Analysts were consistently impressed with Volkswagen's purported technological accomplishments and the potential for future growth driven by clean diesel vehicle sales.  On July 3, 2014, Barclays reported that "[e]missions standards have tightened globally and will continue to do so," and auto companies "believe non-compliance (penalized by fines) is not an option due to the negative impact on brand."    Barclays specifically observed that tightening NOx emissions standards "create opportunities for new combustion engineering approaches that can minimize engine emissions and thereby reduce the need for costly after-treatment solutions."  Moreover, Barclays applauded Volkswagen for "see[ing] environmental leadership as a key differentiator and a core competence."

**H.    Unable To Develop Functional Clean Diesel,
       Volkswagen Installs Cheat Devices**

127.    Unable to develop a functional clean diesel vehicle, Volkswagen admittedly started installing device software in its purportedly "clean diesel" vehicles to pass emissions testing and sell its diesel vehicles in the United States.

128.    Volkswagen's vehicles, like most modern cars, include and are largely run through sophisticated computer systems, including electronic diesel control ("EDC") systems.  In 2006, German automotive parts supplier Bosch, the world's largest supplier of automotive products such as controls, electronics, brakes, and fuel systems, introduced the EDC17, an EDC system that Bosch described as "important for effective, low-emission combustion."

129.    Bosch supplied Volkswagen with EDC17 systems, which Volkswagen installed in its diesel vehicles.  Although many automakers purchased the EDC17 from Bosch, the actual software system ran on the EDC17 varied from maker to maker and engine to engine.  As Bosch's promotional materials explained, "[b]ecause the computing power and functional scope of the new EDC17 can be adapted to match particular requirements, it can be used very flexibly in any vehicle segment on all the world's markets.  In addition to controlling the precise timing and quantity of injection, exhaust gas recirculation, and manifold pressure regulation, it also offers a large number of options such as the control of particulate filters or systems for reducing nitrogen oxides."

130.    Bosch accordingly worked with manufacturers, including Volkswagen, to tailor the EDC17 for specific engines.  Volkswagen worked with Bosch to design the software so that its cars would pass emissions testing despite not meeting applicable emissions standards.  Without a doubt, this is "defeat device" software.  The defeat-device software that Volkswagen installed was used primarily in conjunction with its EA189 model engine, which was installed in approximately 11 million vehicles worldwide, including 5 million Volkswagen brand vehicles, 2.1 million Audis, 1.2 million Škodas, and 1.8 million light commercial vehicles.  Specific models that used the EA189 engine were the Volkswagen Jetta, Jetta SportWagen, Golf, and Beetle, as well as the Audi A3.

131.    Ultimately, Volkswagen used the illegal software with at least four different engine types, including the EA189.  This means that Volkswagen made several changes to its defeat-device software, which Volkswagen intentionally and actively updated numerous times to adjust to different engine types.  As explained by a U.S. official investigating Volkswagen, in a *Reuters* report dated October 17, 2015, "VW would have had to reconfigure the software for each generation of engines."  *Reuters* further reported on October 7, 2015, that "[s]ome industry experts and analysts said several versions of the defeat device raised the possibility that a range of employees were involved.  Software technicians would have needed regular funding and knowledge of engine programs, they said."

132.   On October 3, 2015, *Bild* reported that VWAG's present internal investigation has shown that the Company first decided to install illegal defeat-device software in its vehicles in 2008, shortly before it commenced mass production of the EA189 engine.  VWAG made that decision "because there was no way at the time to reconcile meeting emission standards within the targeted cost of the engine. . . .Otherwise, the company would have to abandon the introduction of the engine, development of which was begun in 2005."

133.   The *Wall Street Journal* likewise reported on October 5, 2015 that, as early as 2006, senior VWAG engineers recognized and publicly stated that the Company could not produce high-performance diesel vehicles that met applicable emissions standards.  Further, regulators suspected and were concerned about Defendants' possible use of defeat devices as early as 2008.  On October 4, 2015, *Süddeutsche Zeitung* reported that it was in possession of documents showing that U.S. authorities have been questioning Volkswagen cars' emissions since at least 2008.  Specifically, according to *Süddeutsche Zeitung,* CARB issued an "Executive Order" in June 2008 demanding a statement from VWAG that no defeat device was installed in the engines of Volkswagen's cars.  Otherwise, the letter states, CARB would withdraw its certification of the vehicles and assess a penalty of $5,000 per car.

134.   The plea agreements of VWAG and former VWAG engineer James Robert Liang confirm the conduct mentioned in these reports.  Both VWAG and Liang have admitted that soon after beginning the design of the new EA 189 engine in 2006, VWAG employees realized that the engine could not meet the new, stricter U.S. emissions standards and attract sufficient customer demand in the U.S. market.

135.   As admitted in the Plea Agreement SOF, "[i]nstead of bringing to market a diesel vehicle that could legitimately meet the new, more restrictive U.S. NOx emissions standards, [VWAG] employees acting at the direction of Supervisors B, C, and F and others … designed, created and implemented a software function to detect, evade and defeat U.S. emissions standards."  VWAG admits that if it had accurately reported the cars' levels of NOx emissions, it could not have obtained the requisite certifications and could not have legally marketed or sold the cars in the United States.

1
2

I.     **How Volkswagen Cheated The Emissions**
       **Regulation Certification Process**

3      136.    The EPA, CARB, and other U.S. and European regulatory agencies do not

4    conduct emissions testing themselves.  Instead, automakers conduct their own emissions testing,

5    and then send those results to the regulators, who then review the makers' results and certify the

6    vehicles.   Historically, there is little risk that the regulators will conduct their own testing,

7    providing automakers with an opportunity to manipulate results.  Moreover, emissions testing is

8    conducted in laboratory conditions, rather than in real-world driving conditions, and automakers

9    have been known to employ a bevy of tricks to manipulate testing results, such as low-resistance

10   tires and covering cracks between panels to reduce wind resistance.

11     137.    To test a vehicle's emissions, automakers put the car on rollers and attach it to a

12   dynamometer, which is a device used to provide a simulated experience mimicking certain

13   specified driving conditions (e.g., stop-and-go urban traffic, high-speed driving).   The maker

14   measures and reports emissions levels under those conditions.  Regulators provide automakers

15   with the testing specifications in advance, and the makers report results after running the tests.

16     138.    This emissions-testing regime enabled VWAG's emissions-cheating scandal by

17   creating ideal circumstances for the Company to produce manipulated results, which it could

18   then self-report to regulators.    VWAG's engineers tailored the EDC17 software in the

19   Company's TDI engines to recognize when a car with that software was undergoing testing,

20   based on factors including wheel movement (including that only the front two wheels were

21   moving, not the rear wheels), engine runtime, and steering wheel positioning.  Specifically, when

22   the car was undergoing emissions testing, lines of code written into the control software

23   produced by Bosch would cause the car's engine to switch into a "dyno calibration" mode or

24   "dyno mode."  In dyno mode, the car would produce lower emissions levels (that met EPA and

25   CARB standards) by, among other things, adjusting air-fuel ratios and exhaust flows.  However,

26   Volkswagen's cars could operate at that level only with significantly reduced power and

27   performance.   Independent testing has shown that the cars in dyno mode had approximately

28   10.5% less power than otherwise.  When testing ended the software switched the cars back to

"road calibration" mode, and the cars produced heightened levels of NOx emissions, up to 40 times the allowable limit under federal law.

139.    In May 2008, Liang moved to the United States to serve as Leader of Diesel Competence for VWGoA.  In that role, Liang assisted in certification, testing, and warranty issues for Volkswagen diesel vehicles in the US.

140.    For each new Model Year of Volkswagen's diesel vehicles, Volkswagen employees met with the EPA to seek certifications required to sell the vehicles to U.S. customers.  Liang personally attended meetings in Ann Arbor, Michigan with the EPA on March 19, 2007, and on March 21, 2007, with CARB, during which Liang and his co-conspirators misrepresented that Volkswagen diesel vehicles complied with U.S. NOx emissions standards. During the meeting, Volkswagen representatives described their diesel technology and emissions control systems in detail to the staff of the EPA and CARB, but intentionally omitted any mention of the defeat devices.  Liang admits in his plea agreement that he knew that Volkswagen was cheating by implementing the defeat device and that he and his co-conspirators were deceiving the EPA in this meeting.

141.    As part of the certification process for each new Model Year, including Model Years 2009-2016, Volkswagen representatives continued to falsely and fraudulently certify to EPA and CARB at various meetings that Volkswagen diesel vehicles met U.S. emissions standards and complied with the Clean Air Act.  Liang admits in his plea agreement to knowing of these continued misrepresentations and omissions to regulators and consumers while they were ongoing.

142.    Volkswagen concealed from the EPA, CARB, and all other regulators that its EDC17 systems included lines of code that could detect when the vehicles were being tested and change the cars' performance and emissions levels at those times.  As discussed above, the software thus constitutes an illegal defeat device under U.S. law.  At the same time, the Company defrauded investors by misrepresenting Volkswagen's compliance with the law and its cars' ability to meet emissions standards, and by overstating the Company's profits by failing to properly reserve for provisions arising out of the diesel scandal, among other things.

143.    The environmental and financial impact of Volkswagen's emissions cheating has been felt both in the United States and throughout the world.  Volkswagen's sales of 580,000 TDI vehicles with defeat devices in the United States are of particular importance to analysts and investors.  Expanding diesel sales in the United States was a central focus for Volkswagen as it pursued aggressive growth plans.  Moreover, due to the legal and regulatory regime in the United States, including stringent NOx emissions standards as well as laws providing significant redress to wronged consumers and others, Volkswagen has incurred billions of dollars of liability based on its U.S. TDI sales alone.

144.    The full impact of Volkswagen's emissions cheating scheme, however, can only be understood in the context of Volkswagen's sales of millions of cars with illegal defeat devices in Europe and around the world.  Volkswagen was able to obtain approvals for, and sell over 8 million cars with defeat devices throughout Europe by taking advantage of European emissions testing procedures that largely rely on manufacturers to provide honest information regarding compliance with each member country's testing regime and standards.  As in the United States, European emissions testing relies on manufacturers to self-report results and testing is conducted only under controlled conditions.  Further, European manufacturers like Volkswagen can decide in which country to have their vehicles tested, with resulting approvals valid throughout the European Union.

145.    In that environment, VWAG was able to tailor its engine software to conceal true emissions levels without detection.  Indeed, Bosch was concerned that VWAG was going to use the EDC17 system Bosch supplied in an illegal manner, to produce artificially low emissions levels in testing.  According to a September 27, 2015 report in *Bild*, in 2007 Bosch sent a letter to VWAG's "top circles" informing the Company that using the software for the planned application of reducing emissions during testing would be illegal.  According to Bosch, the software it provided was intended only for internal testing purposes, not for regular, on-road driving.  Nevertheless, VWAG affirmatively modified the module to detect when a vehicle was undergoing laboratory emissions testing and then shut down when the vehicle was on the road.

1  **J.**     **Volkswagen Improperly Markets**
2            **And Sells Its "Clean Diesel" Cars**

3      146.    Having implemented defeat devices in its cars to improperly gain emissions

4  certifications, Volkswagen then reaped the rewards of making low-emission vehicles.   As

5  VWAG admits, "Supervisors A and C and others marketed, and caused to be marketed, the

6  Subject Vehicles to the U.S. public as 'clean diesel' and environmentally-friendly, when they

7  knew the Subject Vehicles were intentionally designed to detect, evade, and defeat U.S.

8  emissions standards."

9      147.    Beginning in 2008 with the Model Year 2009 Volkswagen Jetta and Touareg

10 models and the 2009 Audi Q7, Volkswagen began marketing and selling non-compliant diesel

11 vehicles (branded as "clean diesel" or "TDI") while conducting a massive, years-long advertising

12 and public relations campaign championing its purportedly successful "clean diesel" design.

13 Volkswagen's advertisements touted its "clean diesel" vehicles, powered by 2.0 liter TDI four-

14 cylinder engines, as environmentally responsible, and fun to drive, "confirming Volkswagen's

15 role as a pioneer in diesel technology."

16     148.    In language on its website that it has since taken down, Volkswagen prominently

17 stated: "This ain't your daddy's diesel.  Stinky, smoky, and sluggish.  Those old diesel realities

18 no longer apply.  Enter TDI Clean Diesel.  Ultra-low-sulfur fuel, direct injection technology, and

19 extreme efficiency.  We've ushered in a new era of diesel."

20     149.    VWAG and its subsidiaries specifically represented that their cars' NOx traps

21 were "[t]he most effective measure to reduce nitrogen oxides (NOx) with an internal combustion

22 engine."  Such boasting was part of a broad marketing scheme designed to grow the Volkswagen

23 Group's U.S. market share by expressly focusing on the low environmental impact of its TDI

24 cars.

25     150.    In 2008 and 2009, Volkswagen and its subsidiaries claimed that their vehicles had

26 the "world's cleanest diesel engines" that complied with the world's "most demanding emissions

27 laws."  Volkswagen brochures stated that the "[c]lean diesel vehicles meet the strictest EPA

28

---

standards in the U.S. Plus, TDI technology helps reduce sooty emissions by up to 90%, giving you a fuel-efficient and eco-conscious vehicle."

151.    VWAG boasted that it had successfully produced a high-performance, low-emissions, fuel-efficient diesel engine.   In 2008, a group of VWAG engineers gave a presentation titled "Volkswagen's New 2.0L TDI Engine Fulfills the Most Stringent Emission Standards" at an industry conference in Vienna, and published papers touting their purported achievement in a technical journal focused on engine technologies.

152.    Similarly, in an October 9, 2009 interview with *Business Insider*, VWGoA's then-Vice President of Sales and Aftersales, Mark Barnes, said that VWAG and VWGoA's 2.0 liter TDI engine was better for the environment than hybrid cars, because it had a "fantastic power train" that "gives very good fuel economy" and "it's also good for the environment because it puts out 25% less greenhouse gas emissions than what a gasoline engine would[,] . . . cuts out the particulate emissions by 90% and the emissions of nitrous oxide are cut by 95%[,] . . . [and is c]lean enough to be certified in all 50 states."

153.    In response to the question, "How do you re-brand something that's dirty like diesel as something that's green?" Barnes responded:

> The way we've gone about it is through a number of communication pieces.  One of them we've used is TDI Truth & Dare.  It is a very good website that compares some older diesels versus the current TDI clean diesel.  And one of the things we do is we put coffee filters over the exhaust pipes of both cars.  We let them run for five minutes and after they are done, we take them off and the older diesel product (not a VW diesel) has a round sooty spot on that coffee filter.  Ours is very clean.  In fact they actually make coffee out of the filter that was attached to the Volkswagen clean diesel tail pipe and they drink it.

154.    Volkswagen's representations regarding its TDI cars' purported low emissions and high performance dominated Volkswagen's marketing materials for years.  For example, in a 2008 press release, VWGoA publicized that the "Internal Revenue Service has issued a certification letter" affirming that the Jetta TDI sedan and SportWagen "qualify for the Advanced Lean Burn Technology Motor Vehicle income tax credit."  The press release further stated:

Jetta TDI sedan and SportWagen showcase the best of both worlds, an alternative fuel vehicle with no compromises.  Fuel efficiency, performance and convenience come standard with the 50-state compliant Jetta TDI sedan and SportWagen models, which meet the most stringent emissions standards in California.

155.    AoA similarly ran ads representing that Audi TDI vehicles would "protect the environment" because diesel is "no longer a dirty word."

156.    In one memorable television ad for Audi cars that ran during the 2010 Super Bowl, the "green police" arrested numerous individuals for such "offenses" as using plastic bottles and incandescent light bulbs rather than more environmentally friendly options.  At a roadblock, the green police stopped numerous vehicles, but singled out one, remarking that "we've got a TDI here—CleanDiesel."  That car was allowed to pass unobstructed, with an officer telling the driver "You're good to go, sir."

157.    Defendants' advertising continued to emphasize that their TDI vehicles did not pose any tradeoff of performance for the sake of reduced emissions.  In a sales brochure for the 2015 Golf, the Company stated that "[w]ith the 2.0L TDI engine, you'll appreciate every fuel-efficient mile with the EPA-estimated 45 hwy mpg.  But that's only half the story.  Step on the pedal and feel the 236 lb-ft of torque and let the performance tell the other half."

158.    In addition, every "Clean Diesel" vehicle sold by Defendants in the United States during the Class Period had a sticker falsely representing that the vehicle "conforms to regulations" with the US EPA and CARD emission standards.

K.    **Volkswagen Is Successful In Marketing "Clean Diesel," Leading To Increase In Market Share And Profits**

159.    As discussed herein, VWAG sought to develop and implement a plan to grow its business dramatically, especially in the United States, with a strong focus on environmentally friendly, low-emissions diesel vehicles.   By illegally falsifying emissions test results, Volkswagen achieved its goals.

160.    In 2007, Volkswagen sold approximately 230,000 cars in the United States, very few of which were diesel vehicles.  By 2013, Volkswagen brands sold over 400,000 vehicles in the United States, including more than 111,000 diesel vehicles.  With a 70% share of the North

American diesel automobile market in 2014, Volkswagen sold more diesel cars in the United States than every other brand combined.  Overall, diesel sales represented 26% of VWAG's U.S. sales, versus a U.S. industry-wide diesel penetration of less than 3%.

161.    Indeed, Volkswagen frequently touted its success and growth in connection with its low-emissions diesel vehicles, while omitting to tell consumers and investors of its use of prohibited defeat devices to achieve its emissions results.  For example, on May 31, 2011, Volkswagen issued a press release entitled "US Department of Transportation Secretary Ray LaHood views Clean Diesel engines as a key component of future technology for highway transportation in the USA."  In the press release, Defendants stated:

> High-tech ***Clean Diesel engines from Volkswagen are a cornerstone in the environmentally-friendly renewal of individual mobility in the United States***. US Secretary of Transportation Ray LaHood focused on this Tuesday last week in his welcoming speech at the opening ceremony for Volkswagen's new plant in Chattanooga, Tennessee.
>
> US Secretary of Transportation Ray LaHood emphasized that the USA finds itself in an era of transition towards a new form of mobility – and thanks to the innovative technologies of Volkswagen, clean diesel engines will play an important role in implementing a new powertrain strategy for the United States. "And that is not only because it is the right engine for environmental and climate protection in the USA.  Clean diesel engines also make sense economically, for both individuals and American companies.  The Clean Diesel technology that is found in the new US Passat, for example, makes a genuine difference."
>
> \*      \*      \*
>
> ***In April 2011, the diesel share of vehicles sold by Volkswagen of America was 24 percent.  This means that nearly one in every four Volkswagen brand cars delivered in the USA has a fuel-efficient and clean TDI engine.***    The Volkswagen Group is the global market leader in diesel engine technology, and back in 2008 ***it was the first carmaker to offer diesel vehicles on the US market that conformed to the BIN-5 standard, the most stringent emissions legislation in the world.***    In America, the Volkswagen brand already offers four TDI clean diesel models, and the Audi brand offers two.  This year, the new Passat TDI and the Beetle TDI will be added.  Audi has announced that it will bring the TDI to the luxury class in the USA and offer TDI clean diesel engines in both the Audi A6 and Audi A8 in 2013.
>
> Many experts consider these diesel engines to be the most advanced combustion engines of our times.  They combine minimum fuel consumption and the ***lowest emissions with maximum power***.  Depending on the specific model, Clean Diesel technologies may include an SCR catalytic converter – which reduces nitrogen oxide emissions (NOx) by up to 90 percent – or a NOx storage catalytic converter and oxidation catalytic converter, particulate filter, exhaust gas recirculation (EGR) and intelligent interventions by the electronic engine management system.

