UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: VOLKSWAGEN "CLEAN DIESEL"
MARKETING, SALES PRACTICES, AND
PRODUCTS LIABILITY LITIGATION

_____/

This Order Relates To:
MDL Dkt. Nos. 4583, 4584

*Environmental Protection Commission of*
*Hillsborough County v. Volkswagen*,
No. 16-cv-2210 (N.D. Cal.)

*Salt Lake County v. Volkswagen*, No. 16-cv-
5649 (N.D. Cal.)

_____/

MDL No. 2672 CRB  (JSC)

**ORDER RE: DEFENDANTS'
MOTIONS TO DISMISS
HILLSBOROUGH AND SALT LAKE
COUNTIES' AMENDED
COMPLAINTS**

In approximately 585,000 new vehicles that it sold in the United States, Volkswagen installed software that caused the vehicles' emission controls to perform one way during emissions testing, and another (less effective) way during normal driving conditions.  The software constituted a "defeat device," and Volkswagen violated the Clean Air Act and EPA regulations by installing it.  *See* 42 U.S.C. § 7522(a)(3); 40 C.F.R. §§ 86.1803–01, 86.1809–01, 86.1809–10, –12.

Certain states and counties have asserted that Volkswagen's defeat device also violated state and local laws that prohibit tampering with vehicle emission controls.  Last year, the Court considered Volkswagen's motion to dismiss one of these actions, which was a case filed by the State of Wyoming.  The Court held that, because the only alleged conduct by Volkswagen that could have violated the State's tampering law took place during vehicle manufacturing, the State's tampering claim was preempted by the Clean Air Act.  *See In re Volkswagen "Clean Diesel"* *Mktg., Sales Practices, & Prod. Liab. Litig.* ("*Wyoming*"), 264 F. Supp. 3d 1040 (N.D. Cal. 2017).

Two counties—Hillsborough County, Florida and Salt Lake County, Utah—have filed

tampering claims against Volkswagen that are similar to Wyoming's, except the Counties also allege that Volkswagen modified its defeat device to operate more effectively, and perhaps even added new defeat devices, through software updates during vehicle maintenance and post-sale recalls. The central question addressed in this Order is whether these new allegations save the Counties' tampering claims from preemption.

Hillsborough County has also named Robert Bosch LLC as a defendant, and Salt Lake County has also filed three additional state law claims against Volkswagen. The Court will also consider whether the tampering claim against Bosch and Salt Lake's additional claims are preempted.

## I

Volkswagen's defeat device is able to detect whether the vehicles in which it is installed are undergoing emissions testing, or being driven normally on the road. During emissions testing, the device causes the vehicles' emission controls to perform in a mode that satisfies EPA's emission standards. When the vehicles are on the road, the device reduces the effectiveness of the emission controls, causing the vehicles to emit nitrogen oxides (NOx) at levels that are sometimes 40 times higher than EPA's standards. (Hillsborough Compl. ¶¶ 2-3; Salt Lake Compl. ¶¶ 4-5, 39-41.)

Volkswagen installed its defeat device in 2.0-liter and 3.0-liter TDI diesel engine vehicles, covering eight model years (model years 2009 through 2016) and a variety of model types—including Volkswagen's Jetta, Beetle, Golf and Passat models, Audi's A3, A6 and A8 models, and the Porsche Cayenne. (Audi and Porsche are subsidiaries of Volkswagen.) For each model year, Volkswagen misrepresented to EPA that these vehicles complied with the agency's emission standards. (Hillsborough Compl. ¶¶ 1-7, 36-37, 44; Salt Lake Compl. ¶¶ 2-5.)[1]

After independent, on-road testing in 2014 called Volkswagen's representations into

---

[1] The Counties have also named Audi of America LLC and Porsche Cars North America, Inc. as defendants. (Hillsborough Compl. ¶¶ 16-17 & nn. 6-7; Salt Lake Compl. ¶¶ 28, 30.) Because the parties have not made Audi or Porsche specific arguments in their briefing on the motions to dismiss, and because Audi and Porsche are subsidiaries of the Volkswagen Group, the Court uses the umbrella term "Volkswagen" to refer to all defendants other than Bosch LLC.

question, EPA began an investigation.  Throughout 2014 and the first half of 2015, Volkswagen

employees responded to EPA's inquiries by offering software and hardware fixes, without

revealing the underlying reason for the discrepancies.  (Hillsborough Compl. ¶¶ 82-86.)  By the

second half of 2015, however, it became clear that the fixes had not worked; and with EPA

threatening not to certify model-year 2016 vehicles for sale in the United States, Volkswagen

finally explained, in the fall of 2015, that certain of its vehicles used defeat device software.  EPA

subsequently issued Notices of Violation of the Clean Air Act, and Volkswagen admitted publicly

that it had deliberately cheated on emissions tests.  (*Id.* ¶¶ 90-94, 102.)

The United States, on behalf of EPA, responded by filing civil and criminal actions against

Volkswagen for violations of the Clean Air Act.  The criminal charges included conspiracy to

defraud the United States by making false statements in submissions to EPA, in violation of 42

U.S.C. § 7413(c)(2)(A); and the civil charges included tampering with vehicle emission controls,

and unlawfully installing a defeat device, in violation of 42 U.S.C. § 7522(a)(3).  (*See United

States v. Volkswagen AG*, No. 16-CR-20394, Dkt. No. 32 (E.D. Mich. Mar. 10, 2017); *United

States v. Volkswagen AG*, No. 16-CV-00295, Dkt. No. 1 (N.D. Cal. Jan. 4, 2016).)  Volkswagen

pled guilty to the criminal charges and settled the civil claims.  The resulting plea agreement and

civil consent decrees require Volkswagen to remove from the road or fix at least 85 percent of the

affected vehicles, to pay $4.3 billion in criminal and civil penalties, to fund $2.0 billion in Zero

Emission Vehicle investments, and to contribute $2.925 billion to a mitigation trust, the

beneficiaries of which are the states and federal Indian tribes.  (*See Volkswagen AG*, No. 16-CR-

20394, Dkt. No. 68 (plea agreement); MDL Dkt. Nos. 2103, 3155, 3228 (civil consent decrees).)

Volkswagen also settled related claims that were brought by classes of consumers.  (*See* Dkt. Nos.

2102, 3229 (2.0-liter and 3.0-liter consumer class action settlement approval orders).)  The 2.0-

liter settlement requires Volkswagen to establish a $10.033 billion funding pool to buy back its

2.0-liter TDI vehicles and to pay the owners and lessees of those vehicles restitution.  (Dkt. No.

2102 at 19.)

