Raymond P. Boucher (SBN 115363)
Maria L. Weitz (SBN 268100)
BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903
Tel:  (818) 240-5400
Fax:  (818) 340-5401
ray@boucher.la
weitz@boucher.la

[Additional Counsel on Following Page]

Attorneys for *Saavedra* Plaintiffs
and the proposed Class

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LIGITATION | Case No. 3:15-md-02672-CRB <br><br> CLASS ACTION <br><br> **PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT** |
| This Document Relates To: <br><br> *Saavedra, et al. v. Volkswagen Aktiengesellschaft, et al.,* <br>   Case No. 3:16-cv-07214-CRB <br><br> *Gaines v. Volkwagen Group of America, Inc.,* <br>   Case No. 3:17-cv-01114-CRB | 1) **Breach of Contract** <br><br> 2) **Negligent Interference with Prospective Economic Advantage** <br><br> 3) **Fraud** <br><br> 4) **Violation of Racketeer Influenced And Corrupt Organizations Act 18 U.S.C. § 1962(c)-(d) ("RICO")** <br><br><br> **DEMAND FOR JURY TRIAL** |

CONSOLIDATED CLASS ACTION COMPLAINT
*Saavedra, et al. v. Volkswagen Aktiengesellschaft, et al.,* Case No. 3:16-cv-07214-CRB
*Gaines v. Volkswagen Group of America, Inc.,* Case No. 3:17-cv-01114-CRB
Lead Case No. 3:15-md-02672-CRB

Todd M. Schneider (SBN 158253)
Carolyn Hunt Cottrell (SBN 166977)
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Tel: (415) 421-7100
Fax: (415) 421-7105
tschneider@schneiderwallace.com
ccottrell@schneiderwallace.com

Sahag Majarian II (SBN 146621)
LAW OFFICES OF SAHAG MAJARIAN II
18250 Ventura Blvd.
Tarzana, California 91356
Tel:  (818) 609-0807
Fax: (818) 609-0892
sahagii@aol.com

Attorneys for *Saavedra* Plaintiffs and the proposed Class

Marcus J. Bradley
Kiley L. Grombacher
BRADLEY/GROMBACHER, LLP
2815 Townsgate Road, Suite 130
Westlake Village, California 91361
Tel: (805) 212-5124
Fax: (805) 270-7589
mbradley@bradleygrombacher.com
kgrombacher@bradleygrombacher.com

Justin Sterling
THE STERLING FIRM
9031 Phyllis Avenue, Suite 1
West Hollywood, California 90069
Tel: (310) 498-2750
Fax: (310) 734-7102

Robert C. Hayden
Richard E. Williamson
EZER WILLIAMSON LAW, A PROFESSIONAL CORPORATION
21515 Hawthorne Boulevard, Suite 1150
Torrance, California 90503
rch@ezerwilliamsonlaw.com
rew@ezerwilliamsonlaw.com
Tel: (310) 277-7747
Fax: (310) 277-2576

Attorneys for *Gaines* Plaintiff and the proposed Class

1   Plaintiffs Robert Saavedra, Armando Rodriguez and Mickey Gaines (referred to as
2   "Plaintiffs"), by their attorneys individually, on behalf of themselves and on behalf of all others
3   similarly situated (the "VW Commissioned Vehicle Sales Representatives") bring this complaint
4   against Defendants collectively known as "Volkswagen":  Volkswagen Aktiengesellschaft ("VW
5   AG"), Volkswagen Group of America, Inc. ("VW America") (together, "VW"), Audi
6   Aktiengesellschaft ("Audi AG"), Dr. Ing. h.c. F. Porsche Aktiengesellschaft ("Porsche AG"), Martin
7   Winterkorn ("Winterkorn"), Matthias Müller ("Müller"), , and Rupert Stadler ("Stadler"); and (2) the
8   Defendants collectively known as "Bosch":  Robert Bosch GmbH, Robert Bosch LLC, and Volkmar
9   Denner for violations of deceptive acts and practices and common law claims.  Plaintiffs allege,
10  upon personal knowledge and belief as to their own acts, and upon information and belief (based
11  upon the investigation of counsel) as to all matters to which allegations Plaintiffs believe substantial
12  evidentiary support will exist after a reasonable opportunity for further investigation and discovery
13  on behalf of themselves and all others similarly situated as follows:

## INTRODUCTION

15  1.   Volkswagen flouted the laws of the United States,  pursuant to the publicly known
16  "Dieselgate scandal" which has proven to have a substantial impact on the Volkswagen brand value
17  and the sales of vehicles for which the individual vehicle sales representatives are commissioned.
18  Volkswagen engaged in the fraudulent and deliberate use of a "defeat device," a secret software
19  algorithm that was designed and installed to cheat emission tests.  The "defeat device" was designed
20  and installed in Volkswagen diesel automobiles to dupe the Environmental Protection Agency
21  ("EPA"), among other regulators, into approving the sale of non-compliant cars ("Defective
22  Vehicles").  To do this, the "defeat device" detects when diesel engines are being tested in laboratory
23  conditions and triggers functions that sacrifice performance in favor of limited emissions, bringing
24  total emissions in line with regulatory requirements.  In normal use, the automobile performs at a
25  higher level and emits pollutants in quantities well in excess of the legal limit.  As such, the
26  Defective Vehicles cannot be legally operated in the United States.

27

28

2. For years, Volkswagen's use of the "defeat device" went undetected. Defective Vehicles were sold into the stream of commerce. Indeed, Volkswagen advertised itself as an innovator in "clean" diesel technology.

3. Volkswagen's "defeat device" scheme ultimately backfired. In the fall of 2015, following pressure from regulators, Volkswagen admitted to the use and function of defeat devices. Volkswagen further admitted that millions of cars worldwide have defeat device software. Volkswagen's defeat device scheme ultimately led to a host of legal actions. For example, several Volkswagen entities entered into, and a Federal Court approved, a class action settlement agreement between, inter alia, several Volkswagen entities and a class of consumers. The class action settlement provides consumers with the opportunity to sell back or modify specified Volkswagen automobiles from model years spanning from 2009 to 2015.

4. By manufacturing and selling cars with defeat devices that allowed for higher levels of emissions than was certified to the Environmental Protection Agency ("EPA"), and higher levels than state and federal regulations allow, Volkswagen violated the Clean Air Act and state environmental regulations, defrauded the public, and engaged in unfair competition under state and federal laws.

5. This case arises because the Volkswagen emission fraud has also caused harm to the hard-working men and women who make their livelihood selling vehicles in the Volkswagen brand. Indeed, the resulting drop in the value of the vehicles affected by "Dieselgate" and the diminution of the Volkswagen brand more generally has caused direct and quantifiable harm to Plaintiffs and the Class. As a result of this scheme, consumers across the nation came to associate the Volkswagen brand with the Defective Vehicles and fraudulent conduct, and sales persons ("SPs") across the nation experienced a sudden drop in customer inquiries, potential sales, and, ultimately, personal income.

6. As a direct and foreseeable result of the unlawful Volkswagen emission fraud, the Volkswagen salespersons such as Plaintiffs have been harmed in their business in the form of

1  reduced sales, diminished inventories, lost commissions and being charged with the responsibility of

2  selling a product which essentially cannot be sold.

3       7.      On behalf of themselves and a Class of all SPs in all 50 states and the District of

4  Columbia, Plaintiffs hereby bring this action for violations of the federal Racketeer Influenced and

5  Corrupt Organizations Act (18 U.S.C. §§ 1961 et seq. ("RICO")) and for common law breach of

6  contract, fraud, and negligent interference with prospective economic advantage.  Plaintiffs seek to

7  recover monetary damages (including treble damages under RICO) for their lost compensation and

8  business caused by the defeat device fraud.

