David A. McDonald (*Pro Hac Vice*)
KILBORN, ROEBUCK AND MCDONALD
P. O. Box 832
Mobile, Alabama 36601
Telephone: (251) 434-0045
Facsimile: (251) 434-0047
dam@krmlaw.com

*Counsel for Plaintiffs Joshua Gunther,*
*Ashley Gunther, Team Gunther Inc.,*
*Gunther Family Holdings, LLC*

## IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No.: 3:15-md-02672-CRB |
| | Hon. Charles R. Breyer |
| | **FIRST AMENDED COMPLAINT** |
| This document relates to: | JURY TRIAL DEMANDED |
| Gunther et al. v. Volkswagen Group of America, Inc. et al. | |
| Case No. 3:17-cv-05764-CRB | |

### FIRST AMENDED COMPLAINT

Joshua Gunther, Ashley Gunther, Team Gunther Inc., and Gunther Family Holdings, LLC state and allege the following in support of their claims for relief against Volkswagen Group of America, Volkswagen Aktiengesellschaft, and VW Credit, Inc.:

### PARTIES

1.      Plaintiff JOSHUA GUNTHER is an individual resident citizen of Baldwin County, Alabama and is over 19 years old.

1

2. Plaintiff ASHLEY GUNTHER is an individual resident citizen of Baldwin County, Alabama and is over 19 years old.

3. JOSHUA AND ASHLEY GUNTHER ("The Gunthers"), individually and as the sole owners and members of the following entities have been defrauded and otherwise damaged by the defendants' wrongful conduct.

4. Joshua Gunther is the president of plaintiff TEAM GUNTHER INC. ("Team Gunther"), an Alabama corporation with its headquarters in Baldwin County, Alabama. Team Gunther Inc. is the entity that holds the franchise agreement to operate a VW dealership in Daphne, Alabama.

5. Joshua and Ashley Gunther are the sole members of GUNTHER FAMILY HOLDINGS, LLC ("Gunther Family"), an Alabama company with its headquarters in Baldwin County, Alabama. Gunther Family Holdings, LLC owns the property and building that plaintiffs purchased and constructed in reliance upon the defendants' false representations.

6. Defendant VOLKSWAGEN GROUP OF AMERICA ("VWGoA") is a New Jersey corporation doing business in Alabama with its headquarters in Virginia. VWGoA is a wholly owned subsidiary of Volkswagen Aktiengesellschaft and engages in business, including the advertising, marketing, and sale of Volkswagen automobiles, in all 50 states, including Alabama.

7. Defendant VOLKSWAGEN AKTIENGESELLSCHAFT ("VWAG") is a German corporation with its headquarters in Wolfsburg, Germany. VWAG is one of the largest automobile manufacturers in the world, and is in the business of designing, developing, manufacturing, and selling automobiles. VWAG engineered, designed, developed, manufactured, and installed the defeat device software on the "clean diesel" vehicles with knowledge that they would be sold or

were intended to be sold throughout the United States at franchise dealerships, including Team Gunther.

8.      VWAG negotiated and communicated with the plaintiffs in Alabama and in Germany on several occasions leading up to and including the opening of the Team Gunther dealership.

9.      VWAG also developed, reviewed, and approved the marketing and advertising campaigns designed to drive sales of the "clean diesel" vehicles.  These advertising materials were directed and distributed throughout the state of Alabama.

10.     VW Credit, Inc. ("VCI") is a wholly owned subsidiary of Volkswagen Group of America, Inc.  As a captive finance company, VCI is intimately involved with U.S. retail customers and dealers. VCI is headquartered at VWGoA in Virginia. VCI has engaged in systematic unfair and illegal practices and has fraudulently misrepresented information regarding the value, viability, expected return, and suitability of investing in a VW dealership. VCI dealt directly with the plaintiffs in Alabama on several occasions leading up to and including the opening of the Team Gunther dealership.

11.     Although each of the three Volkswagen defendants is a distinct legal entity, VWGoA and VCI are both wholly-owned and controlled by VWAG. VWGoA, VWAG, and VCI were and are at all times relevant to the allegations in this Complaint working in concert under the common objective to engage in the emissions scam described in this Complaint.

