United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 2672 CRB  (JSC) |
|---|---|
| ——————————————————/ | **ORDER RE: (1) DEFENDANTS' MOTIONS TO DISMISS THE VW BONDHOLDERS' SECOND AMENDED CLASS ACTION COMPLAINT; (2) PLAINTIFF'S MOTION TO AMEND THE COMPLAINT** |
| This Order Relates To: Dkt. Nos. 5019, 5021, 5153 | |
| ——————————————————/ | |

This order addresses whether the allegations in a Volkswagen bondholder's second amended complaint (1) satisfy the reliance element of its Section 10(b) and Rule 10b–5(b) claims against Volkswagen and related defendants, (2) give rise to a strong inference of scienter as to defendant Michael Horn and Volkswagen Group of America, Inc., and (3) are sufficient to support Section 20(a) control person claims against Horn.  The order also addresses whether the bondholder should be given leave to amend its complaint for a third time to add insider trading claims.

## BACKGROUND

On three occasions in 2014 and 2015, Volkswagen Group of America Finance LLC ("VWGoAF") issued U.S.-dollar denominated bonds to institutional investors.  (SAC ¶ 3.) VWGoAF issued the bonds in private placements, which were led primarily by U.S.-based investment banks.  (SAC ¶ 15.)  The bonds were exempt from registration with the SEC under Rule 144A and so could be purchased only by qualified institutional buyers.  (SAC ¶¶ 1, 3.)  After the initial offerings, the bonds traded in a secondary market.  (SAC ¶ 3.)

Each of the initial offerings was made pursuant to an Offering Memorandum.  Lead Plaintiff, a public pension fund, purchased bonds on May 23, 2014 pursuant to the terms of a May 15, 2014 Offering Memorandum.  (SAC ¶¶ 4, 16.)  Within the Memorandum were certain

statements about Volkswagen's R&D priorities and exposure to regulatory risks. An example of an R&D statement is that "Volkswagen's top priority for research and development in [recent years has been] to develop engines and drivetrain concepts to reduce emissions." (SAC ¶ 227(a).) An example of a regulatory-risk statement is that "Volkswagen's vehicles must comply with increasingly stringent requirements concerning emissions." (SAC ¶ 227(d).)

Plaintiff contends that the R&D and regulatory-risk statements were materially misleading, in violation of Section 10(b) and Rule 10b–5(b), because Defendants failed to disclose that Volkswagen was using a defeat device in many of the diesel vehicles it was selling in the United States and around the globe, which enabled Volkswagen to deceptively pass emission tests and to sell vehicles that emitted certain pollutants at levels up to 40 times the legal limits. (*E.g.*, SAC ¶¶ 7-8, 170, 228.) In *Bondholders I*,[1] the Court concluded that the R&D and regulatory-risk statements were plausibly misleading:

> The statements that Volkswagen's "top priority" and "focal point" for R&D was to develop engines that reduced emissions could have led a reasonable investor to conclude that Volkswagen was committed to emissions-reducing technology. A reasonable investor also could have concluded . . . that Volkswagen's commitment to emissions-reducing technology was important for the Company's future success given the "increasingly stringent [regulatory] requirements concerning emissions" . . . . Together, the inference that arises from these statements is that Volkswagen was a good investment *because* of its commitment to emissions-reducing technology. That inference was misleading because Volkswagen was in its fifth year of a massive fraud to cheat emissions standards.

*Bondholders I*, 2017 WL 3058563, at *7 (alteration in original).

The Court in *Bondholders I* also concluded that Martin Winterkorn (the former CEO of Volkswagen AG ("VWAG")) and Michael Horn (the former CEO of Volkswagen Group of America, Inc. ("VWGoA")) plausibly made the statements in the Offering Memorandum, and that Winterkorn and VWAG (but not Horn and VWGoA) did so with scienter. *See id.* at *8-12. The Court also concluded that Plaintiff was entitled to a presumption of reliance under *Affiliated Ute*

---

[1] *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 3058563 (N.D. Cal. July 19, 2017) [hereinafter *Bondholders I*].

*Citizens of Utah v. United States*, 406 U.S. 128 (1972), and that Section 20(a) control person claims were well pled as to Winterkorn, but not as to Horn. *See id.* at \*14-16.

Plaintiff responded to *Bondholders I* by filing a first amended complaint. In *Bondholders II*,[2] the Court ruled on motions to dismiss the amended complaint. In its order, the Court reconsidered the element of reliance in light of new authority cited by Defendants and held that Plaintiff could not rely on *Affiliated Ute* to plead reliance. *Bondholders II*, 2018 WL 1142884, at \*3-6. The Court also considered two other theories of reliance—direct reliance and fraud on the market—but concluded that neither was well pled. *Id.* at \*6-10. Having determined that the reliance element was not satisfied, the Court dismissed the first amended complaint in its entirety with leave to amend. Plaintiff responded by filing the second amended complaint, and Defendants responded by filing separate motions to dismiss the second amended complaint, one by Horn and the other by the remaining Defendants.

**DISCUSSION**

**I. Reliance**

Plaintiff contends that reliance is now well pled under a direct-reliance theory, and that a presumption of reliance is also available under four different theories. The Court begins with the direct-reliance theory.

**A. Direct Reliance**

In the first amended complaint, Plaintiff asserted that it relied directly on the misleading statements at issue in the May 15, 2014 Offering Memorandum. Plaintiff made this argument even though it did not allege that any of its agents actually read the Memorandum. Instead, Plaintiff asserted that the Memorandum's text supported direct reliance because it effectively stated that investors had relied on the information contained in the Memorandum in making their investment decisions.

Because Plaintiff's argument depended on the language of the Memorandum and no party questioned the Memorandum's authenticity, the Court considered the actual language at issue

---

[2] *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2018 WL 1142884 (N.D. Cal. Mar. 2, 2018) [hereinafter *Bondholders II*].

under the incorporation by reference doctrine. *See VW Bondholders II*, 2018 WL 1142884, at *8-10 (citing *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005)). Upon reviewing two acknowledgment clauses in the Memorandum and their surrounding content, the Court concluded that the clauses did not plausibly support that investors had in fact read the Memorandum, but only that "investors, by accepting the Memorandum, agreed not to rely on extrinsic materials in making their investment decisions." *Id.* at *10. Because the clauses did not carry the meaning asserted by Plaintiff, the Court held that Plaintiff had not plausibly pled direct reliance. The Court gave Plaintiff leave to amend the complaint to include the missing allegations, instructing that "[t]o plausibly plead direct reliance, Plaintiff must also allege that one or more of its agents actually read the Memorandum and relied on the statements therein that are at issue." *Id.*

Seeking to cure the previously noted deficiency, Plaintiff has added new allegations to the second amended complaint. Plaintiff now alleges that

> Pursuant to its relevant contractual investment agreement with its investment advisor, its investment guidelines as incorporated into that relevant contractual investment agreement, and fiduciary obligations owed to it by its investment advisor, Plaintiff, through its authorized investment advisor with complete investment discretion, reviewed and relied upon the information contained in the Offering Memorandum that corresponds to Plaintiff's Bond purchases, including the alleged omissions and misrepresentations.

(SAC ¶ 348.)

The new allegations support (1) that Plaintiff's investment advisor was acting as an authorized agent of Plaintiff; and (2) that Plaintiff, through its agent, "reviewed and relied upon" the Offering Memorandum, "including the alleged omissions and misrepresentations." (SAC ¶ 348.) Taking these allegations as true, they plausibly support direct reliance.

In arguing that Plaintiff's new allegations are insufficient to plead direct reliance, Defendants argue that more detail is needed to satisfy Rule 9(b). But paragraph 348 of the second amended complaint answers the basic "who, what, when, where, and how" questions needed to satisfy Rule 9(b). *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

- **Who** read the Offering Memorandum? Plaintiff's "authorized investment advisor." (SAC

¶ 348.)

- **What** statements did the advisor read? The "information contained in the Offering Memorandum that corresponds to Plaintiff's Bond purchases, including the alleged omissions and misrepresentations." (*Id.*)

- **When** did Plaintiff's investment advisor read these statements? Given that the advisor is alleged to have "relied" on the information in the Memorandum (*id.*), it is reasonable to conclude that the advisor read the statements before executing the bond purchase.

- **Where** did Plaintiff's investment advisor read these statements? The allegations do not answer this question, but this question is of limited importance here. Defendants do not need to know whether the investment advisor read the statements in an office, on a plane, or somewhere else in order to adequately answer the complaint. *See Vess*, 317 F.3d at 1106 (explaining that Rule 9(b) only demands that allegations of fraud be "specific enough to give defendants notice of the particular misconduct so that they can defend against the charge") (citation omitted).

