Stephen G. Recordon (SBN 91401)
**Recordon & Recordon**
225 Broadway, Suite 1900
San Diego, CA  92101
Telephone: (619) 232-1717
Facsimile: (619) 232-5325
Email: 1sgrecordon@gmail.com

Attorneys for Plaintiffs Kirk Zinsser and Tammy Zinsser

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

*In re: Volkswagen 'Clean Diesel' Marketing, Sales Practices, and Products Liability Litigation*

**THIS DOCUMENT RELATES TO CASE No.  18-cv-00669-CRB**

| | |
|---|---|
| Kirk Zinsser and Tammy Zinsser,<br><br>                                        Plaintiff,<br><br>vs.<br><br>Volkswagen Aktiengesellschaft, Volkswagen Group of America, Inc, Robert Bosch GmbH, Robert Bosch, LLC, and James Robert Liang,<br><br>                                        Defendants. | Lead Case No. 15-md-02672-CRB<br> Case No.  18-cv-00669-CRB<br><br>First Amended Complaint for Violations of the Racketeer Influenced and Corrupt Organizations Act, Consumer Legal Remedies Act, California Business and Professions Code §17200 *et seq*., California Business and Professions Code §17500 *et seq*., Fraud, and Negligence |

        Plaintiffs Kirk Zinsser and Tammy Zinsser, through their counsel, bring this action to challenge the acts of Volkswagen Aktiengesellschaft ("Volkswagen AG"), also known as Volkswagen AG, Volkswagen Group of America, Inc ("VGA") (Volkswagen AG and VGA collectively referred to as "Volkswagen"), Robert

Bosch GmbH ("Bosch GmbH") Robert Bosch, LLC ("Bosch, LLC")(Bosch GmbH and Bosch, LLC collectively referred to as "Bosch") and James Robert Liang ("Liang")(all named defendants collectively referred to as "Defendants") regarding the fraudulent manufacture and sale of a defective 2013 Volkswagen Jetta ("Vehicle") to Plaintiffs, and the subsequent concealment of this fraud, and Plaintiffs suffered damage as a result of these acts.

Plaintiff alleges the following on information and belief.

## I.    Introduction

*O what a tangled web we weave, when first we practice to deceive.*
*Sir Walter Scott, 1808.*

Little has changed in human nature since 1808.

1.      This case is fundamentally about a tangled web of deception, straddling continents and corporations. This ill begotten plot, conceived by Volkswagen and Bosch in Germany, bore poisoned fruit on American shores, and damaged hundreds of thousands of American consumers.

2.      This joint enterprise defrauded at least three groups of people in the United States: first, the government regulators charged with preventing noxious NOx emissions in the United States and California, second, the vehicle dealers selling these vehicles to the American public, and third, the American public itself, including hundreds of thousands of consumers such as Plaintiffs.

3.      The goal of this enterprise was to market and sell diesel vehicles in the United States that, unbeknownst to the government or the wholly innocent public, met neither U.S. emissions standards, nor consumer expectations.

4.      In the years leading up to 2007, Volkswagen AG, as well as Audi AG and Volkswagen Group of America, Inc ("VGA")(collectively, "Volkswagen"), had a problem.  Volkswagen's then current diesel engine would not meet United States diesel emissions standards set to take effect in 2007.  Both the United States and California were tightening the emissions requirements for passenger vehicles, and

meeting these new standards would likely require a significant and potentially expensive re-working of Volkswagen's diesel engines.

5.      In the meantime, Toyota was already selling a low emissions hybrid electric-gasoline vehicle, the Prius, in the United States.  Toyota was well positioned to meet U.S. emissions standards, and Volkswagen, which had no hybrid vehicles on offer in the United States, was not.

6.      If Volkswagen wanted to compete in the market for low emission "clean" passenger vehicles, they needed to come up with a vehicle, whether diesel or not, that was price competitive with the Prius and similar vehicles, had low emissions, and was attractive to consumers.

7.      Or alternatively, Volkswagen could simply lie to the public and the government, pretend that their diesel vehicles had low emissions, and advertise them for sale as "clean," low emissions vehicles, and hope no one caught on.

8.      This second course required the use of a "defeat device," a hardware or software solution that would allow Volkswagen's "clean" vehicles to cheat emissions tests, undetected. This course also required an utter contempt for the rule of law, for the air quality breathed by Volkswagen's customers, and for the reasonable expectations of the customers that Volkswagen planned to mislead and fleece of their earnings.

9.      Volkswagen briefly considered the first course, but decided honesty required too high a price, and opted for the second, more lucrative course.

10.      Volkswagen decided to enlist the assistance of another large German manufacturer, Bosch.  Robert Bosch GmbH, and their wholly owned subsidiary, Robert Bosch, LLC (jointly, "Bosch") voluntarily joined Volkswagen in their scheme to design, manufacture, export to the United States, and market and sell in the United States, through a network of vehicle dealers, diesel passenger vehicles that appeared to be "clean," low emission diesel vehicles.  These vehicles were fraudulently marketed and offered as vehicles with low emissions, ample torque and

good gas mileage at a reasonable price: an attractive offer to consumer who otherwise might consider real low emissions alternatives such as the Prius, or other hybrid gasoline electric vehicles.

11.     Bosch, along with Volkswagen and a number of other co-conspirators, formed an enterprise to design and manufacture a "defeat device," install this device on Volkswagen's vehicles, and help Volkswagen mislead the United States and California governments into believing that these vehicles had low emissions, and thus allow them to be sold in the United States and California, and finally help Volkswagen mislead the public into buying hundreds of thousands of "clean" diesel passenger vehicles, unaware that they were polluting their own atmosphere all the while.

12.     This scheme was ultimately successful, and Volkswagen sold hundreds of thousands of "clean diesels" in the United States from 2009 to 2015, until Volkswagen, and eventually the other members of this fraudulent enterprise, were finally caught.

13.     This successful fraud benefited both Volkswagen, who profited from the sales, as well as Bosch, who profited from their significant automotive part sales, as well as the other members of this fraudulent enterprise, who also profited in the form of wages, or other consideration.

14.     The fraudulent acts of this joint enterprise have damaged the environment, as well as the reputation and sales of Volkswagen's chain of dealers.

15.     However the principal parties damaged here are the hundreds of thousands of consumers who bought into Defendants' lies, and handed their money to a criminally convicted corporation.

16.     No reasonable consumer would have purchased Volkswagen's vehicles had they known the true character and quality of these vehicles, which did not even meet minimum legal standards, much less the standards at which they were advertised.

17.     Because of Defendants' false representations and fraudulent acts, American consumers actually paid a premium, for vehicles which never met the standard that Defendants' claimed.

18.     Among those damaged consumers are Plaintiffs, who bring this suit to rectify the damages caused to Plaintiffs by Defendants' repeated, intentional, willful, knowing and joint fraudulent acts.

19.     While many violations are described below with specificity, this Complaint alleges violations of the statutes cited in their entirety.

## II.     Jurisdiction and Venue

20.     Jurisdiction of this Court arises pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1367 for supplemental state claims.

21.     This action arises out of Defendants' violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO Act"), 18 U.S.C. §1962 et seq, the Consumer Legal Remedies Act ("CLRA") California Civil Code §§1750 et seq, California Business and Professions Code §17200 et seq., California Business and Professions Code §17500 et seq, fraud and negligence.

22.     As Defendants do business in the state of California, and committed the acts that form the basis for this suit with the intent to cause effects in the state of California, this Court has personal jurisdiction over Defendants for purposes of this action.

23.     Venue is proper in the Northern District of California pursuant to the standing December 8, 2015 Multi-District Litigation ("MDL") order regarding Defendants' acts, Docket number 1 in case number 15-md-02672 CRB JSC.  Were there no standing MDL Order, venue would still be proper in California as at least one named Defendant does business in California and the acts at issue took place in California.

/ / /

/ / /

# PARTIES

24.    Plaintiffs are natural persons, adults, residents of Ramona, California and purchased the Vehicle at issue in Escondido, California.

25.    Plaintiffs are informed and believe and thereon allege that Defendant Volkswagen AG is a German corporate entity (*Aktiengesellschaft*), doing business in the state of California.

26.    Volkswagen AG is one of the largest motor vehicle manufacturers on Earth, and owns Volkswagen Group of America, Inc ("VGA"), Audi Aktiengesellschaft ("Audi AG") and Dr. Ing. H.c. F. Porsche Aktiengesellschaft ("Porsche AG").

27.    Plaintiffs are informed and believe and thereon allege that Defendant Volkswagen Group of America, Inc ("VGA") is a New Jersey corporation, doing business in the state of California.

28.    At all pertinent times, VGA was a wholly owned subsidiary of Volkswagen AG.  See Paragraph 3 of Exhibit 2, "Statement of Facts", incorporated in the Rule 11 Plea Agreement signed by Volkswagen AG on January 11, 2017 in the criminal matter of *United States of America v. Volkswagen AG,* Case no 16-cr-20394 (ED Mich), filed on March 10, 2017 (docket no 68) and accepted by the Court on April 21, 2017.  For the ease of the Court and parties, as well as economy of space, all further references to this document will be to "VW PA," *e.g.* VW PA ¶3.

