UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION

_____/

This Order Relates To:
MDL Dkt. Nos. 4533, 4534, 5162, 5287

*Nemet v. Volkswagen Group of America, Inc.*,
No. 3:17-cv-04372-CRB

_____/

MDL No. 2672 CRB  (JSC)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS**

On September 18, 2015, the public learned that Volkswagen had been selling diesel cars in the United States since 2009 that were equipped with emission cheating software. Litigation ensued and VW quickly settled claims brought by consumers who owned or leased the cars as of September 18. This order addresses a lawsuit by a putative class of consumers with whom VW has not settled: consumers who had owned or leased an affected car but who resold the car or exited the lease before September 18. VW contends that these consumers were not injured by the fraud because they did not experience a drop in the resale value of the cars.

The former owners rely on a well-accepted theory of injury (overpayment) but with a novel twist. They acknowledge that the price of the cars was likely inflated not only when they purchased them, but also when they resold them. Yet they contend that they did not recover all of their overpayment through resale because a portion of the premium they paid for a low-emission vehicle depreciated. To be clear, the former owners do not assert that their injury is equal to the entire amount by which the cars depreciated, only that a portion of the low-emission premium depreciated and that, because the premium was for a feature the cars never had, this extra depreciation is a loss that is attributable to VW's deceit.

Based on these relatively unique allegations—where consumers each purchased a car, a well-known depreciating asset, where they each paid a premium for a feature they did not receive,

and where they resold the cars before learning that the feature was missing—the Court concludes that Plaintiffs have alleged an injury that is sufficiently concrete to survive a Rule 12(b)(1) motion to dismiss for lack of Article III standing. Whether this depreciation-based injury can be accurately quantified and whether the former owners' losses are more than de minimis remains to be seen. But what matters at the pleading stage is that the fact of damage, rather than the amount of damage, is not speculative.

A variety of other issues are also addressed in this order, including whether other injury allegations are sufficiently concrete, whether Plaintiffs' RICO claims against Robert Bosch GmbH and Robert Bosch LLC are well pled, whether state law claims against VW are preempted or alternatively fail to satisfy Rules 8(a) and 9(b), and whether certain of the state law claims fail for miscellaneous reasons.

## I. BACKGROUND

In 2009, VW began selling its VW and Audi branded TDI "clean diesel" vehicles, which it marketed as being low-emission, environmentally friendly, fuel efficient, and high performing. (Compl. ¶ 6.) Concealed was the fact that VW had installed software in these cars that caused their emission controls to perform one way during emissions testing, and another (less effective) way during normal driving conditions. (*Id.* ¶ 203.) During regular on-road use, the cars are alleged to have emitted nitrogen oxides (NOx) at levels that were sometimes 40 times higher than EPA's legal limit. (*Id.* ¶¶ 10, 203.)

On September 18, 2015, the public learned of the fraud when EPA issued a Notice of Violation to VW, alleging that the company's use of the defeat device violated the Clean Air Act. (*Id.* ¶ 344.) Consumers nationwide responded by filing hundreds of lawsuits. The Judicial Panel on Multidistrict Litigation transferred those cases here. The Court then appointed Lead Plaintiffs' Counsel and a Plaintiffs' Steering Committee (PSC), which filed a consolidated class action complaint against VW, related entities, and Bosch (who allegedly assisted in developing and implementing the defeat device). The consolidated complaint was on behalf of all persons and entities in the United States who purchased or leased an affected vehicle. (*See* Dkt. No. 1804 ¶ 424.)

Settlement talks began almost immediately, and VW and Bosch soon agreed to a series of settlements to compensate consumers who were registered owners or lessees of the cars as of September 18, 2015.[1] (*See* Dkt. Nos. 2102, 3229, 3230.) Excluded from the settlement class definitions were Plaintiffs here: all persons and entities in the United States who "owned, leased, or otherwise acquired" an affected vehicle but who "no longer owned, held an active lease for, or otherwise had a legal interest in that Eligible Vehicle on or after September 18, 2015." (Compl. ¶ 401.)

Plaintiffs filed this lawsuit after the Court approved the PSC-led settlements. They contend that VW, VW related entities (such as Audi), Bosch, and certain individual defendants engaged in a racketeering enterprise in violation of RICO, and that VW also violated 21 states' consumer protection and false advertising laws by deceiving consumers about its vehicles. The complaint also includes a claim for violation of the Magnuson-Moss Warranty Act, but Plaintiffs have agreed not to pursue that claim. (*See* Pls.' Opp'n, Dkt. No. 4713 at 11.)

VW and Bosch have filed motions to dismiss the complaint.

## II. STANDING

To have standing to sue in federal court, Plaintiffs must establish (1) that they have suffered an injury in fact, (2) that their injury is fairly traceable to Defendants' conduct, and (3) that their injury will likely be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). To establish the first of these elements, Plaintiffs must demonstrate that they "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice . . . ." *Lujan*, 504 U.S. at 561.

Plaintiffs allege that they were injured by VW's emissions fraud in three ways. First, they contend that they overpaid to purchase and lease the class vehicles—paying a "clean diesel"

---

[1] The settlements also covered certain consumers who became registered owners of the cars after September 18, 2015. (*See* Dkt. Nos. 1685 ¶ 2.16; 2894 ¶ 2.23.)

premium for cars that were supposed to, but did not, have low emissions. (*See, e.g.*, Compl. ¶¶ 13, 379-82.) Second, they contend that they paid financing and leasing fees for the class vehicles, which they would not have paid, or which would have been less, had they known about the cars' actual emission levels. (*Id.* ¶¶ 13-14, 383.) Third, they contend that even if they did not each pay a premium to buy or lease a class vehicle, they were still injured because they never would have bought or leased the cars in the first place if they had known about the fraud. (*Id.* ¶ 384.)

VW argues that the allegations are insufficient to support an injury in fact under any of these theories. In ruling on VW's challenge, which is a facial challenge to federal jurisdiction, the Court "must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

**A.      Payment of a "Clean Diesel" Premium**

In considering whether Plaintiffs were injured by paying a "clean diesel" premium, the Court discusses former owners and former lessees of the class vehicles separately.

**1.      Former Owners**

Plaintiffs contend that they overpaid for the class vehicles because they paid a premium for a feature—low emissions—that they did not receive. When a consumer overpays for a product because of the seller's conduct, the overpayment is ordinarily "a quintessential injury-in-fact." *Maya v. Centex Corp.*, 658 F.3d 1060, 1069 (9th Cir. 2011). But the purchasing Plaintiffs here are in a unique situation, because they resold the class vehicles before VW's emissions fraud was public knowledge. So even though they purchased the cars at a price that did not take into account the fraud, they also sold them at a price that did not take into account the fraud. (*See* Compl. ¶ 4 (acknowledging that, because they sold the class vehicles before VW's fraud was known, Plaintiffs "might have escaped the . . . injury of lost resale value").)

Plaintiffs respond by arguing that, although they sold the cars before they or the new purchasers knew about the emissions fraud, they were not able to recover the entire "clean diesel" premium through resale. The reason they were not able to do so, they argue, is because of depreciation.

Of course, vehicle depreciation is a fact of life: as vehicles age they decline in value, and

this decline is not a loss that is treated as an injury by the law. But Plaintiffs do not argue that VW is somehow responsible for the natural depreciation of the class vehicles; what they argue is that they were not able to fully recover the premium VW charged for the cars because a portion of the premium effectively depreciated. And because the premium was for a feature they did not receive, Plaintiffs contend that they were injured by the amount of the premium that they were not able to recover through resale.

It is easiest to understand Plaintiffs' argument through examples. Assume that the purchase price of a new VW car without a "clean diesel" premium is $30,000. If the value of the car depreciates by 20% during the first year, its value will decline by $6,000, leaving a resale value of $24,000.

| Scenario 1: No "Clean Diesel" Premium | |
|---|---|
| Purchase price | $30,000 |
| Depreciation rate | 20% |
| Value after 1 year | $24,000 |
| Decline in value from original purchase price | **$6,000** |

Now assume that the same car is sold with a "clean diesel" premium of $6,000. Using the same 20% depreciation rate, the car's value will now decline by $7,200 during the first year, leaving a resale value of $28,800.

| Scenario 2: "Clean Diesel" Premium | |
|---|---|
| Purchase price ($6,000 premium) | $36,000 |
| Depreciation rate | 20% |
| Value after 1 year | $28,800 |
| Decline in value from original purchase price | **$7,200** |

The "clean diesel" premium increased depreciation. This is because of the relationship between vehicle purchase price and depreciation: assuming the depreciation rate is fixed, a higher purchase price will invariably lead to a higher depreciation amount. In Scenario 2, the "clean

5

diesel" premium raises the vehicle purchase price from $30,000 to $36,000.  Multiplying this

$6,000 increase by a 20% depreciation rate, the premium also raises year one depreciation by

$1,200.  Or put differently, the premium itself depreciates by 20% after one year of use: a

consumer pays $6,000 for "clean diesel" attributes and, if sold after one year, sells those attributes

for $4,800.

In a market without fraud, the $1,200 difference in depreciation between a $30,000 car and

a $36,000 car would simply reflect a cost of buying a more expensive depreciating asset.  But if

the increase in the purchase price is attributable to a premium charged by the seller for a certain

feature, and the car does not have that feature, then the $1,200 increase plausibly represents a loss

that is attributable to the seller's deceit.

Plaintiffs contend that this is what happened to them.  They allege that they paid a

premium for VW's vehicles, not knowing that the vehicles lacked a feature—low emissions—that

supported the premium.  And even though they sold these cars before the emissions fraud came to

light, they were not able to recover the entire premium because, by increasing the cost of the cars,

the premium also increased the amount by which the cars depreciated.

Neither Plaintiffs nor VW has cited to any decision in which a court has either accepted or

rejected this depreciation-based theory of injury.  The case that is most analogous, a case VW

cites, is *Licul v. Volkswagen Group of America, Inc.*, No. 13-61686-CIV, 2013 WL 6328734 (S.D.

Fla. Dec. 5, 2013), where the court held that the original purchaser of a latently defective vehicle

did not suffer a loss when she resold the vehicle before the defect was discovered.  *See id.* at *5

("[Plaintiff] purchased the Jetta at a price that did not take account of the defect, and she sold the

Jetta at a price that did not take account of the defect.").  But the *Licul* court did not consider the

effect of depreciation on the potential resale value of the vehicle there; nor did the plaintiff in

*Licul* allege that she paid a specific premium for an attribute that she did not receive.  *Licul* is

therefore not particularly instructive.

VW also attempts to link this case with two other lines of cases, but neither line is

implicated here.  First, VW compares Plaintiffs to "in-and-out traders" who buy and sell stock

before fraud by the issuer is revealed.  Courts have held that traders like these are not injured by

6

their stock purchase. *See, e.g.*, *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (holding that stock purchasers do not suffer a loss the moment they purchase stock at an inflated price due to the issuer's fraud, but only when they sell the stock after "the truth makes its way into the marketplace"). The analogy with this case is inapt because, unlike vehicles, stock does not naturally depreciate. So even if a trader purchases stock for a premium on account of fraud, none of the premium will be lost if the trader sells the stock before the fraud is revealed.

Second, VW compares this case to those in which consumers have alleged that they overpaid for defective vehicles, even when the defect has not manifested and is unlikely to manifest in the future. Courts have dismissed cases based on claims like these for failure to establish an injury in fact. *See, e.g.*, *Cahen v. Toyota Motor Corp.*, 147 F. Supp. 3d 955, 968 (N.D. Cal. 2015) (dismissing complaint when "plaintiffs [did] not allege that any consumer, outside the realm of controlled experiments, has ever been a victim of [the harm that might be caused by the alleged defect]"), *aff'd*, 717 F. App'x 720 (9th Cir. 2017); *Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962, 972 (C.D. Cal. 2014) (dismissing complaint when plaintiffs acknowledged that the vehicle systems they challenged "perform[ed] as described"). These cases do not shed light on Plaintiffs' depreciation-based theory of injury; they are also clearly distinguishable. Underlying these no-injury defect cases is a critical eye toward allegations of overpayment for vehicles that essentially work as advertised. That is not the case here. Plaintiffs allege that the class vehicles emitted NOx at levels up to 40 times the legal limit from the moment they were put in use. (*See* Compl. ¶¶ 10, 203.)[2]

---

[2] Once a reply is filed, the local rules explain that "no additional memoranda, papers or letters may be filed without prior Court approval," except (1) when new evidence has been submitted in the reply, or (2) "*[b]efore* the noticed hearing date, counsel may bring to the Court's attention a relevant judicial opinion published after the date the opposition or reply was filed." Civil L.R. 7-3(d) (emphasis added). After the hearing, VW and Bosch each filed a notice of supplemental authorities, and VW also filed a statement of recent decision. (Dkt. Nos. 5282, 5286, 5341.) The Court did not approve these filings and they do not meet either of Rule 7-3(d)'s exceptions. The two notices of supplemental authorities are also filled with citations to cases that were decided before the hearing here. VW and Bosch's belated reliance on these cases, and their arguments for why they apply, flout the local rules. These supplemental filings have not been considered, and Plaintiffs' motion to strike them is GRANTED. (Dkt. No. 5287.)

