UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION _____/ <br><br> This Order Relates To: <br> MDL Dkt. No. 5193 <br><br> *United States v. Volkswagen AG*, <br> No. 16-cv-295-CRB (N.D. Cal.) <br> _____/ | MDL No. 2672 CRB (JSC) <br><br> **ORDER APPROVING MATERIAL MODIFICATIONS TO THE INDIAN TRIBE TRUST AGREEMENT** |

As part of the settlement between the United States, California, and Volkswagen in this multidistrict litigation, Volkswagen agreed to fund a trust to be used by federally-recognized Indian tribes to finance emission mitigation projects. Volkswagen has since funded the trust, but in March the Court stayed all disbursements pending a determination of whether the trust's allocation formula needs to be modified.

The United States has now asked the Court to approve material modifications to the trust's allocation formula. Currently, if a funding cycle is oversubscribed—that is, if tribes ask for more money than is available—funds are allocated among participating tribes on a pro rata basis, based on population. As proposed, the allocation formula would be modified so that 50 percent of the funds would be allocated equally among participating tribes and 50 percent would be allocated based on population. The result would be that smaller tribes would receive a greater share of the funds than they would under the current allocation formula.

Cherokee Nation, one of the largest Indian tribes, seeks to enforce the current formula. The trust does not give the Nation that right, and instead states that material modifications may be made if they do not change or inhibit the trust's purpose. The proposed allocation formula will do neither of those things and so the Court approves it. The Court also approves all other proposed material modifications, none of which will change or inhibit the trust's purpose.

# I. BACKGROUND

The tribal trust is one of two trusts established to fund emission mitigation projects to offset the negative effects of Volkswagen's "clean diesel" vehicles. The beneficiaries of the tribal trust are the federally-recognized Indian tribes, while the beneficiaries of the second trust are the 50 states, Puerto Rico, and the District of Columbia. Volkswagen has set aside a combined $2.925 billion for these trusts. The company has contributed $2.025 billion to date, with the final payment, of $900 million, scheduled later this month. Almost 98 percent of the money has been allotted to the state trust. After administrative costs and expenses, that leaves approximately $54.5 million for the tribal trust. (*See* Current Tribal Trust, Dkt. No. 51-2 at 1 & ¶ 2.1.)

The two trusts allocate money among their beneficiaries in different ways. For the state trust, money is allocated based primarily on the number of the affected cars registered within each state's borders. (*See* State Trust, App. D-1, Dkt. No. 51-1; MDL Dkt. No. 1973 at 22-23.) States with a greater share of the cars receive larger allocations. Registration information is not available for all Indian tribes, so instead of allocating funds based on vehicle registration numbers, the tribal trust uses a conditional formula.

Under the conditional formula, if the funds set aside for a funding cycle are sufficient to cover all funding requests made during that cycle, each tribe that makes a funding request is eligible to receive the total amount of its request, subject to the trustee's review and approval. (*See* Current Tribal Trust ¶ 5.0.5.2.2.) But if more funds are requested than are available during a given funding cycle, funds are to be allocated to each tribe that applies for funding on a pro rata basis, with each tribe receiving the percentage of the available funds that corresponds with the share of its population to the total population of all the participating tribes. (*See id.* ¶ 5.0.5.2.3.)

Populations vary greatly among the 568 federally-recognized Indian tribes. Some tribes have only a few dozen members, while the three largest tribes have populations between 99,000 and 170,000. (*See* Dkt. No. 62, App. D-8.) Because of this disparity, the tribal trust's oversubscription, population-based formula risks an uneven distribution in which most funds flow to the few disproportionately large tribes. Yet when the trust was formulated, the United States thought that the likelihood of oversubscribed funding cycles was low. This belief was based on

EPA's experience in administering the Diesel Emissions Reduction Act ("DERA"), which has a tribal component. (*See* Mullaney Decl., Ex. A, MDL Dkt. No. 5193-5 at 8.)

