UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION

This Order Relates To:
*City of St. Clair Shores*, 15-6167
*Travalio*, 15-6168
*George Leon Family Trust*, 15-6168
*Charter Twp. of Clinton*, 16-190
*Wolfenbarger*, 16-184

MDL No. 2672 CRB (JSC)

**ORDER GRANTING MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**

MDL Dkt. No. 5267

Among the lawsuits in this multidistrict litigation is a consolidated class action brought by investors in Volkswagen-sponsored American Depository Receipts ("ADRs").[1] These investors contend that Volkswagen AG ("VWAG"), related corporate entities, and members of management violated federal securities laws by making false and misleading statements about Volkswagen's financial condition, regulatory compliance, and commitment to producing environmentally friendly cars.

For much of the last year, the parties have been engaged in discovery. They have now agreed to settle, and a motion for preliminary approval of the settlement is before the Court. For the reasons that follow, the Court grants the motion.

---

[1] An ADR "is a U.S. dollar denominated form of equity ownership in a non-U.S. company. It represents the foreign shares of the company held on deposit by a custodian bank in the company's home country and carries the corporate and economic rights of the foreign shares, subject to the terms specified on the ADR certificate." (Dkt. No. 2862, FAC ¶ 36.)

# I. CLASS CERTIFICATION[2]

A class has yet to be certified so the Court first considers whether Rule 23's certification requirements have been met. This is a necessary step in the process of approving a class action settlement. *See Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003) (explaining that district courts "must pay 'undiluted, even heightened, attention' to class certification requirements" when the parties have agreed to settle before a class has been certified (quoting *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997))).

For a case to be maintained as a class action, Rule 23(a) requires (1) that the class be "so numerous that joinder of all members is impracticable," (2) that there be "questions of law or fact common to the class," (3) that the claims or defenses of the representative parties be "typical of the claims or defenses of the class," and (4) that the representative parties be in a position to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

A proposed class must also satisfy at least one of the three requirements found in Rule 23(b). Plaintiffs rely on Rule 23(b)(3), which is satisfied (1) when "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) when "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Each of these requirements is satisfied here. First, the class is sufficiently numerous as it includes thousands of investors who purchased VWAG's ADRs. (*See* Dkt. No. 5267 at 17.) "Joinder of 1,000 or more co-plaintiffs is clearly impractical." *Palmer v. Stassinos*, 233 F.R.D. 546, 549 (N.D. Cal. 2006). Second, there are questions of fact and law that are common to the class. These include: Did Defendants make false and misleading statements to investors? If so, did Defendants do so intentionally? And did Defendants' conduct violate Sections 10(b) and 20(a) of the Exchange Act? Importantly, these questions are not only common across the class, but classwide proceedings are likely to lead to common answers. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011). Plaintiffs contend that Defendants made false and

---

[2] Summaries of the factual allegations can be found in several prior orders. (*See* Dkt. Nos. 2636, 3392, 4521.)

2

misleading statements in financial reports and in other standardized materials directed at the investing public. Whether Defendants did so, and whether they did so intentionally, are questions that are both "central to the validity" of each class member's claims and that can be resolved "in one stroke." *Id.*

Third, the representative parties—the Arkansas State Highway Employees' Retirement System ("ASHERS") and the Miami Police Relief and Pension Fund ("Miami Police")—assert claims that are typical of those of the class. Like the absent class members, ASHERS and Miami Police purchased VWAG's ADRs at prices that they contend were inflated due to Defendants' false and misleading statements. (*See* FAC ¶¶ 41-42.) The representative parties, in other words, assert the same type of injury as the absent class members (overpayment for VWAG's ADRs), and their claims arise from the same course of conduct that gave rise to the absent class members' claims (Defendants' false and misleading statements). These similarities between the representative parties' claims and the absent class members' claims satisfy the typicality test. *See Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010).

