UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION / | MDL No. 2672 CRB (JSC) **ORDER DENYING MOTION TO REMAND** |
| This Order Relates To: MDL Dkt. No. 3654 / | |

Around 575,000 people who owned or leased a Volkswagen, Audi, or Porsche "clean diesel" car previously agreed to participate in one of two Court-approved class action settlements with these car makers. Rather than participate in those settlements, approximately 4,000 people instead chose to opt out of them. Some of these opt outs filed their own cases against the car makers in state court, and many of those cases were later removed to federal court by the defendants and transferred to this Court as part of the above-captioned MDL.

Whether there was a basis for removal has been contested, and more than 60 motions to remand, covering several hundred opt-out cases, were filed in this Court. This Order addresses one of those motions, ECF No. 3654. The ECF No. 3654 motion covers 34 separate cases, each of which was originally filed in California state court and then removed by Volkswagen Group of America, Inc. ("VWGoA") to federal court.

With one exception, which is discussed in the footnote below, VWGoA removed the ECF No. 3654 cases on the basis of both federal question and diversity subject-matter jurisdiction. Plaintiffs, in their motion to remand, have argued that neither form of jurisdiction is present. The Court considers at this time only whether it has jurisdiction on the basis of diversity. Concluding that it does, it DENIES the ECF No. 3654 motion to remand.[1]

---

[1] One of the ECF No. 3654 cases, *Shepherd v. Volkswagen Group of America, Inc.*, No. 3:17-cv-2728-CRB, was removed only on the basis of federal-question jurisdiction. It appears, however,

# I. BACKGROUND

Each of the ECF No. 3654 cases was filed by either an individual or a couple who bought or leased a Volkswagen or Audi TDI diesel-engine car. The general factual allegations in the cases are the same. Plaintiffs allege that they purchased the cars at California-based dealerships, and that prior to doing so, they read the window stickers attached to the cars, which advertised them as having low emissions. (*E.g.*, Amato Compl. ¶¶ 11, 78, MDL Dkt. No. 3654-4.) They also reviewed marketing materials representing that the cars were "green" vehicles and were good for the environment. (*Id.* ¶¶ 13, 79.) The low-emission representations induced Plaintiffs to purchase the cars. (*Id.* ¶ 14.)

In fact, the cars did not have low emissions and were not good for the environment. (*Id.* ¶¶ 20, 68.) And not only were the cars' emissions higher than represented, but VWGoA, which also did business as Audi of America, Inc., knew this. (*Id.* ¶¶ 3, 31-32.) VWGoA knew that the cars could not perform as promised and had specifically developed and installed software in them that detected and evaded emissions testing. (*Id.* ¶¶ 32-35.) During testing, the cars appeared to satisfy governing emission standards; but when the cars were on the road, they emitted nitrogen oxides at up to 40 times the legal limits. (*Id.* ¶ 68.)

In September 2015, in response to state and federal investigations, VWGoA admitted that it had equipped the cars with emissions-cheating software. (*Id.* ¶ 72.) VWGoA also admitted that the same or similar software had been installed in 11 million diesel cars worldwide. (*Id.* ¶ 76.)

The ECF No. 3654 complaints each include three to four state-law claims against VWGoA. All of the complaints include an implied warranty claim, under California's Song-Beverly Act, and two common law fraud claims (one based on fraudulent misrepresentations and the other based on fraudulent concealment). (*E.g.*, Dixon Compl., Case No. 3:17-cv-3360, Dkt.

---

that *Shepherd* may have been included as a case covered by the ECF No. 3654 motion accidentally, as *Shepherd* is also covered by ECF No. 3631, a separate remand motion filed by the same counsel, which covers cases that were removed by VWGoA only on the basis of federal-question jurisdiction. Rather than consider whether there is federal subject-matter jurisdiction over *Shepherd* here, the Court will consider that question when it resolves ECF No. 3631. For the remainder of this Order, references to the ECF No. 3654 cases or the ECF No. 3654 complaints will not be referring to *Shepherd*.

No. 1-2.) Some of the complaints also include a claim for violation of California's Consumers Legal Remedies Act ("CLRA"). (*E.g.*, Pantoja Compl., Case No. 3:17-cv-2305, Dkt. No. 1-2.)

