United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION

This Order Relates To:
MDL Dkt. No. 3621

MDL No. 2672 CRB (JSC)

**ORDER DENYING MOTION TO REMAND**

Around 575,000 people who owned or leased a Volkswagen, Audi, or Porsche "clean diesel" car previously agreed to participate in one of two Court-approved class action settlements with these car makers. Rather than participate in those settlements, approximately 4,000 people instead chose to opt out of them. Some of these opt outs filed their own cases against the car makers in state court, and many of those cases were later removed to federal court by the defendants and transferred to this Court as part of the above-captioned MDL.

Whether there was a basis for removal has been contested, and more than 60 motions to remand, covering several hundred opt-out cases, were filed in this Court. This Order addresses one of those motions, ECF No. 3621. When it was filed, the ECF No. 3621 motion covered 41 separate cases. Each had been filed in Colorado state court, by counsel at the law firm of Hyde and Swigart, and then removed by Volkswagen Group of America, Inc. ("VWGoA"). Many of the cases have since been voluntarily dismissed; only nine remain outstanding.[1]

VWGoA removed the ECF No. 3621 cases on the basis of both federal question and diversity subject-matter jurisdiction. Plaintiffs, in their motion to remand, have argued that neither form of jurisdiction is present. The Court considers at this time only whether it has jurisdiction on the basis of diversity. Concluding that it does, it DENIES the ECF No. 3621 motion to remand.

---

[1] The nine remaining cases are listed in the Appendix at the end of this Order.

## I. BACKGROUND

Each of the ECF No. 3621 cases was filed by either an individual or a couple who bought or leased a Volkswagen TDI diesel-engine car. The general factual allegations in the cases are the same. Plaintiffs allege that they purchased the cars at Colorado-based dealerships, and that prior to doing so, they read the window stickers attached to the cars, which advertised that the cars offered "good clean diesel fun." (*E.g.*, Lehmann Compl. ¶ 8, Case No. 3:16-cv-4466, Dkt. No. 1-1.) Plaintiffs also allege that VWGoA and Volkswagen AG ("VW AG"), collectively referred to here as "VW," represented to them that the cars would emit 25 percent fewer emissions than comparable gasoline-powered cars, and that the cars were 90 percent cleaner than pervious diesel cars. (*Id.* ¶¶ 8, 14.)

In fact, the cars did not have low emissions. (*Id.* ¶¶ 8-10.) And not only were their emissions higher than represented, but VW knew this. (*Id.*) VW knew that the cars could not perform as promised and had specifically developed and installed software in them that detected and evaded emissions testing. (*Id.*) During testing, the cars appeared to satisfy governing emission standards; but when the cars were on the road, they emitted nitrogen oxides at up to 40 times the legal limits. (*Id.* ¶¶ 8, 10.) In September 2015, in response to state and federal investigations, VW admitted that it had equipped its TDI-diesel engine cars with emissions-cheating software, and that it had been doing so since 2009. (*Id.* ¶¶ 9, 15.)

The ECF No. 3621 complaints each include two to three state-law claims against VWGoA and VW AG. All of the complaints include a breach of warranty claim, under Colorado's version of the Uniform Commercial Code, and a claim for violation of Colorado's Consumer Protection Act ("CCPA"). (*E.g.*, Kehl Compl., Case No. 3:16-cv-5772, Dkt. No. 1-1.) Some of the complaints also include a claim for common law fraud. (*E.g.*, Aukerman Compl., Case No. 3:17-cv-4008, Dkt. No. 1-1.)

Plaintiffs seek remedies which include "reimbursement of the purchase price paid for the subject vehicle[s]," "rescission and repurchase of the subject vehicle[s] and any incidental, consequential, actual, statutory, and punitive damages totaling $74,000," and reasonable attorneys' fees and costs. (*E.g.*, Lehmann Compl. ¶ 40, Prayer for Relief.)

2

VWGoA removed Plaintiffs' cases to federal court, in part on the basis of diversity subject-matter jurisdiction. (*E.g.*, Harvey Notice of Removal, Case No. 3:16-cv-5348, Dkt. No. 1.) VW AG apparently was not served and did not join the notices of removal. Plaintiffs responded by filing the ECF No. 3621 motion to remand.

