UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITUGATION / | MDL No. 2672 CRB (JSC) **ORDER DENYING MOTION TO REMAND** |
| This Order Relates To: MDL Dkt. No. 3619 / | |

Around 575,000 people who owned or leased a Volkswagen, Audi, or Porsche "clean diesel" car previously agreed to participate in one of two Court-approved class action settlements with these car makers. Rather than participate in those settlements, approximately 4,000 people instead chose to opt out of them. Some of these opt outs filed their own cases against the car makers in state court, and many of those cases were later removed to federal court by the defendants and transferred to this Court as part of the above-captioned MDL.

Whether there was a basis for removal has been contested, and more than 60 motions to remand, covering several hundred opt-out cases, were filed in this Court. This Order addresses one of those motions, ECF No. 3619. When it was filed, the ECF No. 3619 motion covered 14 separate cases; each had been filed in Minnesota state court, by counsel at the law firm of Hyde and Swigart, and then removed by Volkswagen Group of America, Inc. ("VWGoA"). Most of the cases have since been voluntarily dismissed; only three remain outstanding.[1]

VWGoA removed the ECF No. 3619 cases on the basis of both federal question and diversity subject-matter jurisdiction. Plaintiffs, in their motion to remand, have argued that neither form of jurisdiction is present. The Court considers at this time only whether it has jurisdiction on the basis of diversity. Concluding that it does, it DENIES the ECF No. 3619 motion to remand.

---

[1] The three remaining cases are listed in the Appendix at the end of this Order.

## I. BACKGROUND

Each of the ECF No. 3619 cases was filed by an individual who bought a Volkswagen TDI diesel-engine car. The general factual allegations in the cases are the same. Plaintiffs allege that they purchased the cars at Minnesota-based dealerships, and that prior to doing so they read the window stickers attached to the cars, which advertised that the cars offered "good clean diesel fun." (*E.g.*, Weekes Compl. ¶ 29, Case No. 3:16-cv-3159, Dkt. No. 1-1.) Plaintiffs also allege that VWGoA and Volkswagen AG ("VW AG"), collectively referred to here as "VW," represented to them that the cars would emit 25 percent fewer emissions than comparable gasoline-powered cars. (*Id.* ¶ 30.)

In fact, the cars did not have low emissions. (*Id.* ¶¶ 31-33.) And not only were their emissions higher than represented, but VW knew this. (*Id.*) VW knew that the cars could not perform as promised and had specifically developed and installed software in them that detected and evaded emissions testing. (*Id.* ¶¶ 11-14, 31-32.) During testing, the cars appeared to satisfy governing emission standards; but when the cars were on the road, they emitted nitrogen oxides at up to 40 times the legal limits. (*Id.* ¶¶ 12, 31.) In September 2015, in response to state and federal investigations, VW admitted that it had equipped its TDI-diesel engine cars with emissions-cheating software, and that it had been doing so since 2009. (*Id.* ¶¶ 11, 21.)

The ECF No. 3619 complaints each include nine state-law claims against VWGoA and VW AG. The claims are for violation of Minnesota's Unlawful Trade Practices Act, Consumer Fraud Act and Deceptive Trade Practices Act, for fraud, breach of an express warranty and breach of the implied warranties of merchantability and fitness for a particular purpose, and for making negligent misrepresentations and false statements in advertising. (*See id.* ¶¶ 46-96.)

Plaintiffs seek remedies which include "incidental, consequential, and actual damages," punitive damages, "rescission and repurchase of the subject vehicle[s] and restitution of all monies expended," and reasonable attorneys' fees and costs. (*Id.*, Prayer for Relief.)

VWGoA removed Plaintiffs' cases to federal court, in part on the basis of diversity subject-matter jurisdiction. (*E.g.*, Lessard Notice of Removal, Case No. 3:16-cv-3155, Dkt. No. 1.) VW AG apparently was not served and did not join the notices of removal. Plaintiffs

responded by filing the ECF No. 3619 motion to remand. With their remand motion, Plaintiffs each included a signed affidavit in which they stated the following:

> I brought the subject action in state court because I only maintained state statutory and common law causes of action and I did not seek a judgment in excess of $74,000.
>
> I did not at the time of filing my Complaint, nor do I now, nor will I in the future, seek any judgment or award in excess of $74,000.
>
> I only claim damages in the amount of up to $74,000, inclusive of actual damages, punitive damages, and attorneys' fees.

(*E.g.*, Lessard Aff. ¶¶ 5-7, Case No. 3:16-cv-3155, Dkt. No. 21.)

## II. LEGAL STANDARD

A defendant who seeks to remove a case to federal court must file a notice of removal "containing a short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a). This "short and plain statement" requirement mirrors the one found in Rule 8(a)(1) of the Federal Rules of Civil Procedure, the general pleading rule for cases filed in federal court. The use of the same language is "[b]y design," the Supreme Court has explained: "Congress, by borrowing the familiar 'short and plain statement' standard from Rule 8(a), intended to 'simplify the "pleading" requirements for removal' and to clarify that courts should 'apply the same liberal rules to removal allegations that are applied to other matters of pleading.'" *Dart Cherokee Basin Operating Co. v. Owens*, 135 S. Ct. 547, 553 (2014) (quoting H.R. Rep. No. 100–889, at 71 (1988)).

