UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 2672 CRB (JSC) **ORDER DENYING MOTION TO REMAND** |
| This Order Relates To: MDL Dkt. No. 3781 | |

Around 575,000 people who owned or leased a Volkswagen, Audi, or Porsche "clean diesel" car previously agreed to participate in one of two Court-approved class action settlements with these car makers. Rather than participate in those settlements, approximately 4,000 people instead chose to opt out of them. Some of these opt outs filed their own cases against the car makers in state court, and many of those cases were later removed to federal court by the defendants and transferred to this Court as part of the above-captioned MDL.

Whether there was a basis for removal has been contested, and more than 60 motions to remand, covering several hundred opt-out cases, were filed in this Court. This Order addresses one of those motions, ECF No. 3781. The ECF No. 3781 motion covers one case, *Adams v. Volkswagen Group of America, Inc.*, Case No. 3:17-cv-5085-CRB. *Adams* was filed in Texas state court, by counsel at the law firm of Hyde and Swigart, and then removed by Volkswagen Group of America, Inc. ("VWGoA"). When *Adams* was filed it had 46 plaintiffs. Many of those plaintiffs have since voluntarily dismissed their claims; only 12, covering 11 separate cars, remain.[1]

VWGoA removed *Adams* on the basis of diversity subject-matter jurisdiction. Plaintiffs, in their motion to remand, have argued that diversity jurisdiction is lacking. Having considered

---

[1] The 12 remaining plaintiffs are listed in the Appendix at the end of this Order.

the papers and the evidence submitted, the Court concludes that it has jurisdiction on the basis of diversity and DENIES the ECF No. 3781 motion to remand.

## I. BACKGROUND

The *Adams* plaintiffs are individuals and couples who bought Volkswagen TDI diesel-engine cars. They allege that they purchased the cars at Texas-based dealerships, and that prior to doing so they read the window stickers attached to the cars, which advertised that the cars offered "good clean diesel fun." (Compl. ¶ 46.) They also allege that VWGoA and Volkswagen AG ("VW AG"), collectively referred to here as "VW," represented that the cars were environmentally friendly and would emit 25 percent fewer emissions than comparable gasoline-powered cars. (*Id.* ¶¶ 46, 51.)

In fact, the cars did not have low emissions and were not good for the environment. (*Id.* ¶ 46.) And not only were the cars' emissions higher than represented, but VW knew this. (*Id.* ¶¶ 46, 49, 60-61.) VW knew that the cars could not perform as promised and had specifically developed and installed software in them that detected and evaded emissions testing. (*Id.*) During testing, the cars appeared to satisfy governing emission standards; but when the cars were on the road, they emitted nitrogen oxides at up to 40 times the legal limits. (*Id.* ¶ 46.)

In September 2015, in response to state and federal investigations, VW admitted that it had equipped its TDI-diesel engine cars with emissions-cheating software, and that it had been doing so since 2009. (*Id.* ¶¶ 49, 55.)

The *Adams* plaintiffs bring five claims against VWGoA and VW AG. The claims are for violation of Texas's Deceptive Trade Practices Act ("DTPA") and for breach of contract, an express warranty, and the implied warranties of merchantability and fitness for a particular purpose. (*Id.* ¶¶ 101-37.) Plaintiffs seek remedies which include actual and punitive damages, "rescission and repurchase of the subject vehicle[s] and restitution of all monies expended," and reasonable attorneys' fees and costs. (*Id.*, Prayer for Relief.) They seek "only monetary relief of not more than $74,499.99 for each vehicle including damages of any kind, penalties, costs, expenses, pre-judgment interests, and attorney fees." (*Id.* ¶ 2.)

VWGoA removed *Adams* to federal court on the basis of diversity subject-matter jurisdiction. (Notice of Removal, Dkt. No. 1.) VW AG apparently was not served and did not join the notice of removal. Plaintiffs responded by filing the ECF No. 3781 motion to remand.

