UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION / | MDL No. 2672 CRB (JSC)<br><br>**ORDER DENYING MOTION TO REMAND** |
| This Order Relates To:<br>MDL Dkt. No. 3659<br><br>*Crook v. VWGoA*, No. 3:17-cv-1977-CRB / | |

This Order addresses a motion to remand *Crook v. Volkswagen Group of America, Inc.* to Alabama state court. The plaintiffs are three individuals who each bought a Volkswagen or Audi 2.0-liter TDI diesel-engine car, and who opted out of the Court-approved 2.0-liter class action settlement.

Volkswagen Group of America, Inc. ("VWGoA") removed *Crook* based on federal question and diversity subject-matter jurisdiction. Plaintiffs, in their motion to remand, have argued that neither form of jurisdiction is present. The Court considers at this time only whether it has jurisdiction on the basis of diversity. Concluding that it does, it DENIES the motion to remand.

**I. BACKGROUND**

Plaintiffs allege that VWGoA and Volkswagen AG ("VW AG"), collectively referred to here as "VW," marketed Volkswagen and Audi TDI diesel-engine cars as having low emissions, good gas mileage, and an environmentally-friendly engine. (*Crook*, Dkt. No. 1-1, Compl. ¶¶ 23-30.) To obtain these benefits, Plaintiffs allege that they agreed to pay premium prices for the cars. (*Id.* ¶ 11.)

In fact, the cars did not have low emissions and were not good for the environment. And not only were the cars' emissions higher than represented, but VW knew this. (*Id.* ¶¶ 10, 31.)

VW knew that the cars could not perform as promised and had specifically developed and installed software in them that detected and evaded emissions testing. (*Id.* ¶¶ 32-36.) During testing, the cars appeared to satisfy governing emission standards; but when the cars were on the road, they emitted nitrogen oxides at up to 40 times the legal limits. (*Id.* ¶ 34.) VW has since admitted that it equipped its TDI diesel-engine cars with emissions-cheating software and that it intentionally deceived U.S. regulators and U.S. consumers about the cars' emissions. (*Id.* ¶¶ 40-43.)

The *Crook* complaint includes four claims against VW. The claims are for (1) fraudulent concealment, (2) fraudulent misrepresentations, (3) violation of the Alabama Deceptive Trade Practices Act ("DTPA"), and (4) unjust enrichment. Plaintiffs seek remedies which include actual and punitive damages and attorneys' fees. (*Id.*, Prayer for Relief.)

VWGoA removed *Crook* to federal court, in part on the basis of diversity jurisdiction. (Notice of Removal, Dkt. No. 1.) VW AG was not served and did not join the notice of removal. Plaintiffs responded by filing a motion to remand.

## II. LEGAL STANDARD

A defendant who seeks to remove a case to federal court must file a notice of removal "containing a short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a). The Ninth Circuit has explained that a notice of removal, like a complaint that is originally filed in federal court, must comply with the familiar *Twombly*/*Iqbal* pleading standard. *See Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014) (citation omitted). The Ninth Circuit has also explained that jurisdictional challenges to removal should be resolved within the framework that governs motions to dismiss complaints for lack of subject-matter jurisdiction:

> A plaintiff who contests the existence of removal jurisdiction may file a motion to remand, *see* 28 U.S.C. § 1447(c), the functional equivalent of a defendant's motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1). As under Rule 12(b)(1), a plaintiff's motion to remand may raise either a facial attack or a factual attack on the defendant's jurisdictional allegations . . . .

*Id.* (citation omitted).

2

The *Leite* court summarized the rules governing facial and factual attacks to jurisdiction:

> A "facial" attack accepts the truth of the . . . allegations but asserts that they are insufficient on their face to invoke federal jurisdiction. The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the . . . allegations as true . . . , the court determines whether [they] are sufficient as a legal matter to invoke the court's jurisdiction.
>
> A "factual" attack, by contrast, contests the truth of the . . . factual allegations, usually by introducing evidence outside the pleadings. When the [party contesting jurisdiction] raises a factual attack, the [party asserting jurisdiction] must support her jurisdictional allegations with competent proof, under the same evidentiary standard that governs in the summary judgment context. The [party asserting jurisdiction] bears the burden of proving by a preponderance of the evidence that each of the requirements for subject-matter jurisdiction has been met.

