1

**BERNSTEIN LITOWITZ BERGER
     & GROSSMANN LLP**

2

JAMES A. HARROD

3

JAI CHANDRASEKHAR
ADAM D. HOLLANDER

4

KATE W. AUFSES
jim.harrod@blbglaw.com

5

jai@blbglaw.com
adam.hollander@blbglaw.com

6

kate.aufses@blbglaw.com

7

1251 Avenue of the Americas
New York, NY 10020

8

Tel: (212) 554-1400
Fax: (212) 554-1444

9

10

*Attorneys for Lead Plaintiff ASHERS and
Plaintiff Miami Police and
Lead Counsel in the Securities Actions*

11

12

UNITED STATES DISTRICT COURT

13

NORTHERN DISTRICT OF CALIFORNIA

14

IN RE: VOLKSWAGEN "CLEAN DIESEL"

15

MARKETING, SALES PRACTICES, AND
PRODUCTS LIABILITY LITIGATION

16

17

_____/

This Document Relates To: Securities Actions

18

19

*City of St. Clair Shores*, 15-1228 (E.D. Va.)
*Travalio*, 15-7157 (D.N.J.)

20

*George Leon Family Trust*, 15-7283 (D.N.J.)
*Charter Twp. of Clinton*, 15-13999 (E.D. Mich.)

21

*Wolfenbarger*, 15-326 (E.D. Tenn.)

22

_____/

MDL No. 2672 CRB (JSC)

**CLASS ACTION**

**PLAINTIFFS' NOTICE OF MOTION
FOR FINAL APPROVAL OF
SETTLEMENT AND PLAN OF
ALLOCATION, AND
MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT
THEREOF**

Judge:        Hon. Charles R. Breyer
Courtroom:  6
Date:         May 10, 2019
Time:         10:00 a.m.

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

NOTICE OF MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION ..................................................................................................................... 1

STATEMENT OF ISSUES TO BE DECIDED ........................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 2

I.      PRELIMINARY STATEMENT .................................................................................... 2

II.     ARGUMENT .................................................................................................................. 4

        A.      THE SETTLEMENT MERITS FINAL APPROVAL BY THE COURT ......................... 4

                1.      Plaintiffs And Lead Counsel Have Adequately Represented The Settlement Class ............................................................................................ 5

                2.      The Settlement Was Reached After Substantial Discovery And Arm's-Length Negotiations Between Experienced Counsel ................................ 6

                3.      The Relief That The Settlement Provides For The Settlement Class Is Adequate, Taking Into Account The Costs And Risks Of Further Litigation And All Other Relevant Factors ............................................... 9

                4.      The Settlement Treats Class Members Equitably Relative To Each Other ........... 17

                5.      The Reaction Of The Settlement Class To The Settlement .................................... 17

        B.      THE PLAN OF ALLOCATION IS FAIR AND REASONABLE .................................... 18

        C.      THE SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED ........................... 21

        D.      NOTICE TO THE SETTLEMENT CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS ................................................................................ 21

III.    CONCLUSION ............................................................................................................ 23

## TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*In re Am. Apparel, Inc. Shareholder Litig.*,
   2014 WL 10212865 (C.D. Cal. July 28, 2014).................................................20

*In re Amgen Inc. Sec. Litig.*,
   2016 WL 10571773 (C.D. Cal. Oct. 25, 2016).............................7, 12, 15, 17

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
   2006 WL 903236 (S.D.N.Y. Apr. 6, 2006)......................................................14

*Bendon v. DTG Operations, Inc.*,
   2018 WL 4976511 (C.D. Cal. Aug. 22, 2018)................................................14

*In re Biolase, Inc. Sec. Litig.*,
   2015 WL 12720318 (C.D. Cal. Oct. 13, 2015)...............................................10

*In re Bluetooth Headset Prods. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011) ....................................................................7, 9

*In re Celera Corp. Sec. Litig.*,
   2015 U.S. Dist. LEXIS 157408 (N.D. Cal. Nov. 20, 2015)..........................13

*Churchill Village L.L.C. v. General Electric*,
   361 F.3d 566 (9th Cir. 2004) ..................................................................5, 21

*Class Plaintiffs v. Seattle*,
   955 F.2d 1268 (9th Cir. 1992) .....................................................................18

*Destefano v. Zynga, Inc.*,
   2016 WL 537946 (N.D. Cal. Feb. 11, 2016) ......................................9, 15, 23

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974)......................................................................................21

*Eisen v. Porsche Cars N. Am., Inc.*,
   2014 WL 439006 (C.D. Cal. Jan. 30, 2014) ..................................................7

*Garner v. State Farm Mut. Auto. Ins. Co.*,
   2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ...............................................4

*In re Global Crossing Sec. & ERISA Litig.*,
   225 F.R.D. 436 (S.D.N.Y. 2004) .................................................................13

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1010 (9th Cir. 1998) ...............................................................5, 6, 9

*Hartless v. Clorox Co.*,
273 F.R.D. 630 (S.D. Cal. 2011), *aff'd in relevant part*, 473 F. App'x 716 (9th Cir. 2012) ............................................................................................................15

*Hayes v. MagnaChip Semiconductor Corp.*,
2016 WL 6902856 (N.D. Cal. Nov. 21, 2016) ........................................................23

*In re Heritage Bond Litig.*,
2005 WL 1594403 (C.D. Cal. June 10, 2005) .................................................14, 18

*In re HP Sec. Litig.*,
No. 3:12-cv-05980 (Breyer, J.) ...............................................................................20

*IBEW v. Int'l Game Tech.*,
2012 WL 5199742 (D. Nev. Oct. 19, 2012) ...........................................................11

*In re Immune Response Sec. Litig.*,
497 F. Supp. 2d 1166 (S.D. Cal. 2007).................................................................12

*Jaffe Pension Plan v. Household Int'l, Inc.*,
No. 02-cv-05893 ......................................................................................................15

*Kirkorian v. Borelli*,
695 F. Supp. 446 (N.D. Cal. 1988) ..........................................................................8

*Knapp v. Art.com, Inc.*,
283 F. Supp. 3d 823 (N.D. Cal. 2017) ....................................................................11

*Lane v. Facebook, Inc.*,
696 F.3d 811 (9th Cir. 2012) .....................................................................................5

*Lerwill v. Inflight Motion Pictures, Inc.*,
582 F.2d 507 (9th Cir. 1978) .....................................................................................6

*In re LinkedIn User Privacy Litig.*,
309 F.R.D. 573 (N.D. Cal. 2015)............................................................................14

*Linney v. Cellular Alaska P'ship*,
1997 WL 450064 (N.D. Cal. July 18, 1997), *aff'd*, 151 F.3d 1234 (9th Cir. 1998) ............................7

*Luna v. Marvell Tech. Grp.*,
2018 WL 1900150 (N.D. Cal. Apr. 20, 2018) ........................................................21

*McPhail v. First Command Fin. Planning, Inc.*,
2009 WL 839841 (S.D. Cal. Mar. 30, 2009) ..........................................................11

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000) .....................................................................................9

*Morrison v. National Australia Bank Ltd.*,
561 U.S. 247 (2010)................................................................................................14

*Nat'l Rural Telecomms. Coop. v. DirecTV, Inc.*,
 221 F.R.D. 523 (C.D. Cal. 2004) ..................................................................7, 8

*In re Netflix Privacy Litig.*,
 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ....................................................7

