UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 2672 CRB (JSC) |
| This Order Relates To:<br>MDL Dkt. Nos. 5730, 5731, 5737, 5807, 5898 | **ORDER RE: BRANDED TITLE CLAIMANTS' MOTIONS TO ENFORCE THE CONSUMER CLASS ACTION SETTLEMENT AGREEMENTS** |

Under the Court-approved 2.0-liter and 3.0-liter settlement agreements, Volkswagen (or VW) initially processes claims for benefits. The Court-appointed Claims Supervisor is then responsible for validating VW's claims decisions. If VW and the Claims Supervisor determine that a claim is ineligible, the claimant may appeal to the Court-appointed Claims Review Committee ("CRC").

Certain claimants that went through this process have filed motions in which they argue that the CRC, by adopting a framework for handling their claims, and by then denying their claims pursuant to that framework, effectively amended the settlement agreements without Court approval. They argue that the CRC exceeded its authority in doing so, and they contend that under the unamended agreements they are entitled to benefits. VW, in opposing Claimants' motions, argues that the CRC acted within its authority and that the CRC's determinations are final. The motions are considered below.

**I. BACKGROUND**

On September 18, 2015, EPA issued a notice of violation ("NOV") to VW, accusing the company of using a defeat device in its 2.0-liter TDI diesel engine cars. EPA issued a second NOV on November 2, 2015, accusing VW of also using a defeat device in its 3.0-liter TDI diesel

engine cars. (*See United States v. Volkswagen AG*, No. 16-CR-20394, Dkt. No. 68 (VW AG Plea Agreement, Statement of Facts ¶¶ 64, 67) (E.D. Mich. Mar. 10, 2017) (available at MDL Dkt. No. 6329-1).) After the NOVs, VW agreed to two consumer class action settlements, respectively relating to the 2.0-liter and 3.0-liter cars. (*See* MDL Dkt. Nos. 2102, 3229 (settlement approval orders).) As part of the settlements, VW generally agreed to buy back the cars and to provide class members with restitution payments.

The 2.0-liter and 3.0-liter classes generally include not only those who owned, leased, or held title to a class car on the date of the NOVs, but also those who acquired a class car after the NOVs but before the end of the claims periods. There are a few exceptions. As relevant here, the settlements exclude:

> Owners whose . . . TDI vehicle . . . (ii) had a Branded Title of Assembled, Dismantled, Flood, Junk, Rebuilt, Reconstructed, or Salvage on September 18, 2015, and was acquired from a junkyard or salvage yard after September 18, 2015.

(2.0-liter ¶ 2.16(c), MDL Dkt. No. 1685; *accord* 3.0-liter ¶ 2.16(c), MDL Dkt. No. 2894.) The term "Branded Title" is not defined in the settlement agreements, but the Claims Supervisor has explained that title brands "indicate, among other things, whether a vehicle has sustained damage or may be unsafe to drive." (Feb. 26, 2018 Report of the Claims Supervisor, MDL Dkt. No. 4835 at 40 n.34.)

In 2017 and 2018, the reach of the branded title exclusion was tested. Certain individuals and entities submitted claims for benefits based on TDI cars with branded titles that they had purchased after September 18, 2015 at insurance auctions. They claimed that the cars were not covered by the branded title exclusion because (i) the cars' titles were branded only *after* September 18, 2015, and (ii) the cars were purchased at insurance auctions, not from junkyards or salvage yards.

VW paid claims of this kind for several months in early 2017. Many of these claims were made by non-VW dealers that regularly bought branded title cars at insurance auctions. While not abundantly clear from the record, it appears that these dealers would ordinarily fix branded title cars and then resell them, or sell them to individuals who were interested in fixing them. The settlements presented these non-VW dealers with an arbitrage opportunity. Instead of fixing the

cars or selling them to individuals, they could sell the cars back to VW for a profit. (*See* Farchione Decl. ¶ 4, MDL Dkt. No. 5730-1 (explaining that TDI cars started selling for more at insurance auctions because they could be resold to VW: "a 2009 Jetta Diesel [with] a Blue Book retail value of $5,000 and a cost to repair of $2,500 . . . . would bring $7,000 at the auction with the damage because it could be sold back to Volkswagen for $12,000").)

In mid-2017, VW started placing new claims of this kind on hold. The Claims Supervisor reported that for the next nine months "the Parties . . . work[ed] with the court-appointed CRC to address how the eligibility requirements in the Class Action Agreement[s] appl[ied]" to these claims. (Feb. 26, 2018 Report, MDL Dkt. No. 4835 at 40; March 13, 2018 Claims Supervisor Report, MDL Dkt. No. 4897 at 4.) The CRC has three members: one is a representative of Class Counsel, one is a representative of VW, and one is a Court-appointed neutral. (*See* MDL Dkt. Nos. 2102 at 44, 3229 at 43.)

