1   Steve W. Berman (*Pro Hac Vice*)
    Thomas E. Loeser (SBN 202724)
2   HAGENS BERMAN SOBOL SHAPIRO LLP
    1301 Second Avenue, Suite 2000
3   Seattle, WA 98101
    Telephone: (206) 623-7292
4   Facsimile: (206) 623-0594
    steve@hbsslaw.com
5   toml@hbsslaw.com

6   Richard N. Sox (*Pro Hac Vice*)
    BASS SOX MERCER
7   2822 Remington Green Circle
    Tallahassee, FL 32308
8   Telephone: (850) 878-6404
    Facsimile: (850) 942-4869
9   rsox@dealerlawyer.com

10  *Counsel for Plaintiffs and*
    *the Franchise Dealer Class*

11
                    UNITED STATES DISTRICT COURT
12
                  NORTHERN DISTRICT OF CALIFORNIA
13
                      SAN FRANCISCO DIVISION
14

15  IN RE: VOLKSWAGEN 'CLEAN DIESEL'        No. 02672-CRB (JSC)
    MARKETING, SALES PRACTICES, AND
16  PRODUCTS LIABILITY LITIGATION           **PLAINTIFFS' NOTICE OF MOTION,**
                                            **MOTION FOR CLASS CERTIFICATION,**
17  This document relates to:               **AND SUPPORTING MEMORANDUM**

18  *Napleton Orlando Imports, LLC, et al. v.*   Date: November 1, 2019
    *Volkswagen Group of America, Inc., et al.,*  Time: 10:00 a.m.
19  Case No. 3:16-cv-02086-CRB             Courtroom: 6, 17th Floor
                                           Hon. Charles R. Breyer
20

21          [REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ............................................................................................1

II.     FACTS COMMON TO THE CLAIMS OF ALL CLASS MEMBERS ...............1

        A.      Bosch's Coconspirators VW and IAV Plead Guilty to Crimes
                Related to Dieselgate. .................................................................1

        B.      Bosch Played a Key Role in the Development of the Software That
                Was At The Core of the Emissions Scheme. ..............................3

        C.      Bosch Disguised the Defeat Device from Regulators While
                Promoting "Clean Diesel." ..........................................................11

        D.      Bosch Sold and Disguised the Defeat Device as a "Special
                Feature." .....................................................................................12

        E.      Bosch Requested Indemnification from Volkswagen to Evade
                Liability. ......................................................................................14

        F.      Revelation of the Scheme Has A Direct and Foreseeable Impact on
                VW Dealers – The Stop-Sale Orders and Termination of TDI
                Models in the United States. .......................................................15

III.    ARGUMENT ...............................................................................................16

        A.      Legal Standards .........................................................................16

        B.      Plaintiffs satisfy Rule 23(a) for the RICO claims and state-law civil
                conspiracy claims. ......................................................................17

                1.      The Class is identifiable and ascertainable. .................17

                2.      Rule 23(a)(1)—the Class is too numerous for joinder. ....17

                3.      Rule 23(a)(2)—common issues exist for the RICO and
                        state-law claims. ...........................................................17

                4.      Rules 23(a)(3)—Plaintiffs' claims are typical of the claims
                        of all Class members. ....................................................17

                5.      Rule 23(a)(4)—The Class Representatives and Class
                        Counsel will adequately protect the interests of the Classes. ........18

        C.      The Class should be certified under Rule 23(b)(3) as to the RICO
                claim. ..........................................................................................19

                1.      Common answers to common questions predominate under
                        RICO. ............................................................................19

        2.    Plaintiffs provide a common methodology of proving class-
              wide impact and damages for both RICO and conspiracy
              claims.................................................................................................27

    D.   Plaintiffs' state-law civil conspiracy claims raise predominately
         common issues with common answers............................................32

        1.    Applicable legal standards...........................................................32

        2.    Civil conspiracy will be proved with common evidence and
              common legal standards. ............................................................33

        3.    Common-law fraud will be proved with common facts
              based on common legal standards. ..............................................34

    E.   A class action for the RICO and civil-conspiracy claims is superior
         to any other method for adjudicating the controversy.......................39

IV.   CONCLUSION ............................................................................................40

1

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aetna, Inc. v. Health Diagnostic Lab. Inc.*,
2015 WL 9460072 (E.D. Pa. Dec. 28, 2015) ............................................................... 36

*Alliance Mortg. Co. v. Rothwell*,
10 Cal. 4th 1226 (1995) ................................................................................................. 39

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ....................................................................................................... 16

*Boardakan Rest. LLC v. Gordon Grp. Holdings, LLC*,
2015 WL 4597970 (E.D. Pa. July 31, 2015) ................................................................. 38

*Cafaro v. Zois*,
693 F. App'x 810 (11th Cir. 2017) ................................................................................ 37

*CGC Holding Co., LLC v. Broad & Cassel*,
773 F.3d 1076 (10th Cir. 2014) ..................................................................................... 23

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices, & Prods. Liab. Litig.*,
2019 WL 536661 (N.D. Cal. Feb. 11, 2019) ................................................................. 33

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices, & Prods. Liab. Litig.*,
295 F. Supp. 3d 927 (N.D. Cal. 2018) ..................................................................... 32, 34

*Coffey v. WCW & Air, Inc.*,
2018 WL 4154256 (N.D. Fla. Aug. 30, 2018) .............................................................. 37

*Cohen v. Trump*,
303 F.R.D. 376 (S.D. Cal. 2014) ................................................................................... 23

*Cote v. R.J. Reynolds Tobacco Co.*,
909 F.3d 1094 (11th Cir. 2018) ................................................................................ 35, 36

*Dent v. NFL*,
902 F.3d 1109 (9th Cir. 2018) .................................................................................. 35, 36

*Downs v. Borough of Jenkintown*,
2019 WL 1383802 (E.D. Pa. Mar. 26, 2019) ............................................................... 34

*In Re Duramax Diesel Litig.*,
298 F. Supp. 3d 1037 (E.D. Mich. 2018) ............................................................... 31, 38

*Edward J. DeBartolo Corp. v. Coopers & Lybrand*,
928 F. Supp. 557 (W.D. Pa. June 11, 1996) ................................................................. 39

*In re First Alliance Mortg. Co.*,
 471 F.3d 977 (9th Cir. 2006) ............................................................................ 32

*Flores v. United Parcel Serv., Inc.*,
 2019 WL 1777280 (9th Cir. Apr. 23, 2019) ...................................................... 22

*In re Gen. Motors LLC Ignition Switch Litig.*,
 257 F. Supp. 3d 372 (S.D.N.Y. 2017) ............................................................... 36

*Gen. Refractories v. Fireman's Fund Ins. Co.*,
 337 F.3d 297 (3d Cir. 2003) .............................................................................. 34

*Gnagey Gas & Oil Co. v. Pa. Underground Storage Tank Indemnification Fund*,
 82 A.3d 485 (Pa. Commw. Ct. 2013) ......................................................... 35, 36

*Hamilton v. Speight*,
 2019 WL 161731 (E.D. Pa. Jan. 10, 2019) ....................................................... 38

*Hauben v. Harmon*,
 605 F.2d 920 (5th Cir. 1979) ............................................................................ 37

*Hess v. Philip Morris USA, Inc.*,
 175 So. 3d 687 (Fla. 2015) ........................................................................ 35, 36

*Hodson v. Mars, Inc.*,
 891 F.3d 857 (9th Cir. 2018) ..................................................................... 35, 37

*Hollister Inc. v. Zassi Holdings, Inc.*,
 752 F. App'x 888 (11th Cir. 2018) .................................................................... 39

*Joiner v. McCullers*,
 28 So. 2d 823 (Fla. 1947) .................................................................................. 35

*Just Film, Inc. v. Buono*,
 847 F.3d 1108 (9th Cir. 2017) ................................................................... 22, 27

*Kirola v. City & Cty. of San Francisco*,
 860 F.3d 1164 (9th Cir. 2017) .......................................................................... 32

*Kutza v. Williams-Sonoma, Inc.*,
 2018 WL 5886611 (N.D. Cal. Nov. 9, 2018) ............................................. 32, 33

*LEM 2Q, LLC v. Guar. Nat'l Title Co.*,
 144 A.3d 174 (2016) (Pa. Super. Ct. 2016) ............................................ 35, 36, 38

*Leyva v. Medline Indus. Inc.*,
 716 F.3d 510 (9th Cir. 2013) ............................................................................ 27

*Menocal v. GEO Grp., Inc.*,
 882 F.3d 905 (10th Cir.), *cert. denied*, 139 S. Ct. 143 (2018) ......................... 23

*In re Mercedes-Benz Emissions Litig.*,
  2019 WL 413541 (D.N.J. Feb. 1, 2019) ............................................................. 38

*MP, LLC v. Sterling Holding, LLC*,
  231 So. 3d 517 (Fla. Dist. Ct. App. 2017) ........................................................ 33

*Norcia v. Samsung Telecomms. Am., LLC*,
  2018 WL 4772302 (N.D. Cal. Oct. 1, 2018) ..................................................... 37

*Pecanha v. The Hain Celestial Grp., Inc.*,
  2018 WL 534299 (N.D. Cal. Jan. 24, 2018) ...................................................... 32

*Philip Morris USA, Inc. v. Duignan*,
  243 So. 3d 426 (Fla. Dist. Ct. App. 2017) ........................................................ 35

*Ponomarenko v. Shapiro*,
  287 F. Supp. 3d 816 (N.D. Cal. 2018) .............................................................. 33

*Rissmiller v. NGK N. Am., Inc.*,
  2018 WL 4203839 (E.D. Pa. Sept. 4, 2018) ...................................................... 36

*Robinson v. Unilever United States*,
  2018 WL 6136139 (C.D. Cal. June 25, 2018) .................................................... 32

*Scaife Co. v. Rockwell-Standard Corp.*,
  285 A.2d 451 (Pa. 1971) ................................................................................... 39

*Silverman v. Bell Sav. & Loan Ass'n*,
  533 A.2d 110 (Pa. Super. Ct. 1987) .................................................................. 39

*Spencer v. Hartford Fin. Servs. Grp., Inc.*,
  256 F.R.D. 284 (D. Conn. 2009) ....................................................................... 33

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ............................................................................ 16

*Tinsley v. Snyder*,
  2019 WL 1868287 (9th Cir. Apr. 26, 2019) ...................................................... 17

*Torres v. S.G.E. Mgmt., L.L.C.*,
  838 F.3d 629 (5th Cir. 2016) ...................................................................... 22, 23

*In re U.S. FoodService Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013) ............................................................................. 23

*United Nat'l Ins. Co. v. Aon Ltd.*,
  2008 WL 3819865 (E.D. Pa. Aug. 8, 2008) ...................................................... 38

*United States v. Colton*,
  231 F.3d 890 (4th Cir. 2000) ............................................................................ 34

*United States v. Stapleton*,
   293 F.3d 1111 (9th Cir. 2002) ........................................................................... 25

*United States v. Woods*,
   335 F.3d 993 (9th Cir. 2003) ............................................................................. 22

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
   349 F. Supp. 3d 881 (N.D. Cal. 2018) ............................................................... 38

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*,
   2016 WL 6091259 (N.D. Cal. Oct. 18, 2016) ............................................ *passim*

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*,
   2017 WL 4890594 (N.D. Cal. Oct. 30, 2017) ............................................ *passim*

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*,
   229 F. Supp. 3d 1052 (N.D. Cal. 2017) ............................................................. 17

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*,
   2017 WL 672820 (N.D. Cal. Feb. 16, 2017) ..................................................... 40

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ......................................................................................... 17

*Waldrup v. Countrywide Fin. Corp.*,
   2018 WL 799156 (C.D. Cal. Feb. 6, 2018) ....................................................... 23

*Wortman v. Air New Zealand*,
   326 F.R.D. 549 (N.D. Cal. 2018) ................................................................ 16, 19

*Youndt v. First Nat'l Bank of Port Allegany*,
   868 A.2d 539 (Pa. Super. Ct. 2005) ..................................................... 35, 37, 38

*ZC Ins. Co. v. Brooks*,
   847 So. 2d 547 (Fla. Ct. App. 2003) ................................................................ 38

## STATUTES

18 U.S.C. § 1961 ...................................................................................................... 26

## OTHER AUTHORITIES

Fed. R. Civ. P. 23 .......................................................................................... 16, 17, 40

Restatement (Second) of Torts § 551 ....................................................................... 38

