1   Steve Mikhov, State Bar No. 224676
2       *stevemusfc@knightlaw.com*
    Amy Morse, State Bar No. 290502
3       *amym@knightlaw.com*
    **KNIGHT LAW GROUP, LLP**
4   10250 Constellation Blvd., Suite 2500
    Los Angeles, CA 90067
5   Tel:    310-552-2250
    Fax:    310-552-7973
6

7
    Attorneys for Plaintiff,
8   SAMIRA SADEGHI

9                **UNITED STATES DISTRICT COURT**

10              **NORTHERN DISTRICT OF CALIFORNIA**

11

| | |
|---|---|
| 12  IN RE: VOLKSWAGEN "CLEAN DIESEL"<br>MARKETING, SALES PRACTICES, AND<br>PRODUCTS LIABILITY LITIGATION | MDL Lead Case No.:  3:15-md-02672-CRB<br><br>Unlimited Jurisdiction |
| 14 **THIS DOCUMENT RELATES TO:** | **AMENDED COMPLAINT**<br><br>1.  **FRAUD IN THE INDUCEMENT -**<br>**INTENTIONAL**<br>**MISREPRESENTATION** |
| 15 *Samira Sadeghi, et al v. Volkswagen Group of*<br>*America, Inc. et al*, Case No. 3:17-cv-04348-<br>CRB | 2.  **FRAUD IN THE INDUCEMENT -**<br>**CONCEALMENT**<br>3.  **VIOLATION OF THE SONG-**<br>**BEVERLY ACT – BREACH OF**<br>**IMPLIED WARRANTY** |

21

22          Plaintiff, SAMIRA SADEGHI, alleges as follows against Defendant, VOLKSWAGEN

23  GROUP OF AMERICA, INC. d/b/a AUDI OF AMERICA, INC., **VOLKSWAGEN**

24  **AKTIENGESELLSCHAFT,** DOES **2** through 10 inclusive, on information and belief, formed

25  after an inquiry reasonable under the circumstances:

26                      **DEMAND FOR JURY TRIAL**

27          1.      Plaintiff, SAMIRA SADEGHI ("Plaintiff"), hereby demands trial by jury in this

28  action.

## GENERAL ALLEGATIONS

2.     Plaintiff, SAMIRA SADEGHI ("Plaintiff"), is an individual residing in the City of Newport Coast, County of Orange, State of California.

3.     Defendant, VOLKSWAGEN GROUP OF AMERICA, INC., d/b/a AUDI OF AMERICA, INC. (hereafter "**Volkswagen America**" or "**VW America**"), is and was a New Jersey corporation registered to do business in the State of California with its registered office in the City of Sacramento, County of Sacramento, State of California.

4.     **Defendant, Volkswagen Aktiengesellschaft ("VW AG" or "Volkswagen AG"), is a German corporation with its principal place of business at Berliner Ring 2, 38440 Wolfsburg, Germany.   VW AG may be served with process at Volkswagen Aktiengesellschaft, Brieffach 1998, D-38436, Wolfsburg, Germany. At all relevant times to the allegations in this lawsuit, VW America was the agent of VW AG and all misrepresentations at issue in this lawsuit and described below in more detail were made with knowledge and intent by VW AG and VW America (together, the "Volkswagen Defendants" or "Volkswagen") that the misrepresentations would be repeated to third-parties, like Plaintiff, and that such third-parties would rely on them.**

5.     Plaintiff does not know the true names and capacities, whether corporate, partnership, associate, individual or otherwise of Defendant issued herein as Does **2** through 10, inclusive, under the provisions of section 474 of the Code of Civil Procedure.  Defendant Does **2** through 10, inclusive, are in some manner responsible for the acts, occurrences and transactions set forth herein, and are legally liable to Plaintiff.  Plaintiff will seek leave to amend this Complaint to set forth the true names and capacities of the fictitiously named Defendants, together with appropriate charging allegations, when ascertained.

6.     All acts of corporate employees as alleged were authorized or ratified by an officer, director or managing agent of the corporate employer.

7.     Each Defendant, whether actually or fictitiously named herein, was the principal, agent (actual or ostensible), or employee of each other Defendant and in acting as such principal

or within the course and scope of such employment or agency, took some part in the acts and omissions hereinafter set forth by reason of which each Defendant is liable to Plaintiff for the relief prayed for herein.

8. On February 18, 2011, Plaintiff purchased a new 2011 Audi Q7 TDI, VIN: WA1WMAFE2BD006329, ("the vehicle"), and express warranties accompanied the sale of the vehicle to Plaintiff by which Defendant Volkswagen undertook to preserve or maintain the utility or performance of Plaintiff's vehicle or provide compensation if there was a failure in such utility or performance.

9. The vehicle was delivered to Plaintiff with serious defects and nonconformities to warranty, including, but not limited to, a defeat device that was programmed to give false emissions readings during emissions testing despite the vehicle emitting hazardous chemicals during normal operation at rates exceeding legal California emissions standards.

10. Plaintiff hereby revokes acceptance of the sales contract.

11. Plaintiff hereby demands trial by jury in this action.

## STATEMENT OF FACTS

12. Plaintiff purchased a 2011 Audi Q7 TDI from Newport Auto Center. Unbeknownst to Plaintiff, at the time of acquisition the vehicle was equipped with a so-called "defeat device," designed specifically to cheat on emissions tests, bypass California emissions standards and deceive consumers and regulators.

13. Before purchasing the vehicle, Plaintiff conducted research and reviewed advertisements regarding Volkswagen's "clean" diesel vehicles, which led Plaintiff to believe that the vehicle was good for the environment and fuel efficient.

14. Representations regarding fuel efficiency and emissions, as well as the vehicle's reputation for maintaining a high resale value, induced Plaintiff into purchasing the vehicle. Due to the inclusion of the defeat device, however, the vehicle could not deliver the high performance that was advertised, including the low emissions and fuel economy. As a result of Volkswagen's conduct, Plaintiff has suffered harm. Volkswagen's conduct is a direct and proximate cause of Plaintiff's damages. But for Volkswagen's fraudulent concealment of presence of the defeat

device, Plaintiff would not have purchased the vehicle.

## PERSONAL JURISDICTION OVER VOLKSWAGEN AG

15.     **Personal jurisdiction over Volkswagen AG is proper because Volkswagen AG purposefully availed itself of the privilege of conducting activities within the State of California with the expectation that its fraudulent vehicles would be purchased by California consumers, thereby giving rise to the underlying controversy. Such purposeful availment and activities within and related to the State of California include, but are not limited to: (1) Defendants' contractual relationships discussed below which give rise to the source, supply, manufacturing, production, importation, research and testing, analyzing, processing, distribution, advertising, marketing, and sale of Plaintiff' vehicle; (2) agreements between Defendants and entities, institutions, and laboratories within the State of California regarding Defendants' fraudulent vehicles; (3) marketing and advertising of the fraudulent vehicles to California citizens, including Plaintiff; (4) direct communications between Volkswagen AG employees and/or agents with California regulators concerning whether Defendants' fraudulent vehicles complied with California's emission standards; (5) and other actions targeted to the State of California to be obtained through discovery and other means.**

16.     **Volkswagen AG acted both directly and indirectly to (1) transact business in California; (2) supply services or things in California; (3) cause tortious injury by an act or omission in California; and (4) cause tortious injury in California by an act or omission outside California.**

17.     **Personal jurisdiction over Volkswagen AG is proper because Volkswagen AG's direct contacts with the state of California form the basis of the fraud claims alleged in this lawsuit. Personal jurisdiction over Volkswagen AG is further proper because the California contacts of Volkswagen America concerning the fraud that forms the basis of this lawsuit can be imputed to Volkswagen AG pursuant to the agency relationship between and among the Defendants as alter egos, co-conspirators, and/or joint venturers.**

18.     **As set forth below, Volkswagen America is the agent, both actual and implied,**

of Volkswagen AG and was Volkswagen AG's agents as to the marketing, promotion, sale, and distribution of the vehicle Plaintiff purchased in California. Volkswagen America carried out the marketing, promotion, sale, and distribution of the vehicle Plaintiff purchased as Volkswagen AG's agent. Volkswagen America's actions in, and contacts with, California can be imputed to Volkswagen AG because of the agency relationship between and among those parties.

