Steve W. Berman (*Pro Hac Vice*)
Thomas E. Loeser (SBN 202724)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com

Richard N. Sox (*Pro Hac Vice*)
BASS SOX MERCER
2822 Remington Green Circle
Tallahassee, FL 32308
Telephone: (850) 878-6404
Facsimile:  (850) 942-4869
rsox@dealerlawyer.com

*Counsel for Plaintiffs and
the Franchise Dealer Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: VOLKSWAGEN 'CLEAN DIESEL' MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | No. 02672-CRB (JSC) |
| This document relates to: | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |
| *Napleton Orlando Imports, LLC, et al. v. Volkswagen Group of America, Inc., et al.,* Case No. 3:16-cv-02086-CRB | Date: December 20, 2019 Time: 10:00 a.m. Courtroom: 6, 17th Floor Hon. Charles R. Breyer |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................1

II.  SUMMARY OF THE ARGUMENT ......................................................................3

III.  ARGUMENT .........................................................................................................5

    A.  The named plaintiffs satisfy the typicality and adequacy requirements.....................5

        1.  Plaintiffs' claims are typical of the claims of the Class. ................................5

        2.  The named Plaintiffs adequately protect the interests of the Class. ........................................................................................................6

    B.  Plaintiffs establish numerosity. ..................................................................8

    C.  Plaintiffs' damage model satisfies the second part of the predominance inquiry...........................................................................................................9

        1.  Plaintiffs will use common evidence to prove that Class members would have continued to receive TDIs if the alleged scheme had not been exposed.........................................................10

        2.  The Stockton model properly calculates damages on an aggregate basis.......................................................................................14

        3.  The Stockton model does not conceal uninjured Class members. ..................................................................................................20

    D.  The state-law claims do not present unmanageable individualized issues.............................................................................................................21

    E.  A class action is the superior method for fairly adjudicating this matter. .................23

IV.  CONCLUSION ....................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Advanced Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.*,
  2010 WL 11575000 (N.D. Cal. Aug. 30, 2010) ................................................................ 19

*Air Caledonie Int'l v. AAR Parts Trading, Inc.*,
  315 F. Supp. 2d 1319 (S.D. Fla. 2004) ............................................................................ 14

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997) ........................................................................................................ 23

*In re Arris Cable Modem Consumer Litig.*,
  327 F.R.D. 334 (N.D. Cal. 2018) .................................................................................... 10

*Arthur v. United Indus. Corp.*,
  2018 WL 2276636 (C.D. Cal. May 17, 2018) ................................................................... 5

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018) ............................................................................................. 15

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639 (2008) ........................................................................................................ 12

*In re Bridgestone/Firestone, Inc.*,
  288 F.3d 1012 (7th Cir. 2002) ........................................................................................ 22

*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) ................................................................................... 14, 24

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
  155 F.3d 331 (4th Cir. 1998) ............................................................................................ 7

*In re Capacitors Antitrust Litig. (No. III)*,
  2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ........................................................... 20, 24

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  2016 WL 6216664 (N.D. Cal. Oct. 25, 2016) .................................................................. 21

*Celano v. Marriott Int'l, Inc.*,
  242 F.R.D. 544 (N.D. Cal. 2007) ...................................................................................... 8

*Corcoran v. CVS Health Corp.*,
  __ F. App'x __, 2019 WL 2454529 (9th Cir. June 12, 2019) ...................................... 6, 17

*Cummings v. Connell*,
  402 F.3d 936 (9th Cir. 2005) .......................................................................................... 16

*Daubert v. Merrell Dow Pharm., Inc.*,
　　509 U.S. 579 (1993) ................................................................................. 19

*Diacakis v. Comcast Corp.*,
　　2013 WL 1878921 (N.D. Cal. May 3, 2013) ................................................ 8

*Diaz v. Gates*,
　　420 F.3d 897 (9th Cit. 2005) ..................................................................... 12

*In re Duramax Diesel Litig.*,
　　298 F. Supp. 3d 1037 (E.D. Mich. 2018) .................................................. 12

*Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, U. A.*,
　　657 F.2d 890 (7th Cir. 1981) ....................................................................... 7

*Ehret v. Uber Techs., Inc.*,
　　148 F. Supp. 3d 884 (N.D. Cal. 2015) ......................................................... 7

*Euroholdings Capital & Inv. Corp. v. Harris Tr. & Sav. Bank*,
　　602 F. Supp. 2d 928 (N.D. Ill. 2009) ........................................................ 13

*Fiberlok, Inc. v. LMS Enters., Inc.*,
　　976 F.2d 958 (5th Cir. 1992) ..................................................................... 13

*Frlekin v. Apple Inc.*,
　　309 F.R.D. 518 (N.D. Cal. 2015) ................................................................. 2

*Gold v. Lumber Liquidators, Inc.*,
　　323 F.R.D. 280 (N.D. Cal. 2017) ................................................................. 5

*Golden v. City of Columbus*,
　　404 F.3d 950 (6th Cir. 2005) ....................................................................... 8

*Grace v. Apple, Inc.*,
　　328 F.R.D. 320 (N.D. Cal. 2018) ......................................................... 10, 14

*Guerrero v. Gates*,
　　442 F.3d 697 (9th Cir. 2006) ..................................................................... 12

*Guy Chem. Co., Inc. v. Romaco S.p.A.*,
　　2009 WL 840386 (W.D. Pa. Mar. 27, 2009) ............................................. 21

*Hatamian v. Advanced Micro Devices, Inc.*,
　　2016 WL 1042502 (N.D. Cal. Mar. 16, 2016) ............................................. 9

*Holmes v. Sec. Inv'r Prot. Corp.*,
　　503 U.S. 258 (1992) ................................................................................. 21

*In re Hyundai & Kia Fuel Econ. Litig.*,
　　926 F.3d 539 (9th Cir. 2019) ....................................................................... 1

*Jimenez v. Allstate Ins. Co.*,
   765 F.3d 1161 (9th Cir. 2014) ............................................................ 2

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
   305 F.R.D. 164 (N.D. Cal. 2015) .................................................... 2, 7

*Kanawi v. Bechtel Corp.*,
   254 F.R.D. 102 (N.D. Cal. 2008) .................................................... 3, 5

*Leyva v. Medline Indus.*,
   716 F.3d 510 (9th Cir. 2013) .......................................................... 24

*In re Lidoderm Antitrust Litig.*,
   2017 WL 679367 (N.D. Cal. Feb. 21, 2017) .................................. 14

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) .......................................................... 22

*McLeod v. Bank of Am., N.A.*,
   2017 WL 6373020 (N.D. Cal. Dec. 13, 2017) ................................. 7

*Milgard Tempering, Inc. v. Selas Corp. of Am.*,
   902 F.2d 703 (9th Cir. 1990) .......................................................... 13

*In re Napster, Inc. Copyright Litig.*,
   2005 WL 1287611 (N.D. Cal. June 1, 2005) .................................... 2

*Newcal Indus., Inc. v. Ikon Office Sol.*,
   513 F.3d 1038 (9th Cir. 2008) ........................................................ 12

*No Ka Oi Corp. v. Nat'l 60 Minute Tune*,
   71 Wn. App. 844 (1993) ................................................................ 13

*In re Optical Disk Drive Antitrust Litig.*,
   2016 WL 467444 (N.D. Cal. Feb. 8, 2016) .................................... 14

*Oscar v. Univ. Students Co-Op. Ass'n*,
   965 F.2d 783 (9th Cir. 1992) .......................................................... 12

*Pace Indus., Inc. v. Three Phoenix Co.*,
   813 F.2d 234 (9th Cir. 1987) .......................................................... 13

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) .......................................................... 10

*In re Rail Freight Fuel Surcharge Antitrust Litig. – MDL No. 1869*,
   934 F.3d 619 (D.C. Cir. 2019) ........................................................ 15

*Ridgeway v. Wal-Mart Stores Inc.*,
   2014 WL 4477662 (N.D. Cal. Sept. 10, 2014) ............................... 23

*Rodriguez v. Instagram, LLC*,
   2013 WL 3732883 (N.D. Cal. July 15, 2013) ................................................ 22

*Ruiz Torres v. Mercer Canyons Inc.*,
   835 F.3d 1125 (9th Cir. 2016) .................................................................. 16

*Siles v. ILGWU Nat'l Ret. Fund*,
   783 F.2d 923 (9th Cir. 1986) ...................................................................... 8

*In re Static Random Access memory (SRAM) Antitrust Litig.*,
   264 F.R.D. 603 (N.D. Cal. 2009) .............................................................. 23

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2012 WL 6000154 (N.D. Cal. Nov. 30, 2012) .......................................... 21

*Torres v. Mercer Canyons Inc.*,
   835 F.3d (9th Cir. 2016) .................................................................. 14, 15

*Tyson Foods, Inc. v. Bouaphakeo*,
   __ U.S. __, 136 S. Ct. 1036 (2016) ......................................................... 16

