UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 2672 CRB (JSC) |
| This Order Relates To:<br>MDL Dkt. Nos. 6919, 6953 | **ORDER (I) GRANTING BOSCH'S MOTION FOR SUMMARY JUDGMENT AND (II) DENYING BOSCH'S MOTION TO EXCLUDE** |
| *Napleton*, No. 3:16-cv-02086-CRB | |

Volkswagen dealerships, in a proposed class action, allege that Robert Bosch GmbH and Robert Bosch LLC were knowing participants in Volkswagen's "clean diesel" emissions fraud. The dealerships assert that they were harmed by the fraud and they seek to recover damages.

The Bosch defendants have moved for summary judgment. They contend that judgment in their favor is warranted because the named plaintiff dealerships, after more than two years of discovery, have not identified any recoverable damages from the emissions fraud. In this Order, each category of damages claimed by the dealerships is reviewed. As will be seen, each category is either factually or legally unsupported. Summary judgment for the Bosch defendants is thus warranted.

## I. THE RICO CLAIMS

### A. Potential damages from the stop-sale orders

After Volkswagen admitted to regulators, in the fall of 2015, that it had been cheating on emissions tests for seven years, the company ordered its dealerships to stop selling new and certified pre-owned versions of the affected cars—the Volkswagen diesel-powered TDIs—at least temporarily. The named plaintiffs (referred to here as "the dealers" or "the dealerships") at one

time alleged that they were harmed by those stop-sale orders, because the orders "rendered millions of dollars of inventory worthless" and forced them to incur "costs to store and maintain unsalable vehicles." (Pls.' Opp'n to Mot. to Dismiss, MDL Dkt. No. 2983 at 23.) Unrebutted evidence submitted by the Bosch defendants now shows that the dealers did not sustain any losses directly from the stop-sale orders.

Volkswagen provided the dealers with support payments that were intended to—and did—cover the costs of servicing, storing, and financing the TDIs that the dealers had in inventory when the stop-sale orders were issued. (*See* MDL Dkt. No. 6954-56, Sheets Report ¶ 27(a)–(b).) And after the EPA approved modifications for the cars and the stop-sale orders were lifted, Volkswagen paid the dealers for the work required to modify the cars and to prepare them for sale. (*See id.* ¶ 86.) The dealers ultimately sold all of the TDIs they had in inventory, and they realized profits on almost all of those sales. In fact, on average their profit margins on those sales exceeded their margins on TDI sales prior to the stop-sale orders. (*See id.* ¶¶ 27(c), 46.) Only one of the dealers incurred a loss on the sale of certain TDIs that it had in inventory at the time of the stop-sale orders. But those losses were more than covered by Volkswagen's support payments. (*See id.* ¶ 27(g).)

The dealers have not meaningfully[1] challenged or rebutted this evidence. It follows that a reasonable fact finder could not find that the dealers suffered losses directly from the stop-sale orders.

**B.      Potential damages from discontinuation of the TDI line**

Volkswagen stopped manufacturing TDIs after its emissions fraud was uncovered. Evidence offered by the dealers supports that if the company had not been caught, it planned to continue manufacturing TDIs, perhaps until 2027. The dealers insist that if Volkswagen had continued making the cars, the dealers would have continued to sell and profit from them. They

---

[1] The only challenge to the Bosch defendants' evidence, if it can be construed that way, is the dealers' expert's assertion that the Bosch defendants' calculations do not take into account that the dealers faced "uncertain prospects" after Volkswagen issued its stop-sale orders. (Stockton Report, MDL Dkt. No. 6840-9 at 5.) The dealers have made no attempt to calculate any damages they sustained from this uncertainty. Nor have they cited to any authority supporting that damages from commercial uncertainty are recoverable under RICO.

also identify ancillary revenue streams that may have resulted from future TDI sales, including revenues from servicing new TDIs and from reacquiring TDIs through trade-ins and selling them as used TDIs. Detailed calculations of the dealers' predicted profits from all of these sources are included in one of the reports of their expert. (*See* Stockton Report, MDL Dkt. No. 6406-6 at 29–41, 56–68, 83–95.)

