# Exhibit 2

Page 1

1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF CALIFORNIA

3   SAN FRANCISCO DIVISION

4   -----------------------------------------

5

6   IN RE:  VOLKSWAGEN "CLEAN DIESEL"

7   MARKETING, SALES PRACTICES, AND

8   PRODUCTS LIABILITY LITIGATION

9

10                       MDL No. 2672 CRB (JSC)

11

12  -----------------------------------------

13

14

15          VIDEOTAPED DEPOSITION OF

16           HONORABLE LOUIS J. FREEH

17

18

19          Monday, December 23, 2019

20            8:11 a.m. - 4:30 p.m.

21

22

23  Reported by:

24  Joan Ferrara, RMR, FCRR

25  Job No. 294702

Page 2

```
1                                    Page 2
2
3
4              December 23, 2019
5                 8:11 a.m.
6            New York, New York
7
8
9
10        Videotaped Deposition of HONORABLE
11   LOUIS J. FREEH, held at the offices of
12   Sullivan & Cromwell, LLP, 535 Madison
13   Avenue, New York, New York, before Joan
14   Ferrara, a Registered Merit Reporter,
15   Federal Certified Realtime Reporter and
16   Notary Public of the State of New York.
17
18
19
20
21
22
23
24
25
```

Page 3

```
1  A P P E A R A N C E S :
2
3  GLASER WEIL
4  Attorneys for Plaintiff and The Witness
5          10250 Constellation Boulevard
6          19th Floor
7          Los Angeles, California 90067
8  BY:     FRED D. HEATHER, ESQ.
9
10
11
12  SULLIVAN & CROMWELL, LLP
13  Attorneys for Defendant Volkswagen Group of
14  America, Inc.
15          125 Broad Street
16          New York, New York 10004-2498
17  BY:     ROBERT J. GIUFFRA, JR., ESQ.
18
19          DYLAN M. ALUISE, ESQ.
20
21          SHARON L. NELLES, ESQ.
22
23  ALSO PRESENT:
24  Jose Rivera, Videographer
25  John G. Rahie
```

Page 4

```
1          THE VIDEOGRAPHER:  This is media
2   unit number one in the video
3   deposition of Louis Freeh in the
4   matter of In Re Volkswagen Clean
5   Diesel Litigation.
6          This deposition is being held at
7   Sullivan & Cromwell, 535 Madison
8   Avenue, New York, New York, on
9   December 23, 2019 at approximately
10   8:11 a.m.
11          My name is Jose Rivera from the
12   firm of U.S. Legal Support and I am
13   the legal video specialist.
14          The court reporter is Joan
15   Ferrara, also in association with U.S.
16   Legal Support.
17          For the record, would counsels
18   please introduce themselves.
19          MR. HEATHER:  Fred Heather, for
20   the witness and for the plaintiffs,
21   from Glaser Weil.
22          MR. RAHIE:  John Rahie from
23   Freeh Sporkin & Sullivan.
24          MR. GIUFFRA:  It's Robert
25   Giuffra from Sullivan & Cromwell for
```

Page 5

```
         Freeh
1   the defendants.
2          MR. ALUISE:  Dylan Aluise.  I'll
3   be supporting Robert Giuffra.
4          MS. NELLES:  Sharon Nelles, from
5   Sullivan & Cromwell, for defendants.
6          THE VIDEOGRAPHER:  Now, will the
7   court reporter please swear in the
8   witness.
9  L O U I S   F R E E H,
10   called as a witness, having been
11   duly sworn by a Notary Public, was
12   examined and testified as follows:
13          (Exhibit 198, Expert Witness
14   Report of Honorable Louis J. Freeh
15   (Retired) December 2, 2009, was marked
16   for Identification, as of this date.)
17  EXAMINATION BY
18  MR. GIUFFRA:
19      Q    Why don't we start.
20          Mr. Freeh, I've just handed you
21   a document which has been marked Exhibit
22   198.  It's entitled Expert Witness Report
23   of Honorable Louis J. Freeh (Retired)
24   December 2, 2009.
25          Do you see it?
```

Page 6

Freeh

1    A    Yes, sir.
2    Q    And is this your expert report
3 that you propose to have filed in
4 connection with this litigation?
5    A    Yes, it is.
6    Q    And are all of your opinions
7 that you intend to express in the
8 litigation of this case stated in this
9 report?
10    A    Correct.
11    Q    And when were you first
12 contacted to serve as an expert in this
13 case?
14    A    I think about 4 or 5 months ago.
15    Q    And who contacted you?
16    A    Fred Heather.
17    Q    Anyone else?
18    A    No.
19    Q    Now, at any time in the history
20 of the world, could you state for the
21 record all lawyers from the United States
22 Department of Justice that you've ever
23 discussed Volkswagen with.
24    A    I would say only two lawyers.
25    Q    Okay.

Page 7

Freeh

1    A    John Cruden, who at the time was
2 the Assistant Attorney General for
3 environmental, and I believe Sally Yates
4 who was then the Deputy Attorney General.
5    Q    So you've never discussed the
6 Volkswagen case with Leslie Caldwell?
7    A    No.
8    Q    And have you ever discussed the
9 Volkswagen case with Andrew Weissman?
10    A    No.
11    Q    Have you ever discussed the
12 Volkswagen case with Loretta Lynch?
13    A    No.
14    Q    Have you ever discussed the
15 Volkswagen case with any United States
16 Attorney or Assistant United States
17 Attorney from the Eastern District of
18 Michigan?
19    A    No.
20    Q    And do you have -- do you know
21 Leslie Caldwell?
22    A    Yes.
23    Q    Do you have a high opinion of
24 her professional qualifications as a
25 prosecutor?

Page 8

Freeh

1    A    Yes.
2    Q    Do you know Mr. Weissman?
3    A    Yes.
4    Q    Do you have a high opinion of
5 Mr. Weissman's professional qualifications
6 as a prosecutor?
7    A    Mixed.
8    Q    Why mixed?
9    A    Well, some of the cases that he
10 worked on.
11    Q    Can you say anything more about
12 why you have a mixed opinion?
13    A    No.  I think some of the cases
14 that he's worked on that are publicly
15 reported have some issues.  The Andersen
16 case might be one.
17    Q    Why did you think -- do you
18 think he mishandled the Andersen case?
19         MR. HEATHER:  I'm just going to
20    object.  Outside the scope of his
21    expert report.  You can answer.
22    A    Yeah, I can't give an opinion on
23 that.  You asked me what my opinion was of
24 him and it's mixed.
25    Q    Well, the Andersen case was a

Page 9

Freeh

1 case where a large corporation or a large
2 entity was criminally indicted.
3         Did you agree with the decision
4 to indict Arthur Andersen?
5         MR. HEATHER:  Objection.  Again,
6    it's calling for expert opinion.
7    Outside the scope.  And I'd like to
8    have a continuing objection as to
9    these questions.  I mean at some
10    point --
11         MR. GIUFFRA:  You can object to
12    the form.  He's your witness.  I'm
13    allowed to ask my questions.
14    A    Well, I don't know the facts of
15 that case.  I can't give an opinion on
16 that.
17    Q    But what about the Andersen case
18 caused you to question Mr. Weissman's
19 handling of his role as prosecutor?
20         MR. HEATHER:  Same objection.
21    A    Well, the indictment put a large
22 company out of business and the case was
23 later taken down by the court.
24    Q    Now, in your own words could you
25 please just describe what you view to be

Page 10

Freeh

1  your assignment in this case.
2      A      So my assignment was to look at
3  the sentence in the court by Judge Cox and
4  to review the facts and the papers and the
5  records and give an opinion whether the
6  sentence imposed was consistent with the
7  conduct and consistent with the applicable
8  sentencing guidelines, and to also review
9  whether or not there were facts that might
10 have been offered and presented to the
11 sentencing judge which were not presented
12 by the company, and also to look at the
13 subsequent, subsequent to the sentence,
14 sales by the company of what they marketed
15 as certified pre-owned vehicles.
16     Q      Now, are you aware that the
17 Jones Day law firm did an internal
18 investigation on behalf of Volkswagen in
19 connection with the diesel emissions
20 issues?
21     A      I believe you told me that, yes.
22     Q      Do you have any other knowledge
23 of the role of Jones Day in the diesel
24 emissions issue other than what I told you?
25     A      No.

Page 11

Freeh

1      Q      And when did I discuss with you
2  the role of Jones Day in connection with
3  the diesel emissions issues?
4      A      I think we were in Washington,
5  it would have been in January of 2016, and
6  you expressed some opinions about Jones Day
7  as well as Kirkland.
8      Q      Do you know anything about the
9  scope of the information that Jones Day
10 provided to the United States Department of
11 Justice in connection with its internal
12 investigation into Volkswagen?
13     A      No.
14     Q      Just in terms of people that you
15 spoke to, so I've got it, have you ever
16 spoken to Loretta Lynch about anything
17 relating to the Volkswagen investigation?
18     A      No.
19     Q      Have you ever spoken to Judge
20 Cox about anything having to do with the
21 Volkswagen litigation?
22     A      No.
23     Q      Why don't you just state for the
24 record what you can recall about your
25 discussions about Volkswagen with John

Page 12

Freeh

1  Cruden.
2      A      Well, it was a very simple
3  discussion.  We had worked together in the
4  BP matter, the settlement of the BP matter.
5  He was in charge of that.  I was the
6  special master for the court in Louisiana.
7  I think I was visiting him on a BP issue
8  and mentioned that I had spoken to
9  Volkswagen about being a compliance advisor
10 to them.
11     Q      Could you --
12     A      Excuse me.  He didn't really
13 make any comment.
14     Q      Do you recall anything further
15 about your discussion with Mr. Cruden?
16     A      Yes.  He asked whether I would
17 be interested in serving as a special
18 master with Judge Breyer in the Volkswagen
19 case, and I said no.
20     Q      Serving as a special master in
21 what capacity in the Volkswagen case?
22     A      The same role that Bob Muller
23 played.
24     Q      So as the settlement master?
25     A      I'm not sure that's exactly what

Page 13

Freeh

1  his title was, but it would be to fulfill
2  the role that he subsequently played.
3      Q      Just to sort of round the
4  circle, have you ever spoken to Robert
5  Muller about anything having to do with the
6  Volkswagen case?
7      A      Yes.  When he became the special
8  master, he called me and asked a lot of
9  questions, asked for some advice with
10 respect to how to organize his special
11 master work administratively, not with
12 respect to the content of the work, and I
13 told him what we had done with the BP case
14 in terms of setting up a structure.
15     Q      Do you recall anything further
16 about your discussions with Mr. Muller in
17 connection with his work on the Volkswagen
18 case?
19     A      No.
20     Q      Have you since -- when was that
21 conversation?
22     A      It would have been sometime
23 after he was appointed, right after he was
24 appointed.  I'm not sure when that was.
25     Q      So sometime in early 2016, does

Page 14

Freeh

1  that sound about right?

2      A    That sounds correct.

3      Q    Now, do you recall anything

4  further about your discussions with

5  Mr. Cruden in connection with the

6  Volkswagen case?

7      A    No.

8      Q    Have you disclosed for us today

9  all of your conversations with Mr. Cruden

10  about the Volkswagen case?

11      A    Yes, I believe so.

12      Q    Now, you indicated that you had

13  discussed with Mr. Cruden serving as a

14  compliance advisor?

15      A    Yes.

16      Q    Isn't it, in fact, the case that

17  you had discussions with Volkswagen about

18  becoming sort of special counsel to

19  Volkswagen in connection with resolving

20  civil and governmental litigations?

21          MR. HEATHER:  Objection to form.

22      A    You know, the conversations were

23  varied, right.  So I had some conversations

24  with Judge Hohmann-Dennhardt.  I had some

25  with you.  I had some with Manfred Doess.

Page 15

Freeh

1  So it varied.  The role was never agreed

2  upon.

3          Obviously, I was not hired.  But

4  we talked about being an advisor to the

5  board on compliance.  We talked about

6  special counsel.  But it was a variety of

7  different conversations.

8      Q    What was your understanding of

9  what your role would be as special counsel

10  to Volkswagen?

11      A    That I would be helping the

12  board with respect to compliance issues,

13  which was really the template that we had

14  used with Daimler, and what I had discussed

15  with Judge Hohmann-Dennhardt was basically

16  doing what I had done in Stuttgart with the

17  Daimler case.

18      Q    Did you have discussions with

19  Ms. Hohmann-Dennhardt -- let's state for

20  the record, who is Ms. Hohmann-Dennhardt?

21      A    So she was the Management Board

22  member in Daimler for compliance and legal

23  affairs.  She was appointed while I was

24  serving as the Department of Justice

25  monitor.  And then towards the end of 2015,

Page 16

Freeh

1  she was hired by Volkswagen to go on their

2  Management Board in the same position.

3      Q    Would it be fair to say that

4  you're a close friend or a good friend of

5  Ms. Hohmann-Dennhardt?

6      A    I wouldn't say a good friend.

7      Q    Are you a friend of

8  Ms. Hohmann-Dennhardt?

9      A    Yes.

10      Q    And when was the last time you

11  spoke to Ms. Hohmann-Dennhardt?

12      A    A couple of years ago.

13      Q    And what were the circumstances

14  of your discussions with

15  Ms. Hohmann-Dennhardt a couple of years

16  ago?

17      A    The attorney that worked for

18  her, Daimler, got very, very sick with

19  cancer.  So we spoke about that.

20      Q    Did you ever have any

21  discussions with Ms. Hohmann-Dennhardt

22  about the circumstances surrounding her

23  leaving Volkswagen?

24      A    No.

25      Q    Do you know why

Page 17

Freeh

1  Ms. Hohmann-Dennhardt left Volkswagen?

2      A    No.

3      Q    Have you ever discussed with

4  Ms. Hohmann-Dennhardt anything related to

5  topics bearing on your expert report in

6  this case?

7      A    No.

8      Q    Is Ms. Hohmann-Dennhardt aware

9  that you're serving as an expert in this

10  case?

11      A    As far as I know, she's not

12  aware.

13      Q    Let's just turn to your expert

14  report for a second just to sort of get it

15  all down.

16          On page -- we'll literally just

17  go right through it and then I'll ask you

18  some other questions.

19      A    Okay.

20      Q    On page 3, am I correct that

21  your expert testimony concerns the plea

22  agreement entered into between U.S. and

23  Volkswagen that was approved by the court

24  on April 21, 2017?

25      A    Yes.  I give an opinion about

Page 30

Freeh

1        A       I believe you did.
2        Q       And I provided you with that
3    report in connection with your possible
4    retention as a lawyer to Volkswagen,
5    correct?
6        A       Well, I'm not sure as a lawyer.
7    You provided it to me in connection with
8    our discussions about how I could assist
9    the company.  And as I recall, you also
10   gave it to me to highlight what you
11   described as attorney dysfunction in
12   Kirkland.
13       Q       Sitting here today, do you
14   believe that among other roles that you
15   were considered for, for Volkswagen, back
16   in 2016, would you agree that one of those
17   roles was to serve as an attorney to the
18   company?
19       A       Yes.
20       Q       Now, in your compensation
21   section of your expert report, it says that
22   you're being compensated at the rate of
23   $1,850 an hour.
24       A       Yes.
25       Q       Do you see that?

