# Exhibit 5

|   |   |   |
|---|---|---|
|   | AUSA: John K. Neal | Telephone: (313) 670-7539 |
|   | Special Agent : Ian Dinsmore | Telephone: (313) 919-1351 |

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

United States of America,

    Plaintiff,

v.

OLIVER SCHMIDT,

    Defendant(s).

Case No. 16-mj-30588

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about the date(s) of __May 2006 through September 2015__, in the county of __Oakland__ in the __Eastern__ District of __Michigan__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code § 371 | Conspiracy |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_Complainant's signature_

Ian M. Dinsmore, Special Agent, FBI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: __12/30/16__

_Judge's signature_

City and state: __Detroit, Michigan__

Honorable David R. Grand
_Printed name and title_

dynamometer (or "dyno") or whether the vehicle was being driven on the road under normal driving conditions. The defeat device accomplished this by recognizing the standard drive cycles of the EPA's and CARB's tests. If the vehicle's software detected that it was being tested, the vehicle performed in one mode, which satisfied U.S. NOx emissions standards. If the defeat device detected that the vehicle was not being tested, it operated in a different mode, in which the vehicle's emissions control systems were reduced substantially, causing the vehicle to emit substantially higher NOx, sometimes 40 times higher than U.S. standards.

30. According to Liang and CWs 1 and 2, and as corroborated by contemporaneous documentation, starting with the first model year 2009 of VW's new "clean diesel" engine through model year 2016, VW employees, and others, then installed, and caused to be installed, the defeat device software in VW vehicles marketed and sold in the United States.

### B. Certification of VW Diesel Vehicles in the United States

31. According to Liang and CWs 1 and 2, and as corroborated by contemporaneous documentation, VW employees met with the EPA and CARB to seek the certifications required to sell the vehicles to U.S. customers. During these meetings, VW employees misrepresented, and caused to be misrepresented, to the EPA and CARB staff that VW diesel vehicles complied with U.S. NOx emissions standards, when they knew the vehicles did not. During these meetings, VW employees described, and caused to be described, VW's diesel technology and emissions control systems to the EPA and CARB staff in detail but omitted the existence of a defeat device.

32. According to Liang and CWs 1 and 2, and as corroborated by contemporaneous documentation, also as part of the certification process for each new model year, VW employees falsely and fraudulently certified, and caused to be certified, to the EPA and CARB that VW

10

diesel vehicles met U.S. emissions standards and complied with the Clean Air Act. VW employees knew that if they had told the truth and disclosed the existence of the defeat device, VW could not have sold any of its diesel vehicles in the United States.

33. According to Liang and CWs 1 and 2, and as corroborated by contemporaneous documentation, following the successful launch of the Gen 1 vehicles in the United States, VW employees worked on a second generation of the diesel engine (the Generation 2 or "Gen 2"), which also contained defeat device software. The Gen 2 engine was included in vehicles sold in the United States in or around 2011.

### C. The ICCT Study

34. According to CW1 and as corroborated by contemporaneous documentation, in or around March 2014, VW learned of the results of a study undertaken by West Virginia University's Center for Alternative Fuels, Engines and Emissions and commissioned by the International Council on Clean Transportation (the "ICCT study"). The ICCT study identified substantial discrepancies in the NOx emissions from certain VW vehicles when tested on the road compared to when these vehicles were undergoing EPA and CARB standard drive cycle tests on a dynamometer. The results of the study showed that two of the three vehicles tested - VW vehicles - emitted NOx at values of up to 40 times the permissible limit in the United States.

35. SCHMIDT learned of the ICCT study results no later than on or about April 2, 2014, when he received an email and attachment that stated, in part, "current diesel PEMS measurements in USA on road by CARB, WVU with ICCT show significantly increased NOx-RDE factors (study to be published soon.)". Based upon my investigation, a PEMS device is used to measure vehicle emissions on the road, and "RDE" refers to real-drive emissions. That same day, SCHMIDT wrote a colleague in reference to VW's compliance with emissions: "It

11

should first be decided whether we are honest. If we are not honest, everything stays as it is. ICCT has stupidly just published measurements of NAR diesel off-cycle, not good." Based upon my investigation, VW employees refer to VW's North American Region as NAR, which includes the United States.

