# Exhibit 10

DOW JONES



Unternehmen & Märkte
**LOUIS FREEH UND OLAF SCHNEIDER; "Das Pendel ist zu weit ausgeschlagen"**

Murphy, Martin; Brower-Rabinowitsch, Grischa
1,806 words
22 February 2017
Handelsblatt
HNDBLT
016
German
Copyright 2017 Handelsblatt GmbH. Alle Rechte vorbehalten. Zum Erwerb weitergehender Rechte wenden Sie sich bitte an nutzungsrechte@vhb.de

Der frühere FBI-Chef und der Chief Compliance Officer von Bilfinger sprechen über gute Unternehmensführung, die Macht von Aufpassern aus den USA, die weltweite Verfolgung von Korruption durch die Amerikaner und den größten deutschen Compliance-Fall: Volkswagen .

Louis Freeh ist ein gefragter Mann. Der frühere Chef der US-Bundespolizei FBI, Richter und Staatsanwalt, berät Firmen bei guter Unternehmensführung, unter anderem den deutschen Dienstleistungskonzern Bilfinger. Freeh war auch der von einem US-Gericht bestellte sogenannte Monitor von Daimler nach einem Korruptionsskandal. Er hat die Aufarbeitung beim Autobauer überwacht. Volkswagen bekommt im Rahmen seiner Einigung mit den US-Behörden bald auch so einen Aufpasser. Zwischen fünf Kundenterminen in vier verschiedenen Ländern Europas steht Freeh dem Handelsblatt am Frankfurter Flughafen Rede und Antwort. Mit dabei ist Olaf Schneider, der bei Bilfinger für die Compliance verantwortlich ist.

Herr Freeh , wie mächtig ist ein Monitor?

Freeh : Der Monitor-Job ist limitiert, Sie sind kein Vorstandschef, Sie treffen keine Entscheidungen. Sie überwachen nur, ob das Unternehmen die Vereinbarungen mit der Regierung einhält. Als Monitor beobachten Sie nur.

Na ja, Sie galten bei Daimler als sehr mächtig ...

Freeh : Sagen wir es mal so: Der Monitor hat nur Erfolg, wenn das Unternehmen bereit für Veränderungen und kooperativ ist. Und es gibt sehr wenige Situationen, in denen Unternehmen sich nicht kooperativ zeigen, weil die Konsequenzen für sie sehr negativ sein können.

Und Daimler war kooperativ?

Freeh : Absolut. Als Daimler den US-Behörden vorschlug, dass ich der Monitor sein soll, da hatte ich das Unternehmen ja auch schon drei Jahre lang in Compliance-Fragen beraten. Mein Zugang zum Vorstand und Aufsichtsrat war deshalb sehr gut. Und in den drei Jahren des Monitorings mussten wir nie zur Regierung gehen und Streitfragen klären.

Aber in allen Unternehmen, die sich einem Monitoring unterwerfen mussten, sei es Daimler, Siemens oder Bilfinger, mussten etliche Mitarbeiter gehen ...

Freeh : Nun, wenn sich ein Unternehmen verändert, dann gehen zwangsläufig die Mitarbeiter, die den Wandel nicht annehmen. Das ist eine klassische Managementaufgabe.

Welche Rolle haben Sie dabei gespielt?

**Freeh**: Ich habe nie einem CEO gesagt: "Mitarbeiter Xpasst nicht mehr zu Ihrem Unternehmen." Aber ich würde in einem Bericht zum Beispiel über die Ergebnisse einer Befragung des Managements in China schreiben. Die Schlüsse daraus muss der Vorstand selber ziehen. Ich habe nie Empfehlungen abgegeben, jemanden zu feuern.

Herr Schneider, wie sehen Sie Ihren Monitor, den Schweizer Anwalt Mark Livschitz?

Schneider: Natürlich kommt der Monitor mit einer großen Befugnis in das Unternehmen. Er hat das Recht, jede Art von Information einzusehen, und er wird im Management, im Vorstand und im Aufsichtsrat gehört. Letztendlich hält er dem Unternehmen den Spiegel vor, und man sieht alles, auch die Stellen, an denen man noch mit Disziplin und Konsequenz arbeiten muss.

Geht es darum, die Kultur des Unternehmens zu ändern?

Schneider: Das ist das übergeordnete Thema. Wenn die Kultur, das heißt vor allem das wertebasierte Handeln, in einem Unternehmen stimmt, haben Sie keine Probleme mit der Compliance.

