UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION _____/ | MDL No. 2672 CRB  (JSC) **ORDER RESOLVING OUTSTANDING ISSUES RELATED TO THE BELLWETHER TRIAL** |
| This Order Relates To: Bellwether Trial. _____/ | |

This Order resolves the four outstanding issues from the Bellwether Trial.  First, it concludes that Volkswagen has met its burden of showing that it offered Plaintiffs an "appropriate correction" under California Civil Code § 1782(b).  Volkswagen has therefore established a valid defense to Plaintiffs' claim for damages under California's Consumers Legal Remedies Act ("CLRA").  Second, it denies Plaintiffs' motion for a mistrial.  Third, it denies Volkswagen's motion for judgment as a matter of law under Federal Rule of Civil Procedure 50.  Fourth, it reduces each prevailing Plaintiffs' punitive damages to four times the amount of their compensatory damages award.

I.       **BACKGROUND**

This Court has previously described the events that are the basis for Plaintiffs' claims:

> Over the course of six years, Volkswagen sold nearly 500,000
> Volkswagen– and Audi-branded TDI "clean diesel" vehicles, which
> they marketed as being environmentally friendly, fuel efficient, and
> high performing.  Consumers were unaware, however, that
> Volkswagen had secretly equipped these vehicles with a defeat
> device that allowed Volkswagen to evade United States
> Environmental Protection Agency ("EPA") and California Air
> Resources Board ("CARB") emissions test procedures.  Specifically,
> the defeat device produces regulation-compliant results when it

> senses the vehicle is undergoing testing, but operates a less effective
> emissions control system when the vehicle is driven under normal
> circumstances.  It was only by using the defeat device that
> Volkswagen was able to obtain Certificates of Conformity from
> EPA and Executive Orders from CARB for its TDI diesel engine
> vehicles.  In reality, these vehicles emit nitrogen oxides ("NOx") at
> a factor of up to 40 times over the permitted limit.

In re: Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., No. 15-md-02672-CRB (JSC), 2016 WL 6248426, at *1 (N.D. Cal. Oct. 25, 2016).  The scandal led to numerous government actions and over a thousand civil lawsuits, which were consolidated before this Court by the Judicial Panel on Multidistrict Litigation.  Id. at *2.

The bulk of the civil actions were resolved in two settlements (one concerning 2.0-liter TDI vehicles and another for 3.0-liter TDI vehicles) approved by this Court.  See generally In re: Volkswagen, 2016 WL 6248426; 3.0-Liter Class Action Settlement Approval Order (MDL dkt. 3229).  The 2.0-Liter Class Settlement offered the owners of TDI diesel vehicles their choice of two remedies.  Volkswagen would either buy their cars back at the pre-defeat device value or modify their cars to bring them into compliance with emissions standards approved by EPA and CARB.  In re: Volkswagen, 2016 WL 6248426, at *4.  Lessees similarly had two options.  Volkswagen would let them cancel their leases with no penalty or modify their vehicle.  Id.  Both owners and lessees were entitled to cash restitution on top of their choice of remedy.  Id.  Former owners who sold their vehicle before June 28, 2016, were entitled to at least $2,550 in cash restitution.  Amended Consumer Class Action Settlement Agreement Ex. 3 (dkt. 1685-3) at 8.  The 2.0-Liter Class Settlement received preliminary approval from this Court on July 26, 2016, and final approval on October 25, 2016.  In re: Volkswagen, 2016 WL 6248426, at *1.

The 3.0-Liter Class Settlement offered all owners a free repair, an extended emissions warranty, and cash restitution.  See generally Amended 3.0-Liter Class Action Settlement Agreement Ex. 2 (dkt. 2894-2).  It received preliminary approval on February 16, 2017, see Order Granting Preliminary Approval of 3.0-Liter Class Settlement (dkt. 2919), and final approval on May 17, 2017, see 3.0-Liter Class Action Settlement Approval Order.  Volkswagen has allowed opt-outs to opt back in and participate in the Class Settlements.  Trial Transcript Vol. 2 (dkt. 7228) at 351:19–24.

Both settlements required class members to release all claims arising from the emissions scandal.  In re: Volkswagen, 2016 WL 6248426, at *25; 3.0-Liter Class Action Settlement Approval Order at 13–14.  The emissions modification and accompanying extended warranty were available to consumers who did not participate in the Class Settlements and did not release their claims.  Trial Transcript Vol. 2 at 350:21–351:4.

Each of the ten Plaintiffs in this case owned or leased a Volkswagen or Audi TDI vehicle and opted out of the applicable Class Settlement.  See Order re: MSJ (dkt. 7093) at 3–4.  They each brought fraud claims and claims under California's Song-Beverly Act.  Id. at 4.  Every plaintiff but Timothy Riley also brought a claim under the CLRA.  Id.

Volkswagen moved for summary judgment on just the statutory claims.  Id.  This Court granted summary judgment as to Plaintiffs' Song-Beverly Act claims and claims for injunctive relief under the CLRA but denied summary judgment on Plaintiffs' CLRA damages claims.  Id. at 1–2.  The Court concluded that Volkswagen had waived its argument that Plaintiffs failed to provide the necessary notice for their CLRA claims.  Id. at 10–12.  But it found that there was a genuine issue of material fact as to whether the Class Settlements constituted an "appropriate correction" under California Civil Code § 1782(b), and therefore a defense to Plaintiffs' CLRA damages claims.  Id. at 10.  Based on California cases holding that the appropriateness of a correction offer should be decided by the court, the Court held that it would decide whether Volkswagen had proved the defense after hearing evidence at trial.  Id. (citing Benson v. Southern Cal. Auto Sales, Inc., 239 Cal. App. 4th 1198, 1207 (Cal. Ct. App. 2015)).  The parties subsequently agreed that the issue of whether Volkswagen offered an appropriate correction should be tried to the Court at a bench trial.  See Response by Plaintiffs to Defendants' Letter Brief (dkt. 7166) at 1.

Evidence commenced with the start of the bench trial on February 24, 2020.  See generally Trial Transcript Vol. 2.  Volkswagen presented two witnesses during the bench trial.  Rachael Zaluzec, Volkswagen Group of America's senior director of customer relations, testified about the Class Settlements generally and the offers made to each Plaintiff under those settlements specifically.  See id. at 306:8–355:15.  Robert Sutschek, vice president of Volkswagen Group of

America's Engineering and Environmental Office, testified about the emissions modification. See Trial Transcript Vol. 3 (dkt. 7229) at 638:3–671:14. Two plaintiffs, Kenneth Coon and Richard Ortiz, testified regarding mechanical problems they experienced after receiving the emissions modification. See Trial Transcript Vol. 2 at 430:15–442:15; Trial Transcript Vol. 3 at 713:20–716:6. Mr. Coon owned a 2014 Audi A6 3.0-liter TDI vehicle. Trial Transcript Vol. 2 at 430:15–17. Mr. Ortiz owned a 2014 Volkswagen Passat 2.0-liter TDI vehicle. Trial Transcript Vol. 3 at 713:20–22.

