Anthony P. Chester, Esq., (*Pro Hac Vice*)
**KAZEROUNI LAW GROUP, APC**
120 S. 6th St., Suite 2050
Minneapolis, MN 55402
Phone Number:  952-225-5333
Fax Number:  800-400-6808
Email:  tony@kazlg.com
*Attorneys for Christine Taylor*

[Additional attorneys listed on signature page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: | Case No.: 3:15-md-02672-CRB |
| VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES, PRACTICES, AND PRODUCTS LIABILITY LITIGATION | AMENDED COMPLAINT FOR DAMAGES AND RESTITUTION |
| | 1. VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT (Tex. Bus. & Comm. Code section 17.41 *et seq.*) |
| THIS DOCUMENT RELATES TO: | 2. BREACH OF EXPRESS WARRANTY |
| *Christine Taylor v. Volkswagen Group of America, Inc., a corporation; VOLKSWAGEN AKTIENGESELLSCHAFT, a business entity, form unknown;* and DOES 1-20, inclusive. | 3. BREACH OF IMPLIED WARRANTY |
| | 4. BREACH OF THE IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE |
| Case No:  3:17-cv-02381-CRB | 5. BREACH OF CONTRACT |
| | 6. FRAUD |
| | 7. NEGLIGENT MISREPRESENTATION |
| | Initial Complaint Dated:  May 5, 2016 |
| | UNLIMITED CIVIL ACTION |

### INTRODUCTION

Plaintiff Christine Taylor ("Plaintiff") alleges as follows against Defendants Volkswagen Group of America, Inc., (hereinafter "VGoA" and/or "Defendants"),Volkswagen Aktiengesellschaft (hereinafter "VW AG" and/or "Defendants"), and DOES 1 through 20, inclusive, on information and belief, formed after an inquiry reasonable under the circumstances:

### PARTIES, JURISDICTION, AND VENUE

1.     At all times mentioned in this Amended Compliant, Plaintiff Christine Taylor was and is a resident of the County of Archer, State of Texas.

2.     Defendant Volkswagen Group of America, Inc., is a New Jersey corporation authorized to do business in Texas. At all times mentioned herein defendant engaged in the business of marketing and selling cars by and through authorized Volkswagen dealerships in Texas.

3.     Defendant Volkswagen Aktiengesellschaft, which conducts business as and under the name Volkswagen Group of American, is a German corporation organized and existing under the laws of Germany and with its principal place of business in Wolfsburg, Germany.

4.     VW AG is an automotive company that manufactures and sells vehicles under the Volkswagen, Audi, Porsche and other brand names with operations in approximately 150 countries, including the United States.  In the first half of 2015, VW AG surpassed Toyota as the world's largest automaker by sales, selling 5.04 million vehicles in the first six months of the year.

5.     VW AG is the parent corporation of VGoA. VW AG, independently and/or through its wholly owned subsidiaries, conducts substantial business in the State of Texas and throughout the United States.  Defendants - individually and/or collectively - design, develop, manufacture, market, sell, lease, warrant, service, and repair motor vehicles of various models, including the Subject Vehicle.

6.     Plaintiff is informed and believes and on that basis alleges that

2

defendants Does 1 through 20, inclusive, are in some manner responsible for the acts, occurrences and transactions set forth herein and are legally liable to Plaintiff and/or they are the alter-ego of the Defendants named herein.   Plaintiff will seek leave to amend this Amended Complaint to set forth the true names and capacities of the fictitiously named Defendants together with appropriate charging allegations when ascertained.

7.    Plaintiff is informed and believes and thereon alleges that all acts of corporate employees as hereinafter alleged were authorized or ratified by an officer, director or managing agent of the corporate employer.

8.    Plaintiff is informed and believes and on that basis alleges that at all times mentioned herein each defendant whether actually or fictitiously named herein, was the principal, agent (actual or ostensible) or employee of each other defendant and in acting as such principal or within the course and scope of such employment or agency, took some part in the acts and omissions hereinafter set forth by reason of which each defendant is liable to Plaintiff for the relief prayed for herein.

9.    Personal jurisdiction over VW AG is proper because VW AG purposefully availed itself of the privilege of conducting activities within the State of Texas with the expectations that its fraudulent vehicles would be purchased by Texas consumers, thereby giving rise to the underlying controversy. Such purposeful availment and activities within and related to the State of Texas include, but are not limited to: (1)  Defendants' contractual relationships discussed below which give rise to the source, supply, manufacturing, production, importation, research and testing, analyzing, processing, distribution, advertising, marketing and sale of Plaintiff's vehicle; (2) agreements between Defendants and entities, institutions, and laboratories within the State of Texas regarding Defendants' fraudulent vehicles; (3) marketing and advertising of the fraudulent vehicles to Texas citizens including Plaintiff; (4) and other actions targeted to the State of Texas to be obtained through discovery and other means.

AMENDED COMPLAINT FOR DAMAGES AND RESTITUTION

10.     VW AG acted both directly and indirectly to (1) transact business in Texas; (2) supply services or things in Texas; (3) cause tortious injury by an act or omission in Texas; and (4) cause tortious injury in Texas by an act or omission outside Texas.

11.     Personal jurisdiction over VW AG is further proper because VW AG's direct contacts with the state of Texas form the basis of the fraud claims alleged in this lawsuit. Texas contacts of VWGoA concerning the fraud that forms the basis of this lawsuit can be imputed to VW AG pursuant to the agency relationship between and among the Defendants as alter egos, co-conspirators, and/or joint venturers.

12.     As set forth below, VWGoA is the agent, both actual and implied, of VW AG and was VW AG's agents as to the marketing, promotion, sale, and distribution of the vehicle Plaintiff purchased in Texas. VWGoA carried out the marketing, promotion, sale, and distribution of the vehicle Plaintiff purchased as VW AG's agent.  VWGoA's actions in, and contacts with, Texas can be imputed to VW AG because of the agency relationship between and among those parties.

13.     VW AG used VWGoA as its alter ego for the marketing, promotion, sale and distribution of the vehicle Plaintiff purchased in Texas.  VWGoA, a wholly owned subsidiary of VW AG, exists solely to promote the sale and distribution of VW AG products, including the vehicle Plaintiff purchased.  VWGoA's actions in, and contacts with, Texas can be imputed to VW AG pursuant to an alter ego theory.

