1
2
3
4
5

UNITED STATES DISTRICT COURT

6

NORTHERN DISTRICT OF CALIFORNIA

7
8
9
10

IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION

_____/

11
12

This Order Relates To:
Dkt. Nos. 7347 & 7349

_____/

13

MDL No. 2672 CRB  (JSC)

**ORDER GRANTING IN PART AND DENYING IN PART VOLKSWAGEN'S MOTION TO DISMISS AND DENYING WINTERKORN'S MOTION TO DISMISS**

14        Volkswagen Aktiengesellschaft ("VW AG") and two of its subsidiaries, Volkswagen

15   Group of America Finance, LLC ("VWGoAF") and VW Credit, Inc. ("VCI"; collectively,

16   "Volkswagen"), along with Volkswagen's former Chief Executive Officer, Martin Winterkorn,

17   once again find themselves the target of litigation arising from Volkswagen's "clean diesel" fraud.

18   This time, the plaintiff is the Securities and Exchange Commission and the claims arise from

19   various securities offerings Volkswagen sponsored in the United States while the clean diesel

20   fraud was ongoing.  This Court has previously ruled on similar claims in suits brought by private

21   investors.  Those decisions help guide the analysis here.  Volkswagen's motion to dismiss is

22   granted, except for its request to strike the SEC's prayers for injunctive relief and disgorgement.

23   Winterkorn's motion to dismiss for lack of personal jurisdiction and failure to state a claim is

24   denied.

25   **I.        BACKGROUND**

26            **A.        The Defeat Device Scheme**

27   Between 2009 and 2015, Volkswagen sold nearly 600,000 TDI "clean diesel" vehicles in

28

United States District Court
Northern District of California

United States District Court
Northern District of California

the United States, which it marketed as being fuel efficient and environmentally friendly.  Compl.

(dkt. 1[1]) ¶¶ 50–51.  Unbeknownst to consumers and regulatory authorities, Volkswagen installed a

software defeat device in these cars that allowed the vehicles to evade Environmental Protection

Agency and California Air Resources Board ("CARB") emissions test procedures.  The defeat

device sensed whether the vehicle was undergoing emissions testing or being operated on the road.

During emissions testing, the defeat device produced regulation-compliant results.  When the

vehicle was on the road, the defeat device reduced the effectiveness of the vehicles' emissions

control systems.  Only by installing the defeat device in its vehicles was Volkswagen able to

obtain Certificates of Conformity from EPA and Executive Orders from CARB for its 2.0– and

3.0–liter TDI diesel engine vehicles; in fact, these vehicles released nitrogen oxides (NOx) at a

factor of up to 40 times permitted limits.  Id. ¶¶ 68–76.

        The public learned about Volkswagen's emissions scheme in the Fall of 2015, when EPA

issued two Notices of Violation of the Clean Air Act announcing that Volkswagen had

deliberately cheated on emissions tests.  Id. ¶ 140.  After public disclosure, consumers, dealers,

investors, and government entities filed suit against Volkswagen, and hundreds of lawsuits were

consolidated before this Court as part of this MDL.  Volkswagen has since settled claims related to

the defeat device scheme brought by classes of U.S. consumers, franchise dealers, and reseller

dealerships, as well as claims brought by EPA, CARB, and the FTC.

        Particularly relevant here is an agreement Volkswagen entered into with the Department of

Justice in November 2017 to pay $50 million plus interest in exchange for the release of "any civil

claims the United States has against the VW Released Entities for the Covered Conduct . . . that

the Civil Division of the Department of Justice has actual and present authority to assert and

compromise pursuant to 28 C.F.R. § 0.45."  VW MTD Ex. B ("Settlement Agreement")

(dkt. 7349-3) ¶¶ 1, 5.[2]  The "Covered Conduct" included VCI's issuance of asset-backed securities

---

[1]  The SEC's Complaint was filed on the individual docket for this case, No. 3:19-cv-01391-CRB.
All other citations to court filings are to the MDL docket, No. 15-md-02672-CRB (JSC).
[2]  The SEC does not argue that the Court cannot consider the Settlement Agreement at the
pleading stage, and references the Settlement Agreement in its own briefing.  See, e.g. VW MTD
Opp'n (dkt. 7491) at 16.

("ABS") in the United States between 2009 and 2015.  Id. ¶ G.

### B.    Volkswagen's American Securities Offerings

At the same time Volkswagen was concealing the clean diesel fraud from the public and environmental regulators, it was raising billions of dollars from U.S. investors on American capital markets.  Compl. ¶ 9.  Two types of securities offerings are relevant here: VCI's issuance of auto ABS in the United States, id. ¶ 227, and three bond offerings issued by VWGoAF between May 2014 and May 2015, id. ¶ 159–60.  Although the SEC identifies numerous specific misstatements and omissions in the relevant offering documents, the gist of its case is that Volkswagen fraudulently represented "its continuing commitment to and dependence upon developing energy-efficient vehicles and the reduction of vehicle emissions" and its compliance "with all applicable emissions laws and regulations."  Id. ¶¶ 9–10.

#### 1.    The ABS Offerings

Auto ABS are a class of investments whose cash flow is backed by a pool of auto loans and leases.  Id. ¶¶ 223–24.  Beginning in 2009, VCI "sponsored the issuance of billions of dollars of automobile ABS offerings in the United States."  Id. ¶ 227.  Those ABS were securities as defined by American law.  Id.  Volkswagen's ABS were backed by pools of consumer automobile leases, pools of consumer automobile loans, and pools of inventory financing loans to Volkswagen and Audi dealerships.  Id. ¶ 228.  Many of the vehicles underlying the leases or loans contained a defeat device.  Id. ¶ 232.

The ABS offerings were accompanied by a prospectus and a prospectus supplement "that made representations regarding, among other things, the deal terms, information about the underlying collateral, and risk factors."  Id. ¶ 233.  Volkswagen did not disclose the "clean diesel" fraud or accompanying risk of civil and criminal liability in the prospectus or the prospectus supplement.  Id. ¶ 236.

