DANIEL J. HAYES (IL Bar No. 6243089)
Email: hayesdj@sec.gov
ERIC M. PHILLIPS  (IL Bar No. 6237871)
Email: phillipse@sec.gov
JAKE A. SCHMIDT (IL Bar No. 6270569)
Email: schmidtj@sec.gov
KEVIN A. WISNIEWSKI (IL Bar No. 6294107)
Email: wisniewskik@sec.gov

175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
Telephone:  (312) 353-3368
Facsimile:  (312) 353-7398

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>                Plaintiff,<br><br>        vs.<br><br>VOLKSWAGEN AKTIENGESELLSCHAFT, MARTIN WINTERKORN, and VOLKSWAGEN GROUP OF AMERICA FINANCE, LLC,<br><br>                Defendants. | Case No. 3:19-cv-1391-CRB<br><br>**AMENDED COMPLAINT**<br><br><br>**JURY DEMANDED** |

## AMENDED COMPLAINT[1]

---

[1] Pursuant to an Order dated August 20, 2020, the Court granted in part a motion to dismiss filed by Defendants Volkswagen Aktiengesellschaft, Volkswagen Group of America Finance, LLC, and VW Credit, Inc. The Court's order dismissed the SEC's claims related to VW's bond offerings that were based on certain risk factor disclosures in VW's offering memoranda, and it dismissed all claims against defendant VW Credit, Inc. ("Dismissed Claims"). The Court's Order did not expressly grant the SEC leave to amend the complaint to reassert the Dismissed Claims; accordingly, and given the

Plaintiff United States Securities and Exchange Commission ("SEC") brings this action against defendants Volkswagen Aktiengesellschaft ("VWAG"), Martin Winterkorn ("Winterkorn"), and Volkswagen Group of America Finance, LLC ("VWGoAF"),  and alleges as follows:

## I.

## <u>SUMMARY</u>

1.      From at least 2007 through September 2015, VW perpetrated a massive fraud.[2] VW, including its CEO Martin Winterkorn and numerous other senior officials, repeatedly lied to and misled United States investors, consumers, and regulators as part of an illegal scheme to sell its purportedly "clean diesel" cars and billions of dollars of corporate bonds in the United States. VW marketed these bonds without disclosing that its "clean diesel" cars used defeat devices to conceal substantial emissions problems.

2.      Winterkorn and other VW executives were made aware of the defeat device as early as November 2007, during a meeting with VW engineers, to discuss the emissions problems with VW's "clean diesel" vehicles. Although at least one meeting participant warned that putting the existing vehicles on the road in the U.S. would damage VW's reputation if the vehicles' high emissions were later discovered, those concerns were ignored.

3.      VW subsequently sold in the U.S. hundreds of thousands of "clean diesel" vehicles containing the defeat device. Meanwhile, it raised billions of dollars from U.S. investors to fund its expanding sales of "clean diesel" cars across the globe. Years

---

Court's reasoning for dismissal, the SEC is not repleading the Dismissed Claims in the Amended Complaint, but preserves them for appeal and is not abandoning them. *Lee v. Maricopa County*, 693 F.3d 896, 928 (9th Cir. 2012) (*en banc*) ("For claims dismissed with prejudice and without leave to amend, we will not require that they be repled in a subsequent amended complaint to preserve them for appeal.")

[2] Unless otherwise indicated, "VW" refers to VWAG including its subsidiaries and affiliated companies.

later, when U.S. authorities began investigating emissions problems with VW vehicles, the company misled government investigators, concocted a sham software fix, and destroyed thousands of incriminating documents and other evidence.

4.      Eventually, U.S. regulators exposed the long-running fraud and ensuing cover-up, and VW was forced to admit its criminal behavior. On March 10, 2017, VW pled guilty in a United States District Court to conspiracy to commit fraud, obstruction of justice, and importing goods by false statements.

5.      Although the seeds of VW's "clean diesel" fraud were sown in 2005, the scheme firmly took root in early 2007. That is when defendant Martin Winterkorn was named CEO and Chairman of VWAG's Board of Management. Winterkorn, who had spent decades climbing the corporate ladder at VW, announced a bold and aggressive plan to make VW the biggest, most profitable, and most environmentally-friendly car company in the world by 2018.

6.      The success of Winterkorn's plan—dubbed "Strategy 2018"—depended in large part on VW's ability to develop, market, and sell its diesel vehicles, particularly in the United States. Known historically for being more powerful and fuel efficient than their gasoline counterparts, diesel engines emitted far more harmful pollutants into the environment. Diesel vehicles, therefore, had difficulty complying with the strict vehicle emissions laws in the United States and were unpopular with American consumers.

7.      But VW claimed to have developed a revolutionary solution to this problem—the "clean diesel" engine. During Winterkorn's reign as CEO, VW unleashed a global marketing campaign touting its groundbreaking "clean diesel" engines and its supposed commitment to reducing toxic vehicle emissions. The successful production and sale of cars with "clean diesel" engines was the cornerstone of Winterkorn's plan to dominate the world auto industry.

8.      Over the next several years, Winterkorn's plan began bearing fruit. By the end of 2013, VW increased its annual sales of diesel vehicles in the United States

from approximately 43,000 in 2009 to over 111,000 in 2013—a more than 150% increase in 4 years. Globally, sales of all VW vehicles increased 54% over the same period. And by mid-2015, VW reached the first milestone of Winterkorn's ambitious goal. It surpassed Toyota in global sales, becoming the largest carmaker in the world.

9.      To finance their ambitious Strategy 2018, VW and Winterkorn needed money. And they relied on the U.S. capital markets to get it. From 2010 to 2015, VW sold billions of dollars of corporate bonds in the United States. In its offering documents, VW stressed its continuing commitment to and dependence upon developing energy-efficient vehicles and the reduction of vehicle emissions. VW assured bond underwriters that its cars complied with all applicable emissions laws and regulations.

10.     But it was all a lie. VW's "clean diesel" engines were a fraud. They did not exist. In fact, the engines emitted pollutants, including nitrogen oxides ("NOx")— described by the U.S. Environmental Protection Agency ("EPA") as a family of poisonous, highly reactive gases—into the environment at levels nearly 40-times greater than U.S. emissions limits.

11.     To hide this fact, VW installed illegal software (called a "defeat device") in 11 million diesel vehicles sold worldwide, including more than 580,000 in the United States. The defeat device software recognized when the car was being tested on a treadmill and then reduced the car's emissions to legal levels. When the defeat device sensed the car was being driven in normal road conditions, it deactivated the car's emission control system, causing it to emit excessive amounts of NOx gas into the environment.

12.     For years, VW lied and made misleading omissions to conceal the existence of a defeat device. VW lied about its cars' compliance with environmental regulations and its commitment to protecting the environment. It lied to U.S. investors, who then paid artificially inflated prices for VW's bonds. These investors did not know that VW was lying to consumers to fool them into buying its "clean diesel"

cars and lying to government authorities in order to sell cars in the United States that did not comply with U.S. emission standards. The entire time, Winterkorn and other senior officials at VW knew the truth: VW's "clean diesel" engine was a sham.

13.     VW's elaborate fraud started to unravel in March 2014. During an industry conference held in San Diego, researchers from West Virginia University disclosed the results of a study commissioned by the International Council on Clean Transportation ("ICCT Study"). Using equipment capable of testing a car's emission levels while it was being driven in normal road conditions (as opposed to on a treadmill), the researchers announced that two of the three cars they tested discharged NOx pollutants at levels greatly exceeding legal limits.

14.     Although the ICCT researchers did not reveal the makes and models of the cars tested, VW employees in attendance knew immediately the two cars that dramatically failed the emissions tests were Volkswagens. It was only a matter of time before U.S. regulators began asking questions and demanding answers from VW about its cars' elevated NOx emissions.

15.     Word of the ICCT Study spread quickly throughout VW. By May 2014, multiple internal memos were circulating inside VW among its most senior officials, including Winterkorn, detailing the depth of the problems VW was facing:

(a)     VW's "clean diesel" engines were emitting deadly NOx at levels nearly 40-times legal limits;

(b)     there was no way to fix the problem; and

(c)     U.S. regulators were investigating and would look for a defeat device.

16.     By VW's own assessment, its potential financial liability for the fraud exceeded $20 billion. VW faced a choice. It could admit its scheme or cover it up. It chose a cover-up.

17.     Senior VW employees and engineers repeatedly told U.S. regulators they did not know what was causing VW's cars to exceed U.S. emissions limits; they

implemented a bogus software fix they knew would not solve the emissions problems with their cars; and, when discovery of the fraud became inevitable, VW employees began destroying documents and ditching their cell phones.

18.     At the same time VW was deceiving U.S. regulators, it pressed ahead with Winterkorn's strategy of conquering the world automotive industry. And it needed more and more money from U.S. investors to do it. Between May 2014 and June 2015, VW conducted three separate bonding offerings in the U.S., selling over $8 billion of bonds to U.S. investors.

19.     The U.S. capital markets, including the corporate bond market, depend on true, complete, and honest disclosures by market participants. By keeping the defeat device and the scope of VW's legal exposure on this issue hidden from U.S investors, VW was able to pay lower interest rates on these securities, thereby defrauding investors out of hundreds of millions of dollars.

20.     Eventually, VW's "clean diesel" fraud and ensuing cover-up collapsed in August 2015. That is when one of its employees confessed unexpectedly to EPA and California state regulators that VW had been using a defeat device in its "clean diesel" cars. Following its employee's unauthorized confession, VW was forced to formally admit its fraud to U.S. regulators on September 3, 2015. The EPA issued a Notice of Violation ("NOV") to VW on September 18, 2015, and announced that it would not certify any of VW's model year 2016 vehicles for sale in the United States.

21.     When notice of VW's fraud became public, the price of its bonds fell in secondary market trading. Major ratings agencies downgraded VW's bonds. VW did not conduct another bond offering in the United States for over three years.

22.     On March 10, 2017, VWAG pled guilty in a United States District Court to three criminal felony counts arising out of its massive "clean diesel" conspiracy. VW paid the Department of Justice a $2.8 billion penalty for its crimes. It paid billions more to resolve civil claims brought by the EPA, state attorneys general, and consumers who unwittingly purchased cars with defeat devices.

23.     VW, however, has never repaid the hundreds of millions of dollars in benefit it fraudulently obtained from the sale of its corporate bonds. Had the truth been known, VW never would have gotten away with charging U.S. investors artificially inflated prices for its bonds.

24.     The SEC brings this civil enforcement action seeking permanent injunctions, disgorgement with prejudgment interest, and civil penalties against the corporate defendants, as well as permanent injunctions, civil penalties and an officer-and-director bar against Winterkorn, as a result of their violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## II.

## JURISDICTION AND VENUE

25.     The SEC brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b), (d) and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d), (e)].

26.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1331.

27.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Defendants offered and sold securities in this district. Acts, practices, and courses of business constituting violations alleged herein occurred within this district and elsewhere. Moreover, defendants transacted business in this district.

28.     Venue also is appropriate pursuant to 28 U.S.C. § 1391. A substantial part of the events or omissions giving rise to the claims occurred within this district. [28 U.S.C. § 1391(b)(2).]  In addition, any defendant not resident in the United States may be sued in any judicial district. [28 U.S.C. § 1391(c)(3) and (d).]

29.     Defendants, directly and indirectly, made use of means or instruments of transportation or communication in interstate commerce, or of the mails, or of any facility of a national securities exchange in connection with the alleged acts, practices, and courses of business.

30.     There is a reasonable likelihood that defendants will, unless enjoined, continue to engage in the transactions, acts, practices and courses of business set forth in this complaint, and transactions, acts, practices and courses of business of similar purport and object.

