Elizabeth J. Cabraser (State Bar No. 083151)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008
E-mail: ecabraser@lchb.com

*Lead Counsel for Plaintiffs*

*[additional counsel listed on signature page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: VOLKSWAGEN 'CLEAN DIESEL' MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br><br>Porsche Gasoline Litigation | **CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED<br><br>MDL No. 2672 CRB (JSC)<br><br>The Honorable Charles R. Breyer |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II.  NATURE OF THE ACTION ............................................................................... 1

III.  PARTIES ............................................................................................................. 2

    A.  Plaintiffs ................................................................................................... 2

    B.  Defendants ............................................................................................. 22

IV.  JURISDICTION AND VENUE ........................................................................ 23

V.  INTRADISTRICT ASSIGNMENT AND RELATED CASE ........................... 24

VI.  FACTS COMMON TO ALL COUNTS ............................................................ 24

    A.  Porsche and its parent and sister companies have a long history of cheating on emissions and fuel economy ..................................................... 24

    B.  Defendants deployed emissions and fuel economy cheating schemes in the Class Vehicles ....................................................................................... 26

        1.  Defendants knew for years that certain Porsche gasoline vehicles contained defeat devices ................................................. 26

        2.  Porsche deceived consumers and regulators about the true fuel economy and emissions of the Class Vehicles ..................... 30

            a.  Altered test vehicles: the Axle Ratio fraud ...................... 30

            b.  Programming used only for test cycles: "Testing Software" fraud ................................................... 35

            c.  False attestations of emissions compliance: "Sport Plus" fraud ............................................................. 36

        3.  Porsche—like all vehicle manufacturers—was subject to specific regulations governing fleet-wide $CO_2$ emissions and vehicle-specific NOx emissions ............................................ 40

            a.  Fleet-wide $CO_2$ regulations ............................................. 40

            b.  Effect on Fuel Economy Ratings ..................................... 41

            c.  NOx regulations ............................................................... 42

    C.  Defendants' advertising featured inflated fuel economy ratings and false promises of environmental friendliness ........................................ 42

VII.  CLASS ACTION ALLEGATIONS .................................................................. 55

    A.  Numerosity: Federal Rule of Civil Procedure 23(a)(1) .......................... 56

    B.  Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3) .............................................................................. 56

    C.  Typicality: Federal Rule of Civil Procedure 23(a)(3) ........................... 57

    D.  Adequacy: Federal Rule of Civil Procedure 23(a)(4) ........................... 57

    E.  Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2) .................................................................................................. 57

    F.  Superiority: Federal Rule of Civil Procedure 23(b)(3) ......................... 57

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

VIII.   ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED ........................... 58

4

    A.   Discovery Rule Tolling ......................................................................... 58

    B.   Tolling Due to Fraudulent Concealment ............................................... 59

5

    C.   Estoppel ............................................................................................... 59

6

IX.    CAUSES OF ACTION ...................................................................................... 60

7

    A.   Claims Asserted on Behalf of the Nationwide Class ........................... 60

8

         NATIONWIDE COUNT I: FRAUD BY CONCEALMENT
(Common Law) ................................................................................... 60

9

         NATIONWIDE COUNT II: IMPLIED AND WRITTEN
WARRANTY Magnuson - Moss Warranty Act (15 U.S.C. §§ 2301,

10

         *et seq.*) ................................................................................................. 62

    B.   State-Specific Claims .......................................................................... 64

11

         ALABAMA COUNT I: Violations of the Alabama Deceptive Trade
Practices Act Ala. Code § 8-19-1, *et seq.* (On Behalf of the Alabama

12

         State Class) ........................................................................................... 64

13

         ALABAMA COUNT II: Breach of Express Warranty Ala. Code
§§ 7-2-313 and 7-2A-210 (On Behalf of the Alabama State Class) ..................... 67

14

         ALABAMA COUNT III: Breach of Implied Warranty of
Merchantability Ala. Code §§ 7-2-314 and 7-2A-212 (On Behalf of

15

         the Alabama State Class) ..................................................................... 70

16

         ALASKA COUNT I: Violations of the Alaska Unfair Trade
Practices and Consumer Protection Act Alaska Stat. Ann.

17

         § 45.50.471 *et seq.* (On Behalf of the Alaska State Class) ................................... 71

18

         ALASKA COUNT II: Breach of Express Warranty Alaska Stat.
§§ 45.02.313 and 45.12.210 (On Behalf of the Alaska State Class).................... 73

19

         ALASKA COUNT III: Breach of Implied Warranty of
Merchantability Alaska Stat. §§ 45.02.314 and 45.12.212 (On Behalf

20

         of the Alaska State Class) ..................................................................... 76

21

         ARIZONA COUNT I: Violations of the Arizona Consumer Fraud
Act Ariz. Rev. Stat. § 44-1521, *et seq.* (On Behalf of the Arizona

22

         State Class) ........................................................................................... 77

23

         ARIZONA COUNT II: Breach of Express Warranty Ariz. Rev. Stat.
§§ 47-2313 and 47-2A210 (On Behalf of the Arizona State Class) ..................... 80

24

         ARIZONA COUNT III: Breach of Implied Warranty of
Merchantability Ariz. Rev. Stat. §§ 47-2314 and 47-2A212 (On

25

         Behalf of the Arizona State Class) ....................................................... 83

26

         ARKANSAS COUNT I: Violations of the Deceptive Trade Practices
Act Ark. Code Ann. § 4-88-101 *et seq.* (On Behalf of the Arkansas

         State Class) ........................................................................................... 84

27

         ARKANSAS COUNT II: Breach of Express Warranty Ark Code
Ann. §§ 4-2-313 and 4-2A-210 (On Behalf of the Arkansas State

28

         Class) ................................................................................................... 86

# TABLE OF CONTENTS
### (continued)

Page

ARKANSAS COUNT III: Breach of Implied Warranty of
Merchantability Ark. Code Ann. §§ 4-2-314 and 4-2A-212 (On
Behalf of the Arkansas State Class) ........................................................... 89

CALIFORNIA COUNT I: Violation of California Consumers Legal
Remedies Act Cal Bus. & Prof. Code § 1750, *et seq.* (On Behalf of
the California State Class) ......................................................................... 90

CALIFORNIA COUNT II: Violations of the California Unfair
Competition Law Cal. Bus. & Prof. Code § 17200 *et seq.* (On Behalf
of the California State Class) ..................................................................... 92

CALIFORNIA COUNT III: Violations of the California False
Advertising Law Cal. Civ. Code § 17500 *et seq.* (On Behalf of the
California State Class) ............................................................................... 93

CALIFORNIA COUNT IV: Breach of Express Warranty Cal. Com.
Code §§ 2313 and 10210 (On Behalf of the California State Class) .................. 95

CALIFORNIA COUNT V: Breach of Implied Warranty of
Merchantability Cal. Com. Code §§ 2314 and 10212 (On Behalf of
the California State Class) ......................................................................... 98

CALIFORNIA COUNT VI: Violation of Song-Beverly Consumer
Warranty Act, Breach of Implied Warranty Cal Civ. Code § 1790, *et
seq.* (On Behalf of the California State Class) ....................................... 99

CALIFORNIA COUNT VII: Violation of the Song-Beverly
Consumer Protection Act, Breach of Express Warranty Cal Civ.
Code § 1790, *et seq.* (On Behalf of the California State Class) ....................... 101

CALIFORNIA COUNT VIII: Breach of Express California
Emissions Warranties Cal. Civ. Code § 1793.2, *et seq.* (On Behalf of
the California State Class) ......................................................................... 102

CALIFORNIA COUNT IX: Failure to Recall/Retrofit (On Behalf of
the California State Class) ......................................................................... 104

COLORADO COUNT I: Violations of the Colorado Consumer
Protection Act Colo. Rev. Stat. § 6-1-101 *et seq.* (On Behalf of the
Colorado State Class) ............................................................................... 105

COLORADO COUNT II: Breach of Express Warranty Colo. Rev.
Stat. §§ 4-2-313 and 4-2.5-210 (On Behalf of the Colorado State
Class) ...................................................................................................... 107

COLORADO COUNT III: Breach of Implied Warranty of
Merchantability Colo. Rev. Stat. §§ 4-2-314 and 4-2.5-212 (On
Behalf of the Colorado State Class) .......................................................... 110

CONNECTICUT COUNT I: Violations of Connecticut Unlawful
Trade Practice Act Conn. Gen. Stat. § 42-110a, *et seq.* (On Behalf of
the Connecticut State Class) ..................................................................... 111

CONNECTICUT COUNT II: Breach of Express Warranty Conn.
Gen. Stat. Ann. § 42A-2-313 (On Behalf of the Connecticut State
Class) ...................................................................................................... 113

# TABLE OF CONTENTS
### (continued)

Page

CONNECTICUT COUNT III: Breach of Implied Warranty of Merchantability Conn. Gen. Stat. Ann. § 42A-2-314 (On Behalf of the Connecticut State Class)................................................................... 116

DELAWARE COUNT I: Violations of the Delaware Consumer Fraud Act 6 Del. Code § 2513 *et seq.* (On Behalf of the Delaware State Class)........................................................................................... 117

DELAWARE COUNT II: Breach of Express Warranty 6 Del. Code §§ 2-313 and 2A-210 (On Behalf of the Delaware State Class)......................... 120

DELAWARE COUNT III: Breach of Implied Warranty of Merchantability 6. Del. Code §§ 2-314 and 7-2A-212 (On Behalf of the Delaware State Class) ................................................................. 123

DISTRICT OF COLUMBIA COUNT I: Violations of the Consumer Protection Procedures Act D.C. Code § 28-3901 *et seq.* (On Behalf of the District of Columbia Class) ......................................... 124

DISTRICT OF COLUMBIA COUNT II: Breach of Express Warranty D.C. Code §§ 28:2-313 and 28:2A-210 (On Behalf of the District of Columbia Class)................................................................ 126

DISTRICT OF COLUMBIA COUNT III: Breach of Implied Warranty of Merchantability D.C. Code §§ 28:2-314 and 28:2A-212 (On Behalf of the District of Columbia Class)................................... 130

FLORIDA COUNT I: Violations of the Florida Unfair & Deceptive Trade Practices Act Fla. Stat. § 501.201, *et seq.* (On Behalf of the Florida State Class) .............................................................. 131

FLORIDA COUNT II: Breach of Express Warranty F.S.A. §§ 672.313 and 680.21 (On Behalf of the Florida State Class) ......................... 133

FLORIDA COUNT III: Breach of Implied Warranty of Merchantability F.S.A. §§ 672.314 and 680.212 (On Behalf of the Florida State Class) .............................................................. 136

GEORGIA COUNT I: Violations of Georgia's Fair Business Practices Act Ga. Code Ann. § 10-1-390 *et seq.* (On Behalf of the Georgia State Class)......................................................... 137

GEORGIA COUNT II: Violations of Georgia's Uniform Deceptive Trade Practices Act Ga. Code Ann. § 10-1-370 *et seq.* (On Behalf of the Georgia State Class) .................................................... 139

GEORGIA COUNT III: Breach of Express Warranty Ga. Code Ann. §§ 11-2-313 and 11-2A-210 (On Behalf of the Georgia State Class)................ 142

GEORGIA COUNT IV: Breach of Implied Warranty of Merchantability Ga. Code Ann. §§ 11-2-314 and 11-2A-212 (On Behalf of the Georgia State Class) .................................................... 145

HAWAII COUNT I: Unfair and Deceptive Acts in Violation of Hawaii Law Haw. Rev. Stat. § 480 *et seq.* (On Behalf of the Hawaii State Class)................................................................... 146

- iv -

1

**TABLE OF CONTENTS**
**(continued)**

2

Page

3

HAWAII COUNT II: Breach of Express Warranty Haw. Rev. Stat.
§§ 490:2-313 and 490:2A-210 (On Behalf of the Hawaii State Class)

4

................................................................................................................ 148

5

HAWAII COUNT III: Breach of Implied Warranty of
Merchantability Haw. Rev. Stat. §§ 490:2-314 and 490:2A-212 (On

6

Behalf of the Hawaii State Class) ...................................................... 151

7

IDAHO COUNT I: Violations of the Idaho Consumer Protection Act
Idaho Code § 48-601 *et seq.* (On Behalf of the Idaho State Class) ................... 152

8

IDAHO COUNT II: Breach of Express Warranty Idaho Code
§§ 28-2-313 and 28-12-210 (On Behalf of the Idaho State Class) ................... 154

9

IDAHO COUNT III: Breach of Implied Warranty of
Merchantability Idaho Code §§ 28-2-314 and 28-12-212 (On Behalf

10

of the Idaho State Class) ................................................................ 157

11

ILLINOIS COUNT I: Violations of the Illinois Consumer Fraud and
Deceptive Business Practices Act 815 ILCS 505/1, *et seq.* and 720

12

ILCS 295/1a (On Behalf of the Illinois State Class)........................................... 158

13

ILLINOIS COUNT II: Breach of Express Warranty 810 Ill. Comp.
Stat. §§ 5/2-313 and 5/2A-210 (On Behalf of the Illinois State Class)

................................................................................................................ 161

14

ILLINOIS COUNT III: Breach of Implied Warranty of
Merchantability 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212 (On

15

Behalf of the Illinois State Class)........................................................ 164

16

INDIANA COUNT I: Violations of the Indiana Deceptive
Consumer Sales Act Ind. Code § 24-5-0.5-3 (On Behalf of the

17

Indiana State Class)............................................................................. 165

18

INDIANA COUNT II: Breach of Express Warranty Ind. Code
§§ 26-1-3-313 and 26-1-2.1-210 (On Behalf of the Indiana State

19

Class)................................................................................................... 167

20

INDIANA COUNT III: Breach of Implied Warranty of
Merchantability Ind. Code §§ 26-1-3-314 and 26-1-2.1-212 (On
Behalf of the Indiana State Class)...................................................... 170

21

IOWA COUNT I: Violations of the Private Right of Action For
Consumer Frauds Act Iowa Code § 714h.1, *et seq.* (On Behalf of the

22

Iowa State Class)................................................................................. 171

23

IOWA COUNT II: Breach of Express Warranty Iowa Code
§§ 554.2313 and 554.13210 (On Behalf of the Iowa State Class)..................... 173

24

IOWA COUNT III: Breach of Implied Warranty of Merchantability
Iowa Code §§ 554.2314 and 554.13212 (On Behalf of the Iowa State

25

Class)................................................................................................... 176

26

KANSAS COUNT I: Violations of the Kansas Consumer Protection
Act Kan. Stat. Ann. § 50-623 *et seq.* (On Behalf of the Kansas State

27

Class)................................................................................................... 177

28

KANSAS COUNT II: Breach of Express Warranty Kan. Stat.
§§ 84-2-313 and 84-2A-210 (On Behalf of the Kansas State Class) ................. 180

**TABLE OF CONTENTS**
(continued)

Page

KANSAS COUNT III: Breach of Implied Warranty of Merchantability Kan. Stat. §§ 84-2-314 and 84-2A-212 (On Behalf of the Kansas State Class) ............................................................... 183

KENTUCKY COUNT I: Violations of the Kentucky Consumer Protection Act Ky. Rev. Stat. Ann. § 367.110 *et seq.* (On Behalf of the Kentucky State Class) ................................................ 184

KENTUCKY COUNT II: Breach of Express Warranty Ky. Rev. Stat. §§ 335.2-313 and 355.2A-210 (On Behalf of the Kentucky State Class)...................................................................................... 186

KENTUCKY COUNT III: Breach of Implied Warranty of Merchantability Ky. Rev. Stat. §§ 335.2-314 and 355.2A-212 (On Behalf of the Kentucky State Class) ................................. 189

LOUISIANA COUNT I: Violations of the Louisiana Unfair Trade Practices and Consumer Protection Law La. Stat. Ann. § 51:1401 *et seq.* (On Behalf of the Louisiana State Class)........................... 190

LOUISIANA COUNT II: Breach of Implied Warranty of Merchantability/Warranty Against Prohibitory Defects La. Civ. Code Art. 2520, 2524 (On Behalf of the Louisiana State Class) ....................... 193

MAINE COUNT I: Violations of the Maine Unfair Trade Practices Act Me. Rev. Stat. Ann. Tit. 5, § 205-A *et seq.* (On Behalf of the Maine State Class) ......................................................... 193

MAINE COUNT II: Breach of Express Warranty Me. Rev. Stat. Tit. 11 §§ 2-313 and 2-1210 (On Behalf of the Maine State Class) .......................... 196

MAINE COUNT III: Breach of Implied Warranty of Merchantability Me. Rev. Stat. Tit. 11 §§ 2-314 and 2-1212 (On Behalf of the Maine State Class)............................................... 199

MARYLAND COUNT I: Violations of the Maryland Consumer Protection Act Md. Code Com. Law § 13-101 *et seq.* (On Behalf of the Maryland State Class) ..................................................... 200

MARYLAND COUNT II: Maryland Lemon Law Md. Code Com. Law § 14-1501 *et seq.* (On Behalf of the Maryland State Class) ..................... 202

MARYLAND COUNT III: Breach of Express Warranty Md. Code Com. Law §§ 2-313 and 2a-210 (On Behalf of the Maryland State Class)...................................................................................... 203

MARYLAND COUNT IV: Breach of Implied Warranty of Merchantability Md. Code Com. Law §§ 2-314 and 2a-212 (On Behalf of the Maryland State Class) .................................... 206

MASSACHUSETTS COUNT I: Deceptive Acts or Practices Prohibited by Massachusetts Law Mass. Gen. Laws Ch. 93a, § 1, *et seq.* (On Behalf of the Massachusetts State Class) ............................ 207

MASSACHUSETTS COUNT II: Massachusetts Lemon Law Mass. Gen. Laws Ch. 90, § 7N1/2(1) (On Behalf of the Massachusetts State Class)............................................................................... 210

# TABLE OF CONTENTS
## (continued)

Page

MASSACHUSETTS COUNT III: Breach of Express Warranty
Mass. Gen. Laws c. 106 §§ 2-313 and 2A-210 (On Behalf of the
Massachusetts State Class)........................................................................ 211

MASSACHUSETTS COUNT IV: Breach of Implied Warranty of
Merchantability Mass. Gen. Laws c. 106 §§ 2-314 and 2A-212 (On
Behalf of the Massachusetts State Class)...................................................... 214

MICHIGAN COUNT I: Violations of the Michigan Consumer
Protection Act Mich. Comp. Laws § 445.903 et seq. (On Behalf of
the Michigan State Class)............................................................................ 215

MICHIGAN COUNT II: Breach of Express Warranty Mich. Comp.
Laws §§ 440.2313 and 440.2860 (On Behalf of the Michigan State
Class)............................................................................................................ 218

MICHIGAN COUNT III: Breach of Implied Warranty of
Merchantability Mich. Comp. Laws §§ 440.2314 and 440.2860 (On
Behalf of the Michigan State Class)............................................................. 221

MINNESOTA COUNT I: Violations of the Minnesota Prevention of
Consumer Fraud Act Minn. Stat. § 325F.68 et seq. (On Behalf of the
Minnesota State Class)................................................................................. 222

MINNESOTA COUNT II: Violations of the Minnesota Uniform
Deceptive Trade Practices Act Minn. Stat. § 325D.43-48 et seq. (On
Behalf of the Minnesota State Class)............................................................ 224

MINNESOTA COUNT III: Breach of Express Warranty Minn. Stat.
§§ 336.2-313 and 336.2A-210 (On Behalf of the Minnesota State
Class)............................................................................................................ 227

MINNESOTA COUNT IV: Breach of Implied Warranty of
Merchantability Minn. Stat. §§ 336.2-314 and 336.2A-212 (On
Behalf of the Minnesota State Class)............................................................ 230

MISSISSIPPI COUNT I: Violations of Mississippi Consumer
Protection Act Miss. Code. Ann. § 75-24-1, et seq. (On Behalf of the
Mississippi State Class) .............................................................................. 231

MISSISSIPPI COUNT II: Breach of Express Warranty Miss. Code
§§ 75-2-313 and 75-2A-210 (On Behalf of the Mississippi State
Class)............................................................................................................ 233

MISSISSIPPI COUNT III: Breach of Implied Warranty of
Merchantability Miss. Code §§ 75-2-314 and 75-2A-212 (On Behalf
of the Mississippi State Class) .................................................................... 236

MISSOURI COUNT I: Violations of the Missouri Merchandising
Practices Act Mo. Rev. Stat. § 407.010 et seq. (On Behalf of the
Missouri State Class) .................................................................................. 237

MISSOURI COUNT II: Breach of Express Warranty Mo. Stat.
§§ 400.2-313 and 400.2A-210 (On Behalf of the Missouri State
Class)............................................................................................................ 240

MISSOURI COUNT III: Breach of Implied Warranty of
Merchantability Mo. Stat. §§ 400.2-314 and 400.2A-212 (On Behalf
of the Missouri State Class) ........................................................................ 243

**TABLE OF CONTENTS**
(continued)

Page

MONTANA COUNT I: Violations of the Montana Unfair Trade Practices and Consumer Protection Act of 1973 Mont. Code Ann. § 30-14-101 *et seq.* (On Behalf of the Montana State Class) ............................. 244

MONTANA COUNT II: Breach of Express Warranty Mont. Code §§ 30-2-313 and 30-2A-210 (On Behalf of the Montana State Class) ................................................................................................................................ 246

MONTANA COUNT III: Breach of Implied Warranty of Merchantability Mont. Code §§ 30-2-314 and 30-2A-212 (On Behalf of the Montana State Class) .................................................................................. 249

NEBRASKA COUNT I: Violations of the Nebraska Consumer Protection Act Neb. Rev. Stat. § 59-1601 *et seq.* (On Behalf of the Nebraska State Class) .................................................................................. 250

NEBRASKA COUNT II: Breach of Express Warranty Neb. Rev. St. U.C.C. §§ 2-313 and 2A-210 (On Behalf of the Nebraska State Class) .............................................................................................................. 252

NEBRASKA COUNT III: Breach of Implied Warranty of Merchantability Neb. Rev. St. U.C.C. §§ 2-314 and 2A-212 (On Behalf of the Nebraska State Class) ............................................................. 255

NEVADA COUNT I: Violations of the Nevada Deceptive Trade Practices Act Nev. Rev. Stat. § 598.0903 *et seq.* (On Behalf of the Nevada State Class) ...................................................................... 256

NEVADA COUNT II: Breach of Express Warranty N.R.S. §§ 104.2313 and 104A.2210 (On Behalf of the Nevada State Class) ............... 259

NEVADA COUNT III: Breach of Implied Warranty of Merchantability N.R.S. §§ 104.2314 and 104A.2212 (On Behalf of the Nevada State Class) ................................................................................ 262

NEW HAMPSHIRE COUNT I: Violations of the New Hampshire Consumer Protection Act N.H. Rev. Stat. § 358-A:1 *et seq.* (On Behalf of the New Hampshire State Class) ........................................... 262

NEW HAMPSHIRE COUNT II: Breach of Express Warranty N.H. Rev. Stat. §§ 382-A:2-313 and 382-A:2A-210 (On Behalf of the New Hampshire State Class) ................................................................. 265

NEW HAMPSHIRE COUNT III: Breach of Implied Warranty of Merchantability N.H. Rev. Stat. §§ 382-A:2-314 and 382-A:2A-212 (On Behalf of the New Hampshire State Class) ................................... 268

NEW JERSEY COUNT I: Violations of the New Jersey Consumer Fraud Act N.J. Stat. Ann. § 56:8-1 *et seq.* (On Behalf of the New Jersey State Class) ........................................................................................ 269

NEW JERSEY COUNT II: Breach of Express Warranty N.J.S. 12A:2-313 and 2A-210 (On Behalf of the New Jersey State Class) ................... 271

NEW JERSEY COUNT III: Breach of Implied Warranty of Merchantability N.J.S. 12A:2-314 and 2A-212 (On Behalf of the New Jersey State Class) ...................................................................................... 274

# TABLE OF CONTENTS
## (continued)

Page

NEW MEXICO COUNT I: Violations of the New Mexico Unfair Trade Practices Act N.M. Stat. Ann. § 57-12-1 *et seq.* (On Behalf of the New Mexico State Class) .................................................................. 275

NEW MEXICO COUNT II: Breach of Express Warranty N.M. Stat. §§ 55-2-313 and 55-2A-210 (On Behalf of the New Mexico State Class) ....................................................................................................... 278

NEW MEXICO COUNT III: Breach of Implied Warranty of Merchantability N.M. Stat. §§ 55-2-314 and 55-2A-212 (On Behalf of the New Mexico State Class) ...................................................... 281

NEW YORK COUNT I: Violations of the New York General Business Law § 349 N.Y. Gen. Bus. Law § 349 (On Behalf of the New York State Class) ..................................................................... 282

NEW YORK COUNT II: Violations of the New York General Business Law § 350 N.Y. Gen. Bus. Law § 350 (On Behalf of the New York State Class) ..................................................................... 284

NEW YORK COUNT III: Breach of Express Warranty N.Y. U.C.C. Law §§ 2-313 and 2A-210 (On Behalf of the New York State Class) ................................................................................................... 286

NEW YORK COUNT IV: Breach of Implied Warranty of Merchantability N.Y. U.C.C. Law §§ 2-314 and 2A-212 (On Behalf of the New York State Class) .......................................................... 289

NORTH CAROLINA COUNT I: Violations of the North Carolina Unfair and Deceptive Acts and Practices Act N.C. Gen. Stat. § 75-1.1 *et seq.* (On Behalf of the North Carolina State Class) ......................... 290

NORTH CAROLINA COUNT II: Breach of Express Warranty N.C.G.S.A. §§ 25-2-313 and 252A-210 (On Behalf of the North Carolina State Class) .......................................................................... 292

NORTH CAROLINA COUNT III: Breach of Implied Warranty of Merchantability N.C.G.S.A. §§ 25-2-314 and 252A-212 (On Behalf of the North Carolina State Class) ............................................. 296

NORTH DAKOTA COUNT I: Violations of the North Dakota Consumer Fraud Act N.D. Cent. Code § 51-15-02 (On Behalf of the North Dakota State Class) .................................................................. 297

NORTH DAKOTA COUNT II: Breach of Express Warranty N.D. Cent. Code §§ 41-02-30 and 41-02.1-19 (On Behalf of the North Dakota State Class) .......................................................................... 299

NORTH DAKOTA COUNT III: Breach of Implied Warranty of Merchantability N.D. Cent. Code §§ 41-02-31 and 41-02.1-21 (On Behalf of the North Dakota State Class) ........................................ 302

OHIO COUNT I: Violations of the Ohio Consumer Sales Practices Act Ohio Rev. Code § 1345.01 *et seq.* (On Behalf of the Ohio State Class) ................................................................................................... 303

OHIO COUNT II: Violations of the Ohio Deceptive Trade Practices Act Ohio Rev. Code § 4165.01 *et seq.* (On Behalf of the Ohio State Class) ................................................................................................... 306

**TABLE OF CONTENTS**
(continued)

Page

OHIO COUNT III: Breach of Express Warranty Ohio. Rev. Code
§ 1302.26, *et seq.* / U.C.C. § 2-313 (On Behalf of the Ohio State
Class) ........................................................................................................ 309

OHIO COUNT IV: Breach of Implied Warranty of Merchantability
Ohio Rev. Code Ann. §§ 1302.27 and 1310.19 (On Behalf of the
Ohio State Class) ..................................................................................... 312

OKLAHOMA COUNT I: Violations of the Oklahoma Consumer
Protection Act Okla. Stat. Tit. 15 § 751 *et seq.* (On Behalf of the
Oklahoma State Class) ............................................................................ 313

OKLAHOMA COUNT II: Breach of Express Warranty Okla. Stat.
Tit. 12 §§ 2-313 and 2A-210 (On Behalf of the Oklahoma State
Class) ........................................................................................................ 315

OKLAHOMA COUNT III: Breach of Implied Warranty of
Merchantability Okla. Stat. Tit. 12A §§ 2-314 and 2A-212 (On
Behalf of the Oklahoma State Class) ...................................................... 318

OREGON COUNT I: Violations of the Oregon Unlawful Trade
Practices Act Or. Rev. Stat. § 646.605, *et seq.* (On Behalf of the
Oregon State Class) ................................................................................. 319

OREGON COUNT II: Breach of Express Warranty Or. Rev. Stat.
§§ 72.3130 and 72A.2100 (On Behalf of the Oregon State Class) .................... 321

OREGON COUNT III: Breach of Implied Warranty of
Merchantability Or. Rev. Stat. §§ 72.3140 and 72A.2120 (On Behalf
of the Oregon State Class) ...................................................................... 324

PENNSYLVANIA COUNT I: Violations of the Pennsylvania
Unfair Trade Practices and Consumer Protection Law 73 P.S.
§ 201-1 *et seq.* (On Behalf of the Pennsylvania State Class) ............................ 325

PENNSYLVANIA COUNT II: Breach of Express Warranty 13. Pa.
Cons. Stat. §§ 2313 and 2A210 (On Behalf of the Pennsylvania State
Class) ........................................................................................................ 328

PENNSYLVANIA COUNT III: Breach of Implied Warranty of
Merchantability 13. Pa. Cons. Stat. §§ 2314 and 2A212 (On Behalf
of the Pennsylvania State Class) ............................................................ 331

RHODE ISLAND COUNT I: Violations of the Rhode Island
Deceptive Trade Practices and Consumer Protection Law R.I. Gen.
Laws § 6-13.1 *et seq.* (On Behalf of the Rhode Island State Class) .................. 332

RHODE ISLAND COUNT II: Breach of Express Warranty 6A R.I.
Gen. Laws §§ 6A-2-313 and 6A-2.1-210 (On Behalf of the Rhode
Island State Class) ................................................................................... 334

RHODE ISLAND COUNT III: Breach of Implied Warranty of
Merchantability 6A R.I. Gen. Laws §§ 6A-2-314 and 6A-2.1-212
(On Behalf of the Rhode Island State Class) .......................................... 337

SOUTH CAROLINA COUNT I: Violations of the South Carolina
Unfair Trade Practices Act S.C. Code Ann. § 39-5-10 *et seq.* (On
Behalf of the South Carolina State Class) ............................................... 338

**TABLE OF CONTENTS**
(continued)

Page

SOUTH CAROLINA COUNT II: Violations of the South Carolina
Regulation of Manufacturers, Distributors, & Dealers Act S.C. Code
Ann. § 56-15-10 *et seq.* (On Behalf of the South Carolina State
Class) .......................................................................................................... 341

SOUTH CAROLINA COUNT III: Breach of Express Warranty S.C.
Code §§ 36-2-313 and 36-2A-210 (On Behalf of the South Carolina
State Class) .................................................................................................. 342

SOUTH CAROLINA COUNT IV: Breach of Implied Warranty of
Merchantability S.C. Code §§ 36-2-314 and 36-2A-212 (On Behalf
of the South Carolina State Class) .............................................................. 345

SOUTH DAKOTA COUNT I: Violations of the South Dakota
Deceptive Trade Practices and Consumer Protection Law S.D.
Codified Laws § 37-24-6 (On Behalf of the South Dakota State
Class) .......................................................................................................... 346

SOUTH DAKOTA COUNT II: Breach of Express Warranty S.D.
Codified Laws §§ 57A-2-313 and 57-2A-210 (On Behalf of the
South Dakota State Class) ........................................................................... 348

SOUTH DAKOTA COUNT III: Breach of Implied Warranty of
Merchantability S.D. Codified Laws §§ 57A-2-314 and 57-2A-212
(On Behalf of the South Dakota State Class) ............................................... 351

TENNESSEE COUNT I: Violations of the Tennessee Consumer
Protection Act Tenn. Code Ann. § 47-18-101 *et seq.* (On Behalf of
the Tennessee State Class) .......................................................................... 352

TENNESSEE COUNT II: Breach of Express Warranty Tenn. Code
Ann. §§ 47-2-313 and 47-2A-210 (On Behalf of the Tennessee State
Class) .......................................................................................................... 355

TENNESSEE COUNT III: Breach of Implied Warranty of
Merchantability Tenn. Code Ann. §§ 47-2-314 and 47-2A-212 (On
Behalf of the Tennessee State Class) .......................................................... 358

TEXAS COUNT I: Violations of the Deceptive Trade Practices Act
Tex. Bus. & Com. Code § 17.41 *et seq.* (On Behalf of the Texas State
Class) .......................................................................................................... 359

TEXAS COUNT II: Breach of Express Warranty Tex. Bus. & Com.
Code §§ 2.313 and 2A.210 (On Behalf of the Texas State Class) ................... 361

TEXAS COUNT III: Breach of Implied Warranty of
Merchantability Tex. Bus. & Com. Code §§ 2.314 and 2A.212 (On
Behalf of the Texas State Class) .................................................................. 364

UTAH COUNT I: Violations of the Utah Consumer Sales Practices
Act Utah Code Ann. § 13-11-1 *et seq.* (On Behalf of the Utah State
Class) .......................................................................................................... 365

UTAH COUNT II: Breach of Express Warranty Utah Code
§§ 70A-2-313 and 70-2A-210 (On Behalf of the Utah State Class) ................. 368

UTAH COUNT III: Breach of Implied Warranty of Merchantability
Utah Code §§ 70A-2-314 and 70-2A-212 (On Behalf of the Utah
State Class) .................................................................................................. 371

# TABLE OF CONTENTS
## (continued)

Page

VERMONT COUNT I: Violations of the Vermont Consumer Fraud Act Vt. Stat. Ann. Tit. 9, § 2451 *et seq.* (On Behalf of the Vermont State Class) ............................................................................................. 372

VERMONT COUNT II: Vermont Lemon Law Vt. Stat. Tit. 9, § 4170 *et seq.* (On Behalf of the Vermont State Class) ..................................... 374

VERMONT COUNT III: Breach of Express Warranty Vt. Stat. Tit. 9, §§ 2-313 and 2A-210 (On Behalf of the Vermont State Class) ..................... 376

VERMONT COUNT IV: Breach of Implied Warranty of Merchantability Vt. Stat. Tit. 9, §§ 2-314 and 2A-212 (On Behalf of the Vermont State Class) ................................................................................. 379

VIRGINIA COUNT I: Violations of the Virginia Consumer Protection Act Va. Code Ann. § 59.1-196 *et seq.* (On Behalf of the Virginia State Class) ............................................................................. 380

VIRGINIA COUNT II: Breach of Express Warranty Va. Code §§ 8.2-313 and 8.2A-210 (On Behalf of the Virginia State Class) .................... 382

VIRGINIA COUNT III: Breach of Implied Warranty of Merchantability Va. Code §§ 8.2-314 and 8.2A-212 (On Behalf of the Virginia State Class) ............................................................................. 385

WASHINGTON STATE COUNT I: Violations of the Washington Consumer Protection Act Wash. Rev. Code Ann. § 19.86.010 *et seq.* (On Behalf of the Washington State Class) ........................................ 386

WASHINGTON STATE COUNT II: Washington Lemon Law Wash. Rev. Code § 19.118.005 *et seq.* (On Behalf of the Washington State Class) ................................................................................................. 388

WASHINGTON STATE COUNT III: Breach of Express Warranty Wash Rev. Code §§ 62A.2-313 and 62A.2A-210 (On Behalf of the Washington State Class) ................................................................................. 390

WASHINGTON STATE COUNT IV: Breach of Implied Warranty of Merchantability Wash Rev. Code §§ 62A.2-314 and 62A.2A-212 (On Behalf of the Washington State Class) ........................................ 393

WEST VIRGINIA COUNT I: Violations of the West Virginia Consumer Credit and Protection Act W. Va. Code § 46A-1-101 *et seq.* (On Behalf of the West Virginia State Class) ................................ 394

WEST VIRGINIA COUNT II: West Virginia Lemon Law W. Va. Code § 46A-6A-1 *et seq.* (On Behalf of the West Virginia State Class) ................................................................................................. 396

WEST VIRGINIA COUNT III: Breach of Express Warranty W. Va. Code §§ 46-2-313 and 46-2A-210 (On Behalf of the West Virginia State Class) ................................................................................. 399

WEST VIRGINIA COUNT IV: Breach of Implied Warranty of Merchantability W. Va. Code §§ 46-2-314 and 46-2A-212 (On Behalf of the West Virginia State Class) ........................................ 402

**TABLE OF CONTENTS**
(continued)

Page

WISCONSIN COUNT I: Violations of the Wisconsin Deceptive Trade Practices Act Wis. Stat. § 100.18 *et seq.* (On Behalf of the Wisconsin State Class) ........................................................................ 403

WISCONSIN COUNT II: Breach of Express Warranty Wis. Stat. §§ 402.313 and 411.210 (On Behalf of the Wisconsin State Class) ................. 405

WISCONSIN COUNT III: Breach of Implied Warranty of Merchantability Wis. Stat. §§ 402.314 and 411.212 (On Behalf of the Wisconsin State Class) ....................................................................... 408

WYOMING COUNT I: Violations of the Wyoming Consumer Protection Act, Wyo. Stat. § 40-12-101, *et seq.* (On Behalf of the Wyoming State Class) ........................................................................ 409

WYOMING COUNT II: Breach of Express Warranty Wyo. Stat. §§ 34.1-2-313 and 34.1-.2A-210 (On Behalf of the Wyoming State Class) .......................................................................................................... 412

WYOMING COUNT III: Breach of Implied Warranty of Merchantability Wyo. Stat. §§ 34.1-2-314 and 34.1-.2A-212 (On Behalf of the Wyoming State Class) ................................................................ 415

X.     REQUEST FOR RELIEF ............................................................................. 415

XI.    DEMAND FOR JURY TRIAL ..................................................................... 417

1  **I.      INTRODUCTION**

2          Plaintiffs, individually and on behalf of all others similarly situated (the "Class"), allege the

3  following against Dr. Ing. H.c. F. Porsche AG ("Porsche AG"), Porsche Cars North America, Inc.

4  ("Porsche NA") (together, "Porsche"), and Volkswagen AG (collectively, "Defendants") based,

5  where applicable, on personal knowledge, information and belief, and the thorough pre-filing

6  investigation and vehicle testing of counsel and their experts.

7  **II.     NATURE OF THE ACTION**

8          1.      This case exposes yet another emissions and fuel economy cheating scheme within

9  the Volkswagen corporate family. As with the "Clean Diesel" cases and the "Audi $CO_2$" gasoline

10 cases that followed, Plaintiffs here allege that Defendants manipulated test results for

11 Porsche-branded vehicles sold in the United States, causing those vehicles to fraudulently pass

12 emissions tests, while in truth the affected vehicles were emitting more pollution and obtaining

13 worse fuel economy than Porsche advertised to consumers and represented to regulators.

14         2.      The broad strokes of this latest scheme were first published in German press reports,

15 which revealed that Germany's Federal Motor Transport Authority, KBA, is investigating Porsche

16 for manipulating the emissions systems of certain vehicles.

17         3.      Following these press reports, Plaintiffs conducted their own extensive

18 investigation and expert testing that both confirms and expands upon the publicly reported

19 allegations of emissions and fuel economy fraud. This investigation has revealed an extensive

20 scheme implemented with the common goal of artificially decreasing emissions test results and

21 increasing fuel economy results to evade fleet-wide and vehicle-specific emissions regulations and

22 to deceive Plaintiffs and the Class about the true nature of Porsche's vehicles. Plaintiffs'

23 investigation shows that this scheme manifested in at least three ways, and affects hundreds of

24 thousands of Porsche vehicles sold in the United States.

25         4.      In short, the three prongs of the scheme are as follows.

26                a.      First, Defendants physically altered the hardware (the gears connecting the

27 drive shaft and rear axle) and manipulated the software of testing vehicles, rendering such vehicles

28 different from the vehicles actually produced and sold to consumers. These testing vehicles emitted

fewer pollutants and were more fuel efficient than the production vehicles that consumers bought and leased. This scheme is labeled herein as the "Rear Axle" or "Axle Ratio" fraud.

b.      Second, Defendants installed secret software in certain vehicles' Electronic Control Unit ("ECU") that again caused the vehicles to run cleaner and obtain better fuel economy during testing than during real-world driving. This scheme is labeled herein as the "Testing Software" fraud.

c.      Third, Defendants falsely attested that certain vehicles' high-performance driving mode, known as Sport Plus, met emissions requirements when in reality the vehicles exceeded legal limits of certain pollutants in Sport Plus mode, and thus were illegal to import or sell in the United States. This scheme is labeled herein as the "Sport Plus" fraud, and is further evidenced by a recent "Stop Sale" in which Porsche ordered dealerships not to "sell, lease, rent, or loan" a substantial list of vehicles equipped with Sport Plus due to "emissions performance" issues.

5.      This manipulation was deceptive, illegal, and material to consumers and regulators. The scheme was also devised by the same companies, in the same time period, and in the same places as the "Clean Diesel" and "Audi $CO_2$" emissions and fuel economy fraud, to which this plot bears a striking resemblance.

6.      Through this action, Plaintiffs and the proposed Class seek to enjoin Defendants' deceptive conduct and recover the economic damages it caused.

## III.   PARTIES

### A.   Plaintiffs

7.      For ease of reference, the following chart identifies the representative Plaintiffs and the state(s) in which they reside and purchased their Class Vehicles:

| Class Representative | Model | Model Year | State of Purchase/Lease | State of residence |
|---|---|---|---|---|
| Allen, Christopher | 911 Carrera S | 2014 | OH | OH |
| Aronson, John | 911 Carrera | 2014 | IL | IL |
| Belle, Frank | Panamera | 2010 | AL | AL |
| Bloom, Erik | 911 Carrera | 2012 | GA | GA |
| Chadha, Ashish | 911 Carrera | 2012 | GA | CA |
| Cohen, Frank | 911 | 2009 | CT | NY |
| Daniels, Rafael | 911 Targa 4S | 2015 | FL | TX |

| Class Representative | Model | Model Year | State of Purchase/Lease | State of residence |
|---|---|---|---|---|
| Del Barrio, Ernesto | 911 Carrera | 2012 | CA | CA |
| Essreg, Alan | 911 Turbo S | 2015 | AL | FL |
| Fajardo, Mallen | 911 Carrera | 2007 | CA | CA |
| Gallion, Vernon | Panamera 4S | 2010 | AK | AK |
| Henderson, Jeffery | Panamera 4S | 2011 | LA | LA |
| Iñiguez, Isaías | Boxster | 2015 | CA | AZ |
| Jeng, Frederick | Cayman | 2010 | CA | CA |
| Kavan, Andrew | Panamera | 2011 | UT | NE |
| Lee, Eric | 911 Turbo | 2010 | CA | CA |
| Lee, Milton | 911 CS | 2013 | CA | CA |
| Luvice, Saul | Panamera S | 2011 | PA | PA |
| Marks, Lee | Boxster S | 2015 | MO | GA |
| Masone, Jino | 911 Carrera | 2015 | PA | MD |
| McCarthy, Robbie | 911 Carrera S | 2013 | PA | PA |
| Menger, Peter | 911 Carrera S | 2009 | NY | NY |
| | 911 Carrera S | 2012 | NY | NY |
| Novales-Li, Philipp | 911 GT3 RS | 2016 | OK | CA |
| Pearl, George | Boxster | 2013 | GA | GA |
| Perkins III, David | 911 Carrera 4S | 2009 | FL | IL |
| Pierce, Tyrell | Panamera Turbo | 2013 | AZ | OR |
| Pinto, Mauricio | 911 Carrera | 2013 | TX | TX |
| Robinson, Cecil | 911 | 2009 | GA | CO |
| Schubert, Richard | Panamera 4 | 2012 | CA | CA |
| Sciabarrasi, Luigi | Panamera | 2011 | CA | CA |
| Shady, Sander | 911 | 2013 | NJ | FL |
| | Cayenne | 2013 | FL | FL |
| Sotelo II, Oscar | Panamera Platinum | 2013 | TX | TX |
| Spiess, Dyana | Boxster | 2013 | NC | FL |
| Taylor, Orville | 911 Carrera S | 2012 | NY | FL |
| Tougas, Lawrence | 911 Carrera | 2017 | CA | CA |
| Vorisek, John | 911 | 2017 | NC | NC |
| Williams, Owen | 911 Carrera | 2015 | NJ | NJ |

8.     Plaintiff **Mallen Fajardo** (for the purpose of this paragraph, "Plaintiff"), a citizen of California, residing in San Bruno, California, purchased a used 2007 Porsche 911 Carrera (for the purpose of this paragraph, the "Class Vehicle") on or around June 17, 2017, from Volvo Palo Alto in Palo Alto, California. The Class Vehicle is equipped with Sport Plus mode. Plaintiff decided to purchase the Class Vehicle based in part on Porsche's representations regarding the vehicle's fuel

- 3 -

economy, emissions, and/or performance. Prior to purchasing the Class Vehicle, Plaintiff researched the vehicle by reviewing Porsche's website, vehicle brochure, and online media, as well as other articles and reviews of the Class Vehicle. At the time of purchase, Plaintiff did not know that the Class Vehicle was designed to deceive regulators and the public, that its advertised fuel economy was fraudulent and overstated, and that it emitted more pollutants than represented and potentially allowed by law. Plaintiff has also paid more for fuel during his possession of the vehicle than he would have had it achieved the represented fuel economy, and has been inconvenienced by having to refill the fuel tank more often. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct.

9.      Plaintiff **Christopher Allen** (for the purpose of this paragraph, "Plaintiff"), a citizen of Ohio, residing in New Albany, Ohio, purchased a used 2014 Porsche 911 Carrera S (for the purpose of this paragraph, the "Class Vehicle") on or around January 16, 2020, from Germain Lexus of Dublin, in Dublin, Ohio. The Class Vehicle is equipped with Sport Plus mode. Plaintiff decided to purchase the Class Vehicle based in part on Porsche's representations regarding the vehicle's fuel economy, emissions, and/or performance. Prior to purchasing the Class Vehicle, Plaintiff reviewed articles about the vehicle and researched its specifications, features, and options. Plaintiff also reviewed the Class Vehicle's Monroney label. At the time of purchase, Plaintiff did not know that the Class Vehicle was designed to deceive regulators and the public, that its advertised fuel economy was fraudulent and overstated, and that it emitted more pollutants than represented and potentially allowed by law. Plaintiff has also paid more for fuel during his possession of the vehicle than he would have had it achieved the represented fuel economy, and has been inconvenienced by having to refill the fuel tank more often. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct.

10.      Plaintiff **John Aronson** (for the purpose of this paragraph, "Plaintiff"), a citizen of Illinois, residing in Wayne, Illinois, purchased a used 2014 Porsche 911 Carrera (for the purpose of this paragraph, the "Class Vehicle") on or around February 8, 2020, from a private sale in Hoffman Estates, Illinois. The Class Vehicle is equipped with Sport Plus mode. Plaintiff decided to purchase the Class Vehicle based in part on Porsche's representations regarding the vehicle's fuel economy,

emissions, and/or performance. Prior to purchasing the Class Vehicle, Plaintiff reviewed the brochure for the 2014 911 Carrera. At the time of purchase, Plaintiff did not know that the Class Vehicle was designed to deceive regulators and the public, that its advertised fuel economy was fraudulent and overstated, and that it emitted more pollutants than represented and potentially allowed by law. Plaintiff has also paid more for fuel during his possession of the vehicle than he would have had it achieved the represented fuel economy, and has been inconvenienced by having to refill the fuel tank more often. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct.

11.     Plaintiff **Frank Belle** (for the purpose of this paragraph "Plaintiff"), a citizen of Alabama, residing in Pleasant Grove, Alabama, purchased a used 2010 Porsche Panamera (for the purpose of this paragraph, the "Class Vehicle") on or around November 24, 2015 from CarMax in Hoover, Alabama. The Class Vehicle is equipped with Sport Plus mode. Plaintiff decided to purchase the Class Vehicle based in part on Porsche's representations regarding the vehicle's fuel economy, emissions, and/or performance. Prior to purchasing the Class Vehicle, Plaintiff reviewed Porsche's website, vehicle brochure, and online media regarding the Class Vehicle. At the time of purchase, Plaintiff did not know that the Class Vehicle was designed to deceive regulators and the public, that its advertised fuel economy was fraudulent and overstated, and that it emitted more pollutants than represented and potentially allowed by law. Plaintiff has also paid more for fuel during his possession of the vehicle than he would have had it achieved the represented fuel economy, and has been inconvenienced by having to refill the fuel tank more often. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct.

12.     Plaintiff **Erik Bloom** (for the purpose of this paragraph, "Plaintiff"), a citizen of Georgia, residing in Cumming, Georgia, purchased a used 2012 Porsche 911 Carrera (for the purpose of this paragraph, the "Class Vehicle") on or around June 1, 2020, from AutoXperts Inc. in Marietta, Georgia. Plaintiff decided to purchase the Class Vehicle based in part on Porsche's representations regarding the vehicle's fuel economy, emissions, and/or performance. Prior to purchasing the Class Vehicle, Plaintiff researched the vehicle's fuel economy and reviewed the Monroney Label. At the time of purchase, Plaintiff did not know that the Class Vehicle was

1  designed to deceive regulators and the public, that its advertised fuel economy was fraudulent and

2  overstated, and that it emitted more pollutants than represented and potentially allowed by law.

3  Plaintiff has also paid more for fuel during his possession of the vehicle than he would have had it

4  achieved the represented fuel economy, and has been inconvenienced by having to refill the fuel

5  tank more often. Plaintiff has suffered a concrete injury as a direct and proximate result of

6  Defendants' misconduct.

7         13.     Plaintiff **Ashish Chadha** (for the purpose of this paragraph, "Plaintiff"), a citizen of

8  California, residing in Oakland, California, purchased a certified pre-owned 2012 Porsche 911

9  Carrera (for the purpose of this paragraph, the "Class Vehicle") on or around January 20, 2018 from

10  Porsche Atlanta Perimeter, an authorized Porsche dealer in Atlanta, Georgia. Plaintiff decided to

11  purchase the Class Vehicle based in part on Porsche's representations regarding the vehicle's fuel

12  economy, emissions, and/or performance. Prior to purchasing the Class Vehicle, Plaintiff

13  conducted research, including by, among other things, reading Motor Trend and Car and Driver

14  articles; watching the Motor Week television show; reviewing the Class Vehicle's window sticker

15  on the dealership website and at the dealership when he inspected the car and reviewed all

16  documentation; reviewing the brochure/booklet (for the 911.2 model—which was the closest

17  brochure available at the dealership). Plaintiff specifically recalls seeing before his purchase that

18  the Class Vehicle had an estimated fuel economy of 20 MPG, which was the bar that he wouldn't

19  go under when buying a sports car. He also recalls hearing continuously that Porsche was moving

20  towards electric/hybrid and was committed to fuel efficiency, including them touting reduced $CO_2$.

21  At the time of purchase, Plaintiff did not know that the Class Vehicle was designed to deceive

22  regulators and the public, that its advertised fuel economy was fraudulent and overstated, and that it

23  emitted more pollutants than represented and potentially allowed by law. Plaintiff has also paid

24  more for fuel during his possession of the vehicle than he would have had it achieved the

25  represented fuel economy, and has been inconvenienced by having to refill the fuel tank more

26  often. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

27  misconduct.

28

1       14.    Plaintiff **Frank Cohen** (for the purpose of this paragraph, "Plaintiff"), a citizen of

2 New York, residing in Melville, New York, purchased a used 2009 Porsche 911 (for the purpose of

3 this paragraph, the "Class Vehicle") in or around January 2020, from a private sale in Easton,

4 Connecticut. Plaintiff decided to purchase the Class Vehicle based in part on Porsche's

5 representations regarding the vehicle's fuel economy, emissions, and/or performance. Prior to

6 purchasing the Class Vehicle, Plaintiff reviewed Porsche's website and also researched the

7 specifications and features of the vehicle. At the time of purchase, Plaintiff did not know that the

8 Class Vehicle was designed to deceive regulators and the public, that its advertised fuel economy

9 was fraudulent and overstated, and that it emitted more pollutants than represented and potentially

10 allowed by law. Plaintiff has also paid more for fuel during his possession of the vehicle than he

11 would have had it achieved the represented fuel economy, and has been inconvenienced by having

12 to refill the fuel tank more often. Plaintiff has suffered a concrete injury as a direct and proximate

13 result of Defendants' misconduct.

14       15.    Plaintiff **Rafael Daniels** (for the purpose of this paragraph, "Plaintiff"), a citizen of

15 Texas, residing in Sugar Land, Texas, purchased a used 2015 Porsche 911 Targa 4S (for the

16 purpose of this paragraph, the "Class Vehicle") in or around June 2017, from Braman Motorcars in

17 West Palm Beach, Florida. The Class Vehicle is equipped with Sport Plus mode. Plaintiff decided

18 to purchase the Class Vehicle based in part on Porsche's representations regarding the vehicle's

19 fuel economy, emissions, and/or performance. Prior to purchasing the Class Vehicle, Plaintiff

20 researched the vehicle's specifications by reviewing the Porsche website and the vehicle's

21 Monroney label. At the time of purchase, Plaintiff did not know that the Class Vehicle was

22 designed to deceive regulators and the public, that its advertised fuel economy was fraudulent and

23 overstated, and that it emitted more pollutants than represented and potentially allowed by law.

24 Plaintiff has also paid more for fuel during his possession of the vehicle than he would have had it

25 achieved the represented fuel economy, and has been inconvenienced by having to refill the fuel

26 tank more often. Plaintiff has suffered a concrete injury as a direct and proximate result of

27 Defendants' misconduct.

28

16.     Plaintiff **Ernesto Del Barrio Jr.** (for the purpose of this paragraph, "Plaintiff"), a citizen of California, residing in San Francisco, California, purchased a used 2012 Porsche 911 Carrera, (for the purpose of this paragraph, the "Class Vehicle") on or around April 2, 2016 from a private sale in San Rafael, California. Plaintiff decided to purchase the Class Vehicle based in part on Porsche's representations regarding the vehicle's fuel economy, emissions, and/or performance. Prior to purchasing the Class Vehicle, Plaintiff reviewed information provided by Porsche in press releases and through the automotive press. At the time of purchase, Plaintiff did not know that the Class Vehicle was designed to deceive regulators and the public, that its advertised fuel economy was fraudulent and overstated, and that it emitted more pollutants than represented and potentially allowed by law. Plaintiff has also paid more for fuel during his possession of the vehicle than he would have had it achieved the represented fuel economy, and has been inconvenienced by having to refill the fuel tank more often. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct.

17.     Plaintiff **Alan Essreg** (for the purpose of this paragraph, "Plaintiff"), a citizen of Florida, residing in North Fort Meyers, Florida, purchased a used 2015 Porsche 911 Turbo S (for the purpose of this paragraph, the "Class Vehicle") on or around January 1, 2018, from Exclusive Auto in Pelham, Alabama. The Class Vehicle is equipped with Sport Plus mode. Plaintiff decided to purchase the Class Vehicle based in part on Porsche's representations regarding the vehicle's fuel economy, emissions, and/or performance. At the time of purchase, Plaintiff did not know that the Class Vehicle was designed to deceive regulators and the public, that its advertised fuel economy was fraudulent and overstated, and that it emitted more pollutants than represented and potentially allowed by law. Plaintiff has also paid more for fuel during his possession of the vehicle than he would have had it achieved the represented fuel economy, and has been inconvenienced by having to refill the fuel tank more often. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct.

18.     Plaintiff **Vernon Gallion** (for the purpose of this paragraph, "Plaintiff"), a citizen of Alaska, residing in Anchorage, Alaska, purchased a used 2010 Porsche Panamera 4S (for the purpose of this paragraph the "Class Vehicle") on or around September 2019, at Good Guys Auto

Sales in Anchorage, Alaska. The Class Vehicle is equipped with Sport Plus mode. Plaintiff decided to purchase the Class Vehicle based in part on Porsche's representations regarding the vehicle's fuel economy, emissions, and/or performance. Prior to purchasing the Class Vehicle, Plaintiff reviewed Porsche's website and online media regarding the Class Vehicle. At the time of purchase, Plaintiff did not know that the Class Vehicle was designed to deceive regulators and the public, that its advertised fuel economy was fraudulent and overstated, and that it emitted more pollutants than represented and potentially allowed by law. Plaintiff has also paid more for fuel during his possession of the vehicle than he would have had it achieved the represented fuel economy, and has been inconvenienced by having to refill the fuel tank more often. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct.

19.     Plaintiff **Jeffery Henderson** (for the purpose of this paragraph, "Plaintiff"), a citizen of Louisiana, residing in Harvey, Louisiana, purchased a used 2011 Porsche Panamera 4S (for the purpose of this paragraph, the "Class Vehicle") on or around August 2016 from Bryan Chevrolet in Metairie, Louisiana. Plaintiff decided to purchase the Class Vehicle based in part on Porsche's representations regarding fuel economy, emissions, and/or performance. Prior to purchasing the Class Vehicle, Plaintiff reviewed Porsche's website and online media regarding the Class Vehicle. At the time of purchase, Plaintiff did not know that the Class Vehicle was designed to deceive regulators and the public, that its advertised fuel economy was fraudulent and overstated, and that it emitted more pollutants than represented and potentially allowed by law. Plaintiff has also paid more for fuel during his possession of the vehicle than he would have had it achieved the represented fuel economy, and has been inconvenienced by having to refill the fuel tank more often. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct.

20.     Plaintiff **Dr. Isaías Iñiguez** (for the purpose of this paragraph, "Plaintiff"), a citizen of Arizona, residing in Yuma, Arizona, purchased a used 2015 Porsche Boxster (for the purpose of this paragraph, the "Class Vehicle") on or around February 16, 2020, from Luxury Preowned Motor Cars in Bellflower, California. The Class Vehicle is equipped with Sport Plus mode. Plaintiff decided to purchase the Class Vehicle based in part on Porsche's representations regarding

the vehicle's fuel economy, emissions, and/or performance. Prior to purchasing the Class Vehicle, Plaintiff reviewed various online publications and reviews. At the time of purchase, Plaintiff did not know that the Class Vehicle was designed to deceive regulators and the public, that its advertised fuel economy was fraudulent and overstated, and that it emitted more pollutants than represented and potentially allowed by law. Plaintiff has also paid more for fuel during his possession of the vehicle than he would have had it achieved the represented fuel economy, and has been inconvenienced by having to refill the fuel tank more often. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct.

21.     Plaintiff **Frederick Jeng** (for the purpose of this paragraph, "Plaintiff"), a citizen of California, residing in Torrance, California, purchased a certified pre-owned 2010 Porsche Cayman (for the purpose of this paragraph, the "Class Vehicle") on or around March 20, 2014, from Rusnak Westlake Porsche, an authorized Porsche dealer in Thousand Oaks, California. Plaintiff decided to purchase the Class Vehicle based in part on Porsche's representations regarding the vehicle's fuel economy, emissions, and/or performance. Prior to purchasing the Class Vehicle, Plaintiff reviewed Porsche's social media accounts, Porsche's CPO program and local inventory, and various online videos and reviews. At the time of purchase, Plaintiff did not know that the Class Vehicle was designed to deceive regulators and the public, that its advertised fuel economy was fraudulent and overstated, and that it emitted more pollutants than represented and potentially allowed by law. Plaintiff has also paid more for fuel during his possession of the vehicle than he would have had it achieved the represented fuel economy, and has been inconvenienced by having to refill the fuel tank more often. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct.

22.     Plaintiff **Andrew Kavan** (for the purpose of this paragraph, "Plaintiff"), a citizen of Nebraska, residing in Omaha, Nebraska, purchased a used 2011 Porsche Panamera (for the purpose of this paragraph, the "Class Vehicle") on or around August 21, 2020, from a private sale in St. George, Utah. The Class Vehicle is equipped with Sport Plus mode. Plaintiff decided to purchase the Class Vehicle based in part on Porsche's representations regarding the vehicle's fuel economy, emissions, and/or performance. Prior to purchasing the Class Vehicle, Plaintiff reviewed Porsche's

website and also researched the specifications, features, and fuel economy rating for the vehicle. At the time of purchase, Plaintiff did not know that the Class Vehicle was designed to deceive regulators and the public, that its advertised fuel economy was fraudulent and overstated, and that it emitted more pollutants than represented and potentially allowed by law. Plaintiff has also paid more for fuel during his possession of the vehicle than he would have had it achieved the represented fuel economy, and has been inconvenienced by having to refill the fuel tank more often. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct.

23.   Plaintiff **Eric Lee** (for the purpose of this paragraph, "Plaintiff"), a citizen of California, residing in City of Industry, California, purchased a used 2010 Porsche 911 Turbo (for the purpose of this paragraph, the "Class Vehicle") on or around July 28, 2011, from a private sale in California. The Class Vehicle is equipped with Sport Plus mode. Plaintiff decided to purchase the Class Vehicle based in part on Porsche's representations regarding the vehicle's fuel economy, emissions, and/or performance. Prior to purchasing the Class Vehicle, Plaintiff reviewed Porsche's website to research the vehicle's specifications, features, and options. At the time of purchase, Plaintiff did not know that the Class Vehicle was designed to deceive regulators and the public, that its advertised fuel economy was fraudulent and overstated, and that it emitted more pollutants than represented and potentially allowed by law. Plaintiff has also paid more for fuel during his possession of the vehicle than he would have had it achieved the represented fuel economy, and has been inconvenienced by having to refill the fuel tank more often. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct.

24.   Plaintiff **Milton Lee** (for the purpose of this paragraph, "Plaintiff"), a citizen of California, residing in Hillsborough, California, purchased a used 2013 Porsche 911 CS, (for the purpose of this paragraph, the "Class Vehicle") on or around July 16, 2019, from RMC Motorcars in San Bruno, California. The Class Vehicle is equipped with Sport Plus mode. Plaintiff decided to purchase the Class Vehicle based in part on Porsche's representations regarding the vehicle's fuel economy, emissions, and/or performance. Prior to purchasing the Class Vehicle, Plaintiff reviewed information and articles about the car online, including visiting Porsche's website, reading

1   third-party articles from car reviews, looking at online videos and performing internet searches and

2   reviewing the results. He recalls that the car was stated to get about 20 mpg. Plaintiff also received

3   and reviewed the Class Vehicle's window sticker. At the time of purchase, Plaintiff did not know

4   that the Class Vehicle was designed to deceive regulators and the public, that its advertised fuel

5   economy was fraudulent and overstated, and that it emitted more pollutants than represented and

6   potentially allowed by law. Plaintiff has also paid more for fuel during his possession of the vehicle

7   than he would have had it achieved the represented fuel economy, and has been inconvenienced by

8   having to refill the fuel tank more often. Plaintiff has suffered a concrete injury as a direct and

9   proximate result of Defendants' misconduct.

10         25.     Plaintiff **Saul Luvice** (for the purpose of this paragraph "Plaintiff"), a citizen of

11  Pennsylvania, residing in Lancaster, Pennsylvania, purchased a used 2011 Porsche Panamera Sport

12  (for the purpose of this paragraph, the "Class Vehicle") on or around February 2020 from Cam

13  Automotive in Lancaster, Pennsylvania. The Class Vehicle was equipped with Sport Plus mode.

14  Plaintiff decided to purchase the Class Vehicle based in part on Porsche's representations regarding

15  the vehicle's fuel economy, emissions, and/or performance. Prior to purchasing the Class Vehicle,

16  Plaintiff reviewed Porsche's website and online media. At the time of purchase, Plaintiff did not

17  know that the Class Vehicle was designed to deceive regulators and the public, that its advertised

18  fuel economy was fraudulent and overstated, and that it emitted more pollutants than represented

19  and potentially allowed by law. Plaintiff has also paid more for fuel during his possession of the

20  vehicle than he would have had it achieved the represented fuel economy, and has been

21  inconvenienced by having to refill the fuel tank more often. Plaintiff has suffered a concrete injury

22  as a direct and proximate result of Defendants' misconduct.

23         26.     Plaintiff **Lee Marks** (for the purpose of this paragraph, "Plaintiff"), a citizen of

24  Georgia, residing in Woodstock, Georgia, purchased a used 2015 Porsche Boxster S (for the

25  purpose of this paragraph, the "Class Vehicle") on or around April 1, 2020, from Napleton Auto

26  Werks in Springfield, Missouri. Plaintiff decided to purchase the Class Vehicle based in part on

27  Porsche's representations regarding the vehicle's fuel economy, emissions, and/or performance.

28  Prior to purchasing the Class Vehicle, Plaintiff researched the vehicle's fuel economy and

1   emissions rating. At the time of purchase, Plaintiff did not know that the Class Vehicle was

2   designed to deceive regulators and the public, that its advertised fuel economy was fraudulent and

3   overstated, and that it emitted more pollutants than represented and potentially allowed by law.

4   Plaintiff has also paid more for fuel during his possession of the vehicle than he would have had it

5   achieved the represented fuel economy, and has been inconvenienced by having to refill the fuel

6   tank more often. Plaintiff has suffered a concrete injury as a direct and proximate result of

7   Defendants' misconduct.

8          27.     Plaintiff **Jino Masone** (for the purpose of this paragraph, "Plaintiff"), a citizen of

9   Maryland, residing in Severna Park, Maryland, purchased a certified pre-owned 2015 Porsche 911

10  Carrera (for the purpose of this paragraph, the "Class Vehicle") on or around April 8, 2017, from

11  Porsche Conshohocken, an authorized Porsche dealer in Conshohocken, Pennsylvania. Plaintiff

12  decided to purchase the Class Vehicle based in part on Porsche's representations regarding the

13  vehicle's fuel economy, emissions, and/or performance. Prior to purchasing the Class Vehicle,

14  Plaintiff researched the vehicle online and reviewed Porsche's website. At the time of purchase,

15  Plaintiff did not know that the Class Vehicle was designed to deceive regulators and the public, that

16  its advertised fuel economy was fraudulent and overstated, and that it emitted more pollutants than

17  represented and potentially allowed by law. Plaintiff has also paid more for fuel during his

18  possession of the vehicle than he would have had it achieved the represented fuel economy, and has

19  been inconvenienced by having to refill the fuel tank more often. Plaintiff has suffered a concrete

20  injury as a direct and proximate result of Defendants' misconduct.

21         28.     Plaintiff **Robbie McCarthy** (for the purpose of this paragraph, "Plaintiff"), a citizen

22  of Pennsylvania, residing in Ardmore, Pennsylvania, purchased a 2013 Porsche 911 Carrera S (for

23  the purpose of this paragraph, the "Class Vehicle") on or around June 1, 2018, from Paul Sevag

24  Motors in West Chester, Pennsylvania. The Class Vehicle was equipped with Sport Plus mode.

25  Plaintiff decided to purchase the Class Vehicle based in part on Porsche's representations regarding

26  the vehicle's fuel economy, emissions, and/or performance. Prior to purchasing the Class Vehicle,

27  Plaintiff researched the vehicle online. At the time of purchase, Plaintiff did not know that the Class

28  Vehicle was designed to deceive regulators and the public, that its advertised fuel economy was

1   fraudulent and overstated, and that it emitted more pollutants than represented and potentially

2   allowed by law. Plaintiff has also paid more for fuel during his possession of the vehicle than he

3   would have had it achieved the represented fuel economy, and has been inconvenienced by having

4   to refill the fuel tank more often. Plaintiff has suffered a concrete injury as a direct and proximate

5   result of Defendants' misconduct.

6       29.     Plaintiff **Peter Menger** (for the purpose of this paragraph, "Plaintiff"), a citizen of

7   New York, residing in Garden City, New York, leased a 2009 Porsche 911 Carrera S on or around

8   April 30, 2009, from Porsche Gold Coast (formerly known as Porsche Roslyn), an authorized

9   Porsche dealership in Jericho, New York. Plaintiff also leased a 2012 Porsche 911 Carrera S on or

10  around April 14, 2012, from Porsche Gold Coast (formerly known as Porsche Roslyn), an

11  authorized Porsche dealership in Jericho, New York. For the purpose of this paragraph, Plaintiffs'

12  two Porsche vehicles are referred to as the "Class Vehicles." The Class Vehicles were equipped

13  with Sport Plus mode. Plaintiff decided to lease the Class Vehicles based in part on Porsche's

14  representations regarding the vehicles' fuel economy, emissions, and/or performance. Prior to

15  leasing the Class Vehicles, Plaintiff reviewed Porsche's website, Porsche vehicle building tools,

16  and various automotive publications regarding the Class Vehicles' specifications and performance.

17  At the time of leasing, Plaintiff did not know that the Class Vehicles were designed to deceive

18  regulators and the public, that their advertised fuel economy was fraudulent and overstated, and that

19  they emitted more pollutants than represented and potentially allowed by law. Plaintiff has also

20  paid more for fuel during his possession of the vehicles than he would have had they achieved the

21  represented fuel economy, and has been inconvenienced by having to refill the fuel tanks more

22  often. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

23  misconduct.

24      30.     Plaintiff **Philipp Novales-Li** (for the purpose of this paragraph, "Plaintiff"), a

25  citizen of California, residing in Livermore, California, purchased a certified pre-owned 2016

26  Porsche 911 GT3 RS (for the purpose of this paragraph, the "Class Vehicle") on or around April 14,

27  2019, from Jackie Cooper Imports of Tulsa (also known as Porsche of Tulsa), an authorized

28  Porsche dealer in Tulsa, Oklahoma. Plaintiff decided to purchase the Class Vehicle based in part on

1    Porsche's representations regarding the vehicle's fuel economy, emissions, and/or performance.

2    Prior to purchasing the Class Vehicle, Plaintiff reviewed Porsche's website, vehicle brochure, and

3    online media regarding the Class Vehicle. Plaintiff also spoke with his local Porsche dealership

4    about the technical features of the vehicle and attended a Porsche launch event that touted the

5    technical and performance specifications of the Porsche 911. At the time of purchase, Plaintiff did

6    not know that the Class Vehicle was designed to deceive regulators and the public, that its

7    advertised fuel economy was fraudulent and overstated, and that it emitted more pollutants than

8    represented and potentially allowed by law. Plaintiff has also paid more for fuel during his

9    possession of the vehicle than he would have had it achieved the represented fuel economy, and has

10   been inconvenienced by having to refill the fuel tank more often. Plaintiff has suffered a concrete

11   injury as a direct and proximate result of Defendants' misconduct.

12       31.    Plaintiff **George Pearl** (for the purpose of this paragraph, "Plaintiff"), a citizen of

13   Georgia, residing in Decatur, Georgia, purchased a new 2013 Porsche Boxster (for the purpose of

14   this paragraph, the "Class Vehicle") on or around December 31, 2013, from Porsche Atlanta

15   Perimeter, an authorized Porsche dealership in Atlanta, Georgia. Plaintiff decided to purchase the

16   Class Vehicle based in part on Porsche's representations regarding the vehicle's fuel economy,

17   emissions, and/or performance. Prior to purchasing the Class Vehicle, Plaintiff researched the

18   vehicle's specifications and reviewed the Porsche website and vehicle brochures. At the time of

19   purchase, Plaintiff did not know that the Class Vehicle was designed to deceive regulators and the

20   public, that its advertised fuel economy was fraudulent and overstated, and that it emitted more

21   pollutants than represented and potentially allowed by law. Plaintiff has also paid more for fuel

22   during his possession of the vehicle than he would have had it achieved the represented fuel

23   economy, and has been inconvenienced by having to refill the fuel tank more often. Plaintiff has

24   suffered a concrete injury as a direct and proximate result of Defendants' misconduct.

25       32.    Plaintiff **David Perkins III** (for the purpose of this paragraph, "Plaintiff"), a citizen

26   of Illinois, residing in Chicago, Illinois, purchased a used 2009 Porsche 911 Carrera 4S (for the

27   purpose of this paragraph, the "Class Vehicle") on or around October 9, 2020, from Johnson Honda

28   of Stuart in Stuart, Florida. The Class Vehicle is equipped with Sport Plus mode. Plaintiff decided

1    to purchase the Class Vehicle based in part on Porsche's representations regarding the vehicle's

2    fuel economy, emissions, and/or performance. Prior to purchasing the Class Vehicle, Plaintiff

3    researched the vehicle's specifications online and reviewed Porsche's website. At the time of

4    purchase, Plaintiff did not know that the Class Vehicle was designed to deceive regulators and the

5    public, that its advertised fuel economy was fraudulent and overstated, and that it emitted more

6    pollutants than represented and potentially allowed by law. Plaintiff has also paid more for fuel

7    during his possession of the vehicle than he would have had it achieved the represented fuel

8    economy, and has been inconvenienced by having to refill the fuel tank more often. Plaintiff has

9    suffered a concrete injury as a direct and proximate result of Defendants' misconduct.

10        33.    Plaintiff **Tyrell Pierce** (for the purpose of this paragraph, "Plaintiff"), a citizen of

11   Oregon, residing in Brookings, Oregon, purchased a used 2013 Panamera Turbo (for the purpose of

12   this paragraph, the "Class Vehicle") on or around February 2017 from Plaza Motors Inc. in Tempe,

13   Arizona. The Class Vehicle is equipped with Sports Plus mode. Plaintiff decided to purchase the

14   Class Vehicle based in part on representations regarding the vehicle's fuel economy, emissions,

15   and/or performance. Prior to purchasing the Class Vehicle, Plaintiff reviewed Porsche's website,

16   online media regarding the Class Vehicle, and representations on the vehicle's Monroney sticker.

17   At the time of purchase, Plaintiff did not know that the Class Vehicle was designed to deceive

18   regulators and the public, that its advertised fuel economy was fraudulent and overstated, and that it

19   emitted more pollutants than represented and potentially allowed by law. Plaintiff has also paid

20   more for fuel during his possession of the vehicle than he would have had it achieved the

21   represented fuel economy, and has been inconvenienced by having to refill the fuel tank more

22   often. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

23   misconduct.

24        34.    Plaintiff **Mauricio Pinto** (for the purpose of this paragraph, "Plaintiff"), a citizen of

25   Texas, residing in Austin, Texas, purchased a certified pre-owned 2013 Porsche 911 Carrera (for

26   the purpose of this paragraph, the "Class Vehicle") on or around May 12, 2015, from Porsche of

27   San Antonio, an authorized Porsche dealership in San Antonio, Texas. The Class Vehicle is

28   equipped with Sport Plus mode. Plaintiff decided to purchase the Class Vehicle based in part on

1   Porsche's representations regarding the vehicle's fuel economy, emissions, and/or performance.

2   Prior to purchasing the Class Vehicle, Plaintiff reviewed Porsche's website and researched

3   information about the performance, emissions rating, and fuel economy of the Class Vehicle.

4   Plaintiff also spoke with the Porsche dealership about the Class Vehicle's specifications and

5   reviewed the vehicle's Monroney label and Porsche's vehicle brochure. At the time of purchase,

6   Plaintiff did not know that the Class Vehicle was designed to deceive regulators and the public, that

7   its advertised fuel economy was fraudulent and overstated, and that it emitted more pollutants than

8   represented and potentially allowed by law. Plaintiff has also paid more for fuel during his

9   possession of the vehicle than he would have had it achieved the represented fuel economy, and has

10  been inconvenienced by having to refill the fuel tank more often. Plaintiff has suffered a concrete

11  injury as a direct and proximate result of Defendants' misconduct.

12          35.     Plaintiff **Cecil Robinson** (for the purpose of this paragraph, "Plaintiff"), a citizen of

13  Colorado, residing in Grand Junction, Colorado, purchased a certified pre-owned 2009 Porsche 911

14  (for the purpose of this paragraph, the "Class Vehicle") on or around December 12, 2015, from

15  Porsche Atlanta Perimeter (part of the Jim Ellis Automotive Group), an authorized Porsche dealer

16  in Atlanta, Georgia. Plaintiff decided to purchase the Class Vehicle based in part on Porsche's

17  representations regarding the vehicle's fuel economy, emissions, and/or performance. Prior to

18  purchasing the Class Vehicle, Plaintiff researched the vehicle's specifications and features and also

19  spoke with the Porsche dealership about the vehicle. At the time of purchase, Plaintiff did not know

20  that the Class Vehicle was designed to deceive regulators and the public, that its advertised fuel

21  economy was fraudulent and overstated, and that it emitted more pollutants than represented and

22  potentially allowed by law. Plaintiff has also paid more for fuel during his possession of the vehicle

23  than he would have had it achieved the represented fuel economy, and has been inconvenienced by

24  having to refill the fuel tank more often. Plaintiff has suffered a concrete injury as a direct and

25  proximate result of Defendants' misconduct.

26          36.     Plaintiff **Richard Schubert** (for the purpose of this paragraph, "Plaintiff"), a citizen

27  of California, residing in Winters, California, purchased a new 2012 Panamera 4 (for the purpose of

28  this paragraph, the "Class Vehicle") in or around October 2011 from Porsche Rocklin, an

1    authorized Porsche dealership in Rocklin, California. The Class Vehicle is equipped with Sport

2    Plus mode. Plaintiff decided to purchase the Class Vehicle based in part on Porsche's

3    representations regarding the vehicle's fuel economy, emissions, and/or performance. Prior to

4    purchasing the Class Vehicle, Plaintiff reviewed Porsche's advertisements and marketing

5    materials, including content on Porsche's website and in promotional brochures. Plaintiff also

6    reviewed the vehicle's Monroney label. At the time of purchase, Plaintiff did not know that the

7    Class Vehicle was designed to deceive regulators and the public, that its advertised fuel economy

8    was fraudulent and overstated, and that it emitted more pollutants than represented and potentially

9    allowed by law. Plaintiff has also paid more for fuel during his possession of the vehicle than he

10   would have had it achieved the represented fuel economy, and has been inconvenienced by having

11   to refill the fuel tank more often. Plaintiff has suffered a concrete injury as a direct and proximate

12   result of Defendants' misconduct.

13         37.    Plaintiff **Luigi Sciabarrasi** (for the purpose of this paragraph, "Plaintiff"), a citizen

14   of California, residing in Agoura Hills, California, purchased a new 2011 Porsche Panamera (for

15   the purpose of this paragraph, the "Class Vehicle") in or around June 2011 from Porsche Redwood

16   City, an authorized Porsche dealership in Redwood City, California. Plaintiff decided to purchase

17   the class vehicle based in part on Porsche's representations regarding the vehicle's fuel economy,

18   emissions, and/or performance. Prior to purchasing the Class Vehicle, Plaintiff reviewed Porsche's

19   website, vehicle brochure, and online media regarding the Class Vehicle, and also reviewed

20   representations on the vehicle's Monroney sticker. At the time of purchase, Plaintiff did not know

21   that the Class Vehicle was designed to deceive regulators and the public, that its advertised fuel

22   economy was fraudulent and overstated, and that it emitted more pollutants than represented and

23   potentially allowed by law. Plaintiff has also paid more for fuel during his possession of the vehicle

24   than he would have had it achieved the represented fuel economy, and has been inconvenienced by

25   having to refill the fuel tank more often. Plaintiff has suffered a concrete injury as a direct and

26   proximate result of Defendants' misconduct.

27         38.    Plaintiff **Sander Shady** (for the purpose of this paragraph, "Plaintiff"), a citizen of

28   Florida, residing in Estero, Florida, purchased a certified pre-owned 2013 Porsche 911 in or around

1    June 2016, from Cherry Hill Porsche, an authorized Porsche dealership in Cherry Hill, New Jersey.

2    Plaintiff also purchased a used 2013 Porsche Cayenne in or around April 2017 from

3    Mercedes-Benz of Bonita Springs in Naples, Florida. For the purpose of this paragraph, Plaintiffs'

4    two Porsche vehicles are referred to as the "Class Vehicles." The Class Vehicles are equipped with

5    Sport Plus mode. Plaintiff decided to purchase the Class Vehicles based in part on Porsche's

6    representations regarding the vehicles' fuel economy, emissions, and/or performance. Prior to

7    purchasing the Class Vehicles, Plaintiff reviewed Porsche's vehicle brochures and advertisements

8    to research the vehicles. Plaintiff also spoke with his local Porsche dealerships about the

9    specifications and features of the Class Vehicles, and he inquired with the dealership service

10   departments about any issues or pending recalls for the vehicles. At the time of purchase, Plaintiff

11   did not know that the Class Vehicles were designed to deceive regulators and the public, that their

12   advertised fuel economy was fraudulent and overstated, and that they emitted more pollutants than

13   represented and potentially allowed by law. Plaintiff has also paid more for fuel during his

14   possession of the vehicles than he would have had they achieved the represented fuel economy, and

15   has been inconvenienced by having to refill the fuel tanks more often. Plaintiff has suffered a

16   concrete injury as a direct and proximate result of Defendants' misconduct.

17           39.     Plaintiff **Oscar Sotelo II** (for the purpose of this paragraph, "Plaintiff"), a citizen of

18   Texas, residing in Dallas, Texas, purchased a used 2013 Porsche Panamera Platinum (for the

19   purpose of this paragraph, the "Class Vehicle") on or around January 1, 2020, from Earth Motor

20   Cars in Carrollton, Texas. Plaintiff decided to purchase the Class Vehicle based in part on

21   Porsche's representations regarding the vehicle's fuel economy, emissions, and/or performance.

22   Prior to purchasing the Class Vehicle, Plaintiff researched the vehicle's performance, emissions

23   rating, and fuel economy, and also reviewed Porsche's website and information about the

24   performance of the Class Vehicle. At the time of purchase, Plaintiff did not know that the Class

25   Vehicle was designed to deceive regulators and the public, that its advertised fuel economy was

26   fraudulent and overstated, and that it emitted more pollutants than represented and potentially

27   allowed by law. Plaintiff has also paid more for fuel during his possession of the vehicle than he

28   would have had it achieved the represented fuel economy, and has been inconvenienced by having

to refill the fuel tank more often. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct.

40.     Plaintiff **Dyana Spiess** (for the purpose of this paragraph, "Plaintiff"), a citizen of Florida, residing in Belleair, Florida, purchased a used 2013 Porsche Boxster (for the purpose of this paragraph, the "Class Vehicle") on or around January 1, 2015, from a private sale in Charlotte, North Carolina. Plaintiff decided to purchase the Class Vehicle based in part on Porsche's representations regarding the vehicle's fuel economy, emissions, and/or performance. Prior to purchasing the Class Vehicle, Plaintiff researched the Class Vehicle's estimated fuel economy. At the time of purchase, Plaintiff did not know that the Class Vehicle was designed to deceive regulators and the public, that its advertised fuel economy was fraudulent and overstated, and that it emitted more pollutants than represented and potentially allowed by law. Plaintiff has also paid more for fuel during her possession of the vehicle than she would have had it achieved the represented fuel economy, and has been inconvenienced by having to refill the fuel tank more often. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct.

41.     Plaintiff **Orville Taylor** (for the purpose of this paragraph, "Plaintiff"), a citizen of Florida, residing in Tallahassee, Florida, purchased a certified pre-owned 2012 Porsche 911 Carrera S (for the purpose of this paragraph, the "Class Vehicle") on or around July 13, 2017, from Roslyn Porsche, an authorized Porsche dealership in New York (now known as Porsche Gold Coast). The vehicle is equipped with Sport Plus mode. Plaintiff decided to purchase the Class Vehicle based in part on Porsche's representations regarding the vehicle's fuel economy, emissions, and/or performance. Prior to purchasing the Class Vehicle, Plaintiff reviewed Porsche's website and researched the vehicle's specifications and fuel economy. At the time of purchase, Plaintiff did not know that the Class Vehicle was designed to deceive regulators and the public, that its advertised fuel economy was fraudulent and overstated, and that it emitted more pollutants than represented and potentially allowed by law. Plaintiff has also paid more for fuel during his possession of the vehicle than he would have had it achieved the represented fuel economy, and has

1    been inconvenienced by having to refill the fuel tank more often. Plaintiff has suffered a concrete

2    injury as a direct and proximate result of Defendants' misconduct.

3              42.    Plaintiff **Lawrence Tougas** (for the purpose of this paragraph, "Plaintiff"), a citizen

4    of California, residing in Fairfield, California, purchased a certified pre-owned 2017 Porsche 911

5    Carrera (for the purpose of this paragraph, the "Class Vehicle") on or around September 22, 2020,

6    from Porsche Fremont, an authorized Porsche dealership in Fremont, California. Plaintiff decided

7    to purchase the Class Vehicle based in part on Porsche's representations regarding the vehicle's

8    fuel economy, emissions, and/or performance. Prior to purchasing the Class Vehicle, Plaintiff

9    researched the vehicle by reviewing Porsche's website as well as the Class Vehicle's build sheet

10   and vehicle maintenance records. Plaintiff also discussed the features of the Class Vehicle with the

11   Porsche dealership. At the time of purchase, Plaintiff did not know that the Class Vehicle was

12   designed to deceive regulators and the public, that its advertised fuel economy was fraudulent and

13   overstated, and that it emitted more pollutants than represented and potentially allowed by law.

14   Plaintiff has also paid more for fuel during his possession of the vehicle than he would have had it

15   achieved the represented fuel economy, and has been inconvenienced by having to refill the fuel

16   tank more often. Plaintiff has suffered a concrete injury as a direct and proximate result of

17   Defendants' misconduct.

18             43.    Plaintiff **John Vorisek** (for the purpose of this paragraph, "Plaintiff"), a citizen of

19   North Carolina, residing in Wilmington, North Carolina, purchased a certified pre-owned 2017

20   Porsche 911 (for the purpose of this paragraph, the "Class Vehicle") in or around October 2018,

21   from Porsche Wilmington, an authorized Porsche dealership in Wilmington, North Carolina.

22   Plaintiff decided to purchase the Class Vehicle based in part on Porsche's representations regarding

23   the vehicle's fuel economy, emissions, and/or performance. Prior to purchasing the Class Vehicle,

24   Plaintiff spoke with the Porsche dealership about the features and specifications of the vehicle and

25   also reviewed the vehicle's window sticker. At the time of purchase, Plaintiff did not know that the

26   Class Vehicle was designed to deceive regulators and the public, that its advertised fuel economy

27   was fraudulent and overstated, and that it emitted more pollutants than represented and potentially

28   allowed by law. Plaintiff has also paid more for fuel during his possession of the vehicle than he

1   would have had it achieved the represented fuel economy, and has been inconvenienced by having

2   to refill the fuel tank more often. Plaintiff has suffered a concrete injury as a direct and proximate

3   result of Defendants' misconduct.

4       44.    Plaintiff **Owen Williams** (for the purpose of this paragraph, "Plaintiff"), a citizen of

5   New Jersey, residing in Branchburg, New Jersey, leased a new 2015 Porsche 911 Carrera S (for the

6   purpose of this paragraph, the "Class Vehicle") in or around November 2014 from Princeton

7   Porsche, an authorized Porsche dealership in Lawrence Township, New Jersey. The Class Vehicle

8   was equipped with Sport Plus mode. Plaintiff decided to lease the Class Vehicle based in part on

9   Porsche's representations regarding the vehicle's fuel economy, emissions, and/or performance.

10  Prior to leasing the Class Vehicle, Plaintiff researched the vehicle's specifications and features on

11  the Porsche website using the vehicle configuration tool and also spoke with the Porsche dealership

12  about the vehicle. At the time of leasing, Plaintiff did not know that the Class Vehicle was designed

13  to deceive regulators and the public, that its advertised fuel economy was fraudulent and overstated,

14  and that it emitted more pollutants than represented and potentially allowed by law. Plaintiff has

15  also paid more for fuel during his possession of the vehicle than he would have had it achieved the

16  represented fuel economy, and has been inconvenienced by having to refill the fuel tank more

17  often. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants'

18  misconduct.

19          **B.**    **Defendants**

20          45.    **Dr. Ing. h.c. F. Porsche AG** ("Porsche AG") is a German corporation with its

21  principal place of business located in Stuttgart, Germany. Porsche AG designs, develops,

22  manufacturers, and sells luxury automobiles. Porsche AG is a wholly-owned subsidiary of VW

23  AG. With the assistance of Volkswagen AG, Porsche AG engineered, designed, developed,

24  manufactured, and installed the software on the Class Vehicles and exported these vehicles with the

25  knowledge and understanding that they would be sold throughout the United States. On

26  information and belief, Porsche AG also reviewed and approved the marketing and advertising

27  campaigns designed to sell the Porsche-branded Class Vehicles.

28

1        46.     **Porsche Cars North America, Inc.** ("Porsche America") is a Delaware

2    corporation with its principal place of business located at 1 Porsche Drive, Atlanta, Georgia 30354.

3    Porsche America is a wholly-owned U.S. subsidiary of Porsche AG, and it engages in business,

4    including the advertising, marketing, and sale of Porsche automobiles, in all 50 states.

5        47.     **Volkswagen AG** ("VW AG") is a German corporation with its principal place of

6    business in Wolfsburg, Germany. VW AG is one of the largest automobile manufacturers in the

7    world, and is in the business of designing, developing, manufacturing, and selling automobiles.

8    VW AG is the parent corporation of Porsche AG. At all times relevant to this action, Volkswagen

9    manufactured, distributed, sold, leased, and warranted the Class Vehicles under the Porsche brand

10   names throughout the United States. Upon information and belief, VW AG reviewed and approved

11   Porsche's vehicle designs, testing strategies, and marketing materials relating to the Class Vehicles.

12   **IV.     JURISDICTION AND VENUE**

13       48.     This Consolidated Class Action Complaint is filed as an original action in this

14   District and as the consolidated complaint in the Porsche Gasoline Litigation within MDL No.

15   2672, pursuant to Dkt. No. 7756.

16       49.     This Court has jurisdiction over this action pursuant to the Class Action Fairness

17   Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship

18   from one Defendant, there are more than 100 Class members, and the aggregate amount in

19   controversy exceeds $5 million, exclusive of interest and costs. The Court also has supplemental

20   jurisdiction over the claim brought under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et*

21   *seq.*, because that claim arises from the same controversy as the state law claims over which this

22   court has jurisdiction under CAFA. The Court has personal jurisdiction over Defendants pursuant

23   to 18 U.S.C. §§ 1965(b) and (d), and Cal. Code Civ. P. § 410.10.

24       50.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part

25   of the events and/or omissions giving rise to the claims occurred in this District, and because

26   Defendants have caused harm to Class members residing in this District, including Plaintiffs

27   Mallen Fajardo, Ashish Chadha, Ernesto Del Barrio, Milton Lee, and Philipp Novales-Li.

28

1  Defendants have marketed, advertised, sold and leased the Class Vehicles from dealers located in
2  this District.

3  **V.      INTRADISTRICT ASSIGNMENT AND RELATED CASE**

4          51.     This action is properly assigned to the San Francisco Division of this District
5  pursuant to N.D. Cal. L.R. 3-2, because a substantial part of the events or omissions giving rise to
6  Plaintiffs' claims arose in the counties served by the San Francisco Division. Moreover,
7  Defendants conduct substantial business in the counties served by this Division, have marketed,
8  advertised, sold, and leased the Class Vehicles in those counties, and have caused harm to Class
9  members residing in those counties, including Mallen Fajardo who resides in San Bruno County,
10 Ashish Chadha who resides in Alameda County, Ernest Del Barrio who resides in San Francisco
11 County, Milton Lee who resides in San Mateo County, and Philipp Novales-Li who resides in
12 Alameda County.

13         52.     Finally, this Consolidated Class Action Complaint serves both as an original
14 complaint in this District as well as the consolidated complaint for the Porsche Gasoline Litigation
15 in MDL No. 2672 proceedings, which have been consolidated before Judge Charles R. Breyer,
16 presiding in the San Francisco Division of this District. As noted above and described further
17 herein, the fraud alleged here involves many of the same players, implementing similar schemes,
18 with nearly identical objectives, as the "Clean Diesel" scandal.

19 **VI.     FACTS COMMON TO ALL COUNTS**

20        **A.      Porsche and its parent and sister companies have a long history of cheating on
21                 emissions and fuel economy.**

22         53.     In the fall of 2015, the public learned that over the course of six years Volkswagen,
23 Audi, and Porsche had deliberately used defeat devices—software designed to cheat emissions
24 tests and deceive federal and state regulators—in nearly 600,000 so-called "clean" diesel vehicles
25 sold in the United States. Unbeknownst to consumers and regulatory authorities, Volkswagen,
26 Audi, and Porsche installed a software defeat device that allowed their diesel vehicles to evade
27 United States Environmental Protection Agency ("EPA") and California Air Resources Board
28 ("CARB") emissions test procedures.

54.     During emissions testing, the defeat device produced regulation-compliant results. When the vehicles were driven on the road, however, the defeat device reduced the effectiveness of the vehicles' emissions control system and caused the vehicles to emit noxious pollutants like oxides of nitrogen ("NOx") at up to 40 times the legal limit. Only by installing the defeat device on their vehicles were Volkswagen, Audi, and Porsche able to deceive the public and obtain permission from EPA and CARB to sell the vehicles. That case was litigated, and ultimately settled, under this Court's guidance in a pair of landmark settlements that provided billions of dollars to consumers and environmental mitigation. *See In re: Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC) (Dkt. 2102), 2016 WL 6248426 (N.D. Cal. Oct. 25, 2016) (2.0L Final Approval Order), *aff'd*, 895 F.3d 597 (9th Cir. 2018); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC) (Dkt. 3329), 2017 WL 2212783, at *2 (N.D. Cal. May 17, 2017) (3.0L Final Approval Order). VW AG and certain of its executives pleaded guilty to a federal criminal indictment in the Eastern District of Michigan, in which they admitted the existence of the defeat device and the conspiracy to defraud federal and state regulators. *U.S. v. Volkswagen AG*, No. 16-CR-20394-SFC, Dkt. No. 68 (E.D. Mich. March 10, 2017).

55.     The Volkswagen Group's cheating was not limited to diesel vehicles. In late 2015 or early 2016, the German Motor Transportation Authority ("KBA") detected increased $CO_2$ emissions and other irregularities in certain Audi vehicles.[1] As it turned out, Volkswagen and its subsidiary companies—including Porsche—had again installed software that caused certain vehicles to perform differently in a testing environment than on the road. The software, called the "Warm-up Program," was calibrated to activate when it encounters certain common "entry conditions" (including key start) and de-activate under certain "exit conditions" (such as steering wheel rotation, longitudinal acceleration, and temperature conditions) which are common in

---

[1] *See, e.g.*, Carsten Rehder, *Examiners Measure Excessive CO2-Values for Many Car Models*, Bild (November 13, 2016), http://www.bild.de/geld/aktuelles/wirtschaft/pruefer-messen-bei-vielen-automodellen-ueberhoehte-48744426.bild.html (German language article); *Ministry of Transportation Examines Accusations Against Audi*, Handelsblatt (November 7, 2016), http://www.handelsblatt.com/politik/deutschland/abgaswertemanipulation-verkehrsministerium-p rueft-vorwuerfe-gegen-audi/14804236.html (German language article).

real-world driving but typically not satisfied during regulator tests. The result was that, in approximately 100,000 Volkswagen-, Audi-, Bentley-, and Porsche-branded vehicles, the Warm-up Program was active for some or all of standard emissions testing procedures and mostly inactive during on-road driving. This mattered because in "normal" mode—*i.e.*, with Warm-up Program deactivated—the vehicles shift at higher RPMs, emit more carbon dioxide, and use more gas. As with the diesel scandal, under this Court's guidance, these issues were litigated, and ultimately settled for a non-reversionary $96.5 million fund that provided full compensation to that class. *See In re: Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), Dkt. 7244 (March 2, 2020) ("Audi $CO_2$" Final Approval Order).

56.     It is now clear that the Warm-up Program was not the only emissions-manipulation mode affecting Porsche's gasoline vehicles. As described herein, Porsche has engaged in several more illegal schemes dating back to at least 2007 that have misled consumers and regulators about the true emissions and fuel economy of up to 400,000 gasoline vehicles sold in the United States.[2]

**B.      Defendants deployed emissions and fuel economy cheating schemes in the Class Vehicles.**

**1.      Defendants knew for years that certain Porsche gasoline vehicles contained defeat devices.**

57.     As with their diesel vehicles, Defendants have for years developed and implemented a secret plan to cheat on emissions tests in certain gasoline vehicles. Upon information and belief, this plan goes back over a decade and was known to the upper echelons of Porsche management for many years.

58.     Upon information and belief, top management at VW AG also knew about and approved the cheating scheme. When Martin Winterkorn left his position as Audi AG's CEO to become VW AG's CEO, he set ambitious sales targets for all of the company's brands. In the United States, Winterkorn's goal was to *triple* sales of Volkswagen automobiles—including

---

[2] *See, e.g.*, Porsche Newsroom US, *Sales Statistics – Porsche Sales in North America*, https://newsroom.porsche.com/en_US/company/porsche-cars-north-america-sales-statistics-1819 0.html (showing that Porsche sold 477,798 MY 2007-2018 vehicles in the United States, a small percentage of which were diesel vehicles, not implicated by the allegations herein).

Volkswagen-, Audi-, and Porsche-branded vehicles—in only ten years.[3] To meet this ambitious target, VW AG had to increase the sales of its fledgling diesel fleet in the U.S., as well as increase sales of its gas fleet in the United States sold under Volkswagen, Audi, and Porsche brands.

59.     As is now known, Winterkorn quickly realized his strategy could not succeed without cheating. Winterkorn wanted affordable diesel vehicles and thus—rather than installing the new and expensive diesel emissions technology used by some competitors—sought to develop a cheaper in-house solution. To quickly develop this technology, he tapped Wolfgang Hatz, a former Audi engineer with whom Winterkorn had worked closely when he was Audi's CEO.[4] But Hatz could not deliver. Instead, he directly oversaw the installation of emissions-manipulating software that had first been developed at Audi in 1999 when Hatz and Winterkorn both worked at the company.[5]

60.     Winterkorn and Hatz have both been charged by German authorities for a variety of offenses relating to the diesel scandal.[6] But Hatz's role at the company was not limited to solving the clean diesel conundrum for Winterkorn. Hatz was head of engines and transmissions for *all* Volkswagen brands in 2007,[7] meaning he was in charge of developing the vehicles at issue in the Audi $CO_2$ litigation, where VW AG installed the Warm-up Program in 100,000 Volkswagen-, Audi-, Bentley-, and Porsche-branded gasoline vehicles.

61.     Hatz also had a special relationship with Porsche. In 2011, in addition to his role at Volkswagen, he also became head of Porsche's research and development team and took a seat on

---

[3] Jack Ewing, *Volkswagen Engine-Rigging Scheme Said to Have Begun in 2008*, New York Times, (Oct. 4, 2015), https://www.nytimes.com/2015/10/05/business/engine-shortfall-pushed-volkswagen-to-evade-emissions-testing.html#:~:text=FRANKFURT%20%E2%80%94%20Volkswagen%20began%20installing%20software,internal%20inquiry%20said%20on%20Sunday.
[4] *Id.*
[5] Jack Ewing, *Volkswagen Suspends 5th Executive in Emissions Scandal*, New York Times (Oct. 20, 2015) https://www.nytimes.com/2015/10/21/business/volkswagen-suspends-5th-executive-in-emissions-scandal.html.
[6] Michael Taylor, *Former Audi CEO Stadler to Stand Trial Over Dieselgate Fraud on Wednesday*, Forbes (Sept. 28, 2020), https://www.forbes.com/sites/michaeltaylor/2020/09/28/former-audi-ceo-stadler-to-stand-trial-over-dieselgate-fraud-on-wednesday/?sh=54d2b2cb9962
[7] Josh Barnett, *Wolfgang Harz Many Leave Porsche Over VW Diesel Scandal*, Total 911: the Porsche Magazine (Sept. 24, 2015) https://www.total911.com/new-porsche-911-first-look-digital-edition-for-ios/

the Porsche AG board.[8] As head of engine and transmission development for all Volkswagen brands and head of Porsche's sports car efforts—roles he held until he was fired in 2015—Hatz was in charge of developing the Class Vehicles at issue in this case.[9]

62.     On information and belief, both Hatz and Winterkorn knew about the illegal emissions and fuel economy scheme in the Class Vehicles.

63.     Winterkorn and Hatz were not the only Volkswagen executives who had knowledge of the fraud related to the Class Vehicles. Frank Tuch was Porsche's chief quality officer from 2002 until 2010, when Winterkorn made him chief quality officer for all of VW AG.[10]

64.     Winterkorn and Tuch worked together closely from the start. According to *Das Auto*, Volkswagen's in-house magazine, Tuch and Winterkorn met every Monday to discuss quality issues, including quality issues with the Class Vehicles. They often took test drives in vehicles manufactured by the company.[11]

65.     In his role as head of quality assurance for VW AG, Tuch was intimately familiar with Volkswagen, Audi, and Porsche engines and transmissions. Among his duties was the development and production of components such as engines and transmissions for small, compact, midsize, and full size product lines, including all the Class Vehicles.

66.     Tuch's additional duties included responsibility for more than 100 factories, the Audi and Porsche brands, and overseeing laboratory locations throughout the world, including the Volkswagen laboratories in the United States, which were primarily responsible for emissions testing of the Class Vehicles.

---

[8] *Id.*; Taylor, *supra*.

[9] Taylor, *supra*.

[10] Jay Ramey, *VW's Head of Quality Control Resigns Amid Diesel Crisis*, Autoweek (Feb. 9, 2016), https://www.autoweek.com/news/a1839911/vws-head-quality-control-resigns-amid-diesel-crisis/

[11] Jack Ewing, *Volkswagen Suspends 5th Executive in Emissions Scandal*, New York Times (Oct. 20, 2015) https://www.nytimes.com/2015/10/21/business/volkswagen-suspends-5th-executive-in-emissions-scandal.html.

67.     On information and belief, Tuch, like Winterkorn, Hatz, and senior management within Porsche, knew about Porsche's illegal emissions and fuel economy scheme in the Class Vehicles from the beginning.

68.     But even if senior Porsche management didn't know about Porsche's emissions cheating in the Class Vehicles at the outset, they learned about it during a "crisis meeting" in November 2015.[12] Two months earlier, in September 2015, Porsche AG CEO Martin Mueller took over the reins at VW AG following Martin Winterkorn's resignation in the wake of the diesel scandal.[13] Mueller's replacement at Porsche commissioned a systematic review of Porsche's gas fleet to determine if Porsche's gas fleet (like its diesel fleet) cheated on emissions tests.[14] In just two months, engineers determined that the answer was "yes." A "crisis meeting" was convened to inform senior management of the findings.

69.     During the crisis meeting, company engineering experts explained to a large group that Porsche had engaged in emissions cheating in gasoline vehicles for years. In meetings attended by senior management, these engineers explained that certain Porsche gasoline vehicles contained defeat devices which caused the vehicles to perform differently—*e.g.*, to emit fewer pollutants like $CO_2$—during testing on a dynamometer than in everyday driving.[15] Upon information and belief, Porsche did not contact the EPA or CARB about its findings. Instead, it continued to seek the required approvals from the EPA and CARB to export its gasoline vehicles that contained illegal defeat devices into the United States. Remarkably, Porsche engaged in this illegal behavior during the diesel scandal, when the KBA, the EPA and CARB were investigating its diesel vehicles, and during litigation involving its diesel and gasoline vehicles before this Court.

---

[12] Jan C. Wehmeyer, *The Gear Trick: Porsche apparently manipulated the transmissions of test vehicles in order to improve their CO2 emissions – the public prosecutor is now investigating*, Business Insider (October 4, 2020), https://www.businessinsider.de/wirtschaft/zahnrad-trick-porsche-manipulierte-offenbar-getriebe-von-testfahrzeugen-um-co2-ausstoss-zu-schoenen/ (German language article).

[13] *Id.*

[14] *Id.*

[15] *Id.*

70.     It took five additional years for these revelations to come to light. In June 2020, a whistleblower at Porsche reported at least one suspected defeat device in certain Porsche gasoline vehicles through an internal reporting system.[16] Only then did Porsche report its findings to the KBA and the EPA.[17] The Stuttgart public prosecutor has now opened a criminal investigation, poring over hundreds of thousands of documents, conducting interviews of employees, and reviewing data.[18] Its investigation is quickly bearing fruit. It has identified four specific Porsche employees it suspects played key roles in the fraud.[19] Meanwhile, the KBA has now taken the extraordinary step of halting future certifications of conformity for certain Porsche vehicles.[20]

## 2.     Porsche deceived consumers and regulators about the true fuel economy and emissions of the Class Vehicles.

71.     Porsche's emissions and fuel economy scheme took at least three forms: (a) submitting vehicles for regulatory testing that were materially different than the vehicles sold and leased to consumers (Axle Ratio fraud); (b) installing a secret software program that caused the vehicles to perform differently in testing than on the road (Testing Software fraud); and (c) falsely attesting that certain vehicles' high performance mode could pass emissions tests (Sport Plus fraud). The three elements of this scheme—described in further detail below—all had the effect of deceiving regulators, Plaintiffs, the proposed Class, and the public at large about the Class Vehicles' true emissions levels and fuel economy.

### a.     Altered test vehicles: the Axle Ratio fraud

72.     One of Porsche's three schemes was to submit to the regulators testing results from doctored vehicles that differed in material ways from the production models Porsche ultimately sold and leased to consumers in the United States.

---

[16] Simon Hage and Gerard Trauffetter, *Has Porsche Fiddled with the 911*, Spiegel (August 28, 2020), https://www.spiegel.de/wirtschaft/unternehmen/porsche-soll-auch-bei-benzinern-getrickst-haben-a-00000000-0002-0001-0000-000172728836 (German language article).
[17] *Id.*
[18] Jan C. Wehmeyer, *supra* note 3.
[19] Gregor Habermehl, *New References to Exhaust Gas Manipulation*, Auto Motor Sport (October 1, 2020), https://www.auto-motor-und-sport.de/verkehr/porsche-verdacht-manipulation-getriebe-benzinmotoren/ (German language article).
[20] Simon Hage and Gerard Trauffetter, *supra* note 7.

73.     Porsche consumers have come to expect sporty performance from its vehicles, including its flagship Porsche 911, which can accelerate to 100 kilometers per hour in under three seconds.[21] Porsche achieves this high level of performance by, among other things, carefully calibrating the drivetrain, including the ratio of the gears connecting the drive shaft to the rear axle.[22] Images illustrating these vehicle components are excerpted below.[23]





[21] Jan C. Wehmeyer, *supra* note 3.
[22] *Id.*
[23] *Gearhead 101: the Drivetrain* (February 11, 2016),
https://www.artofmanliness.com/articles/gearhead-101-the-drivetrain/.

74.     Put simply, the ratio between the gears on the drive shaft and gears on the axle (in the differential) affects both the performance and fuel economy of a vehicle.[24] Vehicles with a lower ratio can spin the axle, and propel the vehicle forward, at lower revolutions per minute ("RPMs"), using less gasoline and emitting fewer pollutants. Vehicles with a higher ratio can, under certain circumstances, achieve a sportier performance, but they do so at the expense of increased emissions and fuel consumption.

75.     Internal documents show that the drivetrains in the vehicles Porsche used for regulatory testing differed materially from the vehicles Porsche produced for consumers.[25] Specifically, Porsche engineered specific vehicles for emissions and fuel economy testing that contained a different differential (a lower gear ratio) than the vehicles it mass produced. The test-specific vehicles were less dynamic but, according to internal investigations, emitted up to 8% less $CO_2$ and obtained correspondingly better fuel economy than the vehicles Porsche actually sold and leased to consumers.[26]

76.     Critically, Porsche did not dispute these characterizations in discussions with the regulators. Porsche informed the Stuttgart public prosecutor, Germany's Federal Motor Transport Authority (KBA), and the U.S. regulators about its cheating in June 2020. Porsche employees also confirmed in internal interviews that Porsche engaged in the so-called "gear trick," by manufacturing special, test-only cars with reduced $CO_2$ emissions while producing vehicles with different specifications to sell to consumers.[27]

77.     Plaintiffs' own expert testing confirms the fraud. As part of their pre-suit investigation, Plaintiffs ran the full battery of regulatory tests—including the Federal Test Procedure ("FTP75"), the Highway Fuel Economy Test ("HWFET"), and the "US06" test cycles—on one of the vehicles Plaintiffs understood to be implicated by this scheme, a 2015 Porsche Boxster. Testing took place on a two-wheel dynamometer and followed the certification

---

[24] Gregor Habermehl, *supra* note 10.

[25] *Id.*

[26] *Id.*

[27] *Id.*

- 32 -

test procedures set out in 40 C.F.R. § 1065, such as using the approved fuel formulation for certification tests, documenting vehicle conditioning, driving a pre-test cycle, and storing a vehicle overnight at approximately 75 degrees Fahrenheit to "reset" before further testing. A picture of the test vehicle in the laboratory is shown below.



78.     After completing the tests, Plaintiffs compared the results to those that Porsche submitted to the regulators. A summary of that comparison is included below. It shows that the carbon emissions from the production vehicles were significantly greater than those from the manipulated, test-only vehicles. Using the EPA's weighting formula, this yields a total $CO_2$ increase—and inversely related fuel economy decrease—of approximately 6%, in line with what was reported in the German press. That translates into a reduction of approximately 2 miles per gallon in the vehicle's combined fuel economy rating, which could cost owners thousands of dollars in extra fuel costs alone over the course of the vehicle's lifespan.[28]

---

[28] The EPA estimates the average useful lifespan of passenger vehicles to be at least 120,000 miles. The useful lifespan of vehicles from a high-end manufacturer like Porsche is potentially even longer.

- 33 -

| Test Cycle | HC (g/mi) | CO (g/mi) | NOx (g/mi) | CO2 (g/mi) | CREE (g/mi) | Fuel Economy | % FE Change |
|---|---|---|---|---|---|---|---|
| FTP - Certification | 0.02890 | 0.1022 | 0.01824 | 319.00 | 319.0 | 26.18 | |
| FTP - Plaintiffs' Test | 0.05680 | 0.3610 | 0.01740 | **361.70** | 362.4 | **24.13** | **-7.8%** |
| HFET - Certification | 0.00282 | 0.0324 | 0.00485 | 198.00 | 198.0 | 44.88 | |
| HFET - Plaintiffs' Test | 0.00290 | 0.0450 | 0.14900 | **200.74** | 200.8 | **43.54** | **-3.0%** |
| US06 - Certification | 0.02297 | 0.2091 | 0.02760 | 292.47 | | 30.36 | |
| US06 - Plaintiffs' Test | 0.01480 | 0.3829 | 0.04340 | **295.16** | 295.8 | **29.56** | **-2.6%** |
| **Combined (55% FTP / 45% HFET) Change:** | | | | | | | **-5.7%** |

79.     Defendants' scheme was both deceptive and illegal. For obvious reasons, vehicles used in regulatory testing must be materially identical to those sold to consumers. *See* 42 U.S.C. § 7541(a)(3)(A) (explaining that it is prohibited "for any person to remove . . . any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations . . . prior to its sale and delivery to the ultimate purchaser").[29] The EPA issued certificates of conformity for the vehicles as tested, and not as ultimately sold and leased to consumers. Accordingly, the Monroney label Porsche caused to be affixed to each and every Class Vehicle that indicated that each vehicle "is covered by a certificate of conformity" contained false information. *See* 42 U.S.C. § 7541(c)(3)(C).

80.     In other words, the vehicles affected by the Axle Ratio fraud emitted more $CO_2$ and obtained worse fuel economy than represented, and—because they were not actually covered by legitimate Certificates of Conformity ("COCs") and Executive Orders ("EOs")—they were illegal to import or sell.

81.     Upon information and belief based on vehicle testing, this fraud affects at least the following Class Vehicles: MY 2009 – 2016 Porsche Boxster and Boxster S; MY 2009 – 2016 Porsche Cayman and Cayman S; MY 2012 – 2016 Porsche 911 Carrera and 911 Carrera S; and MY 2010 – 2013 Porsche Panamera S.

---

[29] The EPA's Certificates of Conformity—which are required for every vehicle sold in the United States—also explain that the certificates cover "only those new motor vehicles or vehicle engines which conform, in all material respects, to the design specifications that apply" to the vehicles that were tested. Similarly, CARB's Executive Orders—required for every vehicle sold in California—clearly state that "[p]roduction vehicles shall be in all material respects the same as those for which certification is granted."

b.    **Programming used only for test cycles: "Testing Software" fraud**

82.     Porsche's second fraudulent manipulation involves a scheme similar to the "Warm-Up Program" issue involving approximately 100,000 Volkswagen-, Audi-, Bentley-, and Porsche-branded gasoline vehicles, detailed at length in the "Audi $CO_2$" matter. *See In re: Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), Dkts. 6628 (Aug. 30, 2019) (Amended Consolidated Compliant) and 7244 (March 2, 2020) (Final Approval Order). Here again, certain Porsche gasoline vehicles were equipped with secret software in the vehicles' ECUs that, in many calibrations, caused the vehicles to perform differently in a testing environment than in comparable real-world driving.

83.     As with the "Warm-Up Program," Porsche's special test mode was activated and deactivated by certain entry and exit conditions.[30] In certain calibrations, the test mode was designed to be activated for some or all of regulatory testing (during which the vehicle would use less fuel and emit less $CO_2$) and de-activated under normal, on-road driving conditions (resulting in increased fuel consumption and emissions).

84.     This scheme, too, was both deceptive and illegal. *See* 42 U.S.C. § 7522(a)(3)(B) (It is a prohibited act "for any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use").

85.     Porsche's senior management was aware of the fraud in November 2015 when Porsche engineers explained to senior management how its drivers cheated during testing.[31] Yet Porsche did not disclose the defeat devices to the regulators. Instead they doubled down, concealed their fraud, and continued to sell mislabeled vehicles to Plaintiffs and the Class.

---

[30] Jan C. Wehmeyer, *supra* note 10.
[31] *Id.*

### c. False attestations of emissions compliance: "Sport Plus" fraud

86. Porsche offers consumers a variety of driving modes in its vehicles. Different modes allow the consumers to customize their driving experience. For example, Porsche offers a "Sport Mode" for "more spirited drives through backroads or canyon passes."[32] As the name implies, this is a high performance mode where the throttle response and shifts are sharper and the suspension is stiffer. But the highest performing mode is its "Sport+ (Plus) Mode." According to Porsche, "the 'SPORT+' mode is your go-to driving mode for track days or simply experiencing all of the performance your Porsche has to offer. The throttle response is instantaneous, shifts are lightning fast, and the overall steering and suspension feel is tight and responsive."[33] Sport Plus mode is a standard feature on some Class Vehicles and an optional configuration for others.

87. As one might expect, the ultra-high performance enabled by Sport Plus mode comes at the cost of higher emissions and greater fuel consumption. What a reasonable consumer would not expect, however, is that the pollutants emitted in Sport Plus mode would actually exceed legal limits, making the vehicles unlawful to import or sell. But this is precisely what happens in the Class Vehicles equipped with Sport Plus mode.

88. Vehicle manufacturers are not always required to submit test cycle results for all of a vehicle's driving modes. Even where test results are not submitted for each driving mode, however, manufacturers must attest to the EPA and CARB that each driving mode in every vehicle meets certification requirements before the vehicles are approved for importation and sale.[34] This includes attesting that vehicles do not exceed the statutory limit for NOx emissions in any driving mode.[35] Moreover, the Clean Air Act requires that manufacturers warrant to all purchasing consumers that their vehicles are designed, built, and equipped to conform with the applicable emissions standards and are free from any defects which would cause it to fail to conform to such regulations. *See* 42 U.S.C. § 7541(a)(1).

---

[32] Porsche Irvine: Porsche Driving Modes (2020), https://www.porscheirvine.com/research/driving-modes.htm.
[33] *Id.*
[34] Jan C. Wehmeyer, *supra* note 10.
[35] *Id.*

89.     Accordingly, Porsche attested to the EPA and CARB, and warranted to every consumer, that each of its gasoline vehicles complied with statutory limits for emissions in every mode, including Sport Plus mode.[36] Porsche's attestation was false. As Porsche's internal investigation has revealed, when certain gasoline vehicles operate in Sport Plus mode, they emit pollutants, including NOx, in excess of legal requirements.[37]

90.     Plaintiffs' own expert testing again confirms this fraud. To determine the scope of this scheme, Plaintiffs ran the regulatory tests described above—FTP75, HWFET, and US06—on a 2016 Porsche Cayenne equipped with Sport Plus mode. Testing took place on a four-wheel dynamometer and followed the certification test procedures set out in 40 C.F.R. § 1065, such as using the approved fuel formulation for certification tests, documenting vehicle conditioning, driving a pre-test cycle, and storing a vehicle overnight at approximately 75 degrees Fahrenheit to "reset" before further testing. Pictures of the test vehicle in the laboratory are shown below.



91.     The testing revealed that with Sport Plus mode activated, the vehicle's emissions significantly exceed the limits established for the Tier 2, Bin 5 category for which the vehicle was certified. Specifically, for the US06 test cycle, the combined HC-NM (non-methane hydrocarbon) + NOx emissions were 0.4625 grams/mile, which is nearly *double the legal limit* of 0.25 grams/mile. This means that the Certificates of Conformity and Executive Orders that Porsche

---

[36] *Id.*
[37] *Id.*

sought and received for these vehicles were fraudulently obtained, and the vehicles were illegal to import into or sell or lease in the United States.

92.     Upon information and belief, this fraud may implicate all Class Vehicles equipped with Sport Plus mode, and testing confirms that it affects at least the following Class Vehicles: MY 2013 Porsche Boxster / Cayman S; MY 2014 Porsche Panamera Turbo; MY 2015 Porsche 911 S; MY 2016 Porsche Cayenne GTS; and MY 2017 Porsche Cayenne S.

93.     Recent developments further support these allegations, corroborate Plaintiff's testing, and indicate that the list of implicated vehicles is likely to be extensive. In or about November 2020, Porsche issued a secretive "Stop Sale" order directing its dealers not to "sell, lease, rent or loan" certain vehicles equipped with a "Sport Chrono" package (Porsche's term for the bundle of optional features that includes Sport Plus mode), as well as models that include Sport Plus mode as a standard feature.

94.     The Stop Sale—parts of which are excerpted below—applies to more than 20 models and variants over seven model years (2012 – 2018), all of which Porsche admits are being investigated for "emissions performance" issues.[38]

---

[38] Specially, the stop sale order covers the following vehicles if equipped with the Sport Chrono package (which includes Sport Plus mode): MY 2012-2016 991 Carrera, Cabriolet, 4, 4 Cabriolet, S, S Cabriolet, 4S, and 4S Cabriolet; MY 2015-2016 Targa and Targa 4S; MY 2015-2017 E2 II Cayenne S; MY 2016-2018 E2 II Cayenne GTS; MY 2014-2016 Panamera G1 II Turbo and Turbo Executive; and MY 2013-2014 981 Boxster S and Cayman S. The order also extends to all of the following: MY 2015-2016 991 GTS, GTS Cabriolet, 4 GTS, 4 GTS Cabriolet, and 4 GTS Targa; and MY 2014-2016 Panamera G1 II Turbo S and Turbo S Executive. (As used here, "991" refers to newer generations of the 911).

# WLN1 Stop Sale - Quality Assurance Hold for certain used vehicles equipped with Sport Chrono



Stop Sale

## DEALERS SHOULD NOT SELL, LEASE, RENT OR LOAN ANY VEHICLES AFFECTED BY THIS ACTION IN DEALER INVENTORY UNTIL FURTHER NOTICE.

## Overview

Porsche is currently investigating emissions performance of certain specific Model Year 2012 to 2018 vehicles equipped with Sport Chrono Package.

While this investigation continues and out of abundance of caution, Porsche is requesting that the following vehicles in dealer's inventory be placed on Quality Assurance hold until further notice.

---

## What Porsche Will Do

Porsche is working to develop an interim solution and will follow up with additional instructions as soon as they are available.
Please inform all necessary dealer staff of this notice as soon as possible.

---

95.     Notably, Porsche is only now "***working*** to develop an ***interim*** solution" (emphasis added), indicating that Porsche has no fix to offer, despite knowing about this issue for years.

96.     Moreover, while Porsche disclosed this information to dealers, it has done so secretly,[39] and it continues to conceal the truth about the vehicles from Plaintiffs, the Class, and the public.

97.     As with the Axle Ratio and Testing Software fraud, Porsche intentionally concealed and did not disclose the Sport Plus fraud to regulators or consumers and instead continued to sell and lease illegal vehicles to Plaintiffs and the Class for years.

**3.      Porsche—like all vehicle manufacturers—was subject to specific regulations governing fleet-wide $CO_2$ emissions and vehicle-specific NOx emissions.**

98.     Porsche cheated on emissions for a reason. As detailed further herein, both emissions and fuel economy are material to consumers—including Plaintiffs and the Class. They are also highly regulated.

**a.      Fleet-wide $CO_2$ regulations**

99.     California, one of the leaders in vehicle emissions regulations, implemented new greenhouse gas regulations in 2006 that took effect in 2009. These regulations, like the federal rules that followed, set a ceiling for a manufacturer's fleet-wide average emissions and governed all light- and medium-duty vehicles sold in California, one of Porsche's biggest markets in the United States.

---

[39] On information and belief, Porsche issued the "quality assurance hold" internally and did not intend for its public release. Copies of the document were leaked by certain dealers to consumers who then shared it on a website for automotive consumer news and information in a forum entitled "Stop Sale Campaign on 911 with Sport Chrono?" *See* https://rennlist.com/forums/991/1222745-stop-sale-campaign-on-911-with-sport-chrono.html.

100.     Federal fleet-wide standards for $CO_2$ emissions and average fuel economy followed suit. New regulations affecting model year 2012-2015 vehicles were implemented in 2011, beginning with 2012 model years, and increased in stringency through model year 2016.[40] New, even more stringent standards went into effect for model year 2017.[41]

101.     The EPA set $CO_2$ emissions standards for light-duty vehicles under section 202(a) of the Clean Air Act. Under these standards, by model year 2016, light-duty vehicles were required to meet an estimated combined average emissions level of 250 grams/mile of $CO_2$. The National Highway Traffic Safety Administration ("NHTSA") set fleet-wide Corporate Average Fuel Economy ("CAFE") standards for passenger cars and light trucks under 49 U.S.C. § 32902. NHTSA's standards required manufacturers to meet an estimated combined average fuel economy level of 34.1 miles per gallon ("MPG") by model year 2016.

102.     Defendants knew that their fleet of vehicles had to meet these standards to be sold in the United States and were equally aware that fuel consumption (MPG ratings) and emissions are important factors for consumers choosing a vehicle to purchase or lease. Rather than meeting these standards through legitimate means, however, Defendants cheated on the emissions tests in the Class Vehicles to feign compliance and cater to consumer demands. They then misled consumers by representing the Class Vehicles as consuming less fuel and emitting less $CO_2$ and other pollutants than they actually do in normal driving conditions.

**b.     Effect on Fuel Economy Ratings**

103.     Defendants' deception had a direct impact on the Class Vehicles' fuel economy ratings.

104.     During the regulatory testing cycles, manufacturers calculate the amount of fuel consumed, in part, by measuring tailpipe emissions. This process includes measuring un-combusted or partially combusted gasoline (hydrocarbons or HC), carbon monoxide (CO), and

---

[40] *See*, *e.g*., Federal Registrar Vol. 75 p. 25324 (May 7, 2010) (summarizing new regulations) https://www.gpo.gov/fdsys/pkg/FR-2010-05-07/pdf/2010-8159.pdf, p.8.

[41] Environmental and Energy Study Institute, *Fact Sheet: Vehicle Efficiency and Emissions Standards* (August 26, 2015), http://www.eesi.org/papers/view/fact-sheet-vehicle-efficiency-and-emissions-standards#1.

1  $CO_2$. The amount of carbon produced is then converted to the amount of gasoline required to

2  produce the carbon in the exhaust. Based on this equation, as the amount of $CO_2$ produced

3  increases, the gasoline used increases and the fuel economy decreases. Within this framework, if a

4  Class Vehicle produced less $CO_2$ during laboratory testing, but higher $CO_2$ when driven on road,

5  the Monroney sticker would correspondingly represent better estimated fuel economy than it would

6  actually achieve during every day driving.

7      105.    This is exactly what happened with the Class Vehicles.

8  <div align="center"><b>c.    <u>NOx regulations</u></b></div>

9      106.    NOx is a dangerous pollutant linked with serious health risks and climate change.

10  Congress first began regulating NOx as a tailpipe emission with the passage of the Clean Air Act in

11  1970. The standards went into effect in 1975 mandated that all passenger cars and light-duty trucks

12  emit no more than 3.1 grams per mile of NOx. In 1990, the CAA was amended to set a lower

13  standard (0.6 grams per mile) for NOx emissions, called Tier 1, effective in 1994.

14      107.    In 1999, newer standards were adopted, called Tier 2, which began taking effect in

15  2004, and which govern most of the Class Vehicles. The Tier 2 standards apply in two ways. First,

16  as with $CO_2$ regulations, a manufacturer's entire fleet must not exceed a specific average. Second,

17  each individual vehicle must also be certified to one of eight specific "bins," which limit the

18  amount of NOx (among other pollutants) that any *individual* vehicle can legally emit.

19      108.    As described above, Porsche represented to the regulators that, in all available

20  driving modes, its vehicles' NOx emissions did not exceed the limits set by the Tier 2 bins to which

21  they were certified. This was false. As a result, the Certificates of Conformity and Executive Orders

22  covering these vehicles were fraudulently obtained, and the vehicles were not legal to sell in the

23  United States.

24  **C.    <u>Defendants' advertising featured inflated fuel economy ratings and false promises of environmental friendliness.</u>**

25      109.    To many consumers, including Plaintiffs, environmental friendliness, fuel

26  economy, and the range of miles between fuel tank refills are important factors in their decision to

27

28

1    purchase or lease a vehicle. Defendants targeted these preferences in their misleading advertising

2    and other consumer-facing representations about the Class Vehicles.

3        110.    As alleged above, new vehicles include a window or "Monroney" sticker disclosing

4    the vehicles' fuel economy. The fuel economy ratings disclosed on Monroney stickers for the Class

5    Vehicles—and repeated in Defendants' own representations to the Class—were false because they

6    were calculated in testing conditions that, because of the fraudulent schemes alleged above, did not

7    reflect on-road driving.

8        111.    Monroney labels from some of the Class Vehicles are included below to exemplify

9    these representations:









- 45 -

| | |
|---|---|
| Year:  2016 | Engine:  8 Cylinder Engine |
| Make:  Porsche | Transmission:  8-speed |
| Model:  Cayenne AWD 4dr Turbo | Exterior:  Black |
| VIN:  WP1A2A2QGLA88370 | Interior:  Leather Interior in Black |

**MECHANICAL**

· 2.92 Axle Ratio
· Full-Time All-Wheel Drive
· 92-Amp/hr Maintenance-Free Battery
· Towing Equipment -inc: Trailer Sway Control
· 4-Corner Auto-Leveling Suspension
· Hydraulic Power-Assist Speed-Sensing Steering
· 26.4 Gal. Fuel Tank
· Permanent Locking Hubs

**EXTERIOR**

· Spare Tire Mobility Kit
· Steel Spare Wheel
· Clearcoat Paint
· Body-Colored Front Bumper
· Body-Colored Rear Bumper
· Aluminum Side Windows Trim and Black Front Windshield Trim
· Body-Colored Door Handles
· Body-Colored Fender Flares
· Body-Colored Power Heated Auto Dimming Side Mirrors w/Power Folding
· Fixed Rear Window w/Fixed Interval Wiper and Defroster
· Deep Tinted Glass
· Rain Detecting Variable Intermittent Wipers w/Heated Jets
· Front Windshield -inc: Sun Visor Strip
· Fully Galvanized Steel Panels
· Lip Spoiler
· Body-Colored Grille
· Front License Plate Bracket
· Front And Rear Fog Lamps
· Perimeter/Approach Lights
· LED Brakelights
· Cornering Lights

**ENTERTAINMENT**

· Audio Theft Deterrent
· Concealed Diversity Antenna
· 585w Regular Amplifier
· Digital Signal Processor
· Bluetooth Wireless Phone Connectivity
· 2 LCD Monitors In The Front

**INTERIOR**

· Power Tilt/Telescoping Steering Column
· Front Cupholder
· Rear Cupholder

· Compass
· HomeLink Garage Door Transmitter
· Cruise Control
· HVAC -inc: Underseat Ducts and Console Ducts
· Illuminated Locking Glove Box
· Driver Foot Rest
· Leather Door Trim Insert
· Leather/Metal-Look Gear Shift Knob
· Full Alcantara Simulated Suede Headliner
· Driver And Passenger Visor Vanity Mirrors w/Driver And Passenger Illumination, Driver And Passenger Auxiliary Mirror
· Day-Night Auto-Dimming Rearview Mirror
· Full Floor Console w/Covered Storage, Mini Overhead Console and 5 12V DC Power Outlets
· Front And Rear Map Lights
· Delay Off Interior Lighting
· Carpet Floor Trim and Carpet Trunk Lid/Rear Cargo Door Trim
· Trunk/Hatch Auto-Latch
· Cargo Area Concealed Storage
· Roll-Up Cargo Cover
· Cargo Features -inc: Spare Tire Mobility Kit
· Cargo Space Lights
· FOB Controls -inc: Trunk/Hatch/Tailgate and Windows
· Refrigerated/Cooled Box Located In The Glovebox, Driver / Passenger And Rear Door Bins and 1st Row Underseat Storage
· Delayed Accessory Power
· Systems Monitor
· Outside Temp Gauge
· Redundant Digital Speedometer
· Manual Adjustable Front Head Restraints and Manual Adjustable Rear Head Restraints
· Sliding Front Center Armrest and Rear Center Armrest
· 2 Seatback Storage Pockets
· Perimeter Alarm
· 5 12V DC Power Outlets
· Air Filtration

**SAFETY**

· Side Impact Beams
· Tire Specific Low Tire Pressure Warning
· Dual Stage Driver And Passenger Front Airbags
· Curtain 1st And 2nd Row Airbags
· Airbag Occupancy Sensor
· Rear Child Safety Locks
· Outboard Front Lap And Shoulder Safety Belts -inc: Rear Center 3 Point, Height Adjusters and Pretensioners

| CITY MPG | HIGHWAY MPG |
|---|---|
| **14** | **21** |

*Actual mileage will vary with options, driving conditions, driving habits and vehicle's condition*

## *New*

| MSRP | $114,460.00 |
|---|---|
| **INSTALLED OPTIONS** | |
| [C4I] Wheels: 21" Cayenne Sport Classic Satin | $3,850 |
| [Q2J] 14 Way Power Seats W/Memory Package (Q2 J) | $0 |
| [LC] Black, Leather Seat Trim | $0 |
| [PJI] Premium Plus Package | $3,660 |
| [1NP] Wheel Hub Cover W/Colored Porsche Crest | $185 |
| [QJ4] Exterior Package In High Gloss Black | $150 |
| [GZ2] Soft Close Doors | $770 |
| [8SI] Tinted Led Taillights | $650 |
| [4D3] Front Seat Ventilation | included |
| [5ZF] Porsche Crest On Front & Rear Seat Headrests | $570 |
| [8T3] Adaptive Cruise Control W/Porsche Active Safe | $2,300 |
| [9AH] 4 Zone Climate Control | $990 |
| [7X8] Front & Rear Parkassist W/Reversing Camera | included |
| [7Y1] Lane Change Assist (Lca) | included |
| [9JB] Smoker Package | $0 |
| [7M7] Illuminated Stainless Steel Door Sill Guards | $1,100 |
| [BASE] Cayenne Turbo | |
| [A1] Black | |
| [G1G] 8 Speed Tiptronic S | |
| Original Shipping Charge | $1,050 |
| **RETAIL PRICE (ORIGINALLY NEW)** | $129,735.00 |

- 46 -

| Year:  2015 | Engine:  Flat 6 Cylinder Engine |
| Make:  Porsche | Transmission:  6-SPEED MANUAL W/OVERDRIVE |
| Model:  Boxster 2dr Roadster | Exterior:  White |
| VIN:  WP0CB2A82FS140488 | Interior:  Black |

**MECHANICAL**

- Rear-Wheel Drive
- 3.89 Axle Ratio
- 70-Amp/Hr 340CCA Maintenance-Free Battery
- 120 Amp Alternator
- 3649# Gvwr 739# Maximum Payload
- Gas-Pressurized Shock Absorbers
- Front And Rear Anti-Roll Bars
- Electric Power-Assist Speed-Sensing Steering
- 16.9 Gal. Fuel Tank
- Strut Front Suspension w/Coil Springs
- Strut Rear Suspension w/Coil Springs
- 4-Wheel Disc Brakes w/4-Wheel ABS, Front And Rear Vented Discs, Brake Assist, Hill Hold Control and Electric Parking Brake

**EXTERIOR**

- Wheels w/Locks
- Spare Tire Mobility Kit
- Clearcoat Paint
- Body-Colored Rear Bumper w/Black Rub Strip/Fascia Accent
- Black Side Windows Trim and Black Front Windshield Trim
- Body-Colored Door Handles
- Body-Colored Power Heated Side Mirrors w/Manual Folding
- Fixed Rear Window w/Defroster
- Light Tinted Glass
- Front Windshield -inc: Sun Visor Strip
- Galvanized Steel/Aluminum Panels
- Trunk Rear Cargo Access
- Front And Rear Fog Lamps
- Perimeter/Approach Lights
- LED Brakelights

**ENTERTAINMENT**

- Radio w/Compatible Remote CD, Clock and Speed Compensated Volume Control
- Audio Theft Deterrent
- Window Grid Diversity Antenna
- 7 Speakers
- Regular Amplifier
- Bluetooth Wireless Phone Connectivity

**INTERIOR**

- Front Cupholder

- Valet Function
- Power Fuel Flap Locking Type
- Remote Releases -Inc: Power Cargo Access
- HomeLink Garage Door Transmitter
- Cruise Control
- Illuminated Locking Glove Box
- Driver Foot Rest
- Full Cloth Headliner
- Leather Door Trim Insert w/Carpet Lower
- Day-Night Rearview Mirror
- Driver And Passenger Visor Vanity Mirrors w/Driver And Passenger Illumination
- Full Floor Console w/Locking Storage and 3 12V DC Power Outlets
- Fade-To-Off Interior Lighting
- Carpet Floor Trim
- Cargo Features -inc: Spare Tire Mobility Kit
- Cargo Space Lights
- FOB Controls -inc: Trunk/Hatch/Tailgate and Sunroof/Convertible Roof
- Interior Concealed Storage, Driver And Passenger Door Bins
- Power 1st Row Windows w/Driver And Passenger 1-Touch Down
- Systems Monitor
- Redundant Digital Speedometer
- Outside Temp Gauge
- Analog Display
- Fixed Front Head Restraints
- Front Center Armrest
- Perimeter Alarm
- 3 12V DC Power Outlets
- Air Filtration

**SAFETY**

- Side Impact Beams
- Dual Stage Driver And Passenger Seat-Mounted Side Airbags
- Tire Specific Low Tire Pressure Warning
- Dual Stage Driver And Passenger Front Airbags
- Curtain 1st Row Airbags
- Airbag Occupancy Sensor
- Outboard Front Lap And Shoulder Safety Belts -inc: Pretensioners

### New

| MSRP | **$65,810.00** |
|---|---|
| **INSTALLED OPTIONS** | |
| [423] Wheels: FR 8 J X 20 & RR 9.5 J X 20 Carrera S Alloy | $1,560 |
| [00] White | $0 |
| [P06] 14 Way Electric Sport Seats W/Memory Package | $2,320 |
| [AG] Black, Partial Leather Seat Trim | $0 |
| [P98] Premium Package W/Sport Seats | $1,170 |
| [P9G] Infotainment Package W/Bose Surround Sound System | $3,990 |
| [658] Power Steering Plus | $270 |
| [603] Bi Xenon Lighting System | $690 |
| [844] Leather Multifunction Steering Wheel | $615 |
| [583] Smoking Package | $0 |
| [250] Porsche Doppelkupplung (PDK) | $995 |
| Original Shipping Charge | |
| **RETAIL PRICE (ORIGINALLY NEW)** | **$77,420.00** |

**Get more information on your smartphone:**

112.    In addition to the Monroney labels, Defendants advertised the Class Vehicles and otherwise supplied consumers with misinformation about them—including exaggerated fuel economy statistics—through various public-facing channels.

113.    Brochures for the Class Vehicles—all of which, like the Monroney labels, include falsely-inflated fuel economy ratings—misleadingly emphasize fuel efficiency and/or

1    environmental cleanliness without the disclosing the truth about the laboratory and real-world

2    contradictions therein.

3        114.    The brochure for the 2016 Cayenne S serves as a representative example. It

4    promises "impressive fuel economy" and the "perfect balance between output and efficiency,"

5    noting that the Cayenne features "something quite special: enhanced power with greater fuel

6    economy." Per the brochure, the 2016 Cayenne features a "significant decrease in fuel

7    consumption" from its predecessor. As to the environment, it affirms that "[e]cological

8    responsibility is nothing new for Porsche" where "all technological developments are carried out

9    with environmental protection in mind," and explains that "even high-performance sports cars can

10   achieve comparatively moderate exhaust emission values." Finally, the brochure includes a

11   detailed chart specifying the fuel consumption ratings for each Cayenne subtype.

| | 2016 Cayenne Turbo S | 2016 Cayenne Turbo | 2016 Cayenne GTS | 2016 Cayenne S E-Hybrid |
|---|---|---|---|---|
| **Estimated EPA fuel economy** | | | | |
| Fuel grade | Premium | Premium | Premium | Premium |
| City | 14 | 19 | 16 | 21 |
| Highway | 21 | 24 | 23 | 24 |
| Combined | 17 | 21 | 19 | 22 |
| Electricity consumption (combined) | – | – | – | 47 MPGe |
| Typical electric range in everyday driving | – | – | – | – |

20       115.    The brochure for the 2011 Cayenne similarly illustrates the types of representations

21   made to consumers in the Class Vehicle brochures. The brochure includes a two-page spread on the

22   environment, emphasizing Porsche's goal of "reducing excess, waste and inefficiency." On exhaust

23   emissions, it describes "effective emissions control" based in part on using an "optimal amount of

24   fuel." And as to fuel economy, it details how the 2011 Cayenne is "increasing performance while

25   enhancing fuel economy." An image of the spread is included in full below, along with magnified

26   excerpts of the paragraphs cited herein for reference.

27

28

Reducing excess, waste and inefficiency has always been our goal.

# Environment.

Since the beginning, the concept behind every Porsche has been to create the most, using the least. We are continually striving to gain performance by eliminating excess.

This is achieved by using advanced engine concepts featuring technologies such as DFI (p. 28), VarioCam Plus (p. 27), the Auto Start Stop function (p. 26), the parallel full hybrid system, and consistent lightweight construction.

Weight reduction is a key aspect of our design philosophy, derived from our rich racing heritage. Part of our R&D Center, the Motorsport Department is located in Weissach, where it shares premises with the German Automotive Industry

Exhaust Emissions Center. Just a coincidence? We call it symbiosis.

In practice: The new Cayenne is up to 408 pounds lighter, depending on the model. This was achieved through new weight-saving developments and materials, new production technologies, advanced functionalities and concept modifications. By using lighter

materials, for example, we cut the weight of the tailgate in half. New materials are also a feature of the axle construction, with steel being replaced where possible by lightweight alternatives such as aluminum and plastic.



Porsche engines.
Performing for today—and the future.

### Exhaust emissions.

Whatever the class, every Porsche combines high performance with comparatively moderate emissions. On the new Cayenne models, this is achieved using advanced drive concepts—from Direct Fuel

Injection (DFI) gasoline engines to our new parallel full hybrid system. This is further aided by the rapid warm-up cycle of the catalytic converters. The optimal operating temperature is reached earlier so emissions are reduced sooner when starting from cold.

On the gasoline-engine and hybrid models, another important feature is the use of twin oxygen-sensor circuits. Each bank of cylinders has a separate control system, which the engine management system uses to establish the optimal amount of fuel—for effective emissions control.

### Fuel and fuel economy.

Increasing performance while enhancing fuel economy. The new Cayenne range offers two different drive systems, each featuring state-of-the-art technology for high efficiency and relatively low fuel consumption. The gasoline engine models already operate on fuels with an ethanol content of up to 10 percent.

This further improves the carbon dioxide balance since the plants grown for the production of biofuels absorb carbon dioxide from the atmosphere. As you can see, for the benefit of the environment, we are continually working on making our cars more efficient—as well as compatible with alternative fuels. While ensuring that they remain one thing: a thoroughbred Porsche.

### Fuel system.

We have also applied the highest standards in order to protect the environment from fuel evaporation. The non-return fuel supply system provides a considerable reduction in vapor emissions. The lines carrying vapor are made from multilayer plastics. A large active-carbon filter and multilayer plastic fuel tank help reduce evaporation still further.

Standard on the Cayenne, Cayenne S, Cayenne S Hybrid and Cayenne Turbo.



Safety and environment | Environment · 53

**Exhaust emissions.**

Whatever the class, every Porsche combines high performance with comparatively moderate emissions. On the new Cayenne models, this is achieved using advanced drive concepts—from Direct Fuel Injection (DFI) gasoline engines to our new parallel full hybrid system. This is further aided by the rapid warm-up cycle of the catalytic converters. The optimal operating temperature is reached earlier so emissions are reduced sooner when starting from cold.

On the gasoline-engine and hybrid models, another important feature is the use of twin oxygen-sensor circuits. Each bank of cylinders has a separate control system, which the engine management system uses to establish the optimal amount of fuel—for effective emissions control.

**Fuel and fuel economy.**

Increasing performance while enhancing fuel economy. The new Cayenne range offers two different drive systems, each featuring state-of-the-art technology for high efficiency and relatively low fuel consumption. The gasoline engine models already operate on fuels with an ethanol content of up to 10 percent. This further improves the carbon dioxide balance since the plants grown for the production of biofuels absorb carbon dioxide from the atmosphere. As you can see, for the benefit of the environment, we are continually working on making our cars more efficient—as well as compatible with alternative fuels. While ensuring that they remain one thing: a thoroughbred Porsche.

116.     Brochures for other Class Vehicles use similar language to send a misleading message of fuel efficiency and environmental protection. Illustrative examples are described below.

a.     The 2008 brochure for the Cayenne touts its "impressive fuel economy" and claims that its "engine management system works its silent magic to help reduce emissions at the source" and to "ensure Cayenne complies with all emissions legislation." The same brochure explains that "Porsche engineers have proven it's not necessary to decrease fuel efficiency in order to increase performance" and that Cayenne provides a "significant increase in fuel efficiency and a reduction of exhaust emissions."

1    b. In the 2008 brochure for the 911, Porsche related that "[p]owerful

2 performance needn't cost the earth," and explained that it "reduces the $CO_2$ emissions of its

3 vehicles annually by an average of 1.7%" given its "high degree of environmental responsibility."

4    c. The brochure for the 2009 911 notes "better fuel economy" and "lower

5 exhaust emissions" and offers "maximum efficiency" as an answer to the question of "fuel

6 consumption."

7    d. The brochure for the 2010 911 promises "reduced fuel consumption and

8 emissions, and outstanding dynamics" including a "distinct fall in fuel consumption and

9 emissions" with a reduction in "$CO_2$ emissions by up to 15% compared with the previous

10 model."

11    e. The brochure for the 2010 911 Turbo and Turbo S affirms that the "911

12 Turbo and Turbo S models comply with stringent emissions standards" which makes them "not

13 just extremely exciting sports cars, but very clean ones too."

14    f. The 2011 Cayenne brochure assures that it is "more fuel-efficient than ever

15 before." Per the brochure, Cayenne provides "optimal fuel economy and lower CO2 emissions,

16 as well as greater power and torque at all times."

17    g. The 2011 brochure for the 911 similarly touts "lower fuel consumption and

18 reduced emissions."

19    h. The 2012 brochure for the Cayman promises "resolute compliance with the

20 environmental regulations" and continues that "efficiency, too, is a question of character." As it

21 further explains, the Cayman reflects the goal of "performance—but not at the expense of the

22 environment."

23    i. The 2012 Boxster brochure describes a "commitment to high power with

24 comparatively low fuel consumption and emissions figures" meaning that even Porsche's

25 "high-performance sports cars can achieve moderate fuel consumption and exhaust emissions

26 values in their respective categories." The same brochure further sets out that while "[e]very

27 automotive manufacturer must ask itself what it has to offer in terms of reducing environmental

28 impact," for Porsche, the answer is purportedly "high efficiency," including that it "managed to

reduce fuel consumption across all model ranges by a double digit percentage." The brochure for the 2012 Panamera assures consumers that Porsche was "achieving the lowest $CO_2$ emissions" through "efficient engine technologies."

j.      The brochure for the 2012 911 expresses Porsche's "concern" about "global climate change and $CO_2$ emissions" and emphasizes that the vehicle engines were "developed with new efficiency-enhancing technologies . . . that reduce fuel consumption."

k.      The 2013 Cayenne brochure similarly describes "greater efficiency in fuel consumption." Indeed, it notes that all gasoline-powered Cayennes purportedly offer a "significant increase in power and torque as well as better fuel economy and lower emissions." On the environment, Porsche explains it is "continually striving" to find a "successful balance" between performance and efficiency, and through new technologies in the Cayenne, it has achieved "efficiency at its best." Further, because Cayenne is "equipped with the latest emissions technology," all models "comply with U.S. EPA standards."

l.      The brochure for the 2013 Panamera suggests that "performance and efficiency need not be mutually exclusive" and details the "highly efficient, state-of-the-art engines" that lead to "comparatively low fuel consumption" while maintaining a sound that is "still unmistakably Porsche."

m.      The 2014 brochure for the 911 notes that its "refined engine" will "consume less fuel." A multi-page spread in that brochure about "Porsche and the environment" explains that "we've defined the 911 in terms of sporty performance. And we've scrutinized it daily for its efficiency-enhancing potential."

n.      The 2014 brochure for the Panamera emphasizes "[c]onserving fuel. Without cutting back on adrenaline" and features "improved fuel efficiency" explaining that "turbocharging isn't just about increased power. It's about enhanced efficiency" including "lower fuel consumption."

o.      A 2015 brochure describes the 911 to be "[n]ot at thirsty as you might think" and likewise touts its "comparatively low fuel consumption" and "high power output" achieved in an "environmentally acceptable and sustainable way."

1        p.    The 2016 Boxster brochure addresses the "environment" and the

2    "intensifying debate about global climate change and CO2 emissions." On these issues, it

3    declares that "fair play" is a "sporting essential" and promises "excellent performance together

4    with excellent efficiency" and "efficient emissions control."

5        q.    The brochure for the 2016 911 describes "fuel consumption and $CO_2$

6    emissions" that are "remarkably low."

7        r.    The 2017 Cayenne brochure likewise describes "comparatively low fuel

8    consumption" and notes that "ecological responsibility is nothing new for Porsche" meaning that

9    "even high-performance sports cars can achieve comparatively moderate exhaust emission

10    values."

11    117.    The Defendants also similarly featured the Class Vehicles' fuel economy and

12    supposedly clean emissions in other consumer-facing marketing materials.

13        a.    A January 25, 2010 Press Release at the launch of the 2010 Porsche 911

14    Turbo notes a "13 percent increase in fuel economy" making it a "more efficient" vehicle.

15        b.    An April 22, 2010 Press Release for the "New Porsche Panamera" boasts of

16    "more performance on less fuel, increased efficiency and lower $CO_2$ emissions."

17        c.    A June 4, 2010 Press Release for the launch of the Panamera and Panamera 4

18    promises "even better fuel economy" where the "Panamera achieves 18 mpg city/27 highway" and

19    the Panamera 4 "delivers 18 mpg city/26 highway, numbers that are no doubt appealing to

20    consumers who demand driving excitement and fuel efficiency."

21        d.    An October 27, 2010 Press Release titled "Cayenne Proves Porsche's Goal

22    of Better Fuel Economy" notes that the "New SUV Sees Significant Fuel Savings." As it describes,

23    through the "Porsche Intelligent Performance" philosophy, the Cayenne offers "more power with

24    lower consumption increased efficiency, and reduced $CO_2$ emissions."

25        e.    A February 6, 2012, Press Release for the 911 Carrera and Carrera S said

26    that "[f]or 2012, the 911 has been completely redesigned from the ground up. The newest

27    incarnation applies singular balance to the priorities of a new era, preserving the classic 911 lines,

28    yet revisiting every inch for advances in power and fuel economy."

f.      A page available on the Porsche USA website (www.porsche.com/usa) on September 5, 2015 regarding "fuel economy and recycling" for the 911 Carrera features "low fuel consumption values in conjunction with outstanding performance" as well "efficient emission control."

g.      A January 27, 2016 Press Release for the Boxster notes that the new models are "now more powerful yet more fuel efficient" with "fuel economy improvements of up to 13 percent."

h.      In an "Environmental Statement" for 2016-2017 entitled "taking our responsibilities seriously," Porsche detailed its purported commitment to "reducing carbon dioxide" in its vehicles and boasted that it "goes without saying that Porsche meets all applicable environmental regulations."

i.      A Press Kit issued at the production anniversary of the 911 (at the production of the one millionth 911 in May 2017) explains that 911s "set the bar yet another notch higher in terms both of performance and efficiency" with "lower fuel consumption and even more power."

118.    As these and other marketing materials reflect, Porsche sought to cater to increasingly eco-conscious consumers and to align its brand—including the Class Vehicles—with a commitment to the environment and efficient use of resources.

119.    These efforts are also reflected throughout a February 18, 2013 interview with Porsche's Board of Management member, Wolfgang Hatz, by the consumer website, Driving the Nation. In that interview, Mr. Hatz assured the public that "[t]hinking 'green' is not a trend at Porsche; it is a way of conducting business." He further affirmed that that Porsche "has **always complied with statutory legal requirements** and has, in fact, done so by a comfortable margin" including through "eco-friendly" initiatives like "lowering fuel consumptions, and further reducing emissions of pollutants and CO2" (emphasis added). At that time, he noted that Porsche had "succeeded in reducing fuel consumption in its new cars, and thereby also CO2 emissions" as part of their mission to "develop, produce, sell and service fascinating, high-quality, exclusive sports cars that meet the highest possible standards of environmental . . . engineering."

120.    As described throughout this Complaint, these statements and those detailed above about Porsche and the Class Vehicles' emissions and fuel economy were not true.

* * *

121.    Defendants' deceptive actions harmed Plaintiffs and the Class. As a result of Defendants' unfair, deceptive, and/or fraudulent business practices, and failure to disclose that the Class Vehicles were designed to mislead consumers about the vehicles' true emissions levels and fuel economy, owners and lessees of the Class Vehicles have suffered losses in money and/or property. Plaintiffs have suffered damages as a result their purchases of the Class Vehicles, including but not limited to payment for additional fuel costs required by the lower fuel economy performance in their Vehicles.

## VII.    CLASS ACTION ALLEGATIONS

122.    Plaintiffs bring this lawsuit as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), (b)(3), and/or (c)(4), on behalf of themselves and all others similarly situated as members of the following Nationwide Class and State Classes (collectively, the "Classes," unless otherwise stated). The Class Vehicles implicated by this Complaint include all model year 2007–2018 Porsche vehicles sold in the United States.

123.    The proposed Nationwide Class includes all persons and entities that purchased or leased a Class Vehicle in the United States, including its territories.

124.    Plaintiffs also propose separate State Classes for all fifty states, each of which includes all persons and entities that purchased or leased a Class Vehicle in that state.

125.    Excluded from the Classes are:

a.    Defendants' officers, directors and employees and participants in the Porsche Associate Lease Program; Defendants' affiliates and affiliates' officers, directors and employees; Defendants' distributors and distributors' officers, directors and employees; and

b.    Judicial officers and their immediate family members and associated court staff assigned to this case.

126.    Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, reduced, divided into additional subclasses under Rule 23(c)(5), or modified in any other way.

127.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used in individual actions alleging the same claims.

128.    This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23 and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of its provisions.

### A.    Numerosity: Federal Rule of Civil Procedure 23(a)(1)

129.    The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Plaintiffs are informed and believe that there are hundreds of thousands of members of the Class, and at least hundreds of members in each State Class. The precise number and identities of Nationwide Class and State Class members may be ascertained from Defendants' records and motor vehicle regulatory data. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

### B.    Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)

130.    This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.    Whether Defendants engaged in the conduct alleged herein;

b.    Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

c.    Whether the Class Vehicles were affected by the Axle Ratio, Testing Software, and Sport Plus defects, as described herein;

d.    Whether Defendants' conduct violates consumer protection statutes, warranty laws, and other laws as asserted herein;

e.      Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

f.      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

**C.      Typicality: Federal Rule of Civil Procedure 23(a)(3)**

131.    Plaintiffs' claims are typical of the claims of the Class members whom they seek to represent under Fed. R. Civ. P. 23(a)(3), because Plaintiffs and each Class member purchased or leased a Class Vehicle and were comparably injured through Defendants' wrongful conduct as described above. Plaintiffs and the other Class members suffered damages as a direct proximate result of the same wrongful practices by Defendants. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other Class members. Plaintiffs' claims are based upon the same legal theories as the claims of the other Class members.

**D.      Adequacy: Federal Rule of Civil Procedure 23(a)(4)**

132.    Plaintiffs will fairly and adequately represent and protect the interests of the Class members as required by Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests do not conflict with the interests of the Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, including vehicle emissions litigation and other consumer protection litigation. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other Class members. Therefore, the interests of the Class members will be fairly and adequately protected.

**E.      Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)**

133.    Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

**F.      Superiority: Federal Rule of Civil Procedure 23(b)(3)**

134.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in its management. The damages or other financial detriment suffered by Plaintiffs and the other Class

members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants such that it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct.

135.    Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.   ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED

### A.    Discovery Rule Tolling

136.    For the following reasons, any otherwise-applicable statutes of limitation have been tolled by the discovery rule with respect to all claims.

137.    Through the exercise of reasonable diligence, and within any applicable statutes of limitation, Plaintiffs and members of the proposed Class could not have discovered that Defendants were concealing and misrepresenting the Class Vehicles' true emissions and fuel efficiency levels, including but not limited to their use of altered testing vehicles, a secret clean operating mode that is not used for real-world driving but is activated only during testing, and falsely attesting that Sport Plus Mode complies with applicable emissions regulations.

138.    Plaintiffs and the other Class members could not have reasonably discovered, and did not know of facts that would have caused a reasonable person to suspect, that Defendants intentionally failed to report information within their knowledge to federal and state authorities, dealerships, or consumers until—at the earliest—August 22, 2020, when published reports surfaced for the first time disclosing the existence of the emissions and fuel economy defects in the Class Vehicles. Plaintiffs did not discover Defendants' deception and unlawful conduct until after August 22, 2020 upon reviewing media reports and/or learning of their counsel's investigation.

139.    Likewise, a reasonable and diligent investigation would not have disclosed that Defendants had information in their possession about the existence of its sophisticated emissions

and fuel economy deception and that they concealed that information, which Plaintiffs only discovered shortly before this action was filed.

## B. Tolling Due to Fraudulent Concealment

140.  Throughout the relevant time period, all applicable statutes of limitation have been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged in this Complaint.

141.  Upon information and belief, prior to the date of this Complaint, and at least as early as September 2015, if not earlier, Defendants knew of the emissions and fuel economy defects in certain Class Vehicles, but continued to distribute, sell, and/or lease the Class Vehicles to Plaintiffs and the class members. In so doing, Defendants concealed and/or failed to notify Plaintiffs and the Class members about the true nature of the Class Vehicles.

142.  Instead of disclosing their deception, or that the emissions and fuel economy from the Class Vehicles were worse than represented, Defendants falsely represented the Class Vehicles' true emissions and fuel economy.

143.  Any otherwise-applicable statutes of limitation have therefore been tolled by Defendants' exclusive knowledge and active concealment of the facts alleged herein.

## C. Estoppel

144.  Defendants were and are under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles, including their fuel economy, emissions systems, and their compliance with applicable federal and state law.

145.  Although Defendants had the duty throughout the relevant period to disclose to Plaintiffs and Class members that they had engaged in the deception described in this Complaint, Defendants did not actively disclose true fuel economy and emissions statistics and did not correct their disclosures with respect to the Class Vehicles, actively concealed the true character, quality, and nature of the Class Vehicles, and made misrepresentations about the quality, reliability, characteristics, and/or performance of the Class Vehicles.

146.    Defendants actively concealed the true character, quality, performance, and nature of the emission and fuel economy defects in the Class Vehicles, and Plaintiffs and the class members reasonably relied upon Defendants' knowing and active concealment of these facts.

147.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## IX.    CAUSES OF ACTION

### A.    Claims Asserted on Behalf of the Nationwide Class

### NATIONWIDE COUNT I:
### FRAUD BY CONCEALMENT
### (Common Law)

148.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

149.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Classes, against all Defendants.

150.    Defendants are liable for both fraudulent concealment and non-disclosure. *See, e.g.*, Restatement (Second) of Torts §§ 550-51 (1977).

151.    Specifically, Defendants committed fraud by submitting testing vehicles that were materially different from production vehicles, installing and calibrating clean driving software in the Class Vehicles for testing only, attesting that the high performance Sport Plus mode complied with applicable emissions laws, and concealing all of this information from regulators, Plaintiffs and the Class.

152.    A reasonable consumer would not have expected that the Class Vehicles they paid for and drove were materially different from the testing-only vehicles used to obtain permission to sell the vehicles, contained software designed to misrepresent the Class Vehicles' true emissions and fuel economy, and did not comply with emissions laws when operated in Sport Plus mode.

153.    Defendants knew that these facts about the Class Vehicles would be important to the consumers deciding to purchase or lease them. Defendants ensured that Plaintiffs and the Class did

1    not discover this information through actively concealing it. Defendants intended for Plaintiffs and

2    the Class to rely on their omissions—which they did by paying for the Class Vehicles.

3        154.    Defendants had a duty to disclose the emissions and fuel economy defects and that

4    the Class Vehicles consumed more fuel and emitted higher levels of harmful pollutants during

5    normal driving operation. These important facts were known and/or accessible only to the

6    Defendants, including due to their involvement in the design, installment, and calibration of the

7    hardware and software in the Class Vehicles. Defendants also knew that these technical facts were

8    not known to or reasonably discoverable by Plaintiffs and the Class. If Defendants had disclosed

9    these material facts, Plaintiffs would have seen them.

10       155.    Defendants also had a duty to disclose the true nature of the Class Vehicles in light

11   of their affirmative statements about the Class Vehicles with respect to emissions standards, fuel

12   efficiency and performance. In uniform advertising and materials provided with each Class

13   Vehicle, Defendants intentionally concealed, suppressed, and failed to disclose to Plaintiffs and the

14   Class that the Class Vehicles were equipped with emissions-cheating software and/or hardware that

15   caused them to obtain worse fuel economy and/or emit more pollution on the road than in

16   regulatory testing.

17       156.    Defendants knew these statements were misleading, deceptive, and incomplete

18   without the disclosure of the additional facts set forth above regarding the existence of the

19   emissions- and fuel economy-cheating fraud. Because they volunteered to provide information

20   about the Class Vehicles that they offered for sale to Plaintiffs and the Class, Defendants had the

21   duty to disclose the whole truth. They did not.

22       157.    Defendants did not fulfill their duties to disclose to Plaintiffs and the Class. Instead,

23   they actively concealed the truth, including during the emissions certification process for the Class

24   Vehicles and throughout their marketing and sale of the Class Vehicles.

25       158.    Defendants' deceptive actions harmed Plaintiffs and the Class. Because

26   Defendants' fraudulently concealed the truth about the Class Vehicles' fuel economy and

27   emissions characteristics, consumers who paid for the Class Vehicles suffered economic losses.

28   Plaintiffs suffered damages including but not limited to payment for additional fuel costs required

by the lower fuel economy performance in their Class Vehicles. Accordingly, Defendants are liable to Plaintiffs and the Class for damages in an amount to be proven at trial.

159.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the rights of Plaintiffs and the Class; and to enrich themselves. Their misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

<div align="center">

**NATIONWIDE COUNT II:**
**IMPLIED AND WRITTEN WARRANTY**
**Magnuson - Moss Warranty Act (15 U.S.C. §§ 2301, *et seq.*)**

</div>

160.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

161.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class against all Defendants.

162.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

163.    Plaintiffs and Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

164.    Defendants are "supplier[s]" and "warrantor[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

165.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

166.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

167.    Defendants provided Plaintiffs and the Nationwide Class with the following two express warranties, which are covered under 15 U.S.C. § 2301(6):

a.    **Manufacturer's Warranty**—This written warranty provides "bumper-to-bumper" limited express warranty coverage for a minimum of 4 years or 50,000 miles, whichever comes first. The warranty covers emissions related repairs.

b.      **Federal Emissions Warranty**—Consistent with federal law, the Defendants provided a "performance warranty" and a "design and defect warranty." In the event that a vehicle fails an emissions test, these warranties cover the repair and replacement of: all emission control and emission-related parts for two years or 24,000 miles (whichever comes first); and specified major emission control components, including catalytic converters, electronic emissions control unit or computer and on–board emissions diagnostic device or computer for 8 years or 80,000 miles (whichever comes first).

168.    The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

169.    The terms of these warranties became part of the basis of the bargain when Plaintiffs and each Class member purchased or leased their Class Vehicles.

170.    Defendants breached these written and implied warranties as described in detail above. Without limitation, the Class Vehicles share a common design defect in that they emit more pollution and consume more fuel than disclosed to regulators, consumers, and the driving public.

171.    Plaintiffs and each Class member have had sufficient direct dealings with either Defendants or their agents (including dealerships) to establish privity of contract between Defendants, on the one hand, and Plaintiffs and each Class member, on the other hand, as to the express and implied warranties detailed in the Counts below.

172.    Nonetheless, privity is not required here because Plaintiffs and each Class member are intended third-party beneficiaries of contracts between Defendants and their dealers, and of their implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers only.

173.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle, Defendants knew, or should have known, of their misrepresentations and/or material omissions concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the design defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs

1    or members of the Class resort to an informal dispute resolution procedure and/or afford

2    Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby

3    deemed satisfied.

4          174.    In addition, given the conduct described herein, any attempts by Defendants, in their

5    capacity as warrantors, to limit the implied warranties in a manner that would exclude coverage of

6    the defect is unconscionable and any such effort to disclaim, or otherwise limit, liability for the

7    defect is null and void.

8          175.    Plaintiffs and the other Class members would suffer economic hardship if they

9    returned their Class Vehicles, but did not receive the return of all payments they made to

10    Defendants. Because Defendants are refusing to acknowledge any revocation of acceptance and

11    have not immediately returned any payments made, Plaintiffs and the Class have not re-accepted

12    their Class Vehicles by retaining them.

13          176.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum

14    of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest

15    and costs, computed on the basis of all claims to be determined in this lawsuit.

16          177.    As a direct and proximate result of the Defendants' breach of the written and

17    implied warranties, Plaintiffs and each Class member have suffered damages.

18          178.    Plaintiffs, individually and on behalf of the Class, seek all damages permitted by

19    law, including compensation for the monetary difference between the Class Vehicles as warranted

20    and as sold or leased; compensation for the reduction in resale value; the cost of purchasing,

21    leasing, or renting replacement vehicles, along with all other incidental and consequential damages,

22    statutory attorney fees, and all other relief allowed by law.

23         **B.**      **State-Specific Claims**

24

**ALABAMA COUNT I:**
**Violations of the Alabama Deceptive Trade Practices Act**

25    **Ala. Code § 8-19-1, *et seq.***
**(On Behalf of the Alabama State Class)**

26

27          179.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully

set forth herein.

28

180.     Plaintiffs Frank Belle and Alan Essreg (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Alabama State Class against all Defendants.

181.     Plaintiffs and Alabama State Class members are "consumers" within the meaning of Ala. Code § 8-19-3(2).

182.     Plaintiffs and Alabama State Class members and Defendants are "persons" within the meaning of Ala. Code § 8-19-3(5).

183.     The Class Vehicles are "goods" within the meaning of Ala. Code § 8-19-3(3).

184.     Defendants were and are engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

185.     The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5.

186.     In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

187.     Plaintiffs and Alabama State Class members had no way of discerning that Defendants' representations were false and misleading because Plaintiffs and Alabama State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology. Alabama State Class members did not and could not unravel Defendants' deception on their own.

188.   Defendants thus violated the Alabama DTPA by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

189.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Alabama State Class.

190.   Defendants knew or should have known that their conduct violated the Alabama DTPA.

191.   Defendants owed the Alabama State Class a duty to disclose the illegality and public health risks, and the true nature of the Class Vehicles, because Defendants:

A.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B.   intentionally concealed the foregoing from regulators and Alabama State Class members; and/or

C.   made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

192.   Defendants' concealment of the Class Vehicles' true fuel consumption and emissions was material to the Alabama State Class.

193.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Alabama Class, about the true environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of Defendants' brands, and the true value of the Class Vehicles.

194.   Plaintiffs and the Alabama State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

195.    Pursuant to Ala. Code § 8-19-10(e), Plaintiffs have sent notice letters to Defendants. Additionally, Defendants are on notice of the issues raised in this count and this Complaint by way of investigations conducted by governmental regulators. The Alabama State Class seeks all damages and relief to which it is entitled.

**ALABAMA COUNT II:**
**Breach of Express Warranty**
**Ala. Code §§ 7-2-313 and 7-2A-210**
**(On Behalf of the Alabama State Class)**

196.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

197.    Plaintiffs Frank Belle and Alan Essreg (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Alabama State Class against all Defendants.

198.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and a "seller" of motor vehicles under § 7-2-103(1)(d).

199.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ala. Code. § 7-2A-103(1)(p).

200.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

201.    In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

202.    Defendants also made numerous representations, descriptions, and promises to Alabama State Class members regarding the performance and emission controls of their vehicles.

203.    For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

204.     The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

205.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

206.     The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

207.     As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

208.     Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased the Class Vehicles.

209.     Despite the existence of warranties, Defendants failed to inform Alabama State Class members that the Class Vehicles were defective and were intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was

- 68 -

1    disclosed to regulators and represented to consumers who purchased or leased them, and

2    Defendants failed to fix the defective emission components free of charge.

3         210.    Defendants breached the express warranty promising to repair and correct

4    Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

5    have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

6         211.    Affording Defendants a reasonable opportunity to cure their breach of written

7    warranties would be unnecessary and futile here.

8         212.    Furthermore, the limited warranty promising to repair and correct Defendants'

9    defect in materials and workmanship fails in its essential purpose because the contractual remedy is

10   insufficient to make Alabama State Class members whole and because Defendants have failed

11   and/or have refused to adequately provide the promised remedies within a reasonable time.

12        213.    Accordingly, recovery by Plaintiffs and the Alabama State Class members is not

13   restricted to the limited warranty promising to repair and correct Defendants' defect in materials

14   and workmanship, and they seek all remedies as allowed by law.

15        214.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or

16   leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not

17   conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

18   material facts regarding the Class Vehicles. Plaintiffs and the Alabama State Class members were

19   therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

20        215.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved

21   through the limited remedy of repairing and correcting Defendants' defect in materials and

22   workmanship, as many incidental and consequential damages have already been suffered because

23   of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued

24   failure to provide such limited remedy within a reasonable time, and any limitation on Alabama

25   State Class members' remedies would be insufficient to make them whole.

26        216.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs and

27   Alabama State Class members assert, as additional and/or alternative remedies, the revocation of

28

acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

217.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

218.    As a direct and proximate result of Defendants' breach of express warranties, Alabama State Class members have been damaged in an amount to be determined at trial.

**ALABAMA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Ala. Code §§ 7-2-314 and 7-2A-212**
**(On Behalf of the Alabama State Class)**

219.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

220.    Plaintiffs Frank Belle and Alan Essreg (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Alabama State Class against all Defendants.

221.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and a "seller" of motor vehicles under § 7-2-103(1)(d).

222.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ala. Code. § 7-2A-103(1)(p).

223.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

224.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ala. Code §§ 7-2-314 and 7-2A-212.

225.    These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

226.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

227.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and Alabama State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**ALASKA COUNT I:**
**Violations of the Alaska Unfair Trade Practices and Consumer Protection Act**
**Alaska Stat. Ann. § 45.50.471 *et seq.***
**(On Behalf of the Alaska State Class)**

</div>

228.     Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

229.     Plaintiff Vernon Gallion (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Alaska State Class against all Defendants.

230.     The Alaska Unfair Trade Practices And Consumer Protection Act ("Alaska CPA") declares unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including: "(4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(6) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" "(8) advertising goods or services with intent not to sell them as advertised;" or "(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged." Alaska Stat. § 45.50.471.

231.     In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road,

and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

232.    Plaintiff and Alaska State Class members had no way of discerning that Defendants' representations were false and misleading because Alaska State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology. Alaska State Class members did not and could not unravel Defendants' deception on their own.

233.    Defendants thus violated the Alaska CPA by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

234.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Alaska State Class.

235.    Defendants knew or should have known that their conduct violated the Alaska CPA.

236.    Defendants owed the Alaska State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B.    intentionally concealed the foregoing from regulators and Alaska Class members; and/or

C.    made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

237.    Defendants' concealment of the Class Vehicles' true fuel consumption and emissions was material to the Alaska State Class.

238.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Alabama State Class, about the true environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of Defendants' brands, and the true value of the Class Vehicles.

239.    Defendants' violations present a continuing risk to the Alaska State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

240.    As a direct and proximate result of Defendants' violations of the Alaska CPA, the Alaska State Class have suffered injury-in-fact and/or actual damage.

241.    Pursuant to Alaska Stat. § 45.50. 531, the Alaska State Class seeks monetary relief against Defendants measured as the greater of (a) three times the actual damages in an amount to be determined at trial or (b) $500 for each Alaska State Class member.

242.    Plaintiff and the Alaska State Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices pursuant to Alaska Stat. § 45.50. 535, attorneys' fees, and any other just and proper relief available under the Alaska CPA.

243.    Pursuant to Alaska Stat. § 45.50.535, Plaintiff sent notice letters to Defendants. Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by way of investigations conducted by governmental regulators. The Alabama State Class seeks all damages and relief to which it is entitled.

**ALASKA COUNT II:**
**Breach of Express Warranty**
**Alaska Stat. §§ 45.02.313 and 45.12.210**
**(On Behalf of the Alaska State Class)**

244.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

245.    Plaintiff Vernon Gallion (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Alaska State Class against all Defendants.

246.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Alaska Stat. §§ 45.02.104(a) and 45.12.103(c)(11), and a "seller" of motor vehicles under Alaska Stat. § 45.02.103(a)(4).

247.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Alaska Stat. § 45.12.103(a)(16).

248.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Alaska Stat. §§ 45.02.105(a) and 45.12.103(a)(8).

249.     In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

250.     Defendants also made numerous representations, descriptions, and promises to Alaska State Class members regarding the performance and emission controls of their vehicles.

251.     For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

252.     The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

253.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the

catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

254.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

255.    As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

256.    Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

257.    Despite the existence of warranties, Defendants failed to inform Alaska State Class members that the Class Vehicles were defective and were intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

258.    Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

259.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

260.    Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Alaska State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

261.     Accordingly, recovery by Plaintiff and the Alaska State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

262.     Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiff and the Alaska State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

263.     Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship fails in its essential purpose as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and Alaska State Class members' remedies would be insufficient to make them whole.

264.     Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff and Alaska State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

265.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

266.     As a direct and proximate result of Defendants' breach of express warranties, Alaska State Class members have been damaged in an amount to be determined at trial.

**ALASKA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Alaska Stat. §§ 45.02.314 and 45.12.212**
**(On Behalf of the Alaska State Class)**

267.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

268.     Plaintiff Vernon Gallion (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Alaska State Class against all Defendants.

269.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Alaska Stat. §§ 45.02.104(a) and 45.12.103(c)(11), and a "seller" of motor vehicles under Alaska Stat. § 45.02.103(a)(4).

270.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Alaska Stat. § 45.12.103(a)(16).

271.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Alaska Stat. §§ 45.02.105(a) and 45.12.103(a)(8).

272.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Alaska Stat. §§ 45.02.314 and 45.12.212.

273.     These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

274.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

275.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Alaska State Class members have been damaged in an amount to be proven at trial.

**ARIZONA COUNT I:**
**Violations of the Arizona Consumer Fraud Act**
**Ariz. Rev. Stat. § 44-1521, *et seq.***
**(On Behalf of the Arizona State Class)**

276.     Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

1        277.     Plaintiffs Isaías Iñiguez and Tyrell Pierce (for the purposes of this count,

2   "Plaintiffs") bring this claim on behalf of themselves and the Arizona State Class against all

3   Defendants.

4        278.     Defendants, Plaintiffs, and Arizona State Class members are "persons" within the

5   meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

6        279.     The Class Vehicles are "merchandise" within the meaning of Ariz. Rev. Stat.

7   § 44-1521(5).

8        280.     The Arizona CFA provides that "[t]he act, use or employment by any person of any

9   deception, deceptive act or practice, fraud, . . . misrepresentation, or concealment, suppression or

10  omission of any material fact with intent that others rely upon such concealment, suppression or

11  omission, in connection with the sale . . . of any merchandise whether or not any person has in fact

12  been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat.

13  § 44-1522(A).

14       281.     In the course of their business, Defendants concealed and suppressed material facts

15  concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for

16  emissions testing that were different from production vehicles, (b) installing a secret software

17  program that caused the vehicles to perform differently during emissions testing than on the road,

18  and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass

19  emissions tests when they in fact did not.

20       282.     Plaintiffs and Arizona State Class members had no way of discerning that

21  Defendants' representations were false and misleading because Plaintiff and Arizona State Class

22  members did not have access to Defendants' emissions certification test vehicles and Defendants'

23  emissions-related hardware and software was extremely sophisticated technology.

24       283.     Defendants thus violated the Arizona CFA by, at minimum: employing deception,

25  deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of

26  any material fact with intent that others rely upon such concealment, suppression or omission, in

27  connection with the sale of Class Vehicles.

28

284. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Arizona State Class.

285. Defendants knew or should have known that their conduct violated the Arizona CFA.

286. Defendants owed Plaintiffs and the Arizona State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

A. possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B. intentionally concealed the foregoing from regulators, Plaintiff, and Arizona State Class members; and/or

C. made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts from Plaintiffs and Arizona State Class members that contradicted these representations.

287. Defendants' concealment of the Class Vehicles' true fuel consumption and emissions was material to Plaintiffs and the Arizona State Class.

288. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and the Arizona State Class, about the true environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of Defendants' brands, and the true value of the Class Vehicles.

289. Plaintiffs and the Arizona State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

290. Plaintiffs and the Arizona State Class seek monetary relief against Defendants in an amount to be determined at trial. Plaintiff and the Arizona State Class also seek punitive damages because Defendants engaged in aggravated and outrageous conduct.

291. Plaintiffs and the Arizona State Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

**ARIZONA COUNT II:**
**Breach of Express Warranty**
**Ariz. Rev. Stat. §§ 47-2313 and 47-2A210**
**(On Behalf of the Arizona State Class)**

292.     Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

293.     Plaintiffs Isaías Iñiguez and Tyrell Pierce (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Arizona State Class against all Defendants.

294.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c); and is a "seller" of motor vehicles under Ariz. Rev. Stat. § 47-2103(A)(4).

295.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

296.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

297.     In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

298.     Defendants also made numerous representations, descriptions, and promises to Plaintiffs and Arizona State Class members regarding the performance and emission controls of their vehicles.

299.     For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

300.     The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

301.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

302.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

303.    As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

304.    Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

305.    Despite the existence of warranties, Defendants failed to inform Plaintiffs and Arizona State Class members that the Class Vehicles were defective and were intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

306.     Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

307.     Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

308.     Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Arizona State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

309.     Accordingly, recovery by Plaintiffs and Arizona State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

310.     Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and Arizona State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

311.     Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' Arizona State Class members' remedies would be insufficient to make them whole.

312.     Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs and Arizona State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

313.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

314.     As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and Arizona State Class members have been damaged in an amount to be determined at trial.

**ARIZONA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Ariz. Rev. Stat. §§ 47-2314 and 47-2A212**
**(On Behalf of the Arizona State Class)**

315.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

316.     Plaintiffs Isaías Iñiguez and Tyrell Pierce (for the purposes of this count, "Plaintiff") bring this claim on behalf of themselves and the Arizona State Class against all Defendants.

317.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c); and is a "seller" of motor vehicles under Ariz. Rev. Stat. § 47-2103(A)(4).

318.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

319.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

320.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ariz. Rev. Stat. §§ 47-2314 and 47-2a212.

321.     These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

322.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

323.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Arizona State Class members have been damaged in an amount to be proven at trial.

**ARKANSAS COUNT I:**
**Violations of the Deceptive Trade Practices Act**
**Ark. Code Ann. § 4-88-101 *et seq.***
**(On Behalf of the Arkansas State Class)**

324.     Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

325.     This count is brought on behalf of the Arkansas State Class against all Defendants.

326.     Defendants and Arkansas State Class members are "persons" within the meaning of Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), Ark. Code Ann. § 4-88-102(5).

327.     The Class Vehicles are "goods" within the meaning of Ark. Code Ann. § 4-88-102(4).

328.     The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" Ark. Code Ann. § 4-88-107(a)(10). The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods: "(1) The act, use, or employment by any person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission." Ark. Code Ann. § 4-88-108.

329.     In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

- 84 -

330.    Arkansas State Class members had no way of discerning that Defendants' representations were false and misleading because the Arkansas State Class did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

331.    Defendants thus violated the Arkansas DTPA by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

332.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Arkansas State Class. Defendants knew or should have known that their conduct violated the Arkansas DTPA.

333.    Defendants owed the Arkansas State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B.    intentionally concealed the foregoing from regulators, and Arkansas State Class members; and/or

C.    made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

334.    Defendants' concealment of the Class Vehicles' true fuel consumption and emissions was material to the Arkansas State Class.

335.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Arkansas State Class about the true environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of Defendants' brands, and the true value of the Class Vehicles.

336.    Defendants' violations present a continuing risk to the Arkansas State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

337.    The Arkansas State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Arkansas DTPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

338.    As a direct and proximate result of Defendants' violations of the Arkansas DTPA, members of the Arkansas State Class have suffered injury-in-fact and/or actual damage.

339.    The Arkansas State Class seeks monetary relief against Defendants in an amount to be determined at trial. The Arkansas State Class also seeks punitive damages because Defendants acted wantonly in causing the injury or with conscious indifference to the consequences.

340.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

<div align="center">

**ARKANSAS COUNT II:**
**Breach of Express Warranty**
**Ark Code Ann. §§ 4-2-313 and 4-2A-210**
**(On Behalf of the Arkansas State Class)**

</div>

341.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

342.    This count is brought on behalf of the Arkansas State Class against all Defendants.

343.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ark. Code §§ 4-2-104(1) and 4-2A-103(3), and "seller[s]" of motor vehicles under § 4-2-103(1)(d).

344.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ark. Code § 4-2A-103(1)(p).

345.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code §§ 4-2-105(1) and 4-2A-103(1)(h).

346.     In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

347.     Defendants also made numerous representations, descriptions, and promises to Arkansas State Class members regarding the performance and emission controls of their vehicles.

348.     For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

349.     The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

350.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

351.     The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission

related parts, which fail to function or function improperly because of a defect in materials or

workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

first, or, for the major emission control components, for eight years or 80,000 miles, whichever

comes first.

352.    As manufacturers of light-duty vehicles, Defendants were required to provide these

warranties to purchasers or lessees of Class Vehicles.

353.    Defendants' warranties formed a basis of the bargain that was reached when

consumers purchased or leased Class Vehicles.

354.    Despite the existence of warranties, Defendants failed to inform Arkansas State

Class members that the Class Vehicles defective and were intentionally designed and manufactured

to emit more pollution and achieve worse fuel economy on the road than what was disclosed to

regulators and represented to consumers who purchased or leased them, and Defendants failed to

fix the defective emission components free of charge.

355.    Defendants breached the express warranty promising to repair and correct

Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

356.    Affording Defendants a reasonable opportunity to cure their breach of written

warranties would be unnecessary and futile here.

357.    Furthermore, the limited warranty promising to repair and correct Defendants'

defect in materials and workmanship fails in its essential purpose because the contractual remedy is

insufficient to make Arkansas State Class members whole and because Defendants have failed

and/or have refused to adequately provide the promised remedies within a reasonable time.

358.    Accordingly, recovery by Arkansas State Class members is not restricted to the

limited warranty promising to repair and correct Defendants' defect in materials and workmanship,

and they seek all remedies as allowed by law.

359.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or

leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not

conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

1    material facts regarding the Class Vehicles. Arkansas State Class members were therefore induced

2    to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

3         360.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved

4    through the limited remedy of repairing and correcting Defendants' defect in materials and

5    workmanship as many incidental and consequential damages have already been suffered because of

6    Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued

7    failure to provide such limited remedy within a reasonable time, and any limitation on Arkansas

8    State Class members' remedies would be insufficient to make them whole.

9         361.    Finally, because of Defendants' breach of warranty as set forth herein, Arkansas

10   State Class members assert, as additional and/or alternative remedies, the revocation of acceptance

11   of the goods and the return to them of the purchase or lease price of all Class Vehicles currently

12   owned or leased, and for such other incidental and consequential damages as allowed.

13        362.    Defendants were provided reasonable notice of these issues by way of a letter sent

14   by Plaintiffs as well as the regulators' investigations.

15        363.    As a direct and proximate result of Defendants' breach of express warranties,

16   Arkansas State Class members have been damaged in an amount to be determined at trial.

17                              **ARKANSAS COUNT III:**
                      **Breach of Implied Warranty of Merchantability**
18                        **Ark. Code Ann. §§ 4-2-314 and 4-2A-212**
                          **(On Behalf of the Arkansas State Class)**
19
20        364.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

21   forth herein.

         365.    This count is brought on behalf of the Arkansas State Class against all Defendants.
22
         366.    Defendants are and were at all relevant times "merchant[s]" with respect to motor
23
     vehicles under Ark. Code §§ 4-2-104(1) and 4-2A-103(3), and "seller[s]" of motor vehicles under
24
     § 4-2-103(1)(d).
25
         367.    With respect to leases, Defendants are and were at all relevant times "lessors" of
26
     motor vehicles under Ark. Code § 4-2A-103(1)(p).
27

28

368.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code §§ 4-2-105(1) and 4-2A-103(1)(h).

369.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ark. Code §§ 4-2-314 and 4-2A-212.

370.    These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

371.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

372.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Arkansas State Class members have been damaged in an amount to be proven at trial.

**CALIFORNIA COUNT I:**
**Violation of California Consumers Legal Remedies Act**
**Cal Bus. & Prof. Code § 1750, *et seq.***
**(On Behalf of the California State Class)**

373.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

374.    Plaintiffs Ashish Chadha, Ernesto Del Barrio, Mallen Fajardo, Isaías Iñiguez, Frederick Jeng, Eric Lee, Milton Lee, Philipp Novales-Li, Richard Schubert, Luigi Sciabarrasi, and Lawrence Tougas (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the California State Class against all Defendants.

375.    Plaintiffs and members of the California State Class were deceived by Defendants' failure to disclose that the Class Vehicles were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy

1    and emissions ratings, and/or did not comply with emissions regulations when being driven in

2    Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

3         376.    Defendants engaged in unfair or deceptive acts or practices when, in the course of

4    their business they, among other acts and practices, knowingly made materially incomplete

5    representations as to the characteristics, uses and benefits of the Class Vehicles.

6         377.    In the various channels of information through which Defendants sold and marketed

7    Class Vehicles, Defendants failed to disclose material information concerning the Class Vehicles,

8    which it had a duty to disclose. Defendants had a duty to disclose the defect because, as detailed

9    above, (a) Defendants knew about the three emissions cheating schemes in the Class Vehicles; (b)

10   Defendants had exclusive knowledge of material facts not known to the general public or the other

11   California State Class members; (c) Defendants actively concealed material facts concerning the

12   software program from the general public and Plaintiffs and California State Class members; and

13   (d) Defendants made partial representations about the Class Vehicles that were misleading because

14   they did not disclose the full truth. As detailed above, Defendants knew the information concerning

15   the defect at the time of advertising and selling the Class Vehicles, all of which was intended to

16   induce consumers to purchase the Class Vehicles.

17        378.    Defendants intended for Plaintiffs and California State Class members to rely on it

18   to provide adequately designed, and adequately manufactured automobiles and to honestly and

19   accurately reveal the problems described throughout this Complaint.

20        379.    Defendants intentionally failed or refused to disclose the defect to consumers.

21        380.    Defendants' conduct and deceptive omissions were intended to induce Plaintiffs and

22   California State Class members to believe that the Class Vehicles were adequately designed and

23   adequately manufactured automobiles.

24        381.    Defendants' conduct constitutes unfair acts or practices as defined by the California

25   Consumers Legal Remedies Act (the "CLRA").

26        382.    Plaintiffs and the other California State Class members have suffered injury in fact

27   and actual damages resulting from Defendants' material omissions.

28

383.     Plaintiffs and the California State Class seek an order enjoining Defendants' unfair or deceptive acts or practices, equitable relief, and any other just and proper relief available under the CLRA. The claim for equitable relief is brought in the alternative should Plaintiffs not have an adequate remedy at law.

384.     Defendants are on notice of the issues raised in this count and this Complaint by way of investigations conducted by governmental regulators. Plaintiffs also sent notice letters to Defendants in accordance with Cal. Civ. Code § 1782(a) of the CLRA, notifying Defendants of their alleged violations of Cal. Civ. Code § 1770(a) and demanding that Defendants correct or agree to correct the actions described therein within thirty (30) days of the notice letter. Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the California State Class are entitled under the CLRA.

<div align="center">

**CALIFORNIA COUNT II:**
**Violations of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200 *et seq.***
**(On Behalf of the California State Class)**

</div>

385.     Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

386.     Plaintiffs Ashish Chadha, Ernesto Del Barrio, Mallen Fajardo, Isaías Iñiguez, Frederick Jeng, Eric Lee, Milton Lee, Philipp Novales-Li, Richard Schubert, Luigi Sciabarrasi, and Lawrence Tougas (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the California State Class against all Defendants.

387.     California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." Defendants have engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

388.     Defendants' conduct, as described herein, was and is fraudulent and in violation of the UCL. Defendants' conduct violates the UCL in at least the following ways:

   a.     by knowingly and intentionally concealing from Plaintiffs and California State Class members that the Class Vehicles suffer from a design defect while obtaining money from the California State Class members;

1            b.      by marketing Class Vehicles as possessing functional and defect-free,

2    EPA-compliant engine systems; and

3            c.      by purposefully designing and manufacturing the Class Vehicles to emit

4    more pollution and achieve worse fuel economy on the road than what was disclosed to regulators

5    and represented to consumers who purchased or leased them, and failing to fix the defective

6    emission component free of charge.

7         389.    Defendants' misrepresentations and omissions alleged herein caused Plaintiffs and

8    the California State Class members to make their purchases or leases of their Class Vehicles.

9    Absent those misrepresentations and omissions, Plaintiffs and California State Class members

10   would not have purchased or leased these vehicles, would not have purchased or leased these Class

11   Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative

12   vehicles that did not cheat on emissions testing or have inflated and misleading fuel economy

13   values.

14        390.    Accordingly, Plaintiffs and California State Class members have suffered

15   ascertainable loss and actual damages as a direct and proximate result of Defendants'

16   misrepresentations and their concealment of and failure to disclose material information.

17        391.    Plaintiffs requests that this Court enter such orders or judgments as may be

18   necessary to enjoin Defendants from continuing its unfair, unlawful, and/or deceptive practices and

19   to restore to members of the California State Class any money it acquired by unfair competition,

20   including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code

21   § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below. The claim for

22   equitable relief is brought in the alternative should Plaintiffs not have an adequate remedy at law.

23    

**CALIFORNIA COUNT III:**
**Violations of the California False Advertising Law**
**Cal. Civ. Code § 17500 *et seq.***
**(On Behalf of the California State Class)**

24

25

26        392.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully

set forth herein.

27

28

- 93 -

1        393.    Plaintiffs Ashish Chadha, Ernesto Del Barrio, Mallen Fajardo, Isaías Iñiguez,

2    Frederick Jeng, Eric Lee, Milton Lee, Philipp Novales-Li, Richard Schubert, Luigi Sciabarrasi, and

3    Lawrence Tougas (for the purposes of this count, "Plaintiffs") bring this claim on behalf of

4    themselves and the California State Class against all Defendants.

5        394.    California Bus. & Prof. Code § 17500 states: "It is unlawful for any . . . corporation

6    . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public

7    to enter into any obligation relating thereto, to make or disseminate or cause to  be made or

8    disseminated . . . from this state before the public in any state, in any newspaper or   other

9    publication, or any advertising device, . . . or in any other manner or means whatever, including

10   over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by

11   the exercise of reasonable care should be known, to be untrue or misleading."

12       395.    Defendants caused to be made or disseminated through California and the United

13   States, through advertising, marketing and other publications, statements that were untrue

14   or  misleading, and which were known, or which by the exercise of reasonable care should have

15   been  known to Defendants, to be untrue and misleading to consumers, including California State

16   Class members.

17       396.    Defendants have violated § 17500 because the misrepresentations and

18   omissions  regarding the reliability and functionality of Class Vehicles as set forth in this

19   Complaint were material and likely to deceive a reasonable consumer.

20       397.    Plaintiffs and the other California State Class members have suffered an injury in

21   fact, including  the loss of money or property, as a result of Defendants' unfair, unlawful, and/or

22   deceptive  practices. In purchasing or leasing their Class Vehicles, the California State Class  relied

23   on the misrepresentations and/or omissions of Defendants with respect to the  performance and

24   reliability of the Class Vehicles. Defendants' representations turned out not to be true because the

25   Class Vehicles are distributed with faulty and defective hardware and software systems, rendering

26   certain emissions functions inoperative.

27       398.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the

28   conduct of Defendants business. Defendants' wrongful conduct is part of a pattern or generalized

course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

399.     The California State Class requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to the California State Class any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below. The claim for equitable relief is brought in the alternative should Plaintiffs not have an adequate remedy at law.

<div align="center">

**CALIFORNIA COUNT IV:**
**Breach of Express Warranty**
**Cal. Com. Code §§ 2313 and 10210**
**(On Behalf of the California State Class)**

</div>

400.     Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

401.      Plaintiffs Ashish Chadha, Ernesto Del Barrio, Mallen Fajardo, Isaías Iñiguez, Frederick Jeng, Eric Lee, Milton Lee, Philipp Novales-Li, Richard Schubert, Luigi Sciabarrasi, and Lawrence Tougas (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the California State Class against all Defendants.

402.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

403.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

404.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

405.     In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

406.     Defendants also made numerous representations, descriptions, and promises to California State Class members regarding the performance and emission controls of their vehicles.

407.     For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

408.     The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

409.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

410.     The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

411.     As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

412.     Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

413.     Despite the existence of warranties, Defendants failed to inform Plaintiffs and California State Class members that the Class Vehicles were defective and were intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

414.     Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

415.     Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

416.     Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make California State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

417.     Accordingly, recovery by Plaintiffs and California State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

418.     Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. California State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

419.     Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued

1    failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs

2    and California State Class members' remedies would be insufficient to make them whole.

3           420.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs and

4    California State Class members assert, as additional and/or alternative remedies, the revocation of

5    acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles

6    currently owned or leased, and for such other incidental and consequential damages as allowed.

7           421.    Defendants were provided reasonable notice of these issues by way of a letter sent

8    by Plaintiffs as well as the regulators' investigations.

9           422.    As a direct and proximate result of Defendants' breach of express warranties,

10   California State Class members have been damaged in an amount to be determined at trial.

**CALIFORNIA COUNT V:**
**Breach of Implied Warranty of Merchantability**
**Cal. Com. Code §§ 2314 and 10212**
**(On Behalf of the California State Class)**

13          423.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

14   forth herein.

15          424.     Plaintiffs Ashish Chadha, Ernesto Del Barrio, Mallen Fajardo, Isaías Iñiguez,

16   Frederick Jeng, Eric Lee, Milton Lee, Philipp Novales-Li, Richard Schubert, Luigi Sciabarrasi, and

17   Lawrence Tougas (for the purposes of this count, "Plaintiffs") bring this claim on behalf of

18   themselves and the California State Class against all Defendants.

19          425.    Defendants are and were at all relevant times "merchant[s]" with respect to motor

20   vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under

21   § 2103(1)(d).

22          426.    With respect to leases, Defendants are and were at all relevant times "lessors" of

23   motor vehicles under Cal. Com. Code § 10103(a)(16).

24          427.    The Class Vehicles are and were at all relevant times "goods" within the meaning of

25   Cal. Com. Code §§ 2105(1) and 10103(a)(8).

428.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

429.    These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

430.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

431.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and California State Class members have been damaged in an amount to be proven at trial.

## CALIFORNIA COUNT VI:
### Violation of Song-Beverly Consumer Warranty Act, Breach of Implied Warranty
### Cal Civ. Code § 1790, *et seq.*
### (On Behalf of the California State Class)

432.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

433.    Plaintiffs Ashish Chadha, Ernesto Del Barrio, Mallen Fajardo, Isaías Iñiguez, Frederick Jeng, Eric Lee, Milton Lee, Philipp Novales-Li, Richard Schubert, Luigi Sciabarrasi, and Lawrence Tougas (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the California State Class against all Defendants.

434.    Plaintiffs and members of the California State Class who purchased Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791.

435.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

436.    Defendants are the "manufacturer[s]" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

437. Defendants impliedly warranted to Plaintiffs and the other members of the California State Class that the Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Class Vehicles do not have the quality that a buyer would reasonably expect.

438. Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

    A.    Pass without objection in the trade under the contract description.

    B.    Are fit for the ordinary purposes for which such goods are used.

    C.    Are adequately contained, packaged, and labeled.

    D.    Conform to the promises or affirmations of fact made on the container or label.

439. The Class Vehicles would not pass without objection in the automotive trade because they share a common design defect in that they were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, which conceals the vehicles' true emissions and overstates their fuel economy.

440. Class Vehicles are not adequately labeled because the labeling fails to disclose the fact that they are defective.

441. In the various channels of information through which Defendants sold and marketed Class Vehicles, Defendants failed to disclose material information concerning the Class Vehicles, which it had a duty to disclose. Defendants had a duty to disclose the defect because, as detailed above: (a) Defendants knew about the defect; (b) Defendants had exclusive knowledge of material facts not known to the general public or the other California State Class members; (c) Defendants actively concealed material facts from the general public and California State Class members concerning the Class Vehicles' true emissions and fuel economy; and (d) Defendants made partial representations about the Class Vehicles that were misleading because they did not disclose the full

truth. As detailed above, Defendants knew the information concerning the defect at the time of advertising and selling the Class Vehicles, all of which was intended to induce consumers to purchase the Class Vehicles.

442.     Defendants breached the implied warranty of merchantability by manufacturing and selling Class Vehicles that are defective. Furthermore, this defect has caused members of the California State Class to not receive the benefit of their bargain and have caused the Class Vehicles to depreciate in value.

443.     Plaintiffs and members of the California State Class have been damaged as a result of the diminished value of Defendants' products.

444.     Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and other members of the California State Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

445.     Under Cal. Civ. Code § 1794, Plaintiffs and the other members of the California State Class are entitled to costs and attorneys' fees.

## CALIFORNIA COUNT VII:
**Violation of the Song-Beverly Consumer Protection Act, Breach of Express Warranty**
**Cal Civ. Code § 1790,** *et seq.*
**(On Behalf of the California State Class)**

446.     Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

447.     Plaintiffs Ashish Chadha, Ernesto Del Barrio, Mallen Fajardo, Isaías Iñiguez, Frederick Jeng, Eric Lee, Milton Lee, Philipp Novales-Li, Richard Schubert, Luigi Sciabarrasi, and Lawrence Tougas (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the California State Class against all Defendants.

448.     Plaintiffs and Members of the California State Class who purchased or leased the Class Vehicles in California are "buyers" within the meaning of California Civil Code § 1791(b).

449.     The Class Vehicles are "consumer goods" within the meaning of California Civil Code § 1791(a).

450.   Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of California Civil Code § 1791(j).

451.   Defendants made express warranties to members of the California State Class within the meaning of California Civil Code §§ 1791.2 and 1793.2, as described above.

452.   As set forth above in detail, the Class Vehicles are inherently defective in that they were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode. This defect substantially impairs the use and value of the Class Vehicles to reasonable consumers.

453.   As a result of Defendants' breach of their express warranties, members of the California State Class received goods whose defect substantially impairs their value to Plaintiffs and the other members of the California State Class. Plaintiffs and members of the California State Class have been damaged as a result of, *inter alia*, the diminished value of Defendants' products.

454.   Pursuant to California Civil Code §§ 1793.2 & 1794, Plaintiffs and members of the California State Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

455.   Pursuant to California Civil Code § 1794, the Class is entitled to costs and attorneys' fees.

<div align="center">

**CALIFORNIA COUNT VIII:**
**Breach of Express California Emissions Warranties**
**Cal. Civ. Code § 1793.2, *et seq.***
**(On Behalf of the California State Class)**

</div>

456.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

457.   Plaintiffs Ashish Chadha, Ernesto Del Barrio, Mallen Fajardo, Isaías Iñiguez, Frederick Jeng, Eric Lee, Milton Lee, Philipp Novales-Li, Richard Schubert, Luigi Sciabarrasi, and Lawrence Tougas (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the California State Class against all Defendants.

458.    Each Class Vehicle is covered by express California Emissions Warranties as a matter of law. *See* Cal. Health & Safety Code § 43205; Cal. Code Regs. tit. 13, § 2037.

459.    The express California Emissions Warranties generally provide "that the vehicle or engine is . . . [d]esigned, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board." *Id*. This provision applies without any time or mileage limitation. *See id*.

460.    The California Emissions Warranties also specifically warrant consumers against any performance failure of the emissions control system for three years or 50,000 miles, whichever occurs first, and against any defect in any emission-related part for seven years or 70,000 miles, whichever occurs first. *See id*.

461.    California law imposes express duties "on the manufacturer of consumer goods sold in this state and for which the manufacturer has made an express warranty." Cal. Civ. Code § 1793.2.

462.    Among those duties, "[i]f the manufacturer or its representative in this state is unable to service or repair a new motor vehicle . . . to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle or promptly make restitution to the buyer" at the vehicle owner's option. *See* Cal. Civ. Code § 1793.2(d)(2).

463.    Plaintiffs and Class members are excused from the requirement to "deliver nonconforming goods to the manufacturer's service and repair facility within this state" because Defendants are refusing to accept them and delivery of the California Vehicles "cannot reasonably be accomplished." Cal. Civ. Code § 1793.2(c).

464.    This Complaint is written notice of nonconformity to Defendants and "shall constitute return of the goods." *Id*.

465.    Plaintiffs and California State Class members are excused from any requirement that they allow a "reasonable number of attempts" to bring California Vehicles into conformity with their California Emissions Warranties based on futility because FCA has no ability to do so at this time.

1    466.    In addition to all other damages and remedies, California State Class members are

2    entitled to "recover a civil penalty of up to two times the amount of damages" for the

3    aforementioned violation. *See* Cal. Civ. Code § 1794(e)(1).

4                              **CALIFORNIA COUNT IX:**
                                 **Failure to Recall/Retrofit**
5                        **(On Behalf of the California State Class)**

6    467.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though

7    fully set forth herein.

8    468.    Plaintiffs Ashish Chadha, Ernesto Del Barrio, Mallen Fajardo, Isaías Iñiguez,

9    Frederick Jeng, Eric Lee, Milton Lee, Philipp Novales-Li, Richard Schubert, Luigi Sciabarrasi, and

10   Lawrence Tougas (for the purposes of this count, "Plaintiffs") bring this claim on behalf of

11   themselves and the California State Class against all Defendants.

12   469.    Defendants manufactured, marketed, distributed, sold, or otherwise placed into the

13   stream of U.S. commerce the Class Vehicles, as set forth above.

14   470.    Defendants knew or reasonably should have known that the Class Vehicles emit a

15   substantially increased amount of pollution and reasonably should have known that the Class

16   Vehicles were likely to be dangerous when used in a reasonably foreseeable manner.

17   471.    Defendants failed to recall the Class Vehicles in a timely manner or warn of the

18   Class Vehicles' heightened emissions.

19   472.    A reasonable manufacturer in same or similar circumstances would have timely and

20   properly recalled the Class Vehicles.

21   473.    Plaintiffs and California State Class members were harmed by Defendants' failure

22   to recall the Class Vehicles properly and in a timely manner and, as a result, have suffered damages,

23   caused by Defendants' ongoing failure to properly recall, retrofit, and fully repair the Class

24   Vehicles.

25   474.    Defendants' failure to timely recall the Class Vehicles was a substantial factor in

26   causing harm to Plaintiffs and California State Class members as alleged herein.

27

28

**COLORADO COUNT I:**
**Violations of the Colorado Consumer Protection Act**
**Colo. Rev. Stat. § 6-1-101 *et seq.***
**(On Behalf of the Colorado State Class)**

475.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

476.   Plaintiff Cecil Robinson (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Colorado State Class against all Defendants.

477.   Defendants are "person[s]" under § 6-1-102(6) of the Colorado Consumer Protection Act "Colorado CPA"), Col. Rev. Stat. § 6-1-101, *et seq.*

478.   Plaintiff and Colorado State Class members are "consumers" for purposes of Col. Rev. Stat § 6-1-113(1)(a) who purchased or leased one or more Class Vehicles.

479.   The Colorado CPA prohibits deceptive trade practices in the course of a person's business. Defendants engaged in deceptive trade practices prohibited by the Colorado CPA, including: (1) knowingly making a false representation as to the characteristics, uses, and benefits of the Class Vehicles that had the capacity or tendency to deceive Colorado State Class members; (2) representing that the Class Vehicles are of a particular standard, quality, and grade even though Defendants knew or should have known they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; and (4) failing to disclose material information concerning the Class Vehicles that was known to Defendants at the time of advertisement or sale with the intent to induce Colorado State Class members to purchase, lease or retain the Class Vehicles.

480.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

481.   Plaintiff and Colorado State Class members had no way of discerning that Defendants' representations were false and misleading because Plaintiff and the Colorado State

1    Class members did not have access to Defendants' emissions certification test vehicles and

2    Defendants' emissions-related hardware and software was extremely sophisticated technology.

3        482.    Defendants thus violated the Colorado CPA by, at minimum: representing that Class

4    Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that

5    Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

6    Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a

7    transaction involving Class Vehicles has been supplied in accordance with a previous

8    representation when it has not.

9        483.    Defendants intentionally and knowingly misrepresented material facts regarding the

10   Class Vehicles with intent to mislead the Colorado State Class.

11       484.    Defendants knew or should have known that their conduct violated the Colorado

12   CPA.

13       485.    Defendants owed the Colorado State Class a duty to disclose the illegality and

14   public health risks, the true nature of the Class Vehicles, because Defendants:

15           A.      possessed exclusive knowledge that they were manufacturing, selling, and

16           distributing vehicles throughout the United States that did not perform as advertised;

17           B.      intentionally concealed the foregoing from regulators and Colorado State

18           Class members; and/or

19           C.      made incomplete representations about the Class Vehicles' fuel economy

20           and emissions, while purposefully withholding material facts that contradicted these

21           representations.

22       486.    Defendants' concealment of the Class Vehicles' true fuel consumption and

23   emissions was material to Plaintiff and the Colorado State Class.

24       487.    Defendants' unfair or deceptive acts or practices were likely to and did in fact

25   deceive regulators and reasonable consumers, including the Colorado State Class, about the true

26   environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of the Defendants'

27   brands, the devaluing of environmental cleanliness and integrity at Defendant companies, and the

28   true value of the Class Vehicles.

488.    Defendants' violations present a continuing risk to the Colorado State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

489.    Plaintiff and the Colorado State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Colorado CPA. All owners and lessees of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

**COLORADO COUNT II:**
**Breach of Express Warranty**
**Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-210**
**(On Behalf of the Colorado State Class)**

490.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

491.    Plaintiff Cecil Robinson (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Colorado State Class against all Defendants.

492.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of motor vehicles under § 4-2-103(1)(d).

493.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

494.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

495.    In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

496.    Defendants also made numerous representations, descriptions, and promises to Colorado State Class members regarding the performance and emission controls of their vehicles.

- 107 -

497.     For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

498.     The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

499.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

500.     The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

501.     As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

502.     Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

503.     Despite the existence of warranties, Defendants failed to inform Colorado State Class members that the Class Vehicles were defective and were intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

504.     Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

505.     Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

506.     Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Colorado State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

507.     Accordingly, recovery by Colorado State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

508.     Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Colorado State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

509.     Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Colorado State Class members' remedies would be insufficient to make them whole.

510. Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff and Colorado State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

511. Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

512. As a direct and proximate result of Defendants' breach of express warranties, Colorado State Class members have been damaged in an amount to be determined at trial.

<div align="center">

**COLORADO COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Colo. Rev. Stat. §§ 4-2-314 and 4-2.5-212**
**(On Behalf of the Colorado State Class)**

</div>

513. Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

514. Plaintiff Cecil Robinson (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Colorado State Class against all Defendants.

515. Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of motor vehicles under § 4-2-103(1)(d).

516. With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

517. The Class Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

518. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-212.

519. These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with

emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

520.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

521.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Colorado State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**CONNECTICUT COUNT I:**
**Violations of Connecticut Unlawful Trade Practice Act**
**Conn. Gen. Stat. § 42-110a, *et seq.***
**(On Behalf of the Connecticut State Class)**

</div>

522.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

523.    Plaintiff Frank Cohen (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Connecticut State Class against all Defendants.

524.    The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

525.    Defendants are "person[s]" within the meaning of Conn. Gen. Stat. § 42-110a(3).

526.    Defendants engaged in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

527.    Defendants participated in deceptive trade practices that violated the Connecticut UTPA as described herein.

528.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

529.    Plaintiff and Connecticut State Class members had no way of discerning that Defendants' representations were false and misleading because Plaintiff and Connecticut State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

530.    Defendants thus violated the Connecticut UTPA by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

531.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Connecticut State Class.

532.    Defendants knew or should have known that their conduct violated the Connecticut UTPA.

533.    Defendants owed Plaintiff and the Connecticut State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B.    intentionally concealed the foregoing from regulators, Plaintiff, and Connecticut State Class members; and/or

C.    made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

534.    Defendants' concealment of the Class Vehicles' true fuel consumption and emissions was material to Plaintiff and the Connecticut State Class.

535.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and the Connecticut State Class, about the true environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

536.     Plaintiff and the Connecticut State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

537.     Plaintiff and the Connecticut State Class seek monetary relief against Defendants in an amount to be determined at trial. Plaintiff and the Connecticut State Class also seek punitive damages because Defendants engaged in aggravated and outrageous conduct.

538.     Plaintiff and the Connecticut State Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Connecticut CFA.

539.     Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Connecticut UTPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

540.     Defendants' violations present a continuing risk to Plaintiff and the Connecticut State Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

541.     As a direct and proximate result of Defendants' violations of the Connecticut UTPA, Plaintiff and the Connecticut State Class have suffered injury-in-fact and/or actual damage.

542.     Class members are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g. Defendants acted with a reckless indifference to another's rights or wanton or intentional violation to another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

**CONNECTICUT COUNT II:**
**Breach of Express Warranty**
**Conn. Gen. Stat. Ann. § 42A-2-313**
**(On Behalf of the Connecticut State Class)**

543.     Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

544.    Plaintiff Frank Cohen (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Connecticut State Class against all Defendants.

545.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

546.    In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

547.    Defendants also made numerous representations, descriptions, and promises to Plaintiff and Connecticut State Class members regarding the performance and emission controls of their vehicles.

548.    For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

549.    The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

550.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

551.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express

warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

552.    As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

553.    Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

554.    Despite the existence of warranties, Defendants failed to inform Plaintiff and Connecticut State Class members that the Class Vehicles were defective and were intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

555.    Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

556.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

557.    Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Connecticut State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

558.    Accordingly, recovery by Plaintiff and Connecticut State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

559. Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiff and Connecticut State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

560. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and Connecticut State Class members' remedies would be insufficient to make them whole.

561. Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff and Connecticut State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

562. Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

563. As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and Connecticut State Class members have been damaged in an amount to be determined at trial.

**CONNECTICUT COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Conn. Gen. Stat. Ann. § 42A-2-314**
**(On Behalf of the Connecticut State Class)**

564. Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

565. Plaintiff Frank Cohen (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Connecticut State Class against all Defendants.

566.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

567.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Conn. Gen. Stat. Ann. § 42a-2-314.

568.    These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

569.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

570.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Connecticut State Class members have been damaged in an amount to be proven at trial.

**DELAWARE COUNT I:**
**Violations of the Delaware Consumer Fraud Act**
**6 Del. Code § 2513 *et seq.***
**(On Behalf of the Delaware State Class)**

571.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

572.    This count is brought on behalf of the Delaware State Class against all Defendants.

573.    Defendants are "person[s]" within the meaning of 6 Del. Code § 2511(7).

574.    The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby." 6 Del. Code § 2513(a).

575. In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

576. Delaware State Class members had no way of discerning that Defendants' representations were false and misleading because the Delaware State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

577. Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

578. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Delaware State Class.

579. Defendants knew or should have known that their conduct violated the Delaware CFA.

580. Defendants owed the Delaware State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

    A. possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

    B. intentionally concealed the foregoing from regulators and Delaware State Class members; and/or

- 118 -

       C.     made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

581.    Defendants' concealment of the Class Vehicles' true fuel consumption and emissions was material to the Delaware State Class.

582.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Delaware State Class, about the true environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of Defendants' brands, and the true value of the Class Vehicles.

583.    Defendants' violations present a continuing risk to the Delaware Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

584.    The Delaware State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Delaware CFA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

585.    As a direct and proximate result of Defendants' violations of the Delaware CFA, the Delaware State Class have suffered injury-in-fact and/or actual damage.

586.    The Delaware State Class seeks damages under the Delaware CFA for injury resulting from the direct and natural consequences of Defendants' unlawful conduct. *See, e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983). The Delaware State Class also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

587.    Defendants engaged in gross, oppressive or aggravated conduct justifying the imposition of punitive damages.

**DELAWARE COUNT II:**
**Breach of Express Warranty**
**6 Del. Code §§ 2-313 and 2A-210**
**(On Behalf of the Delaware State Class)**

588.     Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

589.     This count is brought on behalf of the Delaware State Class against all Defendants.

590.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under 6 Del. C. §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

591.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under 6 Del. C. § 2A-103(1)(p).

592.     The Class Vehicles are and were at all relevant times "goods" within the meaning of 6 Del. C. §§ 2-105(1) and 2A-103(1)(h).

593.     In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

594.     Defendants also made numerous representations, descriptions, and promises to Delaware State Class members regarding the performance and emission controls of their vehicles.

595.     For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

596.     The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

597.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

1   required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

2   whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

3   emission control components are covered for the first eight years or 80,000 miles (whichever

4   comes first). These major emission control components subject to the longer warranty include the

5   catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

6   device or computer.

7       598.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties

8   with respect to their vehicles' emission systems. Thus, Defendants also provide an express

9   warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

10   Design and Defect Warranty required by the EPA covers repair of emission control or emission

11   related parts, which fail to function or function improperly because of a defect in materials or

12   workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

13   first, or, for the major emission control components, for eight years or 80,000 miles, whichever

14   comes first.

15      599.    As manufacturers of light-duty vehicles, Defendants were required to provide these

16   warranties to purchasers or lessees of Class Vehicles.

17      600.    Defendants' warranties formed a basis of the bargain that was reached when

18   consumers purchased or leased Class Vehicles.

19      601.    Despite the existence of warranties, Defendants failed to inform Delaware State

20   Class members that the Class Vehicles were defective and were intentionally designed and

21   manufactured to emit more pollution and achieve worse fuel economy on the road than what was

22   disclosed to regulators and represented to consumers who purchased or leased them, and

23   Defendants failed to fix the defective emission components free of charge.

24      602.    Defendants breached the express warranty promising to repair and correct

25   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

26   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

27      603.    Affording Defendants a reasonable opportunity to cure their breach of written

28   warranties would be unnecessary and futile here.

604.     Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Delaware State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

605.     Accordingly, recovery by the Delaware State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

606.     Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Delaware State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

607.     Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Delaware State Class members' remedies would be insufficient to make them whole.

608.     Finally, because of Defendants' breach of warranty as set forth herein, Delaware State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

609.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

610.     As a direct and proximate result of Defendants' breach of express warranties, Delaware State Class members have been damaged in an amount to be determined at trial.

**DELAWARE COUNT III:**
**Breach of Implied Warranty of Merchantability**
**6. Del. Code §§ 2-314 and 7-2A-212**
**(On Behalf of the Delaware State Class)**

611.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

612.    This count is brought on behalf of the Delaware State Class against all Defendants.

613.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under 6 Del. C. §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

614.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under 6 Del. C. § 2A-103(1)(p).

615.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 6 Del. C. §§ 2-105(1) and 2A-103(1)(h).

616.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 6 Del. C. §§ 2-314 and 2A-212.

617.    These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

618.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

619.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Delaware State Class members have been damaged in an amount to be proven at trial.

**DISTRICT OF COLUMBIA COUNT I:**
**Violations of the Consumer Protection Procedures Act**
**D.C. Code § 28-3901 *et seq.***
**(On Behalf of the District of Columbia Class)**

620.     Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

621.     This count is brought on behalf of the District of Columbia Class against all Defendants.

622.     Defendants are "person[s]" under the Consumer Protection Procedures Act ("District of Columbia CPPA"), D.C. Code § 28-3901(a)(1).

623.     Class members are "consumers," as defined by D.C. Code § 28-3901(1)(2), who purchased or leased one or more Class Vehicles.

624.     Defendants' actions as set forth herein constitute "trade practices" under D.C. Code § 28-3901.

625.     Defendants participated in unfair or deceptive acts or practices that violated the District of Columbia CPPA. By willfully failing to disclose and actively concealing that they submitted vehicles for emissions testing that were different from production vehicles, installed secret software, and falsely attested that Sport Plus code could pass emissions tests, Defendants engaged in unfair or deceptive practices prohibited by the District of Columbia CPPA, D.C. Code § 28-3901, *et seq.*, including: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) representing that the subject of a transaction involving the Class Vehicles has been supplied in accordance with a previous representation when it has not; (5) misrepresenting as to a material fact which has a tendency to mislead; and (6) failing to state a material fact when such failure tends to mislead.

626.     In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road,

and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

627.     District of Columbia Class members had no way of discerning that Defendants' representations were false and misleading because the District of Columbia Class Members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

628.     Defendants thus violated the District of Columbia CPPA by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

629.     Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the District of Columbia Class.

630.     Defendants knew or should have known that their conduct violated the District of Columbia CPPA.

631.     Defendants the District of Columbia Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

A.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B.     intentionally concealed the foregoing from regulators and District of Columbia Class members; and/or

C.     made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

632.     Defendants' concealment of the true characteristics of the Class Vehicles' fuel consumption and emissions were material to the District of Columbia Class.

633.     Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the District of Columbia Class, about the true environmental cleanliness and efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

634.     Defendants' violations present a continuing risk to the District of Columbia Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

635.     The District of Columbia Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the District of Columbia CPPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

636.     As a direct and proximate result of Defendants' violations of the District of Columbia CPPA, the District of Columbia Class have suffered injury-in-fact and/or actual damage.

637.     The District of Columbia Class are entitled to recover treble damages or $1,500, whichever is greater, punitive damages, reasonable attorneys' fees, and any other relief the Court deems proper, under D.C. Code § 28-3901.

638.     The District of Columbia Class seeks punitive damages against Defendants because their conduct evidences egregious conduct. Defendants egregiously misrepresented the fuel economy and emissions of the Class Vehicles and concealed material facts that only they knew. Defendants' unlawful conduct warrants punitive damages.

**DISTRICT OF COLUMBIA COUNT II:**
**Breach of Express Warranty**
**D.C. Code §§ 28:2-313 and 28:2A-210**
**(On Behalf of the District of Columbia Class)**

639.     Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

640.     This count is brought on behalf of the District of Columbia Class against all Defendants.

641.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under D.C. Code §§ 28:2-104(1) and 28:2A-103(a)(20), and "sellers" of motor vehicles under § 28:2-103(1)(d).

642.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under D.C. Code § 28:2A-103(a)(16).

643.     The Class Vehicles are and were at all relevant times "goods" within the meaning of D.C. Code §§ 28:2-105(1) and 28:2A-103(a)(8).

644.     In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

645.     Defendants also made numerous representations, descriptions, and promises to District of Columbia Class members regarding the performance and emission controls of their vehicles.

646.     For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

647.     The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

648.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever

1    comes first). These major emission control components subject to the longer warranty include the

2    catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

3    device or computer.

4        649.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties

5    with respect to their vehicles' emission systems. Thus, Defendants also provide an express

6    warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

7    Design and Defect Warranty required by the EPA covers repair of emission control or emission

8    related parts, which fail to function or function improperly because of a defect in materials or

9    workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

10   first, or, for the major emission control components, for eight years or 80,000 miles, whichever

11   comes first.

12       650.    As manufacturers of light-duty vehicles, Defendants were required to provide these

13   warranties to purchasers or lessees of Class Vehicles.

14       651.    Defendants' warranties formed a basis of the bargain that was reached when

15   consumers purchased or leased Class Vehicles.

16       652.    Despite the existence of warranties, Defendants failed to inform District of

17   Columbia Class members that the Class Vehicles were defective and were intentionally designed

18   and manufactured to emit more pollution and achieve worse fuel economy on the road than what

19   was disclosed to regulators and represented to consumers who purchased or leased them, and

20   Defendants failed to fix the defective emission components free of charge.

21       653.    Defendants breached the express warranty promising to repair and correct

22   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

23   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

24       654.    Affording Defendants a reasonable opportunity to cure their breach of written

25   warranties would be unnecessary and futile here.

26       655.    Furthermore, the limited warranty promising to repair and correct Defendants'

27   defect in materials and workmanship fails in its essential purpose because the contractual remedy is

28

1    insufficient to make District of Columbia Class members whole and because Defendants have

2    failed and/or have refused to adequately provide the promised remedies within a reasonable time.

3        656.    Accordingly, recovery by District of Columbia Class members is not restricted to

4    the limited warranty promising to repair and correct Defendants' defect in materials and

5    workmanship, and they seek all remedies as allowed by law.

6        657.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or

7    leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not

8    conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

9    material facts regarding the Class Vehicles. District of Columbia Class members were therefore

10   induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

11       658.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved

12   through the limited remedy of repairing and correcting Defendants' defect in materials and

13   workmanship as many incidental and consequential damages have already been suffered because of

14   Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued

15   failure to provide such limited remedy within a reasonable time, and any limitation on District of

16   Columbia Class members' remedies would be insufficient to make them whole.

17       659.    Finally, because of Defendants' breach of warranty as set forth herein, District of

18   Columbia Class members assert, as additional and/or alternative remedies, the revocation of

19   acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles

20   currently owned or leased, and for such other incidental and consequential damages as allowed.

21       660.    Defendants were provided reasonable notice of these issues by way of a letter sent

22   by Plaintiffs as well as the regulators' investigations.

23       661.    As a direct and proximate result of Defendants' breach of express warranties,

24   District of Columbia Class members have been damaged in an amount to be determined at trial.

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DISTRICT OF COLUMBIA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**D.C. Code §§ 28:2-314 and 28:2A-212**
**(On Behalf of the District of Columbia Class)**

662.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

663.    This count is brought on behalf of the District of Columbia Class against all Defendants.

664.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under D.C. Code §§ 28:2-104(1) and 28:2A-103(a)(20), and "sellers" of motor vehicles under § 28:2-103(1)(d).

665.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under D.C. Code § 28:2A-103(a)(16).

666.    The Class Vehicles are and were at all relevant times "goods" within the meaning of D.C. Code §§ 28:2-105(1) and 28:2A-103(a)(8).

667.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to D.C. Code §§ 28:2-314 and 28:2A-212.

668.    These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

669.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

670.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, District of Columbia Class members have been damaged in an amount to be proven at trial.

**FLORIDA COUNT I:**
**Violations of the Florida Unfair & Deceptive Trade Practices Act**
**Fla. Stat. § 501.201, *et seq.***
**(On Behalf of the Florida State Class)**

671.     Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

672.     Plaintiffs Rafael Daniels, Alan Essreg, David Perkins III, Sander Shady, Dyana Spiess, and Orville Taylor (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Florida State Class against all Defendants.

673.     Plaintiffs and members of the Florida State Class are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

674.     Defendants engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

675.     FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . ." Fla. Stat. § 501.204(1). Defendants participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.

676.     In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

677.     Plaintiffs and Florida State Class members had no way of discerning that Defendants' representations were false and misleading because Plaintiffs and Florida State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

678.     Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class

- 131 -

1  Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

2  Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a

3  transaction involving Class Vehicles has been supplied in accordance with a previous

4  representation when it has not.

5        679.    Defendants intentionally and knowingly misrepresented material facts regarding the

6  Class Vehicles with intent to mislead Plaintiffs and the Florida State Class.

7        680.    Defendants knew or should have known that their conduct violated the FUDTPA.

8        681.    Defendants owed Plaintiffs and the Florida State Class a duty to disclose the

9  illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

10          A.    possessed exclusive knowledge that they were manufacturing, selling, and

11       distributing vehicles throughout the United States that did not perform as advertised;

12          B.    intentionally concealed the foregoing from regulators, Plaintiffs, and Florida

13       State Class members; and/or

14          C.    made incomplete representations about the Class Vehicles' fuel economy

15       and emissions, while purposefully withholding material facts from Plaintiffs and the Florida

16       State Class that contradicted these representations.

17       682.    Defendants' concealment of the Class Vehicles' true fuel consumption and

18 emissions was material to Plaintiffs and the Florida State Class.

19       683.    Defendants' unfair or deceptive acts or practices were likely to and did in fact

20 deceive regulators and reasonable consumers, including Plaintiffs and the Florida State Class,

21 about the true environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of the

22 Defendants' brands, and the true value of the Class Vehicles.

23       684.    Defendants' violations present a continuing risk to Plaintiffs and the Florida State

24 Class as well as to the general public. Defendants' unlawful acts and practices complained of herein

25 affect the public interest.

26       685.    Plaintiffs and the Florida State Class suffered ascertainable loss and actual damages

27 as a direct and proximate result of Defendants' misrepresentations and concealment of and failure

28 to disclose material information. Defendants had an ongoing duty to all their customers to refrain

from unfair and deceptive practices under the FUDTPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

686.     As a direct and proximate result of Defendants' violations of the FUDTPA, Plaintiffs and members of the Florida State Class have suffered injury-in-fact and/or actual damage.

687.     Plaintiffs and the Florida State Class are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

688.     Plaintiffs and the Florida State Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

**FLORIDA COUNT II:**
**Breach of Express Warranty**
**F.S.A. §§ 672.313 and 680.21**
**(On Behalf of the Florida State Class)**

689.     Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

690.     Plaintiffs Rafael Daniels, Alan Essreg, David Perkins III, Sander Shady, Dyana Spiess, and Orville Taylor (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Florida State Class against all Defendants.

691.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

692.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under F.S.A. § 680.1031(1)(p).

693.     The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

694.     In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

695.    Defendants also made numerous representations, descriptions, and promises to Plaintiffs and Florida State Class members regarding the performance and emission controls of their vehicles.

696.    For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

697.    The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

698.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

699.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

700.    As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

701.    Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

702.    Despite the existence of warranties, Defendants failed to inform Plaintiffs and Florida State Class members that the Class Vehicles were defective and were intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

703.    Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

704.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

705.    Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Florida State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

706.    Accordingly, recovery by Plaintiffs and Florida State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

707.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and Florida State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

708.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the Florida State Class members' remedies would be insufficient to make them whole.

709.   Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs and Florida State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

710.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

711.   As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs and Florida State Class members have been damaged in an amount to be determined at trial.

<div align="center">

**FLORIDA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**F.S.A. §§ 672.314 and 680.212**
**(On Behalf of the Florida State Class)**

</div>

712.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

713.   Plaintiffs Rafael Daniels, Alan Essreg, David Perkins III, Sander Shady, Dyana Spiess, and Orville Taylor (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Florida State Class against all Defendants.

714.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

715.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under F.S.A. § 680.1031(1)(p).

716.    The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

717.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to F.S.A. §§ 672.314 and 680.212.

718.    These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

719.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

720.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and Florida State Class members have been damaged in an amount to be proven at trial.

**GEORGIA COUNT I:**
**Violations of Georgia's Fair Business Practices Act**
**Ga. Code Ann. § 10-1-390 *et seq.***
**(On Behalf of the Georgia State Class)**

721.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

722.    Plaintiffs Erik Bloom, Ashish Chadha, Lee Marks, George Pearl, and Cecil Robinson (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Georgia State Class against all Defendants.

723.    The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code. Ann. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a

1   particular standard, quality, or grade . . . if they are of another," and "[a]dvertising goods or services

2   with intent not to sell them as advertised," Ga. Code. Ann. § 10-1-393(b).

3       724.   In the course of their business, Defendants concealed and suppressed material facts

4   concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for

5   emissions testing that were different from production vehicles, (b) installing a secret software

6   program that caused the vehicles to perform differently during emissions testing than on the road,

7   and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass

8   emissions tests when they in fact did not.

9       725.   Plaintiffs and Georgia State Class members had no way of discerning that

10   Defendants' representations were false and misleading because Plaintiffs and Georgia State Class

11   members did not have access to Defendants' emissions certification test vehicles and Defendants'

12   emissions-related hardware and software was extremely sophisticated technology.

13       726.   Defendants intentionally and knowingly misrepresented material facts regarding the

14   Class Vehicles with intent to mislead Plaintiffs and the Georgia State Class.

15       727.   Defendants knew or should have known that their conduct violated the Georgia

16   FBPA.

17       728.   Defendants owed Plaintiffs and the Georgia State Class a duty to disclose the

18   illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

19           A.   possessed exclusive knowledge that they were manufacturing, selling, and

20   distributing vehicles throughout the United States that did not perform as advertised;

21           B.   intentionally concealed the foregoing from regulators, Plaintiffs, and

22   Georgia State Class members; and/or

23           C.   made incomplete representations about the Class Vehicles' fuel economy

24   and emissions while purposefully withholding material facts from Plaintiffs and George

25   State Class members that contradicted these representations.

26       729.   Defendants' concealment of the true characteristics of the Class Vehicles' fuel

27   consumption and emissions were material to Plaintiffs and the Georgia State Class.

28

730. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and the Georgia State Class, about the true environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

731. Defendants' violations present a continuing risk to Plaintiffs and the Georgia State Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

732. Plaintiffs and the Georgia State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Georgia FBPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

733. As a direct and proximate result of Defendants' violations of the Georgia FBPA, Plaintiffs and the Georgia State Class has suffered injury-in-fact and/or actual damage.

734. Plaintiffs and the Georgia State Class are entitled to recover damages and exemplary damages (for intentional violations) per Ga. Code. Ann. § 10-1-399(a).

735. Plaintiffs and the Georgia State Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per Ga. Code. Ann. § 10-1-399.

736. Pursuant to Ga. Code Ann. § 10-1-399, Plaintiffs sent notice letters to Defendants. Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by way of the investigations conducted by governmental regulators. Plaintiffs and the Georgia State Class seek all damages and relief to which it is entitled.

**GEORGIA COUNT II:**
**Violations of Georgia's Uniform Deceptive Trade Practices Act**
**Ga. Code Ann. § 10-1-370 *et seq.***
**(On Behalf of the Georgia State Class)**

737. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

738.    Plaintiffs Erik Bloom, Ashish Chadha, Lee Marks, George Pearl, and Cecil Robinson (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Georgia State Class against all Defendants.

739.    Defendants, Plaintiffs, and members of the Georgia State Class are "persons" within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code. Ann. § 10-1-371(5).

740.    The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code. Ann. § 10-1-372(a).

741.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

742.    Plaintiffs and Georgia State Class members had no way of discerning that Defendants' representations were false and misleading because Plaintiffs and Georgia State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

743.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

744.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Georgia State Class.

745. Defendants knew or should have known that their conduct violated the Georgia UDTPA.

746. Defendants owed Plaintiffs and the Georgia State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

    A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

    B.    intentionally concealed the foregoing from regulators, Plaintiffs, and Georgia State Class members; and/or

    C.    made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

747. Defendants' concealment of the Class Vehicles' true fuel consumption and emissions was material to Plaintiffs and the Georgia State Class.

748. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and the Georgia State Class, about the true environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

749. Defendants' violations present a continuing risk to Plaintiffs and the Georgia State Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

750. Plaintiffs and the Georgia State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Georgia UDTPA. All owners and lessees of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

751. As a direct and proximate result of Defendants' violations of the Georgia UDTPA, Plaintiffs and the Georgia State Class have suffered injury-in-fact and/or actual damage.

752.     Plaintiffs and the Georgia State Class seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA per Ga. Code. Ann § 10-1-373.

<div align="center">

**GEORGIA COUNT III:**
**Breach of Express Warranty**
**Ga. Code Ann. §§ 11-2-313 and 11-2A-210**
**(On Behalf of the Georgia State Class)**

</div>

753.     Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

754.     Plaintiffs Erik Bloom, Ashish Chadha, Lee Marks, George Pearl, and Cecil Robinson (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Georgia State Class against all Defendants.

755.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

756.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

757.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

758.     In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

759.     Defendants also made numerous representations, descriptions, and promises to Plaintiffs and Georgia State Class members regarding the performance and emission controls of their vehicles.

760.     For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

761. The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

762. The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

763. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

764. As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

765. Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

766. Despite the existence of warranties, Defendants failed to inform Plaintiffs and Georgia State Class members that the Class Vehicles were defective and were intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road

than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

767.    Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

768.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

769.    Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Georgia State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

770.    Accordingly, recovery by Plaintiffs and Georgia State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

771.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and Georgia State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

772.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and Georgia State Class members' remedies would be insufficient to make them whole.

773.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs and Georgia State Class members assert, as additional and/or alternative remedies, the revocation of

acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

774.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

775.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs and Georgia State Class members have been damaged in an amount to be determined at trial.

### GEORGIA COUNT IV:
### Breach of Implied Warranty of Merchantability
### Ga. Code Ann. §§ 11-2-314 and 11-2A-212
### (On Behalf of the Georgia State Class)

776.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

777.    Plaintiffs Erik Bloom, Ashish Chadha, Lee Marks, George Pearl, and Cecil Robinson (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Georgia State Class against all Defendants.

778.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

779.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

780.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

781.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ga. Code Ann. §§ 11-2-314 and 11-2A-212.

782.    These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with

1    emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the

2    ordinary purpose for which vehicles are used.

3         783.    Defendants were provided reasonable notice of these issues by way of a letter sent

4    by Plaintiffs as well as the regulators' investigations.

5         784.    As a direct and proximate result of Defendants' breach of the implied warranty of

6    merchantability, Plaintiffs and Georgia State Class members have been damaged in an amount to

7    be proven at trial.

**HAWAII COUNT I:**
**Unfair and Deceptive Acts in Violation of Hawaii Law**
**Haw. Rev. Stat. § 480 *et seq.***
**(On Behalf of the Hawaii State Class)**

          785.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set
forth herein.

          786.    This count is brought on behalf of the Hawaii State Class against all Defendants.

          787.    Defendants are "person[s]" under Haw. Rev. Stat. § 480-1.

          788.    Hawaii State Class members are "consumer[s]" as defined by Haw. Rev. Stat.
§ 480-1, who purchased or leased one or more Class Vehicles.

          789.    Defendants' acts or practices as set forth above occurred in the conduct of trade or
commerce.

          790.    The Hawaii Act § 480-2(a) prohibits "unfair methods of competition and unfair or
deceptive acts or practices in the conduct of any trade or commerce . . . ."

          791.    In the course of their business, Defendants concealed and suppressed material facts
concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for
emissions testing that were different from production vehicles, (b) installing a secret software
program that caused the vehicles to perform differently during emissions testing than on the road,
and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass
emissions tests when they in fact did not.

          792.    Hawaii State Class members had no way of discerning that Defendants'
representations were false and misleading because Hawaii State Class members did not have access

1    to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware

2    and software was extremely sophisticated technology.

3         793.    Defendants thus violated the Hawaii Act by, at minimum: representing that Class

4    Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that

5    Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

6    Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a

7    transaction involving Class Vehicles has been supplied in accordance with a previous

8    representation when it has not.

9         794.    Defendants intentionally and knowingly misrepresented material facts regarding the

10   Class Vehicles with intent to mislead the Hawaii State Class.

11        795.    Defendants knew or should have known that their conduct violated Hawaii law.

12        796.    Defendants owed the Hawaii State Class a duty to disclose the illegality and public

13   health risks, the true nature of the Class Vehicles, because Defendants:

14             A.      possessed exclusive knowledge that they were manufacturing, selling, and

15        distributing vehicles throughout the United States that did not perform as advertised;

16             B.      intentionally concealed the foregoing from regulators and Hawaii State

17        Class members; and/or

18             C.      made incomplete representations about the Class Vehicles' fuel economy

19        and emissions while purposefully withholding material facts that contradicted these

20        representations.

21        797.    Defendants' concealment of the Class Vehicles' true fuel consumption and

22   emissions was material to the Hawaii State Class.

23        798.    Defendants' unfair or deceptive acts or practices were likely to and did in fact

24   deceive regulators and reasonable consumers, including the Hawaii State Class, about the true

25   environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of the Defendants'

26   brands, and the true value of the Class Vehicles.

27

28

799.    Defendants' violations present a continuing risk to the Hawaii State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

800.    The Hawaii State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under Hawaii law. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

<div align="center">

**HAWAII COUNT II:**
Breach of Express Warranty
**Haw. Rev. Stat. §§ 490:2-313 and 490:2A-210**
**(On Behalf of the Hawaii State Class)**

</div>

801.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

802.    This count is brought on behalf of the Hawaii State Class against all Defendants.

803.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Haw. Rev. Stat. §§ 490:2-104(1) and 490:2A-103(b), and a "seller" of motor vehicles under § 490:2-103(1)(d).

804.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Haw. Rev. Stat. § 490:2A-103(a)(16).

805.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Haw. Rev. Stat. §§ 490:2-105(1) and 490:2A-103(a)(8).

806.    In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

807.    Defendants also made numerous representations, descriptions, and promises to Hawaii State Class members regarding the performance and emission controls of their vehicles.

808.    For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

809.    The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

810.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

811.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

812.    As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

813.    Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

814.    Despite the existence of warranties, Defendants failed to inform Hawaii State Class members that the Class Vehicles were defective and were intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

815.    Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

816.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

817.    Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Hawaii State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

818.    Accordingly, recovery by Hawaii State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

819.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Hawaii State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

820.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Hawaii State Class members' remedies would be insufficient to make them whole.

821.     Finally, because of Defendants' breach of warranty as set forth herein, Hawaii State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

822.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

823.     As a direct and proximate result of Defendants' breach of express warranties, Hawaii State Class members have been damaged in an amount to be determined at trial.

<div align="center">

**HAWAII COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Haw. Rev. Stat. §§ 490:2-314 and 490:2A-212**
**(On Behalf of the Hawaii State Class)**

</div>

824.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

825.     This count is brought on behalf of the Hawaii State Class against all Defendants.

826.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Haw. Rev. Stat. §§ 490:2-104(1) and 490:2A-103(b), and a "seller" of motor vehicles under § 490:2-103(1)(d).

827.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Haw. Rev. Stat. § 490:2A-103(a)(16).

828.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Haw. Rev. Stat. §§ 490:2-105(1) and 490:2A-103(a)(8).

829.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Haw. Rev. Stat. §§ 490:2-314 and 490:2A-212.

830.     These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with

emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

831.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

832.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Hawaii State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**IDAHO COUNT I:**
**Violations of the Idaho Consumer Protection Act**
**Idaho Code § 48-601 *et seq.***
**(On Behalf of the Idaho State Class)**

</div>

833.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

834.   This count is brought on behalf of the Idaho State Class against all Defendants.

835.   Defendants are "person[s]" under the Idaho Consumer Protection Act ("Idaho CPA"), Idaho Code § 48-602(1).

836.   Defendants' acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under Idaho Code § 48-602(2).

837.   Defendants participated in misleading, false, or deceptive acts that violated the Idaho CPA.

838.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

839.   Idaho State Class members had no way of discerning that Defendants' representations were false and misleading because the Idaho State Class did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

840.     Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

841.     Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Idaho State Class.

842.     Defendants knew or should have known that their conduct violated the Idaho CPA.

843.     Defendants owed the Idaho State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

A.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B.     intentionally concealed the foregoing from regulators and Idaho State Class members; and/or

C.     made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

844.     Defendants' concealment of the Class Vehicles' true fuel consumption and emissions were material to the Idaho State Class.

845.     Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Idaho State Class, about the true environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

846.     Defendants' violations present a continuing risk to the Idaho State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

847.    The Idaho State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Idaho CPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

848.    As a direct and proximate result of Defendants' violations of the Idaho CPA, the Idaho State Class has suffered injury-in-fact and/or actual damage.

849.    Pursuant to Idaho Code § 48-608, the Idaho State Class seeks monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each Idaho State Class member.

850.    The Idaho State Class also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho CPA.

851.    The Idaho State Class also seeks punitive damages against Defendants because Defendants conduct evidences an extreme deviation from reasonable standards. Defendants flagrantly and fraudulently misrepresented the reliability of the Class Vehicles, deceived Class members, and concealed material facts that only they knew—all to avoid the expense and public relations nightmare of correcting a flaw in the Class Vehicles. Defendants' unlawful conduct constitutes oppression and fraud warranting punitive damages.

**IDAHO COUNT II:**
**Breach of Express Warranty**
**Idaho Code §§ 28-2-313 and 28-12-210**
**(On Behalf of the Idaho State Class)**

852.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

853.    This count is brought on behalf of the Idaho State Class against all Defendants.

854. Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Idaho Code §§ 28-2-104(1) and 28-12-103(3), and "sellers" of motor vehicles under § 28-2-103(1)(d).

855. With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Idaho Code § 28-12-103(1)(p).

856. The Class Vehicles are and were at all relevant times "goods" within the meaning of Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h).

857. In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

858. Defendants also made numerous representations, descriptions, and promises to Idaho State Class members regarding the performance and emission controls of their vehicles.

859. For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

860. The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

861. The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

862.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

863.    As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

864.    Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

865.    Despite the existence of warranties, Defendants failed to inform Idaho State Class members that the Class Vehicles were defective and were intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

866.    Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

867.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

868.    Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Idaho State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

869.     Accordingly, recovery by Idaho State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

870.     Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Idaho State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

871.     Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Idaho State Class members' remedies would be insufficient to make them whole.

872.     Finally, because of Defendants' breach of warranty as set forth herein, Idaho State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

873.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

874.     As a direct and proximate result of Defendants' breach of express warranties, Idaho State Class members have been damaged in an amount to be determined at trial.

**IDAHO COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Idaho Code §§ 28-2-314 and 28-12-212**
**(On Behalf of the Idaho State Class)**

875.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

876.     This count is brought on behalf of the Idaho State Class against all Defendants.

877.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Idaho Code §§ 28-2-104(1) and 28-12-103(3), and "sellers" of motor vehicles under § 28-2-103(1)(d).

878.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Idaho Code § 28-12-103(1)(p).

879.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h).

880.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Idaho Code §§ 28-2-314 and 28-12-212.

881.    These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

882.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

883.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Idaho State Class members have been damaged in an amount to be proven at trial.

**ILLINOIS COUNT I:**
**Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS 505/1, *et seq.* and 720 ILCS 295/1a**
**(On Behalf of the Illinois State Class)**

884.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

885.    Plaintiffs John Aronson and David Perkins III (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Illinois State Class against all Defendants.

886.    Defendants are "person[s]" as that term is defined in 815 ILCS 505/1(c).

887.   Members of the Illinois State Class are "consumers" as that term is defined in 815 ILCS 505/1(e).

888.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

889.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

890.   Plaintiffs and Illinois State Class members had no way of discerning that Defendants' representations were false and misleading because Plaintiffs and Illinois State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology. Illinois State Class members did not and could not unravel Defendants' deception on their own.

891.   Defendants thus violated the Illinois CFA by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

892.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Illinois State Class.

893.   Defendants knew or should have known that their conduct violated the Illinois CFA.

894.    Defendants owed the Illinois State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B.    intentionally concealed the foregoing from regulators and Illinois State Class members; and/or

C.    made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

895.    Defendants' concealment of the Class Vehicles' fuel consumption and emissions was material to the Illinois State Class.

896.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Illinois State Class, about the true environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

897.    Defendants' violations present a continuing risk to Plaintiffs and the Illinois State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

898.    Plaintiffs and the Illinois State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Illinois CFA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

899.    As a direct and proximate result of Defendants' violations of the Illinois CFA, Plaintiffs and members of the Illinois State Class have suffered injury-in-fact and/or actual damage.

900.    Pursuant to 815 ILCS 505/10a(a), the Illinois State Class seeks monetary relief against Defendants in the amount of actual damages, as well as punitive damages because Defendants acted with fraud and/or malice and/or was grossly negligent.

901.    Plaintiffs and the Illinois State Class also seek an order enjoining Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq.*

<div align="center">

**ILLINOIS COUNT II:**
**Breach of Express Warranty**
**810 Ill. Comp. Stat. §§ 5/2-313 and 5/2A-210**
**(On Behalf of the Illinois State Class)**

</div>

902.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

903.    Plaintiffs John Aronson and David Perkins III (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Illinois State Class against all Defendants.

904.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

905.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

906.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

907.    In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

908.    Defendants also made numerous representations, descriptions, and promises to Illinois State Class members regarding the performance and emission controls of their vehicles.

909.    For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the

1   time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free

2   from defects in material and workmanship which would cause it not to meet those standards."

3       910.    The Clean Air Act also requires manufacturers of light-duty vehicles to provide two

4   federal emission control warranties: a "Performance Warranty" and a "Design and Defect

5   Warranty."

6       911.    The EPA requires vehicle manufacturers to provide a Performance Warranty with

7   respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

8   their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

9   required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

10  whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

11  emission control components are covered for the first eight years or 80,000 miles (whichever

12  comes first). These major emission control components subject to the longer warranty include the

13  catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

14  device or computer.

15      912.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties

16  with respect to their vehicles' emission systems. Thus, Defendants also provide an express

17  warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

18  Design and Defect Warranty required by the EPA covers repair of emission control or emission

19  related parts, which fail to function or function improperly because of a defect in materials or

20  workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

21  first, or, for the major emission control components, for eight years or 80,000 miles, whichever

22  comes first.

23      913.    As manufacturers of light-duty vehicles, Defendants were required to provide these

24  warranties to purchasers or lessees of Class Vehicles.

25      914.    Defendants' warranties formed a basis of the bargain that was reached when

26  consumers purchased or leased Class Vehicles.

27      915.    Despite the existence of warranties, Defendants failed to inform Plaintiffs and

28  Illinois State Class members that the Class Vehicles were defective and intentionally designed and

1    manufactured to emit more pollution and achieve worse fuel economy on the road than what was

2    disclosed to regulators and represented to consumers who purchased or leased them, and

3    Defendants failed to fix the defective emission components free of charge.

4         916.    Defendants breached the express warranty promising to repair and correct

5    Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

6    have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

7         917.    Affording Defendants a reasonable opportunity to cure their breach of written

8    warranties would be unnecessary and futile here.

9         918.    Furthermore, the limited warranty promising to repair and correct Defendants'

10   defect in materials and workmanship fails in its essential purpose because the contractual remedy is

11   insufficient to make Illinois State Class members whole and because Defendants have failed and/or

12   have refused to adequately provide the promised remedies within a reasonable time.

13        919.    Accordingly, recovery by Plaintiffs and Illinois State Class members is not

14   restricted to the limited warranty promising to repair and correct Defendants' defect in materials

15   and workmanship, and they seek all remedies as allowed by law.

16        920.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or

17   leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not

18   conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

19   material facts regarding the Class Vehicles. Plaintiffs and Illinois State Class members were

20   therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

21        921.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved

22   through the limited remedy of repairing and correcting Defendants' defect in materials and

23   workmanship as many incidental and consequential damages have already been suffered because of

24   Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued

25   failure to provide such limited remedy within a reasonable time, and any limitation on the Illinois

26   State Class members' remedies would be insufficient to make them whole.

27        922.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs and

28   Illinois State Class members assert, as additional and/or alternative remedies, the revocation of

1    acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles

2    currently owned or leased, and for such other incidental and consequential damages as allowed.

3           923.    Defendants were provided notice of these issues by numerous complaints filed

4    against them, including the instant Complaint, within a reasonable amount of time.

5           924.    As a direct and proximate result of Defendants' breach of express warranties,

6    Illinois State Class members have been damaged in an amount to be determined at trial.

<div align="center">

**ILLINOIS COUNT III:**
**Breach of Implied Warranty of Merchantability**
**810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212**
**(On Behalf of the Illinois State Class)**

</div>

925.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

926.    Plaintiffs John Aronson and David Perkins III (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Illinois State Class against all Defendants.

927.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

928.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

929.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

930.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 810 Ill. Comp. Stat. §§ 28-2-314 and 28-12-212.

931.    These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with

emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

932.    Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

933.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Illinois State Class members have been damaged in an amount to be proven at trial.

**INDIANA COUNT I:**
**Violations of the Indiana Deceptive Consumer Sales Act**
**Ind. Code § 24-5-0.5-3**
**(On Behalf of the Indiana State Class)**

934.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

935.    This count is brought on behalf of the Indiana State Class against all Defendants.

936.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

937.    Indiana State Class members had no way of discerning that Defendants' representations were false and misleading because Indiana State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology. Indiana State Class members did not and could not unravel Defendants' deception on their own.

938.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a

1  transaction involving Class Vehicles has been supplied in accordance with a previous

2  representation when it has not.

3    939.   Defendants intentionally and knowingly misrepresented material facts regarding the

4  Class Vehicles with intent to mislead the Indiana State Class.

5    940.   Defendants knew or should have known that their conduct violated the Indiana

6  DCSA.

7    941.   Defendants owed the Indiana State Class a duty to disclose the illegality and public

8  health risks, the true nature of the Class Vehicles, because Defendants:

9        A.    possessed exclusive knowledge that they were manufacturing, selling, and

10       distributing vehicles throughout the United States that did not perform as advertised;

11       B.    intentionally concealed the foregoing from regulators and Indiana State

12       Class members; and/or

13       C.    made incomplete representations about the Class Vehicles' fuel economy

14       and emissions while purposefully withholding material facts that contradicted these

15       representations.

16    942.   Defendants' concealment of the Class Vehicles' true fuel consumption and

17  emissions was material to the Indiana State Class.

18    943.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

19  deceive regulators and reasonable consumers, including the Indiana State Class, about the true

20  environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of Defendants'

21  brands, and the true value of the Class Vehicles.

22    944.   Defendants' violations present a continuing risk to the Indiana State Class as well as

23  to the general public. Defendants' unlawful acts and practices complained of herein affect the

24  public interest.

25    945.   The Indiana State Class suffered ascertainable loss and actual damages as a direct

26  and proximate result of Defendants' misrepresentations and concealment of and failure to disclose

27  material information. Defendants had an ongoing duty to all their customers to refrain from unfair

28  and deceptive practices under the Indiana DCSA. All owners of Class Vehicles suffered

1    ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the

2    course of Defendants' business.

3         946.    As a direct and proximate result of Defendants' violations of the Indiana DCSA,

4    members of the Indiana State Class have suffered injury-in-fact and/or actual damage.

5         947.    Pursuant to Ind. Code § 24-5-0.5-4, the Indiana State Class seeks monetary relief

6    against Defendants measured as the greater of (a) actual damages in an amount to be determined at

7    trial and (b) statutory damages in the amount of $500 for each Indiana State Class member,

8    including treble damages up to $1,000 for Defendants' willfully deceptive acts.

9         948.    The Indiana State Class also seeks punitive damages based on the outrageousness

10   and recklessness of the Defendants' conduct and Defendants' high net worth.

11        949.    Pursuant to Ind. Code § 24-5-0.5-5(a), Plaintiffs sent notice letters to Defendants.

12   Additionally, all Defendants were provided notice of the issues raised in this count and this

13   Complaint by way of the investigations conducted by governmental regulators. The Indiana State

14   Class seeks all damages and relief to which it is entitled.

15                           **INDIANA COUNT II:**
                       **Breach of Express Warranty**
16              **Ind. Code §§ 26-1-3-313 and 26-1-2.1-210**
                    **(On Behalf of the Indiana State Class)**
17
         950.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though
18
     fully set forth herein.
19
         951.    This count is brought on behalf of the Indiana State Class against all Defendants.
20
         952.    Defendants are and were at all relevant times "merchant[s]" with respect to motor
21
     vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and "sellers" of motor vehicles
22
     under § 26-1-2-103(1)(d).
23
         953.    With respect to leases, Defendants are and were at all relevant times "lessors" of
24
     motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).
25
         954.    The Class Vehicles are and were at all relevant times "goods" within the meaning of
26
     Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).
27

28

955. In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

956. Defendants also made numerous representations, descriptions, and promises to Indiana State Class members regarding the performance and emission controls of their vehicles.

957. For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

958. The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

959. The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

960. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

1    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

2    comes first.

3         961.    As manufacturers of light-duty vehicles, Defendants were required to provide these

4    warranties to purchasers or lessees of Class Vehicles.

5         962.    Defendants' warranties formed a basis of the bargain that was reached when

6    consumers purchased or leased the Class Vehicles.

7         963.    Despite the existence of warranties, Defendants failed to inform Indiana State Class

8    members that the Class Vehicles were defective and intentionally designed and manufactured to

9    emit more pollution and achieve worse fuel economy on the road than what was disclosed to

10   regulators and represented to consumers who purchased or leased them, and Defendants failed to

11   fix the defective emission components free of charge.

12        964.    Defendants breached the express warranty promising to repair and correct

13   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

14   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

15        965.    Affording Defendants a reasonable opportunity to cure their breach of written

16   warranties would be unnecessary and futile here.

17        966.    Furthermore, the limited warranty promising to repair and correct Defendants'

18   defect in materials and workmanship fails in its essential purpose because the contractual remedy is

19   insufficient to make Indiana State Class members whole and because Defendants have failed and/or

20   have refused to adequately provide the promised remedies within a reasonable time.

21        967.    Accordingly, recovery by Indiana State Class members is not restricted to the

22   limited warranty promising to repair and correct Defendants' defect in materials and workmanship,

23   and they seek all remedies as allowed by law.

24        968.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or

25   leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not

26   conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

27   material facts regarding the Class Vehicles. Indiana State Class members were therefore induced to

28   purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

969.     Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on the Indiana State Class members' remedies would be insufficient to make them whole.

970.     Finally, because of Defendants' breach of warranty as set forth herein, Indiana State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

971.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

972.     As a direct and proximate result of Defendants' breach of express warranties, Indiana State Class members have been damaged in an amount to be determined at trial.

**INDIANA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Ind. Code §§ 26-1-3-314 and 26-1-2.1-212**
**(On Behalf of the Indiana State Class)**

973.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

974.     This count is brought on behalf of the Indiana State Class against all Defendants.

975.     Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and "sellers" of motor vehicles under § 26-1-2-103(1)(d).

976.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

977.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

978.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ind. Code §§ 26-1-2-314 and 26-1-2.1-212.

979.     These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

980.     Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

981.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Indiana State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**IOWA COUNT I:**
**Violations of the Private Right of Action For Consumer Frauds Act**
**Iowa Code § 714h.1, *et seq.***
**(On Behalf of the Iowa State Class)**

</div>

982.     Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

983.     This count is brought on behalf of the Iowa State Class against all Defendants.

984.     Defendants are "person[s]" under Iowa Code § 714H.2(7).

985.     Iowa State Class members are "consumers," as defined by Iowa Code § 14H.2(3), who purchased or leased one or more Class Vehicles.

986.     The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise." Iowa Code § 714H.3.

987.     In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

988.     Iowa State Class members had no way of discerning that Defendants' representations were false and misleading because Iowa State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

989.     Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

990.     Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Iowa State Class.

991.     Defendants knew or should have known that their conduct violated the Iowa CFA.

992.     Defendants owed the Iowa State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

A.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B.     intentionally concealed the foregoing from regulators and Iowa State Class members; and/or

C.     made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

993. Defendants' concealment of the Class Vehicles' true fuel consumption and emissions was material to the Iowa State Class.

994. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Iowa State Class, about the true environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

995. Defendants' violations present a continuing risk to the Iowa State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

996. The Iowa State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Iowa CFA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

997. As a direct and proximate result of Defendants' violations of the Iowa CFA, members of the Iowa State Class have suffered injury-in-fact and/or actual damage.

998. Pursuant to Iowa Code § 714H.5, the Iowa State Class seeks an order enjoining Defendants' unfair and/or deceptive acts or practices; actual damages; in addition to an award of actual damages, statutory damages up to three times the amount of actual damages awarded as a result of Defendants' willful and wanton disregard for the rights of others; attorneys' fees; and such other equitable relief as the Court deems necessary to protect the public from further violations of the Iowa CFA.

**IOWA COUNT II:**
**Breach of Express Warranty**
**Iowa Code §§ 554.2313 and 554.13210**
**(On Behalf of the Iowa State Class)**

999. Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1000.   This count is brought on behalf of the Iowa State Class against all Defendants.

1001.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Iowa Code §§ 554.2104(1) and 554.13103(3), and "sellers" of motor vehicles under § 554.2103(1)(d).

1002.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Iowa Code § 554.13103(1)(p).

1003.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Iowa Code §§ 554.2105(1) and 554.13103(1)(h).

1004.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

1005.   Defendants also made numerous representations, descriptions, and promises to Iowa State Class members regarding the performance and emission controls of their vehicles.

1006.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

1007.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1008.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the

1   catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

2   device or computer.

3          1009.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

4   with respect to their vehicles' emission systems. Thus, Defendants also provide an express

5   warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

6   Design and Defect Warranty required by the EPA covers repair of emission control or emission

7   related parts, which fail to function or function improperly because of a defect in materials or

8   workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

9   first, or, for the major emission control components, for eight years or 80,000 miles, whichever

10  comes first.

11         1010.   As manufacturers of light-duty vehicles, Defendants were required to provide these

12  warranties to purchasers or lessees of Class Vehicles.

13         1011.   Defendants' warranties formed a basis of the bargain that was reached when

14  consumers purchased or leased Class Vehicles.

15         1012.   Despite the existence of warranties, Defendants failed to inform Iowa State Class

16  members that the Class Vehicles were defective and intentionally designed and manufactured to

17  emit more pollution and achieve worse fuel economy on the road than what was disclosed to

18  regulators and represented to consumers who purchased or leased them, and Defendants failed to

19  fix the defective emission components free of charge.

20         1013.   Defendants breached the express warranty promising to repair and correct

21  Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

22  have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

23         1014.   Affording Defendants a reasonable opportunity to cure their breach of written

24  warranties would be unnecessary and futile here.

25         1015.   Furthermore, the limited warranty promising to repair and correct Defendants'

26  defect in materials and workmanship fails in its essential purpose because the contractual remedy is

27  insufficient to make Iowa State Class members whole and because Defendants have failed and/or

28  have refused to adequately provide the promised remedies within a reasonable time.

1016.   Accordingly, recovery by Iowa State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

1017.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Iowa State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1018.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Iowa State Class members' remedies would be insufficient to make them whole.

1019.   Finally, because of Defendants' breach of warranty as set forth herein, Iowa State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1020.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1021.   As a direct and proximate result of Defendants' breach of express warranties, Iowa State Class members have been damaged in an amount to be determined at trial.

**IOWA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Iowa Code §§ 554.2314 and 554.13212**
**(On Behalf of the Iowa State Class)**

1022.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

1023.   This count is brought on behalf of the Iowa State Class against all Defendants.

1024.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Iowa Code §§ 554.2104(1) and 554.13103(3), and "sellers" of motor vehicles under § 554.2103(1)(d).

1025.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Iowa Code § 554.13103(1)(p).

1026.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Iowa Code §§ 554.2105(1) and 554.13103(1)(h).

1027.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Iowa Code §§ 554.2314 and 554.13212.

1028.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

1029.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1030.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Iowa State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**KANSAS COUNT I:**
**Violations of the Kansas Consumer Protection Act**
**Kan. Stat. Ann. § 50-623 *et seq.***
**(On Behalf of the Kansas State Class)**
</div>

1031.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1032.   This count is brought on behalf of the Kansas State Class against all Defendants.

1033.   Each Defendant is a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. Ann. § 50-624(l).

1034.   Kansas State Class members are "consumers," within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased or leased one or more Class Vehicles.

1035.   The sale of the Class Vehicles to the Kansas State Class members was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

1036.   The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. Ann. § 50-626(a), and that deceptive acts or practices include: (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-627(a).

1037.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

1038.   Kansas State Class members had no way of discerning that Defendants' representations were false and misleading because Kansas State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

1039.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a

1   transaction involving Class Vehicles has been supplied in accordance with a previous

2   representation when it has not.

3        1040.   Defendants intentionally and knowingly misrepresented material facts regarding the

4   Class Vehicles with intent to mislead the Kansas State Class.

5        1041.   Defendants knew or should have known that their conduct violated the Kansas CPA.

6        1042.   Defendants owed the Kansas State Class a duty to disclose the illegality and public

7   health risks, the true nature of the Class Vehicles, because Defendants:

8            A.      possessed exclusive knowledge that they were manufacturing, selling, and

9        distributing vehicles throughout the United States that did not perform as advertised;

10           B.      intentionally concealed the foregoing from regulators and Kansas State

11       Class members; and/or

12           C.      made incomplete representations about the Class Vehicles' fuel economy

13       and emissions while purposefully withholding material facts that contradicted these

14       representations.

15       1043.   Defendants' concealment of the Class Vehicles' true fuel consumption and

16   emissions was material to the Kansas State Class.

17       1044.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

18   deceive regulators and reasonable consumers, including the Kansas State Class, about the true

19   environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of the Defendants'

20   brands, and the true value of the Class Vehicles.

21       1045.   Defendants' violations present a continuing risk to the Kansas State Class as well as

22   to the general public. Defendants' unlawful acts and practices complained of herein affect the

23   public interest.

24       1046.   Members of the Kansas State Class suffered ascertainable loss and actual damages

25   as a direct and proximate result of Defendants' misrepresentations and concealment of and failure

26   to disclose material information. Defendants had an ongoing duty to all their customers to refrain

27   from unfair and deceptive practices under the Kansas CPA. All owners of Class Vehicles suffered

28

1   ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the

2   course of Defendants' business.

3       1047.   As a direct and proximate result of Defendants' violations of the Kansas CPA, the

4   Kansas State Class have suffered injury-in-fact and/or actual damage.

5       1048.   Pursuant to Kan. Stat. Ann. § 50-634, the Kansas State Class seeks monetary relief

6   against Defendants measured as the greater of (a) actual damages in an amount to be determined at

7   trial and (b) statutory damages in the amount of $10,000 for each Kansas State Class member.

8       1049.   Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or

9   deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available

10  under Kan. Stat. Ann § 50-623, *et seq*.

11                      **KANSAS COUNT II:**
                        **Breach of Express Warranty**
12                      **Kan. Stat. §§ 84-2-313 and 84-2A-210**
                        **(On Behalf of the Kansas State Class)**
13

14      1050.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

    fully set forth herein.
15

        1051.   This count is brought on behalf of the Kansas State Class against all Defendants.
16

17      1052.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

18  vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and "sellers" of motor vehicles under

    § 84-2-103(1)(d).
19

20      1053.   With respect to leases, Defendants are and were at all relevant times "lessors" of

21  motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

22      1054.   The Class Vehicles are and were at all relevant times "goods" within the meaning of

23  Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

24      1055.   In connection with the purchase or lease of each one of its new vehicles, Defendants

25  provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This

26  warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

27      1056.   Defendants also made numerous representations, descriptions, and promises to

28  Kansas State Class members regarding the performance and emission controls of their vehicles.

1057.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

1058.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1059.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1060.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1061.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

1062.   Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

1063.   Despite the existence of warranties, Defendants failed to inform Kansas State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

1064.   Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1065.   Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1066.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Kansas State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1067.   Accordingly, recovery by Kansas State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

1068.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Kansas State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1069.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Kansas State Class members' remedies would be insufficient to make them whole.

1070.   Finally, because of Defendants' breach of warranty as set forth herein, Kansas State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1071.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1072.   As a direct and proximate result of Defendants' breach of express warranties, Kansas State Class members have been damaged in an amount to be determined at trial.

**KANSAS COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Kan. Stat. §§ 84-2-314 and 84-2A-212**
**(On Behalf of the Kansas State Class)**

1073.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

1074.   This count is brought on behalf of the Kansas State Class against all Defendants.

1075.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and "sellers" of motor vehicles under § 84-2-103(1)(d).

1076.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

1077.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

1078.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Kan. Stat. §§ 84-2-314 and 84-2A-212.

1079.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with

emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

1080.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1081.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Kansas State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**KENTUCKY COUNT I:**
**Violations of the Kentucky Consumer Protection Act**
**Ky. Rev. Stat. Ann. § 367.110 *et seq.***
**(On Behalf of the Kentucky State Class)**

</div>

1082.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1083.   This count is brought on behalf of the Kentucky State Class against all Defendants.

1084.   Defendants, Plaintiffs, and the Kentucky State Class are "persons" within the meaning of the Ky. Rev. Stat. § 367.110(1).

1085.   Defendants engaged in "trade" or "commerce" within the meaning of Ky. Rev. Stat. § 367.110(2).

1086.   The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce . . . ." Ky. Rev. Stat. § 367.170(1). Defendants participated in misleading, false, or deceptive acts that violated the Kentucky CPA. By failing to disclose and by actively concealing the defects identified herein, marketing their vehicles as reliable, efficient, and of high quality, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and fuel efficiency, and stood behind their vehicles after they were sold, Defendants engaged in deceptive business practices prohibited by the Kentucky CPA.

1087.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road,

1    and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass

2    emissions tests when they in fact did not.

3        1088.  Kentucky State Class members had no way of discerning that Defendants'

4    representations were false and misleading because the Kentucky State Class did not have access to

5    Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and

6    software was extremely sophisticated technology.

7        1089.  Defendants thus violated the Act by, at minimum: representing that Class Vehicles

8    have characteristics, uses, benefits, and qualities which they do not have; representing that Class

9    Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

10   Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a

11   transaction involving Class Vehicles has been supplied in accordance with a previous

12   representation when it has not.

13       1090.  Defendants intentionally and knowingly misrepresented material facts regarding the

14   Class Vehicles with intent to mislead the Kentucky State Class.

15       1091.  Defendants knew or should have known that their conduct violated the Kentucky

16   CPA.

17       1092.  Defendants owed the Kentucky State Class a duty to disclose the illegality and

18   public health risks, the true nature of the Class Vehicles, because Defendants:

19           A.    possessed exclusive knowledge that they were manufacturing, selling, and

20           distributing vehicles throughout the United States that did not perform as advertised;

21           B.    intentionally concealed the foregoing from regulators and Kentucky State

22           Class members; and/or

23           C.    made incomplete representations about the Class Vehicles' fuel economy

24           and emissions, while purposefully withholding material facts that contradicted these

25           representations.

26       1093.  Defendants' fraudulent concealment of the Class Vehicles' true fuel consumption

27   were material to the Kentucky State Class.

28

1094.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Kentucky State Class, about the true environmental cleanliness and efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

1095.   Defendants' violations present a continuing risk to the Kentucky State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1096.   Members of the Kentucky State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Kentucky CPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1097.   As a direct and proximate result of Defendants' violations of the Kentucky CPA, Kentucky State Class members have suffered injury-in-fact and/or actual damage.

1098.   Pursuant to Ky. Rev. Stat. Ann. § 367.220, the Kentucky State Class seeks to recover actual damages in an amount to be determined at trial; an order enjoining Defendants' unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under Ky. Rev. Stat. Ann. § 367.220.

<div align="center">

**KENTUCKY COUNT II:**
**Breach of Express Warranty**
**Ky. Rev. Stat. §§ 335.2-313 and 355.2A-210**
**(On Behalf of the Kentucky State Class)**

</div>

1099.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1100.   This count is brought on behalf of the Kentucky State Class against all Defendants.

1101.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and "sellers" of motor vehicles under § 355.2-103(1)(d).

1102.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

1103.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

1104.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

1105.   Defendants also made numerous representations, descriptions, and promises to Kentucky State Class members regarding the performance and emission controls of their vehicles.

1106.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

1107.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1108.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1109.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express

1    warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

2    Design and Defect Warranty required by the EPA covers repair of emission control or emission

3    related parts, which fail to function or function improperly because of a defect in materials or

4    workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

5    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

6    comes first.

7         1110.   As manufacturers of light-duty vehicles, Defendants were required to provide these

8    warranties to purchasers or lessees of Class Vehicles.

9         1111.   Defendants' warranties formed a basis of the bargain that was reached when

10   consumers purchased or leased Class Vehicles.

11        1112.   Despite the existence of warranties, Defendants failed to inform Kentucky State

12   Class members that the Class Vehicles were defective and intentionally designed and manufactured

13   to emit more pollution and achieve worse fuel economy on the road than what was disclosed to

14   regulators and represented to consumers who purchased or leased them, and Defendants failed to

15   fix the defective emission components free of charge.

16        1113.   Defendants breached the express warranty promising to repair and correct

17   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

18   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

19        1114.   Affording Defendants a reasonable opportunity to cure their breach of written

20   warranties would be unnecessary and futile here.

21        1115.   Furthermore, the limited warranty promising to repair and correct Defendants'

22   defect in materials and workmanship fails in its essential purpose because the contractual remedy is

23   insufficient to make Kentucky State Class members whole and because Defendants have failed

24   and/or have refused to adequately provide the promised remedies within a reasonable time.

25        1116.   Accordingly, recovery by Kentucky State Class members is not restricted to the

26   limited warranty promising to repair and correct Defendants' defect in materials and workmanship,

27   and they seek all remedies as allowed by law.

28

1117.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Kentucky State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1118.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Kentucky State Class members' remedies would be insufficient to make them whole.

1119.   Finally, because of Defendants' breach of warranty as set forth herein, Kentucky State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1120.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1121.   As a direct and proximate result of Defendants' breach of express warranties, Kentucky State Class members have been damaged in an amount to be determined at trial.

### KENTUCKY COUNT III:
### Breach of Implied Warranty of Merchantability
### Ky. Rev. Stat. §§ 335.2-314 and 355.2A-212
### (On Behalf of the Kentucky State Class)

1122.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

1123.   This count is brought on behalf of the Kentucky State Class against all Defendants.

1124.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and "sellers" of motor vehicles under § 355.2-103(1)(d).

1125.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

1126.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

1127.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ky. Rev. Stat. §§ 335.2-314 and 355.2A-212.

1128.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

1129.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1130.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Kentucky State Class members have been damaged in an amount to be proven at trial.

**LOUISIANA COUNT I:**
**Violations of the Louisiana Unfair Trade Practices and Consumer Protection Law**
**La. Stat. Ann. § 51:1401 *et seq.***
**(On Behalf of the Louisiana State Class)**

1131.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1132.   Plaintiff Jeffery Henderson (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Louisiana State Class against all Defendants.

1133.   Defendants, Plaintiff, and the Louisiana State Class are "persons" within the meaning of the La. Rev. Stat. § 51:1402(8)

1134.    Plaintiff and Louisiana State Class members are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

1135.   Defendants engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(10).

1136.   The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A). Defendants participated in misleading, false, or deceptive acts that violated the Louisiana CPL.

1137.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

1138.   Plaintiff and Louisiana State Class members had no way of discerning that Defendants' representations were false and misleading because the Louisiana State Class did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

1139.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

1140.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Louisiana State Class.

1141.   Defendants knew or should have known that their conduct violated the Louisiana CPL.

1142.   Defendants owed the Louisiana State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

A.      possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B.      intentionally concealed the foregoing from regulators and Louisiana State Class members; and/or

C.      made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

1143.   Defendants' concealment of the Class Vehicles' true fuel consumption and emissions was material to the Louisiana State Class.

1144.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Louisiana State Class, about the true environmental cleanliness and efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

1145.   Defendants' violations present a continuing risk to the Louisiana State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1146.   The Louisiana State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Louisiana CPL. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1147.   As a direct and proximate result of Defendants' violations of the Louisiana CPL, the Louisiana State Class has suffered injury-in-fact and/or actual damage.

1148.   Pursuant to La. Rev. Stat. § 51:1409, the Louisiana State Class seeks to recover actual damages in an amount to be determined at trial; treble damages for Defendants' knowing violations of the Louisiana CPL; an order enjoining Defendants' unfair, unlawful, and/or deceptive

practices; declaratory relief; attorneys' fees; and any other just and proper relief available under La. Rev. Stat. § 51:1409.

<div align="center">

**LOUISIANA COUNT II:**
**Breach of Implied Warranty of Merchantability/Warranty Against Prohibitory Defects**
**La. Civ. Code Art. 2520, 2524**
**(On Behalf of the Louisiana State Class)**

</div>

1149.   Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

1150.   Plaintiff Jeffery Henderson (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Louisiana State Class against all Defendants.

1151.   Defendants are and were at all relevant times merchants with respect to motor vehicles.

1152.   A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions. These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

1153.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1154.   As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiff Louisiana State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**MAINE COUNT I:**
**Violations of the Maine Unfair Trade Practices Act**
**Me. Rev. Stat. Ann. Tit. 5, § 205-A *et seq.***
**(On Behalf of the Maine State Class)**

</div>

1155.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1156.   This count is brought on behalf of the Maine State Class against all Defendants.

1157.   Defendants, Plaintiffs, and the Maine State Class are "persons" within the meaning of Me. Rev. Stat. Ann. Tit. 5, § 206(2).

1158.   Defendants engaged in "trade" or "commerce" within the meaning of Me. Rev. Stat. Ann. Tit. 5, § 206(3).

1159.   The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Me. Rev. Stat. Ann. Tit. 5 § 207.

1160.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

1161.   Maine State Class members had no way of discerning that Defendants' representations were false and misleading because the Maine State Class did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

1162.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

1163.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Maine State Class.

1164.   Defendants knew or should have known that their conduct violated the Maine UTPA.

1165.   Defendants owed the Maine State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

A.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B.     intentionally concealed the foregoing from regulators and Maine State Class members; and/or

C.     made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

1166.  Defendants' concealment of the Class Vehicles' true fuel consumption and emissions was material to the Maine State Class.

1167.  Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Maine State Class, about the true environmental cleanliness and efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

1168.  Defendants' violations present a continuing risk to the Maine State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1169.  The Maine State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Maine UTPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1170.  As a direct and proximate result of Defendants' violations of the Maine UTPA, the Maine State Class has suffered injury-in-fact and/or actual damage.

1171.  Pursuant to Me. Rev. Stat. Ann. Tit. 5 § 213, the Maine State Class seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Maine UTPA.

1172.   Pursuant to Me. Rev. Stat. Ann. Title 5, § 50-634(g), Plaintiff sent notice letters to Defendants. Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by way of the investigations conducted by governmental regulators. The Maine State Class seeks all damages and relief to which it is entitled.

<div align="center">

**MAINE COUNT II:**
**Breach of Express Warranty**
**Me. Rev. Stat. Tit. 11 §§ 2-313 and 2-1210**
**(On Behalf of the Maine State Class)**

</div>

1173.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1174.   This count is brought on behalf of the Maine State Class against all Defendants.

1175.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Me. Rev. Stat. Ann. Tit. 11,§§ 2-104(1), and 2-1103(3), and is a "seller" of motor vehicles under § 2-103(1)(d).

1176.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Me. Rev. Stat. Ann. Tit. 11,§ 2-1103(1)(p).

1177.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. Tit. 11,§§ 2-105(1), and 2-1103(1)(h).

1178.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

1179.   Defendants also made numerous representations, descriptions, and promises to Maine State Class members regarding the performance and emission controls of their vehicles.

1180.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

1181. The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1182. The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1183. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1184. As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

1185. Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

1186. Despite the existence of warranties, Defendants failed to inform Maine State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to

1    regulators and represented to consumers who purchased or leased them, and Defendants failed to

2    fix the defective emission components free of charge.

3        1187.   Defendants breached the express warranty promising to repair and correct

4    Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

5    have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

6        1188.   Affording Defendants a reasonable opportunity to cure their breach of written

7    warranties would be unnecessary and futile here.

8        1189.   Furthermore, the limited warranty promising to repair and correct Defendants'

9    defect in materials and workmanship fails in its essential purpose because the contractual remedy is

10   insufficient to make Maine State Class members whole and because Defendants have failed and/or

11   have refused to adequately provide the promised remedies within a reasonable time.

12       1190.   Accordingly, recovery by Maine State Class members is not restricted to the limited

13   warranty promising to repair and correct Defendants' defect in materials and workmanship, and

14   they seek all remedies as allowed by law.

15       1191.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or

16   leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not

17   conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

18   material facts regarding the Class Vehicles. Maine State Class members were therefore induced to

19   purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

20       1192.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved

21   through the limited remedy of repairing and correcting Defendants' defect in materials and

22   workmanship as many incidental and consequential damages have already been suffered because of

23   Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued

24   failure to provide such limited remedy within a reasonable time, and any limitation on Maine State

25   Class members' remedies would be insufficient to make them whole.

26       1193.   Finally, because of Defendants' breach of warranty as set forth herein, Maine State

27   Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the

28

goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1194.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1195.   As a direct and proximate result of Defendants' breach of express warranties, Maine State Class members have been damaged in an amount to be determined at trial.

<div align="center">

**MAINE COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Me. Rev. Stat. Tit. 11 §§ 2-314 and 2-1212**
**(On Behalf of the Maine State Class)**

</div>

1196.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

1197.   This count is brought on behalf of the Maine State Class against all Defendants.

1198.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Me. Rev. Stat. Ann. Tit. 11,§§ 2-104(1), and 2-1103(3), and is a "seller" of motor vehicles under § 2-103(1)(d).

1199.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Me. Rev. Stat. Ann. Tit. 11,§ 2-1103(1)(p).

1200.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. Tit. 11,§§ 2-105(1), and 2-1103(1)(h).

1201.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Me. Rev. Stat. Ann. Tit. 11,§§ 2-314, and 2-1212.

1202.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

1203.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1204.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Maine State Class members have been damaged in an amount to be proven at trial.

**MARYLAND COUNT I:**
**Violations of the Maryland Consumer Protection Act**
**Md. Code Com. Law § 13-101 *et seq.***
**(On Behalf of the Maryland State Class)**

1205.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1206.   Plaintiff Jino Masone (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Maryland State Class against all Defendants.

1207.   Defendants and the Maryland State Class are "persons" within the meaning of Md. Code Com. Law § 13-101(h).

1208.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale of any consumer good. Md. Code Com. Law § 13-303. Defendants participated in misleading, false, or deceptive acts that violated the Maryland CPA.

1209.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

1210.   Maryland State Class members had no way of discerning that Defendants' representations were false and misleading because the Maryland State Class Members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology. Maryland State Class members did not and could not unravel Defendants' deception on their own.

- 200 -

1211.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

1212.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Maryland State Class.

1213.   Defendants knew or should have known that their conduct violated the Maryland CPA.

1214.   Defendants owed the Maryland State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

A.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B.   intentionally concealed the foregoing from regulators and Maryland State Class members; and/or

C.   made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

1215.   Defendants' concealment of the Class Vehicles' true fuel consumption and emissions was material to the Maryland State Class.

1216.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Maryland State Class, about the true environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

1217.   Defendants' violations present a continuing risk to the Maryland State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1218.   The Maryland State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Maryland CPA. All owners and lessees of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1219.   As a direct and proximate result of Defendants' violations of the Maryland CPA, the Maryland State Class has suffered injury-in-fact and/or actual damage.

1220.   Pursuant to Md. Code Com. Law § 13-408, the Maryland State Class seeks actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

<div align="center">

**MARYLAND COUNT II:**
**Maryland Lemon Law**
**Md. Code Com. Law § 14-1501 *et seq.***
**(On Behalf of the Maryland State Class)**

</div>

1221.   Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth.

1222.   Plaintiff Jino Masone (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Maryland State Class against all Defendants.

1223.   Plaintiff and the Maryland State Class own or lease "motor vehicles" within the meaning of Md. Code, Com. Law § 14-1501(f), because these vehicles were registered in the state and fall within the categories of vehicles manufactured, assembled, or distributed by Defendants. These vehicles are not auto homes.

1224.   Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of Md. Code, Com. Law § 14-1501(d).

1225.   The Maryland State Class members are "consumers" within the meaning of Md. Code Com. Law § 14-1501(b) because they: purchased the Class Vehicles, were transferred the Class Vehicles during the warranty period, or are otherwise entitled to the attendant terms of warranty.

1226.   The Class Vehicles did not conform to their "warranties" under Md. Code Com. Law § 14-1501(g) during the warranty period because they had inflated and misleading fuel economy and emissions values, and were therefore not fit for the ordinary purpose for which vehicles are used.

1227.   Defendants had actual knowledge of the conformities during the "warranty period" within the meaning of Md. Code, Com. Law § 14-1501(e). But the nonconformities continued to exist throughout this term, as they have not been fixed. Plaintiff and Maryland State Class members are excused from notifying Defendants of the nonconformities because it was already fully aware of the problem—it intentionally created it—and any repair attempt is futile.

1228.   Defendants have had a reasonable opportunity to cure the nonconformities during the warranty period because of its actual knowledge of, creation of, and attempt to conceal the nonconformities, but has not done so as required under Md. Code, Com. Law § 14-1502.

1229.   Plaintiff and the Maryland State Class demands a full refund of the purchase price, including all license fees, registration fees, and any similar governmental charges. Md. Code Com. Law § 14-1502(c). Once payment has been tendered, Maryland State Class members will return their vehicles.

<div align="center">

**MARYLAND COUNT III:**
**Breach of Express Warranty**
**Md. Code Com. Law §§ 2-313 and 2a-210**
**(On Behalf of the Maryland State Class)**

</div>

1230.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1231.   Plaintiff Jino Masone (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Maryland State Class against all Defendants.

1232.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Md. Code Com. Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

1233.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Md. Code Com. Law § 2A-103(1)(p).

1234.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Code Com. Law §§ 2-105(1) and 2a-103(1)(h).

1235.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

1236.   Defendants also made numerous representations, descriptions, and promises to Maryland State Class members regarding the performance and emission controls of their vehicles.

1237.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

1238.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1239.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1240.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or

1    workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

2    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

3    comes first.

4         1241.   As manufacturers of light-duty vehicles, Defendants were required to provide these

5    warranties to purchasers or lessees of Class Vehicles.

6         1242.   Defendants' warranties formed a basis of the bargain that was reached when

7    consumers purchased or leased Class Vehicles.

8         1243.   Despite the existence of warranties, Defendants failed to inform Maryland State

9    Plaintiff and Class members that the Class Vehicles were defective and intentionally designed and

10   manufactured to emit more pollution and achieve worse fuel economy on the road than what was

11   disclosed to regulators and represented to consumers who purchased or leased them, and

12   Defendants failed to fix the defective emission components free of charge.

13        1244.   Defendants breached the express warranty promising to repair and correct

14   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

15   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

16        1245.   Affording Defendants a reasonable opportunity to cure their breach of written

17   warranties would be unnecessary and futile here.

18        1246.   Furthermore, the limited warranty promising to repair and correct Defendants'

19   defect in materials and workmanship fails in its essential purpose because the contractual remedy is

20   insufficient to make Plaintiff and Maryland State Class members whole and because Defendants

21   have failed and/or have refused to adequately provide the promised remedies within a reasonable

22   time.

23        1247.   Accordingly, recovery by Plaintiff and Maryland State Class members is not

24   restricted to the limited warranty promising to repair and correct Defendants' defect in materials

25   and workmanship, and they seek all remedies as allowed by law.

26        1248.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or

27   leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not

28   conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

1    material facts regarding the Class Vehicles. Plaintiff and Maryland State Class members were

2    therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

3          1249.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved

4    through the limited remedy of repairing and correcting Defendants' defect in materials and

5    workmanship as many incidental and consequential damages have already been suffered because of

6    Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued

7    failure to provide such limited remedy within a reasonable time, and any limitation on Maryland

8    State Class members' remedies would be insufficient to make them whole.

9          1250.   Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff and

10   Maryland State Class members assert, as additional and/or alternative remedies, the revocation of

11   acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles

12   currently owned or leased, and for such other incidental and consequential damages as allowed.

13         1251.   Defendants were provided reasonable notice of these issues by way of a letter sent

14   by Plaintiffs as well as the regulators' investigations.

15         1252.   As a direct and proximate result of Defendants' breach of express warranties,

16   Maryland State Class members have been damaged in an amount to be determined at trial.

17                                  **MARYLAND COUNT IV:**
                        **Breach of Implied Warranty of Merchantability**
18                          **Md. Code Com. Law §§ 2-314 and 2a-212**
                            **(On Behalf of the Maryland State Class)**
19

20         1253.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

21   forth herein.

22         1254.   Plaintiff Jino Masone (for the purposes of this count, "Plaintiff") brings this claim

     on behalf of himself and the Maryland State Class against all Defendants.
23
           1255.   Defendants are and were at all relevant times "merchant[s]" with respect to motor
24
     vehicles under Md. Code Com. Law § 2-104(1) and "sellers" of motor vehicles under
25
     § 2-103(1)(d).
26
           1256.   With respect to leases, Defendants are and were at all relevant times "lessors" of
27
     motor vehicles under Md. Code Com. Law § 2A-103(1)(p).
28

1257.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Code Com. Law §§ 2-105(1) and 2a-103(1)(h).

1258.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Md. Code Com. Law §§ 2-314, and 2a-212.

1259.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

1260.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1261.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Maryland State Class members have been damaged in an amount to be proven at trial.

**MASSACHUSETTS COUNT I:**
**Deceptive Acts or Practices Prohibited by Massachusetts Law**
**Mass. Gen. Laws Ch. 93a, § 1, *et seq.***
**(On Behalf of the Massachusetts State Class)**

1262.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1263.   This count is brought on behalf of the Massachusetts State Class against all Defendants.

1264.   Defendants, Plaintiffs, and the Massachusetts State Class are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

1265.   Defendants engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

1266.   Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2. Defendants participated in misleading, false, or deceptive acts that violated the Massachusetts Act.

1267.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

1268.   Massachusetts State Class members had no way of discerning that Defendants' representations were false and misleading because Massachusetts State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

1269.   Massachusetts State Class members did not and could not unravel Defendants' deception on their own.

1270.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

1271.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Massachusetts State Class.

1272.   Defendants knew or should have known that their conduct violated the Massachusetts Act.

1273.   Defendants owed the Massachusetts State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

A.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B.     intentionally concealed the foregoing from regulators and Massachusetts State Class members; and/or

C.     made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

1274.   Defendants' concealment of the Class Vehicles' true fuel consumption and emissions was material to the Massachusetts State Class.

1275.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Massachusetts State Class, about the true environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

1276.   Defendants' violations present a continuing risk to the Massachusetts State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1277.   The Massachusetts State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Massachusetts Act. All owners and lessees of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1278.   As a direct and proximate result of Defendants' violations of the Massachusetts Act, the Massachusetts State Class have suffered injury-in-fact and/or actual damage.

1279.   Pursuant to Mass. Gen. Laws ch. 93A, § 9, the Massachusetts State Class seeks monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Massachusetts State Class member. Because Defendants' conduct was committed willfully and knowingly, each Massachusetts State Class member is entitled to recover up to three times actual damages, but no less than two times actual damages.

1280.   The Massachusetts State Class also seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

1281.   Pursuant to Mass. Gen. Laws ch. 93A, § 9(3), Plaintiffs sent notice letters to Defendants. Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by way of the investigations conducted by governmental regulators. The Massachusetts State Class seeks all damages and relief to which it is entitled.

1282.   As a result of Defendants' conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

<div align="center">

**MASSACHUSETTS COUNT II:**
**Massachusetts Lemon Law**
**Mass. Gen. Laws Ch. 90, § 7N1/2(1)**
**(On Behalf of the Massachusetts State Class)**

</div>

1283.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1284.   This count is brought on behalf of the Massachusetts State Class against all Defendants.

1285.   Massachusetts State Class members own or lease "motor vehicles" within the meaning of Mass. Gen. Laws Ch. 90, § 7N1/2(1), because these vehicles were constructed or designed for propulsion by power and were sold, leased, or replaced by Defendants. These vehicles are not: (1) auto homes, (2) vehicles built primarily for off-read use, and (3) used primarily for business purposes.

1286.   Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of Mass. Gen. Laws Ch. 90, § 7N1/2(1).

1287.   The Massachusetts State Class members are "consumers" within the meaning of Mass. Gen. Laws Ch. 90, § 7N1/2(1) because they bought or leased the Class Vehicles or are otherwise entitled to the attendant terms of warranty.

1288.   The Class Vehicles did not conform to their express and implied warranties because they included software that led to inflated and misleading fuel economy values and misleading emissions values and were therefore not fit for the ordinary purpose for which vehicles are used.

1289.   Defendants had actual knowledge of the conformities during the "term of protection" within the meaning of Mass. Gen. Laws Ch. 90, §§ 7N1/2(1)–7N1/2(2). But the nonconformities continued to exist throughout this term, as they have not been fixed. Massachusetts State Class members are excused from notifying Defendants of the nonconformities because it was already fully aware of the problem—it intentionally created it—and any repair attempt is futile.

1290.   Defendants have had a reasonable opportunity to cure the nonconformities because of its actual knowledge of, creation of, and attempt to conceal the nonconformities, but has not done so as required under Mass. Gen. Laws Ch. 90, § 7N1/2(3).

1291.   For vehicles purchased, the Massachusetts State Class demands a full refund of the contract price. For vehicles leased, the Massachusetts State Class demands a full refund of all payments made under the lease agreement. The Massachusetts State Class exercise their "unqualified right" to reject an offer of replacement and will retain their vehicles until payment is tendered under Mass. Gen. Laws Ch. 90, § 7N1/2(3).

## MASSACHUSETTS COUNT III:
### Breach of Express Warranty
### Mass. Gen. Laws c. 106 §§ 2-313 and 2A-210
### (On Behalf of the Massachusetts State Class)

1292.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1293.   This count is brought on behalf of the Massachusetts State Class against all Defendants.

1294.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under M.G.L. c. 106 § 2-104(1) and is a "seller" of motor vehicles under § 2-103(1)(d).

1295.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under M.G.L. c. 106 § 2A-103(1)(p).

1296.   The Class Vehicles are and were at all relevant times "goods" within the meaning of M.G.L. c. 106 §§ 2-105(1) and 2A-103(1)(h).

1297.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

1298.   Defendants also made numerous representations, descriptions, and promises to Massachusetts State Class members regarding the performance and emission controls of their vehicles.

1299.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

1300.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1301.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1302.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission

- 212 -

related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1303.  As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

1304.  Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

1305.  Despite the existence of warranties, Defendants failed to inform Massachusetts State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

1306.  Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1307.  Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1308.  Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Massachusetts State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1309.  Accordingly, recovery by Massachusetts State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

1310.  Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

1   material facts regarding the Class Vehicles. Massachusetts State Class members were therefore

2   induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

3       1311.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved

4   through the limited remedy of repairing and correcting Defendants' defect in materials and

5   workmanship as many incidental and consequential damages have already been suffered because of

6   Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued

7   failure to provide such limited remedy within a reasonable time, and any limitation on

8   Massachusetts State Class members' remedies would be insufficient to make them whole.

9       1312.   Finally, because of Defendants' breach of warranty as set forth herein,

10  Massachusetts State Class members assert, as additional and/or alternative remedies, the revocation

11  of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles

12  currently owned or leased, and for such other incidental and consequential damages as allowed.

13      1313.   Defendants were provided reasonable notice of these issues by way of a letter sent

14  by Plaintiffs as well as the regulators' investigations.

15      1314.   As a direct and proximate result of Defendants' breach of express warranties,

16  Massachusetts State Class members have been damaged in an amount to be determined at trial.

17                    **MASSACHUSETTS COUNT IV:**
                **Breach of Implied Warranty of Merchantability**
18              **Mass. Gen. Laws c. 106 §§ 2-314 and 2A-212**
                **(On Behalf of the Massachusetts State Class)**
19

20      1315.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

21  forth herein.

22      1316.   This count is brought on behalf of the Massachusetts State Class against all

    Defendants.
23

24      1317.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

25  vehicles under M.G.L. c. 106 § 2-104(1) and is a "seller" of motor vehicles under § 2-103(1)(d).

26      1318.   With respect to leases, Defendants are and were at all relevant times "lessors" of

    motor vehicles under M.G.L. c. 106 § 2A-103(1)(p).
27

28

1319.   The Class Vehicles are and were at all relevant times "goods" within the meaning of M.G.L. c. 106 §§ 2-105(1) and 2A-103(1)(h).

1320.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to M.G.L. c. 106 §§ 2-314 and 2A-212.

1321.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

1322.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1323.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Massachusetts State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**MICHIGAN COUNT I:**
**Violations of the Michigan Consumer Protection Act**
**Mich. Comp. Laws § 445.903 *et seq.***
**(On Behalf of the Michigan State Class)**

</div>

1324.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1325.   This count is brought on behalf of the Michigan State Class against all Defendants.

1326.    Michigan State Class members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

1327.   Defendants are "person[s]" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

1328.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . . ." Mich. Comp. Laws § 445.903(1). Defendants engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that

1   goods or services have . . . characteristics . . . that they do not have. . . .;" "(e) Representing that

2   goods or services are of a particular standard . . . if they are of another;" "(i) Making false or

3   misleading statements of fact concerning the reasons for, existence of, or amounts of price

4   reductions;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive

5   the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a

6   representation of fact or statement of fact material to the transaction such that a person reasonably

7   believes the represented or suggested state of affairs to be other than it actually is;" and "(cc)

8   Failing to reveal facts that are material to the transaction in light of representations of fact made in

9   a positive manner." Mich. Comp. Laws § 445.903(1).

10   1329.   In the course of their business, Defendants concealed and suppressed material facts

11   concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for

12   emissions testing that were different from production vehicles, (b) installing a secret software

13   program that caused the vehicles to perform differently during emissions testing than on the road,

14   and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass

15   emissions tests when they in fact did not.

16   1330.   Michigan State Class members had no way of discerning that Defendants'

17   representations were false and misleading because Michigan State Class members did not have

18   access to Defendants' emissions certification test vehicles and Defendants' emissions-related

19   hardware and software was extremely sophisticated technology.

20   1331.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

21   have characteristics, uses, benefits, and qualities which they do not have; representing that Class

22   Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

23   Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a

24   transaction involving Class Vehicles has been supplied in accordance with a previous

25   representation when it has not.

26   1332.   Defendants intentionally and knowingly misrepresented material facts regarding the

27   Class Vehicles with intent to mislead the Michigan State Class.

28

1      1333.   Defendants knew or should have known that their conduct violated the Michigan

2   CPA.

3      1334.   Defendants owed the Michigan State Class a duty to disclose the illegality and

4   public health risks, the true nature of the Class Vehicles, because Defendants:

5              A.      possessed exclusive knowledge that they were manufacturing, selling, and

6       distributing vehicles throughout the United States that did not perform as advertised;

7              B.      intentionally concealed the foregoing from regulators and Michigan State

8       Class members; and/or

9              C.      made incomplete representations about the Class Vehicles' fuel economy

10      and emissions while purposefully withholding material facts that contradicted these

11      representations.

12      1335.   Defendants' concealment of the true characteristics of the Class Vehicles' fuel

13   consumption and emissions were material to the Michigan State Class.

14      1336.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

15   deceive regulators and reasonable consumers, including the Michigan State Class, about the true

16   environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of the Defendants'

17   brands, and the true value of the Class Vehicles.

18      1337.   Defendants' violations present a continuing risk to the Michigan State Class as well

19   as to the general public. Defendants' unlawful acts and practices complained of herein affect the

20   public interest.

21      1338.   Michigan State Class members suffered ascertainable loss and actual damages as a

22   direct and proximate result of Defendants' misrepresentations and concealment of and failure to

23   disclose material information. Defendants had an ongoing duty to all their customers to refrain

24   from unfair and deceptive practices under the Michigan CPA. All owners of Class Vehicles

25   suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made

26   in the course of Defendants' business.

27      1339.   As a direct and proximate result of Defendants' violations of the Michigan CPA,

28   Michigan State Class members have suffered injury-in-fact and/or actual damage.

1340.   The Michigan State Class seeks injunctive relief to enjoin Defendants from continuing its unfair and deceptive acts; monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each Michigan State Class member; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

1341.   The Michigan State Class also seeks punitive damages against Defendants because it carried out despicable conduct with willful and conscious disregard of the rights of others. Defendants intentionally and willfully misrepresented the reliability of the Class Vehicles and concealed material facts that only they knew—all to avoid the expense and public relations nightmare of correcting a flaw in the Class Vehicles. Defendants' unlawful conduct constitutes oppression and fraud warranting punitive damages.

## MICHIGAN COUNT II:
### Breach of Express Warranty
### Mich. Comp. Laws §§ 440.2313 and 440.2860
### (On Behalf of the Michigan State Class)

1342.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1343.   This count is brought on behalf of the Michigan State Class against all Defendants.

1344.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Mich. Comp. Laws § 440.2104(1) and "sellers" of motor vehicles under § 440.2103(1)(d).

1345.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

1346.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

1347.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

1      1348.   Defendants also made numerous representations, descriptions, and promises to

2   Michigan State Class members regarding the performance and emission controls of their vehicles.

3      1349.   For example, Defendants included in the warranty booklets for some or all of the

4   Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the

5   time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free

6   from defects in material and workmanship which would cause it not to meet those standards."

7      1350.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two

8   federal emission control warranties: a "Performance Warranty" and a "Design and Defect

9   Warranty."

10     1351.   The EPA requires vehicle manufacturers to provide a Performance Warranty with

11   respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

12   their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

13   required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

14   whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

15   emission control components are covered for the first eight years or 80,000 miles (whichever

16   comes first). These major emission control components subject to the longer warranty include the

17   catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

18   device or computer.

19     1352.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

20   with respect to their vehicles' emission systems. Thus, Defendants also provide an express

21   warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

22   Design and Defect Warranty required by the EPA covers repair of emission control or emission

23   related parts, which fail to function or function improperly because of a defect in materials or

24   workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

25   first, or, for the major emission control components, for eight years or 80,000 miles, whichever

26   comes first.

27     1353.   As manufacturers of light-duty vehicles, Defendants were required to provide these

28   warranties to purchasers or lessees of Class Vehicles.

1354.   Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

1355.   Despite the existence of warranties, Defendants failed to inform Michigan State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

1356.   Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1357.   Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1358.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Michigan State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1359.   Accordingly, recovery by the Michigan State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

1360.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Michigan State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1361.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued

failure to provide such limited remedy within a reasonable time, and any limitation on Michigan State Class members' remedies would be insufficient to make them whole.

1362.   Finally, because of Defendants' breach of warranty as set forth herein, Michigan State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1363.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1364.   As a direct and proximate result of Defendants' breach of express warranties, Michigan State Class members have been damaged in an amount to be determined at trial.

<div align="center">

**MICHIGAN COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Mich. Comp. Laws §§ 440.2314 and 440.2860**
**(On Behalf of the Michigan State Class)**

</div>

1365.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

1366.   This count is brought on behalf of the Michigan State Class against all Defendants.

1367.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Mich. Comp. Laws § 440.2104(1) and "sellers" of motor vehicles under § 440.2103(1)(d).

1368.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

1369.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

1370.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mich. Comp. Laws §§ 440.2314 and 440.2862.

1371.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software

that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

1372.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1373.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Michigan State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**MINNESOTA COUNT I:**
**Violations of the Minnesota Prevention of Consumer Fraud Act**
**Minn. Stat. § 325F.68 *et seq.***
**(On Behalf of the Minnesota State Class)**

</div>

1374.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1375.   This count is brought on behalf of the Minnesota State Class against all Defendants.

1376.   The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

1377.   The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby . . . ." Minn. Stat. § 325F.69(1). Defendants participated in misleading, false, or deceptive acts that violated the Minnesota CFA.

1378.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

1379.   Minnesota State Class members had no way of discerning that Defendants' representations were false and misleading because Minnesota State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

1380.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

1381.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Minnesota State Class.

1382.   Defendants knew or should have known that their conduct violated the Minnesota CFA.

1383.   Defendants owed the Minnesota State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

A.      possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B.      intentionally concealed the foregoing from regulators and Minnesota State Class members; and/or

C.      made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

1384.   Defendants' concealment of the Class Vehicles' true fuel consumption and emissions was material to the Minnesota State Class.

1385.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Minnesota State Class, about the true

1   environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of the Defendants'

2   brands, and the true value of the Class Vehicles.

3       1386.   Defendants' violations present a continuing risk to the Minnesota State Class as well

4   as to the general public. Defendants' unlawful acts and practices complained of herein affect the

5   public interest.

6       1387.   Minnesota State Class members suffered ascertainable loss and actual damages as a

7   direct and proximate result of Defendants' misrepresentations and concealment of and failure to

8   disclose material information. Defendants had an ongoing duty to all their customers to refrain

9   from unfair and deceptive practices under the Minnesota CFA. All owners of Class Vehicles

10  suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made

11  in the course of Defendants' business.

12      1388.   As a direct and proximate result of Defendants' violations of the Minnesota CFA,

13  Minnesota State Class members have suffered injury-in-fact and/or actual damage.

14      1389.   Pursuant to Minn. Stat. § 8.31(3a), Minnesota State Class members seek actual

15  damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

16      1390.   Minnesota State Class members also seek punitive damages under Minn. Stat.

17  § 549.20(1)(a) given the clear and convincing evidence that Defendants' acts show deliberate

18  disregard for the rights of others.

19                          **MINNESOTA COUNT II:**
                 **Violations of the Minnesota Uniform Deceptive Trade Practices Act**
20                        **Minn. Stat. § 325D.43-48 *et seq.***
                        **(On Behalf of the Minnesota State Class)**
21

22      1391.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

        1392.   This count is brought on behalf the Minnesota State Class against all Defendants.
23
        1393.   The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits
24
    deceptive trade practices, which occur when a person "(5) represents that goods or services have
25
    sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not
26
    have or that a person has a sponsorship, approval, status, affiliation, or connection that the person
27
    does not have;" "(7) represents that goods or services are of a particular standard, quality, or grade,
28

1    or that goods are of a particular style or model, if they are of another;" and "(9) advertises goods or

2    services with intent not to sell them as advertised." Minn. Stat. § 325D.44. In the course of the

3    Defendants' business, it engaged in deceptive practices by representing that Class Vehicles have

4    sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have;

5    representing that Class Vehicles are of a particular standard, quality, or grade, or that goods are of a

6    particular style or model, if they are of another; and advertising Class Vehicles with intent not to

7    sell them as advertised. Defendants participated in misleading, false, or deceptive acts that violated

8    the Minnesota DTPA.

9        1394.   By submitting vehicles for emissions testing that were different from production

10   vehicles, installing a secret software program that caused the vehicles to perform differently during

11   emissions testing than on the road, falsely attesting that certain vehicles' high performance (Sport

12   Plus) mode could pass emissions tests when they in fact did not, by marketing its vehicles as

13   reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable

14   manufacturer that valued environmental cleanliness and efficiency, and stood behind its vehicles

15   after they were sold, Defendants engaged in deceptive business practices prohibited by the

16   Minnesota DTPA.

17       1395.   Defendants' actions as set forth above occurred in the conduct of trade or

18   commerce.

19       1396.   In the course of their business, Defendants concealed and suppressed material facts

20   concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for

21   emissions testing that were different from production vehicles, (b) installing a secret software

22   program that caused the vehicles to perform differently during emissions testing than on the road,

23   and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass

24   emissions tests when they in fact did not.

25       1397.   Minnesota State Class members had no way of discerning that Defendants'

26   representations were false and misleading because Minnesota State Class members did not have

27   access to Defendants' emissions certification test vehicles and Defendants' emissions-related

28   hardware and software was extremely sophisticated technology.

1398.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

1399.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Minnesota State Class.

1400.   Defendants knew or should have known that their conduct violated the Minnesota DTPA.

1401.   Defendants owed the Minnesota State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B.    intentionally concealed the foregoing from regulators and Minnesota State Class members; and/or

C.    made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

1402.   Defendants' concealment of the true characteristics of the Class Vehicles' true fuel consumption and emissions were material to the Minnesota State Class.

1403.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Minnesota State Class, about the true environmental cleanliness and efficiency of the Class Vehicles, the quality of the Defendants' brands, the devaluing of environmental cleanliness and integrity at Defendant companies, and the true value of the Class Vehicles.

1404.   Defendants' violations present a continuing risk to the Minnesota State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1405.   Minnesota State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Minnesota DTPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1406.   As a direct and proximate result of Defendants' violations of the Minnesota DTPA, Minnesota State Class members have suffered injury-in-fact and/or actual damage.

1407.   Pursuant Minn. Stat. §§ 8.31(3a) and 325D.45, the Minnesota State Class seeks actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

**MINNESOTA COUNT III:**
**Breach of Express Warranty**
**Minn. Stat. §§ 336.2-313 and 336.2A-210**
**(On Behalf of the Minnesota State Class)**

1408.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1409.   This count is brought on behalf of the Minnesota State Class against all Defendants.

1410.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Minn. Stat. § 336.2-104(1) and "sellers" of motor vehicles under § 336.2-103(1)(d).

1411.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

1412.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

1413.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

1414.   Defendants also made numerous representations, descriptions, and promises to Minnesota State Class members regarding the performance and emission controls of their vehicles.

1415.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

1416.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1417.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1418.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1419.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

1420.   Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

1421.   Despite the existence of warranties, Defendants failed to inform Minnesota State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

1422.   Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1423.   Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1424.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Minnesota State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1425.   Accordingly, recovery by Minnesota State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

1426.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Minnesota State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1    1427.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved

2    through the limited remedy of repairing and correcting Defendants' defect in materials and

3    workmanship as many incidental and consequential damages have already been suffered because of

4    Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued

5    failure to provide such limited remedy within a reasonable time, and any limitation on the

6    Minnesota State Class members' remedies would be insufficient to make them whole.

7    1428.   Finally, because of Defendants' breach of warranty as set forth herein, Minnesota

8    State Class members assert, as additional and/or alternative remedies, the revocation of acceptance

9    of the goods and the return to them of the purchase or lease price of all Class Vehicles currently

10   owned or leased, and for such other incidental and consequential damages as allowed.

11   1429.   Defendants were provided reasonable notice of these issues by way of a letter sent

12   by Plaintiffs as well as the regulators' investigations.

13   1430.   As a direct and proximate result of Defendants' breach of express warranties,

14   Minnesota State Class members have been damaged in an amount to be determined at trial.

**MINNESOTA COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**Minn. Stat. §§ 336.2-314 and 336.2A-212**
**(On Behalf of the Minnesota State Class)**

1431.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set
forth herein.

1432.   This count is brought on behalf of the Minnesota State Class against all Defendants.

1433.   Defendants are and were at all relevant times "merchant[s]" with respect to motor
vehicles under Minn. Stat. § 336.2-104(1) and "sellers" of motor vehicles under § 336.2-103(1)(d).

1434.   With respect to leases, Defendants are and were at all relevant times "lessors" of
motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

1435.   The Class Vehicles are and were at all relevant times "goods" within the meaning of
Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

1436.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Minn. Stat. §§ 336.2-314 and 336.2A-212.

1437.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

1438.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1439.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Minnesota State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**MISSISSIPPI COUNT I:**
**Violations of Mississippi Consumer Protection Act**
**Miss. Code. Ann. § 75-24-1, *et seq.***
**(On Behalf of the Mississippi State Class)**

</div>

1440.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1441.   This count is brought on behalf of the Mississippi State Class against all Defendants.

1442.   The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair or deceptive trade practices in or affecting commerce." Miss. Code. Ann. § 75-24-5(1). Unfair or deceptive practices include, but are not limited to, "(e) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;" "(g) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(i) Advertising goods or services with intent not to sell them as advertised." Miss. Code. Ann. § 75-24-5. Defendants participated in deceptive trade practices that violated the Mississippi CPA as described herein, including representing that Class Vehicles have characteristics, uses, benefits, and qualities which

1  they do not have; representing that Class Vehicles are of a particular standard and quality when

2  they are not; and advertising Class Vehicles with the intent not to sell them as advertised.

3  1443.  In the course of their business, Defendants concealed and suppressed material facts

4  concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for

5  emissions testing that were different from production vehicles, (b) installing a secret software

6  program that caused the vehicles to perform differently during emissions testing than on the road,

7  and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass

8  emissions tests when they in fact did not.

9  1444.  Mississippi State Class members had no way of discerning that Defendants'

10  representations were false and misleading because Mississippi State Class members did not have

11  access to Defendants' emissions certification test vehicles and Defendants' emissions-related

12  hardware and software was extremely sophisticated technology.

13  1445.  Defendants thus violated the Act by, at minimum: representing that Class Vehicles

14  have characteristics, uses, benefits, and qualities which they do not have; representing that Class

15  Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

16  Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a

17  transaction involving Class Vehicles has been supplied in accordance with a previous

18  representation when it has not.

19  1446.  Defendants intentionally and knowingly misrepresented material facts regarding the

20  Class Vehicles with intent to mislead the Mississippi State Class.

21  1447.  Defendants knew or should have known that their conduct violated the Mississippi

22  CPA.

23  1448.  Defendants owed the Mississippi State Class a duty to disclose the illegality and

24  public health risks, the true nature of the Class Vehicles, because Defendants:

25  A.  possessed exclusive knowledge that they were manufacturing, selling, and

26  distributing vehicles throughout the United States that did not perform as advertised;

27  B.  intentionally concealed the foregoing from regulators and Mississippi State

28  Class members; and/or

C.      made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

1449.   Defendants' concealment of the Class Vehicles' true fuel consumption and emissions were material to the Mississippi State Class.

1450.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Mississippi State Class, about the true environmental cleanliness and efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

1451.   Defendants' violations present a continuing risk to the Mississippi State Class as well to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1452.   Mississippi State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Mississippi CPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1453.   As a direct and proximate result of Defendants' violations of the Mississippi CPA, Mississippi State Class members have suffered injury-in-fact and/or actual damage.

1454.   Plaintiffs' seek actual damages in an amount to be determined at trial any other just and proper relief available under the Mississippi CPA.

**MISSISSIPPI COUNT II:**
**Breach of Express Warranty**
**Miss. Code §§ 75-2-313 and 75-2A-210**
**(On Behalf of the Mississippi State Class)**

1455.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1456.   This count is brought on behalf of the Mississippi State Class against all Defendants.

- 233 -

1457.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Miss. Code § 75-2-104(1) and "sellers" of motor vehicles under § 75-2-103(1)(d).

1458.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Miss. Code § 75-2A-103(1)(p).

1459.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Miss. Code §§ 75-2-105(1) and 75-2A-103(1)(h).

1460.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

1461.   Defendants also made numerous representations, descriptions, and promises to Mississippi State Class members regarding the performance and emission controls of their vehicles.

1462.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

1463.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1464.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1465.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1466.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

1467.   Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

1468.   Despite the existence of warranties, Defendants failed to inform Mississippi State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

1469.   Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1470.   Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1471.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Mississippi State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1    1472.   Accordingly, recovery by Mississippi State Class members is not restricted to the

2    limited warranty promising to repair and correct Defendants' defect in materials and workmanship,

3    and they seek all remedies as allowed by law.

4    1473.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or

5    leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not

6    conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

7    material facts regarding the Class Vehicles. Mississippi State Class members were therefore

8    induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

9    1474.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved

10   through the limited remedy of repairing and correcting Defendants' defect in materials and

11   workmanship as many incidental and consequential damages have already been suffered because of

12   Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued

13   failure to provide such limited remedy within a reasonable time, and any limitation on Mississippi

14   State Class members' remedies would be insufficient to make them whole.

15   1475.   Finally, because of Defendants' breach of warranty as set forth herein, Mississippi

16   State Class members assert, as additional and/or alternative remedies, the revocation of acceptance

17   of the goods and the return to them of the purchase or lease price of all Class Vehicles currently

18   owned or leased, and for such other incidental and consequential damages as allowed.

19   1476.   Defendants were provided reasonable notice of these issues by way of a letter sent

20   by Plaintiffs as well as the regulators' investigations.

21   1477.   As a direct and proximate result of Defendants' breach of express warranties,

22   Mississippi State Class members have been damaged in an amount to be determined at trial.

**MISSISSIPPI COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Miss. Code §§ 75-2-314 and 75-2A-212**
**(On Behalf of the Mississippi State Class)**

25   1478.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

26   forth herein.

27   1479.   This count is brought on behalf of the Mississippi State Class against all Defendants.

28

1     1480.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

2     vehicles under Miss. Code § 75-2-104(1) and "sellers" of motor vehicles under § 75-2-103(1)(d).

3     1481.   With respect to leases, Defendants are and were at all relevant times "lessors" of

4     motor vehicles under Miss. Code § 75-2A-103(1)(p).

5     1482.   The Class Vehicles are and were at all relevant times "goods" within the meaning of

6     Miss. Code §§ 75-2-105(1) and 75-2A-103(1)(h).

7     1483.   A warranty that the Class Vehicles were in merchantable condition and fit for the

8     ordinary purpose for which vehicles are used is implied by law pursuant to Miss. Code §§ 75-2-314

9     and 75-2A-212.

10    1484.   These Class Vehicles, when sold or leased and at all times thereafter, were

11    materially different from vehicles Defendants submitted for emissions testing, included software

12    that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with

13    emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the

14    ordinary purpose for which vehicles are used.

15    1485.   Defendants were provided reasonable notice of these issues by way of a letter sent

16    by Plaintiffs as well as the regulators' investigations.

17    1486.   As a direct and proximate result of Defendants' breach of the implied warranty of

18    merchantability, Mississippi State Class members have been damaged in an amount to be proven at

19    trial.

**MISSOURI COUNT I:**
**Violations of the Missouri Merchandising Practices Act**
**Mo. Rev. Stat. § 407.010 *et seq.***
**(On Behalf of the Missouri State Class)**

1487.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1488.   Plaintiff Lee Marks (for the purposes of this count, "Plaintiff") brings this claim on

behalf of himself and the Missouri State Class against all Defendants.

1489.   Defendants, Plaintiff, and the Missouri State Class are "persons" within the

meaning of Mo. Rev. Stat. § 407.010(5).

1490.   Defendants engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

1491.   The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise Mo. Rev. Stat. § 407.020.

1492.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

1493.   Plaintiff and Missouri State Class members had no way of discerning that Defendants' representations were false and misleading because Plaintiff and Missouri State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

1494.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

1495.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Missouri State Class.

1496.   Defendants knew or should have known that their conduct violated the Missouri MPA.

1497.   Defendants owed the Plaintiff and Missouri State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

A.       possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B.       intentionally concealed the foregoing from regulators and Missouri State Class members; and/or

C.       made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

1498.   Defendants' concealment of the true fuel consumption and emissions was material to the Missouri State Class.

1499.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Missouri State Class, about the true environmental cleanliness and efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

1500.   Defendants' violations present a continuing risk to Plaintiff, the Missouri State Class, and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1501.   Plaintiff and Missouri State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Missouri MPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1502.   As a direct and proximate result of Defendants' violations of the Missouri MPA, Plaintiff and Missouri State Class members have suffered injury-in-fact and/or actual damage.

1503.   Defendants are liable to Plaintiff and the Missouri State Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Defendants' unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

**MISSOURI COUNT II:**
**Breach of Express Warranty**
**Mo. Stat. §§ 400.2-313 and 400.2A-210**
**(On Behalf of the Missouri State Class)**

1504.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1505.   Plaintiff Lee Marks (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Missouri State Class against all Defendants.

1506.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Mo. Stat. § 400.2-104(1) and "sellers" of motor vehicles under § 400.2-103(1)(d).

1507.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Mo. Stat. § 400.2A-103(1)(p).

1508.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

1509.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

1510.   Defendants also made numerous representations, descriptions, and promises to Missouri State Class members regarding the performance and emission controls of their vehicles.

1511.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

1512.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1513.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

1    required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

2    whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

3    emission control components are covered for the first eight years or 80,000 miles (whichever

4    comes first). These major emission control components subject to the longer warranty include the

5    catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

6    device or computer.

7        1514.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

8    with respect to their vehicles' emission systems. Thus, Defendants also provide an express

9    warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

10   Design and Defect Warranty required by the EPA covers repair of emission control or emission

11   related parts, which fail to function or function improperly because of a defect in materials or

12   workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

13   first, or, for the major emission control components, for eight years or 80,000 miles, whichever

14   comes first.

15       1515.   As manufacturers of light-duty vehicles, Defendants were required to provide these

16   warranties to purchasers or lessees of Class Vehicles.

17       1516.   Defendants' warranties formed a basis of the bargain that was reached when

18   consumers purchased or leased Class Vehicles.

19       1517.   Despite the existence of warranties, Defendants failed to inform Missouri State

20   Class members that the Class Vehicles were defective and intentionally designed and manufactured

21   to emit more pollution and achieve worse fuel economy on the road than what was disclosed to

22   regulators and represented to consumers who purchased or leased them, and Defendants failed to

23   fix the defective emission components free of charge.

24       1518.   Defendants breached the express warranty promising to repair and correct

25   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

26   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

27       1519.   Affording Defendants a reasonable opportunity to cure their breach of written

28   warranties would be unnecessary and futile here.

1520.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Missouri State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1521.   Accordingly, recovery by Plaintiff and Missouri State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

1522.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiff and Missouri State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1523.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Missouri State Class members' remedies would be insufficient to make them whole.

1524.   Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff and Missouri State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1525.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiff as well as the regulators' investigations.

1526.   As a direct and proximate result of Defendants' breach of express warranties, Missouri State Class members have been damaged in an amount to be determined at trial.

**MISSOURI COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Mo. Stat. §§ 400.2-314 and 400.2A-212**
**(On Behalf of the Missouri State Class)**

1527.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

1528.   Plaintiff Lee Marks (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Missouri State Class against all Defendants.

1529.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Mo. Stat. § 400.2-104(1) and "sellers" of motor vehicles under § 400.2-103(1)(d).

1530.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Mo. Stat. § 400.2A-103(1)(p).

1531.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

1532.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mo. Stat. § 400.2-314 and Mo. Stat. § 400.2A-212.

1533.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

1534.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1535.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Missouri State Class members have been damaged in an amount to be proven at trial.

**MONTANA COUNT I:**
**Violations of the Montana Unfair Trade Practices and Consumer Protection Act of 1973**
**Mont. Code Ann. § 30-14-101 *et seq.***
**(On Behalf of the Montana State Class)**

1536.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1537.   This count is brought on behalf of the Montana State Class against all Defendants.

1538.   Defendants and the Montana State Class are "persons" within the meaning of Mont. Code Ann. § 30-14-102(6).

1539.   Montana State Class members are "consumer[s]" under MONT. CODE ANN. § 30-14-102(1).

1540.   The sale or lease of the Class Vehicles to Montana State Class members occurred within "trade and commerce" within the meaning of Mont. Code Ann. § 30-14-102(8), and Defendants committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

1541.   The Montana Unfair Trade Practices and Consumer Protection Act ("Montana CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mont. Code Ann. § 30-14-103.

1542.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

1543.   Montana State Class members had no way of discerning that Defendants' representations were false and misleading because Montana State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

1544.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class

- 244 -

1    Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

2    Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a

3    transaction involving Class Vehicles has been supplied in accordance with a previous

4    representation when it has not.

5        1545.   Defendants intentionally and knowingly misrepresented material facts regarding the

6    Class Vehicles with intent to mislead the Montana State Class.

7        1546.   Defendants knew or should have known that their conduct violated the Montana

8    CPA.

9        1547.   Defendants owed the Montana State Class a duty to disclose the illegality and public

10   health risks, the true nature of the Class Vehicles, because Defendants:

11              A.    possessed exclusive knowledge that they were manufacturing, selling, and

12          distributing vehicles throughout the United States that did not perform as advertised;

13              B.    intentionally concealed the foregoing from regulators and Montana State

14          Class members; and/or

15              C.    made incomplete representations about the Class Vehicles' fuel economy

16          and emissions while purposefully withholding material facts that contradicted these

17          representations.

18       1548.   Defendants' concealment of the true characteristics of the Class Vehicles' fuel

19   economy and emissions was material to the Montana State Class.

20       1549.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

21   deceive regulators and reasonable consumers, including the Montana State Class, about the true

22   environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of the Defendants'

23   brands, and the true value of the Class Vehicles.

24       1550.   Defendants' violations present a continuing risk to the Montana State Class as well

25   as to the general public. Defendants' unlawful acts and practices complained of herein affect the

26   public interest.

27       1551.   Montana State Class members suffered ascertainable loss and actual damages as a

28   direct and proximate result of Defendants' misrepresentations and concealment of and failure to

disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Montana CPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1552.   As a direct and proximate result of Defendants' violations of the Montana CPA, Montana State Class members have suffered injury-in-fact and/or actual damage.

1553.   Because Defendants' unlawful methods, acts, and practices have caused Montana State Class members to suffer an ascertainable loss of money and property, the Montana State Class seeks from Defendants actual damages or $500, whichever is greater, discretionary treble damages, reasonable attorneys' fees, an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, and any other relief the Court considers necessary or proper, under Mont. Code Ann. § 30-14-133.

**MONTANA COUNT II:**
**Breach of Express Warranty**
**Mont. Code §§ 30-2-313 and 30-2A-210**
**(On Behalf of the Montana State Class)**

1554.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1555.   This count is brought on behalf of the Montana State Class against all Defendants.

1556.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Mont. Code § 30-2-104(1) and "sellers" of motor vehicles under § 30-2-103(1)(d).

1557.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Mont. Code § 30-2A-103(1)(p).

1558.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mont. Code §§ 30-2-105(1) and 30-2A-103(1)(h).

1559.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

1560.   Defendants also made numerous representations, descriptions, and promises to Montana State Class members regarding the performance and emission controls of their vehicles.

1561.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

1562.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1563.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1564.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1565.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

1566.   Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

1567.   Despite the existence of warranties, Defendants failed to inform Montana State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

1568.   Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1569.   Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1570.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Montana State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1571.   Accordingly, recovery by Montana State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

1572.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Montana State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1573.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and

1    workmanship as many incidental and consequential damages have already been suffered because of

2    Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued

3    failure to provide such limited remedy within a reasonable time, and any limitation on Montana

4    State Class members' remedies would be insufficient to make them whole.

5        1574.   Finally, because of Defendants' breach of warranty as set forth herein, Montana

6    State Class members assert, as additional and/or alternative remedies, the revocation of acceptance

7    of the goods and the return to them of the purchase or lease price of all Class Vehicles currently

8    owned or leased, and for such other incidental and consequential damages as allowed.

9        1575.   Defendants were provided reasonable notice of these issues by way of a letter sent

10   by Plaintiffs as well as the regulators' investigations.

11       1576.   As a direct and proximate result of Defendants' breach of express warranties,

12   Montana State Class members have been damaged in an amount to be determined at trial.

<div align="center">

**MONTANA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Mont. Code §§ 30-2-314 and 30-2A-212**
**(On Behalf of the Montana State Class)**

</div>

15       1577.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

16   forth herein.

17       1578.   This count is brought on behalf of the Montana State Class against all Defendants.

18       1579.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

19   vehicles under Mont. Code § 30-2-104(1) and "sellers" of motor vehicles under § 30-2-103(1)(d).

20       1580.   With respect to leases, Defendants are and were at all relevant times "lessors" of

21   motor vehicles under Mont. Code § 30-2A-103(1)(p).

22       1581.   The Class Vehicles are and were at all relevant times "goods" within the meaning of

23   Mont. Code §§ 30-2-105(1) and 30-2A-103(1)(h).

24       1582.   A warranty that the Class Vehicles were in merchantable condition and fit for the

25   ordinary purpose for which vehicles are used is implied by law pursuant to Mont. Code

26   §§ 30-2-314 and 30-2A-212.

27

28

1583.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

1584.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1585.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Montana State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**NEBRASKA COUNT I:**
**Violations of the Nebraska Consumer Protection Act**
**Neb. Rev. Stat. § 59-1601 *et seq.***
**(On Behalf of the Nebraska State Class)**

</div>

1586.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1587.   Plaintiff Andrew Kavan (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Nebraska State Class against all Defendants.

1588.   Defendants and Nebraska State Class members are "person[s]" under the Nebraska Consumer Protection Act ("Nebraska CPA"), Neb. Rev. Stat. § 59-1601(1).

1589.   Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under Neb. Rev. Stat. § 59-1601(2).

1590.   The Nebraska CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Neb. Rev. Stat. § 59-1602. The conduct Defendants engaged in as set forth herein constitutes unfair or deceptive acts or practices.

1591.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road,

1  and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass

2  emissions tests when they in fact did not.

3      1592.  Nebraska State Class members had no way of discerning that Defendants'

4  representations were false and misleading because the Nebraska State Class did not have access to

5  Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and

6  software was extremely sophisticated technology.

7      1593.  Defendants thus violated the Act by, at minimum: representing that Class Vehicles

8  have characteristics, uses, benefits, and qualities which they do not have; representing that Class

9  Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

10  Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a

11  transaction involving Class Vehicles has been supplied in accordance with a previous

12  representation when it has not.

13      1594.  Defendants intentionally and knowingly misrepresented material facts regarding the

14  Class Vehicles with intent to mislead the Nebraska State Class.

15      1595.  Defendants knew or should have known that their conduct violated the Nebraska

16  CPA.

17      1596.  Defendants owed the Nebraska State Class a duty to disclose the illegality and

18  public health risks, the true nature of the Class Vehicles, because Defendants:

19          A.    possessed exclusive knowledge that they were manufacturing, selling, and

20      distributing vehicles throughout the United States that did not perform as advertised;

21          B.    intentionally concealed the foregoing from regulators and Nebraska State

22      Class members; and/or

23          C.    made incomplete representations about the Class Vehicles' fuel economy

24      and emissions while purposefully withholding material facts that contradicted these

25      representations.

26      1597.  Defendants' concealment of the Class Vehicles' true fuel consumption and

27  emissions was material to the Nebraska State Class.

28

1598.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and the Nebraska State Class, about the true environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

1599.   Defendants' violations present a continuing risk to the Nebraska State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1600.   Plaintiff and Nebraska State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Nebraska CPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1601.   As a direct and proximate result of Defendants' violations of the Nebraska CPA, Plaintiff and Nebraska State Class members have suffered injury-in-fact and/or actual damage.

1602.   Because Defendants' conduct caused injury to Nebraska State Class members' property through violations of the Nebraska CPA, the Nebraska State Class seeks recovery of actual damages, as well as enhanced damages up to $1,000, an order enjoining Defendants' unfair or deceptive acts and practices, costs of Court, reasonable attorneys' fees, and any other just and proper relief available under Neb. Rev. Stat. § 59-1609.

<div align="center">

**NEBRASKA COUNT II:**
**Breach of Express Warranty**
**Neb. Rev. St. U.C.C. §§ 2-313 and 2A-210**
**(On Behalf of the Nebraska State Class)**

</div>

1603.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1604.   Plaintiff Andrew Kavan (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Nebraska State Class against all Defendants.

1605.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Neb. Rev. St. U.C.C. § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

1606.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Neb. Rev. St. U.C.C. § 2A-103(1)(p).

1607.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Neb. Rev. St. U.C.C. §§ 2-105(1) and 2A-103(1)(h).

1608.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

1609.   Defendants also made numerous representations, descriptions, and promises to Nebraska State Class members regarding the performance and emission controls of their vehicles.

1610.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

1611.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1612.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1613.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1614.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

1615.   Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

1616.   Despite the existence of warranties, Defendants failed to inform Plaintiff and Nebraska State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

1617.   Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1618.   Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1619.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Nebraska State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1620.   Accordingly, recovery by Plaintiff and Nebraska State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

1621.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Nebraska State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1622.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Nebraska State Class members' remedies would be insufficient to make them whole.

1623.   Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff and Nebraska State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1624.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1625.   As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and Nebraska State Class members have been damaged in an amount to be determined at trial.

**NEBRASKA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Neb. Rev. St. U.C.C. §§ 2-314 and 2A-212**
**(On Behalf of the Nebraska State Class)**

1626.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

1627.   Plaintiff Andrew Kavan (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Nebraska State Class against all Defendants.

1628.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Neb. Rev. St. U.C.C. § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

1629.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Neb. Rev. St. U.C.C. § 2A-103(1)(p).

1630.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Neb. Rev. St. U.C.C. §§ 2-105(1) and 2A-103(1)(h).

1631.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Neb. Rev. St. U.C.C.§§ 2-314 and 2A-212.

1632.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

1633.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1634.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Nebraska State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**NEVADA COUNT I:**
**Violations of the Nevada Deceptive Trade Practices Act**
**Nev. Rev. Stat. § 598.0903 *et seq.***
**(On Behalf of the Nevada State Class)**

</div>

1635.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1636.   This count is brought on behalf of the Nevada State Class against all Defendants.

1637.   The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), Nev. Rev. Stat. § 598.0903, *et seq.* prohibits deceptive trade practices. Nev. Rev. Stat. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "9. Advertises goods or services with intent not to sell or lease them as advertised"; or "15. Knowingly makes any other false representation in a transaction."

1638.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

1639.   Nevada State Class members had no way of discerning that Defendants' representations were false and misleading because the Nevada State Class did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

1640.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

1641.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Nevada State Class.

1642.   Defendants knew or should have known that their conduct violated the Nevada DTPA.

1643.   Defendants owed the Nevada State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

     A.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

     B.   intentionally concealed the foregoing from regulators and Nevada State Class members; and/or

     C.   made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

1644.   Defendants' concealment of the Class Vehicles' true fuel consumption and emissions was material to the Nevada State Class.

1645.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Nevada State Class, about the true environmental cleanliness and efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

1646.   Defendants' violations present a continuing risk to the Nevada State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1647.   Nevada State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Nevada DTPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

**NEVADA COUNT II:**
**Breach of Express Warranty**
**N.R.S. §§ 104.2313 and 104A.2210**
**(On Behalf of the Nevada State Class)**

1648.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1649.   This count is brought on behalf of the Nevada State Class against all Defendants.

1650.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.R.S. § 104.2104(1) and "sellers" of motor vehicles under § 104.2103(1)(c).

1651.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.R.S. § 104A.2103(1)(p).

1652.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.R.S. §§ 104.2105(1) and 104A.2103(1)(h).

1653.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

1654.   Defendants also made numerous representations, descriptions, and promises to Nevada State Class members regarding the performance and emission controls of their vehicles.

1655.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

1656.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1657.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

- 259 -

1    whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

2    emission control components are covered for the first eight years or 80,000 miles (whichever

3    comes first). These major emission control components subject to the longer warranty include the

4    catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

5    device or computer.

6        1658.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

7    with respect to their vehicles' emission systems. Thus, Defendants also provide an express

8    warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

9    Design and Defect Warranty required by the EPA covers repair of emission control or emission

10   related parts, which fail to function or function improperly because of a defect in materials or

11   workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

12   first, or, for the major emission control components, for eight years or 80,000 miles, whichever

13   comes first.

14       1659.   As manufacturers of light-duty vehicles, Defendants were required to provide these

15   warranties to purchasers or lessees of Class Vehicles.

16       1660.   Defendants' warranties formed a basis of the bargain that was reached when

17   consumers purchased or leased Class Vehicles.

18       1661.   Despite the existence of warranties, Defendants failed to inform Nevada State Class

19   members that the Class Vehicles were defective and intentionally designed and manufactured to

20   emit more pollution and achieve worse fuel economy on the road than what was disclosed to

21   regulators and represented to consumers who purchased or leased them, and Defendants failed to

22   fix the defective emission components free of charge.

23       1662.   Defendants breached the express warranty promising to repair and correct

24   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

25   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

26       1663.   Affording Defendants a reasonable opportunity to cure their breach of written

27   warranties would be unnecessary and futile here.

28

1664.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Nevada State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1665.   Accordingly, recovery by Nevada State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

1666.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Nevada State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1667.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Nevada State Class members' remedies would be insufficient to make them whole.

1668.   Finally, because of Defendants' breach of warranty as set forth herein, Nevada State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1669.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1670.   As a direct and proximate result of Defendants' breach of express warranties, Nevada State Class members have been damaged in an amount to be determined at trial.

**NEVADA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**N.R.S. §§ 104.2314 and 104A.2212**
**(On Behalf of the Nevada State Class)**

1671.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

1672.   This count is brought on behalf of the Nevada State Class against all Defendants.

1673.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.R.S. § 104.2104(1) and "sellers" of motor vehicles under § 104.2103(1)(c).

1674.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.R.S. § 104A.2103(1)(p).

1675.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.R.S. §§ 104.2105(1) and 104A.2103(1)(h).

1676.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.R.S. §§ 104.2314 and 104A.2212.

1677.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

1678.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1679.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Nevada State Class members have been damaged in an amount to be proven at trial.

**NEW HAMPSHIRE COUNT I:**
**Violations of the New Hampshire Consumer Protection Act**
**N.H. Rev. Stat. § 358-A:1 *et seq.***
**(On Behalf of the New Hampshire State Class)**

1680.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1681.   This count is brought on behalf of the New Hampshire State Class against all Defendants.

1682.   The New Hampshire State Class and Defendants are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire CPA"), N.H. Rev. Stat. § 358-A:1.

1683.   Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. § 358-A:1.

1684.   The New Hampshire CPA prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but . . . not limited to, the following: . . . (V) Representing that goods or services have . . . characteristics, . . . uses, benefits, or quantities that they do not have;" "(VII) Representing that goods or services are of a particular standard, quality, or grade, . . . if they are of another;" and "(IX) Advertising goods or services with intent not to sell them as advertised." N.H. Rev. Stat. § 358-A:2.

1685.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

1686.   New Hampshire State Class members had no way of discerning that Defendants' representations were false and misleading because New Hampshire State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

1687.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

1688.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the New Hampshire State Class.

1689.   Defendants knew or should have known that their conduct violated the New Hampshire CPA.

1690.   Defendants owed the New Hampshire State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

      A.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

      B.     intentionally concealed the foregoing from regulators and New Hampshire State Class members; and/or

      C.     made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

1691.   Defendants' concealment of the Class Vehicles' true fuel consumption and emissions was material to the New Hampshire State Class.

1692.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including New Hampshire State Class, about the true environmental cleanliness and efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

1693.   Defendants' violations present a continuing risk to the New Hampshire State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1694.   New Hampshire State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the New Hampshire CPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

**NEW HAMPSHIRE COUNT II:**
**Breach of Express Warranty**
**N.H. Rev. Stat. §§ 382-A:2-313 and 382-A:2A-210**
**(On Behalf of the New Hampshire State Class)**

1695.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1696.   This count is brought on behalf of the New Hampshire State Class against all Defendants.

1697.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.H. Rev. Stat. § 382-A:2-104(1) and "sellers" of motor vehicles under § 382-A:2-103(1)(d).

1698.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

1699.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. §§ 382-A:2-105(1) and 382-A:2A-103(1)(h).

1700.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

1701.   Defendants also made numerous representations, descriptions, and promises to New Hampshire State Class members regarding the performance and emission controls of their vehicles.

1702.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

1703.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1704.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1705.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1706.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

1707.   Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

1708.   Despite the existence of warranties, Defendants failed to inform New Hampshire State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

1709.   Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1710.   Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1711.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make New Hampshire State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1712.   Accordingly, recovery by the New Hampshire State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

1713.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. New Hampshire State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1714.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on New Hampshire State Class members' remedies would be insufficient to make them whole.

1715.   Finally, because of Defendants' breach of warranty as set forth herein, New Hampshire State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1716.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1717.   As a direct and proximate result of Defendants' breach of express warranties, New Hampshire State Class members have been damaged in an amount to be determined at trial.

**NEW HAMPSHIRE COUNT III:**
**Breach of Implied Warranty of Merchantability**
**N.H. Rev. Stat. §§ 382-A:2-314 and 382-A:2A-212**
**(On Behalf of the New Hampshire State Class)**

1718.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

1719.   This count is brought on behalf of the New Hampshire State Class against all Defendants.

1720.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.H. Rev. Stat. § 382-A:2-104(1) and "sellers" of motor vehicles under § 382-A:2-103(1)(d).

1721.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

1722.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. §§ 382-A:2-105(1) and 382-A:2A-103(1)(h).

1723.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.H. Rev. Stat. §§ 382-A:2-314 and 382-A:2A-212.

1724.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

1725.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1726.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, New Hampshire State Class members have been damaged in an amount to be proven at trial.

**NEW JERSEY COUNT I:**
**Violations of the New Jersey Consumer Fraud Act**
**N.J. Stat. Ann. § 56:8-1 *et seq.***
**(On Behalf of the New Jersey State Class)**

1727.   Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

1728.   Plaintiffs Sander Shady and Owen Williams (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the New Jersey State Class against all Defendants.

1729.   Plaintiffs and New Jersey State Class members and Defendants are "persons" under the New Jersey Consumer Fraud Act ("New Jersey CFA"), N.J. Stat. § 56:8-1(d).

1730.   Defendants engaged in "sales" of "merchandise" within the meaning of N.J. Stat. §56:8-1(c), (e). Defendants' actions as set forth herein occurred in the conduct of trade or commerce.

1731.   The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. Stat. § 56:8-2.

1732.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

1733.   Plaintiffs and New Jersey State Class members had no way of discerning that Defendants' representations were false and misleading because Plaintiffs and New Jersey State

1  Class members did not have access to Defendants' emissions certification test vehicles and

2  Defendants' emissions-related hardware and software was extremely sophisticated technology.

3      1734.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

4  have characteristics, uses, benefits, and qualities which they do not have; representing that Class

5  Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

6  Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a

7  transaction involving Class Vehicles has been supplied in accordance with a previous

8  representation when it has not.

9      1735.   Defendants intentionally and knowingly misrepresented material facts regarding the

10  Class Vehicles with intent to mislead Plaintiffs and the New Jersey State Class.

11      1736.   Defendants knew or should have known that their conduct violated the New Jersey

12  CFA.

13      1737.   Defendants owed Plaintiffs and the New Jersey State Class a duty to disclose the

14  illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

15          A.      possessed exclusive knowledge that they were manufacturing, selling, and

16      distributing vehicles throughout the United States that did not perform as advertised;

17          B.      intentionally concealed the foregoing from regulators, Plaintiffs, and New

18      Jersey State Class members; and/or

19          C.      made incomplete representations about the Class Vehicles' fuel economy

20      and emissions while purposefully withholding material facts that contradicted these

21      representations.

22      1738.   Defendants' concealment of the true characteristics of the Class Vehicles' fuel

23  consumption and emissions was material to Plaintiffs and the New Jersey State Class.

24      1739.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

25  deceive regulators and reasonable consumers, including Plaintiffs and the New Jersey State Class,

26  about the true environmental cleanliness and efficiency of the Class Vehicles, the quality of the

27  Defendants' brands, the devaluing of environmental cleanliness and integrity at Defendant

28  companies, and the true value of the Class Vehicles.

1   1740.   Defendants' violations present a continuing risk to Plaintiffs and the New Jersey

2   State Class as well as to the general public. Defendants' unlawful acts and practices complained of

3   herein affect the public interest.

4   1741.   Plaintiffs and New Jersey State Class members suffered ascertainable loss and

5   actual damages as a direct and proximate result of Defendants' misrepresentations and concealment

6   of and failure to disclose material information. Defendants had an ongoing duty to all their

7   customers to refrain from unfair and deceptive practices under the New Jersey CFA. All owners

8   and lessees of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and

9   unfair acts and practices made in the course of Defendants' business.

10   1742.   As a direct and proximate result of Defendants' violations of the New Jersey CFA,

11   Plaintiffs and the New Jersey State Class have suffered injury-in-fact and/or actual damage in an

12   amount to be proven at trial, and seek all just and proper remedies, including, but not limited to,

13   actual and statutory damages, treble damages, an order enjoining Defendants' deceptive and unfair

14   conduct, costs and reasonable attorneys' fees under N.J. Stat. § 56:8-19, and all other just and

15   appropriate relief.

16
**NEW JERSEY COUNT II:**
**Breach of Express Warranty**
17   **N.J.S. 12A:2-313 and 2A-210**
**(On Behalf of the New Jersey State Class)**
18

19   1743.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

20   fully set forth herein.

21   1744.   Plaintiffs Sander Shady and Owen Williams (for the purposes of this count,

22   "Plaintiffs") bring this claim on behalf of themselves and the New Jersey State Class against all

23   Defendants.

24   1745.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

25   vehicles under N.J.S. 12A:2-104(1) and "sellers" of motor vehicles under 2-103(1)(d).

26   1746.   With respect to leases, Defendants are and were at all relevant times "lessors" of

27   motor vehicles under N.J.S. 12A:2A-103(1)(p).

28

1747.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J.S. 12A:2-105(1) and 2A-103(1)(h).

1748.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

1749.   Defendants also made numerous representations, descriptions, and promises to Plaintiffs and New Jersey State Class members regarding the performance and emission controls of their vehicles.

1750.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

1751.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1752.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1753.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission

1    related parts, which fail to function or function improperly because of a defect in materials or

2    workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

3    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

4    comes first.

5         1754.   As manufacturers of light-duty vehicles, Defendants were required to provide these

6    warranties to purchasers or lessees of Class Vehicles.

7         1755.   Defendants' warranties formed a basis of the bargain that was reached when

8    consumers purchased or leased Class Vehicles.

9         1756.   Despite the existence of warranties, Defendants failed to inform Plaintiffs and New

10   Jersey State Class members that the Class Vehicles were defective and intentionally designed and

11   manufactured to emit more pollution and achieve worse fuel economy on the road than what was

12   disclosed to regulators and represented to consumers who purchased or leased them, and

13   Defendants failed to fix the defective emission components free of charge.

14        1757.   Defendants breached the express warranty promising to repair and correct

15   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

16   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

17        1758.   Affording Defendants a reasonable opportunity to cure their breach of written

18   warranties would be unnecessary and futile here.

19        1759.   Furthermore, the limited warranty promising to repair and correct Defendants'

20   defect in materials and workmanship fails in its essential purpose because the contractual remedy is

21   insufficient to make Plaintiffs and New Jersey State Class members whole and because Defendants

22   have failed and/or have refused to adequately provide the promised remedies within a reasonable

23   time.

24        1760.   Accordingly, recovery by Plaintiffs and New Jersey State Class members is not

25   restricted to the limited warranty promising to repair and correct Defendants' defect in materials

26   and workmanship, and they seek all remedies as allowed by law.

27        1761.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or

28   leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not

1   conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

2   material facts regarding the Class Vehicles. Plaintiffs and New Jersey State Class members were

3   therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

4       1762.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved

5   through the limited remedy of repairing and correcting Defendants' defect in materials and

6   workmanship as many incidental and consequential damages have already been suffered because of

7   Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued

8   failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs'

9   and New Jersey State Class members' remedies would be insufficient to make them whole.

10      1763.   Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs and

11  New Jersey State Class members assert, as additional and/or alternative remedies, the revocation of

12  acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles

13  currently owned or leased, and for such other incidental and consequential damages as allowed.

14      1764.   Defendants were provided reasonable notice of these issues by way of a letter sent

15  by Plaintiffs as well as the regulators' investigations.

16      1765.   As a direct and proximate result of Defendants' breach of express warranties,

17  Plaintiffs and New Jersey State Class members have been damaged in an amount to be determined

18  at trial.

19                        **NEW JERSEY COUNT III:**
                **Breach of Implied Warranty of Merchantability**
20                      **N.J.S. 12A:2-314 and 2A-212**
                  **(On Behalf of the New Jersey State Class)**
21

22      1766.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

23  forth herein.

24      1767.   Plaintiffs Sander Shady and Owen Williams (for the purposes of this count,

25  "Plaintiffs") bring this claim on behalf of themselves and the New Jersey State Class against all

26  Defendants.

27      1768.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

28  vehicles under N.J.S. 12A:2-104(1) and "sellers" of motor vehicles under 2-103(1)(d).

1769.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.J.S. 12A:2A-103(1)(p).

1770.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J.S. 12A:2-105(1) and 2A-103(1)(h).

1771.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.J.S. 12A:2-314 and 2A-212.

1772.   These Class Vehicles, when sold or leased and at all times thereafter, included software that led to inflated and misleading fuel economy values, and were therefore not fit for the ordinary purpose for which vehicles are used.

1773.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1774.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and New Jersey State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**NEW MEXICO COUNT I:**
**Violations of the New Mexico Unfair Trade Practices Act**
**N.M. Stat. Ann. § 57-12-1 *et seq.***
**(On Behalf of the New Mexico State Class)**

</div>

1775.   Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

1776.   This count is brought on behalf of the New Mexico State Class against all Defendants.

1777.   Defendants and New Mexico State Class members are "person[s]" under the New Mexico Unfair Trade Practices Act ("New Mexico UTPA"), N.M. Stat. Ann. § 57-12-2.

1778.   Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. Stat. Ann. § 57-12-2.

1779.   The New Mexico UTPA makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection

with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. Stat. Ann. § 57-12-2(D). Defendants' acts and omissions described herein constitute unfair or deceptive acts or practices under N.M. Stat. Ann. § 57-12-2(D). In addition, Defendants' actions constitute unconscionable actions under N.M. Stat. Ann. § 57-12-2(E), since they took advantage of the lack of knowledge, ability, experience, and capacity of New Mexico State Class members to a grossly unfair degree.

1780.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

1781.   New Mexico State Class members had no way of discerning that Defendants' representations were false and misleading because New Mexico State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

1782.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

1783.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the New Mexico State Class.

1784.   Defendants knew or should have known that their conduct violated the New Mexico UTPA.

1785.   Defendants owed the New Mexico State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

    A.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

    B.   intentionally concealed the foregoing from regulators and New Mexico State Class members; and/or

    C.   made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

1786.   Defendants' concealment of the Class Vehicles' true fuel consumption and emissions was material to the New Mexico State Class.

1787.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the New Mexico State Class, about the true environmental cleanliness and efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

1788.   Defendants' violations present a continuing risk to the New Mexico State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1789.   New Mexico State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the New Mexico UTPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1790.   As a direct and proximate result of Defendants' violations of the New Mexico UTPA, New Mexico State Class members have suffered injury-in-fact and/or actual damage.

1791.   Because Defendants' unconscionable, willful conduct caused actual harm to New Mexico State Class members, the New Mexico State Class seeks recovery of actual damages or

$100, whichever is greater, discretionary treble damages, punitive damages, and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. Stat. Ann. § 57-12-10.

1792.   New Mexico State Class members also seek punitive damages against Defendants because Defendants' conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith.

<div align="center">

**NEW MEXICO COUNT II:**
**Breach of Express Warranty**
**N.M. Stat. §§ 55-2-313 and 55-2A-210**
**(On Behalf of the New Mexico State Class)**

</div>

1793.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1794.   This count is brought on behalf of the New Mexico State Class against all Defendants.

1795.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.M. Stat. § 55-2-104(1) and "sellers" of motor vehicles under § 55-2-103(1)(d).

1796.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.M. Stat. § 55-2A-103(1)(p).

1797.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.M. Stat. §§ 55-2-105(1) and 55-2A-103(1)(h).

1798.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

1799.   Defendants also made numerous representations, descriptions, and promises to New Mexico State Class members regarding the performance and emission controls of their vehicles.

1800.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

1801.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1802.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1803.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1804.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

1805.   Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

1806.   Despite the existence of warranties, Defendants failed to inform New Mexico State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to

regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

1807. Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1808. Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1809. Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make New Mexico State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1810. Accordingly, recovery by New Mexico State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

1811. Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. New Mexico State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1812. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on New Mexico State Class members' remedies would be insufficient to make them whole.

1813. Finally, because of Defendants' breach of warranty as set forth herein, New Mexico State Class members assert, as additional and/or alternative remedies, the revocation of acceptance

of the goods and the return to them of the purchase or lease price of all Class Vehicles currently

owned or leased, and for such other incidental and consequential damages as allowed.

1814.   Defendants were provided reasonable notice of these issues by way of a letter sent

by Plaintiffs as well as the regulators' investigations.

1815.   As a direct and proximate result of Defendants' breach of express warranties, New

Mexico State Class members have been damaged in an amount to be determined at trial.

<div align="center">

**NEW MEXICO COUNT III:**
**Breach of Implied Warranty of Merchantability**
**N.M. Stat. §§ 55-2-314 and 55-2A-212**
**(On Behalf of the New Mexico State Class)**

</div>

1816.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

forth herein.

1817.   This count is brought on behalf of the New Mexico State Class against all

Defendants.

1818.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

vehicles under N.M. Stat. § 55-2-104(1) and "sellers" of motor vehicles under § 55-2-103(1)(d).

1819.   With respect to leases, Defendants are and were at all relevant times "lessors" of

motor vehicles under N.M. Stat. § 55-2A-103(1)(p).

1820.   The Class Vehicles are and were at all relevant times "goods" within the meaning of

N.M. Stat. §§ 55-2-105(1) and 55-2A-103(1)(h).

1821.   A warranty that the Class Vehicles were in merchantable condition and fit for the

ordinary purpose for which vehicles are used is implied by law pursuant to N.M. Stat. §§ 55-2-314

and 55-2A-212.

1822.   These Class Vehicles, when sold or leased and at all times thereafter, were

materially different from vehicles Defendants submitted for emissions testing, included software

that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with

emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the

ordinary purpose for which vehicles are used.

1823.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1824.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, New Mexico State Class members have been damaged in an amount to be proven at trial.

**NEW YORK COUNT I:**
**Violations of the New York General Business Law § 349**
**N.Y. Gen. Bus. Law § 349**
**(On Behalf of the New York State Class)**

1825.   Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

1826.   Plaintiffs Frank Cohen, Peter Menger, and Orville Taylor (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the New York State Class against all Defendants.

1827.   The New York State Class members and Defendants are "persons" under N.Y. Gen. Bus. Law § 349(h), the New York Deceptive Acts and Practices Act ("NY DAPA").

1828.   Defendants' actions as set forth herein occurred in the conduct of trade or commerce under the NY DAPA.

1829.   The NY DAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Defendants' conduct, as set forth herein, constitutes deceptive acts or practices under this section.

1830.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

1831.   New York State Class members had no way of discerning that Defendants' representations were false and misleading because New York State Class members did not have

- 282 -

1    access to Defendants' emissions certification test vehicles and Defendants' emissions-related

2    hardware and software was extremely sophisticated technology.

3          1832.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

4    have characteristics, uses, benefits, and qualities which they do not have; representing that Class

5    Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

6    Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a

7    transaction involving Class Vehicles has been supplied in accordance with a previous

8    representation when it has not.

9          1833.   Defendants intentionally and knowingly misrepresented material facts regarding the

10   Class Vehicles with intent to mislead the New York State Class.

11         1834.   Defendants knew or should have known that their conduct violated the NY DAPA.

12         1835.   Defendants owed the New York State Class a duty to disclose the illegality and

13   public health risks, the true nature of the Class Vehicles, because Defendants:

14               A.     possessed exclusive knowledge that they were manufacturing, selling, and

15          distributing vehicles throughout the United States that did not perform as advertised;

16               B.     intentionally concealed the foregoing from regulators and New York State

17          Class members; and/or

18               C.     made incomplete representations about the Class Vehicles' fuel economy

19          and emissions while purposefully withholding material facts that contradicted these

20          representations.

21         1836.   Defendants' concealment of the true characteristics of the Class Vehicles' true fuel

22   consumption and emissions was material to the New York State Class.

23         1837.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

24   deceive regulators and reasonable consumers, including Plaintiffs and the New York State Class,

25   about the true environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of the

26   Defendants' brands, and the true value of the Class Vehicles.

27

28

1838.   Defendants' violations present a continuing risk to Plaintiffs and the New York State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1839.   Plaintiffs and New York State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the NY DAPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1840.   As a direct and proximate result of Defendants' violations of the NY DAPA, New York State Class members have suffered injury-in-fact and/or actual damage.

1841.   As a result of the foregoing willful, knowing, and wrongful conduct of Defendants, Plaintiffs and New York State Class members have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to actual damages or $50, whichever is greater, treble damages up to $1,000, punitive damages to the extent available under the law, reasonable attorneys' fees and costs, an order enjoining Defendants' deceptive and unfair conduct, and all other just and appropriate relief available under the NY DAPA.

### NEW YORK COUNT II:
### Violations of the New York General Business Law § 350
### N.Y. Gen. Bus. Law § 350
### (On Behalf of the New York State Class)

1842.   Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

1843.   Plaintiffs Frank Cohen, Peter Menger, and Orville Taylor (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the New York State Class against all Defendants.

1844.   Defendants were engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350, the New York False Advertising Act ("NY FAA")

1845.   The NY FAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350. False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of . . . representations [made] with respect to the commodity . . . ." N.Y. Gen. Bus. Law § 350-a.

1846.   Defendants caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements and omissions that were untrue or misleading, and that were known by Defendants, or that through the exercise of reasonable care should have been known by Defendants, to be untrue and misleading to the New York State Class.

1847.   Defendants made numerous material misrepresentations and omissions of fact with intent to mislead and deceive concerning the Class Vehicles, particularly concerning the illegality, efficacy and functioning of the emissions systems on the Class Vehicles. Specifically, Defendants intentionally concealed and suppressed material facts concerning the legality and quality of the Class Vehicles to intentionally and grossly defraud and mislead the New York State Class concerning the true emissions produced by the Class Vehicles.

1848.   The misrepresentations and omissions regarding fuel economy and emissions set forth above were material and likely to deceive a reasonable consumer.

1849.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the New York State Class.

1850.   Defendants' false advertising was likely to and did in fact deceive regulators and reasonable consumers, including the New York State Class, about the illegality and true characteristics of the Class Vehicles, the quality of Defendants brand and the true value of the Class Vehicles.

1851.   Defendants' violations of the NY FAA present a continuing risk to New York State Class members and to the general public. Defendants' deceptive acts and practices affect the public interest.

1852.   The Class Vehicles do not perform as advertised and are not compliant with EPA regulations, making them far less valuable than advertised.

1853. New York State Class members have suffered injury-in-fact and/or actual damages and ascertainable loss as a direct and proximate result of the Defendant's false advertising in violation of the NY FAA.

1854. The New York State Class seeks monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $500 each for New York State Class members. Because Defendants' conduct was committed willingly and knowingly, New York State Class members are entitled to recover three times actual damages, up to $10,000.

1855. The New York State Class also seeks an order enjoining Defendants' false advertising, attorneys' fees, and any other just and proper relief under N.Y. Gen. Bus. Law § 350.

**NEW YORK COUNT III:**
**Breach of Express Warranty**
**N.Y. U.C.C. Law §§ 2-313 and 2A-210**
**(On Behalf of the New York State Class)**

1856. Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1857. Plaintiffs Frank Cohen, Peter Menger, and Orville Taylor (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the New York State Class against all Defendants.

1858. Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

1859. With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

1860. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

1861. In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

- 286 -

1862.   Defendants also made numerous representations, descriptions, and promises to New York State Class members regarding the performance and emission controls of their vehicles.

1863.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

1864.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1865.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1866.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1867.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

1868. Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

1869. Despite the existence of warranties, Defendants failed to inform New York State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

1870. Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1871. Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

1872. Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make New York State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1873. Accordingly, recovery by New York State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

1874. Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. New York State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1875. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued

failure to provide such limited remedy within a reasonable time, and any limitation on New York

State Class members' remedies would be insufficient to make them whole.

1876.   Finally, because of Defendants' breach of warranty as set forth herein, New York

State Class members assert, as additional and/or alternative remedies, the revocation of acceptance

of the goods and the return to them of the purchase or lease price of all Class Vehicles currently

owned or leased, and for such other incidental and consequential damages as allowed.

1877.   Defendants were provided reasonable notice of these issues by way of a letter sent

by Plaintiffs as well as the regulators' investigations.

1878.   As a direct and proximate result of Defendants' breach of express warranties, New

York State Class members have been damaged in an amount to be determined at trial.

**NEW YORK COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**N.Y. U.C.C. Law §§ 2-314 and 2A-212**
**(On Behalf of the New York State Class)**

1879.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

forth herein.

1880.   Plaintiffs Frank Cohen, Peter Menger, and Orville Taylor (for the purposes of this

count, "Plaintiffs") bring this claim on behalf of themselves and the New York State Class against

all Defendants.

1881.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

1882.   With respect to leases, Defendants are and were at all relevant times "lessors" of

motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

1883.   The Class Vehicles are and were at all relevant times "goods" within the meaning of

N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

1884.   A warranty that the Class Vehicles were in merchantable condition and fit for the

ordinary purpose for which vehicles are used is implied by law pursuant to N.Y. UCC Law

§§ 2-314 and 2A-212.

1885.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

1886.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1887.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, New York State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**NORTH CAROLINA COUNT I:**
**Violations of the North Carolina Unfair and Deceptive Acts and Practices Act**
**N.C. Gen. Stat. § 75-1.1 *et seq.***
**(On Behalf of the North Carolina State Class)**

</div>

1888.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1889.   Plaintiffs Dyana Spiess and John Vorisek (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the North Carolina State Class against all Defendants.

1890.   Plaintiffs and North Carolina State Class members are persons under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.* ("NCUDTPA").

1891.   Defendants' acts and practices complained of herein were performed in the course of Defendants' trade or business and thus occurred in or affected "commerce," as defined in N.C. Gen. Stat. § 75-1.1(b).

1892.   The NCUDTPA makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA. N.C. Gen. Stat. § 75-16.

1893.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

1894.   Plaintiffs and North Carolina State Class members had no way of discerning that Defendants' representations were false and misleading because Plaintiffs and North Carolina State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

1895.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

1896.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the North Carolina State Class.

1897.   Defendants knew or should have known that their conduct violated the NCUDTPA.

1898.   Defendants owed to Plaintiffs and the North Carolina State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

A.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B.   intentionally concealed the foregoing from regulators, Plaintiffs, and North Carolina State Class members; and/or

C.   made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts from Plaintiffs and the North Carolina State Class that contradicted these representations.

1899.   Defendants' concealment of the Class Vehicles' true fuel consumption and emissions were material to Plaintiffs and the North Carolina State Class.

1900.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and the North Carolina State Class, about the true environmental cleanliness and efficiency of the Class Vehicles, the quality of the Defendants' brands, the devaluing of environmental cleanliness and integrity at Defendant companies, and the true value of the Class Vehicles.

1901.   Defendants' violations present a continuing risk to Plaintiffs and the North Carolina State Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1902.   Plaintiffs and North Carolina State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the NCUDTPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1903.   As a result of the foregoing wrongful conduct of Defendants, Plaintiffs and the North Carolina State Class has been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to treble damages, an order enjoining Defendants' deceptive and unfair conduct, court costs and reasonable attorneys' fees, and any other just and proper relief available under N.C. Gen. Stat. § 75-16.

<div align="center">

**NORTH CAROLINA COUNT II:**
**Breach of Express Warranty**
**N.C.G.S.A. §§ 25-2-313 and 252A-210**
**(On Behalf of the North Carolina State Class)**

</div>

1904.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1905. Plaintiffs Dyana Spiess and John Vorisek (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the North Carolina State Class against all Defendants.

1906. Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.C.G.S.A. § 25-2-104(1) and "sellers" of motor vehicles under § 25-2-103(1)(d).

1907. With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.C.G.S.A. § 25-2A-103(1)(p).

1908. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C.G.S.A. § 25-2-105(1) and N.C.G.S.A. § 25-2A-103(1)(h).

1909. In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

1910. Defendants also made numerous representations, descriptions, and promises to Plaintiffs and North Carolina State Class members regarding the performance and emission controls of their vehicles.

1911. For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

1912. The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1913. The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever

1  comes first). These major emission control components subject to the longer warranty include the

2  catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

3  device or computer.

4      1914.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

5  with respect to their vehicles' emission systems. Thus, Defendants also provide an express

6  warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

7  Design and Defect Warranty required by the EPA covers repair of emission control or emission

8  related parts, which fail to function or function improperly because of a defect in materials or

9  workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

10 first, or, for the major emission control components, for eight years or 80,000 miles, whichever

11 comes first.

12     1915.   As manufacturers of light-duty vehicles, Defendants were required to provide these

13 warranties to purchasers or lessees of Class Vehicles.

14     1916.   Defendants' warranties formed a basis of the bargain that was reached when

15 consumers purchased or leased Class Vehicles.

16     1917.   Despite the existence of warranties, Defendants failed to inform Plaintiffs and North

17 Carolina State Class members that the Class Vehicles were defective and intentionally designed

18 and manufactured to emit more pollution and achieve worse fuel economy on the road than what

19 was disclosed to regulators and represented to consumers who purchased or leased them, and

20 Defendants failed to fix the defective emission components free of charge.

21     1918.   Defendants breached the express warranty promising to repair and correct

22 Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

23 have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

24     1919.   Affording Defendants a reasonable opportunity to cure their breach of written

25 warranties would be unnecessary and futile here.

26     1920.   Furthermore, the limited warranty promising to repair and correct Defendants'

27 defect in materials and workmanship fails in its essential purpose because the contractual remedy is

28 insufficient to make Plaintiffs and North Carolina State Class members whole and because

1   Defendants have failed and/or have refused to adequately provide the promised remedies within a

2   reasonable time.

3       1921.   Accordingly, recovery by Plaintiffs and North Carolina State Class members is not

4   restricted to the limited warranty promising to repair and correct Defendants' defect in materials

5   and workmanship, and they seek all remedies as allowed by law.

6       1922.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or

7   leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not

8   conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

9   material facts regarding the Class Vehicles. Plaintiffs and North Carolina State Class members

10   were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent

11   pretenses.

12       1923.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved

13   through the limited remedy of repairing and correcting Defendants' defect in materials and

14   workmanship as many incidental and consequential damages have already been suffered because of

15   Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued

16   failure to provide such limited remedy within a reasonable time, and any limitation Plaintiffs' and

17   on North Carolina State Class members' remedies would be insufficient to make them whole.

18       1924.   Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs and

19   North Carolina State Class members assert, as additional and/or alternative remedies, the

20   revocation of acceptance of the goods and the return to them of the purchase or lease price of all

21   Class Vehicles currently owned or leased, and for such other incidental and consequential damages

22   as allowed.

23       1925.   Defendants were provided reasonable notice of these issues by way of a letter sent

24   by Plaintiffs as well as the regulators' investigations.

25       1926.   As a direct and proximate result of Defendants' breach of express warranties,

26   Plaintiffs and North Carolina State Class members have been damaged in an amount to be

27   determined at trial.

28

**NORTH CAROLINA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**N.C.G.S.A. §§ 25-2-314 and 252A-212**
**(On Behalf of the North Carolina State Class)**

1927.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

1928.   Plaintiffs Dyana Spiess and John Vorisek (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the North Carolina State Class against all Defendants.

1929.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.C.G.S.A. § 25-2-104(1) and "sellers" of motor vehicles under § 25-2-103(1)(d).

1930.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.C.G.S.A. § 25-2A-103(1)(p).

1931.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C.G.S.A. § 25-2-105(1) and N.C.G.S.A. § 25-2A-103(1)(h).

1932.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.C.G.S.A. § 25-2-314 and N.C.G.S.A. § 25-2A-212.

1933.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

1934.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1935.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and North Carolina State Class members have been damaged in an amount to be proven at trial.

**NORTH DAKOTA COUNT I:**
**Violations of the North Dakota Consumer Fraud Act**
**N.D. Cent. Code § 51-15-02**
**(On Behalf of the North Dakota State Class)**

1936.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1937.   This count is brought on behalf of the North Dakota State Class against all Defendants.

1938.   North Dakota State Class members and Defendants are "persons" within the meaning of N.D. Cent. Code § 51-15-02(4).

1939.   Defendants engaged in the "sale" of "merchandise" within the meaning of N.D. Cent Code § 51-15-02(3), (5).

1940.   The North Dakota Consumer Fraud Act ("North Dakota CFA") makes unlawful "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise . . . ." N.D. Cent. Code § 51-15-02. As set forth above and below, Defendants committed deceptive acts or practices, with the intent that North Dakota State Class members rely thereon in connection with their purchase or lease of the Class Vehicles.

1941.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

1942.   North Dakota State Class members had no way of discerning that Defendants' representations were false and misleading because North Dakota State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

1943.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO.: 3:20-CV-7473

1    Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

2    Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a

3    transaction involving Class Vehicles has been supplied in accordance with a previous

4    representation when it has not.

5        1944.   Defendants intentionally and knowingly misrepresented material facts regarding the

6    Class Vehicles with intent to mislead the North Dakota State Class.

7        1945.   Defendants knew or should have known that their conduct violated the North

8    Dakota CFA.

9        1946.   Defendants owed the North Dakota State Class a duty to disclose the illegality and

10   public health risks, the true nature of the Class Vehicles, because Defendants:

11           A.    possessed exclusive knowledge that they were manufacturing, selling, and

12       distributing vehicles throughout the United States that did not perform as advertised;

13           B.    intentionally concealed the foregoing from regulators and North Dakota

14       State Class members; and/or

15           C.    made incomplete representations about the Class Vehicles' fuel economy

16       and emissions while purposefully withholding material facts that contradicted these

17       representations.

18       1947.   Defendants' concealment of the true characteristics of the Class Vehicles' fuel

19   consumption and emissions was material to the North Dakota State Class.

20       1948.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

21   deceive regulators and reasonable consumers, including the North Dakota State Class, about the

22   true environmental cleanliness and efficiency of the Class Vehicles, the quality of the Defendants'

23   brands, and the true value of the Class Vehicles.

24       1949.   Defendants' violations present a continuing risk to the North Dakota State Class as

25   well as to the general public. Defendants' unlawful acts and practices complained of herein affect

26   the public interest.

27       1950.   North Dakota State Class members suffered ascertainable loss and actual damages

28   as a direct and proximate result of Defendants' misrepresentations and concealment of and failure

to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the North Dakota CFA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1951.   As a direct and proximate result of Defendants' violations of the North Dakota CFA, North Dakota State Class members have suffered injury-in-fact and/or actual damage.

1952.   North Dakota State Class members seek punitive damages against Defendants because Defendants' conduct was egregious. Defendants' egregious conduct warrants punitive damages.

1953.   Further, Defendants knowingly committed the conduct described above, and thus, under N.D. Cent. Code § 51-15-09, Defendants are liable to the North Dakota State Class for treble damages in amounts to be proven at trial, as well as attorneys' fees, costs, and disbursements. Plaintiffs further seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and other just and proper available relief under the North Dakota CFA.

<div align="center">

**NORTH DAKOTA COUNT II:**
**Breach of Express Warranty**
**N.D. Cent. Code §§ 41-02-30 and 41-02.1-19**
**(On Behalf of the North Dakota State Class)**

</div>

1954.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

1955.   This count is brought on behalf of the North Dakota State Class against all Defendants.

1956.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.D. Cent. Code § 41-02.04(3) and "sellers" of motor vehicles under § 41-02-03(1)(d).

1957.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.D. Cent. Code § 41-02.1-03(1)(p).

1958.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.D. Cent. Code § 41-02-05(2) and N.D. Cent. Code § 41-02.1-03(1)(h).

1959. In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

1960. Defendants also made numerous representations, descriptions, and promises to North Dakota State Class members regarding the performance and emission controls of their vehicles.

1961. For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

1962. The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1963. The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1964. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

1    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

2    comes first.

3        1965.   As manufacturers of light-duty vehicles, Defendants were required to provide these

4    warranties to purchasers or lessees of Class Vehicles.

5        1966.   Defendants' warranties formed a basis of the bargain that was reached when

6    consumers purchased or leased Class Vehicles.

7        1967.   Despite the existence of warranties, Defendants failed to inform North Dakota State

8    Class members that the Class Vehicles were defective and intentionally designed and manufactured

9    to emit more pollution and achieve worse fuel economy on the road than what was disclosed to

10   regulators and represented to consumers who purchased or leased them, and Defendants failed to

11   fix the defective emission components free of charge.

12       1968.   Defendants breached the express warranty promising to repair and correct

13   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

14   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

15       1969.   Affording Defendants a reasonable opportunity to cure their breach of written

16   warranties would be unnecessary and futile here.

17       1970.   Furthermore, the limited warranty promising to repair and correct Defendants'

18   defect in materials and workmanship fails in its essential purpose because the contractual remedy is

19   insufficient to make North Dakota State Class members whole and because Defendants have failed

20   and/or have refused to adequately provide the promised remedies within a reasonable time.

21       1971.   Accordingly, recovery by North Dakota State Class members is not restricted to the

22   limited warranty promising to repair and correct Defendants' defect in materials and workmanship,

23   and they seek all remedies as allowed by law.

24       1972.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or

25   leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not

26   conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

27   material facts regarding the Class Vehicles. North Dakota State Class members were therefore

28   induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1973.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on North Dakota State Class members' remedies would be insufficient to make them whole.

1974.   Finally, because of Defendants' breach of warranty as set forth herein, North Dakota State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1975.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1976.   As a direct and proximate result of Defendants' breach of express warranties, North Dakota State Class members have been damaged in an amount to be determined at trial.

**NORTH DAKOTA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**N.D. Cent. Code §§ 41-02-31 and 41-02.1-21**
**(On Behalf of the North Dakota State Class)**

1977.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

1978.   This count is brought on behalf of the North Dakota State Class against all Defendants.

1979.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.D. Cent. Code § 41-02.04(3) and "sellers" of motor vehicles under § 41-02-03(1)(d).

1980.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.D. Cent. Code § 41-02.1-03(1)(p).

1981.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.D. Cent. Code § 41-02-05(2) and N.D. Cent. Code § 41-02.1-03(1)(h).

1982.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.D. Cent. Code § 41-02-31 and N.D. Cent. Code § 41-02.1-21.

1983.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

1984.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1985.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, North Dakota State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**OHIO COUNT I:**
**Violations of the Ohio Consumer Sales Practices Act**
**Ohio Rev. Code § 1345.01 *et seq.***
**(On Behalf of the Ohio State Class)**

</div>

1986.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1987.   Plaintiff Christopher Allen (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Ohio State Class against all Defendants.

1988.   Defendants, Plaintiff, and Ohio State Class members are "persons" within the meaning of Ohio Rev. Code § 1345.01(B). Defendants are a "supplier" as defined by Ohio Rev. Code § 1345.01(C).

1989.   Plaintiff and the Ohio State Class are "consumers" as that term is defined in Ohio Rev. Code § 1345.01(D), and their purchase and leases of the Class Vehicles with the Defect Devices installed in them are "consumer transactions" within the meaning of Ohio Rev. Code § 1345.01(A).

1990.   Ohio Rev. Code § 1345.02, prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Ohio CSPA prohibits a supplier from (i) representing that

goods have characteristics, uses or benefits which the goods do not have; (ii) representing that their goods are of a particular quality or grade that the product is not; and (iii) representing that the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not.

1991.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

1992.   Plaintiff and Ohio State Class members had no way of discerning that Defendants' representations were false and misleading because Plaintiff and Ohio State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

1993.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

1994.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Ohio State Class.

1995.   Defendants knew or should have known that their conduct violated the Ohio CSPA.

1996.   The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the types of acts and omissions of Defendants in this Complaint—including, but not limited to, the failure to honor both implied warranties and express warranties, the making and distribution of false, deceptive, and/or misleading representations, and

the concealment and/or non-disclosure of a substantial defect—constitute deceptive sales practices in violation of the CSPA. These cases include, but are not limited to, the following:

      A.    *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

      B.    *State ex rel. Betty D. Montgomery v. Ford Motor Co.* (OPIF #10002123);

      C.    *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

      D.    *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

      E.    *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

      F.    *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);

      G.    *Cranford v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

      H.    *Brown v. Spears* (OPIF #10000403);

      I.    *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427);

      J.    *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326); and

      K.    *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524).

1997.  Defendants owed Plaintiff and the Ohio State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

      L.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

      M.    intentionally concealed the foregoing from regulators, Plaintiff, and Ohio State Class members; and/or

      N.    made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

1998.  Defendants' concealment of the true characteristics of the Class Vehicles' fuel consumption and emissions was material to Plaintiff and the Ohio State Class.

1999.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and the Ohio State Class, about the true environmental cleanliness and efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

2000.   Defendants' violations present a continuing risk to Plaintiff and the Ohio State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2001.   Plaintiff and Ohio State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Ohio CSPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

2002.   Pursuant to Ohio Rev. Code § 1345.09, Plaintiff and the Ohio State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, actual damages - trebled, and attorneys' fees, costs, and any other just and proper relief, to the extend available under the Ohio CSPA.

<div align="center">

**OHIO COUNT II:**
**Violations of the Ohio Deceptive Trade Practices Act**
**Ohio Rev. Code § 4165.01 *et seq.***
**(On Behalf of the Ohio State Class)**

</div>

2003.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2004.   Plaintiff Christopher Allen (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Ohio State Class against all Defendants.

2005.   Defendants, Plaintiff, and the Ohio State Class are "persons" within the meaning of Ohio Rev. Code § 4165.01(D).

2006.   Defendants engaged in "the course of [its] business" within the meaning of Ohio Rev. Code § 4165.02(A) with respect to the acts alleged herein.

1    2007.   The Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.02(A) ("Ohio

2    DTPA") provides that a "person engages in a deceptive trade practice when, in the course of the

3    person's business, vocation, or occupation," the person does any of the following: "(2) Causes

4    likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or

5    certification of goods or services; . . . (7) Represents that goods or services have sponsorship,

6    approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a

7    person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

8    . . . (9) Represents that goods or services are of a particular standard, quality, or grade, or that goods

9    are of a particular style or model, if they are of another; . . . [or] (11) Advertises goods or services

10   with intent not to sell them as advertised."

11   2008.   In the course of their business, Defendants concealed and suppressed material facts

12   concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for

13   emissions testing that were different from production vehicles, (b) installing a secret software

14   program that caused the vehicles to perform differently during emissions testing than on the road,

15   and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass

16   emissions tests when they in fact did not.

17   2009.   Plaintiff and Ohio State Class members had no way of discerning that Defendants'

18   representations were false and misleading because Plaintiff and Ohio State Class members did not

19   have access to Defendants' emissions certification test vehicles and Defendants' emissions-related

20   hardware and software was extremely sophisticated technology.

21   2010.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

22   have characteristics, uses, benefits, and qualities which they do not have; representing that Class

23   Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

24   Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a

25   transaction involving Class Vehicles has been supplied in accordance with a previous

26   representation when it has not.

27   2011.   Defendants intentionally and knowingly misrepresented material facts regarding the

28   Class Vehicles with intent to mislead Plaintiff and the Ohio State Class.

2012.   Defendants knew or should have known that their conduct violated the Ohio DTPA.

2013.   Defendants owed Plaintiff and the Ohio State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

      A.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

      B.     intentionally concealed the foregoing from regulators, Plaintiff, and Ohio State Class members; and/or

      C.     made incomplete representations about the Class Vehicles' true fuel consumption and emissions while purposefully withholding material facts that contradicted these representations.

2014.   Defendants' concealment of the true characteristics of the Class Vehicles' fuel consumption and emissions was material to Plaintiff and the Ohio State Class.

2015.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and the Ohio State Class, about the true environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

2016.   Defendants' violations present a continuing risk to Plaintiff and the Ohio State Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2017.   Plaintiff and Ohio State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Ohio DTPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

2018.   Pursuant to Ohio Rev. Code § 4165.03, Plaintiff and the Ohio State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Ohio DTPA.

**OHIO COUNT III:**
**Breach of Express Warranty**
**Ohio. Rev. Code § 1302.26, *et seq.* / U.C.C. § 2-313**
**(On Behalf of the Ohio State Class)**

2019.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

2020.   Plaintiff Christopher Allen (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Ohio State Class against all Defendants.

2021.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and "sellers" of motor vehicles under § 1302.01(4).

2022.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ohio Rev. Code § 1310.01(A)(20).

2023.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code §§ 1302.01(8), and 1310.01(A)(8).

2024.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

2025.   Defendants also made numerous representations, descriptions, and promises Plaintiff and to Ohio State Class members regarding the performance and emission controls of their vehicles.

2026.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

2027.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

- 309 -

2028.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2029.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2030.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

2031.   Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

2032.   Despite the existence of warranties, Defendants failed to inform Plaintiff and Ohio State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

1     2033.   Defendants breached the express warranty promising to repair and correct

2     Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

3     have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

4     2034.   Affording Defendants a reasonable opportunity to cure their breach of written

5     warranties would be unnecessary and futile here.

6     2035.   Furthermore, the limited warranty promising to repair and correct Defendants'

7     defect in materials and workmanship fails in its essential purpose because the contractual remedy is

8     insufficient to make Plaintiff and Ohio State Class members whole and because Defendants have

9     failed and/or have refused to adequately provide the promised remedies within a reasonable time.

10    2036.   Accordingly, recovery by Plaintiff and Ohio State Class members is not restricted to

11    the limited warranty promising to repair and correct Defendants' defect in materials and

12    workmanship, and they seek all remedies as allowed by law.

13    2037.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or

14    leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not

15    conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

16    material facts regarding the Class Vehicles. Plaintiff and Ohio State Class members were therefore

17    induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

18    2038.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved

19    through the limited remedy of repairing and correcting Defendants' defect in materials and

20    workmanship as many incidental and consequential damages have already been suffered because of

21    Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued

22    failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's

23    and Ohio State Class members' remedies would be insufficient to make them whole.

24    2039.   Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff and

25    Ohio State Class members assert, as additional and/or alternative remedies, the revocation of

26    acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles

27    currently owned or leased, and for such other incidental and consequential damages as allowed.

28

2040.  Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2041.  As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and Ohio State Class members have been damaged in an amount to be determined at trial.

**OHIO COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**Ohio Rev. Code Ann. §§ 1302.27 and 1310.19**
**(On Behalf of the Ohio State Class)**

2042.  Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2043.  Plaintiff Christopher Allen (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Ohio State Class against all Defendants.

2044.  Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and "sellers" of motor vehicles under § 1302.01(4).

2045.  With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ohio Rev. Code § 1310.01(A)(20).

2046.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code §§ 1302.01(8), and 1310.01(A)(8).

2047.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ohio Rev. Code §§ 1302.27 and 1310.19.

2048.  These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

2049.  Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2050.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Ohio State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**OKLAHOMA COUNT I:**
**Violations of the Oklahoma Consumer Protection Act**
**Okla. Stat. Tit. 15 § 751 *et seq.***
**(On Behalf of the Oklahoma State Class)**

</div>

2051.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2052.   Plaintiff Philipp Novales-Li (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Oklahoma State Class against all Defendants.

2053.   Defendants and the Oklahoma State Class are "persons" within the meaning of Okla. Stat. Tit. 15 § 752.1.

2054.   Defendants engaged in "the course of [its] business" within the meaning of Okla. Stat. Tit. 15 § 752.3 with respect to the acts alleged herein.

2055.   The Oklahoma Consumer Protection Act ("Oklahoma CPA") prohibits, in the course of business: "mak[ing] a false or misleading representation, knowingly or with reason to know, as to the characteristics . . ., uses, [or] benefits, of the subject of a consumer transaction," or making a false representation, "knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another or "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;" and otherwise committing "an unfair or deceptive trade practice." Okla. Stat. Tit. 753.

2056.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

2057.   Oklahoma State Class members had no way of discerning that Defendants' representations were false and misleading because Oklahoma State Class members did not have

1    access to Defendants' emissions certification test vehicles and Defendants' emissions-related

2    hardware and software was extremely sophisticated technology.

3         2058.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

4    have characteristics, uses, benefits, and qualities which they do not have; representing that Class

5    Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

6    Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a

7    transaction involving Class Vehicles has been supplied in accordance with a previous

8    representation when it has not.

9         2059.   Defendants intentionally and knowingly misrepresented material facts regarding the

10   Class Vehicles with intent to mislead the Oklahoma State Class.

11        2060.   Defendants knew or should have known that their conduct violated the Oklahoma

12   CPA.

13        2061.   Defendants owed the Oklahoma State Class a duty to disclose the illegality and

14   public health risks, the true nature of the Class Vehicles, because Defendants:

15             A.      possessed exclusive knowledge that they were manufacturing, selling, and

16        distributing vehicles throughout the United States that did not perform as advertised;

17             B.      intentionally concealed the foregoing from regulators and Oklahoma State

18        Class members; and/or

19             C.      made incomplete representations about the Class Vehicles' true fuel

20        consumption and emissions while purposefully withholding material facts that contradicted

21        these representations.

22        2062.   Defendants' concealment of the true characteristics of the Class Vehicles' true fuel

23   consumption and emissions was material to the Oklahoma State Class.

24        2063.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

25   deceive regulators and reasonable consumers, including the Oklahoma State Class, about the true

26   environmental cleanliness and efficiency of the Class Vehicles, the quality of the Defendants'

27   brands, and the true value of the Class Vehicles.

28

2064.   Defendants' violations present a continuing risk to the Oklahoma State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2065.   Oklahoma State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Oklahoma CPA. All owners and lessees of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

2066.   Pursuant to Okla. Stat. Tit. 15 § 761.1, the Oklahoma State Class seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Oklahoma CPA.

<div align="center">

**OKLAHOMA COUNT II:**
**Breach of Express Warranty**
**Okla. Stat. Tit. 12 §§ 2-313 and 2A-210**
**(On Behalf of the Oklahoma State Class)**

</div>

2067.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

2068.   Plaintiff Philipp Novales-Li (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Oklahoma State Class against all Defendants.

2069.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Okla. Stat. Tit. 12A §§ 2-104(1) and 2-1103(3), and "sellers" of motor vehicles under § 2A-103(1)(t).

2070.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Okla. Stat. Tit. 12A § 2A-103(1)(p).

2071.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. Tit. 12A §§ 2-105(1) and 2A-103(1)(h).

2072.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

2073.   Defendants also made numerous representations, descriptions, and promises to Oklahoma State Class members regarding the performance and emission controls of their vehicles.

2074.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

2075.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2076.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2077.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

1   first, or, for the major emission control components, for eight years or 80,000 miles, whichever

2   comes first.

3       2078.   As manufacturers of light-duty vehicles, Defendants were required to provide these

4   warranties to purchasers or lessees of Class Vehicles.

5       2079.   Defendants' warranties formed a basis of the bargain that was reached when

6   consumers purchased or leased Class Vehicles.

7       2080.   Despite the existence of warranties, Defendants failed to inform Oklahoma State

8   Class members that the Class Vehicles were defective and intentionally designed and manufactured

9   to emit more pollution and achieve worse fuel economy on the road than what was disclosed to

10  regulators and represented to consumers who purchased or leased them, and Defendants failed to

11  fix the defective emission components free of charge.

12      2081.   Defendants breached the express warranty promising to repair and correct

13  Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

14  have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

15      2082.   Affording Defendants a reasonable opportunity to cure their breach of written

16  warranties would be unnecessary and futile here.

17      2083.   Furthermore, the limited warranty promising to repair and correct Defendants'

18  defect in materials and workmanship fails in its essential purpose because the contractual remedy is

19  insufficient to make Oklahoma State Class members whole and because Defendants have failed

20  and/or have refused to adequately provide the promised remedies within a reasonable time.

21      2084.   Accordingly, recovery by Oklahoma State Class members is not restricted to the

22  limited warranty promising to repair and correct Defendants' defect in materials and workmanship,

23  and they seek all remedies as allowed by law.

24      2085.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or

25  leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not

26  conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

27  material facts regarding the Class Vehicles. Oklahoma State Class members were therefore induced

28  to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2086.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Oklahoma State Class members' remedies would be insufficient to make them whole.

2087.   Finally, because of Defendants' breach of warranty as set forth herein, Oklahoma State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2088.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2089.   As a direct and proximate result of Defendants' breach of express warranties, Oklahoma State Class members have been damaged in an amount to be determined at trial.

<div align="center">

**OKLAHOMA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Okla. Stat. Tit. 12A §§ 2-314 and 2A-212**
**(On Behalf of the Oklahoma State Class)**

</div>

2090.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2091.   Plaintiff Philipp Novales-Li (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Oklahoma State Class against all Defendants.

2092.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Okla. Stat. Tit. 12A §§ 2-104(1) and 2-1103(3), and "sellers" of motor vehicles under § 2A-103(1)(t).

2093.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Okla. Stat. Tit. 12A § 2A-103(1)(p).

2094.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. Tit. 12A §§ 2-105(1) and 2A-103(1)(h).

2095.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Okla. Stat. Tit. 12A §§ 2-314 and 2A-212.

2096.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

2097.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2098.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Oklahoma State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**OREGON COUNT I:**
**Violations of the Oregon Unlawful Trade Practices Act**
**Or. Rev. Stat. § 646.605, *et seq.***
**(On Behalf of the Oregon State Class)**

</div>

2099.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2100.   Plaintiff Tyrell Pierce (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Oregon State Class against all Defendants.

2101.   Plaintiff, Defendants, and the Oregon State Class are "persons" within the meaning of Or. Rev. Stat. § 646.605(4).

2102.   Defendants are engaged in "trade" or "commerce" within the meaning of Or. Rev. Stat. § 646.605(8).

2103.   The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits "unfair or deceptive acts conduct in trade or commerce . . . ." Or. Rev. Stat. § 646.608(1).

2104.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software

1   program that caused the vehicles to perform differently during emissions testing than on the road,

2   and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass

3   emissions tests when they in fact did not.

4        2105.  Oregon State Class members had no way of discerning that Defendants'

5   representations were false and misleading because State Class members did not have access to

6   Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and

7   software was extremely sophisticated technology.

8        2106.  Defendants thus violated the Act by, at minimum: representing that Class Vehicles

9   have characteristics, uses, benefits, and qualities which they do not have; representing that Class

10   Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

11   Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a

12   transaction involving Class Vehicles has been supplied in accordance with a previous

13   representation when it has not.

14        2107.  Defendants intentionally and knowingly misrepresented material facts regarding the

15   Class Vehicles with intent to mislead the Oregon State Class.

16        2108.  Defendants knew or should have known that their conduct violated the Oregon

17   UTPA.

18        2109.  Defendants owed the Oregon State Class a duty to disclose the illegality and public

19   health risks, the true nature of the Class Vehicles, because Defendants:

20            A.    possessed exclusive knowledge that they were manufacturing, selling, and

21        distributing vehicles throughout the United States that did not perform as advertised;

22            B.    intentionally concealed the foregoing from regulators and Oregon State

23        Class members; and/or

24            C.    made incomplete representations about the Class Vehicles' fuel economy

25        and emissions while purposefully withholding material facts that contradicted these

26        representations.

27        2110.  Defendants' concealment of the Class Vehicles' true fuel consumption and

28   emissions were material to the Oregon State Class.

2111.  Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Oregon State Class, about the true environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

2112.  Defendants' violations present a continuing risk to the Oregon State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2113.  Plaintiff and Oregon State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Oregon UTPA. All owners and lessees of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

2114.  Pursuant to Or. Rev. Stat. § 646.638, the Oregon State Class seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Oregon UTPA.

**OREGON COUNT II:**
**Breach of Express Warranty**
**Or. Rev. Stat. §§ 72.3130 and 72A.2100**
**(On Behalf of the Oregon State Class)**

2115.  Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

2116.  Plaintiff Tyrell Pierce (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Oregon State Class against all Defendants.

2117.  Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and "sellers" of motor vehicles under § 72.1030(1)(d).

2118.  With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

2119.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

2120.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

2121.   Defendants also made numerous representations, descriptions, and promises to Oregon State Class members regarding the performance and emission controls of their vehicles.

2122.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

2123.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2124.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2125.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or

1   workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

2   first, or, for the major emission control components, for eight years or 80,000 miles, whichever

3   comes first.

4        2126.   As manufacturers of light-duty vehicles, Defendants were required to provide these

5   warranties to purchasers or lessees of Class Vehicles.

6        2127.   Defendants' warranties formed a basis of the bargain that was reached when

7   consumers purchased or leased Class Vehicles.

8        2128.   Despite the existence of warranties, Defendants failed to inform Oregon State Class

9   members that the Class Vehicles were defective and intentionally designed and manufactured to

10   emit more pollution and achieve worse fuel economy on the road than what was disclosed to

11   regulators and represented to consumers who purchased or leased them, and Defendants failed to

12   fix the defective emission components free of charge.

13        2129.   Defendants breached the express warranty promising to repair and correct

14   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

15   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

16        2130.   Affording Defendants a reasonable opportunity to cure their breach of written

17   warranties would be unnecessary and futile here.

18        2131.   Furthermore, the limited warranty promising to repair and correct Defendants'

19   defect in materials and workmanship fails in its essential purpose because the contractual remedy is

20   insufficient to make Oregon State Class members whole and because Defendants have failed and/or

21   have refused to adequately provide the promised remedies within a reasonable time.

22        2132.   Accordingly, recovery by Oregon State Class members is not restricted to the

23   limited warranty promising to repair and correct Defendants' defect in materials and workmanship,

24   and they seek all remedies as allowed by law.

25        2133.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or

26   leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not

27   conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

28

material facts regarding the Class Vehicles. Oregon State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2134.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Oregon State Class members' remedies would be insufficient to make them whole.

2135.   Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff and Oregon State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2136.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2137.   As a direct and proximate result of Defendants' breach of express warranties, Oregon State Class members have been damaged in an amount to be determined at trial.

**OREGON COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Or. Rev. Stat. §§ 72.3140 and 72A.2120**
**(On Behalf of the Oregon State Class)**

2138.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2139.   Plaintiff Tyrell Pierce (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Oregon State Class against all Defendants.

2140.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and "sellers" of motor vehicles under § 72.1030(1)(d).

2141.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

2142.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

2143.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Or. Rev. Stat. §§ 72.3140 and 72A-2120.

2144.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

2145.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiff as well as the regulators' investigations.

2146.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Oregon State Class members have been damaged in an amount to be proven at trial.

## PENNSYLVANIA COUNT I:
### Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law 73 P.S. § 201-1 *et seq.*
### (On Behalf of the Pennsylvania State Class)

2147.   Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

2148.   Plaintiffs Saul Luvice, Jino Masone, and Robbie McCarthy (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Pennsylvania State Class against all Defendants.

2149.   Plaintiffs, Defendants, and the Pennsylvania State Class are "persons" within the meaning of 73 P.S. § 201-2(2).

2150.   Defendants engaged in "trade" or "commerce" within the meaning of 73 P.S. § 201-2(3).

2151. The Pennsylvania Unfair Trade Practices Act ("Pennsylvania UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 P.S. § 201 3.

2152. In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

2153. Plaintiffs and Pennsylvania State Class members had no way of discerning that Defendants' representations were false and misleading because Pennsylvania State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

2154. Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

2155. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Pennsylvania State Class.

2156. Defendants knew or should have known that their conduct violated the Pennsylvania UTPA.

2157. Defendants owed the Pennsylvania State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

    A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

    B.    intentionally concealed the foregoing from regulators and Pennsylvania State Class members; and/or

- 326 -

C.      made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

2158.   Defendants' concealment of the Class Vehicles' true fuel consumption and emissions was material to the Pennsylvania State Class.

2159.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and the Pennsylvania State Class, about the true environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

2160.   Defendants' violations present a continuing risk to the Pennsylvania State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2161.   Plaintiffs and Pennsylvania State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Pennsylvania UTPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

2162.   As a direct and proximate result of Defendants' violations of the Pennsylvania UTPA, Pennsylvania State Class members have suffered injury-in-fact and/or actual damage.

2163.   Pursuant to 73 P.S. § 201-9.2(a), Plaintiffs and the Pennsylvania State Class seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Pennsylvania UTPA.

**PENNSYLVANIA COUNT II:**
**Breach of Express Warranty**
**13. Pa. Cons. Stat. §§ 2313 and 2A210**
**(On Behalf of the Pennsylvania State Class)**

2164. Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

2165. Plaintiffs Saul Luvice, Jino Masone, and Robbie McCarthy (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Pennsylvania State Class against all Defendants.

2166. Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and "sellers" of motor vehicles under § 2103(a).

2167. With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

2168. The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

2169. In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

2170. Defendants also made numerous representations, descriptions, and promises to Pennsylvania State Class members regarding the performance and emission controls of their vehicles.

2171. For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

2172. The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

- 328 -

2173. The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2174. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2175. As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

2176. Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

2177. Despite the existence of warranties, Defendants failed to inform Plaintiffs and Pennsylvania State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

- 329 -

1    2178.   Defendants breached the express warranty promising to repair and correct

2 Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

3 have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

4    2179.   Affording Defendants a reasonable opportunity to cure their breach of written

5 warranties would be unnecessary and futile here.

6    2180.   Furthermore, the limited warranty promising to repair and correct Defendants'

7 defect in materials and workmanship fails in its essential purpose because the contractual remedy is

8 insufficient to make Pennsylvania State Class members whole and because Defendants have failed

9 and/or have refused to adequately provide the promised remedies within a reasonable time.

10    2181.   Accordingly, recovery by Plaintiffs and Pennsylvania State Class members is not

11 restricted to the limited warranty promising to repair and correct Defendants' defect in materials

12 and workmanship, and they seek all remedies as allowed by law.

13    2182.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or

14 leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not

15 conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

16 material facts regarding the Class Vehicles. Pennsylvania State Class members were therefore

17 induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

18    2183.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved

19 through the limited remedy of repairing and correcting Defendants' defect in materials and

20 workmanship as many incidental and consequential damages have already been suffered because of

21 Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued

22 failure to provide such limited remedy within a reasonable time, and any limitation on the

23 Pennsylvania State Class members' remedies would be insufficient to make them whole.

24    2184.   Finally, because of Defendants' breach of warranty as set forth herein, Pennsylvania

25 State Class members assert, as additional and/or alternative remedies, the revocation of acceptance

26 of the goods and the return to them of the purchase or lease price of all Class Vehicles currently

27 owned or leased, and for such other incidental and consequential damages as allowed.

28

2185.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2186.   As a direct and proximate result of Defendants' breach of express warranties, Pennsylvania State Class members have been damaged in an amount to be determined at trial.

<div align="center">

**PENNSYLVANIA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**13. Pa. Cons. Stat. §§ 2314 and 2A212**
**(On Behalf of the Pennsylvania State Class)**

</div>

2187.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2188.   Plaintiffs Saul Luvice, Jino Masone, and Robbie McCarthy (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Pennsylvania State Class against all Defendants.

2189.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and "sellers" of motor vehicles under § 2103(a).

2190.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

2191.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

2192.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 13 Pa. Cons. Stat. §§ 2314 and 2A212.

2193.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

2194.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2195.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Pennsylvania State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**RHODE ISLAND COUNT I:**
**Violations of the Rhode Island Deceptive Trade Practices and Consumer Protection Law**
**R.I. Gen. Laws § 6-13.1 *et seq.***
**(On Behalf of the Rhode Island State Class)**

</div>

2196.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2197.   This count is brought on behalf of the Rhode Island State Class against all Defendants.

2198.   Defendants, the Rhode Island State Class are "persons" within the meaning of R.I. Gen. Laws § 6-13.1-1(3).

2199.   Defendants are engaged in "trade" or "commerce" within the meaning of R.I. Gen. Laws § 6-13.1-1(5).

2200.   The Rhode Island Deceptive Trade Practices Act ("Rhode Island DTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including: (v) [r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "(vii) [r]epresenting that goods or services are of a particular standard, quality, or grade . . ., if they are of another"; (ix) [a]dvertising goods or services with intent not to sell them as advertised"; "(xiii) [u]sing any other methods, acts or practices which mislead or deceive members of the public in a material respect." R.I. Gen. Laws § 6-13.1-1(6).

2201.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

<div align="center">- 332 -</div>

2202.   Rhode Island State Class members had no way of discerning that Defendants' representations were false and misleading because Rhode Island State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

2203.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

2204.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Rhode Island State Class.

2205.   Defendants knew or should have known that their conduct violated the Rhode Island DTPA.

2206.   Defendants owed the Rhode Island State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

A.      possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B.      intentionally concealed the foregoing from regulators and Rhode Island State Class members; and/or

C.      made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

2207.   Defendants' concealment of the Class Vehicles' true fuel consumption and emissions was material to the Rhode Island State Class.

2208.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Rhode Island State Class, about the

true environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

2209.   Defendants' violations present a continuing risk to the Rhode Island State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2210.   Rhode Island State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Rhode Island DTPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

2211.   The Rhode Island State Class is entitled to recover the greater of actual damages or $200 pursuant to R.I. Gen. Laws § 6-13.1-5.2(a). The Rhode Island State Class is also entitled to punitive damages because Defendants engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

## RHODE ISLAND COUNT II:
### Breach of Express Warranty
### 6A R.I. Gen. Laws §§ 6A-2-313 and 6A-2.1-210
### (On Behalf of the Rhode Island State Class)

2212.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

2213.   This count is brought on behalf of the Rhode Island State Class against all Defendants.

2214.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under 6A R.I. Gen. Laws §§ 6A-2-104(1) and 6A-2.1-103(1)(t), and "sellers" of motor vehicles under § 6A-2-103(a)(4).

2215.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under 6A R.I. Gen. Laws § 6A-2.1-103(1)(p).

2216.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 6A R.I. Gen. Laws §§ 6A-2-105(1) and 6A-2.1-103(1)(h).

2217.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

2218.   Defendants also made numerous representations, descriptions, and promises to Rhode Island State Class members regarding the performance and emission controls of their vehicles.

2219.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

2220.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2221.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2222.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission

related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2223.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

2224.   Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

2225.   Despite the existence of warranties, Defendants failed to inform Rhode Island State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

2226.   Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2227.   Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

2228.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Rhode Island State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2229.   Accordingly, recovery by Rhode Island State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

2230.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

material facts regarding the Class Vehicles. Rhode Island State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2231.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Rhode Island State Class members' remedies would be insufficient to make them whole.

2232.   Finally, because of Defendants' breach of warranty as set forth herein, Rhode Island State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2233.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2234.   As a direct and proximate result of Defendants' breach of express warranties, Rhode Island State Class members have been damaged in an amount to be determined at trial.

### RHODE ISLAND COUNT III:
#### Breach of Implied Warranty of Merchantability
#### 6A R.I. Gen. Laws §§ 6A-2-314 and 6A-2.1-212
#### (On Behalf of the Rhode Island State Class)

2235.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2236.   This count is brought on behalf of the Rhode Island State Class against all Defendants.

2237.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under 6A R.I. Gen. Laws §§ 6A-2-104(1) and 6A-2.1-103(1)(t), and "sellers" of motor vehicles under § 6A-2-103(a)(4).

2238.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under 6A R.I. Gen. Laws § 6A-2.1-103(1)(p).

- 337 -

2239.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 6A R.I. Gen. Laws §§ 6A-2-105(1) and 6A-2.1-103(1)(h).

2240.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 6A R.I. Gen. Laws §§ 6A-2-314 and 6A-2.1-212.

2241.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

2242.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2243.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Rhode Island State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**SOUTH CAROLINA COUNT I:**
**Violations of the South Carolina Unfair Trade Practices Act**
**S.C. Code Ann. § 39-5-10 *et seq.***
**(On Behalf of the South Carolina State Class)**

</div>

2244.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2245.   This count is brought on behalf of the South Carolina State Class against all Defendants.

2246.   Defendants and the South Carolina State Class are "persons" within the meaning of S.C. Code § 39-5-10(a).

2247.   Defendants are engaged in "trade" or "commerce" within the meaning of S.C. Code § 39-5-10(b).

2248.   The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code § 39-5-20(a).

2249.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

2250.   South Carolina State Class members had no way of discerning that Defendants' representations were false and misleading because South Carolina State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

2251.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

2252.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the South Carolina State Class.

2253.   Defendants knew or should have known that their conduct violated the South Carolina UTPA.

2254.   Defendants owed the South Carolina State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

> A.      possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

1              B.        intentionally concealed the foregoing from regulators and South Carolina

2       State Class members; and/or

3              C.        made incomplete representations about the Class Vehicles' fuel economy

4       and emissions while purposefully withholding material facts that contradicted these

5       representations.

6       2255.   Defendants' concealment of the Class Vehicles' true fuel consumption and

7   emissions was material to the South Carolina State Class.

8       2256.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

9   deceive regulators and reasonable consumers, including the South Carolina State Class, about the

10   true environmental cleanliness and efficiency of the Class Vehicles, the quality of the Defendants'

11   brands, and the true value of the Class Vehicles.

12       2257.   Defendants' violations present a continuing risk to the South Carolina Class as well

13   as to the general public. Defendants' unlawful acts and practices complained of herein affect the

14   public interest.

15       2258.   South Carolina State Class members suffered ascertainable loss and actual damages

16   as a direct and proximate result of Defendants' misrepresentations and concealment of and failure

17   to disclose material information. Defendants had an ongoing duty to all their customers to refrain

18   from unfair and deceptive practices under the South Carolina UTPA. All owners of Class Vehicles

19   suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made

20   in the course of Defendants' business.

21       2259.   Pursuant to S.C. Code § 39-5-140(a), the South Carolina State Class seeks an order

22   enjoining Defendants' unfair and/or deceptive acts or practices, damages, treble damages for

23   willful and knowing violations, punitive damages, and attorneys' fees, costs, and any other just and

24   proper relief available under the South Carolina UTPA.

25

26

27

28

**SOUTH CAROLINA COUNT II:**
**Violations of the South Carolina Regulation of Manufacturers, Distributors, & Dealers Act**
**S.C. Code Ann. § 56-15-10 *et seq.***
**(On Behalf of the South Carolina State Class)**

2260.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2261.   This count is brought on behalf of the South Carolina State Class against all Defendants.

2262.   Defendants are "manufacturer[s]" as set forth in S.C. Code Ann. § 56-15-10, as it is engaged in the business of manufacturing or assembling new and unused motor vehicles.

2263.   Defendants committed unfair or deceptive acts or practices that violated the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Dealers Act"), S.C. Code Ann. § 56-15-30.

2264.   Defendants engaged in actions which were arbitrary, in bad faith, unconscionable, and which caused damage to the South Carolina State Class and to the public.

2265.   Defendants' bad faith and unconscionable actions include, but are not limited to: (1) representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Class Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Class Vehicles with the intent not to sell them as advertised, (4) representing that a transaction involving Class Vehicles confers or involves rights, remedies, and obligations which it does not, and (5) representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

2266.   Defendants resorted to and used false and misleading advertisements in connection with their business. As alleged above, Defendants made numerous material statements about the efficiency and reliability of the Class Vehicles that were either false or misleading. Each of these statements contributed to the deceptive context of Defendants' unlawful advertising and representations as a whole.

2267.   Pursuant to S.C. Code Ann. § 56-15-110(2), Plaintiffs bring this action on behalf of themselves and the South Carolina State Class, as the action is one of common or general interest to many persons and the parties are too numerous to bring them all before the court.

2268.   The South Carolina State Class is entitled to double their actual damages, the cost of the suit, attorney's fees pursuant to S.C. Code Ann. § 56-15-110. Plaintiffs also seek injunctive relief under S.C. Code Ann. § 56-15-110.

<div align="center">

**SOUTH CAROLINA COUNT III:**
**Breach of Express Warranty**
**S.C. Code §§ 36-2-313 and 36-2A-210**
**(On Behalf of the South Carolina State Class)**

</div>

2269.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

2270.   This count is brought on behalf of the South Carolina State Class against all Defendants.

2271.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under S.C. Code §§ 36-2-104(1) and 36-2A-103(1)(t), and "sellers" of motor vehicles under § 36-2-103(1)(d).

2272.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under S.C. Code § 36-2A-103(1)(p).

2273.   The Class Vehicles are and were at all relevant times "goods" within the meaning of S.C. Code §§ 36-2-105(1) and 36-2A-103(1)(h).

2274.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

2275.   Defendants also made numerous representations, descriptions, and promises to South Carolina State Class members regarding the performance and emission controls of their vehicles.

2276.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the

1    time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free

2    from defects in material and workmanship which would cause it not to meet those standards."

3        2277.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two

4    federal emission control warranties: a "Performance Warranty" and a "Design and Defect

5    Warranty."

6        2278.   The EPA requires vehicle manufacturers to provide a Performance Warranty with

7    respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

8    their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

9    required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

10   whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

11   emission control components are covered for the first eight years or 80,000 miles (whichever

12   comes first). These major emission control components subject to the longer warranty include the

13   catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

14   device or computer.

15       2279.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

16   with respect to their vehicles' emission systems. Thus, Defendants also provide an express

17   warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

18   Design and Defect Warranty required by the EPA covers repair of emission control or emission

19   related parts, which fail to function or function improperly because of a defect in materials or

20   workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

21   first, or, for the major emission control components, for eight years or 80,000 miles, whichever

22   comes first.

23       2280.   As manufacturers of light-duty vehicles, Defendants were required to provide these

24   warranties to purchasers or lessees of Class Vehicles.

25       2281.   Defendants' warranties formed a basis of the bargain that was reached when

26   consumers purchased or leased Class Vehicles.

27       2282.   Despite the existence of warranties, Defendants failed to inform South Carolina

28   State Class members that the Class Vehicles were defective and intentionally designed and

1  manufactured to emit more pollution and achieve worse fuel economy on the road than what was

2  disclosed to regulators and represented to consumers who purchased or leased them, and

3  Defendants failed to fix the defective emission components free of charge.

4      2283.   Defendants breached the express warranty promising to repair and correct

5  Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

6  have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

7      2284.   Affording Defendants a reasonable opportunity to cure their breach of written

8  warranties would be unnecessary and futile here.

9      2285.   Furthermore, the limited warranty promising to repair and correct Defendants'

10  defect in materials and workmanship fails in its essential purpose because the contractual remedy is

11  insufficient to make South Carolina State Class members whole and because Defendants have

12  failed and/or have refused to adequately provide the promised remedies within a reasonable time.

13      2286.   Accordingly, recovery by South Carolina State Class members is not restricted to

14  the limited warranty promising to repair and correct Defendants' defect in materials and

15  workmanship, and they seek all remedies as allowed by law.

16      2287.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or

17  leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not

18  conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

19  material facts regarding the Class Vehicles. South Carolina State Class members were therefore

20  induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

21      2288.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved

22  through the limited remedy of repairing and correcting Defendants' defect in materials and

23  workmanship as many incidental and consequential damages have already been suffered because of

24  Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued

25  failure to provide such limited remedy within a reasonable time, and any limitation on South

26  Carolina State Class members' remedies would be insufficient to make them whole.

27      2289.   Finally, because of Defendants' breach of warranty as set forth herein, South

28  Carolina State Class members assert, as additional and/or alternative remedies, the revocation of

acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2290.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2291.   As a direct and proximate result of Defendants' breach of express warranties, South Carolina State Class members have been damaged in an amount to be determined at trial.

**SOUTH CAROLINA COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**S.C. Code §§ 36-2-314 and 36-2A-212**
**(On Behalf of the South Carolina State Class)**

2292.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2293.   This count is brought on behalf of the South Carolina State Class against all Defendants.

2294.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under S.C. Code §§ 36-2-104(1) and 36-2A-103(1)(t), and "sellers" of motor vehicles under § 36-2-103(1)(d).

2295.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under S.C. Code § 36-2A-103(1)(p).

2296.   The Class Vehicles are and were at all relevant times "goods" within the meaning of S.C. Code §§ 36-2-105(1) and 36-2A-103(1)(h).

2297.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to S.C. Code §§ 36-2-314 and 36-2A-212.

2298.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

2299.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2300.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, South Carolina State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**SOUTH DAKOTA COUNT I:**
**Violations of the South Dakota Deceptive Trade Practices and Consumer Protection Law**
**S.D. Codified Laws § 37-24-6**
**(On Behalf of the South Dakota State Class)**

</div>

2301.   Plaintiffs re-allege incorporate by reference all paragraphs as though fully set forth herein.

2302.   This count is brought on behalf of the South Dakota State Class against all Defendants.

2303.   Defendants and the South Dakota State Class are "persons" within the meaning of S.D. Codified Laws § 37-24-1(8).

2304.   Defendants are engaged in "trade" or "commerce" within the meaning of S.D. Codified Laws § 37-24-1(13).

2305.   The South Dakota Deceptive Trade Practices and Consumer Protection ("South Dakota CPA") prohibits "deceptive acts or practices, which are defined to include "[k]nowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby." S.D. Codified Laws § 37-24-6(1).

2306.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

2307. South Dakota State Class members had no way of discerning that Defendants' representations were false and misleading because South Dakota State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

2308. Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

2309. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the South Dakota State Class.

2310. Defendants knew or should have known that their conduct violated the South Dakota CPA.

2311. Defendants owed the South Dakota State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

    A. possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

    B. intentionally concealed the foregoing from regulators and South Dakota State Class members; and/or

    C. made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

2312. Defendants' concealment of the Class Vehicles' true fuel consumption and emissions were material to the South Dakota State Class.

2313. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the South Dakota State Class, about the

true environmental cleanliness and fuel efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

2314.   Defendants' violations present a continuing risk to the South Dakota Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2315.   South Dakota State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the South Dakota CPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

2316.   Pursuant to S.D. Codified Laws § 37-24-31, the South Dakota State Class seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief to the extent available under the South Dakota CPA.

**SOUTH DAKOTA COUNT II:**
**Breach of Express Warranty**
**S.D. Codified Laws §§ 57A-2-313 and 57-2A-210**
**(On Behalf of the South Dakota State Class)**

2317.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

2318.   This count is brought on behalf of the South Dakota State Class against all Defendants.

2319.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under S.D. Codified Laws §§ 57A-104(1) and 57A-2A-103(1)(t), and "sellers" of motor vehicles under § 57A-104(1)(d).

2320.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under S.D. Codified Laws § 57A-2A-103(1)(p).

2321.   The Class Vehicles are and were at all relevant times "goods" within the meaning of S.D. Codified Laws §§ 57A-2-105(1) and 57A-2A-103(1)(h).

2322.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

2323.   Defendants also made numerous representations, descriptions, and promises to South Dakota State Class members regarding the performance and emission controls of their vehicles.

2324.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

2325.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2326.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2327.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission

related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2328.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

2329.   Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

2330.   Despite the existence of warranties, Defendants failed to inform South Dakota State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

2331.   Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2332.   Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

2333.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make South Dakota State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2334.   Accordingly, recovery by the South Dakota State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

2335.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

1    material facts regarding the Class Vehicles. South Dakota State Class members were therefore

2    induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

3        2336.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved

4    through the limited remedy of repairing and correcting Defendants' defect in materials and

5    workmanship as many incidental and consequential damages have already been suffered because of

6    Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued

7    failure to provide such limited remedy within a reasonable time, and any limitation on South

8    Dakota State Class members' remedies would be insufficient to make them whole.

9        2337.   Finally, because of Defendants' breach of warranty as set forth herein, South Dakota

10   State Class members assert, as additional and/or alternative remedies, the revocation of acceptance

11   of the goods and the return to them of the purchase or lease price of all Class Vehicles currently

12   owned or leased, and for such other incidental and consequential damages as allowed.

13       2338.   Defendants were provided reasonable notice of these issues by way of a letter sent

14   by Plaintiffs as well as the regulators' investigations.

15       2339.   As a direct and proximate result of Defendants' breach of express warranties, South

16   Dakota State Class members have been damaged in an amount to be determined at trial.

<div align="center">

**SOUTH DAKOTA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**S.D. Codified Laws §§ 57A-2-314 and 57-2A-212**
**(On Behalf of the South Dakota State Class)**

</div>

20       2340.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set

forth herein.

22       2341.   This count is brought on behalf of the South Dakota State Class against all

Defendants.

24       2342.   Defendants are and were at all relevant times "merchant[s]" with respect to motor

25   vehicles under S.D. Codified Laws §§ 57A-104(1) and 57A-2A-103(1)(t), and "sellers" of motor

vehicles under § 57A-104(1)(d).

27       2343.   With respect to leases, Defendants are and were at all relevant times "lessors" of

motor vehicles under S.D. Codified Laws § 57A-2A-103(1)(p).

2344. The Class Vehicles are and were at all relevant times "goods" within the meaning of S.D. Codified Laws §§ 57A-2-105(1) and 57A-2A-103(1)(h).

2345. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to S.D. Codified Laws §§ 57A-2-314 and 57A-2A-212.

2346. These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

2347. Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2348. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, South Dakota State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**TENNESSEE COUNT I:**
**Violations of the Tennessee Consumer Protection Act**
**Tenn. Code Ann. § 47-18-101 *et seq.***
**(On Behalf of the Tennessee State Class)**

</div>

2349. Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2350. This count is brought on behalf of the Tennessee State Class against all Defendants.

2351. Tennessee State Class members are "natural persons" and "consumers" within the meaning of Tenn. Code § 47-18-103(2). Defendants are "person[s]" within the meaning of Tenn. Code § 47-18-103(9).

2352. Defendants are engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tenn. Code § 47-18-103(9).

1       2353.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "unfair or

2  deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code

3  § 47-18-104.

4       2354.   In the course of their business, Defendants concealed and suppressed material facts

5  concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for

6  emissions testing that were different from production vehicles, (b) installing a secret software

7  program that caused the vehicles to perform differently during emissions testing than on the road,

8  and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass

9  emissions tests when they in fact did not.

10      2355.   Tennessee State Class members had no way of discerning that Defendants'

11  representations were false and misleading because Tennessee State Class members did not have

12  access to Defendants' emissions certification test vehicles and Defendants' emissions-related

13  hardware and software was extremely sophisticated technology.

14      2356.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

15  have characteristics, uses, benefits, and qualities which they do not have; representing that Class

16  Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

17  Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a

18  transaction involving Class Vehicles has been supplied in accordance with a previous

19  representation when it has not.

20      2357.   Defendants intentionally and knowingly misrepresented material facts regarding the

21  Class Vehicles with intent to mislead the Tennessee State Class.

22      2358.   Defendants knew or should have known that their conduct violated the Tennessee

23  CPA.

24      2359.   Defendants owed the Tennessee State Class a duty to disclose the illegality and

25  public health risks, the true nature of the Class Vehicles, because Defendants:

26          A.     possessed exclusive knowledge that they were manufacturing, selling, and

27          distributing vehicles throughout the United States that did not perform as advertised;

28

1      B.      intentionally concealed the foregoing from regulators and Tennessee State

2      Class members; and/or

3      C.      made incomplete representations about the Class Vehicles' fuel economy

4      and emissions while purposefully withholding material facts that contradicted these

5      representations.

6      2360.   Defendants' concealment of the true characteristics of the Class Vehicles' fuel

7   consumption and emissions was material to the Tennessee State Class.

8      2361.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

9   deceive regulators and reasonable consumers, including the Tennessee State Class, about the true

10   environmental cleanliness and efficiency of the Class Vehicles, the quality of the Defendants'

11   brands, and the true value of the Class Vehicles.

12      2362.   Defendants' violations present a continuing risk to the Tennessee State Class as well

13   as to the general public. Defendants' unlawful acts and practices complained of herein affect the

14   public interest.

15      2363.   Tennessee State Class members suffered ascertainable loss and actual damages as a

16   direct and proximate result of Defendants' misrepresentations and concealment of and failure to

17   disclose material information. Defendants had an ongoing duty to all their customers to refrain

18   from unfair and deceptive practices under the Tennessee CPA. All owners of Class Vehicles

19   suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made

20   in the course of Defendants' business.

21      2364.   Pursuant to Tenn. Code § 47-18-109, the Tennessee State Class seeks an order

22   enjoining Defendants' unfair and/or deceptive acts or practices, damages, treble damages for

23   willful and knowing violations, pursuant to § 47-18-109(a)(3), punitive damages, and attorneys'

24   fees, costs, and any other just and proper relief to the extent available under the Tennessee CPA.

25

26

27

28

- 354 -                    CONSOLIDATED CLASS ACTION COMPLAINT
                                                                              CASE NO.: 3:20-CV-7473

**TENNESSEE COUNT II:**
**Breach of Express Warranty**
**Tenn. Code Ann. §§ 47-2-313 and 47-2A-210**
**(On Behalf of the Tennessee State Class)**

2365.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

2366.   This count is brought on behalf of the Tennessee State Class against all Defendants.

2367.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of motor vehicles under § 47-2-103(1)(d).

2368.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

2369.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

2370.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

2371.   Defendants also made numerous representations, descriptions, and promises to Tennessee State Class members regarding the performance and emission controls of their vehicles.

2372.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

2373.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2374.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

- 355 -

1    required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

2    whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

3    emission control components are covered for the first eight years or 80,000 miles (whichever

4    comes first). These major emission control components subject to the longer warranty include the

5    catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

6    device or computer.

7        2375.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

8    with respect to their vehicles' emission systems. Thus, Defendants also provide an express

9    warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

10   Design and Defect Warranty required by the EPA covers repair of emission control or emission

11   related parts, which fail to function or function improperly because of a defect in materials or

12   workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

13   first, or, for the major emission control components, for eight years or 80,000 miles, whichever

14   comes first.

15       2376.   As manufacturers of light-duty vehicles, Defendants were required to provide these

16   warranties to purchasers or lessees of Class Vehicles.

17       2377.   Defendants' warranties formed a basis of the bargain that was reached when

18   consumers purchased or leased Class Vehicles.

19       2378.   Despite the existence of warranties, Defendants failed to inform Tennessee State

20   Class members that the Class Vehicles were defective and intentionally designed and manufactured

21   to emit more pollution and achieve worse fuel economy on the road than what was disclosed to

22   regulators and represented to consumers who purchased or leased them, and Defendants failed to

23   fix the defective emission components free of charge.

24       2379.   Defendants breached the express warranty promising to repair and correct

25   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

26   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

27       2380.   Affording Defendants a reasonable opportunity to cure their breach of written

28   warranties would be unnecessary and futile here.

2381.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Tennessee State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2382.   Accordingly, recovery by Tennessee State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

2383.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Tennessee State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2384.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Tennessee State Class members' remedies would be insufficient to make them whole.

2385.   Finally, because of Defendants' breach of warranty as set forth herein, Tennessee State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2386.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2387.   As a direct and proximate result of Defendants' breach of express warranties, Tennessee State Class members have been damaged in an amount to be determined at trial.

**TENNESSEE COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Tenn. Code Ann. §§ 47-2-314 and 47-2A-212**
**(On Behalf of the Tennessee State Class)**

2388.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2389.   This count is brought on behalf of the Tennessee State Class against all Defendants.

2390.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of motor vehicles under § 47-2-103(1)(d).

2391.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

2392.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

2393.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Tenn. Code §§ 47-2-314 and 47-2A-212.

2394.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

2395.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2396.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Tennessee State Class members have been damaged in an amount to be proven at trial.

**TEXAS COUNT I:**
**Violations of the Deceptive Trade Practices Act**
**Tex. Bus. & Com. Code § 17.41 *et seq.***
**(On Behalf of the Texas State Class)**

2397.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2398.   Plaintiffs Rafael Daniels, Mauricio Pinto, and Oscar Sotelo II (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Texas State Class against all Defendants.

2399.   Plaintiffs and the Texas State Class are individuals, partnerships or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), *see* Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4).Defendants are "person[s]" within the meaning of Tex. Bus. & Com. Code § 17.45(3).

2400.   Defendants engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

2401.   The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

2402.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

- 359 -

2403.   Plaintiffs and Texas State Class members had no way of discerning that Defendants' representations were false and misleading because Texas State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

2404.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

2405.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Texas State Class.

2406.   Defendants knew or should have known that their conduct violated the Texas DTPA.

2407.   Defendants owed Plaintiffs and the Texas State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

      A.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

      B.     intentionally concealed the foregoing from regulators and Texas State Class members; and/or

      C.     made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

2408.   Defendants' concealment of the true characteristics of the Class Vehicles' fuel consumption and $CO_2$ emissions were material to the Texas State Class.

2409.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Texas State Class, about the true

1    environmental cleanliness and efficiency of the Class Vehicles, the quality of the Defendants'

2    brands, and the true value of the Class Vehicles.

3        2410.   Defendants' violations present a continuing risk to the Texas State Class as well as

4    to the general public. Defendants' unlawful acts and practices complained of herein affect the

5    public interest.

6        2411.   Texas State Class members suffered ascertainable loss and actual damages as a

7    direct and proximate result of Defendants' misrepresentations and concealment of and failure to

8    disclose material information. Defendants had an ongoing duty to all their customers to refrain

9    from unfair and deceptive practices under the Texas DTPA. All owners of Class Vehicles suffered

10   ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the

11   course of Defendants' business.

12       2412.   Pursuant to Tex. Bus. & Com. Code § 17.50, the Texas State Class seeks an order

13   enjoining Defendants' unfair and/or deceptive acts or practices, damages, multiple damages for

14   knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys'

15   fees, costs, and any other just and proper relief available under the Texas DTPA.

16       2413.   Pursuant to Tex. Bus. & Com. Code Ann. § 17.505, Plaintiffs sent notice letters to

17   Defendants. Additionally, all Defendants were provided notice of the issues raised in this count and

18   this Complaint by way of the investigations conducted by governmental regulators. The Texas

19   State Class seeks all damages and relief to which it is entitled.

20                              **TEXAS COUNT II:**
                     **Breach of Express Warranty**
21              **Tex. Bus. & Com. Code §§ 2.313 and 2A.210**
                  **(On Behalf of the Texas State Class)**
22

23       2414.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though

24   fully set forth herein.

25       2415.   Plaintiffs Rafael Daniels, Mauricio Pinto, and Oscar Sotelo II (for the purposes of

26   this count, "Plaintiffs") bring this claim on behalf of themselves and the Texas State Class against

27   all Defendants.

28

2416.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Tex. Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and "sellers" of motor vehicles under § 2.103(a)(4)

2417.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

2418.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

2419.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

2420.   Defendants also made numerous representations, descriptions, and promises to Texas State Class members regarding the performance and emission controls of their vehicles.

2421.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

2422.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2423.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2424.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2425.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

2426.   Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

2427.   Despite the existence of warranties, Defendants failed to inform Texas State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

2428.   Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2429.   Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

2430.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Texas State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2431.   Accordingly, recovery by Texas State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

2432.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Texas State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2433.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Texas State Class members' remedies would be insufficient to make them whole.

2434.   Finally, because of Defendants' breach of warranty as set forth herein, Texas State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2435.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2436.   As a direct and proximate result of Defendants' breach of express warranties, Texas State Class members have been damaged in an amount to be determined at trial.

**TEXAS COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Tex. Bus. & Com. Code §§ 2.314 and 2A.212**
**(On Behalf of the Texas State Class)**

2437.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2438.   Plaintiffs Rafael Daniels, Mauricio Pinto, and Oscar Sotelo II (for the purposes of this count, "Plaintiffs") bring this claim on behalf of themselves and the Texas State Class against all Defendants.

2439.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Tex. Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and "sellers" of motor vehicles under § 2.103(a)(4)

2440.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

2441.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

2442.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Tex. Bus. & Com. Code §§ 2.314 and 2A.212.

2443.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

2444.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2445.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Texas State Class members have been damaged in an amount to be proven at trial.

**UTAH COUNT I:**
**Violations of the Utah Consumer Sales Practices Act**
**Utah Code Ann. § 13-11-1 *et seq.***
**(On Behalf of the Utah State Class)**

2446.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

1     2447.   Plaintiff Andrew Kavan (for the purposes of this count, "Plaintiff") brings this claim

2     on behalf of himself and the Utah State Class against all Defendants.

3     2448.   Plaintiff and Utah State Class members are "persons" under the Utah Consumer

4     Sales Practices Act ("Utah CSPA"), Utah Code § 13-11-3(5). The sales and leases of the Class

5     Vehicles to Plaintiff and Utah State Class members were "consumer transactions" within the

6     meaning of Utah Code § 13-11-3(2).

7     2449.   Defendants are "supplier[s]" within the meaning of Utah Code § 13-11-3(6).

8     2450.   The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in

9     connection with a consumer transaction." Specifically, "a supplier commits a deceptive act or

10    practice if the supplier knowingly or intentionally: (a) indicates that the subject of a consumer

11    transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if

12    it has not" or "(b) indicates that the subject of a consumer transaction is of a particular standard,

13    quality, grade, style, or model, if it is not." Utah Code § 13-11-4. "An unconscionable act or

14    practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.

15    Utah Code § 13-11-5.

16    2451.   In the course of their business, Defendants concealed and suppressed material facts

17    concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for

18    emissions testing that were different from production vehicles, (b) installing a secret software

19    program that caused the vehicles to perform differently during emissions testing than on the road,

20    and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass

21    emissions tests when they in fact did not.

22    2452.   Plaintiff and Utah State Class members had no way of discerning that Defendants'

23    representations were false and misleading because Plaintiff and Utah State Class members did not

24    have access to Defendants' emissions certification test vehicles and Defendants' emissions-related

25    hardware and software was extremely sophisticated technology.

26    2453.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

27    have characteristics, uses, benefits, and qualities which they do not have; representing that Class

28    Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

1   Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a

2   transaction involving Class Vehicles has been supplied in accordance with a previous

3   representation when it has not.

4       2454.   Defendants intentionally and knowingly misrepresented material facts regarding the

5   Class Vehicles with intent to mislead Plaintiff and the Utah State Class.

6       2455.   Defendants knew or should have known that their conduct violated the Utah CSPA.

7       2456.   Defendants owed Plaintiff and the Utah State Class a duty to disclose the illegality

8   and public health risks, the true nature of the Class Vehicles, because Defendants:

9           A.   possessed exclusive knowledge that they were manufacturing, selling, and

10   distributing vehicles throughout the United States that did not perform as advertised;

11           B.   intentionally concealed the foregoing from regulators, Plaintiff and Utah

12   State Class members; and/or

13           C.   made incomplete representations about the Class Vehicles' fuel economy

14   and emissions, while purposefully withholding material facts from Plaintiff and Utah State

15   Class members that contradicted these representations.

16       2457.   Defendants' concealment of the true characteristics of the Class Vehicles' true fuel

17   consumption and emissions was material to Plaintiff and the Utah State Class.

18       2458.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

19   deceive regulators and reasonable consumers, including Plaintiff and the Utah State Class, about

20   the true environmental cleanliness and efficiency of the Class Vehicles, the quality of the

21   Defendants' brands, and the true value of the Class Vehicles.

22       2459.   Defendants' violations present a continuing risk to Plaintiff, Utah State Class

23   members, as well as to the general public. Defendants' unlawful acts and practices complained of

24   herein affect the public interest.

25       2460.   Plaintiff and Utah State Class members suffered ascertainable loss and actual

26   damages as a direct and proximate result of Defendants' misrepresentations and concealment of

27   and failure to disclose material information. Defendants had an ongoing duty to all their customers

28   to refrain from unfair and deceptive practices under the Utah CSPA. All owners of Class Vehicles

suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

2461.   Pursuant to Utah Code Ann. § 13-11-4, Plaintiff and the Utah State Class seeks monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each Utah State Class member, reasonable attorneys' fees, and any other just and proper relief available under the Utah CSPA.

<div align="center">

**UTAH COUNT II:**
**Breach of Express Warranty**
**Utah Code §§ 70A-2-313 and 70-2A-210**
**(On Behalf of the Utah State Class)**

</div>

2462.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

2463.   Plaintiff Andrew Kavan (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Utah State Class against all Defendants.

2464.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Utah Code § 70A-2-104(1) and 70A-2a-103(1)(t), and "sellers" of motor vehicles under § 70A-2-103(1)(d).

2465.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Utah Code § 70A-2a-103(1)(p).

2466.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Utah Code §§ 70A-2-105(1) and 70A-2a-103(1)(h).

2467.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

2468.   Defendants also made numerous representations, descriptions, and promises to Plaintiff and Utah State Class members regarding the performance and emission controls of their vehicles.

2469.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

2470.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2471.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2472.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2473.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

2474.   Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

2475.   Despite the existence of warranties, Defendants failed to inform Plaintiff and Utah State Class members that the Class Vehicles were intentionally designed and manufactured to emit more to emit more emissions and achieve worse fuel and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and failed to fix the defective emission components free of charge.

2476.   Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2477.   Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

2478.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Utah State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2479.   Accordingly, recovery by Plaintiff and Utah State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

2480.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiff and Utah State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2481.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and Utah State Class members' remedies would be insufficient to make them whole.

2482.   Finally, because of Defendants' breach of warranty as set forth herein, Plaintiff and Utah State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2483.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2484.   As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and Utah State Class members have been damaged in an amount to be determined at trial.

<div align="center">

**UTAH COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Utah Code §§ 70A-2-314 and 70-2A-212**
**(On Behalf of the Utah State Class)**

</div>

2485.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2486.   Plaintiff Andrew Kavan (for the purposes of this count, "Plaintiff") brings this claim on behalf of himself and the Utah State Class against all Defendants.

2487.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Utah Code §§ 70A-2-104(1) and 70A-2a-103(1)(t), and "sellers" of motor vehicles under § 70A-2-103(1)(d).

2488.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Utah Code § 70A-2a-103(1)(p).

2489.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Utah Code §§ 70A-2-105(1) and 70A-2a-103(1)(h).

2490.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Utah Code §§ 70A-2-314 and 70A-2a-212.

2491.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with

emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

2492.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2493.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Utah State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**VERMONT COUNT I:**
**Violations of the Vermont Consumer Fraud Act**
**Vt. Stat. Ann. Tit. 9, § 2451 _et seq._**
**(On Behalf of the Vermont State Class)**

</div>

2494.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2495.   This count is brought on behalf of the Vermont State Class against all Defendants.

2496.   The Vermont State Class are "consumers" within the meaning of Vt. Stat. Tit. 9, § 451a(a).

2497.   Defendants are "person[s]" within the meaning of Vt. Code R. § 100(3) (citing Vt. Stat. Tit. 9, § 2453).

2498.   Defendants are engaged in "commerce" within the meaning of Vt. Stat. Tit. 9, § 2453(a).

2499.   The Vermont Consumer Protection Act ("Vermont CPA") prohibits "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce . . . ." Vt. Stat. Tit. 9, § 2453(a).

2500.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

2501.   Vermont State Class members had no way of discerning that Defendants' representations were false and misleading because Vermont State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

2502.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

2503.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Vermont State Class.

2504.   Defendants knew or should have known that their conduct violated the Vermont UTPA.

2505.   Defendants owed the Vermont State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

> A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;
>
> B.    intentionally concealed the foregoing from regulators and Vermont State Class members; and/or
>
> C.    made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

2506.   Defendants' concealment of the true characteristics of the Class Vehicles' fuel consumption and emissions was material to the Vermont State Class.

2507.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Vermont State Class, about the true

1   environmental cleanliness and efficiency of the Class Vehicles, the quality of the Defendants'

2   brands, and the true value of the Class Vehicles.

3       2508.  Defendants' violations present a continuing risk to the Vermont State Class as well

4   as to the general public. Defendants' unlawful acts and practices complained of herein affect the

5   public interest.

6       2509.  Vermont State Class members suffered ascertainable loss and actual damages as a

7   direct and proximate result of Defendants' misrepresentations and concealment of and failure to

8   disclose material information. Defendants had an ongoing duty to all their customers to refrain

9   from unfair and deceptive practices under the Vermont UTPA. All owners of Class Vehicles

10  suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made

11  in the course of Defendants' business.

12      2510.  Pursuant to Vt. Stat. Tit. 9, § 2461(b), the Vermont State Class seeks an order

13  enjoining Defendants' unfair and/or deceptive acts or practices, actual damages, damages up to

14  three times the consideration provided, punitive damages, attorneys' fees, costs, and any other just

15  and proper relief available under the Vermont UTPA.

16                          **VERMONT COUNT II:**
                            **Vermont Lemon Law**
17                          **Vt. Stat. Tit. 9, § 4170 *et seq.***
                            **(On Behalf of the Vermont State Class)**
18
19      2511.  Plaintiffs re-allege incorporate by reference all paragraphs as though fully set forth

20  herein.

21      2512.  This count is brought on behalf of the Vermont State Class against all Defendants.

22      2513.  The Vermont State Class own or lease "motor vehicles" within the meaning of Vt.

23  Stat. tit. 9, § 4171(6), because these vehicles were purchased, leased, or registered in Vermont by

24  Defendants and were registered in Vermont within 15 days of the date of purchase or lease. These

25  vehicles are not: (1) tractors, (2) motorized highway building equipment, (3) roadmaking

26  appliances, (4) snowmobiles, (5) motorcycles, (5) mopeds, (6) the living portion of recreation

27  vehicles, or (7) trucks with a gross vehicle weight over 10,000 pounds.

28

2514.   Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of Vt. Stat. Tit. 9, § 4171(7) because it manufactures and assembles new motor vehicles or imports for distribution through distributors of motor vehicles. It is also a "manufacturer" within the definition of "distributor" and "factory branch." *Id*.

2515.   The Vermont State Class are "consumers" within the meaning of Vt. Stat. Tit. 9, § 4171(2) because they bought or leased the Class Vehicles, were transferred their vehicles during the duration the applicable warranty, or are otherwise entitled to the attendant terms of warranty. They are not governmental entities or a business or commercial enterprise that registers or leases three or more motor vehicles.

2516.   The Class Vehicles did not conform to their express warranties during the term of warranty because they were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode.

2517.   Defendants had actual knowledge of the conformities during the term of warranty. But the nonconformities continued to exist throughout this term, as they have not been fixed. Vermont State Class members are excused from notifying Defendants of the nonconformities because it was already fully aware of the problem—as it intentionally created it—and any repair attempt is futile.

2518.   Defendants have had a reasonable opportunity to cure the nonconformities during the relevant period because of its actual knowledge of, creation of, and attempt to conceal the nonconformities, but has not done so as required under Vt. Stat. Tit. 9, § 4173.

2519.   For vehicles purchased, the Vermont State Class demands a full refund of the contract price and all credits and allowances for any trade-in or down payment, license fees, finance charges, credit charges, registration fees and any similar charges and incidental and consequential damages. Vt. Stat. Tit. 9, § 4173(e). For vehicles leased, the Vermont State Class demands the aggregate deposit and rental payments previously paid, and any incidental and consequential damages incurred. Vt. Stat. Tit. 9, § 4173(e), (i). The Vermont State Class rejects an offer of replacement and will retain their vehicles until payment is tendered.

**VERMONT COUNT III:**
**Breach of Express Warranty**
**Vt. Stat. Tit. 9, §§ 2-313 and 2A-210**
**(On Behalf of the Vermont State Class)**

2520.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

2521.   This count is brought on behalf of the Vermont State Class against all Defendants.

2522.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Vt. Stat. Tit. 9A, §§ 2-104(1) and 2A-103(1)(t), and "sellers" of motor vehicles under § 2-103(1)(d).

2523.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Vt. Stat. Tit. 9A, § 2A-103(1)(p).

2524.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Vt. Stat. Tit. 9A, §§ 2-105(1) and 2A-103(1)(h).

2525.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

2526.   Defendants also made numerous representations, descriptions, and promises to Vermont State Class members regarding the performance and emission controls of their vehicles.

2527.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

2528.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2529.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

1   required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

2   whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

3   emission control components are covered for the first eight years or 80,000 miles (whichever

4   comes first). These major emission control components subject to the longer warranty include the

5   catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

6   device or computer.

7        2530.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

8   with respect to their vehicles' emission systems. Thus, Defendants also provide an express

9   warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

10  Design and Defect Warranty required by the EPA covers repair of emission control or emission

11  related parts, which fail to function or function improperly because of a defect in materials or

12  workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

13  first, or, for the major emission control components, for eight years or 80,000 miles, whichever

14  comes first.

15       2531.   As manufacturers of light-duty vehicles, Defendants were required to provide these

16  warranties to purchasers or lessees of Class Vehicles.

17       2532.   Defendants' warranties formed a basis of the bargain that was reached when

18  consumers purchased or leased Class Vehicles.

19       2533.   Despite the existence of warranties, Defendants failed to inform Vermont State

20  Class members that the Class Vehicles were defective and intentionally designed and manufactured

21  to emit more pollution and achieve worse fuel economy on the road than what was disclosed to

22  regulators and represented to consumers who purchased or leased them, and Defendants failed to

23  fix the defective emission components free of charge.

24       2534.   Defendants breached the express warranty promising to repair and correct

25  Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

26  have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

27       2535.   Affording Defendants a reasonable opportunity to cure their breach of written

28  warranties would be unnecessary and futile here.

2536.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Vermont State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2537.   Accordingly, recovery by Vermont State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

2538.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Vermont State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2539.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Vermont State Class members' remedies would be insufficient to make them whole.

2540.   Finally, because of Defendants' breach of warranty as set forth herein, Vermont State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2541.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2542.   As a direct and proximate result of Defendants' breach of express warranties, Vermont State Class members have been damaged in an amount to be determined at trial.

**VERMONT COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**Vt. Stat. Tit. 9, §§ 2-314 and 2A-212**
**(On Behalf of the Vermont State Class)**

2543.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2544.   This count is brought on behalf of the Vermont State Class against all Defendants.

2545.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Vt. Stat. Tit. 9A, § 2-104(1) and 2A-103(1)(t), and "sellers" of motor vehicles under § 2-103(1)(d).

2546.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Vt. Stat. Tit. 9A, § 2A-103(1)(p).

2547.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Vt. Stat. Tit. 9A, §§ 2-105(1) and 2A-103(1)(h).

2548.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Vt. Stat. Tit. 9A, §§ 2-314 and 2A-212.

2549.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

2550.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2551.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Vermont State Class members have been damaged in an amount to be proven at trial.

**VIRGINIA COUNT I:**
**Violations of the Virginia Consumer Protection Act**
**Va. Code Ann. § 59.1-196 *et seq.***
**(On Behalf of the Virginia State Class)**

2552.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2553.   This count is brought on behalf of the Virginia State Class against all Defendants.

2554.   Defendants and the Virginia State Class are "persons" within the meaning of Va. Code § 59.1-198.

2555.   Defendants are "supplier[s]" within the meaning of Va. Code § 59.1-198.

2556.   The Virginia Consumer Protection Act ("Virginia CPA") makes unlawful "fraudulent acts or practices." Va. Code § 59.1-200(A).

2557.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

2558.   Virginia State Class members had no way of discerning that Defendants' representations were false and misleading because Virginia State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

2559.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

2560.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Virginia State Class.

- 380 -

2561.   Defendants knew or should have known that their conduct violated the Virginia CPA.

2562.   Defendants owed the Virginia State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

      A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

      B.    intentionally concealed the foregoing from regulators and Virginia State Class members; and/or

      C.    made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

2563.   Defendants' concealment of the true characteristics of the Class Vehicles' fuel consumption and emissions were material to the Virginia State Class.

2564.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Virginia State Class, about the true environmental cleanliness and efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

2565.   Defendants' violations present a continuing risk to the Virginia State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2566.   Virginia State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Virginia CPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

2567.   Pursuant to Va. Code § 59.1-204(A)–(B), the Virginia State Class is entitled to the greater of actual damages or $500 for each Virginia State Class member, attorneys' fees, and costs.

Because Defendants' actions were willful, Virginia State Class members should each receive the greater of treble damages or $1,000. *Id.*

**VIRGINIA COUNT II:**
**Breach of Express Warranty**
**Va. Code §§ 8.2-313 and 8.2A-210**
**(On Behalf of the Virginia State Class)**

2568.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

2569.   This count is brought on behalf of the Virginia State Class against all Defendants.

2570.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Va. Code §§ 8.2-104(1) and 8.2A-103(1)(t), and "sellers" of motor vehicles under § 8.2-103(1)(d).

2571.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Va. Code § 8.2A-103(1)(p).

2572.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Va. Code §§ 8.2-105(1) and 8.2A-103(1)(h).

2573.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

2574.   Defendants also made numerous representations, descriptions, and promises to Virginia State Class members regarding the performance and emission controls of their vehicles.

2575.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

2576.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

- 382 -

2577. The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2578. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2579. As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

2580. Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

2581. Despite the existence of warranties, Defendants failed to inform Virginia State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

- 383 -

1       2582.   Defendants breached the express warranty promising to repair and correct

2  Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

3  have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

4       2583.   Affording Defendants a reasonable opportunity to cure their breach of written

5  warranties would be unnecessary and futile here.

6       2584.   Furthermore, the limited warranty promising to repair and correct Defendants'

7  defect in materials and workmanship fails in its essential purpose because the contractual remedy is

8  insufficient to make Virginia State Class members whole and because Defendants have failed

9  and/or have refused to adequately provide the promised remedies within a reasonable time.

10       2585.   Accordingly, recovery by the Virginia State Class members is not restricted to the

11  limited warranty promising to repair and correct Defendants' defect in materials and workmanship,

12  and they seek all remedies as allowed by law.

13       2586.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or

14  leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not

15  conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

16  material facts regarding the Class Vehicles. Virginia State Class members were therefore induced

17  to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

18       2587.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved

19  through the limited remedy of repairing and correcting Defendants' defect in materials and

20  workmanship as many incidental and consequential damages have already been suffered because of

21  Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued

22  failure to provide such limited remedy within a reasonable time, and any limitation on Virginia

23  State Class members' remedies would be insufficient to make them whole.

24       2588.   Finally, because of Defendants' breach of warranty as set forth herein, Virginia

25  State Class members assert, as additional and/or alternative remedies, the revocation of acceptance

26  of the goods and the return to them of the purchase or lease price of all Class Vehicles currently

27  owned or leased, and for such other incidental and consequential damages as allowed.

28

2589.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2590.   As a direct and proximate result of Defendants' breach of express warranties, Virginia State Class members have been damaged in an amount to be determined at trial.

**VIRGINIA COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Va. Code §§ 8.2-314 and 8.2A-212**
**(On Behalf of the Virginia State Class)**

2591.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2592.   This count is brought on behalf of the Virginia State Class against all Defendants.

2593.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Va. Code §§ 8.2-104(1) and 8.2A-103(1)(t), and "sellers" of motor vehicles under § 8.2-103(1)(d).

2594.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Va. Code § 8.2A-103(1)(p).

2595.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Va. Code §§ 8.2-105(1) and 8.2A-103(1)(h).

2596.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Va. Code §§ 8.2-314 and 8.2A-212.

2597.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

2598.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

1

2

3

2599.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Virginia State Class members have been damaged in an amount to be proven at trial.

4

5

6

**WASHINGTON STATE COUNT I:**
**Violations of the Washington Consumer Protection Act**
**Wash. Rev. Code Ann. § 19.86.010 *et seq.***
**(On Behalf of the Washington State Class)**

7

8

2600.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

9

10

2601.   This count is brought on behalf of the Washington State Class against all Defendants.

11

12

2602.   Defendants and the Washington State Class are "persons" within the meaning of Wash. Rev. Code § 19.86.010(2).

13

14

2603.   Defendants engaged in "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.86.010(2).

15

16

2604.   The Washington Consumer Protection Act ("Washington CPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

17

18

19

20

21

22

2605.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

23

24

25

26

27

2606.   Washington State Class members had no way of discerning that Defendants' representations were false and misleading because Washington State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

28

- 386 -

2607.  Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

2608.  Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Washington State Class.

2609.  Defendants knew or should have known that their conduct violated the Washington CPA.

2610.  Defendants owed the Washington State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

      A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

      B.    intentionally concealed the foregoing from regulators and Washington State Class members; and/or

      C.    made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

2611.  Defendants' concealment of the Class Vehicles' true fuel consumption and emissions were material to the Washington State Class.

2612.  Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Washington State Class, about the true environmental cleanliness and efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

2613.  Defendants' violations present a continuing risk to the Washington State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2614.   Washington State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Washington CPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

2615.   Pursuant to Wash. Rev. Code § 19.86.090, the Washington State Class seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Washington CPA. Because Defendants' actions were willful and knowing, Washington State Class members' damages should be trebled.

### WASHINGTON STATE COUNT II:
**Washington Lemon Law**
**Wash. Rev. Code § 19.118.005 *et seq.***
**(On Behalf of the Washington State Class)**

2616.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

2617.   This count is brought on behalf of the Washington State Class against all Defendants.

2618.   The Washington State Class own or lease "new motor vehicles" within the meaning of Wash. Rev. Code § 19.118.021(12), because these vehicles are self-propelled primarily designed for the transportation of persons or property over the public highways and were originally purchased or leased at retail from a new motor vehicle dealer or leasing company in Washington. These vehicles do not include vehicles purchased or leased by a business as part of a fleet of ten or more vehicles at one time or under a single purchase or lease agreement or those portions of a motor home designated, used, or maintained primarily as a mobile dwelling, office, or commercial space.

2619.   Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of Wash. Rev. Code § 19.118.021(8) because it is in the business of constructing or assembling new

1    motor vehicles or is engaged in the business of importing new motor vehicles into the United States

2    for the purpose of selling or distributing new motor vehicles to new motor vehicle dealers.

3        2620.   The Washington State Class are "consumers" within the meaning of Wash. Rev.

4    Code § 19.118.021(4) because they entered into an agreement or contract for the transfer, lease, or

5    purchase of a new motor vehicle, other than for purposes of resale or sublease, during the eligibility

6    period as defined by Wash. Rev. Code § 19.118.021(6).

7        2621.   The Class Vehicles did not conform to their warranties as defined by Wash. Rev.

8    Code § 19.118.021(22), during the "eligibility period," defined by Wash. Rev. Code

9    § 19.118.021(6), or the coverage period under the applicable written warranty because they

10   contained, among other defects described herein, a software program designed to circumvent state

11   and federal emissions standards and inflate the fuel economy thereon. Wash. Rev. Code

12   § 19.118.031. This program did in fact circumvent emissions standards and overstate fuel economy

13   and substantially impaired the use and market value of their motor vehicles.

14       2622.   Defendants had actual knowledge of the conformities during warranty periods. But

15   the nonconformities continued to exist throughout this term, as they have not been fixed.

16   Washington State Class members are excused from notifying Defendants of the nonconformities

17   because it was already fully aware of the problem—as it intentionally created it—and any repair

18   attempt is futile.

19       2623.   Defendants have had a reasonable opportunity to cure the nonconformities because

20   of its actual knowledge of, creation of, and attempt to conceal the nonconformities, but has not done

21   so as required under Wash. Rev. Code § 19.118.031.

22       2624.   For vehicles purchased, the Washington State Class demands a full refund of the

23   contract price, all collateral charges, and incidental costs. Wash. Rev. Code § 19.118.041(1)(b). For

24   vehicles leased, the Washington State Class demands all payments made under the lease including

25   but not limited to all lease payments, trade-in value or inception payment, security deposit, and all

26   collateral charges and incidental costs. The consumer is also relieved of any future obligation to the

27   lessor or lienholder. The Washington State Class rejects an offer of replacement and will retain

28   their vehicles until payment is tendered.

**WASHINGTON STATE COUNT III:**
**Breach of Express Warranty**
**Wash Rev. Code §§ 62A.2-313 and 62A.2A-210**
**(On Behalf of the Washington State Class)**

2625.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

2626.   This count is brought on behalf of the Washington State Class against all Defendants.

2627.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Wash. Rev. Code §§ 62A.2-104(1) and 62A.2A-103(1)(t), and "sellers" of motor vehicles under § 2.103(a)(4).

2628.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

2629.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

2630.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

2631.   Defendants also made numerous representations, descriptions, and promises to Washington State Class members regarding the performance and emission controls of their vehicles.

2632.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

2633.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1          2634.   The EPA requires vehicle manufacturers to provide a Performance Warranty with

2    respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for

3    their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

4    required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

5    whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

6    emission control components are covered for the first eight years or 80,000 miles (whichever

7    comes first). These major emission control components subject to the longer warranty include the

8    catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

9    device or computer.

10          2635.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

11    with respect to their vehicles' emission systems. Thus, Defendants also provide an express

12    warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

13    Design and Defect Warranty required by the EPA covers repair of emission control or emission

14    related parts, which fail to function or function improperly because of a defect in materials or

15    workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

16    first, or, for the major emission control components, for eight years or 80,000 miles, whichever

17    comes first.

18          2636.   As manufacturers of light-duty vehicles, Defendants were required to provide these

19    warranties to purchasers or lessees of Class Vehicles.

20          2637.   Defendants' warranties formed a basis of the bargain that was reached when

21    consumers purchased or leased Class Vehicles.

22          2638.   Despite the existence of warranties, Defendants failed to inform Washington State

23    Class members that the Class Vehicles were defective and intentionally designed and manufactured

24    to emit more pollution and achieve worse fuel economy on the road than what was disclosed to

25    regulators and represented to consumers who purchased or leased them, and Defendants failed to

26    fix the defective emission components free of charge.

27

28

2639.   Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2640.   Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

2641.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Washington State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2642.   Accordingly, recovery by the Washington State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

2643.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Washington State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2644.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Washington State Class members' remedies would be insufficient to make them whole.

2645.   Finally, because of Defendants' breach of warranty as set forth herein, Washington State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2646.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2647.   As a direct and proximate result of Defendants' breach of express warranties, Washington State Class members have been damaged in an amount to be determined at trial.

**WASHINGTON STATE COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**Wash Rev. Code §§ 62A.2-314 and 62A.2A-212**
**(On Behalf of the Washington State Class)**

2648.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2649.   This count is brought on behalf of the Washington State Class against all Defendants.

2650.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Wash. Rev. Code § 62A.2-104(1) and 62A.2A-103(1)(t), and "sellers" of motor vehicles under § 2.103(a)(4).

2651.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

2652.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

2653.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212.

2654.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

2655.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2656.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Washington State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**WEST VIRGINIA COUNT I:**
**Violations of the West Virginia Consumer Credit and Protection Act**
**W. Va. Code § 46A-1-101 *et seq.***
**(On Behalf of the West Virginia State Class)**

</div>

2657.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2658.   This count is brought on behalf of the West Virginia State Class against all Defendants.

2659.   Defendants and the West Virginia State Class are "persons" within the meaning of W. Va. Code § 46A-1-102(31). West Virginia State Class members are "consumers" within the meaning of W. Va. Code §§ 46A-1-102(2) and 46A-1-102(12).

2660.   Defendants are engaged in "trade" or "commerce" within the meaning of W. Va. Code § 46A-6-102(6).

2661.   The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." W. Va. Code § 46A-6-104.

2662.   In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for emissions testing that were different from production vehicles, (b) installing a secret software program that caused the vehicles to perform differently during emissions testing than on the road, and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass emissions tests when they in fact did not.

2663.   West Virginia State Class members had no way of discerning that Defendants' representations were false and misleading because the West Virginia State Class members did not have access to Defendants' emissions certification test vehicles and Defendants' emissions-related hardware and software was extremely sophisticated technology.

2664.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

2665.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the West Virginia State Class.

2666.   Defendants knew or should have known that their conduct violated the West Virginia CCPA.

2667.   Defendants owed the West Virginia State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

A.      possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

B.      intentionally concealed the foregoing from regulators and West Virginia State Class members; and/or

C.      made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

2668.   Defendants' concealment of the true characteristics of the Class Vehicles' true fuel consumption and emissions were material to the West Virginia State Class.

2669.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the West Virginia State Class, about the true environmental cleanliness and efficiency of the Class Vehicles, the quality of the Defendants' brands, and the true value of the Class Vehicles.

2670.   Defendants' violations present a continuing risk to the West Virginia State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2671.   West Virginia State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the West Virginia CCPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

2672.   Pursuant to W. Va. Code § 46A-6-106(a), the West Virginia State Class seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and any other just and proper relief available under the West Virginia CCPA.

2673.   Pursuant to W. Va. Code § 46A-6-106(b), Plaintiffs sent notice letters to Defendants. Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by way of the investigations conducted by governmental regulators. The West Virginia State Class seeks all damages and relief to which it is entitled.

### WEST VIRGINIA COUNT II:
#### West Virginia Lemon Law
#### W. Va. Code § 46A-6A-1 *et seq.*
#### (On Behalf of the West Virginia State Class)

2674.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2675.   This count is brought on behalf of the West Virginia State Class against all Defendants.

2676.   West Virginia State Class members who purchased or leased the Class Vehicles in West Virginia are "consumers" within the meaning of W. Va. Code § 46A-6A-2(1).

2677.   Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of W. Va. Code § 46A-6A-2(2).

2678.   The Class Vehicles are "motor vehicles" as defined by W. Va. Code § 46A-6A-2(4).

2679.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

2680.   Defendants also made numerous representations, descriptions, and promises to West Virginia State Class members regarding the performance and emission controls of their vehicles.

2681.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

2682.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2683.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emissions systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emissions control unit (ECU), and the onboard emissions diagnostic device or computer.

2684.   The EPA requires vehicle manufacturers to issue Defect Warranties with respect to their vehicles' emissions systems. Thus, Defendants also provide an express warranty to its vehicles through a Federal Emissions Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emissions control components, for eight years or 80,000 miles, whichever comes first.

2685.   As a manufacturer of light-duty vehicles, Defendants were required to provide these warranties to West Virginia State Class members. Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

2686.   The emissions defects in the Class Vehicles existed from the date of the original sale of the new vehicle to the consumer but could not be detected by a reasonable consumer exercising reasonable care and diligence. Therefore, applicable express warranties for the Class Vehicles containing the defects described herein would be extended. Further extension of the express warranty period is now required because of the difficulties the Defendants may have in executing a massive recall Class Vehicles in the United States.

2687.   Pursuant to W.Va. Code §§ 46A-6A-3(a) and 5(c), Plaintiffs have sent notice letters to Defendants. Additionally, Defendants are on notice of the issues raised in this count and this Complaint by way of investigations conducted by governmental regulators.

2688.   As a direct and proximate result of the Defendants' breaches of their duties under West Virginia's Lemon Law, West Virginia State Class members received goods whose defect substantially impairs their value. The West Virginia State Class has been damaged by the diminished market value of the vehicles along with the compromised functioning and/or non-use of their Class Vehicles.

2689.   Defendants have a duty under § 46A-6A-3 to make all repairs necessary to correct the defect herein described to bring the Class Vehicles into conformity with all written warranties. In the event that Defendants cannot affect such repairs, they have a duty to replace each Class Vehicle with a comparable new motor vehicle that conforms to the warranty.

2690.   As a result of Defendants' breaches, the West Virginia State Class are entitled to the following:

>    A.    Revocation of acceptance and refund of the purchase price, including, but not limited to, sales tax, license and registration fees, and other reasonable expenses incurred for the purchase of the new motor vehicle, or if there be no such revocation of acceptance, damages for diminished value of the motor vehicle;

1          B.      Damages for the cost of repairs reasonably required to conform the motor

2   vehicle to the express warranty;

3          C.      Damages for the loss of use, annoyance or inconvenience resulting from the

4   nonconformity, including, but not limited to, reasonable expenses incurred for replacement

5   transportation during any period when the vehicle is out of service by reason of the

6   nonconformity or by reason of repair; and

7          D.      Reasonable attorney fees.

**WEST VIRGINIA COUNT III:**
**Breach of Express Warranty**
**W. Va. Code §§ 46-2-313 and 46-2A-210**
**(On Behalf of the West Virginia State Class)**

2691.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

2692.   This count is brought on behalf of the West Virginia State Class against all Defendants.

2693.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under W. Va. Code § 46-2-104(1) and 46-2A-103(1)(t), and "sellers" of motor vehicles under § 46-2-103(1)(d).

2694.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under W. Va. Code § 46-2A-103(1)(p).

2695.   The Class Vehicles are and were at all relevant times "goods" within the meaning of W. Va. Code §§ 46-2-105(1) and 46-2A-103(1)(h).

2696.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

2697.   Defendants also made numerous representations, descriptions, and promises to West Virginia State Class members regarding the performance and emission controls of their vehicles.

2698.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

2699.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2700.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2701.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2702.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

2703.   Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

2704.   Despite the existence of warranties, Defendants failed to inform West Virginia State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

2705.   Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2706.   Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

2707.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make West Virginia State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2708.   Accordingly, recovery by West Virginia State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

2709.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. West Virginia State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2710.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on West Virginia State Class members' remedies would be insufficient to make them whole.

2711.   Finally, because of Defendants' breach of warranty as set forth herein, West Virginia State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2712.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2713.   As a direct and proximate result of Defendants' breach of express warranties, West Virginia State Class members have been damaged in an amount to be determined at trial.

<div align="center">

**WEST VIRGINIA COUNT IV:**
**Breach of Implied Warranty of Merchantability**
**W. Va. Code §§ 46-2-314 and 46-2A-212**
**(On Behalf of the West Virginia State Class)**

</div>

2714.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2715.   This count is brought on behalf of the West Virginia State Class against all Defendants.

2716.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under W. Va. Code §§ 46-2-104(1) and 46-2A-103(1)(t), and "sellers" of motor vehicles under § 46-2-103(1)(d).

2717.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under W. Va. Code § 46-2A-103(1)(p).

2718.   The Class Vehicles are and were at all relevant times "goods" within the meaning of W. Va. Code §§ 46-2-105(1) and 46-2A-103(1)(h).

2719.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to W. Va. Code §§ 46-2-314 and 46-2A-212.

2720.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with

1    emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the

2    ordinary purpose for which vehicles are used.

3        2721.   Defendants were provided reasonable notice of these issues by way of a letter sent

4    by Plaintiffs as well as the regulators' investigations.

5        2722.   As a direct and proximate result of Defendants' breach of the implied warranty of

6    merchantability, West Virginia State Class members have been damaged in an amount to be proven

7    at trial.

8                          **WISCONSIN COUNT I:**
                 **Violations of the Wisconsin Deceptive Trade Practices Act**
9                        **Wis. Stat. § 100.18 *et seq.***
                     **(On Behalf of the Wisconsin State Class)**
10

11       2723.   Plaintiffs incorporate by reference all allegations in this Complaint as though fully

12   set forth herein.

         2724.   This count is brought on behalf of the Wisconsin State Class against all Defendants.
13

14       2725.   Wisconsin State Class members are "persons" and members of "the public" under

15   the Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA"), Wis. Stat. § 100.18(1).

16   Wisconsin State Class members purchased or leased one or more Class Vehicles.

17       2726.   Defendants are "person[s], firm[s], corporation[s] or association[s]" within the

18   meaning of Wis. Stat. § 100.18(1).

19       2727.   The Wisconsin DTPA makes unlawful any "representation or statement of fact

20   which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

21       2728.   In the course of their business, Defendants concealed and suppressed material facts

22   concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for

23   emissions testing that were different from production vehicles, (b) installing a secret software

24   program that caused the vehicles to perform differently during emissions testing than on the road,

25   and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass

26   emissions tests when they in fact did not.

27       2729.   Wisconsin State Class members had no way of discerning that Defendants'

28   representations were false and misleading because Wisconsin State Class members did not have

1    access to Defendants' emissions certification test vehicles and Defendants' emissions-related

2    hardware and software was extremely sophisticated technology.

3        2730.   Defendants thus violated the Act by, at minimum: representing that Class Vehicles

4    have characteristics, uses, benefits, and qualities which they do not have; representing that Class

5    Vehicles are of a particular standard, quality, and grade when they are not; advertising Class

6    Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a

7    transaction involving Class Vehicles has been supplied in accordance with a previous

8    representation when it has not.

9        2731.   Defendants intentionally and knowingly misrepresented material facts regarding the

10   Class Vehicles with intent to mislead the Wisconsin State Class.

11       2732.   Defendants knew or should have known that their conduct violated the Wisconsin

12   DTPA.

13       2733.   Defendants owed the Wisconsin State Class a duty to disclose the illegality and

14   public health risks, the true nature of the Class Vehicles, because Defendants:

15           A.      possessed exclusive knowledge that they were manufacturing, selling, and

16       distributing vehicles throughout the United States that did not perform as advertised;

17           B.      intentionally concealed the foregoing from regulators and Wisconsin State

18       Class members; and/or

19           C.      made incomplete representations about the Class Vehicles' fuel economy

20       and emissions while purposefully withholding material facts that contradicted these

21       representations.

22       2734.   Defendants' concealment of the true characteristics of the Class Vehicles' true fuel

23   consumption and emissions were material to the Wisconsin State Class.

24       2735.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

25   deceive regulators and reasonable consumers, including the Wisconsin State Class, about the true

26   environmental cleanliness and efficiency of the Class Vehicles, the quality of the Defendants'

27   brands, and the true value of the Class Vehicles.

28

2736.   Defendants' violations present a continuing risk to the Wisconsin State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2737.   Wisconsin State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Wisconsin DTPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

2738.   As a direct and proximate result of Defendants' violations of the Wisconsin DTPA, the Wisconsin State Class have suffered injury-in-fact and/or actual damage.

2739.   The Wisconsin State Class seeks damages, court costs and attorneys' fees under Wis. Stat. § 100.18(11)(b)(2), and any other just and proper relief available under the Wisconsin DTPA.

<div align="center">

**WISCONSIN COUNT II:**
**Breach of Express Warranty**
**Wis. Stat. §§ 402.313 and 411.210**
**(On Behalf of the Wisconsin State Class)**

</div>

2740.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

2741.   This count is brought on behalf of the Wisconsin State Class against all Defendants.

2742.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Wis. Stat. §§ 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under § 402.103(1)(d).

2743.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Wis. Stat. § 411.103(1)(p).

2744.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

2745.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

2746.   Defendants also made numerous representations, descriptions, and promises to Wisconsin State Class members regarding the performance and emission controls of their vehicles.

2747.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

2748.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2749.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles (whichever comes first). These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

2750.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts, which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

2751.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

2752.   Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

2753.   Despite the existence of warranties, Defendants failed to inform Wisconsin State Class members that the Class Vehicles were defective and intentionally designed and manufactured to emit more pollution and achieve worse fuel economy on the road than what was disclosed to regulators and represented to consumers who purchased or leased them, and Defendants failed to fix the defective emission components free of charge.

2754.   Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

2755.   Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

2756.   Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Wisconsin State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

2757.   Accordingly, recovery by Wisconsin State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

2758.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Wisconsin State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2759.  Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Wisconsin State Class members' remedies would be insufficient to make them whole.

2760.  Finally, because of Defendants' breach of warranty as set forth herein, Wisconsin State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

2761.  Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2762.  As a direct and proximate result of Defendants' breach of express warranties, Wisconsin State Class members have been damaged in an amount to be determined at trial.

### WISCONSIN COUNT III:
### Breach of Implied Warranty of Merchantability
### Wis. Stat. §§ 402.314 and 411.212
### (On Behalf of the Wisconsin State Class)

2763.  Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2764.  This count is brought on behalf of the Wisconsin State Class against all Defendants.

2765.  Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Wis. Stat. §§ 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under § 402.103(1)(d).

2766.  With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Wis. Stat. § 411.103(1)(p).

2767.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

2768.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wis. Stat. §§ 402.314 and 411.212.

2769.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

2770.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2771.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Wisconsin State Class members have been damaged in an amount to be proven at trial.

<div align="center">

**WYOMING COUNT I:**
**Violations of the Wyoming Consumer Protection Act,**
**Wyo. Stat. § 40-12-101, *et seq.***
**(On Behalf of the Wyoming State Class)**

</div>

2772.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2773.   This count is brought on behalf of the Wyoming State Class against all Defendants.

2774.   The Wyoming State Class and Defendants are "persons" within the meaning of Wyo. Stat. § 40-12-102(a)(i).

2775.   The Class Vehicles are "merchandise" pursuant to Wyo. Stat. § 40-12-102(a)(vi).

2776.   Each sale or lease of a Class Vehicle to a Wyoming State Class member was a "consumer transaction" as defined by Wyo. Stat. § 40-12-102(a)(ii). These consumer transactions occurred "in the course of [Defendants'] business" under Wyo. Stat. § 40-12-105(a). Wyoming State Class members purchased or leased one or more Class Vehicles.

2777.   The Wyoming Consumer Protection Act ("Wyoming CPA") prohibits lists unlawful deceptive trade practices, including when a seller: "(i) Represents that merchandise has a source, origin, sponsorship, approval, accessories, or uses it does not have;" "(iii) Represents that

1    merchandise is of a particular standard, grade, style or model, if it is not;" "(x) Advertises

2    merchandise with intent not to sell it as advertised;" "(xv) Engages in unfair or deceptive acts or

3    practices." Wyo. Stat. § 40-12-105(a).

4        2778.   In the course of their business, Defendants concealed and suppressed material facts

5    concerning the Class Vehicles. Defendants accomplished this by (a) submitting vehicles for

6    emissions testing that were different from production vehicles, (b) installing a secret software

7    program that caused the vehicles to perform differently during emissions testing than on the road,

8    and/or (c) falsely attesting that certain vehicles' high performance (Sport Plus) mode could pass

9    emissions tests when they in fact did not.

10        2779.   Wyoming State Class members had no way of discerning that Defendants'

11   representations were false and misleading because Wyoming State Class members did not have

12   access to Defendants' emissions certification test vehicles and Defendants' emissions-related

13   hardware and software was extremely sophisticated technology.

14        2780.   Defendants thus violated the Wyoming CPA by, at minimum: representing that

15   Class Vehicles have characteristics, uses, benefits, and qualities which they do not have;

16   representing that Class Vehicles are of a particular standard, quality, and grade when they are not;

17   advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing

18   that the subject of a transaction involving Class Vehicles has been supplied in accordance with a

19   previous representation when it has not.

20        2781.   Defendants intentionally and knowingly misrepresented material facts regarding the

21   Class Vehicles with intent to mislead the Wyoming State Class.

22        2782.   Defendants knew or should have known that their conduct violated the Wyoming

23   CPA.

24        2783.   Defendants owed the Wyoming State Class a duty to disclose the illegality and

25   public health risks, the true nature of the Class Vehicles, because Defendants:

26            A.      possessed exclusive knowledge that they were manufacturing, selling, and

27            distributing vehicles throughout the United States that did not perform as advertised;

28

B.      intentionally concealed the foregoing from regulators and Wyoming State Class members; and/or

C.      made incomplete representations about the Class Vehicles' fuel economy and emissions while purposefully withholding material facts that contradicted these representations.

2784.   Defendants' concealment of the true characteristics of the Class Vehicles' fuel consumption and emissions were material to the Wyoming State Class.

2785.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Wyoming State Class, about the true environmental cleanliness and efficiency of the Class Vehicles, the quality of Defendants' brands, and the true value of the Class Vehicles.

2786.   Defendants' violations present a continuing risk to the Wyoming State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2787.   Wyoming State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Wyoming CPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

2788.   Pursuant to Wyo. Stat. § 40-12-108(a), the Wyoming State Class seeks damages as determined at trial, and any other just and proper relief available under the Wyoming CPA, including but not limited to court costs and reasonable attorneys' fees as provided in Wyo. Stat. § 40-12-108(b).

2789.   Pursuant to Wyo. Stat. Ann. § 40-12-109, Plaintiffs sent notice letters to Defendants. Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by way of the investigations conducted by governmental regulators. The Wyoming State Class seeks all damages and relief to which it is entitled.

**WYOMING COUNT II:**
**Breach of Express Warranty**
**Wyo. Stat. §§ 34.1-2-313 and 34.1-.2A-210**
**(On Behalf of the Wyoming State Class)**

2790.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

2791.   This count is brought on behalf of the Wyoming State Class against all Defendants.

2792.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Wyo. Stat. §§ 34.1-2-104(a) and 34.1-2.A-103(a)(xx), and "sellers" of motor vehicles under § 34.1-2-103(a)(iv).

2793.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Wyo. Stat. § 34.1-2.A-103(a)(xvi).

2794.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wyo. Stat. §§ 34.1-2-105(a) and 34.1-2.A-103(a)(viii).

2795.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express warranty for a period of four years or 50,000 miles, whichever occurs first. This warranty exists to repair the vehicle "if it fails to function properly as designed during normal use."

2796.   Defendants also made numerous representations, descriptions, and promises to Wyoming State Class members regarding the performance and emission controls of their vehicles.

2797.   For example, Defendants included in the warranty booklets for some or all of the Class Vehicles the warranty that its vehicles were "designed, built, and equipped to conform at the time of sale with all U.S. emission standards applicable at the time of manufacture, and that it is free from defects in material and workmanship which would cause it not to meet those standards."

2798.   The Clean Air Act also requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

2799.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

1    required by the EPA applies to repairs that are required during the first two years or 24,000 miles,

2    whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major

3    emission control components are covered for the first eight years or 80,000 miles (whichever

4    comes first). These major emission control components subject to the longer warranty include the

5    catalytic converters, the electronic emission control unit, and the onboard emission diagnostic

6    device or computer.

7         2800.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties

8    with respect to their vehicles' emission systems. Thus, Defendants also provide an express

9    warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

10   Design and Defect Warranty required by the EPA covers repair of emission control or emission

11   related parts, which fail to function or function improperly because of a defect in materials or

12   workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes

13   first, or, for the major emission control components, for eight years or 80,000 miles, whichever

14   comes first.

15        2801.   As manufacturers of light-duty vehicles, Defendants were required to provide these

16   warranties to purchasers or lessees of Class Vehicles.

17        2802.   Defendants' warranties formed a basis of the bargain that was reached when

18   consumers purchased or leased Class Vehicles.

19        2803.   Despite the existence of warranties, Defendants failed to inform Wyoming State

20   Class members that the Class Vehicles were defective and intentionally designed and manufactured

21   to emit more pollution and achieve worse fuel economy on the road than what was disclosed to

22   regulators and represented to consumers who purchased or leased them, and Defendants failed to

23   fix the defective emission components free of charge.

24        2804.   Defendants breached the express warranty promising to repair and correct

25   Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

26   have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

27        2805.   Affording Defendants a reasonable opportunity to cure their breach of written

28   warranties would be unnecessary and futile here.

2806.   Furthermore, the limited warranty promising to repair and correct Defendants'
defect in materials and workmanship fails in its essential purpose because the contractual remedy is
insufficient to make Wyoming State Class members whole and because Defendants have failed
and/or have refused to adequately provide the promised remedies within a reasonable time.

2807.   Accordingly, recovery by Wyoming State Class members is not restricted to the
limited warranty promising to repair and correct Defendants' defect in materials and workmanship,
and they seek all remedies as allowed by law.

2808.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or
leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not
conform to their warranties; further, Defendants had wrongfully and fraudulently concealed
material facts regarding the Class Vehicles. Wyoming State Class members were therefore induced
to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

2809.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved
through the limited remedy of repairing and correcting Defendants' defect in materials and
workmanship as many incidental and consequential damages have already been suffered because of
Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued
failure to provide such limited remedy within a reasonable time, and any limitation on Wyoming
State Class members' remedies would be insufficient to make them whole.

2810.   Finally, because of Defendants' breach of warranty as set forth herein, Wyoming
State Class members assert, as additional and/or alternative remedies, the revocation of acceptance
of the goods and the return to them of the purchase or lease price of all Class Vehicles currently
owned or leased, and for such other incidental and consequential damages as allowed.

2811.   Defendants were provided reasonable notice of these issues by way of a letter sent
by Plaintiffs as well as the regulators' investigations.

2812.   As a direct and proximate result of Defendants' breach of express warranties,
Wyoming State Class members have been damaged in an amount to be determined at trial.

<div align="center">

**WYOMING COUNT III:**
**Breach of Implied Warranty of Merchantability**
**Wyo. Stat. §§ 34.1-2-314 and 34.1-.2A-212**
**(On Behalf of the Wyoming State Class)**

</div>

2813.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

2814.   This count is brought on behalf of the Wyoming State Class against all Defendants.

2815.   Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Wyo. Stat. §§ 34.1-2-104(a) and 34.1-2.A-103(a)(xx), and "sellers" of motor vehicles under § 34.1-2-103(a)(iv).

2816.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Wyo. Stat. § 34.1-2.A-103(a)(xvi).

2817.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wyo. Stat. §§ 34.1-2-105(a) and 34.1-2.A-103(a)(viii).

2818.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wyo. Stat. §§ 34.1-2-314 and 34.1-2.A-212.

2819.   These Class Vehicles, when sold or leased and at all times thereafter, were materially different from vehicles Defendants submitted for emissions testing, included software that led to inflated and misleading fuel economy and emissions ratings, and/or did not comply with emissions regulations when being driven in Sport Plus mode, and were therefore not fit for the ordinary purpose for which vehicles are used.

2820.   Defendants were provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

2821.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Wyoming State Class members have been damaged in an amount to be proven at trial.

## X.   REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class

1   and all Subclasses, respectfully request that the Court grant class certification under the applicable

2   provisions of Fed. R. Civ. P. 23 and enter judgment in their favor and against Defendants, as

3   follows:

4          A.     An order temporarily and permanently enjoining Defendants from

5   continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and

6   practices alleged in this Complaint;

7          B.     Relief in the form of a comprehensive program to fully reimburse and make

8   whole all Class members for all costs and economic losses that resulted from the inaccurate

9   fuel economy disclosures, as well as any other consequential damages suffered as a result of

10  the false fuel economy statistics;

11         C.     A declaration that Defendants are financially responsible for all Class notice

12  and the administration of Class relief;

13         D.     Costs, restitution, compensatory damages for economic loss and

14  out-of-pocket costs, multiple damages under applicable states' laws, punitive and

15  exemplary damages under applicable law, and disgorgement, in an amount to be determined

16  at trial;

17         E.     Rescission of all Class Vehicle purchases or leases, including

18  reimbursement and/or compensation of the full purchase price of all Class Vehicles,

19  including taxes, licenses, and other fees.

20         F.     Any and all applicable statutory and civil penalties;

21         G.     An order requiring Defendants to pay both pre- and post-judgment interest

22  on any amounts awarded.

23         H.     An award of costs and attorneys' fees, as allowed by law;

24         I.     Leave to amend this Complaint to conform to the evidence produced at trial;

25  and

26         J.     Such other or further relief as the Court may deem appropriate, just, and

27  equitable.

28

1
## XI.     DEMAND FOR JURY TRIAL

2          Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any

3   and all issues in this action so triable of right.

4   Dated: January 15, 2021              Respectfully submitted,

5                                        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

6
                                         By: */s/ Elizabeth J. Cabraser*
7                                        Elizabeth J. Cabraser (State Bar No. 083151)
                                         Kevin R. Budner (State Bar No. 287871)
8                                        Phong-Chau G. Nguyen (State Bar No. 286789)
                                         LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
9                                        275 Battery Street, 29th Floor
                                         San Francisco, CA 94111
10                                       Telephone: 415.956.1000
                                         Facsimile: 415.956.1008
11                                       E-mail: ecabraser@lchb.com
                                         kbudner@lchb.com
12                                       pgnguyen@lchb.com

13                                       David S. Stellings
                                         Wilson M. Dunlavey (State Bar No. 307719)
14                                       Katherine I. McBride
                                         LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
15                                       250 Hudson Street, 8th Floor
                                         New York, NY 10013
16                                       Telephone: 212.355.9500
                                         Facsimile: 212.355.9592
17                                       E-mail: dstellings@lchb.com
                                         wdunlavey@lchb.com
18                                       kmcbride@lchb.com

19                                       *Plaintiffs' Lead Counsel*

20

21

22

23

24

25

26

27

28

2098955.6                        - 417 -          CONSOLIDATED CLASS ACTION COMPLAINT
                                                  CASE NO.: 3:20-CV-7473