1  Elizabeth J. Cabraser (State Bar No. 083151)
   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
2  275 Battery Street, 29th Floor
   San Francisco, CA  94111-3339
3  Telephone:  415.956.1000
   Facsimile:  415.956.1008
4  ecabraser@lchb.com

5  *Plaintiffs' Lead Counsel*

6
   [additional Counsel listed on signature page]
7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10              SAN FRANCISCO DIVISION

11

12 | IN RE: VOLKSWAGEN "CLEAN | MDL No. 2672 CRB (JSC) |
   | DIESEL" MARKETING, SALES |  |
13 | PRACTICES, AND PRODUCTS | The Honorable Charles R. Breyer |
   | LIABILITY LITIGATION |  |
14 

15 | This Document Relates to: | **UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT AND DIRECTION OF NOTICE UNDER FED. R. CIV. P. 23(e)** |
16 | Porsche Gasoline Litigation |  |

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................... 1

II.   BACKGROUND AND PROCEDURAL HISTORY ........................................................ 3

A.    Factual background: Plaintiffs alleged long-standing practices by the Defendants to manipulate fuel economy and emissions tests for the Class Vehicles. ................................................................................................................. 3

B.    Procedural background: Plaintiffs investigated their claims through a comprehensive discovery and technical vehicle testing process. .......................... 4

C.    The Settlement process: The Parties engaged in a lengthy, evidence-based negotiation. ................................................................................................................. 6

III.  SUMMARY OF SETTLEMENT TERMS ...................................................................... 8

A.    The Settlement Class definition ............................................................................... 8

B.    Settlement Benefits to Class members .................................................................... 8

C.    Notice and Claims Administration .......................................................................... 10

D.    Attorneys' Fees, Expenses, and Service Awards ................................................... 10

IV.   LEGAL STANDARD FOR PRELIMINARY APPROVAL AND DECISION TO GIVE NOTICE .............................................................................................................. 11

V.    ARGUMENT ................................................................................................................. 11

A.    The Court will be able to certify the proposed Class for settlement purposes upon final approval. ................................................................................................. 11

1.    The Settlement Class meets the requirements of Rule 23(a). .................. 12

a.    Rule 23(a)(1): The Class is sufficiently numerous. ...................... 12

b.    Rule 23(a)(2): The Class Claims present common questions of law and fact. ............................................................................... 12

c.    Rule 23(a)(3): The Settlement Class Representatives' claims are typical of other Class members' claims. ................................. 13

d.    Rule 23(a)(4): The Settlement Class Representatives and Class Counsel have and will protect the interests of the Class. ............................................................................................. 14

2.    The Settlement Class meets the requirements of Rule 23(b)(3). ............. 15

a.    Common issues of law and fact predominate. ............................. 15

b.    Class treatment is superior to other available methods for the resolution of this case. ............................................................ 17

B.    The Court should appoint Lead Plaintiffs' Counsel as Interim Settlement Class Counsel under Rule 23(g)(3). ....................................................................... 18

C.    The Settlement is fair, reasonable, and adequate. ................................................ 18

1.    Rule 23(e)(2)(A): Class Counsel and the Settlement Class Representatives have and will continue to zealously represent the Class. ........................................................................................................... 19

2.    Rule 23(e)(2)(B): The Settlement is the product of good faith, informed, and arm's-length negotiations. ................................................. 19

**TABLE OF CONTENTS**
(continued)

Page

3. Rule 23(e)(2)(C): The Settlement provides substantial compensation in exchange for the compromise of strong claims. ............ 22

    a. The Settlement mitigates the risks, expenses, and delays the Class would bear with continued litigation. ................................. 24

    b. Class members will obtain relief through a straightforward claims process. ................................................................. 26

    c. Counsel will seek reasonable attorneys' fees and costs. .............. 26

4. Rule 23(e)(2)(D): The Proposed Settlement treats all Class members equitably relative to one another. .............................. 28

5. The Proposed Settlement merits approval under this District's Procedural Guidance. .................................................................. 29

    a. Preliminary Approval Guidance (1)(a) and (c): There are no meaningful differences between the litigation and Settlement Classes, and the released claims are consistent with those asserted in the Complaint. ........................................... 29

    b. Preliminary Approval Guidance (1)(e): The Settlement Recovery mirrors that available if Plaintiffs had prevailed in litigation on the merits. ................................................................. 30

    c. Preliminary Approval Guidance (1)(g): A substantial number of Class members are expected to participate through a streamlined claims program. ........................................ 31

    d. Preliminary Approval Guidance (1)(h) & (8): Unclaimed Settlement funds will be redistributed to Class members and then to environmental remediation efforts and will not revert to Defendants. ................................................................... 31

    e. Preliminary Approval Guidance (3)-(5): The proposed Notice Plan comports with Rule 23, Due Process, and this District's Procedural Guidance. .................................................. 32

    f. Preliminary Approval Guidance (7): Plaintiffs will seek modest incentive awards for the Settlement Class Representatives. .......................................................................... 32

    g. Preliminary Approval Guidance (9): The Parties have proposed a reasonable schedule for the Settlement Approval Process that provides Class members sufficient time to exercise their rights. ................................................................... 32

    h. Preliminary Approval Guidance (10): The Settlement complies with the Class Action Fairness Act ("CAFA"). ............. 33

    i. Preliminary Approval Guidance (11): Information about past distributions in comparable class settlements. ....................... 33

D. The Proposed Notice Plan provides the best practicable notice. .......................... 33

VI. CONCLUSION ............................................................................. 35

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ................................................................................... 11, 12, 16

*Astiana v. Kashi Co.*,
    291 F.R.D. 493 (S.D. Cal. 2013) ........................................................................ 13

*Butler v. Sears, Roebuck & Co.*,
    702 F.3d 359 (7th Cir. 2012) .............................................................................. 15

*Churchill Vill., L.L.C., v. Gen. Elec.*,
    361 F.3d 566 (9th Cir. 2004) .............................................................................. 34

*Clemens v. Hair Club for Men, LLC*,
    No. C 15-01431 WHA, 2016 WL 1461944 (N.D. Cal. Apr. 14, 2016) ............... 14, 18

*Cohen v. Trump*,
    303 F.R.D. 376 (S.D. Cal. 2014) ........................................................................ 13

*Counts v. Gen. Motors, LLC*,
    237 F. Supp. 3d 572 (E.D. Mich. 2017) .............................................................. 26

*Ellis v. Gen. Motors, LLC*,
    No. 2:16-cv-11747-GCS-APP (E.D. Mich. July 14, 2017) .................................. 23

*Evon v. Law Offices of Sidney Mickell*,
    688 F.3d 1015 (9th Cir. 2012) ............................................................................ 14

*Free Range Content, Inc. v. Google, LLC*,
    No. 14-CV-02329-BLF, 2019 WL 1299504 (N.D. Cal. Mar. 21, 2019) ................ 19

*Friedman v. 24 Hour Fitness USA, Inc.*,
    No. CV 06-6282 AHM (CTx), 2009 WL 2711956 (C.D. Cal. Aug. 25, 2009) ........ 16

*Gant v. Ford Motor Co.*,
    517 F. Supp. 3d 707 (E.D. Mich. 2021) .............................................................. 25

*Guido v. L'Oreal, USA, Inc.*,
    284 F.R.D. 468 (C.D. Cal. 2012) ........................................................................ 13

*Hanlon* v. *Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ................................................................. 14, 16, 17

*Hanon v. Dataprods. Corp.*,
    976 F.2d 497 (9th Cir. 1992) .............................................................................. 14

*Hernandez v. Cty. of Monterey*,
    305 F.R.D. 132 (N.D. Cal. 2015) ................................................................. 12, 14

*Hernandez v. Dutton Ranch Corp.*,
    No. 19-CV-00817-EMC, 2021 WL 5053476 (N.D. Cal. Sept. 10, 2021) ............. 27

*In re Anthem, Inc. Data Breach Litig.*,
    327 F.R.D. 299 (N.D. Cal. 2018) ................................................................. 20, 21

## TABLE OF AUTHORITIES
(continued)

Page

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices & Prods. Liab. Litig.*,
  295 F. Supp. 3d 927 (N.D. Cal. 2018) ................................................................... 25

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prods. Liab. Litig.*,
  No. 17-MD-02777-EMC, 2019 WL 536661 (N.D. Cal. Feb. 11, 2019) ................. 13

*In re First Alliance Mortg. Co.*,
  471 F.3d 977 (9th Cir. 2006) ................................................................................. 16

*In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*,
  No. 2:19-MD-02901, 2022 WL 551221 (E.D. Mich. Feb. 23, 2022) ..................... 25

*In re Hyundai & Kia Fuel Econ. Litig.*,
  926 F.3d 539 (9th Cir. 2019) ....................................................................... *passim*

*In re Hyundai & Kia Fuel Econ. Litig.*,
  No. MDL 13-2424-GW(FFMx), 2014 WL 12603199 (C.D. Cal. Aug. 21, 2014) ......... 29

*In re Mego Fin. Corp. Sec. Litig.*,
  213 F.3d 454 (9th Cir. 2000) ................................................................................. 20

*In re Toyota Rav4 Hybrid Fuel Tank Litig.*,
  534 F. Supp. 3d 1067 (N.D. Cal. 2021) ................................................................. 25

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
  895 F.3d 597 (9th Cir. 2018) ................................................................................. 21

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
  No. 2672 CRB (JSC), 2016 WL 4010049 (N.D. Cal. July 26, 2016) ............... *passim*

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
  No. 2672 CRB (JSC), 2017 WL 672820 (N.D. Cal. Feb. 16, 2017) ....................... 31

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
  No. MDL 2672 CRB (JSC), 2019 WL 2077847 (N.D. Cal. May 10, 2019) ....... 21, 22

*Jimenez v. Allstate Ins. Co.*,
  765 F.3d 1161 (9th Cir. 2014) ............................................................................... 12

*Kim v. Space Pencil, Inc.*
  No. C 11-03796 LB, 2012 WL 5948951 (N.D. Cal. Nov. 28, 2012) ...................... 24

*Linney v. Cellular Alaska P'ship*,
  151 F.3d 1234 (9th Cir. 1998) ............................................................................... 20

*Marshall v. Holiday Magic, Inc.*,
  550 F.2d 1173 (9th Cir. 1977) ............................................................................... 21

*Mullane v. Cent. Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950) ............................................................................................... 34

*Nachshin v. AOL, LLC*,
  663 F.3d 1034 (9th Cir. 2011) ............................................................................... 31

1

2

**TABLE OF AUTHORITIES**
**(continued)**

Page

3

*Nobles v. MBNA Corp.*,
   No. C 06-3723 CRB, 2009 WL 1854965 (N.D. Cal. June 29, 2009) ...................................... 24

4

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) ............................................................................... 13, 14

5

6

*Ries v. Ariz. Beverages USA LLC*,
   287 F.R.D. 523 (N.D. Cal. 2012) ............................................................................. 13

7

*Roes 1-2 v. SFBSC Mgmt., LLC*,
   944 F.3d 1035 (9th Cir. 2019) .................................................................................. 11

8

9

*Smith v. Cardinal Logistics Mgmt. Corp.*,
   No. 07-2104 SC, 2008 WL 4156364 (N.D. Cal. Sept. 5, 2008) ................................ 17

10

*Stockwell v. City & Cty. of San Francisco*,
   749 F.3d 1107 (9th Cir. 2014) .................................................................................. 12

11

*Sykes v. Mel Harris & Assocs. LLC*,
   285 F.R.D. 279 (S.D.N.Y. 2012), *aff'd* 780 F.3d 70 (2d Cir. 2015) ......................... 13

12

13

*Trosper v. Styker Corp.*,
   No. 13-CV-0607-LHK, 2014 WL 4145448 (N.D. Cal. Aug. 21, 2014) ............................. 15, 17

14

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016) ............................................................................................ 15

15

16

*Vizcaino v. Microsoft Corp.*,
   290 F.3d 1043 (9th Cir. 2002) ................................................................................. 27

