1  Robert J. Giuffra, Jr. (*admitted pro hac vice*)
   David M.J. Rein (*admitted pro hac vice*)
2  Matthew A. Schwartz (*admitted pro hac vice*)
   Nicholas F. Menillo (*admitted pro hac vice*)
3  SULLIVAN & CROMWELL LLP
   125 Broad Street
4  New York, New York 10004
   Telephone:  (212) 558-4000
5  Facsimile:  (212) 558-3588
6
   Michael H. Steinberg (State Bar No. 134179)
7  SULLIVAN & CROMWELL LLP
   1888 Century Park East
8  Los Angeles, California 90067
   Telephone:  (310) 712-6600
9  Facsimile:  (310) 712-8800
10
   Judson O. Littleton (*admitted pro hac vice*)
11 SULLIVAN & CROMWELL LLP
   1700 New York Avenue, N.W. Suite 700
12 Washington, D.C. 20006
   Telephone:  (202) 956-7500
13 Facsimile:  (202) 293-6330

14 *Counsel for Defendants Volkswagen Group of
   America, Inc. and Audi of America, LLC*

15 *[Additional Counsel Listed in Signature Block]*

16

17                    **UNITED STATES DISTRICT COURT**

18                    **NORTHERN DISTRICT OF CALIFORNIA**

19 IN RE: VOLKSWAGEN "CLEAN DIESEL"        )  MDL No. 2672 CRB
   MARKETING, SALES PRACTICES, AND         )
20 PRODUCTS LIABILITY LITIGATION           )  **DEFENDANTS' MOTION FOR**
                                           )  **PARTIAL SUMMARY JUDGMENT**
21 _____     )
                                           )
22 This Document Relates to:               )  The Honorable Charles R. Breyer
                                           )
23 *Environmental Protection Commission of*  )  Hearing:  Sept. 16, 2022 at 9:00 a.m.
   *Hillsborough County, Florida* v. *Volkswagen*  )
24 *AG et al.*, No. 16-cv-2210 (N.D. Cal.)  )
                                           )
25 *Salt Lake County* v. *Volkswagen Group of*  )
   *America, Inc. et al.*, No. 16-cv-5649 (N.D. Cal.)  )
26                                         )
                                           )
27 _____

28

SULLIVAN & CROMWELL LLP

1    **NOTICE OF MOTION AND MOTION**

2              PLEASE TAKE NOTICE that on September 16, 2022, at 9:00 a.m., in Courtroom

3    6 of the United States District Court for the Northern District of California, located at 450 Golden

4    Gate Avenue, San Francisco, California 94102-3489, Defendants Volkswagen Group of America,

5    Inc. ("VWGoA"), Audi of America, LLC (together with VWGoA, "Volkswagen"), Porsche Cars

6    North America, Inc. ("PCNA"), and Robert Bosch LLC ("Bosch"; collectively, "Defendants") will

7    and hereby do move this Court for summary judgment on the following claims:  (i) all of Plaintiff

8    Hillsborough County's claims; (ii) Plaintiff Salt Lake County's first and fourth claims for relief;

9    and (iii) Plaintiff Salt Lake County's third claim for relief to the extent that it is premised on a

10   predicate violation of Utah Admin. Code R307-201-4.

11             This Motion is made pursuant to Federal Rule of Civil Procedure 56 and is based

12   on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the

13   accompanying declaration of Nicholas F. Menillo (the "Menillo Decl.") and the exhibits thereto,

14   including the Expert Report of Ryan Harrington, all pleadings and papers filed herein, oral

15   argument of counsel, and any matter which may be submitted at the hearing.

16   Dated: July 22, 2022                Respectfully submitted,

17                                       By: */s/ Robert J. Giuffra, Jr.*

18                                           Robert J. Giuffra, Jr. (*admitted pro hac vice*)
                                             David M.J. Rein (*admitted pro hac vice*)
19                                           Matthew A. Schwartz (*admitted pro hac vice*)
                                             Nicholas F. Menillo (*admitted pro hac vice*)
20                                           SULLIVAN & CROMWELL LLP
                                             125 Broad Street
21                                           New York, New York 10004
                                             Telephone:  (212) 558-4000
22                                           Facsimile:  (212) 558-3588

23                                           Michael H. Steinberg (State Bar No. 134179)
                                             SULLIVAN & CROMWELL LLP
24                                           1888 Century Park East
                                             Los Angeles, California 90067
25                                           Telephone:  (310) 712-6600
                                             Facsimile:  (310) 712-8800

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Judson O. Littleton (*admitted pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W. Suite 700
Washington, D.C. 20006
Telephone:  (202) 956-7500
Facsimile:  (202) 293-6330

*Counsel for Defendants Volkswagen Group of
America, Inc. and Audi of America, LLC*

By: */s/ Cari K. Dawson*
    Cari K. Dawson (*admitted pro hac vice*)
    Kara F. Kennedy (*admitted pro hac vice*)
    ALSTON & BIRD LLP
    One Atlantic Center
    1201 West Peachtree St.
    Atlanta, Georgia  30309
    Telephone:  404-881-7000
    Facsimile:  404-881-7777

*Counsel for Defendant Porsche Cars North America,
Inc.*

By: */s/ Carmine D. Boccuzzi, Jr.*
    Carmine D. Boccuzzi, Jr. (*admitted pro hac vice*)
    CLEARY GOTTLIEB STEEN & HAMILTON
    LLP
    One Liberty Plaza
    New York, New York 10006
    Telephone:  212-225-2000
    Facsimile:  212-225-3999

    Matthew D. Slater (*admitted pro hac vice*)
    CLEARY GOTTLIEB STEEN & HAMILTON
    LLP
    2112 Pennsylvania Ave., N.W.
    Washington, D.C. 20037
    Telephone:  202-974-1500
    Facsimile:  202-974-1999

*Counsel for Defendant Robert Bosch LLC*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**MEMORANDUM OF POINTS AND AUTHORITIES** ................................................1

**ISSUE TO BE DECIDED** ...............................................................................................1

**SUMMARY OF ARGUMENT** ......................................................................................1

**EVIDENTIARY RECORD** .............................................................................................4

    A.    The Affected Vehicles ......................................................................................4

    B.    The WVU Study and the Development of the Replacement Software ...................5

    C.    2014 Testing by Volkswagen AG Demonstrated that the Replacement Software Resulted in Significant Emissions Reductions ...........................................5

    D.    The Installation of the Replacement Software .......................................................7

    E.    CARB's PEMS Testing Confirmed Volkswagen AG's PEMS Testing Results ........................................................................................................................8

    F.    The Notices of Violation and Subsequent Consent Decree ..................................11

    G.    Rigorous Testing by Exponent Further Confirms the Replacement Software Significantly Reduced Emissions ........................................................12

**LEGAL STANDARD** ....................................................................................................19

**ARGUMENT** ..................................................................................................................20

**I.    SUMMARY JUDGMENT SHOULD BE ENTERED BECAUSE THERE IS NO DISPUTE THAT THE REPLACEMENT SOFTWARE REDUCED EMISSIONS** ............................................................................................................20

**II.    BECAUSE THE REPLACEMENT SOFTWARE REDUCED EMISSIONS, THERE WAS NO VIOLATION OF LAW** ...............................................................21

