Elizabeth J. Cabraser (SBN 083151)
Kevin R. Budner (SBN 287271)
Phong-Chau G. Nguyen (SBN 286789)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008
ecabraser@lchb.com

David S. Stellings
Wilson M. Dunlavey (SBN 307719)
Katherine I. McBride
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Phone: (212) 355-9500
Fax: (212) 355-9592
dstellings@lchb.com

*Plaintiffs' Lead Counsel and Interim Settlement Class Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 2672 CRB<br><br>The Honorable Charles R. Breyer |
| This Document Relates to:<br><br>Porsche Gasoline Litigation | **MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT AND AWARD OF ATTORNEYS' FEES AND COSTS** |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................... 1

II. BACKGROUND AND PROCEDURAL HISTORY ............................................... 2

    A.     The Settlement provides Class members with substantial cash compensation. ................................................................................................... 3

    B.     The Case was complex, risky, and thoroughly investigated. ....................... 5

    C.     The Notice Program is proving a success, and Class members are already engaged and participating in the streamlined claims process in significant numbers. ...................................................................................................... 7

III. ARGUMENT .......................................................................................................... 8

    A.     The Settlement Class satisfies all requirements of Rule 23 and should be certified. .................................................................................................... 8

          1.    Rule 23(a)(1): The Class is sufficiently numerous. ................................... 8

          2.    Rule 23(a)(2): The Class Claims present common questions of law and fact. .......................................................................................................... 9

          3.    Rule 23(a)(3): The Settlement Class Representatives' claims are typical of other Class members' claims. .................................................... 10

          4.    Rule 23(a)(4): The Settlement Class Representatives and Class Counsel have and will protect the interests of the Class. ......................... 11

          5.    Rule 23(b)(3)—Predominance: Common issues of law and fact predominate. ............................................................................................. 11

          6.    Rule 23(b)(3)—Superiority: Class treatment is superior to other available methods for the resolution of this case. ..................................... 12

    B.     The Settlement is fair, reasonable, and adequate. ................................. 14

          1.    Rule 23(e)(2)(A): Class Counsel and the Settlement Class Representatives have and will continue to zealously represent the Class. ......................................................................................................... 14

          2.    Rule 23(e)(2)(B): The Settlement is the product of good faith, informed, and arm's-length negotiations. ................................................. 15

          3.    Rule 23(e)(2)(C): The Settlement provides substantial compensation in exchange for the compromise of strong claims. ........... 17

              a.    The Settlement mitigates the risks, expenses, and delays the Class would bear with continued litigation. .................................... 18

              b.    Class members will obtain relief through a straightforward claims process. .......................................................................... 19

              c.    Counsel seek reasonable attorneys' fees and costs. ...................... 20

          4.    Rule 23(e)(2)(D): The Proposed Settlement treats all Class members equitably relative to one another. ............................................. 20

          5.    The Settlement satisfies the Ninth Circuit's approval factors. .................. 21

              a.    Class Counsel endorse the Settlement. ........................................ 21

**TABLE OF CONTENTS**
(continued)

Page

b.    The government's independent check on the fuel economy revisions and Sport+ recall repair favors final approval. .............. 22

c.    The Class' initial response has been positive. ............................. 22

C.    The Court should appoint Lead Plaintiffs' Counsel as Settlement Class Counsel under Rule 23(g)(1). ............................................................. 23

D.    Class Counsel's requested fee is fair, reasonable, and appropriate...................... 23

1.    Class Counsel obtained substantial cash compensation for the Class. ..................................................................................................... 23

2.    The Settlement resulted from Class Counsel's zealous representation in complex and risky litigation. ......................................... 25

3.    Class Counsel's requested fee percentage is reasonable, appropriate, and strongly supported by precedent.......................................................... 26

4.    Class Counsel carried considerable financial burden in prosecuting this complex litigation................................................................................ 28

5.    A lodestar cross-check confirms the requested fees are reasonable. ........ 28

a.    Class Counsel expended a reasonable number of hours advancing this complex litigation. .................................................. 30

b.    Class Counsel billed reasonable rates for those hours. ................. 31

c.    Class Counsel's performance and the results achieved justify a reasonable lodestar multiplier. ....................................... 31

E.    Class Counsel's expenses are reasonable and appropriate................................... 32

F.    The Settlement Class Representatives have earned the requested service awards. ............................................................................................................. 34

IV.    CONCLUSION ............................................................................................................. 34

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aichele v. City of Los Angeles*,
No. CV-12-10863-DMG, 2015 WL 5286028 (C.D. Cal. Sept. 9, 2015) .................................. 28

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ........................................................................................................... 12

*Astiana v. Kashi Co.*,
291 F.R.D. 493 (S.D. Cal. 2013) ......................................................................................... 9

*Beesley v. Int'l Paper Co.*,
No. 3:06-CV-703-DRH-CJP, 2014 WL 375432 (S.D. Ill. Jan. 31, 2014) .............................. 33

*Bellinghausen v. Tractor Supply Co.*,
306 F.R.D. 245 (N.D. Cal. 2015) ....................................................................................... 29

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) ........................................................................................................... 23

*Buccellato v. AT&T Operations, Inc.*,
No. C10-00463-LHK, 2011 WL 3348055 (N.D. Cal. June 30, 2011) .................................... 32

*Cohen v. Trump*,
303 F.R.D. 376 (S.D. Cal. 2014) ......................................................................................... 9

*Counts v. Gen. Motors, LLC*,
237 F. Supp. 3d 572 (E.D. Mich. 2017) ............................................................................. 19

*Craft v. Cty. of San Bernardino*,
624 F. Supp. 2d 1113 (C.D. Cal. 2008) ............................................................................. 28

*Dyer v. Wells Fargo Bank, N.A.*,
303 F.R.D. 326 (N.D. Cal. 2014) .................................................................................. 29, 31

*Elder v. Hilton Worldwide Holdings, Inc.*,
No. 16-CV-00278-JST, 2021 WL 4785936 (N.D. Cal. Feb. 4, 2021) .................................... 16

*Evon v. Law Offices of Sidney Mickell*,
688 F.3d 1015 (9th Cir. 2012) ........................................................................................... 11

*Fischel v. Equitable Life Assurance Soc'y of U.S.*,
307 F.3d 997 (9th Cir. 2002) ............................................................................................. 29

*Friedman v. 24 Hour Fitness USA, Inc.*,
No. CV 06-6282 AHM (CTx), 2009 WL 2711956 (C.D. Cal. Aug. 25, 2009) ........................ 12

*Gant v. Ford Motor Co.*,
517 F. Supp. 3d 707 (E.D. Mich. 2021) ............................................................................. 18

*Guido v. L'Oreal, USA, Inc.*,
284 F.R.D. 468 (C.D. Cal. 2012) ......................................................................................... 9

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) .................................................................................... passim

**TABLE OF AUTHORITIES**
(continued)

Page

*Hefler v. Wells Fargo & Co.*,
No. 16-CV-05479-JST, 2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) ................................... 29

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) ............................................................................................................ 24

*Hernandez v. Dutton Ranch Corp.*,
No. 19-CV-00817-EMC, 2021 WL 5053476 (N.D. Cal. Sept. 10, 2021) ............................ 27

*In re Anthem, Inc. Data Breach Litig.*,
327 F.R.D. 299 (N.D. Cal. 2018) ........................................................................................ 16

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ........................................................................... 21, 23, 28, 31

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
No. 1917, 2016 WL 4126533 (N.D. Cal. Aug. 3, 2016) ........................................................ 2

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices & Prods. Liab. Litig.*,
295 F. Supp. 3d 927 (N.D. Cal. 2018) ................................................................................ 18

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*,
No. 17-md-02777, 2019 WL 536661 (N.D. Cal. Feb. 11, 2019) ...................................... 5, 9

*In re First Alliance Mortg. Co.*,
471 F.3d 977 (9th Cir. 2006) .............................................................................................. 12

*In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*,
No. 2:19-MD-02901, 2022 WL 551221 (E.D. Mich. Feb. 23, 2022) ............................... 6, 18

*In re Heritage Bond Litig.*,
No. 02-ML-1475 DT, 2005 WL 1594403 (C.D. Cal. June 10, 2005) .................................. 27

*In re Hyundai & Kia Fuel Econ. Litig.*,
926 F.3d 539 (9th Cir. 2019) ........................................................................................... 9, 12

*In re Hyundai & Kia Fuel Econ. Litig.*,
No. MDL 13-2424-GW(FFMx), 2014 WL 12603199 (C.D. Cal. Aug. 21, 2014) ................. 21

*In re Lithium Ion Batteries Antitrust Litig.*,
No . 13-md-2420-YGR, 2019 WL 3856413 (N.D. Cal Aug. 16, 2019) ................................ 28

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000) .................................................................................. 19, 27, 34

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
No. 4:14-MD-2541-CW, 2017 WL 6040065 (N.D. Cal. Dec. 6, 2017) .............................. 2, 27

*In re Nexus 6P Prod. Liab. Litig.*,
No. 17-CV-02185-BLF, 2019 WL 6622842 (N.D. Cal. Nov. 12, 2019) ........................... 24, 25

*In re Omnivision Techs., Inc.*,
559 F. Supp. 2d 1036 (N.D. Cal. 2008) ............................................................................. 24

MOTION FOR FINAL APPROVAL OF CLASS
SETTLEMENT AND ATTORNEYS' FEES & COSTS
MDL No. 2672 CRB

1

2

**TABLE OF AUTHORITIES**
(continued)

Page

3

4

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 934 (9th Cir. 2015)................................................................ 34

*In re Oracle Sec. Litig.*,
   852 F. Supp. 1437 (N.D. Cal. 1994) ..................................................... 26

*In re TFT–LCD (Flat Panel) Antitrust Litigation*,
   No. MDL 3:07–md–1827 SI, 2011 WL 7575003 (N.D. Cal. Dec. 27, 2011) ......................... 27

*In re Toyota Rav4 Hybrid Fuel Tank Litig.*,
   534 F. Supp. 3d 1067 (N.D. Cal. 2021) ................................................. 18

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
   No. MDL 2672 CRB (JSC), 2019 WL 2077847 (N.D. Cal. May 10, 2019) ................ 17, 21, 31

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
   No. 2672 CRB (JSC), 2017 WL 672820 (N.D. Cal. Feb. 16, 2017) ......................... 10

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
   No. MDL 2672 CRB (JSC), 2016 WL 6248426 (N.D. Cal. Oct. 25, 2016)............. 5, 16, 19, 21

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
   No. MDL 2672 CRB (JSC), 2017 WL 2212780 (N.D. Cal. May 17, 2017) ......................... 11

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
   No. 2672 CRB (JSC), 2016 WL 4010049 (N.D. Cal. July 26, 2016)................................ *passim*

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
   No. 2672 CRB (JSC), 2017 WL 1047834 (N.D. Cal. Mar. 17, 2017)................................ *passim*

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
   No. 2672 CRB (JSC), 2017 WL 2178787 (N.D. Cal. May 17, 2017) ....................................... 32

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
   No. 2672 CRB (JSC), 2017 WL 3175924 (N.D. Cal. July 21, 2017)........................................ 32

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
   895 F.3d 597 (9th Cir. 2018).................................................... 14, 16, 25

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
   19 F.3d 1291 (9th Cir. 1994)................................................................ 28

*Jimenez v. Allstate Ins. Co.*,
   765 F.3d 1161 (9th Cir. 2014)................................................................ 9

*Kerr v. Screen Extras Guild, Inc.*,
   526 F.2d 67 (9th Cir. 1975)................................................................ 31

*Kim v. Space Pencil, Inc.*,
   No. C 11-03796 LB, 2012 WL 5948951 (N.D. Cal. Nov. 28, 2012)......................... 19

*Marshall v. Holiday Magic, Inc.*,
   550 F.2d 1173 (9th Cir. 1977)................................................................ 16

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**
(continued)

