**ENVIRONMENTAL MITIGATION TRUST AGREEMENT**
**FOR INDIAN TRIBE BENEFICIARIES**
**(as modified on October 23, 2023~~March 29, 2022~~)**

On October 25, 2016, the Court entered a Partial Consent Decree ("First Partial Consent Decree") in *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 2672 CRB (JSC) (Dkt. No. 2103-1), among Volkswagen AG, Audi AG, Volkswagen Group of America, Inc., and Volkswagen Group of America Chattanooga Operations, LLC (collectively, the "Settling Defendants"), the United States, and the State of California.  In that case, the Court also entered a Second Partial Consent Decree (Dkt. No. 3228-1) on May 17, 2017, among the Settling Defendants, Dr. Ing. h.c. F. Porsche AG, and Porsche Cars North America, Inc. (collectively, the "Defendants"), the United States, and the State of California.  Pursuant to the First Partial Consent Decree and the Second Partial Consent Decree, the Defendants and Wilmington Trust, N.A. (the "Trustee"):  (1) hereby enter into this Environmental Mitigation Trust Agreement for Indian Tribe Beneficiaries (i.e., for federally-recognized Indian Tribes) (hereinafter, the "Indian Tribe Trust Agreement") and establish the environmental mitigation trust described in that agreement ("Indian Tribe Mitigation Trust" or "Indian Tribe Trust"); and (2) concurrently enter into a separate Environmental Mitigation Trust Agreement for State Beneficiaries (i.e., for the 50 States, Puerto Rico, and the District of Columbia) (hereinafter, the "State Trust Agreement") and establish the environmental mitigation trust described in that agreement (the "State Mitigation Trust" or "State Trust").  The Defendants and the Trustee acknowledge that the purpose of the Indian Tribe Mitigation Trust and the State Mitigation Trust is to fulfill the Settling Defendants' environmental mitigation obligations under the First Partial Consent Decree and the Defendants' environmental mitigation obligations under the Second Partial Consent Decree.  All payments to and expenditures from the Indian Tribe Mitigation Trust and the State Mitigation Trust shall be for the sole purpose of fulfilling the Settling Defendants' environmental mitigation obligations under the First Partial Consent Decree and the Defendants' environmental mitigation obligations under the Second Partial Consent Decree, and for the costs and expenses of administering each trust as set forth in the Indian Tribe Mitigation Trust and the State Mitigation Trust.  The Indian Tribe Mitigation Trust and the State Mitigation Trust shall be funded with Mitigation Trust Payments according to the terms of the First Partial Consent Decree and the Second Partial Consent Decree (jointly, the "Consent Decree"), and in accordance with the following allocation:  (1) 97.99% of the Mitigation Trust Payments from the First Partial Consent Decree shall be allocated to the State Mitigation Trust and 2.01% to the Indian Tribe Mitigation Trust; and (2) 97.7% of the Mitigation Trust Payments from the Second Partial Consent Decree shall be allocated to the State Mitigation Trust and 2.3% to the Indian Tribe Mitigation Trust.

**PURPOSE AND RECITALS**

**Whereas,** the Defendants are required to establish this Indian Tribe Mitigation Trust and to fund it with funds to be used for environmental mitigation projects that reduce emissions of nitrogen oxides ("NOx") where the Subject Vehicles were, are, or will be operated ("Eligible Mitigation Actions"), and to pay for Trust Administration Costs as set forth in this Indian Tribe Trust Agreement;

**Whereas,** the funding for the Eligible Mitigation Actions provided for in the Indian Tribe Trust Agreement and the State Trust Agreement is intended to fully mitigate the total, lifetime

excess NOx emissions from the Subject Vehicles where the Subject Vehicles were, are, or will be operated;

**Whereas**, the Defendants hereby establish this Indian Tribe Mitigation Trust to provide funds for Eligible Mitigation Actions and Trust Administration Costs, and distribution of Trust Assets;

**Whereas**, the Trustee has been selected to be the trustee under this Indian Tribe Trust Agreement in accordance with the requirements set forth in the First Partial Consent Decree;

**Whereas**, the Trustee is willing to act as trustee in accordance with the terms of this Indian Tribe Trust Agreement;

**Whereas**, on August 13, 2018, the Defendants and the Trustee agreed to certain material modifications, and, on November 15, 2018, to certain nonmaterial modifications to the Indian Tribe Trust Agreement;

**Whereas**, on May 19, 2020, the United States and the Trustee agreed in writing to certain minor modifications and clarifying amendments to the Indian Tribe Trust Agreement, which became effective on June 20, 2020;

**Whereas,** on March 29, 2022, the United States and the Trustee agreed in writing to certain minor modifications to the Indian Tribe Trust Agreement, which became effective on April 29, 2022;

**Whereas**, on June 1, 2022 in accordance with subparagraph of 5.0.5.3.4, the United States and the Trustee determined, that the Tribal Subaccounts Remainder Balance is insufficient to warrant a fifth funding cycle;

**Whereas**, the United States and the Trustee desire to specify the terms of a Final Distribution of Trust Assets to Designated Beneficiaries and the Final Disposition of Trust Assets to Federal Agencies and to make certain additional modifications;

**Whereas**, the United States, the Trustee, and the technical assistance provider have agreed in writing to certain additional ~~minor~~ modifications and clarifying amendments to the Indian Tribe Trust Agreement that are reflected herein~~, ("minor modifications"),~~ and the United States and the Trustee will jointly seek a Court order approving~~file~~ these ~~minor~~ modifications in accordance with subparagraphs 5.0.5.3.4 and 6.5~~the Court~~;

**Whereas**, the Trustee will provide notice of these ~~minor~~ modifications to the Beneficiaries via Interlinks and by posting the ~~minor~~ modifications on the public-facing website; and

**Whereas,** the ~~minor~~ modifications to the Indian Tribe Trust Agreement shall be effective on the Trust Modification Effective Date;

**Now, therefore,** the Defendants and the Trustee agree as follows:

## I.   DEFINITIONS

1.0    Unless otherwise defined in this Indian Tribe Trust Agreement, all capitalized terms used herein shall have the meaning set forth in the Consent Decree.

1.1     "2010 United States Census Table PCT4" shall mean Table PCT4 (entitled "American Indian and Alaska Native Alone or in Combination with One or More Other Races") of the United States national census conducted by the U.S. Census Bureau in 2010.

1.2     "Beneficiary" shall mean each Indian Tribe determined to be a Beneficiary pursuant to Section IV (Indian Tribe Mitigation Trust Beneficiaries) and subparagraphs 2.1.2 and 5.0.5.

1.3     "Beneficiary Status Certification Form" shall mean the Certification for Beneficiary Status under Environmental Mitigation Trust Agreement form that is attached as Appendix D-3 to this Indian Tribe Trust Agreement.

1.4     "Business Day" means, with respect to any delivery requirement, deadline, or payment under this Indian Tribe Trust Agreement, each Monday, Tuesday, Wednesday, Thursday, and Friday that is not a day on which the Trustee in the State of Delaware or, as to a specific Beneficiary, a day on which that Beneficiary under this Indian Tribe Trust is authorized or obligated by law, regulation, or executive order to close.

1.5     "Claims" shall mean any and all losses, liabilities, claims, actions, suits, or expenses, of any nature whatsoever, including legal fees and expenses.

1.6     "Consent Decree" shall mean the First Partial Consent Decree in *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 2672 CRB (JSC) (Dkt. No. 2103-1), and the Second Partial Consent Decree in that case (Dkt. No. 3228-1).

1.7     "Court" shall mean the United States District Court for the Northern District of California.

1.8     "Court's Approval Order" shall mean the Court's Order dated _____, 2018, approving the October 23, 2023 modifications to the Indian Tribe Trust Agreement in this matter. *United States v. Volkswagen AG, et al.*, No. 16-cv-295 (N.D. Cal.), Dkt. No. ___.

1.9     "Day" shall mean a calendar day unless expressly stated to be a Business Day.  In computing any period of time under this Indian Tribe Trust Agreement, where the last day would fall on a Saturday, Sunday, or federal or Delaware holiday, the period shall run to the close of business of the next Business Day.

1.10    "Delaware Act" shall mean the Delaware Statutory Trust Act, Del. Code Ann. tit.12, §§ 3801-3826.

1.11    "DERA" shall mean the Diesel Emission Reduction Act, Title VII, Subtitle G, of the Energy Policy Act of 2005 (codified at 42 U.S.C. §§ 16131-16139).

1.12    "Designated Beneficiaries" shall mean the 119 Indian Tribes listed in the four Notices of Beneficiary Designation previously filed by the Trustee in *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 2672 CRB (JSC) (Dkt. No. 7863 (fourth funding cycle); Dkt. 7419 (third funding cycle); Dkt. 6314 (second funding cycle); Dkt. No. 4701 (first funding cycle)).

3

~~1.12~~1.13      "Eligible Mitigation Action" shall mean any of the actions listed in Appendix D-2 (Eligible Mitigation Actions and Mitigation Action Expenditures) to this Indian Tribe Trust Agreement.

~~1.13~~1.14      "Eligible Mitigation Action Administrative Expenditure" shall mean those administrative expenditures by Beneficiaries specified in Appendix D-2 (Eligible Mitigation Actions and Mitigation Action Expenditures) to this Indian Tribe Trust Agreement, and shall not include Trust Administration Costs.

~~1.14~~1.15      "EMA Certification Form" shall mean the Beneficiary Eligible Mitigation Action Certification form that is attached as Appendix D-4 to this Indian Tribe Trust Agreement.

~~1.15~~1.16      "Federal Agency" or "Federal Agencies" shall mean any agency of the United States government. Solely for purposes of subparagraph 5.4.5, such term shall mean the National Park Service, or any successor agency thereto, and the Forest Service, or any successor agency thereto.

1.17      "Final Disposition Account" shall mean the non-interest-bearing subaccount in which the Trustee will transfer and accumulate and hold funds for the Final Disposition of Trust Assets, as described in subparagraph 2.1.6.

1.18      "Final Disposition of Trust Assets" shall mean the distribution to the National Park Service and Forest Service of any Trust Assets in the Final Disposition Account, in accordance with subparagraph 5.4.5.

1.19      "Final Distribution of Trust Assets to Designated Beneficiaries" shall mean the final distribution of Trust Assets to the Designated Beneficiaries to fund environmental mitigation projects that reduce emissions of NOx where the Subject Vehicles were, are, or will be operated, in accordance with subparagraph 5.0.5.5 and its subparts.  These projects include: (a) projects listed in Appendix D-2; (b) Eligible Mitigation Actions that were approved by the Trustee in connection with the Fourth Funding Cycle but which the Beneficiary was unable to complete due to an unanticipated increase in costs or supply chain delays; and (c) other projects that reduce emissions of NOx.

~~1.16~~1.20      "First Partial Consent Decree" shall mean the Partial Consent Decree entered by the Court in *In re:  Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 2672 CRB (JSC) (Dkt. No. 2103-1), on October 25, 2016.

~~1.17~~1.21      "Force Majeure" shall have the same meaning as in Paragraph 54 of the First Partial Consent Decree.

1.22      "Forest Service" means the U.S. Department of Agriculture, Forest Service, or any successor agency thereto.

~~1.18~~1.23      "Indian Land" shall mean the lands of any Indian Tribe or within Indian country.

4

1.191.24      "Indian Tribe" shall mean any Indian or Alaska Native Tribe, band, nation, pueblo, village or community that the Secretary of the Interior acknowledges to exist as an Indian Tribe, as provided in the Federally Recognized Indian Tribe List Act of 1994, 25 U.S.C. § 5130. Pursuant to 25 U.S.C. § 5131, the Bureau of Indian Affairs of the Department of the Interior published a current list of federally recognized Indian Tribes at 83 Fed. Reg. 4,235 (Jan. 30, 2018), which will be updated from time to time.

1.201.25      "Indian Tribe Trust Agreement" shall mean the Environmental Mitigation Trust Agreement for Indian Tribe Beneficiaries approved by the Court on September 19, 2017, *United States v. Volkswagen AG, et al.*, No. 16-cv-295 (N.D. Cal.), Dkt. No. 49, as modified, and all subsequent the modifications thereto as approved by the Court's Approval Order, and the fully executed version filed with the Court on the Trust Modification Effective Date.

1.211.26      "Investment Manager" shall mean Wilmington Trust, N.A., acting solely in its role as the professional investment manager of Trust Assets in accordance with subparagraph 3.2.2 of this Indian Tribe Trust Agreement and the Investment Management Agreement entered into on the Trust Effective Date.  In subparagraphs 2.2.4, 3.1.2.8, 3.5.3 (last sentence), 3.5.6, and 3.5.7 of the Indian Tribe Trust Agreement, each reference to the Investment Manager shall include the Investment Manager and its officers, directors, and employees.

1.221.27      "IRS" shall mean the Internal Revenue Service.

1.28    "National Park Service" means the U.S. Department of the Interior, National Park Service, or any successor agency thereto.

1.231.29      "Second Partial Consent Decree" shall mean the Second Partial Consent Decree entered by the Court in *In re:  Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 2672 CRB (JSC) (Dkt. No. 3228-1), on May 17, 2017.

1.241.30      "Shared State and Indian Tribe Administration Costs" shall mean the costs, fees, and expenses of:  (1) establishing and maintaining the Trustee's public-facing website; and (2) establishing and maintaining a secure method of internet-based communication for the Trustee and Beneficiaries.

1.251.31      "Start-up Costs" shall mean all fees, costs, and expenses incurred in connection with establishing the State Mitigation Trust and the Indian Tribe Mitigation Trust and setting them up for operation.  Start-up costs shall not include the cost of premiums for insurance policies.

1.261.32      "Subject Vehicles" shall mean:  (i) the "2.0 Liter Subject Vehicles," as defined in the First Partial Consent Decree in *In re:  Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 2672 CRB (JSC) (Dkt. No. 2103-1); and (ii) the "3.0 Liter Subject Vehicles," as defined in the Second Partial Consent Decree in that case (Dkt. No. 3228-1).

1.271.33      "Tax" or "Taxes" shall mean all federal, state, and local taxes that may be imposed on the Trust by any taxing authority.

5

1.28~~1.34~~        "Tax Professionals" shall mean all accountants and tax lawyers hired to assist the Trustee with the Trust's reporting obligations, tax filings, audits, and all other tax and accounting-related activities, including efforts to obtain and, if granted, maintain the IRS Private Letter Ruling as described in subparagraph 3.1.2.7 and Paragraph 6.7 of this Indian Tribe Trust Agreement.

1.29~~1.35~~        "Tax Return" or "Tax Returns" shall mean all required federal, state, and local tax returns and information returns, including any returns associated with compliance with withholding and reporting requirements.

1.30~~1.36~~        "Termination Date" shall mean the date that the Indian Tribe Trust terminates pursuant to Paragraph 6.8 of this Indian Tribe Trust Agreement.

1.31~~1.37~~        "Trust Administration Costs" shall mean all expenditures of Trust Assets by the Trustee.

1.32~~1.38~~        "Trust Effective Date" shall mean October 2, 2017, the date that the United States filed the fully executed final version of the Indian Tribe Trust Agreement with the Court. *United States v. Volkswagen AG, et al.*, No. 16-cv-295 (N.D. Cal.), Dkt. No. 51-2.

1.33~~1.39~~        "Trust Modification Effective Date" shall be the later of the Court's Approval Order or 30 Days after the ~~following two requirements are satisfied: (1) the United States files with the Court the fully executed version of the Indian Tribe Trust Agreement, as modified on March 29, 2022; and (2) the~~ Trustee provides notice to the Beneficiaries of the ~~minor~~ modifications to the Indian Tribe Trust Agreement as required by Paragraph 6.5.

1.34~~1.40~~        "Trustee" shall mean Wilmington Trust, N.A., acting solely in its role as the Trustee of this Indian Tribe Mitigation Trust as appointed in accordance with Paragraph 3.0, or a successor trustee pursuant to subparagraph 3.7.2.  In subparagraphs 2.2.4, 3.1.2.8, 3.5.2, 3.5.3, 3.5.6, and 3.5.7 of this Indian Tribe Trust Agreement, each reference to the Trustee shall include the Trustee and its officers, directors, and employees.

1.35~~1.41~~        "United States" shall mean the United States of America, acting on behalf of the U.S. Environmental Protection Agency ("EPA"), the National Park Service, and the Forest Service."~~).~~

## II.    INDIAN TRIBE MITIGATION TRUST

### 2.0    Establishment of the Indian Tribe Mitigation Trust

2.0.1    Irrevocable Establishment.  The Defendants hereby and irrevocably establish this Indian Tribe Mitigation Trust on behalf of the Beneficiaries in the form of a statutory trust under the Delaware Act, which shall bear the name "Volkswagen Diesel Emissions Environmental Mitigation Trust for Indian Tribe Beneficiaries."  In connection with the Trustee's power hereunder, the Trustee may use this name or a variation thereof.  The Trustee is hereby authorized and directed to execute and file a Certificate of Trust for the Indian Tribe Mitigation Trust in the form attached hereto as Appendix D-5.  The Trustee hereby accepts and agrees to

hold the assets owned by the Indian Tribe Mitigation Trust ("Trust Assets") for the benefit of the Beneficiaries and for the purposes described herein and in the Consent Decree.

      2.0.2      <u>Trustee</u>.  In accordance with Paragraph 3.0 below, on the Trust Effective Date, the Trustee, not individually but solely in the representative capacity of trustee, shall be appointed as the Trustee in accordance with the Consent Decree to administer the Indian Tribe Mitigation Trust in accordance with this Indian Tribe Trust Agreement and the Consent Decree.

      2.0.3      <u>Trust Purpose</u>.  It shall be the purpose of the Indian Tribe Mitigation Trust to timely and efficiently fund Eligible Mitigation Actions to be proposed and administered by the Beneficiaries subject to the requirements of the Consent Decree and this Indian Tribe Trust Agreement, and to provide funds for the administration and operation of this Indian Tribe Trust in accordance with this Indian Tribe Trust Agreement.  The goal of each Eligible Mitigation Action shall be to achieve reductions of NOx emissions in the United States.

      2.0.4      <u>Creation and Use of Indian Tribe Trust Account</u>.  Within 15 Days following the Trust Effective Date, the Trustee shall establish a trust account ("Indian Tribe Trust Account"), and file with the Court a designation and identification of the Indian Tribe Trust Account.  The purpose of the Indian Tribe Trust Account shall be to receive deposits from the Defendants (directly or through the Court Registry) pursuant to the First Partial Consent Decree and the Second Partial Consent Decree, to hold them in trust, to receive income and gains from any investment of Trust Assets (collectively, "Trust Funds"), and to make disbursements to fund Eligible Mitigation Actions by Beneficiaries and to pay Trust Administration Costs, all in accordance with the Consent Decree and this Indian Tribe Trust Agreement.  Disbursements shall be directed by each Beneficiary pursuant to a Beneficiary Eligible Mitigation Action Certification form ("EMA Certification Form") (Appendix D-4) delivered to the Trustee in accordance with Paragraph 5.2.  Unless otherwise agreed by the parties to the Consent Decree ("Consent Decree Parties"), the Indian Tribe Trust Account shall be the only account that may be used for these purposes.  <u>Notwithstanding the foregoing, the Trustee is also hereby authorized to make Final Distribution of Trust Assets to Designated Beneficiaries in accordance with 5.0.5.5 and Final Disposition of Trust Assets to Federal Agencies from the Indian Tribe Trust Account in accordance with Paragraph 5.4.5.</u>

            2.0.4.1      <u>Indian Tribe Trust Account Divisions</u>.  The Indian Tribe Trust Account may be divided into such number of discrete trust subaccounts dedicated for specific purposes as may be deemed necessary in the discretion of the Trustee to comply with the terms of, and to implement, the Consent Decree and this Indian Tribe Trust Agreement.

    **2.1**    **Funding of the Indian Tribe Mitigation Trust:**  The Settling Defendants shall fund the Indian Tribe Mitigation Trust as required by the First Partial Consent Decree, and the Defendants shall fund the Indian Tribe Mitigation Trust as required by the Second Partial Consent Decree.  The Trustee shall allocate to the Indian Tribe Mitigation Trust the following amounts: (1) 2.01% of the Mitigation Trust Payments from the First Partial Consent Decree plus any income earned on that amount while deposited with the Court Registry account, and (2) 2.3% of the

Mitigation Trust Payments from the Second Partial Consent Decree plus any income earned on that amount while deposited with the Court Registry account.

     2.1.1    Funding and Use of Tribal Allocation Subaccount.  As soon as practicable after the Trust Effective Date, the Trustee's receipt of the Trust Funds from the Court Registry pursuant to subparagraph 2.0.4, and the funding of the Indian Tribe Mitigation Trust pursuant to Paragraph 2.1, the Trustee shall fund the Tribal Allocation Subaccount by transferring into it from the Indian Tribe Trust Account the funds allocated to the Tribal Allocation Subaccount in Appendix D-1 (Initial 2.0 Liter Allocation) and Appendix D-1A (Initial 3.0 Liter Allocation).  These funds may only be used to fund Eligible Mitigation Actions and Eligible Mitigation Action Administrative Expenditures in the United States, and for a technical assistance provider in accordance with subparagraph 2.1.1.1, and for the Final Distribution of Trust Assets to Designated Beneficiaries in accordance with the terms of subparagraph 5.0.5.5.  After lodging the First Partial Consent Decree, the United States consulted with interested Indian Tribes for a 60-Day period ("Consultation Process"), in order to establish a mechanism for allocating the funds in the Tribal Allocation Subaccount among those Indian Tribes that are deemed Beneficiaries hereunder, including setting aside 5% of those funds to be directed towards technical assistance to enable Indian Tribes to prepare funding requests for Eligible Mitigation Actions and to perform other tasks set forth in subparagraph 2.1.1.2.

            2.1.1.1    Technical Assistance Provider.  In comments received during the Consultation Process referenced in subparagraph 2.1.1, Indian Tribes expressed a preference for using an established technical assistance provider to assist Indian Tribes in preparing funding requests for Eligible Mitigation Actions.  The technical assistance provider shall also assist the Designated Beneficiaries with tasks related to the Final Distribution of Trust Assets to Designated Beneficiaries.  Accordingly, the Trustee agrees:  (1) to set aside 5% of the Tribal Allocation Subaccount into a separate subaccount, the Technical Assistance Provider Subaccount, for record keeping purposes only, to be disbursed to a technical assistance provider to assist Indian Tribes in preparing funding requests for Eligible Mitigation Actions; and (2) consistent with comments received from Indian Tribes during the Consultation Process, to select the Institute for Tribal Environmental Professionals as the technical assistance provider for these purposes.  The Trustee may rely on, with no further duty of inquiry, and shall be protected in acting upon, any budget, semiannual report, or other document from the technical assistance provider reasonably believed by the Trustee to be genuine and to have been signed or sent by the proper person or persons.  The technical assistance provider shall provide a budget estimate for their services related to the Final Distribution of Trust Assets to Designated Beneficiaries.

            2.1.1.2    Scope of Tasks.  The technical assistance provider shall perform the following tasks:  (i) provide outreach and training to the Indian Tribes to assist them in completing their Certification for Beneficiary Status under Environmental Mitigation Trust Agreement form ("Beneficiary Status Certification Form") (Appendix D-3) and their EMA Certification Form (Appendix D-4); (ii) review the EMA Certification Forms (Appendix D-4)

submitted by Beneficiaries for each funding cycle for compliance with the requirements of Appendix D-2 (Eligible Mitigation Actions and Mitigation Action Expenditures) as well as Section V (Allocation of Indian Tribe Mitigation Trust Assets) of the Indian Tribe Trust Agreement; (iii) request missing information from the Indian Tribes necessary to complete the Beneficiary Status Certification Forms (Appendix D-3) and EMA Certification Forms (Appendix D-4); and (iv) after review of the EMA Certification Forms (Appendix D-4) submitted in each funding cycle, prepare a report for the Trustee indicating whether each form complies with the requirements of Appendix D-2 (Eligible Mitigation Actions and Mitigation Action Expenditures) and Section V (Allocation of Indian Tribe Mitigation Trust Assets) of the Indian Tribe Trust Agreement.  The technical assistance provider's review and report shall be based on the information provided to it by each Indian Tribe; the technical assistance provider may conclusively rely on the accuracy of the information provided by an Indian Tribe without any further duty of inquiry.  The technical assistance provider's report relating to its review of the EMA Certification Forms (Appendix D-4) shall be delivered to the Trustee five Business Days before the Trustee's deadlines to approve or deny any EMA Certification Forms (Appendix D-4) in subparagraph 5.2.16.  If there are differences or disputes relating to the services provided by the technical assistance provider pursuant to this Indian Tribe Trust Agreement, the Trustee and the United States shall work cooperatively to address and attempt to resolve those issues with the technical assistance provider.  The duties and obligations of the technical assistance provider to the Indian Tribe Mitigation Trust shall terminate with the conclusion of the last funding cycle except for those set forth in this subparagraph related to the Final Distribution of Trust Assets to Designated Beneficiaries.

2.1.1.2.1 Tasks Related to the Final Distribution of Trust Assets to Designated Beneficiaries. In connection with the Final Distribution of Trust Assets to Designated Beneficiaries, the technical assistance provider shall assist the Designated Beneficiaries in completing Appendix D-7A, Appendix D-9, and the report on Final Distribution expenditures required by subparagraph 5.3.1 and return of unused funds, as applicable, and provide general assistance to ensure that the Designated Beneficiaries complete the necessary security procedures documentation required by the Trustee to make payments by the deadlines for delivery to the Trustee set forth in subparagraph 5.0.5.5. The tasks that the technical assistance provider is expected to perform shall include one recorded webinar explaining the process, and telephone and email follow-up thereafter.  To receive assistance with the final report required by subparagraph 5.3.1., a Designated Beneficiary must request assistance from the technical assistance provider at least two months prior to the deadline.

2.1.1.3     Budget.  In order to fund its services, the technical assistance provider shall submit to the Trustee, in electronic and hard-copy formats, an annual budget for its services in each year.  The annual budget shall be submitted 45

Days before the commencement of the applicable budget period for review by the Trustee, and shall include:  (i) a detailed description of the proposed services described above in subparagraph 2.1.1.2; (ii) a proposed management plan for the proposed services, including a detailed budget for proposed expenses for the upcoming year, an identification of all indirect costs, and an implementation and expenditure timeline; (iii) a certification that indirect costs comply with the limits in subparagraph 2.1.1.4; (iv) a certification that all vendors were or will be selected in accordance with state or tribal public contracting laws as applicable; (v) for each proposed expenditure exceeding $25,000, detailed cost estimates from selected or potential vendors; (vi) a detailed description of how the technical services provider will oversee the proposed services, including, but not limited to: identification of the specific entity responsible for reviewing and auditing expenditures of funds to ensure compliance with applicable law, and a commitment by the technical assistance provider to maintain and make publicly available all documentation submitted in support of the funding request and all records supporting all expenditures of funds, subject to applicable laws governing the publication of confidential business information and personally identifiable information, together with an explanation of the procedures by which the technical assistance provider shall make such documentation publicly available; and (vii) a detailed plan for reporting on implementation that meets the requirements of subparagraph 2.1.1.5.  The technical assistance provider shall provide additional information as requested by the Trustee.  The Trustee shall post each proposed annual budget on the Indian Tribe Trust's public-facing website upon receipt.  The Trustee must approve the annual budget for the technical assistance provider's services before disbursing funds for the budget.  Pursuant to the procedures and schedules in subparagraphs 5.2.16 and 5.2.16.1, the Trustee shall approve any funding request in the technical assistance provider's budget that meets the requirements of this subparagraph 2.1.1.3, and shall disburse funds according to the written instructions provided by the technical assistance provider.  In connection with a modification of this Indian Tribe Trust Agreement, the technical assistance provider may revise its initial budget to take into account factors including the scope of tasks listed in subparagraph 2.1.1.2 and the reduction in the number of funding cycles in subparagraph 5.0.5.2. The technical assistance provider shall use any unspent funds it has on hand from prior budget cycles together with a budgeted amount approved by the Trustee to perform the tasks related to the Final Distribution of Trust Assets to Designated Beneficiaries set forth in subparagraph 2.1.1.2.1.

2.1.1.4      <u>Limits on Indirect Costs</u>.  The technical assistance provider's indirect costs associated with administering the technical assistance portion of the Tribal Allocation Subaccount shall not exceed 30.9% of the overall costs in providing technical assistance under subparagraph 2.1.1.1 (i.e., of the 5% portion that will be used for technical assistance, no more than 30.9% of the 5% portion may consist of indirect costs).  For purposes of this subparagraph, "indirect costs" are those costs incurred for a common or joint purpose

10

benefitting more than one cost objective, and not readily assignable to the cost objectives specifically benefitted, without effort disproportionate to the results achieved.  As required by subparagraph 2.1.1.3, the technical assistance provider shall separately set forth the indirect costs in each annual budget submitted to the Trustee.  These indirect costs are subject to the limitations in the Federal Acquisition Regulations at 48 C.F.R. § 31.205.

2.1.1.5    Reporting Obligations.  No later than six months after receiving its first disbursement of Trust Assets, and thereafter no later than January 30 (for the preceding six-month period of July 1 to December 31) and July 30 (for the preceding six-month period of January 1 to June 30) of each year, the technical assistance provider shall provide a semiannual report to the Trustee describing the progress implementing the technical assistance services during the six-month period leading up to the reporting date (including a summary of all costs expended on the services through the reporting date).  Such reports shall include a complete description of the status, development, and implementation of the services.  These reports shall be signed by an official with the authority to submit the report for the technical assistance provider and must contain an attestation that the information is true and correct and that the submission is made under penalty of perjury.  The Trustee shall post each semiannual report on the Indian Tribe Trust's public-facing website upon receipt.  The final semi-annual report of the technical assistance provider shall be provided by January 31, 2024, for the period July 1 to December 31, 2023.

2.1.1.6    Unused Funds and Final Report.  No later 15 Days following the 18-month anniversary of the Final Distribution of Trust Assets to Designated Beneficiaries, the technical assistance provider shall return any unused funds to the Trustee for deposit into the Final Disposition Account.  At the same time, the technical assistance provider shall submit a report to the Trustee, with a copy to EPA, describing the technical assistance services provided since December 31, 2023, including a summary of all costs expended during the reporting period and the amount of any funds returned to the Trustee.  The report shall be signed by an official with the authority to submit the report for the technical assistance provider and must contain an attestation that the information is true and correct and that the submission is made under penalty of perjury.  The Trustee shall post the report on the Indian Tribe Trust's public-facing website upon receipt.

2.1.1.6    Unused Funds.  Upon the termination or completion of services by the technical assistance provider, any unused funds shall be returned by the technical assistance provider to the Indian Tribe Trust and added back to the Tribal Allocation Subaccount.  Not later than December 31, 2022, any unused funds held by the technical assistance provider shall be returned to the Indian Tribe Trust.

2.1.2    Beneficiary Status, Designated Beneficiary's Participation Notice, and Funding Requests.

2.1.2.1    <u>Establishment of Beneficiary Status</u>.  Prior to receiving any funds, each Indian Tribe must establish Beneficiary status pursuant to Paragraph 4.0 by filing with the Court a Beneficiary Status Certification Form (Appendix D-3), containing each of the certifications required by subparagraphs 4.2.1 through 4.2.9.  At the time of filing the Beneficiary Status Certification Form with the Court, each Indian Tribe shall also concurrently provide a copy of the Beneficiary Status Certification Form to the Trustee in electronic format and by mail pursuant to Paragraph 6.0 and subparagraph 6.0.1. <u>No Indian Tribe may seek to establish Beneficiary status after March 16, 2021, consistent with Paragraph 4.0.</u>

2.1.2.2    <u>Designated Beneficiary's Participation Notice</u>.  Beginning with the second funding cycle, after an Indian Tribe has been designated as a Beneficiary pursuant to subparagraphs 4.0.2 and 5.0.5.1, that Indian Tribe Beneficiary may participate in the second and any subsequent funding cycle by submitting to the Trustee, pursuant to subparagraphs 5.0.5.3.3 and 5.0.5.3.5, a Designated Beneficiary's Participation Notice (Appendix D-6) by the deadline established for each funding cycle in which it would like to participate. <u>Designated Beneficiaries are not required to submit a Designated Beneficiary Participation Notice for the Final Distribution to Designated Beneficiaries pursuant to Subparagraph 5.0.5.5.</u>

2.1.2.3    <u>Funding Requests</u>.  In any request for Eligible Mitigation Action funding submitted to the Trustee by any Beneficiary, the Beneficiary shall timely submit an EMA Certification Form (Appendix D-4) for each funding cycle, and shall comply with the requirements of subparagraphs 5.2.2 through 5.2.13, as applicable.  Each allocation provided to any Indian Tribe that is designated as a Beneficiary pursuant to subparagraphs 4.0.2 and 5.0.5.1 shall be subject to Paragraph 5.3 and subparagraphs 5.0.5, 5.2.17, and 5.4.5. <u>Designated Beneficiaries are not required to submit an EMA Certification Form for the Final Distribution to Designated Beneficiaries pursuant to subparagraph 5.0.5.5</u>

2.1.3    Intentionally Reserved.

2.1.3.1    Intentionally Reserved.

2.1.3.2    <u>Tribal Administration Cost Subaccount</u>.  As soon as practicable after the Trust Effective Date, the Trustee's receipt of the Trust Funds from the Court Registry pursuant to subparagraph 2.0.4, and the funding of the Indian Tribe Mitigation Trust pursuant to Paragraph 2.1, the Trustee shall establish a Tribal Administration Cost Subaccount that shall be funded in accordance with the specific allocation for the Tribal Administration Cost Subaccount in Appendix D-1 (Initial 2.0 Liter Allocation) and Appendix D-1A (Initial 3.0 Liter Allocation).  The funds in this subaccount shall be used exclusively to pay for the Indian Tribe Trust's expenses relating to administering the Tribal Allocation Subaccount; provided, however, that the Trustee, consistent with the weighted average allocation percentage of 2% set forth in Appendix D-1B

(Weighted Average Allocation Formula for 2.0 and 3.0 Liter Allocation), may also draw upon this account to pay 2% of the Start-up Costs and 2% of the Shared State and Indian Tribe Administration Costs, in accordance with Paragraph 3.6.  No additional Trust Assets may be directed to the Tribal Administration Cost Subaccount, or to the payment of Trust Administration Costs relating to the Tribal Administration Cost Subaccount, other than investment earnings on the Tribal Administration Cost Subaccount, absent further order of the Court.  If additional funds are required to fund this Tribal Administration Cost Subaccount, the Trustee shall confer with the United States to attempt to find an appropriate resolution to address any funding shortfall.

2.1.3.3     Insurance Premium Payment Subaccount.  No later than November 27, 2023, the Trustee is hereby directed to establish or utilize a non-interest-bearing subaccount to hold funds to pay the remaining insurance premiums for the life of the Indian Tribe Trust and related to its Termination which cannot be prepaid (the "Insurance Premium Payment Subaccount").  Any funds not used for the payment of premiums will be transferred to the Final Disposition Account and used in connection with the Final Disposition of Trust Assets to in accordance with the terms of Paragraph 5.4.5.

2.1.3.4     Payment of Trust Administration Termination Costs.  No later than November 27, 2023, the Trustee shall pay all Trust Administration Costs through the Termination Date (including, without limitation, outstanding amounts due and owing to the Trustee and all third party providers on the Trust Modification Effective Date) together with all the budgeted amounts submitted by each third party provider to provide their required services to the Indian Tribe Trust through the Termination Date and the Trustee's estimate of its own fees, costs, and expenses and all other anticipated Trust Administration Costs (including, without limitation, taxes, website, and insurance premiums that are due) through the Termination Date (the "Trust Administration Termination Costs").  These payments are not subject to the 15-day advance posting requirement of subparagraph 3.6 prior to their payment.  The Trustee shall post all Trust Administration Termination Costs on the public website as promptly as practicable following their payment.  As soon as practicable following payment of all Trust Administration Termination Costs, but no later than November 30, 2023, the Trustee shall transfer all remaining Trust Assets from the Tribal Administration Cost Subaccount, the Technical Assistance Provider Subaccount, and the Tribal Advisory Council Subaccount to the Tribal Allocation Subaccount.  The Trustee shall confirm that all third-party providers agree to return any unused Trust Administration Termination Costs paid to them in accordance with this subparagraph not later than 18 months following the Final Distribution of Trust Assets to Designated Beneficiaries.  The Trustee shall deposit such funds in the Final Disposition Account.

2.1.4     Tribal Advisory Council.  In comments received during the Consultation Process referenced in subparagraph 2.1.1, Indian Tribes expressed a preference that a

portion of the funds in the Tribal Administration Cost Subaccount be used to establish and fund a Tribal Advisory Council.  The Tribal Advisory Council shall: (i) advise the technical assistance provider on its outreach and training efforts to ensure that Indian Tribes are aware of the Indian Tribe Trust; and (ii) provide a forum for Indian Tribes to raise general questions relating to the Indian Tribe Trust Agreement.  The Trustee agrees to select the Institute for Tribal Environmental Professionals to coordinate the establishment of a Tribal Advisory Council.  Within 30 Days after the Trust Agreement becomes effectiveCourt's Approval Order is issued, the Institute for Tribal Environmental Professionals shall undertake efforts to establish a Tribal Advisory Council and shall seek Indian Tribe representatives from the various regions of the United States to serve as Council members.  The technical assistance provider shall provide a summary report to the Trustee regarding its meetings with the Tribal Advisory Council.  The technical assistance provider's summary report may be submitted to the Trustee as a part of its regular semi-annual report to the Trustee pursuant to subparagraph 2.1.1.5.  The Trustee shall set aside $30,000 of the Tribal Administrative Cost Subaccount into a separate subaccount, the Tribal Advisory Council Subaccount, for record keeping purposes only, to fund a Tribal Advisory Council for the purposes listed in this subparagraph.  The Institute for Tribal Environmental Professionals shall follow the requirements of subparagraphs 2.1.1.3, 2.1.1.4, and 2.1.1.5 with respect to funding requests and reporting obligations for the Tribal Advisory Council.  The duties and obligations of the Tribal Advisory Council to the Indian Tribe Mitigation Trust shall terminate with the conclusion of the last funding cycle.  No later than November 30, 2023,Upon the termination or completion of services by the Tribal Advisory Council shall return, any unused Trust Assets to the Trustee to funds shall be deposited intoreturned by the Institute for Tribal AllocationEnvironmental Professionals to the Indian Tribe Trust and added back to the Tribal Administration Cost Subaccount.

2.1.5    Tax Payment Subaccount.  As soon as practicable after the Trust Effective Date, the Trustee's receipt of the Trust Funds from the Court Registry pursuant to subparagraph 2.0.4, and the funding of the Indian Tribe Mitigation Trust pursuant to Paragraph 2.1, the Trustee shall deduct an amount equal to the estimated taxes owed on earnings of the Trust Funds while on deposit in the Court Registry that have been allocated to the Indian Tribe Mitigation Trust pursuant to Paragraph 2.1.  The amount of the deduction shall be based on applicable income tax withholding and reporting requirements, and consistent with Section 468B of the Internal Revenue Code, 26 U.S.C. § 468B, and related Treasury Regulations.  Such amount shall be deposited into a dedicated, non-interest bearing account ("Tax Payment Subaccount").  In addition, prior to the allocation of any investment income pursuant to subparagraph 3.2.3, the Trustee shall deduct an amount equal to the estimated taxes owed on such earnings and deposit that sum into the Tax Payment Subaccount.  The amounts in this Tax Payment Subaccount shall be used for the express purpose of paying all applicable taxes with respect to the Indian Tribe Mitigation Trust in a manner consistent with Paragraph 6.7.  If at any time the funds on deposit in this Tax Payment Subaccount are insufficient to pay all Taxes then due and owing, the Trustee shall seek to resolve any dispute pursuant to the dispute resolution procedures of Paragraph 6.2.  Following the 18-month anniversary of the Final Distribution of Trust Assets to Designated Beneficiaries and the Trustee obtaining confirmation of tax clearance from the IRS and the state taxing authorities of Delaware and California, all remaining funds in this account shall be transferred by the Trustee to the Final Disposition Account for the Final Disposition of Trust Assets in accordance with subparagraph 5.4.5.

14

2.1.6     Final Disposition Account.  No later than November 27, 2023, the Trustee is hereby directed to establish or utilize a non-interest-bearing subaccount to transfer and accumulate and hold funds for the Final Disposition of Trust Assets in accordance with Paragraph 5.4.5 (the "Final Disposition Account") to: (i) accept funds not disbursed to a Designated Beneficiary in accordance with subparagraph 5.0.5.5; (ii) accept returned funds from Designated Beneficiaries that are not used in accordance with subparagraph 5.0.5.5 and the Designated Beneficiary's Appendix D-9 Certification; (iii) accept any unused funds from the technical assistance provider, all third-party providers and the Trustee; and (iv) accept any unused funds from the Tax Payment Subaccount and the Insurance Premium Payment Subaccount.  The Trust Assets transferred and accumulated in the Final Disposition Account will be disbursed in accordance with the terms of subparagraph 5.4.5.

## 2.2     Trust Limitations

2.2.1     No Consent Decree Party or Beneficiary, nor any of its components, agencies, officers, directors, agents, employees, affiliates, successors, or assigns, shall be deemed to be an owner, operator, trustee, partner, agent, shareholder, officer, or director of the Indian Tribe Mitigation Trust.

2.2.2     All Trust Assets shall be used solely for the purposes provided in the Consent Decree and this Indian Tribe Trust Agreement.

2.2.3     This Indian Tribe Mitigation Trust is irrevocable.  The Defendants:  (i) shall not retain any ownership or residual interest whatsoever with respect to any Trust Assets, including, but not limited to, the funds transferred by the Defendants to fund the Indian Tribe Trust pursuant to the terms of the Consent Decree, (ii) shall not have any liabilities or funding obligations with respect to the Indian Tribe Trust (to the Trustee, the Beneficiaries or otherwise) other than the funding obligations expressly set forth in the Consent Decree, and (iii) shall not have any liability or obligation to pay tax on any income or gains from any investments of Trust Assets.  Nor shall the Defendants have any rights or role with respect to the management or operation of the Indian Tribe Trust, or the Trustee's approval of requests for Eligible Mitigation Action funding.

2.2.4     Exculpation.  Neither the Trustee and its officers, directors, and employees, the Investment Manager and its officers, directors, and employees, the Tax Professionals nor the Indian Tribe Mitigation Trust shall have any liability whatsoever to any person or party for any liability of the Defendants; provided, however, that the Indian Tribe Mitigation Trust shall be liable to the Beneficiaries for funding of Eligible Mitigation Actions in accordance with the terms of this Indian Tribe Trust Agreement and the Consent Decree.

## III.   TRUSTEE RESPONSIBILITIES

**3.0     Appointment:**  Pursuant to Paragraph 15.e. of the First Partial Consent Decree, the Court appointed Wilmington Trust, N.A., as Trustee of the Environmental Mitigation Trust. Dkt. No. 3030 at 2.  Wilmington Trust, N.A., not individually but in its representative capacity as Trustee, is hereby appointed to serve as the Trustee to administer the Indian Tribe Mitigation Trust in accordance with this Indian Tribe Trust Agreement and the Consent Decree.  The Trustee hereby

accepts such appointment and agrees to serve, commencing on the Trust Effective Date, in such capacity to the Indian Tribe Mitigation Trust and for the benefit of the Beneficiaries.

       3.0.1      Wilmington Trust, N.A. is acting in two separate and distinct roles under the Indian Tribe Mitigation Trust:  (1) as the Trustee of the Indian Tribe Mitigation Trust; and (2) as the Investment Manager of the Trust Assets.  These roles are subject to different standards of care.  Wilmington Trust, N.A., acting as Trustee, is subject to the standard of care set forth in subparagraphs 3.1.1 and 3.5.2.  In its role as Investment Manager, Wilmington Trust, N.A. is subject to the standard of care set forth in subparagraph 3.2.2.

**3.1     Powers of the Trustee**

3.1.1     Except as set forth in this Indian Tribe Trust Agreement, the Trustee shall have the power to perform those acts necessary and desirable to accomplish the purposes of the Indian Tribe Mitigation Trust, which shall be exercised in an efficient and expeditious manner in furtherance of and in a manner consistent with the purposes of this Indian Tribe Trust Agreement and the Consent Decree.  Subject to the limitations on liability set forth in subparagraph 3.5.2, the Trustee shall act in accordance with the current professional standards of care and with the diligence, skill, and care expected for the administration of such a Trust.  The Trustee shall have only such duties, rights, powers, and privileges expressly set forth in the Consent Decree, this Indian Tribe Trust Agreement, and as otherwise provided by the Delaware Act.  No implied duties (including fiduciary duties) shall be read into this Indian Tribe Trust against Wilmington Trust, N.A., acting as the Trustee.

3.1.2     Upon the Trust Effective Date, the powers of the Trustee shall include the following:

3.1.2.1     To receive, manage, invest, reinvest, supervise, and protect the Trust Assets as provided in Paragraph 3.2 of this Indian Tribe Trust Agreement or to engage a professional investment manager ("Investment Manager") to receive, manage, invest, reinvest, supervise, and protect the Trust Assets as provided in Paragraph 3.2 for the benefit of the Beneficiaries.  The Trustee appoints Wilmington Trust, N.A. as the Investment Manager for the Indian Tribe Mitigation Trust pursuant to an Investment Management Agreement entered into on the Trust Effective Date to manage the Trust Assets in accordance with Paragraph 3.2. Upon the Trust Modification Effective Date, the Trustee shall no longer be required to invest or re-invest any Trust Assets on deposit with it and all Trust Funds may be held in non-interest-bearing Trust accounts or subaccounts uninvested through the Termination Date of the Indian Tribe Trust. The Trustee is hereby directed to terminate the Investment Management Agreement as promptly as practicable following the Trust Modification Effective Date. The termination shall be done in an orderly manner taking into account the need for any existing investments to mature and the need to post income earned on the Trust Assets in the last month of the Investment Management Agreement.

3.1.2.2     To establish and maintain a public-facing website onto which it will post all materials as required hereunder. The Trustee is hereby directed to terminate the public-facing website no sooner than 10 Days prior to the Termination Date.

3.1.2.3     To establish and maintain a secure method of internet-based communications for the use of the Trustee and the Beneficiaries.  Initially, the Trustee will use Intralinks to provide this method of communication.  The Trustee may change this method at any time but shall provide 30 Days' notice to the Beneficiaries in connection with any change. The Trustee is hereby directed to terminate Intralinks as promptly as practicable following

the Final Distribution of Trust Assets to Designated Beneficiaries, provided it has given the required notice to Beneficiaries and established an alternative means of secure communication with the Beneficiaries (e.g., secure email).;

3.1.2.4    To hold title to property in the name of the Trustee in its capacity as such;

3.1.2.5    To incur, and pay from the Tribal Administration Cost Subaccount, any and all customary and commercially reasonable charges and expenses upon or connected with the administration of this Indian Tribe Mitigation Trust in the discharge of its obligations hereunder, including 2% of Start-up Costs, 2% of Shared State and Indian Tribe Administration Costs, and its commercially reasonable fees, costs, and expenses in connection with any modification of this Indian Tribe Trust Agreement.;

3.1.2.6    To engage and compensate professionals to assist the Trustee in accordance with this Indian Tribe Trust Agreement, including, but not limited to, legal, environmental, investment, accounting, tax, website, and third-party auditing professionals, or internet service providers, or insurance providers. Such third-party auditing professionals may be used by the Trustee to audit and/or review expenditures to verify that they comport with the requirements and limitations on use of Trust Funds, as set forth herein.  The Trustee may initiate such an audit and/or review on its own initiative or in response to credible reports or suggestions that such review or audit is appropriate. The Trustee shall have an annual independent audit of the Trust's annual financial statements prepared and posted on the website; except that to preserve Trust Funds the 2023 annual audit may instead be conducted as an independent review and report of the Trust's annual financial statements and the Trust's semi-annual independent review for the period ending June 30, 2023 shall be its last semi-annual independent review. In its sole discretion, the United States may waive the requirement of an annual independent audit of the Trust's annual financial statements and the requirement of a semi-annual independent review of the Trust's financial statement for any semi-annual period, starting in year seven or at an earlier time in order to preserve Trust Funds. The Trustee is hereby authorized to instruct the accountant to prepare any reports or documentation necessary to obtain the final tax clearances from the IRS and the States of Delaware and California and necessary to file the Certificate of Termination with the State of Delaware. ;

3.1.2.7    To engage and compensate professionals to assist the Trustee in requesting a Private Letter Ruling from the IRS:  (1) that the Indian Tribe Mitigation Trust will be treated as a Qualified Settlement Fund under 26 C.F.R. § 1.468B-1; and (2) on any federal tax matter that the Tax Professionals reasonably believe is necessary to support the ruling in (1) or otherwise prudent to clarify an uncertain application of federal tax law to the Indian Tribe Mitigation Trust, and to take such actions as may be reasonably necessary to secure such ruling and to ensure that the Indian Tribe Mitigation Trust continues to comply with such ruling upon the advice of the Tax

18

Professionals. The Trustee may engage and compensate professionals to assist the Trustee in requesting a Private Letter Ruling from the IRS that investment income earned on the Trust Assets will be excludible from gross income upon the advice of Tax Professionals that the pursuit of such a Private Letter Ruling is prudent;

3.1.2.8   To purchase any insurance policies as the Trustee may determine to be prudent to protect the Indian Tribe Mitigation Trust, the Trust Assets, the Trustee and its officers, directors, and employees, Wilmington Trust, N.A., in its role as Investment Manager, and its officers, directors, and employees, and to cover Tax Professionals, if required, from any and all Claims that might be asserted against each;

3.1.2.9   To distribute Trust Assets for the purposes contemplated in this Indian Tribe Trust Agreement and the Consent Decree, including the allocation of funds to Beneficiaries for approved Eligible Mitigation Actions, the Final Distribution of Trust Assets to Designated Beneficiaries, and the Final Disposition of Trust Assets;;

3.1.2.10   To file documents in Court on behalf of itself and the Indian Tribe Trust;

3.1.2.11   To make all necessary state and federal filings and to provide information as required by law;

3.1.2.12   To vote shares or other investments;

3.1.2.13   To open or maintain any additional bank accounts, or close bank accounts or open securities accounts as are necessary or appropriate to manage the Trust Assets;

3.1.2.14   To apply, as soon as practicable after the Trust Effective Date, for an employer identification number for the Indian Tribe Trust pursuant to IRS Form SS-4, and in accordance with Treasury Regulation Section 1.468B-2(k)(4), 26 C.F.R. § 1.468B-2(k)(4);

3.1.2.15   To deduct and withhold from allocation of investment earnings to the Beneficiaries under subparagraph 3.2.3 all Taxes that the Trustee may be required to deduct and withhold under any provision of tax law, and any allocation of investment income under subparagraph 3.2.3 to an Indian Tribe Trust subaccount shall be reduced to the extent such withheld amounts are remitted to the appropriate taxing authority;

3.1.2.16   To file on behalf of the Indian Tribe Trust all required Tax Returns, which shall be completed in consultation with Tax Professionals, ensure compliance with withholding and reporting requirements, and pay any and all Taxes, including estimated Taxes, due and owing with respect to the Indian

Tribe Trust from amounts in the Tax Payment Subaccount pursuant to subparagraph 2.1.5; and

3.1.2.17   Subject to applicable requirements of this Indian Tribe Trust Agreement (including the limitations on liability set forth in subparagraph 3.5.2), the Consent Decree, and other applicable law, to effect all actions and execute and deliver all contracts, instruments, agreements, or other documents that may be necessary to administer the Indian Tribe Mitigation Trust in accordance with this Indian Tribe Trust Agreement and the Consent Decree, each in accordance with its duties and the current professional standards of care, and with the diligence, skill, and care expected for the administration of such a Trust for the benefit of the Indian Tribes.

3.1.2.18   <u>Duty to Comply with Law</u>.  The Trustee shall not be required to take any action that would violate a law or regulation to which it is subject.

3.1.2.19   <u>Relation-Back Election</u>.  If applicable, the Trustee and the Defendants shall fully cooperate in filing a relation-back election under Treasury Regulation Section 1.468B-1(j)(2), 26 C.F.R. § 1.468B-1(j)(2), to treat the Indian Tribe Trust as coming into existence as a settlement fund as of the earliest possible date.

**3.2**   **Investment of Trust Assets:**  The Trustee shall engage the Investment Manager to invest and reinvest the principal and income of the Trust Assets in those investments that are reasonably calculated to preserve the principal value, taking into account the need for the safety and liquidity of principal as may be required to fund Eligible Mitigation Actions and Trust Administration Costs.

3.2.1   Any investment income that is not reinvested shall be deposited into the Indian Tribe Trust Account for allocation among the Beneficiaries.

3.2.2   In investing, reinvesting, exchanging, selling, and managing Trust Assets, the Trustee or Investment Manager must perform its duties solely in the interest of the Beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent investor, acting in a like capacity and familiar with such matters, would exercise in the conduct of an enterprise of like character and with like aims.  The Investment Manager shall comply with all applicable laws and shall be held to a fiduciary standard of care with respect to the investment and reinvestment of the principal and income of Trust Assets; except that the right and power of the Investment Manager to invest and reinvest the Trust Assets shall be limited to:  (i) demand and time deposits, such as certificates of deposit, in banks or other savings institutions whose deposits are federally insured; (ii) U.S. Treasury bills, bonds, and notes, including, but not limited to, long-term U.S. Treasury bills, bonds, and notes; (iii) repurchase agreements for U.S. Treasury bills, bonds, notes, and other Government Securities as defined under Section 2(a)(16) of the Investment Company Act of 1940, 15 U.S.C. § 80a-2(a)(16), including, but not limited to, Fannie Mae, Freddie Mac, Federal Home Loan Bank and Federal Farm Credit; (iv) AA or AAA corporate bonds (with the rating awarded by at least two of the three major rating agencies (Standard & Poor's, Moody's, or Fitch)); or (v) open-ended mutual funds owning

only assets described in subparts (i) through (iv) of this subsection.  The Investment Manager shall maintain prudent diversification across instruments and specific issuers.  The value of bonds of any single company and its affiliates owned by the Indian Tribe Trust directly rather than through a mutual fund shall not exceed 10% of the investment portfolio at time of purchase; this restriction does not apply to any of the following:  Repurchase Agreements; Money Market Funds; U.S. Treasuries; and U.S. Government Agencies.  Any such investments shall be made consistently with the Uniform Prudent Investor Act.  The determination of the rating of any investments made by the Investment Manager shall be made on the date of acquisition of any such investment or on the date of re-investment.  The Investment Manager shall reconfirm that all investments of Trust Assets still meet the original rating requirement on a quarterly basis.  If the Investment Manager determines that any particular investment no longer meets the rating requirement, the Investment Manager shall substitute that investment with an investment that meets the ratings requirement as promptly as practicable, but in no event later than the next reporting period.  Previously purchased securities downgraded below AA may be held for a reasonable and prudent period of time if the Investment Manager believes it is in the interest of the Indian Tribe Trust to do so.  The borrowing of funds or securities for the purpose of leveraging, shorting, or other investments is prohibited.  Investment in non-U.S. dollar denominated bonds is prohibited.  This subparagraph 3.2.2 shall act as a standing default investment instruction for all cash in any account or subaccount that holds any Trust Assets in cash, which shall be invested in the BlackRock Fed Fund (CUSIP 09248U809).  Except for actions or omissions of the Investment Manager that are determined in a final, non-appealable judgment of the Court to be fraudulent, negligent, or willful misconduct, the Investment Manager and its officers, directors, or employees shall have no liability for any and all Claims.  Upon the Trust Modification Effective Date, the Trustee shall no longer be required to invest or re-invest any Trust Assets on deposit with it and all Trust Funds shall be held in a non-interest-bearing Trust account or subaccount uninvested through the Termination Date of the Indian Tribe Trust.  The Trustee is hereby directed to terminate the Investment Management Agreement as promptly as practicable following the Trust Modification Effective Date.  The termination shall be done in an orderly manner, taking into account the need for any existing investments to mature and the need to post income earned on the Trust Assets in the last month of the Investment Management Agreement.

3.2.3     Allocation of Investment Income.  Any and all earnings, interest, and other investment income realized on the investment of the Trust Assets shall be allocated to each Indian Tribe Trust subaccount on the basis of the respective subaccount balances at the end of each month.  Any and all earnings, interest, and other investment income realized on the investment of the assets held in the Tribal Administration Cost Subaccount shall be allocated to that administration subaccount on the basis of the administration subaccount balance at the end of each month.  The final allocation of investment income shall occur at the latter of end of the month following the Trust Modification Effective Date or the last date that investment of Trust Assets matures in the normal course.  Any earnings, interest, or other investment income realized after the Trust Modification Effective Date shall be allocated to the Tribal Allocation Subaccount or, if realized after the Trustee's application of the allocation method for the Final Distribution of Trust Assets to Designated Beneficiaries pursuant to subparagraph 5.0.5.5, to the Final Disposition Account.

3.2.4    Nothing in this Section shall be construed as authorizing the Trustee to cause the Indian Tribe Mitigation Trust to carry on any business or to divide the gains therefrom. The sole purpose of this Section is to authorize the investment of the Trust Assets or any portion thereof as may be reasonably prudent pending use of the proceeds for the purposes of the Indian Tribe Mitigation Trust.

**3.3    Accounting:**  The Trustee shall maintain the books and records relating to the Trust Assets and income and the payment of expenses of and liabilities against the Indian Tribe Mitigation Trust.  The detail of these books and records and the duration the Trustee shall keep such books and records shall be such as to allow the Trustee to make a full and accurate accounting of all Trust Assets, as well as to comply with applicable provisions of law and standard accounting practices, including Generally Accepted Accounting Principles ("GAAP").  The United States, by and through EPA, and each Beneficiary, shall have the right upon 14 Days' prior written notice to inspect such books and records, as well as all supporting documentation.  Except as otherwise provided herein, the Trustee shall not be required to file any accounting or seek approval of the Court with respect to the administration of the Indian Tribe Mitigation Trust, or as a condition for making any payment, allocation, or distribution out of the Trust Assets. Following the Trust Modification Effective Date, the Trust will continue to file Federal and State Tax Returns until its Termination in 2025.  The Trustee is hereby authorized to instruct the accountant to prepare any reports or documentation necessary to obtain the final tax clearances from the IRS and the States of Delaware and California and necessary to file the Certificate of Termination with the State of Delaware or distribution out of the Trust Assets.

3.3.1    <u>Semiannual Reporting</u>.  Within 180 Days of the Trust Effective Date in the first year, and thereafter by February 15 (for the preceding six-month period of July 1 to December 31) and August 15 (for the preceding six-month period of January 1 to June 30) of each year through February 15, 2024 , and then at least 30 Days prior to the filing of a motion to terminate pursuant to Paragraph 6.8 hereof (each a "Financial Reporting Date"), with the six months ending December 31, 2023 being the last semiannual reporting period, the Trustee shall file with the Court and provide each known Beneficiary, the technical assistance provider, and the Defendants with:

3.3.1.1    A statement:  (i) confirming the value of the Trust Assets; (ii) itemizing the investments then held by the Indian Tribe Trust (including applicable ratings on such investments); and (iii) including a cumulative and calendar year accounting of the amount the Trustee has paid out from the Indian Tribe Trust Account and all subaccounts to any recipient;

3.3.1.2    Regarding the Tribal Allocation Subaccount, the Trustee shall provide cumulative and calendar year accounting, as of the Financial Reporting Date, of:  (i) the initial allocation of Trust Assets in the Tribal Allocation Subaccount; (ii) any allocation adjustments pursuant to this Indian Tribe Trust Agreement; (iii) line item descriptions of completed disbursements on account of approved Eligible Mitigation Action; and (iv) the remaining and projected amount in the Tribal Allocation Subaccount.  Such accounting shall also include, for each Beneficiary, a balance statement and projected annual budget of disbursements taking into account those Eligible Mitigation Actions that have been approved as of the Financial Reporting Date;

3.3.1.3     Regarding the Tribal Administration Cost Subaccount, the Trustee shall provide cumulative and calendar year accounting, as of the Financial Reporting Date, of:  (i) line item disbursements of Total Administration Costs; (ii) balance statements; and (iii) 3-year projected annual budgets of disbursements on account of Trust Administration Costs;

3.3.1.4     For the Indian Tribe Trust Account and all subaccounts, including, but not limited to the Tribal Administration Cost Subaccount, balance statements and one-year projected annual budgets that itemize all assets, income, earnings, expenditures, allocations, and disbursements of Trust Assets by Indian Tribe Trust Account and each subaccount;

3.3.1.5     (1) financial statements for the semi-annual period ending June 30 of each year, accompanied by a review report thereon from an independent certified public accounting firm; (2) financial statements for the annual period ending December 31 of each year, accompanied by an audit opinion thereon from an independent certified public accounting firm;  (3) all semi-annual and annual period's financial statements shall include disclosure of the disposition of Trust Assets from the previous year end date through the calendar quarter immediately preceding the Financial Reporting Date, and a supplemental schedule presenting a reconciliation of the Trustee's prior budget projections for Trust Administration Costs to actual performance for that period; and (4) the independent certified public accounting firm shall perform its review of the semi-annual financial statements and its audit of the annual financial statements in accordance with auditing standards generally accepted in the United States (i.e., audit standards issued by the Association of International Certified Professional Accountants ("AICPA")).

3.3.1.6     A description of any previously unreported action taken by the Indian Tribe Trust in performance of its duties which, as determined by the Trustee, counsel, accountants, or other professionals retained by the Trustee, affects the Indian Tribe Trust in a materially adverse way;

3.3.1.7     A brief description of all actions taken in accordance with this Indian Tribe Trust Agreement and the Consent Decree during the previous year; and

3.3.1.8     On each Financial Reporting Date, the Trustee shall simultaneously publish on the Indian Tribe Trust's public-facing website all information required to be provided under Paragraph 3.3.

3.3.1.9     Notwithstanding anything to the contrary in Paragraph 3.3 or any subparagraph thereof, following the Trust Modification Effective Date, the Trust's last semi-annual independent review shall be for the period ended June 30, 2023, and the last annual independent audit shall be for the year ended December 31, 2022.  Consistent with subparagraph 3.1.2.6, the Trust shall have an annual independent review for the year ending December 31, 2023, performed in accordance with Statements on Standards for Accounting

and Review Services promulgated by the Accounting and Review Services Committee of the AICPA.  The Trustee is hereby authorized to instruct the accountant to prepare any reports or documentation necessary to obtain the final tax clearances from the IRS and the States of Delaware and California and necessary to file the Certificate of Termination with the State of Delaware.

3.3.1.9    Notwithstanding anything to the contrary within Paragraph 3.3.1 or any subparagraph thereof, the final report due in connection with termination of the Indian Tribe Trust under Paragraph 6.8 is not required to be audited and does not require an audit opinion from an independent certified public accounting firm.  Instead, that final financial report must follow the requirements of 3.3.1.5(1), (3) and (4), irrespective of whether it relates to the period ending June 30 or the period ending December 31.  For the avoidance of doubt, the Trustee may complete its final reporting obligations before such semi-annual or annual deadline if it is able to do so as part of the orderly process of terminating the Indian Tribe Trust, and in any event at least 30 Days prior to filing a motion to terminate under Paragraph 6.8.

3.3.2    After the Termination Date, the Trustee intends to destroy all records retained pursuant to this Indian Tribe Trust Agreement, except as otherwise required by law.  The Trustee shall notify the United States and the Defendants at least 3090 Days prior to the destruction of the records.  Upon request by the United States or the Defendants, the Trustee shall deliver electronic copies of any such records to the United StatesEPA or the Defendants, respectively, in accordance with Paragraph 6.0.1 or as otherwise directed in writing by that party.

3.3.3    Final Report.  No later than 15 Days following the Final Disbursement of Trust Assets under subparagraph 5.4.5, the Trustee shall submit a report to the United States summarizing its activities and Trust transactions since December 31, 2023.  This report shall contain: (a) a brief description of all actions taken in accordance with this Indian Tribe Trust Agreement during the reporting period; (b) a statement of the aggregate Trust funds returned to the Trustee by Designated Beneficiaries, (c) a statement of the aggregate Trust funds returned to the Trust by third party providers, the technical assistance provider, and the Trustee; (d) a statement of the aggregate Trust funds used to pay taxes and insurance premiums following the Trust Modification Effective Date; (e) the aggregate amount of funds paid to the National Park Service and Forest Service;  and (f) a brief description of the actions remaining to be taken by the Trustee in accordance with this Trust Agreement.  The Trustee shall simultaneously publish this report on the Indian Tribe Trust's public-facing website.

**3.4    Limitation of the Trustee's Authority:**  The Trustee is not authorized to engage in any trade or business with respect to the Trust Assets or proceeds therefrom.  This provision does not prevent Wilmington Trust, N.A. from acting as the Investment Manager.

**3.5    Conditions of Trustee's Obligations:**  The Trustee accepts appointment as the Trustee subject to the following express terms and conditions:

3.5.1 <u>No Bond</u>. Notwithstanding any state or tribal law to the contrary, the Trustee, including any successor Trustee, shall be exempt from giving any bond or other security in any jurisdiction.

3.5.2 <u>Limitation of Liability and Standard of Care for the Trustee</u>. In no event shall the Trustee be held personally liable for any and all Claims asserted against the Trustee and/or the Indian Tribe Mitigation Trust except for actions or omissions of the Trustee that are determined in a final, non-appealable judgment of the Court to be fraudulent, negligent, or willful misconduct by the Trustee. The Trustee shall not be held personally liable for carrying out the express terms of this Indian Tribe Mitigation Trust or carrying out any directions from the Beneficiaries or the United States issued in accordance with this Indian Tribe Trust Agreement or in accordance with any Court Order entered in connection with or arising out of the Indian Tribe Mitigation Trust. The Trustee shall not be held personally liable for any failure or delay in the performance of its obligations hereunder arising from causes beyond the control of the Trustee ("Force Majeure"). The Trustee may consult with legal counsel, accounting and financial professionals, environmental professionals, and other professionals, and shall not be personally liable for any action taken or omission made by it in accordance with advice given by such professionals, except in the case of a final, non-appealable judgment of the Court determining fraud, negligence, or willful misconduct on the part of the Trustee in following such advice. The Trustee shall not be held liable for the negligence, fraud, or willful misconduct of any professional hired by it hereunder provided that the Trustee appointed and engaged the professional with due care. In the absence of willful misconduct, negligence, or fraud by the Trustee, as determined by a final, non-appealable judgment of the Court, the Trustee shall not be personally liable to persons seeking payment from or asserting any and all Claims against the Indian Tribe Mitigation Trust or the Trustee. The Trustee, which is a trustee of this Indian Tribe Trust that has been established under the Delaware Act, shall only be held to the standards of care set forth in this subparagraph 3.5.2; the standards of common law trust laws or the personal trust laws of any state shall not apply in any circumstances hereunder.

3.5.2.1 <u>Limitation of Liability for Tax Professionals</u>. In no event shall the Tax Professionals engaged by the Trustee to assist it with the administration of the Indian Tribe Mitigation Trust be held personally liable for any and all Claims asserted against them except for actions or omissions of the Tax Professionals that are determined in a final, non-appealable judgment of the Court to be fraudulent, negligent, or willful misconduct by the Tax Professionals.

3.5.3 <u>Indemnification</u>. Except for actions or omissions of the Trustee, the Investment Manager, and the Tax Professionals that are determined in a final, non-appealable judgment of the Court to be fraudulent, negligent, or willful misconduct, in each separate case, by the Trustee, the Investment Manager, or the Tax Professionals, each of the Trustee, the Investment Manager, and the Tax Professionals hired hereunder are entitled to indemnification from the Trust Assets, solely as provided in this subparagraph 3.5.3, to hold them harmless against any and all Claims brought against any of them arising out of or in connection with the acceptance or administration of their duties under this Indian Tribe Mitigation Trust, including any and all Claims in connection with enforcing their rights hereunder and defending themselves against any and all Claims. In asserting any

indemnification claim against Trust Assets pursuant to this subparagraph 3.5.3, the Trustee, the Investment Manager, and the Tax Professionals shall first seek to recover the amount by asserting a claim against the Trustee's insurance policies purchased pursuant to subparagraph 3.1.2.8 to protect the Trustee, the Investment Manager, and the Tax Professionals hired hereunder against any and all Claims.  With respect to any and all amounts that:  (1) are not fully and timely paid to the Trustee, the Investment Manager, or the Tax Professionals pursuant to the insurance policies purchased pursuant to subparagraph 3.1.2.8, and (2) are not determined in a final, non-appealable judgment of the Court to be fraudulent, negligent, or willful misconduct, in each separate case, by the Trustee or the Investment Manager or the Tax Professionals, each of the Trustee, the Investment Manager, and the Tax Professionals hired hereunder are entitled to indemnification solely from the portion of Trust Assets in (a) the Tribal Administration Cost Subaccount established pursuant to subparagraph 2.1.3.2; and (b) the investment earnings on the Tribal Administration Cost Subaccount.  Indemnification under this subparagraph 3.5.3 covers only the amounts not fully and timely paid or covered by insurance policies purchased pursuant to subparagraph 3.1.2.8.  The Trustee, the Investment Manager, and the Tax Professionals shall reimburse the Indian Tribe Mitigation Trust for any amount advanced to them or paid from the Tribal Administration Cost Subaccount for any Claim if any proceeds are paid on such Claim from insurance policies purchased pursuant to subparagraph 3.1.2.8.  If insurance payments are denied in whole or part, the Trustee shall confer with legal counsel and consider whether to affirmatively pursue such insurance payments including, without limitation, an insurance coverage suit arising out of a wrongful denial of coverage.  For the avoidance of doubt, subparagraphs 3.5.2, 3.5.2.1, and 3.5.3 do not create for the Indian Tribe Mitigation Trust, the Trustee, the Investment Manager, and the Tax Professionals hired hereunder any express or implied right to indemnification from any Consent Decree Party for any and all Claims asserted against the Trustee, the Indian Tribe Mitigation Trust, the Investment Manager, or the Tax Professionals, and no Consent Decree Party shall be liable for any and all Claims asserted against the Trustee, the Indian Tribe Mitigation Trust, the Investment Manager, or Tax Professionals.

     3.5.4     <u>Reliance on Documentation</u>.  The Trustee may rely on, and shall be protected in acting upon, any notice, requisition, request, consent, certificate, order, affidavit, letter, or other paper or document reasonably believed by it to be genuine and to have been signed or sent by the proper person or persons.  The Trustee may rely upon, with no further duty of inquiry, and shall be protected in acting upon, the certifications made by and delivered to it by the Beneficiaries, including the Beneficiary Status Certification Form (Appendix D-3) the EMA Certification Form (Appendix D-4), the Designated Beneficiary's Participation Notice (Appendix D-6), ~~and~~ the Beneficiary's Election to Opt Out Form (Appendix D-7)<u>), the Beneficiary's Election to Opt Out of Final Distribution (Appendix D-7A), and the Beneficiary's Certification of Participation in Final Distribution (Appendix D-9)</u>.  The Trustee shall have no duty to monitor or supervise the use of Trust Funds paid in accordance with Beneficiary Eligible Mitigation Action Certification and Funding Direction forms or any Beneficiary's compliance with an Eligible Mitigation Action<u>, or any Designated Beneficiary's use or return of Final Distribution funds</u>.~~.~~  The Trustee may rely upon, with no further duty of inquiry, and shall be protected in acting upon, the certifications made by and delivered to it by the technical assistance provider, including, without limitation, the technical assistance provider's report relating to EMA Certification Forms (Appendix D-4) that it has reviewed in each funding cycle pursuant to subparagraph 2.1.1.2, its annual

budget pursuant to subparagraph 2.1.1.3, and its report relating to its services and expenditures pursuant to subparagraph 2.1.1.5.

3.5.5    Right to Demand Documentation.  Notwithstanding anything else in this Indian Tribe Trust Agreement, in the administration of the Trust Assets, the Trustee shall have the right, but shall not be required, to demand from the relevant Beneficiary or the technical assistance provider before the disbursement of any cash or in respect of any action whatsoever within the purview of this Indian Tribe Mitigation Trust, any showings, certificates, opinions, appraisals, or other information, or action or evidence thereof, in addition to that required by the terms hereof that the Trustee reasonably believes to be necessary or desirable.

3.5.6    Limitation on Consequential Damages.  Unless the Trustee, the Investment Manager, or the Tax Professionals are determined in a final, non-appealable judgment of the Court to have engaged in fraudulent or willful misconduct, the United States or any Beneficiary of the Indian Tribe Mitigation Trust shall not have any right to recover, and the Indian Tribe Mitigation Trust, the Trustee, the Investment Manager, or the Tax Professionals shall not be liable for, any special, indirect, punitive, or consequential loss or damages, of any kind whatsoever, against the Indian Tribe Mitigation Trust, the Trustee, the Investment Manager, or the Tax Professionals.  When the Trustee, the Investment Manager, or the Tax Professionals are determined in a final, non-appealable judgment of the Court to have been negligent, any and all Claims by the United States or any Beneficiary of the Indian Tribe Mitigation Trust shall be limited to direct damages.

3.5.7    No Consequential Damages.  In no event shall the Trustee, the Investment Manager, the Tax Professionals, or the Indian Tribe Mitigation Trust be held responsible or liable for special, indirect, punitive, or consequential loss or damages of any kind whatsoever in connection with any and all Claims brought against them by any third party.

**3.6    Payment of Trust Administration Costs:**  Subject to the limits set forth in Appendix D-1 (Initial Allocation) and Appendix D-1A (Initial 3.0 Liter Allocation), the Indian Tribe Mitigation Trust shall pay from the Tribal Administration Cost Subaccount its own reasonable and necessary costs and expenses, and shall reimburse the Trustee for the actual reasonable out-of-pocket fees, costs, and expenses to the extent incurred by the Trustee in connection with the administration of the Indian Tribe Trust, including payment of professionals hired in connection with the duties and responsibilities of the Indian Tribe Trust, payment of insurance premiums for policies purchased pursuant to subparagraph 3.1.2.8, payment of a deductible incurred under an insurance policy for the Indian Tribe Trust, Trustee, Investment Manager, or Tax Professionals hired hereunder purchased pursuant to subparagraph 3.1.2.8 in cases in which the Indian Tribe Trust, Trustee, Investment Manager, or Tax Professionals would be entitled to indemnification under subparagraph 3.5.3, any indemnification amounts as provided in accordance with subparagraph 3.5.3, and its commercially reasonable fees, costs, and expenses in connection with any modification of this Indian Tribe Trust Agreement.  The Trustee also shall be entitled to receive reasonable compensation for services rendered on behalf of the Indian Tribe Mitigation Trust, in accordance with the projected annual budgets for administration of the Indian Tribe Mitigation Trust required under subparagraph 3.3.1 hereof, and shall be entitled to pay itself from the Tribal Administration Cost Subaccount its initial fee and its annual administration fee as set forth in its fee letter dated as of the Trust Effective Date ("Trustee Fee Letter").  The Trustee shall provide a copy

of the Trustee Fee Letter to each Beneficiary via the secure internet site established by the Trustee pursuant to subparagraph 3.1.2.3.  Consistent with the weighted average allocation rates set forth in Appendix D-1B (Weighted Average Allocation Formula for 2.0 and 3.0 Liter Allocation), the Indian Tribe Mitigation Trust shall pay from the Tribal Administration Cost Subaccount 2% of Start-up Costs and 2% of Shared State and Indian Tribe Administration Costs.  Notwithstanding the foregoing, the total amount of allowable Trust Administration Costs shall not exceed the specific allocation established for the Tribal Administration Cost Subaccount in Appendix D-1 (Initial Allocation) and Appendix D-1A (Initial 3.0 Liter Allocation), plus any and all earnings, interest, and other investment income realized on the investment of the assets held in the Tribal Administration Cost Subaccount.  The Trustee shall not use the Tribal Administration Cost Subaccount to pay:  (1) the fees and expenses of the Investment Manager; or (2) any and all Taxes due and owing with respect to the Indian Tribe Trust.  In accordance with the terms of the Investment Management Agreement, the Investment Manager's fees and expenses shall be deducted directly from the investment earnings on the Trust Assets, and not from the corpus of the Trust Assets.  All Taxes shall be paid from amounts on deposit in the Tax Payment Subaccount established in subparagraph 2.1.5.  The Trustee shall include in its semiannual reporting, and post on its public-facing website, all Trust Administration Costs (including the costs and descriptions of the Trustee's services rendered on behalf of the Indian Tribe Trust) at least 15 Days prior to the payment of any such expense; provided, however, that the requirement to post all Trust Administrative Costs at least 15 Days prior to payment shall first take effect when the website is established and ready for use, and shall not initially apply to Start-up Costs and to Shared State and Indian Tribe Administration Costs.  Following the Trust Modification Effective Date, the Trustee is hereby authorized to pay all of its actual and anticipated Trust Administration Termination Costs through the Termination Date.  In addition, any and all payments relating to Taxes are not subject to the 15-Day posting requirement on the public-facing website.  After the Tribal Administration Cost Subaccount is funded pursuant to subparagraph 2.1.3.2, the Trustee, after receipt of invoices from any third-party service providers, shall pay as promptly as practical any and all fees, costs, and expenses incurred by the Trustee to establish the Indian Tribe Mitigation Trust including, but not limited to:  (1) the invoices of third-party service providers (e.g., legal, accounting, website developer, and hosting provider); (2) fees, costs, and expenses necessary to commence the operations of the Indian Tribe Trust (e.g., Intralinks, Pacer, and insurance premiums); and (3) the Trustee's acceptance fee and first quarter portion of the Trustee's annual fee for the first year.  All Trust Administration Costs that are paid prior to the establishment of the website shall be posted on the website as promptly as practicable after the website is established.  Such information shall remain available on the website until the Termination Date.  This 15-Day posting requirement also does not apply to the payment of Trust Administration Termination Costs.  Instead, the Trustee will post the Trust Administration Termination Costs on the public facing website as promptly as practicable following their payment.

### 3.7     Termination, Resignation, and Removal of the Trustee

3.7.1     Termination of Trustee.  The rights, powers, duties, and obligations of the Trustee to the Indian Tribe Mitigation Trust and the Beneficiaries will terminate on the Termination Date.

3.7.2     Resignation of Trustee and Successor Trustee.  The Trustee may commence the resignation process at any time by providing 90 Days' notice to the United States, the Defendants, and the Beneficiaries.  Resignation of the Trustee shall only be effective upon:

(i) selection of a successor pursuant to the procedures set forth in the First Partial Consent Decree; and (ii) order of the Court.  The successor trustee shall have the same powers and duties as those conferred upon the Trustee hereunder.  Upon the appointment of a successor trustee or as otherwise ordered by the Court, the Trustee shall transfer all Indian Tribe Trust records to the successor trustee, and shall take all actions necessary to assign, transfer, and pay over to the successor trustee control of all Trust Assets (including the public website maintained by the Trustee).  In the event that the Trustee ceases to exist or ceases to operate its corporate trust business, the Court may, upon motion by the United States or any Beneficiary, appoint an interim Trustee until such time as a successor trustee is appointed in accordance with the procedures set forth in the First Partial Consent Decree.  Any successor Trustee appointed hereunder shall file an amendment to the Certificate of Trust as required by the Delaware Act.

## IV.   INDIAN TRIBE MITIGATION TRUST BENEFICIARIES

**4.0    Determination of Beneficiary Status:**  Each Indian Tribe may elect to become a Beneficiary hereunder by filing with the Court a Beneficiary Status Certification Form (Appendix D-3), containing each of the certifications required by subparagraphs 4.2.1 through 4.2.9.  For the first funding cycle, an Indian Tribe was required to file its Beneficiary Status Certification Form (Appendix D-3) at the time it filed its first funding request, including any request seeking DERA funds, which was due 90 Days after the Trust Effective Date.  In order to qualify as a designated Beneficiary for funding cycles after the first funding cycle, any Indian Tribe, which has not yet been designated as a Beneficiary by the Trustee, shall file a Beneficiary Status Certification Form (Appendix D-3) with the Court by the following deadlines:  for the second funding cycle -- by March 18, 2019; for the third funding cycle -- by March 16, 2020; for the fourth and any subsequent funding cycle -- by March 16, 2021.  At the time of filing the Beneficiary Status Certification Form (Appendix D-3) with the Court, each Indian Tribe shall also, by the same deadlines, concurrently deliver a copy of the Beneficiary Status Certification Form (Appendix D-3) to the Trustee in electronic format and by mail pursuant to Paragraph 6.0 and subparagraph 6.0.1.  Each Indian Tribe that timely files such certifications shall be a "Certifying Entity."  The Trustee shall be responsible for ensuring that the form of each certification complies with the requirements hereof prior to deeming any Certifying Entity to be a Beneficiary pursuant to subparagraphs 4.0.2 and 5.0.5.1.  No Indian Tribe may file a Beneficiary Status Certification Form after March 16, 2021.  Only the Designated Beneficiaries may participate in the Final Distribution of Trust Assets to Designated Beneficiaries.

4.0.1    Notice of Objection.  If the United States determines that a Beneficiary Status Certification Form (Appendix D-3) filed by any Certifying Entity fails to comply with the requirements of this Section, the United States may file with the Court a notice of objection within 30 Days after the deadline for each funding cycle set in Paragraph 4.0 for a Certifying Entity to file its Beneficiary Status Certification Form (Appendix D-3) with the Court.  Such notice shall explain the basis of objection with specificity.  Any such objections shall be resolved according to the procedures set forth in Paragraph 6.2.

4.0.2    Notice of Beneficiary Designation.  Regarding the determination of Beneficiary status for Indian Tribes pursuant to subparagraphs 5.0.5 and 5.0.5.1, the Trustee shall file with the Court, publish on its public-facing website, and serve on each Consent Decree Party and Certifying Entity a Notice of Beneficiary Designation according to the

following schedule:  for the first funding cycle -- not later than 120 Days after the Trust Effective Date; for the second funding cycle -- by May 17, 2019; for the third funding cycle -- by May 15, 2020; for the fourth funding cycle and any subsequent funding cycle -- by May 17, 2021.  The Trustee's Notice of Beneficiary Designation shall indicate:

> 4.0.2.1    Which Certifying Entities filed certifications as to which no notice of objection has been filed.  Upon the filing of this Notice of Beneficiary Designation, each such Certifying Entity shall be deemed a "Beneficiary" hereunder; and

> 4.0.2.2    Intentionally Reserved.

> 4.0.2.3    Which Certifying Entities timely filed certifications as to which a notice of objection has been filed pursuant to subparagraph 4.0.1, together with an explanation of the status of any such objection.  Each such Certifying Entity shall be a "Pending Beneficiary."  Upon final resolution of each objection, the Pending Beneficiary shall either be deemed a Beneficiary or not qualified as a Beneficiary under this Indian Tribe Trust Agreement.

> 4.0.2.4    Once a Certifying Entity has been deemed a Beneficiary hereunder, it remains a Beneficiary for all future funding cycles, and may apply for Eligible Mitigation Action funding by submitting a Designated Beneficiary's Participation Notice (Appendix D-6) and an EMA Certification Form (Appendix D-4) by the deadline for each respective funding cycle as set forth in subparagraphs 5.0.5.3.3 and 5.0.5.3.5.

**4.1**    Intentionally Reserved.

**4.2    Required Certifications in Appendix D-3 Form**

4.2.1    <u>Identification of Lead Agency and Submission to Jurisdiction</u>.  Each Beneficiary Status Certification Form (Appendix D-3) must include a designation of lead agency, certified by the Office of the Governor (or the analogous chief executive) of the Indian Tribe on whose behalf the Beneficiary Status Certification Form is submitted, indicating which agency, department, office, or division will have the delegated authority to act on behalf of and legally bind such Indian Tribe.  The Beneficiary Status Certification Form shall also include confirmation by the Certifying Entity that:  (i) it has the authority to sign the Beneficiary Status Certification Form; and (ii) it agrees, without limitation, to be bound by the terms of this Indian Tribe Trust Agreement, including the allocations of Trust Assets provided hereunder, and to be subject to the jurisdiction of the Court for all matters concerning the interpretation or performance of, or any disputes arising under, this Indian Tribe Trust Agreement.  The Certifying Entity's agreement to federal jurisdiction for this purpose shall not be construed as consent to federal court jurisdiction for any other purpose.

4.2.2    <u>Consent to Trustee Authority</u>.  Each Beneficiary Status Certification Form (Appendix D-3) must include an agreement by the Certifying Entity that the Trustee has the authorities specified in this Indian Tribe Trust Agreement, including, but not limited to, the authority:  (i) to approve, deny, request modifications, or request further information related

to any request for funds hereunder; and (ii) to implement this Indian Tribe Trust Agreement in accordance with its terms.

4.2.3     Certification of Legal Authority.  Each Beneficiary Status Certification Form (Appendix D-3) must certify that:  (i) the laws of the Certifying Entity do not prohibit it from being a Beneficiary hereunder; and (ii) prior to requesting any funds hereunder, the Certifying Entity has obtained full legal authority to receive and/or direct payments of such funds.  If the Certifying Entity fails to demonstrate that it has obtained such legal authority, it shall not qualify as a Beneficiary pursuant to subparagraphs 4.0.2.1 and 5.0.5.1 until it has obtained such legal authority.

4.2.4     Certification of Legal Compliance.  Each Beneficiary Status Certification Form (Appendix D-3) must include a certification and agreement that, in connection with all actions related to this Indian Tribe Trust, the Certifying Entity has followed and will follow all applicable law and that such Certifying Entity will assume full responsibility for its decisions in that regard.

4.2.5     Certification of Eligible Mitigation Action Accounts.  Each Beneficiary Status Certification Form (Appendix D-3) shall include a certification by the Certifying Entity that all funds received on account of any Eligible Mitigation Action request that are not used for the Eligible Mitigation Action shall be returned to the Trustee for credit to the Tribal Allocation Subaccount.

4.2.6     Waiver of Claims for Injunctive Relief under Environmental or Common Laws.  Each Beneficiary Status Certification Form (Appendix D-3) shall include an express waiver by the Certifying Entity, on behalf of itself and all of its agencies, departments, offices, and divisions, in favor of the parties to the Consent Decree (including the Defendants) of all claims for injunctive relief to redress environmental injury caused by the Subject Vehicles, whether based on the environmental or common law within its jurisdiction.  Such waiver shall be binding on all agencies, departments, offices, and divisions of such Beneficiary asserting, purporting to assert, or capable of asserting such claims.  The waiver need not waive, and the Certifying Entities may expressly reserve, their rights, if any, to seek fines or penalties.  No waiver submitted by any Indian Tribe shall be effective unless and until such Indian Tribe actually receives Trust Funds.

4.2.7     Publicly Available Information.  Each Beneficiary Status Certification Form (Appendix D-3) must include a certification by the Certifying Entity that it will maintain and make publicly available all documentation and records:  (i) submitted by it in support of each Eligible Mitigation Action funding request; and (ii) supporting all expenditures related to Eligible Mitigation Actions~~of Trust Funds~~ by the Certifying Entity, each until the Termination Date, unless the laws of the Certifying Entity require a longer record retention period.  This certification shall include an explanation of the procedures by which the records may be accessed.  These procedures shall be designed to support access and limit the burden for the general public.  This certification can be made subject to applicable laws governing the publication of confidential business information and personally identifiable information.

4.2.8      Notice of Availability of Mitigation Action Funds.  Each Beneficiary Status Certification Form (Appendix D-3) must certify that, not later than 30 Days after being deemed a Beneficiary pursuant to subparagraph 4.0.2.1 hereof, the Certifying Entity will provide a copy of this Indian Tribe Trust Agreement with Appendices to the U.S. Department of the Interior, the U.S. Department of Agriculture, and any other Federal Agency that has custody, control, or management of land within or contiguous to the territorial boundaries of the Certifying Entity and has by then notified the Certifying Entity of its interest hereunder, explaining that the Certifying Entity may request Eligible Mitigation Action funds for use on lands within that Federal Agency's custody, control, or management (including, but not limited to, Clean Air Act Class I and II areas), and setting forth the procedures by which the Certifying Entity will review, consider, and make a written determination upon each such request.  For the U.S. Department of the Interior and the U.S. Department of Agriculture, Beneficiaries may provide notice as required by this subparagraph to the following:

Department of the Interior:

National Park Service, Air Resources Division
VW Settlement
P.O. Box 25287
Denver, CO  80225-0287
Or via email to:  vwsettlement@nps.gov.

Tim Allen or other designated representative
U.S Fish and Wildlife Service
National Wildlife Refuge System
Branch of Air Quality
Re:  VW Settlement
7333 W. Jefferson Ave., Suite 375
Lakewood, CO  80235-2017
Or via email to:  VW_Settlement@fws.gov

Department of Agriculture:

Linda Geiser or other designated representative
National Air Program Manager
lgeiser@fs.fed.us
(202) 756-0068

Bret Anderson or other designated representative
National Air Modeling Coordinator
baanderson02@fs.fed.us
(970) 295-5981

4.2.9      Registration of Subject Vehicles.  Each Beneficiary Status Certification Form (Appendix D-3) must state, for the benefit of the parties to the Consent Decree (including the Defendants) and the owners from time-to-time of Subject Vehicles, that the Certifying Entity:

(a)   Shall not deny registration to any Subject Vehicle based solely on:

    i.   The presence of a defeat device or AECD covered by the resolution of claims in the Consent Decree; or

    ii.   Emissions resulting from such a defeat device or AECD; or

    iii.   The availability of an Approved Emissions Modification, an Emissions Compliant Recall, or the Buyback, Lease Termination, and Owner/Lessee Payment Program.

(b)   Shall not deny registration to any Subject Vehicle that has been modified in accordance with an Approved Emissions Modification or Emissions Compliant Recall based solely on:

    i.   The fact that the vehicle has been modified in accordance with the Approved Emissions Modification or the Emissions Compliant Recall; or

    ii.   Emissions resulting from the modification (including, but not limited to, the anticipated emissions described in Appendix B to the First Partial Consent Decree and Appendix B to the Second Partial Consent Decree); or

    iii.   Other emissions-related vehicle characteristics that result from the modification; or

    iv.   The availability of an Approved Emissions Modification, an Emissions Compliant Recall, or the Buyback, Lease Termination, and Owner/Lessee Payment Program.

(c)   May identify Subject Vehicles as having been modified, or not modified, in accordance with the Approved Emissions Modification or the Emissions Compliant Recall on the basis of VIN-specific information provided to the Certifying Entity by the Defendants.

(d)   Notwithstanding the foregoing, a Certifying Entity may deny registration to any Subject Vehicle on the basis that the Subject Vehicle fails to meet EPA's or the Certifying Entity's failure criteria for the onboard diagnostic ("OBD") inspection; or on other grounds authorized or required under applicable federal regulations (including an approved State Implementation Plan) or under Section 209 or 177 of the Clean Air Act, 42 U.S.C. §§ 7543, 7507, and not explicitly excluded in subparagraphs 4.2.9(a)-(b).

## V.   ALLOCATION OF INDIAN TRIBE MITIGATION TRUST ASSETS

**5.0**    Intentionally Reserved.

    5.0.1    Intentionally Reserved.

5.0.2        Intentionally Reserved.

5.0.3        Allocation of Appendix A Mitigation Trust Payments.  Any "National Mitigation Trust Payment" made pursuant to Section VI (Recall Rate) of Appendix A (Buyback, Lease Termination, and Vehicle Modification Recall Program) of the First Partial Consent Decree or Section X (Recall Rate) of Appendix A (Buyback, Lease Termination, Vehicle Modification, and Emissions Compliant Recall Program) of the Second Partial Consent Decree shall be allocated in accordance with Appendix D-1B (Weighted Average Allocation Formula for 2.0 and 3.0 Liter Allocation) as follows:  1.86% to the Tribal Allocation Subaccount and 0.17% to the Tribal Administration Cost Subaccount. If Defendants make a Mitigation Trust Payment following the Trustee's application of the allocation method for the Final Distribution of Trust Assets to Designated Beneficiaries pursuant to subparagraph 5.0.5.5 but prior to the Final Disposition of Trust Assets pursuant to subparagraph 5.4.5, the Trustee shall deposit the amount allocated to the Indian Tribe Trust in the Final Disposition Account.  If Defendants make a Mitigation Trust Payment after the Final Disposition of Trust Assets, 100% of such payments will be allocated to the State Mitigation Trust.

5.0.4        Allocation of Appendix B Mitigation Trust Payments.  Any Mitigation Trust Payments made pursuant to Appendix B (Vehicle Recall and Emissions Modification Program) of the First Partial Consent Decree or Appendix B (Vehicle Recall and Emissions Modification Program for 3.0 Liter Subject Vehicles) of the Second Partial Consent Decree or any Consent Decree provisions related thereto shall be allocated in accordance with Appendix D-1B (Weighted Average Allocation Formula for 2.0 and 3.0 Liter Allocation) as follows:  1.86% to the Tribal Allocation Subaccount and 0.17% to the Tribal Administration Cost Subaccount.  If Defendants make a Mitigation Trust Payment following the Trustee's application of the allocation method for the Final Distribution of Trust Assets to Designated Beneficiaries pursuant to subparagraph 5.0.5.5 but prior to the Final Disposition of Trust Assets pursuant to subparagraph 5.4.5, the Trustee shall deposit the amount allocated to the Indian Tribe Trust in the Final Disposition Account.  If Defendants make a Mitigation Trust Payment after the Final Disposition of Trust Assets, 100% of such payments will be allocated to the State Mitigation Trust.

5.0.5        Allocation of Tribal Allocation Subaccount.

5.0.5.1        Trustee's Notices.  The Trustee shall post a notice on the Indian Tribe Mitigation Trust's public-facing website according to the following schedule:

(a) First Funding Cycle.  Within 30 Days after the Trust Effective Date, the Trustee was required to post notice:  (i) that each Indian Tribe may seek to become a Beneficiary hereunder by filing with the Court, at the time it submits its first funding request, a Beneficiary Status Certification Form (Appendix D-3) consistent with Paragraph 4.2; (ii) that each Indian Tribe may submit to the Trustee an EMA Certification Form (Appendix D-4) that meet the requirements of subparagraphs 5.2.2 through 5.2.13, as applicable, by 90 Days after the Trust Effective Date; and (iii) stating the date by which the Trustee will determine and post notice of the Beneficiary status of each

certifying Indian Tribe, which determination shall be made in a manner consistent with the procedures set forth in subparagraphs 4.0.2, 4.0.2.1, and 4.0.2.3.  In accordance with this schedule, the Trustee filed a Notice of Beneficiary Designation with the Court on January 29, 2018, which designated 29 Indian Tribes as Beneficiaries pursuant to the terms of the Indian Tribe Trust Agreement.  The Notice of Beneficiary Designation stated that two Tribes of the 29 designated Beneficiaries did not file a Beneficiary Status Certification Form (Appendix D-3) and an EMA Certification Form (Appendix D-4) by the deadline for the first funding cycle, and are not eligible to participate in the first funding cycle.[1]  In addition, one Tribe of the 29 designated Beneficiaries applied for the DERA Option described in Appendix D-2 (Eligible Mitigation Actions and Mitigation Action Expenditures), did not receive a DERA Award from EPA, and is not eligible to participate in the first funding cycle.[2]  As provided in subparagraph 4.0.2.4, once a Certifying Entity has been deemed a Beneficiary, it remains a Beneficiary for all future funding cycles and may apply for Eligible Mitigation Action funding by submitting a Designated Beneficiary's Participation Notice (Appendix D-6) and an EMA Certification Form (Appendix D-4) by the deadline for each respective funding cycle as set forth in subparagraphs 5.0.5.3.3 and 5.0.5.3.5.

(b)  Other Funding Cycles.  For funding cycles after the first funding cycle, the Trustee shall post a notice on the Indian Tribe Trust's public-facing website by January 15, 2019 (for the second funding cycle), January 15, 2020 (for the third funding cycle), and January 15, 2021 (for the fourth funding cycle and any subsequent funding cycles) stating that:  (i) each Indian Tribe, which has not yet been designated a Beneficiary by the Trustee, may seek to become a Beneficiary hereunder by filing with the Court a Beneficiary Status Certification Form (Appendix D-3) consistent with Paragraph 4.2 by the following deadlines:  for the second funding cycle -- March 18, 2019; for the third funding cycle -- March 16, 2020; and for the fourth funding cycle and any subsequent funding cycles -- March 16, 2021; and (ii) the Trustee will determine and post a Notice of Beneficiary Designation of each certifying Indian Tribe by the deadline set in subparagraph 4.0.2, which determination shall be made in a manner consistent with the procedures set forth in subparagraphs 4.0.2, 4.0.2.1, and 4.0.2.3.

5.0.5.2    Four Funding Cycles.  The assets in the Tribal Allocation Subaccount shall be committed to Beneficiaries over four funding cycles as follows: (i) no more than one-sixth of total remaining assets in the Tribal Allocation Subaccount may be committed during the first funding cycle; (ii) no more than one-third of total remaining assets in the Tribal Allocation Subaccount may be committed during the second funding cycle; (iii) no more than one-half of total remaining assets in the Tribal Allocation Subaccount may be committed during the third funding cycle; and (iv) the remaining assets in the

---

[1]  These two Tribes are the Southern Ute Indian Tribe and the Swinomish Indian Tribal Community.
[2]  This Tribe is the San Manuel Band of Mission Indians.

Tribal Allocation Subaccount may be committed during the fourth funding cycle.  In the event uncommitted funds remain in the Tribal Allocation Subaccount or the Tribal Administration Subaccount after all funding requests have been approved or rejected during the fourth funding cycle, such funds may be made available for a fifth funding cycle in accordance with the procedure in subparagraphs 5.0.5.3.4 through 5.0.5.3.5.  For purposes of this subparagraph 5.0.5.2, "remaining assets" shall mean the amount on deposit in the Tribal Allocation Subaccount on the following dates:  (i) December 31, 2017 for the first funding cycle; (ii) December 31, 2018 for the second funding cycle; (iii) December 31, 2019 for the third funding cycle; and (iv) December 31, 2020 for the fourth funding cycle; and "uncommitted funds" shall mean the amount on deposit in the Tribal Allocation Subaccount on December 31, 2021 for the fifth funding cycle (if it occurs).

5.0.5.3     In order to ensure an equitable allocation of funds in the Tribal Allocation Subaccount among Beneficiaries to fund Eligible Mitigation Actions to be proposed and administered by the Beneficiaries, the Trustee shall apply the allocation method set forth below in each funding cycle and for the Final Distribution of Trust Assets to Designated Beneficiaries.

   5.0.5.3.1   Group Division Based on 2010 United States Census Table PCT4.  The 2010 United States Census Table PCT4 shall provide the only population statistics used for the Indian Tribe Trust Agreement as provided herein, and was used to compile the Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas (Appendix D-8) ("Alignment Table").  For the avoidance of doubt, the population statistics in the Alignment Table shall not be updated or revised for the life of the Indian Tribe Trust Agreement.  Based on the 2010 United States Census Table PCT4 and application of a Jenks Grouping algorithm ranking population based on statistical analysis, the Indian Tribes have been divided into three Groups:  (1) Group One with a population range of 0 to 16,906; (2) Group Two with a population range of 16,907 to 47,649; and (3) Group Three with a population of 47,650 and above.  Group One consists of 558 Tribes, which represent 51.52 percent of the sum of the population estimates attributable to the 2010 U.S. geographic census areas, as reported on the 2010 United States Census Table PCT4, that align with the list of federally recognized Indian Tribes; Group Two consists of 6 Tribes, which represent 10.61 percent of the sum of the population estimates attributable to the 2010 U.S. geographic census areas, as reported on the 2010 United States Census Table PCT4, that align with the list of federally recognized Indian Tribes; and Group Three consists of 4 Tribes, which represent 37.87 percent of the sum of the population estimates attributable to the 2010 U.S. geographic census areas, as reported on the 2010 United States Census Table PCT4, that align with the list of federally recognized Indian Tribes.  This categorization, which is reflected in the Alignment Table (Appendix D-8), shall form the basis for part of the allocation (i.e., the pro rata population-based allocation) in each funding cycle.  These three Groups shall not be adjusted except as specifically set forth in the Alignment Table (Appendix D-8) with respect to

36

any new federally recognized Indian Tribes.  If any new Indian Tribe is recognized by the United States, in order to participate as a Beneficiary in the Indian Tribe Trust, that Indian Tribe shall file with the Court a Beneficiary Status Certification Form (Appendix D-3), and concurrently deliver to the Trustee a Beneficiary Status Certification Form (Appendix D-3) together with official documentation of such federal recognition as an Indian Tribe by the deadlines set forth in Paragraph 4.0 for the respective funding cycle.  For purposes of this Indian Tribe Trust, all new federally recognized Indian Tribes shall be deemed to be members of Group One with a zero population for all funding cycles.

5.0.5.3.2   First Funding Cycle.  Twenty-six Indian Tribes, which were designated as Beneficiaries and submitted an approvable funding request by the filing deadline for the first funding cycle, are eligible to participate in the first funding cycle.  Within 10 Business Days after the Trust Modification Effective Date, the Trustee shall implement the steps below for the first funding cycle:

Step 1:  Per Capita Allocation.  The Trustee shall allocate 50 percent of the available funding for the first funding cycle equally among the 26 Beneficiaries participating in the first funding cycle.

Step 2:  Pro Rata Population-based Allocation.  The Trustee shall allocate the other 50 percent of the available funding for the first funding cycle into three separate funding pools, allocating 51.52 percent to Group One, 10.61 percent to Group Two, and 37.87 percent to Group Three.  Within each of the three Groups (Group One, Group Two, and Group Three), the Trustee shall allocate an amount to each of the participating Beneficiaries based on the pro rata share of:  (i) the participating Beneficiary's population to (ii) the total population of all participating Beneficiaries within its Group, in accordance with the Alignment Table (Appendix D-8).

Step 3:  Funding Limit.  The Trustee shall limit the allocation of funding for a Beneficiary to no more than the amount that the Beneficiary requested in its original EMA Certification Form (Appendix D-4).  The Trustee shall reallocate any "overage" among the Beneficiaries in the first funding cycle that did not -- after application of Steps 1 and 2 -- receive the full amount of funding that the Beneficiary had requested in its original EMA Certification Form (Appendix D-4) (the "Remaining Beneficiaries").  This reallocation of the overage shall be based on each Remaining Beneficiary's pro rata share of the total Indian Tribe population of the Remaining Beneficiaries participating in the first funding cycle without regard to any alignment into Groups.[3]  The

---

[3]  For example, assume a Beneficiary requested funding of $200,000 for the first funding cycle, but application of Steps 1 and 2 would result in a projected allocation of $350,000 for that Beneficiary.

population for each Indian Tribe shall be determined in accordance with the population statistics in the 2010 United States Census Table PCT4 as set forth in the Alignment Table (Appendix D-8).

Step 4:  Notice.  Within ten Business Days after applying the allocation rules in Steps 1 through 3, the Trustee shall transmit notice to each of the 26 Beneficiaries via Intralinks regarding the Trustee's allocation determination of the amount of funding available for each Beneficiary.

Within 60 Days after the Trustee has delivered its allocation determination via Intralinks to each Beneficiary, each Beneficiary must either submit to the Trustee a revised EMA Certification Form (Appendix D-4) to implement Eligible Mitigation Actions with the amount allocated to that Beneficiary, or elect to opt out of the first funding cycle by submitting a Beneficiary's Election to Opt Out Form (Appendix D-7).  If a Beneficiary elects to opt out or fails to timely submit a revised EMA Certification Form (Appendix D-4), that Beneficiary has no right or entitlement to those funds; the amount allocated to it shall be returned to the Tribal Allocation Subaccount and shall be made available for allocation to Beneficiaries in the next and/or subsequent funding cycles, as determined pursuant to subparagraph 5.0.5.2. The Beneficiary's revised EMA Certification Form (Appendix D-4) is subject to the Trustee's approval under subparagraph 5.2.16.  Within five Business Days after the distribution of all funds to all of the participating Beneficiaries in the first funding cycle, the Trustee shall post the final allocation amounts for all participating Beneficiaries in the first funding cycle on the Indian Tribe Trust's public-facing website.

5.0.5.3.3   Second through Fourth Funding Cycles.  Within 5 Business Days after filing a Notice of Beneficiary Designation pursuant to subparagraph 4.0.2 for the second through fourth funding cycles, the Trustee shall publish on its public-facing website and provide a notice to each Beneficiary via Intralinks stating that any Beneficiary that would like to participate in the respective funding cycle shall submit to the Trustee a Designated Beneficiary's Participation Notice (Appendix D-6) by the following deadlines:  for the second funding cycle -- June 17, 2019; for the third funding cycle -- June 15, 2020; for the fourth funding cycle -- June 16, 2021.  Based on its receipt of timely-filed Designated Beneficiary's Participation Notices (Appendix D-6), the Trustee shall determine the number of participating Beneficiaries for each respective funding cycle, and shall implement the following steps:

Step 1:  Per Capita Allocation.  The Trustee shall allocate 50 percent of the available funding for the funding cycle equally among the Beneficiaries participating in the funding cycle.

The "overage" of $150,000 would be reallocated among the Remaining Beneficiaries based on each Remaining Beneficiary's pro rata share of the total Indian Tribe population of the Remaining Beneficiaries participating in the first funding cycle without regard to any alignment into Groups.

Step 2:  Pro Rata Population-based Allocation.  The Trustee shall allocate the other 50 percent of the available funding for the funding cycle into three separate funding pools, allocating 51.52 percent to Group One, 10.61 percent to Group Two, and 37.87 percent to Group Three.  Within each of the three Groups, the Trustee shall allocate an amount to each of the participating Beneficiaries based on the pro rata share of:  (i) the participating Beneficiary's population to (ii) the total population of all participating Beneficiaries within its Group, in accordance with the Alignment Table (Appendix D-8).

Step 3:  Procedures for Exception Variants.  The Alignment Table (Appendix D-8) discusses and describes five "Exception Variants" that apply to certain Indian Tribes, and establishes specific allocation rules for these situations.  For all Indian Tribe Beneficiaries associated with an Exception Variant that have submitted a timely-filed Designated Beneficiary's Participation Notice (Appendix D-6) in a given funding cycle, the Trustee shall follow the procedures set out in the Alignment Table (Appendix D-8) in allocating the amount of funding available for those Indian Tribe Beneficiaries.

Step 4:  Notice.  Within ten Business Days after the receipt of Designated Beneficiary's Participation Notices (Appendix D-6) that were timely filed by the deadline for each funding cycle, the Trustee shall apply the allocation rules in Steps 1, 2, and 3 in each funding cycle, and shall transmit notice to each of the participating Beneficiaries via Intralinks regarding the Trustee's allocation determination of the amount of funding available for each Beneficiary.

After the Trustee has delivered its allocation determination via Intralinks to each Beneficiary, each Beneficiary must either submit to the Trustee an EMA Certification Form (Appendix D-4) to implement Eligible Mitigation Actions with the amount allocated to that Beneficiary, or elect to opt out of the funding cycle by submitting a Beneficiary's Election to Opt Out Form (Appendix D-7) by the following deadlines:  August 30, 2019 (for the second funding cycle); August 28, 2020 (for the third funding cycle), and August 30, 2021 (for the fourth funding cycle).  If a Beneficiary elects to opt out or fails to timely submit an EMA Certification Form (Appendix D-4) by the deadline, that Beneficiary has no right or entitlement to those funds; the amount allocated to it shall be returned to the Tribal Allocation Subaccount and shall be made available for allocation to Beneficiaries in the next and/or subsequent funding cycles, as determined pursuant to subparagraph 5.0.5.2.  For funding requests that seek DERA funds, the DERA Notice of Intent to Participate or the DERA Project Narrative may be submitted to the Trustee for purposes of the funding request deadline.  The Beneficiary's EMA Certification Form (Appendix D-4) is subject to the Trustee's approval under subparagraph 5.2.16.  Within five Business Days after the distribution of all funds to all of the participating Beneficiaries in each funding cycle, the

Trustee shall post the final allocation amounts for all participating Beneficiaries in that funding cycle on the Indian Tribe Trust's public-facing website.

5.0.5.3.4    Trustee's Accounting.  By February 28, 2022, the Trustee shall file with the Court, deliver to the United States, by and through EPA, and to each Indian Tribe previously designated a Beneficiary hereunder, and publish on its public-facing website, an accounting of all Trust Assets in the Tribal Allocation Subaccount and Tribal Administration Cost Subaccount that have not by that date been expended on or obligated to approved Eligible Mitigation Actions or prior Trust Administration Costs, together with an estimate of funding reasonably needed to cover the remaining Trust Administration Costs for the Tribal Allocation Subaccount.  The difference between these two amounts shall be referred to as the "Tribal Subaccounts Remainder Balance."  After determining the Tribal Subaccounts Remainder Balance, the Trustee shall meet and confer with the United States.  If the United States and the Trustee determine that the Tribal Subaccounts Remainder Balance contains sufficient funds for a fifth funding cycle, the Trustee, by May 31, 2022, shall publish on its public-facing website and provide a notice to each Beneficiary via Intralinks that it will conduct a fifth funding cycle pursuant to subparagraph 5.0.5.3.5.  If the United States and the Trustee determine that the Tribal Subaccounts Remainder Balance appears to be insufficient to warrant a fifth funding cycle, the United States will seek an Order from the Court for further relief, which may include the authority for the Trustee to terminate the Indian Tribe Trust in accordance with the requirements of Paragraph 6.8.

5.0.5.3.5    Fifth Funding Cycle.  In accordance with the procedures set forth in subparagraph 5.0.5.3.4, the Trustee shall provide notice by May 31, 2022, to the Beneficiaries via Intralinks that the Tribal Subaccounts Remainder Balance is available for a fifth funding cycle.  If there are sufficient funds for the fifth funding cycle, by the deadline of June 28, 2022, any Indian Tribe that has been deemed a Beneficiary hereunder and would like to participate in the fifth funding cycle may submit to the Trustee a Designated Beneficiary's Participation Notice (Appendix D-6).  Based on its receipt of timely-filed Designated Beneficiary's Participation Notices, the Trustee shall determine the number of participating Beneficiaries for the fifth funding cycle, and shall implement the following steps:

Step 1:  Per Capita Allocation.  The Trustee shall allocate 50 percent of the available funding for the fifth funding cycle equally among the Beneficiaries participating in the funding cycle.

Step 2:  Pro Rata Population-based Allocation.  The Trustee shall allocate the other 50 percent of the available funding for the fifth funding cycle into three separate funding pools, allocating 51.52 percent to Group One, 10.61 percent to Group Two, and 37.87 percent to Group Three.  Within each of the three Groups, the Trustee shall allocate an amount to each of

the participating Beneficiaries based on the pro rata share of: (i) the participating Beneficiary's population to (ii) the total population of all participating Beneficiaries within its Group, in accordance with the Alignment Table (Appendix D-8).

Step 3: <u>Procedures for Exception Variants</u>.  The Alignment Table (Appendix D-8) discusses five Exception Variants that apply to certain Indian Tribes, and establishes specific allocation rules for these situations. For all Indian Tribe Beneficiaries associated with an Exception Variant that have submitted a timely-filed Designated Beneficiary's Participation Notice (Appendix D-6) in the fifth funding cycle, the Trustee shall follow the procedures set out in the Alignment Table (Appendix D-8) in allocating the amount of funding available for those Indian Tribe Beneficiaries.

Step 4: <u>Notice</u>.  Within fifteen Business Days after June 28, 2022, the Trustee shall apply the allocation rules in Steps 1, 2, and 3, and shall transmit notice to each of the participating Beneficiaries via Intralinks regarding the Trustee's allocation determination of the amount of funding available for each Beneficiary.

Within 60 Days after the Trustee has delivered its allocation determination via Intralinks to each Beneficiary, each Beneficiary must either submit to the Trustee an EMA Certification Form (Appendix D-4) to implement Eligible Mitigation Actions with the amount allocated to that Beneficiary, or elect to opt out of the funding cycle by submitting a Beneficiary's Election to Opt Out Form (Appendix D-7).  If a Beneficiary elects to opt out or fails to timely submit an EMA Certification Form (Appendix D-4) by the deadline, that Beneficiary has no right or entitlement to those funds; the amount allocated to it shall be returned to the Tribal Allocation Subaccount.  For funding requests that seek DERA funds, the DERA Notice of Intent to Participate or the DERA Project Narrative may be submitted to the Trustee for purposes of the funding request deadline.  The Beneficiary's EMA Certification Form (Appendix D-4) is subject to the Trustee's approval under subparagraph 5.2.16.  Within five Business Days after the distribution of all funds to all of the participating Beneficiaries in the fifth funding cycle, the Trustee shall post the final allocation amounts for all participating Beneficiaries in the fifth funding cycle on the Indian Tribe Trust's public-facing website.

5.0.5.4     Any Beneficiary may use any share of its allocation for Eligible Mitigation Projects on Indian Land or in areas that are not Indian Land.

5.0.5.5     Final Distribution to Designated Beneficiaries.  In accordance with the procedures set forth in subparagraph 5.0.5.3.4, the Trustee and the United States determined there were insufficient funds available as the Tribal Subaccounts Remainder Balance to hold a fifth funding cycle.  On June 1, 2022, the Trustee sent a notice of such determination to all Beneficiaries via Intralinks.  The Trustee shall make a Final Distribution of Trust Funds to

Designated Beneficiaries in accordance with the following subparagraphs.  If a Designated Beneficiary opts to receive its allocation of the Final Distribution, it may use those funds only to fund environmental mitigation projects that reduce emissions of NOx where the Subject Vehicles were, are, or will be operated.  These projects include: (a) projects listed in Appendix D-2; (b) Eligible Mitigation Actions that were approved by the Trustee in connection with the Fourth Funding Cycle but which the Beneficiary was unable to complete due to an unanticipated increase in costs or supply chain delays; and (c) other projects that reduce emissions of NOx.

5.0.5.5.1  After the Trustee pays all Trust Administration Termination Costs through the Termination Date, the Trustee shall transfer and accumulate all unused funds in all other subaccounts (other than those in the Tax Payment Subaccount and in the Insurance Premium Payment Subaccount) under the Indian Tribe Mitigation Trust into the Tribal Allocation Subaccount for the Final Distribution of Trust Assets to Designated Beneficiaries.

5.0.5.5.2  After the foregoing payments of the Trust Administration Termination Costs are made and all remaining funds are transferred and accumulated in the Tribal Allocation Subaccount, the Trustee shall determine the amount available for each of the 119 Designated Beneficiaries by implementing the following steps:

Step 1:  Per Capita Allocation.  The Trustee shall allocate 50 percent of the funds in the Tribal Allocation Subaccount equally among the Designated Beneficiaries participating in the funding cycle.

Step 2:  Pro Rata Population-based Allocation.  The Trustee shall allocate the other 50 percent of the funds in the Tribal Allocation Subaccount into three separate funding pools, allocating 51.52 percent to Group One, 10.61 percent to Group Two, and 37.87 percent to Group Three.  Within each of the three Groups, the Trustee shall allocate an amount to each of the Designated Beneficiaries based on the pro rata share of: (i) the Designated Beneficiary's population to (ii) the total population of all Designated Beneficiaries within its Group, in accordance with the Alignment Table (Appendix D-8).

Step 3:  Procedures for Exception Variants.  The Alignment Table (Appendix D-8) discusses five Exception Variants that apply to certain Indian Tribes and establishes specific allocation rules for these situations.  For all Indian Tribe Beneficiaries associated with an Exception Variant who did not submit an Opt Out Form (Appendix D-7), the Trustee shall follow the procedures set out in the Alignment Table (Appendix D-8) in allocating the amount of funding available for those Indian Tribe Beneficiaries.

Step 4:  Notice.  No later than December 5, 2023, the Trustee shall apply the allocation rules in Steps 1, 2, and 3, and shall transmit notice to each of the Designated Beneficiaries via Intralinks regarding the Trustee's allocation determination of the amount of funding available for each Designated Beneficiary.

5.0.5.5.3  No later than December 20, 2023, each Designated Beneficiary must decide whether to participate in the Final Distribution and submit to the Trustee either: (a) a Beneficiary's Election to Opt Out of Final Distribution (Appendix D-7A); or (b) a Certification of Participation in Final Distribution (Appendix D-9) and its updated security procedures for wire confirming parties (Appendix D-10).  A Designated Beneficiary that fails to submit to the Trustee either Beneficiary's Election to Opt Out of Final Distribution (Appendix D-7A) or a Certification of Participation in Final Distribution (Appendix D-9) and its updated security procedures for wire confirming parties (Appendix D-10) will be deemed to have opted out of the Final Distribution of Trust Assets to Designated Beneficiaries, and its allocation will be transferred to the Final Disposition Account.  For the avoidance of doubt, any Designated Beneficiary that does not complete the required Appendix D-10 security procedures and is not available to complete the call back procedure contained therein on or before December 20, 2023 will forfeit their right to their allocation and the Trustee will transfer those funds to the Final Disposition Account.

5.0.5.5.4  No later than December 29, 2023, the Trustee shall: (a) disburse the allocated share of Trust Funds to all Designated Beneficiaries who submitted an Appendix D-9 Certification and any required Appendix D-10 security procedures; and (b) transfer the allocated shares for any Designated Beneficiaries that elected to opt out of the Final Distribution to the Final Disposition Account.

5.0.5.5.5  Within 10 Business Days after the distribution of all funds from the Tribal Allocation Subaccount to the participating Designated Beneficiaries in the Final Distribution of Trust Assets to Designated Beneficiaries, the Trustee shall post the following items to the Indian Tribe Trust's public-facing website: (a) final allocation amounts for all participating Designated Beneficiaries; (b) all Appendix D-7A forms and Appendix D-9 certifications submitted by Designated Beneficiaries; (c) the amount of funds transferred to the Final Disposition Account in accordance with subparagraph 5.0.5.5.4; and (d) the total amount of funds in the Final Disposition Account as of the date of posting.

5.0.5.5.6  Not later than 18 months following the Final Distribution to Designated Beneficiaries, any Designated Beneficiary that received a disbursement of allocated funds under subparagraph 5.0.5.5.4 shall

return to the Trustee any unused funds held by the Designated Beneficiary for deposit in the Final Disposition Account.  Not later than 12 months following the Final Distribution of Trust Assets to Designated Beneficiaries, the Trustee will send notice to the participating Designated Beneficiaries of the upcoming 18-month deadline.

5.0.5.5.7 For purposes of subparagraph 5.0.5.5 and all subparagraphs thereof, for the avoidance of doubt, following the Trust Modification Effective Date all communications and deliveries of documentation and notice between the Trustee and Designated Beneficiaries shall be done by email using the following email address VW_Indian_Tribe_Trust_WTNA@WilmingtonTrust.com.

**5.1    Eligible Mitigation Actions and Expenditures and Final Distribution of Trust Assets:**  The Trustee may only disburse funds for (a) Eligible Mitigation Actions, and for the Eligible Mitigation Action Administrative Expenditures specified in Appendix D-2 (Eligible Mitigation Actions and Mitigation Action Expenditures), and (b) for the Final Distribution of Trust Assets to Beneficiaries pursuant to subparagraph 5.0.5.5 and the Final Disposition of Trust Assets pursuant to Paragraph 5.4.5.).

**5.2    Funding Requests for Eligible Mitigation Actions:**  Prior to the Trust Modification Effective Date and with the exception of disbursements in connection with the Final Distribution of Trust Assets to Designated Beneficiaries pursuant to subparagraph 5.0.5.5 and the Final Disposition of Trust Assets pursuant to Paragraph 5.4.5, Beneficiaries may submit requests for Eligible Mitigation Action funding by filing with the Trustee an EMA Certification Form (Appendix D-4), containing each of the certifications required by subparagraphs 5.2.2 through 5.2.13, as applicable. Each request for Eligible Mitigation Action funding must be submitted to the Trustee in electronic and hard-copy format, and include:

5.2.1    Intentionally Reserved.

5.2.2    A detailed description of the proposed Eligible Mitigation Action, including its community and air quality benefits;

5.2.3    An estimate of the NOx reductions anticipated as a result of the proposed Eligible Mitigation Action;

5.2.4    A project management plan for the proposed Eligible Mitigation Action, including a detailed budget and an implementation and expenditure timeline;

5.2.5    A certification that all vendors were or will be selected in accordance with state or tribal public contracting laws as applicable;

5.2.6    For each proposed expenditure exceeding $25,000, detailed cost estimates from selected or potential vendors;

5.2.7    A detailed description of how the Beneficiary will oversee the proposed Eligible Mitigation Action, including, but not limited to:

    5.2.7.1    Identification of the specific governmental entity responsible for reviewing and auditing expenditures of Eligible Mitigation Action funds to ensure compliance with applicable law; and

    5.2.7.2    A commitment by the Beneficiary to maintain and make publicly available all documentation submitted in support of the funding request and all records supporting all expenditures of Eligible Mitigation Action funds, subject to applicable laws governing the publication of confidential business information and personally identifiable information, together with an explanation of the procedures by which the Beneficiary shall make such documentation publicly available;

5.2.8    A description of any cost share requirement to be placed upon the owner of each NOx source proposed to be mitigated;

5.2.9    A description of how the Beneficiary complied with subparagraph 4.2.8;

5.2.10    If applicable, a description of how the Eligible Mitigation Action mitigates the impacts of NOx emissions on communities that have historically borne a disproportionate share of the adverse impacts of such emissions; and

5.2.11    A detailed plan for reporting on Eligible Mitigation Action implementation.

5.2.12    <u>DERA Option</u>.  To the extent a Beneficiary intends to avail itself of the DERA Option described in Appendix D-2 (Eligible Mitigation Actions and Mitigation Action Expenditures), that Beneficiary may use its DERA proposal as support for its funding request for those Eligible Mitigation Actions funded through the DERA Option.  In order to qualify for funding for the DERA Option under Appendix D-2 (Eligible Mitigation Actions and Mitigation Action Expenditures), the Beneficiary must deliver a copy of an EPA DERA selection letter to the Trustee by the deadline to timely submit an EMA Certification Form (Appendix D-4) for a particular funding cycle pursuant to either subparagraph 5.0.5.3.3 or subparagraph 5.0.5.3.5.

5.2.13    <u>Joint Application</u>.  After the requirements of subparagraph 5.0.5 have been satisfied and the Trustee has made its allocation determination of the amount of funding available for each participating Beneficiary in a funding cycle, two or more participating Beneficiaries may submit a joint request to fund an Eligible Mitigation Action using their combined allocation.   In order to submit a Joint Application, each participating Beneficiary must comply with all requirements individually as set forth herein.  Upon receipt of the Trustee's allocation determination of available funding pursuant to Step 4 of subparagraphs 5.0.5.3.2, 5.0.5.3.3 or 5.0.5.3.5, each Indian Tribe interested in pursuing a joint request to fund an Eligible Mitigation Action shall complete an individual EMA Certification Form (Appendix D-4) that:  (1) cross-references the other interested Indian Tribe's EMA Certification Form (Appendix D-4);  (2) makes all the required certifications on behalf of each Indian Tribe individually; and (3) explains how the two individually allocated amounts

will be used to jointly fund the Eligible Mitigation Action in that funding cycle. Both individual EMA Certification Forms (Appendix D-4) must be approved in accordance with subparagraph 5.2.16 before any disbursement of funds will be made by the Trustee.

5.2.14    Publication of Funding Requests. The Trustee shall post on the Indian Tribe Trust's public-facing website a copy of each approved EMA Certification Forms (Appendix D-4) and a list of each Beneficiary that filed a Beneficiary's Election to Opt Out Form (Appendix D-7) for each funding cycle 15 Days after the distribution of funds for each funding cycle.

5.2.15    Reliance on Form. The Trustee may rely on, with no further duty of inquiry, and shall be protected in acting upon, any EMA Certification Form (Appendix D-4) reasonably believed by it to be genuine and to have been signed or sent by the proper person or persons.

5.2.16    Approval of Funding Requests. The Trustee shall approve any funding request that meets the requirements of this Indian Tribe Trust Agreement and its Appendices. The Trustee shall transmit to the requesting Beneficiary via Intralinks and post on the Indian Tribe Trust's public-facing website a written determination either: (i) approving the request; (ii) denying the request; (iii) requesting modifications to the request; or (iv) requesting further information according to the following schedule: for the first funding cycle -- within 60 Days after the deadline for Beneficiaries to submit a revised EMA Certification Form (Appendix D-4); and for the second through fifth funding cycles -- within 60 Days after the deadline for Beneficiaries to submit an EMA Certification Form (Appendix D-4) in each funding cycle; provided that, if the Trustee requests a modification to an EMA Certification Form (Appendix D-4) or additional information from a Beneficiary, the Beneficiary shall submit a modified EMA Certification Form (Appendix D-4) or the additional information to the Trustee no later than 30 Days after receiving the Trustee's request via Intralinks. The Trustee shall transmit to the requesting Beneficiary via Intralinks and post on the Indian Tribe Trust's public-facing website a written determination either approving or denying the modified EMA Certification Form (Appendix D-4) within 30 days after receipt of the modified EMA Certification Form (Appendix D-4) or additional information from the Beneficiary. A Beneficiary may use such written determination as proof of funding for any DERA project application that includes Trust Funds as a non-federal voluntary match, as described in Appendix D-2 (Eligible Mitigation Actions and Mitigation Action Expenditures). Each written determination approving or denying an Eligible Mitigation Action funding request shall include an explanation of the reasons underlying the determination, including whether the proposed Eligible Mitigation Action meets the requirements set forth in Appendix D-2 (Eligible Mitigation Actions and Mitigation Action Expenditures) or Appendix D-4 (EMA Certification Form). The Trustee's decision to approve, deny, request modifications, or request further information related to a request shall be reviewable, upon petition of the United States or the submitting Beneficiary, by the Court.

5.2.16.1    Disbursement of Funds. Each Beneficiary must complete all required documentation for the Trustee relating to incumbency and its security procedures prior to receiving any funds. Provided these conditions have been met by the Beneficiary, the Trustee shall begin disbursing funds within 15

Days of approval of an Eligible Mitigation Action funding request according to the written instructions and schedule provided by the Beneficiary, unless such date is not a Business Day and then the payment shall be made on the next succeeding Business Day.

5.2.17    <u>Unused Eligible Mitigation Action Funds</u>.  Upon the termination or completion of any Eligible Mitigation Action, any unused Eligible Mitigation Action funds shall be returned to the Indian Tribe Mitigation Trust and added back to the Tribal Allocation Subaccount.

**5.3    Beneficiary Reporting Obligations:**  For each Eligible Mitigation Action, no later than six months after receiving its first disbursement of Trust Assets, and thereafter no later than January 30 (for the preceding six-month period of July 1 to December 31) and July 30 (for the preceding six-month period of January 1 to June 30) of each year <u>until January 31, 2024</u>, each Beneficiary shall submit to the Trustee a semiannual report describing the progress implementing each Eligible Mitigation Action during the six-month period leading up to the reporting date (including a summary of all costs expended on the Eligible Mitigation Action through the reporting date).  Such reports shall include a complete description of the status (including actual or projected termination date), development, implementation, and any modification of each approved Eligible Mitigation Action.  Beneficiaries may group multiple Eligible Mitigation Actions and multiple sub-beneficiaries into a single report.  These reports shall be signed by an official with the authority to submit the report for the Beneficiary and must contain an attestation that the information is true and correct and that the submission is made under penalty of perjury.  To the extent a Beneficiary avails itself of the DERA Option described in Appendix D-2 (Eligible Mitigation Actions and Mitigation Action Expenditures), that Beneficiary may submit its DERA Quarterly Programmatic Reports in satisfaction of its obligations under this Paragraph as to those Eligible Mitigation Actions funded through the DERA Option.  The Trustee shall post each semiannual report on the Indian Tribe Trust's public-facing website upon receipt.

5.3.1    **Documentation of Final Distribution Funds Expenditures.** No later than 18 months following the Final Distribution of Trust Assets to Designated Beneficiaries, each Designated Beneficiary that receives such funds shall submit to the Trustee a report regarding the Designated Beneficiary's use of such funds, in the form set forth in Appendix D-11.  That report shall include: (a) a complete description of the environmental mitigation projects that were funded with Final Distribution funds, including the cost of each such project; and (b) the amount of funds, if any, returned to the Trust in accordance with subparagraph 5.0.5.5.6. This report shall be signed by an official with the authority to submit the report for the Designated Beneficiary and must contain an attestation that the information is true and correct and that the submission is made under penalty of perjury.  The Trustee shall post each report it receives on the Indian Tribe Trust's public-facing website upon receipt.  Each Designated Beneficiary must maintain and make available to the United States upon request, all documentation and records concerning its use of Final Distribution funds until the Termination Date, unless the laws of the Designated Beneficiary require a longer record retention period.

5.4     **Supplemental Funding for Eligible Beneficiaries and Final Disposition of Trust Assets**

5.4.1     Intentionally Reserved.

5.4.2     Intentionally Reserved.

5.4.3     Intentionally Reserved.

5.4.4     Intentionally Reserved.

5.4.5     <u>Final Disposition of Indian Tribe Trust Assets</u>. No later than 30 Days following the 18 month anniversary of the Final Distribution of Trust Assets to Designated Beneficiaries, the Trustee shall transfer and accumulate into the Final Disposition Account: (i) any and all remaining Trust Assets held in the Indian Tribe Trust Account or any subaccount (including, but not limited to, the Tribal Allocation Subaccount and the Tribal Administration Cost Subaccount) that are not needed for Trust Administration Termination Costs; (ii) all unused funds returned to the Indian Tribe Mitigation Trust by Designated Beneficiaries; and (iii) any funds returned by the technical assistance provider, third party providers, and the Trustee, that were not used for Trust Administration Termination Costs. Within 10 Business Days thereafter, the Trustee will pay 50% of the Trust Assets on deposit in the Final Disposition Account to each the National Park Service and the Forest Service (rounding up to the nearest dollar giving any excess to the National Park Service), to be used for environmental projects that reduce emissions of NOx where the Subject Vehicles were, are, or will be operated.  The Trustee shall contact the Department of Justice on behalf of the United States who will assist them in coordinating with the National Park Service and the Forest Service to obtain the necessary wire payment instructions and the necessary security procedures information required by the Trustee in connection with making such payments. On the date it makes payment to the National Park Service and Forest Service, the Trustee will post notice to its public-facing website of the amount of Trust Assets transferred to each agency.  After the Final Disposition of Trust Assets, and solely for the purpose of liquidating and winding up the Trust's affairs, the Trustee shall continue to act in such capacity until its duties hereunder have been fully performed, and shall have all the rights, protections, immunities and indemnities afforded to it herein as if the Trust had not been terminated ~~Not later than October 2, 2024, the seventh anniversary of the Trust Effective Date, any unused funds held by any Beneficiary shall be returned to the Indian Tribe Mitigation Trust.  After the seventh anniversary of the Trust Effective Date, any Trust Assets held in the Indian Tribe Trust Account or any subaccount (including, but not limited to, the Tribal Allocation Subaccount and the Tribal Administration Cost Subaccount) that are not needed for final Trust Administration Costs shall be deemed to have been donated by the Indian Tribe Trust to fund Eligible Mitigation Actions administered by Federal Agencies that have custody, control, or management of land in the United States that is impacted by excess NOx emissions (including, but not limited to, Clean Air Act Class I and II areas) and that have the legal authority to accept such funds, in accordance with instructions to be provided by the United States.  If no such Federal Agencies exist, the United States will file a motion, with notice to the Defendants and the Beneficiaries, requesting the Court to order that any Trust Assets held in the Indian Tribe Trust Account (or any subaccount thereof) be distributed~~

48

~~either to a governmental unit or to another trust, the income of which is excluded from gross income under the provisions of Internal Revenue Code Section 115, 26 U.S.C. § 115~~.

## VI.   MISCELLANEOUS PROVISIONS

**6.0**    Correspondence with Indian Tribe Trust:  In accordance with subparagraph 3.1.2.3, the Trustee shall establish and maintain a secure method of internet-based communications, initially Intralinks, for the use of the Trustee and the Beneficiaries that will:  (1) enable each Beneficiary to deliver the required documentation under this Indian Tribe Trust Agreement in an electronic format; (2) enable secure communications between the Trustee and each Beneficiary; and (3) provide each Beneficiary with access to its own document base.  In addition, each Beneficiary will have the ability to view the balance in the Tribal Allocation Subaccount in the Trustee's monthly statement in the Intralinks General Information folder.  Any notices required to be provided by the Trustee to the Beneficiaries hereunder shall be deemed to have been properly and sufficiently provided hereunder if the Trustee posts such notice on Intralinks or any successor secure method of internet-based communications in use by the Trustee at that time.  Upon the Trust Modification Effective Date, the Trustee is authorized to terminate its Intralinks engagement and communicate with Beneficiaries by regular email or secure email, as appropriate according to the contents of the communications.  No later than 30 Days prior to termination of Intralinks, the Trustee will send notice to all Beneficiaries regarding the successor secure method of communication.

6.0.1    Addresses for Delivery of Physical Copies of Documentation and Notices.

Indian Tribe Trust or Trustee:

Volkswagen Diesel Emissions Environmental Mitigation Trust for Indian Tribe Beneficiaries
c/o Wilmington Trust, N.A. as Trustee
Wilmington Trust, National Association
Rodney Square North
1100 North Market Street
Attn: Volkswagen Diesel Emissions Environmental Mitigation Trust for Indian Tribe Beneficiaries
~~Attn: Capital Markets & Agency Services~~
Wilmington, DE  19890
Facsimile:  302 636-4145

EPA:

Director, Air Enforcement Division
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue NW
William J. Clinton South Building
MC 2242A
Washington, DC  20460
E-mail:  VW_settlement@epa.gov

U.S. Department of Justice:

Chief, Environmental Enforcement Section
Re:  DJ # 90-5-2-1-11386
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
E-mail:  eescdcopy.enrd@usdoj.gov
Re:  DJ # 90-5-2-1-11386

<u>Technical Assistance Provider</u>:

Institute for Tribal Environmental Professionals
Attn:  Executive Director
Northern Arizona University
P.O. Box 15004
Flagstaff, AZ  86011-5004

<u>Defendants</u>:

As to Volkswagen AG by mail:

Volkswagen AG
Berliner Ring 2
38440 Wolfsburg, Germany
Attention: Company Secretary

With copies to each of the following:

Volkswagen AG
Berliner Ring 2
38440 Wolfsburg, Germany
Attention: Group General Counsel

Volkswagen Group of America, Inc.
2200 Ferdinand Porsche Dr.
Herndon, VA 20171
Attention: U.S. General Counsel

As to Audi AG by mail:

Audi AG
Auto-Union-Strasse 1
85045 Ingolstadt, Germany
Attention: Company Secretary

With copies to each of the following:

Volkswagen AG
Berliner Ring 2
38440 Wolfsburg, Germany
Attention: Group General Counsel

Volkswagen Group of America, Inc.
2200 Ferdinand Porsche Dr.
Herndon, VA 20171
Attention: U.S. General Counsel

As to Volkswagen Group of America, Inc. by mail:

Volkswagen Group of America, Inc.
2200 Ferdinand Porsche Dr.
Herndon, VA 20171
Attention: Company Secretary

With copies to each of the following:

Volkswagen Group of America, Inc.
2200 Ferdinand Porsche Dr.
Herndon, VA 20171
Attention: President

Volkswagen Group of America, Inc.
2200 Ferdinand Porsche Dr.
Herndon, VA 20171
Attention: U.S. General Counsel

As to Volkswagen Group of America Chattanooga Operations, LLC by mail:

Volkswagen Group of America Chattanooga Operations, LLC
8001 Volkswagen Dr.
Chattanooga, TN 37416
Attention: Company Secretary

With copies to each of the following:

Volkswagen Group of America, Inc.
2200 Ferdinand Porsche Dr.
Herndon, VA 20171
Attention: President

Volkswagen Group of America, Inc.
2200 Ferdinand Porsche Dr.
Herndon, VA 20171
Attention: U.S. General Counsel

As to Dr. Ing. h.c. F. Porsche AG by mail:

Dr. Ing. h.c. F. Porsche Aktiengesellschaft
Porscheplatz 1
D-70435 Stuttgart
Attention: GR/Rechtsabteilung/General Counsel

As to Porsche Cars North America, Inc.:

Porsche Cars North America, Inc.
1 Porsche Dr.
Atlanta, GA 30354
Attention: Secretary
With copy by email to: offsecy@porsche.us

As to one or more of the Defendants by email:

Robert J. Giuffra, Jr.
Sharon L. Nelles
Granta Nakayama
Cari Dawson

giuffrar@sullcrom.com
nelless@sullcrom.com
gnakayama@kslaw.com
cari.dawson@alston.com

As to one or more of the Defendants by mail:

Robert J. Giuffra, Jr.
Sharon L. Nelles
Sullivan & Cromwell LLP
125 Broad Street
New York, N.Y. 10004

Granta Nakayama
King & Spalding LLP
1700 Pennsylvania Ave., N.W., Suite 200
Washington, DC 20006

Cari Dawson
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424

    **6.1**    **Jurisdiction:**  The U.S. District Court for the Northern District of California shall be the sole and exclusive forum for the purposes of enforcing this Indian Tribe Mitigation Trust and

resolving disputes hereunder, including the obligations of the Trustee to perform its obligations hereunder, and each of the Consent Decree Parties, the Indian Tribe Mitigation Trust, the Trustee, and each Beneficiary, expressly consents to such jurisdiction.

**6.2     Dispute Resolution:**  Unless otherwise expressly provided for herein, the dispute resolution procedures of this Paragraph shall be the exclusive mechanism to resolve any dispute between or among the Indian Tribes, the Consent Decree Parties, and the Trustee arising under or with respect to this Indian Tribe Trust Agreement.  The United States is a necessary party to any Dispute Resolution process under this Indian Tribe Trust.

6.2.1     Informal Dispute Resolution.  Any dispute subject to Dispute Resolution under this Indian Tribe Trust Agreement shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when the disputing party sends to the counterparty a written Notice of Dispute.  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed 30 Days from the date the dispute arises, unless that period is modified by written agreement.  If the disputing parties cannot resolve the dispute by informal negotiations, then the disputing party may invoke formal dispute resolution procedures as set forth below.

6.2.2     Formal Dispute Resolution.  The disputing party shall invoke formal dispute resolution procedures, within the time period provided in the preceding subparagraph, by serving on the counterparty a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting the disputing party's position and any supporting documentation and legal authorities relied upon by the disputing party.  The counterparty shall serve its Statement of Position within 30 Days of receipt of the disputing party's Statement of Position, which shall also include, but need not be limited to, any factual data, analysis, or opinion supporting the counterparty's position and any supporting documentation and legal authorities relied upon by the counterparty.  If the disputing parties are unable to consensually resolve the dispute within 30 Days after the counterparty serves its Statement of Position on the disputing party, the disputing party may file with the Court a motion for judicial review of the dispute in accordance with the following subparagraph.

6.2.3     Judicial Review.  The disputing party may seek judicial review of the dispute by filing with the Court and serving on the counterparty and the United States, a motion requesting judicial resolution of the dispute.  The motion must be filed within 45 Days of receipt of the counterparty's Statement of Position pursuant to the preceding subparagraph. The motion shall contain a written statement of disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation, and legal authorities, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly administration of the Indian Tribe Trust.  The counterparty shall respond to the motion within the time period allowed by the Local Rules of the Court, and the disputing party may file a reply memorandum, to the extent permitted by the Local Rules.

**6.3     Choice of Law:**  The validity, interpretation, and performance of this Indian Tribe Mitigation Trust shall be governed by the laws of the State of Delaware and the United States, without giving effect to the rules governing the conflicts of law that would require the application of

the law of another jurisdiction.  The duties, rights, protections, and immunities of the Trustee, as a trustee of a statutory trust under the Delaware Act, shall be governed by the laws of the State of Delaware and the United States, without giving effect to the rules governing the conflicts of law that would require the application of the law of another jurisdiction.  This Indian Tribe Trust Agreement shall not be subject to any provisions of the Uniform Trust Code as adopted by any State, now or in the future.  This Indian Tribe Trust Agreement shall be interpreted in a manner that is consistent with the Consent Decree, provided, however, that in the event of a conflict between the Consent Decree and this Indian Tribe Trust Agreement, this Indian Tribe Trust Agreement shall control.

   **6.4    Waiver of Jury Trial:**  Each party hereto and each Beneficiary hereof hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Indian Tribe Trust.

   **6.5    Modification:**  Material modifications to the Indian Tribe Mitigation Trust or Appendix D-2 (Eligible Mitigation Actions and Mitigation Action Expenditures) may be made only with the written consent of the United States and upon order of the Court, and only to the extent that such modification does not change or inhibit the purpose of this Indian Tribe Mitigation Trust.  Any modification of this Indian Tribe Mitigation Trust that affects the rights, powers, duties, obligations, liabilities, or indemnities of the Trustee requires the written consent of the Trustee.  Minor modifications or clarifying amendments to the Indian Tribe Mitigation Trust, Appendix D-2 (Eligible Mitigation Actions and Mitigation Action Expenditures) or Appendix D-4 (EMA Certification Form) may be made upon written agreement between the United States and the Trustee, as necessary to enable the Trustee to effectuate the provisions of this Indian Tribe Mitigation Trust, and shall be filed with the Court.  Minor modifications or clarifying amendments to the Indian Tribe Trust relating to the role of the technical assistance provider may be made upon written agreement among the United States, the Trustee, and the technical assistance provider, as necessary to enable the Trustee and the technical assistance to effectuate the provisions of this Indian Tribe Mitigation Trust, and shall be filed with the Court.  To the extent the consent of the Defendants is required to effectuate the modification or amendment, such consent shall not be unreasonably withheld.  Notwithstanding the foregoing sentence, without the express written consent of the Defendants, no modification shall:  (i) require the Defendants to make any payments to the Indian Tribe Trust other than the Mitigation Trust Payments required by the Consent Decree; or (ii) impose any greater obligation on Defendants than those set forth in the Indian Tribe Trust Agreement that is being modified.  The Trustee shall provide to the Beneficiaries not less than 30 Days' notice of any proposed modification to the Indian Tribe Mitigation Trust, whether material or minor, before such modification shall become effective; provided, however, if the Trustee has provided to the Beneficiaries not less than 30 Days' notice of any proposed material modifications to the Indian Tribe Mitigation Trust or Appendix D-2 (Eligible Mitigation Actions and Mitigation Action Expenditures), the modification shall become effective in accordance with the Order of the Court approving the modification.

   **6.6    Severability:**  If any provision of this Indian Tribe Trust Agreement or application thereof to any person or circumstance shall be finally determined by the Court to be invalid or unenforceable to any extent, the remainder of this Indian Tribe Trust Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Indian Tribe Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

**6.7     Taxes:**  The Indian Tribe Mitigation Trust is intended to be a qualified settlement fund ("QSF") pursuant to Section 468B of the Internal Revenue Code, 26 U.S.C. § 468B, and related Treasury Regulations.  The Trustee is intended to be the Indian Tribe Trust's "administrator," within the meaning of Treasury Regulation Section 1.468B-2(k)(3), 26 C.F.R. § 1.468B-2(k)(3).  The Trustee shall use its best efforts to submit, within six months after the Trust Effective Date, an application and all necessary supporting documentation to the IRS to obtain a Private Letter Ruling from the IRS:  (1) that the Indian Tribe Mitigation Trust will be treated as a Qualified Settlement Fund under 26 C.F.R. § 1.468B-1; and (2) on any federal tax matter that the Tax Professionals reasonably believe is necessary to support the ruling in (1) or otherwise prudent to clarify an uncertain application of federal tax law to the Indian Tribe Mitigation Trust.  Within ten Days after any application has been made to the IRS, the Trustee shall provide a copy of the application and accompanying documentation to the United States (pursuant to subparagraph 6.0.1) and to the known Beneficiaries (pursuant to the secure internet-based communication in Paragraph 6.0).  Within seven Days after receipt of any IRS Private Letter Ruling, the Trustee shall provide a copy to the United States (pursuant to subparagraph 6.0.1) and the known Beneficiaries (pursuant to the secure internet-based communication established in Paragraph 6.0).  The Trustee shall be responsible for filing all required Tax Returns, ensuring compliance with income tax withholding and reporting requirements, and paying applicable Taxes with respect to the Indian Tribe Trust in a manner consistent with Section 468B of the Internal Revenue Code, 26 U.S.C. § 468B, and related Treasury Regulations.  All Taxes shall be paid from amounts on deposit in the Tax Payment Subaccount established pursuant to subparagraph 2.1.5.  The Defendants shall provide to the Trustee and the IRS the statement described in Treasury Regulation Section 1.468B-3(e)(2), 26 C.F.R. § 1.468B-3(e)(2), no later than February 15th of the year following each calendar year in which the Settling Defendants make a transfer to the Indian Tribe Trust.

**6.8     Termination:**  After all funds have been expended pursuant to subparagraph 5.4.5, final reports have been delivered pursuant to Paragraph 3.3 and subparagraph 3.3.1, and notice regarding retained documents has been provided pursuant to subparagraph 3.3.2 (and any requested documents delivered to the requesting party), the Trustee may take all steps which are necessary to file the Certificate of Cancellationa motion with the State ofCourt requesting an order to begin the process under the Delaware Act to terminate the this Indian Tribe Trust.  OnceThe United States and the Beneficiaries shall be given not less than 60 Days to oppose such motion.  After the Trust Modification Effective Date occurs and the Court enters the Order approving the Trust Modification no further Court approval is required forapproves the motion to terminate, the Trustee toshall begin the dissolution and winding up processes under the Delaware Act following the Final Disposition of Trust Assets.  On the date that the Trustee completes all the statutory requirements under the Delaware Act and files a certificate of cancellation, this Indian Tribe Trust shall terminate (the "Termination Date").  The rights, indemnities, limitations of liability, exculpations, and standard of care for the Trustee set forth herein shall survive the termination of the Trust.

**6.9     Counterparts and Electronic Signatures:**  Notwithstanding anything to the contrary contained herein, this Agreement and all documents required to be delivered hereunder may be executed in one or more counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument.  Modifications to this Agreement under Paragraph 6.5, written agreements concerning such modifications, and certain other documents required to be delivered hereunder (as identified by the Trustee) may be signed electronically.  When used in or in connection with any such document, the words "execute," "execution," "signed," and "signature," and words of similar import, shall include

electronic signatures and the keeping of records in electronic form.  For these documents, electronic signatures and electronic records shall have the same legal effect, validity or enforceability as a manually executed signature in ink or the use of a paper-based recordkeeping system, as applicable, to the fullest extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, and any other similar state laws based on the Uniform Electronic Transactions Act. The Trustee is not under any obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Trustee pursuant to its security procedures approved by Trustee.  The Trustee will send a notice to the Beneficiaries via Intralinks indicating which documents required hereunder may be signed or executed using an electronic signature and will update that notice in accordance with its current security procedures from time to time.  The Trustee may subsequently request hard copies, with inked signatures, for any document previously accepted in electronic form, and the Beneficiaries shall provide such requested hard copies as soon as practicable.  For purposes of the Indian Tribe Trust, any reference to "Intralinks" shall also include not only this particular method of secure electronic communication between the Trustee and the Beneficiaries but also any future secure method of electronic communications between the Trustee and the Beneficiaries used for delivery of documents and notices required hereunder.  Upon the Trust Modification Effective Date or at such earlier date as the Trustee shall send a notice to all Beneficiaries of a new email address to be used in connection with the Final Distribution of Trust Assets to Designated Beneficiaries and for all communications between the Trustee and the Beneficiaries used for delivery of documents and notices required hereunder shall be done using the following email address: VW_Indian_Tribe_Trust_WTNA@WilmingtonTrust.com.

**6.10** **Appendices:**  The following appendices are attached to and part of the Indian Tribe Trust Agreement:

Appendix D-1 - Initial Allocation
Appendix D-1A - Initial 3.0 Liter Allocation
Appendix D-1B - Weighted Average Allocation Formula for 2.0 and 3.0 Liter Allocation
Appendix D-2 - Eligible Mitigation Actions and Mitigation Action Expenditures
Appendix D-3 - Certification for Beneficiary Status under Environmental Mitigation Trust Agreement
Appendix D-4 - Beneficiary Eligible Mitigation Action Certification
Appendix D-5 - Form of Certificate of Trust of Volkswagen Diesel Emissions Environmental Mitigation Trust for Indian Tribe Beneficiaries
Appendix D-6 - Designated Beneficiary's Participation Notice
Appendix D-7 - Beneficiary's Election to Opt Out Form
Appendix D-7A - Beneficiary's Election to Opt Out of Final Distribution
Appendix D-8 - Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas
Appendix D-9 – Beneficiary's Certification of Participation in Final Distribution
Appendix D-10 - Updated Security Procedures for Payment of the Final Distribution to Beneficiaries
Appendix D-11 – Form of Report on Final Distribution Funds Expenditures

**FOR THE VOLKSWAGEN DIESEL EMISSIONS ENVIRONMENTAL MITIGATION TRUST FOR INDIAN TRIBE BENEFICIARIES:**

WILMINGTON TRUST, N.A., AS TRUSTEE FOR THE VOLKSWAGEN DIESEL EMISSIONS ENVIRONMENTAL MITIGATION TRUST FOR INDIAN TRIBE BENEFICIARIES, AND NOT IN ITS INDIVIDUAL CAPACITY

Date: _____

David A. Vanaskey, Jr.
Administrative Vice President

By their execution of this Indian Tribe Trust Agreement each undersigned party represents that they are authorized signer for such Company entitled to sign on behalf of each Settling Defendant and that each of the Settling Defendants have taken all necessary corporate actions required to make this a legal, valid and binding obligation of each such Settling Defendant.

FOR VOLKSWAGEN AG:

Date: _____

                                         MANFRED DOESS
                                         VOLKSWAGEN AG
                                         P.O. Box 1849
                                         D-38436 Wolfsburg, Germany

FOR AUDI AG:

Date: _____

                                         MANFRED DOESS
                                         VOLKSWAGEN AG
                                         P.O. Box 1849
                                         D-38436 Wolfsburg, Germany

FOR VOLKSWAGEN GROUP OF AMERICA, INC.:

Date:                                    _____
                                         DAVID DETWEILER
                                         VOLKSWAGEN GROUP OF AMERICA, INC.
                                         2200 Ferdinand Porsche Drive
                                         Herndon, Virginia 20171

FOR VOLKSWAGEN GROUP OF AMERICA CHATTANOOGA OPERATIONS, LLC:

Date:                                    _____
                                         DAVID DETWEILER
                                         VOLKSWAGEN GROUP OF AMERICA, INC.
                                         2200 Ferdinand Porsche Drive
                                         Herndon, Virginia 20171

COUNSEL FOR VOLKSWAGEN AG, AUDI AG, VOLKSWAGEN GROUP OF AMERICA, INC., and VOLKSWAGEN GROUP OF AMERICA CHATTANOOGA OPERATIONS, LLC

Date

_____
ROBERT J. GIUFFRA, JR.
SHARON L. NELLES
WILLIAM B. MONAHAN
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3358
giuffrar@sullcrom.com
nelless@sullcrom.com
monahanw@sullcrom.com

FOR DR. ING. h.c. F. PORSCHE AG:

Date: _____          _____

Member of the Executive Board
Research and Development
DR. ING. h.c. F. PORSCHE
AKTIENGESELLSCHAFT
Porschestrasse 911
71287 Weissach, Germany

Date: _____          _____

ANGELA KREITZ
General Counsel & Chief Compliance Officer
DR. ING. h.c. F. PORSCHE
AKTIENGESELLSCHAFT
Porscheplatz 1
70435 Stuttgart-Zuffenhausen, Germany

FOR PORSCHE CARS NORTH AMERICA, INC.:

Date: _____          _____
                               GEORGE FEYGIN
                               Vice President, Legal & General Counsel
                               PORSCHE CARS NORTH AMERICA, INC.
                               1 Porsche Drive
                               Atlanta, GA 30354

Date: _____          _____
                               GLENN GARDE
                               Vice President, After Sales
                               PORSCHE CARS NORTH AMERICA, INC.
                               1 Porsche Drive
                               Atlanta, GA 30354

COUNSEL FOR DR. ING. h.c. F. PORSCHE AG and PORSCHE CARS NORTH AMERICA, INC.

Date: _____          _____

                                   GRANTA NAKAYAMA
                                   JOSEPH A. EISERT
                                   King & Spalding LLP
                                   1700 Pennsylvania Ave., N.W., Suite 200
                                   Washington, DC 20006
                                   gnakayama@kslaw.com
                                   jeisert@kslaw.com

Date: _____          _____

                                   CARI DAWSON
                                   Alston & Bird LLP
                                   One Atlantic Center
                                   1201 West Peachtree Street
                                   Atlanta, Georgia 30309-3424
                                   cari.dawson@alston.com

**APPENDIX D-1
Initial 2.0 Liter Allocation**

APPENDIX D-1 - INITIAL ALLOCATION

| INITIAL SUBACCOUNTS | INITIAL ALLOCATIONS ($) | INITIAL ALLOCATIONS (%) |
|---|---|---|
| Puerto Rico | $ 7,500,000.00 | 0.28% |
| North Dakota | $ 7,500,000.00 | 0.28% |
| Hawaii | $ 7,500,000.00 | 0.28% |
| South Dakota | $ 7,500,000.00 | 0.28% |
| Alaska | $ 7,500,000.00 | 0.28% |
| Wyoming | $ 7,500,000.00 | 0.28% |
| District of Columbia | $ 7,500,000.00 | 0.28% |
| Delaware | $ 9,051,682.97 | 0.34% |
| Mississippi | $ 9,249,413.91 | 0.34% |
| West Virginia | $ 11,506,842.13 | 0.43% |
| Nebraska | $ 11,528,812.23 | 0.43% |
| Montana | $ 11,600,215.07 | 0.43% |
| Rhode Island | $ 13,495,136.57 | 0.50% |
| Arkansas | $ 13,951,016.23 | 0.52% |
| Kansas | $ 14,791,372.72 | 0.55% |
| Idaho | $ 16,246,892.13 | 0.60% |
| New Mexico | $ 16,900,502.73 | 0.63% |
| Vermont | $ 17,801,277.01 | 0.66% |
| Louisiana | $ 18,009,993.00 | 0.67% |
| Kentucky | $ 19,048,080.43 | 0.71% |
| Oklahoma | $ 19,086,528.11 | 0.71% |
| Iowa | $ 20,179,540.80 | 0.75% |
| Maine | $ 20,256,436.17 | 0.75% |
| Nevada | $ 22,255,715.66 | 0.82% |
| Alabama | $ 24,084,726.84 | 0.89% |
| New Hampshire | $ 29,544,297.76 | 1.09% |
| South Carolina | $ 31,636,950.19 | 1.17% |
| Utah | $ 32,356,471.11 | 1.20% |
| Indiana | $ 38,920,039.77 | 1.44% |
| Missouri | $ 39,084,815.55 | 1.45% |
| Tennessee | $ 42,407,793.83 | 1.57% |
| Minnesota | $ 43,638,119.67 | 1.62% |
| Connecticut | $ 51,635,237.63 | 1.91% |
| Arizona | $ 53,013,861.68 | 1.96% |
| Georgia | $ 58,105,433.35 | 2.15% |
| Michigan | $ 60,329,906.41 | 2.23% |
| Colorado | $ 61,307,576.05 | 2.27% |
| Wisconsin | $ 63,554,019.22 | 2.35% |
| New Jersey | $ 65,328,105.14 | 2.42% |
| Oregon | $ 68,239,143.96 | 2.53% |
| Massachusetts | $ 69,074,007.92 | 2.56% |
| Maryland | $ 71,045,824.78 | 2.63% |
| Ohio | $ 71,419,316.56 | 2.65% |
| North Carolina | $ 87,177,373.87 | 3.23% |
| Virginia | $ 87,589,313.32 | 3.24% |
| Illinois | $ 97,701,053.83 | 3.62% |
| Washington | $ 103,957,041.03 | 3.85% |
| Pennsylvania | $ 110,740,310.73 | 4.10% |
| New York | $ 117,402,744.86 | 4.35% |
| Florida | $ 152,379,150.91 | 5.64% |
| Texas | $ 191,941,816.23 | 7.11% |
| California | $ 381,280,175.09 | 14.12% |
| Tribal Allocation Subaccount | $ 49,652,857.71 | 1.84% |
| Trust Administration Cost Subaccount | $ 23,467,171.38 | 0.87% |
| Tribal Administration Cost Subaccount | $ 4,525,885.71 | 0.17% |
| | $ 2,700,000,000.00 | 100.00% |

**APPENDIX D-1A**
**Initial 3.0 Liter Allocation**

## APPENDIX D-1A – INITIAL 3.0 LITER ALLOCATION

| INITIAL SUBACCOUNTS | INITIAL ALLOCATIONS ($) | INITIAL ALLOCATIONS (%) |
|---|---|---|
| Puerto Rico | $ 625,000.00 | 0.28% |
| North Dakota | $ 625,000.00 | 0.28% |
| Hawaii | $ 625,000.00 | 0.28% |
| Mississippi | $ 625,000.00 | 0.28% |
| West Virginia | $ 625,000.00 | 0.28% |
| District of Columbia | $ 625,000.00 | 0.28% |
| South Dakota | $ 625,000.00 | 0.28% |
| Wyoming | $ 625,000.00 | 0.28% |
| Alaska | $ 625,000.00 | 0.28% |
| Delaware | $ 625,000.00 | 0.28% |
| Arkansas | $ 696,692.86 | 0.31% |
| Nebraska | $ 719,535.25 | 0.32% |
| Maine | $ 796,628.31 | 0.35% |
| Kansas | $ 870,866.08 | 0.39% |
| Rhode Island | $ 873,721.37 | 0.39% |
| Vermont | $ 890,853.17 | 0.40% |
| Montana | $ 1,002,209.81 | 0.45% |
| Iowa | $ 1,022,196.90 | 0.45% |
| New Mexico | $ 1,082,158.17 | 0.48% |
| Idaho | $ 1,102,145.26 | 0.49% |
| Kentucky | $ 1,330,569.15 | 0.59% |
| New Hampshire | $ 1,370,543.33 | 0.61% |
| Alabama | $ 1,396,241.02 | 0.62% |
| Oklahoma | $ 1,835,957.01 | 0.82% |
| Louisiana | $ 1,838,812.30 | 0.82% |
| Indiana | $ 2,015,840.82 | 0.90% |
| Missouri | $ 2,067,236.19 | 0.92% |
| South Carolina | $ 2,258,541.20 | 1.00% |
| Nevada | $ 2,618,308.82 | 1.16% |
| Utah | $ 2,821,035.03 | 1.25% |
| Tennessee | $ 3,352,120.57 | 1.49% |
| Minnesota | $ 3,363,541.76 | 1.49% |
| Wisconsin | $ 3,523,438.48 | 1.57% |
| Arizona | $ 3,646,216.32 | 1.62% |
| Ohio | $ 3,883,206.11 | 1.73% |
| Connecticut | $ 4,085,932.31 | 1.82% |
| Michigan | $ 4,477,108.22 | 1.99% |
| Maryland | $ 4,668,413.23 | 2.07% |
| Oregon | $ 4,728,374.50 | 2.10% |
| North Carolina | $ 4,868,284.13 | 2.16% |
| Georgia | $ 5,519,292.21 | 2.45% |
| Massachusetts | $ 5,990,416.48 | 2.66% |
| Virginia | $ 6,044,667.16 | 2.69% |
| New Jersey | $ 6,886,980.25 | 3.06% |
| Colorado | $ 7,432,342.28 | 3.30% |
| Pennsylvania | $ 7,829,228.79 | 3.48% |
| Washington | $ 8,788,609.12 | 3.91% |
| New York | $ 10,299,062.08 | 4.58% |
| Illinois | $ 10,978,623.15 | 4.88% |
| Florida | $ 13,899,593.63 | 6.18% |
| Texas | $ 17,377,347.34 | 7.72% |
| California | $ 41,356,145.05 | 18.38% |
| Tribal Allocation Subaccount | $ 4,795,063.51 | 2.13% |
| Trust Administration Cost Subaccount | $ 1,955,597.62 | 0.87% |
| Tribal Administration Cost Subaccount | $ 390,303.65 | 0.17% |
| **Grand Total** | $          $ 225,000,000.00 | **100.00%** |

**APPENDIX D-1B**

**Weighted Average Allocation Formula
for 2.0 and 3.0 Liter Allocation**

# Appendix D-1B

*Weighted Average Allocation Formula:*

*(2.0 Allocation$_{Subaccount}$ + 3.0 Allocation $_{Subaccount}$) / ($2,700,000,000 + $225,000,000)*

*where Subaccount represents an individual Beneficiary subaccount or the Tribal, Administration Cost, or Tribal Administration Cost subaccount.*

| State Trust Allocation | Appendix D-1 | | Appendix D-1A | | Appendix D-1B | |
|---|---|---|---|---|---|---|
| | 2.0 Liter Allocation Amount | 2.0 Liter Allocation Percentage | 3.0 Liter Allocation Amount | 3.0 Liter Allocation Percentage | Total Allocation Amount | Weighted Average Allocation Percentage |
| Puerto Rico | $7,500,000.00 | 0.28% | $625,000.00 | 0.28% | $8,125,000.00 | 0.28% |
| North Dakota | $7,500,000.00 | 0.28% | $625,000.00 | 0.28% | $8,125,000.00 | 0.28% |
| Hawaii | $7,500,000.00 | 0.28% | $625,000.00 | 0.28% | $8,125,000.00 | 0.28% |
| South Dakota | $7,500,000.00 | 0.28% | $625,000.00 | 0.28% | $8,125,000.00 | 0.28% |
| Alaska | $7,500,000.00 | 0.28% | $625,000.00 | 0.28% | $8,125,000.00 | 0.28% |
| Wyoming | $7,500,000.00 | 0.28% | $625,000.00 | 0.28% | $8,125,000.00 | 0.28% |
| District of Columbia | $7,500,000.00 | 0.28% | $625,000.00 | 0.28% | $8,125,000.00 | 0.28% |
| Delaware | $9,051,682.97 | 0.34% | $625,000.00 | 0.28% | $9,676,682.97 | 0.33% |
| Mississippi | $9,249,413.91 | 0.34% | $625,000.00 | 0.28% | $9,874,413.91 | 0.34% |
| West Virginia | $11,506,842.13 | 0.43% | $625,000.00 | 0.28% | $12,131,842.13 | 0.41% |
| Nebraska | $11,528,812.23 | 0.43% | $719,535.25 | 0.32% | $12,248,347.48 | 0.42% |
| Montana | $11,600,215.07 | 0.43% | $1,002,209.81 | 0.45% | $12,602,424.88 | 0.43% |
| Rhode Island | $13,495,136.57 | 0.50% | $873,721.37 | 0.39% | $14,368,857.94 | 0.49% |
| Arkansas | $13,951,016.23 | 0.52% | $696,692.86 | 0.31% | $14,647,709.09 | 0.50% |
| Kansas | $14,791,372.72 | 0.55% | $870,866.08 | 0.39% | $15,662,238.80 | 0.54% |
| Idaho | $16,246,892.13 | 0.60% | $1,102,145.26 | 0.49% | $17,349,037.39 | 0.59% |
| New Mexico | $16,900,502.73 | 0.63% | $1,082,158.17 | 0.48% | $17,982,660.90 | 0.61% |
| Vermont | $17,801,277.01 | 0.66% | $890,853.17 | 0.40% | $18,692,130.18 | 0.64% |
| Louisiana | $18,009,993.00 | 0.67% | $1,838,812.30 | 0.82% | $19,848,805.30 | 0.68% |
| Kentucky | $19,048,080.43 | 0.71% | $1,330,569.15 | 0.59% | $20,378,649.58 | 0.70% |
| Oklahoma | $19,086,528.11 | 0.71% | $1,835,957.01 | 0.82% | $20,922,485.12 | 0.72% |
| Iowa | $20,179,540.80 | 0.75% | $1,022,196.90 | 0.45% | $21,201,737.70 | 0.72% |
| Maine | $20,256,436.17 | 0.75% | $796,628.31 | 0.35% | $21,053,064.48 | 0.72% |
| Nevada | $22,255,715.66 | 0.82% | $2,618,308.82 | 1.16% | $24,874,024.48 | 0.85% |
| Alabama | $24,084,726.84 | 0.89% | $1,396,241.02 | 0.62% | $25,480,967.86 | 0.87% |
| New Hampshire | $29,544,297.76 | 1.09% | $1,370,543.33 | 0.61% | $30,914,841.09 | 1.06% |
| South Carolina | $31,636,950.19 | 1.17% | $2,258,541.20 | 1.00% | $33,895,491.39 | 1.16% |
| Utah | $32,356,471.11 | 1.20% | $2,821,035.03 | 1.25% | $35,177,506.14 | 1.20% |
| Indiana | $38,920,039.77 | 1.44% | $2,015,840.82 | 0.90% | $40,935,880.59 | 1.40% |
| Missouri | $39,084,815.55 | 1.45% | $2,067,236.19 | 0.92% | $41,152,051.74 | 1.41% |
| Tennessee | $42,407,793.83 | 1.57% | $3,352,120.57 | 1.49% | $45,759,914.40 | 1.56% |
| Minnesota | $43,638,119.67 | 1.62% | $3,363,541.76 | 1.49% | $47,001,661.43 | 1.61% |
| Connecticut | $51,635,237.63 | 1.91% | $4,085,932.31 | 1.82% | $55,721,169.94 | 1.90% |
| Arizona | $53,013,861.68 | 1.96% | $3,646,216.32 | 1.62% | $56,660,078.00 | 1.94% |
| Georgia | $58,105,433.35 | 2.15% | $5,519,292.21 | 2.45% | $63,624,725.56 | 2.18% |
| Michigan | $60,329,906.41 | 2.23% | $4,477,108.22 | 1.99% | $64,807,014.63 | 2.22% |
| Colorado | $61,307,576.05 | 2.27% | $7,432,342.28 | 3.30% | $68,739,918.33 | 2.35% |
| Wisconsin | $63,554,019.22 | 2.35% | $3,523,438.48 | 1.57% | $67,077,457.70 | 2.29% |
| New Jersey | $65,328,105.14 | 2.42% | $6,886,980.25 | 3.06% | $72,215,085.39 | 2.47% |
| Oregon | $68,239,143.96 | 2.53% | $4,728,374.50 | 2.10% | $72,967,518.46 | 2.49% |
| Massachusetts | $69,074,007.92 | 2.56% | $5,990,416.48 | 2.66% | $75,064,424.40 | 2.57% |
| Maryland | $71,045,824.78 | 2.63% | $4,668,413.23 | 2.07% | $75,714,238.01 | 2.59% |
| Ohio | $71,419,316.56 | 2.65% | $3,883,206.11 | 1.73% | $75,302,522.67 | 2.57% |
| North Carolina | $87,177,373.87 | 3.23% | $4,868,284.13 | 2.16% | $92,045,658.00 | 3.15% |
| Virginia | $87,589,313.32 | 3.24% | $6,044,667.16 | 2.69% | $93,633,980.48 | 3.20% |
| Illinois | $97,701,053.83 | 3.62% | $10,978,623.15 | 4.88% | $108,679,676.98 | 3.72% |
| Washington | $103,957,041.03 | 3.85% | $8,788,609.12 | 3.91% | $112,745,650.15 | 3.85% |
| Pennsylvania | $110,740,310.73 | 4.10% | $7,829,228.79 | 3.48% | $118,569,539.52 | 4.05% |
| New York | $117,402,744.86 | 4.35% | $10,299,062.08 | 4.58% | $127,701,806.94 | 4.37% |
| Florida | $152,379,150.91 | 5.64% | $13,899,593.63 | 6.18% | $166,278,744.54 | 5.68% |
| Texas | $191,941,816.23 | 7.11% | $17,377,347.34 | 7.72% | $209,319,163.57 | 7.16% |
| California | $381,280,175.09 | 14.12% | $41,356,145.05 | 18.38% | $422,636,320.14 | 14.45% |
| State Trust Administration Cost Subaccount | $23,467,171.38 | 0.87% | $1,955,597.62 | 0.87% | $25,422,769.00 | 0.87% |
| **Subtotal** | **$2,645,821,256.54** | **97.99%** | **$219,814,632.84** | **97.70%** | **$2,865,635,889.38** | **97.97%** |
| | | | | | | |
| Tribal Trust Allocation | $49,652,857.71 | 1.84% | $4,795,063.51 | 2.13% | $54,447,921.22 | 1.86% |
| Tribal Administration Cost Subaccount | $4,525,885.77 | 0.17% | $390,303.65 | 0.17% | $4,916,189.42 | 0.17% |
| **Subtotal** | **$54,178,743.48** | **2.01%** | **$5,185,367.16** | **2.30%** | **$59,364,110.64** | **2.03%** |
| | | | | | | |
| **Total** | **$2,700,000,000.00** | **100.00%** | **$225,000,000.00** | **100.00%** | **$2,925,000,000.00** | **100.00%** |

**APPENDIX D-2**
**Eligible Mitigation Actions and Mitigation Action Expenditures**

**APPENDIX D-2**

**ELIGIBLE MITIGATION ACTIONS AND MITIGATION ACTION EXPENDITURES**

1.  Class 8 Local Freight Trucks and Port Drayage Trucks (Eligible Large Trucks)

    a.  Eligible Large Trucks include 1992-2009 engine model year Class 8 Local Freight or Drayage. For Beneficiaries that have State regulations that already require upgrades to 1992-2009 engine model year trucks at the time of the proposed Eligible Mitigation Action, Eligible Large Trucks shall also include 2010-2012 engine model year Class 8 Local Freight or Drayage.

    b.  Eligible Large Trucks must be Scrapped.

    c.  Eligible Large Trucks may be Repowered with any new diesel or Alternate Fueled engine or All-Electric engine, or may be replaced with any new diesel or Alternate Fueled or All-Electric vehicle, with the engine model year in which the Eligible Large Trucks Mitigation Action occurs or one engine model year prior.

    d.  For Non-Government Owned Eligible Class 8 Local Freight Trucks, Beneficiaries may only draw funds from the Trust in the amount of:

        1.  Up to 40% of the cost of a Repower with a new diesel or Alternate Fueled (e.g., CNG, propane, Hybrid) engine, including the costs of installation of such engine.

        2.  Up to 25% of the cost of a new diesel or Alternate Fueled (e.g., CNG, propane, Hybrid) vehicle.

        3.  Up to 75% of the cost of a Repower with a new All-Electric engine, including the costs of installation of such engine, and charging infrastructure associated with the new All-Electric engine.

        4.  Up to 75% of the cost of a new All-Electric vehicle, including charging infrastructure associated with the new All-Electric vehicle.

    e.  For Non-Government Owned Eligible Drayage Trucks, Beneficiaries may only draw funds from the Trust in the amount of:

        1.  Up to 40% of the cost of a Repower with a new diesel or Alternate Fueled (e.g., CNG, propane, Hybrid) engine, including the costs of installation of such engine.

        2.  Up to 50% of the cost of a new diesel or Alternate Fueled (e.g., CNG, propane, Hybrid) vehicle.

   3. Up to 75% of the cost of a Repower with a new All-Electric engine, including the costs of installation of such engine, and charging infrastructure associated with the new All-Electric engine.

   4. Up to 75% of the cost of a new all-electric vehicle, including charging infrastructure associated with the new All-Electric vehicle.

f. For Government Owned Eligible Class 8 Large Trucks, Beneficiaries may draw funds from the Trust in the amount of:

   1. Up to 100% of the cost of a Repower with a new diesel or Alternate Fueled (e.g., CNG, propane, Hybrid) engine, including the costs of installation of such engine.

   2. Up to 100% of the cost of a new diesel or Alternate Fueled (e.g., CNG, propane, Hybrid) vehicle.

   3. Up to 100% of the cost of a Repower with a new All-Electric engine, including the costs of installation of such engine, and charging infrastructure associated with the new All-Electric engine.

   4. Up to 100% of the cost of a new All-Electric vehicle, including charging infrastructure associated with the new All-Electric vehicle.

2. <u>Class 4-8 School Bus, Shuttle Bus, or Transit Bus (Eligible Buses)</u>

a. Eligible Buses include 2009 engine model year or older class 4-8 school buses, shuttle buses, or transit buses. For Beneficiaries that have State regulations that already require upgrades to 1992-2009 engine model year buses at the time of the proposed Eligible Mitigation Action, Eligible Buses shall also include 2010-2012 engine model year class 4-8 school buses, shuttle buses, or transit buses.

b. Eligible Buses must be Scrapped.

c. Eligible Buses may be Repowered with any new diesel or Alternate Fueled or All-Electric engine, or may be replaced with any new diesel or Alternate Fueled or All-Electric vehicle, with the engine model year in which the Eligible Bus Mitigation Action occurs or one engine model year prior.

d. For Non-Government Owned Buses, Beneficiaries may draw funds from the Trust in the amount of:

   1. Up to 40% of the cost of a Repower with a new diesel or Alternate Fueled (e.g., CNG, propane, Hybrid) engine, including the costs of installation of such engine.

   2. Up to 25% of the cost of a new diesel or Alternate Fueled (e.g., CNG, propane, Hybrid) vehicle.

3

3. Up to 75% of the cost of a Repower with a new All-Electric engine, including the costs of installation of such engine, and charging infrastructure associated with the new All-Electric engine.

4. Up to 75% of the cost of a new All-Electric vehicle, including charging infrastructure associated with the new All-Electric vehicle.

e. For Government Owned Eligible Buses, and Privately Owned School Buses Under Contract with a Public School District, Beneficiaries may draw funds from the Trust in the amount of:

1. Up to 100% of the cost of a Repower with a new diesel or Alternate Fueled (e.g., CNG, propane, Hybrid) engine, including the costs of installation of such engine.

2. Up to 100% of the cost of a new diesel or Alternate Fueled (e.g., CNG, propane, Hybrid) vehicle.

3. Up to 100% of the cost of a Repower with a new All-Electric engine, including the costs of installation of such engine, and charging infrastructure associated with the new All-Electric engine.

4. Up to 100% of the cost of a new All-Electric vehicle, including charging infrastructure associated with the new All-Electric vehicle.

3. Freight Switchers

a. Eligible Freight Switchers include pre-Tier 4 switcher locomotives that operate 1000 or more hours per year.

b. Eligible Freight Switchers must be Scrapped.

c. Eligible Freight Switchers may be Repowered with any new diesel or Alternate Fueled or All-Electric engine(s) (including Generator Sets), or may be replaced with any new diesel or Alternate Fueled or All-Electric (including Generator Sets) Freight Switcher, that is certified to meet the applicable EPA emissions standards (or other more stringent equivalent State standard) as published in the CFR for the engine model year in which the Eligible Freight Switcher Mitigation Action occurs.

d. For Non-Government Owned Freight Switchers, Beneficiaries may draw funds from the Trust in the amount of :

1. Up to 40% of the cost of a Repower with a new diesel or Alternate Fueled (e.g., CNG, propane, Hybrid) engine(s) or Generator Sets, including the costs of installation of such engine(s).

2. Up to 25% of the cost of a new diesel or Alternate Fueled (e.g., CNG, propane, Hybrid) Freight Switcher.

3. Up to 75% of the cost of a Repower with a new All-Electric engine(s), including the costs of installation of such engine(s), and charging infrastructure associated with the new All-Electric engine(s).

4. Up to 75% of the cost of a new All-Electric Freight Switcher, including charging infrastructure associated with the new All-Electric Freight Switcher.

e. For Government Owned Eligible Freight Switchers, Beneficiaries may draw funds from the Trust in the amount of:

1. Up to 100% of the cost of a Repower with a new diesel or Alternate Fueled (e.g., CNG, propane, Hybrid) engine(s) or Generator Sets, including the costs of installation of such engine(s).

2. Up to 100% of the cost of a new diesel or Alternate Fueled (e.g., CNG, propane, Hybrid) Freight Switcher.

3. Up to 100% of the cost of a Repower with a new All-Electric engine(s), including the costs of installation of such engine(s), and charging infrastructure associated with the new All-Electric engine(s).

4. Up to 100% of the cost of a new All-Electric Freight Switcher, including charging infrastructure associated with the new All-Electric Freight Switcher.

4. Ferries/Tugs

a. Eligible Ferries and/or Tugs include unregulated, Tier 1, or Tier 2 marine engines.

b. Eligible Ferry and/or Tug engines that are replaced must be Scrapped.

c. Eligible Ferries and/or Tugs may be Repowered with any new Tier 3 or Tier 4 diesel or Alternate Fueled engines, or with All-Electric engines, or may be upgraded with an EPA Certified Remanufacture System or an EPA Verified Engine Upgrade.

d. For Non-Government Owned Eligible Ferries and/or Tugs, Beneficiaries may only draw funds from the Trust in the amount of:

1. Up to 40% of the cost of a Repower with a new diesel or Alternate Fueled (e.g., CNG, propane, Hybrid) engine(s), including the costs of installation of such engine(s).

2. Up to 75% of the cost of a Repower with a new All-Electric engine(s), including the costs of installation of such engine(s), and charging infrastructure associated with the new All-Electric engine(s).

    e.   For Government Owned Eligible Ferries and/or Tugs, Beneficiaries may draw funds from the Trust in the amount of:

        1.  Up to 100% of the cost of a Repower with a new diesel or Alternate Fueled (e.g., CNG, propane, Hybrid) engine(s), including the costs of installation of such engine(s).

        2.  Up to 100% of the cost of a Repower with a new All-Electric engine(s), including the costs of installation of such engine(s), and charging infrastructure associated with the new All-Electric engine(s).

5.   <u>Ocean Going Vessels (OGV) Shorepower</u>

    a.   Eligible Marine Shorepower includes systems that enable a compatible vessel's main and auxiliary engines to remain off while the vessel is at berth. Components of such systems eligible for reimbursement are limited to cables, cable management systems, shore power coupler systems, distribution control systems, and power distribution.  Marine shore power systems must comply with international shore power design standards (ISO/IEC/IEEE 80005-1-2012 High Voltage Shore Connection Systems or the IEC/PAS 80005-3:2014 Low Voltage Shore Connection Systems) and should be supplied with power sourced from the local utility grid.  Eligible Marine Shorepower includes equipment for vessels that operate within the Great Lakes.

    b.   For Non-Government Owned Marine Shorepower, Beneficiaries may only draw funds from the Trust in the amount of up to 25% for the costs associated with the shore-side system, including cables, cable management systems, shore power coupler systems, distribution control systems, installation, and power distribution components.

    c.   For Government Owned Marine Shorepower, Beneficiaries may draw funds from the Trust in the amount of up to 100% for the costs associated with the shore-side system, including cables, cable management systems, shore power coupler systems, distribution control systems, installation, and power distribution components.

6.   <u>Class 4-7 Local Freight Trucks (Medium Trucks)</u>

    a.   Eligible Medium Trucks include 1992-2009 engine model year class 4-7 Local Freight trucks, and for Beneficiaries that have State regulations that already require upgrades to 1992-2009 engine model year trucks at the time of the proposed Eligible Mitigation Action, Eligible Trucks shall also include 2010-2012 engine model year class 4-7 Local Freight trucks.

    b.   Eligible Medium Trucks must be Scrapped.

c. Eligible Medium Trucks may be Repowered with any new diesel or Alternate Fueled or All-Electric engine, or may be replaced with any new diesel or Alternate Fueled or All-Electric vehicle, with the engine model year in which the Eligible Medium Trucks Mitigation Action occurs or one engine model year prior.

d. For Non-Government Owned Eligible Medium Trucks, Beneficiaries may draw funds from the Trust in the amount of:

   1. Up to 40% of the cost of a Repower with a new diesel or Alternate Fueled (e.g., CNG, propane, Hybrid) engine, including the costs of installation of such engine.

   2. Up to 25% of the cost of a new diesel or Alternate Fueled (e.g., CNG, propane, Hybrid) vehicle.

   3. Up to 75% of the cost of a Repower with a new All-Electric engine, including the costs of installation of such engine, and charging infrastructure associated with the new All-Electric engine.

   4. Up to 75% of the cost of a new All-Electric vehicle, including charging infrastructure associated with the new All-Electric vehicle.

e. For Government Owned Eligible Medium Trucks, Beneficiaries may draw funds from the Trust in the amount of:

   1. Up to 100% of the cost of a Repower with a new diesel or Alternate Fueled (e.g., CNG, propane, Hybrid) engine, including the costs of installation of such engine.

   2. Up to 100% of the cost of a new diesel or Alternate Fueled (e.g., CNG, propane, Hybrid) vehicle.

   3. Up to 100% of the cost of a Repower with a new All-Electric engine, including the costs of installation of such engine, and charging infrastructure associated with the new All-Electric engine.

   4. Up to 100% of the cost of a new All-Electric vehicle, including charging infrastructure associated with the new All-Electric vehicle.

7. Airport Ground Support Equipment

a. Eligible Airport Ground Support Equipment includes:

   1. Tier 0, Tier 1, or Tier 2 diesel powered airport ground support equipment; and

   2. Uncertified, or certified to 3 g/bhp-hr or higher emissions, spark ignition engine powered airport ground support equipment.

b. Eligible Airport Ground Support Equipment must be Scrapped.

7

    c.  Eligible Airport Ground Support Equipment may be Repowered with an All-Electric engine, or may be replaced with the same Airport Ground Support Equipment in an All-Electric form.

    d.  For Non-Government Owned Eligible Airport Ground Support Equipment, Beneficiaries may only draw funds from the Trust in the amount of:

        1.  Up to 75% of the cost of a Repower with a new All-Electric engine, including costs of installation of such engine, and charging infrastructure associated with such new All-Electric engine.

        2.  Up to 75% of the cost of a new All-Electric Airport Ground Support Equipment, including charging infrastructure associated with such new All-Electric Airport Ground Support Equipment.

    e.  For Government Owned Eligible Airport Ground Support Equipment, Beneficiaries may draw funds from the Trust in the amount of:

        1.  Up to 100% of the cost of a Repower with a new All-Electric engine, including costs of installation of such engine, and charging infrastructure associated with such new All-Electric engine.

        2.  Up to 100% of the cost of a new All-Electric Airport Ground Support Equipment, including charging infrastructure associated with such new All-Electric Airport Ground Support Equipment.

8.  <u>Forklifts and Port Cargo Handling Equipment</u>

    a.  Eligible Forklifts includes forklifts with greater than 8000 pounds lift capacity.

    b.  Eligible Forklifts and Port Cargo Handling Equipment must be Scrapped.

    c.  Eligible Forklifts and Port Cargo Handling Equipment may be Repowered with an All-Electric engine, or may be replaced with the same equipment in an All-Electric form.

    d.  For Non-Government Owned Eligible Forklifts and Port Cargo Handling Equipment, Beneficiaries may draw funds from the Trust in the amount of:

        1.  Up to 75% of the cost of a Repower with a new All-Electric engine, including costs of installation of such engine, and charging infrastructure associated with such new All-Electric engine.

        2.  Up to 75% of the cost of a new All-Electric Forklift or Port Cargo Handling Equipment, including charging infrastructure associated with such new All-Electric Forklift or Port Cargo Handling Equipment.

    e.  For Government Owned Eligible Forklifts and Port Cargo Handling Equipment, Beneficiaries may draw funds from the Trust in the amount of:

1. Up to 100% of the cost of a Repower with a new All-Electric engine, including costs of installation of such engine, and charging infrastructure associated with such new All-Electric engine.

2. Up to 100% of the cost of a new All-Electric Forklift or Port Cargo Handling Equipment, including charging infrastructure associated with such new All-Electric Forklift or Port Cargo Handling Equipment.

9. <u>Light Duty Zero Emission Vehicle Supply Equipment</u>. Each Beneficiary may use up to fifteen percent (15%) of its allocation of Trust Funds on the costs necessary for, and directly connected to, the acquisition, installation, operation and maintenance of new light duty zero emission vehicle supply equipment for projects as specified below.  Provided, however, that Trust Funds shall not be made available or used to purchase or rent real-estate, other capital costs (e.g., construction of buildings, parking facilities, etc.) or general maintenance (i.e., maintenance other than of the Supply Equipment).

   a. Light duty electric vehicle supply equipment includes Level 1, Level 2 or fast charging equipment (or analogous successor technologies) that is located in a public place, workplace, or multi-unit dwelling and is not consumer light duty electric vehicle supply equipment (i.e., not located at a private residential dwelling that is not a multi-unit dwelling).

   b. Light duty hydrogen fuel cell vehicle supply equipment includes hydrogen dispensing equipment capable of dispensing hydrogen at a pressure of 70 megapascals (MPa) (or analogous successor technologies) that is located in a public place.

   c. Subject to the 15% limitation above, each Beneficiary may draw funds from the Trust in the amount of:

      1. Up to 100% of the cost to purchase, install and maintain eligible light duty electric vehicle supply equipment that will be available to the public at a Government Owned Property.

      2. Up to 80% of the cost to purchase, install and maintain eligible light duty electric vehicle supply equipment that will be available to the public at a Non-Government Owned Property.

      3. Up to 60% of the cost to purchase, install and maintain eligible light duty electric vehicle supply equipment that is available at a workplace but not to the general public.

      4. Up to 60% of the cost to purchase, install and maintain eligible light duty electric vehicle supply equipment that is available at a multi-unit dwelling but not to the general public.

5. Up to 33% of the cost to purchase, install and maintain eligible light duty hydrogen fuel cell vehicle supply equipment capable of dispensing at least 250 kg/day that will be available to the public.

6. Up to 25% of the cost to purchase, install and maintain eligible light duty hydrogen fuel cell vehicle supply equipment capable of dispensing at least 100 kg/day that will be available to the public.

10. <u>Diesel Emission Reduction Act (DERA) Option</u>. Beneficiaries may use Trust Funds for their non-federal voluntary match, pursuant to Title VII, Subtitle G, Section 793 of the DERA Program in the Energy Policy Act of 2005 (codified at 42 U.S.C. § 16133), or Section 792 (codified at 42 U.S.C. § 16132) in the case of Tribes, thereby allowing Beneficiaries to use such Trust Funds for actions not specifically enumerated in this Appendix D-2, but otherwise eligible under DERA pursuant to all DERA guidance documents available through the EPA. Trust Funds shall not be used to meet the non-federal mandatory cost share requirements, as defined in applicable DERA program guidance, of any DERA grant.

<u>Eligible Mitigation Action Administrative Expenditures</u>

For any Eligible Mitigation Action, Beneficiaries may use Trust Funds for actual administrative expenditures (described below) directly associated with implementing such Eligible Mitigation Action, but not to exceed 15% of the total cost of such Eligible Mitigation Action.  The 15% cap includes the aggregated amount of eligible administrative expenditures incurred by the Beneficiary and any third-party contractor(s).  In the project management plan for any proposed Eligible Mitigation Action submitted under subparagraph 5.2.4 of the Indian Tribe Trust Agreement, Beneficiaries shall include a detailed budget specifying the funds allocated for administrative expenditures as well as an implementation and expenditure timeline.  For any contracted services, the budget shall include detailed cost estimates from selected or potential vendors.  If the contracted services are billed on an hourly basis, the cost estimate shall include a detailed description of the services provided or to be provided, the number of hours, and the cost per hour.  Administrative expenditures may include incurred costs that are directly connected with funding project development and solicitation for an Eligible Mitigation Action. Administrative expenditures shall not include:  (1) any amount incurred or billed prior to October 2, 2017 (the Trust Effective Date), for contracted services by any third party service provider or third party contractor, including, but not limited to, lawyers or law firms, accountants or accounting firms, consultants, or other similar third party service providers; (2) any contingency fees for contracted services including, but not limited to, evaluation, consulting, legal services or other professional services; (3) any expenses incurred for preparation of a Certification for Beneficiary Status under Environmental Mitigation Trust Agreement (Appendix D-3); (4) any expenses incurred for dispute resolution, including for judicial review of the dispute, under Paragraph 6.2 of the Indian Tribe Trust Agreement; and (5) any expenses incurred for judicial challenges or claims brought by any Beneficiary under the Indian Tribe Trust.

Administrative expenditures for Beneficiaries include the following:

1. Personnel including costs of employee salaries and wages, but not consultants.
2. Fringe Benefits including costs of employee fringe benefits such as health insurance, FICA, retirement, life insurance, and payroll taxes.
3. Travel including costs of Mitigation Action-related travel by program staff, but does not include consultant travel.
4. Supplies including tangible property purchased in support of the Mitigation Action that will be expensed on the Statement of Activities, such as educational publications, office supplies, etc.  Identify general categories of supplies and their Mitigation Action costs.
5. Contractual including all contracted services and goods except for those charged under other categories such as supplies, construction, etc.  Contracts for evaluation and consulting services and contracts with sub-recipient organizations are included.
6. Construction including costs associated with ordinary or normal rearrangement and alteration of facilities.
7. Other costs including insurance, professional services, occupancy and equipment leases, printing and publication, training, indirect costs, and accounting.

<u>Definitions/Glossary of Terms</u>

"Airport Ground Support Equipment" shall mean vehicles and equipment used at an airport to service aircraft between flights.

"All-Electric" shall mean powered exclusively by electricity provided by a battery, fuel cell, or the grid.

"Alternate Fueled" shall mean an engine, or a vehicle or piece of equipment that is powered by an engine, which uses a fuel different from or in addition to gasoline fuel or diesel fuel (e.g., CNG, propane, diesel-electric Hybrid).

"Certified Remanufacture System or Verified Engine Upgrade" shall mean engine upgrades certified or verified by EPA or CARB to achieve a reduction in emissions.

"Class 4-7 Local Freight Trucks (Medium Trucks)" shall mean trucks, including commercial trucks, used to deliver cargo and freight (e.g., courier services, delivery trucks, box trucks moving freight, waste haulers, dump trucks, concrete mixers) with a Gross Vehicle Weight Rating (GVWR) between 14,001 and 33,000 lbs.

"Class 4-8 School Bus, Shuttle Bus, or Transit Bus (Buses)" shall mean vehicles with a Gross Vehicle Weight Rating (GVWR) greater than 14,001 lbs. used for transporting people.  <u>See</u> definition for School Bus below.

"Class 8 Local Freight, and Port Drayage Trucks (Eligible Large Trucks)" shall mean trucks with a Gross Vehicle Weight Rating (GVWR) greater than 33,000 lbs. used for port drayage and/or freight/cargo delivery (including waste haulers, dump trucks, concrete mixers).

"CNG" shall mean Compressed Natural Gas.

"Drayage Trucks" shall mean trucks hauling cargo to and from ports and intermodal rail yards.

"Forklift" shall mean nonroad equipment used to lift and move materials short distances; generally includes tines to lift objects.  Eligible types of forklifts include reach stackers, side loaders, and top loaders.

"Freight Switcher" shall mean a locomotive that moves rail cars around a rail yard as compared to a line-haul engine that moves freight long distances.

"Generator Set" shall mean a switcher locomotive equipped with multiple engines that can turn off one or more engines to reduce emissions and save fuel depending on the load it is moving.

"Government" shall mean a State or local government agency (including a school district, municipality, city, county, special district, transit district, joint powers authority, or port authority, owning fleets purchased with government funds), and a tribal government or native

village.  The term "State" means the several States, the District of Columbia, and the Commonwealth of Puerto Rico.

"Gross Vehicle Weight Rating (GVWR)" shall mean the maximum weight of the vehicle, as specified by the manufacturer.  GVWR includes total vehicle weight plus fluids, passengers, and cargo.

> Class 1: < 6000 lb.
> Class 2:  6001-10,000 lb.
> Class 3: 10,001-14,000 lb.
> Class 4: 14,001-16,000 lb.
> Class 5: 16,001-19,500 lb.
> Class 6: 19,501-26,000 lb.
> Class 7: 26,001-33,000 lb.
> Class 8: > 33,001 lb.

"Hybrid" shall mean a vehicle that combines an internal combustion engine with a battery and electric motor.

"Infrastructure" shall mean the equipment used to enable the use of electric powered vehicles (e.g., electric vehicle charging station).

"Intermodal Rail Yard" shall mean a rail facility in which cargo is transferred from drayage truck to train or vice-versa.

 "Port Cargo Handling Equipment" shall mean rubber-tired gantry cranes, straddle carriers, shuttle carriers, and terminal tractors, including yard hostlers and yard tractors that operate within ports.

"Plug-in Hybrid Electric Vehicle (PHEV)" shall mean a vehicle that is similar to a Hybrid but is equipped with a larger, more advanced battery that allows the vehicle to be plugged in and recharged in addition to refueling with gasoline.  This larger battery allows the car to be driven on a combination of electric and gasoline fuels.

"Repower" shall mean to replace an existing engine with a newer, cleaner engine or power source that is certified by EPA and, if applicable, CARB, to meet a more stringent set of engine emission standards.  Repower includes, but is not limited to, diesel engine replacement with an engine certified for use with diesel or a clean alternate fuel, diesel engine replacement with an electric power source (e.g., grid, battery), diesel engine replacement with a fuel cell, diesel engine replacement with an electric generator(s) (genset), diesel engine upgrades in Ferries/Tugs with an EPA Certified Remanufacture System, and/or diesel engine upgrades in Ferries/Tugs with an EPA Verified Engine Upgrade.  All-Electric and fuel cell Repowers do not require EPA or CARB certification.

"School Bus" shall mean a Class 4-8 bus sold or introduced into interstate commerce for purposes that include carrying students to and from school or related events.  May be Type A-D.

"Scrapped" shall mean to render inoperable and available for recycle, and, at a minimum, to specifically cut a 3-inch hole in the engine block for all engines.  If any Eligible Vehicle will be replaced as part of an Eligible project, Scrapped shall also include the disabling of the chassis by cutting the vehicle's frame rails completely in half.

"Tier 0, 1, 2, 3, 4" shall refer to corresponding EPA engine emission classifications for nonroad, locomotive, and marine engines.

"Tugs" shall mean dedicated vessels that push or pull other vessels in ports, harbors, and inland waterways (e.g., tugboats and towboats).

"Zero Emission Vehicle (ZEV)" shall mean a vehicle that produces no emissions from the on-board source of power (e.g., All-Electric or hydrogen fuel cell vehicles).

**APPENDIX D-3**
**Certification for Beneficiary Status**
**Under Environmental Mitigation Trust Agreement**

<u>**APPENDIX D-3**</u>

**CERTIFICATION FOR BENEFICIARY STATUS
UNDER ENVIRONMENTAL MITIGATION TRUST AGREEMENT**

1.   <u>Identity of Lead Agency</u>

_____("Beneficiary"), by and through the Office of the
Governor (or the analogous Chief Executive) of the Indian Tribe on whose behalf the
Certification Form is submitted:  (i) hereby identifies _____
("Lead Agency") as the Lead Agency for purposes of the Beneficiary's participation in the
Environmental Mitigation Trust ("Trust") as a Beneficiary; and (ii) hereby certifies that the Lead
Agency has the delegated authority to act on behalf of and legally bind the Beneficiary for
purposes of the Trust.

<u>**BENEFICIARY'S LEAD AGENCY CONTACT INFORMATION:**</u>

| | |
|---|---|
| **Contact:** | |
| **Address:** | |
| **Phone:** | |
| **Fax:** | |
| **Email:** | |

2.   <u>Submission to Jurisdiction</u>

The Beneficiary expressly consents to the jurisdiction of the U.S. District Court for the Northern
District of California for all matters concerning the interpretation or performance of, or any
disputes arising under, the Trust and the Environmental Mitigation Trust Agreement ("Trust
Agreement").  The Beneficiary's agreement to federal jurisdiction for this purpose shall not be
construed as consent to federal court jurisdiction for any other purpose.

3.   <u>Agreement to be Bound by the Trust Agreement and Consent to Trustee Authority</u>

The Beneficiary agrees, without limitation, to be bound by the terms of the Trust Agreement,
including the allocations of the Trust Assets set forth in Appendix D-1 and Appendix D-1A to
the Trust Agreement, as such allocation may be adjusted in accordance with the Trust
Agreement.  The Beneficiary agrees, without limitation, that any and all future modifications to
the Indian Tribe Trust Agreement done in accordance with the Paragraph 6.5 of the Indian Tribe
Trust Agreement shall automatically bind the Beneficiary to the Indian Tribe Trust Agreement
without any further action on behalf of the Beneficiary.  The Beneficiary further agrees that the
Trustee has the authorities set forth in the Trust Agreement, including, but not limited to, the
authority:  (i) to approve, deny, request modifications, or request further information related to
any request for funds pursuant to the Trust Agreement; and (ii) to implement the Trust
Agreement in accordance with its terms.

1

4.   Certification of Legal Authority

The Beneficiary certifies that:  (i) it has the authority to sign and be bound by this Certification Form; (ii) the Beneficiary's laws do not prohibit it from being a Trust Beneficiary; and (iii) prior to requesting any funds from the Trust, the Beneficiary has obtained full legal authority to receive and/or direct payments of such funds.  If the Beneficiary fails to demonstrate that it has obtained such legal authority, it shall not qualify as a Beneficiary under the Trust Agreement until it has obtained such legal authority.

5.   Certification of Legal Compliance and Disposition of Unused Funds

The Beneficiary certifies and agrees that, in connection with all actions related to the Trust and the Trust Agreement, the Beneficiary has followed and will follow all applicable law and will assume full responsibility for its decisions in that regard.  The Beneficiary further certifies that all funds received on account of any Eligible Mitigation Action request that are not used for the Eligible Mitigation Action shall be returned to the Trust for credit to the Tribal Allocation Subaccount.

6.   Waiver of Claims for Injunctive Relief under Environmental or Common Laws

Upon becoming a Beneficiary, the Beneficiary, on behalf of itself and all of its agencies, departments, offices, and divisions, hereby expressly waives, in favor of the parties (including the Settling Defendants) to the Partial Consent Decree (Dkt. No. 2103-1) and the parties (including the Defendants) to the Second Partial Consent Decree (Dkt. No. 3228-1), all claims for injunctive relief to redress environmental injury caused by the 2.0 Liter Subject Vehicles and the 3.0 Liter Subject Vehicles (jointly, "Subject Vehicles"), whether based on the environmental or common law within its jurisdiction.  This waiver is binding on all agencies, departments, offices, and divisions of the Beneficiary asserting, purporting to assert, or capable of asserting such claims.  This waiver does not waive, and the Beneficiary expressly reserves, its rights, if any, to seek fines or penalties.  No waiver submitted by any Indian Tribe shall be effective unless and until such Indian Tribe actually receives Trust Funds.

7.   Publicly Available Information

The Beneficiary certifies that it will maintain and make publicly available all documentation and records:  (i) submitted by it in support of each funding request; and (ii) supporting all expenditures of Trust Funds by the Beneficiary, each until the Termination Date of the Trust pursuant to Paragraph 6.8 of the Trust Agreement, unless the laws of the Beneficiary require a longer record retention period.  Together herewith, the Beneficiary attaches an explanation of: (i) the procedures by which the records may be accessed, which shall be designed to support access and limit burden for the general public; and (ii) a description of whether and the extent to which the certification in this Paragraph 7 is subject to the Beneficiary's applicable laws governing the publication of confidential business information and personally identifiable information.

8.  Notice of Availability of Mitigation Action Funds

The Beneficiary certifies that, not later than 30 Days after being deemed a Beneficiary pursuant to the Trust Agreement, the Beneficiary will provide a copy of the Trust Agreement with Attachments to the U.S. Department of the Interior, the U.S. Department of Agriculture, and any other Federal agency that has custody, control or management of land within or contiguous to the territorial boundaries of the Beneficiary and has by then notified the Beneficiary of its interest hereunder, explaining that the Beneficiary may request Eligible Mitigation Action funds for use on lands within that Federal agency's custody, control or management (including, but not limited to, Clean Air Act Class I and II areas), and setting forth the procedures by which the Beneficiary will review, consider, and make a written determination upon each such request.

9.  Registration of Subject Vehicles

The Beneficiary certifies, for the benefit of the Parties (including the Settling Defendants) to the Partial Consent Decree and the Parties to the Second Partial Consent Decree (including the Defendants) and the owners from time-to-time of Subject Vehicles, that upon becoming a Beneficiary, the Beneficiary:

> (a) Shall not deny registration to any Subject Vehicle based solely on:
>
>> i.  The presence of a defeat device or AECD covered by the resolution of claims in the Partial Consent Decree or in the Second Partial Consent Decree; or
>>
>> ii.  Emissions resulting from such a defeat device or AECD; or
>>
>> iii.  The availability of an Approved Emissions Modification, an Emissions Compliant Recall or the Buyback, Lease Termination, and Owner/Lessee Payment Program.
>
> (b) Shall not deny registration to any Subject Vehicle that has been modified in accordance with an Approved Emissions Modification or an Emissions Compliant Recall based solely on:
>
>> i.  The fact that the vehicle has been modified in accordance with the Approved Emissions Modification or the Emissions Compliant Recall; or
>>
>> ii.  Emissions resulting from the modification (including, but not limited to, the anticipated emissions described in Appendix B to the Partial Consent Decree and Appendix B to the Second Partial Consent Decree); or
>>
>> iii.  Other emissions-related vehicle characteristics that result from the modification; or

3

    iv.   The availability of an Approved Emissions Modification, an Emissions Compliant Recall or the Buyback, Lease Termination, and Owner/Lessee Payment Program.

  (c)  May identify Subject Vehicles as having been modified, or not modified, in accordance with the Approved Emissions Modification or the Emissions Compliant Recall on the basis of VIN-specific information provided to the Beneficiary by the Defendants.

  (d)  Notwithstanding the foregoing, the Beneficiary may deny registration to any Subject Vehicle on the basis that the Subject Vehicle fails to meet EPA's or the Beneficiary's failure criteria for the onboard diagnostic ("OBD") inspection; or on other grounds authorized or required under applicable federal regulations (including an approved State Implementation Plan) or under Section 209 or 177 of the Clean Air Act and not explicitly excluded in subparagraphs 9(a)-(b).

10.    <u>Reliance on Certification</u>

The Beneficiary acknowledges that the Trustee is entitled to rely conclusively on, without further duty of inquiry, and shall be protected in relying upon, this Appendix D-3 Certification, or a subsequent communication from the Lead Agency designating new or additional authorized individuals, as setting forth the Lead Agency and the authorized individuals who may direct the Trustee with respect to all of the Beneficiary's rights and duties under the Trust Agreement. The Beneficiary and its delegated Lead Agency, including all authorized individuals, agree to comply with all security procedures, standard payment and signatory authorization protocols, as well as procedures for designating new or additional authorized individuals, as set forth by the Trustee.


**FOR THE GOVERNOR (or the analogous Chief Executive):**

Signature: _____

Name: _____
Title: _____
Date: _____
Location: _____


**[FOR OTHER REQUIRED SIGNATORIES]:**

Signature: _____

Name: _____
Title: _____
Date: _____
Location: _____

**[FOR OTHER REQUIRED SIGNATORIES]:**

Signature:    _____

Name:       _____
Title:        _____
Date:        _____
Location:     _____

**APPENDIX D-4**
**Beneficiary Eligible Mitigation Action Certification**

**BENEFICIARY ELIGIBLE MITIGATION ACTION CERTIFICATION**

Beneficiary _____

Lead Agency Authorized to Act on Behalf of the Beneficiary _____
*(Any authorized person with delegation of such authority to direct the Trustee delivered to the Trustee pursuant to a Delegation of Authority and Certificate of Incumbency*)

| | |
|---|---|
| **Action Title:** | |
| **Beneficiary's Project ID:** | |
| **Funding Request No.** | *(sequential)* |
| **Request Type:** (select one or more) | ☐ Reimbursement          ☐ Advance<br>☐ Other (specify): _____ |
| **Payment to be made to:** (select one or more) | ☐ Beneficiary<br>☐ Other (specify): _____ |
| **Funding Request & Direction (Attachment A)** | ☐ Attached to this Certification<br>☐ To be Provided Separately |

## **SUMMARY**

| | |
|---|---|
| **Eligible Mitigation Action Action Type** | ☐ Appendix D-2 item (specify): _____<br>☐ Item 10 - DERA Option (5.2.12) (specify and attach DERA Proposal): |
| **Detailed Description of Mitigation Action Item Including Community and Air Quality Benefits (5.2.2):** | |
| **Estimate of Anticipated NOx Reductions (5.2.3):** | |
| **Identification of Governmental Entity Responsible for Reviewing and Auditing Expenditures of Eligible Mitigation Action Funds to Ensure Compliance with Applicable Law (5.2.7.1):** | |
| **Describe how the Beneficiary will make documentation publicly available (5.2.7.2).** | |
| **Describe any cost share requirement to be placed on each NOx source proposed to be mitigated (5.2.8).** | |
| **Describe how the Beneficiary complied with subparagraph 4.2.8, related to notice to U.S. Government Agencies (5.2.9).** | |

> If applicable, describe how the mitigation action will mitigate the impacts of NOx emissions on communities that have historically borne a disproportionate share of the adverse impacts of such emissions (5.2.10).

## ATTACHMENTS
## (CHECK BOX IF ATTACHED)

☐  **Attachment A**    **Funding Request and Direction.**

☐  **Attachment B**    **Eligible Mitigation Action Management Plan Including Detailed Budget and Implementation and Expenditures Timeline (5.2.4).**

☐  **Attachment C**    **Detailed Plan for Reporting on Eligible Mitigation Action Implementation (5.2.11).**

☐  **Attachment D**    **Detailed cost estimates from selected or potential vendors for each proposed expenditure exceeding $25,000 (5.2.6). [Attach only if project involves vendor expenditures exceeding $25,000.]**

☐  **Attachment E**    **DERA Option (5.2.12). [Attach only if using DERA option.]**

☐  **Attachment F**    **Attachment specifying amount of requested funding to be debited against each beneficiary's allocation (5.2.13). [Attach only if this is a joint application involving multiple beneficiaries.]**

## CERTIFICATIONS

**By submitting this application, the Lead Agency makes the following certifications:**

1.    **This application is submitted on behalf of Beneficiary _____, and the person executing this certification has authority to make this certification on behalf of the Lead Agency and Beneficiary, pursuant to the Certification for Beneficiary Status filed with the Court.**

2.    **Beneficiary requests and directs that the Trustee make the payments described in this application and Attachment A to this Form.**

3.    **This application contains all information and certifications required by Paragraph 5.2 of the Trust Agreement, and the Trustee may rely on this application, Attachment A, and related certifications in making disbursements of trust funds for the aforementioned Project ID.**

4.    **Any vendors were or will be selected in accordance with a jurisdiction's public contracting law as applicable. (5.2.5)**

5.    **Beneficiary will maintain and make publicly available all documentation submitted in**

support of this funding request and all records supporting all expenditures of eligible mitigation action funds subject to applicable laws governing the publication of confidential business information and personally identifiable information.  (5.2.7.2)


DATED:      _____                    _____

                                                     [NAME]
                                                     [TITLE]


                                                     _____

                                                     [LEAD AGENCY]

                                                     for


                                                     _____

                                                     [BENEFICIARY]

4

## ATTACHMENT A

## FUNDING REQUEST AND DIRECTION

*(Attachment to Appendix D-4, Beneficiary Eligible Mitigation Action Certification, pursuant to Paragraph 5.2 of the Environmental Mitigation Trust Agreement)*

Pursuant to the authority granted to _____ [*insert Lead Agency]* to act on behalf of Beneficiary _____ under the Mitigation Trust, *[Lead Agency]* directs the Trustee to make the following payments from its subaccount no. _____ to the following payees, for the amounts specified on the dates specified below.

### LEAD AGENCY INFORMATION

| | |
|---|---|
| Beneficiary Name: | Lead Agency Contact Person: _____ |
| Lead Agency Name: _____ | Lead Agency Email Address: _____ |
| Lead Agency Address: _____ | Lead Agency Fax: _____ |
| Lead Agency Phone: _____ | Lead Agency TIN: _____ |

*Contact information entered above may correspond to Lead Agency or any authorized person with delegation of such authority to direct the Trustee delivered to the Trustee pursuant to a Delegation of Authority and Certificate of Incumbency*

### MITIGATION ACTION INFORMATION

| | |
|---|---|
| Action Title: _____ | Funding Request No: _____ |
| Beneficiary's Project ID: _____ | |

### PAYMENTS REQUESTED
*(attach additional pages if needed)*

| Amount | Requested Date | Payee | Request Type |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## PAYEE CONTACT AND WIRE INFORMATION
*(fill out both tables below for each payee and payment identified in "Payments Requested" table on p. 1; attach additional pages if needed)*

### PAYEE CONTACT INFORMATION

| | | | |
|---|---|---|---|
| Action Title: | _____ | Beneficiary Project ID: | _____ |
| Payee Name: | _____ | Payee Contact Person: | _____ |
| Payee Address: | _____ | Payee Email Address: | _____ |
| Payee Phone: | _____ | Payee Fax: | _____ |
| Payee TIN: | _____ | | |

| Payment Amount | Requested Date | Request Type |
|---|---|---|
| | | |

### WIRE INFORMATION

| | |
|---|---|
| Receiving Bank Name: | _____ |
| Receiving Bank Branch: | _____ |
| Receiving Bank Address: | _____ |
| Bank Swift ID: | _____  National Routing No. / Bank ABA Number *(Sort Code, BLZ)* _____ |
| Amount of Wire: | _____ |
| Message to Payee: | _____ |
| Instructions to Receiving Bank: | _____ |
| For Credit to: | _____ |
| Other Special Instructions: | _____ |

*[Signature Block]*

6

**[SAMPLE ATTACHMENT B - USE OF THIS FORMAT IS NOT MANDATORY]**

## PROJECT MANAGEMENT PLAN
## PROJECT SCHEDULE AND MILESTONES

| Milestone | Date |
|---|---|
| Lead Agency Provides Notice of Availability of Mitigation Action Funds | |
| Project Sponsor Submits Proposal to Lead Agency | |
| Lead Agency Provides Written Approval of Project Sponsor's Proposal | |
| Lead Agency Incorporates Project Sponsor's Proposal into Mitigation Plan | |
| Trustee Acknowledges Receipt of Project Certification and Funding Direction | |
| Trustee Allocates Share of Funds for Approved Project | |
| Lead Agency Directs Funding (Advance Funded Projects) | |
| Project Sponsor Obtains Cost Share, Notifies or Certifies to Lead Agency | |
| Project Sponsor Enters into Contracts, Purchase Orders, etc. - Start | |
| Project Sponsor Enters into Contracts, Purchase Orders, etc. - Complete | |
| Project Installation(s) – Start | |
| Project Installation(s) – Complete | |
| Project Sponsor provides detailed invoices for all claimed project costs, documentation for emission reduction estimates, required certification documents to Lead Agency to support direction to Trustee for Payment (Reimbursement, Direct-to-Vendor) or final accounting (Forward Funded Projects) | - |
| Lead Agency completes review and certifies payment direction to Trustee (Reimbursement) | |
| Trustee Acknowledges Receipt of Direction for Payment(s) (Advance Funded, Reimbursement) | - |
| Project Sponsor Certifies Project Completion | |
| Lead Agency Reports Project Completion | |

## PROJECT BUDGET

Period of Performance: _____

| Budget Category | Total Approved Budget | Share of Total Budget to be Funded by the Trust | Cost-Share, if applicable (Entity #1) | Cost-Share, if applicable (Entity #2) |
|---|---|---|---|---|
| 1. Equipment Expenditure | $ | $ | $ | $ |
| 2. Contractor Support *(Provide List of Approved Contractors as Attachment with approved funding ceilings)* | $ | $ | $ | $ |
| 3. Subrecipient Support *(Provide List of Approved Subrecipients or Grant Awardees as Attachment with approved funding ceilings)* | $ | $ | $ | $ |
| 4. Administrative[1] | $ | $ | $ | $ |
| **Project Totals** | $ | $ | $ | $ |
| **Percentage** | % | % | % | % |

---

[1] Subject to Appendix D-2 15% administrative cap.

## PROJECTED TRUST ALLOCATIONS:

| | **2017** | **2018** | **2019** | **2020** | **2021** |
|---|---|---|---|---|---|
| 1. Anticipated Annual Project Funding Request to be paid through the Trust | $ | $ | $ | $ | $ |
| 2. Anticipated Annual Cost Share | $ | $ | $ | $ | $ |
| 3. Anticipated Total Project Funding by Year (line 1 plus line 2) | $ | $ | $ | $ | $ |
| 4. Cumulative Trustee Payments Made to Date Against Cumulative Approved Beneficiary Allocation | $ | $ | $ | $ | $ |
| 5. Current Beneficiary Project Funding to be paid through the Trust (line 1) | $ | $ | $ | $ | $ |
| 6. Total Funding Allocated to for Beneficiary, inclusive of Current Action by Year (line 4 plus line 5) | $ | $ | $ | $ | $ |
| 7. Beneficiary Share of Estimated Funds Remaining in Trust | $ | $ | $ | $ | $ |
| 8. Net Beneficiary Funds Remaining in Trust, net of cumulative Beneficiary Funding Actions (line 7 minus line 6) | $ | $ | $ | $ | $ |

8

**APPENDIX D-5**
**Form of Certificate of Trust of the**
**Volkswagen Diesel Emissions Environmental Mitigation Trust**
**for Indian Tribe Beneficiaries**

**APPENDIX D-5**

**FORM OF CERTIFICATE OF TRUST OF THE
VOLKSWAGEN DIESEL EMISSIONS ENVIRONMENTAL MITIGATION TRUST
FOR INDIAN TRIBE BENEFICIARIES**

This Certificate of Trust of the Volkswagen Diesel Emissions Environmental Mitigation Trust for  (the "Trust") is being duly executed and filed on behalf of the Trust by the undersigned, as Trustee, to form a statutory trust under the Delaware Statutory Trust Act, Del. Code Ann. tit.12, §§ 3801-3826 (the "Act").

1.      <u>Name</u>.  The name of the statutory trust formed by this Certificate of Trust is the Volkswagen Diesel Emissions Environmental Mitigation Trust for Indian Tribe Beneficiaries.

2.      <u>Delaware Trustee</u>.  The name and business address of the Trustee of the Trust with a principal place of business in the State of Delaware are Wilmington Trust, N.A., 1100 North Market Street, Wilmington, Delaware 19890.  Attn: Corporate Trust Administration.

3.      <u>Effective Date</u>.  This Certificate of Trust shall be effective upon filing.

4.      IN WITNESS WHEREOF, the undersigned has duly executed this Certificate of Trust in accordance with Section 3811(a)(1) of the Act.

WILMINGTON TRUST, N.A.,
not in its individual capacity but solely
as Trustee

By:_____
Name:
Title:

2

**APPENDIX D-6**

**Designated Beneficiary's Participation Notice**

**APPENDIX D-6**

**Designated Beneficiary's Participation Notice**

_____ ("Beneficiary"), by and through
_____, the Lead Agency with the delegated authority to act on behalf
of and legally bind the Beneficiary for purposes of the Environmental Mitigation Trust
Agreement for Indian Tribe Beneficiaries ("Trust Agreement"), hereby provides notice to the
Trustee that the Beneficiary intends to participate in the _____ funding cycle of
the Trust Agreement.

The Beneficiary acknowledges that providing this Notice to the Trustee does not entitle the
Beneficiary to any funds unless and until it satisfies all of the requirements set forth in the Indian
Tribe Trust Agreement, including, without limitation, Section V (Allocation of Indian Tribe
Mitigation Trust Assets) and all paragraphs and subparagraphs thereof, in connection with the
submission of funding requests.

The Beneficiary further acknowledges that the Trustee is entitled to rely conclusively on, without
further duty of inquiry, and shall be protected in relying on, this Appendix D-6 Notice.

DATED:  _____

_____

[NAME]

[TITLE]

_____

[LEAD AGENCY]

for

_____

[BENEFICIARY]

**APPENDIX D-7**

**Beneficiary's Election to Opt Out Form**

**APPENDIX D-7**

**Beneficiary's Election to Opt Out Form**

_____ ("Beneficiary"), by and through
_____, the Lead Agency with the delegated authority to act on behalf
of and legally bind the Beneficiary for purposes of the Environmental Mitigation Trust
Agreement for Indian Tribe Beneficiaries ("Trust Agreement"), hereby provides notice to the
Trustee that the Beneficiary elects to opt out of the _____ funding cycle of the
Trust Agreement.

The Beneficiary acknowledges that the submittal of this Beneficiary's Election to Opt Out Form
to the Trustee means that:  (1) the Beneficiary will not receive any funds in the funding cycle
identified above; and (2) the Beneficiary has no right or entitlement to the funds identified by the
Trustee as available to the Beneficiary for the funding cycle identified above.

The Beneficiary further acknowledges that the Trustee is entitled to rely conclusively on, without
further duty of inquiry, and shall be protected in relying on, this Appendix D-7 Election.


DATED:  _____           _____

                                           [NAME]

                                           [TITLE]


                                           _____

                                           [LEAD AGENCY]

                                           for

                                           _____

                                           [BENEFICIARY]

**APPENDIX D-7A**
**Designated Beneficiary's Election to Opt Out of Final Distribution**

**APPENDIX D-7A**

**Designated Beneficiary's Election to Opt Out of Final Distribution**

_____ ("Designated Beneficiary"), by and through
_____, the Lead Agency with the delegated authority to act on behalf
of and legally bind the Designated Beneficiary for purposes of the Environmental Mitigation
Trust Agreement for Indian Tribe Beneficiaries ("Trust Agreement"), hereby provides notice to
the Trustee that the Designated Beneficiary elects to opt out of the Final Distribution of Trust
Assets to Designated Beneficiaries.

The Designated Beneficiary acknowledges that the submittal of this Election to Opt Out of Final
Distribution to the Trustee means that:  (1) the Designated Beneficiary will not receive any funds
in the distribution identified above and will receive no further funds from the Trust; and (2) the
Designated Beneficiary has no right or entitlement to the funds identified by the Trustee as
available to the Designated Beneficiary for the Final Distribution of Trust Assets to Designated
Beneficiaries.

The Designated Beneficiary further acknowledges that the Trustee is entitled to rely conclusively
on, without further duty of inquiry, and shall be protected in relying on, this Appendix D-7A
Election.

DATED: _____     BY:     _____

                                        [NAME]

                                        [TITLE]

                                        [LEAD AGENCY]


                                 FOR:     _____

                                        [BENEFICIARY]

**APPENDIX D-8**

**Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas**

APPENDIX D-8

**Alignment Table of Federally Recognized Indian Tribes to
2010 U.S. Geographic Census Areas**

Pursuant to 25 U.S.C. § 5131, the Bureau of Indian Affairs of the Department of the Interior published a current list of federally recognized Indian Tribes at 83 Fed. Reg. 4,235 (Jan. 30, 2018) ("Federal Register List"). The 2010 United States Census published Table PCT4, which reported the total American Indian and Alaska Native population of American Indian and Alaska Native geographic census areas, including reservations, off-reservation trust lands, and statistical areas. This Appendix D-8 includes an Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas and Jenks Groups (the "Alignment Table") that aligns federally recognized Indian Tribes on the Federal Register List with geographic census areas from the 2010 United States Census, and provides a crosswalk between the federally recognized Indian Tribes and the total population values reported in the 2010 United States Census Table PCT4. This information, which is included on the Alignment Table, shall be used to identify the population of each Indian Tribe for the purposes of the Indian Tribe Trust Agreement ("Trust Agreement"). In particular, this information shall be used to determine the pro rata population-based allocation in each funding cycle of the Trust Agreement consistent with subparagraph 5.0.5.3 of the Trust Agreement.

An alignment of the current Federal Register List of Indian Tribes with Table PCT4 of the 2010 United States Census raised five issues ("Exception Variants") that are discussed below. In addition, some Indian Tribes may be federally recognized to exist as Indian Tribes after publication of the Federal Register List. These situations shall be subject to the following resolution for the purposes of this Trust Agreement.

1. The 2010 United States Census listed a total population of zero for 29 geographic census areas that align to 29 federally recognized Indian Tribes. The Alignment Table denotes these Indian Tribes as Exception Variant "A," listing a population of zero for each Tribe. For the per capita allocation in each funding cycle of the Trust Agreement, each of these 29 Indian Tribes that has been designated as a Beneficiary and files a Designated Beneficiary's Participation Notice in a given funding cycle shall be counted as a separate Indian Tribe. These Tribes shall not be eligible for the pro rata population-based allocation in any funding cycle of the Trust Agreement, because they are aligned with geographic census areas with a listed total population of zero in the 2010 United States Census, as denoted on the Alignment Table.

2. The Federal Register List denoted 12 Indian Tribes that align to more than one geographic census area in the 2010 United States Census. The Alignment Table lists these Indian Tribes as Exception Variant "B;" each of these Indian Tribes is represented on an individual row in the Alignment Table. For the per capita allocation in each funding cycle of the Trust Agreement, each of these 12 Alignment Table rows shall represent and be counted as one Indian Tribe. For the pro rata population-based allocation in each funding cycle of the Trust Agreement, the allocation shall be based on the respective total population listed in that Alignment Table row. Within each Indian Tribe denoted as Exception Variant B, more than one

1

entity may be designated as a Beneficiary pursuant to subparagraph 4.0.2.  If this occurs in a funding cycle, the Trustee shall divide the total amount allocated to an Exception Variant B Indian Tribe (i.e., the sum of the per capita allocation and the pro rata population-based allocation) equally among the entities that were designated as participating Beneficiaries and comprise that Indian Tribe.

Example:  According to the Federal Register List, the Minnesota Chippewa Tribe represents one Indian Tribe that consists of six component reservations.  Assume that three of the six component reservations, the Fond du Lac Band, the Mille Lacs Band, and the White Earth Band, are designated as Beneficiaries pursuant to subparagraph 4.0.2 and each submits a timely Designated Beneficiary's Participation Notice (Appendix D-6) to the Trustee for the second funding cycle.  The Trustee shall count these three Bands as one Indian Tribe for the per capita allocation, and shall base the pro rata population-based allocation on the combined population of 14,834 consistent with the corresponding geographic census area, as denoted on the Alignment Table.  The Trustee shall then divide the total per capita and pro-rata population-based allocated amount into three equal shares, one share for each Band that is a participating Beneficiary.  After the Trustee provides notice of the amount of funding available for each Beneficiary, the three participating Beneficiaries can choose to file separate EMA Certification Forms (Appendix D-4) or can follow the procedures for a joint application pursuant to subparagraph 5.2.13 of the Trust Agreement.

3.  In some cases, the 2010 United States Census reports the total population of a single geographic census area that aligns to more than one federally recognized Indian Tribe.  The Alignment Table denotes these Indian Tribes as Exception Variant "C."  For the per capita allocation in each funding cycle of the Trust Agreement, each of the Indian Tribes denoted with Exception Variant "C" shall be counted as one Indian Tribe.  For the pro rata population-based allocation in each funding cycle of the Trust Agreement, the allocation shall be based on the alignment of the Indian Tribes denoted with Exception Variant "C" to the corresponding specified geographic census area and respective total population consistent with the 2010 United States Census, as denoted on the Alignment Table.  Once the pro-rata population-based allocation for the geographic census area has been calculated, the Trustee shall divide it equally among the Indian Tribes designated as participating Beneficiaries aligned to that geographic census area.

Example:  The Cherokee Nation ("Cherokee") and the United Keetoowah Band of Cherokee Indians in Oklahoma ("UKB") are aligned to a single geographic area, the Cherokee OTSA, Oklahoma.  Assume that both the Cherokee and the UKB are designated as Beneficiaries and each submits a timely Designated Beneficiary's Participation Notice (Appendix D-6) to the Trustee for the second funding cycle.  The Trustee shall count the Cherokee and the UKB as two separate Indian Tribes for purposes of the per capita allocation, and shall base the pro rata population-based allocation on the combined population of 125,440 attributable to the single geographic area of Cherokee OTSA, Oklahoma.  Once the pro-rata population-based allocation for this geographic census area has been calculated, the Trustee shall then divide it into two equal shares, one for the Cherokee and one for the UKB.  After the Trustee provides notice of the

2

amount of funding available for each Beneficiary, the two Indian Tribes can choose to file separate EMA Certification Forms (Appendix D-4) or can follow the procedures for a joint application pursuant to subparagraph 5.2.13 of the Trust Agreement.

    4. The 2010 United States Census reports the total population of two geographic census areas that align to four Indian Tribes. The Alignment Table denotes these four Indian Tribes as Exception Variant "D." For the per capita allocation in each funding cycle of the Trust Agreement, each of the Indian Tribes denoted with Exception Variant "D" shall be counted as one Indian Tribe. For the pro rata population-based allocation in each funding cycle of the Trust Agreement, the allocation shall be based on the listed population of 21,692, as denoted in the Alignment Table. Once the pro-rata population-based allocation for the combined geographic census areas has been calculated, the Trustee shall divide it equally among the Indian Tribes designated as participating Beneficiaries within the geographic census areas.

    Example 1: The Apache Tribe of Oklahoma ("Apache"), the Comanche Nation, the Fort Sill Apache Tribe, and the Kiowa Indian Tribe are aligned within two geographic areas in Oklahoma. Assume that all four Indian Tribes are designated as Beneficiaries and each submits a timely Designated Beneficiary's Participation Notice (Appendix D-6) to the Trustee for the second funding cycle. The Trustee shall count the Indian Tribes as four separate Indian Tribes for purposes of the per capita allocation, and shall base the pro rata population-based allocation on the combined population of 21,692 for the combined geographic census areas, as denoted on the Alignment Table. Once the pro-rata population based allocation for the combined geographic census area has been calculated, the Trustee shall divide it into four equal shares, allocating one share to each of the four participating Beneficiaries within the combined geographic census areas. After the Trustee provides notice of the amount of funding available for each Beneficiary, the four Indian Tribes can choose to file separate EMA Certification Forms (Appendix D-4) or can follow the procedures for a joint application pursuant to subparagraph 5.2.13 of the Trust Agreement.

    Example 2: Assume that only two of these four Tribes denoted with Exception Variant D on the Alignment Table, the Comanche and the Kiowa, are designated as Beneficiaries and timely submit a Designated Beneficiary's Participation Notice (Appendix D-6) to the Trustee for the second funding cycle. In that case, the Trustee shall count the Indian Tribes as two separate Indian Tribes for purposes of the per capita allocation, and shall base the pro rata population-based allocation on the combined population of 21,692 for the combined geographic census areas, as denoted on the Alignment Table. Once the pro rata population-based allocation for the combined geographic census areas has been calculated, the Trustee shall divide it into two equal shares, allocating one share to each of the two participating Beneficiaries within the combined geographic census areas. After the Trustee provides notice of the amount of funding available for each Beneficiary, the two Indian Tribes can choose to file separate EMA Certification Forms (Appendix D-4) or can follow the procedures for a joint application pursuant to subparagraph 5.2.13 of the Trust Agreement.

    5. There are 26 Indian Tribes included on the Federal Register List for which there is no evident alignment to a 2010 United States Census geographic census area name in Table PCT4.

The Alignment Table denotes these Indian Tribes as Exception Variant "E," listing a population of zero for each Indian Tribe.  For the per capita allocation in each funding cycle of the Trust Agreement, each of these 26 Indian Tribes that has been designated as a Beneficiary and files a Designated Beneficiary's Participation Notice in a given funding cycle shall be counted as a separate Indian Tribe.  These Tribes shall not be eligible for the pro rata population-based allocation in any funding cycle of the Trust Agreement.

6. Pursuant to 25 U.S.C. § 5131, the Bureau of Indian Affairs of the Department of the Interior publishes a current list of federally recognized Indian Tribes; this list may be updated from time to time.  Following such updates, newly recognized Indian Tribes that do not appear on the Alignment Table may elect to become a Beneficiary hereunder by complying with Paragraph 4.0 and subparagraph 5.0.5.3.1 of the Trust Agreement.  By the deadlines set out in Paragraph 4.0, the newly recognized Indian Tribe shall file a Beneficiary Status Certification Form (Appendix D-3) with the Court, and concurrently submit to the Trustee a copy of the Beneficiary Status Certification Form (Appendix D-3) together with official documentation of federal recognition as an Indian Tribe.  These newly recognized Indian Tribes shall be deemed to have a population of zero.  For the per capita allocation in each funding cycle of the Trust Agreement, each newly recognized Indian Tribe that has been designated as a Beneficiary and files a Designated Beneficiary's Participation Notice in a given funding cycle shall be counted as a separate Indian Tribe.  These newly recognized Indian Tribes shall not be eligible for the pro rata population-based allocation in any funding cycle of the Trust Agreement.

The Alignment Table is attached hereto.

4

Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas and Jenks Groups

June 18, 2018

| No. | Sequential Number[1] | Exception Variant | Indian Tribe(s)[2] | Geographic Census Area Name[3] | Total Population per 2010 U.S. Census Table PCT4[4] | Group Alignment |
|---|---|---|---|---|---|---|
| 1 | 1,2,3 | C | Absentee-Shawnee Tribe of Indians of Oklahoma | Citizen Potawatomi Nation-Absentee Shawnee OTSA, OK | 13,463 | 1 |
| 2 | 4 | | Agdaagux Tribe of King Cove | King Cove ANVSA, AK | 384 | 1 |
| 3 | 5 | | Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California | Agua Caliente Indian Reservation and Off-Reservation Trust Land, CA | 435 | 1 |
| 4 | 6 | | Ak-Chin Indian Community (previously listed as the Ak Chin Indian Community of the Maricopa (Ak Chin) Indian Reservation, Arizona | Maricopa (Ak Chin) Indian Reservation, AZ | 903 | 1 |
| 5 | 7 | | Akiachak Native Community | Akiachak ANVSA, AK | 603 | 1 |
| 6 | 8 | | Akiak Native Community | Akiak ANVSA, AK | 328 | 1 |
| 7 | 9 | | Alabama-Coushatta Tribe of Texas (previously listed as the Alabama-Coushatta Tribes of Texas) | Alabama-Coushatta Reservation and Off-Reservation Trust Land, TX | 567 | 1 |
| 8 | 10 | E | Alabama-Quassarte Tribal Town | No Census Area Mapped | None | 1 |
| 9 | 11 | | Alatna Village | Alatna ANVSA, AK | 31 | 1 |
| 10 | 12 | | Algaaciq Native Village (St. Mary's) | Algaaciq ANVSA, AK | 408 | 1 |
| 11 | 13 | | Allakaket Village | Allakaket ANVSA, AK | 170 | 1 |
| 12 | 14 | ▲ | Alturas Indian Rancheria, California | Alturas Indian Rancheria, CA | 0 | 1 |
| 13 | 15 | | Alutiiq Tribe of Old Harbor (previously listed as Native Village of Old Harbor and Village of Old Harbor) | Old Harbor ANVSA, AK | 194 | 1 |
| 14 | 16 | | Angoon Community Association | Angoon ANVSA, AK | 405 | 1 |
| 15 | 17 | | Anvik Village | Anvik ANVSA, AK | 82 | 1 |
| 16 | 18, 19, 20, 21 | D | Apache Tribe of Oklahoma / Comanche Nation, Oklahoma / Fort Sill Apache Tribe of Oklahoma / Kiowa Indian Tribe of Oklahoma | Kiowa-Comanche-Apache-Fort Sill Apache OTSA, OK, Kiowa-Comanche-Apache-Ft Sill Apache/Caddo-Wichita-Delaware joint-use OTSA, OK | 21,692 | 2 |
| 17 | 22, 23 | C | Arapaho Tribe of the Wind River Reservation, Wyoming / Eastern Shoshone Tribe of the Wind River Reservation, Wyoming (previously listed as the Shoshone Tribe of the Wind River Reservation, Wyoming) | Wind River Reservation and Off-Reservation Trust Land, WY | 8,445 | 1 |
| 18 | 24 | | Arctic Village (See Native Village of Venetie Tribal Government) | Arctic Village ANVSA, AK | 145 | 1 |
| 19 | 25 | | Aroostook Band of Micmacs (previously listed as the Aroostook Band of Micmac Indians) | Aroostook Band of Micmac Trust Land, ME | 150 | 1 |
| 20 | 26 | | Asa'carsarmiut Tribe | Mountain Village ANVSA, AK | 773 | 1 |
| 21 | 27 | | Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana | Fort Peck Indian Reservation and Off-Reservation Trust Land, MT | 6,973 | 1 |
| 22 | 28 | | Atqasuk Village (Atkasook) | Atqasuk ANVSA, AK | 217 | 1 |
| 23 | 29 | ▲ | Augustine Band of Cahuilla Indians, California (previously listed as the Augustine Band of Cahuilla Mission Indians of the Augustine Reservation) | Augustine Reservation, CA | 0 | 1 |
| 24 | 30 | | Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin | Bad River Reservation, WI | 1,159 | 1 |
| 25 | 31 | | Bay Mills Indian Community, Michigan | Bay Mills Reservation and Off-Reservation Trust Land, MI | 849 | 1 |
| 26 | 32 | | Bear River Band of the Rohnerville Rancheria, California | Rohnerville Rancheria, CA | 16 | 1 |
| 27 | 33 | | Beaver Village | Beaver ANVSA, AK | 83 | 1 |
| 28 | 34 | | Berry Creek Rancheria of Maidu Indians of California | Berry Creek Rancheria and Off-Reservation Trust Land, CA | 119 | 1 |

Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas and Jenks Groups

June 18, 2018

| No. | Sequential Number[1] | Exception Variant | Indian Tribe(s)[2] | Geographic Census Area Name[3] | Total Population per 2010 U.S. Census Table PCT4[4] | Group Alignment |
|---|---|---|---|---|---|---|
| 29 | 35 | | Big Lagoon Rancheria, California | Big Lagoon Rancheria, CA | 17 | 1 |
| 30 | 36 | | Big Pine Paiute Tribe of the Owens Valley (previously listed as the Big Pine Band of Owens Valley Paiute Shoshone Indians of the Big Pine Reservation, California) | Big Pine Reservation, CA | 418 | 1 |
| 31 | 37 | | Big Sandy Rancheria of Western Mono Indians of California (previously listed as the Big Sandy Rancheria of Mono Indians of California) | Big Sandy Rancheria, CA | 113 | 1 |
| 32 | 38 | | Big Valley Band of Pomo Indians of the Big Valley Rancheria, California | Big Valley Rancheria, CA | 115 | 1 |
| 33 | 39 | | Birch Creek Tribe | Birch Creek ANVSA, AK | 33 | 1 |
| 34 | 40 | | Bishop Paiute Tribe (previously listed as the Paiute-Shoshone Indians of the Bishop Community of the Bishop Colony, California) | Bishop Reservation, CA | 1,180 | 1 |
| 35 | 41 | | Blackfeet Tribe of the Blackfeet Indian Reservation of Montana | Blackfeet Indian Reservation and Off-Reservation Trust Land, MT | 9,149 | 1 |
| 36 | 42 | | Blue Lake Rancheria, California | Blue Lake Rancheria and Off-Reservation Trust Land, CA | 39 | 1 |
| 37 | 43 | | Bridgeport Indian Colony (previously listed as the Bridgeport Paiute Indian Colony of California) | Bridgeport Reservation, CA | 32 | 1 |
| 38 | 44 | E | Buena Vista Rancheria of Me-Wuk Indians of California | No Census Area Mapped | None | 1 |
| 39 | 45 | | Burns Paiute Tribe (previously listed as the Burns Paiute Tribe of the Burns Paiute Indian Colony of Oregon) | Burns Paiute Indian Colony and Off-Reservation Trust Land, OR | 124 | 1 |
| 40 | 46 | | Cabazon Band of Mission Indians, California | Cabazon Reservation, CA | 30 | 1 |
| 41 | 47 | | Cachil DeHe Band of Wintun Indians of the Colusa Indian Community of the Colusa Rancheria, California | Colusa Rancheria, CA | 65 | 1 |
| 42 | 48, 49, 50, 51 | C | Caddo Nation of Oklahoma / Delaware Nation, Oklahoma / Delaware Tribe of Indians / Wichita and Affiliated Tribes (Wichita, Keechi, Waco & Tawakonie), Oklahoma | Caddo-Wichita-Delaware OTSA, OK | 1,961 | 1 |
| 43 | 52 | | Cahto Tribe of the Laytonville Rancheria | Laytonville Rancheria, CA | 194 | 1 |
| 44 | 53 | | Cahuilla Band of Indians (previously listed as the Cahuilla Band of Mission Indians of the Cahuilla Reservation, California) | Cahuilla Reservation, CA | 152 | 1 |
| 45 | 54 | E | California Valley Miwok Tribe, California | No Census Area Mapped | None | 1 |
| 46 | 55 | | Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California | Campo Indian Reservation, CA | 276 | 1 |
| 47 | 56 | B | Capitan Grande Band of Diegueno Mission Indians of California (Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California; Viejas Group of Capitan Grande Band of Mission Indians of the Viejas Reservation, California) | Barona Reservation, CA, Viejas Reservation, CA | 881 | 1 |
| 48 | 57 | | Catawba Indian Nation (aka Catawba Tribe of South Carolina) | Catawba Reservation, SC | 644 | 1 |
| 49 | 58 | | Cayuga Nation | Cayuga Nation TDSA, NY | 38 | 1 |
| 50 | 59 | | Cedarville Rancheria, California | Cedarville Rancheria and Off-Reservation Trust Land, CA | 8 | 1 |
| 51 | 60 | E | Central Council of the Tlingit & Haida Indian Tribes | No Census Area Mapped | None | 1 |
| 52 | 61 | E | Chalkyitsik Village | Chalkyitsik ANVSA, AK | 59 | 1 |

Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas and Jenks Groups

June 18, 2018

| No. | Sequential Number[1] | Exception Variant | Indian Tribe(s)[2] | Geographic Census Area Name[3] | Total Population per 2010 U.S. Census Table PCT4[4] | Group Alignment |
|---|---|---|---|---|---|---|
| 53 | 62 | | Cheesh-Na Tribe (previously listed as the Native Village of Chistochina) | Chistochina ANVSA, AK | 50 | 1 |
| 54 | 63 | | Chemehuevi Indian Tribe of the Chemehuevi Reservation, California | Chemehuevi Reservation, CA | 202 | 1 |
| 55 | 64 | | Cher-Ae Heights Indian Community of the Trinidad Rancheria, California | Trinidad Rancheria and Off-Reservation Trust Land, CA | 103 | 1 |
| 56 | 65, 66 | C | Cherokee Nation / United Keetoowah Band of Cherokee Indians in Oklahoma | Cherokee OTSA, OK | 125,440 | 3 |
| 57 | 67 | | Chevak Native Village | Chevak ANVSA, AK | 912 | 1 |
| 58 | 68 | | Cheyenne and Arapaho Tribes, Oklahoma (previously listed as the Cheyenne-Arapaho Tribes of Oklahoma) | Cheyenne-Arapaho OTSA, OK | 13,145 | 1 |
| 59 | 69 | | Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota | Cheyenne River Reservation and Off-Reservation Trust Land, SD | 6,331 | 1 |
| 60 | 70 | | Chickaloon Native Village | Chickaloon ANVSA, AK | 2,373 | 1 |
| 61 | 71 | ▲ | Chicken Ranch Rancheria of Me-Wuk Indians of California | Chicken Ranch Rancheria and Off-Reservation Trust Land, CA | 1 | 1 |
| 62 | 72 | | Chignik Bay Tribal Council (previously listed as the Native Village of Chignik) | Chignik ANVSA, AK | 56 | 1 |
| 63 | 73 | | Chignik Lake Village | Chignik Lake ANVSA, AK | 70 | 1 |
| 64 | 74 | | Chilkat Indian Village (Klukwan) | Chilkat ANVSA, AK | 88 | 1 |
| 65 | 75 | | Chilkoot Indian Association (Haines) | Chilkoot ANVSA, AK | 105 | 1 |
| 66 | 76 | | Chinik Eskimo Community (Golovin) | Golovin ANVSA, AK | 148 | 1 |
| 67 | 77 | | Chippewa Cree Indians of the Rocky Boy's Reservation, Montana (previously listed as the Chippewa-Cree Indians of the Rocky Boy's Reservation, Montana) | Rocky Boy's Reservation and Off-Reservation Trust Land, MT | 3,256 | 1 |
| 68 | 78 | | Chitimacha Tribe of Louisiana | Chitimacha Reservation, LA | 396 | 1 |
| 69 | 79 | | Chulloonawick Native Village | Chulloonawick ANVSA, AK | 0 | 1 |
| 70 | 80 | | Circle Native Community | Circle ANVSA, AK | 90 | 1 |
| 71 | 81 | E | Cloverdale Rancheria of Pomo Indians of California | No Census Area Mapped | None | 1 |
| 72 | 82 | | Cocopah Tribe of Arizona | Cocopah Reservation, AZ | 539 | 1 |
| 73 | 83 | | Coeur D'Alene Tribe (previously listed as the Coeur D'Alene Tribe of the Coeur D'Alene Reservation, Idaho) | Coeur d'Alene Reservation, ID | 1,551 | 1 |
| 74 | 84 | | Cold Springs Rancheria of Mono Indians of California | Cold Springs Rancheria, CA | 162 | 1 |
| 75 | 85 | | Colorado River Indian Tribes of the Colorado River Indian Reservation, Arizona and California | Colorado River Indian Reservation, AZ--CA | 2,830 | 1 |
| 76 | 86 | | Confederated Salish and Kootenai Tribes of the Flathead Reservation | Flathead Reservation, MT | 9,138 | 1 |
| 77 | 87 | | Confederated Tribes and Bands of the Yakama Nation | Yakama Nation Reservation and Off-Reservation Trust Land, WA | 8,022 | 1 |
| 78 | 88 | | Confederated Tribes of Siletz Indians of Oregon (previously listed as the Confederated Tribes of the Siletz Reservation) | Siletz Reservation and Off-Reservation Trust Land, OR | 427 | 1 |
| 79 | 89 | | Confederated Tribes of the Chehalis Reservation | Chehalis Reservation and Off-Reservation Trust Land, WA | 363 | 1 |
| 80 | 90 | | Confederated Tribes of the Colville Reservation | Colville Reservation and Off-Reservation Trust Land, WA | 4,994 | 1 |
| 81 | 91 | | Confederated Tribes of the Coos, Lower Umpqua and Siuslaw Indians | Coos, Lower Umpqua, and Siuslaw Reservation and Off-Reservation Trust Land, OR | 31 | 1 |
| 82 | 92 | | Confederated Tribes of the Goshute Reservation, Nevada and Utah | Goshute Reservation, NV--UT | 127 | 1 |

Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas and Jenks Groups

June 18, 2018

| No. | Sequential Number[1] | Exception Variant | Indian Tribe(s)[2] | Geographic Census Area Name[3] | Total Population per 2010 U.S. Census Table PCT4[4] | Group Alignment |
|---|---|---|---|---|---|---|
| 83 | 93 | | Confederated Tribes of the Grand Ronde Community of Oregon | Grand Ronde Community and Off-Reservation Trust Land, OR | 353 | 1 |
| 84 | 94 | | Confederated Tribes of the Umatilla Indian Reservation, Oregon (previously listed as the Confederated Tribes of the Umatilla Reservation, Oregon) | Umatilla Reservation, OR | 1,561 | 1 |
| 85 | 95 | | Confederated Tribes of the Warm Springs Reservation of Oregon | Warm Springs Reservation and Off-Reservation Trust Land, OR | 3,754 | 1 |
| 86 | 96 | | Coquille Indian Tribe (previously listed as the Coquille Tribe of Oregon) | Coquille Reservation, OR | 157 | 1 |
| 87 | 97 | | Cortina Indian Rancheria (previously listed as the Cortina Indian Rancheria of Wintun Indians of California) | Cortina Indian Rancheria, CA | 19 | 1 |
| 88 | 98 | | Coushatta Tribe of Louisiana | Coushatta Reservation and Off-Reservation Trust Land, LA | 74 | 1 |
| 89 | 99 | | Cow Creek Band of Umpqua Tribe of Indians (previously listed as the Cow Creek Band of Umpqua Indians of Oregon) | Cow Creek Reservation and Off-Reservation Trust Land, OR | 48 | 1 |
| 90 | 100 | E | Cowlitz Indian Tribe | No Census Area Mapped | None | 1 |
| 91 | 101 | | Coyote Valley Band of Pomo Indians of California | Coyote Valley Reservation, CA | 132 | 1 |
| 92 | 102 | | Craig Tribal Association (previously listed as the Craig Community Association) | Craig ANVSA, AK | 455 | 1 |
| 93 | 103 | | Crow Creek Sioux Tribe of the Crow Creek Reservation, South Dakota | Crow Creek Reservation, SD | 1,821 | 1 |
| 94 | 104 | | Crow Tribe of Montana | Crow Reservation and Off-Reservation Trust Land, MT | 5,408 | 1 |
| 95 | 105 | E | Curyung Tribal Council | No Census Area Mapped | None | 1 |
| 96 | 106 | | Death Valley Timbi-sha Shoshone Tribe (previously listed as the Death Valley Timbi-Sha Shoshone Band of California) | Timbi-Sha Shoshone Reservation and Off-Reservation Trust Land, CA-NV | 18 | 1 |
| 97 | 107 | | Douglas Indian Association | Douglas ANVSA, AK | 972 | 1 |
| 98 | 108 | ► | Dry Creek Rancheria Band of Pomo Indians, California (previously listed as the Dry Creek Rancheria of Pomo Indians of California) | Dry Creek Rancheria, CA | 0 | 1 |
| 99 | 109 | | Duckwater Shoshone Tribe of the Duckwater Reservation, Nevada | Duckwater Reservation, NV | 122 | 1 |
| 100 | 110 | | Eastern Band of Cherokee Indians | Eastern Cherokee Reservation, NC | 7,351 | 1 |
| 101 | 111 | | Eastern Shawnee Tribe of Oklahoma | Eastern Shawnee OTSA, OK | 215 | 1 |
| 102 | 112 | | Egegik Village | Egegik ANVSA, AK | 51 | 1 |
| 103 | 113 | | Eklutna Native Village | Eklutna ANVSA, AK | 44 | 1 |
| 104 | 114 | | Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria, California | Sulphur Bank Rancheria, CA | 47 | 1 |
| 105 | 115 | | Elk Valley Rancheria, California | Elk Valley Rancheria and Off-Reservation Trust Land, CA | 52 | 1 |
| 106 | 116 | | Ely Shoshone Tribe of Nevada | Ely Reservation, NV | 160 | 1 |
| 107 | 117 | | Emmonak Village | Emmonak ANVSA, AK | 737 | 1 |
| 108 | 118 | | Enterprise Rancheria of Maidu Indians of California | Enterprise Rancheria, CA | 1 | 1 |
| 109 | 119 | | Evansville Village (aka Bettles Field) | Evansville ANVSA, AK | 9 | 1 |
| 110 | 120 | ► | Ewiiaapaayp Band of Kumeyaay Indians, California | Ewiiaapaayp Reservation, CA | 0 | 1 |
| 111 | 121 | E | Federated Indians of Graton Rancheria, California | No Census Area Mapped | None | 1 |
| 112 | 122 | | Flandreau Santee Sioux Tribe of South Dakota | Flandreau Reservation, SD | 371 | 1 |
| 113 | 123 | | Forest County Potawatomi Community, Wisconsin | Forest County Potawatomi Community and Off-Reservation Trust Land, WI | 514 | 1 |

Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas and Jenks Groups

June 18, 2018

| No. | Sequential Number[1] | Exception Variant | Indian Tribe(s)[2] | Geographic Census Area Name[3] | Total Population per 2010 U.S. Census Table PCT4[4] | Group Alignment |
|---|---|---|---|---|---|---|
| 114 | 124 | | Fort Belknap Indian Community of the Fort Belknap Reservation of Montana | Fort Belknap Reservation and Off-Reservation Trust Land, MT | 2,738 | 1 |
| 115 | 125 | | Fort Bidwell Indian Community of the Fort Bidwell Reservation of California | Fort Bidwell Reservation and Off-Reservation Trust Land, CA | 86 | 1 |
| 116 | 126 | | Fort Independence Indian Community of Paiute Indians of the Fort Independence Reservation, California | Fort Independence Reservation, CA | 62 | 1 |
| 117 | 127 | | Fort McDermitt Paiute and Shoshone Tribes of the Fort McDermitt Indian Reservation, Nevada and Oregon | Fort McDermitt Indian Reservation, NV–OR | 327 | 1 |
| 118 | 128 | | Fort McDowell Yavapai Nation, Arizona | Fort McDowell Yavapai Nation Reservation, AZ | 891 | 1 |
| 119 | 129 | | Fort Mojave Indian Tribe of Arizona, California & Nevada | Fort Mojave Reservation and Off-Reservation Trust Land, AZ–CA–NV | 683 | 1 |
| 120 | 130 | | Galena Village (aka Louden Village) | Galena ANVSA, AK | 324 | 1 |
| 121 | 131 | | Gila River Indian Community of the Gila River Indian Reservation, Arizona | Gila River Indian Reservation, AZ | 11,251 | 1 |
| 122 | 132 | | Grand Traverse Band of Ottawa and Chippewa Indians, Michigan | Grand Traverse Reservation and Off-Reservation Trust Land, MI | 485 | 1 |
| 123 | 133 | | Greenville Rancheria (previously listed as the Greenville Rancheria of Maidu Indians of California) | Greenville Rancheria, CA | 19 | 1 |
| 124 | 134 | | Grindstone Indian Rancheria of Wintun-Wailaki Indians of California | Grindstone Indian Rancheria, CA | 153 | 1 |
| 125 | 135 | | Guidiville Rancheria of California | Guidiville Rancheria and Off-Reservation Trust Land, CA | 42 | 1 |
| 126 | 136 | | Gulkana Village | Gulkana ANVSA, AK | 97 | 1 |
| 127 | 137 | | Habematolel Pomo of Upper Lake, California | Upper Lake Rancheria, CA | 29 | 1 |
| 128 | 138 | | Hannahville Indian Community, Michigan | Hannahville Indian Community and Off-Reservation Trust Land, MI | 454 | 1 |
| 129 | 139 | | Havasupai Tribe of the Havasupai Reservation, Arizona | Havasupai Reservation, AZ | 455 | 1 |
| 130 | 140 | | Healy Lake Village | Healy Lake ANVSA, AK | 11 | 1 |
| 131 | 141 | | Ho-Chunk Nation of Wisconsin | Ho-Chunk Nation Reservation and Off-Reservation Trust Land, WI–MN | 1,215 | 1 |
| 132 | 142 | | Hoh Indian Tribe (previously listed as the Hoh Indian Tribe of the Hoh Indian Reservation, Washington) | Hoh Indian Reservation, WA | 104 | 1 |
| 133 | 143 | | Holy Cross Village | Holy Cross ANVSA, AK | 170 | 1 |
| 134 | 144 | | Hoonah Indian Association | Hoonah ANVSA, AK | 502 | 1 |
| 135 | 145 | | Hoopa Valley Tribe, California | Hoopa Valley Reservation, CA | 2,667 | 1 |
| 136 | 146 | | Hopi Tribe of Arizona | Hopi Reservation and Off-Reservation Trust Land, AZ | 6,912 | 1 |
| 137 | 147 | | Hopland Band of Pomo Indians, California (formerly Hopland Band of Pomo Indians of the Hopland Rancheria, California) | Hopland Rancheria and Off-Reservation Trust Land, CA | 30 | 1 |
| 138 | 148 | | Houlton Band of Maliseet Indians | Houlton Maliseet Reservation and Off-Reservation Trust Land, ME | 169 | 1 |
| 139 | 149 | | Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona | Hualapai Indian Reservation and Off-Reservation Trust Land, AZ | 1,290 | 1 |
| 140 | 150 | | Hughes Village | Hughes ANVSA, AK | 75 | 1 |
| 141 | 151 | | Huslia Village | Huslia ANVSA, AK | 256 | 1 |
| 142 | 152 | | Hydaburg Cooperative Association | Hydaburg ANVSA, AK | 324 | 1 |
| 143 | 153 | | Igiugig Village | Igiugig ANVSA, AK | 35 | 1 |
| 144 | 154 | | Iipay Nation of Santa Ysabel, California (previously listed as the Santa Ysabel Band of Diegueno Mission Indians of the Santa Ysabel Reservation) | Santa Ysabel Reservation, CA | 289 | 1 |

Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas and Jenks Groups

June 18, 2018

| No. | Sequential Number[1] | Exception Variant | Indian Tribe(s)[2] | Geographic Census Area Name[3] | Total Population per 2010 U.S. Census Table PCT4[4] | Group Alignment |
|---|---|---|---|---|---|---|
| 145 | 155 | | Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation, California | Inaja and Cosmit Reservation, CA | 0 | 1 |
| 146 | 156 | E | Inupiat Community of the Arctic Slope | No Census Area Mapped | None | 1 |
| 147 | 157 | A | Ione Band of Miwok Indians of California | Ione Band of Miwok Indians of California | 0 | 1 |
| 148 | 158 | | Iowa Tribe of Kansas and Nebraska | Iowa (KS-NE) Reservation and Off-Reservation Trust Land, KS-- NE | 95 | 1 |
| 149 | 159 | | Iowa Tribe of Oklahoma | Iowa OTSA, OK | 625 | 1 |
| 150 | 160 | | Iqurmiut Traditional Council | Russian Mission ANVSA, AK | 302 | 1 |
| 151 | 161 | | Ivanof Bay Tribe (previously listed as the Ivanof Bay Tribe and the Ivanof Bay Village) | Ivanof Bay ANVSA, AK | 7 | 1 |
| 152 | 162 | A | Jackson Band of Miwuk Indians (previously listed as the Jackson Rancheria of Me-Wuk Indians of California) | Jackson Rancheria, CA | 0 | 1 |
| 153 | 163 | | Jamestown S'Klallam Tribe | Jamestown S'Klallam Reservation and Off-Reservation Trust Land, WA | 5 | 1 |
| 154 | 164 | A | Jamul Indian Village of California | Jamul Indian Village, CA | 0 | 1 |
| 155 | 165 | A | Jena Band of Choctaw Indians | Jena Band of Choctaw Reservation, LA | 0 | 1 |
| 156 | 166 | | Jicarilla Apache Nation, New Mexico | Jicarilla Apache Nation Reservation and Off-Reservation Trust Land, NM | 3,013 | 1 |
| 157 | 167 | E | Kaguyak Village | No Census Area Mapped | None | 1 |
| 158 | 168 | | Kaibab Band of Paiute Indians of the Kaibab Indian Reservation, Arizona | Kaibab Indian Reservation, AZ | 211 | 1 |
| 159 | 169 | | Kaktovik Village (aka Barter Island) | Kaktovik ANVSA, AK | 215 | 1 |
| 160 | 170 | | Kalispel Indian Community of the Kalispel Reservation | Kalispel Reservation and Off-Reservation Trust Land, WA | 195 | 1 |
| 161 | 171 | A | Karuk Tribe (previously listed as the Karuk Tribe of California) | Karuk Reservation and Off-Reservation Trust Land, CA | 387 | 1 |
| 162 | 172 | | Kashia Band of Pomo Indians of the Stewarts Point Rancheria, California | Stewarts Point Rancheria, CA | 75 | 1 |
| 163 | 173 | | Kasigluk Traditional Elders Council | Kasigluk ANVSA, AK | 550 | 1 |
| 164 | 174 | | Kaw Nation, Oklahoma | Kaw OTSA, OK | 852 | 1 |
| 165 | 175 | | Kenaitze Indian Tribe | Kenaitze ANVSA, AK | 3,417 | 1 |
| 166 | 176 | | Ketchikan Indian Corporation | Ketchikan ANVSA, AK | 2,605 | 1 |
| 167 | 177 | | Kewa Pueblo, New Mexico (previously listed as the Pueblo of Santo Domingo) | Santo Domingo Pueblo, NM | 3,219 | 1 |
| 168 | 178 | | Keweenaw Bay Indian Community, Michigan | L'Anse Reservation and Off-Reservation Trust Land, MI | 1,286 | 1 |
| 169 | 179 | E | Kialegee Tribal Town | No Census Area Mapped | None | 1 |
| 170 | 180 | | Kickapoo Traditional Tribe of Texas | Kickapoo (TX) Reservation, TX | 351 | 1 |
| 171 | 181 | B | Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas | Kickapoo (KS) Reservation, KS, Kickapoo (KS) Reservation/Sac and Fox Nation Trust Land joint-use area, KS | 771 | 1 |
| 172 | 182 | | Kickapoo Tribe of Oklahoma | Kickapoo OTSA, OK | 2,968 | 1 |
| 173 | 183 | E | King Island Native Community | No Census Area Mapped | None | 1 |
| 174 | 184 | | King Salmon Tribe | King Salmon ANVSA, AK | 103 | 1 |
| 175 | 185 | | Klamath Tribes | Klamath Reservation, OR | 15 | 1 |
| 176 | 186 | | Klawock Cooperative Association | Klawock ANVSA, AK | 396 | 1 |
| 177 | 187 | | Knik Tribe | Knik ANVSA, AK | 6,582 | 1 |
| 178 | 188 | E | Koi Nation of Northern California (previously listed as the Lower Lake Rancheria, California) | No Census Area Mapped | None | 1 |
| 179 | 189 | | Kokhanok Village | Kokhanok ANVSA, AK | 153 | 1 |

Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas and Jenks Groups

June 18, 2018

| No. | Sequential Number[1] | Exception Variant | Indian Tribe(s)[2] | Geographic Census Area Name[3] | Total Population per 2010 U.S. Census Table PCT4[4] | Group Alignment |
|---|---|---|---|---|---|---|
| 180 | 190 | | Kootenai Tribe of Idaho | Kootenai Reservation and Off-Reservation Trust Land, ID | 67 | 1 |
| 181 | 191 | | Koyukuk Native Village | Koyukuk ANVSA, AK | 95 | 1 |
| 182 | 192 | | La Jolla Band of Luiseno Indians, California (previously listed as the La Jolla Band of Luiseno Mission Indians of the La Jolla Reservation) | La Jolla Reservation, CA | 394 | 1 |
| 183 | 193 | | La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California | La Posta Indian Reservation, CA | 33 | 1 |
| 184 | 194 | | Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin | Lac Courte Oreilles Reservation and Off-Reservation Trust Land, WI | 2,221 | 1 |
| 185 | 195 | | Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin | Lac du Flambeau Reservation, WI | 2,244 | 1 |
| 186 | 196 | | Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan | Lac Vieux Desert Reservation, MI | 118 | 1 |
| 187 | 197 | | Las Vegas Tribe of Paiute Indians of the Las Vegas Indian Colony, Nevada | Las Vegas Indian Colony, NV | 86 | 1 |
| 188 | 198 | | Leveock Village | Leveock ANVSA, AK | 62 | 1 |
| 189 | 199 | | Lime Village | Lime Village ANVSA, AK | 28 | 1 |
| 190 | 200 | | Little River Band of Ottawa Indians, Michigan | Little River Reservation and Off-Reservation Trust Land, MI | 29 | 1 |
| 191 | 201 | | Little Traverse Bay Bands of Odawa Indians, Michigan | Little Traverse Bay Reservation and Off-Reservation Trust Land, MI | 37 | 1 |
| 192 | 202 | | Lone Pine Paiute-Shoshone Tribe (previously listed as the Paiute-Shoshone Indians of the Lone Pine Community of the Lone Pine Reservation, California) | Lone Pine Reservation, CA | 162 | 1 |
| 193 | 203 | | Los Coyotes Band of Cahuilla and Cupeno Indians, California (previously listed as the Los Coyotes Band of Cahuilla & Cupeno Indians of the Los Coyotes Reservation) | Los Coyotes Reservation, CA | 72 | 1 |
| 194 | 204 | | Lovelock Paiute Tribe of the Lovelock Indian Colony, Nevada | Lovelock Indian Colony, NV | 82 | 1 |
| 195 | 205 | | Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota | Lower Brule Reservation and Off-Reservation Trust Land, SD | 1,396 | 1 |
| 196 | 206 | | Lower Elwha Tribal Community (previously listed as the Lower Elwha Tribal Community of the Lower Elwha Reservation, Washington) | Lower Elwha Reservation and Off-Reservation Trust Land, WA | 517 | 1 |
| 197 | 207 | | Lower Sioux Indian Community in the State of Minnesota | Lower Sioux Indian Community, MN | 384 | 1 |
| 198 | 208 | ➤ | Lummi Tribe of the Lummi Reservation | Lummi Reservation, WA | 2,643 | 1 |
| 199 | 209 | | Lytton Rancheria of California | Lytton Rancheria, CA | 0 | 1 |
| 200 | 210 | | Makah Indian Tribe of the Makah Indian Reservation | Makah Indian Reservation, WA | 1,232 | 1 |
| 201 | 211 | | Manchester Band of Pomo Indians of the Manchester Rancheria, California (previously listed as the Manchester Band of Pomo Indians of the Manchester-Point Arena Rancheria, California) | Manchester-Point Arena Rancheria, CA | 177 | 1 |
| 202 | 212 | | Manley Hot Springs Village | Manley Hot Springs ANVSA, AK | 26 | 1 |
| 203 | 213 | | Manokotak Village | Manokotak ANVSA, AK | 425 | 1 |
| 204 | 214 | | Manzanita Band of Diegueno Mission Indians of the Manzanita Reservation, California | Manzanita Reservation and Off-Reservation Trust Land, CA | 62 | 1 |
| 205 | 215 | | Mashantucket Pequot Indian Tribe (previously listed as the Mashantucket Pequot Tribe of Connecticut) | Mashantucket Pequot Reservation and Off-Reservation Trust Land, CT | 223 | 1 |

Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas and Jenks Groups

June 18, 2018

| No. | Sequential Number[1] | Exception Variant | Indian Tribe(s)[2] | Geographic Census Area Name[3] | Total Population per 2010 U.S. Census Table PCT4[4] | Group Alignment |
|---|---|---|---|---|---|---|
| 206 | 216 | E | Mashpee Wampanoag Tribe (previously listed as the Mashpee Wampanoag Indian Tribal Council, Inc.) | No Census Area Mapped | None | 1 |
| 207 | 217 | ▲ | Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan | Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan Reservation, MI | 0 | 1 |
| 208 | 218 | | McGrath Native Village | McGrath ANVSA, AK | 192 | 1 |
| 209 | 219 | | Mechoopda Indian Tribe of Chico Rancheria, California | Mechoopda TDSA, CA | 217 | 1 |
| 210 | 220 | | Menominee Indian Tribe of Wisconsin | Menominee Reservation and Off-Reservation Trust Land, WI | 3,000 | 1 |
| 211 | 221 | | Mentasta Traditional Council | Mentasta Lake ANVSA, AK | 86 | 1 |
| 212 | 222 | | Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation, California | Mesa Grande Reservation, CA | 91 | 1 |
| 213 | 223 | | Mescalero Apache Tribe of the Mescalero Reservation, New Mexico | Mescalero Reservation, NM | 3,394 | 1 |
| 214 | 224 | | Metlakatla Indian Community, Annette Island Reserve | Annette Island Reserve, AK | 1,294 | 1 |
| 215 | 225 | | Miami Tribe of Oklahoma | Miami OTSA, OK | 94 | 1 |
| 216 | 226 | ▲ | Miccosukee Tribe of Indians | Miccosukee Reservation and Off-Reservation Trust Land, FL | 0 | 1 |
| 217 | 227 | | Middletown Rancheria of Pomo Indians of California | Middletown Rancheria, CA | 43 | 1 |
| 218 | 228 | B | Minnesota Chippewa Tribe, Minnesota (Six component reservations: Bois Forte Band (Nett Lake); Fond du Lac Band; Grand Portage Band; Leech Lake Band; Mille Lacs Band; White Earth Band) | Bois Forte Reservation, MN, Fond du Lac Reservation and Off-Reservation Trust Land, MN, Grand Portage Reservation and Off-Reservation Trust Land, MN, Leech Lake Reservation and Off-Reservation Trust Land, MN, Mille Lacs Reservation and Off-Reservation Trust Land, MN, White Earth Reservation and Off-Reservation Trust Land, MN, Minnesota Chippewa Trust Land | 14,834 | 1 |
| 219 | 229 | | Mississippi Band of Choctaw Indians | Mississippi Choctaw Reservation, MS | 7,028 | 1 |
| 220 | 230 | | Moapa Band of Paiute Indians of the Moapa River Indian Reservation, Nevada | Moapa River Indian Reservation, NV | 234 | 1 |
| 221 | 231 | | Mohegan Tribe of Indians of Connecticut (previously listed as Mohegan Indian Tribe of Connecticut) | Mohegan Reservation and Off-Reservation Trust Land, CT | 30 | 1 |
| 222 | 232 | | Mooretown Rancheria of Maidu Indians of California | Mooretown Rancheria and Off-Reservation Trust Land, CA | 140 | 1 |
| 223 | 233 | | Morongo Band of Mission Indians, California (previously listed as the Morongo Band of Cahuilla Mission Indians of the Morongo Reservation) | Morongo Reservation and Off-Reservation Trust Land, CA | 632 | 1 |
| 224 | 234 | | Muckleshoot Indian Tribe (previously listed as the Muckleshoot Indian Tribe of the Muckleshoot Reservation, Washington) | Muckleshoot Reservation and Off-Reservation Trust Land, WA | 1,374 | 1 |
| 225 | 235 | ▲ | Nakrek Native Village | Naknek ANVSA, AK | 283 | 1 |
| 226 | 236 | | Narragansett Indian Tribe | Narragansett Reservation, RI | 0 | 1 |
| 227 | 237 | E | Native Village of Atqopak | No Census Area Mapped | None | 1 |
| 228 | 238 | | Native Village of Akhiok | Akhiok ANVSA, AK | 62 | 1 |
| 229 | 239 | | Native Village of Akutan | Akutan ANVSA, AK | 76 | 1 |
| 230 | 240 | | Native Village of Aleknagik | Aleknagik ANVSA, AK | 185 | 1 |
| 231 | 241 | | Native Village of Ambler | Ambler ANVSA, AK | 228 | 1 |
| 232 | 242 | | Native Village of Atka | Atka ANVSA, AK | 58 | 1 |
| 233 | 243 | | Native Village of Barrow Inupiat Traditional Government | Barrow ANVSA, AK | 2,889 | 1 |
| 234 | 244 | ▲ | Native Village of Belkofski | Belkofski ANVSA, AK | 0 | 1 |
| 235 | 245 | | Native Village of Brevig Mission | Brevig Mission ANVSA, AK | 366 | 1 |
| 236 | 246 | | Native Village of Buckland | Buckland ANVSA, AK | 405 | 1 |

Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas and Jenks Groups

June 18, 2018

| No. | Sequential Number[1] | Exception Variant | Indian Tribe(s)[2] | Geographic Census Area Name[3] | Total Population per 2010 U.S. Census Table PCT4[4] | Group Alignment |
|---|---|---|---|---|---|---|
| 237 | 247 | | Native Village of Cantwell | Cantwell ANVSA, AK | 45 | 1 |
| 238 | 248 | | Native Village of Chenega (aka Chanega) | Chenega ANVSA, AK | 46 | 1 |
| 239 | 249 | | Native Village of Chignik Lagoon | Chignik Lagoon ANVSA, AK | 58 | 1 |
| 240 | 250 | | Native Village of Chitina | Chitina ANVSA, AK | 42 | 1 |
| 241 | 251 | | Native Village of Chuathbaluk (Russian Mission, Kuskokwim) | Chuathbaluk ANVSA, AK | 112 | 1 |
| 242 | 252 | ► | Native Village of Council | Council ANVSA, AK | 0 | 1 |
| 243 | 253 | | Native Village of Deering | Deering ANVSA, AK | 111 | 1 |
| 244 | 254 | | Native Village of Diomede (aka Inalik) | Inalik ANVSA, AK | 110 | 1 |
| 245 | 255 | | Native Village of Eagle | Eagle ANVSA, AK | 28 | 1 |
| 246 | 256 | | Native Village of Eek | Eek ANVSA, AK | 289 | 1 |
| 247 | 257 | | Native Village of Ekuk | Ekuk ANVSA, AK | 2 | 1 |
| 248 | 258 | | Native Village of Ekwok (previously listed as Ekwok Village) | Ekwok ANVSA, AK | 109 | 1 |
| 249 | 259 | ► | Native Village of Elim | Elim ANVSA, AK | 305 | 1 |
| 250 | 260 | | Native Village of Eyak (Cordova) | Eyak ANVSA, AK | 9 | 1 |
| 251 | 261 | | Native Village of False Pass | False Pass ANVSA, AK | 27 | 1 |
| 252 | 262 | | Native Village of Fort Yukon | Fort Yukon ANVSA, AK | 530 | 1 |
| 253 | 263 | | Native Village of Gakona | Gakona ANVSA, AK | 34 | 1 |
| 254 | 264 | | Native Village of Gambell | Gambell ANVSA, AK | 654 | 1 |
| 255 | 265 | | Native Village of Georgetown | Georgetown ANVSA, AK | 2 | 1 |
| 256 | 266 | | Native Village of Goodnews Bay | Goodnews Bay ANVSA, AK | 232 | 1 |
| 257 | 267 | ► | Native Village of Hamilton | Hamilton ANVSA, AK | 0 | 1 |
| 258 | 268 | E | Native Village of Hooper Bay | Hooper Bay ANVSA, AK | 1,070 | 1 |
| 259 | 269 | | Native Village of Kanatak | No Census Area Mapped | None | 1 |
| 260 | 270 | | Native Village of Karluk | Karluk ANVSA, AK | 35 | 1 |
| 261 | 271 | | Native Village of Kiana | Kiana ANVSA, AK | 338 | 1 |
| 262 | 272 | | Native Village of Kipnuk | Kipnuk ANVSA, AK | 626 | 1 |
| 263 | 273 | | Native Village of Kivalina | Kivalina ANVSA, AK | 366 | 1 |
| 264 | 274 | | Native Village of Kluti Kaah (aka Copper Center) | Copper Center ANVSA, AK | 184 | 1 |
| 265 | 275 | | Native Village of Kobuk | Kobuk ANVSA, AK | 136 | 1 |
| 266 | 276 | | Native Village of Kongiganak | Kongiganak ANVSA, AK | 430 | 1 |
| 267 | 277 | | Native Village of Kotzebue | Kotzebue ANVSA, AK | 2,585 | 1 |
| 268 | 278 | | Native Village of Koyuk | Koyuk ANVSA, AK | 319 | 1 |
| 269 | 279 | | Native Village of Kwigillingok | Kwigillingok ANVSA, AK | 310 | 1 |
| 270 | 280 | | Native Village of Kwinhagak (aka Quinhagak) | Kwinhagak ANVSA, AK | 650 | 1 |
| 271 | 281 | | Native Village of Larsen Bay | Larsen Bay ANVSA, AK | 66 | 1 |
| 272 | 282 | | Native Village of Marshall (aka Fortuna Ledge) | Marshall ANVSA, AK | 402 | 1 |
| 273 | 283 | ► | Native Village of Mary's Igloo | Mary's Igloo ANVSA, AK | 0 | 1 |
| 274 | 284 | | Native Village of Mekoryuk | Mekoryuk ANVSA, AK | 185 | 1 |
| 275 | 285 | | Native Village of Minto | Minto ANVSA, AK | 200 | 1 |
| 276 | 286 | | Native Village of Nanwalek (aka English Bay) | Nanwalek ANVSA, AK | 227 | 1 |
| 277 | 287 | | Native Village of Napaimute | Napaimute ANVSA, AK | 1 | 1 |
| 278 | 288 | | Native Village of Napakiak | Napakiak ANVSA, AK | 344 | 1 |
| 279 | 289 | | Native Village of Napaskiak | Napaskiak ANVSA, AK | 393 | 1 |
| 280 | 290 | | Native Village of Nelson Lagoon | Nelson Lagoon ANVSA, AK | 40 | 1 |
| 281 | 291 | | Native Village of Nightmute | Nightmute ANVSA, AK | 257 | 1 |
| 282 | 292 | | Native Village of Nikolski | Nikolski ANVSA, AK | 17 | 1 |

Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas and Jenks Groups

June 18, 2018

| No. | Sequential Number[1] | Exception Variant | Indian Tribe(s)[2] | Geographic Census Area Name[3] | Total Population per 2010 U.S. Census Table PCT4[4] | Group Alignment |
|---|---|---|---|---|---|---|
| 283 | 293 | | Native Village of Noatak | Noatak ANVSA, AK | 499 | 1 |
| 284 | 294 | | Native Village of Nuiqsut (aka Nooiksut) | Nuiqsut ANVSA, AK | 360 | 1 |
| 285 | 295 | | Native Village of Nunam Iqua (previously listed as the Native Village of Sheldon's Point) | Nunam Iqua ANVSA, AK | 174 | 1 |
| 286 | 296 | | Native Village of Nunapitchuk | Nunapitchuk ANVSA, AK | 484 | 1 |
| 287 | 297 | | Native Village of Ouzinkie | Ouzinkie ANVSA, AK | 146 | 1 |
| 288 | 298 | ► | Native Village of Paimiut | Paimiut ANVSA, AK | 0 | |
| 289 | 299 | | Native Village of Perryville | Perryville ANVSA, AK | 110 | 1 |
| 290 | 300 | | Native Village of Pilot Point | Pilot Point ANVSA, AK | 57 | 1 |
| 291 | 301 | | Native Village of Pitka's Point | Pitkas Point ANVSA, AK | 107 | 1 |
| 292 | 302 | | Native Village of Point Hope | Point Hope ANVSA, AK | 629 | 1 |
| 293 | 303 | | Native Village of Point Lay | Point Lay ANVSA, AK | 168 | 1 |
| 294 | 304 | | Native Village of Port Graham | Port Graham ANVSA, AK | 160 | 1 |
| 295 | 305 | | Native Village of Port Heiden | Port Heiden ANVSA, AK | 87 | 1 |
| 296 | 306 | | Native Village of Port Lions | Port Lions ANVSA, AK | 119 | 1 |
| 297 | 307 | | Native Village of Ruby | Ruby ANVSA, AK | 157 | 1 |
| 298 | 308 | | Native Village of Saint Michael | St. Michael ANVSA, AK | 379 | 1 |
| 299 | 309 | | Native Village of Savoonga | Savoonga ANVSA, AK | 637 | 1 |
| 300 | 310 | | Native Village of Scammon Bay | Scammon Bay ANVSA, AK | 472 | 1 |
| 301 | 311 | | Native Village of Selawik | Selawik ANVSA, AK | 792 | 1 |
| 302 | 312 | | Native Village of Shaktoolik | Shaktoolik ANVSA, AK | 242 | 1 |
| 303 | 313 | | Native Village of Shishmaref | Shishmaref ANVSA, AK | 540 | 1 |
| 304 | 314 | | Native Village of Shungnak | Shungnak ANVSA, AK | 247 | 1 |
| 305 | 315 | | Native Village of Stevens | Stevens Village ANVSA, AK | 71 | 1 |
| 306 | 316 | | Native Village of Tanacross | Tanacross ANVSA, AK | 122 | 1 |
| 307 | 317 | | Native Village of Tanana | Tanana ANVSA, AK | 220 | 1 |
| 308 | 318 | | Native Village of Tatitlek | Tatitlek ANVSA, AK | 58 | 1 |
| 309 | 319 | | Native Village of Tazlina | Tazlina ANVSA, AK | 134 | 1 |
| 310 | 320 | | Native Village of Teller | Teller ANVSA, AK | 220 | 1 |
| 311 | 321 | | Native Village of Tetlin | Tetlin ANVSA, AK | 122 | 1 |
| 312 | 322 | | Native Village of Tuntutuliak | Tuntutuliak ANVSA, AK | 370 | 1 |
| 313 | 323 | | Native Village of Tununak | Tununak ANVSA, AK | 314 | 1 |
| 314 | 324 | | Native Village of Tyonek | Tyonek ANVSA, AK | 162 | 1 |
| 315 | 325 | | Native Village of Unalakleet | Unalakleet ANVSA, AK | 574 | 1 |
| 316 | 326 | E | Native Village of Unga | No Census Area Mapped | None | |
| 317 | 327, 328 | C | Native Village of Venetie Tribal Government (Arctic Village and Village of Venetie) (See Native Village of Venetie Tribal Government) | Venetie ANVSA, AK | 142 | 1 |
| 318 | 329 | | Native Village of Wales | Wales ANVSA, AK | 136 | 1 |
| 319 | 330 | | Native Village of White Mountain | White Mountain ANVSA, AK | 167 | 1 |
| 320 | 331 | | Navajo Nation, Arizona, New Mexico & Utah | Navajo Nation Reservation and Off-Reservation Trust Land, AZ–NM–UT | 169,321 | 3 |
| 321 | 332 | | Nenana Native Association | Nenana ANVSA, AK | 161 | 1 |
| 322 | 333 | | New Koliganek Village Council | New Koliganek ANVSA, AK | 202 | 1 |
| 323 | 334 | | New Stuyahok Village | New Stuyahok ANVSA, AK | 491 | 1 |

Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas and Jenks Groups

June 18, 2018

| No. | Sequential Number¹ | Exception Variant | Indian Tribe(s)² | Geographic Census Area Name³ | Total Population per 2010 U.S. Census Table PCT4⁴ | Group Alignment |
|---|---|---|---|---|---|---|
| 324 | 335 | | Newhalen Village | Newhalen ANVSA, AK | 175 | 1 |
| 325 | 336 | | Newtok Village | Newtok ANVSA, AK | 343 | 1 |
| 326 | 337 | | Nez Perce Tribe (previously listed as the Nez Perce Tribe of Idaho) | Nez Perce Reservation, ID | 2,692 | 1 |
| 327 | 338 | | Nikolai Village | Nikolai ANVSA, AK | 87 | 1 |
| 328 | 339 | | Ninilchik Village | Ninilchik ANVSA, AK | 1,112 | 1 |
| 329 | 340 | | Nisqually Indian Tribe (previously listed as the Nisqually Indian Tribe of the Nisqually Reservation, Washington) | Nisqually Reservation, WA | 394 | 1 |
| 330 | 341 | | Nome Eskimo Community | Nome ANVSA, AK | 2,396 | 1 |
| 331 | 342 | | Nondalton Village | Nondalton ANVSA, AK | 137 | 1 |
| 332 | 343 | | Nooksack Indian Tribe | Nooksack Reservation and Off-Reservation Trust Land, WA | 695 | 1 |
| 333 | 344 | | Noorvik Native Community | Noorvik ANVSA, AK | 638 | 1 |
| 334 | 345 | | Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana | Northern Cheyenne Indian Reservation and Off-Reservation Trust Land, MT–SD | 4,478 | 1 |
| 335 | 346 | | Northfork Rancheria of Mono Indians of California | North Fork Rancheria and Off-Reservation Trust Land, CA | 48 | 1 |
| 336 | 347 | | Northway Village | Northway ANVSA, AK | 213 | 1 |
| 337 | 348 | A | Northwestern Band of the Shoshone Nation (previously listed as Northwestern Band of Shoshoni Nation and the Northwestern Band of Shoshoni Nation of Utah (Washakie) | Northwestern Shoshone Reservation, UT | 0 | 1 |
| 338 | 349 | | Nottawaseppi Huron Band of the Potawatomi, Michigan (previously listed as the Huron Potawatomi, Inc.) | Huron Potawatomi Reservation and Off-Reservation Trust Land, MI | 34 | 1 |
| 339 | 350 | | Nulato Village | Nulato ANVSA, AK | 250 | 1 |
| 340 | 351 | E | Nunakauyarmiut Tribe | No Census Area Mapped | None | 1 |
| 341 | 352 | | Oglala Sioux Tribe (previously listed as the Oglala Sioux Tribe of the Pine Ridge Reservation, South Dakota) | Pine Ridge Reservation, SD–NE | 16,906 | 1 |
| 342 | 353 | | Ohkay Owingeh, New Mexico (previously listed as the Pueblo of San Juan) | Ohkay Owingeh, NM | 1,513 | 1 |
| 343 | 354 | | Omaha Tribe of Nebraska | Omaha Reservation, NE–IA | 2,353 | 1 |
| 344 | 355 | | Oneida Nation of New York | Oneida Nation Reservation, NY | 18 | 1 |
| 345 | 356 | | Oneida Nation (previously listed as the Oneida Tribe of Indians of Wisconsin) | Oneida (WI) Reservation and Off-Reservation Trust Land, WI | 4,654 | 1 |
| 346 | 357 | | Onondaga Nation | Onondaga Nation Reservation, NY | 457 | 1 |
| 347 | 358 | | Organized Village of Grayling (aka Holikachuk) | Grayling ANVSA, AK | 181 | 1 |
| 348 | 359 | | Organized Village of Kake | Kake ANVSA, AK | 449 | 1 |
| 349 | 360 | | Organized Village of Kasaan | Kasaan ANVSA, AK | 22 | 1 |
| 350 | 361 | | Organized Village of Kwethluk | Kwethluk ANVSA, AK | 703 | 1 |
| 351 | 362 | | Organized Village of Saxman | Saxman ANVSA, AK | 276 | 1 |
| 352 | 363 | | Orutsararmiut Traditional Native Council (previously listed as Orutsararmiut Native Village (aka Bethel)) | Bethel ANVSA, AK | 4,334 | 1 |
| 353 | 364 | | Oscarville Traditional Village | Oscarville ANVSA, AK | 67 | 1 |
| 354 | 365 | | Otoe-Missouria Tribe of Indians, Oklahoma | Otoe-Missouria OTSA, OK | 422 | 1 |
| 355 | 366 | | Ottawa Tribe of Oklahoma | Ottawa OTSA, OK | 1,359 | 1 |

Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas and Jenks Groups

June 18, 2018

| No. | Sequential Number[1] | Exception Variant | Indian Tribe(s)[2] | Geographic Census Area Name[3] | Total Population per 2010 U.S. Census Table PCT4[4] | Group Alignment |
|---|---|---|---|---|---|---|
| 356 | 367 | B | Paiute Indian Tribe of Utah (Cedar Band of Paiutes, Kanosh Band of Paiutes, Koosharem Band of Paiutes, Indian Peaks Band of Paiutes, and Shivwits Band of Paiutes (formerly Paiute Indian Tribe of Utah (Cedar City Band of Paiutes, Indian Peaks Band of Paiutes, Kanosh Band of Paiutes, Koosharem Band of Paiutes, and Shivwits Band of Paiutes)) | Paiute (UT) Reservation, UT | 249 | 1 |
| 357 | 368 | B | Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada | Fallon Paiute-Shoshone Colony and Off-Reservation Trust Land, NV; Fallon Paiute-Shoshone Reservation and Off-Reservation Trust Land, NV | 614 | 1 |
| 358 | 369 | | Pala Band of Mission Indians (previously listed as the Pala Band of Luiseno Mission Indians of the Pala Reservation, California) | Pala Reservation, CA | 706 | 1 |
| 359 | 370 | | Pamunkey Indian Tribe | Pamunkey (state) Reservation, VA | 43 | 1 |
| 360 | 371 | | Pascua Yaqui Tribe of Arizona | Pascua Pueblo Yaqui Reservation, AZ | 3,219 | 1 |
| 361 | 372 | A | Paskenta Band of Nomlaki Indians of California | Paskenta Rancheria, CA | 0 | 1 |
| 362 | 373 | B | Passamaquoddy Tribe | Passamaquoddy Trust Land, ME, Indian Township Reservation, ME, Pleasant Point Reservation, ME | 1,263 | 1 |
| 363 | 374 | E | Pauloff Harbor Village | No Census Area Mapped | None | 1 |
| 364 | 375 | | Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California | Pauma and Yuima Reservation, CA | 156 | 1 |
| 365 | 376 | | Pawnee Nation of Oklahoma | Pawnee OTSA, OK | 2,786 | 1 |
| 366 | 377 | | Pechanga Band of Luiseno Mission Indians of the Pechanga Reservation, California | Pechanga Reservation, CA | 250 | 1 |
| 367 | 378 | | Pedro Bay Village | Pedro Bay ANVSA, AK | 30 | 1 |
| 368 | 379 | | Penobscot Nation (previously listed as the Penobscot Tribe of Maine) | Penobscot Reservation and Off-Reservation Trust Land, ME | 512 | 1 |
| 369 | 380 | | Peoria Tribe of Indians of Oklahoma | Peoria OTSA, OK | 1,202 | 1 |
| 370 | 381 | | Petersburg Indian Association | Petersburg ANVSA, AK | 327 | 1 |
| 371 | 382 | | Picayune Rancheria of Chukchansi Indians of California | Picayune Rancheria and Off-Reservation Trust Land, CA | 58 | 1 |
| 372 | 383 | | Pilot Station Traditional Village | Pilot Station ANVSA, AK | 558 | 1 |
| 373 | 384 | | Pinoleville Pomo Nation, California (previously listed as the Pinoleville Rancheria of Pomo Indians of California) | Pinoleville Rancheria, CA | 87 | 1 |
| 374 | 385 | B | Pit River Tribe, California (includes XL Ranch, Big Bend, Likely, Lookout, Montgomery Creek and Roaring Creek Rancherias) | Big Bend Rancheria, CA, Likely Rancheria, CA, Lookout Rancheria, CA, Montgomery Creek Rancheria, CA, Roaring Creek Rancheria, CA, XL Ranch Rancheria, CA, Pit River Trust Land | 97 | 1 |
| 375 | 386 | | Platinum Traditional Village | Platinum ANVSA, AK | 57 | 1 |
| 376 | 387 | | Poarch Band of Creeks (previously listed as the Poarch Band of Creek Indians of Alabama) | Poarch Creek Reservation and Off-Reservation Trust Land, AL--FL | 216 | 1 |
| 377 | 388 | | Pokagon Band of Potawatomi Indians, Michigan and Indiana | Pokagon Reservation and Off-Reservation Trust Land, MI | 2 | 1 |
| 378 | 389 | | Ponca Tribe of Indians of Oklahoma | Ponca OTSA, OK | 824 | 1 |
| 379 | 390 | | Ponca Tribe of Nebraska | Ponca (NE) Trust Land, NE--IA | 9 | 1 |
| 380 | 391 | | Port Gamble S'Klallam Tribe (previously listed as the Port Gamble Band of S'Klallam Indians) | Port Gamble Reservation, WA | 592 | 1 |
| 381 | 392 | | Portage Creek Village (aka Ohgsenakale) | Portage Creek ANVSA, AK | 1 | 1 |
| 382 | 393 | E | Potter Valley Tribe, California | No Census Area Mapped | None | 1 |

Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas and Jenks Groups

June 18, 2018

| No. | Sequential Number[1] | Exception Variant | Indian Tribe(s)[2] | Geographic Census Area Name[3] | Total Population per 2010 U.S. Census Table PCT4[4] | Group Alignment |
|---|---|---|---|---|---|---|
| 383 | 394 | | Prairie Band Potawatomi Nation (previously listed as the Prairie Band of Potawatomi Nation, Kansas) | Prairie Band of Potawatomi Nation Reservation, KS | 822 | 1 |
| 384 | 395 | | Prairie Island Indian Community in the State of Minnesota | Prairie Island Indian Community and Off-Reservation Trust Land, MN | 178 | 1 |
| 385 | 396 | | Pueblo of Acoma, New Mexico | Acoma Pueblo and Off-Reservation Trust Land, NM | 2,947 | 1 |
| 386 | 397 | | Pueblo of Cochiti, New Mexico | Pueblo de Cochiti, NM | 854 | 1 |
| 387 | 398 | | Pueblo of Isleta, New Mexico | Isleta Pueblo, NM | 3,170 | 1 |
| 388 | 399 | | Pueblo of Jemez, New Mexico | Jemez Pueblo, NM | 1,797 | 1 |
| 389 | 400 | | Pueblo of Laguna, New Mexico | Laguna Pueblo and Off-Reservation Trust Land, NM | 3,909 | 1 |
| 390 | 401 | | Pueblo of Nambe, New Mexico | Nambe Pueblo and Off-Reservation Trust Land, NM | 529 | 1 |
| 391 | 402 | | Pueblo of Picuris, New Mexico | Picuris Pueblo, NM | 221 | 1 |
| 392 | 403 | | Pueblo of Pojoaque, New Mexico | Pueblo of Pojoaque and Off-Reservation Trust Land, NM | 462 | 1 |
| 393 | 404 | | Pueblo of San Felipe, New Mexico | San Felipe Pueblo, NM | 2,836 | 1 |
| 394 | 405 | | Pueblo of San Ildefonso, New Mexico | San Ildefonso Pueblo and Off-Reservation Trust Land, NM | 498 | 1 |
| 395 | 406 | | Pueblo of Sandia, New Mexico | Sandia Pueblo, NM | 692 | 1 |
| 396 | 407 | | Pueblo of Santa Ana, New Mexico | Santa Ana Pueblo, NM | 597 | 1 |
| 397 | 408 | | Pueblo of Santa Clara, New Mexico | Santa Clara Pueblo, NM | 1,547 | 1 |
| 398 | 409 | | Pueblo of Taos, New Mexico | Taos Pueblo and Off-Reservation Trust Land, NM | 1,308 | 1 |
| 399 | 410 | | Pueblo of Tesuque, New Mexico | Tesuque Pueblo and Off-Reservation Trust Land, NM | 356 | 1 |
| 400 | 411 | | Pueblo of Zia, New Mexico | Zia Pueblo and Off-Reservation Trust Land, NM | 736 | 1 |
| 401 | 412 | | Puyallup Tribe of the Puyallup Reservation | Puyallup Reservation and Off-Reservation Trust Land, WA | 2,127 | 1 |
| 402 | 413 | | Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada | Pyramid Lake Paiute Reservation, NV | 1,265 | 1 |
| 403 | 414 | | Qagan Tayagungin Tribe of Sand Point Village | Sand Point ANVSA, AK | 417 | 1 |
| 404 | 415 | | Qawalangin Tribe of Unalaska | Unalaska ANVSA, AK | 355 | 1 |
| 405 | 416 | | Quartz Valley Indian Community of the Quartz Valley Reservation of California | Quartz Valley Reservation and Off-Reservation Trust Land, CA | 99 | 1 |
| 406 | 417 | | Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona | Fort Yuma Indian Reservation, CA–AZ | 1,461 | 1 |
| 407 | 418 | | Quileute Tribe of the Quileute Reservation | Quileute Reservation, WA | 394 | 1 |
| 408 | 419 | | Quinault Indian Nation (previously listed as the Quinault Tribe of the Quinault Reservation, Washington) | Quinault Reservation, WA | 1,098 | 1 |
| 409 | 420 | | Ramona Band of Cahuilla, California (previously listed as the Ramona Band or Village of Cahuilla Mission Indians of California) | Ramona Village, CA | 12 | 1 |
| 410 | 421 | | Rampart Village | Rampart ANVSA, AK | 23 | 1 |
| 411 | 422 | | Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin | Red Cliff Reservation and Off-Reservation Trust Land, WI | 984 | 1 |
| 412 | 423 | | Red Lake Band of Chippewa Indians, Minnesota | Red Lake Reservation, MN | 5,805 | 1 |
| 413 | 424 | | Redding Rancheria, California | Redding Rancheria, CA | 22 | 1 |
| 414 | 425 | | Redwood Valley or Little River Band of Pomo Indians of the Redwood Valley Rancheria California (previously listed as the Redwood Valley Rancheria of Pomo Indians of California) | Redwood Valley Rancheria, CA | 101 | 1 |
| 415 | 426 | | Reno-Sparks Indian Colony, Nevada | Reno-Sparks Indian Colony, NV | 875 | 1 |
| 416 | 427 | | Resighini Rancheria, California | Resighini Rancheria, CA | 26 | 1 |
| 417 | 428 | | Rincon Band of Luiseno Mission Indians of the Rincon Reservation, California | Rincon Reservation, CA | 511 | 1 |

Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas and Jenks Groups

June 18, 2018

| No. | Sequential Number[1] | Exception Variant | Indian Tribe(s)[2] | Geographic Census Area Name[3] | Total Population per 2010 U.S. Census Table PCT4[4] | Group Alignment |
|---|---|---|---|---|---|---|
| 418 | 429 | | Robinson Rancheria (previously listed as the Robinson Rancheria Band of Pomo Indians, California and the Robinson Rancheria of Pomo Indians of California) | Robinson Rancheria and Off-Reservation Trust Land, CA | 199 | 1 |
| 419 | 430 | | Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota | Rosebud Indian Reservation and Off-Reservation Trust Land, SD | 9,809 | 1 |
| 420 | 431 | | Round Valley Indian Tribes, Round Valley Reservation, California (previously listed as the Round Valley Indian Tribes of the Round Valley Reservation, California) | Round Valley Reservation and Off-Reservation Trust Land, CA | 292 | 1 |
| 421 | 432 | B | Sac & Fox Nation of Missouri in Kansas and Nebraska | Sac and Fox Nation Reservation and Off-Reservation Trust Land, NE--KS, Kickapoo (KS) Reservation/Sac and Fox Nation Trust Land joint-use area, KS | 71 | 1 |
| 422 | 433 | | Sac & Fox Nation, Oklahoma | Sac and Fox OTSA, OK | 8,347 | 1 |
| 423 | 434 | | Sac & Fox Tribe of the Mississippi in Iowa | Sac and Fox/Meskwaki Settlement, IA | 1,004 | 1 |
| 424 | 435 | | Saginaw Chippewa Indian Tribe of Michigan | Isabella Reservation, MI | 2,409 | 1 |
| 425 | 436 | | Saint George Island (See Pribilof Islands Aleut Communities of St. Paul & St. George Islands) | St. George ANVSA, AK | 92 | 1 |
| 426 | 437 | | Saint Paul Island (See Pribilof Islands Aleut Communities of St. Paul & St. George Islands) | St. Paul ANVSA, AK | 417 | 1 |
| 427 | 438 | | Saint Regis Mohawk Tribe (previously listed as the St. Regis Band of Mohawk Indians of New York) | St. Regis Mohawk Reservation, NY | 3,131 | 1 |
| 428 | 439 | | Salt River Pima-Maricopa Indian Community of the Salt River Reservation, Arizona | Salt River Reservation, AZ | 4,692 | 1 |
| 429 | 440 | | Samish Indian Nation (previously listed as the Samish Indian Tribe, Washington) | Samish TDSA, WA | 801 | 1 |
| 430 | 441 | | San Carlos Apache Tribe of the San Carlos Reservation, Arizona | San Carlos Reservation, AZ | 9,901 | 1 |
| 431 | 442 | E | San Juan Southern Paiute Tribe of Arizona | No Census Area Mapped | None | 1 |
| 432 | 443 | | San Manuel Band of Mission Indians, California (previously listed as the San Manuel Band of Serrano Mission Indians of the San Manuel Reservation) | San Manuel Reservation, CA | 72 | 1 |
| 433 | 444 | | San Pasqual Band of Diegueno Mission Indians of California | San Pasqual Reservation, CA | 641 | 1 |
| 434 | 445 | | Santa Rosa Band of Cahuilla Indians, California (previously listed as the Santa Rosa Band of Cahuilla Mission Indians of the Santa Rosa Reservation) | Santa Rosa Reservation, CA | 61 | 1 |
| 435 | 446 | | Santa Rosa Indian Community of the Santa Rosa Rancheria, California | Santa Rosa Rancheria, CA | 575 | 1 |
| 436 | 447 | | Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California | Santa Ynez Reservation, CA | 214 | 1 |
| 437 | 448 | | Santee Sioux Nation, Nebraska | Santee Reservation, NE | 686 | 1 |
| 438 | 449 | | Sauk-Suiattle Indian Tribe | Sauk-Suiattle Reservation, WA | 57 | 1 |
| 439 | 450 | | Sault Ste. Marie Tribe of Chippewa Indians, Michigan | Sault Sainte Marie Reservation and Off-Reservation Trust Land, MI | 1,231 | 1 |
| 440 | 451 | | Scotts Valley Band of Pomo Indians of California | No Census Area Mapped | None | 1 |
| 441 | 452 | E | Seldovia Village Tribe | Seldovia ANVSA, AK | 118 | 1 |
| 442 | 453 | B | Seminole Tribe of Florida (previously listed as the Seminole Tribe of Florida (Dania, Big Cypress, Brighton, Hollywood & Tampa Reservations)) | Big Cypress Reservation, FL, Brighton Reservation, FL, Hollywood Reservation, FL, Seminole (FL) Trust Land, FL, Tampa Reservation, FL | 1,530 | 1 |

Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas and Jenks Groups

June 18, 2018

| No. | Sequential Number[1] | Exception Variant | Indian Tribe(s)[2] | Geographic Census Area Name[3] | Total Population per 2010 U.S. Census Table PCT4[4] | Group Alignment |
|---|---|---|---|---|---|---|
| 443 | 454 | B | Seneca Nation of Indians (previously listed as the Seneca Nation of New York) | Allegany Reservation, NY; Cattaraugus Reservation, NY; Oil Springs Reservation, NY | 3,783 | 1 |
| 444 | 455 | | Seneca-Cayuga Nation (previously listed as the Seneca-Cayuga Tribe of Oklahoma) | Seneca-Cayuga OTSA, OK | 802 | 1 |
| 445 | 456 | | Shageluk Native Village | Shageluk ANVSA, AK | 80 | 1 |
| 446 | 457 | | Shakopee Mdewakanton Sioux Community of Minnesota | Shakopee Mdewakanton Sioux Community and Off-Reservation Trust Land, MN | 406 | 1 |
| 447 | 458 | | Sherwood Valley Rancheria of Pomo Indians of California | Sherwood Valley Rancheria and Off-Reservation Trust Land, CA | 140 | 1 |
| 448 | 459 | | Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California | Shingle Springs Rancheria, CA | 77 | 1 |
| 449 | 460 | | Shinnecock Indian Nation | Shinnecock (state) Reservation, NY | 584 | 1 |
| 450 | 461 | | Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation (previously listed as the Shoalwater Bay Tribe of the Shoalwater Bay Indian Reservation, Washington) | Shoalwater Bay Indian Reservation and Off-Reservation Trust Land, WA | 53 | 1 |
| 451 | 462 | | Shoshone-Bannock Tribes of the Fort Hall Reservation | Fort Hall Reservation and Off-Reservation Trust Land, ID | 3,776 | 1 |
| 452 | 463 | | Shoshone-Paiute Tribes of the Duck Valley Reservation, Nevada | Duck Valley Reservation, NV–ID | 1,232 | 1 |
| 453 | 464 | | Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota | Lake Traverse Reservation and Off-Reservation Trust Land, SD–ND | 4,393 | 1 |
| 454 | 465 | | Sitka Tribe of Alaska | Sitka ANVSA, AK | 1,240 | 1 |
| 455 | 466 | | Skagway Village | Skagway ANVSA, AK | 52 | 1 |
| 456 | 467 | | Skokomish Indian Tribe (previously listed as the Skokomish Indian Tribe of the Skokomish Reservation, Washington) | Skokomish Reservation, WA | 528 | 1 |
| 457 | 468 | | Skull Valley Band of Goshute Indians of Utah | Skull Valley Reservation, UT | 22 | 1 |
| 458 | 469 | ➤ | Snoqualmie Indian Tribe (previously listed as the Snoqualmie Tribe, Washington) | Snoqualmie Reservation, WA | 0 | 1 |
| 459 | 470 | | Soboba Band of Luiseno Indians, California | Soboba Reservation and Off-Reservation Trust Land, CA | 413 | 1 |
| 460 | 471 | | Sokaogon Chippewa Community, Wisconsin | Sokaogon Chippewa Community and Off-Reservation Trust Land, WI | 363 | 1 |
| 461 | 472 | | South Naknek Village | South Naknek ANVSA, AK | 66 | 1 |
| 462 | 473 | | Southern Ute Indian Tribe of the Southern Ute Reservation, Colorado | Southern Ute Reservation, CO | 1,743 | 1 |
| 463 | 474 | | Spirit Lake Tribe, North Dakota | Spirit Lake Reservation, ND | 3,642 | 1 |
| 464 | 475 | | Spokane Tribe of the Spokane Reservation | Spokane Reservation and Off-Reservation Trust Land, WA | 1,771 | 1 |
| 465 | 476 | | Squaxin Island Tribe of the Squaxin Island Reservation | Squaxin Island Reservation and Off-Reservation Trust Land, WA | 341 | 1 |
| 466 | 477 | | St. Croix Chippewa Indians of Wisconsin | St. Croix Reservation and Off-Reservation Trust Land, WI | 639 | 1 |
| 467 | 478 | | Standing Rock Sioux Tribe of North & South Dakota | Standing Rock Reservation, SD–ND | 6,414 | 1 |
| 468 | 479 | ➤ | Stebbins Community Association | Stebbins ANVSA, AK | 530 | 1 |
| 469 | 480 | ➤ | Stillaguamish Tribe of Indians of Washington (previously listed as the Stillaguamish Tribe of Washington) | Stillaguamish Reservation and Off-Reservation Trust Land, WA | 0 | 1 |
| 470 | 481 | | Stockbridge Munsee Community, Wisconsin | Stockbridge Munsee Community, WI | 534 | 1 |
| 471 | 482 | | Summit Lake Paiute Tribe of Nevada | Summit Lake Reservation and Off-Reservation Trust Land, NV | 1 | 1 |
| 472 | 483 | ➤ | Sun'aq Tribe of Kodiak (previously listed as the Shoonaq' Tribe of Kodiak) | Kodiak ANVSA, AK | 0 | 1 |
| 473 | 484 | | Suquamish Indian Tribe of the Port Madison Reservation | Port Madison Reservation, WA | 941 | 1 |

Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas and Jenks Groups

June 18, 2018

| No. | Sequential Number[1] | Exception Variant | Indian Tribe(s)[2] | Geographic Census Area Name[3] | Total Population per 2010 U.S. Census Table PCT4[4] | Group Alignment |
|---|---|---|---|---|---|---|
| 474 | 485 | | Susanville Indian Rancheria, California | Susanville Indian Rancheria and Off-Reservation Trust Land, CA | 301 | 1 |
| 475 | 486 | | Swinomish Indian Tribal Community (previously listed as the Swinomish Indians of the Swinomish Reservation of Washington) | Swinomish Reservation and Off-Reservation Trust Land, WA | 734 | 1 |
| 476 | 487 | | Sycuan Band of the Kumeyaay Nation | Sycuan Reservation, CA | 147 | 1 |
| 477 | 488 | | Table Mountain Rancheria of California | Table Mountain Rancheria, CA | 3 | 1 |
| 478 | 489 | | Takotna Village | Takotna ANVSA, AK | 25 | 1 |
| 479 | 490 | ▶ | Tangirnaq Native Village (formerly Lesnoi Village (aka Woody Island)) | Lesnoi ANVSA, AK | 0 | 1 |
| 480 | 491 | E | Tejon Indian Tribe | No Census Area Mapped | None | 1 |
| 481 | 492 | E | Telida Village | Telida ANVSA, AK | 3 | 1 |
| 482 | 493 | B | Te-Moak Tribe of Western Shoshone Indians of Nevada (Four constituent bands: Battle Mountain Band; Elko Band; South Fork Band and Wells Band) | Battle Mountain Reservation, NV; Elko Colony, NV; South Fork Reservation and Off-Reservation Trust Land, NV, Wells Colony, NV | 961 | 1 |
| 483 | 494 | | The Chickasaw Nation | Chickasaw OTSA, OK | 41,048 | 2 |
| 484 | 495 | | The Choctaw Nation of Oklahoma | Choctaw OTSA, OK | 47,649 | 2 |
| 485 | 496 | | The Modoc Tribe of Oklahoma | Modoc OTSA, OK | 139 | 1 |
| 486 | 497 | | The Muscogee (Creek) Nation | Creek OTSA, OK | 99,451 | 3 |
| 487 | 498 | | The Osage Nation (previously listed as the Osage Tribe) | Osage Reservation, OK | 9,920 | 1 |
| 488 | 499 | | The Quapaw Tribe of Indians | Quapaw OTSA, OK | 1,314 | 1 |
| 489 | 500 | | The Seminole Nation of Oklahoma | Seminole OTSA, OK | 5,664 | 1 |
| 490 | 501 | E | Thlopthlocco Tribal Town | No Census Area Mapped | None | 1 |
| 491 | 502 | | Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota | Fort Berthold Reservation, ND | 4,763 | 1 |
| 492 | 503 | | Tohono O'odham Nation of Arizona | Tohono O'odham Nation Reservation and Off-Reservation Trust Land, AZ | 9,278 | 1 |
| 493 | 504 | | Tolowa Dee-ni' Nation (previously listed as the Smith River Rancheria, California) | Smith River Rancheria and Off-Reservation Trust Land, CA | 86 | 1 |
| 494 | 505 | | Tonawanda Band of Seneca Indians of New York (previously listed as the Tonawanda Band of Seneca Indians of New York) | Tonawanda Reservation, NY | 497 | 1 |
| 495 | 506 | | Tonkawa Tribe of Indians of Oklahoma | Tonkawa OTSA, OK | 625 | 1 |
| 496 | 507 | | Tonto Apache Tribe of Arizona | Tonto Apache Reservation, AZ | 90 | 1 |
| 497 | 508 | | Torres Martinez Desert Cahuilla Indians, California (previously listed as the Torres-Martinez Band of Cahuilla Mission Indians of California) | Torres-Martinez Reservation, CA | 225 | 1 |
| 498 | 509 | | Traditional Village of Togiak | Togiak ANVSA, AK | 767 | 1 |
| 499 | 510 | | Tulalip Tribes of Washington (previously listed as the Tulalip Tribes of the Tulalip Reservation, Washington) | Tulalip Reservation and Off-Reservation Trust Land, WA | 2,882 | 1 |
| 500 | 511 | | Tule River Indian Tribe of the Tule River Reservation, California | Tule River Reservation and Off-Reservation Trust Land, CA | 947 | 1 |
| 501 | 512 | | Tuluksak Native Community | Tuluksak ANVSA, AK | 357 | 1 |
| 502 | 513 | | Tunica-Biloxi Indian Tribe | Tunica-Biloxi Reservation and Off-Reservation Trust Land, LA | 81 | 1 |
| 503 | 514 | | Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California | Tuolumne Rancheria, CA | 155 | 1 |
| 504 | 515 | | Turtle Mountain Band of Chippewa Indians of North Dakota | Turtle Mountain Reservation and Off-Reservation Trust Land, MT--ND--SD | 8,413 | 1 |

Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas and Jenks Groups

June 18, 2018

| No. | Sequential Number[1] | Exception Variant | Indian Tribe(s)[2] | Geographic Census Area Name[3] | Total Population per 2010 U.S. Census Table PCT4[4] | Group Alignment |
|---|---|---|---|---|---|---|
| 505 | 516 | | Tuscarora Nation | Tuscarora Nation Reservation, NY | 385 | 1 |
| 506 | 517 | | Twenty-Nine Palms Band of Mission Indians of California | Twenty-Nine Palms Reservation, CA | 5 | 1 |
| 507 | 518 | | Twin Hills Village | Twin Hills ANVSA, AK | 72 | 1 |
| 508 | 519 | | Ugashik Village | Ugashik ANVSA, AK | 9 | 1 |
| 509 | 520 | E | Umkumiut Native Village (previously listed as Umkumiute Native Village) | No Census Area Mapped | None | 1 |
| 510 | 521 | ➤ | United Auburn Indian Community of the Auburn Rancheria of California | Auburn Rancheria and Off-Reservation Trust Land, CA | 0 | 1 |
| 511 | 522 | | Upper Sioux Community, Minnesota | Upper Sioux Community and Off-Reservation Trust Land, MN | 133 | 1 |
| 512 | 523 | | Upper Skagit Indian Tribe | Upper Skagit Reservation, WA | 190 | 1 |
| 513 | 524 | | Ute Indian Tribe of the Uintah & Ouray Reservation, Utah | Uintah and Ouray Reservation and Off-Reservation Trust Land, UT | 3,457 | 1 |
| 514 | 525 | | Ute Mountain Ute Tribe (previously listed as the Ute Mountain Ute Tribe of the Ute Mountain Reservation, Colorado, New Mexico & Utah) | Ute Mountain Reservation and Off-Reservation Trust Land, CO–NM–UT | 1,701 | 1 |
| 515 | 526 | | Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation, California | Benton Paiute Reservation and Off-Reservation Trust Land, CA | 58 | 1 |
| 516 | 527 | | Village of Alakanuk | Alakanuk ANVSA, AK | 660 | 1 |
| 517 | 528 | | Village of Anaktuvuk Pass | Anaktuvuk Pass ANVSA, AK | 298 | 1 |
| 518 | 529 | | Village of Aniak | Aniak ANVSA, AK | 397 | 1 |
| 519 | 530 | | Village of Atmautluak | Atmautluak ANVSA, AK | 271 | 1 |
| 520 | 531 | ➤ | Village of Bill Moore's Slough | Bill Moore's Slough ANVSA, AK | 0 | 1 |
| 521 | 532 | | Village of Chefornak | Chefornak ANVSA, AK | 403 | 1 |
| 522 | 533 | | Village of Clarks Point | Clarks Point ANVSA, AK | 55 | 1 |
| 523 | 534 | | Village of Crooked Creek | Crooked Creek ANVSA, AK | 97 | 1 |
| 524 | 535 | | Village of Dot Lake | Dot Lake ANVSA, AK | 57 | 1 |
| 525 | 536 | | Village of Iliamna | Iliamna ANVSA, AK | 71 | 1 |
| 526 | 537 | | Village of Kalskag | Kalskag ANVSA, AK | 193 | 1 |
| 527 | 538 | | Village of Kaltag | Kaltag ANVSA, AK | 179 | 1 |
| 528 | 539 | | Village of Kotlik | Kotlik ANVSA, AK | 563 | 1 |
| 529 | 540 | ➤ | Village of Lower Kalskag | Lower Kalskag ANVSA, AK | 274 | 1 |
| 530 | 541 | | Village of Ohogamiut | Ohogamiut ANVSA, AK | 0 | 1 |
| 531 | 542 | | Village of Red Devil | Red Devil ANVSA, AK | 19 | 1 |
| 532 | 543 | | Village of Salamatoff | Salamatof ANVSA, AK | 236 | 1 |
| 533 | 544 | | Village of Sleetmute | Sleetmute ANVSA, AK | 66 | 1 |
| 534 | 545 | ➤ | Village of Solomon | Solomon ANVSA, AK | 0 | 1 |
| 535 | 546 | | Village of Stony River | Stony River ANVSA, AK | 50 | 1 |
| 536 | 547 | | Village of Wainwright | Wainwright ANVSA, AK | 510 | 1 |
| 537 | 548 | | Walker River Paiute Tribe of the Walker River Reservation, Nevada | Walker River Reservation, NV | 643 | 1 |
| 538 | 549 | | Wampanoag Tribe of Gay Head (Aquinnah) | Wampanoag-Aquinnah Trust Land, MA | 60 | 1 |
| 539 | 550 | B | Washoe Tribe of Nevada & California (Carson Colony, Dresslerville Colony, Woodfords Community, Stewart Community & Washoe Ranches) | Carson Colony, NV; Dresslerville Colony, NV; Stewart Community, NV; Washoe Ranches Trust Land, NV–CA, Woodfords Community, CA | 984 | 1 |
| 540 | 551 | | White Mountain Apache Tribe of the Fort Apache Reservation, Arizona | Fort Apache Reservation, AZ | 13,014 | 1 |

Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas and Jenks Groups

June 18, 2018

| No. | Sequential Number[1] | Exception Variant | Indian Tribe(s)[2] | Geographic Census Area Name[3] | Total Population per 2010 U.S. Census Table PCT4[4] | Group Alignment |
|---|---|---|---|---|---|---|
| 541 | 552 | E | Wilton Rancheria, California | No Census Area Mapped | None | 1 |
| 542 | 553 | | Winnebago Tribe of Nebraska | Winnebago Reservation and Off-Reservation Trust Land, NE–IA | 1,749 | 1 |
| 543 | 554 | | Winnemucca Indian Colony of Nevada | Winnemucca Indian Colony, NV | 43 | 1 |
| 544 | 555 | | Wiyot Tribe, California (previously listed as the Table Bluff Reservation—Wiyot Tribe) | Table Bluff Reservation, CA | 81 | 1 |
| 545 | 556 | | Wrangell Cooperative Association | Wrangell ANVSA, AK | 371 | 1 |
| 546 | 557 | | Wyandotte Nation | Wyandotte OTSA, OK | 454 | 1 |
| 547 | 558 | | Yakutat Tlingit Tribe | Yakutat ANVSA, AK | 330 | 1 |
| 548 | 559 | | Yankton Sioux Tribe of South Dakota | Yankton Reservation, SD | 3,074 | 1 |
| 549 | 560 | | Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona | Yavapai-Apache Nation Reservation, AZ | 634 | 1 |
| 550 | 561 | | Yavapai-Prescott Indian Tribe (previously listed as the Yavapai-Prescott Tribe of the Yavapai Reservation, Arizona) | Yavapai-Prescott Reservation, AZ | 143 | 1 |
| 551 | 562 | B | Yerington Paiute Tribe of the Yerington Colony & Campbell Ranch, Nevada | Yerington Colony, NV; Campbell Ranch, NV | 382 | 1 |
| 552 | 563 | | Yocha Dehe Wintun Nation, California (previously listed as the Rumsey Indian Rancheria of Wintun Indians of California) | Rumsey Indian Rancheria, CA | 42 | 1 |
| 553 | 564 | | Yomba Shoshone Tribe of the Yomba Reservation, Nevada | Yomba Reservation, NV | 81 | 1 |
| 554 | 565 | | Ysleta del Sur Pueblo (previously listed as the Ysleta Del Sur Pueblo of Texas) | Ysleta del Sur Pueblo and Off-Reservation Trust Land, TX | 609 | 1 |
| 555 | 566 | | Yupiit of Andreafski | Andreafski ANVSA, AK | 80 | 1 |
| 556 | 567 | | Yurok Tribe of the Yurok Reservation, California | Yurok Reservation, CA | 712 | 1 |
| 557 | 568 | | Zuni Tribe of the Zuni Reservation, New Mexico | Zuni Reservation and Off-Reservation Trust Land, NM–AZ | 7,627 | 1 |
| | | | | Total: | 1,040,851 | — |

Notes:

[1] In some instances, the geographic census areas are mapped to an Indian Tribe were also mapped to other Indian Tribes. To avoid double-counting, it was necessary to group Indian Tribes together. When this occurs, the column contains multiple numbers, reflecting the number of grouped Indian Tribes. See also Exception Variants below.

[2] This Table reflects the mapping of federally recognized Indian Tribes per 83 Fed. Reg. 4,235 (Jan. 30, 2018) to Table PCT4 (entitled "American Indian and Alaska Native Alone or in Combination with One or More Races") of the United States national census conducted by the U.S. Census Bureau in 2010, accessible via the U.S. Census Bureau's American FactFinder. In order to access Table PCT4, take the following steps: 1. Access the U.S. Census Bureau's American FactFinder, accessible at factfinder.census.gov. 2. Click the "Geographies" label on the left sidebar. 3. Select "American Indian Area/Alaska Native Area/Hawaiian Home Land - 250" from the dropdown menu. 4. Select "All American Indian Areas/Alaska Native Areas/Hawaiian Home Lands within the United States" from the resulting list. 5. Click "Add to your selection" with the item in step 4 selected. 6. Click the "Race and Ethnic Groups" label on the left sidebar. 7. Click the link "Alaska Native." 8. Click the link "American Indian." 9. Use the dropdown menu that reads "All Available Programs" to select "Decennial Census." 10. From the resulting array of tables, select Table PCT4: "AMERICAN INDIAN AND ALASKA NATIVE ALONE OR IN COMBINATION WITH ONE OR MORE RACES."

[3] - Reflects geographic census area(s) name(s) mapped to specific Indian Tribe(s), per Table PCT4 (entitled "American Indian and Alaska Native Area/Alaska Native Alone or in Combination with One or More Races") of the United States national census conducted by the U.S. Census Bureau in 2010, accessible via the U.S. Census Bureau data repository, American FactFinder, as explained above.

[4] - Reflects the value of "Total Population" for the census area(s) mapped to specific Indian Tribe(s), per Table PCT4 (entitled "American Indian and Alaska Native Alone or in Combination with One or More Races") of the United States national census conducted by the U.S. Census Bureau in 2010, accessible via the U.S. Census Bureau data repository, American FactFinder, as explained above.

Exception Variant:

A. The U.S. Census population data lists zero population for 29 Indian Tribes. These Indian Tribes are included in Group 1 of the Jenks Groupings.

B. The Federal Register notice lists 12 Indian Tribes for which the U.S. Census aligns more than one geographic census area. For purposes of Jenks groupings, all 12 Indian Tribes are aligned to the Group 1 category.

Alignment Table of Federally Recognized Indian Tribes to 2010 U.S. Geographic Census Areas and Jenks Groups

June 18, 2018

| No. | Sequential Number[1] | Exception Variant | Indian Tribe(s)[2] | Geographic Census Area Name[3] | Total Population per 2010 U.S. Census Table PCT4[4] | Group Alignment |
|-----|----------------------|-------------------|--------------------|--------------------------------|-----------------------------------------------------|-----------------|
|     |                      |                   |                    |                                |                                                     |                 |

1. The U.S. Census population data aligns the population of more than one Indian Tribe to only one census area. For purposes of Jenks Groupings, each Indian Tribe is counted as a separate and distinct Indian Tribe, and is aligned to Jenks Groupings based on the population listed for the census area.

2. The U.S. Census population data aligns the population of more than one Tribal Nation to more than one census area, with a combined population of 21,692. For purposes of Jenks Groupings, each Indian Tribe is counted as a separate and distinct Indian Tribe, and are aligned to Jenks Groupings based on the total population listed for the census areas.

3. The Federal Register notice lists 26 Indian Tribes for which there is no evident alignment to U.S. Census geographic area names, and therefore no population estimate. These Indian Tribes are included in Group 1.

**APPENDIX D-9**

**Certification Regarding Receipt and Use of Final Distribution of Trust Assets to Designated Beneficiaries**

**APPENDIX D-9**

**Certification Regarding Receipt and Use of Final Distribution of Trust Assets to
Designated Beneficiaries**

I, [Name of Authorized Tribal Representative], [Lead Agency], as an authorized representative
of [Name of Indian Tribe] "Designated Beneficiary," hereby certify that the Designated
Beneficiary accepts its allocated share of the Final Distribution of Trust Assets to Designated
Beneficiaries, as established by application of the allocation formula set forth in Paragraph 5.0.6
and Appendix D-8 of the Indian Tribe Trust.  In doing so, the undersigned further certifies that
the Designated Beneficiary will:

> (1) use its allocated share of the Final Distribution to fund environmental mitigation
> projects that reduce emissions of nitrogen oxides ("NOx") where the Subject Vehicles
> were, are, or will be operated, including  (a) projects listed in Appendix D-2; (b)
> Eligible Mitigation Actions that were approved by the Trustee in connection with the
> Fourth Funding Cycle but which the Beneficiary was unable to complete due to an
> unanticipated increase in costs or supply chain delays; and (c) other projects that
> reduce emissions of NOx; and

> (2) no later than 18 months from the date of the Final Distribution of Trust Assets to
> Designated Beneficiaries, return to the Trustee in accordance with subparagraph
> 5.0.5.5.6 any funds that are not used in accordance with (1), above.

Reporting and Publicly Available Information.  The Designated Beneficiary acknowledges that
any funds it receives in connection with the Final Distribution of Trust Assets to Designated
Beneficiaries are subject to the reporting requirement set forth in subparagraph 5.3.1 of the
Agreement, which requires the submission of a report regarding the Designated Beneficiary's
use of such funds including (a) a complete description of the environmental mitigation projects
that were funded with Final Distribution funds, including the cost of each project; and (b) the
amount of funds, if any, returned to the Trust.  It further certifies that it will maintain and make
publicly available upon request all documentation and records supporting expenditures of Trust
funds under the Final Distribution until the Termination Date of the Trust pursuant to Paragraph
6.8 of the Indian Tribe Trust Agreement, unless the laws of the Designated Beneficiary require a
longer record retention period.

Waiver of Claims.  Designated Beneficiary understands that any funds returned to the Trustee in
accordance with subparagraph 5.0.5.5.6 will be distributed in accordance with subparagraph
5.4.5 of the Indian Tribe Trust.  The Designated Beneficiary expressly waives any claims to
those returned funds and all other Trust funds subject to distribution under Paragraph 5.4.5. To
ensure the Trust has sufficient funds to maximize the funds for Final Distribution of Trust Assets
to Designated Beneficiaries and for orderly termination of the Trust, Designated Beneficiary
hereby confirms that it has no claims against the Trust or the Trustee and expressly waives any
claims, in law or in equity, against the Trust or the Trustee, that it might acquire now or at any
time hereafter, and agrees that it will not initiate suit against the Trust or the Trustee.

<u>Reliance on Certification</u>.  The Designated Beneficiary acknowledges that the Trustee is entitled to rely conclusively on, without further duty of inquiry, and shall be protected in relying upon, this Certification.


I, [Name of Authorized Tribal Representative], attest that the information provided in this certification is true and correct and that the submittal of this certification is made under penalty of perjury.


DATED: _____          BY:  _____
                                             [NAME]
                                             [TITLE]
                                             [LEAD AGENCY]


                                        FOR:  _____
                                              [DESIGNATED BENEFICIARY]

**APPENDIX D-10**

**Confirmation Of Contact and Incumbency Information Security
Procedures**

**APPENDIX D-10**

**Confirmation Of Contact and Incumbency Information Security Procedures in Connection With The Final Distribution of Trust Assets to Designated Beneficiaries Pursuant To Subparagraph 5.0.5.5 of the Volkswagen Diesel Emissions Environmental Mitigation Trust For Indian Tribe Beneficiaries (the "Indian Tribe Trust")**

**Confirmation of Contact and Incumbency Information For each Designated Beneficiary**

In connection with the Final Distribution of Trust Assets pursuant to Subparagraph 5.0.5.5 of the Indian Tribe Trust, the Designated Beneficiary named herein agrees to follow the procedures set forth in this Appendix D-10 which is an update to Exhibit A to the Delegation of Authority and Incumbency for the Indian Tribe of [_____] previously delivered to the Trustee with respect to each funding request presented by the Beneficiary to the Trustee pursuant to Paragraph 5.2 hereof.

Name of Lead Agency for Indian Tribe:_____ *(insert full legal entity name)*

Street Address (P.O. Box is **NOT** acceptable): _____

Subaccount No.:_____

This Confirmation of Contact and Incumbency Information (for the Designated Beneficiary named herein) ("**Confirmation**") is dated as of the last date set forth below and is provided by the Lead Agency for the Designated Beneficiary named above ("**Client**") to Wilmington Trust, National Association ("**WT**" or the "**Trustee**").

This Confirmation sets forth Client's designated 'Authorized Instructors' and 'Authorized Confirmers' and, for each such person, true and correct contact details and, in the case of each Authorized Instructor, his/her specimen signature. Each 'Authorized Instructor' is authorized to execute and transmit written instructions to WT for the payment of funds by check or wire transfer (a "Payment Order") from the subaccount at WT specified above (the "**Subaccount**"). Each 'Authorized Confirmer' is authorized to confirm such instructions that have been delivered to WT.

By its execution hereof, Client hereby represents and warrants that the designated Authorized Instructors and Authorized Confirmers, and their contact information and specimen signatures set forth in this Confirmation, do not conflict with any authorizations, terms or conditions set forth in the Indian Tribe Trust (or any other certificates, authorizations or documents delivered to WT) relating to the transaction for the above Subaccount for which WT provides services (**"Indian Tribe Beneficiary Transaction"**). All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indian Tribe Trust.

| | |
|---|---|
| **Action** *(select one only)*:    □ Add  □ Remove    □ **Change Details of Existing** **Authorized Instructor/Authorized Confirmer** | |
| **Type** *(select all that apply)*:    □ **Authorized Instructor**    □ **Authorized Confirmer** | |

| Name: | Title: |
|---|---|
| Email 1: | Cell Phone: |
| Email 2: | Office Phone: |
| Fax No.: | Other Phone: |
| **Specimen Signature** *(for Authorized Instructor only):* ||

| **Action** *(select one only)*:        □ Add  □ Remove        □ **Change Details of Existing Authorized Instructor/Authorized Confirmer** ||
|---|---|
| **Type** *(select all that apply)*:        □ **Authorized Instructor**        □ **Authorized Confirmer** ||
| Name: | Title: |
| Email 1: | Cell Phone: |
| Email 2: | Office Phone: |
| Fax No.: | Other Phone: |
| **Specimen Signature** *(for Authorized Instructor only):* ||

| **Action** *(select one only)*:        □ Add  □ Remove        □ **Change Details of Existing Authorized Instructor/Authorized Confirmer** ||
|---|---|
| **Type** *(select all that apply)*:        □ **Authorized Instructor**        □ **Authorized Confirmer** ||
| Name: | Title: |
| Email 1: | Cell Phone: |
| Email 2: | Office Phone: |
| Fax No.: | Other Phone: |
| **Specimen Signature** *(for Authorized Instructor only):* ||

| **Action** *(select one only)*:        □ Add  □ Remove        □ **Change Details of Existing Authorized Instructor/Authorized Confirmer** ||
|---|---|
| **Type** *(select all that apply)*:        □ **Authorized Instructor**        □ **Authorized Confirmer** ||
| Name: | Title: |
| Email 1: | Cell Phone: |
| Email 2: | Office Phone: |
| Fax No.: | Other Phone: |
| **Specimen Signature** *(for Authorized Instructor only):* ||

□ Additional designated Authorized Instructors and/or Authorized Confirmers listed on attached sheet.

**ADDITIONAL INDIVIDUALS AUTHORIZED TO TRANSMIT PAYMENT ORDERS FOR AUTHORIZED INSTRUCTORS**

For check and wire Payment Orders transmitted via Intralinks\* to the Trustee from the Lead Agency for the Indian Tribe Beneficiary named herein, Client hereby agrees that the following additional individuals are permitted, on behalf of Authorized Instructors named herein, to transmit to WT the instructions referred to in this Confirmation:

**Name 1:**_____  **Email 1:**

**Name 2:**_____  **Email 2:**

**Name 3:**_____  **Email 3:**

**Name 4:**_____  **Email 4:**

**Name 5:**_____  **Email 5:**

**Name 6:**_____  **Email 6:**

*\*Pursuant to Paragraph 6.0, the Trustee maintains a secure internet-based portal (Intralinks) to enable secure communications and delivery of documentation between the Trustee and each Beneficiary. In order to transmit payment instructions to Trustee, all Authorized Instructors and Additional Individuals named above must have Intralinks access granted by Trustee.*

Client agrees that WT may rely on the authorizations, contact information and/or specimen signatures listed above in connection with the Indian Tribe Beneficiary Transaction. The parties' rights, obligations and duties in respect of the Indian Tribe Beneficiary Transaction are set forth in the relevant written underlying transactional agreement(s) entered into between the parties in respect thereof, and nothing herein imposes on WT any other obligations or duties of any kind whatsoever.

Client agrees that WT may rely on the authorizations, contact information and/or specimen signatures listed above in connection with the Final Distribution of Trust Assets to Designated Beneficiaries delivered by the Designated Beneficiary. The term "Written Direction" used herein shall mean the Designated Beneficiary's Beneficiary's Certification of Participation in Final Distribution (Appendix D-9) or any other notice, direction or instruction delivered by the Lead Agency for the Designated Beneficiary along with the Confirmation of Contact and Incumbency Information contained herein of the Authorized Instructors who are entitled to give directions to the Trustee on behalf of the Designated Beneficiary pursuant to the Indian Tribe Trust.

**Client's Instructions**

In connection with the Final Distribution of Trust Assets or other Written Direction, or any other notice, direction or instruction required to be delivered by the Client to the Trustee under the Indian Tribe Trust, the Trustee is authorized to follow and rely upon and all such instructions given to it from time to time if the Trustee believes, in good faith, that such instruction is genuine and to have been signed by an Authorized Instructor, as appropriate, for the Designated

Beneficiary. The Trustee shall have no duty or obligation to verify that the person who sent such Written Direction is, in fact, a person duly authorized to give instructions on behalf of the Designated Beneficiary, other than to verify that the signature of the Authorized Instructor on any such Written Direction appears to be the signature of such person. The Trustee shall have no responsibility or liability for any loss which shall result form (i) any action taken or not taken by the Trustee in good faith reliance on any such signatures or instructions, (ii) as a result of a party's reliance upon or use of any particular method of delivering instructions to the Trustee, including the risk of interception of such instruction and misuse by third parties or (iii) any officer of Authorized Instructor or Authorized Confirmer named in this Confirmation of Contact and Incumbency Information hereunder prior to the actual receipt by the Trustee of a more current executed Confirmation of Contact and Incumbency Information and a reasonable time for the Trustee to act upon and countersign such updated and more current Confirmation of Contact and Incumbency Information.

**Payment Order Delivery Method and Security Procedures.**

Client agrees that all transactions that involve the exchange or transmission of banking information to WT be encrypted or transmitted via a secure session, using a commercially reasonable security technology that, at a minimum, is currently equivalent to 128-bit RC4 encryption technology. Pursuant to Paragraph 6.0, the Trustee maintains a secure internet-based portal (Intralinks) to enable secure communications and delivery of documentation between the Trustee and each Beneficiary. An Authorized Instructor of Client must deliver a Payment Order to WT by uploading via Intralinks Beneficiary's Certification of Participation in Final Distribution (Appendix D-9) and a completed copy of this Confirmation of Contact and Incumbency Information. WT will review the uploaded document to verify that (i) the name of the person purporting to deliver the Payment Order to WT is an Authorized Instructor and (ii) the Payment Order appears to have been sent to WT from an Intralinks login for an Authorized Instructor on file with WT (or from an Intralinks login for an Additional Individual Authorized, under this Confirmation, to transmit the Payment Order to WT on behalf of the Authorized Instructor). WT will then make a telephone call-back to an Authorized Confirmer (which Representative may be the same person as the Authorized Instructor who delivered the Payment Order instruction to WT) at the telephone number for such person according to WT's records to obtain oral confirmation of the authenticity of the requested Payment Order. If WT is unable to obtain oral confirmation of the authenticity of the requested Payment Order, WT will not initiate the Funds Transfer associated with such Payment Order and shall have no liability to Client for any consequences that may arise out of failure to initiate the Payment Order. Other than reviewing the Intralinks upload as noted above and the aforementioned call-back verification, WT will have no duty to verify that the Authorized Instructor who purportedly delivered the Payment Order actually did so, or that the account information is correct. Client acknowledges and agrees that the above security procedures are commercially reasonable for the transmission of Payment Orders to WT and for verifying the authenticity of a Payment Order received by WT via Intralinks upload apparently from Client.

Subject to and in accordance with this Agreement, WT may, in its sole discretion, accept any Payment Order received from Client or any of its Authorized Instructors. If WT informs Client of any 'value date' or estimated date that a Funds Transfer may arrive at the recipient institution or recipient account, Client understands that such information is an estimate only and provided in good faith by WT with information available at the time of the Payment Order, and WT provides

no promise or guarantee that the Funds Transfer will be deposited in the recipient's account by that date, since the various funds clearing and processing systems are independent of and outside the control of WT.

The Client acknowledges that over the term of the Indian Tribe Trust WT may amend, update or change its security procedures and requirements and in connection with such amendments, updates and changes to its security procedures the Client may be requested to complete a new Confirmation of Contact and Incumbency Information which reflects those amendments, updates and changes.

In the event that the Trustee makes any payment to any other party pursuant to this Confirmation of Contact and Incumbency Information in connection with the Final Distribution of Trust Assets to Designated Beneficiaries and for any reason such payment (or any portion thereof) is required to be returned to the Trustee or another party or is subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a receiver, trustee or other party under any bankruptcy or insolvency law, other federal or state law, common law or equitable doctrine, then the recipient shall repay to the Trustee upon written request the amount so paid to it.

The Trustee shall, in its sole discretion, comply with judgements or orders issued or process entered by any court with respect to the Indian Tribe Trust Funds, including without limitation any attachment, levy or garnishment, without any obligation to determine such court's jurisdiction in the matter and in accordance with its normal business practices. If the Trustee complies with any such judgement, order or process, then it shall not be liable to either Party or any other person by reason of such compliance, regardless of the final disposition of any such judgement, order or process.

Each Party acknowledges and agrees that given its particular circumstances, including the nature of its business, the size, type and frequency of its instructions, transactions and files internal procedures and systems, the alternative security procedures offered by the Trustee and the security procedures in general use by other customers and banks similarly situated, the security procedures set forth in this Section are a commercially reasonable method of verifying the authenticity of a Written Direction in connection with the Final Distribution of Trust Assets to Designated Beneficiaries.

Notwithstanding anything else, the Trustee shall be deemed to have acted in good faith and without negligence, willful misconduct or fraud if the Trustee is authorized to execute the payment in the Written Direction under this Confirmation of Contact and Incumbency Information. Any action taken by the Trustee pursuant to this paragraph prior to the Trustee's actual receipt and acknowledgement of a notice of revocation, cancellation or amendment of a Written Direction shall not be affected by such notice.

The security procedures set forth in this Confirmation of Contact and Incumbency Information are intended to verify the authenticity of Written Directions provided to the Confirmation of Contact and Incumbency Information Trustee and are not designed to, and do not detect errors in the transmission or content of any Written Direction. The Trustee is not responsible for detecting an error in Written Direction, regardless of whether either party believes the error was apparent, and the Trustee is not liable for any damages arising from any failure to detect an error.

When instructed to credit or pay a party by both name and unique numeric or alpha-numeric identifier (e.g. ABA number or account number), the Trustee, and any other banks participating in the funds transfer, may rely solely on the unique identifier, even if it identifies a party different than the party named. Each party agrees to be bound by the rules of any funds transfer network used in connection with any Written Direction accepted by the Trustee hereunder and under the Indian Tribe Trust.

The Trustee shall not be obligated to make any payment requested under the Indian Tribe Trust if it is unable to validate the authenticity of the request by the security procedures set forth in this Confirmation of Contact and Incumbency Information. The Trustee's inability to confirm a payment order in a Written Direction may result in a delay or failure to act on that Written Direction. Notwithstanding anything else in the Indian Tribe Trust Agreement, the Trustee shall not be required to treat a Written Direction as having been received until the Trustee has authenticated it pursuant to the security procedures in this Confirmation of Contact and Incumbency Information and shall not be liable or responsible for any losses arising in relation to such delay or failure to act.

IN WITNESS WHEREOF, this Confirmation has been duly executed as of the last date written below. The person(s) signing on behalf of Client below hereby represents and warrants that s/he is duly authorized by all corporate or other action to enter into and deliver to WT, and to bind the Client, hereto.

**CLIENT:**

_____     _____     _____
Signature of authorized person          Printed Name            Title

Date: _____

_____     _____     _____
Signature of authorized person (*if applicable*)   Printed Name            Title

Date: _____

**WT:**

_____     _____     _____
Signature of Bank Officer               Printed Name            Title

Date: _____

**APPENDIX D-11**

**Report Regarding Designated Beneficiary Use of Final Distribution Funds**

**Appendix D-11**
**Report Regarding Designated Beneficiary Use of Final Distribution Funds**

This report is hereby presented to Wilmington Trust, as Trustee for the Volkswagen Diesel Emissions Environmental Mitigation Trust for Indian Tribe Beneficiaries ("Trust").  The Designated Beneficiary named below submits this report regarding its use of Final Distribution funds, in accordance with subparagraph 5.3.1 of the Trust.

**Beneficiary Name:**

**Lead Agency:**

**Lead Agency Contact:**

**Complete description of the environmental mitigation project(s) undertaken using Final Distribution funds, including the cost of each project:**

**Amount of Final Distribution funds returned to Trustee in accordance with subparagraph 5.0.5.5.6, if any:**

I, [Name of Authorized Representative], attest that the information provided in this report is true and correct and that the submittal of this report is made under penalty of perjury.

_____          _____

Signature                                                              Date