| | | |
|---|---|---|
| **MARYLAND DEPARTMENT** | * | **IN THE** |
| **OF THE ENVIRONMENT** | | |
| **Plaintiff** | * | **CIRCUIT COURT** |
| | | |
| **v.** | * | **FOR** |
| | | |
| **VOLKSWAGEN** | * | **BALTIMORE CITY** |
| **AKTIENGESELLSCHAFT, et al.** | | |
| **Defendants** | * | **CASE NO.: 24-C-16-004114** |

*     *     *     *     *

## ORDER

All claims in this action having been resolved through the entry of a Consent Decree, it is,

this __3rd__ day of May, 2018, by the Circuit Court for Baltimore City,

**ORDERED** that all pending motions are DENIED as Moot, and further

**ORDERED** that the Clerk shall close this case, and further

**ORDERED** that open costs, if any, shall be paid by Defendants.

**W. MICHEL PIERSON, Judge**
Judge's signature appears on original document

Judge W. Michel Pierson

**EXHIBIT B**

IN THE CIRCUIT COURT FOR BALTIMORE CITY

| | |
|---|---|
| MARYLAND DEPARTMENT OF THE ENVIRONMENT, | * |
| Plaintiff, | * |
| | * |
| v. | * |
| VOLKSWAGEN AKTIENGESELLSCHAFT d/b/a VOLKSWAGEN GROUP and/or VOLKSWAGEN AG; AUDI AG; AUDI OF AMERICA, INC.; AUDI OF AMERICA, LLC; VOLKSWAGEN GROUP OF AMERICA, INC.; DR. ING. H.C. F. PORSCHE d/b/a PORSCHE AG; and PORSCHE CARS NORTH AMERICA, INC., | * |
| | * CIVIL CASE NO: 24-C-16-004114 |
| | * |
| | * |
| | * |
| | * |
| Defendants. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## CONSENT DECREE

### I.    Recitations.

**WHEREAS**, Plaintiff, the Maryland Department of the Environment, by its attorneys, Brian E. Frosh, Attorney General of Maryland, and Roberta R. James, Assistant Attorney General, filed the Complaint in this Action seeking civil penalties and injunctive relief for alleged violations of the State's ambient air quality control laws as provided in Title 2, Subtitle 6, of the Environment Article, Annotated Code of Maryland, and Title 26, Subtitle 11 of the COMAR, by Volkswagen and Porsche; and

**WHEREAS**, the Parties hereby represent and acknowledge that they agree to enter into this Consent Decree resolving the Department's allegations of unlawful vehicle emissions as a result of the Defendants' actions; and

**WHEREAS**, as authorized by § 177 of the federal Clean Air Act, 42 U.S.C. § 7507, and required by the Maryland Clean Cars Act of 2007, Md. Code Ann., Envir. §§ 2-1101 – 1108, the

Department adopted and incorporated by reference California's CA LEV Regulations, which are codified in Title 13 of the CCR §§ 1900, *et seq*. Accordingly, vehicles transferred into, and offered for sale in, Maryland must meet California's emissions standards and violations of the CA LEV Regulations that have been adopted by the Department are violations of Maryland's Low Emissions Vehicle Program regulations (Md. Code Ann., Envir. §§ 2-1101 – 1108; *see also* COMAR 26.11.34); and

**WHEREAS**, the Department represents that it is the unit within State government with the authority, as provided in the Environment Article, to bring this Action or to enforce any potentially applicable state, environmental laws, rules, and/or regulations, regarding mobile source emissions, certification, reporting of information, inspection and maintenance of vehicles and/or anti-tampering provisions, together with related common law and equitable claims which were not part of this Action; and

**WHEREAS**, in this Action Defendants are alleged to have engaged in activity that violated Maryland laws; and

**WHEREAS**, on November 21, 2016, Defendants, together with Volkswagen Group of America Chattanooga Operations LLC, and the Consumer Protection Division of the Office of the Attorney General of Maryland, entered into the Assurance of Discontinuance ("2016 Assurance of Discontinuance") effectuating the terms of the First Partial Settlement Agreement between Volkswagen, Porsche and Maryland, which inter alia, resolved certain "claims that were brought or could be brought under UDAP Laws arising from or related to the Covered Conduct;" and

**WHEREAS**, Paragraphs 11(B)(iv) and 11(B)(vi) of the 2016 Assurance of Discontinuance reserved certain claims, which claims were not resolved by the 2016 Assurance of Discontinuance; and

**WHEREAS,** Defendants, together with Volkswagen Group of America Chattanooga Operations LLC, have entered into a further Assurance of Discontinuance with the State of Maryland to resolve all potentially applicable consumer protection and unfair trade and deceptive acts and practices laws, rules and/or regulations, as well as common law and equitable claims, arising from or related to the Covered Conduct, including the claims reserved under Paragraphs 11(B)(iv) and 11(B)(vi) of the 2016 Assurance of Discontinuance; and

**WHEREAS,** Defendants, together with Volkswagen Group of America Chattanooga Operations LLC, have entered into a separate settlement agreement with the State of Maryland, the Maryland Partial Settlement Agreement, to resolve all potentially applicable federal, state, and/or local environmental laws, rules, and/or regulations, including, but not limited to, laws, rules, and/or regulations regarding mobile source emissions, certification, reporting of information, inspection and maintenance of vehicles and/or anti-tampering provisions, together with related common law and equitable claims which were not part of this Action; and

**WHEREAS,** the Parties have negotiated in good faith and agree that settlement of this Action is in the best interest of the Parties and the public and that execution of this Consent Decree is the most appropriate means of resolving the Department's claims against the Defendants.

**NOW, THEREFORE,** it is hereby **ORDERED, ADJUDGED AND DECREED** as follows:

3

II.     Definitions.

1.      As used herein, including the Recitations above, the below capitalized terms shall have the following meanings:

"**Action**" means the action between the Parties captioned at the head of this Consent Decree.

"**BEV**" means Battery Electric Vehicle.

"**CA AG**" means the California Attorney General.

"**CA LEV Regulations**" means the State of California's Low Emission Vehicle Program Regulations.

"**CARB**" means the California Air Resources Board.

"**CCR**" means the California Code of Regulations.

"**COMAR**" means the Code of Maryland Regulations.

"**Consent Decree**" means this Consent Decree.

"**Covered Conduct**" means any and all acts or omissions, including all communications, occurring up to and including the effective date of this Consent Decree, relating to: (a) the design, installation, presence, or failure to disclose any Defeat Device in any Subject Vehicle; (b) the offering for sale, sale, delivery for sale, or lease of the Subject Vehicles in Maryland not in compliance with Maryland's Low Emissions Vehicle Program regulations; (c) statements or omissions concerning the Subject Vehicles' emissions and/or the Subject Vehicles' compliance with applicable emission standards, including, but not limited to, certifications of compliance or other similar documents or submissions; and (d) conduct alleged, or any related conduct that could have been alleged, in the Complaint filed by the Department, including, but not limited to, that the Subject Vehicles contain prohibited Defeat Devices that cause the Subject Vehicles to emit NOx in excess of applicable legal standards and that Volkswagen and Porsche falsely

4

reported vehicle emissions, that Volkswagen and/or Porsche tampered with any emissions control device or element of design installed in the Subject Vehicles, that Volkswagen and/or Porsche affixed labels to the Subject Vehicles that were false, invalid or misleading and/or that Volkswagen and/or Porsche breached its warranties relating to the Subject Vehicles.

"**Defeat Device**" means "an auxiliary emission control device (AECD) that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use, unless: (1) Such conditions are substantially included in the Federal emission test procedure; (2) The need for the AECD is justified in terms of protecting the vehicle against damage or accident; (3) The AECD does not go beyond the requirements of engine starting; or (4) The AECD applies only for emergency vehicles[.]" 40 C.F.R. § 86.1803-01, or "any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with [the Emission Standards for Moving Sources section of the Clean Air Act], and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use," 42 U.S.C. § 7522(a)(3)(B).

"**Defendants**" means, collectively, Volkswagen and Porsche.

"**Department**" means the State of Maryland, Department of the Environment.

"**Environmental Claims**" mean claims that could be brought by the Department, under all potentially applicable federal, state, and/or local environmental laws, rules, and/or regulations, including, but not limited to, laws, rules, and/or regulations regarding mobile source

emissions, certification, reporting of information, inspection and maintenance of vehicles and/or anti-tampering provisions, together with related common law and equitable claims.

"**Environmental Laws**" means laws, rules, regulations, and/or common law or equitable principles or doctrines under which Environmental Claims may arise including, without limitation, Title 2, Subtitle 6, of the Environmental Article, Annotated Code of Maryland, and Title 26, Subtitle 11 of the COMAR.

"**EPA**" means the United States Environmental Protection Agency, together with any of its successor departments or agencies.

"**First Partial Settlement Agreement**" means the Partial Settlement Agreement entered June 28, 2016 by a 43-state multistate coalition that included Maryland, with Defendants and Volkswagen Group of America Chattanooga Operations LLC.

"**MDL**" means the multidistrict litigation styled as *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, No. 3:15-md-02672-CRB (N.D. Cal.) (MDL 2672).

"**MDL Court**" means the court in which the MDL is pending in the U.S. District Court for the Northern District of California.

"**Party**" and "**Parties**" means, individually and collectively, respectively, the Department and Defendants.

