Carmine D. Boccuzzi, Jr. (pro hac vice)
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
(212) 225-2000 (Phone)
(212) 225-3999 (Facsimile)
cboccuzzi@cgsh.com

Jennifer Kennedy Park (SBN 244888)
Cleary Gottlieb Steen & Hamilton LLP
1841 Page Mill Road, Suite 250
Palo Alto, CA 94304
(650) 815-4100 (Phone)
jkpark@cgsh.com

*Counsel for Defendants*
*Robert Bosch GmbH and*
*Robert Bosch LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re: Volkswagen 'Clean Diesel' Marketing, Sales Practices, and Products Liability Litigation*<br><br>This document relates to:<br><br>*Iconic Motors, Inc., et al. v. Volkswagen Group of America, Inc., et al.*, No. 3:17-cv-3185-CRB | LEAD CASE No. 15-md-02672-CRB<br><br>**ROBERT BOSCH GMBH AND ROBERT BOSCH LLC'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hon. Charles R. Breyer<br><br>Hearing: October 18, 2024, 10:00am |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION .................................................................................... 1

REQUEST FOR RELIEF ..................................................................................................... 1

ISSUES TO BE DECIDED ................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 2

SUMMARY OF THE ARGUMENT......................................................................................... 2

FACTUAL AND PROCEDURAL BACKGROUND..................................................................... 3

      A.    Volkswagen Provided Significant Compensation to Its Dealers After Temporarily Stopping Sales of TDIs. ........................................................................... 3

      B.    Plaintiffs Received Generous Compensation from Volkswagen That More Than Compensated Them for Any Losses Caused By Volkswagen's Emissions Noncompliance. ................................................................................... 6

      C.    Procedural History ...................................................................... 9

LEGAL STANDARD ........................................................................................................ 10

ARGUMENT ................................................................................................................... 10

I.     PLAINTIFFS SUFFERED NO INJURY TO "BUSINESS OR PROPERTY." ................ 10

II.    ANY INJURY WAS NOT PROXIMATELY CAUSED BY THE BOSCH DEFENDANTS. ......................................................................................... 12

III.   PLAINTIFFS' CONSPIRACY CLAIM UNDER ILLINOIS LAW FAILS FOR THE SAME REASONS. ................................................................................... 17

CONCLUSION................................................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006) .................................................................................. 12, 15

*Canyon Cty. v. Syngenta Seeds, Inc.*,
    519 F.3d 969 (9th Cir. 2008)........................................................................ 12

*Dunmore v. Dunmore*,
    2013 WL 5569979 (E.D. Cal. Oct. 9, 2013) ................................................ 13

*Finnegan v. Citi*,
    703 F. App'x 625 (9th Cir. 2017) ................................................................ 10

*FTC v. Stefanchik*,
    559 F.3d 924 (9th Cir. 2009)........................................................................ 10

*Gov. App Solutions, Inc. v. City of New Haven*,
    2023 WL 2957862 (E.D. Cal. Apr. 13, 2023) .............................................. 14

*Gov. App Solutions, Inc. v. City of New Haven*,
    2024 WL 1299993 (9th Cir. Mar. 27, 2024)................................................. 14

*Hemi Grp., LLC v. City of New York*,
    559 U.S. 1 (2010)..................................................................................... 12, 15

*Holmes v. Sec. Inv'r Prot. Corp.*,
    503 U.S. 258 (1992).................................................................................. 12, 15

*In re Am. Express Co. S'holder Litig.*,
    39 F.3d 395 (2d Cir. 1994)........................................................................... 13

*In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prods. Liab. Litig.*,
    2017 WL 4890594 (N.D. Cal. Oct. 30, 2017)........................................ 10-12

*In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prods. Liab. Litig.*,
    2019 WL 6749534 (N.D. Cal. Dec. 6, 2019) ......................................... passim

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    842 F. App'x 112 (9th Cir. 2021) ....................................................... 2, 13, 17

*Mendia v. Garcia*,
    768 F.3d 1009 (9th Cir. 2014)...................................................................... 13

*Meng v. Schwartz,*
    116 F. Supp. 2d 92 (D.D.C. 2000) ...................................................................... 13

*Napleton's Arlington Heights Motors, Inc. v. FCA US LLC,*
    214 F. Supp. 3d 675 (N.D. Ill. 2016) ................................................................... 15

*Patterson v. Int'l Bhd. of Teamsters, Local 959,*
    121 F.3d 1345 (9th Cir. 1997).............................................................................. 10

*Sedima, S.P.R.L. v. Imrex Co., Inc.,*
    473 U.S. 479 (1985).................................................................................... 10, 12

*Sheperd v. Am. Honda Motor Co. Inc.,*
    822 F. Supp. 625 (N.D. Cal. 1993) ...................................................................... 16

**State Cases**

*Merrilees v. Merrilees,*
    998 N.E.2d 147 (Ill. App. Ct. 2013) .................................................................... 17

*Turcios v. DeBruler Co.,*
    32 N.E. 3d 1117 (Ill. 2015) .................................................................................. 17