162.    On December 20, 2013, VWGoA issued a press release entitled "It's Official: Volkswagen Group of America Has Sold More Than 100,000 TDI® Clean Diesel Vehicles in 2013."  In the press release, Defendants announced that Volkswagen "has **sold 100,000 TDI® Clean Diesel vehicles from the Volkswagen and Audi brands this year**.  This is the first time it has reached this milestone in a calendar year."  The press release further stated that "Audi and Volkswagen pioneered TDI® Clean Diesel engines and, as a result, the **Volkswagen Group of America is the current market leader in Clean Diesel**.  Today's Clean Diesel engines deliver more torque, better highway fuel consumption and **reduced CO2 emissions** compared with equivalent gasoline engines."  VWGoA's Chief Operating Officer Mark McNabb was quoted in the press release, stating that "'[s]elling more than 100,000 TDI Clean Diesel vehicles is a significant milestone for Volkswagen Group of America … We're excited to see the increasing numbers of customers able to enjoy the reliability, durability, fuel-efficiency and power of the clean diesel engine.'  Scott Keogh, President of Audi of America, was also quoted in the press release, stating that "'[t]he past year has shown that American consumers clearly recognize the benefits of clean diesel TDI vehicles … They understand now more than ever that this is a technology **delivering real answers to society's concerns about fuel consumption and greenhouse gas emissions without compromises**.'"

163.    On January 3, 2014, VWGoA issued a press release entitled "Volkswagen Reports December 2013 and Year End Results."  In the press release, Defendants stated:

> …Volkswagen of America, Inc. (VWoA) today reported 407,704 units delivered in 2013. December deliveries totaled 34,015.
>
> **Volkswagen's high-mileage, TDI® Clean Diesel models totaled 95,823 units for the year accounting for 23.5 percent of sales in 2013 and 17.8 percent in December.  Since 2000, Volkswagen of America has delivered over 500,000 TDI® Clean Diesel vehicles**.
>
> "Volkswagen is now operating at a new plateau, delivering over 400,000 units for the second consecutive year in over 40 years," said Mark McNabb, chief operating officer, Volkswagen of America, Inc.  "We look forward to 2014, with the introduction of the new Golf family, continued increased awareness and enthusiasm for the brand's core models and the strength of our TDI offerings, we are well positioned for our next phase of growth to come over the next few years."
>
> The Chattanooga-built Volkswagen Passat continues to demonstrate its strong appeal in the market with 9,254 units sold in December and 109,652 for the year.

*Clean Diesel TDI Passat sales were the best year on the record with 34,963 vehicles delivered, accounting for 32 percent of sales of the year.*

164.     On March 6, 2014, VWGoA issued a press release entitled "Volkswagen Group of America Releases 2013 Corporate Social Responsibility Report."   In the press release, Defendant Horn stated that "Volkswagen Group of America is united not only by our devotion to building quality vehicles, but also by our **commitment to doing what's right for the environment**, our communities and our employees."   The press release also stated that "[c]utting-edge technologies have enabled Volkswagen to **progress towards carbon-neutral vehicles, including … TDI® clean diesel vehicles**."   In 2013, Volkswagen and Audi accounted for 75 percent of the U.S. market for clean diesel vehicle sales, enabling owners nationwide to achieve up to 30 percent improved fuel-economy compared to gasoline vehicles."

165.     On May 16, 2014, VWoA's U.S. media site issued a press release titled "Volkswagen Honored with Environmental Award," announcing their acceptance of a Model Medal for International Corporate Achievement in Sustainable Development by the World Environment Center at a reception in Washington D.C.   Christian Klingler, a member of VWAG's Board of Management, accepted the award on behalf of the Company, and commented, "Our aim is to create lasting value: for the Company, its employees and its shareholders, but also for the countries and regions in which we operate."   He added, "This all-embracing view of sustainability is shared by all twelve brands, our companies and all our employees across the Group.   Together we work to find solutions for the challenges of the future – and make no mistake, those challenges are substantial: markets are shifting, resources are becoming scarcer, emissions regulations are tightening up all over the world, and booming cities call for new and intelligent traffic and mobility concepts.   We consider it part of our responsibility to find the right answers to these trends."

166.     On January 5, 2015, VWoA/VWGoA issued a press release entitled "Volkswagen Reports December 2014 Sales and 2014 Year-End Results."   In the press release, Defendants stated:

. . . Volkswagen of America, Inc. (VWoA) today reported 34,058 units delivered in December, with 366,970 units delivered in 2014.

"In 2014 Volkswagen of America enhanced the lineup of German-engineered vehicles with an all-new, award-winning Golf family, a refreshed Jetta and most recently a refined Touareg," said Mark McNabb, chief operating officer, Volkswagen of America.  "As we kick off 2015, we are encouraged that the vehicles have been well received by both the automotive press and our dealers."

\* \* \*

**Volkswagen's high-mileage, TDI® Clean Diesel models totaled 79,422 units for the year, accounting for 21.6 percent of sales in 2014.  In December, 5,348 units were sold, 15.7 percent of sales.**

167.    VWAG has admitted that it sold 8.5 million diesel vehicles in Europe that did not comply with European emissions standards and that approximately 11 million vehicles were affected by its emission scheme worldwide.  Diesel sales in Europe were highly important to Volkswagen because diesel vehicles accounted for more than half of all European car registrations in 2012–2014.   In Europe in 2014, diesel vehicles accounted for 56% of Volkswagen brand sales, 72% of Audi brand sales, and 43% of Porsche brand sales.

168.    In all, Volkswagen sold approximately 580,000 TDI vehicles in the United States, including from the Audi and Porsche brands, that did not meet EPA and CARB emissions standards, as well as 11 million diesel vehicles globally that were equipped with defeat devices, and a currently unknown number of Audi diesel and gasoline vehicles equipped with separate defeat devices for $CO_2$ emissions.  The affected diesel vehicle models equipped with NOx defeat devices are:

| MAKE | MODEL | YEAR(S) |
| --- | --- | --- |
| Audi | A3 | 2010-2015 |
| Audi | A6 Quattro | 2014-2016 |
| Audi | A7 Quattro | 2014-2016 |
| Audi | A8/A8L | 2014-2016 |
| Audi | Q5 | 2014-2016 |
| Audi | Q7 | 2009-2016 |
| Porsche | Cavenne | 2014-2016 |
| Volkswagen | Beetle, Beetle Convertible | 2013-2015 |
| Volkswagen | Golf | 2010-2015 |
| Volkswagen | Gold SportWagen | 2015 |
| Volkswagen | Jetta, Jetta SportWagen | 2009-2014 |
| Volkswagen | Passat | 2012-2015 |
| Volkswagen | Touareg | 2009-2016 |

169.   Volkswagen further profited by charging consumers a significant premium for TDI model cars, compared to the standard gasoline-powered models of those same vehicles.  For example, between 2012 and 2015, the TDI model Passat had a manufacturer suggested retail price ("MSRP") ranging from $5,380 to $5,755 more than the MSRP for the standard model in the U.S.  Between 2009 and 2015, the TDI model Jetta Sportswagen had an MSRP ranging from $4,795 to $5,570 more than the standard model in the U.S.  Between 2009 and 2015, the TDI model Beetle had a premium MSRP ranging from $3,500 to $4,600 more than the standard model in the U.S.  Between 2009 and 2015, the TDI model Jetta had an MSRP ranging from $4,755 to $7,445 more than the standard model in the U.S.  To further entice consumers to pay a premium for TDI vehicles, Defendants successfully lobbied the U.S. government to provide tax credits for purchasers of many of their TDI cars, resulting in an earmark of at least $78 million for TDI Jetta purchasers in 2009 and 2010 alone.  Defendants also claimed that their TDI models "typically have a higher resale value versus comparable gasoline vehicles."

### L.   Volkswagen Tries To Hide Its Defeat Device And Limit Exposure

170.   On March 31, 2014, engineers at VWAG and VWGoA were warned via email from Audi colleagues of the upcoming publication of a study by ICCT and WVU, as set forth in the New York Complaint (*see* ¶77).  The results of the study showed, among other things, that Volkswagen's purportedly "clean diesel" vehicles produced NOx emissions far in excess of allowable limits.  ICCT commissioned WVU to study how manufacturers had been able to produce diesel vehicles that met strict U.S. emissions standards.  ICCT and WVU began the study believing that Volkswagen's vehicles' reported emissions testing levels were consistent with real-world, on-road emissions levels.  What WVU's study showed, however, was that under real-world driving conditions, Volkswagen's diesel vehicles produced emissions up to nearly 40 times higher than allowed by EPA and CARB.

171.   Upon learning of the upcoming publication, there was a flurry of communications between Volkswagen and Audi employees, as set forth in the New York Complaint.  Indeed, shortly after March 31, 2014, multiple high-ranking Volkswagen executives demanded reports

and analyses of the upcoming WVU study, **including Defendant Horn**.  Managing engineers at VWAG and VWGoA (including several engineers who participated in the design and implementation of the defeat devices in the early-2000s) then provided documentation and information to numerous senior management officials including both Defendants Horn and Winterkorn.

172.    ICCT and WVU published the results of their study in May 2014 and notified the EPA and CARB of the results.  As the regulators launched investigations, VWAG sought to limit its culpability and exposure.

173.    VW engineers formed an ad hoc task force to formulate responses to questions from regulators.  As admitted in the Plea Agreement SOF, "Supervisors A, D, and E, and others, determined not to disclose to U.S. regulators that the testes vehicle models operated with a defeat device.  Instead, Supervisors A, D, and E, and others decided to pursue a strategy of concealing the defeat device in responding to questions from U.S. regulators, while appearing to cooperate."  Defendants blamed faulty testing procedures and abnormalities, and even offered disguised software and hardware "fixes" to customers without ever revealing the existence of the defeat device.

174.    In his testimony to Congress on October 8, 2015, Defendant Horn stated that he was informed in May 2014 of "a possible emissions non-compliance."  According to the *Financial Times*, Oliver Schmidt, then-head of Volkswagen's U.S. Regulatory Compliance Office, sent an email to Defendant Horn on or about May 15, 2014, stating that Volkswagen vehicles did not meet governing emissions standard, and warning of the significant risks arising out of an emissions scandal, including monetary penalties, recall of vehicles, removal of the cars from the United States, and possibly having to buy back the cars.  Specifically, the email stated that 500,000-600,000 cars in the United States from model years 2009-2014 could be affected and warned that Volkswagen could incur a potential fine of $37,500 from the EPA and $5,500 from CARB per violation.

175.    At or around this same time, Liang and his co-conspirators discussed how they could answer the regulatory agencies' questioning of the discrepancy between reported and

recorded emissions levels, without revealing the use of the defeat device to manipulate emissions testing.  VWAG and Liang admit in their plea agreements that VW employees intentionally made fraudulent explanations to the EPA and CARB when providing testing results, data, presentations, and statements by failing to disclose the fact that the primary reason for the discrepancy was the defeat device.

176.  With the EPA's and CARB's permission, and without disclosing the defeat device, VWoA agreed on December 2, 2014 to recall approximately 500,000 model-year 2009 to 2014 vehicles whose actual emissions deviated significantly from test results, so that VWoA could implement a proposed "recalibration fix" to its engine software.  VWoA claimed that the voluntary recall would allow it to fix the problem of real-world elevated NOx emissions levels as compared to test levels, and "CARB cautioned VW that if our confirmatory testing showed that the fix did not address the on-road NOx issues, they would have to conduct another recall."

177.  When VWoA notified car owners of the recall, it did not disclose that the subject vehicles contained defeat-device software, or that they produced unacceptably high emissions levels.  Rather, VWoA sent a letter telling owners that "[t]he vehicle's engine management software has been improved," and that dealers would install a software upgrade "to assure your vehicle's tailpipe emissions are optimized and operating efficiently."  That letter falsely claimed that the issue was related to a problem with the cars' malfunction indicator light.

178.  Throughout the spring of 2015, CARB made multiple requests for information to Volkswagen and conducted multiple follow ups.  Engineers and officials at VWAG and VWGoA were in almost constant contact with CARB but refused to provide clear answers to CARB's questions regarding the success of the software updates and whether the Model Year 2016 2.0L and 3.0Ls had the same issues as the previous model year's engines.

179.  After several months of communication, CARB alerted Volkswagen that it planned to conduct follow up testing on the Generation 2 engines, causing panic at Volkswagen. In an email dated May 18, 2015, VWAG engineering executive Jürgen Peter expressed serious concern regarding the upcoming CARB testing.  For example, regarding CARB's questions relating to the soot loading of the Soot Filter, Peter begged: "Come up with the story please!"

Additionally, in an email dated May 21, 2015 to multiple senior managers and engineers, Mike Hennard, Senior Manager of Emissions Compliance at the VWGoA Engineering and Environmental Office, warned that "this type of action from California ARB staff/management is not a normal process and that we are concerned that there may be possible future problems/risks involved." Upon receipt of Hennard's email, one of the senior managers alerted Stuart Johnson Head of the VWGoA Engineering and Environmental Office, admonishing him for allowing his staff to send such an open email to that audience.

180.   In June 2015, the CARB conducted follow up testing on a 2012 VW Passat equipped with an SCR. The results of the test showed that the recalled cars continued to exceed emissions limits. Although "testing showed that the recall calibration did reduce the emissions to some degree[,] NOx emissions were still significantly higher than expected." For vehicles that were equipped with SCR technology, the urea levels introduced were "not sufficient to keep NOx emission levels from rising throughout the cycle," which "resulted in uncontrolled NOx emissions."

181.   On July 8, 2015, CARB shared its test results with VWoA and the EPA. Then on July 21, 2015, Defendant Horn expressed the urgency of the CARB situation to multiple VWAG board members and executives in Germany including, Heinz-Jakob Neuβer, Head of Engine Development for all of VWAG. Horn made clear in his email that if Volkswagen failed to provide CARB with all of the still outstanding information, certification of the 2016 vehicles was at risk.

182.   Upon notification that the certification of the 2016 vehicles was at risk, VWAG supervisors called an emergency meeting in the United States. On or about July 27, 2015, VW employees, including Oliver Schmidt, the General Manager in charge of VWGoA's Environmental and Engineering Office, presented to VWAG executive management on the issue.

183.   At a meeting with CARB on August 5, 2015, VW employees, including Oliver Schmidt, the General Manager in charge of VWGoA's Environmental and Engineering Office, discussed the discrepancies in emissions of the 2.0 Liter Vehicles. Still, Schmidt and other employees, attempted to, and did mislead CARB by offering technical reasons for the higher

NOx measurements on the road including "irregularities" and "abnormalities" but failed to reveal the existence of the defect device.

184.    On or about August 18, 2015, Heinz-Jakob Neußer, Head of Engine Development for all of VWAG, and others developed and approved a script for any VWAG employees involved in upcoming meetings with regulatory agencies, such as CARB.  "The script provided for the continued concealment of the defect device from CARB in the 2.0 Liter Subject Vehicles, with the goal of obtaining approval to sell the [2016] 2.0 Liter Subject  Vehicles in the United States."

185.    At a meeting with CARB on or about August 19, 2015, "a VW employee explained for the first time to U.S. regulators and in direct contravention of instructions from supervisors at [VWAG]" the existence of the defect device.  On September 3, 2015, Defendants finally and formally admitted to regulators that the recalled vehicles "had a second calibration intended to run only during certification testing"—i.e., a defect device.  On September 18, 2015, the EPA issued a Notice of Violation ("NOV") to VWAG, Audi AG, and VWGoA, and CARB sent those same entities an in-use compliance letter.

M.    **Volkswagen's Scheme Was A Deliberate Strategy By The Company's Top Management**

186.    As several U.S. and German news sources have reported, and contrary to Horn's Congressional testimony, the emissions scandal-related misconduct at VWAG went far beyond any rogue group of engineers.  On October 14, 2015, *Der Spiegel* reported that based on information about VWAG's internal investigation being conducted by the law firm Jones Day's, "the longstanding emissions fraud with illegal software was by no means the offense of a 'small group' of managers as the company has claimed so far.  Dozens of Volkswagen managers were involved."  In Horn's Congressional testimony he refused to be forthcoming and claimed that the corporation was not responsible for the scheme rather, it was the work of a select few individuals.  Yet, after VWAG's emissions cheating emerged and the Company offered amnesty to whistleblowers, as many as 50 employees elected to participate, further belying any notion that VWAG's cheating was limited to a small number of low-level, rogue employees.

187.   Defendant Winterkorn and other senior executives and managers, knew, or were severely reckless in not knowing, that the Company was using defeat-device software to hide the fact that the TDI vehicles could not meet emissions standards.

188.   As reported in the September 26, 2015 *Frankfurter Allgemeine*, VWAG's investigation into the emissions-cheating scandal (conducted by the Jones Day law firm) has revealed that a whistleblower at VWAG warned management in 2011 that the Company was illegally manipulating reported emissions data.  Recipients of the warning included Heinz-Jakob Neußer, who was then the head of powertrain development for the Volkswagen brand and subsequently became Volkswagen's brand manager and a member of the VWAG Management Board.  Another engineer at the Company, notified management of the misconduct, but neither Neußer nor anyone else in management took any action to investigate whether the allegations were true or to otherwise to remedy the problem.  Neußer has been a member of the Board of Management for the Development Division of the Volkswagen brand since 2013, and served as the head of powertrain development since 2012.

189.   Credible reports also indicate that Winterkorn's top lieutenants were centrally involved in the decision to use defeat-device software to manipulate emissions data.  An October 3, 2015 *Bild* article reported that several engineers have incriminated former VWAG head of development Hackenberg as having known about VWAG's emissions cheating and as having been one of the Company's executives to order the installation of the defeat devices.

190.   Despite significant and substantial consequences that could result from VWAG's use of defeat-device software, management and employees continued to be secretive and focused on the public relations impact of being caught.  On February 14, 2016, *Bild* reported that internal communications among VWAG's engineers and management "coolly calculated" "the 'risks' and 'benefits' of the emission fraud," discussing "scenarios on how to handle the allegations of US agencies."   Among other options, the engineers discussed "[a]cknowledgement without comment or ignoring of the results," "further tests/inspection," and a "worst case scenario" of having to "[b]uy back" vehicles.  The engineers even discussed the "offer of a software upgrade" "to placate the US agencies," even though all involved understood that the Company could not

achieve "compliance with the required limits."  These comments have been confirmed in VW's Plea Agreement SOF the Liang Plea Agreement.

191.    Market observers have made clear their belief that the upper echelons of management at Volkswagen knew of the defeat devices.  A *Businessweek* article, dated October 21, 2015, detailed the ICCT and WVU investigation that revealed Volkswagen's emissions cheating, and astutely asked: "[T]he diesel engine has been around for more than 100 years.  It was invented in Germany.  Is it really possible that a German company run by engineers believed the diesel engine had suddenly become clean?"  The article went on:

> It's not credible that top managers were unaware corners had been cut, says Dudenhoeffer, who worked at Porsche and other carmakers before entering academia.  In contrast to GM, where finance people have run the show for years, and Ford Motor, whose former CEO is a turnaround specialist from another industry, **VW is a company where the engineers are in charge**.  It's always claimed that an engineer-filled executive suite was a precondition of building top-quality cars.  Winterkorn ran around at auto shows with a tape measure and a magnet to examine vehicles from rival carmakers, while back in his own ship he got involved in technical details.  **When VW managers called for clean diesel without the urea system, "they must have known that it's impossible, or else it's not possible they have degrees as engineers**," Dudenhoeffer says.