As part of Volkswagen's plea agreement, the company agreed to a Statement of Facts that

it stipulated was "true and correct" and that it agreed to "neither contest the admissibility of, nor

contradict, . . . in any proceeding." (Plea Agreement § 1.E.) Therein Volkswagen admitted to, among other things, making certain modifications to its defeat device in or around April 2013. The Counties acknowledge in their joint opposition brief that their post-sale software change allegations are based on these admissions. The Counties have also attached a copy of the Statement of Facts to their joint opposition to Defendants' motions to dismiss. (*See* Dkt. No. 4640-1.) For simplicity, the Court cites to the Statement of Facts throughout this order in discussing the software change allegations, and addresses any additional or conflicting allegations from the Counties' complaints where necessary.[2]

As relevant here, Volkswagen has admitted that it modified its defeat device in order to remedy hardware failures that developed in certain of its 2.0-liter TDI diesel engine vehicles in or around 2012. (SOF ¶ 47.) The company hypothesized that the failures were the result of a glitch with the defeat device, whereby the vehicles were staying in testing or "dyno" mode even when driven on the road, which was placing increased stress on the vehicles' exhaust systems. (*Id.*) To solve the problem, the company developed a "steering wheel angle recognition" feature, which "interacted with the [defeat device] by enabling the vehicles to detect whether [they] were being tested on a dynamometer (where the steering wheel is not turned), or being driven on the road." (*Id.* ¶ 49.) After a Volkswagen supervisor authorized activation of this feature, in or around April 2013, Volkswagen employees "installed the new software function in new 2.0 Liter Subject Vehicles being sold in the United States, and later installed it in existing 2.0 Liter Subject Vehicles through software updates during maintenance." (*Id.* ¶ 50.) Volkswagen also modified these vehicles so that they would start in "street mode," and then shift to "dyno mode" when the defeat device recognized that the vehicles were undergoing emissions testing. (*Id.*)

Deviating from Volkswagen's plea agreement somewhat, Hillsborough alleges that Volkswagen not only modified its defeat device, but also installed "[a]t least two new defeat devices . . . through post-sale recalls." (Hillsborough Compl. ¶ 88.) Yet Hillsborough describes

---

[2] Volkswagen AG, a German corporation, is the entity that was charged and pled guilty in the federal criminal case, whereas Volkswagen Group of America, Inc., a Volkswagen AG subsidiary, is the defendant in this case. This distinction is not material for purposes of this Order, as the Counties allege that both Volkswagen entities engaged in the conduct at issue.

these "new" defeat devices in a manner that mirrors the defeat device modifications described in Volkswagen's plea agreement. (*See id.* (describing one new defeat device as a "steering wheel angle function" device, and another new defeat device as a "start function" device that started the vehicles in one mode and switched them to the other mode during testing).) Hillsborough also alleges that Bosch LLC, as an engineering and electronics company, assisted with developing the defeat device and with implementing the post-sale software changes. (*Id.* ¶¶ 38-42, 89.)

The Hillsborough Environmental Protection Commission (EPC) and the State of Utah have both adopted vehicle tampering laws. These laws generally prohibit anyone from removing or rendering inoperable a vehicle's emission control system. *See* EPC Rule 1–8.05(1), (6); Utah Admin. Code R307-201-4. The Counties allege that Defendants violated these laws (1) by manufacturing the defeat device and installing it in vehicles that were ultimately registered in the Counties; and (2) by modifying the defeat device in vehicles that were in use within the Counties. (Hillsborough Compl. ¶¶ 143-44; Salt Lake Compl. ¶ 55.) A violation of either Hillsborough's or Salt Lake's tampering law is punishable by a civil penalty of up to $5,000 per offense, with each day that a violation occurs constituting a separate offense. *See* Hillsborough EPC Enabling Act, Fla. Laws 84-446 § 17(2) (as amended by Fla. Laws 87-495 (2005));[3] Utah Code Ann. § 19-1-303. As alleged, at least 1,118 affected vehicles are registered in Hillsborough County, and at least 5,000 affected vehicles are registered in Salt Lake County. (Hillsborough Compl. ¶10; Salt Lake Compl. ¶ 47.)

Salt Lake's complaint also includes three claims in addition to its tampering claim. These additional claims are for common law fraud, violation of Utah's Pattern of Unlawful Activity Act, Utah Code Ann. §§ 76-10-1601 to -1609, and common law nuisance. (Salt Lake Compl. ¶¶ 58-78.)

## II

Before considering the preemption questions, the Court first addresses Defendants' statutory arguments—that their conduct does not come within the terms of the Counties'

---

[3] Hillsborough has attached a copy of the EPC Enabling Act and the EPC's tampering rules to its complaint. (*See* Dkt. Nos. 4457-1, -2.)

tampering rules.  The parties have not cited to any judicial decision in which these rules have been interpreted, or any legislative history with respect to the rules.  The Court therefore looks only to the text of the rules.

A

Salt Lake County alleges that Volkswagen violated the following rule in the Utah Administrative Code.  The Court has added italics to the terms and phrases at issue.

> Any person *owning or operating* any motor vehicle or motor vehicle engine registered or principally operated in the State of Utah *on which is installed or incorporated* a system or device for the control of crankcase emissions or exhaust emissions *in compliance with the Federal motor vehicle rules*, shall maintain the system or device in operable condition and shall use it at all times that the motor vehicle or motor vehicle engine is operated.  No person shall *remove or make inoperable the system or device* or any part thereof, except for the purpose of installing another system or device, or part thereof, which is equally or more effective in reducing emissions from the vehicle to the atmosphere.

Utah Admin. Code R307-201-4 (emphasis added).

Volkswagen argues that its conduct, as alleged, does not come within the terms of this tampering rule for three reasons.  First, Volkswagen contends that the rule prohibits tampering only by those "owning or operating" a motor vehicle, not manufacturers.  This argument is based on the first sentence of the rule: "Any person *owning or operating* any motor vehicle . . . on which is installed or incorporated a system or device for the control of . . . emissions . . . shall maintain the system or device in operable condition . . . ."  If Salt Lake's tampering claim was based on that portion of the rule, Volkswagen's argument would have merit, as the "owning or operating" modifier of "any person" can reasonably be read to limit the rule's coverage to end users of motor vehicles, not vehicle manufacturers.  Salt Lake's claim, though, is based on the second sentence of the rule, not the first.  And unlike the first sentence, the second does not include the "owning or operating" modifier, but instead applies to any person that removes or makes inoperable an emission control system or device.  *See id.* ("No person shall remove or make inoperable [an emission control system or device] . . . .").  The broader scope of the second sentence is not surprising.  While the conduct proscribed by the first sentence—failing to "maintain" a vehicle's

emission controls—would most naturally apply only to those who use or are responsible for a vehicle that is in use, the conduct proscribed by the second sentence—tampering with vehicle emission controls—could be taken by mechanics, manufacturers, parts suppliers, or strangers in the parking lot. Volkswagen is accordingly within the universe of parties to which the second sentence of Salt Lake's rule may apply, and Volkswagen's focus on the "owning or operating" modifier in the first sentence is not persuasive.

Volkswagen next focuses on the language "remov[ing] or mak[ing] inoperative" in the second sentence of Salt Lake's tampering rule. It suggests that "the word 'remove' most naturally connotes extracting a pre-existing emission control device from a used car, and 'mak[ing] inoperative' contemplates a transformation from an operative emissions control system to an inoperative one." (Dkt. No. 4583 at 26.) It then contends that the allegations do not support that it performed either of these actions.