9                                  **PARTIES**

10      8.      Plaintiff Robert Saavedra ("Plaintiff Saavedra") is an individual over the age of

11 eighteen, and, at all times mentioned in this Complaint, was a resident of the County of Los Angeles,

12 State of California.  Plaintiff Saavedra has worked as a SP at car dealerships selling Volkswagen

13 automobiles since approximately 2010.  He has also been certified as a SP throughout that time

14 period.  As such, he receives incentive compensation from VW America for each Volkswagen

15 automobile he sells.  He also receives compensation from other sources tied to the number of

16 Volkswagen automobiles he sells.

17      9.      Plaintiff Armando Rodriguez ("Plaintiff Rodriguez") is an individual over the age of

18 eighteen, and, at all times relevant to this Complaint, was a resident of the County of Los Angeles,

19 State of California.  Plaintiff Rodriguez worked at car dealerships selling Volkswagen automobiles

20 between approximately June 2013 and July 2016.  Plaintiff Armando Rodriguez obtained his

21 certification as a SP in or around the beginning of 2014.  As such, he received compensation from

22 VW America for each Volkswagen automobile he sold as a SP.  He also received compensation

23 from other sources tied to the number of Volkswagen automobiles he sold.

24      10.     Plaintiff Mickey Gaines ("Plaintiff Gaines") is an individual over the age of eighteen,

25 and, at all times relevant to this Complaint, was a resident of the County of Los Angeles, State of

26 California.  Plaintiff Gaines is employed as a commissioned VW sales representative for Livingston

27 VW, Inc., located at 21141 Ventura Blvd, Woodland Hills, CA. 91364. Plaintiff has been employed

28

by Livingston VW, Inc., since in or about 2011.  He has also been certified as a SP throughout that time period.  As such, he receives incentive compensation from VW America for each Volkswagen automobile he sells.  He also receives compensation from other sources tied to the number of Volkswagen automobiles he sells.  During his employment, Plaintiff Gaines has cultivated a loyal customer base which has resulted in sales of vehicles to repeat customers.

11.     Defendant VW AG is a German corporation with its principal place of business in Wolfsburg, Germany.  VW AG is in the business of designing, developing, manufacturing, and selling automobiles.  On information and belief, VW AG is the parent company of VW America, Audi AG, and Porsche AG.  According to VW AG, it sold 10.14 million cars worldwide in 2014—including 6.12 million VW-branded cars, 1.74 million Audi-Branded cars, and 189,849 Porsche-branded cars.  Combined with other brands, VW AG boasts a 12.9% share of the worldwide passenger car market.  VW AG's sales revenue in 2014 totaled €202 billion (approximately $221 billion) and sales revenue in 2013 totaled €197 billion (approximately $215 billion).  At €12.7 billion (approximately $13.9 billion), VW AG generated its highest ever operating profit in fiscal year 2014, beating the previous record set in 2013 by €1.0 billion (approximately $1.1 billion).

12.     On information and belief, VW AG engineered, designed, manufactured, and installed the "defeat device" software in Defective Vehicles and exported these vehicles with the knowledge and understanding that they would be sold throughout the United States.  On information and belief, VW AG also developed, reviewed, and approved marketing and advertising campaigns designed to sell the Defective Vehicles.

13.     Volkswagen Group of America, Inc. ("VW America") is a corporation doing business including, the advertising, marketing and sale of Volkswagen automobiles, in all 50 states (including the District of Columbia) and is organized under the laws of the State of New Jersey, with its principal place of business located at 2200 Ferdinand Porsche Dr., Herndon, Virginia 20171.  VW America is a wholly-owned subsidiary of Volkswagen AG, and it engages in business, in all 50 states.  In 2014 alone, VW America sold 552,729 vehicles from its 1,018 dealer locations in all 50 states, including 95,240 TDI®"clean" diesel vehicles.  These vehicles were sold by commissioned

sales representatives.  On information and belief, VW America is a wholly-owned subsidiary of VW AG.

14.     Defendant Audi AG is a German corporation with its principal place of business in Ingolstadt, Germany.  On information and belief, Audi AG is the parent of Audi America, and a subsidiary of the Audi Group, which is a wholly-owned subsidiary of VW AG.  Audi AG designs, develops, manufactures, and sells luxury automobiles.  On information and belief, Audi AG engineered, designed, developed, manufactured, and installed defect device software in Defective Vehicles and exported those vehicles with the knowledge and understanding that they would be sold throughout the United States.  On information and belief, Audi AG also developed, reviewed, and approved the marketing and advertising campaigns designed to sell Defective Vehicles.

15.     Defendant Porsche AG is a German corporation with its principal place of business located in Stuttgart, Germany.  Porsche AG designs, develops, manufactures, and sells luxury automobiles.  On information and belief, Porsche AG is a wholly-owned subsidiary of VW AG.  On information and belief, Porsche AG installed "defeat device" software on Defective Vehicles, exported those vehicles with the knowledge and understanding that they would be sold throughout the United States.  On information and belief, Porsche AG also developed, reviewed, and approved the marketing and advertising campaigns designed to sell Defective Vehicles.

16.     Defendant Martin Winterkorn is a resident of Germany.  Winterkorn was CEO of VW AG until he resigned on September 23, 2015 in the wake of the diesel emissions scandal. Winterkorn profited from the illegal scheme and course of conduct based on the revenues and profits from the Defective Vehicles, and Volkswagen's increased market share.  On information and belief, Winterkorn approved, authorized, directed, ratified, and/or participated in the acts complained of herein.  Winterkorn is subject to the personal jurisdiction of this Court because he has availed himself of the laws of the United States through his management and control over VW America as well as the manufacture, distribution, testing, and sale of Defective Vehicles imported and sold across the United States.

17.     Defendant Matthias Müller is a resident of Germany.  Müller has held many different positions at Volkswagen.  In 2007, Winterkorn appointed Müller as Head of Product Management across all Volkswagen brands.  In 2010, Müller was appointed CO of Porsche AG.  Müller became CEO of VW AG following Winterkorn's resignation.  Müller profited from the illegal scheme and course of conduct based on the revenues and profits from the Defective Vehicles and Volkswagen's increased market share.  On information and belief, Müller approved, authorized, directed, ratified, and/or participated in the acts complained of herein.  Müller is subject to the personal jurisdiction of this Court because he has availed himself of the laws of the United States through his management and control of various Volkswagen entities, as well as the design, manufacture, distribution, testing, and/or sale of Defective Vehicles imported and sold across the United States.

18.     Defendant Rupert Stadler is a resident of Germany.  Stadler became CEO of Audi AG in or around January 2010.  Stadler held numerous other positions within Audi AG.  Stadler profited from the illegal scheme and course of conduct based on the revenues and profits from the sale of Defective Vehicles and Volkswagen's increased market share.  On information and belief, Stadler approved, authorized, directed, ratified, and/or participated in the acts complained of herein.  Stadler is subject to the personal jurisdiction of this Court because he has availed himself of the laws of the United States through his management and control over Audi America as well as the design, manufacture, distribution, testing, and/or sale of Defective Vehicles imported and sold across the United States.

19.     Defendant Robert Bosch GmbH is a German multinational engineering and electronics company headquartered in Gerlingen, Germany.  Robert Bosch GmbH is a parent company of Robert Bosch LLC.  On information and belief, Robert Bosch GmbH, directly and/or through its North-American subsidiary Robert Bosch LLC, at all material times, designed, manufactured, and supplied elements of the "defeat device" to Volkswagen for use in the Defective Vehicles.