12.     VWGoA, VWAG, and VCI were and are the agents of each other and have acted and act for their common goals and profit.  Therefore, all acts and knowledge ascribed to one of VWGoA, VWAG, or VCI are properly imputed to the others.  VWGoA, VWAG, and VCI are collectively referred to as "VW."

## JURISDICTION AND VENUE

13.     The Court has temporary jurisdiction and venue over this action pursuant to a Transfer Order issued on October 4, 2017 by the United States Judicial Panel on Multidistrict Litigation. (MDL No. 2672, Doc. 4019).  This Order, pursuant to 28 U.S.C. § 1407, temporarily transferred for certain pretrial purposes this action from the United States District Court for the Southern District of Alabama to the United States District Court for the Northern District of California, assigned to the Honorable Charles R. Breyer.

14.     The United States District Court for the Southern District of Alabama has diversity jurisdiction in this action pursuant to 28 U.S.C. § 1332 because the plaintiffs and defendants reside in different states and the amount-in-controversy exceeds $75,000.

15.     The United States District Court for the Southern District of Alabama has personal jurisdiction over each defendant because each defendant had sufficient minimum contacts with the United States and Alabama, and intentionally availed themselves of the laws of Alabama by conducting a substantial amount of business in and through Alabama, including but not limited to the marketing, promotion, design, manufacture, distribution, testing, sale, lease, and/or warranty of VW vehicles in Alabama.

16.     Each defendant separately and collectively negotiated a business relationship or contract with the plaintiffs which anticipated and resulted in an ongoing business enterprise in Alabama.  For these reasons, this action was properly filed in Alabama in accordance with Ala. R. Civ. P. 4.2, Alabama's equivalent to a long-arm statute.

17.     The United States District Court for the Southern District of Alabama also has personal jurisdiction over all defendants because many of the false representations and material suppressions were made by the defendants while with the plaintiffs in Alabama.  Moreover,

defendants purposefully directed false advertisements and misrepresentations to consumers and dealers in Alabama, defendants purposefully injected the "clean diesel" vehicles into the stream of commerce in Alabama, defendants knew or should have known that injuries from their tortious conduct would occur in Alabama, and the injuries alleged in this Complaint arise from defendants' tortious conduct directed at Alabama.

18.    Venue is proper in the United States District Court for the Southern District of Alabama pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in the district. Venue is further proper pursuant to 18 U.S.C. § 1965(a). VWGoA and VCI were properly and timely served with plaintiffs' original Complaint. VWGoA's registered agent purported to reject service for VWAG, however, plaintiff contends that the registered agent's purported rejection constitutes proof of delivery and, therefore, proof of service on VWAG. Without waiving any arguments on this point, plaintiffs will effect service on VWAG of this First Amended Complaint.

## FACTS

19.    This case arises from VW's misrepresentations and omissions in fraudulently inducing plaintiffs into a business relationship (and ultimately a Dealer Agreement), requiring plaintiffs to acquire land and construct expensive sales and service facilities, inducing plaintiffs to take out a substantial loan for said acquisition and construction, making misrepresentations and omissions to plaintiffs regarding sales and service forecasts, and the commission of fraud on plaintiffs regarding so-called "clean diesel" vehicles.

20.    Plaintiff Joshua Gunther grew up in the car dealer business and has worked at a car dealership nearly all of his life. Mr. Gunther's grandfather, father, and uncles have owned and operated car dealerships in south Florida for roughly fifty years.

21.     In 2008, Mr. Gunther's grandfather owned a minority interest in East Bay Kia, Inc., a small dealership in Daphne, Alabama.

22.     East Bay Kia, Inc. was so poorly managed and suffering such severe financial losses that the Gunther family asked Joshua and his wife Ashley to move from south Florida to Alabama to oversee the winding down of the dealership.

23.     The Gunthers, young and eager to prove themselves capable of operating a car dealership on their own (even if only to stem the losses until it could be closed), agreed to move to Alabama.