- And **how** did the investment advisor rely on these statements? By considering them before executing the bond purchase.

These answers are "specific enough to give defendants notice" so that they can "defend against the charge." *Vess*, 317 F.3d at 1106 (citation omitted). The allegations therefore satisfy Rule 9(b). Taking these allegations as true, they also plausibly support that Plaintiff, through its agent, directly relied on the misrepresentations at issue.[3]

---

[3] At the motion to dismiss hearing, Defendants questioned the factual basis for the allegations that Plaintiff's investment advisor reviewed and relied upon the relevant information contained in the Offering Memorandum. (*See generally* Aug. 3, 2018 Hr'g at 4-15.) Whether factual allegations have evidentiary support is not a Rule 8 or Rule 9 issue, it is a Rule 11 issue. *See* Fed. R. Civ. P. 11(b)(3) (providing that the factual contentions made in pleadings must, to the best of the attorney's knowledge, "have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery"). Defendants focus on the factual basis for these allegations therefore does not alter the Court's conclusion that the allegations support the element of reliance under Rules 8(a) and 9(b). *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (explaining that on a motion to dismiss under Rule 12(b)(6), the court proceeds "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)").

**B.**     **Presumptions of Reliance**

While Plaintiff has plausibly alleged that it relied directly on the statements at issue in the Offering Memorandum, Plaintiff also argues that it can invoke a presumption of reliance under several different theories. Having concluded that reliance is now well pled under a direct-reliance theory, the Court does not need to address whether a presumption of reliance is also appropriate. Nevertheless, because the parties have submitted extensive briefing on the question of whether a presumption of reliance applies, because the Court considered in *Bondholders I* and *II* whether a presumption would be available, and because the parties acknowledge that Plaintiff may have difficulty proving direct reliance on a class-wide basis, the Court again considers whether a presumption of reliance is appropriate.

    **1.**     **Market Based Presumptions**

Plaintiff contends that a presumption of reliance is appropriate under *Basic*'s fraud-on-the-market theory, as well as under two related theories, one termed "fraud created the market" and the other known as "fraud on the regulatory process." For the reasons discussed in the next three subsections, a presumption of reliance is not appropriate here under any of these theories.

    **a.**     **Fraud on the Market**

*Basic*'s fraud-on-the-market presumption of reliance applies in securities-fraud cases when (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the securities traded in an efficient market, and (4) the plaintiff traded the securities between the time the misrepresentations were made and when the truth was revealed. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014) ("*Halliburton II*") (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 238 n.27 (1988)).

In *Bondholders II*, the Court held that Plaintiff had not satisfied the third of these elements, the "efficient market" requirement, and so could not invoke the presumption. This was because Plaintiff purchased VWGoAF bonds in an initial offering, not in a post-offering market, and did not allege that the initial-offering market was efficient. The Court gave Plaintiff leave to amend the complaint "to add any allegations that it believes support *Basic*'s application." *Bondholders II*, 2018 WL 1142884, at *8.

United States District Court
Northern District of California

In the second amended complaint, Plaintiff has added allegations about how the VWGoAF bonds were originally priced. For example, Plaintiff alleges that the bonds' original price was dependent upon a number of factors, including the risk profile of Volkswagen, the credit rating of Volkswagen and the bonds, and the comparative yield of the bonds versus other investment-grade bonds. (SAC ¶¶ 356-58.) Plaintiff also alleges that these factors "reflect[ed] all publicly available information that [was] material to investors." (SAC ¶ 357.)

Even taking these allegations as true, they are insufficient to support the efficient-market element. The fraud-on-the-market presumption "is available *only* when a plaintiff alleges that a defendant made material misrepresentations or omissions concerning a security that is *actively traded* in an 'efficient market,' thereby establishing a 'fraud on the market.'" *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999) (emphasis added). Also, not only must the security be actively traded, but it must be "traded on *well-developed* markets." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811 (2011) ("*Halliburton I*") (emphasis added) (quoting *Basic*, 485 U.S. at 246). Plaintiff does not allege that it purchased an "actively traded" bond, much less one that traded on "well-developed markets." To the contrary, Plaintiff alleges that it purchased the VWGoAF bonds at issue directly from two investment banks in a Rule 144A private placement, not by trading in any market. (SAC ¶¶ 3, 15-16.) And the May 15, 2014 Offering Memorandum confirms that the bonds were "new issues of securities *for which there currently is no market*." (Giuffra Decl., Ex. B at 6, Dkt. No. 5022-2 at 11 (emphasis added).)

Plaintiff asserts that it should at least have the opportunity to present expert evidence in support of the presumption at the class certification stage. But no expert evidence will change that Plaintiff purchased the bonds at issue at a time when the bonds were not "actively traded" on a "well-developed market." Plaintiff accordingly cannot rely on *Basic*'s fraud-on-the-market theory to prove reliance in this case.

### b.     Fraud Created the Market

Plaintiff alternatively seeks to rely on a variation of *Basic* for newly issued securities— known as the fraud-created-the-market presumption of reliance. Courts that have recognized this theory have limited its use to the narrow circumstance "where but for the fraud the securities

would not have been marketable." *Lipton v. Documation, Inc.*, 734 F.2d 740, 747 (11th Cir. 1984); *see also Freeman v. Laventhol & Horwath*, 915 F.2d 193, 200 (6th Cir. 1990) (under the "fraud created the market" theory, the plaintiff must establish that "the securities could not have been marketed at any price absent fraud"). To be unmarketable, the securities must be "so lacking in basic requirements that [they] would never have been approved by the [issuing entity] nor presented by the underwriters had any one of the participants in the scheme not acted with intent to defraud or in reckless disregard of whether the other defendants were perpetrating a fraud." *Shores v. Sklar*, 647 F.2d 462, 468 (5th Cir. 1981).

The fraud-created-the-market presumption has "been criticized in many circuits and [the Ninth Circuit] ha[s] not accepted it." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1121 n.4 (9th Cir. 2013). But even if the presumption were available, it would not apply here. For despite the gravity of VW's emissions fraud, it is almost inconceivable that, but for the fraud, the credit markets would have completely shut out one of the world's largest automakers. Indeed, as alleged the price of Plaintiff's VWGoAF bonds fell only 3.02% after the fraud was revealed (SAC ¶ 257), suggesting that the bonds were far from worthless.

In arguing that the bonds would have been unmarketable but for the fraud, Plaintiff contends that Volkswagen was unable to issue any new debt securities for a period of over 18 months after the fraud was disclosed. But as alleged, Volkswagen was the one that initiated this pause in issuing new debt (SAC ¶ 365), and no allegations support that Volkswagen would have been unable to raise debt "at any price" after the fraud. *Freeman*, 915 F.2d at 200. Likewise, allegations that Volkswagen's credit rating declined and that the cost of credit default swaps on Volkswagen debt increased after the fraud was disclosed (SAC ¶¶ 359-60), only support that Volkswagen was a riskier borrower after the disclosure, not that the company would have been unable to access credit markets.

Plaintiff has not established that the VWGoAF bonds at issue "could not have been marketed at any price absent fraud." *Freeman*, 915 F.2d at 200. As a result, the fraud-create-the-market presumption of reliance does not apply.

### c. Fraud on the Regulatory Process

Adopted in *Arthur Young & Co. v. U.S. District Court*, 549 F.2d 686, 695 (9th Cir. 1977), the fraud-on-the-regulatory-process theory creates a presumption of reliance when "the purchaser of an original issue security relies, at least indirectly, on the integrity of the regulatory process and the truth of any representations made to the appropriate agencies and the investors at the time of the original issue."  Plaintiff contends that the theory is valid, applies to unregistered securities, and relates not only to statements made to the SEC, but also to statements made to regulatory agencies governing business operations such as EPA.  Defendants question whether the theory is still valid, but even if it is, they assert that the theory applies only to registered securities and statements made to agencies responsible for overseeing registered securities.

Courts in other circuits have called the fraud-on-the-regulatory-process theory into question or rejected it.  Some of these courts contend that the theory is based on a faulty premise that the regulatory process provides a check on fraud, when in fact the SEC does not read all of the publicly available information about an offering or vouch for the information's veracity.  *See, e.g.*, *Malack v. BDO Seidman, LLP*, No. 08-0784, 2009 U.S. Dist. LEXIS 67785, at *40-41 (E.D. Pa. Aug. 3, 2009).  Others maintain that the theory would expand the SEC's role beyond its intended scope and create a form of investor's insurance.  *See Joseph v. Wiles*, 223 F.3d 1155, 1165-66 (10th Cir. 2000).