29.    VGA imports, markets and distributes Volkswagen AG's vehicles in the United States.

30.    Volkswagen AG conducts its business in the United States through VGA and VGA performs all or most of the functions, such as marketing, importation and distribution of vehicles that Volkswagen AG would perform if Volkswagen AG conducted its business in the United States directly, instead of through its subsidiary VGA.

First Amended Complaint                                                                                    15-md-02672-CRB

31.     VGA uses Volkswagen's logo, trademarks and trade name.

32.     Plaintiffs are informed and believe, and thereon allege that during the course of the conspiracy at issue here, Volkswagen AG and VGA shared employees, or had employees change employment from on entity to the other, and that a portion of these employees were directly involved in the conspiracy at issue.

33.     Volkswagen AG's relationship with VGA gives Volkswagen AG substantially the business advantages that it would enjoy if it conducted its business through its own offices or paid agents in the United States, and in California.

34.     Given the relationship between Volkswagen AG and VGA, VGA is a "general manager" of Volkswagen AG for purposes of California Code of Civil Procedure §426.10(d) and is an involuntary agent for Volkswagen AG for purposes of service of process.

35.     Plaintiffs are informed and believe and thereon allege that Defendant Bosch GmbH is a German corporate entity (*Gesellschaft mit beschränkter Haftung*) doing business in the state of California.

36.     Bosch GmbH generates the majority of its annual sales worldwide from automotive technology, and is deeply involved in the design and implementation of control systems for passenger vehicles across the globe, including diesel passenger vehicles.

37.     Bosch GmbH is subject to the personal jurisdiction of this Court because it availed itself of the laws of the United States through its management and control over Bosch LLC, and over the design, development, manufacture, distribution, testing, and sale of the defeat devices that were installed in the Plaintiff's vehicles and thousands of other affected vehicles throughout each of the fifty states in the United States.

38.     Plaintiffs are informed and believe and thereon allege that Defendant Robert Bosch, LLC ("Bosch LLC") is a Delaware limited liability company with its principal place of business in Michigan.

39.     Bosch LLC is a wholly-owned subsidiary of Bosch GmbH, and directly and/or in conjunction with its parent Bosch GmbH, designed, manufactured, developed, tailored, reviewed, approved, and supplied elements of the defeat devices at issue here.

40.     Bosch, LLC also lobbied U.S. regulators on behalf of both Bosch GmbH and Volkswagen, and promoted its "clean diesel" technology.

41.     Bosch GmbH conducts its business in the United States through Bosch, LLC and Bosch LLC performs all or most of the functions, such as marketing, that Bosch GmbH would perform if Bosch GmbH conducted its business in the United States directly, instead of through its subsidiary Bosch, LLC.

42.     Bosch, LLC uses Bosch's logo, trademarks and trade name, and identifies itself as "Bosch," both identifying itself and acting as if Bosch, LLC and Bosch GmbH were a single unit.

43.     Plaintiffs are informed and believe, and thereon allege that during the course of the conspiracy at issue here, Bosch LLC and Bosch GmbH shared employees, or had employees change employment from one entity to the other, and that a portion of these employees were directly involved in the conspiracy at issue.

44.     Bosch GmbH's relationship with Bosch, LLC gives Bosch GmbH substantially the business advantages that it would enjoy if it conducted its business through its own offices or paid agents in the United States, and in California.

45.     Given the relationship between Bosch GmbH and Bosch LLC, Bosch, LLC is a "general manager" of Bosch GmbH for purposes of California Code of Civil Procedure §426.10(d) and is an involuntary agent for Robert Bosch GmbH for purposes of service of process.

46.     James Liang is an individual, who was living and working in California at some of the pertinent times at issue here.

/ / /

/ / /

47.     From 1983 to May 2008, Defendant James Robert Liang ("Liang") was an employee of Volkswagen AG ("Volkswagen AG"), working in Volkswagen AG's diesel development department in Wolfsburg, Germany.

48.     From about May 2008 to the present, Liang was the Leader of Diesel Competence for VGA, a Volkswagen subsidiary.

49.     Liang is currently an inmate at Taft Correctional Institute in Taft, California.

50.     All of the named parties herein formed a conspiracy, and an enterprise, which willfully and fraudulently committed the joint intentional wrongful acts which form the basis for this action.

## OTHER PARTIES OF INTEREST

51.     Heinz-Jakob Neusser was the head of the Volkswagen brand engine development department from October of 2011 until July of 2013.[1]

52.     From July of 2013 until September of 2015, Neusser was the head of Engine Development for all of Volkswagen's brands, as well as head of development for the Volkswagen brand, and sat on the Management Board for the Volkswagen brand.[2]

53.     From October of 2012 until September 2015.  Heinz-Jakob Neusser was also head of Development for the Volkswagen Brand, and in that capacity oversaw over 10,000 Volkswagen employees.[3]

54.     Rudolf Krebs was a supervisor in charge of the Volkswagen brand engine development department from May of 2005 until April of 2007.[4]

55.     Jens Hadler was the head of Engine Development for the Volkswagen brand from May of 2007 until March of 2011.[5]

---

[1] VW PA ¶7
[2] Id
[3] Id
[4] VW PA ¶8
[5] VW PA ¶9

56.     Richard Dorenkamp was the head of Volkswagen AG's Engine Development After-Treatment Department from 2003 until December of 2012.[6]

57.     From 2006 until December of 2012, Dorenkamp led the team of engineers that developed the "EA 189 2.0 liter engine," also later referred to as the "Generation 1" or "Gen 1" engine.

58.     Oliver Schmidt is an individual who was employed by VGA as General Manager of their Environment and Engineering Office in Michigan, from 2012 to about February of 2015.

59.     Oliver Schmidt was later employed, from March of 2015 to September of 2015, by Volkswagen AG, and worked under the head of Engine Development for Volkswagen AG during that period.

60.     Plaintiffs are informed and believe and thereon allege that Defendant Audi Aktiengesellschaft ("Audi AG") is a German corporation, doing business in the state of California.

61.     Audi AG is a motor vehicle manufacturer.

62.     Volkswagen AG holds a 99.55 percent ownership stake in Audi AG.

63.     Audi of America, LLC is a Delaware limited liability company, and a wholly owned subsidiary of Audi AG, and an involuntary agent for Audi AG for purposes of service of process.

64.     Audi of America, LLC engages in advertising, marketing and sales of Audi-branded vehicles throughout the United States, including California.

65.     At all pertinent times, Volkswagen AG owned a fifty percent stake in a vehicle software and technology company, IAV GmbH.[7]

66.     IAV GmbH has an American subsidiary, Automotive Engineering, Inc.

67.     IAV employees were part of an enterprise that included Bosch and Volkswagen and that had a common purpose of designing and implementing a defeat device in diesel vehicles to be later exported and sold in the United States.

---

[6] VW PA ¶12

First Amended Complaint

## FACTS COMMON TO ALL CAUSES OF ACTION

***Volkswagen's Problem***

68.     During the opening years of this century, Volkswagen faced a problem.

*Stricter European NOx Standards*

69.     In Volkswagen's home market in Western Europe, nearly half of the passenger vehicles sold were diesel vehicles, and that number was on the increase, passing fifty percent in 2006.[8]

70.     As the largest European vehicle manufacturer, Volkswagen was deeply invested in this diesel market.

71.     In the meanwhile, Western Europe was adopting progressively stricter emissions controls for both diesel and gasoline powered passenger vehicles, including nitrous oxides (nitrous oxide and nitrous dioxide, collectively referred to hereinafter as "NOx").

72.     In 2005, the European standard "Euro 4" went into effect, reducing by half the level of NOX emissions allowed for diesel passenger vehicles, with a further reduction set for 2009, under the "Euro 5a" standard.

73.     Volkswagen needed to meet European emissions standards, and as half of the market was for diesel, wanted to continue selling diesel vehicles in Europe.

74.     Without a diesel vehicle able to meet these standards, Volkswagen would have to either limit themselves to gasoline or hybrid engines, or design a "cleaner" diesel emissions system.

75.     Given the strong market for diesel passenger vehicles, it made economic sense to develop a "clean" diesel vehicle that met these new standards.

/ / /

/ / /

/ / /

---

[7] VW PA ¶6 and https://www.iav.com/en/about-iav/iav-figures
[8] https://www.acea.be/statistics/tag/category/share-of-diesel-in-new-passenger-cars, downloadable Excel sheet entitled "Share_of_diesel_in_new_cars_in_West_Europe_(1990-2017)"

First Amended Complaint                                                                15-md-02672-CRB

*Stricter American NOx Standards*

76.     In the United States, the market was different: instead of a nearly even split between gasoline and diesel, passenger vehicles were overwhelmingly gasoline powered.

77.     However, like Western Europe, the United States was moving towards stricter NOx emissions standards for both diesel and gasoline passenger vehicles.