As to VW's statement of recent decision, which identified *In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices & Liability Litigation*, No. 17-2980, -- F.3d ----,

VW also cites to the declaration of Professor Robert H. Klonoff that the PSC submitted in support of the prior consumer settlements. Professor Klonoff, a law professor, stated there that "individuals who sold their vehicles prior to disclosure of the fraud . . . suffered no economic harm, since they sold their vehicles before the announcement of the fraud and the resulting price drop of the vehicles." (Dkt. No. 1976-1 ¶ 79.) This evidence is not helpful to VW here for three reasons. First, it does not appear that Professor Klonoff considered the effects of depreciation in his analysis. Second, the declaration is outside the complaint and VW does not claim to be mounting a factual attack on standing such that the Court could rely on extrinsic evidence. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). And third, Professor Klonoff does not purport to be an expert on economics or vehicle depreciation, so he may not be sufficiently qualified to render an expert opinion on the depreciation question at issue.

Without any caselaw on point, the ultimate question is whether, when the allegations are taken as true, Plaintiffs have identified a "concrete and particularized" injury. *Lujan*, 504 U.S. at 560. There are two questions that must be answered to make this determination here. First, is the theory of injury plausible? Second, are the allegations sufficient to support that Plaintiffs *did* pay a premium for the class vehicles and that they did *not* get what they paid for?

The two scenarios laid out above answer the first question affirmatively. These scenarios illustrate that when a premium is charged for a depreciating asset, the premium will plausibly increase the total amount by which the asset depreciates. And if the premium is for a feature that the asset does not actually have, then the original purchaser cannot recover the full value of the premium through resale because of depreciation. The amount of the premium that is unrecoverable plausibly constitutes overpayment, which is "a quintessential injury-in-fact." *Maya*, 658 F.3d at 1069.

The second question (which has two subparts) requires an examination of the actual facts alleged rather than of hypotheticals. Subpart one: do the allegations support that Plaintiffs paid a

---

2018 WL 4292359, at *1 (3d Cir. Sept. 6, 2018), a decision that postdated the hearing here, that submission was also improper because VW did not first obtain the Court's approval to file it. In any event, the Court has reviewed the decision and has determined that it does not affect the analysis.

premium for the class vehicles? They do. The class vehicles are VW's 2.0-liter and 3.0-liter TDI diesel engine vehicles, model years 2009 through 2016. (*See* Compl. ¶ 9.) Plaintiffs allege that VW charged 7 to 27 percent more for the 2.0-liter TDIs over the non-diesel versions. (Compl. ¶ 379.) As an example, they highlight the 2015 Passat. The non-diesel version started at $21,340, while the diesel version started at $27,100, a price that was approximately 27 percent higher and $6,000 more than the non-diesel. (*Id.*) Fewer specifics are offered for the 3.0-liter vehicles. But because the distinguishing characteristics of the cars, which are discussed more below, were allegedly the same for both the 2.0-liter and 3.0-liter versions, it is plausible that these cars also sold for a premium. (*See, e.g.*, Compl. ¶ 302 (alleging that in 2012 VW used the same "clean diesel" brochure for six models of TDIs then on the market, one of which was the Touareg, a 3.0-liter model).)

Subpart two: do the allegations support that Plaintiffs did not get what they paid for in return for the premium? They do. Plaintiffs allege that they paid a premium for "low-emission, environmentally friendly vehicles, with high fuel economy and exceptional performance." (Compl. ¶ 6.) They also allege that, in fact, the class vehicles emitted NOx, a toxic pollutant that produces smog and leads to environmental and health problems, at levels up to 40 times the legal limit. (*Id.* ¶¶ 10, 203.) Given the cars' NOx emissions, it would be reasonable for the trier of fact to conclude that the cars were not "low-emission" or "environmentally friendly" as advertised. It is therefore plausible that Plaintiffs paid a premium for something they did not receive. And given the workings of depreciation, it is also plausible that they did not recover the entire amount of this premium through resale.

VW responds by flagging what it argues are shortcomings with Plaintiffs' pleading of the "clean diesel" premium. The first of these, VW argues, is that the complaint "lacks any factual allegations showing that any portion of the difference—let alone the entire difference—in price between the TDI and gasoline vehicles stems specifically from *lower NOx emissions*, as opposed to other factors." (VW Mot., Dkt. No. 4534 at 37.) Because of this, VW contends that Plaintiffs have not sufficiently pled that they paid a premium for something that they did not receive—a vehicle with lower NOx emissions.

It is true that Plaintiffs have not pled that they paid a premium specifically for lower NOx emissions. Yet they do not need to. For if they each paid a premium for a low-emission vehicle, and they each received a vehicle that emitted unreasonably high amounts of NOx, it would be reasonable to conclude that they did not get what they paid for. This is because a premium for low emissions reasonably can be viewed as covering *all* vehicle emissions, including NOx.

As alleged, there is also no reason to doubt that Plaintiffs each paid a premium for a car with low emissions. The complaint includes detailed allegations about how low emissions were "the identifying characteristic" of the class vehicles and formed the basis for VW's marketing of them. (*Id.* ¶ 380.) Plaintiffs explain that diesel engine cars were known to have better fuel efficiency than gasoline engine cars, but that diesel's Achilles' heel was its emission of "thick, toxic smoke full of dangerous and destructive pollutants." (Compl. ¶ 181; *see also id.* ¶ 185.) Through "millions of dollars in research and development," VW claimed to have solved these "environmental problems." (*Id.* ¶ 179.) And VW's asserted breakthrough was a key point that it championed in advertising. (*See, e.g.*, Compl. ¶ 290 (advertising that the Jetta TDI had "Ultra low emissions"); ¶ 302 (advertising that "[t]hese are not the kind of diesel engines that you find spewing sooty exhaust like an old 18-wheeler").) Plaintiffs' assertion that they paid a premium for a low-emission vehicle is entirely plausible in light of these allegations.

VW next notes that the alleged premium was not just for a vehicle with low emissions, but also for a vehicle with "high fuel economy" and "exceptional performance." (Compl. ¶ 6.) As to these other features, VW contends that there are no well-pled allegations supporting that the class vehicles did not provide what was promised. So, VW asserts, the amount of money that Plaintiffs paid specifically for a low-emission vehicle is speculative, and the amount that was not recovered through depreciation is even more speculative, making Plaintiffs' injuries entirely "'conjectural' or 'hypothetical'" rather than "actual or imminent" as required to satisfy Article III. *Lujan*, 504 U.S. at 560.

If, as alleged, low emissions was one of several features in a "clean diesel" package for which Plaintiffs paid a premium, it indeed may be challenging for Plaintiffs to prove the amount that they paid specifically for low emissions. And it is doubtful that Plaintiffs' overpayment

10

would have been equivalent to the entire cost of the package if the package also included features that Plaintiffs received. Each Plaintiff's overpayment, then, may have only represented a fraction of the $6,000 average premium paid for the "clean diesel" package. And their economic losses were likely even less because they probably recovered most of the premium through resale. Only the amount of the premium that depreciated and could not be recovered through resale would be a concrete injury.

At this stage in the proceedings, however, these concerns are premature. They highlight uncertainty about the "amount of damage;" yet only the "fact of damage" matters at the pleading stage. *See Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1171 (9th Cir. 2002). *Mendoza* makes this distinction clear. There, a group of agricultural workers brought a RICO claim against agricultural companies that allegedly hired undocumented immigrants. The agricultural workers argued that this practice depressed their wages. *Id.* at 1166. In dismissing the complaint, the district court had held that the workers' losses were speculative and not concrete because many intervening factors could have interfered with their wages. *Id.* at 1170-71; *see also Mendoza v. Zirkle Fruit Co.*, No. CS-00-3024-FVS, 2000 WL 33225470, at *9-10 (E.D. Wash. Sept. 27, 2000). The Ninth Circuit reversed, noting that

> it is important to distinguish between uncertainty in the fact of damage and in the amount of damage. That wages would be lower if, as alleged, the growers relied on a workforce consisting largely of undocumented workers, is a claim at least plausible enough to survive a motion to dismiss, whatever difficulty might arise in establishing how much lower the wages would be.

*Mendoza*, 301 F.3d at 1171 (citation omitted). The Ninth Circuit also explained that complex questions about the amount of the plaintiffs' damages were best addressed after the pleading stage:

> [T]he workers must be allowed to make their case through presentation of evidence, including experts who will testify about the labor market, the geographic market, and the effects of the illegal scheme. Questions regarding the relevant labor market and the growers' power within that market are exceedingly complex and best addressed by economic experts and other evidence at a later stage in the proceedings.

*Id.*[3] As *Mendoza* shows, and as district courts in the circuit have also noted, "Plaintiffs are not required to quantify their damages . . . in order to establish injury for Article III purposes," so long as "the *fact* of injury is not speculative." *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*, No. 13-cv-01180-BLF, 2015 WL 4755335, at *15 (N.D. Cal. Aug. 11, 2015).

The fact of damage is not speculative here. When the allegations are taken as true and construed in the light most favorable to Plaintiffs, it is plausible that some portion of the $6,000 average "clean diesel" premium was for a vehicle with low emissions, which is a feature that the class vehicles did not have. These allegations, combined with the plausible theory that a portion of the premium depreciated before Plaintiffs resold the cars, are sufficient at the pleading stage to support an injury in fact.

### 2. Former Lessees

The proposed class also includes persons who leased a VW TDI vehicle if their lease ended before September 18, 2015. Plaintiffs contend that these former lessees were also harmed by the emissions fraud because VW used its vehicles' initial purchase prices to set lease payments, and for the class vehicles the initial purchase prices were inflated by the "clean diesel" premium. Each lease payment, then, contained an amount that Plaintiffs contend was directly attributable to the inflated premium, and Plaintiffs assert that class members "were injured in that amount, which they paid for a feature they did not receive." (Compl. ¶ 14.)

The former lessees' premium-related injury theory is more straightforward than the former owners' theory. Unlike former owners, former lessees did not have the opportunity to resell the class vehicles because they did not own them. So even though their leases ended before VW's fraud was known, they were plausibly injured if, as alleged, their lease payments were artificially inflated by a premium for a low-emission vehicle.

VW nevertheless challenges the former lessees' theory, noting that the lease payments for

---

[3] The *Mendoza* court made these statements in a section of its opinion that addressed whether proximate cause was well pled for the plaintiffs' RICO claims. But the court was specifically addressing whether the measure of harm was "speculative," *id.* at 1170, a consideration made not only in analyzing RICO proximate cause but also in analyzing Article III's injury-in-fact requirement. Further, immediately after the just quoted discussion, the court held that the plaintiffs had also satisfied Article III for the same reasons. *See id.* at 1172.

12

each vehicle were allegedly based on the difference between the vehicle's initial purchase price and "residual value," with the residual value being the vehicle's estimated value at the end of the lease term. (*See id.* (acknowledging that lease rates were based in part on the vehicles' residual value).) Because of this, VW argues that even if the purchase price of the cars was inflated when Plaintiffs entered into their leases, so was the residual value, as both values would have taken into account the "clean diesel" premium.

VW is correct that, based on the lease formula that Plaintiffs identify, both the initial purchase price and the residual value of the class vehicles would have included an amount attributable to the "clean diesel" premium. But VW overlooks that the residual value also would have plausibly taken into account depreciation. Because of depreciation, the value of the premium would be expected to decline between the initial purchase price and the residual value, which would mean that lease payments would have been higher because of the premium.