Contrary to the United States' expectations, the first funding cycle was oversubscribed. The first cycle has approximately $6 million available for distribution. (*See* Vanaskey Decl. ¶ 6, MDL Dkt. No. 5193-6 at 3.) And although only 29 tribes applied for funding in the first cycle— 26 of which the trustee determined were eligible to participate (MDL Dkt. No. 5193 at 10 & n.7)—the funding requests amounted to more than $33 million. (*See* Vanaskey Decl. ¶ 8.) The oversubscription triggered the trust's population-based formula. Using that formula, the trustee determined that the three largest Indian tribes that applied for funding would receive a total allocation of approximately $5.55 million, amounting to 92 percent of the total funds available for distribution. (*See* Vanaskey Decl., Ex. B.) Seven smaller tribes, in contrast, would each receive distributions of less than $1,000. (*See id.*)[1]

In March 2018, the United States, Volkswagen, and the trustee informed the Court of the oversubscription and expressed concern that the consequences would be inconsistent with the tribal trust's purpose. The Court responded by ordering the United States and interested tribal beneficiaries to meet and confer, in consultation with the trustee, to discuss whether any adjustments to the allocation formula were necessary. The Court also stayed all disbursements of trust funds until further notice. (*See* MDL Dkt. No. 4867.)

The United States proceeded to conduct three separate discussion sessions with current and potential tribal beneficiaries, and after each session the tribes were permitted to submit written comments. (*See* Status Report, Dkt. No. 58.) After considering the comments made, the United States worked with the trustee to modify the trust, and the United States filed proposed modifications to the trust in June. (Dkt. No. 62.)[2]

As most relevant here, the United States proposes a modified allocation formula for the

---

[1] For the 26 beneficiaries in the first funding cycle, populations range from 30 to 125,440. (*See* Vanaskey Decl., Ex. C.)

[2] Since filing Dkt. No. 62, the United States and the trustee have agreed to a number of minor modifications to the trust agreement. (*See* MDL Dkt. No. 5558.) The most recent version of the trust is found at MDL Dkt. No. 5558-1.

3

first funding cycle consisting of the following three steps:

- Step 1: <u>Per Tribe Allocation</u> – The trustee will allocate 50 percent of the available funds equally among the 26 participating beneficiaries (Proposed Trust ¶ 5.0.5.3.2, MDL Dkt. No. 5558-1);

- Step 2: <u>Pro Rata Population-based Allocation</u> – The trustee will allocate the remaining 50 percent of the available funds into three separate funding pools based on the "Jenks natural breaks optimization method." (*Id.* ¶ 5.0.5.3.1.)[3] The trustee will assign 51.52 percent of the available funding to Group One, 10.61 percent to Group Two, and 37.87 percent to Group Three based on the relative population of each group, and will then allocate an amount to each participating beneficiary based on the pro rata share of its population to the total population of all the participating beneficiaries within its group (*id.* ¶ 5.0.5.3.2);[4] and

- Step 3: <u>Funding Limit</u> – The trustee will limit the amount of funding for a beneficiary to no more than the beneficiary requested in its original funding request and will reallocate the remaining amount to the other beneficiaries. (*Id.*)

As compared with the current, exclusively population-based oversubscription formula, the proposed formula would allocate more funds to the smaller tribes. In the first funding cycle, for example, Beaver Village, a tribe with 83 members, would receive $68,348 under the proposed formula, as compared to $345 under the current formula. (*See* Vanaskey Decl., Exs. B & C.) This increase comes at the expense of the larger tribes. Cherokee Nation, a tribe with 125,440

---

[3] As explained by the United States: "The Jenks data clustering method is a generally accepted approach to create groupings when there is only one delimiting statistic. In this case, the Trust Agreement established population as the delimiting statistic by which the Beneficiaries can receive Trust funds. The Jenks method uses computer calculations to calculate every possible grouping in order to determine which grouping will best meet two goals: (1) values within each group should be as similar as possible; and (2) values across each group should be as different as possible from the values in any other group." (MDL Dkt. No. 5193 at 11 n.9.)