Fourth, the adequacy requirement is satisfied because the representative parties have obtained qualified and competent counsel, the representative parties have certified that they understand their responsibilities as class representatives (*see* Dkt. Nos. 1510-1, 1510-2), and there is no reason to believe that the representative parties or their counsel have any conflicts of interest with the absent class members. These findings satisfy Rule 23(a)(4). *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

The two Rule 23(b)(3) requirements—predominance and superiority—are also satisfied. Common questions predominate over individual ones when they "present a significant aspect of the case and [] can be resolved for all members of the class in a single adjudication." *Hanlon*, 150 F.3d at 1022 (citations omitted). That is the case here. Plaintiffs allege that Defendants perpetrated the same fraud in the same manner against all class members, and almost every element of Plaintiffs' 10(b) and 20(a) claims is susceptible to common proof. Further, because the aggregation of these claims can be expected to save "time, effort and expense," and to promote uniformity "without sacrificing procedural fairness," Fed. R. Civ. P. 23, 1966 Advisory

1  Committee Notes, "a class action is superior to other available methods for fairly and efficiently
2  adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

3  Plaintiffs have satisfied the Rule 23(a) and (b)(3) requirements. The Court therefore
4  conditionally certifies the proposed class for settlement purposes. The Court also appoints
5  ASHERS and Miami Police as class representatives and James A. Harrod of Bernstein Litowitz
6  Berger & Grossmann LLP as class counsel.

## II. THE SETTLEMENT

Having conditionally certified the class, the Court continues by considering the settlement's terms and by evaluating whether the settlement warrants preliminary approval.

### A. Settlement Terms

#### 1. Payment Terms

The agreement, if approved, will require VWAG to contribute $48 million to a settlement fund. (Dkt. No. 5267-1 ¶¶ 1(tt), 8.) Before distribution, the fund will be used to pay Plaintiffs' attorneys' fees and litigation expenses, notice and administration costs, taxes, and any other costs or fees approved by the Court. (*Id.* ¶¶ 1(cc), 10.) The remaining balance will be distributed to class members who submit timely and valid claims to the claims administrator. (*Id.* ¶¶ 1(d), 10.) If class members do not cash their distribution checks, and if follow-on distributions are unsuccessful or not cost effective, any remaining funds will be given to the Investor Protection Trust, a nonprofit organization dedicated to investor education, as a *cy pres* recipient. (*Id.*, Ex. A-1 ¶ 70.)

Class counsel will file a motion for attorneys' fees and litigation expenses before the final fairness hearing. Class counsel has agreed to limit the request for reimbursement of litigation expenses to no more than $500,000, and to limit the request for attorneys' fees to 25 percent of the settlement fund, net of litigation expenses. (*Id.*, Ex. A-1 ¶¶ 5, 73.) Class counsel also intends to seek an award for the two class representatives, in an amount not to exceed a total of $50,000, to reimburse them for their time and expenses in representing the class. (*Id.*) This award will also be deducted from the settlement fund.

### 2. The Settlement Class

The settlement class consists of "all persons and entities in the U.S. or elsewhere who purchased or otherwise acquired VWAG Ordinary American Depositary Receipts (CUSIP: 928662303) and/or VWAG Preferred American Depositary Receipts (CUSIP: 928662402) from November 19, 2010 through January 4, 2016, inclusive (the "Class Period"), and who were allegedly damaged thereby." (Dkt. No. 5267-1 ¶ 1(uu).) Excluded from the class will be (1) class members who opt out and (2) Defendants, their officers and directors, and certain other persons and entities with ties to Defendants. (*See id.*) Other than minor modifications to the exclusion list, the class definition is identical to the one that appears in the operative complaint. (*Compare id.*, *with* FAC ¶ 540.)

### 3. The Release

Unless they opt out of the settlement, class members will release all claims that the class representatives or any member of the settlement class

> (i) asserted in the Complaint, or (ii) could have asserted in any forum that concern, arise out of, relate to, involve, or are based upon any of the allegations, circumstances, events, transactions, facts, matters, representations, or omissions involved, set forth, or referred to in the Complaint and that relate to the purchase, acquisition, or ownership of VWAG ADRs during the Class Period.

(Dkt. No. 5267-1 ¶ 1(pp).) Released claims do not include any claims relating to the enforcement of the settlement. (*Id.*)

### 4. The Allocation Plan

Settlement funds will be allocated on a pro rata basis based on a comparison of the relative size of each claimant's recognized claim. (*Id.*, Ex A-1 ¶ 68.) The value of each recognized claim is the product of several calculations.