Plaintiffs seek remedies which include "general, special and actual damages according to proof at trial," "rescission of the purchase contract and restitution of all monies expended," injunctive and equitable relief, punitive damages, and reasonable attorneys' fees and costs. (*E.g.*, Johnson Compl., Prayer for Relief, Case No. 3:17-cv-3429, Dkt. No. 1-2.) Some Plaintiffs also seek civil penalties "in the amount of two times [their] actual damages." (*E.g.*, Amato Compl., Prayer for Relief.)

VWGoA removed Plaintiffs' cases to federal court, in part on the basis of diversity subject-matter jurisdiction. (*E.g.*, Redman Notice of Removal, Case No. 3:17-cv-1196, Dkt. No. 1.) Plaintiffs responded by filing the ECF No. 3654 motion to remand.

## II. LEGAL STANDARD

A defendant who seeks to remove a case to federal court must file a notice of removal "containing a short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a). This "short and plain statement" requirement mirrors the one found in Rule 8(a)(1) of the Federal Rules of Civil Procedure, the general pleading rule for cases filed in federal court. The use of the same language is "[b]y design," the Supreme Court has explained: "Congress, by borrowing the familiar 'short and plain statement' standard from Rule 8(a), intended to 'simplify the "pleading" requirements for removal' and to clarify that courts should 'apply the same liberal rules to removal allegations that are applied to other matters of pleading.'" *Dart Cherokee Basin Operating Co. v. Owens*, 135 S. Ct. 547, 553 (2014) (quoting H.R. Rep. No. 100–889, at 71 (1988)).

Highlighting this symmetry, the Ninth Circuit explained in *Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014), that notices of removal, like complaints that are originally filed in federal court, must comply with the familiar *Twombly*/*Iqbal* pleading standard, and that jurisdictional challenges to removal should be resolved within the framework that governs motions to dismiss complaints for lack of subject-matter jurisdiction:

> Like plaintiffs pleading subject-matter jurisdiction under Rule 8(a)(1), a defendant seeking to remove an action may not offer mere

3

> legal conclusions; it must allege the underlying facts supporting each of the requirements for removal jurisdiction. A plaintiff who contests the existence of removal jurisdiction may file a motion to remand, *see* 28 U.S.C. § 1447(c), the functional equivalent of a defendant's motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1). As under Rule 12(b)(1), a plaintiff's motion to remand may raise either a facial attack or a factual attack on the defendant's jurisdictional allegations . . . .

*Leite*, 749 F.3d at 1122 (citation omitted).

The *Leite* court also summarized the rules governing facial and factual attacks to jurisdiction:

> A "facial" attack accepts the truth of the . . . allegations but asserts that they are insufficient on their face to invoke federal jurisdiction. The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the . . . allegations as true . . . , the court determines whether [they] are sufficient as a legal matter to invoke the court's jurisdiction.
>
> A "factual" attack, by contrast, contests the truth of the . . . factual allegations, usually by introducing evidence outside the pleadings. When the [party contesting jurisdiction] raises a factual attack, the [party asserting jurisdiction] must support her jurisdictional allegations with competent proof, under the same evidentiary standard that governs in the summary judgment context. The [party asserting jurisdiction] bears the burden of proving by a preponderance of the evidence that each of the requirements for subject-matter jurisdiction has been met.

*Id.* at 1121 (citations and internal quotation marks omitted).

One form of federal subject-matter jurisdiction, which is the only form considered in this Order, is diversity: district courts have subject-matter jurisdiction over civil cases where (1) the matter "is between . . . citizens of different States," and (2) the amount in controversy "exceeds the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332(a)(1). Consistent with the framework outlined above, "[t]he party seeking to invoke the district court's diversity jurisdiction always bears the burden of both pleading and proving diversity jurisdiction." *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 613-14 (9th Cir. 2016).

Subject-matter jurisdiction must exist when a case is first filed. A federal court that is considering whether it has jurisdiction on the basis of diversity must therefore consider "the state

4

of things at the time of the action brought." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473 (2007) (quoting *Mullan v. Torrance*, 9 Wheat. 537, 539 (1824)). This means examining whether the parties' citizenship was diverse and whether the amount in controversy exceeded $75,000 at the time the case was originally filed.

## III. DISCUSSION

VWGoA, as the removing party, bears the burden of demonstrating that this Court has diversity jurisdiction over the ECF No. 3654 cases. Whether VWGoA has satisfied that burden is considered next.