## II. LEGAL STANDARD

A defendant who seeks to remove a case to federal court must file a notice of removal "containing a short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a). This "short and plain statement" requirement mirrors the one found in Rule 8(a)(1) of the Federal Rules of Civil Procedure, the general pleading rule for cases filed in federal court. The use of the same language is "[b]y design," the Supreme Court has explained: "Congress, by borrowing the familiar 'short and plain statement' standard from Rule 8(a), intended to 'simplify the "pleading" requirements for removal' and to clarify that courts should 'apply the same liberal rules to removal allegations that are applied to other matters of pleading.'" *Dart Cherokee Basin Operating Co. v. Owens*, 135 S. Ct. 547, 553 (2014) (quoting H.R. Rep. No. 100–889, at 71 (1988)).

Highlighting this symmetry, the Ninth Circuit explained in *Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014), that notices of removal, like complaints that are originally filed in federal court, must comply with the familiar *Twombly*/*Iqbal* pleading standard, and that jurisdictional challenges to removal should be resolved within the framework that governs motions to dismiss complaints for lack of subject-matter jurisdiction:

> Like plaintiffs pleading subject-matter jurisdiction under Rule 8(a)(1), a defendant seeking to remove an action may not offer mere legal conclusions; it must allege the underlying facts supporting each of the requirements for removal jurisdiction. A plaintiff who contests the existence of removal jurisdiction may file a motion to remand, *see* 28 U.S.C. § 1447(c), the functional equivalent of a defendant's motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1). As under Rule 12(b)(1), a plaintiff's motion to remand may raise either a facial attack or a factual attack on the defendant's jurisdictional allegations . . . .

*Leite*, 749 F.3d at 1122 (citation omitted).

The *Leite* court also summarized the rules governing facial and factual attacks to jurisdiction:

> A "facial" attack accepts the truth of the . . . allegations but asserts that they are insufficient on their face to invoke federal jurisdiction. The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the . . . allegations as true . . . , the court determines whether [they] are sufficient as a legal matter to invoke the court's jurisdiction.
>
> A "factual" attack, by contrast, contests the truth of the . . . factual allegations, usually by introducing evidence outside the pleadings. When the [party contesting jurisdiction] raises a factual attack, the [party asserting jurisdiction] must support her jurisdictional allegations with competent proof, under the same evidentiary standard that governs in the summary judgment context. The [party asserting jurisdiction] bears the burden of proving by a preponderance of the evidence that each of the requirements for subject-matter jurisdiction has been met.

*Id.* at 1121 (citations and internal quotation marks omitted).

One form of federal subject-matter jurisdiction, which is the only form considered in this Order, is diversity: district courts have subject-matter jurisdiction over civil cases where (1) the matter "is between . . . citizens of different States . . . [or between] citizens of a State and citizens or subjects of a foreign state," and (2) the amount in controversy "exceeds the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332(a)(1)–(2). Consistent with the framework outlined above, "[t]he party seeking to invoke the district court's diversity jurisdiction always bears the burden of both pleading and proving diversity jurisdiction." *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 613-14 (9th Cir. 2016).

Subject-matter jurisdiction must exist when a case is first filed. A federal court that is considering whether it has jurisdiction on the basis of diversity must therefore consider "the state of things at the time of the action brought." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473 (2007) (quoting *Mullan v. Torrance*, 9 Wheat. 537, 539 (1824)). This means examining whether the parties' citizenship was diverse and whether the amount in controversy exceeded $75,000 at the time the case was originally filed.

4

**III. DISCUSSION**

VWGoA, as the removing party, bears the burden of demonstrating that this Court has diversity jurisdiction over the ECF No. 3621 cases. Whether VWGoA has satisfied that burden is considered next.

**A.   Diversity of Citizenship**

Diversity jurisdiction requires "complete diversity": "each plaintiff must be of a different citizenship from each defendant." *Grancare, LLC v. Mills ex rel. Thrower*, 889 F.3d 543, 548 (9th Cir. 2018). The rules governing citizenship differ for corporations and natural persons. A corporation is a citizen of the state or foreign state where it is incorporated and of the state or foreign state where it has its principal place of business. *See* 28 U.S.C. § 1332(c)(1). A natural person is a citizen of the state of her domicile, which is generally identified though "a compound of physical presence plus an intention to make a certain definite place one's permanent abode." *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001).