Highlighting this symmetry, the Ninth Circuit explained in *Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014), that notices of removal, like complaints that are originally filed in federal court, must comply with the familiar *Twombly*/*Iqbal* pleading standard, and that jurisdictional challenges to removal should be resolved within the framework that governs motions to dismiss complaints for lack of subject-matter jurisdiction:

> Like plaintiffs pleading subject-matter jurisdiction under Rule 8(a)(1), a defendant seeking to remove an action may not offer mere legal conclusions; it must allege the underlying facts supporting each of the requirements for removal jurisdiction. A plaintiff who contests the existence of removal jurisdiction may file a motion to remand, *see*

3

> 28 U.S.C. § 1447(c), the functional equivalent of a defendant's motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1). As under Rule 12(b)(1), a plaintiff's motion to remand may raise either a facial attack or a factual attack on the defendant's jurisdictional allegations . . . .

*Leite*, 749 F.3d at 1122 (citation omitted).

The *Leite* court also summarized the rules governing facial and factual attacks to jurisdiction:

> A "facial" attack accepts the truth of the . . . allegations but asserts that they are insufficient on their face to invoke federal jurisdiction. The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the . . . allegations as true . . . , the court determines whether [they] are sufficient as a legal matter to invoke the court's jurisdiction.
>
> A "factual" attack, by contrast, contests the truth of the . . . factual allegations, usually by introducing evidence outside the pleadings. When the [party contesting jurisdiction] raises a factual attack, the [party asserting jurisdiction] must support her jurisdictional allegations with competent proof, under the same evidentiary standard that governs in the summary judgment context. The [party asserting jurisdiction] bears the burden of proving by a preponderance of the evidence that each of the requirements for subject-matter jurisdiction has been met.

*Id.* at 1121 (citations and internal quotation marks omitted).

One form of federal subject-matter jurisdiction, which is the only form considered in this Order, is diversity: district courts have subject-matter jurisdiction over civil cases where (1) the matter "is between . . . citizens of different States . . . [or between] citizens of a State and citizens or subjects of a foreign state," and (2) the amount in controversy "exceeds the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332(a)(1)–(2). Consistent with the framework outlined above, "[t]he party seeking to invoke the district court's diversity jurisdiction always bears the burden of both pleading and proving diversity jurisdiction." *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 613-14 (9th Cir. 2016).

Subject-matter jurisdiction must exist when a case is first filed. A federal court that is considering whether it has jurisdiction on the basis of diversity must therefore consider "the state

4

of things at the time of the action brought." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473 (2007) (quoting *Mullan v. Torrance*, 9 Wheat. 537, 539 (1824)). This means examining whether the parties' citizenship was diverse and whether the amount in controversy exceeded $75,000 at the time the case was originally filed.

## III. DISCUSSION

VWGoA, as the removing party, bears the burden of demonstrating that this Court has diversity jurisdiction over the ECF No. 3619 cases. Whether VWGoA has satisfied that burden is considered next.

### A. Diversity of Citizenship

Diversity jurisdiction requires "complete diversity": "each plaintiff must be of a different citizenship from each defendant." *Grancare, LLC v. Mills ex rel. Thrower*, 889 F.3d 543, 548 (9th Cir. 2018). The rules governing citizenship differ for corporations and natural persons. A corporation is a citizen of the state or foreign state where it is incorporated and of the state or foreign state where it has its principal place of business. *See* 28 U.S.C. § 1332(c)(1). A natural person is a citizen of the state of her domicile, which is generally identified though "a compound of physical presence plus an intention to make a certain definite place one's permanent abode." *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001).

VWGoA's notices of removal in the ECF No. 3619 cases include citizenship allegations that mirror the following:

> Plaintiff is a Minnesota citizen. (Compl. ¶ 2.)
>
> . . . .
>
> VWGoA is incorporated under the laws of the state of New Jersey and maintains its headquarters and principal place of business in the state of Virginia, making VWGoA a citizen of both New Jersey and Virginia within the meaning of 28 U.S.C. § 1332.
>
> Defendant [VW AG] . . . is a publicly held German corporation with its principal place of business located in Germany. As such, VW AG is a citizen of Germany.

(*E.g.*, Lessard Notice of Removal ¶¶ 23, 25-26.)

5

1  Plaintiffs have not contested the truth of these allegations, nor have they argued that the allegations are insufficient. In other words, they have not made a facial or factual attack on VWGoA's citizenship allegations. The Court nevertheless considers the sufficiency of the allegations because it has an independent obligation to examine its subject-matter jurisdiction. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).