## II. LEGAL STANDARD

A defendant who seeks to remove a case to federal court must file a notice of removal "containing a short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a). This "short and plain statement" requirement mirrors the one found in Rule 8(a)(1) of the Federal Rules of Civil Procedure, the general pleading rule for cases filed in federal court. The use of the same language is "[b]y design," the Supreme Court has explained: "Congress, by borrowing the familiar 'short and plain statement' standard from Rule 8(a), intended to 'simplify the "pleading" requirements for removal' and to clarify that courts should 'apply the same liberal rules to removal allegations that are applied to other matters of pleading.'" *Dart Cherokee Basin Operating Co. v. Owens*, 135 S. Ct. 547, 553 (2014) (quoting H.R. Rep. No. 100–889, at 71 (1988)).

Highlighting this symmetry, the Ninth Circuit explained in *Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014), that notices of removal, like complaints that are originally filed in federal court, must comply with the familiar *Twombly*/*Iqbal* pleading standard, and that jurisdictional challenges to removal should be resolved within the framework that governs motions to dismiss complaints for lack of subject-matter jurisdiction:

> Like plaintiffs pleading subject-matter jurisdiction under Rule 8(a)(1), a defendant seeking to remove an action may not offer mere legal conclusions; it must allege the underlying facts supporting each of the requirements for removal jurisdiction. A plaintiff who contests the existence of removal jurisdiction may file a motion to remand, *see* 28 U.S.C. § 1447(c), the functional equivalent of a defendant's motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1). As under Rule 12(b)(1), a plaintiff's motion to remand may raise either a facial attack or a factual attack on the defendant's jurisdictional allegations . . . .

*Leite*, 749 F.3d at 1122 (citation omitted).

The *Leite* court also summarized the rules governing facial and factual attacks to jurisdiction:

3

> A "facial" attack accepts the truth of the . . . allegations but asserts that they are insufficient on their face to invoke federal jurisdiction. The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the . . . allegations as true . . . , the court determines whether [they] are sufficient as a legal matter to invoke the court's jurisdiction.
>
> A "factual" attack, by contrast, contests the truth of the . . . factual allegations, usually by introducing evidence outside the pleadings. When the [party contesting jurisdiction] raises a factual attack, the [party asserting jurisdiction] must support her jurisdictional allegations with competent proof, under the same evidentiary standard that governs in the summary judgment context. The [party asserting jurisdiction] bears the burden of proving by a preponderance of the evidence that each of the requirements for subject-matter jurisdiction has been met.

*Id.* at 1121 (citations and internal quotation marks omitted).

One form of federal subject-matter jurisdiction, which is the only form considered in this Order, is diversity: district courts have subject-matter jurisdiction over civil cases where (1) the matter "is between . . . citizens of different States . . . [or between] citizens of a State and citizens or subjects of a foreign state," and (2) the amount in controversy "exceeds the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332(a)(1)–(2). Consistent with the framework outlined above, "[t]he party seeking to invoke the district court's diversity jurisdiction always bears the burden of both pleading and proving diversity jurisdiction." *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 613-14 (9th Cir. 2016).

Subject-matter jurisdiction must exist when a case is first filed. A federal court that is considering whether it has jurisdiction on the basis of diversity must therefore consider "the state of things at the time of the action brought." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473 (2007) (quoting *Mullan v. Torrance*, 9 Wheat. 537, 539 (1824)). This means examining whether the parties' citizenship was diverse and whether the amount in controversy exceeded $75,000 at the time the case was originally filed.

\\

\\

\\

4

## III. DISCUSSION

VWGoA, as the removing party, bears the burden of demonstrating that this Court has diversity jurisdiction over *Adams*. Whether VWGoA has satisfied that burden is considered next.

### A. Diversity of Citizenship

Diversity jurisdiction requires "complete diversity": "each plaintiff must be of a different citizenship from each defendant." *Grancare, LLC v. Mills ex rel. Thrower*, 889 F.3d 543, 548 (9th Cir. 2018). The rules governing citizenship differ for corporations and natural persons. A corporation is a citizen of the state or foreign state where it is incorporated and of the state or foreign state where it has its principal place of business. *See* 28 U.S.C. § 1332(c)(1). A natural person is a citizen of the state of her domicile, which is generally identified though "a compound of physical presence plus an intention to make a certain definite place one's permanent abode." *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001).