*Id.* at 1121 (citations and internal quotation marks omitted).

One form of federal subject-matter jurisdiction, which is the only form considered in this Order, is diversity: district courts have subject-matter jurisdiction over civil cases where (1) the matter "is between . . . citizens of different States," and (2) the amount in controversy "exceeds the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332(a)(1). Consistent with the framework outlined above, "[t]he party seeking to invoke the district court's diversity jurisdiction always bears the burden of both pleading and proving diversity jurisdiction." *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 613-14 (9th Cir. 2016).

When, as here, there are multiple plaintiffs and they have asserted individual interests, the value of their claims cannot be aggregated. Instead, the defendant must demonstrate that each plaintiff has placed more than $75,000 in dispute. *See Urbino v. Orkin Servs. of Cal., Inc.*, 726 F.3d 1118, 1122 (9th Cir. 2013) (explaining that non-aggregation is the "traditional rule" and holding that employees' discrimination and wage and hour claims could not be aggregated to satisfy the amount in controversy because "[e]ach employee suffers a unique injury" and "[d]efendants' obligation to them is not "'as a group,' but as 'individuals severally'").

Subject-matter jurisdiction must exist when a case is first filed. A federal court that is considering whether it has jurisdiction on the basis of diversity must therefore consider "the state

3

of things at the time of the action brought." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473 (2007) (quoting *Mullan v. Torrance*, 9 Wheat. 537, 539 (1824)). This means examining whether the parties' citizenship was diverse and whether the amount in controversy exceeded $75,000 at the time the case was originally filed.

## III. DISCUSSION

Plaintiffs do not dispute that there is complete diversity of citizenship between them, on the one hand, and VWGoA and VW AG on the other. (*See* Mot., MDL Dkt. No. 3659 at 4 n.2.) They have, however, made a factual attack on VWGoA's amount-in-controversy allegations.

VWGoA, in responding to Plaintiffs' factual attack, has submitted evidence of the amount in controversy. That evidence falls into three categories: proof of actual damages in dispute, proof of punitive damages in dispute, and proof of attorneys' fees in dispute. Each category is considered in turn below. In considering the evidence, the Court must determine whether a preponderance of it supports that the $75,000 threshold has been passed. *See Leite*, 749 F.3d at 1121 (preponderance of the evidence standard applies to factual attacks on jurisdiction); *Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015) (preponderance of the evidence standard applies "where, as here, defendant's assertion of the amount in controversy is contested by plaintiffs").

### A. Actual Damages

VWGoA has offered evidence of the purchase prices of the cars at issue. It contends that these amounts are an accurate measure of the amounts of actual damages in dispute.

Under Alabama law, the measure of damages in an action "based on fraud in the inducement of a purchase . . . is generally the difference between the value of the property as represented and its actual value." *Reynolds v. Mitchell*, 529 So. 2d 227, 233 (Ala. 1988). Under this standard, for Plaintiffs' damages to be equal to the full amount that they paid to buy the cars, the trier of fact will need to determine that the cars, because they used emissions-cheating software and emitted pollutants at levels well above the legal limits, had no value. This seems like an unlikely conclusion given that the software did not make the cars inoperative, and Plaintiffs presumably obtained some benefit from driving them.