*Officers of Justice v. Civ. Serv. Comm'n of City and Cnty. of S.F.*,
 688 F. 2d 615 (9th Cir. 1982) ...............................................................................9

*In re Omnivision Techs., Inc.*,
 559 F. Supp. 2d 1036 (N.D. Cal. 2008) ...................................................4, 10, 18

*In re Oracle Sec. Litig.*,
 1994 WL 502054 (N.D. Cal. June 18, 1994) .....................................................18

*In re Polaroid ERISA Litig.*,
 240 F.R.D. 65 (S.D.N.Y. 2006) .............................................................................6

*In re Portal Software, Inc. Sec. Litig.*,
 2007 WL 4171201 (N.D. Cal. Nov. 26, 2007) .......................................8, 20, 23

*Shapiro v. JPMorgan Chase & Co.*,
 2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ...................................................10

*Spann v. J.C. Penney Corp.*,
 314 F.R.D. 312 (C.D. Cal. 2016) ........................................................................22

*Stewart v. Applied Materials, Inc.*,
 2017 WL 3670711 (N.D. Cal. Aug. 25, 2017) .....................................................7

*In re Syncor ERISA Litig.*,
 516 F.3d 1095 (9th Cir. 2008) ..............................................................................4

*Torrisi v. Tucson Elec. Power Co.*,
 8 F.3d 1370 (9th Cir. 1993) .........................................................................11, 14

*In re Veeco Instruments Inc. Sec. Litig.*,
 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) .......................................................8

*Vivendi Universal, S.A. Sec. Litig.*,
 No. 02-cv-5571 ...................................................................................................15

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
 2017 WL 2212783 (N.D. Cal. May 17, 2017) ...................................................14

**STATUTES**

Private Securities Litigation Reform Act of 1995 .........................................*Passim*

PSLRA (15 U.S.C. § 78u-4(a)(7)) ..........................................................................22

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(a) and (b)(3) ...........................................................................................1, 21

Fed. R. Civ. P. 23(b)(3) .........................................................................................................21

Fed. R. Civ. P. 23(c)(2)(B) ........................................................................................21, 22, 23

Fed. R. Civ. P.  23(e) ...........................................................................................................1, 4

Fed. R. Civ. P. 23 (e)(1) .........................................................................................................21

Fed. R. Civ. P. 23(e)(2) ...........................................................................................4, 5, 17, 18

Fed. R. Civ. P. 23(e)(2)(A) .......................................................................................................5

Fed. R. Civ. P. 23(e)(2)(B) .......................................................................................................6

Fed. R. Civ. P. 23(e)(2)(C) ................................................................................................9, 15

Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv) .........................................................................................15

Fed. R. Civ. P. 23(e)(2)(C)(iv) ...............................................................................................16

Fed. R. Civ. P. 23(e)(3).................................................................................................5, 15, 16

Fed. R. Civ. P. 23(f) ................................................................................................................14

1
2

**NOTICE OF MOTION FOR FINAL APPROVAL
OF SETTLEMENT AND PLAN OF ALLOCATION**

3  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

4          PLEASE TAKE NOTICE that, in accordance with Rule 23(e) of the Federal Rules of Civil

5  Procedure and the Court's Order Granting Motion for Preliminary Approval of Settlement ("Preliminary

6  Approval Order," ECF No. 5593), on May 10, 2019, at 10:00 a.m., Lead Plaintiff Arkansas State

7  Highway Employees' Retirement System ("ASHERS" or "Lead Plaintiff") and named Plaintiff Miami

8  Police Relief and Pension Fund ("Miami Police," and together with ASHERS, "Plaintiffs") will move

9  the Court, before the Honorable Charles R. Breyer, for (1) entry of a Judgment granting final approval

10  of the proposed settlement of this Action (the "Settlement") and (2) entry of an Order granting approval

11  of the proposed plan of allocation of the net proceeds of the Settlement (the "Plan of Allocation").

12          This Motion is based on the following Memorandum of Points and Authorities, the accompanying

13  Declaration of James A. Harrod in Support of (I) Plaintiffs' Motion for Final Approval of Settlement and

14  Plan of Allocation and (II) Lead Counsel's Motion for An Award of Attorneys' Fees and Reimbursement

15  of Litigation Expenses ("Harrod Declaration" or "Harrod Decl.") and its exhibits, all other prior pleadings

16  and papers in this Action, arguments of counsel, and any additional information or argument that may be

17  required by the Court.

18          A proposed Judgment and proposed Order approving the Plan of Allocation will be submitted with

19  Plaintiffs' reply submission on May 3, 2019, after the April 18, 2019 deadline for Settlement Class

20  Members to request exclusion from the Settlement Class or object to the Settlement or Plan of Allocation

21  has passed.

22                          **STATEMENT OF ISSUES TO BE DECIDED**

23          1.          Whether the Court should approve the proposed Settlement as fair, reasonable, and

24  adequate under Rule 23(e).

25          2.          Whether the Court should approve the Plan of Allocation as fair and reasonable.

26          3.          Whether the Court should finally certify the Action as a class action under Rules 23(a) and

27  (b)(3) for the purposes of the Settlement only.

28

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs ASHERS and Miami Police, on behalf of themselves and the Settlement Class, respectfully submit this memorandum in support of their motion for final approval of the proposed Settlement and approval of the proposed Plan of Allocation for the Settlement proceeds.[1]

## I. PRELIMINARY STATEMENT

Subject to Court approval, Plaintiffs have agreed to settle all claims in the Action in exchange for a cash payment by or on behalf of VWAG of $48 million, which has been deposited into an escrow account. Plaintiffs respectfully submit that the proposed Settlement is an excellent result for the Settlement Class and satisfies the standards for final approval under Rule 23 of the Federal Rules of Civil Procedure. As detailed in the accompanying Harrod Declaration and summarized in this memorandum, the proposed Settlement represents approximately 33% of the likely maximum recoverable damages in the Action, which is an excellent recovery for the Settlement Class.[2]

The Settlement was reached after extensive litigation and is the product of arm's-length settlement negotiations that involved highly experienced counsel on both sides. The Settlement is also favorable to the Settlement Class in light of the risks of continued litigation. As discussed below and in the Harrod Declaration, there was a real risk in this Action that Plaintiffs would be unable to establish that Defendants acted with scienter, particularly considering the significant challenges Plaintiffs faced in proving that VW's senior management, including the Individual Defendants, had direct knowledge about the emissions violations. Moreover, Plaintiffs faced risks in establishing that Defendants' alleged false statements about Volkswagen's compliance with emissions regulations were material to investors and that the correction of prior false statements, rather than other factors, was the cause of the price declines in VWAG ADRs during the Class Period.

---

[1] Unless otherwise defined in this memorandum, all capitalized terms have the meanings defined in the Stipulation and Agreement of Settlement, dated August 27, 2018 (ECF No. 5267-1) (the "Stipulation" or "Settlement Stipulation") or the Harrod Declaration. Citations to "¶" herein refer to paragraphs in the Harrod Declaration.

[2] The Harrod Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, *inter alia* , the nature of the claims asserted (¶¶ 16-18), the history of the Action (¶¶ 19-58), the negotiations leading to the Settlement (¶¶ 59-61), the risks and uncertainties of continued litigation (¶¶ 64-90), and the terms of the Plan of Allocation (¶¶ 100-111).