On February 26, 2018, the Claims Supervisor reported that "[b]ased on a holistic review of the [2.0-liter settlement agreement] in response to consumer appeals, the CRC [has] adopted a general framework for processing branded title claims." (Feb. 26, 2018 Report, MDL Dkt. No. 4835 at 41.) The next month, the Claims Supervisor reported that the CRC had adopted a substantially similar framework for processing branded title claims under the 3.0-liter settlement agreement. The framework included four "non-exhaustive . . . categories of branded title . . . claims and the eligibility determinations that Volkswagen anticipate[d] reaching as to each, based on the CRC's guidance":

> (i) Owners of vehicles that were branded on or before September 18, 2015, and were acquired from a junk yard, salvage yard, or the equivalent (i.e., insurance auction) with a branded title after September 18, 2015, will be deemed ineligible for compensation.
>
> (ii) Owners who acquired their vehicles prior to September 18, 2015, with a non-branded or salvage rebuilt title may be eligible for both Vehicle Value and Owner Restitution if the vehicles currently have a branded title (including salvage and salvage rebuilt titles), provided that all other eligibility requirements are met. If the vehicle currently has a brand of junk, non-repairable, "parts only," or any equivalent brand denoting that the vehicle can never be rebuilt or repaired, the vehicle is eligible only for Owner Restitution.

3

    (iii) Owners of used vehicles that were purchased with a branded title and had a "salvage rebuilt" or equivalent title as of February 26, 2018, are potentially eligible for Vehicle Value if all other eligibility requirements are met. If the previous owner of the vehicle does not submit a claim for Owner Restitution by the September 1, 2018 claim filing deadline, the consumer also may be eligible to receive Owner Restitution in addition to Vehicle Value.

    (iv) Owners of used vehicles that were purchased with a salvage title and continue to have a salvage title on or after February 26, 2018, are ineligible for compensation. Once a vehicle has been deemed ineligible to participate in the Claims Program due to the existence of a salvage title, no new claims submitted in connection with the VIN will be accepted for processing.

(Feb. 26, 2018 Report, MDL Dkt. No. 4835 at 41-43; *see also* March 13, 2018 Report, MDL Dkt. No. 4987 at 45-46.)

Between February 26, 2018 and December 9, 2018, VW processed 5,913 branded title claims, which included all of the claims that it had previously placed on hold. Of those claims, it approved 2,474 and denied 3,439. According to the Claims Supervisor, the "majority of eligible claims processed . . . involved vehicles with rebuilt titles [category 3 in the above framework], and the majority of ineligible claims . . . involved vehicles that had salvage titles as of February 26, 2018 [category 4 in the above framework]." (Nov. 26, 2018 Report of the Claims Supervisor, MDL Dkt. No. 5585 at 42 (2.0-liter claims); *see also* Dec. 13, 2018 Report of the Claims Supervisor, MDL Dkt. No. 5715 at 39 (3.0-liter claims).) The CRC affirmed VW's denials of the salvage-title claims, although some appeals remain pending.

Many of the individuals and entities whose branded title claims were denied after February 26, 2018 filed or joined the motions that are now before the Court.

## II. DISCUSSION

The Court has retained jurisdiction to "enforce, administer, and ensure compliance" with the terms of the 2.0-liter and 3.0-liter settlement agreements. (MDL Dkt. Nos. 2102 at 48 ¶ 14, 3229 at 47 ¶ 14.) Looking at those terms, both agreements state that "[d]eterminations by the CRC as to ineligible Claims will constitute final determinations." (2.0-liter ¶ 5.3; 3.0-liter ¶ 8.4.) Yet the agreements also explain that they cannot be amended in a manner that "limit[s] the rights

4

of [c]lass [m]embers" without Court approval and the Parties' consent. (2.0-liter ¶ 14.1; 3.0-liter ¶ 17.1.) The "Parties" are defined as "the Class Representatives and Volkswagen." (2.0-liter ¶ 2.53; 3.0-liter ¶ 2.69.)

VW, relying on the CRC finality provisions, urges the Court not to consider the merits of Claimants' motions, as it asserts that the motions attempt to add a further level of review that was not contemplated by the agreements. Claimants, relying on the amendment provisions, argue that the February 26, 2018 framework, under which their claims were denied, constituted an amendment that "limit[ed] the rights of [c]lass [m]embers" and so should have (but was not) approved by the Court.

The disagreement centers on how the settlement agreements' claims review and amendment provisions interact. The Court, however, does not need to resolve that dispute to decide the motions at hand. Assuming that the CRC's determinations are reviewable and that the CRC, through the challenged framework, effectively amended the settlement agreements, the Court approves those amendments, which are consistent with the intent of the agreements.