## GLOSSARY OF TERMS

| TERM | DEFINITION | CITATIONS IN MOTION |
|---|---|---|
| AdBlue | A urea and water solution injected into the exhaust system to treat emissions. | pp. 2, 9 |
| "Akustikfunktion" or "acoustic function" | The code name developed by Bosch and VW for the software modification that switched on the emissions system during testing. | pp. 4, 6-14 |
| CARB or ("ARB") | California Air Resources Board (or "Air Resources Board"). | pp. 3, 12 n.47 |
| Cycle-beater | Software that will active the emissions controls if it detects it is undergoing emissions testing. | pp. 4, 8, 12 |
| Defeat device | A device that reduces the effectiveness of emissions control systems in real-world drive conditions. | pp. 2, 3, 7-14 |
| EDC | Electronic Diesel Control. Hardware which housed software that controlled a vehicle's operation. | p. 1 |
| EDC 16 | The EDC developed by Bosch for earlier model Audis that injected more fuel at ignition to minimize noise. | pp. 4, 8 n.30 |
| EDC 17 | The EDC developed by Bosch for the Dirty Diesels which controlled performance of the vehicles' emissions system. | pp. 4-6 |
| "Fld_InjCrvNsCharCor" | The name of a software function that activates the defeat device. | p. 4 n.10 |
| FP sheets | Function specification sheets Bosch used to modify the EDC 17. | p. 11 |
| IAV | IAV GmbH, an automotive engineering company 50% owned by VW AG. | pp. 1, 3, 6-7, 11 |
| "InjCrv_stNsCharCor" | The name of the software function that injected diesel to facilitate the defeat device. | p. 4 n.10 |
| OEMs | Original Equipment Manufacturers (shorthand in this case for automobile manufacturers). | pp. 6, 12-14 |
| SCR | Selective Catalytic Reduction, which is a method for converting nitrogen oxides into water and harmless gas. | pp. 7, 13 |
| "Special Characteristics" | A sales term created by Bosch to refer to the software it developed to evade emissions testing. | pp. 1, 13, 14 |
| SW | Emissions software. | pp. 4, 12 |
| TDI vehicles | Turbocharged direct injection diesel vehicles manufactured by VW. | pp. 2, 15, 31 |
| US07 | Shorthand for the effort by Bosch and VW to develop an emissions system that would meet the EPA 2007 emissions standards. | pp. 5, 6 |

**KEY PERSONNEL**

| Name | Entity | Job Title |
|---|---|---|
| ███████████ | Bosch GmbH | ████████████████████████████ |
|  | Bosch GmbH | ██████████████████████████████ |
| ███████████ |  | █████████████████████████████████ |
| ███████████ | Bosch GmbH | ████████████████████████ |
|  | Bosch GmbH | ████████████████████████████ |
| ███████████ | Bosch GmbH | ████████████████████████████ |
|  | Bosch GmbH | █████████████████████ |
| Norman Johnson | Bosch LLC | Director – Governmental and External Affairs |
| ███████████ | Bosch GmbH | ███████████████████████████████████ |
|  | VW AG | ████████████████████████████ |
| ███████████ | Bosch GmbH | █████████████████ |
|  | Bosch GmbH | ███████████████████████ |
|  | VW AG | ████████████████████ |
| ███████████ | Bosch GmbH | ███████████████████ |
|  | Bosch GmbH | ███████████████████████ |
|  | Bosch GmbH | ████████████████████████████ |
| ███████████ | Bosch GmbH | ██████████████████ |
|  | Bosch GmbH | ████████████████████████ |
|  | Bosch GmbH | ███████████████████████ |
| ███████████ | Bosch GmbH | ███████████████████ |
|  | Bosch GmbH | ████████████████████████████ |
|  | Bosch GmbH | ████████████████████████ |
|  | Bosch GmbH | █████████████████████████████ |
|  | Bosch GmbH | ██████████████████ |
| ███████████ | Bosch GmbH | ████████████████████ |
|  | Bosch GmbH | █████████████████████ |
|  | Bosch GmbH | ████████████████████████ |
| ███████████ | Bosch GmbH | ████████████████████████████████ |

1

**NOTICE OF MOTION AND MOTION**

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3

PLEASE TAKE NOTICE that on November 1, 2019, at 10:00 a.m., or as soon thereafter as

4

the matter may be heard by the Honorable Charles R. Breyer of the United States District Court of

5

the Northern District of California, San Francisco Division, located at 450 Golden Gate Avenue, San

6

Francisco, California, Courtroom 6, 17th Floor, Plaintiffs will and hereby do move the Court under

7

Federal Rules of Civil Procedure 23 for an order:

8
9

>   (1) certifying a class of all persons or entities who owned a
>   Volkswagen-branded franchise dealership that operated in the United
>   States as of September 18, 2015 (the "Class");

10
11

>   (2) certifying the Class for claims under the Racketeer Influenced and
>   Corrupt Organizations Act, 18 U.S.C. § 1962(c)–(d) and for civil
>   conspiracy to defraud under the laws of all fifty states;

12

>   (3) appointing all three Plaintiffs as Class representatives; and

13
14

>   (4) appointing Hagens Berman Sobol Shapiro LLP and Bass Sox
>   Mercer as Class Counsel under Fed. R. Civ. P. 23(g).

15

This motion is based upon this notice of motion and motion for class certification, the

16

following memorandum of points and authorities, the accompanying declarations of Steve W.

17

Berman, Jason Kuhn, Greg Bozzani, and John Bertolet, the pleadings and papers on file in this

18

action, the arguments of counsel presented at the hearing of this motion, and such further matters as

19

the Court may consider.

20

DATED: June 14, 2019

HAGENS BERMAN SOBOL SHAPIRO LLP

21

By: */s/ Steve W. Berman*
    Steve W. Berman (*Pro Hac Vice*)

22

Thomas E. Loeser (SBN 202724)
1301 Second Avenue, Suite 2000

23

Seattle, WA 98101
Telephone: (206) 623-7292

24

Facsimile: (206) 623-0594
steve@hbsslaw.com

25

toml@hbsslaw.com

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Richard N. Sox (*Pro Hac Vice*)
BASS SOX MERCER
2822 Remington Green Circle
Tallahassee, FL 32308
Telephone: (850) 878-6404
Facsimile: (850) 942-4869
rsox@dealerlawyer.com

*Counsel for Plaintiffs and
the Franchise Dealer Class*

## I.     INTRODUCTION

Plaintiffs seek certification of a Class of all persons or entities who owned a Volkswagen-branded franchise dealership that operated in the United States as of September 18, 2015. Whether Bosch's misconduct is viewed through the lens of RICO or civil conspiracy, its conduct was uniformly directed at all Class members causing common injury. The common questions of law and fact raised by this course of conduct decisively predominate, and will result in answers common to all Class members. The best, fairest, most consistent—and likely the only practical—way to litigate this case is as a class action. Plaintiffs therefore respectfully request that the Court grant their motion.

## II.     FACTS COMMON TO THE CLAIMS OF ALL CLASS MEMBERS

Common evidence will show that Bosch, VW, and software developer IAV worked together to develop modifications to the emissions software for the Dirty Diesels[1] to deceive regulators, dealers and consumers in violation of RICO and civil conspiracy laws. Set forth below is a proffer of some of the common evidence that Plaintiffs will use to prove on a classwide basis Bosch's liability under RICO and civil conspiracy. Bosch provided hardware to VW in the form of an electronic diesel control ("EDC"), which housed a computer running software that controlled vehicle emission systems. Bosch was an integral part of a scheme to develop proprietary software that allowed the Dirty Diesels to detect and pass emissions tests, even as they spewed high levels of pollutants in real-world driving conditions. As shown below, Bosch, VW, and IAV agreed to ███

███████████████████████████████████████████

███████████████████████████████████████████

███████—a clear recognition that they knew their conduct was illegal.

### A.     Bosch's Coconspirators VW and IAV Plead Guilty to Crimes Related to Dieselgate.

VW has admitted its role in the conspiracy, and agreed to pay a $2.8 billion fine. On March 10, 2017, Volkswagen AG pleaded guilty in the Eastern District of Michigan to three

---

[1] Dirty Diesels are those subject to the EPA's NOVs and are identified in the Third Amended Complaint ("TAC"), ECF No. 5862, ¶ 6.

counts: (1) Conspiracy to violate the Clean Air Act; (2) Obstruction of Justice, and (3) Importation of Merchandise by Means of False Statements.[2] In its guilty plea, VW admitted[3] that, from May 2006 to November 2015, it represented to regulators, dealers and customers that its vehicles met emissions standards and that it "agreed to deceive U.S. regulators and U.S. customers about whether the Subject Vehicles and the Porsche Vehicles[4] complied with U.S. emissions standards." *Id.* ¶¶ 30-31. The conspiracy centered on the 2.0 liter and the 3.0 liter ("TDI") vehicles. Regarding the 2.0 liter vehicles, VW AG admitted that key personnel knew that "VW was using software to cheat the U.S. testing process. *Id.* The software was designed to detect when the vehicles were undergoing emissions testing, and upon detection would switch to a mode that would pass the testing. *Id.* ¶ 34. The software also detected when the vehicles were being driven on the road, and would substantially derate the emissions system to improve the vehicle's performance. *Id.*

According to the guilty plea, starting in or around 2006, Audi AG engineers developed a 3.0 liter diesel vehicle for the U.S. market, with a more powerful engine. *Id.* ¶ 39. The engineers also developed a defeat device that, through software coding, varied the injection of a urea and water solution (called AdBlue) into the exhaust system based on whether the vehicle was undergoing emissions testing. The goal of this defeat device was to reduce the AdBlue tank size to make the trunk roomier and to decrease required service intervals, both of which VW believed was important for the U.S. market. *Id.* ¶ 40.

In 2011, VW launched a second generation of 2.0 Liter vehicles. Following a series of hardware problems upon their launch in 2012, the emissions software was modified so that it could detect when the steering wheel was turning, to more accurately detect when the vehicle was being

---

[2] *See United States v. Volkswagen AG*, 16-CR-20394 (E.D. Mich.), "Rule 11 Plea Agreement," ECF No. 68 (attached as Ex. 48 to the Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Class Certification). All references to "Ex." herein are to the Berman Declaration.

[3] The admissions are in the Statement of Facts attached to the plea which VW cannot contest. Plaintiffs will depose a VW representative to admit these facts so they are admissible in this case.

[4] Collectively, the Subject Vehicles and the Porsche Vehicles are virtually identical to the Dirty Diesels in this case. *See* Third Amended Complaint, ECF No. 5862, ¶ 6.

1    driven on the road. *Id.* ¶ 49. As shown below, Bosch was a participant in each of the foregoing

2    schemes.

3        In March 2014, VW learned that researchers at West Virginia University had determined

4    that two VW vehicles, when tested on the road, were emitting approximately 40 times the

5    permissible limits of NOx. EPA and CARB soon began investigating, in part by asking VW

6    questions and doing their own testing. *Id.* ¶ 53. In response to these inquiries, VW admitted that it

7    worked to thwart the investigation and did not disclose the defeat devices and software

8    manipulation.

9        On December 17, 2018, IAV GmbH, also pled guilty to conspiracy to violate the Clean Air

10   Act in connection with the dieselgate scandal.[5] As part of the plea, IAV admitted that from at least

11   May 2006 to November 2015, "IAV and its co-conspirators, including VW, worked on the design

12   and calibration of engine control units containing defeat devices and agreed to defraud U.S.

13   regulators and U.S. customers, and violate the Clean Air Act, by misleading U.S. regulators and

14   U.S. customers about whether the [VW] 2.0 liter diesel engine vehicles for MY 2009-2014

15   (collectively, the 'Gen 1 Vehicles') complied with U.S. emissions standards." *Id.* ¶ 19. In

16   particular, IAV "worked collaboratively in designing, testing, implementing, and improving

17   software they knew that VW was using to cheat the U.S. testing process by making it appear as if

18   the Gen 1 Vehicles met U.S. emissions standards when, in fact, they did not." *Id.* ¶ 19.

19   **B.    Bosch Played a Key Role in the Development of the Software That Was At The Core
         of the Emissions Scheme.**

20

21       Common evidence will demonstrate that the Bosch entities were a key player in every

22   aspect of this conspiracy, and joined with VW and IAV to both plan and program the cheating

23   software and to conceal it.[6] This illicit partnership was forged by Bosch's work developing illegal

24   software modifications for previous Audi models. Starting in 1999, VW sought to dampen the loud

25   ───────────────
         [5] *See United States v. IAV GmbH*, 16-CR-20394 (E.D. Mich.), "Plea Agreement," ECF No. 138
26   (Ex. 49).