19.     Volkswagen AG used Volkswagen America as its alter ego for the marketing, promotion, sale and distribution of the vehicle Plaintiff purchased in California. Volkswagen of America, a wholly owned subsidiary of Volkswagen AG, exists solely to promote the sale and distribution of Volkswagen AG products, including the vehicle Plaintiff purchased. Volkswagen America's actions in, and contacts with, California can be imputed to Volkswagen AG pursuant to an alter ego theory.

20.     At all relevant times herein, Volkswagen AG and Volkswagen America operated a joint venture (the "Joint Venture") in California in which they agreed to assist each other in designing, importing, distributing, marketing and selling certain motor vehicles in California, including the vehicle Plaintiff purchased that is at issue in this lawsuit.

21.     At the critical stages in the foregoing activities, Defendants acted as agents for each other in pursuing their common goal of selling their fraudulent vehicles, including the vehicle Plaintiff purchased. Each Defendant maintained a voice in the control and management of the Joint Venture, and each shared in the profits and losses of the Joint Venture. Volkswagen America's actions in, and jurisdictional contacts with, California are imputed to Volkswagen AG by virtue of the Joint Venture.

22.     Volkswagen AG's relationship with Volkswagen America goes far beyond that of a mere parent-subsidiary relationship.   Volkswagen AG exercises significant and total control over Volkswagen America's day to day operations, and exercised total control over Volkswagen America in directing and carrying out the fraud that forms the basis of this lawsuit.   Indeed, Volkswagen AG's control is so persistent and total that numerous courts across the country have found that Volkswagen America is the proper agent for service of

1    process for Volkswagen AG.

2        23.    **Even if there was no parent-subsidiary relationship between Volkswagen AG and**

3    **Volkswagen America, personal jurisdiction would still be proper over Volkswagen AG**

4    **because of Volkswagen AG's own conduct with regard to the fraud that forms the basis of**

5    **this lawsuit. Volkswagen AG sold to Volkswagen America, both directly and indirectly, their**

6    **fraudulent vehicles with the knowledge and intent that Volkswagen America would resell**

7    **and distribute them to Plaintiff and throughout the United States. Further, Volkswagen AG**

8    **worked with and directed Volkswagen America to advertise and market their fraudulent**

9    **vehicles to consumers, such as Plaintiff. Volkswagen AG used its own employees and directed**

10   **Volkswagen America to formulate and disseminate false information about their fraudulent**

11   **vehicles. Volkswagen AG not only directed Volkswagen America employees to carry out the**

12   **fraud, but Volkswagen AG sent its own employees to carry out and perpetrate the fraud that**

13   **forms the basis of this lawsuit. Volkswagen AG required Volkswagen America to use false**

14   **information about their fraudulent vehicles in marketing campaigns. Volkswagen AG**

15   **employees developed and promoted these campaigns.**

16       24.    **The entire Volkswagen Dieselgate scandal occurred as a result of Volkswagen**

17   **AG's focused efforts to increase its market share in the United States. In 2007, Volkswagen**

18   **AG set goals for Volkswagen to become a world leader in automobile manufacturing,**

19   **including tripling of the number of vehicles sold in the United States. In order to sell their**

20   **fraudulent vehicles in the United States and California, Volkswagen AG appointed its**

21   **wholly-owned subsidiary, Volkswagen America, to transact and manage the business affairs**

22   **of importing, distributing, marketing and the sale of Volkswagen AG vehicles, including the**

23   **vehicle Plaintiff purchased.  Pursuant to this agreement, Volkswagen AG sold the fraudulent**

24   **vehicles, along with hundreds of thousands of other vehicles to Volkswagen America**

25   **throughout the United States and California. All of this was accomplished, and the**

26   **fraudulent vehicle was sold to Plaintiff, pursuant to an Importer Agreement between**

27   **Volkswagen AG and Volkswagen America (the "Volkswagen Importer Agreement"). This**

28   **Importer Agreement was not arms-length transactions. Volkswagen AG required**

1    Volkswagen America to enter into the agreement.

2        25.    The Importer Agreement appoints Volkswagen America as the sole authorized

3    U.S. importer and distributor of vehicles manufactured by Volkswagen AG.  Volkswagen

4    America agreed to assume responsibility for the importation, distribution, marketing and

5    sale of Volkswagen vehicles, including the vehicle Plaintiff purchased. Volkswagen America

6    was the sole authorized U.S. importer and distributor of the fraudulent vehicles, as well as

7    other vehicles manufactured by Volkswagen AG, and Volkswagen America obtained the

8    Certificates of Conformity that allowed Volkswagen AG and to sell the fraudulent vehicles,

9    and all their vehicles, in the United States.

10        26.    The Importer Agreement divides functions and promotes the common purpose of

11    selling Volkswagen vehicles, including the fraudulent vehicles, throughout the United States.

12    Pursuant to these agreements, Volkswagen AG had the right and power to control the means

13    and methods by which Volkswagen America performed its work in marketing, sales,

14    promotion and public relations and did in fact exercise such power and control over

15    Volkswagen America.   Volkswagen AG oversaw and controlled all of the details of

16    Volkswagen America's marketing, sales, promotion and public relations concerning the

17    fraudulent vehicles.

18        27.    The Importer Agreement required Volkswagen America to establish a dealer

19    network based on Volkswagen AG's schedule and conditions.  It was this extensive dealer

20    network that allowed Volkswagen AG to sell over 600,000 of the fraudulent vehicles to

21    Plaintiff and other consumers throughout the United States.   Volkswagen America

22    established this dealer network at the direction, and with the direct participation, of

23    Volkswagen AG.

24        28.    Volkswagen AG appointed Volkswagen America to transact and manage the

25    business affairs of importing, distributing, marketing and the sale of the fraudulent vehicles,

26    as well as other Volkswagen  vehicles.  Volkswagen AG, and Volkswagen America divided

27    functions and worked together for the common purpose of selling Volkswagen vehicles,

28    including the vehicle Plaintiff purchased.  Pursuant to their agreements, Volkswagen AG

had the right and power to control the means and methods by which Volkswagen America performed its work in the marketing, sales, promotion and public relations concerning the fraudulent vehicles.  Volkswagen AG could not conduct business in the United States or California, either directly or indirectly, without the assistance of Volkswagen America. Volkswagen AG controls the methods and details of Volkswagen America's work to such an extent that Volkswagen America is the agent of Volkswagen AG.