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
   2016 WL 6091259 (N.D. Cal. Oct. 18, 2016) ............................................ 9

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
   2016 WL 6248426 (N.D. Cal. Oct. 25, 2016), aff'd sub nom. In re Volkswagen
   "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., 895 F.3d 597 (9th
   Cir. 2018) .................................................................................................. 7

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*,
   2017 WL 672820 (N.D. Cal. Feb. 16, 2017) ...................................... *passim*

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................................ 16

*Washington v. Kellwood Co.*,
   714 F. App'x 35 (2d Cir. 2017) ............................................................... 13

*Wilbern v. Culver Franchising Sys., Inc.*,
   2015 WL 5722825 (N.D. Ill. Sept. 29, 2015) .......................................... 13

*Wortman v. Air New Zealand*,
   326 F.R.D. 549 (N.D. Cal. 2018) ...................................................... *passim*

*Yamada v. Nobel Biocare Holding AG*,
   275 F.R.D. 573 (C.D. Cal. 2011) ............................................................... 9

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
   594 F.3d 1087 (9th Cir. 2010) ................................................................. 18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.  INTRODUCTION

Bosch's memorandum ("Mem.") in opposition to the motion for class certification provides no basis to deny the motion.[1] As the Court has explained, "Rule 23(b)(3)'s first test, predominance, itself consists of two parts. First, a plaintiff must show that common questions of law and fact predominate over individual questions. Second, a plaintiff must present a model of damages that (1) identifies damages that stem from the defendant's alleged wrongdoing and (2) is 'susceptible of measurement across the entire class.'" *Wortman v. Air New Zealand*, 326 F.R.D. 549, 557 (N.D. Cal. 2018) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)).

Bosch does not address the first part of the test, for good reason—common issues of fact and law plainly predominate, as they did in the consumer action against Bosch. In granting preliminary approval to a settlement between Bosch and a consumer class, the Court stated that if it "were to find that Bosch and Volkswagen have indeed engaged in a deceptive and fraudulent scheme, such a finding would apply to all of the Class Members' claims. Plaintiffs also allege a common and unifying injury, as their and other Class Members' injuries arise solely from Bosch's and Volkswagen's use of the defeat device. As such, the Court finds predominance is met." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*, 2017 WL 672820, at *8 (N.D. Cal. Feb. 16, 2017). Those are common issues here also—the fraudulent scheme is common to all Franchise Dealers, who allege common and unifying injuries. As the *en banc* Ninth Circuit stated recently, "even if just one common question predominates, 'the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately.'" *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557–58 (9th Cir. 2019) (en banc) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, __ U.S. __, 136 S. Ct. 1036, 1045 (2016)).

Rather than address the first part of the predominance test, Bosch falsely asserts that some common issues are irrelevant:

> Plaintiffs try to obscure the substantial individualized issues that
> preclude class treatment by re-hashing unsubstantiated and

---

[1] *See* Bosch Defendants' Opposition to Plaintiffs' Motion for Class Certification, ECF No. 6603. Plaintiffs refer in this brief to the Bosch defendants collectively as "Bosch," because they do not make any argument relating solely to one of them.

sensationalized allegations of the purported conspiracy in their motion. *But those distractions are irrelevant to the Court's analysis here*, as the parties have stipulated that "[w]hether Robert Bosch LLC or Robert Bosch GmbH engaged in the conduct alleged in the Complaint presents a question of law or fact that is common to the proposed class," and that "[t]he Parties need not brief th[at] matter[]."

Mem. at 4 (emphasis added). In fact, the parties did *not* stipulate that common issues relating to Bosch's engagement in fraud are *irrelevant* to the Court's predominance analysis but instead that whether Bosch engaged in the alleged fraud presents a common issue. Bosch can't eliminate overriding common issues from the predominance calculus by stipulating they *are* common. By not discussing predominant common issues, Bosch concedes commonality. *See In re Napster, Inc. Copyright Litig.*, 2005 WL 1287611, at *7 (N.D. Cal. June 1, 2005) (defendant's claim that individual issues predominated "ignores the fact that the claims of every member of the class are uniformly premised upon the uploading or downloading of a copyrighted work by Napster users").[2]

And Bosch fails to show that Plaintiffs do not satisfy the second part of the predominance test. Bosch's argument rests largely on the erroneous claim that the *only* permissible damages under RICO are those relating to the sale of cars that dealers had in inventory when the Stop-Sale Order was issued. But that presents an issue of law that is common to all Class members—whether Class members can recover lost future profits from (a) termination of the TDI product lines and (b) the buyback of 388,000 in use TDIs, both of which resulted in concrete financial loss. Either all Franchise Dealers can recover such damages or none can. Further, Bosch does not show that the damages model is not "plausible and consistent with their theory of liability." *Wortman*, 326 F.R.D. at 560. Instead, Bosch offers only "challenges to Plaintiffs' method of calculating aggregate

---

[2] Because Bosch does not contest commonality under the first part of the predominance test, the Court could certify the Class for purposes of proving liability even if Plaintiffs did not satisfy the second part of the predominance test. *See Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th Cir. 2014) ("'no matter how individualized the issue of damages may be, determination of damages may be reserved for individual treatment with the question of liability tried as a class action'") (quoting *In re Whirlpool Corp. Front–Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 857 (6th Cir. 2013)); *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 189 (N.D. Cal. 2015) ("the *Leyva* rule applies to require class certification, at least to determine liability issues amenable to classwide adjudication, even where individual determinations of damages may ultimately show that some class members suffered none"); *Frlekin v. Apple Inc.*, 309 F.R.D. 518, 526 (N.D. Cal. 2015) (certifying liability class where fact of injury and damages had to be proved individually). But in any event, as shown below and in their opening brief, Plaintiffs satisfy the second part of the *Wortman/Comcast* test, rendering the entire case amenable to class certification.

1  damages." *Id.* at 559. Even if "[s]ome of these asserted deficiencies may be valid," the "'issue at

2  class certification is not which expert is the most credible, or the most accurate modeler, but rather

3  have the plaintiffs demonstrated that there is a way to prove a class-wide measure of [impact]

4  through generalized proof.'" *Id.* (citation omitted). As shown in Plaintiffs' opening brief and

5  below, Mr. Stockton's aggregate-damages model satisfies that standard.

6       For these reasons, and for the reasons set forth below and in Plaintiffs' opening brief, the

7  motion for class certification should be granted.

8                          **II.      SUMMARY OF THE ARGUMENT**

9       Bosch's challenges to the typicality of the Named Plaintiffs' claims lack merit. Bosch

10 improperly and incorrectly argues that no Named Plaintiff was injured. Mem. at 17. That argument

11 is improper, because "typicality is a 'permissive' standard and 'the focus should be on the

12 defendants' conduct and plaintiff's legal theory, not the injury caused to the plaintiff.'" *Kanawi v.*

13 *Bechtel Corp.*, 254 F.R.D. 102, 110 (N.D. Cal. 2008) (quoting *Simpson v. Fireman's Fund Ins. Co.*,

14 231 F.R.D. 391, 396 (N.D. Cal. 2005) (internal quotation marks omitted)). And it is incorrect in

15 any event, as Plaintiffs will show in their summary judgment Opposition.

16       Nor is there any merit to Bosch's claim that the Named Plaintiffs are inadequate. Plaintiffs

17 establish they do not have any conflicts of interest with other Class members and that they will

18 prosecute the action vigorously on behalf of the class. Bosch's challenge to the adequacy of the

19 *former* Napleton plaintiffs is irrelevant. And Bosch's argument that Brandon VW is inadequate

20 because it "disparages … Volkswagen vehicles," Mem. at 19, is incorrect. The subjective opinions

21 of Brandon VW about *Volkswagen*, which has settled this matter, are irrelevant in this action

22 against *Bosch*, whose supposed paternalistic concern for Class members rings hollow.

23       Contrary to Bosch's argument, the numerosity requirement is satisfied. Bosch erroneously

24 argues that, to establish numerosity, Plaintiffs must "affirmatively demonstrate that there are

25 numerous parties who have actually suffered the harm for which they seek recovery." *See* Mem. at

26 21. Bosch does not cite a single case that supports that assertion. Instead, the cases cited by Bosch

27 hold that when a proposed class includes substantial numbers of members who *indisputably* were

28 not injured, the class cannot be certified. That is not the case here, where all Class members were

1    defrauded by the allege scheme. As discussed in Plaintiffs' opening brief and this brief, Mr.

2    Stockton offers substantial evidence that all Class members suffered injuries. And in any event,

3    "[p]roof is not a prerequisite for class certification." *Wortman*, 326 F.R.D. at 558. Finally, there is

4    no merit to Bosch's claim that joinder of all 652 Class members would be practicable.