For their lost profits from yet-to-be-manufactured TDIs to be recoverable under RICO, the dealers must establish that these losses resulted from an injury to their "business or property" that was "by reason of" a pattern of racketeering activity. 18 U.S.C. § 1964(c). *See generally Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005) (en banc).

The dealers do not suggest that they had a "property" interest in the sale of TDIs that they did not own or possess at the time of the stop-sale orders. For good reason: Volkswagen's franchise agreements gave Volkswagen, not its dealers, discretion to choose the types of cars to manufacture and to make available for sale. (*See* MDL Dkt. No. 6954-43 at 21, 28, 42.) The dealers instead assert that they were injured in their "business" when Volkswagen stopped manufacturing TDIs.

Assuming that the dealers' lost profits from yet-to-be-manufactured TDIs can be characterized as an injury to their "business," as that term is used in the RICO statute, these profits were not lost "by reason of" a pattern of racketeering activity. The TDIs did not comply with emissions standards, and it was racketeering activity (or at least conduct that is alleged to have amounted to racketeering activity) that made the TDIs available for sale in spite of their noncompliance. Specifically, Volkswagen (allegedly with Bosch's assistance) installed defeat devices in the cars, which allowed the cars to circumvent the EPA's and the California Air Resources Board's emissions tests, from 2009 to 2015. The dealers benefited from selling the TDIs during those years, and thus unknowingly benefited from the scheme. What the dealers implicitly claim now is that they had a right to continue benefiting from racketeering activity— that is, to keep selling noncompliant TDIs until 2027. They have not cited to any authority that supports this contention. Their losses from the TDI line's discontinuation were not "by reason" of the emissions fraud; they were by reason of the fraud's discovery. The needed causal connection

3

between the challenged conduct and the claimed injuries is therefore lacking.

The Second Circuit reached a similar conclusion in affirming dismissal of a RICO claim in *In re American Express Co. Shareholder Litigation*, 39 F.3d 395 (2d Cir. 1994). In that derivative action, American Express shareholders alleged that the company's officers and directors had conspired with foreign operatives to defame a rival by falsely linking him to organized crime. When the conspiracy came to light, the shareholders asserted that American Express lost profits, suffered harm to its reputation, and was forced to incur significant legal costs. *See id.* at 396–98. The Second Circuit held that American Express could not recover for these damages under RICO. The court explained that the conspiracy "was not what injured American Express;" it was "the exposure of [the conspiracy] that caused the [company's] harm." *Id.* at 400. As the requisite chain of causation was not established, the RICO claim could not proceed.

Here, too, it was not the predicate acts of racketeering activity—Volkswagen's (and perhaps Bosch's) misrepresentations to the EPA and to CARB and their falsifications of emissions tests—that prevented the dealers from selling TDIs until 2027; it was the discovery of those acts. Indeed, until those acts were discovered, the dealers benefited from them, profiting from the sale of noncompliant cars. The dealers' losses from the cessation of the TDI line "arose as a result of the scandal, not the scheme itself." *Meng v. Schwartz*, 116 F. Supp. 2d 92, 97 (D.D.C. 2000) (dismissing RICO claim when the predicate acts of bribery were undertaken to benefit the plaintiffs and the plaintiffs' injuries arose only after the bribery was discovered), *aff'd*, 48 F. App'x 1 (D.C. Cir. 2002).

The dealers make an alternative causation argument. They maintain that their losses were caused by the defendants' racketeering activity because if the defendants had not installed defeat devices in the TDIs, then they would have manufactured *legal* TDIs, and the dealers would have sold those cars until 2027. In other words, the dealers assert that but for the emissions fraud, they would have profited from selling the TDIs for the entire expected life cycle of the line, instead of only from 2009 to 2015.