Page 31

Freeh

1                Now, are you also -- let me
2    restate that.
3                When did the meter start running
4    on the $1,850 per hour?
5        A       When I started preparing for the
6    deposition.
7        Q       Preparing for the deposition.
8                How many hours have you spent
9    preparing for this deposition?
10       A       I'm not sure.
11       Q       Is it 5 hours, 10 hours, 20
12   hours?
13       A       More like 10 to 15 hours.
14       Q       Ten to 15 hours.
15               And then you'll be paid for your
16   testimony today, right?
17       A       Yes.
18       Q       And then if you were to testify
19   at trial, you'll also be compensated,
20   right?
21       A       Correct.
22       Q       And that's all on top of the
23   $50,000, right?
24       A       It is.
25       Q       And the -- is the rate of $1,850

Page 32

Freeh

1    the rate you'll be compensated for if you
2    testify at the trial in this case?
3        A       We haven't agreed on that.
4        Q       So you may have a higher rate of
5    compensation if you testify at trial?
6        A       No, it wouldn't be higher.
7        Q       Now, the time when you were
8    first discussing serving as an expert in
9    this case, did you disclose to plaintiff's
10   counsel your prior involvement with
11   Volkswagen?
12       A       Yes.
13       Q       And what did you tell
14   plaintiff's counsel about your prior
15   involvement with Volkswagen?
16               MR. HEATHER:  I'm going to
17           object to that on the grounds that
18           it's privileged.
19   BY MR. GIUFFRA:
20       Q       Did you discuss with plaintiff's
21   counsel the fact that you had repeated
22   conversations with Ms. Hohmann-Dennhardt
23   about being retained by Volkswagen?
24               MR. HEATHER:  Same objection.
25   BY MR. GIUFFRA:

Page 33

Freeh

1        Q       It's a yes or no question.  I'm
2    not asking for the disclosure of any
3    privileged information.
4        A       Yes.
5        Q       And did you discuss with
6    plaintiff's counsel that you had had
7    multiple conversations with Manfred Doess,
8    the general counsel of Volkswagen AG, about
9    being, coming on board as a lawyer for
10   Volkswagen?
11       A       Yes, and with you.  But again,
12   not solely as a lawyer.  There were
13   multiple roles that were being discussed
14   during that period.
15       Q       Don't worry, we'll get to that.
16   We'll cover it.  I just want to get the
17   general parameters of what you discussed
18   with plaintiff's counsel.
19               In connection with serving as an
20   expert in this matter, did you have any
21   discussions with any ethics council about
22   whether you can serve as an expert in this
23   case in light of your prior discussions
24   with Volkswagen?
25       A       We discussed it internally, but

|  | Page 34 |
|---|---|

Freeh

1   not with a separate expert.
2        Q     So you have not consulted with
3   an ethics expert on whether your prior
4   involvement with Volkswagen in some way
5   might be disabling in serving as an expert
6   in this matter?
7        A     No.
8             MR. HEATHER:  Objection to form.
9        A     No.
10       Q     Now, am I correct that the
11  purpose of your expert report is to -- let
12  me restate that.
13            Am I correct that the plan would
14  be that you would testify in connection
15  with the punitive damages phase of this
16  case?
17       A     I don't think so.  That's not my
18  understanding.
19            My understanding is I would talk
20  about the plea agreement and the sentence
21  and whether, in my opinion, that accurately
22  reflected, 1, the procedure that should
23  have been followed under the guidelines;
24  and 2, whether the sentence addressed the
25  full scope of Volkswagen's misconduct, both

|  | Page 35 |
|---|---|

Freeh

1   before and after the plea.
2        Q     Do you have an understanding as
3   to in what phase of this case you would be
4   testifying?
5        A     No.
6        Q     Do you have any understanding as
7   to what this case is about?
8        A     I understand what the case is
9   about.
10       Q     What's your understanding as to
11  what this case is about?
12       A     It's a class action by people
13  who purchased cars, cars that were sold as
14  pre-owned certified cars and --
15       Q     So you think the case is a class
16  action, is that right?
17       A     I think it's a class action.
18       Q     And do you know how many
19  plaintiffs are in the case?
20       A     No.
21       Q     And do you know how much money
22  damages the plaintiffs are seeking in this
23  case?
24       A     No.
25       Q     Do you think that this is a

|  | Page 36 |
|---|---|

Freeh

1   class action involving certified pre-owned
2   cars?
3        A     I'm not familiar with the
4   specifics of the case.
5        Q     Okay.
6             But you believe it's a class
7   action?
8        A     I think it's a class action.
9        Q     Do you have any understanding as
10  to whether you would be an expert witness
11  in connection with the setting of punitive
12  damages in this case?
13       A     I don't know.
14       Q     Are you aware that under
15  California law plaintiff cannot recover
16  punitive damages for harm to others?
17            MR. HEATHER:  Objection to form.
18       A     No, I'm not an expert on
19  California punitive damages law.
20       Q     Do you consider yourself an
21  expert on the sentencing guidelines?
22       A     Yes, I think I am.
23       Q     Why do you consider yourself to
24  be an expert on the sentencing guidelines?
25       A     Because I applied them as a

|  | Page 37 |
|---|---|

Freeh

1   judge, I applied them as a prosecutor, I
2   have a lot of familiarity with the
3   calculations, and I think particularly
4   because of my role as a judge, I have a
5   completely different and unique insight
6   into the guidelines and what judges expect
7   when parties come before them for
8   sentencing and prepare and submit materials
9   in connection with sentencing.
10       Q     Okay.
11            So you served as a United States
12  District Judge for 2 years, correct?
13       A     Correct.
14       Q     And your term in office ended in
15  1993, correct?
16       A     Yes.
17       Q     Since 1993, has any part of your
18  professional responsibilities -- let me
19  restate that.
20            Since 1993, have you had any
21  role in connection with -- let me restate
22  that again.  It must be early in the
23  morning.
24            Since 1993, have you had any
25  involvement with the application of the

Page 58

Freeh

1   their interactions with the United States
2   Department Criminal Division with respect
3   to the wrongdoing of the company?
4       A.   No.
5       Q.   So as far as you know, the
6   lawyers who are representing Volkswagen in
7   connection with its criminal resolution
8   with the United States Department did not
9   conceal any facts from the United States
10  Department of Justice?
11      A.   Do you include their general
12  counsel in that?
13      Q.   Just asking the question.
14      A.   Yeah, so not all of them, I
15  guess.
16      Q.   When you say their general
17  counsel, what do you mean?
18      A.   The U.S. General Counsel.
19      Q.   Do you believe -- let me restate
20  this.
21           When you said the U.S. General
22  Counsel, what do you mean?  Who are you
23  referring to?
24      A.   Well, there's information in the
25  record about the U.S. Volkswagen General

Page 59

Freeh

1   Counsel Geanacopoulos.
2       Q.   Do you know when
3   Mr. Geanacopoulos ceased being the general
4   counsel of Volkswagen Group of America?
5       A.   No.
6       Q.   Do you know if Mr. Geanacopoulos
7   was the general counsel of Volkswagen Group
8   of America in connection with -- during the
9   period of the Volkswagen -- Volkswagen's
10  settlement discussions with the United
11  States Department of Justice Criminal
12  Division?
13      A.   I don't know his timeframe in
14  the company.
15      Q.   Sitting here today, as far as
16  you know, Mr. Geanacopoulos has never been
17  indicted, right?
18      A.   No, not to my knowledge.
19      Q.   And you would agree that in your
20  experience as a federal judge, an
21  indictment is not admissible evidence in a
22  case, right?
23           MR. HEATHER:  Object to the
24  form.
25      A.   That's correct.

Page 60

Freeh

1       Q.   Now, your opinion on the top of
2   page 6 references something called
3   certified pre-owned cars.
4       A.   Uh-huh, yes.
5       Q.   Are you aware that plaintiff's
6   counsel in this case has made allegations
7   about Volkswagen's sale of certified
8   preowned cars?
9       A.   Yes.
10      Q.   The issue of whether Volkswagen
11  is or is not selling certified pre-owned
12  cars in violation of law, is that something
13  you learned about from plaintiff's counsel?
14      A.   Yes.
15      Q.   Are you aware of Judge Breyer's
16  recent ruling dated 12/10/2019 in which he
17  wrote:  "To the extent that VWGOA labeled
18  the cars that it bought back pursuant to
19  the settlement as certified pre-owned and
20  to the extent that this labeling was
21  improper, there is not a sufficient nexus
22  between that conduct and the conduct that
23  injured plaintiffs such that the conduct
24  would be relevant in determining punitive
25  damages."

Page 61

Freeh

1       A.   To answer your question, I'm not
2   aware of his Order.
3       Q.   Okay.
4           But I assume that you'd -- if
5   Judge Breyer indicated that portion of your
6   opinion was not relevant, you wouldn't be
7   testifying about it, right?
8           MR. HEATHER:  Objection to form.
9       A.   Yeah, he can make whatever
10  ruling he needs.
11      Q.   Now, do you know whether the
12  actual pecuniary loss in the sentencing
13  documents submitted in connection with the
14  Volkswagen case was based on the gross
15  sales price of the TDI vehicles sold in the
16  United States?
17      A.   So as I said, I don't know how
18  they calculated that.  I accepted it as the
19  actual pecuniary loss because both parties
20  agreed to it.  But as I said, I didn't do
21  an independent calculation.  I don't know
22  how they calculated it.
23      Q.   Okay.
24           So you don't know whether there
25  had been discussions between the United

Page 62

Freeh

1  States Department of Justice Criminal
2  Division and Volkswagen about the
3  calculation of actual pecuniary loss?
4       A    I don't know.
5       Q    And you don't know whether that
6  calculation of actual pecuniary loss was
7  based on an arms-length negotiation between
8  the United States Department of Justice and
9  Volkswagen as to the amount of pecuniary
10 loss?
11      A    As I said, I don't know how it
12 was calculated.
13      Q    And you don't know whether
14 Volkswagen was advocating a substantially
15 lower actual pecuniary loss than the
16 pecuniary loss it had agreed to?
17      A    Don't know.
18      Q    And again, your own knowledge of
19 what that actual pecuniary loss constitutes
20 is just based on what's in the sentencing
21 documents you reviewed, right?
22      A    Yes, what the parties agreed to.
23      Q    Sitting here today, are you
24 aware of any upper management of Volkswagen
25 who have been convicted of criminal

Page 63

Freeh

1  offenses in the United States?
2       A    I think Mr. Schmidt entered some
3  kind of a plea.
4       Q    Is it your understanding that
5  Mr. Schmidt was upper management of
6  Volkswagen?
7       A    I'd say he was probably middle
8  management.
9       Q    Okay.
10           What's your understanding of
11 what his position was?
12      A    I think he was an engineer with
13 respect to homologation and emissions.
14      Q    Other than Mr. Schmidt, are you
15 aware of any member of Volkswagen
16 management who has been convicted in the
17 United States?
18      A    I'm aware of the Fifth
19 Superseding Indictment and I believe
20 there's some German charges I'm not
21 familiar with.  I don't know if there have
22 been any convictions.  I'm not aware of
23 any.
24      Q    I may have asked you this
25 question, so I apologize, but just to be

Page 64

Freeh

1  clear, do you know what the largest
2  criminal fine ever imposed by a United
3  States Court on a corporation is?
4       A    You did, but I don't know.
5       Q    Okay.
6            Are you aware of a United States
7  Court ever imposing a criminal fine on a
8  corporation of more than $5 billion?
9       A    No.  Offhand, I'm not.
10      Q    $3 billion?
11      A    Again, I'd have to do some
12 research.  I don't know of anything.
13      Q    Sitting here today, you would
14 agree that the criminal fine that was
15 imposed in the Volkswagen case was $2.8
16 billion, right?
17      A    Yes.
18      Q    Are you aware of a larger
19 criminal fine ever imposed by a United
20 States Court in the history of the United
21 States on a corporation?
22      A    I'd have to do the research.  I
23 don't know.
24           MR. HEATHER:  Bob, when you get
25 to a convenient place, can we take a

Page 65

Freeh

1  short break?
2            MR. GIUFFRA:  Yeah.  Let's take
3  just a couple of more minutes -- yeah,
4  we'll take a break now, that's fine.
5  Thank you.
6            THE VIDEOGRAPHER:  The time is
7  9:10 a.m. and we're going off the
8  record.
9            (Recess taken 9:10 a.m.)
10           (Resumed 9:22 a.m.)
11           THE VIDEOGRAPHER:  The time is
12 9:22 a.m. and we are back on the
13 record.
14 BY MR. GIUFFRA:
15      Q    Mr. Freeh, just to clarify for
16 the record, when you were first retained as
17 an expert in this case, what did you think
18 the subject matter of the litigation was?
19      A    That plaintiffs who had claims
20 against the company for damages in
21 connection with the purchase of their
22 vehicles were looking for compensation.
23      Q    And you thought it was a class
24 action, right?
25      A    I thought it was a class action.

Page 74

Freeh

1       A    Yes.
2       Q    And that corporation had
3   shareholders, right?
4       A    Yes.
5       Q    And would it be fair to say that
6   the Board of Directors of a public company
7   owes fiduciary duties to its shareholders,
8   right?
9       A    Right.
10      Q    And the obligation of lawyers
11  who represent a large corporation in
12  interacting with the United States
13  Department of Justice is to try to get the
14  best deal you can, right?
15      A    Yes.
16      Q    And your obligation is not to
17  just like hand money over to the United
18  States Department of Justice for no reason
19  at all, right?
20      A    Correct.
21      Q    Now, are you aware of any
22  compliments paid to Volkswagen by Judge
23  Breyer, the judge in this case, about its
24  conduct in connection with resolving
25  various litigation matters brought by

Page 75

Freeh

1   consumers?
2            MR. HEATHER:  Objection to form.
3       A    I think he makes reference to
4   that in the sentencing transcript I read.
5       Q    No, not Judge Cox.  I'm talking
6   about Judge Breyer.
7       A    Oh, Judge Breyer, I'm sorry, no.
8       Q    Are you aware of any public
9   commentary about the speed with which
10  Volkswagen resolved its civil and criminal
11  litigation arising out of the TDI matter?
12      A    No.
13      Q    During the period when you were
14  in discussions about being engaged with
15  Volkswagen, do you recall any discussions
16  that you had at which you discussed the
17  speed with which the matter could be
18  resolved?
19      A    Don't recall that.
20      Q    Does 5 years ring a bell to you?
21      A    No.
22      Q    Am I correct that you provided a
23  draft agreement to Volkswagen providing for
24  a 3-year term for your engagement?
25      A    Yes.

Page 76

Freeh

1       Q    And am I correct that the term
2   of that agreement provided for compensation
3   of $10 million over the course of that
4   3-year term?
5       A    That sounds correct, yes.
6       Q    And there was also a provision
7   in the agreement providing for contingent
8   fee.  Are you aware of that?
9       A    I'm not aware of that.
10      Q    You're not aware of any
11  provision that you would have gotten
12  additional monies beyond the $10 million
13  depending on the results that you were able
14  to achieve for Volkswagen?
15      A    No, I'm not aware of that.
16      Q    Okay.  We'll come back to
17  that -- oh, actually, do you have it here?
18           MR. GIUFFRA:  Mark this as 199.
19           (Exhibit 199, E-mail dated
20           1/7/16, was marked for Identification,
21           as of this date.)
22  BY MR. GIUFFRA:
23      Q    This is a document -- we have an
24  English translation that I'll attach.
25           I'll represent to you this is an

Page 77

Freeh

1   e-mail between you and Christine
2   Hohmann-Dennhardt, dated January 7, 2016,
3   and it attaches a document called Relevant
4   Points of Contact and then there's an
5   agreement between you and Volkswagen.
6            Do you see that?
7       A    Yes.
8       Q    Okay.
9            One question.  Let's just start
10  at the very first page of the document.
11           Why did you send this to
12  Ms. Hohmann-Dennhardt's personal account as
13  opposed to her corporate account?
14      A    You know, I never had her
15  corporate account.  So when she left, I had
16  her personal account -- I don't think even
17  in my contacts, because I checked.  I never
18  had a Volkswagen address for her.
19      Q    Now, this agreement says that
20  you had a draft letter of engagement based
21  on our conversation last night.
22           Do you see that?
23      A    Yes.
24      Q    Could you please state for the
25  record what you can recall about your

Page 78

Freeh

1  conversation with Ms. Hohmann-Dennhardt on
2  January 6, 2016?
3       A    So that was in Wolfsburg and we
4  talked about the meeting the next morning
5  that was scheduled with the Board of
6  Management and what my role would be and
7  what the board might ask about in terms of
8  the scope of what we were doing.  It was
9  just a discussion in preparation for the
10 meeting.
11      Q    Did you ever meet with the Board
12 of Management of Volkswagen?
13      A    Yes.
14      Q    And how many times did you meet
15 with the Board of Management?
16      A    Just once, on the 6th.
17      Q    Did you make a full presentation
18 to the Board of Management?
19           MR. HEATHER:  Objection to the
20      form.
21      A    I made a presentation to them.
22 They asked some questions.
23      Q    And that was in connection with
24 your retention as a lawyer for Volkswagen,
25 right?