36. According to Liang, CWs 1 and 2, and CE1 and CE2, and as corroborated by contemporaneous documentation, following the ICCT study, CARB, in coordination with the EPA, attempted to work with VW to determine the cause for the higher NOx emissions in VW diesel vehicles when being driven on the road as opposed to on the dynamometer undergoing standard emissions test cycles. To do this, CARB, in coordination with the EPA, repeatedly asked VW questions that became increasingly more specific and detailed, as well as conducted additional testing themselves.

37. On or about May 20, 2014, SCHMIDT emailed the then-Chief Executive Officer of VW GOA and another employee a document analyzing "Possible Consequences/Risks" of the ICCT study. The analysis noted possible monetary penalties per vehicle of up to $37,500 from the EPA, with 500,000 to 600,000 affected vehicles. The document also noted, "Difference between street and test stand must be explained. (Intent = penalty!)" and "applications modifications in GEN1 and GEN2 can achieve reductions of NOx emissions under RDE, but not compliance with the limits." In his cover email, SCHMIDT noted, "the EPA is currently starting a research project on this topic."

38. According to Liang and CWs 1 and 2, and as corroborated by contemporaneous documentation, after learning about the results of the ICCT study, engineers in the VW engine development group formed an ad hoc task force to formulate responses to questions that arose from the U.S. regulators. VW employees determined not to disclose to U.S. regulators that the

12

tested vehicle models operated with a defeat device. Instead, VW employees pursued a strategy of concealing the defeat device in responding to questions from U.S. regulators, while appearing to cooperate.

39. According to Liang and CWs 1 and 2, and as corroborated by contemporaneous documentation, throughout 2014 and until at least August 2015, VW employees, and their co-conspirators, continued to offer, and cause to be offered, software and hardware "fixes" and explanations without revealing the underlying reason for the higher NOx measurements on the road.

**D. SCHMIDT'S Role in the Conspiracy**

40. In the summer of 2015, SCHMIDT took on a direct role in VW's response to questions from U.S. regulators about the higher NOx measurements exhibited by VW vehicles on the road compared to during U.S. emissions tests.

41. According to CWs 1 and 2, and as corroborated by contemporaneous documentation, when U.S. regulators threatened not to certify VW model year 2016 vehicles for sale in the United States, VW's executive management requested a briefing on the situation, which took place on July 27, 2015. According to CW1 and as corroborated by contemporaneous documentation, in meetings in preparation for the July 27, 2015, meeting, CW1 fully briefed SCHMIDT on the defeat device. For example, on or about July 27, 2015, SCHMIDT and other VW employees met in advance of the meeting with VW's executive management. During this pre-meeting, the VW employees, including SCHMIDT, prepared a chart showing possible consequences of a meeting SCHMIDT was scheduled to have with CARB the following week. The slide showed that if the outcome was "positive for VW," VW would obtain approval for model year 2016 vehicles, but that if "negative for VW" and there was "no explanation for

13

GEN1 and GEN2," there could be an "Indictment?"

42. According to CWs 1 and 2, and as corroborated by contemporaneous documentation, on or about July 27, 2015, SCHMIDT and other VW employees presented to VW's executive management in Wolfsburg, Germany, regarding the existence, purpose and characteristics of the defeat device. In the presentation, VW employees assured VW executive management that U.S. regulators were not aware of the defeat device--that is the engine's ability to distinguish between the dynamometer and road mode. Rather than advocate for disclosure of the defeat device to U.S. regulators, VW executive management authorized its continued concealment.

43. On or about August 1, 2015, SCHMIDT travelled from Germany to Wayne County, Michigan.

44. According to CE1, as corroborated by contemporaneous documentation, on or about August 5, 2015, in a meeting in Traverse City, Michigan, SCHMIDT and a colleague met with CE1 to discuss the discrepancy in emissions of VW diesel vehicles. SCHMIDT offered technical reasons and excuses such as "irregularities" or "abnormalities" for the discrepancy without revealing the fundamental reason for the higher NOx measurements on the road: software intentionally installed in VW vehicles so the vehicles could detect and evade emissions testing.

45. According to CE2, as corroborated by contemporaneous documentation, on or about August 7, 2015, in a telephone call with CE2, SCHMIDT and a colleague discussed the discrepancies in emissions of VW diesel vehicles. SCHMIDT again offered technical reasons and excuses without revealing the fundamental reason for the higher NOx measurements on the road: software intentionally installed in VW vehicles so the vehicles could detect and evade

14