Und der Kulturwandel fängt wo an ...?

Schneider: Ganz oben! Der Aufsichtsrat muss entscheiden, ob der Vorstand für den Wandel richtig besetzt ist, der Vorstand über das Management und so weiter. Grundlage können die Berichte des Monitors sein. Meine persönliche Erfahrung ist, dass sich mit einem Führungswechsel die Haltung und Kultur im Unternehmen zum Positiven ändern.

Ist das bei Bilfinger passiert?

Schneider: Sie wissen, dass wir viele Wechsel im Aufsichtsrat und Vorstand in den vergangenen Jahren hatten. Mit dem neuen Team haben wir nun alle Möglichkeiten! Wir machen erkennbar Fortschritte, der Wandel ist auf allen Ebenen spürbar.

**Freeh**: Die Führung muss dahinterstehen, sie muss ein wirklich sauber agierendes Unternehmen wollen, das ist das Wichtigste. Und das ist nach meiner Einschätzung bei Bilfinger absolut der Fall. Wenn das gegeben ist, dann ist es nur noch Handwerk, die richtigen Systeme zu implementieren. Nehmen Sie zum Beispiel Enron ...

... das Energieunternehmen, das 2004 nach einem Bilanzbetrug pleiteging ...

**Freeh**: ... dann sehen Sie, dass Enron auf dem Papier das beste Compliance-System hatte, das es damals gab. Aber niemand hat es gelebt. Compliance war nicht Teil der DNA des Unternehmens.

Können Sie ein konkretes Beispiel nennen, Herr Schneider, wie man eine neue Kultur durchsetzt?

Schneider: Sie müssen sehr transparent sein. Wir veröffentlichen ganz genau, wie viele Whistleblower wir in einem Jahr hatten, wie viele Compliance-Fälle, wie viele disziplinarische Maßnahmen wir getroffen und wie viele Mitarbeiter das Compliance-Helpdesk angerufen haben. Diese Transparenz hilft beim Wandel!

Das Ganze kostet doch auch eine Stange Geld - oder, Herr Schneider?

Schneider: Richtig, wir haben gerade bekanntgegeben, dass wir unsere Compliance-Aufwendungen erhöhen: von rund 50 auf einen hohen zweistelligen Millionen-Euro-Betrag für die Zeit von 2015 bis 2019. Aber wir holen uns andererseits auch Geld zurück.

Wie das?

Schneider: Aus drei Quellen. Wir haben zum Beispiel einen Unternehmenskauf rückabgewickelt, weil das Unternehmen in einen Bestechungsskandal verwickelt war, über den wir im Rahmen des Erwerbsvorgangs nicht ausreichend informiert wurden. Auch bei anderen Unternehmenskäufen in der Vergangenheit haben wir bereits Schadensersatz geltend gemacht. Zweitens haben wir einen nicht unerheblichen Schadensersatzbetrag von einem Dax-Konzern zurückbekommen ...

... von welchem?

Schneider: Das kann ich Ihnen leider nicht sagen. Wir waren in dem Fall Opfer im Rahmen einer Kartellbildung.

Wo bekommen Sie noch Geld her?

Page 2 of 4 © 2019 Factiva, Inc. All rights reserved.

Schneider: Wir gehen gegen alle beteiligten Manager vor, um Entschädigung von diesen oder den D & O-Versicherungen zu bekommen. Das sind wir nicht zuletzt auch unseren Aktionären schuldig.

Und was kommt da zusammen?

Schneider: Es ist nicht unerheblich. Mehr kann ich dazu nicht sagen.

Kommen wir zu dem größten deutschen Compliance-Fall: VW. Der Konzern hat sich kürzlich von Christine Hohmann-Dennhardt getrennt, mit der Sie erfolgreich bei Daimler zusammengearbeitet haben, Herr Freeh. Ist das ein fatales Signal?

Freeh: Ich kenne keinerlei interne Hintergründe bei VW, die dazu geführt haben, und möchte mich daher zu ihrer Demission auch nicht äußern. Ich kann nur sagen, dass ihre Arbeit bei Daimler herausragend war. Ich würde denken, dass jedes Unternehmen ihre Erfahrung und Expertise gebrauchen kann, weil sie absolut integer ist.

Stimmt es, dass Hohmann-Dennhardt Sie als Berater für Volkswagen engagieren wollte?