The jury trial was divided into two phases. The first phase was to determine compensatory damages. Trial Transcript Vol. 6 (dkt. 7292) at 1322:24–1323:2. During this phase, Plaintiffs sought damages for economic harm only. Id. at 1323:13–17. Because Volkswagen stipulated that the other elements of Plaintiffs' claims were satisfied, the only issue during this phase of the trial was whether Plaintiffs had suffered economic harm and, if so, in what amount. Id. at 1321:9–1322:23. Each Plaintiff testified to the dollar amount he, she, or they paid in reliance on Volkswagen's fraud. See Trial Transcript Vol. 4 (dkt. 7230) at 765:6–9, 768:5–7, 771:1–9, 773:2–4, 775:12–24, 778:3–5, 780:7–15. Volkswagen offered the testimony of an economics professor, Dr. Timothy Bresnahan, who used a market analysis to determine the excess amount each Plaintiff paid for his, her, or their vehicle as a result of Volkswagen's fraud. Id. at 802:14–849:20, 857:17–906:1. Dr. Bresnahan testified that Luke and Kathryn Sanwick's economic loss was $3,133, Mr. Riley's economic loss was $1,080, Julia Robertson's economic loss was $952, Scott Salzer's economic loss was $582, and the other Plaintiffs suffered no economic harm. Id. at 905:6–24. The jury's compensatory damages award adopted Dr. Bresnahan's conclusions. See Phase One Jury Verdict (dkt. 7251).

The second phase of the trial was to determine punitive damages. Relevant here, Plaintiffs presented evidence of the egregiousness of Volkswagen's misconduct, including expert testimony that increased NOx emissions increase the risk of harm to human health. See Trial Transcript Vol. 8 (dkt. 7294) at 1652:23–1682:8, 1683:3–11, 1684:3–1687:6. The jury awarded the Sanwicks, Mr. Riley, Ms. Robertson, and Mr. Salzer each $25,000 in punitive damages. See Phase Two Jury Verdict (dkt. 7264).

## II.    CORRECTION DEFENSE TO THE CONSUMER LEGAL REMEDIES ACT

California Civil Code § 1782(b) provides that "no action for damages may be maintained under Section 1780 if an appropriate correction, repair, replacement, or other remedy is given, or agreed to be given within a reasonable time, to the consumer within 30 days after receipt of the" consumer's notice to the defendant of his or her claim for damages under the CLRA.  Volkswagen argues that the Class Settlements constituted an appropriate correction offer to each of the Plaintiffs,[1] foreclosing their damages claims under the CLRA.  The Court has considered the evidence presented at trial on this issue as well as the parties' briefing.  For the reasons explained below, it concludes that Volkswagen has successfully established the correction defense as to Mr. Salzer, Ms. Robertson, and the Sanwicks' CLRA claims.[2]

### A.    Elements of the defense.

As an initial matter, the parties dispute the elements of the correction defense.  Plaintiffs maintain that in order to benefit from the correction defense, Volkswagen must show that its CLRA violations were "the result of a bona fide error or mistake."  Plaintiffs' Pretrial CLRA Brief (dkt. 7204) at 12–13.  Because Volkswagen concedes that its conduct was willful, the existence of a "bona fide error" requirement would be fatal to the correction defense.  See Trial Transcript Vol. 6 at 1321:9–1322:23.  But Volkswagen does not concede that lack of intent is an element of the defense announced by section 1782(b).  VW Pretrial CLRA Brief at 11–12.

The disagreement revolves around the interaction of two statutory provisions: California Civil Code §§ 1782(b) and 1784.  The former states that "no action for damages may be maintained under Section 1780 if an appropriate correction, repair, replacement or other remedy is given, or agreed to be given within a reasonable time, to the consumer within 30 days after receipt of the notice."  The latter states that:

> No award of damages may be given in any action based on a
> method, act, or practice declared to be unlawful by Section 1770 if
> the person alleged to have employed or committed such method, act,

---

[1]  Besides Mr. Riley, who has not brought a CLRA claim.  VW Pretrial CLRA Brief (dkt. 7201) at 1 n.1.
[2]  Because Plaintiffs who failed to prove that they suffered economic harm at trial failed to prove their CLRA claims regardless of the correction defense, the Court does not consider whether those Plaintiffs were offered an appropriate correction.

> or practice (a) proves that such violation was not intentional and resulted from a bona fide error notwithstanding the use of reasonable procedures adopted to avoid any such error and (b) makes an appropriate correction, repair or replacement or other remedy of the goods and services according to the provisions of subdivisions (b) and (c) of Section 1782.

Cal. Civ. Code § 1784. Volkswagen's position is that sections 1782(b) and 1784 establish two separate affirmative defenses, only one of which has as an element lack of intent. VW Pretrial CLRA Brief at 11–12. Plaintiffs' position is that section 1784 lays out the elements of the correction defense to a CLRA claim. Section 1782(b) makes reference to the affirmative defense while explaining the CLRA's notice requirements but does not list the defense's elements. Plaintiffs' Pretrial CLRA Brief at 7–8.

The Court previously concluded that sections 1782(b) and 1784 announce independent defenses to damages claims under the CLRA. See Order re: MSJ at 9. Since then, the Court has invited and considered additional argument on this issue. It nonetheless concludes that its initial interpretation was correct, for three reasons.

First, interpreting sections 1782(b) and 1784 as independent defenses is the far more natural reading of the statute. The plain language of section 1782(b) purports to establish a complete defense to any "action for damages under Section 1780" and makes no reference to section 1784 or a "bona fide error" requirement. Section 1784 does cross-reference section 1782(b). But that undermines rather than supports Plaintiffs' interpretation. If section 1784 established the elements for a defense that was referenced in section 1782, one would expect section 1782 to cross-reference section 1784, not the other way around. Plaintiffs would have the Court believe that the legislature established an affirmative defense by offering an incomplete description of its requirements at section 1782(b), then cross-referencing that section while adding an additional, dispositive element at section 1784. The Court does not believe the legislature would have employed such a roundabout scheme to establish the elements of the correction defense, especially because on Plaintiffs' reading section 1782(b)'s failure to reference the additional element announced at section 1784 effectively lays a trap for unwary readers.

Second, although prior precedent offers little guidance in this area, Volkswagen's position finds more support in the cases than Plaintiffs'. Plaintiffs claim that courts "analyzing the

'appropriate correction' defense . . . discuss section 1782 and 1784 <u>together</u>."  Plaintiffs' Pretrial

CLRA Brief at 9.  But most or all of the cases they cite merely state that an appropriate correction

offer may be a defense to a CLRA damages award, then cite either section 1784 or both

section 1784 and section 1782.  <u>Whelan v. Miles Industries</u>, No. C-11-02146 EDL, 2013 WL

12174135 (N.D. Cal. Jan. 3, 2013), the case Plaintiffs identify as the "most artful[ ] and

accurate[ ]" statement of their position, is indeed a representative example.  <u>See id.</u> at *2 (stating

that compliance with a demand for correction may be a defense to a CLRA damages claim and

citing section 1784); <u>see also</u> Plaintiffs' Pretrial CLRA Brief at 10.  These cases do not announce,

even sub silentio, that there is only one correction defense under the CLRA whose elements are

enumerated at section 1784.  The cases citing both sections may just as easily be read as saying

that an appropriate correction can block a damages claim and then citing the <u>two</u> defenses that

require such a correction.  <u>See, e.g.</u> <u>In re MacBook Keyboard Litig.</u>, No. 5:18-cv-02813-EJD,

2019 WL 6465285, at *9 (N.D. Cal. Dec. 2, 2019).  Or these courts may have discussed section

1784 but had no occasion to consider the separate defense established by section 1782(b).  <u>See,</u>

<u>e.g.</u> <u>Whelan</u>, 2013 WL 12174135, at *2.

On the other hand, Volkswagen cites several cases that applied the defense despite claims

of fraud or intentional misrepresentation.  Volkswagen's Post-Trial CLRA Brief (dkt. 7236) at 11

(citing <u>Flores v. Southcoast Auto. Liquidators, Inc.</u>, 17 Cal. App. 5th 841, 850 (Cal. Ct. App.