14.     At all relevant times herein, VW AG and VWGoA operated a joint venture (the "Joint Venture") in Texas in which they agreed to assist each other in designing, importing, distributing, marketing and selling certain motor vehicles in Texas, including the vehicle Plaintiff purchased that is at issue in this lawsuit.

15.     At the critical stages in the foregoing activity, Defendants acted as agents for each other in pursuing their common goal of selling their fraudulent vehicles, including the vehicle Plaintiff purchased  Each Defendant maintained a voice in the control and management of the Joint Venture, and each shared in the profits and

AMENDED COMPLAINT FOR DAMAGES AND RESTITUTION

1  losses of the Joint Venture.   VWGoA's actions in, and jurisdictional contacts with,

2  Texas are imputed to VW AG by virtue of the Joint Venture.

3       16.     VW AG's relationship with VWGoA goes far beyond that of a mere

4  parent-subsidiary relationship.   VW AG exercises significant and total control over

5  VWGoA's day-to-day operations, and exercised total control over VWGoA in

6  directing and carrying out the fraud that forms the basis of this lawsuit.   Indeed, VW

7  AG's control is so persistent and total that numerous courts across the country have

8  found that VWGoA is the proper agent for service of process for VW AG.

9       17.     Even if there was no parent-subsidiary relationship between VW AG and

10  VWGoA, personal jurisdiction would still be proper over VW AG because of VW

11  AG's own conduct with regard to the fraud that forms the basis of this lawsuit.   VW

12  AG sold to VWGoA, both directly and indirectly, their fraudulent vehicles with the

13  knowledge and intent that VWGoA would resell and distribute them to Plaintiff and

14  throughout the United States.   Further, VW AG worked with and directed VWGoA to

15  advertise and market their fraudulent vehicles to consumers, such as Plaintiff.   VW

16  AG used its own employees and directed VWGoA to formulate and disseminate false

17  information about their fraudulent vehicles. VW AG not only directed VWGoA

18  employees to carry out the fraud, but VW AG sent its own employees to carry out and

19  perpetuate the fraud that forms the basis of this lawsuit.  VW AG required VWGoA to

20  use false information about their fraudulent vehicles in marketing campaigns.   VW

21  AG employees developed and promoted these campaigns.

22       18.     The entire Volkswagen "Dieselgate" scandal occurred as a result of VW

23  AG's focused efforts to increase its market share in the United States.   In 2007, VW

24  AG set goals for Volkswagen to become a world leader in automobile manufacturing

25  including tripling of the number of vehicles sold in the United States.   In order to sell

26  their fraudulent vehicles in the United States and Texas, VW AG appointed its

27  wholly-owned subsidiary, VWGoA, to transact and manage the business affairs of

28  importing, distributing, marketing and selling VW AG vehicles, including the vehicle

AMENDED COMPLAINT FOR DAMAGES AND RESTITUTION

Plaintiff purchased.  Pursuant to this agreement, VW AG sold the fraudulent vehicles along with hundreds of thousands of other vehicles to VWGoA throughout the United States and Texas.  All of this was accomplished, including the sale of the fraudulent vehicle to Plaintiff, pursuant to an Importer Agreement between VW AG and VWGoA (the "VW Importer Agreement").  This VW Importer Agreement was not an arms-length transaction.  VW AG required VWGoA to enter into the agreement.

19.    The VW Importer Agreement appoints VWGoA as the sole authorized U.S. importer and distributor of vehicles manufactured by VW AG.  VWGoA agreed to assume responsibility for the importation, distribution, marketing and selling of Volkswagen vehicles, including the vehicle Plaintiff purchased.  VWGoA is the sole authorized U.S. importer and distributor of the fraudulent vehicles, as well as other vehicles manufactured by VW AG. Further, VWGoA obtained the Certificates of Conformity that allowed VW AG to sell the fraudulent vehicles, and all their vehicles, in the United States.

20.    The VW Importer Agreement divides functions and promotes the common purpose of selling Volkswagen vehicles, including the fraudulent vehicles, throughout the United States.  Pursuant to these agreements, VW AG had the right and power to control the means and methods by which VWGoA performed its work in marketing, sales, promotion, and public relations and did in fact exercise such power and control over VWGoA.  VW AG oversaw and controlled all of the details of VWGoA's marketing, sales, promotion and public relations concerning the fraudulent vehicles.

21.    The VW Importer Agreement required VWGoA to establish a dealer network based on VW AG's schedule and conditions. It was this extensive dealer network that allowed VW AG to sell over 480,000 of the fraudulent vehicles to Plaintiff and other consumers throughout the United States.  VWGoA established this dealer network at the direction, and with the direct participation, of VW AG.

22.    VW AG appointed VWGoA to transact and manage the business affairs

AMENDED COMPLAINT FOR DAMAGES AND RESTITUTION

of importing, distributing, marketing and selling the fraudulent vehicles as well as other Volkswagen vehicles. VW AG and VWGoA divided functions and worked together for the common purpose of selling Volkswagen vehicles, including the vehicle Plaintiff purchased. Pursuant to their agreements, VW AG had the right and power to control the means and method by which VWGoA performed its work in the marking, sales, promotion and public relations concerning the fraudulent vehicles. VW AG could not conduct business in the United States or Texas, either directly or indirectly, without the assistance of VWGoA. VW AG controls the methods and details of VWGoA's work to such an extent that VWGoA is the agent of VW AG.