#### 2.    The Bond Offerings

As early as 2010, VW AG's Supervisory Board authorized Volkswagen to raise money by issuing corporate debt in the United States.  Id. ¶ 155.  In February 2014, Volkswagen's Board of

3

Management, including Winterkorn, authorized the formation of VWGoAF "for the sole purpose of issuing and selling corporate bonds in the United States." Id. ¶ 157.  VWGoAF issued $8.3 billion worth of bonds in three separate offerings between May 2014 and May 2015.  Id. ¶ 159.

Each offering was made pursuant to an Offering Memorandum.  Id. ¶ 164.  The offering memoranda included legal and financial disclosures, the terms of the offering, and various business and regulatory risk factors for investors to consider.  Id.  Appended to the memoranda were VW AG's annual and interim financial statements.  Id. ¶ 185.  The annual financial statements represented that they had recognized all provisions required by International Accounting standards.  Id. ¶ 192.  They were signed by Volkswagen's Board of Management, including Winterkorn.  Id. ¶ 187.

### C.    The SEC's Lawsuit

The SEC filed this civil enforcement action last year.  See generally id.  It charges Volkswagen and Winterkorn with primary violations of the securities laws arising from the ABS and bond offerings.  Id. ¶¶ 256–58, 262–65, 269–72.  It also charges Winterkorn with aiding and abetting and control person liability.  Id. ¶¶ 259–61, 266–68, 273–82.  It requests, inter alia, injunctive relief and disgorgement.  Id. ¶¶ (1)–(8).

Volkswagen moves to dismiss claims based on the ABS offerings and certain statements appended to or contained in the various bond offering memoranda.  See VW MTD (dkt. 7349) at 19–35.  It also moves to dismiss or strike the SEC's requests for injunctive relief and disgorgement.  Id. at 36–39.  Winterkorn moves to dismiss the claims against him for lack of personal jurisdiction or, in the alternative, failure to state a claim.  See generally Winterkorn MTD (dkt. 7347).

## II.    VOLKSWAGEN'S MOTION TO DISMISS

### A.    Legal Standard

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted.  Dismissal may be based on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal

United States District Court
Northern District of California

4

theory." Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019).  A complaint must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  When evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party."  Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).  "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

Claims for fraud must meet the pleading standard of Federal Rule of Civil Procedure 9(b), which requires a party "alleging fraud or mistake [to] state with particularity the circumstances constituting fraud or mistake."  Rule 9(b) "requires . . . an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations."  Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted).

If a court does dismiss a complaint for failure to state a claim, it should "freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  A court nevertheless has discretion to deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment."  Leadsinger, Inc. v. BMG Music Publ'g., 512 F.3d 522, 532 (9th Cir. 2008) (alteration in original) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

**B.      Discussion**

Volkswagen moves to dismiss the SEC's claims based on the ABS offerings, certain

warnings regarding potential recalls or declines in product quality, and the financial statements attached to the offering memorandum for the May 2014 Bond offering.  VW MTD at 5–9.  It also moves to strike the SEC's requests for injunctive relief and disgorgement.  Id. at 9–12.

### 1.    The ABS Offerings

Volkswagen argues that claims based on the ABS offerings must be dismissed because the Department of Justice already settled them on behalf of the United States, including the SEC.  Id. at 19–21.  The Settlement Agreement "fully and finally release[d] [Volkswagen] . . . from any civil claims the United States has against [Volkswagen] for the Covered Conduct . . . that the Civil Division of the Department of Justice has actual and present authority to assert and compromise pursuant to 28 C.F.R. § 0.45."  Settlement Agreement ¶ 5.  The Covered Conduct includes VCI's issuance of seventeen ABS in the United States between 2009 and 2015.  Id. ¶ G.  And 28 C.F.R. § 0.45(h) authorizes the DOJ's Civil Division to handle civil "litigation by and against the United States [and] its agencies," with certain enumerated exceptions irrelevant here.  Volkswagen reasons that because claims based on the ABS offerings are civil litigation brought by a United States agency that the Civil Division was authorized to assert and compromise under 28 C.F.R. § 0.45, they were released by the Settlement Agreement.  The SEC responds that the DOJ had no power to settle these claims, VW MTD Opp'n at 13–16, and that even if it did, the Settlement Agreement does not reach them, id. at 16–18.

### a.    DOJ's authority to settle civil securities law claims.

"Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party . . . is reserved to officers of the Department of Justice, under the direction of the Attorney General."  28 U.S.C. § 516.  The DOJ's authority to settle the SEC's civil claims therefore depends on whether an exception to its presumptive authority to resolve those claims was "otherwise authorized by law."  See id.

The SEC's authorities do not establish the existence of such an exception.  True, the SEC has "discretion" to "bring an action in . . . district court" to enjoin violations of the Securities Exchange Act of 1934 and the Securities Act of 1933.  See 15 U.S.C. § 77t(b); 15 U.S.C.

United States District Court
Northern District of California

§ 78u(d)(1).  But the fact that the SEC has authority to assert and resolve civil securities law claims does not mean that authority is exclusive.  The SEC's cases similarly establish only its own authority to bring these claims, not the DOJ's lack of such authority.  The SEC's best case, <u>SEC v. Robert Collier & Co., Inc.</u>, 76 F.2d 939 (2d Cir. 1935), contains some suggestive language, but ultimately holds only that the SEC is authorized to bring civil enforcement actions.  <u>See generally id.</u>  It does not address whether the DOJ also enjoys that power.  Indeed, none of the SEC's cases reach that crucial question.

But a district court in this circuit has addressed the DOJ's authority to assert civil securities law claims in the context of a pro hac vice application.[3]  That decision concluded that "[t]he SEC's authorization to bring the present civil enforcement action does not mean that only the SEC's own attorneys may do so, such that the U.S. Attorney cannot represent the United States or the SEC in this action."  <u>SEC v. Banc De Binary Ltd.</u>, No. 2:13-cv-00993-RCJ-VCF, 2014 WL 2197740, at *1 (D. Nev. May 27, 2014).  "[T]he usual practice of the SEC and the DOJ"—having the SEC handle civil litigation—was not dispositive.  <u>Id.</u>

The Court agrees with that conclusion.  No authority, statutory or otherwise, purports to divest the DOJ of the power to file civil enforcement actions under the securities laws.  That is especially significant because exceptions to the DOJ's authority under 28 U.S.C. § 516 must be "clear and unambiguous."  <u>United States v. Hercules, Inc.</u>, 961 F.2d 796, 798–99 (8th Cir. 1992); <u>see also Thomas v. INS</u>, 35 F.3d 1332, 1339 (9th Cir. 1994) (Immigration and Naturalization Service was bound by terms of plea bargain entered into by United States Attorney because "[w]e have found no express limitation on the United States' Attorneys' power to bind the INS").