### III.
### DEFENDANTS

31.     **Volkswagen Aktiengesellschaft ("VWAG")** is a multinational automotive manufacturing company headquartered in Wolfsburg, Germany. VWAG is the ultimate parent and controlling company of numerous subsidiary companies and organizations, including the Volkswagen Group ("VW Group"). VWAG, through the VW Group, develops, produces, and sells vehicles for twelve automotive brands: Volkswagen Passenger Cars, Volkswagen Commercial Vehicles, Audi, Porsche, Bentley, Bugatti, Lamborghini, Ducati, Scania, Man, Seat, and Skoda.

32.     VWAG is managed by a Board of Management, which has responsibility for managing the business activities of VWAG, including the VW Group. Each member of the Board of Management is designated responsibility for supervising one or more specific functions with the VW Group—such as Research and Development ("R&D"). VWAG also has a Supervisory Board that appoints and supervises the VWAG Board of Management.

33.     VW Group and each of its twelve brands also have their own boards of management, all of which report to and must follow the directives of the VWAG Board of Management. The members of the VWAG Board of Management also sit on the VW Group Board of Management.

34.     VWAG is the ultimate parent and controlling company of several financing subsidiaries, including defendant VWGoAF. At all relevant times, VWAG was involved in the daily operations of and exercised power and control over VWGoAF including by, among other things, appointing its boards of directors and executive officers and by directing and approving its financial and operational activities.

35.     At all relevant times, VWAG, through subsidiaries such as VWGoAF, offered and sold securities in the United States to U.S. investors in order to finance its and its subsidiaries' business operations. VWAG is and was exempt from the registration requirements of Section 12(g) of the Exchange Act pursuant to Rule 12g3-2(b) promulgated thereunder. Pursuant to Rule 12g3-2(b) and other applicable rules pursuant to which it offered and sold securities in the United States, VWAG published in English on its website certain required financial information, including its annual and interim financial statements, for the benefit of U.S. investors.

36.     **Martin Winterkorn**, age 71, resides in or near Wolfsburg, Germany. Winterkorn worked directly for VWAG or affiliated companies for 30 years, until his resignation in or about September 2015. Winterkorn was appointed Chief Executive Officer and Chairman of VWAG's Board of Management in 2007. From approximately January 2007 until at least September 2015, Winterkorn held, among others, the following positions:

        (a)     CEO of VWAG;

        (b)     Chairman of VWAG's Board of the Management;

        (c)     Head of the R&D department for VWAG; and

        (d)     Chairman of the Board of Directors of
                Volkswagen Group of America, Inc.

37.     Winterkorn also served as Chairman of the Board of Management of Porsche Automobil Holding SE ("Porsche") until his resignation on October 17, 2015, and Chairman of the Supervisory Board of Audi AG ("Audi") until his resignation on November 11, 2015.

38.     In 2014, Winterkorn's compensation was approximately €15.8 million. In 2015, he received €7.3 million in compensation through September 2015. In addition, Winterkorn had a vested pension benefit valued at more than €28.5 million by 2015.

39.     **Volkswagen Group of America Finance, LLC ("VWGoAF")** is a Delaware limited liability company with its principal place of business in Herndon, Virginia. VWGoAF is a wholly-owned subsidiary of Volkswagen Group of America, Inc. ("VWGoA"), which itself is a wholly-owned subsidiary of VWAG. VWGoAF was incorporated on February 14, 2014 to serve as a "finance subsidiary" for VW. VWAG's Board of Management, including Winterkorn, directed and approved the incorporation of VWGoAF for the sole purpose of financing VW's business operations through the issuance of corporate debt in the United States (with VWAG as the guarantor of the debt).

40.     VWGoAF has no employees of its own and has no business operations other than issuing debt securities in the United States. All VWGoAF executives and directors were and are employed by a different VW entity. As a finance subsidiary for VW, VWGoAF is and was exempt from the registration requirements of the U.S. securities laws pursuant to Rule 3a-5 of the Investment Company Act of 1940. As a result of the public disclosure of VW's "clean diesel" fraud in 2015, it did not conduct another bond offering in the United States for over three years.

### IV.

### RELATED PARTIES

41.     **Volkswagen Group of America, Inc.** is a New Jersey corporation with its principal place of business in Herndon, Virginia. VWGoA is a wholly-owned subsidiary of VWAG. VWGoA advertises, markets, sells, and leases Volkswagen and Audi vehicles through dealers and independent distributors across the United States. At all relevant times, Winterkorn was the Chairman of the Board of Directors of VWGoA.

42.     **Audi AG** ("Audi") is a motor vehicle manufacturer based in Ingolstadt, Germany and a subsidiary of VWAG. At all relevant times, VWAG owned 99.55% of Audi.

**V.**

**FACTS**

**A.     VW Stakes Its Future On "Clean Diesel" Technology.**

43.     In 2005, VW made a strategic decision to launch a large-scale promotion of diesel vehicles in the United States. Rather than follow the lead of carmakers like Toyota and General Motors, who were investing in hybrid technology, VW committed to developing a "clean diesel" engine to satisfy the public's growing demand for environmentally-friendly vehicles, especially in the United States.

44.     Traditional diesel engines, although generally more fuel efficient and powerful than gasoline engines, emitted far greater amounts of toxic and ecologically harmful pollutants into the air. Diesel vehicles, therefore, had difficulty complying with U.S. environmental laws and regulations, which placed strict limits on the level of pollutants that could be emitted from new cars sold in the United States. Already among the most demanding in the world, the emissions regulations in place in the U.S. were scheduled to get even tougher in 2007.

45.     In the mid-2000s, Martin Winterkorn was a member of VWAG's powerful Board of Management and the Head of the R&D department for VW. VW was spending billions of dollars on research and development, including millions of dollars to develop a clean diesel engine. Winterkorn, a detail-oriented and hands-on manager, was committed to introducing a new diesel vehicle to the United States market.

46.     In January 2007, Winterkorn was promoted to CEO and Chairman of the Board of Management of VWAG. Soon after his ascension to the apex of VW, Winterkorn announced an ambitious and aggressive plan to make VW the largest, most profitable, and most environmentally-friendly car maker in the world by 2018. Winterkorn's plan was called "Strategy 2018."

47.     Achieving a dramatic growth in sales of VW vehicles in the United States, particularly sales of diesel vehicles, was a vital component of Winterkorn's Strategy 2018. But it was no easy task. For years, VW tried unsuccessfully to develop a diesel car that both complied with U.S. environmental regulations and appealed to the American consumer.

48.     In 2006, the year prior to Winterkorn taking control, VW sold fewer than 240,000 cars in the U.S., with only about 35,000 of those being diesels. And after the U.S. tightened its emissions laws in 2007, VW was forced to withdraw from the U.S. diesel car market altogether.

49.     Around the time Winterkorn was named CEO in January 2007, VW claimed it had solved the engineering enigma that had long-stumped car manufacturers. VW announced it was developing a 2.0-liter "clean TDI [turbo direct injection]" diesel engine that would comply with U.S. emissions laws without sacrificing the power and fuel-efficiency of a traditional diesel engine. VW's new "clean diesel" cars were expected to be released in the United States in late 2008, as part of its Model Year ("MY") 2009 lineup.

50.     With the introduction of VW's "clean diesel" cars, its sales steadily increased both in the United States and across the world. By 2012, VW was selling approximately 100,000 "clean diesel" vehicles annually in the United States. By mid-2015, VW checked off the first of its Strategy 2018 goals. It moved past both General Motors and Toyota in global sales, becoming the largest carmaker in the world—three years ahead of Winterkorn's schedule. VW's "clean diesel" vehicles were a smashing success, with over 11 million sold worldwide, including nearly 600,000 in the United States.

51.     During this time, VW relied heavily on the U.S. financial markets to fuel its aggressive growth, selling billions of dollars of bonds and asset-backed securities in the United States. As part of its pitch to potential investors and underwriters, VW championed its "clean diesel" technology, emphasized its commitment to reducing

emissions and producing environmentally-friendly vehicles, and guaranteed that its cars complied with "all environmental laws" in the United States.

52.    But there was one problem. It was all a lie.

**B.    <u>Defendant Martin Winterkorn Rises to the Top of VW.</u>**

53.    Defendant Martin Winterkorn devoted his entire professional life to the German automobile industry. Shortly after obtaining his doctorate in Metal Research and Metal Physics in 1977, he went to work for Robert Bosch GmbH. In 1981, Winterkorn joined Audi, as an assistant to the member of Audi's Board of Management responsible for Quality Assurance. From there, he spent the next 30 years ascending the ranks of Audi and its parent company VWAG, all in positions devoted to quality assurance and technical development.

54.    In 1993, Winterkorn was made the Head of Quality Assurance for the entire VW Group. In 1996, he was appointed to be the Member of the VW Brand Board of Management responsible for the Technical Development department. He joined VWAG's Board of Management in 2000 and was made the Head of the R&D department for VW.

55.    In 2002, Winterkorn was named CEO and Chairman of the Board of Management for Audi. In 2003, he became the Head of the Technical Development department at Audi. He held these positions until the end of 2006.

56.    In or about January 1, 2007, Winterkorn was appointed CEO of VWAG and Chairman of the VWAG Board of Management. He continued to serve as the Head of R&D for VW. He remained in these positions until he resigned from VW in September 2015.

57.    During a professional career that spanned over three decades, Winterkorn earned a reputation as a demanding, detail-oriented micro-manager who took pride in his hands-on management style.

1    58.    After he was named CEO and Chairman of the VWAG Board of

2  Management in January 2007, Winterkorn made certain there was no confusion

3  among the public about whether he would retain control of the technical aspects of the

4  business. During a March 2007 earnings call, Winterkorn proclaimed: "I, myself, will

5  assume responsibility for [VW] Group research and development."

6    59.    In VWAG's 2010 annual report, the company highlighted a conversation

7  between Winterkorn and German astronaut Hans Wilhelm Schlegel, in which the two

8  compared their "share[d] passion for scientific analysis combined with hands-on

9  expertise." The annual report described Winterkorn as "someone who is *au fait* [*i.e.*,

10 knowledgeable or skilled] with every last technical detail," and quoted Winterkorn as

11 stating:

> The Volkswagen Group is so successful today because this
> notion of 'digging deeper' has become part of our corporate
> culture. . . . As an automotive manager, it is not enough
> simply to enjoy driving cars—you have to understand them
> right down to every last detail. Many things in our Group
> today only work because my Board of Management colleagues
> and I are extremely well versed in all aspects of the business.
> If developers say that a solution is not possible from a
> technical, timing, or financial point of view, I am able to
> challenge them. And everyone knows that.

19   60.    As CEO and Chairman of VWAG, Winterkorn frequently traveled the

20 world to attend and make presentations at car shows to promote VW's cars and its

21 "clean diesel" technology. He traveled to the United States more than 20 different

22 times during this period.

23   61.    Winterkorn did not attend the shows simply as a figurehead, there to

24 draw a spotlight and drum up media attention for the VW Group. While there, he

25 inspected cars, both VW's and its competitors. He used micrometers and tape

26 measures to verify technical specifications, even getting down on his hands and knees

27 to inspect a car's undercarriage or tailpipe assembly.

28

62.    The following pictures (a. through d.) show Winterkorn examining various vehicles during visits to auto shows while he was the CEO and Chairman of VWAG's Board of Management:

a.



b.



c.



d.

63.    By Winterkorn's own admission, his "love for details" and "perfect processing" were personal trademarks known to "[e]veryone." And he was proud of it. As CEO, he boasted that he could "identify with" managers who "keep [their] finger[s] on the pulse of events."

**C.    VW's "Clean Diesel" Engines Were Anything But Clean.**

64.    When VW first introduced its new "clean diesel" engine to the U.S. market with the launch of its MY 2009 Jetta, it appeared to the world that VW had solved the emissions mystery that had tormented developers for years. Winterkorn and other senior officials and engineers inside VW, however, knew the truth. VW's "clean diesel" engine was a complete fraud.