17

*Wahl v. Yahoo! Inc.*,
   No. 17-CV-02745-BLF, 2018 WL 6002323 (N.D. Cal. Nov. 15, 2018) ................................ 20

18

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .......................................................................................... 12, 13

19

20

*Wolin v. Jaguar Land Rover N. Am., LLC*,
   617 F.3d 1168 (9th Cir. 2010) ...................................................................... 14, 16, 17

21

**Statutes**

22

28 U.S.C. § 1712 ............................................................................................................. 33

23

28 U.S.C. § 1713 ............................................................................................................. 33

24

28 U.S.C. § 1714 ............................................................................................................. 33

28 U.S.C. § 1715(b) ......................................................................................................... 33

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES**
(continued)

Page

**Rules**

Fed. R. Civ. P. 23(a) ........................................................................................ 11, 12

Fed. R. Civ. P. 23(a)(1) ............................................................................................ 12

Fed. R. Civ. P. 23(a)(3) ............................................................................................ 13

Fed. R. Civ. P. 23(a)(4) ..................................................................................... 14, 15

Fed. R. Civ. P. 23(b)(3) ................................................................... 12, 15, 17, 34

Fed. R. Civ. P. 23(c)(2) ..................................................................................... 11, 34

Fed. R. Civ. P. 23(e) ............................................................................................ 2, 11

Fed. R. Civ. P. 23(e)(1) ............................................................................. 11, 18, 33

Fed. R. Civ. P. 23(e)(2) ................................................................................... passim

Fed. R. Civ. P. 23(e)(3) ............................................................................................ 27

Fed. R. Civ. P. 23(e)(5) ............................................................................................ 11

Fed. R. Civ. P. 23(g) ................................................................................................ 18

SA § 9.2 ...................................................................................................................... 33

**Treatises**

5 *Moore's Federal Practice—Civil* § 23.22 (2016) ............................................ 12

William B. Rubenstein, et al., 4 Newberg on Class Actions § 13:49 (5th ed. 2012 ............... 20, 21

**Other Authorities**

2018 Advisory Committee Notes to Rule 23 ...................................................... 11

Northern District of California Procedural Guidance for Class Action Settlements ......... 29, 30, 32

## NOTICE OF MOTION AND MOTION

TO ALL THE PARTIES AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on Friday July 22, 2022 or at such other date and time as the Court may set, in Courtroom 6 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Lead Counsel and the Plaintiffs' Steering Committee, on behalf of a proposed Settlement Class of owners and lessees of certain Porsche gasoline vehicles, will and hereby do move the Court for an order granting preliminary approval of the Class Action Settlement and directing notice to the Class under Fed. R. Civ. P. 23(e)(1); appointing Interim Settlement Class Counsel and Class Representatives under Fed. R. Civ. P. 23(g)(3); and scheduling a final approval hearing under Fed. R. Civ. P. 23(e)(2).

Plaintiffs notice this motion for Friday July 22, 2022 in accordance with Civil Local Rule 7-2(a) and this Court's Standing Orders. However, the parties are prepared to present the proposed Settlement to the Court on an earlier hearing date and time at the Court's convenience, or for the Court to decide this matter on the papers, if the Court is inclined to do so.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

The proposed Settlement before the Court resolves claims for consumers who purchased or leased certain model year 2005-2020 gasoline-powered Porsche vehicles (the "Class Vehicles"). As detailed in the operative Complaint, Plaintiffs allege that two historical practices improperly skewed the emissions and fuel economy test results for the Class Vehicles: one tactic of physically altering test vehicles that impacted $CO_2$ emissions and fuel economy results; and a second practice that impacted the emissions test results of certain vehicles equipped with a high-performance "Sport+" operating mode. The Settlement provides a guaranteed, non-reversionary fund of at least $80 million to compensate Class members who purchased and leased these Class Vehicles.

As part of the extensive discovery efforts in this case, the Parties conducted and reviewed results from rigorous and comprehensive testing that they believe to have covered all potentially affected vehicles. *See* Settlement Agreement, ("SA") at p.1.[1]  The Settlement funds will be allocated among Class members based on the degree to which their vehicles were potentially affected by the alleged improper practices. There are three categories of compensation available to Class members through the Settlement: Fuel Economy Cash Benefits, Sport+ Cash Benefits, and Other Class Vehicle Cash Benefits, explained in turn below.

Testing and other discovery regarding certain Class Vehicles—referred to herein as the "Fuel Economy Class Vehicles"—revealed a possible deviation in fuel economy, where the real-world performance of the affected vehicles in City, Highway and/or Combined fuel economy may have been one or two miles per gallon lower than the MPG promised to Class members on the Monroney labels. As a result, Class members who purchased or leased a Fuel Economy Class Vehicle would have paid more for gasoline over time—and had to visit the gas station more frequently than they would have—if the vehicles had performed as promised. Class members with Fuel Economy Class Vehicles will be eligible to receive Fuel Economy Cash Benefits,

---

[1] All capitalized terms used herein have the meaning set forth in the Consumer Class Action Settlement Agreement and Release ("Settlement," "Settlement Agreement," or "Agreement"), unless otherwise indicated. The Settlement is attached as Exhibit 1 hereto.

ranging from $250-$1,109 per Class Vehicle, correlating to their vehicle's revised fuel economy ratings and the number of months they possessed the vehicle. These cash payments are intended to compensate Fuel Economy Class members for the potential increased fuel consumption of their vehicle. SA at p. 1. In other words and as explained below, while market prices for gasoline fluctuate and future gas prices are unpredictable, the Fuel Economy compensation will pay all Fuel Economy Class members a very high percentage of their potential recoverable damages (and the vast majority of them 100% of damages). *See* Section V.C.3.

In addition, Class members whose vehicles are equipped with a high-performance Sport+ Mode that are the subject of an ongoing recall (the "Sport+ Class Vehicles") will also be eligible for Sport+ Cash Benefits of an *automatic* cash payment of $250. Finally, Class members with Class Vehicles that were also conceivably impacted by the testing practices at issue (the "Other Class Vehicles"), but for which no potential deviations were identified through the comprehensive testing program, will be eligible to receive cash payments of up to $200 per vehicle. As with the Fuel Economy Cash Benefits, the Sport+ and Other Class Vehicle payments provide substantial compensation to Class members tied to the potential impact of the practices at issue on their Class Vehicles.

If any of the settlement funds are not claimed by Class members, the remaining money will *not* revert to the Defendants. Instead, funds that remain after the claims process concludes will be redistributed to Class members unless and until it is not economically feasible to do. After that redistribution, any final balance will be dedicated to environmental causes, subject to Court approval. The process will ensure that the full Settlement Value inures to the benefit of the Class and the underlying goals of this litigation.

The proposed Settlement is an outstanding result for the Class, and provides significant monetary value to compensate every Class member for the impact the alleged improper practices had on their Class Vehicles. Plaintiffs are proud to present this Settlement to the Court, and respectfully request approval to give notice to the Class and set the matter for final settlement approval. *See* Fed. R. Civ. P. 23(e).

## II.     BACKGROUND AND PROCEDURAL HISTORY

### A.     Factual background: Plaintiffs alleged long-standing practices by the Defendants to manipulate fuel economy and emissions tests for the Class Vehicles.

Plaintiffs allege in the operative Amended Consolidated Complaint (the "Amended Complaint" or "Complaint") that Defendants altered fuel economy and emissions test results in certain gasoline-powered Porsche vehicles manufactured for model years 2005 through 2020 (the "Class Vehicles").[2] Notably, this alleged conduct occurred within the same companies and during similar time periods as the "Clean Diesel" and "Audi $CO_2$" emissions and fuel economy matters, which were the subject of parallel cases and class settlements in this MDL.

This case began after prominent German news site *Der Spiegel* in August 2020 broke news of possible emissions and fuel economy irregularities in Porsche's gasoline vehicles. Complaint ¶ 67. As these reports described, in September 2015, Porsche AG CEO Martin Mueller took over at Volkswagen AG following former CEO Martin Winterkorn's post-diesel-emissions-scandal resignation. After that transition, the new CEO at Porsche commissioned a systematic review of Porsche's gas fleet to determine if Porsche's gas fleet (like its diesel fleet) had emissions and fuel economy irregularities.  After engineers determined that the answer was "yes," Porsche subsequently reported its findings to the EPA and to German regulators. *Id.* ¶¶ 65-67.

Nearly two years after this initial news—and based on the extensive investigation, discovery, and testing, that followed—Plaintiffs now allege that Porsche used two strategies that could have impacted the emissions and fuel economy test results for the Class Vehicles. These strategies are described in Plaintiffs' operative Complaint as the "Axle Ratio Fraud" and the "Sport+ Fraud." As to the Axle Ratio Fraud, (referred to in the Settlement as the "Fuel Economy Matter"), Plaintiffs allege that Porsche used physically doctored vehicles for emissions and fuel economy testing, such that the hardware and software in the tested vehicles differed in material ways from the hardware and software in vehicles that were sold to the public. This practice included testing vehicles with a lower gear ratio than the models ultimately produced. *Id.* ¶ 72. A lower gear ratio consumes less gasoline and emits fewer pollutants than a higher ratio, because

---

[2] Plaintiffs filed the Amended Consolidated Complaint on June 15, 2022.

1   the axle can spin and propel the vehicle at fewer revolutions per minute. *Id.* ¶ 71.  As a result, the

2   test-specific vehicles with a lower gear ratio obtained better fuel economy and emitted less $CO_2$ in

3   the laboratory tests (the results of which were reported to the regulators and marketed to

4   consumers) than the higher gear ratio vehicles that were actually sold and leased to consumers. *Id.*

5   ¶ 72.

6          In addition to the Axle Ratio Fraud, Plaintiffs allege a second tactic through which

7   Porsche wrongly represented to the regulators that its vehicles' $NO_x$ emissions were compliant

8   with applicable limits in *all* available driving modes. These representations were not true, as some

9   vehicles equipped with a user-selected, high-performance "Sport+ mode" exceed legal emissions

10  limits in that mode. The impacted Sport+ Class Vehicles are now (or are expected to soon be) the

11  subject of a Porsche voluntary, regulator-approved recall that brings the vehicles into compliance

12  with applicable emissions standards in all modes.

13         As set forth in the Complaint, these practices persisted for years, and led to misleading

14  Monroney labels and marketing about the Class Vehicles' real-world fuel economy performance

15  and emissions compliance. Together, Plaintiffs allege that the conduct summarized above and in

16  the Amended Complaint deceived regulators, Plaintiffs, and the proposed Class about *true*

17  emissions performance and fuel economy in the Class Vehicles.  *See, e.g.*, *id.*  ¶ 68.

18         **B.      Procedural background: Plaintiffs investigated their claims through a
                   comprehensive discovery and technical vehicle testing process.**
19

20         After reports about potential emissions issues in Porsche gasoline vehicles first broke in

21  August 2020, consumers filed six class action lawsuits against Porsche AG, Porsche Cars North

22  America, Inc. (together, "Porsche") and Volkswagen AG ("Volkswagen") alleging that Porsche

23  modified its tested vehicles to alter fuel economy results and that certain vehicles did not comply

24  with relevant emissions regulations in Sport+ Mode. The filed actions were consolidated before

25  this Court with *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products*

26  *Liability Litigation*, MDL No. 2672 CRB (JSC).  The Court had previously appointed Plaintiffs'

27  Lead Counsel and a PSC in the MDL (Dkt. 1084), and ordered Plaintiffs to file a consolidated

28  complaint in the new Porsche gasoline matters.  *See* Dkt. 7756.

Plaintiffs and their experts continued to conduct extensive investigation and technical vehicle testing to detect discrepancies in emissions and fuel economy performance between lab and normal driving conditions. Thereafter, Plaintiffs' Lead Counsel filed a thorough, 417-page Consolidated Class Action Complaint reflecting their initial test results and investigation. Dkt. 7803.  In that Consolidated Complaint, Plaintiffs brought claims against Porsche and Volkswagen for fraud by concealment, violation of the Magnuson-Moss Warranty Act, breach of express and implied warranties, and violations of state consumer protection and unfair practices statutes of all 50 states and the District of Columbia.