    A.    Utah's Anti-Tampering Provision Provides an Explicit Safe Harbor for Conduct that Does Not Worsen Emissions ...........................................................21

    B.    Conduct that Reduces Emissions Does Not Violate Utah's Public Nuisance Statute ...................................................................................................23

    C.    Conduct that Reduces Emissions Does Not Violate the Relevant Hillsborough County Rule ..................................................................................23

**CONCLUSION** ...............................................................................................................26

SULLIVAN & CROMWELL LLP

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Adoption of Baby E.Z.*,
  266 P.3d 702 (Utah 2011)...........................................................................................21

*Anderson* v. *Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).....................................................................................................20

*Cline* v. *Indus. Maint. Eng'g & Contracting Co.*,
  200 F.3d 1223 .............................................................................................................19

*DaVita Inc.* v. *Va. Mason Mem'l Hosp.*,
  981 F.3d 679 (9th Cir. 2020) ......................................................................................21

*Env't Prot. Comm'n of Hillsborough Cnty.* v. *Mercedes-Benz*,
  2022 WL 1136610 (M.D. Fla. Apr. 18, 2022)....................................................3, 25

*Nehme* v. *Smithkline Beecham Clinical Labs.*,
  863 So. 2d 201 (Fla. 2003)..........................................................................................24

*Nissan Fire & Marine Ins. Co.* v. *Fritz Cos.*,
  210 F.3d 1099 (9th Cir. 2000) ....................................................................................19

*Parth* v. *Pomona Valley Hosp. Med. Ctr.*,
  630 F.3d 794 (9th Cir. 2010) ......................................................................................19

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Products Liab. Litig.*,
  959 F.3d 1201 (9th Cir. 2020) ....................................................................................22

*Whaley* v. *Park City Mun. Corp.*,
  190 P.3d 1 (Utah Ct. App. 2008) ...............................................................................23

## STATUTES

Utah Code Ann. §§ 76-10-1601 *et seq.*..........................................................................21

Utah Code Ann. § 19-2-101 ...........................................................................................21

Utah Code Ann. § 76-10-803 .....................................................................................3, 23

## RULES & REGULATIONS

Fed. R. Civ. P. 56...........................................................................................................19

Hillsborough EPC Rule 1-8.03 ..................................................................................3, 24

Hillsborough EPC Rule 1-8.05 ........................................................................3, 23, 24, 25

-ii-

1

Utah Admin. Code R307-201-4 ...................................................................2, 21, 22, 26

2

### OTHER AUTHORITIES

3

Cambridge Dictionary ..........................................................................................24

4

Restatement (Second) of Torts § 821A ..................................................................23

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-iii-

1
### MEMORANDUM OF POINTS AND AUTHORITIES

2      Defendants Volkswagen Group of America, Inc. ("VWGoA"), Audi of America,

3 LLC (together with VWGoA, "Volkswagen"), Porsche Cars North America, Inc. ("PCNA"), and

4 Robert Bosch LLC ("Bosch"; collectively, "Defendants")[1] respectfully submit this Motion for

5 Partial Summary Judgment and the supporting Declaration of Nicholas F. Menillo, pursuant to the

6 Court's July 15, 2022 Order (ECF No. 8003).

7
### ISSUE TO BE DECIDED

8      Whether the Court should grant Defendants summary judgment dismissing the

9 claims of Hillsborough County, Florida and Salt Lake County, Utah (together, the "Counties")

10 seeking to challenge Volkswagen's installation of replacement engine control unit ("ECU")

11 software in VW- and Audi-brand model year 2010 to 2014 2.0-liter diesel vehicles (the "Affected

12 Vehicles"), because no genuine dispute exits that the replacement software did not increase

13 emissions from those vehicles.

14
### SUMMARY OF ARGUMENT

15      The Counties' only remaining claims in this action seek to penalize Defendants for

16 the installation of replacement software on cars at dealerships in Hillsborough and Salt Lake

17 Counties.  Volkswagen AG developed the replacement software in 2014 to address high on-road

18 NOx emissions identified in the Affected Vehicles in a study conducted by researchers at the West

19 Virginia University ("WVU") that was published in early 2014.    In response to that study,

20 Volkswagen AG developed new replacement ECU software that increased the frequency of the

21 operation of emissions controls during "road mode."   From 2014-2016, dealers installed the

22 replacement software on cars through a single software file, which completely removed and

23 replaced the preexisting ECU software on the Affected Vehicles.

24      In late 2014, engineers at Volkswagen AG performed on-road testing of the

25 replacement software using a portable emissions measurement system ("PEMS")—a device that

26 attaches to the tailpipe of a vehicle and measures emissions during real-world driving, not on a

27 dynamometer (or "dyno").  The PEMS testing showed that the replacement software caused a

28
---
[1]      Bosch is not a party to the Salt Lake County action.

1   significant reduction in NOx emissions.  Volkswagen AG then presented these test results to the

2   California Air Resources Board ("CARB"), which then performed its own PEMS testing and

3   confirmed that the replacement software resulted in "significant" reductions in NOx emissions

4   over a wide range of driving conditions.  In fact, CARB observed reductions in emissions of NOx

5   of *up to 77.5%*.  (*See* Section E *infra*.)

6          On the basis of CARB's testing, both EPA's and CARB's September 18, 2015

7   Notices of Violation ("NOVs") expressly recognized that the replacement software reduced NOx

8   emissions.[2]  As a result, even after the NOVs, Volkswagen continued to install the replacement

9   software on Affected Vehicles until October 2016, when Volkswagen entered into its settlements

10  with EPA and CARB providing for the installation of new replacement software (the AEMs) that

11  further reduced NOx emissions.  (*See* Section F *infra*.)

12         Following the NOVs—as part of Volkswagen's defense in litigation brought by the

13  State of Texas and certain Texas counties—the engineering and scientific consulting firm,

14  Exponent, conducted a comprehensive series of PEMS tests, based on CARB's testing plan, that

15  again confirmed significant emissions reductions across a broad cross section of vehicles and

16  driving conditions.  In fact, Exponent's testing showed an average emissions reduction of 45%

17  among Generation 1 Affected Vehicles and 50% among Generation 2 Affected Vehicles.

18  Volkswagen has provided these test results to the Counties and has made them part of this motion

19  for summary judgment.  (*See* Section G *infra*.)  To date, the Counties have cited no evidence that

20  the replacement software increased emissions.

21         In its February 23, 2022 Order denying the Counties' motion to remand, this Court

22  rightly recognized that "[t]he Hillsborough County and Utah regulations appear to exclude from

23  liability post-sale changes that reduce emissions."  (Feb. 23 Order at 2 (ECF No. 7944).)  By its

24  terms, the Utah anti-tampering rule expressly permits the removal of emissions software and its

25  replacement with software "which is equally or more effective in reducing emissions from the

26  vehicle to the atmosphere."  Utah Admin. Code R307-201-4.  Similarly, Utah's nuisance law only

27  _____

28  [2]      *See* CARB In-Use Compliance Letter (Ex. A) ("[o]ver-the-road PEMS testing showed that
    the recall calibration did reduce the emissions"); EPA Notice of Violation (Ex. B) (replacement
    software provided a "limited *benefit*" (emphasis added).)