Page

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
 221 F.R.D. 523 (C.D. Cal. 2004) ................................................................... 21

*Nobles v. MBNA Corp.*,
 No. C 06-3723 CRB, 2009 WL 1854965 (N.D. Cal. June 29, 2009) ......................... 19

*Officers for Justice v. Civil Serv. Comm'n*,
 688 F.2d 615 (9th Cir. 1982) ........................................................................ 14

*Ontiveros v. Zamora*,
 303 F.R.D. 356 (E.D. Cal. 2014). .......................................................... 15, 16, 21

*Palmer v. Stassinos*,
 233 F.R.D. 546 (N.D. Cal. 2006) ..................................................................... 8

*Parsons v. Ryan*,
 754 F.3d 657 (9th Cir. 2014) ........................................................................ 10

*Rieckborn v. Velti PLC*,
 No. 13-3889, 2015 WL 468329 (N.D. Cal. Feb. 3, 2015) ..................................... 29

*Ries v. Ariz. Beverages USA LLC*,
 287 F.R.D. 523 (N.D. Cal. 2012) ..................................................................... 9

*Rodriguez v. Hayes*,
 591 F.3d 1105 (9th Cir. 2010) ....................................................................... 10

*Six (6) Mexican Workers v. Ariz. Citrus Growers*,
 904 F.2d 1301 (9th Cir. 1990) ....................................................................... 23

*Slaven v. BP Am., Inc.*,
 190 F.R.D. 649 (C.D. Cal. 2000) ...................................................................... 8

*Smith v. Cardinal Logistics Mgmt. Corp.*,
 No. 07-2104 SC, 2008 WL 4156364 (N.D. Cal. Sept. 5, 2008) .............................. 13

*Staton v. Boeing Co.*,
 327 F.3d 938 (9th Cir. 2003) .................................................................... 23, 32

*Stetson v. Grissom*,
 821 F.3d 1157 (9th Cir. 2016) ....................................................................... 31

*Stockwell v. City & Cty. of San Francisco*,
 749 F.3d 1107 (9th Cir. 2014) ........................................................................ 9

*Sykes v. Mel Harris & Assocs. LLC*,
 285 F.R.D. 279 (S.D.N.Y. 2012), *aff'd* 780 F.3d 70 (2d Cir. 2015) ....................... 10

*Trosper v. Styker Corp.*,
 No. 13-CV-0607-LHK, 2014 WL 4145448 (N.D. Cal. Aug. 21, 2014) ..................... 13

*Tyson Foods, Inc. v. Bouaphakeo*,
 136 S. Ct. 1036 (2016) ................................................................................ 11

**TABLE OF AUTHORITIES**
(continued)

Page

*Vizcaino v. Microsoft Corp.*,
   290 F.3d 1043 (9th Cir. 2002)...................................................................... 23, 27, 28, 29

*Wakefield v. Wells Fargo & Co.*,
   No. 3:13-cv-05053 LB, 2015 WL 3430240 (N.D. Cal. May 28, 2015)..................................... 32

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................................................. 9, 10

*Willner v. Manpower Inc.*,
   No. 11-cv-02846-JST, 2015 WL 3863625 (N.D. Cal. June 22, 2015) ......................... 32

*Wolin v. Jaguar Land Rover N. Am., LLC*,
   617 F.3d 1168 (9th Cir. 2010)................................................................................. 12, 13

**Rules**

Fed. R. Civ. P. 23(a)(1) ....................................................................................................... 8

Fed. R. Civ. P. 23(a)(3) ..................................................................................................... 10

Fed. R. Civ. P. 23(e)........................................................................................................... 23

Fed. R. Civ. P. 23(e)(2)(A) ............................................................................................... 15

Fed. R. Civ. P. 23(e)(2)(B) ............................................................................................... 15

Fed. R. Civ. P. 23(e)(2)(C)...................................................................................... 17, 18, 21

Fed. R. Civ. P. 23(e)(2)(C)(i) ........................................................................................... 19

Fed. R. Civ. P. 23(e)(2)(C)(ii) .......................................................................................... 20

Fed. R. Civ. P. 23(e)(2)(C)(iii) ......................................................................................... 20

Fed. R. Civ. P. 23(e)(2)(D) ............................................................................................... 21

Fed. R. Civ. P. 23(h) .......................................................................................................... 32

**Treatises**

4 Newberg § 13:49 (5th ed. 2012) ..................................................................................... 16

Federal Judicial Center, *Manual for Complex Litigation* § 21.71 (4th ed.)................................... 24

**Other Authorities**

Fed. R. Civ. P. 23(h) committee note.................................................................................. 24

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action*
   *Settlements: 1993–2008*, 7 J. Empirical Legal Stud. 248 (2010)................................ 32

Theodore Eisenberg, Geoffrey Miller, & Roy Germano,
   *Attorneys' Fees in Class Actions 2009-2013*, 92 N.Y.U. L. Rev. 937 (2017).................... 31, 32

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

TO ALL THE PARTIES AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on October 21, 2022 at 9:00 a.m. or at such other date and time as the Court may set, in Courtroom 6 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Lead Counsel, on behalf of a proposed Settlement Class of current and former owners and lessees of certain Porsche gasoline vehicles, will and hereby do move the Court for an order and judgment granting final approval of the Class Action Settlement and the motion for attorneys' fees and costs, and appointing Settlement Class Counsel and Class Representatives under Fed. R. Civ. P. 23(g)(1).

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.      INTRODUCTION**

3      The Settlement before the Court resolves claims for consumers who purchased or leased

4   certain model year 2005-2020 gasoline-powered Porsche vehicles (the "Class Vehicles"). As

5   detailed in the operative Complaint, Plaintiffs allege that two historical practices improperly

6   skewed the emissions and fuel economy test results for the Class Vehicles. The Settlement

7   provides a guaranteed, non-reversionary fund of at least $80 million (and up to $85 million) to

8   compensate Class members who purchased and leased these Class Vehicles.

9      As part of the extensive investigation efforts in this case, the Parties conducted and

10   reviewed results from rigorous and comprehensive testing that they believe to have covered all

11   vehicles potentially affected by the alleged practices. *See* Settlement Agreement ("SA"), Dkt.

12   7971-1 at 1. Testing results for a subset of the Class Vehicles—the "Fuel Economy Class

13   Vehicles"—revealed that the real-world fuel economy may have been one or two miles per gallon

14   lower than the MPG promised to Class members on the Monroney labels and in other marketing.

15   As a result, Class members who purchased or leased a Fuel Economy Class Vehicle may have

16   paid for more gasoline over time—and may have had to visit the gas station more frequently—

17   than if the vehicles had performed as promised. Class members with Fuel Economy Class

18   Vehicles will be eligible to receive Fuel Economy Cash Benefits, ranging from $250 to $1,109.66

19   per Class Vehicle. While market prices for gasoline fluctuate and future gas prices are

20   unpredictable, the Fuel Economy compensation will pay all Fuel Economy Class members a very

21   high percentage of their potential recoverable damages (and the vast majority of them 100% of

22   damages). *See* Section II.A.

23      Class members with Class Vehicles that were also conceivably impacted by the testing

24   practices at issue (the "Other Class Vehicles"), but for which no potential deviations were

25   identified through the comprehensive vehicle testing program, will be eligible to receive cash

26   payments of up to $200 per vehicle. Finally, in addition to the Fuel Economy and Other Class

27   Vehicle compensation, Class members whose vehicles are equipped with a high-performance

28   Sport+ Mode that are the subject of an ongoing emissions recall (the "Sport+ Class Vehicles")

will *also* be eligible for a free software upgrade and a cash payment of $250 ("Sport+ Cash Benefits"), which will be paid automatically, without the need for a claim form. As with the Fuel Economy Cash Benefits, the Sport+ and Other Class Vehicle payments provide substantial compensation to Class members tied to the potential impact of the practices at issue on their Class Vehicles.

The proposed Settlement is an outstanding result for the Class, and provides significant monetary value to the Class for the impact the alleged improper testing practices may have had on their Class Vehicles. For their work in securing this result, Class Counsel seek $24,000,000 in fees and $710,733.89 in costs. The requested fees are 30% of the guaranteed $80,000,000 non-reversionary settlement fund, and 28.2% of the settlement's total potential monetary value. This modest upward departure from the 25% benchmark is warranted in light of the exceptional results obtained for the Class, including a substantial payment available to all Class members to redress the relevant harms (arguably 100% of damages for most Class members). *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2016 WL 4126533, at *5 (N.D. Cal. Aug. 3, 2016), *dismissed sub nom. In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 16-16368, 2017 WL 3468376 (9th Cir. Mar. 2, 2017) (awarding 30% of $576,750,000 fund); *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, No. 4:14-MD-2541-CW, 2017 WL 6040065, at *2 (N.D. Cal. Dec. 6, 2017), *aff'd*, 768 F. App'x 651 (9th Cir. 2019) (observing that "many cases in this circuit . . . have granted fee awards of 30% or more," and, "in most common fund cases, the award exceeds the [25%] benchmark"). The reasonableness of the requested fees is further confirmed by a lodestar cross-check that yields a routine multiplier of just 1.86.

Plaintiffs thus respectfully request that the Court certify the Settlement Class, grant final approval to the Settlement, and approve an aggregate award of $24,710,733.89 in attorneys' fees and costs to be allocated by Lead Counsel among participating PSC firms for their common benefit work devoted to obtaining this excellent result.

## II.    BACKGROUND AND PROCEDURAL HISTORY

The Court is very familiar with the history of this litigation, much of which is detailed in Plaintiffs' preliminary approval briefing (Dkt. 7971). In the interest of efficiency, Plaintiffs will

1   not reiterate that history here and incorporate it by reference. A few points, however, bear

2   emphasis.

3       **A.      The Settlement provides Class members with substantial cash compensation.**

4           This case centers on allegations that Defendants altered fuel economy and emissions test

5   results in certain gasoline-powered Porsche vehicles manufactured for model years 2005 through

6   2020. Specifically, Plaintiffs allege two improper strategies that could have impacted the

7   emissions and fuel economy test results for the Class Vehicles: referred to in the Amended

8   Complaint as the "Axle Ratio Fraud" and the "Sport+ Fraud." Dkt. 7969 at ¶¶ 68-90. As to the

9   Axle Ratio Fraud, (referred to in the Settlement as the "Fuel Economy Matter"), Plaintiffs allege

10  that Porsche used doctored vehicles for emissions and fuel economy testing, such that the

11  hardware and software in the tested vehicles differed in material ways from the hardware and

12  software in vehicles that were sold to the public. As a result, the tested vehicles obtained better

13  fuel economy and emitted less $CO_2$ in the laboratory than the vehicles that were actually sold and

14  leased to consumers. With respect to the Sport+ Fraud, Plaintiffs allege that some Class Vehicles

15  exceeded emissions limits when driven in a user-selected, high-performance "Sport+" driving

16  mode.

17          The proposed Settlement provides substantial cash payments to all Class members whose

18  vehicles were or could have been impacted by one or both of these tactics. The amount of

19  compensation available to each Class member is based on the model and model year Class

20  Vehicle they purchased or leased, and the degree to which there is a measured impact on their

21  Class Vehicle from the relevant conduct. Class members with a Fuel Economy Class Vehicle—

22  for which testing and other discovery revealed a deviation in fuel economy—will receive cash

23  compensation for (1) the difference in cost for the amount of gasoline that would have been

24  required under the original Monroney fuel economy label and the greater amount required under

25  the adjusted fuel economy label, and (2) a goodwill payment of an additional 15% of those

26  damages to compensate for any inconvenience. Dkt. 7971-1 ¶ 4.1. Payments range from $250 to

27  $1,109.66 for Class members who owned the vehicle for 96 months after it was first sold or

28  leased. *Id.*, Ex. 1. Compensation for Class members who sold, purchased used, or leased their

Fuel Economy Class Vehicles follows the same concept, but will be prorated to the number of months of possession during the 96 month period.