"**Porsche**" or "**Porsche Defendants**" means, collectively, Dr. Ing. h.c. F. Porsche d/b/a Porsche AG, and Porsche Cars North America, Inc.

"**Port Facility**" means a Maryland-based port facility to provide certain logistical and other support to Volkswagen Group of America, Inc.'s U.S. East Coast operations over an estimated five-year term, pursuant to the RFI.

"**Released Claims**" means the claims released by the Department under Section VII below.

"**Released Parties**" means, collectively, Volkswagen, Porsche, their affiliates and any of Volkswagen's, Porsche's or their affiliates' former, present or future owners, shareholders, directors, officers, employees, attorneys, parent companies, subsidiaries, predecessors, successors, dealers, agents, assigns and representatives.[1]

"**RFI**" means the Request for Information titled "Volkswagen Group of America, Inc. East Coast Port Processing" delivered to Maryland and other potentially interested parties during 2016.

"**Scheduled Announcement Date**" means: (i) June 29, 2018; or, (ii) August 31, 2018, if Volkswagen (or one of their affiliates) provides the Department with notice of a need for additional time by June 28, 2018.  If prior to August 31, 2018, Volkswagen (or one of their affiliates) provides the Department with notice of a reasonable need for additional time, it may request an extension of the Scheduled Announcement Date beyond August 31, 2018, through an additional four-week extension (or further four-week extensions, to the extent reasonably necessary).  Any request for an extension past August 31, 2018, shall be subject to the Department's discretion to grant or refuse.  For the purpose of this provision, notice may be provided by email to the addressees listed for the Department in Section X and will be effective upon sending.

"**Second California Partial Consent Decree**" means the California Attorney General's Second Partial Consent Decree, entered May 17, 2017 by the MDL Court and executed by

---

[1]    For avoidance of doubt, for purposes of this Consent Decree, Robert Bosch GmbH and Robert Bosch LLC are not Released Parties and IAV GmbH and IAV Automotive Engineering, Inc. are Released Parties.

Volkswagen AG, Audi AG, Volkswagen Group of America, Inc., Volkswagen Group of America Chattanooga Operations LLC, Porsche, and California and filed on December 20, 2016, in *People of the State of California* v. *Volkswagen AG*, No. 3:16-CV-03620-CRB, Doc. No. 2519-1 (N.D. Cal.).

"**Section 177 States**" means, collectively, Connecticut, Delaware, Maine, Maryland, New York, Oregon, Rhode Island, Vermont, Washington, and the Commonwealths of Massachusetts and Pennsylvania.

"**State**" means the State of Maryland.

"**Subject Vehicles**" means each and every light duty diesel vehicle equipped with a 2.0 liter or 3.0 liter TDI engine that the Defendants, or their respective affiliates, sold or offered for sale in, leased or offered for lease in, or introduced or delivered for introduction into commerce in the United States or its states or territories, or imported into the United States or its states or territories, and that is or was purported to have been covered by the following EPA Test Groups:

**2.0 Liter Diesel Models**

| Model Year | EPA Test Group | Vehicle Make and Model(s) |
|---|---|---|
| 2009 | 9VWXV02.035N<br>9VWXV02.0U5N | VW Jetta, VW Jetta Sportwagen |
| 2010 | AVWXV02.0U5N | VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2011 | BVWXV02.0U5N | VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2012 | CVWXV02.0U5N | VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2013 | DVWXV02.0U5N | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2014 | EVWXV02.0U5N | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen |
| 2012<br>2013<br>2014 | CVWXV02.0U4S<br>DVWXV02.0U4S<br>EVWXV02.0U4S | VW Passat |

| Model Year | EPA Test Group | Vehicle Make and Model(s) |
|---|---|---|
| 2015 | FVGAV02.0VAL | VW Beetle, VW Beetle Convertible, VW Golf, VW Golf Sportwagen, VW Jetta, VW Passat, Audi A3 |

### 3.0 Liter Diesel Models

| Model Year | EPA Test Groups | Vehicle Make and Model(s) |
|---|---|---|
| 2009 | 9ADXT03.03LD | VW Touareg, Audi Q7 |
| 2010 | AADXT03.03LD | VW Touareg, Audi Q7 |
| 2011 | BADXT03.02UG<br>BADXT03.03UG | VW Touareg<br>Audi Q7 |
| 2012 | CADXT03.02UG<br>CADXT03.03UG | VW Touareg<br>Audi Q7 |
| 2013 | DADXT03.02UG<br>DADXT03.03UG<br>DPRXT03.0CDD | VW Touareg<br>Audi Q7<br>Porsche Cayenne Diesel |
| 2014 | EADXT03.02UG<br>EADXT03.03UG<br>EPRXT03.0CDD<br>EADXJ03.04UG | VW Touareg<br>Audi Q7<br>Porsche Cayenne Diesel<br>Audi A6, Audi A7, Audi A8, Audi A8L, Audi Q5 |
| 2015 | FVGAT03.0NU2<br>FVGAT03.0NU3<br>FPRXT03.0CDD<br>FVGAJ03.0NU4 | VW Touareg<br>Audi Q7<br>Porsche Cayenne Diesel<br>Audi A6, Audi A7, Audi A8, Audi A8L, Audi Q5 |
| 2016 | GVGAT03.0NU2<br>GPRXT03.0CDD<br>GVGAJ03.0NU4 | VW Touareg<br>Porsche Cayenne Diesel<br>Audi A6 Quattro, Audi A7 Quattro, Audi A8, Audi A8L, Audi Q5 |

"**U.S. First Partial Consent Decree**" means the consent decree executed by Volkswagen, the United States, on behalf of the EPA, and California, by and through the CARB and the CA AG concerning the 2.0-liter Subject Vehicles and entered by the MDL Court on October 25, 2016.

"**U.S. Second Partial Consent Decree**" means the Second Partial Consent Decree with DOJ/EPA and California, by and through CARB and the CA AG, concerning the 3.0-liter Subject Vehicles and entered by the MDL Court on May 17, 2017.

"**Volkswagen**" or "**Volkswagen Defendants**" means, collectively, Volkswagen Aktiengesellschaft d/b/a Volkswagen Group and/or Volkswagen AG, Audi AG, Audi of America, Inc., Audi of America, LLC, Volkswagen Group of America, Inc.

"**ZEV**" means Zero Emission Vehicle.

## III.   Civil Penalty.

2.      The Volkswagen Defendants are assessed a total civil penalty of Thirty-Three Million and Five Hundred Thousand Dollars ($33,500,000) ("Settlement Amount"). The Settlement Amount shall consist of two components:

> a.      a monetary payment to the Department in the amount of Twenty-Nine Million Dollars ($29,000,000) (the "Base Payment"); and
>
> b.      at the Volkswagen Defendants' election, either (a) the selection of a Port Facility; or (b) a payment to the Department of Four Million Five Hundred Thousand Dollars ($4,500,000) (the "Additional Payment").

3.      The Volkswagen Defendants shall pay to the Department the Base Payment by wire transfer within 30 days after the Department provides: (i) notice that this Consent Decree has been entered by the Court and is final under Maryland law in the form and to the addressees set forth in Exhibit A; and (ii) provides signed wire instructions in the form and to the addressees set forth in Exhibit B. The funds received by the Department shall be handled by the Department in accordance with the requirements of § 2-107 of the Environment Article.

4.    If a Maryland-based port is not selected as a Port Facility, the Volkswagen Defendants shall pay the Additional Payment by wire transfer to the Department thirty days after the earliest occurrence of either:

      a.    the Scheduled Announcement Date, or

      b.    the Department receives notice in the manner set forth in Section X ("Notices") that no Maryland port has been selected as a Port Facility.

5.    If a Maryland-based port is not selected as a Port Facility, the Department shall promptly provide signed wire instructions in the form set forth in Exhibit B.  The funds received by the Department pursuant to the Additional Payment shall be handled by the Department in accordance with the requirements of § 2-107 of the Environmental Article.

6.    If a Maryland-based port is selected as a Port Facility, the Volkswagen Defendants shall have no obligation to pay the Additional Payment and counsel for the Volkswagen Defendants shall provide written notice to counsel for the Department regarding which Maryland port was selected to be a Port Facility.

7.    The Department states that the civil penalty described in this Section III takes into account (i) the complete civil penalty assessed by the Department under this Consent Decree, (ii) the payments and other relief that the Defendants have agreed to provide to the State of Maryland under the U.S. First Partial Consent Decree, the U.S. Second Partial Consent Decree, and this Consent Decree; and (iii) the Department's position that Subject Vehicles for environmental penalty purposes may include vehicles delivered to or offered for sale in a state, even if not sold.

8.    The Parties agree to reasonably cooperate in the implementation of this Consent Decree, including, if a Maryland-based port is selected: (i) the Department and Volkswagen shall

reasonably cooperate in the preparation and execution of additional documents related to the Port Facility; and (ii) from the Scheduled Announcement Date to the commencement of operations at the Port Facility, Volkswagen shall keep the Department reasonably informed of its progress in developing the Port Facility.