**Federal Statutes**

18 U.S.C. § 1964(c) ...................................................................................................... 10

**Other Authorities**

Federal Rule of Civil Procedure 56(a) .......................................................................... 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on October 18, 2024 at 10:00am, or such other date as may be agreed upon or ordered, in Courtroom 6 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Defendants Robert Bosch GmbH ("Bosch GmbH") and Robert Bosch LLC ("Bosch LLC") (together, "Bosch Defendants") will and hereby do move this Court to grant summary judgment in their favor as to all claims raised against them by plaintiffs Iconic Motors, Inc. d/b/a Elgin Volkswagen ("Elgin VW") and Slevin Capital Investments, Inc. ("SCI" and together with Elgin VW, "Plaintiffs"). The Bosch Defendants submit this Motion pursuant to Federal Rule of Civil Procedure 56(a), Local Civil Rule 56, and the Court's order granting leave to move for summary judgment dated January 14, 2020 (MDL ECF No. 7031).[1]  This Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities and exhibits thereto, the accompanying Declaration of Patrick Swiber, all pleadings and papers filed herein, oral argument of counsel, and any other matter that may be submitted at any hearing of this Motion.

## REQUEST FOR RELIEF

The Bosch Defendants respectfully request that the Court grant summary judgment in favor of the Bosch Defendants as to all claims asserted by Plaintiffs against them.

## ISSUES TO BE DECIDED

1.  Whether Plaintiffs suffered cognizable injuries or recoverable damages proximately caused by the Bosch Defendants' alleged misconduct.  The Bosch Defendants answer "no."

2.  Whether the Bosch Defendants are entitled to judgment in their favor as a matter of law in light of Plaintiffs' lack of cognizable injury and recoverable damages.  The Bosch Defendants answer "yes."

---

[1] Citations to "ECF No." refer to Case No. 3:17-cv-3185-CRB.  Citations to "MDL ECF No." refer to Lead Case No. 15-md-02672-CRB.

## MEMORANDUM OF POINTS AND AUTHORITIES

## SUMMARY OF THE ARGUMENT

Four years ago, this Court granted the Bosch Defendants' motion for summary judgment on all claims brought on behalf of a putative class of Volkswagen dealers.  *See In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prods. Liab. Litig.*, 2019 WL 6749534 (N.D. Cal. Dec. 6, 2019), *aff'd* 842 F. App'x 112 (9th Cir. 2021) ("*Napleton*").  The *Napleton* dealers claimed out-of-pocket losses resulting from Volkswagen's stop-sale orders that prevented them from selling "turbocharged direct injection" diesel vehicles ("TDIs") in their inventory, as well as lost future income resulting from the dealers' inability to continue to sell and service new TDIs that Volkswagen decided not to make after its emissions noncompliance was revealed.  *See id.* at *1.

The *Napleton* dealers' out-of-pocket loss claim failed, because although the dealers could not sell their TDIs in inventory for a period of months, "Volkswagen provided the dealers with support payments that were intended to – and did – cover the costs of servicing, storing, and financing the TDIs that the dealers had in inventory when the stop-sale orders were issued."  *Id.*  And the *Napleton* dealers' lost future income claim failed for lack of proximate causation:  The TDIs "did not comply with emissions standards, and it was racketeering activity (or at least conduct that is alleged to have amounted to racketeering activity) that made the TDIs available for sale in spite of their noncompliance."  *Id.* at *2.  Thus, the *Napleton* dealers' alleged "losses from the TDI line's discontinuation were not 'by reason' of the emissions fraud; they were by reason of the fraud's discovery."  *Id*.; *see also In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 842 F. App'x 112, 114-15 (9th Cir. 2021) ("Allowing Plaintiffs to recover for all possible consequences of the alleged RICO violations—including fallout from the discovery of RICO violations—runs counter to the notion of proximate cause.").

Plaintiffs here – an individual Volkswagen dealer (Elgin VW) and its holding company (SCI) – bring the same claims as in *Napleton* and they fail for the same reasons.  Like the *Napleton* dealers, Plaintiffs claim out-of-pocket losses resulting from the stop-sale orders.  First Am. Compl. of Iconic Motors, Inc. and Slevin Cap. Invs., Inc. ¶¶ 319, 337, ECF No. 25 ("Compl.") (alleging diminished inventory value and "increased inventory carrying costs").  But

*unlike* the *Napleton* dealers, it is undisputed that Plaintiffs did not have *any* affected TDIs in inventory, and thus they did not suffer any out-of-pocket losses at all.  And, despite not incurring out-of-pocket costs, Plaintiffs *still benefited* from Volkswagen's substantial support payments while the stop-sale orders were pending and then received a massive windfall from their settlement with Volkswagen.