192.    As set forth in the New York Complaint (*see* ¶77), on or about March 31, 2014, engineers at VWAG learned of the upcoming publication of the ICCT and WVU study.  Upon learning of the results, Defendant Horn ordered analyses and reports of the ICCT and WVU study from VWAG's Environmental and Engineering Office.    Additionally, Defendant Winterkorn was aware of the Company's emissions cheating by at least spring of 2014 when he was provided with information by managing engineers at VWAG, Audi AG, VWGoA and AoA, including reports from many of the engineers who participated in the design and implementation of the defeat devices in the early 2000s.  Still, in a *Bild* report on October 22, 2015, Winterkorn denied knowing about the Company's emissions cheating until September 2015.

193.    The EPA's September 18, 2015 NOV evidences that Volkswagen top management knew by at least May 2014 that its TDI vehicles produced NOx emissions at levels far higher than permitted by applicable regulations.  The EPA wrote:

"[CARB] and the EPA were alerted to emissions problems with these vehicles in May 2014 when the West Virginia University's (WVU) Center for Alternative Fuels, Engines & Emissions published results of a study commissioned by the [ICCT] that found significantly higher in-use emissions from two light duty diesel vehicles (a 2012 Jetta and a 2013 Passat).  Over the course of the year following the publication of the WVU study, VW continued to assert to CARB and the EPA that the increased emissions from these vehicles could be attributed to various technical issues and unexpected in-use conditions. . . . None of the potential technical issues suggested by VW explained the higher test results consistently confirmed during CARB's testing.  It became clear that CARB and the EPA would not approve certificates of conformity for VW's 2016 model year diesel vehicles until VW could adequately explain the anomalous emissions and ensure the agencies that the 2016 model year vehicles would not have similar issues.  Only then did VW admit it had designed and installed a defeat device in these vehicles in the form of a sophisticated software algorithm that detected when a vehicle was undergoing emissions testing."

194.   CARB's September 18, 2015 letter to Volkswagen likewise showed that Volkswagen was aware of the problems that ICCT and WVU had identified, as CARB wrote that ICCT's investigation

"[P]rompted CARB to start an investigation and discussions with the Volkswagen Group of America (VW) on the reasons behind these high NOx emissions observed on their 2.0 liter diesel vehicles over real world driving conditions.  As you know, these discussions over several months culminated in VW's admission in early September 2015 that it has, since model year 2009, employed a defeat device to circumvent CARB and the EPA emission test procedures."

195.   As part of its response, according to the CARB letter, Volkswagen "initiated testing to replicate the ICCT/WVU testing and identify the technical reasons for the high on-road emissions."

196.   As *Bild* reported on February 14, 2016, Winterkorn received a memorandum on May 23, 2014—16 months before the emissions-cheating scandal became public—from Bernd Gottweis, a veteran Volkswagen executive whom employees referred to as the "fireman" for his ability to "smell trouble" and "sound the alarm" and address emergent crises at the Company. Gottweis was Volkswagen's top quality-assurance executive and led the Company's "Product Safety Taskforce" and, according to a February 15, 2016 *Wall Street Journal* article, "ran a team of product sleuths that Volkswagen management dispatched around the world to put out quality flare-ups before they grew into a full-fledged blaze."  According to a February 14, 2016 report in

*Süddeutsche Zeitung*, Gottweis always communicated openly with Winterkorn regarding quality issues, and Winterkorn usually followed up with Gottweis.

197.    In Gottweis' memorandum, which Winterkorn took home to read as part of his "weekend suitcase," Gottweis discussed tests by U.S. agencies in which the NOx output of TDI vehicles exceeded acceptable levels by over 30 times.  Specifically, and as *Süddeutsche Zeitung* reported, Gottweis wrote that Volkswagen's U.S. engineers could not provide an honest explanation for the heightened NOx emissions levels, and that "[n]o plausible explanation for the dramatically increased NOx emissions can be given to authorities."  Gottweis warned that "[i]t is to be assumed that the authorities will subsequently examine VW systems to determine if Volkswagen has installed test recognition into the engine control unit software (a so-called defeat device)."

198.    *Bild* also reported on February 14, 2016 that Winterkorn admitted, during a deposition as part of Jones Day's investigation into the Volkswagen emissions scandal, that by May 2014, he was aware of the problems regarding impermissibly high emissions levels in the TDI vehicles.

199.    In a March 2, 2016 press release in connection with the Company's defense to securities-fraud litigation in Germany, VWAG itself admitted that "[o]n 23 May 2014, a memo about the ICCT study was prepared for Martin Winterkorn, then-Chairman of the Management Board of VWAG.  This memo was included in his extensive weekend mail."

200.    After first being placed on notice of Volkswagen's emissions cheating in late May 2014, Winterkorn and other top managers did nothing to address or acknowledge the issue.  The March 2, 2016 VWAG press release stated "[o]n 14 November 2014, Mr. Winterkorn received another memo that … referred to a cost framework of approx. EUR 20 million for the diesel issue in North America."  The lack of action following the assessment of a cost framework for the issue indicates that cost may have been a reason for the Company's continued inaction, ignoring compelling evidence of illegal conduct to focus on its bottom line, without regard to compliance or environmental impact.

201.   Winterkorn and his executives were aware that U.S. regulators were investigating long before they disclosed it to the public, or to their potential investors.

202.   Executives demonstrated awareness of the issue by discussing it in meetings.  As *Bild* reported on February 14, 2016, "[a]s late as July 2015 a VW technician noted in a matrix under 'prospects' the possibility that the emissions fraud could slip through the cracks at the agencies . . . or 'monetary fines could be lower,'" and VWAG has admitted that on July 27, 2015, "Volkswagen employees discussed the diesel issue on the periphery of a regular meeting about damage and product issues, in the presence of Martin Winterkorn" and Chairman of the Volkswagen Passenger Cars brand since July 2015, Herbert Diess.  These concerns were not mentioned in the Bond Offering Memoranda issued as potential risks.

203.   In addition, according to a February 14, 2016 *Bild* report, a senior Volkswagen manager admitted true emissions levels to a CARB official on August 5, 2015 (over a month before Volkswagen's emissions cheating became public), and Herbert Diess held meetings on August 24 and 25, 2015 to discuss the Company's response to the scandal that was about to break.

204.   Similarly, leading German business newspaper *Handelsblatt* reported on February 15, 2016 that Volkswagen sources admitted that "it appears that top management at VW knew about the existence of a U.S. probe for more than a year before it went public—but apparently did little to address the situation, which angered U.S. investigators."  Indeed, "it wasn't just Mr. Winterkorn who knew, but it was common knowledge in top management circles.  **At the very latest, by the time of the first recall at the end of 2014, the entire Management Board at VW had been informed of the problem**, which had been the subject of intense discussions."  Further, "senior managers surrounding Mr. Winterkorn were informed of the scandal very early on in its development."

205.   Winterkorn was warned again regarding Volkswagen's use of illegal defeat devices just two weeks before the scandal became public.  On February 27, 2016, *Fortune* reported on internal Volkswagen documents demonstrating that a Volkswagen manager sent a letter directly to Winterkorn on September 4, 2015, stating that "[i]n the conversation on

1  [September 3, 2015] with the regulator CARB (California Air Resources Board), the defeat

2  device was admitted."  However, Winterkorn still stayed silent.

3  ### N.    Financial Impact Of The Scheme

4  206.    Volkswagen's emissions cheating has resulted in significant financial harm to the

5  Company.   In the wake of the disclosure of the scheme, ratings agencies such as S&P and

6  Moody's downgraded Volkswagen debt, resulting in a sharply increased cost of capital—

7  particularly damaging for Volkswagen's financing unit.   According to an October 13, 2015

8  Morgan Stanley analyst report, Volkswagen's cost of capital had risen by more than 200 basis

9  points.  As Morgan Stanley noted, "[o]n a consumer finance business with over €140bn in assets,

10  the annual cost of this rise in capital costs is very significant—if VW cannot pass this on to the

11  consumer, as it does normally, this could almost entirely wipe out current VW Financial Services

12  annual EBIT [Earnings Before Interest and Tax] of almost €2bn [per annum].  On the other hand,

13  if VW does pass on the higher costs to consumers, it will present a sharp competitive barrier for

14  VW and Audi against their closest peers."

15  207.    Consumers will likely be further turned away from Volkswagen cars by the drop

16  in resale values that Volkswagen cars have experienced.   Volkswagen vehicles' resale values

17  were long a key selling point and value generator.   In an August 20, 2012 analyst report, Morgan

18  Stanley reported that resale values were "[b]y far the biggest single driver of ownership cost . . .

19  .Here the quality and strong brand of VW vehicles [is] largely unmatched in the mass market

20  segments. . . .When compared to the average peer, VW's residual advantage looks to provide a

21  €750-1250 per vehicle [total cost of ownership] advantage (equivalent to c. 5- 7% of the 3-year

22  [total cost of ownership]."

23  208.    In the wake of the scandal, however, resale values have plummeted.  As Barclays

24  wrote in a November 13, 2015 analyst report:

25  Kelley Blue Book, a research group that tracks car values, said resale values of
   VW models affected by the scandals have fallen 16% on average since their pre-
26  crisis levels.  According to Autolist, models affected by the scandal are taking 123
   days to sell, about 44% longer than a control group of similar non-Volkswagen
27  cars.  List prices are about 5% below what the company's algorithms suggest they
   should be, and this drop has yet to cease.  It is not just the affected models that are
28  likely to be impacted by this general tail off in sentiment.  Consumers are either

not clued-up enough to know which models have been implicated or, more likely, have little faith in VW's ability to draw a line under the situation.

209.     VWAG also faces significantly increased financial exposure because far fewer leasing customers will purchase their vehicles at lease-end at the agreed upon resale values, which were set before the emissions scandal was revealed and do not reflect the loss in value caused by the scandal.  As a result of the drop in purchases, Volkswagen will then be left with increased inventory of used vehicles.  Even assuming a fix is available to render the cars compliant with emissions standards that will allow the Company to resell the cars, they would have to do so in a depressed market.

210.     Volkswagen faces massive monetary liability.  Those costs include civil and criminal penalties, vehicles' fall in residual value, the cost of required fixes to the vehicles, and a clawback of government subsidies that had been provided for energy-efficient vehicles.  Credit Suisse presented a thorough analysis in an October 2, 2015 analyst report, discussing its base case of €43.6 billion cost impact to VWAG (including €6.5 billion in criminal and civil penalties) alongside a €77.8 billion bear case and a €22.3 billion bull case.  Société Générale's forecast is even starker, estimating in a January 7, 2016 analyst report that Volkswagen's legal liabilities alone will total €100 billion.  None of these liabilities or contingencies were properly accounted for during the Class Period.

211.     On June 27, 2016, the *New York Times* published an article, "Volkswagen to Pay $14.7 Billion to Settle Diesel Claims in the U.S." reporting the record settlement between VWAG and state authorities and about 475,000 owners of 2.0 liter diesel vehicles affected in the US, including $10.033 billion set aside for buybacks and owner compensation, and $4.7 billion on programs to offset excess emissions and boost clean-vehicle projects.  *Reuters* reported that the settlement was approved by the Court on October 25, 2016, making it the largest civil settlement worldwide ever reached with an automaker accused of misconduct.

212.     On September 30, 2016, *Fortune* reported that Volkswagen had confirmed a settlement with dealers, agreeing to make $1.21 billion in payments to 652 U.S. brand dealers.  Together with the $14.7 billion consumer settlement and payments to states and attorneys for

owners, *Reuters* reports that Volkswagen has so far agreed to spend up to $16.5 billion on the scandal.

## VI. AS A RESULT OF VOLKSWAGEN'S EMISSION SCHEME, VWAG FRADULENTLY UNDERSTATED CONTINGENT LIABILITIES AND OVERSTATED PROFITS

213.    As a German corporation, VWAG is required to prepare its financial statements in accordance with International Financial Reporting Standards and International Accounting Standards ("IAS").  IAS 37 governs when a company is required to recognize a "provision" for contingencies.  Provisions are recognized as liabilities in financial statements because they are present obligations and it is probable that an outflow of resources will be required to settle the obligations.

214.    Under IAS 37, a provision must be recognized when a company has a present obligation (legal or constructive) as a result of a past event; it is probable that an outflow of resources embodying economic benefits will be required to settle the obligation; and a reliable estimate can be made of the amount of the obligation, including when there is a range of possible outcomes, in which case the amount accrued should be either the best estimate of the obligation or, if there is no best estimate, the midpoint of the range.  IAS 37 further provides that "[e]xcept in extremely rare cases, an entity will be able to determine a range of possible outcomes and can therefore make an estimate of the obligation that is sufficiently reliable to use in recognizing a provision."  A past event is deemed to give rise to a present obligation if, taking into account all available evidence, it is more likely than not that a present obligation exists at the end of each reporting period.

215.    In contrast to U.S. Generally Accepted Accounting Principles (or, "GAAP"), which does not define "probably" with reference any specific percentage likelihood, a loss is considered "probable" and therefore must be recognized under IAS 37 when the loss is more likely than not, i.e., a probability of greater than 50%.

216.    As a result of Volkswagen's emission scheme, Volkswagen had billions of dollars in probable and reliably estimated liabilities that would result from damages and repairs to consumers, and fines and penalties to government regulating agencies, which should have been

recorded as a provision in its financial statements during the Class Period.  IAS 37 specifically cites "penalties or clean-up costs for unlawful environmental damage" as an example of a present obligation arising from past events that should be recorded as a provision.  As a liability, the provision would have reduced VWAG's operating profit during each period for which it should have been recognized and would have reduced VWAG's net assets and shareholders' equity as of the balance-sheet date at the end of the period.

217.   VWAG stated in each of its annual reports during the Class Period that "[i]n accordance with IAS 37, provisions are recognized where a present obligation exists to third parties as a result of a past event, where a future outflow of resources is probable and where a reliable estimate of that outflow can be made."  Contrary to this statement and in violation of IAS 37, VWAG recognized no provision for its present obligations relating to its emissions-cheating scheme during the Class Period.

218.   Specifically, VWAG faced the financial costs of fixing the affected diesel vehicles in light of warranty claims or otherwise (including potential EPA fines of $37,500 and CARB fines of $5,000 for each affected car in the United States), legal and regulatory fines and penalties in the United States and abroad, and civil liability in the United States, Europe, and elsewhere to consumers, dealers, and investors.  EPA's $37,500 penalty applies to violations occurring after January 13, 2009.  At all relevant times before January 13, 2009, the penalty was $32,500 per car.  CARB's relevant fine for violations was $5,000 per car at all relevant times.  Despite Defendants' awareness of VWAG's financial exposure, Defendants failed to take meaningful corrective action not only with regard to the affected vehicles, but also with regard to VWAG's accounting for that exposure.

219.   Under IAS 37, VWAG was obligated to recognize provisions to account for estimable liabilities that arose out of past events.  VWAG should have recognized provisions in an amount representing the Company's best estimate of the expenditures required to settle its obligations.  On information and belief, none of VWAG's financial statements issued during the Class Period included any provision relating to its use of illegal defeat devices to circumvent emissions standards, except for its Third Quarter 2015 Interim Report issued on October 28,

2015, which included an inadequate provision for the Company's liabilities arising from the diesel scandal.

220.    VWAG should have recognized provisions relating to its use of the illegal defeat devices in each of its quarterly and annual financial statements issued during the Class Period. The losses relating to the use of defeat devices were "probable" under IAS 37 because it was more likely than not that the defeat devices would be discovered and that VWAG would incur enormous liabilities to address this self-inflicted problem.  The losses were "reliably estimable" because VWAG knew the likely amounts of penalties that governmental authorities would impose on it when they discovered the defeat devices, as well as the likely amounts of its liabilities to purchasers of the cars.  VWAG could reliably estimate the cost of fixing or buying back the unlawful vehicles it sold to consumers.  VWAG should have recognized a provision for these likely penalties and costs for every car sold with illegal defeat devices during every quarter during the Class Period.

221.    The illegal defeat devices also affected the valuation of residual value risk in VWAG's financial services business, which agrees to buy back selected vehicles at a residual value that is fixed at the inception of each lease contract.  VWAG stated in each of its annual reports during the Class Period that "[w]e evaluate the underlying lease contracts at regular intervals and recognize any necessary provisions if we identify any potential risks."  VWAG should have recognized provisions during each quarter of the Class Period for the probable and reliably estimable loss it would incur when leased cars that were returned to Volkswagen became unsellable and substantially worthless as a result of the illegal defeat devices.  On information and belief, VWAG did not recognize any provision for the residual value risk relating to the defeat devices during the Class Period.

222.    VWAG's failure to recognize contingency reserves relating to its use of illegal defeat devices to circumvent emissions standards caused its operating profit, net assets, and shareholders' equity to be materially overstated and its liabilities to be materially understated in all of its financial statements issued during the Class Period.

223.     Thus far, Volkswagen has inadequately provisioned for its obligations.  In the late summer and early fall of 2015, Volkswagen belatedly recognized a €6.7 billion provision to cover only the actual costs of repairing affected vehicles (~€5.3 billion) and the decline in the residual values of those cars (~€1.3 billion).  Those provisions, which did not include amounts such as the costs of auto buybacks and resolving any government investigations or civil lawsuits, represented approximately half of Volkswagen's 2014 net income.  On January 11, 2016, Volkswagen CEO Müller stated the Company's mistaken belief that the €6.7 billion provision "should be enough."  It was not until February 29, 2016, that Volkswagen admitted that its emissions scandal-related provisions "need to be increased."  Then, on April 22, 2016, the Company announced that it needed to set aside €16.2 billion (over $18 billion) to fund the recall of millions of cars, legal claims, and related costs arising out of the diesel scandal, resulting in an operating loss of approximately €4.1 billion and a net loss of €5.5 billion for 2015.

## VII.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS

224.     Throughout the Class Period, Defendants made numerous materially false and misleading statements and omissions, including to Bondholders, regarding the Company's operations and financial results, NOx emissions, emissions-control technology, its business and financial results, outlook, and compliance with U.S. and European regulatory standards.

### A.     Defendants Made False And Misleading Statements And Omissions In The Bond Offering Memoranda

225.     The Bonds issued on May 23, 2014, were marketed through an Offering Memorandum dated May 15, 2014 (the "May 2014 Offering Memorandum"); the Bonds issued on November 20, 2014, were marketed through an Offering Memorandum dated November 12, 2014 (the "November 2014 Offering Memorandum"); and the Bonds issued on May 22, 2015, were marketed through an Offering Memorandum dated May 19, 2015 (the "May 2015 Offering Memorandum") (collectively, the "Offering Memoranda").

226.     As alleged herein, Defendants made materially false or misleading statements and omissions in the Offering Memoranda by failing to disclose material information regarding Volkswagen's use of a "defeat device" in certain of its diesel-power cars to circumvent

regulatory emissions standards.  Defendants were obligated to disclose material facts to make their statements about reduced emissions and regulatory emissions standards and requirements not misleading.  Defendants also had a duty to disclose material information to the purchasers of the Bonds concerning Defendants' secret and illegal scheme, which exposed Volkswagen to the risk of suffering billions of dollars in damages in fines, penalties, judgments and reputational damage.  Such undisclosed risk materially impacted the creditworthiness of the Company, as well as its ability to pay its debts, including the Bonds at issue in this action, which materially impacted the value and pricing of the Bonds.