Salt Lake is relying on the "mak[ing] inoperative" prong, not the "remov[ing]" prong of the rule. For example, Salt Lake alleges that, due to post-sale software changes, "the affected vehicles' emission control systems were made inoperable most of the time the vehicles were being operated in Salt Lake County." (Salt Lake Compl. ¶ 42.) This conduct clearly comes within the reach of the "mak[ing] inoperative" prong: the allegations just quoted specifically refer to making the emission control systems inoperable. Salt Lake also alleges that, before the software changes, Volkswagen's defeat device could detect when emissions testing was complete, and "would respond by relaxing emissions controls to permit higher levels of emissions of NOx and other pollutants." (*Id.* ¶ 4.) Arguably, "relaxing" emission controls is not the same as making emission controls "inoperative," as inoperative suggests that the controls were not functioning, while "relaxing" suggests that the controls were functioning less effectively. Under the circumstances alleged here, however, this is a distinction without a difference. Salt Lake alleges that Volkswagen's defeat device reduced the effectiveness of emission controls in such a manner that the vehicles in which it was installed went from complying with EPA's emission standards to emitting as much as 40 times the level of NOx permitted by those standards. (*See id.* ¶ 43; *cf.* SOF ¶ 34 (referring to NOx levels that were sometimes 35 times higher than U.S. standards).) This was

a drastic reduction in the effectiveness of the emission controls; so drastic that, for all practical purposes, the emission controls in the affected vehicles were indeed rendered "inoperable" when the defeat device began to operate. The Court therefore concludes that Volkswagen's initial installation of the defeat device in the affected vehicles, and subsequent post-sale software changes, come within the scope of the "mak[ing] inoperative" prong of Salt Lake's tampering rule.

Finally, Volkswagen points to the following language in Salt Lake's rule: "on which is installed or incorporated a system or device for the control of . . . exhaust emissions in compliance with the Federal motor vehicle rules." Volkswagen contends that this clause indicates that Salt Lake's tampering rule "does not apply to the original installation or updating of a *noncompliant* system, as Salt Lake alleges here." (Dkt. No. 4583 at 26 (emphasis added).) That is, Volkswagen suggests that because Salt Lake alleges that Volkswagen installed the defeat device in its vehicles during manufacturing, the vehicles never had compliant emission control systems, and therefore could not be tampered with under Salt Lake's rule.

The Court does not agree with this interpretation. Salt Lake alleges that Volkswagen installed emission controls in the affected vehicles that, during emissions testing, *were* able to satisfy EPA's standards. The defeat device then rendered the vehicles' otherwise compliant emission controls noncompliant when the vehicles were driven on the road. The defeat device, then, "ma[d]e inoperable [a] system or device" that was "installed or incorporated . . . for the control of . . . exhaust emissions in compliance with the Federal motor vehicle rules." Utah Admin. Code R307-201-4.

Volkswagen's alleged conduct comes within the terms of Salt Lake's tampering rule.

**B**

Volkswagen and Bosch also contend that their conduct does not come within the bounds of the tampering rules invoked by Hillsborough County. Hillsborough relies on two mobile source rules, which read as follows:

> No person shall tamper, cause, or allow the tampering of the emission control system of any motor vehicle.

8

EPC Rule 1–8.05(1).

> No person shall manufacture, install, sell or advertise for sale, devices to defeat or render inoperable any component of a motor vehicle's emission control system . . . .

EPC Rule 1–8.05(6). As used in these rules, "tampering" is defined as "the intentional inactivation, disconnection, removal or other modification of a component or components of the emission control system." EPC Rule 1–8.03(2)(h). An "emission control system" in turn is defined in part as "the devices and mechanisms installed as original equipment at the time of manufacture . . . for the purpose of reducing or aiding in the control of emissions." EPC Rule 1-8.03(2)(b).

Defendants contend that EPC Rule 1–8.05(1) applies only to the modification of "pre-existing emission control systems." (Dkt. Nos. 4583 at 27; 4584 at 7-8.) Similarly, Defendants contend that EPC 1–8.05(6) prohibits only the manufacture or installation of a device "to defeat or render inoperable" a part of an existing "emission control system," i.e., one that was already "installed as original equipment at the time of manufacture." (Dkt. No. 4583 at 27.) Defendants then assert that their conduct, as alleged by Hillsborough, does not come within these provisions, because Hillsborough alleges that they installed a defeat device in the affected vehicles at the same time that they installed the emission control system. They therefore assert that they did not modify or render inoperable a pre-existing "emission control system" as required to violate Hillsborough's tampering rules.

This argument is essentially the same as the third argument addressed above with respect to Salt Lake's tampering rule. For the same reasons, it is unpersuasive. As alleged, Defendants equipped the affected vehicles with emission controls that could—and did—meet EPA's emission standards during testing. Defendants also equipped the affected vehicles with a defeat device, which reduced the effectiveness of the vehicles' emission controls during normal on-road driving. Whether the defeat device was installed at the exact same time as the emission controls, or was installed sometime later during the manufacturing process, the defeat device reduced the effectiveness of the vehicles' emission controls during normal vehicle use and therefore

"modified" and "render[ed] inoperable" certain "devices and mechanisms installed as original equipment at the time of manufacture . . . for the purpose of reducing or aiding in the control of emissions." EPC Rules 1–8.03(2)(b), 1–8.05(1), (6). The same is true of the alleged post-sale software changes, which clearly took place after the original emission control systems were installed in the affected vehicles. (*See* SOF ¶¶ 47-51; *see also* Hillsborough Compl. ¶¶ 87-88; Salt Lake Compl. ¶ 42.) The Court accordingly concludes that Defendants' alleged conduct comes within the bounds of Hillsborough's tampering rules.

### III

Turning to the preemption analysis, the Court starts on familiar ground. Like the Counties, Wyoming previously asserted that Volkswagen violated a local tampering law by manufacturing and installing a defeat device in its vehicles. The Court held that Wyoming's tampering claim was expressly preempted by Section 209(a) of the Clean Air Act.

Section 209(a) provides that

> No State or any political subdivision thereof shall adopt or attempt to enforce any *standard relating to the control of emissions from new motor vehicles* or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

42 U.S.C. § 7543(a) (emphasis added).

The Act defines "new motor vehicle" as "a motor vehicle the equitable or legal title to which has never been transferred to an ultimate purchaser." *Id.* § 7550(3). The Act does not define a "standard relating to the control of emissions," but the Supreme Court offered two examples of such a standard in *South Coast Air Quality*. The first is a rule that a vehicle "not emit more than a certain amount of a given pollutant." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 253 (2004). The second is a rule that a vehicle "be equipped with a certain type of pollution-control device." *Id.*

These "standards" are the same types of rules that Congress requires EPA to enact and

1    enforce in Title II of the Clean Air Act.  Specifically, Congress has tasked EPA with setting

2    emission limits for new vehicles introduced into commerce, 42 U.S.C. § 7521(a); setting standards

3    governing the use of emission-control devices in those vehicles, *e.g.*, *id.* § 7521(a)(4)(A), (m);

4    running a certification and testing program to ensure that new vehicles meet these standards, *id.*

5    § 7525; and enforcing these standards by refusing to certify vehicles that do not meet all

6    regulatory requirements and by bringing civil enforcement actions against violators, *see id.*

7    §§ 7522(a), 7524, 7525(a).  Section 209(a) prohibits States and political subdivisions from doing

8    the same.[4]  Through this give and take, Congress has created a uniform regulatory regime

9    governing emissions from new vehicles, which it has done to avoid "the possibility of 50 different

10   state regulatory regimes" governing vehicle emissions, which would "raise[] the spectre of an

11   anarchic patchwork of federal and state regulatory programs" and would threaten "to create

12   nightmares for the manufacturers."  *Engine Mfrs. Ass'n v. EPA* (*"EMA"*), 88 F.3d 1075, 1079

13   (D.C. Cir. 1996) (citation omitted).