20.     Defendant Robert Bosch LLC is a Delaware limited liability company with its principal place of business in Farmington Hills, Michigan.  Robert Bosch LLC is a wholly-owned

subsidiary of Robert Bosch GmbH.  On information and belief, Robert Bosch LLC, directly and/or in conjunction with its parent Robert Bosch GmbH, at all material times, designed, manufactured, and supplied elements of the "defeat device" to Volkswagen for use in the Defective Vehicles.

21.    Defendant Volkmar Denner is a resident of Germany.  Denner has been the CEO of Robert Bosch GmbH since approximately July 2012.  Denner has held numerous positions within the company since 1986.  Denner profited from the illegal scheme and course of conduct based on the revenues and profits from the sale of "defeat devices" to Volkswagen.  On information and belief, Denner approved, authorized, directed, ratified, and/or participated in the acts complained of herein.  Denner is subject to the personal jurisdiction of this Court because he has availed himself of the laws of the United States through his management and control over Robert Bosch LLC, as well as the design, manufacture, distribution, testing, and/or sale of elements of the "defeat devices" installed in Defective Vehicles.

22.    Defendants were and are at all times relevant to the allegations in this complaint working in concert under the common objective to engage in the emissions scheme described in this complaint.  Each of the Defendants were and are the agents of each other and have acted and act for their common goals and profit.  Therefore, all acts and knowledge ascribed to one of the Defendants are properly imputed to the other.

23.    Plaintiffs are informed and believe, and thereon allege, that Defendants, at all times herein mentioned, were the partners, joint venturers, subsidiaries, successors in interest, managing agent, merged entities, agents, alter egos, part of a jointly owned, managed, and/or operated business enterprise, and/or employees of each other Defendant and in doing the acts, omissions, and things alleged herein were acting as such and within the scope of their authority as such agents and employees and with the permission and consent of all other Defendants.  Plaintiffs are informed and believe, and thereon allege, that Defendants have, and at all times herein mentioned had, a joint economic and business interest, goal and purpose in the Duo matchmaking services that are the subject of this lawsuit.

## JURISDICTION

24.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 based upon Plaintiffs' federal RICO claims.  The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.  The Court also has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.  The Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965(b), (d) and Cal. Code Civ. P. § 410.10.

**VENUE**

25.     Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.  Volkswagen has marketed, advertised, sold, and leased Defective Vehicles, and Defendants otherwise conducted extensive business, in this District.  Moreover, multidistrict litigation involving the similar claims of consumers who purchased Defective Vehicles was venued in this District.

**INTRADISTRICT ASSIGNMENT**

26.     This action is properly assigned to the San Francisco Division of this District pursuant to N.D. Cal. L.R. 3-2 because a substantial part of the events or omissions giving rise to Plaintiffs' claims arose in the counties served by the San Francisco Division.  Volkswagen conducts substantial business in the counties served by this Division, has marketed, advertised, sold, and leased automobiles in those counties, and has caused harm to Class members residing in those counties.  Moreover, multidistrict litigation involving the similar claims of consumers who purchased Defective Vehicles was assigned to the San Francisco Division of this district.

**FACTUAL ALLEGATIONS**

**The "Clean Diesel" Emission Fraud Scandal**

27.     To sell automobiles in the United States, Volkswagen is required to comply with the emission standards and to obtain an EPA-administered Certificate of Conformity ("COC").  Volkswagen sought to compete in the evolving market for environmentally-friendly vehicles through

9

the use of turbocharged direct injection ("TDI") engines, which were purported to provide high performance while limiting harmful emissions.  Volkswagen's TDI diesel engines were anticipated to fuel Volkswagen's growth and success in the United States.

28.    Volkswagen's TDI diesel engines in many of Volkswagen's automobiles did not meet the required emission standards.  Rather than meet the standards, Defendants conspired to cheat the system by installing a "defeat device" in their diesel vehicles so that the vehicles could pass mandatory emission testing at lower performance levels while performing at a higher level in normal road use, albeit with unlawful emission levels.  Volkswagen's fraud began at least 2009, if not sooner, when Defective Vehicles first were released in the United States.

29.    The engines in Volkswagen's automobiles are integrated with sophisticated computer components to manage the vehicle's operation, such as an electronic diesel control ("EDC") system. In simplistic terms, the software detects when the vehicle is undergoing emissions testing and engages full emissions controls during the test.  But otherwise, at all other times that the vehicle is running, the emissions controls are suppressed.  Thus, the Defective Vehicles meet emissions standards in the laboratory or testing station, but during normal operation emit nitrogen oxides (NOx) at up to 40 times the standard allowed under federal and state laws and regulations.  It is a defeat device as defined by the Clean Air Act.

30.    Bosch tested, manufactured, and sold the EDC system used by Volkswagen in the Defective Vehicles.  Together, Bosch and Volkswagen developed and implemented the EDC system to automatically and surreptitiously detect emission testing, and then to downgrade the engine's power and performance while upgrading the performance of the emission control system to bring emissions under the legal limit. Under normal conditions, the EDC system allows emissions to exceed the legal limit, enabling increased performance.  Bosch was aware that Volkswagen was using its emission control components as a defeat device and worked with Volkswagen to develop the software algorithm specifically tailored for the Defective Vehicles.

31.    In this manner, Volkswagen fraudulently obtained COCs from the government regulators.  The Defective Vehicles were not legal for sale and did not meet mandatory emission

1    standards.  In affirmatively concealing this fact, Volkswagen lied to the government, its customers,

2    its SPs, and the public at large.

3    **<u>Volkswagen Aggressively Marketed the Defective Vehicles</u>**

4    32.    While Volkswagen's clean diesel wasn't the technological marvel it appeared to be,

5    the marketing campaign for it was a juggernaut, helping to move more than half a million diesel

6    vehicles over seven years with a combination of Super Bowl commercials, social-media messages

7    and print advertising costing tens of millions of dollars.

8    33.    Indeed, Volkswagen consistently disseminated misrepresentations about the Affected

9    Vehicles through various media platforms including the internet, radio, television and print

10   advertising which were intended to mislead regulators and the public about the fuel efficiency,

11   emissions standards, and other performance metrics of such vehicles.

12   34.    Starting in 2009, Volkswagen embarked on a massive North American campaign to

13   promote clean diesel. The "Truth & Dare" effort, as VW's VP of Marketing put it to AdWeek, was

14   about "debunking the myths on clean diesel and fueling the passion of existing diesel owners."

15   35.    The 2014 and 2015 ads featuring the "old wives" who gab on about diesel and Italian

16   deli meats were probably the most effective, in the sense that they are memorable. Most viewer can

17   recall, their famous linen scarf demonstration whereby the "old wives" put their white linens against

18   a Sportswagon's exhaust to prove its cleanliness.



CONSOLIDATED CLASS ACTION COMPLAINT

36.    Indeed, throughout the Dieselgate time period, Volkswagen ran ads touting the Affected Vehicles fuel efficiency and environmentally friendly attributes:





**Efficiency isn't just a word.** **It's our philosophy.**

Our commitment to making vehicles that are eco-conscious is part of bigger thinking. Because by building efficient vehicles that people actually want to drive, we're also building a better future for all of us. It's how we Think Blue®.

View key fuel efficiency info

37.     Volkswagen knew that consumers, regulators, Plaintiffs and the members of the Class, would reasonably rely on the material misrepresentations and omissions made by them about the Affected Vehicles. Indeed, as fully alleged herein, Plaintiffs and the members of the Class did, in fact rely upon such misrepresentations in staking their business and economic well-being to the success of Volkswagen.

38.     Ultimately, Volkswagen's success was in creating the niche Clean Diesel market and exploiting it. While hiding its wrongdoing from regulators, the public, and SPs alike, Volkswagen affirmatively represented in its branding and advertisements that it had developed "Clean Diesel" TDI technology. Volkswagen spent years touting the high performance and low emissions of its "Clean Diesel" vehicles.