24.     When the Gunthers arrived in Alabama, they exceeded all expectations.  The Gunthers were so effective in managing East Bay Kia that, rather than winding the dealership down, they turned the business around and purchased it to operate and grow themselves.

25.     By 2011, the Gunthers had renamed their dealership Team Gunther Kia, Inc., and had moved to a larger, more visible location.

26.     Within three years of relocating to Daphne, Alabama, the Gunthers were active in the community and had developed near instant name recognition for their "Team Gunther" brand.

27.     By 2012, the Gunthers were ready to expand again.  In fact, Team Gunther was consistently exceeding Kia's sales objectives by 130%, 140%, and even 160%.

28.     In late 2011 or early 2012, Joshua Gunther began discussing with Bob Kim, VWGoA's General Manager of Network Operations for the Southeast, the possibility of becoming a VW dealer in south Alabama.

29.     The Gunthers expressed to Mr. Kim (and others such as Don Hughes and Randy Pressgrove) that, in keeping with the Gunther family history, they had a strong desire to own and

operate a VW dealership. The Gunthers expressed that they were especially excited about VW's plans to expand diesel sales in the USA and VW's plans to expand its line of diesel vehicles.

30.     After Don Hughes, VWGoA's Southeast Regional Director toured the Team Gunther Kia dealership, spent time with the Gunthers, and saw firsthand the potential for VW sales on the gulf coast, Hughes was so impressed that he directed Joshua Gunther to attempt to purchase the existing VW dealership in Mobile, Alabama.

31.     Mr. Hughes assured Mr. Gunther that VWGoA would assist with or participate in the Gunthers' purchase of the Mobile, Alabama VW dealership.

32.     When the existing VW dealer in Mobile refused to sell to the Gunthers, VWGoA, with VWAG's knowledge and approval, concluded that an additional point in Daphne, Alabama was warranted.

33.     VWGoA, through Kim, Hughes, Pressgrove and others told the Gunthers that they could become a new VW dealer in Daphne, Alabama if the Gunthers agreed to build a state of the art facility on property approved by VWGoA.

34.     As an add point, the Gunthers would not have an established VW sales and service customer base. Instead, the Gunthers would need to build a market through VW's reputation, competitive advertising, sales offers, and customer service in order to supply future service and sales revenue.

35.     This made the Gunthers' anticipated VW dealership particularly vulnerable to fluctuations in VW's market share and brand perception because success of the new dealership depended significantly on the strength of the VW brand to attract new customers.

36.     In 2012-2013, when the Gunthers were contemplating becoming a VW dealer, VW had strengthened its brand image, in large part through the promotion of TDI diesel vehicles.

37.     By 2013, VWGoA announced that it had sold over 100,000 TDI vehicles in that year alone, comprising 24 percent of new VW sales.

38.     VWGoA made the same or similar statement to the Gunthers during several meetings and discussions.  On every such occasion VWGoA referenced the nearly untapped market along the gulf coast in which to promote VW's much lauded diesel line of vehicles.

39.     VWGoA and VWAG encouraged the Gunthers to distinguish their VW dealership from the dozens of other car dealers in the Mobile, Daphne and Pensacola area by emphasizing the fuel economy that VW's diesels offered without sacrificing style or performance.

40.     The Gunthers saw tremendous opportunity to sell VW's fuel-efficient TDI vehicles, along the gulf coast because of rising gas prices and because consumers along the gulf coast are much more inclined to purchase diesel vehicles than are customers in other parts of the country.

41.     VWGoA (with VWAG's knowledge and approval) executives made frequent trips to Gunthers' Kia dealership in Daphne, Alabama. The parties also communicated frequently by telephone and email.  During these exchanges, the parties discussed business philosophies, market strategies, and the utmost importance of integrity.

42.     VWGoA and VWAG impressed upon the Gunthers the unique relationship that VW had with its customers and the exceptional level of brand loyalty that VW enjoyed with its customers.