Courts have also rejected the theory because they assert that the validity of *Arthur Young* was undercut by Justice White's partial concurrence in *Basic*, which was issued over a decade after *Arthur Young*.  In his partial concurrence, Justice White noted that he agreed with the majority's "reject[ion] [of] that [fraud-on-the-market] theory, heretofore adopted by some courts." *Basic*, 485 U.S. at 251 (last alteration in the original).  He then cited *Arthur Young* in a footnote as an example of a variation on the fraud-on-the-market theory that the majority opinion rejected, even though the majority did not mentioned *Arthur Young* or the fraud-on-the-regulatory-process theory.  *See id.* at 251 n.2.  Because of Justice White's comments, some courts have interpreted *Basic* as a rejection of *Arthur Young*.  *See, e.g.*, *Eckstein v. Balcor Film Inv'rs*, 740 F. Supp. 572, 582 n.7 (E.D. Wis. 1990).

Despite Justice White's statements in *Basic* and the criticisms leveled by courts in other circuits, district courts in the Ninth Circuit have continued to recognize the fraud-on-the-regulatory-process theory, in large part because the Ninth Circuit has never expressly overruled *Arthur Young*. *See, e.g.*, *In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1302-03 (E.D. Wash. 2007) ("*Basic* did not overrule the extension of the 'fraud on the market' presumption . . . . *Basic* was not an initial stock offering case and said nothing to indicate that the 'fraud on the market' test should no longer be used in the related context of initial stock offerings as was done in *Arthur Young*."); *In re Jenny Craig Sec. Litig.*, No. 92-0845-IEG, 1992 U.S. Dist. LEXIS 22769, at *17 (S.D. Cal. Dec. 19, 1992) ("[A]lthough it has been widely criticized, the [fraud-on-the- regulatory-process theory] does not appear to have been overruled, and this Court is bound to follow it where applicable."); *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 140 F.R.D. 425, 433 (D. Ariz. 1991) ("The Ninth Circuit ratified the fraud on the regulatory process doctrine in *Arthur Young*[.]").

Ultimately, this Court does not need to decide whether the theory is still viable, for even if it is, it does not apply in this case. By its terms, the theory applies only when "representations [are] made to the appropriate agencies and the investors at the time of original issue." *Arthur Young*, 549 F.2d at 695. That is to say, plaintiffs are only entitled to a presumption of reliance based on the theory if misrepresentations are made directly to a regulatory agency such as the SEC. *See Antonoplulos v. N. Am. Thoroughbreds, Inc.*, No. 87-0979-G(CM), 1991 WL 185147, at *2 (S.D. Cal. Apr. 16, 1991) (concluding that the fraud-on-the-regulatory-process theory only applies when misrepresentations are made "directly to a regulatory agency" such as the SEC); *Lubin v. Sybedon Corp.*, 688 F. Supp. 1425, 1446 (S.D. Cal. 1988) (holding that the fraud-on-the-regulatory-process theory does not apply when an "exchange commission" has not certified the security).

The alleged misrepresentations at issue here were not made directly to a regulatory agency such as the SEC. As Plaintiff acknowledges, the VWGoAF bonds were "exempt from registration" with the SEC under Rule 144A of the U.S. Securities Act of 1933, 17 C.F.R. § 230.144A. (SAC ¶ 1). As a result, the SEC did not evaluate the bonds or the veracity of the

Offering Memorandum. And indeed, the Offering Memorandum explicitly warned prospective investors that "[n]either the . . . SEC[,] any state securities commission nor any other regulatory authority has approved or disapproved the securities, nor have any of the foregoing authorities passed upon or endorsed the merits of this Offering or the accuracy or adequacy of this Offering Memorandum." (Giuffra Decl., Ex. B. at ii, Dkt. No. 5022-2 at 4 (internal quotation marks omitted).)

Plaintiff asserts that the fraud-on-the-regulatory-process theory applies because this case is analogous to *Lincoln*, where the theory was applied based on misrepresentations to the Federal Home Loan Bank Board ("FHLBB"). Plaintiff maintains that Defendants similarly misled regulatory agencies governing its business operations, such as EPA and CARB. But the role of the FHLBB in *Lincoln* is not analogous to the role of EPA and CARB here, and so the comparison is not persuasive.

In *Lincoln*, the district court concluded that the plaintiffs were only entitled to a presumption of reliance under *Arthur Young* "if a network of misrepresentations or omissions to the Federal Home Loan Bank Board or other federal and state regulators *enabled the bond sales to go forward.*" *Lincoln*, 140 F.R.D. at 434 (emphasis added). Here, there is no reason to believe that misrepresentations to EPA and CARB had any bearing on the viability of the bond offerings. Unlike the FHLBB in *Lincoln*, EPA does not function as a gatekeeper for securities offerings. And Plaintiff has not cited to any authority that would have given EPA the power to certify or suspend the VWGoAF bond offering based on the truthfulness of the statements in the Offering Memorandum. Even under *Lincoln*'s reading of *Arthur Young*, then, the fraud-on-the-regulatory-process theory does not apply here because Defendants' representations to EPA and CARB did not plausibly enable the bond sale to go forward.

Assuming, without deciding, that the fraud-on-the-regulatory-process theory remains valid in the Ninth Circuit, the theory does not apply here.

### 2. The *Affiliated Ute* Presumption

Turning away from market-based presumptions, Plaintiff alternatively argues that it can invoke a presumption of reliance under *Affiliated Ute*, 406 U.S. 128. A presumption of reliance is

generally available under *Affiliated Ute* for plaintiffs alleging violations of Section 10(b) and Rule 10b–5 based on "omissions of material fact." *Binder*, 184 F.3d at 1063. The theory behind this presumption is that direct proof of reliance in omission cases requires "proof of a speculative negative"—that, "I would not have bought had I known." *Blackie v. Barrack*, 524 F.2d 891, 908 (9th Cir. 1975). To relax this "difficult evidentiary burden," *id.*, *Affiliated Ute* allows reliance to be presumed "when the information withheld is material." *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 941 (9th Cir. 2009). In cases in which both omissions and misrepresentations are alleged, the presumption is only appropriate if the case can be characterized as "primarily a nondisclosure case." *Binder*, 184 F.3d at 1064. If instead the case is best characterized as "a positive misrepresentation case," the presumption is not available. *Id.*

### a.  This Court's Prior Orders

In *Bondholders I*, the Court held that Plaintiff could rely on *Affiliated Ute* to prove reliance. The Court reached this holding after explaining that, although Plaintiff's case is based on both misleading statements and omissions, the "heart of the case" is an omission—VW's failure to disclose its emissions fraud—and so the case can be characterized as "one that primarily alleges omissions." *Bondholders I*, 2017 WL 3058563, at *14.

The Court changed course in *Bondholders II*. In doing so, it relied on a recent decision by the Second Circuit, *Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017). Investors in that case asserted that Barclays violated Rule 10b–5(b) by omitting information that made certain affirmative statements misleading. For example, investors alleged that Barclays told them that a proprietary tool would allow them to "choose which trading styles they interacted with" on a specialized trading platform, but that Barclays failed to disclose that the tool did not apply to a significant portion of the trades conducted on the platform. *Id.* at 90.

Similar to this Court's reasoning in *Bondholders I*, the district court in *Waggoner* had held that *Affiliated Ute* applied because "a case could be made that it is the material omissions, not the affirmative statements, that are the heart of this case." *Id.* at 91. The Second Circuit disagreed. Noting that "the labels 'misrepresentation' and 'omission' are of little help," the Second Circuit reasoned that "what is important is to understand the rationale" of the *Affiliated Ute* presumption,

which is that in cases where "no positive statements exist . . . reliance as a practical matter is impossible to prove." *Id.* at 95 (quoting *Wilson v. Comtech Telecomms. Corp.*, 648 F.2d 88, 93 (2d Cir. 1981)). Reliance was not impossible to prove in the case before it, the Second Circuit explained, because the investors had alleged that Barclays made multiple affirmative statements, and the omission was only of "the truth that the statement[s] misrepresent[ed]." *Id.* at 96.