78.     In 1998, the United States established new federal emissions standards that would be implemented in separate steps, or Tiers. Tier II emissions standards, including for NOx emissions, were significantly stricter than Tier I.

79.     For light-duty vehicles, the regulations required manufacturers to begin to phase in compliance with the new, stricter Tier II NOx emissions standards in 2004 and required manufacturers to fully comply with the stricter standards for model year 2007.[9]

80.     Similarly, California adopted "LEV II" standards that required the same emissions for light duty diesel vehicles by 2004, with certain exceptions for a "phase-in" period through the end of 2006.[10]

*Demand for Fuel Efficient Vehicles*

81.     Meanwhile, during the period from 2002 to 2008, in the United States the average price of fuel, both gasoline[11] and diesel,[12] rose steadily year over year, leading to significant demand for fuel efficient passenger vehicles during this period.

/ / /

/ / /

---

[9] VW PA ¶22, 66 FR 5009 ("For vehicles up to 6000 lbs GVWR (LDVs) and light light-duty trucks (LLDTs)), the interim standards begin in 2004 and phase out by 2007, as they are replaced by the final Tier 2 standards.")

[10] 13 CCR 1961.

[11] https://www.statista.com/statistics/204740/retail-price-of-gasoline-in-the-united-states-since-1990/

[12] https://data.worldbank.org/indicator/EP.PMP.DESL.CD?end=2016&start=1993

82.     In other words, during the period leading up to 2009, it became obvious that vehicle manufacturers who wanted to sell passenger vehicles in the United States and Western Europe would only be able to meet customer demand and minimum legal standards by producing fuel efficient, low emission vehicles, whether diesel or gasoline powered.

83.     Democratic governments respond to public needs, and these new higher standards, in both Europe and the United States, were driven by a public demand for cleaner vehicles.

84.     If Volkswagen wanted to continue to sell passenger vehicles in the United States, and to meet the rising public demand for "cleaner" passenger vehicles, they needed to develop a vehicle that both fuel efficient and low-emission.

*Toyota's Solution*

85.     Volkswagen's largest competitor, Toyota, responded to these trends by designing and marketing a variety of low emission, fuel efficient gasoline passenger vehicles, including the Toyota Prius.

86.     Toyota developed the Prius, and introduced it to the U.S. and European markets in 2000,[13] where sales steadily grew.[14] [15]

*Volkswagen Decides to Concentrate on Diesel*

87.     Volkswagen, which sold primarily gasoline passenger vehicles, could have focused on a fuel efficient, low emission gasoline engine, as Toyota did, and simply move away from diesel.

88.     However, Volkswagen had significant investments in diesel, and a major market, Western Europe, that was accustomed to purchasing diesel passenger vehicles.

89.     Volkswagen could also have developed a diesel engine for Western Europe, and concentrated on gasoline engines in the American market.

---

[13] http://www.greencarcongress.com/2012/05/tmc-20120522.html
[14] http://carsalesbase.com/european-car-sales-data/toyota/toyota-prius/
[15] http://www.greencarcongress.com/2012/05/tmc-20120522.html

90.     However, while Volkswagen did produce thousands of gasoline powered vehicles across the world, they needed a vehicle that was both fuel efficient and clean for the American market, to compete with Toyota.

91.     Regular gasoline engines are cleaner than diesel, but are far less fuel efficient: a diesel engine can be up to thirty percent more fuel efficient than an equivalent gasoline engine.[16]

92.     If the goal was simply fuel efficiency, Volkswagen was well placed to meet Toyota's challenge:  Volkswagen was already selling thousands of diesel passenger vehicles.

93.     However, this efficiency comes with a caveat: diesel emissions are far harder to control than gasoline emissions.

94.     While gasoline engines burn fuel more completely due to the use of a spark plug, and therefore are cleaner, diesel engines use compression for combustion and tend not to burn fuel completely when they are at idle.[17]  In other words, one kind of engine provided half of the solution, and the other kind provided the other half.

95.     Toyota cut through this Gordian knot by using a low emission gasoline engine, and then achieving fuel efficiency by using an electric engine: a "hybrid" design.

96.     Volkswagen could have invested the funds necessary to compete with Toyota head-to-head using this design, but elected to take a different path: they invested their resources in diesel instead.

97.     Competing with Toyota required market differentiation: Volkswagen needed to come up with a reason for consumers to buy a Volkswagen instead of a fuel efficient, low emission Toyota.

---

[16] https://www.autoguide.com/auto-news/2014/09/why-are-diesels-more-efficient-than-gasoline-engines.html

[17] https://www.autoindustriya.com/editors-note/defeated-why-dieselgate-isn-t-just-about-emissions.html

98.     The possibility of a "clean" diesel vehicle provided that market differentiation:  As diesel engines typically have higher torque[18] and last longer than gasoline engines, a diesel engine is typically sold at a premium. Volkswagen could offer a high mileage, supposedly "clean" low emission diesel vehicle, that would have more torque than a hybrid gasoline Prius, or a normal gasoline vehicle.

99.     As Volkswagen already had a strong European market for their diesels, and could charge a premium for such vehicles, a "clean diesel" would allow Volkswagen to not only compete with Toyota, but charge a premium to consumer who believed they were buying high torque, high mileage, and low emission vehicle.

100.   Given these market demands, Volkswagen decided that what they needed to meet consumer demand was a fuel efficient, low emission diesel vehicle. The problem was that they did not have one.

***Volkswagen's NOxious Solution***

*Initial refusal to invest in real clean diesel*

101.   In order to create a "clean diesel," Volkswagen AG needed to design a new engine.

102.   Starting on or before 2006, Volkswagen employees, including James Liang ("Liang"), working under the supervision of Richard Dorenkamp ("Dorenkamp"), and consecutively, Rudolf Krebs ("Krebs") and Jens Hadler ("Hadler"), began to develop a new diesel 2.0 liter engine, to be sold and used in the United States. This engine was known as the "EA 189 2.0 liter engine," also later referred to as the "Generation 1" or "Gen 1" engine.[19]

103.   The project of developing this EA 189 2.0 liter engine was known internally at Volkswagen AG as the "US'07" project.[20]

---

[18] http://www.businessinsider.com/10-reasons-why-you-should-buy-a-diesel-car-2013-8

[19] VW PA ¶32

[20] *Id*

First Amended Complaint                                                                                    15-md-02672-CRB

104.   Initially, Volkswagen considered using a "selective catalytic reduction" ("SCR") system to reduce NOx emissions.

105.   After calculating the cost of implementing the SCR system to be approximately $350.00 per vehicle, Volkswagen AG's rejected this design in favor of a less expensive solution: a "lean NOx trap" ("LNT") system.

106.   However every compromise comes at a price: while a LNT system cost less per vehicle, it also resulted in lower fuel efficiency, and was less effective in reducing NOx emissions.

107.   Ultimately, Volkswagen AG was unwilling to spend $350.00 per vehicle for an SCR system, and unable to design a system for less than $350.00 that would maintain the high fuel efficiency and horsepower that consumers expect.

108.   Dorenkamp, Krebs, Hadler, Liang and others at Volkswagen AG realized that Volkswagen AG could not design a diesel engine without an SCR system that would both meet the stricter U.S. NOx emissions standards that would become effective in 2007 and attract sufficient customer demand in the U.S. market.[21]

*Volkswagen Decides to Design and Manufacture a Defeat Device*

109.   At this point, Volkswagen had a decision to make: if they could not make a real "clean" diesel in the timeframe needed, would they take the high road and shelve the "clean" diesel project until they could get it right?  Or would they take the low road, and simply market dirty diesels as "clean diesels?

110.   Moved by contempt and utter disregard for both European and American law, Volkswagen, the world's largest diesel passenger vehicle manufacturer, took the low road.

/ / /

/ / /

/ / /

---

[21] VW PA ¶33

First Amended Complaint

15-md-02672-CRB

111.   Dorenkamp, Krebs, Hadler, Liang and others at Volkswagen AG conspired to develop and use a software function to cheat standard U.S. emissions tests ("defeat device").  Volkswagen wanted to market "clean diesel" vehicle in the United States, and they could not very well do this if their vehicle could not even pass minimum U.S. emissions standards.

112.   Volkswagen first turned to an older project developed by Audi AG, a Volkswagen subsidiary.  This was not Volkswagen's first defeat device.

*Origin of the defeat device*

113.   The origin of Volkswagen's defeat devices goes back at least to the emissions issues that Audi AG dealt with in 1999.[22]

114.   Engineers for Audi AG developed a new technology called "Pilot Injection" that reduced the noise of diesel engines at start-up through the injection of additional fuel into the combustion chamber on ignition. However, activation of Pilot Injection upon ignition caused the engine to exceed European emissions standards during emissions testing.

115.   Audi solved this problem by implementing defeat device software that allowed the engine to recognize the European emissions test cycle and deactivate Pilot Injection during the test cycle.