Examples are again helpful. Assume a $30,000 purchase price for a new VW car without a "clean diesel" premium, a 20% depreciation rate, a one-year lease, and monthly lease payments. Using the formula that Plaintiffs allege VW used, the total lease amount will be equal to the difference between the initial purchase price ($30,000) and the residual value of the car after one year. In this example, the residual value will be $24,000, as the car will decline in value by 20% after one year due to depreciation. The difference between the initial purchase price and the residual value is $6,000. Dividing this amount by 12 leads to monthly lease payments of $500.

| Lease Scenario 1: No "Clean Diesel" Premium / One-Year Lease | |
|---|---|
| Purchase price | $30,000 |
| Depreciation rate | 20% |
| Vehicle's residual value | $24,000 |
| Total cost of lease | $6,000 |
| Monthly payments | **$500** |

13

Now assume that a $6,000 "clean diesel" premium is added to the initial price for the same car, raising the purchase price to $36,000. The residual value at the end of the lease will now be $28,800, which represents a 20% decline in value due to depreciation. The difference between the initial purchase price and the residual value is now $7,200. And dividing this amount by 12 leads to monthly lease payments of $600.

| Lease Scenario 2: "Clean Diesel" Premium / One-Year Lease | |
|---|---|
| Purchase price ($6,000 premium) | $36,000 |
| Depreciation rate | 20% |
| Vehicle's residual value | $28,800 |
| Total cost of lease | $7,200 |
| Monthly payments | **$600** |

These examples show, under the lease formula alleged, that when the initial purchase price of a VW vehicle increases, the lease payments will also increase—a result that is consistent with common knowledge. (It is not surprising that a $50,000 vehicle would cost more to lease than a $20,000 vehicle.) Applied here, this means that if the "clean diesel" premium increased the initial purchase price of the class vehicles, as Plaintiffs allege, then the amount of Plaintiffs' lease payments also would have risen. In arguing to the contrary—asserting that the lease payments would not have been affected by the premium because the premium would have been included in both the initial purchase price and the residual value—VW does not take into account depreciation.

If the amount of Plaintiffs' lease payments increased because of the "clean diesel" premium, then Plaintiffs were plausibly injured. This is because Plaintiffs allege that the premium was in part for the benefit of low emissions, which is a feature that VW did not provide. Similar to the former owners, the former lessees will eventually need to identify with more precision the amount of the premium that was specifically for low emissions. But at this stage, the fact of damage is concrete. *See Mendoza*, 301 F.3d at 1171; *Los Gatos Mercantile*, 2015 WL 4755335, at

*15. The former lessees' injury allegations are therefore sufficient to support Article III standing.

* * *

Plaintiffs' first theory of injury—that they were injured when they paid a premium for something they did not receive—is well pled. The Court now moves on to address the other two alleged injuries: Plaintiffs' payment of financing charges and leasing fees and Plaintiffs' assertion that they were injured when they purchased and leased the class vehicles even if they did not pay a premium.

**B.      Financing Charges and Leasing Fees**

Plaintiffs who purchased class vehicles assert that they were also injured when they paid inflated financing fees, and Plaintiffs who leased class vehicles assert that they were also injured when they paid lease acquisition and lease termination fees, which they contend they would not have paid if they had known about VW's emissions fraud. (Compl. ¶¶ 13-14.)

The complaint does not include much detail on these fees, but Plaintiffs indirectly allege that the financing fees, at least, increased in proportion to the price of the financed vehicles. (*See* Compl. ¶ 13 (alleging that if the "clean diesel" premium was 27% of the vehicle purchase price, then 27% of the financing charges would have been on account of the premium); *see also* Pls.' Opp'n, Dkt. No. 4713 at 33 (asserting that the financing fees were "inflated as a result of the clean-diesel premium they paid").) Taking these allegations as true, the increased financing fees are fairly traceable to VW's conduct. The "clean diesel" premium plausibly increased the price of the financed vehicles, which in turn would have led directly to higher financing fees.

In arguing that the financing fees are not traceable to it, VW contends that these fees are dependent on many factors, such as applicants' "personal finances, credit ratings, willingness to take loans, occupations, and the state of the auto financing market in general and in their own areas." (VW Mot. at 40.) This may be true, but even if these factors affected the amount of the financing fees, the "clean diesel" premium would have marginally increased those fees in an amount proportional to the price of the financed vehicles; and this marginal increase is fairly traceable to VW.

As an example of this marginal increase, assume that an individual with robust personal finances and a good credit rating (named Allison) is able to finance a new $30,000 VW vehicle at a low interest rate and with a 1% financing fee. The dollar amount of Allison's financing fee will be $300. If Allison instead purchases a $36,000 "clean diesel" vehicle, again with a 1% financing fee, then the dollar amount of the financing fee will rise to $360, a 20% increase.

| Financing Scenario 1: Allison | | |
| --- | --- | --- |
| | **No "Clean Diesel" Premium** | **"Clean Diesel" Premium** |
| Purchase Price | $30,000 | $36,000 |
| Financing fee rate | 1% | 1% |
| Financing fee amount | $300 | $360 |
| % Increase | | 20% |

Now take the same two scenarios, but replace Allison with an individual with shaky personal finances and a poor credit rating (named Matthew). Due to his finances, Matthew must pay a high interest rate and a 2% financing fee to finance his purchase of a VW vehicle. Yet although Matthew's financing fee is greater than Allison's, the dollar amount of Matthew's financing fee, like Allison's, will rise by 20% in the "clean diesel" scenario.

| Financing Scenario 2: Matthew | | |
| --- | --- | --- |
| | **No "Clean Diesel" Premium** | **"Clean Diesel" Premium** |
| Purchase Price | $30,000 | $36,000 |
| Financing fee rate | 2% | 2% |
| Financing fee amount | $600 | $720 |
| % Increase | | 20% |

Even though Allison and Matthew pay different financing fees due to their personal finances, both of them experience a 20% increase in their fee from buying a "clean diesel." Thus, regardless of the individual factors that are considered in setting the financing fee percentage

(personal finances, credit ratings, etc.), a portion of the fee is directly attributable to VW's challenged conduct.

Because Plaintiffs allege that the amount of their financing fees increased in proportion to vehicle purchase price, their injury from increased fees is not "dependent upon many factors" in the same way that the alleged injury was in *Kaing v. Pulte Homes, Inc.*, No. 09-5057 SC, 2010 WL 625365 (N.D. Cal. Feb. 18, 2010), *aff'd sub nom. Kaing v. Pultegroup, Inc.*, 464 F. App'x 630 (9th Cir. 2011), a case on which VW relies. The court in *Kaing* held that a decline in the value of the plaintiff's home was not fairly traceable to the defendant developer's practice of selling other homes in the neighborhood to unqualified buyers because any loss was dependent upon many factors, including a general weakening economy and unemployment and health problems experienced by the other residents in the neighborhood. *See id.* at *6.

As noted above, here too there may have been many factors that affected the financing fees for the class vehicles; but as alleged, the amount of these fees that is tied to VW's emissions fraud is capable of being identified, as it is tied to the percent by which the vehicles' purchase price increased because of the "clean diesel" premium. Causation here, then, is much clearer than in *Kaing* where there was no identified way to tie the defendant developer's practices to a specific decline in the value of plaintiff's home.

Unlike the financing fees, Plaintiffs do not allege that the lease acquisition and lease termination fees increased in proportion to the cost of the lease. Instead, Plaintiffs allege that if they had been informed of VW's fraud before agreeing to lease the class vehicles, then they would not have agreed to the leases and so would not have paid these fees. (*See, e.g.*, Compl. ¶ 43 ("[T]he Lease committed [named plaintiff Tonya Dreher] to pay a $695 acquisition fee and a $350 turn-in/disposition fee at the expiration of the Lease—fees that Plaintiff would never have paid had Plaintiff been informed of the fraud either before or during the course of the Lease.").)

The causal connection between VW's emissions fraud and Plaintiffs' payments of these lease acquisition and termination fees is shaky, as Plaintiffs very well may have paid similar fees to lease other cars if they had known about the fraud. Plaintiffs do not allege that these leasing fees were unique to the class vehicles. And it is unlikely, or at best speculative, that those who

United States District Court
Northern District of California

leased class vehicles would have forgone leasing a car altogether if they had known of VW's fraud. Thus, because Plaintiffs plausibly would have paid similar lease acquisition and termination fees even if they had known of VW's fraud, Plaintiffs have not shown a "causal connection between [this] injury and the conduct complained of" as required for Article III standing. *Lujan*, 504 U.S. at 560. But as discussed above, Plaintiffs have established this causal connection for the purchase financing fees.

## C.     Never Would Have Purchased or Leased Theory of Injury

Even if there was no "clean diesel" premium, Plaintiffs contend that they were harmed by VW because they never would have bought or leased the class vehicles in the first place if they had known about the emissions fraud. (*See* Pls.' Opp'n at 29 ("[E]ach Plaintiff alleges that he or she 'would not have purchased or leased their Vehicles had Defendants not concealed the illegal cheat device,' [citing paragraphs from the complaint], and/or that they 'would not have purchased' the Vehicles 'had [they] known the true emission levels and gas mileage,' [citing additional paragraphs]."); *see also id.* at 31 n. 35 (arguing that "Plaintiffs' standing does not even hinge on the existence of [a] premium" because they also allege that they "purchased or leased Vehicles that they would otherwise not have purchased").)

This alternative theory of injury may work for former lessees, but it does not work for former owners. The idea behind the theory is that Plaintiffs each spent money to buy or lease a car that they contend they would not have spent if they had known about the emissions fraud. But if the former owners did not pay a "clean diesel" premium (and the corresponding inflated financing fees), then they were not harmed by this expenditure. For if there was no premium, then former owners would have fully recovered the money they paid for the class vehicles (minus depreciation based on standard wear and tear) when they resold the vehicles before they or the public learned of the emissions fraud. Even if they parted with their money, they ultimately got it back. (*See* Compl. ¶ 4 (acknowledging that, because they sold their class vehicles before VW's fraud was known, Plaintiffs "might have escaped the additional injury of lost resale value").)

There was no comparable resale in any of the cases on which Plaintiffs rely in arguing that they were injured when they purchased the class vehicles. In *Victor v. R.C. Bigelow, Inc.*, No. 13-

18

cv-2976-WHO, 2014 WL 1028881 (N.D. Cal. Mar. 14, 2014), for example, the plaintiffs purchased and consumed Bigelow's tea before they realized that Bigelow had misrepresented the tea's health benefits.  Having consumed the tea, the plaintiffs had no chance to resell it and recover their loss, so the court held that the plaintiffs had plausibly been injured when they purchased it.  *See id.* at *4.  The same happened in *Morgan v. Wallaby Yogurt Co., Inc.*, No. 13-cv-0296-WHO, 2013 WL 5514563, at *3-4 (N.D. Cal. Oct. 4, 2013), except the plaintiffs there purchased and consumed mislabeled yogurt instead of tea.

Plaintiffs' opposition brief contains other analogous cases featuring mislabeled products.  (*See* Pls.' Opp'n at 18-19.)  And even if the products in these other cases were not consumed like the tea in *Victor* or the yogurt in *Morgan*, *see, e.g.*, *In re Vizio, Inc., Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1217 (C.D. Cal. 2017) (smart TVs with misrepresented features), there are no allegations of resale is any of these cases, let alone resale at prices that were not affected by the allegedly misleading labels.  In short, then, the never-would-have-purchased theory of injury, to the extent it is separated from the "clean diesel" premium, does not work for Plaintiffs who formerly owned class vehicles.

The analysis of the never-would-have-purchased theory of injury is different for the former lessees.  Because these Plaintiffs never owned the cars, they did not resell them.  So they did not have the same opportunity as former owners to recoup their money.  It is thus plausible that these Plaintiffs were injured when they paid money to lease vehicles that they otherwise would not have leased but for VW's emissions fraud.  *See Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 n.3 (9th Cir. 2013) ("We have explained that when, as here, 'Plaintiffs contend that class members paid more for [a product] than they otherwise would have paid, *or* bought it when they otherwise would not have done so' they have suffered an Article III injury in fact." (emphasis added) (alteration in original) (quoting *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595 (9th Cir. 2012))).

VW argues that to prevail on this theory the former lessees need to identify the specific advertisements on which they relied.  Without allegations of actual reliance on specific advertisements about emissions, VW contends that Plaintiffs' assertion that they would not have leased the cars had they known about the emissions fraud is not credible.  This particularity

argument is better directed toward the merits of Plaintiffs' claims. For purposes of Article III standing, it is sufficient that the named plaintiffs have alleged in general terms that they relied on VW's advertising that the class vehicles were "environmentally friendly" and had low emissions. (*E.g.*, Compl. ¶ 20.) At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct" are sufficient. *Lujan*, 504 U.S. at 561.

To the extent that the court in *In re Mercedes-Benz Emissions Litigation* reached a different result, *see* No. 16-881 (JLL), 2016 WL 7106020, at *7-8 (D.N.J. Dec. 6, 2016) (concluding that consumers needed to at least identify the medium or category of advertising upon which they relied to satisfy Article III), the Court disagrees with that decision, as have other courts. *See Counts v. General Motors, LLC*, 237 F. Supp. 3d 572, 586 (E.D. Mich. 2017) (reasoning that *Mercedes* "blur[red]" the lines between the standing and merits inquiries); *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 948 (N.D. Cal. 2018) (not citing to *Mercedes* but concluding that a particularity requirement of the type adopted there "is at odds with the principle that Article III requires only general factual allegations of injury resulting from the defendant's conduct at the pleading stage") (internal quotation marks omitted). Plaintiffs' general allegations of how they relied on VW's advertising about low emissions are sufficient to satisfy Article III.[4]

Returning to the theory of injury, even if former lessees are not able to prove that VW charged a premium for the class vehicles, they may be able to prove that they never would have leased the vehicles in the first place but for VW's emissions fraud, and that they were injured when they parted with their money to do so. Practically, however, this theory may be difficult to prove on a classwide basis. For even though Plaintiffs claim that they would not have leased the cars if they had known about the fraud, they did lease them and almost certainly received value from doing so. It is therefore not plausible that they were injured by the entire amount they paid to lease the class vehicles. *See Chrysler*, 295 F. Supp. 3d at 958 (rejecting consumers' theory that they were injured in the amount of "*all* the money" they spent to purchase vehicles that secretly

---

[4] Plaintiffs' motion to file a surreply to further address this particularity argument, which Plaintiffs assert was first raised by VW in its reply, is DENIED. No further briefing of the issue is needed.