[4] The 26 beneficiaries in the first funding cycle are distributed across the three Jenks Groups as follows: (1) 23 are in Group One, (2) one is in Group Two, and (3) two are in Group Three. Cherokee Nation and Muscogee (Creek) Nation, the two largest tribes by population among the 26, are the two tribes in Group Three. (*See* MDL Dkt. No. 5193 at 12.)

4

1  members, would receive $808,789 under the proposed formula, as compared to $2,072,034 under
2  the current formula. (*See id.*)

3  The proposed allocation formula would also apply in all future funding cycles. (*See*
4  Proposed Trust ¶¶ 5.0.5.3.3, 5.0.5.3.5.) The United States also proposes reducing the number of
5  funding cycles from six to four (*see id.* ¶ 5.0.5.2) and modifying the funding request procedures so
6  that, in future funding cycles, each beneficiary would learn of its allocation before it is required to
7  submit a funding request (*see id.* ¶¶ 5.0.5.3.1, 5.0.5.3.2, 5.0.5.3.3). This change would avoid
8  oversubscribed funding cycles. The United States also proposes adding an alignment table as an
9  appendix to the trust, which would be used to determine the population of each Indian tribe by
10 comparing the Bureau of Indian Affairs' current list of federally-recognized Indian tribes to Table
11 PCT4 of the 2010 U.S. Census (*see id.* ¶ 5.0.5.3.1, App. D-8).

12 The trustee notified the Indian tribes of the proposed modifications after submitting them
13 to the Court in June. The United States also agreed to accept written comments from the tribes for
14 a 30-day period thereafter. (*See* Dkt. No. 62 at 2.) In August 2018, the United States filed a
15 request for Court approval of the proposed modifications. (MDL Dkt. No. 5193.) With its
16 request, the United States included a copy of all comments it had received. (*See* MDL Dkt. No.
17 5193-3.) The United States also filed its own summary of and responses to the comments. (MDL
18 Dkt. No. 5193-4.)

19 Cherokee Nation opposes the United States' request for Court approval of the modified
20 allocation formula. (*See* MDL Dkt. No. 5264; Dkt. No. 61.)

**II. DISCUSSION**

22 Material modifications to the tribal trust require Court approval and may be made only if
23 they do not "change or inhibit" the trust's purpose. (*See* Current Trust ¶ 6.5.) Whether the
24 proposed allocation formula satisfies this test is considered below, but first the Court considers a
25 preliminary question: whether Cherokee Nation has the right to enforce the trust's current terms.

**A.    The Nation's Third-Party Beneficiary and Reliance Arguments**

27 In considering the rights of third parties to consent decrees and government contracts,
28 general contract principles apply. *See GECCMC 2005-C1 Plummer St. Office Ltd. v. JPMorgan*

*Chase Bank, Nat. Ass'n*, 671 F.3d 1027, 1033 (9th Cir. 2012); *United States v. FMC Corp.*, 531 F.3d 813, 819-21 (9th Cir. 2008); *Hook v. State of Ariz., Dep't of Corr.*, 972 F.2d 1012, 1014-15 (9th Cir. 1992). Relying on those principles, Cherokee Nation contends that it has the right to enforce the current allocation formula as a third-party beneficiary to the tribal trust. In support of this position, the Nation cites to portions of the trust agreement that reflect an intent to benefit the Nation and other tribes. As the Nation reads these sections, they created enforceable rights. (*See* Opp'n, Dkt. No. 5264 at 9-11.)

That may be, but whether the trust created enforceable rights in Indian tribes is somewhat beside the point. A principle of contract law is that whether an agreement has *created* rights in a third party and whether those rights can be *modified* without the third party's consent are different questions. *See* Restatement (Second) of Contracts § 304, Comment *b* (1981) (explaining that "[w]hether the right of the beneficiary can be varied without his consent . . . is a separate question" from whether the parties intended for their contract to benefit a third party). The Nation focuses on the creation question, but the modification question is the one at issue here. And as the Restatement explains, the answer to the modification question "depends on the terms of the contract." *Id.*[5]