Initially, Plaintiffs' damages expert has sought to estimate the amount by which VWAG's ordinary and preferred ADRs were artificially inflated due to Defendants' allegedly false and misleading statements. In making these estimates, Plaintiffs' expert considered, among other things, changes in the prices of the ADRs when Defendants made the statements at issue and when the truth of these statements was later revealed. (*See id.*, Ex A-1 ¶ 54.) Tables at the back of the

5

proposed long-form notice are organized by date range and provide artificial-inflation estimates for any transaction date during the class period. (*See* Dkt. No. 5267-1 at 81-82.)[3]

Using the artificial-inflation estimates, as well as data tracking when each claimant bought and sold VWAG's ADRs, a recognized amount will be calculated for each ADR purchased during the class period. If, for example, a claimant bought and resold an ordinary or preferred ADR during the class period, the claimant's recognized amount for that ADR will be the lesser of (i) the difference between the estimated artificial inflation of the ADR on the date of purchase and on the date of sale, or (ii) the difference between the actual ADR purchase and sale prices. (*Id.*, Ex. A-1 ¶¶ 57(a), 58(a).) If the recognized amount is a positive number, it will be considered a recognized loss; if the recognized amount is a negative number, it will be considered a recognized gain. (*Id.*)

Similar calculations will be used if a claimant bought VWAG's ADRs during the class period and then resold them during the 90-day period following the end of the class period or held them at the end of the 90-day period. A distinction for transactions of this type is that the claimant's recognized loss will be limited based on the average price of the ADRs during the 90-day period following the end of the class period. (*See id.*, Ex. A-1 ¶¶ 57(b)-(c), 58(b)-(c).)[4]

After recognized losses and gains are calculated, each recognized claim will be determined based on the sum of the claimant's recognized losses minus the sum of the claimant's recognized gains. (*Id.*, Ex. A-1 ¶ 65.) For purposes of this calculation, recognized gains calculated under ¶ 57(a) and ¶ 58(a) will be expressed as positive numbers. (*Id.*, Ex. A-1 ¶¶ 57(a), n.4; 58(a), n. 6.) If the calculation results in a negative number—that is, if the recognized gains are greater than the recognized losses—then the claimant's recognized claim will be zero. (*Id.*, Ex. A-1 ¶ 65.) A

---

[3] As examples, Plaintiffs' expert estimates that if a class member purchased VWAG's ordinary ADRs on December 1, 2010, near the beginning of the class period, the price would have been inflated by $1.22 per share. Whereas if a class member purchased VWAG's ordinary ADRs on September 1, 2015, weeks before the fraud became public knowledge, the price would have been inflated by $13.54 per share. (*See id.*)

[4] The 90-day-average limitation is required by 15 U.S.C. § 78u–4(e)(1). *See In re Veritas Software Corp. Sec. Litig.*, 496 F.3d 962, 967 n.3 (9th Cir. 2007) ("This '90-day bounce back rule' (as the parties refer to it) limits the plaintiffs to rescissory damages and does not calculate damages based on the single day decline in price, but instead allows the security an opportunity to recover.").

1  distribution amount will then be calculated for each claimant, which will be equal to the claimant's

2  recognized claim amount divided by the total recognized claims of all authorized claimants,

3  multiplied by the total amount of the net settlement fund.  (*See id.*, Ex. A-1 ¶ 69.)

The recognized loss amounts for ADRs purchased during the period from November 19, 2010 through April 30, 2014 will be reduced by half.  (*See id.*, Ex A-1 ¶¶ 56, 59.)  This adjustment reflects class counsel's belief that it will be "much more difficult" to prove Defendants' liability for the period before May 2014.  (Dkt. No. 5267 at 28.)  Specifically, counsel contends that it will be difficult to prove scienter prior to May 2014 because there is "an absence of evidence that before May 2014, top management were told about the defeat devices and warned about potential fines for using them."  (*Id.*)  Counsel also notes that the Court previously dismissed Plaintiffs' Section 10(b) claims to the extent that they were based on false or misleading financial statements before May 2014.  *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 258 F. Supp. 3d 1037, 1050 (N.D. Cal. 2017).  Since claims related to VWAG's financial statements after May 2014 were not dismissed, *see id.*, counsel asserts that Plaintiffs have "additional avenues of recovery in the post-April 2014 portion of the Class Period."  (Dkt. No. 5267 at 28.)