### A. Diversity of Citizenship

Diversity jurisdiction requires "complete diversity": "each plaintiff must be of a different citizenship from each defendant." *Grancare, LLC v. Mills ex rel. Thrower*, 889 F.3d 543, 548 (9th Cir. 2018). The rules governing citizenship differ for corporations and natural persons. A corporation is a citizen of its state of incorporation and of the state where it has its principal place of business. *See* 28 U.S.C. § 1332(c)(1). A natural person is a citizen in the state of her domicile, which is generally identified though "a compound of physical presence plus an intention to make a certain definite place one's permanent abode." *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001).

VWGoA's notices of removal in the ECF No. 3654 cases include citizenship allegations that mirror the following:

> Upon information and belief, [each] Plaintiff is a citizen and resident of California." (Compl. ¶ 2 ("Plaintiff, Heidi S. Amato, ('Plaintiff') is an individual residing in the City of San Diego, County of San Diego, State of California.").)
>
> VWGoA is incorporated under the laws of the state of New Jersey and maintains its headquarters and principal place of business in the state of Virginia. *See Kim v. Volkswagen Group of Am., Inc.*, 2013 WL 1283399 at *1 (N.D. Cal. Mar. 26, 2013) ("VWGoA is a New Jersey corporation with its principal place of business in Virginia.").
>
> . . . .

5

> Because Plaintiff is a citizen of California and VWGoA is a citizen of New Jersey and Virginia, there is complete diversity of citizenship in this action as required by § 1332(a).

(*E.g.*, Amato Notice of Removal ¶¶ 15-16, 18, MDL Dkt. No. 3654-4.)

Plaintiffs, in their motion to remand, have not contested the truth of these allegations. They have not asserted that they were citizens of a state other than California or that VWGoA was a citizen of states other than New Jersey and Virginia at the time the complaints were filed. Instead, Plaintiffs have made a facial challenge, arguing that the allegations of their citizenship are insufficient to invoke diversity jurisdiction. Specifically, they argue that the allegations of their citizenship are insufficient because "the only source of evidence of each Plaintiffs' citizenship" is "a paragraph from each Plaintiffs' complaint which states that each Plaintiff 'is an individual *residing* in' the State of California," and a person residing in a state is not necessarily *domiciled* there. (MDL Dkt. 3654 at 20-21 (emphasis added).)

Plaintiffs are correct that residence does not always equal domicile. Domicile requires residence plus "the intention to remain," or a lack of residence but the "inten[tion] to return." *Kanter*, 265 F.3d at 857. Thus, if one resides in California, but only temporarily and with the intent to return to another state (after a short-term job, school, etc.), one is not domiciled in California, and so is not a citizen of California. *See id.* ("A person residing in a given state is not necessarily domiciled there, and thus is not necessarily a citizen of that state.").

By focusing on the "source of evidence of [their] citizenship," however, Plaintiffs overstate what is required at this stage. VWGoA, as the removing party, need only provide "a short and plain statement of the grounds for removal," 28 U.S.C. § 1446(a), in which it "allege[s] the underlying facts supporting each of the requirements for removal jurisdiction," *Leite*, 749 F.3d at 1122. The requirement at issue here is complete diversity; and VWGoA has alleged the underlying facts supporting this requirement by alleging that it was a citizen of New Jersey and Virginia and that Plaintiffs were citizens of California when the complaints were filed. Plaintiffs have not cited to any authority that would require more than this to withstand a facial attack.

Even if additional factual allegations are required, beyond the allegations that Plaintiffs were citizens of California, VWGoA has provided such allegations by alleging that Plaintiffs

resided in California.  Although Plaintiffs correctly note that residence does not conclusively establish domicile, the Ninth Circuit has endorsed the "longstanding principle that 'the place where a person lives is taken to be his domicile until facts adduced establish to the contrary.'" *NewGen*, 840 F.3d at 614 (citing *Anderson v. Watts*, 138 U.S. 694, 706 (1891)).  No contrary facts have been offered by Plaintiffs here.  Thus, VWGoA's allegations that Plaintiffs resided in California are sufficient at this stage to establish that Plaintiffs were domiciled in and citizens of California when the complaints were filed.