VWGoA's notices of removal in the ECF No. 3621 cases include citizenship allegations that mirror the following:

> Plaintiff is a Colorado citizen. (Compl. ¶ 2.)
>
> . . . .
>
> VWGoA is incorporated under the laws of the state of New Jersey and maintains its headquarters and principal place of business in the state of Virginia, making VWGoA a citizen of both New Jersey and Virginia within the meaning of section 1332.
>
> Defendant Volkswagen AG . . . is a publicly-held German corporation with its principal place of business located in Germany. As such, Volkswagen AG is a citizen of Germany.
>
> . . . .
>
> Accordingly, the parties are citizens of different states.

(*E.g.*, Lehmann Notice of Removal ¶¶ 19, 21-22, 24, Case No. 3:16-cv-4466, Dkt. No. 1.)

Plaintiffs have not contested the truth of these allegations, nor have they argued that the allegations are insufficient. In other words, they have not made a facial or factual attack on VWGoA's citizenship allegations. The Court nevertheless considers the sufficiency of the allegations because it has an independent obligation to examine its subject-matter jurisdiction. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).

VWGoA, as the removing party, need only provide "a short and plain statement of the grounds for removal," 28 U.S.C. § 1446(a), in which it "allege[s] the underlying facts supporting each of the requirements for removal jurisdiction," *Leite*, 749 F.3d at 1122. The requirement at issue here is complete diversity; and VWGoA has alleged the underlying facts supporting this requirement by alleging that, when the complaints were filed, VWGoA was a citizen of New Jersey and Virginia, VW AG was a citizen of Germany, and Plaintiffs were citizens of Colorado. These allegations are sufficient to support that Plaintiffs and Defendants were citizens of different states when the cases began. The requirement of complete diversity is therefore satisfied.

## B. Amount in Controversy

When removal is based on diversity jurisdiction under 28 U.S.C. § 1332(a), the defendant bears the burden of establishing that the amount in controversy exceeds $75,000. Consistent with the pleading requirements outlined above, the Supreme Court has explained that "a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee*, 135 S. Ct. at 554. But when the plaintiff challenges the defendant's allegations of the amount in controversy, "[e]vidence establishing the amount is required." *Id.*; *see also Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015) (citing *Dart Cherokee* for the same proposition).

Plaintiffs, in their motion to remand, have challenged VWGoA's amount-in-controversy allegations, and VWGoA, in response, has submitted evidence in support of its allegations. The Court therefore construes the ECF No. 3621 motion as making a factual attack on the amount in controversy.

Before VWGoA's evidence may be considered, however, a preliminary issue must be addressed. Plaintiffs, in their complaints, have stated that they seek "rescission and repurchase of

6

the subject vehicle[s] and any incidental, consequential, actual, statutory, and punitive damages totaling $74,000." (*E.g.*, Lehmann Compl., Prayer for Relief.) Plaintiffs assert that these demands for less than $75,000 should control and that no further evidence of the amount in controversy should be considered.

For two reasons, Plaintiffs' demands do not control. First, as framed, Plaintiffs' demands apply only to the remedies of rescission and damages. But the amount in controversy also includes attorneys' fees, *see Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1156 (9th Cir. 1998), which Plaintiffs have specifically put in dispute. (*See, e.g.*, Lehmann Compl., Prayer for Relief (requesting "reasonable attorneys' fees and costs of suit as specified under C.R.S. 6–1–113(2)(b)").) Under Plaintiffs' formulation, if they each sought $74,000 in damages and $20,000 in attorneys' fees, they would be within the bounds of what they demanded, yet the total amounts in dispute would clearly exceed the $75,000 amount-in-controversy requirement. Because Plaintiffs' demands for $74,000 do not take into account all forms of relief that they have requested, they do not set a ceiling on the amounts in controversy.