VWGoA, as the removing party, need only provide "a short and plain statement of the grounds for removal," 28 U.S.C. § 1446(a), in which it "allege[s] the underlying facts supporting each of the requirements for removal jurisdiction," *Leite*, 749 F.3d at 1122. The requirement at issue here is complete diversity; and VWGoA has alleged the underlying facts supporting this requirement by alleging that, when the complaints were filed, VWGoA was a citizen of New Jersey and Virginia, VW AG was a citizen of Germany, and Plaintiffs were citizens of Minnesota. These allegations are sufficient to support that Plaintiffs and Defendants were citizens of different states when the cases began. The requirement of complete diversity is therefore satisfied.

**B.      Amount in Controversy**

When removal is based on diversity jurisdiction under 28 U.S.C. § 1332(a), the defendant bears the burden of establishing that the amount in controversy exceeds $75,000. Consistent with the pleading requirements outlined above, the Supreme Court has explained that "a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee*, 135 S. Ct. at 554. But when the plaintiff challenges the defendant's allegations of the amount in controversy, "[e]vidence establishing the amount is required." *Id.*; *see also Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015) (citing *Dart Cherokee* for the same proposition).

Plaintiffs, in their motion to remand, have challenged VWGoA's amount-in-controversy allegations, and both sides have submitted evidence in support of their positions. The Court therefore construes the ECF No. 3619 motion as making a factual attack on the amounts in controversy and considers the evidence submitted. In considering the evidence, the Court must determine whether a preponderance of it supports that the $75,000 threshold has been passed. *See Leite*, 749 F.3d at 1121 (preponderance of the evidence standard applies to factual attacks on

jurisdiction); *Ibarra*, 775 F.3d at 1197 (preponderance of the evidence standard applies "where, as here, defendant's assertion of the amount in controversy is contested by plaintiffs").

### 1. Plaintiffs' Post-Removal Affidavits

To prove that the amounts in controversy are below the jurisdictional threshold, Plaintiffs rely principally on the affidavits that they submitted with their motion to remand. Among other things, the affidavits state that Plaintiffs have not and will not "seek any judgment or award in excess of $74,000." (*E.g.*, Lessard Aff. ¶ 6.)

Affidavits and stipulations that seek to limit the amount in controversy to $75,000 or less must satisfy two requirements to support remand to state court. First, they must be legally binding. *See Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 595-96 (2013) (noting that the "essential feature" of stipulations to the amounts in controversy "is that they are legally binding on all plaintiffs"). Second, because the jurisdictional inquiry "is limited to examining the case as of the time it was filed in state court," *id.* at 593 (internal quotation marks omitted), they must ordinarily be executed prior to removal. *See Hargis v. Access Capital Funding, LLC*, 674 F.3d 783, 789 (8th Cir. 2012) ("[A] binding stipulation . . . that [the plaintiff] [will] not seek damages greater than the jurisdictional minimum . . . . must be made prior to the defendant's removal of the case.") (internal quotation marks omitted); *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 667 (3d Cir. 2002) ("[A] plaintiff's stipulation subsequent to removal as to the amount in controversy or the types of relief sought is of 'no legal significance' to the court's determination."); *De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1412 (5th Cir. 1995) ("[L]itigants who want to prevent removal must file a binding stipulation or affidavit with their complaints; once a defendant has removed the case, . . . later filings [are] irrelevant." (quoting *In re Shell Oil Co.*, 970 F.2d 355, 356 (7th Cir. 1992) (per curiam))).

Some courts have recognized a limited exception to this second rule. When the amount in controversy is not facially apparent from the complaint, and particularly when the state in which the complaint is filed prohibits the plaintiff from demanding a particular sum, some courts have interpreted post-removal affidavits and stipulations as clarifying that the amount in controversy has always been less than the jurisdictional threshold. *See, e.g.*, *Asociacion Nacional de*

7

*Pescadores a Pequena Escala O Artesanales de Colombia (ANPAC) v. Dow Quimica de Colombia S.A.*, 988 F.2d 559, 565 (5th Cir. 1993) ("Although Dow Chemical is correct that a plaintiff may not defeat removal by subsequently *changing* his damage request, . . . in this case the affidavits clarify a petition that previously left the jurisdictional question ambiguous. Under those circumstances, the court is still examining the jurisdictional facts *as of the time* the case is removed . . . ."), *abrogated on other grounds by Marathon Oil Co. v. Ruhrgas AG*, 145 F.3d 211 (5th Cir. 1998), *rev'd* 526 U.S. 574 (1999); *Egan v. Premier Scales & Sys.*, 237 F. Supp. 2d 774, 776, 778 n.5 (W.D. Ky. 2002) (holding that "a Plaintiff may *clarify* the amount at issue by stipulation, particularly where a state statute prohibited a precise allegation in the original complaint," and citing other district court decisions that have endorsed the same exception). *But see, e.g.*, *Kier v. Lowery*, No. 16-CV-370-JED-FHM, 2017 WL 1015319, at *9 (N.D. Okla. Mar. 15, 2017) ("[D]eclin[ing] to credit plaintiff's attempt to defeat diversity jurisdiction in the form of a post-removal stipulation.").