VWGoA's notice of removal in *Adams* includes the following citizenship allegations:

> At all relevant times, including the time of filing the Petition and the time of removal, Plaintiffs are and were citizens of the states of Texas, Georgia, and South Dakota. See Petition at ¶ 3–¶ 39.
>
> At all relevant times, including the time of filing the Petition and the time of removal, VWGoA is and was incorporated under the laws of the state of New Jersey and maintains and maintained its principal place of business in the state of Virginia. Therefore, VWGoA is and was a citizen of New Jersey and Virginia within the meaning of 28 U.S.C. § 1332(c). . . .
>
> Defendant . . . . VWAG, at the time of the initial filing of this action and ever since, has been a corporation duly incorporated and organized under the laws of the Republic of Germany, having its principal place of business in the Republic of Germany.

(Notice of Removal ¶¶ 9-11.)

Plaintiffs have not contested the truth of these allegations, nor have they argued that the allegations are insufficient. In other words, they have not made a facial or factual attack on VWGoA's citizenship allegations. The Court nevertheless considers the sufficiency of the

5

allegations because it has an independent obligation to examine its subject-matter jurisdiction. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).

VWGoA, as the removing party, need only provide "a short and plain statement of the grounds for removal," 28 U.S.C. § 1446(a), in which it "allege[s] the underlying facts supporting each of the requirements for removal jurisdiction," *Leite*, 749 F.3d at 1122. The requirement at issue here is complete diversity; and VWGoA has alleged the underlying facts supporting this requirement by alleging that, when the complaints were filed, VWGoA was a citizen of New Jersey and Virginia, VW AG, by implication of being incorporated and headquartered in Germany, was a citizen of Germany, and Plaintiffs were citizens of Texas, Georgia, and South Dakota. These allegations are sufficient to support that Plaintiffs and Defendants were citizens of different states when the case began. The requirement of complete diversity is therefore satisfied.

**B.      Amount in Controversy**

When removal is based on diversity jurisdiction under 28 U.S.C. § 1332(a), the defendant bears the burden of establishing that the amount in controversy exceeds $75,000. When, as here, there are multiple plaintiffs and they have asserted individual interests, the value of their claims cannot be aggregated. Instead, the defendant must demonstrate that each individual (or in this case, each individual or couple who bought a VW TDI diesel-engine car) has placed more than $75,000 in dispute. *See Urbino v. Orkin Servs. of Cal., Inc.*, 726 F.3d 1118, 1122 (9th Cir. 2013) (explaining that non-aggregation is the "traditional rule" and holding that employees' discrimination and wage and hour claims could not be aggregated to satisfy the amount in controversy because "[e]ach employee suffers a unique injury" and "[d]efendants' obligation to them is not "'as a group,' but as 'individuals severally'").

Consistent with the pleading requirements outlined above, the Supreme Court has explained that "a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee*, 135 S. Ct. at 554. But when the plaintiff challenges the defendant's allegations of the amount in controversy, "[e]vidence establishing the amount is required." *Id.*; *see also Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015) (citing *Dart Cherokee* for the same proposition).

Plaintiffs, in their motion to remand, have challenged VWGoA's amount-in-controversy allegations, and VWGoA has submitted evidence in support of its allegations in response. The Court therefore construes the ECF No. 3781 motion as making a factual attack on the amount in controversy.

Before considering VWGoA's evidence, however, a preliminary issue must be addressed. Plaintiffs, in their complaint, have explicitly demanded "monetary relief of not more than $74,499.99 for each vehicle including damages of any kind, penalties, costs, expenses, pre-judgment interests, and attorney fees." (Compl. ¶ 2.) This cap on the amount sought will control unless it is established that the state where the action was first filed "either does not permit demand for a specific sum or permits recovery of damages in excess of the amount demanded." 28 U.S.C. § 1446(c)(2)(A)(ii).