4

Nevertheless, to the extent that the cars retained some value, Plaintiffs have made no attempt to quantify that value. Nor have they clearly asserted that they will not seek to recover the full amounts that they paid for the cars in damages. It could be argued that Plaintiffs do not need to make such a showing, as it is VWGoA that bears the burden of proof. But VWGoA has offered evidence of the amount of actual damages in controversy, and Plaintiffs have made no attempt to rebut that evidence. A plaintiff cannot file a motion to remand and then stand idly by when the defendant submits evidence to support the amount in controversy. Indeed, when the amount in controversy is in question, "the Supreme Court has said that *both sides* submit proof and the court then decides where the preponderance lies." *Ibarra*, 775 F.3d at 1198 (emphasis added) (citing *Dart Cherokee*, 135 S. Ct. at 554-55).

The amount in controversy is "not a prospective assessment of [the] defendant's liability;" it is "simply an estimate of the total amount in dispute." *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010). Given VWGoA's evidence and Plaintiffs' silence, it appears more likely than not that the purchase prices of the cars are indeed in dispute.

* * *

The amounts that Plaintiffs paid to buy the cars are not identified in the complaint. But the complaint does identify the makes, models, and model years of the cars. (*See, e.g.*, Compl. ¶ 13 (alleging that plaintiff Crook "purchased a 2012 Volkswagen Jetta TDI in August 2012").) Using that information, VWGoA contends that the amounts paid to buy the cars can be reasonably estimated.

The estimates take some work because VWGoA reports that it does not have access to granular retail sales-price data for its cars. (Dealers negotiate the sales prices, and although dealers provide VWGoA with certain sales information—including customer names, customer contact information, VINs, and sales dates—the retail sales prices are apparently not reported.) (*See* Lytle Decl. ¶ 8, MDL Dkt. No. 4232-8.) Because VWGoA does not have access to sales-price data, it hired Jay R. Lytle, an Analytical Services Manager at Urban Science Applications, Inc., to estimate the amounts that Plaintiffs paid to buy the cars. Mr. Lytle states that Urban Science performs consulting work for car manufacturers and that his work "regularly involves

5

analyzing vehicle pricing, including prices paid by consumers for new and used vehicles." (*Id.* ¶¶ 4-5.)

Mr. Lytle's declaration describes his methodology in detail. In short, he used the information Plaintiffs provided (*e.g.*, vehicle models and model years), industry guides (*e.g.*, Kelley Blue Book and TRUECar), and a discounted version of the Manufacturer's Suggested Retail Price for the same model cars to estimate the original purchase prices of the cars. (*See id.* ¶¶ 13-22.) His estimates can be found in Exhibits A, B, and C to his declaration. (*See* MDL Dkt. No. 5834-3.) For the three cars that are at issue in *Crook*, Mr. Lytle's purchase price estimates range from $25,713 to $33,010.

Plaintiffs have not challenged the accuracy of Mr. Lytle's numbers; they have not, for example, offered evidence to support that they paid materially different amounts for the cars in question. This fact suggests that Mr. Lytle has made reasonably accurate calculations. Mr. Lytle's methodology also appears sensible: he used the vehicle-specific information that Plaintiffs provided in their complaints and respected market metrics and resources, and he explained in detail how he arrived at his estimates.

Plaintiffs have not asserted that they won't seek to recover the full amounts that they paid for the cars in damages. Mr. Lytle's estimates serve as a sufficient proxy of those amounts. Based on Mr. Lytle's estimates, the actual damages in controversy range from **$25,713 to $33,010** per plaintiff.

**B. Punitive Damages**

"It is well established that punitive damages are part of the amount in controversy in a civil action." *Gibson v. Chrysler Corp.*, 261 F.3d 927, 945 (9th Cir. 2001) (citing *Bell v. Preferred Life Assur. Soc'y*, 320 U.S. 238, 240 (1943); *Goldberg v. CPC Int'l, Inc.*, 678 F.2d 1365, 1367 (9th Cir. 1982)). Before they may be included, however, two steps must generally be taken. First, the party asserting jurisdiction must establish that punitive damages would be permitted under the applicable state law based on the conduct alleged. *See Davenport v. Mut. Ben. Health & Accident Ass'n*, 325 F.2d 785, 787 (9th Cir. 1963) (noting that exemplary damages should not be included in the amount in controversy "if under the applicable state law [they] would be legally impossible

to recover"). Second, if punitive damages are allowed under state law, the amount of punitive damages that are in controversy must be determined. To do so, "[the] party asserting federal diversity jurisdiction may introduce evidence of jury verdicts in cases involving analogous facts." *Surber v. Reliance Nat. Indem. Co.*, 110 F. Supp. 2d 1227, 1232 (N.D. Cal. 2000).