When the Settlement was reached, Plaintiffs and Lead Counsel were well informed of the strengths and weaknesses of their case based on the extensive, hard-fought prosecution of the claims asserted in the Action. Lead Counsel, *inter alia*, (i) conducted a comprehensive investigation into the claims asserted in the Action and drafted the highly detailed First Consolidated Complaint and Amended Complaint; (ii) researched, briefed, and argued oppositions to Defendants' two rounds of motions to dismiss the complaints; (iii) filed a motion to lift the stay of discovery imposed by the PSLRA; (iv) moved for partial summary judgment regarding the issues of falsity and scienter with respect to several of VWAG's alleged false statements; (v) engaged in substantial fact discovery, including drafting and serving discovery requests on Defendants, serving several dozen document subpoenas on nonparties, serving and responding to interrogatories, obtaining and reviewing more than 4 million pages of documents produced by Defendants and third parties, producing over 26,000 pages of documents to Defendants, and litigating numerous discovery disputes; (vi) consulted with experts and consultants on loss causation, damages, and accounting issues presented by the Action; (vii) prepared a motion for class certification, including consulting with an expert on market efficiency and Class-wide damages; and (viii) negotiated the Settlement with Defendants. ¶¶ 9, 19-61, 123.

Absent the Settlement, the Parties faced the prospect of additional protracted litigation through the remainder of fact discovery, costly expert discovery, additional contested motions, a trial, post-trial motion practice, individual Class member loss-causation and damages challenges, and likely ensuing appeals. The Settlement avoids these risks and delays while providing a substantial, certain, and immediate benefit to the Settlement Class in the form of a $48 million cash payment.

The Settlement has the full support of the Court-appointed Lead Plaintiff, which is an institutional investor of the type Congress favored when it passed the Private Securities Litigation Reform Act of 1995 ("PSLRA"). ASHERS was intimately involved in the litigation and settlement negotiations and witnessed first-hand Lead Counsel's vigorous prosecution of the asserted claims. *See* Declaration of Robyn Smith submitted by ASHERS (the "Smith Decl."), attached as Exhibit 1 to the Harrod Declaration, at ¶¶ 6-7.[3]

---

[3] The Settlement also has the full support of the additional named Plaintiff, Miami Police, which was also actively involved in the litigation and the settlement negotiations. *See* Declaration of Daniel Kerr submitted by Miami Police (the "Kerr Decl."), attached as Exhibit 2 to the Harrod Declaration, at ¶¶ 5-6.

In light of the considerations discussed in this memorandum and the accompanying papers, Plaintiffs and Lead Counsel submit that the Settlement is fair, reasonable, and adequate, satisfies the standards of Rule 23, and provides an excellent recovery for the Settlement Class. Plaintiffs accordingly respectfully request that the Court grant final approval of the Settlement and deem the Plan of Allocation, presented in the mailed Notice, to be a fair and reasonable method for distributing the Net Settlement Fund to eligible Settlement Class Members.

## II.     ARGUMENT

### A.     THE SETTLEMENT MERITS FINAL APPROVAL BY THE COURT

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class-action claims. *See* Fed. R. Civ. P. 23(e). A class-action settlement should be approved if the court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

The Ninth Circuit recognizes "a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008); *see also In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1041 (N.D. Cal. 2008) ("the court must also be mindful of the Ninth Circuit's policy favoring settlement, particularly in class action law suits"). Class-action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation. Settlements of complex cases such as this one greatly contribute to the efficient utilization of scarce judicial resources and achieve the speedy resolution of claims. *See, e.g.*, *Garner v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 1687832, at *10 (N.D. Cal. Apr. 22, 2010) ("'Settlement avoids the complexity, delay, risk and expense of continuing with the litigation and will produce a prompt, certain, and substantial recovery for the Plaintiff class.'").

Rule 23(e)(2), as amended on December 1, 2018, provides that the Court should determine whether a proposed settlement is "fair, reasonable, and adequate" after considering whether:

(A)   the class representatives and class counsel have adequately represented the class;

(B)   the proposal was negotiated at arm's length;

(C)   the relief provided for the class is adequate, taking into account:

　　　(i)   the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). As discussed below, all of these factors strongly support approval of the Settlement here.

To evaluate the substantive fairness of a settlement, courts in the Ninth Circuit have historically considered the following factors established in cases such as *Hanlon v. Chrysler Corp.* and *Churchill Village L.L.C. v. General Electric*:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill,* 361 F.3d 566, 575 (9th Cir. 2004); *see also Hanlon*, 150 F.3d 1010, 1026 (9th Cir. 1998); *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012).

The Advisory Committee Notes to the 2018 amendments to the Federal Rules of Civil Procedure indicate that the four factors provided in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by the courts, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Advisory Committee Notes to 2018 Amendments.

Accordingly, Plaintiffs discuss below the fairness, reasonableness, and adequacy of the Settlement principally in relation to the four factors provided in Rule 23(e)(2) but also discuss the application of relevant, non-duplicative *Hanlon* factors.

### 1. Plaintiffs And Lead Counsel Have Adequately Represented The Settlement Class

In determining whether to approve a class-action settlement, the Court should consider whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A).

Here, both Plaintiffs and Lead Counsel have adequately represented the Settlement Class in both the litigation and the Settlement. ASHERS and Miami Police have claims that are typical of and coextensive with those of the Settlement Class, and they lack any interests that are antagonistic to the interest of other members of the Settlement Class. *See Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978); *Hanlon*, 150 F.3d at 1020. On the contrary, Plaintiffs—like all other Settlement Class Members—have an interest in obtaining the largest possible recovery from Defendants. *See In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members."). Moreover, the institutional investor Plaintiffs have played an active role in supervising and participating in the litigation. *See* Smith Decl. ¶¶ 6-7; Kerr Decl. ¶¶ 5-6.

Plaintiffs have also retained counsel who are highly experienced in securities litigation and have successfully prosecuted may complex class action throughout the United States. *See* Ex. 4A-5 to Harrod Decl. (Bernstein Litowitz firm resume). Lead Counsel has vigorously prosecuted the Settlement Class's claims to date by overcoming Defendants' motions to dismiss in substantial part, winning partial summary judgment on falsity and scienter, and engaging in extensive discovery.

Accordingly, as the Court previously found in conditionally certifying the Settlement Class and appointing Plaintiffs as Class representatives and Lead Counsel as Class counsel, Plaintiffs and Lead Counsel have adequately represented the Settlement Class. *See* Preliminary Approval Order, ECF No. 5593 at 3-4.

### 2. The Settlement Was Reached After Substantial Discovery And Arm's-Length Negotiations Between Experienced Counsel

In weighing approval of a class-action settlement, the Court must consider whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). Courts have traditionally considered other related circumstances in determining the "procedural" fairness of a settlement, including (i) counsel's understanding of the strengths and weakness of the case based on factors such as "the extent of discovery completed and the stage of the proceedings";[4] (ii) the "experience and views of counsel";[5] and (iii) the

---

[4] *See Hanlon*, 150 F.3d at 1026 (fifth factor).

[5] *See id.* (sixth factor).

absence of any indicia of collusion.[6] These circumstances strongly support the approval of the Settlement here.