The settlements' twin goals are (1) "to compensate owners or lessees of Eligible Vehicles for any harm they suffered as a result of the emissions issues," and (2) "to ensure that Volkswagen's . . . TDI vehicles do not generate excess NOx emissions." (2.0-liter ¶ 1; *accord* 3.0-liter ¶ 1.) Claimants' salvage title claims do not further either of those goals. Claimants bought the cars at issue after VW's emissions fraud became public knowledge, so they didn't suffer harm directly from the fraud. And the vast majority of the cars in question were already off the road when Claimants purchased them because they had been totaled and transferred to insurance companies. The cars, then, were not polluting when Claimants acquired them.

It appears that Claimants purchased large volumes of TDI cars to profit from the settlements. By way of the February 26 framework, VW and Class Counsel (through the CRC) sought to close loopholes in the agreements that Claimants were relying on. The four categories in the framework do so and are consistent with the settlements' goals. The categories draw distinctions between cars that will likely never be driven again (and that were purchased in that condition) and cars that, although damaged at some point, may return to the road. Under the

5

February 26 framework, cars of the former type are ineligible for class benefits, while cars of the latter type may not be.

By approving the framework, the Court is not acting contrary to *Jeff D. v. Andrus*, 899 F.2d 753 (9th Cir. 1989), as Claimants suggest. (*See* Mot., MDL Dkt. No. 5807 at 24.) In *Jeff D*, the Ninth Circuit explained that a district court cannot sua sponte modify a negotiated settlement agreement. *See id.* at 758 ("Rule 23(e) wisely requires court approval of the terms of any settlement of a class action, but . . . does not authorize the court to require the parties to accept a settlement to which they have not agreed . . . ." (quoting *Evans v. Jeff D.*, 475 U.S. 717, 726-27 (1986))). The Court is not making a sua sponte modification here; it is approving modifications that the Parties (i.e., the Class Representatives and VW) agreed to.

It is also not correct, as Claimants suggest, that the agreements may only be amended after a showing of a substantial change in circumstances. (*See* Mot., MDL Dkt. No. 5807 at 24-25.) The agreements explain that they may be amended by the Parties with Court approval; they do not condition amendments on a substantial change in circumstances. The decisions that Claimants rely upon for their substantial changes test are not on point. (*See id.* at 24-25 & n.9.) In some of those decisions, courts refused to grant one side's request—over the other side's objection—to modify a previously executed settlement agreement absent special circumstances. *See Jankowski v. Castaldi*, No. 01-CV-164 (KAM), 2010 WL 882867, at *5-7 (E.D.N.Y. Mar. 12, 2010); *Barcia v. Sitkin*, No. 79 CIV. 5831 (RLC), 1996 WL 251848, at *3-5 (S.D.N.Y. May 10, 1996). In other decisions cited by Claimants, courts addressed motions for relief from consent decrees in institutional reform cases, where the parties seeking relief were institutions which argued that court-imposed controls over their conduct were no longer needed. *See, e.g.*, *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1181 (10th Cir. 2018) (consent decrees that governed how New Mexico cared for developmentally disabled persons); *Flores v. Lynch*, 828 F.3d 898, 901, 909-10 (9th Cir. 2016) (consent decrees that governed how INS detained minors). Neither kind of case addressed a situation like that here, where both sides to negotiated class action settlements have agreed to modify how certain claims for benefits are handled to better reflect the goals of the settlements.

Claimants also raise equitable concerns with the February 26 framework. They argue that they relied on VW's initial interpretation of the settlement agreements, in early 2017, in deciding to buy additional branded title cars, and some of them have submitted evidence supporting this claim. (*See, e.g.*, MDL Dkt. No. 5730-1, Farchione Decl. ¶ 7 (explaining that claimant Farchione Motors, Inc. purchased 67 additional branded title cars after VW bought back and paid restitution for 51 similar cars); MDL Dkt. No. 5731-1, Renzetti Decl. ¶¶ 7-8 (attesting that claimant Autovid LLC purchased 96 additional branded title cars after VW bought back and paid restitution for 33 similar cars).)

The equities of the framework cut both ways. VW was inundated with claims in early 2017. (See Feb. 27, 2017 Claims Supervisor Report, MDL Dkt. No. 2979 at 7 (noting that "aggressive claims processing timetables . . . combined with a surge of initial claims submissions and a number of other challenges initially strained Volkswagen's resources and caused certain processing delays").) Just because VW, during that frenzied time, awarded benefits for certain claims that didn't further the goals of the settlements doesn't mean it must continue paying claims of that type for the remainder of the claims periods.

### III. CONCLUSION

Assuming that the CRC's determinations are reviewable and that the CRC, through the February 26 framework, effectively amended the 2.0-liter and 3.0-liter settlement agreements, the Court approves those amendments, which are consistent with the goals of the agreements and the Parties' intentions in agreeing to settle their claims. VW and the CRC denied Claimants' claims pursuant to the February 26 framework. Having approved that framework, the Court affirms the denial of Claimants' claims. Claimants' motions, in which they seek an order that would reverse the denial of their claims, are DENIED.

**IT IS SO ORDERED.**

Dated: June 14, 2019

CHARLES R. BREYER
United States District Judge