27       [6] In Bosch's motion to dismiss, Bosch claimed knowledge of the defeat device was limited to a
     small group of VW employees and that Bosch was not part of the communications involving the
28   same. ECF No. 4175, at p. 8, ll. 21-26; *see also*, p. 9, ll. 3-7, p. 1, ll. 21-25. As demonstrated
     herein, this pleading is false and/or misleading.

clattering noise that its Audis made upon startup. But the fix for this problem – injecting more fuel into the engine upon ignition – exceeded European emissions standards during testing.[7] Audi and Bosch jointly developed an illegal modification to the software controlling the added fuel injection by turning it on only when in real-world driving conditions.[8] Since this feature was developed to correct a perceived acoustics problem, the development of illegal emissions testing software modifications became known at Bosch and VW as an "acoustic function," and that code word remained long after the function had anything to do with acoustics.

In an April 28, 2009 email entitled ███████████████████████ ██████" Bosch employee ████████████ succinctly summarized the history of the "███ ████ :

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████[9]

████████ then described how the illegal software modification worked in VW vehicles: "█
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████" *Id.* (emphasis added).[10] ████████ concluded by noting, "█████████████████████████████████████

<hr />

[7] *See State of New York v. Volkswagen Aktiengesellschaft*, 904021-16 (N.Y. Sup. Ct.), ¶ 72 (NYSCEF Doc. No. 2).

[8] Bosch's own documents demonstrate this fact. ████████████████████████████████████
██████████████████████████ *See* Ex. 1, RBG-MDL2672-NE-0026477737, at 6.
████████████████████████████. *Id.* at 7.

[9] Ex. 2, RBG-MDL2672-NE-002142948 (emphasis added).

[10] *See also* Ex. 3, RBG-MDL2672-NE-003641254 (██████████████████████████
██████████████████████████.") (emphasis added).

█████████████████████████████████████████████████████." *Id.* A Bosch colleague

responded, ██████████████████████████████████████████████

████████████████████████" *Id.* The answer as to legality was "████████████████

████████████████████████████████████."[11] █████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████[12]

    To the extent secret software manipulation was at the heart of the scheme as admitted by

VW and IAV, the terms of the operative contract between VW and Bosch were unequivocal that

Bosch controlled the software. On April 7, 2005, Bosch GmbH and VW AG entered into ██

████████████████████████████████████████████████████████████████

████[13] *Id.* at 2. The specific provisions detailing the Bosch/VW partnership are detailed below.



*Id.* at 2-6.

*Id.* at 7.

*Id.* at 7-8.

*Id.* at 9.

    The purpose of the Agreement was to develop software for diesel vehicles, and was the

development platform for the first diesels set to be launched in 2009. The project became known as

the "US07" project. The importance of Bosch's collaboration in the US07 project was recognized

and celebrated by VW. ███████████████████████████████████████

_____

[11] Ex. 4, RBG-MDL2672-NE-002124057.

[12] Ex. 5, RBG-MDL2672-NE-002124063.

[13] *See* Ex. 6, VW-MDL2672-03752699.

1 ████████████████████████████████████████████████████[14]

2 ████████████████████████████████████████████████████

3 ██████████████████████████████████████████████

4 ████████████████████████████████████████████████████

5 ████████████████████[15]██████████████████████████████

6 ████████████████████████████████████████████████████

7 ████████████████████████████████ *Id.* For its part, Bosch

8 emphasized that it could easily tailor emissions software to meet OEMs' needs. On February 28,

9 2006, Bosch issued a press release entitled "EDC17: Ready for future demands."[16]

10         Bosch's documents show beyond any doubt that it was modifying the illegal software for

11 VW. ████████████████████████████████████████████████

12 ████████████████████████████████████████████████████

13 ██████████████████████████████████████[17]██████████████

14 ████████████████████████████████████████████████████

15 ██████████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 ██████████████████████████████████████████████

18 ████████████████████████[8]██████████████████████████

19 ████████████████████████████████████████████████████

20 ████████████████████████████████████████████████

21 ████████████████████████████[9] In an article entitled "How They

<hr />

[14] *See* Ex. 7, RBG-MDL2672-NE-003093990.

[15] *See* Ex. 8, RBG-MDL2672-NE-003093992, at 2 (emphasis added).

[16] *See* Feb. 28, 2006 Bosch press release, "The brain of diesel injection: New Bosch EDC17 engine management system," http://www.bosch-presse.de/presseforum/details.htm?txtID=2603&locale=en.

[17] Ex. 9, RBG-MDL2672-NE-002694535. ██████████████████████

[18] Ex. 10, RBG-MDL2672-NE-001936607.

[19] Ex. 11, RBG-MDL2672-NE-002559780 (excerpt). As stated in the spreadsheet, the column entitled "Translation" was not in the original, but added by a translator retained by plaintiffs.

Did It: An Analysis of emission Defeat Devices in Modern Automobile," the authors were able to access the Bosch function sheets and determine the software commands that manipulated emissions.[20] A review of documents produced by Bosch reveal those same code strings are present and have the same illicit function described in the article.[21]

Bosch internally discussed the implementation of the defeat device and discussed how it would be used in specific models: ████████████████████████████████████████████████████████████████████████████████████████████████████████ [22] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ [3] In a November 2, 2009 email, a Bosch employee also confirmed that the "████████████████████████████████████████████████████████████████████████████████████ [24]

Documents also reveal that Bosch worked quickly to fix any bugs in the software related to the acoustic function. ████████████████████████████████████████████████████████████████████████████████ [25] ████████████████████████████████████████████████████████████████████████████████ [6] ████████████████████████████████████████

---

[20] Ex. 47.
[21] *See* Ex. 46.
[22] Ex. 12, RBG-MDL2672-NE-001948207.
[23] Ex. 13, RBG-MDL2672-NE-001819747.
[24] Ex. 14, RBG-MDL2672-NE-004233587.
[25] Ex. 15, RBG-MDL2672-NE-001966439.
[26] Ex. 16, RBG-MDL2672-NE-001873113.



*Id.* at 2.

*Id.* at 1.

*Id.* Viewed in context of the entire document, the engineer's last statement was certainly sarcastic and made with the understanding that everyone on the email chain was in on the joke.

Problems with the acoustic function were treated differently, and required a higher level of review, compared to other technical problems. For example,

---

[27] Ex. 17, RBG-MDL2672-NE-001935895, at 2.

[28] Ex. 18, RBG-MDL2672-NE-001935818.

[29] Ex. 19, RBG-MDL2672-NE-002121559.

[30] *Id.* at 2; *see also* Ex. 20, RBG-MDL2672-NE-002296578

1    One aspect of the scheme was, due to the AdBlue tank size, to program vehicles to use less

2    AdBlue in real world driving conditions.[31] Bosch was there for VW as it helped develop

3    modifications to the AdBlue dosing so that a smaller tank could be used and refill intervals

4    enlarged. ███████████████████████████████████████████████

5    ████████████████████ [2] ███████████████████████████

6    ████████████████    The special feature was described as follows: ████████████

7    █████████████████████████████████████████████████████████

8    █████████████████████████████████    This presentation

9    was circulated widely within Bosch management. *Id.*[33] VW has admitted in its plea that part of the

10   scheme was to reduced AdBlue dosing in real world conditions.

11    Bosch employees also openly discussed that the purpose of the acoustics function was to

12   pass emissions tests. █████████████████████████████████████

13   ███████████████████████ [4] ███████████████████████

14   ███████████████████████████████████

15   ████████████  *Id.* at 4. █████████████████████████

16   █████████████████████████████████████████████

17    In internal communications, VW personnel made clear that Bosch's technical expertise and

18   assistance was necessary for the acoustic function. ████████████████████

19   █████████████████████████████████████████████████████████

20   ████████████████████████████████████████

21   █████████████████████████████████████████████████████████

22   ████████████████████████████████████████████

---

[31] Rule 11 Plea Agreement ¶ 42.

[32] Ex. 21, RBG-MDL2672-NE-003307529, at 3.

[33] *See* Rule 11 Plea Agreement ¶¶ 39-40 regarding varying injections of urea and the AdBlue tank.

[34] Ex. 22, RBG-MDL2672-NE-001991853.

█████████████████████████████████████████████████████████████████

████████████████[35]

Proof that Bosch knew exactly what it was doing – and carefully tracked the performance of the acoustics function – also comes from its scramble to evade liability after the September 15, 2015 NOV. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████[3]██████████████████████████████████████[3]███████

██████████████████████[38] After the EPA's NOV Bosch took the position, like the infamous Sergeant Schultz from Hogan's Heroes', that it knew nothing: ████████████████████████████████

███████████████████████████████████[39] This post-scandal denial of responsibility for calibrating and configuring is a marked departure from the truth emailed in a

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████[0]

Just recently, Bosch all but admitted its culpability in developing software that cheats emissions. On May 23, 2019, German prosecutors announced that Bosch agreed not to contest a $100 million fine for its role in the diesel cheating scheme based on its work with VW. According to a news article, prosecutors stated that Bosch "was responsible for some 17 million computers that eventually held software that helped Volkswagen Group cheat on emissions tests."[41]

---

[35] Ex. 23, VW-MDL2672-02569922.

[36] Ex. 24, RBG-MDL2672-NE-004350618.

[37] Ex. 25, RBG-MDL2672-NE-004350623.

[38] *See supra* note 36 (citing -004350618).

[39] *See* Ex. 26, RBL-MDL2672-NE-000014395.

[40] Ex. 27, RBG-MDL2672-NE-001873504. Again this evidence cannot be squared with statements in Bosch's motion to dismiss that the deception was "limited to a small group of VW employees" (ECF No. 4175, p. 8) or that Bosch had an ordinary business relationship with VW (p. 10).

[41] *See* "Germany Slaps Bosch with $100 million fine for role in Dieselgate" (May 23, 2019), https://www.cnet.com/roadshow/news/germany-bosch-dieselgate-fine/.

**C.      Bosch Disguised the Defeat Device from Regulators While Promoting "Clean Diesel."**

Bosch and VW AG recognized and agreed from the beginning that details regarding the software modification should not be described in documentation in order to avoid detection by regulators. For example, ███████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████ [4] ███████████████████████ *Id.*

████████████████████████████████████████████████

████████████████████ *Id.* ███████████████████████████

███████████████████████████ [43] ████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████ [44]

████████████████████████████████████████████

███████████████ [4] ██████████████████████████

██████████████████████████████████████████████

███████████████████████████████ *Id.* ██████

██████████████████████████████ *Id.*

Even as Bosch was faking the documentation, it shamelessly promoted "Clean Diesel." On Feb. 1-2, 2006, it hosted a "Bosch Clean Diesel Day" in Sacramento, California. As Bosch described it in a letter to VW ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

---

[42] Ex. 28, RBG-MDL2672-NE-002273872.
[43] Ex. 29, RBG-MDL2672-NE-002273871.
[44] Ex. 30, RBG-MDL2672-NE-002273869.
[45] Ex. 31, RBG-MDL2672-NE-002697447.

████████████████████████████████████████████████████████ [6]

Bosch continued to host events where it disingenuously promoted its "clean diesel" technology, even as it was creating defeat devices that insured the emissions systems stayed dirty.[47] A Bosch document confirms that ████████████████████████████████████████ ████████████████████████████████████████ [48]

**D.    Bosch Sold and Disguised the Defeat Device as a "Special Feature."**

When Bosch personnel learned about the defeat device, some of them were cognizant of its illegality and sought to place the blame on VW for its development. For example, ████████████ ██████████████████████████████████████████████, and appeared to have discovered the acoustic function for the first time. In response, he sought to minimize Bosch's involvement and shift all the blame on VW for its creation, although he appeared to recognize that this was a tenuous position. Hence, in an email chain dated November 2, 2009, ██████ emailed several Bosch employees (including ████████████████ ██████████████████████████ a PowerPoint regarding the defeat device.[49] ████████ responded, "[t]here is a possibility in our software to 'misuse'? . . . If this is correct, then we must just mention this as you suggested in 'special features.' Of course the wording should not mention 'misuse' . . . but we can say it in better words." *Id.* ██████ responded, and stated in part (*id.*; all emphases added):

- **"we know – from >20 years of history – all about cycle beating."**

- "Bosch is releasing SW [software] + calibration (Bosch is encrypting the entire SW + calibration data). ==> **how can it be that Bosch doesn't know?"**

---

[46] Ex. 32, RBL-MDL2672-NE-000001273.

[47] Ex. 33, RBG-MDL2672-NE-002430818 █████████████████████████ ████████████████████████████████████████████: Ex. 34, VW-MDL2672-03331605 ███████████████████████████ ██████████████████████████████████"): Ex. 35, VW-MDL2672-002434381 ███████████████████████████).