29.     The following additional facts further demonstrate the total control Volkswagen AG exercises over Volkswagen America, either directly or indirectly, making the subsidiary nothing more than a corporate division of Volkswagen AG

- **Volkswagen AG owns 100% of the outstanding stock of Volkswagen America;**

- **Volkswagen AG elects and controls the board of directors and the chairman of the board of directors of Volkswagen America in Virginia ;**

- **Volkswagen America is the sole authorized U.S. importer and distributor of vehicles manufactured by Volkswagen AG ;**

- **Volkswagen America  officials participated in the obtaining of the Certificates of Conformity that allowed Volkswagen AG to sell their vehicles, including the the vehicle Plaintiff purchased;**

- **Volkswagen America is required to, and does in fact, promote the image and good reputation of Volkswagen AG, which was done in furtherance of the fraud that forms the basis for this lawsuit;**

- **Volkswagen America is prohibited by Volkswagen AG from modifying any of Volkswagen AG's vehicles, including the fraudulent vehicles, without their prior written approval;**

- **Volkswagen AG is authorized, both directly and indirectly, by Volkswagen America to control the means and methods by which Volkswagen America marketed and sold Volkswagen AG's vehicles, including the vehicle Plaintiff purchased.  Volkswagen AG exercises this control at and through Volkswagen America's corporate headquarters;**

- **Volkswagen America is prohibited by Volkswagen AG from  selling, marketing or promoting vehicles manufactured by companies other than Volkswagen AG and Audi AG;**

- **Volkswagen America is required by Volkswagen AG to sell and service used cars at its U.S. dealerships and to take used cars in trade;**

- **Volkswagen AG determines, both directly and indirectly, the warranty offered on the cars sold by Volkswagen America, including the warranty offered on the fraudulent vehicles;**

- **Volkswagen AG make no warranty (express or implied) as to the products supplied by Volkswagen AG to Volkswagen America;**

- **Volkswagen America is required by Volkswagen AG to lease cars;**

- **Volkswagen America is required to establish marketing and public relations objectives and strategies within the guidelines established by Volkswagen AG. These objectives and strategies using false information to market the fraudulent vehicles were established by Volkswagen America;**

- **Volkswagen AG controls Volkswagen America's advertising content as well as how much money it spends on advertising, including advertising concerning the fraudulent vehicles. Such advertising content for the fraudulent vehicles was developed by Volkswagen America;**

- **Volkswagen America is required by Volkswagen AG to make warranty repairs on all Volkswagen AG vehicles, including the fraudulent vehicle Plaintiff purchased, in accordance with Volkswagen AG's guidelines and procedures;**

- **Volkswagen America is required by Volkswagen AG to use the workshop tools and equipment specified by Volkswagen AG to service vehicles, including the fraudulent vehicle Plaintiff purchased;**

- **Volkswagen America is required by Volkswagen AG to perform all repairs and maintenance work in accordance with Volkswagen AG's guidelines and procedures;**

- **Volkswagen America is required to perform its pre-delivery inspections of Volkswagen AG's vehicles, including the fraudulent vehicle Plaintiff purchased, according to Volkswagen AG's instructions and guidelines;**

- **Volkswagen America is required to ensure that its standardized data processing and communications programs are compatible with Volkswagen AG's standardized data processing and communications programs;**

- **Volkswagen America is required to maintain a modern computer communications system for processing warranty claims that is compatible with Volkswagen AG's system to enable Volkswagen AG to track warranty cost projections;**

- **Volkswagen America is required to submit to Volkswagen AG on a regular basis information requested by Volkswagen AG concerning business data, warranty and warranty related matters, enactments or changes of any relevant laws and regulations, including taxes and customs and any other matters which may affect any aspect of their import agreement;**

- **Volkswagen America is required to inform Volkswagen AG of any modification of U.S. laws which may affect the manufacturing of vehicles and regulations governing the use thereof including safety requirements;**

- **Volkswagen America provides regular reports to Volkswagen AG on the development of the market generally and its business activities in the U.S., including reports on the fraudulent vehicles;**

- **Volkswagen America and Volkswagen AG determine the profit margin Volkswagen America received on the sale of the fraudulent vehicles, as well as its sale of other Volkswagen cars; and**

- **Volkswagen America cannot, without written approval of Volkswagen AG, enter into any agreements or arrangements to promote the sale of goods or services from its business premises unless such activities do not affect in any regard Volkswagen AG's business interests**

30. **One of the many ways that Volkswagen AG directly managed and controlled Volkswagen America's affairs, including the fraud that forms the basis for this lawsuit, is through an expatriate program wherein Volkswagen AG officers and employees were assigned to work for Volkswagen America at Volkswagen America's corporate headquarters. Volkswagen AG employees came to Volkswagen America's corporate headquarters and directed, controlled, and participated in the fraud that forms the basis of this lawsuit. Volkswagen AG's expatriate officers and employees oversaw Volkswagen America's operations, including its marketing, promotion, and distribution of the fraudulent vehicles. For example, Volkswagen AG used the expatriate program to appoint Michael Horn as Volkswagen America's CEO. Volkswagen AG used Michael Horn and other German expatriates to manage and control Volkswagen America's operations, including the distribution of the fraudulent vehicle to Plaintiff and the marketing and advertising of the fraudulent vehicle to Plaintiff.**

31. **Further, Volkswagen AG trains and assigns Volkswagen America employees.**

32.     **In furtherance of the "Dieselgate" fraud, Volkswagen AG developed technical service "flash" software that was designed to help hide the presence of the defeat device. Volkswagen AG labeled the software as an "update," provided this update to Volkswagen America, and directed  Volkswagen America to install the software on their fraudulent vehicles unbeknownst to U.S. consumers, including Plaintiff.**

### Volkswagen's Plot to Illegally Circumvent California Emissions Regulations

33.     **This lawsuit is about a fraudulent deceptive scheme (referred to herein as the "Deceptive Emissions Scheme") to deliberately lie, cheat and intentionally deceive consumers about the characteristics, benefits and value of Volkswagen's "clean" diesel vehicles.**

34.     In or around 2005, following the success of environmentally friendly vehicles such as the Toyota Prius, Volkswagen made the decision to focus on "clean" diesel technology to achieve its market share of "green" vehicle consumers.

35.     Volkswagen spent millions of dollars in research and development in the production of the EA 189 TDI ("TDI" stands for "turbocharged direct injection") diesel engine.

36.     At the time of development, diesel engines made up just 5% of the U.S. car market and Volkswagen saw an opportunity to become the market leader through this so-called "clean" diesel; however, in order to capitalize on the "green" vehicle market, Volkswagen needed to overcome public stigma associated with diesel technology, which included the perception that diesel engines emit high levels of toxic pollutants.  With the TDI, Volkswagen claimed to have drastically limited toxic emissions.

37.     Volkswagen marketed the TDI as a "clean" diesel alternative to other environmentally friendly green engines, such as hybrids and electric cars.

38.     Behind the scenes, Volkswagen realized internally that it was not possible to roll out these so-called "clean" diesel vehicles within its self-imposed budgets and engineering constraints.  Volkswagen mandated the development of a diesel engine that maintained the performance of traditional gasoline engines with reduced $CO_2$ emissions and fuel consumption, all while meeting the strict $NO_x$ emission standards in California.

39.     $NO_x$ is a generic term for the mono-nitrogen oxides NO and $NO_2$ (nitric oxide and nitrogen dioxide), which are predominantly produced from the reaction of nitrogen and oxygen gases in the air during combustion.  $NO_x$ is produced by the burning of fossil fuels, but it is particularly difficult to control from the burning of diesel fuel.  $NO_x$ is a toxic pollutant, which produces smog and a litany of environmental and health problems, as detailed further below.

40.     Diesel fuel is traditionally denser than gasoline, and the syrupy fuel contains longer hydrocarbon chains, which tend to produce a more efficient vehicle.   In fact, diesel engines can convert over 45% of diesel's chemical energy into useful mechanical energy, whereas gasoline engines convert only 30% of gasoline's energy into mechanical energy.  To make use of this dense diesel fuel, diesel engines combine under high pressure to ignite a combination of diesel fuel and air through "compression ignition," as opposed to gasoline engines that typically use electric discharge from a spark plug to ignite a combination of gasoline and air through "spark ignition." Though more efficient, diesel engines come with their own set of challenges, as emissions from diesel engines can include higher levels of $NO_x$ and particulate matter ("PM"), or "soot" than emissions from gasoline engines due to the different ways the different fuels combust and the different ways the resulting emissions are treated following combustion.  One way $NO_x$ emissions can be reduced by adjusting the compression and temperature, but that in turn produces PM, a similarly-undesirable hydrocarbon-based emission.  Another way $NO_x$ emissions can be reduced is through expensive exhaust gas after treatment devices, primarily, catalytic converters, that use a series of chemical reactions to transform the chemical composition of a vehicle's $NO_x$ emissions into less harmful, relatively inert, and triple bonded nitrogen gas ($N_2$; just over 78% of the Earth's atmosphere by volume consists of $N_2$) and carbon dioxide ($CO_2$).