5          Bosch's challenge to predominance fails. Bosch does not address the first part of the

6    predominance test, which asks whether "common questions of law and fact predominate over

7    individual questions," *Wortman*, 326 F.R.D. at 557. As Plaintiffs demonstrated in their opening

8    brief, common issues of fact and law plainly predominate. And Bosch's challenge to the second

9    part of the predominance test is misguided. *First*, Plaintiffs will use common evidence to prove that

10   Volkswagen discontinued the TDI line solely because the alleged scheme was exposed, causing the

11   Class members to suffer future lost sales and losses from termination of the TDI product lines.

12   *Second*, Bosch's erroneous argument that, as a matter of law, the Class can't recover damages for

13   future lost sales or losses from termination of the TDI product lines presents a common issue that

14   should be resolved on a classwide basis. *Third*, whether the Stockton model properly aggregates

15   damages for future lost profits also presents a common issue. *Fourth*, Bosch's challenge to

16   Plaintiffs' damages model provide no basis to deny certification, because Bosch fails to show that

17   it is implausibly inconsistent with Plaintiffs' theory of liability. *Fifth*, Bosch's specific challenges

18   to the details of Plaintiffs' model provide no basis to deny certification. *See Wortman*, 326 F.R.D.

19   at 559 ("[s]ome of these asserted deficiencies may be valid," but the "'issue at class certification is

20   not which expert is the most credible, or the most accurate modeler, but rather have the plaintiffs

21   demonstrated that there is a way to prove a class-wide measure of [impact] through generalized

22   proof'") (citation omitted). *Sixth*, Bosch's specific challenges lack merit in any event.

23         Finally, Bosch incorrectly claims that a class action is not superior. The claims of the Class

24   members are not so large as to require individual actions. And any perceived manageability

25   concerns regarding variations in state law may be handled at trial by grouping similar plaintiffs

26   together and treating them as a unit. Moreover, Bosch fails to show that trying more than six

27   hundred individual cases is superior.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.    ARGUMENT

**A.    The named plaintiffs satisfy the typicality and adequacy requirements.**

    **1.    Plaintiffs' claims are typical of the claims of the Class.**

        Bosch incorrectly claims the Named Plaintiffs are atypical. *See* Mem. at 17–18. In granting preliminary approval to a settlement by Bosch and a consumer class, the Court found that the "Settlement Class Representatives' claims are based on the same pattern of Volkswagen's and Bosch's wrongdoing as those brought on behalf of Class Members. The Settlement Class Representatives, as well as Class Members, purchased or leased an Eligible Vehicle equipped with a defeat device. Their claims are typical because they were subject to the same conduct as other Class Members, and as a result of that conduct, the Settlement Class Representatives and Class Members suffered the same injury." *In re Volkswagen*, 2017 WL 672820, at *7. For the same reasons, Plaintiffs' claims are typical here.

        Bosch improperly and incorrectly argues that "no Named Plaintiff was injured as a direct result of the Stop-Sale Orders. As the Bosch Defendants will demonstrate in their forthcoming motion for summary judgment, no Named Plaintiff has any recoverable damages." Mem. at 17. That argument is improper, because "typicality is a 'permissive' standard and 'the focus should be on the defendants' conduct and plaintiff's legal theory, not the injury caused to the plaintiff.'" *Kanawi*, 254 F.R.D. at 110 (quoting *Simpson*, 231 F.R.D. at 396 (internal quotation marks omitted)). And it is incorrect in any event, because Plaintiffs will demonstrate in their Opposition to the summary judgment motion that they suffered injuries.

        The cases cited by Bosch do not support its argument, because they involved plaintiffs who relied on different *types* of claims than the class.[3] Here, the *type* of injury is identical for the named Plaintiffs and Class members, all of whom claim they were injured by their inability to sell and service new and bought-back TDIs. So, unlike in the cases cited by Bosch, the goals of the named

---

[3] *See Arthur v. United Indus. Corp.*, 2018 WL 2276636, at *8 (C.D. Cal. May 17, 2018) ("plaintiff complains of a different *type* of injury than the putative class members"); *Gold v. Lumber Liquidators, Inc.*, 323 F.R.D. 280, 289 (N.D. Cal. 2017) ("Because Mendez no longer has the defective flooring in his home, he no longer shares an interest with putative class members whose primary goal is to obtain full replacement of their bamboo flooring.").

1   Plaintiffs and Class members are the same. *See Corcoran v. CVS Health Corp.*, __ F. App'x __,

2   2019 WL 2454529, at *2 (9th Cir. June 12, 2019) (the "district court abused its discretion in

3   narrowing the proposed classes on typicality grounds," where "the named plaintiffs were injured in

4   the same manner as the absent class members and they suffered the same type of damages").

5        Bosch also erroneously argues that Plaintiffs' claims are atypical even if Bosch's summary

6   judgment motion is *denied*. According to Bosch, denial of the summary judgment motion "would

7   necessarily be based on the conclusion that there are substantial issues as to individual damages

8   that would threaten to become a focus of a trial, to the disadvantage of absent proposed class

9   members." Mem. at 18. In Bosch's topsy-turvy world, whenever a court *denies* a defendant's

10  summary judgment motion that challenges the named plaintiffs' injury claims, it necessarily must

11  also deny any class certification motion. Nonsense. Denial of the summary judgment motion has no

12  bearing on whether individual damage issues exist or on whether such issues predominate over the

13  central question in this case—did Bosch knowingly participate in the emissions-cheating fraud.[4]

14       **2.      The named Plaintiffs adequately protect the interests of the Class.**

15       To establish adequacy, courts "ask: (1) do the named plaintiffs and their counsel have any

16  conflicts of interest with other Class Members and (2) will the named plaintiffs and their counsel

17  prosecute the action vigorously on behalf of the class?" *Volkswagen "Clean Diesel"*, 2017 WL

18  672820, at *7 (citation and internal quotation marks omitted). Bosch does not demonstrate that

19  Plaintiffs have failed to establish adequacy under either prong.

20       Bosch's first argument—that the *former* Napleton plaintiffs "were controlling the action to

21  pursue their individual interests"—is irrelevant. *See* Mem. at 19. As to plaintiff Bertolet VW, the

22  Court found in the consumer action that "nothing in the record suggests the Settlement Class

23  Representatives or Class Counsel have any conflicts of interests with other potential Class

24

25

26  _____

       [4] In a footnote, Bosch erroneously asserts that any claim for "injury based on the Volkswagen
27  Withdrawal … is based on individual commitments each Named Plaintiff claims Volkswagen
    purportedly made to each…." Mem. at 18 n.45. As discussed below, that damage claim does *not*
28  rest on such "individual commitments" but rather on classwide proof that Volkswagen would have
    continued TDI sales but for Defendants' fraudulent scheme.

1    Members." *In re Volkswagen*, 2017 WL 672820, at *7. The facts underlying that finding have not

2    changed, so Plaintiffs Brandon VW and Bozzani VW are also adequate representatives.[5]

3          Bosch nonetheless incorrectly argues that Brandon VW is inadequate because it "disparages

4    … Volkswagen vehicles on which the purported dealer class depends for their livelihood." Mem. at

5    19. The subjective opinions of Brandon VW about Volkswagen, which has settled this matter, are

6    irrelevant in this action *against Bosch*.[6] And Bosch's supposed paternalistic concern for Class

7    members rings hollow. As the Seventh Circuit has stated, "it is often the defendant, preferring not

8    to be successfully sued by anyone, who supposedly undertakes to assist the court in determining

9    whether a putative class should be certified," but that "is a bit like permitting a fox, although with a

10    pious countenance, to take charge of the chicken house." *Eggleston v. Chicago Journeymen*

11    *Plumbers' Local Union No. 130, U. A.*, 657 F.2d 890, 895 (7th Cir. 1981).[7]

12          Finally, the sole case Bosch cites is inapposite. In *Broussard v. Meineke Discount Muffler*

13    *Shops, Inc.,* 155 F.3d 331, 338 (4th Cir. 1998), the court found a conflict where "one group of EDP

14    franchisees [claimed] that their ongoing business relationship with Meineke and their interests in

15    the long-term financial health of the company were imperiled by plaintiffs' efforts to wring a large

16    damage award out of defendants." Here, Bosch has presented no evidence that Brandon VW's

17    efforts in this action imperil the financial health of VW, which has settled this case. Any large

18

19    _____

20       [5] *See* Declaration of Greg Bozzani In Support of Plaintiffs' Motion for Class Certification (ECF No. 6390) and Declaration of Jason M. Kuhn In Support of Plaintiffs' Motion for Class Certification (ECF No. 6391).

21

22       [6] *See Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 893 (N.D. Cal. 2015) ("Whatever [plaintiff's] subjective reasons or motivations…, her general claim challenges Uber's conduct under an objective test and is sufficiently co-extensive with the remainder of the class to satisfy typicality.").