No evidence has been offered by the dealers to support this claim, and the evidence in the record is contrary to it. After admitting to using defeat devices in the TDIs, Volkswagen

4

confessed that years earlier it had determined that it "could not design a diesel engine that would both meet the stricter U.S. NOx emissions standards . . . and attract sufficient customer demand in the U.S. market." (MDL Dkt. No. 5862, Ex. A, Rule 11 Plea Agreement, Statement of Facts ¶ 33, *United States v. Volkswagen AG*, No. 16-CR-20394 (E.D. Mich. Mar. 10, 2017).) The EPA effectively confirmed Volkswagen's admission, concluding after the fraud that there were "no practical engineering solutions" that could bring the cars into compliance with governing emissions standards "without [a] negative impact to vehicle functions and unacceptable delay." (Partial Consent Decree, MDL Dkt. No. 2103-1 at 5.) The TDIs that were promised, in other words, were illusory.[2]

The dealers' suggestion that Volkswagen could have manufactured legal TDIs that would have attracted a similar level of consumer demand as the illegal TDIs is unsupported and speculative. More is needed to support their claim. *See Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 983 (9th Cir. 2008) (affirming dismissal of a RICO claim that would have required the court "to construct the alternative scenario" of what would have occurred had the defendants operated legally).

The dealers' lost profits from yet-to-be-manufactured TDIs did not result from an injury to their "business or property" that was "by reason of" a pattern of racketeering activity. 18 U.S.C. § 1964(c). The dealers accordingly cannot recover these lost profits under RICO.

**C.     Potential damages from the buyback**

Following Volkswagen's class settlements with the owners and lessors of its TDIs, the company bought back more than 385,000 in-use TDIs. (*See* Claims Supervisor's 2.0-Liter Report, November 26, 2018, MDL Dkt. No. 5585 at 11; Claims Supervisor's 3.0-Liter Report, June 13, 2019, MDL Dkt. No. 6384 at 12.) The dealers insist that the buyback reduced their profits. If not for the buyback, they contend that they would have profited from servicing the returned cars and

---

[2] After the fraud was revealed, Volkswagen did develop modifications for the TDIs that reduced the cars' emissions. But with few exceptions, the modifications did not bring the cars into compliance with their originally certified emissions standards. (*See* EPA's Motions for Entry of Partial Consent Decrees, MDL Dkt. Nos. 1973 at 19; 3083 at 16–18.) The modifications, then, do not support that Volkswagen could have manufactured an entire line of legal TDIs.

5

from selling replacement parts for the returned cars.

Like the dealers' lost profits from the TDI line's discontinuation, their buyback-related losses were not caused by the challenged racketeering activity. Until the emissions fraud came to light, the dealers benefited from servicing noncompliant TDIs. They did not lose that revenue stream until the fraud was revealed and Volkswagen was forced to buy back many of the cars. As it was the emissions fraud's discovery, not the fraud itself, that caused the dealers' buyback-related losses, the chain of causation between the challenged conduct and the dealers' damages is again lacking. As a result, this category of damages is also not recoverable against the Bosch defendants under RICO.[3]

## D. Potential damages from harm to goodwill

In a prior Order, the Court held that the dealers could not recover under RICO for a decline in goodwill following the emissions fraud. The Court explained that damage to goodwill is an intangible injury and that RICO requires "more than 'mere injury to a valuable intangible property interest.'" *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 4890594, at *6 (N.D. Cal. Oct. 30, 2017) (quoting *Oscar v. Univ. Students Co-op Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992), *abrogated on other grounds by Diaz*, 420 F.3d 897).

The dealers have asked the Court to reconsider this holding, but they have not identified any controlling authority that supports their request. They rely on *Harmoni International Spice, Inc. v. Hume*, 914 F.3d 648, 653 (9th Cir. 2019), but the panel there expressly declined to resolve whether harm to business reputation is recoverable under RICO, leaving the issue "for the district court to take up on remand." On remand, the plaintiffs abandoned their reputation-based theory of injury, so the district court never considered the issue that was reserved. *See Harmoni Int'l Spice, Inc. v. Wenxuan Bai*, No. 2:16-cv-00614-AB (ASx), 2019 WL 4194306, at *8 (C.D. Cal. July 2,

---

[3] The Bosch defendants have moved to exclude as unreliable the dealers' expert's estimates of the dealers' lost profits from yet-to-be-manufactured TDIs and from the TDI buyback. (*See* MDL Dkt. No. 6919.) The Court will not consider the merits of the motion to exclude, because even if the expert's estimates are reliable, they are estimates of damages that are not recoverable under RICO. For this reason, the motion to exclude is DENIED without prejudice.