Page 80

Freeh

1  with Ms. Hohmann-Dennhardt on the terms of
2  your engagement?
3       A    We had a general agreement, I
4  think, yes.
5       Q    And that would include, you
6  know, the scope of what you would be doing,
7  right?
8       A    Yes.
9       Q    Okay.
10           Now, if you just look on page
11 KVW-235.
12      A    Okay.
13      Q    It said that you were going to
14 be commissioned as a special counsel.
15           Do you see that?
16      A    Yes.
17      Q    And then it said you would
18 handle court proceedings enforcement
19 measures as well as official measures in
20 reference to examining the investigations
21 initiated by the United States of America
22 concerning exhaust gas emissions.
23           Do you see that?
24      A    Yes.
25      Q    Does that fairly state the scope

Page 79

Freeh

1       A    Yes.
2       Q    Now, let's just turn and look at
3  the agreement first.  I just want to try
4  and refresh your recollection.
5           If you look on page -- it's
6  KVW -- that's your law firm's name or Bates
7  number, am I right?
8       A    I'm sorry?
9       Q    Do you know what KVW stands for,
10 down at the Bates number, down at the
11 bottom of these documents?
12      A    No.
13      Q    This was a document that would
14 have been produced by you in response to a
15 subpoena that was --
16      A    Knight for Volkswagen -- I
17 assume that's correct, but I don't know.
18      Q    Okay.
19           Now, I just want to sort of take
20 you through this agreement.
21           Now, this agreement was based on
22 a discussion that you had with
23 Ms. Hohmann-Dennhardt, right?
24      A    Yes.
25      Q    Had you reached an agreement

Page 81

Freeh

1  of what your understanding was of your role
2  that was being contemplated with
3  Volkswagen?
4       A    It was a discussion of what she
5  was contemplating as the role, but I'd say
6  not anyone beyond her at that point.
7       Q    Okay.
8           And then you see up on the top
9  in the letter, it says Hans Dieter Potsch,
10 P-O-T-S-C-H?
11      A    Yes.
12      Q    He was the Chairman of the Board
13 of Supervisors, right?
14      A    Correct.
15      Q    And you understood that, you
16 know, was a very important person within
17 Volkswagen, right?
18      A    Yes.
19      Q    And you actually have some
20 understanding of German corporate law,
21 right?
22      A    Yes.
23      Q    And so the Chairman of the Board
24 of Supervisors of a German company is, you
25 know, probably the most senior official in

Page 82

Freeh

1   the company, right?
2       A     It depends on the personalities,
3   but sure, very significant powerful
4   individual.
5       Q     And then the next person,
6   Matthias Muller, M-U-L-L-E-R, he was
7   Chairman of the Board of Management, right?
8       A     Yes.
9       Q     He would be the equivalent of
10  the CEO of the company, right?
11      A     Correct.
12      Q     Another very senior person at
13  Volkswagen, right?
14      A     Yes.
15      Q     And Ms. Christine
16  Hohmann-Dennhardt, at this point in time,
17  was the Board Manager for Volkswagen for
18  Law and Integrity, right?
19      A     Yes.
20      Q     So she was even above the
21  general counsel of the company, right, at
22  that point in time?
23      A     Yes.
24      Q     Okay.
25            So these are probably three of

Page 83

Freeh

1   the most senior people within the whole
2   Volkswagen organization, right?
3       A     Yes.
4       Q     And now the -- there's a
5   discussion here under scope of mandate.
6       A     Uh-huh.
7       Q     Do you see that?
8       A     Yes.
9       Q     Would it be fair to say that,
10  you know, your scope of mandate would
11  include civil investigations, court
12  proceedings and official measures in the
13  context with exhaust gas emissions?
14      A     Yeah.  We stated it -- we agreed
15  to put it in the broadest terms.
16      Q     And was it your understanding
17  that your engagement would include civil
18  litigation brought by consumers against
19  Volkswagen?
20      A     Those would be some of the
21  lawsuits, correct.
22      Q     And potentially that would
23  include opt-out litigation, right?
24      A     Yes.
25      Q     What is your understanding of

Page 84

Freeh

1   opt-out litigation?
2       A     People who didn't want to be in
3   the class action.
4       Q     Do you know whether the action
5   that we're dealing with here today is an
6   opt-out case?
7       A     I believe it is.
8       Q     Okay.
9             Do you know how many plaintiffs
10  there are in the case?
11      A     No.
12      Q     Do you know the value of the
13  cars that they purchased?
14      A     No.
15      Q     Do you know the amount of
16  damages they're seeking?
17      A     No.
18      Q     Are you aware that the
19  plaintiffs have made demands of Volkswagen
20  in excess of million -- $2 million a car?
21            MR. HEATHER:  Object to the
22  form.
23      A     I don't know that.
24      Q     Would that surprise you?
25            MR. HEATHER:  Objection to the

Page 85

Freeh

1   form.
2       A     I'd have to see what the claim
3   was based on.
4       Q     Now, paragraph 2 uses the
5   expression extremely complex legal
6   problems.
7             Do you see that?
8       A     Yes.
9       Q     You would agree that in January
10  2016 Volkswagen faced extremely complex
11  legal problems, right?
12      A     Yes.
13      Q     Now, just -- and would it be
14  fair to say that when you wrote this -- did
15  you prepare this document or did
16  Ms. Hohmann-Dennhardt?
17      A     I prepared it.
18      Q     Do you speak German?
19      A     No.
20      Q     Do you know who would have
21  prepared the German version of this
22  document?
23      A     I don't recall.
24      Q     Now, in January 2016, was it
25  your understanding that the job you were

Page 86

Freeh

1 looking for was to be in charge of all of
2 Volkswagen's litigation arising out of the
3 diesel emissions matters in the United
4 States?
5      A     So her request was that I come
6 in as a special counsel to advise her and
7 the board and oversee everything that was
8 taking place in connection with the
9 emissions issues.
10     Q     And the meeting you had with --
11 was it with the Board of Management on the
12 7th?
13     A     I think it was the 6th, the
14 Board of Management.
15     Q     Yeah.  How long was that
16 meeting?
17     A     No more than I'd say 90 minutes.
18     Q     Okay.
19            And without disclosing any
20 privileged communications, did you have
21 discussions with the Board of Management
22 about the diesel emissions exposure that
23 the company faced in the United States?
24     A     I can't remember the exact
25 details of the conversation.  I described

Page 87

Freeh

1 to them the role that I could play.  I
2 spent a lot of time talking about my work
3 at Daimler and the value would be for the
4 board and them to have a compliance
5 advisor.
6            I don't think we talked much
7 about the scope of the mandate, which is
8 reflected in Exhibit 199.  It was more a
9 discussion of what had happened at Daimler,
10 what I thought I could do to assist them.
11            They asked a lot of questions.
12 It was an English meeting.  Everybody spoke
13 English at the meeting.
14     Q     Was there a discussion during
15 this meeting in January 2016 about the
16 monetary exposure that Volkswagen faced
17 from investigations and litigations in the
18 United States arising out of the diesel
19 matter?
20     A     No, not that I recall.
21     Q     Okay, now --
22     A     Didn't get that specific.
23     Q     Now, there's a discussion in
24 this document of base remuneration.
25            Do you see that?

Page 88

Freeh

1      A     Yes.
2      Q     So the plan was you were going
3 to get $5 million per year for serving as
4 special counsel, right?
5      A     Yes.
6      Q     And then am I correct that you
7 were looking for a multi-year agreement,
8 right?
9      A     Correct.
10     Q     And so the expectation was that
11 your role would last at least 3 years,
12 right?
13     A     Well, that was what Christine
14 Hohmann-Dennhardt indicated she would need
15 my total time and commitment for.
16     Q     Okay.
17            Now, on the next page, page 4,
18 there is a discussion of performance-based
19 commission.
20            Do you see that?
21     A     Yes.
22     Q     Now, it said that you were
23 planning -- you wanted the company to pay
24 you additional performance-based commission
25 on top of the $5 million per year, right?

Page 89

Freeh

1      A     Correct.
2      Q     And that performance-based
3 commission would depend on whether the
4 company "achieved settlements with or
5 decisions by U.S. authorities in litigating
6 U.S. parties in the context of the
7 above-mentioned special matters based on
8 consulting negotiations, recommendations,
9 and the work of the special counsel."
10            Do you see that?
11     A     Yes.
12     Q     And that was accurate, right?
13     A     Well, you've read it accurately,
14 yes.
15     Q     Now, as I understand it, your
16 plan was to devote the majority of your
17 working hours to your mandate for
18 Volkswagen, right?
19     A     No.  It was actually to devote
20 all of my time and energy to it.
21     Q     And you were going to have to
22 stop working on other professional business
23 matters that you had, right?
24     A     Yes.
25     Q     Now, it says here -- I'll just

Page 126

Freeh

1  corporation is public, right?
2      A    The sentencing is usually
3  public, yes.
4      Q    It's meaning that there are --
5  in this case -- let me restate that.
6          Are you aware that at the
7  sentencing of the Volkswagen case there
8  were reporters present?
9      A    Sure.
10     Q    The press, right?
11     A    Yes.
12     Q    And you were a federal
13 prosecutor, right?
14     A    Yes.
15     Q    And would you have wanted a
16 public company to disclose in open court
17 all of your discussions with that company
18 about information it had provided to you as
19 a prosecutor?
20     A    Well, if I thought the
21 information was relevant to the Court, I
22 would submit it to the Court.  You could do
23 it in camera, as you know.  You don't have
24 to do it on the public record.
25          But here, the judge clearly

Page 127

Freeh

1  wanted to know about upper management
2  involvement and was not told.
3      Q    Well, did you think that the
4  Department of Justice prosecutors had an
5  obligation, if any, to the Court to
6  disclose what they knew and what they had
7  learned from Volkswagen about involvement
8  of upper management?
9      A    Yes.
10     Q    And so do you think those
11 prosecutors breached those duties to the
12 Court in not disclosing to Judge Cox in
13 open court what they were told by
14 Volkswagen about wrongdoing by senior
15 management?
16         MR. HEATHER:  Objection to form.
17     A    Well, first of all, they didn't
18 have to make all their disclosures in open
19 court.
20         Secondly, I don't know what
21 their discussions or deliberations or
22 decisions were or what their thinking was
23 at the time.  All I know is that the judge
24 specifically, more than specifically,
25 repeatedly asked about upper management and

Page 128

Freeh

1  nobody responded to it.
2      Q    Including from the Department of
3  Justice?
4      A    As far as I know.  Whether they
5  submitted something to them in camera --
6  there's nothing on the record, I think,
7  that's sealed, but I don't know if there
8  was any attempt to think about how they
9  would communicate that to him.
10     Q    Are you aware of any -- let me
11 restate that.
12         Do you know the extent to which
13 there were chambers discussions between the
14 Department of Justice and Volkswagen and
15 Judge Cox in connection with the
16 sentencing?
17     A    No.
18     Q    You're not privy to any of those
19 discussions?
20     A    No.
21     Q    So you don't know what
22 discussions Judge Cox had with Volkswagen
23 and the United States Department of Justice
24 Criminal Division in connection with the
25 sentencing of Volkswagen in camera?

Page 129

Freeh

1      A    No.  But I know what he said in
2  open court at the sentencing.
3      Q    Okay.
4          And you don't have any
5  understanding of the number of chambers
6  conferences between Judge Cox and
7  Volkswagen and the Department of Justice
8  prior to the sentencing of Volkswagen?
9      A    No.
10     Q    You said earlier that Volkswagen
11 had intentionally and deliberately not
12 provided information to -- to whom, who
13 were you referring to?
14     A    Well, I didn't say that.  I said
15 my opinion says either negligently or
16 deliberately.  So I didn't couch it only in
17 terms of a deliberate misrepresentation.
18     Q    Well, but who was that
19 information supposed to be provided to?
20     A    I think in this case it should
21 have gone to the Court.
22     Q    Okay.
23         Are you aware of any instances
24 in your career where a public company in an
25 open sentencing, meaning open to the

Page 130

Freeh

1  public, disclosed facts to a federal judge?
2      A    I don't understand your
3  question.
4      Q    Let me restate the question,
5  okay.
6          Okay.  You don't know the extent
7  to which Volkswagen provided information to
8  the Department of Justice about wrongdoing
9  by senior management, right?
10     A    Correct.
11     Q    And you don't know the extent to
12 which information that was provided by
13 Volkswagen was relied upon by the
14 Department of Justice in the Fifth
15 Superseding Indictment, right?
16     A    Correct.
17     Q    And you don't know the amount of
18 money that Volkswagen spent on the Jones
19 Day internal investigation, right?
20     A    Correct.
21     Q    And you don't know the scope of
22 Jones Day internal investigation, right?
23     A    No.
24     Q    And you don't know how many
25 people Jones Day interviewed, right?

Page 131

Freeh

1      A    No.
2      Q    And you don't know how much --
3  how many documents were reviewed in
4  connection with the Jones Day
5  investigation?
6      A    Not familiar at all with the
7  specifics of the Jones Day investigation.
8      Q    You don't know the amount of
9  money that was spent by Volkswagen to image
10 computers, do you?
11     A    No.
12     Q    Okay.
13         So sitting here today, are you
14 aware of a situation where in connection
15 with the sentencing of a corporation the
16 company has taken upon itself, at a
17 sentencing, to disclose information that it
18 had confidentially provided to the
19 Department of Justice in open court to a
20 federal judge?
21         MR. HEATHER:  Objection.  May I
22     have the question read back, please?
23         (The requested portion was read
24     back by the Court Reporter.)
25         MR. HEATHER:  Object to the

Page 132

Freeh

1  form.
2      A    I'm not aware of any situation
3  where a federal judge at sentencing has
4  asked the specific questions that Judge Cox
5  asked and was not given what I believe was
6  then known to the company and the
7  government.
8      Q    Do you believe it was the
9  obligation of the United States Attorney's
10 Office and the Department of Justice to
11 provide information to Judge Cox in open
12 court about what the Department of Justice
13 knew about the involvement of upper
14 management in the diesel emissions issues?
15     A    Perhaps not in open court, but
16 they should have advised him one way or the
17 other.
18     Q    And you don't know whether they
19 did advise him in chambers?
20     A    Well, I'm not familiar with the
21 chambers discussions, but his question
22 would certainly indicate that he was not
23 advised.
24     Q    Did Judge Cox impose a sentence
25 at the hearing that you're referencing

Page 133

Freeh

1  where the question was asked or did he
2  impose the sentence later?
3      A    He imposed it in April.  The
4  hearing was in March.
5      Q    Okay.
6          So you don't know what
7  discussions occurred between March and
8  April between Judge Cox and Volkswagen and
9  the Department of Justice?
10     A    No.
11     Q    In chambers, right?
12     A    No.
13     Q    So your opinion presupposes that
14 there was no in-chambers discussion between
15 Judge Cox and the United States Department
16 of Justice and Volkswagen about the
17 involvement of upper management in the
18 company's diesel emissions issues?
19         MR. HEATHER:  Objection to form.
20     A    I don't know of any such
21 discussions.
22     Q    Are you aware that Judge Cox is
23 the judge who is handling other criminal
24 cases involving Volkswagen?
25     A    I did hear that, yes.

Page 146

Freeh

1  time.
2      Q      Really?  Where the company --
3  let me restate that.
4            In your experience when a
5  company cooperates with the U.S. Attorney's
6  Office -- let me restate that.
7            In your experience when a
8  company cooperates with the Department of
9  Justice, it normally provides information
10  on a confidential basis, right?
11     A      Well, not always -- but yes, can
12  be.
13     Q      And as a former federal
14  prosecutor, you would agree that the United
15  States Department of Justice wants to
16  determine when information provided to it
17  by a company that's cooperating with it is
18  disclosed publicly, right?
19     A      Yes.
20     Q      And that's because prosecutors
21  don't want other wrongdoers to know what
22  information the government has obtained
23  from the company that's cooperating with
24  it, right?
25     A      That's one of the reasons, yeah.

Page 147

Freeh

1      Q      And so in your experience, which
2  is long, you would agree that prosecutors
3  like to be the ones who decide what
4  information that's been provided to them by
5  a cooperating company is disclosed
6  publicly, right?
7      A      Well, in my experience, I also
8  know that if you're a prosecutor standing
9  before a judge and the judge asks a
10  specific question, as Judge Cox did at the
11  sentencing, you would either answer him in
12  open court or request to see him and
13  defendant's counsel in a confidential
14  proceeding.  That didn't happen here, which
15  is why I'm making --
16     Q      You don't know whether it
17  happened here?
18     A      If you'd let me finish.
19     Q      Yeah.
20     A      That's why I make the conclusion
21  that I stated there.
22     Q      Okay.
23            Now, have you ever represented a
24  corporation at a corporate criminal
25  sentencing?

Page 148

Freeh

1      A      No, I've not.
2      Q      And in your long experience,
3  have you ever seen a corporation at a
4  criminal, corporate criminal sentencing
5  disclose confidential information that the
6  corporation had provided to the United
7  States Department of Justice at the
8  sentencing?
9            MR. HEATHER:  Objection to form.
10     Asked and answered.
11     A      So I haven't represented a
12  company in that circumstance.
13     Q      My question, though, is have you
14  in your long experience, have you ever seen
15  a company disclose confidential information
16  that it had provided to the Department of
17  Justice at a sentencing proceeding?
18     A      If the government agrees to it,
19  yes.
20     Q      But not -- but if the
21  government -- if the government was silent
22  and didn't respond, have you ever seen a
23  company jump up and say, oh, your Honor,
24  let me give you some confidential
25  information that I provided to the

Page 149

Freeh

1  Department of Justice?
2      A      I don't personally know of an
3  instance like that.
4      Q      And you would agree that
5  normally it takes many months to make a
6  criminal case, right?
7      A      Depends on the case.
8      Q      Sometimes years, right?
9      A      Yes.
10     Q      And you don't know when the
11  Department of Justice made the judgment
12  that it had enough evidence to file a
13  superseding indictment in the Volkswagen
14  case, right?
15     A      Well, I assume it would have
16  been around the time that they returned the
17  Fifth Superseding Indictment.
18     Q      And you don't know what work --
19  let me restate that.
20            You don't know sitting here
21  today what information Volkswagen
22  provided -- let me restate that.
23            You don't know sitting here
24  today what information Volkswagen's lawyers
25  learned between April 2017 and March 2018

Page 150

Freeh

1  when the Fifth Superseding Indictment was
2  filed, right?
3       A    I don't know what the lawyers
4  learned, but if you look at the Schmidt
5  e-mail and the other conversations, you
6  could clearly conclude that the company,
7  leaving aside the lawyers for the moment,
8  the company had substantial knowledge of
9  involvement by upper management.
10      Q    Okay.
11           Do you believe the Schmidt
12 e-mail is evidence of knowledge of the
13 company's senior management of wrongdoing?
14      A    Yes.
15      Q    Do you know when the Schmidt
16 e-mail was first provided to the United
17 States Department of Justice?
18      A    No.
19      Q    Isn't it the case that you
20 actually received a copy of the Schmidt
21 e-mail in January 2016 in connection with
22 your possible retention by Volkswagen?
23      A    Yes.
24      Q    And, in fact, I provided you
25 with a copy of the Schmidt e-mail, right?