Freeh: Sagen wir mal so: Ich hatte Diskussionen mit ihr und dem Unternehmen im Januar vergangenen Jahres. Aber das waren vertrauliche Gespräche, über die ich nicht reden darf.

VW sucht gerade nach einem Monitor. Würden Sie den Job übernehmen?

Freeh: Ich würde es überdenken, wenn man mich fragen würde. Ich müsste vorher aber sicher mit vielen Leuten darüber sprechen.

Sie klingen zögerlich. Ist der VW-Fall nicht der Sechser im Lotto für jeden Monitor?

Freeh: Das stimmt, es ist ein großer Fall. Aber ich würde auch bei VW nicht anders verfahren als immer. Ich würde mich mit dem Vorstand und dem Aufsichtsrat zusammensetzen und mich zwei Dinge fragen: Kann ich den Job übernehmen, und ist das Unternehmen bereit, die nötige Kooperation zu zeigen. Wenn die Antwort auf beide Fragen ja ist, dann würde ich ihn nehmen. Aber mit 67 brauche ich nicht mehr jeden Job machen.

VW scheint den Kulturwandel nicht allzu ernst zu nehmen. Könnte das ein Problem sein?

Freeh: Das ist Ihre Ansicht. Ich kenne die Leute beim US-Justizministerium sehr gut, die den VW-Fall bearbeiten. Aber ich habe nicht mit ihnen darüber geredet, und ich kenne zu wenig Details, um ihnen darauf eine Antwort geben zu können.

Fragen wir etwas allgemeiner. Wie sehen Sie Deutschland in Bezug auf Compliance?

Freeh: Das Bewusstsein und das Bekenntnis der Unternehmen zu Compliance in Deutschland sind sehr, sehr groß. Viel größer als vor zehn Jahren. Ich würde sagen, die Compliance ist heute so stark ausgeprägt wie bei amerikanischen Unternehmen.

Schneider: Siemens und die vielen anderen Fälle in Deutschland haben dazu geführt, dass Compliance sehr viel ernster genommen wird.

Mr. Freeh, wird sich durch die neue US-Regierung in Compliance-Fragen etwas ändern?

Freeh: Ja, ich glaube schon. Es gibt genügend Indizien dafür, dass die neue Regierung die Absicht hat, die Regulierung zurückzufahren, nicht nur bei Finanzinstituten, wo sie es ja schon sehr deutlich gemacht hat.

Wie stehen Sie dazu?

Freeh: Ich bin nicht zwangsläufig dagegen. Wenn der neue Generalstaatsanwalt sagt, dass wir Unternehmen zu stark regulieren, insbesondere ausländische, dann könnte das künftig einen erheblichen Unterschied in der Verfolgung von Korruption machen.

Sie würden weniger Regulierung begrüßen?

Freeh: Meiner Meinung nach ist das Pendel zu weit ausgeschlagen, wenn es darum geht, die Geschäfte von Unternehmen weltweit zu untersuchen und Fehlverhalten zu verfolgen, ja.

Wäre Bilfinger so ein Fall?

**Freeh**: Ich will nicht auf einzelne Fälle eingehen. Aber ich glaube, dass unsere ganze Vorstellung, wie wir Finanzinstitute und ausländische Unternehmen regulieren, überdacht werden muss. So, wie wir es heute machen, geht es über das valide Interesse von US-Behörden an Unternehmen hinaus.

Wie meinen Sie das?

**Freeh**: Natürlich ist es gut, wenn die USA ihre Vorstellungen von Corporate Governance weltweit durchsetzen können, aber es ist unwahrscheinlich, dass das passieren wird. Und wir bestrafen immer die Aktionäre mit Milliardensummen, die das Unternehmen zahlen muss. Man sollte aber nicht die Unternehmen, sondern vielmehr die Verantwortlichen härter in die Pflicht nehmen, so wie es die frühere Generalbundesanwältin Sally Yates im vergangenen Jahr angedeutet hat. Die Debatte ist richtig. Es sind immer Personen, die das Recht gebrochen haben.

Herr **Freeh**, Herr Schneider, vielen Dank für das Interview.

Die Fragen st ellten Martin Murphy und Grischa Brower-Rabinowitsch.