2017).  These decisions assume, albeit without explanation or discussion of section 1784, that

section 1782(b)'s correction defense is available even in cases of intentional misconduct.

Third, the legislative history cited by Plaintiffs supports Volkswagen's position.  Plaintiffs

rely heavily on a law review article recounnting the CLRA's drafting, written by one of its

authors, James Reed.  <u>See</u> Plaintiffs' Pretrial CLRA Brief at 11–12.  But Mr. Reed discusses

sections 1782(b) and 1784 separately, suggesting that they announce two independent defenses,

and never suggests that section 1782(b) is intended to cross-reference section 1784.  <u>See</u> James S.

Reed, <u>Legislating for the Consumer: An Insider's Analysis of the Consumers Legal Remedies Act</u>,

2 McGeorge L. Rev. 1, 17–20 (1971).  And Reed states that "[i]t was recognized that even the

most corrupt merchant can exonerate himself under" section 1782(b), contradicting Plaintiffs'

1    theory that the correction defense is only available in cases of bona fide error.  Id. at 17.

2           Similarly, the legislative history of the CLRA furnished by Plaintiffs shows that the

3    provision that ultimately became section 1784 was added to the draft bill before section 1782, and

4    with no mention of a correction.  See CLRA Legislative History (dkt. 7233-1) at 8.  Section 1782

5    was added approximately a month later in essentially the form it appears in now (including the

6    correction defense).  Id. at 11.  It was only several months later that the legislature amended

7    section 1784 to also require an appropriate correction.  Id. at 24.  It is implausible that

8    section 1784 lists the elements for the defense discussed at section 1782(b) when those provisions

9    were added to the draft bill at different times and the correction requirement—the only connection

10   between the two sections—appeared first in section 1782(b).

11          Plaintiffs' best argument is that Volkswagen's reading renders section 1784 a nullity.  See

12   Plaintiffs' Pretrial CLRA Brief at 9.  If sections 1784 and 1782 do establish separate defenses,

13   section 1784 requires defendants to prove all the same things as section 1782(b), plus the

14   additional element of lack of intent.  This is troubling, because presumably no defendant would

15   bother proving a "bona fide error" when they could avoid liability by showing an appropriate and

16   timely correction alone.  Cf. United States v. Menasche, 348 U.S. 528, 538–39 (1955) (courts

17   must "give effect, if possible, to every clause and word of a statute . . . rather than . . . emasculate

18   an entire section" (internal quotation marks and citations omitted)).

19          Volkswagen's efforts to explain this seeming discrepancy are unpersuasive.  It points out

20   that section 1782(b) applies to any "action for damages . . . under Section 1780," while

21   section 1784 applies to "any action [for damages] based on a method, act, or practice declared to

22   be unlawful by Section 1770."  See VW Post-Trial CLRA Brief (dkt. 7236) at 9–10.  But

23   California Civil Code § 1770 lists methods, acts, and practices proscribed under the CLRA, while

24   section 1780 states who may bring an action based on the misconduct enumerated at section 1770.

25   So the universe of actions brought under section 1780 and based on misconduct declared unlawful

26   by section 1770 is identical.[3]  Volkswagen tries to distinguish section 1782(b) from section 1784

27

28   _____
     [3]  To the extent Volkswagen argues that section 1784 is a defense to non-CLRA claims based on
     conduct that is unlawful under both the CLRA and other California laws, see VW Post-Trial

on the grounds that the former states that "no action for damages may be maintained," while the latter says that "[n]o award of damages may be given." VW Post-Trial CLRA Brief at 10–11. But any argument that some practical difference results from the divergent phrasing is unpersuasive. Finally, Volkswagen thinks that section 1784 does not incorporate section 1782(c)'s thirty-day time limit. Id. But section 1784 states that the defendant must "make[ ] an appropriate correction, repair or replacement or other remedy of the goods and services according to the provisions of subdivisions (b) and (c) of Section 1782." The thirty-day deadline is one of the provisions of section 1782(b), so it is also incorporated by reference.

Although this is an anomalous result, it is not a dispositive one. See Marx v. Gen. Revenue Corp., 568 U.S. 371, 385 (2013) ("The canon against surplusage is not an absolute rule."); Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253 (1992) ("Redundancies across statutes are not unusual events in drafting."). The Court finds the redundancy insufficient to overcome the evidence discussed above, including the statute's plain language, California case law, and the legislative history relied on by both sides. The same is true of the interpretive presumption that the CLRA should be construed liberally in consumers' favor. See Cal. Civ. Code § 1760. Even a thumb on the scale in favor of a more consumer-friendly reading is insufficient to adopt Plaintiffs' interpretation in the face of the evidence to the contrary. And while the model jury instruction Plaintiffs rely on does support their position, see Plaintiffs' Pretrial CLRA Brief at 7 (citing CACI 4710) the Court finds it unpersuasive for the reasons explained above, see People v. Alvarez, 14 Cal. 4th 155, 217 (Cal. 1996) (noting that pattern instructions are not the law, but "merely an attempt at a statement thereof").

**B.    Timeliness of the offer.**

Section 1782(b) requires that the defendant make the correction offer "within 30 days after receipt" of the plaintiff's CLRA notice. The parties dispute whether Volkswagen's purported correction offers were timely.

Much of the disagreement revolves around what CLRA notice Plaintiffs may rely on.

CLRA Brief at 9–10, the Court is unpersuaded.

Plaintiffs seek to rely on a letter sent by Elizabeth Cabraser on October 15, 2015, on behalf of twenty-six individual clients and a proposed class of similarly situated 2.0-liter TDI vehicle owners and lessees.[4]  Plaintiffs' Pretrial CLRA Brief at 13–14; see also Trial Ex. 5448.  None of the twenty-six individual clients represented by Ms. Cabraser are parties to this action.  Trial Ex. 5448.  It is well-established that once CLRA notice is sent on behalf of a putative class, members of the class may rely on that notice, regardless of whether they send their own CLRA letters.  See, e.g. Asghari v. Volkswagen Grp. of Am., Inc., 42 F. Supp. 3d 1306, 1317–18 (C.D. Cal. 2013).  However, the Court has not found, and the parties do not cite, any case addressing whether that rule extends to plaintiffs who have since opted out of the class.  Volkswagen, naturally, argues it does not.  Volkswagen's Post-Trial CLRA Brief at 7.

The Court need not decide this novel issue of California law, because it concludes that Plaintiffs are bound by the representations in their Complaints that the operative notice for each of their CLRA claims was sent by their own counsel between April and July 2017.  See Salzer Compl. (dkt. 6473) ¶ 146; Robertson Compl. (dkt. 6491) ¶ 146; Sanwick Compl. (dkt. 6499) ¶ 134; see also Am. Title Ins. Co. v. Lacelaw Corp., 861 F.2d 224, 226 (9th Cir. 1988) ("A statement in a complaint . . . is a judicial admission.").  The Court therefore assesses the timeliness of Volkswagen's purported correction offers according to Plaintiffs' individual CLRA notices, not Ms. Cabraser's letter.  Given that, there is little question the offers were timely, since they were made before the operative notices were received.  Trial Transcript Vol. 2 at 422:6–11 (2.0-liter settlement offers were made between July and August 2016, 3-liter settlement offers were made February 2017).