23. The following additional facts further demonstrate the total control VW AG exercises over VWGoA, either directly or indirectly, making the subsidiary nothing more than a corporate division of VW AG:

- VW AG owns 100% of the outstanding stock of VWGoA;
- VW AG elects and controls the board of directors and the chairman of the board of directors of VWGoA in Virginia;
- VWGoA is the sole authorized U.S. importer and distributor of vehicles manufactured by VW AG;
- VWGoA officials participated in the obtaining of the Certificates of Conformity that allowed VW AG to sell their vehicles, including the vehicle Plaintiff purchased.
- VWGoA is required to and does in fact promote the image and good reputation of VW AG, which was done in furtherance of the fraud that forms the basis for this lawsuit;
- VWGoA is prohibited by VW AG from modifying any of VW AG's vehicles, including the fraudulent vehicles, without their prior written approval;
- VW AG is authorized, both directly and indirectly, by VWGoA to control the means and methods by which VWGoA marketed and sold

VW AG's vehicles, including the vehicle Plaintiff purchased. VW AG exercises this control at and through VWGoA's corporate headquarters;

- VWGoA is prohibited by VW AG from selling, marketing or promoting vehicles manufactured by companies other than VW AG and Audi AG;

- VWGoA is required by VW AG to sell and service used cars at its U.S. dealerships and to take used cars in trade;

- VW AG determines, both directly and indirectly, the warranty offered on the cars sold by VWGoA, including the warranty offered on the fraudulent vehicles;

- VW AG makes no warranty (express or implied) as to the products supplied by VW AG to VWGoA;

- VWGoA is required by VW AG to lease cars;

- VWGoA is required to establish marketing and public relations objectives and strategies within the guidelines established by VW AG. These objectives and strategies using false information to market the fraudulent vehicles were established by VWGoA;

- VW AG controls VWGoA's advertising content as well as how much money it spends on advertising including advertising concerning the fraudulent vehicles.   Such advertising content for the fraudulent vehicles was developed by VWGoA.

- VWGoA is required by VW AG to make warranty repairs on all VW AG vehicles including the fraudulent vehicle Plaintiff purchased in accordance with VW AG's guidelines and procedures;

- VWGoA is required by VW AG to use the workshop tools and equipment specified by VW AG to service vehicles, including the fraudulent vehicle Plaintiff purchased;

- VWGoA is required by VW AG to perform all repairs and maintenance work in accordance with VW AG's guidelines and procedures;

- VWGoA is required to perform its pre-delivery inspections of VW AG's vehicles, including the fraudulent vehicle Plaintiff purchased according to VW AG's instructions and guidelines;

- VWGoA is required to ensure that its standardized data processing and communications programs are compatible with VW AG's standardized data processing and communications programs;

- VWGoA is required to maintain a modern computer communications system for processing warranty claims that is compatible with VW AG's system to enable VW AG to track warranty cost projections;

- VWGoA is required to submit to VW AG on a regular basis information requested by VW AG concerning business data, warranty and warranty related matters, enactments or changes of any relevant laws and regulations, including taxes and customs and any other matters which may affect any aspect of their import agreement;

- VWGoA is required to inform VW AG of any modification of U.S. laws which may affect the manufacturing of vehicles and regulations governing the use thereof including safety requirements.

- VWGoA provides regular reports to VW AG on the development of the market generally and its business activities in the U.S., including reports on the fraudulent vehicles;

- VWGoA and VW AG determined the profit margins VWGoA received on the sale of the fraudulent vehicles, as well as its sale of other Volkswagen cars; and

- VWGoA cannot, without written approval of VW AG, enter into any agreements or arrangements to promote the sale of goods or services

9

from its business premises unless such activities do not affect in any regard VW AG's business interests.

24.   One of the many ways that VW AG directly managed and controlled VWGoA's affairs, including the fraud that forms the basis for this lawsuit, is through an expatriate program wherein VW AG officers and employees were assigned to work for VWGoA at VWGoA's corporate headquarters. VW AG employees came to VWGoA's corporate headquarters and directed, controlled, and participated in the fraud that forms the basis of this lawsuit. VW AG's expatriate officers and employees oversaw VWGoA's operations including its marketing, promotion, and distribution of the fraudulent vehicles.  For example, VW AG used the expatriate program to appoint Michael Horn as VWGoA's CEO.  VW AG used Michael Horn and other German expatriates to manage and control VWGoA's operations, including the distribution of the fraudulent vehicle to Plaintiff and the marketing and advertising of the fraudulent vehicle to Plaintiff. Further, VW AG trains and assigns VWGoA employees.

25.   In furtherance of the "Dieselgate" fraud, VW AG developed technical service "flash" software that was designed to help hide the presence of the defeat device.  VW AG labeled the software as an "update," provided this update to VWGoA, and directed VWGoA to install the software on their fraudulent vehicles unbeknownst to U.S. consumers, including Plaintiff.

**FACTUAL ALLEGATIONS**

26.   On or about September 12, 2013, Plaintiff purchased a 2009 Volkswagen Jetta (hereinafter "Car" and/or "Subject Vehicle"), Vehicle Identification Number 3VWRL71k39M040054, from Defendants' certified dealership, Herb Easley, located at 1125 Central Freeway, Wichita Falls, TX 76306, for a total sale price of $10,842.19.

### *Defendants' Representations*

27.   This case addresses nothing less than one of the most deliberate and blatant frauds to be perpetrated on the consumer marketplace and on a sovereignty by an

international automotive conglomerate in history. It arises from Defendants', VGoA and VW AG, September 21, 2015 admission that, for more than seven years, they had been intentionally, deliberately, and maliciously designing, manufacturing, and distributing hundreds of thousands of their purportedly "clean diesel" car with a software algorithm embedded in the engine control module ("defeat device"). The sole purpose of this algorithm was to detect when an emissions test was being conducted and to cause the Subject Vehicle's emissions system to switch to an operating mode that would enable the Subject Vehicle to appear to pass state and federal clean air emissions standards.

28.     Defendants purposefully and intentionally breached the laws of the United States, Texas, and the rules and regulations of the EPA by selling in the United States Volkswagen and Audi vehicles, including the Subject Vehicle, that purposefully evaded federal and state laws.  As stated by Cynthia Giles, Assistant Administrator for the office of Enforcement and Compliance Assurance at the EPA:  "Using a defeat device in cars to evade clean air standards is illegal and a threat to public health."  Yet that is exactly what Defendants did in their 2009-2015 Volkswagen and Audi CleanDiesel vehicles.[1]

29.     The window sticker attached to the Subject Vehicle advertised the car as "good clean diesel fun."

30.     Defendants represented that the 2.0L TDI engine, which was installed in the Subject Vehicle, would outperform all other vehicles in miles per gallon and would do so while emitting 25% fewer emissions into the air—fully compliant with current emissions standards.

31.     Unwilling and/or unable to design and manufacture the Subject Vehicle so that it would meet these high standards in all conditions (during laboratory testing and in real driving conditions, in the customer's hands), Defendants cheated by installing a "defeat device" into the Subject Vehicle so that the Subject Vehicle would appear to have the qualities and characteristics that Defendants represented when laboratory tested.   However, this "defeat device" deactivated the operation of the

---

[1] See Sept. 18, 2015 EPA News Release.