---

[3]  The court reached this question because it refused to grant the SEC attorneys' pro hac vice application until they "show[ed] that the U.S. Attorney's Office in this District is incapable of litigating the present matter."  <u>Banc De Binary Ltd.</u>, 2014 WL 2197740, at *1.  In a later case, the Ninth Circuit held Judge Jones' policy of denying out-of-state government attorneys pro hac vice admission clear error.  <u>See In re United States</u>, 791 F.3d 945, 950, 955 (9th Cir. 2015).  Unlike the SEC, the Court does not believe that Judge Jones' erroneous treatment of government pro hac vice applications infected the statutory interpretation question relevant here.  <u>See</u> VW MTD Opp'n at 15 n.7.

United States District Court
Northern District of California

### b.      Whether the Settlement Agreement reaches the SEC's claims.

The DOJ had authority to settle the SEC's civil claims based on the ABS offerings, but the question remains whether it exercised that power in the Settlement Agreement.  Volkswagen's argument is straightforward.  As explained above, the Settlement Agreement released claims arising from the ABS offerings which the DOJ's Civil Division had authority to assert and compromise under 28 C.F.R. § 0.45, including the civil securities claims at issue here.

The SEC's arguments to the contrary are not compelling.  First, it points out that it was not a party to the Settlement Agreement and that that document "makes no reference **at all** to the SEC, the Securities Act, the Exchange Act, or even generally to 'federal securities laws.'"  VW MTD Opp'n at 16 (original emphasis).  But the Settlement Agreement binds the "United States," Settlement Agreement ¶ 5, which includes the federal government's constituent agencies, see Margalli-Olvera v. INS, 43 F.3d 345, 352–53 (8th Cir. 1994).  Nor was the Settlement Agreement required to name every cause of action covered by its release.  Chaplin v. NationsCredit Corp., 307 F.3d 368, 373 (5th Cir. 2002) ("It would be an odd public policy that favored settlements and releases, but then forced [the parties] to scour the United States Code . . . to identify every possible cause of action.").

Next, the SEC points out that 28 C.F.R. § 0.45 "is not an independent grant of authority to DOJ Civil to bring claims arising under the federal securities laws."  VW MTD Opp'n at 16.  But as explained above, the DOJ's statutory authority to resolve these claims derives from 28 U.S.C. § 516.  The regulation simply defines the universe of claims covered by the Settlement Agreement.  Its status as an independent grant of authority is irrelevant.

The SEC also points out that the DOJ normally does not bring civil enforcement actions arising from the securities laws.  Id. at 17.  But the Settlement Agreement does not speak in terms of what claims the DOJ customarily brings.  Settlement Agreement ¶ 5.  It releases claims the DOJ has "authority to assert and compromise."  Id.

Finally, the SEC suggests that the Settlement Agreement covered only ABS offerings for which "[f]ederally insured financial institutions served as trustees . . . and also purchased certain notes."  VW MTD Opp'n at 17–18 (quoting Settlement Agreement ¶ G).  That is wrong.  The

8

Settlement Agreement notes that federally insured institutions served as trustees and purchased notes in certain ABS.  Settlement Agreement ¶ G.  But it does not limit the definition of "Covered Conduct" to those ABS.  That term covers all seventeen ABS issued in the United States between 2009 and 2015.  See id.

The DOJ had the power to and did release the SEC's civil securities law claims arising out of the ABS offerings.  Volkswagen's motion to dismiss those claims is granted.  It is therefore unnecessary to consider Volkswagen's other arguments against the ABS claims.  See VW MTD at 22–31.

### 2.     The 144A Bond Offerings

Recognizing that this Court's previous decisions have held similar allegations sufficient at the pleading stage, Volkswagen does not seek wholesale dismissal of claims based on the 144A Bond offerings.  VW MTD at 31.  However, it does seek dismissal of these claims insofar as they are based on two categories of statements: warnings regarding the possibility of recalls or declines in quality and the financial statements attached to the offering memorandum for the May 2014 bond offering.  Id. at 31–35.

### a.     Warnings regarding possible recalls or declines in product quality.

The SEC's claims are based in part on the following two statements from the "Risk Factors" section of the offering memoranda for the 144A Bonds.  First, that "[a] decline in our product quality or consumer perception . . . could have a material adverse effect on our general business activities, net assets, financial position and results of operations."  Compl. ¶ 175.  Second, that Volkswagen could "face . . . liability depending on the applicable laws and contractual obligations" and might be required to "perform recall campaigns."  Id.  Volkswagen asserts that these "indisputably accurate" statements are not actionable as a matter of law.  VW MTD at 31–33.  The SEC responds that they were "actionably misleading" because "they leave the reader with the false impression that the stated risks are mere future possibilities despite the fact that those risks have already begun to materialize."  VW MTD Opp'n at 26.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Volkswagen's position is supported by numerous decisions from this district holding that

2  "cautionary statements . . . are not actionable to the extent plaintiffs contend defendants should

3  have stated that the adverse factors 'are' affecting financial results rather than 'may' affect

4  financial results."  See, e.g. In re LeapFrog Enters., Inc. Sec. Litig., 527 F. Supp. 2d 1033, 1048

5  (N.D. Cal. 2007).  It also accords better with the Ninth Circuit's holding that warnings that "a 'risk

6  factor' that 'could' affect the ability of loan customers to repay 'in the future'" were not

7  misleading just because "that risk had already come to fruition."[4]  Lloyd v. CVB Fin. Corp., 811

8  F.3d 1200, 1207 (9th Cir. 2016).  Although there are out-of-circuit cases supporting the SEC's

9  position, see, e.g. In re Van der Moolen Holding N.V. Sec. Litig., 405 F. Supp. 2d 388, 400

10  (S.D.N.Y. 2005) ("[T]o warn that the untoward may occur when the event is contingent is prudent;

11  to caution that it is only possible for the unfavorable events to happen when they have already

12  occurred is deceit." (internal citations omitted)), the Court will follow decisions that are closer to

13  home and easier to reconcile with binding precedent.