65.     VW's so-called "clean diesel" cars sold in the U.S. failed to comply with applicable U.S. emissions laws. As environmentally-conscious consumers proudly piloted their new "clean diesel" cars over the roads, streets, and highways of America's smallest towns and biggest cities, they unwittingly spewed alarming quantities of toxic pollution into the environment.

66.     Defendants, meanwhile, continued peddling the success of VW's "clean diesel" technology and its supposed commitment to protecting the environment in order to sell billions of dollars of bonds to American investors at inflated prices. VW used the money to finance its growing operations and fulfill Winterkorn's promise to make VW the biggest and most profitable car company in the world—even if not the most environmentally-friendly.

1.      **The Use of a "Defeat Device" is Illegal Under Applicable Federal and State Laws.**

67.     At all relevant times, applicable environmental laws in the United States prohibited vehicle manufacturers from selling or offering for sale any new motor vehicle unless the vehicle complied with U.S. emissions requirements, including NOx emissions standards, and was issued an EPA certificate of conformity.

68.     To obtain a certificate of conformity, a manufacturer had to submit an application to the EPA for each model year and for each test group of vehicles that it intended to sell in the United States. It had to include, among other things, a description of the engine, the emission control system, and fuel system components, including a detailed description of each Auxiliary Emission Control Device ("AECD") installed on the vehicle.

69.     U.S. law defines an AECD as "any element of design which senses temperature, vehicle speed, engine RPM, transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system."

70.     The manufacturer was also required to include a justification for each AECD. If the EPA determined the AECD "reduced the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use," and the need for it was not otherwise justified, the AECD was considered a "***defeat device.***" It was called a "defeat device" because the AECD defeated regulators' efforts to measure the vehicle's actual emission levels by activating the emission control system only during testing. At all relevant times, U.S. and state laws prohibited the installation of any "defeat device" on vehicles sold in the United States, a fact that was known to all defendants.

71.     The California Air Resources Board ("CARB") (together with the EPA, "U.S. regulators") issued its own certificates, called executive orders, for the sale of motor vehicles in the State of California. To obtain such a certificate, the manufacturer was required to satisfy the standards set forth by the State of California, which were equal to or more stringent than those of the EPA.

### 2.     VW Installs "Defeat Devices" in Millions of Diesel Vehicles.

72.     Beginning in or about 2008, VW installed defeat devices in over 11 million of its "clean diesel" vehicles sold worldwide, including over 580,000 sold in the United States. The defeat device designed and used by VW was computer software installed in the vehicle's electronic control module that sensed when the vehicle was being tested on a treadmill (a "dynamometer"—also known as a "dyno" or "roller"), or when it was being operated under normal road driving conditions.

73.     VW's defeat device was made possible by the way regulators tested vehicles for emissions compliance. In the United States, emissions tests are performed on a dynamometer. During the test, a vehicle follows precise "drive cycles" which define the conditions of the test, such as temperature, acceleration, speed, engine RPMs, etc. The specifics of the drive cycles are both standardized and publicly available. Knowing the exact test conditions made it possible for VW to design

software that could accurately detect when the vehicle was being tested and when it was not.

74.     When the defeat device recognized an EPA/CARB drive cycle, it caused the vehicle to operate in "dyno mode." In "dyno mode," the emission control system functioned at full capacity, thereby reducing NOx emissions to levels that complied with federal and state standards, but also reducing the vehicle's power and torque.

75.     When the defeat device software sensed the vehicle was being driven on the road, it caused the vehicle to operate under a different "road mode" (sometimes called "street mode" or "normal mode") that produced full power and torque, but reduced the effectiveness of the emission control system. As a result, during normal road operation (*i.e.*, street mode), the vehicles emitted NOx at levels nearly 40-times the EPA and CARB limits.

76.     The "dual mode" defeat device VW installed in its vehicles was originally developed and implemented by Audi, while Winterkorn served as Audi's CEO and the Head of the Technical Development department.

77.     Audi ran into early emissions-related engineering challenges in 1999, as it embarked on the development of its large, 3.0-liter V6 diesel engine luxury cars for the European market. Audi later "solved" the problem by developing and installing defeat device software in its European-market Audi 3.0-liter V6 diesels from 2004 to 2008.

78.     Two of Audi's top engineers during this time were ENGINEER 1 and ENGINEER 2. ENGINEER 1 was the Head of Engines and Transmissions Development for Audi. ENGINEER 2 was Audi's chief engineer. Both reported to Winterkorn.

### 3.     Winterkorn is Told About VW's Use of a Defeat Device in 2007.

79.     In or about February 2007, shortly after he became CEO of VWAG, Winterkorn brought over ENGINEER 1 and ENGINEER 2 to VWAG. At the time, VW engineers were struggling to develop a marketable diesel engine that would comply with strict emissions laws in the United States. Winterkorn made ENGINEER 1 the Head of Powertrain, and ENGINEER 2 the Head of Development for the VW Brand. ENGINEER 1 and ENGINEER 2 were involved in the development of the "clean diesel" engine. They would subsequently become two of the first VW executives suspended once VW's emissions cheating became public.

80.     In November 2007, engineers from VW's Brand Engine Development Department met with Winterkorn and a few other members of the VW Brand Board of Management to discuss problems the engineers were encountering trying to develop a diesel engine that complied with U.S. NOx emissions limits, and to discuss possible hardware and software modifications. ENGINEER 1 and ENGINEER 2 also attended this meeting.

81.     The engineers from the Brand Engine Development department informed Winterkorn and the others present that the VW diesel vehicles being developed for sale in the U.S. used a dual-mode emissions system with an "on-cycle" and "off-cycle." It was further explained that emissions are higher in the off-cycle mode than in the on-cycle mode. The participants also used the term "emissions-tight" to describe the on-cycle mode, where the engine would produce lower emissions. Winterkorn was present and participated in these discussions.

82.     The engineers used presentation slides during the November 2007 meeting. They also prepared a set of backup slides that included additional details for the engineers to support their presentation. The backup slides referenced the dual-mode capability of the emission control software. They specifically mentioned both a "normal operation" mode and an "emission-tight operation" mode. They also referenced

the software's "[r]ecognition of other driving cycles" and its "[r]ecognition of a roller adjustment."

83.     During the November 2007 meeting, Jens Hadler, the Head of the VW Brand Engine Development department, advocated that VW should not put the diesel vehicles on the road without improving the exhaust system hardware and adjusting the software. Hadler was concerned that, without these proposed modifications, the vehicles' emissions were too high under U.S. law and that future discovery of the high emissions could damage VW's reputation. Hadler's request led to a dispute with the board members (including Winterkorn) since the proposed modifications would lead to a significant increase in cost and also delay the start of production.

84.     The proposed modifications were not approved. Instead, VW produced and sold to consumers throughout the world three generations of 2.0 liter and 3.0 liter "clean diesel" vehicles, all of which contained a modified version of Audi's original dual-mode defeat device. From late 2008 to 2015, VW sold 500,000 2.0 liter diesel vehicles and 80,000 3.0 liter diesel vehicles in the United States with a defeat device. These vehicles are sometimes collectively referred to as the "Subject Vehicles."

**4.     VW Improves the Defeat Device.**

85.     In or around 2012, exhaust system hardware failures developed in certain 2.0 liter Subject Vehicles being driven by consumers in the United States. VW discovered that vehicles equipped with the defeat device stayed in "dyno mode" even when driven on the road outside of testing conditions. Since the 2.0 liter Subject Vehicles were not designed to be driven for longer periods of time in "dyno mode," the increased stress on the exhaust system components caused them to fail.

86.     In or around July 2012, engineers from the VW Brand Engine Development Department met with Berndt Gottweis, the Head of VW Product Safety and a member of VW's Product Safety Committee, to discuss the hardware failures and the defeat device. During the meeting, the engineers used a document to illustrate

the operation of the defeat device. When the meeting ended, Gottweis ordered the engineers to destroy the document.

87.     Around the same time, the engineers used a similar document illustrating the operation of the defeat device during a meeting with Heinz-Jakob Neusser to discuss the hardware failures. Neusser was VW's Head of Group Engine Development and reported directly to Winterkorn. Like Gottweis, Neusser instructed the engineers to destroy the document after the meeting.

88.     Following their meetings with Gottweis and Neusser, VW engineers modified the defeat device software. To increase the likelihood that the Subject Vehicles would recognize when the vehicles were being tested on a treadmill, VW installed a "steering wheel angle recognition" feature. The steering wheel angle recognition interacted with the defeat device software by enhancing the vehicle's ability to detect whether it was being tested on a dynamometer (where the steering wheel is not turned), or being driven on the road.

89.     The steering wheel modification was approved by senior VW executives, including Neusser, in or around April 2013.

90.     But even with this improvement, VW's defeat device had a weak spot: if the vehicles' emissions levels were ever tested under real-world driving conditions, without the use of a treadmill, VW knew its diesel vehicles would fail to meet emissions standards. Fortunately for VW, state and federal regulators conducted emissions tests on a dynamometer pursuant to publicly available drive cycles. Enterprising third party researchers, however, were free to conduct emissions tests under any circumstances, including on-road tests.

**D.     The ICCT Study Threatens to Expose VW's "Clean Diesel" Fraud.**

91.     After years of lies and deceit, VW's "clean diesel" fraud began slowly unraveling in March 2014. On March 31, 2014, at a conference in San Diego, presenters from West Virginia University's Center for Alternative Fuels, Engines & Emissions revealed the results of a study commissioned by the International Council

on Clean Transportation (previously defined as the "ICCT Study"). The ICCT Study found that two unidentified 2.0 liter diesel vehicles emitted NOx during normal road operation at levels nearly 40-times the legal limit. These two unidentified cars were Volkswagens.

92.     The ICCT researchers conducted their testing over multiple real-world test routes, using a portable emissions measurement system, a lightweight transportable emissions testing device that is generally attached to a vehicle's tailpipe.

93.     The graph[3] below—modified to identify the specific vehicles tested— illustrates the ICCT Study's findings relating to the Volkswagen vehicles:



94.     Because VW's defeat device was designed to evade only treadmill testing, it did not reduce the cars' emissions levels during the road testing performed by the ICCT researchers. As a result, the VW vehicles produced excessively high levels of NOx emissions.

---

[3] Guilbert Gates, *et al.*, *How Volkswagen's 'Defeat Device' Worked*, N.Y. TIMES, Mar. 16, 2017.

95.     Although the ICCT researchers did not understand the reason for the high NOx levels at the time they presented the results of their study in San Diego on March 31, 2014, the reason was already known to many inside VW, including Winterkorn.

**E.     The Results of the ICCT Study Spread Rapidly
to the Highest Levels of VW, Including to Winterkorn.**

96.     VW and Audi employees in attendance at the presentation realized instantly that two of the unidentified vehicles were VWs. Alarmed, an Audi employee took screen shots of the presentation with his phone and immediately sent an email attaching the pictures to Oliver Schmidt, the General Manager of VWGoA's Engineering and Environmental Office in the U.S. ("EEO"). The EEO is the office within VWGoA responsible for interfacing with U.S. regulators. In his email to Schmidt, the Audi employee described the ICCT presentation as "explosive."

97.     Over the next several weeks, the results of the ICCT Study and VW's own internal assessment of its potential consequences were communicated both orally and in writing to senior managers, officers, and board members throughout VWAG and its subsidiaries, including defendant VWGoAF. As described more fully below, between March 31, 2014 and July 2014, the following VW board members, executives, and supervisors, among many others, were made aware of the ICCT Study and the significant problems it created for VW:

      (a)    Martin Winterkorn
- CEO of VWAG;
- Chairman of VWAG Board of Management;
- Head of R&D for VW;
- Chairman of VWGoA Board of Directors.

      (b)    VWAG BOARD MEMBER 1
- Member of VWAG Board of Management;
- Head of VW Sales and Marketing.

      (c)    VWAG MANAGER 1
- Head of VW Quality Management;
- Direct report to Winterkorn.