On May 14, 2021, Porsche and Volkswagen filed a 60-page motion to dismiss for failure to state a claim.  Plaintiffs filed a 60-page opposition on August 12, 2021, and briefing on the motions to dismiss concluded on October 25, 2021. Dkt. 7862, 7884, 7901. A hearing on those pending motions was scheduled for December 10, 2021, but on October 29, 2021, the Parties asked the Court to postpone the hearing as they pursued detailed discovery and vehicle testing, and engaged in potential settlement discussions. Dkt. 7904.

As part of the extensive discovery efforts in this case, Plaintiffs and Defendants undertook exhaustive testing of dozens of representative Porsche models to assess the degree of impact, if any, on the vehicles that may have been affected by the alleged conduct.  Ultimately, the investigations and comprehensive testing program revealed and measured the scope of the impact on the vehicles.  Specifically, testing showed a measurable fuel economy difference of up to 1-2 miles per gallon (and correspondingly, a fleetwide $CO_2$ emissions increase) in certain "Fuel Economy Class Vehicles." As a result, the estimated fuel economy values for these vehicles will be revised, and the new values will be available on the EPA's "Fuel Economy Label Updates" website.[3] As a direct result of their vehicles' decreased fuel economy, consumers polluted more, paid more for fuel, and were inconvenienced by more frequent trips to the fuel pump through the duration of their ownership or lease of a Fuel Economy Class Vehicle.  Similarly, as to the Sport+ Class Vehicles, testing revealed an emissions exceedance while the vehicles operated in the high-performance Sport+ Mode. For these vehicles, Porsche has launched an EPA- and CARB-

---

[3] https://www.epa.gov/recalls/fuel-economy-label-updates, as well as www.fueleconomy.gov.

1   approved recall that will apply a software fix to bring the vehicles into compliance with relevant

2   emissions standards. SA ¶ 2.21.

3       In addition to the comprehensive vehicle testing, the Parties also engaged in extensive

4   document and information exchanges. This included the production and review of millions of

5   pages of potentially relevant documents from the MDL, more than 500,000 technical German-

6   language documents made available to Plaintiffs in Germany that relate to the design,

7   development, and testing of the Porsche Class Vehicles, and the production of over twelve

8   thousand additional pages of documents specific to issues unique to the Porsche Gasoline

9   litigation, including technical presentations and data that Porsche provided to the regulators. *See*

10  Declaration of David Stellings ("Stellings Decl.") ¶ 5.

11      Plaintiffs recently filed a 428-page Amended Consolidated Class Action Complaint to

12  account for these developments and to reflect their further knowledge of the technological

13  background and scope of the fuel economy and emissions issues gained throughout the

14  intervening months of litigation and discovery. The lengthy and detailed allegations in both the

15  Amended Complaint and the earlier Consolidated Complaint reflect the exacting process

16  undertaken by Class Counsel to analyze the complex technologies at issue in this case, and to

17  research, develop, and assert the various claims and the remedies available to those impacted by

18  the Defendants' conduct.

19      **C.    The Settlement process: The Parties engaged in a lengthy, evidence-based
20             negotiation.**

21      After Plaintiffs filed the Consolidated Complaint in January 2021, the Parties engaged in

22  extensive discovery and information exchanges regarding the claims and allegations therein.  This

23  included the review of millions of pages of documents, as well as a thorough testing of dozens of

24  vehicles conducted over more than a year's time. The Parties intended and believe that this

25  detailed and extensive testing regime covered all affected vehicles. SA at pp.1-2.

26       This technical information facilitated months of data-driven and sophisticated settlement

27  negotiations between the Parties, ultimately resulting in the proposed Settlement Agreement now

28  before the Court. Throughout these negotiations, the Parties held numerous settlement meetings,

1  including multiple in-person sessions in New York and Germany. The Parties continued their

2  discussions with many video and telephone conferences and exchanges of information before and

3  between those meetings. Stellings Decl. ¶¶ 8, 10.  By design, many of the in-person settlement

4  meetings included discussions with Porsche's in-house counsel, high-level engineers, and

5  technical experts.  Meanwhile, Plaintiffs' Counsel continued to spend considerable time and

6  resources investigating the strengths and weaknesses of their claims, including through a robust

7  and prolonged exchange of documents and information with the Defendants.  *Id.* ¶¶ 8, 11.  In

8  support of both the litigation and settlement efforts, Plaintiffs' counsel retained technical experts

9  to conduct testing on multiple vehicles from a range of models and model years under approved

10  federal vehicle testing procedures. This testing regime enabled Plaintiffs to measure and compare,

11  among other things, the vehicles' emissions and fuel economy results to those represented when

12  the vehicles were originally certified, and whether driving Sport+ mode caused the vehicles to

13  exceed relevant emissions limitations.

14        In response to regulatory inquiries and this litigation, Defendants also undertook their own

15  comprehensive testing and analysis of the emissions and fuel economy of the Class Vehicles.

16  Plaintiffs' counsel and their experts reviewed Defendants' testing data, discussed the testing

17  methodology with Defendants and their engineers at length, and observed some of the testing in

18  person.  *Id.* ¶ 10.  In October 2021, Plaintiffs and their experts traveled to Porsche's facilities in

19  Weissach, Germany to observe Porsche's fuel economy and emissions testing for the Class

20  Vehicles and to assess first-hand the Emissions Compliant Repair that Porsche developed (and the

21  regulators approved) for Sport+ Class Vehicles.  *Id.* During that trip, Plaintiffs' counsel met with

22  several high-level engineers and other personnel responsible for investigating the alleged testing

23  irregularities in the Class Vehicles.  Plaintiffs continued that discussion in March 2022 at

24  Porsche's headquarters in Stuttgart, Germany. There, Plaintiffs further evaluated Porsche's

25  testing, reviewed updated test results, and held further discussions with Porsche's engineers and

26  attorneys. *Id.*

27

28

The outcome of all these meetings, exchanges of information, and months of negotiations is a proposed Agreement under which the Defendants will pay at least $80 million to the benefit of the proposed Class.

## III.   SUMMARY OF SETTLEMENT TERMS

The Settlement provides substantial cash compensation to each Class Member through a streamlined, state-of-the-art claims process that includes automatic payments for many Class members.

### A.   The Settlement Class definition

The Settlement Class is defined as follows: "a nationwide class of all persons (including individuals and entities) who own, owned, lease, or leased a Class Vehicle." SA ¶ 2.8.[4]  The Class Vehicles include approximately 500,000 Porsche gasoline vehicles, model years 2005-2020, as defined in the proposed Settlement Agreement. *Id.* ¶ 2.14.

### B.   Settlement Benefits to Class members

The proposed Settlement delivers substantial cash payments to any Class Member who submits a valid claim and/or obtains the Sport+ Emissions Compliant Repair. The amount of compensation available to each Class Member is based on the model and model year Class Vehicle they purchased or leased, and the degree to which there is a measured impact on their Class Vehicle from the conduct and testing practices at issue.

Class members with a Fuel Economy Class Vehicle will receive cash compensation for (1) the difference in cost for the amount of gasoline that would have been required under the original Monroney fuel economy label and the greater amount required under the adjusted fuel economy label, and (2) a goodwill payment of an additional 15% of those damages to compensate for any inconvenience. *Id.* ¶ 4.1.  The payments range from $250 to $1,109.66 for Class members who

---

[4] Those excluded from the Class are: (a) Defendants' officers, directors and employees and participants in the Porsche Associate Lease Program; Defendants' affiliates and affiliates' officers, directors and employees; Defendants' distributors and distributors' officers, directors and employees; (b) Judicial officers and their immediate family members and associated court staff assigned to this case;  (c) All individuals who leased a Class Vehicle from a lessor other than Porsche Financial Services; (d) All individuals who are not Tested Fuel Economy Class Members, Sport+ Class Members, or Fuel Economy Class Members; and (e) All those otherwise in the Class who or which timely and properly exclude themselves from the Class as provided in this Class Action Agreement. SA ¶ 2.8.

1    owned the vehicle for all 96 months after the vehicle was first sold or leased (the full useful life of

2    the vehicle). *Id.*, Ex. 1.  Compensation for Class members who sold, purchased used, or leased

3    their Fuel Economy Class Vehicles follows the same concept, but will be prorated to the number

4    of months of their ownership or possession.

5         In addition to the Fuel Economy Class Vehicles, testing indicated that certain Class

6    Vehicles equipped with "Sport+" driving mode exceeded emissions limits when driven in that

7    mode (the "Sport+ Class Vehicles").  Porsche expects that Class members with a Sport+ Class

8    Vehicle will be offered an emissions compliant repair ("ECR") software update that will reduce

9    their vehicles' emissions in Sport+ Mode and bring them into compliance with the relevant

10   regulatory limits. Class members with a Sport+ vehicle will *automatically* receive a $250 cash

11   payment upon completion of the ECR, without having to submit any further claim for

12   compensation.[5] This is a significant payment to incentivize Class members to bring their Class

13   Vehicle to a Porsche dealership for an ECR, and to compensate them for their time and

14   inconvenience in doing so.[6]

15        Finally, Class members with "Other Class Vehicles" for which emissions or fuel economy

16   deviations were not identified through the Parties' extensive investigation and testing efforts—but

17   which could conceivably have experienced a discrepancy given the timing and circumstances of

18   their development and manufacture—will also be offered meaningful cash payments of up to

19   $200 per vehicle, depending on the overall settlement claims rate. If an *extraordinary* claims rate

20   causes the allocation to the Other Class Vehicles to fall below $150 per vehicle, Defendants have

21   agreed to pay an *additional* $5 million into the Settlement Fund, bringing the total to $85 million.

22        If there are any funds remaining in the Settlement Value after all valid, complete, and

23   timely Claims are paid, the Parties anticipate a redistribution of the remaining funds to Class

24   members unless and until it is economically infeasible to do so. SA ¶ 4.4. Finally, after a

25   redistribution, and subject to Court approval, any final balance will be directed *cy pres* to

26

27   [5] Payments to Sport+ Class Members will be automatic given the contemporaneous records and
     contact information available after obtaining the Sport+ ECR at a Porsche dealership, thereby
     eliminating the need to submit a claim form.

28   [6] Defendants are in the process of obtaining regulator approval for an ECR for a small fraction of
     the Sport+ Class Vehicles; the ECRs for the vast majority of vehicles has already been approved.

1   environmental remediation efforts. *Id.* This ensures that *all* of the money secured by the

2   Settlement will inure to the benefit of the Class and the interests advanced in this litigation.

3         **C.**      **Notice and Claims Administration**

4         The fees and costs of the Settlement Administrator—in implementing the notice program,

5   administering the claims process, mailing checks as necessary, and performing the other

6   administrative tasks described in the Settlement—will be paid from the Settlement Fund.  SA

7   ¶¶ 5.4, 9.3. The proposed Settlement Administrator was selected through a competitive bidding

8   and interview process. Proposed Settlement Class Counsel received and analyzed bids from 6

9   respected and experienced administrators. Stellings Decl., ¶ 19.  Ultimately, after multiple rounds

10  of vetting, Plaintiffs, with the consent of Defendants, selected JND Legal Administration.  JND is

11  a well-known firm that has successfully administrated numerous class settlements and judgments.

12  *See* Declaration of Jennifer Keough, ("Keough Decl."), ¶¶ 7, 8. Lead Counsel has engaged JND

13  as the settlement claims and/or notice provider in approximately 8 cases over the last two years,

14  but has also worked with numerous other providers over this time period.  Stellings Decl. ¶ 21.

15  JND estimates that the Notice and Administrative Costs in this case will range from

16  approximately $1.5 million to $2.5 million, with the total based on the final tally of owners,

17  lessees, and claims associated with the approximately 500,000 Class Vehicles. Plaintiffs believe

18  the estimates are reasonable and necessary given the extensive size of the Class and the

19  proportional costs to send notice and administer claims.