1   bars conduct that "annoys, injures, or endangers the comfort, repose, health, or safety" of the public

2   or causes the public to be "insecure in life or the use of property," which cannot result from an act

3   that reduces emissions.  *See* Utah Code Ann. § 76-10-803(1).  And Hillsborough's anti-tampering

4   rule requires Hillsborough to show that the replacement software "circumvented," "defeated," or

5   "deleteriously affected," the emissions control system, EPC Rule 1-8.03(2)(c), (h); 1-8.05(1),

6   (6)—meaning that Hillsborough can prevail only if the replacement software rendered the

7   emissions control system "even less functional than it had been with the original defeat device."

8   *Env't Prot. Comm'n of Hillsborough Cnty.* v. *Mercedes-Benz*, 2022 WL 1136610, at \*5-6 (M.D.

9   Fla. Apr. 18, 2022).

10          In its July 15, 2022 Order, the Court rejected the Counties' theory that "constituent

11   features of a software update can qualify as separate instances of tampering under the Counties'

12   regulations" and held that "any modification or alleged tampering that was accomplished at one

13   time is indivisible and can qualify as only one instance of tampering under the relevant

14   regulations."  (July 15 Order at 1-2 (ECF No. 8003).)

15          Accordingly, this case is now straightforward and ripe for summary judgment.  The

16   Counties cite *no* evidence showing the replacement software made emissions *worse*—as required

17   to establish liability.  Nor is there any indication that the Counties will be able to do so with yet

18   more discovery.  Indeed, the evidence is overwhelming and uncontroverted that the replacement

19   software *reduced* NOx emissions from the Affected Vehicles on which it was installed—and did

20   so *by a significant amount*.  Because there is no genuine dispute that the challenged replacement

21   software reduced emissions, and there are no other disputed material facts, the Court should enter

22   summary judgment dismissing the Counties' claims under their anti-tampering provisions and for

23   nuisance as a matter of law.[3]

24

25   [3]     As noted in prior briefing (ECF No. 7965, at 5 n.2), only 2.0-liter diesel engine cars
received the replacement software, there are no 2.0-liter Porsche vehicles, and no Porsche vehicles

26   received the replacement software challenged by the Counties.  Likewise, Bosch LLC was not
involved in the design, programming, calibration, or distribution of the replacement software.

27   Thus, while PCNA and Bosch LLC are entitled to summary judgment on the basis that the
challenged replacement software reduced emissions, the Counties' claims against PCNA and

28   Bosch LLC fail for these additional reasons.

1    **EVIDENTIARY RECORD**

2    **A.    The Affected Vehicles**

3            After dismissal on federal preemption grounds of their claims based on factory

4    installation of "defeat device" software, the Counties' lawsuits now only challenge the installation

5    of the replacement software in the Affected Vehicles.[4]   The Affected Vehicles used various

6    emissions control strategies to limit the emissions of NOx and other pollutants.  Two "generations"

7    of Affected Vehicles received the replacement software:  Generation 1 ("Gen 1"),[5] which used a

8    technology known as a "lean NOx trap" ("LNT") as their primary NOx control system, and

9    Generation 2 ("Gen 2"),[6] which instead used a Selective Catalytic Reduction ("SCR") system to

10   control NOx emissions.  (*See* Expert Report of Ryan Harrington (Ex. D) at 18-19.)[7]

11           Volkswagen AG has admitted that, at the time of manufacture, both Gen 1 and

12   Gen 2 vehicles contained a defeat device, which detected when the vehicles were undergoing

13   dynamometer testing using standard federal emissions testing patterns.  (*See* Volkswagen AG Plea

14   Agreement Statement of Facts (Ex. C) ¶ 34.)  The defeat device switched the vehicles between a

15   lower-emitting "dyno mode" when it detected federal dynamometer testing and a higher-emitting

16   "road mode" when it detected normal driving patterns.  (*Id.*)  Thus, on Gen 1 cars, the LNT system

17   had different operating parameters in dyno mode and road mode, and on Gen 2 cars, the SCR

18   system had different operating parameters in dyno mode and road mode.  (Harrington Rep. (Ex.

19   D) at 28-29.)

20

21

---

22   [4]     *See*, *e.g.*, Volkswagen AG Plea Agreement Statement of Facts (Ex. C) ¶ 49 (alleging
     Volkswagen AG "sought ways to improve [the defeat device's] operation in existing 2.0 Liter
23   Subject Vehicles"); Salt Lake Third Am. Compl. ¶ 42 (ECF No. 4456) (paraphrasing VWAG plea
     agreement description of updates to 2.0-liter vehicles); Hillsborough First Am. Compl. ¶¶ 87-88
24   (ECF No. 4457) (same).

25   [5]     As relevant to this litigation:  Model Year 2010-14 Volkswagen Jetta, Golf, and
     Sportwagen, Model Year 2013-14 Volkswagen Beetle, and Model Year 2010-13 Audi A3.

26   [6]     Model Year 2012-14 Volkswagen Passat.

27   [7]     The replacement software was released as part of recalls bearing campaign codes 23O6
     and 23N4 (Gen 1) and 23N5 (Gen 2) and the following field fix codes:  FF_AV2 0U5N_10_14;
28   FF_BV2 0U5N_09_14; FF_CV2 0U5N_08_14; FF_DV2 0U5N_05_14; FF_EV2 0U5N_02_14;
     FF_CV2 0U4S_05_14; FF DV2 0U4S_05 14; FF_EV2 0U4S_02_14; and FF_CV2 0U4S_05_14.

**B.      The WVU Study and the Development of the Replacement Software**

In early 2014, researchers at West Virginia University published a study showing excess emissions from Volkswagen 2.0-liter diesel vehicles during on-road emissions testing (the "WVU Study").  (Volkswagen AG Plea Agreement Statement of Facts (Ex. C) ¶ 52.)  The WVU Study showed excess emissions because WVU tested the cars by driving them on the road with a PEMS unit, instead of running the cars through the standard federal dynamometer emissions testing patterns that the defeat device was configured to detect.  (*See*, *e.g.*, Harrington Rep. (Ex. D) at 31-32.)  Because the defeat device "was designed to identify regulatory test cycles and not regular, on-road driving by consumers," PEMS testing that deviated from standard dynamometer test cycles caused Affected Vehicles to operate in the higher-emitting "road mode."  (*Id.*)

In response to the WVU Study and scrutiny from EPA and CARB, Volkswagen AG developed replacement ECU software that—while it did not remove the defeat device and also modified its operation—improved the performance of emissions controls while in "road mode," and so lowered on-road emissions.  (Harrington Rep. (Ex. D) at 33-34.)  The replacement software accomplished this by, among other things, increasing the frequency with which the LNT in Gen 1 vehicles "regenerated," allowing the LNT to absorb more NOx, and, for Gen 2 vehicles, increasing the amount of ammonia on the SCR catalyst, allowing for the elimination of additional NOx before reaching the tailpipe.  (*Id.* at 35-36.)  In addition to these operations, the replacement software also included the configurations that the Counties refer to as the "SWARF" and the "Start Function." (*Id.* at 37.)