Class members with "Other Class Vehicles"—for which emissions or fuel economy deviations were not identified through the Parties' extensive investigation and testing efforts, but nonetheless could conceivably have experienced a discrepancy given the time periods and places in which they were developed—will be offered meaningful cash payments of up to $200 per vehicle. If an *extraordinary* claims rate causes the payments allocated to the Other Class Vehicles to fall below $150 per vehicle, Defendants have agreed to pay an *additional* $5 million into the Settlement Fund, bringing the total to $85 million.

Finally, and in addition to the Fuel Economy and Other Class Vehicle compensation described above, Class members with a Sport+ Class Vehicle will be eligible to receive an Emissions Complaint Repair ("ECR"), a software reflash that upgrades the Sport+ program to Porsche's most up-to-date version and brings the vehicles into compliance with the relevant regulatory limits. The ECR does not compromise Sport+ performance, but Class members who receive it will *automatically* receive a $250 cash payment upon completion, without having to submit any further claim.[1] This significant payment will incentivize Class members to bring their Class Vehicle to a dealership for a software update and compensate them for their time and inconvenience in doing so.[2]

The $80 million available to the Class is non-reversionary. If there are any funds remaining after all valid, complete, and timely Claims are paid, the Settlement contemplates a redistribution of the remaining funds to Class members unless and until it is economically infeasible to do so. SA ¶ 4.4. Finally, any final balance (an amount which will be relatively modest given the Class member redistribution) will be directed *cy pres* to environmental remediation efforts subject to Court approval. *Id.* This ensures that *all* of the money secured by

---

[1] Sport+ Class members who complete or have already completed the ECR will have their information sent to the settlement administrator for automatic payment after final approval, thereby eliminating the need to submit a claim for the $250 payment.

[2] The ECRs for the vast majority of Sport+ Class vehicles has already been approved, and Defendants are in the process of obtaining regulatory approval for the remainder.

- 4 -

1   the Settlement will inure to the benefit of the Class and the interests advanced in this litigation.

2           **B.**        **The Case was complex, risky, and thoroughly investigated.**

3         This $80 million settlement for the Class was not easily obtained. Indeed, the Porsche

4   Gasoline cases presented a unique set of facts and complex issues from the beginning. The

5   litigation traces back two years, when a prominent German news site *Der Spiegel* in August 2020

6   first broke news of possible emissions and fuel economy irregularities in Porsche gasoline

7   vehicles. Class Counsel then dedicated two years to the extensive investigation, litigation, and

8   discovery of the complex emissions and fuel economy test practices at issue.

9         Those two years brought significant challenges and required a lot of work. After the initial

10   consolidation into this MDL, the Court tasked Plaintiffs' Lead Counsel (previously appointed in

11   the diesel emissions cases) with filing a consolidated complaint for the Porsche Gasoline cases.

12   *See* Dkt. 7756. This was no small feat. Unlike other recent vehicle emissions settlements,

13   including within this MDL, no parallel action was filed by the government to bolster Plaintiffs'

14   claims and assist in the investigation. As such, Plaintiffs had no formal Notice of Violation on

15   which to ground their allegations and steer the focus of their investigation.[3] Without a roadmap

16   from a formal government citation, Plaintiffs pushed forward to thoroughly investigate and

17   aggressively pursue their claims, as evidenced by the detailed factual allegations and legal claims

18   in the 417-page Consolidated Consumer Class Action Complaint. *See* Dkt. 7803.

19         In response to those allegations, Defendants filed a comprehensive motion to dismiss

20   addressing numerous and complex issues, including, for example: Plaintiffs' standing to bring

21   claims under Article III; preemption of Plaintiffs' claims by the federal Energy Policy and

22   _____

23   [3] In this case, as detailed below (§ III.B.5), government agencies did later review and approve the
fuel economy rating adjustments underpinning the proposed Settlement, as well as the ECR for

24   Sport+ vehicles, but this confirmatory role did not serve to bolster Plaintiffs' allegations and
investigation in the litigation track. For example, in the Fiat Chrysler EcoDiesel settlement, the

25   government's issuance of a Notice of Violation, followed by their parallel investigation and
prosecution of the emissions scheme at issue, resulted in a Consent Decree and additional fines
that worked "in tandem" with the consumer litigation. *In re Chrysler-Dodge-Jeep Ecodiesel*

26   *Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 17-md-02777, 2019 WL 536661, at *3 (N.D.
Cal. Feb. 11, 2019); *see also In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod.*

27   *Liab. Litig.*, No. MDL 2672 CRB (JSC), 2016 WL 6248426, at *14 (N.D. Cal. Oct. 25, 2016)
(consumer claims followed issuance of a Notice of Violation, and were supported by settlement

28   negotiations conducted "alongside" the regulators).

1   Conservation Act of 1975 ("EPCA"), Federal Trade Commission ("FTC") regulations, and the

2   Clean Air Act; and whether Plaintiffs' claims—which cover conduct reaching back nearly two

3   decades—were barred by statutes of limitation. Dkt. 7862. Class Counsel then researched,

4   drafted, and filed a 60-page opposition brief, and Defendants lodged a reply in support. Dkts.

5   7884, 7901. Those briefs, as well as subsequent developments in the law, reveal the strengths of

6   Plaintiffs' claims, but also the very real risks Plaintiffs faced in advancing them. Indeed, as

7   discussed further below, another court recently found—incorrectly, in Plaintiffs' view—that

8   claims of falsified fuel economy ratings like this one are preempted by the EPCA. *See In re Ford*

9   *Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig*., No. 2:19-MD-02901,

10  2022 WL 551221, at *12 (E.D. Mich. Feb. 23, 2022).

11        In this context, and after detailed briefing, the parties agreed to commence settlement

12  negotiations in earnest. Throughout these negotiations, Plaintiffs continued to press forward in

13  parallel with significant factual investigation and discovery efforts. For example, Class Counsel

14  retained technical experts to conduct testing on the Class Vehicles in on-road and laboratory

15  settings, yielding comprehensive data and analysis to inform their understanding of the testing

16  practices at issue. Declaration of David S. Stellings ("Stellings Decl.") ¶¶ 3. Defendants likewise

17  conducted an extensive testing and review process in response to regulatory inquiries and

18  Plaintiffs' claims. The Parties intended and believe that this detailed and extensive testing regime

19  covered all affected vehicles. SA at pp. 1-2. Plaintiffs' counsel and their experts traveled to

20  Porsche's facilities in Weissach, Germany, to monitor the Defendants' testing and to meet with

21  several of the key engineers and personnel involved in the design and regulatory testing for the

22  Class Vehicles. Stellings Decl. ¶¶ 8-10. Plaintiffs continued that discussion in March 2022 at

23  Porsche's headquarters in Stuttgart, Germany, where they further evaluated Porsche's ongoing

24  testing, reviewed updated test results, and held further meetings with Porsche's engineers and

25  attorneys. *Id.*

26        The Parties also engaged in extensive document and information exchanges in this case

27  apart from the comprehensive vehicle testing program. On this front, Plaintiffs took due

28  advantage of their ability to access Defendants' documents in the MDL database. Specifically,

Plaintiffs developed, tested, and refined English and German-language search terms to isolate materials relevant to the Porsche vehicles and issues in this litigation. Through this rigorous process, Plaintiffs reviewed and analyzed millions of pages of relevant documents produced in this MDL. Plaintiffs also reviewed and analyzed additional documents through discovery in the Porsche Gasoline cases, including over 500,000 technical, German-language documents made available to Plaintiffs in Germany, and thousands of pages of additional documents.

Based on all of this investigation—and thus armed with a more comprehensive understanding of the technologies at issue—Plaintiffs recently filed a 425-page Amended Complaint that refined their theories of liability and presented detailed claims under federal law and the laws of all 50 states. Dkt. 7969. At the same time, the significant amounts of data, documents, and information exchanged facilitated an arm's-length, technical, and evidence-based settlement negotiation process, ultimately resulting in the proposed resolution now before the Court.

**C.    The Notice Program is proving a success, and Class members are already engaged and participating in the streamlined claims process in significant numbers.**

Following preliminary approval, the Parties worked with respected class notice provider and settlement administrator JND to roll out the Court-approved Notice Program with great success. JND reports that the Notice Program is on track to reach "virtually all" Class members. Declaration of Jennifer Keough ("Keough Decl.") ¶ 6. To date, JND has sent 1,096,929 individual notices by email, and 555,294 by mail, to individual Class members. *Id.* ¶¶ 9-10. Banner notices have yielded 41,990,491 impressions, and sponsored search listings have been displayed 2,699 times. *Id.* ¶¶ 15-16. While the Notice program remains underway, and several months remain in the claims period, Class members are already visiting the Settlement Website at an impressive rate, with 684,208 page hits from 146,074 unique visitors so far. *Id.* ¶ 20.[4] As of

---

[4] In the preliminary approval motion, Plaintiffs estimated that the cost of notice and administration could reach approximately $2.5 million, depending on the "final tally of owners, lessees, and claims associated with the approximately 500,000 Class Vehicles." Dkt. 7971 at 10. Based on the strong initial response and the availability of more physical addresses than initially expected, Plaintiffs anticipate that the final cost may exceed that projection, proportionate to the needs of effectuating the best notice practicable to the Class in this case.

August 26, moreover, JND had received 38,252 Settlement Claims, the vast majority of which were submitted through the streamlined submission portal available on the Settlement Website. *Id.* ¶ 25. In addition, at least 12,319 Class members had already obtained the ECR for their Sport+ Class Vehicles as of August 19, 2022. All of them will receive their Sport+ payments automatically after final approval. Stellings Decl. ¶ 16. Together, these are "encouraging" signs of the Class' engagement that—coupled with targeted claim stimulation efforts—will yield substantial participation from the Class. Keough Decl. ¶ 12. Regardless, to maximize the success of the settlement program, the Parties intend to send claim-stimulation reminder notices and may seek to extend the claim deadline, if appropriate.

## III.   ARGUMENT

### A.   The Settlement Class satisfies all requirements of Rule 23 and should be certified.

As the Court concluded in granting preliminary approval and directing notice to the Class, "the Class and its representatives likely meet all relevant requirements of Rule 23(a) and Rule 23(b)(3)." Dkt. 7997 at 4. This remains true, and the Settlement Class should be certified.

#### 1.   Rule 23(a)(1): The Class is sufficiently numerous.

Rule 23(a)(1) is satisfied where, as here, "the class is so numerous that joinder of all class members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity is generally met when the class exceeds forty members. *See, e.g.*, *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000). It is undisputed that several hundred thousand Class Vehicles were sold and/or leased nationwide and that the Settlement Class—which includes current and former owners and lessees of those Vehicles—includes at least as many Class members. The size of the Settlement Class and its geographic dispersal across the United States render joinder impracticable. *See Palmer v. Stassinos*, 233 F.R.D. 546, 549 (N.D. Cal. 2006) ("Joinder of 1,000 or more co-plaintiffs is clearly impractical."). Numerosity is satisfied.

1

2

### 2.     Rule 23(a)(2): The Class Claims present common questions of law and fact.

3

"Federal Rule of Civil Procedure 23(a)(2) conditions class certification on demonstrating

4

that members of the proposed class share common 'questions of law or fact.'" *Stockwell v. City &*

5

*Cty. of San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014). Commonality "does not turn on the

6

number of common questions, but on their relevance to the factual and legal issues at the core of

7

the purported class' claims." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014).