IV.   <u>Admissions.</u>

9.   Volkswagen admits that:

   a.   software in the 2.0 and 3.0 Liter Subject Vehicles enables the vehicles' engine control modules to detect when the vehicles are being driven on the road, rather than undergoing Federal Test Procedures, and that this software renders certain emission control systems in the vehicles inoperative when the engine control module detects the vehicles are not undergoing Federal Test Procedures, resulting in NOx emissions that exceed EPA-compliant and CARB-compliant levels (which CARB standards are applicable in Section 177 States) when the vehicles are driven on the road;

   b.   this software was not disclosed in the Certificate of Conformity and Executive Order applications for the 2.0 and 3.0 Liter Subject Vehicles, and, as a result, the design specifications of the 2.0 and 3.0 Liter Subject Vehicles, as manufactured, differ materially from the design specifications described in the Certificate of Conformity and Executive Order applications.

12

10. Porsche admits that:

    a.      software in the 3.0 Liter Subject Vehicles enables the vehicles' engine control modules to detect when the vehicles are being driven on the road, rather than undergoing Federal Test Procedures, and that this software renders certain emission control systems in the vehicles inoperative when the engine control module detects the vehicles are not undergoing Federal Test Procedures, resulting in NOx emissions that exceed EPA-compliant and CARB-compliant levels (which CARB standards are applicable in Section 177 States) when the vehicles are driven on the road;

    b.      this software was not disclosed in the Certificate of Conformity and Executive Order applications for the 3.0 Liter Subject Vehicles, and, as a result, the design specifications of the 3.0 Liter Subject Vehicles, as manufactured, differ materially from the design specifications described in the Certificate of Conformity and Executive Order applications.

11. Volkswagen AG admits, agrees, and stipulates that the factual allegations set forth in the Statement of Facts attached as Exhibit 2 to its January 11, 2017 Rule 11 Plea Agreement in *U.S.* v. *Volkswagen AG,* No. 16-CR-20394 are true and correct. Volkswagen AG agrees it will neither contest the admissibility of, nor contradict, the Statement of Facts contained in Exhibit 2 to the Rule 11 Plea Agreement in any proceeding.  A true and correct copy of the Statement of Facts described in this paragraph is attached hereto as Attachment A.

12.     Except as provided in paragraphs 9 to 11 above, Volkswagen and/or Porsche neither admit nor deny any allegations relating to the Covered Conduct.

V.     Zero Emission Vehicle (ZEV) Commitment.

13.     Defendants shall increase the availability of ZEVs in Maryland by introducing in Maryland the three additional BEV models to be introduced in California under Paragraphs 11.a. and 11.b. of the Second California Partial Consent Decree.   Defendants shall introduce and continue to market these BEV models in Maryland within the same time periods that are set forth for California in Paragraphs 11.a. and 11.b. of the Second California Partial Consent Decree.

14.     In Maryland until at least 2019, Volkswagen shall offer its existing BEV model (the VW e-Golf BEV) or its successor or replacement models.

15.     In the event that Volkswagen agrees to offer a new BEV model in the United States between 2020 and 2025 (in addition to the three BEV models identified in paragraph 13 above), it will offer that BEV model (or its successor) in Maryland until at least 2025.

16.     Defendants shall make each BEV model launched in Maryland available to their dealers of new vehicles in Maryland and encourage such dealers to make the BEV models available for potential consumers for demonstration and test drive.   Defendants shall deliver at least one vehicle of each BEV model within eight weeks of the port release date, to all of their dealers in Maryland that (i) agree to sell BEV models; and (ii) sell the brand of that particular BEV model (*e.g.*, Volkswagen BEV models need only be delivered to Volkswagen dealers and need not be delivered to Audi or Porsche dealers).

17.     Defendants shall undertake commercially reasonable efforts to make each such BEV model available to their dealers through the course of each model's production for purposes of consumer demonstration, test drive, sale and lease.

18.     In Maryland, Defendants' launch and marketing of each BEV model shall include advertising, promotional support, and support to dealers to incentivize dealer participation in the offering for sale or lease of the BEV models. This dealer support shall include support for dealers in (i) making the BEV models available for consumer demonstration and test driving; and (ii) the servicing of the BEV models.

19.     Defendants' obligations under paragraphs 13-18, including to introduce, offer for sale, deliver, advertise, market or promote the BEV models, shall be limited to (i) Maryland, provided Defendants have dealers of new vehicles in Maryland; and (ii) dealers that agree to sell the BEV models.  Defendants shall have no obligations under paragraphs 13-18 (i) if they have no dealer of new vehicles in Maryland; and (ii) with respect to any dealer that does not agree to sell the BEV models.

20.     Regardless of the foregoing, Volkswagen will ensure that at least one vehicle of each of the Audi- or Volkswagen-branded BEV models introduced in the Section 177 States is available for consumer demonstration and driving in Maryland until at least 2025 to the extent that there is at least one Audi or Volkswagen dealer in Maryland and for so long as such BEV model is being offered nationally for new vehicle sale.

21.     Volkswagen and Porsche shall promptly respond to the Department's reasonable inquiries about the status of their respective undertakings under this Section V.  Volkswagen and Porsche shall each provide the Department with contact information for a representative for purposes of receipt of such inquiries.

## VI.     Effect of Judgment.

22.     Entry of this Consent Decree fully and finally resolves and disposes with prejudice the Environmental Claims arising from or related to the Covered Conduct that were alleged in the Department's Complaint in this matter or that could be brought by the Department.

23.     This Consent Decree will, upon the date that it is entered by the Court, constitute a fully binding and enforceable agreement between the Parties, and the Parties consent to its entry as a final judgment by the Court.

24.     This Consent Decree fully extinguishes the reservations set forth in Paragraph 8(B)(vi) of the First Partial Settlement Agreement.

## VII.   Release.

25.     Subject to paragraph 26 below, in consideration of the payment of the civil penalty described in Section III, the Admissions described in Section IV, the ZEV Commitment described in Section V, and upon the Defendants' payment of the Base Payment and selection of a Port Facility in Maryland or the payment of the Additional Payment, whichever occurs:

a.     The Department releases the Released Parties from all Environmental Claims arising from or related to the Covered Conduct, including, without limitation, penalties, fines, or other monetary payments and/or injunctive relief.

b.     The claims released under subsection a. above include claims that the Department brought or could have brought under Environmental Laws.

26.     The Department reserves, and this Consent Decree is without prejudice to, all claims, rights and remedies against Volkswagen, Porsche and their affiliates, and Volkswagen, Porsche and their affiliates reserve, and this Consent Decree is without prejudice to, all defenses, with respect to all matters not expressly released in paragraph 25 above, including, without limitation:

a.     any civil claims unrelated to the Covered Conduct; and

    b.    any action to enforce this Consent Decree and subsequent, related orders or judgments.

VIII.   <u>Dispute Resolution.</u>

27.    The Parties shall attempt to resolve any dispute relating to this Consent Decree in accordance with this paragraph 27 in good faith. To initiate dispute resolution under the terms of this Consent Decree, a Party shall submit to the other Parties a written statement that describes the nature of the dispute and attach supporting evidence or documentation the Party deems to be appropriate. Within 30 days of receipt of the written statement, the other Party (or Parties) shall review the information provided and send a written response either agreeing or not agreeing. In the event that the dispute fails to resolve pursuant to this paragraph 27, any Party may approach the Court consistent with paragraphs 29 and 30 below.

28.    The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any right or obligation of any Party under this Consent Decree, unless and until final resolution of the dispute so provides.

IX.   <u>Continuing Jurisdiction and Venue.</u>

29.    Defendants consent to this Court's continuing subject matter and personal jurisdiction solely for the purposes of entry, enforcement and modification of this Consent Decree, including resolving any disputes arising under this Consent Decree, and without waiving their right to contest this Court's jurisdiction in other matters.

30.    Solely for purposes of entry, enforcement and modification of this Consent Decree, Defendants consent to venue in this Court and do not waive their right to contest this Court's venue in other matters.

17

## X.    Notices.

31.    Unless otherwise specified in this Consent Decree, notices and submissions required by this Consent Decree shall be given in writing, sent by United States mail, First Class Mail, Certified, Return Receipt Requested, or other nationally recognized courier service that provides for tracking services and identification of the person signing for the document.  Notice shall be considered to have been fully given when actually received.  The documents shall be sent to the following addresses:

**For the Department:**

Roberta R. James
Office of the Attorney General
Maryland Department of the Environment
1800 Washington Boulevard, Suite 6048
Baltimore, Maryland 21230
Phone: 410-537-3748
Email: roberta.james@maryland.gov

Ben Grumbles
Secretary
Maryland Department of the Environment
1800 Washington Boulevard
Baltimore, Maryland 21230
Phone: 410-537-4187
Email: ben.grumbles@maryland.gov

**For Volkswagen:**

As to Volkswagen AG and Audi AG:

Berliner Ring 2
38440 Wolfsburg, Germany
Attention: Group General Counsel

As to Volkswagen Group of America, Inc. and Audi LLC:

2200 Ferdinand Porsche Dr.
Herndon, VA 20171
Attention: U.S. General Counsel

As to one or more of the Volkswagen Defendants:

David M.J. Rein
William B. Monahan
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
reind@sullcrom.com
monahanw@sullcrom.com

**For Porsche:**

As to Dr. Ing. h.c. F. Porsche AG:

Dr. Ing. h.c. F. Porsche Aktiengesellschaft
Porscheplatz 1, D-70435 Stuttgart, Germany
Attention: GR/Rechtsabteilung/General Counsel

As to Porsche Cars North America, Inc.:

1 Porsche Dr.
Atlanta, GA 30354
Attention: Secretary
With copy by email to offsecy@porsche.us

As to one or more of the Porsche Defendants:

Granta Y. Nakayama
Joseph A. Eisert
King & Spalding LLP
1700 Pennsylvania Ave., N.W., Suite 200
Washington, DC 20006
gnakayama@kslaw.com
jeisert@kslaw.com

18

Any Party may change its address for notices by notice given in accordance with this paragraph.