Also like the *Napleton* dealers, Plaintiffs claim damages from lost future sales and servicing of TDIs that Volkswagen chose not to manufacture.  Plaintiffs try to avoid the *Napleton* dealers' fate by calling this injury a loss of their "investment" in the dealership, but this wordplay cannot save their claim.  Plaintiffs' theory is that the dealership they continue to operate is "worth substantially less" because they lost the opportunity to sell noncompliant TDIs "at a premium," which "was a significant contributor to the high value of goodwill . . . associated with owning a Volkswagen dealership."  Compl. ¶¶ 312, 314.  But Plaintiffs' inability to sell noncompliant TDIs at a premium (the exact same theory as put forward by the *Napleton* plaintiffs) was caused by the *revelation* of the alleged RICO violation, not the RICO violation itself – again, just as in *Napleton*.

The lack of damages proximately caused by the Bosch Defendants' alleged conduct is fatal to both Plaintiffs' RICO and Illinois civil conspiracy claims.  The Bosch Defendants respectfully request that the Court grant them summary judgment on all of Plaintiffs' claims against them, and thereby bring to a close the last active matter pending against them in this MDL.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.  Volkswagen Provided Significant Compensation to Its Dealers After Temporarily Stopping Sales of TDIs.**

The Bosch Defendants are suppliers to Volkswagen that have no direct relationship with Plaintiffs.  *See* Compl. ¶¶ 25-26.  Relevant here, the Bosch Defendants supplied engine control units to Volkswagen, which Volkswagen used in certain diesel vehicles that it manufactured for sale in the United States.  *See id*. ¶¶ 73-74.  In September and November 2015, the Environmental Protection Agency ("EPA") and California Air Resources Board ("CARB") issued Notices of

Violation ("NOVs") to Volkswagen, Audi, and Porsche disclosing that the diesel vehicles manufactured from 2009 through 2015 did not comply with U.S. emissions laws.[2]  Following the NOVs, Volkswagen made the unilateral decision to order its U.S. franchise dealers to temporarily stop selling new or certified pre-owned TDIs (the "Stop-Sale Orders").  When Volkswagen issued its Stop-Sale Orders, its dealers were temporarily prevented from selling the small number of TDIs they had already bought from Volkswagen (the "TDIs in Inventory").

As part of the Stop-Sale Orders, Volkswagen created a comprehensive financial support program for its dealers.  *Napleton*, 2019 WL 6749534, at *1.  Through this program, Volkswagen provided regular payments to prevent dealers from incurring costs or other losses from the Stop-Sale Orders (collectively, the "Stop-Sale Support Payments"), including:

- "Discretionary" support payments:  Beginning in October 2015, right after the first Stop-Sale Order, Volkswagen began providing dealers with funds to help dealers respond to their "local operational and customer needs in real time."[3]

- Inventory maintenance support payments:  Volkswagen paid dealers to maintain their TDIs in Inventory by paying for 30 minutes of service time per vehicle each month in anticipation of their eventual sale.[4]

- Incentive payments:  Volkswagen gave incentive payments for selling non-TDI vehicles during the Stop-Sale period without the sales and performance requirements that were previously in place for such payments.[5]

---

[2] *See* MDL ECF Nos. 6954-2 (EPA NOV for 2.0L diesel vehicles); 6954-3 (CARB NOV for 2.0L diesel vehicles); 6954-4 (EPA NOV for 3.0L diesel vehicles); 6954-5 (CARB NOV for 3.0L diesel vehicles).

[3] MDL ECF No. 6954-48 (VW-MDL2672-NAPLETON-BERTOLET-00002012).

[4] MDL ECF No. 6954-10 (VW-MDL2672-NAPLETON-BERTOLET-00001996).

[5] MDL ECF No. 6954-11 (VW-MDL2672-NAPLETON-BERTOLET-00002013).

1 ████████████████████████████████████

2 ████████████████████████████████████████

3 ██████ █ ██████████████████████████████████ █

   As part of its resolution with the government and consumers, Volkswagen agreed to
provide emissions repairs that brought the TDIs on the road closer to compliance with emissions
regulations (the "Approved Emissions Modifications" or "AEMs").[8]  Once the AEMs were
approved,[9] ████████████████████████████████████████████
████████████████████████████ █ ████████████████████████████████
██████████████████         Volkswagen also offered to buy back TDIs (other than some
3.0L TDIs) from consumers who did not want the AEMs ("Bought-Back TDIs").[12]

   Once the Bought-Back TDIs were on the road again, dealers like Elgin VW had the
opportunity to earn additional profits if consumers chose to come to them for service.
Volkswagen incentivized consumers to do so by offering an enhanced warranty to consumers
who purchased Bought-Back TDIs from dealers.[13]  While a purchaser of a Bought-Back TDI was

---

[6] Ex. 1 (ICONIC012272).  Citations to "Ex." refer to exhibits to the Declaration of Patrick Swiber submitted herewith.

[7] *Id*.

[8] Order Granting Final Approval of the 2.0-Liter TDI Consumer and Reseller Dealership Class Action Settlement (Oct. 25, 2016), MDL ECF No. 2102 ("TDI Settlement Order").

[9] *See* MDL ECF Nos. 6954-16 (Jan. 6, 2017 AEM Announcement); 6954-17 (Oct. 20, 2017 AEM Announcement).