227.    All three of the Offering Memoranda contained substantively identical false and misleading statements, including, but not limited to, the following:

(a)    "Volkswagen's top priority for research and development in [2011, 2012 and 2013/2012, 2013 and 2014] was to develop engines and drivetrain concepts to reduce emissions, and to develop and expand the modular longitudinal toolkit platforms and the modular transverse toolkit platforms."

(b)    "A focal point of Volkswagen's current and future development activities is and will be innovative mobility concepts and the reduction of fuel consumption and emissions of the fleet.  Currently, Volkswagen offers in Europe [438/532] models or model variants with $CO_2$ emissions below 130g $CO_2$/km; [324/416] models emit less than 120g $CO_2$/km and [54/85] models are currently already below 100g $CO_2$/km.  All of these models are sold on the European Market.  With a broad range of development activities in the drivetrain sector, Volkswagen will continue to reduce the emissions of our vehicles in the coming years.  To this end, Volkswagen is aiming to electrify the drivetrain such as with hybrid and electric vehicles, but at the same time to optimize conventional combustion engines, which, in the Company's opinion will continue to dominate for decades, in particular in the large growth regions."

(c)    "Volkswagen is subject to laws and regulations that require it to control automotive emissions, including exhaust emission standards, vehicle evaporation standards and onboard diagnostic system requirements."

1        (d)     "Volkswagen's vehicles must comply with increasingly stringent

2   requirements concerning emissions.  With respect to exhaust emissions, in the case of passenger

3   cars and light commercial vehicles, EC type approval must comply with the Euro 5 exhaust

4   emission standards.  Furthermore, in the case of passenger cars and some light commercial

5   vehicles, EC type approval or national approval for new types of vehicles must comply with the

6   stricter Euro 6 standards from September 1, 2014, and new vehicles must comply with the Euro 6

7   standards from September 1, 2015.  These requirements will be applied to all light duty vehicles

8   one year later.  Heavy passenger and commercial vehicles must currently meet the Euro 6

9   standard.  The competent government authorities in the Member States of the European Union

10  monitor compliance with the limits and may require non-compliant manufacturers to take certain

11  measures, including a recall of the affected vehicles.  Automobile manufacturers must reduce the

12  $CO_2$ emissions of their new passenger car fleet in the European Union according the EU average

13  of 130g $CO_2$/km from 2012 onward with a phase-in until 2015.  The target to be achieved from

14  2020 onward is 95g $CO_2$/km.  In 2011, Regulation 510/2011 setting performance standards to

15  reduce $CO_2$ emissions for new light commercial vehicles has become effective supplementing

16  the regulation on $CO_2$ emissions of passenger car classes.   Under the new Regulation,

17  manufacturers in the European Union must, for the average of their new fleet of cars, reduce the

18  $CO_2$ emissions of light commercial vehicles in category N1 gradually to 175g $CO_2$/km from

19  2014 to 2017.  147 $CO_2$/km is set as the limit to be achieved by 2020 (depending on its

20  feasibility).  A failure to meet the annual emission targets results in an excess emission premium

21  on the automobile manufacturer based on the level by which the emission limits were exceeded."

22       (e)     "U.S. federal and state governments and agencies (i.e. the U.S.

23  Environmental Protection Agency, or ("EPA")) have created a suite of vehicle emission

24  regulations aimed at improving local air quality and minimizing the potential effects of global

25  climate change.  Automobile manufacturers must ensure that their individual vehicles, and in

26  some cases, fleets of vehicles, must comply with various pollutant, carbon dioxide, fuel

27  economy, and zero-emission technology requirements.  Federal and state agencies also impose

28  standards for onboard diagnostic systems to monitor the emission control system, including the

onboard refueling vapor recovery systems that control refueling and evaporative emissions. Volkswagen is responsible under these regulations for the performance of vehicle emission control systems, as well as the emission performance of its sold cars and light duty trucks over certain time and mileage periods."

(f)     "In order to be placed on the European Union market, vehicles must comply with EC type-approval legislation, which sets out the standardized requirements for vehicles, vehicle systems, components and separate technical units.  Within the context of the Framework Directive 2007/46/EC, Volkswagen must comply with extensive legislation regulating specific safety, emissions and technical features of vehicles and their components. The Directive provides for an EC type-approval system.  With the EC type-approval, the competent government agency of the Member State certifies that a type of motor vehicle or system (such as braking systems), component (such as tires) or independent technical unit (such as lateral safety devices) conforms to the applicable regulations and technical requirements.  A valid EC type-approval is a prerequisite to registering, selling and operating motor vehicles, systems, components or separate technical units in the Member States of the European Union."

(g)     "Assembly, manufacturing and other operations in the United States must meet substantial regulatory requirements under various federal and state laws.  These laws severely restrict airborne and waterborne emissions, discharges of pollutants and the disposal of waste from Volkswagen's facilities, as well as the handling of hazardous materials.  These requirements may require Volkswagen to install additional monitoring and other pollution control equipment, which would be costly."

(h)     "Our future business success depends on our ability to develop new, attractive and energy-efficient products that are tailored to our customers' needs and to offer these products on competitive terms and conditions.  In their purchasing decisions, customers are increasingly emphasizing lower fuel consumption and exhaust emissions.  Alternative drive technologies (for example, electric powertrains or hybrid engines) are increasingly important to customers.  A significant factor in our future success is our ability to recognize trends in customer requirements in sufficient time to react to these changes and thus strengthen our

position in our existing product range and the market segments we already serve, as well as to expand into new market segments.  We are under continual pressure to develop new products and improve existing products in increasingly shorter time periods."

228.   The statements in the Offering Memoranda quoted in ¶227 were materially false and misleading, and omitted material facts that were necessary to render those statements not misleading, because:

(a)   Volkswagen utilized an unlawful "defeat device" in many of its diesel vehicles sold in the United States and around the globe in order to meet regulatory requirements that allowed Volkswagen to sell noncompliant vehicles that would otherwise be prohibited. Specifically, the defeat device used by Volkswagen was designed and intended to detect when the vehicle was undergoing official emissions testing and then enable full emissions controls during the test.  At all other times, however, the emissions controls were deactivated, meaning that pollution was released into the environment at levels that far exceeded those allowed by federal and state clean air regulators, as well as the emissions level proclaimed by Volkswagen.

(b)   Defendants' statements failed to state material facts about Volkswagen's exposure to the risk of suffering billions of dollars in damages from fines, penalties, judgments and reputational damage, among other things, if and when its unlawful misconduct were discovered.  These facts, if known, would have had a material impact on the creditworthiness of the Company, its ability to pay the Bonds and other debts, and the value of the Bonds.

(c)   More specifically, Defendants' statements in ¶227(a) & (b), referencing Volkswagen's "top priority" and "focal point" to reduce emissions in its vehicles were materially false because Defendants did not intend to, or effectively, reduce emissions.  Rather, Defendants intended to use, and prioritized using, an illegal defeat device to create the impression of reduced emissions.   Furthermore, those statements were misleading because they implied that Volkswagen had already reduced vehicle emissions when in truth Volkswagen's diesel engines emitted more pollutants than Defendants represented.   Moreover, those statements were misleading because they failed to disclose the material facts that Volkswagen equipped a substantial number of its vehicles with an illegal defeat device that allowed those vehicles to

reduce emissions only during certification testing, and that the vehicles otherwise and predominately produced increased emissions, and emissions at greater levels than were touted by Volkswagen.

(d)     Defendants' statements in ¶227(c)-(f) regarding emissions regulations and requirements applicable to Volkswagen and its vehicles were misleading because they implied that Volkswagen's vehicles were compliant with all such emissions regulations and requirements, but failed to disclose that a substantial number of Volkswagen's vehicles were only able to meet regulatory requirements by utilizing an illegal defeat device during emissions certification testing.   But for the use of the defeat device, Volkswagen would have been prohibited from selling those vehicles.

(e)     Defendants' statements in ¶227(g) regarding the potential cost impact of increasingly stricter regulatory requirements were misleading because they implied that increased costs were uncertain, when Defendants knew that Volkswagen was exposed to considerable fines, penalties, and compliance costs, once its unlawful conduct was discovered.

(f)     Defendants' statements in ¶227(h) regarding Volkswagen's past and future sales, future business success, income and profitability were materially false and misleading because Defendants failed to disclose that a substantial portion of its past sales, income and profitability were *only* achieved by misleading its customers, government regulators and investors regarding the operation, performance and environmental impact of its diesel engines; and, that its future sales, income and profitability were dependent upon Volkswagen continuing its unlawful scheme, or would be negatively impacted if and when the unlawful scheme was inevitably discovered.

**B.     Defendants Made False And Misleading Statements And Omissions In Interim and Annual Reports Referenced In The Offering Memoranda**

229.   The May 2014 Offering Memorandum contained financial statements and information referencing VWAG's interim financial statement for the period January-March 2014, also known as the "First Quarter 2014 Interim Report."   The First Quarter 2014 Interim

Report was signed by the VWAG Management Board, including Defendant Winterkorn, on April 29, 2014.

230.   The November 2014 Offering Memorandum states that all information presented is qualified in its entirety by "Developments since January 1, 2014 and Outlook," reflecting information disclosed in VWAG's interim financial statement for the period January-September 2014, also known as the "Third Quarter 2014 Interim Report."  The Third Quarter 2014 Interim Report was signed by the VWAG Management Board, including Defendant Winterkorn, on October 30, 2014.

231.   The May 2015 Offering Memorandum states that all information presented is qualified in its entirety by "Developments since January 1, 2015 and Outlook," reflecting information disclosed in VWAG's interim financial statement for the period January-March 2015, also known as the "First Quarter 2015 Interim Report."  The First Quarter 2015 Interim Report was signed by the VWAG's Management Board, including Defendant Winterkorn, on April 29, 2015.

232.   The First Quarter 2014 Interim Report, Third Quarter 2014 Interim Report, and First Quarter 2015 Interim Report all included the following false and misleading statement: "We offer an extensive range of environmentally friendly, cutting-edge, high-quality vehicles for all markets and customer groups that is unparalleled in the industry."

233.   The May 2014 Offering Memorandum and the November 2014 Offering Memorandum also included VWAG's financial statements and referenced VWAG's 2013 Annual Report, dated February 21, 2014.  VWAG's  2013 Annual Report quoted Defendant Winterkorn as saying that "Our pursuit of innovation and perfection and our responsible approach will help to make us the world's leading automaker by 2018—both economically and ecologically"; that "our goal is to become better and better, more efficient, more environmentally friendly and even more customer-centric—from development through production down to sales"; and that "our goal is to ensure the Volkswagen Group reaches the top of the automotive industry by 2018—in both economic and ecological terms. We are focusing all our efforts and energy on achieving this goal."

234.    The 2013 Annual Report also stated:

We are focusing in particular on the environmentally friendly orientation and profitability of our vehicle projects so that the Volkswagen Group has the right products for success even in more challenging economic conditions. . . . Our attractive and environmentally friendly range of vehicles, which we are selectively expanding, and the strong position enjoyed by our individual brands in the markets worldwide, are key factors allowing us to leverage the Group's strengths and to systematically increase our competitive advantages.

235.    The 2013 Annual Report also stated that "Volkswagen is . . . continuing to focus in depth on developing efficient drive technologies, thus extending its position as an innovation leader in the area of environmentally friendly mobility," and that "We offer an extensive range of environmentally friendly, cutting-edge, high-quality vehicles for all markets and customer groups that is unparalleled in the industry."

236.    In addition, the May 2015 Offering Memorandum cites VWAG's 2014 Annual Report as an additional source of information for investors.  The 2014 Annual Report, signed by VWAG's Management Board, including Defendant Winterkorn, on February 17, 2015, and released to the public on February 27, 2015, contains the following false or misleading statements:

(a)    Featured prominently before the table of contents is a quote from Defendant Winterkorn, "Our pursuit of innovation and perfection and our responsible approach will help to make us the world's leading automaker by 2018 – both economically and ecologically."

(b)    "We are focusing in particular on the environmentally friendly orientation and profitability of our vehicle projects so that the Volkswagen group has the right products for success even in more challenging economic conditions." … "Our attractive and environmentally friendly range of vehicles, which we are selectively expanding, and the strong position enjoyed by our individual brands in the markets worldwide, are key factors allowing us to leverage the Group's strengths and to systematically increase our competitive advantages."

(c)    "Our activities are primarily oriented on setting new ecological standards in the areas of vehicles, drive trains, and lightweight construction."

(d)     "The Volkswagen Group closely coordinates technology and product planning with its brands so as to avoid breaches of emission limits, which would entail severe sanctions."

(e)     "Our attractive and environmentally friendly model portfolio impresses customers around the globe.  The trust placed in us by customers, as well as our high quality and efficiency standards, allow us to meet and even exceed our financial targets."

(f)     "We offer an extensive array of attractive, environmentally friendly, cutting edge, high-quality vehicles for all markets and customer groups."

(g)     "To the best of our knowledge, and in accordance with the applicable reporting principles, the consolidated financial statements give a true and fair view of the assets, liabilities, financial position and profit or loss of the Group, and the Group management report includes a fair review of the development and performance of the business and the position of the Group, together with a description of the material opportunities and risks associated with the expected development of the Group."

237.     The statements in VWAG's periodic reports quoted in ¶¶232-236 were materially false and misleading because rather than actually being "environmentally friendly," VWAG's diesel vehicles were equipped with secret defeat devices that allowed them to be sold under the pretense that their NOx emissions were within the legal limits when they actually  exceeded such limits by as much as 40 times.

238.     The statements in VWAG's periodic reports referenced in ¶¶232-236 concerning the Company's efforts to avoid breaches of emission limits, the trust of customers, and its environmentally friendly vehicles, were misleading because they failed to disclose that its basis for avoiding breaches of emissions limits, building trust of customers and offering environmentally friendly emissions standards was an unlawful scheme to meet regulatory emissions standards; and, that but for the illegal scheme, Volkswagen would not have been able to sell a substantial portion of its vehicles.

239.     The statements in VWAG's periodic reports referenced in ¶¶232-236 concerning, among other things, the Company's vehicles' compliance with emissions standards, Defendants'

commitment to being environmentally friendly, and their use of technology and engineering expertise to produce "clean diesel" vehicles triggered an obligation for Defendants to disclose in each of VWAG's annual and interim reports the omitted facts concerning, among other things, that the subject "clean diesel" vehicles could not have been legally sold in the United States or Europe as they did not meet the applicable emissions standards and utilized illegal defeat devices.

### C. Defendants Made False And Misleading Statements And Omissions About VWAG's Financial Results And Condition

240.    VWAG's failure to recognize the probable liabilities stemming from their use of illegal defeat devices into their periodic financial statements issued during the Class Period and referenced in the Bond Offering Memoranda constituted material misrepresentations and omissions.   In each of VWAG's financial statements attached to the Offering Documents, VWAG failed to account for reliably estimable, present obligations under IAS 37, as a result of its likely liabilities to purchasers and lessees of its "clean diesel" cars for damages and repairs, to US and foreign governmental agencies for fines and penalties resulting from its emissions-cheating scheme, and its obligation to repurchase leased cars at contractual resale values vastly exceeding their actual, impaired values.   As a liability, the provision would have reduced VWAG's operating profit during the period for which it should have been recognized and would have increased the Company's total liabilities.   Furthermore, any such liability would have reduced the Company's net assets and shareholders' equity, thereby impacting the creditworthiness of the Company and its ability to pay its debts, including the Bonds, and materially decreasing the value of its Bonds.

241.    To date, VWAG's accrued liabilities as a result of its scheme to utilize the unlawful defeat device amount to at least $18 billion, before even giving effect to liabilities arising from all fines, damage awards, criminal penalties, and other costs that the Company has not yet accrued.

242.    As a result of VWAG's failure to properly recognize provisions relating to its use of unlawful defeat devices in its "clean diesel" vehicles, its total liabilities were materially

understated and its operating profit, total assets, and shareholders' equity were materially overstated in each of VWAG's following periodic reports during the Class Period.  VWAG's Board of Management, including Defendant Winterkorn, signed each of the Annual and Interim Reports during the Class Period.  All amounts in the table below are in Euros in millions:

| VWAG Report | Reported Total Liabilities | Reported Total Assets | Reported Shareholder Equity | Reported Operating Profit |
|---|---|---|---|---|
| 2013 Annual Report, issued on February 21, 2014 | 234,296 | 324,333 | 87,733 | 11,671 |
| First Quarter 2014 Interim Report, issued on April 29, 2014 | 246,568 | 333,909 | 80,031 | 2,855 |
| Third Quarter 2014 Interim Report, issued on October 30, 2014 | 256,305 | 347,308 | 85,806 | 3,230 |
| 2014 Annual Report, issued on February 17, 2015 | 261,020 | 351,209 | 89,991 | 12,697 |
| First Quarter 2015 Interim Report, issued on April 29, 2015 | 286,560 | 375,827 | 81,610 | 3,328 |

## VIII.  THE TRUTH IS REVEALED

243.    The conduct alleged herein, and the materially false and misleading statements and omissions made during the Class Period, operated as a fraud or deceit on Plaintiff and members of the Class that allowed Defendants to improperly benefit from the sale of Volkswagen Bonds, and caused Volkswagen Bonds to trade at inflated prices during the Class Period.  When the relevant truth began to be disclosed regarding Defendants' conduct, and their misleading statements and omissions concerning the use of emissions defeat devices, the prices of Volkswagen Bonds suffered significant declines, as the artificial inflation began to come out of the prices and the Bonds were downgraded by credit ratings agencies, including S&P and Moody's.  As a result of their purchases of Bonds during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.* damages, under the federal securities laws.

244.    On Friday, September 18, 2015, the EPA and CARB announced that Volkswagen admitted to systematically defrauding investors and the public for years by deliberately cheating on emissions tests and making its diesel vehicles appear cleaner and more powerful than they actually are.  That day, the EPA issued an NOV of the Clean Air Act to VWAG, Audi AG, and

VWGoA, stating that Volkswagen and Audi cars equipped with four-cylinder 2.0 liter diesel engines from Model Years 2009–2015 included illegal software known as a "defeat device" that was designed to circumvent EPA emissions standards.  Also, CARB sent a letter to VWAG, Audi AG and VWGoA advising that it had initiated an enforcement investigation of Volkswagen pertaining to the vehicles at issue.

245.    As described in the NOV, Volkswagen's fraud was brazen and broad. Volkswagen's misconduct affected approximately 580,000 diesel cars sold in the United States from 2008 through 2015, and spanned several different Volkswagen car brands and numerous different Volkswagen models.  The affected diesel vehicles include the: (1) Jetta (Model Year 2009–2015); (2) Jetta SportWagen (Model Year 2009–2014); (3) Beetle (Model Year 2012–2015); (4) Beetle Convertible (Model Year 2012–2015); (5) Audi A3 (Model Year 2010–2015); (6) Golf (Model Year 2010–2015); (7) Golf SportWagen (Model Year 2015); and (8) Passat (Model Year 2012–2015).

246.    According to the September 18, 2015 NOV, the EPA determined that Volkswagen had "manufactured and installed defeat devices in certain model year 2009 through 2015 diesel light-duty vehicles equipped with 2.0 liter engines.  These defeat devices bypass, defeat, or render inoperative elements of the vehicles' emission control system that exist to comply with CAA [Clean Air Act] emission standards."  Volkswagen manufactured and installed software that "sensed when the vehicle was being tested for compliance with EPA emission standards" detecting "whether the vehicle is being tested or not based on various inputs including the position of the steering wheel, vehicle speed, the duration of the engine's operation, and barometric pressure."  This illegal software detects when the car is undergoing official emissions testing, and utilizes full emissions controls only during the test.  In normal driving conditions, the software shuts down, which greatly reduces the effectiveness of the vehicles' pollution emissions controls.  As a result of this software, Volkswagen's diesel vehicles met emissions standards in the laboratory or testing station, but not during normal operation, when they emitted NOx at up to 40 times the legal limit.