14         In *Wyoming*, this Court held that EPA's rule prohibiting the installation of defeat devices

15   in new vehicles is a "standard relating to the control of emissions from new motor vehicles."

16   *Wyoming*, 264 F. Supp. 3d at 1052.  In opposing Volkswagen's motion to dismiss, Wyoming

17   argued that its tampering claim was nevertheless not an "attempt to enforce" EPA's rule, but rather

18   was only an attempt to regulate the use of Volkswagen's defeat device within the State's borders.

19   It was on the roads of Wyoming, the State argued, that the device reduced (and thereby tampered

20   with) vehicle emission controls.  Framed in this way, Wyoming asserted that its claim not only

21   escaped the reach of Section 209(a)'s express preemption clause, but also was protected by the

22   Clean Air Act's savings clause, Section 209(d), which provides that "Nothing in this part shall

23   preclude or deny any State or political subdivision thereof the right otherwise to control, regulate,

24   or restrict the use, operation, or movement of registered or licensed motor vehicles."  42 U.S.C.

25   _____

26   [4] The exception is California: Congress has allowed California to set its own vehicle emission
     standards, and allows other states to adopt California's standards.  *See* 42 U.S.C. §§ 7507;

27   7543(b); *Jensen Family Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d
     934, 938 n.3 (9th Cir. 2011).  Because of this exception, the California Air Resources Board

28   (CARB) also played an important role in investigating Volkswagen's conduct, as noted in
     Volkswagen's plea agreement.

§ 7543(d).

The Court did not find Wyoming's in-use argument persuasive. Yes, the defeat device operated in vehicles within the State, but Volkswagen's conduct took place during manufacturing, when it installed the defeat device in its new vehicles. Wyoming, then, was attempting to regulate Volkswagen's conduct before its vehicles were sold to end users. And by doing so, the State was attempting to enforce a standard relating to the control of emissions from new motor vehicles. *See Wyoming*, 264 F. Supp. 3d at 1056. The Court also noted that, by definition, all defeat devices work by reducing the effectiveness of emission controls during "normal vehicle operation and use." *Id.* (quoting 40 C.F.R. § 86.1803–01). Under Wyoming's reading, then, "every defeat device installed in a new vehicle that is later registered in the State will violate its tampering . . . rule[], without any additional action by the manufacturer who installed the device." *Id.* Thus, by regulating the use of defeat devices, Wyoming would "effectively [be] regulating their installation." *Id.*

**IV**

To the extent the Counties' tampering claims are based on the manufacture and installation of a defeat device in new vehicles that were later registered in the Counties, their claims are expressly preempted by Section 209(a) for the same reasons identified in *Wyoming*. Although the defeat device may operate in vehicles within the Counties, Defendants are alleged to have manufactured the device and installed it in these vehicles before the vehicles were sold to end users. To the extent the Counties seek to regulate that conduct, they are "attempt[ing] to enforce [a] standard relating to the control of emissions from new motor vehicles," which states and local governments cannot do under Section 209(a).

The alleged post-sale software changes to the affected vehicles requires a different analysis. The Counties allege that Defendants modified the defeat device in the affected vehicles during vehicle maintenance, or installed new defeat devices during post-sale recalls. In either case, this conduct affected vehicles that had already been sold to consumers and were in use within the Counties, not "new motor vehicles." The Counties' attempts to regulate Defendants' post-sale software changes are therefore not expressly preempted by Section 209(a).

In arguing to the contrary, Defendants note that Wyoming also attempted to base its tampering claims in part on certain post-sale software changes, and the Court rejected that attempt. The Court did so on statutory grounds, however, not on the basis of preemption under Section 209(a). This was because Wyoming alleged that certain software changes by Volkswagen brought emissions *down* relative to the emissions allowed by the original defeat device. On that basis, the Court held that the changes "did not violate . . . Wyoming's tampering provision . . . because the updates did not 'render ineffective or inoperative' the emission control system." *Wyoming*, 264 F. Supp. 3d at 1057 n.8. In contrast, the Counties' allegations support that the post-sale software changes *increased* emissions. (*See* Salt Lake Compl. ¶ 42; *see also* SOF ¶¶ 50-51 (admitting that the steering wheel angle recognition feature "improve[d] the defeat device's precision" and marked an "expansion of the defeat device," as this feature reduced the likelihood that the vehicles in which it was installed would inadvertently operate in testing or "dyno" mode during normal driving conditions). Unlike Wyoming's allegations, then, the Counties' are based on conduct that could constitute tampering under their respective tampering rules. And because the software changes were made to vehicles that had already been sold to consumers, the Counties' attempts to regulate the changes are not expressly preempted by Section 209(a).

Defendants make one additional argument with respect to Section 209(a), asserting that the relation-back concept discussed in *Allway Taxi, Inc. v. City of New York*, 340 F. Supp. 1120 (S.D.N.Y. 1972), *aff'd*, 468 F.2d 624 (2d Cir. 1972), and cited favorably by EPA in a regulation implementing non-road vehicle emission standards, *see* 59 Fed. Reg. 31306–01 (June 17, 1994), brings the Counties' tampering claims within the scope of Section 209(a). It does not. The idea behind that concept is that if a state were to adopt "in-use emission control measures that would apply immediately after a new vehicle or engine were purchased," this would amount to "an attempt to circumvent section 209 preemption and would obstruct interstate commerce," as manufacturers would feel pressure to ensure that their new vehicles complied with the state's in-use control measures. 59 Fed. Reg. at 31330. As a result, courts have reasoned that, even though such measures would be imposed on vehicles only after they were sold, the measures would relate back to the vehicle manufacturing process, and would therefore be preempted by Section 209(a).

13

See *Allway Taxi*, 340 F. Supp. at 1123-24; *EMA*, 88 F.3d at 1086 ("The *Allway Taxi* interpretation, postponing state regulation so that the burden of compliance will not fall on the manufacturer, has prevented the definition of 'new motor vehicle' from 'nullifying' the motor vehicle preemption regime."). The Counties' attempt to regulate Defendants' post-sale software changes does not raise the same concerns. The Counties are not attempting to impose emission measures that would require manufacturers to change the way they construct new vehicles. Rather, the Counties are attempting to prevent manufacturers from tampering with their vehicles after the vehicles are sold to end users. Because the relation-back concept is not implicated here, it does not bring the Counties' claims within the preemptive scope of Section 209(a).

That Section 209(a) does not expressly bar the Counties' attempts to regulate Defendants' post-sale software changes does not end the preemption analysis, however. This is because "neither an express pre-emption provision nor a saving clause 'bars the ordinary working of conflict pre-emption principles.'" *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 352 (2001) (quoting *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 69 (2000)). The Court must therefore also consider whether, "under the circumstances of [this] particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Atay v. Cty. of Maui*, 842 F.3d 688, 699 (9th Cir. 2016) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000)). Where a statute "regulates a field traditionally occupied by states, such as health, safety, and land use," courts "assume that a federal law does not preempt the states' police power absent a 'clear and manifest purpose of Congress.'" *Id.* (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)).