39.     In response to Volkswagen's aggressive advertising of "Clean" diesel, consumers bought them in record numbers.  Volkswagen has sold more diesel cars in the United States than every other brand combined.  However, half a million cars running this emissions setup should never have left the factory.

**Exposure of the Fraud and Consumer Fall Out**

40.     The truth, as it so often does, ultimately became public.  In September 2015, Volkswagen admitted the true function of its defeat device to regulators.  That same month, the EPA determined that Volkswagen's conduct violated the Clean Air Act.  This revelation ballooned into a scandal, including a flood of consumer protection litigation.  For example, a settlement agreement

between several Volkswagen entities and consumers provides for consumers to sell automobiles from 2009 to 2015 back to those Volkswagen entities, or to have those automobiles retrofitted to come into compliance with the law.

41.     Volkswagen's monumental fraud in the certification of its so-called "Clean Diesel" automobiles in the U.S. and worldwide through the use of illegal "defeat devices" was certainly the most significant event in the automotive industry in the last decade, and one of the most significant environmental crimes in history.  As stated by Cynthia Giles, Assistant Administrator for the Office of Enforcement and Compliance Assurance at the EPA: "Using a defeat device in cars to evade clean air standards is illegal and a threat to public health." Volkswagen used the defeat device in its 2009-2015 Volkswagen, Audi, and Porsche Clean Diesel vehicles.  The defeat device at issue was supplied to Volkswagen by Defendant Robert Bosch GmbH ("Bosch"). Everything about Volkswagen's fraudulent scheme was coolly calculated, as Michael Horn, the newly departed CEO of VW America, confessed in the fall of 2015 at Congressional hearings: "[the defeat device] was installed for this purpose, yes."

42.     Since the confirmation of Volkswagen's scheme, the U.S. DOJ and at least 45 state attorneys general have announced they are investigating Volkswagen's misconduct. The Federal Trade Commission has separately sued Volkswagen for fraudulent advertising; and other criminal and civil investigations are underway across the globe.

43.     This case arises because the Volkswagen emissions fraud has also caused great harm to VW Commissioned Vehicle Sales Representatives, like Plaintiffs whose profits have been erased and whose commissions have plummeted in value due to the inability to sell tens of thousands of vehicles and the significant decline in brand value for all Volkswagen vehicles as a result of Volkswagen's purposeful fraud and deceit.

**The Effect of the Scandal on SPs**

44.     SPs, including Plaintiffs, were among the members of the public taken in by Volkswagen's global fraud.

45.     SPs obtain certification from Volkswagen to sell Volkswagen automobiles.   In exchange, SPs are paid incentive compensation for each Volkswagen automobile they sell.  SPs also receive compensation from other sources for selling Volkswagen automobiles, as Volkswagen is aware.

46.     SPs are paid on an essentially "commission only" pay plan. This means if they do not sell a car, they do not get paid more than a miniscule salary (i.e. $1,000 dollars per month). SPs commission are determined based upon a set formula.   Specifically, the majority of the compensation received by SPs derives from a percentage payment (ranging between 25% and 30% ) of the "front end" profits from the sale of the vehicles.  The "front end" is the difference between the dealer's invoice cost and the amount the customer actually paid for the vehicle.

47.     Where SPs sell a vehicle at or below the cost or invoice price, they are guaranteed a payment in an amount of or about $150.00.

48.     SPs are also compensated for bonuses based upon a non-discretionary bonus matrix. Under such matrix, SPs will receive a lump sum bonus payment if they are able to sell a target number of vehicles in a given month.  For example, if one of the Plaintiffs sells twelve (12) vehicles in a given month he is entitled to a lump sum payment of $500.00.  This payment is increased as the SPs hit higher target numbers.

49.     Additionally, programs such as the "Fast Start" program provide further opportunities for SPs to earn compensation.  Such programs are, again, tethered, directly to the Volkswagen's Commissioned Sales Representatives' volume of sales in a given time period.  For example, the "Fast Start" program provides a lump sum monetary payment to Volkswagen's Commissioned Sales Representatives who sell a given number of vehicles within the first fifteen (15) days of the month.

50.     Another component of the compensation provided to SPs comes directly from Volkswagen.  This includes payments for each sale made as well as VW Elite cash bonus incentives.

51.     By contractual agreement, these VW Elite cash bonus incentives are provided directly to the commissioned sales representatives by Volkswagen by electronic fund transfer onto Visa credit cards.

52.     These VW Elite cash bonus incentives are based on Customer Service Index or "CSI" performance.    CSI is a VW corporate monitored performance of behavior which measures the manner in which commissioned sales representative represent the product and, more broadly, the VW brand to the consumer.

53.     Plaintiffs obtained their certification to sell Volkswagen automobiles in or around 2010, 2014, and 2011 respectively.    Plaintiff Saavedra received incentive compensation from Volkswagen for the sales of Volkswagen automobiles he made throughout the time period from 2010 to the present.  Plaintiff Rodriguez received incentive compensation from Volkswagen for the sales of Volkswagen automobiles he made throughout the time period between early 2014 and July 2016.    Plaintiff Gaines received incentive compensation from Volkswagen for the sales of Volkswagen automobiles he made throughout the time period from 2011 to the present.

54.     Plaintiffs also received compensation from other sources tied to the number of Volkswagen automobiles they sold during the same, respective, periods.

55.     Once the "Dieselgate" scandal went public in 2015, the value of the Volkswagen brand was greatly diminished, sales of VW diesels were completely halted, and sales of all VW plummeted. In November of 2015, Forbes reported that Volkswagen's passenger brand witnessed a fall of 5.3% in vehicle deliveries worldwide in the month of October, bringing the year-to-date drop in sales to 4.7%.  This brand alone constitutes approximately 60% of the net volumes for the group, and thus the continual slowdown in sales for the namesake passenger brand is weighing on the group's overall performance.

56.     In July of 2016, Bloomberg reported that sales of Volkswagen vehicles tumbled 17% in May of that year. The Jetta line, the brand's best-selling models, fell 22% from a year earlier while the Passat dropped 14%.

57.     Indeed, Volkswagen AG admitted that its world-wide sales declined in 2015 for the first time since 2002. December sales dropped 5.2% to 834,800 vehicles, while full-year sales declined 2% to 9.9 million cars.

58. Given the compensation structure of SPs which was based in many ways upon sales volume, such losses directly resulted in decreased commissions for Plaintiffs and the Class.

59. By becoming SPs, individuals stake their livelihood and their reputation to Volkswagen.

60. Volkswagen's emission fraud resulted in thousands of defrauded and disgruntled customers. Such consumers felt betrayed, not only by Volkswagen at large but specifically by the man or woman from whom they directly interacted in the purchase of their vehicles. Volkswagen's SPs are the face of Volkswagen to the customers. The relationships which had been cemented through the hard work and fair dealings of the SPs were poisoned by the bad acts of Volkswagen such that loyal customers were driven away from the brand and transformed from referral sources to vocal detractors.

61. Volkswagen provided its SPs with no guidance regarding the "Dieselgate" scandal keeping them in the dark about all issues including potential repairs/fixes for the Affected Vehicles, loaner vehicles for customers with Affected Vehicles, the legality of driving the Affected Vehicles in the customers respective states, vehicle buy-back options or other potential remedies. For many months following the scandal Volkswagen provided customers affected by the scandal no satisfactory option for redress.

62. These irate customers, have little relationship with Volkswagen save through their interactions with employees at the dealership level-particularly the SPs. As such, Plaintiffs and the members of the Class found themselves on the receiving end of inquiries and complaints from irate customers. Unable to provide the much-needed information and guidance further eroded the goodwill and previously cultivated trustworthy reputations of the SPs.