43.     Randy Pressgrove, VWGoA's general manager for network development in the southeast, set as his email closing, VW's popular motto: "we vow to strengthen customer relationships with each and every contact and to make owning a VW something to smile about."

44.     Between 2012 – 2014, VW spent a substantial amount of time grooming the Gunthers to open their own VW dealership.  VW hosted Joshua Gunther on a tour of the VWAG

factory and facility in Wolfsburg, Germany. While in Germany, Joshua Gunther met with various VWAG representatives who echoed and reinforced the representations made by VWGoA, particularly VW's plans to emphasize and expand its stable of diesel vehicles.

45.     Mr. Gunther left his meeting in Wolfsburg, Germany convinced more than ever that a VW dealership was the right fit for the Gunthers on the gulf coast because of VW's dominance of the diesel market.

46.     Further, the Gunthers completely bought into VW's emphasis on developing long term customer relationships based on integrity and trust.

47.     Between 2013 and 2015, the plaintiffs exchanged dozens of proformas or sales and profit forecasts with VWGoA executives such as Hughes, Pressgrove, and Paul Hargrave-Thomas. These proformas and sales forecasts were based on information provided by VWGoA and VWAG.

48.     Every sales and profit forecast, whether prepared by the Gunthers or VWGoA, included the expectation that TDI diesel cars would account for 25-30% of the plaintiffs' new car sales.

49.     The plaintiffs relied on VWGoA and VWAG's repeated representations that plaintiffs could reasonably expect for the sale of diesel vehicles to constitute at least 25-30% of their vehicle sales, especially since VW was preparing to market and promote new diesel models, including a diesel SUV.

50.     On March 6, 2013, VWGoA issued a Letter of Intent ("LOI") to enter into a VW Dealer Agreement with an entity to be formed by the Gunthers provided certain conditions and requirements were met, including: (1) secure specific property in Daphne, Alabama to serve as the location for the new dealership; (2) obtain sufficient capitalization for VW dealership operations; (3) construct a brand new dealership facility at the approved location that fully complied with VW

corporate brand imagining requirements; and (4) secure adequate floorplan financing to meet VW's criteria.

51.     VWGoA knew (because it was discussed between the parties) that to acquire the property and build the facility that VW wanted, the Gunthers would have to leverage everything, including their existing Kia dealership (which the Gunthers would also have to move in order to meet VWGoA's demand).

52.     VWGoA later provided the Gunthers with "Volkswagen Facility Minimum Requirements" which specified the size and layout of the new dealership to be built on the property selected and approved by VWGoA.

53.     VWGoA was keenly aware of the Gunthers' financial limitations.  In fact, VWGoA repeatedly redrafted and revised the Gunthers' sales projections so that the Gunthers' dealer application would meet VW's own guidelines regarding debt to equity and projected sales.

54.     The Gunthers formed Gunther Family Holdings, LLC to acquire the property and construct the new dealership facility.  The Gunthers changed the name of their existing company from Team Gunther Kia, Inc. to Team Gunther, Inc., so that the newly named Team Gunther Inc. could be the named dealership for both Kia and VW.

55.     When the parties began discussing the prospect of the Gunthers becoming a VW dealer, the Gunthers were leasing property to operate their Kia dealership. Because there was room available on that property to add a VW dealership, the Gunthers proposed acquiring the property and constructing the VW dealership next to their existing Kia dealership.

56.     VWGoA rejected this suggestion and insisted that if the Gunthers wanted to become VW dealers they would have to purchase prime real estate in a location to be selected by VWGoA.

57.     The Gunthers could not afford to operate two dealerships at two separate locations, so, in order to become VW dealers, the Gunthers agreed to move their Kia dealership and build a new Kia facility alongside the new VW facility.

58.     VW was aware of this added expense and burden because it was discussed at length between the Gunthers and VWGoA and VCI.  VCI provided the financing to move and build the new Kia dealership.

59.     Throughout 2013 and 2014, VW pushed the Gunthers to accelerate their plans to acquire the property and finalize the design of the new facility.