This Court found *Waggoner*'s reasoning persuasive. The Court explained that *Waggoner*'s focus on the purpose behind *Affiliated Ute* was a helpful touchstone, which the Ninth Circuit had also identified. *See Bondholders II*, 2018 WL 1142884, at *5-6 (citing *Desai*, 573 F.3d at 941). And although the Ninth Circuit stated in *Binder* that *Affiliated Ute* may apply in cases that "allege both misstatements and omissions" if the case can be characterized as one that "primarily alleges omissions," 184 F.3d at 1064, the Court noted that "the Ninth Circuit has not offered detailed guidance on how to distinguish a complaint that 'primarily alleges omissions' from one that alleges omissions, but not primarily." *Bondholders II*, 2018 WL 1142884, at *5. The Court also explained that "despite the statement in *Binder* that the *Affiliated Ute* presumption may be available in cases that 'allege both misstatements and omissions,' it appears that the Ninth Circuit has yet to uphold the use of the presumption in such a scenario." *Id.*

Using *Waggoner*'s test, the Court reasoned that "whether the *Affiliated Ute* presumption of reliance is applicable is a decision that should be based on whether the presumption's purpose—of avoiding the need to prove a speculative negative—is implicated." *Bondholders II*, 2018 WL 1142884, at *6. "Here, it is not," the Court concluded. *Id.* Explaining why, the Court reasoned that

> Plaintiff's claims are predicated on affirmative statements that Defendants are alleged to have made—specifically, the R&D and regulatory-risk statements in the bond Offering Memoranda. Plaintiff contends that these statements were misleading because Defendants did not disclose Volkswagen's emissions fraud. In other words, the omission is of the truth that certain affirmative statements allegedly misrepresent.

> Either Plaintiff and the other putative class members relied on the R&D and regulatory-risk statements in purchasing VWGoAF bonds or they did not. And if they did not, they should not be able to

overcome this shortfall by characterizing their claims as primarily alleging omissions.

*Id.* (citations omitted).

Having concluded that the presumption's purpose of avoiding the need to prove a speculative negative was not implicated, the Court reconsidered its decision in *Bondholders I* and held that Plaintiff could no longer rely on *Affiliated Ute* to plead reliance. *Id.*

### b. Plaintiff's Request for Reconsideration[4]

Although the Court grounded *Bondholders II* in identifying whether *Affiliated Ute*'s purpose would be furthered by permitting Plaintiff to invoke the presumption, Plaintiff argues that the Court's analysis went too far. Plaintiff asserts that under the reasoning in *Bondholders II*, anytime a securities-fraud claim is brought under Rule 10b–5(b), the *Affiliated Ute* presumption will be unavailable. This is because Rule 10b–5(b) "do[es] not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Rather, a duty to disclose arises under Rule 10b–5(b) only when disclosure is "necessary . . . to make *the statements made*, in light of the circumstances under which they are made, not misleading." 17 C.F.R. § 240.10b–5(b) (emphasis added). As a result, Rule 10b–5(b) cases will always be predicated on affirmative statements, and so Plaintiff reasons that the need to prove a speculative negative in such cases will not be implicated, at least under the reasoning in *Bondholders II*.

Plaintiff asserts that there are several problems with this result. First, Plaintiff contends that this result—the *Affiliated Ute* presumption not being available in Rule 10b–5(b) cases— would be inconsistent with the Ninth Circuit's decision in *Binder*. *Binder*, Plaintiff notes, was a Rule 10b–5(b) case, and yet rather than hold that the presumption would never be appropriate in Rule 10b–5(b) cases, *Binder* instructed courts to analytically characterize each "mixed case" of

---

[4] This is not a true motion for reconsideration because an amended complaint "supercedes the original complaint and renders it without legal effect." *Lacey v. Maricopa Cty.*, 693 F.3d 896, 927 (9th Cir. 2012) (en banc); *see also O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 995-96 (N.D. Cal. 2014) (permitting defendants to use a motion to dismiss an amended complaint as a means to challenge claims that were previously deemed well pled without satisfying the more demanding reconsideration standard in Civil L.R. 7-9).

misstatements and omissions "as either primarily a nondisclosure case (which would make the presumption applicable), or a positive misrepresentation case." *Binder*, 184 F.3d at 1064. According to Plaintiff, this test suggests that *Affiliated Ute*'s presumption may be available in at least some Rule 10b–5(b) cases, so long as the case can be characterized as "primarily a nondisclosure case." *Id.*

Second, Plaintiff relatedly contends that *Bondholders II*'s reasoning would effectively cabin the availability of the *Affiliated Ute* presumption to cases that exclusively involve a failure to disclose, instead of cases that involve "*primarily* a nondisclosure," as *Binder* instructs. 184 F.3d at 1064 (emphasis added). "Primarily a nondisclosure," Plaintiff asserts, suggests that the presumption should be available in cases in which there are some affirmative statements but more significant omissions.

Third, Plaintiff contends that *Bondholders II* is inconsistent with the Ninth Circuit's decision in *Blackie*, 524 F.2d 891, a case that involved both misstatements and omissions and in which the Ninth Circuit held that the plaintiffs could rely on *Affiliated Ute*'s presumption to prove reliance. Citing to *Blackie*, Plaintiff argues that the Court was incorrect when it stated in *Bondholders II* that "the Ninth Circuit has yet to uphold the use of the presumption" in cases that "allege both misstatements and omissions." *Bondholders II*, 2018 WL 1142884, at *5.

The Court acknowledged *Blackie* in *Bondholders II*, noting that it was arguably a "mixed case" of misstatements and omissions because the plaintiffs there asserted that the defendants' financial statements misrepresented particular line items by, among other things, failing to include adequate reserves for uncollectable accounts and obsolete inventory. *See id.* at *5 n. 2 (citing *Blackie*, 524 F.3d at 903-06). But what left the Court unsure of *Blackie*'s effect was the way *Binder* characterized the decision. Citing to *Blackie*, *Binder* stated that "[w]e have applied the *Affiliated Ute* presumption to cases that 'are, or can be, cast in omission or non-disclosure terms[,] . . . [but] [w]e have not squarely decided . . . whether the presumption may be invoked in a case involving misrepresentations or both omissions and misrepresentations." *Binder*, 184 F.3d at 1063-64. *Binder*, then, referred to the issue of whether *Affiliated Ute* applies to mixed cases of misrepresentations and omissions as an issue that the Ninth Circuit had not yet decided, even

though *Blackie* seemed to have touched on that issue. And in dissent in *Binder*, Judge Reinhardt even stated that "*Blackie* was a pure omissions case." *Binder*, 184 F.3d at 1068 (Reinhardt, J. dissenting). As a result, the Court concluded in *Bondholders II* that *Blackie* was "not instructive in considering when a case that alleges both misstatements and omissions can be characterized as one that 'primarily alleges omissions.'" *Bondholders II*, 2018 WL 1142884, at *8 n.2 (quoting *Binder*, 184 F.3d at 1064).

Despite the somewhat confusing discussion of *Blackie* in *Binder*, *Blackie* does give the Court some pause. Because there were misstatements in that case—namely, inaccurate line items in financial reports—*Affiliated Ute*'s purpose of avoiding the need to prove a speculative negative was arguably not implicated there. And yet rather than concluding that the presumption was not available, as this Court did in *Bondholders II*, the Ninth Circuit held in *Blackie* that the plaintiffs could rely on the presumption to plead reliance.

Also giving the Court pause is Plaintiff's argument that the reasoning in *Bondholders II* would foreclose the use of *Affiliated Ute* in all Rule 10b–5(b) cases. On the one hand, such a result would not be ungrounded. The Fifth Circuit has held that *Affiliated Ute*'s presumption is only available for claims under subsections (a) and (c) of Rule 10b–5, and not for claims under subsection (b), because claims under Rule 10b–5(b) are inherently tied up with affirmative statements and therefore do not require proof of a speculative negative. In the Fifth Circuit's own words:

> By the terms of [Rule 10b–5], a presumption of reliance would not arise where the plaintiff's case is grounded in the second subsection. Subsection [(b)] requires disclosure only when necessary to make a statement made not misleading. For this reason, a subsection [(b)] claim always rests upon an affirmative statement of some sort, reliance on which is an essential element plaintiff must prove. . . . By contrast, under the first and third subsections the duty not to engage in a fraudulent 'scheme' or 'course of conduct' could be based primarily on an omission. Hence, the presumption could be warranted only under subsections one and three, but not under subsection two.

*Smith v. Ayres*, 845 F.2d 1360, 1363 (5th Cir. 1988).[5]

---

[5] A person violates Rule 10b–5(a) by "employ[ing] any device, scheme, or artifice to defraud" in

16

The Fifth Circuit's framework is also consistent with *Affiliated Ute* itself, for the claims in that case were not based on Rule 10b–5(b). The Supreme Court in *Affiliated Ute* considered whether members of the Ute Indian Tribe were required to prove reliance affirmatively when they alleged that bank officers bought tribal members' restricted stock without disclosing the bank's creation of a secondary market in which the stock could be resold for profit. *See* 406 U.S. at 133-39. The Court ruled that the tribal members' allegations were not based on misrepresentations under what is now Rule 10b–5(b), but instead on a "'course of business' or a 'device, scheme or artifice' that operated as a fraud" under what are now subsections (a) and (c) of Rule 10b–5. *Id.* at 153. Given the bank's relationship with the tribal members and its access to material information about the market for the members' shares, the Court held that the bankers had a duty to disclose the existence of this secondary market to the plaintiffs. *Id.* at 152-53. The Court also held that "[u]nder the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Id.* at 153.