116.   Audi later developed and installed this defeat device software on certain Audi 3.0 liter V6 diesels starting in 2004. Because of its noise-reducing properties, Audi referred to this defeat device as the "akustikfunktion," meaning "Acoustic Function."

*Expansion of Volkswagen's Conspiracy*

117.   Volkswagen wanted to expand their "akustikfunktion" cheat device to their new EA 189 engine, but lacked the expertise to fully implement this device in house.

/ / /

---

[22] VW PA ¶35

118.   So, Volkswagen turned to a fellow German automotive company, and one of Volkswagen's principal and most sophisticated suppliers, Bosch, and IAV.[23]

119.   Bosch GmbH, together with Volkswagen AG, Audi AG and IAV GmbH, an auto parts engineering firm fifty percent owned by Volkswagen AG, formed a "working group" to design create, and implement a software function to detect, evade and defeat U.S. emissions standards.[24]

120.   This "working group" was formed to further a common goal: to market and sell Volkswagen diesel vehicles in the United States that, unbeknownst to the government or the wholly innocent public, met neither U.S. emissions standards, nor consumer expectations of a "clean," low emission diesel passenger vehicle.

121.   These vehicles would be sold at a premium, and all of the members of this enterprise, this "working group" stood to gain something for their participation.

122.   The working group's project was significant in both scope and duration, and required a high degree of coordination, cooperation and communication between all of the members of this conspiracy.

123.   The member of this working group communicated regularly with each other in furtherance of their shared goal of deceiving the American government and public, and this communication was regularly by email, as well as the mails.

124.   Bosch and Volkswagen's joint planning and execution of the goals of their shared joint enterprise was particularly close, involving a series of negotiated written agreements for the sharing of Bosch's software in order to tailor Bosch's EDC-17 to meet Volkswagen's needs.

125.   In these agreements, Bosch retained ownership and control of their software, and monitored the implementation of their software, retaining the right to ultimate approval of the use of their software before Volkswagen rolled out the final product.

---

[23] *Id*
[24] *Id*

126. Volkswagen and Bosch's joint enterprise expanded as time went on, and as the members of the enterprise needed further assistance to reach their illicit goals.

127. As the need to deceive the government of the United States and of California arose, and the American public who thought they were buying a low emission vehicle, Volkswagen's enterprise grew to include not only Volkswagen AG, Bosch GmbH and IAV Gmbh, but also included: Robert Bosch, LLC ("Bosch, LLC"), IAV Automotive Engineering, Inc ("IAV, Inc"), Audi of America, LLC, and numerous individuals serving as employees, officers, or other agents of these entities, including Volkmar Denner, James Robert Liang, Martin Winterkorn, Mattias Müller, Richard Dorenkamp, Heinz-Jakob Neusser, Jens Hadler, Bernd Gottweis, Oliver Schmidt, Jürgen Peter, Michael Horn, and James Liang.

128. In the United States, as a result of criminal prosecution, Volkswagen AG, Audi AG, VGA, Oliver Schmidt and James Liang all admitted that they were part of a criminal conspiracy to defraud the government of the United States regarding the defeat device they hid, and the true nature of the emissions systems on Volkswagen and Audi branded diesel vehicles for the model years in question.

129. This conspiracy was not merely to deceive the government of the United States, though, but ultimately to mislead the American public.

**Volkswagen/Bosch's Fraudulent Enterprise**

*Design and Manufacture of the Defeat Device*

130. Working from Volkswagen specifications and at Volkswagen's direction, Bosch employees developed code that instructed Bosch's "EDC17" Engine Control Unit, later installed in Volkswagen's diesel engines, to fully deploy pollution controls only when the cars were undergoing emissions tests.

131. This code, as installed on Bosch's "EDC17" Engine Control Unit, was a "defeat device" intended to mask the true emissions, including NOx emissions, of Volkswagen's diesel passenger vehicles.

132.   In most modern vehicles, there are between 70 to 100 electronic controls.  Among these controls is the Engine Control Unit ("ECU").

133.   The ECU controls a number of parameters of engine function, including the amount of diesel fuel released into the combustion chamber.

134.   All of the Volkswagen and Audi diesel passenger vehicles sold in the United States during the period at issue used an ECU developed jointly by Volkswagen and Bosch, called "EDC17," including the following vehicles ("Affected Vehicles):

*2.0 liter Vehicles*

2009 to 2015 Volkswagen Jetta

2009 to 2014 Volkswagen Jetta Sportswagen

2010 to 2015 Volkswagen Golf

2015 Volkswagen Golf Sportswagen

2010 to 2013 and 2015 Audi A3

2013 to 2015 Volkswagen Beetle and Volkswagen Beetle Convertible

2012 to 2015 Volkswagen Passat

*3.0 liter Vehicles*

2009 to 2016 Volkswagen Touareg

2009 to 2015 Audi Q7

2014 to 2016 Audi A6 Quattro

2014 to 2016 Audi A7 Quattro

2014 to 2016 Audi A8L

2014 to 2016 Audi Q5[25]

135.   Bosch began development of the EDC17 ECU as early as 2001, after the United States issued the "Tier II" emissions standards to take effect in 2007.

136.   Bosch sold the EDC17 to multiple diesel vehicle manufacturers, including Volkswagen, Mercedes, Fiat Chrysler, General Motors, Renault and Peugeot.

137.   Bosch collaborated with its clients to modify the EDC17 to meet their individual needs.

138.   Both Bosch GmbH and Bosch, LLC (jointly "Bosch") worked with Volkswagen to develop and modify the EDC17 for Volkswagen's use in Volkswagen's "EA189" 2.0 liter diesel engine and Volkswagen's 3.0 liter engine, over a period of several years.

139.   Bosch controlled every aspect of the development of the EDC17: Bosch's software prevents unauthorized changes to the software, and no manufacturer could make significant changes to this software without Bosch's knowledge and authorization.

140.   Under their contractual arrangement with Bosch, before Volkswagen could deploy the EDC17 in their vehicles, Bosch first had to approve the "modules," or modifications made to Bosch's core operating software in the EDC17, over which Bosch retained ownership and control.

141.   The defeat device employed by Volkswagen, a highly sophisticated control of the timing and function of the emissions systems, is a significant change to the EDC17, and could not have occurred without Bosch's knowing authorization, of these modifications.

142.   Indeed, the defeat device was so sophisticated, and buried so far into the operating code of the EDC17, that it took a joint team of researchers at the University of California-San Diego and Ruhr University in Germany approximately one year to find the code used for the defeat device, *even after they knew of the existence of the defeat device, and that it was located in the EDC17.*[26]

143.   Kirill Lovchenko, one of the computer scientists at the University of California-San Diego responsible for uncovering the code used for the defeat device, described this device as "arguably the most complex in automotive history."[27]

---

[25] VW PA ¶¶23-24

[26] http://ucsdnews.ucsd.edu/pressrelease/researchers_find_computer_code_that_volkswagen_used_to_cheat_emissions_test

[27] *Id*

First Amended Complaint                                                           15-md-02672-CRB

144.   Bosch, who modified the EDC17 for other manufacturers, also appears to have collaborated with Fiat Chrysler to insert a different, less sophisticated defeat device in the EDC17 used in certain Dodge vehicles.[28]

145.   Indeed, nearly all of the vehicles recently found or alleged to have been manipulating emissions in the United States, by Mercedes, Fiat Chrysler America, General Motors, and Volkswagen, use a Bosch device.

146.   In the years leading up to 2006, Bosch, Volkswagen and Audi, worked together to modify the EDC17 for Volkswagen and Audi's use.

147.   By 2006, when Volkswagen rejected the use of SCR technology to reduce emissions and discovered that they could not sufficiently reduce emissions with LNT technology, Volkswagen and Bosch knowingly and intentionally modified the EDC17 ECU to incorporate a sophisticated, customized version of Audi's earlier "akustikfunktion" defeat device.

*Volkswagen ignores the warnings of its own employees*

148.   Volkswagen had already been warned not to use the "akustikfunktion" device on the EA189, or "US'07" diesel engine.

149.   On or about May 17, 2006, a VW engineer, in describing the Audi software, sent an email to employees in the VW Brand Engine Development department that described aspects of the software and cautioned against using it in its current form because it was "pure" cycle-beating, i.e., as a mechanism to detect, evade and defeat U.S. emissions cycles or tests.[29]

150.   The VW AG engineer wrote (in German), "within the clearance structure of the pre-fuel injection the acoustic function is nearly always activated within our current US'07-data set. This function is pure [cycle-beating] and can like this absolutely not be used for US'07."[30]

---

[28] "How They Did It: An Analysis of Emission Defeat Devices in Modern Automobiles" by Moritz Contag, Guo Li, Andre Pawlowski, Felix Domke, Kirill Levchenko, Thorsten Holz, and Stefan Savage, see also *United States of America v. FCA US, LLC et al* case no 17-cv-11633, ED Mich
[29] VW PA ¶35
[30] *Id*

151.   On or around 2006, Dorenkamp authorized Volkswagen AG engineers to use the defeat device in the development of the EA189/U'07 project, despite concerns expressed by certain VW AG employees about the propriety of designing and activating the defeat device software.[31]

152.   In or about the fall of 2006, lower level Volkswagen AG engineers, with the support of their supervisors, raised objections to the propriety of the defeat device, and elevated the issue to Krebs.