United States District Court
Northern District of California

had high emissions because "their use of the vehicles must be considered"). At this stage in the proceedings, however, the Court cannot reject this theory of injury given the Ninth Circuit's endorsement of it in *Hinojos* and *Mazza*.

* * *

To summarize the standing analysis:

- For all Plaintiffs, it is plausible that they overpaid for the class vehicles when they paid a premium for a low-emission vehicle and (in the case of former owners) only received a portion of that premium back through resale because of depreciation, or (in the case of former lessees) did not recover that premium.

- Former owners were also plausibly injured when they paid inflated financing fees for the class vehicles, but former lessees have not demonstrated that they were plausibly injured by paying lease acquisition and lease termination fees.

- If there was no "clean diesel" premium, former owners were not plausibly injured just by purchasing the class vehicles, but former lessees plausibly were—although the amount of their injury may be difficult to determine.

### III. RICO CLAIMS

Plaintiffs allege that VW AG, Audi AG, Bosch GmbH, Bosch LLC, and certain individual defendants participated in racketeering activity that violated § 1962(c) and (d) of RICO. *See* 18 U.S.C. § 1962. VW AG and Audi AG have not yet been served, and the remaining VW defendants (Volkswagen Group of America, Inc. and Audi of America, LLC) have chosen not to address the RICO claims. (*See* VW Mot. at 14 n.2.) The individual defendants have not filed motions to dismiss and so they also have not addressed the RICO claims. Both Bosch entities, however, have been served and they have moved to dismiss the RICO claims against them on both statutory standing and merits grounds.

The Court previously considered and rejected Bosch's RICO merits arguments in *Napleton*, a putative class action by VW franchise dealers. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 4890594, at *17 (N.D. Cal. Oct. 30, 2017) [hereinafter *Napleton*] ("The Franchise Dealers' allegations are

sufficient to satisfy the four elements of their § 1962(c) RICO claim. They have plausibly alleged that Bosch partnered with Volkswagen to implement the defeat device in the affected vehicles, and by doing so participated in the conduct of a years-long enterprise to defraud U.S. regulators and consumers."); *id.* at *17 (concluding that the Franchise Dealers' allegations also support a RICO conspiracy claim against Bosch under § 1962(d)). The same analysis governs here because the allegations of Bosch's involvement in the emissions fraud are identical. Bosch disagrees with *Napleton* and explains why in its briefing in this case, but Bosch has not raised any arguments that warrant reconsideration of *Napleton*.

With the RICO merits arguments resolved by *Napleton*, that leaves RICO standing. To have standing, Plaintiffs must plausibly allege (1) an injury to "business or property" that (2) is "by reason of" Bosch's alleged RICO violations. *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008) (quoting 18 U.S.C. § 1964(c)). The Court considers whether Plaintiffs have satisfied these requirements below.

## A. Injury to "Business or Property"

RICO's injury requirement is narrower than Article III's, and yet the distinction is immaterial here. By requiring an injury to "business or property," RICO weeds out cases that are based on only intangible injuries like emotional distress. *See Oscar v. Univ. Students Co-op. Ass'n*, 965 F.2d 783, 787 (9th Cir. 1992) (holding that plaintiff could not recover for "personal discomfort and annoyance" under RICO). But Plaintiffs do not base their claims on intangible injuries; they base them on financial loss.

As the Supreme Court recognized in *Reiter v. Sonotone Corp.* in interpreting the Clayton Act's identical injury to "business or property" requirement, "[m]oney, of course, is a form of property," and so when "a consumer . . . acquir[es] goods or services for personal use, [she] is injured in 'property' when the price of those goods or services is artificially inflated by reason of the anticompetitive conduct complained of." 442 U.S. 330, 338-39 (1979).

The same result follows here: Plaintiffs allege that they each paid a premium for something that they did not receive—a vehicle with low emissions—and that they also paid inflated financing fees for the class vehicles. These premiums and overcharges plausibly constitute an injury to their

22

"property." *See also Canyon Cty.*, 519 F.3d at 976 (relying on *Reiter* in considering a RICO claim and stating that "[i]n the ordinary context of a commercial transaction, a consumer who has been overcharged can claim an injury to her property, based on a wrongful deprivation of her money").

A RICO injury must also be "concrete" or "tangible." *Canyon Cty.*, 519 F.3d at 975; *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc). In the Ninth Circuit, however, this requirement sets "a relatively low threshold." *Chrysler*, 295 F. Supp. 3d at 962. As with Article III, Plaintiffs do not need to identify "the amount of damage" so long as "the fact of damage" is based on a plausible theory. *Mendoza*, 301 F.3d at 1171 (explaining that complex damages questions are best addressed "at a later stage in the proceedings"). Plaintiffs have identified plausible theories of damage here. *See* Part I, *supra*.

Bosch relies on certain out-of-circuit decisions in which courts have held that when consumers do not receive the benefit of their bargain the injury they suffer is one to their expectation interests, not to their "business or property" as RICO requires. *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 228 (2d Cir. 2008); *In re General Motors LLC Ignition Switch Litig.*, No. 14–md–2543 JMF, 2016 WL 3920353, at *16 (S.D.N.Y. July 15, 2016). As the district court in *Chrysler* recently noted, the Supreme Court's decision in *Reiter* and the Ninth Circuit's decision in *Canyon County* support the opposite: that "when a plaintiff alleges that he or she overpaid for a good or service because of anticompetitive or deceptive conduct, . . . such an injury is one to 'property,' not merely 'expectation interests.'" *Chrysler*, 295 F. Supp. 3d at 960 ("[*Reiter* and *Canyon County*] bind this Court; *McLaughlin* and *General Motors* do not."). The Court therefore does not follow *McLaughlin* and *General Motors* here.

Bosch also relies on another decision in the *General Motors* litigation in which the court held that consumers who had sold, traded in, or returned their vehicles prior to GM's announcement of a recall could not pursue certain state law claims because "[i]n all likelihood, a plaintiff who resold her car before the recall suffered no economic loss damages, as the then-unknown defect could not have affected the resale price." *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 403 (S.D.N.Y. 2017). This analysis in *General Motors* mirrors the analysis in *Licul*, the case VW cites in the Article III standing section of its brief in support of the

same point. As with *Licul*, *General Motors* did not consider the effect of depreciation on the potential resale value of the vehicles and so the decision is not instructive.

Finally with respect to former lessees, Bosch argues that their situation is parallel to that of the plaintiff in *Oscar*, who was an apartment renter that the Ninth Circuit held lacked a cognizable RICO injury. 965 F.2d at 786-87. Due to drug dealing by her neighbors, the renter in *Oscar* alleged a "decrease in the value of her property." *Id.* at 786. The Ninth Circuit held that this theory of injury was not actionable under RICO because the renter "does not own the property on which she lives," and therefore has lost nothing if the resale value of the property declines. *Id.* at 786-87. The situation here is different. Former lessees of the class vehicles do not base their RICO claims on a decline in value theory; they assert that they overpaid to lease the class vehicles because they paid a premium for something that they did not receive. Under *Reiter* and *Canyon County*, overpayment by a consumer is a cognizable RICO injury.

Plaintiffs have satisfied RICO's injury to "business or property" requirement.

## B. RICO Proximate Cause

The civil RICO statute requires plaintiffs "to show that a RICO predicate offense not only was a 'but for' cause of [their] injury, but was the proximate cause as well." *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010) (citation omitted). The "central question" in the RICO proximate cause analysis is "whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). Courts consider three nonexhaustive factors in making this assessment:

> (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries.

*Mendoza*, 301 F.3d at 1169. Bosch's proximate cause arguments center on these factors and the Court considers them below.

### 1.      More Direct Victims Factor

With respect to the first factor, Bosch argues that there are three more direct victims of the alleged RICO enterprise: (1) consumers who still owned or leased an affected vehicle when the emissions fraud was publicly disclosed, (2) the regulators (EPA and CARB), and (3) VW dealers.

Consumers in the first of these categories were not more direct victims of the alleged RICO enterprise. They may have been deceived at a different point in time and in different amounts, but all consumers who bought or leased the affected vehicles were plausibly deceived, even if they resold the vehicles or completed their leases prior to public disclosure of the emissions fraud. Neither set of consumers is further ahead in the causal chain than the other.

The second group, the regulators, were in front of Plaintiffs in the causal chain to some degree: before consumers were deceived into purchasing the class vehicles, the regulators were deceived into certifying them. But the regulators were more like gatekeepers than victims of the fraud: they did not lose money from the fraud like consumers did. *Compare Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 653-58 (2008) (concluding that a county treasurer's office, although deceived by racketeering conduct, was not the direct victim as it did not lose any money from the fraud), *with Anza*, 547 U.S. at 460 (concluding that a state taxing authority *was* a more direct victim of racketeering conduct when it was defrauded "out of a substantial amount of money"). Also, Plaintiffs base their RICO claims at least in part on allegations that VW (on behalf of the enterprise) directly deceived consumers into believing that the class vehicles were "clean" and "environmentally friendly," when they were not. (Compl. ¶ 418.) To prevail on this theory, Plaintiffs would not even need to prove that VW first defrauded EPA and CARB; they would only need to demonstrate that VW defrauded *them* about certain vehicle attributes. As to this specific deceit, Plaintiffs are clearly the direct victims.

The third group, VW dealers, were also in front of Plaintiffs in the causal chain because they sold the class vehicles to Plaintiffs. But if dealers sold the cars for a profit then they would not have been injured by the premium. (*See* Pls.' Opp'n at 24 ("Dealers, who by definition resold cars at a profit prior to the fraud's discovery, did not suffer this [overpayment] injury . . . .").) Complicating the issue, the VW dealers in *Napleton* do allege an overpayment RICO injury. If the

basis for that alleged injury is that dealers did not automatically pass on the entire premium to consumers, then proximate cause could be lacking. *Compare Pillsbury, Madison & Sutro v. Lerner*, 31 F.3d 924, 930 (9th Cir. 1994) (affirming dismissal of subtenant's RICO claim against building owner on proximate cause grounds when there was "nothing 'automatic'" about the pass on of fraudulently raised rents from the master tenant, the directly injured victim, to the subtenant), *with Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 139 (2014) (concluding that proximate cause was well pled when there was "very close to a 1:1 relationship" between the direct victim's and the plaintiff's injuries).

Despite the allegations in *Napleton* which suggest that VW dealers may have been injured by overpaying for the TDI vehicles, it is appropriate at this stage to presume, as Plaintiffs assert, that dealers passed on the full premium to consumers. There are no allegations to the contrary in Plaintiffs' complaint. If it turns out otherwise during discovery, Bosch may renew its proximate cause challenge. *See Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1055 (9th Cir. 2008) (concluding that under the circumstances of the RICO case before it the direct-victim and apportionment questions were "factual questions, which we cannot resolve on a Rule 12(b)(6) motion in this case").

Drawing all reasonable inferences in Plaintiffs' favor, Bosch has not identified a more direct victim of the emissions fraud than Plaintiffs. The first *Mendoza* factor therefore weighs in favor of proximate cause.

### 2. Ascertaining Damages Factor

The second proximate cause factor requires a non-speculative connection between the plaintiff's alleged injury and the alleged RICO violation. *See Canyon Cty.*, 519 F.3d at 982 & n.12. Bosch argues that this factor cuts against proximate cause for two reasons. First, Bosch asserts that Plaintiffs do not allege a direct injury "from the fallout of September 18, 2015." (Bosch Mot., Dkt. No. 4533 at 17.) This argument mistakes the fraud with the later disclosure of the fraud. It was the fraud itself that harmed Plaintiffs, and they have plausibly established a direct connection between their injuries and the fraud: VW deceived them into paying a premium for vehicles that were marketed as "clean" and "environmentally friendly," but that were not.