Trust modifications are governed by Paragraph 6.5 of the agreement. That paragraph explains that material modifications "may be made only with the written consent of the United States and upon order of the Court, and only to the extent that such modification does not change or inhibit the purpose of this Indian Tribe Mitigation Trust." (Current Trust ¶ 6.5.) Notably, Paragraph 6.5 does not require tribal beneficiaries to consent to material modifications. To the contrary, Paragraph 6.5 explains that all that is required for tribal beneficiaries is that "[t]he Trustee shall provide to the Beneficiaries not less than 30 Days' notice of any proposed

---

[5] Because trust modifications are governed by contract law, two decisions cited by the Nation that involve administrative law are inapposite. *See Denny Klepper Oil Co. v. United States Dep't of Energy*, 598 F. Supp. 522, 529 (D.D.C. 1984) (holding that once the DOE selected a procedure for allocating funds from an escrow account, the agency was bound by its own rules and it was "unfair and arbitrary for it to change its mind with no notice"); *Teleprompter Cable Commc'ns Corp. v. FCC*, 565 F.2d 736, 742 (D.C. Cir. 1977) (reversing an FCC order when the agency "fail[ed] to abide by its own rules" given the "elementary principle that an administrative agency is bound to adhere to its own rules and procedures").

6

modification to the Indian Tribe Mitigation Trust, whether material or minor, before such modification shall become effective[.]" (*Id.*) Tribal beneficiaries, then, must be notified of proposed modifications to the tribal trust, but their consent to modifications is not required.

The Nation argues that it has the right to enforce the trust's current allocation formula. This is another way of saying that the Nation believes that it can prevent the allocation formula from being modified because of its beneficiary status. The tribal trust makes clear that this is not so. The trust can be modified without beneficiary consent.

There is one exception. Under contract law, the power of the promisor and promisee to discharge or modify a duty to an intended beneficiary "terminates when the beneficiary, before he receives notification of the discharge or modification, materially changes his position in justifiable reliance on the promise." Restatement (Second) of Contracts § 311(3). The Nation contends that it has changed its position in this way. Specifically, the Nation notes that it "has spent substantial time and effort developing an appropriately proportioned and scalable mitigation project for the first funding cycle," and it undertook these efforts based on its "understanding and expectations about funding availability and allocation under the [trust], including planning for a likely oversubscription scenario." (Dkt. No. 61 at 18.)

The Nation's planning efforts do demonstrate a certain degree of reliance on the current allocation formula, but the record does not support that the Nation has materially changed its position based on that formula. The Nation has not identified any contracts that it has entered into to execute its planned mitigation project. Nor has the Nation suggested that it has already made investments in its planned project that would be compromised if the modified formula is approved.

There is also no reason to believe that the Nation will need to scrap its planned project entirely if the proposed formula is approved. The Nation's plan is to use trust funds to replace multiple heavy-duty diesel vehicles with new electric vehicles, and to install the charging infrastructure needed for the new electric vehicles. (*See* Dkt. No. 61 at 6.) As the Nation notes, this is a scalable mitigation project. (*See id.*) The Nation, then, should be able to complete portions of its project even if it receives less funding under the new formula.

In sum, the record does not support that the Nation has "materially change[d] [its] position

7

in justifiable reliance on the [current formula]." Restatement (Second) of Contracts § 311(3). The Nation therefore cannot enforce the current formula on reliance grounds. And as noted above, even though the trust may have created enforceable rights in the tribes, those rights can be modified without the tribes consent. What matters is whether the proposed modifications satisfy Paragraph 6.5 of the trust. That issue is considered below.

**B.      The Proposed Allocation Formula and the Trust's Purpose**

Material modifications to the tribal trust "may be made only with the written consent of the United States and upon order of the Court, and only to the extent that such modification does not change or inhibit the purpose of this Indian Tribe Mitigation Trust." (Current Trust ¶ 6.5.) There is no dispute that the proposed changes to the allocation formula would be material modifications. And because the United States has proposed the changes, consent is also not at issue. The only relevant question is whether the modifications "change or inhibit" the trust's purpose.