### 5. Claims Process

For a class member to be eligible for a settlement payment, the class member must timely complete and return a claims form and include with the claims form documentation for all relevant ADR transactions.  (Dkt. No. 5267-1, Ex. A-2 ¶ 7.)   A copy of the claims form will be included with the long-form notice that is mailed to class members and will also be available on the settlement website.  (*Id.*, Ex. A-1 ¶ 43.)  The notice will also advise class members of their rights to opt-out of the settlement and to object to the settlement. (*Id.*, Ex. A-1 ¶¶ 75, 82.)

### B. Preliminary Fairness Review

The Ninth Circuit has identified nearly a dozen factors that district courts usually consider before approving a class action settlement that is reached prior to class certification.  *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (highlighting eight factors that courts generally must consider in determining whether a settlement is fair, adequate,

and reasonable); *id.* at 947 (identifying three additional factors that courts should consider when the parties agree to settle before a class has been certified).

It can be more effective to consider these factors after notice of the settlement has been sent to the class members and they have had the opportunity to object or opt out. *See, e.g.*, *Wilson v. Tesla, Inc.*, No. 17-cv-03763-JSC, 2018 WL 4616358, at *5 (N.D. Cal. Sept. 26, 2018) ("The Court cannot fully assess all of these fairness factors until after the final approval hearing."). At the preliminary approval stage, then, district courts in this circuit often consider a separate set of factors, which better reflect that the review at this stage is only an initial evaluation of the settlement's fairness.

These preliminary-approval factors examine whether the settlement (1) appears to be the product of serious, informed, and noncollusive negotiations, (2) has any obvious deficiencies, (3) improperly grants preferential treatment to class representatives or segments of the class, and (4) provides class members with an award that falls within the range of possible approval. *See, e.g.*, *id.*; *Ruch v. AM Retail Grp., Inc.*, No. 14-cv-05352-MEJ, 2016 WL 1161453, at *7 (N.D. Cal. Mar. 24, 2016); *Cruz v. Sky Chefs, Inc.*, No. C-12-02705 DMR, 2014 WL 2089938, at *7 (N.D. Cal. May 19, 2014). These factors are considered below.[5]

### 1. Settlement Process

For at least two reasons, the proposed settlement appears to be the product of serious, informed, and noncollusive negotiations. First, the record supports that at the time of settlement the parties were "armed with sufficient information about the case to . . . reasonably assess its strengths and value." *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 396 (C.D. Cal. May 31, 2007). The parties engaged in discovery for nearly a year before they reached an agreement in principle to settle. (*See* Dkt. No. 5267 at 13.) They also litigated two motions to dismiss and a

---

[5] After Plaintiffs filed their motion for preliminary approval of the settlement, the Northern District of California revised its procedural guidance for class action settlements. *See* N.D. Cal. Guidance, https://www.cand.uscourts.gov/ClassActionSettlementGuidance (updated Nov. 1, 2018). Given the timing of the revisions, the Court will not consider whether Plaintiffs' motion complies to the letter with the updated guidelines. Plaintiffs, however, should consult the revised guidelines and follow them to the extent applicable when moving for final approval of the settlement.

8

1   motion for partial summary judgment before agreeing to settle. (*See id.* at 12-13 (reviewing the
2   motions and the Court's orders).) Having used discovery and motion practice to obtain
3   information about the case, Plaintiffs were able to assess the merits of the claims and to determine
4   whether Defendants' settlement offers were reasonable. (*See id.* at 13 (noting that class counsel
5   "conducted an extensive review of the relevant facts" before the settlement was reached, which
6   enabled the parties to "engage[] in a series of arm's length negotiations").) With sufficient
7   information in hand, in other words, the parties were able to engage in serious and informed
8   negotiations.