The Ninth Circuit's decision in *Kanter* does not warrant a different conclusion.  The defendants' notice of removal there stated simply that the plaintiffs "were California residents," but did not include "any allegation regarding Plaintiffs' state citizenship." 265 F.3d at 857.  In affirming a decision that remanded the case to state court, the Ninth Circuit explained that the defendants' "failure to specify Plaintiffs' state citizenship was fatal to [their] assertion of diversity jurisdiction." *Id.* at 858.  Here, VWGoA's notices of removal do specify Plaintiffs' state citizenship: VWGoA explicitly alleged that each Plaintiff was "a citizen and resident of California." (*E.g.*, Amato Notice of Removal ¶ 15.)  What was lacking in *Kanter* is therefore present here.

The fact that VWGoA has based its allegations of Plaintiffs' citizenship on "information and belief" is also not a shortcoming.  "[W]hen information . . . necessary to establish diversity of citizenship is not reasonably available," the party with the burden of proving diversity "should be permitted to plead jurisdictional allegations . . . on information and belief." *Carolina Cas. Ins. Co. v. Team Equip., Inc.*, 741 F.3d 1082, 1088 (9th Cir. 2014).  The answer to the question of whether Plaintiffs had the intent to remain in California at the time they filed their complaints, a question of subjective intent that needs to be answered to definitively establish domicile and citizenship, is information that is not reasonably available at this stage in the proceedings.

The allegations in VWGoA's notices of removal are sufficient to support that Plaintiffs and VWGoA were citizens of different states when the complaints were filed.  The requirement of complete diversity is therefore satisfied.

**B.     Amount in Controversy**

When removal is based on diversity jurisdiction under 28 U.S.C. § 1332(a), the defendant bears the burden of establishing that the amount in controversy exceeds $75,000. Consistent with the pleading requirements outlined above, the Supreme Court has explained that "a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee*, 135 S. Ct. at 554. But when the plaintiff challenges the defendant's allegations of the amount in controversy, "[e]vidence establishing the amount is required." *Id.*; *see also Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015) (citing *Dart Cherokee* for the same proposition).[2]

Plaintiffs, in their motion to remand, have challenged VWGoA's amount-in-controversy allegations, and VWGoA has submitted evidence in support of its allegations in response. The Court therefore construes the ECF No. 3654 motion as making a factual attack on the amount in controversy and proceeds by considering whether a preponderance of the evidence supports that the $75,000 threshold has been passed. *See Leite*, 749 F.3d at 1121 (preponderance of the evidence standard applies to factual attacks on jurisdiction); *Ibarra*, 775 F.3d at 1197 (preponderance of the evidence standard applies "where, as here, defendant's assertion of the amount in controversy is contested by plaintiffs").

The evidence falls into three categories: proof of "actual damages" in dispute (a term used here as a shorthand not only for compensatory damages, but also for the value of the equitable remedies of rescission and restitution), proof of punitive damages in dispute, and proof of attorneys' fees in dispute. Each category is considered in turn below.[3]

---

[2] A further showing must be made if the complaint explicitly identifies the sum demanded and the defendant argues that a different sum is in controversy. *See* 28 U.S.C. § 1446(c)(2)(A)(ii). Because the ECF No. 3654 complaints do not demand specific sums, the Court does not consider that requirement here.

[3] While some Plaintiffs also seek civil penalties under the Song-Beverly Act, civil penalties are not available under Song-Beverly for "a claim based solely on a breach of an implied warranty," Cal. Civ. Code § 1794(c), which is the only type of warranty claim Plaintiffs bring. Because "a specific rule of law" makes civil penalties unavailable, the Court does not include them in the amount in controversy. *Pachinger v. MGM Grand Hotel-Las Vegas, Inc.*, 802 F.2d 362, 364 (9th Cir. 1986).

8

### 1. Actual Damages

VWGoA has offered evidence of the total amounts that Plaintiffs paid to buy and lease the cars. It contends that these amounts are an accurate measure of the actual damages in controversy.

Plaintiffs have not explicitly identified the amounts that they seek to recover in damages. But they have alleged that if VWGoA had not defrauded them, they "would not have purchased" the cars. (*E.g.*, Amato Compl. ¶ 100.) It is conceivable, given these allegations, that Plaintiffs will seek to recover damages equivalent to the full amounts that they paid to buy and lease the cars. (Plaintiffs have not asserted otherwise.) Further, Plaintiffs explicitly seek "rescission of the purchase contract and restitution of *all monies expended*," (*e.g.*, Amato Compl., Prayer for Relief (emphasis added)), a request that clearly puts the full amounts paid to buy and lease the cars in dispute.