Second, even if Plaintiffs had explicitly demanded *judgments* not to exceed $74,000—a demand that would cover all forms of relief, including attorneys' fees—those demands would not control. When a complaint explicitly identifies the sum demanded and the defendant argues that a different sum is in controversy, the sum demanded will control unless it is established that the state where the action was first filed "either does not permit demand for a specific sum or permits recovery of damages in excess of the amount demanded." 28 U.S.C. § 1446(c)(2)(A)(ii).

Colorado "does not permit demand for a specific sum," and, to the extent a sum is demanded anyway, Colorado "permits recovery of damages in excess of the amount demanded." *Id. See* Colo. R. Civ. P. 8(a) (stating that "[n]o dollar amount shall be stated in the prayer or demand for relief"); *Township Homeowners Ass'n v. Arapahoe Roofing and Sheet Metal Co.*, 844 P.2d 1316, 1318 (Colo. App. 1992) (interpreting Colorado Rule of Civil Procedure 54(c) as "specifically direct[ing] the court to grant the relief to which the claimant 'is entitled' even if the party has not demanded such relief in his pleadings"). Given Colorado's practice, Plaintiffs'

7

demands for specific sums, even if they are interpreted as capping all forms of relief, are not binding. VWGoA's evidence of the amounts in controversy may therefore be considered.

The evidence of the amounts in dispute falls into four categories: "actual damages" (a term used here as a shorthand not only for compensatory damages, but also for the value of the equitable remedy of rescission), civil penalties, punitive damages, and attorneys' fees. Each category is considered in turn below.

In considering the evidence, the Court must determine whether a preponderance of it supports that the $75,000 threshold has been passed. *See Leite*, 749 F.3d at 1121 (preponderance of the evidence standard applies to factual attacks on jurisdiction); *Ibarra*, 775 F.3d at 1197 (preponderance of the evidence standard applies "where, as here, defendant's assertion of the amount in controversy is contested by plaintiffs").

### 1. Actual Damages

VWGoA has offered evidence of the total amounts that Plaintiffs paid to buy and lease the cars. It contends that these amounts are an accurate measure of the actual damages in controversy.

Plaintiffs have indeed put the full amounts that they paid for the cars in controversy. Among other things, they seek "reimbursement of the purchase price[s] paid for the subject vehicle[s]," and "rescission and repurchase of the subject vehicle[s]." (*E.g.*, Lehmann Compl. ¶ 40, Prayer for Relief.) Whether Plaintiffs will be able to recover what they seek is a different question and is currently irrelevant. The amount in controversy is "not a prospective assessment of [the] defendant's liability;" it is "simply an estimate of the total amount in dispute." *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010). Plaintiffs, by seeking rescission and reimbursement of the purchase prices of the cars in question, have clearly put the full amounts that they paid to buy and lease the cars in dispute.

Contrary to an argument made by Plaintiffs, what VW agreed to pay the owners and lessors of the same model cars in the 2.0-liter and 3.0-liter class action settlements, which this Court previously approved, is not an accurate proxy of the amounts in controversy in the ECF No. 3621 cases. Plaintiffs opted out of those settlements and, by seeking the full amounts that they paid to buy and lease the cars, they seek more than what was offered by VW in those settlements.

8

Similarly, individual offers that VW has made to settle the opt-out cases are not relevant because they do not indicate the full amounts in dispute; if they did, one would expect Plaintiffs to accept those offers and voluntarily dismiss their cases.

\* \* \*

The amounts that Plaintiffs paid to buy and lease the cars are generally not identified in the complaints. But the complaints do generally identify the makes, models, model years, and Vehicle Identification Numbers ("VINs") of the cars. (*See e.g.*, Lehmann Compl. ¶ 8 (alleging that Plaintiff "purchased or leased a 2013 Volkswagen Jetta TDI" and listing the VIN).) Using that information, VWGoA contends that the amounts paid to buy and lease the cars can be reasonably estimated.

The estimates take some work because VWGoA reports that it does not have access to granular retail sales-price data for its cars. (Dealers negotiate the sales prices, and although dealers provide VWGoA with certainسales information—including customer names, customer contact information, VINs, and sales dates—the retail sales prices are apparently not reported.) (*See* Lytle Decl. ¶ 8, MDL Dkt. No. 4232-8.) Because VWGoA does not have access to sales-price data, it hired Jay R. Lytle, an Analytical Services Manager at Urban Science Applications, Inc., to estimate the amounts that Plaintiffs paid to buy and lease the cars. Mr. Lytle states that Urban Science performs consulting work for car manufacturers and that his work "regularly involves analyzing vehicle pricing, including prices paid by consumers for new and used vehicles." (*Id.* ¶¶ 4-5.)