"[T]o guard against forum shopping and encroachments on the defendant's right of removal," the clarification exception is narrowly construed. *Egan*, 237 F. Supp. 2d at 778. Only when the clarifying affidavit or stipulation "is unequivocal will it limit the amount of recoverable damages and warrant remand." *Proctor v. Swifty Oil Co.*, No. 3:12-CV-0490-TBR, 2012 WL 4593409, at *3 (W.D. Ky. Oct. 1, 2012). An affidavit or stipulation is unequivocal when, for example, "it indicates that the plaintiff neither seeks, nor will accept, damages in an amount exceeding $75,000." *Shelton v. Volkswagen Grp. of Am., Inc.*, No. 1:15-CV-733, 2015 WL 13021895, at *2 (S.D. Ohio Dec. 28, 2015). If either of these promises is missing, the affidavit or stipulation will likely be deemed equivocal and will not defeat diversity jurisdiction.

In *Stephens v. Charter Communications Holdings, LLC*, for example, the plaintiff filed a motion to remand and a stipulation stating that he "[would] not seek a judgment or request a verdict for an amount in excess of $74,999.00 and [would] not seek attorney's fees for any amount that, together with any judgment or verdict, would exceed $74,999." No. 3:17-CV-0354-JHM, 2017 WL 4273307, at *2 (W.D. Ky. Sept. 26, 2017). In denying the plaintiff's motion, the district court explained that the stipulation was "less than unequivocal and thus deficient to defeat

removal." *Id.* (internal quotation marks omitted). "While [the plaintiff] stipulate[d] that he [would] not *seek* a verdict of $75,000 or more," the court explained, "he d[id] not stipulate that he [would] not *accept or seek to enforce* a judgment of that amount." *Id.*

It does not appear that the Ninth Circuit has considered whether to adopt the clarification exception to the general rule against post-removal stipulations. This Court does not need to independently consider whether to adopt the exception, for even if the exception is available in some cases, it does not apply here. Plaintiffs' post-removal affidavits are not unequivocal.

As highlighted above, Plaintiffs asserted the following in their post-removal affidavits:

> I brought the subject action in state court because I only maintained state statutory and common law causes of action and I did not seek a judgment in excess of $74,000.
>
> I did not at the time of filing my Complaint, nor do I now, nor will I in the future, seek any judgment or award in excess of $74,000.
>
> I only claim damages in the amount of up to $74,000, inclusive of actual damages, punitive damages, and attorneys' fees.

(*E.g.*, Lessard Aff. ¶¶ 5-7.)

These statements are analogous to the ones that were addressed in *Stephens*. While Plaintiffs state that they have not and will not "seek any judgment or award in excess of $74,000," and "only claim damages in the amount of up to $74,000," they have not stated that they "will not *accept or seek to enforce* a judgment" that exceeds $75,000. *Stephens*, 2017 WL 4273307, at *2. The affidavits accordingly leave open the possibility that if the evidence supports awards that exceed $75,000, Plaintiffs will not refuse to accept those awards. The post-removal affidavits are thus equivocal, so they do not set a ceiling on the amounts in controversy.

**2. VWGoA's Evidence of the Amounts in Controversy**

Because Plaintiffs' post-removal stipulations do not control, the Court continues by considering VWGoA's evidence of the amounts in controversy. This evidence falls into three categories: proof of "actual damages" in dispute (a term used here as a shorthand not only for compensatory damages, but also for the value of equitable remedies such as restitution), proof of

9

punitive damages in dispute, and proof of attorneys' fees in dispute. Each category is considered in turn below.

### a. Actual Damages

VWGoA has offered evidence of the total amounts that Plaintiffs paid to buy the cars. It contends that these amounts are an accurate measure of the actual damages in controversy.

Plaintiffs have indeed put the full amounts that they paid for the cars in controversy. Among other things, they seek "restitution of all monies expended." (*E.g.*, Lessard Compl., Prayer for Relief.) Whether Plaintiffs will be able to recover what they seek is a different question and is currently irrelevant, for the amount in controversy is "not a prospective assessment of [the] defendant's liability;" it is "simply an estimate of the total amount in dispute." *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010). But by seeking restitution of all monies expended, Plaintiffs have clearly put the full amounts that they paid to buy the cars in dispute.

Contrary to an argument made by Plaintiffs, what VW agreed to pay owners of the same model cars in the 2.0-liter and 3.0-liter class action settlements, which this Court previously approved, is not an accurate proxy of the amounts in controversy in the ECF No. 3619 cases. Plaintiffs opted out of those settlements and, by seeking the full amounts that they paid to buy the cars, they seek more than what VW offered in those settlements. Similarly, individual offers that VW has made to settle the opt-out cases are not relevant because they do not indicate the full amount in dispute; if they did, one would expect Plaintiffs to accept those offers and voluntarily dismiss their cases.