Plaintiffs filed their case in Texas state court, and Texas "does not permit demand for a specific sum." *Id. See* Tex. R. Civ. P. 47(c)(1) (instructing that plaintiffs must state the *range* of damages they seek, with the lowest permitted range being "monetary relief of $100,000 or less"); *Chavez v. State Farm Lloyds*, Civ. A. No. 7:15-CV-487, 2016 WL 641634, at *2 (S.D. Tex. Feb. 18, 2016) ("Texas law simply does not permit a plaintiff to plead that he or she seeks damages not to exceed $75,000."); *De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1410 (5th Cir. 1995) ("[M]any states, like Texas, have enacted rules that strictly prohibit plaintiffs from pleading for specific amounts in cases of unliquidated damages."). Given Texas's practice, Plaintiffs' demand for monetary relief not to exceed $74,499.99 per vehicle is not binding, and VWGoA's evidence of the amount in controversy may be considered.

The evidence of the amount in dispute falls into three categories: proof of "actual damages" in dispute (a term used here as a shorthand not only for economic damages, but also for the value of equitable remedies such as restitution), proof of punitive damages in dispute, and proof of attorneys' fees in dispute. Each category is considered in turn below.

In considering the evidence, the Court must determine whether a preponderance of it supports that the $75,000 threshold has been passed. *See Leite*, 749 F.3d at 1121 (preponderance of the evidence standard applies to factual attacks on jurisdiction); *Ibarra*, 775 F.3d at 1197

7

(preponderance of the evidence standard applies "where, as here, defendant's assertion of the amount in controversy is contested by plaintiffs").

### 1. Actual Damages

VWGoA has offered evidence of the total amounts that Plaintiffs paid to buy the cars. It contends that these amounts are an accurate measure of the actual damages in controversy.

Plaintiffs have indeed put the full amounts that they paid for the cars in controversy. Among other things, they seek "restitution of all monies expended." (Compl., Prayer for Relief.) Further, although their demands for economic damages are less specific (*see, e.g.*, *id.* ¶ 109 (seeking "economic damages . . . under the [DTPA]")), there is no reason to believe that they will seek a lesser recovery in damages than they do in restitution.

Whether Plaintiffs will be able to recover what they seek is a different question and is currently irrelevant, for the amount in controversy is "not a prospective assessment of [the] defendant's liability;" it is "simply an estimate of the total amount in dispute." *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010). By seeking restitution of all monies expended, Plaintiffs have clearly put the full amounts that they paid to buy the cars in dispute.

\* \* \*

Consistent with the approach VWGoA has taken in defending against other motions to remand in this MDL, it has hired Jay R. Lytle, an Analytical Services Manager at Urban Science Applications, Inc., to estimate the amounts that Plaintiffs paid to buy the cars. (*See* Lytle Decl., MDL Dkt. No. 4232-8; Lytle Redacted Exs. A–D, MDL Dkt. No. 5834-3.) For *Adams*, however, these estimates are unnecessary because Plaintiffs have identified in their complaint the approximate amounts that they paid for the cars. (*See* Compl. ¶ 64 (alleging that "Plaintiff Grant Blake purchased a 2015 VW Passat . . . for approximately $29,000"); *id.* ¶ 99 (alleging that "Plaintiffs Meaghan Zavitz and Keith Zavitz purchased a 2015 VW Passat . . . for approximately $34,700").) Plaintiffs' purchase price approximations range from **$18,000** (Compl. ¶ 89 (Edgar Ruiz)) to **$55,400** (*id.* ¶ 74 (Marcelino Estrada)). Because Plaintiffs have put the full amounts that they paid to buy the cars in dispute, these amounts represent the actual damages in controversy.

8

### 2. Punitive Damages

"It is well established that punitive damages are part of the amount in controversy in a civil action." *Gibson v. Chrysler Corp.*, 261 F.3d 927, 945 (9th Cir. 2001) (citing *Bell v. Preferred Life Assur. Soc'y*, 320 U.S. 238, 240 (1943); *Goldberg v. CPC Int'l, Inc.*, 678 F.2d 1365, 1367 (9th Cir. 1982)). Before they may be included, however, two steps must generally be taken. First, the party asserting jurisdiction must establish that punitive damages would be permitted under the applicable state law based on the conduct alleged. *See Davenport v. Mut. Ben. Health & Accident Ass'n*, 325 F.2d 785, 787 (9th Cir. 1963) (noting that exemplary damages should not be included in the amount in controversy "if under the applicable state law [they] would be legally impossible to recover"). Second, if punitive damages are allowed under state law, the amount of punitive damages that are in controversy must be determined. To do so, "[the] party asserting federal diversity jurisdiction may introduce evidence of jury verdicts in cases involving analogous facts." *Surber v. Reliance Nat. Indem. Co.*, 110 F. Supp. 2d 1227, 1232 (N.D. Cal. 2000).