Under the circumstances alleged here, punitive damages would be permitted under Alabama law. "[I]n a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice," Alabama permits punitive damages. Ala. Code § 6–11–20(a). Taking the allegations as true, this standard is satisfied here. Plaintiffs allege that VW represented to them that its TDI diesel-engine cars were environmentally friendly, when in fact VW knew that the cars utilized software to evade emissions testing and emitted nitrogen oxides at levels far exceeding the legal limits. (Compl. ¶¶ 23-42.) This amounts to deliberate fraudulent conduct.

As for the amount of punitive damages in controversy, VWGoA has offered evidence of jury verdicts in three cases that it asserts involved facts analogous to those here. The first of these cases is *Johnson v. Ford Motor Company*, 113 P.3d 82 (Cal. 2005), where the plaintiffs sued Ford for concealing that a used car it had sold them had a history of transmission repairs and replacements. *Id.* at 85. Evidence supported that Ford had engaged in similar conduct "in some number of cases in addition to plaintiffs' own, perhaps a large number of other cases." *Id.* at 96. The jury awarded $10 million in punitive damages against Ford, but the California Supreme Court concluded that the award was inconsistent with due process. On remand, the Court of Appeal affirmed a punitive damages award of $175,000, which was just less than 10 times the compensatory damages award. *See Johnson v. Ford Motor Co.*, 135 Cal. App. 4th 137, 150 (2005).

VWGoA next points to *Chrysler Corporation v. Schiffer*, 736 So. 2d 538 (Ala. 1999). The plaintiff there purchased a truck that Chrysler had represented was new but that in fact had been damaged, repaired, and repainted. *Id.* at 540, 546. Finding for the plaintiff, the jury awarded $50,000 in compensatory damages and $325,000 in punitive damages. *Id.* at 540. The Alabama

7

Supreme Court affirmed on the condition that the plaintiff agree to accept a reduced punitive damages award of $150,000, a 3:1 multiple of compensatory damages. *Id.* at 549.

Lastly, VWGoA cites to *BMW of North America, Inc. v. Gore* ("*BMW II*"), 701 So. 2d 507 (Ala. 1997). The plaintiff there alleged that BMW failed to disclose that the car it sold him had been damaged by acid rain during its shipment from Germany and had subsequently been repainted. *Id.* at 508. Evidence at trial supported that BMW had a nationwide policy of not disclosing pre-delivery damage when the cost of repairs did not exceed three percent of the car's suggested retail price, a practice that was illegal in some states but not in others. *See id.* at 509; *see also BMW of N. Am., Inc. v. Gore* ("*BMW I*"), 646 So. 2d 619, 627 n.6 (Ala. 1994). The jury found for the plaintiff and awarded $4,000 in compensatory damages and $4 million in punitive damages. *BMW II*, 701 So. 2d at 509. On appeal, the U.S. Supreme Court held that the $4 million punitive damages award (and even a reduced punitive damages award of $2 million that was entered by the Alabama Supreme Court) was excessive and violated due process. *See BMW of N.A., Inc. v. Gore*, 517 U.S. 559, 562-63, 585-86 (1996). The Alabama Supreme Court, on remand, entered an order requiring the plaintiff to accept a reduced punitive damages award of $50,000, a 12:1 multiple of compensatory damages. *BMW II*, 701 So. 2d at 515.