As courts in this District have found, the fact that the Parties reached the Settlement after arm's-length negotiations between experienced counsel creates a presumption of its fairness. *See In re Netflix Privacy Litig.*, 2013 WL 1120801, at *4 (N.D. Cal. Mar. 18, 2013) ("Courts have afforded a presumption of fairness and reasonableness of a settlement agreement where that agreement was the product of non-collusive, arms' length negotiations conducted by capable and experienced counsel"); *Stewart v. Applied Materials, Inc.*, 2017 WL 3670711, at *6 (N.D. Cal. Aug. 25, 2017) (in deciding whether to approve a proposed class-action settlement, "[t]he recommendations of plaintiffs' counsel should be given a presumption of reasonableness"); *Linney v. Cellular Alaska P'ship*, 1997 WL 450064, at *5 (N.D. Cal. July 18, 1997) ("The involvement of experienced class action counsel and the fact that the settlement agreement was reached in arm's length negotiations, after relevant discovery had taken place create a presumption that the agreement is fair."), *aff'd*, 151 F.3d 1234 (9th Cir. 1998).

Indeed, the Settlement merits a presumption of fairness because it was achieved after arm's-length negotiations between well-informed and experienced counsel after a substantial amount of discovery was completed in the Action. ¶¶ 59-61; *see In re Amgen Inc. Sec. Litig.*, 2016 WL 10571773, at *3 (C.D. Cal. Oct. 25, 2016); *Nat'l Rural Telecomms. Coop. v. DirecTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) (finding that "a settlement following sufficient discovery and genuine arms-length negotiation is presumed fair."); *Eisen v. Porsche Cars N. Am., Inc.*, 2014 WL 439006, at *4 (C.D. Cal. Jan. 30, 2014) (approving settlement when record established that "all counsel had ample information and opportunity to assess the strengths and weaknesses of their claims and defenses").

In addition, as noted above, the Parties and their counsel were knowledgeable about the strengths and weaknesses of the case before reaching the agreement to settle it. Lead Counsel conducted a detailed, substantive investigation into the allegations in the First Consolidated Complaint and Amended Complaint by, among other things, reviewing SEC filings, analyst research reports, investor conference calls, press releases, media reports, Volkswagen advertisements and marketing materials, information from

---

[6] *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).

government and private actions filed against Defendants, and other public materials. ¶¶ 25-27, 39. Lead Counsel also performed extensive legal research in preparing the complaints, the briefing in opposition to Defendants' two rounds of motions to dismiss, and Plaintiffs' motion for partial summary judgment. ¶¶ 25, 30-35, 39-41, 45-48. After the motions to dismiss the Amended Complaint were decided, Lead Counsel obtained a substantial amount of fact discovery, including over 4 million pages of documents produced by Defendants and third parties, the review of which was underway at the time of the Settlement. ¶¶ 50-57. Lead Counsel also consulted with experts regarding accounting, loss causation, and damages to enhance their understanding of the subject matter of the Action. ¶¶ 26, 58, 81-85, 103, 123, 136. Finally, the Parties engaged in extensive settlement negotiations, including the exchange of information concerning Class-wide damages and other merits-based considerations, which further informed the Parties of the strength of each side's arguments. ¶¶ 59-61.

The conclusion of Lead Counsel that the Settlement is fair and reasonable and in the best interests of the Settlement Class further supports its approval. "The recommendation of experienced counsel carries significant weight in the court's determination of the reasonableness of the settlement." *Kirkorian v. Borelli*, 695 F. Supp. 446, 451 (N.D. Cal. 1988); *see also DirectV*, 221 F.R.D. at 528 ("'Great weight' is accorded to the recommendation of counsel . . . because 'parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation'") (citation omitted). Here, as discussed above, Lead Counsel has a thorough understanding of the merits and risks of the Action and extensive prior experience in securities litigation. ¶¶ 64-90, 122. Therefore, Lead Counsel's belief that the Settlement represents a favorable outcome for Settlement Class Members should be given substantial weight.

In addition, Plaintiffs, who have a substantial financial interest in the outcome of the case and actively supervised the litigation, strongly endorse the Settlement. *See* Smith Decl. ¶¶ 6-7; Kerr Decl. ¶¶ 5-6. Courts have considered "the role taken by the lead plaintiff in [the settlement] process, a factor somewhat unique to the PSLRA." *In re Portal Software, Inc. Sec. Litig.*, 2007 WL 4171201, at *3 (N.D. Cal. Nov. 26, 2007). Under the PSLRA, the Plaintiffs' support for a settlement should be accorded "special weight" because plaintiffs "have a better understanding of the case than most members of the class." *DirectV*, 221 F.R.D. at 528; *see also In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *5

1   (S.D.N.Y. Nov. 7, 2007) (a settlement reached "under the supervision and with the endorsement of a

2   sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness'").

3   Further, the Settlement has none of the indicia of possible collusion identified by the Ninth Circuit,

4   such as a clear-sailing fee agreement or a provision that would allow settlement proceeds to revert to

5   Defendants. *See Bluetooth Headset*, 654 F.3d at 947. In short, the Settlement here was reached after arm's-

6   length negotiations by capable counsel and was not a product of fraud, overreaching, or collusion among

7   the Parties.

8          **3.     The Relief That The Settlement Provides For The Settlement Class Is**
           **Adequate, Taking Into Account The Costs And Risks Of Further**
9          **Litigation And All Other Relevant Factors**

10  In determining whether a class-action settlement is "fair, reasonable, and adequate," the Court

11  must consider whether "the relief provided for the class is adequate, taking into account . . . the costs,

12  risks, and delay of trial and appeal," as well as other relevant factors. Fed. R. Civ. P. 23(e)(2)(C). This

13  factor under Rule 23(e)(2)(C) essentially encompasses four of the seven factors of the traditional *Hanlon*

14  analysis: (1) the strength of Plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further

15  litigation; (3) the risk of maintaining class-action status throughout the trial; and (4) the amount offered

16  in settlement. *See Hanlon*, 150 F.3d at 1026. As demonstrated below, each of these factors supports

17  approval of the Settlement under Rule 23(e)(2)(C).

18          **a.     The Amount Offered In Settlement**

19  The amount of a settlement "is generally considered the most important [factor], because the

20  critical component of any settlement is the amount of relief obtained by the class." *Destefano v. Zynga,*

21  *Inc.*, 2016 WL 537946, at *11 (N.D. Cal. Feb. 11, 2016).

22  "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery

23  does not per se render the settlement inadequate or unfair." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d

24  454, 459 (9th Cir. 2000). In assessing the recovery, a fundamental question is how the value of the

25  settlement compares to the amount the class potentially could recover at trial, discounted for risk, delay,

26  and expense. "Naturally, the agreement reached normally embodies a compromise; in exchange for the

27  saving of cost and elimination of risk, the parties each give up something they might have won had they

28  proceeded with litigation." *Officers of Justice v. Civ. Serv. Comm'n of City and Cnty. of S.F.*, 688 F. 2d

615, 624 (9th Cir. 1982); *see also Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at *11 (S.D.N.Y. Mar. 24, 2014) (holding that settlement amount must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case").

Here, the Settlement Amount—$48 million in cash—represents a significant recovery for the Settlement Class. The Settlement is approximately ***six times*** the size of the median securities-class-action settlement in the Ninth Circuit between 2009 and 2018 ($8.3 million). *See* Cornerstone Research, *Securities Class Action Settlements 2018 Review and Analysis* (2019), at 19 (Harrod Decl. Ex. 6) ("Cornerstone Report"). More importantly, the proposed recovery would provide a substantial financial benefit to the Settlement Class in comparison to overall potential damages and eliminate the significant risk that the Settlement Class could recover less, or even nothing at all, if the Action continued. ¶¶ 4, 64-90.