[48] Ex. 36, RBL-MDL2672-NE-000080391.

[49] Ex. 37, RBG-MDL-NE-4170733.

o   "Special characteristics regarding safety etc. we are used to. The only new now is that this is a special characteristic regarding compliance with legal requirements."

████████ then became the point person for the cycle beating device, as demonstrated below:



(*id.* at 2):

—————————

[50] Ex. 38, RBG-MDL-NE-002448436. ████████████████████████████████. He clearly did not want ████████ to interfere with the relationship with VW.

[51] *See* Ex. 39, RBG-MDL-NE 2143427.

[52] *See* Ex. 40, RBG-MDL2672-NE-001876208.

[53] *See* Ex. 41, RBG-MDL2672-NE-004170803.

[54] *See* Ex. 42, RBG-MDL2672-NE-004170804.

○ ███████████████████████████████████████

● ███████████████████████████████████████

● ███████████████████████████████████████

This collection of emails and documents demonstrates that, when mid-level Bosch employees learned of the acoustics function, they attempted to package the function as a "special function" to sell to VW, but disclaim any responsibility for its use.

**E.      Bosch Requested Indemnification from Volkswagen to Evade Liability.**

Finally, Bosch's knowledge that the scheme to defraud regulators and the public was illegal is also evidenced by its request for indemnification from VW.[58] ████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████" Although VW never signed Bosch's proposed indemnification agreement, Bosch continued to work closely with VW to develop and modify the acoustics function after this request.

---

[55] *See* Ex. 43, RBG-MDL2672-NE-004170793.

[56] *See* Ex. 44, RBG-MDL2672-NE-002297241.

[57] Despite the overwhelming evidence that ████████ and ██████ were key actors in the conspiracy, Bosch never identified them as custodians, and resisted Plaintiffs' efforts to make them custodians. *See* Berman Declaration, ¶¶ 4-15.

[58] *See* Ex. 45, VW-MDL2672-02570091.

F.     **Revelation of the Scheme Has A Direct and Foreseeable Impact on VW Dealers – The Stop-Sale Orders and Termination of TDI Models in the United States.**

In September 2015 and November 2015, Volkswagen issued separate stop-sale orders for its TDI vehicles.[59] The first ceased the sales of 2.0-liter vehicles; the second ceased the sales of the Volkswagen Touareg, which had a 3.0-liter TDI engine, as well as certain Audi and Porsche vehicles also equipped with 3.0 liter TDI engines. The stop sale orders immediately halted the sales of new and Certified Pre-Owned ("CPO") TDI vehicles. The arrested sales of new and CPO TDI vehicles also prevented those TDI vehicles that would have been sold from becoming in-use vehicles within the market. Collectively, the stop-sale orders deprived the Franchise Dealer Class of the profits associated with: (a) new TDI sales, including profits on the vehicle sales themselves and on ancillary related products; (b) used vehicle sales that would have flowed directly from the new TDI sales; and (c) the fixed operations sales, including warranty, customer pay, and wholesale sales.[60] The effect of the stop sale orders related most closely to a franchise termination or discontinuation, in that the profit opportunities that flowed to dealerships from the TDI vehicle portion of the Volkswagen franchise ceased, leaving behind only the residual value associated with the in-use TDI vehicles in the market. This cessation became permanent when Volkswagen declared it would no longer sell TDI vehicles or any other diesel vehicles in the United States.[61]

In connection with a global class-action settlement with TDI vehicle owners, the FTC and the DOJ, Volkswagen agreed to buy back all 2.0-liter TDI vehicles and 2009-2012 MY 3.0-liter TDI Touaregs.[62] The buyback resulted in the removal of approximately 78% of then in-use Volkswagen TDI vehicles from the U.S. passenger fleet. The midpoint of the buyback occurred in

---

[59] Kelly Pleskot, "Volkswagen Issues Stop-Sale on Diesel Cars Following Emissions Scandal," Motortrend.com (Sept. 21, 2015): https://www.motortrend.com/news/volkswagen-issues-stop-sale-on-diesel-cars-following-emissions-scandal/ and Kelly Pleskot, "VW Issues Stop-Sale on Cars with 3.0-Liter TDI V-6 Engines," Motortrend.com (Nov. 4, 2015): https://www.motortrend.com/news/vw-issues-stop-sale-on-cars-with-3-0-liter-tdi-v-6-engines/.

[60] Report of Edward M. Stockton In Support of Plaintiffs' Motion for Class Certification at pp. 2-3, 12-15 ("Stockton Report") (attached as Ex. 50 to the Berman Declaration).

[61] See *id.*

[62] *Order Granting Final Approval of the 2.0-Liter TDI Consumer and Reseller Dealership Class Action Settlement* (ECF No. 2102) and *Order Granting Final Approval of the Consumer and Reseller Dealership 3.0-Liter Class Action Settlement* (ECF No. 3229).

1   March 2017. The effect of the buyback was different from that of the stop-sale order, as it removed

2   from the market nearly 400,000 in-use TDI vehicles, reducing revenue opportunities and thus

3   profits to the Franchise Dealers by prematurely terminating fixed operations opportunities

4   associated with those vehicles.[63]

### III.   ARGUMENT

**A.   Legal Standards**

Plaintiffs must prove by a preponderance of the evidence that the Class should be certified. *Wortman v. Air New Zealand*, 326 F.R.D. 549, 554 (N.D. Cal. 2018). "Certification is a three-step process." *Id.* First, plaintiffs must show that an identifiable and ascertainable class exists. Second, plaintiffs must meet Rule 23(a) requirements: numerosity, commonality, typicality, and adequacy. Third, plaintiffs here must show the Class fulfills the Rule 23(b)(3)requirements: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These two requirements of Rule 23(b)(3) are known as "predominance" and "superiority." *Wortman*, 326 F.R.D. at 554.

In analyzing a certification motion, a court may consider merits questions "to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). The certification inquiry may involve substantive analysis, but the "court may not go so far ... as to judge the validity" of a plaintiff's claims. *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003).

---

[63] *See* Stockton Report at pp. 14, 28-30.

**B.      Plaintiffs satisfy Rule 23(a) for the RICO claims and state-law civil conspiracy claims.**

  **1.      The Class is identifiable and ascertainable.**

Bosch has stipulated that the proposed class is ascertainable.[64] *See also*, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*, 229 F. Supp. 3d 1052, 1062–63 (N.D. Cal. 2017) (granting final certification of settlement class).

  **2.      Rule 23(a)(1)—the Class is too numerous for joinder.**

The Class satisfies the numerosity requirement. In granting preliminary approval to the Franchise Dealers' settlement with Volkswagen, this Court stated that there "are 652 Eligible Dealers and thus 652 potential Class Members. (Dkt. No. 1970 ¶ 2.12.) Plaintiff therefore satisfies the numerosity requirement." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*, 2016 WL 6091259, at *7 (N.D. Cal. Oct. 18, 2016). The proposed Class here is identical and thus satisfies Rule 23(a)(1).[65]

  **3.      Rule 23(a)(2)—common issues exist for the RICO and state-law claims.**

The proposed Class satisfies the requirement of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A single common question of law or fact suffices. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 369 (2011). Bosch has stipulated that common questions are present. ECF No. 6365.

  **4.      Rules 23(a)(3)—Plaintiffs' claims are typical of the claims of all Class members.**

As required by Rule 23(a)(3), Plaintiffs' claims are "typical of the claims or defenses of the class." A class representative's claims "are 'typical' if they are 'reasonably coextensive with those of absent class members; they need not be substantially identical.'" *Tinsley v. Snyder*, 2019 WL 1868287, at *7 (9th Cir. Apr. 26, 2019) (citation omitted). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* (citation and internal quotation marks omitted).

---

[64] *See* ECF No. 6365.

[65] Bosch refused to stipulate as to numerosity.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs' claims are typical of the Class members' claims. In granting preliminary approval to the Franchise Dealers' settlement with Volkswagen, this Court stated that "Plaintiff's claims are based on the same pattern of wrongdoing as those brought on behalf of Class Members…. Plaintiff and Class Members were also harmed by the same course of conduct, namely, Volkswagen's allegedly unauthorized and secret use of the defeat device which led to a stop sale order on all Volkswagen diesel cars and to a decline in the worth of the Volkswagen brand. Because Plaintiff's claims and underlying facts are identical to those of the Class, Plaintiff satisfies the typicality requirement." *Volkswagen "Clean Diesel"*, 2016 WL 6091259, at \*8. The same analysis applies here.

### 5. Rule 23(a)(4)—The Class Representatives and Class Counsel will adequately protect the interests of the Classes.

Plaintiffs will "fairly and adequately protect the interests of the class," as required by Rule 23(a)(4). As this Court stated in granting preliminary approval to the Franchise Dealers' settlement with Volkswagen, courts "ask: (1) do the named plaintiffs and their counsel have any conflicts of interest with other Class Members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Volkswagen "Clean Diesel"*, 2016 WL 6091259, at \*8 (citation and internal quotation marks omitted). In granting preliminary approval to the Franchise Dealers' settlement with Volkswagen, this Court explained that "Plaintiff represents it is 'committed to the action and has devoted substantial time to assisting counsel with this action, providing documents and reviewing pleadings.' (Dkt. No. 1971 at 20; *see* Dkt. No. 1972 ¶ 15.) At this point, nothing in the record suggests Plaintiff has any conflicts with Class Members or otherwise cannot adequately represent the Class." *Id.* Similarly, the three named plaintiffs in the Third Amended Complaint represent that they are committed to the litigation.[66] Therefore, they satisfy the adequacy requirement.

Proposed Class Counsel also satisfy Rule 23(a)(4). In granting preliminary approval to the Franchise Dealers' settlement with Volkswagen, this Court stated that "Class Members are also

---

[66] *See* Declarations of Jason Kuhn, Greg Bozzani, and John Bertolet.

1   represented by adequate counsel. Both Hagens Berman and Bass Sox Mercer are experienced

2   counsel…. In light of the foregoing, it appears Plaintiff is able to vigorously prosecute this action

3   through qualified counsel." *Id.* The same attorneys continue to represent the proposed Class and

4   seek appointment as Class Counsel. Therefore, Plaintiffs meet the adequacy requirement.

5   **C.     The Class should be certified under Rule 23(b)(3) as to the RICO claim.**

6          The proposed Class satisfies Rule 23(b)(3) for the RICO claim. "Rule 23(b)(3)'s first test,

7   predominance, itself consists of two parts. First, a plaintiff must show that common questions of

8   law and fact predominate over individual questions. Second, a plaintiff must present a model of

9   damages that (1) identifies damages that stem from the defendant's alleged wrongdoing and (2) is

10  'susceptible of measurement across the entire class.' *Comcast Corp. v. Behrend*, 569 U.S. 27, 133

11  S. Ct. 1426, 1433–34, 185 L.Ed.2d 515 (2013)." *Wortman*, 326 F.R.D. at 557–58. Plaintiffs need

12  not prove their claims with evidence at this juncture. *See id.* at 558 ("Plaintiffs present extensive

13  evidence of Defendant's participation in collusive behavior, but even if they had not, certification

14  would still be proper. Proof is not a prerequisite for class certification.").

15         **1.     Common answers to common questions predominate under RICO.**

16               **a.     Common evidence will be used to prove that all Plaintiffs and Class
                      members have statutory RICO standing.**

17         RICO standing is limited "to those who have suffered (1) an injury to 'business or

18  property,' that is (2) 'by reason of' a RICO violation. 18 U.S.C. § 1964(c)." *In re Volkswagen*

19  *"Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*, 2017 WL 4890594, at *4 (N.D. Cal.

20  Oct. 30, 2017) ("*MTD Order*"). Both requirements will be proved with common evidence, yielding

21  common answers for all Plaintiffs and Class members.