41.     Diesel engines thus operate according to this trade-off between price, $NO_x$ and PM, and for the California Air Resources Board ("CARB") to designate a diesel car as a "clean" vehicle, it must produce both low PM and low $NO_x$.

42.     California's strict emission standards posed a serious challenge to Volkswagen's engineers.  In fact, during a 2007 demonstration in San Francisco, the chief of the TDI's research and development team, Wolfgang Hatz, lamented presciently that "[Volkswagen] can do quite a

1   bit and we will do a bit, but 'impossible we cannot do . . . From my point of view, the [CARB

2   standard] is not realistic… I see it as nearly impossible for [Volkswagen]."

3       43.    It was of the utmost importance to Volkswagen that it achieve (or at least appear to

4   achieve) this "impossible" goal, for it could not legally sell a single vehicle that failed to comply

5   with California emissions regulations.

6       44.    California's regulator, CARB, requires that automakers complete an application

7   and obtain an Executive Order ("EO"), confirming compliance with California's emission

8   regulations, before allowing the vehicle onto California's roads.

9   ///

10      45.    Thus, in order to successfully grow the U.S. Diesel market and meet its ambitious

11  objectives, it was critical that Volkswagen develop the technology to maintain the efficient,

12  powerful performance of a diesel, while drastically reducing $NO_x$ emission to comply with

13  California emission standards.

14      46.    This engineering dilemma led to a deep dilemma at Volkswagen that led to

15  proposals for two divergent exhaust gas after treatment technical approaches.  One approach

16  involved a selective catalytic reduction ("SCR") system that proved to be effective but expensive.

17  The other, which utilized a lean $NO_x$ trap, was significantly cheaper but was less effective and

18  resulted in lower fuel efficiency.

19      47.    The SCR system utilized the organic compound urea, a post-combustion emission

20  reductant generically referred to as "Diesel Exhaust Fluid" or "DEF."  When injected into the

21  exhaust stream in a catalyst chamber, urea converts $NO_x$ into nitrogen gas, water, and carbon

22  dioxide.  The SCR system was expensive, costing $350 per vehicle, and came with other

23  compromises, including, primarily, the need for installation of a DEF tank that would require

24  regular refills.  Volkswagen decided to drop the SCR system because the $350 per-vehicle cost

25  was deemed too expensive.

26      48.    The second strategy, the $NO_x$ traps, involved the storage of $NO_x$ emissions in a

27  catalyst substrate during vehicle operation.  Once the substrate filled up, the system burned off the

28  stored $NO_x$ by pumping an extra burst of fuel into the cylinders, most of which passed through to

the converter, where it then converts the NO$_x$ into less harmful emissions. This method was cheaper and easier to implement than the SCR system. The NO$_x$ trap system was less effective at reducing emissions, however, and resulted in lower miles-per-gallon fuel efficiency, directly contradicting one of the key elements (high miles-per-gallon fuel efficiency) necessary to execute Volkswagen's ambitious diesel sales goals. Accordingly, this option, too, was unacceptable to Volkswagen.

49.     But at Volkswagen, failure was not an option. According to many sources (including journalists, industry insiders, and Volkswagen whistleblowers), Volkswagen's ranking officials directed its engineers to find a way to meet emissions standards, including those of California, despite tight budgetary and technical constraints, or suffer the consequences. For example, former CEO of Volkswagen Aktiengesellschaft, Ferdinand Piëch, created "a culture where performance was driven by fear and intimidation," and his leadership was characterized as a "reign of terror."[1] Employees were told, "[y]ou will sell diesels in the U.S., and you will not fail. Do it, or I'll find somebody who will." [2] Piëch was infamous for firing subordinates who failed to meet his exacting standards: "Stories are legion in the industry about Volkswagen engineers and executives shaking in their boots prior to presentations before Piech, knowing that if he was displeased, they might be fired instantly."[3] And so it seems, out of self-preservation, the defeat device was created.

50.     Volkswagen engineers had to find a solution to the "impossible" problem of passing stricter emission standards while maintaining performance and fuel efficiency, all while hamstrung by cost-cutting measures. And it had to be done fast, because the new diesel vehicles were scheduled for imminent release in the U.S. Ultimately, Volkswagen ran out of time and instead of being honest and risk being fired, executives, engineers, and others conspired to cheat California emissions standards by installing a "defeat device" in the new diesel vehicles, including Plaintiff's vehicle, so that those vehicles could "pass" CARB emission testing, and Volkswagen could obtain

---

[1] Bob Lutz, *One Man Established the Culture That Led to VW's Emissions Scandal*, Road & Track (Nov. 4, 2015), http://www.roadandtrack.com/car-culture/a27197/bob-lutz-vw-diesel-fiasco/.
[2] *Id.*
[3] Doron Levin, *The Man Who Created VW's Toxic Culture Still Looms Large*, Fortune (Oct. 16, 2015), http://fortune.com/2015/10/16/vw-ferdinand-piech-culture/.

EOs to sell the vehicles to make its sales targets throughout California.

51.    After it became clear that the TDI engine would not meet California emissions standards by the launch of the Jetta TDI "clean diesel," initially scheduled for 2007 but delayed due emission testing failure, Volkswagen decided to cheat.  It has been reported that the decision to cheat CARB, and other regulators worldwide was an "open secret" in Volkswagen's engine development department,[4] as it was necessary for the "EA 189 engine to pass U.S. diesel emissions limit [including California's] within the budget and time frame allotted."[5]

52.    All modern engines are integrated with sophisticated computer components to manage the vehicle's operation, such as an electronic diesel control ("EDC").  The EDC used by Volkswagen in its TDI engine, including the TDI engine in Plaintiff's vehicle, is more formerly referred to as the Electronic Diesel Control Unit 17 ("EDC Unit 17").  The EDC Unit 17 was tested, manufactured, and sold by Robert Bosch GMBH ("Bosch").  Upon its introduction, EDC Unit 17 was publicly touted by Bosch as follows:

> … EDC17 … controls every parameter that is important for effective, low-emission combustion.
>
> Because the computing power and functional scope of the new EDC17 can be adapted to match particular requirements, it can be used very flexibly in any vehicle segment on all the world's markets. In addition to controlling the precise timing and quantity of injection, exhaust gas recirculation, and manifold pressure regulation, it also offers a large number of options such as the control of particulate filters or systems for reducing nitrogen oxides. The Bosch EDC17 determines the injection parameters for each cylinder, making specific adaptations if necessary.  This improves the precision of injection throughout the vehicle's entire service life. The system therefore makes an important contribution to observing future exhaust gas emission limits.[6]

53.    EDC Unit 17 was widely used throughout the automotive industry, including BMW and Mercedes, to operate modern clean diesel engines.  Bosch worked with each vehicle manufacturer that utilized EDC Unit 17 to create a unique set of specifications and software code

---

[4] Georgina Prodham, *Volkswagen probe finds manipulation was open secret in department*, Reuters (Jan. 23, 2016), http://www.reuters.com/article/us-volkswagen-emissions-investigation-idUSKCN0V02E7.
[5] Jay Ramey, *VW chairman Poetsch: Company 'tolerated breaches of rules'*, Autoweek (Dec. 10, 2015), http://autoweek.com/article/vw-diesel-scandal/vw-chairman-poetsch-company-toerated-breaches-rules.
[6] *See* February 28, 2006, Bosch press release, "The brain of diesel injection: New Bosch EDC17 engine management system," http://www.bosch-presse.de/presseforum/details.htm?txtID=2603&locale=en

1    to manage the vehicle's engine operation.