23

24       [7] Moreover. Bosch's speculations about the supposed effect of VW Brandon's opinions on Class members carries no weight. *See, e.g., McLeod v. Bank of Am., N.A.*, 2017 WL 6373020, at

25    *15 (N.D. Cal. Dec. 13, 2017) ("Defendant has not presented evidence to support that theory other than isolated anecdotes and speculation.") (footnote omitted); *Kamakahi v. Am. Soc'y for Reprod.*

26    *Med.*, 305 F.R.D. at 184 ("There is no evidence or even suggestion that any class representative or member signed an agreement with the Defendants compelling arbitration of their claims."). *Cf. In*

27    *re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2016 WL 6248426, at *9 (N.D. Cal. Oct. 25, 2016) ("claim that 'hundreds if not thousands of other dealers' did not receive notice is unsupported speculation"), *aff'd sub nom. In re Volkswagen "Clean Diesel"*

28    *Mktg., Sales Practices, & Prod. Liab. Litig.*, 895 F.3d 597 (9th Cir. 2018).

1    damage award against Bosch would have no bearing on Volkswagen's financial health. Bosch's

2    paternalistic argument, which is for its own benefit, should be rejected.

3    **B.    Plaintiffs establish numerosity.**

4         Bosch erroneously contends that, to establish numerosity, Plaintiffs must "affirmatively

5    demonstrate that there are numerous parties who have actually suffered the harm for which they

6    seek recovery." *See* Mem. at 21. None of the cases cited by Bosch supports that proposition. Those

7    cases instead hold that when a proposed class includes substantial numbers of members who

8    *indisputably* were not injured, the class cannot be certified. For example, in *Siles v. ILGWU Nat'l*

9    *Ret. Fund*, 783 F.2d 923, 930 (9th Cir. 1986), the plaintiff sued on behalf of a class denied pension

10   benefits, but she only proved the number of employees who lost jobs, with "no evidence regarding

11   how many of these employees did not receive a pension…." In contrast, the putative Class here is

12   Volkswagen-Branded Franchise Dealers who had and have the exclusive right to sell and provide

13   warranty service for new Volkswagen cars. Similarly, in *Diacakis v. Comcast Corp.*, 2013 WL

14   1878921 (N.D. Cal. May 3, 2013), the court explained that "Plaintiff contends that the numerosity

15   requirement is satisfied based on the fact that there were 649,576 Triple Play subscribers in

16   California as of August 2010…. That fact is uncompelling. Plaintiff offers no evidence regarding

17   the number of those subscribers who were allegedly misled by Comcast into believing there would

18   be no modem-related fees if they signed up for the Triple Play package." *Id*. at *5. Here, Plaintiffs

19   limit the class to dealers who allegedly were defrauded.[8]

20        So there is no merit to Bosch's argument that Plaintiffs cannot establish numerosity because

21   they allegedly "offer no facts that any of them—much less a sufficiently large number—were

22   injured." Mem. at 22. As discussed in Plaintiffs' opening brief and this brief, Mr. Stockton offers

23   substantial evidence that all Class members suffered compensable injuries. And in any event,

24   "[p]roof is not a prerequisite for class certification." *Wortman*, 326 F.R.D. at 558.

25

26        [8] The other cases cited by Bosch are also inapposite. *See Celano v. Marriott Int'l, Inc.*, 242
     F.R.D. 544, 549 (N.D. Cal. 2007) ("Plaintiffs' census data and statistics are too ambiguous and
27   speculative to establish numerosity."); *Golden v. City of Columbus*, 404 F.3d 950, 966 (6th Cir.
     2005) ("reference to the total number of tenants in Columbus is not probative of the number of
28   tenants reasonably likely to face the harm for which Golden seeks redress").

1    Finally, there is no basis for Bosch's *ipse dixit* that certification should be denied because

2    joinder of all 652 dealers would be practicable. *See Hatamian v. Advanced Micro Devices, Inc.*,

3    2016 WL 1042502, at *4 (N.D. Cal. Mar. 16, 2016) (a "proposed class of at least forty members

4    presumptively satisfies the numerosity requirement") (internal quotation marks and citation

5    omitted); *Yamada v. Nobel Biocare Holding AG*, 275 F.R.D. 573, 577 (C.D. Cal. 2011) ("Joining

6    more than one hundred plaintiffs is impracticable.").[9]

7    **C.    Plaintiffs' damage model satisfies the second part of the predominance inquiry.**

8    Bosch erroneously claims that purported "individualized issues of injury, causation, and

9    damages" predominate over common issues. Mem. at 22 (capital letters omitted). That argument is

10   incorrect. *First*, as explained in the Introduction, above, Bosch does not address the first part of the

11   predominance inquiry. By ignoring the common issues that the Court identified in approving

12   Bosch's settlement with consumers, Bosch concedes the first part of the predominance test.

13   *Second*, as shown in Plaintiffs' opening brief and in this Section, Bosch fails to show that

14   Plaintiffs do not satisfy the second part of the predominance test. *See Wortman*, 326 F.R.D. at 558

15   ("To satisfy the second part of the predominance inquiry, a plaintiff must present a damages model

16   that identifies damages that stem from the defendant's alleged wrongdoing and that is 'susceptible

17   of measurement across the entire class.' *Comcast*, 133 S. Ct. at 1433–34."). Bosch's arguments to

18   the contrary are based on misinterpretations of class-certification law and are factually incorrect.[10]

19

20   _____

21   [9] The Court cited those two cases in finding with respect to the Volkswagen settlement that there "are 652 Eligible Dealers and thus 652 potential Class Members…. Plaintiff therefore

22   satisfies the numerosity requirement." I*n re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2016 WL 6091259, at *7 (N.D. Cal. Oct. 18, 2016).

23   [10] Bosch's assertion that Plaintiffs advance a "concoction of eleventh-hour liability and damages theories" is wrong. *See* Mem. at 3. Bosch has known Plaintiffs' liability and damages

24   theory since December 12, 2016, when Plaintiffs filed an expert report in support of Volkswagen's settlement in this case. *See* ECF No. 2475 (Dec. 12, 2016). That report set out a version of the lost-

25   profit contribution model used here that was also based upon the TDI product line being permanently terminated as a result of Defendants' alleged scheme. And on September 4, 2018,

26   Plaintiffs served supplemental disclosures that included a detailed description of the lost-profit contribution model, including a proposed goodwill damages offset. *See* Declaration of Steve W.

27   Berman In Support of Plaintiffs' Reply In Support of Motion for Class Certification ("Berman Decl."), Ex. 5. So Bosch has known Plaintiffs' damages model for at least over a year, if not for

28   nearly three years.

1       **1.     Plaintiffs will use common evidence to prove that Class members would have continued to receive TDIs if the alleged scheme had not been exposed.**

Bosch erroneously claims that Plaintiffs "assume" that "(1) but for the Bosch Defendants' conduct, an individual dealer would have received diesel vehicles from Volkswagen for years into the future—until at least 2025; and (2) that Plaintiffs have some cognizable right or expectation to those hypothetical future TDI vehicles." Mem. at 26. Bosch is wrong on both points.

      **a.     Plaintiffs will use common evidence to establish that Volkswagen would have increased sales of TDIs but for revelation of the scheme.**

Bosch erroneously claims that in order to prove damages from lost future sales, "each Named Plaintiff is left to rely on alleged individualized communications and distinctive state laws to establish a purported expectation for a perpetual stream of diesel vehicles from Volkswagen." Mem. at 28. That is not *Plaintiffs'* theory of the case. And Bosch must address Plaintiffs' theory of the case, not a theory of its own creation.[11]

Plaintiffs' theory is that common evidence will prove that Volkswagen discontinued the TDI line because the admissions-cheating scheme was exposed. For example, before revelation of the emissions-cheating conspiracy, Volkswagen projected that TDI sales would increase from 22.6% of all Powertrain sales in 2016 to 27.8% in 2026.[12] Even in October 2015, weeks *after* the EPA issued the first NOV on September 18, 2015, Volkswagen projected that the 2.0 TDI line would account for 29.20% of all Powertrain sales in 2021.[13]

And common evidence shows that Volkswagen recognized the precarious position of its TDI line following revelation of the emissions-cheating fraud. A September 2015 presentation

---

[11] *See Parsons v. Ryan*, 754 F.3d 657, 683 n.25 (9th Cir. 2014) ("[W]hether there is a systemic deficiency in the availability of community-based services, and whether that deficiency follows from the State's policies and practices, are questions central to plaintiffs' theory of the case. These questions will, necessarily, be answered similarly for every class member."); *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 365 (N.D. Cal. 2018) ("Even if Defendant's argument does go to predominance, Defendant's argument still fails because it misunderstands Plaintiffs' theory of the case."); *Grace v. Apple, Inc.*, 328 F.R.D. 320, 333 (N.D. Cal. 2018) ("Plaintiffs' theory of the case is that Apple is liable because the FaceTime Break reduced the monetary value of class members' iPhones. Determining precisely how often a class member like Grace used FaceTime is irrelevant to that analysis.").

[12] *See* Berman Decl., Ex. 1 at VW-MDL2672-15624765.