6

2019).

The dealers also rely on *Xcentric Ventures, LLC v. Borodkin*, 798 F.3d 1201, 1203 (9th Cir. 2015), but the relevant holding there was that damages from the loss of "specific business opportunities and contracts" are recoverable under RICO. A loss of goodwill is not the same as a loss of specific business opportunities and contracts. Goodwill, which is the probability that old customers will return and that the business "will continue in the future as in the past," is intangible. *Rise Basketball Skill Dev., LLC v. K Mart Corp.*, No. 16-CV-04895-WHO, 2017 WL 2775030, at *5 (N.D. Cal. June 27, 2017) (citation omitted); *see also Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (recognizing that "intangible injuries, such as damage to . . . goodwill, qualify as irreparable harm"). Specific business opportunities and contracts are not.

Finally, the dealers rely on *Diaz*, 420 F.3d at 898, where the Ninth Circuit held that "false imprisonment that caused the victim to lose employment and employment opportunities [was] an injury to 'business or property' within the meaning of RICO." This Court considered *Diaz* in its prior Order and did not find the decision inconsistent with its conclusion that harm to goodwill is not recoverable under RICO.

The Court reaffirms that the dealers cannot recover under RICO for losses resulting from a decline in goodwill. The Court also notes that the dealers have not offered any evidence supporting such losses.

No damages that are recoverable under RICO have been identified. As a result, the dealers' RICO claims cannot proceed.

## II. THE STATE LAW CLAIMS

In addition to their RICO claims, the dealers also bring state law civil-conspiracy claims against the Bosch defendants. (*See* TAC ¶¶ 444–50 (Bertolet VW's civil conspiracy claim under Pennsylvania law); *id.* ¶¶ 451–57 (Brandon VW's civil conspiracy claim under Florida law); *id.* ¶¶ 458–64 (Bozzani VW's civil conspiracy claim under California law).) The damages that the dealers seek to recover under these state laws are materially the same as the damages they seek to recover under RICO. As with their RICO claims, the dealers have not submitted proof that these

7

damages are recoverable.

- <u>Potential damages from the stop-sale orders</u>: The Bosch defendants' unrebutted evidence again supports that the dealers did not sustain any damages directly from the stop-sale orders.
- <u>Potential damages from discontinuation of the TDI line</u>: As with RICO, each of the relevant civil conspiracy laws requires proof that the damages claimed were caused by the conspiracy. *See Chicago Title Ins. Co. v. Great W. Fin. Corp.*, 444 P.2d 481, 488 (Cal. 1968); *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159–60 (Fla. Dist. Ct. App. 2008); *Viguers v. Philip Morris USA, Inc.*, 837 A.2d 534, 540 (Pa. Super. Ct. 2003), *aff'd*, 881 A.2d 1262 (Pa. 2005). As explained above, the dealers have not satisfied this causation requirement, because their losses from yet-to-be-manufactured TDIs were not caused by the emissions fraud, but instead by the fraud's discovery.
- <u>Potential damages from the buyback</u>: Causation is also lacking for this category of damages. To the extent that the dealers lost servicing and replacement-parts revenues as a result of the buyback, those losses were caused by the emissions fraud's discovery, not by the fraud itself.
- <u>Potential damages from harm to goodwill</u>: The dealers have not cited to any authority supporting that harm to goodwill is recoverable under the relevant civil conspiracy laws. Also, there is no evidence in the record of damages sustained by the dealers due to a decline in goodwill.

\* \* \*

The dealers have not submitted proof of any damages that are recoverable under their causes of action against the Bosch defendants. The Court accordingly GRANTS the Bosch defendants' motion for summary judgment.

**IT IS SO ORDERED.**

Dated: December 6, 2019

_____
CHARLES R. BREYER
United States District Judge