Page 151

Freeh

1       A    Correct.
2       Q    And so certainly there was no,
3  at least in our interactions, there was no
4  desire on the part of Volkswagen's counsel
5  to not provide the Schmidt e-mail to you,
6  right?
7       A    No.
8       Q    And did you discuss the Schmidt
9  e-mail with any representative of
10 Volkswagen in January 2016?
11      A    Just you and the general
12 counsel.
13      Q    Mr. Manfred Doess, right?
14      A    Yes.
15      Q    And you had discussions with
16 both Mr. Doess and me about what the
17 consequences of the Schmidt e-mail were,
18 right?
19      A    Yes.
20      Q    And you provided, you know, your
21 views as to what you thought the
22 consequences of the Schmidt e-mail were,
23 right?
24      A    You asked me what my views were.
25      Q    Yes.

Page 152

Freeh

1            And you provided your views to
2  us?
3       A    Yes.
4       Q    Other than the Schmidt e-mail,
5  are you aware of any evidence of senior
6  management wrongdoing?
7       A    I think there were conversations
8  between Johnson, who I think was a
9  whistleblower, and Horn, who was the
10 America CEO.  And I think from those
11 conversations, as I understand them, there
12 was clear statements about knowledge that
13 at that point Horn should have had.  I
14 think those are in 2015.
15           2014, of course, was the Schmidt
16 e-mail.  And I think it's fair to say, in
17 my opinion, that Horn was on notice of what
18 was going on and the options that Schmidt
19 gave him, for instance, three of them were
20 not all consistent with either what I would
21 call a cooperation or a truthful disclosure
22 to the interested parties.
23      Q    Well, do you know what
24 Volkswagen's counsel had provided to the
25 United States Department of Justice about

Page 153

Freeh

1  Mr. Horn's knowledge of the diesel
2  emissions issue prior to the plea
3  agreement?
4       A    No.
5       Q    Do you know what information the
6  United States -- let me restate that.
7            Do you know as of April 2017
8  what information Volkswagen had provided to
9  the United States Department of Justice
10 about Mr. Johnson's knowledge of diesel
11 emissions issues?
12      A    No.
13      Q    Do you know as of April 2017
14 what information Volkswagen had provided to
15 the United States Department of Justice
16 about discussions between Mr. Johnson and
17 Mr. Horn?
18      A    Specifically, no.
19      Q    And what's the basis for your
20 understanding of Mr. Stuart Johnson's
21 involvement in the Volkswagen's diesel
22 emissions issues?
23      A    Just that he had a conversation
24 with Mr. Horn, which if it's accurately
25 reported to me would have certainly put

Page 154
Freeh
1  Mr. Horn on notice that there were defeat
2  devices being employed and that was, of
3  course, inconsistent with his testimony in
4  front of the Congress.
5       Q     And what information -- let me
6  restate that.
7             Who reported to you information
8  about what Mr. Johnson had told Mr. Horn
9  about diesel emissions issues?
10      A     Mr. Heather.
11      Q     And what did Mr. Heather tell
12 you?
13      MR. HEATHER:  Objection.
14  Privileged.
15      MR. GIUFFRA:  Well, if he's
16  relying on that information in forming
17  his opinion, it's no longer
18  privileged.
19      A     I'm not relying on that
20 information.  As you know, it's not in the
21 report.
22            My opinion is based just on the
23 four corners of the Schmidt e-mail, which I
24 believe is more than sufficient to
25 attribute knowledge -- this is 2014 -- to

Page 155
Freeh
1  Mr. Horn and the general counsel that there
2  were very, very serious issues and they
3  looked at options to not disclose and to
4  frustrate the investigations.
5       Q     Do you know anything about what
6  Mr. Horn did between the time he received
7  that May 15, 2014 e-mail and the November
8  18 -- let me restate that -- and the
9  September 18, 2015 notice of violation?
10      A     No.
11      Q     Do you know anything about any
12 communications between anyone at Volkswagen
13 and the Department of Environmental
14 Protection about something called the ICCT
15 study?
16      A     I do not.
17      Q     Do you know anything about the
18 ICCT study?
19      A     No.
20      Q     Sometimes called the West
21 Virginia study?
22      A     No.  Well, I mean, I know that
23 that was the predication for the initial
24 reporting and disclosures and inquiries and
25 investigations.

Page 156
Freeh
1       Q     Do you know the scope of work
2  that was done by the West Virginia
3  investigators?
4       A     No.
5       Q     Do you know --
6       A     I know they did scientific
7  testing and reporting.
8       Q     Do you know what the extent of
9  that testing was?
10      A     No.
11      Q     Do you know how many cars they
12 tested?
13      A     No.
14      Q     Do you know how many Volkswagen
15 vehicles were tested?
16      A     No.
17      Q     Do you know how that testing was
18 done?
19      A     No.
20      Q     Do you know whether that testing
21 was done pursuant to a method that was
22 relied upon by the EPA in making emissions
23 determinations?
24      A     It's nothing to do with the
25 scope of my review or opinion, as you know.

Page 157
Freeh
1       Q     Okay.
2             Do you know what the knowledge
3  was of the United States Department of
4  Environmental Protection and the California
5  Resources Board with respect to the West
6  Virginia study?
7       MR. HEATHER:  Objection to form.
8       A     No.
9       Q     You keep saying that Judge Cox
10 asked a specific question about the extent
11 to which there was senior management
12 knowledge of the diesel emissions issues
13 during the, I guess the earlier -- I guess
14 this is the March sentencing hearing?
15      A     I think it was at the actual
16 sentencing in April.
17      Q     Okay.
18            Do you remember him putting a
19 specific question to either the government
20 or to Volkswagen about what the government
21 and/or Volkswagen knew about the
22 involvement of senior management?
23      A     No.  I mean we can quote his
24 statement.  I don't know whether you'd call
25 it a question or a statement.

Page 158

Freeh

1    What he said is, I would hope
2  that somebody would disclose -- obviously
3  to him, is the way I read his transcript --
4  whether there was upper management
5  involvement, and I hope the Department of
6  Justice and the German authorities can find
7  that out.
8       Q    If you'd just turn to page 12 of
9  your expert report.  Is the quote you're
10  referring to under paragraph 8(b)?
11      A    Yes.
12      Q    I'll read it:  "This is a case
13  of deliberate massive fraud" --
14      A    Yeah, that's it.
15      Q    -- "perpetrated by Volkswagen
16  management," right?
17      A    Yes.
18      Q    Do you see that?
19           So at least as of that point,
20  Judge Cox understood that this was a case
21  of deliberate massive fraud perpetrated by
22  Volkswagen management, right?
23           Do you see that?
24      A    That's what he said.
25      Q    And then he says:  "We don't

Page 159

Freeh

1  know how far up the corporate ladder it
2  goes."
3           Do you see that?
4      A    Yeah, and then he continues in
5  another sentence.
6      Q    We're just going to go sentence
7  by sentence.  That's what he said, right?
8      A    Yes.
9      Q    Now, is that a question -- did
10  he ask a question like I want to know how
11  far up the corporate ladder it goes before
12  I sentence Volkswagen?
13           MR. HEATHER:  Object to the
14      form.
15      A    Well, he didn't ask a specific
16  question, but my view is if you take his
17  whole statement, he was clearly inquiring
18  whether there was knowledge of involvement
19  of upper management.
20      Q    Based on the -- and your belief
21  that there was an inquiry by Judge Cox
22  about the knowledge of senior management is
23  based on the quotation that you have on
24  page 12 of your expert report under
25  paragraph little (b)?

Page 160

Freeh

1      A    Not just that.  And then at
2  other points at the sentencing, you know,
3  he talks about how the little guy, I think
4  is the phrase he uses, you know, is the
5  sort of the punching bag here, not the more
6  senior people.
7           So it's -- so, you know, it's
8  interspersed throughout the sentencing that
9  he's very interested and very concerned as
10  to whether there was upper management
11  involvement.
12      Q    Well, is that the quote, the two
13  quotes you have on page 11 of your expert
14  report under 1 and 2?
15      A    Yes, it would be those.
16      Q    And then he says:  "Hopefully,
17  the DOJ probably, probably most
18  importantly, hopefully the German
19  government will do its duty and find out
20  and prosecute those who are responsible for
21  this massive fraud, this deliberate massive
22  fraud."
23           Right?
24      A    That's what he said.
25      Q    And, in fact, isn't it the case

Page 161

Freeh

1  that Mr. Winterkorn has been indicted in
2  Germany?
3      A    Yeah.  He's also been charged in
4  the U.S.
5      Q    Both places, right?
6      A    Correct.
7      Q    You don't have any understanding
8  sitting here today the extent to which
9  Volkswagen has provided information to
10  German prosecutors, right?
11      A    No.
12      Q    Sitting here today, are you
13  aware of any complaints stated publicly by
14  the United States Department of Justice
15  about Volkswagen's cooperation in the
16  diesel emissions case?
17      A    No.
18      Q    Sitting here today, are you
19  aware of any complaints stated by German
20  prosecutors about Volkswagen's cooperation
21  in diesel emissions matters?
22      A    No.
23      Q    Now, you would agree with me
24  that the Fifth Superseding Indictment
25  states allegations, right?

Page 162

Freeh

1    A    Every indictment states
2  allegations.
3    Q    Those are not proven facts,
4  right?
5    A    Correct.
6    Q    And the mere fact that Martin
7  Winterkorn has been indicted in the U.S.
8  doesn't mean, as a matter of fact, that he
9  knew about the diesel emissions issues,
10  right?
11    A    No, but that doesn't have
12  anything to do with responding to what the
13  judge clearly asked about at the sentencing
14  hearing.
15    Q    When you say clearly asked,
16  that's the statement "we don't know how far
17  up the corporate ladder it goes"?
18    A    Yeah.  The judge was intensely
19  interested in a very relevant issue to
20  sentencing, specifically whether upper
21  management was involved or not, and he
22  expressed that, in my opinion, very clearly
23  to the parties.
24    Q    Now, you don't know when the
25  Department of Justice believed it had

Page 163

Freeh

1  sufficient evidence to charge
2  Dr. Winterkorn?
3    A    You mean at what early point,
4  no.
5    Q    What is the best piece of
6  evidence that you're aware of that
7  Dr. Winterkorn knew about the diesel
8  emissions fraud?
9    A    I don't know of any specific
10  evidence.  I know what the indictment
11  recites, their allegations, and it was a
12  sufficient basis for the government under
13  its guidelines to return a charge, criminal
14  charge.
15    Q    Do you know what -- do you
16  believe that -- do you believe that Michael
17  Horn, the CEO of Volkswagen Group of
18  America, knew about the diesel emissions
19  issues?
20    A    The clear inference from the
21  Schmidt e-mail going to him is that he was
22  on notice as the CEO of the company.
23          And the idea that he didn't know
24  what a defeat device was or whether it was
25  installed when he talked to Congress, I

Page 164

Freeh

1  find that very incredible.
2    Q    Do you believe that David
3  Geanacopoulos, the general counsel of
4  Volkswagen Group of America, knew about the
5  existence of defeat devices in Volkswagen
6  vehicles as of the time he received the
7  Schmidt memo?
8    A    Clearly put on notice, yes.
9    Q    Okay.
10          So your view is that the Schmidt
11  memo put Mr. Geanacopoulos on notice of the
12  existence of defeat devices in the
13  Volkswagen vehicles?
14    A    Certainly put him on notice to
15  inquire and find out, which was not a very
16  big secret in the company to find out.
17    Q    Well, do you know what steps
18  Mr. Geanacopoulos took after he received
19  that memo?
20    A    No, I don't.
21    Q    He has not been indicted, right?
22    A    He's not been indicted.
23    Q    And with respect to Martin
24  Winterkorn, are you aware of whether he
25  read the attachment to the Schmidt memo?

Page 165

Freeh

1    A    Don't know what he read.
2    Q    Okay.
3          You have no idea what
4  information he read, right?
5    A    No.
6    Q    You don't know any -- you have
7  no knowledge sitting here today what
8  information was told to Mr. Winterkorn
9  about whether there were defeat devices in
10  Volkswagen vehicles?
11    A    I don't know what he knows,
12  correct.
13    Q    And you don't know what Mr. Horn
14  knows other than he received this May 15
15  memo?
16    A    Yes.
17          MR. HEATHER:  Object to the
18      form.  Misstates testimony.
19  BY MR. GIUFFRA:
20    Q    Now, do you know sitting here
21  today what actions Mr. Horn and
22  Geanacopoulos took after receiving the
23  Schmidt memo?
24    A    I know Mr. Horn testified to the
25  Congress.

Page 166

Freeh

1      Q      What did he testify to -- what
2  is your understanding of what he testified
3  to?
4      A      He said he didn't learn about
5  any of this until the September 2015
6  disclosures to CARB by the company.
7      Q      Do you know when Volkswagen
8  hired Kirkland & Ellis?
9      A      No.
10      Q      You know, I have a question.  On
11  page 18 of your expert report --
12      A      Yes.
13      Q      Do you see -- that's your
14  signature at the bottom of it, right?
15      A      Yes.
16      Q      Was the expert report prepared
17  on Mr. Heather's computer system?
18      A      Well, it was -- I think it was
19  drafted on that, sent to me, and then I
20  made some changes on my own system.
21      Q      And then it appears that this --
22  was this signature page PDF'd by you to
23  Mr. Heather's office?
24      A      I don't recall.
25      Q      Do you recall whether when you

Page 167

Freeh

1  signed the document you had the full expert
2  report in front of you?
3      A      Yes, I did.
4      Q      Okay.
5              Because it appears that page 18,
6  which is where your signature appears,
7  looks different than the other pages in the
8  expert report.
9              Do you see that?
10      A      Well, the part under conclusion
11  looks different than the rest of the text.
12      Q      Well, no, I'm just looking at
13  page 18.  It just looks different in terms
14  of the typeface, in terms of -- I mean the
15  darkness of the typeface and whether it's
16  sort of straight and where the top of the
17  page is compared to the rest of the
18  document.
19              So my question is, do you recall
20  faxing the signature engage or PDF'g the
21  signature page to Mr. Heather's office?
22      A      I think I was out in California
23  when I signed it.  Yes, I was in
24  California.  I was in Los Angeles in his
25  office.  So I signed it in his office.

Page 168

Freeh

1      Q      You signed it in his office?
2      A      Yes.
3      Q      Okay.
4              MR. GIUFFRA:  Let's mark this --
5      I guess do we have to -- let's mark
6      this as whatever number we're up to,
7      200.  This is Exhibit 25 to your
8      expert report.
9              (Exhibit 200, Exhibit to Freeh
10      Expert Report, marked for
11      Identification, as of this date.)
12  BY MR. GIUFFRA:
13      Q      All right.  I've just handed you
14  Exhibit 200, which is Exhibit 25 of your
15  expert report.
16      A      Yes.
17      Q      Okay.
18              And your recollection is that I
19  provided a copy of this document to you
20  back in January 2016?
21      A      Yes, I think so.
22      Q      And you would consider that this
23  document is probably one of the linchpins
24  of your expert report in terms of the
25  knowledge of senior management at

Page 169

Freeh

1  Volkswagen?
2      A      Yeah, I wouldn't call it the
3  linchpin, but it's certainly, as I
4  described in my testimony today, a basis
5  for the opinion I've made.
6      Q      And are you aware of another
7  document that is referenced in your expert
8  report that's more important than Exhibit
9  25 with respect to the question of senior
10  management knowledge of Volkswagen of the
11  diesel emissions issue?
12      A      No, I mean except for the
13  superseding indictment, the Fifth
14  Superseding Indictment.
15              Again, I don't know when the
16  government made those determinations, but
17  it's clearly based on events that happened
18  well before the plea and the sentencing.
19      Q      And, obviously, the indictment
20  itself is not evidence, we've established
21  that.
22              So in terms of something that's
23  actually evidence, would it be fair to say
24  that this Exhibit 25 to your expert report
25  is the best document reflecting senior

Page 182

Freeh

1  in the 2.0 liter.
2      Q    But you would agree with me you
3  just conceded that the memo doesn't say
4  that there were defeat devices in TDI
5  vehicles.
6      A    The memo does not say that
7  specifically, correct.
8      Q    Now, down at paragraph 6, you
9  say that "Mr. Horn and Mr. Geanacopoulos
10  participated in the coverup."
11          Do you see that?
12      A    Yes.
13      Q    Do you believe that Mr. Horn
14  participated in the coverup?
15      A    Yes.
16      Q    And what was the coverup that he
17  participated in?
18      A    Well, I believe that they were
19  knowledgable -- my opinion -- they were
20  knowledgable well before September 2015 in
21  the defeat devices and no disclosure or
22  attempt to disclose that or stop the sale
23  of the vehicles until September of 2015
24  when CARB intervened.
25      Q    Well, again, I think you

Page 183

Freeh

1  testified you don't know what information
2  they disclosed to CARB or EPA before
3  September 2014, right?
4      A    No.  Specifically, I don't know.
5      Q    And you think Mr. Geanacopoulos
6  participated in a coverup?
7      A    My answer and my opinion is
8  based on this e-mail and notice, which goes
9  back to 2014, May of 2014, it seems -- it
10  seems to defy all my experience with
11  general counsels and CEOs and companies and
12  governance that they would not have
13  immediately determined after receiving this
14  memo, if not before, that there were
15  specific defeat devices both in the 2.0
16  liters and the 3.0 liters.
17      Q    Do you know whether the
18  information that's contained in Exhibit 25
19  of your expert report about the West
20  Virginia study was disclosed to CARB or EPA
21  as of May 2014?
22      A    As I said before, I don't know
23  what they disclosed to CARB.
24      Q    Do you know when CARB -- what
25  about EPA, you don't know?