ZITATE FAKTEN MEINUNGEN

Vita **Louis Freeh** und Olaf Schneider **Louis Freeh** Der 67-jährige US-Amerikaner war unter Präsident Bill Clinton von 1993 bis 2001 Direktor der amerikanischen Bundespolizei FBI. Zuvor war er Special Agent des FBI, stellvertretender Bundesstaatsanwalt für den Distrikt von New York und schließlich Bundesrichter in dem Bezirk. Nach seiner Zeit als FBI-Direktor gründete er unter anderem mit zwei anderen ehemaligen Bundesrichtern eine Kanzlei, die weltweit Unternehmen in Compliance-Fragen berät. In Deutschland wurde **Freeh** vor allem dadurch bekannt, dass er nach einem Korruptionsfall bei Daimler drei Jahre lang das Unternehmen überwachte - im Auftrag eines US-Gerichts. Olaf Schneider Der 45-Jährige hat große Erfahrung mit guter Unternehmensführung. Er war bereits bei MAN, GE und bei Siemens für Corporate Governance zuständig. Seit November 2015 ist er Chief Compliance Officer bei Bilfinger. Der Dienstleistungskonzern steht unter der Aufsicht eines von den USA bestellten Monitors, weil Mitarbeiter in Afrika korrupt gehandelt hatten. Bilfinger hat mehrere Führungswechsel hinter sich, seit Mitte des vergangenen Jahres leitet der Brite Tom Blades das Unternehmen. Mit den US-Behörden einigte sich Bilfinger im Spätsommer 2016 auf eine Verlängerung des Monitorings bis Ende 2018, weil die Erfolge noch nicht ausreichten. Ich habe nie eine Empfehlung abgegeben, jemanden zu feuern. **Louis Freeh** früherer FBI-Chef Mit einem Führungs- wechsel ändern sich die Haltung und Kultur im Unternehmen zum Positiven. Olaf Schneider Chief Compliance Officer von Bilfinger

Lesen Sie auf der folgenden Seite, was der Monitor für **Volkswagen** bedeutet. **Louis Freeh** und Olaf Schneider (r.) im Interview: Deutsche Unternehmen sind bei der Compliance so weit wie amerikanische. Bert Bostelmann für Handelsblatt

Document HNDBLT0020170222ed2m0000f

**Search Summary**

| Text | Louis and Freeh and Volkswagen |
|---|---|
| Date | In the last 5 years |
| Source | All Sources |
| Author | All Authors |
| Company | All Companies |
| Subject | All Subjects |
| Industry | All Industries |
| Region | All Regions |
| Language | English Or German |
| Results Found | 233 |
| Timestamp | 4 December 2019 19:04 |

Page 4 of 4 © 2019 Factiva, Inc. All rights reserved.

DOW JONES

# Handelsblatt

Unternehmen & Märkte
**LOUIS FREEH AND OLAF SCHNEIDER; "The Pendulum Swings too far"**

Murphy, Martin; Brower-Rabinowitsch, Grischa
1,806 words
February 22, 2017
Handelsblatt
HNDBLT
016
German
Copyright 2017 Handelsblatt GmbH. All rights reserved. To acquire further rights, please contact nutzungsrechte@vhb.de
The former FBI Director and Bilfinger's Chief Compliance Officer talk about good corporate governance, the power of US watchdogs, the worldwide persecution of corruption by U.S. Americans, and the biggest German compliance case: **Volkswagen** .

**Louis Freeh** is in high demand. The former Head of the Federal Bureau of Investigation, the FBI, judge and prosecutor, advises companies in good corporate governance, among others the German service provider Bilfinger. **Freeh** was also ordered the so-called monitor of Daimler appointed by a US court after a corruption scandal. He monitored the remedial actions at the automotive manufacturer. **Within the framework of the settlement with the U.S. government agencies, Volkswagen** will also soon have such a monitor appointed. Between five customer appointments in four different European countries, **Freeh** gave Handelsblatt an interview at Frankfurt Airport. Olaf Schneider, responsible for compliance at Bilfinger, is also there.

Mr. **Freeh,** how powerful is a monitor?

**Freeh:** The monitor job is limited. Your are not the CEO. You do not make any decisions. You only monitor whether the company complies with the agreements concluded with the government. As monitor, you only observe.

Well, you were considered very powerful at Daimler ...

**Freeh:** Let's just say: the monitor is only successful if the company is ready for changes and it is cooperative. And there are very few situations where companies are not cooperative, because the consequences for them can be very negative.

And, was Daimler cooperative?

**Freeh:** Absolutely. When Daimler suggested to the U.S. authorities that I should be the monitor, I had already advised the company on compliance issues for three years. Therefore, my access to the executive board and the supervisory board was very good.  And during the three years of monitoring, we never had to go to the government and resolve any disputes.