This includes the offer of an emissions modification ultimately approved by the EPA and CARB.  Although, as Plaintiffs point out, the emissions modification only became available for certain vehicles some months after Volkswagen received Plaintiffs' CLRA notices, see, e.g. Plaintiffs' Pretrial CLRA Brief at 18, section 1782(b) does not require that the correction become available within thirty days.  It requires that "an appropriate correction, repair, replacement, or

---

[4]  Because Ms. Cabraser's letter was sent on behalf of 2.0-liter TDI vehicle owners and lessees, Plaintiffs who owned or leased 3.0-liter vehicles could not rely on it in any event.

other remedy [be] given, <u>or agreed to be given within a reasonable time</u>, . . . within thirty days." Cal. Civ. Code § 1782(b) (emphasis added). As noted above, the Court is considering only the adequacy of the offers to Plaintiffs who were awarded compensatory damages, so only the emissions modifications for their cars are relevant. And as discussed below, neither Mr. Salzer nor Ms. Robertson was eligible to receive a modification, <u>see</u> <u>infra</u> Section II.C.2, so the modifications for their cars are also not relevant. That leaves only the Sanwicks' 3.0-liter Audi Q7. <u>See</u> Trial Transcript Vol. 2 at 340:25–341:4. 3. The emissions modification for that vehicle was available within roughly six months of Volkswagen's receipt of the Sanwicks' CLRA notice. <u>Compare</u> Trial Transcript Vol. 3 at 645:4–8, <u>with</u> Sanwick Compl. ¶ 134. Based on that timeline, the Court finds that Volkswagen's offer of an emissions modification or, if no modification was approved, a buyback, constituted an agreement to give a correction within a reasonable time. <u>See</u> Trial Transcript Vol. 2 at 427:4–11.

### C. Adequacy of the offer.

Having concluded that Volkswagen made a timely offer to each Plaintiff, the Court must determine whether those offers constituted "an appropriate correction, repair, replacement, or other remedy." Cal. Civ. Code § 1782(b). Because the offers made to 3.0-liter owners and 2.0-liter owners or lessees were meaningfully different, the Court considers those offers separately.

#### 1. Offer to 3.0 liter plaintiffs.

Plaintiffs Luke and Kathryn Sanwick owned a 3.0-liter 2013 Audi Q7. <u>See</u> Trial Transcript Vol. 2 at 340:25–341:4; <u>see also</u> Trial Transcript Vol. 3 at 645:3–8. Having considered the evidence presented at trial, the Court finds that the emission-compliant repair for the Sanwick's vehicle constituted "an appropriate . . . repair" under section 1782(b). <u>See</u> Trial Transcript Vol. 3 at 645:4–7. The evidence at trial showed that Volkswagen offered an emissions modification that would have brought the Sanwicks' vehicle into compliance with the standards to which it was originally certified. <u>Id.</u> at 642:2–8. An offer to turn what the Sanwicks received into the product they were initially promised at no cost to them would substantially undo their claimed harm and constitutes an appropriate repair.

The Court has considered Plaintiffs' argument that the emissions modification was

11

detrimental to the vehicles' performance in other ways. See Plaintiffs' Pretrial CLRA Brief at 20–22. This argument is not dispositive, for two reasons. First, the evidence at trial established that the emissions modification had at most a minor impact on the Sanwick's vehicle. See, e.g. Trial Transcript Vol. 3 at 655:4–21 (Volkswagen disclosed a possible one mile per gallon decrease in fuel efficiency for the Sanwick's vehicle, the modification did not increase the speed of vehicles at idle, EPA and CARB would not have approved modifications that had significant adverse impacts on performance), 691:2–23 (explaining that increased warranty claims for certain parts was likely attributable to the extended warranty), 703:1–705:6 (discussing Volkswagen's disclosures of potential impacts the modification would have on Audi 3.0-liter Generation 2.1 vehicles), 707:14–708:9 (explaining that the impacts were minor); see also Trial Transcript Vol. 2 at 345:1–12 (there have been relatively few complaints about the modification).

Although Plaintiff Kenneth Coon testified to problems he experienced with his 3.0-liter Audi vehicle after receiving the modification, see Trial Transcript Vol. 2 at 431:6–438:24, the Court finds this evidence unpersuasive for several reasons. First, it is not clear that all or even most of the problems Mr. Coon described were related to the modification. See id. Second, Mr. Coon acknowledged that several of the issues he described were covered under the extended warranty that accompanied the fix (discussed in greater detail below). See id. at 432:6–12. Third, Mr. Coon testified to problems with his vehicle, not the Sanwick's. Finally, and most importantly, the Court does not find Mr. Coon credible, in particular because he was impeached multiple times on cross-examination. Id. at 443:2–445:19, 447:23–448:24, 449:2–451:6, 451:18–453:1.

Second, the emissions modification was accompanied by an extended warranty for either ten years or 120,000 miles past the date of sale or four years and 48,000 miles after the modification. Id. at 342:12–343:12. The warranty covered all emissions-related parts, any problem related to the modification, and additional potential repairs. Trial Transcript Vol. 3 at 657:4–10. It was more encompassing than the typical emissions warranty. Id. at 657:13–17. The Court finds that to the extent the modification would have impacted the performance of the Sanwick's vehicle, the difference was more than made up for by the accompanying warranty.

Plaintiffs point out that the modification and accompanying warranty were offered as part

of a mandatory recall, not the settlement. Plaintiffs' Pretrial CLRA Brief at 18. But they do not appear to argue that the modification had to be part of the Class Settlements to qualify as an appropriate correction, and the Court has seen no authority or argument that would support that position. Indeed, the fact that the modification was available outside of the Class Settlements means it was not conditioned on Plaintiffs releasing any of their claims. Trial Transcript Vol. 2 at 350:21–351:4. Although, as discussed below, the Court holds that an appropriate correction offer may be premised on release of non-CLRA claims, this means that one of Plaintiffs' arguments that the settlement offers were not appropriate corrections is inapplicable to the emissions modification.

### 2. Offer to 2.0 liter plaintiffs.

Volkswagen concedes that neither Ms. Robertson nor Mr. Salzer was offered an emissions modification. Volkswagen's Pretrial CLRA Brief at 3 n.9. The Court therefore does not consider whether the emissions modification for their vehicles constituted an appropriate repair. Instead, it concludes that the restitution payment these Plaintiffs were offered as part of the 2.0-liter Class Settlement constituted an "appropriate correction" under section 1782(b).

As an initial matter, to the extent Plaintiffs argue that only a total refund of their purchase price or lease payments would constitute an appropriate correction, the Court rejects that argument. Mr. Salzer's case demonstrates why such a rule would lead to absurd results. He sold his 2010 Volkswagen Jetta in October 2015. Trial Transcript Vol. 2 at 333:3–6. As a result, Volkswagen could not offer to repair it (or at least could not make that offer to Mr. Salzer). If Volkswagen could only make an appropriate correction by offering Mr. Salzer a replacement or a full refund, the only way it could utilize the correction defense would be to offer Mr. Salzer a double recovery, on top of the price he sold his vehicle for. This result would be particularly insensible, because Mr. Salzer himself created the conundrum by selling the car after learning that it contained a defeat device. See id.

The Court therefore concludes that a settlement offer short of a full refund may constitute an appropriate correction offer, at least in cases like Mr. Salzer and Ms. Robertson's, where the claimant no longer owns the vehicle and therefore cannot have it repaired or return it for a

1  replacement or a refund.  See id., see also id. at 332:3–7.  This conclusion is supported by the

2  legislative history Plaintiffs cite, which suggests that an appropriate correction may approximate

3  damages.  See Reed, supra, at 18 ("[T]he court should equate the term 'correction, repair,

4  replacement or other remedy' with damages, since it is essentially a substitute for damages.").

5      The comparison to damages suggests a useful metric for determining the appropriateness

6  of the settlement offers.  If Volkswagen offered Ms. Robertson and Mr. Salzer an amount greater

7  than the compensatory damages awarded by the jury, that suggests the offers were "appropriate,"

8  since it would mean that, according to the jury's verdict, Volkswagen offered these plaintiffs a

9  monetary amount more than adequate to undo their harm.