AMENDED COMPLAINT FOR DAMAGES AND RESTITUTION

emissions control system during normal operation of the Subject Vehicle.   Because Defendants cheated, the Subject Vehicle does not have the uses, benefits, qualities and characteristics as represented by Defendants at the time Plaintiff purchased the Subject Vehicle.

32.   To obtain permission to sell the Subject Vehicle in the U.S., Defendants applied for and obtained the Certificate of Conformity from the Environmental Protection Agency of the United States Federal Government ("EPA") and an Executive Order from the California Air Resource Board ("CARB").  In those applications, Defendants were required to, among other things, disclose all Auxiliary Emissions Control Devices ("AECDs") on the vehicles, *i.e.*, any engine function which senses temperature, vehicle speed, engine RPM, or any other parameter for the purpose of activating, modulating, or **deactivating** the operation of any part of the emission control system.  For each such AECD, Defendants were required to provide: a written, detailed justification; the parameters the AECD sensors and controls; and a rationale for why the AECD is not a "defeat device."  Defendants did not disclose the "defeat device" on the applications.  Defendants did not have legal permission to sell the Subject Vehicle in the United States with the undisclosed "defeat device".   As result Defendants deceived Plaintiff as to the certification and required approval of the Subject Vehicle.

33.   The Clean Air Act, enacted in 1970, is a comprehensive federal law that regulates air emissions from stationary and mobile sources.  42 U.S.C. § 7401. et seq. (1970).   Congress determined that "the increasing use of motor vehicles . . . has resulted in mounting danger to the public health and welfare."  CAA § 101(a)(2), 42 U.S.C. § 7401(a)(2).  The Clean Air Act and the regulations under it, as well as state regulations, were passed and are intended to reduce the emission of NOx and other pollutants, thereby protecting human health and the environment.

34.   NOx contributes to nitrogen dioxide, ground-level ozone and fine particulate matter.  When humans are exposed to nitrogen dioxide, they may be at a

greater risk for serious health dangers, including asthma attacks and other respiratory illness requiring hospitalization.   Ozone and particulate matter exposure have been associated with premature death due to respiratory related or cardiovascular-related effects.  Children, the elderly and people with pre-existing respiratory illness are at an elevated risk for adverse health consequences associated with these pollutants.

35.    The Clean Air Act requires car makers to certify that vehicles sold in the United States meet federal emissions standards.   The EPA certifies conformity with regulations to car makers for vehicles that satisfy emissions regulations.  To be sold in the United States, a vehicle must be certified by the EPA to comply with its regulations.

36.    The Clean Air Act defines a "defeat device" as one "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation use."   When a defeat device is in place, it can bypass, defeat, or render inoperative elements of the vehicle's emission control system that are put in place to ensure compliance with the Clean Air Act.   Motor vehicles that are equipped with defeat devices cannot be certified by the EPA.[2]

37.    At the time of purchase, Plaintiff was unaware and Defendants: (1) did not disclose that they fraudulently obtained the Certificate of Conformity and the Executive Order, (2) did not disclose that they fraudulently obtained permission to sell the Subject Vehicle in the United States, (3) did not disclose that they fraudulently marketed the Subject Vehicle which was brought into the United States market illegally, and (4) did not disclose that they fraudulently sold the Subject Vehicle with the "defeat device."  As a result, Defendants misrepresented the source, sponsorship, approval and certifications of the Subject Vehicle.

38.    Defendants knew on the day they sold the Subject Vehicle to Plaintiff that they had installed a "defeat device" which caused the Subject Vehicle to emit upwards of 40 times more pollutants into the air than any other light duty car on the road.

---

[2] EPA, Advisory Circular Number 24: Prohibition on use of Emissions Control Defeat Device (Dec. 11, 1972).

Defendants did not disclose this information to Plaintiff thereby deceiving Plaintiff.

39.    Defendants knew on the day they sold the Subject Vehicle to Plaintiff that the Subject Vehicle could not pass any emissions standards in the United States if the "defeat device" were removed from the Subject Vehicle.   Defendants did not disclose this information to Plaintiff thereby deceiving Plaintiff.

40.    Plaintiff was unaware that the "defeat device" was embedded in the Subject Vehicle. Defendants concealed this information from Plaintiff thereby deceiving Plaintiff.

41.    In addition to defrauding the state and federal agencies responsible for regulating car emissions, Defendants carried out a disgusting fraud on the American car-buying public.   It traded on the reputation for stellar engineering that Audi, Porsche and Volkswagen enjoyed, by aggressively marketing the non-compliant diesel engines to U.S. consumers as the product of environmentally-friendly German advanced technology, thereby obtaining premiums for the cars on the basis of this fundamentally dishonest and deceptive marketing.

42.    Plaintiff relied upon this reputation, relied upon the representation that the Subject Vehicle would legally pass emissions tests and relied upon the Monroney sticker which advertised the car as "good clean diesel fun."

43.    Defendants issued a written warranty against the Subject Vehicle at the time of Plaintiff's purchase.   The written warranty included an express warranty and an implied warranty of merchantability under Texas law. Because the Subject Vehicle could not pass any United States emissions test without the "defeat device," the Subject Vehicle was not merchantable on the day of purchase.

44.    As detailed in the EPA's Notice of Violation, sophisticated software in the Volkswagen and Audi diesel vehicles sold by Defendants in the United States detects when the vehicle is undergoing official emissions testing.   The software is designed to turn on all emissions controls during the test. The "defeat device" would command the emissions system to run in this clean air mode ONLY when the engine

control module determined that the vehicle was being operated under the testing conditions for emissions testing.  At all other times, the engine control module would command the emissions system to operate in such a way that the "clean diesel vehicles" would, in fact, emit up to 40 times the quantity of nitrogen oxides allowed for by emissions standards.  The Subject Vehicle is one of hundreds of thousand of automobiles introduced into the United States market that flagrantly violated state and federal law regulating emissions standards.

45.   Since 2008, Defendants claimed that the 2.0L TDI Clean Diesel engine was a "fantastic power train" that "gives very good fuel economy" that "is also good for the environment because it puts 25% less green house gas emissions than what a gasoline engine would… [and is] clean enough to be certified in all 50 states." (Statement of Volkswagen Group of America, Inc.'s Chief Operating Officer Mark Barnes, to The Business Insider, October 9, 2009.)