14   This result is not inconsistent with Boston Retirement Sys. v. Uber Tech., Inc., No. 19-cv-

15  06361-RS, 2020 WL 4569846 (N.D. Cal. Aug. 7, 2020), which the SEC cites in a Statement of

16  Recent Decision (dkt. 7659).  In Uber, Judge Seeborg held that misleading statements that Uber

17  had "changed," were actionable because it was, in fact, repeating the mistakes that had plagued it

18  in the past.  Uber, 2020 WL 4569846, at *5–6.  He concluded that a "Risk Factors" section which

19  listed various hypothetical obstacles Uber might encounter, but did not disclose that "any of those

20  scenarios already exist[ed]," "was not enough to render what was not disclosed, not misleading."

21  Id.  But holding that generic risk factors cannot correct other omissions is not the same as finding

22  that those risk factors are themselves independently actionable.  Volkswagen does not suggest that

23  the generic risk factors at issue here can protect it from liability for other misstatements and

24  omissions, only that they themselves cannot be the basis for liability.  See VW MTD at 31–33.

25   Finally, Volkswagen correctly argues that these statements are distinguishable from the

---

[4]  Lloyd may be distinguishable, because other warnings provided context that helped avoid any misleading implication from the challenged statement.  Lloyd, 811 F.3d at 1207.  It nonetheless provides at least some support for the Northern District of California decisions that unambiguously endorse Volkswagen's position.

United States District Court
Northern District of California

1  risk factors this Court found actionable in a previous case brought by private bondholders.  The

2  Court reasoned that statements regarding Volkswagen's efforts to reduce emissions, taken with

3  claims that those efforts were crucial to regulatory compliance and commercial success, were

4  misleading in light of the emissions fraud.  See In re Volkswagen "Clean Diesel" Mktg., Sales

5  Practices, & Prod. Liab. Litig., No. 15-md-02672-CRB (JSC), 2017 WL 3058563, at *6–7 (N.D.

6  Cal. July 19, 2017).  That logic is inapplicable to generic warnings about product quality and

7  potential recalls writ large.

b.     **Financial statements attached to the offering memorandum for the May 2014 Bond offering.**

Volkwagen contends that the financial statements appended to the offering memorandum

for the May 2014 Bond offering were not misleading, because the SEC's allegations do not

establish that they failed to recognize a "provision" or "contingent liability" required by the

applicable accounting standard.  VW MTD at 33–35.  Recognition of "provisions" and

"contingent liabilities" for German companies like VW AG is governed by IAS 37, which requires

a company to recognize a "provision" if, among other things, "it is probable that an outflow of

resources embodying economic benefits will be required to settle" "a present obligation (legal or

constructive) as a result of a past event."  Compl. ¶ 188.

This Court has held on two previous occasions that IAS 37 did not require Volkswagen to

record a provision for potential liability for the emissions scandal until "an investigation

. . . began."  See In re Volkswagen "Clean Diesel" Mktg., Sales Practices &Prods. Liab. Litig.,

258 F. Supp. 3d 1037, 1043–44 (N.D. Cal. 2017); In re Volkswagen, 2017 WL 3058563, at *13.

As a result, it has previously concluded that the financial statements appended to the May 2014

offering memorandum did not violate IAS 37 and could not give rise to a Section 10(b) claim,

because they were prepared before Winterkorn knew that an investigation was imminent.  In re

Volkswagen, 2017 WL 3058563, at *13.

Those decisions dictate a similar result here.  The financial statements for the May 2014

bond offering were prepared as of April 29, 2014.  Id.; Compl. ¶ 185.  The SEC does not allege

11

that EPA and CARB began their investigations until "early May 2014."  Compl. ¶ 178(i).  Per this Court's prior rulings, Volkswagen had no obligation to disclose a provision related to the clean diesel scandal when these financial statements were completed.  See In re Volkswagen, 258 F. Supp. 3d at 1043–44.

The SEC does not seek reconsideration of the Court's prior rulings on this issue.  VW MTD Opp'n at 30.  It argues in its opposition that those rulings on Section 10(b) claims brought by private plaintiffs are distinguishable, because its Section 17(a)(2) claims require it to show only that Volkswagen "failed to exercise reasonable care . . . not scienter."[5]  Id.  The problem with this argument is that the Court's prior rulings establish that the relevant financial statements did not violate IAS 37 at all—there was no obligation to record a provision or contingent liability reflecting the emissions fraud when the financial statements appended to the May 2014 offering memorandum were prepared.  That being the case, the scienter requirement—or lack thereof—is irrelevant.  Volkswagen did not fail to exercise reasonable care or act with scienter in violating IAS 37, because there was no violation.

### 3. Injunctive Relief

"[T]he Commission may seek injunctive relief whenever it appears that a person is engaged or is about to engage in any acts or practices constituting a violation of the 1933 or 1934 Acts or regulations promulgated thereunder."  Aaron v. SEC, 446 U.S. 680, 700 (1980) (internal alterations and omissions omitted).  To obtain an injunction, the SEC must prove "at a minimum . . . that a person is engaged in or is about to engage in a substantive violation of" the securities laws.  Id. at 700–01.  Volkswagen moves to strike or dismiss the SEC's request for injunctive relief, on the grounds that it has not adequately alleged its entitlement to an injunction.  See VW MTD at 36–37.

---

[5] The SEC has since indicated that it intends to abandon this argument as well, and will "not . . . pursue its allegation that the failure to record a provision or disclose a contingent liability, pursuant to IAS 37, in the financial statements appended to the May 2014 Offering Memorandum is a basis for . . . liability under Section 17(a)(2) of the Securities Act of 1933."  Commissioner's Letter (dkt. 7665) at 2.  In any event, as explained above, the Court disagrees with the position taken in the SEC's brief.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Volkswagen's request is premature.  "[W]here, as here, the complaint plausibly alleges that defendants intentionally violated the federal securities laws, it is most unusual to dismiss a prayer for injunctive relief at this preliminary stage of the litigation, since determining the likelihood of future violations is almost always a fact-specific inquiry."  SEC v. Gabelli, 653 F.3d 49, 61 (2d Cir. 2011), reversed on other grounds by Gabelli v. SEC, 568 U.S. 442 (2013); see also SEC v. Drake, No. 2:17-cv-06204-CAS (GJSx), 2017 WL 6507766, at *7 (C.D. Cal. Dec. 18, 2017) ("[R]ulings on remedies are typically made after finding liability—not at the motion to dismiss stage.").