(d)   Bernd Gottweis
- Head of VW Product Safety;
- Member of VW Product Safety Committee;
- Direct report to Winterkorn and VWAG MANAGER 1.

(e)   Heinz-Jakob Neusser
- Head of VW Brand Engine Development;
- Head of Development for VW Brand;
- Member of VW Brand Board of Management;
- Direct report to Winterkorn.

(f)   VWAG ATTORNEY 1
- Associate General Counsel in VW Group Legal;
- Member of VW Product Safety Committee.

(g)   VWGoA CEO
- CEO of VWGoA.

(h)   VWGoA GENERAL COUNSEL
- General Counsel of VWGoA;
- Vice President of VWGoAF.

(i)   Oliver Schmidt
- General Manager of VW EEO.

(j)   EEO MANAGER 1
- Senior Manager in VW EEO.

(k)   VWAG QUALITY EMPLOYEE 1
- Employee in VW Quality Management.

(l)   Carsten Nagel
- Senior Manager of Emissions Certification at Audi.

(m)   Zaccheo Giovanni Pamio
- Head of Thermodynamics in Audi Diesel Engine Development Department.

(n)   PORSCHE MANAGER 1
- Director of Emission Certification, Legislation and Regulatory Affairs at Porsche.

(o)   VWGoA CFO
- CFO of VWGoA.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

98.     Promptly after receiving the Audi employee's email, Schmidt forwarded it to his EEO colleagues, including EEO MANAGER 1. On April 2, 2014, Schmidt sent another email to an EEO colleague complaining that the ICCT Study was "not good."

99.     Schmidt knew U.S. regulators soon would start asking VW questions about the ICCT Study. In his email, Schmidt assured his colleague that now was not the time for VW to come clean. "If we are not honest," Schmidt calculated, "everything stays as it is."

100.     Schmidt would later be indicted by the U.S. Department of Justice for his role in the scheme. On August 4, 2017, he pled guilty to conspiring to defraud the United States, to committing wire fraud, and to violating the Clean Air Act. He was sentenced to 84 months in prison.

101.     Shortly after receiving Schmidt's email, EEO MANAGER 1 called VWGoA ATTORNEY 1, who was responsible for evaluating possible vehicle recalls, and told him about the ICCT Study results. EEO MANAGER 1 specifically mentioned the excess emissions discovered with VW's cars.

102.     The following Monday, April 7, VWGoA ATTORNEY 1 spoke with VWAG ATTORNEY 1, Associate General Counsel in the VW Group Legal department in Germany. VWGoA ATTORNEY 1 told VWAG ATTORNEY 1 about the ICCT Study results and the emissions problems with VW's diesel cars.

103.     VWAG ATTORNEY 1—along with Gottweis—was a member of VW's Product Safety Committee. The Product Safety Committee was responsible for reviewing and addressing issues involving product safety and product defects. This included a product's failure to "comply with statutory regulations and standards set by the authorities," and "any other defects which could result in high consequential costs or could cause significant damage to the [VWAG's] image." Winterkorn, as the VWAG Management Board member in charge of R&D, had ultimate responsibility for monitoring the activities of the Product Safety Committee.

104.    Soon after learning about the ICCT Study, including the specific makes and models of cars tested, CARB and EPA contacted VW about the results. Engineers in the VW Brand Engine Development department formed a task force ("ICCT Task Force") to formulate possible responses to the U.S. regulators.

105.    The ICCT Task Force did *not* attempt to figure out why VW's diesel cars failed emissions testing during real world driving. Nobody at VW asked them to do that and, in any event, they already knew why: the cars were using defeat devices that lowered emissions levels only during treadmill testing.

106.    They also already knew the makes, models, and approximate number of cars containing defeat devices. And they knew the defeat device software could not be modified to bring the vehicles into compliance with U.S. emissions laws. Their mission, instead, was to come up with responses that might satisfy the U.S. regulators without disclosing the existence of the defeat device. Disclosure of the defeat device to U.S. regulators would jeopardize VW's efforts to obtain EPA and CARB certifications for the next year's vehicles.

107.    By the end of April and/or early May 2014, the ICCT Task Force prepared a memo ("Task Force Memo") and PowerPoint ("Task Force PowerPoint") (collectively, "Task Force Presentation") that: (a) discussed the emissions violations discovered by ICCT researchers, (b) outlined the significant risks and potential consequences associated with investigations by U.S. regulators into those violations, and (c) proposed a communication strategy for responding to the U.S. regulators.

108.    Among other things, the Task Force Presentation:

(a) summarized the ICCT Study's findings, including that NOx emissions of VW vehicles were "15 to 35 times over the [legal] limit";

(b) noted that VW could install modified software in the affected vehicles to help "reduce [real world driving] emissions in [VW's diesel vehicles], but not to comply with the limits."

(c) analyzed the "risks" facing VW and the potential "consequences," including:

    i.   monetary penalties of $43,000 for each of the 500,000 to 600,000 affected vehicles (*i.e.*, $21.5 to $25.8 billion); and

    ii.  recalls or buybacks of the affected vehicles; and

(d) proposed a communication strategy for dealing with U.S. regulators, which did not include telling them about the defeat device.

109.    In describing the risks, the ICCT Task Force Presentation warned that "[t]he authorities can carry out their own engineering tests (defeat device testing/analysis)" and "[t]he difference road/dynamometer must be explained. (intentional conduct = penalties!)."

110.    The 500,000 to 600,000 affected vehicles identified by the Task Force constituted nearly 100% of all diesel cars VW sold in the United States from 2008 to 2014.

111.    On April 15, 2014, Schmidt sent an email to Gottweis in the Quality Assurance department, who already knew about the defeat device. Schmidt's email notified Gottweis of the results of the ICCT Study and attached PowerPoint slides used by the ICCT researchers during their presentation in San Diego. VW employees referred to Gottweis, a long-time confidant of Winterkorn, as the "Fireman" because of his ability to put out fires at VW. He was known within VW as an expert crisis manager.

112.    Gottweis met with the ICCT Task Force on April 28, 2014. During that meeting, the ICCT Task Force explained to Gottweis:

(a)    it was likely U.S. regulators would figure out that VW has a defeat device;

(b)    the substantial financial consequences VW could face if the defeat device was discovered by U.S. regulators, including but not limited to applicable fines per vehicle; and

(c)    it was impossible to fix the vehicles to comply with U.S. emissions standards.

At the end of the meeting, Gottweis said he would talk to Winterkorn.

113.    On or about May 15, 2014, Schmidt sent an email attaching the Task Force Presentation to: (a) VWGoA CEO and (b) VWGoA GENERAL COUNSEL, who also was a Vice President of VWGoAF.

114.    Schmidt's email noted that he previously sent the ICCT Study to VWGoA GENERAL COUNSEL and that EPA was investigating the results of the ICCT Study. VWGoA GENERAL COUNSEL was responsible for identifying business risks and reporting the risks to VW's Risk and Compliance department in Germany.

115.    On May 19, 2014, VWGoA CEO responded to Schmidt's May 15th email, informing Schmidt that he (VWGoA CEO) already notified VWAG BOARD MEMBER 1 about the ICCT Study.

116.    On or about May 19, 2014, VWAG MANAGER 1 told Winterkorn about the ICCT Study during a VW Brand Board of Management meeting. He told Winterkorn that the ICCT Study reported that NOx emissions for certain VW diesel vehicles were up to 35-times legal limits. At this time, Winterkorn already knew that VW engineers had developed and installed dual-mode defeat device software in its "clean diesel" vehicles sold in the United States.

117.    On May 20, 2014, VWAG BOARD MEMBER 1's assistant sent a series of emails to EEO MANAGER 1 and others requesting additional information on the diesel emissions testing done by the ICCT researchers. EEO MANAGER 1 advised VWAG BOARD MEMBER 1's assistant to contact VWGoA GENERAL COUNSEL. However, he also warned her against sending any more emails because they may be discoverable in any future litigation: "We should write as few [emails] as possible regarding this topic because of eDiscovery."

118.    Also on May 20, 2014, Schmidt forwarded to Gottweis the May 15th email he previously sent to VWGoA CEO and VWGoA GENERAL COUNSEL, including the Task Force Presentation. That same day, Gottweis forwarded Schmidt's May 15 email to VWAG QUALITY EMPLOYEE 1 along with the Task Force Memo.

119.    On May 22, 2014, Gottweis emailed a memo ("Gottweis Memo") to VWAG MANAGER 1. The Gottweis Memo stated:

(a)    Researchers measured the emissions of VW diesel vehicles under real world driving conditions and recorded NOx emissions 15 to 35 times greater than regulatory limits;

(b)    The issue affected VW's "EA 189 GenI and GenII vehicles," which were nearly 100% of the 2.0 liter diesel vehicles that VW sold in the United States from 2009 through 2014;

(c)    "A thorough explanation for the dramatic increase in NOx emissions cannot be given to the authorities";

(d)    "It can be assumed that the authorities will then investigate the VW systems to determine whether Volkswagen implemented ... a so-called defeat device []"; and

(e)    The vehicles' software could be modified to reduce emissions levels, but not enough to comply with legal limits.

120.    VWAG MANAGER 1 gave the Gottweis Memo to Winterkorn the next day, May 23. With it, he attached a one-page cover memo ("Winterkorn Memo").

121.    The Winterkorn Memo repeated for Winterkorn the ICCT Study's use of real-world testing conditions and that researchers recorded NOx emissions in VW's diesel vehicles that were 15 to 35 times greater than legal limits. VWAG MANAGER 1 promised to report to Winterkorn on further developments and VW's discussions with U.S. authorities.

122.    Thus, in under two months, news of the ICCT Study results spread from two VW employees attending a conference in San Diego to:

(a)    the General Manager and other senior employees in VW's EEO;

(b)    the CEO of VWGoA;

(c)    the General Counsel of VWGoA, who also was a Vice President at VWGoAF;

(d)    the Head of VW's Quality Assurance department in Germany;

(e)    VWAG's Group Legal department in Germany;

(f)    VW's Product Safety Committee; and

(g)    Members of VWAG's Board of Management, including its Chairman and CEO Martin Winterkorn.

123.    In July 2014, Schmidt provided additional updates on the ICCT Study to: (a) VWGoA CEO; (b) VWGoA CFO; and (c) the VW Product Safety Committee.

## F.    VW Lies to U.S. Regulators, Implements a Sham Software "Fix," and Destroys Evidence.

124.    In the Spring and Summer of 2014, U.S. regulators were communicating with VW about the ICCT Study results and VW's response. VW's representatives stalled, claiming VW was conducting its own emissions testing and working to resolve the issues. They did not tell the regulators VW was using a defeat device.

125.    On or about October 1, 2014, VW representatives met with CARB officials to further discuss the ICCT Study and the significant differences in emissions recorded when VW vehicles were subjected to on-road testing as compared to dyno testing. During the meeting, VW's representatives conceded the accuracy of the ICCT Study's test results but continued concealing the existence of the defeat device. In fact, they gave CARB false reasons for the discrepancies in emissions testing results, such as differences in driving patterns and other technical issues.

126.    In November 2014, VW told the U.S. regulators it had developed a software "fix" to address the high NOx emissions. VW representatives proposed conducting a recall of its diesel cars to install updated software that would, according to them, fix the emissions problems.

127.    The software "fix" was never going to work, and VW knew it. It was just another lie designed to conceal the existence of the defeat device, to obstruct the

investigation by U.S. authorities, and to buy VW time. As the Task Force Presentation (April 2014) and Gottweis Memo (May 2014) clearly stated, a software update might help reduce emissions levels but it could not make the Subject Vehicles comply with legal emissions limits.

128.    EEO MANAGER 1 later admitted that VW rolled out the software update "to further its cheat."

129.    The EPA, however, did not know VW's software update was a charade. Consequently, it authorized the recall based on VW's misrepresentations.