20        **D.**      **Attorneys' Fees, Expenses, and Service Awards**

21        Proposed Settlement Class Counsel will apply to the Court for an award of reasonable

22  attorneys' fees in a total amount not to exceed $24 million (*i.e.*, up to 30% of the Settlement

23  Fund) and reimbursement of reasonable litigation expenses up to $1.1 million.  Settlement Class

24  Counsel will also apply for service awards of up to $250 for each of the 33 named Plaintiffs, to

25  compensate them for their efforts and commitment in prosecuting this case on behalf of the

26  Settlement Class. Any attorneys' fees, expenses, and service awards granted by the Court will be

27  paid from the Settlement Fund.  SA ¶¶ 12.1, 16.2.

28

1    **IV.**    **LEGAL STANDARD FOR PRELIMINARY APPROVAL AND DECISION TO GIVE NOTICE**

2

3      Federal Rule of Civil Procedure 23(e) governs a district court's analysis of the fairness of

4 a proposed class action settlement and creates a three-step process for approval.  First, a court

5 must determine that it is likely to (i) approve the proposed settlement as fair, reasonable, and

6 adequate, after considering the factors outlined in Rule 23(e)(2), and (ii) certify the settlement

7 class after the final approval hearing.  *See* Fed. R. Civ. P. 23(e)(1)(B); *see also* 2018 Advisory

8 Committee Notes to Rule 23 (standard for directing notice is whether the Court "likely will be

9 able both to approve the settlement proposal under Rule 23(e)(2) and . . . certify the class for

10 purposes of judgment on the proposal").  Second, a court must direct notice to the proposed

11 settlement class, describing the terms of the proposed settlement and the definition of the

12 proposed class, to give them an opportunity to object or to opt out.  *See* Fed. R. Civ. P.

13 23(c)(2)(B); Fed. R. Civ. P. 23(e)(1), (5).  Third, after a hearing, the court may grant final

14 approval of the proposed settlement on a finding that the settlement is fair, reasonable, and

15 adequate, and certify the settlement class.  Fed. R. Civ. P. 23(e)(2).  In this District, a movant's

16 submission should also include the information called for under the District's Procedural

17 Guidance for Class Action Settlements ("Procedural Guidance").  Where, as here, "the parties

18 negotiate a settlement agreement before the class has been certified, settlement approval requires

19 a higher standard of fairness and a more probing inquiry than may be normally required under

20 Rule 23(e)." *Roes 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048 (9th Cir. 2019).

21    **V.**    **ARGUMENT**

22      **A.**    **The Court will be able to certify the proposed Class for settlement purposes upon final approval.**

23

24      Certification of a settlement class is "a two-step process." *In re Volkswagen "Clean*

25 *Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672 CRB (JSC), 2016 WL 4010049,

26 at *10 (N.D. Cal. July 26, 2016) (Breyer, J.) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S.

27 591, 613 (1997)).  First, the Court must find that the proposed settlement class satisfies the

28 requirements of Rule 23(a).  *Id.* (citing Fed. R. Civ. P. 23(a)).  Second, the Court must find that "a

1    class action may be maintained under either Rule 23(b)(1), (2), or (3)." *Id.* (citing *Amchem*, 521

2    U.S. at 613).  The proposed Settlement Class here readily satisfies all Rule 23(a)(1)-(4) and (b)(3)

3    certification requirements. *See In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557 (9th Cir.

4    2019) (en banc) (upholding district court's preliminary approval and certification of nationwide

5    settlement class in similar fuel economy settlement); *see also* Dkt. 6764 (Order granting

6    preliminary approval and directing notice in similar fuel economy settlement in the Audi $CO_2$

7    Cases in this litigation).

1.       **The Settlement Class meets the requirements of Rule 23(a).**

a.       **Rule 23(a)(1): The Class is sufficiently numerous.**

10       Rule 23(a)(1) requires that "the class is so numerous that joinder of all class members is

11   impracticable."  Fed. R. Civ. P. 23(a)(1).  A "class of 41 or more is usually sufficiently

12   numerous." 5 *Moore's Federal Practice—Civil* § 23.22 (2016); *see also Hernandez v. Cty. of

13   Monterey*, 305 F.R.D. 132, 153 (N.D. Cal. 2015).  The Settlement Class, as defined, includes

14   current and former owners and lessees of at least 500,000 Class Vehicles. Numerosity is easily

15   satisfied here.

b.       **Rule 23(a)(2): The Class Claims present common questions of
                  law and fact.**

18       "Federal Rule of Civil Procedure 23(a)(2) conditions class certification on demonstrating

19   that members of the proposed class share common 'questions of law or fact.'"  *Stockwell v. City

20   & Cty. of San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014).  Commonality "does not turn on

21   the number of common questions, but on their relevance to the factual and legal issues at the core

22   of the purported class' claims."  *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014).

23   "'Even a single question of law or fact common to the members of the class will satisfy the

24   commonality requirement.'"  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 369 (2011).[7]

25       Courts routinely find commonality where, as here, the class claims arise from a

26   defendant's uniform course of fraudulent conduct.  *See, e.g.*, *In re Chrysler-Dodge-Jeep

27   Ecodiesel Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 17-MD-02777-EMC, 2019 WL

28

---

[7] Here, and throughout, internal citations are omitted unless otherwise indicated.

536661, at *6 (N.D. Cal. Feb. 11, 2019) (commonality satisfied where claims arose from the defendants' "common course of conduct" in perpetrating alleged vehicle emissions cheating scheme); *Cohen v. Trump*, 303 F.R.D. 376, 382 (S.D. Cal. 2014) (finding "common questions as to 'Trump's scheme and common course of conduct, which ensnared Plaintiff[] and the other Class members alike."").[8]

Here, the Settlement Class claims are rooted in common questions of fact relating to Defendants' alleged irregularities relating to emissions and fuel economy test results in the Class Vehicles, and related representations to regulators and consumers. *See, e.g.*, Am. Compl. ¶ 1; *see also In re Hyundai,* 926 F.3d at 557 (similar common questions about misrepresented fuel economy ratings satisfied commonality requirement). These common questions will, in turn, generate common answers "apt to drive the resolution of the Clitigation" for the Settlement Class as a whole. *See Dukes*, 564 U.S. at 350. As the Settlement Class's "injuries derive from [D]efendants' alleged 'unitary course of conduct,'" Plaintiffs have "'identified a unifying thread that warrants class treatment.'" *Sykes v. Mel Harris & Assocs. LLC*, 285 F.R.D. 279, 290 (S.D.N.Y. 2012), *aff'd* 780 F.3d 70 (2d Cir. 2015). As in the *Volkswagen* diesel litigation, "[w]ithout class certification, individual Class members would be forced to separately litigate the same issues of law and fact which arise from Volkswagen's use of the [emissions cheat] and Volkswagen's alleged common course of conduct." 2016 WL 4010049, at *10.

### c.   Rule 23(a)(3): The Settlement Class Representatives' claims are typical of other Class members' claims.

Under Rule 23(a)(3), Plaintiffs' claims are "typical" if they are "reasonably coextensive with those of absent class members; they need not be substantially identical." *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (citation omitted). "The test of typicality is whether other

---

[8] Likewise, commonality is satisfied in cases where defendants deployed uniform misrepresentations to deceive the public (such as the Monroney labels and other advertisements for the Class Vehicles here). *See Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("Courts routinely find commonality in false advertising cases . . . ."); *Astiana v. Kashi Co.*, 291 F.R.D. 493, 501-02 (S.D. Cal. 2013) (same); *see also Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 478 (C.D. Cal. 2012) (whether misrepresentations "are unlawful, deceptive, unfair, or misleading to reasonable consumers are the type of questions tailored to be answered in 'the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation'") (quoting *Dukes*, 564 U.S. at 350).

1    members have the same or similar injury, whether the action is based on conduct which is not

2    unique to the named plaintiffs and whether other class members have been injured by the same

3    course of conduct." *Hernandez*, 305 F.R.D. at 159. Typicality "assure[s] that the interest of the

4    named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am.,*

5    *LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting *Hanon v. Dataprods. Corp.*, 976 F.2d 497,

6    508 (9th Cir. 1992)). Thus, where a plaintiff suffered a similar injury and other class members

7    were injured by the same course of conduct, typicality is satisfied. *See Parsons*, 754 F.3d at 685;

8    *see also Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012).

9         Here, the same course of conduct injured the Settlement Class Representatives and the

10   other members of the proposed Settlement Class in the same ways. The Settlement Class

11   Representatives, like other Settlement Class members, purchased or leased Class Vehicles that

12   did not or may not obtain the fuel economy and emissions performance they reasonably expected.

13   As a result, they had to pay for more gas and visit the gas pump more frequently, and/or will take

14   their vehicles in for a software fix to ensure their compliance with emissions regulations. The

15   typicality requirements are satisfied.

16             **d.      Rule 23(a)(4): The Settlement Class Representatives and Class
                         Counsel have and will protect the interests of the Class.**
17

18        Rule 23(a)(4)'s adequacy requirement is met where, as here, "the representative parties

19   will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy

20   entails a two-prong inquiry: "'(1) do the named plaintiffs and their counsel have any conflicts of

21   interest with other class members and (2) will the named plaintiffs and their counsel prosecute the

22   action vigorously on behalf of the class?'" *Evon*, 688 F.3d at 1031 (quoting *Hanlon* v. *Chrysler*

23   *Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). Both prongs are readily satisfied here.

24        The Settlement Class Representatives have no interests antagonistic to Settlement Class

25   members and will continue to protect the Class's interests in overseeing the Settlement

26   administration and through any appeals. *See Clemens v. Hair Club for Men, LLC*, No. C 15-

27   01431 WHA, 2016 WL 1461944, at *2-3 (N.D. Cal. Apr. 14, 2016). Indeed, the Settlement Class

28   Representatives "are entirely aligned [with the Settlement Class] in their interest in proving that

1    [Defendants] misled them and share the common goal of obtaining redress for their injuries."

2    *Volkswagen*, 2016 WL 4010049, at *11.  The Representatives understand their duties, have

3    agreed to consider the interests of absent Settlement Class members, and have reviewed and

4    uniformly endorsed the Settlement terms.  *See* Stellings Decl. ¶ 22*; see also, e.g.*, *Trosper v.*

5    *Styker Corp.*, No. 13-CV-0607-LHK, 2014 WL 4145448, at *12 (N.D. Cal. Aug. 21, 2014) ("All

6    that is necessary is a 'rudimentary understanding of the present action and … a demonstrated

7    willingness to assist counsel in the prosecution of the litigation.'").  The proposed Settlement

8    Class Representatives are more than adequate.

9        Similarly, as demonstrated throughout this litigation, Lead Counsel and many of the PSC

10   firms have undertaken an enormous amount of work, effort, and expense in this MDL and in

11   litigating the Porsche Gasoline cases. They have demonstrated their willingness to devote

12   whatever resources were necessary to reach a successful outcome throughout the nearly one and

13   half years since filing the Consolidated Complaint.  They, too, satisfy Rule 23(a)(4).

14            **2.       The Settlement Class meets the requirements of Rule 23(b)(3).**

15       Rule 23(b)(3)'s requirements are also satisfied because (i) "questions of law or fact

16   common to class members predominate over any questions affecting only individual members";

17   and (ii) a class action is "superior to other available methods for fairly and efficiently adjudicating

18   the controversy."  Fed. R. Civ. P. 23(b)(3).

19            **a.       Common issues of law and fact predominate.**

20        "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in

21   the case are more prevalent or important than the non-common, aggregation-defeating, individual

22   issues.'"  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).  "When 'one or more

23   of the central issues in the action are common to the class and can be said to predominate, the

24   action may be considered proper under Rule 23(b)(3) even though other important matters will

25   have to be tried separately, such as damages or some affirmative defenses peculiar to some

26   individual class members.'"  *Id.*  At its core, "[p]redominance is a question of efficiency."

27   *Butler v. Sears, Roebuck & Co.*, 702 F.3d 359, 362 (7th Cir. 2012).  Thus, "[w]hen common

28   questions present a significant aspect of the case and they can be resolved for all members of the

1    class in a single adjudication, there is clear justification for handling the dispute on a

2    representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022.