**C.      2014 Testing by Volkswagen AG Demonstrated that the Replacement Software Resulted in Significant Emissions Reductions**

In October 2014, prior to releasing the replacement software to VWGoA for installation on vehicles in the field, Volkswagen AG presented the results of its own on-road PEMS emissions testing to both the EPA and CARB.  In its presentation, Volkswagen AG explained: "Today Volkswagen can provide calibrations for the Gen1 and the Gen2 engine showing significantly better emission performance on road, in customer's hands."  (VW-COUNTIES-00108382 (Ex. E) at 387.)  The presentation contained the results of PEMS testing Volkswagen

1    AG had conducted on a Gen 1 car and a Gen 2 car before and after installing the replacement

2    software.  This PEMS testing used three of the same routes used in the WVU Study—an "Urban

3    LA," "Uphill/Downhill," and "Highway" routes.  (*Compare* VW-COUNTIES-00108429 (Ex. F)

4    at -438-41, *with* VW-COUNTIES-00108499 (Ex. G) at -525-32.)

5              The results of this PEMS testing are excerpted below as Figures 1 and 2.  In the

6    charts, the orange "VW PEMS" bars show the emissions with the *original* software, the blue

7    "optimized data set" bars refer to the emissions with the *replacement* software.  As shown below,

8    for *both* generations across *all* routes, the testing showed a significant reduction in emissions after

9    installing the replacement software:[8]

10



Figure 1 – Summary of VW AG PEMS Testing of Gen 1 Replacement Software
(VW-COUNTIES-00108382 (Ex. E) at 387)

[8]       "The gray "icct" bars denote the results of the WVU Study.  The WVU Study results labeled "R" and the white "optimized data set with DPF-regeneration" bars refer to tests during which a diesel particulate filter ("DPF") regeneration occurred.  DPF regenerations are a normal part of diesel aftertreatment operation and are necessary to clear the DPF of accumulated soot. (*See* Harrington Rpt. (Ex. D) at 17-18.)  Because NOx emissions are temporarily elevated during a DPF regeneration event, test results that include a DPF regeneration are not comparable with results that did not include a regeneration.



Figure 2 – Summary of VW AG PEMS Testing of Gen 2 Replacement Software
(VW-COUNTIES-00108382 (Ex. E) at 388)

Overall, these test results showed that the replacement software reduced emissions for both Gen 1 and Gen 2 vehicles by over 50% on average across the *same* test routes used in the WVU Study.

**D.    The Installation of the Replacement Software**

Following the presentation of these test results, Volkswagen initiated voluntary recalls and associated field fixes to install the replacement software on in-use Gen 2 and Gen 1 vehicles in late 2014 and early 2015, respectively.   To facilitate the installation of the replacement software, Volkswagen AG uploaded an encrypted software file containing the entire replacement software to a server accessible to VWGoA.  (Expert Report of Dr. John K. Bennett (ECF No. 7954-3) at 56-57, 73.)  VWGoA did not have the ability to examine or alter the software files provided by Volkswagen AG.  (*Id.* at 62.)  VWGoA in turn hosted the files it received from Volkswagen AG on servers in the United States, which were in turn accessible by dealerships.  (*Id.* at 56-58.) Dealerships installed the replacement software by connecting a computer to the vehicle's onboard diagnostic port, which would download the file from VWGoA's servers and then install it on that vehicle.  (*Id.* at 58-60.)  The replacement software replaced the entirety of the memory contained

1   on the emissions control unit, *i.e.*, it fully removed and replaced the preexisting software in a single

2   step.  (*Id.* at 72.)

3       **E.    CARB's PEMS Testing Confirmed Volkswagen AG's PEMS Testing Results**

4           In response to Volkswagen AG's presentation of its testing results, CARB did not

5   simply take Volkswagen AG's word for it—CARB worked to "verify the fix."  (VW-COUNTIES-

6   00085313 (Ex. H) at -313.)  CARB performed its own testing of the replacement software using a

7   PEMS unit, which CARB viewed as a "good screening tool to look at real-world emissions that

8   were being emitted from vehicles."  (Hebert Tr. (Ex. I) at 19:16-18.)  As described in the test plan

9   prepared by CARB, the purpose of the program was to "conduct an on-road and laboratory

10  emissions test program on two California certified Volkswagen (VW) diesel vehicles to evaluate

11  the effectiveness of their corrective action for the high NOx conditions discovered by West

12  Virginia University."  (VW-COUNTIES-00073050 (Ex. J) at -050.)  CARB was to use a PEMS

13  device to measure the vehicles' on-road NOx emissions "in an as-received condition" (*i.e.*, without

14  the replacement software) and "with the new calibration installed" (*i.e.*, with the replacement

15  software) to determine the emissions impact of the replacement software.  (*Id.*)  CARB's test

16  program would include two routes:  an "Uphill/Downhill Drive Route" and a "Heavy Demand

17  Freeway Route," also called the inbound/outbound route or the Oxnard Route.  (*Id.* at -053.)  The

18  test plan explained that the "test routes were designed to follow basic everyday driving patterns."

19  (*Id.*)

20          Between May and July 2015, CARB tested the Gen 2 original and replacement

21  software.  (VW-COUNTIES-00098932 (Ex. K) at -943 to -944).  The results of this testing were

22  consistent with the results Volkswagen AG had presented to CARB.  Figures 3 and 4 excerpt two

23  slides prepared by CARB summarizing the numerical results of CARB's PEMS testing, and Figure

24  5 converts these numerical results into a graph for demonstrative purposes.[9]  They show the Gen 2

25  replacement software reduced on-road emissions by 77.5% on the uphill route (going from 2.14

26

27

28  _____
    [9]     The "A Condition" in Figure 5 represents emissions prior to the replacement software, and
    the "B Condition" represents emissions with the replacement software installed.

SULLIVAN & CROMWELL LLP

mg/mile with the original software to 0.48 mg/mile with the replacement software) and consistently reduced NOx emissions across all test routes by an average of approximately 50%:

## PEMS Testing Summary – Up/Down Hill

### Uphill NO$_x$ Emissions

| Date | Baseline (mg/mile) | Calibration Fix (mg/mile) | Percent Change (%) |
|---|---|---|---|
| 5/26/2015 | 2.09 | | |
| 5/27/2015 | 1.92 | | |
| 5/28/2015 | 2.42 | | |
| 7/2/2015 | | 0.60 | |
| 7/8/2015 | | 0.39 | |
| 7/10/2015 | | 0.45 | |
| AVERAGE | 2.14 | 0.48 | |
| STD | 0.25 | 0.11 | -77.5 |

### Downhill NOx Emissions

| Date | Baseline (mg/mile) | Calibration Fix (mg/mile) | Percent Change (%) |
|---|---|---|---|
| 5/26/2015 | 0.40 | | |
| 5/27/2015 | 0.39 | | |
| 5/28/2015 | 0.30 | | |
| 7/2/2015 | | 0.37 | |
| 7/8/2015 | | 0.31 | |
| 7/10/2015 | | 0.29 | |
| AVERAGE | 0.36 | 0.32 | |
| STD | 0.06 | 0.04 | -10.5 |