8

"'Even a single question of law or fact common to the members of the class will satisfy the

9

commonality requirement.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 369 (2011).[5]

10

Courts routinely find commonality where, as here, the class claims arise from a

11

defendant's uniform course of fraudulent conduct. *See, e.g.*, *In re Chrysler-Dodge-Jeep Ecodiesel*

12

*Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 17-MD-02777-EMC, 2019 WL 536661, at *6

13

(N.D. Cal. Feb. 11, 2019) (commonality satisfied where claims arose from the defendants'

14

"common course of conduct" in perpetrating alleged vehicle emissions cheating scheme);

15

*Cohen v. Trump*, 303 F.R.D. 376, 382 (S.D. Cal. 2014) (finding "common questions as to

16

'Trump's scheme and common course of conduct, which ensnared Plaintiff[] and the other Class

17

members alike.").[6]

18

Here, the Settlement Class claims are rooted in common questions of fact relating to

19

alleged irregularities in the emissions and fuel economy test results for the Class Vehicles, and

20

related misrepresentations to regulators and consumers. *See, e.g.*, Am. Compl. ¶ 1; *see also In re*

21

*Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557 (9th Cir. 2019) (similar common questions

22

about misrepresented fuel economy ratings satisfied commonality requirement). These common

23

---

[5] Here, and throughout, internal citations are omitted unless otherwise indicated.

24

[6] Likewise, commonality is satisfied in cases where defendants deployed uniform misrepresentations to deceive the public (such as the Monroney labels and other advertisements

25

for the Class Vehicles here). *See Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("Courts routinely find commonality in false advertising cases . . . ."); *Astiana v. Kashi*

26

*Co.*, 291 F.R.D. 493, 501-02 (S.D. Cal. 2013) (same); *see also Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 478 (C.D. Cal. 2012) (whether misrepresentations "are unlawful, deceptive, unfair, or

27

misleading to reasonable consumers are the type of questions tailored to be answered in 'the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the

28

litigation'") (quoting *Dukes*, 564 U.S. at 350).

- 9 -

1   questions will, in turn, generate common answers "apt to drive the resolution of the litigation" for

2   the Settlement Class as a whole. *See Dukes*, 564 U.S. at 350. As the Settlement Class's "injuries

3   derive from [D]efendants' alleged 'unitary course of conduct,'" Plaintiffs have "'identified a

4   unifying thread that warrants class treatment.'" *Sykes v. Mel Harris & Assocs. LLC*, 285 F.R.D.

5   279, 290 (S.D.N.Y. 2012), *aff'd* 780 F.3d 70 (2d Cir. 2015). As in the *Volkswagen* diesel

6   litigation and the Audi $CO_2$ cases, "[w]ithout class certification, individual Class members would

7   be forced to separately litigate the same issues of law and fact which arise from Volkswagen's

8   use of the [emissions cheat] and Volkswagen's alleged common course of conduct." *In re*

9   *Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672 CRB (JSC),

10  2016 WL 4010049, at *10 (N.D. Cal. July 26, 2016) ("*VW 2L Preliminary Approval Order*").

       **3.**      **Rule 23(a)(3): The Settlement Class Representatives' claims are typical of other Class members' claims.**

13        Under Rule 23(a)(3), "'the claims or defenses of the representative parties'" must be

14  "'typical of the claims or defenses of the class.'" *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir.

15  2014) (quoting Fed. R. Civ. P. 23(a)(3)). "Like the commonality requirement, the typicality

16  requirement is 'permissive' and requires only that the representative's claims are 'reasonably co-

17  extensive with those of absent class members; they need not be substantially identical.'"

18  *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quoting *Hanlon v. Chrysler Corp.*, 150

19  F.3d 1011, 1020 (9th Cir. 1998)). Here, the same course of conduct injured the Settlement Class

20  Representatives and the other members of the proposed Settlement Class in the same ways. The

21  Settlement Class Representatives, like other Settlement Class members, purchased or leased Class

22  Vehicles that did not or may not obtain the fuel economy and emissions performance they

23  reasonably expected. As a result, they may have paid for more gas and visited the gas pump more

24  frequently, and/or will take their vehicles in for a software upgrade to bring them into compliance

25  with emissions regulations. The typicality requirements are satisfied. *See In re Volkswagen*

26  *"Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL

27  672820, at *7 (N.D. Cal. Feb. 16, 2017); *see also In re Volkswagen "Clean Diesel" Mktg., Sales*

28  *Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 2212780, at *5 (N.D. Cal.

1   May 17, 2017).

2       **4.      Rule 23(a)(4): The Settlement Class Representatives and Class Counsel
3              have and will protect the interests of the Class.**

4       Rule 23(a)(4)'s adequacy requirement is met where "(1) . . . the named plaintiffs and their

5   counsel have [no] conflicts of interest with other class members and (2) . . . the named plaintiffs

6   and their counsel [have] prosecute[d] the action vigorously on behalf of the class[.]'" *Evon v. Law*

7   *Offices of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012) (quoting *Hanlon*, 150 F.3d at

8   1020). Both prongs are readily satisfied here.

9       The Settlement Class Representatives "are entirely aligned [with the Settlement Class] in

10  their interest in proving that [Defendants] misled them and share the common goal of obtaining

11  redress for their injuries." *VW 2L Preliminary Approval Order*, 2016 WL 4010049, at *11. The

12  Representatives understand their duties, have agreed to consider the interests of absent Settlement

13  Class members, and have reviewed and uniformly endorsed the Settlement terms. *See* Stellings

14  Decl. ¶ 20. The proposed Settlement Class Representatives are more than adequate.

15      Furthermore, Lead Counsel and several of the PSC firms have undertaken an enormous

16  amount of work, effort, and expense in this MDL and specifically in litigating the Porsche

17  Gasoline cases. They have demonstrated their willingness to devote whatever resources were

18  necessary to reach a successful outcome throughout the nearly two years of investigation,

19  litigation, and parallel settlement negotiations. They, too, satisfy Rule 23(a)(4).

20      **5.      Rule 23(b)(3)—Predominance: Common issues of law and fact
21             predominate.**

22      "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in

23  the case are more prevalent or important than the non-common, aggregation-defeating, individual

24  issues.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). Thus, "[w]hen common

25  questions present a significant aspect of the case and they can be resolved for all members of the

26  class in a single adjudication, there is clear justification for handling the dispute on a

27  representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022.

28

1    The Ninth Circuit therefore favors class treatment of fraud claims stemming from a

2   "'common course of conduct.'" *See In re First Alliance Mortg. Co.*, 471 F.3d 977, 990 (9th Cir.

3   2006); *Hanlon*, 150 F.3d at 1022-23. Even outside of the settlement context, predominance is

4   readily met for consumer claims arising from the defendants' common course of conduct. *See*

5   *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *Wolin v. Jaguar Land Rover N. Am.,*

6   *LLC*, 617 F.3d 1168, 1173, 1175 (9th Cir. 2010) (consumer claims based on uniform omissions

7   certifiable where "susceptible to proof by generalized evidence," even if individualized issues

8   remain); *Friedman v. 24 Hour Fitness USA, Inc*., No. CV 06-6282 AHM (CTx), 2009 WL

9   2711956, at *8 (C.D. Cal. Aug. 25, 2009) ("Common issues frequently predominate" in actions

10   alleging "injury as a result of a single fraudulent scheme.").

11    Here, too, questions of law and fact common to the Settlement Class members' claims

12   predominate over any questions affecting only individual members because the common issues

13   "turn on a common course of conduct by the defendant . . . in [a] nationwide class action." *See*

14   *Hyundai*, 926 F.3d at 559 (citing *Hanlon*, 150 F.3d at 1022–23). Similar to *Hyundai*, Defendants'

15   common course of conduct—the alleged manipulation of emissions and fuel economy test

16   results—are central to the claims asserted in the Amended Complaint. Common, unifying

17   questions as to the Defendants' conduct include, for example, "(1) '[w]hether the fuel economy

18   statements were in fact inaccurate'; and (2) 'whether [the Defendants] knew that their fuel

19   economy statements were false or misleading.'" *Id.* The alleged misrepresentations to the Class

20   were (among other sources) "uniformly made via Monroney stickers." *Id.* As such, Defendants

21   allegedly "perpetrated the same fraud in the same manner against all Class Members." *VW 2L*

22   *Preliminary Approval Order*, 2016 WL 4010049, at *12. Predominance is satisfied.

23    **6.     Rule 23(b)(3)—Superiority: Class treatment is superior to other**
          **available methods for the resolution of this case.**

24

25    Superiority asks "whether the objectives of the particular class action procedure will be

26   achieved in the particular case." *Hanlon*, 150 F.3d at 1023. In other words, it "requires the court

27   to determine whether maintenance of this litigation as a class action is efficient and whether it is

28   fair." *Wolin*, 617 F.3d at 1175-76. Under Rule 23(b)(3),

MOTION FOR FINAL APPROVAL OF CLASS
SETTLEMENT AND ATTORNEYS' FEES & COSTS
MDL No. 2672 CRB

1
2
3
4
5

the Court evaluates whether a class action is a superior method of adjudicating plaintiff's claims by evaluating four factors: "(1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action."

6   *Trosper v. Styker Corp.*, No. 13-CV-0607-LHK, 2014 WL 4145448, at *17 (N.D. Cal. Aug. 21,

7   2014).

8          Class treatment here is far superior to the litigation of well over 500,000 individual

9   consumer actions. "From either a judicial or litigant viewpoint, there is no advantage in individual

10  members controlling the prosecution of separate actions. There would be less litigation or

11  settlement leverage, significantly reduced resources and no greater prospect for recovery."

12  *Hanlon*, 150 F.3d at 1023; *see also Wolin*, 617 F.3d at 1176 ("Forcing individual vehicle owners

13  to litigate their cases, particularly where common issues predominate for the proposed class, is an

14  inferior method of adjudication."). The maximum damages sought by each Settlement Class

15  member (ranging from $250 to $1,109.66 per Fuel Economy Class Vehicle, up to $200 for each

16  Other Class Vehicle, and an additional $250 for Sport+ Vehicles) are significant to individual

17  Class members but relatively small in comparison to the substantial cost of prosecuting individual

18  claims, especially given the technical nature of the claims at issue. *See Smith v. Cardinal*

19  *Logistics Mgmt. Corp.*, No. 07-2104 SC, 2008 WL 4156364, at *11 (N.D. Cal. Sept. 5, 2008)

20  (small interest in individual litigation where damages averaged $25,000-$30,000 per year of

21  work).

22          Class resolution is also superior from an efficiency and resource perspective. Indeed, "[i]f

23  Class Members were to bring individual lawsuits against [Defendants], each Member would be

24  required to prove the same wrongful conduct to establish liability and thus would offer the same

25  evidence." *VW 2L Preliminary Approval Order*, 2016 WL 4010049, at *12. Given that the

26  conduct at issue involves over 500,000 Class Vehicles, "there is the potential for just as many

27  lawsuits with the possibility of inconsistent rulings and results." *Id.* "Thus, classwide resolution

28  of their claims is clearly favored over other means of adjudication, and the proposed Settlement

resolves Class Members' claims at once." *Id.* Superiority is met here, and Rule 23(e)(1)(B)(ii) is satisfied.

* * *

The Settlement Class meets all relevant requirements of Rule 23(a) and (b). Plaintiffs thus request that the Court confirm the certification of the Settlement Class and the appointment of the Settlement Class Representatives.

### B.   The Settlement is fair, reasonable, and adequate.

A "district court's task in reviewing a settlement is to make sure it is 'not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.'" *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 895 F.3d 597, 617 (9th Cir. 2018) (quoting *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982)). As detailed above, many Class members stand to recover their damages *in full* under the proposed Settlement, and all Class members are eligible for significant compensation tethered to the degree of impact on their specific vehicle model and year. This remarkable result, and all of the factors set forth in Fed. R. Civ. P. 23(e)(2), weigh strongly in favor of final approval. Indeed, in granting preliminary approval, the Court already observed that the proposed Settlement "appears to be fair, reasonable, and adequate" such that it would "likely" be able to approve it. Dkt. 7997 at 2, 4. These same conclusions support final approval here.

### 1.   Rule 23(e)(2)(A): Class Counsel and the Settlement Class Representatives have and will continue to zealously represent the Class.