XI.   Authority of Signatories to Bind the Parties.

32.   Each of the persons who signs his/her name below affirms that he/she has the authority to execute this Consent Decree on behalf of the Party whose name appears next to his/her signature and that this Consent Decree is a binding obligation enforceable against said Party under applicable Maryland law.  The signatory from the Department represents that he/she has the authority to execute this Consent Decree on behalf of the State and that this Consent Decree is a binding obligation enforceable against the State under Maryland law.

XII.   No Third Party Beneficiary.

33.   Except for the rights of the Released Parties with respect to the Released Claims: (1) this Consent Decree shall not be construed to create any rights in persons other than the Department, the State and the Defendants; and (2) nothing in this Consent Decree shall be deemed to create any right in a non-party to enforce any aspect of this Consent Decree or claim any legal or equitable injury for a violation of this Consent Decree; and (3) the exclusive right to enforce any violation or breach of this Consent Decree shall be with the Parties to this Consent Decree.

XIII.   Miscellaneous Provisions.

34.   If any portion of this Consent Decree is held invalid by operation of law, the remaining terms of this Consent Decree shall not be affected and shall remain in full force and effect.

35.   This Consent Decree is made without trial or adjudication of any issue of fact or law or finding of liability of any kind.

36.     This Consent Decree constitutes a resolution of the Department's enforcement actions under the Environmental Laws. Nothing in this Consent Decree shall create or give rise to a private right of action of any kind.

37.     Nothing in this Consent Decree releases any private rights of action asserted by entities or persons not releasing claims under this Consent Decree, nor does this Consent Decree limit any defense available to Volkswagen or Porsche in any such action.

38.     The Parties agree that this Consent Decree does not enforce the laws of other countries, including the emissions laws or regulations of any jurisdiction outside the United States. Nothing in this Consent Decree is intended to apply to, or affect, the Defendants' obligations under the laws or regulations of any jurisdiction outside the United States. At the same time, the laws and regulations of other countries shall not affect the Defendants' obligations under this Consent Decree.

39.     This Consent Decree takes no position with regard to its tax consequences relating to federal, state, local and foreign taxes. Nothing in this provision purports to affect the Department's obligations under 26 U.S.C. § 6050X or any other applicable law.

40.     This Consent Decree supersedes any other prior agreements or understandings, whether oral or written, concerning the settlement embodied herein. The Parties acknowledge that there are no documents, representations, inducements, agreements, understandings or promises that constitute any part of this Consent Decree or the settlement it represents other than those expressly contained in this Consent Decree.

41.     This Consent Decree may be executed in counterparts, each of which shall be deemed an original, but all of which shall together be one and the same Consent Decree.

Signatures by facsimile or other electronic imaging shall be deemed to constitute original signatures.

42.     The Parties agree to enter into this Consent Decree for the purpose of avoiding prolonged and costly litigation, and in furtherance of the public interest.  Each of the Parties warrants and represents that the terms of this Consent Decree were negotiated in good faith.

43.     The terms of this Consent Decree are binding on the Parties and shall be enforceable in this Court.  In the event that the Defendants fail to timely pay any sum owing pursuant to this Consent Decree, the Department may institute an action to enforce this Consent Decree against the Defendants.  This Consent Decree shall be governed by and interpreted under the laws of the State of Maryland.

44.     The terms of this Consent Decree are contractual and not mere recitals.  This Consent Decree may be modified only in writing signed by both the Department and the Defendants.

45.     This Consent Decree has been negotiated freely by the Department and the Defendants and shall in all cases be construed as a whole, according to its fair meaning and not strictly for or against the Department or the Defendants.

46.     The effective date of this Consent Decree shall be the date upon which this Consent Decree becomes final under Maryland law.  The Department represents that it has full power and authority to execute and deliver this Consent Decree and that the official so doing is fully authorized to agree, execute and deliver and that all administrative action, if any, has been taken to render this Consent Decree when so executed and delivered as fully enforceable against the Department and the State.

47.     By signing this Consent Decree, Defendants waive their right to an informal meeting and hearing as provided in § 2-610.1 of the Environment Article and agree to imposition of a civil penalty in accordance with this Consent Decree.

48.     Nothing in this Consent Decree shall be construed to alter the Defendants' obligation to comply with all applicable air pollution control laws and regulations.

49.     Nothing in this Consent Decree shall be construed to prevent the Department from pursuing any remedies or sanctions available to the Department for violations of this Consent Decree or any other violations of State law, regulations, permits, or orders issued by the Department not expressly resolved or released in this Consent Decree.

50.     This Consent Decree shall terminate automatically upon the full provision of the civil penalty set forth in Section III and the ZEV Commitment set forth in Section V.

51.     The Parties agree that each Party shall bear its own costs and expenses, including without limitation, all attorney's fees.

IT IS SO DECREED, this **3rd** day of **May.**, 2018.

**W. MICHEL PIERSON, Judge**
Judge's signature appears on original document
W. Michel Pierson
Judge, Circuit Court for Baltimore City

**IT IS SO AGREED AND CONSENTED TO:**

STATE OF MARYLAND
DEPARTMENT OF THE ENVIRONMENT

April ⎯⎯ 25 ⎯⎯, 2018

BENJAMIN H. GRUMBLES
Secretary

April ⎯⎯ 25 ⎯⎯, 2018

GEORGE ABURN, Director
Air and Radiation Administration

April ⎯⎯⎯⎯⎯, 2018

BRIAN E. FROSH
Attorney General of Maryland

23

COUNSEL FOR VOLKSWAGEN
AKTIENGESELLSCHAFT D/B/A VOLKSWAGEN
GROUP AND/OR VOLKSWAGEN AG, AUDI AG,
AUDI OF AMERICA, INC., AUDI OF AMERICA,
LLC, VOLKSWAGEN GROUP OF AMERICA, INC.

April 23, 2018

G. Stewart Webb, Jr.
(gswebb@venable.com)
John T. Prisbe
(jtprisbe@venable.com)
Venable LLP
750 E. Pratt Street, Suite 900
Baltimore, Maryland  21202
Tel: (410) 244-7400
Fax: (410) 244-7742

April _____, 2018

Robert J. Giuffra, Jr. (admitted *Pro Hac Vice*)
Sharon L. Nelles (admitted *Pro Hac Vice*)
David M.J. Rein (admitted *Pro Hac Vice*)
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

24

**COUNSEL FOR VOLKSWAGEN
AKTIENGESELLSCHAFT D/B/A VOLKSWAGEN
GROUP AND/OR VOLKSWAGEN AG, AUDI AG,
AUDI OF AMERICA, INC., AUDI OF AMERICA,
LLC, VOLKSWAGEN GROUP OF AMERICA, INC.**

April _____, 2018

_____

G. Stewart Webb, Jr.
(gswebb@venable.com)
John T. Prisbe
(jtprisbe@venable.com)
Venable LLP
750 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
Tel: (410) 244-7400
Fax: (410) 244-7742

April 20, 2018

_____

Robert J. Giuffra, Jr. (admitted *Pro Hac Vice*)
Sharon L. Nelles (admitted *Pro Hac Vice*)
David M.J. Rein (admitted *Pro Hac Vice*)
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

**COUNSEL FOR DR. ING. H.C. F. PORSCHE D/B/A PORSCHE AG AND PORSCHE CARS NORTH AMERICA, INC.**

April 20, 2018

Kenneth Y. Turnbull
Joseph A. Eisert (admitted *Pro Hac Vice*)
King & Spalding LLP
1700 Pennsylvania Ave., N.W. Suite 200
Washington, DC 20006
(202) 737-0500

Approved as to form and legal sufficiency
this 24th day of April, 2018.

Roberta R. James
Assistant Attorney General

# EXHIBIT A

*[STATE LETTERHEAD]*

*[DATE]*

*VIA ELECTRONIC MAIL [& FIRST-CLASS MAIL]*

Volkswagen Group of America, Inc.
Attn: Office of the General Counsel
2200 Ferdinand Porsche Drive
Herndon, VA 20171
Kevin.duke@vw.com

David M.J. Rein, Esq.
William B. Monahan, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
reind@sullcrom.com
monahanw@sullcrom.com

RE:     ***Maryland Department of the Environment* v. *Volkswagen AG
        et al.*, Civil Case No. 24-C-16-004114 – Certification Pursuant
        to Consent Decree**

Dear Messrs. Duke, Rein, and Monahan:

Pursuant to Paragraph 3 of the Consent Decree entered on or about [DATE], I hereby certify the
following:

1. The attached Consent Decree, which was duly executed by the parties thereto, was
   entered by the Circuit Court for Baltimore City on [DATE], and is now final under the
   law of the State of Maryland.

2. I, [NAME], [TITLE], am a duly authorized representative of the State of Maryland and
   am duly authorized to make the certifications contained herein.