[10] *See, e.g.,* Ex. 2 (ICONIC011910)████████████████████████████████ ████████████████████████ *see also* Ex. 3 (ICONIC018331).

[11] Ex. 4 ████████████████████████████████

[12] *See* TDI Settlement Order.

[13] MDL ECF No. 6954-52 (Dec. 1, 2017 email titled "Important Used TDI Resale Incentives and Program Announcement"); *see also* Ex. 5 (ICONIC013416)████████████████ ██████████

1    not required to take it to a dealership for service, these vehicles represented additional servicing

2    opportunities for dealers.

3          Beginning in November 2016, over a year after the NOVs and Stop-Sale Orders,

4    Volkswagen unilaterally announced that it would not manufacture new diesel vehicles for sale in

5    the United States.[14]  According to Volkswagen, its decision stemmed from the difference in

6    emissions standards between the United States and Europe and its plans to expand its role in the

7    SUV market, a "key segment[]" of the U.S. market in which it had only limited diesel offerings.[15]

8    Further, in light of the increased costs and investments required to comply with forthcoming

9    emissions regulations, Volkswagen shifted focus to make electric cars worldwide "the new

10   trademark of Volkswagen."[16]

11        **B.  Plaintiffs Received Generous Compensation from Volkswagen That More Than
          Compensated Them for Any Losses Caused By Volkswagen's Emissions
12        Noncompliance.**

13         Plaintiff Elgin VW is a Volkswagen dealership, and Plaintiff SCI is Elgin VW's holding

14   company.  Compl. ¶¶ 17-18.  Unlike the *Napleton* dealers, Plaintiffs had not executed a

15   dealership agreement with Volkswagen at the time the first NOV was issued in September 2015.

16   ███████████████████████████████████████████████████████████

17   ███████████████████████████████████████████████████████████

18   ███████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████

20

21   ─────────────────────

     [14] MDL ECF No. 6954-38 (VW to Withdraw From U.S. Diesel Market, Handelsblatt Today
22   (Nov. 22, 2016)).

23   [15] *Id.* (quoting CEO Diess that "the legal framework," in terms of emissions standards, is the
     reason why Volkswagen would no longer offer diesel vehicles in the U.S.); *see also* MDL ECF
24   Nos. 6954-39 (Press Release, Volkswagen (Nov. 22, 2016)) (describing Volkswagen's
     "realignment of product strategy – with an SUV offensive in the first stage"); 6954-41 (VW Done
25   With Diesel Push in U.S., Exec Says, Automotive News (July 19, 2016)) (quoting Volkswagen
     Group of America CEO: "The regulations from 2019-2020 are going to be so hard that we would
26   have had to find an alternative to a certain extent anyhow.").

27   [16] *See* MDL ECF No. 6954-39 ("Our future electric cars will be the new trademark of
     Volkswagen.").
28
     [17] Ex. 6 (ICONIC000830-ICONIC000831) ████████████████████████

─────────────────────

1 ██████████████████████████████████████████████████████████████████

2 ██████████████████████████████████████████████

3       Even before the emissions noncompliance was revealed, Volkswagen dealers were

4 experiencing poor sales.  According to Haig Partners – automotive industry analysts – 2013 was a

5 "disappointing year with [Volkswagen] sales down 6.9%."[19]  Volkswagen dealers were "not

6 contenders in several key product segments like crossovers and full sized trucks," and "sales per

7 dealership [had] fallen by 10% since additional dealerships [had] been added around the

8 country."[20]  And in 2014, VW sales "continue[d] to badly lag the market, down a dismal 10% in a

9 market that was up 6%" in part because newly-added Volkswagen dealers "further depress[ed]

10 sales per store and margins."[21]  Despite these trends, and on the heels of the revelation that TDIs

11 did not comply with emissions laws, Plaintiffs decided to move forward with the Elgin VW

12 dealership.

13       ██████████████████████████████████████████████████████

14 ██████████████████████████████████ ██████████████████████████████████

15 ████████████████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████████████

17 ███████████████████████████████████████████████████████████████████

18 ██████████████████████████████████████████████████

19

20 [18] Ex. 7 (ICONIC000570) ████████████████████████████████████████

21

22 [19] Ex. 8 (Haig Partners, The Blue Sky Report Year End 2013), at 8 ("2013 Haig Report").

[20] *Id.*

23 [21] Ex. 9 (Haig Partners, The Haig Report Year End 2014), at 15 ("2014 Haig Report").

24 [22] Ex. 4, █████████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████████████████

26 [23] Ex. 10 (ICONIC024102) █████████████████████████████████████████████████

27 [24] *See, e.g.*, Ex. 11 (ICONIC011615) ██████████████████████████████

28 [25] *See, e.g.*, Ex. 12 (ICONIC010983) ███████████████████████████████

1 ██████████████████████████████████████████

2 ███████████████████████████████████████████████

3 That amount essentially paid back the entire $13 million investment Plaintiffs claim that they

4 made to build and open the dealership. *See* Compl. ¶ 244. ███████████████████████

5 ████████████████████████████████████████████

6 ████████████████████████

7       Added together, this generous compensation from Volkswagen means that Plaintiffs today

8 have a dealership that they continue to operate that cost them essentially nothing out-of-pocket to

9 open, and since then they have had the opportunity to sell and service hundreds of vehicles as

10 compensation for issues related to TDIs, which Plaintiffs never had on their lot anyway.