247.    The EPA determined that the effect of the software rendered it to be an illicit "defeat device" as defined by the Clean Air Act, and found that Volkswagen violated Section 203(a)(3)(B) of the Clean Air Act, 42 U.S.C. §§ 7522(a)(3), 7522(a)(1), 7522(a)(3)(B), as well as 40 C.F.R. §§ 86.1854-12(a)(3)(ii) and 86.1854-12(a).  The EPA also found that Volkswagen's 2.0 liter diesel cars violated the U.S. Tier 2, Bin 5 standard, and were not able to comply with the Tier 3 standard as Volkswagen represented because, but-for the installation and use of the defeat devices, the vehicles' emissions of NOx were 10 to 40 times above compliant levels.

248.    That same day, the *New York Times* published an article on its website (and on the front page of its next print issue on Saturday, September 19, 2015) under the title "U.S. Orders Major VW Recall Over Emissions Test Trickery."  The article reported that the Company had "illegally installed software in its diesel-power cars to evade standards for reducing smog," and that Volkswagen had "admitted to the use a so-called defeat device.  The recall involves 4 cylinder Volkswagen and Audi vehicles from model years 2009-2015."  The article also reported that the DOJ had opened an investigation and that fines of as much as $18 billion could be imposed as a result of Defendants' misconduct.  The article reported that Tyson Slocum, Director of the Energy Program at Public Citizen, stated that VWAG's misconduct is "several steps beyond the violations that we've [Public Citizen has] seen from other auto companies.  They appear to have designed a system with the intention to mislead consumers and the government."

249.    On Sunday, September 20, 2015, Defendant Winterkorn admitted on behalf of the Company that Volkswagen broke the public's trust by defrauding federal and state regulators, adding that he was "personally . . . deeply sorry for the breach of trust."  According to Winterkorn, the Company's "manipulations . . . violate American environmental standards . . . [and] [w]e do not and will not tolerate violations of any kind of our internal rules or of the law."  In addition to issuing a sweeping apology for lying to the public, Volkswagen halted U.S. sales of its diesel-powered cars on September 20, 2015, and launched an internal investigation into its misconduct to be conducted by the major U.S. law firm Jones Day.  Despite these "conciliatory" statements, Volkswagen continued to sell its 3.0-liter diesel models, even though Defendants knew that they contained similar, but not-yet-disclosed defeat devices.

250.    On Monday, September 21, 2015, the DOJ Environmental and Natural Resources Division opened a criminal probe into Volkswagen's admission that it rigged its diesel cars to beat emissions tests.  Also, on September 21, 2015, the German government stated that it would investigate whether VWAG manipulated emissions testing in Europe, and, the U.S. House of Representatives Energy Committee's Oversight Subcommittee announced plans to hold a hearing on the Volkswagen case.

251.    Numerous authorities, regulators, professors, and analysts quickly denounced Volkswagen's actions:

- Stephan Weil, the prime minister of Lower Saxony (which owns 20% of the Company) issued a statement on September 21, 2015, that "[m]anipulation of an emissions test is completely unacceptable and without any justification."

- Deutsche Bank issued an analyst report on September 20, 2015, stating that "this appears to be intentional cheating" by Volkswagen.

- Karl Brauer, an analyst at Kelley Blue Book, explained to the *New York Times* on September 21, 2015, that the Company "must have had a mix of performance, durability and economy that they liked, but realized they couldn't achieve it and still get the emissions" without using the defeat devices.

- A Commerzbank analyst report issued on September 21, 2015, "[i]n a nutshell, VW is violating the Clean Air Act [and] acknowledged that there might be wrongdoing by VW USA."

252.    On September 22, 2015, Volkswagen issued a press release disclosing that as many as 11 million vehicles worldwide contained the defeat devices used to evade emissions tests, and, as a result, the Company would take a $7.3 billion charge to earnings and cut its full-year outlook to account for expected liabilities.  The Company reported that "further internal investigations conducted to date have established that the relevant engine management software is also installed in other Volkswagen Group vehicles with diesel engines. . . .  Discrepancies relate to vehicles with Type EA 189 engines, involving some eleven million vehicles worldwide."  Volkswagen recognized a $7.3 billion provision in the "cost of sales" category of

the Company's income statement for the third fiscal quarter of 2015, resulting in a dollar-for-dollar reduction in operating profit.  Significantly, this $7.3 billion charge included only the cost of the software and hardware to update the defective vehicles, residual value risks for the Company's leasing portfolio, and a support fund for Volkswagen dealers.  The costs of any legal measures, penalties, or fines flowing from the scandal were not included in the $7.3 billion provision.  This news was quickly reported by news outlets across the world, including an article in the *New York Times* entitled "Volkswagen Says 11 Million Cars Worldwide Are Affected in Diesel Deception."

253.   On September 22, 2015, Winterkorn again acknowledged "misconduct," and stating that "[m]illions of people in the world trust our brand, our cars, and our technology.  I am endlessly sorry that we have betrayed that trust."  Also on September 22, 2015, Defendant Horn, then-CEO of VWGoA, admitted that "[o]ur company was dishonest with the EPA, and the [CARB] and with all of you . . . . [W]e've totally screwed up."

254.   On September 22, 2015, Kevin Tynan, a Bloomberg Intelligence auto industry analyst, reported, "[w]hat is so damning is that this was something actively pursued.  This isn't an oversight.  Someone at VW had to decide that cheating the system was going to be a better use of time, money, and resources than meeting regulatory requirements."  That same day, auto expert Dudenhoeffer stated his belief, in *Deutsche Welle*, that Volkswagen consciously and purposefully violated U.S. law, and the executives in charge knew what defeat devices are. Dudenhoeffer opined that Volkswagen consciously violated U.S. law and its misconduct could not have occurred by accident.

255.   By the evening of September 22, 2015, (and further updated the following morning) Bloomberg published an article on its website, "Volkswagen Emissions Scandal Takes Toll on Corporate Bond Market."  According to the article, by September 22, 2015, investors in the United States were demanding yields of as much as 4.6 percent, numbers that are "more in line with companies with ratings closest to junk than the A grade that Volkswagen has from Standard & Poor's.  Credit default swaps traders drove up the cost to protect against losses on debt across the auto industry as they braced for the potential of a widening probe."

256.    On September 24, 2015, Moody's changed VWAG's outlook to "negative," citing the concern that "Volkswagen's alleged breach of US environment rules and, especially, the process by which that breach occurred, will have an adverse effect on its reputation and credibility within the global passenger car markets."   On November 4, 2015, Moody's downgraded Volkswagen's ratings to A3/P-2, with a negative outlook, citing a second NOV from the EPA regarding the 80,000 3.0 liter diesel vehicles equipped with defeat devices.

257.    In response to the above events revealing Defendant's fraudulent scheme to the public, the value of the Bonds declined over this time period through the close of trading on September 22, 2015, dropping from between 0.38% to 7.82% of par value (prices are quoted as a percentage of face value), with the longer-term bonds generally falling more than the shorter-term bonds.  For example, the 1.250% Bond issued on May 23, 2014 (CUSIP: 928668AA0) purchased by Plaintiff PRGERS dropped 3.02% of par value.  Over the same time period, the price of Volkswagen's common stock and preferred stock similarly plummeted by over 33% and 36%, respectively.

258.    The timing and magnitude of the declines in the prices of Volkswagen's Bonds negates any inference that the losses suffered by Plaintiff and other Class members were caused by changed market conditions, macroeconomic factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

IX.    **POST CLASS PERIOD DEVELOPMENTS**

259.    Following the September 18-22, 2015 disclosures, Volkswagen pledged to prosecute those involved in the scheme to cheat emissions tests.   Amidst Volkswagen's escalating scandal, Defendant Winterkorn resigned from his position on September 23, 2015.  In a statement following his resignation, Winterkorn stated that he would "accept responsibility" for the "irregularities that have been found in diesel engines."

260.    On September 23, 2015, Klaus Breitenbach, an analyst at Baader Helvea Equity research, issued a report stating, "[i]t is difficult to understand why Mr. Winterkorn, who is well known for his attention to detail, had no knowledge of the irregularities which have been found in diesel cars."   Thomas Donaldson, a professor of legal studies and business at the Wharton

School at the University of Pennsylvania, said of Winterkorn that "[f]rom a man renowned for attention to detail, and a company itself known for highly centralized decision making, it's hard to think he didn't know."   In a September 23, 2015 interview with *Berliner Morgenpost*, Dudenhoeffer opined that Winterkorn was responsible for the scandal and it was simply not conceivable that Winterkorn was not aware of the issues.

261.    On September 24, 2015, Attorneys General from 27 U.S. states announced that it would begin investigations into Volkswagen after the Company admitted that it rigged diesel emissions technology to pass U.S. smog tests.  Eventually, Attorneys General from each of the 50 states and the District of Columbia joined the investigation.

262.    On September 25, 2015, the acting Chairperson of the VWAG Supervisory Board, Berthold Huber, announced that VWAG suspended a group of eight senior engineers pending proof of their innocence.  The executives include Audi development chief Hackenberg, Volkswagen research and development head Neußer, and Porsche development leader Hatz. Hackenberg resigned on December 3, 2015, and Hatz resigned on May 3, 2016.

263.    Also on September 25, 2015, VWAG's Supervisory Board named Matthias Müller, the head of Volkswagen's Porsche sports-car division, as CEO to replace Winterkorn. The Company's major shareholders also announced the most sweeping corporate restructuring that Volkswagen has undertaken in decades.   When accepting the CEO position, Müller acknowledged Volkswagen's failings and stated in a VWAG press release that his "most urgent task is to win back trust for the Volkswagen group."  Müller also announced that the Company hired renowned U.S. law firm Jones Day to conduct an investigation on behalf of the Company. However, as reported by *Handelsblatt Global* on January 19, 2017, Volkswagen has refused to release the results of the investigation as it admits "that publishing the investigation could strengthen the legal case of investors and customers against the automaker[.]"

264.    The German Minister of Transportation, Alexander Dobrindt, also disclosed on September 25, 2015 that of the 11 million cars rigged with a defeat device, nearly 3 million of them were sold in Germany.  According to a September 25, 2015 *Wall Street Journal* report,

when making the announcement, Dobrindt stated that "[t]he manipulations are inadmissible and illegal."

265.    Further, on September 25, 2015, the EPA initiated testing of all Volkswagen Model Year 2015 and 2016 light-duty diesel models available in the United States using updated testing procedures specifically designed to detect potential defeat devices.

266.    The fact that the Company's senior management knew of the emissions scandal long before it was disclosed to the public was further confirmed on September 26, 2015.  On that day, the German newspaper *Frankfurter Allgemeine Zeitung*, based on information it learned stemming from VWAG's internal investigation, reported that VWAG's own technicians warned the Company at least as early as 2011 about the Company's illegal emissions practices.

267.    Corroborating *Frankfurter Allgemeine Zeitung*'s report, on Sunday, September 27, 2015, *Bild* reported that Bosch warned Volkswagen's "top circles" as early as 2007 not to use the devices for illegal purposes.  In particular, while Bosch provided EDC17 to VWAG, Bosch was under the impression that EDC17 would be used only in internal vehicle testing.  But VWAG affirmatively modified the module to detect when a vehicle was undergoing laboratory emissions testing and then shut down when the vehicle was on the road.  *Bild* also reported that Bosch told Volkswagen that the Company's plans for the use of the software were, in fact, "illegal."  Further, according to *Bild*, Volkswagen knew even before 2007 that its diesel engines developed for the U.S. market would not meet emissions standards unless they used a different engine technology.

268.    On Monday, September 28, 2015, prosecutors in Germany announced a criminal investigation into the conduct of Defendant Winterkorn and other unnamed Volkswagen executives to determine whether they committed fraud through the sale of vehicles with manipulated emissions data.  Zaccheo Pamio, an Italian who was head of thermodynamics in Audi's Engine Development Department was arrested in Germany in July 2017.

269.    On September 29, 2015, Olaf Lies, a VWAG Board member and Economy Minister of Lower Saxony admitted to the BBC that VWAG staff "acted criminally" based on their role in cheating emissions tests, and that they "must take personal responsibility."  Also on

September 29, *Süddeutsche Zeitung* reported that a VWAG technician warned Neußer, the former head of the VWAG engine development department, about the illegality of the emission practices as early as 2011, but that these warnings were disregarded.

270.    On October 2, 2015, VWAG's scandal widened as France and Italy launched probes into the Company to investigate suspicions of "aggravated deception," among other things.  Further, the *New York Times* reported on October 2 that as of that date Attorneys General from at least 30 states and the District of Columbia were quickly progressing with their bipartisan investigation into allegations of consumer fraud and violation of environmental regulations by Defendants, and that they had served subpoenas on the Company and its divisions.

271.    On October 8, 2015, Defendant Horn testified under oath before the House Congressional Committee on Energy and Commerce Subcommittee on Oversight and Investigations, during which he admitted that Volkswagen used "a software program that served to defeat the regular emissions testing regime," and that Volkswagen takes "full responsibility for our actions."  According to Horn, the emissions cheating software was installed "for the express purpose of beating tests" in light of tightened emissions standards.

272.    On October 8, 2015, Defendant Horn admitted that he knew of the emissions non-compliance "in the spring of 2014 when the West Virginia University [WVU] study was published."  The Volkswagen Group's actions, according to Horn, "are deeply troubling. . . . We have broken the trust of our customers, dealerships, and employees, as well as the public and regulators."  Horn continued that "[w]e are determined to make things right.  This includes accepting the consequences for our acts, providing a remedy, and beginning to restore the trust of our customers, our employees, the regulators, and the American public."

273.    Also on October 8, 2015, prosecutors in Germany raided Volkswagen's headquarters in Wolfsburg and offices elsewhere, seeking records regarding the emissions scandal.  According to the prosecutor's office in Braunschweig, Germany, which is overseeing the probe, three state attorneys and 50 state police officers raided Volkswagen offices and private homes in order to secure documents and data-storage devices that could provide information about those responsible for the emissions scandal.

274.    On October 14, 2015, Winfried Vahland suddenly resigned.  Mr. Vahland spent 25 years at Volkswagen and lead Volkswagen's Škoda before being appointed to head Volkswagen's North America division less than a month earlier on September 25, 2015.

275.    On October 15, 2015, the Company suspended Falko Rudolph, the head of its main transmissions plant in Kassel, Germany.  Rudolph, who previously ran Volkswagen's main engines plant in Salzgitter, oversaw the development of diesel engines at Volkswagen between 2006 and 2010.

276.    Also on October 15, 2015, Germany's Ministry of Transport ordered Volkswagen to conduct a mandatory recall of 2.4 million cars in Germany, and consequently, 8.5 million cars in Europe implanted with its emissions-cheating technology.  Under EU rules, cars that are cleared (or not cleared) to operate in one country are automatically approved (or not approved) across the European Union, so the recall in Germany also affected the approval of vehicles elsewhere in the Union.

277.    On October 16, 2015, the U.S. Attorney's Office in Detroit and the DOJ's Fraud Section joined the sweeping federal probes of VWAG over emissions-test cheating.

278.    On October 20, 2015, VWAG suspended its Quality Control Chief Frank Tuch, the fifth senior executive to be put on leave in connection with the emissions-cheating scandal. Defendant Winterkorn hand-picked Tuch in 2010 to head the Company's quality-control department.  At the time of Tuch's appointment, Winterkorn said the quality-control expert "will bring us forward in the U.S.A."  Tuch and Winterkorn worked together closely, and met together every Monday to discuss quality issues, often taking test drives in vehicles manufactured by the Company.

279.    On October 21, 2015, the *Financial Times* reported that VWAG suspended Richard Dorenkamp, former head of technical development for low-emission engines, and that Peter Doerfler, head of group auditing and Volkswagen's anti-corruption officer, was also being replaced.

280.    On October 22, 2015, *Bild* reported that top management at Volkswagen knew about problems with emissions levels of diesel vehicles at least as early as the spring of 2014,

when the EPA sent a letter to Volkswagen questioning the discrepancies between Volkswagen's purported emissions and the levels measured by ICCT and WVU.  Winterkorn and other top executives discussed the letter and possible responses.  Further, according to *Bild*, Neußer also received information from the United States in the spring of 2014 regarding possible violations of U.S. emissions standards.

281.  Further, on October 25, 2015, the Company suspended Hanno Jelden, Volkswagen's Head of Powertrain Electronics, in connection with the emissions scandal.  Volkswagen also suspended numerous other unspecified employees, ranging from board-level executives at Volkswagen divisions to technicians who may be implicated in the scandal, at the recommendation of counsel at Jones Day.

282.  On November 2, 2015, the EPA issued a second NOV of the Clean Air Act to VWAG, Audi AG, VWGoA, Porsche AG, and Porsche Cars North America.  This NOV stated that Volkswagen developed and installed a defeat device in larger vehicles equipped with 3.0-liter diesel engines for Model Year 2014 through 2016 that masked the fact that the cars emitted NOx at up to nine times EPA's standard, in violation of U.S. Tier 2, Bin 5.  The affected diesel models include the (1) 2014 VW Touareg; (2) 2015 Porsche Cayenne; and (3) 2016 Audi A6 Quattro, A7 Quattro, A8, A8L and Q5.  In total, the second NOV covers approximately 10,000 diesel passenger cars already sold in the United States.  The EPA and CARB also began an investigation into these violations.

283.  Similar to the September 18, 2015 NOV, the November 2, 2015 NOV states that Volkswagen manufactured and installed software in the electronic control module of these vehicles that senses when the vehicle is being tested for compliance with EPA emissions standards.  When the vehicle senses that it is undergoing a federal emissions test, it operates in a low NOx "temperature conditioning" mode.  Under that mode, the vehicle meets emission standards.  In all other driving conditions, the cars operate in "normal mode" and emit NOx at up to nine times the EPA standard.  Given the effect this software had on the emissions for Volkswagen's 3.0 liter diesel engines, the EPA determined that it was an unjustified and illegal defeat device.  According to Cynthia Giles, Assistant Administrator for the EPA's Office of

Enforcement and Compliance Assurance, "VW has once again failed its obligation to comply with the law that protects clean air for all Americans."

284.    On November 3, Volkswagen, Porsche and Audi ordered dealers to stop selling all models at issue in the second NOV.

285.    On November 8, 2015, Volkswagen announced a "goodwill package" for owners of its diesel vehicles.  The package consisted of a $500 prepaid Visa card, a $500 dealership card, and three years of free roadside assistance services.  According to U.S. Senators Richard Blumenthal and Edward Markey, Volkswagen's consumer program was "insultingly inadequate" and "a fig leaf attempting to hide the true depths of Volkswagen's deception."

286.    On November 19, 2015, Volkswagen officials informed the EPA that the illegal defeat devices existed in all of the Company's U.S. 3.0-liter diesel models since 2009.  This increased the number of 3.0-liter diesel engine cars implicated by the EPA's second NOV issued to Volkswagen on November 2 by approximately 850%, from 10,000 vehicles to 85,000 vehicles, going back in time further than previously alleged by the EPA.  Violations include all Volkswagen and Audi U.S. vehicles with 3.0-liter diesel engines from the 2009–2016 Model Years.