## A

The Counties allege that Volkswagen and Bosch made the post-sale software changes at issue on a model-wide basis in thousands of vehicles nationwide. As a consequence, the congressional objective that the Court must identify is how Congress intended for model-wide tampering by vehicle manufacturers and parts suppliers to be regulated. The Counties view Section 209 of the Clean Air Act as answering that question: When vehicles are tampered with when they are new, they contend that Section 209(a) prohibits states and local governments from

attempting to regulate that conduct; but when vehicles are tampered with when they are in use, they contend that Section 209(d) allows states and local governments to regulate that conduct, regardless of the magnitude of the tampering offense or the identity of the offender, without interfering with the federal regulatory scheme.

The Clean Air Act does not draw such a clear line. For one thing, the Act requires vehicles to meet EPA's emission standards during their "useful life." 42 U.S.C. § 7521(a)(1). The federal regulation of vehicle emissions therefore does not stop after vehicles are sold to end users. And although Congress has looked to both EPA and the states and local governments to enforce these useful life standards, the enforcement roles of these entities do not entirely overlap. Instead, it is evident from the statutory scheme and legislative history that Congress intended for EPA and the states and local governments to serve specific and separate functions in regulating emissions from in-use vehicles.

EPA's primary role after vehicles are put in use is to ensure that entire classes or models of vehicles remain in compliance with the agency's emission standards. Similar to during the new vehicle certification process, EPA works with vehicle manufacturers to accomplish this. For example, pursuant to 42 U.S.C. § 7541(b), EPA has established "[m]anufacturer in-use verification testing requirements." 40 C.F.R. § 86.1845–04. To comply, vehicle manufacturers must procure and test a specific number of vehicles in each test group (categorized by, among other things, engine type) that have been driven at least 10,000 miles (low-mileage testing) and 50,000 miles (high-mileage testing). *See id.* §§ 86.1827–01; 86.1845–04(b), (c). If a manufacturer's vehicles do not pass these in-use tests, or if EPA otherwise determines that "a substantial number of any class or category of vehicles or engines, although properly maintained and used, do not conform to the regulations prescribed," EPA has authority to recall those vehicles. 42 U.S.C. § 7541(c)(1). Either before or after vehicles are sold to end users, EPA may also inspect vehicle manufacturers' records related to emissions testing, and may observe activities at the manufacturers' plants. 42 U.S.C. § 7542. EPA also requires manufactures to report to the agency emission related defects discovered in used vehicles if the defects affect at least 25 vehicles of the same model year. 40 C.F.R. § 85.1903(a). Emission related defects include

defective "software . . . which must function properly to ensure continued compliance with emission standards." *Id.* § 85.1902(b)(2).

While Congress has tasked EPA with enforcing useful life emission standards on a model-wide basis, other provisions in the Clean Air Act, and the Act's legislative history, reveal Congress' intent to have states and local governments enforce these standards by inspecting individual vehicles for compliance. Since Congress first adopted the modern vehicle emissions scheme, in 1967, it has intended that "States responsibility would be to assume responsibility for inspection of pollution control systems as an integral part of safety inspection programs . . . ." S. Rep. 90-403, at 35 (1967). To encourage states to adopt such programs, Congress included a provision in the Air Quality Act of 1967 that authorizes EPA to "make grants to appropriate State air pollution control agencies in an amount up to two-thirds of the cost of developing meaningful uniform motor vehicle emission device inspection and emission testing programs." Pub. L. 90-148, § 209, 81 Stat. 502 (1967) (codified as amended at 42 U.S.C. § 7544). In commenting on minor amendments to this provision as part of the Clean Air Act Amendments of 1970, Congress also noted that "Effective State emission testing and inspection programs [are] essential . . . to assur[e] that vehicles, once delivered to the ultimate and subsequent purchasers, continue to conform to the standards for which they were certified." S. Rep. 91-1196, at 31 (1970).

As Congress has made further amendments to the Clean Air Act, and in particular as it responded to increasing emissions from vehicles in the 1970s and '80s, which resulted from the increasing use of vehicles throughout the nation, it has made some of these state inspection programs mandatory, at least for states with particularly high levels of certain pollutants. *See* Clean Air Act Amendments of 1977, Pub. L. 95-95 § 172(b)(11)(B), 91 Stat. 685, 747; Clean Air Act Amendments of 1990, Pub. L. 101-549, § 182(b)(4), (c)(3), 104 Stat. 2399, 2426. Under the current Clean Air Act, then, certain states must adopt in-use vehicle inspection programs. *See* 42 U.S.C. § 7511a(b)(4), (c)(3). And these programs must comply with EPA-established minimum standards with respect to the frequency of inspection, the types of vehicles to be inspected, and the test methods and measures used. *See id.* § 7511a(a)(2)(B)(i); EPA Inspection/Maintenance Program Requirements Rule, 57 Fed. Reg. 52950 (Nov. 5, 1992). In states that are required to

16

adopt "enhanced" inspection programs, enforcement through denial of vehicle registration is required.  *See* 42 U.S.C. § 7511a(c)(3)(C)(iv).  Many states and local governments, like the Counties in this case, have also adopted tampering laws to bolster state inspection programs, or as standalone provisions.  These tampering laws generally "prohibit the operation of motor vehicles when air pollution devices have been removed, altered, or rendered inoperative."  Arnold W. Reitze Jr., *Air Pollution Control Law: Compliance and Enforcement* § 10–5(d) (2001); *see also* 57 Fed. Reg. 24370-01 (June 9, 1992) (EPA's approval of Florida's anti-tampering program); 52 Fed. Reg. 4921-02 (Feb. 18, 1987) (EPA's approval of Utah's inspection and anti-tampering programs).

By their nature, state inspection programs operate on an individual vehicle basis.  This is clear from, among other things, the use of vehicle registration denial as a means of enforcement— which is a penalty that affects the owners of specific non-compliant vehicles.  It is also clear from Section 207(h)(2) of the Clean Air Act.  There, Congress has provided that "Nothing in [Section 209(a)] shall be construed to prohibit a State from testing or requiring testing of, a motor vehicle after the date of sale of such vehicle to the ultimate purchaser . . . ."  42 U.S.C. § 7541(h)(2).  But the same provision follows with this exception: "(except that no new motor vehicle manufacturer or dealer may be required to conduct testing under this paragraph)."  Through this exception, Congress has manifested its intent that state inspection programs should not interfere with vehicle manufacturers.

At times, the federal scheme reveals overlap between federal, state, and local enforcement authority of emission standards.  As notable for present purposes, Congress has adopted a federal tampering provision, which prohibits "any person" from removing or rendering inoperative emission control devices either before or after the vehicles in which the devices are installed are sold to ultimate purchasers.  *See* 42 U.S.C. § 7522(a)(3)(A).  Until 1990, this provision applied only to manufacturers, dealers, fleet owners, service stations or garage operators, and those in the business of leasing vehicles.  *See* Clean Air Act Amendments of 1977, Pub. L. 95-95 § 219(a), 91 Stat. 685, 761.  But in the Clean Air Act Amendments of 1990, Congress expanded the reach of the federal tampering law to also cover individual owners and operators of vehicles.  *See* Pub. L.