63. Less vocal customers "voted-with-their-feet" as visits to the dealership sharply decreased, sales premiums and promotions vanished, and profits eroded.

64. SPs were unaware that Volkswagen was selling Defective Vehicles through an organized scheme intended to defraud the government regulators, consumers, SPs, and the public at

1    large.   SPs would not have become SPs, and would not have sold Volkswagen automobiles,

2    including Defective Vehicles, had they known of Volkswagen's unlawful scheme.

3         65.    Accordingly, SPs, who have bound their livelihood to the Volkswagen brand, have

4    seen a sharp decrease in their compensation, including in the incentive payments they receive from

5    Volkswagen and other compensation from other sources.   Plaintiffs, for their part, have seen a

6    substantial decrease in their sales and compensation in the time period since the fraud became

7    public.  These concrete and tangible economic losses are caused by Volkswagen's scheme to defraud

8    government regulators, SPs, and the public at large, in which Bosch was complicit.

9         **Tolling Of The Statute Of Limitations**

10        **Discovery Rule Tolling**

11        66.    Plaintiffs and SPs had no way of knowing about Volkswagen's deception with respect

12   to its Clean Diesel engine system and "defeat device."   It took federal EPA and California Air

13   Resources Board ("CARB") investigations to uncover Volkswagen's deception, which involved

14   sophisticated software manipulation on Defendants' part.  As reported by the Los Angeles Times on

15   September 18, 2015, it took CARB testing on a special dynamometer in a laboratory, open road

16   testing using portable equipment, and the use of special testing devised by the Board to uncover

17   Volkswagen's scheme and to detect how software on the engine's electronic control module was

18   deceiving emissions certifications tests.   Plainly, Volkswagen was intent on expressly hiding its

19   behavior from regulators, consumers, dealerships, SPs, and everybody including the general public.

20        67.    Within the time period of any applicable statutes of limitation, Plaintiffs and SPs

21   could not have discovered through the exercise of reasonable diligence that Volkswagen was

22   concealing the conduct complained of herein and misrepresenting the Company's true position with

23   respect to the emission qualities of its vehicles.

24        68.    Plaintiffs and the other SPs did not discover, and did not know of facts that would

25   have caused a reasonable person to suspect, that Volkswagen did not report information within its

26   knowledge to federal and state authorities, its dealerships, its commissioned sales representatives, or

27   consumers; nor would a reasonable and diligent investigation have disclosed that Volkswagen had

28

information in its possession about the existence of its sophisticated emissions scheme and that it opted to conceal that information, which was discovered by Plaintiffs only when an admission was made by Defendants.  Nor in any event would such an investigation on the part of Plaintiffs and other SPs have disclosed that Volkswagen valued profits over compliance with federal and state law, or the trust that Plaintiffs and other SPs had placed in its representations, or that, necessarily, Volkswagen actively discouraged its personnel from raising or disclosing issues with regard to the true quality and quantity of the emissions, and the emissions software, of its vehicles, or of Volkswagen's emissions scheme.

69.    For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to all vehicles identified herein.

**Fraudulent Concealment Tolling**

70.    All applicable statutes of limitation have also been tolled by Volkswagen's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

71.    Instead of disclosing its emissions scheme, or that the quality and quantity of emissions from the subject vehicles were far worse than represented, and of its disregard of federal and state law, Volkswagen falsely represented that its vehicles complied with federal and state emissions standards, and that it was a reputable manufacturer whose representations could be trusted.

**Estoppel**

72.    Volkswagen was under a continuous duty to disclose to Plaintiffs and SP's the true character, quality, and nature of emissions from the vehicles at issue, and of those vehicles' emissions systems, and of the compliance of those systems with applicable federal and state law.

73.    Volkswagen knowingly, affirmatively, and actively concealed the true nature, quality, and character of the emissions systems, and the emissions, of the vehicles at issue.

74.    Volkswagen was also under a continuous duty to disclose to Plaintiffs and SPs that it had engaged in the scheme complained of herein to evade federal and state emissions and clean air

standards, and that it systematically devalued compliance with, and deliberately flouted, federal and state laws regulating vehicle emissions and clean air.

75.     Based on the foregoing, Volkswagen is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

76.     Plaintiffs bring Causes of Action I-IV as a class action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure ("FRCP") 23.  The Class that Plaintiffs seek to represent is defined as follows:

> All individuals who were qualified to receive or received incentive compensation from any of Defendants for selling Volkswagen automobiles in the United States during the time period beginning when Defendants' defeat device scheme was revealed and extending through the present, excluding individuals who did not sell any Volkswagen automobiles for incentive compensation prior to October 1, 2015 (herein referred to as the "Class").

77.     This action has been brought and may properly be maintained as a class action under FRCP 23 because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

a.     **Numerosity**:  The potential members of the Class as defined are so numerous that joinder of all the members of the Class is impracticable.

b.     **Commonality**:  There are questions of law and fact common to Plaintiffs and the Class that predominate over any questions affecting only individual members of the Class.  These common questions of law and fact include, but are not limited to:

i.     Whether Defendants sold Defective Vehicles in the United States by using defeat devices to fool regulators by misrepresenting the amount of pollutants the Defective Vehicles emitted during normal use;

ii.     Whether Defendants designed, manufactured, advertised, marketed, distributed, leased, sold, or otherwise placed the Defective Vehicles into the stream of commerce in the United States;

iii.     Whether Defendants knew or should have known about the defeat device and the emission levels in the Defective Vehicles;

iv.     Whether Defendants entered into contracts with SPs to pay incentive compensation for the sale of Defendants' automobiles;

v.     Whether Defendants breached the covenant of good faith and fair dealing implied in their contracts with SPs by providing Defective Vehicles for sale;

vi.     Whether Defendants made material misrepresentations regarding the nature of the Defective Vehicles to SPs;

vii.     Whether Defendants omitted, actively concealed, and/or failed to disclose material facts about the Defective Vehicles to SPs;

viii.     Whether Defendants' concealment of the true nature of the Defective Vehicles would have induced a reasonable SP to act to their detriment by agreeing to sell Defective Vehicles;

ix.     Whether Defendants knew or should have known that SPs were in economic relationships with third parties that would have resulted in economic benefits to SPs tied to the sale of Volkswagen automobiles;

x.     Whether Defendants knew or should have known that the SPs' economic relationships with third parties would be disrupted if Defendants failed to act with reasonable care in complying with emissions regulations and common law and statutory laws protecting consumers;

xi.     Whether Defendants' wrongful conduct was a substantial factor in reduced sales of Volkswagen automobiles;

xii.     Whether reduced sales of Volkswagen automobiles caused SPs harm in their economic relations with third parties;

xiii.     Whether Defendants' conduct violated RICO and the other laws alleged herein; and

xiv.     Whether Plaintiffs and Class members are entitled to damages and other monetary relief and, if so, in what amount.

c.     **Typicality**:   Plaintiffs' claims are typical of the claims of the Class.

Defendant's common course of conduct in violation of law as alleged herein has caused Plaintiffs and proposed Class members to sustain the same or similar injuries and damages. Plaintiffs' claims are thereby representative of and co-extensive with the claims of the Class.

d.  **Adequacy of Representation**:  Plaintiffs are members of the Class, do not have any conflicts of interest with other proposed Class members, and will prosecute the case vigorously on behalf of the Class.  Counsel representing Plaintiffs is competent and experienced in litigating large employment class actions, including wage and hour class actions.  Plaintiffs will fairly and adequately represent and protect the interests of the Class members.

e.  **Superiority of Class Action**:  A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all proposed Class members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.  Each proposed Class member has been damaged and is entitled to recovery by reason of Defendants' illegal policies and/or practices.  Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system. The injury suffered by each Class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Defendants economically feasible.  Individualized litigation increases the delay and expense to all Parties and the Court.  By contrast, class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

78.  In the alternative, the Class may be certified because the prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class, and, in turn, would establish incompatible standards of conduct for Defendants.