60.     On October 3, 2014, for example, VWGoA wrote Joshua Gunther chastising him for being behind schedule: "we are concerned that, given that you are behind on your milestones, your completion date may be in jeopardy.  VWoA recommends that you take immediate steps to rectify this issue and bring this facility project back into compliance with our agreed-upon deadlines."

61.     The message VW consistently communicated to the Gunthers was that time was of the essence, and that the Gunthers needed to close on their loan with VCI, acquire the property, and begin construction of the new dealership.

62.     Ultimately, VCI loaned the Gunthers $5.4 million to acquire the property and construct the dealership.

63.     Although the $5.4 million loan was from VCI to Gunther Family, it was personally secured by Joshua and Ashley Gunther, as well as Team Gunther, Inc., the company that operated both the VW and Kia dealerships.

64.     In addition, VWGoA and VCI knew that the Gunthers had obtained a nearly $1 million loan from a family member.

65.     On July 1, 2015, the Gunthers began construction of the new facility. Below is what their budding dealership (and life savings) looked like when news of the scandal broke on or around September 18, 2015:



66.     Construction of the new facility continued throughout 2015. At the insistence of VWGoA, and as required by the LOI, the plaintiffs and their contractors and architects worked to ensure that the new Gunther VW facility complied with VW's strict corporate brand image program and facility requirements.  To accomplish this, the plaintiffs were required to purchase materials and signage from VW and/or its approved vendors and to incorporate certain design elements only suited for a VW dealership.

67.     As a result of VW's unique architectural requirements and design elements, the Gunther VW facility can effectively only be used as a VW facility, and is not suited for other motor vehicle franchises.  Essentially, without a VW dealership to put in it, the building is virtually worthless.  The plaintiffs are now stuck with a very expensive facility that they built to sell and service vehicles that were never delivered.



68.     The success of the VW brand (based largely on the sale and production of diesel vehicles) allowed VWGoA and VWAG to require substantial facility investments from the Gunthers.

69.     The whole time that VW was wooing the Gunthers to leverage their life savings and their future on becoming a VW dealer, VW suppressed the fact that the VW high-performance diesel technology was a sham.

70.     From the very first contact with the Gunthers about their becoming a new VW dealer, VWAG, VWGoA, and VCI knew that VW had intentionally and deliberately installed software defeat devices in all "clean diesel" vehicles sold within the United States, and that the Gunthers were, in reliance upon the representations made to them, unwittingly investing their life savings into a house of cards.

71.     From 2009 to 2015, VW sold and/or leased in the United States nearly 580,000 dirty diesels that VW disguised as clean.

72.     As detailed in the EPA's Notice of Violation ("NOV"), and as is now well known, VW installed sophisticated software in its diesel vehicles in order to fool regulators into believing that VW diesels met U.S. emissions regulations.

73.     In reality, VW diesels, during normal operation, emit oxides of nitrogen (NOx) at up to 40 times the standard allowed under federal and state laws and regulations.

74.     As part of its Plea Agreement with the United States Department of Justice, VWAG has already admitted to intentionally installing the defeat device discussed above.  See Volkswagen Plea Agreement Statement of Facts, *United States v. Volkswagen AG*, Case No. 16-CR-20394.) (Attached as Ex. A). Plaintiffs incorporate by reference this Statement of Facts as part of this First Amended Complaint.

75.     Throughout the negotiations that led up to the LOI and throughout the construction process, VW kept its fraud regarding the defeat device hidden and concealed from the plaintiffs. At no time did VWAG, VWGoA or VCI disclose the existence of this massive fraudulent scheme to the plaintiffs.

76.     However, VWAG, VWGoA, and VCI knew that regulating bodies were raising questions about inconsistent tests and unsatisfactory responses given by VWAG and VWGoA.

77.     The defendants knew that their fraud was on the cusp of being exposed before the plaintiffs acquired this property, and certainly before plaintiffs began construction of this new VW facility.

78.     At no point in time prior to or during the construction process did VW alert plaintiffs that VW was under investigation by the United States government for cheating emissions standards or that the inevitable result would be a massive recall of all TDI vehicles.