In *Affiliated Ute*, then, the predicate acts of fraud were omissions, not misstatements. *See Titan Group, Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir. 1975) (referring to *Affiliated Ute* as a case of "total non-disclosure"). There was therefore concern in *Affiliated Ute* that if the plaintiffs needed to affirmatively prove reliance they would essentially be required to prove a speculative negative—that they would have relied on information about the secondary market for tribal stock had the bank disclosed it. The same concern is not present in cases under Rule 10b–5(b), as claims under that subsection must be based on one or more false or misleading statements. As a result, plaintiffs bringing such claims are not necessarily required to prove a speculative negative in order to prove reliance; they can prove that they relied on the actual statements made.

On the other hand, the Ninth Circuit has not expressly held that *Affiliated Ute* applies only in claims under Rule 10b–5 subsections (a) and (c). And indeed, the Ninth Circuit's decision in

---

connection with the purchase or sale of a security. 17 C.F.R. § 240.10b–5(a).

A person violates Rule 10b–5(c) by "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with the purchase or sale of a security. 17 C.F.R. § 240.10b–5(c).

17

*Binder*, which was a Rule 10b–5(b) case, suggests that *Affiliate Ute*'s presumption may be available in Rule 10b–5(b) cases if they "can be characterized as [cases] that primarily allege[] omissions." *Binder*, 184 F.3d at 1064. Also, despite the somewhat confusing characterization of *Blackie* in *Binder*, *Blackie* appears to have involved both misstatements and omissions, but the Ninth Circuit held that the *Affiliated Ute* presumption was nevertheless available in that case. *Blackie* too, then, suggests that in the Ninth Circuit the *Affiliated Ute* presumption may be available in cases that are based at least in part of affirmative misstatements.

Given these difficulties, it is worth remembering that the question of whether *Affiliated Ute* applies is ultimately not one that needs to be answered at this stage in the litigation. Plaintiff has plausibly alleged that, through its investment advisor, it relied directly on the misleading statements in the Offering Memorandum. Those allegations are sufficient to support the reliance element at the pleading stage, while the question of whether Plaintiff can use *Affiliated Ute* to prove reliance on a class-wide basis is a question that needs to be resolved in considering class certification. Taking this procedural posture into account, the Court will not finally resolve at this time whether Plaintiff may invoke *Affiliated Ute*'s presumption of reliance to prove its case.

**C.     Reliance Summary**

The element of reliance is now well pled under a direct-reliance theory, and so Plaintiff's case may proceed past the pleading stage. It is also clear that a presumption of reliance is *not* available under fraud-on-the-market, fraud-created-the-market, or fraud-on-the-regulatory-process theories. Whether a presumption of reliance is available under *Affiliated Ute* is a thornier issue. But because it is an issue that does not need to be finally resolved until the class certification stage, the Court will not finally resolve it at this time.

**II.     Scienter**

In *Bondholders I*, the Court concluded that it was plausible that Winterkorn and Horn made the misleading R&D and regulatory-risk statements in the May 15, 2014 Offering Memorandum, and that Winterkorn and VWAG (but not Horn and VWGoA) made these statements intentionally or recklessly, i.e., with scienter. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991-92 (9th Cir. 2009) (discussing the scienter standard). Plaintiff has added

allegations to the second amended complaint in an effort to cure the scienter shortfall for Horn and VWGoA. As discussed below, scienter is now well pled as to both of these defendants.

**A.    Analysis of Horn's Scienter in *Bondholders I***

In the original complaint, the earliest allegations supporting that Horn was aware of Volkswagen's emissions fraud were that, on the same date VWGoAF issued the May 15, 2014 Offering Memorandum, he received an email from the then-head of Volkswagen's U.S. Regulatory Compliance Office, Oliver Schmidt, which indicated "that 500,000 [to] 600,000 vehicles in the United States from model years 2009 to 2014 could be affected by the diesel scandal[,]" that potential fines included "'EPA: $37,500 and CARB: $5,500' per violation," and that, given the potential penalties, "'[t]he contents of this [ICCT] study cannot be ignored!'" (Compl. ¶ 290 (third and fourth alterations in complaint).) The ICCT study referenced was a study conducted at West Virginia University that was commissioned by the International Council on Clean Transportation. It indicated that during road tests Volkswagen's "clean diesel" vehicles emitted nitrogen oxides at levels up to 40 times the legal limits. (Compl. ¶ 151.)

Based on the timing of when Horn received the Schmidt email—the same day that the May 14, 2014 Offering Memorandum was issued and only a week before Plaintiff's bond purchase was finalized on May 23, 2014—the Court previously concluded that the email did not support a strong inference that Horn made the statements in the May 15, 2014 Offering Memorandum with scienter, or that his failure to correct the Offering Memorandum by May 23, 2014 was done with scienter. *See Bondholders I*, 2017 WL 3058563, at *11. In reaching this conclusion, the Court explained that "[e]ven if Plaintiff did not finalize its bond purchase until May 23, 2014, and Horn accordingly had time to read the Schmidt email before the transaction was complete, managers are permitted a reasonable amount of time to consider, digest, and investigate negative information before they disclose that information to the public." *Id.* And under the circumstances alleged, the Court reasoned that "it would have been reasonable for Horn to have obtained the Schmidt email and to have considered and investigated the issue for more than a week before disclosing the information to potential bondholders or the public." *Id.*

**B.     New Allegations of Horn's Scienter**

Plaintiff now alleges that Horn first learned of the ICCT study on March 31, 2014, not on May 15, 2014. Specifically, Plaintiff alleges that on March 31 an Audi engineer warned Horn that soon a study would be published that showed that under real-world driving conditions VW's "clean diesel" vehicles "produced emissions up to nearly 40 times higher than allowed by EPA and CARB." (SAC ¶ 170; *see also id.* ¶¶ 77, 171.) Upon learning of this study, Plaintiff alleges that "Horn requested reports and analyses of the ICCT report from VWGoA's Environmental and Engineering Office." (SAC ¶ 77.) Horn allegedly asked for these reports in April 2014. (SAC ¶ 324.) "Managing engineers at VWAG and VWGoA (including several engineers who participated in the design and implementation of the defeat devices in the early-2000s) then provided documentation and information to numerous senior management officials including both Defendants Horn and Winterkorn." (SAC ¶ 171.)

The new allegations adjust the timeline with respect to when Horn first learned that Volkswagen's vehicles were significantly out of compliance with U.S. emission standards. Instead of being notified of the ICCT report on the day that the May 15, 2014 Offering Memorandum was released, and only one week before Plaintiff finalized its purchase of the bonds, on May 23, 2014, Plaintiff now alleges that Horn knew of the ICCT report seven weeks before May 23. Given the amount of time between when Horn is now alleged to have learned about the emissions issue and when Plaintiff's bond purchase was finalized, a strong inference arises that Horn acted with an intent to deceive or with deliberate recklessness when he failed to disclose in the May 15 Offering Memorandum that there was reason to believe that VW's "clean diesel" vehicles were significantly out of compliance with U.S. emission standards.

Horn and Volkswagen, on separate grounds, argue that the new allegations are still not sufficient to support scienter with respect to Horn, but their arguments are not persuasive.

First, Horn contends that the seven-week period between when he is alleged to have learned of the ICCT study and when the bond offering was finalized is still within the bounds of what courts have concluded is a reasonable period of time for managers to investigate potentially negative information before public disclosure. In support of this position, he cites to three cases

that this Court previously relied on in concluding that "managers are permitted a reasonable amount of time to consider, digest, and investigate negative information before they disclose that information to the public." *Bondholders I*, 2017 WL 3058563, at *11 (citing *Slayton v. Am. Express Co.*, 604 F.3d 758, 763-64, 774, 777 (2d Cir. 2010) (affirming dismissal; taking two months to "ascertain and disclose future losses" is "both proper and lawful" (citation omitted)); *Higginbotham v. Baxter Intern., Inc.*, 495 F.3d 753, 760-61 (7th Cir. 2007) (affirming dismissal; disclosing accounting errors at subsidiary two months after discovery was within a "reasonable time" because "[p]rudent managers conduct inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention"); *In re Yahoo! Inc. Sec. Litig.*, No. C 11–02732 CRB, 2012 WL 3282819, at *22 (N.D. Cal. Aug. 10, 2012) (granting dismissal; relying on *Slayton* and *Higginbotham* and concluding that the defendants' disclosure of a corporate restructuring five weeks after receiving notice was reasonable)).