153.   During a meeting that occurred in or about November 2006, VW AG employees briefed Krebs on the purpose and design of the defeat device. During the meeting, Krebs decided that VW should continue with production of the US'07 project with the defeat device, and instructed those in attendance, in sum and substance, not to get caught.[32]

154.   Throughout 2007, various technical problems arose with the EA189/US'07 project that led to internal discussions and disagreements among members of the Volkswagen AG team that was primarily responsible for ensuring vehicles met U.S. emissions standards.[33]

155.   Those disagreements over the direction of the project were expressly articulated during a contentious meeting on or about October 5, 2007, over which Hadler presided.[34]

156.   As a result of the meeting, Hadler authorized Dorenkamp and his team to proceed with the EA189/US'07 project despite knowing that only the use of the defeat device software would enable VW diesel vehicles to pass U.S. emissions tests.[35]

/ / /

/ / /

---

[31] VW PA ¶36
[32] Id
[33] VW PA ¶37
[34] Id
[35] Id

First Amended Complaint

157.   Volkswagen later expanded the use of this technology both in Volkswagen's other diesel engines, and in Audi's engines, with the assistance of Bosch GmbH, Bosch, LLC and IAV.

*Bosch warns Volkswagen of illegal conduct*

158.   Bosch, as well as Volkswagen, was well aware of the "akustikfunktion" defeat device, and of its illegality.

159.   In June of 2008, Bosch GmbH sent a letter to Volkswagen's Thorsten Schmidt in which Bosch demanded that Volkswagen indemnify Bosch for any liability arising from the creation of this "defeat device."

160.   In this letter, Bosch warned Volkswagen that the modifications requested by Volkswagen to the EDC17 ECU could be illegal, and demanded that Volkswagen indemnify Bosch for any legal exposure arising from work on the defeat device.

161.   When Volkswagen refused to sign an indemnification agreement, Bosch chose to continue development and implementation of the EDC17 ECU containing the "akustikfunktion" defeat device in vehicles destined for sale in the United States.

**Volkswagen Launches their Dirty Diesels into the U.S. Market**

162.   The entire point of designing, fabricating and installing an unlawful "defeat device" was to deceive U.S. regulators, so Volkswagen could sell their illegal vehicles in the United States to unsuspecting consumers, the ultimate goal.

163.   Before Volkswagen and Bosch could deceive the U.S. public, they first had to get past the U.S. government.

/ / /

/ / /

/ / /

/ / /

/ / /

*Volkswagen's Enterprise Conspires to Deceive United States and California Regulators*

164.   The Clean Air Act prohibits the installation and use of a "defeat device," a device used to escape detection of vehicle emissions that exceed the standards set by the Clean Air Act, as well as the sale of components used in defeat devices.[36]

165.   The members of the Volkswagen Enterprise were aware that the defeat device they designed and installed in the Affected Vehicles was illegal in the United States.

166.   Despite this fact, some members of the Volkswagen Enterprise made repeated intentional misrepresentations or omissions to U.S. regulators.

167.   For assistance in the American portion of their plot, Volkswagen AG and Bosch GmbH turned to their American subsidiaries, VGA and Bosch, LLC.

*Bosch, LLC*

168.   Bosch's North American subsidiary, Defendant Bosch LLC, was part of this fraudulent enterprise. Bosch LLC worked closely with Bosch GmbH and Volkswagen, in the United States and in Germany, to ensure that the vehicles containing Bosch and Volkswagen's defeat device passed U.S. emission tests.

169.   Employees of Bosch LLC, Bosch GmbH and IAV provided specific information to U.S. regulators about how Volkswagen's vehicles functioned and stated that the vehicles met emissions standards.

170.   Bosch LLC regularly communicated with Volkswagen and with Bosch GmbH about how to deal with questions from US regulators about Volkswagen's diesel vehicles.

/ / /

/ / /

/ / /

---

[36] 42 USC §7522(a)(3) and 40 CFR §86.1803-01 and §86.1809.10.

First Amended Complaint                                                                 15-md-02672-CRB

*Bosch GmbH*

171.  Bosch GmbH employees also directly participated in meetings with CARB. For example, in January, 2015, Bosch GmbH conferred about setting up a conference call with Audi and California Air Resource Board to explain problems with the diagnostics relating to faulty fuel pumps, issues that likely arose because the defeat device was causing problems with the on board diagnostic system in certain Affected Vehicles, including Plaintiff's vehicle.

*VGA*

*Application for Certificate of Conformity*

172.  VGA, a wholly owned subsidiary of Volkswagen AG, prepared and submitted applications for a certificate of conformity and an executive order to the Environmental Protection Agency ("EPA") and California's Air Resource Board ("CARB") to obtain authorization to sell the Affected Vehicles in the United States.[37]

173.  VGA's Test Center California performed testing related to the Affected Vehicles.[38]

174.  VGA's applications to the EPA were accompanied by a separate statement, signed by a VGA employee or agent, containing the following text:

> The Volkswagen Group states that any element of design, system or emission control device installed on or incorporated in the Volkswagen Group's new motor vehicles or new motor vehicle engines for the purpose of complying with standards prescribed under section 202 of the Clean Air Act, will not, to the best of Volkswagen Group's information and belief, cause the emission into the ambient air of pollutants in the operation of its motor vehicles or motor vehicle engines which cause or contribute to an unreasonable risk to public health or welfare except as specifically permitted under section 202 of the Clean Air Act.  The Volkswagen Group further states that any element of design, system or emission control device installed on or incorporated in the Volkswagen Group's new motor vehicles or new

---

[37] VW PA ¶25.
[38] *Id.*

First Amended Complaint                                                              15-md-02672-CRB

motor vehicle engines for the purpose of complying with standards prescribed under section 202 of the Clean Air Act, will not, to the best of Volkswagen Group's information and belief, cause or contribute to an unreasonable risk to public safety.

…

All vehicles have been tested in accordance with good engineering practice to ascertain that such test vehicles meet the requirement of this section for the useful life of the vehicle.[39]

175.   In the meanwhile, Volkswagen and Bosch employees actively courted the EPA in order to gain the certification needed to import the Affected Vehicles.

*James Robert Liang*

176.   James Robert Liang ("Liang") worked on the EA 189 engine design for Volkswagen AG in Germany, and was well aware that this engine could not meet U.S. emissions standards.[40]

177.   In May of 2008, Liang moved to the United States to assist with the fraudulent launch of the EA189 in the United States.  From May of 2008 until he was later imprisoned for his acts, Liang was the "Leader of Diesel Competence" for VGA.  In this capacity, Liang assisted in the certification and testing process for Volkswagen vehicles.[41]

178.   Just prior to his assumption of duties at VGA, on March 19, 2007, Liang attended a meeting between Volkswagen and the EPA, and two days later, Liang attended a similar meeting between Volkswagen and CARB.[42]

/ / /

/ / /

---

[39] VW PA ¶27

[40] See page 5 of the Rule 11 Plea Agreement signed by James Robert Liang on August 31, 2016 in the criminal matter of *United States of America v. D-1 James Robert Liang*, Case no 16-cr-20394, filed on September 9, 2016 (docket no. 19) and reduced to judgment by the Court on August 25, 2017.  For the ease of the Court and parties, as well as economy of space, all further references to this document will be to "Liang PA," *e.g.* Liang PA pp 5.

[41] *Id*

[42] Liang PA pp 6

First Amended Complaint

15-md-02672-CRB

179.   At both of these meetings, Liang participated and "played along" as his co-conspirators misrepresented to the agency in question that the Affected Vehicles for the following model year complied with U.S. NOx emissions standards.[43]

180.   Liang knew that his co-conspirators were intentionally misleading the EPA and CARB regarding the true nature of the Affected Vehicles, and he chose to say nothing, and in so doing facilitated Volkswagen's deception of the EPA and CARB.[44]

181.   Each year after that, while Liang was employed as Leader of Diesel Competence, he was aware that Volkswagen AG and VGA were falsely representing to the EPA and CARB that the Affected Vehicles met U.S. and California NOx emissions standards.[45]

182.   Liang also know that Volkswagen AG and VGA were marketing the Affected Vehicles as "clean diesel," environmentally-friendly vehicles, when in fact the opposite was true.  Lang and his co-conspirators knew that these representations were false, and decided to say nothing, a significant omission.[46]

183.   Liang then assisted in "enhancing" the defeat device, allowing the device to more easily detect when the vehicle was no longer being tested, so it could go back to spewing up to 40 times the legal limit of NOx into the atmosphere.[47]

184.   In 2014, Volkswagen told their U.S. customers that this "enhancement" was a software update to improve the vehicle's performance, when the truth was exactly the opposite.[48]