Second, Bosch argues that there is no meaningful way to connect Plaintiffs' alleged overpayment to any conduct by Bosch. Bosch notes, for example, that there are no allegations that it had any role in determining the prices Plaintiffs paid for their vehicles. Bosch also argues that the decision to charge a premium for the cars was "contrary to the Bosch Defendants' purported goal to sell more EDC17s, because raising prices typically reduces demand, which would result in fewer EDC17s being sold than if VW charged lower prices for the Affected Vehicles." (Bosch Mot. at 18 (citation omitted).)

Bosch made similar arguments in *Chrysler* and the court rejected them on grounds that are persuasive. "That the Bosch Defendants are not alleged to have played a role in setting the price for the Class Vehicles," the *Chrysler* court reasoned, "does not support" that the Bosch Defendants did not proximately cause the plaintiffs' injuries. For "[w]hatever price was set, that price was for a defect-free car. That is not what Plaintiffs allege they received. And because the Bosch Defendants directly contributed to the Class Vehicles' defects, they directly contributed to Plaintiffs' economic injury." *Chrysler*, 295 F. Supp. 3d at 967 n.5.

The district court in *In re Duramax Diesel Litigation*, 298 F. Supp. 3d 1037 (E.D. Mich. 2018), also rejected similar arguments by Bosch. The plaintiffs there alleged that they each paid a premium for diesel vehicles that GM marketed as having low emissions, but which utilized Bosch defeat devices and actually emitted NOx at levels that exceeded EPA's limit. *See id.* at 1045-48, 1050. The district court reasoned that the plaintiffs allegedly "overpaid for their vehicles *because* Bosch worked closely with GM to install working defeat devices in the Duramax vehicles." *Id.* at 1053. The court also noted that "Bosch has provided no authority for the proposition that a RICO defendant may avoid liability simply by identifying a separate action by its codefendant which partially contributed to the plaintiff's injury (especially, when, as here, the Plaintiffs allege that the RICO Defendants worked together to cause the injury)." *Id.* at 1074-75.

Plaintiffs have identified a non-speculative connection between their alleged overpayment injuries and the alleged RICO violations by Bosch. The second *Mendoza* factor also weighs in favor of proximate cause.

### 3.     Risk of Double Recoveries Factor

Finally, Bosch argues that Plaintiffs' RICO claims create a risk of double recoveries and will lead to difficult apportionment questions because the injuries asserted are tied to vehicles "for which, by definition, compensation has already been provided by the VW Defendants and the Bosch Defendants to other parties"—namely, to consumers who owned or were leasing the vehicles when the fraud was disclosed.  (Bosch Mot. at 18.)

Plaintiffs' case will not necessarily led to apportionment problems, as the prior consumer settlements valued the affected vehicles based on their trade-in values immediately before the fraud was disclosed, not based on their values when they were brand new.  (*See* Dkt. Nos. 2102 at 6, 3229 at 8.)  So to the extent a portion of the premium depreciated before the fraud was disclosed, consumers in those settlements would not have recovered that portion of the premium. Also, Plaintiffs seek to recover certain fees that they paid.  These fees do not overlap with the damages that were recovered by consumers in the earlier class settlements.

Practically, it may be difficult to identify with precision the portion of the premium that Plaintiffs did not recover, and this difficultly may pose a risk of double recoveries.  But that outcome is not certain at this stage.  Whether Plaintiffs' claims pose a serious risk of multiple recoveries is a factual question that should be resolved in later proceedings.  *See Newcal*, 513 F.3d at 1055 (refusing to address the apportionment factor at the motion to dismiss stage because it raised factual questions).  This factor currently weighs in favor of proximate cause.

All three of the *Mendoza* factors weigh in favor of proximate cause.  As a result, proximate cause is well pled.

* * *

Plaintiffs' allegations are sufficient to support that Bosch engaged in racketeering activity in violation of RICO, and that Plaintiffs suffered a concrete injury to their property "by reason" of this activity.  The RICO claims against Bosch are well pled.[5]

_____

[5] Bosch also argues that the Court lacks personal jurisdiction over Bosch GmbH.  The arguments that Bosch raises on this point are the same arguments that it raised in *Napleton*.  The Court rejected those arguments in *Napleton* and does so again here.  *See Napleton*, 2017 WL 4890594, at \*17-18 (concluding that the exercise of personal jurisdiction over Bosch GmbH comports with due

Plaintiffs contend that VW violated the consumer protection and false advertising laws of 21 states. These laws generally prohibit companies from misrepresenting the characteristics of their goods to consumers, whether through affirmative misrepresentations or by concealing material facts about the goods. Plaintiffs assert that VW violated these laws in both ways.

For their affirmative misrepresentation claims, Plaintiffs generally allege that VW misrepresented its vehicles "as legal, reliable, environmentally clean, efficient, and of high quality." (*E.g.*, Compl. ¶ 542 (California CLRA claim); ¶ 576 (Connecticut CUTPA claim); ¶ 592 (Illinois CFA claim).) More specific examples include that VW advertised that the Jetta TDI "Clean Diesel" had "Ultra low emissions," that VW's TDI technology "help[ed] reduce sooty emissions by up to 90% compared to previous diesel engines," and that VW's "Clean diesel vehicles meet the strictest EPA standards in the U.S." (Compl. ¶¶ 290, 300, 302.) These representations were false, Plaintiffs assert, because VW's vehicles only operated in a low-emission mode during testing and did not comply with EPA regulations. (*E.g.*, Compl. ¶¶ 542-44, 576-77, 592-94.)

As for the concealment claims, Plaintiffs allege that VW failed to disclose and actively concealed that "the Clean Diesel engine systems were not EPA-compliant and used software that caused the vehicles to operate in a low-emission test mode only during emissions testing." (*E.g.*, Compl. ¶ 527 (Arizona CFA claim); *see also* Compl. ¶ 609 (Maryland CPA claim); ¶ 688 (New Jersey CFA claim).)

VW argues that the state law claims cannot proceed because (1) they are preempted by the Clean Air Act, (2) they are not well pled, and (3) several of them have other deficiencies (such as expired statues of limitations) or are subject to pre-suits requirements that Plaintiffs have not satisfied or state bars on class actions. These issues are considered below.

## A.  Preemption

Congress can preempt state law either expressly, by enacting a statute that prohibits states

---

process because "Bosch and Volkswagen are alleged to have intentionally designed the defeat device to evade U.S. emission requirements").

from regulating certain conduct, or implicitly, either by occupying a given field with so much

federal law that it is reasonable to conclude that Congress did not intend for states to regulate in

that field, or by enacting federal law that conflicts with state law.  *See Chae v. SLM Corp.*, 593

F.3d 936, 941 (9th Cir. 2010) (discussing the three forms of preemption).  In considering whether

state law is preempted under any of these theories, "the purpose of Congress is the ultimate

touchstone."  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).  Congressional purpose is

discerned from the language of the preemption clause, if there is one, and the "structure and

purpose of the statute as a whole."  *Id.* at 486.

With respect to implied preemption, there is a presumption against preemption when "a

statute regulates a field traditionally occupied by states."  *Atay v. Cty. of Maui*, 842 F.3d 688, 699

(9th Cir. 2016).  One of these traditionally state-occupied fields is the field of "consumer

protection laws."  *Chae*, 593 F.3d at 944.  No presumption against preemption is applied when

considering express preemption because the focus is instead "on the plain wording of the clause,

which necessarily contains the best evidence of Congress' pre-emptive intent."  *Puerto Rico v.

Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1946 (2016).  And yet when a preemption clause can

be interpreted in more than one way, "courts ordinarily accept the reading that disfavors pre-

emption."  *McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1039 (9th Cir. 2015) (quoting *Altria Grp.,

Inc. v. Good*, 555 U.S. 70, 77 (2008)).

### 1.      Express Preemption

VW invokes all three forms of preemption—express, field, and conflict preemption.  With

respect to express preemption, VW argues that the state law claims are preempted by Section

209(a) of the Clean Air Act.  In relevant part, Section 209(a) states that

> No State or any political subdivision thereof shall adopt or attempt to
> enforce any standard relating to the control of emissions from new
> motor vehicles or new motor vehicle engines subject to this part.

42 U.S.C. § 7543(a).

VW contends that 209(a) preempts the state law claims because, as VW puts it, "the

fundamental misconduct underlying all the claims is the sale of vehicles that failed to meet the

federal standards promulgated by the EPA." (VW Reply, Dkt. No. 4934 at 32 (internal quotation marks omitted).) Framed in this way, VW asserts that Plaintiffs are using state law to "attempt to enforce" federal "standard[s] relating to the control of emissions from new motor vehicles." 42 U.S.C. § 7543(a). Plaintiffs respond that 209(a) does not bar their claims because they are not attempting to enforce the types of standards covered 209(a), but rather are attempting to enforce laws that prohibit deceiving consumers.

The federal standards at issue, which are found in regulations promulgated by EPA pursuant to the Clean Air Act, bar the use of "defeat devices" in, and limit NOx emissions from, new motor vehicles. *See* 40 C.F.R. §§ 86.1803–01, 86.1809–10(a), 86.1811–04. As VW notes, Plaintiffs assert in multiple sections of their complaint (sometimes directly and other times indirectly) that VW violated these standards. (*See, e.g.*, Compl. ¶¶ 2, 207, 324, 343-44, 355, 359-360.) And VW argues that Plaintiffs "effectively seek to use state law to penalize Volkswagen for producing engines which failed to comply with the Federal standards promulgated pursuant to the CAA." (VW Reply at 32.)

Although Plaintiffs refer to these federal standards in their complaint, ultimately their state law claims are not an attempt to enforce them. This is because the state law claims require proof of both more and less than what is required to enforce the federal standards.

First, all of the state law claims require proof of some conduct above and beyond what is required to prove a violation of the federal standards. To prevail on their state law claims, Plaintiffs must prove that VW lied to them, or that VW deceived them by concealing material information about the class vehicles. (*See, e.g.*, Compl. ¶¶ 540-42 (basing California CLRA claim on allegations of misrepresentations and concealment of material facts concerning the class vehicles).) No similar showing that VW deceived consumers is needed to prove noncompliance with EPA's NOx emission and defeat device standards. That Plaintiffs' state law claims require a showing of more than what is required for a violation of the federal standards suggests that the claims are not an attempt to enforce those standards.[6]

---

[6] The same was not the case for the state law claims in *Wyoming*. There the only conduct by VW that gave rise to the State's tampering claims was VW's installation of a defeat device in its

Second, not only do the state law claims require proof of more than what is required to prove a violation of the federal standards, but they also do not require proof of a regulatory violation to succeed. Plaintiffs could prove, for example, that VW lied when it said that the class vehicles had "[u]ltra low emissions" (Compl. ¶ 290) by showing that the vehicles' actual emissions were far above the industry average and thus not "ultra low." Proof that emissions exceeded federal limits would not be necessary. Nor would proof that VW installed an EPA-prohibited "defeat device" in the class vehicles be needed for Plaintiffs to prevail on their fraudulent concealment theory. Plaintiffs could instead prove, without reference to EPA's defeat device definition, that VW installed and concealed software in the cars that reasonable consumers would have wanted to know about.

To be sure, this second point does not apply to some of the alleged misrepresentations. For example, to prove that VW lied when it represented in advertising that its vehicles "me[t] the strictest EPA standards in the U.S." (Compl. ¶ 302), Plaintiffs would need to prove the opposite— that the class vehicles did not meet EPA standards. If Plaintiffs proceed by basing their claims on statements like this one, their claims get closer to the line of "attempting to enforce" standards relating to the control of emissions from new motor vehicles. But at least some of the representations do not pose this problem—including the "[u]ltra low emissions" representation highlighted above.

For a consumer to "attempt to enforce" the federal standards at issue here, one would expect that the consumer would need to attempt to prove that those standards were violated. But Plaintiffs do not need to make such a showing to prevail on their state law claims. Not only that, but to prevail Plaintiffs need to prove that VW deceived them, which is conduct that is not required to prove that VW violated the federal standards. These are key differences which show that Plaintiffs' state law claims are not an "attempt to enforce" standards relating to the control of

vehicles; no showing that VW deceived the State or consumers was required. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.* ("*Wyoming*"), 264 F. Supp. 3d 1040, 1044-45, 1056-57 (N.D. Cal. 2017).

emissions from new motor vehicles.[7]

Five courts have considered the same 209(a) preemption argument that VW raises here in other "clean" or "eco" diesel consumer fraud cases. All five, on substantially the same two grounds highlighted above, have held that 209(a) does not preempt consumers' fraud based claims. *See Chrysler*, 295 F. Supp. 3d at 993-94 ("[T]he wrongful conduct being targeted by [consumers] is not [Fiat Chrysler's] failure to comply with federal law (the CAA), but rather [Fiat Chrysler's] *deceit* about the vehicles' emissions. . . . Furthermore, Plaintiffs may establish their . . . claims without proving a violation of the CAA. For example, Plaintiffs could prove that the Class Vehicles are not environmentally friendly (contrary to the 'EcoDiesel' label) by offering evidence as to how much NOx is spewed into the air when the vehicles are in regular use and then offering expert testimony as to how that amount of NOx poses risks to health and safety."); *Duramax*, 298 F. Supp. 3d at 1062 ("Plaintiffs can prevail without showing that the subject vehicles violate EPA regulations. The gravamen of their state law claims is that they purchased a vehicle which polluted at levels far greater than a reasonable consumer would expect. . . . And, importantly, Plaintiffs allege that this disparity results from a nondisclosed vehicle component which is inherently deceptive . . . ."); *Felix v. Volkswagen Grp. of Am., Inc.*, 2017 WL 3013080, at *6 (N.J. Super. Ct. App. Div. July 17, 2017) ("[P]laintiffs do not seek to enforce an EPA emission standard . . . . It may well be that plaintiffs will prove their vehicles failed to comply with EPA emission standards, something VW has publicly acknowledged, but the gravamen of plaintiffs' complaint centers on VW's alleged deceitful, fraudulent practices, and its alleged breach of a duty not to mislead consumers."); *accord Counts*, 237 F. Supp. 3d at 588-92; *In re Volkswagen "Clean Diesel" Litigation*, 94 Va. Cir. 189, 2016 WL 10880209, at *5-6 (2016).