To answer this question, it is first necessary to identify that purpose. Paragraph 2.0.3 does so directly and reads as follows:

> 2.0.3 <u>Trust Purpose</u>. It shall be the purpose of the Indian Tribe Mitigation Trust to timely and efficiently fund Eligible Mitigation Actions to be proposed and administered by the Beneficiaries subject to the requirements of the Consent Decree and this Indian Tribe Trust Agreement, and to provide funds for the administration and operation of this Indian Tribe Trust in accordance with this Indian Tribe Trust Agreement. The goal of each Eligible Mitigation Action shall be to achieve reductions of NOx emissions in the United States.

(Current Trust ¶ 2.0.3.)

Eligible Mitigation Actions, as used in Paragraph 2.0.3, are defined in the Purpose and Recitals as "environmental mitigation projects that reduce emissions of nitrogen oxides ("NOx") where the Subject Vehicles were, are, or will be operated ("Eligible Mitigation Actions")." (Current Trust at 1.) Eligible Mitigation Action, the singular form, is defined separately in the Trust's definitions section as "any of the actions listed in Appendix D-2 to this Indian Tribe Trust Agreement." (*Id.* ¶ 1.9.) The Purpose and Recitals also explain that the funds distributed by the state mitigation trust and the tribal trust are "intended to fully mitigate the total, lifetime excess NOx emissions from the Subject Vehicles where the Subject Vehicles were, are, or will be

8

operated." (*Id.* at 1-2.)

The United States contends that the proposed allocation formula is consistent with the tribal trust's purpose. When the formula is applied, the United States asserts that it will result in a more equitable distribution of funds to the 26 tribal beneficiaries participating in the first funding cycle, and it will enable each of these tribes to complete at least one Environmental Mitigation Action. By allocating funds in this way, the United States contends that the proposed formula will serve the trust's purpose "to timely and efficiently fund Eligible Mitigation Actions to be proposed and administered by the Beneficiaries . . . ." (Current Trust ¶ 2.0.3.)

Cherokee Nation responds that a distribution that allows each Indian tribe to fund an Environmental Mitigation Action is not required to promote the trust's purpose. Instead, the Nation contends that what is required is that mitigation projects be funded in areas where the Subject Vehicles *were, are, or will be operated* ("Eligible Mitigation Actions")." (Current Trust at 1 (emphasis added).) In other words, if more of the Subject Vehicles were, are, or will be operated within the geographic borders of certain Indian tribes, the Nation asserts that the trust's purpose would be inhibited if those tribes did not receive proportionally larger distributions.

The trust does reflect, as the Nation argues, an intent to establish a nexus between the number of the Subject Vehicles in each tribe and the amount of money allocated to each tribe. This intent is clear from the definition of Eligible Mitigation Actions, with its focus on where the vehicles "were, are, or will be operated." (*Id.*) Further, because vehicle registration information is not available for tribal areas, tribal population serves as a helpful proxy for identifying where Subject Vehicles are located. (*Id.*) As a result, it is consistent with the trust's purpose that more funds be allocated to larger tribes than to smaller tribes.

At the same time, it is also evident that the parties to the trust did not intend for only the most populous tribes to benefit from it. In explaining how beneficiaries are determined, the trust states that "[e]ach Indian Tribe may elect to become a Beneficiary" by timely filing a complete Certification for Beneficiary Status. (Current Trust ¶ 4.0.) The trust then defines "Indian Tribe" as "any Indian or Alaska Native Tribe, band, nation, pueblo, village or community that the Secretary of the Interior acknowledges to exist as an Indian Tribe, as provided in the Federally

9

Recognized Indian Tribe List Act of 1994." (Current Trust ¶ 1.15.) If the parties had intended for trust funds to be allocated only to the largest Indian tribes, they could have stated so explicitly. Rather than doing so, they designed the trust so that any Indian tribe, regardless of size, can become a beneficiary. Having formulated the trust in this way, it would frustrate the trust's purpose "to timely and efficiently fund Eligible Mitigation Actions to be proposed and administered *by the Beneficiaries*" (Current Trust ¶ 2.0.3), if, as has happened under the current allocation formula, smaller tribes are unable to fund a single Eligible Mitigation Action.