Second, there is no reason to believe that settlement negotiations were collusive. As just noted, class counsel states that the parties "engaged in a series of arm's-length negotiations," which culminated in the proposed settlement. (*Id.*) There is no reason to doubt the veracity of this statement, and indeed a presumption of fairness is usually appropriate if class counsel recommends the settlement after arm's-length bargaining. *See, e.g.*, *Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011). The structure of the settlement also does not suggest collusion: the parties have not negotiated a "clear sailing" arrangement, whereby class counsel would receive attorneys' fees separate and apart from class funds; unused funds in the settlement fund will not revert to Defendants; and, as discussed below, class counsel will not receive a disproportionate share of the settlement funds. The absence of these characteristics is strong evidence of noncollusive negotiations. *See In re Bluetooth*, 654 F.3d at 947.

Because the proposed settlement appears to be the product of serious, informed, and noncollusive negotiations, the first factor weighs in favor of preliminary approval.

### 2. Obvious Deficiencies

There are no obvious deficiencies with the settlement. The terms discussed below are illustrative of this conclusion.

- Attorneys' fees: Class counsel has agreed to limit his attorneys' fees request to 25 percent of the settlement fund, net of litigation expenses. (Dkt. No. 5267-1, Ex. A-1 ¶¶ 5, 73.) Twenty-five percent is the benchmark for attorneys' fees awards in

9

- common fund class actions, *see Staton*, 327 F.3d at 968, so the settlement is not obviously deficient on this basis.

- *Cy Pres*: The settlement's *cy pres* provisions are consistent with Ninth Circuit law. Payments will be made to the *cy pres* recipient only if remaining distributions to claimants are not cost effective. (*See* Dkt. No. 5267-1, Ex. A-1 ¶ 70.) As a result, the concerns implicated by *cy pres*-only settlements are not implicated. *See In re Google Referrer Header Privacy Litig.*, 869 F.3d 737, 741 (9th Cir. 2017) (refusing to impose a categorical ban on *cy pres*-only settlements but noting that they "are considered the exception, not the rule"), *cert. granted sub nom. Frank v. Gaos*, 138 S. Ct. 1697 (2018). Also, the proposed *cy pres* recipient is not "divorced from the concerns embodied in [the securities law]," which would make the selection improper. *Dennis v. Kellogg Co.*, 697 F.3d 858, 866 (9th Cir. 2012) (citation omitted). The proposed *cy pres* recipient, the Investor Protection Trust, is a nonprofit organization focused on investor education. A savvy, educated investor is hopefully more likely to identify signs of securities fraud, which furthers the Exchange Act's purpose of maintaining "fair and honest markets." 15 U.S.C. § 78b.

- <u>Scope of the release</u>: The proposed release of claims is sufficiently tailored. The release's scope is limited to claims that relate to both the complaint's factual allegations and to the purchase or ownership of VWAG's ADRs. (*See* Dkt. No. 5267-1 ¶ 1(pp).) These prerequisites ensure that "the released claim[s] [are] based on the identical factual predicate as that underlying the claims in the settled class action." *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010).

The absence of obvious deficiencies weighs in favor of preliminary approval.

### 3. Preferential Treatment

In two respects, the agreement treats certain class members differently, but neither instance constitutes unreasonable preferential treatment. First, class counsel plans to seek an additional award, not to exceed $50,000, for the class representatives. The effect of this award, if approved, will be that the class representatives' recoveries will be marginally higher than those of the absent

10

class members. This distinction is reasonable. The award would be limited to reimbursing the class representatives for their time and expenses in representing the class. (*See* Dkt. No. 5267-1, Ex. A-1 ¶ 5.) The Exchange Act permits such awards, *see* 15 U.S.C. § 78u–4(a)(4), so the award does not raise preferential treatment concerns.[6]

Second, the proposed allocation plan will reduce by half the recognized loss amounts for ADRs purchased during the period from November 19, 2010 through April 30, 2014. (*See* Dkt. No. 5267-1, Ex A-1 ¶¶ 56, 59.) All else being equal, this means that class members who only purchased VWAG's ADRs before April 30, 2014 will receive smaller recoveries than class members who only purchased VWAG's ADRs after April 30, 2014.