The amount in controversy is "not a prospective assessment of [the] defendant's liability;" it is "simply an estimate of the total amount in dispute." *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010). By alleging that they would not have purchased the cars but for VWGoA's fraud, and by seeking rescission of the purchase contracts and restitution of all monies expended, Plaintiffs have put the total amounts that they paid to buy and lease the cars in controversy.

Contrary to an argument made by Plaintiffs, what VWGoA agreed to pay the owners and lessors of the same model cars in the 2.0-liter and 3.0-liter class action settlements, which this Court previously approved, is not an accurate proxy of the amounts in controversy in the ECF No. 3654 cases. Plaintiffs opted out of those settlements and, by now asking for the return of "all monies expended," seek more than what was offered by VWGoA in those settlements.

\* \* \*

The amounts that Plaintiffs paid to buy and lease the cars are generally not identified in the complaints. But the complaints do generally identify the makes, models, model years, and Vehicle Identification Numbers ("VINs") of the cars. (*See e.g.*, Amato Compl. ¶ 7 (alleging that Plaintiff "purchased a new 2012 Volkswagen Jetta TDI" and listing the VIN).) Using that

9

information, VWGoA contends that the amounts paid to buy and lease the cars can be reasonably estimated.

The estimates take some work because VWGoA reports that it does not have access to granular retail sales-price data for its cars. (Dealers negotiate the sales prices, and although dealers provide VWGoA with certain sales information—including customer names, customer contact information, VINs, and sales dates—the retail sales prices are apparently not reported.) (*See* Lytle Decl. ¶ 8, MDL Dkt. No. 4232-8.) Because VWGoA does not have access to sales-price data, it hired Jay R. Lytle, an Analytical Services Manager at Urban Science Applications, Inc., to estimate the amounts that Plaintiffs paid to buy and lease the cars. Mr. Lytle states that Urban Science performs consulting work for car manufacturers and that his work "regularly involves analyzing vehicle pricing, including prices paid by consumers for new and used vehicles." (*Id.* ¶¶ 4-5.)

Mr. Lytle's declaration describes his methodology in detail. In short, for cars that were purchased new or leased, he used the information Plaintiffs provided (*e.g.*, vehicle models, model years, and VIN numbers), industry guides (*e.g.*, Kelley Blue Book and TRUECar), and a discounted version of the Manufacturer's Suggested Retail Price for the same model cars to estimate the original purchase prices and the total amount of lease payments. (*See id.* ¶¶ 13-22.) To estimate the prices paid for used cars, he used the information Plaintiffs provided and the NADA Guides' Clean Trade-In Values. (*See id.* ¶¶ 23-24.)

Mr. Lytle's estimates can be found in Exhibits A, B, and C to his declaration. (*See* MDL Dkt. No. 5834-3.) Of the 33 cars that are at issue in the ECF No. 3654 cases, 26 were purchased new, and Mr. Lytle's purchase price estimates for those cars range from $22,339 to $71,739. Of the other 7 cars at issue, 4 were purchased used and 3 were leased. Mr. Lytle's purchase price estimates for the used cars range from $10,250 to $18,500; his estimates of the total lease payments for the leased cars range from $15,081 to $18,522.

Plaintiffs have not challenged the accuracy of Mr. Lytle's numbers; they have not, for example, offered evidence to support that they paid materially different amounts for the cars in question. This fact suggests that Mr. Lytle has made reasonably accurate calculations. Mr.

10

Lytle's methodology also appears sensible: he used the vehicle-specific information that Plaintiffs provided in their complaints and respected market metrics and resources, and he explained in detail how he arrived at his estimates.

Plaintiffs have put the full amounts that they paid to buy and lease the cars in dispute, and Mr. Lytle's estimates serve as a sufficient proxy of those amounts. Based on Mr. Lytle's estimates, the actual damages in controversy range from **$10,250** to **$71,739** per case.