Mr. Lytle's declaration describes his methodology in detail. In short, he first used the VINs that Plaintiffs provided, as well as VWGoA's retail-sales data, to determine if the cars were purchased new, purchased used, or leased. (*Id.* ¶ 10.) For cars that were purchased new or leased, he then used industry guides (*e.g.*, Kelley Blue Book and TRUECar) and a discounted version of the Manufacturer's Suggested Retail Price for the same model cars to estimate the original purchase prices and the total amount of lease payments. (*See id.* ¶¶ 13-22.) To estimate the prices paid for used cars, he used the NADA Guides' Clean Trade-In Values. (*See id.* ¶¶ 23-24.)

9

Mr. Lytle's estimates can be found in Exhibits A, B, and C to his declaration. (*See* MDL Dkt. No. 5834-3.) Of the nine cars that remain at issue in the ECF No. 3621 cases, seven were purchased new, and Mr. Lytle's purchase price estimates for those cars range from $22,647 to $31,327. With respect to the other two cars, one was purchased used and one was leased. Mr. Lytle's purchase price estimate for the used car is $21,000; his estimate of the total lease payments for the leased car is $18,358.

Plaintiffs have not challenged the accuracy of Mr. Lytle's numbers; they have not, for example, offered evidence to support that they paid materially different amounts for the cars in question. Yet they have objected to Mr. Lytle's declaration and the accompanying exhibits on grounds of relevance, failure to authenticate, and hearsay. (*See* MDL Dkt. No. 4490-10, Turnage Decl. ¶¶ 3-7.)

The objections are not meritorious. The exhibits to Mr. Lytle's declaration, which track and support his analysis, are clearly relevant. Mr. Lytle himself has declared what the exhibits are—e.g., his calculations, Kelly Blue Book prices, and VWGoA sales data—which is sufficient to authenticate them. *See* Fed. R. Evid. 901(b)(1) (explaining that evidence can be authenticated by "[t]estimony that an item is what it is claimed to be"). And the facts and data that Mr. Lytle has relied on are the type that "experts in the particular field" would use, Fed. R. Evid. 703, so even if these facts and data constitute hearsay, Mr. Lytle may offer opinions based on them, *see United States v. Vera*, 770 F.3d 1232, 1237 (9th Cir. 2014).

The fact that Plaintiffs have not challenged the accuracy of Mr. Lytle's numbers suggests that he has made reasonably accurate calculations. Mr. Lytle's methodology also appears sensible: he used the vehicle-specific information that Plaintiffs provided in their complaints and respected market metrics and resources, and he explained in detail how he arrived at his estimates. Plaintiffs have put the full amounts that they paid to buy and lease the cars in dispute, and Mr. Lytle's estimates serve as a sufficient proxy of those amounts. Based on Mr. Lytle's estimates, the actual damages in controversy range from **$18,358** to **$31,327** per case.

### 2. Civil Penalties

Each of the ECF No. 3621 complaints includes a claim for violation of the CCPA. When there is clear and convincing evidence that a person has violated the CCPA by engaging in "bad faith conduct," which is defined as "fraudulent, willful, knowing, or intentional conduct that causes injury," the Act permits recovery of "[t]hree times the amount of actual damages sustained." Colo. Rev. Stat. § 6–1–113(2)(a)(iii), (2.3).

Based on the allegations, VWGoA asserts that this treble-damages remedy could be available. Plaintiffs do not disagree, but they contend that the trebling should not be of the full amount that they paid to buy and lease the cars, but of some unidentified lesser amount. This is because their request for rescission, which clearly put the full amounts that they paid for the cars in dispute, is tied only to their warranty claims, and they note (correctly) that the CCPA only permits the trebling of damages that are specifically attributable to a CCPA claim. *See Walter v. Hall*, 940 P.2d 991, 1000 (Colo. App. 1996) (explaining that "if some portion of the award of damages [was] attributable to [a] trespass claim, then only the remaining amount of actual damages could be trebled for the CCPA claim"), *aff'd* 969 P.2d 224 (Colo. 1998).