\* \* \*

The amounts that Plaintiffs paid to buy the cars are not identified in the complaints. But the complaints do identify the makes, models, model years, and Vehicle Identification Numbers ("VINs") of the cars. (*See e.g.*, Lessard Compl. ¶ 28 (alleging that Plaintiff "purchased or leased a 2013 Volkswagen Jetta Sportwagen" and listing the VIN).) Using that information, VWGoA contends that the amounts paid to buy the cars can be reasonably estimated.

The estimates take some work because VWGoA reports that it does not have access to granular retail sales-price data for its cars. (Dealers negotiate the sales prices, and although

10

1 dealers provide VWGoA with certain sales information—including customer names, customer
2 contact information, VINs, and sales dates—the retail sales prices are apparently not reported.)
3 (*See* Lytle Decl. ¶ 8, MDL Dkt. No. 4232-8.) Because VWGoA does not have access to sales-
4 price data, it hired Jay R. Lytle, an Analytical Services Manager at Urban Science Applications,
5 Inc., to estimate the amounts that Plaintiffs paid to buy the cars. Mr. Lytle states that Urban
6 Science performs consulting work for car manufacturers and that his work "regularly involves
7 analyzing vehicle pricing, including prices paid by consumers for new and used vehicles." (*Id.*
8 ¶¶ 4-5.)

9 Mr. Lytle's declaration describes his methodology in detail. In short, he first used the
10 VINs that Plaintiffs provided, as well as retail-sales data from VWGoA, to determine if the cars
11 were purchased new, purchased used, or leased. (*Id.* ¶ 10.) For cars that were purchased new, he
12 then used industry guides (*e.g.*, Kelley Blue Book and TRUECar) and a discounted version of the
13 Manufacturer's Suggested Retail Price for the same model cars to estimate the original purchase
14 prices. (*See id.* ¶¶ 13-22.) To estimate the prices paid for used cars, he used the NADA Guides'
15 Clean Trade-In Values. (*See id.* ¶¶ 23-24.)

16 Mr. Lytle's estimates can be found in Exhibits A, B, and C to his declaration. (*See* MDL
17 Dkt. No. 5834-3.) Of the three cars that remain at issue in the ECF No. 3619 cases, two were
18 purchased new and one was purchased used. Mr. Lytle's purchase price estimates for the new cars
19 are $23,582 and $26,720; his purchase price estimate for the used car is $20,850.

20 Plaintiffs have not challenged the accuracy of Mr. Lytle's numbers; they have not, for
21 example, offered evidence to support that they paid materially different amounts for the cars in
22 question. Yet they have objected to Mr. Lytle's declaration and the accompanying exhibits on
23 grounds of relevance, failure to authenticate, and hearsay. (*See* Dkt. No. 4490-10, Turnage Decl.
24 ¶¶ 3-7.)

25 The objections are not meritorious. The exhibits to Mr. Lytle's declaration, which track
26 and support his analysis, are clearly relevant. Mr. Lytle himself has declared what the exhibits
27 are—e.g., his calculations, Kelly Blue Book prices, and VWGoA sales data—which is sufficient
28 to authenticate them. *See* Fed. R. Evid. 901(b)(1) (explaining that evidence can be authenticated

11

by "[t]estimony that an item is what it is claimed to be"). And the facts and data that Mr. Lytle has relied on are the type that "experts in the particular field" would use, Fed. R. Evid. 703, so even if these facts and data constitute hearsay, Mr. Lytle may offer opinions based on them, *see United States v. Vera*, 770 F.3d 1232, 1237 (9th Cir. 2014).

The fact that Plaintiffs have not challenged the accuracy of Mr. Lytle's numbers suggests that he has made reasonably accurate calculations. Mr. Lytle's methodology also appears sensible: he used the vehicle-specific information that Plaintiffs provided in their complaints and respected market metrics and resources, and he explained in detail how he arrived at his estimates. Plaintiffs have put the full amounts that they paid to buy the cars in dispute, and Mr. Lytle's estimates serve as a sufficient proxy of those amounts. Based on Mr. Lytle's estimates, the actual damages in controversy range from **$20,850** to **$26,720** per case.

### b. Punitive Damages

"It is well established that punitive damages are part of the amount in controversy in a civil action." *Gibson v. Chrysler Corp.*, 261 F.3d 927, 945 (9th Cir. 2001) (citing *Bell v. Preferred Life Assur. Soc'y*, 320 U.S. 238, 240 (1943); *Goldberg v. CPC Int'l, Inc.*, 678 F.2d 1365, 1367 (9th Cir. 1982)). Before they may be included, however, two steps must generally be taken. First, the party asserting jurisdiction must establish that punitive damages would be permitted under the applicable state law based on the conduct alleged. *See Davenport v. Mut. Ben. Health & Accident Ass'n*, 325 F.2d 785, 787 (9th Cir. 1963) (noting that exemplary damages should not be included in the amount in controversy "if under the applicable state law [they] would be legally impossible to recover"). Second, if punitive damages are allowed under state law, the amount of punitive damages that are in controversy must be determined. To do so, "[the] party asserting federal diversity jurisdiction may introduce evidence of jury verdicts in cases involving analogous facts." *Surber v. Reliance Nat. Indem. Co.*, 110 F. Supp. 2d 1227, 1232 (N.D. Cal. 2000).