Under the circumstances alleged here, punitive damages would be permitted under Texas law. "[I]f the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery . . . result[ed] from: (1) fraud; (2) malice; or (3) gross negligence," Texas permits "exemplary damages," which include punitive damages. Tex. Civ. Prac. & Rem. Code §§ 41.001(5), 41.003(a). Taking the allegations as true, this standard is satisfied here. Plaintiffs allege that VW represented that its TDI diesel-engine cars were environmentally friendly, when in fact VW knew that the cars utilized software to evade emissions testing and emitted nitrogen oxides at levels far exceeding the legal limits. (Compl. ¶¶ 46, 49, 51.) This amounts to fraudulent conduct.

As for the amount of punitive damages in controversy, VWGoA has offered evidence of jury verdicts in three cases that it asserts involved facts analogous to those here. The first of these cases is *Johnson v. Ford Motor Company*, 113 P.3d 82 (Cal. 2005), where the plaintiffs sued Ford for concealing that a used car it had sold them had a history of transmission repairs and replacements. *Id.* at 85. Evidence supported that Ford had engaged in similar conduct "in some number of cases in addition to plaintiffs' own, perhaps a large number of other cases." *Id.* at 96.

9

The jury awarded $10 million in punitive damages against Ford, but the California Supreme Court concluded that the award was inconsistent with due process. On remand, the Court of Appeal affirmed a punitive damages award of $175,000, which was just less than 10 times the compensatory damages award. *See Johnson v. Ford Motor Co.*, 135 Cal. App. 4th 137, 150 (2005).

VWGoA next points to *Chrysler Corporation v. Schiffer*, 736 So. 2d 538 (Ala. 1999). The plaintiff there purchased a truck that Chrysler had represented was new but that in fact had been damaged, repaired, and repainted. *Id.* at 540, 546. Finding for the plaintiff, the jury awarded $50,000 in compensatory damages and $325,000 in punitive damages. *Id.* at 540. The Alabama Supreme Court affirmed on the condition that the plaintiff agree to accept a reduced punitive damages award of $150,000, a 3:1 multiple of compensatory damages. *Id.* at 549.

Lastly, VWGoA cites to *BMW of North America, Inc. v. Gore* ("*BMW II*"), 701 So. 2d 507 (Ala. 1997). The plaintiff there alleged that BMW failed to disclose that the car it sold him had been damaged by acid rain during its shipment from Germany and had subsequently been repainted. *Id.* at 508. Evidence at trial supported that BMW had a nationwide policy of not disclosing pre-delivery damage when the cost of repairs did not exceed three percent of the car's suggested retail price, a practice that was illegal in some states but not in others. *See id.* at 509; *see also BMW of N. Am., Inc. v. Gore* ("*BMW I*"), 646 So. 2d 619, 627 n.6 (Ala. 1994). The jury found for the plaintiff and awarded $4,000 in compensatory damages and $4 million in punitive damages. *BMW II*, 701 So. 2d at 509. On appeal, the U.S. Supreme Court held that the $4 million punitive damages award (and even a reduced punitive damages award of $2 million that was entered by the Alabama Supreme Court) was excessive and violated due process. *See BMW of N.A., Inc. v. Gore*, 517 U.S. 559, 562-63, 585-86 (1996). The Alabama Supreme Court, on remand, entered an order requiring the plaintiff to accept a reduced punitive damages award of $50,000, a 12:1 multiple of compensatory damages. *BMW II*, 701 So. 2d at 515.