Based on the awards in *Johnson*, *Schiffer*, and *Gore*, VWGoA argues that a conservative estimate of the punitive damages in controversy is $50,000 for each plaintiff in *Crook*. That was the amount awarded in *Gore*, and it was the lowest award in the three sample cases. A $50,000 punitive damages award would also be less than a 3:1 multiple of each *Crook* plaintiff's estimated actual damages, which is on the low end of the multiples permitted in *Johnson*, *Schiffer* and *Gore*. Further, although Alabama law includes a cap on punitive damages, awards of $50,000 would not exceed that cap. *See* Ala. Code § 6–11–21(a) (limiting punitive damages to "three times the compensatory damages . . . or five hundred thousand dollars ($500,000), whichever is greater").

Fraudulent conduct comes in many forms, and it is almost always possible to draw distinctions between the facts of one fraud and another. But when *Johnson*, *Schiffer*, and *Gore* are stripped to their essentials, they offer reasonable comparisons to this case. Each involved a global car manufacturer that deceived its customers about the characteristics of its cars. And in *Johnson*

8

and (to a lesser degree) in *Gore*, evidence also supported that the deceit was part of a pattern of fraudulent business practices, as is alleged here.

At this stage, the question is whether at least $50,000 in punitive damages is at stake for each plaintiff in *Crook*. Given the facts alleged and the amount of punitive damages awarded in comparable cases, it is clear that the answer to this question is yes.

## C. Attorneys' Fees

When state law "authorizes an award of attorneys' fees, either with mandatory or discretionary language, such fees may be included in the amount in controversy." *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1156 (9th Cir. 1998). Until recently, it was an "open question [in this circuit] whether attorney's fees that [were] anticipated but unaccrued at the time of removal or filing in federal court . . . [could] be included in the amount-in-controversy." *Gonzales v. CarMax Auto Superstores, LLC*, 840 F.3d 644, 649 n.2 (9th Cir. 2016). That question was resolved, and answered affirmatively, last year:

> As explained in *Chavez* [*v. JPMorgan Chase & Co.*, 888 F.3d 413 (9th Cir. 2018)], when we assess the amount in controversy at the time of removal, we must include all relief to which a plaintiff is entitled if the action succeeds. 888 F.3d at 418. Accordingly, if the law entitles the plaintiff to future attorneys' fees if the action succeeds, "then there is no question that future [attorneys' fees] are 'at stake' in the litigation," *id.* at 417, and the defendant may attempt to prove that future attorneys' fees should be included in the amount in controversy.

*Fritsch v. Swift Transp. Co. of Ariz., LLC*, 899 F.3d 785, 794 (9th Cir. 2018) (second alteration in original).

If Plaintiffs prevail on their DTPA claim, they may obtain attorneys' fees. *See* Ala. Code § 8-19-10(a)(3) (providing that "a reasonable attorney's fee" may be recovered in "any successful [DTPA] action"). Attorneys' fees are therefore "'at stake' in the litigation." *Fritsch*, 899 F.3d at 794 (quoting *Chavez*, 888 F.3d at 417).

To determine the amount of attorneys' fees at stake, the removing party can provide an "estimate[] [of] the amount of time that the case will require," and an estimate of "plaintiff's

9

counsel's hourly billing rate." *Surber*, 110 F. Supp. 2d at 1232. VWGoA has offered the following evidence of this type here.

To estimate Plaintiffs' counsel's hourly billing rate, VWGoA has identified motions that other plaintiffs' counsel have filed in this MDL and that list those counsel's hourly rates. To be conservative, VWGoA has used the low end of those rates, which is $295 per hour, as an estimate of Plaintiffs' counsel's hourly rate. (*See* MDL Dkt. No. 4232 at 57.)