Plaintiffs' damages expert has estimated that the likely maximum recoverable damages for the Settlement Class in the Action would be $147 million. ¶¶ 6, 91-92. Thus, the $48 million Settlement represents approximately 33% of the likely recoverable damages that would have been established if Plaintiffs prevailed at trial (assuming a favorable resolution of the loss-causation and damages issues). Indeed, Defendants would have raised several other arguments concerning loss causation and damages that would have substantially reduced the Class-wide damages. ¶¶ 81-85. This recovery is many multiples above the typical percentage recovery in securities actions, which are known to present complicated questions of proof for plaintiffs. For example, one study has found that, from 2009 to 2017, in all securities class actions where damages were estimated to be in the range of $75–$149 million, the median settlement recovery was only 5.0% of damages (before reductions for attorneys' fees and litigation expenses). *See* Cornerstone Report at 6. Based on these statistics, courts have routinely approved and even lauded settlements with substantially lower percentage recoveries than here. *See, e.g.*, *In re Biolase, Inc. Sec. Litig.*, 2015 WL 12720318, at *4 (C.D. Cal. Oct. 13, 2015) (finding that settlement recovery of 8% of maximum recoverable damages "equals or surpasses the recovery in many other securities class actions"); *Omnivision*, 559 F. Supp. 2d at 1042 (finding that settlement yielding 9% of potential damages was "higher than the median percentage of investor losses recovered in recent shareholder class action settlements");

*McPhail v. First Command Fin. Planning, Inc*., 2009 WL 839841, at *5 (S.D. Cal. Mar. 30, 2009) (finding that securities-class-action settlement recovery of 7% of estimated damages "weigh[s] in favor of final approval"); *IBEW v. Int'l Game Tech.,* 2012 WL 5199742, at *3 (D. Nev. Oct. 19, 2012) (approving settlement representing "about 3.5% of the maximum damages that Plaintiffs believe[d] could be recovered at trial" and finding it "within the median recovery in securities class actions settled in the last few years").

When viewed in this context and relative to other securities recoveries nationwide, the recovery achieved in this case is extremely favorable to the Settlement Class. Indeed, it is even more so in light of the substantial risks of establishing liability and damages here, as discussed below.

### b.   The Strength Of Plaintiffs' Case And The Significant Risks Of Continued Litigation

Courts evaluating proposed class-action settlements consider the strength of the plaintiffs' case and the risks of further litigation. *See Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993). To determine whether the proposed Settlement is fair, reasonable, and adequate, the Court "must balance the risks of continued litigation, including the strengths and weaknesses of plaintiff's case, against the benefits afforded to class members, including the immediacy and certainty of a recovery." *Knapp v. Art.com, Inc.*, 283 F. Supp. 3d 823, 831 (N.D. Cal. 2017).

In considering whether to enter into the Settlement, Plaintiffs, represented by counsel experienced in securities litigation, weighed the risks inherent in establishing the elements of their claims, including risks of proving falsity, materiality, scienter, loss causation, and recoverable damages, as well as the expense and likely duration of the Action. Plaintiffs and Lead Counsel believed in the merits of the claims they asserted, but also recognized that there were considerable risks. Plaintiffs and Lead Counsel were aware that, in order to defeat a summary-judgment motion and prevail at trial, they would have to prove not only that Defendants' statements about Volkswagen's emissions violations were false or misleading but also that those statements were material; that Defendants knew or were reckless in not knowing that their statements were false when made; and that those statements were corrected and caused recoverable damages for the Settlement Class. Each of these elements is addressed in turn below.

*Materiality.* Defendants contended that any false or misleading statements they may have made in Volkswagen's marketing materials and about Volkswagen's compliance with U.S. emissions regulations,

particularly in the subject vehicles' emissions-compliance stickers, were not material to investors and thus not actionable. ¶¶ 72-74, 76. In particular, Defendants argued and would have continued to argue that statements in vehicle stickers and marketing brochures about Volkswagen vehicles' compliance with emissions regulations were not directed to investors in VWAG ADRs and could not be presumed to be relied upon by investors under the fraud-on-the-market doctrine.

*Scienter.* A defendant's state of mind in a securities case "is the most difficult element of proof and one that is rarely supported by direct evidence" such as an admission. *Amgen*, 2016 WL 10571773, at *3; *see also In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1172 (S.D. Cal. 2007) (noting that scienter is a "complex and difficult [element] to establish at trial"). Had the litigation continued, proof of scienter would have been extremely challenging here, as Plaintiffs faced a significant hurdle in establishing that VW's senior management, including the Individual Defendants, had direct knowledge about the emissions violations. ¶¶ 77-80.

For example, Defendants argued and would have continued to argue that VW's senior management were not aware of the defeat devices until shortly before the end of the Class Period, and that VWAG's guilty plea in the criminal case concerning the emissions scandal addressed only one of Defendants' alleged misrepresentations and did not establish that knowledge of the defeat devices reached senior executives whose scienter is attributable to VWAG. ¶¶ 78, 80.

Plaintiffs would also have faced enormous challenges in obtaining the evidence necessary to establish Defendants' scienter due to the absence of any discovery procedures under German law like those available in the United States. Indeed, Plaintiffs' ability to obtain testimony in support of their scienter allegations, as well as other aspects of the case, would have been either difficult (if German-resident witnesses were unwilling to testify voluntarily, as was likely because many were under risk of personal legal jeopardy), or procedurally onerous and expensive (due to the need for travel to Germany or other locations in Europe and for translation and other services). ¶ 79.

Further, the difficulty of proving Defendants' scienter is underscored by the fact that despite Plaintiffs' discovery efforts and investigations by multiple prosecutors, regulators, and other private parties (in both the United States and Europe), little evidence has ever been uncovered directly linking any of the Individual Defendants to the alleged fraud. Considering the Court's ruling on Plaintiffs' motion

for partial summary judgment, which established that Plaintiffs could prove scienter only by demonstrating that one of the Individual Defendants, or another VW employee, who made a false and misleading statement had knowledge or acted recklessly with respect to the emissions fraud, the lack of evidence showing a direct link between the Individual Defendants and the fraud is significant. Indeed, if Plaintiffs were unable to meet the standard of proof established by the Court and demonstrate that Defendants acted with scienter, this would have resulted in zero recovery for the Settlement Class. ¶ 80.

**Loss Causation.** Plaintiffs also faced substantial challenges in proving that the revelation of the truth about Defendants' false and misleading statements caused the declines in the prices of VWAG ADRs, and in establishing the amount of Class-wide damages. ¶¶ 81-85. Defendants would have argued that the fraud concerning the subject vehicles' violations of emissions standards was fully revealed to investors no later than September 22, 2015, if not earlier, and that none of the declines associated with Plaintiffs' subsequent alleged corrective disclosures revealed any truth concerning the fraud to investors, and thus that the subsequent declines could not satisfy the applicable loss-causation standards. ¶¶ 82-83. If accepted by the Court or a jury, this argument would have reduced the Class's recoverable damages by 50% or more. Defendants would also have made substantial arguments that the price declines on many of Plaintiffs' alleged corrective-disclosure dates were not due to revelation of the alleged misstatements or omissions, but instead were responses to repetitive details about the previously disclosed emissions problem, additional governmental investigations, or unrelated news about Volkswagen. ¶ 84. Indeed, at summary judgment and trial and on appeal, Defendants would have challenged each of the claimed corrective disclosures as inadequate to support loss causation. *Id.*

The resolution of these disputed issues regarding damages and loss causation would have come down to a battle of experts, and Defendants would undoubtedly have been able to present a well-qualified expert who would opine that the Class's damages were small or nonexistent. ¶85. As Courts have long recognized, the uncertainty as to which side's expert's view might be credited by the jury presents a substantial litigation risk. *See In re Celera Corp. Sec. Litig.*, 2015 U.S. Dist. LEXIS 157408, at *17 (N.D. Cal. Nov. 20, 2015) (finding that risks related to the "battle of experts" weighed in favor of settlement approval); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004) ("[P]roof of

damages in securities cases is always difficult and invariably requires expert testimony which may, or may not be, accepted by a jury.").