22               **(1)     Injury to business or property**

23         Common evidence will prove that all Plaintiffs and Class members suffered the same

24  injuries to business or property under RICO. In granting preliminary approval to the Franchise

25  Dealers' settlement with Volkswagen, this Court stated that "Plaintiff and Class Members were

26  also harmed by the same course of conduct, namely, Volkswagen's allegedly unauthorized and

27  secret use of the defeat device which led to a stop sale order on all Volkswagen diesel cars and to a

28

decline in the worth of the Volkswagen brand." *Volkswagen "Clean Diesel"*, 2016 WL 6091259, at *8. Similarly in denying Bosch's motion to dismiss the Second Amended Complaint, this Court concluded that "the Franchise Dealers have plausibly alleged multiple injuries to their business and property interests, and these injuries are sufficiently concrete to survive a motion to dismiss. The stop-sale order has prevented the Franchise Dealers from selling their inventory of affected vehicles. (SAC ¶¶ 4, 21, 29, 285.)" *MTD Order*, 2017 WL 4890594, at *6. This Court further found that "as a result of this deprivation, the Franchise Dealers plausibly allege that they have lost profits, have incurred inventory carrying costs, have had to purchase replacement inventory, and have lost servicing revenues from the vehicles they could not legally sell. (*See* SAC ¶ 441(c), (d), (f), (i).)" *Id.* And the Franchise Dealers "also allege that they overpaid for the 'clean diesels,' believing they were compliant with U.S. emission standards. (*Id.* ¶ 441(a).) This out-of-pocket loss is also a cognizable injury to the Franchise Dealers' property…. The mirror image injury is also cognizable: the value of the Franchise Dealers' inventory of affected vehicles declined in value after the fraud was disclosed." *Id.*[67]

Based on common evidence, Plaintiffs will establish that they and all Class members suffered RICO injuries. The stop-sale orders, termination of the TDI product lines and buyback of nearly 400,000 in-use TDIs applied to *all* Plaintiffs and Class members and necessarily caused them to suffer the types of RICO injuries identified by this Court.[68]

### (2)     Injury "by reason of" a RICO violation

Plaintiffs will establish "but for" and proximate cause for all Class members with common evidence. As this Court has explained, Plaintiffs' allegations "plausibly support that, 'but for' the alleged enterprise, the Franchise Dealers would not have suffered the injuries they allege. Each injury stems from the defeat device, which when discovered led to a drop in the value of the 'clean diesels' and the stop-sale order." *MTD Order*, 2017 WL 4890594, at *8. So, common evidence will be used to show "but for" causation for all Class members.

---

[67] The Third Amended Complaint contains the same allegations of RICO injuries suffered by Plaintiffs and Class members. *See* TAC ¶¶ 4, 22, 28, 34, 315, 317, 335, 336, 438, 441.

[68] *See, e.g.,* Stockton Report at pp. 13-18.

1   Similarly, Plaintiffs will utilize common evidence to prove proximate cause for each

2   Plaintiff and Class member. "Three nonexhaustive factors are considered as part of [the proximate

3   cause] inquiry: '(1) whether there are more direct victims of the alleged wrongful conduct who can

4   be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to

5   ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and

6   (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the

7   risk of multiple recoveries.'" *Id.* As this Court found in denying Bosch's motion to dismiss in this

8   action, "[e]ach of these factors supports a direct connection between Bosch's alleged RICO

9   violation and the Franchise Dealers' alleged injuries." *Id.*

10   Those three factors will be resolved with common evidence that will yield common

11   answers. First, common proof will show that "there are no more direct victims of the wrongful

12   conduct because the Franchise Dealers bought the affected vehicles directly from co-schemer

13   Volkswagen." *Id.* Second, common evidence will demonstrate that "the emissions fraud led

14   directly to the stop-sale order, which led directly to the Franchise Dealers' inability to sell their

15   inventory of 'clean diesel' vehicles." *Id.* And third, this Court has explained that "there is no reason

16   to currently conclude that this case will require the Court 'to adopt complicated rules apportioning

17   damages to obviate the risk of multiple recoveries.'" *Id.* at *9 (quoting *Mendoza v. Zirkle Fruit

18   Co.*, 301 F.3d 1163, 1169 (9th Cir. 2002)). And in any event, deciding whether and how to

19   apportion damages is a common issue. In short, common evidence will show that "there is a

20   'sufficiently direct relationship between the defendant's wrongful *conduct* and the plaintiff's

21   injury....'" *MTD Order*, 2017 WL 4890594, at *9 (quoting *Bridge v. Phoenix Bond & Indem. Co.*,

22   553 U.S. 639, 657 (2008) (emphasis added by this Court)).

23   Moreover, as in *Bridge*, third-party reliance by federal and state regulators on the RICO

24   fraud presents a common issue to establish all Plaintiffs and Class members suffered RICO injuries

25   by reason of the RICO violation. *See id.* at *11 ("The misrepresentation also does not need to be

26   made to the RICO plaintiff, but instead may be made to a third-party. *See Bridge*, 553 U.S. at

27   661...."). As Plaintiffs allege and will prove with evidence common to all Class members "EPA,

28   CARB, and other regulators relied on the misrepresentations and material omissions made or

1    caused to be made by the RICO Defendants; otherwise Volkswagen could not have obtained valid

2    COCs and EOs to sell the Affected Vehicles." TAC ¶ 436.

3          Similarly, in *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1121 (9th Cir. 2017), the Ninth

4    Circuit identified third-party reliance as a common issue in affirming class certification. The

5    plaintiffs alleged that the "pattern of racketeering includes Leasing Defendants' alleged

6    misrepresentations to ACH processors," which debited class members' accounts in reliance on

7    those misrepresentations. *Id.* at 1117. The Ninth Circuit held that the "district court properly

8    identified several common questions and determined they predominate in Plaintiffs' RICO claim.

9    These questions include ... whether ACH processors relied on fraudulent misrepresentations by

10   Leasing Defendants when they processed the debits." *Id.* at 1121. Thus, the Court identified

11   whether the third-party ACH processors relied on misrepresentations as a common question.

12   Similarly, the issue of whether state and federal regulators relied on misrepresentations by

13   Volkswagen and Bosch.

14         Finally, common issues predominate as to reliance for Plaintiffs' claim that, in addition to

15   making misrepresentations to regulators, Bosch failed to disclose material information to dealers

16   and consumers.[69] As the *en banc* Fifth Circuit has explained, RICO plaintiffs "may use a common

17   inference of reliance to prove proximate causation under RICO. A jury may reasonably infer that,

18   in deciding to pay to become IAs, the Plaintiffs relied on Ignite's 'implicit representation that it is a

19   legal multi-level marketing program, when it is in fact a fraudulent pyramid scheme." *Torres v.*

20   *S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 643 (5th Cir. 2016) (*en banc*). The court explained that "the

21   record is devoid of evidence that a single putative class member joined as an IA despite having

22   knowledge of the fraud. Even after the close of discovery and the commencement of summary

23   judgment motions before the district court, the Defendants produced no evidence that a single class

24

25         [69] *United States v. Woods*, 335 F.3d 993, 998 (9th Cir. 2003) (RICO claim can be based on "the
26   concealment of material facts") (citation omitted). *See also Flores v. United Parcel Serv., Inc.*,
     2019 WL 1777280, at *1 (9th Cir. Apr. 23, 2019) (failure to disclose can be the basis of a RICO
27   fraudulent scheme if there is a duty to disclose). Any issue as to whether Volkswagen and Bosch
     had a duty to disclose material information to regulators and Class members presents a common
28   issue.

member even knew of the fraud or would have paid to become an IA knowing of the fraud." *Id.* And in *CGC Holding Co., LLC v. Broad & Cassel*, the court similarly explained that "[i]n the RICO context, class certification is proper when 'causation can be established through an inference of reliance where the behavior of plaintiffs and the members of the class cannot be explained in any way other than reliance upon the defendant's conduct.'" 773 F.3d 1076, 1089–90 (10th Cir. 2014) (citation omitted).[70]

Likewise here, Plaintiffs will present common evidence that the behavior of the Franchise Dealers cannot be explained in any way other than reliance upon the fraudulent conduct of Bosch and Volkswagen. *See* TAC ¶ 436 ("Plaintiffs, along with hundreds of franchise dealers, relied upon RICO Defendants' representations and omissions that were made or caused by them. Plaintiffs' reliance is made obvious by the fact that: (1) they purchased hundreds of thousands of vehicles that never should have been introduced into the U.S. stream of commerce and whose worth has now plummeted since the scheme was revealed; and (2) they invested millions of dollars in the continuing operation of their franchise dealerships.").

---

[70] *See also Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 919 (10th Cir.) ("[W]hen a class member could individually establish causation based on circumstantial evidence, a court may likewise allow a class to rely on circumstantial evidence that the class shares to establish causation on a class-wide basis. *CGC Holding*'s reasoning applies with equal force to the facts of this case because (1) a court could permit an individual TVPA class member to establish causation through circumstantial evidence, and (2) the TVPA class members share the relevant evidence in common because their claims are based on allegations of a single, common scheme."), *cert. denied*, 139 S. Ct. 143 (2018); *In re U.S. FoodService Inc. Pricing Litig.*, 729 F.3d 108, 119, 120 (2d Cir. 2013) (affirming class certification under RICO because "'while each plaintiff must prove reliance, he or she may do so through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue)'" and because "the record here contains *no such individualized proof* indicating knowledge or awareness of the fraud by any plaintiffs") (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004)) (emphasis in original); *Waldrup v. Countrywide Fin. Corp.*, 2018 WL 799156, at *13 (C.D. Cal. Feb. 6, 2018) ("If every LandSafe appraisal was illegitimate because of defendants' alleged systematic USPAP violations as plaintiffs allege, it is reasonable to infer that no rational class member would have paid the fees if the illegitimacy of the appraisal process had been disclosed. Accordingly, the Court finds that causation under RICO may be established by class-wide proof such that individual issues of class member reliance on the alleged misrepresentations do not predominate.") (footnote omitted); *Cohen v. Trump*, 303 F.R.D. 376, 385 (S.D. Cal. 2014) ("Courts have found that reliance can be established on a class-wide basis [under RICO] where the behavior of plaintiffs and class members cannot be explained in any way other than reliance upon the defendant's conduct…. The Court finds that [Plaintiff's] evidence provides a method for Plaintiff to establish proximate causation on a classwide basis without resort to individualized inquiries, by relying on a common sense inference that consumers are likely to rely on prominently marketed features of a product which they purchase.").

**b.      Each merits element of the RICO claim will be proved by predominately common evidence that will yield common answers.**

Plaintiffs will establish each merits element of the RICO claim with common evidence. To prevail on their RICO claim, the Franchise Dealers must prove that Bosch participated, directly or indirectly, in (1) the conduct, (2) of an enterprise that affects interstate commerce, (3) through a pattern, (4) of racketeering activity. *See MTD Order*, 2017 WL 4890594, at *11. Plaintiffs will address these elements below in reverse order, as this Court did in denying Bosch's motion to dismiss. *Id.*

Plaintiffs will show that they meet the predominance requirement for the same reasons that the requirement was met for the settlement classes in the MDL litigation. In granting preliminary approval to the dealers' settlement with Volkswagen, this Court stated:

> This action meets Rule 23(b)(3)'s predominance requirement. Plaintiff alleges Volkswagen engaged in the same fraud in the same manner against all Class Members. Specifically, Plaintiff asserts Volkswagen defrauded Class Members through its use of the defeat device. Should the Court find Volkswagen indeed engaged in the fraud as described, such a finding would affect all Class Members' claims. Further, Plaintiff alleges all Class Members suffered the same harm from the same cause, specifically, the subsequent stop sale orders and brand damage caused by Volkswagen's disclosure of the device. As such, the Court finds common questions of law or fact predominate.

*Volkswagen "Clean Diesel"*, 2016 WL 6091259, at *9. That reasoning applies here.[71]

**(1)      Common issues with common answers predominate as to Element 4: Racketeering Activity**

All of the racketeering activity will be proved with common evidence. As this Court has explained, "the Franchise Dealers can satisfy their burden of demonstrating that Bosch engaged in the predicate acts of mail and wire fraud with allegations that Bosch was (1) a knowing participant in a scheme to defraud, (2) that Bosch participated in the scheme with the intent to defraud, and (3)

---

[71] If the Court certifies the Class for the RICO claim under § 1964(c), the Class should also be certified for the RICO claim under § 1964(d). *See MTD Order*, 2017 WL 4890594, at *17 ("The same allegations that demonstrate Bosch's participation in the enterprise support the Franchise Dealers' conspiracy claim. It is plausible that Bosch was aware of the scheme because it exercised near-total control over modifications to the EDC 17. And Bosch's intent to participate in the scheme is inferable from its alleged willingness to let Volkswagen use the modified EDC17 in its vehicles for years.").

1    that a co-schemer's acts of mail and wire fraud occurred during Bosch's participation in the

2    scheme and were within the scope of the scheme." *MTD Order*, 2017 WL 4890594, at *13. In

3    denying Bosch's motion to dismiss the Second Amended Complaint in this matter, this Court held

4    that Plaintiffs adequately alleged that Bosch was a knowing participant in the scheme, "because the

5    Franchise Dealers plausibly alleges that Bosch controlled all modifications to the EDC17, the

6    Franchise Dealers' complaint supports an inference that Bosch must have known about and

7    approved the changes that converted the EDC17 into a defeat device." *Id.* In reaching that

8    conclusion, this Court cited only class-wide allegations in the complaint. *See id.* at *13–15.