2        54.    With respect to Volkswagen's TDI vehicles, including Plaintiff's vehicle, however,

3    EDC Unit 17 was also used to enable Bosch and Volkswagen to surreptitiously evade emissions

4    regulations.  Bosch and Volkswagen worked together to develop and implement a specific set of

5    software algorithms for implementation in Volkswagen's TDI vehicles, which enabled

6    Volkswagen to adjust fuel levels, exhaust gas recirculation, air pressure levels, and even urea

7    injection rates (for applicable vehicles).

8        55.    When carmakers test their vehicles against CARB emission standards, they place

9    their cars on dynamometers (large rollers) and then perform a series of specific maneuvers

10   prescribed by federal regulations.  Bosch's EDC Unit 17 gave Volkswagen the power to detect test

11   scenarios by monitoring vehicle speed, acceleration, engine operation, air pressure and even the

12   position of the steering wheel.  When the EDC Unit 17's detection algorithm detected that the

13   vehicle was on a dynamometer (and undergoing an emission test), additional software code within

14   the EDC Unit 17 downgraded the engine's power and performance and upgraded the emissions

15   control systems' performance by switching to a "dyno calibration" to cause a subsequent reduction

16   in emissions to legal levels.  Once the EDC Unit 18 detected that the emission test was complete,

17   the EDC Unit17 would then enable a different "road calibration" that caused the engine to return

18   to full power while reducing the emissions control systems' performance, and consequently,

19   caused the car to spew the full amount of NOx emissions out on the road, in excess of California's

20   emissions standards.

21       56.    Thus, in order to obtain the EOs necessary to sell its vehicles in California,

22   Volkswagen did not disclose, and affirmatively concealed, the presence of the test-detecting and

23   performance altering software code within the EDC Unit 17 from government regulators.  In other

24   words, Volkswagen lied to the government, its customers, including Plaintiff, and the public at

25   large.

26       57.    Because the EOs were fraudulently obtained, and because all Volkswagen vehicles

27   equipped with the TDI engine did not conform to the specifications provided in the EO

28   applications, the vehicles, including Plaintiff's vehicle, were never covered by valid EOs and, thus,

1   were never legal for sale, nor were they CARB compliant, as presented.  Volkswagen hid these

2   facts from CARB, other regulators, consumers, and Plaintiff, and it continued to sell and lease the

3   vehicles to the driving public, despite their illegality.

4         58.   Volkswagen hid the fact of the defeat devices from CARB, such that the EOs were

5   fraudulently obtained.   Volkswagen submitted EO applications that described compliant

6   specifications and concealed the dual-calibration strategy of the defeat device.  In reality, the

7   vehicles differed in material respects from the specifications described in the EO applications.

8         59.   Because the EOs were fraudulently obtained, vehicles equipped with the TDI

9   engine, including Plaintiff's vehicle, were never covered by valid EOs and, thus, were never

10   offered legally for sale.  Volkswagen hid these facts from CARB, and consumers, including

11   Plaintiff, and it continued to sell and lease the vehicles to the public, including Plaintiff, despite

12   their illegality.

13

14   **<u>Volkswagen's "Clean" Diesel Advertising Campaign</u>**

15         60.   While secretly using defeat devices to bypass California emission testing,

16   Volkswagen publicly declared a landmark victory – touting that it had successfully optimized its

17   engines to maintain legal emissions, while simultaneously enjoying the cost savings and

18   convenience factors of a lean $NO_x$ trap system.  Volkswagen claimed it accomplished this by

19   monitoring and adjusting combustion conditions and using a two-stage exhaust gas recirculation

20   system to reduce initial emissions, while neutralizing the remaining ones with a lean $NO_x$ trap to

21   comply with California law.  Volkswagen branded and advertised this purportedly revolutionary

22   technology to American consumers as "CleanDiesel" TDI technology.

23         61.   Volkswagen's "clean" diesel campaign was built upon a lie. Indeed, the TDI

24   equipped vehicles were so "dirty" that they could not pass the minimum emission standards in

25   California, and Volkswagen had to lie in order to sell them in the California. But, of course,

26   Volkswagen marketed and sold these vehicles without ever disclosing to consumers that they were

27   unlawful to sell or drive due to their high levels of $NO_x$ emissions.

28         62.   Volkswagen's "clean" diesel campaign was its key selling point for consumers

increasingly concerned about the environment. Its marketing mission was to "get clean-diesel power the recognition it deserves as a true 'green' technology," thereby growing Volkswagen's market share to match its lofty goals.  The objective was to change the way consumers thought of diesel technology, by replacing the mental image of sulfur emissions amid clouds of thick soot with that of heightened efficiency and reduced $CO_2$ emissions. In fact, the Volkswagen website stated: "This ain't your daddy's diesel. Stinky, smoky, and sluggish. Those old diesel realities no longer apply. Enter TDI "clean" diesel. Ultra-low-sulfur fuel, direct injection technology, and extreme efficiency. We've ushered in a new era of diesel."

63.    Dubbing these diesel engines as "CleanDiesel" was a symptom of the brazen arrogance underlying the fraud. Volkswagen's entire marketing campaign, from the branding of the products to the advertisements, focused on convincing consumers that the TDU equipped vehicles were not merely compliant with California emission regulations, but that they exceeded them. This deception culminated in a Guinness World Record attempt in a 2013 Volkswagen Passat TDI, which ironically won an award for "lowest fuel consumption—48 U.S. states for a non-hybrid car."

64.    Volkswagen pitched its Audi diesel engines as environmentally friendly, powerful, and efficient. Volkswagen's advertisements deceptively portrayed its Audi Vehicles as clean and safe for the environment, unlike the diesels of yesteryear.

65.    Volkswagen proclaimed that "[d]iesel [was] no longer a dirty word," but failed to disclose that its vehicles were so dirty that they could not pass emission standards in the California and that the only reason why they were introduced into the stream of commerce here is because Volkswagen fraudulently obtained EOs from CARB for these vehicles. With equal audacity, Volkswagen advertised that, by driving an Audi TDI, you could "[p]rotect the environment and look good doing it," while failing to disclose the pernicious $NO_x$ spewed into the environment.

66.    Volkswagen also ran numerous TV commercials for its Audi "clean" diesel vehicles, many of which touted the "eco-friendly" characteristics of its diesel technology. One ad, "The Green Police" (which aired during the 2010 Super Bowl) portrayed a world in which the environmental police ("Green Police") arrested people for using Styrofoam cups, failing to

compost, asking for plastic bags at the grocery store, throwing out batteries, and drinking water from plastic bottles. And at a highway checkpoint, the "ECO ROADBLOCK," the Green Police flagged cars that were harmful to the environment.  When the Green Police at the ECO ROADBLOCK see an Audi A3 TDI SportWagen, they give the car a "thumbs up" and allow the driver to bypass the roadblock.  After the white A3 TDI cruises past the other vehicles, the screen fades to black and falsely touts the supposed "green credentials" of the A3 TDI.

/ / /

67.     Volkswagen also made false representations in print brochures available at dealerships and on Audi's website. For example, an Audi 2011 A3 TDI brochure states:

> With the potent combination of direct diesel injection and turbocharging, the 2.0-liter TDI® clean diesel engine delivers an impressive 236 lb-ft. of torque and produces 140hp. The power and performance is complemented with impressive EPA-estimated 30 MPG city and 42 MPG highway ratings. ***Producing 30 percent fewer $CO_2$ emissions than a comparable gasoline engine, the 2.0 TDI clean diesel also meets or exceeds the 50 state emissions requirements.***
> . . .
> ***Long gone are the days of dirty, smoking diesel engines. Audi TDI clean diesel technology is responsible for the cleanest diesel engines in the world***, with 30 percent fewer $CO_2$ emissions than comparable gasoline engines, making it an environmentally friendly alternative to gasoline power. ***In fact, TDI clean diesel is compliant with California 's ULEV II requirement—the world's most stringent emission standard. The result is a significant reduction in emissions that contribute to global warming.***

(Emphasis added.)