[13] *Id.*, Ex. 2 at VW-MDL2672-32966173.

recommended that TDI Management "[i]nvestigate pull-ahead of powertrain/electrification strategy to substitute TDI risk, support brand and ensure compliance" and *Change Volkswagen from TDI to electrified brand*[.]"[14] By early 2016, Volkswagen realized that its reputation suffered "severe damages" and it was the "brand America can't stand anymore."[15] In fact, a Q1 2016 brand survey revealed that "VW's imagery gaps to key competitors widen after the TDI crisis" and that "Key Brand Indicators" had declined since the revelation of the emissions-cheating conspiracy.[16] To repair this reputational harm, a "US Brand Positioning 2025" presentation recommended an "[a]ggressive electrification expansion as foundation for 2025" that would allow Volkswagen to move "[f]rom TDI emissions scandal to a leader in the electric mobility[.]"[17]

In sum, Plaintiffs will present common evidence that until the emissions-cheating fraud was exposed, Volkswagen had planned for the TDI line to account for an increasingly larger portion of its sales until the revelation of the scheme. But once Volkswagen recognized the harm that the TDI scandal caused to its brand and reputation, it decided the best way forward was to terminate the TDI line and focus its priorities elsewhere. Even the articles and press releases cited by Bosch are consistent with this theory.[18]

---

[14] *Id.*, Ex. 1 at VW-MDL2672-15624757 (emphasis in original).

[15] *Id.*, Ex. 3 at VW-MDL2672-21109946.

[16] *Id.* at VW-MDL2672-21109944.

[17] *Id.* at VW-MDL2672-21109948, 9959.

[18] In the *Handelsblatt* article, Volkswagen's Herbert Diess makes clear that the "legal framework" was the reason the company terminated the TDI line. *See* Slater Decl., Ex. 45. Volkswagen's press release citing its strategy for the next decade similarly supports Plaintiffs' theory. In the release, Diess states "we want to create a new Volkswagen," the obvious impetus being the need to move away from the "old" Volkswagen, which was mired in the emissions-cheating conspiracy. *See id.* at Ex. 46. The remaining articles refer to the emissions-cheating conspiracy as the reason for the termination of the TDI line. *See id.* at Ex. 47 ("*Eager to put its diesel woes behind it*, Volkswagen has hatched a new vision for the brand and for North America….") (emphasis added); *id.* at Ex. 48 ("Volkswagen will take a step back from the diesel powertrains that defined its U.S. vehicle lineup for the better part of a decade amid a repositioning of the brand *in the aftermath of the company's emissions scandal*...") (emphasis added). Regardless, whether Volkswagen terminated the TDI line because of the emissions-cheating conspiracy is a common merits issue that will be established by common evidence.

1

**b.     Under RICO and state law, Plaintiffs may recover lost future profits.**

2      Bosch incorrectly argues the Class cannot recover damages for lost future profits because,

3   as a matter of law, they purportedly "could have no right or expectation of future TDI vehicles."

4   Mem. at 26. The Ninth Circuit has held that "[t]here may be a practical difference between current

5   and future employment for purposes of RICO ... but this difference is not relevant to whether there

6   was an injury to 'business or property.'" *Diaz v. Gates,* 420 F.3d 897, 900–01 (9th Cit. 2005). *See*

7   *also Guerrero v. Gates*, 442 F.3d 697, 707 (9th Cir. 2006) (plaintiff adequately asserted claim

8   under RICO based on allegation of "injury due to lost employment prospects"). Similarly, in

9   *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 649 (2008), the Court held that the plaintiffs

10  suffered an injury to business or property when they were deprived of "valuable liens they

11  otherwise would have been awarded." So Plaintiffs here suffered a compensable injury when they

12  were deprived of sales they otherwise would have made.[19] And in any event, this issue presents a

13  classwide question. Either Franchise Dealers can recover for profits they lost from not selling and

14  servicing 2016–2020 TDIs that would have by now already been sold, or none of them can. Either

15  all of the Franchise Dealers can recover from the profits they will lose in the future from not selling

16  and servicing 2021–2025 TDIs, or none of them can.

17      Bosch also misleadingly and briefly asserts that in some states, new businesses cannot

18  recover lost profits "as a matter of law." *See* Mem. at 32. Bosch does not demonstrate that even a

19  single franchise is arguably barred as a matter of law from recovering lost profits here but instead

20  vaguely claims "[i]t appears that 65 dealers … have franchise dates of 2014 or 2015." *Id.* Bosch

21  then incorrectly argues that "brief survey of the law applicable to those dealerships shows that any

22

23      [19] Bosch ignores those cases and instead cites *Oscar v. Univ. Students Co-Op. Ass'n*, 965 F.2d 783 (9th Cir. 1992), and *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037 (E.D. Mich. 2018). In
24  *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1055 (9th Cir. 2008), the Court explained that the district court erroneously relied on *Oscar* instead of *Diaz*, because "we have overturned the
25  rules on which the court relied.… We therefore remand the RICO claim to the district court for reconsideration of the compensable injury requirement under *Diaz.*" And the *Duramax* court,
26  which is not bound by *Diaz*, discussed claims by consumers that were "contingent on future, uncertain developments." 298 F. Supp. 3d at 1071. Here, in contrast, Plaintiffs' alleged lost profits
27  are based on the stop-sale order, TDI termination, and TDI buy-back, which are events that have come to pass, and thus not contingent at all. And in any event, Bosch's arguments apply classwide
28  and should be resolved on the merits, not at the class-certification stage.

claim that they would make for lost profits of future sales would be inherently speculative and subject to substantial defenses (and in some States might not be recoverable as a matter of law)." Bosch's "brief survey" of four cases undermines its argument. For example, its argument is undermined by its citation to *Fiberlok, Inc. v. LMS Enters., Inc.*, 976 F.2d 958, 962–63 (5th Cir. 1992), in which the court held that counterclaimant LMS could recover lost profits, because it "was neither an unestablished business at the time the contract was confected nor when it was breached. LMS had been in the business of manufacturing micronized resins for use in fiberbonding for more than a year prior to contract execution, and LMS's financial statements indicate that year was a profitable one." Similarly, Bosch does not prove that any Class member was unestablished. And in another case cited by Bosch, the court rejected a motion to "exclude all lost profits as calculated by" plaintiff's expert, because his calculations "are based upon appropriate data." *Euroholdings Capital & Inv. Corp. v. Harris Tr. & Sav. Bank*, 602 F. Supp. 2d 928, 937 (N.D. Ill. 2009). The calculations here by Plaintiffs' expert similarly are based upon appropriate data.[20] Moreover, the purported "new businesses" are Franchise Dealers, and a franchise is not the same as a wholly new venture for purposes of calculating lost profits.[21] And finally, the other cases cited by Bosch are inapposite. *See Washington v. Kellwood Co.*, 714 F. App'x 35, 40 (2d Cir. 2017) (where plaintiff "sold less than $200,000 in merchandise to only a few small retailers and high school and college

---

[20] *See Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 711 (9th Cir. 1990) ("Expert testimony alone can provide a sufficient factual basis for an award of loss of profits."); *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 240 (9th Cir. 1987) (explaining that another case, "we determined that because the size of the market for 1966 model year cars could be estimated with reasonable accuracy, '[n]o difficulties with projecting market share existed in late 1964 that do not exist today,'" so that "the uncertain extent of such damage was neither too speculative nor its amount or nature unprovable") (quoting *In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68, 73 (9th Cir. 1979)).

[21] *See, e.g.*, *No Ka Oi Corp. v. Nat'l 60 Minute Tune*, 71 Wn. App. 844, 851-52 (1993) ("It has come to be recognized that in the arena of franchise or chain stores, 'courts are displaying increasing reluctance [to bar the award of lost profits] because of the inherent characteristics of franchise outlets, which 'eliminate nearly all uncertainty.'"); *Wilbern v. Culver Franchising Sys., Inc.*, 2015 WL 5722825, at *31 (N.D. Ill. Sept. 29, 2015) ("Generally, there is no one method by which a plaintiff must establish lost profits with reasonable certainty. In the franchise context, however, courts have held that historical data from franchise operations can be a proper yardstick for losses sustained by a potential franchisee who was prevented from going into the franchise business by the wrongful conduct of the defendant."). *See also* Rebuttal Expert Report of Edward Stockton at ¶ 46 (attached as Exhibit 4 to the Berman Decl.).

1    athletic team, … the expert's testimony that SP's revenues were reasonably certain to increase

2    from a few hundred thousand dollars to approximately $80,000,000 in two years was so unfounded

3    that it failed to establish any legal basis for awarding lost-profits damages"); *Air Caledonie Int'l v.*

4    *AAR Parts Trading, Inc.*, 315 F. Supp. 2d 1319, 1344 (S.D. Fla. 2004) ("AAR's entire lost profit

5    claim is based on 'profits' made from a single engine sale to FedEx, and it failed to present

6    evidence that similar profits were made on its other engine sales.").