Page 184

Freeh

1      A    Same thing.
2      Q    And so you don't know sitting
3  here today when EPA made the judgment there
4  were defeat devices in VW vehicles, right?
5      A    Right.
6      Q    And you don't know when CARB
7  made that judgment, right?
8      A    Correct.
9      Q    And you don't know what
10  significance CARB placed on the West
11  Virginia study, correct?
12      A    No, I don't know.
13      Q    And you don't know what
14  significance EPA placed on the West
15  Virginia study, right?
16      A    Correct.
17      Q    The information about the
18  certified preowned vehicles in your expert
19  report, which was found on pages 13 through
20  17 -- do you see that?
21      A    Yes.
22      Q    That all came from your
23  counsel -- well, from counsel for
24  plaintiffs, right?
25      A    Well, no.  I mean the documents

Page 185

Freeh

1  and the data and the information came from
2  them, but these are my conclusions based on
3  assumed facts.
4      Q    Based on assumed facts.
5          Similarly, the other information
6  in your expert report, to the extent
7  there's documents identified, that all came
8  from counsel or plaintiffs, right?
9      A    The documents, yes.
10      Q    Do you know how many people have
11  opted out of the Volkswagen class action
12  settlement?
13      A    No.
14      Q    Do you know how many vehicles
15  Volkswagen has purchased pursuant to that
16  class action settlement?
17      A    No.  I mean I'm familiar with
18  the documents that I report in my opinion,
19  you know, 500 sold in California, less than
20  100 sold outside, brought into
21  California -- but in terms of the total
22  numbers, I don't know.
23      Q    Okay.
24          In terms of some of the
25  judgments you make in your opinion about,

Page 186

Freeh

1  for example, you know, whether people
2  participated in a coverup, that's based on
3  your review of documents, right?
4      A     Yeah, my review of the documents
5  that were all public and which I reviewed
6  to make my opinion.
7      Q     And why do you believe that you
8  have some expert opinion to provide to the
9  jury in this case about what your review of
10 documents that could be admitted into
11 evidence mean with respect to the knowledge
12 of people at Volkswagen AG about the diesel
13 emissions issues?
14     A     I think I can give an opinion as
15 to what, if anything, needs to be disclosed
16 to calculate the guidelines accurately,
17 which I don't think was done here, and then
18 subsequently what is required to be
19 disclosed and reported to the Court at
20 sentencing, particularly when the Court
21 specifically inquires about a subject
22 matter.
23     Q     And again, that goes back to the
24 statement "we don't know how far up the
25 corporate ladder it goes."

Page 187

Freeh

1          You view that as a specific
2  request for information about all the
3  information that the government has learned
4  from Volkswagen about corporate knowledge?
5      A     No.  I answered that before and
6  it's a complex question.
7          What I said, I think -- I'll
8  repeat it again -- is that based on all the
9  judge's comments at the sentencing, not
10 just that one, but clearly that one, he was
11 inquiring whether or not there was
12 involvement of upper management and
13 directly told the parties how important
14 that was.
15          And as somebody who knows how
16 the guidelines works, and particularly on
17 the judicial side, it seemed to me basic
18 protocol and response that somebody should
19 have told him what was going on or upper
20 management's involvement as I believe was
21 known to the company at that point.
22     Q     And potentially DOJ?
23     A     And potentially DOJ.  My
24 conclusion that DOJ didn't know is that
25 they stood silent when the judge made that

Page 188

Freeh

1  request at sentencing.  It would be highly
2  unusual, in my experience, for a prosecutor
3  to sit there quietly if, in fact, they knew
4  that there was upper management
5  involvement.
6      Q     And your understanding of this
7  so-called upper management involvement, as
8  least as far as you know, is from Exhibit
9  25 of your expert report and you don't know
10 when that was provided to the government?
11         MR. HEATHER:  Objection.
12     Misstates the testimony.
13     A     Well, that's not what I said.
14 But also the Winterkorn indictment and when
15 that was known to the government.  We don't
16 know exactly when that occurred.
17     Q     Would it be fair to say in your
18 experience that criminal investigations
19 involve both review of documents and
20 interviewing witnesses, right?
21     A     And many other things, yes.
22     Q     And you don't know the timing of
23 whether -- of when DOJ interviewed
24 witnesses that it relied upon in bringing
25 the Fifth Superseding Indictment, right?

Page 189

Freeh

1      A     Correct.
2      Q     Now, do you plan to testify at
3  trial in this case about whether any senior
4  management folks at Volkswagen had knew
5  about the diesel emissions issues?
6      A     No.  I think I would give an
7  opinion as to when and how they were put on
8  notice with respect to the defeat devices.
9      Q     And which -- just for the
10 record, which Volkswagen senior management
11 do you intend to testify at trial had
12 knowledge of diesel emissions issues, and
13 when -- that's complicated.  Let me restate
14 it.
15     A     Yeah, that is complicated.
16     Q     Okay, let me restate it.
17         At trial, when do you plan to
18 opine as to when Volkswagen senior
19 management had knowledge of the diesel
20 emissions issues?
21         MR. HEATHER:  Object to form.
22     A     Mr. Horn certainly when he
23 received the -- or immediately after he
24 received the Schmidt memo.  There is,
25 again, the conversations I related, which I

Page 190

Freeh

1  didn't rely upon in my report, which detail
2  the conversation the following year, 2015,
3  between Johnson and Horn.
4      Q    And those are conversations that
5  your client -- that counsel for plaintiffs
6  disclosed to you?
7      A    Yes.  I haven't done the
8  research and verified those myself, but if
9  they're accurate, that would be the second
10  time when he was clearly put on notice that
11  there were defeat devices in his vehicles.
12     Q    Is there any reference to Stuart
13  Johnson in your expert report?
14     A    No.
15     Q    So do you plan to testify about
16  matters that are not specified in your
17  expert report at trial?
18     A    Only if asked about them.
19     Q    Okay.
20          So what, specifically, do you
21  intend to testify about Stuart Johnson and
22  his testimony at trial?
23     A    Well, I don't know.  It depends
24  on who asks me a question and what the
25  judge would permit.

Page 191

Freeh

1      Q    Well, you know, you sat as a
2  judge.  Do you think it's consistent with
3  the federal rules for an expert to testify
4  about matters that are not disclosed in the
5  expert's report?
6          MR. HEATHER:  Objection to form.
7          Calls for an expert opinion.  Outside
8          the scope of his report.
9      A    Well, I know that judges
10  frequently ask experts questions that go
11  well beyond their written opinions, and
12  cross-examination also would bring that
13  out.  It depends on the parties and the
14  Court.
15     Q    Well, other than Mr. Horn, can
16  you think of -- so your testimony is
17  Mr. Horn knew about diesel emissions issues
18  in May 2014?
19     A    Had reason to know about them,
20  yes.
21     Q    But you don't have a basis for
22  testifying he knew there were defeat
23  devices in the vehicles as of May 2014,
24  right?
25          MR. HEATHER:  Objection to the

Page 192

Freeh

1  form.
2      A    Well, I believe on the basis of
3  this memo he was on notice and would have
4  found that out within a very short period
5  if he exercised common interest and due
6  diligence.
7      Q    But as far as you know, from the
8  face of the memo, you've previously stated
9  it doesn't say there were defeat devices in
10  the vehicles, right?
11          MR. HEATHER:  Objection to form.
12     A    It doesn't say that
13  specifically.
14     Q    Okay.
15          Now with respect to anyone else
16  other than Mr. Horn you intend to testify
17  about?
18     A    No.  It depends what I'm asked
19  about based on my opinion as you see in the
20  report.
21     Q    Do you intend to testify about
22  what your understanding is of
23  Mr. Geanacopoulos' knowledge of defeat
24  devices as of any point in time?
25     A    Well, I'd have the same opinion.

Page 193

Freeh

1  If you were the general counsel and you
2  received a memo like that, it shouldn't
3  take you very long to do what you're
4  supposed to do in that circumstance and
5  find out what the facts are.
6      Q    Okay.
7          Other than Mr. Geanacopoulos and
8  Mr. Horn, do you plan to make any
9  statements about the knowledge of any other
10  Volkswagen management with respect to
11  diesel emissions issues at trial in this
12  case?
13     A    The question is, you know, what
14  the company knew about Mr. Winterkorn and
15  when they knew it, and I don't have the
16  inside view of that.
17          But the superseding indictment
18  certainly represents information that was
19  not before the sentencing judge, which is
20  really the basis of my expert opinion that
21  the Court did not have all the information
22  with respect to relevant factors at
23  sentencing, particularly the involvement of
24  upper management, which he specifically and
25  repeatedly asked about at the sentencing.

Page 218

Freeh

1 Doess is the general counsel of Volkswagen
2 AG?
3       A    Yes, I do.
4       Q    And is the telephone number
5 202-215-8321, is that your telephone
6 number?
7       A    Yes.
8       Q    And it appears that you sent --
9 does this refresh your -- why don't you
10 read the e-mail.
11      A    Yes, I've read this.
12      Q    Does this refresh your
13 recollection that you reached out to
14 Volkswagen in December 2016 and asked to be
15 considered as the monitor for the
16 Volkswagen criminal case?
17           MR. HEATHER:  Objection to form.
18      A    Yeah.  I wouldn't say I reached
19 out for him, though.  I was following up a
20 conversation where he broached the subject
21 back in January.
22           MR. HEATHER:  Excuse me, what
23      exhibit number is this?
24           MR. GIUFFRA:  201.
25           THE WITNESS:  201.

Page 219

Freeh

1 BY MR. GIUFFRA:
2       Q    Now between January 2016 and
3 December 2016, would it be fair to say
4 there was a lot of press about the
5 Volkswagen case?
6       A    Yes.
7       Q    Do you recall reading that
8 press?
9       A    I read some of it, yes.
10      Q    And did you have any view with
11 respect to the speed with which Volkswagen
12 was able to reach settlements with the
13 Department of Justice and civil plaintiffs?
14      A    No.  I mean as these large cases
15 go, I think it seemed to go quicker than I
16 would have expected in a big complex case.
17      Q    I mean would it be fair to say
18 that in terms of reaching a settlement in
19 the civil case, that Volkswagen moved quite
20 quickly to settle the case that was brought
21 by consumers in a class action?
22      A    Yeah.  Again, I don't know the
23 actual timeframe.  My previous answer was
24 as to the criminal case.  My view was that
25 it was settled in a fairly quick efficient

Page 220

Freeh

1 manner.
2       Q    When you say efficient, what do
3 you mean?
4       A    Well, you reached the settlement
5 with the government, you know, in less than
6 a year after the investigation started,
7 that seems to be with these large cases
8 very fast.
9       Q    And in your text to Manfred, you
10 write:  "Congratulations on moving this
11 complex matter along to a final solution."
12           What do you mean by that?
13      A    Well, that the case was
14 progressing in terms of a settlement.  When
15 I left conversations with Manfred in either
16 January or February, I was aware that
17 contacts were being made with the
18 government.  I didn't know what the
19 substance was, but they seemed to be moving
20 forward to some kind of resolution.
21      Q    In your experience does service
22 as a monitor, is that an economically
23 remunerative matter typically for the
24 monitor?
25      A    Yes.

Page 221

Freeh

1       Q    And typically a monitorship in a
2 case like Volkswagen would involve tens of
3 millions of dollars in fees, correct?
4       A    It could, yes.
5       Q    I mean you were the monitor in
6 Daimler, right?
7       A    Correct.
8       Q    What were the fees that you
9 charged in Daimler?
10           MR. HEATHER:  Objection.
11      A    Yeah, over a period of 3 years,
12 I'd have to go calculate them.
13      Q    Many millions of dollars, I
14 would think?
15      A    Yes.
16      Q    And so would you say for someone
17 who is a former government official,
18 serving as a monitor is a plum position,
19 right?
20           MR. HEATHER:  Object to the
21      form.
22      A    I'd say for anyone.
23      Q    It's a plum position, right?
24      A    I don't know that I'd call it a
25 plum position.  It's a good engagement and

Page 222

Freeh

1   it's a great way to practice what you've
2   learned and known about both corporations
3   and compliance and government
4   investigations.
5       Q     And you would have liked to have
6   served as the monitor for Volkswagen,
7   right?
8       A     You know, I never actually went
9   into the process formally.  So as you
10  know -- I mean I'm reading my statement on
11  201, but that was in response to
12  Volkswagen -- distinctly and clearly
13  telling me that they would like to keep me
14  in mind and consider me later as the
15  monitor, which, by the way, indicated to me
16  that they didn't see any conflict with
17  respect to our prior conversations.
18      But did I ever, you know -- I
19  mean I was aware that the company asked for
20  bids and that Larry and other people put
21  them in.  I never put them in.
22      Q     Well, in fact, isn't it the case
23  in this e-mail that you actually sent them
24  after this was an unsolicited text other
25  than maybe some comment that you think was

Page 223

Freeh

1   made back in January, is that fair?
2       MR. HEATHER:  Objection to form.
3       A     No, it's not fair.  It wasn't a
4   comment made.  He basically told me that
5   they'd like to consider me for the
6   monitorship, which I understood from his
7   description was one of the reasons they
8   didn't want me to get involved at that
9   point.
10      Q     Do you recall reaching out to me
11  in late 2016 about being the monitor for
12  Volkswagen?
13      A     Very likely.  We stayed in touch
14  on that.
15      Q     Did your firm participate in the
16  process to be named as the auditor for Fiat
17  Chrysler?
18      A     You know, I'm not sure.  It's
19  possible we did.  I'd have to go check with
20  somebody.
21      Q     Do you recall Joe Guccione
22  reaching out about being the monitor -- of
23  the auditor for Fiat Chrysler?
24      A     Yeah, he would have been
25  involved in that, yes.

Page 224

Freeh

1       Q     And reaching out to me?
2       A     You know, I don't recall that,
3   no.
4       Q     Are you aware that Sullivan &
5   Cromwell is counsel for Fiat Chrysler in
6   their emissions counsel?
7       A     No.
8       Q     And that I'm involved as counsel
9   to them?
10      A     No, did not know.
11      Q     And are you aware that your firm
12  was not selected?
13      A     I know we weren't given that
14  engagement, but I wasn't involved in the
15  process.
16      Q     Are you aware that your name was
17  identified in the selection materials to be
18  the principal auditor?
19      A     I'm sorry, what do you mean the
20  selection materials?
21      Q     The materials that were
22  submitted by your firm --
23      A     Oh, yes.  I think that's
24  correct.
25      Q     I think it's called the Freeh

Page 225

Freeh

1   Group?
2       A     Yes.
3       Q     Okay.
4       So in terms of -- I want to just
5   spend a little time going through the
6   dealings you had with Volkswagen in late
7   2015 into 2016.
8       So would it be fair to say that
9   you learned at some point in late 2015 that
10  Ms. Hohmann-Dennhardt would be becoming a
11  member of the Management Board of
12  Volkswagen?
13      A     Yes.  She reached out to me to
14  tell me that.
15      Q     And how many communications did
16  you have with Ms. Hohmann-Dennhardt about
17  becoming, getting involved on behalf of
18  Volkswagen in connection with the diesel
19  emissions matters?
20      A     I had one meeting or two
21  meetings, one in Stuttgart, I think that
22  was in 2015, one in Wolfsburg 2016, maybe
23  one or two telephone calls and a number of
24  e-mails and messages, all of which I could
25  find, we've turned over to you.