However, quite some employees had to leave the company in all companies that had to submit to monitoring, be it Daimler, Siemens or Bilfinger ...

**Freeh:** Well, if a company changes, then employees who do not accept the change leave inevitably. This is a classic responsibility of management.

What role did you play in this?

**Freeh:** I have never told a CEO: "Employee X is no longer acceptable for your company." However, I would mention in a report, for example the results of a management survey in China. The executive board has to draw its own conclusions from it. I have never recommended to fire someone.

Mr. Schneider, what do you think about your monitor, the Swiss Attorney Mark Livschitz?

Schneider: Of course, the monitor comes with a great deal of power into the company. He has the right to obtain any kind of information and he is heard by management, the executive board and the supervisory board. Ultimately, he holds a mirror in front of the company, and you can see everything, including the positions, which still require work in terms of discipline and outcome.

Is it about changing the culture of the company?

Schneider: That is the overriding issue. If the culture, in other words primarily value-based action is correct in a company, then there are no compliance issues.

And the culture change starts where ...?

Schneider: At the very top! The supervisory board has to decide whether the executive board is correctly staffed, the executive board over management and so on. This can be based on the monitor's reports. My personal experience is a change in management changes the attitude and culture in the company positively.

Is this what happened at Bilfinger?

Schneider: You know we had multiple changes in the supervisory board and the executive board over the past years. Now, the new team offers us all options are on the table. We are making noticeable progress. You can sense the change at all levels.

**Freeh:** You must have the support of management. They must want a truly clean acting company. This is most important. And I believe this is absolutely the case at Bilfinger. If that's the case, then it's only a matter of implementing the right systems. Take for example Enron ...

... the energy company that went bankrupt in 2004 after accounting fraud ...

**Freeh:** ... then you see that Enron had on paper the best compliance system available at that time. But nobody lived it. Compliance was not part of the DNA of the company.

Can you name one specific example, Mr. Schneider, how to enforce a new culture?

Schneider: You must be transparent. We're publishing exactly how many whistleblowers we've had in one year, how many compliance cases, how many disciplinary actions we've taken, and how many employees have called the Compliance Helpdesk. This transparency helps with the change!

Mr. Schneider, doesn't the whole thing also costs a lot of many?

Schneider: That's true. We have just announced that we are increasing our compliance expenditures: from around 50 to a high double-digit million Euro amount for the period from 2015 to 2019. On the other hand, we also get back money.

How come?

Schneider: From three sources. For example, we rescinded a contract for a company acquisition because the company was involved in a bribery scandal, of which we were not adequately informed during the acquisition process. We have already claimed damages in other company acquisitions in the past. Second, we got back a not inconsiderable amount of compensation from a DAX company ...

... from which?

Schneider: Unfortunately, I can't disclose this. In this case, we were victims of cartel formation. Where else do you get money from?

Page 2 of 4 © 2019 Factiva, Inc. All rights reserved.

Schneider: We take action against all the managers involved in order to get compensation from them or the D&O insurances. After all, we also owe it to our shareholders.

And how much will it add up to?

Schneider: It is not an inconsiderable amount. That's all I can say about it.

Now, let's talk about the largest German compliance case: VW. The group recently severed its ties with Christine Hohmann-Dennhardt, with whom you worked successfully at Daimler, Mr. **Freeh.** Does this set a fatal signal?

**Freeh:** I do not know the internal background at VW, which led to this action and therefore, I would not like to comment on her resignation.   All I can say is that her work at Daimler was outstanding. I would think that any company can use her experience and expertise. She is completely honest.

Is it true that Hohmann-Dennhardt wanted to engage you as consultant for **Volkswagen?**

**Freeh:** Let's just say: Last January, I had discussions with her and the company. However, these were confidential communications. I cannot talk about it.

VW is currently looking for a monitor. Would you take the job?

**Freeh:** I would have to think about it if I they would ask me. I would certainly have to discuss this beforehand with quite a few people.

You sound hesitant. Is the case of VW not like the jackpot for every monitor?

**Freeh:** That's true, it is a large case. However, I would not proceed any different at VW. I would sit down with the members of the executive board and the supervisory board and I would ask myself two things: can I take the job and is the company ready to show the necessary cooperation. If the answer to both questions is yes, I would take the job. However, at age 67 I no longer have to take any job.

VW does not seem to take cultural change too seriously. Could this present a problem?