10     Ms. Robertson was awarded $952 in compensatory damages and Mr. Salzer was awarded

11  $582.  Phase One Jury Verdict at 2.  Volkswagen offered Ms. Robertson $3,129 and Mr. Salzer

12  $2,550 under the 2.0 Liter Class Settlement.  Trial Transcript Vol. 2 at 333:12–13, 350:3–6.  The

13  Court finds that monetary offers three to four times greater than these Plaintiffs' economic harm

14  constitute an appropriate correction offer.

15     It rejects Plaintiffs' other arguments that the Class Settlements were not appropriate

16  correction offers.  Plaintiffs argue that a settlement offer that "includes numerous conditions,

17  including a broad release of claims, is not an appropriate correction under the CLRA."  Plaintiffs

18  Pretrial CLRA Brief at 23–24.  It is true that some courts have held that "a correction offer cannot

19  require the consumer to release claims that would not otherwise be barred under section 1782,

20  subdivision (b)."  See, e.g. Valdez v. Seidner-Miller, Inc., 33 Cal. App. 5th 600, 615 (Cal. Ct.

21  App. 2019).  But at least one California appellate court has reached the opposite conclusion,

22  reasoning that "[t]he written notice requirement is intended to forestall litigation, by requiring

23  consumer and merchant to attempt to fix the problem before resorting to the courts.  Precluding a

24  merchant from obtaining an end to litigation that, in essence, consists of . . . different versions of

25  the same cause of action frustrates this intention."  Benson, 239 Cal. App. 4th at 1211.  The Court

26  agrees with this logic and adopts it.

27     Similarly, Plaintiffs cite Valdez to argue that because they could have recovered their

28  attorneys' fees and punitive damages in this case, but not under the Class Settlement, that

14

settlement was not an appropriate correction. Plaintiffs Pretrial CLRA Brief at 24–25. But as noted above, the Court declines to adopt <u>Valdez</u>'s holding that an appropriate settlement offer cannot be conditioned on release of other claims and remedies. The remedies Plaintiffs assert they would have been denied under the settlement demonstrate why that rule would lead to absurd results. The 2.0-Liter Class Settlement required Volkswagen to pay fees and costs for class counsel. <u>In re: Volkswagen</u>, 2016 WL 6248426, at *4. Plaintiffs' position is that in order to make an appropriate correction offer, Volkswagen also had to pay for Plaintiffs' non-class counsel. Plaintiffs Pretrial CLRA Brief at 24–25. Plaintiffs argue that the correction was inadequate because it did not pay for the lawyers Plaintiffs had to retain because they rejected the correction. The Court declines to endorse this circular reasoning. Nor does the Court believe that an appropriate correction offer must include punitive damages anytime punitive damages might be awarded at trial. "The written notice requirement is intended to forestall litigation, by requiring consumer and merchant to attempt to fix the problem before resorting to the courts." <u>Benson</u>, 239 Cal. App. 4th at 1211. Merchants will have little incentive to make correction offers if doing so requires them to pay the entire award a plaintiff could conceivably receive at trial. Perhaps there is a case where a correction offer is rendered inappropriate because it does not account for punitive damages. But the Court finds that this is not that case, especially because Plaintiffs were offered much more than the compensatory damages ultimately awarded by the jury.

Finally, Plaintiffs once again cite <u>Valdez</u>, this time to argue that "[a]n offer which gives the defendant the ability to determine what relief the plaintiff might be eligible for or eventually get based on criteria that they have a role in determining or setting (and which is out of the consumer's control) is not an appropriate correction." Plaintiffs' Pretrial CLRA Brief at 25. But in this regard, <u>Valdez</u> is distinguishable. In that case, the correction offer "improperly allowed [the defendant] to void the proposed settlement agreement if it determined after an inspection that the vehicle was in an unacceptable position." <u>Valdez</u>, 33 Cal. App. 5th at 615. "[C]onditioning CLRA remedies on [the defendant's] subjective determination . . . rendered [the] offer illusory." <u>Id.</u> Volkswagen did not have comparable unilateral control over payments under the Class Settlements. Plaintiffs point out that Volkswagen negotiated with class counsel the criteria for

eligibility and the amounts class members would receive. Plaintiffs' Pretrial CLRA Brief at 25.

But anytime a defendant makes a correction offer the defendant will have a say in how much is

offered and to who. And unlike in <u>Valdez</u>, Volkswagen's power over the settlement was not

unilateral. Plaintiffs acknowledge that Volkswagen negotiated the terms of the settlement with

class counsel, and has only one representative on the Claims Review Committee. <u>Id.</u> Finally,

while Volkswagen negotiated the criteria for determining eligibility and payment size, once those

criteria were set, determinations regarding eligibility and the amount of each award were

"formulaic." <u>See, e.g.</u> Trial Transcript Vol. 2 at 332:24–333:1, 340:24–341:1. This, too, is unlike

<u>Valdez</u>, where the defendant could unilaterally invalidate the settlement based on his subjective

assessment "whether the vehicle was in an acceptable condition." 33 Cal. App. 5th at 615.

In sum, the Court finds that Volkswagen has met its burden of showing that it offered each

prevailing Plaintiff an appropriate correction under section 1782(b).

## III.     MOTION FOR MISTRIAL

Plaintiffs moved for a mistrial during Phase One of the jury trial. Trial Transcript Vol. 5

(dkt. 7243) at 1161:19–20. At the Court's request, <u>id.</u> at 1162:14–17, Plaintiffs subsequently filed

briefs citing those portions of the record which ostensibly demonstrate the necessity of a mistrial,

<u>see</u> Mot. for Mistrial (dkt. 7240); Plaintiffs' Supp. Mistrial Brief (dkt. 7261). The Court has

carefully reviewed Plaintiffs' briefing and the accompanying exhibits. Because none of the

statements, rulings, or purported actions of the Court "projected to the jury an appearance of

advocacy or partiality" or demonstrated "actual bias," the motion for a mistrial is denied.[5] <u>United</u>

<u>States v. Mostella</u>, 802 F.2d 358, 361 (9th Cir. 1986).

### A.     Legal Standard

A court's statements or intervention during trial require a new trial "only if the record

'discloses actual bias on the part of the trial judge or leaves . . . an abiding impression that the

judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or

---

[5]  Volkswagen cites four other cases in which Plaintiffs' counsel have brought motions for mistrial
or to disqualify the presiding judge. <u>See</u> Opp'n to Mistrial (dkt. 7248) at 1; VW Supp. Mistrial
Brief (dkt. 7320) at 1. Motions brought in other cases are irrelevant to the instant dispute and the
Court does not consider them in ruling on Plaintiffs' motion in this case.

partiality.'" Id. (quoting Shad v. Dean Witter Reynolds, Inc., 799 F.2d 525, 531 (9th Cir. 1986)). "It is well established that a trial judge is more than a moderator or umpire." Id. "It is entirely proper for him to participate in the examination of witnesses for the purpose of clarifying the evidence, confining counsel to evidentiary rulings, controlling the orderly presentation of the evidence, and preventing undue repetition of testimony." Id. "Before a jury's verdict will be overturned because of the conduct of a trial judge in rebuking or punishing an attorney or otherwise intervening in the proceedings, it must appear that the conduct measured by the facts of the case presented together with the result of the trial, was clearly prejudicial to the rights of the party." United States v. Scott, 642 F.3d 791, 799 (9th Cir. 2011) (internal quotation marks omitted).

"[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." Liteky v. United States, 510 U.S. 540, 555 (1994). "They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." Id. "Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display." Id. at 555–56.

## B. Analysis

Plaintiffs' briefs reveal a fundamental misunderstanding of the standard for a new trial and the role of the trial judge. As explained below, the remarks and interventions Plaintiffs believe demonstrate actual bias or an appearance of partiality reflect only the Court's obligation to ensure the truthful and orderly presentation of evidence in compliance with the Rules of Evidence and the Court's previous rulings. See United States v. Marks, 530 F.3d 799, 808 (9th Cir. 2008).

### 1. Examination by the Court.

Plaintiffs complain that on several occasions the Court stepped in to conduct its own examination of Dr. Bresnahan and Ms. Zaluzec. See Mot. for Mistrial at 7, 13–15; Plaintiffs' Supp. Mistrial Brief at 10–11. But a trial court may properly "participate in the examination of

witnesses for the purpose of clarifying the evidence," <u>Mostella</u>, 802 F.2d at 361, or "mak[ing] the testimony clearer to the jury," <u>United States v. Poland</u>, 659 F.2d 884, 893 (9th Cir. 1981).

That was the case in each of the three instances of examination by the Court that Plaintiffs object to. For example, during cross-examination of Dr. Bresnahan, Plaintiffs' counsel asked whether the witness had previously "taken the position that the legality of a product, or lack thereof, could be an important consideration in determining price." Trial Transcript Vol. 4 at 933:14–17. After counsel confirmed that this line of questioning went to the legality of Volkswagen's diesel vehicles after disclosure of the defeat device, <u>id.</u> at 933:24–934:1, the Court asked Dr. Bresnahan whether the fact that "the EPA . . . and CARB said after the disclosure that these cars were legal to drive and legal to sell" was "an important factor" in his analysis, <u>id.</u> at 934:2–7. This question clarified for the jury what role the legality of Plaintiffs' vehicles played in Dr. Bresnahan's analysis. Similarly, later questions clarified what data Dr. Bresnahan had relied on in his analysis, <u>id.</u> at 965:25–967:1, and the relevance to his analysis of certain regulatory differences between states, Trial Transcript Vol. 5 at 1079:21–1080:2. These instances of limited judicial examination fall far short of the extensive questioning approved in other cases. <u>See</u> <u>Scott</u>, 642 F.3d at 799–800 (questioning by trial judge that took up twenty pages of trial transcript did not establish "excessive judicial intervention"). And while Plaintiffs may have preferred that these points not have been clarified for the jury, even "quite pointed and intemperate" questioning does not necessitate a mistrial when it is for the purpose of "clarifying the evidence." <u>Id.</u> at 800 (internal quotation marks omitted).

Finally, Plaintiffs complain that the Court, after directing Ms. Zaluzec to answer Plaintiffs' counsel's question over Volkswagen's objection, repeated that question nearly verbatim so the witness could respond, and then asked a follow up question when the witness gave a non-responsive answer. <u>See</u> Plaintiffs' Supp. Mistrial Brief at 10–11. This was an appropriate attempt to make Ms. Zaluzec's testimony clear for the jury, but in any event it is difficult to see how Plaintiffs could be prejudiced by the Court's efforts to have Ms. Zaluzec answer their own question.

### 2. Enforcing the Rules of Evidence and confining counsel to prior evidentiary rulings.

The Court has broad discretion to "ensure that a trial proceeds in a proper manner," and may exercise that power to ensure the parties "abide by the rules of evidence and rules of procedure, . . . not expose the jury to constant irrelevant argumentation, and . . . follow the directions of the court." Marks, 530 F.3d at 808. Many of Plaintiffs' complaints are directed to the Court's efforts to ensure compliance with its previous orders and the Rules of Evidence, prevent or clarify misleading argument and questioning, or avoid irrelevant or cumulative evidence that would waste the limited time available for trial. Relatedly, Plaintiffs' object to various statements the Court made while trying to understand the parties' positions in order to rule and in explaining its rulings to counsel.

Plaintiffs complain that the Court disallowed various questions during the cross-examination of Dr. Bresnahan as irrelevant. See Mot. for Mistrial at 5–10, 13. But the Court is empowered to ensure that the jury is not "expose[d] . . . to constant irrelevant argumentation." Marks, 530 F.3d at 808. It was proper—whether in response to Volkswagen's objections or not—for the Court to step in to prevent irrelevant questioning, particularly where those questions threatened to run afoul of prior rulings. See, e.g. Mot. for Mistrial at 5, 8; see also Order re: Jury Instructions (dkt. 7199) at 4; Mostella, 802 F.2d at 361 (court may rule sua sponte and may intervene to confine counsel to prior rulings). To the extent Plaintiffs object because they believe their questions were, in fact, relevant, the Court's rulings are not a proper basis for demonstrating judicial bias. See United States v. Johnson, 610 F.3d 1138, 1148 (9th Cir. 2010) ("Adverse findings do not equate to bias.").

Similarly, the Court may properly "control[ ] the orderly presentation of the evidence" including by "preventing undue repetition of testimony." Mostella, 802 F.2d at 361. Plaintiffs' objections to the Court halting cumulative or redundant questioning are therefore inapposite. See Mot. for Mistrial at 6 (citing Trial Transcript Vol. 4 at 930:15–18), 11 (citing Trial Transcript Vol. 4 at 956:6–17), 20. Similarly, it was not error for the Court to suggest that Plaintiffs' counsel could begin cross-examination of Ms. Zaluzec immediately after her direct examination in an effort to avoid wasting the jury's time. See Plaintiffs' Supp. Mistrial Brief at 4. Although the

United States District Court
Northern District of California

1   Court had previously agreed to, and later did, allow Plaintiffs' counsel to wait a day to prepare for

2   the cross-examination, attempting to move forward in a timely manner was well within the Court's

3   discretion to manage the trial.  See Marks, 530 F.3d at 808.  And, out of an abundance of caution,

4   the Court offered to give a curative instruction to ensure there was no implication that Plaintiffs'

5   counsel was unprepared.  Trial Transcript Vol. 8 (dkt. 7294) at 1781:24–1782:1.  Contrary to

6   Plaintiffs' position, see Mot. for Mistrial at 21–22, the Ninth Circuit has recognized that juries are

7   able to follow such instructions, Scott, 642 F.3d at 800.

8           **3.**        **Clarifying the evidence.**

9        As noted above, the Court may intervene to "clarify[ ] the evidence" or to "make

10  testimony . . . clearer to the jury."  Scott, 642 F.3d at 799–800; Poland, 659 F.2d at 893.  It was

11  therefore within the Court's discretion to offer clarification when counsels' arguments and

12  questions threatened to mislead the jury.  See Mot. for Mistrial at 4, 10; Plaintiffs' Supp. Mistrial

13  Brief at 3–4, 7–9.  The Ninth Circuit has upheld comparable judicial interventions necessary to

14  alleviate a risk of misunderstanding.  See Poland, 659 F.2d at 893 ("Defense counsel dropped the

15  subject with this answer, leaving the jury with the possible impression that the two witnesses had a

16  discussion just before coming to the Courtroom.  Questions by the court brought out that the

17  discussion to which the witness was referring took place some two and a half years before the trial.

18  Such questioning by a trial judge cannot be the basis for proper criticism.").  Similarly, when the

19  Court believed counsel's questions were confusingly phrased, it requested clarification for its own

20  sake and that of the jury.  See Mot. for Mistrial at 9, 17; Plaintiffs' Supp. Mistrial Brief at 9–10.

21  This, too, was an appropriate exercise of the Court's power to "clarify the evidence."  Poland, 659

22  F.2d at 893 (no judicial misconduct where court asked counsel to clarify the meaning of a phrase

23  that was ambiguous in context).

24       Furthermore, any prejudice that may have resulted from these statements (or those made

25  during the parties' evidentiary arguments or to explain the Court's rulings, discussed in greater

26  detail below), was alleviated by the jury instructions.  See Trial Transcript Vol. 1 (dkt. 7185) at

27  132:21–24 ("Please do not read into these instructions or into anything I may say or do that I have

28  an opinion regarding the evidence or what your verdict should be."); see also Laurins, 857 F.2d at

538.

**4.      Statements explaining the Court's rulings.**

In some instances, Plaintiffs object not only to the Court's decisions, but to its explanations for those decisions.  See Mot. for Mistrial at 5–10, 18–20; see also id. at 21 ("Not only what the Court has said—what [sic] how the Court has said it—has created the appearance of favoritism for the Defendants' positions regarding key issues.").  At one point, Plaintiffs object to the Court's stating the grounds on which it was ruling.  Mot. for Mistrial at 9–10 (arguing that rather than responding to Volkswagen's objection by saying "Irrelevant.  It's irrelevant," the Court should have "just sustain[ed] the objection").  Their position appears to be that the Court should have limited itself to "just sustaining or overruling" counsels' objections.  See, e.g. id. at 8.

This, too, misunderstands the role of the trial court.  The Court is not a judicial traffic signal whose function is to give lawyers binary directions to continue or stop a particular question or argument.  In order to provide counsel appropriate guidance and thus facilitate the orderly presentation of evidence, the Court must be able to explain its rulings.

Plaintiffs contend that the Court's explanations of its rulings went beyond what was appropriate and created the appearance of advocacy or partiality.  Mot. for Mistrial at 2.  But the Ninth Circuit has held that far harsher rebukes did not warrant overturning a jury's verdict when they were "aimed at stopping . . . counsel from engaging in irrelevant, repetitive, or otherwise improper questioning or editorializing."  Scott, 642 F.3d at 799 (court suggested that counsel "knew that she was acting improperly or was 'smirking,'" and criticized counsel for treating the jury as though they had no brains and could not count or read, and for deliberately wasting the jury's time (internal alterations omitted)).  And any danger of prejudice was again alleviated by the jury instructions.  See Trial Transcript Vol. 1 at 132:21–24, 133:17–18 ("You should not be influenced by the objection or by the Court's ruling on it.").

**5.      Statements made during argument.**

Relatedly, Plaintiffs object to various statements made by the Court when trying to determine the admissibility of evidence or the propriety of certain questions.  See Mot. for Mistrial at 7 (citing Trial Transcript Vol. 4 at 933:19–22), 9, 11–12, 16–19; Plaintiffs' Supp. Mistrial Brief

at 7–10. It is sometimes necessary for the Court to clarify the parties' positions or ask for additional explanation before ruling. See Poland, 659 F.2d at 893 (finding no error where court asked counsel to clarify the meaning of a question). Perhaps, in an ideal world, such discussions between the Court and counsel would occur exclusively outside the presence of the jury. But the practical realities of conducting a trial in a timely manner sometimes make that impossible, cf. Laurins, 857 F.2d at 538 ("It is within the court's discretion whether to conduct side-bar discussions."), and in any case it does not appear that either side requested a sidebar during the exchanges Plaintiffs cite.

In several instances it is difficult to see what prejudice could have resulted from the statements Plaintiffs complain of. Two examples will suffice. After overruling an objection from Volkswagen during the cross-examination of Dr. Bresnahan, the Court sought to clarify the grounds for the objection. It stated, "The objection is on the left is the United States of America. On the right is the state of California. So you're comparing two different things here." Trial Transcript Vol. 5 at 1083:12–15. Plaintiffs' counsel confirmed, "Right," and was allowed to continue his questioning. Id. at 1083:16. It is hard to see how the Court's characterization, which Plaintiffs' counsel agreed with, of a question which the Court allowed over Volkswagen's objection, suggested partiality to the defense. If, as Plaintiffs now argue, that characterization suggested "Plaintiffs' counsel was not making valid points," Mot. for Mistrial at 16, it would appear the fault lies with the points, not the Court's characterization of them.

Similarly, in response to a later objection from Volkswagen during the same cross-examination, the Court asked Plaintiffs' counsel whether "your point is that until this piece of paper, this press release came out on November 20th, until it did, the market didn't realize that a car that your client had was subject to the defeat device." Trial Transcript Vol. 5 at 1116:7–11. Plaintiffs' counsel agreed with this characterization, id. at 1116:14, and the Court stated that it was "a valid point," explained its relevance, and allowed the questioning, id. at 1116:15–1117:4. It is not clear why Plaintiffs believe the Court's characterization suggested that "Plaintiffs' counsel was not making a legitimate point," when the Court stated the opposite and Plaintiffs' counsel agreed with its characterization. See Mot. for Mistrial at 19.

But to some extent whether the Court characterized Plaintiffs' positions unfavorably while considering how to rule is beside the point. As noted above, harsher statements have been upheld when necessary to prevent improper questioning or evidence, Scott, 642 F.3d at 799, and the jury instructions alleviated any potential prejudice, see Trial Transcript Vol. 1 at 132:21–24, 133:17–18.

### 6.    Statements made outside the presence of the jury.

Plaintiffs' motion for a mistrial relies on various statements the Court made outside the presence of the jury. See Plaintiffs' Supp. Mistrial Brief at 4–7, 11–13. Given that these statements could not have "projected to the jury an appearance of advocacy or partiality," they will support a mistrial only if they demonstrate "actual bias on the part of the trial judge." Mostella, 802 F.2d at 361. But "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display," are insufficient to establish bias. Liteky, 510 U.S. at 555–56. The Court finds that the statements Plaintiffs rely on do not meet the high standard for establishing judicial bias.

### 7.    Non-verbal signals.

Three plaintiffs have furnished declarations stating that the Court made nonverbal signals indicating when defense counsel should object or otherwise undermining Plaintiffs' case. See Kenneth Coon Decl. (dkt. 7261-3); Maria Coon Decl. (dkt. 7261-4); Robertson Decl. (dkt. 7261-5). This is inaccurate. The Court did not signal when any lawyer should object, nor did it deliberately undermine Plaintiffs' case with nonverbal gestures. As discussed above, if the Court believed that any lawyer's argument or questioning was inappropriate, it was empowered to, and did, interject on its own.

## IV.    JUDGMENT AS A MATTER OF LAW

At the end of Plaintiffs' case-in-chief for Phase One of the jury trial, Volkswagen moved for judgment as a matter of law under Federal Rule of Civil Procedure Rule 50(a). Trial Transcript Vol. 4 at 786:2–11. The Court took the motion under submission, id. at 786:10–11, and now denies the motion.

1    Rule 50(a) provides that "[i]f a party has been fully heard on an issue during a jury trial

2    and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to

3    find for the party on that issue, the court may . . . grant a motion for judgement as a matter of law

4    against the party on a claim or defense that, under the controlling law, can be maintained or

5    defeated only with a favorable finding on that issue."

6    The only issue during Phase One was whether Plaintiffs suffered economic harm and, if so,

7    in what amount.  Trial Transcript Vol. 6 at 1322:24–1323:17.  "[U]nder the controlling law,"

8    Plaintiffs' economic damages were measured by the fair market value of what Plaintiffs paid for

9    their vehicles, less the fair market value of what they received.  Id. at 1323:18–21.  Volkswagen's

10   theory appears to be that Plaintiffs failed to show that they suffered economic harm, because they

11   offered no proof of the fair market value of what they had received (their vehicles).

12   But Plaintiffs did offer proof of the fair market value of what they paid for their vehicles.

13   Each Plaintiff testified to the dollar amount he, she, or they paid in reliance on Volkswagen's

14   fraud.  See Trial Transcript Vol. 4 at 765:6–9, 768:5–7, 771:1–9, 773:2–4, 775:12–24, 778:1–5,

15   780:7–15.  Volkswagen's objection, then, is that although Plaintiffs established the fair market

16   value of what they gave for their cars, they failed to show how much that amount should be

17   reduced by.  The Court finds this insufficient to show that Plaintiffs failed to establish a "legally

18   sufficient evidentiary basis" for a finding that they were economically harmed.  A reasonable jury

19   could well have concluded, based on Plaintiffs' testimony, that the fact that they spent money in

20   reliance on Volkswagen's misrepresentations established by a preponderance of the evidence that

21   they had suffered economic damages.  Volkswagen was entitled to argue that amount should be

22   reduced by the fair market value of what Plaintiffs received, but Plaintiffs had no obligation to

23   adduce evidence that would reduce their compensation.

24   Nor can Volkswagen complain that there was insufficient evidence to support the jury's

25   verdict awarding certain Plaintiffs compensatory damages.  That verdict was amply supported by

26   the testimony of Dr. Bresnahan during Volkswagen's own case-in-chief.  Compare Phase One

27   Jury Verdict, with Trial Transcript Vol. 4 at 905:6–24.

28

## V.     REDUCTION OF PUNITIVE DAMAGES

Volkswagen argues that the jury's punitive damages award of $25,000 to each of Luke and Kathryn Sanwick, Timothy Riley, Julia Robertson, and Scott Salzer violates constitutional due process. See generally VW Brief re: Punitive Damages (dkt. 7324). The Supreme Court has directed courts to consider three guideposts when evaluating the constitutionality of punitive damages awards. First, "the degree of reprehensibility of the defendant's misconduct." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418 (2003). Second, "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award." Id. Third, "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." Id.

The Court has considered each of these factors and concludes that the jury's punitive damages award crosses "the line of constitutional impropriety." See id. at 425. For the reasons explained below, the punitive damages awarded to each Plaintiff will be reduced to four times the amount of his, her, or their compensatory damages. Luke and Kathryn Sanwick's punitive damages are reduced to $12,532, Timothy Riley's punitive damages are reduced to $4,320, Julia Robertson's punitive damages are reduced to $3,808, and Scott Salzer's punitive damages are reduced to $2,328.

### A.     Reprehensibility of Volkswagen's misconduct.

To determine the reprehensibility of the defendant's misconduct, courts must consider whether:

> [T]he harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

Id. at 419. Several of these factors were present in this case. For instance, Volkswagen has conceded that the conduct "involved repeated actions"; it was not an isolated incident. And there is no dispute that the harm was the result of "intentional . . . deceit." See Joint Proposed Pretrial Order (dkt. 7040) at 6–7; see also Trial Transcript Vol. 6 at 1321:9–1322:18. The evidence at trial also established that Volkswagen acted with "indifference to . . . the health or safety of others."

25

See, e.g. Trial Transcript Vol. 8 at 1660:8–25.

However, there was no evidence at trial that either these Plaintiffs or any other person did suffer physical harm as a result of Volkswagen's misconduct. See id. at 1608:9–12. Indeed, Plaintiffs sought remuneration only for economic harm, not personal injury. Trial Transcript Vol. 6 at 1323:13–17. Nor was there any evidence that the targets of Volkswagen's misconduct were financially vulnerable.

In sum, the Court concludes that Volkswagen's conduct was egregious.

**B.      Disparity between Plaintiffs' actual harm and the punitive damages award.**

There are no "concrete constitutional limits on the ration between harm, or potential harm, to the plaintiff and the punitive damages award." State Farm, 538 U.S. at 424. Nonetheless, the Supreme Court has recognized that certain ratios are "instructive," if not "binding." Id. at 425. "[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process." Id. And "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." Id. at 425. Notably, the Ninth Circuit has recently held that a four-to-one ratio was "the most the Constitution permits" in a case involving comparably egregious misconduct. See Ramirez v. TransUnion LLC, 951 F.3d 1008, 1036–37 (9th Cir. 2020).

Plaintiffs' arguments that the Supreme Court's guidelines are inapplicable are unavailing. They argue that "when the compensatory award is small, it can support a much higher than single-digit ratio." Plaintiffs' Brief re: Punitive Damages (dkt. 7323) at 8. But Plaintiffs fail to show that the compensatory damages awarded to these Plaintiffs were "small." Cases involving nominal damages are not on point. The compensatory damages awards reflected evidence adduced at trial of the actual economic harm Plaintiffs suffered. See Damages, Black's Law Dictionary (11th ed. 2019) (defining nominal damages as "[a] trifling sum awarded when a legal injury is suffered but there is no substantial loss or injury to be compensated"); see also Trial Transcript Vol. 4 at 905:6–24. Plaintiffs assert that the compensatory damages "are small compared to what the jury could have determined," but the Court is aware of no precedent—and Plaintiffs cite none— directing courts to consider what compensatory damages a jury might have awarded. This is

especially true because, as noted above, the jury's compensatory damages were supported by the evidence at trial.

Plaintiffs suggest that "the potential harm to these plaintiffs are substantially greater than the small compensatory damages awarded," because Plaintiffs "could . . . have suffered adverse health effects from the NOx coughed up by their VW cars," and "the impact of the fraud, both in economic and emotional damages, could well have supported more significant damages." Plaintiffs' Brief re: Punitive Damages at 10. But "potential harm" refers to unrealized risk from the defendant's misconduct, not the possibility that the jury might have decided to award higher damages or that Plaintiffs might have won a larger award if they had pursued a different litigation strategy. See Bains LLC v. Arco Prods. Co., Div. of Atlantic Ritchfield Co., 405 F.3d 764, 776 (9th Cir. 2005). This case is unlike the hypothetical Plaintiffs cite from TXO Prod. Corp. v. Alliance Resources Corp., 509 U.S. 443 (1993), in which a wrongdoer fires a gun into a crowd but by sheer luck causes only $10 in damage. Id. at 459–60. The misconduct Plaintiffs complain of succeeded; relying on Volkswagen's fraudulent representations, Plaintiffs purchased Volkswagen's cars. There is no need for the Court to try to guess at the harm that fraud might have caused—the jury evaluated the harm it did cause. See Bains LLC, 405 F.3d at 776.

The Court concludes that even in light of Volkswagen's egregious misconduct, a punitive damages award four times the compensatory damages award is the most the Constitution will allow.

## C. Civil penalties.

The Court agrees with Volkswagen that the California Unfair Competition Law and Fair Advertising Law provide the most relevant civil sanctions in this case. See VW Brief re: Punitive Damages at 14–15. That those laws impose a maximum civil penalty of $2,500 per violation further supports the reduction of the punitive damages award in this case. See Cal. Bus. & Prof. Code §§ 17206(a) & 17536(a).

## VI. CONCLUSION

For the foregoing reasons, the Court holds that Volkswagen has established a valid "correction" defense under California Civil Code § 1782(b) to each prevailing Plaintiffs' CLRA

1  damages claim, denies Plaintiffs' motion for a mistrial and Volkswagen's Rule 50(a) motion, and

2  reduces the punitive damages awards to four times the amount of each Plaintiff's compensatory

3  damages award.

4      **IT IS SO ORDERED.**

5      Dated: April 10, 2020



CHARLES R. BREYER
United States District Judge