46.   Defendants broadly boasted about the performance and environmental cleanliness of its 2.0 liter TDI engine systems used in Volkswagen and Audi diesel vehicles.  In an October 2008 press release, Defendants bragged:

> The Jetta TDI is amongst the ten most fuel efficient vehicles on the US market.  In the recently published "Fuel Economy Guide 2009" the EPA (Environmental Protection Agency) listed the Jetta TDI in the top ten low consumption and low emissions vehicles.
>
> In the current edition of the publication, the Jetta 2.0L CleanTDI introduced to the market two months ago is praised particularly for its excellent consumption figures - it has a fuel consumption of 5.7 litre per 100 kilometre. Moreover, the Jetta Clean TDI also fulfills strident California emission standards.  This was achieved through modifications within the engine and by implementing an exhaust treatment system developed especially by Volkswagen and which reduces nitrogen oxide emissions (NOx) by up to 90 percent.  The central element of the exhaust treatment system is the NOx storage catalytic converter.

47.   In responding to critiques on how VWGoA planned to "re-brand something dirty like a diesel as something that's green," VWGoA stated:

> "The way we've gone about it is through a number of communication pieces.  Once of them we've used is TDI Truth & Dare.  It is a very good website that compares older diesels versus the current TDI clean diesel.  And one of the things we do is put coffee filters over the exhaust pipes of both cars.  We let them run for five minutes and after they are done, we take them off and the older diesel product (not a VW diesel) has a round sooty spot on that coffee filter.  Ours is very clean.  In fact, they actually make coffee out of the filter that was attached to the Volkswagen clean diesel tail pipe and they drink it."

48.  Defendants implemented a national marketing campaign to engage consumer awareness and interest in their so-called "Clean Diesel Technology".

49.  From 2009 through 2015, Defendants spent hundreds of millions of dollars to develop and place internet, television and print ads advertising the fuel efficiency, performance and environmental hygiene of the vehicles, to rebrand diesel as a clean-running, fuel-efficient, fun alternative to gas and hybrid competitors and to associate the Volkswagen and Audi brands with progressive ideals, environmental consciousness and innovation.

50.  Defendants advertised their "clean diesel vehicles" in a commercial using three elderly ladies using a white scarf up against the exhaust pipe and then holding it up to purportedly show how "clean" the vehicle was due to their not being soot on the scarf.

51.  Defendants' false advertising was effective.  Defendants used this fraud to allow Defendants to position themselves as the market leader in automotive diesel sales in the United States, capturing 78% of the market by 2013, according to its own statistics.  Defendants also sold approximately 11,000,000 of the vehicles in approximately 150 countries around the world.   By 2015, Defendants became the world's largest automaker by sales, and by 2015 ranked eighth on the Fortune Global 500 list of the world's largest companies.

52.  In addition to Defendants' strong marketing techniques to raise

consumer awareness of the TDI Clean Diesel Technology, Defendants also emphasized the fuel efficiency of the TDI Clean Diesel.  Defendants combined the alleged proficiencies of the engine with claims that the "clean diesel vehicles" had a greater mileage range on a single tank of gas than did the Toyota Prius, Mazda 3, Honda Civic HF, Ford Focus SE, and Toyota Corolla S—at the same time that it alleged the TDI was "90% cleaner than previous diesel engines."

53.    Defendants received several accolades based upon their deceptive representations of what their "clean diesel vehicles" could do. Particularly, the VW Jetta TDI and the Audi A3 TDI were named the 2009 Green Car of the Year and the 2010 Green Car of the Year, respectively.  Defendants shamelessly trumpeted these awards despite knowing their "clean diesel vehicles were not even compliant under EPA or CARB emissions standards.  Defendants even had the audacity to advertise "*Promise kept*" when the 2015 Audi A3 diesel was also name the "2014 World Car of the Year"—an honor that was revoked upon the world discovering the true nature of Defendants' "clean diesel vehicles."

### *Defendants' Deception Exposed*

54.    In early 2014, the Center for Alternative Fuels, Engines and Emissions (hereinafter "CAFEE") at West Virginia University ("WVU") was contracted by the International Counsel on Clean Transportation to conduct testing of vehicles using a portable emissions measurement system ("PEMS") over test routes in the State of California.

55.    Two of the vehicles tested by CAFEE were a 2012 Volkswagen Jetta and a 2013 Volkswagen Jetta (the "Test Vehicles").

56.    Based upon CAFEE's testing using a PEMS, the Test Vehicles were found to have greatly exceeded EPA emissions standards for NOx emissions.

57.    CAFEE issued a report on May 15, 2014 titled, "In-Use Emissions Testing of Light-Duty Diesel Vehicles in the United States" which alerted EPA and CARB to the emissions issues with the Test Vehicles.

58.     EPA and CARB opened an investigation to determine the discrepancy between the emissions standards the Test Vehicles were certified as having versus the PEMS test results.

59.     In the year that followed, Defendants continued to maintain that the Test Vehicles were compliant to emissions standards set by the EPA and CARB and attempted to explain the discrepancies away by claiming technical and use issues at play during the test performed by the PEMS.

60.     Defendants went so far as to attempt to further hide their "defeat device" by claiming to EPA and CARB that the emissions issue could be addressed through a simple software recall.

61.     EPA and CARB did not accept Defendants' explanations for the higher emissions it measured in Defendants' "clean diesel vehicles" and confronted Defendants with the threat of withholding all "Certificates of Conformity" and "Executive Orders" on the 2016 TDI vehicles unless the emissions issue was satisfactorily explained.

62.     On September 18, 2015, the EPA issued to Defendants a Notice of Violation. The Notice explained the EPA's allegations that Defendants installed sophisticated software in the Volkswagen and Audi diesel vehicles sold by defendants in the United States that detects when the vehicle is undergoing official emissions testing and turns full emissions controls on only during the test.  At all other times that the Vehicle is running, however, the emissions controls are deactivated, meaning that pollution is freely released into the environment at levels that exceed those allowed by federal and state laws and regulations   The software produced and used by defendants falls under the legal description of a defeat device, which is prohibited by the Clean Air Act.

63.     The Notices of Violation applied to the following vehicles equipped with the 2.0L TDI clean diesel engine (herein referred to as the "clean diesel vehicles"):

//

//

//

| Model Year | Make and Model(s) |
|---|---|
| 2009 | VW Jetta, VW Jetta Sportwagen |
| 2010 | VW Jetta, VW Jetta Sportwagen |
| 2011 | VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2012 | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3, VW Passat |
| 2013 | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3, VW Passat |
| 2014 | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3,  VW Passat |
| 2015 | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3, VW Passat |

64.     With Defendants' backs against the wall, after years of lying about the nature of the purported "clean diesel vehicles", on September 21, 2015, Defendants finally admitted to both EPA and CARB (and the world) that, beginning in 2009 and continuing through 2015, Defendants had designed, manufactured, and installed a "defeat device" for the purpose of bypassing, defeating, or rendering inoperative elements of its diesel vehicles' emission control system.

65.     Specifically, Defendants deliberately and knowingly installed a "defeat device" consisting of a software algorithm within the engine control module that was designed to sense when the vehicle was being tested for compliance with EPA emissions standards, based on various inputs, including the position of the steering wheel, vehicle speed, the duration of the engine's operation, and barometric pressure.

66.     Upon sensing that a "clean diesel vehicle" was being tested for emissions, the "defeat device" ran software to calibrate the "clean diesel vehicles" into a mode that would produce compliant emissions results.

67.     What resulted was Defendants' "clean diesel vehicles" would meet emissions standards in labs or testing stations but at all other times emit NOx at up to 40 times the standard allowed under United States laws and regulations.

AMENDED COMPLAINT FOR DAMAGES AND RESTITUTION

68.     The Federal Clean Air Act makes it illegal "for any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use."  (42 U.S.C. § 7522(A)(3)(B); 40 C.F.R. § 86.1854-12(a)(3)(ii)).

69.     This software produced and used by Defendants is a defeat device as defined by the Clean Air Act and is illegal.   Selling cars with defeat devices that allowed for higher levels of emissions than what was certified by EPA, and higher levels than state and federal regulations allow, violated the Federal Clean Air Act and state regulations and laws.

70.     At all relevant times, in an effort to spur sales in the United States, Defendants proudly touted the performance and reliability of their "clean diesel vehicles" and their purported environmental leadership while also intentionally targeting marketing to environmentally-conscious consumers.

71.     From as early as 2007, internal documents relating to "Volkswagen's Opportunities with Clean Diesel" reflect Volkswagen's determination to "OWN the segment before the competition come to market" and "own 'Clean Diesel' the way Toyota owns 'Hybrid'." Defendants' marketing strategy focused on positioning "Clean Diesel as [an] environmental halo over [the] VW brand" and making "environmental conscience" the "centerpiece" of Defendants' "innovations/technology story."

72.     Robert Bosch GmbH ("Bosch"), the world's largest supplier of automotive components based in Gerlingen Germany, provided Defendants the software to install the defeat device in their "clean diesel vehicles", and in 2007, Bosch warned Defendants in writing that it would be illegal to use the software in

actual production cars—that Bosch would only provide the software to Defendants for test purposes only, and not production vehicles that would be sold to the public.

73.    Defendants therefore knew as early as 2007 that their "defeat device" was completely and totally illegal, yet they continued to aggressively advertise and sell "clean diesel vehicles" through claims of low emissions and high fuel economy.

74.    Prior to his resignation as a result of the disclosure of the emissions fraud, Volkswagen AG's CEO Martin Winterkorn stated: "I personally am deeply sorry that we have broken the trust of our customers and the public."

75.    Michael Horn, President and CEO of Volkswagen America reportedly admitted on September 21, 2015:

> As you have seen since Friday the EPA, the Environmental Protection Agency, has issued a statement and reality that Volkswagen Group manipulated engine software in our TDI diesel cars, and we violated emissions standards.  The CEO of our parent company, Dr. Martin Winterkorn said yesterday Volkswagen will fully cooperate with the responsible agencies, and much much more important as I see it he stated that he was personally and deeply sorry for this - that Volkswagen has broken the trust of our customers, and the public here in America.  And lastly he stated that this matter, and this is I think common sense, now this is the first priority for him personally and for the entire [board].   So let's be clear about this: our company was dishonest with the EPA and the California Air Resources Board, and with all of you.  And in my German words, <u>we've totally screwed up</u>.  We must fix those cars, and prevent this from ever happening again, and we have to make things right - with the government, the public, our customers, our employees, and also very importantly our dealers. This kind of behavior I can tell you out of my heart, is completely inconsistent with our core values.   The core values of our brand are value, innovation, and in this context very importantly responsibility:  for our employees, for our stakeholders, and for the environment.   So it goes totally against what we believe is right.  Along with our German headquarters, we are committed to do what must be done and to begin to restore your trust. (Emphasis added.)

76.    On September 9, 2016, James Robert Liang, a longtime VW AG engineer, pleaded guilty to charges of conspiracy to defraud the United Sates, to commit wire fraud, and to violate the Clear Air Act, in the case of *United States v. Liang*, Case No.

16-CR-20394 (E.D. Mich.).  Mr. Liang admitted that he was one of the designers of the Volkswagen diesel engine; that he pursued and planned the use of the "defeat device; that he knew that his co-conspirators at Volkswagen were falsely and fraudulently certifying to the EPA and CARB between 2007-2015 that the "clean diesel vehicles" met United Staes emissions standards and complied with the Clean Air Act; that his co-conspirators falsely and fraudulently told United States consumers, EPA, and CARB that a voluntary recall in early 2015 was intended to "fix" the discrepancies between the amounts of emissions detected in road testing and the amount detected in EPA standard dynamometer testing, when in fact he and his co-conspirators knew that the update did not remove the defeat device; and that he and his co-conspirators caused defeat device software to be installed in the "clean diesel vehicles".

77.     By manufacturing and selling cars with "defeat devices" that allowed for higher levels of emissions than were certified to the EPA, Defendants violated the Clean Air Act, defrauded their customers, placed in commerce vehicles that were illegal to drive on U.S. roadways, engaged in unfair competition and false advertising under state and federal laws.

78.     Moreover, Defendants' fraud harmed not just the customers they duped into buying their heavily polluting, not-so-clean diesels, but it harmed the environment. Through seven years of fraud defendant put on the United States roadways over 483,000 cars that spewed up to 40 times the permitted level of NOx and other pollutants.  These emissions invariably have harmed the air quality and environment and, as a result, harmed the United States and its citizens.

### Plaintiff's Injury

79.     Defendants knowingly and willfully installed a "defeat device" in the Subject Vehicle in order to market and sell the Subject Vehicle as a fuel efficient, clean diesel car.

80.     Defendants knowingly and willfully sold the Subject Vehicle to Plaintiff knowing the Subject Vehicle did not comply with any emissions regulations.

81.    Plaintiff paid a premium to purchase the car.  Plaintiff paid the premium as a result of Defendants' false claims that the Clean Diesel engine system was environmentally friendly, clean, efficient and EPA compliant.   Plaintiff was harmed because from the day Plaintiff drove the car off the lot, Plaintiff did not get what Plaintiff paid for.

82.    Plaintiff's loss in value on the Subject Vehicle is particularly acute because Plaintiff did not want to own a car that polluted and harmed the environment. Cleanliness was the core of Defendants' marketing efforts.

83.    Defendants have been ordered by the EPA to recall the affected vehicles and repair them so that they comply with EPA emissions requirements at all times during normal operation.   However, Defendants will not be able to make the "clean diesel vehicles" comply with emissions standards without substantially degrading their performance characteristics—including their horsepower and their efficiency  As a result, even if Defendants are able to make the "clean diesel vehicles" EPA compliant, Plaintiff will nonetheless suffer actual harm and damages because the Subject Vehicle will no longer perform as it did when purchased and as advertised. This necessarily results in a diminution in value of the Subject Vehicle.

84.    Defendants knowingly and willfully sold the Subject Vehicle to Plaintiff knowing the Subject Vehicle did not comply with any emissions regulations.

85.    The Subject Vehicle did not have the characteristics, qualities, uses and benefits as advertised by Defendants.

86.    Defendants knowingly misrepresented the true quality of the Subject Vehicle.

87.    Defendants knew and concealed from Plaintiff the fact that Defendants obtained the necessary Certificate of Conformity and the Executive Order certifications through fraudulent means. Therefore, Plaintiff purchased a car which was not certified in its true form, as represented by Defendants.

88.    Defendants acted, used, or employed fraud, false pretenses, false promises,

misrepresentations, misleading statements or deceptive practices, with the intent that Plaintiff rely thereon in connection with the sale of that merchandise.

89.     Defendants, with the intent to sell, advertised materials assertions, representations or statements of fact regarding the vehicle which were untrue, deceptive, or misleading.

90.     Defendants engaged in a deceptive trade practice in their course of business by causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of the goods or services sold.

91.     Defendants engaged in a deceptive trade practice in their course business by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have.

92.     Defendants engaged in a deceptive trade practice in their course business by representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they were in fact of another.

93.     Defendants engaged in a deceptive trade practice in their course business by advertising goods or services with the intent not to sell them as advertised.

94.     Defendants engaged in a deceptive trade practice in their course business by engaging in other conduct which similarly creates a likelihood of confusion or of misunderstanding.

95.     Defendants committed fraud against Plaintiff.

96.     Defendants made negligent misrepresentations that Plaintiff relied upon.

97.     Defendants breached express and implied warranties.

98.     Defendants caused Plaintiff to purchase a vehicle that Plaintiff would not have otherwise purchased had Plaintiff known of the true nature of the Subject Vehicle and Plaintiff spent additional money on the Subject Vehicle for upkeep and repairs.

99.     As a result of all of the acts, individually and together, as outlined herein, Defendants have caused Plaintiff damages.

**S**PECIFIC **A**LLEGATIONS

<u>**FIRST CAUSE OF ACTION**</u>

**Violations of the Texas Deceptive Trade Practices Act**

**Tex. Bus. & Comm. Code section 17.41 *et seq*.**

100. Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs in this Amended Complaint as if set forth herein verbatim.

101. Plaintiff is a consumer as defined by the Texas Deceptive Trade Practices Act ("DTPA"). Tex. Bus. & Comm. Code section 17.45(4).

102. The Subject Vehicle constitutes a "good" as defined by the DTPA. Tex. Bus. & Comm. Code section 17.45(1).

103. Defendants are "persons" as defined by the DTPA. Tex. Bus. & Comm. Code section 17.45(3).

104. Defendants engaged in trade and commerce as defined by the DTPA in the purchase transaction of the Subject Vehicle to Plaintiff. Tex. Bus. & Comm. Code section 17.45(6).

105. Pursuant to the DTPA, the following unfair methods of competition and unfair or deceptive acts or practices are prohibited pursuant to section 17.46: (2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; (3) causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another; (5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not; (7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; (9) advertising goods or services with intent not to sell them as advertised; (12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; and (24) failing to disclose information

concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

106.   The DTPA also prohibits the use or employment of a false, misleading, or deceptive act or practice that is a breach of an express or implied warranty in violation of Texas Business and Commerce Code §17.50(a)(2); and the use or employment of a false, misleading, or deceptive act or practice that is an unconscionable action or course of action in violation of Texas Business and Commerce Code §17.50(a)(3).

107.   Plaintiff also sent Defendants, via certified return receipt mail, a notice and demand letter pursuant to Tex. Bus. & Comm. Code section 17.505. Defendants have failed to repurchase or in any other way effectively correct their violations of Texas law.

108.   Plaintiff seeks economic and punitive damages under the Texas Deceptive Trade Practices Act for violation of Tex. Bus. & Comm. Code sections 17.46(b)(2), (3), (5), (7), (9), (12), and (24); 17.50(a)(2); and 17.50(a)(3).

109.   Plaintiff alleges that Defendants violated the DTPA in the following manner: (1) causing confusion or misunderstanding regarding the approval, characteristics, ingredients, uses, benefits, or quantities of the Subject Vehicle, (2) causing confusion or misunderstanding regarding the standard, quality, or grade of the Subject Vehicle, (3) advertising the Subject Vehicle with intent not to sell them as advertised; (4) misrepresenting the rights, remedies, or obligations which Subject Vehicle does not have or involve, or which are prohibited by law; and failing to disclose information concerning the Subject Vehicle which was known at the time of the transactions, the purpose of which was to induce Plaintiff into a transaction into which Plaintiff would not have entered had the information been disclosed.

110.   Defendants' aforementioned acts or omissions constitute a producing

cause of economic damages to Plaintiff.

111.   Since the acts or omissions of the Defendants were committed knowingly, Plaintiff is entitled to up to three times the amount of Plaintiff's economic damages, pursuant to Tex. Bus. & Comm. Code section 17.50(b)(1).

112.   Under Tex. Bus. & Comm. Code section 17.50(d), if Plaintiff is the prevailing party, Plaintiff shall recover reasonable and necessary attorneys' fees and costs.

## SECOND CAUSE OF ACTION

### Breach of Express Warranty

113.   Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs in this Amended Complaint as if set forth herein verbatim.

114.   Defendants made an affirmation of fact or promise to Plaintiff, which related to the goods and became part of the basis of the bargain.

115.   Defendants likewise made a description of the goods, which was part of the basis of the bargain.

116.   An affirmation, promise, or description create an express warranty that the goods shall conform to the affirmation, promise, or description.

117.   Defendants breached that express warranty and Plaintiff is entitled to damages.

118.   In addition to the damages Plaintiff suffered as a result of this breach, Plaintiff request this Court award Plaintiff's reasonable attorneys' fees pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code, as this action is based on written contracts.

## THIRD CAUSE OF ACTION

### Breach of Implied Warranty

119.   Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs in this Amended Complaint as if set forth herein verbatim.

120.   Defendants sold products that were not fit for the ordinary purpose for which such goods are used.

AMENDED COMPLAINT FOR DAMAGES AND RESTITUTION

121.   Defendants sold products that did not conform to the promises or affirmations of fact made on the Monroney Sticker.

122.   Defendants breached the implied warranty of merchantability and Plaintiff is entitled to damages.

123.   In addition to the damages Plaintiff suffered as a result of this breach, Plaintiff requests this Court award Plaintiff's reasonable attorneys' fees pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code, as this action is based on written contracts.

## FOURTH CAUSE OF ACTION

### Breach of Implied Warranty of Fitness for a Particular Purpose

124.   Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs in this Amended Complaint as if set forth herein verbatim.

125.   Defendants had reason to know of the particular purpose for which the goods are required.

126.   Plaintiff relied on Defendant's skill or judgment in selecting or furnishing suitable goods.

127.   The goods were not fit for such purpose.

128.   Defendants breached the implied warranty of fitness for a particular purpose and Plaintiff is entitled to damages.

129.   In addition to the damages Plaintiff suffered as a result of this breach, Plaintiff requests this Court award Plaintiff's reasonable attorneys' fees pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code, as this action is based on written contracts.

## FIFTH CAUSE OF ACTION

### Breach of Contract

130.   Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs in this Amended Complaint as if set forth herein verbatim.

131.   Valid, enforceable contracts existed for the sale of the Subject Vehicle

AMENDED COMPLAINT FOR DAMAGES AND RESTITUTION

between Plaintiff and Defendants.

132.   Defendants breached the contract by failing to provide the Subject Vehicle in the condition promised.

133.   As a result of Defendants' failure, Plaintiff has not received the benefit of the contract that was entered into.

134.   Accordingly, Plaintiff has suffered damages in the amount of the purchase price, finance charges, and other fees charged for the Subject Vehicle pursuant to the contract.  Plaintiff requests compensatory and punitive damages in an amount to be determined at trial.

135.   In addition to the damages Plaintiff suffered as a result of this breach, Plaintiff request this Court award Plaintiff's reasonable attorneys' fees pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code, as this action is based on written contracts.

## SIXTH CAUSE OF ACTION

### Fraud

136.   Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs in this Amended Complaint as if set forth herein verbatim.

137.   Defendant made a material representations (as described above) about the Subject Vehicle that were false.

138.   Defendants knew the representations they made about the Subject Vehicle (as described above) were false and/or made such representations recklessly as a positive assertion without any knowledge of its truth.

139.   Defendants intended to induce Plaintiff to act upon the representations described in this Amended Complaint.

140.   Plaintiff actually and justifiably relied on the representation described in this Amended Complaint, which caused Plaintiff's damages.

141.   Defendants are therefore liable for Plaintiff's damages.

## SEVENTH CAUSE OF ACTION

### Negligent Misrepresentation

142.   Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs in this Amended Complaint as if set forth herein verbatim.

143.   Defendants made representations about the Subject Vehicle in the course of their business or in a transaction where they have a pecuniary interest.

144.   Defendants supplied false information for the guidance of others in their business transactions.

145.   Defendants failed to exercise reasonable care or competence in obtaining or communicating the information.

146.   Plaintiff justifiably relied on said representation about the Subject Vehicle.

147.   Defendant's negligent misrepresentations about the Subject Vehicle proximately caused Plaintiff's damages.

148.   Defendants are therefore liable for Plaintiff's damages.

### REQUEST FOR JURY TRIAL

149.   Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiff is entitled to, and demands, a trial by jury.

### CONDITIONS PRECEDENT

150.   All conditions precedent to Plaintiff's claims for relief have been performed or have occurred.

### REQUEST FOR DISCLOSURE

151.   Pursuant to Tex. R. Civ. P. 194, Plaintiff requests that Defendant disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

### OPT OUT TIMELY FILED

152.   Plaintiff timely filed Plaintiff's Opt Out Notice dated August 30, 2016, indicating Plaintiff's intent to be excluded from the Class Action Lawsuit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants, and Plaintiff be awarded damages from Defendants, as follows:

1.      For incidental, consequential, and actual damages, according to proof at trial;

2.      For statutory, exemplary, and punitive damages, according to proof at trial;

3.      For rescission and repurchase of the Subject Vehicle and restitution of all monies expended;

4.      For disgorgement of unjust enrichment;

5.      For pre-judgment interest at the legal rate;

6.      For reasonable attorneys' fees and costs of suit; and

7.      For such other and further relief as the Court deems just and proper under the circumstance.

Date: May 28, 2020

**KAZEROUNI LAW GROUP, APC**

By:/s/ Anthony P. Chester
Anthony P. Chester, Esq.
*Attorneys for Plaintiff*

**Additional Attorneys for Plaintiff**
Abbas Kazerounian (SBN: 249203)
**KAZEROUNI LAW GROUP, APC**
245 Fischer Ave., Suite D1
Costa Mesa, CA 92626
Telephone:  (800) 400-6808
Facsimile:  (800) 520-5523
Email: ak@kazlg.com

AMENDED COMPLAINT FOR DAMAGES AND RESTITUTION