Volkswagen protests that the alleged violations happened "**more than five years ago.**" VW MTD Reply (dkt. 7536) at 20 (original emphasis).  But the Ninth Circuit has rejected a similar argument.  See SEC v. Koracorp Indus., Inc., 575 F.2d 692, 699 (9th Cir. 1978) ("The fact that illegal conduct ceased provides no further support for defendants' assurances that injunctive relief is unnecessary where the acts of contrition and process of reformation did not begin until the defendants must have realized that the . . . scandal could no longer be kept hidden.").

Volkswagen is left to point out that the SEC cites no authority holding "that a district court may never dismiss claims for injunctive relief at the motion to dismiss stage."  VW MTD Reply at 21.  Be that as it may, Volkswagen fails to establish that this is "the type of 'unusual'" case where that would be appropriate.  See id. at 22.  The decisions it cites dismissing claims for injunctive relief at the pleading stage all involved plaintiffs who lacked standing to seek injunctive relief, see Perez v. Leprino Foods Co., No. 1:17-cv-00686-AWI-BAM, 2018 WL 1426561, at *6 (E.D. Cal. Mar. 22, 2018), Guerrero v. Halliburton Energy Servs., Inc., 231 F. Supp. 3d 797, 808 (E.D. Cal. 2017), or failed to allege that legal remedies would be inadequate, see In re Atlas Roofing Corp. Chalet Shingly Prods. Liab. Litig., No. 2495 1:13-md-2495-TWT, 2015 WL 3824020, at *2 (N.D. Ga. June 19, 2015).  It is undisputed that the SEC is entitled to seek injunctive relief, so Volkswagen's cases are inapt.  Volkswagen's request to strike or dismiss the SEC's request for an injunction is denied.

### 4.   Disgorgement

Volkswagen's request that the Court strike or dismiss the SEC's prayer for disgorgement is similarly premature.  <u>See Drake</u>, 2017 WL 6507766, at *7.  "Disgorgement is designed to deprive a wrongdoer of unjust enrichment."  <u>SEC v. JT Wallenbrock & Assocs.</u>, 440 F.3d 1109, 1113 (9th Cir. 2006), <u>abrogated on other grounds by Liu v. SEC</u>, 140 S. Ct. 1936 (2020).  The SEC plausibly alleges that Volkswagen was unjustly enriched because passing the bonds off as lower risk than they actually were allowed it to pay lower interest rates.  Compl. ¶ 19.  Those allegations are sufficient to avoid a motion to strike at the pleading stage.

Volkswagen points out that it has already paid "<u>billions</u>" to resolve claims related to the emissions scandal, VW MTD Reply at 22–23 (original emphasis), but it is unclear at this point whether those fines and settlements reflected wrongful gains from the fraudulently low interest rates implicated here.  And while Volkswagen argues that disgorgement would be inequitable because of the SEC's delay in bringing this case, VW MTD at 38, that fact can be taken into account later in the proceedings, when the Court can evaluate the propriety of a disgorgement award on a full record.

## III.   WINTERKORN'S MOTION TO DISMISS

### A.   Legal Standard

Federal Rule of Civil Procedure 12(b)(2) authorizes defendants to move to dismiss for lack of personal jurisdiction.  "In opposing a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper."  <u>CollegeSource, Inc. v. AcademyOne, Inc.</u>, 653 F.3d 1066, 1073 (9th Cir. 2011).  "Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, 'the plaintiff need only make a <u>prima facie</u> showing of jurisdictional facts to withstand the motion to dismiss.'"  <u>Id.</u> (quoting <u>Brayton Purcell LLP v. Recordon & Recordon</u>, 606 F.3d 1124, 1127 (9th Cir. 2010)).  A plaintiff may not "simply rest on the bare allegations of [the] complaint."  <u>Schwarzenegger v. Fred Martin Motor Co.</u>, 374 F.3d 797, 800 (9th Cir. 2004) (quoting <u>Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.</u>, 551 F.2d 784, 787 (9th Cir. 1977)).  But uncontroverted

14

allegations must be taken as true, and "[c]onflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." Id.

Winterkorn's motion to dismiss for failure to state a claim is governed by the legal standards discussed above. See supra Part II.A.

**B.  Discussion**

Winterkorn moves to dismiss all claims against him for lack of personal jurisdiction. Winterkorn MTD at 2–4.  Alternatively, he moves to dismiss Counts I, III, V, and VI for failure to state a claim. Id. at 4–5.

**1.  Personal jurisdiction.**

This Court has found personal jurisdiction over Winterkorn on multiple occasions and various grounds.  For the reasons explained below, it reaches the same result here.

**a.  Personal jurisdiction based on control person allegations.**

This Court has found personal jurisdiction over Winterkorn under Section 20(a) based on "non-frivolous allegation[s] that [Winterkorn] controlled a person liable for the fraud." See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., No. 15-md-02672-CRB (JSC), 2017 WL 66281, at *20 (N.D. Cal. Jan. 4, 2017) (citing San Mateo Cty. Transit Dist. v. Dearman, Fitzgerald & Roberts, Inc., 979 F.2d 1356, 1358 (9th Cir. 1992)).  It rejected Winterkorn's argument that this would run afoul of case law holding that personal jurisdiction cannot be premised solely on a corporate officer or director's supervision of a corporation, because the "Plaintiffs allege[d] Winterkorn's direct involvement in the emissions scandal, including directly and indirectly making and signing off on various statements that he knew to be false." Id. at *21.  The fiduciary shield doctrine was therefore no help to Winterkorn. Id.  As discussed below, the SEC also adequately alleges Winterkorn's control-person status, see infra Part III.B.4, and direct involvement in the emissions scandal, see infra Part III.B.2, so San Mateo and the Court's earlier rulings require finding personal jurisdiction here as well.

Winterkorn acknowledges that the Court's prior decisions dictate this result but urges the Court to reconsider its previous holding.  Winterkorn MTD at 12 n.9.  Winterkorn's argument

United States District Court
Northern District of California

relies on Supreme Court precedent that predates the decision he urges the Court to reconsider. Winterkorn Reply (dkt. 7534) at 4–5.  Because the Court had the benefit of those decisions when it previously interpreted <u>San Mateo</u>, they are not a sufficient justification for reconsideration.

### b.    Specific personal jurisdiction.

This Court has also found specific personal jurisdiction over Winterkorn under a purposeful availment or direction theory.  Courts in the Ninth Circuit employ a three-prong test to evaluate whether specific personal jurisdiction is consistent with due process: "(1) the nonresident defendant must purposefully direct his activities or consummate some transaction with the forum or residents thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction . . . must be reasonable."  <u>Lake v. Lake</u>, 817 F.2d 1416, 1421 (9th Cir. 1987).  The plaintiff bears the burden on the first two prongs.  <u>See</u> <u>Schwarzenegger</u>, 374 F.3d at 802.  If the plaintiff fails to satisfy either of these prongs, the motion to dismiss must be granted. <u>Id.</u>  If the plaintiff establishes both prongs one and two, the defendant must come forward with a "compelling case" that the exercise of jurisdiction would not be reasonable.  <u>Id.</u> (citation omitted). Because this is a securities fraud case, the relevant forum is the United States.  <u>Sec. Inv'r Prot. Corp. v. Vigman</u>, 764 F.2d 1309, 1316 (9th Cir. 1985).

### i.    Purposeful availment or direction.

"[C]ourts have found that the transactional aspects of securities fraud establish purposeful availment."  <u>In re Volkswagen</u>, 2017 WL 66281, at *22 (quoting <u>Chassin Holdings Corp. v. Formula VC Ltd.</u>, No. 15-cv-02294-MEJ, 2016 WL 1569986, at *6 (N.D. Cal. Apr. 19, 2016)). Based on those decisions, this Court has held that Winterkorn "purposefully availed himself of the benefits of doing business in the United States by taking advantage of the [capital] markets available here."  <u>Id.</u>  "Winterkorn, as Volkswagen's CEO, was not required to offer the Volkswagen [securities] here and benefited by having the [securities] available to United States investors."  <u>Id.</u>  Essentially identical allegations establish purposeful availment here.  The SEC

United States District Court
Northern District of California

alleges that Winterkorn specifically targeted American investors and capital markets to raise money, Compl. ¶¶ 155–58, including by forming Volkswagen Group of America Finance specifically to sell bonds to investors in this country, id. ¶ 39.  Volkswagen argues that Winterkorn did not personally approve any particular securities offering.  Winterkorn Reply at 5–6.  Be that as it may, he is alleged to have personally and specifically targeted American capital markets and investors to raise money.  That is sufficient to satisfy the purposeful availment prong.

This Court has also found purposeful direction satisfied by allegations that "Winterkorn was able to and did control the content of the various offering memoranda."  In re Volkswagen, 2017 WL 3058563, at *17 (internal quotation marks and citations omitted).  However, Volkswagen argues that those decisions are distinguishable because they were based on allegations that Winterkorn personally controlled the content of the offering memoranda for bond offerings in the United States.  Winterkorn Reply at 7–8.  Here, the SEC alleges only that Winterkorn signed the financial statements appended to the offering memoranda.  Id.

It is ultimately unnecessary to decide whether those allegations establish purposeful direction.  Specific jurisdiction can be established by either purposeful availment or purposeful direction, see Lake, 817 F.2d at 1421, and the control person allegations provide an additional basis for personal jurisdiction, see supra Part III.B.1.a.  There is therefore no need to address whether purposeful direction provides a third justification for personal jurisdiction.

### ii.      Arising out of.

To determine whether a plaintiff's claims arise out of the defendant's local conduct, the Ninth Circuit asks whether the defendant's forum-related activities were a "but-for" cause of the plaintiff's claims. See Ballard v. Savage, 65 F.3d 1495, 1500 (9th Cir. 1995).  That standard is plainly met here.  If Winterkorn had not targeted American capital markets to raise cash for Volkswagen, the emissions fraud would not have deceived American investors.  See Compl. ¶ 9.  Winterkorn protests that Volkswagen could have raised capital in the United States regardless of whether or not he signed off on the formation of VWGoAF.  Winterkorn Reply at 8.  But the forum-related activity that led to the fraud was targeting American investors.  That Volkswagen

could have done that through some avenue other than VWGoAF is beside the point.

### iii.      Reasonableness.

If the first two prongs are satisfied, the defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985).  Courts balance seven factors in weighing reasonableness, none of which are dispositive: "(1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum." See Core–Vent Corp. v. Nobel Indus. AB, 11 F.3d 1482, 1487–88 (9th Cir. 1993).  This Court has previously applied this test and found it reasonable to exercise jurisdiction over Winterkorn.  See, e.g. In re Volkswagen, 2017 WL 66281, at *22–23.

Winterkorn identifies only one new development that could plausibly impact the analysis: his indictment on related criminal charges in Germany.  Winterkorn MTD at 12–14.  He argues the criminal proceedings in his home country will increase the burden of having to defend this action in the United States.  Id. at 13.  Additionally, because Germany has now "explicitly voiced a sovereign interest in the case," comity is more likely to weigh against an American court's jurisdiction over Winterkorn.  See Bauman v. DaimlerChrysler AG, No. C-04-00194 RMW, 2005 WL 3157472, at *14 (N.D. Cal. Nov. 22, 2005).  The German proceedings notwithstanding, the Court finds that Winterkorn has not presented a compelling case that exercising personal jurisdiction would be unreasonable.  This Court has previously held that trying a case involving "[Winterkorn's] violations of U.S. securities law based on conduct that is sufficiently tied to the United States" did not seriously impede Germany's sovereignty, even though Germany was investigating related misconduct.  In re Volkswagen, 2017 WL 66281, at *23.  And although the proceedings in Germany may increase the burden of simultaneously defending this case in San Francisco, concerns about that burden are greatly reduced by the fact that Winterkorn is already

18

defending multiple lawsuits here.  Davis v. Metro Prods., Inc., 885 F.2d 515, 523 (9th Cir. 1989).

### 2.      Section 10(b) (Count I)

Winterkorn argues that Count I, which charges him with primary violations of Section 10(b), must be dismissed for two reasons.  First, because he is not alleged to have "engaged in any relevant conduct using an instrumentality of interstate commerce, the mails, or any national securities exchange in connection with the bond offerings."  Winterkorn MTD at 15–16 (original emphasis).  Second, because even though Winterkorn signed the financial statements appended to the bond offering memoranda, he did not do so "in connection with the purchase or sale of securities in the United States."  Id. at 17–18.

### a.      Jurisdictional requirement.

Section 10(b) and Rule 10b-5 reach only fraud conducted "by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange."  15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5.  This requirement is jurisdictional.  Spilker v. Shayne Laboratories, Inc., 520 F.2d 523, 524 (9th Cir. 1975).  "It is not required that a particular defendant personally carry out the mailing or use of an instrumentality of interstate commerce.  Rather, it is sufficient if he causes it to be carried out by setting forces in motion which foreseeably result in use of the mails."  SEC v. Rana Research, Inc., No. 89-1865 AAH(TX), 1990 WL 267365, at *18 (C.D. Cal. Oct. 2, 1990), aff'd, 8 F.3d 1358 (9th Cir. 1993).

Winterkorn contends this requirement is not met, because there is no allegation that he himself used instrumentalities of interstate commerce in connection with the fraud, or caused anyone else to do so.  Winterkorn MTD at 15–16.  But Winterkorn is alleged to have signed the fraudulent financial statements ultimately appended to the offering memoranda.  Compl. ¶ 187.  Presenting those financial statements to American investors obviously required using some instrumentality of interstate commerce, either the mail or the Internet.  See id. ¶¶ 181–85.  And it was foreseeable that filling out the fraudulent financial statements would lead to this use of the instrumentalities of interstate commerce, since Winterkorn knew that Volkswagen was selling securities to American investors and would have realized that doing so required presenting

Americans with the company's financial statements.  See id. ¶¶ 155–58.  That is enough to satisfy Section 10(b)'s "minimal" jurisdictional requirement.  See Kauffman v. Yoskowitz, No. 85 CIV. 8414 (PKL), 1989 WL 79364, at *7 (S.D.N.Y. July 13, 1989).

### b.  Nexus.

Winterkorn next argues that the SEC has not adequately alleged that he made "'any untrue statement of a material fact' in connection with the purchase or sale of securities in the United States."  Winterkorn MTD at 16 (citing 17 C.F.R. § 240.10b-5(b)).  Both sides agree that for purposes of the SEC's Section 10(b) claim, Winterkorn was the maker of Volkswagen's financial statements, but not of any other statements challenged in this suit.  Id. at 16–17; Winterkorn MTD Opp'n (dkt. 7492) at 16.

The question, then, is whether Winterkorn made the financial statements "in connection with the purchase or sale of a security listed on an American stock exchange, [or] the purchase or sale of any other security in the United States."  Morrison v.Nat'l Australia Bank Ltd., 561 U.S. 247, 273 (2010).  Winterkorn emphasizes the foreign character of the financial statements—that they were signed in Germany, written in Euros, and prepared according to European accounting standards.  Winterkorn MTD at 17.  This is something of a red herring.  Winterkorn relies heavily on Morrison, but that case held that false statements made in Florida could not support a Section 10(b) claim when the transaction those statements affected happened overseas.  See Morrison, 561 U.S. at 266 ("[W]e think that the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States.").  There is no question that the bond offerings occurred in this country, so what matters is not the foreign character of Winterkorn's conduct but whether the SEC has adequately alleged a nexus between that conduct and the bond offerings.

The Ninth Circuit has "said that the 'in connection with' requirement is met if the fraud alleged 'somehow touches upon' or has 'some nexus' with 'any securities transaction.'"  SEC v. Rana Research, Inc., 8 F.3d 1358, 1362 (9th Cir. 1993) (quoting SEC v. Clark, 915 F.2d 439, 449 (9th Cir.1990)).  The fraud "must be done to induce the purchase at issue."  Stoyas v. Toshiba

20

United States District Court
Northern District of California

Corp., 896 F.3d 933, 951 (9th Cir. 2018).  "While interpretations of 'in connection with' continue to change as applied to private plaintiffs, its meaning in SEC actions remains as broad and flexible as is necessary to accomplish the statute's purpose of protecting investors." Rana Research, 8 F.3d at 1362.  "Where the fraud alleged involves public dissemination in a document such as a press release, annual report, investment prospectus or other such document on which an investor would presumably rely, the 'in connection with' requirement is generally met by proof of the means of dissemination and the materiality of the misrepresentation or omission." Id.

The financial statements were annual reports "on which an investor would presumably rely," and Winterkorn does not dispute the materiality of the omissions at issue.  That is sufficient to satisfy the "in connection with" requirement. See id.  Winterkorn's suggestion that the result should be different because the financial statements were prepared in Germany is untenable.  It would hold executives of foreign corporations to a lower standard of liability under Rule 10(b)-5, even when they were alleged to have deliberately and consistently raised capital from American investors on American markets.  That rule is inconsistent with the Supreme Court's direction "that the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States," Morrison, 561 U.S. at 266, as well as the Ninth Circuit's holding that the "in connection with" requirement must be "as broad and flexible as is necessary to accomplish the statute's purpose of protecting investors," Rana Research, 8 F.3d at 1362.

Winterkorn's motion to dismiss Count I is denied.  Because the Court finds that the "in connection with" requirement is satisfied, it is unnecessary to address the SEC's argument that Morrison is inapplicable in civil enforcement actions.[6]  See Winterkorn MTD Opp'n at 17–18.

### 3.    Aiding and Abetting (Counts II and IV)

Counts II and IV charge Winterkorn with aiding and abetting Volkswagen's violations of Sections 10(b) and 17(a)(2), respectively.  Compl. ¶¶ 259–61, 266–68.  Aiding and abetting

---

[6]  The SEC advocates applying a less stringent test that would be satisfied by foreign misconduct with a foreseeable substantial effect in the United States.  Winterkorn MTD Opp'n at 17–18.  If applicable, that test would be satisfied for the same reasons the nexus requirement is.

liability has three requirements: "(1) the existence of an independent primary violation; (2) actual knowledge by the alleged aider and abettor of the primary violation and of his or her own role in furthering it; and (3) 'substantial assistance' by the defendant in the commission of the primary violation."  SEC v. Fehn, 97 F.3d 1276, 1288 (9th Cir. 1996).  Winterkorn argues that because he is not alleged to have "played any role in the Bond Offerings or in reviewing the Offering Memoranda, DDQ Responses or Subscription Agreements," the SEC has not alleged that he substantially assisted primary violations of the securities laws or knew of those violations and his own role in furthering them.  Winterkorn MTD at 18.

The SEC alleges that Winterkorn was responsible for the misleading financial statements appended to the bond offering memoranda.  See Compl. ¶ 187.  That constitutes substantial assistance in the securities law violations Volkswagen committed when it disseminated the bond offering memoranda.  See Ponce v. SEC, 345 F.3d 722, 737–38 (9th Cir. 2003) (preparing financial statements filed with quarterly and annual reports constituted substantial assistance).[7]

As for knowledge, the SEC's general allegations that Winterkorn knew the false financial statements were being used to solicit purchases of Volkswagen's bonds, see Compl. ¶¶ 183, 260, 267, satisfy Rule 9(b)'s requirements, see SEC v. Berry, 580 F. Supp. 2d 911, 923 (N.D. Cal. 2008) ("[T]he plain text of Rule 9(b) requires only a general allegation of knowledge." (internal quotation marks omitted)).

Winterkorn's motion to dismiss Counts II and IV is denied.

### 4.    Control Person of VWGoAF (Count VI)

In order to plead a prima facie control-person claim under Section 20(a) of the Exchange Act, the SEC must allege "(1) a primary violation of federal securities laws . . .; and (2) "that the defendant exercised actual power or control over the primary violator."  Howard v. Everex Sys.,

---

[7] Ponce concluded that the defendant substantially assisted a primary violation of the securities laws in part because he audited and certified the quarterly and annual reports, as required by the relevant provisions of the Exchange Act and accompanying regulations.  345 F.3d at 737–38. However, it appears that preparing the financial statements was an independent form of substantial assistance.  And in any event, regardless of Ponce, the Court concludes that preparing the misleading financial statements constituted substantial assistance because those statements were an important element of the misleading offering memoranda.

United States District Court
Northern District of California

Inc., 228 F.3d 1057, 1065 (9th Cir. 2000).  The decision "is an intensely factual question" and "involve[es] scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions."  Id. (quoting Kaplan v. Rose, 49 F.3d 1363, 1382 (9th Cir. 1994)).  "[A] plaintiff must plead the circumstances of the control relationship with sufficient particularity to satisfy rule 9(b)."  Howard v. Hui, No. C 92–3742–CRB, 2001 WL 1159780, at *4 (N.D. Cal. Sept. 24, 2001).  Winterkorn thinks the SEC fails to "allege specific facts" to "demonstrate his involvement in the day-to-day affairs of [VWGoAF] or specific control over the preparation and release of the allegedly false and misleading statements." Winterkorn MTD at 19 (quoting Bao v. SolarCity Corp., No. 14-cv-01435-BLF, 2015 WL 1906105, at *5 (N.D. Cal. Apr. 27, 2015).

This Court has previously held that the private bondholder plaintiffs adequately pled Winterkorn's control person status over VWGoAF by alleging that "he was the CEO of VW AG, which was the ultimate parent company of VWGoAF and the guarantor of VWGoAF's bonds," "was able to and did control the content of the various offering memoranda, and was provided with copies of documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected," "was an infamous micromanager," and "was involved in VW AG's financial reporting and accounting, and [signed] the Offering Memoranda certifications."  In re Volkswagen, 2017 WL 3058563, at *16 (internal quotation marks omitted).  The Court rejected the signature allegations, noting that Winterkorn had in fact signed only the financial statements appended to the offering memoranda, but concluded that the plaintiffs had nonetheless successfully pled their control-person claim.  Id.  "That Winterkorn was a detail-oriented executive of VW AG—the guarantor of VWGoAF's bonds—and that he controlled the content of the Memoranda, supports that he had specific control over the preparation and release of the allegedly misleading false and misleading statements, which supports control-person liability."  Id. (internal citations and quotation marks omitted).

Like the bondholder plaintiffs, the SEC alleges that Winterkorn was VW GA's CEO, Compl. ¶ 5, was able to control the content of the offering memoranda, id. ¶ 158, was a

23

micromanager, id. ¶ 58, and was involved in Volkswagen's financial reporting and accounting, including signing Volkswagen's financial statements, id. ¶ 182.  These similar allegations adequately plead that Winterkorn was a control person of VWGoAF.  The chief difference is that the bondholder plaintiffs alleged that Winterkorn actually participated in the preparation of the bond offering memoranda.  As Winterkorn points out, the SEC alleges that he had control over the offering memoranda, but not that he exercised that authority.  Winterkorn Reply at 14.  However, the distinction is irrelevant at this stage in the proceedings.  "[I]n order to make out a prima facie case, it is not necessary to show actual participation or the exercise of actual power."  Howard, 228 F.3d at 1065.  That Winterkorn enjoyed " specific control over the preparation and release of the allegedly misleading false and misleading statements . . . supports control-person liability," In re Volkswagen, 2017 WL 3058563, at *16, even absent allegations that he participated in the preparation of the offering memoranda, Howard, 228 F.3d at 1065 (holding that plaintiffs need not show that "actual power or influence" was exercised in order to make out a prima facie case of control person liability).

## IV.    CONCLUSION

For the foregoing reasons, Volkswagen's motion is granted, except insofar as it moves to strike or dismiss the SEC's requests for injunctive relief and disgorgement.  Winterkorn's motion is denied.

**IT IS SO ORDERED.**

Dated: August 20, 2020

CHARLES R. BREYER
United States District Judge