130.    Although the software update scheme did buy VW time, it did not bring an end to the investigations by U.S. regulators. From November 2014 through July 2015, CARB continued to ask detailed questions about VW's diesel emissions. VW continued to lie, always providing evasive and misleading answers to conceal its defeat device.

131.    When U.S. regulators learned by mid-2015 that the software update did not fix the emissions violations, they continued to press VW for answers. In or about late July 2015, a meeting was held in Wolfsburg, Germany among members of the ICCT Task Force and VW's top executives, including Winterkorn and VWAG MANAGER 1. A member of the ICCT Task Force and Schmidt updated Winterkorn on the defeat device, the current status of discussions with U.S. regulators, and CARB's refusal to certify VW's MY 2016 vehicles due to the outstanding emissions issues.

132.    Winterkorn blamed the situation on "[HJ]'s software." Up to that point in the meeting, no one had mentioned HJ, who was the Head of Software Development in VW's Engine Development department. But Winterkorn already knew about the defeat device, and knew its development could be traced back to HJ's team.

133.    During the meeting, Winterkorn requested input on how VW should proceed with U.S. regulators. Schmidt suggested that he meet with CARB to try to gain certification for VW's MY 2016 vehicles. Winterkorn agreed but instructed Schmidt not to disclose the existence of the defeat device. At the end of the meeting,

1  VWAG MANAGER 1 collected from the attendees all documents used to discuss the

2  defeat device.

3      134.   Over the next few weeks, CARB and VW representatives met multiple

4  times to discuss the emissions issues. Following Winterkorn's directive, VW's

5  representatives continued lying about the cause for the emissions problems in VW's

6  diesel vehicles.

7      135.   Then, in a meeting with CARB in El Monte, California on or about

8  August 19, 2015, a VW employee admitted to U.S. regulators, for the first time, that

9  VW had been using a defeat device in its diesel vehicles.

10     136.   With its defeat device secret now out, VW was forced to come clean. On

11 September 3, 2015, after obstructing U.S. regulators for over a year, VW formally

12 confessed to EPA and CARB that it had installed defeat device software in hundreds of

13 thousands of its diesel vehicles imported and sold in the United States.

14     137.   VW, however, was not done scheming. With its near decade-long fraud

15 now exposed, it quickly sought to minimize the damage. As VW prepared to admit its

16 use of a defeat device to U.S. regulators, VWAG ATTORNEY 1 made statements that

17 several VW employees understood as suggesting they destroy documents relating to

18 the diesel emissions issues.

19     138.   VW later admitted that at least 40 individuals destroyed thousands of

20 documents relating to the diesel emissions issue. Many key executives—including

21 VWGoA GENERAL COUNSEL, VWGoA Senior Vice President of Industry and

22 Government Relations for VWGoA, and the Director of VW's Emissions Test Center in

23 Oxnard, California—"lost" or wiped clean their phones before they could be imaged.

24     139.   The public first learned of VW's fraud on September 18, 2015, when the

25 EPA issued a Notice of Violation ("NOV") stating that VW's use of the defeat device in

26 its 2.0 liter Subject Vehicles violated the Clean Air Act. On September 22, 2015, VW

27 issued a press release revealing that as many as 11 million of its vehicles worldwide

28

contained defeat devices. On November 2, 2015, EPA issued a second NOV stating that VW had installed similar defeat devices in its 3.0 liter Subject Vehicles.

140.   Winterkorn apologized that Volkswagen had "broken the trust of our customers and the public." Winterkorn further announced that "Volkswagen has ordered an external investigation of this matter," and that VW would "do everything necessary in order to reverse the damage this has caused." Winterkorn said, "I am endlessly sorry that we have disappointed this trust" that "millions of people across the world" had in "our brands, our cars, and our technology."

141.   Likewise, VWGoA President and CEO Michael Horn admitted that VW had lied, stating "Let's be clear about this. Our company was dishonest. With the EPA, and the California Air Resources Board, with all of you. And in my German words, we have totally screwed up."

142.   By late September 2015, several VW executives had either been suspended or resigned, including: (a) Winterkorn; (b) VWAG BOARD MEMBER 1; (c) ENGINEER 1; (d) ENGINEER 2; (d) VWAG MANAGER 1; and (e) Gottweis.

143.   By October 2015, VW suspended 10 senior executives in the Engine Development and Quality Assurance departments, including direct reports to Winterkorn. Winterkorn and VWAG BOARD MEMBER 1—the two board members initially notified about the ICCT Study—were the only member of VWAG's Board of Management who resigned as a result of the scandal.

144.   The United States Department of Justice later brought criminal charges against VWAG and many of its executives and senior officials for their participation in VW's "clean diesel" conspiracy, including: (a) Winterkorn; (b) Gottweis; (c) Neusser; and (d) Schmidt.

145.   On January 11, 2017, VWAG pled guilty to three criminal felony counts as a result of the company's emissions fraud scheme and for obstructing justice by intentionally destroying documents. As part of its plea agreement, VWAG admitted, among other things, that for nearly a decade, it and its employees (including some who

reported directly to Winterkorn): (a) knew the Subject Vehicles did not meet U.S. emissions standards; (b) knew VWAG was using a defeat device to cheat the U.S. emissions standards testing process; and (c) conspired to deceive U.S. regulators into believing that the Subject Vehicles complied with U.S. emissions standards.

146.   VWAG also admitted: (a) Neusser, Gottweis, and other senior employees knew of the defeat device scheme since at least 2012; and (b) those employees, along with VWAG ATTORNEY 1, instructed or suggested to engineers and other employees that they destroy documents relating to VW's use of the defeat device.

**G.   VW's Bond Offerings**

147.   In the years before VW's massive "clean diesel" scandal was made public, VW relied heavily on the U.S. capital markets to sustain its global business operations and fuel Winterkorn's Strategy 2018. In a May 2014 internal memo, senior officers of VWAG and VWGoAF stressed that participation in the U.S. capital markets "is of utmost importance to the [VW Group] in order to assure its funding requirements and growth." Later, in its Annual Report for 2014, VWAG claimed it was "able to exploit [a] favorable pricing situation to its advantage" through the completion of two bond offerings in the U.S. during 2014.

148.   And it was right. Even after learning of the "explosive" ICCT Study on March 31, 2014, VW sold over $8 billion worth of bonds to U.S. investors who had no inkling of the existence or scope of VW's global fraud.

149.   None of VW's bond offering documents, financial statements, or other information provided to investors or underwriters made any mention of:

(a)   VW's defeat device;

(b)   the ICCT Study;

(c)   the EPA and CARB investigations;

(d)   the emissions violations affecting nearly 600,000 VW diesel vehicles sold in the U.S. and over 11 million worldwide;

(e)    the more than $20 billion in potential fines and penalties VW was facing in the U.S. alone; or

(f)    any other fact relating to its near decade-long "clean diesel" fraud.

150.    To the contrary, as part of each bond offering, VW promised that its cars complied with applicable laws, that there were no pending or threatened governmental investigations involving its diesel vehicles, and that it was committed to reducing harmful emissions and manufacturing environmentally-friendly cars.

151.    None of this was true.

152.    Following the public disclosure of VW's fraud, the value of its bonds fell. By September 22, 2015, the price of the bonds plummeted, falling by more than 7% of par value in some cases. Furthermore, ratings agencies cut the credit ratings on some bonds, the risk of default on the bonds increased, and all of the bonds were trading below par value.

153.    In the end, U.S. investors purchased billions of dollars of VW debt, with low interest rates, based on their understanding that they were buying a safe investment in a world-class company. Instead, when VW's decade-long scheme finally came to light, investors were left holding bonds that were far riskier than they were told, thought, or were compensated for.

1.    **Winterkorn and VWAG Board of Management Approved the Sale of Bonds in the United States.**

154.    From at least as early as 2010, the VWAG Supervisory Board established a debt issuance framework ("Debt Framework") to finance VW's operations. The Debt Framework authorized the VWAG Board of Management: (a) to sell bonds in the United States, (b) to create special-purpose vehicles to serve as issuer of the bonds, and (c) to have VWAG guarantee the payment of principal and interest on the bonds.

155.    Each year, including for the years 2010 through 2015, VWAG's Board of Management, including Winterkorn, prepared and approved budgets reflecting VW's anticipated financing needs. Pursuant to the Debt Framework, each budget relied

upon the issuance and sale of corporate bonds in the United States to meet VW's financing requirements. The bond offerings were private placements offered and sold to U.S. investors pursuant to an exemption from registration under Rule 144A promulgated under the Securities Act (the "144A Bond Offerings"). *See* 17 C.F.R. § 230.144A(a)(1).

156.   In or about February 2014, VWAG's Board of Management, including Winterkorn, authorized the formation of VWGoAF for the sole purpose of issuing and selling corporate bonds in the United States. At all times, VWGoAF had no employees of its own and no operations other than serving as a financing shell for VWAG. All persons listed as officers or directors of VWGoAF were employed by VWAG or an affiliate.

157.   As CEO and Chairman of the VWAG Board of Management and as Chairman of the Board of Directors of VWGoA (VWAG's wholly-owned subsidiary), Winterkorn possessed and exercised power and control over VWGoAF and its day-to-day business operations, which consisted entirely of issuing bonds in the United States. He also possessed the power and ability to modify and correct the bond offering documents alleged below to be misleading—both before and after their issuance—and/or to prevent their issuance altogether.

2.   **VWAG's Fraudulent 2014 and 2015 144A Bond Offerings**

158.   Between May 2014 and May 2015, VWGoAF and VWAG issued and sold bonds in the United States as part of three seperate144A Bond Offerings, totaling $8.3 billion:

| Bond Issuance Date | Amount |
|---|---|
| May 23, 2014 | $3,500,000,000 |
| November 20, 2014 | $2,000,000,000 |

| May 22, 2015 | $2,800,000,000 |
|---|---|

159.   On or about the date of each 144A Bond Offering, VWGoAF, as issuer, and VWAG, as guarantor, offered and sold the bonds to U.S. institutional investors through a syndicate of investment banks ("Underwriters"). All but one of the Underwriters was based in the United States.

160.   Each 144A Bond Offering included separate classes of notes (*e.g.*, Class A Notes, Class B Notes, etc.). If an issuer wishes to issue a security with more risk, it generally must pay investors a higher rate of return.

161.   VWAG and VWGoAF prepared a number of documents in connection with each 144A Bond Offering, including: (a) an Offering Memorandum; (b) a Subscription Agreement; and (c) responses to due diligence questions submitted by the Underwriters.

162.   U.S. investors and Underwriters relied on VW to provide accurate and complete information in connection with the 144A Bond Offerings. VW knew that U.S. investors and Underwriters relied on the information set forth in these materials to make their investment decisions.

(a)   The Offering Memorandum

163.   For each 144A Bond Offering, VWAG and VWGoAF prepared, approved, and distributed to U.S. investors and Underwriters an Offering Memorandum. Each Offering Memorandum set forth, among other things, the terms of the investment, the principal risk factors that may affect VWAG's ability to fulfill its obligations under the guarantee, and descriptions of VW's business and regulatory environment applicable to its operations.

(i) The Offering Memorandum
Preparation and Review Process

164.    VWAG and VWGoAF used a standardized process to prepare the Offering Memorandum. They started with an Offering Memorandum used with an earlier bond offering; they then reviewed and updated it. Three VWAG departments—Group Legal, Group Treasury, and Group Accounting—were primarily responsible for coordinating the assembly, review and approval of information for inclusion in the Offering Memorandum.

165.    The Offering Memorandum was divided into sections and distributed to various VW departments based on the particular subject matters or risk factors discussed in each section. Each department was responsible for reviewing and updating its assigned sections of the Offering Memorandum with the information necessary to make its sections accurate and complete. Charts identifying specific misleading sections of the Offering Memorandum as well as the VW department assigned responsibility for ensuring the accuracy of those sections are contained below at Paragraphs 175 and 176.

166.    By way of example, VW Group Legal was responsible for preparing, reviewing, and ensuring the accuracy of the "Emission Control" sections of each Offering Memorandum. (*See* Paragraph 176, below, §§10.1.2, 10.1.2.2, and 10.1.2.2.1.) Those sections discussed the applicable laws and regulations relating to automotive emissions. VW Group Legal also was responsible for the "risks in connection with … recall campaigns" section of each Offering Memorandum. That section discussed the risks relating to potential recalls of VW vehicles.

167.    Within VW Group Legal, VWAG ATTORNEY 1 was one of the principal reviewers responsible for approving the accuracy and completeness of this information. By the time of each 144A Bond Offering, VWAG ATTORNEY 1 already knew, at a minimum, (a) about the ICCT Study results, (b) that VW's diesel vehicles were violating U.S. emissions laws, and (c) that EPA and CARB were investigating VW's emissions violations.

168.   As another example, the VW Quality Assurance department was assigned responsibility for the portion of the "Risk Factors" section of each Offering Memorandum relating to the performance and operation of VW's vehicles. Within Quality Assurance, VWAG MANAGER 1 and VWAG QUALITY EMPLOYEE 1 had primary responsibility for approving the accuracy and completeness of the disclosures in this section. Gottweis—VW's "Fireman"—was a supervisor in the Quality Assurance department and reported directly to VWAG MANAGER 1.

169.   By the time of each 144A Bond Offering, VWAG MANAGER 1, VWAG QUALITY EMPLOYEE 1, and Gottweis collectively already knew, at a minimum: (a) about the ICCT Study; (b) that VW's diesel vehicles were violating U.S. emissions laws; (c) that the emissions problems affected nearly every VW diesel vehicle sold in the United States since late 2008; (d) that EPA and CARB were investigating; (e) that VW could not bring its cars into compliance with U.S. emissions laws; and (f) VW was facing more than $20 billion in fines and penalties in the U.S. alone. Moreover, Gottweis had known since at least 2012 that VW was using a defeat device in its "clean diesel" vehicles.

170.   Other sections in the Offering Memoranda cautioned investors that VWAG's "future business success" depended on its "ability to develop new, attractive and energy-efficient products" (§2.2.2), represented that VW's top priority in recent years had been developing vehicles that "reduce emissions" (§9.5), and stressed that reducing vehicle emissions would remain a primary focus for VW research and development going forward (§9.5.3). These sections of the Offering Memorandum were assigned to Winterkorn's R&D department to ensure they were updated, accurate and complete. Specifically, Winterkorn's executive assistants, who reported directly to him (hereinafter EXECUTIVE ASSISTANT 1 and EXECUTIVE ASSISTANT 2), were assigned responsibility for updating these sections.

171.   By the time of each 144A Bond Offering, Winterkorn already knew, at a minimum: (a) that VW was using a defeat device in its "clean diesel" vehicles; (b)

1  about the ICCT Study results; (c) that VW's diesel vehicles were violating U.S.
2  emissions laws; (d) that the emissions problems affected nearly every VW diesel
3  vehicle sold in the United States since late 2008; (e) that EPA and CARB were
4  investigating VW's emissions violations; and (f) that VW could not bring its cars into
5  compliance with U.S. emissions laws.

6      172.   The Offering Memorandum for each of the 144A Bond Offerings identified
7  in was reviewed, updated, and otherwise prepared and approved in this manner.

8           *(ii)   VWAG and VWGoAF Made False and Misleading*
9                *Statements and Omissions in the Offering Memoranda.*

10     173.   VWAG and VWGoAF made materially misleading statements and
11  omissions in each and every Offering Memorandum prepared and distributed for the
12  144A Bond Offerings identified in Paragraph 159.

13     174.   In each Offering Memorandum, VWAG and VWGoAF misleadingly
14  stated:

| OM § | Misleading Statement | Reviewing Dep't | Individual(s) (Issuance Date) |
|---|---|---|---|
| 2.2.2 | "Our future business success depends on our ability to develop new, attractive and energy-efficient products that are tailored to our customers' needs and to offer these products on competitive terms and conditions. In their purchasing decisions, customers are increasingly emphasizing lower fuel consumption and exhaust emissions." | Research & Development | Winterkorn's EXEC. ASST. 1 (5/23, 11/20); Winterkorn's EXEC. ASST. 2 (5/22) |
| 9.5 | "Volkswagen's top priority for research and development in [2011], 2012, 2013, and [2014] was to develop engines and drivetrain concepts to reduce emissions." | Research & Development | Winterkorn's EXEC. ASST. 1 (5/23, 11/20); Winterkorn's EXEC. ASST. 2 (5/22) |

| 9.5.3 | "A focal point of Volkswagen's current and future development activities is and will be ... the reduction of fuel consumption and emissions of the fleet.… With a broad range of development activities in the drivetrain sector, Volkswagen will continue to reduce the emissions of our vehicles in the coming years." | Research & Development | Winterkorn's EXEC. ASST. 1 (5/23, 11/20);<br><br>Winterkorn's EXEC. ASST. 2 (5/22) |

175.    Each Offering Memorandum also made materially misleading statements concerning VW's supposed compliance with the environmental laws and other regulations in the United States:

| OM § | Misleading Statement | Reviewing Dep't | Individual(s) |
|---|---|---|---|
| 10.1.2 | "Volkswagen must comply with … increasingly technical product requirements, particularly with regard to environmental protection …." | Group Legal | VWAG ATTORNEY 1 (5/23, 11/20, 5/22) |
| 10.1.2.2 | "Volkswagen is subject to laws and regulations that require it to control automotive emissions, including exhaust emissions standards, vehicle evaporation standards and onboard diagnostic system requirements." | Group Legal | VWAG ATTORNEY 2 VWAG ATTORNEY 3 (5/23, 11/20, 5/22) |
| 10.1.2.2.1 | "Volkswagen's vehicles must comply with increasingly stringent requirements concerning emissions." | Group Legal | VWAG ATTORNEY 2 VWAG ATTORNEY 3 (5/23, 11/20, 5/22) |
| 10.1.2.2.2 | "U.S. federal and state governments and agencies… have created a suite of vehicle emission regulations aimed at improving local air quality and minimizing the potential effect | Group Legal | VWAG ATTORNEY 2 VWAG ATTORNEY 3 (5/23, 11/20, 5/22) |

| | | |
|---|---|---|
| of global climate change. Automotive manufacturers must ensure that their individual vehicles… comply with various pollutant, carbon dioxide, fuel economy and zero-emission technology requirements…. Volkswagen is responsible under these regulations for the performance of vehicle emission control systems, as well as the emission performance of its sold cars and light duty trucks over certain time and mileage periods." | | |

176. The statements in the Offering Memoranda quoted in Paragraphs 175 and 176 were materially misleading. The Offering Memoranda omitted material facts that were necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

177. Each Offering Memorandum omitted, among others, the following necessary and material facts:

(a) VW had installed and was continuing to install illegal defeat devices in millions of diesel vehicles sold worldwide to cheat emissions standards.

(b) VW had installed and was continuing to install defeat devices in hundreds of thousands of diesel vehicles sold in the United States to cheat emissions standards.

(c) VW installed defeat devices in nearly all diesel vehicles VW sold in the United States since late 2008.

(d) VW's "clean diesel" vehicles sold in the United States did not and could not comply with U.S. federal and state emissions standards.

(e) VW's "clean diesel" vehicles sold in the United States was spewing toxic pollution into the environment at levels many multiples higher than permitted by law.

(f)     VW had submitted and was continuing to submit false and misleading applications to EPA and CARB to obtain certifications for the Subject Vehicles.

(g)     VW had submitted and was continuing to submit false and misleading information to U.S. authorities in order to import the Subject Vehicles into the United States.

(h)     VW could not fix the Subject Vehicles or otherwise bring them into compliance with U.S. federal and state emissions standards.

(i)     As of early May 2014, EPA and CARB were investigating the toxic emissions coming from the Subject Vehicles.

(j)     As a result of the conduct described in sub-paragraphs (a)-(i), VW was in violation of federal and state environmental laws and regulations.

(k)     As a result of the conduct described in sub-paragraphs (a)-(i), hundreds of thousands of vehicles were subject to potential recalls costing billions of dollars.

(l)     As a result of the conduct described in sub-paragraphs (a)-(i), VW faced potential fines, penalties, and other costs exceeding $20 billion in the U.S. alone.

178.    These facts would have been important to a reasonable investor because, among other reasons, they materially impacted the profitability and creditworthiness of VW, its ability to pay the bonds and other debts, the risk associated with the bonds, the interest rates paid on the bonds, and the value of the bonds. These facts also contradicted VW's repeated statements that it was committed to producing energy-efficient and environmentally-friendly vehicles.

179.    After VW's "clean diesel" fraud was made public in September 2015, the value of the bonds decreased by a material amount and credit ratings agencies downgraded the bonds. The decrease in value was greatest for the bonds with the longest maturity dates. After the public disclosure of its fraud, VW did not conduct any new bond offerings in the United States for over three years.

          *(iii)    VWAG's Financial Statements Falsely Understated Liabilities and Failed to Disclose Material Contingencies.*

180.    VWAG's financial statements, which were included in the Offering Memoranda, were also materially misstated because they failed to disclose a provision or record a contingent liability relating to the defeat device scheme.

181.    Each Offering Memorandum included (a) VWAG's audited consolidated financial statements for the prior two years; and (b) its most recent unaudited consolidated interim financial statements. VWAG's Board of Management, including Winterkorn, reviewed and approved each of these financial statements.

182.    VWAG, including all members of its Board of Management, and VWGoAF knew VWAG's financial statements were being used to solicit U.S. bond investors. And they knew that investors would consider VWAG's financial statements in deciding whether or not to buy the bonds. In addition to including VWAG's financial statements in the Offering Memoranda, VWAG published English translations of its financial statements on its website for use by U.S. investors and underwriters.

183.    As VWAG's CEO and Chairman of the Board of Management and as the Chairman of VWGoA's Board of Directors, Winterkorn reviewed and approved the financial statements included with each Offering Memorandum, and he possessed the power and ability to control the content and accuracy of those financial statements.

184.    VWAG's interim and annual financial statements were included in the Offering Memorandum for each 144A Bond Offering, as shown in the following chart:

| Bond Deal | Annual Statements (Board Approval Date) | Interim Statement (Board Approval Date) |
|---|---|---|
| May 23, 2014 | Not Applicable | Not Applicable |

| | | |
|---|---|---|
| November 20, 2014 | December 31, 2013 (2/11/14) December 31, 2012 (2/12/13) | September 30, 2014 (10/30/14) |
| May 22, 2015 | December 31, 2014 (2/17/15) December 31, 2013 (2/11/14) | March 31, 2015 (4/29/15) |

185.   As a German corporation, VWAG was at all relevant times required to prepare its financial statements in accordance with International Financial Reporting Standards, which includes applicable International Accounting Standards ("IAS") (collectively, "IFRS"). A fundamental objective of IFRS is to ensure that a company provides accurate and reliable information concerning its financial performance during the period being represented.

186.   IFRS required VWAG and those individuals signing its financial statements (including Winterkorn) to ensure that VWAG's financial statements were accurate and complied with all relevant provisions of IFRS. In the Notes to its annual and interim financial statements, VWAG represented that its consolidated financial statements were prepared in compliance with IFRS. Each member of VWAG's Board of Management, including Winterkorn, signed the annual financial statements and certified, among other things, that the statements "give a true and fair view of the assets, liabilities, [and] financial position and profit or loss" of VWAG.

187.   IAS 37, which is included within IFRS and made applicable to VWAG, governs when a company is required to recognize a provision in its financial statements. Under IAS 37, a provision must be recognized when: (a) a company has a present obligation (legal or constructive) as a result of a past event; (b) it is probable that an outflow of resources embodying economic benefits will be required to settle the

obligation; and (c) a reliable estimate can be made of the amount of the obligation, including when there is a range of possible outcomes.

188.   If there is a range of possible outcomes, IAS 37 states that the amount accrued should be either the best estimate of the obligation or, if there is no best estimate, the midpoint of the range. IAS 37 further provides that "[e]xcept in extremely rare cases, an entity will be able to determine a range of possible outcomes and can therefore make an estimate of the obligation that is sufficiently reliable to use in recognising a provision." In those rare cases, a past event is still deemed to give rise to a present obligation if, taking into account all available evidence, it is more likely than not (*i.e.*, a greater than 50% chance) that a present obligation exists at the end of each reporting period.

189.   IAS 37 specifically cites "penalties or clean-up costs for unlawful environmental damage" as an example of a present obligation arising from past events that should be recognized as a provision because it would lead to an outflow of resources embodying economic benefits in settlement regardless of the future actions of the entity.

190.   Even if the likelihood of an outflow of resources embodying economic benefits is not *probable*, IAS 37 requires companies to disclose a contingent liability for *possible* or present obligations, when the possibility of an outflow of resources embodying economic benefits is more than "remote."

191.   VWAG represented in each of its annual financial statements identified in Paragraph 185 that "[t]he assets and liabilities of the German and foreign companies included in the consolidated financial statements are recognized in accordance with the uniform accounting policies used within the Volkswagen Group." VWAG also represented, in its financial statements, that it recognized a provision "where a present obligation exists to third parties as a result of a past event, where a future outflow of resources is probable and where a reliable estimate of that outflow can be made."

192.    These statements were false. VWAG recognized no provision for its present obligations and made no disclosure of any contingent liability relating to its "clean diesel" fraud in any of its financial statements included with the Offering Memoranda.

193.    At the time the financial statements were authorized and approved by the Board of Management, VWAG faced over $20 billion in exposure because of the emissions fraud, including: (a) the financial costs of fixing, replacing, or repurchasing the affected diesel vehicles in light of warranty claims and recalls; (b) legal and regulatory fines and penalties in the United States and abroad; and (c) civil and criminal liability in the United States, Europe, and elsewhere.

194.    These present and reliably estimable costs and expenses were probable and were required to be recognized as a provision in all of VWAG's financial statements. At a minimum, they were more than remotely possible, and VWAG should have disclosed them as a contingent liability.

195.    VWAG's failure to recognize a provision or disclose a contingent liability relating to its use of defeat devices to circumvent emissions standards caused its operating profit, net assets, and shareholders' equity to be materially overstated and its liabilities to be materially understated in the financial statements included with the November 20, 2014, and May 22, 2015 Offering Memoranda.

196.    In April 2016, after VW's "clean diesel" fraud was made public, VWAG recognized a $16.2 billion provision relating to the fraud in its 2015 audited financial statements. To date, VWAG has incurred over $30 billion in criminal and civil fines, penalties, damages and other costs and expenses as a direct result of its emissions fraud.

197.    In addition, VWAG stated, in the interim financial statements included with its November 20, 2014 and May 22, 2015 Offering Memoranda, that "[t]here were no significant changes . . . in the contingent assets and liabilities described in the [previous annual report]" and that there "were no significant events" after the balance

sheet date. These representations, which the VWAG Board of Management (including Winterkorn) authorized and approved, were false for the same reasons as detailed above. Due to the "clean diesel" fraud scheme, there were significant changes in the contingent assets and liabilities described in the previous annual report, which should have been disclosed (but were not), and there were significant events following the balance sheet date, which should have been disclosed (but were not).

    (b)    DDQ Responses

198.    In addition to the Offering Memoranda, for each 144A Bond Offering, the Underwriters sent VWAG and VWGoAF two sets of due diligence questions to answer. The due diligence process facilitated the Underwriters' ability to discharge their obligation to conduct a reasonable investigation of VW and to identify material issues in connection with the sale of bonds to investors.

199.    The Underwriters' first set of questions required VWAG and VWGoAF to provide information on numerous areas relating to, among many other things, VW's business operations and strategy, possible recalls, government investigations, and its legal, environmental, and regulatory compliance. VWAG and VWGoAF provided their responses to the first set of questions ("First DDQ Responses"), during a conference call with Underwriters, days or weeks prior to the issuance date for the bonds.

200.    The Underwriters' second set of questions required VWAG and VWGoAF to update their original responses with any new information learned since they responded to the first set of due diligence questions ("Second DDQ Responses"). (Collectively, the "DDQ Responses".) VWAG and VWGoAF provided their Second DDQ Responses, during a conference call with Underwriters, on or about the day the bonds were issued.

201.    VWAG and VWGoAF provided the DDQ Responses to the Underwriters for the 144A Bond Offerings as follows:

| Bond Offering | First<br>DDQ Responses | Second<br>DDQ Responses |
|---|---|---|
| May 23, 2014 | 5/14/14 | 5/23/14 |
| November 20, 2014 | 11/11/14 | 11/20/14 |
| May 22, 2015 | 5/18/15 | 5/22/15 |

202.   As with the Offering Memoranda, VWAG and VWGoAF used a standardized process for preparing its DDQ Responses. This process existed for many years and was followed for each 144A Bond Offering.

203.   After the written questions were received from the Underwriters, the VWAG Group Legal department distributed them to various departments within VWAG, with each department being responsible for preparing, reviewing, and approving responses to the questions pertaining to that department's business area. The specific DDQ Responses were prepared, reviewed, and approved by the same departments and employees who prepared, reviewed, and approved the sections of the Offering Memoranda covering the same topic.

204.   For example, the Group Legal department, including VWAG ATTORNEY 1, prepared, reviewed, and approved the DDQ Responses relating to recalls.

205.   Group Legal, including VWAG ATTORNEY 1, also was responsible for preparing, reviewing, and approving the DDQ Responses relating to: (a) "material exposure to environmental issues," and (b) "potential, pending or threatened investigations" and "legal or regulatory issues that may affect VW Group's operations."

206.   As another example, the Quality Assurance department, including VWAG MANAGER 1 and VWAG QUALITY EMPLOYEE 1, prepared, reviewed, and approved the DDQ Responses relating to the quality of VW's vehicles.

207.   The Underwriters asked VWAG and VWGoAF the following questions, among others, in connection with each bond offering:

       (a)    "Please confirm that there is no material exposure to environmental issues, which could give rise to material claims."

(b)  "Have you discovered any material quality issues (*e.g.*, potentially leading to recall programs)?"

(c)  "Have any new... regulatory developments, [or] contingent liabilities... in relation to the VW Group occurred or are they expected in the near future?"

(d)  "Have there been any material changes impacting the business operations or financial condition or VWAG, the VW Group or any direct or indirect participants of VWAG consolidated at equity...?"

(e)  "Are there any potential, pending or threatened investigations ... or legal or regulatory issues that may adversely affect the VW Group's operations?"

(f)  "Please confirm that as of today all statements, including the risk factors in the offering memorandum for the bond offering, and information incorporated by reference therein are correct and accurately reflect Group's views and current situation and that the bond offering does not omit any information which might reasonably be considered to be relevant to an investor in the bond offering so as to enable such investor to fully assess the risks inherent in an investment in this offering."

(g)  "Please confirm that there are no other matters which should be drawn to the [Underwriters'] attention in the context of the envisaged bond offering."

208.    Although VWAG and VWGoAF responded to each due diligence question (including each question listed above), they never disclosed any information related to the defeat device, the illegal emissions by VW's vehicles, the ICCT Study, or the EPA and CARB investigations into those issues.

209.    VWAG's and VWGoAF's false and misleading responses to the Underwriters first set of due diligence questions for each bond deal, as specific in Paragraph 208(a)-(g) above, are set forth in the chart below:

| Question | May 23, 2014 Bond Offering | November 20, 2014 Bond Offering | May 22, 2015 Bond Offering |
|----------|---------------------------|---------------------------------|----------------------------|
| (a) | "Responsible internal departments have confirmed that we have | "Responsible internal departments have confirmed that we have | "Responsible internal departments have confirmed that we have |

|  |  |  |  |
|---|---|---|---|
|  | no such material environmental issues which could give rise to material claims." | no such material environmental issues which could give rise to material claims." | no such material environmental issues which could give rise to material claims." |
| (b) | • Recall in Asian market to fix DSG transmission issue caused by extreme climate conditions<br>• Recall of Tiguan and Jetta Hybrid in U.S. to fix fuse and cabling issues<br>• Recall of 850,000 Audis due to airbags<br>• Recall of 1.3 million cars to fix rear axle<br>• Recall of 589,000 cars for defect in tailgate<br>• Recall of 160,000 U.S. Passats to fix loose clamp in lights;<br>• Stop sale order for 27,000 cars in U.S. to fix defective O-ring | • Recall of 850,000 Audis due to airbags<br>• Recall of 1.3 million cars to fix rear axle<br>• Recall of 589,000 cars for defect in tailgate<br>• Recall of 160,000 U.S. Passats to fix loose clamp in lights;<br>• Stop sale order for 27,000 cars in U.S. to fix defective O-ring | • Recall of 1.3 million cars to fix rear axle |
| (c) | "No material developments regarding … regulatory developments, contingent liabilities … have occurred since the release of FY 2013 results." | "No material developments regarding … regulatory developments, contingent liabilities … have occurred since the release of FY 2013 results." | "No material developments regarding … regulatory developments, contingent liabilities … have occurred since the release of FY 2014 results." |
| (d) | • "[VW] Financial Services AG] acquired MAN Finance International GmbH"<br>• VWAG recapitalized VW Financial Services with € 2.3 billion following MAN acquisition "Otherwise—Not to the best of our knowledge." | • "[VW] Financial Services AG] acquired MAN Finance International GmbH"<br>• VWAG recapitalized VW Financial Services with € 2.3 billion following MAN acquisition<br>• VWAG closed the acquisition of Scania AB for € 6.5 billion<br>• "Otherwise—Not to the best of our knowledge." | "No, to the best of our knowledge." |

| (e) | [VW Group] "from time to time" be involved in "official proceedings such as with [the German federal financial supervisory agency], the EU Commission, the US Department of Justice, the FAS Russia (which is the Russian competition authority), etc." | • [VW Group] may "from time to time" be involved in "official proceedings such as with [the German federal financial supervisory agency], the EU Commission, the US Department of Justice, the FAS Russia (which is the Russian competition authority), etc." | • [VW Group] may "from time to time" be involved in "official proceedings such as with [the German federal financial supervisory agency], the EU Commission, the US Department of Justice, the FAS Russia (which is the Russian competition authority), etc." |
|---|---|---|---|
| (f) | "Yes, to the best of our knowledge." | "Yes, to the best of our knowledge." | "Yes, we confirm." |
| (g) | "Yes, we confirm." | "Yes, we confirm." | "Yes, we confirm." |

210.     For the May 2014 144A Bond Offering, the second set of due diligence questions required VWAG and VWGoAF to answer the following questions:

(a)     With respect to Volkswagen Aktiengesellschaft and its subsidiaries and affiliates ("VW AG") as well as Volkswagen Group of America Finance, LLC ("VWGoAF") have there been any material developments, including, but not limited to, developments in respect of the financial and operating condition, projected future performance, or funding and liquidity position of VW AG or VWGoAF, or any legal or regulatory developments, that would affect any of the statements made in the due diligence call held on May 14, 2014?

(b)     Please confirm that as of today all statements in the [May 2014 Offering Memorandum] (title "Prospectus") are correct and accurately reflect VWAG's and VWGoAF's views and that the Prospectus does not omit any information, including known or anticipated matters of a material nature, which might reasonably be considered to be relevant to an investor in the notes issued under the Prospectus.

(c)     Please confirm that there are no other matters which should be drawn to our attention in the context of the proposed transaction.

211.    The second set of due diligence questions for the November 2014 and May 2015 144A Bond Offerings contained substantially the same questions except that they referenced different dates.

212.    In response to the second set of due diligence questions (*see* Paragraph 211 above), VWAG and VWGoAF disclosed VWAG's acquisition of shares of Scania, which was announced in May 2014. They did not disclose any information related to the defeat device, the illegal emissions by VW's vehicles, the ICCT Study, or the EPA and CARB investigations into those issues.

213.    The above statements by VWAG and VWGoAF in response to the Underwriters' due diligence questions were materially false and misleading. At all relevant times, due to VW's "clean diesel" fraud, the truth was:

    (a) VW had material exposure to environmental issues, which could give rise to material claims;

    (b) VW had material quality issues (*e.g.*, potentially leading to recall programs);

    (c) VW had expected material regulatory developments, or contingent liabilities;

    (d) VW had material changes impacting its business operations or financial condition;

    (e) VW had potential, pending or threatened investigations or legal or regulatory issues that may adversely affect the VW Group's operations; and

    (f) The offering documents, including the Offering Memoranda, were inaccurate and incomplete and omitted material information.

        (c)    Subscription Agreements

214.    For each 144A Bond Offering, the Underwriters also required VWAG and VWGoAF to enter into Subscriptions Agreements. In the Subscription Agreements, VWAG and VWGoAF made numerous representations and disclosures about their business operations and practices; VW's compliance with applicable environmental,

1   health, and safety laws; and the existence or nonexistence of legal disputes,

2   proceedings, or investigations.

3       215.    VWAG and VWGoAF also used a standardized process to prepare the

4   Subscription Agreements. VWAG's Group Legal department prepared, reviewed, and

5   approved the Subscription Agreement using the information it gathered and received

6   through the preparation and approval processes for the Offering Memorandum and

7   DDQ Responses, as well as through VWAG's centralized risk management system.

8       216.    With each new bond offering, VW Group Legal started with a finalized

9   Subscription Agreement used in an earlier bond offering. VW Group Legal then

10  revised and updated the disclosures in the Subscription Agreement using the

11  information it collected from the other departments during the review and approval of

12  their respective sections of the Offering Memorandum and DDQ Responses. VWAG

13  ATTORNEY 1 assisted in the assembly, review, and approval of the information

14  contained in the Subscription Agreement.

15      217.    Also, VWAG's centralized risk management system and employee Code of

16  Conduct required VW employees to identify and report material issues up, through

17  their departments, to Group Legal. Prior to the completion of the Subscription

18  Agreement, VWAG's General Counsel, who had access to the risk management

19  system, informed attorneys within Group Legal whether there were any additional

20  issues identified through the system that required disclosure in the Subscription

21  Agreement. Group Legal then approved the final Subscription Agreement.

22      218.    In each Subscription Agreement for the Subject Bond Offerings, VWAG

23  and VWGoAF falsely stated that the Offering Memorandum did not contain:

24          "any untrue statement of a material fact, or omit to state a
            material fact necessary to make the statements therein, in
25          the light of the circumstances under which they are made,
            not misleading."
26  This statement was materially false when made. As alleged above, the Offering

27  Memoranda contained numerous false and misleading statements of material fact.

28

219.   Additionally, VWAG and VWGoAF made the following materially false and misleading representations in the Subscription Agreements:

(a) There are no legal disputes, arbitration or administrative proceedings or investigations or other out-of-court proceedings pending or, to the best knowledge of the Issuer and [VWAG], threatened to which the Issuer or any of its subsidiaries, if any, is a party which could constitute or likely result in an Issuer Material Adverse Effect or that are otherwise material in the context of the issue of the Notes. [§2(t) (by VWGoAF and VWAG).]

   [**"Issuer Material Adverse Effect"** includes anything "which could impair the ability of the Issuer or the Guarantor to consummate the transactions contemplated under the Agreements or could otherwise materially adversely affect the affairs of the Issuer or the transactions contemplated under the Agreements."] [§1(h).]

(b) There are no legal disputes, arbitration or administrative proceedings or investigations or other out-of-court proceedings pending or, to the best knowledge of [VWAG], threatened to which [VWAG] or any of its subsidiaries is a party, which could, separately or taken as a whole, reasonably be expected to have a material adverse effect on the business or financial results or prospects of the Volkswagen Group or which could impair the ability of the Issuer or [VWAG] to consummate the transactions contemplated under the Agreements or could otherwise materially adversely affect the affairs of the Volkswagen Group or the transactions contemplated under the Agreements (such effect a "**Material Adverse Effect**") or that are otherwise material in the context of the issue of the Notes." [§2(v) (by VWAG).]

(c) "[I]n the ordinary course of its business, [VWAG] periodically reviews the effects of environmental, health and safety laws on the business, operations and properties of [VWAG] and its Material Subsidiaries, in the course of which it identifies and evaluates associated costs and liabilities (including, without limitation, any capital or operating expenditures required for clean-up, closure of properties or compliance with environmental, health and safety laws, or any permit, license or approval, any related

constraints on operating activities and any potential
liabilities to third parties); on the basis of such review,
[VWAG] has reasonably concluded that such associated costs
and liabilities would not, individually or in the aggregate,
have a Material Adverse Effect." [§2(ll) (by VWAG).]

(d) "In conducting their business, [VWAG] and its Material
Subsidiaries have complied with all environmental, health
and safety laws applicable to such companies, their assets
and properties (including, without limitation, real estate
owned or used by such companies), …" [§2(ll) (by VWAG).]

The Subscription Agreements defined VWAG's "Material Subsidiaries" as

including Audi and Porsche, among others.

220.    The true facts, which were omitted, were very different from these

false representations.

221.    At all relevant times, VWAG and VWGoAF, through their

respective board members and/or numerous other executives and senior

officials, knew:

(a)     there were pending, or at least threatened, investigations,
legal disputes or other out-of-court proceedings by the EPA
and CARB which could, separately or taken as a whole, (i)
reasonably be expected to have a material adverse effect on
the business, financial results, or prospects of the VW
Group; (ii) impair the ability of VWGoAF or VWAG to
consummate the transactions contemplated under the
Subscription Agreements; (iii) otherwise materially
adversely affect the affairs of the VW Group or the
transactions contemplated under the Subscription
Agreements; or (iv) otherwise be material in the context of
the issue of the bonds;

(b)     VWAG and its Material Subsidiaries *were not* complying
with *and had not been* complying with all applicable
environmental, health and safety laws; and

(c)     VWAG had not reasonably concluded that the costs and
liabilities associated with the effects of environmental,
health, and safety laws on its and its Material Subsidiaries'
business, operations, and properties *would not*, individually
or in the aggregate, have a Material Adverse Effect. To the
contrary, VWAG estimated those costs and liabilities could

exceed $20 billion for the U.S. alone.

## COUNT I
### VWAG, WINTERKORN, AND VWGoAF
### SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(b)
### THEREUNDER
### [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5]

222.   The Commission realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 221 above.

223.   VWAG, Winterkorn, and VWGoAF, by engaging in the conduct described above, directly or indirectly, with knowledge or recklessness, in connection with the purchase or sale of securities, and by use of the means or instruments of interstate commerce, or of the mails, or of any facility of any national securities exchange, have: made untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

224.   By reason of the foregoing acts and practices, VWAG, Winterkorn, and VWGoAF violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5] thereunder.

## COUNT II
### WINTERKORN
### AIDING AND ABETTING
### SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(b)
### THEREUNDER
### [15 U.S.C. § 78t(a)]

225.   The Commission realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 221 above.

226.   Winterkorn substantially assisted VWAG's and VWGoAF's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. §

240.10b-5(b)] thereunder; he had actual knowledge of or was reckless in not being aware of their violations and his role in furthering them.

227.   By engaging in the conduct described above, Winterkorn aided and abetted VWAG and VWGoAF in their violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

### COUNT III
### VWAG AND VWGoAF
### SECTION 17(a)(2) OF THE SECURITIES ACT
### [15 U.S.C. § 77q(a)(2)]

228.   The Commission realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 221 above.

229.   VWAG and VWGoAF, directly or indirectly, in the offer or sale of securities, and by use of the means and instrumentalities of interstate commerce, or the mails, or any facility of a national security exchange, have obtained money or property by means of untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

230.   VWAG and VWGoAF acted negligently, recklessly, and/or knowingly in connection with the misconduct alleged in this count.

231.   For these reasons, VWAG and VWGoAF have violated and, unless enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. 77q(a)(2)].

### COUNT IV
### WINTERKORN
### AIDING AND ABETTING
### SECTION 17(a)(2) OF THE SECURITIES ACT
### [15 U.S.C. § 77o(b)]

232.   The Commission realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 221 above.

233.   Winterkorn substantially assisted VWAG's and VWGoAF's violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)]; he had actual knowledge of, or was reckless in not being aware of, their violations and his role in furthering them.

234.   By engaging in the conduct described above, Winterkorn aided and abetted VWAG and VWGoAF in their violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

**COUNT V**
**VCI**
**SECTION 17(a)(2) AND (a)(3) OF THE SECURITIES ACT**
**[15 U.S.C. § 77q(a)(2), (a)(3)]**

235.   The Court previously dismissed this count without leave to amend.

**COUNT VI**
**VWAG and WINTERKORN AS CONTROLLING PERSONS**
**SECTION 20(a) OF THE EXCHANGE ACT**
**[15 U.S.C. § 78t(a)]**

236.   The Commission realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 221 above.

237.   As alleged above, VWGoAF violated Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.

238.   During the relevant period, VWAG and Winterkorn each possessed the power to direct or cause the direction of the management, policies, and actions of VWGoAF. VWAG and Winterkorn each exercised that power by, directly or indirectly, inducing VWGoAF to engage in the acts and omissions alleged in this Complaint.

239.   VWAG and Winterkorn are each a "controlling person" of VWGoAF pursuant to Section 20(a) of the Exchange Act.

240.   As a controlling person of VWGoAF, VWAG and Winterkorn are each liable for VWGoAF's violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.

**COUNT VII**
**WINTERKORN AS A CONTROLLING PERSON**
**SECTION 20(a) OF THE EXCHANGE ACT**
**[15 U.S.C. § 78t(a)]**

241.    The Commission realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 221 above.

242.    As alleged above, VWAG violated Section 10(b) of the Exchange Act and Rule 10b-5(b)(b) thereunder.

243.    During the relevant period, Winterkorn possessed the power to direct or cause the direction of the management, policies, and actions of VWAG. Winterkorn exercised that power by, directly or indirectly, inducing VWAG to engage in the acts and omissions alleged in this Complaint.

244.    Winterkorn is a "controlling person" of VWAG pursuant to Section 20(a) of the Exchange Act.

245.    As a controlling person of VWAG, Winterkorn is liable for VWAG's violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.

**PRAYER FOR RELIEF**

(1)    Enter an Order finding that Defendants committed, and unless enjoined, will continue to commit, the violations alleged in this Complaint;

(2)    Permanently enjoin Defendants VWAG, Winterkorn, and VWGoAF from future violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5] thereunder;

(3)    Bar Defendant Winterkorn from serving as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77w(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

(4)    Order Defendants VWAG and VWGoAF to disgorge all ill-gotten gains from the conduct alleged herein, with prejudgment interest;

1    (5)    Order civil penalties against Defendants VWAG, Winterkorn, and

2    VWGoAF pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and

3    Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] for violations of the federal

4    securities laws as alleged herein; and

5    (6)    Order such other and further relief as the Court may deem just and

6    proper.

7    Plaintiff United States Securities and Exchange Commission demands a trial by

8    jury on all issues and claims so triable.

9

10   Dated:  September 4, 2020                Respectfully submitted,

11                                            /s/Daniel J. Hayes

12                                            Daniel J. Hayes
                                              U.S. Securities and Exchange Commission

13