3        The Ninth Circuit favors class treatment of fraud claims stemming from a "'common

4    course of conduct.'" *See In re First Alliance Mortg. Co.*, 471 F.3d 977, 990 (9th Cir. 2006);

5    *Hanlon*, 150 F.3d at 1022-23.  Even outside of the settlement context, predominance is readily

6    satisfied for consumer claims arising from the defendants' common course of conduct.  *See*

7    *Amchem Prods.*, 521 U.S. at 625; *Wolin*, 617 F.3d at 1173, 1176 (consumer claims based on

8    uniform omissions certifiable where "susceptible to proof by generalized evidence," even if

9    individualized issues remain); *Friedman v. 24 Hour Fitness USA, Inc*., No. CV 06-6282 AHM

10   (CTx), 2009 WL 2711956, at *8 (C.D. Cal. Aug. 25, 2009) (common issues predominate where

11   alleged injury is a result "of a single fraudulent scheme.").

12       Here, too, questions of law and fact common to the Settlement Class members' claims

13   predominate over any questions affecting only individual members, because the common issues

14   "turn on a common course of conduct by the defendant in [a] nationwide class action."  *See In re*

15   *Hyundai*, 926 F.3d at 559 (citing *Hanlon*, 150 F.3d at 1022–23).  Indeed, "[i]n many consumer

16   fraud cases, the crux of each consumer's claim is that a company's mass marketing efforts,

17   common to all consumers, misrepresented the company's product"—here, the vehicles' fuel

18   efficiency and emissions-compliant performance.  *Id.*

19       Similar to *Hyundai*, Defendants' common course of conduct—the alleged irregularities as

20   to emissions and fuel economy test results—are central to the claims asserted in the Amended

21   Complaint.  Common, unifying questions as to the Defendants' conduct include, for example,

22   "(1) "[w]hether the fuel economy statements were in fact inaccurate"; and (2) "whether [the

23   Defendants] knew that their fuel economy statements were false or misleading." *Id.*  The alleged

24   misrepresentations to the Class were (among other sources) "uniformly made via Monroney

25   stickers." *Id.* (internal quotation marks omitted).  As such, Defendants allegedly "perpetrated the

26   same fraud in the same manner against all Class members."  *Volkswagen*, 2016 WL 4010049, at

27   *12.  Predominance is satisfied.

28

**b.   Class treatment is superior to other available methods for the resolution of this case.**

Superiority asks "whether the objectives of the particular class action procedure will be achieved in the particular case." *Hanlon*, 150 F.3d at 1023.  In other words, it "requires the court to determine whether maintenance of this litigation as a class action is efficient and whether it is fair." *Wolin*, 617 F.3d at 1175-76.  Under Rule 23(b)(3), "the Court evaluates whether a class action is a superior method of adjudicating plaintiff's claims by evaluating four factors:  '(1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action.'" *Trosper*, 2014 WL 4145448, at *17.

Class treatment here is far superior to the litigation of hundreds of thousands of individual consumer actions.  "From either a judicial or litigant viewpoint, there is no advantage in individual members controlling the prosecution of separate actions.  There would be less litigation or settlement leverage, significantly reduced resources and no greater prospect for recovery." *Hanlon*, 150 F.3d at 1023; *see also Wolin*, 617 F.3d at 1176 ("Forcing individual vehicle owners to litigate their cases, particularly where common issues predominate for the proposed class, is an inferior method of adjudication.").  The maximum damages sought by each Settlement Class Member (ranging from $250-$1,109.66 per Fuel Economy Class Vehicle, up to $250 for Sport+ Vehicles, and up to $200 for each Other Class Vehicle), while significant to individual Class members, are relatively small in comparison to the substantial cost of prosecuting each one's individual claims, especially given the technical nature of the claims at issue. *See Smith v. Cardinal Logistics Mgmt. Corp.*, No. 07-2104 SC, 2008 WL 4156364, at *11 (N.D. Cal. Sept. 5, 2008) (small interest in individual litigation where damages averaged $25,000-$30,000 per year of work).

Class resolution is also superior from an efficiency and resource perspective.  Indeed, "[i]f Class members were to bring individual lawsuits against [Defendants], each Member would be

1   required to prove the same wrongful conduct to establish liability and thus would offer the same

2   evidence." *Volkswagen*, 2016 WL 4010049, at *12.  With a Class of well over 500,000

3   associated with at least that many Class Vehicles, "there is the potential for just as many lawsuits

4   with the possibility of inconsistent rulings and results." *Id.*  "Thus, classwide resolution of their

5   claims is clearly favored over other means of adjudication, and the proposed Settlement resolves

6   Class members' claims at once." *Id.* Superiority is met here, and Rule 23(e)(1)(B)(ii) is satisfied.

7                                              * * *

8        For all the reasons set forth above, Plaintiffs respectfully submit that the Court will—after

9   notice is issued and Class member input received—"likely able to . . . certify the class for

10  purposes of judgment on the proposal." *See* Fed. R. Civ. P. 23(e)(1)(B).

11      **B.      The Court should appoint Lead Plaintiffs' Counsel as Interim Settlement
12              Class Counsel under Rule 23(g)(3).**

13       The Court is required to appoint class counsel to represent the Settlement Class.  *See* Fed.

14  R. Civ. P. 23(g).  At the outset of the MDL, as part of a competitive application process with a

15  total of 150 submissions, the Court chose Lead Counsel and each member of the PSC due to their

16  qualifications, experience, and commitment to the successful prosecution of this litigation.  *See*

17  Dkt. 1084.  The criteria that the Court considered in appointing Lead Counsel and the PSC align

18  with the considerations set forth in Rule 23(g).  *See, e.g.*, *Clemens*, 2016 WL 1461944, at *2.  As

19  noted above, Lead Counsel and several of the PSC firms have undertaken an enormous amount of

20  work, effort, and expense in this MDL and in litigating the Porsche gasoline cases.  *See* Stellings

21  Decl. ¶¶ 5-7.  Plaintiffs therefore submit that Lead Counsel should be appointed as Interim

22  Settlement Class Counsel under Rule 23(g)(3) to conduct the necessary steps in the Settlement

23  approval process.

24      **C.      The Settlement is fair, reasonable, and adequate.**

25       Rule 23(e)(2) identifies several criteria for the Court to use in deciding whether to grant

26  preliminary approval of a proposed class settlement and direct notice to the proposed class.  A

27  "presumption of correctness" attaches where, as here, a "class settlement [was] reached in arm's-

28  length negotiations between experienced capable counsel after meaningful discovery."  *See Free*

*Range Content, Inc. v. Google, LLC*, No. 14-CV-02329-BLF, 2019 WL 1299504, at *6 (N.D. Cal. Mar. 21, 2019). The Settlement proposed here readily satisfies the criteria for preliminary approval.

**1.    Rule 23(e)(2)(A): Class Counsel and the Settlement Class Representatives have and will continue to zealously represent the Class.**

Class Counsel and the Settlement Class Representatives fought hard to protect the interests of the Class, as evidenced by the significant compensation available to the Class through the proposed Settlement. Class Counsel prosecuted this action and the fair resolution of it with vigor and dedication since the Porsche Gasoline litigation began in 2020. *See* Fed. R. Civ. P. 23(e)(2)(A). As detailed above, Class Counsel undertook significant efforts to uncover the facts—including retaining technical experts and conducting multiple rounds of vehicle testing—to continuously prosecute and refine the Class claims. Class Counsel also engaged in robust Rule 12 motion practice—researching, drafting, and filing a thorough, 60-page opposition brief to Defendants' motion to dismiss. *See* § II.B, *supra*.

The Settlement Class Representatives are actively engaged. Each worked with counsel to review and evaluate the terms of the proposed Settlement Agreement and has endorsed its terms. Each Representative has also expressed their continued willingness to protect the Class until the Settlement is approved and its administration completed. *See* Stellings Decl. ¶ 22.

**2.    Rule 23(e)(2)(B): The Settlement is the product of good faith, informed, and arm's-length negotiations.**

The Parties undertook serious, informed, and arm's-length negotiations over more than a year's time—including multiple in-person negotiation sessions in Germany and New York and multiple remote sessions via video and telephone. *Id.* ¶ 8. These detailed, technical, and evidence-based discussions culminated in in the proposed Settlement now before the Court. *See* Fed. R. Civ. P. 23(e)(2)(B).

With negotiations ongoing, and as described above (§ II.C), Class Counsel retained technical experts to independently test Class Vehicles and analyze comprehensive data on the vehicles' emissions and fuel economy performance, including in the user-selected Sport+ mode.

1    Defendants likewise conducted an extensive testing and review process, which included third-

2    party validation of the results.  The Parties agreed to share information about their independent

3    processes and results to facilitate informed negotiations.  This robust process included, among

4    other things, vehicle testing conducted in Germany with experts from all Parties; detailed

5    questioning of high-level Porsche managers and engineers; review and analysis of millions of

6    pages of documents pertaining to Porsche vehicles, including documents that had been produced

7    in the MDL; over 500,000 technical German language documents made available to Plaintiffs' in

8    Germany; and more than twelve thousand pages of documents specific to certain issues in the

9    Porsche Gasoline cases. Stellings Decl. ¶ 5.

10        Where extensive information has been exchanged, "[a] court may assume that the parties

11   have a good understanding of the strengths and weaknesses of their respective cases and hence

12   that the settlement's value is based upon such adequate information."  William B. Rubenstein, et

13   al., 4 Newberg on Class Actions § 13:49 (5th ed. 2012) ("*Newberg*"); *cf. In re Anthem, Inc. Data

14   Breach Litig.*, 327 F.R.D. 299, 320 (N.D. Cal. 2018) (concluding that the "extent of discovery"

15   and factual investigation undertaken by the parties gave them "a good sense of the strength and

16   weaknesses of their respective cases in order to 'make an informed decision about settlement")

17   (citing *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000)).

18        Here, too, the significant exchange of documents and information supports the Parties'

19   ability to make a well-supported decision on settlement.  Notably, discovery supporting a

20   settlement does not need to have been formally produced and can include documents and

21   information learned in related proceedings.  *See Linney v. Cellular Alaska P'ship*, 151 F.3d 1234,

22   1239–40, 1241 (9th Cir. 1998) (noting that formal discovery is not required for settlement

23   approval and that "[i]n particular, the district court and plaintiffs may rely on discovery developed

24   in prior or related proceedings"); *Wahl v. Yahoo! Inc.,* No. 17-CV-02745-BLF, 2018 WL

25   6002323, at *4 (N.D. Cal. Nov. 15, 2018) (granting final approval of class settlement although

26   "little formal discovery" was conducted, noting relevant inquiry was whether parties had

27   "sufficient information to evaluate the case's strengths and weaknesses.").  Here, Defendants have

28   produced or made available hundreds of thousands of documents relevant to Plaintiffs' claims in

1   the Porsche Gasoline matters, and millions more pages of relevant documents pertaining to

2   Porsche vehicles from the Audi $CO_2$ cases and the "Clean Diesel" MDL —all of which informed

3   Plaintiffs' understanding of the strengths and weaknesses of their claims.  Stellings Decl. ¶ 5.

4          A meaningful exchange of documents and information also evidences that the litigation

5   was adversarial, and therefore serves as "an indirect indicator that a settlement is not collusive but

6   arms-length."  4 *Newberg* § 13:49; *see also In re Anthem*, 327 F.R.D. at 320 ("Extensive

7   discovery is also indicative of a lack of collusion. . . ."); *In re Volkswagen "Clean Diesel" Mktg.,*

8   *Sales Practices, & Prods. Liab. Litig*., No. MDL 2672 CRB (JSC), 2019 WL 2077847, at *1

9   (N.D. Cal. May 10, 2019) ("Lead Counsel vigorously litigated this action during motion practice

10  and discovery, and the record supports the continuation of that effort during settlement

11  negotiations.").  Here, Plaintiffs reviewed and analyzed a significant production of the

12  Defendants' documents, data, and other information, and conducted on-the-ground investigations

13  with expert interviews and site visits to Defendant Porsche's testing facility in Weissach,

14  Germany, among other things.  Stellings Decl. ¶¶ 8, 10.

15         It is also worth noting that the methodology and outcomes of the Parties' testing were

16  independently assessed by the EPA and CARB, who have already approved the ECR for most of

17  the Sport+ Class Vehicles, and reviewed the fuel economy calculations underpinning the

18  Settlement's compensation formula for the Fuel Economy recovery.  The revised fuel economy

19  values will be updated on the official government website, www.fueleconomy.gov. *See In re*

20  *Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig*., No. MDL 2672 CRB

21  (JSC), 2016 WL 4010049 at *14 (N.D. Cal. Oct. 25, 2016), *aff'd sub nom. In re Volkswagen*

22  *"Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 895 F.3d 597 (9th Cir. 2018)

23  (government participation in negotiations weighed "heavily in favor" of approval); *Marshall v.*

24  *Holiday Magic, Inc*., 550 F.2d 1173, 1178 (9th Cir. 1977) ("The participation of a government

25  agency serves to protect the interests of the class members, particularly absentees, and approval

26  by the agency is an important factor for the court's consideration.").

27         But perhaps most importantly of all, the result of the negotiations speaks for itself.

28  Where, as here, the vast majority of Fuel Economy Class members stand to be fully compensated

1    for their damages (*see* Section V.C.3), and Sport+ and Other Class Vehicle Class members will

2    each be offered substantial compensation closely tethered to how their Class Vehicles were

3    affected from the conduct at issue, there is little room for argument that counsel failed to protect

4    the interests of the Class or otherwise engaged in collusive behavior.  *See* Stellings Decl. ¶¶ 14-

5    16; *see also In re Volkswagen*, 2019 WL 2077847, at *1 (granting final settlement approval where

6    "Lead Counsel ha[d] . . . a successful track record of representing [plaintiffs] in cases of this kind

7    . . . [and] attest[ed] that both sides engaged in a series of intensive, arm's-length negotiations" and

8    there was "no reason to doubt the veracity of Lead Counsel's representations").

9               **3.       Rule 23(e)(2)(C): The Settlement provides substantial compensation in
                           exchange for the compromise of strong claims.**

10

11          The Settlement provides substantial relief for the Class, especially considering (i) the

12   costs, risks, and delay of trial and appeal; (ii) the effectiveness of the proposed distribution plan;

13   and (iii) the fair terms of the requested award of attorney's fees.  *See* Fed. R. Civ. P. 23(e)(2)(C).

14          As noted above, the Settlement secures at least $80 million for cash payments to

15   compensate Class members for the impacts on their Class Vehicles due to the Defendants' alleged

16   practices of influencing regulatory test results.  The compensation available for Fuel Economy

17   Class Vehicles consists of (1) the difference in cost for the amount of gasoline that would have

18   been required under the original Monroney fuel economy label and the greater amount required

19   under the adjusted fuel economy label, and (2) a goodwill payment of an additional 15% of those

20   damages to compensate for any inconvenience.  This compensation formula, which is detailed in

21   the Long Form Notice, relies on a number of negotiated parameters—including the average miles

22   per year, the expected duration of ownership, and fuel cost—each of which is favorable to the

23   Class.

24          Specifically, the Settlement formula calculates the extra gallons attributable to the reduced

25   fuel economy based on specific data about the average annual mileage for the impacted Class

26   Vehicle models. Stellings Decl. ¶ 14.  Furthermore, the Settlement compensates Class members

27   for 96 months' worth of extra gasoline combined with the monthly estimates for average mileage.

28   *Id.*  This compares favorably to the number of months compensated in three recent class action

1   settlements related to fuel economy reductions, including in this MDL.  *See Ellis v. Gen. Motors,*

2   *LLC*, No. 2:16-cv-11747-GCS-APP, Dkt. 34-2 at 12 (E.D. Mich. July 14, 2017); *In re Hyundai*,

3   926 F.3d at 554; *In re Volkswagen "Clean Diesel"*, No. 15-md-2672, Dkts. 6764, 7244 (N.D.

4   Cal.) (orders granting preliminary and final approval of consumer class settlements in Audi $CO_2$

5   Cases using analogous compensation formula for fuel economy differential).

6          Finally, the compensation formula uses an estimated (inflation adjusted) fuel cost of $3.97

7   per gallon, and applies a 15% goodwill premium to account for any inconvenience to Class

8   members.  Given the scope of the Class Vehicles involved in this litigation, the $3.97 average

9   premium fuel price in the Settlement is a proxy for a wide range of market prices over a 21-year

10  period, from 2005 to 2026.[9]  Applying an average premium fuel price over this time period will

11  create a streamlined and efficient claims process that avoids an unwieldy individualized damages

12  formula, especially in light of the fact that many Fuel Economy Class Vehicles during this 21-

13  year period were subject to a range of higher or lower gas prices across different states at different

14  points in time. *See, e.g.*, *In re Volkswagen "Clean Diesel"*, No. 15-md-2672, Dkt. 3229 (Order

15  granting final approval of 3.0L settlement, and reasoning "a settlement that attempted to

16  compensate consumers on an individual basis . . . would require so many individualized

17  assessments that the cost and difficulty of administering it would necessarily result in fewer

18  benefits than the proposed Class-wide Settlement."). As such, this compensation formula will pay

19  all Fuel Economy Class members a very high percentage of their recoverable damages (and the

20  vast majority of them 100% of damages).[10] *See, e.g.*, Dkt. 6634-3, Declaration of Edward M.

21

22  [9] As to the $3.54 per gallon price in the Audi $CO_2$ Settlement, Mr. Stockton opined in 2019 that it
    compared favorably to the average retail price of premium gasoline from 2014 to 2019. Dkt.
23  6634-3 at ¶ 20. Here, the $3.54 per gallon price has been increased to $3.97 to account for
    inflation in the intervening years.

24  [10] For most of the Fuel Economy Class Vehicles, the 96 months of fuel usage for which they will
    be compensated has already concluded. For these vehicles, the $3.97 premium fuel price
25  conservatively estimates the average amount that the Fuel Economy Class Members paid at the
    pump over time and provides full compensation for the damages incurred. However, for a small
26  subset of Fuel Economy Class Vehicles first sold or leased fewer than 96 months ago (*i.e.* model
    years 2015 and onward, which make up approximately 18% of the affected vehicles), the 96
    months eligible for compensation is ongoing and will include the current surge in fuel prices in
27  the summer of 2022. An extended period of unusually high fuel prices in the coming years,
    without reprieve, could interfere with the intention to provide full compensation on fuel prices for
28  this subset of vehicles. Because the parties cannot predict the uncertainty of future gas prices and

Stockton, (opining that analogous compensation framework provided "full" compensation for class members' damages in a comparable fuel economy settlement). It is nearly identical to that approved by the Court in the similar Audi $CO_2$ Fuel Economy matter, with the exception that the gas price was increased from $3.54 to $3.97 to account for inflation in the years after that settlement. *See In re Volkswagen "Clean Diesel"*, No. 15-md-2672, Dkts. 6764, 7244.

The compensation for Sport+ and Other Class Vehicles is similarly significant, including a cash benefit of $250 to Sport+ Class members to incentivize and compensate them for the time in bringing their Class Vehicles to a dealership to receive the ECR, and a payment of up to $200 per vehicle to compensate Other Class Vehicle Class members whose vehicles conceivably could have been impacted by the conduct at issue, but for which no deviations were identified through the comprehensive testing program that the Parties believe covered all potentially impacted vehicles. This is an exceptional result for the compromise of contested claims that have not yet survived a motion to dismiss.

**a.** **The Settlement mitigates the risks, expenses, and delays the Class would bear with continued litigation.**

The Settlement benefits (described above) are even more impressive given the inherent uncertainties of continued litigation and the inevitable delay that would accompany it. Even if the Settlement had secured something less than actual damages, compromise of potential recovery in exchange for certain and timely provision of the benefits under the Settlement is an unquestionably reasonable outcome. *See Nobles v. MBNA Corp.*, No. C 06-3723 CRB, 2009 WL 1854965 at *2 (N.D. Cal. June 29, 2009) ("The risks and certainty of recovery in continued litigation are factors for the Court to balance in determining whether the Settlement is fair."); *Kim v. Space Pencil, Inc.*, No. C 11-03796 LB, 2012 WL 5948951, at *5 (N.D. Cal. Nov. 28, 2012) ("The substantial and immediate relief provided to the Class under the Settlement weighs heavily in favor of its approval compared to the inherent risk of continued litigation, trial, and appeal, as well as the financial wherewithal of the defendant.").

---

global disruptions in the fuel supply chain, the $3.97 figure—which is based on historic averages and adjusted for inflation—remains a fair and practicable way to approximate the fuel costs for these vehicles as well.

This case, like those cited above, is not without risk.  Defendants moved to dismiss the Consolidated Complaint, and there is little doubt they would raise similar arguments against the now-operative Amended Complaint should the litigation proceed.  The motion to dismiss is not yet decided, and the outcome of those motions was far from certain.

For example, one of the central arguments of Defendants' motion to dismiss is that Plaintiffs' claims about misleading fuel economy representations are preempted by the Environmental Policy and Conservation Act ("EPCA") as enforced by the Federal Trade Commission ("FTC"). A recent decision from the Eastern District of Michigan credited a similar argument in a fuel economy manipulation case and concluded that plaintiffs' claims based on EPA fuel economy estimates were both expressly and impliedly preempted by the EPCA. *See In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, No. 2:19-MD-02901, 2022 WL 551221, at *12 (E.D. Mich. Feb. 23, 2022). Plaintiffs respectfully submit that the better-reasoned authority rejects these arguments, including for the reasons articulated in Plaintiffs' opposition brief (*see* Dkt. 7884 at 19-28); *see also, e.g.*, *In re Toyota Rav4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067, 1095 (N.D. Cal. 2021) (rejecting EPCA/FTC preemption where plaintiffs alleged that failure to obtain advertised mileage range was due to diminished fuel tank capacity). Nonetheless, the recent decision from the Eastern District of Michigan stands to show that Defendants' preemption arguments are not without merit.

Success on Plaintiffs' individual state-law claims is likewise not guaranteed.  Indeed, courts have dismissed similar state-law claims in recent automotive cases. *See, e.g.*, *id.* at 1118 (dismissing Deceptive Trade Practices Act claims from Ohio based on conclusion that statute does not confer standing on consumers, and Nebraska and Oklahoma given an exemption under those statutes to claims based on vehicle advertising); *Gant v. Ford Motor Co.*, 517 F. Supp. 3d 707, 719 (E.D. Mich. 2021) (dismissing Michigan Consumer Protection Act claim and concluding that motor vehicle sales and lease transactions are not covered by the statute); *In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 1027 (N.D. Cal. 2018) (dismissing plaintiffs' common law fraud claims, and various other state-law claims for lack of privity and failure to obtain approval of state attorneys general);

UNOPPOSED MOTION FOR PRELIMINARY
APPROVAL OF CLASS SETTLEMENT AND NOTICE
MDL No. 2672 CRB (JSC)

*Counts v. Gen. Motors, LLC*, 237 F. Supp. 3d 572, 594 (E.D. Mich. 2017) (similar). Plaintiffs would likely face these same challenges, and others, here.

Finally, while Plaintiffs have not moved to certify a litigation class, that process would be expensive, lengthy, and, again, uncertain.  Avoiding years of additional, risky litigation in exchange for the immediate and significant cash payments is a principled compromise that works to the clear benefit of the Class.

> **b.    Class members will obtain relief through a straightforward claims process.**

The Parties were exacting and intentional in their efforts to ensure that the claims process will be straightforward and efficient. Class members will be able to select streamlined forms of e-payments, including through Venmo, PayPal, and other forms of online transfer. For Fuel Economy and Other Class Vehicles, Class members need only submit a short claim form online or by mail with basic documentation sufficient to establish their ownership or lease of a Class Vehicle and the duration for which they did so (*e.g.*, purchase agreement, sale documentation, and/or proof of current registration). No further action is required. Fuel Economy and Other Class members who have submitted a complete and valid claim will receive compensation after the Fuel Economy Claims Deadline, which is 120 days from the entry of the Preliminary Approval Order. SA ¶ 2.6. Sport+ Class members will receive compensation *automatically* after completing an ECR in their vehicle, for a period of eighteen months from the Preliminary Approval Order, to allow sufficient time for completion of the ECR. SA ¶ 2.6. [11]  The effort required and safeguards incorporated in this process are proportional to the compensation available, and necessary and appropriate to preserve the integrity of the Claims Program.

> **c.    Counsel will seek reasonable attorneys' fees and costs.**

Settlement Class Counsel will move for an award of reasonable attorneys' fees and reimbursement of their litigation expenses for work performed and expenses incurred in furtherance of this litigation pursuant to Pretrial Orders 7 and 11.  Fed. R. Civ. P. 23(e)(2)(C)(iii).

---

[11] For the small population of Sport+ Class Members for whom an ECR has not yet been formally approved by the regulators, this group will receive notice of the need to submit a claim form. Should approval of the ECR occur prior to the conclusion of the Claims Period, they too will receive payments automatically without the need to submit a claim.

1   Settlement Class Counsel currently anticipate requesting that the Court award a total of 30% of

2   the non-reversionary Settlement Fund in attorneys' fees, plus expenses (*i.e.*, approximately $25.1

3   million). As a percentage of the $85 million total compensation available to the Class, the

4   anticipated fee request will represent 28% of the settlement fund. This request is within the range

5   regularly approved in common fund settlements in this Circuit. *See, e.g.*, *Vizcaino v. Microsoft*

6   *Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002)  (observing that Ninth Circuit cases support that

7   between 20 and 30 percent of the settlement common fund in attorneys' fees is within the "usual

8   range"); *Hernandez v. Dutton Ranch Corp.*, No. 19-CV-00817-EMC, 2021 WL 5053476, at *6

9   (N.D. Cal. Sept. 10, 2021) (collecting cases and finding that"[d]istrict courts within this circuit,

10   including this Court, routinely award attorneys' fees that are one-third of the total settlement fund

11   . . . [s]uch awards are routinely upheld by the Ninth Circuit.").

12          Settlement Class Counsel will file their fee application, which will provide the supporting

13   basis for their request, at least 35 days in advance of the Objection Deadline, and it will be

14   available on the Settlement Website after it is filed.  Any attorneys' fees and expenses awarded by

15   the Court will be paid from the Settlement Fund following the Effective Date of the Settlement.

16   Based on their preliminary review, Class Counsel's total combined hours in this case through

17   April 30, 2022 are approximately 28,935 hours, for a total combined lodestar of approximately

18   $13,056,461 during that period.  The total combined litigation expenses in this case through April

19   30, 2022 are approximately $1,070,617.  Based on the above numbers, a fee and expense award

20   equal to 30% of the Settlement Fund plus costs, after subtracting the expenses portion, would

21   represent a 1.84 multiplier on Settlement Class Counsels' approximate lodestar.  Settlement Class

22   Counsel will continue to incur time in seeking settlement approval and on implementation efforts

23   should the Settlement be approved. Class Counsel will continue to review their respective

24   records, and will provide additional information regarding time and expenses and rationale for

25   their request in the fee application and in the class notice, so that Class members will have the

26   opportunity to comment on or object to the requested fees prior to the final approval hearing.[12]

27

28   ---

[12] Finally, there are no agreements between the Parties other than the Settlement.  *See* Fed. R. Civ. P. 23(e)(3) ("the parties seeking approval must file a statement identifying any agreement made in connection with the proposal").

1                  **4.        Rule 23(e)(2)(D): The Proposed Settlement treats all Class members equitably relative to one another.**

2

3  The proposed Settlement fairly and reasonably allocates payments among the Class

4  members tailored to the impact on their Class Vehicles. For Fuel Economy Class Vehicles, a

5  straightforward formula tied to the duration of possession of the Class Vehicle and the original

6  and amended mileage ratings for each particular Class Vehicle make and model.  The formula for

7  calculating the maximum compensation for each Class Vehicle is described above (*see* § V.C.3)

8  and further explained in the Long Form Notice. Keough Decl., Exhibit B.

9  Fuel Economy Class members who are the original owners of their Vehicles and

10  continued to own them for 96 months thereafter will receive the maximum compensation for that

11  Vehicle. All other Fuel Economy Class members will receive compensation under the same

12  formula, but prorated to account for the months that they owned or leased their Class Vehicles.

13  Prorating will occur only in instances where multiple valid claims are filed on the same Class

14  Vehicle; where only one timely and valid claim is filed for a particular Class Vehicle, the

15  compensation will cover the full 96 months. Fuel Economy Class members who purchased their

16  Vehicles used, but owned them as of the date this Motion is filed, will be entitled to compensation

17  for the months they have owned their Class Vehicles, as well as any remaining months up to a

18  total of 96 months after their Class Vehicles were first sold. Where a Class Vehicle has had

19  multiple owners, but only one owner submits a valid claim, the full value of the compensation

20  will not be prorated and will be distributed to the sole claimant for that vehicle.

21  Likewise, for Other Class Vehicles, Other Class Vehicle Class members who are the

22  original and sole owners of their vehicles will receive the maximum compensation for that

23  vehicle. All others will receive compensation under the same formula, divided by the numbers of

24  owners associated with a particular VIN.  Finally, for Sport+ Class Vehicles, all Sport+ Class

25  members who take their vehicle in for an ECR by the ECR deadline will automatically receive the

26  same payment of $250.

27  This system of calculating payment values in monthly increments, and based on the

28  degree of impact in a particular Class Vehicle make, model, and year, uses transparent and

objective criteria to determine Class Member payments.  These reasonable parameters ensure that

the Settlement treats Class members equitably relative to one another.  *See* Fed. R. Civ. P.

23(e)(2)(D); *see also In re Hyundai & Kia Fuel Econ. Litig.*, No. MDL 13-2424-GW(FFMx),

2014 WL 12603199 at *2 (C.D. Cal. Aug. 21, 2014) (granting preliminary approval of similar

settlement, where payment amounts for each make and model ranged from $240 to $1,420 and

were "correlated to the amount of the fuel economy misstatements" and thus "differences

between the recovery amounts stem[med] mostly from differences in the damages suffered . . .

rather than any improper favoring of one group of Class members over another.").

### 5.    The Proposed Settlement merits approval under this District's Procedural Guidance.

The Northern District's Procedural Guidance for Class Action Settlements provisions

relevant to this Agreement are addressed below. The discussion in other sections of this brief

provides relevant information regarding (and is equally applicable to) Procedural Guidance 1(f)

on the settlement allocation plan (*see* Section V.C.3); Procedural Guidance 2 on notice and claims

administrator selection (See Section III.C); Procedural Guidance 6 on attorneys' fees and costs

(*see* Section V.C.3.c); and Procedural Guidance 9 (*see* Section V.C.3.c). The remaining

applicable provisions—all of which favor approval of the proposed Settlement—are addressed

below.

#### a.    Preliminary Approval Guidance (1)(a) and (c): There are no meaningful differences between the litigation and Settlement Classes, and the released claims are consistent with those asserted in the Complaint.

Where a litigation class has not been certified, the Guidance instructs a party to explain

differences between the settlement class and claims to be released compared to the class and

claims in the operative complaint.  *See* Procedural Guidance, Preliminary Approval (1)(a), (1)(c).

Here, the proposed Settlement Class is essentially identical to the class in the Amended

Complaint. Am. Compl. ¶ 258.  The Settlement Class closes the class period, with a backstop as

of the date of filing for Preliminary Approval for most Class members,[13] and treats Class

[13] Sport+ Class Members who obtain a Sport+ Class Vehicle after settlement approval, but before

1   members equitably according to the duration of their possession of the Class Vehicle, and/or

2   whether their Class Vehicle will receive a software reflash for the Sport+ ECR. This minor

3   refinement in the definition of the Settlement Class is appropriate to facilitate a principled and

4   equitable Settlement, and reflects the fact that those who purchase or lease a Class Vehicle after

5   the filing of this motion will—both through this litigation and through the disclosures that are to

6   be amended on www.fueleconomy.gov—do so with full notice of the allegations resolved herein.

7        Finally, the claims released in the Settlement are limited to those arising out of the

8   "subject of the Complaint" including the Sport+ Matter and Fuel Economy Matter, which covers

9   the emissions and fuel economy practices alleged in the Complaint, the marketing of fuel

10  economy for the Class Vehicles, and the "the subject matter of the Action." SA ¶ 10.3.  Thus, the

11  claims at issue in the operative Amended Complaint and those released in the Settlement are

12  substantially the same, if not identical.

13            **b.**      **Preliminary Approval Guidance (1)(e): The Settlement
                            Recovery mirrors that available if Plaintiffs had prevailed in
14                          litigation on the merits.**

15       The Guidance instructs a party to address the "anticipated class recovery under the

16  settlement, the potential class recovery if plaintiffs had fully prevailed on each of their claims,

17  and an explanation of the factors bearing on the amount of the compromise."  *See* Procedural

18  Guidance, Preliminary Approval (1)(e).  These considerations are addressed in Section V.C.3,

19  above.  To recap, many Class members stand to receive *full* compensation for the Class Vehicles

20  impacted by the Fuel Economy matter (with at least a very high percentage for the remainder);

21  the benefits available for Other Class Vehicle and Sport+ are likewise substantial and meaningful

22  compensation for the harms alleged, and to incentivize Sport+ Class members to bring their

23  vehicles in for the ECR.

24       In sum, the Settlement secures compensation that meets or significantly exceeds virtually

25  all Class members' actual damages in compromise for contested and uncertain claims that, if

26  litigated to their conclusion, would not have resolved for several more years.

27

28  the ECR deadline, are not subject to this backstop, and instead have until the Sport+ ECR
    deadline to obtain compensation.

1

2

**c.**      **Preliminary Approval Guidance (1)(g): A substantial number of Class members are expected to participate through a streamlined claims program.**

3      The Settlement, the Notice Plan, and the Claims process are all designed to maximize

4   Class member participation and to ensure maximal recovery in the hands of individual Class

5   members.  Sport+ benefits will be distributed through a streamlined auto-payment system upon

6   completion of the Sport+ ECR, and will require no further action from Class members. Fuel

7   Economy and Other Class Vehicle compensation will be available through a simple claim form

8   supported by common documents minimally necessary to establish eligibility.  The amount of

9   compensation available to Class members, on the other hand, is considerable.  Furthermore,

10   Defendants are not incentivized to minimize participation because the $80 million Settlement

11   Value is fixed at the outset and non-reversionary, and any unclaimed monies will be redistributed

12   to Class members, and then otherwise put toward environmental remediation efforts, subject to

13   the Court's approval.[14]  Given all of the above, the Parties anticipate a high participation rate.

14

15

16

**d.**      **Preliminary Approval Guidance (1)(h) & (8): Unclaimed Settlement funds will be redistributed to Class members and then to environmental remediation efforts and will not revert to Defendants.**

17      As discussed above, unclaimed Settlement funds (if any) that are not paid directly to Class

18   members will not revert to Defendants. SA ¶ 4.4.  Instead, they will first be redistributed to Class

19   members who submit timely and valid claims until it is economically infeasible to do so.  Only

20   then will any remaining funds be directed toward "environmental remediation efforts"—

21   approved by the Court—that are consistent with "(1) the objectives of the underlying statute(s)

22   and (2) the interests of the silent class members."  *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039

23   (9th Cir. 2011).  This Settlement provision ensures that all parties are properly motivated to

24   compensate as many Class members as possible and that all the Settlement funds will benefit the

25   Class.  *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672

26   CRB (JSC), 2017 WL 672820, at *3 (N.D. Cal. Feb. 16, 2017) (granting preliminary approval of

27

28

---

[14] Defendants have agreed to contribute an additional $5 million to the Settlement Value in the event that allocation to Other Class Vehicles is less than $150, but this amount is reserved only to supplement the agreed-to $80 million settlement fund, which will not revert to the Defendants in any circumstance.

Bosch "Clean Diesel" settlement, including provision that remaining funds not distributed to the class would be "distributed through *cy pres* payments according to a distribution plan and schedule filed by Class Counsel and approved by the Court"). If there are remaining funds after initial and subsequent distributions to individual Class members, the Parties' selection of *cy pres* recipients (if any) will be announced on the Settlement Website—as explained in the Long Form Notice.

> **e.      Preliminary Approval Guidance (3)-(5): The proposed Notice Plan comports with Rule 23, Due Process, and this District's Procedural Guidance.**

As detailed below (§ V.D) and in the accompanying Keough Declaration, the notice program comports with the best-practices outlined in the Procedural Guidance. *See* Preliminary Approval Guidance (3). It also explains Class members' rights to opt-out of or object to the Settlement, and provides clear instructions for how and when to exercise those rights. *See* Preliminary Approval Guidance (4)-(5).

> **f.      Preliminary Approval Guidance (7): Plaintiffs will seek modest incentive awards for the Settlement Class Representatives.**

The Settlement Class Representatives will be entitled to the same compensation, calculated under the same formula, as all other Settlement Class members. In addition, Class Counsel intends to seek Court approval for modest service awards of up to $250 to compensate the Settlement Class Representatives for their time and efforts in prosecuting claims on behalf of the Class.

> **g.      Preliminary Approval Guidance (9): The Parties have proposed a reasonable schedule for the Settlement Approval Process that provides Class members sufficient time to exercise their rights.**

The last step in the settlement approval process is the fairness hearing, at which the Court may hear any evidence and argument necessary to evaluate the Settlement and the application for attorneys' fees and costs. The Parties propose a detailed schedule for final approval and implementation in the attached Proposed Order and Plaintiffs incorporate it by reference herein.

**h.     Preliminary Approval Guidance (10): The Settlement complies with the Class Action Fairness Act ("CAFA").**

Pursuant to the Settlement Agreement, Defendants will serve notices in accordance with the requirements of 28 U.S.C. § 1715(b) within ten days of the filing of this motion. SA ¶ 9.2. The Settlement fully complies with all of CAFA's substantive requirements because it does not provide for a recovery of coupons (28 U.S.C. § 1712), does not result in a net loss to any Class Member (28 U.S.C. § 1713), and does not provide for payment of greater sums to some Class members solely on the basis of geographic proximity to the Court (28 U.S.C. § 1714).

**i.     Preliminary Approval Guidance (11): Information about past distributions in comparable class settlements.**

Pursuant to the Guidance, Plaintiffs provide an "easy-to-read" chart detailing certain information about comparable settlements in the attached Stellings Declaration.  Stellings Decl., Attachment 1.  The settlements are four settlements that were previously negotiated by Class Counsel in this MDL: the 2.0-liter settlement (Dkt. 1685), the 3.0-liter settlement (Dkt. 2894), the Bosch settlement (Dkt. 2918), and the Audi $CO_2$ settlement reached most recently (Dkt. 6634-1). As the chart shows, those settlements have delivered more than **$10 billion** in compensation to the classes. Stellings Decl., Attachment 1.

The Settlement now before the Court will utilize a similar notice and outreach program, provides substantial compensation, and utilizes a simplified administration.  Class Counsel are therefore able to predict with some confidence that much of the money available to Class members will be paid out in this case as well.  And notably, to the extent money remains after the Class is paid, it too will be redistributed to Class members, and only then directed towards efforts that benefit the interests of the Class and the causes advanced in this litigation.

**D.     The Proposed Notice Plan provides the best practicable notice.**

Rule 23(e)(1) requires that before a proposed settlement may be approved, the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal."  "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and come forward and be heard.'"

1   *Churchill Vill., L.L.C., v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).  For a Rule 23(b)(3)

2   Settlement class, the Court must "direct to class members the best notice that is practicable under

3   the circumstances, including individual notice to all members who can be identified through

4   reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).  The best practicable notice is that which is

5   "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency

6   of the action and afford them an opportunity to present their objections." *Mullane v. Cent.*

7   *Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

8       The proposed Notice Plan meets these standards.  The Parties created this proposed

9   program—including both the content and the distribution plan—with JND Legal Administration,

10   an experienced firm specializing in notice in complex class action litigation.  The program

11   includes a Long and Short Form Notice and a comprehensive Settlement Website that are clear

12   and complete, and that meet all the requirements of Rule 23 and the Procedural Guidance.

13       The Long Form Notice is designed to explain Class members' rights and obligations under

14   the Settlement in clear terms and in a well-organized and reader-friendly format, and follows the

15   Ninth Circuit's *en banc* guidance in *In re Hyundai*.  926 F.3d at 567 ("[S]ettlement notices must

16   'present information about a proposed settlement neutrally, simply, and understandably.'"); *see*

17   *also* Keough Declaration, Exhibit B.  It includes an overview of the litigation; an explanation of

18   the Settlement benefits; contact information for Class Counsel; the address for a comprehensive

19   Settlement Website that will house links to the notice, motions for approval, attorneys' fees, and

20   other important documents; instructions on how to access the case docket; and detailed

21   instructions on how to participate in, object to, or opt out of the Settlement.  *Id.*  The Settlement

22   Website will also feature a user-friendly calculator for potential Class members to enter their VIN

23   and obtain an estimated payment from the Settlement.

24       The principal method of reaching Class members will be through direct, individual notice,

25   consisting of individual email notices where email contact information validated by third-party

26   data sources is available, and letter notices by U.S. first class mail to those Class members for

27   whom externally-validated email addresses are not available.  *Id.* ¶ 13, 17; Exhibits D, E.  The

28   Email notice conveys the structure of the Settlement and is designed to capture Class members'

- 34 -

1    attention with concise, plain language. The email notice program was designed specifically to

2    avoid spam filters and to be easily readily across all formats, including mobile. Keough Decl.

3    ¶¶ 21-22. The mailed notice is similarly structured and provides all basic information about the

4    Settlement and Class members' rights thereunder. Both forms of Short Form Notice (email and

5    letter) direct readers to the Settlement Website, where the Long Form Notice is available, for

6    more information.

7         Finally, the notice program will include a robust supplement digital notice campaign

8    including digital banner advertisements through Google Display Network, a digital search

9    campaign, a toll-free telephone number, and a Settlement Website.  *Id.* ¶¶ 29-35.  Based on her

10   considerable experience, Ms. Keough anticipates that the Notice Plan will provide direct notice of

11   the settlement for "virtually all" Class members. *Id.* ¶ 27.  This Notice Plan satisfies due process

12   and Rule 23, and comports with all accepted standards and this District's Procedural Guidance.

13   **VI.    CONCLUSION**

14        Plaintiffs respectfully request that the Court: (1) determine under Rule 23(e)(1) that it is

15   likely to approve the Settlement and certify the Settlement Class; (2) direct notice to the Class

16   through the proposed notice program; (3) appoint Lead Plaintiffs' Counsel as Interim Settlement

17   Class Counsel to conduct the necessary steps in the Settlement approval process; and (4) schedule

18   the final approval hearing under Rule 23(e)(2).

19

20   Dated: June 15, 2022                          Respectfully submitted,

21                                                 */s/ Elizabeth J. Cabraser*
                                                   Elizabeth J. Cabraser
22                                                 LIEFF CABRASER HEIMANN &
                                                   BERNSTEIN, LLP
23                                                 275 Battery Street, 29th Floor
                                                   San Francisco, California 94111-3339
24                                                 Telephone: 415.956.1000
                                                   Facsimile: 415.956.1008
25                                                 E-mail: ecabraser@lchb.com

26                                                 *Plaintiffs' Lead Counsel*

27

28

Benjamin L. Bailey
BAILEY GLASSER LLP
209 Capitol Street
Charleston, WV 25301
Telephone: 304.345.6555
Facsimile:  304.342.1110
E-mail: bbailey@baileyglasser.com

Roland K. Tellis
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, CA  91436
Telephone: 818.839.2320
Facsimile:  818.986.9698
E-mail: rtellis@baronbudd.com

W. Daniel "Dee" Miles III
BEASLEY ALLEN LAW FIRM
218 Commerce Street
Montgomery, AL  36104
Telephone: 800.898.2034
Facsimile:  334.954.7555
E-mail: dee.miles@beasleyallen.com

Lesley E. Weaver
BLEICHMAR FONTI & AULD LLP
Bleichmar Fonti & Auld LLP
555 12th St., Suite 1600
Oakland, CA 94607
Telephone: 415.445.4004
Facsimile:  415.445.4020
E-mail: lweaver@bfalaw.com

David Boies
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY  10504
Telephone: 914.749.8200
Facsimile:  914.749.8300
E-mail: dboies@bsfllp.com

J. Gerard Stranch IV
BRANSTETTER, STRANCH & JENNINGS,
PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN  37203
Telephone: 615.254.8801
Facsimile: 615.250.3937
E-mail: gerards@bsjfirm.com

James E. Cecchi
CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO P.C.
5 Becker Farm Road
Roseland, NJ  07068-1739
Telephone: 973.994.1700
Facsimile:  973.994.1744
E-mail: jcecchi@carellabyrne.com

David Seabold Casey, Jr.
CASEY GERRY SCHENK FRANCAVILLA
BLATT & PENFIELD, LLP
110 Laurel Street
San Diego, CA  92101-1486
Telephone: 619.238.1811
Facsimile:  619.544.9232
E-mail: dcasey@cglaw.com

Frank Mario Pitre
COTCHETT PITRE & McCARTHY LLP
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone: 650.697.6000
Facsimile:  650.697.0577
E-mail: fpitre@cpmlegal.com

Rosemary M. Rivas, Esq.
LEVI & KORSINSKY LLP
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: 415.291.2420
Facsimile:  415.484.1294
E-mail:  rrivas@zlk.com

Adam J. Levitt
DICELLO LEVITT & CASEY LLC
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois  60602
Telephone:  312.214.7900
E-mail: alevitt@dlcfirm.com

Steve W. Berman
HAGENS BERMAN
1918 8th Avenue, Suite 3300
Seattle, WA  98101
Telephone: 206.623.7292
Facsimile:  206.623.0594
E-mail: steve@hbsslaw.com

1

Michael D. Hausfeld
HAUSFELD
1700 K Street, N.W., Suite 650
Washington, DC  20006
Telephone: 202.540.7200
Facsimile:  202.540.7201
E-mail: mhausfeld@hausfeld.com

Michael Everett Heygood
HEYGOOD, ORR & PEARSON
6363 North State Highway 161, Suite 450
Irving, TX  75038
Telephone: 214.237.9001
Facsimile:  214.237-9002
E-mail: michael@hop-law.com

Lynn Lincoln Sarko
KELLER ROHRBACK L.L.P.
1201 3rd Avenue, Suite 3200
Seattle, WA  98101-3052
Telephone: 206.623.1900
Facsimile:  206.623.3384
E-mail: lsarko@kellerrohrback.com

Joseph F. Rice
MOTLEY RICE, LLC
28 Bridgeside Boulevard
Mount Pleasant, SC  29464
Telephone: 843.216.9000
Facsimile:  843.216.9450
E-mail: jrice@motleyrice.com

Paul J. Geller
ROBBINS GELLER RUDMAN &
DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone: 561.750.3000
Facsimile:  561.750.3364
E-mail: pgeller@rgrdlaw.com

Roxanne Barton Conlin
ROXANNE CONLIN & ASSOCIATES, P.C.
319 Seventh Street, Suite 600
Des Moines, IA  50309
Telephone: 515.283.1111
Facsimile:  515.282.0477
E-mail: roxlaw@aol.com

*Plaintiffs' Steering Committee*

1

## **CERTIFICATE OF SERVICE**

2          I hereby certify that, on June 15, 2022 service of this document was accomplished

3     pursuant to the Court's electronic filing procedures by filing this document through the ECF

4     system.

5

6                              /s/ Elizabeth J. Cabraser
                             Elizabeth J. Cabraser

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28