## PEMS Testing Summary – Oxnard Route

### ARB to Oxnard NO$_x$ Emissions

| Date | Baseline (mg/mile) | Calibration Fix (mg/mile) | Percent Change (%) |
|---|---|---|---|
| 5/19/2015 | 0.82 | | |
| 5/20/2015 | 0.51 | | |
| 5/22/2015 | 0.52 | | |
| 7/3/2015 | | 0.26 | |
| 7/7/2015 | | 0.31 | |
| 7/9/2015 | | 0.24 | |
| AVERAGE | 0.62 | 0.27 | |
| STD | 0.18 | 0.03 | -56.1 |

### Oxnard to ARB NOx Emissions

| Date | Baseline (mg/mile) | Calibration Fix (mg/mile) | Percent Change (%) |
|---|---|---|---|
| 5/19/2015 | 1.00 | | |
| 5/20/2015 | 0.54 | | |
| 5/22/2015 | 0.47 | | |
| 7/3/2015 | | 0.33 | |
| 7/7/2015 | | 0.23 | |
| 7/9/2015 | | 0.29 | |
| AVERAGE | 0.67 | 0.28 | |
| STD | 0.29 | 0.05 | -57.7 |

Figures 3 and 4 – CARB Gen 2 Testing Results
(VW-COUNTIES-00098932 (Ex. K) at -943 to -944)

1
2
3
4
5
6
7
8
9
10
11
12



13    Figure 5 – Graphical Depiction of CARB's Gen 2 Testing Results

14

15          As one CARB presentation concluded, the Gen 2 replacement software showed

16    "*[s]ignificant* NOx reduction in on-road testing."  (VW-COUNTIES-00079279 (Ex. L) at -287

17    (emphasis added).)  And in this litigation, CARB's corporate representative testified that "the over-

18    the-road testing definitely showed some NOx improvement after" the installation of the

19    replacement software.  (Hebert Tr. (Ex. I) 65:2-4.)

20          CARB also conducted PEMS testing of a vehicle with the Gen 1 replacement

21    software installed, and separately tested a different Gen 1 vehicle without the replacement software

22    on comparable test routes.   (*See* Harrington Rep. (Ex. D) at 45-49.)   Although a CARB

23    representative did not recall at her deposition over six years later that the Gen 1 replacement

24    software reduced emissions (Hebert Tr. (Ex. I) 190:10-22, 205:17-24), CARB's results, shown in

25    Figure 6, are clear.  The blue "A" condition bars represent the emissions from the car with the

26    original software, and the orange "B" condition bars represent the emissions from the car with the

27

28

replacement software.[10]   As Mr. Harrington confirmed in his report, the vehicle with the replacement software had consistently lower on-road emissions than the vehicle with the original software:



Figure 6 – Comparison of CARB's Gen 1 PEMS Results (Harrington Rep. (Ex. D) at 49)

## F.   The Notices of Violation and Subsequent Consent Decree

While CARB's testing showed that the replacement software reduced emissions, EPA and CARB continued to investigate because the Affected Vehicles, even with the replacement software, still showed a significant discrepancy between the reduced on-road NOx emissions and the even lower NOx emissions measured on a dynamometer.  In August 2015, Volkswagen AG admitted that the Affected Vehicles used different emissions control strategies when the vehicle detected that it was being tested on a dynamometer versus on the road.  (Statement of Facts (Ex. C) ¶ 62.)  On September 18, 2015, both CARB and EPA issued Notices of Violation regarding the defeat device.  (*See* EPA Notice of Violation (Ex. B); CARB In-Use Compliance Letter (Ex. A).)  Although finding that the cars did not comply with EPA and CARB regulations due to the presence of a defeat device that caused the vehicles to operate in different modes (road and dyno), both notices acknowledged that the replacement software improved emissions.  (*See* n. 2, *supra*.)

Volkswagen dealers continued to install the replacement software until October 2016, just prior to the entry of Volkswagen's First Partial Consent Decree with the DOJ.  (*See*

---

[10]     The light blue "ICCT/WVU A-condition bar" represents results from the WVU Study.

VWGoA_TX-MDL_00199399 (CARB Subpoena Exhibit 41) (Ex. M); VWGoA_TX-MDL_00200798 (CARB Subpoena Exhibit 44) (Ex. N).) That Consent Decree provided for the development of an approved emissions modification ("AEM") that would remove the defeat device and reduce emissions even further—although, for some model years, not by enough to meet federal emissions standards. (*See* First Partial Consent Decree App'x B at 9-12 (ECF No. 2103-1).)

### G. Rigorous Testing by Exponent Further Confirms the Replacement Software Significantly Reduced Emissions

In connection with litigation challenging the installation of the replacement software, Volkswagen retained Ryan Harrington—a Principal at Exponent—to oversee and analyze additional PEMS emissions testing of the replacement software. (Harrington Rep. (Ex. D) at 5-6.) Mr. Harrington has over 20 years of experience in the automotive industry and the federal government relating to motor vehicle emissions and fuel economy standards and testing. (*Id.* at 6-7.) Exponent is an engineering and scientific consulting firm, which operates a vehicle test track at its Test and Engineering Center in Phoenix, Arizona. (*Id.* at 7, 52.)

Exponent formulated a detailed test plan—which was based on CARB's 2015 testing program—in order to assess the emissions impact of the replacement software. Exponent's testing significantly expanded upon CARB's testing in both the number and variety of vehicles tested. Exponent tested four additional Gen 1 vehicles from three separate model years, and three additional Gen 2 vehicles—covering every affected model year of Gen 2 vehicle. Exponent's testing included vehicles of different models, vehicles with both automatic and manual transmissions, vehicles with both low and high mileage, and vehicles ranging from MY 2010 to MY 2014 (the entire relevant MY range). (*Id.* at 52-53.)[11]

---

[11] The vehicles tested were (*see* Harrington Rep. (Ex. D) at 52):

| GEN | Make/Model | Model Year | Test Vehicle # | VIN | Mileage (mi) | Transmission |
|---|---|---|---|---|---|---|
| 1 | VW Jetta SW TDI | 2013 | 1 | 3VWPL7AJ3DM671488 | 27,588 | Automatic |
| | VW Jetta TDI | 2014 | 2 | 3VWLL7AJXEM311344 | 55,743 | Automatic |
| | VW Jetta TDI | 2013 | 3 | 3VW3L7AJ8DM400246 | 71,377 | Manual |
| | Audi A3 | 2010 | 4 | WAUBJAFM0AA127393 | 75,271 | Automatic |
| 2 | VW Passat TDI | 2012 | 5 | 1VWBN7A30CC016209 | 93,763 | Auto |
| | VW Passat TDI | 2014 | 6 | 1VWBN7A30EC075974 | 60,418 | Auto |
| | VW Passat TDI | 2013 | 7 | 1VWBN7A35DC142227 | 66,163 | Manual |

-12-

1          Like CARB and Volkswagen AG, Exponent measured the NOx output by using a

2    PEMS.  (*See* Figure 7, below.)  The PEMS equipment was provided and installed by subcontractor

3    Emissions Analytics—the same firm that provided and installed the PEMS equipment used in

4    testing the AEM for CARB and EPA.  (*See* Proposed Emissions Modification: Part C (Ex. O) at

5    7.)  Exponent tested the vehicles on a track using a throttle controller—a device that can precisely

6    execute pre-programed throttle inputs—allowing for an effective simulation of real-world driving

7    while also ensuring the repeatability of tests and comparability of results.  Using this controller,

8    Exponent took the exact speed profiles of the actual trips driven as part of the WVU and CARB

9    PEMS testing programs and input them to the throttle controller to precisely replicate the prior test

10   routes.  (Harrington Rep. (Ex. D) at 51-57.)  The testing included an inbound trip taken from

11   CARB's testing, which simulated freeway driving conditions, and an urban trip from the WVU

12   Study, which simulated city driving under stop-and-go conditions.  (*Id.* at 52-54.)  Exponent was

13   further able to replicate the effects of uphill driving using a towing dynamometer, a device which

14   applies additional load to the vehicle axle, simulating the strain of the additional load of ascending

15   a steep grade.  (*Id.* at 57-59.)[12]

16         Because emissions regulators do not have standardized PEMS testing routes, these

17   three routes were chosen both to reflect conditions that CARB and WVU previously determined

18   were appropriate to test the emissions impact of the replacement software, and to provide results

19   across a broad range of real-world driving conditions.  Exponent drove each of these three test

20   routes twice for each of the seven test vehicles.  Exponent's detailed test plan also outlined standard

21   procedures for preparing vehicles for testing, ensuring comparable testing conditions (*e.g.*, ambient

22   temperature), and identifying invalid tests.  (*See id.* App. G.)

23

24

25

26   ───────────────

27   [12]   A towing dynamometer is not the same device as the chassis dynamometer used for
     regulatory emissions tests.  The test cycles run with the towing dynamometer were still run on the

28   test track with a PEMS unit attached, not in a laboratory, and did not use a chassis dynamometer.



Figure 7 – Test Vehicle with PEMS Equipment Installed by Emissions Analytics

The results of Exponent's testing are consistent with the prior test results from VWAG and CARB.  In Figures 8 and 9—based on data from Mr. Harrington's report—the blue "A" condition bars represent NOx emissions from the vehicle with the original software, and the orange "B" condition bars represent NOx emissions from the vehicle with the replacement software.[13]  The replacement software consistently reduced emissions across each of the test routes for both Gen 1 and Gen 2 by a substantial margin:



Figure 8 – Summary of Exponent's Gen 1 Emissions Testing (Harrington Rep. (Ex. D) at 61)

---

[13]    In certain instances, the "A-Condition" bar represents an average result among two different software versions that the replacement software was installed to replace.  *See* Harrington Rep. (Ex. D) at 60-63 for more detail.

-14-



Figure 9 – Summary of Exponent's Gen 2 Emissions Testing
(*See* Harrington Rep (Ex. D) at 63)

The reductions in emissions were significant across all routes.  On average, the Gen 1 replacement software reduced NOx emissions by approximately 41% on the City route, 53% on the Inbound (highway) route, and 43% on the Hill Ascent route.  (*Id.* at 60.)  The Gen 2 replacement software reduced NOx emissions by approximately 54% on the City route, 50% on the Inbound (highway) route, and 43% on the Hill Ascent route. (*Id.* at 62.)  As noted by Mr. Harrington, these results are "consistent with the confirmatory testing conducted by CARB that showed substantial improvement in on-road NOx emissions."  (*Id.* at 10.)

And not only were the *average* emissions across each Generation lower for each test route, *every single vehicle* Exponent tested *individually* performed better on *every* test route, as illustrated in Figures 10-16 below.  (*Id.* at 60-63.)  In other words, whether being driven in city, highway, or uphill conditions, the replacement software caused every vehicle that was tested to emit less NOx:

SULLIVAN & CROMWELL LLP



Figure 10 – Vehicle #1 Test Results



Figure 11 – Vehicle #2 Test Results

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
MDL No. 2672 CRB



Figure 12 – Vehicle #3 Test Results



Figure 13 – Vehicle #4 Test Results



Figure 14 – Vehicle #5 Test Results



Figure 15 – Vehicle #6 Test Results



Figure 16 – Vehicle #7 Test Results

**LEGAL STANDARD**

This Court should grant summary judgment where, as here, the movant demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In other words, summary judgment should be entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Parth* v. *Pomona Valley Hosp. Med. Ctr.*, 630 F.3d 794, 798-99 (9th Cir. 2010).

The moving party may satisfy its burden at summary judgment by "either produc[ing] evidence negating an essential element of the nonmoving party's claim or defense or show[ing] that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co.* v. *Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its burden, then the non-moving party "must go beyond the pleadings and identify facts which show a genuine issue for trial."  *Cline* v. *Indus. Maint. Eng'g*

& *Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment"; "[o]nly disputes over facts that might affect the outcome of the suit" will preclude summary judgment. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

**ARGUMENT**

**I.    SUMMARY JUDGMENT SHOULD BE ENTERED BECAUSE THERE IS NO DISPUTE THAT THE REPLACEMENT SOFTWARE REDUCED EMISSIONS.**

In its July 15, 2022 Order, the Court directed that "[t]he next issue to be resolved is whether the post-sale software modification in this case violated the Counties' regulations by increasing vehicle emissions relative to emissions before the modification." (July 15, 2022 Order at 2 (ECF No. 8003).) The uncontroverted evidence described above provides a clear and consistent answer: not only did the replacement *not* increase emissions, it *significantly reduced* them.

The replacement software was designed to lower NOx emissions, and significantly increased the effectiveness of the emissions controls of the Affected Vehicles in "road mode." (*See* Section B *supra*.) This emissions reduction was clear at the time the replacement software was released. Volkswagen AG's 2014 PEMS testing showed a 50% reduction in NOx emissions over the routes used in the WVU Study. (*See* Section C *supra*.) CARB's 2015 PEMS testing program showed "significant" NOx reductions, including reductions of up to 77.5% over one route for Gen 2 vehicles, and an average of 50% for Gen 2 vehicles, and 30.5% for Gen 1 vehicles. (*See* Section E *supra*.)

Exponent's testing confirms these results on a broader basis. Mr. Harrington's report shows emissions reductions for *every car tested across every route tested*, and an average NOx reduction of 45% for Gen 1 Affected Vehicles and 50% for Gen 2 Affected Vehicles. (*See* Section G *supra*.) The Counties have pointed to no evidence that would put these test results in dispute, let alone any evidence which would show that the replacement software *increased* emissions. Accordingly, the installation of the replacement software cannot possible have

-20-

1  "violated the Counties' regulations by increasing vehicle emissions." (July 15, 2022 Order at 2

2  (ECF No. 8003).)

3  **II.     BECAUSE THE REPLACEMENT SOFTWARE REDUCED EMISSIONS, THERE WAS NO VIOLATION OF LAW.**

4

5          This Court previously recognized that "[t]he Hillsborough County and Utah

6  regulations appear to exclude from liability post-sale changes that reduce emissions." (Feb. 23

7  Order at 2 (ECF No. 7944).) That is the correct interpretation of the applicable provisions.

8          **A.      Utah's Anti-Tampering Provision Provides an Explicit Safe Harbor for Conduct that Does Not Worsen Emissions.**

9          Utah's anti-tampering provision contained in the second sentence of Utah Admin.

10 Code R307-201-4—which forms the basis of Salt Lake's first claim for relief—could not be

11 clearer. It provides:

12          No person shall remove or make inoperable the system or device or any part thereof,
13          ***except for the purpose of installing another system or device, or part thereof,
            which is equally or more effective in reducing emissions from the vehicle to the***
14          ***atmosphere***.

15 Utah Admin. Code R307-201-4 (emphasis added). Under the unambiguous language of this rule,

16 installation of replacement emissions software is prohibited only if that act *worsens* emissions.

17          This plain-text interpretation is reinforced by the rule's express purpose set out in

18 its enabling statute: "to achieve and maintain levels of air quality which will protect human health

19 and safety." Utah Code Ann. § 19-2-101(2); *see In re Adoption of Baby E.Z.*, 266 P.3d 702, 707

20 (Utah 2011) ("Our overall goal is to give effect to the legislative intent, as evidenced by the

21 [statute's] plain language, in light of the purpose the statute was meant to achieve." (brackets in

22 original)); *DaVita Inc.* v. *Va. Mason Mem'l Hosp.*, 981 F.3d 679, 692-93 (9th Cir. 2020) ("[W]e

23 may consider the purpose of the statute in its entirety, and whether the proposed interpretation

24 would frustrate or advance that purpose."). Prohibiting software updates that *improve* air quality

25 would contradict this core objective.[14]

26 _____

27 [14]     For the same reasons, this Court should grant summary judgment dismissing Salt Lake's
   third claim for relief under Utah's Pattern of Unlawful Activity Act, Utah Code Ann. §§ 76-10-1601
28 *et seq.*, to the extent that it relies on a predicate violation of the tampering rule. (*See* Salt Lake
   Cnty. Third Am. Compl. ¶ 71.a.)

-21-

1          Salt Lake is not saved by its puzzling argument during the July 15, 2022 hearing

2 that the references to "compliance with the Federal motor vehicle rules" and the requirement to

3 "maintain the system or device in operable condition" in the first sentence of R307-201-4

4 authorizes it to penalize any act—even one that reduces emissions—that does not leave the car in

5 full compliance with "Federal motor vehicle rules." (*See* Tr. of July 15, 2022 Hrg. (Ex. P) at 15:8-

6 16:3.)  To posit that theory, Salt Lake simply skipped over the first part of that sentence, which

7 demonstrates that it is irrelevant to this action:  "***Any person owning or operating any motor***

8 ***vehicle*** . . . on which is installed or incorporated a system or device for the control of crankcase

9 emissions or exhaust emissions in compliance with the Federal motor vehicle rules, shall maintain

10 the system or device in operable condition and shall use it at all times that the motor vehicle or

11 motor vehicle engine is operated."  Utah Admin. Code R307-201-4 (emphasis added).

12          Nor does this sentence somehow inject into the anti-tampering provision contained

13 in the second sentence of R307-201-4 a requirement to bring cars into compliance with federal

14 emissions standards.  As noted above, the plain text of the anti-tampering safe harbor says "equally

15 or more effective in reducing emissions"—not "compliant with federal emissions standards."  By

16 Salt Lake County's logic, even the AEMs authorized by EPA and CARB as part of the October

17 2016 Consent Decree would be unlawful in Utah, because they did not bring certain cars into

18 compliance with federal emissions standards.[15]

19          And in any event, this Court already ruled, and the Ninth Circuit affirmed, that any

20 claim that the replacement software was unlawful because it did not fully remedy excess NOx

21 attributable to the defeat device would be preempted by the Clean Air Act, because it is predicated

22 on the cars being non-compliant with federal standards *as manufactured.  See In re Volkswagen*

23 *"Clean Diesel" Mktg., Sales Practices, & Products Liab. Litig.*, 959 F.3d 1201, 1218 (9th Cir.

24 2020) ("Because the Counties' rules attempt to enforce the integrity of the emission-control

---

25 [15]    *See* First Partial Consent Decree at 3 (ECF No. 2103-1).  As this Court previously

26 acknowledged, the Counties would "jeopardize [the] balance" between federal and local

27 authorities under the Clean Air Act "by asserting that vehicles with EPA-approved modifications continue to violate their tampering rules because the modifications do not bring the vehicles into

28 compliance with the originally certified emission standards."  (*See* Apr. 26, 2018 Order re: Defs' Mot. to Dismiss at 22 n.7 (ECF No. 4979).)

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
MDL No. 2672 CRB

1    technology with which the pre-sale vehicles must be equipped, they attempt to enforce a standard,

2    and are therefore preempted by § 209(a)." (internal quotation marks and citation omitted)).

3    **B.**   **Conduct that Reduces Emissions Does Not Violate Utah's Public Nuisance**

4    **Statute.**

5    The Utah public nuisance statute underpinning Salt Lake's fourth claim for relief is

6    similarly inapplicable to conduct that reduced emissions.  That statute prohibits conduct that

7    "*annoys, injures, or endangers the comfort, repose, health, or safety* of three or more persons"

8    or "in any way renders three or more persons *insecure in life or the use of property*."   Utah Code

9    Ann. § 76-10-803(1) (emphasis added).  Thus, even putting aside whether the factory-installed

10   defect devices could "annoy[], injure[], or endanger[] the comfort, repose, health, or safety" of

11   anyone or "render[]" anyone "insecure in life or the use of property," the post-sale conduct of

12   reducing emissions at issue in this case could not conceivably meet this standard.

13   The Restatement's description of nuisance, which requires a showing of harm or

14   annoyance, underscores this conclusion.  Restatement (Second) of Torts § 821A cmt. b (Am. L.

15   Inst. 1979)  ("'nuisance' has been employed in three different senses":  (i) "human activity or a

16   physical condition that is *harmful or annoying* to others"; (ii) "the *harm* [itself] caused by the

17   human conduct or physical condition"; and (iii) "the legal liability that arises from the combination

18   of the two" foregoing uses); *see Whaley* v. *Park City Mun. Corp.*, 190 P.3d 1, 6-7 (Utah Ct. App.

19   2008) (applying the Restatement to interpret public nuisance under Utah Code Ann. § 76-10-803).

20   Again, common sense dictates that reducing emissions only has the potential to reduce harm and

21   annoyance, not to cause it.[16]

22   **C.**   **Conduct that Reduces Emissions Does Not Violate the Relevant Hillsborough**

23   **County Rule.**

24   The relevant portions of the anti-tampering rule underpinning Hillsborough's sole

25   count are likewise clear.  EPC Rule 1-8.05(1) provides:  "No person shall tamper, cause, or allow

---

[16]    Although this motion specifically addresses only Salt Lake's tampering and nuisance claims, Salt Lake's other claims are fundamentally defective for various reasons, and Defendants reserve all rights in that regard, including to seek summary judgment on those claims at a later stage of this case.

1    the tampering of the emission control system of any motor vehicle."  "Tampering" is in turn

2    defined only as those acts that "result[] in [the emission control system] being inoperable."  EPC

3    Rule 1-8.03(2)(h).  And an emissions control system is "inoperable" only if its *operation or*

4    *efficiency* has been *circumvented, defeated, or deleteriously affected*."  EPC Rule 1-8.03(2)(c)

5    (emphasis    added).    "Circumvent"    means    "avoid,"    Cambridge    Dictionary,

6    https://dictionary.cambridge.org/us/dictionary/english/circumvent (last visited July 22, 2022);

7    "defeat"  means  "to  cause  someone  or  something  to  fail,"  Cambridge  Dictionary,

8    https://dictionary.cambridge.org/us/dictionary/english/defeat (last visited July 22, 2022); and to

9    "deleteriously"  affect  means  to  affect  "in  a  harmful  way,"  Cambridge  Dictionary,

10   https://dictionary.cambridge.org/us/dictionary/english/deleteriously (last visited July 22, 2022).

11   Read together, all of these terms reflect the concept of *weakening* the performance of the emissions

12   system.  *See Nehme* v. *Smithkline Beecham Clinical Labs.*, 863 So. 2d 201, 205 (Fla. 2003)

13   ("Under the doctrine of *noscitur a sociis* (a word is known by the company it keeps), one examines

14   the other words used within a string of concepts to derive the legislature's overall intent.").

15   Replacement software that reduced NOx emissions cannot possibly have "circumvented, defeated,

16   or deleteriously affected" the "operation or efficiency" of any emissions system or component.

17   (*See also* Feb. 23 Order at 2 (ECF No. 7944); July 15 Order at 2 (ECF No. 8003).)

18          The same is true of EPC Rule 1-8.05(6), which boils down to the same key terms.

19   That subsection provides:  "No person shall manufacture, install, sell or advertise for sale, devices

20   to defeat or render inoperable any component of a motor vehicle's emission control system."  As

21   in subsection (1), the term "inoperable emissions system" means one whose "operation or

22   efficiency has been circumvented, defeated, or deleteriously affected."  Because the same terms

23   are used in subsections (1) and (6) of EPC Rule 1-8.05, the same analysis applies, and there can

24   be no violation where the challenged replacement software improved emissions.

25          Other than this Court, the Middle District of Florida is the only other court to have

26   construed Hillsborough's anti-tampering provision.  In dismissing Hillsborough's similar post-sale

27   claims against Mercedes Benz as a matter of law, the Florida court reasoned that Hillsborough had

28   failed to allege "how the field fixes, recalls, or post-sale software updates tampered with the

-24-

1   vehicles' emission control systems, *such as by rendering a system even less functional than it had*

2   *been with the original defeat device*."  *Env't Prot. Comm'n of Hillsborough Cnty.* v. *Mercedes-*

3   *Benz*, 2022 WL 1136610, at *5-6 (M.D. Fla. Apr. 18, 2022) (emphasis added).  The Middle District

4   of Florida's understanding that Rule 1-8.05 is violated only when an emissions system is rendered

5   "less functional" underscores why emissions modifications that reduce emissions do not violate

6   the rule.

7            Like Salt Lake, Hillsborough has advanced the makeweight argument—including

8   in public statements this week following the Court's July 15, 2022 Order[17]—that Hillsborough

9   may penalize Defendants because the replacement software did not bring the cars fully into

10  compliance with federal standards.  There is no legal support for this position anywhere in the text

11  of the rules, which prohibit "circumvent[ing], defeat[ing], or deleteriously affect[ing]" an emission

12  control system or component thereof.  EPC Rule 1-8.05(1), (6).  Nowhere does this language

13  mention federal standards, and for good reason—like Salt Lake County, Hillsborough County

14  lacks the authority to enforce federal standards.  Indeed, the Middle District of Florida expressly

15  rejected this theory when Hillsborough County sought to bring claims under its anti-tampering

16  rules against Mercedes Benz for post-sale software updates that allegedly failed to remove a defeat

17  device installed during manufacture.  *See Env't Prot. Comm'n of Hillsborough Cnty.*, 2022 WL

18  1136610, at *5 ("These updates are not 'tampering' as defined by the [EPC] rule because they do

19  not cause the emissions control system to be inoperable.  Rather, the original pre-sale defeat

20  devices—on which the Commission has not and cannot base its claims—have rendered the

21  emissions control system inoperable . . . .").  And as shown in Section II.A, *supra*, such claims to

22  enforce federal standards are preempted.

23

24

25

26  _____
    [17]      Linda Chiem, Law360, *Counties Can't Dig Through VW Emissions-Cheating Software*
27  (July 18, 2022), available at https://www.law360.com/articles/1512627/counties-can-t-dig-
    through-vw-emissions-cheating-software (Hillsborough's counsel stated that Hillsborough is
28  "confident that those cars with the post-sale emissions cheat device updates did . . . not meet the
    EPA standards").

**CONCLUSION**

Defendants have provided overwhelming, uncontested evidence demonstrating that the replacement software reduced emissions.  Conduct that reduced emissions does not give rise to liability under laws designed to punish conduct that makes emissions worse.  For these reasons, the Court should grant Defendants summary judgment dismissing Hillsborough County's sole count; Salt Lake County's first and fourth claims for relief; and Salt Lake County's third claim for relief to the extent that it is premised on a predicate violation of Utah Admin. Code R307-201-4.

Dated:  July 22, 2022                     Respectfully submitted,

By: */s/ Robert J. Giuffra, Jr.*
    Robert J. Giuffra, Jr. (*admitted pro hac vice*)
    David M.J. Rein (*admitted pro hac vice*)
    Matthew A. Schwartz (*admitted pro hac vice*)
    Nicholas F. Menillo (*admitted pro hac vice*)
    SULLIVAN & CROMWELL LLP
    125 Broad Street
    New York, New York 10004
    Telephone:  (212) 558-4000
    Facsimile:  (212) 558-3588

    Michael H. Steinberg (State Bar No. 134179)
    SULLIVAN & CROMWELL LLP
    1888 Century Park East
    Los Angeles, California 90067
    Telephone:  (310) 712-6600
    Facsimile:  (310) 712-8800

    Judson O. Littleton (*admitted pro hac vice*)
    SULLIVAN & CROMWELL LLP
    1700 New York Avenue, N.W. Suite 700
    Washington, D.C. 20006
    Telephone:  (202) 956-7500
    Facsimile:  (202) 293-6330

    *Counsel for Defendants Volkswagen Group of America, Inc. and Audi of America, LLC*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By: */s/ Cari K. Dawson*

Cari K. Dawson (*admitted pro hac vice*)
Kara F. Kennedy (*admitted pro hac vice*)
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree St.
Atlanta, Georgia 30309
Telephone:  404-881-7000
Facsimile:  404-881-7777

*Counsel for Defendant Porsche Cars North America, Inc.*

By: */s/ Carmine D. Boccuzzi, Jr.*

Carmine D. Boccuzzi, Jr. (*admitted pro hac vice*)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone:  212-225-2000
Facsimile:  212-225-3999

Matthew D. Slater (*admitted pro hac vice*)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Ave., N.W.
Washington, D.C. 20037
Telephone:  202-974-1500
Facsimile:  202-974-1999

*Counsel for Defendant Robert Bosch LLC*

-27-

1

## ATTESTATION (CIVIL LOCAL RULE 5-1(h)(3))

2        In accordance with Civil Local Rule 5-1(h)(3), I attest that concurrence in the filing

3    of this document has been obtained from the signatories.

4    Dated:  July 22, 2022                    SULLIVAN & CROMWELL LLP

5

6                                                   */s/ Nicholas F. Menillo*

7                                                   Nicholas F. Menillo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28