Class Counsel and the Class Representatives fought hard to protect the interests of the Class. These efforts find no better evidence than the outstanding results achieved through the proposed Settlement. Indeed, the vast majority of Fuel Economy Class members stand to be fully compensated for their damages, and Sport+ and Other Class Vehicle Class members will each be eligible for substantial cash compensation that reflects how their Class Vehicles were affected by the conduct at issue. *See* Section II.A.

- 14 -

As this outcome reflects, Class Counsel showed dedication to investigating, prosecuting, and resolving this action over the course more than two years. *See* Fed. R. Civ. P. 23(e)(2)(A). As detailed above, Class Counsel undertook significant efforts to uncover the facts to continuously pursue and refine the Class claims. Class Counsel also engaged in robust Rule 12 motion practice—including researching, drafting, and filing a 60-page brief in opposition to the Defendants' thorough motion to dismiss, a process that fleshed out the strengths and vulnerabilities of Plaintiffs' claims. Class Counsel were therefore well-positioned to evaluate the case and to negotiate a fair and reasonable Settlement. *See Ontiveros v. Zamora*, 303 F.R.D. 356, 371 (E.D. Cal. 2014). They have done so.

The Settlement Class Representatives are also actively engaged. Each was consulted on the terms of the Settlement and has expressed their support and continued willingness to protect the Class until the Settlement is approved and its administration completed. Stellings Decl. ¶ 20. The Class was and remains well represented.

### 2. Rule 23(e)(2)(B): The Settlement is the product of good faith, informed, and arm's-length negotiations.

As the Court observed in granting preliminary approval, the proposed Settlement arose out of "intensive, thorough, serious, informed, and non-collusive negotiations." Dkt. 7997 at 2; s*ee also* Fed. R. Civ. P. 23(e)(2)(B). Negotiations leading up to the proposed Settlement took place between sophisticated parties that endured for more than a year's time. The relatively lengthy timeframe reflects the detailed and technical nature of the negotiations, and efforts to inform and support them through a parallel investigatory process involving numerous experts and multiple rounds of vehicle testing by both Plaintiffs and Defendants. The Parties also engaged in extensive document and information exchanges. As part of this process, Plaintiffs carefully analyzed hundreds of thousands of documents obtained through discovery in this litigation, including many complex and technical German language documents made available to Plaintiffs in Germany, as well as a cache of documents produced in the MDL and identified through targeted searches. Stellings Decl. ¶¶ 5, 27.

1    In this case, the robust exchange of information and documents further demonstrates that

2    the Settlement was reached in a procedurally fair manner between well-informed parties. *See*

3    4 Newberg § 13:49 (5th ed. 2012) (extensive exchange of information in litigation supports the

4    assumption that "the parties have a good understanding of the strengths and weaknesses of their

5    respective cases and hence that the settlement's value is based upon such adequate information");

6    *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 320 (N.D. Cal. 2018) (concluding that an

7    extensive discovery exchange gave the parties "a good sense of the strength and weaknesses of

8    their respective cases" and was "indicative of a lack of collusion" between them); *Elder v. Hilton*

9    *Worldwide Holdings, Inc.*, No. 16-CV-00278-JST, 2021 WL 4785936, at *7 (N.D. Cal. Feb. 4,

10   2021) ("[T]he extent of discovery completed supports approval of a proposed settlement" in

11   particular where the litigation has "proceeded to a point at which both plaintiffs and defendants

12   ha[ve] a clear view of the strengths and weaknesses of their cases."); *Ontiveros*, 303 F.R.D. at

13   371 (granting final approval where class counsel had "conducted discovery and non-discovery

14   investigation" indicating that the parties carefully investigated claims before reaching a

15   resolution).

16   So too does the government's role in reviewing and approving the revised fuel economy

17   labels for the Class Vehicles—which will be posted on the official government website,

18   www.fueleconomy.gov—and the ECR recall repair for the Sport+ Class Vehicles. These

19   government-approved changes underlie the compensation model in the Settlement. The

20   procedurally fair manner in which this Settlement was reached, coupled with the government's

21   role, weighs "heavily in favor" of granting final approval. *See VW 2L Final Approval Order*,

22   2016 WL 6248426, at *14; *see also In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., &*

23   *Prod. Liab. Litig.*, 895 F.3d at 610 n.18 (recognizing "the presence of a governmental participant"

24   as a factor favoring approval); *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir.

25   1977) ("The participation of a government agency serves to protect the interests of the class

26   members, particularly absentees, and approval by the agency is an important factor for the court's

27   consideration.").

28

- 16 -

Finally, it bears mention that Class Counsel, based on their own significant experience in complex vehicle emissions cases like this one, are confident in the proposed result and the process used to reach it. *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2019 WL 2077847, at *1 (N.D. Cal. May 10, 2019) (granting final settlement approval where "Lead Counsel ha[d] . . . a successful track record of representing [plaintiffs] in cases of this kind . . . [and] attest[ed] that both sides engaged in a series of intensive, arm's-length negotiations" and there was "no reason to doubt the veracity of Lead Counsel's representations"). This, too, supports approval.

### 3. Rule 23(e)(2)(C): The Settlement provides substantial compensation in exchange for the compromise of strong claims.

Avoiding years of additional, risky litigation in exchange for immediate and significant cash payments is a principled compromise that works to the clear benefit of the Class in this case. *See* Fed. R. Civ. P. 23(e)(2)(C). The Settlement secures at least $80 million (and up to $85 million) to compensate Class members for the effects of Defendants' alleged practices of improperly influencing regulatory test results. The compensation available for Fuel Economy Class Vehicles consists of (1) the difference in cost for the amount of gasoline that would have been required under the original Monroney fuel economy label and the greater amount required under the adjusted fuel economy label, and (2) a goodwill payment of an additional 15% of those damages to compensate for any inconvenience. This compensation formula is nearly identical to that approved by the Court in the similar Audi $CO_2$ Fuel Economy matter, with the exception that the gas price increased from $3.54 to $3.97 to account for inflation in the years after that settlement, and the miles per year were pegged to real-world data about these specific vehicles. *See In re Volkswagen "Clean Diesel,"* No. 15-md-2672, Dkts. 6764, 7244.

The compensation for Sport+ and Other Class Vehicles is similarly significant, including a cash benefit of $250 to Sport+ Class members to incentivize and compensate them for the time in bringing their Class Vehicles to a dealership to receive the ECR, and a payment of up to $200 per vehicle to compensate Other Class Vehicle Class members whose vehicles conceivably could have been impacted by the conduct at issue, but for which no deviations were identified.

1    This is an exceptional result for the compromise of contested claims that have not yet

2    survived a motion to dismiss. In short, the Settlement provides the Class significant cash

3    payments now, not years from now (if ever). Clearly, the settlement reflects a fair, reasonable,

4    and adequate compromise of Plaintiffs' claims, especially considering (i) the costs, risks, and

5    delay of trial and appeal and (ii) the effectiveness of the proposed distribution plan. *See* Fed. R.

6    Civ. P. 23(e)(2)(C).

7                    **a.      The Settlement mitigates the risks, expenses, and delays the**
                           **Class would bear with continued litigation.**
8

9    Plaintiffs believed in the strength of their case and were prepared to take it all the way to

10   trial. But many hurdles lay ahead. Most immediately, Plaintiffs' claims have not yet survived

11   Defendants' comprehensive motion to dismiss. The outcome of this motion is by no means a

12   guarantee.

13   For example, a court in the Eastern District of Michigan recently dismissed a similar

14   lawsuit alleging that a vehicle manufacturer improperly influenced its testing and test results to

15   obtain improperly inflated fuel economy ratings. The defendants there, like Defendants here,

16   argued that such claims were preempted by the EPCA. The court agreed, and dismissed the case

17   entirely. *See In re Ford Motor Co. F-150*, 2022 WL 551221, at *12. While other authority

18   supports Plaintiffs' arguments against preemption in this case,[7] the *Ford Ranger* decision makes

19   clear that the threat to Plaintiffs' claims from Defendants' preemption arguments is very real.

20   Success on Plaintiffs' individual state-law claims was likewise not guaranteed. Indeed,

21   courts have dismissed similar state-law claims in recent automotive cases. *See, e.g.*, *Gant v. Ford

22   Motor Co*., 517 F. Supp. 3d 707, 719 (E.D. Mich. 2021) (dismissing Michigan Consumer

23   Protection Act claim and concluding that motor vehicle sales and lease transactions are not

24   covered by the statute); *In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices & Prods.

25   Liab. Litig.*, 295 F. Supp. 3d 927, 1027 (N.D. Cal. 2018) (dismissing plaintiffs' common law

26   fraud claims, and various other state-law claims for lack of privity and failure to obtain approval

---

27   [7] *See* Dkt. 7884 at 19-30; *see also, e.g.*, *In re Toyota Rav4 Hybrid Fuel Tank Litig*., 534 F. Supp.
     3d 1067, 1095 (N.D. Cal. 2021) (rejecting EPCA/FTC preemption where plaintiffs alleged that
28   failure to obtain advertised mileage range was due to diminished fuel tank capacity).

of state attorneys general); *Counts v. Gen. Motors, LLC*, 237 F. Supp. 3d 572, 594 (E.D. Mich. 2017) (similar). Plaintiffs would likely face these same challenges, and others, here.

If Defendants were to prevail in dismissing some (or all) of Plaintiffs' claims, Plaintiffs would lose considerable leverage. And even if not, Plaintiffs would still face an expensive, lengthy, and uncertain process for certifying a litigation class. Assuming their claims ultimately made it to trial, moreover, Plaintiffs would still have to prove an intricate and technical multi-party fraud, among many other things. And if Plaintiffs prevailed at trial, they would have to re-litigate virtually all of these issues in the inevitable appeals. Notably, Plaintiffs would stand alone in facing all of these challenges in continued litigation, without governmental support in the litigation or discovery efforts.

The proposed Settlement eliminates all of this risk and expense, cuts through the delay, and provides immediate and significant compensation to the Class. This factor strongly favors final approval. *See Nobles v. MBNA Corp.*, No. C 06-3723 CRB, 2009 WL 1854965, at *2 (N.D. Cal. June 29, 2009) ("The risks and certainty of recovery in continued litigation are factors for the Court to balance in determining whether the Settlement is fair.") (citing *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000); *Kim v. Space Pencil, Inc.*, No. C 11-03796 LB, 2012 WL 5948951, at *5 (N.D. Cal. Nov. 28, 2012) ("The substantial and immediate relief provided to the Class under the Settlement weighs heavily in favor of its approval compared to the inherent risk of continued litigation, trial, and appeal, as well as the financial wherewithal of the defendant."); *VW 2L Final Approval Order*, 2016 WL 6248426, at *12; Fed. R. Civ. P. 23(e)(2)(C)(i).

**b.    Class members will obtain relief through a straightforward claims process.**

The Parties designed a simple and efficient claims process in order to maximize Class member participation. For Fuel Economy and Other Class Vehicles, Class members need only submit a short claim form online or by mail with basic supporting documentation (*e.g.*, purchase agreement, sale documentation, and/or proof of current registration). No further action is required. Fuel Economy and Other Class members who have submitted a complete and valid claim will

1    receive compensation after the claims deadline, currently set for November 7, 2022. SA ¶ 2.6.

2    Sport+ Class members will receive additional compensation ***automatically*** after completing an

3    ECR Sport+ upgrade in their vehicle within eighteen months of the Preliminary Approval Order.

4    SA ¶ 2.6.[8] Class members will be able to select streamlined forms of e-payments, including

5    through Venmo, PayPal, and other forms of online transfer. The Settlement's method for

6    processing claims and distributing relief is straightforward, fair, and reasonable. *See* Fed. R. Civ.

7    P. 23(e)(2)(C)(ii).

8                     **c.    Counsel seek reasonable attorneys' fees and costs.**

9         Class Counsel's reasonable fee request is detailed below (§ III.D) but in this context it is

10   worth reiterating that "terms of . . . [the] proposed award of attorneys' fees" are fair and

11   reasonable, particularly in light of the substantial recovery of a non-reversionary fund of at least

12   $80 million (up to $85 million) that stands to provide ***full compensation*** for many Class

13   members. *See* Fed. R. Civ. P. 23(e)(2)(C)(iii).

14                 **4.    Rule 23(e)(2)(D): The Proposed Settlement treats all Class members**
               **equitably relative to one another.**
15

16        In granting Preliminary Approval, the Court observed that the proposed Settlement "does

17   not improperly grant preferential treatment to . . . segments of the Class." Dkt. 7997 at ¶ 1. This

18   remains true. Indeed, each Class member stands to receive a cash payment tied directly to how,

19   and how much, their Class Vehicles were demonstrably affected by the alleged testing practices at

20   issue. For Fuel Economy Class Vehicles, the Settlement fairly and reasonably allocates payments

21   among the Class members pursuant to a straightforward formula tied to the duration of possession

22   of the Class Vehicle and the difference between the original and amended mileage ratings for

23   each make and model. For Other Class Vehicles and Sport+ Class Vehicles, the Settlement offers

24   a fixed cash payment (up to $200 and $250, respectively) that applies equally to all eligible Class

25   members.

26   _____

27   [8] The small population of Sport+ Class members for whom an ECR has not yet been formally
     approved by the regulators will receive notice of the need to submit a claim form. Should
     approval of the ECR occur prior to the conclusion of the Claims Period, they too will receive
28   payments automatically without the need to submit a claim.

This system uses transparent and objective criteria to determine Class member payments, thus ensuring that the Settlement treats Class members equitably relative to one another. *See* Fed. R. Civ. P. 23(e)(2)(D); *see also In re Hyundai & Kia Fuel Econ. Litig.*, No. MDL 13-2424-GW(FFMx), 2014 WL 12603199, at *2 (C.D. Cal. Aug. 21, 2014) (approving similar settlement where payment amounts varied between make and model years and "correlated to the amount of the fuel economy misstatements" and thus "differences between the recovery amounts stem[med] mostly from differences in the damages suffered . . . rather than any improper favoring of one group of Class Members over another").

### 5.     The Settlement satisfies the Ninth Circuit's approval factors.

The Ninth Circuit has identified a number of additional factors for courts to consider when evaluating the fairness, reasonableness, and adequacy of a class action settlement. Those factors include: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). Many of these—*e.g.*, the strength of plaintiffs' case, the risk and duration of further litigation, and the amount offered—overlap with the Rule 23(e)(2)(C) factors and are addressed above. The remainder, addressed below, favor final approval as well.

#### a.     Class Counsel endorse the Settlement.

In considering whether to grant final approval, courts are entitled to give "considerable weight" to the opinions of experienced class counsel who are familiar with the litigation. *Ontiveros*, 303 F.R.D. at 371 (citing *Hanlon*, 150 F.3d at 1026); *see also VW 2L Final Approval Order*, 2016 WL 6248426, at *14 ("Courts afford 'great weight to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation.'") (quoting *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004)); *see also In re Volkswagen*, 2019 WL 2077847, at *1 (granting final settlement approval where "Lead

Counsel . . . attest[ed] that both sides engaged in a series of intensive, arm's-length negotiations" and there was "no reason to doubt the veracity of Lead Counsel's representations").

Proposed Settlement Class Counsel are deeply experienced in complex class action litigation and settlement—including in complex cases of alleged emissions and fuel economy test irregularities like this one. Based on this experience, proposed Settlement Class Counsel firmly believe that the Settlement provides an excellent outcome for all Class members in the face of the uncertainties in continued litigation, and strongly recommend its approval.

> **b.    The government's independent check on the fuel economy
> revisions and Sport+ recall repair favors final approval.**

The EPA and CARB independently reviewed the test results on which the Settlement is predicated, including the adjustments to the Fuel Economy Class Vehicle mileage ratings that underpin the Settlement's payment formula for those vehicles. These revisions will be posted to the official U.S. Department of Energy website, www.fueleconomy.gov. Likewise, the regulators assessed and approved the ECR software reflash for Sport+ Class Vehicles. The government's independent review and confirmation demonstrates that the basis on which the Parties' reached the proposed resolution was sound and thus also counsels in favor of final approval.

> **c.    The Class' initial response has been positive.**

The Class is already showing their support for the Settlement. With many months remaining in the Claims period, more than 50,000 Class members have submitted claims or brought their vehicles in for an ECR. Keough Decl. ¶ 25; Stellings Decl. ¶ 16. In contrast, no potential Class member has objected to or commented on the Settlement. Keough Decl. ¶ 12. Class Counsel will provide a full accounting of the information outlined in the District's Procedural Guidance once the Notice Program has been completed in full. As it stands, the "encouraging" response from the Class supports final approval (*id.*), and Class Counsel have every reason to believe it will stay that way.

* * *

The Settlement is fair, reasonable, and adequate, and merits final approval.

MOTION FOR FINAL APPROVAL OF CLASS
SETTLEMENT AND ATTORNEYS' FEES & COSTS
MDL No. 2672 CRB

**C.     The Court should appoint Lead Plaintiffs' Counsel as Settlement Class Counsel under Rule 23(g)(1).**

Lead Counsel and a number of the PSC firms have undertaken a significant amount of work, effort, and expense in litigating the Porsche Gasoline cases. *See generally,* Stellings Decl. Following these efforts, the Court previously appointed Lead Counsel as Interim Settlement Class Counsel at the preliminary approval stage. Dkt. 7997 at ¶ 10. In the intervening period, Lead Counsel has continued to demonstrate the skill and experience necessary to oversee and effectuate this Settlement through their efforts in the approval process and in overseeing the Notice Program roll out. Plaintiffs thus request that the Court appoint Lead Counsel as Settlement Class Counsel under Rule 23(g)(1) in connection with Final Approval of the Settlement.

**D.     Class Counsel's requested fee is fair, reasonable, and appropriate.**

"[L]awyer[s] who recover[] a common fund . . . [are] entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). In deciding whether a requested fee amount is appropriate, the Court's role is to determine whether such amount is "'fundamentally fair, adequate, and reasonable.'" *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003) (quoting Fed. R. Civ. P. 23(e)). In this Circuit, the determination typically involves analysis of a number of factors, including: (1) the results achieved by class counsel; (2) the complexity of the case and skill required; (3) the risks of litigation; (4) the benefits to the class beyond the immediate generation of a cash fund; (5) the market rate of customary fees for similar cases; (6) the contingent nature of the representation and financial burden carried by counsel; and (7) a lodestar cross-check. *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig*., No. 2672 CRB (JSC), 2017 WL 1047834, at *1 (N.D. Cal. Mar. 17, 2017) ("*VW 2L Fee Order*") (citing *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-52 (9th Cir. 2002)); *see also Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). Each of these factors supports Class Counsel's request in this case.

**1.     Class Counsel obtained substantial cash compensation for the Class.**

The benefit Class Counsel secured for the Class is the single most important factor in evaluating the reasonableness of a requested fee. *In re Bluetooth*, 654 F.3d at 942; *In re*

1   *Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008); *see also In re Nexus 6P*

2   *Prod. Liab. Litig.*, No. 17-CV-02185-BLF, 2019 WL 6622842, at *12 (N.D. Cal. Nov. 12, 2019)

3   ("The most critical factor is the results achieved for the class."); *Hensley v. Eckerhart*, 461 U.S.

4   424, 436 (1983) (same); Federal Judicial Center, *Manual for Complex Litigation* § 21.71 (4th ed.)

5   ("The "fundamental focus is the result actually achieved for class members.") (citing Fed. R. Civ.

6   P. 23(h) committee note). Put simply, "[o]utstanding results merit a higher fee." *CRT Antitrust*

7   *Litig.*, 2016 WL 4126533, at *4 (citing *Omnivision Techs.*, 559 F. Supp. 2d at 1046). That

8   principle strongly supports the requested fees here.

9        As described in detail above, the proposed Settlement provides sizeable monetary relief—

10   at least $80 million and up to $85 million—to the Class. Individual compensation to Class

11   members is similarly substantial, and fairly reflects the potential impact of the relevant practices

12   on their Class Vehicles. The settlement provides the vast majority of Fuel Economy Class

13   members with 100% of their damages. The remainder stand to receive at a minimum a very high

14   percentage of recoverable damages, depending on the future, unknown price of gas.[9] *See, e.g.*,

15   Dkt. 6634-3, Declaration of Edward M. Stockton, (opining that analogous compensation

16   framework provided "full" compensation to class members in a similar fuel economy settlement).

17        The compensation Other Class Vehicles and Sport+ Class Vehicles is similarly

18   significant. Payments include a cash benefit of $250 to Sport+ Class members to compensate

19   them for the time in bringing their Class Vehicles to a dealership to receive the ECR Sport+

20   upgrade, and a payment of up to $200 per vehicle to compensate Other Class Vehicle Class

21   members. Notably, the $250 Sport+ compensation will be paid to Class members *in addition to*

22   the separate payments for the Fuel Economy and Other Class Vehicle matters.

23   _____

24   [9] As explained in Plaintiffs' motion for preliminary approval (Dkt. 7971 at 23), for most of the
     Fuel Economy Class Vehicles (82%), the 96 months of fuel usage for which they will be
25   compensated has already concluded. For these vehicles, the settlement payments provide full
     compensation because the $3.97 price of fuel in the settlement generously estimates the average
     amount that the Fuel Economy Class members actually paid at the pump. For a small subset of
26   Fuel Economy Class Vehicles (approximately 18%) first sold or leased fewer than 96 months ago
     (*i.e.* model years 2015 and onward), the 96 month compensation period is ongoing. Because the
27   parties cannot predict the uncertainty of future gas prices, the $3.97 figure—which is based on
     historic averages and adjusted for inflation—remains a fair and practicable way to approximate
28   the fuel costs for these vehicles as well.

It also bears mention that even under the most ambitious potential claims rates—rates that Interim Settlement Class Counsel are working hard to achieve—funds are likely to remain.[10] This means that after redistribution back to the Class the compensation figures outlined above will only *increase*, and all participating Class members are likely to receive full compensation, *or more*.

It is "highly unusual" for a class action settlement to recover what is, by some measures, close to if not all of what the class could recover at trial. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig*., 895 F.3d at 610. That this Settlement achieves such substantial relief through the compromise of contested claims is a remarkable result and strongly supports the requested fees. *See In re Nexus 6P Prod. Liab. Litig*., 2019 WL 6622842, at *13 (upward adjustment from the 25% benchmark was warranted where settlement "allow[ed] all class members to receive a monetary benefit").

### 2.   The Settlement resulted from Class Counsel's zealous representation in complex and risky litigation.

This was a complex case, both factually and legally. It involves numerous Defendants and allegations of a wide-ranging and complex scheme. Defendants include three separate corporate entities (two of them based in Germany) that played various roles in the manufacture, testing, or sale of the Class Vehicles.

Investigating and uncovering the multiple strategies that could have led to irregularities in the Class Vehicles' fuel economy and emissions test results was even more technically challenging—in particular given the range of Class Vehicles that were or may have been implicated over the course of more than a decade of vehicle development—with vehicle models dating as far back as 2005. Plaintiffs alleged in the Amended Complaint that the Fuel Economy Class Vehicles' inflated fuel economy ratings can be traced back to Defendants' use of physically

---

[10] The FTC, for example, concluded after substantial analysis that the mean and median claims rates in class action settlements were 9% and 4% respectively, while the 90th percentile claims rate was 49%. *See* Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns, *FTC Staff Report* (Sept. 2019) at 11, 21. Settlements in this MDL have fared much better, and this one is likely to as well. But the point remains that even under the most optimistic projections significant funds will likely remain for redistribution.

doctored vehicles for emissions and fuel economy testing, such that the hardware and software in the tested vehicles differed in material ways from the hardware and software in vehicles that were sold to the public. Plaintiffs allege that this practice included testing vehicles with a lower gear ratio than the models ultimately produced. Dkt. 7969 ¶ 72. Investigating allegations of the physical alteration of a test vehicle in a laboratory nearly 20 years ago required comprehensive analysis of contemporaneous documentation and a rigorous vehicle testing program. Arriving at this nuanced understanding of the ways in which the Class Vehicles were or may have been impacted by the conduct at issue took time, effort, and expertise. To do so, Class Counsel worked closely with experts to understand the complex minutiae of the fuel economy and emissions testing processes and regulatory frameworks.

Complexities aside, it was a risky case, too, for several reasons. First, unlike many other emissions settlements, Class Counsel did not have the benefit or support of a Notice of Violation from the government on which to ground their allegations and support their plausibility. Second, and as detailed above, Plaintiffs claims have not yet survived a motion to dismiss, and would face significant challenges in doing so, particularly in light of recent authority finding similar claims to be preempted by the EPCA. *See* § III.B.3.a. Looking ahead, the case would face serious risks to certifying a class of more than 500,000 consumers who purchased or leased different vehicle models, for various reasons and from various sellers (including third parties not related to the Defendants), over the course of 15 years.

That Class Counsel achieved such substantial relief in the face of all of this complexity and risk speaks to their skill, effort, and dedication to the Class. It also strongly supports their fee request. *See, e.g.*, *Hanlon*, 150 F.3d at 1029 (The "complexity and novelty of the issues" can justify upward departure from benchmark); *In re Oracle Sec. Litig.*, 852 F. Supp. 1437, 1450–51 (N.D. Cal. 1994) (same).

### 3. Class Counsel's requested fee percentage is reasonable, appropriate, and strongly supported by precedent.

When a settlement establishes a common fund or calculable monetary benefit for a class, it is both appropriate and preferred to award attorneys' fees based on a percentage of the

1    monetary benefit obtained. *See Vizcaino*, 290 F.3d at 1047.

2          Class Counsel request 30% of the Settlement Fund in fees, plus reimbursement of costs

3    they reasonably incurred in prosecuting this case, for a total of $24,710,733.89. As explained

4    below, the requested fees, which represent a modest (and justified) upward departure from the

5    Ninth Circuit's typical 25% benchmark, fall within the usual range of awards routinely approved.

6    In fact, in this circuit, "fee awards exceed[] the [25%] benchmark" in "*most* common fund cases,"

7    and awards of 30% or more are common. *In re NCAA*, No. 4:14-MD-2541-CW, 2017 WL

8    6040065, at *2; *see also In re: CRT Antitrust Litig.*,, 2016 WL 4126533, at *5 (N.D. Cal. Aug. 3,

9    2016) (awarding 30% of $576,750,000 fund); *Hernandez v. Dutton Ranch Corp.*, No. 19-CV-

10   00817-EMC, 2021 WL 5053476, at *6 (N.D. Cal. Sept. 10, 2021) (collecting cases and finding

11   that"[d]istrict courts within this circuit . . . routinely award attorneys' fees that are one-third of the

12   total settlement fund . . . [s]uch awards are routinely upheld by the Ninth Circuit").[11]

13         Regardless, this is no ordinary case. As discussed the above, the results achieved—

14   recovery at or near 100% of potential damages—are unusually strong and more than justify the

15   fees requested. Indeed, courts commonly "justif[y] upward departures from the 25% benchmark"

16   with "[f]ar lesser results (with 20% recovery of damages or less)." *NCAA Antitrust Litig.*, 2017

17   WL 6040065, at *3 (collecting cases); *see also In re Heritage Bond Litig.*, No. 02-ML-1475 DT,

18   2005 WL 1594403, at *19 (C.D. Cal. June 10, 2005) (settlement recovering 36% of available

19   damages was "exceptional result" justifying fee award of 33.33%) (collecting additional cases).

20          Consistent with this authority, in granting preliminary approval, the Court observed that

21   the anticipated fee request seemed "appropriate under the circumstances." *See* June 29, 2022 Tr.

22   at 3-4. Class Counsel respectfully submit the request is indeed appropriate, as supported by the

23   exceptional results obtained for the Class in this case, and the thorough, focused, and technical

---

24   [11] *See also, e.g.*, *id.* ("[T]he Ninth Circuit uses 25 percent of the fund as the presumptively
     reasonable 'benchmark' for awarding fees . . . it also recognizes that 20 to 30 percent is the usual

25   range for common fund fee recoveries . . .[The] exact percentage [awarded] varies depending on
     the facts of the case, and in most common fund cases, the award exceeds that benchmark.")

26   (citations and quotation omitted); *In re TFT–LCD (Flat Panel) Antitrust Litigation*, No. MDL
     3:07–md–1827 SI, 2011 WL 7575003, *1 (N.D. Cal. Dec. 27, 2011) (awarding attorneys' fees in

27   the amount of 30 percent of $405 million settlement fund); *In re Mego Fin. Corp. Sec. Litig.*, 213
     F.3d 454, 463 (9th Cir. 2000), as amended (June 19, 2000) (upholding district court's award of 33

28   1/3 percent of the settlement fund).

1    work that Counsel undertook to obtain it.

2            **4.      Class Counsel carried considerable financial burden in prosecuting
                       this complex litigation.**

3

4            It is an established practice to reward attorneys who assume representation on a contingent

5    basis to compensate them for the risk that they might be paid nothing at all. *See In re Wash. Pub.*

6    *Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299-1300 (9th Cir. 1994). Such a practice

7    encourages the legal profession to assume such a risk and promotes competent representation for

8    plaintiffs who could not otherwise hire an attorney. *Id.*; *see also Vizcaino*, 290 F.3d at 1051. Class

9    Counsel devoted thousands of hours and advanced whatever expenses were necessary to

10   investigate and see this case through to a successful outcome, all with no guarantee of

11   reimbursement. Stellings Decl. ¶¶ 23-35. In so doing, Class Counsel "turn[ed] down opportunities

12   to work on other cases to devote the appropriate amount of time, resources, and energy necessary

13   to responsibly handle this complex case." *VW 2L Fee Order*, 2017 WL 1047834, at *3. This

14   factor further supports Class Counsel's request.

15           **5.      A lodestar cross-check confirms the requested fees are reasonable.**

16           "Because the benefit to the class is easily quantified in common-fund settlements," the

17   Ninth Circuit permits district courts "to award attorneys a percentage of the common fund in lieu

18   of the often more time-consuming task of calculating the lodestar." *Bluetooth*, 654 F.3d at 942. In

19   common fund cases, "the primary basis of the fee award remains the percentage method." *In re*

20   *Lithium Ion Batteries Antitrust Litig.*, No. 13-md-2420-YGR, 2019 WL 3856413, at *7 (N.D. Cal

21   Aug. 16, 2019) (quoting *Vizcaino*, 290 F.3d at 1050 & n.5); *cf. Craft v. Cty. of San Bernardino*,

22   624 F. Supp. 2d 1113, 1122 (C.D. Cal. 2008) ("A lodestar cross-check is not required in this

23   circuit, and in some cases is not a useful reference point."); *Aichele v. City of Los Angeles*, No.

24   CV-12-10863-DMG, 2015 WL 5286028, at *6 (C.D. Cal. Sept. 9, 2015) (same). Nevertheless,

25   courts sometimes employ a "streamlined" lodestar analysis to "cross-check" the reasonableness of

26   a requested award. *See, e.g.*, *Vizcaino*, 290 F.3d at 1050 ("[W]hile the primary basis of the fee

27   award remains the percentage method, the lodestar may provide a useful perspective on the

28   reasonableness of a given percentage award."). In so doing, "[t]he lodestar crosscheck need not

entail either mathematical precision or bean counting." *Rieckborn v. Velti PLC*, No. 13-3889, 2015 WL 468329, at *21 (N.D. Cal. Feb. 3, 2015).

As explained below and in the accompanying Stellings Declaration,[12] Class Counsel worked a reasonable number of hours billed at reasonable rates under the circumstances of this complex, multi-district litigation. The resulting lodestar of $12,261,791.50 yields a modest multiplier of 1.96 for work performed to date and 1.86 including time anticipated for the on-the-ground work necessary to implement, oversee, and protect this Settlement through potential appeals. Stellings Decl. ¶¶ 23-25. Either multiplier is well within—and, indeed, on the low end of—the "presumptively acceptable range of 1.0-4.0" in this Circuit. *Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 334 (N.D. Cal. 2014); *see also Vizcaino*, 290 F.3d at 1051 n.6 (approving 3.65 multiplier, and citing appendix of cases showing "a range of 0.6-19.6, with most . . . from 1.0-4.0 and a bare majority . . . in the 1.5-3.0 range").

Notably, this lodestar calculation is based on the historical, "then-present" billing recorded in the monthly time reports submitted to Lead Counsel since the inception of this case. Stellings Decl. ¶ 26. This is, if anything, a conservative calculation of the lodestar given that it is a "well established" common practice for "attorneys in common fund cases" to adjust their billing to their current rates to account for "any delay in payment." *Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL 6619983, at *14 n.17 (N.D. Cal. Dec. 18, 2018) (quoting *Fischel v. Equitable Life Assurance Soc'y of U.S.*, 307 F.3d 997, 1010 (9th Cir. 2002)). Had Counsel made

---

[12] The Stellings Declaration includes, among other information: (1) the total common benefit hours billed, lodestar incurred, and blended average billing rate; and (2) the total common benefit hours billed, lodestar incurred, range of billing rates, and blended average billing rates for each category of timekeeper (Partner, Associate, Non-Partner-Track Attorney, and other professional). This detailed declaration comports with the Court's directives and this District's Procedural Guidance for Class Action Settlements. *See Procedural Guidance*, Attorneys' Fees ("Declarations of class counsel as to the number of hours spent on various categories of activities related to the action by each biller, together with hourly billing rate information may be sufficient, provided that the declarations are adequately detailed."); *see also VW 2L Fee Order*, 2017 WL 1047834, at *5, n.5 (finding that class counsel had complied with similar pretrial order and overruling objection that more lodestar information was necessary in similar fee application because "it is well established that '[t]he lodestar cross-check calculation need entail neither mathematical precision nor bean counting . . . [courts] may rely on summaries submitted by the attorneys and need not review actual billing records.'") (quoting *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 264 (N.D. Cal. 2015)). Class Counsel are nevertheless prepared to submit detailed copies of the thousands of individual time entries should the Court wish to engage in a line-by-line review.

1  those adjustments here, the lodestar would have increased and the multiplier decreased

2  significantly.

3            a.      **Class Counsel expended a reasonable number of hours**
                     **advancing this complex litigation.**

4

5            As summarized above, this was a technical case requiring thorough investigation and

6  analysis. *See, e.g.*, § II, *supra*; Stellings Decl. ¶¶ 2-11. Class Counsel reviewed and analyzed

7  hundreds of thousands of documents obtained through discovery for Plaintiffs' claims in the

8  Porsche Gasoline matter, and millions more of pages of relevant documents in the MDL, all of

9  which informed the efforts to prosecute Plaintiffs' claims. Stellings Decl. ¶¶ 5, 27. Reviewing,

10 coding, analyzing and summarizing this discovery was a very significant undertaking that was

11 critical to the litigation and resolution of this case. *Id.* So too were the extensive testing efforts

12 that were undertaken throughout the pendency of the litigation and settlement process on an

13 evolving—and large—group of affected and potentially affected vehicles. *Id.* ¶¶ 5, 9-10. Class

14 Counsel also engaged in thorough legal research and briefing efforts on dispositive issues at the

15 motion to dismiss stage. *Id.* ¶¶ 6, 28. The settlement process itself also took a lot of time and

16 persistence, and involved dozens of meetings, conferences, calls, and much more, including in

17 New York, Stuttgart, and Weissach. *Id.* ¶¶ 8-10. Underpinning all of this was Class Counsel's

18 work to fully understand the complex regulations and procedures for fuel economy measurement,

19 testing, and reporting in the United States that provided the framework for understanding the

20 allegations and alleged damages in this case. As this (partial) list demonstrates, this litigation (and

21 its result) took a lot of effort.

22           In furtherance of these common benefit efforts, among many others, Class Counsel

23 worked a reasonable 27,888.80 hours. *Id.* ¶¶ 23-28. Based on their experience in defending and

24 implementing other automotive class settlements, Class Counsel estimate that approximately

25 1,500 more hours will be necessary for the on-the-ground efforts to finalize, implement, and

26 protect the Settlement. This will include, for example, work required to: (1) obtain final approval

27 of the Settlement; (2) protect the Settlement on appeal (if any appeals are lodged); and (3) oversee

28 and help implement the Settlement, which will include, among other things, responding to

1    inquiries from Class members who owned or leased one of the approximately 500,000 Class

2    Vehicles. *Id.* ¶ 24. Class Counsel's reasonable hours appropriately reflect the efforts necessary to

3    secure and protect the favorable outcome here.

4                    **b.    Class Counsel billed reasonable rates for those hours.**

5            The blended average billing rate for the work described above is approximately $439.67

6    per hour. *Id.* ¶ 23. This is in line with average rates in this District and reasonable here given the

7    skill, experience, and reputation of Class Counsel and the PSC—all of whom were appointed

8    through a competitive leadership application process. *See, e.g.*, *In re Volkswagen "Clean Diesel"*

9    *Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672 CRB (JSC), Dkt. 3396-2 ¶ 29 (N.D. Cal.

10   June 30, 2017) (noting that the average blended rate of 40 class action settlements approved in

11   this District in 2016 and 2017 was $528.11 per hour); *VW 2L Fee Order*, 2017 WL 1047834, at

12   *5 (approving blended average billing rate of $529 per hour in this MDL).[13]

13                    **c.    Class Counsel's performance and the results achieved justify a
                             reasonable lodestar multiplier.**
14

15           The Ninth Circuit *requires* an upward multiplier when certain risk factors are present and

16   authorizes a multiplier for certain "reasonableness" factors, including the quality of

17   representation, the complexity of the issues presented, and most importantly, the benefit obtained

18   for the class. *See, e.g.*, *Stetson v. Grissom*, 821 F.3d 1157, 1166 (9th Cir. 2016); *Kerr v. Screen*

19   *Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975); *In re Bluetooth*, 654 F.3d at 942. As noted

20   above, in this Circuit, multipliers in the 1-4 range are "presumptively acceptable." *Dyer*, 303

21   F.R.D. at 334. Moreover, multipliers for large settlements, like this one, tend to fall on the high

22   end of this range. The Eisenberg-Miller 2017 study, for example, found that the average

23   multiplier in cases valued over $67.5 million was 2.72. Theodore Eisenberg, Geoffrey Miller, &

24   Roy Germano, *Attorneys' Fees in Class Actions 2009-2013*, 92 N.Y.U. L. Rev. 937, 967 (2017).

25   Class Counsel's requested multiplier—1.86 with anticipated future time and 1.96 without, *see*

---

26   [13] A number of other courts in this District have also recently approved fee requests based on
     similar hourly rates. *See, e.g.*, *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK,
27   2018 WL 3960068, at *17 (N.D. Cal. Aug. 17, 2018); *In re Intuit Data Litig.*, No. 15-CV-1778-
     EJD-SVK, 2019 WL 2166236, at *1 (N.D. Cal. May 15, 2019); *Carlotti v. Asus Comput. Int'l*,
28   No. 18-CV-03369-DMR, 2020 WL 3414653, at *5 (N.D. Cal. June 22, 2020).

1   Stellings Decl. ¶¶ 23—is therefore significantly below the average multiplier awarded in similar

2   cases and more than justified by the exceptional results in this case. *See VW 2L Fee Order*, 2017

3   WL 1047834, at *5 (approving multiplier of 2.63 in 2.0-liter settlement); *In re Volkswagen*

4   *"Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL

5   3175924, at *4 (N.D. Cal. July 21, 2017) ("*VW 3L Fee Order*") (approving multiplier of 2.02 in

6   3.0-liter settlement); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab.*

7   *Litig.*, No. 2672 CRB (JSC), 2017 WL 2178787, at *3 (N.D. Cal. May 17, 2017) ("*VW/Bosch Fee*

8   *Order*") (approving multiplier of 2.32 in Bosch settlement); *In re Volkswagen "Clean Diesel"*

9   *Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672 CRB (JSC), Dkt. 7244 at 5 (March 2,

10  2020) (approving multiplier of 2.06 in Audi CO2 settlement).

11          **E.      Class Counsel's expenses are reasonable and appropriate.**

12          "Class counsel are entitled to reimbursement of reasonable out-of-pocket expenses."

13  *Wakefield v. Wells Fargo & Co.*, No. 3:13-cv-05053 LB, 2015 WL 3430240, at *6 (N.D. Cal.

14  May 28, 2015); *see also Staton*, 327 F.3d at 974; Fed. R. Civ. P. 23(h). This includes expenses

15  that are reasonable, necessary, directly related to the litigation, and normally charged to a fee-

16  paying client. *See, e.g.*, *Willner v. Manpower Inc.*, No. 11-cv-02846-JST, 2015 WL 3863625, at

17  *7 (N.D. Cal. June 22, 2015); *Buccellato v. AT&T Operations, Inc.*, No. C10-00463-LHK, 2011

18  WL 3348055, at *2 (N.D. Cal. June 30, 2011).

19          Here, Class Counsel seek $710,733.89 in litigation expenses, which includes $560,733.89

20  already expended by Lead Counsel and PSC firms to advance the common benefit pursuant to the

21  terms of PTO 11. Stellings Decl. ¶ 32, Tbl. 3 (breaking out the costs across categories of work

22  undertaken to advance the litigation). It also includes $150,000 that Class Counsel are responsibly

23  reserving to cover the anticipated costs associated with the future on-the-ground administration

24  and Settlement implementation efforts. *Id.* At 0.89% of the total Settlement value, these costs are

25  significantly less than the average costs awarded in class action settlements. Theodore Eisenberg

26  & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J.

27  Empirical Legal Stud. 248, 267 (2010) (mean and median of 2.8% and 1.7% before 2002 and

28  2.7% and 1.7% thereafter); Eisenberg-Miller 2017 at 963 (mean and median of 3.9% and 1.7%

1   since 2009).

2           More importantly, these costs are commensurate with the stakes, complexity, and intensity

3   of this particular litigation. This includes, for example, approximately $169,227.47 to employ

4   technical experts on emissions system functionality, testing processes, and software programming

5   and code analysis. These experts worked hand-in-hand with Class Counsel from the beginning of

6   the case in, among other things: (1) designing testing protocols for the Class Counsel's

7   independent testing of the vehicles; (2) testing multiple vehicles several times under the various

8   protocols; (3) evaluating and analyzing Class Counsel's test results; (4) evaluating and analyzing

9   the Defendants' test protocols, data, and results; and (5) working with Class Counsel to prepare

10  for and evaluate vehicle testing in Germany, attending and monitoring the testing, and consulting

11  with Class Counsel on the results. Stellings Decl. ¶ 34. As is evident from this list, the experts'

12  involvement was significant and their contributions were critical to the litigation and resolution.

13          The costs also include the funds used to purchase vehicles for emissions and fuel economy

14  testing. These vehicles were expensive, but critical to the litigation and settlement efforts, and

15  counsel have deducted the vehicles' reasonable projected resale value. *Id.* ¶ 33.

16          Other significant costs included $65,907.98 for the eDiscovery services and document

17  processing platform necessary for processing, maintaining, and analyzing the millions pages of

18  documents produced in this litigation, and $131,096.29 for travel expenses related to, among

19  other things, negotiation sessions in New York, as well as two separate, multi-day vehicle testing

20  and discovery meetings in Stuttgart and Weissach, Germany. *Id.* ¶¶ 35-36.

21          No doubt, this was a technical case, and it was expensive to prosecute. But, as other courts

22  have recognized, "Class Counsel had a strong incentive to keep expenses at a reasonable level

23  due to the high risk of no recovery when the fee is contingent." *Beesley v. Int'l Paper Co.*, No.

24  3:06-CV-703-DRH-CJP, 2014 WL 375432, at *3 (S.D. Ill. Jan. 31, 2014). This is true, and Class

25  Counsel expended only that which they believed was necessary to advance the interests of the

26  Class. The requested costs are reasonable and should be reimbursed.

27

28

1
2

**F.      The Settlement Class Representatives have earned the requested service awards.**

3    Class Counsel request service awards of $250 for each of the 33 proposed Settlement

4    Class Representatives, to be paid from the settlement fund. Dkt. 7971-1 ¶¶ 16.2. This amount falls

5    far below the $5,000 "presumptively reasonable" service award in this Circuit, and is well-

6    supported by the time and efforts the proposed Representatives dedicated to prosecuting this case.

7    *CRT Antitrust Litig.*, 2016 WL 4126533, at *11. *See also, e.g.*, *In re Online DVD-Rental Antitrust*

8    *Litig.*, 779 F.3d 934, 943 (9th Cir. 2015) (affirming awards of $5,000); *In re Mego Fin. Corp.*,

9    213 F.3d at 463 (same). The Settlement Class Representatives have served to protect the interests

10   of the Class by, among other things: committing to investigate and prosecute this case on behalf

11   of the Class; regularly communicating with counsel to stay abreast of developments in this

12   litigation; working with counsel to review and evaluate the terms of the proposed Settlement

13   Agreement; and expressing their continued willingness to protect the Class until the Settlement is

14   approved and its administration completed. *See* Stellings Decl. ¶ 20. They have earned the

15   moderate service awards requested.

16   **IV.   CONCLUSION**

17   Settlement Class Representatives and Settlement Class Counsel respectfully request that

18   the Court certify the Settlement Class and appoint Settlement Class Counsel and Class

19   Representatives; grant final approval to the Settlement; and award $24 million in attorneys' fees

20   and $710,733.89 in reasonable costs to be allocated by Lead Counsel among the PSC firms

21   performing work under Pretrial Order Nos. 7 and 11.

22
23
24
25
26
27
28

1   Dated: August 26, 2022                    Respectfully submitted,

2                                              */s/ Elizabeth J. Cabraser*
                                               Elizabeth J. Cabraser (SBN 083151)
3                                              Kevin R. Budner (SBN 287271)
                                               Phong-Chau G. Nguyen (SBN 286789)
4                                              LIEFF CABRASER HEIMANN &
                                               BERNSTEIN, LLP
5                                              275 Battery Street, 29th Floor
                                               San Francisco, California 94111-3339
6                                              Telephone: 415.956.1000
                                               Facsimile: 415.956.1008
7                                              E-mail: ecabraser@lchb.com
                                               E-mail: kbudner@lchb.com
8                                              E-mail: pgnguyen@lchb.com

9
                                               David S. Stellings
10                                             Wilson M. Dunlavey (SBN 307719)
                                               Katherine I. McBride
11                                             LIEFF CABRASER HEIMANN &
                                               BERNSTEIN, LLP
12                                             250 Hudson Street, 8th Floor
                                               New York, NY 10013
13                                             Phone: (212) 355-9500
                                               Fax: (212) 355-9592
14                                             E-mail: dstellings@lchb.com
                                               E-mail: wdunlavey@lchb.com
15                                             E-mail: kmcbride@lchb.com

16
                                               *Plaintiffs' Lead Counsel and Interim Settlement*
17                                             *Class Counsel*

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR FINAL APPROVAL OF CLASS
SETTLEMENT AND ATTORNEYS' FEES & COSTS
MDL No. 2672 CRB

1

## **CERTIFICATE OF SERVICE**

2          I hereby certify that, on August 26, 2022, service of this document was accomplished

3   pursuant to the Court's electronic filing procedures by filing this document through the ECF

4   system.

5

6                                   /s/ *Elizabeth J. Cabraser*
                                    Elizabeth J. Cabraser

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28