3. The attached Consent Decree is a true and accurate copy of the document filed in the
   Court and entered on [DATE].

A copy of the State of Maryland's wiring instructions is also attached.  Please disburse
$29,000,000 in accordance with the enclosed wiring instructions on or before [DATE].  Please
contact me if you have any questions or require any additional information.

Sincerely,

_____
*Signature*

_____
*Print Name and Title*

# EXHIBIT B

*[STATE LETTERHEAD]*

*[DATE]*

**TO:**      **Volkswagen Group of America, Inc.**
              *(addressees listed on following page)*

**RE:**      **Wire Instructions – VW Consent Decree**

Ladies and Gentlemen:

Reference is made to the Consent Decree in connection with *Maryland Department of the Environment* v. *Volkswagen AG et al.*, Civil Case No. 24-C-16-004114, entered into on or about [DATE] by the Circuit Court for Baltimore City.

Please find below wire instructions for the disbursement of funds pursuant to the Consent Decree.

| | |
|---|---|
| Funds to be Transferred (USD): | $ |
| Beneficiary Name: | |
| Beneficiary Account Number: | |
| Bank Name: | |
| Bank Routing Information: (ABA # or SWIFT Code) | |
| Memo: | |

If you have any questions regarding these wire instructions, please contact *[NAME]* at *[TELEPHONE]* or *[EMAIL]*.

I certify that I am a representative of the State of Maryland authorized to deliver these instructions and that the information provided above is true and correct.

Sincerely,

_____
*Signature*

_____
*Print Name and Title*

**The preceding wire instructions should be delivered to the following persons:**

|  |  |
|---|---|
| Name: | Volkswagen Group of America, Inc. |
| Address: | 2200 Ferdinand Porsche Drive |
|  | Herndon, Virginia 20171 |
|  |  |
| Attn: | Office of the General Counsel |
| Telephone: | 703-364-7290 |
| Facsimile: | 703-364-7080 |
| E-mail: | kevin.duke@vw.com |

|  |  |
|---|---|
| Name: | Sullivan & Cromwell LLP |
| Address: | 125 Broad Street |
|  | New York, New York 10004 |
|  |  |
| Attn: | David M.J. Rein, Esq. |
| Telephone: | 212-558-3035 |
| Facsimile: | 212-291-9120 |
| E-mail: | reind@sullcrom.com |

|  |  |
|---|---|
| Name: | Sullivan & Cromwell LLP |
| Address: | 125 Broad Street |
|  | New York, New York 10004 |
|  |  |
| Attn: | William B. Monahan, Esq. |
| Telephone: | 212-558-7375 |
| Facsimile: | 212-291-9414 |
| E-mail: | monahanw@sullcrom.com |

# ATTACHMENT A

**EXHIBIT 2**

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the

Plea Agreement (the "Agreement") between the United States Department of

Justice (the "Department") and Volkswagen AG ("VW AG").  VW AG hereby

agrees and stipulates that the following information is true and accurate.  VW AG

admits, accepts, and acknowledges that under U.S. law it is responsible for the acts

of its employees set forth in this Statement of Facts, which acts VW AG

acknowledges were within the scope of the employees' employment and, at least in

part, for the benefit of VW AG.  All references to legal terms and emissions

standards, to the extent contained herein, should be understood to refer exclusively

to applicable U.S. laws and regulations, and such legal terms contained in this

Statement of Facts are not intended to apply to, or affect, VW AG's rights or

obligations under the laws or regulations of any jurisdiction outside the United

States.  This Statement of Facts does not contain all of the facts known to the

Department or VW AG; the Department's investigation into individuals is

ongoing.  The following facts took place during the time frame specified in the

Third Superseding Information and establish beyond a reasonable doubt the

charges set forth in the criminal Information attached to this Agreement:

Exh. 2-1

## Relevant Entities and Individuals

1.    VW AG was a motor vehicle manufacturer based in Wolfsburg, Germany.  Under U.S. law, VW AG acts through its employees, and conduct undertaken by VW AG, as described herein, reflects conduct undertaken by employees.  Pursuant to applicable German stock corporation law, VW AG was led by a Management Board that was supervised by a Supervisory Board.  Solely for purposes of this Statement of Facts, unless otherwise indicated, references in this Statement of Facts to "supervisors" are to senior employees below the level of the VW AG Management Board.

2.    Audi AG ("Audi") was a motor vehicle manufacturer based in Ingolstadt, Germany and a subsidiary approximately 99.55% owned by VW AG. Under U.S. law, Audi AG acts through its employees, and conduct undertaken by Audi AG, as described herein, reflects conduct undertaken by employees.

3.    Volkswagen Group of America, Inc. ("VW GOA") was a wholly-owned subsidiary of VW AG based in Herndon, Virginia.  Under U.S. law, VW GOA acts through its employees, and conduct undertaken by VW GOA, as described herein, reflects conduct undertaken by employees.

4.    VW AG, Audi AG, and VW GOA are collectively referred to herein as "VW."

Exh. 2-2

5.     "VW Brand" was an operational unit within VW AG that developed vehicles to be sold under the "Volkswagen" brand name.

6.     Company A was an automotive engineering company based in Berlin, Germany, which specialized in software, electronics, and technology support for vehicle manufacturers.  VW AG owned fifty percent of Company A's shares and was Company A's largest customer.

7.     "Supervisor A," an individual whose identity is known to the United States and VW AG, was the supervisor in charge of Engine Development for all of VW AG from in or about October 2012 to in or about September 2015.  From July 2013 to September 2015, Supervisor A also served as the supervisor in charge of Development for VW Brand, where he supervised a group of approximately 10,000 VW AG employees.  From in or about October 2011, when he joined VW, until in or about July 2013, Supervisor A served as the supervisor in charge of the VW Brand Engine Development department.

8.     "Supervisor B," an individual whose identity is known to the United States and VW AG, was a supervisor in charge of the VW Brand Engine Development department from in or about May 2005 to in or about April 2007.

9.     "Supervisor C," an individual whose identity is known to the United States and VW AG, was a supervisor in charge of the VW Brand Engine Development department from in or about May 2007 to in or about March 2011.

10. "Supervisor D," an individual whose identity is known to the United States and VW AG, was a supervisor in charge of the VW Brand Engine Development department from in or about October 2013 to the present.

11. "Supervisor E," an individual whose identity is known to the United States and VW AG, was a supervisor with responsibility for VW AG's Quality Management and Product Safety department who reported to the supervisor in charge of Quality Management from in or about 2007 to in or about October 2014.

12. "Supervisor F," an individual whose identity is known to the United States and VW AG, was a supervisor within the VW Brand Engine Development department from in or about 2003 until in or about December 2012.

13. "Attorney A," an individual whose identity is known to the United States and VW AG, was a German-qualified in-house attorney for VW AG who was the in-house attorney principally responsible for providing legal advice in connection with VW AG's response to U.S. emissions issues from in or about May 2015 to in or about September 2015.

## U.S. NOx Emissions Standards

14.  The purpose of the Clean Air Act and its implementing regulations was to protect human health and the environment by, among other things, reducing emissions of pollutants from new motor vehicles, including nitrogen oxides ("NOx").

15.  The Clean Air Act required the U.S. Environmental Protection Agency ("EPA") to promulgate emissions standards for new motor vehicles.  The EPA established standards and test procedures for light-duty motor vehicles sold in the United States, including emission standards for NOx.

16.  The Clean Air Act prohibited manufacturers of new motor vehicles from selling, offering for sale, introducing or delivering for introduction into U.S. commerce, or importing (or causing the foregoing with respect to) any new motor vehicle unless the vehicle complied with U.S. emissions standards, including NOx emissions standards, and was issued an EPA certificate of conformity.

17.  To obtain a certificate of conformity, a manufacturer was required to submit an application to the EPA for each model year and for each test group of vehicles that it intended to sell in the United States.  The application was required to be in writing, to be signed by an authorized representative of the manufacturer, and to include, among other things, the results of testing done pursuant to the published Federal Test Procedures that measure NOx emissions, and a description

Exh. 2-5

of the engine, emissions control system, and fuel system components, including a detailed description of each Auxiliary Emission Control Device ("AECD") to be installed on the vehicle.

18.   An AECD was defined under U.S. law as "any element of design which senses temperature, vehicle speed, engine RPM, transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." The manufacturer was also required to include a justification for each AECD. If the EPA, in reviewing the application for a certificate of conformity, determined that the AECD "reduced the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use," and that (1) it was not substantially included in the Federal Test Procedure, (2) the need for the AECD was not justified for protection of the vehicle against damage or accident, or (3) it went beyond the requirements of engine starting, the AECD was considered a "defeat device." Whenever the term "defeat device" is used in this Statement of Facts, it refers to a defeat device as defined by U.S. law.

19.   The EPA would not certify motor vehicles equipped with defeat devices. Manufacturers could not sell motor vehicles in the United States without a certificate of conformity from the EPA.

20.  The California Air Resources Board ("CARB") (together with the EPA, "U.S. regulators") issued its own certificates, called executive orders, for the sale of motor vehicles in the State of California.  To obtain such a certificate, the manufacturer was required to satisfy the standards set forth by the State of California, which were equal to or more stringent than those of the EPA.

21.  As part of the application for a certification process, manufacturers often worked in parallel with the EPA and CARB.  To obtain a certificate of conformity from the EPA, manufacturers were required to demonstrate that the light-duty vehicles were equipped with an on-board diagnostic ("OBD") system capable of monitoring all emissions-related systems or components. Manufacturers could demonstrate compliance with California OBD standards in order to meet federal requirements.  CARB reviewed applications from manufacturers, including VW, to determine whether their OBD systems were in compliance with California OBD standards, and CARB's conclusion would be included in the application the manufacturer submitted to the EPA.

22.  In 1998, the United States established new federal emissions standards that would be implemented in separate steps, or Tiers.  Tier II emissions standards, including for NOx emissions, were significantly stricter than Tier I. For light-duty vehicles, the regulations required manufacturers to begin to phase in compliance with the new, stricter Tier II NOx emissions standards in 2004 and required

Exh. 2-7

manufacturers to fully comply with the stricter standards for model year 2007. These strict U.S. NOx emissions standards were applicable specifically to vehicles in the United States.

## VW Diesel Vehicles Sold in the United States

23.   In the United States, VW sold, offered for sale, introduced into commerce, delivered for introduction into commerce, imported, or caused the foregoing actions (collectively, "sold in the United States") the following vehicles containing 2.0 liter diesel engines ("2.0 Liter Subject Vehicles"):

a.      Model Year ("MY") 2009-2015 VW Jetta;

b.      MY 2009-2014 VW Jetta Sportwagen;

c.      MY 2010-2015 VW Golf;

d.      MY 2015 VW Golf Sportwagen;

e.      MY 2010-2013, 2015 Audi A3;

f.      MY 2013-2015 VW Beetle and VW Beetle Convertible; and

g.      MY 2012-2015 VW Passat.

24.   VW sold in the United States the following vehicles containing 3.0 liter diesel engines ("3.0 Liter Subject Vehicles"):

a.      MY 2009-2016 VW Touareg;

b.      MY 2009-2015 Audi Q7;

c.      MY 2014-2016 Audi A6 Quattro;

    d.    MY 2014-2016 Audi A7 Quattro;

    e.    MY 2014-2016 Audi A8L; and

    f.    MY 2014-2016 Audi Q5.

25.    VW GOA's Engineering and Environmental Office ("EEO") was located in Auburn Hills, Michigan, in the Eastern District of Michigan. Among other things, EEO prepared and submitted applications (the "Applications") for a certificate of conformity and an executive order (collectively, "Certificates") to the EPA and CARB to obtain authorization to sell each of the 2.0 Liter Subject Vehicles and 3.0 Liter Subject Vehicles in the United States (collectively, the "Subject Vehicles"). VW GOA's Test Center California performed testing related to the Subject Vehicles.

26.    VW AG developed the engines for the 2.0 Liter Subject Vehicles. Audi AG developed the engines for the 3.0 Liter Subject Vehicles and the MY 2013-2016 Porsche Cayenne diesel vehicles sold in the United States (the "Porsche Vehicles").

27.    The Applications to the EPA were accompanied by the following signed statement by a VW representative:

> The Volkswagen Group states that any element of design, system, or emission control device installed on or incorporated in the Volkswagen Group's new motor vehicles or new motor vehicle engines for the purpose of complying with standards prescribed under section 202 of the Clean Air Act, will not, to the best of the Volkswagen Group's information and belief,

cause the emission into the ambient air of pollutants in the
operation of its motor vehicles or motor vehicle engines which
cause or contribute to an unreasonable risk to public health or
welfare except as specifically permitted by the standards
prescribed under section 202 of the Clean Air Act. The
Volkswagen Group further states that any element of design,
system, or emission control device installed or incorporated in
the Volkswagen Group's new motor vehicles or new motor
vehicle engines, for the purpose of complying with standards
prescribed under section 202 of the Clean Air Act, will not, to
the best of the Volkswagen Group's information and belief,
cause or contribute to an unreasonable risk to public safety.

. . .

All vehicles have been tested in accordance with good
engineering practice to ascertain that such test vehicles meet the
requirement of this section for the useful life of the vehicle.

28.    Based on the representations made by VW employees in the

Applications for the Subject Vehicles, EPA and CARB issued Certificates for these

vehicles, allowing the Subject Vehicles to be sold in the United States.

29.    Upon importing the Subject Vehicles into the United States, VW

disclosed to U.S. Customs and Border Protection ("CBP") that the vehicles were

covered by valid Certificates by affixing an emissions label to the vehicles'

engines. These labels stated that the vehicles conformed to EPA and CARB

emissions regulations. VW affixed these labels to each of the Subject Vehicles that

it imported into the United States.

30.    VW represented to its U.S. customers, U.S. dealers, U.S. regulators

and others in the United States that the Subject Vehicles met the new and stricter

U.S. emissions standards identified in paragraph 22 above.  Further, VW designed a specific marketing campaign to market these vehicles to U.S. customers as "clean diesel" vehicles.

## VW AG's Criminal Conduct

31.  From approximately May 2006 to approximately November 2015, VW AG, through Supervisors A-F and other VW employees, agreed to deceive U.S. regulators and U.S. customers about whether the Subject Vehicles and the Porsche Vehicles complied with U.S. emissions standards.  During their involvement with design, marketing and/or sale of the Subject Vehicles and the Porsche Vehicles in the United States, Supervisors A-F and other VW employees: (a) knew that the Subject Vehicles and the Porsche Vehicles did not meet U.S. emissions standards; (b) knew that VW was using software to cheat the U.S. testing process by making it appear as if the Subject Vehicles and the Porsche Vehicles met U.S. emissions standards when, in fact, they did not; and (c) attempted to and did conceal these facts from U.S. regulators and U.S. customers.

### *The 2.0 Liter Defeat Device in the United States*

32.  In at least in or about 2006, VW AG employees working under the supervision of Supervisors B, C, and F were designing the new EA 189 2.0 liter diesel engine (later known as the Generation 1 or "Gen 1") for use in the United States that would be the cornerstone of a new project to sell passenger diesel

Exh. 2-11

vehicles in the United States. Selling diesel vehicles in the U.S. market was an important strategic goal of VW AG. This project became known within VW as the "US'07" project.

33.    Supervisors B, C, and F, and others, however, realized that VW could not design a diesel engine that would both meet the stricter U.S. NOx emissions standards that would become effective in 2007 and attract sufficient customer demand in the U.S. market. Instead of bringing to market a diesel vehicle that could legitimately meet the new, more restrictive U.S. NOx emissions standards, VW AG employees acting at the direction of Supervisors B, C, and F and others, including Company A employees, designed, created, and implemented a software function to detect, evade and defeat U.S. emissions standards.

34.    While employees acting at their direction designed and implemented the defeat device software, Supervisors B, C, and F, and others knew that U.S. regulators would measure VW's diesel vehicles' emissions through standard U.S. tests with specific, published drive cycles. VW AG employees acting at the direction of Supervisors B, C, and F, and others designed the VW defeat device to recognize whether the vehicle was undergoing standard U.S. emissions testing on a dynamometer (or "dyno") or whether the vehicle was being driven on the road under normal driving conditions. The defeat device accomplished this by recognizing the standard drive cycles used by U.S. regulators. If the vehicle's

software detected that it was being tested, the vehicle performed in one mode, which satisfied U.S. NOx emissions standards. If the defeat device detected that the vehicle was not being tested, it operated in a different mode, in which the effectiveness of the vehicle's emissions control systems was reduced substantially, causing the vehicle to emit substantially higher NOx, sometimes 35 times higher than U.S. standards.

35.  In designing the defeat device, VW engineers borrowed the original concept of the dual-mode, emissions cycle-beating software from Audi. On or about May 17, 2006, a VW engineer, in describing the Audi software, sent an email to employees in the VW Brand Engine Development department that described aspects of the software and cautioned against using it in its current form because it was "pure" cycle-beating, i.e., as a mechanism to detect, evade and defeat U.S. emissions cycles or tests. The VW AG engineer wrote (in German), "within the clearance structure of the pre-fuel injection the acoustic function is nearly always activated within our current US'07-data set. This function is pure [cycle-beating] and can like this absolutely not be used for US'07."

36.  Throughout in or around 2006, Supervisor F authorized VW AG engineers to use the defeat device in the development of the US'07 project, despite concerns expressed by certain VW AG employees about the propriety of designing and activating the defeat device software. In or about the fall of 2006, lower level

Exh. 2-13

VW AG engineers, with the support of their supervisors, raised objections to the propriety of the defeat device, and elevated the issue to Supervisor B. During a meeting that occurred in or about November 2006, VW AG employees briefed Supervisor B on the purpose and design of the defeat device. During the meeting, Supervisor B decided that VW should continue with production of the US'07 project with the defeat device, and instructed those in attendance, in sum and substance, not to get caught.

37. Throughout 2007, various technical problems arose with the US'07 project that led to internal discussions and disagreements among members of the VW AG team that was primarily responsible for ensuring vehicles met U.S. emissions standards. Those disagreements over the direction of the project were expressly articulated during a contentious meeting on or about October 5, 2007, over which Supervisor C presided. As a result of the meeting, Supervisor C authorized Supervisor F and his team to proceed with the US'07 project despite knowing that only the use of the defeat device software would enable VW diesel vehicles to pass U.S. emissions tests.

38. Starting with the first model year 2009 of VW's new engine for the 2.0 Liter Subject Vehicles through model year 2016, Supervisors A-D and F, and others, then caused the defeat device software to be installed in the 2.0 Liter Subject Vehicles marketed and sold in the United States.

Exh. 2-14

### *The 3.0 Liter Defeat Device in the United States*

39.   Starting in or around 2006, Audi AG engineers designed a 3.0 liter diesel for the U.S. market.  The 3.0 liter engine was more powerful than the 2.0 liter engine, and was included in larger and higher-end model vehicles.  The 3.0 liter engine was ultimately placed in various Volkswagen, Audi and Porsche diesel vehicles sold in the United States for model years 2009 through 2016.  In order to pass U.S. emissions tests, Audi engineers designed and installed software designed to detect, evade and defeat U.S. emissions standards, which constituted a defeat device under U.S. law.

40.   Specifically, Audi AG engineers calibrated a defeat device for the 3.0 Liter Subject Vehicles and the Porsche Vehicles that varied injection levels of a solution consisting of urea and water ("AdBlue") into the exhaust gas system based on whether the vehicle was being tested or not, with less NOx reduction occurring during regular driving conditions.  In this way, the vehicle consumed less AdBlue, and avoided a corresponding increase in the vehicle's AdBlue tank size, which would have decreased the vehicle's trunk size, and made the vehicle less marketable in the United States.  In addition, the vehicle could drive further between service intervals, which was also perceived as important to the vehicle's marketability in the United States.

### *Certification of VW Diesel Vehicles in the United States*

41.   VW employees met with the EPA and CARB to seek the certifications required to sell the Subject Vehicles to U.S. customers.  During these meetings, some of which Supervisor F attended personally, VW employees misrepresented, and caused to be misrepresented, to the EPA and CARB staff that the Subject Vehicles complied with U.S. NOx emissions standards, when they knew the vehicles did not.  During these meetings, VW employees described, and caused to be described, VW's diesel technology and emissions control systems to the EPA and CARB staff in detail but omitted the fact that the engine could not meet U.S. emissions standards without using the defeat device software.

42.   Also as part of the certification process for each new model year, Supervisors A-F and others certified, and/or caused to be certified, to the EPA and CARB that the Subject Vehicles met U.S. emissions standards and complied with standards prescribed by the Clean Air Act.  Supervisors A-F, and others, knew that if they had told the truth and disclosed the existence of the defeat device, VW would not have obtained the requisite Certificates for the Subject Vehicles and could not have sold any of them in the United States.

### *Importation of VW Diesel Vehicles in the United States*

43.   In order to import the Subject Vehicles into the United States, VW was required to disclose to CBP whether the vehicles were covered by valid certificates for the United States.  VW did so by affixing a label to the vehicles' engines.  VW employees caused to be stated on the labels that the vehicles complied with applicable EPA and CARB emissions regulations and limitations, knowing that if they had disclosed that the Subject Vehicles did not meet U.S. emissions regulations and limitations, VW would not have been able to import the vehicles into the United States.  Certain VW employees knew that the labels for the Porsche Vehicles stated that those vehicles complied with EPA and CARB emissions regulations and limitations, when in fact, the VW employees knew they did not.

### *Marketing of "Clean Diesel" Vehicles in the United States*

44.   Supervisors A and C and others marketed, and caused to be marketed, the Subject Vehicles to the U.S. public as "clean diesel" and environmentally-friendly, when they knew the Subject Vehicles were intentionally designed to detect, evade and defeat U.S. emissions standards.

45.   For example, on or about November 18, 2007, Supervisor C sent an email to Supervisor F and others attaching three photos of himself with

California's then-Governor, which were taken during an event at which Supervisor C promoted the 2.0 Liter Subject Vehicles in the United States as "green diesel."

### The Improvement of the 2.0 Liter Defeat Device in the United States

46.   Following the launch of the Gen 1 2.0 Liter Subject Vehicles in the United States, Supervisors C and F, and others, worked on a second generation of the vehicle (the "Gen 2"), which also contained software designed to detect, evade and defeat U.S. emissions tests.  The Gen 2 2.0 Liter Subject Vehicles were launched in the United States in or around 2011.

47.   In or around 2012, hardware failures developed in certain of the 2.0 Liter Subject Vehicles that were being used by customers on the road in the United States. VW AG engineers hypothesized that vehicles equipped with the defeat device stayed in "dyno" mode (i.e., testing mode) even when driven on the road outside of test conditions.  Since the 2.0 Liter Subject Vehicles were not designed to be driven for longer periods of time in "dyno" mode, VW AG engineers suspected that the increased stress on the exhaust system from being driven too long in "dyno" mode could be the root cause of the hardware failures.

48.   In or around July 2012, engineers from the VW Brand Engine Development department met, in separate meetings, with Supervisors A and E to explain that they suspected that the root cause of the hardware failures in the 2.0 Liter Subject Vehicles was the increased stress on the exhaust system from being

driven too long in "dyno" mode as a result of the use of software designed to detect, evade and defeat U.S. emissions tests. To illustrate the software's function, the engineers used a document. Although they understood the purpose and significance of the software, Supervisors A and E each encouraged the further concealment of the software. Specifically, Supervisors A and E each instructed the engineers who presented the issue to them to destroy the document they had used to illustrate the operation of the defeat device software.

49. VW AG engineers, having informed the supervisor in charge of the VW AG Engine Development department and within the VW AG Quality Management and Product Safety department of the existence and purpose of the defeat device in the 2.0 Liter Subject Vehicles, then sought ways to improve its operation in existing 2.0 Liter Subject Vehicles to avoid the hardware failures. To solve the hardware failures, VW AG engineers decided to start the 2.0 Liter Subject Vehicles in the "street mode" and, when the defeat device recognized that the vehicle was being tested for compliance with U.S. emissions standards, switch to the "dyno mode." To increase the likelihood that the vehicle in fact realized that it was being tested on the dynamometer for compliance with U.S. emissions standards, the VW AG engineers activated a "steering wheel angle recognition" feature. The steering wheel angle recognition interacted with the software by

enabling the vehicle to detect whether it was being tested on a dynamometer (where the steering wheel is not turned), or being driven on the road.

50.   Certain VW AG employees again expressed concern, specifically about the expansion of the defeat device through the steering wheel angle detection, and sought approval for the function from more senior supervisors within the VW AG Engine Development department.  In particular, VW AG engineers asked Supervisor A for a decision on whether or not to use the proposed function in the 2.0 Liter Subject Vehicles.  In or about April 2013, Supervisor A authorized activation of the software underlying the steering wheel angle recognition function.  VW employees then installed the new software function in new 2.0 Liter Subject Vehicles being sold in the United States, and later installed it in existing 2.0 Liter Subject Vehicles through software updates during maintenance.

51.   VW employees falsely told, and caused others to tell, U.S. regulators, U.S. customers and others in the United States that the software update in or around 2014 was intended to improve the 2.0 Liter Subject Vehicles when, in fact, VW employees knew that the update also used the steering wheel angle of the vehicle as a basis to more easily detect when the vehicle was undergoing emissions tests, thereby improving the defeat device's precision in order to reduce the stress on the emissions control systems.

Exh. 2-20

*The Concealment of the Defeat Devices in the United States – 2.0 Liter*

52.  In or around March 2014, certain VW employees learned of the results of a study undertaken by West Virginia University's Center for Alternative Fuels, Engines and Emissions and commissioned by the International Council on Clean Transportation (the "ICCT study"). The ICCT study identified substantial discrepancies in the NOx emissions from certain 2.0 Liter Subject Vehicles when tested on the road compared to when these vehicles were undergoing EPA and CARB standard drive cycle tests on a dynamometer.  The results of the study showed that two of the three vehicles tested on the road, both 2.0 Liter Subject Vehicles, emitted NOx at values of up to approximately 40 times the permissible limit applicable during testing in the United States.

53.  Following the ICCT study, CARB, in coordination with the EPA, attempted to work with VW to determine the cause for the higher NOx emissions in the 2.0 Liter Subject Vehicles when being driven on the road as opposed to on the dynamometer undergoing standard emissions test cycles.  To do this, CARB, in coordination with the EPA, repeatedly asked VW questions that became increasingly more specific and detailed, as well as conducted additional testing themselves.

54.  In response to learning about the results of the ICCT study, engineers in the VW Brand Engine Development department formed an ad hoc task force to

Exh. 2-21

formulate responses to questions that arose from the U.S. regulators. VW AG supervisors, including Supervisors A, D, and E, and others, determined not to disclose to U.S. regulators that the tested vehicle models operated with a defeat device. Instead, Supervisors A, D, and E, and others decided to pursue a strategy of concealing the defeat device in responding to questions from U.S. regulators, while appearing to cooperate.

55.   Throughout 2014 and the first half of 2015, Supervisors A, D, and E, and others, continued to offer, and/or cause to be offered, software and hardware "fixes" and explanations to U.S. regulators for the 2.0 Liter Subject Vehicles' higher NOx measurements on the road without revealing the underlying reason – the existence of software designed to detect, evade and defeat U.S. emissions tests.

56.   On or about April 28, 2014, members of the VW task force presented the findings of the ICCT study to Supervisor E, whose supervisory responsibility included addressing safety and quality problems in vehicles in production. Included in the presentation was an explanation of the potential financial consequences VW could face if the defeat device was discovered by U.S. regulators, including but not limited to applicable fines per vehicle, which were substantial.

57.   On or about May 21, 2014, a VW AG employee sent an email to his supervisor, Supervisor D, and others, describing an "early round meeting" with

Supervisor A, at which emissions issues in North America for the Gen 2 2.0 Liter

Subject Vehicles were discussed, and questions were raised about the risk of what

could happen and the available options for VW.  Supervisor D responded by email

that he was in "direct touch" with the supervisor in charge of Quality Management

at VW AG and instructed the VW AG employee to "please treat confidentially" the

issue.

     58.  On or about October 1, 2014, VW AG employees presented to CARB

regarding the ICCT study results and discrepancies identified in NOx emissions

between dynamometer testing and road driving.  In response to questions, the VW

AG employees did not reveal that the existence of the defeat device was the

explanation for the discrepancies in NOx emissions, and, in fact, gave CARB

various false reasons for the discrepancies in NOx emissions including driving

patterns and technical issues.

     59.  When U.S. regulators threatened not to certify VW model year 2016

vehicles for sale in the United States, VW AG supervisors requested a briefing on

the situation in the United States.  On or about July 27, 2015, VW AG employees

presented to VW AG supervisors.  Supervisors A and D were present, among

others.

     60.  On or about August 5, 2015, in a meeting in Traverse City, Michigan,

two VW employees met with a CARB official to discuss again the discrepancies in

emissions of the 2.0 Liter Subject Vehicles. The VW employees did not reveal the existence of the defeat device.

61. On or about August 18, 2015, Supervisors A and D, and others, approved a script to be followed by VW AG employees during an upcoming meeting with CARB in California on or about August 19, 2015. The script provided for continued concealment of the defeat device from CARB in the 2.0 Liter Subject Vehicles, with the goal of obtaining approval to sell the Gen 3 model year 2016 2.0 Liter Subject Vehicles in the United States.

62. On or about August 19, 2015, in a meeting with CARB in El Monte, California, a VW employee explained, for the first time to U.S. regulators and in direct contravention of instructions from supervisors at VW AG, that certain of the 2.0 Liter Subject Vehicles used different emissions treatment depending on whether the vehicles were on the dynamometer or the road, thereby signaling that VW had evaded U.S. emissions tests.

63. On or about September 3, 2015, in a meeting in El Monte, California with CARB and EPA, Supervisor D, while creating the false impression that he had been unaware of the defeat device previously, admitted that VW had installed a defeat device in the 2.0 Liter Subject Vehicles.

64. On or about September 18, 2015, the EPA issued a public Notice of Violation to VW stating that the EPA had determined that VW had violated the

Clean Air Act by manufacturing and installing defeat devices in the 2.0 Liter

Subject Vehicles.

### *The Concealment of the Defeat Devices in the United States – 3.0 Liter*

65.   On or about January 27, 2015, CARB informed VW AG that CARB

would not approve certification of the Model Year 2016 3.0 Liter Subject Vehicles

until Audi AG confirmed that the 3.0 Liter Subject Vehicles did not possess the

same emissions issues as had been identified by the ICCT study and as were being

addressed by VW with the 2.0 Liter Subject Vehicles.

66.   On or about March 24, 2015, in response to CARB's questions, Audi

AG employees made a presentation to CARB, during which Audi AG employees

did not disclose that the Audi 2.0 and 3.0 Liter Subject Vehicles and the Porsche

Vehicles in fact contained a defeat device, which caused emissions discrepancies

in those vehicles. The Audi AG employees informed CARB that the 3.0 Liter

Subject Vehicles did not possess the same emissions issues as the 2.0 Liter Subject

Vehicles when, in fact, the 3.0 Liter Subject Vehicles possessed at least one defeat

device that interfered with the emissions systems to reduce NOx emissions on the

dyno but not on the road.  On or about March 25, 2015, CARB, based on the

misstatements and omissions made by the Audi AG representatives, issued an

executive order approving the sale of Model Year 2016 3.0 Liter Subject Vehicles.

67.  On or about November 2, 2015, EPA issued a Notice of Violation to VW AG, Audi AG and Porsche AG, citing violations of the Clean Air Act related to EPA's discovery that the 3.0 Liter Subject Vehicles and the Porsche Vehicles contained a defeat device that resulted in excess NOx emissions when the vehicles were driven on the road.

68.  On or about November 2, 2015, VW AG issued a statement that "no software has been installed in the 3-liter V6 diesel power units to alter emissions characteristics in a forbidden manner."

69.  On or about November 19, 2015, Audi AG representatives met with EPA and admitted that the 3.0 Liter Subject Vehicles contained at least three undisclosed AECDs. Upon questioning from EPA, Audi AG representatives conceded that one of these three undisclosed AECDs met the criteria of a defeat device under U.S. law.

70.  On or about May 16, 2016, Audi AG representatives met with CARB and admitted that there were additional elements within two of its undisclosed AECDs, which impacted the dosing strategy in the 3.0 Liter Subject Vehicles and the Porsche Vehicles.

71.  On or about July 19, 2016, in a presentation to CARB, Audi AG representatives conceded that elements of two of its undisclosed AECDs met the definition of a defeat device.

Exh. 2-26

72.   Supervisors A-F and others caused defeat device software to be installed on all of the approximately 585,000 Subject Vehicles and the Porsche Vehicles sold in the United States from 2009 through 2015.

### **Obstruction of Justice**

73.   As VW employees prepared to admit to U.S. regulators that VW used a "defeat device" in the 2.0 Liter Subject Vehicles, counsel for VW GOA prepared a litigation hold notice to ensure that VW GOA preserved documents relevant to diesel emissions issues. At the same time, VW GOA was in contact with VW AG to discuss VW AG preserving documents relevant to diesel emissions issues. Attorney A made statements that several employees understood as suggesting the destruction of these materials. In anticipation of this hold taking effect at VW AG, certain VW AG employees destroyed documents and files related to U.S. emissions issues that they believed would be covered by the hold. Certain VW AG employees also requested that their counterparts at Company A destroy sensitive documents relating to U.S. emissions issues. Certain Audi AG employees also destroyed documents related to U.S. emissions issues. The VW AG and Audi AG employees who participated in this deletion activity did so to protect both VW and themselves from the legal consequences of their actions.

74.   Between the August 19, 2015 and September 3, 2015 meetings with U.S. regulators, certain VW AG employees discussed issues with Attorney A and others.

75.   On or about August 26, 2015, VW GOA's legal team sent the text of a litigation hold notice to Attorney A in VW AG's Wolfsburg office that would require recipients to preserve and retain records in their control.  The subject of the e-mail was "Legal Hold Notice – Emissions Certification of MY2009-2016 2.0L TDI Volkswagen and Audi vehicles."  The VW GOA legal team stated that VW GOA would be issuing the litigation hold notice to certain VW GOA employees the following day.  On or about August 28, 2015, Attorney A received notice that VW GOA was issuing that litigation hold notice that day.  Attorney A indicated to his staff on August 31 that the hold would be sent out at VW AG on September 1. Among those at VW AG being asked to retain and preserve documents were Supervisors A and D and a number of other VW AG employees.

76.   On or about August 27, 2015, Attorney A met with several VW AG engineers to discuss the technology behind the defeat device.  Attorney A indicated that a hold was imminent, and that these engineers should check their documents, which multiple participants understood to mean that they should delete documents prior to the hold being issued.

77.   On or about August 31, 2015, a meeting was held to prepare for the September 3 presentation to CARB and EPA where VW's use of the defeat device in the United States was to be formally revealed.  During the meeting, within hearing of several participants, Attorney A discussed the forthcoming hold and again told the engineers that the hold was imminent and recommended that they check what documents they had.  This comment led multiple individuals, including supervisors in the VW Brand Engine Development department at VW AG, to delete documents related to U.S. emissions issues.

78.   On or about September 1, 2015, the hold at VW AG was issued.  On or about September 1, 2015, several employees in the VW Brand Engine Development department at VW AG discussed the fact that their counterparts at Company A would also possess documents related to U.S. emissions issues.  At least two VW AG employees contacted Company A employees and asked them to delete documents relating to U.S. emissions issues.

79.   On or about September 3, 2015, Supervisor A approached Supervisor D's assistant, and requested that Supervisor D's assistant search in Supervisor D's office for a hard drive on which documents were stored containing emails of VW AG supervisors, including Supervisor A.  Supervisor D's assistant recovered the hard drive and gave it to Supervisor A.  Supervisor A later asked his assistant to throw away the hard drive.

Exh. 2-29

80.   On or about September 15, 2015, a supervisor within the VW Brand Engine Development department convened a meeting with approximately 30-40 employees, during which Attorney A informed the VW AG employees present about the current situation regarding disclosure of the defeat device in the United States.  During this meeting, a VW AG employee asked Attorney A what the employees should do with new documents that were created, because they could be harmful to VW AG.  Attorney A indicated that new data should be kept on USB drives and only the final versions saved on VW AG's system, and then, only if "necessary."

81.   Even employees who did not attend these meetings, or meet with Attorney A personally, became aware that there had been a recommendation from a VW AG attorney to delete documents related to U.S. emissions issues.  Within VW AG and Audi AG, thousands of documents were deleted by approximately 40 VW AG and Audi AG employees.

82.   After it began an internal investigation, VW AG was subsequently able to recover many of the deleted documents.

Exh. 2-30