11       And yet Plaintiffs still seek more from the Bosch Defendants, with whom Plaintiffs never

12 had any relationship.  Plaintiffs' only potential "evidence" of damages in the record, however,

13 would be a comparison between two appraisals of the Elgin VW dealership, which Plaintiffs may

14 use to imply that the dealership is worth less now than they expected it to be. ███████████

15 ███████████████████████████████████████████████

16 ████████████████ █ ███████████████████████████████

17 ██████████████████████████ The two appraisals are summarized in the

18 following chart:

19

20

21

22

23

24

25 _____

26 [26] Ex. 13 (ICONIC004762-ICONIC004771) ████████████████████████

27 [27] *Id.*

28 [28] Ex. 14 (ICONIC000194).

[29] Ex. 15 (ICONIC000024).

**C. Procedural History**

On May 18, 2017, Plaintiffs filed the present action against Volkswagen Group of America, Inc., Volkswagen AG, and the Bosch Defendants. Complaint, ECF No. 1 (as amended on July 3, 2018). On August 28, 2018, the Bosch Defendants filed their Notice of Motion and Motion to Dismiss First Amended Complaint and Memorandum of Authorities in Support Thereof, ECF No. 29 (the "Motion to Dismiss"). On January 14, 2020, following briefing by the parties, the Court denied the Bosch Defendants' Motion to Dismiss. Order Denying Bosch's Motion to Dismiss, MDL ECF No. 7031 (the "MTD Order"). The Court noted that, taking Plaintiffs' allegations as true, the allegations plausibly supported a recoverable injury under RICO based on Plaintiffs' claim that they invested in the dealership without knowledge of the defeat-device scheme. *Id.* at 1-2. However, the Court stated that "[a]s in *Napleton* . . . the Bosch defendants may take discovery and may move for summary judgment if discovery reveals that plaintiffs' losses are insufficiently supported by fact or lack a causal nexus to the defeat-device scheme." *Id.* at 2.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  To avoid summary judgment, plaintiffs "must produce more than a 'mere scintilla' of evidence . . . ." *Patterson v. Int'l Bhd. of Teamsters, Local 959*, 121 F.3d 1345, 1350 (9th Cir. 1997) (quoting *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1369 (9th Cir. 1992)).  Plaintiffs must show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in their favor.  *See Finnegan v. Citi*, 703 F. App'x 625, 626 (9th Cir. 2017) (affirming summary judgment on RICO claim where plaintiff failed to raise a genuine dispute of material fact as to actual damages); *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009).

**ARGUMENT**

The Court's MTD Order allowed this case to proceed to discovery based on Plaintiffs' claim that they suffered a loss in constructing a Volkswagen dealership when Plaintiffs had no knowledge of the defeat-device scheme.  The record now shows that Plaintiffs have not suffered any out-of-pocket loss, as any conceivable losses were already fully addressed by Volkswagen's generous payments to Plaintiffs.  Though Plaintiffs may lean on supposed differences in appraisals for the dealership before, and years after, Volkswagen's fraud was revealed, any such losses are speculative and cannot be RICO injury.  And, in any event, none of the losses Plaintiffs may claim were proximately caused by the Bosch Defendants' conduct.  The Court should grant summary judgment to the Bosch Defendants.

**I.     PLAINTIFFS SUFFERED NO INJURY TO "BUSINESS OR PROPERTY."**

RICO requires proof of an injury to a "business or property" interest. 18 U.S.C. § 1964(c); *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985) (A RICO "plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation.").  This standard "requires the plaintiff to plead 'a harm to a specific business or property interest,'" *see In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prods. Liab. Litig.*, 2017 WL 4890594, at *4 (N.D. Cal. Oct. 30, 2017) ("*Napleton*"),

1 and "requires more than 'mere injury to a valuable intangible property interest.'" *Id.* at *6

2 (quoting *Oscar v. Univ. Students Co-Operative Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) (en

3 banc)).  To support RICO standing, an injury must "result in a 'tangible' or 'concrete' financial

4 loss." *Id.* at *7 (citations omitted).  Plaintiffs fall far short of meeting that standard.

5        *First*, Plaintiffs cannot claim any out-of-pocket losses from the Stop-Sale Orders, and

6 certainly none for which they have not already been compensated by Volkswagen several times

7 over. ███████████████████████████████████████  Unlike the *Napleton* dealers,

8 Plaintiffs did not incur out-of-pocket costs to maintain unsellable TDIs, and they did not lose the

9 opportunity to sell those vehicles.  They suffered no damages from the Stop-Sale Orders.  *See*

10 *Napleton*, 2019 WL 6749534, at *1 (finding that "the dealers did not sustain any losses directly

11 from the stop-sale orders" because Volkswagen provided support payments to cover the costs of

12 servicing, storing, and financing their TDIs).

13        Indeed, not only did Plaintiffs suffer no injury in connection with unsellable TDIs, they

14 actually *benefited from* the assortment of support programs that Volkswagen offered its dealers.

15 ████████████████████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████████████

17 ████████████████████████  ████████████████████████████████████████████

18 ████████████████████████████████████████████████████████████████████

19 ███████████████████████████████████████████  The Court has held that compensation from

20 Volkswagen would offset treble damages Plaintiffs might recover against the Bosch Defendants.

21 *See Napleton*, 2017 WL 4890594, at *4.  To the extent Plaintiffs somehow could claim small

22 actual damages here, such damages even when trebled would be far less than the extensive

23 payments Plaintiffs have received from Volkswagen.  Any further recovery against the Bosch

24 Defendants would only add to the windfall Plaintiffs already received.

25

26 [30] Ex. 4, ████████████████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████████████████████████

28 [31] *See* Ex. 10 (ICONIC024102); Ex. 11 (ICONIC011615); Ex. 12 (ICONIC010983).

1     *Second*, Plaintiffs cannot show RICO injury by comparing their 2014 and 2018 appraisals.

2   The Court has made abundantly clear that RICO's stringent injury requirement does not allow

3   recovery for harm to goodwill, since that is an "intangible injury." *Napleton*, 2019 WL 6749534,

4   at *4; *Napleton*, 2017 WL 4890594, at *6.  But, to the extent Plaintiffs claim that their land and

5   facility are worth less today than they expected, that simply reflects a claim that the alleged

6   emissions fraud diminished Volkswagen's "brand value."  *See* Compl. ¶ 314.  That is not

7   cognizable under RICO, and the Court should grant summary judgment as Plaintiffs lack any

8   proof of injury.  *See Napleton*, 2019 WL 6749534, at *5 (reaffirming that "dealers cannot recover

9   under RICO for losses resulting from a decline in goodwill").

10  **II.     ANY INJURY WAS NOT PROXIMATELY CAUSED BY THE BOSCH DEFENDANTS.**

11

12     RICO also requires proof of proximate causation – that is, proof that "the alleged violation

13  led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461

14  (2006); *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992) (proximate cause requires

15  "some direct relation between the injury asserted and the injurious conduct alleged"); *Canyon*

16  *Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 980–81 (9th Cir. 2008).  Only injuries directly caused

17  by the actual conduct constituting the RICO violation are actionable.  *See Sedima*, 473 U.S. at

18  497 (A RICO plaintiff can only recover for losses from "the commission of the predicate acts.");

19  *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 13 (2010) ("[T]he compensable injury flowing

20  from a [RICO] violation . . . 'necessarily is the harm caused by [the] predicate acts.'") (quoting

21  *Anza*, 547 U.S. at 457).  In other words, to satisfy RICO's proximate causation requirement, the

22  alleged injury must directly result from the racketeering activity.  *Hemi*, 559 U.S. at 10 (noting

23  that the "general tendency" of the law with respect to "proximate cause inquiries under RICO" is

24  "not to go beyond the first step.").

25     Plaintiffs' supposed lost profits, decline in value of the dealership, and land acquisition

26  and construction costs were not, as a matter of law, proximately caused by the alleged RICO

27  violation, and so the Bosch Defendants are entitled to summary judgment.  *See Napleton*, 2019

28  WL 6749534, at *2-3.

1    *First*, Elgin VW's owner signed the dealer agreement for Elgin VW to become a

2    Volkswagen franchise dealer on October 30, 2015, nearly 45 days **after** the revelation of the

3    alleged emissions fraud.  *See* Compl. ¶¶ 251, 259.  Any alleged subsequent injuries therefore

4    resulted from Plaintiffs' own decision to open a Volkswagen dealership knowing about the

5    emissions noncompliance.  *See Mendia v. Garcia*, 768 F.3d 1009, 1013 n.1 (9th Cir. 2014) (no

6    Article III standing, much less RICO standing, for "self-inflicted" injury); *Dunmore v. Dunmore*,

7    2013 WL 5569979, at *8 (E.D. Cal. Oct. 9, 2013) (plaintiff's injury from defendants'

8    procurement of fraudulent loans through identity theft was not proximately caused by defendants

9    where plaintiff guaranteed the loans after learning about the fraudulent scheme).[32]

10    *Second*, any possible injury to Plaintiffs stems not from the alleged RICO enterprise itself,

11    but rather from its revelation and the resulting NOVs.  *See Napleton*, 842 F. App'x at 114-15;

12    *Napleton*, 2019 WL 6749534, at *2.  Indeed, Plaintiffs' theory of "lost" investment value of the

13    Elgin VW dealership, *see* Compl. ¶ 6,  just repackages the *Napleton* dealers' failed claims for lost

14    future profits from the sale of hypothetical TDIs that Volkswagen chose not to make.  The Ninth

15    Circuit affirmed this Court's ruling granting summary judgment in *Napleton*, holding that the

16    dealers' alleged future lost profits from the cessation of the TDI line were not proximately caused

17    by the alleged RICO violation.  That theory "necessarily encompasse[d] an intervening step: the

18    discovery of the fraud."  *Napleton*, 842 F. App'x at 114-15; *see also Napleton*, 2019 WL

19    6749534, at *2 ("[Plaintiffs'] losses from the TDI line's discontinuation were not 'by reason' of

20    the emissions fraud; they were by reason of the fraud's discovery. The needed causal connection

21    between the challenged conduct and the claimed injuries is therefore lacking."); *In re Am.*

22    *Express Co. S'holder Litig.*, 39 F.3d 395, 400 (2d Cir. 1994) (RICO plaintiffs failed to adequately

23    allege proximate cause because the plaintiffs' losses "were caused only because the scheme itself

24    was exposed and thus failed"); *Meng v. Schwartz*, 116 F. Supp. 2d 92, 97 (D.D.C. 2000)

25    (dismissing case where plaintiffs' injury arose "as a result of" the scandal from a bribery scheme,

26    and "not the scheme itself").

27
28
---
[32] That Plaintiffs purportedly reserved their rights with respect to the emissions scandal in the dealership agreement with Volkswagen, *see supra* note 18 and accompanying text, is of no moment to the Bosch Defendants, who were never parties to that agreement.

1    The exact same reasoning applies here.  Plaintiffs claim that they "lost" part of their

2    investment because the dealership they have is worth less than the dealership they expected to

3    have, and the dealership is allegedly worth less *because the emissions scandal was revealed*.  *See*

4    Compl. ¶ 6 (noting that before Elgin VW opened, "the EPA announced" Volkswagen's alleged

5    fraud, leading to "financial losses, lost profits, and diminution in value").  Specifically, Plaintiffs

6    claim that their dealership is worth less because they lost the opportunity to sell noncompliant

7    TDIs "at a premium," which "was a significant contributor to the high value of goodwill"

8    associated with owning a Volkswagen dealership.  *Id*. ¶ 314.  This theory goes even a step further

9    than the one this Court and the Ninth Circuit rejected in *Napleton*:  Plaintiffs claim the revelation

10   of the alleged emissions fraud caused Plaintiffs to lose hypothetical future TDI sales, which *in*

11   *turn* impacted the value of Plaintiffs' dealership.

12   The Ninth Circuit recently rejected, yet again, similar claims.  In *Gov. App Solutions, Inc.*

13   *v. City of New Haven*, the plaintiff company, which sold software to government entities, claimed

14   that its business value "plummeted" after it was revealed that a consultant the company hired was

15   an FBI operative enlisted to catch government officials in a bribery scheme.  2023 WL 2957862,

16   at *4 (E.D. Cal. Apr. 13, 2023), *aff'd* 2024 WL 1299993 (9th Cir. Mar. 27, 2024).  The district

17   court dismissed the plaintiff's claims, ruling that "it was the public discovery of the alleged RICO

18   violations that led directly to" plaintiff's alleged lost business value, and not the violation itself.

19   *Id*. at *6.  The Ninth Circuit affirmed, holding that the alleged loss of value of plaintiff's business

20   "resulted from at least two additional factors – the publication of [the consultant's book exposing

21   the scheme] and the decisions of municipalities to not do business with the company."  *Gov. App*

22   *Solutions, Inc. v. City of New Haven,* 2024 WL 1299993, at *2 (9th Cir. Mar. 27, 2024).

23   Similarly, in this case Plaintiffs' alleged loss resulted from at least two additional factors besides

24   the alleged RICO violation: the revelation of the emissions noncompliance, and consumers'

25   independent decisions not to do business with Plaintiffs.

26   The connection is even more tenuous for SCI, which owns the property and building

27   where Elgin VW is located, but is not alleged to have any ownership interest in Elgin VW or its

28   inventory.  *See* Compl. ¶ 18.  Indeed, any claim for alleged injury to SCI is purely derivative of

1   harm to Elgin VW, and therefore must fail for a lack of proximate causation.  *See Holmes*, 503

2   U.S. at 268-69 (no proximate cause where a plaintiff's "harm flow[s] merely from the

3   misfortunates visited upon a third person by the defendant's acts").  Any potential injury to SCI

4   from Elgin VW's alleged loss of value is simply far too removed from the alleged RICO violation

5   to satisfy RICO's proximate cause requirement.  *See id*.

6          *Third*, Plaintiffs' claims fail for the additional reason that calculating the portion of

7   Plaintiffs' alleged losses, if any, attributable to the alleged RICO violation would be uncertain

8   and speculative, the very sort of exercise RICO's proximate cause requirement is meant to

9   prevent.  *See Napleton's Arlington Heights Motors, Inc. v. FCA US LLC*, 214 F. Supp. 3d 675,

10  682, 691 (N.D. Ill. 2016) (rejecting RICO claim where alleged scheme deprived some dealerships

11  of "more high demand vehicles," because "it [was] entirely possible . . . that [the plaintiffs] would

12  have lost sales or not received allocations of popular vehicles for any number of reasons,

13  including their own underperformance"); *Anza*, 547 U.S. at 459-60 (instructing courts not to

14  engage in "intricate, uncertain inquiries" where the plaintiff's "lost sales could have resulted from

15  factors other than [the] alleged acts of fraud").

16         As the Court previously recognized, it was in Volkswagen's sole and independent

17  discretion whether to stop making TDIs at any time, or to not allocate any TDIs to Elgin VW.

18  *Compare Napleton*, 2019 WL 6749534, at *2 (noting that "Volkswagen's franchise agreements

19  gave Volkswagen, not its dealers, discretion to choose the types of cars to manufacture and to

20  make available for sale" and citing to Volkswagen Dealer Agreement Standard Provisions), *with*

21  Ex. 6 (ICONIC000830) ████████████████████████████

22  ████████████████████   Indeed, Volkswagen's decision to stop offering diesel vehicles

23  in the U.S. is "entirely distinct" from the Bosch Defendants' alleged conduct, and this decision

24  could have arisen (and did arise) for "any number of reasons" having nothing to do with that

25  conduct.  *See Anza*, 547 U.S. at 458-59.  Put differently, Plaintiffs' "theory of liability rests not

26  just on separate *actions*, but separate actions carried out by separate *parties*."  *Hemi*, 559 F. at

27  11.  That fails under RICO.

28

1    For that matter, even if Plaintiffs could establish a hypothetical world in which they could

2    continue to sell noncompliant TDIs, they ignore the numerous unpredictable factors that make it

3    impossible to determine what Plaintiffs' dealership might be worth in that hypothetical world.

4    For years before the emissions issues were revealed, Volkswagen dealers were seeing worse and

5    worse sales even while the overall automotive industry was performing well.[33]  These poor sales

6    resulted in part from Volkswagen's poor vehicle lineup and in part from Volkswagen's decision

7    to grant more and more "add points" – that is, new dealerships like Elgin VW – which created

8    more competition among Volkswagen dealers.[34]

9    Plaintiffs' own 2018 appraisal, even taken at face value, demonstrates that Plaintiffs'

10   claimed loss was not proximately caused by the alleged RICO violation, but rather by unrelated

11   factors.  *See Sheperd v. Am. Honda Motor Co. Inc.*, 822 F. Supp. 625, 630 (N.D. Cal. 1993)

12   (dismissing RICO claim for lack of proximate causation because "a multitude of imaginable

13   factors may have contributed to the diminished profitability of [plaintiffs'] dealership").

14

15

16

17

18

19

20

21   None of these alleged losses provide any basis to

22   recover against the Bosch Defendants.

23

24   ──────────────
[33] Ex. 8, 2013 Haig Report at 8; Ex. 9, 2014 Haig Report at 15.

25   [34] *Id.*; *see also* Compl. ¶¶ 232-33.

26   [35] *See* Ex. 15 (ICONIC 000029)                    ; Ex. 14
     (ICONIC000265)                              .

27   [36] Ex. 15 (ICONIC000116, ICONIC000118).

28   [37] Ex. 15 (ICONIC000116).

1    **III.    PLAINTIFFS' CONSPIRACY CLAIM UNDER ILLINOIS LAW FAILS FOR THE
2           SAME REASONS.**

3         Plaintiffs' Illinois conspiracy claim also requires proof of proximately-caused damages.

4    *See Turcios v. DeBruler Co.*, 32 N.E. 3d 1117, 1125 (Ill. 2015); *see also Merrilees v. Merrilees*,

5    998 N.E.2d 147, 162 (Ill. App. Ct. 2013) (same).  This claim therefore fails for the same reasons

6    as Plaintiffs' RICO claim.  *See Napleton*, 2019 WL 6749534, at *5 ("The damages that the

7    dealers seek to recover under these state laws are materially the same as the damages they seek to

8    recover under RICO. As with their RICO claims, the dealers have not submitted proof that these

9    damages are recoverable."); *Napleton*, 842 F. App'x at 114 ("The district court also correctly

10   granted summary judgment on the state law claims for lack of proximate cause.").

11                                          **CONCLUSION**

12        For the reasons stated above, the Court should grant summary judgment in favor of the

13   Bosch Defendants on all of Plaintiffs' claims against the Bosch Defendants.

14   Dated: September 11, 2024

15

16   By: /s/ *Carmine D. Boccuzzi, Jr.*
     CLEARY GOTTLIEB STEEN &
17   HAMILTON LLP
     Carmine D. Boccuzzi, Jr. (pro hac vice)
18   One Liberty Plaza
     New York, New York 10006
19   (212) 225-2000 (Phone)
     (212) 225-3999 (Facsimile)
20   cboccuzzi@cgsh.com

21

22   Jennifer Kennedy Park (SBN 244888)
     1841 Page Mill Road, Suite 250
23   Palo Alto, CA 94304
     (650) 815-4100 (Phone)
24   jkpark@cgsh.com

25

26   *Counsel for Defendants*
     *Robert Bosch GmbH and*
27   *Robert Bosch LLC*

28