287.    On December 1, 2015, the *New York Times* reported that the German Federal Motor Transport Authority, Kraftfahrt-Bundesamt (the "KBA"), determined that the software that Volkswagen installed in its diesel cars in Europe constituted an illegal defeat device and, consequently, violated Euro-5 rules.

288.    On December 3, 2015, Hackenberg resigned as top manager of the Audi luxury-car division.

289.    On December 10, 2015, Pötsch, the Chairman of Volkswagen's Supervisory Board, provided an update with regard to the Company's internal investigation.  To that point, the investigation confirmed that the Company's decision to cheat emissions tests was made in 2005, after Volkswagen realized that it would be unable "to meet by legal means the stricter nitrogen oxide requirements in the United States within the required timeframe and budget." Pötsch stated that the cheating took place in a climate of lax ethical standards and that "[t]here

1   was a tolerance for breaking the rules."  "It proves not to have been a one-time error, but rather a

2   chain of errors that were allowed to happen."

3       290.   On January 4, 2016, the DOJ filed a complaint on behalf of the EPA against

4   VWAG, Audi AG, VWGoA, Volkswagen Group of America Chattanooga Operations, LLC, Dr.

5   Ing. h.c. F. Porsche AG, and Porsche Cars North America, Inc. for violations of Sections 204 and

6   205 of the Clean Air Act, 42 U.S.C. §§ 7523 and 7524, arising out of Volkswagen's emissions

7   scandal.  The DOJ action alleges that the defendants violated the Clean Air Act by illegally

8   selling approximately 580,000 vehicles equipped with 2.0 and 3.0 liter diesel engines that were

9   not properly certified by the EPA and violated environmental laws; tampering with the

10  emissions-control system; failing to report violations to regulators; and providing misleading

11  information and affirmative misrepresentations to regulators.  Deputy Attorney General Sally

12  Yates said Volkswagen's wrongdoing constituted "the most flagrant violations of our consumer

13  and environmental laws in our country's history," said Yates.  "We cannot undo the damage

14  that's been done to our air quality, but we can offset that damage," said Yates.

15      291.   On January 11, 2017, VWAG entered into the Plea Agreement SOF with the DOJ,

16  taking responsibility for the actions of its employees and agreeing to pay $4.3 billion in civil and

17  criminal penalties.  The Plea Agreement SOF states that "[f]rom approximately May 2006 to

18  approximately November 2015, VWAG, through Supervisors A-F and other VW employees,

19  [VWAG] agreed to deceive U.S. regulators and U.S. customers about whether the Subject

20  Vehicles and the Porsche Vehicles complies with U.S. emissions standards.  During their

21  involvement with design, marketing and/or sale of the Subject Vehicles and the Porsche Vehicles

22  in the United States, Supervisors A-F and other VW employees: (a) knew that the Subject

23  Vehicles and the Porsche Vehicles did not meet U.S. emissions standards; (b) knew that VW was

24  using software to cheat the U.S. testing process by making it appear as if the Subject Vehicles

25  and the Porsche Vehicles met U.S. emissions standards when, in fact, they did not; and (c)

26  attempted to and did conceal these facts from U.S. regulators and U.S. customers."

27      292.   Even after the EPA issued its September 18 NOV to Volkswagen and Defendant

28  Horn testified before Congress, Volkswagen failed to come forward and reveal to regulators that

the 3.0L vehicles contained defeat devices.  The existence of the defeat devices was uncovered only because of EPA and CARB diligence.

293.    On January 12, 2016, CARB rejected Volkswagen's proposal to recall and remedy the Company's diesel cars equipped with 2.0-liter engines, finding that the plans were "incomplete, substantially deficient, and fall far short of meeting the legal requirements to return these vehicles to the claimed certification configuration."  CARB also issued another NOV to VWAG and VWGoA on January 12, explaining that the Company's 2.0-liter diesel vehicles certified under LEV, LEV II, LEV III, ULEV, and ULEV II did not meet emissions standards. Following the rejection, CARB Chair Mary D. Nichols stated that "Volkswagen made a decision to cheat on emissions tests and then tried to cover it up.  They continued and compounded the lie and when they were caught they tried to deny it.  The result is thousands of tons of nitrogen oxide that have harmed the health of Californians.  They need to make it right.  Today's action is a step in the direction of assuring that will happen."

294.    On January 22, 2016, the German newspaper *Süddeutsche Zeitung* reported that "almost all executives involved in the emissions problems in the engine development knew about the manipulations or even were involved in it.  In the relevant department, it had been no secret that this was the only way Volkswagen could officially meet the emission limits for nitrogen oxide in the emissions test of the authorities in the United States and Europe.  Many employees and managers in this division were privy to this."  According to the report, one whistleblower involved in the deception had alerted Neußer as early as 2011, but Neußer apparently did nothing.  *Süddeutsche Zeitung* based its report on information from Volkswagen's internal investigation, which has not been made public because it would strengthen the legal claims of investors and customers.

295.    On February 4, 2016, CARB told Volkswagen that the Company's 3.0 liter cars produced excess emissions and were otherwise non-compliant under applicable California standards.  Also on February 4, 2016, Volkswagen announced that it replaced the head of VWGoA's legal department, David Geanacopoulos, who was also the head of VWGoA's public affairs department.

296.     On February 8, 2016, VWAG's Head of Quality Assurance, Tuch—who was appointed by Winterkorn in 2010—announced that he would leave the Company.

297.     On March 2, 2016, VWAG issued a press release stating that it concealed its fraud because it believed that fines in only a "two-digit or lower three-digit million amount would be imposed" and that the issue "could be contained" by "technical solutions."   VWAG also confirmed that the diesel scandal began as early as 2005, when the Company decided to begin a major push to increase market share in the United States through the use of purportedly "clean diesel" technology.  Because Volkswagen was unable to meet the United States' strict emissions standards, the Company decided to cheat and install defeat devices in its diesel cars.  Volkswagen also confirmed that Winterkorn received a memo on May 23, 2014 regarding the defeat devices, as well as a second memo on November 14, 2014 that warned the then-CEO that Volkswagen could face a fine of approximately €20 million arising out of the diesel scandal in the United States.  Then, according to Volkswagen, on July 27, 2015, Defendant Winterkorn and Herbert Diess attended a meeting at which they specifically discussed the diesel issues.  Still, no disclosure was made to investors.

298.     On March 7, 2016, prosecutors in France announced that they had opened a serious fraud investigation into Volkswagen over the devices the automaker fitted into cars to cheat on emissions tests.   According to Serious Fraud Office Chief Nathalie Homobono, investigators had already established that Volkswagen had cheated "with intent" and that the Company's actions were "intentional."

299.     On March 8, 2016, the *Wall Street Journal* reported that the DOJ was expanding its probe of VWAG using the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), which is designed to combat bank fraud.   The DOJ issued a subpoena to Volkswagen under FIRREA to investigate possible violations of tax laws, among other matters, including whether lenders were harmed by financing customers' purchases of Volkswagen cars at inflated values.   Federal prosecutors are also examining whether Volkswagen may be legally and financially liable for customers who obtained tax credits when they bought cars they thought emitted fewer pollutants than they actually did.

300.   Also on March 8, 2016, German prosecutors announced that they widened their criminal investigation of VWAG's diesel emissions-cheating scandal to cover 17 people, up from 6.

301.   On March 9, 2016, Defendant Horn resigned as President and CEO of VWGoA, after 25 years at the Company.

302.   Shortly after his resignation, on March 10, 2016, the *Financial Times* reported that the May 15, 2014 email sent to Defendant Horn (summarized by *Bild* on February 14, 2016) by then-Head of Volkswagen's U.S. Regulatory Compliance Office Oliver Schmidt attached a letter stating that 500,000–600,000 cars in the United States from Model Years 2009– 2014 could be affected by the diesel scandal.  Significantly, the letter also enumerated the potential fines of "EPA: $37,500, and CARB: $5,500" per violation and specifically warned Horn that given the potential level of penalties, "[t]he contents of this [ICCT] study cannot be ignored!"  In fact, subsequent disclosures have confirmed the accuracy of that email as it has been revealed that a total of 580,000 U.S. diesel cars were impacted.

303.   On March 29, 2016, the Federal Trade Commission filed a complaint against VWGoA, VWGoA d/b/a/ VWoA, and VWGoA d/b/a AoA seeking a permanent injunction and other equitable relief arising out of the defendants' "deceptive representations" and "deceptive failure to disclose" in marketing materials for Volkswagen's diesel cars.  *See FTC v. Volkswagen Grp. of Am., Inc.*, 16-cv-1534 (C.D. Cal. filed Mar. 29, 2016).  According to the complaint, for years Volkswagen ran nationally televised advertisements and national print and online media campaigns and issued press releases and other public statements that touted the Company's "clean diesel" technology.  Volkswagen's marketing campaign further emphasized that its "clean diesel" vehicles reduced NOx emissions by 90%, that they met the strictest EPA standards, and that they were environmentally friendly.  In truth, Volkswagen knew that its "clean diesel" cars did not reduce NOx emissions by 90%, violated EPA standards, and were anything but environmentally friendly.  Volkswagen was able to justify its fraudulent claims only by fitting its vehicles with illegal defeat devices designed to understate the true levels of emissions during regulatory tests.

304.    On April 13, 2016, VWAG's Management Board accepted bonus cuts of at least 30% in a tacit acknowledgement that they are responsible for the scandal.

305.    On April 20, 2016, *Reuters* reported that VWAG and U.S. officials reached a deal under which VWAG would offer to buy back almost 500,000 2.0-liter diesel cars that used the emissions-cheating devices.  This includes versions of the Jetta sedan, the Golf compact, and the Audi A3 sold since 2009.  According to *Reuters*, the buyback offer does not apply to the 80,000 larger, 3.0-liter diesel vehicles that also exceeded U.S. pollution limits, including Audi and Porsche SUV models.  In addition to buying back the cars, VWAG also agreed to establish a compensation fund for owners.  Volkswagen also offered to repair polluting diesel vehicles if U.S. regulators approved a fix.

306.    Separately, *Die Welt* also reported on April 20 that the deal to settle the case would involve paying each affected customer up to $5,000.  After considering the costs of resolving this aspect of the scandal, according to another *Reuters* report issued on April 20, VWAG was expected to hike its provisions arising out of the diesel-emissions scandal from $7.6 billion to a "double-digit billion amount."

307.    On April 21, 2016, Volkswagen formally announced before the Court that it reached an agreement in principle with U.S. regulators to buy back 500,000 2.0 liter diesel vehicles, along the lines of the deal announced by *Reuters* on April 20.  The settlement was approved by the Court on October 25, 2016 at $14.7 billion dollars – with Volkswagen liable for up to $10.033 billion for buybacks and owner compensation, and $4.7 billion to programs to offset excess emissions and boost clean-vehicle projects, making it one of the largest corporate settlements on record.  In a June 28, 2016 article on CNN Money, titled "Volkswagen Agrees to Record $14.7 Billion Settlement Over Emissions Testing," *AutoTrader* analyst Michelle Krebs described the settlement as "unprecedented in its dollar amount, but the situation was unprecedented, in that it was not a mistake but a deliberate deception."

308.    Volkswagen announced on April 21, 2016 that it reached an agreement in principle on the basic features of a settlement with the civil class-action plaintiffs representing purchasers, lessees, and dealers of Volkswagen cars.

309.    On April 22, 2016, VWAG published its consolidated financial statements for 2015.  Specifically, VWAG disclosed that it needed to set aside €16.2 billion (over $18 billion) in special items to fund the recall of millions of cars, legal claims, and related costs arising out of the diesel scandal, resulting in an operating loss of approximately €4.1 billion and a net loss of €5.5 billion for 2015.

310.    Also on April 22, 2016, VWAG announced that the investigation by law firm Jones Day would not conclude until the fourth quarter of 2016, and did not provide a timeline for the release of any results of the report (if results are ever released at all).  Even though VWAG has in its possession interim results of the investigation (and had promised to release the results by late April 2016), it claimed it was unable to release them because doing so "would present unacceptable risks for Volkswagen and, therefore, cannot take place now."

311.    On April 30, 2016, *Bild* reported that the DOJ is investigating a senior lawyer in Volkswagen's legal department, given the pseudonym "Christoph R.", who asked colleagues in August 2015 to delete "incriminating material" regarding the emissions fraud.  *Bild*'s report is based on testimony given to Jones Day during the course of its investigation into the Company following a meeting of Volkswagen's Product Safety Committee on August 24, 2015.  According to *Bild*, several confidential documents can no longer be found on the Company's systems.  Christoph R. also advised colleagues in the summer of 2015 to avoid the words "defeat device" in any written statements.  In fact, Volkswagen waited until September 1, 2015, a week later, to issue a litigation hold.  Significantly, Christoph R., the lawyer who told colleagues to delete the "incriminating material" is the same lawyer who issued the litigation hold to Volkswagen employees.

312.    On May 7, 2016, *Bild* further reported that Volkswagen had for many years misled authorities and misrepresented emissions data with the knowledge of former CEO Winterkorn.  Specifically, in November 2013, the Company's Quality Assurance Department warned Winterkorn of a "borderline consumption situation" with regard to carbon dioxide ("CO2") emissions of Volkswagen cars.  According to Volkswagen's analysis, many of its car models met CO2 requirements only under the "best possible test conditions."  During a "real-life

test," the $CO_2$ emissions and fuel consumption rose by 10% to 18%, and did not meet $CO_2$ requirements or the $CO_2$ values set in Volkswagen's catalogues.  The "action recommendation" that Volkswagen's Quality Assurance Department gave to Winterkorn was to set "realistic $CO_2$ catalogue values" in the future.  Winterkorn, however, blatantly disregarded this recommendation.  Rather than correct the embellished consumption data, on July 17, 2014, Winterkorn ordered subordinates to close the "target gap between labelling and measured consumption" with unnamed and unknown technical innovations to be developed in the future.  This directive came in spite of the internal Volkswagen analysis conducted in July 2014 showed that "since the market year 2012, the critical consumption concepts ($CO_2$) are rising significantly."  In fact, Volkswagen engineers prepared a crisis report in November 2014 warning of a "disproportionate increase of the red concepts ($CO_2 > 108\%$)," and that "All Polo diesel concepts are red.  Situation is no longer manageable.  No reporting to KBA possible. Possible withdrawal of affected type permits."

313.    The DOJ Office of Public Affairs website published an article on September 9, 2016 titled "Volkswagen Engineer Pleads Guilty for His Role in Conspiracy to Cheat U.S. Emissions Tests," where the details of former VWAG engineer James Robert Liang's guilty plea and indictment under seal were released.  Mr. Liang pled guilty to one count of conspiracy to defraud the United States, to commit wire fraud, and to violate the Clean Air Act.

314.    According to the Liang Plea Agreement, from 1983 until May 2008, Liang was an employee of VWAG, working in its diesel development department in Wolfsburg, Germany. Liang admitted that beginning in about 2006, he and his co-conspirators started to design a new "EA 189" diesel engine for sale in the United States.  According to Liang's admissions, when he and his co-conspirators realized that they could not design a diesel engine that would meet the stricter U.S. emissions standards, they designed and implemented software to recognize whether a vehicle was undergoing standard U.S. emissions testing on a dynamometer or being driven on the road under normal driving conditions (the defeat device), in order to cheat the emissions tests.  Liang admitted that he used the defeat device while working on the EA 189 and assisted in making the defeat device work.  In May 2008, Liang, a citizen of Germany, moved to the United

States to assist in the launch of Volkswagen's new "clean diesel" vehicles in the U.S. market, according to the plea agreement.  While working at Volkswagen's testing facility in Oxnard, California, he has held the title of Leader of Diesel Competence.

315.   According to the plea agreement, employees of VWAG and its U.S. subsidiaries met with the EPA and the California Air Resources Board (CARB) to seek the certifications required to sell each model year of its vehicles to U.S. customers.  Liang admitted that during some of these meetings, which he personally attended, his co-conspirators misrepresented that Volkswagen diesel vehicles complied with U.S. emissions standards and hid the existence of the defeat device from U.S. regulators.

316.   As part of the certification process for each new Model Year, including Model Years 2009 through 2016, the co-conspirators continued to falsely and fraudulently certify to EPA and CARB that Volkswagen diesel vehicles met U.S. emissions standards and complied with the Clean Air Act, according to the plea agreement.  Liang admitted that during this time, he and his co-conspirators knew that Volkswagen marketed its diesel vehicles to the U.S. public as "clean diesel" and environmentally-friendly, and promoted the increased fuel economy.  Liang and his co-conspirators knew that these representations were false and that Volkswagen's diesel vehicles were not "clean," he admitted.

317.   In connection with pleading guilty, Liang admitted that he helped his co-conspirators continue to lie to the EPA, CARB and Volkswagen customers even after the regulatory agencies started raising questions about the vehicles' on-road performance following an independent study commissioned by the International Council on Clean Transportation, which showed that the diesel vehicles' emissions on the road were up to 40 times higher than shown on the dynamometer.

318.   On January 11, 2017, a federal grand jury in the Eastern District of Michigan indicted six Volkswagen executives on conspiracy charges.  The executives indicted are Heinz-Jakob Neußer, Jens Hadler, Richard Dorenkamp, Bernd Gottweis, Oliver Schmidt, and Jürgen Peter.  Oliver Schmidt, General Manager in charge of VWAG's Environmental and Engineering Office, was arrested on January 7, 2017 and entered a guilty plea on August 4, 2017.

1    319.    In May 2017, Volkswagen reached an agreement with the FTC covering the 3.0L

2    engines.   The settlement provided for an additional $1.2 billion in compensation.   Thus, under

3    both the 2.0L and 3.0L settlement agreements, Volkswagen will pay over $11 billion in

4    compensation to consumers.

5    320.    Volkswagen still faces criminal charges in European countries, possible liability

6    in civil suits in the U.S. and Europe, and additional actions in the U.S. regarding violations of

7    state environmental regulations.

8    **X.     ADDITIONAL ALLEGATIONS SUPPORTIVE OF FALSITY AND SCIENTER**

9    321.    As alleged in this Complaint, Defendants engaged in a decade-long scheme to

10   defraud investors through numerous materially false and misleading representations and

11   omissions, as well as to violate governing emissions standards and defraud consumers.

12   Defendants, when they committed that misconduct, acted with scienter in that they knew, or

13   recklessly disregarded, that the public documents and statements issued or disseminated in the

14   name of VWAG, VWGoA, VWoA and AoA detailed above were materially false or misleading,

15   and knowingly and substantially participated or acquiesced in the issuance or dissemination of

16   those statements or documents as primary violators of the federal securities laws.

17   322.    At all relevant times, Defendants were aware or, alternatively, recklessly

18   disregarded that (i) approximately 11 million of Volkswagen's diesel vehicles worldwide

19   contained illegal defeat-device software that had no proper or lawful purpose, but enabled the

20   vehicles to pass emissions tests while far exceeding emissions limits under real-world, on-road

21   driving conditions; (ii) Volkswagen pursued and met its aggressive U.S. growth goals through a

22   concerted effort to market and sell approximately 580,000 purportedly "clean diesel" cars that

23   failed to comply with governing federal and state emissions standards; and (iii) Volkswagen

24   significantly overstated its profits by failing to properly record provisions for the Company's

25   inevitable massive liability arising out of its fraudulent misconduct.

26   323.    VWAG has admitted that it defrauded consumers and misled regulators.   Among

27   other things, Defendants have stated that "these vehicles were designed and manufactured with a

28   defeat device to bypass, defeat, or render inoperative elements of the vehicles' emissions control

system" and "[w]e have admitted it to the regulator. It is true." Defendant Winterkorn apologized that VWAG had "broken the trust of our consumers and the public." And Defendant Horn admitted that "our company was dishonest. With EPA, and [CARB], with all of you… [w]e have totally screwed up."

324.   VWAG has admitted, its top executives, including Defendant Winterkorn, knew of, and received reports concerning the Company's use of defeat-device software and VWAG's attendant financial and legal exposure. As early as 2007, Bosch warned VWAG's top executives, including Winterkorn, that the Company's intended use of its emissions-regulating software was illegal. In 2011, an internal whistleblower warned the Company, including Winterkorn's confidant and Volkswagen's then-head of development Neußer, that the Company was illegally manipulating reported emissions data. In April 2014, after learning the results of the ICCT and WVU study, Defendant Horn asked for reports and analyses from VWGoA's Engineering and Environmental Office. Despite knowing the results, executives and senior supervisors offered lies and excuses to the EPA and CARB instead of revealing the truth about the defeat devices.

325.   According to sources within the company that spoke to *Handelsblatt Global,* "top management at VW knew about the existence of a U.S. probe for more than year before it went public—but apparently did little to address the situation." Indeed, the Company has admitted, and Winterkorn reportedly confirmed in deposition testimony from related actions, that Winterkorn received a memorandum in May 2014 from Volkswagen's "fireman" Gottweis, whose job was to "sound the alarm" when crises emerged. The May 2014 memo read by Winterkorn detailed the Company's use of defeat devices and the lack of any defensible, honest explanation for the defeat devices when regulators would inevitably discover the devices and scrutinize their use. Gottweis wrote in the memorandum that "[n]o plausible explanation for the dramatically increased NOx emissions can be given to authorities." Winterkorn took that memorandum home to read as part of his "weekend suitcase." Winterkorn received another memorandum discussing Volkswagen's emissions cheating in November 2014 and, in July 2015,

Winterkorn was present at a meeting where employees discussed Volkswagen's emissions cheating.

326. Moreover, as detailed above, Winterkorn's hand-picked officers at VWAG, Hatz and Hackenberg, were instrumental in the development and introduction of the defeat devices at the center of this case. Given Winterkorn's detail-oriented nature, his knowledge of everything his two closest lieutenants were doing reasonably implies knowledge from the outset of the Class Period.

327. Defendant Horn was a "Wolfsburg insider" with close connections to Winterkorn, and well-versed in the inner workings of Volkswagen, including access to and knowledge of the same information as Winterkorn. As reported by the *Wall Street Journal* on December 11, 2014, Winterkorn specifically picked Horn as CEO of VWGoA (in December 2013) because Winterkorn was frustrated with the slow progress of increasing sales in the United States. Indeed, Defendant Horn was known as "a seasoned VW executive with deep ties to Wolfsburg," *i.e.,* VWAG's headquarters (*Automotive News*, Jan. 23, 2015). *Automotive News* reported that "the management team in Wolfsburg trusts him, believes in [Horn] and fully supports [Horn]." In connection with selecting Defendant Horn as CEO of VWGoA with the specific goal to increase U.S. sales, Defendant Winterkorn formed a "North America Committee" comprised of "U.S. executives and approximately half of VW[AG]'s management board," which is believed to have included Defendant Horn, and met regularly holding "at least five" meetings from February 2014-December 2014 (*Wall Street Journal*, Dec. 11, 2014). Defendant Horn was also personally involved with Volkswagen's response to the ICCT and WVU report, which VWGoA's Environmental and Engineering Department learned about by at least March 31, 2014. Within a few days of March 31, 2014, Horn is believed to have requested reports from VWGoA's Environmental and Engineering Department about the results of the study (*see* ¶¶77, 171, 192). On May 15, 2014, Horn received an email from Oliver Schmidt in the Environmental and Engineering Department outlining Volkswagen's potential liabilities in relation to the ICCT and WVU reports (¶¶82, 174), and then he specifically warned VWAG executives and board members of potential consequences, including non-certification of the Model Year Generation 3

vehicles (¶181).  In addition, at all relevant times, the Board of Directors of VWGoAF included Jan Vycital, who concurrently served as the Executive Vice President and Chief Financial Officer of VWGoA, and Bjoern Baetage, who was the Treasurer of VWGoA, both of whom, upon information and belief, reported to Defendant Horn.

328.    Rather than investigating, reporting, or taking action to halt the emissions cheating, Volkswagen continued to sell the illegally equipped cars, maintained secrecy, and managing public-relations fallout.  Internal communications at the Company reportedly show engineers and management weighing the risks and benefits of Volkswagen's fraud, including how to placate U.S. regulators, discussing potential fines and other sanctions, and deciding not to prioritize addressing the Company's emissions cheating out of a mistaken and unreasonable belief that Volkswagen's financial exposure would be at most €20 million—and could possibly even slip through the cracks entirely.

329.    Even as Volkswagen's cheating was discovered through the ICCT and WVU study published in May 2014, and notice from regulators including the EPA and CARB that they had discovered abnormalities in Volkswagen's emissions-testing results, Defendants continued to hide their misconduct, blaming faulty testing procedures.  Senior supervisors even developed a script for VW employees to use when speaking with regulators that strategically concealed the use of the defeat devices.  In December 2014, Volkswagen agreed to recall approximately 500,000 vehicles whose actual emissions deviated significantly from test results, stating that it did so to implement a proposed "recalibration fix" to its engine software;  but, Volkswagen did not disclose that its vehicles contained defeat-device software or that they produced emissions in excess of legal limits, instead telling consumers that "engine management software has been improved," "to assure your vehicle's tailpipe emissions are optimized and operating efficiently." The recall was authorized by or known to the most senior executives at VWAG, VWGoA, VWoA, and AoA, including Defendants Winterkorn and Horn.

330.    The EPA's September 18, 2015 NOV to Volkswagen concerning observed discrepancies between emissions levels in tests and on the road also shows that Volkswagen falsely denied to EPA that there was any problem at all.  The EPA explained how Volkswagen

falsely "continued to assert to CARB and the EPA that the increased emissions from these vehicles could be attributed to various technical issues and unexpected in-use conditions."

331.    New reports indicate that even once the fact of Volkswagen's use of illegal defeat devices emerged, top executives directed Volkswagen's employees to destroy evidence in order to hide and minimize Volkswagen's culpability and exposure.   A high-level official in Volkswagen's legal department, "Christoph R.," is reported to have directed colleagues in August 2015 to delete "incriminating material" concerning the diesel scandal, days before sending employees a "litigation hold" to preserve relevant documents.   In other words, the Volkswagen executive responsible for ensuring the preservation of evidence was, at the same time, personally directing the destruction of that evidence.   Destruction of evidence from high-level officials as early as August further supports that the widespread use of defeat devices was not something limited to a small group of rogue engineers

332.    Further indications that there was intentional spoliation of evidence relating to the emissions scandals are supported by allegations in other actions.

333.    In March 2016, a wrongful termination lawsuit was filed where former employee Daniel Donovan states he called Volkswagen's Chief Information Officer for the Americas, Abdallah Shanti, on September 18, 2015 to tell him to "stop deleting data effective immediately" in compliance with instructions from the Department of Justice, though the Company did not cease deletions until 3 days later.   Mr. Donovan was subsequently fired.

334.    The U.S.-based Volkswagen entities—VWGoA, VWoA, and AoA, as well as VWGoA and VWoA executive Horn —acted with scienter because they were centrally involved in the process for acquiring all necessary approvals and certifications so that their vehicles could legally be sold and driven in the United States.   As part of the regulatory process, those entities regularly and frequently interacted with regulators, and were responsible for understanding and complying with emissions limits and regulations.   The entities were responsible for submitting numerous applications and made detailed representations to regulators and the public confirming the vehicles' compliance with governing regulations, evidencing a high degree of knowledge of the vehicles' emissions and compliance.   Furthermore, Horn was centrally involved in

communications with regulators about the affected vehicles. The VW Plea Agreement SOF and the Liang Plea Agreement corroborate that these false and fraudulent representations were made by Volkswagen representatives who knew such representations and omissions were false or misleading. Horn also appeared before Congress in October 2015 as a representative for Volkswagen, speaking on their behalf admitting that the company had "broken the trust of our customers, dealerships, and employees, as well as the public and regulators." Defendant Horn also suddenly resigned following the events of the scandal further showing his scienter. VWGoA, VWoA, AoA, and Horn either knew or were reckless in not knowing that the purportedly "clean diesel" vehicles that were subject to these regulatory processes were equipped with defeat devices and in reality emitted NOx emissions far in excess of allowable limits.

335. Volkswagen's culture, including Defendant Winterkorn's hands-on micromanagement, supports a strong inference that Winterkorn and other top executives were aware that Volkswagen implemented a sophisticated emissions-cheating scheme for over a decade, as the Company has admitted that the current diesel scandal has its roots in the Company's "strategic decision to launch a large-scale promotion of diesel vehicles in the United States in 2005." In the ensuing years, it was widely known at Volkswagen that engineers were unable to successfully design a high-performance and low-emissions "clean diesel" engine.

336. Among other things, when Winterkorn took over as VWAG's CEO, he personally appointed Hatz and Hackenberg to positions overseeing diesel and the emissions scheme. Beginning in late 2006, the Company committed to aggressively expand its diesel sales in the United States but also abandoned Volkswagen's use of the effective SCR system in favor of cheaper, less effective NOx traps. Winterkorn, Hatz, and Hackenberg, all demanding, detail-oriented engineers, were hostile to environmental regulations and had long opposed any measures that reduced emissions but had any negative impact on driving performance. By all accounts, Winterkorn was imperious and focused on engineering details, going so far as to attend auto shows with a tape measure and a magnet to precisely examine vehicles.

337. In addition, it has been widely reported how both Winterkorn and Piëch ran Volkswagen through a "reign of terror" and "culture of fear" that served as a "breeding ground

for scandal" and "an accident waiting to happen" that made "shortcuts and cheating more likely" while making "arrogant bosses feel invincible in the face of competition and regulation." Further, the Chairman of VWAG's Supervisory Board has admitted that the diesel scandal arose from "a tolerance for breaking the rules" at the Company.   Automotive-industry expert Dudenhoeffer has explained how Winterkorn "had his hands in everything," leading to a lack of any effective internal controls at the Company that allowed for the intentional violation of laws and regulations.   Winterkorn and his team demanded the impossible, that engineers design a diesel engine that met emissions standards, did not sacrifice performance, and did not use SCR, and were well aware that goal could not be met legitimately and honestly.   The fact that the emissions cheating was an open secret at Volkswagen is further shown by the use of code words such as "acoustic mode" and "acoustic function" to discuss the defeat-device software.

338.   Reports indicate that the idea for the defeat devices was originally developed under Winterkorn's leadership at Audi in 1999 and that, by the time years later when Volkswagen implemented the defeat devices, Hackenberg himself was one of the executives known to order the emissions cheating.   And Hatz stressed how important it was for Volkswagen to "keep the pleasure" so that its cars were "fun to drive," while also admitting that it was "nearly impossible" for Volkswagen's diesel engines to meet CARB's emissions standards.   As *Bild* has reported, when Volkswagen first installed defeat-device software in 2008, "there was no way . . . to reconcile meeting emission standards within the targeted cost of the engine. . . . Otherwise, the company would have to abandon the introduction of the engine, development of which was begun in 2005."

339.   Further, a top Volkswagen technician gave a PowerPoint presentation in 2006 laying out, in detail, ways that Volkswagen could cheat on U.S. emissions testing.   The PowerPoint made clear that Volkswagen insiders knew that its diesel engines exceeded emissions standards, but executives repeatedly rejected proposals to lower emissions levels, and the entire Volkswagen Management Board—led by Defendant Winterkorn—repeatedly refused technical proposals to upgrade emissions controls.

340.     Defendants' scienter is evidenced by the numerous iterations of defeat-device software that Volkswagen employed in its purportedly "clean diesel" vehicles over the years. The Company altered the illegal software to use with four different engine types, including intentionally and actively updating the software numerous times so that vehicles could pass emissions testing while keeping true, on-road emissions levels hidden.  Engineers also enhanced the effectiveness of the defeat device when it was causing cars to remain in "dyno" mode for extended periods of time resulting in malfunctioning engines.  It is simply not plausible that a rogue group of low-level employees could or would have developed and kept secret a sophisticated, years-long plan to continually update the defeat-device software.

341.     The delay in rolling out the purportedly "clean diesel" Jetta in the United States in 2008 evidences Defendants' scienter.  After announcing a spring-2008 rollout of the Jetta TDI, Volkswagen was forced to push back the rollout until summer 2008 due to the Company's inability to develop a high-performance diesel engine that met emissions standards.   That decision garnered significant industry scrutiny, and was a significant blow to Volkswagen's acknowledged aspirations to use "clean diesel" vehicles as the primary driver of U.S. market growth.

342.     There is a compelling inference of scienter because growth through "clean diesel" sales was a central focus for Volkswagen throughout the Class Period.  As discussed above, VWAG saw expanding diesel sales—particularly in the United States—as a critical driver of market and earnings growth that would enable Volkswagen to become the world's largest automaker.  In turn, the U.S.-based entities—VWGoA, VWoA, and AoA—were pushed to expand diesel sales and implemented aggressive, large-scale campaigns to sell purportedly "clean diesel" vehicles and take over an increasing portion of the U.S. environmentally friendly car market.  That focus manifested itself in television and print advertising, as well as in numerous statements to investors throughout the Class Period.

343.     The sudden resignations, firings, and suspensions of top executives, including Winterkorn, Horn, Hatz, Hackenberg, Neußer, Vahland, Dorenkamp, Rudolph, Doerfler, Tuch, and Jelden, who are either known to have been directly involved in the use and consequences of

defeat devices, or who were likely to have been involved based on their positions, roles, and tenure, provide strong evidence of Defendants' scienter.  Each of those individuals resigned, was fired, or suspended, as news of Volkswagen's emissions cheating came to light and shortly after Volkswagen commenced its internal investigation.

344.    The numerous investigations and legal actions concerning Volkswagen's diesel cheating scandal evidence scienter.  The Company's internal investigation is ongoing, as are investigations and prosecutions by the EPA and CARB, as well as the DOJ, the Federal Trade Commission, the U.S. House Energy Committee, the Attorneys General of all 50 states and the District of Columbia, the British Parliament, and the German, French, and Italian governments—along with Volkswagen consumers and dealers.  Volkswagen is attempting to finalize the details of the resolution of certain claims of the U.S. government and consumers, including committing billions of dollars to buy back affected vehicles, repair vehicles if possible, and pay into funds for environmental remediation.

345.    VWAG, VWGoA, and VWGoAF each acted with scienter because the scienter of top executives Winterkorn and Horn is imputed to the companies that those individuals spoke on behalf of and controlled.  Winterkorn was VWAG's CEO during the Class Period and Chairman of the VWAG Management Board.  Horn was the President and CEO of VWGoA, as well as president for the VWoA brand.  Winterkorn spoke on behalf of VWAG and controlled VWGoA and VWGoAF, and Horn spoke on behalf of and controlled VWGoA, and controlled VWGoAF. Each of Winterkorn and Horn made, caused to be made, or certified materially false statements and omissions that misled investors with regard to the companies' financial results, compliance with governing emissions standards, and use of illegal defeat devices, as detailed in this Complaint.

## XI.    **RELIANCE**

346.    In connection with the Bond Offerings, Defendants issued the Offering Memoranda, which stated that the information contained in each Offering Memorandum was accurate as of "the date on the front of this Offering Memorandum."

347.   Each Offering Memorandum omitted material facts concerning Volkswagen's emissions scheme and unlawful use of a defeat device in its vehicles, which were necessary to make the representations in the Offering Memoranda not misleading.

348.   Pursuant to its relevant contractual investment agreement with its investment advisor, its investment guidelines as incorporated into that relevant contractual investment agreement, and fiduciary obligations owed to it by its investment advisor, Plaintiff, through its authorized investment advisor with complete investment discretion, reviewed and relied upon the information contained in the Offering Memorandum that corresponds to Plaintiff's Bond purchases, including the alleged omissions and misrepresentations.

349.   Plaintiff and direct purchases of the Bonds also further directly relied on the false and misleading Offering Memorandums, based on an express, uniform acknowledgement, and representation that by accepting the Offering Memorandum, each Offering investor "relied only on the information contained in this document."   Specifically, the Offering Memorandums contained the following:

> Investors also acknowledge that: (i) they have not relied on the Initial Subscribers or any person affiliated with the Initial Subscribers in connection with any investigation of the accuracy of any information contained in this Offering Memorandum or their investment decision; and (ii) they have relied only on the information contained in this document, and that no person has been authorized to give any information or to make any representation concerning the Issuer, the Guarantor or its subsidiaries or the Notes (other than as contained in this document) and, if given or made, any such other information or representation should not be relied upon as having been authorized by the Issuer, the Guarantor or the Initial Subscribers.

350.   Accordingly, each purchaser of Bonds in the Offerings can demonstrate that it (1) was aware of the alleged misrepresentations and omissions in the Offering Document, and (2) purchased the Offering securities based on those misrepresentations and omissions.

351.   By issuing misleading Offering Memorandums and failing to disclose material facts about Volkswagen's emissions scheme and use of a defeat device in millions of vehicles, Defendants enacted a single fraudulent scheme, or "common course of fraud," against the Class of Bond purchasers.

352.     But for the information contained in each Offering Memorandum, including the omissions of material facts concerning Volkswagen's emissions scheme and use of a defeat device in its vehicles, Plaintiff would not have purchased the Bonds as offered.

353.     As stated in the Offering Memorandum in connection to the Offering of the Bonds bought by Plaintiff, "[i]n making an investment decision, prospective investors must rely on their own examination of the Issuer and Guarantor and the terms of this Offering, including the merits and risks involved."  Had Defendants' fraudulent scheme been disclosed to the market, it would have impacted Plaintiff's examination and consideration of the Issuer, Guarantor, and terms of the Offering, including the merits and risks involved in purchasing the Bonds.  Each of the other Offering Memoranda contained similar, if not identical, provisions.

354.     Accordingly, because the claims asserted in this Complaint against Defendants are predicated upon omissions of material fact, Plaintiff and Class members are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

355.     Furthermore, but for the fact that Defendants concealed material facts concerning Volkswagen's emissions scheme and use of a defeat device, there would have been no market for the Bonds; or, in the alternative, there would have been no market for the Bonds at the terms offered.

356.     The Bonds at issue in this action, like other corporate bonds, reflect a debt owed by the corporation to the bondholder that calls for periodic payments of interest at a specified rate, as well as a lump sum payment of the principal amount at a designated maturity date.

357.     Corporate bonds are priced in accordance with their yield in comparison to a relative benchmark or benchmark curve pricing.  The bond's relative yield to its benchmark is called a "spread."  The yield spread is used both as a pricing mechanism and as a relative comparison between bonds.  The issuer of the bonds determines an appropriate spread range that will attract potential buyers based on comparable bonds already trading in the secondary market, existing bonds of the underlying corporation, and the credit rating of the corporation's other bonds.  The price of bonds also reflects the present value of the expected future cash flow it

generates.  The present value considers and depends on the likelihood of ultimate repayment of the principal amount – *i.e.*, the likelihood of default of the issuing corporation, or "credit risk" – as well as the market interest rate for other comparable securities and the risk-free interest rates of U.S. Treasury bonds.  The objective is to determine the market price for the new issue bond that reflects all publicly available information that is material to investors.

358.    Based on this pricing mechanism for new issue bonds, investment-grade corporate bonds that are issued by public companies, such as the Bonds in this case, are issued at efficient market prices in that there is no significant premium or discount.  Furthermore, investment-grade corporate bonds that are issued by companies with bond issuances already outstanding, such as the Bonds in this case, are issued at efficient market prices, meaning there is no significant premium or discount.  In this case, the Bonds were issued at efficient market prices with yields versus time to maturity that were not significantly different from what is expected based on other seasoned Volkswagen bonds trading in an efficient market.

359.    Following the disclosure of Volkswagen's fraudulent and unlawful emissions scheme and use of a defeat device, there was an immediate spike in the credit default swap prices of Volkswagen, indicated by a change in the company's credit risk.  A "credit default swap" is a financial contract whereby a buyer of corporate debt is provided insurance in the event of default.  Accordingly, as the perceived chance of default by the corporation increases, so does the price of a credit default swap contract insuring against default.  In the two trading days after Volkswagen admitted to its EPA violations, the cost to protect Volkswagen bonds from a default through credit default swaps surged 185 basis points.  Using the Bond yields and credit default swap prices of Volkswagen, Plaintiff can demonstrate that the offering price of the Bonds would have been impacted by market information disclosed prior to the Offerings, including the disclosure of concealed material facts regarding Volkswagen's fraudulent and unlawful emissions scheme and use of a cheat device.

360.    In fact, following Volkswagen's admission of its EPA violations, and due to the rising cost of credit default swaps, Fitch Solutions stated that the cost to protect Volkswagen bonds implied a sub-investment grade rating.  On September 23, 2015, *Forbes* reported, under

the headline "Volkswagen's EPA Emissions Scandal Has Some Debt Traders Pricing In A Junk Rating," that "investors are beginning to price in a dramatic impact to the company's financial position in the wake of its emissions scandal."

361. In addition to impacting the price of the Bonds in the Offerings, Plaintiff, pursuant to its investment guidelines, would have been prohibited from investing in non-investment grade bonds, as would have several other members of the Class. Indeed, Plaintiff, through its investment advisor, employed portfolio managers and analysts who evaluate the impact of news regarding the creditworthiness of new or existing issuances of bonds.

362. Accordingly, Plaintiff and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for the Volkswagen Bonds was efficient. Market efficiency with respect to the Bonds is further supported by the following reasons, among others:

(a) Volkswagen communicated with eligible Bond purchasers via offering memoranda bearing the same or substantially similar information;

(b) Volkswagen filed periodic public reports readily available to all actual Bondholders and potential bondholders;

(c) Volkswagen regularly communicated with the public via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(d) Volkswagen was followed extensively by the media and by numerous securities analysts employed by major brokerage firms who wrote over 495 analyst reports about Volkswagen during the Class Period, which were public available and entered the public market place;

(e) Analysts for major credit rating agencies (Moody's, S&P) provided ratings on the Bonds in their initial offering and throughout the Class Period; and

(f)    the market value of the Bonds was sizeable during the Class Period and prices reacted promptly to the dissemination of new public information regarding Volkswagen.

363.    Furthermore, but for Defendants' misrepresentations, including omissions of material fact concerning Volkswagen's fraudulent and unlawful emissions scheme and use of a defeat device, there would be no market for the Bonds, at the same price or any other price, pending resolution of Defendants' criminal conduct.

364.    Defendants' inability to market the Bonds but for Defendants' fraudulent scheme is evidenced by Volkswagen's inability to issue any corporate bonds following the disclosure of its emissions scheme and in consideration of its potential liability.

365.    On November 13, 2015, it was reported on *Bloomberg* under the headline "Volkswagen Pauses Bond Issuance Amid Emissions Cheating Scandal," that "Volkswagen AG has put bond financing on hold as it grapples with uncertainty over the ultimate cost of the emissions cheating scandal."

366.    During the period from September 10, 2015, which was eight days before Volkswagen's emissions scandal and use of a cheat device became public, until March 23, 2017, which was well after Volkswagen's January 11, 2017 Consent Decree, Volkswagen was unable to market debt securities.  Furthermore, when Volkswagen re-commenced debt offerings in late March of 2017, it did so in Europe – not the United States – and at "attractive prices" that "eased the comeback trail," according to a March 24, 2017 *Reuters* article, "VW hits top gear with comeback deal."

367.    Accordingly, in purchasing the Bonds as offered, Plaintiff and other Class members are entitled to a presumption of reliance based on the fact that Defendants' fraud created a market for the Bonds, beyond merely impacting the price of the Bonds.

368.    Alternatively, Plaintiff and the Class members can demonstrate class-wide "causation-in-fact" beyond issues of individual reliance, through Defendants' fraud on the regulatory process.

369.     Plaintiff and Class members who purchased the original issue of the Bonds relied, at least indirectly, on the integrity of the regulatory process and the truth of any representations made to appropriate agencies and investors at the time of the original issue.  Defendants engaged in a fraud on the regulatory process through its Rule 144A Bond offerings.

370.     Securities regulations restrict the sale of unregistered or Rule 144A bond offerings only to qualified institutional buyers (QIBs), who meet certain statutory requirements. While Rule 144A offerings are legal when properly employed, Defendants misused the 144A offering process in a deceptive manner to hide the continuing fraud and conceal from the SEC what they were otherwise under a duty to disclose.

## XII.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

371.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded in this Complaint.  The statements alleged to be false or misleading herein all relate to facts and conditions existing at the time the statements were made.  No statutory safe harbor applies to any of Defendants' materially false or misleading statements.

372.     Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  Additionally, to the extent applicable, Volkswagen's verbal "safe harbor" warnings accompanying its oral forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Volkswagen who knew that those statements were false when made.

## XIII. CLASS ACTION ALLEGATIONS

373.    Plaintiff brings this action on its own behalf and as a class action pursuant to Rules 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired Volkswagen Bonds exempt from registration with the SEC under Rule 144A between May 23, 2014 and September 22, 2015, inclusive, and who were damaged thereby.   Specifically, VWGoAF issued $3.5 billion in bonds on May 23, 2014, $2 billion in bonds on November 20, 2014, and $2.8 billion in bonds on May 22, 2015, all guaranteed by VWAG, as follows:

- VW 1.250%  Guaranteed Notes due 5/23/17, CUSIP: 928668AA0 (Issue Date: 5/23/14)
- VW 2.125%  Guaranteed Notes due 5/23/19, CUSIP: 928668AB8  (Issue Date: 5/23/14)
- VW Floating Rate Guaranteed Notes due 11/23/15, CUSIP: 928668AE2 (Issue Date: 5/23/14)
- VW Floating Rate Guaranteed Notes due 5/23/16, CUSIP: 928668AD4 (Issue Date: 5/23/14)
- VW Floating Rate Guaranteed Notes due 5/23/17, CUSIP: 928668AC6 (Issue Date: 5/23/14)
- VW Floating Rate Guaranteed Notes due 11/20/17, CUSIP: 928668AG7 (Issue Date: 11/20/14)
- VW 1.6% Guaranteed Notes due 11/20/17, CUSIP: 928668AF9 (Issue Date: 11/20/14)
- VW 2.45% Guaranteed Notes due 11/20/19, CUSIP: 928668AH5 (Issue Date: 11/20/14)
- VW 2.4% Guaranteed Notes due 5/22/20, CUSIP: 928668AM4 (Issue Date: 5/22/15)
- VW 1.65% Guaranteed Notes due 5/22/18, CUSIP: 928668AK8 (Issue Date: 5/22/15)
- VW Floating Rate Guaranteed Notes due 05/22/18, CUSIP: 928668AL6 (Issue Date: 5/22/15)
- VW Floating Rate Guaranteed Notes due 11/22/16, CUSIP: 928668AJ1 (Issue Date: 5/22/15)

374.    Excluded from the Class are Defendants, the officers and directors of the Company and its wholly-owned subsidiaries at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.   For the avoidance of doubt, "affiliates" are persons or entities that directly, or indirectly through one or more intermediaries, control, are controlled by, or are under common control with one of the Defendants, and include any employee benefit plan organized for the benefit of Volkswagen's employees.

375.    The members of the Class are so numerous that joinder of all members is impracticable.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiff believes that the proposed Class numbers at least in the hundreds and that they are geographically dispersed.   Class members who purchased Volkswagen Bonds may be identified from records maintained by

Volkswagen, its transfer agent(s), or the sponsor(s) of the bond program, and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

376.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

377.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that are contrary to or in conflict with those of the Class members that Plaintiff seeks to represent.

378.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether Defendants' regulatory filings, press releases, reports, offering memoranda and public statements made by Defendants during the Class Period contained misstatements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)    whether Defendants acted with scienter;

(d)    whether the price of the Bonds during the Class Period was artificially inflated due to the nondisclosures and misrepresentations complained of in this Complaint; and

(e)    the extent of damages sustained by Class members and the appropriate measure of damages.

379.    A class action is superior to all other available methods of fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impracticable for members of the Class to individually redress the wrongs done to them.   Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## XIV.   CLAIMS FOR RELIEF

### COUNT I
### For Violations Of Section 10(b) Of The Exchange Act And
### Rule 10b-5 Promulgated Thereunder Against Defendants VWAG, VWGoA, VWGoAF, Winterkorn, and Horn

380.     Plaintiff repeats and realleges each of the allegations contained above as if fully set forth herein.

381.     This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Defendants VWAG, VWGoA, VWGoAF, Winterkorn, and Horn.

382.     As alleged in this Complaint, throughout the Class Period, VWAG, VWGoA, VWGoAF, Winterkorn, and Horn, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, including without limitation the U.S. mails and interstate telephone communications, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.   Defendants carried out a plan, scheme, and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   Defendants VWAG, VWGoA, VWGoAF, Winterkorn, and Horn intended to and did, as alleged in this Complaint, (1) deceive the investing public, including Plaintiff and the other members of the Class; and (2) cause Plaintiff and the other members of the Class to purchase or acquire Volkswagen Bonds at artificially inflated prices.  Defendants

383.     Defendants VWAG, VWGoA, VWGoAF, Winterkorn, and Horn were individually and collectively responsible for making the material misstatements and omissions alleged in this Complaint and for engaging in a plan, scheme, and course of conduct designed to deceive Plaintiff and the other members of the Class, by virtue of having spoken, written, prepared, approved, signed, and disseminated documents that contained untrue statements of

material fact and omitted facts necessary to make the statements in the documents not misleading. Defendants each had a duty to promptly disseminate accurate and truthful information regarding the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects and to correct any previously issued statements that had become materially misleading or untrue so that the price of the Bonds would be based upon truthful and accurate information. Defendants' material misrepresentations and omissions and participation in a scheme to defraud during the class period violated these specific requirements and obligations.

384.     Defendants VWAG, VWGoA, VWGoAF, Winterkorn, and Horn had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though they had access to such facts and such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Volkswagen's financial condition from the investing public and supporting the artificially inflated price of its Bonds. As demonstrated by Defendants' false and misleading statements during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by failing to take steps necessary to discover whether those statements were false or misleading.

385.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth obscured by Volkswagen's material misstatements and omissions, Plaintiff and other members of the Class would not have purchased or otherwise acquired Volkswagen Bonds, or, if they had acquired such Bonds during the Class Period, they would not have done so at the artificially inflated or distorted prices at which they paid. As alleged in this Complaint, when the true facts were subsequently disclosed, the prices of Volkswagen Bonds declined precipitously. Plaintiff and other members of the Class were harmed and damaged as a direct and proximate result of their purchases of

Volkswagen Bonds at artificially inflated prices and the subsequent declines in the prices of Volkswagen Bonds when the truth was disclosed.

386.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

387.    As a direct and proximate result of the wrongful conduct of Defendants VWAG, VWGoA, VWGoAF, Winterkorn, and Horn, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's Bonds during the Class Period.

**COUNT II**
**For Violations Of Section 20(a) Of The**
**Exchange Act, Asserted Against VWAG, VWGoA, Winterkorn, And Horn**

388.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

389.    This claim is brought under Section 20(a) of the Exchange Act against Defendants VWAG, VWGoA, Winterkorn, and Horn on behalf of Plaintiff and the other members of the Class.

390.    As alleged in this Complaint, Defendant VWAG caused VWGoA and VWGoAF to violate Section 10(b) and Rule 10b-5 by making material misstatements and omissions in connection with the purchase and sale of Bonds and by participating in a scheme and course of business or conduct throughout the Class Period.  This conduct was undertaken with the scienter of VWAG, which knew of or recklessly disregarded the falsity of VWGoA's, and VWGoAF's statements of their omissions of material fact and the nature of their scheme during the Class Period.

391.    As alleged in this Complaint, VWGoA caused VWGoAF to violate Section 10(b) and Rule 10b-5 by making material misstatements and omissions in connection with the purchase and sale of securities and by participating in a scheme and course of business or conduct throughout the Class Period.  This conduct was undertaken with the scienter of VWGoA, which knew of or recklessly disregarded the falsity of VWGoAF's statements of their omissions of material fact and the nature of their scheme during the Class Period.  VWGoAF is a

wholly-owned subsidiary of VWGoA that was incorporated on February 14, 2014, as a debt issuing vehicle for VWAG (with VWAG as the ultimate obligor of the debt). VWGoAF and VWGoA share principle place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171. At all relevant times, the Board of Directors of VWGoAF included Jan Vycital, who concurrently served as the Executive Vice President and Chief Financial Officer of VWGoA, and Bjoern Baetage, who was the Treasurer of VWGoA under Defendant Horn.

392. As alleged in this Complaint, Defendants Winterkorn and Horn caused VWAG, VWGoA, and VWGoAF to violate Section 10(b) and Rule 10b-5 by making material misstatements and omissions in connection with the purchase and sale of securities and by participating in a scheme and course of business or conduct throughout the Class Period. This conduct was undertaken with the scienter of Defendants Winterkorn and Horn, who knew of or recklessly disregarded the falsity of VWAG'S, VWGoA's, and VWGoAF's statements or their omissions of material fact and the nature of their scheme during the Class Period.

393. Winterkorn was a controlling person of VWAG, VWGoA, and VWGoAF during the Class Period, due to (a) Winterkorn's senior executive position at VWAG; (b) Winterkorn's direct involvement in VWAG's day-to-day operations, financial reporting, and accounting and Winterkorn's signatures on and participation in the preparation and dissemination of VWAG's public statements and regulatory actions; (c) VWAG's ownership of 100% of VWGoA's and VWoA's America's stock; (d) VWAG's possession and exercise of the authority to appoint all of VWGoA's, VWoA's, and AoA's directors and executive officers; (e) Winterkorn's signatures on at least three certifications in the 2015 and 2015 Bond Offering Memoranda attesting to the truth and accuracy of the Company's financial position, the development and performance of its business, and descriptions of the material opportunities and risks associated with the Company's expected development; and (f) VWAG's direct involvement in VWGoA's, VWoA's and AoA's day-to-day operations, and financial reporting,

394. Horn was a controlling person of VWGoA and VWGoAF during the Class Period. Horn was a veteran of the Company serving for nearly 25 years and held various senior management positions, including Head of Sales and Marketing for Volkswagen's premium

vehicles and Head of Global European Aftersales.  As reported by the *Wall Street Journal, Dow Jones*, and *Automotive News*, Horn was a Wolfsburg insider and well versed in the inner workings of Volkswagen.  As reported by the *Wall Street Journal* on December 11, 2014, Winterkorn specifically appointed Horn as CEO of VWGoA because Winterkorn was frustrated with the slow progress of increasing sales in the United States.  The same *Wall Street Journal* article reported that Winterkorn formed a "North America Committee" comprised of "U.S. executives and approximately half of VW[AG]'s management board," which is believed to have included Defendant Horn and met regularly.  Winterkorn specifically selected Horn to serve as CEO as he was "a seasoned VW executive with deep ties to Wolfsburg," *i.e.,* VWAG's headquarters.  On January 24, 2015, *Automotive News* reported that "the management team in Wolfsburg trusts him, believes in [Horn] and fully supports [Horn]."  Horn was also personally involved with Volkswagen's response to the ICCT and WVU report, which VWGoA's Environmental and Engineering Department learned about by at least March 31, 2014.  Within a few days of March 31, 2014, Horn is believed to have requested reports from VWGoA's Environmental and Engineering Department about the results of the study (*see* ¶¶77, 171, 192).  On May 15, 2014, Horn received an email from Oliver Schmidt in the Environmental and Engineering Department outlining Volkswagen's potential liabilities in relation to the ICCT and WVU reports (¶¶82, 174), and then he specifically warned VWAG executives and board members of potential consequences, including non-certification of the Model Year Generation 3 vehicles (¶181).  In addition, at all relevant times, the Board of Directors of VWGoAF included Jan Vycital, who concurrently served as the Executive Vice President and Chief Financial Officer of VWGoA, and Bjoern Baetage, who was the Treasurer of VWGoA, both of whom, upon information and belief, reported to Defendant Horn.  In conjunction with the above mentioned facts, and due to (a) Horn's senior executive position at VWGoA; (b) Horn's direct involvement in VWGoA's day-to-day operations, financial reporting, regulatory reporting and accounting and Horn's signatures on and participation in the preparation and dissemination of VWGoA's public statements, including those made to Congress; (c) VWGoA's 100% ownership of VWGoAF; and (d) VWGoA's direct involvement in VWGoAF's day-to-day operations and

1  financial reporting Horn had the power to and did influence and control, directly or indirectly,

2  VWGoA and VWGoA's decisions including VWGoA's public statements.

3      395.    By reason of the foregoing, Defendants VWAG, VWGoA, Winterkorn, and Horn

4  are liable to Plaintiff and other members of the Class for violations of Section 20(a) of the

5  Exchange Act.

6  ## XV.   <u>**PRAYER FOR RELIEF**</u>

7      WHEREFORE, Plaintiff prays for the relief and judgment individually, and on behalf of

8  the Class, as follows:

9      A.     Declaring this action to be a proper class action pursuant to Rule 23 of the Federal

10 Rules of Civil Procedure and certifying Plaintiff as Class Representative and Lead Counsel as

11 Class Counsel;

12     B.     Awarding compensatory damages in favor of Plaintiff and against all Defendants,

13 jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an

14 amount to be proven at trial, including interest on that amount;

15     C.     Awarding Plaintiff and members of the Class their reasonable costs and expenses

16 incurred in this action, including attorneys' and experts' fees and expenses; and

17     D.     Awarding such other and further relief as the Court may deem just and proper.

18 ## XVI.   <u>**JURY DEMAND**</u>

19     Plaintiff demands a trial by jury for all issues so triable.

20 Dated: April 2, 2018                    Respectfully submitted,

21                                         ABRAHAM, FRUCHTER &
                                              TWERSKY, LLP
22
                                         _____*/s/ Ian D. Berg*_____
23                                          IAN D. BERG

24                                       IAN D. BERG   (Bar No. 263586)
25                                       TAKEO A. KELLAR   (Bar No. 234470)
                                         11622 El Camino Real, Suite 100
                                         San Diego, CA 92130
26                                       Tel:    (858) 764-2580
                                         Fax:    (858) 764-2582
27                                       *iberg@aftlaw.com*
                                         *tkellar@aftlaw.com*
28

- and -

MITCHELL M.Z. TWERSKY
ATARA HIRSCH
One Penn Plaza, Suite 2805
New York, NY 10119
Tel:     (212) 279-5050
Fax:     (212) 279-3655
*mtwersky@aftlaw.com*
*ahirsch@aftlaw.com*

*Attorneys for Lead Plaintiff Puerto Rico
Government Employees and Judiciary Retirement
Systems Administration*