United States District Court
Northern District of California

101-549, § 228(b), 104. Stat. 2399, 2507 (codified at 42 U.S.C. § 7522(a)(3)(A)).  In this respect, EPA, similar to states and local governments, can regulate individual vehicle owners' compliance with emission standards.  Although no similar provisions in the Clean Air Act reveal a crossover going the other way, with states and local governments given authority to supplement EPA's enforcement authority over vehicle manufacturers' compliance with emission standards.  Further, the legislative history of the 1990 amendments reveals that Congress amended the federal tampering law only to supplement state efforts to regulate tampering by individual vehicle owners and operators, as tampering by individuals was proving to be problematic in states with and without inspection and tampering programs.  *See* S. Rep. 101-228, at 123 (1989) (citing tampering statistics from a 1988 tampering survey).  And while the amendments authorized EPA to regulate tampering by individuals, Congress "[did] not require sweeping new enforcement initiatives to be undertaken by EPA."  (*Id.* at 124.)

The division of authority discussed above—with EPA enforcing useful life vehicle emission standards primarily on a model-wide basis, and at the manufacturer level, and states and local governments enforcing the same standards on an individual vehicle basis at the end-user level—is sensible, as it best utilizes the comparative advantages of EPA and the states and local governments.  EPA, as a federal agency, is best positioned to enforce emission standards on a model-wide basis because model-wide emission problems will almost invariably affect vehicles in states and counties throughout the country.  Further, when investigating model-wide emission issues, EPA can also rely on testing data it acquired from manufacturers during the new vehicle certification process, which it can utilize to understand how vehicle models are performing in use as compared to how they were performing during assembly-line testing.  Likewise, because the new vehicle certification process requires EPA to work directly with vehicle manufacturers, the agency has preexisting relationships that it can rely on when addressing model-wide emission defects in used vehicles.

States and local governments, in contrast, are in a better position than EPA to enforce emission standards at the individual user level.  Although Congress could theoretically task EPA with overseeing nationwide vehicle inspection programs—with the agency running testing centers

18

and requiring vehicle owners to have their vehicles checked on a regular basis—states and local governments can more efficiently do so because they already oversee vehicle registration and drivers' licensing, and can use state police power to aid enforcement. Indeed, when Congress first sought to motivate states to create vehicle inspection programs, it did so based on the belief that states would adopt such programs "as an integral part of safety inspection programs." S. Rep. 90-403, at 35 (1967).

This is not to say that there is no conceivable scenario, consistent with the Clean Air Act, in which states and local governments could regulate a vehicle manufacturer's compliance with emission standards. If, for example, a manufacturer were to tamper with a single in-use vehicle during vehicle maintenance, the Clean Air Act would not bar a state or local government from bringing a tampering claim against the manufacturer if the tampering occurred within its borders. In such a scenario, the manufacturer is not acting on a model-wide basis, and therefore the enforcement advantages that EPA has over the states and local governments are not implicated. But when a manufacturer's actions affect vehicles model wide, the Clean Air Act manifests Congress' intent that EPA, not the states or local governments, will regulate that conduct.

## B

The model-wide nature of the post-sale software changes alleged here makes them the type of conduct that Congress intended EPA to regulate. And indeed, EPA has regulated this conduct. EPA was instrumental in bringing Volkswagen's emissions fraud to light, as it began an investigation in 2014 to determine why on-road emissions from the affected vehicles significantly exceeded emissions during testing. (*See* Hillsborough Compl. ¶¶ 82-86; SOF ¶¶ 52-63.) And it was only after EPA threatened not to certify certain model-year 2016 vehicles that Volkswagen finally admitted that it had equipped the affected vehicles with a defeat device. (*See* Hillsborough Compl. ¶ 90; SOF ¶ 59.) EPA has also brought civil and criminal actions against Volkswagen based not only on the company's initial installation of a defeat device in its vehicles, but also as a result of the company's post-sale software changes. (*See* SOF ¶¶ 47-51 (detailing Volkswagen's defeat device modifications as part of the factual basis for the company's guilty plea); *Volkswagen AG*, No. 3:16-CV-00295, Dkt. No. 32-3, EPA Am. Civil Compl. ¶¶ 114-16, 195-97 (detailing

United States District Court
Northern District of California

1    Volkswagen's defeat device modifications as conduct that violated the Clean Air Act and EPA

2    regulations).) These criminal and civil actions have resulted in Volkswagen paying penalties and

3    remediation payments totaling $9.23 billion, which is in addition to a $10.033 billion funding pool

4    Volkswagen agreed to establish to buy back its 2.0-liter TDI vehicles and to pay the owners and

5    lessees of those vehicles restitution.

6      The model-wide nature of the post-sale software changes also distinguishes them from

7    the type of conduct that Congress intended for states and local governments to regulate. State and

8    local tampering laws are meant to be used as a tool by states and counties to regulate vehicles

9    within their borders. If a mechanic removes or alters a vehicle's emission control system during

10   routine maintenance, for example, states and counties are in the best position to penalize that

11   conduct. But when the tampering at issue involves thousands of vehicles, and the changes are

12   made through software updates instituted on a nationwide basis, EPA is in a better position to

13   regulate that conduct, as it can rely on the tools Congress has given it to police vehicle

14   manufacturers' compliance with emission standards before and after vehicles are put in use.

15      Due to technological advances, manufacturers today also have the ability to impact their

16   vehicles well after sale to end users. Vehicles are increasingly computerized, and similar to the

17   types of a remote updates that consumers may receive on their phones or computers,

18   manufacturers may be able to modify software installed in vehicles just as easily. This is not the

19   type of conduct that states and local governments are in the best position to regulate. Although it

20   may be characterized as conduct that takes place at least in part within their borders, it is conduct

21   on a much broader, national scale. And it is not conduct involving an individual consumer's

22   vehicle; rather, it involves entire vehicle lines, makes, and models. This is the type of conduct that

23   Congress intended EPA to regulate.

24      Not only is EPA better positioned than the Counties to regulate Volkswagen's post-sale

25   software changes, but if the Counties were permitted to regulate this conduct, the size of the

26   potential tampering penalties could significantly interfere with Congress' regulatory scheme.

27   "The obligation to pay compensation can be, indeed is designed to be, a potent method of

28   governing conduct and controlling policy." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 521

(1992) (quoting *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 247 (1959)). This is because "[e]ven if [a] regulated entity can comply with both state and federal sanctions, the mere fact of . . . inconsistent sanctions can undermine the federal choice of the degree of pressure to be employed, 'undermining the congressional calibration of force.'" *Compass Airlines LLC v. Mont. Dep't of Labor & Indus.*, No. CV 12-105-H-CCL, 2013 WL 4401045, at *13 (D. Mont. Aug. 12, 2013) (quoting *Crosby*, 530 U.S. at 379-80).

As relevant here, Congress has set specific penalties for vehicle tampering by manufacturers. *See* 42 U.S.C. § 7524(a) (up to $25,000 per violation by manufacturers and dealers, and up to $2,500 per violation by any other person). And Volkswagen's tampering has triggered those penalties. The Counties now seek to impose additional, significant sanctions for the same conduct, with a violation of either Hillsborough's or Salt Lake's tampering rule punishable by a civil penalty of up to $5,000 per offense per day of noncompliance. *See* Hillsborough EPC Enabling Act § 17(2); Utah Code Ann. § 19-1-303. With at least 1,118 affected vehicles allegedly registered in Hillsborough County, and at least 5,000 allegedly registered in Salt Lake County, and with the tampering at issue occurring in or around April 2013, and continuing for over a year until Volkswagen admitted to using a defeat device in the fall of 2015, the potential penalties could reach $30.6 million per day and $11.2 billion per year—and that is just for two counties. If other counties and states bring similar claims—and indeed some already have[5]—the potential penalties could dwarf those paid to EPA, which would seriously undermine the congressional calibration of force for tampering by vehicle manufacturers.[6]

Even if actual penalties are lower, if tampering claims like the Counties' are allowed to

---

[5] Counsel for Volkswagen has represented that 28 counties in Texas, and at least 8 states have asserted tampering claims against the company that are based on its post-sale software modifications. (*See* Dkt. No. 4715 at 7 (Feb. 1, 2018 Hr'g Tr.); Dkt. No. 4887 (Notice of Recent Decisions).) The Counties have not contested these representations.

[6] The penalties sought by the Counties would also be above and beyond the remediation that consumers in the Counties have already received by way of the consumer class action settlements, and beyond the payments that the Counties' home states—Florida and Utah—have or are expected to receive as beneficiaries to Volkswagen's emissions mitigation trust. As beneficiaries, Florida is expected to receive approximately $166 million, and Utah is expected to receive approximately $35 million. (Dkt. Nos. 2103-1 at 207; 3228-1 at 164.)

United States District Court
Northern District of California

proceed, vehicle manufacturers could be subjected to up to 50 state and approximately 3,000 county regulatory actions based on uniform conduct that happened nationwide. The substantial nature of the potential penalties for the Counties' tampering claims, and the significant regulatory burden that would ensue if manufacturers were subject to tampering claims throughout the United States, further demonstrates the conflict that the Counties' claims create with federal policy. *See Crosby*, 530 U.S. at 380 ("'Conflict is imminent' when 'two separate remedies are brought to bear on the same activity.'" (quoting *Wis. Dept. of Indus. v. Gould, Inc.*, 475 U.S. 282, 286 (1986))).[7]

The same analysis applies to Hillsborough's tampering claim against Bosch. Hillsborough alleges that Bosch assisted Volkswagen in developing the defeat device that was ultimately used in hundreds of thousands of vehicles in the United States, and in implementing the post-sale software changes to these vehicles. EPA, not the states and counties, is in the best position to regulate this conduct, as the conduct allegedly affected vehicles on a model-wide basis. And although EPA has not filed an enforcement action against Bosch, it has the authority to do so under federal tampering laws. *See* 42 U.S.C. § 7522(a)(3)(A) (reaching "any person" that removes or renders inoperative vehicle emission control devices). State and local tampering actions against Bosch also threaten to create the same regulatory nightmare that would occur if the actions are allowed to proceed against Volkswagen. In either instance, the claims could subject companies that are responsible for developing motor vehicles to enforcement actions throughout the country based on uniform conduct that happened nationwide.

---

[7] The Counties' tampering claims also threaten to interfere with the injunctive relief obtained by EPA. At the time of the consent decrees, EPA and Volkswagen acknowledged that there were "no practical engineering solutions that would, without negative impact to vehicle functions and unacceptable delay," bring the majority of the affected vehicles into compliance with existing emission standards. (Dkt. Nos. 2103-1 at 5 ¶ 2; 3228-1 at 5 ¶ 2.) Yet to "avoid undue waste and potential environmental harm that would be associated with removing" the affected vehicles from service, EPA agreed to allow Volkswagen to offer emissions modifications to the owners and lessees of the affected vehicles if the modifications "would substantially reduce NOx emissions." (Dkt. Nos. 2103-1 at 6 ¶ 4; 3228-1 at 7 ¶ 4.) This approach reflected the type of careful balancing that is required in responding to a nationwide environmental problem like the one at issue here. But the Counties may jeopardize this balance by asserting that vehicles with EPA-approved modifications continue to violate their tampering rules because the modifications do not bring the vehicles into compliance with the originally certified emission standards. This threat of inconsistent sanctions further demonstrates the conflict between the Counties' tampering claims and federal policy.

The Clean Air Act's savings clause, Section 209(d), does not alter any of the above analysis. That provision does not give states and local governments carte blanche to regulate any conduct that affects emissions from vehicles that are in use. Rather, the provision provides that "Nothing in this part shall preclude or deny to any State or political subdivision thereof the right *otherwise* to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles." 42 U.S.C. § 7543(d) (emphasis added). The use of the term "otherwise" indicates that state and local government regulation of in-use vehicles is subject to the limitations otherwise imposed by federal law. And those limitations include the division of authority between EPA and the states and local governments discussed above.

Bolstering this conclusion, the legislative history of Section 209(d) reveals that Congress' intent in enacting this saving clause was to ensure that states and local governments had authority to adopt transportation planning regulations, not to regulate vehicle manufacturers. In the Senate Report for the Air Quality Act of 1967, the Committee on Public Works noted the following with respect to Section 209(d):

> This language is of particular importance. While there has been a great deal of concern expressed regarding control of new vehicles little attention has been paid to control of used vehicles, either their emissions or their use. It may be that, in some areas, certain conditions at certain times will require control of movement of vehicles. Other areas may require alternative methods of transportation. Unfortunately some of these alternatives have been ignored and the onus of control has been placed solely on the automobile manufacturers.
>
> It is clear that, if a pollution-free (or at least minimized) rapid transit system reduced commuter traffic there would be a corresponding decrease in automobile-related air pollution. And any significant advance in control of used vehicles would result in a corresponding reduction in air pollution. These are areas in which the States and local government can be most effective.

S. Rep. No. 90-403, at 34 (1967).

Section 209(d), then, was viewed as providing states and local governments with the authority to "control [the] movement of vehicles" so that they could "reduce[] commuter traffic" and thereby "decrease . . . automobile-related air pollution." *Id.*; *see also EMA*, 88 F.3d at 1094

1    (recognizing that Section 209(d) "protect[s] the power of states to adopt . . . in-use regulations,"

2    such as "carpool lanes, restrictions on car use in downtown areas, and programs to control

3    extended idling of vehicles") (citation omitted).  These are not the types of measures that affect

4    vehicle manufacturers and parts suppliers.  To the contrary, the legislative history reveals that the

5    intent of Section 209(d) was to give states and local governments a tool to *lessen* the burden on

6    vehicle manufacturers—as manufacturers are ultimately the ones that must develop and implement

7    the technology capable of meeting federal vehicle emission standards.

8        Courts have "repeatedly 'declined to give broad effect to saving clauses where doing so

9    would upset the careful regulatory scheme established by federal law.'"  *Geier*, 529 U.S. at 870

10   (quoting *United States v. Locke*, 529 U.S. 89, 106-07 (2000)).  Interpreting Section 209(d) in the

11   manner suggested by the Counties would have just such a destabilizing effect.  When the Clean

12   Air Act is considered as a whole, it is clear that Congress intended for EPA to regulate vehicle

13   emission standards on a model-wide basis, while states and local governments would regulate

14   compliance with these standards at the individual vehicle level.  Section 209(d) does not modify

15   that framework.

16                                     * * *

17       The Counties' tampering claims, based on post-sale software changes to the affected

18   vehicles by Volkswagen and Bosch, are an attempt to enforce vehicle emission standards on a

19   model-wide basis.  Because Congress intended for only EPA to regulate such conduct, the Court

20   concludes that these claims stand as an obstacle to Congress' purpose and are preempted by the

21   Clean Air Act.

22                                       **V**

23       Salt Lake County's complaint includes three additional claims against Volkswagen.  These

24   claims are for common law fraud, violation of Utah's Pattern of Unlawful Activity Act, which is a

25   state RICO statute, and common law nuisance.  Volkswagen argues that each of these claims is

26   preempted by the Clean Air Act.  The Court agrees.

27       The decision in *In re Office of Attorney General of State of New York* ("*Detroit Diesel*"),

28   269 A.D.2d 1 (N.Y. App. Div. 2000), is instructive.  Similar to here, that case involved vehicle

manufacturers' use of a defeat device, and a state's attempt to bring common law claims against the manufacturers as a result. The dispute between the state and the manufacturers followed an EPA investigation, lawsuit, and settlement. *Id.* at 3-4. After the settlement was formalized in a series of consent decrees, the New York Attorney General subpoenaed the manufacturers— seeking testing data and other documents that the manufacturers had provided to EPA. *Id.* at 4. Although the Attorney General initially represented that he would use the requested material primarily to support New York's public comments on the consent decrees, he later noted that he sought to bring "State common-law actions for damages, such as fraud, breach of warranty, public nuisance and conspiracy to restrain trade," which he asserted were "not preempted by the Clean Air Act." *Id.* at 5.

The state trial court held that the common law claims were preempted, and the appellate court affirmed. *Id.* In the appellate decision, the court noted that common law claims "may be preempted if such claims would unavoidably result in serious interference with the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 10 (internal quotation marks omitted). The court then concluded that the Attorney General's common law claims would create just such interference, because the Attorney General was "seeking to use [state] common law to penalize the manufacturers for producing engines which failed to comply with the Federal standards promulgated pursuant to the [Clean Air Act]." *Id.* at 11. For example, the court reasoned that "the Attorney General's claim sounding in fraud has its genesis in the manufacturers' purported concealment or misrepresentation of their violations of the Federal emissions standards, and liability would necessarily be based on the scope of those standards." *Id.* at 11-12. Similarly, the court reasoned that the Attorney General's nuisance claim, which was "based upon the notion that the manufacturers' alleged circumvention of federal emission control requirements ha[d] resulted in 1.3 million[] . . . tons of excess NOx emissions annually," would require "a determination of whether the manufacturers complied with the Federal emissions standard." *Id.* at 12 (internal quotation marks omitted). If the Attorney General were allowed to bring these claims, the court reasoned, the Attorney General would be indirectly attempting to enforce the federal emission standards. The court concluded that such a result would lead to "the

25

United States District Court
Northern District of California

chaotic situation which Congress sought to avoid" under the Clean Air Act, as all 50 states could bring similar actions against vehicle manufacturers to indirectly enforce EPA's emission standards. *Id.* at 11.

The situation here is the same. Through its fraud, nuisance, and state RICO claims, Salt Lake County is attempting to penalize Volkswagen for its failure to comply with federal emission standards. Salt Lake's fraud claim, for instance, is based on the contention that Volkswagen misrepresented the amount of pollutants emitted by its vehicles, and concealed the use of a defeat device in its vehicles. (Salt Lake Compl. ¶¶ 58-65.) This is the same conduct underlying EPA's claims against Volkswagen for violations of the Clean Air Act. The same is true of Salt Lake's state RICO claim, which is based on a "pattern of unlawful activity" that includes alleged violations of Utah's tampering, fraud, deceptive business practices, and computer crime laws. (*See id.* ¶¶ 66-73.) Salt Lake does not offer any factual allegations to support this claim other than the allegations underlying Volkswagen's violations of the Clean Air Act. The state RICO claim accordingly "has its genesis in the manufacturers' . . . violations of the Federal emissions standards, and liability would necessarily be based on the scope of those standards." *Detroit Diesel*, 269 A.D.2d at 11-12. Finally, Salt Lake bases its nuisance claim on Volkswagen's "use of defeat devices on the vehicles [it] distributed and [its] modification of software on in-service vehicles," which the County alleges "created a public nuisance" that "rendered the air of Salt Lake County impure or unwholesome." (Compl. ¶ 75.) As the focus on Volkswagen's use of a defeat device demonstrates, this claim too is an attempt by the County to indirectly enforce EPA's emission standards.

With respect to the fraud claim, it is worth noting that the facts here are distinguishable from those in several cases in which courts have recently held that fraud claims based on a vehicle manufacturer's use of a defeat device are not preempted by the Clean Air Act. *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 17-MD-02777-EMC, 2018 WL 1335901, at *43-51 (N.D. Cal. Mar. 15, 2018); *In re Duramax Diesel Litig.*, No. 17-CV-11661, 2018 WL 949856 TLL, at *10-17 (E.D. Mich. Feb. 20, 2018); *Counts v. General Motors LLC*, 237 F. Supp. 3d 572, 588-92 (E.D. Mich. 2017); *In re Volkswagen "Clean Diesel" Litig.*

("*VW Va.*"), CL-2016-9917, 2016 WL 10880209, at *2-6 (Va. Cir. Ct. Aug. 30, 2016). In each of those cases, the fraud claims at issue were filed by consumers who allegedly purchased vehicles that contained a defeat device, and who alleged that they were deceived by the manufacturers' representations about the vehicles' emissions, or by the manufacturers' concealment of the emissions cheating software. Under those circumstances, the courts concluded that the consumers' fraud claims were not preempted by the Clean Air Act because the claims were not an attempt to enforce EPA's emission standards, but rather were an attempt to hold the manufacturers liable for their false promises and deceit. *See VW Va.*, 2016 WL 10880209, at *5 ("Plaintiffs' fraud and VCPA claims do not rely on emissions violations . . . . Instead, Plaintiffs' claims rely upon allegedly false promises of compliance, efficiency, and new technology; or concealment of the fact that compliance testing was being circumvented."); *Counts*, 237 F. Supp. 3d at 591 (reasoning that "the gravamen of Plaintiffs' claims . . . focus on the deceit about compliance, rather than the need to enforce compliance") (internal quotation marks omitted); *Chrysler*, 2018 WL 1335901, at *50 ("[T]he gravamen of Plaintiffs' complaint . . . is Defendants' deceit, not the violation *per se* of federal emissions standards."); *Duramax*, 2018 WL 949856, at *14 ("The gravamen of their state law claims is that they purchased a vehicle which polluted at levels far greater than a reasonable consumer would expect."). Unlike the consumers in the cases cited, Salt Lake has not alleged that it purchased a vehicle affected by Volkswagen's defeat device scheme. The County therefore cannot contend that it was deceived into purchasing one of the affected vehicles. The impact of a manufacturer's deceit of consumers on the preemption analysis is therefore not relevant here.

Like the Attorney General in *Detroit Diesel*, Salt Lake seeks to use its common law and state statutory claims to penalize Volkswagen for its model-wide noncompliance with EPA's emission standards. Because Congress intended for EPA to regulate such conduct, Salt Lake's claims would "unavoidably result in serious interference with the accomplishment and execution of the full purposes and objectives of Congress." *Detroit Diesel*, 269 A.D.2d at 10 (internal quotation marks omitted). Salt Lake's claims are therefore preempted.

## VI

Having concluded that the Counties' claims are preempted, the Court GRANTS Defendants' motions to dismiss the Counties' complaints. Finding that an amendment of the complaints would be futile, the Court dismisses the complaints with prejudice.

**IT IS SO ORDERED.**

Dated: April 16, 2018

_____
CHARLES R. BREYER
United States District Judge