/ / /

**FIRST CAUSE OF ACTION**

**BREACH OF CONTRACT**

**(On Behalf of the Class Against Defendants Volkswagen Group of America, Inc., and**

**Volkswagen AG)**

79.     Plaintiffs repeat and re-allege the contents of all preceding paragraphs as if fully set forth at length.

80.     SPs, including Plaintiffs, entered into contracts with VW America pursuant to which they were to complete various trainings to obtain a certification to sell Volkswagen automobiles.

81.     The contract entitled SPs, including Plaintiffs, to receive incentive compensation from VW America for each Volkswagen automobile he sold.  Plaintiff Saavedra entered his contract with VW America in or around 2010.  Plaintiff Rodriguez entered his contract with VW America in or around 2010. Plaintiff Gaines entered into his contract with VW America in or around 2011.

82. Moreover, VW America has entered into a contractual agreement with SPs including Plaintiffs whereby such individuals interface with customers as their agents and are subsequently compensated for such efforts based upon CSI scores.

83.     VW America was aware that SPs, including Plaintiffs, received other income for selling Volkswagen automobiles from other sources.

84.     Pursuant to such contract, VW America is compelled to perform its obligations in accordance with its terms, conditions and covenants, industry standards, and custom and practice.

85.     Plaintiffs and the SPs have performed all conditions, covenants and promises required of it to be performed in accordance with the terms and conditions of the Contract, except for those conditions, covenants and promises of which performance has been legally excused.

86.     Plaintiffs and the SPs are now and has been ready, willing and able to perform under the terms and conditions required of it in accordance with the Contract and has offered, and continues to offer, to perform them, except those that are excused by Defendants' breach of the Contract, or otherwise.

87.     VW America breached the Agreement by, *inter alia*, interfering with the ability of Plaintiffs and the Class to earn bonus and incentive payments.

88.     The covenant of good faith and fair dealing is implied in all contracts.  Here, the covenant of good faith and fair dealing precludes VW America from engaging in conduct (particularly, illegal conduct) that interferes with the rights of SPs, including Plaintiffs, to enjoy the fruits of the contract, i.e., the incentive payments and/or other bonus payments or commissions or otherwise that they earn for selling Volkswagen automobiles.

89.     VW America breached its implied promise of good faith and fair dealing by engaging in the conduct alleged herein, all of which unfairly interfered with the rights of SPs, including Plaintiffs, to receive the benefit of their contracts with VW America. VW America marketed and sold, through unwitting SPs, vehicles that did not comply with emission laws and regulations in the United States.  VW America then actively concealed its fraud from government regulators, consumers, and SPs alike. In so doing, VW America damaged its brand reputation and destroyed its goodwill among consumers, all of which hindered SPs', including Plaintiffs', ability to sell Volkswagen vehicles and earn the incentive payments promised under the contract.

90.     As a result of Volkswagen's conduct, SPs were duped into obtaining certification to sell Volkswagen's automobiles and selling cars that could not lawfully be sold or operated in the United States.  When it became known that Volkswagen, through its unwitting SPs, had been selling Defective Vehicles, Volkswagen sales plummeted and SPs were left to suffer the consequences.

91.     VW America was aware that its breach of contract would inhibit SPs, including Plaintiffs, from selling Volkswagen automobiles and receiving the promised incentive payments for those sales. VW America was also aware that SPs, including Plaintiffs, would lose compensation from other sources as a result of the breach.

92.     Because VW America breached the implied covenant of good faith and fair dealing in its contract to SPs by providing unmarketable vehicles for sale, SPs, including Plaintiffs, suffered concrete economic losses in the form of lost incentive payments.  SPs, including Plaintiffs, are

continuing to suffer consequential damages.  SPs, including Plaintiffs, have suffered damages in an amount to be proven at the time of trial.

## SECOND CAUSE OF ACTION

### Negligent Interference with Prospective Economic Advantage

### (On Behalf of the Class Against All Defendants)

93.     Plaintiffs re-allege and incorporate the foregoing paragraphs as though fully set forth herein.

94.     SPs, including Plaintiffs, were in economic relationships with third parties whereby they received compensation for selling Volkswagen automobiles separate and apart from the compensation they received from Defendants.

95.     To note, however, the existence of a legally binding agreement is not a *sine qua non* to the maintenance of a suit based on the inclusive wrong of interference with economic relationships.

96.     Defendants knew, or should have known, of this relationship.   Specifically, Defendants knew, or should have known, that the incentive payments from VW America were not the only compensation SPs, including Plaintiffs, received for selling Volkswagen automobiles.

97.     Defendants engaged in wrongful conduct by perpetrating a fraud against regulators, consumers, SPs, and the public at large by equipping Defective Vehicles with defeat devices intended to falsify emissions tests.

98.     Through engaging in this conduct, Defendants failed to exercise reasonable care.

99.     Defendants knew, or should have known, that this failure to exercise reasonable care would cause the sales of Volkswagen automobiles to plummet if, and when, the true facts became public.

100.     Furthermore, Defendants knew, or should have known, that a substantial decrease in Volkswagen sales would disrupt the economic relationships SPs, including Plaintiffs, have with third parties, causing SPs, including Plaintiffs, to suffer damages.

101.   Defendants wrongful conduct was a substantial factor in causing damages to SPs, including Plaintiffs, in the form of lost compensation flowing from decreased sales of Volkswagen automobiles.  SPs, including Plaintiffs, have suffered a substantial decrease in compensation from third parties since the fraud became public.  This loss is continuous and ongoing.  SPs, including Plaintiffs, have suffered damages in an amount to be proven at the time of trial.

## THIRD CAUSE OF ACTION

### FRAUD

**(On Behalf of the Class Against All Defendants)**

102.   Plaintiffs repeat and re-allege the contents of all preceding paragraphs as if fully set forth at length. Defendants have continuously engaged in numerous acts and omissions that constitute fraudulent concealment.

103.   Volkswagen intentionally concealed that the Clean Diesel engine systems were not EPA-compliant and used a "defeat device," or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their business decisions to sell VW vehicles and/or maintain their position as SPs.

104.   Volkswagen further affirmatively misrepresented to Plaintiffs and SPs in advertising and other forms of communication, including standard and uniform material, that the Defective Vehicles being sold by the SPs had no significant defects, complied with EPA regulations and would perform and operate properly when driven in normal usage.

105.   As has been admitted by Defendants, Volkswagen knew these representations were false when made.

106.   The Defective Vehicles sold by Plaintiffs and the SPs were, in fact, defective, non-EPA-compliant, unsafe, and unreliable because the Defective Vehicles contained faulty and defective Clean Diesel engine systems, as alleged herein.

107.   Volkswagen had a duty to be truthful and to disclose that these Defective Vehicles were defective, non-EPA compliant and unreliable in that certain crucial emissions functions of the Defective Vehicles would be rendered inoperative due to the "defeat device" installed in the

defective Clean Diesel engine system, because Plaintiffs and the SP's relied on Volkswagen's material representations that the Defective Vehicles they were selling for commission were environmentally clean, efficient and free from defects.

108.   The aforementioned concealment was material because if it had been disclosed, Plaintiffs and the other Class members would not have sold the VW vehicles and would not maintain positions as VW Commissioned Vehicle Sales Representatives.

109.   The aforementioned representations were material because they were facts that would typically be relied on by a person serving as a commissioned sales representative.   Volkswagen knew or recklessly disregarded that its representations were false because it knew that it had to use the "defeat device" in order for Defective Vehicles to pass EPA emissions requirements. Volkswagen intentionally made the false statements in order to sell Defective Vehicles through Plaintiffs and other SPs.

110.   Plaintiffs and the other SPs relied on Volkswagen's reputation – along with Volkswagen's failure to disclose the faulty and defective nature of the Clean Diesel engine system and Volkswagen's affirmative assurance that its Defective Vehicles were safe and reliable, and other similar false statements.

111.   As a result of their reliance, Plaintiffs and the other SPs have been injured in an amount to be proven at trial, including, but not limited to, their diminished sales commissions.

112.   Volkswagen's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the SPs. Plaintiffs and the other SPs are therefore entitled to an award of punitive damages.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**FOURTH CAUSE OF ACTION**

**Violation of 18 U.S.C. § 1962(c)-(d)**

**The Racketeer Influenced and Corrupt Organizations Act ("RICO")**

**(On Behalf of the Class Against VW AG, Audi AG, Porsche AG, Winterkorn, Müller,**

**Stadler, and Bosch)**

113.    Plaintiffs re-allege and incorporate the foregoing paragraphs as though fully set forth herein.

114.    Plaintiffs brings this cause of action on behalf of the Class against the following Defendants:   VW AG, Audi AG, Porsche AG, Winterkorn, Müller, Stadler, and Bosch ("RICO Defendants").

115.    Volkswagen conducts its business through various affiliates and subsidiaries, each of each is a separate legal entity.  Bosch also conducts its business through subsidiaries and affiliates. At all relevant times, the RICO Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

116.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).

117.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions.  See 18 U.S.C. § 1962(d).

118.    The RICO Defendants sought to increase their sales of Defective Vehicles in an effort to increase their profits and market share.  To do this, the RICO Defendants ultimately relied on an unlawful scheme devised by VW AG, Audi AG, and/or Porsche AG, implemented in the United States by VW America, Audi of America, LLC ("Audi America"), and/or Porsche Cars North America, Inc. ("Porsche America"), and executed with the complicity of Bosch.  The RICO Defendants, along with other entities and individuals, were employed by or associated with, and conducted or participated in the affairs of, one or several RICO enterprises whose purpose was to

deceive regulators, SPs, and the public into believing the Defective Vehicles were compliant with emission standards, "clean," and environmentally friendly so as to increase profits from the design, manufacture, distribution, and sale of the Defective Vehicles and the "defeat devices" installed therein.

119.   While perpetrating this unlawful scheme, Volkswagen certified SPs to sell Volkswagen automobiles.  SPs were not aware of the unlawful scheme undertaken by Volkswagen and the RICO Defendants.  Moreover, SPs were compensated for selling Volkswagen automobiles. Because Volkswagen engaged in unlawful practices, and because that scheme came to light, SPs suffered from a severe public backlash.  Volkswagen sales plummeted, resulting in a sharp decrease in the compensation SPs received, including in incentive compensation from Volkswagen and compensation from other sources.  The financial loss suffered by SPs, and the devaluation of the business of the SPs and their certifications from Volkswagen, as a result of the unlawful enterprise is concrete and measurable because the downturn in sales resulted in a decrease in this compensation.

**The RICO Enterprise**

120.   VW AG controls VW America, a United States subsidiary.  VW AG also controls Audi AG and Porsche AG, each of which formed separate United States subsidiaries – Audi America and Porsche America, respectively.  At all times, on information and belief, VW AG maintained control over the design, manufacture, and testing of the Defective Vehicles.

121.   The RICO Defendants, along with other individuals and entities, including unknown third parties involved in the design, manufacture, testing, and sale of the Defective Vehicles, operated an association-in-fact enterprise, which was formed for the purpose of fraudulently obtaining COCs from the EPA to import and sell Defective Vehicles containing "defeat devices" throughout the United States, and through which they conducted a pattern of racketeering activity under 18 U.S.C. § 1961(4).

122.   In the alternative, each of VW America, Audi America, and Porsche America constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the RICO Defendants conducted their pattern of racketeering activity in the United States

Specifically, on information and belief, VW America is the entity through which Volkswagen applied for, and obtained, the EPA COCs for the VW- and Audi-branded Defective Vehicles with material misrepresentations and omissions about their specifications in order to introduce them into the United States stream of commerce. Similarly, on information and belief, Porsche America is the entity through which Volkswagen applied for, and obtained, the EPA COCs for the Porsche-branded Defective Vehicles with material misrepresentations and omissions about their specifications in order to introduce them into the United States stream of commerce. And, on information and belief, VW AG, Audi AG, Porsche AG, and Individual Volkswagen Defendants (Winterkorn, Müller, and Stadler) used each of VW America, Audi America, and Porsche America to distribute and sell the illegal Defective Vehicles throughout the United States.  Finally, Bosch participated, either directly or indirectly, in the conduct of the enterprise's affairs by customizing and supplying components for the "defeat devices".  The separate legal statuses of VW America, Audi America, and Porsche America facilitated the fraudulent scheme and provided a hoped-for shield from liability for the RICO Defendants and their co-conspirators.

123.    At all relevant times, the enterprise described above constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in RICO Defendants' profit-making scheme.

124.    On information and belief, the association-in-fact enterprise consisted of:  (1)  the Volkswagen entity Defendants (VW AG, Audi AG, Porsche AG, VW America, Audi America, and Porsche America), each of which is a distinct legal entity but each of which is controlled (directly or indirectly) by VW AG; (2) the directors and officers of the Volkswagen entity defendants (including Defendants Winterkorn, Müller, and Stadler); and (3) Bosch, which worked with Volkswagen to develop and implement a specific and unique set of software algorithms to surreptitiously evade emissions regulations and knew or recklessly disregarded that the Defective Vehicles used Bosch's component part as "defeat devices" to evade federal and state vehicle emission standards.

/ / /

**The Enterprise Sought to Increase RICO Defendants' Profits and Revenues**

125.   The RICO enterprise began in or before 2009, with Volkswagen's decision to produce illegal Defective Vehicles for sale in the United States.   The "Defeat Device" RICO Enterprise continued without interruption until at least the fall of 2015, when United States regulators finally uncovered the fraudulent scheme.

126.   At all relevant times, the enterprise:  (1) had an existence separate and distinct from each RICO Defendant; (2) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; and (3) was an ongoing and continuing organization consisting of legal entities, including the Volkswagen entity Defendants, the individual Defendants, Bosch, and other entities and individuals associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Defective Vehicles to consumers through fraudulent COCs, false emissions tests, deceptive and misleading sales tactics and materials, and deriving profits and revenues from those activities. Each member of the enterprise shared in profits derived from increased sales revenue generated by the scheme.

127.   The enterprise functioned by selling Defective Vehicles to the consuming public. Many of the RICO Defendants' products are legitimate, including vehicles that do not contain "defeat devices". However, the RICO Defendants and their co-conspirators, through their illegal enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the RICO Defendants and the other entities and individuals associated-in-fact with the enterprise's activities through the illegal scheme to sell the Defective Vehicles.

128.   The enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement and sale or lease of the Defective Vehicles throughout the country, and the receipt of monies from the sale of the same.

129.   On information and belief, within the enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. On information and belief,

the enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Defective Vehicles to the general public nationwide.

130. Each participant in the enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the enterprise, the RICO Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

131. The RICO Defendants participated in the operation and management of the enterprise by directing its affairs, as described herein. While the RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

132. Volkswagen exerted substantial control over the enterprise, and participated in the affairs of the enterprise by: (1) designing Defective Vehicles with "defeat devices"; (2) manufacturing, distributing, and selling Defective Vehicles that emitted pollutants at unlawful levels; (3) introducing Defective Vehicles into the stream of United States commerce without valid EPA COCs; (4) concealing the existence of "defeat devices" and the unlawfully high emissions from regulators, SPs, and the public; (5) designing and distributing marketing materials that misrepresented and concealed the defects in the Defective Vehicles; and (6) ensuring that other RICO Defendants complied with the fraudulent scheme.

133. Bosch participated in, operated, and/or directed the enterprise. Bosch manufactured, installed, tested, modified, and supplied the EDC system to include a "defeat device" in Defective Vehicles. Furthermore, Bosch participated by concealing the truth about the Defective Vehicles and collecting revenues and profits from the same.

134. Without the RICO Defendants' willing participation, including Bosch's provision of the component parts for the "defeat devices" contained in the Defective Vehicles, the enterprise's scheme and common course of conduct would not have been successful.

135.    The RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the Defendants' and others' hands.

**Predicate Acts – Wire Fraud**

136.    To carry out, or attempt to carry out the scheme, the RICO Defendants, each of whom is a person associated-in-fact with the enterprise, did knowingly conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and which employed the use of the wire facilities, in violation of 18 U.S.C. § 1343 (wire fraud).

137.    Specifically, the RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. § 1343), within the past ten years. The multiple acts of racketeering activity which the RICO Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

138.    The RICO Defendants used, directed the use of, and/or caused to be used, numerous interstate wire communications, including television and radio communications, in service of their scheme through virtually uniform misrepresentations, concealments and material omissions.

139.    In devising and executing the illegal scheme, the RICO Defendants devised and intentionally carried out a scheme and/or artifice to defraud consumers or to obtain money from consumers by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the illegal scheme, the RICO Defendants committed these racketeering acts intentionally and knowingly with the specific intent to advance the illegal scheme.

140.    The RICO Defendants' predicate acts of racketeering (18 U.S.C. §1961(1)) include, but are not limited to wire fraud: The RICO Defendants violated 18 U.S.C. §1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials, including

advertisements, by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

141.    On information and belief, the RICO Defendants' use of the wires include, but is not limited to, the transmission of the following by the RICO Defendants or third parties that were foreseeably caused to be sent as a result of RICO Defendants' illegal scheme: (1) fraudulent applications for EPA COCs; (2) fraudulently obtained EPA COCs; (3) sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, that misrepresented and concealed the true nature of the Defective Vehicles; and (4) other documents and things, including electronic communications.

142.    The RICO Defendants also used television, the internet, and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities. Specifically, Volkswagen made misrepresentations about the Defective Vehicles on their websites, YouTube, and through advertisements made on various platforms, including on the internet and on television, all of which were intended to mislead regulators and the public about the fuel efficiency, emissions standards, and other performance metrics. For example: (1) Volkswagen caused a commercial to be aired during the Super Bowl, and thereafter over the internet, on February 7, 2010 touting the "Audi A3 TDI clean diesel" as the "Green Car of the Year"; and (2) Volkswagen caused a commercial to be aired via television and/or the internet in or around early 2015 advertising the Volkswagen Golf TDI clean diesel to disprove the "old wives tale" that "diesel is dirty" by holding a white scarf to the exhaust pipe. On information and belief, Volkswagen made comprehensive further misrepresentations in other wire advertising, including television and internet advertising, and in wire communications, including applications for COCs from regulators.

143.    The wire transmissions described herein were made in furtherance of the RICO Defendants' scheme and common course of conduct to deceive regulators, SPs, and consumers alike to further the sales of Defective Vehicles, which the RICO Defendants knew, or recklessly disregarded, were emitting illegal amounts of pollution.

144.     Many of the precise dates of the fraudulent uses of the interstate wire facilities cannot be alleged without access to the RICO Defendants' books and records. However, Plaintiffs has described the types of, and in some instances, occasions on which the predicate acts of wire fraud occurred. On information and belief, they include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

145.     The RICO Defendants have undertaken the practices described herein as part of a common scheme and conspiracy in violation of 18 U.S.C. § 1962(d).  On information and belief, various other persons, firms and corporations, including third-party entities and individuals not named as Defendants in this Complaint, have participated as co-conspirators with the RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

146.     The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. § 1343 offenses.

147.     On information and belief, the RICO Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling the Defective Vehicles (and the "defeat devices" contained therein).

148.     For the conspiracy to succeed, each of the RICO Defendants and their coconspirators had to agree to implement and use the similar devices and fraudulent tactics against their intended targets.

149.     The RICO Defendants knew and intended that government regulators, consumers, and Plaintiffs and Class members, would rely on the material misrepresentations and omissions made by them about the Defective Vehicles.  As fully alleged herein, Plaintiffs relied upon RICO Defendants' representations and omissions that were made or caused by them in staking his business and economic well-being to the success of the RICO Defendants. In addition, the EPA and other

regulators relied on the misrepresentations and material omissions made or caused to be made by the RICO Defendants; otherwise Volkswagen could not have obtained valid COCs to sell the Defective Vehicles.

150.    As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years.   The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

151.    The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants.   On information and belief, the RICO Defendants shared technical, marketing, and financial information that revealed the existence of the "defeat devices" contained in the Defective Vehicles during the design, manufacture, testing, marketing and sale of those vehicles. Nevertheless, the RICO Defendants shared and disseminated information that deliberately misrepresented the Defective Vehicles as legal, "clean," environmentally friendly, and fuel efficient.

**Injury**

152.    By reason of, and as a result of the conduct of the RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiffs and Class members have been injured in their business and/or property in multiple ways.  This includes, without limitation, lost compensation (including commissions and guaranteed incentive payments) due to the decreased sales of Volkswagen automobiles since the fall of 2015.  The financial loss suffered by SPs as a result of the unlawful enterprise, and the devaluation of the business of the SPs, is concrete and measurable because the downturn in sales resulted in a decrease in incentive payments and other compensation tied to the sale of Volkswagen automobiles.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.    Compensatory damages and treble damages under in amounts to be proven at trial;

2.    For general and special damages;

3.    For all costs of suit;

4.      An award of costs and attorneys' fees, as allowed by law;

5.      Any and all applicable statutory and civil penalties;

6.      For pre- and post-judgment interest, as allowed by law; and

7.      For such other and further relief as this Court deems just and proper.

Respectfully submitted,

Date: May 22, 2018

/s/ *Carolyn Hunt Cottrell*
Carolyn Hunt Cottrell

Todd M. Schneider
Carolyn Hunt Cottrell
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP

Attorneys for *Saavedra* Plaintiffs and the proposed Class

Date: May 22, 2018

/s/ *Raymond P. Boucher*
Raymond P. Boucher

Raymond P. Boucher
Maria L. Weitz
BOUCHER LLP

Attorneys for *Saavedra* Plaintiffs and the proposed Class

Date: May 22, 2018

/s/ *Kiley Lynn Grombacher*
Kiley Lynn Grombacher

Marcus J. Bradley
Kiley L. Grombacher
BRADLEY/GROMBACHER, LLP

Attorneys for *Gaines* Plaintiff and the proposed Class

CONSOLIDATED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SIGNATORY ATTESTATION**

The e-filing attorney hereby attests that concurrence in the content of the foregoing document and authorization to file the foregoing document has been obtained from the other signatories indicated by a conformed signature (/s/) within the foregoing e-filed document.

Date: May 22, 2018

*/s/ Kiley Lynn Grombacher*
Kiley Lynn Grombacher

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States District Court, Northern District of California, in *In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation* (Case No. 3:15-md-02672-CRB) by using the Court's CM/ECF system on May 22, 2018. Service will be accomplished by the Court's CM/ECF system.

Date: May 22, 2018

*/s/ Kiley Lynn Grombacher*
Kiley Lynn Grombacher

CONSOLIDATED CLASS ACTION COMPLAINT