79.     Had the plaintiffs known of this fraudulent scheme, they never would have agreed to become a VW dealer, they never would have borrowed $5.4 million from VCI, they never would have borrowed another $1 million from a family member, they never would have purchased the real estate off Interstate 10, they never would have built a state of the art VW facility, they never would have agreed to move their established Kia dealership, they never would have built the adjoining Kia dealership facility, and they never would have wasted three years negotiating with VW, touring VW's facilities, familiarizing themselves with VW policies, or otherwise promoting the VW brand.

80.     VWGoA repeatedly held out its vehicles as marketable and saleable throughout the LOI and construction process. Such representations were made directly to the plaintiffs and were found in marketing and promotional material, inventory information, and other documents and materials provided to the plaintiffs, or that was publicly available.

81.     In reliance on these representations and omissions, plaintiffs continued to fund the construction of the dealership, purchase equipment and inventory, hire and train staff, and make other investments necessary to open and operate a new dealership.

82.     Plaintiffs would not have taken these actions had they known that VW was involved in one of the most prolific environmental and consumer frauds in history and, further, that the TDI models—comprising over 20 percent of projected new vehicle sales—would not be available for sale by Team Gunther.

83.     On September 18, 2015, after the Gunthers had poured their life savings into constructing the new VW facility, and just months before the plaintiffs were to enter into a franchise agreement and open the doors of Team Gunther VW, the EPA issued its First NOV.

15

News coverage of the EPA's action was the first time that plaintiffs learned that there was a potential problem with the VW "clean diesel" vehicles.

84.     Once news of the scandal broke, VWGoA misrepresented to the plaintiffs its ability to repair or remedy the defects, the extent of the scandal, the culpability of VWGoA and VWAG, and what VWGoA was willing to do for its customers and dealers to remedy their losses.

85.     These assurances were false and were made in order to induce the plaintiffs to enter into the franchise agreement and to begin operations as a franchise VW dealer.

86.     During such conversations, VWGoA never revealed that VWAG was contemplating closing its manufacture of diesel vehicles altogether or that a regulatory ban on VW diesels was inevitable.  VWGoA otherwise suppressed from the plaintiffs the extent of the scandal.

87.     In entering into the Dealer Agreement, the plaintiffs relied on VWGoA's representations about the limited nature of the "clean diesel" crisis, the steps that VWGoA was purportedly taking to minimize the impact of the scandal to its brand, and to address customer mistrust.

88.     VWGoA and VWAG have failed to put in place an appropriate advertising strategy to repair the injury the diesel scandal has caused VW's brand's reputation.   This has compounded Team Gunthers' damages which opened its doors in 2016 with no diesels and with the stigma of a nationwide fraudulent scheme.

89.     Compounding the injury to the plaintiffs, VWGoA started offering compensation and numerous incentives to competing VW dealers who were, by definition, members of the putative dealer class action filed against VWGoA and VWAG.[1]

---

[1] Dealers who were operating on or before September 18, 2015.

90.     Team Gunther, which opened its doors with a fraction of the inventory it was promised and with a severely damaged reputation, could not possibly compete against other VW dealers along the gulf coast who were receiving numerous concessions from VWGoA that were denied Team Gunther.

91.     As a result of VW's illegal, conspiratorial, and unconscionable fraud on the plaintiffs (and VW's unconscionable treatment thereafter) plaintiffs have suffered, and continue to suffer, millions of dollars in losses, lost profits, diminution in value, mental anguish, damage to their business reputation, and lost opportunity costs that they would not have suffered but for VW's wrongful conduct.

92.     In reliance on VWGoA's affirmative misrepresentations about the salability of its products and its omission about its involvement in a massive criminal enterprise – a material omission, to say the least – the Gunthers borrowed in excess of $6 million to fund the acquisition and construction of their new VW dealership facility.

93.     The dealership property and facility are worth substantially less today in light of VW's fraud. Because plaintiffs were required to construct the dealership in compliance with VW's strict corporate imaging and facility requirements, the facility is only useable as a VW dealership without substantial renovations.  As a result, the plaintiffs have suffered diminution in value to their assets that it would not have suffered but for VW's fraudulent scheme.

94.     Team Gunther VW's new vehicle sales are a fraction of what they would have been had the brand continued to perform as it had in 2013.  These losses are particularly compounded given that Team Gunther VW is an add point dealership without a built-in customer base to provide service and parts revenue, and repeat sales business.

## First Cause of Action

### FRAUDULENT MISREPRESENTATION / INDUCEMENT

95.    Plaintiffs adopt and reallege the previous paragraphs as if fully set forth herein.

96.    Defendants misrepresented material facts as set forth above in order to induce the plaintiffs to make a massive investment in their companies.

97.    Defendants knew these representations were false.

98.    Plaintiffs reasonably relied on these material misrepresentations to enter into the LOIs, loan contract, and other agreements as set forth above – as well as to take other injurious actions.

99.    Plaintiffs did not know, and could not have known, the truth of the magnitude of the scandal that VW was hiding.

100.    Plaintiffs have suffered actual and consequential damages as a result of plaintiffs' reasonable reliance on defendants' misrepresentations.

**WHEREFORE**, the plaintiffs demand judgment against the defendants for compensatory and punitive damages in an amount to be determined by the jury.

## Second Cause of Action

### NEGLIGENT / RECKLESS MISREPRESENTATION

101.    Plaintiffs adopt and reallege the previous paragraphs as if fully set forth herein.

102.    The plaintiffs allege that all the willful misrepresentations alleged in this complaint were made at least recklessly and were reasonably relied upon by the plaintiffs to their detriment.

103.    Defendants owed a duty of care to see that truthful information was communicated to the plaintiffs.

104.     Defendants breached their duty by making inaccurate, false, or misleading statements or by withholding material information which was necessary to correct prior false statements.

105.     Defendants misrepresented this material information in order to induce plaintiffs to take injurious actions that would benefit defendants financially.

106.     Plaintiffs reasonably relied on defendants' false representations and took actions and refrained from actions in reliance on the false representations.

107.     Plaintiffs suffered actual damages as a proximate result of defendants' willful, wanton, reckless, or grossly negligent conduct.

**WHEREFORE**, the plaintiffs demand judgment against the defendants for compensatory and punitive damages in an amount to be set by the jury.

### Third Cause of Action

### FRAUDULENT SUPPRESSION / CONCEALMENT / INDUCEMENT

108.     Plaintiffs adopt and reallege the previous paragraphs as if fully set forth herein.

109.     Defendants intentionally and maliciously suppressed and concealed material information which they had a duty to disclose.

110.     Defendants misrepresented material facts as set forth above in order to induce the Plaintiffs to make a massive investment in their companies.

111.     Defendants watched as plaintiffs leveraged everything they had, borrowed as much money as VCI would lend them, convinced family members to loan them $1 million, and otherwise reoriented their lives in order to permanently attach themselves to VW, with its "clean diesel" and "brand loyalty."

112.     Because of the nature of the relationship, defendants had a duty to disclose (at a minimum not proactively conceal) material information that they knew would have a severe negative impact on the plaintiffs.

113.     Defendants concealed and suppressed information of its fraud and wrongdoing in order to induce plaintiffs to enter into the LOIs, loan contract, and other agreements as set forth above – as well as to take other injurious actions.

114.     But for defendants' fraudulent concealment of material information, plaintiffs would have never entered into the LOIs, loan contract, and other agreements as set forth above.

**WHEREFORE**, the plaintiffs demand judgment against the defendants for compensatory and punitive damages in an amount to be set by the jury.

### Fourth Cause of Action

### BREACH OF CONTRACT

115.     Plaintiffs adopt and reallege the previous paragraphs as if fully set forth herein.

116.     Defendants made multiple written and oral agreements with the plaintiffs as set forth above. Plaintiffs performed their duties and fulfilled their promises under these agreements.

117.     Defendants, on the other hand, failed to fulfill their promises in multiple ways, all of which constitute actionable breaches of contract.

118.     Among other things, Defendants promised plaintiffs that they would deliver, in sufficient quantity, vehicle inventory to be sold at their dealership. Defendants have failed to do the same.

119.     Defendants promised plaintiffs that they would deliver, specifically, clean burning diesel engine vehicles for sale in the U.S. Defendants failed to deliver a single diesel engine vehicle to the plaintiffs.

120.     Defendants worked closely with the plaintiffs in preparing a proforma of what the expectations were for the new dealership.

121.     Plaintiffs have not reached sales expectations because VW has discontinued its diesel production, has damaged the brand, and has done nothing to rehabilitate the brand.

122.     The Dealer Agreement requires the defendants to safeguard and promote the reputation of VW and its products.

123.     The Dealer Agreement also requires defendants to refrain from all actions that might harm the reputation or marketing of VW's products or that are inconsistent with the public interest. This includes refraining from deceptive, misleading, unprofessional, or un-ethical practices.

124.     Plaintiffs have suffered actual and consequential damages as a result as a result of the above-mentioned failures of the defendants to meet their contractual obligations.

132.     Defendants' actions in breaching their contractual agreements were willful, malicious, and in violation of their duty of good faith and fair dealing.

**WHEREFORE**, the plaintiffs demand judgment against the defendants for compensatory and punitive damages in an amount to be determined by the jury.

<u>**Fifth Cause of Action**</u>

**Violations of Alabama's Motor Vehicle Franchise Act**

133.     The Plaintiffs adopt and reallege the previous paragraphs as if fully set forth herein.

134.     Defendants have violated multiple provisions of The Alabama Motor Vehicle Franchise Act § 8-20-1 et seq. Code of Ala. (1975), namely anything and everything having to do with bad faith conduct. Defendants' actions as described above constitute unfair and deceptive trade practices in that they are unlawful, against public policy, unethical, and oppressive.

135.     Defendants violated § 8-20-4(2) by engaging in actions with respect to the plaintiffs that were in bad faith and unconscionable. As set forth above, the defendants violated their duty of good faith and fair dealing during all phases of negotiating with the plaintiffs both before and after the new VW dealership opened.

136.     Defendants violated § 8-20-4(3)c by refusing to deliver, in reasonable quantities and within a reasonable time frame, sufficient inventory that was otherwise advertised for sale by the manufacturer, throughout the state.

137.     Defendants violated § 8-204(o) by not indemnifying the plaintiffs for damages and losses as a result of actions taken by the manufacturer, in regards to defects in assembly and design, that are beyond the Gunthers' control.  Defendants, by and through VCI, exacerbated these damages by coercively pressuring the plaintiffs into fulfilling debt obligations on a bill of goods that defendants never had an intent to provide. Defendants abused the power that this fraudulently induced debt obligation gave them over the plaintiffs to the detriment of the plaintiffs.

138.     Defendants provided unfair competitive advantages to existing dealers and withheld the same from the plaintiffs as set forth above.

139.     Plaintiffs suffered damages as the direct and proximate result of defendants' reckless, willful, and malicious violations as set forth above.

**WHEREFORE**, the plaintiffs demand judgment against the defendants for compensatory and punitive damages, court costs and reasonable attorneys' fees, in an amount to be determined by the jury.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims in this First Amended Complaint so triable.

Respectfully submitted,

___/s/ David A. McDonald_____

DAVID A. MCDONALD (MCD042)
**KILBORN, ROEBUCK & MCDONALD**
P. O. Box 832
Mobile, Alabama 36601
Telephone: (251) 434-0045
Facsimile:   (251) 434-0047

*Counsel for Plaintiffs Joshua Gunther,
Ashley Gunther, Team Gunther Inc. and
Gunther Family Holdings, LLC.*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 14, 2018, I electronically filed the foregoing document with

the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to

counsel of record for this case.

/s/ David A. McDonald
*Counsel for Plaintiffs Joshua Gunther,*
*Ashley Gunther, Team Gunther Inc. and*
*Gunther Family Holdings, LLC.*