While the Court previously cited favorably to these decisions, they were context specific decisions, and the Court did not conclude that a specific period of time would be reasonable for investigation. Instead, the Court concluded that "it would have been reasonable for Horn to have obtained the [May 15, 2014] Schmidt email and to have considered and investigated the [emissions] issue for more than a week before disclosing the information to potential bondholders or the public." *Bondholders I*, 2017 WL 3058563, at *11. Under the facts alleged now, and drawing all reasonable inferences in Plaintiff's favor, the Court can no longer conclude that Horn's delay was reasonable as a matter of law.

Also, the time periods in the three cited decisions are distinguishable from the time period here in a material way. In each of those decisions, the relevant time period was between the defendants' discovery of potentially negative information and their disclosure of that information to shareholders following internal investigations. On this scale, the seven-week gap between Horn's March 2014 discovery of the emissions issue and the May 2014 bond offering is incomplete. For Horn did not disclose the emissions fraud seven weeks after he is alleged to have become aware of it; he disclosed the fraud *one-and-a-half years* later, on October 8, 2015, in testimony before Congress after EPA had determined that VW had "manufactured and installed

defeat devices in certain model year 2009 through 2015 diesel light-duty vehicles." (SAC ¶ 246; *see also id.* ¶ 271.)  And during that one-and-a-half-year period, Plaintiff alleges that supervisors at Volkswagen agreed to conceal the defeat device in response to questions from U.S. regulators. (SAC ¶ 173.)  Given that Horn did not disclose the emissions issues until Volkswagen was actually caught, the inference that Horn acted with intent to deceive or with deliberate recklessness when he was silent at the time of the May 2014 offering is "cogent and at least as compelling" as the inference that he was still innocently conducting an investigation at that time.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

While Horn focuses on the length of time between the March 2014 email and the May 2014 offering, Volkswagen instead focuses on the content of the March disclosure.  As alleged, Horn learned in March 2014 that certain Volkswagen vehicles did not comply with U.S. emission standards.  (SAC ¶ 77.)  But Plaintiff does not allege that Horn received any report suggesting the existence of an illegal defeat device in the vehicles prior to the May 15, 2014 Schmidt email. (SAC ¶ 302.)  "There is a world of difference," VW argues, "between learning of an anomalous test result on March 31, 2014, to learning of the defeat device on May 15, 2014."  (Dkt. No. 4422 at 23.)

Defendants' failure to disclose Volkswagen's use of the defeat device is indeed the primary omission upon which Plaintiff relies.  *See Bondholders I*, 2017 WL 3058563, at *5 ("Plaintiff contends that the 'heart of this action' is Defendants' failure to disclose their massive defeat-device scheme.").  But Plaintiff also alleges that Defendants omitted other information in the Offering Memorandum, including that a significant number of Volkswagen's vehicles were out-of-compliance with U.S emission standards.  (*See, e.g.*, SAC ¶ 228(c) (alleging that the R&D statements in the Offering Memorandum were misleading, not only because Defendants failed to disclose the illegal defeat device, but also because the statements "implied that Volkswagen had already reduced vehicle emissions when in truth Volkswagen's diesel engines emitted more pollutants than Defendants represented.").)  As alleged in the second amended complaint, Horn knew by March 31, 2014 that Volkswagen's vehicles were significantly out of compliance with U.S. emission standards.  Given what he knew and when he knew it, a strong inference arises that

he acted with intent to deceive or with deliberate recklessness when he failed to disclose this information to bond investors who participated in the May 2014 offering.

The second amended complaint cures the deficiency with respect to pleading a strong inference of scienter as to Horn.

## C.   VWGoA's Scienter

Because Horn was the CEO of VWGoA during the relevant period, the allegations supporting Horn's scienter are also sufficient to raise a strong inference of scienter as to VWGoA. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) ("[A] corporation is responsible for a corporate officer's fraud committed within the scope of his employment[.]").

## III.   Section 20(a) Claims Against Horn

Plaintiff also brings claims against Horn under Section 20(a) of the Exchange Act, asserting that he was a "control person" of VWGoA and VWGoAF.  To prove a prima facie case under Section 20(a), Plaintiff must prove: (1) a primary violation of federal securities laws, and (2) that Horn "exercised actual power or control over the primary violator."  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  In *Bondholders I*, the Court held that a primary violation of the federal securities laws was sufficiently alleged as to VWGoAF, but the Court deferred considering the Horn control-person claims at that time.  Now that scienter is also well pled as to VWGoA, the "primary violation" requirement is satisfied as to both VWGoA and VWGoAF.  Whether the "actual power or control" requirement is satisfied is in dispute.[6]

There is no concrete test for establishing whether a defendant exercises actual power or control over the primary violator.  The question "is an intensely factual" one and "involve[es] scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions."  *Id.* (quoting *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994)).

With respect to Horn's control over VWGoA and VWGoAF, Plaintiff first alleges that

---

[6] In *Bondholders I*, the Court held that Section 20(a) claims against Winterkorn, which asserted that he was a control person of VWGoA and VWGoAF, were well pled.  *See Bondholders I*, 2017 WL 3058563, at *15-16.

1    Horn was President and CEO of VWGoA throughout the class period, and that VWGoA was the

2    direct parent company of VWGoAF.  (SAC ¶¶ 22, 25, 394.)  "[A]lthough a person's being an

3    officer or director does not create any presumption of control, it is a sort of red light."  *Arthur*

4    *Children's Trust v. Keim*, 994 F.2d 1390, 1397 (9th Cir. 1993) (emphasis omitted).  Horn's

5    position as CEO of VWGoA is therefore indicative of control, at least as to VWGoA.

6         Plaintiff also alleges that Horn was personally involved with VWGoA's response to the

7    ICCT study, as he "is believed to have requested reports from VWGoA's Environmental and

8    Engineering Department about the results of the study."  (SAC ¶ 394.)  This allegation supports

9    that Horn exercised "day-to-day oversight" over transactions at VWGoA that contributed to the

10   ultimate fraud, which also supports a finding of control.  *Howard*, 228 F.3d at 1065.

11        Similar allegations support Horn's control over VWGoAF.  Specifically, that Horn was

12   "provided with copies" of the VWGoAF bond Offering Memoranda "prior to or shortly after their

13   issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be

14   corrected."  (SAC ¶ 27.)  "Specific control over the preparation and release of the allegedly

15   misleading false and misleading statements," like this, supports a finding of control.  *Bao v.*

16   *SolarCity Corp.*, No. 14-cv-01435-BLF, 2015 WL 1906105, at *5 (N.D. Cal. Apr. 27, 2015); *see*

17   *also Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1441 (9th Cir. 1987) (directors' day-to-day

18   oversight of company's operations and involvement with the financial statements at issue was

19   sufficient to presume control over "the particular transactions giving rise to the alleged securities

20   violation"), *overruled on other grounds as recognized in Flood v. Miller*, 35 F. App'x 701, 703

21   n.3 (9th Cir. 2002).

22        Horn argues that his role with VWGoA and VWGoAF was similar to the role of the

23   Chairman and former CEO in *Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.3d

24   1151, 1163-64 (9th Cir. 1996), which the Ninth Circuit held was a role that was insufficient to

25   satisfy the "actual control" element.  But the Chairman and former CEO in *Paracor* "was not

26   authorized to act" on the debt offering at issue in that case, and "was not involved in the

27   preparation of any of the offering materials."  *Id.* at 1163-64.  Plaintiff's allegations with respect to

28   Horn are materially different, as Plaintiff alleges that Horn "had the ability and/or opportunity to

24

prevent [the] issuance" of the bond Offering Memoranda, or to "cause them to be corrected." (SAC ¶ 27.) As alleged, Horn had the type of power and control over the allegedly misleading statements that the Chairman and former CEO in *Paracor* lacked.

Horn also notes that in *Howard*, 228 F.3d 1057, the Ninth Circuit determined that a CEO qualified as a control person because he "was authorized to participate in the release of the financial statements *and signed off the on the statements as correct*." *Id.* at 1066 (emphasis added). Unlike in *Howard*, Horn argues that Plaintiff has failed to allege that he signed the Offering Memoranda, or that he otherwise had any involvement in or control over VWGoAF's bond offerings.

The Ninth Circuit did not hold in *Howard* that a Section 20(a) defendant must sign the documents at issue in order to qualify as a control person; singing the documents is simply one sign of control. And contrary to Horn's contention, the allegations do support that he was involved in or had control over the bond offerings, as Plaintiff alleges that he was "provided with copies" of the VWGoAF bond Offering Memoranda "prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected." (SAC ¶ 27.)

Together, the allegations are sufficient to support that Horn exercised actual power or control over VWGoA and VWGoAF. Because the allegations also support a primary violation as to VWGoA and VWGoAF, the Section 20(a) control person claims against Horn are now well pled.

**IV.     Motion to Amend the Complaint**

In opposition to Defendants' motions to dismiss the second amended complaint, Plaintiff asserted for the first time that when Defendants sold VWGoAF bonds in the initial offerings, they engaged in insider trading in violation of Section 10(b) and Rule 10b–5 subsections (a) and (c) and Section 20A of the Exchange Act because they sold the bonds without disclosing the emissions fraud. In raising these claims, Plaintiff noted that insider trading can be committed without affirmative statements, and so Plaintiff asserted that *Affiliated Ute*'s presumption of reliance would apply under this "pure omissions" theory. *See Binder*, 184 F.3d at 1063 (explaining that the

*Affiliated Ute* presumption "is generally available to plaintiffs alleging violations of section 10(b) based on omissions of material fact").

Defendants responded in their reply by noting that these insider-trading claims were not included in the second amended complaint, to which Plaintiff responded by filing a motion to amend the second amended complaint to add the claims. (Dkt. No. 5153.) Defendants have opposed the amendment, arguing that the amendment would be futile. A proposed amended complaint is futile if it would immediately be "subject to dismissal," *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998), and if there is no reason to believe that "the deficiencies can be cured with additional allegations that are consistent with the challenged pleading and that do not contradict the allegations in the original complaint," *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011) (internal quotation marks omitted). That is the case here: the new claims are not meritorious, they would be immediately be subject to dismissal, and the Court cannot conceive of additional facts that would cure the deficiencies identified below.

### A.    Section 10(b) and Rule 10b–5 Insider Trading Claims

Under an insider trading theory of liability, Section 10(b) and Rule 10b–5 are violated (even if no affirmative statements are made) "when a corporate insider trades in securities of his corporation on the basis of material, nonpublic information." *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 370 (2d Cir. 2014) (quoting *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997)). A traditional corporate insider would be someone in senior management or a member of the board of directors. But the Ninth Circuit has held that "[a] corporate *issuer* in possession of material nonpublic information, must, like other insiders in the same situation, disclose that information to its shareholders or refrain from trading with them." *WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1056 (9th Cir. 2011) (quoting *McCormick v. Fund Am. Cos.*, 26 F.3d 869, 876 (9th Cir. 1994)) (emphasis added). "Otherwise, a corporate issuer selling its own securities would be left to exploit its informational trading advantage, at the expense of the investors, by delaying disclosure of nonpublic negative news until after completion of the offering." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1204 (1st Cir. 1996). The Second Circuit has also held that "the duty of corporate insiders to abstain from trading or to disclose material information applies

to unregistered securities." *Steginsky*, 741 F.3d at 371.

So far so good for Plaintiff. All three corporate defendants could conceivably qualify as corporate issuers, as Plaintiff alleges that that VWAG, through VWGoA and VWGoAF, conducted the offerings and issued the bonds. (TAC ¶¶ 390, 397.) And the allegations support that all three entities were in possession of material nonpublic information about the emissions fraud at the time of the offerings. Where Plaintiff runs into trouble, however, is in establishing that Defendants had a duty to disclose this material information to purchasers of corporate *debt*.

To successfully bring a traditional insider trading claim, as is alleged here, a private plaintiff must establish that the defendant had a duty to disclose the information that was withheld. Addressing an insider trading claim in *Chiarella v. United States*, 445 U.S. 222 (1980), the Supreme Court explained that "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Id.* at 235. Such a duty arises, the Court stated, only when one party has information "that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *Id.* at 228 (citation omitted); *see also Paracor*, 96 F.3d at 1157 (explaining that "parties to an impersonal market transaction owe no duty of disclosure to one another absent a fiduciary or agency relationship, prior dealings, or circumstances such that one party has placed trust and confidence in the other").

As to shareholders, the Ninth Circuit has held that "there is little doubt that the relationship between a corporation and its shareholders engenders the type of trust and confidence necessary to trigger the duty to disclose" material information or abstain from trading. *McCormick*, 26 F.3d at 876 (citation omitted). But the overwhelming majority of courts have held that "corporations do *not* have a fiduciary relationship with their unsecured creditors, including debt security holders," because this relationship "is contractual rather than fiduciary." *Alexandra Glob. Master Fund, Ltd. v. Ikon Office Sols., Inc.*, No. 06 CIV. 5383 (JGK), 2007 WL 2077153, at *4 (S.D.N.Y. July 20, 2007) (emphasis added) (describing this rule as "well established" and collecting cases in support); *see also Lorenz v. CSX Corp.*, 1 F.3d 1406, 1417 (3d Cir. 1993) ("It is well-established that a corporation does not have a fiduciary relationship with its debt security holders, as with its shareholders."); Harvey L. Pitt & Karl A. Groskaufmanis, *A Tale of Two Instruments: Insider*

*Trading in Non-Equity Securities*, 49 Bus. Law. 187, 213 (1993) ("[T]he prevailing notion of debt securities expressly rules out the fiduciary relationship that gives rise to a duty to abstain or disclose.").

The basis for this distinction between shareholders and debtholders (including bondholders) is that "a contractual entitlement to the repayment of a debt . . . does not represent an equitable interest in the issuing corporation necessary for the imposition of a trust relationship with concomitant fiduciary duties." *Alexandra*, 2007 WL 2077153, at *5 (quoting *Simons v. Cogan*, 549 A.2d 300, 303, (Del. 1988)); *see also* Morey W. McDaniel, *Bondholders and Corporate Governance*, 41 Bus. Law 413, 413 (1986) ("Stockholders are owners; bondholders are creditors. Corporate law is for stockholders; contract law is for the debtholders."). There is also a well-established belief that bondholders, as creditors, can protect themselves—or alternatively that an indentured trustee can protect future bondholders—by negotiating the terms of the indenture agreements. *See, e.g.*, *Simon*, 542 A.2d 785, 789 (Del. 1987) ("Courts traditionally have directed bondholders to protect themselves against self-interested issuer action with explicit contractual provisions . . . . [A] heavy black-letter line bars the extension of corporate fiduciary protections to them." (quoting Bratton, *The Economics and Jurisprudence of Convertible Bonds*, 1984 Wis. L. Rev. 667, 668 (1984))).

The distinction between the duties owed to shareholders and bondholders is not without academic critique. *See* Lawrence E. Mitchell, *The Fairness Rights of Corporate Bondholders*, 65 N.Y.U. L. Rev. 1165, 1179, 1184, 1187 (1990) (asserting that indenture agreements provide limited protection to bondholders and that although bondholders are not owners of the corporation they entrust their investments to corporate management in a manner similar to the way shareholders do). But those making these critiques have acknowledged that they "do not have a great deal of law supporting them." *Id.* at 1168 n.11.

Indeed, although Plaintiff has cited to a number of decisions in which courts have held that a corporate issuer has a duty to disclose material information or refrain from trading, almost all of those decisions involved trading with shareholders, not debt holders, and so are not on point. *See, e.g.*, *Steginsky*, 741 F.3d at 367, 370-71 (corporate insiders had a duty to disclose material

nonpublic information before purchasing unregistered shares of stock in the company); *Spot Runner*, 655 F.3d at 1056 (explaining that a "corporate issuer in possession of material nonpublic information, must, like other insiders in the same situation, disclose that information to its *shareholders* or refrain from trading with them") (citation omitted) (emphasis added); *Shaw*, 82 F.3d at 1204 (discussing duty to disclose in the context of "a stock transaction"); *Sec. & Exch. Comm'n v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 840-42, 848 (2d Cir. 1968) (discussing duty to disclose in context of stock purchase by insiders).

Plaintiff does cite to two decisions in which courts have held that corporate insiders have a fiduciary relationship with their creditors or otherwise owe their creditors a duty to disclose material information. *See In re Worlds of Wonder Sec. Litig*, No. C 87-5491, 1990 U.S. Dist. LEXIS 18396 (N.D. Cal. Oct. 19, 1990); *Little v. First Cal. Co.*, No. Civ. 74-71, 1977 U.S. Dist. LEXIS 13427 (D. Az. Oct. 17, 1977). *Worlds of Wonder* is distinguishable for this case and *Little* is not persuasive.

In *Worlds of Wonder*, the court held that corporate insiders owed fiduciary duties to those who held the company's convertible debt. Convertible debt is "something of a hybrid—basically a debt security, but with equity features." *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 940 (5th Cir. 1981). Because of this special status, it is not particularly surprising that the court in *Worlds of Wonder* held that the corporate insiders there owed fiduciary duties not only to the corporation's shareholders but also to its convertible debtholders. The VWGoAF bonds at issue here were not convertible and so there is no similar reason why Defendants' fiduciaries duties should be extended.[7]

As for *Little*, 1977 U.S. Dist. LEXIS 13427, the district court there did hold that a controlling shareholder's agents (and by implication, the controlling shareholder) had a duty to disclose material information to purchasers of subordinated capital notes. *See id.* at *1-3, 13-17.

---

[7] Also, contrary to *Worlds of Wonder*, other courts have refused to extend fiduciary duties to the holders of convertible debt. *See, e.g.*, *Simons*, 542 A.2d at 791 (reasoning that the "risks that the fiduciary duty concept was designed to address" do not arise until convertible bonds are actually converted into stock).

United States District Court
Northern District of California

But the *Little* court did not address the distinction drawn by other courts between an insider's duty to disclose material information to its shareholders and the lack of such a duty to its debtholders. Instead, the court appeared to assume, as a starting point, that the controlling shareholder had a duty to disclose, and then turned its focus to the "open question" of whether the controlling shareholder's disclosure obligations were shared by its agents. *Id.* at *14. *Little*, then, did not directly engage with the question at issue here. Also, *Little* is only one district court case, and a number of more recent decisions have held that a corporation does not have a duty to disclose material nonpublic information to its debt security holders. *See, e.g.*, *Lorenz*, 1 F.3d at 1417; *Aleandra*, 2007 WL 2077153, at *4.[8]

With the weight of authority supporting that corporate insiders do not owe fiduciary duties to purchasers of corporate debt, Plaintiff argues that Defendants, as corporate insiders, nevertheless had a duty to disclose the emissions fraud to VWGoAF bond purchasers simply because they were counterparties to the sale of the bonds. In support of this point, Plaintiff quotes from *SEC v. Bauer*, 723 F.3d 758 (7th Cir. 2013), where the court stated that corporate insiders have "an affirmative duty to disclose to the trading *counterparty* or abstain from trading." *Id.* at 769 (emphasis added). In the sentence immediately preceding the one just quoted, the *Bauer* court explained that this affirmative duty arises from the "relationship of trust and confidence between the *shareholders* of a corporation and those insiders who have obtained confidential information by reason of their position within that corporation." *Id.* (emphasis added) (quoting *Chiarella*, 445 U.S. 222). In light of this specific focus on the relationship between corporate insiders and shareholders, *Bauer* does not support a broad duty to disclose to any and all counterparties, as Plaintiff argues.

Plaintiff also relies on the SEC's decision *In re Cady, Roberts & Co.*, 40 S.E.C. 907, 1961 WL 60638 (Nov. 8, 1961), in which the Commission concluded that an insider's disclosure

---

[8] Plaintiff also relies on *SEC v. Rorech*, 720 F. Supp. 2d 367, 376 (S.D.N.Y. 2010), but the court there did not hold that corporate insiders owe fiduciary duties to debtholders. Instead, the court noted that a salesperson selling high-yield debt owed a "duty of confidentiality" to its employer, Deutsche Bank, not to engage in "conduct constituting secreting, stealing, or purloining of material non-public information." *Id.* at 409. No similar "employer-imposed fiduciary duty" is implicated here.

responsibilities are not "limited to existing stockholders," but also extend to the "buying public." *Id.* at *5. Based on this statement in *Cady, Roberts* Plaintiff suggests that Defendants owed a duty to disclose the emissions fraud to the market at large. *Cady*, though, like most other cases on which Plaintiff relies, involved the sale of stock. Indeed, the Supreme Court in *Chiarella* discussed *Cady, Roberts* and explained that the Commission there "recognized a relationship of trust and confidence between the *shareholders* of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation." 445 U.S. at 228 (emphasis added). The sale of stock is simply not at issue here. Nor has Plaintiff cited to authority supporting that a corporation's bondholders can sidestep the fact that they do not have a fiduciary or similar relation of trust with the corporation—as needed to prevail on a traditional insider trading claim—by relying on the duties owed by the corporation to current and future shareholders.

"When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Chiarella*, 445 U.S. 222. Defendants owed no such duty to Plaintiff because at the time they sold Plaintiff VWGoAF bonds Plaintiff was a prospective bondholder, not a current or future shareholder. Because of this shortcoming, Plaintiff's proposed Section 10(b) and Rule 10b–5 insider trading claims would be immediately subject to dismissal were the Court to permit Plaintiff to amend its complaint. There is also no reason to believe that the deficiencies in the pleading, which are based on Plaintiff's status as a bondholder, a status that is central to the other claims alleged (which are based on statements made to Plaintiff in a bond offering memorandum), can be cured with additional allegations. The Court therefore concludes that Plaintiff's proposed Section 10(b) and Rule 10b–5 subsection (a) and (c) insider trading claims are futile.

## B. Section 20A Insider Trading Claim

Plaintiff also seeks to amend the complaint to add an insider trading claim under Section 20A of the Exchange Act, which provides a private right of action against "[a]ny person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information." 15 U.S.C. § 78t–1(a).

Congress enacted Section 20A as part of the Insider Trading and Securities Fraud

Enforcement Act of 1988, Pub. L. No. 100–704, § 5, 102 Stat. 4677, 4680. The provision was added both to "codify the existence of a private right of action for insider trading violations," which had already been recognized as an implied right of action under Section 10(b) and Rule 10b–5, *Gordon v. Sonar Capital Mgmt. LLC*, 92 F. Supp. 3d 193, 203 (S.D.N.Y. 2015), and to "alter the remedies available in insider trading cases." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 362 (1991). Specifically, given the "difficulties of ferreting out evidence sufficient to prosecute insider trading cases," *Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir. 1994) (citation omitted), Congress added a five-year limitations period for Section 20A claims, which extended the limitations period well past that for claims brought under other sections of the Exchange Act. *See Gilbertson*, 501 U.S. at 359-60.

As the Supreme Court explained in *Gilbertson*, "[t]he language of § 20A makes clear that . . . Congress sought to alter the remedies available in insider trading cases, and *only* in insider trading cases." 501 U.S. at 362. As a result, courts have held that in order to state a claim for violation of Section 20A, the plaintiff must first plead "a predicate insider trading violation of the Exchange Act." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 309 (S.D.N.Y. 2008); *see also In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1202 (C.D. Cal. 2008) (reasoning that the "*by* purchasing or selling" language of Section 20A "means that the predicate violation must be an act of insider trading").

The only predicate insider trading claims alleged by Plaintiff are for violation of Section 10(b) and Rule 10b–5 subsections (a) and (c). These insider-trading claims are not meritorious for the reasons discussed above. Plaintiff has therefore failed to plead "a predicate insider trading violation of the Exchange Act," *Take-Two*, 551 F. Supp. 2d at 309, as necessary to bring a Section 20A claim. Further, because the predicate claims are futile, so is the Section 20A claim.

## CONCLUSION

The allegations in the second amended complaint have cured previously noted deficiencies with respect to the elements of reliance and scienter. As a result, Plaintiff has now sufficiently pled Section 10(b) and Section 20(a) claims against Defendants and the parties may proceed with discovery. *See* 15 U.S.C. § 78u-4(b)(3)(B) (requiring that "all discovery and other proceedings

shall be stayed during the pendency of any motion to dismiss"). Defendants' motions to dismiss are DENIED.

Although Plaintiff has plausibly alleged that it relied directly on the misleading statements at issue in the May 2014 Offering Memorandum, Plaintiff is not entitled to a presumption of reliance under *Basic* or under the fraud-created-the-market or fraud-on-the-regulatory-process theories. The Court will, however, reconsider at the class certification stage whether Plaintiff may invoke a presumption of reliance under *Affiliated Ute*.

Plaintiff's motion to amend the complaint is DENIED. The insider trading claims that Plaintiff seeks to add are based upon nondisclosure. As a result, they would be actionable only if Defendants had information that Plaintiff was entitle to know "because of a fiduciary or other similar relation of trust and confidence." *Chiarella*, 445 U.S. at 228. No such fiduciary duty or relation of trust existed because Plaintiff was a purchaser of corporate debt.

Defendants shall answer the complaint by Friday, September 28, 2018.

**IT IS SO ORDERED.**

Dated: September 7, 2018

_____

CHARLES R. BREYER
United States District Judge