/ / /

/ / /

/ / /

---

[43] *Id*
[44] *Id*
[45] *Id*
[46] *Id*
[47] *Id*
[48] *Id*

185.   Liang also knew that Volkswagen AG and VGA, and several other co-conspirators falsely represented to U.S. consumers that this "enhancement" was an update intended to improve the performance of the Affected Vehicles.  Liang again promoted the ends of the enterprise by keeping silent.[49]

186.   In early 2014, a non-profit organization, the International Council on Clean Transportation, discovered that some of the Affected Vehicles did not, in fact, meet U.S. NOx emissions standards, despite their certification.[50]

187.   CARB and the EPA followed up with Volkswagen AG and VGA in order to ascertain the reason for this discrepancy.[51]

188.   Liang and some of his co-conspirators discussed how they ·could answer the regulatory agencies' questions without revealing the defeat device.[52]

189.   Liang knew that, after these discussions, his co-conspirators intentionally made fraudulent explanations to the EPA and CARB when providing testing results, data, presentations, and statements to the EPA and CARB by failing to disclose the fact that the primary reason for the discrepancy was the defeat device.[53]

190.   Liang knew that his co-conspirators also falsely and fraudulently told U.S. customers, EPA, and CARB that a voluntary recall in or around early 2015 was intended to "fix" the issues that were causing the discrepancy, when, in fact, Liang and his co-conspirators knew that although the update lowered the NOx emissions in certain VW diesel vehicles on the road, the update did not remove the defeat device software that was the true reason for the discrepancy.[54]

/ / /

/ / /

---

[49] *Id*
[50] *Id*
[51] Liang PA pp 6-7
[52] Liang PA pp 7
[53] *Id*
[54] *Id*

First Amended Complaint                                                                    15-md-02672-CRB

191.   Liang later pleaded guilty to criminal charges of conspiracy to mislead the government of the United States.[55]

192.   That same group of co-conspirators, Volkswagen's fraudulent enterprise, also conspired to mislead the U.S. public, including Plaintiff.[56]

193.   In his capacity as an employee of both Volkswagen AG and VGA, Liang used wire, radio or television communications in interstate or foreign commerce in furtherance of this conspiracy.[57]

*Oliver Schmidt*

194.   From about 2012 until February of 2015, Oliver Schmidt ("Schmidt") was employed as General Manager for the Environment and Engineering Office for VGA.[58]

195.   From about February of 2015 to September of 2015, Schmidt was employed by Volkswagen AG as a subordinate to Heinz-Jakob Neusser, the head of Engine Development for Volkswagen AG.[59]

196.   In the summer of 2015, and on information and belief well before then, Schmidt was aware of cheating software installed in the Affected Vehicles, an illegal "defeat device."[60]

/ / /

/ / /

/ / /

/ / /

---

[55] Liang PA pp 2-4
[56] Liang PA pp 6
[57] Liang PA pp 2-4

[58] See page 5 of the Rule 11 Plea Agreement signed by Oliver Schmidt on July 24, 2017 in the criminal matter of *United States of America v. D-6 Oliver Schmidt*, Case no 16-cr-20394, filed on August 4, 2017 (docket no. 96) and reduced to judgment by the Court on December 8, 2017.  For the ease of the Court and parties, as well as economy of space, all further references to this document will be to "Schmidt PA," *e.g.* Schmidt PA pp 5.
[59] *Id.*
[60] Schmidt PA pp 6

First Amended Complaint                                                                 15-md-02672-CRB

197.   Schmidt was told that Volkswagen employees had installed software in the 2.0 liter Affected Vehicles that recognized whether the vehicle was undergoing emissions testing or not, and adjusted the performance of the vehicle to meet emissions standards during the testing period alone.[61]

198.   Schmidt was informed that during normal driving periods, the Affected Vehicles emitted levels of NOx that exceeded U.S. standards by up to thirty times.[62]

199.   Schmidt was told that Volkswagen had used software to cheat on emissions for years.[63]

200.   Armed with this knowledge, Schmidt could have told the truth to the American public, or could at least have refused to participate in the schemes of the Volkswagen Enterprise.

201.   Instead, Schmidt agreed with other Volkswagen employees to mislead and defraud the United States and the American consumers who purchased the Affected Vehicles, including Plaintiff.[64]

202.   In the summer of 2015, Schmidt participated in discussions with other Volkswagen employees regarding how to best answer questions from U.S. regulators regarding emissions of the Affected Vehicles, without revealing the truth; that these vehicles contained the Volkswagen Enterprise's defeat device.[65]

203.   Schmidt knew that Volkswagen employees intentionally provided false information to U.S. regulators regarding a 2012 Passat tested by CARB, as these Volkswagen employees hid the true cause of the pollution: a dirty diesel system masked only by Volkswagen's defeat device.[66]

/ / /

/ / /

---

[61] *Id*
[62] *Id*
[63] *Id*
[64] *Id*
[65] *Id*
[66] *Id*

First Amended Complaint                                                    15-md-02672-CRB

204.   On June 27, 2015, Schmidt gave a presentation to his superiors at Volkswagen detailing the financial consequences for Volkswagen if the U.S. government became aware of Volkswagen's fraudulent defeat device.[67]

205.   Volkswagen's upper management instructed Schmidt to seek a meeting with a senior CARB employee with whom Schmidt had dealings in the past, Alberto Ayala.[68]

206.   Schmidt's marching orders were to obtain regulatory approval from CARB for the 2016 model year for the Volkswagen diesel vehicles, and not to reveal Volkswagen's defeat device and intentional cheating of emissions standards.[69]

207.   On August 5, 2015, true to his marching orders, Schmidt met with Mr. Ayala, and presented him with a binder of information which purported to explain the discrepancy between Volkswagen's real world emissions and the emissions during emissions tests.[70]

208.   Schmidt made no mention of Volkswagen's defeat device and emissions cheating, although he knew that these were the real causes of the discrepancies between NOx emissions on the road, and during emissions tests.[71]

209.   On August 7, 2015, Schmidt spoke to another CARB employee by telephone, and made the same omissions.[72]

210.   During his participation in Volkswagen's fraudulent enterprise, Schmidt knew that Volkswagen marketed diesel vehicles to the U.S. public as both compliant with environmental standards and regulations, and as environmentally friendly, as well as being fuel efficient.[73]

/ / /

---

[67] Schmidt PA pp 7
[68] *Id*
[69] *Id*
[70] *Id*
[71] *Id*
[72] *Id*
[73] Schmidt PA pp 8

First Amended Complaint

15-md-02672-CRB

211.   Schmidt knew that these representations were false, and decided to participate in this conspiracy regardless.[74]

*Volkswagen and Bosch's scheme was successful*

212.   Based on the representations and omissions made by employees of Volkswagen AG, Audi AG, and VGA, as well as Bosch GmbH and Bosch LLC, the EPA and CARB issued Certificates of Conformity for the Affected Vehicles, allowing their sale in the United States.[75]

213.   Volkswagen AG, Audi AG and VGA represented to United States Border and Customs Patrol that the Affected Vehicles were covered by valid Certificates of Conformity by affixing an emissions label to the engines of the Affected Vehicles.  These labels stated, falsely, that the Affected Vehicles conformed to EPA and CARB emissions regulations.  Volkswagen AG, Audi AG and VGA affixed these labels to each of the Affected Vehicles that they imported into the United States, including the vehicle that Volkswagen ultimately sold to Plaintiff.[76]

**Volkswagen marketed their dirty diesels as "clean diesel," environmentally friendly, low emission, high mileage, high torque passenger vehicles**

214.   In print and on television, on the internet and through their (wholly innocent) dealer network, Volkswagen repeatedly and consistently communicated to the American public that the Affected Vehicles were "clean diesels," which had low NOx and sulfur emissions, and high mileage, and yet were powerful.

215.   Volkswagen marketed these vehicles as environmentally superior to gasoline engines, and charged a premium for these "green" vehicles.

216.   Volkswagen's trickery was successful: Volkswagen sold well over a half million "clean diesel" vehicles in the United States based on this false advertising.

---

[74] *Id*
[75] VW PA ¶28
[76] VW PA ¶29

First Amended Complaint                                                      15-md-02672-CRB

-33-

*Plaintiff unwittingly purchased an illegal vehicle*

217.   In or about August 22, 2010, Plaintiffs purchased a 2010 Volkswagen diesel Jetta ("Vehicle") because they thought it was environmentally safe and provided good fuel efficiency, among other things, based on Defendants' representations.

218.   Volkswagen advertised that the Vehicle model at issue was a "clean diesels" that had good fuel efficiency, and presumably went well beyond the applicable EPA and CARB emissions standards, as it was being sold in the United States, and in California.

219.   In reality, the Vehicle did not even meet the applicable EPA and CARB emissions standards, with NOx emissions of over 40 times the legal limit.

220.   In no way were the Affected Vehicles "clean diesels."

221.   Defendants jointly manufactured and sold Plaintiffs a vehicle that did not meet the applicable EPA and CARB emissions standards, and were not "clean diesels" as they claimed.

222.   Defendants knew that the vehicle at issue did not meet EPA and CARB emissions standards, and masked that fact by installing a "defeat device" on the vehicle.

223.   The sale of the vehicle to Plaintiffs violated both federal and California law, but this illegal sale passed undetected because of the above "defeat device."

224.   On May 15, 2014, West Virginia University's "Center for Alternative Fuels, Engines and Emissions" published a study of the "real world" emissions of three diesel vehicles, including a Volkswagen four cylinder diesel Jetta and a four-cylinder Volkswagen diesel Passat.

225.   In that study both of the Volkswagen diesels were discovered not to comply with United States and California emissions standards.

/ / /

/ / /

226.   After the above study, CARB began testing Volkswagen four cylinder diesel vehicles, and on July 8, 2015 reported to the EPA and Volkswagen that these vehicles did not meet California emissions standards.

227.   On September 18, 2015, both the EPA and CARB sent letters to Volkswagen advising Volkswagen that their four cylinder diesel vehicles did not meet United States or California emissions standards.

228.   Volkswagen has since admitted that Volkswagen and Audi four cylinder diesel vehicles, including the vehicle at issue here, were equipped with a "defeat device" and do not meet United States and California emissions standards, and are not the "clean diesels" advertised to Plaintiff, and the American public.

229.   As a result, the Vehicles do not function as a reasonable consumer would expect, and have lost considerable value.

230.   Defendants failed to disclose these material facts to the public and to consumers. Had Plaintiffs known of the defect at the time they decided to purchase the Vehicle, they would have declined to purchase the Vehicles, or would have paid considerably less than they did.

231.   In sum, Defendants' deliberate deception has caused significant harm to Plaintiffs.

232.   On August 23, 2016, Plaintiffs, through counsel, sent a letter to Volkswagen by certified mail advising Volkswagen of the above defects as to the Volkswagen Vehicle, and requesting that Volkswagen provide a place, time and manner in which they would cure the above defects.

233.   Plaintiffs also put Volkswagen on notice that the acts described above were violations of the California's Consumer Legal Remedies Act, California Business and Professions Code §§17200 et seq and §§17500 et seq, and Plaintiff's common law rights.

234.   Volkswagen did not provide a place, time and manner in which they would cure the above defects, nor did they cure the above defects.

235.   Plaintiffs then filed the original complaint in this action.

236.   All named defendants but Liang are already parties to the lead case in this matter, case number 15-md-02672-CRB, and Liang has already been served with the initial state court summons in the state court action Plaintiffs filed, before removal to federal court in this matter.

237.   The removal of Plaintiffs' original complaint to this Court, and service the original state court complaint on Liang placed all named defendants on notice of the nature of Plaintiffs' claims.

238.   No named defendant has since taken any action to remedy the damage they caused.

**Tolling of the Statute of Limitations**

239.   Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants had conspired to install software that would evade emissions regulation, and that the Defendants were concealing and misrepresenting the true emissions levels of its vehicles, and that Plantiffs' vehicle was not a "clean diesel."

240.   The fraud, as set forth herein, was elaborate and well concealed. In fact, the EPA and CARB uncovered the software manipulation only through the use of highly technical equipment.

241.   Plaintiffs had no realistic ability to discover the presence of the Defeat Devices, or to otherwise learn of the fraud, until it was discovered by the EPA and CARB and revealed to the public through the September 18, 2015, and November 2, 2015, NOVs.

242.   Any statutes of limitation otherwise applicable to any claims asserted herein have thus been tolled by the discovery rule.

243.   All applicable statutes of limitation have also been tolled by the Defendants' knowing, active and ongoing fraudulent concealment of the facts alleged herein.

## ALLEGATIONS SPECIFIC TO CERTAIN CAUSES OF ACTION

## <u>FIRST CLAIM FOR RELIEF</u>

### (Violations of the Racketeer Influenced and Corrupt Organizations Act-All Named Defendants)

244.   Plaintiffs repeat, re-allege, and incorporate by reference all the allegations contained in the paragraphs above.

245.   Under 18 U.S.C 1962(c):

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

246.   Under 18 U.S.C 1962(d):

It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

*Persons*

247.   All named Defendants to this action are "persons" under 18 U.S.C. §1961(3) as they are all capable of holding a legal or beneficial interest in property.

*Enterprise*

248.   All named Defendants to this action, as well as a number of co-conspirators, created and/or participated in the affairs of an illegal enterprise ("Volkswagen Enterprise") whose direct purpose was to deceive U.S. regulators and the U.S. public into believing the Affected Vehicles were "clean diesels" and "environmentally friendly," and on this false basis to market the Affected Vehicles, and sell them at a premium to the unsuspecting American public, enriching Defendants in the process.

/ / /

/ / /

First Amended Complaint                                                                    15-md-02672-CRB

249.   The named Defendants to this action formed part of this "association in fact" as early as 2005, and continued until recently dismantled by repeated criminal proceedings and the largest automotive fraud civil action in Amercian history.

250.   This Enterprise had an existence separate from any single Defendants, and encompassed at least six entities, and potentially hundreds of individuals.

***Racketeering Activity***

251.   18 USC 1961(1)(B) defines "racketeering activity" in pertinent part, as:

> any act which is indictable under any of the following provisions of title 18, United States Code:
> …
> section 1341 (relating to mail fraud), section 1343 (relating to wire fraud)
> …

252.   As Volkswagen AG have already admitted in Volkswagen's plea agreement, both Volkswagen AG and VGA committed intentional wire fraud against the United States, in making misrepresentations or omissions regarding the diesel emissions of the Affected Vehicles and Volkswagen's defeat device.

253.   Volkswagen employees Oliver Schmidt and James Liang have admitted in their plea agreements that they also each committed intentional wire fraud against the United States, in making misrepresentations or omissions regarding the diesel emissions of the Affected Vehicles and Volkswagen's defeat device.

254.   The wire fraud committed by Volkswagen AG and VGA was committed in furtherance of a fraud against the American public as well, including Plaintiff.

255.   On information and belief, both Volkswagen AG and VGA also used the mails in furtherance of their conspiracy to defraud the American public, and Plaintiff, regarding the true nature of the Affected Vehicles.

/ / /

/ / /

256.   On information and belief, both Bosch GmbH and Bosch, LLC also utilized both the mails and wire, radio or television communications to defraud or conspire to defraud the American public, including Plaintiff, regarding the true nature of the Affected Vehicles.

257.   As all named Defendants used the mails or wire, radio or television communications in furtherance of a conspiracy to defraud or the commission of fraud upon the American public, including Plaintiff, all named Defendants engaged in "racketeering activity."

***Willing or knowing participation***

258.   As described more fully above, all of the named Defendants to this action acted intentionally, and knowing, over a period of years, and repeatedly conferred together in their joint attempts, initially successful, to defraud the American public, including Plaintiff.

***Pattern***

259.   Defendants' repeated planned acts and omissions, carried out intentionally over a period of several years, and in coordination between large entities with hundreds or thousands of employees, was not a single occurrence, but rather a multi-year planned international plot: a pattern in every sense of the word.

***Effect on interstate or international commerce***

260.   Defendants' acts both crossed national and state borders, and directly involved the import and export of merchandise and services across the world, and between continents.

***Damages***

261.   Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs, in that they purchased a vehicle they would not have had they known that the vehicle was not a "clean diesel."

/ / /

262.   Plaintiffs are entitled under 18 U.S.C. §1964(c) to three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

**(Violations of the Consumer Legal Remedies Act-All Named Defendants)**

263.   Plaintiffs repeat, re-allege, and incorporate by reference all the allegations contained in the paragraphs above.

264.   Plaintiffs are "consumers" as defined by Cal. Civ. Code § 1761(d).

265.   The Vehicle at issue in this action constitutes a "good" as defined by Cal. Civ. Code § 1761(a).

266.   The acts and practices of Defendants as discussed throughout the Complaint, constitute "unfair or deceptive acts or practices" by Defendants, that are unlawful, as enumerated in section 1770(a) of the California Civil Code, specifically in at least the following CLRA provisions:

      a.      California Civil Code §1770(a)(5): Representing that goods have characteristics, uses, and benefits which they do not have;

      b.      California Civil Code §1770 (a)(7): Representing that goods are of a particular standard, quality, or grade, if they are of another;

      c.      California Civil Code §1770 (a)(9): Advertising goods with the intent not to sell them as advertised; and

      d.      California Civil Code §1770 (a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

267.   Plaintiffs have suffered injury in fact and actual damages resulting from Defendants' material omissions and misrepresentations because they paid an inflated purchase price for the Vehicle.

/ / /

/ / /

First Amended Complaint

15-md-02672-CRB

268.   Pursuant to § 1782 of the CLRA, by letter dated August 23, 2016, Plaintiffs notified Volkswagen in writing of the particular violations of § 1770 of the CLRA and demanded that Volkswagen rectify the actions described above. Plaintiffs sent this notice by certified mail, return receipt requested, to Defendants' agents for service of process.

269.   As a result of the removal of Plaintiffs' original complaint to this Court, and service on Liang of Plaintiff's original state court complaint, all named defendants also received written notice, months ago, of the nature of Plaintiffs' claims.

270.   On information and belief, Defendants' conduct alleged herein was and is fraudulent within the meaning of Cal. Civil Code § 3294(a) and (c)(3), and all such conduct was undertaken with the advanced authorization of officers, directors and/or authorized agents of Defendants.

## THIRD CLAIM FOR RELIEF

### (Violations of California Business and Professions Code §17200 et seq-All Named Defendants)

271.   Plaintiff repeats, re-alleges, and incorporates by reference all the allegations contained in the paragraphs above.

272.   Defendants' acts and practices, as alleged in this complaint, constitute unlawful, unfair, and fraudulent business practices, in violation of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq*.

273.   Defendants' acts and practices constitute unlawful business practices, as discussed elsewhere in this Complaint, in that they violate section California's Consumers Legal Remedies Act (California Civil Code §§ 1750, *et seq.*).

274.   Defendants' acts and practices constitute unfair practices in that (i) they are unethical, unscrupulous, and substantially injurious to consumers; (ii) any legitimate utility of Defendants' conduct is outweighed by the harm to Plaintiffs; (iii) the injury is not one that Plaintiffs reasonably could have avoided; and/or (iv)

the conduct runs afoul of the policies underlying the federal Clean Air Act, its implementing regulations, and California emissions standards, which seek to minimize harmful emissions and provide consumers with accurate information about the pollutant levels emitted by vehicles placed in the stream of commerce.

275.   Defendants' acts and practices constitute fraudulent practices in that they were likely to deceive Plaintiffs, who would not have purchased the Vehicles, or would have paid substantially less for the Vehicles, had Volkswagen adequately disclosed that the Vehicles were not "clean diesels" and did not even comply with federal and California emissions standards.

276.   As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business practices, Plaintiffs have suffered injury in fact and lost money or property, in that Plaintiffs purchased Vehicles when they otherwise would not have, overpaid for the Vehicles, did not receive the benefit of their bargain, and the Vehicle suffered a diminution in value. In addition, Plaintiffs will incur additional fuel costs, and a diminution in the performance of the Vehicles, if and when the Vehicles are altered in order to bring it into compliance with federal and state emissions standards. Meanwhile, Defendants have sold or leased more vehicles than they otherwise could have and charged inflated prices for these vehicles, thereby unjustly enriching themselves.

### FOURTH CLAIM FOR RELIEF

### (Violations of California Business and Professions Code §17500 et seq-Volkswagen AG and VGA)

277.   Plaintiffs repeat, re-allege, and incorporate by reference all the allegations contained in the paragraphs above.

/ / /

/ / /

/ / /

/ / /

278.   California's False Advertising Law prohibits any "unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17500. This prohibition extends to advertising which is false, and also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.

279.   Through advertising, marketing, and other publications described at length above, Volkswagen disseminated, or caused to be disseminated, in California and nationally, statements regarding their vehicles which were false or misleading, including that these vehicles are "Clean Diesel" vehicles when, in fact, they did not even meet federal or California emissions standards.

280.   Volkswagen's misrepresentations and omissions regarding their vehicles' emissions compliance, its performance, and its fuel efficiency were material and likely to deceive reasonable consumers such as Plaintiffs.

281.   Volkswagen knew or should have known these statements were false and misleading and would deceive consumers, including Plaintiffs.

282.   Plaintiffs have suffered injury-in-fact, including the loss of money and property, as a result of Volkswagen's misrepresentations and omissions, which are unfair, deceptive, untrue, or misleading in violation of the False Advertising Law.

283.   Plaintiffs would not have purchased the Vehicles had he known of the deceptive nature of Volkswagen's misrepresentations and omissions, or he would have paid less for the Vehicles. Also, Plaintiffs will incur additional fuel costs, and a diminution in the performance of the Vehicles, if and when the Vehicles are altered in order to bring them into compliance with federal and state emissions standards.

## **FIFTH CLAIM FOR RELIEF**
### **(Fraud-All Named Defendants)**

284.   Plaintiffs repeat, re-allege, and incorporate by reference all the allegations contained in the paragraphs above.

/ / /

First Amended Complaint

15-md-02672-CRB

285.   Defendants intentionally concealed and suppressed material facts concerning the quality of their vehicles by engaging in a scheme to evade federal and California vehicle emissions standards by installing defeat devices designed to conceal its vehicles' emissions of nitrogen oxides during normal operation.

286.   Defendants not only represented that the Affected Vehicles met minimum legal standards and were legal to sell, but all represented that the Affected Vehicles were "clean diesels" and were environmentally friendly.

287.   Plaintiffs reasonably relied upon Defendants' false representations. Plaintiffs had no way of knowing that Defendants' representations were false and misleading.

288.   Defendants' false representations were material to Plaintiffs, because they concern the quality of the Vehicle, including the Vehicle's compliance with applicable federal and California law and regulations. The representations were also material because they played a significant role in the value of the Vehicles.

289.   Defendants had a duty to disclose that the Vehicle was defective and contained a defeat device because Defendants had exclusive knowledge as to the implementation and maintenance of its scheme, and because Defendants knew the facts were not known or reasonably discoverable by Plaintiffs.

290.   Defendants also had a duty to disclose that the Vehicle was defective and contained a defeat device because they made general affirmative representations about the qualities of their vehicles regarding emissions standards which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above.

291.   Defendants also had a duty to disclose that the Affected Vehicles were not "clean diesels" at all, but rather gross polluters whose real NOx emissions exceeded minimum legal standards but up to forty times.

/ / /

/ / /

292.   Defendants are sophisticated manufacturers of motor vehicles and vehicle parts who sell vehicles to a public that relies on the Defendants' expertise and truthfulness. The omitted and concealed facts were material because they directly impacted the value of the Vehicles that Plaintiffs bought.

293.   Defendants actively concealed and/or suppressed these material facts with the intention, in whole or in part, to profit at the expense of Plaintiffs and the public.

294.   Plaintiffs had no knowledge of, and had no reason to know, that Defendants have concealed or suppressed these material facts. In fact, given their deliberately complex and secretive scheme, which even fooled federal and state regulators, such facts were exclusively known by Defendants.

295.   Plaintiffs relied upon Defendants' misrepresentations to their detriment. Plaintiffs would not have purchased the Vehicle for the price they paid or would have taken other affirmative steps in light of the information concealed from them, had Defendants not concealed or suppressed these material facts.

296.   Defendants' intentional deceptive conduct induced Plaintiffs to purchase the Vehicle.

297.   Because of the concealment, suppression, or misrepresentation of the facts alleged herein, Plaintiffs have sustained damage because Plaintiffs paid for a Vehicle that was worth far less than the price they paid. Defendants' conduct was a substantial factor in causing these damages.

298.   As a result of Defendants' fraudulent concealment and/or misrepresentation, the Vehicle at issue has lost significant value. Plaintiffs are thus entitled to damages in an amount to be determined.

299.   Because Defendants' conduct was wanton, deliberate, oppressive and malicious, or in reckless disregard of Plaintiffs' rights, Plaintiffs are entitled to an award of punitive or exemplary damages in an amount to be determined.

/ / /

## SIXTH CLAIM FOR RELIEF

### (Negligence-All Named Defendants)

300.   At all times relevant, Defendants were under a duty to exercise reasonable care in the manufacture, sale, marketing, and distribution of their vehicles to ensure that these cars met the environmental restrictions imposed by CARB and the EPA, that they did not contain illegal defeat devices and that they performed in accordance with the representations Defendants made in their marketing materials, including that the Affected Vehicle were actually "clean diesels" and were environmentally friendly.

301.   Defendants breached their duty of care in that the Vehicles purchased by plaintiff, and approximately 11 million other Volkswagen and Audi cars were secretly equipped with a defeat device.

302.   As a direct and proximate result of the acts and omissions of Defendants alleged here, Plaintiffs have been damaged in an amount subject to proof at the time of trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against all named Defendants, and pray for the following relief:

1.   An award of actual damages according to proof;

2.   For restitution;

3.   For a civil penalty of three times Plaintiff's actual damages pursuant to 18 U.S.C. §1964(c);

4.   For punitive damages. both under common law and under California Civil Code §1785.31(a)(2)(B);

5.   For consequential and incidental damages;

6.   An award of costs of litigation and reasonable attorney's fees, pursuant to 18 U.S.C. §1964(c), and California Civil Code §1780(e);

7.   For interest at the legal rate; and

First Amended Complaint                                                      15-md-02672-CRB

8.     Such other and further relief this court may deem just and proper.

## JURY DEMAND

1.     Plaintiffs demand a trial by jury.

Respectfully submitted,


DATED: October 1, 2018                    /s/ Stephen G. Recordon
                                          STEPHEN G. RECORDON
                                          Attorney for Plaintiffs