---

[7] A helpful point of reference is *Blockburger*'s "same offense" test, which courts use to determine whether there are two offenses or one for Double Jeopardy purposes. There are two separate offenses under *Blockburger* if each "requires proof of a fact which the other does not." *United States v. Overton*, 573 F.3d 679, 691 (9th Cir. 2009) (citation omitted). That test is satisfied here: Plaintiffs' state law claims require proof that VW deceived consumers, while an action for violation of federal emission standards does not. And an action to enforce federal emission standards requires proof of specific regulatory violations, while Plaintiffs' state law claims do not. Because of the need to prove different facts, it is sensible to view Plaintiffs' state law claims and claims for violation of the federal standards as separate. The former is not an "attempt to enforce" the latter.

VW's only argument for why these five cases are distinguishable is that the plaintiffs in these cases, unlike Plaintiffs here, still owned or were still leasing the affected vehicles when news broke that the manufacturers may have installed defeat devices in the vehicles. VW does not explain how this distinction would impact the preemption analysis; it is instead an argument for why Plaintiffs may not have been injured, which was discussed above. Rather than addressing the five decisions that have directly rejected VW's 209(a) preemption argument, VW instead relies on *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992), and *Jackson v. General Motors Corp.*, 770 F. Supp. 2d 570 (S.D.N.Y. 2011), two decisions that it contends support preemption. Neither case does.

In interpreting a different express preemption provision, *Morales* held that the phrase "relating to," which also appears in 209(a), is indicative of "a broad pre-emptive purpose." 504 U.S. at 383. That holding is not helpful to VW here because there is no question that the EPA standards at issue "relate to" the control of emissions from new motor vehicles. What is at issue is whether Plaintiffs' state law claims are an "attempt to enforce" those standards. *Morales*'s interpretation of "relating to" does not address this issue and therefore does not further VW's 209(a) preemption argument.

VW also relies on *Jackson*, 770 F. Supp. 2d 570, a case in which local transit employees brought design defect and failure to warn claims against the manufacturers of city buses because the buses failed to comply with federal emission standards. *Id.* at 572-73. The court held that both claims were preempted by 209(a) because they were "premised on failure to meet the federal standards," *id.* at 574, and clearly "related to" the control of emissions from motor vehicles, *id.* at 577.

The claims in *Jackson* are distinguishable from the fraud-based claims here because the *Jackson* claims were based entirely on noncompliance with federal emission standards. That is, the *Jackson* plaintiffs asserted that the defendants' buses were defective *because* they did not meet federal emission standards; and the failure to warn claim appeared to be based on a failure to warn about this defect. *See id.* at 577 ("[W]here 'failure to warn claims are themselves premised on defective design claims found to be preempted, the . . . failure to warn claims are also preempted

by federal law.'") (omission in original). Plaintiffs here, in contrast, can prevail on their claims without establishing that the class vehicles violated federal standards. *Jackson*, then, does not support VW's express preemption argument.[8]

Plaintiffs' state law claims are not an "attempt to enforce" federal standards relating to the control of emissions from new motor vehicles because they require proof of both more and less than what is required to prevail on claims to enforce those standards. The state law claims therefore are not preempted by 209(a) of the Clean Air Act.[9]

### 2. Implied Preemption

VW alternatively argues that the state law claims are impliedly preempted under both field and conflict preemption principles. Under either theory VW's burden is high, for as noted above, "consumer protection laws have traditionally been in state law enforcement hands." *Chae*, 593 F.3d at 944. As an area falling within the traditional powers of the states, there is a presumption that these powers "will not be superseded absent a 'clean and manifest purpose of Congress.'" *Id.* (quoting *Wyeth v. Levine*, 555 U.S. 555 (2009)).

VW has not identified such a clear and manifest purpose by Congress to preempt consumer fraud claims simply because the claims touch on representations about motor vehicle emissions. To be sure, as the Supreme Court noted in *Washington v. General Motors Corp.*, "Congress has largely pre-empted the field with regard to 'emissions from new motor vehicles' and motor vehicle fuels and fuel additives." 406 U.S. 109, 114 (1972) (citations omitted). But the state law claims here are ultimately about VW's lies about vehicle emissions, not about the emissions themselves.

VW has not identified any authority supporting that Congress intended for federal law to

---

[8] All five of the "clean" or "eco" diesel decisions cited above also distinguished *Jackson* on this basis. *See, e.g.*, *Chrysler*, 295 F. Supp. 3d at 997 ("In *Jackson*, the common law claim was based on injury resulting from noncompliance with federal emissions standard[s]. In contrast, in the instant case, the injury from the misrepresentation claims is based on the deceptive acts of Defendants, not the noncompliance with federal emissions standards *per se* . . . ."); *Duramax*, 298 F. Supp. 3d at 1062 (citing *Jackson* as an example of where plaintiffs' claims "were predicated on proving noncompliance with EPA regulations").

[9] Having concluded that the state law claims are not preempted by 209(a), the Court does not consider an alternative argument made by Plaintiffs: that 209(a) applies only to claims by states and political subdivisions, not by individuals.

United States District Court
Northern District of California

leave no room for states to regulate falsehoods about emissions that are directed toward consumers. VW's field preemption argument is therefore not compelling. *See Chrysler*, 295 F. Supp. 3d at 1002 (rejecting a similar field preemption argument and reasoning that "[n]othing suggests Congress intended to broadly preempt the field of deception, even deception which pertains to emissions.").

With respect to conflict preemption, VW argues that Plaintiffs' state law claims stand as an obstacle to Congress's objectives because the claims "seek to impose remedies beyond those provided by federal law for the same conduct that the EPA is charged with addressing." (VW Mot. at 51.) The shortcoming with this argument is that it again conflates the conduct at issue. Plaintiffs' claims are based on VW's deceit of consumers, which is not the "same conduct that the EPA is charged with addressing." (*Id.*) *See Duramax*, 298 F. Supp. 3d at 1064 ("The EPA is tasked with *environmental* protection, not *consumer* protection. Defendants have not provided 'any basis to conclude[] that a significant federal regulatory goal of the CAA is consumer protection from false advertising claims regarding emissions compliance, vehicle efficiency, or implementation of new emissions technology.'").

Because the remedies that Plaintiffs seek are tied to conduct that EPA is not responsible for regulating, Plaintiffs' claims do not stand as an obstacle to Congress's objectives in regulating motor vehicle emissions. *See Chrysler*, 295 F. Supp. 3d at 1003 (rejecting a similar conflict preemption challenge and reasoning that consumers were not seeking remedies "for the same conduct that the EPA is charged with addressing").[10]

\* \* \*

Plaintiffs' state law claims, which are all based on VW's misrepresentations to consumers and VW's concealment of material facts from consumers, are not expressly or impliedly

---

[10] In *Hillsborough*, by contrast, the Counties' tampering claims were based on VW's installation of a defect device in its vehicles and VW's post-sale software changes to its defeat device. EPA was clearly responsible for regulating that conduct, and EPA indeed did investigate and penalize it. The Counties' tampering claims, unlike those here, were therefore duplicative of EPA's enforcement claims and were impliedly preempted by the Clean Air Act. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.* ("*Hillsborough*"), 310 F. Supp. 3d 1030, 1040-47 (N.D. Cal. 2018).

preced by the Clean Air Act.

**B.      Rule 9(b)**

Although Plaintiffs' state law claims are not preempted, the affirmative misrepresentation allegations do not currently satisfy Rule 9(b). Rule 9(b) applies to the state law claims because they are based on "a unified course of fraudulent conduct." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). To satisfy the rule, the allegations of fraud "must be accompanied by 'the who, what, when, where, and how of the misconduct charged.'" *Id.* at 1124. "[U]nadorned references to [an] advertising campaign and marketing materials" do not meet these requirements. *Yastrab v. Apple Inc.*, 173 F. Supp. 3d 972, 978 (N.D. Cal. 2016).

In *Kearns*, for example, a consumer alleged that Ford violated California's UCL and CLRA by making false and misleading statements about the safety and reliability of its certified pre-owned vehicles. 567 F.3d at 1122-23. Among the alleged misrepresentations by Ford were statements about the rigors of its certified pre-owned vehicle inspections. The plaintiff generally alleged that he was exposed to these representations through Ford's sales materials and a televised national marketing campaign. *Id.* at 1123. In affirming dismissal of the complaint for failure to satisfy Rule 9(b), the Ninth Circuit explained that the complaint lacked sufficient detail about the particular circumstances surrounding these representations. "Nowhere in the [complaint] does Kearns specify what the television advertisements or other sales material specifically stated. Nor did Kearns specify when he was exposed to them or which ones he found material." *Id.* at 1126.

The allegations here also lack sufficient detail about the particular circumstances surrounding VW's misrepresentations to Plaintiffs. For example, Alabama plaintiff Jennifer Nemet alleges only that the class vehicle she purchased could not deliver the "advertised" combination of low emissions, high performance, and fuel economy. (Compl. ¶ 20.) She does not identify when and where she saw this advertising, what type of advertising it was, or what the advertising actually represented. Many of the other named plaintiffs make the exact same advertising allegations that Nemet does.[11]

---

[11] (*E.g.*, Compl. ¶ 29 (California Plaintiff); Compl. ¶ 63 (Georgia Plaintiff); Compl. ¶ 66 (Illinois Plaintiff); Compl. ¶ 95 (New Jersey Plaintiff); Compl. ¶ 99 (New York Plaintiff); Compl. ¶ 136

Other named plaintiffs reference advertising about "'Clean Diesel' technology" (*e.g.*, Compl. ¶ 25 (Arizona Plaintiff); Compl. ¶ 58 (Connecticut Plaintiff)) and "environmental[] friendl[iness]" (Compl. ¶ 45 (California Plaintiff); Compl. ¶ 73 (Massachusetts Plaintiff)). Like Nemet, these named plaintiffs do not identify when and where they saw this advertising, what type of advertising it was, or the specifics of what was represented.

Some named plaintiffs offer more detail. For example, California plaintiff Eddie Field alleges that he decided to purchase a 2009 VW Jetta TDI because the vehicle "was reported to have superior gas mileage, stunning performance, and was being called the 'Green Car of the Year.'" (Compl. ¶ 33.) Unlike Nemet, Field does identify what was represented—"Green Car of the Year"—but like Nemet, Field does not identify when and where he saw this advertising. The allegations also suggest that Field interpreted "Green Car of the Year" as a representation of good fuel efficiency. (*See id.* ("Plaintiff was extremely frustrated and disappointed by the Vehicle's actual gas mileage compared to the advertised gas mileage.").) But there are no well-pled allegations supporting that the vehicles did not obtain advertised fuel efficiency levels. Field's allegations therefore muddle the claims somewhat and also do not appear particular enough to satisfy Rule 9(b).

To be sure, the complaint does detail specific advertisements and marketing materials that were part of VW's "clean diesel" campaign. (*See e.g.*, Compl. ¶¶ 290-95 (detailing specific display advertisements); ¶¶ 296-99 (detailing specific television advertisements); ¶¶ 300-08 (detailing specific print brochures).) And many of these advertisements touted the TDI vehicles' low emissions. (*See, e.g.*, Compl. ¶ 290 ("Ultra low emissions. Jetta TDI Clean Diesel."); ¶¶ 296-99 (television advertising debunking myth that "diesel is dirty"); ¶ 301 (advertising that TDI technology "help[s] reduce emissions by up to 90% compared to previous diesels").) Lacking, though, are allegations that any named plaintiff saw these advertisements and relied on the promises contained within them.

Multiple courts in this district have held that such linking allegations are required to satisfy

_____

(Texas Plaintiff); Compl. ¶ 142 (Utah Plaintiff).)

Rule 9(b). *See, e.g.*, *Chrysler*, 295 F. Supp. 3d at 987 ("While the [complaint] does refer to [Fiat's] website and some blogs operated by a [Fiat] entity, there is no allegation that any named plaintiff actually saw the website or blogs, or any promises contained therein, regarding fuel economy and performance.") (citations omitted); *Yastrab*, 173 F. Supp. 3d at 978 ("unadorned references to [an] advertising campaign and marketing materials" do not satisfy Rule 9(b)). Plaintiff has not identified any caselaw to the contrary.

Fraudulent omission claims, like fraudulent misrepresentation claims, are subject to Rule 9(b). *See Kearns*, 567 F.3d at 1127. But Plaintiffs do identify the specifics of what VW failed to disclose: (1) that "the Clean Diesel engine systems were not EPA-compliant," and (2) that the class vehicles "used software that caused the vehicles to operate in low-emission test mode during emissions testing." (Compl. ¶ 527.) VW does not argue that these allegations are insufficient to satisfy Rule 9(b).

* * *

Plaintiffs' misrepresentation claims do not satisfy Rule 9(b). These claims are dismissed with leave to amend. Plaintiffs' omission claims satisfy Rule 9(b) and so will not be dismissed on these grounds.

## C. Rule 8(a)

For each state law claim, VW also contends that Plaintiffs have failed to plausibly plead the required elements of damages and proximate causation so as to satisfy Rule 8(a). With respect to certain state law claims, VW also asserts that Plaintiffs have failed to sufficiently plead the element of reliance. In evaluating if the complaint satisfies Rule 8(a), the relevant question is whether it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### 1. Damages

VW correctly notes that a plaintiff may suffer an Article III injury and yet fail to adequately plead damages for purposes of a particular cause of action. *See Krottner v. Starbucks Corp.*, 406 F. App'x 129, 131 (9th Cir. 2010) ("[O]ur holding that Plaintiffs–Appellants pled an

injury-in-fact for purposes of Article III standing does not establish that they adequately pled damages for purposes of their state-law claims.").

The reason for this distinction is that certain causes of action may require a particular type of injury, such as economic damages, while Article III is less restrictive. *See, e.g.*, *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264-65 (2d Cir. 2006) (noting that exposure alone to toxic substances "has been held sufficient to satisfy the Article III injury-in-fact requirement," even though "exposure alone may not provide sufficient ground for a claim under state tort law"); *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 324 (2011) (explaining that California's UCL has a loss of "money or property" requirement that "renders standing under [the UCL] substantially narrower than federal standing under article III").

Having made this point, however, VW does not convincingly explain how the distinction applies here. Plaintiffs allege that they have suffered economic injury through overpayment, and VW has not pointed to any state law claim in the complaint for which an overpayment injury would not be actionable. Instead, as in the section of VW's brief addressing Article III, VW argues that the overpayment injury is not well pled because "Plaintiffs have not adequately pled any premium related to NOx emissions, and even if they had they would have recovered that amount when they sold their vehicles." (VW Mot. at 53-54.)

As discussed above, Plaintiffs' premium allegations are sufficient because they support that Plaintiffs paid a premium for low emissions generally, which would reasonably include low NOx emissions. Further, the allegations support that Plaintiffs were not able to recover the full amount of the emissions premium through resale because the lessee Plaintiffs did not have the opportunity to resell their vehicles and the purchaser Plaintiffs plausibly did not recover a portion of the premium because of depreciation. Plaintiffs' premium allegations not only satisfy Article III's injury-in-fact requirement, but they also satisfy the damages element of their state law claims.

### 2. Proximate Cause

The common law rule of proximate cause has been incorporated into many state consumer protection laws. *See, e.g.*, *Lorenzo v. Qualcomm Inc.*, No. 08-cv-2124 WQH, 2009 WL 2448375, at *6 (S.D. Cal. Aug. 10, 2009) (interpreting California's UCL as requiring a showing of

proximate cause); *Muir v. Playtex Prod., LLC*, 983 F. Supp. 2d 980, 987 (N.D. Ill. 2013) (noting that a claim under Illinois's Consumer Fraud and Deceptive Business Practices Act requires a showing of proximate cause). The proximate cause requirement "generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Lexmark*, 572 U.S. at 133.

In asserting that proximate cause is not well pled, VW restates arguments that it raised in the Article III section of its brief. The main point VW makes is that *if* Plaintiffs' overpayment injury is not fairly traceable to VW's conduct (Article III), *then* it follows that the same injury also was not proximately caused by VW's conduct (state law). As noted above, VW's Article III arguments are not persuasive. The Court therefore concludes that Plaintiffs' injuries are not too remote from VW's conduct to satisfy the state law proximate cause requirements.

### 3. Reliance

VW argues that Plaintiffs have failed to sufficiently allege reliance as required under Arizona, California, New York, North Carolina, Pennsylvania, and Virginia law because the complaint does not identify the misrepresentations or omissions on which each named plaintiff personally relied.

Plaintiffs respond first by challenging VW's assessment of the complaint, which Plaintiffs contend includes "explicit allegations that Plaintiffs and Class members relied on VW's misrepresentations." (Pls.' Opp'n at 44.) Plaintiffs' characterization of their allegations is not accurate. As discussed above in the analysis of Rule 9(b), the complaint only vaguely references an "advertised" combination of low emissions, high performance and fuel economy, and other "Clean Diesel" advertising on which the named plaintiffs relied. And although the complaint does include more detail about VW's marketing campaign—including allegations about specific display, television, and brochure advertisements—Plaintiffs do not allege that any of the named plaintiffs actually saw and relied on these advertisements.

Plaintiffs respond by suggesting that less detail is required to plead reliance under the laws of the states at issue than is needed to satisfy Rule 9(b), particularly when, as here, there are allegations of a pervasive, market-wide fraud. There is support for this point, at least under the laws of some of the states at issue. *See, e.g.*, *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d

41

979, 985-86 (9th Cir. 2015) (explaining that to state a claim under California's UCL and FAL based on false advertising, "it is necessary only to show that members of the public are likely to be deceived" (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009))). But the pleading requirements for reliance are at times imprecise and vary depending on the state laws at issue.

Ultimately, the Court does not need to delve into the state laws on reliance at this point. For even if the state law reliance standards can be satisfied with allegations that are less specific than those needed to satisfy Rule 9(b), Plaintiffs must satisfy Rule 9(b) to bring these claims in federal court. *See Kearns*, 567 F.3d at 1125 ("It is well-settled that the Federal Rules of Civil Procedure apply in federal court, 'irrespective of the source of the subject matter jurisdiction, and irrespective of whether the substantive law at issue is state or federal.'" (quoting *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1102 (9th Cir. 2003))).

Plaintiffs have not satisfied Rule 9(b) as to the affirmative misrepresentation claims. Further, if Plaintiffs eventually *do* satisfy Rule 9(b), those same allegations may be sufficient to satisfy the actual reliance requirements under the state laws at issue. The Court therefore will not consider the reliance issue as to the affirmative misrepresentation claims at this time.

The omission claims are different. Those claims satisfy Rule 9(b), as Plaintiffs have identified the specific omissions at issue: VW's failure to disclose that (1) "the Clean Diesel engine systems were not EPA-compliant," and (2) that the class vehicles "used software that caused the vehicles to operate in a low-emission test mode only during emissions testing." (Compl. ¶ 527.) VW argues, however, that these allegations are insufficient to establish reliance under Arizona, California, New York, North Carolina, Pennsylvania, and Virginia law.

Pleading reliance on an omission is not a particularly difficult burden. Under California law, a plaintiff may do so simply by alleging "that, had the omitted information been disclosed, one would have been aware of it and behaved differently." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (quoting *Mirkin v. Wasserman*, 5 Cal. 4th 1082 (1993)). The named plaintiffs from California have included such allegations in their complaint. (*See, e.g.*, Compl. ¶ 45 (California plaintiff Adam Schell alleges that he "absolutely would not have purchased [two class vehicles] had Defendants not concealed the illegal cheat device").) VW has not cited to any

42

authority suggesting that more is required to plead reliance on an omission under the laws of the other states at issue.  And the named plaintiffs from those other states make similar allegations. (*See, e.g.*, Compl. ¶ 109 (North Carolina plaintiff Mark Miller alleges that "had Defendants not concealed the illegal cheat device . . . [he] would have purchased the regular model and not the diesel model, or [he] would have purchased a different vehicle altogether").)  For the omission claims, then, Plaintiffs' allegations are sufficient to satisfy the reliance element under the laws of the states in question.[12]

### D.     Miscellaneous State Law Issues

VW lastly argues that certain state law claims should be dismissed because (1) the relevant statutes of limitations have expired, (2) certain states bar or place limits on class actions to enforce their consumer protection laws, (3) Plaintiffs have not satisfied two states' pre-suit requirements, and (4) Plaintiffs lack statutory standing under another state's consumer protection laws because they do not allege a commercial injury.  These arguments are considered below.

#### 1.     Expired Statutes of Limitations – Arizona and Oregon

VW argues that Plaintiffs' claims under Arizona's Consumer Fraud Act and Oregon's Unlawful Trade Practices Act should be dismissed for failure to file suit within the limitations periods set by those laws.  Claims under both of those laws are subject to a one-year statute of limitations, which ordinarily begins to run from the date when the defrauded party discovers the fraud, or with reasonable diligence could have discovered the fraud.  *See* Or. Rev. Stat. § 646.638(6); *Alaface v. Nat'l Inv. Co.*, 892 P.2d 1375, 1380 (Ariz. Ct. App. 1994).

Plaintiffs filed this lawsuit on August 9, 2017, almost two years after EPA informed the public in the fall of 2015 about VW's emissions fraud.  On first impression, then, their Arizona and Oregon claims appear to be time barred.  Plaintiffs, however, argue that the limitations period for these claims was tolled by way of *American Pipe* because Plaintiffs were named as class

---

[12] In VW's reply, it cites to *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1141-42 (9th Cir. 2012), in arguing that Plaintiffs have failed to plead reliance with respect to their omission claims. (VW Reply at 37.)  *Wilson* did not address what is needed to plead reliance; the decision instead addressed when a duty to disclose arises under California law.  VW has not argued that it lacked a duty to disclose its emissions cheating software to consumers, and so the Court will not address the duty element at this time.

members in other complaints, including the PSC's timely February 2016 consolidated class action complaint.

American Pipe established that "the commencement of the original class suit tolls the running of the statute [of limitations] for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status." *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 553 (1974). "A contrary rule," the Court reasoned, "would deprive Rule 23 class actions of the efficiency and economy of litigation which is a principal purpose of the procedure." *Id.* For without tolling "[p]otential class members would be induced to file protective motions to intervene or to join in the event that a class was later found unsuitable." *Id.*

In *Crown, Cork*, the Court clarified that *American Pipe* applies not only to putative class members who make timely motions to intervene, but also to class members who "prefer to bring an individual suit rather than intervene . . . . once the economics of a class action [are] no longer available." *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 350 (1983). The Court explained that a failure to extend *American Pipe* to subsequent individual actions would result in "a needless multiplicity of actions" filed by class members seeking to preserve their individual claims, which is "precisely the situation that Federal Rule of Civil Procedure 23 and the tolling rule of *American Pipe* were designed to avoid." *Id.* at 351.

Determining whether *American Pipe* applies here is not straightforward. For one thing, the circumstances are fairly unique. Class certification was not denied in the PSC's consumer class action; instead, class certification was granted and three consumer settlements were reached. Unlike the class actions in *American Pipe* and *Crown, Cork*, then, the PSC's class action was successful. The hiccup is that Plaintiffs were not included in the PSC-led settlements because the PSC pared down the settlement class definitions so as not to include persons who had sold their TDI vehicles or completed their TDI leases before September 18, 2015. (*See* Dkt. Nos. 2102, 3229 at 4-5.) As a result, Plaintiffs did not share in the success of those settlements, even though they came within the original class definition in the PSC's consolidated complaint.

The parties have not cited to any decision addressing *American Pipe*'s application is a

44

situation like this. Further complicating the matter are two other legal issues.

First, this past June the Supreme Court held that *American Pipe* tolling does not apply to new *class actions* that are filed after certification of an earlier class action is denied. *See China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1804 (2018). The Court in *China Agritech* reasoned that "[t]he 'efficiency and economy of litigation' that support tolling of individual claims do not support maintenance of untimely successive class actions," for "any additional *class* filings should be made early on, soon after the commencement of the first action seeking class certification." *Id.* at 1806 (citation omitted). *China Agritech* was decided after the pending motions to dismiss were fully briefed and so neither side has addressed its effect here.

Second, state statutes of limitations and tolling rules are viewed as substantive not procedural law, and so *American Pipe*'s application turns on whether the relevant state courts— here the highest state courts of Arizona and Oregon—would apply the rule. *See Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011) (explaining that "[f]ederal courts must abide by a state's tolling rules," and inquiring whether a state supreme court "would adopt the rule of *American Pipe/Crown, Cork*").[13] Plaintiffs have not cited to any authority from Arizona or Oregon which would support that the highest courts in those states would apply *American Pipe* tolling to permit follow-on class actions past the expiration of the statute of limitations.

Given that the parties' briefing did not address several important issues on *American Pipe*'s application here, the Court will not resolve the statute of limitations dispute at this time. Plaintiffs will need to amend their complaint to cure the Rule 9(b) deficiencies detailed above. If VW moves to dismiss the amended complaint, the parties should brief the *American Pipe* issue in more detail at that time.

### 2. Class Action Barred or Limited – Mississippi and Utah

VW argues that Plaintiffs' claims for violation of Mississippi's Consumer Protection Act are barred by a provision of the Act that prohibits bringing claims as class actions. *See* Miss. Code Ann. § 75-24-15(4). VW also contends that Plaintiffs' claims under Utah's Consumer Sales

---

[13] *American Pipe* itself addressed a federal antitrust suit, *Crown, Cork* addressed a Title VII civil rights suit, and *China Agritech* addressed a federal securities suit.

Practices Act are limited because, although the complaint seeks "statutory damages," the Act limits damages that can be sought in class actions to "actual damages." Utah Code Ann. § 13-11-19(4)(a).

Whether these state-law limits on class actions apply in federal court depends on (1) whether they conflict with Rule 23, (2) if they do conflict, whether the application of Rule 23 would "abridge, enlarge, or modify any substantive right" in violation of the Rules Enabling Act, 28 U.S.C. § 2072(b), and (3) if they do not conflict, whether they are part of state substantive law or procedural law. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010); *id.* at 417 (Stevens, J., concurring in part).

The Court will not make these determinations at this stage. VW's arguments focus on whether Plaintiffs can pursue *class* claims under certain state consumer laws, not on whether the claims themselves are well pled. Only the second question is at issue in a Rule 12(b)(6) motion to dismiss. The Court will therefore wait until the class certification stage to address whether Mississippi's and Utah's class action limits apply.

### 3. Pre-Suit Requirements – Mississippi and Texas

#### a. Mississippi

VW also argues that Plaintiffs' Mississippi CPA claims fail because Plaintiffs do not allege that they have participated in a pre-suit settlement program approved by the Mississippi Attorney General, as required by the CPA. *See* Miss. Code Ann. § 75-24-15(2). Whether this pre-suit requirement applies in federal court is also subject to the *Shady Grove* framework laid out above. Unlike for the class action limits discussed above, the Court will address whether the pre-suit requirement applies in federal court at this time. For if it does apply, then Plaintiffs' Mississippi CPA claims cannot go forward until Plaintiffs comply with it.

Plaintiffs argue that the pre-suit requirement does not apply because it conflicts with Rule 23. It does not. The pre-suit requirement does not single out class actions; it applies to "any private action" brought under the Mississippi CPA. *Id.* As a result, it does not "attempt[] to answer the same question" as Rule 23. *Shady Grove*, 559 U.S. at 399. To be sure, if the pre-suit requirement applies in federal court and is not satisfied, then Plaintiffs' claims for violation of the

1  Mississippi CPA cannot be certified as a class action. But that is because the claims will be

2  dismissed, not because the pre-suit requirement restricts class actions in a manner that conflicts

3  with Rule 23.

4  Having determined that Mississippi's pre-suit requirement does not conflict with Rule 23,

5  the next question that must be addressed is whether the requirement is substantive or procedural

6  for *Erie* purposes. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). The

7  answer to that question turns on whether application of the requirement is outcome determinative

8  in the sense that failure to apply it would be likely to lead to forum-shopping and an "inequitable

9  administration of the laws." *Hanna v. Plumer*, 380 U.S. 460, 468 & n.9 (1965). If the state law is

10  outcome determinative in this sense, it should be applied in federal court unless it is outweighed

11  by "countervailing federal interests." *Gasperini*, 518 U.S. at 432.

12  VW argues that Mississippi's pre-suit requirement falls into what the Seventh Circuit has

13  labeled as a class of "pretty easy cases" in which a state rule is substantive and ought to be applied

14  by federal courts sitting in diversity. *S.A. Healy Co. v. Milwaukee Metro. Sewerage Dist.*, 60 F.3d

15  305, 310 (7th Cir. 1995). This class of cases includes those that involve the application of state

16  rules that, "though undeniably 'procedural' in the ordinary sense of the term, [are] limited to a

17  particular substantive area, such as contract law." *Id.* When a state rule is limited in this manner,

18  the Seventh Circuit in *Healy* reasoned that "the state's intention to influence substantive outcomes

19  is manifest and would be defeated by allowing parties to shift their litigation into federal court

20  unless the state's rule was applied there as well." *Id.*

21  The Ninth Circuit has not expressly adopted the *Healy* rule, although several district courts

22  in the circuit have applied it. *See, e.g.*, *Thomas v. Hickman*, No. CV F 06-0215 AWI SMS, 2006

23  WL 2868967, at *40 (E.D. Cal. Oct. 6, 2006) (applying *Healy* and concluding that a California

24  rule that set certain procedural requirements for obtaining punitive damages in professional

25  negligence cases was substantive for *Erie* purposes); *Comput. Econ., Inc. v. Gartner Grp.*, 50 F.

26  Supp. 2d 980, 992 (S.D. Cal. 1999) (applying *Healy* and concluding that California's heightened

27  pleading rule for misappropriation of trade secrets claims should be applied in federal court).

28  The Court follows these decisions as it finds *Healy* persuasive and consistent with the

47

recognized fact that states may at times use procedural rules to make it more difficult to bring

certain types of claims, which is a policy decision that is bound up in state substantive law. *See*

*Shady Grove*, 559 U.S. at 420 (Stevens, J., concurring) ("Congress has not mandated that federal

courts dictate to state legislatures the form that their substantive law must take. And were federal

courts to ignore those portions of substantive state law that operate as procedural devices, it could

in many instances limit the ways that sovereign States may define their rights and remedies.");

*Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 556 (1949) (concluding that a state

procedural law that required plaintiffs in certain shareholder derivative actions to post a bond

before suing furthered a state crafted substantive scheme and should be applied in federal court).

Applying *Healy* here, Mississippi's pre-suit requirement should be applied in federal court.

The requirement is not a general rule that applies to any cause of action brought in Mississippi

state court, but instead is a specific rule that applies to private actions for violation of Mississippi's

CPA. The pre-suit requirement is also part of the same section of the CPA that bars CPA class

actions and that provides that defendants in CPA actions may recover attorneys' fees if the court

determines that the claims were frivolous. *See* Miss. Code Ann. § 75-24-15(3)–(4). Although

touching on procedure, these sections appear to reflect policy decisions by Mississippi that are

bound up with state substantive law.

Given that Mississippi's pre-suit requirement is tied specifically to State CPA claims, the

Court will apply it in this case. And because Plaintiffs have not demonstrated that they have

complied with the pre-suit requirement, which requires them to engage in "an informal dispute

settlement program approved by the [Mississippi] Attorney General," Miss. Code Ann. § 75-24-

15(2), their claims for violation of Mississippi's CPA are dismissed without prejudice.

### b. Texas

VW also contends that Plaintiffs did not comply with the notice requirement under Texas's

Deceptive Trade Practices Act. Before filing a DTPA claim for damages against any person, the

requirement instructs that the consumers seeking to pursue the claim must provide "written notice

to the person at least 60 days before filing the suit." Tex. Bus. & Com. Code § 17.505(a).

Though "undeniably 'procedural' in the ordinary sense of the term," *Healy*, 60 F.3d at 310,

United States District Court
Northern District of California

Texas's notice requirement is found in, and only applies to, suits for violation of the DTPA. Thus, like Mississippi's, Texas's DTPA notice requirement reflects "the state's intention to influence substantive outcomes." *Id.*; *see also Shady Grove*, 559 U.S. at 420 (Stevens, J., concurring). The notice requirement therefore applies in federal court.

Plaintiffs do not suggest that they complied with the 60-day notice requirement. But they contend that an exception applies because "notice [was] rendered impracticable by reason of the necessity of filing suit in order to prevent the expiration of the statute of limitations." Tex. Bus. & Com. Code § 17.505(b). The Court agrees that the exception applies.

The limitations period for a Texas DTPA claim is two years. *See* Tex. Bus. & Com. Code § 17.565. By the time Plaintiffs filed this suit, in early August 2017, they were within 60 days of when the limitations period reasonably could have been expected to expire given that EPA's Notice of Violation to VW was made public on September 18, 2015. (Compl. ¶ 2.) Sixty days' notice was therefore not practicable at the time Plaintiffs filed suit, making them eligible for the §17.505(b) exception. The Court will not abate the DTPA claims.

### 4. Statutory Standing – Ohio

Courts are split on whether consumers have standing to sue under Ohio's Deceptive Trade Practices Act. The text of the law seems broad enough to cover actions by consumers,[14] but the majority of courts to address the issue have reasoned that Ohio's DTPA is substantially similar to section 43(a) of the Lanham Act, which applies only to commercial injuries. *See Greene v. Gerber Prod. Co.*, 262 F. Supp. 3d 38, 63 (E.D.N.Y. 2017) (summarizing the split between courts in Ohio and noting that the majority have favored the commercial injury restriction).

A straightforward rule applies here. Although several federal district courts in Ohio have held that consumers have standing under the DTPA, the Ohio Court of Appeals has held that consumers do not have standing under the DTPA because of similarities between the DTPA and the Lanham Act. *See Dawson v. Blockbuster, Inc.*, No. 86451, 2006 WL 1061769, at *3-4 (Ohio

---

[14] Ohio's DTPA authorizes actions by any "person" who is injured by, or is likely to be damaged by, a person who commits a deceptive trade practice. ORC § 4165.03(A)(1)–(2). A "person" is defined under the DTPA to include "an individual, corporation, government, governmental subdivision or agency" or "any other legal or commercial entity." *Id.* § 4165.01(D).

49

Ct. App. Mar. 16, 2006) (affirming dismissal of a DTPA claim because the plaintiff was not a commercial entity), *cert. denied*, 110 Ohio St. 3d 1442 (2006).

When a state's highest court has yet to address a state law issue, and when "there is no convincing evidence that the state supreme court would decide differently, a federal court is obligated to follow the decisions of the state's intermediate appellate courts." *Teleflex Med. Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 851 F.3d 976, 982 (9th Cir. 2017) (citation omitted). There is no convincing evidence that the Ohio Supreme Court would decide the DTPA consumer standing issue differently than the Ohio Court of Appeals did. This Court therefore follows the Ohio Court of Appeals and holds that Plaintiffs lack standing to pursue their Ohio DTPA claims. *See Greene*, 262 F. Supp. 3d at 63-64 (conducting a similar analysis and concluding that Ohio's DTPA does not confer standing upon consumers).

## V. CONCLUSION

The Court GRANTS in part and DENIES in part Defendants' motions to dismiss.

(1)     Plaintiffs have Article III standing.

(2)     Their RICO claims against Bosch are well pled.

(3)     Their state law claims are not preempted.

(4)     Their state law misrepresentation claims do not currently satisfy Rule 9(b); their omission claims do. Plaintiffs have leave to amend the misrepresentation claims.

(5)     The damages and proximate cause elements of Plaintiffs' state law claims are well pled. Reliance is also well pled as to the omission claims. The Court defers considering the reliance element for the misrepresentation claims until Plaintiffs are able to correct their pleadings to satisfy Rule 9(b).

(6)     The Court defers resolving whether Plaintiffs are entitled to *American Pipe* tolling for their Arizona and Oregon claims. The parties should address the issues highlighted in this order with respect to *American Pipe*'s application in any briefing of motions to dismiss an amended complaint.

(7)     The Court will not determine whether Mississippi's and Utah's class action limitations apply in federal court at the pleading stage.

(8)    Mississippi's pre-suit requirement applies, and because Plaintiffs have not complied with it their Mississippi CPA claims are dismissed without prejudice.

(9)    The Texas DTPA claims will not be abated.

(10)   Plaintiffs lack statutory standing to bring their claims under Ohio's DTPA.

* * *

Plaintiffs shall file an amended complaint no later than 30 days after this order is entered. With their amended complaint, Plaintiffs shall also file a separate statement explaining how they intend to prove (1) the portion of the "clean diesel" premium that was for a low-emission vehicle, and (2) the portion of the premium that depreciated.

**IT IS SO ORDERED.**

Dated: October 3, 2018

_____
CHARLES R. BREYER
United States District Judge