Cherokee Nation acknowledges that that the parties did not intend for the trust to only benefit a handful of large Indian tribes. (*See* Opp'n, Dkt. No. 5264 at 4 ("The Nation has long advocated that all Tribes should be included in any settlement of the VW clean diesel scandal."); Mot. To Lift Stay, Dkt. No. 61 at 8 ("Despite being the largest Indian Tribe, the Nation has not argued that a straight population-based model is the only viable solution to tribal allocation.").) But in the Nation's view, the best way to accommodate the disparity in the tribes' sizes, while still furthering the trust's purpose, is to add less expensive projects to the list of Eligible Mitigation Actions. (*See* Buckheit Decl., Dkt. No. 61-2; Second Buckheit Decl., MDL Dkt. No. 5265.)

The United States has been reluctant to modify the project list, which includes nine project categories that it selected based on EPA's experience in implementing NOx mitigation projects under the DERA program. (*See* Gov't Response to Comments, MDL Dkt. No. 5193-4 at 14.) The United States asserts that these project categories "have a proven track record, are cost effective, are relatively straightforward, and can be approved by the Trustee and implemented by the Beneficiaries in an efficient and expeditious manner." (Dkt. No. 5193-4 at 14.) No evidence indicates that this is an incorrect assessment.

Perhaps other project categories could be added. But at this stage, the relevant question is not whether other formulations of the trust are possible, but whether the United States' proposed allocation formula "change[s] or inhibit[s] the purpose of [the] Indian Tribe Mitigation Trust." (Current Trust ¶ 6.5.) The Court concludes that it does not.

The proposed formula does not completely jettison tribal population from the allocation decision; rather, it continues to base half of the allocation on population. And through this proxy,

the proposed formula maintains a nexus between the number of the Subject Vehicles in each tribe and the amount of funds allocated to each tribe. To be sure, this nexus will be weaker under the proposed formula than under the current formula, as half of the money will be allocated evenly among tribal beneficiaries (regardless of population). But this result comes with a positive trade-off: unlike under the current formula, the proposed formula will provide smaller tribes with enough money to fund mitigation actions—a result that furthers the parties' intent that all Indian tribes, large and small, be able to use Volkswagen's settlement payments to mitigate NOx pollution.

The proposed allocation formula does not "change or inhibit" the trust's purpose. (Current Trust ¶ 6.5.) To the contrary, it furthers the trust's purpose by ensuring that tribes with more members (and likely more of the Subject Vehicles) receive more of the trust funds, while also enabling smaller tribes to participate in emission mitigation efforts. The Court therefore approves the proposed formula.

**C.    Other Material Modifications**

The United States has proposed several other material modifications to the tribal trust, including modifications that reduce the number of funding cycles and simplify funding request procedures. There is no reason to believe that any of the proposed modifications would "change or inhibit the purpose of this Indian Tribe Mitigation Trust." (*Id.*). The Court therefore approves all of the remaining material modifications.[6]

## III. CONCLUSION

The Court GRANTS the United States' request for approval of the proposed modifications. Within two weeks of this Order, (a) the trustee and the settling defendants shall execute and deliver to the United States the executed tribal trust agreement, and (b) the United States shall file the fully executed tribal trust agreement with the Court. The modifications to the trust agreement

---

[6] The United States and the trustee have also agreed to several minor modifications and clarifying amendments to the tribal trust. For example, amendments that clarify the technical assistance provider's role and reporting obligations. (*See* MDL Dkt. No. 5193 at 21-22 (reviewing minor modifications and clarifying amendments); MDL Dkt. No. 5558 (proposing additional minor modifications).) Pursuant to Paragraph 6.5 of the trust, minor modifications do not require Court approval.

11

shall become effective on the date that the fully executed modified agreement is filed with the Court. The stay imposed on trust disbursements is lifted.

**IT IS SO ORDERED.**

Dated: November 16, 2018

CHARLES R. BREYER
United States District Judge