This distinction is also reasonable. Courts often "endorse distributing settlement proceeds according to the relative strengths and weaknesses of the various claims." *In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2007 WL 4171201, at *6 (N.D. Cal. Nov. 26, 2007). And here, Plaintiffs acknowledge that they will have a harder time proving that the earlier transactions were tainted by fraud because of "an absence of evidence that before May 2014, top management were told about the defeat devices and warned about potential fines for using them." (Dkt. No. 5267 at 28.)

If class members object to the distinction between the earlier and later ADR purchases, or if class members object to the amount of the discount for the earlier purchases, the Court will consider those objections before final approval of the settlement. At the preliminary approval stage, the discount appears fair and reasonable.

### 4. Range of Possible Approval

The final fairness factor examines whether the settlement falls within the range of possible approval. To evaluate this factor, courts consider the plaintiffs' expected recovery if they were to prevail in the action versus the value of the settlement offer. *See, e.g.*, *Wilson*, 2018 WL 4616358, at *7; *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007).

Plaintiffs estimate that if they were to proceed with litigating their claims, their maximum

---

[6] With Plaintiffs' motion for final approval of the settlement, class counsel should provide records of the class representatives' time and expenses.

11

recovery would be $147.4 million. (*See* Dkt. No. 5267-1, Ex. A-1 ¶ 4.) The proposed $48 million settlement represents 33 percent of this projected maximum recovery. And if class counsel obtains an attorneys' fees award equivalent to 25 percent of the settlement fund, the amount of the settlement that would be available for distribution to class members would be equivalent to 24 percent of their maximum recovery.

Given prior admissions by Volkswagen that it installed and failed to disclose defeat devices in its "clean diesel" vehicles, a 24 percent recovery could be viewed as low. Although to prevail, Plaintiffs must prove more than that Volkswagen deceived regulators about its cars' emissions; they must also prove that the Volkswagen employees who made the challenged statements to investors knew that the statements were false or misleading. Plaintiffs very well may be able to make this additional evidentiary showing, but doing so would likely require costly and time-consuming litigation, with any recovery coming years in the future. The settlement, in contrast, avoids the risks of future litigation and provides benefits in the near future.

A 24 percent recovery also compares favorably with settlements in other securities-fraud related cases in this district. *See, e.g.*, *Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 WL 4207245, at *9 (N.D. Cal. Sept. 4, 2018) (preliminarily approving a settlement valued at approximately 15 percent of the maximum recoverable damages at trial); *Destefano v. Zynga, Inc.*, No. 12-cv-04007-JSC, 2016 WL 537946, at *11 (N.D. Cal. Feb. 11, 2016) (approving settlement valued at 9.5 percent of the likely recoverable damages after netting out expected attorneys' fees); *In re Celera Corp. Sec. Litig.*, No. 5:10-cv-02604-EJD, 2015 WL 7351449, at *6 (N.D. Cal. Nov. 20, 2015) (approving settlement valued at 17 percent of estimated damages award).

Given the risks and delay of further litigation, as well as the fact that the recovery here compares favorably with the recoveries in other securities-fraud class actions in this district, the Court concludes that the proposed settlement appears within the range of possible approval.

\*\*\*

Having considered the above factors, the Court concludes that the settlement appears fair, adequate, and reasonable. Having reached this determination, the Court continues by considering the class notice plan.

# III. CLASS NOTICE

## A. Method of Providing Notice

For any class certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

The proposed notice here will operate as follows. Within five business days of preliminary approval, VWAG has agreed to provide the claims administrator with an electronic list of the names and addresses of record holders who purchased the company's ADRs during the class period to the extent that such information is available. (Dkt. No. 5267-1 ¶ 20.) The claims administrator will then mail the notice and claims form to those class members who VWAG identifies or who otherwise may be identified with reasonable effort. (*Id.*) The claims administrator will do so within 15 business days of preliminary approval. (Dkt. No. 5267 at 33.)

The notice explains that broker-dealers and other nominees that acquired VWAG's ADRs on behalf of others are to either provide the claims administrator with the names and addresses of those beneficial owners, or are to request copies of the notice packet to forward to the beneficial owners. (Dkt. No. 5267-1, Ex. A-1 ¶ 90.) Nominees can seek reimbursement from the claims administrator for reasonable expenses incurred to comply with these requirements. (*Id.*)

Plaintiffs' counsel will also instruct the claims administrator to publish a short-form, summary notice in *Investor's Business Daily* and over PR Newswire. (Dkt. No. 5267 at 31.) The claims administrator will also maintain a website that will include downloadable copies of the long-form notice, the claims form, and the settlement-related papers filed with this Court. (*Id.*; *see also* Dkt. No. 5267-1, Ex. A-1 ¶ 43.) The website will also list a toll-free phone number and email address that class members can use if they have questions about the settlement, or to request the notice packet. (*See id.*)

The Court is satisfied that this notice plan is adequate. There is no indication that class members cannot be identified by VWAG or through other reasonable efforts. As a result, direct mail notice, as proposed, should provide individual notice to identifiable class members as required by Rule 23(c)(2). *See Hunt v. Check Recovery Sys., Inc.*, No. C 05-04993 MJJ, 2007 WL

2220972, at *3 (N.D. Cal. Aug. 1, 2007) ("Delivery by first-class mail can satisfy the best notice practicable when there is no indication that any of the class members cannot be identified through reasonable efforts."), *aff'd sub nom. Hunt v. Imperial Merch. Servs., Inc.*, 560 F.3d 1137 (9th Cir. 2009). Also, the settlement website and the publication of the short-form notice will bolster the notice program and increase the likelihood that notice reaches each class member.

**B.     Content of Notice**

The notice for any class certified under Rule 23(b)(3) must also "clearly and concisely" state the following in "plain, easily understood language":

> (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). In addition, the Private Securities Litigation Reform Act requires that the notice contain (1) "[t]he amount of the settlement . . . determined in the aggregate and on an average per share basis," (2) "the average amount of [the] potential damages per share," (3) a statement of any fees or costs that counsel intends to seek from the settlement fund, (4) class counsel's contact information, and (5) "[a] brief statement explaining the reasons why the parties are proposing the settlement." 15 U.S.C. § 78u-4(a)(7)(A)-(F).

The Court has reviewed the long-form notice (*see* Dkt. No. 5267-1, Ex. A-1) and is satisfied that it meets each of these requirements.

**C.     Claims Administrator**

After competitive bidding, class counsel has selected Epiq Class Action & Claims Solutions, Inc. ("Epiq") to serve as the claims administrator and to supervise the notice plan. (Dkt. No. 5267 at 31.) Epiq's estimates that it will mail 200,000 notice packets, that 50,000 claims will be process, and that the total notice and administrative costs will be approximately $500,000. (*Id.*) The notice and administrative costs will be paid from the settlement fund. (Dkt. No. 5267-1 ¶ 10.)

14

The Court is satisfied with and approves the selection of Epiq, which is a firm that also served as the notice and claims administrator for the Bosch class action settlement. (*See* Dkt. No. 2920.)

## IV. CONCLUSION

For the reasons stated above, the Court GRANTS Plaintiffs' motion for preliminary approval of the class settlement.

1. The claims administrator shall commence mailing the notice and claims form to potential settlement class members by **December 19, 2018** in accordance with the method of notice set forth in the motion for preliminary approval and in this Order. Summary notice shall be published by **January 4, 2019**.

2. Class members shall submit their objections or requests for exclusion by **April 18, 2019** in the manner set forth in the settlement.

3. Eligible class members shall submit claims forms as required by the settlement by **April 18, 2019**.

4. On or before **April 5, 2019**, class counsel shall file a motion for final approval of the settlement and a motion for approval of attorneys' fees and litigation expenses. The deadline for any reply papers is **May 3, 2019**.

The Court will hold a fairness hearing to finally determine whether the settlement is fair, reasonable, and adequate on **May 10, 2019** at **10:00 a.m.** in Courtroom 6, 450 Golden Gate Avenue, San Francisco, California.[7] The deadline for class members to file a notice of intent to appear at the fairness hearing is **April 26, 2019**.

**IT IS SO ORDERED.**

Dated: November 28, 2018

CHARLES R. BREYER
United States District Judge

---

[7] The Court will hold the fairness hearing after the claims period has ended. With their reply in support of final approval, Plaintiffs should include data on the number of claims submitted.

15