### 2. Punitive Damages

"It is well established that punitive damages are part of the amount in controversy in a civil action." *Gibson v. Chrysler Corp.*, 261 F.3d 927, 945 (9th Cir. 2001) (citing *Bell v. Preferred Life Assur. Soc'y*, 320 U.S. 238, 240 (1943); *Goldberg v. CPC Int'l, Inc.*, 678 F.2d 1365, 1367 (9th Cir. 1982)). Before they may be included, however, two steps must generally be taken. First, the party asserting jurisdiction must establish that punitive damages would be permitted under the applicable state law based on the conduct alleged. *See Davenport v. Mut. Ben. Health & Accident Ass'n*, 325 F.2d 785, 787 (9th Cir. 1963) (noting that exemplary damages should not be included in the amount in controversy "if under the applicable state law [they] would be legally impossible to recover"). Second, if punitive damages are allowed under state law, the amount of punitive damages that are in controversy must be determined. To do so, "[the] party asserting federal diversity jurisdiction may introduce evidence of jury verdicts in cases involving analogous facts." *Surber v. Reliance Nat. Indem. Co.*, 110 F. Supp. 2d 1227, 1232 (N.D. Cal. 2000).

Under the circumstances alleged here, punitive damages would be permitted under California law. "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice," California permits punitive damages. Cal. Civ. Code § 3294(a). Taking the allegations as true, this standard is satisfied here. Plaintiffs allege that VWGoA represented to them that its TDI diesel-engine cars were environmentally friendly, when in fact VWGoA knew that the cars utilized software to evade emissions testing and emitted nitrogen oxides at levels far exceeding the legal limits. (*E.g.*, Amato Compl. ¶¶ 11-14, 35-36, 77-79.) This amounts to fraudulent conduct.

11

As for the amount of punitive damages in controversy, VWGoA has offered evidence of jury verdicts in three cases that it asserts involved facts analogous to those here. The first of these cases is *Johnson v. Ford Motor Company*, 113 P.3d 82 (Cal. 2005), where the plaintiffs sued Ford for concealing that a used car it had sold them had a history of transmission repairs and replacements. *Id.* at 85. Evidence supported that Ford had engaged in similar conduct "in some number of cases in addition to plaintiffs' own, perhaps a large number of other cases." *Id.* at 96. The jury awarded $10 million in punitive damages against Ford, but the California Supreme Court concluded that the award was inconsistent with due process. On remand, the Court of Appeal affirmed a punitive damages award of $175,000, which was just less than 10 times the compensatory damages award. *See Johnson v. Ford Motor Co.*, 135 Cal. App. 4th 137, 150 (2005).

VWGoA next points to *Chrysler Corporation v. Schiffer*, 736 So. 2d 538 (Ala. 1999). The plaintiff there purchased a truck that Chrysler had represented was new but that in fact had been damaged, repaired, and repainted. *Id.* at 540, 546. Finding for the plaintiff, the jury awarded $50,000 in compensatory damages and $325,000 in punitive damages. *Id.* at 540. The Alabama Supreme Court affirmed on the condition that the plaintiff agree to accept a reduced punitive damages award of $150,000, a 3:1 multiple of compensatory damages. *Id.* at 549.

Lastly, VWGoA cites to *BMW of North America, Inc. v. Gore* ("*BMW II*"), 701 So. 2d 507 (Ala. 1997). The plaintiff there alleged that BMW failed to disclose that the car it sold him had been damaged by acid rain during its shipment from Germany and had subsequently been repainted. *Id.* at 508. Evidence at trial supported that BMW had a nationwide policy of not disclosing pre-delivery damage when the cost of repairs did not exceed three percent of the car's suggested retail price, a practice that was illegal in some states but not in others. *See id.* at 509; *see also BMW of N. Am., Inc. v. Gore* ("*BMW I*"), 646 So. 2d 619, 627 n.6 (Ala. 1994). The jury found for the plaintiff and awarded $4,000 in compensatory damages and $4 million in punitive damages. *BMW II*, 701 So. 2d at 509. On appeal, the U.S. Supreme Court held that the $4 million punitive damages award (and even a reduced punitive damages award of $2 million that was entered by the Alabama Supreme Court) was excessive and violated due process. *See BMW of*

*N.A., Inc. v. Gore*, 517 U.S. 559, 562-63, 585-86 (1996). The Alabama Supreme Court, on remand, entered an order requiring the plaintiff to accept a reduced punitive damages award of $50,000, a 12:1 multiple of compensatory damages. *BMW II*, 701 So. 2d at 515.

Based on the awards in *Johnson*, *Schiffer*, and *Gore*, VWGoA argues that a conservative estimate of the punitive damages in controversy in each of the ECF No. 3654 cases is $50,000. That was the amount awarded in *Gore*, and it was the lowest award in the three sample cases. For 29 of the 33 cases at issue here, $50,000 in punitive damages would be less than a 3:1 multiple of the estimated actual damages, while the ratios would span from just above 3:1 to just below 5:1 for the other 4 cases. All of these multiples are within the range of those permitted in *Johnson*, *Schiffer*, and *Gore*.

Fraudulent conduct comes in many forms, and it is almost always possible to draw distinctions between the facts of one fraud and another. But when *Johnson*, *Schiffer*, and *Gore* are stripped to their essentials, they offer reasonable comparisons to this case. Each involved a global car manufacturer that deceived its customers about the characteristics of its cars. And in *Johnson* and (to a lesser degree) in *Gore*, evidence also supported that the deceit was part of a pattern of fraudulent business practices, as is alleged here.

At this stage, the question is whether at least $50,000 in punitive damages is at stake in each of the cases. Given the facts alleged and the amounts of punitive damages awarded in comparable cases, it is clear that the answer to this question is yes.

At least **$50,000** in punitive damages is at stake in each of the ECF No. 3654 cases.

**3.     Attorneys' Fees**

When state law "authorizes an award of attorneys' fees, either with mandatory or discretionary language, such fees may be included in the amount in controversy." *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1156 (9th Cir. 1998). Until recently, it was an "open question [in this circuit] whether attorney's fees that [were] anticipated but unaccrued at the time of removal or filing in federal court . . . [could] be included in the amount-in-controversy." *Gonzales v. CarMax Auto Superstores, LLC*, 840 F.3d 644, 649 n.2 (9th Cir. 2016). That question was resolved, and answered affirmatively, last year:

13

United States District Court
Northern District of California

> As explained in *Chavez* [*v. JPMorgan Chase & Co.*, 888 F.3d 413 (9th Cir. 2018)], when we assess the amount in controversy at the time of removal, we must include all relief to which a plaintiff is entitled if the action succeeds. 888 F.3d at 418. Accordingly, if the law entitles the plaintiff to future attorneys' fees if the action succeeds, "then there is no question that future [attorneys' fees] are 'at stake' in the litigation," *id.* at 417, and the defendant may attempt to prove that future attorneys' fees should be included in the amount in controversy.

*Fritsch v. Swift Transp. Co. of Ariz., LLC*, 899 F.3d 785, 794 (9th Cir. 2018) (second alteration in original).

If Plaintiffs prevail on either their CLRA or Song-Beverly Act claims, they may obtain attorneys' fees. *See* Cal. Civ. Code § 1780(e) ("The court shall award . . . attorney's fees to a prevailing plaintiff in litigation filed pursuant to [the CLRA]."); Cal. Civ. Code § 1794(d) ("If the buyer prevails in an action under [Song-Beverly], the buyer shall be allowed by the court to recover as part of the judgment . . . attorney's fees based on actual time expended . . . ."). Attorneys' fees are therefore "'at stake' in the litigation." *Fritsch*, 899 F.3d at 794 (quoting *Chavez*, 888 F.3d at 417).

To determine the amount of attorneys' fees at stake, the removing party can provide an "estimate[] [of] the amount of time that the case will require," and an estimate of "plaintiff's counsel's hourly billing rate." *Surber*, 110 F. Supp. 2d at 1232. VWGoA has offered the following evidence of this type here.

To estimate Plaintiffs' counsel's hourly billing rate, VWGoA has identified motions that counsel previously filed in this MDL that list counsel's hourly rates. For a partner and an associate who were responsible for Plaintiffs' cases when the ECF No. 3654 motion to remand was filed, those rates are respectively listed as $750 and $350 per hour. (*See, e.g.*, Lebovits Decl. ¶ 3, Nikfarjam Decl. ¶ 3, MDL Dkt. Nos. 3631-3, -5.) In VWGoA's calculations, it has used the associate rate to be conservative.[4]

---

[4] VWGoA points to ECF No. 3601 as an example of a motion that lists counsel's hourly rates. (*See* Opp'n, MDL Dkt. No. 4232 at 57 (citing ECF No. 3601).) That citation appears to be an error, as ECF No. 3601 is a notice of change in counsel for different plaintiffs and involving

14

To estimate the number of hours that Plaintiffs' counsel will spend litigating the ECF No. 3654 cases, VWGoA reviewed 34 "Lemon Law" cases that resulted in awards of attorneys' fees and expenses. Some of those cases settled; others went to trial. (*See* MDL Dkt. No. 4232-5, App. D (listing cases).) The number of hours that plaintiffs' counsel spent litigating these cases was often not disclosed, but VWGoA performed the following calculations to reach an average number of 201.6 hours per case:

> First, [VWGoA] separated attorneys' fees from attorneys' expenses in the 34 listed Lemon Law cases. Out of the total award of attorneys' fees and expenses, on average, 87.1% of the award was attributable to attorneys' fees and 12.9% was attributable to expenses. Therefore, to estimate the average amount of attorneys' fees in these cases (not including attorneys' expenses), [VWGoA] took 87.1% of $92,583.63 [with $92,583.63 reflecting the average total award of attorneys' fees and expenses]: [the result was] $80,640.34.
>
> Second, [VWGoA] used this estimate of the attorneys' fee awards to determine the average number of attorney hours for which fees were awarded in these 34 cases (given that the number of hours were not disclosed or readily available for many cases). [VWGoA] divided $80,640.34 by an inflated billing rate of $400/hour. The result is an estimate of the number of hours for which attorneys were awarded fees, on average, in these cases: 201.6 hours.

(Opp'n, MDL Dkt. No. 4232 at 58 (footnote omitted).)

Multiplying the estimated hourly rate of $350 by 201.6 hours, VWGoA has estimated that $70,560 in attorneys' fees are in controversy in each of the ECF No. 3654 cases.

Plaintiffs have not challenged VWGoA's estimates, and the methodology used strikes the Court as generally reasonable. The estimated hourly rate is supported by evidence, and the lemon-law cases that VWGoA has identified serve as reasonable comparisons to this case, as Plaintiffs' implied warranty claim under the Song-Beverly Act is effectively a lemon-law claim. *See Jensen v. BMW of N. Am., Inc.*, 35 Cal. App. 4th 112, 130 (1995) (referring to the Song-Beverly Act as a "Lemon Law"). Although Plaintiffs also bring fraud claims here, the need to prove fraud in

---

different counsel. The hourly rates that VWGoA has identified, however, are listed in other motions that have been filed in the MDL, including ECF No. 3631, the motion cited above.

15

addition to a lemon-law violation, if anything, may increase the number of hours counsel spends litigating.

The Court's only concern with VWGoA's estimates is that they do not take into account that Plaintiffs' counsel is litigating dozens of cases against VWGoA that are based on the same core allegations, and it is likely that certain efficiencies will be realized. For example, any evidence that counsel gathers to support that VWGoA used emissions-cheating software will likely be used in all of the ECF No. 3654 cases.

To be sure, even with such efficiencies, Plaintiffs' counsel could easily spend at least 201.6 hours litigating each case. At a minimum, each Plaintiff will likely need to be deposed. And if the cases proceed to trial, separate trials may be required (if the cases remain unconsolidated) and there may be Plaintiff-specific damages issues.

To be conservative and to reflect possible economies of scale, however, the Court will only include 100.8 hours in the estimate for each of the ECF No. 3654 cases, which is half of the hours that VWGoA has estimated. The reduced number reflects that there are likely to be efficiencies in litigating many similar cases, but that these efficiencies will not reduce the time spent litigating each case to zero.

Multiplying 100.8 hours by the hourly rate of $350 leads to an estimate of **$35,280** in attorneys' fees per case. At least that amount of attorneys' fees is reasonably in controversy in each of the ECF No. 3654 cases.[5]

### 4. Total Amount in Controversy

When $50,000 in punitive damages is added to $35,280 in attorneys' fees, the combined amount exceeds $75,000. And when actual damages are also added, the amounts in controversy for the ECF No. 3654 cases range from **$95,530** to **$157,019**. Section 1332(a)'s amount-in-controversy requirement is satisfied.

---

[5] VWGoA has also provided an estimate of costs for each of the ECF No. 3654 cases, but costs cannot be included in amount-in-controversy calculations. *See* 28 U.S.C. § 1332(a) (requiring that the amount in controversy "exceed[] the sum or value of $75,000, *exclusive of interests and costs*") (emphasis added).

16

## IV. CONCLUSION

VWGoA has plausibly alleged that there is complete diversity of citizenship between it and Plaintiffs, and a preponderance of the evidence supports that the amount-in-controversy requirement is met. The Court therefore concludes that it has diversity subject-matter jurisdiction over the ECF No. 3654 cases and DENIES the motion to remand.

**IT IS SO ORDERED.**

Dated: February 19, 2019

CHARLES R. BREYER
United States District Judge