Plaintiffs' argument raises this question: What amounts of CCPA damages are in controversy? A common measure of damages under state consumer protection acts is the difference between the value of a product as promised and the value of the product received. *See, e.g.*, *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1122 (C.D. Cal. 2015) (California's Consumer Legal Remedies Act); *Gastaldi v. Sunvest Resort Cmtys., LC*, 709 F. Supp. 2d 1299, 1304 (S.D. Fla. 2010) (Florida's Deceptive and Unfair Trade Practices Act); *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 373 (Tex. 1984) (Texas's Deceptive Trade Practices Act). There is no reason to believe that a different measure would be applied under the CCPA.

Under this measure, for CCPA damages to be equal to the full amount that Plaintiffs paid for the cars, the trier of fact will need to determine that the cars, because they used emissions-cheating software and emitted pollutants at levels well above the legal limits, had no value. That conclusion seems unlikely given that the software did not make the cars inoperative. Yet it is

11

difficult to decipher from the complaints whether Plaintiffs believe they have obtained any value from the cars. Plaintiffs do not specifically allege that they drove the cars, while they do allege that the cars were "not merchantable on the day of purchase." (*E.g.*, Lehmann Compl. ¶ 8.) Perhaps, then, Plaintiffs intend to argue that the cars were worthless. The complaints leave that option open.

Noting that Plaintiffs may contend that the cars have no value, VWGoA asserts that the full amounts that Plaintiffs paid to buy and lease the cars are reasonable estimates of the amounts of CCPA damages in dispute. In response, Plaintiffs have made no attempt to quantify their damages. Nor have they clearly asserted that they will not seek to recover the full amounts that they paid for the cars in damages under the CCPA. Under these circumstances, the Court concludes that VWGoA's estimates are reasonable. VWGoA has offered evidence in support of those estimates, while Plaintiffs have not made a meaningful attempt to rebut that evidence.

Of course, VWGoA bears the ultimate burden of proof. But a plaintiff cannot file a motion to remand and then stand idly by when the defendant submits evidence to support the amount in controversy. Indeed, when the amount in controversy is in question, "the Supreme Court has said that *both sides* submit proof and the court then decides where the preponderance lies." *Ibarra*, 775 F.3d at 1198 (emphasis added) (citing *Dart Cherokee*, 135 S. Ct. at 554-55). Given VWGoA's evidence and Plaintiffs' silence, the Court concludes that the full amounts that Plaintiffs paid for the cars are reasonable estimates of the amounts of CCPA damages in dispute.

Because the allegations support that VWGoA's conduct was fraudulent, treble damages under the CCPA may be permitted. Treble damages are therefore part of the amount in controversy. When the estimates of CCPA damages are trebled, the total amounts of damages in controversy in the ECF No. 3621 cases range from **$55,074** to **93,981**.

### 3. Punitive Damages

"It is well established that punitive damages are part of the amount in controversy in a civil action." *Gibson v. Chrysler Corp.*, 261 F.3d 927, 945 (9th Cir. 2001) (citing *Bell v. Preferred Life Assur. Soc'y*, 320 U.S. 238, 240 (1943); *Goldberg v. CPC Int'l, Inc.*, 678 F.2d 1365, 1367 (9th Cir. 1982)). Before they may be included, however, the party asserting jurisdiction must establish

that punitive damages would be permitted under the applicable state law based on the conduct alleged. *See Davenport v. Mut. Ben. Health & Accident Ass'n*, 325 F.2d 785, 787 (9th Cir. 1963) (noting that exemplary damages should not be included in the amount in controversy "if under the applicable state law [they] would be legally impossible to recover").

VWGoA, while asserting that Colorado would permit punitive damages under the circumstances alleged, acknowledges that Colorado does not permit the recovery of both treble damages and punitive damages. *See Hall*, 969 P.2d at 229 n.5 (holding that a "treble damages award under [the CCPA] precluded an award of punitive damages on the same facts"). Given that restriction, either treble damages or punitive damages may be included in the amount in controversy, but not both.

Colorado caps punitive damages at "the amount of the actual damages awarded to the injured party." Colo. Rev. Stat. § 13–21–102(1)(a). In the ECF No. 3621 cases, then, a treble damages award under the CCPA would exceed a punitive damages award. The Court therefore includes treble damages, but not punitive damages, in the amount in controversy, as the higher amount is a better indicator of the "amount in dispute." *Lewis*, 627 F.3d at 400.

### 4. Attorneys' Fees

When state law "authorizes an award of attorneys' fees, either with mandatory or discretionary language, such fees may be included in the amount in controversy." *Galt*, 142 F.3d at 1156. Until recently, it was an "open question [in this circuit] whether attorney's fees that [were] anticipated but unaccrued at the time of removal or filing in federal court . . . [could] be included in the amount-in-controversy." *Gonzales v. CarMax Auto Superstores, LLC*, 840 F.3d 644, 649 n.2 (9th Cir. 2016). That question was resolved, and answered affirmatively, last year:

> As explained in *Chavez* [*v. JPMorgan Chase & Co.*, 888 F.3d 413 (9th Cir. 2018)], when we assess the amount in controversy at the time of removal, we must include all relief to which a plaintiff is entitled if the action succeeds. 888 F.3d at 418. Accordingly, if the law entitles the plaintiff to future attorneys' fees if the action succeeds, "then there is no question that future [attorneys' fees] are 'at stake' in the litigation," *id.* at 417, and the defendant may attempt to prove that future attorneys' fees should be included in the amount in controversy.

13

*Fritsch v. Swift Transp. Co. of Ariz., LLC*, 899 F.3d 785, 794 (9th Cir. 2018) (second alteration in original).

If Plaintiffs prevail on their CCPA claims, they may obtain attorneys' fees. *See* Colo. Rev. Stat. § 6–1–113(2)(b) ("In the case of any successful action to enforce [the CCPA], the costs of the action together with reasonable attorney fees as determined by the court" shall be recoverable). Attorneys' fees are therefore "'at stake' in the litigation." *Fritsch*, 899 F.3d at 794 (quoting *Chavez*, 888 F.3d at 417).

To determine the amount of attorneys' fees at stake, the removing party can provide an "estimate[] [of] the amount of time that the case will require," and an estimate of "plaintiff's counsel's hourly billing rate." *Surber*, 110 F. Supp. 2d at 1232. VWGoA has offered the following evidence of this type here.

To estimate Plaintiffs' counsel's hourly billing rate, VWGoA has identified motions that were previously filed in this MDL and that list counsel's hourly rates. For a partner and an associate at counsel's firm, those rates are respectively listed as $605 and $295 per hour. (*See* MDL Dkt. No. 2608-4 at 8.) In VWGoA's calculations, it has used the associate rate to be conservative.

To estimate the number of hours that Plaintiffs' counsel will spend litigating the ECF No. 3621 cases, VWGoA reviewed 34 "Lemon Law" cases that resulted in awards of attorneys' fees and expenses. Some of those cases settled; others went to trial. (*See* MDL Dkt. No. 4232-5, App. D (listing cases).) The number of hours that plaintiffs' counsel spent litigating these cases was often not disclosed, but VWGoA performed the following calculations to reach an average number of 201.6 hours per case:

> First, [VWGoA] separated attorneys' fees from attorneys' expenses in the 34 listed Lemon Law cases. Out of the total award of attorneys' fees and expenses, on average, 87.1% of the award was attributable to attorneys' fees and 12.9% was attributable to expenses. Therefore, to estimate the average amount of attorneys' fees in these cases (not including attorneys' expenses), [VWGoA] took 87.1% of $92,583.63 [with $92,583.63 reflecting the average total award of attorneys' fees and expenses]: [the result was] $80,640.34.

14

> Second, [VWGoA] used this estimate of the attorneys' fee awards to determine the average number of attorney hours for which fees were awarded in these 34 cases (given that the number of hours were not disclosed or readily available for many cases). [VWGoA] divided $80,640.34 by an inflated billing rate of $400/hour. The result is an estimate of the number of hours for which attorneys were awarded fees, on average, in these cases: 201.6 hours.

(Opp'n, MDL Dkt. No. 4232 at 58 (footnote omitted).)

Multiplying the estimated hourly rate of $295 by 201.6 hours, VWGoA has estimated that $59,472 in attorneys' fees are in controversy in each of the ECF No. 3621 cases.

The methodology that VWGoA has used strikes the Court as generally reasonable. The estimated hourly rate is supported by evidence, and the lemon-law cases that VWGoA has identified serve as reasonable comparisons to this case, as Plaintiffs' warranty claims are effectively lemon-law claims. *See* 88 A.L.R.5th 301 (2001) (explaining that "lemon laws" were designed "to give consumers a means of enforcing a manufacturer's express warranty on a motor vehicle"). Although Plaintiffs also bring CCPA and fraud claims here, those claims include additional elements that, if anything, may increase the number of hours counsel spends litigating. Also, contrary to an argument made by Plaintiffs, VWGoA was not required to specifically identify cases that were litigated by the same counsel that is representing Plaintiffs here.

The Court's only concern with VWGoA's estimates is that they do not take into account that Plaintiffs' counsel is litigating dozens of cases against VW that are based on the same core allegations, and it is likely that certain efficiencies will be realized. For example, any evidence that counsel gathers to support that VW used emissions-cheating software will likely be used in all of the ECF No. 3621 cases.

To be sure, even with such efficiencies, Plaintiffs' counsel could easily spend at least 201.6 hours litigating each case. At a minimum, each Plaintiff will likely need to be deposed. And if the cases proceed to trial, separate trials may be required (if the cases remain unconsolidated) and there may be Plaintiff-specific damages issues.

To be conservative and to reflect possible economies of scale, however, the Court will only include 100.8 hours in the estimate for each of the ECF No. 3621 cases, which is half of the hours

that VWGoA has estimated. The reduced number reflects that there are likely to be efficiencies in litigating many similar cases, but that these efficiencies will not reduce the time spent litigating each case to zero.

Multiplying 100.8 hours by the hourly rate of $295 leads to an estimate of **$29,736** in attorneys' fees per case. At least that amount of attorneys' fees is reasonably in controversy in each of the ECF No. 3621 cases.[2]

### 5. Total Amount in Controversy

When $29,736 in attorneys' fees is added to the above estimates of treble damages, the amounts in controversy in the ECF No. 3621 cases range from **$84,810** to **$123,717**. Because these amounts all exceed $75,000, § 1332(a)'s amount-in-controversy requirement is satisfied for each of the ECF No. 3621 cases.

## IV. CONCLUSION

VWGoA has plausibly alleged that there is complete diversity of citizenship between it and VW AG on the one hand, and Plaintiffs on the other. Also, a preponderance of the evidence supports that the amount-in-controversy requirement is met. The Court therefore concludes that it has diversity subject-matter jurisdiction over the ECF No. 3621 cases and DENIES the motion to remand.

**IT IS SO ORDERED.**

Dated: February 19, 2019

CHARLES R. BREYER
United States District Judge

---

[2] VWGoA has also provided an estimate of costs for each of the ECF No. 3621 cases, but costs cannot be included in amount-in-controversy calculations. *See* 28 U.S.C. § 1332(a) (requiring that the amount in controversy "exceed[] the sum or value of $75,000, *exclusive of interests and costs*") (emphasis added).

16

**APPENDIX**

**(List of remaining ECF No. 3621 cases)**

1. *Aukerman v. VWGoA*, No. 17-cv-4008-CRB
2. *Fox v. VWGoA*, No. 17-cv-1988-CRB
3. *Gladbach v. VWGoA*, No. 16-cv-4464-CRB
4. *Harvey v. VWGoA*, No. 16-cv-5348-CRB
5. *Jamison v. VWGoA*, No. 16-cv-4462-CRB
6. *Kehl v. VWGoA*, No. 16-cv-5772-CRB
7. *Lehmann v. VWGoA*, No. 16-cv-4466-CRB
8. *McDonald v. VWGoA*, No. 17-cv-1989-CRB
9. *Zunich v. VWGoA*, No. 17-cv-4010-CRB