Plaintiffs argue that a different standard applies. They note that in discussing punitive damages in the context of calculating the amount in controversy, a number of courts in this circuit (including this one) have stated that punitive damages may be included in the amount-in-controversy calculation "only if they are recoverable as a matter of law." *Wilson v. Union Sec.*

12

*Life Ins. Co.*, 250 F. Supp. 2d 1260, 1264 n.6 (D. Idaho 2003); *accord Simmons v. PCR Tech.*, 209 F. Supp. 2d 1029, 1033 (N.D. Cal. 2002); *Surber*, 110 F. Supp. 2d at 1232 (citing *Richmond v. Allstate Ins. Co.*, 897 F. Supp. 447, 450 (S.D. Cal. 1995)). Relying on this phrasing, Plaintiffs argue that before punitive damages may be included in the amount in controversy, VWGoA "must put forward a showing that Plaintiffs' claims will . . . actually be awarded punitive damages." (Reply, Dkt. No. 4490 at 12 (emphasis omitted).)

Plaintiffs misinterpret what is required. The proper inquiry is not *will* punitive damages be recovered as a matter of law, but "*are* [punitive damages] recoverable as a matter of law." *Wilson*, 250 F. Supp. 2d at 1264 n.6; *see also Bell v. Preferred Life Assur. Soc. of Montgomery, Ala.*, 320 U.S. 238, 241 (1943) (concluding that the amount in controversy was satisfied where the plaintiffs' claims "might justify" an award of punitive damages under the governing state law).

None of the district court decisions cited above asked, in considering the amount in controversy, whether punitive damages would "actually be awarded." For good reason. Such a standard would be impossible to meet, as it would effectively require courts to prophesy about the ultimate results in the cases before them. Such a requirement is clearly not what is intended, for the amount in controversy is "simply an *estimate* of the total amount in dispute." *Lewis*, 627 F.3d at 400 (emphasis added).

The Court continues, then, by asking whether punitive damages *are recoverable* under the applicable state law based on the conduct alleged. Indeed they are. Minnesota "allow[s] punitive damages in consumer fraud cases," *Wexler v. Bros. Entm't Grp., Inc.*, 457 N.W.2d 218, 222 (Minn. Ct. App. 1990), "upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others," Minn. Stat. § 549.20(a). Taking the allegations as true, this standard is satisfied here. Plaintiffs allege that VW represented that its TDI diesel-engine cars had low emissions, when in fact VW knew that the cars utilized software to evade emissions testing and emitted nitrogen oxides at levels far exceeding the legal limits. (*E.g.*, Lessard Compl. ¶¶ 31-33.) This amounts to fraudulent conduct that displays deliberate disregard for the rights of others.

13

As for the amount of punitive damages in controversy, VWGoA has offered evidence of jury verdicts in three cases that it asserts involved facts analogous to those here. The first of these cases is *Johnson v. Ford Motor Company*, 113 P.3d 82 (Cal. 2005), where the plaintiffs sued Ford for concealing that a used car it had sold them had a history of transmission repairs and replacements. *Id.* at 85. Evidence supported that Ford had engaged in similar conduct "in some number of cases in addition to plaintiffs' own, perhaps a large number of other cases." *Id.* at 96. The jury awarded $10 million in punitive damages against Ford, but the California Supreme Court concluded that the award was inconsistent with due process. On remand, the Court of Appeal affirmed a punitive damages award of $175,000, which was just less than 10 times the compensatory damages award. *See Johnson v. Ford Motor Co.*, 135 Cal. App. 4th 137, 150 (2005).

VWGoA next points to *Chrysler Corporation v. Schiffer*, 736 So. 2d 538 (Ala. 1999). The plaintiff there purchased a truck that Chrysler had represented was new but that in fact had been damaged, repaired, and repainted. *Id.* at 540, 546. Finding for the plaintiff, the jury awarded $50,000 in compensatory damages and $325,000 in punitive damages. *Id.* at 540. The Alabama Supreme Court affirmed on the condition that the plaintiff agree to accept a reduced punitive damages award of $150,000, a 3:1 multiple of compensatory damages. *Id.* at 549.

Lastly, VWGoA cites to *BMW of North America, Inc. v. Gore* ("*BMW II*"), 701 So. 2d 507 (Ala. 1997). The plaintiff there alleged that BMW failed to disclose that the car it sold him had been damaged by acid rain during its shipment from Germany and had subsequently been repainted. *Id.* at 508. Evidence at trial supported that BMW had a nationwide policy of not disclosing pre-delivery damage when the cost of repairs did not exceed three percent of the car's suggested retail price, a practice that was illegal in some states but not in others. *See id.* at 509; *see also BMW of N. Am., Inc. v. Gore* ("*BMW I*"), 646 So. 2d 619, 627 n.6 (Ala. 1994). The jury found for the plaintiff and awarded $4,000 in compensatory damages and $4 million in punitive damages. *BMW II*, 701 So. 2d at 509. On appeal, the U.S. Supreme Court held that the $4 million punitive damages award (and even a reduced punitive damages award of $2 million that was entered by the Alabama Supreme Court) was excessive and violated due process. *See BMW of*

14

*N.A., Inc. v. Gore*, 517 U.S. 559, 562-63, 585-86 (1996). The Alabama Supreme Court, on remand, entered an order requiring the plaintiff to accept a reduced punitive damages award of $50,000, a 12:1 multiple of compensatory damages. *BMW II*, 701 So. 2d at 515.

Based on the awards in *Johnson*, *Schiffer*, and *Gore*, VWGoA argues that a conservative estimate of the punitive damages in controversy in each of the ECF No. 3619 cases is $50,000. That was the amount awarded in *Gore*, and it was the lowest award in the three sample cases. For all of the remaining ECF No. 3619 cases, $50,000 in punitive damages would be less than a 3:1 multiple of the estimated actual damages, which is also on the low end of the multiples permitted in *Johnson*, *Schiffer*, and *Gore*.

Plaintiffs take issue with the fact that *Johnson*, *Schiffer*, and *Gore* were each decided under either Alabama or California law, not Minnesota law. But Plaintiffs have not identified any concrete reason why Minnesota law would preclude the same results. Plaintiffs also argue that VWGoA's showing is insufficient because VWGoA "did not cite to a single case litigated by [Plaintiffs' counsel]." (Reply, MDL Dkt. No. 4490 at 13.) Plaintiffs have not cited to any authority that would require VWGoA to do so. Nor would such a requirement be sensible, as counsel may not have litigated an analogous case to verdict and that fact alone does not mean that punitive damages are not in controversy in the cases in dispute.

Fraudulent conduct comes in many forms, and it is almost always possible to draw distinctions between the facts of one fraud and another. But when *Johnson*, *Schiffer*, and *Gore* are stripped to their essentials, they offer reasonable comparisons to this case. Each involved a global car manufacturer that deceived its customers about the characteristics of its cars. And in *Johnson* and (to a lesser degree) in *Gore*, evidence also supported that the deceit was part of a pattern of fraudulent business practices, as is alleged here.

At this stage, the question is whether at least $50,000 in punitive damages is at stake in each of the cases. Given the facts alleged and the amounts of punitive damages awarded in comparable cases, it is clear that the answer to this question is yes.

At least **$50,000** in punitive damages is at stake in each of the ECF No. 3619 cases.

### c. Attorneys' Fees

When state law "authorizes an award of attorneys' fees, either with mandatory or discretionary language, such fees may be included in the amount in controversy." *Galt*, 142 F.3d at 1156. Until recently, it was an "open question [in this circuit] whether attorney's fees that [were] anticipated but unaccrued at the time of removal or filing in federal court . . . [could] be included in the amount-in-controversy." *Gonzales v. CarMax Auto Superstores, LLC*, 840 F.3d 644, 649 n.2 (9th Cir. 2016). That question was resolved, and answered affirmatively, last year:

> As explained in *Chavez* [*v. JPMorgan Chase & Co.*, 888 F.3d 413 (9th Cir. 2018)], when we assess the amount in controversy at the time of removal, we must include all relief to which a plaintiff is entitled if the action succeeds. 888 F.3d at 418. Accordingly, if the law entitles the plaintiff to future attorneys' fees if the action succeeds, "then there is no question that future [attorneys' fees] are 'at stake' in the litigation," *id.* at 417, and the defendant may attempt to prove that future attorneys' fees should be included in the amount in controversy.

*Fritsch v. Swift Transp. Co. of Ariz., LLC*, 899 F.3d 785, 794 (9th Cir. 2018) (second alteration in original).

If Plaintiffs prevail on their Unlawful Trade Practices Act claims, or on any of their other claims that are based on false or fraudulent advertising, they may obtain attorneys' fees. *See* Minn. Stat. § 8.31(1), (3a) (providing that "any person injured by a violation of any of the laws referred to in subdivision 1," which include the UTPA and "other laws against false or fraudulent advertising," may "bring a civil action and recover damages . . . and reasonable attorney's fees"). Attorneys' fees are therefore "'at stake' in the litigation." *Fritsch*, 899 F.3d at 794 (quoting *Chavez*, 888 F.3d at 417).

To determine the amount of attorneys' fees at stake, the removing party can provide an "estimate[] [of] the amount of time that the case will require," and an estimate of "plaintiff's counsel's hourly billing rate." *Surber*, 110 F. Supp. 2d at 1232. VWGoA has offered the following evidence of this type here.

To estimate Plaintiffs' counsel's hourly billing rate, VWGoA has identified motions that were previously filed in this MDL and that list counsel's hourly rates. For a partner and an

16

associate at counsel's firm, those rates are respectively listed as $605 and $295 per hour. (*See* MDL Dkt. No. 2608-4 at 8.) In VWGoA's calculations, it has used the associate rate to be conservative.

To estimate the number of hours that Plaintiffs' counsel will spend litigating the ECF No. 3619 cases, VWGoA reviewed 34 "Lemon Law" cases that resulted in awards of attorneys' fees and expenses. Some of those cases settled; others went to trial. (*See* MDL Dkt. No. 4232-5, App. D (listing cases).) The number of hours that plaintiffs' counsel spent litigating these cases was often not disclosed, but VWGoA performed the following calculations to reach an average number of 201.6 hours per case:

> First, [VWGoA] separated attorneys' fees from attorneys' expenses in the 34 listed Lemon Law cases. Out of the total award of attorneys' fees and expenses, on average, 87.1% of the award was attributable to attorneys' fees and 12.9% was attributable to expenses. Therefore, to estimate the average amount of attorneys' fees in these cases (not including attorneys' expenses), [VWGoA] took 87.1% of $92,583.63 [with $92,583.63 reflecting the average total award of attorneys' fees and expenses]: [the result was] $80,640.34.
>
> Second, [VWGoA] used this estimate of the attorneys' fee awards to determine the average number of attorney hours for which fees were awarded in these 34 cases (given that the number of hours were not disclosed or readily available for many cases). [VWGoA] divided $80,640.34 by an inflated billing rate of $400/hour. The result is an estimate of the number of hours for which attorneys were awarded fees, on average, in these cases: 201.6 hours.

(Opp'n, MDL Dkt. No. 4232 at 58 (footnote omitted).)

Multiplying the estimated hourly rate of $295 by 201.6 hours, VWGoA has estimated that $59,472 in attorneys' fees are in controversy in each of the ECF No. 3619 cases.

The methodology that VWGoA has used strikes the Court as generally reasonable. The estimated hourly rate is supported by evidence, and the lemon-law cases that VWGoA has identified serve as reasonable comparisons to this case, as Plaintiffs' warranty claims are effectively lemon-law claims. *See* 88 A.L.R.5th 301 (2001) (explaining that "lemon laws" were designed "to give consumers a means of enforcing a manufacturer's express warranty on a motor vehicle"). Although Plaintiffs also bring fraud-based claims here, those claims include additional

elements that, if anything, may increase the number of hours counsel spends litigating. Also, contrary to an argument made by Plaintiffs, VWGoA was not required to specifically identify cases that were litigated by the same counsel that is representing Plaintiffs here.

The Court's only concern with VWGoA's estimates is that they do not take into account that Plaintiffs' counsel is litigating dozens of cases against VW that are based on the same core allegations, and it is likely that certain efficiencies will be realized. For example, any evidence that counsel gathers to support that VW used emissions-cheating software will likely be used in all of the ECF No. 3619 cases.

To be sure, even with such efficiencies, Plaintiffs' counsel could easily spend at least 201.6 hours litigating each case. At a minimum, each Plaintiff will likely need to be deposed. And if the cases proceed to trial, separate trials may be required (if the cases remain unconsolidated) and there may be Plaintiff-specific damages issues.

To be conservative and to reflect possible economies of scale, however, the Court will only include 100.8 hours in the estimate for each of the ECF No. 3619 cases, which is half of the hours that VWGoA has estimated. The reduced number reflects that there are likely to be efficiencies in litigating many similar cases, but that these efficiencies will not reduce the time spent litigating each case to zero.

Multiplying 100.8 hours by the hourly rate of $295 leads to an estimate of **$29,736** in attorneys' fees per case. At least that amount of attorneys' fees is reasonably in controversy in each of the ECF No. 3619 cases.[2]

#### d. Total Amount in Controversy

When $50,000 in punitive damages is added to $29,736 in attorneys' fees, the combined amount exceeds $75,000. And when actual damages are also added, the amounts in controversy for the ECF No. 3619 cases range from **$100,586** to **$106,456**. Section 1332(a)'s amount-in-controversy requirement is satisfied.

---

[2] VWGoA has also provided an estimate of costs for each of the ECF No. 3619 cases, but costs cannot be included in amount-in-controversy calculations. *See* 28 U.S.C. § 1332(a) (requiring that the amount in controversy "exceed[] the sum or value of $75,000, *exclusive of interests and costs*") (emphasis added).

18

## IV. CONCLUSION

VWGoA has plausibly alleged that there is complete diversity of citizenship between it and VW AG on the one hand, and Plaintiffs on the other. Also, a preponderance of the evidence supports that the amount-in-controversy requirement is met. The Court therefore concludes that it has diversity subject-matter jurisdiction over the ECF No. 3619 cases and DENIES the motion to remand.

**IT IS SO ORDERED.**

Dated: February 22, 2019

CHARLES R. BREYER
United States District Judge

**APPENDIX**

**(List of remaining ECF No. 3619 cases)**

1. *Hinderscheid v. VWGoA*, No. 16-cv-3153-CRB
2. *Lessard v. VWGoA*, No. 16-cv-3155-CRB
3. *Weekes v. VWGoA*, No. 16-cv-3159-CRB