Based on the awards in *Johnson*, *Schiffer*, and *Gore*, VWGoA argues that a conservative estimate of the punitive damages in controversy in *Adams* is $50,000 for each individual or couple who bought a TDI diesel-engine car. That was the amount awarded in *Gore*, and it was the lowest

award in the three sample cases. A $50,000 punitive damages award would also be less than a 3:1 multiple of each individual's or couple's estimated actual damages, which is on the low end of the multiples permitted in *Johnson*, *Schiffer* and *Gore*, and is also beneath Texas's exemplary damages ceiling for DTPA claims, which limits exemplary damages to "three times . . . economic damages." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006).

Fraudulent conduct comes in many forms, and it is almost always possible to draw distinctions between the facts of one fraud and another. But when *Johnson*, *Schiffer*, and *Gore* are stripped to their essentials, they offer reasonable comparisons to this case. Each involved a global car manufacturer that deceived its customers about the characteristics of its cars. And in *Johnson* and (to a lesser degree) in *Gore*, evidence also supported that the deceit was part of a pattern of fraudulent business practices, as is alleged here.

At this stage, the question is whether at least $50,000 in punitive damages is at stake for each individual or couple in *Adams*. Given the facts alleged and the amount of punitive damages awarded in comparable cases, it is clear that the answer to this question is yes.

### 3. Attorneys' Fees

When state law "authorizes an award of attorneys' fees, either with mandatory or discretionary language, such fees may be included in the amount in controversy." *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1156 (9th Cir. 1998). Until recently, it was an "open question [in this circuit] whether attorney's fees that [were] anticipated but unaccrued at the time of removal or filing in federal court . . . [could] be included in the amount-in-controversy." *Gonzales v. CarMax Auto Superstores, LLC*, 840 F.3d 644, 649 n.2 (9th Cir. 2016). That question was resolved, and answered affirmatively, last year:

> As explained in *Chavez* [*v. JPMorgan Chase & Co.*, 888 F.3d 413 (9th Cir. 2018)], when we assess the amount in controversy at the time of removal, we must include all relief to which a plaintiff is entitled if the action succeeds. 888 F.3d at 418. Accordingly, if the law entitles the plaintiff to future attorneys' fees if the action succeeds, "then there is no question that future [attorneys' fees] are 'at stake' in the litigation," *id.* at 417, and the defendant may attempt to prove that future attorneys' fees should be included in the amount in controversy.

11

*Fritsch v. Swift Transp. Co. of Ariz., LLC*, 899 F.3d 785, 794 (9th Cir. 2018) (second alteration in original).

If Plaintiffs prevail on their DTPA claims, they may obtain attorneys' fees. *See* Tex. Bus. & Com. Code § 17.50(d) ("Each consumer who prevails [on a DTPA claim] shall be awarded court costs and reasonable and necessary attorneys' fees."). Attorneys' fees are therefore "'at stake' in the litigation." *Fritsch*, 899 F.3d at 794 (quoting *Chavez*, 888 F.3d at 417).

To determine the amount of attorneys' fees at stake, the removing party can provide an "estimate[] [of] the amount of time that the case will require," and an estimate of "plaintiff's counsel's hourly billing rate." *Surber*, 110 F. Supp. 2d at 1232. VWGoA has offered the following evidence of this type here.

To estimate Plaintiffs' counsel's hourly billing rate, VWGoA has identified motions that counsel previously filed in this MDL that list counsel's hourly rates. For a partner and an associate at counsel's firm, those rates are respectively listed as $605 and $295 per hour. (*See* MDL Dkt. No. 2608-4 at 8.) In VWGoA's calculations, it has used the associate rate to be conservative.

To estimate the number of hours that Plaintiffs' counsel will spend litigating each individual's or couple's claims in *Adams*, VWGoA reviewed 34 "Lemon Law" cases that resulted in awards of attorneys' fees and expenses. Some of those cases settled; others went to trial. (*See* MDL Dkt. No. 4232-5, App. D (listing cases).) The number of hours that plaintiffs' counsel spent litigating these cases was often not disclosed, but VWGoA performed the following calculations to reach an average number of 201.6 hours per case:

> First, [VWGoA] separated attorneys' fees from attorneys' expenses in the 34 listed Lemon Law cases. Out of the total award of attorneys' fees and expenses, on average, 87.1% of the award was attributable to attorneys' fees and 12.9% was attributable to expenses. Therefore, to estimate the average amount of attorneys' fees in these cases (not including attorneys' expenses), [VWGoA] took 87.1% of $92,583.63 [with $92,583.63 reflecting the average total award of attorneys' fees and expenses]: [the result was] $80,640.34.
>
> Second, [VWGoA] used this estimate of the attorneys' fee awards to determine the average number of attorney hours for which fees were

12

> awarded in these 34 cases (given that the number of hours were not disclosed or readily available for many cases). [VWGoA] divided $80,640.34 by an inflated billing rate of $400/hour. The result is an estimate of the number of hours for which attorneys were awarded fees, on average, in these cases: 201.6 hours.

(Opp'n, MDL Dkt. No. 4232 at 58 (footnote omitted).)

Multiplying the estimated hourly rate of $295 by 201.6 hours, VWGoA has estimated that $59,472 in attorneys' fees are in controversy for each individual or couple in *Adams*.

The methodology that VWGoA has used strikes the Court as generally reasonable. The estimated hourly rate is supported by evidence, and the lemon-law cases that VWGoA has identified serve as reasonable comparisons to this case, as Plaintiffs' warranty claims are effectively lemon-law claims. *See* 88 A.L.R.5th 301 (2001) (explaining that "lemon laws" were designed "to give consumers a means of enforcing a manufacturer's express warranty on a motor vehicle"). Although Plaintiffs also bring breach of contract and DTPA claims here, those claims include additional elements that, if anything, may increase the number of hours counsel spends litigating.

The Court's only concern with VWGoA's estimates is that they do not take into account that the *Adams* plaintiffs' claims are all based on the same core allegations, and it is likely that certain efficiencies will be realized. For example, any evidence that counsel gathers to support that VW used emissions-cheating software will likely be used to support each Plaintiff's claims.

To be sure, even with such efficiencies, Plaintiffs' counsel could easily spend at least 201.6 hours litigating each case. At a minimum, each Plaintiff will likely need to be deposed. And if the case proceeds to trial, there may be Plaintiff-specific damages issues.

To be conservative and to reflect possible economies of scale, however, the Court will only include 100.8 hours in the estimate of the time that Plaintiffs' counsel will spend litigating each individual's or couple's claims in *Adams*, which is half of the hours that VWGoA has estimated. The reduced number reflects that there are likely to be efficiencies in litigating the claims of many similar plaintiffs, but that these efficiencies will not reduce the time spent litigating each plaintiff's claims to zero.

Multiplying 100.8 hours by the hourly rate of $295 leads to an estimate of **$29,736** in attorneys' fees. At least that amount of attorneys' fees is reasonably in controversy for each individual or couple in *Adams*.[2]

### 4. Total Amount in Controversy

When the above estimates of actual damages, punitive damages, and attorneys' fees are added together, the amounts in controversy for each individual or couple in *Adams* range from **$97,736** to **$135,136**. Section 1332(a)'s amount-in-controversy requirement is satisfied.

## IV. CONCLUSION

VWGoA has plausibly alleged that there is complete diversity of citizenship between it and VW AG on the one hand, and Plaintiffs on the other. Also, a preponderance of the evidence supports that the amount-in-controversy requirement is met. The Court therefore concludes that it has diversity subject-matter jurisdiction over *Adams* and DENIES the ECF No. 3781 motion to remand.

**IT IS SO ORDERED.**

Dated: February 27, 2019

CHARLES R. BREYER
United States District Judge

---

[2] VWGoA has also provided an estimate of costs *Adams*, but costs cannot be included in amount-in-controversy calculations. *See* 28 U.S.C. § 1332(a) (requiring that the amount in controversy "exceed[] the sum or value of $75,000, *exclusive of interests and costs*") (emphasis added).

14

**APPENDIX**

**(List of remaining *Adams* plaintiffs)**

1. Grant Blake
2. Chris Chandler
3. Blake Cunningham
4. Marcelino Estrada
5. Ginger Foster
6. Don Randall
7. Kurt Rathjen
8. Margaret Rickman
9. Edgar Ruiz
10. Gregory Tindel
11. Meghan Zavitz and Keith Zavitz