To estimate the number of hours that Plaintiffs' counsel will spend litigating *Crook*, VWGoA reviewed 34 "Lemon Law" cases that resulted in awards of attorneys' fees and expenses. Some of those cases settled; others went to trial. (*See* MDL Dkt. No. 4232-5, App. D (listing cases).) The number of hours that plaintiffs' counsel spent litigating those cases was often not disclosed, but VWGoA performed the following calculations to reach an average number of 201.6 hours per case:

> First, [VWGoA] separated attorneys' fees from attorneys' expenses in the 34 listed Lemon Law cases. Out of the total award of attorneys' fees and expenses, on average, 87.1% of the award was attributable to attorneys' fees and 12.9% was attributable to expenses. Therefore, to estimate the average amount of attorneys' fees in these cases (not including attorneys' expenses), [VWGoA] took 87.1% of $92,583.63 [with $92,583.63 reflecting the average total award of attorneys' fees and expenses]: [the result was] $80,640.34.
>
> Second, [VWGoA] used this estimate of the attorneys' fee awards to determine the average number of attorney hours for which fees were awarded in these 34 cases (given that the number of hours were not disclosed or readily available for many cases). [VWGoA] divided $80,640.34 by an inflated billing rate of $400/hour. The result is an estimate of the number of hours for which attorneys were awarded fees, on average, in these cases: 201.6 hours.

(Opp'n, MDL Dkt. No. 4232 at 58 (footnote omitted).)

Multiplying the estimated hourly rate of $295 by 201.6 hours, VWGoA has estimated that $59,472 in attorneys' fees are in controversy for each *Crook* plaintiff.

Plaintiffs have not challenged the accuracy of VWGoA's estimates, and the methodology used strikes the Court as generally reasonable. The estimated hourly rate is supported by evidence, and the lemon-law cases that VWGoA has identified serve as reasonable comparisons to

10

this case. *See* 88 A.L.R.5th 301 (2001) (explaining that "lemon laws" were designed "to give consumers a means of enforcing a manufacturer's express warranty on a motor vehicle"). Although Plaintiffs bring fraud claims here rather than warranty claims, the need to prove fraud, if anything, may increase the number of hours counsel spends litigating.

The Court's only concern with VWGoA's estimates is that they do not take into account that Plaintiffs' claims are all based on the same core allegations, and it is likely that certain efficiencies will be realized. For example, any evidence that counsel gathers to support that VW used emissions-cheating software will likely be used to support each plaintiff's claims.

To be sure, even with such efficiencies, Plaintiffs' counsel could easily spend at least 201.6 hours litigating each plaintiff's claims. At a minimum, each plaintiff will likely need to be deposed. And if the case proceeds to trial, there may be plaintiff-specific damages issues.

To be conservative and to reflect possible economies of scale, however, the Court will only include 100.8 hours in the estimate of the time that Plaintiffs' counsel will spend litigating each plaintiff's claims, which is half of the hours that VWGoA has estimated. The reduced number reflects that there are likely to be efficiencies in litigating the claims of similar plaintiffs, but that these efficiencies will not reduce the time spent litigating each plaintiff's claims to zero.

Multiplying 100.8 hours by the hourly rate of $295 leads to an estimate of **$29,736** in attorneys' fees. At least that amount of attorneys' fees is reasonably in controversy for each plaintiff in *Crook*.[1]

**D.  Total Amount in Controversy**

When $50,000 in punitive damages is added to $29,736 in attorneys' fees, the combined amount exceeds $75,000. And when actual damages are also added, the amounts in controversy for each plaintiff in *Crook* range from **$105,449** to **$112,746**. Section 1332(a)'s amount-in-controversy requirement is satisfied.

---

[1] VWGoA has also provided an estimate of costs in *Crook*, but costs cannot be included in amount-in-controversy calculations. *See* 28 U.S.C. § 1332(a) (requiring that the amount in controversy "exceed[] the sum or value of $75,000, *exclusive of interests and costs*") (emphasis added).

11

## IV. CONCLUSION

Plaintiffs do not dispute that there is complete diversity of citizenship between them, on the one hand, and VWGoA and VW AG on the other. Also, a preponderance of the evidence supports that the amount-in-controversy requirement is met. The Court therefore concludes that it has diversity jurisdiction over *Crook* and DENIES the motion to remand.

**IT IS SO ORDERED.**

Dated: April 5, 2019

CHARLES R. BREYER
United States District Judge