### c.    The Risk of Maintaining Class-Action Status Through Trial

At the time the Settlement was reached, Plaintiffs had prepared their motion for class certification (due on July 27, 2018, just nine days after the settlement in principle was reached) but had not yet filed it. While Plaintiffs fully believe that this Action is appropriate for class treatment, if the litigation had continued, Defendants would undoubtedly have raised various challenges to certification of the Class (¶ 86), including whether the locations of individual Class members' purchases of unlisted, over-the-counter VWAG ADRs created individual questions as to the applicability of § 10(b) to those transaction under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), precluding class certification. *Id*. Even assuming that Plaintiffs obtained class certification, there was a risk of an interlocutory Rule 23(f) appeal or decertification at a later stage in the proceedings. Accordingly, the risk and uncertainty surrounding certification of the Settlement Class also support approval of the Settlement. *See Bendon v. DTG Operations, Inc.*, 2018 WL 4976511, at *5 (C.D. Cal. Aug. 22, 2018); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 2212783, at *14 (N.D. Cal. May 17, 2017).

### d.    The Complexity, Expense, and Likely Duration of Litigation

Courts consistently recognize that the expense, complexity, and possible duration of the litigation are key factors in evaluating the reasonableness of a settlement. *See, e.g.*, *Torrisi*, 8 F.3d at 1375-76 (finding that "the cost, complexity and time of fully litigating the case" rendered the settlement fair). "Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015). Due to the "notorious complexity" of securities class actions in particular, settlement is often appropriate because it "circumvents the difficulty and uncertainty inherent in long, costly trials." *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 2006 WL 903236, at *8 (S.D.N.Y. Apr. 6, 2006); *see also In re Heritage Bond Litig.*, 2005 WL 1594403, at *6 (C.D. Cal. June 10, 2005) (finding that class actions have well-deserved reputation as most complex litigation).

Continuing litigation through the conclusion of fact discovery, expert discovery, class certification, summary judgment, trial, and appeals would have been extremely expensive and would have delayed any

recovery for Settlement Class Members, possibly for years. *See Zynga*, 2016 WL 537946, at \*10; *Amgen*, 2016 WL 10571773, at \*3 ("A trial of a complex, fact-intensive case like this could have taken weeks, and the likely appeals of rulings on summary judgment and at trial could have added years to the litigation."). And even with a verdict at trial affirmed on appeal, the Settlement Class would have faced a potentially complex, lengthy, and (almost certainly) contested claims-administration process.[7] Barring settlement, there is no question that resolution of this case would take considerable time and require additional expenses, with the end result far from certain. *See Hartless v. Clorox Co.*, 273 F.R.D. 630, 640 (S.D. Cal. 2011) ("Considering these risks, expenses and delays, an immediate and certain recovery for class members . . . favors settlement of this action."), *aff'd in relevant part*, 473 F. App'x 716 (9th Cir. 2012).

Thus, the risk, expense, complexity, and likely duration of further litigation support approval of the Settlement. The present value of a certain recovery now, as opposed to the mere chance for a possibly greater one years later, supports approval of a settlement that eliminates the expense and delay of continued litigation and the risk that the Settlement Class could receive no recovery. *See id.* (holding that courts "shall consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation").

**e.    All Other Factors Established By Rule 23(e)(2)(C) Support Approval Of The Settlement**

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims," "the terms of any proposed award of attorney's fees, including timing of payment," and "any agreement required to be identified under Rule 23(e)(3)." Fed. R.

---

[7]  In other securities-fraud class actions that have gone to trial, the time from a verdict to a final judgment has been as long as seven years. *See Jaffe Pension Plan v. Household Int'l, Inc.*, No. 1:-02-cv-05893, Verdict Form, ECF No. 1611 (N.D. Ill. May 7, 2009) & Final Judgment and Order of Dismissal With Prejudice, ECF No. 2267 (N.D. Ill. Nov. 10, 2016); *see also Vivendi Universal, S.A. Sec. Litig.*, Civ. No. 02-5571 (RJH/HBP), Verdict Form, ECF No. 998 (S.D.N.Y. Feb. 2, 2010) (jury verdict issued on Jan. 29, 2010) & Final Judgment Approving Class Action Settlement of All Remaining Claims, ECF No. 1317 (S.D.N.Y. May 9, 2017).

Civ. P. 23(e)(2)(C)(ii)-(iv). Each of these factors also supports approval of the Settlement or is neutral and does not suggest any basis for inadequacy of the Settlement.

First, the procedures for processing Settlement Class Members' claims and distributing the proceeds of the Settlement to eligible claimants are well established, effective methods that have been widely used in securities-class-action litigation. Here, the proceeds of the Settlement will be distributed to Settlement Class Members who submit eligible Claim Forms with required documentation to the Court-approved Claims Administrator, Epiq Class Action & Claims Solutions, Inc. ("Epiq"). Epiq, an independent company with extensive experience administering securities class actions, will review and process the claims under Lead Counsel's supervision, provide claimants with an opportunity to cure any deficiencies in their claims or request review of the denial of their claims by the Court, and then mail or wire claimants their *pro rata* share of the Net Settlement Fund (as calculated under the Plan of Allocation) upon approval of the Court.[8] This type of claims processing is standard in securities class actions and has long been used and found to be effective. This claim procedure is necessary because neither Plaintiffs nor Defendants possess individual investors' trading data that would allow the Parties to create a claims-free process to distribute Settlement funds.

Second, the relief provided for the Settlement Class in the Settlement is also adequate when the terms of the proposed award of attorney's fees are taken into account. As discussed in the accompanying Fee Memorandum, the proposed attorneys' fees of 25% of the Settlement Fund (net of litigation expenses), to be paid upon approval by the Court, are reasonable in light of the efforts of Plaintiffs' Counsel and the risks in the litigation. Most important with respect to the Court's consideration of the fairness of the Settlement is the fact that approval of the requested attorneys' fees is entirely separate from approval of the Settlement, and neither Plaintiffs nor Lead Counsel may terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees. *See* Stipulation ¶ 17.

Lastly, the amended Rule 23 asks the Court to consider the proposed Settlement's fairness in light of any agreements required to be identified under Rule 23(e)(3). *See* Fed. R. Civ. P. 23(e)(2)(C)(iv). Here,

---

[8] The Settlement is not a claims-made settlement. If the Settlement is approved, Defendants will have no right to the return of any portion of the Settlement based on the number or value of claims submitted. *See* Stipulation ¶ 14.

the only agreement so required to be identified (other than the Stipulation itself) is the Parties' confidential Supplemental Agreement, which establishes the conditions under which VWAG would be able to terminate the Settlement if the number of Settlement Class Members who request exclusion from the Settlement Class reaches a specified threshold. This type of agreement is a standard provision in securities class actions and has no negative impact on the fairness of the Settlement.

### 4. The Settlement Treats Class Members Equitably Relative To Each Other

The proposed Settlement treats members of the Settlement Class equitably relative to one another. As discussed below in Part II, under the Plan of Allocation, eligible claimants approved for payment by the Court will receive their *pro rata* share of the recovery based on their transactions in VWAG ADRs. Plaintiffs will receive precisely the same level of *pro rata* recovery (based on their Recognized Claims as calculated under the Plan of Allocation) as all other similarly situated Settlement Class Members.

### 5. The Reaction Of The Settlement Class To The Settlement

One *Hanlon* factor not included in Rule 23(e)(2) that should be considered in assessing the proposed Settlement's fairness and adequacy is the Settlement Class's reaction to the proposed Settlement. *See, e.g.*, *Amgen*, 2016 WL 10571773, at *4.

In accordance with the Preliminary Approval Order, Epiq began mailing copies of the Notice Packet (consisting of the Notice and Claim Form) to potential Settlement Class Members and nominees on December 19, 2018. *See* Declaration of Alexander Villanova Regarding (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Villanova Decl."), Exhibit 3 to the Harrod Declaration, at ¶¶ 3, 5.

Through April 3, 2019, Epiq had mailed a total of 217,587 copies of the Notice Packet to potential Settlement Class Members and nominees. *See id*. ¶ 8. In addition, the Summary Notice was published in *Investor's Business Daily* and transmitted over the PR Newswire. *See id*. ¶ 9. The Notice states the essential terms of the Settlement and informs potential Settlement Class Members of, among other things, their right to opt out of the Settlement Class or object to the Settlement, the Plan of Allocation, or Lead Counsel's motion for attorneys' fees and expenses. The deadline set by the Court for Settlement Class Members to exclude themselves or object to the Settlement is April 18, 2019. To date, nine requests for exclusion have been received (*see* Villanova Decl. ¶ 15), and no objections to the Settlement, the Plan of

Allocation, or Lead Counsel's fee and expense application have been filed on the Court's docket. As provided in the Preliminary Approval Order, Plaintiffs will file reply papers on May 3, 2019, after the deadline for requesting exclusions or objecting has passed, that will address all requests for exclusion and objections received at one time.

*       *       *

In sum, all of factors to be considered under Rule 23(e)(2) support a finding that the Settlement is fair, reasonable, and adequate.

### B.       THE PLAN OF ALLOCATION IS FAIR AND REASONABLE

In addition to seeking final approval of the Settlement, Plaintiffs seek approval of the proposed Plan of Allocation for the Settlement proceeds.

The standard for approval of a plan of allocation in a class action under Rule 23 is the same as the standard applicable to the settlement as a whole—the plan must be "fair, reasonable, and adequate." *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1284-85 (9th Cir. 1992); *see also Omnivision*, 559 F. Supp. 2d at 1045. An allocation formula need only have a reasonable basis, particularly if recommended by experienced class counsel. *See Heritage Bond*, 2005 WL 1594403, at *11. Moreover, "[a] plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable." *In re Oracle Sec. Litig.*, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994); *Omnivision*, 559 F. Supp. 2d at 1045 ("It is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits.").

The Plan of Allocation is included at pages 10 to 14 of the Notice mailed to Settlement Class Members. *See* Notice attached as Exhibit A to the Villanova Decl. at pp. 10-14. Lead Counsel developed the Plan of Allocation with the assistance of Plaintiffs' damages expert. ¶ 101. The Plan provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis based on the extent of their injuries attributable to the alleged fraud. ¶¶ 103-107.

In developing the Plan of Allocation, Plaintiffs' expert calculated the estimated amount of likely recoverable artificial inflation in the per-ADR closing prices of VWAG ADRs that was alleged to have been proximately caused by Defendants' alleged false and misleading statements and omissions. ¶ 103.

To calculate the estimated artificial inflation, Plaintiffs' damages expert considered (i) price changes in VWAG Ordinary ADRs and VWAG Preferred ADRs due to the allegedly materially false and misleading public announcements and other representations and omissions, adjusting for price changes that were attributable to market, industry, or currency factors; (ii) price changes in VWAG Ordinary ADRs and VWAG Preferred ADRs in reaction to public announcements and other statements and events regarding Volkswagen in which the alleged misrepresentations and omissions were alleged to have been revealed to the market, adjusting for price changes that were attributable to market, industry, or currency factors; (iii) the allegations in the Complaint; and (iv) the evidence developed in support of those allegations, as advised by Lead Counsel. *Id*.; Notice ¶ 54. The same methodology would have been proffered by Plaintiffs at summary judgment and trial had the Action not settled.

The Plan of Allocation calculates a "Recognized Loss Amount" or "Recognized Gain Amount" for each purchase or acquisition of a VWAG Ordinary ADR or a VWAG Preferred ADR during the Class Period that is identified on a Settlement Class Member's Claim Form and for which adequate documentation is provided. ¶ 104. The calculation of Recognized Loss and Gain Amounts depends upon several factors, including when the security was purchased and sold and the purchase and sales price. *Id*. In general, Recognized Loss or Gain Amounts will be the lower of (i) the difference between the estimated alleged artificial inflation on the date of purchase and the estimated alleged artificial inflation on the date of sale, or (ii) the difference between the actual purchase price and sales price. *Id*.[9] Claimants who purchased VWAG ADRs during the Class Period but did not hold the securities through at least one of the dates where artificial inflation was allegedly removed from the price of the securities will have no Recognized Loss Amount as to those transactions because any loss they suffered would not have been caused by the disclosure of the alleged fraud. ¶ 105; Notice ¶ 55.

Also, as explained in Plaintiffs' Notice of Unopposed Motion for Preliminary Approval of the Settlement and Memorandum of Points and Authorities in Support Thereof (ECF No. 5267) (the "Preliminary Approval Motion"), because the Court dismissed Plaintiffs' claims based on VWAG's financial statements before May 2014, the Recognized Loss Amounts for ADRs purchased from

---

[9] For VWAG ADRs sold during the PSLRA's 90-day look-back period or held as of the end of that period, the Plan of Allocation also limits Recognized Loss Amounts based on the average price of the ADRs during that period, consistent with the PSLRA. *See* Notice ¶¶57(b)-(c), 58(b)-(c).

November 19, 2010, through April 30, 2014, will be reduced by half. *See* Notice ¶¶ 56, 59. This adjustment reflects Lead Counsel's assessment that proving Defendants' liability for the period before May 2014 would be much more difficult than for the post-April 2014 portion of the Class Period. The Court dismissed Plaintiffs' claims based on VWAG's financial statements before May 2014 largely on the basis of scienter, and similar arguments would apply to all of Plaintiffs' claims during that period. Specifically, proving Defendants' scienter would be more difficult for the earlier period due to an absence of evidence that before May 2014, top management were told about the defeat devices and warned about potential fines for using them. Moreover, since claims related to VWAG's financial statements after May 2014 were not dismissed, Plaintiffs had additional avenues of recovery in the post-April 2014 portion of the Class Period. Thus, discounting the weaker claims for the earlier period is fair, reasonable, and appropriate under Ninth Circuit law. *See* Preliminary Approval Order at 11 (finding 50% reduction for Recognized Loss Amounts on VWAG ADRs purchased during the period from November 19, 2010 through April 30, 2014 to be "reasonable"); *see also In re HP Sec. Litig.*, No. 3:12-cv-05980-CRB (Breyer, J.), ECF Nos. 268, 269, 280 (approving plan of allocation that discounted claims that had been dismissed by the Court to 15%); *Portal Software*, 2007 WL 4171201, at *5-6 (approving allocating 5% of settlement fund to dismissed claims and 95% to sustained claims, and noting that "Courts endorse distributing settlement proceeds according to the relative strengths and weaknesses of the various claims"); *In re Am. Apparel, Inc. Shareholder Litig.*, 2014 WL 10212865, at *19 (C.D. Cal. July 28, 2014) (approving discounting dismissed claims by 10%).

Further, under the Plan of Allocation, claimants' Recognized Loss Amounts will be netted against their Recognized Gain Amounts, if any, to determine the claimants' "Recognized Claims," and the Net Settlement Fund will be allocated *pro rata* to Authorized Claimants based on the relative size of their Recognized Claims. ¶ 107; Notice ¶¶ 65, 69.[10]

---

[10] As discussed in the Preliminary Approval Motion, the Plan of Allocation also identifies a proposed *cy pres* recipient of any residual funds that may remain after one or more distributions of the Net Settlement Fund: the Investor Protection Trust, a 501(c)(3) nonprofit organization devoted to investor education. ¶ 108; Notice ¶ 70. However, under the Plan, 100% of the Net Settlement Fund will be distributed to eligible claimants, and if any funds remain after the initial distribution (for example, as a result of uncashed or returned checks), subsequent distributions to eligible claimants will be conducted until the residual amount left is so small that a further distribution would not be cost effective. Only then would a donation

Plaintiffs and Lead Counsel believe that the proposed Plan of Allocation will result in a fair and equitable distribution of the Settlement proceeds among Settlement Class Members who suffered losses as a result of the conduct alleged in the Action, similar to the result if Plaintiffs prevailed at trial. ¶ 109. Moreover, as of April 3, 2019, more than 217,000 copies of the Notice, which contains the Plan of Allocation and advises Settlement Class Members of their right to object to the Plan, have been mailed to potential Settlement Class Members, *see* Villanova Decl. ¶ 8, and, to date, no objections to the Plan of Allocation have been filed on the Court's docket. *See* ¶ 111. For all of these reasons, Plaintiffs respectfully request that the Court approve the proposed Plan of Allocation.

### C.     THE SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED

The Court's Preliminary Approval Order conditionally certified the Settlement Class under Rules 23(a) and (b)(3) for purposes of the Settlement. ECF No. 5593 at 1-4. For all of the reasons stated in the Preliminary Approval Order and Plaintiffs' Preliminary Approval Motion (ECF No. 5267 at 8-15), Plaintiffs respectfully request that the Court grant final certification of the Settlement Class under Rules 23(a) and (b)(3). *See* Preliminary Approval Order (ECF No. 5593) at 1-4 (analyzing how the Action satisfies each element for class certification).

### D.     NOTICE TO THE SETTLEMENT CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

The Notice provided to the Settlement Class satisfied all the requirements of due process, Rule 23, and the PSLRA. For any class certified under Rule 23(b)(3), due process and Rule 23 require that class members be given "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974). In addition, the Court must direct notice of a settlement in a "reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23 (e)(1). Notice of a class-action settlement "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *See Churchill*, 361 F.3d at 575; *Luna v. Marvell Tech. Grp.*, 2018 WL 1900150, at *2 (N.D.

---

to the *cy pres* recipient be made. *See* Preliminary Approval Order at 9 (finding that the Settlement's *cy pres* procedures are "consistent with Ninth Circuit Law").

Cal. Apr. 20, 2018) (same); *Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 330 (C.D. Cal. 2016) ("Settlement notices must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings.").

Both the substance of the Notice and the method of its dissemination to potential members of the Settlement Class satisfied these standards here. The Notice provides the necessary information for Settlement Class Members to make an informed decision regarding the Settlement and contains all of the information required by Rule 23(c)(2)(B), the PSLRA (15 U.S.C. § 78u-4(a)(7)), and this District's Procedural Guidelines for Class Action Settlements. The Notice informed Settlement Class Members of, among other things, (1) the nature of the Action and the claims asserted; (2) the definition of the Settlement Class; (3) the amount of the Settlement; (4) the reasons why the parties are proposing the Settlement; (5) the estimated average recovery per affected VW Ordinary or Preferred ADR; (6) the maximum amount of attorneys' fees and expenses that will be sought; (7) the identity and contact information for the representatives of Lead Counsel who are reasonably available to answer questions from Settlement Class Members; (8) Settlement Class Members' right to opt out of the Settlement Class or to object to the Settlement, the Plan of Allocation, or the requested attorneys' fees or expenses; (9) the binding effect of a judgment on Settlement Class Members; and (10) the dates and deadlines for Settlement-related events. The Notice also contains the Plan of Allocation and provides Settlement Class Members with information on how to submit a Claim Form in order to be eligible to receive a distribution from the Net Settlement Fund.

As noted above, in accordance with the Court's Preliminary Approval Order, Epiq, the Court-approved Claims Administrator, began mailing copies of the Notice Packet to potential Settlement Class Members and nominees on December 19, 2018. *See* Villanova Decl. ¶¶ 3, 5. As of April 3, 2019, Epiq had mailed 217,587 copies of the Notice Packet by first-class mail to potential Settlement Class Members and nominees. *See id.* ¶ 8. In addition, Epiq arranged for the Summary Notice to be published in *Investor's Business Daily* and transmitted over the PR Newswire on December 31, 2018. *See id.* ¶ 9. Epiq established a dedicated settlement website, www.VolkswagenADRLitigation.com, to provide potential Settlement Class Members with information concerning the Settlement and access to downloadable copies of the Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, and Complaint.

*See id*. ¶ 14. Copies of the Notice and Claim Form are also available on Lead Counsel's website, www.blbglaw.com. ¶ 98.

This combination of individual first-class mail to all Settlement Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely circulated publication, transmission over a newswire, and publication on internet websites, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 6902856, at *4-5 (N.D. Cal. Nov. 21, 2016) (approving similar notice program); *Zynga*, 2016 WL 537946, at *7 (finding individual notice mailed to class members combined with summary publication constituted "the best form of notice available under the circumstances"); *Portal Software*, 2007 WL 4171201, at *1.

In sum, the Notice fairly apprises Settlement Class Members of their rights with respect to the Settlement, is the best notice practicable under the circumstances, and complies with the Court's Preliminary Approval Order, the Federal Rules of Civil Procedure, the PSLRA, and due process.

## III.   CONCLUSION

For the reasons stated in this memorandum and in the Harrod Declaration, Plaintiffs respectfully request that the Court grant final approval of the proposed Settlement and approve the Plan of Allocation.

Dated: April 5, 2019

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

By:  *s/ James A. Harrod*
James A. Harrod (*pro hac vice*)
Jai Chandrasekhar (*pro hac vice*)
Adam D. Hollander (*pro hac vice*)
Kate W. Aufses (*pro hac vice*)
Jim.Harrod@blbglaw.com
Jai@blbglaw.com
Adam.Hollander@blbglaw.com
Kate.Aufses@blbglaw.com
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

*Attorneys for Lead Plaintiff ASHERS, and Plaintiff Miami Police and the Settlement Class*

**KLAUSNER KAUFMAN JENSEN & LEVINSON**
Robert D. Klausner
Stuart A. Kaufman
bob@robertdklausner.com
stu@robertdklausner.com
780 NW 4th Street
Plantation, FL 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232

*Counsel for Plaintiff Miami Police*

#1277978