9    Plaintiffs now have more than allegations to prove on a classwide basis that Bosch was a knowing

10   participant in a scheme to defraud. *See e.g., infra* § II B-D outlining Bosch's knowing participation

11   in calibrating "cycle beating" software and removing description of the software's function.

12          As to "intent to defraud," this Court then explained that "Bosch's intent to defraud

13   reasonably can be inferred from the scheme itself…. No one to date in this multidistrict litigation

14   has sought to justify, or explain a lawful purpose for, software that effectively turns a vehicle's

15   emission systems on or off depending on whether the vehicle is undergoing emissions testing or

16   being operated under normal driving conditions." *MTD Order*, 2017 WL 4890594, at *15.

17   Documents provided to date show "that is the function for which Bosch allowed its EDC17 to be

18   used for years in Volkswagen's vehicles." *Id.* But plaintiffs now have more than an inference,

19   plaintiffs will introduce evidence that Bosch intended to defraud. *See infra* § II B-D. And Plaintiffs

20   will use common evidence to prove Volkswagen's acts of mail and wire fraud "occurred during

21   Bosch's participation in the scheme and were within the scope of the scheme so as to support co-

22   schemer liability. *United States v. Stapleton*, 293 F.3d 1111, 1117-18 (9th Cir. 2002).

23                 **(2)      Common issues and answers predominate as to Element 3: A
                              Pattern of Racketeering Activity**

24
25          Plaintiffs will rely solely on common evidence to prove a pattern of racketeering activity. In

26   denying Bosch's motion to dismiss the Second Amended Complaint, this Court stated that the

27   "predicate acts here were not isolated or sporadic: the Franchise Dealers allege that Volkswagen

28   misrepresented the emission levels of multiple vehicle models over the course of a decade. Bosch

1    does not contend otherwise." *MTD Order*, 2017 WL 4890594, at *16. Proof of the pattern

2    necessarily will rest on common evidence that yields common answers for all Plaintiffs and Class

3    members. As outlined in the common facts section, Bosch and Volkswagen acted with a common

4    purpose in utilizing "cycle beating software" and disguising the same, and did so over a period of

5    nine years with multiple acts of mail and wire fraud. *See* § II B-D.

6              **(3)     Common issues and answers predominate as to Element 2: An
              Enterprise that Affects Interstate Commerce**

7

8              Yet again, only common evidence will be produced to prove the existence of a RICO

9    enterprise. In denying Bosch's motion to dismiss the RICO claim, this Court noted that the

10   "Franchise Dealers allege that Bosch and Volkswagen were part of an associated-in-fact enterprise.

11   *See* 18 U.S.C. § 1961(4). Such an enterprise has three elements: (1) a common purpose, (2) a

12   structure or organization, and (3) longevity necessary to accomplish the purpose. *Boyle v. United*

13   *States*, 556 U.S. 938, 946 (2009). Each element is satisfied here." *MTD Order*, 2017 WL 4890594,

14   at *16. Proving all three of those elements requires common evidence only, and there is little

15   question common evidence exists that Bosch and VW had a common purpose in using cycle

16   beating software and in disguising its purpose.

17             **(4)     Common issues and answers predominate as to Element 1:
              Conducting the Affairs of the Enterprise**

18             Common evidence *only* will be used to prove Bosch had a role in conducting the

19   enterprise's affairs. In denying Bosch's motion to dismiss, this Court stated that, "[i]n their 2005

20   agreement, Bosch and Volkswagen agreed that Bosch's approval would be required before any

21   Volkswagen modules could be implemented in the EDC17. Through this approval right, Bosch had

22   the final say as to whether to implement the defeat device. Bosch's final-approval right made it

23   'indispensable to achievement of the enterprise's goals,' and provided it with a position in the

24   'chain of command' of the enterprise, both factors that support an inference that it had a role in

25   conducting the enterprise's affairs. *Walter*, 538 F.3d at 1249." *MTD Order*, 2017 WL 4890594, at

26   *17 (citation omitted). Discovery has amply confirmed Bosch's implementation of the defeat

27

28

device scheme.[72] As a further example of its role in the enterprise, Bosch confirmed its willingness to implement the scheme when in November 2014, Bosch employees discussed usage of the acoustic function with felon Oliver Schmidt. ███████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████[73] Elsewhere in the email chain a VW employee with responsibility for the acoustic function notes the "███████████████████████████"[74] Bosch's participation is further evidenced when Bosch's █████████ sent a "High" importance email with the subject being

████████████████████████████████████████████,"[75] noting "████████████

██████████████████?" The cover-up of the documentation was requested by VW's ████████

███████[76] Bosch notified VW ████████████████████████████."[77] There is little question that common proof can be used to prove Bosch helped conduct the affairs of the enterprise.

### 2. Plaintiffs provide a common methodology of proving class-wide impact and damages for both RICO and conspiracy claims.

At class certification, Plaintiffs "must be able to show that their damages stemmed from the defendant's actions that created the legal liability," and can be measured on a class-wide basis.[78] The existence of individualized damage issues does not defeat predominance when damages can be modeled based on a measure of common proof.[79] And, Plaintiffs need not show that each class member's damages are identical. *Just Film v. Buono*, 847 F.3d at 1120. Plaintiffs satisfy this requirement through the expert report of Mr. Ted Stockton, which provides a common method of

---

[72] *See supra* Part II B-D.

[73] Ex. 23, at 2 (emphasis added).

[74] *Id.* at 1.

[75] Ex. 31.

[76] Ex. 28.

[77] *Id.*

[78] *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).

[79] *Id.*

proving injury to business and property and a common method of calculating the Class members' damages under both their RICO claim and their state-law conspiracy claims.

Mr. Stockton is an expert in the economics of the automobile market in the United States. For over 20 years he has researched various aspect of this market, and provided reports, consulting services and litigation assistance, to franchised dealers, manufacturers and consumers, both directly and through their counsel in litigation. Mr. Stockton has provided damages-related testimony in over 120 litigated matters between franchise dealers and manufacturers and in over a dozen automotive consumer class actions.[80] On multiple occasions he has written reports relating to the economic impact of the discontinuation of brands and product lines including Mercury, Suzuki, Mini, Oldsmobile, Ford Heavy Truck, Sterling Truck, and the transfer of the Sprinter brand from Freightliner to Dodge. Mr. Stockton's work was submitted to this Court in six declarations (absent any protest by defendants) in support of: (1) Volkswagen's and Bosch's settlement in the consumer cases;[81] and (2) Volkswagen's settlement of its liability in this case.[82] Mr. Stockton's work was also submitted in support of all four consumer class cases to resolve the diesel emissions litigation in Canada.[83] Without objection from Bosch, Judge Chen relied on Mr. Stockton's damages work in support of Bosch and Fiat-Chrysler's settlement of claims against them for the installation of defeat devices in certain FCA EcoDiesel vehicles.[84] Mr. Stockton co-authored "Franchise and Dealership Litigation Damages" in *The Comprehensive Guide to Economic Damages* and has presented on multiple occasions to automotive accounting groups and government agencies.[85]

The Court held "Franchise Dealers have plausibly alleged multiple tangible injuries to their business and property interests[,]" and the Court has explained what harms suffered by the

---

[80] *See* Stockton Report at Tab 1.

[81] ECF Nos. 1784-1, 1976-4, 2786-2, 3088-1, and 3396-3.

[82] ECF No. 2485.

[83] *See* ECF No. 3088-1, n. 2.

[84] *In re: Chrysler-Dodge-Jeep Ecodiesel® Marketing, Sales Practices, and Products Liability Litigation*, No. 3:17-md-02777-EMC, ECF No. 491-3.

[85] *See* Stockton Report at Tab 1.

1   Franchise Dealers are recoverable under RICO, and which are not.[86] The precise underpinnings of

2   Mr. Stockton's damages model are drawn from the *MTD Order*. The Court held: "The stop-sale

3   order has prevented the Franchise Dealers from selling their inventory of affected vehicles….the

4   Franchise Dealers plausibly allege that they have *lost profits*, have incurred inventory carrying

5   costs, have had to purchase replacement inventory, and have *lost servicing revenues* from the

6   vehicles they could not legally sell." *Id*. at *6 (emphasis in original).

7   Tracing the *MTD Order*, Mr. Stockton's "profit contribution" model captures the Franchise

8   Dealers' *lost profits* from these components. The class-wide model uses the sales and profit

9   structures of retail automotive dealerships to estimate the degree to which a change to the inputs to

10  that structure, the permanent loss of the TDI portion of the franchise and the removal of buyback

11  TDI vehicles from the market, affects the profit output from that structure. The stop-sale orders and

12  termination of TDI models permanently ended the Franchise Dealers sales of new TDIs. Mr.

13  Stockton's model measures the *lost profits* from never again being able to sell new TDIs and the

14  *lost profits* from not selling the cars that would have been taken in on trade for those TDIs.[87] And it

15  measures *lost profits* from the *lost servicing revenue* as a result of not selling new TDIs.

16  Separately, it also measures the *lost profits* from the *lost servicing revenues* as a result of the

17  buyback removing nearly 400,000 in-use vehicles from the U.S. market.[88]

18  Also directly tracing the *MTD Order*, Mr. Stockton's model is able to incorporate the

19  "offsets to certain injuries, such as if the Franchise Dealers paid for alternative inventory but then

20  successfully sold that inventory for a profit, or if independent market forces caused a drop in

21  profits or a decline in the value of the affected vehicles."[89] For example, the model adjusts

22  forecasted TDI sales for the changes in competitive registrations, which is a widely accepted

23  industry method for evaluating independent market forces.[90] Other possible mitigation, for

24  

25  [86] *MTD Order*, 2017 WL 4890594, at *8; *see id.* at *4-8.

26  [87] *See* Stockton Report at pp. 18-36.

    [88] *See id.*

27  [89] *MTD Order*, 2017 WL 4890594, at *6.

28  [90] *See* Stockton Report at pp. 18-19.

1    example, if data shows that customers shifted their buying to gasoline-powered cars when

2    Volkswagen terminated its diesel offerings, can be incorporated by Mr. Stockton's model, should

3    evidence in the case warrant that adjustment.[91]

4            Critically, to estimate damages under the RICO claim, the model completely removes

5    damages flowing from the loss of goodwill, which the Court determined is not recoverable under

6    RICO.[92] The Court defined goodwill as "'the positive reputation a business may enjoy in the eyes

7    of the public that creates a probability that old customers will continue their patronage.'"[93] Taking

8    an example from the Complaint, the Court further defined loss of goodwill as "'loss of sales

9    associated with replacement vehicles for existing customers.'"[94] Mr. Stockton's model is able to

10   exclude the goodwill portion of lost profits from the damages estimate. The vehicle industry has

11   long established metrics for the share of new sales that result from returning customers.[95] By

12   reducing sales by that returning customer share (which for VW was 37%), the model removes

13   goodwill damages since every sale to a returning customer is excluded from the measure of lost

14   profits. Because the lost new sales figure after removing goodwill sales is used to determine

15   associated lost profits from lost used car sales and lost profits from not servicing lost new and used

16   sales, *lost profits associated with goodwill are entirely removed from each component of the model*.

17           The model can also easily incorporate offsets to lost profits, such as the dealer support

18   payments made by Volkswagen immediately following the issuance of the NOVs, financing

19   assistance, as well as changes to Volkswagen's volume-based pricing scheme that increased the

20   amount of rebates received by the Franchise Dealers in connection with new car sales. As a result,

21   Plaintiffs are able to model their damages on a class-wide basis, capturing their lost profits as a

22   result of the alleged RICO violation after possible mitigation and exclusive of "goodwill damages"

23   that the Court has determined are not recoverable under RICO. Per the *MTD Order*, under RICO,

24   _____

25   [91] *See id.* at pp. 31-34.

26   [92] *See MTD Order*, 2017 WL 4890594, at *6-7.

     [93] *See id.*

27   [94] *See id.*

28   [95] *See* Stockton Report at pp. 15-16.

MOTION FOR CLASS CERTIFICATION   - 30
Case No.: 02672-CRB (JSC)
010584-12/1135299 V1

1    these *singles* damages are then subject to mandatory trebling, *after which* Volkswagen's settlement

2    payments to the Class are applied.

3           In its recent motion to dismiss claims for relief brought by Volkswagen salespeople against

4    Volkswagen and Bosch,[96] and its just-filed *Lone Pine* motion here (ECF No. 6359), Bosch

5    advances an extreme and unsupportable interpretation of permissible RICO damages and the *MTD*

6    *Order*. Bosch argues that the Court held the Franchise Dealers can only recover RICO damages for

7    the lost sales of cars *in inventory at the time of the stop-sale orders*, and *all future lost sales are*

8    *non-recoverable goodwill damages*.[97] The *MTD Order* does not support this extraordinary

9    reading.[98] Likewise, the cases Bosch cites are unavailing because they concern losses stemming

10   from future, uncertain events.[99] Here, in stark contrast, the Franchise Dealers' lost profits stem

11   from the stop-sale and permanent cessation of VW's TDI models, both of which have already

12   occurred immediately following and as a result of exposure of the RICO conspiracy.

13          But importantly for this motion, the extent to which the Franchise Dealers can recover

14   RICO future lost profits (net of goodwill) from termination of the TDI product line *is*

15   *unquestionably a class-wide issue*. It does not depend on the characteristics or circumstance of any

16   particular Dealer, it is the quintessential question of law that could only be determined for the

17   Franchise Dealer Class as a whole *after class certification has been granted*.

18

19          [96] *Saavedra, et al. v. Volkswagen et al.*, No. 3:15-md-2672-CRB, Dkt. No. 6333, at pp. 4-6.

20          [97] *See id.*

21          [98] The *MTD Order* clearly states that *only returning* customers' future purchases are non-
     recoverable goodwill sales, yet Bosch argues, *ipse dixit*, that the Court meant to say *all future sales*
22   *of TDI vehicles* are non-recoverable goodwill. To borrow from Abraham Lincoln, "calling a tail a
     leg does not make it a leg." Bosch already argued in its Motion to Dismiss that *all damages are*
23   *goodwill*—and lost. The Court made clear that goodwill sales were limited to returning customers
     ("…Franchise Dealers' claims of lost profits is not predicated solely on a loss of sales to former
24   customers…"). *MTD Order*, 2017 WL 4890594, at *7. Further, Bosch's fallacious argument that
     the Franchise Dealers have no damages completely ignores the buy-back of over 400,000 TDIs,
25   which removed those cars from the population of in-use vehicles that the Franchise Dealers
     serviced. The lost profits from lost servicing revenue was specifically identified by the Court as
26   recoverable and it has nothing to do with TDI sales following the stop-sale orders (returning
     *goodwill customers* or new ones). *See id.*

27          [99] *See, e.g, In Re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1070-72 (E.D. Mich. 2018)
     (distinguishing unrecoverable future losses from contingent or future events from recoverable
28   losses from events that have already occurred).

1

2

**D.     Plaintiffs' state-law civil conspiracy claims raise predominately common issues with
common answers.**

Under the laws of all 50 states, Plaintiffs allege that Volkswagen and Bosch entered into a

civil conspiracy to defraud Plaintiffs and all Class members. The Ninth Circuit has explained that

"this [C]ourt has followed an approach that favors class treatment of fraud claims stemming from a

'common course of conduct.' *See Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975)…." *In re*

*First Alliance Mortg. Co.*, 471 F.3d 977, 990 (9th Cir. 2006). As shown below, class treatment of

the civil-conspiracy claims is appropriate.

**1.     Applicable legal standards.**

Three legal principles underlie Plaintiffs' motion to certify the Class for civil-conspiracy

claims under the laws of all 50 states. *First*, Plaintiffs have standing to seek certification of those

claims for all Class members. In *Kirola v. City and County of San Francisco*, 860 F.3d 1164, 1176

(9th Cir. 2017), the Court explained that a "panel of our court recently clarified the relationship

between Article III and class certification. *See Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir.

2015). Adopting the 'class certification approach,' the panel in *Melendres* held that 'once the

named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is

concluded, and the court proceeds to consider whether the Rule 23(a) prerequisites for class

certification have been met.' *Id*. (quoting 1 William B. Rubenstein, Newberg on Class Actions §

2:6 (5th ed.))." The same "class certification approach" applies when a plaintiff brings state-law

claims on behalf of putative class members who live in states other than the plaintiff's home state.

*See Kutza v. Williams-Sonoma, Inc.*, 2018 WL 5886611, at *3 (N.D. Cal. Nov. 9, 2018); *Robinson*

*v. Unilever United States*, 2018 WL 6136139, at *4 (C.D. Cal. June 25, 2018); *Pecanha v. The*

*Hain Celestial Grp., Inc.*, 2018 WL 534299, at *9 (N.D. Cal. Jan. 24, 2018); *In re Chrysler-Dodge-*

*Jeep EcoDiesel Mktg., Sales Practices, & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 955 (N.D. Cal.

2018).[100]

---

[100] This is particularly true because Plaintiffs do not bring *only* state-law claims. *See Kutza*,
2018 WL 5886611, at *3 ("This is not an instance where a California plaintiff seeks to represent
residents of other states under a plethora of state consumer statutes with potentially differing

1       *Second*, the relevant laws of all 50 states are sufficiently similar to allow certification of the

2   Class. The issue is whether in *this* case—where Plaintiffs and Class members had no knowledge

3   that the Volkswagen vehicles contained defeat devices and where they were defrauded by common

4   omissions, not individual representations—variations in state law preclude class certification. And

5   as shown below, any differences in state laws can be handled by special interrogatories or special

6   verdict forms. *See In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices, & Prods. Liab.*

7   *Litig.*, 2019 WL 536661, at *7 (N.D. Cal. Feb. 11, 2019) ("while there are some variations in state

8   law, Plaintiffs have made at least a fair argument (in their class certification briefing) that such

9   variations are not so extensive or complicated that they defeat predominance"); *Spencer v.*

10  *Hartford Fin. Servs. Grp., Inc.*, 256 F.R.D. 284, 301 (D. Conn. 2009) ("Plaintiffs have adequately

11  demonstrated that the elements of fraud are substantially similar from state to state.... With regard

12  to the differing standards of proof and other requirements pointed out by the defendants, the court

13  agrees with plaintiffs that, because the underlying factual proof is the same, these differences could

14  be adequately addressed with a verdict form and do not defeat predominance.").

### 2.   Civil conspiracy will be proved with common evidence and common legal standards.

15
16      The elements of a civil conspiracy under the laws of all 50 states do not materially vary.

17  *First*, they do not materially vary under the laws of the Plaintiffs' states. In California, the elements

18  are: (1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the

19  conspiracy, and (3) damages arising from the wrongful conduct. *Ponomarenko v. Shapiro*, 287 F.

20  Supp. 3d 816, 831 (N.D. Cal. 2018). In Florida, the elements are: (1) an agreement between two or

21  more parties, (2) to do an unlawful act or to do a lawful act by unlawful means, (3) the doing of

22  some overt act in pursuance of the conspiracy, and (4) damage to plaintiff as a result of the acts

23  done under the conspiracy. *MP, LLC v. Sterling Holding, LLC*, 231 So. 3d 517, 521–522 (Fla. Dist.

24  Ct. App. 2017). And in Pennsylvania, the elements are: (1) a combination of two or more persons

25  acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for

procedural and substantive requirements, and scopes. Rather, the claims are brought under a federal
statute, and the common law, which likely will not vary much among the states.").

an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual

legal damage. *Gen. Refractories v. Fireman's Fund Ins. Co*., 337 F.3d 297, 313 (3d Cir. 2003);

*Downs v. Borough of Jenkintown*, 2019 WL 1383802, at *8 (E.D. Pa. Mar. 26, 2019).

 *Second*, there are no material differences in the elements of a civil conspiracy claim under

the laws of the other 47 states. *See* Appendix 1. Moreover, Plaintiffs will use common, class-wide

evidence to establish the existence of a civil conspiracy under the laws of all states, using the same

evidence that they will use to establish a RICO enterprise.

### 3. Common-law fraud will be proved with common facts based on common legal standards.

 Plaintiffs' civil-conspiracy claims require proof of an underlying tort, which Plaintiffs will

prove with common evidence. The underlying torts are (1) common-law fraud by active

concealment of material facts and (2) common-law fraud by nondisclosure. In *United States v.*

*Colton*, 231 F.3d 890, 899 (4th Cir. 2000), the Fourth Circuit explained the difference between

those two legal theories:

> [T]he common law clearly distinguishes between concealment and
> nondisclosure. The former is characterized by deceptive acts or
> contrivances intended to hide information, mislead, avoid suspicion,
> or prevent further inquiry into a material matter. The latter is
> characterized by mere silence. Although silence as to a material fact
> (nondisclosure), without an independent disclosure duty, usually
> does not give rise to an action for fraud, suppression of the truth with
> the intent to deceive (concealment) does.

*Accord*, *In re Chrysler-Jeep-Dodge EcoDiesel*, 295 F. Supp. 3d at 1008 ("[A]n affirmative act of

concealment by the defendant effectively negates the duty-to-disclose requirement (i.e., there is a

difference between silence, where a duty to disclose is required, and active concealment, where

there is no such requirement).").[101]

 With respect to the Franchise Dealers' damages under their conspiracy claims, the Stockton

Model provides an accurate and reliable methodology. It differs from the RICO model only in the

---

[101] The California and Florida plaintiffs must prove their fraud claims by a preponderance of
the evidence, while the Pennsylvania plaintiff must prove its fraud claims by clear and convincing
evidence. *See* Appendix 3. As a result, they will adequately represent all Class members, because
all states require proof of fraud by a preponderance of the evidence or by clear and convincing
evidence. *See id.*

extent to which lost profits stemming from goodwill sales to returning customers are excluded from singles damages. The conspiracy damages are not subject to mandatory trebling, but in certain states exemplary damages are available. These variations do not hinder the ability of the Franchise Dealers to prove class-wide damages attributable to Bosch's acts in furtherance of the alleged conspiracy.

### a. Plaintiffs' active-concealment fraud claim will be proved with common evidence based on common legal standards.

Under the laws of all 50 states, active concealment of a material fact is actionable without proof of a duty to disclose. *See* Appendix 2. And the elements of an active-concealment claim do not materially vary from state to state. For example, the elements of an active-concealment claim under California law are: (1) concealment or suppression of a material fact by a defendant; (2) the defendant intended to defraud the plaintiff by intentionally and actively concealing or suppressing the fact; (3) the plaintiff was unaware of the fact and would not have acted as he or she did if he or she had known of the concealed or suppressed fact; and (4) plaintiff sustained damage as a result of the concealment or suppression of the fact.[102] Similarly, the elements in Florida are that: (1) the defendant actively concealed a material fact; (2) the defendant knew or should have known the material fact should be disclosed; (3) the defendant knew that its active concealment of the material fact would induce the plaintiff to act; and (4) the plaintiff detrimentally relied on the misinformation.[103] And the elements under Pennsylvania law are: (1) Actively concealing from another a fact that Defendant knows may justifiably induce the other to act or refrain from acting in a business transaction; (2) which is material to the transaction at hand; (3) with the intent of misleading another into relying on it; (4) justifiable reliance; and (5) the resulting injury was proximately caused by the reliance.[104]

---

[102] *Dent v. NFL*, 902 F.3d 1109, 1125 (9th Cir. 2018); *Hodson v. Mars, Inc.*, 891 F.3d 857, 862 (9th Cir. 2018).

[103] *Hess v. Philip Morris USA, Inc.*, 175 So. 3d 687, 691 (Fla. 2015); *Cote v. R.J. Reynolds Tobacco Co.*, 909 F.3d 1094, 1106 n.6 (11th Cir. 2018); *Joiner v. McCullers*, 28 So. 2d 823, 825 (Fla. 1947); *Philip Morris USA, Inc. v. Duignan*, 243 So. 3d 426, 440 (Fla. Dist. Ct. App. 2017).

[104] *LEM 2Q, LLC v. Guar. Nat'l Title Co.*, 144 A.3d 174, 181 & n.11 (2016) (Pa. Super. Ct. 2016) (citing Restatement (Second) of Torts § 551); *Youndt v. First Nat'l Bank of Port Allegany*, 868 A.2d 539, 550 (Pa. Super. Ct. 2005) (citing Restatement (Second) of Torts § 551); *Gnagey Gas*

There are no material differences in the elements of an active-concealment claim under the laws of the other 47 states. *See* Appendix 2. And Plaintiffs will use common, class-wide evidence to establish active concealment under the laws of all states

   **b.**  **Plaintiffs' fraud claim based on nondisclosure will be proved with common evidence based on common legal standards.**

    **(1)**  **The elements of a fraudulent nondisclosure claim are common.**

The elements of a fraudulent nondisclosure claim do not materially vary from state to state. The elements of a nondisclosure claim under California law are: (1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact to the plaintiff; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would not have acted as he or she did if he or she had known of the concealed or suppressed fact; and (5) plaintiff sustained damage as a result of the concealment or suppression of the fact. *Dent*, 902 F.3d at 1125. The elements of such a claim under Florida law are: (1) the defendant concealed or failed to disclose a material fact; (2) the defendant knew or should have known the material fact should be disclosed; (3) the defendant knew that its concealment of or failure to disclose the material fact would induce the plaintiff to act; (4) the defendant had a duty to disclose the material fact; and (5) the plaintiff detrimentally relied on the misinformation. *Hess*, 175 So. 3d at 691; *Cote*, 909 F.3d at 1106 n.6. And in Pennsylvania, the elements are: (1) failure to disclose material facts (2) that defendant knows may justifiably induce the other to act or refrain from acting in a business transaction, (3) in contemplation of plaintiff's reliance upon these falsely omitted material facts, (4) when under a duty to the other to exercise reasonable care to disclose the matter in question; (5) justifiable reliance; and (6) the resulting injury was proximately caused by the reliance. *LEM 2Q, LLC*, 144 A.3d at 181 & n.11 (citing

---

& *Oil Co. v. Pa. Underground Storage Tank Indemnification Fund*, 82 A.3d 485, 501 (Pa. Commw. Ct. 2013); *Rissmiller v. NGK N. Am., Inc.*, 2018 WL 4203839, at *3 (E.D. Pa. Sept. 4, 2018); *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 442–43 (S.D.N.Y. 2017); *Aetna, Inc. v. Health Diagnostic Lab. Inc.*, 2015 WL 9460072, at *4 (E.D. Pa. Dec. 28, 2015).

1    Restatement (Second) of Torts § 551); *Youndt*, 868 A.2d at 550 (citing Restatement (Second) of

2    Torts § 551).

3          There are no material differences in the elements of a nondisclosure claim under the laws of

4    the other states. *See* Appendix 4. Moreover, Plaintiffs will use common, class-wide evidence to

5    establish nondisclosure under the laws of all states

6                        **(2)    A duty to disclose will established with common evidence, based**
                                  **on common standards.**

7          All states apply a few common standards for proof of a duty to disclose, presenting

8    common issues. Under California law, a defendant has a duty to disclose in two circumstances

9    relevant to this case: (1) when the defendant has superior knowledge of a material defect that is

10   central to the functioning of a product and that is not known or reasonably accessible to the

11   plaintiff; and (2) when the defendant makes partial representations that are misleading because

12   some other material fact has not been disclosed. *Hodson*, 891 F.3d at 862. *See Norcia v. Samsung*

13   *Telecomms. Am., LLC*, 2018 WL 4772302, at *2 (N.D. Cal. Oct. 1, 2018) ("No reasonable person

14   could disagree that 'speed and performance' go to the heart of a smartphone's central function.

15   Manufacturers like Samsung and its competitors typically highlight speed and performance

16   features as reasons to buy their phones and not someone else's products, particularly when new

17   models hit the market… That manipulation was a material fact not known to plaintiff and, as

18   alleged, was within the exclusive knowledge of Samsung. Plaintiff has adequately alleged an

19   omission of a fact that Samsung was obliged to disclose, a conclusion strongly supported by our

20   circuit's guidance in *Hodson*.").

21         Similarly under Florida law, there is a duty to disclose based on superior knowledge[105] and

22   partial, misleading disclosures.[106] And in Pennsylvania, there is a duty to disclose based on the

---

24         [105] *Hauben v. Harmon*, 605 F.2d 920, 924 (5th Cir. 1979) ("an affirmative duty to disclose
25   exists in Florida" where "the facts are solely within the knowledge of the representor"); *Coffey v.
     WCW & Air, Inc.*, 2018 WL 4154256, at *4 (N.D. Fla. Aug. 30, 2018) ("The Florida Supreme
26   Court has long held that a seller has a duty to disclose material information that is 'not equally
     within the ken of the buyer.'") (quoting *Kitchen v. Long, L.R.A.*, 64 So. 429, 430 (Fla. 1914)).

27         [106] *Cafaro v. Zois*, 693 F. App'x 810, 816 (11th Cir. 2017) (A duty to disclose "exists if a
28   defendant 'undert[akes] to disclose material information' but fails 'to disclose that information
     fully.' *See Philip Morris USA, Inc. v. Naugle*, 103 So. 3d 944, 946 (Fla. Dist. Ct. App. 2012) (per

1    standards of the Restatement (Second) of Torts § 551.[107] Section 551(2) states, in relevant part, that

2    a party to a business transaction is under a duty to exercise reasonable care to disclose "(b) matters

3    known to him that he knows to be necessary to prevent his partial or ambiguous statement of the

4    facts from being misleading; and … (e) facts basic to the transaction, if he knows that the other is

5    about to enter into it under a mistake as to them, and that the other, because of the relationship

6    between them, the customs of the trade or other objective circumstances, would reasonably expect

7    a disclosure of those facts." All of the other states use some or all of the same standards. *See*

8    Appendix 4.

9           Moreover, the evidentiary proof of duty to disclose under those standards will be common

10   to all Class members and will yield common answers. Further, the factual proof of what should

11   have been disclosed is common to the Class members. *In re Volkswagen "Clean Diesel" Mktg.,*

12   *Sales Practices, & Prods. Liab. Litig.*, 349 F. Supp. 3d 881, 915 (N.D. Cal. 2018) (Plaintiffs allege

13   "what VW failed to disclose: (1) that 'the Clean Diesel engine systems were not EPA-compliant,'

14   and (2) that the class vehicles 'used software that caused the vehicles to operate in low-emission

15   test mode during emissions testing'") (quoting complaint). *See also In re Mercedes-Benz Emissions*

16   *Litig.*, 2019 WL 413541, at *22 (D.N.J. Feb. 1, 2019) ("In none of [its nationwide marketing

17   efforts to promote its BlueTEC clean diesel vehicles] does Mercedes disclose that the purported

18   benefits of the BlueTEC engine could only be achieved through or were completely obscured by

19   the use of a defeat device. These allegations are sufficient to establish partial disclosures that

20   Mercedes had an obligation to make true."); *In re Duramax Diesel Litig.*, 298 F. Supp. 3d at 1084

21   ("The nondisclosure of the true operation of the Duramax engine was material precisely because

22   GM worked so hard to convince consumers that it was a 'clean diesel' engine.").

23

24   ───────────────

25   curiam.")); *ZC Ins. Co. v. Brooks*, 847 So. 2d 547, 551 (Fla. Dist. Ct. App. 2003) ("Florida law
     recognizes that fraud can occur by omission, and places a duty on one who undertakes to disclose
     material information to disclose that information fully.").

26       [107] *See LEM 2Q, LLC*, 144 A.3d at 181 & n.11; *Youndt*, 868 A.2d at 545; *Hamilton v. Speight*,
27   2019 WL 161731, at *2 (E.D. Pa. Jan. 10, 2019); *Boardakan Rest. LLC v. Gordon Grp. Holdings,*
     *LLC*, 2015 WL 4597970, at *1 n.4 (E.D. Pa. July 31, 2015); *United Nat'l Ins. Co. v. Aon Ltd.*, 2008
28   WL 3819865, at *6 (E.D. Pa. Aug. 8, 2008).

1

### c.     Compensatory damages will be proved with common evidence.

2       Compensatory damages will be proved by common evidence under common legal

3   standards. In California, "[o]ne defrauded in the purchase, sale or exchange of property is entitled

4   to recover the difference between the actual value of that with which the defrauded person parted

5   and the actual value of that which he received, together with any additional damage arising from

6   the particular transaction…." *See Alliance Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1241 n.5

7   (1995) ("section 3343 does not require that a plaintiff show 'out-of-pocket' loss in order to be

8   entitled to consequential or additional damages of the type prescribed by the statute"). In Florida

9   fraud plaintiffs may recover benefit-of-the bargain damages or out-of-pocket damages, whichever

10  will more fully compensate plaintiff. *Hollister Inc. v. Zassi Holdings, Inc.*, 752 F. App'x 888, 893

11  (11th Cir. 2018). And under Pennsylvania law, fraud plaintiffs may recover out-of-pocket damages,

12  plus damages that were the proximate result of the fraud. *Scaife Co. v. Rockwell-Standard Corp.*,

13  285 A.2d 451, 457 (Pa. 1971); *Silverman v. Bell Sav. & Loan Ass'n*, 533 A.2d 110, 116 (Pa. Super.

14  Ct. 1987); *Edward J. DeBartolo Corp. v. Coopers & Lybrand*, 928 F. Supp. 557, 566 (W.D. Pa.

15  June 11, 1996).

16      All states allow damages for fraud under the benefit-of-the-bargain or out-of-pocket

17  standards (or both), along with proximately-caused consequential damages. *See* Appendix 5. As the

18  Stockton Report makes clear, the Franchise Dealers were directly harmed as a result of the VW-

19  Bosch-IAV conspiracy.[108] Proof and quantification of this harm is not dependent on the individual

20  characteristics of any particular dealership. Instead, it flows from class-wide evidence, such as the

21  number of new TDI sales that never occurred because of the product line termination, and the

22  amount of servicing that was never done because of those lost sales and because the buyback

23  removed nearly 400,000 TDIs from the market.[109]

24  **E.      A class action for the RICO and civil-conspiracy claims is superior to any other**
         **method for adjudicating the controversy.**

25
        To meet Rule 23(b)(3)'s superiority requirement, Plaintiffs must show "that a class action is

26

27      ---
        [108] *See* Stockton Report at pp. 10-18.

28      [109] *See id.*

1   superior to other available methods for fairly and efficiently adjudicating the controversy." A court

2   must consider Rule 23(b)(3)'s four factors.[110] In granting preliminary approval to the Franchise

3   Dealers' settlement with Volkswagen, this Court stated:

> The superiority test is also satisfied. This test "requires the court to
> determine whether maintenance of this litigation as a class action is
> efficient and whether it is fair." *Wolin*, 617 F.3d at 1175-76. If Class
> Members were to litigate their claims independently, each one would
> be required to prove the same wrongful conduct to establish liability
> and would offer the same evidence. There are 652 Class Members
> and thus the potential for just as many lawsuits. This risks the
> possibility of inconsistent rulings and results. Classwide resolution is
> clearly favorable compared to other means of adjudication, and the
> Settlement resolves Class Members' claims at once. Thus, class
> action treatment is superior to other methods and will efficiently and
> fairly provide a resolution to this litigation.

*Volkswagen "Clean Diesel"*, 2016 WL 6091259, at *9. The same analysis applies here. *See also In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*, 2017 WL 672820, at *8 (N.D. Cal. Feb. 16, 2017) (finding superiority for certification of class for purposes of settlement by Bosch and consumers).

## IV.    CONCLUSION

This is the quintessential case for class certification. Proving Bosch's liability to Plaintiffs and the Class under their RICO and conspiracy claims will require only class-wide evidence. Trial of Bosch's liability should be done for all 652 Class members at the same time. The harm from the alleged misconduct is also uniquely class-wide. Both in terms of all sales in the present and future (due to the stop sale orders and termination of TDI product lines), and in terms of virtually all servicing (as a result of the buy-back) an entire product line was wiped out for the entire VW market. The Stockton Report plainly presents a viable model for class-wide damages that measures damages directly flowing from the conspiracy. Plaintiffs' motion should be granted.

---

[110] The factors are: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A–D).

1    DATED: June 14, 2019                    Respectfully submitted,

2                                            HAGENS BERMAN SOBOL SHAPIRO LLP

3                                            By: */s/ Steve W. Berman*

4                                                 Steve W. Berman (*Pro Hac Vice*)
                                             Thomas E. Loeser (SBN 202724)

5                                            1301 Second Avenue, Suite 2000
                                             Seattle, WA 98101

6                                            Telephone: (206) 623-7292
                                             Facsimile: (206) 623-0594

7                                            steve@hbsslaw.com
                                             toml@hbsslaw.com

8

9                                            Richard N. Sox (*Pro Hac Vice*)

10                                           BASS SOX MERCER
                                             2822 Remington Green Circle

11                                           Tallahassee, FL 32308
                                             Telephone: (850) 878-6404

12                                           Facsimile: (850) 942-4869
                                             rsox@dealerlawyer.com

13

14                                           *Counsel for Plaintiffs and the*
                                             *Franchise Dealer Class*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2        I hereby certify that on June 14, 2019, I electronically transmitted the foregoing document

3   to the Court Clerk using the ECF System for filing. The Clerk of the Court will transmit a Notice of

4   Electronic Filing to all ECF registrants.

5

                                    */s/ Steve W. Berman*
6                                   STEVE W. BERMAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28