68.     Audi's 2016 A6 and A7 brochures similarly (and falsely) stated that the TDI versions of these cars meet emission rating "ULEV II," and the 2016 A6, A7, and Q5 brochures all similarly stated:

> Taking advantage of the greater power density of diesel fuel over traditional gasoline, the available 240-hp 3.0-liter TDI® clean diesel V6 delivers incredible torque (428 lb-ft) and passing power, while boasting impressive fuel efficiency numbers. ***It also produces fewer emissions with a combination of Piezo direct injection, a high compression ratio, and innovative after-exhaust treatment that helps eliminate up to 95% of diesel NOx emissions.***

(Emphasis added.)

69.     An Audi 2016 A8 brochure also listed the TDI models as meeting emission rating "ULEV II," and further stated:

> With 240 hp and 428 lb-ft of torque on tap, the available 3.0-liter TDI® clean diesel engine's elasticity in the passing lane is almost as impressive as its ability to take on even the longest road trips. ***And with features like AdBlue® exhaust after-treatment helping to make every journey a little cleaner, this is a performance win for all sides.*** (Emphasis added.)

### Volkswagen Profit's from Selling Vehicle's Equipped with the Defeat Device

70.     Volkswagen's massive advertising campaign for the TDI equipped vehicles proved highly successful, as Volkswagen took a commanding lead in U.S. diesel vehicle sales. Volkswagen's diesel vehicles were profiled on environmental websites and blogs as the responsible choice, relying on Volkswagen's representations of high mileage and low emissions.

71.     And the success of Volkswagen's advertising campaign resulted in skyrocketing sales. In 2007, Volkswagen sold 230,572 cars in the United States and a negligible number of those were diesel vehicles.  In fact, in 2007 only approximately 16,700 light-duty diesel vehicles were sold in the United States.  As Volkswagen released its "clean" diesel lineup and fraudulent advertising campaign, sales of TDI vehicles grew dramatically, from 43,869 in 2009 to a peak of 111,285 in 2013.  This largely accounted for Volkswagen's sales growth to over 400,000 sales in 2013, nearly double the sales in 2007. Likewise, the TDI vehicles contributed significantly to Audi's growth from 93,506 sales in 2007 to 182,011 in 2014.

72.     Volkswagen reaped considerable benefit from their fraud, charging premiums of thousands of dollars for the "clean" diesel models of the TDI vehicles.

73.     Volkswagen also engaged in an aggressive lobbying campaign for federal tax credits for the TDI vehicles, akin to the credits offered for electric cars.  These efforts were met with some success, as many of the TDI vehicles were deemed eligible for federal income tax credits in order to spur "clean" diesel technology.  In fact, at least $78 million was earmarked for TDI Jetta buyers in 2009 and 2010.

74.     Volkswagen's fraudulent scheme started to unravel approximately five years after

Volkswagen introduced its first diesel model containing the defect device into the U.S. stream of commerce.  In May 2014, West Virginia University's Center for Alternative Fuels, Engines & Emissions published results of a study commissioned **in California** by the International Council on Clean Transportation ("ICCT"), which found that certain of the TDI equipped vehicles' real world NOX and other emissions exceeded the allowable CARB emission standards.

75.    The ICCT researchers had been comparing the real-world performance of "clean" diesel vehicles in Europe with reported results and noted numerous discrepancies. Since California emission regulations were significantly more stringent than its European counterparts, the ICCT sought to test the equivalent California "clean" diesel cars, presuming that they would run cleaner. West Virginia University's team of emissions researchers was a qualified and enthusiastic partner, as they had already been engaged in the study of heavy truck emissions.

76.    Shockingly, the study showed that, contrary to testing lab results, real world driving of Volkswagen "clean" diesel vehicles produced levels of $NO_x$ up to 40 times higher than legal limits promulgated by the CARB.

77.    The results of this study prompted an immediate investigation by CARB, who demanded an explanation from Volkswagen.  Despite knowing that the TDI vehicles contained emission systems designed for fraudulent purposes—and defeat devices intentionally designed to comply with California emission standards on a test bench but not under normal driving operation and use— Volkswagen failed to come clean. Instead, Volkswagen denied the allegations and blamed faulty testing procedures.

78.    In December 2014, Volkswagen issued a recall purportedly to update emission control software in the TDI vehicles, and CARB conducted follow-up testing of the TDI vehicles in the laboratory and during normal road operation. CARB attempted to identify the source and nature of the TDI vehicles' poor performance and determine why their on-board diagnostic systems did not detect the increased emissions.  None of the technical issues suggested by Volkswagen adequately explained the $NO_x$ test results as confirmed by CARB.

79.    Dissatisfied with Volkswagen's explanations, California government officials

1    finally threatened to withhold the emissions certifications for Volkswagen's 2016 diesel vehicles

2    until it adequately explained the anomaly of the higher emissions. Then, and only then, did

3    Volkswagen finally relent and start to lift the curtain on its fraudulent scheme.

4        80.    On September 3, 2015, Volkswagen officials finally disclosed at a meeting with

5    CARB that it had installed a sophisticated software algorithm on the 2.0-liter TDI

6    vehicles, which could detect when the car was undergoing emission testing on a test bench and

7    switch the car into a cleaner running mode.

8        81.    On September 18, 2015, CARB sent a letter to Volkswagen advising that it had

9    initiated an enforcement investigation of Volkswagen pertaining to the vehicles at issue in the a

10   notice of violation sent previously by another agency. .

11       82.    On September 20, 2015, Volkswagen confirmed that it had ordered dealers to stop

12   selling both new and used vehicles with 2.0-liter diesel engines.

13       83.    Volkswagen continued to sell its 3.0-liter diesel models, despite containing similar,

14   but not-yet-disclosed defeat devices.

15       84.    On September 22, 2015, Volkswagen announced that 11 million diesel cars

16   worldwide were installed with the same defeat device software that had evaded emission testing

17   by California regulators.

18                              **PLAINTIFF'S EXPERIENCE**

19       85.    The vehicle was equipped with a TDI diesel engine.

20       86.    On February 18, 2011, Plaintiff visited Newport Auto Center in Newport Beach,

21   California, with hopes of purchasing a new vehicle.  Plaintiff walked the dealership in search of a

22   vehicle to meet Plaintiff's needs.  Plaintiff was specifically searching for a vehicle that was fuel

23   efficient and had low emissions.  In searching the car inventory on the car lot, Plaintiff reviewed

24   the window stickers of 2011 Audi Q7 TDI vehicles that caught his eye.  The window stickers on

25   most of these vehicles identified the vehicles as having low emissions.  Plaintiff identified a 2011

26   Audi Q7 TDI she was interested in purchasing. Plaintiff's conversations with the salesman and

27   manager and the window sticker on the vehicle reinforced Plaintiff's belief that the vehicle was

28   in fact equipped with a clean diesel engine that had low emission output. The salesman never

1    disclosed to Plaintiff that the vehicle was not a low emission vehicle.  Plaintiff relied on the

2    statements on the window sticker and marketing materials she had received about the 2011 Audi

3    Q7 TDI and the TDI diesel engine.

4         87.    Prior to purchasing the vehicle, Plaintiff reviewed marketing brochures, viewed

5    television commercials and/or heard radio commercials about the qualities of the Volkswagen's

6    TDI engine.  Plaintiff also relied on Volkswagen's reputation as an established and experienced

7    auto manufacturer; Plaintiff relied on the statements made during the sales process by

8    Volkswagen's agents, on window stickers, and within the marketing brochures provided by

9    Volkswagen regarding it being a "green" vehicle.  However, Volkswagen and its authorized

10   agents did not publicly or privately disclose to Plaintiff any information about the defeat devices.

11   These omissions were material to Plaintiff's decision to purchase the vehicle.  Had Volkswagen

12   and/or its authorized agents publicly or privately disclosed the existence of the defeat device and

13   the truth about the TDI's emissions before Plaintiff purchased the vehicle, Plaintiff would have

14   been aware of such disclosures, and would not have purchased the vehicle.

15                 All Statute of Limitations Periods are Tolled by the Discovery Rule and the

16                              Doctrine of Fraudulent Concealment

17        88.    Volkswagen misrepresented the qualities of the TDI diesel engine in the Vehicle,

18   including its emissions output, to Plaintiff at the time of the sale of the Vehicle.  Volkswagen also

19   concealed the fact that the TDI diesel engine's EDC Unit 17 defeat device was designed to

20   fraudulently defeat emissions standards set by CARB.

21        89.    At all relevant times, Volkswagen was aware of the fraudulent nature of the TDI diesel

22   engine equipped with the EDC Unit 17 defeat device.

23        90.    As described in more detail above, as early as 2005, Volkswagen began developing

24   the TDI diesel engine and had made the determination to equip the engine with the EDC Unit 17

25   defeat device specifically programmed to defeat California emissions standards set by CARB,

26   prior to it began selling vehicles equipped with the TDI diesel engine in or around 2007.  At no

27   point prior to the sale of the Vehicle to Plaintiff or during Plaintiff's ownership of the Vehicle did

28   Volkswagen or an authorized dealer ever inform Plaintiff that his vehicle was equipped with an

1    fraudulent EDC Unit 17 defeat device or that Volkswagen had fraudulently obtained an EO from

2    CARB that permitted Volkswagen to sell the Vehicle in California.

3    　　91.  Volkswagen had a duty to disclose the concealed facts alleged above because

4    Volkswagen knew that Plaintiff did not know a material fact and further knew that such facts were

5    not readily accessible to the Plaintiff because Volkswagen actively concealed those facts.

6    　　92.  Volkswagen had a duty to disclose the concealed facts alleged above because

7    Volkswagen made misrepresentations in its marketing materials and window stickers and through

8    its authorized sales representatives about the quality, characteristics, and emissions output of the

9    TDI diesel engine.

10   　　93.  Volkswagen had a duty to disclose the concealed facts alleged above because

11   Volkswagen actively concealed material facts in order to induce a false belief.

12   　　94.  Volkswagen intended for Plaintiff to rely on those misrepresentations to conceal the

13   fact that the Vehicle's TDI diesel engine equipped with the EDC Unit 17 defeat device did not

14   comply with California's emissions regulations.

15   　　95.  Prior to the sale of the Vehicle, and at all times thereafter, Defendant therefore failed

16   to disclose the existence of the vehicle's fraudulent nature to Plaintiff, which prevented the Vehicle

17   from conforming to California emissions regulations.  Volkswagen also continued to conceal the

18   fact that Plaintiff's Vehicle did not, in fact, obtain an EO as required by CARB for sale in

19   California.

20   　　96.  On or around September 22, 2015, after extensive investigations by government

21   entities, including CARB, Defendant Volkswagen finally publicly admitted to the fraud and

22   announced that 11 million diesel cars worldwide were installed with the same defeat device

23   software that had evaded emission testing by California regulators.  This was the earliest date that

24   Volkswagen made any attempt to notify the public of any of the fraudulent defeat device and its

25   scheme to defraud consumers and government regulators.  This date was the earliest date that

26   Plaintiff could have had any sort of notice of the facts which give rise to Plaintiff's fraud cause of

27   action.  Volkswagen did not disclose any of this information prior to the sale of the vehicle to

28   Plaintiff or at any earlier date during ownership.  Accordingly, Plaintiff could not have discovered

Plaintiff's claims prior to September 2015.  Plaintiff could not, through reasonable and diligent investigation, have discovered such on an earlier date because of Volkswagen's fraudulent misrepresentations and concealment of the EDC Unit 17 defeat device and the scheme to defraud consumers and government entities, as previously alleged above.  The statute of limitations for each of Plaintiff's claims against Volkswagen was therefore tolled under the delayed discovery rule and the doctrine of fraudulent concealment until Plaintiff could have first discovered on or around September 2015, that Volkswagen had misrepresented the characteristics of the TDI diesel engine and concealed the known fraudulent nature of the EDC Unit 17 defeat device and fraudulently obtained EOs during the ownership of the Vehicle.

97.  Because Volkswagen failed to disclose these foregoing facts to Plaintiff, all statute of limitations periods with respect to sale of the Vehicle were tolled by the doctrines of fraudulent concealment, the discovery rule, and/or equitable tolling.  As alleged herein, Volkswagen wrongfully concealed the fact (1) that the Vehicle was equipped with a fraudulent EDC Unit 17 defeat device, (2) that the TDI diesel engine did not comply with California's emissions standards, and (3) that Volkswagen had fraudulently obtained the EO from CARB that allowed it to sell the Vehicle is California.

98.  Plaintiff did not discover the operative facts that are the basis of the claims alleged herein because the facts were concealed in confidential and privileged documents, which a consumer would not know about and could not obtain.

99.  No amount of diligence by Plaintiff could have led to the discovery of these facts because they were kept secret by Volkswagen and, therefore, Plaintiff was not at fault for failing to discover these facts.

100. Plaintiff did not have actual knowledge of facts sufficient to put him on notice. Plaintiff did not know, nor could have known, about the EDC Unit 17 defeat device or the fact that the Vehicle did not comply with California emissions regulations and did not have a valid EO from CARB because the EO was obtained fraudulently because, as alleged above, Volkswagen kept this information highly confidential.

**FIRST CAUSE OF ACTION**

**(Fraud in the Inducement – Intentional Misrepresentation) –** *Against Volkswagen*

*Defendants ONLY*

101.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

102.    Volkswagen made multiple public representations about quantifiable qualities of the TDI engine, including statements regarding its emissions, its compliance with government regulations, fuel efficiency, power, and drivability.

103.    Volkswagen drafted, produced, and distributed marketing brochures to the public containing factual representations about the TDI engine. Volkswagen also engaged in a nationwide television and print advertising campaigns containing factual representations about the TDI engine.  Volkswagen's marketing the Vehicle represented the TDI engine's "green" technology, as further described in paragraphs **60-69**, above.

104.    Unfortunately, the Vehicle as delivered to Plaintiff was equipped with "defeat device" that was specifically designed to circumvent government environmental regulations, including California emissions standards, and to defraud the public at large, including the Plaintiff.

105.    The defeat device was not a defect exclusive to Plaintiff's Vehicle but was intentionally designed by **Defendants** with the intent to defraud government regulators and the public by convincing them that TDI engine equipped vehicles actually complied with government environmental regulations, including California's emissions standards.  Volkswagen had exclusive knowledge of this fact and concealed information to fraudulently induce Plaintiff and other consumers into purchasing vehicles equipped with the TDI engine and the defeat device.  As such, the defeat device is more than just a non-conformity to the Vehicle's warranties, but, rather, the basis of a wide ranging fraud and a breach of a separate duty that arises from Volkswagen's exclusive knowledge and concealment of the defeat device.

106.    Volkswagen made such representations regarding TDI engine despite its extensive internal knowledge of the defeat device and the poor emissions performance.  Volkswagen's knowledge of the defeat device and intentional fraud is laid out in detail above.

107.   Defendants intended that Plaintiff rely on the representations made in marketing brochure and add campaigns related to the "clean diesel" TDI engine in inducing Plaintiff to purchase the Vehicle.

108.   Plaintiff reasonably relied on **Defendants'** representations related to the Vehicle being "clean diesel" and "green: because Volkswagen was the manufacturer of the vehicle and claimed to have performed and relied upon extensive pre-release testing of the Vehicle's emissions in compliance with California's rigorous emissions standards.  Volkswagen was in a superior position of knowledge.

109.   Plaintiff was harmed by purchasing a vehicle that Plaintiff would not have purchased had she known the true facts about the defeat device and the Vehicle's actual emissions.

110.   Plaintiff's reliance on Defendants' representations about the Vehicle's "green" qualities was a substantial factor in Plaintiff's harm, as Volkswagen and its agents were the exclusive source of information about the emissions qualities, the defeat device, and the intent to defraud the public.

## SECOND CAUSE OF ACTION

**(Fraud in the Inducement – Concealment) –***Against Volkswagen Defendants ONLY*

111.   Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

112.   Volkswagen and its agents intentionally concealed and failed to disclose facts relating to TDI defeat device and the Subject Vehicle's non-conformance with California emission standards.

113.   Volkswagen was the only party with knowledge of the TDI defeat device because that knowledge came from an intentional scheme to defraud government regulators and consumers, including CARB and the Plaintiff.  None of this information was available to the public, nor did **Defendants** publicly or privately disclose any of the information to Plaintiff.  Volkswagen had exclusive knowledge of the defect.

114.    Volkswagen actively concealed information from the public, preventing Plaintiff from discovering any of the concealed facts regarding the defeat device and the truth about the TDI engine emissions.

115.    Prior to the date of sale, on the date of sale, and on the date of each of the repair attempts, **Defendants** had an opportunity to disclose to Plaintiff, but instead concealed from and failed to disclose to Plaintiff, any of the known irreparable issues with the Vehicle, **including** the existence of the TDI defeat device.

116.    Volkswagen intended to deceive Plaintiff by concealing the existence of the TDI defeat device, in an effort to sell the Vehicle at a maximum price.

117.    Prior to the sale of the Vehicle Defendant Volkswagen knew that the TDI defeat device was intended to use it to defraud CARB and the general public, including Plaintiff. Volkswagen specifically designed the TDI defeat device to fraudulently circumvent California emissions regulations and trick the public into purchasing vehicles that could not deliver on their emissions promises.  Volkswagen intended the Vehicle to be sold to the public, including the Plaintiff with the fraudulent defeat device.

118.    Plaintiff did not know about the TDI defeat device, the Vehicle's non-conformance with California emissions regulations, or Volkswagen's plan to defraud consumers at the time of sale.

119.    Had Volkswagen and/or its agents publicly or privately disclosed the existence of the TDI defeat device or the Vehicle's failure to conform to California emissions standards to Plaintiff at or prior to the sale, Plaintiff would not have purchased the Vehicle.

120.    Plaintiff was harmed by **Defendants'** concealment of the TDI defeat device because Plaintiff was induced to enter into the sale of a vehicle that Plaintiff would not have otherwise purchased.

121.    Defendant's concealment of the defeat device and the fact that the Vehicle failed to conform to California emissions regulations was a substantial factor in causing Plaintiff's harm.

### **THIRD CAUSE OF ACTION**

**(Violation of the Song-Beverly Act – Breach of Implied Warranty)** – *Against Volkswagen*

*Defendants ONLY*

122.    Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

123.    Pursuant to the Song-Beverly Consumer Warranty Act (herein after the "Act") Civil Code sections 1790 *et seq.* the vehicle constitutes "consumer goods" used primarily for family or household purposes, and Plaintiff has used the vehicle primarily for those purposes.

124.    Plaintiff is a "buyer" of consumer goods under the Act.

125.    Defendant Volkswagen is a "manufacturer" and/or "distributor" under the Act.

126.    Volkswagen and its authorized dealership at which Plaintiff purchased the Vehicle had reason to know the purpose of the Vehicle at the time of sale of the Vehicle.  The sale of the Vehicle was accompanied by an implied warranty of fitness.

127.    The sale of the Vehicle was accompanied by an implied warranty that the Vehicle was merchantable pursuant to Civil Code section 1792.

128.    The Vehicle was not of the same quality as those generally acceptable in the trade because it was equipped with a defeat device.

129.    The Vehicle was not fit for the ordinary purpose for which such goods are used because it was equipped with a defeat device.

130.    The Vehicle did not measure up to the promises or facts stated on the container or label because it was equipped with a defeat device.

131.    The Vehicle did not measure up to the promises or facts stated on the container or label because it was equipped with defeat device intended to deceive emissions tests and regulators, including CARB and California emissions standards.

132.    Plaintiff is entitled to justifiably revoke acceptance of the Vehicle under Civil Code section 1794, *et seq*; Plaintiff hereby revokes acceptance of the Vehicle.

133.    Plaintiff is entitled to replacement or reimbursement pursuant to Civil Code section 1794, *et seq.*

134.    Plaintiff is entitled to rescission of the contract pursuant to Civil Code section 1794, *et seq.* and Commercial Code section 2711.

135.   Plaintiff is entitled to recover any "cover" damages under Commercial Code sections 2711, 2712, and Civil Code section 1794, *et seq.*

136.   Plaintiff is entitled to recover all incidental and consequential damages pursuant to 1794 *et seq* and Commercial Code sections 2711, 2712, and 2713 *et seq.*

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against **Defendants**, as follows:

1.   For general, special and actual damages according to proof at trial;

2.   For rescission of the purchase contract and restitution of all monies expended;

3.   For incidental and consequential damages according to proof at trial;

4.   For prejudgment interest at the legal rate;

5.   For punitive damages pursuant to Civil Code section 3294;

6.   For reasonable attorney's fees and costs of suit; and

7.   For such other and further relief as the Court deems just and proper under the circumstances.

Dated:  July 8    , 2019                                    **KNIGHT LAW GROUP, LLP**


 /s/ Amy Morse
_____
Steve Mikhov (SBN 224676)
Amy Morse (SBN 290502)
Attorneys for Plaintiff,
SAMIRA SADEGHI

1    <u>**DEMAND FOR TRIAL BY JURY**</u>

2         **Plaintiff SAMIRA SADEGHI hereby demands a trial by jury to the full extent**

3    **permitted by law.**

4

5    **Dated:**  July 8, 2019                              **KNIGHT LAW GROUP, LLP**

6

7                                                          /s/ Amy Morse

8                                                          **Steve Mikhov (SBN 224676)**
                                                           **Amy Morse (SBN 290502)**
9                                                          **Attorneys for Plaintiff,**
                                                           **SAMIRA SADEGHI**
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and not a party to the within action.  My business address is 10250 Constellation Blvd., Ste. 2500, Los Angeles, CA 90067.

I served the foregoing documents described as:

1.  **AMENDED COMPLAINT**

Said documents were served on the interested parties in this action, by placing true copies thereof enclosed in sealed envelopes, with postage prepaid, addressed as follows:

Sullivan & Cromwell LLP
William B. Monahan
125 Broad Street
New York NY 1004
monahanw@sullcrom.com
**Counsel for Defendant**

Sullivan & Cromwell LLP
Sverker Kristoffer Hogberg
125 Broad Street
New York NY 1004
hogbergs@sullcrom.com
**Counsel for Defendant**

Sullivan & Cromwell LLP
Natalie A. Muscatello
125 Broad Street
New York NY 1004
muscatellon@sullcrom.com
**Counsel for Defendant**

Sullivan & Cromwell LLP
Laura K. Oswell
125 Broad Street
New York NY 1004
oswelll@sullcrom.com
**Counsel for Defendant**

XX   BY E-MAIL OR ELECTRONIC TRANSMISSION:  Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed July 8, 2019 at Los Angeles, California.

_____
SARENA FARANESH