7         **2.     The Stockton model properly calculates damages on an aggregate basis.**

8         Bosch erroneously argues at length that the Stockton model impermissibly aggregates

9    damages for future lost profits. *See* Bosch Mem. at 33–43. As a general proposition, aggregate

10   damages are permissible in class actions. In *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1132

11   (9th Cir. 2017), the Ninth Circuit explained that "in cases in which aggregate liability can be

12   calculated …, 'the identity of particular class members does not implicate the defendant's due

13   process interest at all' because '[t]he addition or subtraction of individual class members affects

14   neither the defendant's liability nor the total amount of damages it owes to the class.'" *Id.* (citation

15   omitted). *See also Torres v. Mercer Canyons Inc.*, 835 F.3d at 1140–41 (9th Cir. 2016) ("Of

16   course, the partitioning of damages among class members may lead to individual calculations. Yet

17   those calculations would not impact a defendant's liability for the total amount of damages.").[22]

18        Bosch tries to distinguish *Torres* by incorrectly asserting, without any proof, that "the

19   Stockton model relies upon probability instead of logic to aggregate damages across a wholly-

20   disparate class that have little in common." *See* Mem. at 43 n.100. *Torres* explained that "[h]ere,

21   proof is not a matter of probability—it is a matter of logic that an aggregate underpayment means

22

23        [22] *See also Grace v. Apple, Inc.*, 328 F.R.D. at 339 ("that [plaintiff's expert] has examined the
24   market as a whole is unproblematic because she is attempting to measure market demand in the
     aggregate rather than demand for un-upgraded iPhones"); *In re Lidoderm Antitrust Litig.*, 2017 WL
25   679367, at *1 (N.D. Cal. Feb. 21, 2017) (the "experts have shown how to determine aggregate
     damages—carving out purchases made by entities or individuals who are not included within the
26   class definitions—with classwide proof."); *In re Optical Disk Drive Antitrust Litig.*, 2016 WL
     467444, at *10 (N.D. Cal. Feb. 8, 2016) ("the IPPs have adequately shown that any questions
27   regarding the appropriate degree to which data should be aggregated to derive reliable results fall
     on the 'merits' side of the line and do not present grounds for denying class certification at this
28   point in time").

1     that Mercer underpaid some, possibly all, subclass members." 835 F.3d at 1140. Similarly here, it

2     is a matter of logic and common sense that aggregate lost sales means that some, possibly all, Class

3     members suffered lost profits, because they were in the business of selling TDIs. *See Wortman*, 326

4     F.R.D. at 560 (plaintiffs' aggregate-damages model "is partially based on a common-sense theory

5     that 'there would be no reason to collude on fuel surcharges if [ANA and JAL] were going to

6     continue to compete on base fares'"). And any argument by Bosch to the contrary is a merits issue.

7           In support of its erroneous argument that Plaintiffs improperly aggregate damages, Bosch

8     relies on two out-of-circuit cases in which (unlike here) a substantial portion of the proposed class

9     *indisputably* suffered no injury. In *In re Asacol Antitrust Litig.*, 907 F.3d 42, 51, 53 (1st Cir. 2018),

10    the First Circuit explained that a proposed class included people who suffered no injury, because it

11    indisputably "includes consumers who would have continued to purchase a brand drug for various

12    reasons, even if a cheaper, generic version had been available." The court held that "[o]ur inability

13    to fairly presume that these plaintiffs can rely on unrebutted testimony in affidavits to prove injury-

14    in-fact is fatal to plaintiffs' motion to certify this case." Similarly, in the other case cited by Bosch,

15    the D.C. Circuit affirmed the denial of class certification where the plaintiffs' damage model

16    "indicates that 2,037 members of the proposed class—or 12.7 percent—suffered 'only negative

17    overcharges' and thus *no* injury from any conspiracy." *In re Rail Freight Fuel Surcharge Antitrust*

18    *Litig. – MDL No. 1869*, 934 F.3d 619, 623 (D.C. Cir. 2019). "So even assuming the model can

19    reliably show injury and causation for 87.3 percent of the class, that still leaves the plaintiffs with

20    no common proof of those essential elements of liability for the remaining 12.7 percent." *Id.* at

21    623–24. Here, Stockton's model sufficiently shows, for certification purposes, that every putative

22

23

24

25

26

27

28

Class member suffered injury.[23] Even if it appeared that some class members suffered no injuries, which is not the case here, a class could still be certified.[24]

Moreover, Bosch's specific challenges to Plaintiffs' damages model provide no basis to deny certification, because Mr. Stockton's model of aggregate damages is plausible and consistent with Plaintiffs' theory of liability. *See Wortman*, 326 F.R.D. at 560 ("Plaintiffs' proposed aggregate damages models are plausible and consistent with their theory of liability. Accordingly, they are sufficient to pass the class certification stage."). Plaintiffs' theory of liability is that the conspiracy to defeat emissions standards, and the subsequent reveal of that conspiracy, resulted in the stop-sale order, TDI buy-back and termination of the TDI line. The damages model proffered by Plaintiffs measures how these events affected the profits of the Franchise Dealers. *See* Stockton Report at -3; Stockton Rebuttal ¶ 1; Mot. at 28-31. And Bosch does not argue that there is mismatch between Plaintiffs' damages model and the theory of liability but rather asserts merits arguments about the inputs used and not used in Mr. Stockton's model and the proper amount of damages.

And Bosch does not address *why* aggregate damages are preferable to individual damage calculations in this matter. As explained in the Stockton Report, Plaintiffs' model calculates damages on a class-wide level that is more accurate than could be determined from summing the individual damages of all 652 Franchise Dealers. This is because customer shift from one dealership to another (where a customer buys a car from one dealer but chooses to have service work done elsewhere) has no effect on aggregate damages, but necessitates a wider estimation band on a dealer-by-dealer basis to account for the loss or gain of some servicing and/or trade-in

---

[23] The other cases cited by Bosch are also inapposite. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 (2011) ("Respondents have not identified a common mode of exercising discretion that pervades the entire company…."); *Cummings v. Connell*, 402 F.3d 936, 944 (9th Cir. 2005) ("The purpose of a class action is to obviate the need for all similarly situated persons to file separate lawsuits when impractical to do so. This purpose is defeated if only the named individuals recover nominal damages.").

[24] *See, e.g.*, *Tyson Foods*, 136 S. Ct. at 1043 (affirming district court certification of a class of 3,344 members even though it was "undisputed that hundreds of class members suffered no injury in this case") (Roberts, C.J., concurring); *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1137 (9th Cir. 2016) (the "fortuitous non-injury to a subset of class members does not necessarily defeat certification of the entire class").

revenue from customer shift.[25] Nonetheless, the economic soundness of Plaintiffs' class-wide damages model allows it to be applied to Plaintiffs individually to estimate their damages in this case and thus unequivocally establish their standing as class representatives.

Rather than try to rebut Mr. Stockton's explanation of why aggregate damages are more preferable than individual calculations, Bosch challenges the details of Mr. Stockton's model. But those challenges are misplaced at the class certification stage. In *Wortman*, the defendant argued that "there are various deficiencies with Plaintiffs' expert's damages model, including: … the use of averages to mask variability among the proposed class members, 'many of which ... did not suffer harm.'" 326 F.R.D. at 559.[26] The Court noted that "[s]ome of these asserted deficiencies may be valid" but explained that the "'issue at class certification is not which expert is the most credible, or the most accurate modeler, but rather have the plaintiffs demonstrated that there is a way to prove a class-wide measure of [impact] through generalized proof.'" *Id.* (quoting *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 604 (N.D. Cal. 2010), *amended in part*, 2011 WL 3268649 (N.D. Cal. July 28, 2011)). Without addressing the defendants' arguments on the merits, the Court found that "Plaintiffs' proposed aggregate damages models are plausible and consistent with their theory of liability. Accordingly, they are sufficient to pass the class certification stage." *Id.* at 560. Similarly, the Court should not address the merits of Bosch's challenges to the Stockton model, because Plaintiffs' propose aggregate damages model is plausible and consistent with their theory of liability. Bosch's arguments that the Stockton model are deficient should be presented "at trial, when the Court will scrutinize them closely with the benefit of additional evidence and testimony." *Id. See also Corcoran*, __ F. App'x __, 2019 WL 2454529, at *3 ("Dr. Barlag's analysis doesn't show Dr. Hay's analysis to be without foundation or the product of questionable or unreliable methodology; if credited, Dr. Barlag's testimony does

---

[25] *See* Stockton Report at 26; Stockton Rebuttal Report at ¶¶ 44-45.

[26] The defendants also asserted the following alleged deficiencies: "1) failure to account for 'yield-management' software systems; (2) exclusion of certain Japan Class itineraries; (3) the presence of 'false positives;' (4) failure to account for individual consumer preferences, which may induce customers to make purchasing decisions based on factors other than price…." *Id.* at 559.

little more than cast some doubt on Dr. Hay's conclusions. Resolving the conflict between these experts is a matter for the jury, not a basis to exclude one of them under Rule 702.").[27]

And in any event, Bosch's challenges to the Stockton model lack merit. Bosch contends that Mr. Stockton "did not take into account the individual factors that would cause variation among dealers in their ability to generate profits from future TDI sales, and therefore it could not be applied to measure the sum of individual damages." Mem. at 34–35. Bosch bases that argument solely on the critique offered by its own expert, Richard Hoffman. *See id*. at 35–43. To the extent Mr. Hoffman's opinions are admissible at all—which is doubtful[28]—the critiques either prove his lack of expertise in economics and econometrics or, as explained by Mr. Stockton in his rebuttal report, are misguided. What is important for purposes of this motion from the Hoffman report is what it *does not challenge* about Plaintiffs' damages model, including:

  a.   The use of profit contribution analysis to evaluate dealership profitability and change in profitability;

  b.   The specific profit contribution model used to evaluate incremental profitability by dealership department;

  c.   The use of a discount factor to normalize profit changes to a common time period;

  d.   The relationship between new vehicle sales and downstream used vehicle sales;

  e.   The relationship between new vehicle sales and downstream parts and service sales;

  f.   The method used to measure the depletion of the unit-in-operation base associated with the buyback of in-service vehicles;

  g.   The method to quantify the average in-service life of Volkswagen vehicles;

[27] In *Yokoyama v. Midland Nat'l Life Ins. Co.*, the district court denied class certification because damages calculations would require consideration of "the financial circumstances and objectives of each class member; their ages; the [indexed annuity product ('IAP')] selected; any changes in the fixed interest rate for that particular IAP; the performance of the selected index; any changes in the index margin for that particular IAP; any cap on the indexed interest; the length of the surrender periods; whether the individual had undertaken or wanted to undertake an early withdrawal of funds; any benefit the individual policy holder derived from the form of the annuity itself, including the tax-deferral of credited interest; and the actual rate of return on the IAP." 594 F.3d 1087, 1093–94 (9th Cir. 2010). Nonetheless, the Ninth Circuit reversed, because "damage calculations alone cannot defeat certification.... Thus, because there are no individualized issues sufficient to render class certification inappropriate under Rule 23, class issues predominate." *Id*. at 1094.

[28] *See* Plaintiff's Notice of Motion and Motion to Exclude the Report and Expert Testimony, or portions thereof, of Richard S. Hoffman, filed concurrently with this reply.

h.  The aging of the unit-in-operation base for the purpose of generating fixed operations revenue;

i.  The use of a Baseline TDI Sales as a forecast element;

j.  The general use of a Competitive Registration Adjustment to account for external market factors that might affect TDI sales;

k.  The use of an estimated 6-year average new vehicle purchase cycle; and

l.  The distribution of individual experiences of dealerships within the class.

As explained by Mr. Stockton in his rebuttal report, "Mr. Hoffman's Report does not confront the suitability of the Damages Model to quantify the economic losses that I propose to quantify in this matter. Its criticisms of the variable inputs into the Damages Model take issue with the proposed execution of the inputs or the values employed for those inputs by the Stockton Report. Its allegation that the Stockton Report fails to include sources of potential mitigation ignores that these potential sources of mitigation, if appropriate, could be applied within the structure of the Stockton Model."[29]

Moreover, Mr. Hoffman's critiques demonstrate a paucity of expertise in the economic and econometric concepts that underlie the proposed damages model. For example, he fails to present his criticisms in falsifiable form, meaning they fail basic concepts of testability and application to an empirical model.[30] *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993) (the "'criterion of the scientific status of a theory is its falsifiability, or refutability, or testability'") (citation omitted); *Advanced Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.*, 2010 WL 11575000, at *3 (N.D. Cal. Aug. 30, 2010) (finding expert opinion unreliable when there was no evidence expert's theory was "falsifiable, refutable, or testable"). In sum, the Hoffman Report is Bosch's single pillar for any argument that Plaintiffs' damages model is infirm, yet the expert himself, and his conclusions carry no relevant evidentiary weight.

---

[29] Stockton Rebuttal Report at ¶ 11.

[30] *See* Stockton Rebuttal Report at ¶¶ 12, 39-41.

1

**3.        The Stockton model does not conceal uninjured Class members.**

2          Bosch incorrectly claims that Plaintiffs' damages model "is fatal to predominance" because

3     it "would compensate a significant portion of the class that does not have an actual injury is fatal to

4     predominance." Mem. at 43–44. Bosch's argument rests on the remarkable premise that "[t]here is

5     *ample reason to believe* (and Plaintiffs have offered no evidence to refute) that the experience of

6     the three Named Plaintiffs were shared by all (or virtually all) other class members and they too

7     would have trouble proving any damages or injury, as will be shown in the Bosch Defendants'

8     forthcoming summary judgment motion." Mem. at 44 (footnote omitted; emphasis added). Bosch's

9     professed belief in its supposed evidence provides no basis to deny class certification. And in any

10    event, "[p]roof is not a prerequisite for class certification." *Wortman*, 326 F.R.D. at 558. *See also*

11    *In re Capacitors Antitrust Litig. (No. III)*, 2018 WL 5980139, at *7 (N.D. Cal. Nov. 14, 2018)

12    ("[D]efendants demand too much. In effect, they argue that DPPs must prove that each and every

13    putative class member was harmed before certification can be granted. But Rule 23 does not

14    require proof of impact on each purchaser before a class can be certified.").

15          And Bosch's claim that the Named Plaintiffs were not injured is both misplaced and wrong.

16    *See* Mem. at 11-13. Bosch erroneously asserts that, "[a]s will be demonstrated in the Bosch

17    Defendants' forthcoming motion for summary judgment, the Named Plaintiffs did not suffer any

18    damages from the Stop-Sale Orders." Mem. at 11. Bosch ignores damages suffered by Plaintiffs

19    from the TDI buy-back (which was the direct result of Volkswagen's settlement with regulators

20    and consumers) and from lost future TDI sales (which were the direct result of Volkswagen's

21    decision to abruptly abandon its tainted TDI products in the United States while its stop-sale orders

22    were still in force). So any profits that Named Plaintiffs and Class members may have received

23    from selling existing TDI inventory after the stop-sale orders were lifted is a matter of mitigation,

24    which Mr. Stockton has explained may be taken into account by his model on a class-wide basis.

25    Further, Bosch does not show that it is entitled to mitigation, which presents a common issue.[31]

26
          ────────────────────────

27          [31] Bosch's Eleventh Affirmative Defense alleges its claim of mitigation: "Plaintiffs failed to
      exercise due care to investigate these matters and take steps to ensure that they were selling legally
      compliant vehicles and otherwise protect their interests, electing instead to turn a blind eye and
28    reap premium profits from their promotion of the Affected Vehicles." ECF No. 6032, at 97. But

1    **D.    The state-law claims do not present unmanageable individualized issues.**

2          Bosch incorrectly argues that "variations in state laws regarding the prima facie elements to

3    show a conspiracy claim, standards of proof, and availability of damages prohibit the certification

4    of a nationwide class." *See* Mem. at 48. Bosch cites only two differences among the Plaintiffs'

5    home-state laws and does not identify any material differences among the conspiracy elements of

6    the remaining states outlined in Plaintiffs' Appendix 1 to their motion. Instead, Bosch merely avers

7    that civil conspiracy under Pennsylvania law requires a showing of malice, which Florida and

8    California do not require. *See* Mem. at 48. But that difference is not sufficient to deny certification,

9    because it can be presented in jury instructions.[32] And in any event, malice can be proved under the

10   law of Pennsylvania by proof that Bosch had an "intent to injure." *See, e.g., Guy Chem. Co., Inc. v.*

11   *Romaco S.p.A.*, 2009 WL 840386, at *16 (a cause of action for civil conspiracy requires a plaintiff

12   to allege that the defendant had "an unjustified intent to injure, or acted with malice"). And to

13   prevail on the RICO claim, Plaintiffs must prove that Bosch had an intent to defraud, so Plaintiffs

14   will not need to present any unique evidence or legal arguments on behalf of Franchise Dealers

15   from Pennsylvania.

16

17

_____

18   Bosch asserts no basis for that claim, legally or factually. *First*, it does not even try to show that
     Class members had a duty to investigate whether Bosch was participating in a fraudulent RICO
19   scheme, let alone that they ever knew about the scheme before it became public. A dealer cannot
     turn a "blind eye" to a scam of which it is unaware. *Second*, such claims are irrelevant. *In In re*
20   *TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 6000154, at *3 (N.D. Cal. Nov. 30, 2012), the
     court explained that "[w]hile an antitrust plaintiff alleging a refusal to deal or vertical price-fixing
21   could reasonably be expected to mitigate damages by finding another supplier, a victim of
     horizontal price-fixing does not have this option." Similarly here, Class members are Volkswagen
22   dealers and had no other source of supply. *Accord, In re Cathode Ray Tube (CRT) Antitrust Litig.*,
     2016 WL 6216664, at *11 (N.D. Cal. Oct. 25, 2016) (excluding evidence of alleged mitigation
23   where defendants argued plaintiffs "failed to mitigate their damages by either (a) ceasing to
     purchase price-fixed CRTs from cartel members or (b) reporting the conspiracy to authorities").
24   These holdings apply here, because "[w]e may fairly credit the 91st Congress, which enacted
     RICO, with knowing the interpretation federal courts had given the words earlier Congresses had
25   used first in § 7 of the Sherman Act, and later in the Clayton Act's § 4." *Holmes v. Sec. Inv'r Prot.*
     *Corp.*, 503 U.S. 258, 268 (1992).

26        [32] In any event, malice can be established under Pennsylvania law by evidence that Bosch had
     an "intent to injure." *See, e.g., Guy Chem. Co., Inc. v. Romaco S.p.A.*, 2009 WL 840386, at *16
27   (W.D. Pa. Mar. 27, 2009) (a cause of action for civil conspiracy requires a plaintiff to allege that
     the defendant had "an unjustified intent to injure, or acted with malice").

28

PLAINTIFFS' REPLY ISO MOTION FOR CLASS CERTIFICATION - 21
Case No.: 02672-CRB (JSC)
010584-12/1200574 V1

1    Bosch also asserts, without explaining why it should preclude certification, that the state

2    laws present variations as to burden of proof, since California and Florida require a "preponderance

3    of the evidence" standard while Pennsylvania applies a "clear and convincing standard." *See* Mem.

4    at 48. Bosch ignores that where a claim involves common questions with common answers, like

5    Plaintiffs' civil-conspiracy claims here, variations in the burden of proof can be handled by special

6    verdict forms. *See* Mot. at 33 (citing *Spencer v. Hartford Fin. Servs. Grp., Inc.*, 256 F.R.D. 284,

7    301 (D. Conn. 2009)). And Bosch does not respond to Plaintiffs' argument that common-law fraud,

8    which is the underlying tort Plaintiffs must establish to prevail on their civil-conspiracy claims,

9    will be proved with common evidence. As a result, Bosch concedes that common questions

10   predominate for this overarching issue.

11    The remaining cases cited by Bosch are inapposite. In *Mazza v. Am. Honda Motor Co.*, 666

12   F.3d 581, 594 (9th Cir. 2012), the Court held that "that each class member's consumer protection

13   claim should be governed by the consumer protection laws of the jurisdiction in which the

14   transaction took place." Plaintiffs here acknowledge that the laws of the Class members' states

15   apply. And *Mazza* explained that "[w]e express no view whether on remand it would be correct to

16   certify … a class with members more broadly but with subclasses for class members in different

17   states, with different jury instruction for materially different bodies of state law." *Id.* at 594. So

18   *Mazza* did not address the issue before the Court. And in *In re Bridgestone/Firestone, Inc.*, 288

19   F.3d 1012, 1018–19 (7th Cir. 2002), the Seventh Circuit held that "this litigation is not manageable

20   as a class action even on a statewide basis" because of substantial factual variations in class

21   members' claims, including that "Firestone's tires likewise exhibit variability; that's why fewer

22   than half of those included in the tire class were recalled." Here, in contrast, no such factual

23   variations preclude certification—each dealer Class member sold and serviced TDI vehicles before

24   revelation of the emissions-cheating conspiracy and every dealer Class member had the ability to

25   do so stripped away when the fraud was exposed. No Class member dealer was excluded from the

26   mechanism of harm and no Class member dealer escaped the ensuing injury.[33]

27

28        [33] In *Rodriguez v. Instagram, LLC*, 2013 WL 3732883, at *3 (N.D. Cal. July 15, 2013), the
     court ruled that "it would be futile to allow plaintiff to amend to a putative nationwide class where

1

**E.     A class action is the superior method for fairly adjudicating this matter.**

2

Bosch incorrectly asserts that a class action is not superior for adjudicating the claims in

3

this matter. Bosch first argues erroneously that each Franchise Dealer has a sufficiently large claim

4

to justify bringing an individual action. Mem. at 49. Even if true, which is highly dubious given

5

Bosch's strenuous defense in this matter, it would not establish that individual actions are a

6

superior method for adjudicating this case. As the Supreme Court has explained, "the text of Rule

7

23(b)(3) does not exclude from certification cases in which individual damages run high…."

8

*Amchem Prod., Inc. v. Winds*or, 521 U.S. 591, 617 (1997). And "[w]hile plaintiffs here estimate

9

damages that may not be small individual sums, the Court does not find this a bar to certification as

10

some plaintiffs may be unable to litigate as individuals 'because of the disparity between their

11

litigation costs and what they hope to recover.'" *Ridgeway v. Wal-Mart Stores Inc*., 2014 WL

12

4477662, at *10 (N.D. Cal. Sept. 10, 2014) (quoting *Judicial Joint Exec. Bd. of Culinary/Bartender*

13

*Trust Fund v. Las Vegas Sands, Inc*., 244 F.3d 1152, 1164 (9th Cir. 2001)). Further, "the amount of

14

plaintiffs' estimated damages does not negate the judicial economy of consolidating hundreds of

15

individual actions into a class action lawsuit." *Id.* at *10. Here, even assuming the dubious

16

proposition that all Franchise Dealers would have the ability to file individual actions, the Court

17

would have to consolidate 652 actions, all of which require an answers to numerous common

18

issues, including whether Bosch a knowing and willful participant in the emissions-cheating

19

conspiracy Volkswagen has already admitted existed. That is not superior to a class action.

20

Moreover, any perceived manageability concerns regarding variations in state law may be

21

handled at trial by grouping similar plaintiffs together and treating them as a unit.[34] Thus, a class

22

23

_____

24

plaintiff's overreaching will almost certainly be denied at the class certification stage." That ruling
has no bearing on whether certification should be granted here.

25

[34] *See, e.g.*, *In re Static Random Access memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 615
(N.D. Cal. 2009) ("Defendants are also concerned that this Court will be unable to manage state-

26

law claims from twenty-seven state classes…. [C]ourts frequently certify classes under the laws of
multiple jurisdictions. *See, e.g., Norvir Anti–Trust Litig.*, 2007 WL 1689899, at *8 (N.D. Cal.)

27

(certifying class under the common law of forty-eight states); *In re Pharm. Indus. Average
Wholesale Price Litig.*, 233 F.R.D. 229, 230–31 (D. Mass. 2006) (certifying multi-state defendant

28

subclasses under the consumer protection laws of forty-one states)."

1    action is the superior method of resolving this controversy. Similarly, if developments at trial

2    necessitate individual damage hearings, the Court would have a variety of tools to utilize.[35]

3        Finally, there is a "'well-settled presumption that courts should not refuse to certify a class

4    merely on the basis of manageability concerns.'" *Briseno*, 844 F.3d at 1128 (citation omitted). That

5    presumption applies here. And Bosch fails to establish that trying hundreds of individual cases is

6    superior. *See Leyva v. Medline Indus.*, 716 F.3d 510, 515 (9th Cir. 2013) ("The district court

7    concluded that class certification is not the superior method of adjudication but did not suggest any

8    other means for putative class members to adjudicate their claims. Indeed, it appears that none

9    exist.").

10                    **IV.    CONCLUSION**

11        Plaintiffs' motion for class certification should be granted.

12
      DATED: October 18, 2019                     Respectfully submitted,

13
                                                   HAGENS BERMAN SOBOL SHAPIRO LLP

14

15                                                 By: */s/ Steve W. Berman*
                                                       Steve W. Berman (*Pro Hac Vice*)

16                                                 Thomas E. Loeser (SBN 202724)
                                                   1301 Second Avenue, Suite 2000

17                                                 Seattle, WA 98101
                                                   Telephone: (206) 623-7292

18                                                 Facsimile:  (206) 623-0594
                                                   steve@hbsslaw.com

19                                                 toml@hbsslaw.com

20

21

22

23

24

25    _____

26    [35] *See In re Capacitors*, 2018 WL 5980139, at *9 ("[A] variety of tools can be used to address
      damages. These range from the appointment of a magistrate judge or special master to preside over

27    individual damages proceedings, to altering or amending the class definition in response to
      developments at trial…. The Court may also call for a trial plan from DPPs that addresses how the
      aggregate damages estimated from their expert's report can then be apportioned among the class

28    members.").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Richard N. Sox (*Pro Hac Vice*)
BASS SOX MERCER
2822 Remington Green Circle
Tallahassee, FL 32308
Telephone: (850) 878-6404
Facsimile:  (850) 942-4869
rsox@dealerlawyer.com

*Counsel for Plaintiffs and the
Franchise Dealer Class*

1

**CERTIFICATE OF SERVICE**

2

     I hereby certify that on October 18, 2019, I electronically transmitted the foregoing

3

document to the Court Clerk using the ECF System for filing. The Clerk of the Court will transmit

4

a Notice of Electronic Filing to all ECF registrants.

5

6

                                _/s/ Steve W. Berman_
                                STEVE W. BERMAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28