Page 226

Freeh

1    Q    When you visited Wolfsburg, did
2  Volkswagen pay your expenses?
3    A    No.
4    Q    So you think the first
5  communication would have been sometime in
6  say November 2015?
7    A    I think November.  That's when
8  she reached out for me.
9    Q    Okay.
10        Do you recall ever reaching out
11  to Ms. Hohmann-Dennhardt in December 2015
12  and advising her about the consolidation of
13  the VW cases before Judge Charles Breyer in
14  San Francisco?
15    A    I may have, yes.
16    Q    Do you recall advising
17  Ms. Hohmann-Dennhardt that you thought that
18  the consolidation of the cases before Judge
19  Breyer was a very important development?
20    A    I may have said that, yes.
21    Q    And did you discuss with her at
22  any point the implications of the
23  consolidation of the VW cases before Judge
24  Breyer?
25    A    I don't think so.  I think that

Page 227

Freeh

1  was a piece of news I saw in the U.S.  I
2  didn't know whether she had that.  So I
3  sent it to her when I read it.
4    Q    Have you ever met Judge Breyer?
5    A    No.
6    Q    Have you ever met Steven Breyer?
7    A    No -- well, I'm sorry, I have
8  met him, yes.
9    Q    Did you discuss with
10  Ms. Hohmann-Dennhardt the fact that you had
11  met Steven Breyer?
12    A    No.
13    Q    Now, did there ever come a time
14  in -- let me restate that.
15        In late December/January, late
16  December 2015/January 2016, did you ever
17  have a conversation with then Assistant
18  Attorney General John Cruden of the
19  environmental natural resources decision
20  that you might be retained as a lawyer for
21  Volkswagen to try to resolve its issues
22  with the U.S. Government?
23    A    It was -- it was more of just a
24  heads up to him than a conversation -- yes,
25  I said there was a possibility I would be

Page 228

Freeh

1  working with Volkswagen on that case and he
2  said thank you, he appreciated hearing
3  that.
4    Q    Did you speak to Ms. Yates and
5  tell her -- she was the Deputy Attorney
6  General -- that you might be retained as a
7  lawyer for Volkswagen to try to resolve its
8  issues with the U.S. Government?
9    A    It was the same conversation,
10  the same day.  I was down there on another
11  matter and I mentioned it to both of them,
12  yes.
13    Q    Did you seek out Mr. Cruden when
14  you were at -- when -- let me restate the
15  question.  It's a poorly-phrased question.
16        When you met with Mr. Cruden,
17  were you meeting with him on the BP matter
18  or did you reach out to him about the VW
19  matter?
20    A    The BP matter.
21    Q    Did there come a time when you
22  reported to Ms. Hohmann-Dennhardt that both
23  Ms. Yates and Mr. Cruden were very
24  supportive of the idea of you being
25  retained as a lawyer to help resolve VW's

Page 229

Freeh

1  issues with the U.S. Government?
2    A    Yes.  Mr. Cruden was supportive.
3    Q    And did you advise
4  Ms. Hohmann-Dennhardt that he was
5  supportive?
6    A    Yes.
7    Q    Did you advise
8  Ms. Hohmann-Dennhardt that Ms. Yates was
9  also very supportive of the idea of you
10  being hired as a lawyer?
11    A    Yeah, I think she was.  But the
12  conversation with John Cruden on that is
13  much clearer to me.
14    Q    What do you remember about your
15  conversation with John Cruden?
16    A    Well, as I said, we were there
17  on some other matters and I mentioned to
18  him that I might be working with Volkswagen
19  on those matters.  His reaction was very
20  positive to that.  Then he brought up the
21  idea of working or submitting my name to
22  Judge Breyer as the special master.
23    Q    Do you have a view as to whether
24  the lawyers who handled the BP case -- let
25  me restate that.

Page 230

Freeh

1    Do you have a view as to whether
2  the BP case was resolved as fast as it
3  could have been resolved?
4    A    I don't have a particular view
5  on that.  It's a complicated case and went
6  on for a long period.
7    Q    Why do you think the BP case
8  went on so much longer than the Volkswagen
9  case did?
10    MR. HEATHER:  I'm going to
11    object.  You're asking him for an
12    opinion that goes way outside the
13    scope of his report.
14  BY MR. GIUFFRA:
15    Q    Can you answer the question?
16    A    I don't know.
17    Q    Did you ever tell
18  Ms. Hohmann-Dennhardt that you thought you
19  could reach good settlements for Volkswagen
20  in a shorter time than it took to resolve
21  the BP cases?
22    A    Don't recall that.
23    Q    Did you ever tell
24  Ms. Hohmann-Dennhardt that you thought you
25  could save VW money, time and reputation by

Page 231

Freeh

1  being involved in the resolution of the VW
2  emissions cases?
3    A    Yes, I think I said that.
4    Q    Did you ever, in any way,
5  express any view that the BP case could
6  have been resolved cheaper had you been
7  more actively involved?
8    A    I don't recall that, in
9  particular.
10    Q    Did you ever meet privately with
11  the CEO of Volkswagen, Matthias Muller?
12    A    No, I don't believe I did.  I
13  met with the Chairman of the Supervisory
14  Board.  He came over to see me the morning
15  after we did the meeting we talked on
16  January 6th, but I don't believe I ever met
17  separately with Mr. Muller.
18    Q    Okay.
19    So you would have met with
20  Mr. Potsch?
21    A    Potsch.
22    Q    You met with him the day after
23  the Management Board meeting?
24    A    Yes.
25    Q    How long did you meet with

Page 232

Freeh

1  Mr. Potsch?
2    A    No more than 15 minutes.
3    Q    Without disclosing any
4  privileged communications, do you remember
5  the topics you discussed with Mr. Potsch?
6    A    Yeah.  It was only one topic.
7  He said he was very pleased with the
8  presentation, appreciated me coming over on
9  my own time and expense to meet with him,
10  but said that I'd have to discuss this with
11  both Manfred and U.S. counsel and would I
12  be willing to contact him when I got back
13  to the United States, and I said yes.
14    Q    Did you ever discuss with
15  Ms. Hohmann-Dennhardt your confidence that
16  you could save VW very large amounts of
17  money from legal fees to settlement costs?
18    A    I don't think it was that
19  specific, no.
20    Q    But you definitely recall
21  discussing with her the fact that you
22  needed a contingent compensation provision
23  in connection with work you might do for
24  Volkswagen, right?
25    A    Yes.

Page 233

Freeh

1    Q    I apologize if I asked this
2  question, but let me just be sure.  Had you
3  ever previously asked for a contingent
4  compensation arrangement in connection with
5  work as a lawyer?
6    A    Yes, many times.
7    Q    Have you ever asked for a
8  contingent compensation arrangement in
9  connection with work as a defense lawyer?
10    A    Yes.
11    Q    Do you remember any instances
12  when you did so?
13    A    Well, a number of cases and
14  clients, but I don't know that I should
15  mention them.
16    Q    Okay.
17    Now, did you ever prepare a
18  written presentation for the Board of
19  Management, Board of VW AG?
20    A    Yes, I did.
21    Q    And that would be a slide deck
22  that you talked about various topics?
23    A    Correct.
24    Q    And did the topics include
25  international and U.S. media perception of

Page 234
Freeh

1  Volkswagen?
2      A    Yes.
3      Q    And did you discuss prior
4  scandals the company had?
5      A    I'd have to look at the deck,
6  but I did -- in preparation for the meeting
7  in Wolfsburg with the Board of Management
8  put together a deck, which we sent you as
9  part of our materials.
10     Q    In the presentation that you
11 made to the Management Board of Volkswagen,
12 did you discuss setting up something called
13 an Office of Special Counsel?
14     A    Yes.  I think that was part of
15 the proposal.
16     Q    And would you be the head of the
17 Office of Special Counsel?
18     A    Yes.
19     Q    And would it be fair to say that
20 the role of the Office of Special Counsel
21 would be to coordinate global, criminal,
22 and regulatory response?
23     A    To oversee everything going on
24 in connection with emissions.
25     Q    And did you also say that you

Page 235
Freeh

1  would act as a spokesperson for the
2  company?
3      A    On the areas related to what I
4  was doing, yes.
5      Q    And did you also tell the board
6  that you would be a coordinator of an
7  "effective resolution to mass claims"?
8      A    You know, I didn't go through
9  the deck with the board.  It was more of a
10 general conversation.  As far as I know,
11 they had the deck.  I didn't use it at the
12 briefing.  I didn't go through it.  I had
13 given it to Christine Hohmann-Dennhardt a
14 few days before.
15          But the conversation was more of
16 a general conversation about what I could
17 do, but focused mainly on Daimler, what I
18 thought was the value of what we did for
19 Daimler.
20     Q    Did you meet -- and I apologize
21 if I asked this -- did you meet separately
22 with Matthias Muller, the CEO, outside of
23 the Management Board meeting?
24     A    No, I don't think I did.
25     Q    Were you aware in late December,

Page 236
Freeh

1  early January -- well, 2015 into '16, that
2  Ken Feinberg had been retained by
3  Volkswagen?
4      A    Yes, I think I knew that.
5      Q    You know who Ken Feinberg is,
6  right?
7      A    Right.
8      Q    Who is Ken Feinberg?
9      A    So Ken Feinberg is a lawyer and
10 he's done a lot of practice in the area of
11 claims administration.  He worked on the BP
12 case.  And I just know him as a lawyer for
13 many years.
14     Q    In your communications with
15 Volkswagen Management Board members, did
16 you tell them that your work on BP had
17 saved BP several billion UK pounds?
18     A    No, I don't remember saying that
19 at all.  I think -- again, the conversation
20 at the meeting was very, very general.  I
21 talked about the resolution, they're saving
22 the company not just a lot of money, but
23 getting the settlement done and behind them
24 as a matter of corporate reputation.  But
25 we talked more about Daimler.  I don't

Page 237
Freeh

1  think we spoke much about BP, my
2  recollection.
3      Q    Did you have any discussions in
4  January 2016 about VW's desire to obtain a
5  fast resolution of the diesel emissions
6  issues?
7      A    Well, the Management Board
8  clearly said they wanted to obtain a fast
9  resolution.  So we discussed that at the
10 meeting.
11     Q    Did anyone at the Management
12 Board say anything to you that made you not
13 want to be a lawyer for Volkswagen?
14     A    No, not that I can recall.
15     Q    Was it your sense that the
16 members of the Management Board were
17 looking to move proactively to resolve the
18 issues that the company had in the United
19 States?
20     A    Yes.
21     Q    And that members of the
22 Management Board wanted to try to reach
23 settlements with U.S. regulatory
24 authorities as fast as they could?
25     A    That's what they said, yes.

Page 246

Freeh

1       Q    Now, did there ever come a time
2  when you advised folks at Volkswagen about
3  the mood in the United States vis-a-vis
4  Volkswagen?
5            MR. HEATHER:  Object to the
6       form.
7       A    It may have come up in the
8  conversations even with the board, but I
9  don't have a specific recollection.
10      Q    Did you have any discussions
11 with anyone at Volkswagen where you
12 discussed what U.S. regulators were saying
13 about the company?
14           MR. HEATHER:  Objection to form.
15      A    During that period, I recall
16 sending to at least Dr. Hohmann-Dennhardt,
17 you know, press articles, things that I saw
18 in the newspapers, because of the ongoing
19 conversations we were having and I wanted
20 to make sure that she had the benefit of
21 the things I was reading.
22           So yes, I think -- I think I
23 would send her an article if I saw it in
24 one of the newspapers, and I don't recall
25 sending it to anyone else.

Page 247

Freeh

1       Q    Other than the conversations
2  that you had with Sally Yates and with John
3  Cruden, did you have any other
4  conversations with any U.S. Government
5  officials about Volkswagen in 2015 and '16?
6       A    No.
7       Q    In 2016, at any time did you
8  have any conversations with any U.S.
9  Government officials about Volkswagen?
10      A    No.
11      Q    In 2017, did you have any
12 conversations with any U.S. Government
13 officials about Volkswagen?
14      A    No.
15      Q    2018?
16      A    No.
17      Q    '19?
18      A    No.
19      Q    Now, did you prepare a chart
20 identifying what your role would be as
21 special counsel?
22      A    Yes, I did.
23      Q    And could you just briefly, for
24 the record, describe that chart?
25      A    Yeah.  It's in the materials

Page 248

Freeh

1  that we provided to you -- I don't have a
2  copy in front of me -- but it was
3  functioning as a counsel and advisor to the
4  Management Board, I think it was reporting
5  up to Christine Hohmann-Dennhardt, and the
6  depiction, at least in the chart, as I
7  recall it, was as we've said before,
8  overseeing everything that was going on
9  with respect to emissions in the United
10 States.
11           MR. GIUFFRA:  Could we take a
12      quick break just for 5 minutes?
13           MR. HEATHER:  Sure.
14           THE VIDEOGRAPHER:  The time is
15      1:29.  We're going off the record.
16           (Recess taken 1:29 p.m.)
17           (Resumed 1:34 p.m.)
18           THE VIDEOGRAPHER:  The time is
19      1:34 p.m. and we're back on record.
20 BY MR. GIUFFRA:
21      Q    Did you ever discuss with
22 Ms. Hohmann-Dennhardt that having you as
23 the "main legal coordinator in the U.S.
24 would add great value to VW"?
25      A    Yes, I think I did.

Page 249

Freeh

1       Q    And did you have discussions --
2  let me restate that.
3            There came a time when you had a
4  meeting with Manfred Doess and me in mid
5  January 2016, right?
6       A    Yes.
7       Q    And the meeting lasted for what,
8  two and a half hours?
9       A    Something like that, yeah.
10      Q    And it was at the Sullivan &
11 Cromwell office in Washington, D.C.?
12      A    Yes.
13      Q    And would it be fair to say that
14 during that meeting we discussed the
15 ongoing legal risks in the U.S. that
16 Volkswagen faced?
17      A    Well, I'm not sure of how
18 extensive the conversation was.  We talked,
19 I know, about my role and had been advised
20 before the meeting by Christine
21 Hohmann-Dennhardt that Manfred Doess was
22 not agreeable to a role for me, but that I
23 should try to meet with him and just
24 persuade him that I could provide some
25 assistance.

Page 250

Freeh

1    Q      But do you recall discussing
2  during the meeting that you had with
3  Manfred Doess and me some of the legal
4  risks that -- let me restate that.
5          During this meeting in mid
6  January 2016 with Manfred Doess and myself,
7  do you recall discussing the legal risks
8  that Volkswagen faced in the United States?
9    A      Not specifically, no.
10   Q      Do you recall advising
11 Ms. Hohmann-Dennhardt in an e-mail that you
12 had discussed the legal risks in the United
13 States with Dr. Doess and myself?
14   A      No, I don't recall that.
15   Q      Do you recall discussing with
16 Dr. Doess and me the various regulatory
17 investigations that were then pending
18 against Volkswagen?
19   A      No, not in any detail.  My
20 recollection of the meeting was would there
21 be a role for me in some capacity either as
22 an attorney or a compliance advisor.
23          I believe you had the chart.  I
24 think I sent the chart to Manfred that
25 Christine and the board.  And as I said, I

Page 251

Freeh

1  went into that meeting with the knowledge
2  from Christine that Manfred was not
3  supportive of a role for me, but I agreed
4  to have the meeting because she and the
5  Chairman of the Board asked me to do that.
6    Q      Do you recall discussing with
7  Dr. Doess and me the work that was being
8  performed by other law firms?
9    A      Yes.  You brought that to my
10 attention.  You used the phrase attorney
11 dysfunction and you were critical, as was
12 Manfred, of both Jones & Day and Kirkland.
13   Q      Do you recall discussing with
14 Dr. Doess and me the work that Jones Day
15 was performing?
16   A      No, not in any detail, just that
17 they were doing an internal investigation.
18   Q      And do you recall discussions of
19 the work that Kirkland & Ellis was doing?
20   A      No, not in any detail, just that
21 they were one of the firms working with you
22 and there was not a lot of -- well, that's
23 my answer.
24   Q      Did you have discussions with
25 Dr. Doess and me about having you run the

Page 252

Freeh

1  compliance work for Volkswagen?
2    A      Yes.
3    Q      And did you have discussions
4  with Dr. Doess and me about having you be
5  involved in the resolution of regulatory
6  investigations?
7    A      Not a clear memory of that.  I
8  remember clearly the discussion about
9  compliance.  And then, as I mentioned
10 before, would I be willing to serve as the
11 compliance monitor if an agreement with the
12 Department of Justice was made, and that
13 was the reason for my follow-up to the
14 Manfred later in the year.
15   Q      Now, I think it's -- I think you
16 testified earlier that the document that's
17 marked as Exhibit 25 to your expert report
18 was an important -- it's an important
19 document for purposes of your expert
20 report, right?
21   A      I'm sorry, 25?
22   Q      Yeah.  That's the Oliver Schmidt
23 memo.
24   A      Oh, okay.  I have it as 200.  I
25 see 25 -- okay, got it.

Page 253

Freeh

1    Q      It's 200.
2    A      Yep.
3    Q      And do you recall having the
4  subject of David Geanacopoulos, the then
5  general counsel of VW Group of America,
6  coming up at your meeting with Manfred
7  Doess and me?
8    A      I remember a discussion and then
9  you asking me to read the Kirkland & Ellis
10 memo describing some of the events just
11 referred to in this Exhibit 25.
12   Q      Well, in fact, didn't I provide
13 you with a copy of Exhibit 25 to your
14 expert report?
15   A      I don't recall that exhibit
16 specifically, but I believe I -- you may
17 have.  I just don't recall.
18   Q      Do you recall discussing with
19 Dr. Doess and me at any time whether
20 Mr. Geanacopoulos could continue to serve
21 as U.S. general counsel?
22   A      Yes.
23   Q      Do you recall discussing with
24 Dr. Doess and/or me efforts that had been
25 made to preserve e-mails of

Page 254

Freeh

1  Mr. Geanacopoulos?
2      A     Yes, I recall that.
3      Q     Do you recall discussing with
4  Dr. Doess and me the potential impact of
5  this document that's now attached to your
6  report as Exhibit 25 --
7      A     Yes.
8      Q     -- on the resolution of U.S.
9  litigation?
10     A     Yes.
11     Q     Do you recall -- let me restate
12  that.
13           Do you recall receiving e-mails
14  from me that were sent to you that said
15  attorney client communication work product
16  confidential and privileged?
17     A     I'm not sure if you marked any
18  of your e-mails that way to me.  I remember
19  marking some of mine to you in that manner.
20     Q     Okay.
21           And why did you mark some of the
22  communications that you were having with me
23  as attorney client communication work
24  product confidential and privileged?
25     A     Part of it was my FSS convention

Page 255

Freeh

1  which would, I believe, automatically lead
2  with that unless you took it off.  That may
3  have been part of the reason.  I never
4  thought we had an attorney client
5  relationship.
6           And if you'll note, all my
7  communications with Christine
8  Hohmann-Dennhardt, none of those were
9  marked in that manner.
10     Q     But you're aware that the
11  attorney disciplinary rules cover both the
12  period post-retention and the period
13  pre-retention?
14     A     Yes.
15     Q     Do you recall my sending you a
16  copy of a memo that had been written by
17  Kirkland & Ellis on August 6, 2015?
18     A     Yes.  I think you asked me what
19  I thought of it.
20     Q     And --
21           MR. HEATHER:  Counsel, let me
22           just interject.  I have not seen that
23           document or been told about its
24           contents.
25           So if you're going to put that

Page 256

Freeh

1  on the record, then you're waiving any
2  confidentiality.
3           MR. GIUFFRA:  I am only going to
4           talk about just -- I want to just
5           establish what he saw.
6  BY MR. GIUFFRA:
7      Q     And do you recall also receiving
8  a copy of a submission made by Volkswagen
9  to the BaFin?
10     A     I don't recall that
11  specifically, no.
12     Q     Do you recall discussing with
13  Dr. Doess or me, or both, your own
14  experience working with BaFin?
15     A     I may have related that since I
16  had prior experience.  Do I specifically
17  recall that from our meeting, no.
18     Q     Do you recall discussing, either
19  in writing or in person with Dr. Doess
20  and/or me this Kirkland & Ellis memo that
21  was sent to the company in September 2015?
22     A     Yes.
23     Q     And do you recall that the memo
24  generally covered prior precedence dealing
25  with settlements of emissions cases in the

Page 257

Freeh

1  United States?
2      A     I don't recall that part of it.
3  I recall you highlighting to me in the
4  meeting the references to the general
5  counsel.  But I read it at the time, so
6  whatever was in there, I read.
7      Q     Okay.
8           Do you recall expressing any
9  views on any of the conclusions stated in
10  the Kirkland & Ellis memo to either
11  Dr. Doess and/or me?
12     A     Yeah.  I think, I think I said
13  with respect --
14           MR. HEATHER:  Let me caution you
15           not to go into the contents unless he
16           puts them in front of you.
17  BY MR. GIUFFRA:
18     Q     No, I don't -- just, you just
19  have to say yes or no as to the topics, but
20  not the --
21     A     I'm sorry, could you restate
22  that then?
23     Q     My question was, do you recall
24  expressing any views on any of the
25  conclusions stated in the Kirkland & Ellis

Page 258

Freeh

1   memo to either Dr. Doess and/or me, and I
2   think the answer to that is yes or no.
3          A      Well, not the conclusions, but I
4   did give you my reaction to one aspect of
5   it, what you asked me about.
6          Q      Okay.
7                 Now in addition to the meeting
8   in mid January at Sullivan & Cromwell, you
9   had telephone conversations with Dr. Doess,
10  right?
11         A      Yes.
12         Q      And you had telephone
13  conversations with me?
14         A      Correct.
15         Q      And we discussed aspects of our
16  strategy for trying to resolve the U.S.
17  diesel emissions cases, right?
18         A      No.  My recollection is we were
19  talking about my role and the conversation
20  then shifted to some type of compliance
21  work as opposed to any legal work, which I
22  got the clear impression was not being
23  supported by the general counsel at least.
24         Q      The general counsel of --
25         A      Manfred.

Page 259

Freeh

1          Q      Oh.
2                 And your impression was based on
3   what, what Ms. Hohmann-Dennhardt told you?
4          A      Well, first
5   Dr. Hohmann-Dennhardt told me that and
6   that's reflected in the e-mails that I gave
7   you, and it was also clear from the
8   conversation that another attorney was not
9   wanted or needed.
10                However, the conversation then
11  moved to whether I could assist in the
12  regulatory or compliance aspect.  I think I
13  said I could.  And then the conversations
14  just trailed off and nothing happened.
15         Q      Do you recall any discussions at
16  any time with Dr. Doess about what his
17  strategy was for trying to resolve the U.S.
18  diesel emissions issues?
19         A      No, not specifically.
20         Q      Do you recall any discussion of
21  the topic of a global settlement?
22         A      No.
23         Q      But did you have any
24  understanding as to whether the company was
25  looking to try to resolve the diesel

Page 260

Freeh

1   emissions matters as quickly as it could?
2          A      Yeah.  Well, the board told me
3   that.  I'm sure that both you and Manfred
4   said that.  I just don't have a specific
5   recollection of that and certainly no
6   details about how that would be done.
7          Q      Now, did there come a time when
8   there were press reports that you were
9   going to be retained by Volkswagen?
10         A      Yes.
11         Q      Do you know how those press
12  reports came about?
13         A      No.  Ms. Dennhardt thought they
14  came out of Germany somewhere.  That's what
15  she told me.
16         Q      Did Ms. Dennhardt indicate
17  whether she had spoken to the press about
18  you being hired?
19         A      She never said she spoke to the
20  press.
21         Q      Did you ever speak to the press
22  about being hired by Volkswagen?
23         A      No, I don't think so.
24         Q      Did you have any conversations
25  with any reporters at any time about

Page 261

Freeh

1   anything having to do with Volkswagen?
2          A      No.
3          Q      Do you know why you were not
4   retained to be counsel to Volkswagen?
5          A      Well, both counsel and
6   compliance advisor -- yeah, I mean my
7   understanding was the board and management
8   was in favor of it, but Manfred and --
9   Manfred at least was not.  At least I know
10  that specifically because I was told that
11  by Hohmann-Dennhardt.
12         Q      Were you aware that there was
13  opposition to you from members of the
14  so-called Works Council?
15         A      I heard about that.  There was a
16  press report about that.  I don't know the
17  accuracy or the specifics of it.
18         Q      Do you recall drafting a press
19  release announcing your appointment as
20  special counsel to assist in resolving
21  litigation law enforcement and regulatory
22  actions relating to the emissions
23  investigations and to design and implement
24  a company-wide compliance program?
25         A      I believe Ms. Hohmann-Dennhardt

Page 266

Freeh

1  So she knew that.  That could have very
2  likely been a topic, but I don't recall it
3  specifically.
4      Q    Do you remember
5  Ms. Hohmann-Dennhardt in February 2016
6  communicating with you about a meeting that
7  she was going to be having in Washington
8  with the Department of Justice?
9      A    I don't recall that, no.  I
10 recall when I met her in January, she said
11 they wanted to have a meeting with the
12 Department of Justice, would like me to
13 come to that.  But I didn't have any
14 subsequent conversations with her about the
15 meeting.
16     Q    Do you remember
17 Ms. Hohmann-Dennhardt at any time
18 expressing to you concern about her
19 inability to play a more active role in the
20 resolution of U.S. litigation?
21     A    Yes.
22     Q    What did she tell you?
23     A    She said she was just very
24 frustrated and said that Manfred Doess was
25 not accepting either her role or my

Page 267

Freeh

1  proposed role and expressed a lot of
2  frustration about that.
3      Q    Did you ever discuss with
4  Ms. Hohmann-Dennhardt designing and
5  implementing a Daimler-like compliance
6  program for VW?
7      A    Sure.  That was a big part of
8  our conversations.
9      Q    And did you ever learn that a
10 man named Dr. Garcia had been appointed by
11 the board to be the lead person vis-a-vis
12 the U.S. over Hohmann-Dennhardt?
13     A    Yes, at some point I did hear
14 that.
15     Q    And that's something that would
16 have been discussed with you and
17 Ms. Hohmann-Dennhardt, right?
18     A    I don't believe I discussed that
19 with her.  I think I read that somewhere in
20 the media.
21     Q    Did Ms. Hohmann-Dennhardt ever
22 discuss with you what she thought her role
23 should be in connection with VW's
24 communications with the Department of
25 Justice?

Page 268

Freeh

1      A    Yes.  My understanding from
2  speaking to her was that she thought that
3  she should be the lead officer or
4  management board member for all
5  conversations with the Department of
6  Justice.
7      Q    Now, did you subsequently learn
8  that Ms. Hohmann-Dennhardt was going to be
9  leaving Volkswagen?
10     A    Yes.
11     Q    And how did you learn that?
12     A    I think I read it in the
13 newspaper.
14     Q    Did you subsequently have a
15 conversation with Ms. Hohmann-Dennhardt
16 after you read it in the newspaper that she
17 might be leaving the company?
18     A    No.
19     Q    Have you ever discussed with
20 Ms. Hohmann-Dennhardt reasons for leaving
21 the company?
22     A    No.
23     Q    Have you ever had any
24 discussions with Ms. Hohmann-Dennhardt
25 about her -- about the company's U.S.

Page 269

Freeh

1  settlements?
2      A    No.
3      Q    Now, you would agree that you
4  discussed with Dr. Doess and me the
5  organization of the U.S. legal team?
6      A    Yes.
7      Q    And you also discussed with
8  Dr. Doess and me, you know, the role of
9  Mr. Geanacopoulos in the U.S. legal team,
10 right?
11     A    I don't recall that
12 specifically, no.  I think my recollection
13 of the conversation was what role, if any,
14 would I play on a legal team and that was,
15 I think, a central part of our
16 conversation.
17     Q    Without disclosing any
18 privileged communications, you certainly
19 did discuss, would it be fair to say, the
20 implications for Mr. Geanacopoulos of
21 Exhibit 25 to your expert report?
22          MR. HEATHER:  Objection to form.
23     A    Yeah, I think I expressed an
24 opinion to you.  You asked me my opinion on
25 that and I gave it to you in an e-mail.

Page 270

Freeh

1    Q    Now, did you also prepare
2  talking points for CEO Matthias Muller in
3  connection with a visit that he was making
4  to the United States?
5    A    Yes, for the Detroit Auto Show.
6    Q    And you did that at whose
7  request?
8    A    Christine Hohmann-Dennhardt.
9        Let me just supplement that.  At
10  the Board of Management meeting, he said
11  that he was going to the Detroit Auto Show
12  and I remember asking him if he had a press
13  statement, because the press was going to
14  be very aggressive.  And he said no.  And I
15  think he may have also asked for talking
16  points or asked whether I could provide
17  some talking points.
18    Q    So the CEO asked you to prepare
19  some talking points for him?
20    A    Christine Hohmann-Dennhardt for
21  sure, and I think he also mentioned it at
22  the end of the meeting.  He was very --
23  excuse me, he was very concerned about the
24  appearance at the show.
25    Q    Did the talking points that you

Page 271

Freeh

1  prepared for Mr. Muller reflect your
2  understanding of what Mr. Muller and the
3  company's strategy was for trying to
4  address the U.S. situation?
5    A    No.  I wrote them up as just
6  sort of media points that I would suggest
7  be made given what I was reading in the
8  newspapers in the U.S.
9    Q    Did you have any discussions
10  with anyone in either late 2015 and 2016
11  about VW's ability to fix the affected
12  vehicles in the U.S.?
13    A    No.
14    Q    Do you remember that topic ever
15  coming up?
16    A    No.
17    Q    Do you recall any discussions
18  with anyone about -- let me restate that.
19        Did the talking points for CEO
20  Muller's U.S. visit that you prepared
21  contain any recitation of what you, VW's
22  strategy would be for trying to resolve the
23  U.S. litigations?
24    A    I don't believe so.  They were
25  very general talking points based on my

Page 272

Freeh

1  experience, you know, what the U.S. press
2  would ask a CEO in that type of situation,
3  particularly the auto press.
4    Q    But you had particular expertise
5  because you worked in the Daimler matter?
6    A    Sure.  I knew a lot about what
7  they would probably be asking.  I thought I
8  did anyway.
9    Q    And so you were attempting in
10  the talking points to address questions
11  that Mr. Muller might get from the U.S.
12  press in the Detroit Auto Show?
13    A    Yes, that was exactly the
14  purpose.
15    Q    Do you recall discussing with
16  anyone at VW in either late 2015 into 2016
17  how other automobile OEMs had addressed
18  serious problems that they faced with U.S.
19  regulators?
20    A    I think I had discussions about,
21  you know, what was done at Daimler, to the
22  extent that I could talk about those
23  things, most of which were publicly known
24  or disclosed.
25        A lot of the meeting on the 6th

Page 273

Freeh

1  or 7th with the board was what happened to
2  Daimler and could that model work at
3  Volkswagen.  So yes, I did discuss Daimler
4  in that regard.
5    Q    And what was the Daimler model?
6    A    Well, the Daimler model was
7  bringing me in as a -- called an
8  independent compliance advisor to the
9  board, the Board of Supervisors, and
10  working with the management to assess the
11  compliance plan, put together a mediation
12  strategy, and then help implement it.  And
13  then that morphed into a monitorship by the
14  Department of Justice after my 3-year work
15  as a compliance advisor.
16    Q    Now in -- but in Daimler, you
17  were appointed by -- well, recommended by
18  the Department of Justice and then
19  appointed by a federal judge pursuant to a
20  settlement agreement, right?
21    A    Well, yes, that was the second
22  phase.  The first phase I was just working
23  for the board.
24    Q    Got it.
25        And so there was discussion

Page 330

Freeh

1   policy statements issued by the Sentencing
2   Commission, in applying the guidelines?
3       A   Yes.
4       Q   So it would be fair to say that
5   what you're doing is, in your opinion,
6   you're critical of the exercise of the
7   prosecutor's discretion in applying the
8   sentencing guidelines?
9       A   No.
10      Q   Why not?
11      A   Well, my testimony is different
12  from that.  My testimony has been that the
13  calculation made and the justification for
14  the calculation was incorrect and not
15  supported by either the guidelines or the
16  precedent that is cited in the sentencing
17  agreement.  That's different from your
18  question.
19      Q   And that's because you don't
20  like the 50 percent discount, right?
21      A   It's not a question of not
22  liking it.  It's just not justified.
23      Q   And that 50 percent discount
24  went, as far as you know, to the question
25  of the pecuniary loss, right?

Page 331

Freeh

1       A   Yes, base fine.
2       Q   Would you agree with me that the
3   Department of Justice was uniquely situated
4   to assess VW's cooperation and the extent
5   thereof?
6           MR. HEATHER:  Objection to form.
7       A   Only if it had all the accurate
8   and complete information.
9       Q   And you have no reason to
10  believe that DOJ did not have all of the
11  accurate and complete information, right?
12      A   Well, I think I testified a
13  number of times today that I'm not sure
14  that's the case based on the sentencing
15  judge's question and the lack of the
16  government's response.
17      Q   Are you aware that Judge Cox
18  considered and rejected claims for
19  restitution before imposing sentence
20  against Volkswagen?
21      A   Yes.
22      Q   And are you critical of that
23  decision?
24      A   No.
25      Q   Why not?

Page 332

Freeh

1       A   Because I'm not.
2       Q   Other than, you know, because
3   you're not, why specifically?
4       A   Certainly within his discretion.
5       Q   And it was within his discretion
6   to take into account all of the money that
7   Volkswagen paid to consumers, right?
8       A   If he wanted to.
9       Q   In your experience as both a
10  prosecutor and a defense lawyer, do parties
11  often have disputes about the extent to
12  which management culpability should be
13  reflected in a statement of facts in a
14  guilty plea?
15      A   Yes.
16      Q   With the company urging less
17  culpability and the government wanting more
18  culpability, right?
19      A   It's usually not the reverse.
20      Q   Now, you keep talking about a
21  question that was put by Judge Cox to the
22  Department of Justice and to Volkswagen and
23  I just want to give you a copy of the
24  sentencing transcript, which we'll mark as
25  203.

Page 333

Freeh

1           (Exhibit 203, Sentencing
2           Transcript, was marked for
3           Identification, as of this date.)
4   BY MR. GIUFFRA:
5       Q   Now, I'll try to speed this up.
6           Page 26, line 16 to 23 -- 22,
7   actually -- is what you believe to be the
8   question that was not answered by either
9   the prosecutors or Volkswagen?
10      A   Well, you keep characterizing it
11  as a question.  I have not.
12          What I said is that reading that
13  portion you've just cited, but other
14  portions of the transcript it's very clear
15  to me that the judge was intensely
16  interested in whether or not there was
17  senior management involvement and certainly
18  presented that interest and concern to the
19  parties.  And whether you call it a
20  question or not, the Court was clearly very
21  intensely interested in that and did not
22  receive, in my view, an accurate answer.
23      Q   Okay.
24          But you've been describing this
25  as a question.

Page 334

Freeh

1      A      No, you've been describing it as
2  a question.
3      Q      Well, because you seem to think
4  that somehow someone should have, you know,
5  provided some information to Judge Cox.
6             And so if you look on page 25,
7  26, 27 and 28, 29 into 31, all those pages,
8  there is a long colloquy from Judge Cox in
9  which he imposes his sentence and he
10 doesn't -- he just says and that will be --
11 at page 31 -- and that will be the sentence
12 of the Court.
13            He doesn't at any point, you
14 know, pause, ask a question other than just
15 making the statement we don't know how far
16 up the corporate ladder it goes.
17            So my question to you is, what
18 was Volkswagen supposed to do while it's
19 sitting there and the judge is imposing
20 sentence on Volkswagen, should we have like
21 jumped up and said, oh, your Honor, let us
22 tell you about, you know, everything we
23 know that we've told the government about
24 senior management, or management?
25     A      Well, I'll try to rephrase it

Page 335

Freeh

1  again for you.
2             Based on the judge's comments
3  and based upon the knowledge that the
4  company had at the time of sentencing, it
5  should have been communicated to the Court
6  that it wasn't just the low-level
7  supervisors that the Court had in mind when
8  he was assessing and imposing sentence.
9  But, conversely, it was some of the most
10 senior people in the company.
11     Q      Well, at the point of the
12 sentence, there was a statement of facts
13 which identified a series of managers who
14 were, by Volkswagen's admission, involved
15 in the diesel admissions matter.
16            MR. HEATHER:  Objection to form.
17     Objection to form.
18     A      Yeah, that's what said in the
19 sentence, in the statement of facts.
20     Q      So -- and again, what Volkswagen
21 told the Department of Justice about senior
22 management, you don't know, right?
23     A      Well, I know the Court was not
24 informed by either party of the information
25 that the company clearly had that there was

Page 336

Freeh

1  senior participation.  That's my opinion.
2      Q      Okay.
3             And the only senior
4  participation I guess that you've
5  identified here today that wasn't -- is, I
6  guess, Winterkorn who was indicted, some
7  allegation about Horn who was never
8  indicted, and some allegation about
9  Geanacopoulos who was never indicted, is
10 that right?
11     A      Well, they're not allegations.
12 They're statements.  They're testimony in
13 the case of Horn's conversation with
14 Johnson that postdates the sentence.  But
15 the other material predates the sentence.
16 And I wouldn't call it allegations.  I
17 would call it facts and reports that would
18 lead any reasonable person to conclude that
19 Horn, certainly, was well aware and on
20 notice about defeat devices and obviously
21 did not do anything, as far as the record
22 is concerned, to address that.
23     Q      And again, you're presupposing
24 that no documents were put before Judge Cox
25 in any other proceedings referencing the

Page 337

Freeh

1  risk consequences memo that's referenced in
2  your report?
3      A      I'm not talking about other
4  proceedings.  I'm talking about what was
5  before this Court.
6      Q      Yeah, but in Volkswagen
7  proceedings.
8      A      I'm not familiar with all the
9  other Volkswagen proceedings.
10     Q      I got it.  So you don't know.
11 So you're sort of guessing there's nothing
12 in the other proceedings.
13            MR. HEATHER:  Objection to form.
14 BY MR. GIUFFRA:
15     Q      If I were to represent to you
16 that Judge Cox was aware of the risk
17 consequences memo based on other
18 proceedings that were before him, would
19 that have changed your opinion?
20     A      I'd have to read the transcript.
21     Q      Could you just identify for the
22 record all of the questions that Judge Cox
23 put to the parties at the April 21, 2017
24 sentencing hearing that should have caused
25 counsel for the United States in Volkswagen

Page 338

Freeh

1  to disclose information about senior
2  management involvement beyond what had
3  already been disclosed to the Court?
4       MR. HEATHER:  I'm going to
5       object to that because he's been asked
6       that and answered that multiple times.
7       And at this point it's bordering on
8       badgering the witness by keeping
9       repeating the same questions.
10      MR. GIUFFRA:  Well, it's a
11      pretty important point, though, Fred.
12      Your expert is claiming that
13      there was some sort of a concealment
14      of information from Judge Cox.
15      The only thing that's in his
16      expert report is on page 26 of the
17      sentencing transcript, line 16 through
18      22, that is contained in the middle of
19      the actual imposition of the sentence.
20      So I'm wanting to know what the
21      question was that someone should have
22      answered and didn't answer.
23      MR. HEATHER:  Well, I'm going to
24      stand by my objection.  You may not
25      like the fact that the basis on which

Page 339

Freeh

1       his opinion was given is acceptable to
2       you, but you've asked the question,
3       he's given you an answer, he's
4       explained what in the sentencing
5       transcript causes him to believe that
6       something wasn't disclosed that should
7       have been disclosed.  But he's done
8       that multiple times.
9       MR. GIUFFRA:  Okay.  All I'm
10      asking --
11      MR. HEATHER:  So why don't you
12      ask him if he has anything to add.
13  BY MR. GIUFFRA:
14  Q    Okay.
15      I'd just like to know, beyond
16  paragraph -- which is the only thing we've
17  talked about -- page 26, lines 16 through
18  22 of this transcript, are there any other
19  questions that judge -- or any other
20  statements by Judge Cox that should have
21  alerted Volkswagen and the Department of
22  Justice that Judge Cox wanted to know, you
23  know, name, rank and serial number for
24  other managers that were involved in the
25  wrongdoing?

Page 340

Freeh

1  A    Yeah, well, look, I have
2  answered this multiple times, but I'll be
3  happy to answer it again.
4       In my report, besides the
5  paragraph on page 26, line 16 which you
6  cite, there's two other references that,
7  for me, in my opinion, make it very clear,
8  if I was standing before the Court that
9  this judge was very interested and was
10  inquiring, maybe not asking a specific
11  question, but was certainly inquiring about
12  whether there was senior level management
13  complicity.
14      And my opinion, again, repeating
15  it many times for you, but happy to do it
16  again, is that the documentation I've
17  reviewed and based on my experience clearly
18  indicates to me that the company was aware
19  of high-level management and that was not
20  given to the judge.
21  Q    Okay.
22      My question, though, Mr. Freeh,
23  was where else is there a reference in the
24  sentencing transcript to the judge wanting
25  to know about high-level management

Page 341

Freeh

1  involvement other than, you know, the
2  statement we don't know how far up the
3  corporate ladder it goes, which was in the
4  middle of his actual imposition of
5  sentence?
6  A    Well, there's references to the
7  little guy being left holding the bag in
8  another portion of the transcript.
9  Q    That's also in the imposition of
10  sentence.
11  A    Right.  Well, there's several
12  references to it in the imposition of
13  sentence.
14  Q    Okay.
15      But it wasn't a question that
16  was put or a statement that was made before
17  the judge started to impose his sentence on
18  Volkswagen?
19  A    Well, look, the sentencing is
20  not over until the judge imposes sentence.
21      My view is it was a very
22  apparent opportunity for the judge to hear
23  an answer to a matter that intensely
24  interested him and was relevant to the
25  sentencing.

Page 342

Freeh

1    Q    How many sentencings have you
2  attended as a prosecutor, a judge, and as a
3  defense lawyer?  Probably hundreds, right?
4    A    Yes.
5    Q    Okay.
6         Have you ever -- can you recall
7  an instance in the middle of the imposition
8  of a sentence where a prosecutor jumped up
9  and interrupted the Court?
10   A    Well, it's a pretty narrow
11 question.  I recall many instances during a
12 sentencing where the government interrupted
13 the defense attorney, where the defense
14 attorney interrupted the prosecutor, where
15 either party tried to bring information to
16 the attention of the judge, or where
17 they've asked for a side bar to talk to the
18 judge not off the record, but certainly not
19 in the courtroom about certain matters.  It
20 happens all the time.
21   Q    By the way, would it be fair to
22 say that in imposing sentence on
23 Volkswagen, Judge Cox understood, as he
24 expressed, while he was imposing the
25 sentence, that this was a case of

Page 343

Freeh

1  deliberate massive fraud perpetrated by VW
2  management?
3    A    Well, that's what he said, yes.
4         MR. HEATHER:  As a matter of
5  personal privilege, I will not make my
6  plane if you going to keep going.  And
7  you're entitled to keep going, but if
8  you'd let me know, I'd appreciate it.
9         MR. GIUFFRA:  I'm going to try.
10 I just want to go through my outline
11 to make sure I've covered all the
12 topics and then we'll be out of here.
13        THE WITNESS:  What time is your
14 flight?
15        MR. HEATHER:  6:40.
16        MR. GIUFFRA:  Oh, you're fine.
17        THE WITNESS:  He's a New Yorker.
18        MR. HEATHER:  I have questions,
19 though.
20 BY MR. GIUFFRA:
21   Q    Did you ever express any
22 disappointment to Ms. Hohmann-Dennhardt
23 about not being retained as Special Counsel
24 of Volkswagen?
25   A    No.

Page 344

Freeh

1    Q    None at all?
2    A    No.
3    Q    Not in an e-mail and not by
4  telephone?
5         MR. HEATHER:  No is sufficient.
6  BY MR. GIUFFRA:
7    Q    Are you aware that your
8  testimony is going to be used in -- let me
9  restate that.
10        Do you have any understanding of
11 what purpose plaintiffs intend to make use
12 of your testimony?
13   A    Just generally.
14   Q    Would you state for the record
15 what you think it is?
16   A    Well, I think it relates to the
17 issue of damages in the current lawsuit and
18 litigation and whether based on the guilty
19 plea at least, all the adequate information
20 and possible sanctions were considered with
21 respect to the company.
22   Q    Well, in terms of all the
23 sanctions with respect to the company, if
24 there had been a higher criminal fine paid
25 by Volkswagen, that money would have gone

Page 345

Freeh

1  to the U.S. Treasury, right?
2    A    Yes.
3    Q    So in a case which we're talking
4  about now between opt-out plaintiffs and
5  Volkswagen, what is the relevance of your
6  testimony, in your own words?
7    A    Well, the relevance is up to the
8  judge to determine.
9    Q    Would you describe a criminal
10 fine as a form of damages that goes to
11 consumers -- not typically, right?
12   A    No.  As I said, it goes to the
13 government.
14   Q    So what the relevance -- what is
15 your understanding of the relevance of your
16 proposed expert testimony in this upcoming
17 trial that we're going to have in February
18 of next year?
19   A    Again, I think the relevance is
20 for the Court to decide.
21   Q    Can you provide any -- do you
22 have any other reason --
23   A    I think I just did, but I'll say
24 it again for you, whether or not the fine
25 and sentence in the criminal case was based

Page 346

Freeh

1  upon an adequate and proper sentencing
2  guideline calculation, whether the company
3  disclosed all the relevant information at
4  the time and whether that sentence deterred
5  the company from further unlawful action.
6       Q    And sitting here today, the only
7  other unlawful action that you've
8  identified is this whole question about
9  branded title, is that right?
10      A    The certified pre-owned cars,
11 yes.
12      Q    You're not aware of any other
13 wrongdoing by Volkswagen other than the
14 certified pre-owned car issue, right?
15      A    That's the only one I considered
16 in my opinion.
17      Q    And that issue was brought to
18 your attention by plaintiff's counsel,
19 right?
20      A    Yes.
21      Q    Are you aware of how much each
22 plaintiff in this case would have received
23 under the class action settlement?
24      A    No.
25      Q    And you don't know what their

Page 347

Freeh

1  settlement demands are, right?
2       A    No.
3       Q    Have you ever seen an expert
4  report suggesting a method for calculating
5  punitive damages?
6       A    In this case?
7       Q    In any case.
8       A    I don't recall.
9       Q    Have you ever seen an expert
10 report suggesting a potential range of
11 punitive damages?
12      A    I've not seen one myself, no.
13      Q    Have you ever seen an expert
14 opining on the application of the
15 sentencing guidelines in a civil case?
16      A    No.
17      Q    Have you ever seen an expert
18 opining on the application of the
19 sentencing guidelines in the context of
20 civil punitive damages?
21      A    No.
22      Q    Are you aware of any cases of
23 the magnitude of Volkswagen settling as
24 quickly as the Volkswagen case did?
25      A    I have no knowledge of that.  I

Page 348

Freeh

1  didn't do any research on that issue.
2       Q    Would it be fair to say that a
3  plea agreement typically reflects the
4  ability of the government to prove or not
5  prove the crimes charged in that agreement?
6       A    Not necessarily.
7       Q    Now, I think we've established
8  you don't know all the facts and
9  circumstances underlying the department's
10 decision to enter into this plea agreement,
11 right?
12      A    I don't.
13      Q    And you don't know how many
14 documents VW produced to DOJ, right?
15      A    No.
16      Q    You're not aware of how many
17 documents DOJ received before deciding to
18 reach the plea agreement with VW, right?
19      A    No.
20      Q    Haven't seen the entire document
21 production to the DOJ by VW, right?
22      A    Have not.
23      Q    You're not aware of the
24 specifics of any briefings by VW to the
25 Department of Justice, right?

Page 349

Freeh

1       A    No.
2       Q    You don't know how many
3  presentations VW made to the Department of
4  Justice, right?
5       A    Same answer.
6       Q    Don't know anything about the
7  conversations between VW's counsel and the
8  Department of Justice in connection with
9  the plea agreement, right?
10      A    You asked me that many times,
11 no.
12      Q    Okay.
13           And are you aware of any
14 specific documents that the Department of
15 Justice did not receive from VW?
16      A    No.
17      Q    Are you aware of the extent to
18 which VW's cooperation with the Department
19 of Justice resulted in later criminal
20 indictments?
21      A    No.
22      Q    And you don't know the extent to
23 which the Department of Justice took VW's
24 ability to pay into account in entering
25 into this plea agreement, right?

Page 350

Freeh

```
 1       A    I don't think that's in the
 2  sentencing agreement, no.
 3       Q    In your experience would that be
 4  taken into account expressly on the face of
 5  the sentencing document?
 6       A    It would be one of the Filip
 7  factors.  It would also be a Rita factor in
 8  the sentencing guidelines, yes.
 9       Q    Would all of the Filip factors
10  normally be listed in a plea agreement?
11       A    No, not necessarily.
12       Q    So in your experience the -- how
13  the government goes about exercising its
14  discretion as reflected in the Filip
15  factors would not be reflected on the text
16  of the plea agreement, right?
17       A    Well, I think we said before --
18  I said before, sorry -- that all of the
19  government's factors that went into its
20  decision-making would not necessarily be
21  reflected in the sentencing agreement.
22       Q    And is it your understanding
23  that if there are punitive damages awarded
24  in this case it would go to the named
25  plaintiffs in this case, it would go to the
```

Page 351

Freeh

```
 1  plaintiffs in this case?
 2            MR. HEATHER:  Asked and
 3       answered.
 4  BY MR. GIUFFRA:
 5       Q    Or you don't know?
 6       A    I assume they would get the
 7  damages in a punitive settlement.
 8       Q    Or punitive award, right?
 9       A    Whatever.
10       Q    In your experience as a
11  prosecutor, would the DOJ reach a plea
12  agreement when it suspects that a company
13  has -- when it expects to uncover further
14  undisclosed wrongdoing?
15            MR. HEATHER:  Objection to form.
16       A    I'm sorry, I don't understand
17  your question.
18       Q    Let me restate the question.
19            When the government enters into
20  a plea with a company, it normally does so
21  after it's satisfied that it's aware of all
22  the wrongdoing that was engaged in by the
23  company, right?
24       A    That's the general posture for a
25  settlement, yes.
```

Page 352

Freeh

```
 1       Q    And am I correct that the
 2  Department of Justice, if it believed that
 3  a plea was obtained on false pretenses,
 4  would have the ability to petition the
 5  Court to undo the plea?
 6       A    Yes.
 7       Q    And in this case, if the
 8  Department of Justice believed that
 9  Volkswagen had misled the Department of
10  Justice in obtaining the resolution that it
11  obtained here, it could make an application
12  to Judge Cox to undo the plea, right?
13       A    It could, yes.
14       Q    And, in fact, in this case
15  because of the existence of the monitor,
16  the term of the monitor, VW is still before
17  Judge Cox, right?
18       A    Yes.
19       Q    And if VW failed to cooperate
20  with the Department of Justice during the
21  period of the monitorship, the Department
22  of Justice could make an application to
23  Judge Cox to undo the plea, right?
24       A    Yeah, it would depend on the
25  facts and circumstances, but assuming they
```

Page 353

Freeh

```
 1  reached a certain level of materiality,
 2  they could.
 3       Q    And so, you know, sitting here
 4  today, if the Department of Justice read
 5  your report and thought that VW had done
 6  something untoward in connection with its
 7  sentencing, the Department of Justice would
 8  have the ability to seek to a higher fine,
 9  right -- higher penalty, excuse me?
10       A    Well, it's a complex question.
11  The Department of Justice could take action
12  to void the plea agreement if any of the
13  conditions in the plea agreement were not
14  met or if other information came to their
15  attention that would give them that basis.
16       Q    Including if VW had not provided
17  information to the Department of Justice
18  prior to the plea that it had represented
19  it had done?
20       A    That would be a factor, yes.
21       Q    And if VW stopped cooperating
22  with the Department of Justice, they could
23  try to undo the plea agreement and seek a
24  higher penalty, right?
25       A    If they stopped cooperating or
```