**Freeh:** This is your opinion. I know the people at the U.S. Department of Justice who work on the VW case very well. But I did not discuss this case with them and I do not know enough details to answer your question.

Let's ask something more general. How do you see Germany with regard to compliance?

**Freeh:** German companies are very much aware of compliance and they are highly committed to it. Much more so than ten years ago. I would say compliance is as significant today as it is with American companies.

Schneider: Compliance is taken much more seriously due to Siemens and the many other cases in Germany.

Mr. **Freeh,** will something change with regard to compliance due to the new U.S. government?

**Freeh:** Yes, I believe so. There is enough evidence that the new government intends to scale back regulation. This will not only affect financial institutions, where it has already made it very clear.

What is your position on it?

**Freeh:** I am not necessarily opposed to it. If the new Attorney General says that we over-regulate companies, in particular, foreign companies, it could significantly change the prosecution of corruption in the future.

Would you welcome less regulation?

**Freeh:** Yes, I believe the pendulum has gone too far, when it comes to investigating the business companies worldwide and prosecuting their misconduct.

Would Bilfinger be such a case?

**Freeh:** I don't want to talk about particular cases. But I do believe that our whole idea of how we regulate financial institutions and foreign companies needs to be reconsidered. The way we are doing it today goes beyond the valid interest U.S. government agencies have in companies.

Page 3 of 4 © 2019 Factiva, Inc. All rights reserved.

What do you mean by this?

**Freeh:** Of course, it is good that the U.S. is able to enforce its vision of corporate governance worldwide but it is unlikely to happen. And we always punish the shareholders with billions of dollars that the company has to pay. However, it would more beneficial to not hold the company responsible but rather those in charge, as Sally Yates, the former Attorney General indicated last year. This debate is correct. These are always persons who have broken the law.

Mr. **Freeh,** Mr. Schneider, thank you for the interview.

The interview was conducted by Martin Murphy and Grischa Brower-Rabinowitsch.

CITATIONS FACTS OPINIONS

Vita **Louis Freeh** and Olaf Schneider **Louis Freeh** From 1993 to 2001, the 67-year-old U.S. American was under Bill Clinton as President Director of the Federal Bureau of Investigation, the FBI. He has previously served as Special Agent of the FBI, Deputy Attorney for the District of New York and finally as Federal Judge in the same district. After serving as an FBI Director he established among other things a law firm with two other former federal judges consulting companies on compliance issues worldwide. In Germany, **Freeh**   became mainly known for having overseen the corruption case at Daimler for three years - as ordered by a U.S. court. Olaf Schneider The 45-year-old has a lot of experience in good corporate governance. He has already been responsible for corporate governance at MAN, GE and at Siemens. Since November 2015, he is the Chief Compliance Officer at Bilfinger. The service provider group is under the supervision of a monitor appointed by the U.S. because of the corruption of employees in Africa. Bilfinger has undergone multiple changes in leadership, and since the middle of last year, the British citizen Tom Blades manages the company. In the late summer of 2016, Bilfinger settled with the U.S. authorities to extend the monitoring until the end of 2018, because the successes were still insufficient. I have never recommended to fire someone. **Louis Freeh** the former FBI Director With a change in leadership, the attitude and culture changes in the company for the better. Olaf Schneider Chief Compliance Officer at Bilfinger

Read on the next page, what the monitor means for **Volkswagen.**   **Louis Freeh** and Olaf Schneider (r.) during the interview: German companies are in compliance at the same level as American companies. Bert Bostelmann for Handelsblatt

Document HNDBLT0020170222ed2m0000f

**Search Summary**

| Text | Louis and Freeh and Volkswagen |
|---|---|
| Date | In the last 5 years |
| Source | All Sources |
| Author | All Authors |
| Company | All Companies |
| Subject | All Subjects |
| Industry | All Industries |
| Region | All Regions |
| Language | English Or German |
| Results Found | 233 |
| Timestamp | 4 December2019 19:04 |

Page 4 of 4 © 2019 Factiva, Inc. All rights reserved.



**TRANSPERFECT**  City of New York, State of New York, County of New York

I, Alyssa Mullally, hereby certify that the document **"Factiva-20191204-1911"** is to the best of my knowledge and belief, a true and accurate translation from German into English.

Alyssa Mullally

Sworn to before me this
December 9, 2019

Signature, Notary Public

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 6TH FLOOR, NEW YORK, NY 10001 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE